# PX0409



Privacy and Safety Hub    Privacy ⌄    Safety ⌄    Transparency ⌄    News

## Snap Safety Advisory Board

## Meet Snap's Safety Advisory Board Members

PX0409-001

Snap's Safety Advisory Board is made up of 19 members. It consists of 14 professionals from traditional online safety-focused non-profits and related organizations, as well as technologists, academics, researchers, and survivors of online harms. Members are experts in combating significant online safety risks, like child sexual exploitation and abuse and lethal drugs, and have broad experience across a range of safety-related disciplines. In addition, we have 2 experts in AI. We are also joined by 3 Board members who are young adults and youth advocates. We selected these applicants to ensure the Board has ready-access to the all-important "youth voice" and viewpoint; to make certain a portion of the Board includes committed Snapchat users; and to seek to balance professional views with practical perspectives from a core demographic of the Snapchat community.

Below are our Safety Advisory Board Members.



**Alex Holmes**

Deputy CEO, The Diana Award, UK

Bio

PX0409-002

Safety Advisory Board



### Amanda Third

Professorial research fellow, Institute for Culture and Society, Western Sydney University, Australia

**Bio**



### Castra Pierre

Young adult, member of USAID's Digital Youth Council, Haiti

**Bio**

PX0409-003

4/4/24, 5:36 PM                                                                 Safety Advisory Board



**Ed Ternan**

President, Song for Charlie, U.S.

Bio



**Hany Farid**

Professor of computer science,
University of California, Berkeley, U.S.

Bio

PX0409-004

4/4/24, 5:36 PM                                                    Safety Advisory Board

## Jacob Sedese

Young adult, student and part-time tech journalist, U.S.

Bio





## Janice Richardson

International advisor on children's rights and digital citizenship, Insight2Act, based in The Netherlands and focused on Europe and North Africa

Bio

PX0409-005

4/4/24, 5:36 PM                                                        Safety Advisory Board



## Justine Atlan

Director general, eEnfance, France

Bio



## Jutta Croll

Chair of the board, Stiftung Digitale Chancen (Digital Opportunities Foundation), Germany

Bio

PX0409-006

4/4/24, 5:36 PM                                    Safety Advisory Board



**Lucy Thomas**

CEO and co-founder, PROJECT
ROCKIT, Australia

Bio



**Maria Loodberg**

Expert advisor, Friends/World Anti-
Bullying Forum, Sweden

Bio

PX0409-007

4/4/24, 5:36 PM                                                    Safety Advisory Board



## Meeri Haataja

Co-founder and CEO, Saidot





## Michael Rich

Pediatrician, founder and director
Digital Wellness Lab & Clinic for
Interactive Media and Internet
Disorders, Boston Children's
Hospital, Harvard Medical School,
U.S.

Bio

PX0409-008

4/4/24, 5:36 PM                                               Safety Advisory Board



## Okulaja

Rapper, content creator, youth
advocate, UK

Bio



## Sudhir Venkatesh

Professor, Columbia University, U.S.

Bio

PX0409-009

4/4/24, 5:36 PM

Safety Advisory Board



## Victoria Baines

Professor of IT, Gresham College, UK

Bio



## Yuhyun Park

Founder and CEO, DQ Institute, Singapore

Bio

---

**Company**

Snap Inc.

Careers

News

**Community**

Snapchat Support

Pixy Support

**Advertising**

**Legal**

PX0409-010

Privacy and Safety

Community
Guidelines

Safety Advisory Board

Snapchat Ads                          Snap Terms

Advertising Policies                  Law Enforcement

Political Ads Library                 Cookie Policy

Brand Guidelines                      Cookie Settings

Promotions Rules                      Report Infringement

## Snap Inc.

Privacy Policy

Terms of Service

**Language**    English (US)    ⌄

PX0409-011

# PX0410

4/4/24, 5:37 PM                                    Audit | EY - US





Insights    Services    Careers    Industries    About us

# Audit

As risks, stakeholder expectations and the regulatory environment evolve, we provide the high-quality audits that efficient capital markets are built upon.

The EY investment in audit quality begins with our global network of audit professionals and depth of business experience and extends to our methodology-backed solutions.

Our multidisciplinary teams deliver independent audits that benefit investors and the broader economy while also bringing independent insights to both management and the audit committee.

PX0410-001

Audit | EY - US

Featured thinking

Eight AI-related US policy
issues for boards and
management to consider
**Bridget M. Neill, John D. Hallmark**
21 Sep 2023

# Serving the public interest

Our top priority continues to be serving the public interest by executing high-quality audits with
independence, objectivity and professional skepticism.

# The EY audit approach

Learn how our approach puts data at the center of everything: engaging our exceptional
talent, delivering value and building trust.

PX0410-002

How EY can help

PX0410-003

## Audit services

Powered by the capabilities of our teams and our global technology platform, the EY data-first approach delivers high-quality audits that empower audit committees and management to focus on the risks that matter most.

**Learn more**

## Expanded Assurance

As auditors, we provide an independent and objective review of internal controls, compliance management systems and other risks that are integral to a company's reporting. We can assist companies with a range of permissible services focused on assurance, assessment, compliance, reporting and more.

**Learn more**

## Audit experience – designed for private

Scaled to meet the unique needs and requirements of private companies, our teams have bespoke services and offerings to support private businesses at every stage of their evolution.

PX0410-004

Learn more

# Our latest thinking on Audit

PX0410-005

Audit | EY - US

## What audit committees should prioritize in 2024

We highlight key priorities for audit committees on risk manage...

2 Jan 2024 | **Pat Niemann**

## How Gen Z insights are shaping the accounting p...

The EY Accounting Professional of the Future survey reveals insight...

2 Nov 2023 | **EY Americas**

## How audit committees can prepare for 2023 Q3 rep...

We provide important information for audit committees about recen...

3 Oct 2023 | **Pat Niemann**

## How finance leaders and boards can fuel resiliency

There are fundamental ways to build resilience into your organiz...

20 Sep 2023 | **EY Americas**

## What cyber disclosures are telling shareholders in 20...

Investors need accurate and timely disclosures on cybersecurity risk ...

21 Aug 2023 | **Pat Niemann**

## 2023 AICPA & CIMA Conference on Current SEC and PCAOB

PX0410-006

Developments

A compendium summarizing comments on current SEC
and PCAOB developments.

┌─────────────────────┐
│   **Learn more**    │
└─────────────────────┘

# The team

### Dante D'Egidio

Transformative leader.
Market growth driver.
Strat...

### Natalie Deak Jaros

Committed to driving audit
quality and accelerating
inn...

### Katrina Kimpel

Champion of inclusive
teaming and audit
innovatio...

EY | Assurance | Consulting | Strategy and Transactions | Tax

**About EY**

EY is a global leader in assurance, consulting, strategy and transactions, and tax services. The insights and
quality services we deliver help build trust and confidence in the capital markets and in economies the world
over. We develop outstanding leaders who team to deliver on our promises to all of our stakeholders. In so
doing, we play a critical role in building a better working world for our people, for our clients and for our
communities.

EY refers to the global organization, and may refer to one or more, of the member firms of Ernst & Young
Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by
guarantee, does not provide services to clients. For more information about our organization, please visit
ey.com.

© EYGM Limited. All Rights Reserved.

EYG/OC/FEA no.

ED MMYY

This material has been prepared for general informational purposes only and is not intended to be relied upon
as accounting, tax, or other professional advice. Please refer to your advisors for specific advice.

PX0410-007

# PX0411

English 

**Stop Non-Consensual Intimate Image Abuse**

Partners ▶ Industry Partners

▶ **Industry Partners**

▶ Global Network of Partners

▶ Expert Partners

▶ Supporters

# Industry Partners

Companies who will receive cases and hashes from StopNCII.org:







Want to become a partner, contact us.

PX0411-001

# Need More?

**Privacy Policy**          **Resources and Support**                    **FAQ**

Copyright 2024 StopNCII.org

PX0411-002

# PX0412

# Support on Social Media

SHARE 

For over 10 years, the 988 Suicide & Crisis Lifeline has worked with social media platforms and digital communities to establish recommended best practices in suicide prevention for social and digital media.

## Safety Processes on Social Media

If you are worried about someone on social media, you can contact safety teams, who will reach out to connect the user with the help they need. *Note: Tumblr no longer directly responds to reports of suicide or self-harm.



| Facebook | Twitter | Instagram | Snapchat | YouTube | Discord |

### Facebook

The Lifeline has worked with Facebook to develop their supportive community tools, which include resources, messages for you to use, and directly contacting Facebook.



**Report Suicidal Content**

**From Reporting to Supporting**

## Safety Processes on Social Media (cont.)

| TikTok | Reddit | Pinterest |

PX0412-001

**TikTok**

To report for self-harm on TikTok, tap the arrow at the bottom right hand corner of the video. Tap the report icon, select "Self injury" and follow the prompts.



What to do if you see a user who needs support

# Download the Social Media Toolkit

For digital community managers and organizations



Support for Suicidal Individuals on Social and Digital Media

# How to Engage on Social Media

The "Support for Suicidal Individuals on Social and Digital Media" free toolkit was developed by the 988 Suicide & Crisis Lifeline to help digital community managers and social media platforms establish safety policies for helping individuals in suicidal crisis. While we recommend downloading the full kit, we have shared some excerpts below.

PX0412-002

One of the first hurdles to cross in establishing a process for suicidal community members is one of identification. How do you know if someone may be in suicidal crisis? Examples of a community post from someone who may be at-risk:

- "Hi, I really need some help, can someone please contact me."

- "My daughter has fibromyalgia and the treatment alone costs too much for us to keep up with everything else. It's become a full-time job to take care of her and I don't know how I can keep going on like this. I feel hopeless with all of this and don't know how I can keep going."

- "My 15-year-old son has been texting one of his friends and he has been having what appears to be thoughts of suicide. What should I do?"

- "I've been really depressed lately and I don't know how to deal with this. I have been thinking about suicide lately, my grandfather committed suicide 10 years ago. I'm so scared about all of this."

If you have identified an individual that is at risk of suicide or in suicidal crisis but doesn't seem to be at imminent risk, research suggests that the community moderator reach out to that individual directly, through a set of clear processes established by and best suited to the needs of your platform or community.

While we encourage active moderation and response online, we do not encourage community managers to take on the role of mental health care professionals. All engagement with an at-risk individual should be designed to provide appropriate support while connecting that individual to mental health or crisis resources like the Lifeline, your local crisis center, or other local mental health providers.

If, while engaging with an at-risk individual, you believe that the person may actually be at imminent risk of suicide, call 911 or other local emergency services for immediate assistance. Local emergency services are the fastest way to help a person who is at imminent risk. Other resources or protocols may be inappropriate during this situation and should not be applied.

**If your organization is interested in a more hands-on approach to crafting suicide prevention protocols, use our Contact Us form below.**

**Call or Text the Lifeline anytime, 24/7**

# 988

## CONNECT

**Contact Us**

Do not use this contact form if you
need crisis counseling. If you
need immediate help, please call 988 to
talk with a trained counselor.

**CONTACT US**

PX0412-004

# PX0413

We've launched our 2024 Working Groups! Click here to learn more and apply



Who We Are     What We Do     Join Us     News & Resources     Contact

## Mission

To prevent terrorists and violent extremists from exploiting digital platforms.

### Vision

A world in which the technology sector marshals its collective creativity and capacity to render terrorists and violent extremists ineffective online.

### Values

In every aspect of our work, we aim to be transparent, inclusive, and respectful of the fundamental and universal human rights that terrorists and violent extremists seek to undermine.

[ 2021 Annual Report ]     [ 2022 Annual Report ]

## Terrorist and violent extremist exploitation of the Internet threatens open societies everywhere.

The Global Internet Forum to Counter Terrorism (GIFCT) is an NGO designed to prevent terrorists and violent extremists from exploiting digital platforms. Founded by Facebook, Microsoft, YouTube and X (formerly Twitter) in 2017, the Forum was established to foster technical collaboration among member companies, advance relevant research, and share knowledge with smaller platforms. Since 2017, GIFCT's membership has expanded beyond the founding companies to include over two dozen diverse platforms committed to cross-industry efforts to counter the spread of terrorist and violent extremist content online.

View More

PX0413-001

4/8/24, 1:24 PM                                      About | GIFCT



## Organizational Principles

### Inclusion



### Transparency

### Results



Read the GIFCT Story Here

PX0413-002

4/8/24, 1:24 PM                                        About | GIFCT

We've launched our 2024 Working Groups! Click here to learn more and apply

GIFCT
Global Internet Forum
to Counter Terrorism

Who We Are    What We Do    Join Us    News & Resources    Contact

PX0413-003

# PX0415

POSTED ON NOVEMBER 5, 2014 TO SECURITY

# Security @Scale 2014 Recap



By Fernanda Weiden

  

Making online services safe and secure for more than a billion people means that security solutions have to scale well. Recent internet-wide incidents involving SSL technology, such as POODLE and Heartbleed, only reinforce the importance of getting this stuff right, as well as the extent to which security technology impacts more than any single company.

For our second Security @Scale conference, we wanted to openly discuss and learn from the different ways companies such as GitHub, HackerOne, Square, Twitter, and Facebook are solving the same problems. Our goals are ultimately the same: finding better engineering solutions so our front-end teams don't have to always think about writing security into their programs but can benefit by default. Our jobs, as security team leaders, encompass everything from incident response and product consulting to compliance and, more generally, cleaning up all the code on our networks.

At the event last Wednesday, we previewed where security was as far back as 2010, how far it has come, and how much we still have to accomplish. Check out the talks below to hear from some of the industry's leading voices on security solutions that scale.

## Presentation Summaries and Videos

### Opening Remarks



Scott Renfro of Facebook's Security Infrastructure team welcomed the group to this year's Security @Scale by discussing the state of cyber security and his experience with past Security @Scale conferences.

### Mutiny on the Bounty: Lessons Learned in How Data Defeated Dogma



Katie Moussouris, now Chief Policy Officer of HackerOne, dove into the development of Microsoft's bug bounty program, which she pioneered over three years of looking at data starting in 2010 and announced in 2013. Her talk showed how the game theory, economics, politics and data turned heresy to gospel at the world's largest software company. Katie's talk focused on alternate bounty models and levers that don't require vendors to be the highest bidder to create successful structured incentive programs that bring about specific strategic outcomes. Katie walked though the motivations of hackers outside of monetary compensation and showed the success of the programs she created, having paid out $253,000 since June 2013. She stressed that organizations who offer bounties have choices in factors like timing and turning a thin market into a thick market, and how researchers should not have to choose between doing the right thing and getting paid. She then wrapped up by previewing how to set up a bounty program based on data plugged into any organizations models and goals.

PX0415-002

## Human Botnet: Scaling Your Security Organization



Diogo Mónica talked about Square scaled vulnerability management, access control and security monitoring initiatives while still effectively managing the organization's risk. As the organization adds employees, the number of hours Security Engineers sleep every night continuously decreases. This phenomenon happens due to the increasingly hard task of ensuring security against malicious actors, both internal and external, as the company increases in size. Diogo presented many different systems that Square built internally to effectively scale the security team's job. In particular, he introduced Report Card, a tool to socialize the security status of a project within the company; Doorman, a centralized 2-Factor SSO that allows self-enrollment and expiration of arbitrary capabilities; and Sting, a security alerting tool that distributes the load of dealing with low SNR alerts throughout the engineering organization.

## Better Large Scale Rule Engines with Haxl



Louis Brandy of Facebook's Site Integrity team kicked off a discussion about scalable spam fighting and the anti-abuse structure at Facebook and Instagram. He stressed the importance of focusing on systems instead of spam itself, and how his team at Facebook has focused on progressive refinement in developing an efficient scalable rule engine powered by a domain-specific language called Haxl. Haxl works by allowing the user to write a simple and expressive set of rules, and have those rules be run with aggressive I/O scheduling and optimizations. Haxl automatically explores the computation to batch multiple requests to the same source, fetch from multiple sources concurrently and cache and deduplicate identical requests. This creates a simple and expressive rule language that executes optimally and reduces latency.

PX0415-003

## SSL++: Tales of Transport-Layer Security at Twitter

Twitter's unofficial motto, as explained by Jim O'Leary, is 'all TSL everything.' During his talk, he detailed the process of switching an entire user base from HTTP to HTTPS across Twitter and third-party clients. Since 2011, there have been lessons learned, including the process of introducing security features (from opt-in to opt-out to completely deprecating old insecure methods). Jim also describes a few tricks for protecting users: secure indexing in search engines, Strict-Transport-Security, Content-Security-Policy, and certificate pinning. Twitter has open-sourced the secureheaders library so that developers also benefit from secure defaults in their projects. The talk ends with a walk through some of the recent vulnerabilities in SSL and how a large organization like Twitter responds to them.

## Host Intrusion Detection with osquery

Mike Arpaia announced Facebook's latest open source project, [osquery](). Osquery is a simple, performant and reliable, easy to integrate and flexible solution to catch attackers for defenders at scale by using SQL queries to explore OS states. The project is broken into two smaller products, osqueryi and osqueryd. Osqueryi exposes tables via an interactive SQL shell, which allows you to join and aggregate information across several simple tables. Osqueryd is a daemon for low-level host monitoring and determines how the results of a query change over time. He then closed the talk with a description of hosting even pub/sub stream and operating system introspection and how the team uses homebrew to manage dependencies.

PX0415-004

## Homebrew Incident Response

Facebook's Michael McGrew began where Mike Arpaia left off with a description of homebrew incident response. He explored the state of affairs for incident response (IR), including the positives and negatives of how many companies are approaching IR. This is important because no company is immune to a data breach. Michael went through basic questions that IR teams will need to ask of their environments during an incident. Incident response relies heavily on preparation; otherwise, you may not have logs that answer your questions. He went on to talk in-depth about Facebook's Network Security Monitoring platform and the components that comprise the stack. The takeaway was that if companies follow established IR guidelines, prepare for breach by instrumenting their network and their systems and build tools and infrastructure to automate as much as possible, the faster they will be able to identify, contain and eradicate threats.

## Building Your Own DFIR Sidekick: ChatOps for Incident Response

Scott Roberts described to the crowd how he and the rest of the team at GitHub were able to develop security capabilities for their company chat bot called Hubot. As a result of the team's vast geographic distribution, difference in operating device, and ability to time shift, most of the communications—including incident response—rely on what he calls ChatOps. Team members can monitor code that's currently running, change firewall tools, and even ban users. The collaborative nature of ChatOps is comparable to World of Warcraft, he explained, and is a multi-device, teachable way to communicate. This Hubot is based on Nodejs, which makes developing new security tasks something everyone on the team can do. He then explained the creation of Hubot and the many examples where Hubot is deployed.

We hope you enjoyed this set of talks from Security@Scale. Facebook's @Scale conference series was created for members of the technology industry to discuss lessons and best practices for working at large scale, and we will post more here when we have updates to share.

TAGS:   INFRA

PX0415-005

4/5/24, 11:49 AM                                    Security @Scale 2014 Recap - Engineering at Meta

Like    Share    Sign Up to see what your friends like.

---



◄ **Prev**
**Introducing Proxygen, Facebook&#039;s C++ HTTP framework**

**Next** ►
**Year class: A classification system for Android**    

---

# Read More in Security                                                    View All ►



MAR 6, 2024

Making messaging interoperability with third parties safe for users in Europe

PX0415-006



DEC 6, 2023

Building end-to-end security for Messenger



NOV 8, 2023

Enhancing the security of WhatsApp calls



SEP 12, 2023

Meta Quest 2: Defense through offense



AUG 29, 2023

Scheduling Jupyter Notebooks at Meta

PX0415-008



AUG 8, 2023

How Meta is improving password security and preserving privacy

## Related Posts

## Related Positions

Privacy Engineer, Incident Response and Investigation

**LONDON, UK**

Security Engineer, XRM

**NEW YORK, US**

Manager, Integrity Assurance

**LONDON, UK**

Manager, Integrity Issue Management

**BELLEVUE, US**

Manager, Integrity Issue Management

**MENLO PARK, US**

See All Jobs

## Available Positions

Privacy Engineer, Incident Response and Investigation
LONDON, UK

Security Engineer, XRM

## Stay Connected



Engineering at Meta

Like

## Open Source

Meta believes in building community through open source technology. Explore our latest projects in Artificial Intelligence,

PX0415-009

NEW YORK, US

Manager, Integrity Assurance
LONDON, UK

Manager, Integrity Issue Management
BELLEVUE, US

Manager, Integrity Issue Management
MENLO PARK, US

See All Jobs


Meta Open Source

Follow


Meta Research

Like


Meta for Developers

Like


RSS

Subscribe

Data Infrastructure, Development Tools, Front End, Languages, Platforms, Security, Virtual Reality, and more.


ANDROID


iOS


WEB


BACKEND


HARDWARE

Learn More

 Meta

Engineering at Meta is a technical news resource for engineers interested in how we solve large-scale technical challenges at Meta.

Home

Company Info

Careers

© 2024 Meta

TermsPrivacyCookiesHelp

PX0415-010

# PX0419



# Discover our child safety toolkit

At Google and YouTube, we've developed tools to help organizations protect children by better prioritizing abusive content for review.

At the center of this toolkit are two APIs, the Content Safety API and CSAI Match, that we offer to qualifying partners free of charge. Our partners use these technologies to process billions of files, allowing them to evaluate millions of images and videos for abusive behavior each year.



### Better prioritization

The APIs aid in the fight against online child exploitation by prioritizing abusive content for human review.



### Quicker identification

Identifying content more quickly increases the likelihood that victims can be identified and protected from further abuse.



PX0419-001

Making review queues more efficient and less noisy also reduces the toll on human content moderators.

# Learn about our tools

Our tools have complementary capabilities. They can be used jointly, and with other solutions, to meet different needs.



## Content Safety API

USED FOR:
CLASSIFYING PREVIOUSLY UNSEEN IMAGES

The Content Safety API classifier uses programmatic access and artificial intelligence to help our partners classify and prioritize billions of images for review. The higher the priority given by the classifier, the more likely the image contains abusive material, which can help partners prioritize their human review and make their own determination of the content. Content Safety API issues a prioritization recommendation on content sent to it. Partners must conduct their own review in order to determine whether they should take action on the content.

Operationally, we recommend organizations use the Content Safety API right before the manual review process, to classify, prioritize and help them to organize their queue. The Content Safety API can be used in parallel with other solutions, like YouTube's CSAI Match video hashing tool, or Microsoft's PhotoDNA, each of which address different needs.

PX0419-002

See how it works



## CSAI Match

USED FOR:
MATCHING KNOWN ABUSIVE VIDEO SEGMENTS

CSAI Match is YouTube's proprietary technology for combating CSAI (Child Sexual Abuse Imagery) videos online. This technology was the first to use hash-matching to identify known violative content and allows us to identify this type of violative content amid a high volume of non-violative video content. When a match of violative content is found, it is then flagged to partners to review, confirm, and responsibly report in accordance with local laws and regulations. YouTube makes CSAI Match available to partners in industry and NGOs. We give access to fingerprinting software and an API to identify matches against our database of known abusive content.

Online platforms can prevent violative content from being displayed and shared on their sites by using CSAI Match to compare their content against one of the largest indices of known CSAI content. CSAI Match is simple for partners to integrate into their system, allowing them to better scale challenging content management.

See how it works



## Interested in using our toolkit?

Share a few details about your organization to register your interest

PX0419-003

# Testimonials



"Google's hash matching solution has revolutionized our workflows and led to better, faster results. Because of Google's significant contribution to the National Center for Missing & Exploited Children, automated processes reduce the need for human review of previously reported CSAM, which minimizes our staff's exposure. It's critical that these images are taken down as quickly as possible because every time a child's photo is re-shared, they are re-victimized all over again. This also allows us to focus our work on new and unknown child victims and survivors." - National



"Our platform is making visual content accessible, and it is our responsibility to make sure that all the user-contributed content is moderated effectively. Google's Content Safety API and the AI behind it enables us to streamline a tedious process with an efficient way to quickly review, take down, and report any offending content- helping us in doing our part to make the world a safer place." - Plugon

"Easy
stable
Safety
the ar
conte
image
proce
on the

PX0419-004

Developing and sharing tools to fight child sexual abuse

o o o o          >

FAQs

PX0419-005

Developing and sharing tools to fight child sexual abuse

# Google

Content Safety API

Does the Content Safety API work for video?                                                    ⌄

Who can sign up to access the technology and Content Safety API?                               ⌄

Why do you make these tools so widely available?                                               ⌄

CSAI Match

Does CSAI Match work for images?                                                               ⌄

What information is returned with an identified match?                                         ⌄

What makes the CSAI Match technology so efficient?                                             ⌄

Google          About Google    Google products    Privacy    Terms

❓ Help          English

PX0419-006

# PX0421


Innovation

# Microsoft's PhotoDNA: Protecting children and businesses in the cloud

By Tracy Ith  | 15 July, 2015 Microsoft News Center Staff

Imagine you're a doctor struggling to figure out what's ailing your patient, but you don't have medical equipment, a lab or any of today's modern diagnostic tests. Yet somehow, you must identify the problem among the nearly infinite possibilities and treat it before it does more damage.

Similarly, for social media and photo sharing companies, trying to stop the spread of online child sexual abuse photos is just as daunting until they have the right tools. About 720,000 of these illegal images are among the 1.8 billion pictures uploaded across the Internet each

PX0421-001

day, making it incredibly complicated for service providers to find and remove them — until now.

Click here to load media

## PhotoDNA Cloud Service helps find and remove online images that exploit children.

Microsoft's PhotoDNA technology, a free service that helps identify and remove these photos, is now available in the cloud. It's a major advance that gives companies like Flipboard – a popular social magazine that lets its tens of millions of monthly users share and curate content from the Web and social media — a powerful way to help protect users and young victims while helping make the Internet safer for everyone.

"The Flipboard community is built on the desire to inspire each other with the things we love. Our community needs to trust that we do everything possible to stop the spread of illegal content, especially images of child sexual abuse," says David Creemer, Flipboard's head of Platform Engineering. "Manually searching for a handful of illegal images among the millions uploaded and curated every day is simply an impossible task, so we looked for a solution and found it in Microsoft's PhotoDNA. Together we built an effective service that scales and works great."

PhotoDNA has already helped detect millions of illegal photos on the Internet. It's been a breakthrough for more than 70 companies and organizations already using it, such as Facebook and Twitter, but the on-premise version required time, money and technical expertise to get it up and running and keep it up-to-date.

PX0421-002



Courtney Gregoire, senior attorney in
Microsoft's Digital Crimes Unit

The new PhotoDNA Cloud Service takes away those potential hurdles for smaller companies
and other organizations that want to give users the freedom to upload content while
ensuring the integrity of their platforms.

"Finding these known child sex abuse images in that huge universe is like finding a needle
in a haystack," says Courtney Gregoire, a senior attorney at Microsoft's Digital Crimes Unit.
"We needed an easier, more scalable way to identify and detect these worst of the worst
images … and that's how the concept for PhotoDNA in the cloud was born."

Development of PhotoDNA began in 2009, when Microsoft partnered with Dartmouth
College to help solve a problem the National Center of Missing and Exploited Children
(NCMEC) was all too familiar with: Many of the same images of sexually abused children
were being circulated over and over again on the Internet.

While it was possible to identify illegal images if they were exact matches of known sexual
abuse photos, perpetrators could keep the photos from being detected by changing them
slightly — adjusting the size or making a small mark on them, for example.

PX0421-003



Federico Gomez Suarez, senior
project manager on PhotoDNA team.

PhotoDNA overcomes that obstacle: Its use of "hash" matching technology can identify
known illegal photos even if someone has altered them.

It works by converting images into a grayscale format, creating a grid and assigning a
numerical value to each tiny square. Those numerical values represent the "hash" of an
image, or its "PhotoDNA signature." The program protects user privacy in that it doesn't
look at images or scan photos; it simply matches a numerical hash against a database of
known illegal images.

The technology allows companies to compare millions of photos against a hash set of child
sexual abuse images. The hash set is created by NCMEC and derived from the "worst of the
worst" child pornography images uploaded to the CyberTipline by electronic service
providers.

For NCMEC, PhotoDNA is a proactive way to make the Internet safer while helping victims
heal at the same time.

"Certainly, it's important from a victims' rights perspective; these are crime scene
photographs," says John Shehan, vice president of NCMEC's Exploited Child Division.
"Microsoft providing this service is immense."

Federico Gomez Suarez, a senior project manager on Microsoft's PhotoDNA team, has been
working on the technology for six years and still recalls the elation of learning it had
identified its first illegal image. "It was exciting to see the work we were doing was actually
going to make a difference," he says.

PX0421-004

Mike McCarter, director of Online
Operations at Microsoft.

Kik, a chat network that's popular among teens and young adults around the world,
recently became the first company in Canada to deploy the PhotoDNA Cloud Service. Kik
uses it to detect exploitive profile photos as they're being uploaded, so the company can
immediately remove them, report them to law enforcement and remove the user's account.

"It is allowing us to identify and remove illegal content, so it's been a huge plus from our
perspective in helping keep our users safe," says Heather Galt, Kik's head of privacy.

The company does manually review some images, but with more than 200 million users
globally, automation is a must. PhotoDNA allows Kik to identify known illegal images
among a much greater number of photos, while in many cases letting human moderators
avoid the disturbing task of identifying them.

Another crucial advantage for Kik is that it doesn't cause any delay for users sharing
content.

It's "so fast and does its work so efficiently that it's been implemented with no negative
impact whatsoever on the experience for users," Galt says.

Mike McCarter, director of Online Operations at Microsoft, says beyond adding the speed
and efficiency of Microsoft Azure cloud technology, Microsoft also enhanced the algorithm
used to find illegal images, making PhotoDNA 1,000 times faster than previous versions.

PX0421-005

Larry Zitnick, principal researcher for
Microsoft Research.

"The fact that the service is free and in the cloud completely eliminates a financial and budgeting hurdle that might otherwise stand in the way of service adoption," he says.

Gregoire says that if many more companies used PhotoDNA, it could greatly reduce the number of child sexual abuse photos on the Internet.

"At its core, this is really one of the most heinous crimes that can happen to a child during some of their most vulnerable years," Gregoire says. "My hope is much wider-scale deployment of this important technology to better protect these victims of sexual abuse."

Larry Zitnick, principal researcher for Microsoft Research, helped develop the technology in the beginning and is glad to see it's now a cloud service with the potential to be used by many more organizations worldwide.

"This is a net to catch these illegal images," he says, "and the wider the net, the better."

Companies and organizations can learn how to access these free tools to help protect their businesses and curb the spread of child sexual abuse images on the PhotoDNA Cloud Service site.

---

*Lead photo credit: Scott Eklund/Red Box Pictures*

## More Stories

PX0421-006

**2022: Doing more with less >**

**An easier way to help people give tech support to loved ones wins Microsoft Hackathon top prize >**

**New mix-and-match computer accessories give people with disabilities easier ways to work and create >**

**With an idea and a LinkedIn account, thousands find free help turning startup dreams into reality >**

PX0421-007

# PX0424

☰  **Google** Transparency Report



| Removals | Views | Appeals | Flags | Featured policies |
|----------|-------|---------|-------|-------------------|

# YouTube Community Guidelines enforcement

At YouTube, we work hard to maintain a safe and vibrant community. We have Community Guidelines that set the rules of the road for what we don't allow on YouTube. For example, we do not allow pornography, incitement to violence, harassment, or hate speech. We rely on a combination of people and technology to flag inappropriate content and enforce these guidelines. Flags can come from our automated flagging systems, from members of the Priority Flagger program, or from users in the broader YouTube community. This report provides data on the flags YouTube receives and how we enforce our policies.

## Removed channels by the numbers

Oct 2023 – Dec 2023  ▼

Total channels removed

# 20,592,341

When a channel is terminated, all of its videos are removed.
Number of videos removed during this time period due to a channel-level termination: 95,534,236.

A YouTube channel is terminated if it accrues three Community Guidelines strikes in 90 days, has a single case of severe abuse (such as predatory behavior), or is determined to be wholly dedicated to violating our guidelines (as is often the case with spam accounts). When a channel is terminated, all of its videos are removed.

This exhibit shows the number of channels removed by YouTube for violating its Community Guidelines per quarter.

PX0424-001

Channels removed, by removal reason



● Spam, misleading and sca...    ● Nudity or sexual    ● Misinformation    ● Child safety    ● Hateful or abusive    ◀ 1/3 ▶

Oct 2023 – Dec 2023 ▾

This chart shows the volume of channels removed by YouTube, by the reason a channel was removed. The majority of channel terminations are a result of accounts being dedicated to spam or adult sexual content in violation of our guidelines.

When we terminate a channel for receiving three Community Guidelines strikes for violating several different policies within a three month period, we categorize it under a separate label - "Multiple policy violations" - because these accounts were not wholly dedicated to one policy violation.

Removed videos by the numbers

PX0424-002

Oct 2023 – Dec 2023  ▾      Include automated flagging  ▾

Total videos removed

# 9,012,232

YouTube relies on teams around the world to review flagged videos and remove content that violates our Community Guidelines; restrict videos (e.g., age-restrict content that may not be appropriate for all audiences); or leave the content live when it doesn't violate our guidelines.

This exhibit shows the number of videos removed by YouTube for violating its Community Guidelines per quarter.

## Videos removed, by source of first detection



Oct 2023 – Dec 2023  ▾      Include automated flagging  ▾

This chart shows the volume of videos removed by YouTube, by source of first detection (automated flagging or human detection). Flags from human detection can come from a user or a member of YouTube's Priority Flagger program. Priority Flagger program members include NGOs and government agencies that are particularly effective at notifying YouTube of content that violates our Community Guidelines.

PX0424-003

## Videos removed, by views



Oct 2023 – Dec 2023  ▾    All detection sources  ▾

YouTube strives to prevent content that breaks our rules from being widely viewed—or viewed at all—before it's removed. Automated flagging enables us to act more quickly and accurately to enforce our policies. This chart shows the percentage of video removals that occurred before they received any views versus those that occurred after receiving some views.

PX0424-004

Videos removed, by removal reason



This chart shows the volume of videos removed by YouTube, by the reason a video was removed. These removal reasons correspond to YouTube's Community Guidelines. Reviewers evaluate flagged videos against all of our Community Guidelines and policies, regardless of the reason the video was originally flagged.

## Videos removed, by country/region

This chart shows the number of videos removed by YouTube, by the country/region of upload. This data is based on the uploader's IP address at the time the video was uploaded. The IP address usually corresponds with where an uploader is geolocated, unless they are using a virtual private network (VPN) or proxy server.

YouTube's Community Guidelines are enforced consistently across the globe, regardless of where the content is uploaded. When content is removed for violating our guidelines, it is removed globally. For information about content removals or restrictions based on local laws, see Google's Government requests to remove content transparency report.

PX0424-005

Oct 2023 – Dec 2023  ▼     All countries/regions  ▼

| Rank | Country/region* | Videos Removed |
|------|-----------------|----------------|
| 1 | India | 2,254,902 |
| 2 | Singapore | 1,243,871 |
| 3 | United States | 788,354 |
| 4 | Indonesia | 770,157 |
| 5 | Russia | 516,629 |
| 6 | Brazil | 475,118 |
| 7 | Pakistan | 212,770 |
| 8 | Bangladesh | 152,051 |
| 9 | Germany | 114,129 |
| 10 | Finland | 105,425 |

‹ **Previous**   1 of 3   **Next** ›

\* Country/region is based on IP address at time of video upload

## Removed comments by the numbers

Oct 2023 – Dec 2023  ▼

Total comments removed

# 1,197,687,868

YouTube is a vibrant community in which millions of people post billions of comments each quarter. Using a combination of people and technology, we remove comments that violate our Community Guidelines. We also filter comments which we have high confidence are spam for creators to review and approve if they choose.

This exhibit shows the volume of comments removed by YouTube for violating our Community Guidelines and filtered as likely spam which creators did not approve.

The data does not include comments removed when YouTube disables the comment section on a video. It also does not include comments taken down when a video itself is removed (individually or through a channel-level suspension), when a commenter's account is terminated, or when a user chooses to remove certain comments or hold them for review.

PX0424-006

Comments removed, by source of first detection



99.6%

● Automated flagging    ● Human flagging

Oct 2023 – Dec 2023 ▼

Most removed comments are detected by our automated flagging systems but they can also be flagged by human flaggers. We rely on teams around the world to review flagged comments and remove content that violates our Terms of Service, or leave the content live when it doesn't violate our guidelines.

This chart shows the volume of comments removed by YouTube for violating our Community Guidelines, by source of first detection (automated flagging or human detection). The majority of actions we take on comments is for violating our guidelines against spam.

PX0424-007

Comments removed, by removal reason



● Spam, misleading and scams    ● Harassment and cyberbullying    ● Violent or graphic    ● Child safety    ◀ 1/2 ▶

Oct 2023 – Dec 2023 ▾

This chart shows the number of comments removed by YouTube, by the reason a comment was removed. These removal reasons correspond to YouTube's Community Guidelines. The majority of actions that we take on comments is for violating our guidelines against spam.

---

## YouTube Community Guidelines enforcement

Viewers and Creators around the world use YouTube to express their ideas and opinions. YouTube's approach to responsibility involves four Rs: Remove violative content, Raise authoritative voices, Reduce recommendations of borderline content, and Reward trusted

PX0424-008

creators.

**Learn more at How YouTube Works** ↗

Back to top ⬆

Share  𝕏  [f]

| Transparency Report | Security and privacy | Content removal | Additional reports |
|---|---|---|---|
| Home | Requests for user information | Content delistings due to copyright | PDF Download Center |
| About | Google Safe Browsing | Government requests to remove content | Political advertising on Google |
| FAQ | Email encryption in transit | Requests to delist content under European privacy law | Traffic and disruptions to Google |
| | HTTPS encryption on the web | YouTube Community Guidelines enforcement | Information about EU Monthly Active Recipients |
| | Android ecosystem security | Removals under the Network Enforcement Law | VLOSE/VLOP Transparency Report under the EU DSA |
| | Combating Child Sexual Abuse Material | YouTube Copyright Transparency Report | |

Google

? Help     Privacy     About Google     Transparency Center     Send feedback

English

PX0424-009

# PX0425



Privacy and Safety Hub

Privacy ⌄    Safety ⌄    Transparency ⌄    News

Transparency ⌃

**Transparency** ⌃

**Transparency Report**

About

Glossary

Previous Reports

Community Guidelines

European Union

Ads Gallery

Australia

California

India

Researchers

Transparency Report

January 1, 2023 – June 30, 2023

Released:

October 25, 2023

Updated:

December 13, 2023

To provide insight into Snap's safety efforts and the nature and volume of content reported on our platform, we publish transparency reports twice a year. We are committed to continuing to make these reports more comprehensive and informative to the many stakeholders who care deeply about our content moderation and law enforcement practices, as well as the well-being of our community.

This Transparency Report covers the first half of 2023 (January 1 - June 30). As with our previous reports, we share data about the global number of in-app content and account-level reports we received and enforced against across specific categories of policy violations; how we responded to requests from law enforcement and governments; and our enforcement actions broken down by country.

As part of our ongoing commitment to continually improve our transparency reports, we are introducing a few new elements with this release. We have added additional data points around our advertising practices and moderation, as well as content and account appeals. In alignment with the EU Digital Services Act, we've also added new contextual

PX0425-001

Snapchat Transparency Report | Snapchat Transparency

information around our operations in EU Member States, such as the number of content moderators and monthly active users (MAUs) in the region. Much of this information can be found throughout the report, and in our Transparency Center's dedicated European Union page.

Finally, we have updated our Glossary with links to our Community Guidelines explainers, which provide additional context around our platform policy and operational efforts.

For more information about our policies for combating online harms, and plans to continue evolving our reporting practices, please read our recent Safety & Impact blog about this Transparency Report.

To find additional resources for safety and privacy on Snapchat, see our *About Transparency Reporting* tab at the bottom of the page.

Please note that the most up-to-date version of this Transparency Report can be found in the en-US locale.

## Overview of Content and Account Violations

From January 1 - June 30, 2023, Snap enforced against 6,216,118 pieces of content globally that violated our policies.

During the reporting period, we saw a Violative View Rate (VVR) of 0.02 percent, which means that out of every 10,000 Snap and Story views on Snapchat, 2 contained content found to violate our policies.

PX0425-002

Snapchat Transparency Report | Snapchat Transparency

| Total Content & Account Reports | Total Content Enforced | Total Unique Accounts Enforced |
| --- | --- | --- |
| 17,267,985 | 6,216,118 | 3,687,082 |

| Reason | Content & Account Reports | Content Enforced | % of Total Content Enforced | Uni Acc Enf |
| --- | --- | --- | --- | --- |
| Sexual Content | 5,843,879 | 3,270,318 | 52.6% | 1,8: |
| Harassment and Bullying | 6,645,969 | 920,070 | 14.8% | 778 |
| Threats & Violence | 615,011 | 94,556 | 1.5% | 73, |
| Self-Harm & Suicide | 122,369 | 24,621 | 0.4% | 22, |
| False Information | 387,242 | 238 | 0.0% | 20! |
| Impersonation | 521,168 | 12,379 | 0.2% | 12,: |
| Spam | 1,924,768 | 1,380,341 | 22.2% | 94' |
| Drugs | 642,421 | 297,554 | 4.8% | 20: |
| Weapons | 81,223 | 16,622 | 0.3% | 12,: |
| Other Regulated Goods | 216,562 | 141,514 | 2.3% | 10: |
| Hate Speech | 267,373 | 57,905 | 0.9% | 49, |

PX0425-003

Snapchat Transparency Report | Snapchat Transparency

\*Correctly and consistently enforcing against false information is a dynamic process that requires up-to-date context and diligence.  As we strive to continually improve the precision of our agents' enforcement in this category, we have chosen, since H1 2022, to report figures in the "Content Enforced" and "Unique Accounts Enforced" categories that are estimated based on a rigorous quality-assurance review of a statistically significant portion of false information enforcements. Specifically, we sample a statistically significant portion of false information enforcements across each country and quality-check the enforcement decisions. We then use those quality-checked enforcements to derive enforcement rates with a 95% confidence interval (+/- 5% margin of error), which we use to calculate the false information enforcements reported in the Transparency Report.

## Analysis of Content and Account Violations

Our overall reporting and enforcement rates remained fairly similar to the previous six months, with a few exceptions in key categories. We saw an approximate 3% decrease in total content and account reports and enforcements this cycle.

The categories with the most notable fluctuations were Harassment & Bullying, Spam, Weapons, and False Information. Harassment & Bullying saw a ~56% increase in total reports, and a subsequent ~39% increase in content and unique account enforcements. These increases in enforcements were coupled with a ~46% decrease in turnaround time, highlighting the operational efficiencies our team made in enforcing against this type of violating content. Similarly, we saw a ~65% increase in total reports for Spam, with a ~110% increase in content enforcements and ~80% increase in unique accounts enforced, while our

PX0425-004

teams also reduced turnaround time by ~80%. Our Weapons category saw a ~13% decrease in total reports, and a ~51% decrease in content enforcements and ~53% reduction in unique accounts enforced. Lastly, our False Information category saw a ~14% increase in total reports, but a ~78% decrease in content enforcements and ~74% decrease in unique accounts enforced. This can be attributed to the continued Quality Assurance (QA) process and resourcing we apply to false information reports, to ensure that our moderation teams are accurately catching and actioning false information on the platform.

Overall, while we saw generally similar figures as in the last period, we believe it is important to continue to improve the tools our community uses to actively and accurately report potential violations as they appear on the platform.

## Combating Child Sexual Exploitation & Abuse

The sexual exploitation of any member of our community, especially minors, is illegal, abhorrent, and prohibited by our Community Guidelines. Preventing, detecting, and eradicating Child Sexual Exploitation and Abuse Imagery (CSEAI) on our platform is a top priority for Snap, and we continually evolve our capabilities to combat these and other crimes.

We use active technology detection tools, such as PhotoDNA robust hash-matching and Google's Child Sexual Abuse Imagery (CSAI) Match to identify known illegal images and videos of child sexual abuse, respectively, and report them to the U.S. National Center for Missing and Exploited Children (NCMEC), as required by law. NCMEC then, in turn, coordinates with domestic or international law enforcement, as required.

PX0425-005

Snapchat Transparency Report | Snapchat Transparency

In the first half of 2023, we proactively detected and actioned 98 percent of the total child sexual exploitation and abuse violations reported here — a 4% increase from the previous period.

| Reason | Total Content Enforced | Total Account Deletions | Total Submissions to NCMEC* |
|--------|------------------------|-------------------------|------------------------------|
| CSEAI | 548,509 | 228,897 | 292,489 |

**Note that each submission to NCMEC can contain multiple pieces of content. The total individual pieces of media submitted to NCMEC is equal to our total content enforced.

## Terrorist and Violent Extremist Content

During the reporting period, January 1 2023- June 30 2023, we removed 18 accounts for violations of our policy prohibiting terrorist and violent extremist content.

At Snap, we remove terrorist and violent extremism content reported through multiple channels. We encourage users to report terrorist and violent extremist content through our in-app reporting menu, and we work closely with law enforcement to address terrorist and violent extremist content that may appear on Snap.

| Total Account Deletions |
|-------------------------|
| 18 |

PX0425-006

Snapchat Transparency Report | Snapchat Transparency

## Self-harm and Suicide Content

We care deeply about the mental health and well-being of Snapchatters, which has informed – and continues to inform – our decisions to build Snapchat differently. As a platform designed for communications between real friends, we believe Snapchat can play a unique role in empowering friends to help each other through difficult times.

When our Trust & Safety team recognizes a Snapchatter in distress, they can forward self-harm prevention and support resources, and notify emergency response personnel when appropriate. The resources that we share are available on our global list of safety resources, and these are publicly available to all Snapchatters.

| Total Times Suicide Resources Shared |
| --- |
| 24,278 |

## Appeals

As of this report, we are starting to report on the number of appeals by users whose accounts were locked for violation of our policies. We only reinstate accounts that our moderators determine were incorrectly locked. During this period, we are reporting on appeals relating to drug content.  In our next report, we're looking forward to releasing more data relating to appeals stemming from other violations of our policies.

PX0425-007

Snapchat Transparency Report | Snapchat Transparency

| Total Appeal Submissions | Total Accounts Reinstated | % Reinstated | Turnaround Time (in median minutes) |
| --- | --- | --- | --- |
| 36,682 | 1,249 | 3.40% | 1,008 |

## Ads Moderation

Snap is committed to steadfastly ensuring that all ads are fully compliant with our platform policies. We believe in a responsible and respectful approach to advertising, creating a safe and enjoyable experience for all of our users. Below we have included insight into our advertising moderation. Note that ads on Snapchat can be removed for a variety of reasons as outlined in Snap's Advertising Policies, including deceptive content, adult content, violent or disturbing content, hate speech, and intellectual property infringement. Additionally, you can now find Snapchat's Ads Gallery in the navigation bar of this transparency report.

| Total Ads Reported | Total Ads Removed |
| --- | --- |
| 186,344 | 5,145 |

## Country Overview

This section provides an overview of the enforcement of our Community Guidelines in a sampling of geographic regions. Our Guidelines apply to all content on Snapchat—

PX0425-008

and all Snapchatters—across the globe, regardless of location.

Information for individual countries is available for download via the attached CSV file:

**Download CSV**

| Region | Content & Account Reports | Content Enforced | Unique Accounts Enforced |
|---|---|---|---|
| North America | 6,062,193 | 2,688,389 | 1,618,171 |
| Europe | 4,265,947 | 1,570,674 | 1,001,229 |
| Rest of World | 6,939,845 | 1,957,055 | 1,192,703 |
| Total | 17,267,985 | 6,216,118 | 3,687,082 |



Australia        Austria        Belgium

PX0425-009

4/5/24, 12:06 PM                    Snapchat Transparency Report | Snapchat Transparency







New Zealand          Norway          Poland



Saudi Arabia         Spain           Sweden

Turkey    United Arab Emirat    United Kingdom



United States

                    



Government &          About            Glossary of
Intellectual         Transparency     Transparency

PX0425-011



Property Removal          Reporting                 Report
Requests

**Learn More**              **Learn More**            **Learn More**

---

**Company**               **Community**             **Advertising**            **Legal**

Snap Inc.                 Snapchat Support          Snapchat Ads               Snap Terms

Careers                   Pixy Support              Advertising Policies       Law Enforcement

News                      Community                 Political Ads Library      Cookie Policy
                          Guidelines
Privacy and Safety                                  Brand Guidelines           Cookie Settings

                                                    Promotions Rules           Report Infringement

---



Privacy Policy

Terms of Service

**Language**    English (US)    ⌄

PX0425-012

# PX0426



Home    🔍

**Community Guidelines Enforcement**                                              ⌄

# Community Guidelines Enforcement Report

*October 1, 2023 – December 31, 2023*
*Published March 19, 2024*

## About this report

At TikTok, our mission is to inspire creativity and bring joy. We prioritize safety, well-being and integrity so that our community can feel free to create, make connections, and be entertained.

More than 40,000 trust and safety professionals work alongside innovative technology to maintain and enforce our robust Community Guidelines, Terms of Service and Advertising Policies, which apply to all content on our platform. This latest report provides insight into these efforts, showing how we continue to uphold trust, authenticity, and accountability.

## Latest data

⬇ **Download**

## Safety

As our platform continues to grow, we remain focused on implementing robust safety strategies. We continue to respond vigorously to the evolving ways that people attempt to circumvent our rules. In addition, we are investing in

PX0426-001

proactively and expediently removing violative content and accounts. As part of our commitment to transparency, we're now providing more detail on how often videos have been viewed before being removed.

**Israel-Hamas war**

Since the start of the Israel-Hamas war on October 7, 2023, we provided regular updates on our extensive actions to safeguard our community, including mobilizing significant resources and personnel, introducing product features, and working with experts.

To stay accountable to the communities we serve, we have also been transparent about the efficacy of our efforts through regular disclosures on content removals. From the start of the war through to the end of 2023, we removed more than 1.5 million videos and suspended more than 46,000 livestreams in Israel and Palestine for violating our Community Guidelines, including content promoting Hamas, hate speech, terrorism and misinformation.

We also remain vigilant against deceptive behaviors. From October 7 through to the end of 2023, we removed more than 169 million fake accounts globally, and we have removed about 1.2 million bot comments on content tagged with hashtags related to the war.

## Video removals and LIVE suspensions relative to publish

PX0426-002



Video: Removal rate of published
LIVE: Suspension rate of published

*NOTE: Video removal volumes referenced in this report inclu
(including image-based videos and stories). A violation of ou
may lead to further LIVE restrictions or an account ban.*

## Total removals and restorations, by content type

PX0426-003



**Selection**

⦿ Videos actioned
◯ Accounts removed
◯ LIVE sessions suspended

# Removal rates, view distribution, and report response times

PX0426-004

**Selection**

◉ Video removal rates
○ Views at time of removal
○ Response time to user-reported content

|  | 2020 | 2021 |
|---|---|---|

100.0%

80.0%

60.0%

40.0%

20.0%

0.0%

■ Removal rate within 24 hours
■ Proactive removal rate

*NOTE: Limited to short form video. Proactive removal means i*
*before it's reported. Removal within 24 hours means removing*
*posted on our platform.*

## Policy distribution of removals

PX0426-005

**Policy category**

Integrity & Authenticity

# Moderation by market and language

PX0426-006

**Selection**

◉ Removal volumes and rates, by market

◯ Human moderation language distribution

© 2024 Mapbox © OpenStreetMap

*NOTE: This chart shows the fifty markets with the largest volu*
*represents approximately 90% of overall removal volume.*

## Covert influence operations

| Accounts targeting political discourse in Panama | > |
|---|---|

| Accounts targeting political discourse in Indonesia | > |
|---|---|

| Accounts targeting war between Russia and Ukraine | > |
|---|---|

PX0426-007



Accounts targeting war between Russia and Ukraine ⟩

Accounts promoting Syria and targeting war between Hamas and Israel ⟩

Accounts targeting war between Russia and Ukraine ⟩

Accounts targeting political discourse in Iraq ⟩

Accounts promoting Shia Islam and targeting war between Hamas and Israel ⟩

Accounts targeting political discourse in Germany ⟩

Accounts targeting political discourse in Taiwan ⟩

Accounts targeting war between Russia and Ukraine ⟩

*NOTE: Disrupting a covert influence operation requires layered operations, including investigation, removal, and post-mortem analysis. We report the removal of these networks during the quarter in which the full operations process has been completed.*

## Terminology

- **Networks operated from:** Indicates geographic location of network operation based on technical and behavioral evidence from proprietary and open sources; TikTok may not be able to attribute networks to specific entities, individuals, or groups.
- **Detection source:** Denoted as internal when presence of activity is identified solely through an internally driven investigation; external detection refers to investigations that originated through an external report which then led to an investigation.
- **Followers of network:** Cumulative total number of accounts that followed any account within a network as of the date of that network's removal.

PX0426-008

# Platform security

Our priority is keeping our global community safe, and we continue to invest in robust measures that actively enforce and defend the security of our platform. We prohibit: (1) access to any part of TikTok through unauthorized methods; (2) attempts to obtain sensitive, confidential, commercial, or personal information; or (3) any abuse of the security, integrity, or reliability of our platform.

To strengthen and test our internal defenses, we continue to collaborate with HackerOne on our global bug bounty program, encouraging security researchers to proactively report security vulnerabilities so we can fix them. In the fourth quarter of 2023, our HackerOne bug bounty program resolved 36 reports, rewarding over $87,000 in bounties. TikTok also participated in HackerOne's Ambassador World Cup, inviting the top ethical hackers from around the world to test our defenses in a live hacking event.

In addition to our investment in platform security, we strive to educate our community on how to stay safe online, and what tools and options TikTok offers for security and privacy. We continued our TikTok Facts series in the fourth quarter of 2023 by debunking common claims around our personalized advertising tools, and continue to share resources with our community to reflect important information about security and privacy at TikTok.

# Spam and fake engagement

We remain vigilant in our efforts to detect external threats and safeguard the platform from fake accounts and engagement. These threats persistently probe and attack our systems, leading to occasional fluctuations in the reported metrics within these areas. Despite this, we are steadfast in our commitment to promptly identify and remove any accounts, content, or activities that seek to artificially boost popularity on our platform. During the fourth quarter of 2023, we saw an increase in some of our fake engagement metrics, as seen in the charts below. Our spam-detection systems worked as expected, accurately

PX0426-009

identifying and removing the accounts and content in question, ensuring that we were able to maintain the integrity of our platform.



**Selection**

| Fake likes removed | ▼ |
| --- | --- |

*NOTE: We take action to both remove and prevent likes, follo deem the activity to come through automated or inauthentio accounts for spam, we also remove videos created by those i*

---

# Ads

Advertiser accounts and ad content must comply with our Community Guidelines, Advertising Policies, and Terms of Service. TikTok has strict policies to protect our community from fake, fraudulent or misleading ad content. Ensuring the safety of users and advertisers is an ongoing commitment. During the fourth quarter of 2023, there was an increase in the volume of ads removed for violating our advertising policies and a decrease in the volume of ads removed due to account-level actions. We are continually reviewing and strengthening our systems to identify new patterns and quickly and accurately remove ads that violate our policies.

PX0426-010

By upholding strict policies, leveraging advanced detection mechanisms, and continuously improving our systems, we strive to foster an advertising experience that is trustworthy, enjoyable, and aligned with the values of our vibrant TikTok community.

## Ads policy enforcement



NOTE: Ads may be removed either at the individual ad level
entire advertiser account.

## Other reports

- Government Removal Requests
- Intellectual Property Removal Requests
- Information Requests

**Was this helpful?**

PX0426-011



PX0426-012



Privacy Policy for Younger Users

Intellectual Property Policy

Law Enforcement

Privacy Policy

Terms of Service

English (United States)  ▼

©2024 TikTok

PX0426-013

# PX0427

Transparency 

# Community Report

This report covers actions we took on content that violated our Professional Community Policies and User Agreement for the six-month period between January 1 and June 30, 2023. It also summarizes requests to remove content based on copyright infringement claims.



## This report covers:

Fake accounts

Spam and scams

Content violations

Copyrighted materials

Community Report
Government Requests Report 

PX0427-001

Transparency 



# Fake accounts

We are a safe, trusted and professional community where real people share, learn and connect. Our policies prohibit fake profiles and require that members are real people who represent themselves accurately and contribute authentically.

## What we do to catch fake accounts

Our automated defenses blocked 90.1% of the fake accounts we stopped during the January - June 2023 period, with the remaining 9.9% stopped by our manual investigations and restrictions. 99.7% of the fake accounts were stopped proactively, before a member report. We continue enhancing our defenses to prevent and remove malicious accounts.

**Community Report**
**Government Requests Report**                    ›

PX0427-002

4/5/24, 12:08 PM                                   Community Report

 Transparency                                                    ☰



Fake accounts detected and removed

| 2023: Jan–Jun | 2022: Jul–Dec | 2022: Jan–Jun | 2021: Jul–Dec | 2021: Jan–Jun | 2020: Jul–Dec | 2020: Jan–Jun | 2019: Jul–Dec | 2019: Jan–Jun |
|---|---|---|---|---|---|---|---|---|

2023: January-June

Transparency



PX0427-004

Transparency                                                                    ☰



M = millions      K = thousands

## Spam and scams

Spam and scams are not permitted on LinkedIn. By far the most common type of inappropriate content we take action on is spam or scam content, which includes inappropriate commercial activity and repetitive communications or invitations, often meant for financial gain.

## What we do to catch spam and scams

Of the spam or scam content removed in this reporting period, our automated defenses stopped 99.6% and our teams manually removed the rest.

**Community Report**
**Government Requests Report**          

PX0427-005

Transparency                                                          ☰



**99.6%**

Stopped by
automated defenses

## Spam and scams detected and removed

| **2023:** **Jan– Jun** | **2022:** **Jul– Dec** | **2022:** **Jan - Jun** | **2021:** **Jul– Dec** | **2021:** **Jan– Jun** | **2020:** **Jul– Dec** | **2020:** **Jan– Jun** | **2019:** **Jul– Dec** | **2019:** **Jan– Jun** |
|---|---|---|---|---|---|---|---|---|

2023: January-June

M = millions    K = thousands

# Content violations

**Community Report**
**Government Requests Report**                     ›

PX0427-006

Transparency

content, attributable to enhanced messaging defenses.

Learn more about content policy violations

Content removed

| 2023: Jan–Jun | 2022: Jul–Dec | 2022: Jan-Jun | 2021: Jul–Dec | 2021: Jan-Jun | 2020: Jul–Dec | 2020: Jan-Jun | 2019: Jul–Dec | 2019: Jan–Jun |
|---|---|---|---|---|---|---|---|---|

2023: January-June

# Copyright removal requests

We respect the intellectual property rights of others and do not allow copyright infringement. Our User Agreement requires members to respect others' rights and follow the law, including gathering any necessary legal permissions before sharing protected content.

| 2023 | 2022 | 2021 | 2020 | 2019 | 2018 |
|---|---|---|---|---|---|

Community Report
Government Requests Report ❯

4/5/24, 12:08 PM                                    Community Report

Transparency                                                                    ☰

| 2,143 | 1,994 | 1,168 | 826 |
|-------|-------|-------|-----|

[1] Requests from copyright owners claiming infringement of protected works.

[2] Requests often cite multiple infringements.

[3] Infringements removed means action was taken.

[4] Reported infringements not removed.

# Additional resources

**Professional Community Policies**

**Law Enforcement Guidelines**

**Updates to our Professional Community Policies**

**How our content abuse systems work to keep members safe**

**Help Center: Government Requests for Data**

**Responsible AI Principles**

**Redefining Work in the Age of AI**

**Welcoming the Digital Services Act**

**Community Report**
**Government Requests Report**                    ❯

PX0427-008

 Transparency

☰

**Your California Privacy Choices**

**User Agreement**

**Accessibility**

 © LinkedIn Corporation 2024

PX0427-009

# PX0435

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2022**
or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from      to     **
**Commission File Number: 001-35551**



# Meta Platforms, Inc.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **20-1665019** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**1601 Willow Road, Menlo Park, California 94025**
(Address of principal executive offices and Zip Code)
**(650) 543-4800**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, $0.000006 par value | META | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 (Exchange Act) during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐ No ☒

The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant as of June 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, was $378 billion based upon the closing price reported for such date on the Nasdaq Global Select Market. On January 27, 2023, the registrant had 2,225,763,078 shares of Class A common stock and 366,876,470 shares of Class B common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Proxy Statement for the 2023 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2022.

PX0435-001

PX0435-002

**Meta Platforms, Inc.**
Form 10-K

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Note About Forward-Looking Statements |  | 3 |
| Limitations of Key Metrics and Other Data |  | 4 |
| **PART I** |  |  |
| Item 1. | Business | 7 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 48 |
| Item 2. | Properties | 48 |
| Item 3. | Legal Proceedings | 48 |
| Item 4. | Mine Safety Disclosures | 51 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | [Reserved] | 53 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 54 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 78 |
| Item 8. | Financial Statements and Supplementary Data | 80 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 120 |
| Item 9A. | Controls and Procedures | 120 |
| Item 9B. | Other Information | 120 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 120 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 121 |
| Item 11. | Executive Compensation | 121 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 121 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 121 |
| Item 14. | Principal Accountant Fees and Services | 121 |
| **PART IV** |  |  |
| Item 15. | Exhibit and Financial Statement Schedules | 122 |
| Item 16. | Form 10-K Summary | 124 |
| Signatures |  | 125 |

2

Table of Contents

## NOTE ABOUT FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements. All statements contained in this Annual Report on Form 10-K other than statements of historical fact, including statements regarding our future results of operations and financial position, our business strategy and plans, and our objectives for future operations, are forward-looking statements. The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions are intended to identify forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in Part I, Item 1A, "Risk Factors" in this Annual Report on Form 10-K. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Annual Report on Form 10-K may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

We undertake no obligation to revise or publicly release the results of any revision to these forward-looking statements, except as required by law. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.

Unless expressly indicated or the context requires otherwise, the terms "Meta," "company," "we," "us," and "our" in this document refer to Meta Platforms, Inc., a Delaware corporation, and, where appropriate, its subsidiaries. The term "Family" refers to our Facebook, Instagram, Messenger, and WhatsApp products. For references to accessing Meta's products on the "web" or via a "website," such terms refer to accessing such products on personal computers. For references to accessing Meta's products on "mobile," such term refers to accessing such products via a mobile application or via a mobile-optimized version of our websites such as m.facebook.com, whether on a mobile phone or tablet.

3

Table of Contents

## LIMITATIONS OF KEY METRICS AND OTHER DATA

The numbers for our key metrics are calculated using internal company data based on the activity of user accounts. We report our estimates of the numbers of our daily active people (DAP), monthly active people (MAP), and average revenue per person (ARPP) (collectively, our "Family metrics") based on the activity of users who visited at least one of Facebook, Instagram, Messenger, and WhatsApp (collectively, our "Family" of products) during the applicable period of measurement. We have historically reported the numbers of our daily active users (DAUs), monthly active users (MAUs), and average revenue per user (ARPU) (collectively, our "Facebook metrics") based on user activity only on Facebook and Messenger and not on our other products. We believe our Family metrics better reflect the size of our community and the fact that many people are using more than one of our products. As a result, over time we intend to report our Family metrics as key metrics in place of DAUs, MAUs, and ARPU in our periodic reports filed with the Securities and Exchange Commission.

While these numbers are based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring usage of our products across large online and mobile populations around the world. The methodologies used to measure these metrics require significant judgment and are also susceptible to algorithm or other technical errors. In addition, we are continually seeking to improve our estimates of our user base, and such estimates may change due to improvements or changes in our methodology. We regularly review our processes for calculating these metrics, and from time to time we discover inaccuracies in our metrics or make adjustments to improve their accuracy, which can result in adjustments to our historical metrics. Our ability to recalculate our historical metrics may be impacted by data limitations or other factors that require us to apply different methodologies for such adjustments. We generally do not intend to update previously disclosed Family metrics for any such inaccuracies or adjustments that are within the error margins disclosed below.

In addition, our Family metrics and Facebook metrics estimates will differ from estimates published by third parties due to differences in methodology.

### Family Metrics

Many people in our community have user accounts on more than one of our products, and some people have multiple user accounts within an individual product. Accordingly, for our Family metrics, we do not seek to count the total number of user accounts across our products because we believe that would not reflect the actual size of our community. Rather, our Family metrics represent our estimates of the number of unique people using at least one of Facebook, Instagram, Messenger, and WhatsApp. We do not require people to use a common identifier or link their accounts to use multiple products in our Family, and therefore must seek to attribute multiple user accounts within and across products to individual people. To calculate these metrics, we rely upon complex techniques, algorithms and machine learning models that seek to count the individual people behind user accounts, including by matching multiple user accounts within an individual product and across multiple products when we believe they are attributable to a single person, and counting such group of accounts as one person. These techniques and models require significant judgment, are subject to data and other limitations discussed below, and inherently are subject to statistical variances and uncertainties. We estimate the potential error in our Family metrics primarily based on user survey data, which itself is subject to error as well. While we expect the error margin for our Family metrics to vary from period to period, we estimate that such margin generally will be approximately 3% of our worldwide MAP. At our scale, it is very difficult to attribute multiple user accounts within and across products to individual people, and it is possible that the actual numbers of unique people using our products may vary significantly from our estimates, potentially beyond our estimated error margins. As a result, it is also possible that our Family metrics may indicate changes or trends in user numbers that do not match actual changes or trends.

To calculate our estimates of Family DAP and MAP, we currently use a series of machine learning models that are developed based on internal reviews of limited samples of user accounts and calibrated against user survey data. We apply significant judgment in designing these models and calculating these estimates. For example, to match user accounts within individual products and across multiple products, we use data signals such as similar device information, IP addresses, and user names. We also calibrate our models against data from periodic user surveys of varying sizes and frequency across our products, which are inherently subject to error. The timing and results of such user surveys have in the past contributed, and may in the future contribute, to changes in our reported Family metrics from period to period. In addition, our data limitations may affect our understanding of certain details of our business and increase the risk of error for our Family metrics estimates. Our techniques and models rely on a variety of data signals from different products, and we rely on more limited data signals for some products compared to others. For example, as a result of limited visibility into encrypted products, we have fewer

4

PX0435-005

Table of Contents

data signals from WhatsApp user accounts and primarily rely on phone numbers and device information to match WhatsApp user accounts with accounts on our other products. Similarly, although Messenger Kids users are included in our Family metrics, we do not seek to match their accounts with accounts on our other applications for purposes of calculating DAP and MAP. Any loss of access to data signals we use in our process for calculating Family metrics, whether as a result of our own product decisions, actions by third-party browser or mobile platforms, regulatory or legislative requirements, or other factors, also may impact the stability or accuracy of our reported Family metrics, as well as our ability to report these metrics at all. Our estimates of Family metrics also may change as our methodologies evolve, including through the application of new data signals or technologies, product changes, or other improvements in our user surveys, algorithms, or machine learning that may improve our ability to match accounts within and across our products or otherwise evaluate the broad population of our users. In addition, such evolution may allow us to identify previously undetected violating accounts (as defined below).

We regularly evaluate our Family metrics to estimate the percentage of our MAP consisting solely of "violating" accounts. We define "violating" accounts as accounts which we believe are intended to be used for purposes that violate our terms of service, including bots and spam. In the fourth quarter of 2022, we estimated that approximately 3% of our worldwide MAP consisted solely of violating accounts. Such estimation is based on an internal review of a limited sample of accounts, and we apply significant judgment in making this determination. For example, we look for account information and behaviors associated with Facebook and Instagram accounts that appear to be inauthentic to the reviewers, but we have limited visibility into WhatsApp user activity due to encryption. In addition, if we believe an individual person has one or more violating accounts, we do not include such person in our violating accounts estimation as long as we believe they have one account that does not constitute a violating account. From time to time, we disable certain user accounts, make product changes, or take other actions to reduce the number of violating accounts among our users, which may also reduce our DAP and MAP estimates in a particular period. We intend to disclose our estimates of the percentage of our MAP consisting solely of violating accounts on an annual basis. Violating accounts are very difficult to measure at our scale, and it is possible that the actual number of violating accounts may vary significantly from our estimates.

The numbers of Family DAP and MAP discussed in this Annual Report on Form 10-K, as well as ARPP, do not include users on our other products, unless they would otherwise qualify as DAP or MAP, respectively, based on their other activities on our Family products.

**Facebook Metrics**

We regularly evaluate our Facebook metrics to estimate the number of "duplicate" and "false" accounts among our MAUs. A duplicate account is one that a user maintains in addition to his or her principal account. We divide "false" accounts into two categories: (1) user-misclassified accounts, where users have created personal profiles for a business, organization, or non-human entity such as a pet (such entities are permitted on Facebook using a Page rather than a personal profile under our terms of service); and (2) violating accounts, which represent user profiles that we believe are intended to be used for purposes that violate our terms of service, such as bots and spam. The estimates of duplicate and false accounts are based on an internal review of a limited sample of accounts, and we apply significant judgment in making this determination. For example, to identify duplicate accounts we use data signals such as identical IP addresses and similar user names, and to identify false accounts we look for names that appear to be fake or other behavior that appears inauthentic to the reviewers. Any loss of access to data signals we use in this process, whether as a result of our own product decisions, actions by third-party browser or mobile platforms, regulatory or legislative requirements, or other factors, also may impact the stability or accuracy of our estimates of duplicate and false accounts. Our estimates also may change as our methodologies evolve, including through the application of new data signals or technologies or product changes that may allow us to identify previously undetected duplicate or false accounts and may improve our ability to evaluate a broader population of our users. Duplicate and false accounts are very difficult to measure at our scale, and it is possible that the actual number of duplicate and false accounts may vary significantly from our estimates.

In the fourth quarter of 2022, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets. In the fourth quarter of 2022, we estimated that false accounts may have represented approximately 4-5% of our worldwide MAUs. Our estimation of false accounts can vary as a result of episodic spikes in the creation of such accounts, which we have seen originate more frequently in specific countries such as Indonesia, Nigeria, and Vietnam. From time to time, we disable certain user accounts, make product changes, or take other actions to reduce the number of duplicate or false accounts among our users, which may also reduce our DAU and

PX0435-006

Table of Contents

MAU estimates in a particular period. We intend to disclose our estimates of the number of duplicate and false accounts among our MAUs on an annual basis.

The numbers of DAUs and MAUs discussed in this Annual Report on Form 10-K, as well as ARPU, do not include users on Instagram, WhatsApp, or our other products, unless they would otherwise qualify as DAUs or MAUs, respectively, based on their other activities on Facebook.

**User Geography**

Our data regarding the geographic location of our users is estimated based on a number of factors, such as the user's IP address and self-disclosed location. These factors may not always accurately reflect the user's actual location. For example, a user may appear to be accessing Facebook from the location of the proxy server that the user connects to rather than from the user's actual location. The methodologies used to measure our metrics are also susceptible to algorithm or other technical errors, and our estimates for revenue by user location and revenue by user device are also affected by these factors.

6

PX0435-007

Table of Contents

# PART I

## Item 1.  Business

### Overview

Our mission is to give people the power to build community and bring the world closer together.

All of our products, including our apps, share the vision of helping to bring the metaverse to life. We build technology that helps people connect and share, find communities, and grow businesses. Our useful and engaging products enable people to connect and share with friends and family through mobile devices, personal computers, virtual reality headsets, and wearables. We also help people discover and learn about what is going on in the world around them, enable people to share their experiences, ideas, photos and videos, and other activities with audiences ranging from their closest family members and friends to the public at large, and stay connected everywhere by accessing our products. Meta is moving our offerings beyond 2D screens toward immersive experiences like augmented and virtual reality to help build the metaverse, which we believe is the next evolution in social technology. Our vision for the metaverse does not center on any single product, but rather an entire ecosystem of experiences, devices, and new technologies. While the metaverse is in the very early stages of its development, we believe it will become the next computing platform and the future of social interaction.

We report financial results for two segments: Family of Apps (FoA) and Reality Labs (RL). Currently, we generate substantially all of our revenue from selling advertising placements on our family of apps to marketers, which is reflected in FoA. Ads on our platforms enable marketers to reach people across a range of marketing objectives, such as generating leads or driving awareness. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites. RL reflects our efforts to develop the metaverse and generates revenue from sales of consumer hardware products, software and content.

We invest in our business based on our company priorities, and the majority of our investments are directed toward developing our family of apps. In 2022, 82% of our total costs and expenses were recognized in FoA and 18% were recognized in RL. Our FoA investments were $71.79 billion in 2022 and include expenses relating to headcount, data centers and technical infrastructure as part of our efforts to develop our apps and our advertising services. We are also making significant investments in our metaverse efforts, including developing virtual and augmented reality devices, software for social platforms, neural interfaces, and other foundational technologies for the metaverse. Our total RL investments were $15.88 billion in 2022 and include expenses relating to headcount and technology development across these efforts. As these are fundamentally new technologies that we expect will evolve as the metaverse ecosystem develops, many products for the metaverse may only be fully realized in the next decade. Although it is inherently difficult to predict when and how the metaverse ecosystem will develop, we expect our RL segment to continue to operate at a loss for the foreseeable future, and our ability to support our metaverse efforts is dependent on generating sufficient profits from other areas of our business. We expect this will be a complex, evolving, and long-term initiative. We are investing now because we believe this is the next chapter of the internet and will unlock monetization opportunities for businesses, developers, and creators, including around advertising, hardware, and digital goods.

### Family of Apps Products

- *Facebook.* Facebook helps give people the power to build community and bring the world closer together. It's a place for people to share life's moments and discuss what's happening, nurture and build relationships, discover and connect to interests, and create economic opportunity. They can do this through Feed, Reels, Stories, Groups, and more.

- *Instagram.* Instagram brings people closer to the people and things they love. Instagram Feed, Stories, Reels, Video, Live, Shops, and messaging are places where people and creators can connect and express themselves through photos, video, and private messaging, and discover and shop from their favorite businesses.

- *Messenger.* Messenger is a simple yet powerful messaging application for people to connect with friends, family, communities, and businesses across platforms and devices through text, audio and video calls.

PX0435-008

Table of Contents

- **WhatsApp.** WhatsApp is a simple, reliable, and secure messaging application that is used by people and businesses around the world to communicate and transact in a private way.

**Reality Labs Products**

Many of our metaverse investments are directed toward long-term, cutting edge research and development for products that are not on the market today and may only be fully realized in the next decade. This includes exploring new technologies such as neural interfaces using electromyography, which lets people control their devices using neuromuscular signals, as well as innovations in artificial intelligence (AI) and hardware to help build next-generation interfaces. In the near term, we are continuing to develop early metaverse experiences through Reality Labs' augmented and virtual reality products that help people feel connected, anytime, anywhere. Our current product offerings include Meta Quest virtual reality devices, as well as software and content available through the Meta Quest Store, which enable a range of social experiences that allow people to defy physical distance, including gaming, fitness, entertainment, and more. For example, we have launched Horizon Worlds, a social platform where people can interact with friends, meet new people, play games, and attend virtual events, and Horizon Workrooms, a virtual reality space for teams to connect and collaborate at work. As part of our virtual reality initiatives, we have also introduced mixed reality capabilities through our Meta Reality system on Meta Quest Pro, which allows users to experience the immersion and presence of virtual reality while still being grounded in the physical world. As part of our augmented reality initiatives, we have introduced Ray-Ban Stories smart glasses, which let people stay more present through hands-free interaction, and Meta Spark, a platform that allows creators and businesses to build augmented reality experiences that bring the digital and physical worlds together in our apps. In general, while all of these investments are part of our long-term initiative to help build the metaverse, our virtual reality and social platform efforts also include notable shorter-term projects developing specific products and services to go to market, whereas our augmented reality efforts are primarily directed toward longer-term research and development projects. For example, in 2023, we expect to spend approximately 50% of our Reality Labs operating expenses on our augmented reality initiatives, approximately 40% on our virtual reality initiatives, and approximately 10% on social platforms and other initiatives. We apply significant judgment in estimating this expense breakdown as there are certain shared costs across product lines, and our expectations are subject to change, including as the metaverse ecosystem and our business strategies evolve. In particular, we regularly evaluate our product roadmaps and make significant changes as our understanding of the technological challenges and market landscape and our product ideas and designs evolve.

**Competition**

Our business is characterized by innovation, rapid change, and disruptive technologies. We compete with companies providing connection, sharing, discovery, and communication products and services to users online, as well as companies that sell advertising to businesses looking to reach consumers and/or develop tools and systems for managing and optimizing advertising campaigns. We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to create, share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences. We compete to attract, engage, and retain people who use our products, to attract and retain businesses that use our free or paid business and advertising services, and to attract and retain developers who build compelling applications that integrate with our products. We also compete with companies that develop and deliver consumer hardware and virtual and augmented reality products and services. As we introduce or acquire new products, as our existing products evolve, or as other companies introduce new products and services, including as part of efforts to develop the metaverse or innovate through the application of new technologies such as AI, we may become subject to additional competition.

**Technology**

Our product development philosophy centers on continuous innovation in creating and improving products that are social by design, which means that our products are designed to place people and their social interactions at the core of the product experience. As our user base grows, as engagement with products like video and virtual reality increases, and as we deepen our investment in new technologies, our computing needs continue to expand. We make significant investments in technology both to improve our existing products and services and to develop new ones, as well as for our marketers and developers. We are also investing in protecting the security, privacy, and integrity of our platform by investing in both people and technology to strengthen our systems against abuse. Across all of these efforts, we are making significant investments in AI and machine learning, including to recommend relevant unconnected content across our products through our AI-powered discovery engine, to enhance our advertising tools and improve our ad delivery, targeting, and measurement capabilities, and

8

PX0435-009

Table of Contents

to develop new product features using generative AI.

### Sales and Operations

The majority of our marketers use our self-service ad platform to launch and manage their advertising campaigns. We also have a global sales force that is focused on attracting and retaining advertisers and providing support to them throughout the stages of the marketing cycle from pre-purchase decision-making to real-time optimizations to post-campaign analytics. We work directly with these advertisers, as well as through advertising agencies and resellers. We operate offices in more than 90 cities around the globe, the majority of which have a sales presence. We also invest in and rely on self-service tools to provide direct customer support to our users and partners.

### Marketing

Historically, our communities have generally grown organically with people inviting their friends to connect with them, supported by internal efforts to stimulate awareness and interest. In addition, we have invested and will continue to invest in marketing our products and services to grow our brand and help build community around the world.

### Intellectual Property

To establish and protect our proprietary rights, we rely on a combination of patents, trademarks, copyrights, trade secrets, including know-how, license agreements, confidentiality procedures, non-disclosure agreements with third parties, employee disclosure and invention assignment agreements, and other contractual rights. In addition, to further protect our proprietary rights, from time to time we have purchased patents and patent applications from third parties. We do not believe that our proprietary technology is dependent on any single patent or copyright or groups of related patents or copyrights. We believe the duration of our patents is adequate relative to the expected lives of our products.

### Government Regulation

We are subject to a variety of laws and regulations in the United States and abroad that involve matters central to our business, many of which are still evolving and being tested in courts, and could be interpreted in ways that could harm our business. These laws and regulations involve matters including privacy, data use, data protection and personal information, biometrics, encryption, rights of publicity, content, integrity, intellectual property, advertising, marketing, distribution, data security, data retention and deletion, data localization and storage, data disclosure, artificial intelligence and machine learning, electronic contracts and other communications, competition, protection of minors, consumer protection, civil rights, accessibility, telecommunications, product liability, e-commerce, taxation, economic or other trade controls including sanctions, anti-corruption and political law compliance, securities law compliance, and online payment services. Foreign data protection, privacy, content, competition, consumer protection, and other laws and regulations can impose different obligations, or penalties or fines for non-compliance, or be more restrictive than those in the United States.

These U.S. federal, state, and foreign laws and regulations, which in some cases can be enforced by private parties in addition to government entities, are constantly evolving and can be subject to significant change. As a result, the application, interpretation, and enforcement of these laws and regulations are often uncertain, particularly in the new and rapidly evolving industry in which we operate, and may be interpreted and applied inconsistently from jurisdiction to jurisdiction and inconsistently with our current policies and practices. For example, regulatory or legislative actions or litigation affecting the manner in which we display content to our users, moderate content, or obtain consent to various practices, or otherwise relating to content that is made available on our products, could adversely affect our financial results. In the United States, the U.S. Supreme Court recently agreed to review a matter in which the scope of the protections available to online platforms under Section 230 of the Communications Decency Act (Section 230) is at issue. In addition, there have been, and continue to be, various efforts to remove or restrict the scope of the protections available to online platforms under Section 230, and any such changes may increase our costs or require significant changes to our products, business practices, or operations, which could adversely affect our business and financial results.

We are also subject to evolving laws and regulations that dictate whether, how, and under what circumstances we can transfer, process and/or receive certain data that is critical to our operations, including data shared between countries or regions in which we operate and data shared among our products and services. If we are unable to transfer data between and among countries and regions in which we operate, or if we are restricted from sharing data among our products and services,

9

PX0435-010

Table of Contents

it could affect our ability to provide our services, the manner in which we provide our services or our ability to target ads, which could adversely affect our financial results. For example, the Privacy Shield, a transfer framework we relied upon for data transferred from the European Union to the United States, was invalidated in July 2020 by the Court of Justice of the European Union (CJEU). In addition, the other bases upon which Meta relies to transfer such data, such as Standard Contractual Clauses (SCCs), have been subjected to regulatory and judicial scrutiny. On July 6, 2022, we received a draft decision from the Irish Data Protection Commission (IDPC) that preliminarily concluded that Meta Platforms Ireland's reliance on SCCs in respect of European Union/European Economic Area Facebook user data does not achieve compliance with the General Data Protection Regulation (GDPR) and preliminarily proposed that such transfers of user data from the European Union to the United States should therefore be suspended. Separately, on March 25, 2022, the European Union and United States announced that they had reached an agreement in principle on a new EU-U.S. Data Privacy Framework (EU-U.S. DPF). On October 7, 2022, President Biden signed the Executive Order on Enhancing Safeguards for United States Signals Intelligence Activities (E.O.), and on December 13, 2022, the European Commission published its draft adequacy decision on the proposed new EU-U.S. DPF. We believe a final decision in this inquiry may issue as early as the first quarter of 2023. Although the E.O. is a significant and positive step, if no adequacy decision is adopted by the European Commission and we are unable to continue to rely on SCCs or rely upon other alternative means of data transfers from the European Union to the United States, we will likely be unable to offer a number of our most significant products and services, including Facebook and Instagram, in Europe, which would materially and adversely affect our business, financial condition, and results of operations.

We have been subject to other significant legislative and regulatory developments in the past, and proposed or new legislation and regulations could significantly affect our business in the future. For example, we have implemented a number of product changes and controls as a result of requirements under the GDPR, and may implement additional changes in the future. The GDPR also requires submission of personal data breach notifications to our lead European Union privacy regulator, the IDPC, and includes significant penalties for non-compliance with the notification obligation as well as other requirements of the regulation. The interpretation of the GDPR is still evolving and draft decisions in investigations by the IDPC are subject to review by other European privacy regulators as part of the GDPR's consistency mechanism, which may lead to significant changes in the final outcome of such investigations. As a result, the interpretation and enforcement of the GDPR, as well as the imposition and amount of penalties for non-compliance, are subject to significant uncertainty. In addition, Brazil, the United Kingdom, and other countries have enacted similar data protection regulations imposing data privacy-related requirements on products and services offered to users in their respective jurisdictions. The California Consumer Privacy Act, as amended by the California Privacy Rights Act, and similar laws recently enacted by other states also establish transparency rules and create certain data privacy rights for users. In addition, the European Union's ePrivacy Directive and national implementation laws impose additional limitations on the use of data across messaging products and include significant penalties for non-compliance. Changes to our products or business practices as a result of these or similar developments have in the past adversely affected, and may in the future adversely affect, our advertising business. Similarly, there are a number of legislative proposals or recently enacted laws in the European Union, the United States, at both the federal and state level, as well as other jurisdictions that could impose new obligations or limitations in areas affecting our business. For example, the Digital Markets Act (DMA) in the European Union imposes new restrictions and requirements on companies like ours, including in areas such as the combination of data across services, mergers and acquisitions, and product design. The DMA also includes significant penalties for non-compliance, and its key requirements will be enforceable against designated gatekeeper companies in early 2024. We expect the DMA will cause us to incur significant compliance costs and make additional changes to our products or business practices. The requirements under the DMA will likely be subject to further interpretation and regulatory engagement. Pending or future proposals to modify competition laws in the United States and other jurisdictions could have similar effects. Further, the Digital Services Act (DSA) in the European Union, which will apply to our business as early as June 2023, will impose new restrictions and requirements for our products and services and may significantly increase our compliance costs. The DSA also includes significant penalties for non-compliance. In addition, some countries, such as India and Turkey, are considering or have passed legislation implementing data protection requirements or requiring local storage and processing of data or similar requirements that could increase the cost and complexity of delivering our services, cause us to cease the offering of our products and services in certain countries, or result in fines or other penalties. New legislation or regulatory decisions that restrict our ability to collect and use information about minors may also result in limitations on our advertising services or our ability to offer products and services to minors in certain jurisdictions.

We are, and expect to continue to be, the subject of investigations, inquiries, data requests, requests for information, actions, and audits by government authorities and regulators in the United States, Europe, and around the world, particularly in the areas of privacy and data protection, including with respect to minors, law enforcement, consumer protection, civil

10

PX0435-011

Table of Contents

rights, content moderation, and competition. We are also currently, and may in the future be, subject to regulatory orders or consent decrees, including the modified consent order we entered into with the U.S. Federal Trade Commission (FTC), which took effect in April 2020 and, among other matters, requires us to maintain a comprehensive privacy program. Orders issued by, or inquiries or enforcement actions initiated by, government or regulatory authorities could cause us to incur substantial costs, expose us to civil and criminal liability (including liability for our personnel) or penalties (including substantial monetary remedies), interrupt or require us to change our business practices in a manner materially adverse to our business (including changes to our products or user data practices), result in negative publicity and reputational harm, divert resources and the time and attention of management from our business, or subject us to other structural or behavioral remedies that adversely affect our business.

For additional information about government regulation applicable to our business, see Part I, Item 1A, "Risk Factors" in this Annual Report on Form 10-K.

**Human Capital**

At Meta, our mission is to give people the power to build community and bring the world closer together. People are at the heart of every connection we empower, and we are proud of our unique company culture. We strive to build diverse teams across engineering, product design, marketing, and other areas to further our mission.

As we look forward, we expect the lasting effects of the global COVID-19 pandemic will change how we work and who we reach. We are proud of our response to the COVID-19 pandemic both internally and externally. Employee benefits were robust and established quickly: we implemented 15 days of subsidized backup care for child, adult, or eldercare; we paid emergency leave to help address short-term or transitional needs; and we established a temporary stipend to help employees work from home, to name just a few of the benefits.

We are committed to fostering an enriching environment for our global workforce, and we are focused on supporting our people in doing the best work of their careers, no matter where they are located. For example:

- Location is flexible but presence is essential. As of September 30, 2022, 83% of managers at Meta had direct reports in a different location, and 24% of our employees were fully remote.

- Remote work has helped us reach new talent in a competitive tech landscape and broaden our representation. We have seen that candidates who accepted remote job offers were more often underrepresented people.

- Beginning March 2023, we are permitting employees in eligible roles to transfer to any Meta office within their country of employment. We expect distributed teams to establish strong norms that support efficiency, including more predictable and coordinated in-person working time.

At the start of the COVID-19 pandemic, the world rapidly moved online and the surge of online commerce led to accelerated revenue growth. Many people predicted this would be a permanent acceleration that would continue even after the pandemic ended. Instead, not only did online commerce return to prior trends, but the more challenging macroeconomic environment and limitations on our ad targeting and measurement tools, among other factors, contributed to a decline in our revenue.

To address this new environment, we took a number of steps to become a more capital efficient company and, in November 2022, made one of the most difficult changes in Meta's history and announced a layoff of approximately 11,000 employees. The cost reduction efforts that we announced, including our plans to scale back budgets, reduce company perks, shrink our real estate footprint, and restructure teams to increase efficiency alone would not bring our expenses in line with our revenue growth and we had to implement the layoff. We made it a priority to treat outgoing employees with respect and announced a package for U.S. employees that included:

- Severance: 16 weeks of base pay plus two additional weeks for every year of service.

- Paid time off: payment for all remaining paid time off.

11

Table of Contents

- Restricted stock unit vesting: receipt of November 2022 vesting for outstanding employee restricted stock unit awards.

- Health insurance: coverage of the cost of healthcare for employees and their families for six months.

- Career services: three months of career support with an external vendor, including early access to unpublished job leads.

- Immigration support: dedicated immigration specialists to help guide employees based on their needs.

We offered similar support for outgoing employees outside of the United States, taking into account local employment laws.

### Employee Learning and Development

We value our investment in growing and keeping a highly skilled and efficient workforce. In addition to permitting employees to seek education reimbursement, we offer career development opportunities and work experience programs that extend beyond the physical and virtual classroom. To do this, we utilize various learning modalities, such as live virtual and in-person learning experiences, on-demand e-learning, self-service resources, learning communities, and coaching engagements.

### The Pulse of Our Workforce

Each year, we conduct company-wide employee surveys to help understand how employees feel about working at Meta and what we can do to improve their experience. Our surveys help us measure company, manager, and personal experience over time. Further, our more frequent surveys, such as those that have been administered daily to an ongoing random sample of employees, allows us to measure real-time sentiment around emerging events and company changes. These surveys are designed to invite feedback and actionable suggestions, inform decisions, and drive change across the company.

### Health and Well-being

Meta's health and well-being programs are designed to give employees a choice of flexible benefits to help them reach their personal well-being goals. Our programs are tailored to help boost employee physical and mental health, create financial peace of mind, provide support for families, and help employees build a strong community. Programs are designed and funded to support needs like autism care, cancer care, transgender services, holistic well-being, and mental health programs, which represent a few of the ways we support our employees and their dependents.

### Diversity, Equity and Inclusion

We work to build a diverse and inclusive workplace where we can leverage our collective cognitive diversity to build the best products and make the best decisions for the global community we serve.

We offer full-time fully remote positions, including in locations where we do not have offices, which has deepened the diversity of our candidate pool. As published in our Diversity Report in July 2022, we saw that providing remote optionality increased the diversity of the overall composition of our workforce: U.S candidates who accepted remote job offers were substantially more likely to be Black, Hispanic, Native American, Alaskan Native, Pacific Islander, veterans and/or people with disabilities, and globally, candidates who accepted remote job offers were more likely to be women.

As part of our 2022 Diversity Report, we published our global gender diversity and U.S. ethnic diversity workforce data. As of June 30, 2022, our global employee base was comprised of 37.1% females and 62.9% males, and our U.S. employee base was comprised of the following ethnicities: 46.5% Asian, 37.6% White, 6.7% Hispanic, 4.9% Black, 4.0% two or more ethnicities, and 0.3% additional groups (including American Indian or Alaska Native and Native Hawaiian or Other Pacific Islander).

We want our products to work for the world and we need to grow and keep the best talent in order to do that. To aid in this effort, we have taken steps to reduce bias from our hiring processes and performance management systems.

12

Table of Contents

We have also invested in learning opportunities to identify and reduce inherent bias through Diversity, Equity and Inclusion trainings for our employees and enhanced learning and development courses. In addition, we offer career development programs to employees, including opportunities for women leaders at Meta to connect, support and grow together and programs to help ensure that we develop leaders of color, build a more diverse leadership pipeline and foster a culture of sponsorship through leader advocacy.

### Compensation and Benefits

We offer competitive compensation to attract and retain the best people, and we help care for our people so they can focus on our mission. Our employees' total compensation package includes market-competitive salary, bonuses or sales incentives, and equity. We generally offer full-time employees equity at the time of hire and through annual equity grants because we want them to be owners of the company and committed to our long-term success. We have conducted pay equity analyses for many years, and continue to be committed to pay equity. In 2022, we announced that our analyses indicate that we continue to have pay equity across genders globally and race in the United States for people in similar jobs, accounting for factors such as location, role, and level.

Through Life@ Meta, our holistic approach to benefits, we provide our employees and their dependents with resources to help them thrive. We offer a wide range of benefits across areas such as health, family, finance, community, and time away, including healthcare and wellness benefits, family building benefits, family care resources, retirement savings plans, access to tax and legal services, and Meta Resource Groups to build community at Meta.

### Corporate Information

We were incorporated in Delaware in July 2004. We completed our initial public offering in May 2012 and our Class A common stock is currently listed on the Nasdaq Global Select Market under the symbol "META." Our principal executive offices are located at 1601 Willow Road, Menlo Park, California 94025, and our telephone number is (650) 543-4800.

Meta, the Meta logo, Facebook, FB, Instagram, Oculus, WhatsApp, and our other registered or common law trademarks, service marks, or trade names appearing in this Annual Report on Form 10-K are the property of Meta Platforms, Inc. or its affiliates. Other trademarks, service marks, or trade names appearing in this Annual Report on Form 10-K are the property of their respective owners.

### Available Information

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (Exchange Act), are filed with the U.S. Securities and Exchange Commission (SEC). We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements, and other information with the SEC. Such reports and other information filed by us with the SEC are available free of charge on our website at investor.fb.com when such reports are available on the SEC's website. We use our investor.fb.com and about.fb.com/news/ websites as well as Mark Zuckerberg's Facebook Page (www.facebook.com/zuck) and Instagram account (www.instagram.com/zuck) as means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at www.sec.gov.

The contents of the websites referred to above are not incorporated into this filing. Further, our references to the URLs for these websites are intended to be inactive textual references only.

PX0435-014

Table of Contents

### Item 1A. Risk Factors

*Certain factors may have a material adverse effect on our business, financial condition, and results of operations. You should consider carefully the risks and uncertainties described below, in addition to other information contained in this Annual Report on Form 10-K, including our consolidated financial statements and related notes. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. If any of the following risks actually occurs, our business, financial condition, results of operations, and future prospects could be materially and adversely affected. In that event, the trading price of our Class A common stock could decline, and you could lose part or all of your investment.*

### Summary Risk Factors

Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, results of operations, cash flows, and prospects. These risks are discussed more fully below and include, but are not limited to, risks related to:

#### *Risks Related to Our Product Offerings*

- our ability to add and retain users and maintain levels of user engagement with our products;
- the loss of, or reduction in spending by, our marketers;
- reduced availability of data signals used by our ad targeting and measurement tools;
- ineffective operation with mobile operating systems or changes in our relationships with mobile operating system partners;
- failure of our new products, or changes to our existing products, to attract or retain users or generate revenue;

#### *Risks Related to Our Business Operations and Financial Results*

- our ability to compete effectively;
- fluctuations in our financial results;
- unfavorable media coverage and other risks affecting our ability to maintain and enhance our brands;
- the COVID-19 pandemic, including its impact on our advertising business;
- acquisitions and our ability to successfully integrate our acquisitions;
- our ability to build, maintain, and scale our technical infrastructure, and risks associated with disruptions in our service;
- operating our business in multiple countries around the world;
- litigation, including class action lawsuits;

#### *Risks Related to Government Regulation and Enforcement*

- government restrictions on access to Facebook or our other products, or other actions that impair our ability to sell advertising, in their countries;
- complex and evolving U.S. and foreign privacy, data use and data protection, content, competition, consumer protection, and other laws and regulations;

14

PX0435-015

Table of Contents

• the impact of government investigations, enforcement actions, and settlements, including litigation and investigations by privacy and competition authorities;

• our ability to comply with regulatory and legislative privacy requirements, including our consent order with the Federal Trade Commission (FTC);

*Risks Related to Data, Security, and Intellectual Property*

• the occurrence of security breaches, improper access to or disclosure of our data or user data, and other cyber incidents or undesirable activity on our platform;

• our ability to obtain, maintain, protect, and enforce our intellectual property rights; and

*Risks Related to Ownership of Our Class A Common Stock*

• limitations on the ability of holders of our Class A Common Stock to influence corporate matters due to the dual class structure of our common stock and the control of a majority of the voting power of our outstanding capital stock by our founder, Chairman, and CEO.

**Risks Related to Our Product Offerings**

***If we fail to retain existing users or add new users, or if our users decrease their level of engagement with our products, our revenue, financial results, and business may be significantly harmed.***

The size of our user base and our users' level of engagement across our products are critical to our success. Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products that deliver ad impressions, particularly for Facebook and Instagram. We have experienced, and expect to continue to experience, fluctuations and declines in the size of our active user base in one or more markets from time to time, particularly in markets where we have achieved higher penetration rates. User growth and engagement are also impacted by a number of other factors, including competitive products and services, such as TikTok, that have reduced some users' engagement with our products and services, as well as global and regional business, macroeconomic, and geopolitical conditions. For example, the COVID-19 pandemic has led to increases and decreases in the size and engagement of our active user base from period to period at different points during the pandemic, and may continue to have a varied impact on the size and engagement of our active user base in the future. In addition, in connection with the war in Ukraine, access to Facebook and Instagram was restricted in Russia and these services were then prohibited by the Russian government, which contributed to slight declines on a quarter-over-quarter basis in the number of DAUs and MAUs on Facebook in Europe in the first quarter and the second quarter of 2022, as well as a slight decline on a quarter-over-quarter basis in the total number of MAUs on Facebook in the second quarter of 2022. Any future declines in the size of our active user base may adversely impact our ability to deliver ad impressions and, in turn, our financial performance.

If people do not perceive our products to be useful, reliable, and trustworthy, we may not be able to attract or retain users or otherwise maintain or increase the frequency and duration of their engagement. A number of other social networking companies that achieved early popularity have since seen their active user bases or levels of engagement decline, in some cases precipitously. There is no guarantee that we will not experience a similar erosion of our active user base or engagement levels. Our user engagement patterns have changed over time, and user engagement can be difficult to measure, particularly as we introduce new and different products and services. Any number of factors can negatively affect user retention, growth, and engagement, including if:

• users increasingly engage with other competitive products or services;

• we fail to introduce new features, products, or services that users find engaging or if we introduce new products or services, or make changes to existing products and services, that are not favorably received;

• users feel that their experience is diminished as a result of the decisions we make with respect to the frequency, prominence, format, size, and quality of ads that we display;

15

PX0435-016

Table of Contents

- users have difficulty installing, updating, or otherwise accessing our products on mobile devices as a result of actions by us or third parties that we rely on to distribute our products and deliver our services;

- user behavior on any of our products changes, including decreases in the quality and frequency of content shared on our products and services;

- we are unable to continue to develop products for mobile devices that users find engaging, that work with a variety of mobile operating systems and networks, and that achieve a high level of market acceptance;

- there are decreases in user sentiment due to questions about the quality or usefulness of our products or our user data practices, concerns about the nature of content made available on our products, or concerns related to privacy, safety, security, well-being, or other factors;

- we are unable to manage and prioritize information to ensure users are presented with content that is appropriate, interesting, useful, and relevant to them;

- we are unable to obtain or attract engaging third-party content;

- we are unable to successfully maintain or grow usage of and engagement with applications that integrate with our products;

- users adopt new technologies where our products may be displaced in favor of other products or services, or may not be featured or otherwise available;

- there are changes mandated by legislation, government and regulatory authorities, or litigation that adversely affect our products or users;

- we are unable to offer a number of our most significant products and services, including Facebook and Instagram, in Europe, or are otherwise limited in our business operations, as a result of European regulators, courts, or legislative bodies determining that our reliance on Standard Contractual Clauses (SCCs) or other legal bases we rely upon to transfer user data from the European Union to the United States is invalid;

- there is decreased engagement with our products, or failure to accept our terms of service, as part of privacy-focused changes that we have implemented or may implement in the future, whether voluntarily, in connection with the General Data Protection Regulation (GDPR), the European Union's ePrivacy Directive, the California Privacy Rights Act (CPRA), or other laws, regulations, or regulatory actions, or otherwise;

- technical or other problems prevent us from delivering our products in a rapid and reliable manner or otherwise affect the user experience, such as security breaches or failure to prevent or limit spam or similar content, or users feel their experience is diminished as a result of our efforts to protect the security and integrity of our platform;

- we adopt terms, policies, or procedures related to areas such as sharing, content, user data, or advertising, or we take, or fail to take, actions to enforce our policies, that are perceived negatively by our users or the general public, including as a result of decisions or recommendations from the independent Oversight Board regarding content on our platform;

- we elect to focus our product decisions on longer-term initiatives that do not prioritize near-term user growth and engagement (for example, we have announced plans to focus product decisions on optimizing the young adult experience in the long term);

- we make changes in our user account login or registration processes or changes in how we promote different products and services across our family of products;

16

PX0435-017

Table of Contents

- initiatives designed to attract and retain users and engagement, including the use of new technologies such as artificial intelligence, are unsuccessful or discontinued, whether as a result of actions by us, our competitors, or other third parties, or otherwise;

- third-party initiatives that may enable greater use of our products, including low-cost or discounted data plans, are scaled back or discontinued, or the pricing of data plans otherwise increases;

- there is decreased engagement with our products as a result of taxes imposed on the use of social media or other mobile applications in certain countries, internet shutdowns, or other actions by governments that affect the accessibility of our products in their countries (for example, beginning in the first quarter of 2022, our user growth and engagement were adversely affected by the war in Ukraine and service restrictions imposed by the Russian government);

- we fail to provide adequate customer service to users, marketers, developers, or other partners;

- we, developers whose products are integrated with our products, or other partners and companies in our industry are the subject of adverse media reports or other negative publicity, including as a result of our or their user data practices; or

- our current or future products, such as our development tools and application programming interfaces that enable developers to build, grow, and monetize applications, reduce user activity on our products by making it easier for our users to interact and share on third-party applications.

From time to time, certain of these factors have negatively affected user retention, growth, and engagement to varying degrees. If we are unable to maintain or increase our user base and user engagement, particularly for our significant revenue-generating products like Facebook and Instagram, our revenue and financial results may be adversely affected. Any significant decrease in user retention, growth, or engagement could render our products less attractive to users, marketers, and developers, which is likely to have a material and adverse impact on our ability to deliver ad impressions and, accordingly, our revenue, business, financial condition, and results of operations. As the size of our active user base fluctuates in one or more markets from time to time, we will become increasingly dependent on our ability to maintain or increase levels of user engagement and monetization in order to grow revenue.

***We generate substantially all of our revenue from advertising. The loss of marketers, or reduction in spending by marketers, could seriously harm our business.***

Substantially all of our revenue is currently generated from marketers advertising on Facebook and Instagram. As is common in the industry, our marketers do not have long-term advertising commitments with us. Many of our marketers spend only a relatively small portion of their overall advertising budget with us. Marketers will not continue to do business with us, or they will reduce the budgets they are willing to commit to us, if we do not deliver ads in an effective manner, if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives, or if they are not satisfied for any other reason. We have implemented, and we will continue to implement, changes to our user data practices. Some of these changes reduce our ability to effectively target ads, which has to some extent adversely affected, and will continue to adversely affect, our advertising business. If we are unable to provide marketers with a suitable return on investment, the demand for our ads may not increase, or may decline, in which case our revenue and financial results may be harmed.

Our advertising revenue can also be adversely affected by a number of other factors, including:

- decreases in user engagement, including time spent on our products;

- our inability to continue to increase user access to and engagement with our products;

- product changes or inventory management decisions we may make that change the size, format, frequency, or relative prominence of ads displayed on our products or of other unpaid content shared by marketers on our products;

17

PX0435-018

Table of Contents

- our inability to maintain or increase marketer demand, the pricing of our ads, or both;

- our inability to maintain or increase the quantity or quality of ads shown to users;

- changes to the content or application of third-party policies that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;

- adverse litigation, government actions, or legislative, regulatory, or other legal developments relating to advertising, including developments that may impact our ability to deliver, target, or measure the effectiveness of advertising;

- user behavior or product changes that may reduce traffic to features or products that we successfully monetize, such as our feed and Stories products, including as a result of increased usage of our Reels or other video or messaging products;

- reductions of advertising by marketers due to our efforts to implement or enforce advertising policies that protect the security and integrity of our platform;

- the availability, accuracy, utility, and security of analytics and measurement solutions offered by us or third parties that demonstrate the value of our ads to marketers, or our ability to further improve such tools;

- loss of advertising market share to our competitors, including if prices to purchase our ads increase or if competitors offer lower priced, more integrated, or otherwise more effective products;

- limitations on our ability to offer a number of our most significant products and services, including Facebook and Instagram, in Europe as a result of European regulators, courts, or legislative bodies determining that our reliance on SCCs or other legal bases we rely upon to transfer user data from the European Union to the United States is invalid;

- changes in our marketing and sales or other operations that we are required to or elect to make as a result of risks related to complying with foreign laws or regulatory requirements or other government actions;

- decisions by marketers to reduce their advertising as a result of announcements by us or adverse media reports or other negative publicity involving us, our user data practices, our advertising metrics or tools, content on our products, our interpretation, implementation, or enforcement of policies relating to content on our products (including as a result of decisions or recommendations from the independent Oversight Board), developers with applications that are integrated with our products, or other companies in our industry;

- reductions of advertising by marketers due to objectionable content made available on our products by third parties, questions about our user data practices or the security of our platform, concerns about brand safety or potential legal liability, or uncertainty regarding their own legal and compliance obligations;

- the effectiveness of our ad targeting or degree to which users opt in or out of the use of data for ads, including as a result of product changes and controls that we have implemented or may implement in the future in connection with the GDPR, ePrivacy Directive, California Privacy Rights Act (CPRA), the Digital Markets Act (DMA), other laws, regulations, regulatory actions, or litigation, or otherwise, that impact our ability to use data for advertising purposes;

- the degree to which users cease or reduce the number of times they engage with our ads;

- changes in the way advertising on mobile devices or on personal computers is measured or priced;

- the success of technologies designed to block the display of ads or ad measurement tools;

- changes in the composition of our marketer base or our inability to maintain or grow our marketer base; and

18

Table of Contents

- the impact of macroeconomic and geopolitical conditions, whether in the advertising industry in general, or among specific types of marketers or within particular geographies (for example, the war in Ukraine and service restrictions imposed by the Russian government have adversely affected our advertising business in Europe and other regions).

From time to time, certain of these factors have adversely affected our advertising revenue to varying degrees. The occurrence of any of these or other factors in the future could result in a reduction in demand for our ads, which may reduce the prices we receive for our ads, or cause marketers to stop advertising with us altogether, either of which would negatively affect our revenue and financial results.

*Our ad targeting and measurement tools incorporate data signals from user activity on websites and services that we do not control, as well as signals generated within our products, and changes to the regulatory environment, third-party mobile operating systems and browsers, and our own products have impacted, and we expect will continue to impact, the availability of such signals, which will adversely affect our advertising revenue.*

Our ad targeting and measurement tools rely on data signals from user activity on websites and services that we do not control, as well as signals generated within our products, in order to deliver relevant and effective ads to our users, and any changes in our ability to use such signals will adversely affect our business. For example, legislative and regulatory developments, such as the GDPR, ePrivacy Directive, and California Consumer Privacy Act (CCPA), as amended by the CPRA, have impacted, and we expect will continue to impact, our ability to use such signals in our ad products. In particular, we have seen increases in the number of users opting to control certain types of ad targeting in Europe following product changes implemented in connection with our GDPR and ePrivacy Directive compliance, and we have introduced product changes that limit data signal use for certain users in California following adoption of the CCPA. Regulatory guidance, decisions, or new legislation in these or other jurisdictions, such as the DMA, may require us to make additional changes to our products in the future that further reduce our ability to use these signals, which has occurred in the past. For example, we expect to implement additional changes in response to the December 2022 decision by the IDPC regarding the legal basis for our delivery of behavioral advertising in Europe.

In addition, mobile operating system and browser providers, such as Apple and Google, have implemented product changes and/or announced future plans to limit the ability of websites and application developers to collect and use these signals to target and measure advertising. For example, in 2021, Apple made certain changes to its products and data use policies in connection with changes to its iOS operating system that reduce our and other iOS developers' ability to target and measure advertising, which has negatively impacted, and we expect will continue to negatively impact, the size of the budgets marketers are willing to commit to us and other advertising platforms. In addition, we have implemented, and may continue to implement, product changes that give users the ability to limit our use of such data signals to improve ads and other experiences on our products and services, including changes implemented in connection with the GDPR and other regulatory frameworks.

These developments have limited our ability to target and measure the effectiveness of ads on our platform and negatively impacted our advertising revenue. For example, our advertising revenue has been negatively impacted by marketer reaction to targeting and measurement challenges associated with iOS changes beginning in 2021. If we are unable to mitigate these developments as they take further effect in the future, our targeting and measurement capabilities will be materially and adversely affected, which would in turn significantly impact our advertising revenue.

*Our user growth, engagement, and monetization on mobile devices depend upon effective operation with mobile operating systems, networks, technologies, products, and standards that we do not control.*

The substantial majority of our revenue is generated from advertising on mobile devices. There is no guarantee that popular mobile devices will continue to feature our products, or that mobile device users will continue to use our products rather than competing products. We are dependent on the interoperability of our products with popular mobile operating systems, networks, technologies, products, and standards that we do not control, such as the Android and iOS operating systems and mobile browsers. Changes, bugs, or technical issues in such systems, or changes in our relationships with mobile operating system partners, handset manufacturers, browser developers, or mobile carriers, or in the content or application of their terms of service or policies (which they have made in the past and continue to seek to implement) that degrade our products' functionality, reduce or eliminate our ability to update or distribute our products, give preferential treatment to competitive products, limit our ability to deliver, target, or measure the effectiveness of ads, or charge fees related to the distribution of our products or our delivery of ads have in the past adversely affected, and could in the future adversely affect,

19

Table of Contents

the usage of our products and monetization on mobile devices. For example, Apple previously released an update to its Safari browser that limits the use of third-party cookies, which reduces our ability to provide the most relevant ads to our users and impacts monetization, and also released changes to iOS that limit our ability to target and measure ads effectively, while expanding their own advertising business. We expect that any similar changes to its, Google's, or other browser or mobile platforms will further limit our ability to target and measure the effectiveness of ads and impact monetization. Additionally, in order to deliver high quality mobile products, it is important that our products work well with a range of mobile technologies, products, systems, networks, and standards that we do not control, and that we have good relationships with handset manufacturers, mobile carriers, and browser developers. We may not be successful in maintaining or developing relationships with key participants in the mobile ecosystem or in developing products that operate effectively with these technologies, products, systems, networks, or standards. In the event that it is more difficult for our users to access and use our products on their mobile devices, or if our users choose not to access or use our products on their mobile devices or use mobile products that do not offer access to our products, our user growth and user engagement could be harmed. From time to time, we may also take actions regarding the distribution of our products or the operation of our business based on what we believe to be in our long-term best interests. Such actions may adversely affect our users and our relationships with the operators of mobile operating systems, handset manufacturers, mobile carriers, browser developers, other business partners, or advertisers, and there is no assurance that these actions will result in the anticipated long-term benefits. In the event that our users are adversely affected by these actions or if our relationships with such third parties deteriorate, our user growth, engagement, and monetization could be adversely affected and our business could be harmed. We have in the past experienced challenges in operating with mobile operating systems, networks, technologies, products, and standards that we do not control, and any such occurrences in the future may negatively impact our user growth, engagement, and monetization on mobile devices, which may in turn materially and adversely affect our business and financial results.

***Our new products and changes to existing products could fail to attract or retain users or generate revenue and profits, or otherwise adversely affect our business.***

Our ability to retain, increase, and engage our user base and to increase our revenue depends heavily on our ability to continue to evolve our existing products and to create successful new products, both independently and in conjunction with developers or other third parties. We may introduce significant changes to our existing products or acquire or introduce new and unproven products, including using technologies with which we have little or no prior development or operating experience. For example, we do not have significant experience with consumer hardware products or virtual or augmented reality technology, which may adversely affect our ability to successfully develop and market these products and technologies. We continue to incur substantial costs, and we may not be successful in generating profits, in connection with these efforts. We are also making significant investments in artificial intelligence (AI) initiatives, including to recommend relevant unconnected content across our products, enhance our advertising tools, and develop new product features using generative AI. These efforts, including the introduction of new products or changes to existing products, may result in new or enhanced governmental or regulatory scrutiny, litigation, ethical concerns, or other complications that could adversely affect our business, reputation, or financial results. We have also invested, and expect to continue to invest, significant resources in growing our messaging products to support increasing usage of such products. We have historically monetized messaging in only a limited fashion, and we may not be successful in our efforts to generate meaningful revenue or profits from messaging over the long term. In addition, we are moving forward with plans to implement end-to-end encryption across our messaging services, as well as facilitate cross-app communication between these platforms, which are subject to governmental and regulatory scrutiny in multiple jurisdictions. If our new products or changes to existing products fail to engage users, marketers, or developers, or if our business plans are unsuccessful, we may fail to attract or retain users or to generate sufficient revenue, operating margin, or other value to justify our investments, and our business may be adversely affected.

***We make product and investment decisions that may not prioritize short-term financial results and may not produce the long-term benefits that we expect.***

We frequently make product and investment decisions that may not prioritize short-term financial results if we believe that the decisions are consistent with our mission and benefit the aggregate user experience and will thereby improve our financial performance over the long term. For example, we have implemented, and we will continue to implement, changes to our user data practices. Some of these changes reduce our ability to effectively target ads, which has to some extent adversely affected, and will continue to adversely affect, our advertising business. For example, our Off-Facebook Activity tool enables users to place limits on our storage and use of information about their interactions with advertisers' apps and websites, which reduces our ability to deliver the most relevant and effective ads to our users. Similarly, from time to time we update our feed display and ranking algorithms or other product features to optimize the user experience, and these changes have had, and

20

Table of Contents

may in the future have, the effect of reducing time spent and some measures of user engagement with our products, which could adversely affect our financial results. From time to time, we also change the size, frequency, or relative prominence of ads as part of our product and monetization strategies. In addition, we have made, and we expect to continue to make, other changes to our products which may adversely affect the distribution of content of publishers, marketers, and developers, and could reduce their incentive to invest in their efforts on our products. We also may introduce new features or other changes to existing products, or introduce new stand-alone products, that attract users away from properties, formats, or use cases where we have more proven means of monetization, such as our feed products. In addition, as we focus on growing users and engagement across our family of products, from time to time these efforts have reduced, and may in the future reduce, engagement with one or more products and services in favor of other products or services that we monetize less successfully or that are not growing as quickly. For example, we plan to continue to promote Reels, which we do not currently monetize at the same rate as our feed or Stories products. These decisions may adversely affect our business and results of operations and may not produce the long-term benefits that we expect.

***We may not be successful in our metaverse strategy and investments, which could adversely affect our business, reputation, or financial results.***

We believe the metaverse, an embodied internet where people have immersive experiences beyond two-dimensional screens, is the next evolution in social technology. In 2021, we announced a shift in our business and product strategy to focus on helping to bring the metaverse to life. We expect this will be a complex, evolving, and long-term initiative that will involve the development of new and emerging technologies, continued investment in infrastructure as well as privacy, safety, and security efforts, and collaboration with other companies, developers, partners, and other participants. However, the metaverse may not develop in accordance with our expectations, and market acceptance of features, products, or services we build for the metaverse is uncertain. We regularly evaluate our product roadmaps and make significant changes as our understanding of the technological challenges and market landscape and our product ideas and designs evolve. In addition, we have limited experience with consumer hardware products and virtual and augmented reality technology, which may enable other companies to compete more effectively than us. We may be unsuccessful in our research and product development efforts, including if we are unable to develop relationships with key participants in the metaverse or develop products that operate effectively with metaverse technologies, products, systems, networks, or standards. Our metaverse efforts may also divert resources and management attention from other areas of our business. We expect to continue to make significant investments in virtual and augmented reality and other technologies to support these efforts, and our ability to support these efforts is dependent on generating sufficient profits from other areas of our business. In addition, as our metaverse efforts evolve, we may be subject to a variety of existing or new laws and regulations in the United States and international jurisdictions, including in the areas of privacy, safety, competition, content regulation, consumer protection, and e-commerce, which may delay or impede the development of our products and services, increase our operating costs, require significant management time and attention, or otherwise harm our business. As a result of these or other factors, our metaverse strategy and investments may not be successful in the foreseeable future, or at all, which could adversely affect our business, reputation, or financial results.

***If we are not able to maintain and enhance our brands, our ability to expand our base of users, marketers, and developers may be impaired, and our business and financial results may be harmed.***

We believe that our brands have significantly contributed to the success of our business. We also believe that maintaining and enhancing our brands is critical to expanding our base of users, marketers, and developers. Many of our new users are referred by existing users. Maintaining and enhancing our brands will depend largely on our ability to continue to provide useful, reliable, trustworthy, and innovative products, which we may not do successfully. We may introduce new products or terms of service or policies that users do not like, which may negatively affect our brands. Additionally, the actions of our developers or advertisers may affect our brands if users do not have a positive experience using third-party applications integrated with our products or interacting with parties that advertise through our products. We will also continue to experience media, legislative, or regulatory scrutiny of our actions or decisions regarding user privacy, data use, encryption, content, product design, algorithms, advertising, competition, and other issues, including actions or decisions in connection with elections, the COVID-19 pandemic, or geopolitical events, which has in the past adversely affected, and may in the future adversely affect, our reputation and brands. For example, beginning in September 2021, we became the subject of media, legislative, and regulatory scrutiny as a result of a former employee's allegations and release of internal company documents relating to, among other things, our algorithms, advertising and user metrics, and content enforcement practices, as well as misinformation and other undesirable activity on our platform, and user well-being. In addition, in March 2018, we announced developments regarding the misuse of certain data by a developer that shared such data with third parties in

21

PX0435-022

Table of Contents

violation of our terms and policies. We also may fail to respond expeditiously or appropriately to the sharing of objectionable content on our services or objectionable practices by advertisers or developers, or to otherwise enforce our policies or address user concerns, which has occurred in the past and which could erode confidence in our brands. Our brands may also be negatively affected by the actions of users that are deemed to be hostile or inappropriate to other users, by the actions of users acting under false or inauthentic identities, by the use of our products or services to disseminate information that is deemed to be misleading (or intended to manipulate opinions), by perceived or actual efforts by governments to obtain access to user information for security-related purposes or to censor certain content on our platform, by the use of our products or services for illicit or objectionable ends, including, for example, any such actions around the pandemic, geopolitical events, or elections in the United States and around the world, by decisions or recommendations regarding content on our platform from the independent Oversight Board, by research or media reports concerning the perceived or actual impacts of our products or services on user well-being, or by our decisions regarding whether to remove content or suspend participation on our platform by persons who violate our community standards or terms of service. Maintaining and enhancing our brands will require us to make substantial investments and these investments may not be successful. Certain of our actions, such as the foregoing matter regarding developer misuse of data and concerns around our handling of political speech and advertising, hate speech, and other content, as well as user well-being issues, have eroded confidence in our brands and may continue to do so in the future. If we fail to successfully promote and maintain our brands or if we incur excessive expenses in this effort, our business and financial results may be adversely affected.

***We may not be able to continue to successfully maintain or grow usage of and engagement with applications that integrate with our products.***

We have made and are continuing to make investments to enable developers to build, grow, and monetize applications that integrate with our products. Such existing and prospective developers may not be successful in building, growing, or monetizing applications that create and maintain user engagement. Additionally, developers may choose to build on other platforms, including platforms controlled by third parties, rather than building products that integrate with our products. We are continuously seeking to balance the distribution objectives of our developers with our desire to provide an optimal user experience, and we may not be successful in achieving a balance that continues to attract and retain such developers. For example, from time to time, we have taken actions to reduce the volume of communications from these developers to users on our products with the objective of enhancing the user experience, and such actions have reduced distribution from, user engagement with, and our monetization opportunities from, applications integrated with our products. In addition, as part of our efforts related to privacy, safety, and security, we conduct investigations and audits of platform applications from time to time, and we also have announced several product changes that restrict developer access to certain user data. In some instances, these actions, as well as other actions to enforce our policies applicable to developers, have adversely affected, or will adversely affect, our relationships with developers. If we are not successful in our efforts to maintain or grow the number of developers that choose to build products that integrate with our products or if we are unable to continue to build and maintain good relations with such developers, our user growth and user engagement and our financial results may be adversely affected.

### Risks Related to Our Business Operations and Financial Results

***Our business is highly competitive. Competition presents an ongoing threat to the success of our business.***

We compete with companies providing connection, sharing, discovery, and communication products and services to users online, as well as companies that sell advertising to businesses looking to reach consumers and/or develop tools and systems for managing and optimizing advertising campaigns. We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to create, share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences. We compete to attract, engage, and retain people who use our products, to attract and retain businesses that use our free or paid business and advertising services, and to attract and retain developers who build compelling applications that integrate with our products. We also compete with companies that develop and deliver consumer hardware and virtual and augmented reality products and services. As we introduce or acquire new products, as our existing products evolve, or as other companies introduce new products and services, including as part of efforts to develop the metaverse or innovate through the application of new technologies such as artificial intelligence, we may become subject to additional competition.

22

PX0435-023

Table of Contents

Some of our current and potential competitors may have greater resources, experience, or stronger competitive positions in certain product segments, geographic regions, or user demographics than we do. For example, some of our competitors may be domiciled in different countries and subject to political, legal, and regulatory regimes that enable them to compete more effectively than us. These factors may allow our competitors to respond more effectively than us to new or emerging technologies and changes in market conditions. We believe that some users, particularly younger users, are aware of and actively engaging with other products and services similar to, or as a substitute for, our products and services, and we believe that some users have reduced their use of and engagement with our products and services in favor of these other products and services. In the event that users increasingly engage with other products and services, we may experience a decline in use and engagement in key user demographics or more broadly, in which case our business would likely be harmed.

Our competitors may develop products, features, or services that are similar to ours or that achieve greater acceptance, may undertake more far-reaching and successful product development efforts or marketing campaigns, or may adopt more aggressive pricing policies. Some competitors may gain a competitive advantage against us in areas where we operate, including: by making acquisitions; by limiting our ability to deliver, target, or measure the effectiveness of ads; by imposing fees or other charges related to our delivery of ads; by making access to our products more difficult or impossible; by making it more difficult to communicate with our users; or by integrating competing platforms, applications, or features into products they control such as mobile device operating systems, search engines, browsers, or e-commerce platforms. For example, each of Apple and Google have integrated competitive products with iOS and Android, respectively. In addition, Apple has released changes to iOS that limit our ability, and the ability of others in the digital advertising industry, to target and measure ads effectively. As a result, our competitors may, and in some cases will, acquire and engage users or generate advertising or other revenue at the expense of our own efforts, which would negatively affect our business and financial results. In addition, from time to time, we may take actions in response to competitive threats, but we cannot assure you that these actions will be successful or that they will not negatively affect our business and financial results.

We believe that our ability to compete effectively depends upon many factors both within and beyond our control, including:

- the popularity, usefulness, ease of use, performance, and reliability of our products compared to our competitors' products;

- the size and composition of our user base;

- the engagement of users with our products and competing products;

- our ability to attract and retain businesses who use our free or paid business and advertising services;

- the timing and market acceptance of products, including developments and enhancements to our or our competitors' products;

- our safety and security efforts and our ability to protect user data and to provide users with control over their data;

- our ability to distribute our products to new and existing users;

- our ability to monetize our products;

- the frequency, size, format, quality, and relative prominence of the ads displayed by us or our competitors;

- customer service and support efforts;

- marketing and selling efforts, including our ability to measure the effectiveness of our ads and to provide marketers with a compelling return on their investments;

- our ability to establish and maintain developers' interest in building applications that integrate with our products;

- our ability to establish and maintain publisher interest in integrating their content with our products;

23

PX0435-024

Table of Contents

- changes mandated by legislation, regulatory authorities, or litigation, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry, which may result in more formidable competitors;

- our ability to attract, retain, and motivate talented employees, particularly software engineers, designers, and product managers;

- our ability to cost-effectively manage and grow our operations; and

- our reputation and brand strength relative to those of our competitors.

If we are not able to compete effectively, our user base, level of user engagement, and ability to deliver ad impressions may decrease, we may become less attractive to developers and marketers, and our revenue and results of operations may be materially and adversely affected.

***Our financial results will fluctuate from quarter to quarter and are difficult to predict.***

Our quarterly financial results have fluctuated in the past and will fluctuate in the future. Additionally, we have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results. As a result, you should not rely upon our past quarterly financial results as indicators of future performance. You should take into account the risks and uncertainties frequently encountered by companies in rapidly evolving markets. Our financial results in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including:

- our ability to maintain and grow our user base and user engagement, particularly for our products that deliver ad impressions;

- our ability to attract and retain marketers in a particular period;

- our ability to recognize revenue or collect payments from marketers in a particular period;

- fluctuations in spending by our marketers due to seasonality, such as historically strong spending in the fourth quarter of each year, episodic regional or global events, including the COVID-19 pandemic, or other factors;

- the frequency, prominence, size, format, and quality of ads shown to users;

- the success of technologies designed to block the display of ads;

- changes to the content or application of third-party policies that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;

- the pricing of our ads and other products;

- the diversification and growth of revenue sources beyond advertising on Facebook and Instagram;

- our ability to generate revenue from Payments, or the sale of our consumer hardware products or other products we may introduce in the future;

- changes to existing products or services or the development and introduction of new products or services by us or our competitors;

- user behavior or product changes that may reduce traffic to features or products that we successfully monetize;

24

PX0435-025

Table of Contents

- increases in marketing, sales, and other operating expenses that we will incur to grow and expand our operations and to remain competitive, including costs related to our data centers and technical infrastructure;

- costs related to our privacy, safety, security, and content review efforts, including as a result of implementing changes to our practices, whether voluntarily, in connection with laws, regulations, regulatory actions, or decisions or recommendations from the independent Oversight Board, or otherwise;

- costs and expenses related to the development, manufacturing, and delivery of our consumer hardware products;

- our ability to maintain gross margins and operating margins;

- costs related to acquisitions, including costs associated with amortization and additional investments to develop the acquired technologies;

- charges associated with impairment or abandonment of any assets on our balance sheet, including as a result of changes to our real property lease arrangements and data center assets;

- our ability to obtain equipment, components, and labor for our data centers and other technical infrastructure in a timely and cost-effective manner;

- system failures or outages or government blocking that prevent us from serving ads for any period of time;

- breaches of security or privacy, and the costs associated with any such breaches and remediation;

- changes in the manner in which we distribute our products or inaccessibility of our products due to third-party actions;

- fees paid to third parties for content or the distribution of our products;

- refunds or other concessions provided to advertisers;

- share-based compensation expense, including acquisition-related expense;

- adverse litigation judgments, settlements, or other litigation-related costs;

- changes in the legislative or regulatory environment, including with respect to privacy, data protection, and content, or actions by governments or regulators, including fines, orders, or consent decrees;

- the overall tax rate for our business, which is affected by the mix of income we earn in the U.S. and in jurisdictions with different tax rates, the effects of share-based compensation, the effects of integrating intellectual property from acquisitions, the effects of changes in our business or structure, and the effects of discrete items such as legal and tax settlements and tax elections;

- the impact of changes in tax laws or judicial or regulatory interpretations of tax laws, which are recorded in the period such laws are enacted or interpretations are issued, and may significantly affect the effective tax rate of that period;

- tax obligations that may arise from resolutions of tax examinations, including the examination we are currently under by the Internal Revenue Service (IRS), that materially differ from the amounts we have anticipated;

- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;

- trading activity in our share repurchase program;

25

PX0435-026

Table of Contents

- fluctuations in the market values of our investments in marketable securities, in the valuation of our non-marketable equity securities, and in interest rates;

- the incurrence of indebtedness or our ability to refinance existing indebtedness on acceptable terms;

- changes in U.S. generally accepted accounting principles; and

- changes in regional or global business, macroeconomic, or geopolitical conditions, including as a result of the COVID-19 pandemic, which may impact the other factors described above.

***Unfavorable media coverage negatively affects our business from time to time.***

We receive a high degree of media coverage around the world. Unfavorable publicity regarding, for example, our privacy practices, advertising policies, product decisions, product quality, litigation or regulatory activity, government surveillance, the actions of our advertisers, the actions of our developers whose products are integrated with our products, the use of our products or services for illicit or objectionable ends, the substance or enforcement of our community standards, terms of service, or other policies, the actions of our users, the quality and integrity of content shared on our platform, the perceived or actual impacts of our products or services on user well-being, or the actions of other companies that provide similar services to ours, has in the past, and could in the future, adversely affect our reputation. For example, we have been the subject of significant media coverage involving concerns around our handling of political speech and advertising, hate speech, and other content, as well as user well-being issues, and we continue to receive negative publicity related to these topics. Beginning in September 2021, we became the subject of significant media coverage as a result of allegations and the release of internal company documents by a former employee. In addition, we have been, and may in the future be, subject to negative publicity in connection with our handling of misinformation and other illicit or objectionable use of our products or services, including in connection with the COVID-19 pandemic, geopolitical events, and elections in the United States and around the world. Any such negative publicity could have an adverse effect on the size, engagement, and loyalty of our user base and marketer demand for advertising on our products, which could result in decreased revenue and adversely affect our business and financial results, and we have experienced such adverse effects to varying degrees from time to time.

***The COVID-19 pandemic has previously had, and may in the future have, a significant adverse impact on our advertising revenue and also exposes our business to other risks.***

We are subject to public health crises such as the COVID-19 pandemic, which has previously significantly impacted, and may in the future impact, our business and results of operations. For example, the COVID-19 pandemic resulted in authorities implementing numerous preventative measures from time to time to contain or mitigate the outbreak of the virus, such as travel bans and restrictions, limitations on business activity, quarantines, and shelter-in-place orders, which have previously caused, and may in the future cause, business slowdowns or shutdowns in certain affected countries and regions. These developments led to volatility in the demand for and pricing of our advertising services at various points throughout the pandemic, and we may experience similar effects in the future. In addition to the impact on our advertising business, the pandemic exposes our business, operations, and workforce to a variety of other risks, including:

- volatility in the size of our user base and user engagement, particularly for our messaging products, whether as a result of shelter-in-place measures or other factors;

- delays in product development or releases, or reductions in manufacturing production and sales of consumer hardware, as a result of inventory shortages, supply chain or labor shortages;

- increased misuse of our products and services or user data by third parties, including improper advertising practices or other activity inconsistent with our terms, contracts, or policies, misinformation or other illicit or objectionable material on our platforms, election interference, or other undesirable activity;

- significant volatility and disruption of global financial markets, which could cause fluctuations in currency exchange rates or negatively impact our ability to access capital in the future;

- illnesses to key employees, or a significant portion of our workforce, which may result in inefficiencies, delays, and disruptions in our business; and

26

PX0435-027

Table of Contents

• increased volatility and uncertainty in the financial projections we use as the basis for estimates used in our financial statements.

Any of these developments may adversely affect our business, harm our reputation, or result in legal or regulatory actions against us.

*Our costs are continuing to grow, and some of our investments, particularly our investments in virtual and augmented reality, have the effect of reducing our operating margin and profitability. If our investments are not successful longer-term, our business and financial performance will be harmed.*

Operating our business is costly, and we expect our expenses to continue to increase in the future as we broaden our user base, as users increase the amount and types of content they consume and the data they share with us, for example with respect to video, as we develop and implement new products, as we market new and existing products and promote our brands, as we continue to expand our technical infrastructure, as we continue to invest in new and emerging technologies, including artificial intelligence and machine learning, and as we continue our efforts to focus on privacy, safety, security, and content review. We have recently undertaken cost reduction measures in light of a more challenging operating environment, which may adversely affect these or other business initiatives, and some of these measures have involved, and may in the future involve, up-front charges and outlays of cash to reduce certain longer-term expenses. In addition, from time to time we are subject to settlements, judgments, fines, or other monetary penalties in connection with legal and regulatory developments that may be material to our business. We are also continuing to increase our investments in new platforms and technologies, including as part of our efforts related to building the metaverse. Some of these investments, particularly our significant investments in virtual and augmented reality, have generated only limited revenue and reduced our operating margin and profitability, and we expect the adverse financial impact of such investments to continue for the foreseeable future. For example, our investments in Reality Labs reduced our 2022 overall operating profit by approximately $13.72 billion, and we expect our investments to increase in the future. If our investments are not successful longer-term, our business and financial performance will be harmed.

*We plan to continue to make acquisitions and pursue other strategic transactions, which could impact our financial condition or results of operations and may adversely affect the price of our common stock.*

As part of our business strategy, we have made and intend to continue to make acquisitions to add specialized employees and complementary companies, products, or technologies, and from time to time may enter into other strategic transactions such as investments and joint ventures. We may not be able to find suitable acquisition candidates, and we may not be able to complete acquisitions or other strategic transactions on favorable terms, or at all, including as a result of regulatory challenges. For example, in 2022, the United Kingdom Competition and Markets Authority directed us to divest our Giphy acquisition. In addition, in 2022, the FTC filed lawsuits against us to enjoin our proposed acquisition of Within Unlimited. In some cases, the costs of such acquisitions or other strategic transactions may be substantial, and there is no assurance that we will realize expected synergies and potential monetization opportunities for our acquisitions or a favorable return on investment for our strategic investments.

We may pay substantial amounts of cash or incur debt to pay for acquisitions or other strategic transactions, which has occurred in the past and could adversely affect our liquidity. The incurrence of indebtedness also results in increased fixed obligations and increased interest expense, and could also include covenants or other restrictions that would impede our ability to manage our operations. We may also issue equity securities to pay for acquisitions and we regularly grant RSUs to retain the employees of acquired companies, which could increase our expenses, adversely affect our financial results, and result in dilution to our stockholders. In addition, any acquisitions or other strategic transactions we announce could be viewed negatively by users, marketers, developers, or investors, which may adversely affect our business or the price of our Class A common stock.

We may also discover liabilities, deficiencies, or other claims associated with the companies or assets we acquire that were not identified in advance, which may result in significant unanticipated costs. The effectiveness of our due diligence review and our ability to evaluate the results of such due diligence are dependent upon the accuracy and completeness of statements and disclosures made or actions taken by the companies we acquire or their representatives, as well as the limited amount of time in which acquisitions are executed. In addition, we may fail to accurately forecast the financial impact of an acquisition or other strategic transaction, including tax and accounting charges. Acquisitions or other strategic transactions

27

PX0435-028

Table of Contents

may also result in our recording of significant additional expenses to our results of operations and recording of substantial finite-lived intangible assets on our balance sheet upon closing. Any of these factors may adversely affect our financial condition or results of operations.

**We may not be able to successfully integrate our acquisitions, and we incur significant costs to integrate and support the companies we acquire.**

The integration of acquisitions requires significant time and resources, particularly with respect to companies that have significant operations or that develop products where we do not have prior experience, and we may not manage these processes successfully. We continue to make substantial investments of resources to support our acquisitions, which has in the past resulted, and we expect will in the future result, in significant ongoing operating expenses and the diversion of resources and management attention from other areas of our business. We cannot assure you that these investments will be successful. If we fail to successfully integrate the companies we acquire, we may not realize the benefits expected from the transaction and our business may be harmed.

**Our business is dependent on our ability to maintain and scale our technical infrastructure, and any significant disruption in our service could damage our reputation, result in a potential loss of users and engagement, and adversely affect our financial results.**

Our reputation and ability to attract, retain, and serve our users is dependent upon the reliable performance of our products and our underlying technical infrastructure. We have in the past experienced, and may in the future experience, interruptions in the availability or performance of our products from time to time. Our systems may not be adequately designed or may not operate with the reliability and redundancy necessary to avoid performance delays or outages that could be harmful to our business. If our products are unavailable when users attempt to access them, or if they do not load as quickly as expected, users may not use our products as often in the future, or at all, and our ability to serve ads may be disrupted, any of which could adversely affect our business and financial performance. We have experienced such issues to varying degrees from time to time. For example, in October 2021, a combination of an error and a bug resulted in an approximately six-hour outage of our services. In addition, as the amount and types of information shared on our products continue to grow and evolve, as the usage patterns of our global community continue to evolve, and as our internal operational demands continue to grow, we will need an increasing amount of technical infrastructure, including network capacity and computing power, to continue to satisfy our needs. It is possible that we may fail to continue to effectively scale and grow our technical infrastructure to accommodate these increased demands, which may adversely affect our user engagement and advertising revenue. In addition, our business may be subject to interruptions, delays, or failures resulting from earthquakes, adverse weather conditions, other natural disasters, power loss, terrorism, geopolitical conflict, other physical security threats, cyber-attacks, or other catastrophic events. Global climate change could result in certain types of natural disasters occurring more frequently or with more intense effects. Any such events may result in users being subject to service disruptions or outages and we may not be able to recover our technical infrastructure and user data in a timely manner to restart or provide our services, which may adversely affect our financial results. We also have been, and may in the future be, subject to increased energy and/or other costs to maintain the availability or performance of our products in connection with any such events.

A substantial portion of our network infrastructure is provided by third parties. Any disruption or failure in the services we receive from these providers could harm our ability to handle existing or increased traffic and could significantly harm our business. Any financial or other difficulties these providers face may adversely affect our business, and we exercise little control over these providers, which increases our vulnerability to problems with the services they provide. Due to the effects of the COVID-19 pandemic, we have experienced, and expect to continue to experience, supply and labor shortages and other disruptions in logistics and the supply chain for our technical infrastructure. As a result, we have had to make certain changes to our procurement practices, and in the future we may not be able to procure sufficient components, equipment, or services from third parties to satisfy our needs, or we may be required to procure such components, equipment, or services on unfavorable terms.

Any of these developments may result in interruptions in the availability or performance of our products, require unfavorable changes to existing products, delay the introduction of future products, or otherwise adversely affect our business and financial results.

28

PX0435-029

Table of Contents

***We could experience unforeseen difficulties in building and operating key portions of our technical infrastructure.***

We have designed and built our own data centers and key portions of our technical infrastructure through which we serve our products, and we plan to continue to significantly expand the size of our infrastructure primarily through data centers, subsea and terrestrial fiber optic cable systems, and other projects. The infrastructure expansion we are undertaking is complex and involves projects in multiple locations around the world, including in emerging markets that expose us to increased risks relating to anti-corruption compliance and political challenges, among others. We have in the past suspended, and may in the future suspend, certain of these projects as a result of the COVID-19 pandemic or other factors. Additional unanticipated delays or disruptions in the completion of these projects, including due to any shortage of labor necessary in building portions of such projects, or availability of components, challenges in obtaining required government or regulatory approvals, or other geopolitical challenges or actions by governments, whether as a result of the pandemic, trade disputes, or otherwise, may lead to increased project costs, operational inefficiencies, interruptions in the delivery or degradation of the quality or reliability of our products, or impairment of assets on our balance sheet. In addition, there may be issues related to this infrastructure that are not identified during the testing phases of design and implementation, which may only become evident after we have started to fully utilize the underlying equipment, that could further degrade the user experience or increase our costs. Further, much of our technical infrastructure is located outside the United States, and action by a foreign government, or our response to such government action, has resulted in the past, and may result in the future, in the impairment of a portion of our technical infrastructure, which may interrupt the delivery or degrade the quality or reliability of our products and lead to a negative user experience or increase our costs. Any of these events could adversely affect our business, reputation, or financial results.

***Real or perceived inaccuracies in our community and other metrics may harm our reputation and negatively affect our business.***

The numbers for our key metrics, which include our Family metrics (DAP, MAP, and average revenue per person (ARPP)) and Facebook metrics (DAUs, MAUs, and average revenue per user (ARPU)), are calculated using internal company data based on the activity of user accounts. While these numbers are based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring usage of our products across large online and mobile populations around the world. The methodologies used to measure these metrics require significant judgment and are also susceptible to algorithm or other technical errors. In addition, we are continually seeking to improve our estimates of our user base, and such estimates may change due to improvements or changes in our methodology. We regularly review our processes for calculating these metrics, and from time to time we discover inaccuracies in our metrics or make adjustments to improve their accuracy, which can result in adjustments to our historical metrics. Our ability to recalculate our historical metrics may be impacted by data limitations or other factors that require us to apply different methodologies for such adjustments. We generally do not intend to update previously disclosed Family metrics for any such inaccuracies or adjustments that are within the error margins disclosed below.

In addition, our Family metrics and Facebook metrics estimates will differ from estimates published by third parties due to differences in methodology.

Many people in our community have user accounts on more than one of our products, and some people have multiple user accounts within an individual product. Accordingly, for our Family metrics, we do not seek to count the total number of user accounts across our products because we believe that would not reflect the actual size of our community. Rather, our Family metrics represent our estimates of the number of unique people using at least one of Facebook, Instagram, Messenger, and WhatsApp. We do not require people to use a common identifier or link their accounts to use multiple products in our Family, and therefore must seek to attribute multiple user accounts within and across products to individual people. To calculate these metrics, we rely upon complex techniques, algorithms and machine learning models that seek to count the individual people behind user accounts, including by matching multiple user accounts within an individual product and across multiple products when we believe they are attributable to a single person, and counting such group of accounts as one person. These techniques and models require significant judgment, are subject to data and other limitations discussed below, and inherently are subject to statistical variances and uncertainties. We estimate the potential error in our Family metrics primarily based on user survey data, which itself is subject to error as well. While we expect the error margin for our Family metrics to vary from period to period, we estimate that such margin generally will be approximately 3% of our worldwide MAP. At our scale, it is very difficult to attribute multiple user accounts within and across products to individual people, and it is possible that the actual numbers of unique people using our products may vary significantly from our estimates,

29

PX0435-030

Table of Contents

potentially beyond our estimated error margins. As a result, it is also possible that our Family metrics may indicate changes or trends in user numbers that do not match actual changes or trends.

To calculate our estimates of Family DAP and MAP, we currently use a series of machine learning models that are developed based on internal reviews of limited samples of user accounts and calibrated against user survey data. We apply significant judgment in designing these models and calculating these estimates. For example, to match user accounts within individual products and across multiple products, we use data signals such as similar device information, IP addresses, and user names. We also calibrate our models against data from periodic user surveys of varying sizes and frequency across our products, which are inherently subject to error. The timing and results of such user surveys have in the past contributed, and may in the future contribute, to changes in our reported Family metrics from period to period. In addition, our data limitations may affect our understanding of certain details of our business and increase the risk of error for our Family metrics estimates. Our techniques and models rely on a variety of data signals from different products, and we rely on more limited data signals for some products compared to others. For example, as a result of limited visibility into encrypted products, we have fewer data signals from WhatsApp user accounts and primarily rely on phone numbers and device information to match WhatsApp user accounts with accounts on our other products. Similarly, although Messenger Kids users are included in our Family metrics, we do not seek to match their accounts with accounts on our other applications for purposes of calculating DAP and MAP. Any loss of access to data signals we use in our process for calculating Family metrics, whether as a result of our own product decisions, actions by third-party browser or mobile platforms, regulatory or legislative requirements, or other factors, also may impact the stability or accuracy of our reported Family metrics, as well as our ability to report these metrics at all. Our estimates of Family metrics also may change as our methodologies evolve, including through the application of new data signals or technologies, product changes, or other improvements in our user surveys, algorithms, or machine learning that may improve our ability to match accounts within and across our products or otherwise evaluate the broad population of our users. In addition, such evolution may allow us to identify previously undetected violating accounts (as defined below).

We regularly evaluate our Family metrics to estimate the percentage of our MAP consisting solely of "violating" accounts. We define "violating" accounts as accounts which we believe are intended to be used for purposes that violate our terms of service, including bots and spam. In the fourth quarter of 2022, we estimated that approximately 3% of our worldwide MAP consisted solely of violating accounts. Such estimation is based on an internal review of a limited sample of accounts, and we apply significant judgment in making this determination. For example, we look for account information and behaviors associated with Facebook and Instagram accounts that appear to be inauthentic to the reviewers, but we have limited visibility into WhatsApp user activity due to encryption. In addition, if we believe an individual person has one or more violating accounts, we do not include such person in our violating accounts estimation as long as we believe they have one account that does not constitute a violating account. From time to time, we disable certain user accounts, make product changes, or take other actions to reduce the number of violating accounts among our users, which may also reduce our DAP and MAP estimates in a particular period. We intend to disclose our estimates of the percentage of our MAP consisting solely of violating accounts on an annual basis. Violating accounts are very difficult to measure at our scale, and it is possible that the actual number of violating accounts may vary significantly from our estimates.

We also regularly evaluate our Facebook metrics to estimate the number of "duplicate" and "false" accounts among our MAUs. A duplicate account is one that a user maintains in addition to his or her principal account. We divide "false" accounts into two categories: (1) user-misclassified accounts, where users have created personal profiles for a business, organization, or non-human entity such as a pet (such entities are permitted on Facebook using a Page rather than a personal profile under our terms of service); and (2) violating accounts, which represent user profiles that we believe are intended to be used for purposes that violate our terms of service, such as bots and spam. The estimates of duplicate and false accounts are based on an internal review of a limited sample of accounts, and we apply significant judgment in making this determination. For example, to identify duplicate accounts we use data signals such as identical IP addresses and similar user names, and to identify false accounts we look for names that appear to be fake or other behavior that appears inauthentic to the reviewers. Any loss of access to data signals we use in this process, whether as a result of our own product decisions, actions by third-party browser or mobile platforms, regulatory or legislative requirements, or other factors, also may impact the stability or accuracy of our estimates of duplicate and false accounts. Our estimates also may change as our methodologies evolve, including through the application of new data signals or technologies or product changes that may allow us to identify previously undetected duplicate or false accounts and may improve our ability to evaluate a broader population of our users. Duplicate and false accounts are very difficult to measure at our scale, and it is possible that the actual number of duplicate and false accounts may vary significantly from our estimates.

30

PX0435-031

Table of Contents

In the fourth quarter of 2022, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets. In the fourth quarter of 2022, we estimated that false accounts may have represented approximately 4-5% of our worldwide MAUs. Our estimation of false accounts can vary as a result of episodic spikes in the creation of such accounts, which we have seen originate more frequently in specific countries such as Indonesia, Nigeria, and Vietnam. From time to time, we disable certain user accounts, make product changes, or take other actions to reduce the number of duplicate or false accounts among our users, which may also reduce our DAU and MAU estimates in a particular period. We intend to disclose our estimates of the number of duplicate and false accounts among our MAUs on an annual basis.

Other data limitations also may affect our understanding of certain details of our business. For example, while user-provided data indicates a decline in usage among younger users, this age data may be unreliable because a disproportionate number of our younger users register with an inaccurate age. Accordingly, our understanding of usage by age group may not be complete.

In addition, our data regarding the geographic location of our users is estimated based on a number of factors, such as the user's IP address and self-disclosed location. These factors may not always accurately reflect the user's actual location. For example, a user may appear to be accessing Facebook from the location of the proxy server that the user connects to rather than from the user's actual location. The methodologies used to measure our metrics are also susceptible to algorithm or other technical errors, and our estimates for revenue by user location and revenue by user device are also affected by these factors.

In addition, from time to time we provide, or rely on, certain other metrics and estimates, including those relating to the reach and effectiveness of our ads. Many of our metrics involve the use of estimations and judgments, and our metrics and estimates are subject to software bugs, inconsistencies in our systems, and human error. Such metrics and estimates also change from time to time due to improvements or changes in our terminology or methodology, including as a result of loss of access to data signals we use in calculating such metrics and estimates. We have in the past been, and may in the future be, subject to litigation as well as marketer, regulatory, and other inquiries regarding the accuracy of such metrics and estimates. Where marketers, developers, or investors do not perceive our metrics or estimates to be accurate, or where we discover material inaccuracies in our metrics or estimates, we may be subject to liability, our reputation may be harmed, and marketers and developers may be less willing to allocate their budgets or resources to our products that deliver ad impressions, which could negatively affect our business and financial results.

***We cannot assure you that we will effectively manage our scale.***

Our employee headcount and the scale and complexity of our business have increased significantly over time. The scale of our business and breadth of our products create significant challenges for our management, operational, and financial resources, including managing multiple relationships with users, marketers, developers, and other third parties, and maintaining information technology systems and internal controls and procedures that support the scale and complexity of our business. In addition, some members of our management do not have significant experience managing a large global business operation, so our management may not be able to manage our scale effectively. To effectively manage our scale, we must maintain, and continue to adapt, our operational, financial, and management processes and systems, manage our headcount and facilities, and effectively train and manage our personnel. Many of our personnel work remotely, which may lead to challenges in productivity and collaboration. In addition, from time to time, we implement organizational changes to pursue greater efficiency and realign our business and strategic priorities. For example, in 2022, we announced a layoff of approximately 11,000 employees and initiated several measures to scale down our office facilities. As our organization continues to evolve, and we are required to implement and adapt complex organizational management structures, we may find it difficult to maintain the benefits of our corporate culture, including our ability to quickly develop and launch new and innovative products. This could negatively affect our business performance.

***We have significant international operations and plan to continue expanding our operations abroad where we have more limited operating experience, and this may subject us to increased business, economic, and legal risks that could affect our financial results.***

We have significant international operations and plan to continue the international expansion of our business operations and the translation of our products. We currently make Facebook available in more than 100 different languages,

31

PX0435-032

Table of Contents

and we have offices or data centers in approximately 40 different countries. We may enter new international markets where we have limited or no experience in marketing, selling, and deploying our products. Our products are generally available globally, but some or all of our products or functionality may not be available in certain markets due to legal and regulatory complexities. For example, several of our products are not generally available in China. We also outsource certain operational functions to third parties globally. If we fail to deploy, manage, or oversee our international operations successfully, our business may suffer. In addition, we are subject to a variety of risks inherent in doing business internationally, including:

- political, social, or economic instability;

- risks related to legal, regulatory, and other government scrutiny applicable to U.S. companies with sales and operations in foreign jurisdictions, including with respect to privacy, tax, law enforcement, content, trade compliance, supply chain, competition, consumer protection, intellectual property, environmental, health and safety, licensing, and infrastructure matters;

- potential damage to our brand and reputation due to compliance with local laws, including potential censorship or requirements to provide user information to local authorities;

- enhanced difficulty in reviewing content on our platform and enforcing our community standards across different languages and countries;

- fluctuations in currency exchange rates and compliance with currency controls;

- foreign exchange controls and tax and other regulations and orders that might prevent us from repatriating cash earned in countries outside the United States or otherwise limit our ability to move cash freely, and impede our ability to invest such cash efficiently;

- higher levels of credit risk and payment fraud;

- enhanced difficulties of integrating any foreign acquisitions;

- burdens of complying with a variety of foreign laws, including laws related to taxation, content removal, content moderation, data localization, data protection, e-commerce and payments, and regulatory oversight;

- reduced protection for intellectual property rights in some countries;

- difficulties in staffing, managing, and overseeing global operations and the increased travel, infrastructure, and legal compliance costs associated with multiple international locations, including difficulties arising from personnel working remotely;

- compliance with statutory equity requirements and management of tax consequences; and

- geopolitical events affecting us, our marketers or our industry, including trade disputes, armed conflicts, and pandemics.

In addition, we must manage the potential conflicts between locally accepted business practices in any given jurisdiction and our obligations to comply with laws and regulations, including anti-corruption laws or regulations applicable to us, such as the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010. We also must manage our obligations to comply with laws and regulations related to import and export controls, trade restrictions, and sanctions, including regulations established by the U.S. Office of Foreign Assets Control. Government agencies and authorities have a broad range of civil and criminal penalties they may seek to impose against companies for violations of anti-corruption laws or regulations, import and export controls, trade restrictions, sanctions, and other laws, rules, and regulations.

If we are unable to expand internationally and manage the complexity of our global operations successfully, our financial results could be adversely affected. We also may be required to or elect to cease or modify our operations or the offering of our products and services in certain regions, including as a result of the risks described above, which could adversely affect our business, user growth and engagement, and financial results.

<div style="text-align:center">32</div>

PX0435-033

Table of Contents

***We face design, manufacturing, and supply chain risks that, if not properly managed, could adversely impact our financial results.***

We face a number of risks related to design, manufacturing, and supply chain management with respect to our consumer hardware products. For example, the consumer hardware products we sell from time to time have had, and in the future may have, quality issues resulting from the design or manufacture of the products, or from the software used in the products. Sometimes, these issues may be caused by components we purchase from other manufacturers or suppliers. Our brand and financial results could be adversely affected by any such quality issues, other failures to meet our customers' expectations, or findings of our consumer hardware products to be defective.

We rely on third parties to manufacture and manage the logistics of transporting and distributing our consumer hardware products, which subjects us to a number of risks that have been exacerbated as a result of the COVID-19 pandemic. We have experienced, and may in the future experience, supply or labor shortages or other disruptions in logistics and the supply chain, which could result in shipping delays and negatively impact our operations, product development, and sales. We could be negatively affected if we are not able to engage third parties with the necessary capabilities or capacity on reasonable terms, or if those we engage with fail to meet their obligations (whether due to financial difficulties, manufacturing or supply constraints, or other reasons), or make adverse changes in the pricing or other material terms of such arrangements with them. The manufacturing, distribution, and sale of our consumer hardware products also may be negatively impacted by macroeconomic conditions, geopolitical challenges, trade disputes, or other actions by governments that subject us to supply shortages, increased costs, or supply chain or logistics disruptions.

We also require the suppliers and business partners of our consumer hardware products to comply with laws and certain company policies regarding sourcing practices and standards on labor, trade compliance, health and safety, the environment, and business ethics, but we do not control them or their practices and standards. If any of them violates laws, fails to implement changes in accordance with newly enacted laws, or implements practices or standards regarded as unethical, corrupt, or non-compliant, we could experience supply chain disruptions, government action or fines, canceled orders, or damage to our reputation.

***We face inventory risk with respect to our consumer hardware products.***

We are exposed to inventory risks with respect to our consumer hardware products as a result of rapid changes in product cycles and pricing, unsafe or defective merchandise, supply chain disruptions, changes in consumer demand and consumer spending patterns, changes in consumer tastes with respect to our consumer hardware products, and other factors. The demand for our products can also change significantly between the time inventory or components are ordered and the date of sale. While we endeavor to accurately predict these trends and avoid overstocking or understocking consumer hardware products we may sell, from time to time we have experienced difficulties in accurately predicting and meeting the consumer demand for our products. In addition, when we begin selling or manufacturing a new consumer hardware product or enter new international markets, it may be difficult to establish vendor relationships, determine appropriate product or component selection, and accurately forecast demand. The acquisition of certain types of inventory or components may require significant lead-time and prepayment and they may not be returnable. Any one of the foregoing factors may adversely affect our operating results.

***We are involved in numerous class action lawsuits and other litigation matters that are expensive and time consuming, and, if resolved adversely, could harm our business, financial condition, or results of operations.***

We are involved in numerous lawsuits, including stockholder derivative lawsuits and putative class action lawsuits, many of which claim statutory damages and/or seek significant changes to our business operations, and we anticipate that we will continue to be a target for numerous lawsuits in the future. Because of the scale of our user, advertiser, and developer base, the plaintiffs in class action cases filed against us typically claim enormous monetary damages even if the alleged per-user or entity harm is small or non-existent. In addition, we have faced, currently face, and will continue to face additional class action and other lawsuits based on claims related to advertising, antitrust, privacy, security, biometrics, content, algorithms, user well-being, employment, activities on our platform, consumer protection, or product performance or other claims related to the use of consumer hardware and software, including virtual reality technology and products, which are new and unproven. For example, we are currently the subject of multiple putative class action suits in connection with our platform and user data practices and the misuse of certain data by a developer that shared such data with third parties in

33

PX0435-034

Table of Contents

violation of our terms and policies; the disclosure of our earnings results for the second quarter of 2018; our acquisitions of Instagram and WhatsApp, as well as other alleged anticompetitive conduct; a former employee's allegations and release of internal company documents beginning in September 2021; the disclosure of our earnings results for the fourth quarter of 2021; and allegations that we inflated our estimates of the potential audience size for advertisements, resulting in artificially increased demand and higher prices. We are also the subject of multiple lawsuits related to our alleged recommendation of and/or failure to remove harmful content. The results of any such lawsuits and claims cannot be predicted with certainty, and any negative outcome from any such lawsuits could result in payments of substantial monetary damages or fines, or undesirable changes to our products or business practices, and accordingly our business, financial condition, or results of operations could be materially and adversely affected.

There can be no assurances that a favorable final outcome will be obtained in all our cases, and defending any lawsuit is costly and can impose a significant burden on management and employees. Any litigation to which we are a party may result in an onerous or unfavorable judgment that may not be reversed upon appeal or in payments of substantial monetary damages or fines, or we may decide to settle lawsuits on similarly unfavorable terms, which has occurred in the past and which could adversely affect our business, financial conditions, or results of operations.

***We may have exposure to greater than anticipated tax liabilities.***

Our tax obligations, including income and non-income taxes, are based in part on our corporate operating structure and intercompany arrangements, including the manner in which we operate our business, develop, value, manage, protect, and use our intellectual property, and the valuations of our intercompany transactions. The tax laws applicable to our business, including the laws of the United States and other jurisdictions, are subject to interpretation and certain jurisdictions are aggressively interpreting their laws in new ways in an effort to raise additional tax revenue from companies such as Meta. We are subject to regular review and audit by U.S. federal, state, and foreign tax authorities. Tax authorities may disagree with certain positions we have taken, including our methodologies for valuing developed technology or intercompany arrangements, and any adverse outcome of such a review or audit could increase our worldwide effective tax rate, increase the amount of non-income taxes imposed on our business, and harm our financial position, results of operations, and cash flows. For example, in 2016 and 2018, the IRS issued formal assessments relating to transfer pricing with our foreign subsidiaries in conjunction with the examination of the 2010 through 2013 tax years. Although we disagree with the IRS's position and are litigating this issue, the ultimate resolution is uncertain and, if resolved in a manner unfavorable to us, may adversely affect our financial results.

The determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment by management, and there are many transactions where the ultimate tax determination is uncertain. Our provision for income taxes is determined by the manner in which we operate our business, and any changes to such operations or laws applicable to such operations may affect our effective tax rate. Although we believe that our provision for income taxes and estimates of our non-income tax liabilities are reasonable, the ultimate settlement may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

Our future income tax rates could be volatile and difficult to predict due to changes in jurisdictional profit split, changes in the amount and recognition of deferred tax assets and liabilities, or by changes in tax laws, regulations, or accounting principles.

***Changes in tax laws or tax rulings could materially affect our financial position, results of operations, and cash flows.***

The tax regimes we are subject to or operate under, including income and non-income taxes, are unsettled and may be subject to significant change. Changes in tax laws or tax rulings, or changes in interpretations of existing laws, could materially affect our financial position, results of operations, and cash flows. For example, the 2017 Tax Cuts and Jobs Act (Tax Act) enacted in December 2017 had a significant impact on our tax obligations and effective tax rate for the fourth quarter of 2017. The issuance of additional regulatory or accounting guidance related to the Tax Act, or other executive or Congressional actions in the United States or globally could materially increase our tax obligations and significantly impact our effective tax rate in the period such guidance is issued or such actions take effect, and in future periods. In addition, many countries have recently proposed or recommended changes to existing tax laws or have enacted new laws that could significantly increase our tax obligations in many countries where we do business or require us to change the manner in which we operate our business.

<div align="center">34</div>

PX0435-035

Table of Contents

Over the last several years, the Organization for Economic Cooperation and Development has been working on a Base Erosion and Profit Shifting Project that, if implemented, would change various aspects of the existing framework under which our tax obligations are determined in many of the countries in which we do business. In 2021, more than 140 countries tentatively signed on to a framework that imposes a minimum tax rate of 15%, among other provisions. As this framework is subject to further negotiation and implementation by each member country, the timing and ultimate impact of any such changes on our tax obligations are uncertain. Similarly, the European Commission and several countries have issued proposals that would apply to various aspects of the current tax framework under which we are taxed. These proposals include changes to the existing framework to calculate income tax, as well as proposals to change or impose new types of non-income taxes, including taxes based on a percentage of revenue. For example, several jurisdictions have proposed or enacted taxes applicable to digital services, which include business activities on digital advertising and online marketplaces, and which apply to our business.

The European Commission has conducted investigations in multiple countries focusing on whether local country tax rulings or tax legislation provides preferential tax treatment that violates European Union state aid rules and concluded that certain member states, including Ireland, have provided illegal state aid in certain cases. These investigations may result in changes to the tax treatment of our foreign operations.

Due to the large and expanding scale of our international business activities, many of these types of changes to the taxation of our activities described above could increase our worldwide effective tax rate, increase the amount of non-income taxes imposed on our business, and harm our financial position, results of operations, and cash flows. Such changes may also apply retroactively to our historical operations and result in taxes greater than the amounts estimated and recorded in our financial statements.

*Given our levels of share-based compensation, our tax rate may vary significantly depending on our stock price.*

The tax effects of the accounting for share-based compensation may significantly impact our effective tax rate from period to period. In periods in which our stock price varies from the grant price of the share-based compensation vesting in that period, we will recognize excess tax benefits or shortfalls that will impact our effective tax rate. For example, in 2022, tax shortfalls recognized from share-based compensation increased our provision for income taxes by $471 million and our effective tax rate by two percentage points as compared to the tax rate without such shortfalls. In future periods in which our stock price varies in comparison to the grant price of the share-based compensation vesting in that period, our effective tax rate may be inversely impacted. The amount and value of share-based compensation issued relative to our earnings in a particular period will also affect the magnitude of the impact of share-based compensation on our effective tax rate. These tax effects are dependent on our stock price, which we do not control, and a decline in our stock price could significantly increase our effective tax rate and adversely affect our financial results.

*If our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings.*

We review our intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable, such as a decline in stock price and market capitalization. We test goodwill for impairment at the reporting unit level at least annually. If such goodwill or intangible assets are deemed to be impaired, an impairment loss equal to the amount by which the carrying amount exceeds the fair value of the assets would be recognized. We may be required to record a significant charge in our financial statements during the period in which any impairment of our goodwill or intangible assets is determined, which would negatively affect our results of operations.

*The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could harm our business.*

We currently depend on the continued services and performance of our key personnel, including Mark Zuckerberg. Although we have entered into an employment agreement with Mr. Zuckerberg, the agreement has no specific duration and constitutes at-will employment. In addition, many of our key technologies and systems are custom-made for our business by our personnel. The loss of key personnel, including members of management as well as key engineering, product development, marketing, and sales personnel, could disrupt our operations and have an adverse effect on our business.

35

PX0435-036

Table of Contents

In addition, we cannot guarantee we will continue to attract and retain the personnel we need to maintain our competitive position. In particular, we expect to continue to face significant challenges in hiring technical personnel, particularly for engineering talent, whether as a result of competition with other companies or other factors. As we continue to mature, the incentives to attract, retain, and motivate employees provided by our equity awards or by future arrangements may not be as effective as in the past, and if we issue significant equity to attract additional employees or to retain our existing employees, we would incur substantial additional share-based compensation expense and the ownership of our existing stockholders would be further diluted. Our ability to attract, retain, and motivate employees may also be adversely affected by stock price volatility. In addition, restrictive immigration policies or legal or regulatory developments relating to immigration may negatively affect our efforts to attract and hire new personnel as well as retain our existing personnel. If we do not succeed in attracting, hiring, and integrating excellent personnel, or retaining and motivating existing personnel, we may be unable to grow effectively.

***Our CEO has control over key decision making as a result of his control of a majority of the voting power of our outstanding capital stock.***

Mark Zuckerberg, our founder, Chairman, and CEO, is able to exercise voting rights with respect to a majority of the voting power of our outstanding capital stock and therefore has the ability to control the outcome of all matters submitted to our stockholders for approval, including the election of directors and any merger, consolidation, or sale of all or substantially all of our assets. This concentrated control could delay, defer, or prevent a change of control, merger, consolidation, or sale of all or substantially all of our assets that our other stockholders support, or conversely this concentrated control could result in the consummation of such a transaction that our other stockholders do not support. This concentrated control could also discourage a potential investor from acquiring our Class A common stock, which has limited voting power relative to the Class B common stock, and might harm the trading price of our Class A common stock. In addition, Mr. Zuckerberg has the ability to control the management and major strategic investments of our company as a result of his position as our CEO and his ability to control the election or, in some cases, the replacement of our directors. In the event of his death, the shares of our capital stock that Mr. Zuckerberg owns will be transferred to the persons or entities that he has designated. As a board member and officer, Mr. Zuckerberg owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, even a controlling stockholder, Mr. Zuckerberg is entitled to vote his shares, and shares over which he has voting control as governed by a voting agreement, in his own interests, which may not always be in the interests of our stockholders generally.

***We cannot guarantee that our share repurchase program will be fully consummated or that it will enhance long-term stockholder value. Share repurchases could also increase the volatility of the trading price of our stock and will diminish our cash reserves.***

Although our board of directors has authorized a share repurchase program that does not have an expiration date, the program does not obligate us to repurchase any specific dollar amount or to acquire any specific number of shares of our Class A common stock. We cannot guarantee that the program will be fully consummated or that it will enhance long-term stockholder value. The program could affect the trading price of our stock and increase volatility, and any announcement of a termination of this program may result in a decrease in the trading price of our stock. In addition, this program will diminish our cash reserves.

### Risks Related to Government Regulation and Enforcement

***Actions by governments that restrict access to Facebook or our other products in their countries, censor or moderate content on our products in their countries, or otherwise impair our ability to sell advertising in their countries, could substantially harm our business and financial results.***

Governments from time to time seek to censor or moderate content available on Facebook or our other products in their country, restrict access to our products from their country partially or entirely, or impose other restrictions that may affect the accessibility of our products in their country for an extended period of time or indefinitely. For example, user access to Facebook and certain of our other products has been or is currently restricted in whole or in part in China, Iran, and North Korea. In addition, government authorities in other countries may seek to restrict user access to our products if they consider us to be in violation of their laws or a threat to public safety or for other reasons, and certain of our products have been restricted by governments in other countries from time to time. For example, in 2020, Hong Kong adopted a National Security Law that provides authorities with the ability to obtain information, remove and block access to content, and suspend

36

PX0435-037

Table of Contents

user services, and if we are found to be in violation of this law then the use of our products may be restricted. In addition, if we are required to or elect to make changes to our marketing and sales or other operations in Hong Kong as a result of the National Security Law or other legislation, our revenue and business in the region will be adversely affected. In addition, in connection with the war in Ukraine in the first quarter of 2022, access to Facebook and Instagram was restricted in Russia and the services were then prohibited by the Russian government, which has adversely affected, and will likely continue to adversely affect, our revenue and business in the region. It is also possible that government authorities could take action that impairs our ability to sell advertising, including in countries where access to our consumer-facing products may be blocked or restricted. For example, we generate meaningful revenue from a limited number of resellers serving advertisers based in China, and it is possible that the Chinese government could take action that reduces or eliminates our China-based advertising revenue, whether as a result of the trade dispute with the United States, in response to content issues or information requests in Hong Kong or elsewhere, or for other reasons, or take other action against us, such as imposing taxes or other penalties, which could adversely affect our financial results. Similarly, if we are found to be out of compliance with certain legal requirements for social media companies in Turkey, the Turkish government could take action to reduce or eliminate our Turkey-based advertising revenue or otherwise adversely impact access to our products. In the event that content shown on Facebook or our other products is subject to censorship, access to our products is restricted, in whole or in part, in one or more countries, we are required to or elect to make changes to our operations, or other restrictions are imposed on our products, or our competitors are able to successfully penetrate new geographic markets or capture a greater share of existing geographic markets that we cannot access or where we face other restrictions, our ability to retain or increase our user base, user engagement, or the level of advertising by marketers may be adversely affected, we may not be able to maintain or grow our revenue as anticipated, and our financial results could be adversely affected.

***Our business is subject to complex and evolving U.S. and foreign laws and regulations regarding privacy, data use and data protection, content, competition, safety and consumer protection, e-commerce, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our products and business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are subject to a variety of laws and regulations in the United States and abroad that involve matters central to our business, including privacy, data use, data protection and personal information, biometrics, encryption, rights of publicity, content, integrity, intellectual property, advertising, marketing, distribution, data security, data retention and deletion, data localization and storage, data disclosure, artificial intelligence and machine learning, electronic contracts and other communications, competition, protection of minors, consumer protection, civil rights, accessibility, telecommunications, product liability, e-commerce, taxation, economic or other trade controls including sanctions, anti-corruption and political law compliance, securities law compliance, and online payment services. The introduction of new products, expansion of our activities in certain jurisdictions, or other actions that we may take may subject us to additional laws, regulations, or other government scrutiny. In addition, foreign data protection, privacy, content, competition, consumer protection, and other laws and regulations can impose different obligations or be more restrictive than those in the United States.

These U.S. federal, state, and foreign laws and regulations, which in some cases can be enforced by private parties in addition to government entities, are constantly evolving and can be subject to significant change. As a result, the application, interpretation, and enforcement of these laws and regulations are often uncertain, particularly in the new and rapidly evolving industry in which we operate, and may be interpreted and applied inconsistently from jurisdiction to jurisdiction and inconsistently with our current policies and practices. For example, regulatory or legislative actions or litigation affecting the manner in which we display content to our users, moderate content, or obtain consent to various practices could adversely affect user growth and engagement. Such actions could affect the manner in which we provide our services or adversely affect our financial results.

We are also subject to evolving laws and regulations that dictate whether, how, and under what circumstances we can transfer, process and/or receive certain data that is critical to our operations, including data shared between countries or regions in which we operate and data shared among our products and services. For example, in 2016, the European Union and United States agreed to a transfer framework for data transferred from the European Union to the United States, called the Privacy Shield, but the Privacy Shield was invalidated in July 2020 by the Court of Justice of the European Union (CJEU). In addition, the other bases upon which Meta relies to transfer such data, such as Standard Contractual Clauses (SCCs), have been subjected to regulatory and judicial scrutiny. For example, the CJEU considered the validity of SCCs as a basis to transfer user data from the European Union to the United States following a challenge brought by the Irish Data Protection Commission (IDPC). Although the CJEU upheld the validity of SCCs in July 2020, our continued reliance on

37

PX0435-038

Table of Contents

SCCs will be the subject of future regulatory consideration. In particular, in August 2020, we received a preliminary draft decision from the IDPC that preliminarily concluded that Meta Platforms Ireland's reliance on SCCs in respect of European Union/European Economic Area Facebook user data does not achieve compliance with the GDPR and preliminarily proposed that such transfers should therefore be suspended. In February 2022, we received a revised preliminary draft decision in which the IDPC maintained its preliminary conclusion that these transfers should be suspended. The IDPC's draft decision was then further refined and shared on July 6, 2022 with other European data protection regulators (CSAs) as part of the GDPR's consistency mechanism. Separately, on March 25, 2022, the European Union and United States announced that they had reached an agreement in principle on a new EU-U.S. Data Privacy Framework (EU-U.S. DPF). On October 7, 2022, President Biden signed the Executive Order on Enhancing Safeguards for United States Signals Intelligence Activities (E.O.), and on December 13, 2022, the European Commission published its draft adequacy decision on the proposed new EU-U.S. DPF. On January 19, 2023, the IDPC referred the inquiry to a vote by the European Data Protection Board (EDPB), pursuant to the dispute resolution process under Article 65 GDPR, in respect of elements of the draft decision over which consensus could not be reached between concerned supervisory authorities. We believe a final decision in this inquiry may issue as early as the first quarter of 2023. Although the E.O. is a significant and positive step, if no adequacy decision is adopted by the European Commission and we are unable to continue to rely on SCCs or rely upon other alternative means of data transfers from the European Union to the United States, we will likely be unable to offer a number of our most significant products and services, including Facebook and Instagram, in Europe, which would materially and adversely affect our business, financial condition, and results of operations. In addition, we have been managing investigations and lawsuits in Europe, India, and other jurisdictions regarding the 2016 and 2021 updates to WhatsApp's terms of service and privacy policy and its sharing of certain data with other Meta products and services, including a lawsuit currently pending before the Supreme Court of India. If we are unable to transfer data between and among countries and regions in which we operate, or if we are restricted from sharing data among our products and services, it could affect our ability to provide our services, the manner in which we provide our services or our ability to target ads, which could adversely affect our financial results.

We have been subject to other significant legislative and regulatory developments in the past, and proposed or new legislation and regulations could significantly affect our business in the future. For example, we have implemented a number of product changes and controls as a result of requirements under the European General Data Protection Regulation (GDPR), and may implement additional changes in the future. The GDPR also requires submission of personal data breach notifications to our lead European Union privacy regulator, the IDPC, and includes significant penalties for non-compliance with the notification obligation as well as other requirements of the regulation. The interpretation of the GDPR is still evolving and draft decisions in investigations by the IDPC are subject to review by other European privacy regulators as part of the GDPR's consistency mechanism, which may lead to significant changes in the final outcome of such investigations. As a result, the interpretation and enforcement of the GDPR, as well as the imposition and amount of penalties for non-compliance, are subject to significant uncertainty. In addition, Brazil, the United Kingdom, and other countries have enacted similar data protection regulations imposing data privacy-related requirements on products and services offered to users in their respective jurisdictions. The California Consumer Privacy Act (CCPA), as amended by the California Privacy Rights Act (CPRA), also establishes certain transparency rules and create new data privacy rights for users, including limitations on our use of certain sensitive personal information and more ability for users to control the purposes for which their data is shared with third parties. Other states have proposed or enacted similar comprehensive privacy laws that afford users with similar data privacy rights and controls. These laws and regulations are evolving and subject to interpretation, and resulting limitations on our advertising services, or reductions of advertising by marketers, have to some extent adversely affected, and will continue to adversely affect, our advertising business. For example, state regulators in California and Colorado are considering adopting regulations that could further limit how companies can use personal information for advertising purposes. In Europe, regulators continue to issue guidance concerning the ePrivacy Directive's requirements regarding the use of cookies and similar technologies, and may impose specific measures in the future which could directly impact our use of such technologies. In addition, the ePrivacy Directive and national implementation laws impose additional limitations on the use of data across messaging products and include significant penalties for non-compliance. Changes to our products or business practices as a result of these or similar developments have in the past adversely affected, and may in the future adversely affect, our advertising business. Similarly, there are a number of legislative proposals or recently enacted laws in the European Union, the United States, at both the federal and state level, as well as other jurisdictions that could impose new obligations or limitations in areas affecting our business. For example, the DMA in the European Union imposes new restrictions and requirements on companies like ours, including in areas such as the combination of data across services, mergers and acquisitions, and product design. The DMA also includes significant penalties for non-compliance, and its key requirements will be enforceable against designated gatekeeper companies in early 2024. We expect the DMA will cause us to incur significant compliance costs and make additional changes to our products or business practices. The requirements under the DMA will likely be subject to further interpretation and regulatory engagement. Pending or future proposals to

38

PX0435-039

Table of Contents

modify competition laws in the United States and other jurisdictions could have similar effects. Further, the Digital Services Act (DSA) in the European Union, which will apply to our business as early as June 2023, will impose new restrictions and requirements for our products and services and may significantly increase our compliance costs. The DSA also includes significant penalties for non-compliance. In addition, some countries, such as India and Turkey, are considering or have passed legislation implementing data protection requirements or requiring local storage and processing of data or similar requirements that could increase the cost and complexity of delivering our services, cause us to cease the offering of our products and services in certain countries, or result in fines or other penalties. New legislation or regulatory decisions that restrict our ability to collect and use information about minors may also result in limitations on our advertising services or our ability to offer products and services to minors in certain jurisdictions.

These laws and regulations, as well as any associated claims, inquiries, or investigations or any other government actions, have in the past led to, and may in the future lead to, unfavorable outcomes including increased compliance costs, loss of revenue, delays or impediments in the development of new products, negative publicity and reputational harm, increased operating costs, diversion of management time and attention, and remedies that harm our business, including fines or demands or orders that we modify or cease existing business practices.

***We have been subject to regulatory and other government investigations, enforcement actions, and settlements, and we expect to continue to be subject to such proceedings and other inquiries in the future, which could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business.***

We receive formal and informal inquiries from government authorities and regulators regarding our compliance with laws and regulations, many of which are evolving and subject to interpretation. We are and expect to continue to be the subject of investigations, inquiries, data requests, requests for information, actions, and audits in the United States, Europe, and around the world, particularly in the areas of privacy and data protection, including with respect to minors, law enforcement, consumer protection, civil rights, content moderation, and competition. In addition, we are currently, and may in the future be, subject to regulatory orders or consent decrees. For example, data protection, competition, and consumer protection authorities in the European Union and other jurisdictions have initiated actions, investigations, or administrative orders seeking to restrict the ways in which we collect and use information, or impose sanctions, and other authorities may do the same. In addition, beginning in March 2018, we became subject to FTC, state attorneys general, and other government inquiries in the United States, Europe, and other jurisdictions in connection with our platform and user data practices as well as the misuse of certain data by a developer that shared such data with third parties in violation of our terms and policies. In July 2019, we entered into a settlement and modified consent order to resolve the FTC inquiry, which was approved by the federal court and took effect in April 2020. Among other matters, our settlement with the FTC required us to pay a penalty of $5.0 billion and to significantly enhance our practices and processes for privacy compliance and oversight. The state attorneys general inquiry and certain government inquiries in other jurisdictions remain ongoing. We also notify the IDPC, our lead European Union privacy regulator under the GDPR, and other regulators of certain other personal data breaches and privacy issues, and are subject to inquiries and investigations by the IDPC and other regulators regarding various aspects of our regulatory compliance. We have in the past been, and may in the future be, subject to fines and requirements to changes to our business practices as a result of such inquiries and investigations. In addition, we are subject to a lawsuit by the state of Texas in connection with the "tag suggestions" and other facial recognition features on our products.

We are also subject to various litigation and formal and informal inquiries and investigations by competition authorities in the United States, Europe, and other jurisdictions, which relate to many aspects of our business, including with respect to users and advertisers, as well as our industry. Such inquiries, investigations, and lawsuits concern, among other things, our business practices in the areas of social networking or social media services, digital advertising, and/or mobile or online applications, as well as our acquisitions. For example, in June 2019 we were informed by the FTC that it had opened an antitrust investigation of our company. In addition, beginning in the third quarter of 2019, we became the subject of antitrust inquiries and investigations by the U.S. Department of Justice and state attorneys general. Beginning in December 2020, we also became subject to lawsuits by the FTC and the attorneys general from 46 states, the territory of Guam, and the District of Columbia in the U.S. District Court for the District of Columbia alleging that we violated antitrust laws, including by acquiring Instagram in 2012 and WhatsApp in 2014 and by maintaining conditions on access to our platform, among other things. The complaints of the FTC and attorneys general both sought a permanent injunction against our company's alleged violations of the antitrust laws, and other equitable relief, including divestiture or reconstruction of Instagram and WhatsApp. In addition, in December 2022, the European Commission issued a Statement of Objections alleging that we tie Facebook Marketplace to Facebook and use data in a manner that infringes European Union competition rules. We are also subject to other government inquiries and investigations relating to our business activities and disclosure practices. For example,

39

PX0435-040

Table of Contents

beginning in September 2021, we became subject to government investigations and requests relating to allegations and the release of internal company documents by a former employee.

Orders issued by, or inquiries or enforcement actions initiated by, government or regulatory authorities could cause us to incur substantial costs, expose us to civil and criminal liability (including liability for our personnel) or penalties (including substantial monetary remedies), interrupt or require us to change our business practices in a manner materially adverse to our business (including changes to our products or user data practices), result in negative publicity and reputational harm, divert resources and the time and attention of management from our business, or subject us to other structural or behavioral remedies that adversely affect our business, and we have experienced some of these adverse effects to varying degrees from time to time.

***Compliance with our FTC consent order, the GDPR, the CPRA, the ePrivacy Directive, the DMA, the DSA, and other regulatory and legislative privacy requirements require significant operational resources and modifications to our business practices, and any compliance failures may have a material adverse effect on our business, reputation, and financial results.***

We are engaged in ongoing privacy compliance and oversight efforts, including in connection with our modified consent order with the FTC, requirements of the GDPR, and other current and anticipated regulatory and legislative requirements around the world, such as the CPRA, ePrivacy Directive, DMA, and DSA. In particular, we are maintaining a comprehensive privacy program in connection with the FTC consent order that includes substantial management and board of directors oversight, stringent operational requirements and reporting obligations, prohibitions against making misrepresentations relating to user data, a process to regularly certify our compliance with the privacy program to the FTC, and regular assessments of our privacy program by an independent third-party assessor, which has been and will continue to be challenging and costly to maintain and enhance. These compliance and oversight efforts are increasing demand on our systems and resources, and require significant new and ongoing investments, including investments in compliance processes, personnel, and technical infrastructure. We are reallocating resources internally to assist with these efforts, and this has had, and will continue to have, an adverse impact on our other business initiatives. In addition, these efforts require substantial modifications to our business practices and make some practices such as product and ads development more difficult, time-consuming, and costly. As a result, we believe our ability to develop and launch new features, products, and services in a timely manner has been and will continue to be adversely affected. We also expect that our privacy compliance and oversight efforts will require significant time and attention from our management and board of directors. The requirements of the FTC consent order and other privacy-related laws and regulations are complex and apply broadly to our business, and from time to time we notify relevant authorities of instances where we are not in full compliance with these requirements or otherwise discover privacy issues, and we expect to continue to do so as any such issues arise in the future. In addition, regulatory and legislative privacy requirements are constantly evolving and can be subject to significant change and uncertain interpretation. For example, we will be subject to new restrictions and requirements under the DMA, including in areas such as the combination of data across services and product design, which will likely be subject to further interpretation and regulatory engagement. If we are unable to successfully implement and comply with the mandates of the FTC consent order, GDPR, CPRA, ePrivacy Directive, DMA, DSA, or other regulatory or legislative requirements, or if we are found to be in violation of the consent order or other applicable requirements, we may be subject to regulatory or governmental investigations or lawsuits, which may result in significant monetary fines, judgments, or other penalties, and we may also be required to make additional changes to our business practices. Any of these events could have a material adverse effect on our business, reputation, and financial results.

***We may incur liability as a result of information retrieved from or transmitted over the internet or published using our products or as a result of claims related to our products, and legislation regulating content on our platform may require us to change our products or business practices and may adversely affect our business and financial results.***

We have faced, currently face, and will continue to face claims relating to information or content that is published or made available on our products, including our policies, algorithms, and enforcement actions with respect to such information or content. In particular, the nature of our business exposes us to claims related to defamation, dissemination of misinformation or news hoaxes, discrimination, harassment, intellectual property rights, rights of publicity and privacy, personal injury torts, laws regulating hate speech or other types of content, online safety, products liability, consumer protection, and breach of contract, among others. For example, we have recently seen an increase in claims brought by younger users related to well-being issues based on allegedly harmful content that is shared on or recommended by our products. The potential risks relating to any of the foregoing types of claims are currently enhanced in certain jurisdictions

40

Table of Contents

outside the United States where our protection from liability for third-party actions may be unclear or where we may be less protected under local laws than we are in the United States. For example, in April 2019, the European Union passed a directive (the European Copyright Directive) expanding online platform liability for copyright infringement and regulating certain uses of news content online, which member states are currently implementing into their national laws. In addition, the European Union revised the European Audiovisual Media Service Directive to apply to online video-sharing platforms, which member states have begun to implement. In the United States, the U.S. Supreme Court recently agreed to review a matter in which the scope of the protections available to online platforms under Section 230 of the Communications Decency Act (Section 230) is at issue. In addition, there have been, and continue to be, various state and federal legislative and executive efforts to remove or restrict the scope of the protections under Section 230, as well as to impose new obligations on online platforms with respect to commerce listings, user content, counterfeit goods and copyright-infringing material, and our current protections from liability for third-party content in the United States could decrease or change. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages. We could also face fines, orders restricting or blocking our services in particular geographies, or other government-imposed remedies as a result of content hosted on our services. For example, legislation in Germany and India has resulted in the past, and may result in the future, in the imposition of fines or other penalties for failure to comply with certain content removal, law enforcement cooperation, and disclosure obligations. Numerous other countries in Europe, the Middle East, Asia-Pacific, and Latin America are considering or have implemented similar legislation imposing potentially significant penalties, including fines, service throttling, or advertising bans, for failure to remove certain types of content or follow certain processes. For example, we have been subject to fines and may in the future be subject to other penalties in connection with social media legislation in Turkey, and we have been subject to fines and service blocking and prohibition in Russia. Content-related legislation also has required us in the past, and may require us in the future, to change our products or business practices, increase our costs, or otherwise impact our operations or our ability to provide services in certain geographies. For example, the European Copyright Directive requires certain online services to obtain authorizations for copyrighted content or to implement measures to prevent the availability of that content, which may require us to make substantial investments in compliance processes. Member states' laws implementing the European Copyright Directive may also require online platforms to pay for content. In addition, our products and services will be subject to new restrictions and requirements, and our compliance costs may significantly increase, as a result of the Digital Services Act in the European Union, which will apply to our business as early as June 2023, and potentially other content-related legislative developments such as proposed online safety bills in Ireland and the United Kingdom. Certain countries have also proposed legislation that may require us to pay publishers for certain news content shared on our products. In the United States, changes to the protections available under Section 230 or the First Amendment to the U.S. Constitution or new state or federal content-related legislation may increase our costs or require significant changes to our products, business practices, or operations, which could adversely affect user growth and engagement. Any of the foregoing events could adversely affect our business and financial results.

***Payment transactions may subject us to additional regulatory requirements and other risks that could be costly and difficult to comply with or that could harm our business.***

Several of our products offer Payments functionality, including enabling our users to purchase tangible, virtual, and digital goods from merchants and developers that offer applications using our Payments infrastructure, send money to other users, and make donations to certain charitable organizations, among other activities. We are subject to a variety of laws and regulations in the United States, Europe, and elsewhere, including those governing anti-money laundering and counter-terrorist financing, money transmission, stored value, gift cards and other prepaid access instruments, electronic funds transfer, virtual currency, consumer protection, charitable fundraising, trade sanctions, and import and export restrictions. Depending on how our Payments products evolve, we may also be subject to other laws and regulations including those governing gambling, banking, and lending. In some jurisdictions, the application or interpretation of these laws and regulations is not clear. To increase flexibility in how our use of Payments may evolve and to mitigate regulatory uncertainty, we have received certain payments licenses in the United States, the European Economic Area, and other jurisdictions, which will generally require us to demonstrate compliance with many domestic and foreign laws in these areas. Our efforts to comply with these laws and regulations could be costly and result in diversion of management time and effort and may still not guarantee compliance. In the event that we are found to be in violation of any such legal or regulatory requirements, we may be subject to monetary fines or other penalties such as a cease and desist order, or we may be required to make product changes, any of which could have an adverse effect on our business and financial results.

In addition, we are subject to a variety of additional risks as a result of Payments transactions, including: increased costs and diversion of management time and effort and other resources to deal with bad transactions or customer disputes; potential fraudulent or otherwise illegal activity by users, developers, employees, or third parties; restrictions on the

41

PX0435-042

Table of Contents

investment of consumer funds used to transact Payments; and additional disclosure and reporting requirements. We have also launched payments functionality on certain of our applications and may in the future undertake additional payments initiatives, including as part of our metaverse efforts, which may subject us to many of the foregoing risks and additional licensing requirements.

### Risks Related to Data, Security, and Intellectual Property

***Security breaches, improper access to or disclosure of our data or user data, other hacking and phishing attacks on our systems, or other cyber incidents could harm our reputation and adversely affect our business.***

Our industry is prone to cyber-attacks by third parties seeking unauthorized access to our data or users' data or to disrupt our ability to provide service. Our products and services involve the collection, storage, processing, and transmission of a large amount of data. Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data, including personal information, content, or payment information from users, or information from marketers, could result in the loss, modification, disclosure, destruction, or other misuse of such data, which could harm our business and reputation and diminish our competitive position. In addition, computer malware, viruses, social engineering (such as spear phishing attacks), scraping, and general hacking continue to be prevalent in our industry, have occurred on our systems in the past, and will occur on our systems in the future. We also regularly encounter attempts to create false or undesirable user accounts, purchase ads, or take other actions on our platform for purposes such as spamming, spreading misinformation, or other objectionable ends. As a result of our prominence, the size of our user base, the types and volume of personal data and content on our systems, and the evolving nature of our products and services (including our efforts involving new and emerging technologies), we believe that we are a particularly attractive target for such breaches and attacks, including from nation states and highly sophisticated, state-sponsored, or otherwise well-funded actors, and we experience heightened risk from time to time as a result of geopolitical events. Our efforts to address undesirable activity on our platform also increase the risk of retaliatory attacks. Such breaches and attacks may cause interruptions to the services we provide, degrade the user experience, cause users or marketers to lose confidence and trust in our products, impair our internal systems, or result in financial harm to us. Our efforts to protect our company data or the information we receive, and to disable undesirable activities on our platform, may also be unsuccessful due to software bugs or other technical malfunctions; employee, contractor, or vendor error or malfeasance, including defects or vulnerabilities in our vendors' information technology systems or offerings; government surveillance; breaches of physical security of our facilities or technical infrastructure; or other threats that evolve. In addition, third parties may attempt to fraudulently induce employees or users to disclose information in order to gain access to our data or our users' data. Cyber-attacks continue to evolve in sophistication and volume, and inherently may be difficult to detect for long periods of time. Although we have developed systems and processes that are designed to protect our data and user data, to prevent data loss, to disable undesirable accounts and activities on our platform, and to prevent or detect security breaches, we cannot assure you that such measures will provide absolute security, that we will be able to react in a timely manner, or that our remediation efforts will be successful. The changes in our work environment as a result of certain personnel working remotely could also impact the security of our systems, as well as our ability to protect against attacks and detect and respond to them quickly.

In addition, some of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with our products. We provide limited information to such third parties based on the scope of services provided to us. However, if these third parties or developers fail to adopt or adhere to adequate data security practices, or in the event of a breach of their networks, our data or our users' data may be improperly accessed, used, or disclosed.

We experience such cyber-attacks and other security incidents of varying degrees from time to time, and we incur significant costs in protecting against or remediating such incidents. In addition, we are subject to a variety of laws and regulations in the United States and abroad relating to cybersecurity and data protection, as well as obligations under our modified consent order with the FTC. As a result, affected users or government authorities could initiate legal or regulatory actions against us in connection with any actual or perceived security breaches or improper access to or disclosure of data, which has occurred in the past and which could cause us to incur significant expense and liability or result in orders or consent decrees forcing us to modify our business practices. Such incidents or our efforts to remediate such incidents may also result in a decline in our active user base or engagement levels. Any of these events could have a material and adverse effect on our business, reputation, or financial results.

42

PX0435-043

Table of Contents

For example, in September 2018, we announced our discovery of a third-party cyber-attack that exploited a vulnerability in Facebook's code to steal user access tokens, which were then used to access certain profile information from approximately 29 million user accounts on Facebook. The events surrounding this cyber-attack became the subject of Irish Data Protection Commission and other government inquiries. Any such inquiries could subject us to substantial fines and costs, require us to change our business practices, divert resources and the attention of management from our business, or adversely affect our business.

***We anticipate that our ongoing efforts related to privacy, safety, security, and content review will identify additional instances of misuse of user data or other undesirable activity by third parties on our platform.***

In addition to our efforts to mitigate cybersecurity risks, we are making significant investments in privacy, safety, security, and content review efforts to combat misuse of our services and user data by third parties, including investigations and audits of platform applications, as well as other enforcement efforts. As a result of these efforts we have discovered and announced, and anticipate that we will continue to discover and announce, additional incidents of misuse of user data or other undesirable activity by third parties. We may not discover all such incidents or activity, whether as a result of our data or technical limitations, including our lack of visibility over our encrypted services, the scale of activity on our platform, the allocation of resources to other projects, or other factors, and we may be notified of such incidents or activity by the independent privacy assessor required under our modified consent order with the FTC, the media, or other third parties. Such incidents and activities have in the past, and may in the future, include the use of user data or our systems in a manner inconsistent with our terms, contracts or policies, the existence of false or undesirable user accounts, election interference, improper advertising practices, activities that threaten people's safety on- or offline, or instances of spamming, scraping, data harvesting, unsecured datasets, or spreading misinformation. We may also be unsuccessful in our efforts to enforce our policies or otherwise remediate any such incidents. Consequences of any of the foregoing developments include negative effects on user trust and engagement, harm to our reputation and brands, changes to our business practices in a manner adverse to our business, and adverse effects on our business and financial results. Any such developments may also subject us to additional litigation and regulatory inquiries, which could subject us to monetary penalties and damages, divert management's time and attention, and lead to enhanced regulatory oversight.

***Our products and internal systems rely on software and hardware that is highly technical, and any errors, bugs, or vulnerabilities in these systems, or failures to address or mitigate technical limitations in our systems, could adversely affect our business.***

Our products and internal systems rely on software and hardware, including software and hardware developed or maintained internally and/or by third parties, that is highly technical and complex. In addition, our products and internal systems depend on the ability of such software and hardware to store, retrieve, process, and manage immense amounts of data. The software and hardware on which we rely has contained, and will in the future contain, errors, bugs, or vulnerabilities, and our systems are subject to certain technical limitations that may compromise our ability to meet our objectives. Some errors, bugs, or vulnerabilities inherently may be difficult to detect and may only be discovered after the code has been released for external or internal use. For example, in September 2018, we announced our discovery of a third-party cyber-attack that exploited a vulnerability in Facebook's code to steal user access tokens and access certain profile information from user accounts on Facebook. Errors, bugs, vulnerabilities, design defects, or technical limitations within the software and hardware on which we rely, or human error in using such systems, have in the past led to, and may in the future lead to, outcomes including a negative experience for users and marketers who use our products, compromised ability of our products to perform in a manner consistent with our terms, contracts, or policies, delayed product introductions or enhancements, targeting, measurement, or billing errors, compromised ability to protect the data of our users and/or our intellectual property or other data, or reductions in our ability to provide some or all of our services. For example, we make commitments to our users as to how their data will be collected, used, shared, and retained within and across our products, and our systems are subject to errors, bugs and technical limitations that may prevent us from fulfilling these commitments reliably. In addition, any errors, bugs, vulnerabilities, or defects in our systems or the software and hardware on which we rely, failures to properly address or mitigate the technical limitations in our systems, or associated degradations or interruptions of service or failures to fulfill our commitments to our users, have in the past led to, and may in the future lead to, outcomes including damage to our reputation, loss of users, loss of marketers, loss of revenue, regulatory inquiries, litigation, or liability for fines, damages, or other remedies, any of which could adversely affect our business and financial results.

43

PX0435-044

Table of Contents

***If we are unable to protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business may be adversely affected.***

We rely and expect to continue to rely on a combination of confidentiality, assignment, and license agreements with our employees, consultants, and third parties with whom we have relationships, as well as trademark, copyright, patent, trade secret, and domain name protection laws, to protect our proprietary rights. In the United States and internationally, we have filed various applications for protection of certain aspects of our intellectual property, and we currently hold a significant number of registered trademarks and issued patents in multiple jurisdictions and have acquired patents and patent applications from third parties. Third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, and pending and future trademark and patent applications may not be approved. In addition, effective intellectual property protection may not be available in every country in which we operate or intend to operate our business. In any or all of these cases, we may be required to expend significant time and expense in order to prevent infringement or to enforce our rights. Although we have generally taken measures to protect our proprietary rights, there can be no assurance that others will not offer products or concepts that are substantially similar to ours and compete with our business. In addition, we regularly contribute software source code under open source licenses and have made other technology we developed available under other open licenses, and we include open source software in our products. As a result of our open source contributions and the use of open source in our products, we may license or be required to license or disclose code and/or innovations that turn out to be material to our business and may also be exposed to increased litigation risk. If the protection of our proprietary rights is inadequate to prevent unauthorized use or appropriation by third parties, the value of our brands and other intangible assets may be diminished and competitors may be able to more effectively mimic our products, services, and methods of operations. Any of these events could have an adverse effect on our business and financial results.

***We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property rights claims that are expensive and time consuming and, if resolved adversely, could have a significant impact on our business, financial condition, or results of operations.***

Companies in the internet, technology, and media industries own large numbers of patents, copyrights, trademarks, and trade secrets, and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" that own patents and other intellectual property rights often attempt to aggressively assert their rights in order to extract value from technology companies. Furthermore, from time to time we may introduce or acquire new products, including in areas where we historically have not competed, which could increase our exposure to patent and other intellectual property claims from competitors and non-practicing entities.

From time to time, we receive notice from patent holders and other parties alleging that certain of our products and services, or user content, infringe their intellectual property rights. We presently are involved in a number of intellectual property lawsuits, and as we face increasing competition and develop new products and services, we expect the number of patent and other intellectual property claims against us to grow. Defending patent and other intellectual property litigation is costly and can impose a significant burden on management and employees, and there can be no assurances that favorable final outcomes will be obtained in all cases. In addition, plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of any such litigation, including potential preliminary injunctions requiring us to cease some or all of our operations. We may decide to settle such lawsuits and disputes on terms that are unfavorable to us. Similarly, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that may not be reversed upon appeal. The terms of such a settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, we may have to seek a license to continue practices found to be in violation of a third party's rights, which may not be available on reasonable terms, or at all, and may significantly increase our operating costs and expenses. As a result, we may also be required to develop alternative non-infringing technology or practices or discontinue the practices. The development of alternative non-infringing technology or practices could require significant effort and expense, could result in less effective technology or practices or otherwise negatively affect the user experience, or may not be feasible. We have experienced unfavorable outcomes in such disputes and litigation in the past, and our business, financial condition, and results of operations could be adversely affected as a result of an unfavorable resolution of the disputes and litigation referred to above.

44

PX0435-045

Table of Contents

<div align="center">**Risks Related to Ownership of Our Class A Common Stock**</div>

*The trading price of our Class A common stock has been and will likely continue to be volatile.*

The trading price of our Class A common stock has been, and is likely to continue to be, volatile. Since shares of our Class A common stock were sold in our initial public offering in May 2012 at a price of $38.00 per share, our stock price has ranged from $17.55 to $384.33 through December 31, 2022. In addition to the factors discussed in this Annual Report on Form 10-K, the trading price of our Class A common stock has in the past fluctuated and may in the future fluctuate significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our revenue and other operating results for either of our reportable segments;

- the financial projections we may provide to the public, any changes in these projections, or our failure to meet these projections;

- actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company, or our failure to meet these estimates or the expectations of investors;

- additional shares of our stock being sold into the market by us, our existing stockholders, or in connection with acquisitions, or the anticipation of such sales;

- investor sentiment with respect to our competitors, our business partners, and our industry in general;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- announcements by us or estimates by third parties of actual or anticipated changes in the size of our user base, the level of user engagement, or the effectiveness of our ad products;

- changes in operating performance and stock market valuations of technology companies in our industry, including our developers and competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- the inclusion, exclusion, or deletion of our stock from any trading indices, such as the S&P 500 Index;

- media coverage of our business and financial performance;

- lawsuits threatened or filed against us, or developments in pending lawsuits;

- adverse government actions or legislative or regulatory developments relating to advertising, competition, content, privacy, or other matters, including interim or final rulings by tax, judicial, or regulatory bodies;

- trading activity in our share repurchase program; and

- other events or factors, including those resulting from war, incidents of terrorism, pandemics, and other disruptive external events, or responses to these events.

In addition, the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many technology companies. We are currently subject to securities litigation in connection with our platform and user data practices and the misuse of certain data by a developer that shared such data with third parties in violation of our terms and policies; the disclosure of our earnings results for the second quarter of 2018; a former employee's allegations and release of internal company documents beginning in September 2021; and the disclosure of our earnings results for the fourth quarter of 2021. We may experience more such litigation following future periods of volatility. Any securities litigation could subject us to substantial costs, divert resources and the attention of management from our business, and adversely affect our business.

<div align="center">45</div>

PX0435-046

Table of Contents

***We do not intend to pay cash dividends for the foreseeable future.***

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business and fund our share repurchase program, and we do not expect to declare or pay any cash dividends in the foreseeable future. As a result, you may only receive a return on your investment in our Class A common stock if the trading price of your shares increases.

***The dual class structure of our common stock and a voting agreement between certain stockholders have the effect of concentrating voting control with our CEO and certain other holders of our Class B common stock; this will limit or preclude your ability to influence corporate matters.***

Our Class B common stock has ten votes per share and our Class A common stock has one vote per share. Holders of our Class B common stock, including our founder, Chairman, and CEO, together hold a majority of the combined voting power of our outstanding capital stock, and therefore are able to control the outcome of all matters submitted to our stockholders for approval so long as the shares of Class B common stock represent at least 9.1% of all outstanding shares of our Class A and Class B common stock. This concentrated control will limit or preclude your ability to influence corporate matters for the foreseeable future.

Transfers by holders of Class B common stock will generally result in those shares converting to Class A common stock, subject to limited exceptions, such as certain transfers effected for estate planning or charitable purposes. The conversion of Class B common stock to Class A common stock will have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term. If, for example, Mr. Zuckerberg retains a significant portion of his holdings of Class B common stock for an extended period of time, he could, in the future, continue to control a majority of the combined voting power of our outstanding capital stock.

***Our status as a "controlled company" could make our Class A common stock less attractive to some investors or otherwise harm our stock price.***

Because we qualify as a "controlled company" under the corporate governance rules for Nasdaq-listed companies, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function. In the future we could elect not to have a majority of our board of directors be independent or not to have a compensation committee or an independent nominating function. Accordingly, should the interests of our controlling stockholder differ from those of other stockholders, the other stockholders may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance rules for Nasdaq-listed companies. Our status as a controlled company could make our Class A common stock less attractive to some investors or otherwise harm our stock price.

***Delaware law and provisions in our certificate of incorporation and bylaws could make a merger, tender offer, or proxy contest difficult, thereby depressing the trading price of our Class A common stock.***

Our status as a Delaware corporation and the anti-takeover provisions of the Delaware General Corporation Law may discourage, delay, or prevent a change in control by prohibiting us from engaging in a business combination with an interested stockholder for a period of three years after the person becomes an interested stockholder, even if a change of control would be beneficial to our existing stockholders. In addition, our current certificate of incorporation and bylaws contain provisions that may make the acquisition of our company more difficult, including the following:

- until the first date on which the outstanding shares of our Class B common stock represent less than 35% of the combined voting power of our common stock, any transaction that would result in a change in control of our company requires the approval of a majority of our outstanding Class B common stock voting as a separate class;

- we currently have a dual class common stock structure, which provides Mr. Zuckerberg with the ability to control the outcome of matters requiring stockholder approval, even if he owns significantly less than a majority of the shares of our outstanding Class A and Class B common stock;

46

PX0435-047

Table of Contents

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock, certain amendments to our certificate of incorporation or bylaws will require the approval of two-thirds of the combined vote of our then-outstanding shares of Class A and Class B common stock;

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of our common stock, vacancies on our board of directors will be able to be filled only by our board of directors and not by stockholders;

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of our common stock, our board of directors will be classified into three classes of directors with staggered three-year terms and directors will only be able to be removed from office for cause;

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of our common stock, our stockholders will only be able to take action at a meeting of stockholders and not by written consent;

- only our chairman, our chief executive officer, our president, or a majority of our board of directors are authorized to call a special meeting of stockholders;

- advance notice procedures apply for stockholders to nominate candidates for election as directors or to bring matters before an annual meeting of stockholders;

- our certificate of incorporation authorizes undesignated preferred stock, the terms of which may be established, and shares of which may be issued, without stockholder approval; and

- certain litigation against us can only be brought in Delaware.

47

Table of Contents

## Item 1B.  Unresolved Staff Comments

None.

## Item 2.  Properties

Our corporate headquarters are located in Menlo Park, California. As of December 31, 2022, we owned and leased approximately 10 million square feet of office and building space for our corporate headquarters and in the surrounding areas. However, beginning in the third quarter of 2022, we made a decision to either sublease, early terminate, or abandon several office buildings under operating leases. We also owned and leased approximately 62 acres of land to be developed to accommodate anticipated future growth.

In addition, we have offices in more than 90 cities across North America, Europe, the Middle East, Africa, Asia Pacific, and Latin America. We also own 21 data centers locations globally.

See Note 3 — Restructuring in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for additional information regarding our facilities consolidation efforts.

We believe that our facilities are adequate for our current needs.

## Item 3.  Legal Proceedings

Beginning on March 20, 2018, multiple putative class actions and derivative actions were filed in state and federal courts in the United States and elsewhere against us and certain of our directors and officers alleging violations of securities laws, breach of fiduciary duties, and other causes of action in connection with our platform and user data practices as well as the misuse of certain data by a developer that shared such data with third parties in violation of our terms and policies, and seeking unspecified damages and injunctive relief. Beginning on July 27, 2018, two putative class actions were filed in federal court in the United States against us and certain of our directors and officers alleging violations of securities laws in connection with the disclosure of our earnings results for the second quarter of 2018 and seeking unspecified damages. These two actions subsequently were transferred and consolidated in the U.S. District Court for the Northern District of California with the putative securities class action described above relating to our platform and user data practices. On September 25, 2019, the district court granted our motion to dismiss the consolidated putative securities class action, with leave to amend. On November 15, 2019, a second amended complaint was filed in the consolidated putative securities class action. On August 7, 2020, the district court granted our motion to dismiss the second amended complaint, with leave to amend. On October 16, 2020, a third amended complaint was filed in the consolidated putative securities class action. On December 20, 2021, the district court granted our motion to dismiss the third amended complaint, with prejudice. On January 17, 2022, the plaintiffs filed a notice of appeal of the order dismissing their case, and the appeal is now pending before the U.S. Court of Appeals for the Ninth Circuit. With respect to the multiple putative class actions filed against us beginning on March 20, 2018 alleging fraud and violations of consumer protection, privacy, and other laws in connection with the same matters, several of the cases brought on behalf of consumers in the United States were consolidated in the U.S. District Court for the Northern District of California. On September 9, 2019, the court granted, in part, and denied, in part, our motion to dismiss the consolidated putative consumer class action. On December 22, 2022, the parties entered into a settlement agreement to resolve the lawsuit, which provides for a payment of $725 million by us and is subject to court approval. In addition, our platform and user data practices, as well as the events surrounding the misuse of certain data by a developer, became the subject of U.S. Federal Trade Commission (FTC), state attorneys general, and other government inquiries in the United States, Europe, and other jurisdictions. We entered into a settlement and modified consent order to resolve the FTC inquiry, which took effect in April 2020 and required us to pay a penalty of $5.0 billion and to significantly enhance our practices and processes for privacy compliance and oversight. The state attorneys general inquiry and certain government inquiries in other jurisdictions remain ongoing and could subject us to additional substantial fines and costs, require us to change our business practices, divert resources and the attention of management from our business, or adversely affect our business. On July 16, 2021, a stockholder derivative action was filed in Delaware Chancery Court against certain of our directors and officers asserting breach of fiduciary duty and related claims relating to our historical platform and user data practices, as well as our settlement with the FTC. On July 20, 2021, other stockholders filed an amended derivative complaint in a related Delaware Chancery Court action, asserting breach of fiduciary duty and related claims against certain of our current and former directors and officers in connection with our historical platform and user data practices. On November 4, 2021, the lead

48

PX0435-049

Table of Contents

plaintiffs filed a second amended and consolidated complaint in the stockholder derivative action. We believe the lawsuits described above are without merit, and we are vigorously defending them.

We also notify the Irish Data Protection Commission (IDPC), our lead European Union privacy regulator under the General Data Protection Regulation (GDPR), of certain other personal data breaches and privacy issues, and are subject to inquiries and investigations by the IDPC and other European regulators regarding various aspects of our regulatory compliance. For example, in August 2020, we received a preliminary draft decision from the IDPC that preliminarily concluded that Meta Platforms Ireland's reliance on Standard Contractual Clauses in respect of European Union/European Economic Area Facebook user data does not achieve compliance with the GDPR and preliminarily proposed that transfers of such user data from the European Union to the United States should therefore be suspended. In February 2022, we received a revised preliminary draft decision in which the IDPC maintained its preliminary conclusion that these transfers should be suspended. The IDPC's draft decision was then further refined and shared on July 6, 2022 with other European data protection regulators (CSAs) as part of the GDPR's consistency mechanism. Separately, on October 7, 2022, President Biden signed the Executive Order on Enhancing Safeguards for United States Signals Intelligence Activities, and on December 13, 2022, the European Commission published its draft adequacy decision on the proposed new European Union-U.S. Data Privacy Framework. On January 19, 2023, the IDPC referred the inquiry to a vote by the European Data Protection Board, pursuant to the dispute resolution process under Article 65 GDPR, in respect of elements of the draft decision over which consensus could not be reached between concerned supervisory authorities. We believe a final decision in this inquiry may issue as early as the first quarter of 2023. For additional information, see Part I, Item 1A, "Risk Factors—Our business is subject to complex and evolving U.S. and foreign laws and regulations regarding privacy, data use and data protection, content, competition, safety and consumer protection, e-commerce, and other matters" in this Annual Report on Form 10-K. Any such inquiries or investigations (including the IDPC proceeding) could subject us to substantial fines and costs, require us to change our business practices, divert resources and the attention of management from our business, or adversely affect our business.

In addition, we are subject to various litigation and government inquiries and investigations, formal or informal, by competition authorities in the United States, Europe, and other jurisdictions. Such investigations, inquiries, and lawsuits concern, among other things, our business practices in the areas of social networking or social media services, digital advertising, and/or mobile or online applications, as well as our acquisitions. For example, in June 2019 we were informed by the FTC that it had opened an antitrust investigation of our company. On December 9, 2020, the FTC filed a complaint against us in the U.S. District Court for the District of Columbia alleging that we engaged in anticompetitive conduct and unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act and Section 2 of the Sherman Act, including by acquiring Instagram in 2012 and WhatsApp in 2014 and by maintaining conditions on access to our platform. In addition, beginning in the third quarter of 2019, we became the subject of antitrust investigations by the U.S. Department of Justice and state attorneys general. On December 9, 2020, the attorneys general from 46 states, the territory of Guam, and the District of Columbia filed a complaint against us in the U.S. District Court for the District of Columbia alleging that we engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act, including by acquiring Instagram in 2012 and WhatsApp in 2014 and by maintaining conditions on access to our platform. The complaint also alleged that we violated Section 7 of the Clayton Act by acquiring Instagram and WhatsApp. The complaints of the FTC and attorneys general both sought a permanent injunction against our company's alleged violations of the antitrust laws, and other equitable relief, including divestiture or reconstruction of Instagram and WhatsApp. On June 28, 2021, the court granted our motions to dismiss the complaints filed by the FTC and attorneys general, dismissing the FTC's complaint with leave to amend and dismissing the attorneys general's case without prejudice. On July 28, 2021, the attorneys general filed a notice of appeal of the order dismissing their case and that appeal is now pending before the U.S. Court of Appeals for the District of Columbia Circuit. On August 19, 2021, the FTC filed an amended complaint, and on October 4, 2021, we filed a motion to dismiss this amended complaint. On January 11, 2022, the court denied our motion to dismiss the FTC's amended complaint. Multiple putative class actions have also been filed in state and federal courts in the United States and in the United Kingdom against us alleging violations of antitrust laws and other causes of action in connection with these acquisitions and/or other alleged anticompetitive conduct, and seeking damages and injunctive relief. Several of the cases brought on behalf of certain advertisers and users in the United States were consolidated in the U.S. District Court for the Northern District of California. On January 14, 2022, the court granted, in part, and denied, in part, our motion to dismiss the consolidated actions. On March 1, 2022, a first amended consolidated complaint was filed in the putative class action brought on behalf of certain advertisers. On December 6, 2022, the court denied our motion to dismiss the first amended consolidated complaint filed in the putative class action brought on behalf of certain advertisers. In addition, on July 27, 2022, the FTC filed a complaint against us in the U.S. District Court for the Northern District of California seeking to preliminarily enjoin our proposed acquisition of Within Unlimited as an alleged violation of antitrust law. The FTC subsequently filed a related complaint in

49

PX0435-050

Table of Contents

their administrative court seeking to permanently enjoin the transaction as a violation of Section 7 of the Clayton Act, and seeking other relief as well. We believe these lawsuits are without merit, and we are vigorously defending them. In December 2022, the European Commission issued a Statement of Objections alleging that we tie Facebook Marketplace to Facebook and use data in a manner that infringes European Union competition rules. The result of such litigation, investigations or inquiries could subject us to substantial monetary remedies and costs, interrupt or require us to change our business practices, divert resources and the attention of management from our business, or subject us to other structural or behavioral remedies that adversely affect our business.

Beginning in January 2022, we became subject to litigation and other proceedings that were filed in various federal and California state courts alleging that Facebook and Instagram cause "social media addiction" in teenage users, resulting in various mental health and other harms. A putative class action alleging similar harms was also filed in California state court on behalf of users under the age of 13 and three school districts recently filed public nuisance claims based on similar allegations. On October 6, 2022, the federal cases were consolidated in the U.S. District Court for the Northern District of California. The state court proceedings are now pending before a trial judge from Los Angeles County Superior Court. We believe these lawsuits are without merit, and we are vigorously defending them. We are also subject to government investigations and requests from multiple regulators concerning the use of our products, and the related mental and physical health and safety impacts on teenage users.

We are also subject to other government inquiries and investigations relating to our business activities and disclosure practices. For example, beginning in September 2021, we became subject to government investigations and requests relating to a former employee's allegations and release of internal company documents concerning, among other things, our algorithms, advertising and user metrics, and content enforcement practices, as well as misinformation and other undesirable activity on our platform, and user well-being. We have since received additional requests relating to these and other topics. Beginning on October 27, 2021, multiple putative class actions and derivative actions were filed in the U.S. District Court for the Northern District of California against us and certain of our directors and officers alleging violations of securities laws, breach of fiduciary duties, and other causes of action in connection with the same matters, and seeking unspecified damages. We believe these lawsuits are without merit, and we are vigorously defending them.

On March 8, 2022, a putative class action was filed in the U.S. District Court for the Northern District of California against us and certain of our directors and officers alleging violations of securities laws in connection with the disclosure of our earnings results for the fourth quarter of 2021 and seeking unspecified damages. We believe this lawsuit is without merit, and we are vigorously defending it.

Beginning on August 15, 2018, multiple putative class actions were filed against us alleging that we inflated our estimates of the potential audience size for advertisements, resulting in artificially increased demand and higher prices. The cases were consolidated in the U.S. District Court for the Northern District of California and seek unspecified damages and injunctive relief. In a series of rulings in 2019, 2021, and 2022, the court dismissed certain of the plaintiffs' claims, but permitted its fraud and unfair competition claims to proceed. On March 29, 2022, the court granted the plaintiffs' motion for class certification. On June 21, 2022, the U.S. Court of Appeals for the Ninth Circuit granted our petition for permission to appeal the district court's class certification order, and the district court subsequently stayed the case. We believe this lawsuit is without merit, and we are vigorously defending it.

In July 2017, an individual filed an action in the U.S. District Court for the Northern District of California against us and other companies for allegedly violating the Anti-Terrorism Act by aiding, abetting, and providing material support to an organization that committed an international terrorist act, and seeking unspecified damages. In October 2018, the district court granted our motion to dismiss. In June 2021, the U.S. Court of Appeals for the Ninth Circuit reversed the judgment. On October 3, 2022, the U.S. Supreme Court agreed to review the judgment in this action, along with a companion case against another company in which the U.S. Supreme Court agreed to review the scope of protection available to online platforms under Section 230 of the Communications Decency Act (Section 230). We believe this lawsuit is without merit, and we are vigorously defending it. However, changes to the protections available under Section 230 may increase our costs or require significant changes to our products, business practices, or operations, which could adversely affect our business.

On February 14, 2022, the State of Texas filed a lawsuit against us in Texas state court alleging that "tag suggestions" and other facial recognition features on our products violated the Texas Capture or Use of Biometric Identifiers Act and the Texas Deceptive Trade Practices-Consumer Protection Act, and seeking statutory damages and injunctive relief. The case is currently scheduled for trial in October 2023. We believe this lawsuit is without merit, and we are vigorously defending it.

50

Table of Contents

In addition, we are subject to litigation and other proceedings involving law enforcement and other regulatory agencies, including in particular in Brazil, Russia, and other countries in Europe, in order to ascertain the precise scope of our legal obligations to comply with the requests of those agencies, including our obligation to disclose user information in particular circumstances. A number of such instances have resulted in the assessment of fines and penalties against us. We believe we have multiple legal grounds to satisfy these requests or prevail against associated fines and penalties, and we intend to vigorously defend such fines and penalties.

We are also party to various other legal proceedings, claims, and regulatory, tax or government inquiries and investigations that arise in the ordinary course of business, and we may in the future be subject to additional legal proceedings and disputes.

**Item 4.  Mine Safety Disclosures**

Not applicable.

51

Table of Contents

## PART II

### Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

#### Market Information for Common Stock

On June 9, 2022, Meta's Class A common stock began trading on the Nasdaq Global Select Market under the ticker symbol 'META'. This replaced the ticker symbol 'FB,' which had been used since the company's initial public offering in 2012. Prior to that time, there was no public market for our stock.

Our Class B common stock is not listed on any stock exchange nor traded on any public market.

#### Holders of Record

As of December 31, 2022, there were 3,204 stockholders of record of our Class A common stock, and the closing price of our Class A common stock was $120.34 per share as reported on the Nasdaq Global Select Market. Because many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders. As of December 31, 2022, there were 27 stockholders of record of our Class B common stock.

#### Dividend Policy

We have never declared or paid any cash dividend on our common stock. We intend to retain any future earnings to finance the operation and expansion of our business and fund our share repurchase program, and we do not expect to pay cash dividends in the foreseeable future.

#### Purchases of Equity Securities by the Issuer and Affiliated Purchasers

The following table summarizes the share repurchase activity for the three months ended December 31, 2022:

| | Total Number of Shares Purchased [1] | Average Price Paid Per Share [2] | Total Number of Shares Purchased as Part of Publicly Announced Programs [1] | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs [1] |
|---|---|---|---|---|
| | (in thousands) | | (in thousands) | (in millions) |
| October 1 - 31, 2022 | 20,180 | $  126.03 | 20,180 | $  15,232 |
| November 1 - 30, 2022 | 24,878 | $  105.28 | 24,878 | $  12,613 |
| December 1 - 31, 2022 | 14,808 | $  117.87 | 14,808 | $  10,868 |
| | 59,866 | | 59,866 | |

---

(1)  Our board of directors has authorized a share repurchase program of our Class A common stock, which commenced in January 2017 and does not have an expiration date. In January 2023, an additional $40 billion of repurchases was authorized under this program. The timing and actual number of shares repurchased depend on a variety of factors, including price, general business and market conditions, and other investment opportunities, and shares may be repurchased through open market purchases or privately negotiated transactions, including through the use of trading plans intended to qualify under Rule 10b5-1 under the Exchange Act. See Note 14 — Stockholders' Equity in Part II, Item 8 of the Annual Report on Form 10-K for additional information related to share repurchases.

(2)  Average price paid per share includes costs associated with the repurchases.

#### Recent Sale of Unregistered Securities and Use of Proceeds

##### *Recent Sale of Unregistered Securities*

None.

PX0435-053

Table of Contents

**Stock Performance Graph**

*This performance graph shall not be deemed "soliciting material" or to be "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities under that Section, and shall not be deemed to be incorporated by reference into any filing of Meta Platforms, Inc. under the Securities Act of 1933, as amended, or the Exchange Act.*

      The following graph shows a comparison of the cumulative total return for our Class A common stock, the Dow Jones Internet Composite Index (DJINET), the Standard & Poor's 500 Stock Index (S&P 500) and the Nasdaq Composite Index (Nasdaq Composite) for the five years ended December 31, 2022. The graph assumes that $100 was invested at the market close on the last trading day for the fiscal year ended December 31, 2017 in the Class A common stock of Meta Platforms, Inc., the DJINET, the S&P 500, and the Nasdaq Composite and data for the DJINET, the S&P 500, and the Nasdaq Composite assumes reinvestments of gross dividends. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



Comparison of Five-Year Cumulative Total Return for Meta Platforms, Inc.,

DJINET, S&P 500 and Nasdaq Composite

**Item 6.**   **[Reserved]**

PX0435-054

Table of Contents

**Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read the following discussion of our financial condition and results of operations in conjunction with our consolidated financial statements and the related notes included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K. In addition to our historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in Part I, Item 1A, "Risk Factors." For a discussion of limitations in the measurement of certain of our community metrics, see the section entitled "Limitations of Key Metrics and Other Data" in this Annual Report on Form 10-K.*

*To supplement our consolidated financial statements, which are prepared and presented in accordance with generally accepted accounting principles in the United States (GAAP), we present revenue on a constant currency basis and free cash flow, which are non-GAAP financial measures. Revenue on a constant currency basis is presented in the section entitled "—Revenue—Foreign Exchange Impact on Revenue." To calculate revenue on a constant currency basis, we translated revenue for the full year 2022 using 2021 monthly exchange rates for our settlement or billing currencies other than the U.S. dollar. For a full description of our free cash flow non-GAAP measure, see the section entitled "—Liquidity and Capital Resources—Free Cash Flow."*

*These non-GAAP financial measures are not intended to be considered in isolation or as a substitute for, or superior to, financial information prepared and presented in accordance with GAAP. These measures may be different from non-GAAP financial measures used by other companies, limiting their usefulness for comparison purposes. Moreover, presentation of revenue on a constant currency basis is provided for year-over-year comparison purposes, and investors should be cautioned that the effect of changing foreign currency exchange rates has an actual effect on our operating results. We believe these non-GAAP financial measures provide investors with useful supplemental information about the financial performance of our business, enable comparison of financial results between periods where certain items may vary independent of business performance, and allow for greater transparency with respect to key metrics used by management in operating our business.*

**Executive Overview of Full Year 2022 Results**

Our mission is to give people the power to build community and bring the world closer together. In 2022, we continued to focus on our main revenue growth priorities: (i) helping marketers use our products to connect with consumers and (ii) making our ads more relevant and effective. We also continued to invest in both our family of apps and our metaverse efforts based on our company priorities.

Our financial results and key community metrics for 2022 are set forth below. Our total revenue for 2022 was $116.61 billion, a decrease of 1% compared to 2021, which reflects a $5.96 billion negative impact from the appreciation of the U.S. dollar relative to other foreign currencies. Revenue on a constant currency basis was $122.57 billion for 2022, an increase of 4% compared to 2021. Our advertising revenue was impacted by a reduction in advertising demand during 2022 compared to 2021, which we believe was primarily driven by reduced marketer spending as a result of a more challenging macroeconomic environment, as well as limitations on our ad targeting and measurement tools arising from changes to iOS and the regulatory environment. Our average price per ad decreased by 16% year-over-year in 2022, partially offset by an 18% year-over-year increase in ad impressions delivered across our Family of Apps.

Income from operations for 2022 was $28.94 billion, a decrease of $17.81 billion, or 38%, compared to 2021, mainly due to an increase in payroll and related expenses associated with a 20% increase in employee headcount particularly in engineering and other technical functions and higher operational expenses related to our data centers and technical infrastructure. Starting in the third quarter of 2022, we began a series of cost management initiatives including facilities consolidation, a layoff of approximately 11,000 employees, and a pivot in our data center strategy, which resulted in total restructuring charges of $4.61 billion in 2022. We expect we may incur significant additional restructuring charges as we continue to focus on cost efficiency measures through 2023.

PX0435-055

Table of Contents

*Consolidated and Segment Results*

We report our financial results for our two reportable segments: Family of Apps (FoA) and Reality Labs (RL). FoA includes Facebook, Instagram, Messenger, WhatsApp, and other services. RL includes our augmented and virtual reality related consumer hardware, software, and content.

| | Family of Apps | | | Reality Labs | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2022 | 2021 | % change | 2022 | 2021 | % change | 2022 | 2021 | % change |
| | *(in millions, except percentages)* | | | | | | | | |
| Revenue | $ 114,450 | $ 115,655 | *(1)%* | $ 2,159 | $ 2,274 | *(5)%* | $ 116,609 | $ 117,929 | *(1)%* |
| Costs and expenses | $ 71,789 | $ 58,709 | *22%* | $ 15,876 | $ 12,467 | *27%* | $ 87,665 | $ 71,176 | *23%* |
| Income (loss) from operations | $ 42,661 | $ 56,946 | *(25)%* | $ (13,717) | $ (10,193) | *(35)%* | $ 28,944 | $ 46,753 | *(38)%* |
| *Operating margin* | *37 %* | *49 %* | | *(635)%* | *(448)%* | | *25 %* | *40 %* | |

- Net income was $23.20 billion, with diluted earnings per share of $8.59 for the year ended December 31, 2022.
- Capital expenditures, including principal payments on finance leases, were $32.04 billion for the year ended December 31, 2022.
- Effective tax rate was 19.5% for the year ended December 31, 2022.
- Cash, cash equivalents, and marketable securities were $40.74 billion as of December 31, 2022.
- Long-term debt was $9.92 billion as of December 31, 2022.
- Headcount was 86,482 as of December 31, 2022, an increase of 20% year-over-year. Our reported headcount includes a substantial majority of the approximately 11,000 employees impacted by the layoff we announced in November 2022, who will no longer be reflected in our headcount by the end of the first quarter of 2023.

*Restructuring*

In 2022, we initiated several measures to pursue greater efficiency and to realign our business and strategic priorities. This includes a facilities consolidation strategy to sublease, early terminate, or abandon several office buildings under operating leases, a layoff of approximately 11,000 of our employees across the FoA and RL segments, and a pivot towards a next generation data center design, including cancellation of multiple data center projects.

A summary of our restructuring charges for the year ended December 31, 2022 by major activity type is as follows (in millions):

| | Facilities Consolidation | Severance and Other Personnel Costs | Data Center Assets | Total |
|---|---|---|---|---|
| Cost of revenue | $ 154 | $ — | $ 1,341 | $ 1,495 |
| Research and development | 1,311 | 408 | — | 1,719 |
| Marketing and sales | 404 | 234 | — | 638 |
| General and administrative | 426 | 333 | — | 759 |
| Total | $ 2,295 | $ 975 | $ 1,341 | $ 4,611 |

Total restructuring charges recorded under our FoA segment were $4.10 billion and RL segment were $515 million. These charges lowered our operating margin by four percentage points and diluted earnings per share (EPS) by $1.34. The impact of severance and other personnel costs recorded in the fourth quarter of 2022 was not material after offsetting with the savings from the decreases in payroll, bonus and other benefits expenses.

See Note 3 — Restructuring in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for additional information regarding restructuring charges.

PX0435-056

Table of Contents

*Family of Apps Metrics*

- Family daily active people (DAP) was 2.96 billion on average for December 2022, an increase of 5% year-over-year.
- Family monthly active people (MAP) was 3.74 billion as of December 31, 2022, an increase of 4% year-over-year.
- Facebook daily active users (DAUs) were 2.00 billion on average for December 2022, an increase of 4% year-over-year.
- Facebook monthly active users (MAUs) were 2.96 billion as of December 31, 2022, an increase of 2% year-over-year.
- Ad impressions delivered across our Family of Apps increased by 18% year-over-year in 2022, and the average price per ad decreased by 16% year-over-year in 2022.

*Developments in Advertising*

Substantially all of our revenue is currently generated from advertising on Facebook and Instagram. We rely on targeting and measurement tools that incorporate data signals from user activity on websites and services that we do not control in order to deliver relevant and effective ads to our users. Our advertising revenue has been, and we expect will continue to be, adversely affected by reduced marketer spending as a result of limitations on our ad targeting and measurement tools arising from changes to the regulatory environment and third-party mobile operating systems and browsers.

In particular, legislative and regulatory developments such as the General Data Protection Regulation, ePrivacy Directive, and California Privacy Rights Act have impacted our ability to use data signals in our ad products, and we expect these and other developments such as the Digital Markets Act will have further impact in the future. As a result, we have implemented, and we will continue to implement, changes to our products and user data practices, which reduce our ability to effectively target and measure ads. In addition, mobile operating system and browser providers, such as Apple and Google, have implemented product changes and/or announced future plans to limit the ability of websites and application developers to collect and use these signals to target and measure advertising. For example, in 2021, Apple made certain changes to its products and data use policies in connection with changes to its iOS operating system that reduce our and other iOS developers' ability to target and measure advertising, which has negatively impacted, and we expect will continue to negatively impact, the size of the budgets marketers are willing to commit to us and other advertising platforms.

To mitigate these developments, we are working to evolve our advertising systems to improve the performance of our ad products. We are developing privacy enhancing technologies to deliver relevant ads and measurement capabilities while reducing the amount of personal information we process, including by relying more on anonymized or aggregated third-party data. In addition, we are developing tools that enable marketers to share their data into our systems, as well as ad products that generate more valuable signals within our apps. More broadly, we also continue to innovate our advertising tools to help marketers prepare campaigns and connect with consumers, including developing growing formats such as Reels ads and our business messaging ad products. Across all of these efforts, we are making significant investments in artificial intelligence and machine learning to improve our delivery, targeting, and measurement capabilities. We are also engaging with others across our industry to explore the possibility of new open standards for the private and secure processing of data for advertising purposes. We expect that some of these efforts will be long-term initiatives, and that the regulatory and platform developments described above will continue to adversely impact our advertising revenue for the foreseeable future.

*Other Business and Macroeconomic Conditions*

Other global and regional business, macroeconomic, and geopolitical conditions also have had, and we believe will continue to have, an impact on our user growth and engagement and advertising revenue. In particular, we believe advertising budgets have been pressured by factors such as inflation, rising interest rates, and related market uncertainty, which has led to reduced marketer spending. In addition, competitive products and services have reduced some users' engagement with our products and services. In response to competitive pressures, we have introduced new features such as Reels and are investing in our artificial intelligence-powered discovery engine to recommend relevant unconnected content across our products. While Reels is growing in usage, it is not currently monetized at the same rate as our feed or Stories products. We also have seen fluctuations and declines in the size of our active user base in one or more markets from time to time. For example, in connection with the war in Ukraine, access to Facebook and Instagram was restricted in Russia and the services were then prohibited by the Russian government, which adversely affected user growth and engagement in 2022. These trends adversely affected advertising revenue in 2022, and we expect will continue to affect our advertising revenue in the foreseeable future.

56

PX0435-057

Table of Contents

The COVID-19 pandemic has also impacted our business and results of operations, with a varied impact on user growth and engagement, as well as the demand for and pricing of our ads from period to period. While we experienced a reduction in advertising demand and a related decline in pricing during the onset of the pandemic, we believe the pandemic subsequently contributed to an acceleration in the growth of online commerce, and we experienced increasing demand for advertising as a result of this trend. More recently, we believe this growth has declined, and we saw continued softening of advertising demand in 2022 as many activities that shifted online during COVID-19 related lockdowns resumed in person. We may experience similar volatility in the demand for and pricing of our advertising services as a result of the pandemic in the future.

Although we regularly evaluate a variety of sources to understand trends in our advertising revenue, we do not have perfect visibility into the factors driving advertiser spending decisions and our assessments involve complex judgments about what is driving advertising decisions across a large and diversified advertiser base across the globe. Trends impacting advertising spend are also dynamic and interrelated. As a result, it is difficult to identify with precision which advertiser spending decisions are attributable to which trends, and we are unable to quantify the exact impact that each trend had on our advertising revenue during the periods presented.

*Investment Philosophy*

In 2022, we continued to invest based on the following company priorities: (i) continue making progress on the major social issues facing the internet and our company, including privacy, safety, and security; (ii) build new experiences that meaningfully improve people's lives today and set the stage for even bigger improvements in the future; (iii) keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs; and (iv) communicate more transparently about what we're doing and the role our services play in the world.

We anticipate that investments in our data center capacity, servers, network infrastructure, and headcount will continue to drive expense growth in 2023, which will adversely affect our operating margin and profitability. The majority of our investments are directed toward developing our family of apps. In 2022, 82% of our total costs and expenses were recognized in FoA and 18% were recognized in RL. Our FoA investments include expenses relating to headcount, data centers and technical infrastructure as part of our efforts to develop our apps and our advertising services. We are also making significant investments in our metaverse efforts, including developing virtual and augmented reality devices, software for social platforms, neural interfaces, and other foundational technologies for the metaverse. Our RL investments include expenses relating to headcount and technology development across these efforts. Many of our RL investments are directed toward long-term, cutting-edge research and development for products for the metaverse that are not on the market today and may only be fully realized in the next decade. Although it is inherently difficult to predict when and how the metaverse ecosystem will develop, we expect our RL segment to continue to operate at a loss for the foreseeable future, and our ability to support our metaverse efforts is dependent on generating sufficient profits from other areas of our business. We expect this will be a complex, evolving, and long-term initiative. We are investing now because we believe this is the next chapter of the internet and will unlock monetization opportunities for businesses, developers, and creators, including around advertising, hardware, and digital goods.

57

PX0435-058

Table of Contents

**Trends in Our Family Metrics**

The numbers for our key Family metrics, our DAP, MAP, and average revenue per person (ARPP), do not include users on our other products unless they would otherwise qualify as DAP or MAP, respectively, based on their other activities on our Family products.

Trends in the number of people in our community affect our revenue and financial results by influencing the number of ads we are able to show, the value of our ads to marketers, as well as our expenses and capital expenditures. Substantially all of our daily and monthly active people (as defined below) access our Family products on mobile devices.

- ***Daily Active People (DAP).*** We define a daily active person as a registered and logged-in user of Facebook, Instagram, Messenger, and/or WhatsApp (collectively, our "Family" of products) who visited at least one of these Family products through a mobile device application or using a web or mobile browser on a given day. We do not require people to use a common identifier or link their accounts to use multiple products in our Family, and therefore must seek to attribute multiple user accounts within and across products to individual people. Our calculations of DAP rely upon complex techniques, algorithms, and machine learning models that seek to estimate the underlying number of unique people using one or more of these products, including by matching user accounts within an individual product and across multiple products when we believe they are attributable to a single person, and counting such group of accounts as one person. As these techniques and models require significant judgment, are developed based on internal reviews of limited samples of user accounts, and are calibrated against user survey data, there is necessarily some margin of error in our estimates. We view DAP, and DAP as a percentage of MAP, as measures of engagement across our products. For additional information, see the section entitled "Limitations of Key Metrics and Other Data" in this Annual Report on Form 10-K.



Note: We report the numbers of DAP and MAP as specific amounts, but these numbers are estimates of the numbers of unique people using our products and are subject to statistical variances and errors. While we expect the error margin for these estimates to vary from period to period, we estimate that such margin generally will be approximately 3% of our worldwide MAP. At our scale, it is very difficult to attribute multiple user accounts within and across products to individual people, and it is possible that the actual numbers of unique people using our products may vary significantly from our estimates, potentially beyond our estimated error margins. For additional information, see the section entitled "Limitations of Key Metrics and Other Data" in this Annual Report on Form 10-K. In the first quarter of 2021, we updated our Family metrics calculations to maintain calibration of our models against recent user survey data, and we estimate such update contributed an aggregate of approximately 60 million DAP to our reported worldwide DAP in March 2021. In the third quarter of 2022, we updated our Family metrics calculations to maintain calibration of our models against recent user survey data, and we estimate such update contributed an aggregate of approximately 30 million DAP to our reported worldwide DAP in September 2022.

Worldwide DAP increased 5% to 2.96 billion on average during December 2022 from 2.82 billion during December 2021.

58

PX0435-059

Table of Contents

- **Monthly Active People (MAP).** We define a monthly active person as a registered and logged-in user of one or more Family products who visited at least one of these Family products through a mobile device application or using a web or mobile browser in the last 30 days as of the date of measurement. We do not require people to use a common identifier or link their accounts to use multiple products in our Family, and therefore must seek to attribute multiple user accounts within and across products to individual people. Our calculations of MAP rely upon complex techniques, algorithms, and machine learning models that seek to estimate the underlying number of unique people using one or more of these products, including by matching user accounts within an individual product and across multiple products when we believe they are attributable to a single person, and counting such group of accounts as one person. As these techniques and models require significant judgment, are developed based on internal reviews of limited samples of user accounts, and are calibrated against user survey data, there is necessarily some margin of error in our estimates. We view MAP as a measure of the size of our global active community of people using our products. For additional information, see the section entitled "Limitations of Key Metrics and Other Data" in this Annual Report on Form 10-K.



*Note: We report the numbers of DAP and MAP as specific amounts, but these numbers are estimates of the numbers of unique people using our products and are subject to statistical variances and errors. While we expect the error margin for these estimates to vary from period to period, we estimate that such margin generally will be approximately 3% of our worldwide MAP. At our scale, it is very difficult to attribute multiple user accounts within and across products to individual people, and it is possible that the actual numbers of unique people using our products may vary significantly from our estimates, potentially beyond our estimated error margins. For additional information, see the section entitled "Limitations of Key Metrics and Other Data" in this Annual Report on Form 10-K. In the first quarter of 2021, we updated our Family metrics calculations to maintain calibration of our models against recent user survey data, and we estimate such update contributed an aggregate of approximately 70 million MAP to our reported worldwide MAP in March 2021. In the third quarter of 2022, we updated our Family metrics calculations to maintain calibration of our models against recent user survey data, and we estimate such update contributed an aggregate of approximately 40 million MAP to our reported worldwide MAP in September 2022.*

As of December 31, 2022, we had 3.74 billion MAP, an increase of 4% from 3.59 billion as of December 31, 2021.

PX0435-060

Table of Contents

- **_Average Revenue Per Person (ARPP)._** We define ARPP as our total revenue during a given quarter, divided by the average of the number of MAP at the beginning and end of the quarter. While ARPP includes all sources of revenue, the number of MAP used in this calculation only includes users of our Family products as described in the definition of MAP above. We estimate that the share of revenue from users who are not also MAP was not material.



_Note: Non-advertising revenue includes RL revenue generated from the delivery of consumer hardware products and FoA Other revenue, which consists of net fees we receive from developers using our Payments infrastructure and revenue from various other sources._

Our annual worldwide ARPP in 2022, which represents the sum of quarterly ARPP during such period, was $31.79, a decrease of 6% from 2021.

60

PX0435-061

Table of Contents

**Trends in Our Facebook User Metrics**

The numbers for our key Facebook metrics, our DAUs, MAUs, and average revenue per user (ARPU), do not include users on Instagram, WhatsApp, or our other products, unless they would otherwise qualify as DAUs or MAUs, respectively, based on their other activities on Facebook.

Trends in the number of users affect our revenue and financial results by influencing the number of ads we are able to show, the value of our ads to marketers, as well as our expenses and capital expenditures. Substantially all of our daily and monthly active users (as defined below) access Facebook on mobile devices.

• *Daily Active Users (DAUs).* We define a daily active user as a registered and logged-in Facebook user who visited Facebook through our website or a mobile device, or used our Messenger application (and is also a registered Facebook user), on a given day. We view DAUs, and DAUs as a percentage of MAUs, as measures of user engagement on Facebook.



*Note: For purposes of reporting DAUs, MAUs, and ARPU by geographic region, Europe includes all users in Russia and Turkey and Rest of World includes all users in Africa, Latin America, and the Middle East.*

61

Table of Contents

Worldwide DAUs increased 4% to 2.00 billion on average during December 2022 from 1.93 billion during December 2021. Users in India, the Philippines, and Bangladesh represented the top three sources of growth in DAUs during December 2022, relative to the same period in 2021.

- *Monthly Active Users (MAUs).* We define a monthly active user as a registered and logged-in Facebook user who visited Facebook through our website or a mobile device, or used our Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement. MAUs are a measure of the size of our global active user community on Facebook.









As of December 31, 2022, we had 2.96 billion MAUs, an increase of 2% from December 31, 2021. Users in India, Nigeria, and Bangladesh represented the top three sources of growth in 2022, relative to the same period in 2021.

62

PX0435-063

Table of Contents

**Trends in Our Monetization by Facebook User Geography**

We calculate our revenue by user geography based on our estimate of the geography in which ad impressions are delivered, virtual and digital goods are purchased, or consumer hardware products are shipped. We define ARPU as our total revenue in a given geography during a given quarter, divided by the average of the number of MAUs in the geography at the beginning and end of the quarter. While ARPU includes all sources of revenue, the number of MAUs used in this calculation only includes users of Facebook and Messenger as described in the definition of MAU above. While the share of revenue from users who are not also Facebook or Messenger MAUs has grown over time, we estimate that revenue from users who are Facebook or Messenger MAUs represents the substantial majority of our total revenue. See "Average Revenue Per Person (ARPP)" above for our estimates of trends in our monetization of our Family products. The geography of our users affects our revenue and financial results because we currently monetize users in different geographies at different average rates. Our revenue and ARPU in regions such as United States & Canada and Europe are relatively higher primarily due to the size and maturity of those online and mobile advertising markets. For example, ARPU in 2022 in the United States & Canada region was more than 11 times higher than in the Asia-Pacific region.



Note: Non-advertising revenue includes RL revenue generated from the delivery of consumer hardware products and FoA Other revenue, which consists of net fees we receive from developers using our Payments infrastructure and revenue from various other sources.

63

PX0435-064

Table of Contents

*Our revenue by user geography in the charts above is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in Note 2 — Revenue in our consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplemental Data" where revenue is geographically apportioned based on the addresses of our customers.*

Our annual worldwide ARPU in 2022, which represents the sum of quarterly ARPU during such period, was $39.63, a decrease of 3% from 2021. For 2022, ARPU decreased by 9% in Europe and 4% in United States & Canada, and increased by 4% in Asia-Pacific and 8% in Rest of World. In addition, user growth was mostly in geographies with relatively lower ARPU, such as Asia-Pacific and Rest of World. We expect that user growth in the future will be primarily concentrated in those regions where ARPU is relatively lower, such that worldwide ARPU may decrease at a higher rate, or increase at a slower rate, relative to ARPU in any geographic region in a particular period, or potentially decrease even if ARPU increases in each geographic region.

64

Table of Contents

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses, and related disclosures. On an ongoing basis, we evaluate our estimates and assumptions based on historical experience and on various other assumptions that we believe are reasonable under the circumstances. Our actual results could differ from these estimates under different assumptions or conditions.

An accounting policy is deemed to be critical if the nature of the estimates or assumptions is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change, and the impact of the estimates and assumptions on our consolidated financial statements is material. We believe that the assumptions and estimates associated with gross vs. net in revenue recognition, valuation of non-marketable equity securities, income taxes, loss contingencies, and valuation of long-lived assets including goodwill, intangible assets, and property and equipment, and their associated estimated useful lives, when applicable, have the greatest potential impact on our consolidated financial statements. Therefore, we consider these to be our critical accounting policies and estimates. For further information on all of our significant accounting policies, see Note 1 — Summary of Significant Accounting Policies in the accompanying notes to consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

*Gross vs. Net in Revenue Recognition*

For revenue generated from arrangements that involve third parties, there is significant judgment in evaluating whether we are the principal, and report revenue on a gross basis, or the agent, and report revenue on a net basis. In this assessment, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. The assessment of whether we are considered the principal or the agent in a transaction could impact our revenue and cost of revenue recognized on the consolidated statements of income.

*Valuation of Non-marketable Equity Securities*

For our non-marketable equity securities without readily determinable fair values accounted for using the measurement alternative, determining whether a non-marketable equity security issued by the same issuer is similar to the non-marketable equity security we hold may require judgment in (a) assessment of differences in rights and obligations associated with the instruments such as voting rights, distribution rights and preferences, and conversion features, and (b) adjustments to the observable price for differences such as, but not limited to, rights and obligations, control premium, liquidity, or principal or most advantageous markets. In addition, the identification of observable transactions will depend on the timely reporting of these transactions from our investee companies, which may occur in a period subsequent to when the transactions take place. Therefore, our fair value adjustment for these observable transactions may occur in a period subsequent to when the transaction actually occurred. For non-marketable equity securities, we perform a qualitative assessment at each reporting date to determine whether there are triggering events for impairment. The qualitative assessment considers factors such as, but not limited to, the investee's financial condition and business outlook; industry and sector performance; regulatory, economic or technological environment; operational and financing cash flows; and other relevant events and factors affecting the investee. When indicators of impairment exist, we estimate the fair value of our non-marketable equity securities using the market approach and/or the income approach and recognize impairment loss in the consolidated statements of income if the estimated fair value is less than the carrying value. Estimating fair value requires judgment and use of estimates such as discount rates, forecast cash flows, holding period, and market data of comparable companies, among others.

*Income Taxes*

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our provision for income taxes and income tax assets and liabilities, including evaluating uncertainties in the application of accounting principles and complex tax laws.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. These uncertain tax positions include our estimates for transfer pricing that have been developed based upon analyses of appropriate

PX0435-066

Table of Contents

arms-length prices. Similarly, our estimates related to uncertain tax positions concerning research and development tax credits are based on an assessment of whether our available documentation corroborating the nature of our activities supporting the tax credits will be sufficient. Although we believe that we have adequately reserved for our uncertain tax positions (including net interest and penalties), we can provide no assurance that the final tax outcome of these matters will not be materially different. We make adjustments to these reserves in accordance with the income tax accounting guidance when facts and circumstances change, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different from the amounts recorded, such differences will affect the provision for income taxes in the period in which such determination is made, and could have a material impact on our financial condition and operating results.

### Loss Contingencies

We are involved in legal proceedings, claims, and regulatory, tax or government inquiries and investigations that arise in the ordinary course of business. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages. Additionally, we are required to comply with various legal and regulatory obligations around the world, and we regularly become subject to new laws and regulations in the jurisdictions in which we operate. The requirements for complying with these obligations may be uncertain and subject to interpretation and enforcement by regulatory and other authorities, and any failure to comply with such obligations could eventually lead to asserted legal or regulatory action. With respect to these matters, asserted and unasserted, we evaluate the associated developments on a regular basis and accrue a liability when we believe that it is both probable that a loss has been incurred and the amount can be reasonably estimated. If we determine there is a reasonable possibility that we may incur a loss and the loss or range of loss can be reasonably estimated, we disclose the possible loss in the accompanying notes to the consolidated financial statements to the extent material.

We review the developments in our contingencies that could affect the amount of the provisions that have been previously recorded, and the matters and related reasonably possible losses disclosed. We make adjustments to our provisions and changes to our disclosures accordingly to reflect the merits of our defenses and the impact of negotiations, settlements, regulatory proceedings, rulings, advice of legal counsel, and updated information. Significant judgment is required to determine the probability of loss and the estimated amount of loss, including when and if the probability and estimate has changed for asserted and unasserted matters. Certain factors, in particular, have resulted in significant changes to these estimates and judgments in prior quarters based on updated information available. For example, in certain jurisdictions where we operate, fines and penalties may be the result of new laws and preliminary interpretations regarding the basis of assessing damages, which may make it difficult to estimate what such fines and penalties would amount to if successfully asserted against us. In addition, certain government inquiries and investigations, such as matters before our lead European Union privacy regulator, the IDPC, are subject to review by other regulatory bodies before decisions are finalized, which can lead to significant changes in the outcome of an inquiry. As a result of these and other factors, we reasonably expect that our estimates and judgments with respect to our contingencies may continue to be revised in future quarters.

The ultimate outcome of these matters, such as whether the likelihood of loss is remote, reasonably possible, or probable or if and when the reasonably possible range of loss is estimable, is inherently uncertain. Therefore, if one or more of these matters were resolved against us for amounts in excess of management's estimates of losses, our results of operations and financial condition, including in a particular reporting period in which any such outcome becomes probable and estimable, could be materially adversely affected. See Note 13 — Commitments and Contingencies and Note 16 — Income Taxes of the accompanying notes to our consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" and Part I, Item 3, "Legal Proceedings" of this Annual Report on Form 10-K for additional information regarding these contingencies.

### Valuation of Long-lived Assets including Goodwill, Intangible Assets, and Property and Equipment and Estimated Useful Lives

We allocate the fair value of purchase consideration to the tangible assets acquired, liabilities assumed, and intangible assets acquired based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill to reporting units based on the expected benefit from the business combination. Such valuations require management to make significant estimates and assumptions, especially with respect to intangible assets. Significant estimates in valuing certain intangible assets include, but are not limited to, estimated replacement costs and future expected cash flows from acquired users, acquired technology, acquired patents, and trade

66

PX0435-067

Table of Contents

names from a market participant perspective, useful lives, and discount rates. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. Allocation of purchase consideration to identifiable assets and liabilities affects our amortization expense, as acquired finite-lived intangible assets are amortized over the useful life, whereas any indefinite-lived intangible assets, including goodwill, are not amortized. During the measurement period, which is not to exceed one year from the acquisition date, we may record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings.

Goodwill is tested for impairment at the reporting unit level annually or more frequently if events or changes in circumstances would more likely than not reduce the fair value of a reporting unit below its carrying value. We have two reporting units subject to goodwill impairment testing. As of December 31, 2022, no impairment of goodwill has been identified.

Long-lived assets, including property and equipment and finite-lived intangible assets are reviewed for possible impairment whenever events or circumstances indicate that the carrying amount of such assets may not be recoverable. The evaluation is performed at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. Recoverability of these assets is measured by a comparison of the carrying amounts to the future undiscounted cash flows the assets are expected to generate from the use and eventual disposition. If such review indicates that the carrying amount of property and equipment and intangible assets is not recoverable, the carrying amount of such assets is reduced to fair value.

The useful lives of our long-lived assets including property and equipment and finite-lived intangible assets are determined by management when those assets are initially recognized and are routinely reviewed for the remaining estimated useful lives. The current estimate of useful lives represents our best estimate based on current facts and circumstances, but may differ from the actual useful lives due to changes in future circumstances such as changes to our business operations, changes in the planned use of assets, and technological advancements. When we change the estimated useful life assumption for any asset, the remaining carrying amount of the asset is accounted for prospectively and depreciated or amortized over the revised remaining useful life.

In connection with our periodic reviews of the estimated useful lives of property and equipment, we extended the estimated average useful lives of our servers and network assets category effective the second and the fourth quarters of 2022. The financial impact of the changes in estimates was a reduction in depreciation expense of $860 million and an increase in net income of $693 million, or $0.26 per diluted share for the year ended December 31, 2022. The impact from the changes in our estimates was calculated based on the servers and network assets existing as of the effective date of the change and applying the revised useful lives prospectively.

See Note 1 — Summary of Significant Accounting Policies in the accompanying notes to consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K, for additional information regarding the changes in the estimated useful lives of our servers and network assets.

67

Table of Contents

**Components of Results of Operations**

**Revenue**

*Family of Apps (FoA)*

*Advertising.* We generate substantially all of our revenue from advertising. Our advertising revenue is generated by displaying ad products on Facebook, Instagram, Messenger, and third-party mobile applications. Marketers pay for ad products either directly or through their relationships with advertising agencies or resellers, based on the number of impressions delivered or the number of actions, such as clicks, taken by users.

We recognize revenue from the display of impression-based ads in the contracted period in which the impressions are delivered. Impressions are considered delivered when an ad is displayed to a user. We recognize revenue from the delivery of action-based ads in the period in which a user takes the action the marketer contracted for. The number of ads we show is subject to methodological changes as we continue to evolve our ads business and the structure of our ads products. In particular, the number of ads we show may vary by product (for example, our video and Reels products are not currently monetized at the same rate as our feed or Stories products), and from time to time we increase or decrease the number or frequency of ads we show as part of our product and monetization strategies. We calculate average price per ad as total advertising revenue divided by the number of ads delivered, representing the average price paid per ad by a marketer regardless of their desired objective such as impression or action. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis.

*Other revenue.* Other revenue consists of net fees we receive from developers using our Payments infrastructure and revenue from WhatsApp Business Platform and various other sources.

*Reality Labs (RL)*

RL revenue is generated from the delivery of consumer hardware products, such as Meta Quest, wearables, and related software and content.

**Cost of Revenue and Operating Expenses**

*Cost of revenue.* Our cost of revenue consists mostly of expenses associated with the delivery and distribution of our products. These include expenses related to the operation of our data centers and technical infrastructure, such as depreciation expense from servers, network infrastructure and buildings, as well as payroll and related expenses which include share-based compensation for employees on our operations teams, and energy and bandwidth costs. Cost of revenue also includes costs associated with partner arrangements, including traffic acquisition costs and credit card and other fees related to processing customer transactions, and content costs. Additionally, cost of revenue includes RL inventory costs, which consist of cost of products sold and estimated losses on non-cancelable contractual commitments.

*Research and development.* Research and development expenses consist primarily of payroll and related expenses which include share-based compensation, facilities-related costs for employees on our engineering and technical teams who are responsible for developing new products as well as improving existing products, RL technology development costs, and professional services.

*Marketing and sales.* Marketing and sales expenses consist mostly of marketing and promotional expenses as well as payroll and related expenses which include share-based compensation for our employees engaged in sales, sales support, marketing, business development, and customer service functions. Our marketing and sales expenses also include professional services such as content reviewers to support our community and product operations.

*General and administrative.* General and administrative expenses consist primarily of payroll and related expenses which include share-based compensation for certain of our executives as well as our legal, finance, human resources, corporate communications and policy, and other administrative employees; legal-related costs, which include estimated fines, settlements, or other losses in connection with legal and related matters, as well as other legal fees; professional services, and other taxes, such as digital services taxes, other tax levies.

68

PX0435-069

Table of Contents

**Results of Operations**

In this section, we discuss the results of our operations for the year ended December 31, 2022 compared to the year ended December 31, 2021. For a discussion of the year ended December 31, 2021 compared to the year ended December 31, 2020, please refer to Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the year ended December 31, 2021.

The following table sets forth our consolidated statements of income data (in millions):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
| --- | --- | --- | --- |
| Revenue | $ 116,609 | $ 117,929 | $ 85,965 |
| Costs and expenses: | | | |
| Cost of revenue | 25,249 | 22,649 | 16,692 |
| Research and development | 35,338 | 24,655 | 18,447 |
| Marketing and sales | 15,262 | 14,043 | 11,591 |
| General and administrative | 11,816 | 9,829 | 6,564 |
| Total costs and expenses | 87,665 | 71,176 | 53,294 |
| Income from operations | 28,944 | 46,753 | 32,671 |
| Interest and other income (expense), net | (125) | 531 | 509 |
| Income before provision for income taxes | 28,819 | 47,284 | 33,180 |
| Provision for income taxes | 5,619 | 7,914 | 4,034 |
| Net income | $ 23,200 | $ 39,370 | $ 29,146 |

The following table sets forth our consolidated statements of income data (as a percentage of revenue)[1]:

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
| --- | --- | --- | --- |
| Revenue | 100 % | 100 % | 100 % |
| Costs and expenses: | | | |
| Cost of revenue | 22 | 19 | 19 |
| Research and development | 30 | 21 | 21 |
| Marketing and sales | 13 | 12 | 13 |
| General and administrative | 10 | 8 | 8 |
| Total costs and expenses | 75 | 60 | 62 |
| Income from operations | 25 | 40 | 38 |
| Interest and other income (expense), net | — | — | 1 |
| Income before provision for income taxes | 25 | 40 | 39 |
| Provision for income taxes | 5 | 7 | 5 |
| Net income | 20 % | 33 % | 34 % |

_____

(1)   Percentages have been rounded for presentation purposes and may differ from unrounded results.

69

Table of Contents

### Revenue

The following table sets forth our revenue by source and by segment. For comparative purposes, amounts for the year ended December 31, 2020 have been recast:

| | Year Ended December 31, | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
| | 2022 | 2021 | 2020 | | |
|---|---|---|---|---|---|
| | *(in millions, except percentages)* | | | | |
| Advertising | $    113,642 | $    114,934 | $    84,169 | (1)% | 37 % |
| Other revenue | 808 | 721 | 657 | 12 % | 10 % |
| Family of Apps | 114,450 | 115,655 | 84,826 | (1)% | 36 % |
| Reality Labs | 2,159 | 2,274 | 1,139 | (5)% | 100 % |
| Total revenue | $    116,609 | $    117,929 | $    85,965 | (1)% | 37 % |

#### Family of Apps

FoA revenue in 2022 decreased $1.21 billion, or 1%, compared to 2021. The decrease was mostly driven by advertising revenue.

##### Advertising

Advertising revenue in 2022 decreased $1.29 billion, or 1%, compared to 2021 due to a decrease in the average price per ad, partially offset by an increase in the number of ads delivered. In 2022, the average price per ad decreased by 16%, as compared with an increase of 24% in 2021. The decrease in average price per ad was driven by an increase in the number of ads delivered, especially in geographies and in products such as video and Reels that monetize at lower rates, and an unfavorable foreign exchange impact. In addition, the decrease in average price per ad was impacted by a reduction in advertising demand, which we believe was primarily driven by reduced marketer spending as a result of a more challenging macroeconomic environment and limitations on our ad targeting and measurement tools arising from changes to iOS and the regulatory environment, as well as, to a lesser extent, the other factors discussed in the section entitled "—Executive Overview of Full Year 2022 Results." In 2022, the number of ads delivered increased by 18%, as compared to a 10% increase in 2021. Ads impressions grew in all regions during 2022, mostly driven by an increase in ads delivered in Asia-Pacific and Rest of World. The increase in the ads delivered during 2022 was driven by increases in the number and frequency of ads displayed across our products and an increase in users. We anticipate that future advertising revenue will be driven by a combination of price and the number of ads delivered.

#### Reality Labs

RL revenue in 2022 decreased $115 million, or 5%, compared to 2021. The decrease in RL revenue was driven by a decrease in the volume of Meta Quest sales.

#### Revenue Seasonality and Customer Concentration

Revenue is traditionally seasonally strong in the fourth quarter of each year due in part to seasonal holiday demand. We believe that this seasonality in both advertising revenue and RL consumer hardware sales affects our quarterly results, which generally reflect significant growth in revenue between the third and fourth quarters and a decline between the fourth and subsequent first quarters. For instance, our total revenue increased 16%, 16%, and 31% between the third and fourth quarters of 2022, 2021, and 2020, respectively, while total revenue for the first quarters of 2022, 2021, and 2020 declined 17%, 7%, and 16% compared to the fourth quarters of 2021, 2020, and 2019, respectively.

No customer represented 10% or more of total revenue during the years ended December 31, 2022, 2021, and 2020.

#### Foreign Exchange Impact on Revenue

The general strengthening of the U.S. dollar relative to certain foreign currencies in the full year 2022 compared to the same period in 2021 had an unfavorable impact on revenue. If we had translated revenue for the full year 2022 using the prior

70

PX0435-071

Table of Contents

year's monthly exchange rates for our settlement or billing currencies other than the U.S. dollar, our total revenue and advertising revenue would have been $122.57 billion and $119.54 billion, respectively. Using these constant rates, total revenue and advertising revenue would have been $5.96 billion and $5.90 billion higher than actual total revenue and advertising revenue, respectively, for the full year 2022. Using the same constant rates, full year 2022 total revenue and advertising revenue would have been $4.64 billion and $4.60 billion, respectively, higher than actual total revenue and advertising revenue for the full year 2021.

*Cost of revenue*

| | Year Ended December 31, | | | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | | |
| | *(in millions, except percentages)* | | | | | | |
| Cost of revenue | $ | 25,249 | $ | 22,649 | $ | 16,692 | 11 % | 36 % |
| Percentage of revenue | | 22 % | | 19 % | | 19 % | | |

Cost of revenue in 2022 increased $2.60 billion, or 11%, compared to 2021. The increase was mainly due to an increase in operational expenses related to our data centers and technical infrastructure, adjusted for a decrease in the depreciation growth rate due to extensions in the useful lives of servers and network assets. In addition, we recorded $1.34 billion of abandonment charges related to data center assets. These increases were partially offset by a decrease in RL inventory cost including lower losses on purchase commitments.

See Note 1 — Summary of Significant Accounting Policies and Note 3 — Restructuring in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for additional information regarding changes in the estimated useful life of our servers and network assets as well as the abandonment charges related to data center assets, respectively.

*Research and development*

| | Year Ended December 31, | | | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | | |
| | *(in millions, except percentages)* | | | | | | |
| Research and development | $ | 35,338 | $ | 24,655 | $ | 18,447 | 43 % | 34 % |
| Percentage of revenue | | 30 % | | 21 % | | 21 % | | |

Research and development expenses in 2022 increased $10.68 billion, or 43%, compared to 2021. The increase was mainly due to higher payroll and related expenses and $1.31 billion impairment charges to leases and leasehold improvements as part of our restructuring efforts. Our payroll and related expenses increased as a result of a 26% increase in employee headcount from December 31, 2021 to December 31, 2022 in engineering and other technical functions supporting our continued investment in our family of products and RL.

*Marketing and sales*

| | Year Ended December 31, | | | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | | |
| | *(in millions, except percentages)* | | | | | | |
| Marketing and sales | $ | 15,262 | $ | 14,043 | $ | 11,591 | 9 % | 21 % |
| Percentage of revenue | | 13 % | | 12 % | | 13 % | | |

Marketing and sales expenses in 2022 increased $1.22 billion, or 9%, compared to 2021. The increase was mostly due to increases in payroll and related expenses and $404 million impairment charges to leases and leasehold improvements as part of our restructuring efforts.

71

Table of Contents

*General and administrative*

| | Year Ended December 31, | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | | |
| | *(in millions, except percentages)* | | | | |
| General and administrative | $    11,816 | $    9,829 | $    6,564 | 20 % | 50 % |
| Percentage of revenue | 10 % | 8 % | 8 % | | |

General and administrative expenses in 2022 increased $1.99 billion, or 20%, compared to 2021. The increase was primarily due to increases in payroll and related expenses and $426 million impairment charges to leases and leasehold improvements as part of our restructuring efforts. Our payroll and related expenses increased as a result of a 20% increase in employee headcount from December 31, 2021 to December 31, 2022 in our general and administrative functions.

See Note 3 — Restructuring in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for additional information regarding impairment charges to leases and leasehold improvements.

*Segment profitability*

The following table sets forth income (loss) from operations by segment. For comparative purposes, amounts for the year ended December 31, 2020 have been recast:

| | Year Ended December 31, | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | | |
| | *(in millions, except percentages)* | | | | |
| Family of Apps | $    42,661 | $    56,946 | $    39,294 | (25)% | 45 % |
| Reality Labs | (13,717) | (10,193) | (6,623) | (35)% | (54)% |
| Total income from operations | $    28,944 | $    46,753 | $    32,671 | (38)% | 43 % |

*Family of Apps*

FoA income from operations in 2022 decreased $14.29 billion, or 25%, compared to 2021. The decrease was due to an increase in FoA total costs and expenses, primarily due to an increase in payroll and related expenses as a result of higher employee headcount, additional charges recorded related to our restructuring efforts and an increase in costs related to our data centers and technical infrastructure.

See Note 3 — Restructuring in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for additional information.

*Reality Labs*

RL loss from operations in 2022 increased $3.52 billion, or 35%, compared to 2021. The increase in loss from operations was mainly driven by increases in payroll and related expenses and research and development expenses, partially offset by a decrease in RL inventory cost including lower losses on purchase commitments.

72

PX0435-073

Table of Contents

*Interest and other income (expense), net*

|  | Year Ended December 31, | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
|---|---|---|---|---|---|
|  | 2022 | 2021 | 2020 | | |
|  | *(in millions, except percentages)* | | | | |
| Interest income, net | $ 276 | $ 461 | $ 672 | (40)% | (31)% |
| Foreign currency exchange losses, net | (81) | (140) | (129) | 42 % | (9)% |
| Other income (expense), net | (320) | 210 | (34) | (252)% | NM |
| Interest and other income (expense), net | $ (125) | $ 531 | $ 509 | (124)% | 4 % |

Interest and other income (expense), net in 2022 decreased $656 million, or 124%, compared to 2021. The decrease was mostly due to a decrease in other income (expense), net related to higher unrealized losses recognized for our equity investments and an increase in interest expense recognized on long-term debt.

*Provision for income taxes*

|  | Year Ended December 31, | | | 2022 vs 2021 % change | 2021 vs 2020 % change |
|---|---|---|---|---|---|
|  | 2022 | 2021 | 2020 | | |
|  | *(in millions, except percentages)* | | | | |
| Provision for income taxes | $ 5,619 | $ 7,914 | $ 4,034 | (29)% | 96 % |
| Effective tax rate | 19.5 % | 16.7 % | 12.2 % | | |

Our provision for income taxes in 2022 decreased $2.29 billion, or 29%, compared to 2021, mostly due to a decrease in income from operations.

Our effective tax rate in 2022 increased compared to 2021, mainly due to an increase in tax shortfalls recognized from share-based compensation and the effect of regulations issued by the U.S. Department of the Treasury in 2022 on foreign tax credits, partially offset by an increase in tax benefits from foreign-derived intangible income.

*Effective Tax Rate Items.* Our effective tax rate in the future will depend upon the proportion between the following items and income before provision for income taxes: U.S. tax benefits from foreign-derived intangible income, tax effects from share-based compensation, research tax credit, tax effects of integrating intellectual property from acquisitions, settlement of tax contingency items, tax effects of changes in our business, and the effects of changes in tax law.

The accounting for share-based compensation may increase or decrease our effective tax rate based upon the difference between our share-based compensation expense and the deductions taken on our tax return, which depend upon the stock price at the time of employee award vesting. If our stock price remains constant to the January 27, 2023 price, and absent any changes to U.S. tax law, we expect our effective tax rate for the full year 2023 to be in the low twenties. This includes the effects of the mandatory capitalization and amortization of research and development expenses incurred in 2022, as required by the 2017 Tax Cuts and Jobs Act (Tax Act). The mandatory capitalization requirement increased our 2022 cash tax liabilities materially but also decreased our effective tax rate due to increasing the foreign-derived intangible income deduction. If the mandatory capitalization requirement is deferred, our effective tax rate in 2023 could be higher when compared to current law and our cash tax liabilities could be several billion dollars lower.

Integrating intellectual property from acquisitions into our business generally involves intercompany transactions that have the impact of increasing our provision for income taxes. Consequently, our provision for income taxes and our effective tax rate may initially increase in the period of an acquisition and integration. The magnitude of this impact will depend upon the specific type, size, and taxing jurisdictions of the intellectual property as well as the relative contribution to income in subsequent periods.

On August 16, 2022, Congress passed the Inflation Reduction Act of 2022. The key tax provisions applicable to us are a 15% corporate minimum tax on book income and a 1% excise tax on stock repurchases effective January 1, 2023. We do

73

PX0435-074

Table of Contents

not expect these tax law changes to have a material impact on our consolidated financial position; however, we will continue to evaluate their impact as further information becomes available.

*Unrecognized Tax Benefits*. As of December 31, 2022, we had net uncertain tax positions of $5.49 billion which were accrued as other liabilities. These unrecognized tax benefits were predominantly accrued for uncertainties related to transfer pricing with our foreign subsidiaries, which includes licensing of intellectual property, providing services and other transactions, as well as for uncertainties regarding the utilization of our research tax credits. The ultimate settlement of the liabilities will depend upon resolution of tax audits, litigation, or events that would otherwise change the assessment of such items. Based upon the status of litigation described below and the current status of tax audits in various jurisdictions, we do not anticipate a material change to such amounts within the next 12 months.

See Note 16 — Income Taxes in the notes to consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for additional information regarding income tax contingencies.

74

Table of Contents

**Liquidity and Capital Resources**

Our principal sources of liquidity are our cash and cash equivalents, marketable securities, and cash generated from operations. Cash and cash equivalents and marketable securities consist mostly of cash on deposit with banks, investments in money market funds, U.S. government securities, U.S. government agency securities, and investment grade corporate debt securities. Cash and cash equivalents and marketable securities were $40.74 billion as of December 31, 2022, a decrease of $7.26 billion from December 31, 2021. The majority of the decrease was due to $32.04 billion for capital expenditures, including principal payments on finance leases, $27.96 billion repurchases of our Class A common stock, $3.60 billion of taxes paid related to net share settlement of employee restricted stock unit (RSU) awards, and $1.31 billion for acquisitions of businesses and intangible assets. These decreases were partially offset by $50.48 billion of cash generated from operations and $9.92 billion of net proceeds from the issuance of fixed-rate senior notes (the "Notes") in August 2022.

Cash paid for income taxes was $6.41 billion for the year ended December 31, 2022. As of December 31, 2022, our federal net operating loss carryforward was $196 million and our federal tax credit carryforward was $276 million. We anticipate the utilization of most of these net operating losses and credits within the next two years.

Our board of directors has authorized a share repurchase program of our Class A common stock, which commenced in January 2017 and does not have an expiration date. In 2022, we repurchased and subsequently retired 161 million shares of our Class A common stock for an aggregate amount of $27.93 billion. As of December 31, 2022, $10.87 billion remained available and authorized for repurchases. In January 2023, an additional $40 billion of repurchases was authorized under this program.

The following table presents our cash flows (in millions):

|  | Year Ended December 31, | | | | | |
|  | 2022 | | 2021 | | 2020 | |
| --- | --- | --- | --- | --- | --- | --- |
| Net cash provided by operating activities | $ | 50,475 | $ | 57,683 | $ | 38,747 |
| Net cash used in investing activities | $ | (28,970) | $ | (7,570) | $ | (30,059) |
| Net cash used in financing activities | $ | (22,136) | $ | (50,728) | $ | (10,292) |

*Cash Provided by Operating Activities*

Cash provided by operating activities during 2022 mostly consisted of net income adjusted for certain non-cash items, such as $11.99 billion of share-based compensation expense, $8.69 billion of depreciation and amortization, and $3.56 billion of impairment for leases, leasehold improvements, and abandonment charges for data center assets related to our restructuring efforts. The decrease in cash flows from operating activities during 2022 compared to 2021 was mainly due to a decrease in net income as adjusted for the aforementioned non-cash items, partially offset by changes in working capital.

*Cash Used in Investing Activities*

Cash used in investing activities during 2022 mostly consisted of $31.19 billion of net purchases of property and equipment as we continued to invest in servers, data centers, and network infrastructure, partially offset by $3.53 billion proceeds from net sales and maturities of marketable debt securities. The increase in cash used in investing activities during 2022 compared to 2021 was mostly due to an increase in net purchases of property and equipment, and a decrease in proceeds from net sales and maturities of marketable debt securities.

We anticipate making capital expenditures of approximately $30 billion to $33 billion in 2023.

*Cash Used in Financing Activities*

Cash used in financing activities during 2022 mostly consisted of $27.96 billion for repurchases of our Class A common stock and $3.60 billion of taxes paid related to net share settlement of RSUs, partially offset by $9.92 billion proceeds from the issuance of the Notes. The decrease in cash used in financing activities during 2022 compared to 2021 was mostly due to a decrease in repurchases of our Class A common stock and proceeds from the issuance of the Notes.

75

PX0435-076

Table of Contents

*Free Cash Flow*

In addition to other financial measures presented in accordance with U.S. GAAP, we monitor free cash flow (FCF) as a non-GAAP measure to manage our business, make planning decisions, evaluate our performance, and allocate resources. We define FCF as net cash provided by operating activities reduced by net purchases of property and equipment and principal payments on finance leases.

We believe that FCF is one of the key financial indicators of our business performance over the long term and provides useful information regarding how cash provided by operating activities compares to the property and equipment investments required to maintain and grow our business.

We have chosen our definition for FCF because we believe that this methodology can provide useful supplemental information to help investors better understand underlying trends in our business. We use FCF in discussions with our senior management and board of directors.

FCF has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of other GAAP financial measures, such as net cash provided by operating activities. FCF is not intended to represent our residual cash flow available for discretionary expenses. Some of the limitations of FCF are:

•    FCF does not reflect our future contractual commitments; and
•    other companies in our industry present similarly titled measures differently than we do, limiting their usefulness as comparative measures.

Management compensates for the inherent limitations associated with using the FCF measure through disclosure of such limitations, presentation of our financial statements in accordance with GAAP, and reconciliation of FCF to the most directly comparable GAAP measure, net cash provided by operating activities, as presented below.

The following is a reconciliation of FCF to the most comparable GAAP measure, net cash provided by operating activities (in millions):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Net cash provided by operating activities | $    50,475 | $    57,683 | $    38,747 |
| Purchases of property and equipment, net | (31,186) | (18,567) | (15,115) |
| Principal payments on finance leases | (850) | (677) | (604) |
| Free Cash Flow | $    18,439 | $    38,439 | $    23,028 |

## Material Cash Requirements

We currently anticipate that our available funds and cash flow from operations and financing activities will be sufficient to meet our operational cash needs and fund our share repurchase program for at least the next 12 months and thereafter for the foreseeable future. We continuously evaluate our liquidity and capital resources, including our access to external capital, to ensure we can finance our future capital requirements.

*Leases and Contractual Commitments*

Our operating lease obligations mostly include, among others, offices, data centers, colocations, and land. Our finance lease obligations mostly include certain network infrastructure. Our restructuring efforts to sublease, early terminate or abandon several office buildings under operating leases did not materially change our operating lease obligations.

Our contractual commitments are primarily related to our investments in network infrastructure, servers, and consumer hardware products in Reality Labs.

76

PX0435-077

Table of Contents

### Long-term Debt

In August 2022, we issued an aggregate of $10.0 billion principal amount of the Notes. The Notes were issued in four series, which mature from 2027 through 2062. Short-term and long-term future interest payments obligations as of December 31, 2022 are $411 million and $7.69 billion, respectively. We intend to use the net proceeds from the offering for general corporate purposes, which may include, but are not limited to, capital expenditures, repurchases of outstanding shares of our common stock, acquisitions, or investments.

### Taxes

As of December 31, 2022, we had taxes payable of $1.51 billion related to a one-time transition tax payable incurred as a result of the Tax Act, of which $361 million is due within one year. As permitted by the Tax Act, we will pay the transition tax in annual interest-free installments through 2025. Our other liabilities also include $5.49 billion related to the uncertain tax positions as of December 31, 2022. Due to uncertainties in the timing of the completion of tax audits, the timing of the resolution of these positions is uncertain and we are unable to make a reasonably reliable estimate of the timing of payments.

### Contingencies

We are involved in legal proceedings, claims, and regulatory, tax or government inquiries and investigations. We record a liability when we believe that it is both probable that a liability has been incurred, and that the amount can be reasonably estimated. If we determine there is a reasonable possibility that we may incur a loss and the loss or range of loss can be estimated, we disclose the possible loss in the accompanying notes to the consolidated financial statements to the extent material. Significant judgment is required to determine both probability and the estimated amount of loss. Such matters are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change or prove to be incorrect, it could have a material impact on our results of operations, financial position, and cash flows.

See Note 9 — Leases, Note 11 — Long-term Debt, Note 13 — Commitments and Contingencies, and Note 16 — Income Taxes in the notes to the consolidated financial statements included in Part II, Item 8, and "Legal Proceedings" contained in Part I, Item 3 of this Annual Report on Form 10-K for additional information regarding leases and contractual commitments, long-term debt, taxes, and contingencies.

## Recently Issued Accounting Pronouncements

For information on recently issued accounting pronouncements, see Note 1 — Summary of Significant Accounting Policies in the accompanying notes to consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

Table of Contents

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risks, including changes to foreign currency exchange rates, interest rates, and equity price risk.

**Foreign Currency Exchange Risk**

We have foreign currency risks related to our revenue and operating expenses denominated in currencies other than the U.S. dollar, primarily the Euro. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, have negatively affected, and may continue to negatively affect, our revenue and other operating results as expressed in U.S. dollars. See Management's Discussion and Analysis of Financial Condition and Results of Operations — Foreign Exchange Impact on Revenue section included in Part II, Item 7 of this Annual Report on Form 10-K for additional information.

We have experienced and will continue to experience fluctuations in our net income as a result of transaction gains or losses related to revaluing monetary asset and liability balances that are denominated in currencies other than the functional currency of the entities in which they are recorded. At this time, we have not entered into, but in the future we may enter into, derivatives or other financial instruments in an attempt to hedge our foreign currency exchange risk. It is difficult to predict the effect hedging activities would have on our results of operations. Foreign currency exchange net losses of $81 million, $140 million, and $129 million were recognized in 2022, 2021, and 2020, respectively.

**Interest Rate Sensitivity**

Our exposure to changes in interest rates relates primarily to interest income and market value of our cash equivalents, marketable debt securities, and the fair value of our long-term debt.

Our cash, cash equivalents, and marketable debt securities consist of cash, certificates of deposit, time deposits, money market funds, U.S. government securities, U.S. government agency securities, and investment grade corporate debt securities. Our investment policy and strategy are focused on preservation of capital and supporting our liquidity requirements. Changes in U.S. interest rates affect the interest earned on our cash, cash equivalents, and marketable securities, and the market value of those securities. A hypothetical 100 basis point increase in market interest rates would have resulted in a decrease of $558 million and $714 million in the market value of our available-for-sale debt securities and cash equivalents as of December 31, 2022 and 2021, respectively. Any realized gains or losses resulting from such interest rate changes and from the current unrealized losses would only occur if we sold the investments prior to maturity.

As of December 31, 2022, we also had $10.0 billion aggregate principal amount of fixed-rate senior notes (the "Notes") outstanding. Since our Notes bear interest at fixed rates and are carried at amortized cost, fluctuations in interest rates do not have any impact on our consolidated financial statements. However, the fair value of the Notes will fluctuate with movements in market interest rates, increasing in periods of declining interest rates and declining in periods of increasing interest rates.

**Equity Price Risk**

Our equity investments are substantially all in non-marketable equity securities and are subject to equity price risks that could have a material impact on the carrying value of our holdings.

Our non-marketable equity securities are investments in privately-held companies without readily determinable fair values. We elected to account for most of our non-marketable equity securities using the measurement alternative, which is cost, less any impairment, adjusted for changes in fair value resulting from observable transactions for identical or similar investments of the same issuer. We perform a qualitative assessment at each reporting date to determine whether there are triggering events for impairment. The qualitative assessment considers factors such as, but not limited to, the investee's financial condition and business outlook; industry and sector performance; economic or technological environment; and other relevant events and factors affecting the investee. Valuations of our non-marketable equity securities are complex due to the lack of readily available market data and observable transactions. Uncertainties in the global economic climate and financial markets could adversely impact the valuation of these companies we invest in and, therefore, result in a material impairment or downward adjustment in our investments. Our total non-marketable equity securities had a carrying value of $6.20 billion and $6.78 billion as of December 31, 2022 and 2021, respectively.

PX0435-079

Table of Contents

    For additional information, see Note 1 — Summary of Significant Accounting Policies, Note 6 — Non-marketable Equity Securities, Note 7 — Fair Value Measurements, and Note 11 — Long-term Debt in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data" and Part II, Item 7, "Management's Discussion and Analysis of Financial Conditions and Results of Operations — Critical Accounting Policies and Estimates" contained in this Annual Report on Form 10-K.

<div align="center">79</div>

Table of Contents

**Item 8.  Financial Statements and Supplementary Data**

<div align="center">

**META PLATFORMS, INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

</div>

|  | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm (PCAOB ID No. 42) | 81 |
| Consolidated Financial Statements: | |
| Consolidated Balance Sheets | 85 |
| Consolidated Statements of Income | 86 |
| Consolidated Statements of Comprehensive Income | 87 |
| Consolidated Statements of Stockholders' Equity | 88 |
| Consolidated Statements of Cash Flows | 89 |
| Notes to Consolidated Financial Statements | 91 |

<div align="center">80</div>

Table of Contents

**Report of Independent Registered Public Accounting Firm**

 To the Stockholders and the Board of Directors of Meta Platforms, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Meta Platforms, Inc. (the Company) as of December 31, 2022 and 2021, the related consolidated statements of income, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 1, 2023, expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the Audit & Risk Oversight Committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

81

PX0435-082

Table of Contents

**Loss Contingencies**

|  |  |
|---|---|
| *Description of the Matter* | As described in Note 13 to the consolidated financial statements, the Company is party to various legal proceedings, claims, and regulatory or government inquiries and investigations. The Company accrues a liability when it believes a loss is probable and the amount can be reasonably estimated. In addition, the Company believes it is reasonably possible that it will incur a loss in some of these cases, actions or inquiries described above. When applicable, the Company discloses an estimate of the amount of loss or range of possible loss that may be incurred. However, for certain other matters, the Company discloses that the amount of such losses or a range of possible losses cannot be reasonably estimated at this time. |
|  | Auditing the Company's accounting for, and disclosure of, these loss contingencies was especially challenging due to the significant judgment required to evaluate management's assessments of the likelihood of a loss, and their estimate of the potential amount or range of such losses. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the identification and evaluation of these matters, including controls relating to the Company's assessment of the likelihood that a loss will be realized and their ability to reasonably estimate the potential range of possible losses. |
|  | To test the Company's assessment of the probability of incurrence of a loss, whether the loss was reasonably estimable, and the conclusion and disclosure regarding any range of possible losses, including when the Company believes it cannot be reasonably estimated at this time, we read the minutes or a summary of the meetings of the committees of the board of directors, read the proceedings, claims, and regulatory, or government inquiries and investigations, or summaries as we deemed appropriate, requested and received internal and external legal counsel confirmation letters, met with internal and external legal counsel to discuss the nature of the various matters, and obtained representations from management. We also evaluated the appropriateness of the related disclosures included in Note 13 to the consolidated financial statements. |

82

PX0435-083

Table of Contents

**Uncertain Tax Positions**

*Description of the Matter*    As discussed in Note 16 to the consolidated financial statements, the Company has received certain notices from the Internal Revenue Service (IRS) related to transfer pricing agreements with the Company's foreign subsidiaries for certain periods examined. The IRS has stated that it will also apply its position to tax years subsequent to those examined. If the IRS prevails in its position, it could result in an additional federal tax liability, plus interest and any penalties asserted. The Company uses judgment to (1) determine whether a tax position's technical merits are more-likely-than-not to be sustained and (2) measure the amount of tax benefit that qualifies for recognition.

Auditing the Company's accounting for, and disclosure of, these uncertain tax positions was especially challenging due to the significant judgment required to assess management's evaluation of technical merits and the measurement of the tax position based on interpretations of tax laws and legal rulings.

*How We Addressed the Matter in Our Audit*    We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's process to assess the technical merits of tax positions related to these transfer pricing agreements and to measure the benefit of those tax positions.

As part of our audit procedures over the Company's accounting for these positions, we involved our tax professionals to assist with our assessment of the technical merits of the Company's tax positions. This included assessing the Company's correspondence with the relevant tax authorities, evaluating income tax opinions or other third-party advice obtained by the Company, and requesting and receiving confirmation letters from third-party advisors. We also used our knowledge of, and experience with, the application of international and local income tax laws by the relevant income tax authorities to evaluate the Company's accounting for those tax positions. We analyzed the Company's assumptions and data used to determine the amount of the federal tax liability recognized and tested the mathematical accuracy of the underlying data and calculations. We also evaluated the appropriateness of the related disclosures included in Note 16 to the consolidated financial statements in relation to these matters.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2007.

San Mateo, California
February 1, 2023

83

PX0435-084

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Meta Platforms, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Meta Platforms, Inc.'s internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the COSO criteria). In our opinion, Meta Platforms, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2022 and 2021, the related consolidated statements of income, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes and our report dated February 1, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

San Mateo, California
February 1, 2023

84

PX0435-085

Table of Contents

**META PLATFORMS, INC.**
**CONSOLIDATED BALANCE SHEETS**
*(In millions, except for number of shares and par value)*

| | December 31, | | | |
|---|---|---|---|---|
| | | 2022 | | 2021 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 14,681 | $ | 16,601 |
| Marketable securities | | 26,057 | | 31,397 |
| Accounts receivable, net | | 13,466 | | 14,039 |
| Prepaid expenses and other current assets | | 5,345 | | 4,629 |
| Total current assets | | 59,549 | | 66,666 |
| Non-marketable equity securities | | 6,201 | | 6,775 |
| Property and equipment, net | | 79,518 | | 57,809 |
| Operating lease right-of-use assets | | 12,673 | | 12,155 |
| Intangible assets, net | | 897 | | 634 |
| Goodwill | | 20,306 | | 19,197 |
| Other assets | | 6,583 | | 2,751 |
| **Total assets** | $ | 185,727 | $ | 165,987 |
| | | | | |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 4,990 | $ | 4,083 |
| Partners payable | | 1,117 | | 1,052 |
| Operating lease liabilities, current | | 1,367 | | 1,127 |
| Accrued expenses and other current liabilities | | 19,552 | | 14,873 |
| Total current liabilities | | 27,026 | | 21,135 |
| Operating lease liabilities, non-current | | 15,301 | | 12,746 |
| Long-term debt | | 9,923 | | — |
| Other liabilities | | 7,764 | | 7,227 |
| Total liabilities | | 60,014 | | 41,108 |
| Commitments and contingencies | | | | |
| Stockholders' equity: | | | | |
| Common stock, $0.000006 par value; 5,000 million Class A shares authorized, 2,247 million and 2,328 million shares issued and outstanding, as of December 31, 2022 and 2021, respectively; 4,141 million Class B shares authorized, 367 million and 413 million shares issued and outstanding, as of December 31, 2022 and 2021, respectively | | — | | — |
| Additional paid-in capital | | 64,444 | | 55,811 |
| Accumulated other comprehensive loss | | (3,530) | | (693) |
| Retained earnings | | 64,799 | | 69,761 |
| Total stockholders' equity | | 125,713 | | 124,879 |
| **Total liabilities and stockholders' equity** | $ | 185,727 | $ | 165,987 |

*See Accompanying Notes to Consolidated Financial Statements.*

85

PX0435-086

Table of Contents

**META PLATFORMS, INC.**
**CONSOLIDATED STATEMENTS OF INCOME**
*(In millions, except per share amounts)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Revenue | $ 116,609 | $ 117,929 | $ 85,965 |
| Costs and expenses: | | | |
| Cost of revenue | 25,249 | 22,649 | 16,692 |
| Research and development | 35,338 | 24,655 | 18,447 |
| Marketing and sales | 15,262 | 14,043 | 11,591 |
| General and administrative | 11,816 | 9,829 | 6,564 |
| Total costs and expenses | 87,665 | 71,176 | 53,294 |
| Income from operations | 28,944 | 46,753 | 32,671 |
| Interest and other income (expense), net | (125) | 531 | 509 |
| Income before provision for income taxes | 28,819 | 47,284 | 33,180 |
| Provision for income taxes | 5,619 | 7,914 | 4,034 |
| Net income | $ 23,200 | $ 39,370 | $ 29,146 |
| Earnings per share attributable to Class A and Class B common stockholders: | | | |
| Basic | $ 8.63 | $ 13.99 | $ 10.22 |
| Diluted | $ 8.59 | $ 13.77 | $ 10.09 |
| Weighted-average shares used to compute earnings per share attributable to Class A and Class B common stockholders: | | | |
| Basic | 2,687 | 2,815 | 2,851 |
| Diluted | 2,702 | 2,859 | 2,888 |
| Share-based compensation expense included in costs and expenses: | | | |
| Cost of revenue | $ 768 | $ 577 | $ 447 |
| Research and development | 9,361 | 7,106 | 4,918 |
| Marketing and sales | 1,004 | 837 | 691 |
| General and administrative | 859 | 644 | 480 |
| Total share-based compensation expense | $ 11,992 | $ 9,164 | $ 6,536 |

*See Accompanying Notes to Consolidated Financial Statements.*

86

PX0435-087

Table of Contents

**META PLATFORMS, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
*(In millions)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Net income | $ 23,200 | $ 39,370 | $ 29,146 |
| Other comprehensive income (loss): | | | |
|   Change in foreign currency translation adjustment, net of tax | (1,184) | (1,116) | 1,056 |
|   Change in unrealized gain (loss) on available-for-sale investments and other, net of tax | (1,653) | (504) | 360 |
| Comprehensive income | $ 20,363 | $ 37,750 | $ 30,562 |

*See Accompanying Notes to Consolidated Financial Statements.*

87

PX0435-088

Table of Contents

**META PLATFORMS, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
*(In millions)*

| | Class A and Class B Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Par Value | | | | |
| **Balances at December 31, 2019** | 2,852 | $ — | $ 45,851 | $ (489) | $ 55,692 | $ 101,054 |
| Issuance of common stock | 38 | — | — | — | — | — |
| Shares withheld related to net share settlement | (14) | — | (2,369) | — | (1,195) | (3,564) |
| Share-based compensation | — | — | 6,536 | — | — | 6,536 |
| Share repurchases | (27) | — | — | — | (6,298) | (6,298) |
| Other comprehensive income | — | — | — | 1,416 | — | 1,416 |
| Net income | — | — | — | — | 29,146 | 29,146 |
| **Balances at December 31, 2020** | 2,849 | — | 50,018 | 927 | 77,345 | 128,290 |
| Issuance of common stock | 45 | — | — | — | — | — |
| Shares withheld related to net share settlement | (17) | — | (3,371) | — | (2,144) | (5,515) |
| Share-based compensation | — | — | 9,164 | — | — | 9,164 |
| Share repurchases | (136) | — | — | — | (44,810) | (44,810) |
| Other comprehensive loss | — | — | — | (1,620) | — | (1,620) |
| Net income | — | — | — | — | 39,370 | 39,370 |
| **Balances at December 31, 2021** | 2,741 | — | 55,811 | (693) | 69,761 | 124,879 |
| Issuance of common stock | 54 | — | — | — | — | — |
| Shares withheld related to net share settlement | (20) | — | (3,359) | — | (236) | (3,595) |
| Share-based compensation | — | — | 11,992 | — | — | 11,992 |
| Share repurchases | (161) | — | — | — | (27,926) | (27,926) |
| Other comprehensive loss | — | — | — | (2,837) | — | (2,837) |
| Net income | — | — | — | — | 23,200 | 23,200 |
| **Balances at December 31, 2022** | 2,614 | $ — | $ 64,444 | $ (3,530) | $ 64,799 | $ 125,713 |

*See Accompanying Notes to Consolidated Financial Statements.*

88

Table of Contents

**META PLATFORMS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In millions)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Cash flows from operating activities** | | | |
| Net income | $ 23,200 | $ 39,370 | $ 29,146 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 8,686 | 7,967 | 6,862 |
| Share-based compensation | 11,992 | 9,164 | 6,536 |
| Deferred income taxes | (3,286) | 609 | (1,192) |
| Impairment charges for leases and leasehold improvements | 2,218 | — | — |
| Abandonment charges for data center assets | 1,341 | — | — |
| Fair value adjustments for non-marketable securities | 463 | (232) | 33 |
| Other | 178 | 105 | 85 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | 231 | (3,110) | (1,512) |
| Prepaid expenses and other current assets | 162 | (1,750) | 135 |
| Other assets | (106) | (349) | (34) |
| Accounts payable | 210 | 1,436 | (17) |
| Partners payable | 90 | (12) | 178 |
| Accrued expenses and other current liabilities | 4,210 | 3,544 | (946) |
| Other liabilities | 886 | 941 | (527) |
| Net cash provided by operating activities | 50,475 | 57,683 | 38,747 |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (31,431) | (18,690) | (15,163) |
| Proceeds relating to property and equipment | 245 | 123 | 48 |
| Purchases of marketable debt securities | (9,626) | (30,407) | (33,930) |
| Sales of marketable debt securities | 11,083 | 31,671 | 11,787 |
| Maturities of marketable debt securities | 2,075 | 10,915 | 13,984 |
| Purchases of non-marketable equity securities | (5) | (47) | (6,361) |
| Acquisitions of businesses and intangible assets | (1,312) | (851) | (388) |
| Other investing activities | 1 | (284) | (36) |
| Net cash used in investing activities | (28,970) | (7,570) | (30,059) |
| **Cash flows from financing activities** | | | |
| Taxes paid related to net share settlement of equity awards | (3,595) | (5,515) | (3,564) |
| Repurchases of Class A common stock | (27,956) | (44,537) | (6,272) |
| Proceeds from issuance of long-term debt, net | 9,921 | — | — |
| Principal payments on finance leases | (850) | (677) | (604) |
| Other financing activities | 344 | 1 | 148 |
| Net cash used in financing activities | (22,136) | (50,728) | (10,292) |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | (638) | (474) | 279 |
| Net decrease in cash, cash equivalents, and restricted cash | (1,269) | (1,089) | (1,325) |
| Cash, cash equivalents, and restricted cash at beginning of the period | 16,865 | 17,954 | 19,279 |
| Cash, cash equivalents, and restricted cash at end of the period | $ 15,596 | $ 16,865 | $ 17,954 |
| **Reconciliation of cash, cash equivalents, and restricted cash to the consolidated balance sheets** | | | |
| Cash and cash equivalents | $ 14,681 | $ 16,601 | $ 17,576 |
| Restricted cash, included in prepaid expenses and other current assets | 294 | 149 | 241 |
| Restricted cash, included in other assets | 621 | 115 | 137 |
| Total cash, cash equivalents, and restricted cash | $ 15,596 | $ 16,865 | $ 17,954 |

*See Accompanying Notes to Consolidated Financial Statements.*

89

Table of Contents

**META PLATFORMS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In millions)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Supplemental cash flow data** | | | |
| Cash paid for income taxes, net | $ 6,407 | $ 8,525 | $ 4,229 |
| Non-cash investing and financing activities: | | | |
| Property and equipment in accounts payable and accrued expenses and other current liabilities | $ 3,319 | $ 3,404 | $ 2,201 |
| Acquisition of businesses in accrued expenses and other current liabilities and other liabilities | $ 291 | $ 73 | $ 118 |
| Other current assets through financing arrangement in accrued expenses and other current liabilities | $ 16 | $ 508 | $ — |
| Repurchases of Class A common stock in accrued expenses and other current liabilities | $ 310 | $ 340 | $ 68 |

*See Accompanying Notes to Consolidated Financial Statements.*

90

Table of Contents

META PLATFORMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1. Summary of Significant Accounting Policies**

*Organization and Description of Business*

We were incorporated in Delaware in July 2004. Our mission is to give people the power to build community and bring the world closer together. All of our products, including our apps, share the vision of helping to bring the metaverse to life.

We report our financial results based on two reportable segments: Family of Apps (FoA) and Reality Labs (RL). The segment information aligns with how the chief operating decision maker (CODM), who is our Chief Executive Officer (CEO), reviews and manages the business. We generate substantially all of our revenue from advertising.

*Basis of Presentation*

We prepared the consolidated financial statements in accordance with U.S. generally accepted accounting principles (GAAP). The consolidated financial statements include the accounts of Meta Platforms, Inc., its subsidiaries where we have controlling financial interests, and any variable interest entities for which we are deemed to be the primary beneficiary. All intercompany balances and transactions have been eliminated.

*Use of Estimates*

Preparation of consolidated financial statements in conformity with GAAP requires the use of estimates and judgments that affect the reported amounts in the consolidated financial statements and accompanying notes. These estimates form the basis for judgments we make about the carrying values of our assets and liabilities, which are not readily apparent from other sources. We base our estimates and judgments on historical information and on various other assumptions that we believe are reasonable under the circumstances. GAAP requires us to make estimates and judgments in several areas, including, but not limited to, those related to revenue recognition, valuation of non-marketable equity securities, income taxes, loss contingencies, including the ultimate resolution of litigation, regulatory matters, and asserted and unasserted claims, valuation of long-lived assets including goodwill, intangible assets, and property and equipment, and their associated estimated useful lives, credit losses of available-for-sale (AFS) debt securities and accounts receivable, fair value of financial instruments, and fair value of leases. These estimates are based on management's knowledge about current events, interpretation of regulations, and expectations about actions we may undertake in the future. Actual results could differ materially from those estimates.

In connection with our periodic reviews of the estimated useful lives of property and equipment, we extended the estimated average useful lives of a majority of the servers and network assets from four years to 4.5 years, effective the second quarter of 2022, and further extended the useful lives to five years effective the fourth quarter of 2022. The changes in estimated useful lives were due to expected longer refresh cycles in our data centers. The financial impact of the changes was a reduction in depreciation expense of $860 million and an increase in net income of $693 million, or $0.26 per diluted share for the year ended December 31, 2022. The impact from the changes in our estimates was calculated based on the servers and network assets existing as of the effective dates of the changes and applying the revised estimated useful lives prospectively.

*Revenue Recognition*

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those goods or services.

We determine revenue recognition by applying the following steps:

- identification of the contract, or contracts, with a customer;
- identification of the performance obligations in the contract;
- determination of the transaction price;
- allocation of the transaction price to the performance obligations in the contract; and

91

PX0435-092

Table of Contents

- recognition of revenue when, or as, we satisfy a performance obligation.

We expense sales commissions when incurred if the amortization period is one year or less. These costs are recorded within marketing and sales on our consolidated statements of income.

We do not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which we recognize revenue at the amount to which we have the right to invoice for services performed.

Revenue excludes sales and usage-based taxes where it has been determined that we are acting as a pass-through agent.

*Advertising*

Advertising revenue is generated by displaying ad products on Facebook, Instagram, Messenger, and third-party mobile applications. Marketers pay for ad products either directly or through their relationships with advertising agencies or resellers, based on the number of impressions delivered or the number of actions, such as clicks, taken by our users.

We recognize revenue from the display of impression-based ads in the contracted period in which the impressions are delivered. Impressions are considered delivered when an ad is displayed to users. We recognize revenue from the delivery of action-based ads in the period in which a user takes the action the marketer contracted for. In general, we report advertising revenue on a gross basis, since we control the advertising inventory before it is transferred to our customers. Our control is evidenced by our sole ability to monetize the advertising inventory before it is transferred to our customers. For revenue generated from arrangements that involve third-party publishers, we evaluate whether we are the principal or the agent, and for those advertising revenue arrangements where we are the agent, we recognize revenue on a net basis.

We may accept lower consideration than the amount promised per the contract for certain revenue transactions and certain customers may receive cash-based incentives, credits, or refunds, which are accounted for as variable consideration when estimating the amount of revenue to recognize. We estimate these amounts and reduce revenue based on the amounts expected to be provided to customers. We believe that there will not be significant changes to our estimates of variable consideration.

*Reality Labs Revenue*

RL revenue is generated from the delivery of consumer hardware products, such as Meta Quest, wearables, and related software and content. Revenue is recognized at the time control of the products is transferred to customers, which is generally at the time of delivery, in an amount that reflects the consideration RL expects to be entitled to in exchange for the products.

*Other Revenue*

Other revenue consists of net fees we receive from developers using our Payments infrastructure and revenue from WhatsApp Business Platform and various other sources.

### Cost of Revenue

Our cost of revenue consists mostly of expenses associated with the delivery and distribution of our products. These include expenses related to the operation of our data centers and technical infrastructure, such as depreciation expense from servers, network infrastructure and buildings, as well as payroll and related expenses which include share-based compensation for employees on our operations teams, and energy and bandwidth costs. Cost of revenue also includes costs associated with partner arrangements, including traffic acquisition costs and credit card and other fees related to processing customer transactions, and content costs. Additionally, cost of revenue includes RL inventory costs, which consist of cost of products sold and estimated losses on non-cancelable contractual commitments.

### Content Costs

Our content costs are mostly related to payments to content providers from whom we license video and music to increase engagement on the platform. For licensed video, we expense the cost per title when the title is accepted and available

92

PX0435-093

Table of Contents

for viewing if the capitalization criteria are not met. Video content costs that meet the criteria for capitalization were not material to date.

For licensed music, we expense the license fees over the contractual license period. Expensed content costs are included in cost of revenue on the consolidated statements of income.

*Software Development Costs*

Software development costs, including costs to develop software products or the software component of products to be marketed or sold to external users, are expensed before the software or technology reach technological feasibility, which is typically reached shortly before the release of such products.

Software development costs also include costs to develop software to be used solely to meet internal needs and applications used to deliver our services. These software development costs meet the criteria for capitalization once the preliminary project stage is complete and it is probable that the project will be completed and the software will be used to perform the function intended.

Development costs that meet the criteria for capitalization were not material to date.

*Share-based Compensation*

Share-based compensation expense consists of the company's restricted stock units (RSUs) expense. RSUs granted to employees are measured based on the grant-date fair value. In general, our RSUs vest over a service period of four years. Share-based compensation expense is generally recognized based on the straight-line basis over the requisite service period. We account for forfeitures as they occur.

*Income Taxes*

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our provision for income taxes and income tax assets and liabilities, including evaluating uncertainties in the application of accounting principles and complex tax laws.

We record a provision for income taxes for the anticipated tax consequences of the reported results of operations using the asset and liability method. Under this method, we recognize deferred income tax assets and liabilities for the expected future consequences of temporary differences between the financial reporting and tax bases of assets and liabilities, as well as for loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using the tax rates that are expected to apply to taxable income for the years in which those tax assets and liabilities are expected to be realized or settled. We recognize the deferred income tax effects of a change in tax rates in the period of the enactment.

We record a valuation allowance to reduce our deferred tax assets to the net amount that we believe is more likely than not to be realized. We consider all available evidence, both positive and negative, including historical levels of income, expectations and risks associated with estimates of future taxable income and ongoing tax planning strategies in assessing the need for a valuation allowance.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. These uncertain tax positions include our estimates for transfer pricing that have been developed based upon analyses of appropriate arms-length prices. Similarly, our estimates related to uncertain tax positions concerning research tax credits are based on an assessment of whether our available documentation corroborating the nature of our activities supporting the tax credits will be sufficient. Although we believe that we have adequately reserved for our uncertain tax positions (including net interest and penalties), we can provide no assurance that the final tax outcome of these matters will not be materially different. We make adjustments to these reserves in accordance with the income tax accounting guidance when facts and circumstances change, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different from the amounts recorded, such differences will affect the provision for income taxes in the period in which such determination is made, and could have a material impact on our financial condition and operating results.

93

PX0435-094

Table of Contents

*Advertising Expense*

Advertising costs are expensed when incurred and are included in marketing and sales expenses on the consolidated statements of income. We incurred advertising expenses of $2.65 billion, $2.99 billion, and $2.26 billion for the years ended December 31, 2022, 2021, and 2020, respectively.

*Cash and Cash Equivalents, Marketable Securities, and Restricted Cash*

Cash and cash equivalents consist of cash on deposit with banks and highly liquid investments with maturities of 90 days or less from the date of purchase.

We hold investments in marketable securities, consisting mostly of U.S. government securities, U.S. government agency securities, and investment grade corporate debt securities. We classify our marketable securities as available-for-sale (AFS) investments in our current assets because they represent investments of cash available for current operations. Our AFS investments are carried at estimated fair value with any unrealized gains and losses, net of taxes, included in accumulated other comprehensive income (loss) in stockholders' equity. AFS debt securities with an amortized cost basis in excess of estimated fair value are assessed to determine what amount of that difference, if any, is caused by expected credit losses. Allowance for credit losses on AFS debt securities are recognized as a charge in interest and other income (expense), net on our consolidated statements of income, and any remaining unrealized losses, net of taxes, are included in accumulated other comprehensive income (loss) in stockholders' equity. The amounts of credit losses recorded for the years ended December 31, 2022, 2021, and 2020 were not material. We determine realized gains or losses on sale of marketable securities on a specific identification method and include such gains or losses in interest and other income (expense), net on the consolidated statements of income.

We classify certain restricted cash balances, consisting mostly of cash related to insurance policies, and retention and indemnification holdback for our acquisitions, within prepaid expenses and other current assets and other assets on the consolidated balance sheets based upon the expected duration of the restrictions.

*Non-marketable Equity Securities*

Our non-marketable equity securities are investments in privately-held companies without readily determinable fair values. We elected to account for substantially all of our non-marketable equity securities using the measurement alternative, which is cost, less any impairment, adjusted for changes in fair value resulting from observable transactions for identical or similar investments of the same issuer as of the respective transaction dates. The change in carrying value, if any, is recognized in interest and other income (expense), net on our consolidated statements of income. We periodically review our non-marketable equity securities for impairment. When indicators exist and the estimated fair value of an investment is below the carrying amount, we write down the investment to fair value. During the year ended December 31, 2022, losses resulted from such remeasurements were $447 million. Gains and losses recorded in the years ended December 31, 2021 and 2020 were immaterial. For additional information, see Note 6 — Non-marketable Equity Securities.

In addition, we also held other non-marketable equity securities accounted for under the equity method which were immaterial as of December 31, 2022 and 2021.

*Fair Value Measurements*

We apply fair value accounting for all financial assets and liabilities and non-financial assets and liabilities that are recognized or disclosed at fair value in the financial statements on a recurring basis. We define fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities, which are required to be recorded at fair value, we consider the principal or most advantageous market in which we would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as risks inherent in valuation techniques, transfer restrictions and credit risk. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

*Level 1-* Quoted prices in active markets for identical assets or liabilities.

94

PX0435-095

Table of Contents

*Level 2*- Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

*Level 3*- Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

Our cash equivalents and marketable debt securities are classified within Level 1 or Level 2 of the fair value hierarchy because their fair value is derived from quoted market prices or alternative pricing sources and models utilizing observable market inputs. Our marketable equity securities are publicly traded stocks measured at fair value and classified within Level 1 in the fair value hierarchy because we use quoted prices for identical assets in active markets to estimate their fair value. Certain other assets are classified within Level 3 because factors used to develop the estimated fair value are unobservable inputs that are not supported by market activity.

Our non-marketable equity securities accounted for using the measurement alternative are recorded at fair value on a non-recurring basis. When indicators of impairment exist or observable price changes of qualified transactions occur, the respective non-marketable equity security would be classified within Level 3 of the fair value hierarchy because the valuation methods include a combination of the observable transaction price at the transaction date and other unobservable inputs including volatility, rights, and obligations of the securities we hold.

### Accounts Receivable and Allowances

Accounts receivable are recorded and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. We make estimates of expected credit and collectibility trends for the allowance for credit losses and allowance for unbilled receivables based upon our assessment of various factors, including historical experience, the age of the accounts receivable balances, credit quality of our customers, current economic conditions, reasonable and supportable forecasts of future economic conditions, and other factors that may affect our ability to collect from customers. Expected credit losses are recorded as general and administrative expenses on our consolidated statements of income. As of December 31, 2022 and 2021, the allowances for accounts receivable were immaterial.

### Property and Equipment

Property and equipment, which includes amounts recorded under finance leases, which are amortized, are stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets or the remaining lease term, whichever is shorter.

The estimated useful lives of property and equipment and amortization periods of finance lease right-of-use assets are described below:

| Property and Equipment | Useful Life/ Amortization period |
| --- | --- |
| Servers and network assets | Four to Five years |
| Buildings | 25 to 30 years |
| Equipment and other | One to 25 years |
| Finance lease right-of-use assets | Three to 20 years |
| Leasehold improvements | Lesser of estimated useful life or remaining lease term |

We evaluate at least annually the recoverability of property and equipment for possible impairment whenever events or circumstances indicate that the carrying amount of such assets may not be recoverable. If such review indicates that the carrying amount of property and equipment assets is not recoverable, and the asset's fair value is less than the carrying amount, an impairment charge is recognized. During the year ended December 31, 2022, we recorded $1.34 billion of abandonment charges for data center construction in progress (CIP) assets under Accounting Standards Codification (ASC) Topic 360 related to our restructuring efforts. For additional information regarding our restructuring efforts, see Note 3 — Restructuring.

95

PX0435-096

Table of Contents

The useful lives of our property and equipment are determined by management when those assets are initially recognized and are routinely reviewed for the remaining estimated useful lives. Our current estimate of useful lives represents the best estimate of the useful lives based on current facts and circumstances, but may differ from the actual useful lives due to changes to our business operations, changes in the planned use of assets, and technological advancements. When we change the estimated useful life assumption for any asset, the remaining carrying amount of the asset is accounted for prospectively and depreciated or amortized over the revised estimated useful life. See section "Use of Estimates" above for additional information regarding changes in the estimated useful lives of our servers and network assets.

Servers and network assets include property and equipment mostly in our data centers, which is used to support production traffic. Land and assets held within construction in progress are not depreciated. Construction in progress is related to the construction or development of property and equipment that have not yet been placed in service for their intended use.

The cost of maintenance and repairs is expensed as incurred. When assets are retired or otherwise disposed of, the cost and related accumulated depreciation are removed from their respective accounts, and any gain or loss on such sale or disposal is reflected in income from operations.

*Lease Obligations*

We have operating leases comprised of certain offices, data centers, colocations, land, network infrastructure, and other equipment. We also have finance leases for certain network infrastructure. We determine if an arrangement is a lease at inception. Most of our leases contain lease and non-lease components. Non-lease components include fixed payments for maintenance, utilities, real estate taxes, and management fees. We combine fixed lease and non-lease components and account for them as a single lease component. Our lease agreements may contain variable costs such as contingent rent escalations, common area maintenance, insurance, real estate taxes, or other costs. Such variable lease costs are expensed as incurred on the consolidated statements of income. For certain colocation and equipment leases, we apply a portfolio approach to effectively account for the operating lease right-of-use (ROU) assets and lease liabilities.

For leases with a lease term greater than 12 months, ROU assets and lease liabilities are recognized on the consolidated balance sheets at the commencement date based on the present value of the remaining fixed lease payments and includes only payments that are fixed and determinable at the time of commencement.

Our lease terms may include options to extend or terminate the lease when it is reasonably certain that we will exercise such options. When determining the probability of exercising such options, we consider contract-based, asset-based, entity-based, and market-based factors.

As most of our leases do not provide an implicit rate, we use our incremental borrowing rate based on the information available at the commencement date in determining the present value of lease payments. Our incremental borrowing rate is a hypothetical rate based on our understanding of what our credit rating would be in a similar economic environment.

Operating leases are included in operating lease ROU assets, operating lease liabilities, current, and operating lease liabilities, non-current on our consolidated balance sheets. Finance leases are included in property and equipment, net, accrued expenses and other current liabilities, and other liabilities on our consolidated balance sheets.

Operating lease costs are recognized on a straight-line basis over the lease terms. Finance lease assets are amortized on a straight-line basis over the shorter of the estimated useful lives of the assets or the lease terms.

During the year ended December 31, 2022, we recorded impairment losses of $2.22 billion in aggregate for operating lease ROU assets and leasehold improvements under ASC Topic 360 as a part of our facilities consolidation restructuring efforts. The fair values of the impaired assets were estimated using discounted cash flow models (income approach) based on market participant assumptions with Level 3 inputs. The assumptions used in estimating fair value include the expected downtime prior to the commencement of future subleases, projected sublease income over the remaining lease periods, and discount rates that reflect the level of risk associated with receiving future cash flows. For additional information regarding our restructuring efforts, see Note 3 — Restructuring.

96

PX0435-097

Table of Contents

*Loss Contingencies*

We are involved in legal proceedings, claims, and regulatory, tax or government inquiries and investigations that arise in the ordinary course of business. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages. Additionally, we are required to comply with various legal and regulatory obligations around the world, and we regularly become subject to new laws and regulations in the jurisdictions in which we operate. The requirements for complying with these obligations may be uncertain and subject to interpretation and enforcement by regulatory and other authorities, and any failure to comply with such obligations could eventually lead to asserted legal or regulatory action. With respect to these matters, asserted and unasserted, we evaluate the associated developments on a regular basis and accrue a liability when we believe that it is both probable that a loss has been incurred and the amount can be reasonably estimated. If we determine there is a reasonable possibility that we may incur a loss and the loss or range of loss can be reasonably estimated, we disclose the possible loss in the accompanying notes to the consolidated financial statements to the extent material.

We review the developments in our contingencies that could affect the amount of the provisions that have been previously recorded, and the matters and related reasonably possible losses disclosed. We make adjustments to our provisions and changes to our disclosures accordingly to reflect the merits of our defenses and the impact of negotiations, settlements, regulatory proceedings, rulings, advice of legal counsel, and updated information. Significant judgment is required to determine the probability of loss and the estimated amount of loss, including when and if the probability and estimate has changed for asserted and unasserted matters. Certain factors, in particular, have resulted in significant changes to these estimates and judgments in prior quarters based on updated information available. For example, in certain jurisdictions where we operate, fines and penalties may be the result of new laws and preliminary interpretations regarding the basis of assessing damages, which may make it difficult to estimate what such fines and penalties would amount to if successfully asserted against us. In addition, certain government inquiries and investigations, such as matters before our lead European Union privacy regulator, the IDPC, are subject to review by other regulatory bodies before decisions can be finalized, which can lead to significant changes in the outcome of an inquiry. As a result of these and other factors, we reasonably expect that our estimates and judgments with respect to our contingencies may continue to be revised in future quarters.

*Business Combinations*

We allocate the fair value of purchase consideration to the tangible assets acquired, liabilities assumed and intangible assets acquired based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill to reporting units based on the expected benefit from the business combination. Allocation of purchase consideration to identifiable assets and liabilities affects the amortization expense, as acquired finite-lived intangible assets are amortized over the useful life, whereas any indefinite-lived intangible assets, including goodwill, are not amortized. During the measurement period, which is not to exceed one year from the acquisition date, we record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings. Acquisition-related expenses are recognized separately from business combinations and are expensed as incurred.

*Goodwill and Intangibles Assets*

We allocate goodwill to reporting units based on the expected benefit from business combinations. We evaluate our reporting units annually, as well as when changes in our operating segments occur. For changes in reporting units, we reassign goodwill using a relative fair value allocation approach. Goodwill is tested for impairment at the reporting unit level annually or more frequently if events or changes in circumstances would more likely than not reduce the fair value of a reporting unit below its carrying value. We have two reporting units subject to goodwill impairment testing. As of December 31, 2022, no impairment of goodwill has been identified.

We evaluate the recoverability of finite-lived intangible assets for possible impairment whenever events or circumstances indicate that the carrying amount of such assets may not be recoverable. The evaluation of these intangible assets are performed at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. Recoverability of these assets is measured by a comparison of the carrying amounts to the future undiscounted cash flows the assets are expected to generate from the use and eventual disposition. If such review indicates that the carrying amount of finite-lived intangible assets is not recoverable, and the assets fair value is less than the carrying amount, an impairment charge is recognized. We have not recorded any material impairment charges during the years presented.

97

PX0435-098

Table of Contents

Our finite-lived intangible assets are amortized on a straight-line basis over the estimated useful lives of the assets. Indefinite-lived intangible assets are not amortized. If an indefinite-lived intangible asset is subsequently determined to have a finite useful life, the asset will be tested for impairment and accounted for as a finite-lived intangible asset prospectively over its estimated remaining useful life. We routinely review the remaining estimated useful lives of finite-lived intangible assets. If we change the estimated useful life assumption for any asset, the remaining unamortized balance is amortized over the revised estimated useful life.

### Foreign Currency

Generally, the functional currency of our international subsidiaries is the local currency. We translate the financial statements of these subsidiaries to U.S. dollars using month-end rates of exchange for assets and liabilities, and average rates of exchange for revenue, costs, and expenses. Translation gains and losses are recorded in accumulated other comprehensive income (loss) as a component of stockholders' equity. As of December 31, 2022 and 2021, we had cumulative translation losses, net of tax of $1.86 billion and $677 million, respectively.

Foreign currency transaction gains and losses from transactions denominated in a currency other than the functional currency of the subsidiary involved are recorded within interest and other income (expense), net on our consolidated statements of income. Net losses resulting from foreign currency transactions were $81 million, $140 million, and $129 million for the years ended December 31, 2022, 2021, and 2020, respectively.

### Credit Risk and Concentration

Our financial instruments that are potentially subject to concentrations of credit risk consist primarily of cash, cash equivalents, restricted cash, marketable securities, and accounts receivable. Cash equivalents consists mostly of money market funds, that primarily invest in U.S. government and agency securities. Marketable securities consist of investments in U.S. government securities, U.S. government agency securities, and investment grade corporate debt securities. Our investment portfolio in corporate debt securities is highly liquid and diversified among individual issuers. The amount of credit losses recorded for the year ended December 31, 2022 was not material.

Accounts receivable are typically unsecured and are derived from revenue earned from customers across different industries and countries. We generated 40%, 41%, and 42% of our revenue for the years ended December 31, 2022, 2021, and 2020, respectively, from marketers and developers based in the United States, with the majority of revenue outside of the United States coming from customers located in western Europe, China, Brazil, Canada, Australia and Japan.

We perform ongoing credit evaluations of our customers and generally do not require collateral. We maintain an allowance for estimated credit losses, and bad debt expense on these losses was not material during the years ended December 31, 2022, 2021, or 2020. In the event that accounts receivable collection cycles deteriorate, our operating results and financial position could be adversely affected.

No customer represented 10% or more of total revenue during the years ended December 31, 2022, 2021, and 2020.

### Recently Adopted Accounting Pronouncements

On January 1, 2022, we early adopted Accounting Standards Update (ASU) No. 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers* (ASU 2021-08), which clarifies that an acquirer of a business should recognize and measure contract assets and contract liabilities in a business combination in accordance with Accounting Standards Codification (ASC) Topic 606, Revenue from Contracts with Customers. The adoption of this new standard did not have a material impact on our consolidated financial statements.

On July 1, 2022, we early adopted ASU No. 2022-03, *Fair Value Measurement (Topic 820): Fair Value Measurement of Equity Securities Subject to Contractual Sale Restrictions* (ASU 2022-03), which clarifies and amends the guidance of measuring the fair value of equity securities subject to contractual restrictions that prohibit the sale of the equity securities. The adoption of this new standard did not have a material impact on our consolidated financial statements.

On October 1, 2022, we adopted ASU No. 2021-10, *Government Assistance (Topic 832): Disclosure by Business Entities about Government Assistance* (ASU 2021-10), which improves the transparency of government assistance received

98

PX0435-099

Table of Contents

by most business entities by requiring annual disclosures of: (1) the types of government assistance received; (2) the accounting for such assistance; and (3) the effect of the assistance on a business entity's financial statements. The adoption of this new standard did not have a material impact on our consolidated financial statements.

**Note 2. Revenue**

Revenue disaggregated by revenue source and by segment consists of the following (in millions). For comparative purposes, amounts for the year ended December 31, 2020 have been recast:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Advertising | $ 113,642 | $ 114,934 | $ 84,169 |
| Other revenue | 808 | 721 | 657 |
| Family of Apps | 114,450 | 115,655 | 84,826 |
| Reality Labs | 2,159 | 2,274 | 1,139 |
| Total revenue | $ 116,609 | $ 117,929 | $ 85,965 |

Revenue disaggregated by geography, based on the addresses of our customers, consists of the following (in millions):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| United States and Canada [1] | $ 50,150 | $ 51,541 | $ 38,433 |
| Europe [2] | 26,681 | 29,057 | 20,349 |
| Asia-Pacific | 27,760 | 26,739 | 19,848 |
| Rest of World [2] | 12,018 | 10,592 | 7,335 |
| Total revenue | $ 116,609 | $ 117,929 | $ 85,965 |

(1)   United States revenue was $47.20 billion, $48.38 billion, and $36.25 billion for the years ended December 31, 2022, 2021, and 2020, respectively.
(2)   Europe includes Russia and Turkey, and Rest of World includes Africa, Latin America, and the Middle East.

Our total deferred revenue was $526 million and $596 million as of December 31, 2022 and 2021, respectively. As of December 31, 2022, we expect $482 million of our deferred revenue to be realized in less than a year.

Table of Contents

**Note 3. Restructuring**

During the year ended December 31, 2022, we initiated several measures to pursue greater cost efficiency and to realign our business and strategic priorities.

Beginning in the third quarter of 2022, as a part of our facilities consolidation strategy, we made a decision to sublease, early terminate, or abandon several office buildings under operating leases to align our real property lease arrangements with our anticipated operating needs. As a result, we recorded impairment charges for the related operating lease right-of-use (ROU) assets and leasehold improvements.

In November 2022, we announced a layoff of approximately 11,000 of our employees across the FoA and RL segments. As a result, we recorded severance and other personnel related expenses for the impacted employees.

In December 2022, we reevaluated our data center investment strategy to improve efficiency and further advance our efforts around artificial intelligence. As a result, we decided to pivot several of our data center building projects to a next generation design while also canceling multiple existing data center projects. This strategy led to abandonment charges of the related data center assets.

A summary of our restructuring charges for the year ended December 31, 2022 by major activity type is as follows (in millions):

| | Facilities Consolidation [1] | Severance and Other Personnel Costs | Data Center Assets | Total |
|---|---|---|---|---|
| Cost of revenue | $ 154 | $ — | $ 1,341 | $ 1,495 |
| Research and development | 1,311 | 408 | — | 1,719 |
| Marketing and sales | 404 | 234 | — | 638 |
| General and administrative | 426 | 333 | — | 759 |
| Total | $ 2,295 | $ 975 | $ 1,341 | $ 4,611 |

(1) Facilities consolidation includes impairment charges and accelerated expenses related to certain operating lease ROU assets and leasehold improvements.

Total restructuring charges recorded under our FoA segment were $4.10 billion and RL segment were $515 million.

The following table is a summary of the changes in the severance and other personnel liabilities, included within accrued expenses and other current liabilities on the consolidated balance sheets, related to the workforce reduction (in millions):

| | |
|---|---|
| Balance as of January 1, 2022 | $ — |
| Severance and other personnel costs | 975 |
| Cash payments during the period | (203) |
| Balance as of December 31, 2022 [1] | $ 772 |

(1) We expect the remaining severance and termination related liabilities to be substantially paid out in cash during the first half of 2023.

100

Table of Contents

**Note 4. Earnings per Share**

We compute earnings per share (EPS) of Class A and Class B common stock using the two-class method. As the liquidation and dividend rights for both Class A and Class B common stock are identical, the undistributed earnings are allocated on a proportionate basis to the weighted-average number of common shares outstanding for the period.

Basic EPS is computed by dividing net income by the weighted-average number of shares of our Class A and Class B common stock outstanding. For the calculation of diluted EPS, net income for basic EPS is adjusted by the effect of dilutive securities, including awards under our equity compensation plan.

In addition, the computation of the diluted EPS of Class A common stock assumes the conversion of our Class B common stock to Class A common stock, while the diluted EPS of Class B common stock does not assume the conversion of those shares to Class A common stock. Diluted EPS is computed by dividing the resulting net income by the weighted-average number of fully diluted common shares outstanding.

For the year ended December 31, 2022, approximately 95 million shares of Class A common stock equivalents of restricted stock units (RSUs) were excluded from the diluted EPS calculation as including them would have an anti-dilutive effect. RSUs with anti-dilutive effect were not material for the years ended December 31, 2021 and 2020.

Basic and diluted EPS are the same for each class of common stock because they are entitled to the same liquidation and dividend rights.

The numerators and denominators of the basic and diluted EPS computations for our common stock are calculated as follows (in millions, except per share amounts):

| | Year Ended December 31, | | | | | |
| | 2022 | | 2021 | | 2020 | |
| | Class A | Class B | Class A | Class B | Class A | Class B |
|---|---|---|---|---|---|---|
| **Basic EPS:** | | | | | | |
| Numerator | | | | | | |
| Net income | $ 19,729 | $ 3,471 | $ 33,328 | $ 6,042 | $ 24,607 | $ 4,539 |
| Denominator | | | | | | |
| Shares used in computation of basic earnings per share | 2,285 | 402 | 2,383 | 432 | 2,407 | 444 |
| Basic EPS | $ 8.63 | $ 8.63 | $ 13.99 | $ 13.99 | $ 10.22 | $ 10.22 |
| **Diluted EPS:** | | | | | | |
| Numerator | | | | | | |
| Net income | $ 19,729 | $ 3,471 | $ 33,328 | $ 6,042 | $ 24,607 | $ 4,539 |
| Reallocation of net income as a result of conversion of Class B to Class A common stock | 3,471 | — | 6,042 | — | 4,539 | — |
| Reallocation of net income to Class B common stock | — | (19) | — | (93) | — | (58) |
| Net income for diluted EPS | $ 23,200 | $ 3,452 | $ 39,370 | $ 5,949 | $ 29,146 | $ 4,481 |
| Denominator | | | | | | |
| Shares used in computation of basic earnings per share | 2,285 | 402 | 2,383 | 432 | 2,407 | 444 |
| Conversion of Class B to Class A common stock | 402 | — | 432 | — | 444 | — |
| Weighted-average effect of dilutive RSUs | 15 | — | 44 | — | 37 | — |
| Shares used in computation of diluted earnings per share | 2,702 | 402 | 2,859 | 432 | 2,888 | 444 |
| Diluted EPS | $ 8.59 | $ 8.59 | $ 13.77 | $ 13.77 | $ 10.09 | $ 10.09 |

101

PX0435-102

Table of Contents

**Note 5. Cash, Cash Equivalent, Marketable Securities, and Restricted Cash**

The following table sets forth cash, cash equivalents, marketable securities and restricted cash (in millions):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Cash and cash equivalents: | | |
| Cash | $ 6,176 | $ 7,308 |
| Money market funds | 8,305 | 8,850 |
| U.S. government securities | — | 25 |
| U.S. government agency securities | 16 | 108 |
| Certificates of deposit and time deposits | 156 | 250 |
| Corporate debt securities | 28 | 60 |
| Total cash and cash equivalents | 14,681 | 16,601 |
| Marketable securities: | | |
| Marketable debt securities: | | |
| U.S. government securities | 8,708 | 10,901 |
| U.S. government agency securities | 4,989 | 5,927 |
| Corporate debt securities | 12,335 | 14,569 |
| Total marketable debt securities | 26,032 | 31,397 |
| Marketable equity securities | 25 | — |
| Total marketable securities | 26,057 | 31,397 |
| Restricted cash: | | |
| Restricted cash included in prepaid expenses and other current assets | 294 | 149 |
| Restricted cash included in other assets | 621 | 115 |
| Total restricted cash | 915 | 264 |
| Total cash, cash equivalents, marketable securities, and restricted cash | $ 41,653 | $ 48,262 |

102

Table of Contents

The following table summarizes our available-for-sale marketable debt securities and cash equivalents with unrealized losses as of December 31, 2022 and 2021, aggregated by major security type and the length of time that individual securities have been in a continuous loss position (in millions):

| | December 31, 2022 | | | | | | | |
| | Less than 12 months | | 12 months or greater | | Total | |
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
|---|---|---|---|---|---|---|
| U.S. government securities | $ 5,008 | $ (234) | $ 3,499 | $ (247) | $ 8,507 | $ (481) |
| U.S. government agency securities | 524 | (17) | 4,415 | (308) | 4,939 | (325) |
| Corporate debt securities | 4,555 | (249) | 7,256 | (634) | 11,811 | (883) |
| Total | $ 10,087 | $ (500) | $ 15,170 | $ (1,189) | $ 25,257 | $ (1,689) |

| | December 31, 2021 | | | | | | | |
| | Less than 12 months | | 12 months or greater | | Total | |
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
|---|---|---|---|---|---|---|
| U.S. government securities | $ 5,184 | $ (38) | $ 30 | $ — | $ 5,214 | $ (38) |
| U.S. government agency securities | 5,029 | (61) | 2 | — | 5,031 | (61) |
| Corporate debt securities | 10,041 | (93) | 40 | (1) | 10,081 | (94) |
| Total | $ 20,254 | $ (192) | $ 72 | $ (1) | $ 20,326 | $ (193) |

The increase in the gross unrealized losses for the year ended December 31, 2022 is due to higher interest rates. The allowance for credit losses and the gross unrealized gains on our marketable debt securities was not material as of December 31, 2022 and 2021.

The following table classifies our marketable debt securities by contractual maturities (in millions):

| | December 31, 2022 |
|---|---|
| Due within one year | $ 4,170 |
| Due after one year to five years | 21,862 |
| Total | $ 26,032 |

103

PX0435-104

Table of Contents

**Note 6. Non-marketable Equity Securities**

Our non-marketable equity securities are investments in privately-held companies without readily determinable fair values. The following table summarizes our non-marketable equity securities that were measured using measurement alternative and equity method (in millions):

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2022 | | 2021 | |
| Non-marketable equity securities under measurement alternative: | | | | |
| Initial cost | $ | 6,388 | $ | 6,480 |
| Cumulative upward adjustments |  | 293 |  | 311 |
| Cumulative impairment/downward adjustments |  | (497) |  | (50) |
| Carrying value |  | 6,184 |  | 6,741 |
| Non-marketable equity securities under equity method |  | 17 |  | 34 |
| Total | $ | 6,201 | $ | 6,775 |

During the year ended December 31, 2022, we recorded $447 million of impairment and downward adjustments on our non-marketable equity securities that were measured using measurement alternative, which includes the impairment of our equity investment in Giphy due to a regulatory decision announced by the United Kingdom Competition and Markets Authority in October 2022.

**Note 7. Fair Value Measurements**

The following table summarizes our assets measured at fair value on a recurring basis and the classification by level of input within the fair value hierarchy (in millions):

|  |  | | Fair Value Measurement at Reporting Date Using | | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | December 31, 2022 | | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
| Cash equivalents: | | | | | | | | |
| Money market funds | $ | 8,305 | $ | 8,305 | $ | — | $ | — |
| U.S. government agency securities |  | 16 |  | 16 |  | — |  | — |
| Certificates of deposit and time deposits |  | 156 |  | — |  | 156 |  | — |
| Corporate debt securities |  | 28 |  | — |  | 28 |  | — |
| Marketable securities: | | | | | | | | |
| U.S. government securities |  | 8,708 |  | 8,708 |  | — |  | — |
| U.S. government agency securities |  | 4,989 |  | 4,989 |  | — |  | — |
| Corporate debt securities |  | 12,335 |  | — |  | 12,335 |  | — |
| Marketable equity securities |  | 25 |  | 25 |  | — |  | — |
| Restricted cash equivalents |  | 583 |  | 583 |  | — |  | — |
| Other assets |  | 157 |  | — |  | — |  | 157 |
| Total | $ | 35,302 | $ | 22,626 | $ | 12,519 | $ | 157 |

104

Table of Contents

| | | Fair Value Measurement at Reporting Date Using | | |
| Description | December 31, 2021 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Cash equivalents: | | | | |
| Money market funds | $ 8,850 | $ 8,850 | $ — | $ — |
| U.S. government securities | 25 | 25 | — | — |
| U.S. government agency securities | 108 | 108 | — | — |
| Certificates of deposit and time deposits | 250 | — | 250 | — |
| Corporate debt securities | 60 | — | 60 | — |
| Marketable securities: | | | | |
| U.S. government securities | 10,901 | 10,901 | — | — |
| U.S. government agency securities | 5,927 | 5,927 | — | — |
| Corporate debt securities | 14,569 | — | 14,569 | — |
| Restricted cash equivalents | 71 | 71 | — | — |
| Other assets | 160 | — | — | 160 |
| Total | $ 40,921 | $ 25,882 | $ 14,879 | $ 160 |

We classify our cash equivalents and marketable debt securities within Level 1 or Level 2 because we use quoted market prices or alternative pricing sources and models utilizing market observable inputs to determine their fair value. Our marketable equity securities are publicly traded stocks measured at fair value and classified within Level 1 in the fair value hierarchy because we use quoted prices for identical assets in active markets to estimate their fair value. Certain other assets are classified within Level 3 because factors used to develop the estimated fair value are unobservable inputs that are not supported by market activity.

Our non-marketable equity securities accounted for using the measurement alternative are measured at fair value on a non-recurring basis and are classified within Level 3 of the fair value hierarchy because we use significant unobservable inputs to estimate their fair value. Assets remeasured at fair value within Level 3 during the years ended December 31, 2022 and 2021 were immaterial and $913 million, respectively. For additional information, see Note 6 — Non-marketable Equity Securities.

**Note 8. Property and Equipment**

Property and equipment, net consists of the following (in millions):

| | December 31, | |
| | 2022 | 2021 |
|---|---|---|
| Land | $ 1,874 | $ 1,688 |
| Servers and network assets | 34,330 | 25,584 |
| Buildings | 27,720 | 22,531 |
| Leasehold improvements | 6,522 | 5,795 |
| Equipment and other | 5,642 | 4,764 |
| Finance lease right-of-use assets | 3,353 | 2,840 |
| Construction in progress | 25,052 | 14,687 |
| Property and equipment, gross | 104,493 | 77,889 |
| Less: Accumulated depreciation | (24,975) | (20,080) |
| Property and equipment, net | $ 79,518 | $ 57,809 |

105

Table of Contents

Construction in progress includes costs mostly related to construction of data centers, network infrastructure, servers, and office facilities. As of December 31, 2022, construction in progress also includes $2.18 billion of servers and network assets components stored by our suppliers until required by our design manufacturers to fulfill certain purchase orders.

Depreciation expense on property and equipment was $8.50 billion, $7.56 billion, and $6.39 billion for the years ended December 31, 2022, 2021, and 2020, respectively. The majority of the property and equipment depreciation expense was from servers and network assets depreciation of $5.29 billion, $4.94 billion, and $4.38 billion for the years ended December 31, 2022, 2021, and 2020, respectively. For additional information regarding changes in the estimated useful life of our servers and network assets, see Note 1 — Summary of Significant Accounting Policies.

During the year ended December 31, 2022, we recorded $1.34 billion abandonment charge and $508 million impairment loss for data center assets and leasehold improvements assets, respectively, as a result of our restructuring efforts. For additional information, see Note 3 — Restructuring.

**Note 9. Leases**

We have entered into various non-cancelable operating lease agreements mostly for certain of our offices, data centers, colocations, and land. We have also entered into various non-cancelable finance lease agreements mostly for certain network infrastructure. Our leases have original lease periods expiring between 2023 and 2093. Many leases include one or more options to renew. We do not assume renewals in our determination of the lease term unless the renewals are deemed to be reasonably assured. Our lease agreements generally do not contain any material residual value guarantees or material restrictive covenants.

The components of lease costs are as follows (in millions):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | |
| Finance lease cost: | | | | | | |
| Amortization of right-of-use assets | $ | 380 | $ | 344 | $ | 259 |
| Interest | | 16 | | 15 | | 14 |
| Operating lease cost | | 1,857 | | 1,540 | | 1,391 |
| Variable lease cost and other, net | | 363 | | 272 | | 269 |
| Total lease cost | $ | 2,616 | $ | 2,171 | $ | 1,933 |

During the year ended December 31, 2022, we also recorded $1.71 billion impairment loss for operating lease ROU assets as a part of our facilities consolidation restructuring efforts. For additional information, see Note 3 — Restructuring.

Supplemental balance sheet information related to leases is as follows:

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Weighted-average remaining lease term: | | |
| Finance leases | 14.4 years | 13.9 years |
| Operating leases | 12.5 years | 13.0 years |
| Weighted-average discount rate: | | |
| Finance leases | 3.1 % | 2.7 % |
| Operating leases | 3.2 % | 2.8 % |

106

Table of Contents

The following is a schedule, by years, of maturities of lease liabilities as of December 31, 2022 (in millions):

|  | Operating Leases | | Finance Leases | |
|---|---|---|---|---|
| 2023 | $ | 1,739 | $ | 146 |
| 2024 | | 2,034 | | 57 |
| 2025 | | 1,771 | | 57 |
| 2026 | | 1,723 | | 53 |
| 2027 | | 1,699 | | 52 |
| Thereafter | | 11,801 | | 460 |
| Total undiscounted cash flows | | 20,767 | | 825 |
| Less: Imputed interest | | (4,099) | | (138) |
| Present value of lease liabilities [(1)] | $ | 16,668 | $ | 687 |
| | | | | |
| Lease liabilities, current | $ | 1,367 | $ | 129 |
| Lease liabilities, non current | | 15,301 | | 558 |
| Present value of lease liabilities [(1)] | $ | 16,668 | $ | 687 |

_____
(1)   Lease liabilities include those operating leases that we plan to sublease or abandon as a part of our facilities consolidation restructuring efforts. For additional information, see Note 3 — Restructuring.

The table above does not include lease payments that were not fixed at commencement or lease modification. As of December 31, 2022, we have additional operating and finance leases, that have not yet commenced, with lease obligations of approximately $8.36 billion and $1.43 billion, respectively, mostly for data centers, offices, network infrastructure, and colocations. These operating and finance leases will commence between 2023 and 2028 with lease terms of greater than one year to 30 years.

Supplemental cash flow information related to leases is as follows (in millions):

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2022 | | 2021 | | 2020 | |
| Cash paid for amounts included in the measurement of lease liabilities: | | | | | | |
| Operating cash flows for operating leases | $ | 1,654 | $ | 1,406 | $ | 1,208 |
| Operating cash flows for finance leases | $ | 16 | $ | 15 | $ | 14 |
| Financing cash flows for finance leases | $ | 850 | $ | 677 | $ | 604 |
| Lease liabilities arising from obtaining right-of-use assets: | | | | | | |
| Operating leases | $ | 4,366 | $ | 4,466 | $ | 1,158 |
| Finance leases | $ | 223 | $ | 160 | $ | 121 |

**Note 10. Acquisitions, Goodwill, and Intangible Assets**

During the year ended December 31, 2022, we completed several business combinations with total cash consideration transferred of $1.23 billion, which in aggregate was allocated to $317 million of intangible assets, $1.14 billion of goodwill, and $223 million of net liabilities assumed. Goodwill generated from all business acquisitions completed was primarily attributable to expected synergies and potential monetization opportunities. The amount of goodwill generated that was deductible for tax purposes was not material. Acquisition-related costs were immaterial and were expensed as incurred. Pro forma historical results of operations related to these business acquisitions have not been presented because they are not significant to our consolidated financial statements, either individually or in aggregate. We have included the financial results of these acquired businesses in our consolidated financial statements from their respective dates of acquisition.

107

PX0435-108

Table of Contents

Changes in the carrying amount of goodwill by reportable segment for the years ended December 31, 2022 and 2021 are as follows (in millions):

| | Family of Apps | Reality Labs | Total |
|---|---|---|---|
| Goodwill at December 31, 2020 | | | $ 19,050 |
| Acquisitions | | | 210 |
| Adjustments/transfer | | | (191) |
| Effect of currency translation adjustment | | | (4) |
| Segment allocation in the fourth quarter of 2021 [1] | $ 18,455 | $ 610 | 19,065 |
| Acquisitions in the fourth quarter of 2021 | — | 128 | 128 |
| Effect of currency translation adjustment | 3 | 1 | 4 |
| Goodwill at December 31, 2021 | 18,458 | 739 | 19,197 |
| Acquisitions | 773 | 364 | 1,137 |
| Adjustments | 19 | (47) | (28) |
| Goodwill at December 31, 2022 | $ 19,250 | $ 1,056 | $ 20,306 |

(1) Represents reallocation of goodwill as a result of our change in segments in the fourth quarter of 2021. See Note 17 — Segment and Geographical Information for further details.

The following table sets forth the major categories of the intangible assets and the weighted-average remaining useful lives for those assets that are not already fully amortized (in millions):

| | Weighted-Average Remaining Useful Lives (in years) | December 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Acquired technology | 5.2 | $ 507 | $ (144) | $ 363 | $ 1,412 | $ (1,169) | $ 243 |
| Acquired patents | 3.0 | 380 | (289) | 91 | 827 | (722) | 105 |
| Trade names | 3.7 | 11 | (3) | 8 | 644 | (633) | 11 |
| Other | 8.9 | 75 | (22) | 53 | 176 | (167) | 9 |
| Total finite-lived assets | | 973 | (458) | 515 | 3,059 | (2,691) | 368 |
| Total indefinite-lived assets | N/A | 382 | — | 382 | 266 | — | 266 |
| Total intangible assets | | $ 1,355 | $ (458) | $ 897 | $ 3,325 | $ (2,691) | $ 634 |

Amortization expense of intangible assets for the years ended December 31, 2022, 2021, and 2020 was $185 million, $407 million, and $473 million, respectively.

As of December 31, 2022, expected amortization expense for the unamortized finite-lived intangible assets for the next five years and thereafter is as follows (in millions):

| | |
|---|---|
| 2023 | $ 153 |
| 2024 | 126 |
| 2025 | 83 |
| 2026 | 44 |
| 2027 | 27 |
| Thereafter | 82 |
| Total | $ 515 |

108

PX0435-109

Table of Contents

**Note 11. Long-term Debt**

In August 2022, we issued an aggregate of $10.0 billion principal amount of fixed-rate senior unsecured notes in four series (the "Original Notes") in a private offering to qualified institutional buyers and certain non-U.S. persons. The proceeds from this offering, net of discounts and debt issuance costs, was $9.92 billion. We intend to use the net proceeds from the offering for general corporate purposes, which may include, but are not limited to, capital expenditures, repurchases of outstanding shares of our common stock, acquisitions, or investments. In connection with the offering, we entered into a registration rights agreement (the "Registration Rights Agreement") providing for the filing of a registration statement with the Securities and Exchange Commission in order to exchange the Original Notes for registered notes having substantially the same terms.

On November 29, 2022, we commenced an offer to exchange (the "Exchange Offer") the Original Notes for new registered notes (the "Exchange Notes" and, together with the Original Notes, the "Notes") in order to fulfill our obligations under the Registration Rights Agreement. The Exchange Offer expired on December 28, 2022 and settled on December 29, 2022. We did not receive any proceeds from the Exchange Offer, and the aggregate principal amount of the Exchange Notes that were issued was equal to the aggregate principal amount of the Original Notes that were surrendered pursuant to the Exchange Offer. Each series of the Exchange Notes is part of the same series of the applicable series of the Original Notes and the terms of the Exchange Notes offered in the Exchange Offer are substantially identical to the terms of the respective series of the Original Notes, except that the Exchange Notes are registered under the Securities Act, and certain transfer restrictions, registration rights, and additional interest provisions relating to the Original Notes do not apply to the Exchange Notes. The Notes of each series rank equally with each other and we are not subject to any financial covenants. We may redeem each series of the Notes at any time in whole or in part, at specified redemption prices.

The following table summarizes the Notes and the carrying amount of our debt as of December 31, 2022 (in millions, except percentages):

|  | Maturity | Stated Interest Rate | Effective Interest Rate | December 31, 2022 |
|---|---|---|---|---|
| 2027 Notes | 2027 | 3.50% | 3.63% | $ 2,750 |
| 2032 Notes | 2032 | 3.85% | 3.92% | 3,000 |
| 2052 Notes | 2052 | 4.45% | 4.51% | 2,750 |
| 2062 Notes | 2062 | 4.65% | 4.71% | 1,500 |
| Total face amount of long-term debt |  |  |  | 10,000 |
| Unamortized discount and issuance costs, net |  |  |  | (77) |
| Long-term debt |  |  |  | $ 9,923 |

Interest on each of the Notes is payable semi-annually in arrears in February and August of each year, commencing in February 2023. The effective interest rates include the interest rates stated on the Notes and amortization of the discounts and issuance costs. For the year ended December 31, 2022, interest expense recognized on the debt was $160 million.

The total estimated fair value of our outstanding debt was $8.63 billion as of December 31, 2022. The fair value was determined based on the closing trading price per $100 of the Notes as of December 31, 2022 and is categorized accordingly as Level 2 in the fair value hierarchy.

As of December 31, 2022, future principal payments for the Notes, by year, are as follows (in millions):

| | |
|---|---|
| 2023 through 2026 | $ — |
| 2027 | 2,750 |
| Thereafter | 7,250 |
| Total outstanding debt | $ 10,000 |

PX0435-110

Table of Contents

**Note 12. Liabilities**

The components of accrued expenses and other current liabilities are as follows (in millions):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Legal-related accruals [1] | $ 4,795 | $ 3,254 |
| Accrued compensation and benefits | 4,591 | 3,152 |
| Accrued property and equipment | 2,921 | 1,392 |
| Accrued taxes | 2,339 | 1,256 |
| Other current liabilities | 4,906 | 5,819 |
| Accrued expenses and other current liabilities | $ 19,552 | $ 14,873 |

(1)    Includes accruals for estimated fines, settlements, or other losses in connection with legal and related matters, as well as other legal fees. For further information, see *Legal and Related Matters* in Note 13 — Commitments and Contingencies.

The components of other liabilities are as follows (in millions):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Income tax payable | $ 6,645 | $ 5,938 |
| Other non-current liabilities | 1,119 | 1,289 |
| Other liabilities | $ 7,764 | $ 7,227 |

**Note 13. Commitments and Contingencies**

*Guarantee*

In 2018, we established a multi-currency notional cash pool for certain of our entities with a third-party bank provider, which was terminated on December 2, 2022. As a result, the parental guarantee by Meta Platforms, Inc. was no longer required.

*Contractual Commitments*

We have $19.91 billion of non-cancelable contractual commitments as of December 31, 2022, which are primarily related to our investments in network infrastructure, servers, and consumer hardware products in Reality Labs. The following is a schedule, by years, of non-cancelable contractual commitments as of December 31, 2022 (in millions):

| | |
| --- | --- |
| 2023 | $ 13,203 |
| 2024 | 2,295 |
| 2025 | 1,434 |
| 2026 | 265 |
| 2027 | 209 |
| Thereafter | 2,504 |
| Total | $ 19,910 |

Additionally, as part of the normal course of business, we have entered into multi-year agreements to purchase renewable energy that do not specify a fixed or minimum volume commitment or to purchase certain server components that do not specify a fixed or minimum price commitment. We enter into these agreements in order to secure either volume or price. Using the projected market prices or expected volume consumption, the total estimated spend as of December 31, 2022

110

Table of Contents

is approximately $10.34 billion, a majority of which is due beyond five years. The ultimate spend under these agreements may vary and will be based on prevailing market prices or actual volume purchased.

In January 2023, we entered into multi-year agreements to purchase renewable energy in the amount of approximately $1.6 billion.

*Legal and Related Matters*

Beginning on March 20, 2018, multiple putative class actions and derivative actions were filed in state and federal courts in the United States and elsewhere against us and certain of our directors and officers alleging violations of securities laws, breach of fiduciary duties, and other causes of action in connection with our platform and user data practices as well as the misuse of certain data by a developer that shared such data with third parties in violation of our terms and policies, and seeking unspecified damages and injunctive relief. Beginning on July 27, 2018, two putative class actions were filed in federal court in the United States against us and certain of our directors and officers alleging violations of securities laws in connection with the disclosure of our earnings results for the second quarter of 2018 and seeking unspecified damages. These two actions subsequently were transferred and consolidated in the U.S. District Court for the Northern District of California with the putative securities class action described above relating to our platform and user data practices. On September 25, 2019, the district court granted our motion to dismiss the consolidated putative securities class action, with leave to amend. On November 15, 2019, a second amended complaint was filed in the consolidated putative securities class action. On August 7, 2020, the district court granted our motion to dismiss the second amended complaint, with leave to amend. On October 16, 2020, a third amended complaint was filed in the consolidated putative securities class action. On December 20, 2021, the district court granted our motion to dismiss the third amended complaint, with prejudice. On January 17, 2022, the plaintiffs filed a notice of appeal of the order dismissing their case, and the appeal is now pending before the U.S. Court of Appeals for the Ninth Circuit. With respect to the multiple putative class actions filed against us beginning on March 20, 2018 alleging fraud and violations of consumer protection, privacy, and other laws in connection with the same matters, several of the cases brought on behalf of consumers in the United States were consolidated in the U.S. District Court for the Northern District of California. On September 9, 2019, the court granted, in part, and denied, in part, our motion to dismiss the consolidated putative consumer class action. On December 22, 2022, the parties entered into a settlement agreement to resolve the lawsuit, which provides for a payment of $725 million by us and is subject to court approval. In addition, our platform and user data practices, as well as the events surrounding the misuse of certain data by a developer, became the subject of U.S. Federal Trade Commission (FTC), state attorneys general, and other government inquiries in the United States, Europe, and other jurisdictions. We entered into a settlement and modified consent order to resolve the FTC inquiry, which took effect in April 2020. Among other matters, our settlement with the FTC required us to pay a penalty of $5.0 billion which was paid in April 2020 upon the effectiveness of the modified consent order. The state attorneys general inquiry and certain government inquiries in other jurisdictions remain ongoing. On July 16, 2021, a stockholder derivative action was filed in Delaware Chancery Court against certain of our directors and officers asserting breach of fiduciary duty and related claims relating to our historical platform and user data practices, as well as our settlement with the FTC. On July 20, 2021, other stockholders filed an amended derivative complaint in a related Delaware Chancery Court action, asserting breach of fiduciary duty and related claims against certain of our current and former directors and officers in connection with our historical platform and user data practices. On November 4, 2021, the lead plaintiffs filed a second amended and consolidated complaint in the stockholder derivative action. We believe the lawsuits described above are without merit, and we are vigorously defending them.

We also notify the Irish Data Protection Commission (IDPC), our lead European Union privacy regulator under the General Data Protection Regulation (GDPR), of certain other personal data breaches and privacy issues, and are subject to inquiries and investigations by the IDPC and other European regulators regarding various aspects of our regulatory compliance. For example, we are currently subject to an IDPC inquiry regarding Meta Platforms Ireland's ability to transfer European Union/European Economic Area Facebook user data to the United States, which is described further in "Legal Proceedings" contained in Part I, Item 3 of this Annual Report on Form 10-K. The interpretation of the GDPR is still evolving and draft decisions in investigations by the IDPC are subject to review by other European privacy regulators as part of the GDPR's consistency mechanism, which may lead to significant changes in the final outcome of such investigations. As a result, the interpretation and enforcement of the GDPR, as well as the imposition and amount of penalties for non-compliance, are subject to significant uncertainty. Although we are vigorously defending our regulatory compliance, we have accrued significant amounts for loss contingencies related to these inquiries and investigations in Europe, and we believe there is a reasonable possibility that additional accruals for losses related to these matters could be material in the aggregate.

111

PX0435-112

Table of Contents

Beginning in January 2022, we became subject to litigation and other proceedings that were filed in various federal and California state courts alleging that Facebook and Instagram cause "social media addiction" in teenage users, resulting in various mental health and other harms. A putative class action alleging similar harms was also filed in California state court on behalf of users under the age of 13 and three school districts recently filed public nuisance claims based on similar allegations. On October 6, 2022, the federal cases were consolidated in the U.S. District Court for the Northern District of California. The state court proceedings are now pending before a trial judge from Los Angeles County Superior Court. We believe these lawsuits are without merit, and we are vigorously defending them. We are also subject to government investigations and requests from multiple regulators concerning the use of our products, and the related mental and physical health and safety impacts on teenage users.

We are also subject to other government inquiries and investigations relating to our business activities and disclosure practices. For example, beginning in September 2021, we became subject to government investigations and requests relating to a former employee's allegations and release of internal company documents concerning, among other things, our algorithms, advertising and user metrics, and content enforcement practices, as well as misinformation and other undesirable activity on our platform, and user well-being. We have since received additional requests relating to these and other topics. Beginning on October 27, 2021, multiple putative class actions and derivative actions were filed in the U.S. District Court for the Northern District of California against us and certain of our directors and officers alleging violations of securities laws, breach of fiduciary duties, and other causes of action in connection with the same matters, and seeking unspecified damages. We believe these lawsuits are without merit, and we are vigorously defending them.

On March 8, 2022, a putative class action was filed in the U.S. District Court for the Northern District of California against us and certain of our directors and officers alleging violations of securities laws in connection with the disclosure of our earnings results for the fourth quarter of 2021 and seeking unspecified damages. We believe this lawsuit is without merit, and we are vigorously defending it.

Beginning on August 15, 2018, multiple putative class actions were filed against us alleging that we inflated our estimates of the potential audience size for advertisements, resulting in artificially increased demand and higher prices. The cases were consolidated in the U.S. District Court for the Northern District of California and seek unspecified damages and injunctive relief. In a series of rulings in 2019, 2021, and 2022, the court dismissed certain of the plaintiffs' claims, but permitted its fraud and unfair competition claims to proceed. On March 29, 2022, the court granted the plaintiffs' motion for class certification. On June 21, 2022, the U.S. Court of Appeals for the Ninth Circuit granted our petition for permission to appeal the district court's class certification order, and the district court subsequently stayed the case. We believe this lawsuit is without merit, and we are vigorously defending it.

In addition, we are subject to litigation and other proceedings involving law enforcement and other regulatory agencies, including in particular in Brazil, Russia, and other countries in Europe, in order to ascertain the precise scope of our legal obligations to comply with the requests of those agencies, including our obligation to disclose user information in particular circumstances. A number of such instances have resulted in the assessment of fines and penalties against us. We believe we have multiple legal grounds to satisfy these requests or prevail against associated fines and penalties, and we intend to vigorously defend such fines and penalties.

With respect to the cases, actions, and inquiries described above, we evaluate the associated developments on a regular basis and accrue a liability when we believe a loss is probable and the amount can be reasonably estimated. In addition, we believe there is a reasonable possibility that we may incur a loss in some of these matters. With respect to the matters described above that do not include an estimate of the amount of loss or range of possible loss, such losses or range of possible losses either cannot be estimated or are not individually material, but we believe there is a reasonable possibility that they may be material in the aggregate.

We are also party to various other legal proceedings, claims, and regulatory, tax or government inquiries and investigations that arise in the ordinary course of business. For example, we are subject to various litigation and government inquiries and investigations, formal or informal, by competition authorities in the United States, Europe, and other jurisdictions. Such investigations, inquiries, and lawsuits concern, among other things, our business practices in the areas of social networking or social media services, digital advertising, and/or mobile or online applications, as well as our acquisitions. For example, in June 2019 we were informed by the FTC that it had opened an antitrust investigation of our company. On December 9, 2020, the FTC filed a complaint against us in the U.S. District Court for the District of Columbia alleging that we engaged in anticompetitive conduct and unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act and Section 2 of the Sherman Act, including by acquiring Instagram in 2012 and WhatsApp

PX0435-113

Table of Contents

in 2014 and by maintaining conditions on access to our platform. In addition, beginning in the third quarter of 2019, we became the subject of antitrust investigations by the U.S. Department of Justice and state attorneys general. On December 9, 2020, the attorneys general from 46 states, the territory of Guam, and the District of Columbia filed a complaint against us in the U.S. District Court for the District of Columbia alleging that we engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act, including by acquiring Instagram in 2012 and WhatsApp in 2014 and by maintaining conditions on access to our platform. The complaint also alleged that we violated Section 7 of the Clayton Act by acquiring Instagram and WhatsApp. The complaints of the FTC and attorneys general both sought a permanent injunction against our company's alleged violations of the antitrust laws, and other equitable relief, including divestiture or reconstruction of Instagram and WhatsApp. On June 28, 2021, the court granted our motions to dismiss the complaints filed by the FTC and attorneys general, dismissing the FTC's complaint with leave to amend and dismissing the attorneys general's case without prejudice. On July 28, 2021, the attorneys general filed a notice of appeal of the order dismissing their case and that appeal is now pending before the U.S. Court of Appeals for the District of Columbia Circuit. On August 19, 2021, the FTC filed an amended complaint, and on October 4, 2021, we filed a motion to dismiss this amended complaint. On January 11, 2022, the court denied our motion to dismiss the FTC's amended complaint. Multiple putative class actions have also been filed in state and federal courts in the United States and in the United Kingdom against us alleging violations of antitrust laws and other causes of action in connection with these acquisitions and/or other alleged anticompetitive conduct, and seeking damages and injunctive relief. Several of the cases brought on behalf of certain advertisers and users in the United States were consolidated in the U.S. District Court for the Northern District of California. On January 14, 2022, the court granted, in part, and denied, in part, our motion to dismiss the consolidated actions. On March 1, 2022, a first amended consolidated complaint was filed in the putative class action brought on behalf of certain advertisers. On December 6, 2022, the court denied our motion to dismiss the first amended consolidated complaint filed in the putative class action brought on behalf of certain advertisers. In addition, on July 27, 2022, the FTC filed a complaint against us in the U.S. District Court for the Northern District of California seeking to preliminarily enjoin our proposed acquisition of Within Unlimited as an alleged violation of antitrust law. The FTC subsequently filed a related complaint in their administrative court seeking to permanently enjoin the transaction as a violation of Section 7 of the Clayton Act, and seeking other relief as well. We believe these lawsuits are without merit, and we are vigorously defending them. In December 2022, the European Commission issued a Statement of Objections alleging that we tie Facebook Marketplace to Facebook and use data in a manner that infringes European Union competition rules.

On February 14, 2022, the State of Texas filed a lawsuit against us in Texas state court alleging that "tag suggestions" and other facial recognition features on our products violated the Texas Capture or Use of Biometric Identifiers Act and the Texas Deceptive Trade Practices-Consumer Protection Act, and seeking statutory damages and injunctive relief. The case is currently scheduled for trial in October 2023. We believe this lawsuit is without merit, and we are vigorously defending it.

Additionally, we are required to comply with various legal and regulatory obligations around the world. The requirements for complying with these obligations may be uncertain and subject to interpretation and enforcement by regulatory and other authorities, and any failure to comply with such obligations could eventually lead to asserted legal or regulatory action. With respect to these other legal proceedings, claims, regulatory, tax, or government inquiries and investigations, and other matters, asserted and unasserted, we evaluate the associated developments on a regular basis and accrue a liability when we believe a loss is probable and the amount can be reasonably estimated. In addition, we believe there is a reasonable possibility that we may incur a loss in some of these other matters. We believe that the amount of losses or any estimable range of possible losses with respect to these other matters will not, either individually or in the aggregate, have a material adverse effect on our business and consolidated financial statements.

The ultimate outcome of the legal and related matters described in this section, such as whether the likelihood of loss is remote, reasonably possible, or probable, or if and when the reasonably possible range of loss is estimable, is inherently uncertain. Therefore, if one or more of these matters were resolved against us for amounts in excess of management's estimates of loss, our results of operations and financial condition, including in a particular reporting period in which any such outcome becomes probable and estimable, could be materially adversely affected.

For information regarding income tax contingencies, see Note 16 — Income Taxes.

### Indemnifications

In the normal course of business, to facilitate transactions of services and products, we have agreed to indemnify certain parties with respect to certain matters. We have agreed to hold certain parties harmless against losses arising from a breach of representations or covenants, or out of intellectual property infringement or other claims made by third parties.

113

Table of Contents

These agreements may limit the time within which an indemnification claim can be made and the amount of the claim. In addition, we have entered into indemnification agreements with our officers, directors, and certain employees, and our certificate of incorporation and bylaws contain similar indemnification obligations.

It is not possible to determine the maximum potential amount under these indemnification agreements due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each particular agreement. Historically, payments made by us under these agreements have not had a material impact on our consolidated financial statements. In our opinion, as of December 31, 2022, there was not a reasonable possibility we had incurred a material loss with respect to indemnification of such parties. We have not recorded any liability for costs related to indemnification through December 31, 2022.

### Note 14. Stockholders' Equity

#### Common Stock

Our certificate of incorporation authorizes the issuance of Class A common stock and Class B common stock. As of December 31, 2022, we are authorized to issue 5,000 million shares of Class A common stock and 4,141 million shares of Class B common stock, each with a par value of $0.000006 per share. Holders of our Class A common stock and Class B common stock are entitled to dividends when, as, and if declared by our board of directors, subject to the rights of the holders of all classes of stock outstanding having priority rights to dividends. As of December 31, 2022, we have not declared any dividends. The holder of each share of Class A common stock is entitled to one vote, while the holder of each share of Class B common stock is entitled to ten votes. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. Class A common stock and Class B common stock are collectively referred to as common stock throughout the notes to these financial statements, unless otherwise noted.

As of December 31, 2022, there were 2,247 million shares of Class A common stock and 367 million shares of Class B common stock issued and outstanding.

#### Share Repurchase Program

Our board of directors has authorized a share repurchase program of our Class A common stock, which commenced in January 2017 and does not have an expiration date. As of December 31, 2021, $38.79 billion remained available and authorized for repurchases under this program. In 2022, we repurchased and subsequently retired 161 million shares of our Class A common stock for an aggregate amount of $27.93 billion. As of December 31, 2022, $10.87 billion remained available and authorized for repurchases. In January 2023, an additional $40 billion of repurchases was authorized under this program.

The timing and actual number of shares repurchased under the repurchase program depend on a variety of factors, including price, general business and market conditions, and other investment opportunities, and shares may be repurchased through open market purchases or privately negotiated transactions, including through the use of trading plans intended to qualify under Rule 10b5-1 under the Securities Exchange Act of 1934, as amended.

#### Share-based Compensation Plan

We have one active share-based employee compensation plan, the 2012 Equity Incentive Plan (Amended 2012 Plan), which was amended in each of June 2016, February 2018, and December 2022. Our Amended 2012 Plan provides for the issuance of incentive and nonqualified stock options, restricted stock awards, stock appreciation rights, RSUs, performance shares, and stock bonuses to qualified employees, directors, and consultants. Shares that are withheld in connection with the net settlement of RSUs or forfeited are added to the reserves of the Amended 2012 Plan.

As of December 31, 2022, there were 66 million shares of our Class A common stock reserved for future issuance under our Amended 2012 Plan. Pursuant to the automatic increase provision under our Amended 2012 Plan, the number of shares reserved for issuance increases automatically on January 1 of each of the calendar years during the term of the Amended 2012 Plan, which will continue through April 2026, by a number of shares of Class A common stock equal to the lesser of (i) 2.5% of the total issued and outstanding shares of our Class A common stock as of the immediately preceding

114

PX0435-115

Table of Contents

December 31st or (ii) a number of shares determined by our board of directors. Pursuant to this automatic increase provision, our board of directors approved an increase of 56 million shares of Class A common stock reserved for issuance, effective January 1, 2023.

In December 2022, our board of directors approved an amendment to our Amended 2012 Plan to increase the number of shares reserved for issuance under the Amended 2012 Plan by 425 million shares, effective March 1, 2023 (Plan Amendment). The Plan Amendment was also approved by holders of a majority of the voting power of our outstanding capital stock in December 2022.

The following table summarizes the activities for our unvested RSUs for the year ended December 31, 2022:

| | Number of Shares | | Weighted-Average Grant Date Fair Value Per Share |
|---|---|---|---|
| | (in thousands) | | |
| Unvested at December 31, 2021 | 98,848 | $ | 244.32 |
| Granted | 106,693 | $ | 195.66 |
| Vested | (54,013) | $ | 218.24 |
| Forfeited | (24,418) | $ | 231.98 |
| Unvested at December 31, 2022 | 127,110 | $ | 216.93 |

The weighted-average grant date fair value of RSUs granted in the years ended December 31, 2021 and 2020 was $305.40 and $188.73, respectively. The fair value as of the respective vesting dates of RSUs that vested during the years ended December 31, 2022, 2021, and 2020 was $9.44 billion, $14.42 billion, and $9.38 billion, respectively. The income tax benefit recognized related to awards vested during the years ended December 31, 2022, 2021, and 2020 was $2.0 billion, $3.08 billion, and $1.81 billion, respectively.

As of December 31, 2022, there was $26.01 billion of unrecognized share-based compensation expense related to RSU awards. This unrecognized compensation expense is expected to be recognized over a weighted-average period of approximately three years based on vesting under the award service conditions.

**Note 15. Interest and Other Income (Expense), Net**

The following table presents the detail of interest and other income (expense), net (in millions):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | |
| Interest income, net | $ | 276 | $ | 461 | $ | 672 |
| Foreign currency exchange losses, net | | (81) | | (140) | | (129) |
| Other income (expense), net | | (320) | | 210 | | (34) |
| Interest and other income (expense), net | $ | (125) | $ | 531 | $ | 509 |

115

Table of Contents

**Note 16. Income Taxes**

The components of income before provision for income taxes are as follows (in millions):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Domestic | $ 25,025 | $ 43,669 | $ 24,233 |
| Foreign | 3,794 | 3,615 | 8,947 |
| Income before provision for income taxes | $ 28,819 | $ 47,284 | $ 33,180 |

The provision for income taxes consists of the following (in millions):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $ 6,094 | $ 4,971 | $ 3,297 |
| State | 874 | 548 | 523 |
| Foreign | 1,928 | 1,786 | 1,211 |
| Total current tax expense | 8,896 | 7,305 | 5,031 |
| Deferred: |  |  |  |
| Federal | (2,776) | 585 | (859) |
| State | (405) | 43 | (122) |
| Foreign | (96) | (19) | (16) |
| Total deferred tax (benefits)/expense | (3,277) | 609 | (997) |
| Provision for income taxes | $ 5,619 | $ 7,914 | $ 4,034 |

A reconciliation of the U.S. federal statutory income tax rates to our effective tax rate is as follows (in percentages):

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| U.S. federal statutory income tax rate | 21.0 % | 21.0 % | 21.0 % |
| State income taxes, net of federal benefit | 1.0 | 1.0 | 0.8 |
| Share-based compensation | 2.6 | (1.7) | (1.4) |
| Research and development tax credits | (2.4) | (1.3) | (1.3) |
| Foreign-derived intangible income deduction | (7.0) | (3.5) | (1.9) |
| Effect of non-U.S. operations | 3.0 | 0.9 | (2.4) |
| Research and development capitalization | — | — | (3.0) |
| Other | 1.3 | 0.3 | 0.4 |
| Effective tax rate | 19.5 % | 16.7 % | 12.2 % |

116

PX0435-117

Table of Contents

Our deferred tax assets (liabilities) are as follows (in millions):

|  | December 31, | |
|---|---|---|
|  | 2022 | 2021 |
| **Deferred tax assets:** | | |
| Loss carryforwards | $ 234 | $ 2,443 |
| Tax credit carryforwards | 1,576 | 1,385 |
| Share-based compensation | 368 | 319 |
| Accrued expenses and other liabilities | 1,627 | 1,195 |
| Lease liabilities | 3,200 | 2,597 |
| Capitalized research and development | 8,175 | 1,691 |
| Unrealized losses in securities and investments | 489 | — |
| Other | 621 | 449 |
| Total deferred tax assets | 16,290 | 10,079 |
| Less: valuation allowance | (2,493) | (1,586) |
| Deferred tax assets, net of valuation allowance | 13,797 | 8,493 |
| | | |
| **Deferred tax liabilities:** | | |
| Depreciation and amortization | (6,296) | (4,425) |
| Right-of-use assets | (2,555) | (2,339) |
| Total deferred tax liabilities | (8,851) | (6,764) |
| Net deferred tax assets | $ 4,946 | $ 1,729 |

The valuation allowance was approximately $2.49 billion and $1.59 billion as of December 31, 2022 and 2021, respectively, primarily related to U.S. state tax credit carryforwards, U.S. foreign tax credits, unrealized losses in securities and investments, and certain foreign tax attributes for which we do not believe a tax benefit is more likely than not to be realized.

As of December 31, 2022, the U.S. federal and state net operating loss carryforwards were $196 million and $1.40 billion, which will begin to expire in 2035 and 2032, respectively, if not utilized. We have federal tax credit carryforwards of $276 million, which will begin to expire in 2029, if not utilized, and state tax credit carryforwards of $3.72 billion, most of which do not expire.

Utilization of our net operating loss and tax credit carryforwards may be subject to substantial annual limitations due to the ownership change limitations provided by the Internal Revenue Code and similar state provisions. Such annual limitations could result in the expiration of the net operating loss and tax credit carryforwards before their utilization. The events that may cause ownership changes include, but are not limited to, a cumulative stock ownership change of greater than 50% over a three-year period.

The following table reflects changes in the gross unrecognized tax benefits (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
| Gross unrecognized tax benefits - beginning of period | $ 9,807 | $ 8,692 | $ 7,863 |
| Increases related to prior year tax positions | 210 | 328 | 356 |
| Decreases related to prior year tax positions | (172) | (86) | (253) |
| Increases related to current year tax positions | 1,166 | 963 | 1,045 |
| Decreases related to settlements of prior year tax positions | (254) | (90) | (319) |
| Gross unrecognized tax benefits - end of period | $ 10,757 | $ 9,807 | $ 8,692 |

117

PX0435-118

Table of Contents

These unrecognized tax benefits were primarily accrued for the uncertainties related to transfer pricing with our foreign subsidiaries, which include licensing of intellectual property, providing services and other transactions, as well as for the uncertainties with our research tax credits. During all years presented, we recognized interest and penalties related to unrecognized tax benefits within the provision for income taxes on the consolidated statements of income. The amount of interest and penalties accrued as of December 31, 2022 and 2021 were $1.07 billion and $960 million, respectively.

If the balance of gross unrecognized tax benefits of $10.76 billion as of December 31, 2022 were realized in a future period, this would result in a tax benefit of $6.49 billion within our provision of income taxes at such time.

We are subject to taxation in the United States and various other state and foreign jurisdictions. The material jurisdictions in which we are subject to potential examination include the United States and Ireland. We are under examination by the Internal Revenue Service (IRS) for our 2014 through 2019 tax years. Our 2020 and subsequent tax years remain open to examination by the IRS and the Irish Revenue Commissioners.

In July 2016, we received a Statutory Notice of Deficiency (Notice) from the IRS related to transfer pricing with our foreign subsidiaries in conjunction with the examination of the 2010 tax year. While the Notice applies only to the 2010 tax year, the IRS stated that it will also apply its position for tax years subsequent to 2010 and has done so in years covered by the second Notice described below. We do not agree with the position of the IRS and have filed a petition in the Tax Court challenging the Notice. The first session of the trial was completed in March 2020 and the final trial session was completed in August 2022. We expect the Tax Court to issue an opinion in 2024. Based on the information provided, we believe that, if the IRS prevails in its updated position, this could result in an additional federal tax liability of an estimated, aggregate amount of up to approximately $9.0 billion in excess of the amounts in our originally filed U.S. return, plus interest and any penalties asserted.

In March 2018, we received a second Notice from the IRS in conjunction with the examination of our 2011 through 2013 tax years. The IRS applied its position from the 2010 tax year to each of these years and also proposed new adjustments related to other transfer pricing with our foreign subsidiaries and certain tax credits that we claimed. If the IRS prevails in its position for these new adjustments, this could result in an additional federal tax liability of up to approximately $680 million in excess of the amounts in our originally filed U.S. returns, plus interest and any penalties asserted. We do not agree with the positions of the IRS in the second Notice and have filed a petition in the Tax Court challenging the second Notice.

We have previously accrued an estimated unrecognized tax benefit consistent with the guidance in ASC 740, Income Taxes (ASC 740), that is lower than the potential additional federal tax liability from the positions taken by the IRS in the two Notices and its Pretrial Memorandum. In addition, if the IRS prevails in its positions related to transfer pricing with our foreign subsidiaries, the additional tax that we would owe would be partially offset by a reduction in the tax that we owe under the mandatory transition tax on accumulated foreign earnings from the 2017 Tax Cuts and Jobs Act. As of December 31, 2022, we have not resolved these matters and proceedings continue in the Tax Court.

We believe that adequate amounts have been reserved in accordance with ASC 740 for any adjustments to the provision for income taxes or other tax items that may ultimately result from these examinations. The timing of the resolution, settlement, and closure of any audits is highly uncertain, and it is reasonably possible that the balance of gross unrecognized tax benefits could significantly change in the next 12 months. Given the number of years remaining that are subject to examination, we are unable to estimate the full range of possible adjustments to the balance of gross unrecognized tax benefits. If the tax authorities prevail in the assessment of additional tax due, the assessed tax, interest, and penalties, if any, could have a material adverse impact on our financial position, results of operations, and cash flows.

118

PX0435-119

Table of Contents

**Note 17. Segment and Geographical Information**

Beginning in the fourth quarter of 2021, we report our financial results for our two reportable segments: Family of Apps (FoA) and Reality Labs (RL). FoA includes Facebook, Instagram, Messenger, WhatsApp, and other services. RL includes augmented and virtual reality related consumer hardware, software, and content. Our operating segments are the same as our reportable segments.

Our Chief Executive Officer is our chief operating decision maker (CODM), who allocates resources to and assesses the performance of each operating segment using information about the operating segment's revenue and income (loss) from operations. Our CODM does not evaluate operating segments using asset or liability information.

Revenue and costs and expenses are generally directly attributed to our segments. These costs and expenses include certain product development related operating expenses, costs associated with partnership arrangements, consumer hardware product costs, content costs, and legal-related costs. Indirect costs are allocated to segments based on a reasonable allocation methodology, when such costs are significant to the performance measures of the operating segments. Indirect cost of revenue is allocated to our segments based on usage, such as costs related to the operation of our data centers and technical infrastructure. Indirect operating expenses, such as facilities, information technology, certain shared research and development activities, recruiting, and physical security expenses, are mostly allocated based on headcount.

The following table sets forth our segment information of revenue and income (loss) from operations (in millions). For comparative purposes, amounts for the year ended December 31, 2020 have been recast:

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Revenue: | | | |
| Family of Apps | $ 114,450 | $ 115,655 | $ 84,826 |
| Reality Labs | 2,159 | 2,274 | 1,139 |
| Total revenue | $ 116,609 | $ 117,929 | $ 85,965 |
| | | | |
| Income (loss) from operations: | | | |
| Family of Apps | $ 42,661 | $ 56,946 | $ 39,294 |
| Reality Labs | (13,717) | (10,193) | (6,623) |
| Total income from operations | $ 28,944 | $ 46,753 | $ 32,671 |

For information regarding revenue disaggregated by geography, see Note 2 — Revenue.

The following table sets forth our long-lived assets by geographic area, which consist of property and equipment, net and operating lease right-of-use assets (in millions):

|  | December 31, | |
|  | 2022 | 2021 |
|---|---|---|
| United States | $ 76,334 | $ 55,497 |
| Rest of the world [1] | 15,857 | 14,467 |
| Total long-lived assets | $ 92,191 | $ 69,964 |

_____

(1)  No individual country, other than disclosed above, exceeded 10% of our total long-lived assets for any period presented.

119

Table of Contents

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer (CEO) and chief financial officer (CFO), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d- 15(e) under the Securities Exchange Act of 1934, as amended (Exchange Act)), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our CEO and CFO have concluded that as of December 31, 2022, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2022 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Ernst & Young LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

**Changes in Internal Control**

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the fourth quarter of 2022 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures and Internal Control over Financial Reporting**

In designing and evaluating the disclosure controls and procedures and internal control over financial reporting, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures and internal control over financial reporting must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

**Item 9B. Other Information**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not Applicable.

120

PX0435-121

Table of Contents

**PART III**

**Item 10.  Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

Our board of directors has adopted a Code of Conduct applicable to all officers, directors, and employees, which is available on our website (investor.fb.com) under "Leadership & Governance." We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our Code of Conduct by posting such information on the website address and location specified above.

**Item 11.  Executive Compensation**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

**Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

**Item 13.  Certain Relationships and Related Transactions, and Director Independence**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

**Item 14.  Principal Accountant Fees and Services**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

PX0435-122

Table of Contents

**PART IV**

**Item 15. Exhibit and Financial Statement Schedules**

We have filed the following documents as part of this Form 10-K:

1. Consolidated Financial Statements:

|  | Page |
| --- | --- |
| Reports of Independent Registered Public Accounting Firm (PCAOB ID No. 42) | 81 |
| Consolidated Balance Sheets | 85 |
| Consolidated Statements of Income | 86 |
| Consolidated Statements of Comprehensive Income | 87 |
| Consolidated Statements of Stockholders' Equity | 88 |
| Consolidated Statements of Cash Flows | 89 |
| Notes to Consolidated Financial Statements | 91 |

2. Financial Statement Schedules

All schedules have been omitted because they are not required, not applicable, not present in amounts sufficient to require submission of the schedule, or the required information is otherwise included.

3. Exhibits

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
|  |  | Form | File No. | Exhibit | Filing Date |  |
| 3.1 | Amended and Restated Certificate of Incorporation. | 8-K | 001-35551 | 3.1 | October 28, 2021 |  |
| 3.2 | Amended and Restated Bylaws. | 8-K | 001-35551 | 3.2 | October 28, 2021 |  |
| 4.1 | Form of Class A Common Stock Certificate. | 10-K | 001-35551 | 4.1 | February 3, 2022 |  |
| 4.2 | Form of Class B Common Stock Certificate. | 10-K | 001-35551 | 4.2 | February 3, 2022 |  |
| 4.3 | Form of "Type 1" Holder Voting Agreement, between Registrant, Mark Zuckerberg, and certain parties thereto. | S-1 | 333-179287 | 4.3 | February 8, 2012 |  |
| 4.4 | Indenture, dated as of August 9, 2022, between Meta Platforms, Inc. and U.S. Bank Trust Company, National Association, as trustee. | 8-K | 001-35551 | 4.1 | August 9, 2022 |  |
| 4.5 | First Supplemental Indenture, dated as of August 9, 2022, between Meta Platforms, Inc. and U.S. Bank Trust Company, National Association, as trustee. | 8-K | 001-35551 | 4.2 | August 9, 2022 |  |
| 4.6 | Description of Registrant's Capital Stock. |  |  |  |  | X |
| 10.1+ | Form of Indemnification Agreement. | 8-K | 001-35551 | 10.1 | April 15, 2019 |  |
| 10.2(A)+ | 2012 Equity Incentive Plan, as amended. |  |  |  |  | X |
| 10.2(B)+ | Third Amendment to the 2012 Equity Incentive Plan. |  |  |  |  | X |
| 10.2(C)+ | 2012 Equity Incentive Plan forms of award agreements. | 10-Q | 001-35551 | 10.2 | July 31, 2012 |  |
| 10.2(D)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-Q | 001-35551 | 10.1 | May 4, 2017 |  |
| 10.2(E)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-Q | 001-35551 | 10.1 | July 27, 2017 |  |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.2(F)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-Q | 001-35551 | 10.2 | April 26, 2018 | |
| 10.2(G)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-K | 001-35551 | 10.3(G) | January 31, 2019 | |
| 10.2(H)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-Q | 001-35551 | 10.2 | April 25, 2019 | |
| 10.2(I)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-Q | 001-35551 | 10.2 | April 30, 2020 | |
| 10.2(J)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-Q | 001-35551 | 10.2 | July 29, 2021 | |
| 10.2(K)+ | 2012 Equity Incentive Plan forms of award agreements (Additional Forms). | 10-Q | 001-35551 | 10.3 | April 28, 2022 | |
| 10.3+ | Bonus Plan, effective January 1, 2022. | 10-K | 001-35551 | 10.3 | February 3, 2022 | |
| 10.4+ | Amended and Restated Offer Letter, dated January 27, 2012, between Registrant and Mark Zuckerberg. | S-1 | 333-179287 | 10.6 | February 8, 2012 | |
| 10.5+ | Offer Letter, dated November 15, 2022, between Registrant and David M. Wehner. | | | | | X |
| 10.6+ | Offer Letter, dated June 5, 2020, between Registrant and Christopher K. Cox. | 10-Q | 001-35551 | 10.1 | April 29, 2021 | |
| 10.7+ | Amended and Restated Offer Letter, dated September 14, 2021, between Registrant and Marne L. Levine. | 10-Q | 001-35551 | 10.2 | April 28, 2022 | |
| 10.8+ | Offer Letter, dated December 22, 2022, between Registrant and Javier Olivan. | | | | | X |
| 10.9+ | Form of Executive Officer Offer Letter. | 10-Q | 001-35551 | 10.3 | July 25, 2019 | |
| 10.10+ | Executive Sales Incentive Plan. | 10-Q | 001-35551 | 10.4 | July 25, 2019 | |
| 10.11+ | Director Compensation Policy, as amended. | 10-Q | 001-35551 | 10.1 | July 29, 2021 | |
| 10.12+ | Deferred Compensation Plan for Non-Employee Directors. | | | | | X |
| 10.13+ | Indemnification Agreement Relating to Subsidiary Operations, dated March 14, 2021, between Registrant and Mark Zuckerberg. | 10-Q | 001-35551 | 10.2 | April 29, 2021 | |
| 21.1 | List of Subsidiaries. | | | | | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm. | | | | | X |
| 31.1 | Certification of Mark Zuckerberg, Chief Executive Officer, pursuant to Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 31.2 | Certification of Susan Li, Chief Financial Officer, pursuant to Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 32.1# | Certification of Mark Zuckerberg, Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | X |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 32.2# | Certification of Susan Li, Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 101.INS | Inline XBRL Instance Document (the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document). | | | | | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | | | | | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | | | | | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. | | | | | X |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document. | | | | | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | | | | | X |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101). | | | | | X |

+ Indicates a management contract or compensatory plan.

\# This certification is deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (Exchange Act), or otherwise subject to the liability of that section, nor shall it be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act.

**Item 16. Form 10-K Summary**

None.

124

Table of Contents

### SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Menlo Park, State of California, on this 1st day of February 2023.

**META PLATFORMS, INC.**

Date:    February 1, 2023                    /s/ Susan Li

**Susan Li**
**Chief Financial Officer**

125

PX0435-126

Table of Contents

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Susan Li and Katherine R. Kelly, and each of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming that all said attorneys-in-fact and agents, or any of them or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Mark Zuckerberg<br>Mark Zuckerberg | Chairman and Chief Executive Officer<br>*(Principal Executive Officer)* | February 1, 2023 |
| /s/ Susan Li<br>Susan Li | Chief Financial Officer<br>*(Principal Financial Officer)* | February 1, 2023 |
| /s/ Susan J.S. Taylor<br>Susan J.S. Taylor | Chief Accounting Officer<br>*(Principal Accounting Officer)* | February 1, 2023 |
| /s/ Peggy Alford<br>Peggy Alford | Director | February 1, 2023 |
| /s/ Marc L. Andreessen<br>Marc L. Andreessen | Director | February 1, 2023 |
| /s/ Andrew W. Houston<br>Andrew W. Houston | Director | February 1, 2023 |
| /s/ Nancy Killefer<br>Nancy Killefer | Director | February 1, 2023 |
| /s/ Robert M. Kimmitt<br>Robert M. Kimmitt | Director | February 1, 2023 |
| /s/ Sheryl K. Sandberg<br>Sheryl K. Sandberg | Director | February 1, 2023 |
| /s/ Tracey T. Travis<br>Tracey T. Travis | Director | February 1, 2023 |
| /s/ Tony Xu<br>Tony Xu | Director | February 1, 2023 |

126

# PX0470



Print subscriptions    Sign in    Search jobs    Search    US edition

**Fearless, factual, global news**

Independent journalism funded by readers

Support us with $5 a month →

# The Guardian

**News**    **Opinion**    **Sport**    **Culture**    **Lifestyle**    More

US   US elections 2024   World   Environment   Ukraine   Soccer   Business   **Tech**   Science   Newsletters   Wellness



**Facebook**

● This article is more than **2 years old**

# Facebook: some high-profile users 'allowed to break platform's rules'

### XCheck system 'whitelists' well-known users who are given special treatment, says Wall Street Journal report

**Dan Milmo** *Global technology editor*

Mon 13 Sep 2021 15.50 EDT

< Share



📷 Facebook users are placed on the XCheck list if they meet criteria such as being newsworthy, influential or popular. Photograph: Dado Ruvić/Reuters

Facebook gives high-profile users special treatment, which includes immunity from its rules for some, and allowed Brazilian footballer Neymar to post nude pictures of a woman who had accused him of rape, according to a report.

The XCheck or "CrossCheck" system steers reviews of posts by well-known users such as celebrities, politicians and journalists into a separate system, according to an investigation by the Wall Street Journal. Under the programme, some users are "whitelisted" – not subject to enforcement action – while others are allowed to post material that violates Facebook rules, pending content reviews that often do not take place.

People are placed on the XCheck list – where they are given special scrutiny – if they meet criteria such as being "newsworthy", "influential or popular" or "PR risky". Names on the XCheck programme included Donald Trump, US senator Elizabeth Warren and Facebook founder Mark Zuckerberg, although the report does not state whether those names were whitelisted at any point. By 2020 there were 5.8 million users on the XCheck list, the Wall Street Journal said.

In one example cited by the WSJ, Brazilian football star Neymar responded to a rape accusation in 2019 by posting Facebook and Instagram videos defending himself, which included showing viewers his WhatsApp correspondence with his accuser. The WhatsApp clips included the accuser's name and nude photos of her. Instagram and WhatsApp are owned by Facebook.



**Facebook is obstructing our work on disinformation. Other researchers could be next**

 Read more

Instead of immediately deleting the material, which is Facebook's procedure for "nonconsensual intimate imagery", moderators were blocked for more than a day from removing the video, according to the WSJ.

An internal review of the Neymar posts found that the video was viewed 56m times on Facebook and Instagram before its removal. A separate internal document described the posts as "revenge porn".

The internal review stated that the woman faced bullying and harassment online over the posts and that Neymar was not subject to the normal Facebook procedure for someone who posts unauthorised nude photos, which is to have their account deleted.

"After escalating the case to leadership we decided to leave Neymar's accounts active, a departure from our usual 'one strike' profile disable policy," the review said.

Neymar denied the rape allegation and no charges were filed against the footballer. His accuser was charged in Brazil with fraud, extortion and slander. The slander and extortion charges were dismissed in 2019 and she was acquitted of the fraud charge in 2020.



Don't blame Russian trolls for America's anti-vaxx problem. Our misinformation is homegrown

*Sophie Zhang*

➡ Read more

A spokesperson for Neymar told the WSJ that the footballer adheres to Facebook's rules and declined to comment further.

The WSJ investigation details the process known as "whitelisting", where some high-profile accounts are not subject to enforcement at all. An internal review in 2019 stated that whitelists "pose numerous legal, compliance, and legitimacy risks for the company and harm to our community". The review found favouritism to those users to be both widespread and "not publicly defensible".

"We are not actually doing what we say we do publicly," said the confidential review. It called the company's actions "a breach of trust" and added: "Unlike the rest of our community, these people can violate our standards without any consequences."

According to another internal document, enforcement procedures and rule-drafting were subject to interventions from members of Facebook's public-policy team and senior executives. One 2020 memo from a Facebook data scientist added: "Facebook routinely makes exceptions for powerful actors."

The WSJ also reported that the system suffered from enforcement delays that allowed posts to stay up before they were eventually prohibited. In 2020, posts being reviewed by XCheck were viewed at least 16.4bn times before being removed.

A March memo revealed that Facebook was struggling to limit the number of users on the XCheck list. "VIP lists continue to grow," a product manager on Facebook's Mistakes Prevention Team wrote.

A Facebook spokesperson said criticisms of how XCheck was used were "fair" but the system had been created to deal with content that could require "more understanding" such as reports from conflict zones.

"A lot of this internal material is outdated information stitched together to create a narrative that glosses over the most important point: Facebook itself identified the issues with cross check and has been working to address them. We've made investments, built a dedicated team, and have been redesigning cross check to improve how the system operates."

I hope you appreciated this article. Before you move on, I wanted to ask if you would consider supporting the Guardian's journalism as we enter one of the most consequential news cycles of our lifetimes in 2024.

With the potential of another Trump presidency looming, there are countless angles to cover around this year's election – and we'll be there to shed light on

PX0470-002

each new development, with explainers, key takeaways and analysis of what it means for America, democracy and the world.

From Elon Musk to the Murdochs, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest – not profit motives.

And we avoid the trap that befalls much US media: the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. We always strive to be fair. But sometimes that means calling out the lies of powerful people and institutions – and making clear how misinformation and demagoguery can damage democracy.

From threats to election integrity, to the spiraling climate crisis, to complex foreign conflicts, our journalists contextualize, investigate and illuminate the critical stories of our time. As a global news organization with a robust US reporting staff, we're able to provide a fresh, outsider perspective – one so often missing in the American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone – whether they can afford to pay for news, or not.

**If you can, please consider supporting us just once, or better yet, support us every month with a little more. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

| One-time | Monthly | Annual |
|---|---|---|

| $5 per month | $13 per month | Other |
|---|---|---|

**Continue →**    Remind me in May    VISA  [mastercard]  [American Express]  P PayPal

Explore more on these topics

Facebook    Social media    Digital media    Social networking    Mark Zuckerberg

Donald Trump    news

**< Share**                                                    Reuse this content

PX0470-003

4/10/24, 11:04 AM                    Facebook: some high-profile users 'allowed to break platform's rules' | Facebook | The Guardian

## Related stories

● ○ ○ ○ ○



Finally, Facebook can say it's not the most toxic social network

| Donald Trump suspended from Facebook indefinitely, says Mark Zuckerberg | Biden's path to the White House could hit a dead end on Facebook |

22 Oct 2021   💬 367     7 Jan 2021     26 Jul 2020   💬 175

    

## More from
## Headlines

● ○ ○ ○ ○ ○ ○

**Live**
Arizona Republicans who cheered fall of Roe backpedal to denounce 1864 abortion ban

**Allen Weisselberg**
Ex-Trump Organization CFO sentenced to five months for perjury

**PFAS**
US imposes first-ever limits on levels of toxic chemicals in drinking water

17m ago            1h ago            3h ago

    

## Most viewed

**Across The Guardian**        **In Technology**

Arizona Republicans denounce revived 1864 abortion ban in sudden reversal

Amanda Knox retrial over slander conviction begins in Italy

Outrage after US hunter who reportedly took wolf in bar and killed it only fined

Missouri death row inmate executed despite widespread calls for clemency

'It's a weird dynamic': the US parents financially supporting their adult children



Warning: with Back to Black and four Beatles movies, Hollywood's most cliched genre isn't going away

A moment that changed me: I was divorced, broke and alone – but I turned my life around with a list

Ex-Trump Organization CFO Allen Weisselberg sentenced to five months for perjury

Woman sentenced to prison for stealing and selling Biden's daughter's diary

Residents in wealthy California town block access to public hot springs with boulders

PX0470-004

4/10/24, 11:04 AM                              Facebook: some high-profile users 'allowed to break platform's rules' | Facebook | The Guardian

US  US elections 2024  World  Environment  Ukraine  Soccer  Business  **Tech**  Science  Newsletters  Wellness

**News**        **Opinion**      **Sport**        **Culture**        **Lifestyle**

Original reporting and incisive analysis, direct from the        About us              All topics              Advertise with us
Guardian every morning                                           Help                  All writers             Guardian Labs
                                                                 Complaints &          Digital newspaper       Search jobs
[ Sign up for our email → ]                                      corrections           archive
                                                                 SecureDrop            Facebook                **Suppor**
                                                                 Work for us           YouTube                 **the Gua**
                                                                 California resident   Instagram               Available for ev
                                                                    – Do Not Sell      LinkedIn                readers
                                                                 Privacy policy        Twitter                 Support us  →
                                                                 Cookie policy         Newsletters
                                                                 Terms &
                                                                 conditions
                                                                 Contact us

© 2024 Guardian News & Media Limited or its affiliated companies. All rights reserved. (dcr)

PX0470-005

# PX0477



Stanford | Internet Observatory
Cyber Policy Center

Cross-Platform Dynamics of Self-Generated CSAM

David Thiel, Renée DiResta and Alex Stamos
Stanford Internet Observatory
v1.2.0 (2023-06-07)

PX0477-001

Stanford | Internet Observatory
*Cyber Policy Center*

# Contents

**1  Key Takeaways**                                                                    **2**

**2  Background**                                                                        **2**

**3  Methods**                                                                           **3**

**4  Findings**                                                                          **4**

**5  Platform dynamics**                                                                 **7**
  5.1  Instagram  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
  5.2  Twitter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
  5.3  Telegram and Discord  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
  5.4  Snapchat and TikTok  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
  5.5  Mastodon and other platforms  . . . . . . . . . . . . . . . . . . . . . . . . .  10

**6  Policy analysis**                                                                  **10**
  6.1  Instagram  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
  6.2  Twitter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
  6.3  Discord  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
  6.4  Snapchat  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
  6.5  TikTok  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
  6.6  Telegram  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
  6.7  G2G  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

**7  Recommendations for platforms**                                                    **14**

**8  Ethical and Safety Considerations for Researchers**                                **15**

**9  Conclusions**                                                                      **17**

PX0477-002

Stanford | Internet Observatory
Cyber Policy Center

# 1 Key Takeaways

- Large networks of accounts, putatively operated by minors, are openly advertising self-generated child sexual abuse material (SG-CSAM) for sale.

- Instagram is currently the most important platform for these networks, with features that help connect buyers and sellers.

- Instagram's recommendation algorithms are a key reason for the platform's effectiveness in advertising SG-CSAM.

- Twitter had an apparent regression allowing CSAM to be posted to public profiles, despite hashes of these images being available to platforms and researchers.

- Telegram implicitly allows the trading of CSAM in private channels.

- Gift card swapping and exchanges such as G2G are a critical part of the monetization of SG-CSAM, allowing anonymous compensation for content.

- Study of these dynamics is challenging but necessary, particularly in an environment where platform providers are divesting from Trust and Safety programs. SIO has implemented systems to study these networks while preventing exposure to or storage of CSAM itself.

# 2 Background

The creation and trading of Child Sexual Abuse Material, or CSAM, is often regarded as the most harmful of the widespread abuses of online communication and social media platforms. Most of the policy, law enforcement and platform discussion around CSAM rightfully focuses on the behavior of adult offenders who create, distribute and monetize sexual imagery of children without the victim's consent. This is appropriate, as the majority of content being purchased or traded online is created by adult abusers.

Adult-generated CSAM, however, does not represent the entire universe of online child sexual exploitation. When an image or video appears to be created by the minor subject in the image, that content is called Self-Generated Child Sexual Abuse Material (SG-CSAM). While this content is often still illegal to possess and distribute in the United States, the fact that children (often teenagers) are sharing these images amongst each other voluntarily has reduced the focus on this vector of CSAM creation. SG-CSAM can sometimes be initially distributed voluntarily (such as to a romantic partner) but then redistributed or posted publicly, leading to uncontrolled redistribution of images. This issue can overlap with Non-Consensual Intimate Imagery (NCII, sometimes referred to as "revenge porn"), in which sexual images are distributed without the consent of the subject. SG-CSAM can also be the product of sextortion, where a minor is coerced into producing illicit sexual content.

In recent years, the creation and distribution of SG-CSAM has increasingly become

PX0477-003

Stanford | Internet Observatory
*Cyber Policy Center*

a commercial venture. This commercialization often replicates the pattern of legitimate independent adult content production:[1] posting content "menus" for imagery of various acts, the curation of networks of followers and fans of an adult performer and content packs for customized offerings. Accounts can also advertise more dangerous services, such as in-person sexual encounters or media of bodily self-harm.

After being alerted to specific hashtags and keywords commonly used in this community, SIO began an investigation to assess the scope and scale of the practice, and to examine how platforms are succeeding or failing in detecting and suppressing SG-CSAM. During this process, we identified hundreds of accounts dedicated to selling as well as likely buyers detected by social graph connections and public account metadata. These seller and suspected buyer accounts were referred to the National Center for Missing and Exploited Children (NCMEC)[2] for further investigation.

While child safety practitioners have exchanged anecdotal reports of commercial SG-CSAM, in this paper we intend to provide quantitative data on the scope and scale of one network as well as an analysis of the product features most responsible for its success.

## 3  Methods

The initial set of accounts in the network were identified via externally-supplied keywords and hashtags. Subsequent examination of the social graphs of these initial accounts surfaced the contours of the broader network of sellers and buyers. In the case of Twitter, the initial accounts using the hashtags were identified via the PowerTrack streaming API.[3]

On Instagram and TikTok, account identification was conducted via manual searching of hashtags, due to the lack of a suitable research API, and public metadata was saved via Zeeschuimer.[4] Accounts identified in this initial pass were then loaded into Maltego[5] and enriched with various transforms before using Social Links[6] to gather follower graphs and determine whether accounts in the graph also existed across other social media platforms. Note that while we identified what appeared to be linked accounts with the same usernames and profile pictures on services such as Telegram and Snapchat, Stanford Internet Observatory does not access or conduct research on private communication channels and therefore those accounts were not analyzed.

---

1. The most popular such site for adults would be OnlyFans. We observed no SG-CSAM activity on OnlyFans, which has strict age verification and rules against the use of its platform by minors.

2. The National Center for Missing and Exploited Children is the legally designated clearinghouse for reports of child sexual abuse and routinely relays such reports to relevant platforms and law enforcement.

3. https://developer.twitter.com/en/docs/twitter-api/enterprise/powertrack-api/overview

4. https://github.com/digitalmethodsinitiative/zeeschuimer

5. https://www.maltego.com/

6. https://sociallinks.io/

PX0477-004

Stanford | Internet Observatory
Cyber Policy Center

A core part of SIO's social media ingest infrastructure is dedicated to detecting harmful content to quarantine it or prevent its ingest entirely—both for legal reasons and to protect researchers from encountering harmful material. URLs to all images are submitted to PhotoDNA[7] to detect known instances of CSAM—any image that matches is not stored, and the available metadata is submitted to NCMEC for investigation.[8] Images with no match are hashed with PDQ[9] for tracking image proliferation, as well as run through Google's SafeSearch API[10] to detect images that may contain nudity or violence.

Due to Twitter's permissiveness with regard to nudity and the resultant potential for it ingesting known or unknown instances of CSAM, a separate ingest pipeline was built that runs through the detection pipeline but never stores content, regardless of whether any match occurred. We would recommend a similar pipeline be used by any researchers studying child safety issues or studying platforms with less restrictive content policies or moderation procedures.

## 4    Findings

SIO identified 405 accounts advertising the sale of self-generated CSAM on Instagram, as well as 128 seller accounts on Twitter. 58 accounts within the Instagram follower network appeared to be probable content buyers who used their real names, many of which were matched to Facebook, LinkedIn or TikTok profiles using Social Links name and profile picture similarity transforms. Accounts were manually reviewed, then sent to NCMEC for investigation in accordance with legal obligations and best practices. One month after our report to NCMEC, a re-check showed 31 of the Instagram seller accounts were still active, along with 28 accounts identified as likely buyers. On Twitter, 22 out of the original 128 were still active. However, in the intervening time, hundreds of new SG-CSAM accounts were created, recreated or activated on both platforms, linked to the network as indicated by follower graph, hashtags and post/bio content.

The network appears to be almost entirely English–language and primarily active on Instagram and Twitter, though many other online services are leveraged, such as Telegram, Discord and Snapchat. While it is likely that some seller accounts may be impostors redistributing content, scammers, or a third party coercing the child, it appears that by and large underage sellers are producing and marketing content of their own accord. They are receiving compensation either via payment services such as CashApp or PayPal (a risk in and of itself, as these can reveal personal information), or through gift cards to companies and services such as Amazon, PlayStation Network or DoorDash.

Using open source intelligence tooling, we also detected an unexpectedly large

---

7. https://www.microsoft.com/en-us/photodna

8. This is a technique SIO has utilized on media content beginning in 2021, when it detected instances of known CSAM on Gettr; see https://purl.stanford.edu/xn269fv2966.

9. https://raw.githubusercontent.com/facebook/ThreatExchange/main/hashing/hashing.pdf

10. https://cloud.google.com/vision/docs/detecting-safe-search

PX0477-005

Stanford | Internet Observatory
Cyber Policy Center

number of buyer usernames matching accounts on G2G,[11] a marketplace for buying and selling a wide variety of virtual goods and gift cards. Most sellers list their age in their profile bios either directly or through allusions such as simple equations or emoji. Based on the bios, most self- identified as between the ages of 13 and 17, but it is common for them to offer content of themselves from even younger ages, which is marketed at a premium (see, for example, Figure 2).



Figure 1: A typical Instagram seller account, accepting payment via CashApp and gift card.



Figure 2: Left: A typical content "menu". Note that in addition to redactions added by SIO, the user themselves has attempted to obscure sex-related words with white marks. Right: A "proof" of sending content upon payment.

Content menus and details are often hosted off-site on services like Carrd, which also maintain a list of a seller's other social media accounts. This allows for being more explicit about offered content and services without risking being found by detection mechanisms on social media platforms themselves.

While sellers market their content on Instagram and Twitter, material generally

---

11. https://www.g2g.com

PX0477-006

Stanford | Internet Observatory
Cyber Policy Center



Figure 3: Left: A seller in the network reporting in an Instagram Story that an impostor account is redistributing their content. Right: A seller Story requesting a DoorDash gift card.

does not appear to be actually exchanged on-platform. Actual content delivery appears to happen on file sharing services such as Dropbox or Mega—links to these services are often seen in "proofs" of transactions organized over DMs (see Figure 2 on the previous page). The DM conversations are redacted, screen captured, and subsequently posted to the main account profile as Stories to bolster the authenticity of the seller.

When accounts in the network are limited (e.g. blocked from exchanging DMs by Instagram) or taken down, sellers either switch to a backup (often previously noted on their main profile) or make a new account, which is then promoted in Instagram Stories or Tweets by other accounts in the network to help it regain lost followers; some accounts also advertise their openness to "Shoutout for Shoutout" (SFS) cross-promotion in general. Accounts will periodically switch between being private or public: going public to attract new followers before going private to avoid moderation.

Most accounts only occasionally use hashtags and keywords hinting at the nature of the content—this appears to be a strategy to attract newcomers, but is deployed in limited fashion so that platforms do not detect and deactivate accounts. Recommendation algorithms inadvertently boost the network; a user who follows one seller account receives related suggestions for others.

During this investigation, we encountered menus offering several types of content

PX0477-007



for sale that represent even greater harms than baseline sexual content by minors, including:

- Self-harm videos, both with and without explicit nudity.
- Advertisements for paid in-person sexual acts (see Figure 5 on page 9), some of which is then recorded and sold to other customers.
- Imagery of the minor performing sexual acts with animals.
- Sexual imagery from when the sellers were significantly younger, i.e. 10–12 years old.

## 5    Platform dynamics

The distinct features and affordances of different platforms mean that SG-CSAM manifests in different ways on each:

### 5.1    Instagram

Instagram appears to have a particularly severe problem with commercial SG-CSAM accounts, and many known CSAM keywords return results. Search results for some terms return an interstitial alerting the user of potential CSAM content in the results; while the warning text is accurate and potentially helpful, the prompt nonetheless strangely presents a clickthrough to "see results anyway" (see Figure 4). Instagram's user suggestion recommendation system also readily promotes other SG-CSAM accounts to users viewing an account in the network, allowing for account discovery without keyword searches.



Figure 4: The interstitial clickthrough offered by Instagram when searching for a CSAM-related hashtag.

Due to the widespread use of hashtags, relatively long life of seller accounts and, especially, the effective recommendation algorithm, Instagram serves as the key discovery mechanism for this specific community of buyers and sellers. The overall size of the seller network examined appears to range between 500 and

PX0477-008


Stanford | Internet Observatory
Cyber Policy Center

1000 accounts at a given time, with follower, like and view counts ranging from dozens to thousands.

Also of note is the seller's heavy reliance on transient media such as Stories; accounts will often have one or no actual posts, but will frequently post stories with content menus, promotions or cross-site links. Stories are censored to obscure any explicit content; some sellers also seem to suspect that the overlaid text is being scanned, as indicated by the self-censorship to obscure possible "trigger words" (see Figure 2 on page 5). It is unclear whether Instagram is actually performing this detection—if not, it would be a useful Trust and Safety signal to implement.

## 5.2  Twitter

SG-CSAM accounts are also heavily prevalent on Twitter. Accounts participating in SG-CSAM offerings appear to be taken down more aggressively: the majority of accounts detected by our ingest systems were removed within a week. Twitter's recommendation system also appears to be more conservative: viewing an account in the network offers 2–3 related accounts that may also be "sellers", but when viewing more suggestions, usually it is a variety of popular accounts on the platform that are presented.

However, the fact that nudity is allowed on Twitter makes it more likely that explicit and illegal material may be posted or distributed before the account is suspended. Our ingest systems detected dozens of images matching PhotoDNA hashes in posts matching our indicated set of keywords, indicating that PhotoDNA matches—which consist of previously identified CSAM images—are not being actioned upon upload. In some cases, accounts that posted known CSAM images remained active until multiple infractions had occurred. These detected instances were automatically reported to NCMEC by our ingest pipeline, and the overall problem was communicated to members of Twitter's Trust and Safety team. As of the latest update to this paper, this problem appears to have largely ceased due to subsequent fixes to Twitter's CSAM detection systems.[12]

## 5.3  Telegram and Discord

Commercial SG-CSAM activity does appear to take place on Telegram and Discord, with several Instagram accounts advertising Telegram or Discord join links in their bios or Stories. These Telegram and Discord groups had hundreds or thousands of users; some appeared to be managed by individual sellers, though there were also multi-seller groups (who sometimes appear to redistribute third-party content). This activity was not analyzed by SIO due to the need to join a channel or message a user to retrieve metadata; the channels and accounts were instead referred to NCMEC. It is worth noting that in the course of other projects, SIO's ingest systems have detected known CSAM being distributed in public Telegram groups—typically

---

12. Our ability to continue to detect and report CSAM on Twitter ended with Twitter's termination of SIO's data access agreement on May 31, 2023.

PX0477-009

Stanford | Internet Observatory
Cyber Policy Center



Figure 5: Examples of two Twitter seller accounts with trivial age obfuscation (61 for 16, for example). The accounts specify whether they are open to in-person encounters.

in the context of QAnon-adjacent conspiracy theories—indicating that Telegram is also either not using or not strictly enforcing against PhotoDNA matches.

## 5.4   Snapchat and TikTok

Several Snapchat QR codes or URLs were present in account metadata, and it was indicated that Snap was a platform buyers could communicate with sellers on. However, this being a peer-to-peer communication system rather than publicly available data, SIO did not perform further analysis.

TikTok is one platform where this type of content does not appear to proliferate. Very few Instagram or Twitter seller accounts had discoverable TikTok equivalents, and searches of known keywords or hashtags produce almost no results. The lack of visibility of social graph data means that discovery via followers is not an option. Sellers did not appear to promote their TikTok accounts, and those that had them (apparent from watermarked content posted on Instagram) censored their usernames to prevent reporting—indicating they were more concerned about content enforcement on TikTok than Twitter or Instagram.

Because TikTok appears to have stricter and more rapid content enforcement, it is perhaps less of a platform for content distribution; it might be useful primarily as a way to reach a large audience to redirect users to other social media accounts before the seller's "burner" TikTok account is terminated.[13] The fact that TikTok is far more oriented around content recommendations instead of hashtag-based discovery or friend recommendations also makes it harder for users to discover specific types of material intentionally.

---

13. TikTok has a reputation of aggressively banning the accounts of adult sex workers, even when not appearing to violate their terms of service: https://www.rollingstone.com/culture/culture-features/onlyfans-sex-workers-tiktok-purge-banned-1101928/

PX0477-010

Stanford | Internet Observatory
Cyber Policy Center

## 5.5   Mastodon and other platforms

Given the recent rise in popularity of Mastodon as a Twitter alternative, we also assessed whether the networks appeared on that platform. Mastodon, too, does not appear to be a hub for SG-CSAM. This may be a reflection of it not having reached a critical mass of utility, but there are also other limitations that may make it less attractive: namely, it does not have true "DMs" to communicate between users, the ability to search is limited, and servers found to have lax administration standards tend to be cut off from other parts of the network. Parts of the Mastodon and Fediverse network still have problems with CSAM and NCII, but selling of self-generated content in particular does not seem to have gained traction.

Facebook does not appear to be a popular platform for this type of activity, presumably due to a combination of its unpopularity with young people and its "real name" policy.[14]

# 6   Policy analysis

The content and behaviors found violate existing platform policies against child sexualization, solicitation of CSAM, coordinating exchange of illegal goods, and arranging in-person sexual encounters—the notable exception being Telegram, which has no explicit policies in this regard.[15] A summary of our interpretation of the policies of individual platforms can be seen in Table 1.

Table 1: Allowed activity by platform policy



| | Meta | Twitter | Discord | Snapchat | TikTok | Telegram |
|---|---|---|---|---|---|---|
| CSAM on public surfaces | ✖ | ✖ | ✖ | ✖ | ✖ | ✖ |
| CSAM in private chats | ✖ | ✖ | ✖ | ✖ | ✖ | ☐ |
| Adult Nudity | ✖ | ✅ | ✅ | ✅ | ✖ | ✅ |
| Adult Pornography | ✖ | ✅ | ✅ | ✖ | ✖ | ✅ |
| Sexualization of children | ✖ | ✖ | ☐ | ☐ | ✖ | ☐ |
| Grooming | ✖ | ✖ | ✖ | ✖ | ✖ | ☐ |

Explicitly allowed: ✅ Disallowed: ✖ Not addressed: ☐

## 6.1   Instagram

Meta has content policy rules[16] that apply across its platforms that prohibit sexualization of children, advertising of CSAM, sexual conversations with minors and obtaining sexual material from minors. Its policies explicitly prohibit:

- Content of children in a sexual fetish context

---

14. https://www.facebook.com/help/229715077154790/
15. https://telegram.org/faq
16. https://transparency.fb.com/policies/community-standards/child-sexual-exploitation-abuse-nudity/

PX0477-011



- Content that supports, promotes, advocates or encourages participation in pedophilia unless it is discussed neutrally in an academic or verified health context
- Content that solicits:
  - Child Sexual Abuse Material (CSAM)
  - Nude imagery of children
  - Sexualized imagery of children
  - Real-world sexual encounters with children
- Arranging or planning real-world sexual encounters with children
- Purposefully exposing children to sexually explicit language or sexual material
- Engaging in implicitly sexual conversations in private messages with children
- Obtaining or requesting sexual material from children in private messages
- Content (including photos, videos, real-world art, digital content, and verbal depictions) that sexualizes children

These policies are comprehensive and should effectively apply to the sexualized, non-nude content that is used as a standard advertisement for SG-CSAM sellers as well as a broad array of sexualized content featuring minors. Instagram's role as the key platform in our investigation is likely not due to a lack of policies, but ineffective enforcement.

## 6.2    Twitter

Twitter's child sexual exploitation policy[17] prohibits much of the same content, along with links to third-party sites that contain CSAM. However, its policy of permitting adult nudity and depictions of sexual behavior[18] in posts make removing explicit imagery a more manual process than on platforms such as Instagram.

Twitter explicitly bans:

- Visual depictions of a child engaging in sexually explicit or sexually suggestive acts;
- Links to third-party sites that host child sexual exploitation material
- Recruiting, advertising or expressing an interest in a commercial sex act involving a child, or in harboring and/or transporting a child for sexual purposes
- Trying to obtain sexually explicit media from a child or trying to engage a child in sexual activity through blackmail or other incentives
- Promoting or normalizing sexual attraction to minors as a form of identity or sexual orientation

---

17. https://help.twitter.com/en/rules-and-policies/sexual-exploitation-policy
18. https://help.twitter.com/en/rules-and-policies/media-policy

PX0477-012

Stanford | Internet Observatory
Cyber Policy Center

## 6.3   Discord

Discord's policies[19] are unique in their focus on the behavior not just of adults but of the minors who comprise a large percentage of their user base. Discord explicitly prohibits users under 18 from engaging "in sexual conduct or any conduct that puts your online or physical safety at risk", a broad prohibition against not only the image and video-based content we focus on in this report but text and audio-based sexual conduct.

Like Twitter, Discord allows adult nudity in channels marked 18+, and simple searches show hundreds of Discord servers dedicated to sexual content. This likely complicates Discord's enforcement efforts against the exchange of nude material from post-pubescent minors (B2 in the Tech Coalition's Industry Classification System[20]).

Discord specifically prohibits:

- Solicitation or sexual conduct between adults and minors
- Making sexual content available to minors (although how server admins are supposed to enforce this is not defined)
- Distribution of non-consensual intimate imagery
- Any content that "depicts, promotes, or attempts to normalize child sexual abuse."

## 6.4   Snapchat

Snap's Community Guidelines[21] explicitly mention self-generated nudity of minors with specific guidance:[22]

> "Never post, save, send, forward, distribute, or ask for nude or sexually explicit content involving anyone under the age of 18 (this includes sending or saving such images of yourself)."

It further prohibits:

- Promoting, distributing, or sharing pornographic content.
- Commercial activities that relate to pornography or sexual interactions
- Activity that involves sexual exploitation or abuse of a minor, including sharing child sexual exploitation or abuse imagery, grooming, or sexual extortion (sextortion).

---

19. https://discord.com/guidelines
20. https://paragonn-cdn.nyc3.cdn.digitaloceanspaces.com/technologycoalition.org/uploads/Tech_-Coalition_Industry_Classification_System.pdf
21. https://values.snap.com/privacy/transparency/community-guidelines
22. https://values.snap.com/privacy/transparency/community-guidelines/sexual-content

PX0477-013

## 6.5    TikTok

TikTok has detailed Community Guidelines[23] outlining its policy and child safety measures, prohibiting:

> "...content that may put young people at risk of exploitation, or psychological, physical, or developmental harm. This includes child sexual abuse material (CSAM), youth abuse, bullying, dangerous activities and challenges, exposure to overtly mature themes, and consumption of alcohol, tobacco, drugs, or regulated substances."

It also limits discovery of content created by users under 16 (insofar as they can detect a user's real age), restricts direct messages to those 16 and older, and restricts the use of livestreaming features to users 18 and older.[24]  CSAM and grooming are explicitly mentioned, notably including digitally created content:

> "We do not allow youth exploitation and abuse, including child sexual abuse material (CSAM), nudity, grooming, sextortion, solicitation, pedophilia, and physical or psychological abuse of young people. This includes content that is real, fictional, digitally created, and shown in fine art or objects."

Also notable are TikTok's links to global and local support resources to those potentially seeking out CSAM,[25] though it is unclear under what contexts this information might surface to a user during actual use of the app.

## 6.6    Telegram

Telegram's Terms of Service[26] (see Figure 6 on the following page) states that posting illegal pornographic content is not allowed on publicly viewable channels, implicitly allowing CSAM on its platform, provided it is shared in private groups or direct messages.[27]  It further states that "All Telegram chats and group chats are private amongst their participants. We do not process any requests related to them,"[28] presumably even if reported by a user. They further state that "To this day, we have disclosed 0 bytes of user data to third parties, including governments."

As noted in Section 5.3, Telegram has also been observed by SIO as failing to perform even basic content enforcement on public channels, with instances of known CSAM being detected and reported by our ingest systems. Given that use of PhotoDNA requires reporting material to NCMEC, which would violate their principle of not providing data to third parties, Telegram may not be using it at all.

---

23. https://www.tiktok.com/community-guidelines/en/
24. https://www.tiktok.com/community-guidelines/en/safety-civility/#4
25. https://www.tiktok.com/safety/en-us/prevent-csam/
26. https://telegram.org/tos/terms-of-service-for-telegram
27. Note that private chats and channels, contrary to popular perception, are not end-to-end encrypted; see https://www.kaspersky.com/blog/telegram-why-nobody-uses-secret-chats/46889/.
28. https://telegram.org/faq

PX0477-014

Stanford | Internet Observatory
Cyber Policy Center

**Terms of Service**

By signing up for Telegram, you accept our Privacy Policy and agree not to:

- Use our service to send spam or scam users.
- Promote violence on publicly viewable Telegram channels, bots, etc.
- Post illegal pornographic content on publicly viewable Telegram channels, bots, etc.

We reserve the right to update these Terms of Service later.

Citizens of EU countries and the United Kingdom must be at least 16 years old to sign up.

Figure 6: A screenshot of an except of Telegram's Terms of Service, as of May 11, 2023.

### 6.7  G2G

G2G is something of an outlier, in that it is acting as a de-facto payment provider rather than a networking or messaging service. Its safety guidelines[29] primarily center around scams, and a broad declaration that illegal activities are not allowed.[30]  It allows payment with a broad range of e-wallets and cryptocurrencies,[31] with little in the way of identity verification measures for buyers. As a platform, it has relatively little data to work with to detect SG-CSAM-related activity; however, it is notable as a potential source of signal for other platforms, as well as a platform that may be useful in investigations to determine identity of buyers.

## 7    Recommendations for platforms

**Better proactive investigations and heavier enforcement on keywords and hashtags:** The proliferation of these accounts, particularly on platforms such as Twitter and Instagram, and the recurring patterns common to many accounts in the network (i.e., mentions of "menu", certain emoji in bio, obvious hashtags involving variations on "pedo"), indicate a general lack of resources devoted to detecting SG-CSAM and associated commercial activity. SG-CSAM distribution rings could easily have been detected and acted upon by internal investigation teams, and there are existing policies in place that cover this type of content, but accounts often stay active for months. Reactive enforcement based on user reports is inadequate: investigative reporters regularly find activity that platforms have missed, simply by actively looking rather than relying on reports. Platforms should have a well-staffed internal team responsible for the detection and content enforcement of SG-CSAM, with proactive discovery mechanisms at their disposal.

**Signal sharing across platforms:** Given the breadth of platforms used by the SG-CSAM ecosystem, information sharing between platforms and services on the changing characteristics, hashtags, keywords and advertising tactics could improve detection and enforcement mechanisms on an industry-wide level.

---

29. https://support.g2g.com/support/solutions/articles/5000001431
30. https://support.g2g.com/support/solutions/articles/5000861666-prohibition-of-illegal-activities
31. https://www.g2g.com/payment-guide/

14



**Models to detect accounts that behave like buyers:** Apparent buyers had relatively distinctive positions in the network graph, and presumably have distinctive behaviors (following seller accounts, messaging underage users, receiving links to fileshare platforms). Platforms should build classifiers based off of these buyer accounts to detect them in the future and report to law enforcement when there is reason to suspect illegal activity.

**Better age detection mechanisms:** Sellers use fairly trivial and predictable methods of obfuscating their real age, in addition to keywords and hashtags that imply being underage. CSAM detection logic and classifiers should take these signals into account.

**Detection of gift card-related transactions:** Transactions involving gift cards are particularly likely to be used by unbanked younger sellers or in exchange of illicit goods. Similar to how various companies have mechanisms to detect credit card numbers in data where they should not appear, mechanisms to detect exchange of gift card redemption codes should be possible to implement as a signal that a financial transaction may be taking place.

**Reevaluation of recommendation systems:** It is very likely that part of the reason that Instagram and Twitter were platforms of choice for this network is because their recommendation systems are extremely efficient at suggesting similar accounts to follow, as a growth tactic. Any medium that is going to rely heavily on recommending content to other users—whether those be posts, accounts "Reels" or "Stories"—needs to be implemented in such a way that does not recommend SG-CSAM producers to buyers or vice versa.

**Education for sellers:** When an account is identified as selling SG-CSAM, disabling the account should be accompanied by messaging to the seller to attempt to discourage recidivism. This messaging might include:

- The fact that this content is widely illegal and can result in prosecution; being a minor does not prevent legal consequences.
- That it increases the user's risk for being a victim of sextortion, stalking and other harms.
- That producing this content helps prop up a CSAM industry where content is created against people's will—the content they sell may be traded to gain access to this.
- Links to supportive resources, such as NCMEC's Take It Down which can help prevent content from proliferating.

## 8   Ethical and Safety Considerations for Researchers

Academic and civil society research teams looking to have a positive impact against online child sexual exploitation (OCSE) have to navigate a thicket of complicated equities, including:

- Treating victims ethically and empathetically, even if they are participating

PX0477-016

Stanford | Internet Observatory
Cyber Policy Center

in their own abuse

- Fulfilling legal requirements around the handling and reporting of CSAM
- Meeting organizational requirements around human subject research, if appropriate
- Protecting researchers from legal risk and potential emotional harms related to dealing with OCSE
- Creating trustworthy research that serves our goal of reducing the harm of online abuses
- Mitigating short-term harms via reporting illegal activity

The SIO team took these steps to fulfill these goals:

**Avoiding direct user interaction:** During this and other child safety projects, the SIO team has avoided any interactions with individual victims or offenders. The purpose of our research is to understand the network behaviors, not understand the individual motivations.

**Automatic scanning of high-risk media:** The SIO has deployed PhotoDNA scanning into all our standard media ingest pipelines to prevent the possibility of known CSAM being ingested or viewed by SIO researchers. If our detection system is triggered, the metadata of the image is encrypted and stored in a location only available to two senior SIO staff members (both of whom have worked on child safety investigations professionally) and the original image deleted before it touches persistent storage. This also triggers an automatic report to the NCMEC CyberTipline. SIO is currently integrating the new Take It Down[32] hash bank into our pipeline.

**Reporting to NCMEC:** Beyond the automatic reporting of known CSAM described above, SIO reached out to brief NCMEC analysts on our findings and provided them with full Maltego graphs of the networks of buyers and sellers we discovered. Our goal was to help NCMEC coordinate the various relevant law enforcement agencies as they investigated and took action on our reports.

**Briefing relevant platforms and coordinating bodies:** The SIO team also briefed the child safety teams at several platforms, including Instagram and Twitter. While NCMEC has the primary responsibility for relaying CyberTipline reports, such referrals from NCMEC are often aimed at specific offenders and not at the broader problem. In our briefings, we provided recommendations on the product and operational changes we believe could reduce the size and effectiveness of the SG-CSAM ecosystem. We also worked closely with Twitter to troubleshoot the unwanted appearance of known, hashed CSAM on public profiles.

We recommend that academic and other research groups performing work on Twitter data deploy PhotoDNA or an equivalent technology on any data ingest pipelines. This suggestion also holds for Telegram. Academic research groups are invited to contact the authors for assistance or implementation details.

---

32. https://takeitdown.ncmec.org/

PX0477-017



# 9 Conclusions

The social and technical causes and conditions that lead to the production of SG-CSAM are varied,[33] with mitigation requiring technical countermeasures but also education, social services and support—as well as preventing the circumstances in which minors might feel coerced or compelled to exchange SG-CSAM for money. Even when material is truly self-produced and distributed intentionally, minors do not have the ability to meaningfully consent to the implications of having widely distributed explicit material and the other harms for which it puts them at risk. Future work by qualified groups could include surveys or interviews of the producers of SG-CSAM, to understand how many producers have been forced into this ecosystem and what drove those who choose to sell underage sexual material to do so.

While the primary platforms identified as having significant SG-CSAM activity were Instagram and Twitter, a wide cross-section of the industry is connected to this ecosystem—some of which we could not analyze using open-source methods. An industry-wide initiative to limit production, discovery, advertisement and distribution of SG-CSAM is needed—not just with social media platforms, but with file sharing services, merchants and payment providers. Given the highly multi-platform nature of the problem, this will require a better knowledge sharing of the shifting nature of the SG-CSAM production networks, countermeasures and methods for identifying buyers.

This work also demonstrated a weakness the authors have noticed in the global child safety framework. While there are some examples of law enforcement and child-safety centers working on SG-CSAM as a major source of illegal material, the ease with which we found and explored this network, with no special data access or investigatory powers raises questions about the effectiveness of the current enforcement regime. Further work is necessary on whether the correct statutory and law enforcement framework exists to deal with this issue.

With as much time and energy that platforms and service providers have spent policing and deplatforming legal, adult sex workers, the lack of attention to commercial SG-CSAM and the apparent difficulty some platforms have in controlling it was unexpected and unfortunate. This is an issue needs enough resources devoted to it such that it can be identified and rapidly triaged—proactively, instead of based on user reports. We hope that this report will aid the industry in doing so, and will continue to to partner with technology and child safety organizations to further research and recommend countermeasures.

---

33. https://www.thorn.org/blog/youth-continue-sharing-sg-csam/

PX0477-018



*The Stanford Internet Observatory is a cross-disciplinary program of research, teaching and policy engagement for the study of abuse in current information technologies, with a focus on social media. The Stanford Internet Observatory was founded in 2019 to research the misuse of the internet to cause harm, formulate technical and policy responses, and teach the next generation how to avoid the mistakes of the past.*

PX0477-019



PX0477-020

# PX0478

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/instagram-vast-pedophile-network-4ab7189

WSJ NEWS EXCLUSIVE

# Instagram Connects Vast Pedophile Network

The Meta unit's systems for fostering communities have guided users to child-sex content; company says it is improving internal controls

*By Jeff Horwitz* [Follow] *and Katherine Blunt* [Follow]

June 7, 2023 7:05 am ET

Instagram, the popular social-media site owned by Meta   META **-0.71%** ▼   Platforms, helps connect and promote a vast network of accounts openly devoted to the commission and purchase of underage-sex content, according to investigations by The Wall Street Journal and researchers at Stanford University and the University of Massachusetts Amherst.

Pedophiles have long used the internet, but unlike the forums and file-transfer services that cater to people who have interest in illicit content, Instagram doesn't merely host these activities. Its algorithms promote them. Instagram connects pedophiles and guides them to content sellers via recommendation systems that excel at linking those who share niche interests, the Journal and the academic researchers found.

Though out of sight for most on the platform, the sexualized accounts on Instagram are brazen about their interest. The researchers found that Instagram enabled people to search explicit hashtags such as #pedowhore and #preteensex and connected them to accounts that used the terms to advertise child-sex material for sale. Such accounts often claim to be run by the children themselves and use overtly sexual handles incorporating words such as "little slut for you."

Instagram accounts offering to sell illicit sex material generally don't publish it openly, instead posting "menus" of content. Certain accounts invite buyers to commission specific acts. Some menus include prices for videos of children harming themselves and "imagery of the minor performing sexual acts with animals," researchers at the Stanford Internet Observatory found. At the right price, children are available for in-person "meet ups."

PX0478-001

The promotion of underage-sex content violates rules established by Meta as well as federal law.

In response to questions from the Journal, Meta acknowledged problems within its enforcement operations and said it has set up an internal task force to address the issues raised. "Child exploitation is a horrific crime," the company said, adding, "We're continuously investigating ways to actively defend against this behavior."

Meta said it has in the past two years taken down 27 pedophile networks and is planning more removals. Since receiving the Journal queries, the platform said it has blocked thousands of hashtags that sexualize children, some with millions of posts, and restricted its systems from recommending users search for terms known to be associated with sex abuse. It said it is also working on preventing its systems from recommending that potentially pedophilic adults connect with one another or interact with one another's content.

Alex Stamos, the head of the Stanford Internet Observatory and Meta's chief security officer until 2018, said that getting even obvious abuse under control would likely take a sustained effort.

"That a team of three academics with limited access could find such a huge network should set off alarms at Meta," he said, noting that the company has far more effective tools to map its pedophile network than outsiders do. "I hope the company reinvests in human investigators," he added.

PX0478-002



Alex
Stamos,
director
of the
Stanford
Internet
Observatory
in
Palo
Alto,
Calif.
PHOTO:
HELYNN
OSPINA
FOR
THE
WALL
STREET
JOURNAL

Technical and legal hurdles make determining the full scale of the network hard for anyone outside Meta to measure precisely.

Because the laws around child-sex content are extremely broad, investigating even the open promotion of it on a public platform is legally sensitive.

In its reporting, the Journal consulted with academic experts on online child safety. Stanford's Internet Observatory, a division of the university's Cyber Policy Center focused on social-media abuse, produced an independent quantitative analysis of the Instagram features that help users connect and find content.

The Journal also approached UMass's Rescue Lab, which evaluated how pedophiles on Instagram fit into the larger world of online child exploitation. Using different methods, both entities were able to quickly identify large-scale communities promoting criminal sex abuse.

Test accounts set up by researchers that viewed a single account in the network were immediately hit with "suggested for you" recommendations of purported child-sex-content sellers and buyers, as well as accounts linking to off-platform content trading sites. Following just a handful of these recommendations was enough to flood a test account with content that sexualizes children.

PX0478-003

The Stanford Internet Observatory used hashtags associated with underage sex to find 405 sellers of what researchers labeled "self-generated" child-sex material—or accounts purportedly run by children themselves, some saying they were as young as 12. According to data gathered via Maltego, a network mapping software, 112 of those seller accounts collectively had 22,000 unique followers.

Underage-sex-content creators and buyers are just a corner of a larger ecosystem devoted to sexualized child content. Other accounts in the pedophile community on Instagram aggregate pro-pedophilia memes, or discuss their access to children. Current and former Meta employees who have worked on Instagram child-safety initiatives estimate the number of accounts that exist primarily to follow such content is in the high hundreds of thousands, if not millions.

A Meta spokesman said the company actively seeks to remove such users, taking down 490,000 accounts for violating its child safety policies in January alone.

"Instagram is an on-ramp to places on the internet where there's more explicit child sexual abuse," said Brian Levine, director of the UMass Rescue Lab, which researches online child victimization and builds forensic tools to combat it. Levine is an author of a 2022 report for the National Institute of Justice, the Justice Department's research arm, on internet child exploitation.

Instagram, estimated to have more than 1.3 billion users, is especially popular with teens. The Stanford researchers found some similar sexually exploitative activity on other, smaller social platforms, but said they found that the problem on Instagram is particularly severe. "The most important platform for these networks of buyers and sellers seems to be Instagram," they wrote in a report slated for release on June 7.

PX0478-004



The
Menlo
Park
campus
of
Meta
Platforms.
PHOTO:
HELYNN
OSPINA
FOR
THE
WALL
STREET
JOURNAL

Instagram said that its internal statistics show that users see child exploitation in less than one in 10 thousand posts viewed.

The effort by social-media platforms and law enforcement to fight the spread of child pornography online centers largely on hunting for confirmed images and videos, known as child sexual abuse material, or CSAM, which already are known to be in circulation. The National Center for Missing & Exploited Children, a U.S. nonprofit organization that works with law enforcement, maintains a database of digital fingerprints for such images and videos and a platform for sharing such data among internet companies.

Internet company algorithms check the digital fingerprints of images posted on their platforms against that list, and report back to the center when they detect them, as U.S. federal law requires. In 2022, the center received 31.9 million reports of child pornography, mostly from internet companies—up 47% from two years earlier.

Meta, with more than 3 billion users across its apps, which include Instagram, Facebook and WhatsApp, is able to detect these types of known images if they aren't encrypted. Meta accounted for 85% of the child pornography reports filed to the center, including some 5 million from Instagram.

Meta's automated screening for existing child exploitation content can't detect new images or efforts to advertise their sale. Preventing and detecting such activity requires not just reviewing user reports but tracking and disrupting pedophile networks, say current and

PX0478-005

former staffers as well as the Stanford researchers. The goal is to make it difficult for such users to connect with each other, find content and recruit victims.

Such work is vital because law-enforcement agencies lack the resources to investigate more than a tiny fraction of the tips NCMEC receives, said Levine of UMass. That means the platforms have primary responsibility to prevent a community from forming and normalizing child sexual abuse.

Meta has struggled with these efforts more than other platforms both because of weak enforcement and design features that promote content discovery of legal as well as illicit material, Stanford found.

The Stanford team found 128 accounts offering to sell child-sex-abuse material on Twitter, less than a third the number they found on Instagram, which has a far larger overall user base than Twitter. Twitter didn't recommend such accounts to the same degree as Instagram, and it took them down far more quickly, the team found.

Among other platforms popular with young people, Snapchat is used mainly for its direct messaging, so it doesn't help create networks. And TikTok's platform is one where "this type of content does not appear to proliferate," the Stanford report said.

Twitter didn't respond to requests for comment. TikTok and Snapchat declined to comment.

David Thiel, chief technologist at the Stanford Internet Observatory, said, "Instagram's problem comes down to content-discovery features, the ways topics are recommended and how much the platform relies on search and links between accounts." Thiel, who previously worked at Meta on security and safety issues, added, "You have to put guardrails in place for something that growth-intensive to still be nominally safe, and Instagram hasn't."

The platform has struggled to oversee a basic technology: keywords. Hashtags are a central part of content discovery on Instagram, allowing users to tag and find posts of interest to a particular community—from broad topics such as #fashion or #nba to narrower ones such as #embroidery or #spelunking.

Pedophiles have their chosen hashtags, too. Search terms such as #pedobait and variations on #mnsfw ("minor not safe for work") had been used to tag thousands of posts dedicated to advertising sex content featuring children, rendering them easily findable by buyers, the academic researchers found. Following queries from the Journal, Meta said it is in the process of banning such terms.



A screenshot taken by the Stanford Internet Observatory shows the warning and clickthrough option when searching for a pedophilia-related hashtag on Instagram. PHOTO: STANFORD INTERNET OBSERVATORY

In many cases, Instagram has permitted users to search for terms that its own algorithms know may be associated with illegal material. In such cases, a pop-up screen for users warned that "These results may contain images of child sexual abuse," and noted that production and consumption of such material causes "extreme harm" to children. The screen offered two options for users: "Get resources" and "See results anyway."

In response to questions from the Journal, Instagram removed the option for users to view search results for terms likely to produce illegal images. The company declined to say why it had offered the option.

The pedophilic accounts on Instagram mix brazenness with superficial efforts to veil their activity, researchers found. Certain emojis function as a kind of code, such as an image of a map—shorthand for "minor-attracted person"—or one of "cheese pizza," which shares its initials with "child pornography," according to Levine of UMass. Many declare themselves "lovers of the little things in life."

Accounts identify themselves as "seller" or "s3ller," and many state their preferred form of payment in their bios. These seller accounts often convey the child's purported age by saying they are "on chapter 14," or "age 31" followed by an emoji of a reverse arrow.

Some of the accounts bore indications of sex trafficking, said Levine of UMass, such as one displaying a teenager with the word WHORE scrawled across her face.

Some users claiming to sell self-produced sex content say they are "faceless"—offering images only from the neck down—because of past experiences in which customers have stalked or blackmailed them. Others take the risk, charging a premium for images and videos that could reveal their identity by showing their face.

Many of the accounts show users with cutting scars on the inside of their arms or thighs, and a number of them cite past sexual abuse.

PX0478-007

Even glancing contact with an account in Instagram's pedophile community can trigger the platform to begin recommending that users join it.



Sarah Adams, a Canadian mother of two, has built an Instagram audience combatting child exploitation. PHOTO: ALANA PATERSON FOR THE WALL STREET JOURNAL

Sarah Adams, a Canadian mother of two, has built an Instagram audience discussing child exploitation and the dangers of oversharing on social media. Given her focus, Adams' followers sometimes send her disturbing things they've encountered on the platform. In February, she said, one messaged her with an account branded with the term "incest toddlers."

Adams said she accessed the account—a collection of pro-incest memes with more than 10,000 followers—for only the few seconds that it took to report to Instagram, then tried to forget about it. But over the course of the next few days, she began hearing from horrified parents. When they looked at Adams' Instagram profile, she said they were being recommended "incest toddlers" as a result of Adams' contact with the account.

A Meta spokesman said that "incest toddlers" violated its rules and that Instagram had erred on enforcement. The company said it plans to address such inappropriate recommendations

PX0478-008

as part of its new child-safety task force.

As with most social-media platforms, the core of Instagram's recommendations are based on behavioral patterns, not by matching a user's interests to specific subjects. This approach is efficient in increasing the relevance of recommendations, and it works most reliably for communities that share a narrow set of interests.

In theory, this same tightness of the pedophile community on Instagram should make it easier for Instagram to map out the network and take steps to combat it. Documents previously reviewed by the Journal show that Meta has done this sort of work in the past to suppress account networks it deems harmful, such as with accounts promoting election delegitimization in the U.S. after the Jan. 6 Capitol riot.

Like other platforms, Instagram says it enlists its users to help detect accounts that are breaking rules. But those efforts haven't always been effective.

Sometimes user reports of nudity involving a child went unanswered for months, according to a review of scores of reports filed over the last year by numerous child-safety advocates.

Earlier this year, an anti-pedophile activist discovered an Instagram account claiming to belong to a girl selling underage-sex content, including a post declaring, "This teen is ready for you pervs." When the activist reported the account, Instagram responded with an automated message saying: "Because of the high volume of reports we receive, our team hasn't been able to review this post."

After the same activist reported another post, this one of a scantily clad young girl with a graphically sexual caption, Instagram responded, "Our review team has found that [the account's] post does not go against our Community Guidelines." The response suggested that the user hide the account to avoid seeing its content.

A Meta spokesman acknowledged that Meta had received the reports and failed to act on them. A review of how the company handled reports of child sex abuse found that a software glitch was preventing a substantial portion of user reports from being processed, and that the company's moderation staff wasn't properly enforcing the platform's rules, the spokesman said. The company said it has since fixed the bug in its reporting system and is providing new training to its content moderators.

Even when Instagram does take down accounts selling underage-sex content, they don't always stay gone.

PX0478-009

Under the platform's internal guidelines, penalties for violating its community standards are generally levied on accounts, not users or devices. Because Instagram allows users to run multiple linked accounts, the system makes it easy to evade meaningful enforcement. Users regularly list the handles of "backup" accounts in their bios, allowing them to simply resume posting to the same set of followers if Instagram removes them.



Sarah Adams' followers sometimes send her disturbing things they've encountered on Instagram. PHOTO: ALANA PATERSON FOR THE WALL STREET JOURNAL

In some instances, Instagram's recommendations systems directly undercut efforts by its own safety staff. After the company decided to crack down on links from a specific encrypted file-transfer service notorious for transmitting child-sex content, Instagram blocked searches for its name.

Instagram's AI-driven hashtag suggestions didn't get the message. Despite refusing to show results for the service's name, the platform's autofill feature recommended that users try variations on the name with the words "boys" and "CP" added to the end.

The company tried to disable those hashtags amid its response to the queries by the Journal. But within a few days Instagram was again recommending new variations of the service's name that also led to accounts selling purported underage-sex content.

Following the company's initial sweep of accounts brought to its attention by Stanford and the Journal, UMass's Levine checked in on some of the remaining underage seller accounts on Instagram. As before, viewing even one of them led Instagram to recommend new ones. Instagram's suggestions were helping to rebuild the network that the platform's own safety staff was in the middle of trying to dismantle.

A Meta spokesman said its systems to prevent such recommendations are currently being built. Levine called Instagram's role in promoting pedophilic content and accounts unacceptable.

"Pull the emergency brake," he said. "Are the economic benefits worth the harms to these children?"

PX0478-010

# PX0480

4/10/2024 12:33 PM



All Cyber News / Blogs / September 21, 2023

## An update on the SG-CSAM ecosystem

Stanford Internet Observatory                    f  X  in  ✉



The Stanford Internet Observatory **released a report** on commercial distribution of self-generated child sexual abuse material (SG-CSAM) in June, documenting a network of underage explicit content sellers and buyers across many tech platforms. Instagram and Twitter were the primary channels used to advertise content.

The research team briefed several companies with platforms used to advertise or distribute content which then took measures to suppress this activity. We then conducted a smaller follow-up study to measure progress combating SG-CSAM on Instagram and Twitter.

The network's tactics and characteristics have evolved since the original assessment. One of the main findings of the original report is that rapid adaptation of the SG-CSAM network requires sustained proactive attention by platforms. We discuss those adaptations in this update, emphasizing that human investigators are best positioned to observe and mitigate these shifts.

### Methodology

Previously, Twitter analysis was performed via the PowerTrack API; however, given the **effective retirement** of Twitter's Academic API offerings, methodology for retesting on Twitter was altered, using a combination of a Firefox profile equipped with **Zeeschuimer** for metadata collection and with image and video capabilities disabled via the following settings changes:

- media.mp4.enabled = false
- media.webm.enabled = false
- media.mediasource.enabled = false
- media.mediasource.mp4.enabled = false
- media.mediasource.vp9.enabled = false
- media.mediasource.webm.enabled = false
- media.gmp-gmpopenh264.enabled = false
- media.rdd-ffvpx.enabled = false
- permissions.default.image = 2

This methodology is considerably less comprehensive and the retest should not be considered a complete assessment of the prevalence of SG-CSAM-related content on Twitter. The process is also significantly slower, given Twitter's **implementation of limits** on the number of tweets an account can view per 24 hours. Additionally, without API access, it is no longer possible to programmatically detect instances of known CSAM on Twitter to assess whether issues found during the previous test have been addressed.

Similar methodology was used for Instagram, except with media enabled, to gather referral links from user Stories. While Meta's CrowdTangle provides some access to Instagram data, it does not provide the ability to do full site search, and Meta's academic API offerings focus on Facebook rather than Instagram.

Initial data collected was then analyzed via a combination of **4cat** and **VisiData**. For both platforms, seed accounts were identified by hashtag search (and on Instagram, cross-promotion via Stories). These seeds were then used to discover additional accounts by using Maltego and Social Links to pull the users each one was following and identify the most centrally connected accounts. When a new account was identified as a seller, the users that account followed were added to the network, and the process was repeated for any newly found sellers.

## Findings

We identified 162 likely seller accounts on Instagram, with 70 likely buyer accounts. Many of those accounts were identified via links to accounts on other platforms. On Twitter, 81 seller accounts were identified, however, buyer accounts were difficult to determine due to pseudonymity and a low frequency of sellers following other users on the platform. The accounts identified were then referred to Meta and Twitter for triage. It is unclear how many of the identified accounts were part of the network analyzed in the original report.

While the number of detected sellers is lower than the original report findings, the discovery and analysis period was shorter. Most data was gathered within one week, while the original investigation gathered data over a months-long period. Generally, there was minimal change to seller strategy since the original report. Many hashtags that were previously used by the network are now restricted on Twitter and Instagram. On Instagram, a warning for searches related to pedophilia that still allowed users to view content has been updated to fully block search results. However, the overall ecosystem remains active, with significant room for improvement in content enforcement.

### Weak hashtag enforcement

On Instagram, multiple SG-CSAM-related hashtags were still in use. Some hashtags had minor alterations made to avoid new blocking measures which should have been caught by a blocklisting function. For example, #pxdobait was blocked from search, but the same hashtag with an emoji after it was not. Rather than performing an exact string match, content enforcement systems should block any hashtag that contains substrings substantially related to SG-CSAM.

Additionally, hashtags consisting of a single emoji related to the network were also in use, making it somewhat harder to justify a ban given the multiple meanings of many emoji. Disallowing emoji from hashtags entirely would likely be overbroad, given their use in many types of conversations. However, assessing emoji that take on high salience within the SG-CSAM networks and flagging them for a comprehensive review would be a reasonable action without too much user impact.

On Twitter, several older hashtags associated with SG-CSAM remained active with ads placed adjacent to them. Apart from SG-CSAM-related hashtags, other explicit adult content hashtags do not seem to prevent ad placement despite Twitter's default **ad sensitivity settings** which are intended to limit ads adjacent to "explicit adult content." Therefore, these settings may only apply to media, and not explicit sexual speech.

### Adult sellers posing as underage

The prior report speculated that some users may be adults posing as underage users to sell content, and the retest confirmed one instance of this. An Instagram user identifying as 14 years old and using keywords associated with SG-CSAM had a link to a profile on an adult site known to verify the age of models. This profile was reported by SIO to the site's trust and safety team as a potential underage user. The team subsequently determined that this user was verified as being at least 18 years old with high confidence -- however, off-site advertising in which a user claims to be underage violates the site's policies and the account was terminated.

Besides violating policy, posing as an underage person to sell explicit material is **prohibited under U.S. law** with a minimum punishment of five years in prison. The extent to which this behavior is present in the larger SG-CSAM ecosystem is unclear, but being of legal age is not a legal defense under U.S. law for offering to sell purportedly underage material.

### Changes in age indication

Suspected SG-CSAM sellers now often identify as being 18 or 19 (sometimes in quotes), and then give indications that they are underage elsewhere in their profile, or direct buyers to DM for their age despite already stating it. Some users created images similar to CAPTCHAs to illustrate age in a more difficult to detect way. However, even with this evolution in evasive behavior, the trivial emoji and numeric reversals or mathematical operations to indicate age were still in use on both platforms and apparently not detected.

### Self-Policing on Twitter

Our prior report notes that SG-CSAM accounts seem to be removed more quickly on Twitter than on Instagram, and that only Twitter allows nudity and adult content of those two platforms. As such, there is a legal community of adult content buyers and sellers on Twitter. As part of the retest, we found several adult content buyers and sellers who called upon users to mass report accounts claiming to sell CSAM with hashtags used by the legal, adult content community. In some cases, the adult content community also called out accounts that purportedly sold material to underage users, calling for similar mass reporting of accounts. While difficult to assess, the adult content community may be self-policing hashtags used to share legal, adult nudity on the site with underage accounts coming down faster and more often.

This raises some interesting questions regarding moderation strategy on sites

4/10/2024 12:33 PM

that allow adult content versus those that don't. Twitter's allowance of mixed content, with permissiveness in regard to sex work, fosters an above-ground community of buyers and sellers that may feel more empowered to report illegal activity. In contrast, Instagram's effective ban of sex work and adult content as a whole may result in all buyers and sellers inhabiting an underground sphere which tries not to call attention to itself — we were not able to find any similar public self-policing behavior on that platform.

Given the differing functions and user bases on Twitter and Instagram, it is unlikely that any general recommendation can be made based on this apparent increase in self-policing. However, it is an interesting area for future content moderation research.

## Conclusion and recommendations

Our initial report received significant attention from policymakers. While it generated important discussions, some involved two common public policy proposals to address children's safety online that we believe would be counter-productive.

First, restricting end-to-end encryption would not mitigate the issues observed in our reports as most solicitation happens in public view. Second, age verification on platforms such as Instagram would likely provide little benefit for this area of concern, as the media posted is not sexually explicit. While age verification of users posting explicit content on sites which allow it—such as Twitter—could strengthen the prevention of CSAM and non-consensual adult content, overbroad provisions raise privacy and free expression risks for users of all ages.

So what could make a difference?

While many of the prior issues raised in our June report have been addressed, mechanisms do not appear to be in place at either Twitter or Instagram to effectively track evolution in SG-CSAM trends. It remains easy to find seed accounts that allow for discovery of the wider network, and the network appears to be resilient.

First, proactive monitoring and discovery, including by way of human investigators, is still needed on both platforms, with more effective tracking and actioning of relevant hashtags and keywords, as well as changing iconography.

Second, our prior recommendations of signal sharing between platform trust and safety teams and changes for recommendation systems and machine learning models to better detect obfuscated keywords and symbols indicating SG-CSAM activity, still apply.

Addressing the sale of CSAM by minors online will require collaboration between technology companies, research and nonprofit organizations, and law enforcement agencies. Continuing to study these dynamics for SG-CSAM is challenging but necessary, particularly in an environment where many platform providers are divesting from Trust and Safety programs. Social media and other technology companies should be incentivized to invest in Trust and Safety teams and resources to proactively address online harms including, but not limited to, child sexual exploitation and abuse.

— READ MORE —

| Reports                June 2023 | Journal Articles          June 2023 | Journal Articles          May 2023 |
|---|---|---|
| Cross-Platform Dynamics of Self-Generated CSAM | Google the Gatekeeper: How Search Components Affect Clicks and Attention | Users choose to engage with more partisan news than they are exposed to on Google Search |
| **Author(s)** | **Author(s)** | **Author(s)** |
| David Thiel, Renee DiResta, Alex Stamos | Jeffrey Gleason, Desheng Hu, Ronald E. Robertson, Christo Wilson | Ronald E. Robertson, Jon Green, Damian J. Ruck, Katherine Ognyanova, Christo Wilson & David Lazer |

ALL CYBER NEWS

**Stanford** | Cyber Policy Center
Freeman Spogli Institute and Stanford Law School

OUR ADDRESS                NAVIGATE        FOLLOW US              SUPPORT US

Encina Hall                Research        General inquiries     Learn more about how your support
616 Jane Stanford Way      Education        650-723-4581          makes a difference or make a gift now
Stanford University        Policy
Stanford, CA 94305-6055    People                                 MAKE A GIFT
                           Centers
                           News
                           Events
                           About

**Stanford**        Stanford Home    Maps & Directions    Search Stanford    Emergency Info
University           Terms of Use    Privacy    Copyright    Trademarks    Non-Discrimination    Accessibility    Copyright Complaints
                    © Stanford University, Stanford, California 94305.

PX0480-003

# PX0481

11/27/23, 8:56 AM    Instagram's Algorithm Delivers Toxic Video Mix to Adults Who Follow Children - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/tech/meta-instagram-video-algorithm-children-adult-sexual-content-72874155

WSJ NEWS EXCLUSIVE

# Instagram's Algorithm Delivers Toxic Video Mix to Adults Who Follow Children

Content served to WSJ test accounts included risqué footage of kids, overtly sexual adult videos and ads from major brands

*By Jeff Horwitz* [ Follow ]   *and Katherine Blunt* [ Follow ]

Nov. 27, 2023 5:30 am ET

Instagram's Reels video service is designed to show users streams of short videos on topics the system decides will interest them, such as sports, fashion or humor.

The Meta Platforms META **-0.95%** ▼ -owned social app does the same thing for users its algorithm decides might have a prurient interest in children, testing by The Wall Street Journal showed.

The Journal sought to determine what Instagram's Reels algorithm would recommend to test accounts set up to follow only young gymnasts, cheerleaders and other teen and preteen influencers active on the platform.

Instagram's system served jarring doses of salacious content to those test accounts, including risqué footage of children as well as overtly sexual adult videos—and ads for some of the biggest U.S. brands.

The Journal set up the test accounts after observing that the thousands of followers of such young people's accounts often include large numbers of adult men, and that many of the accounts who followed those children also had demonstrated interest in sex content related to both children and adults. The Journal also tested what the algorithm would recommend after its accounts followed some of those users as well, which produced more-disturbing content interspersed with ads.

In a stream of videos recommended by Instagram, an ad for the dating app Bumble appeared between a video of someone stroking the face of a life-size latex doll and a video of a young girl with a digitally obscured face lifting up her shirt to expose her midriff. In another, a Pizza

PX0481-001

Hut commercial followed a video of a man lying on a bed with his arm around what the caption said was a 10-year-old girl.

The Canadian Centre for Child Protection, a child-protection group, separately ran similar tests on its own, with similar results.

Meta said the Journal's tests produced a manufactured experience that doesn't represent what billions of users see. The company declined to comment on why the algorithms compiled streams of separate videos showing children, sex and advertisements, but a spokesman said that in October it introduced new brand safety tools that give advertisers greater control over where their ads appear, and that Instagram either removes or reduces the prominence of four million videos suspected of violating its standards each month.

The Journal reported in June that algorithms run by Meta, which owns both Facebook and Instagram, connect large communities of users interested in pedophilic content. The Meta spokesman said a task force set up after the Journal's article has expanded its automated systems for detecting users who behave suspiciously, taking down tens of thousands of such accounts each month. The company also is participating in a new industry coalition to share signs of potential child exploitation.

Companies whose ads appeared beside inappropriate content in the Journal's tests include Disney, Walmart, online dating company Match Group, Hims, which sells erectile-dysfunction drugs, and The Wall Street Journal itself. Most brand-name retailers require that their advertising not run next to sexual or explicit content.

"Our systems are effective at reducing harmful content, and we've invested billions in safety, security and brand suitability solutions," said Samantha Stetson, a Meta vice president who handles relations with the advertising industry. She said the prevalence of inappropriate content on Instagram is low, and that the company invests heavily in reducing it.

PX0481-002

Instagram
owner
Meta,
whose
headquarters,
above,
is
in
Menlo
Park,
Calif.,
created
Reels
to
compete
with
the
video-
sharing
platform
TikTok.
PHOTO:
KORI
SUZUKI
FOR
THE
WALL
STREET
JOURNAL

After the Journal contacted companies whose ads appeared in the testing next to inappropriate videos, several said that Meta told them it was investigating and would pay for brand-safety audits from an outside firm.

Following what it described as Meta's unsatisfactory response to its complaints, Match began canceling Meta advertising for some of its apps, such as Tinder, in October. It has since halted all Reels advertising and stopped promoting its major brands on any of Meta's platforms. "We have no desire to pay Meta to market our brands to predators or place our ads anywhere near this content," said Match spokeswoman Justine Sacco.

Robbie McKay, a spokesman for Bumble, said it "would never intentionally advertise adjacent to inappropriate content," and that the company is suspending its ads across Meta's platforms.

PX0481-003

Charlie Cain, Disney's vice president of brand management, said the company has set strict limits on what social media content is acceptable for advertising and has pressed Meta and other platforms to improve brand-safety features. A company spokeswoman said that since the Journal presented its findings to Disney, the company had been working on addressing the issue at the "highest levels at Meta."

Walmart declined to comment, and Pizza Hut didn't respond to requests for comment.

Hims said it would press Meta to prevent such ad placement, and that it considered Meta's pledge to work on the problem encouraging.

The Journal said that it was alarmed that its ad appeared next to a video of an apparent adult sex act and that it would demand action from Meta.

Meta created Reels to compete with TikTok, the video-sharing platform owned by Beijing-based ByteDance. Both products feed users a nonstop succession of videos posted by others, and make money by inserting ads among them. Both companies' algorithms show to a user videos the platforms calculate are most likely to keep that user engaged, based on his or her past viewing behavior.

The Journal reporters set up the Instagram test accounts as adults on newly purchased devices and followed the gymnasts, cheerleaders and other young influencers. The tests showed that following only the young girls triggered Instagram to begin serving videos from accounts promoting adult sex content alongside ads for major consumer brands, such as one for Walmart that ran after a video of a woman exposing her crotch.

When the test accounts then followed some users who followed those same young people's accounts, they yielded even more disturbing recommendations. The platform served a mix of adult pornography and child-sexualizing material, such as a video of a clothed girl caressing her torso and another of a child pantomiming a sex act.

PX0481-004

## Disturbing Mix

In Wall Street Journal tests, Instagram's Reels service delivered streams of short videos showing risqué footage of children, overtly sexual adult videos and ads from big brands.



| | | AD | | | | |
|---|---|---|---|---|---|---|
| Length of video 6 sec | 6 sec | 15 sec | 7 sec | 5 sec | 4 sec | 8 sec |
| Adult content creator uncrosses her legs to reveal her underwear. | Sprinter at a track meet runs over a small boy who steps onto the track. | Disney ad promoting Disneyland's Coco-themed "Plaza de la Familia." | Young woman wearing lingerie and a furry tail poses with fake blood dripping from her mouth. | Child in a bathing suit records herself posing in a mirror. | Adult content creator gives a come-hither motion. | Girl twerking in a car while song with sexual lyrics plays. |

Experts on algorithmic recommendation systems said the Journal's tests showed that while gymnastics might appear to be an innocuous topic, Meta's behavioral tracking has discerned that some Instagram users following preteen girls will want to engage with videos sexualizing children, and then directs such content toward them.

"Niche content provides a much stronger signal than general interest content," said Jonathan Stray, senior scientist for the Center for Human-Compatible Artificial Intelligence at the University of California, Berkeley.



In the Journal's test accounts, ads for Disneyland, above, ran next to videos of a sexual nature. A Disney executive said the company has pressed Meta to improve brand-safety features PHOTO: DANIA MAXWELL/LOS ANGELES TIMES/GETTY IMAGES

Current and former Meta employees said in interviews that the tendency of Instagram algorithms to aggregate child sexualization content from across its platform was known internally to be a problem. Once Instagram pigeonholes a user as interested in any particular subject matter, they said, its recommendation systems are trained to push more related content to them.

Preventing the system from pushing noxious content to users interested in it, they said, requires significant changes to the recommendation algorithms that also drive engagement for normal users. Company documents reviewed by the Journal show that the company's safety staffers are broadly barred from making changes to the platform that might reduce daily active users by any measurable amount.

The test accounts showed that advertisements were regularly added to the problematic Reels streams. Ads encouraging users to visit Disneyland for the holidays ran next to a video of an adult acting out having sex with her father, and another of a young woman in lingerie with fake blood dripping from her mouth. An ad for Hims ran shortly after a video depicting an apparently anguished woman in a sexual situation along with a link to what was described as "the full video."

Even before the 2020 launch of Reels, Meta employees understood that the product posed safety concerns, according to former employees.

Part of the problem is that automated enforcement systems have a harder time parsing video content than text or still images. Another difficulty arises from how Reels works: Rather than showing content shared by users' friends, the way other parts of Instagram and Facebook often do, Reels promotes videos from sources they don't follow.

In an analysis conducted shortly before the introduction of Reels, Meta's safety staff flagged the risk that the product would chain together videos of children and inappropriate content, according to two former staffers. Vaishnavi J, Meta's former head of youth policy, described the safety review's recommendation as: "Either we ramp up our content detection capabilities, or we don't recommend any minor content," meaning any videos of children.

At the time, TikTok was growing rapidly, drawing the attention of Instagram's young users and the advertisers targeting them. Meta didn't adopt either of the safety analysis's recommendations at that time, according to J.

PX0481-006

Stetson, Meta's liaison with digital-ad buyers, disputed that Meta had neglected child safety concerns ahead of the product's launch. "We tested Reels for nearly a year before releasing it widely, with a robust set of safety controls and measures," she said.

Video-sharing platforms appeal to social-media companies because videos tend to hold user attention longer than text or still photos do, making them attractive for advertisers.

Social-
media
platforms
like
videos
because
they
tend
to
hold
user
attention
longer
than
text
or
still
photos
do.
Meta
CEO
Mark
Zuckerberg
at
an
event
in
September.
PHOTO:
GODOFREDO
A.
VÁSQUEZ/ASSOCIATED
PRESS

After initially struggling to maximize the revenue potential of its Reels product, Meta has improved how its algorithms recommend content and personalize video streams for users.

PX0481-007

Social-media platforms and digital advertising agencies often describe inappropriate ad placements as unfortunate mistakes. But the test accounts run by the Journal and the Canadian Centre for Child Protection suggest Meta's platforms appeared to target some digital marketing at users interested in sex.

Among the ads that appeared regularly in the Journal's test accounts were those for "dating" apps and livestreaming platforms featuring adult nudity, massage parlors offering "happy endings" and artificial-intelligence chatbots built for cybersex. Meta's rules are supposed to prohibit such ads.

The Journal informed Meta in August about the results of its testing. In the months since then, tests by both the Journal and the Canadian Centre for Child Protection show that the platform continued to serve up a series of videos featuring young children, adult content and apparent promotions for child sex material hosted elsewhere.

As of mid-November, the center said Instagram is continuing to steadily recommend what the nonprofit described as "adults and children doing sexual posing."

After the Journal began contacting advertisers about the placements, and those companies raised questions, Meta told them it was investigating the matter and would pay for brand-safety auditing services to determine how often a company's ads appear beside content it considers unacceptable.

Meta hasn't offered a timetable for resolving the problem or explained how in the future it would restrict the promotion of inappropriate content featuring children.

The Journal's test accounts found that the problem even affected Meta-related brands. Ads for the company's WhatsApp encrypted chat service and Meta's Ray-Ban Stories glasses appeared next to adult pornography. An ad for Lean In Girls, the young women's empowerment nonprofit run by former Meta Chief Operating Officer Sheryl Sandberg, ran directly before a promotion for an adult sex-content creator who often appears in schoolgirl attire. Sandberg declined to comment.

Through its own tests, the Canadian Centre for Child Protection concluded that Instagram was regularly serving videos and pictures of clothed children who also appear in the National Center for Missing and Exploited Children's digital database of images and videos confirmed to be child abuse sexual material. The group said child abusers often use the images of the girls to advertise illegal content for sale in dark-web forums.

# PX0483



# 1. Overview

## Understanding our Advertising Standards

Our Advertising Standards provide policy detail and guidance on the types of ad content we allow, and the types of ad content we prohibit. When advertisers place an order, each ad is reviewed against our policies. Our Advertising Standards also provide guidance on advertiser behavior that may result in advertising restrictions being placed on a Business Account or its assets (an ad account, Page or user account).

If you think your ad was mistakenly rejected, or if you think your Business Account or its assets were mistakenly restricted, you can request a review of either decision in Account Quality.

## Common points of confusion

PX0483-001

To help you build a compliant and user-friendly ads experience, we've highlighted some common areas of confusion. Click the links below to learn more about:

- [Personal attributes](#)

- [Sexually suggestive content](#)

- [Meta brand usage in ads](#)

- [Advertising restrictions on business assets](#)

---

# 2. Meta advertising policy principles

Advertisers contribute to the Meta community in many ways, including highlighting new products and services or drawing attention to events and issues. To help keep both businesses and organizations who use our ad tools safe, and create a welcoming environment for everyone who uses our products and services, we have put in place our Advertising Standards to guide what is allowed across Meta technologies.

Advertisers running ads across Meta technologies must follow our [Community Standards](#) and our Advertising Standards. In addition, advertisers on Instagram must also follow our [Instagram Community Guidelines.](#)

## Our advertising policy principles

Our policies are guided by our company's core [values](#) and the following principles:

PX0483-002



## PROTECTING PEOPLE FROM UNSAFE AND DISCRIMINATORY PRACTICES

Our policies require all advertisers to comply with the laws in their jurisdiction, not engage in discriminatory practices, and not sell illegal or unsafe substances.



## PROTECTING PEOPLE FROM FRAUD OR SCAMS

Our policies prohibit ads promoting products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information.

PX0483-003



### PROMOTING POSITIVE USER EXPERIENCES

Because ads may be delivered to people in their Feed from Pages or accounts they don't follow, we want to help ensure that the ads don't detract from the overall experience across our technologies. For that reason, we prohibit ads containing shocking, sensational, or excessively violent content, certain adult content and profanity. We also prohibit other objectionable material, such as content implying or attempting to generate negative self-perception in order to promote diet, weight loss or other health related products.

PX0483-004



**PROMOTING TRANSPARENCY**

We strive to make advertising more transparent and to give people more information about the ads they see. Our Ad Library offers a view of all ads currently running across our apps and services. It also offers additional information on ads about social issues, elections or politics, including range of spend, who saw the ad and the entities responsible for those ads. Ads about these topics are visible whether they're active or inactive and are stored in the Ad Library for 7 years. We also have an Info and Ads section on all Facebook Pages where people are able to click to see active ads a Page is running to help keep advertisers accountable.

## Enforcement of our policies

We use automated and, in some instances, manual review to enforce our policies. Beyond reviewing individual ads, we also monitor and investigate advertiser behavior, and may restrict advertiser accounts that don't follow our Advertising Standards, Community Standards or other Meta policies and terms. Our review process may not detect all policy violations, and ads remain subject to review and re-review and may be rejected for violating our policies at any time. It is an advertiser's responsibility to understand and comply with our policies outlined in Meta's Advertising Standards, our Terms of Service and any other applicable terms and guidelines, in addition to all local laws, regulations and, where applicable, self-regulatory advertising codes. Advertisers whose ads are rejected will typically be provided an opportunity to edit their ads in order to bring them into compliance and can request another review if they believe their ad was incorrectly rejected.

PX0483-005

People can report ads if they believe they violate our policies. They can also see the details on why a certain ad appeared in their Feed, and they can control the ads they see in their Feed through our Ad Preferences tool.

---

# 3. The ad review process

Our ad review system relies primarily on automated tools to check ads and business assets against our policies. Our ad review process starts automatically before ads begin running, and is typically completed within 24 hours, although it may take longer in some cases. During this review, the status of the ad will be "In review." Additionally, ads may be reviewed again, including after they are live. You can find more information in our Business Help Center.

## What is reviewed

The ad review system reviews ads for violations of our policies. This review process may include the specific components of an ad, such as images, video, text and targeting information, as well as an ad's associated landing page or other destinations, among other information.

## Business asset review

We also review and take action on an advertiser's Business Account or its assets (ad accounts, Pages and user accounts). As part of our review, we assess whether the account or its assets have violated our policies.

PX0483-006



## Outcome of review

If a violation is found at any point in the review process, the ad will be rejected, and the Business Account or its assets may be restricted. Lower quality ads which do not necessarily violate our policies may experience impacted performance. You can find more information about how quality may affect your ad in our Business Help Center.

If a Business Account or its assets (ad account, Page or user account) is restricted, that account or asset can't be used to advertise across our technologies. If a user account is restricted from advertising on a Business Account or ad account, other members of those accounts may still be able to advertise.

## Re-review of ads

Ads remain subject to review and re-review at all times, and may be rejected or restricted for violation of our policies at any time. It is your responsibility to understand and comply with our policies.

PX0483-007

# 4. What to do if your ad is rejected or if your business asset is restricted

## Create a new ad or edit your ad

You may create a new ad or edit your ad to comply with our policies. These ads will be treated as new ads and reviewed by our ad review system. Check this page for editing steps.

## Request another review

If you believe the ad, ad account, user account, Page or Business Account was incorrectly rejected or restricted, you can request a review of the decision in Account Quality.



## Community standards

The Facebook Community Standards, along with Instagram Community Guidelines, outline what is not allowed across Meta technologies.

PX0483-008

Community Standards

Ads must not violate our Community Standards. Ads on
Instagram must not violate the Instagram Community
Guidelines.

**Learn more**

---

# Unaccepted content

Content that is illegal or otherwise considered unacceptable to people who use our
technologies.

### Child Sexual Exploitation, Abuse, and Nudity

Ads must not contain content that sexually exploits or
endangers children. When we become aware of apparent child
exploitation, we report it to the National Center for Missing and
Exploited Children (NCMEC), in compliance with applicable law.

**Learn more**

### Coordinating Harm and Promoting Crime

Ads must not facilitate, organize, promote or admit to certain
criminal or harmful activities targeted at people, businesses,
property or animals.

**Learn more**

PX0483-009

Dangerous Organizations and Individuals

Ads must not contain praise, support or representation of individuals or groups designated by Meta as Dangerous Organizations and Individuals.

**Learn more**

PX0483-010

Discriminatory Practices

PX0483-011

Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition.

Meta prohibits advertisers from using our ads products to discriminate against people. This means that advertisers may not (1) use our audience selection tools to (a) wrongfully target specific groups of people for advertising (see advertising policy on Targeting), or (b) wrongfully exclude specific groups of people from seeing their ads; or (2) include discriminatory content in their ads. Advertisers are also required to comply with applicable laws that prohibit discrimination (see advertising policy on Illegal Products or Services). These include laws that prohibit discriminating against groups of people in connection with, for example, offers of housing, employment, and credit.

Any United States advertiser or advertiser targeting the United States, Canada or certain parts of Europe that is running credit, housing or employment ads, must self identify as a Special Ad Category, as it becomes available, and run such ads with approved targeting options.

Additional information and resources on United States non-discrimination laws:

U.S. Department of Housing and Urban Development
U.S. Equal Employment Opportunity Commission
Consumer Financial Protection Bureau
American Civil Liberties Union
Leadership Conferences on Civil and Human Rights
Department of Justice – Civil Rights Division
National Fair Housing Alliance

Disclaimer: This guide is not a substitute for legal advice. Consult a legal professional for specific advice about your situation.

**Learn more**

PX0483-012

## Hate Speech

Ads must not attack people on the basis of what we call protected characteristics: race, ethnicity, national origin, disability, religious affiliation, caste, sexual orientation, sex, gender identity and serious disease.

**Learn more**

## Human Exploitation

Ads must not contain content that facilitates or coordinates the exploitation of humans, including human trafficking.

**Learn more**

## Illegal Products and Services

Ads must not constitute, facilitate, or promote illegal products, services or activities.

**Learn more**

## Misinformation

Meta prohibits ads that include content debunked by third-party fact checkers. Advertisers that repeatedly post information deemed to be false may have restrictions placed on their ability to advertise across Meta technologies. Find out more about our fact-checking program.

Meta also prohibits ads that include misinformation that violates our Community Standards.

**Learn more**

PX0483-013

Introduction to the Advertising Standards | Transparency Center

## Vaccine Discouragement

Ads must not discourage people from vaccination or advocate against vaccines.

**Learn more**

# Deceptive content

Content that may deceive or mislead people.

## Unacceptable Business Practices

Ads must not promote products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information.

**Learn more**

## Cheating and Deceitful Practices

Ads may not promote products or services that are designed to enable people to engage in cheating or deceitful practices.

**Learn more**

## Unrealistic Outcomes

Ads must not contain promises or suggestions of unrealistic outcomes as specified below for health, weight loss, or economic opportunity.

**Learn more**

PX0483-014

## Circumventing Systems

Ads must not use tactics that are intended to circumvent our ad review process. This includes techniques that attempt to disguise the ad's content or destination (landing) page. See more here for other advertiser behavior that we prohibit.

**Learn more**

## Prohibited Financial Products and Services

Ads must not promote financial products and services that are frequently associated with misleading or deceptive promotional practices.

**Learn more**

## Spyware or Malware

Ads must not contain spyware, malware or any software that results in an unexpected or deceptive experience.

**Learn more**

## Nonexistent Functionality

Ads must not contain images with nonexistent functionality. This includes imagery that replicates play buttons, notifications, or checkboxes, as well as ads containing features that do not work, such as multiple choice options in the ad creative itself.

**Learn more**

# Dangerous content

PX0483-015

Content that may negatively impact people's health and safety.

## Unsafe Substances

Ads must not promote the sale or use of illicit or recreational drugs, or other unsafe substances, products or supplements, as determined by Meta at its sole discretion.

**Learn more**

## Weapons, Ammunition or Explosives

Ads must not promote the sale or use of weapons, ammunition or explosives. This includes ads for weapon modification accessories.

**Learn more**

## Tobacco and Related Products

Ads must not promote the sale or use of tobacco or nicotine products and related paraphernalia. Ads must not promote delivery devices, such as electronic cigarettes, vaporizers, or any other products that simulate smoking or are otherwise designed for use with tobacco or nicotine products. Ads may promote cessation products approved by either the World Health Organization or the U.S. Food and Drug Administration, and must comply with all applicable local laws, required or established industry codes and guidelines.

**Learn more**

---

# Objectionable content

Content that may lead to negative experiences.

PX0483-016

## Adult Sexual Solicitation and Sexually Explicit Language

Ads must not contain content that facilitates sexual encounters, commercial sexual services between adults, or content asking for or offering pornographic content. In addition, we also restrict the use of sexually explicit language.

**Learn more**

## Bullying and Harassment

Ads must not contain attacks that are meant to degrade or shame public and private individuals. We also provide heightened protections for anyone under the age 18, regardless of their user status.

**Learn more**

## Adult Content

Ads must not contain adult content. This includes nudity, depictions of people in explicit or suggestive positions, or activities that are overly suggestive or sexually provocative.

Ads that assert or imply the ability to meet someone, connect with them, or view content created by them must not be positioned in a sexual way or with an intent to sexualize the person featured in the ad.

**Learn more**

PX0483-017

## Grammar and Profanity

Ads must not contain profanity or incorrect grammar and punctuation. Symbols, numbers and letters must be used properly, without the intention of circumventing our ad review process or other enforcement systems.

**Learn more**

## Low Quality or Disruptive Content

Ads must not contain content leading to external destination (landing) pages that provide an unexpected or disruptive experience. This includes misleading ad positioning, such as overly sensationalized headlines or prompts for users to inauthentically interact with the ad, and leading people to landing pages that contain minimal original content and a majority of unrelated or low quality ad content. For more information on what we consider low quality, visit our Business Help Center.

**Learn more**

## Personal Attributes

Ads must not contain content that asserts or implies personal attributes. This includes direct or indirect assertions or implications about a person's race, ethnicity, religion, beliefs, age, sexual orientation or practices, gender identity, disability, physical or mental health (including medical conditions), vulnerable financial status, voting status, membership in a trade union, criminal record, or name.

**Learn more**

PX0483-018

## Sensational Content

Ads must not contain shocking, sensational or excessively violent content.

**Learn more**

## Commercial Exploitation of Crises and Controversial Events

Ads must not contain content that exploits crises or controversial events for commercial purposes.

**Learn more**

## Personal Health and Appearance

Ad content must not imply or attempt to generate negative self-perception in order to promote diet, weight loss, or other health-related products.

**Learn more**

## Sale of Body Parts

Ads must not promote the sale of human body parts or fluids.

**Learn more**

---

# Content-specific restrictions

Content associated with certain kinds of businesses or products.

PX0483-019

## Alcohol

Ads that promote or reference alcohol must comply with all applicable local laws, required or established industry codes, guidelines, licenses and approvals, and include age and country targeting criteria consistent with Meta's targeting requirements and applicable local laws. Note that our policies prohibit ads promoting or referencing alcohol in some countries, based on local law.

Advertisers must follow all applicable laws, including targeting their ads in accordance with legal requirements. At a minimum, ads may not be targeted to people under 18 years of age.

**Learn more**

## Adult Products or Services

Ads must not promote the sale or use of adult products or services. Ads promoting sexual and reproductive health products or services, like contraception and family planning, must be targeted to people 18 years or older and must not focus on sexual pleasure.

**Learn more**

## Dating

Ads for dating services are only allowed with prior written permission. These must adhere to the dating targeting requirements and our dating ad guidelines. Details on the requirements for permission can be found here. In order to seek permission, please fill out this form to begin your application process.

**Learn more**

PX0483-020

## Cosmetic Procedures and Wellness

Ads marketing weight loss products and services must be targeted to people at least 18 years or older.
Ads marketing cosmetic surgeries and procedures must be targeted to people at least 18 years or older.
Ads marketing dietary, health or herbal supplements must be targeted to people at least 18 years or older.

**Learn more**

## Online Pharmacies

Ads for online pharmacies are only allowed with prior written permission. Meta requires online pharmacies who wish to run ads to be certified with LegitScript.

Advertisers can apply for certification with LegitScript here. Advertisers can request permission from Meta using this form.

**Learn more**

## Over-The-Counter Drugs

Ads that promote the sale of over-the-counter medicines must comply with all applicable local laws, required or established industry codes, guidelines, licenses and approvals, and include age and country targeting criteria consistent with applicable local laws. At a minimum, ads may not be targeted to people under 18 years of age.

**Learn more**

PX0483-021

## Prescription Drugs

Ads may not promote prescription drugs without prior written permission.

The following entities are eligible to apply for permission from Meta: online pharmacies, telehealth providers and pharmaceutical manufacturers. Advertisers can learn how to apply here.

Ads may only promote prescription drugs in the following jurisdictions: United States, New Zealand and Canada.

Ads promoting prescription drugs must not be targeted to people under 18 years of age.

**Learn more**

## Drug and Alcohol Addiction Treatment

Meta requires advertisers who wish to run addiction treatment ads targeting people in the United States to be certified with LegitScript and apply to Meta for permission to advertise.

Advertisers can apply for certification with LegitScript here.

**Learn more**

PX0483-022

Introduction to the Advertising Standards | Transparency Center

## Financial and Insurance Products and Services

Ads promoting credit cards, loans or insurance services must be targeted to people 18 years or older and must not directly request the input of any personally identifiable information within the ad's destination (landing) page.

Advertisers promoting financial products and services must demonstrate they are authorized by the relevant regulatory authorities where this is a requirement; and any such authorization may be subject to review by Meta. Advertisers are also required to comply with disclosure requirements set by law.

Learn more about the authorization process in our Business Help Center.

**Learn more**

## Cryptocurrency Products and Services

Ads may not promote cryptocurrency trading platforms, software and related services and products that enable monetisation, reselling, swapping or staking of cryptocurrencies without prior written permission. To apply, please click here. For more information, see our Business Help Center.

**Learn more**

## Online Gambling and Gaming

Meta defines online gambling and gaming as any product or service where anything of monetary value is included as part of a method of entry and prize. Ads that promote online gambling and gaming are only allowed with our prior written permission. Authorized advertisers must follow all applicable laws and include targeting criteria consistent with Meta's targeting requirements. At a minimum, ads may not be targeted to people under 18 years of age. Learn more in our Business Help Center.

**Learn more**

PX0483-023

Introduction to the Advertising Standards | Transparency Center

## Social Casino Games

Ads for social casino games, which are online games that simulate casino gambling (e.g. poker, slots, roulette etc) where there is no opportunity to win money or money's worth, are allowed only if they are targeted to people 18 years or older. Learn more in our Business Help Center.

Please note, if the game allows virtual prizes to be bought or sold between players within the game and/or on secondary markets for money or money's worth, please refer to our Online Gambling and Gaming policy.

**Learn more**

## Subscription Services

Ads for subscription services must disclose information on pricing and recurrent billing.

**Learn more**

PX0483-024

CBD and Related Products

Ads may not promote or offer the sale of THC products or cannabis products containing related psychoactive components.

Ads that promote or offer the sale of cannabidiol (CBD) or similar cannabinoid products are only allowed with prior written permission. Meta requires advertisers promoting CBD products to be certified with LegitScript. Certified advertisers must comply with all applicable local laws, required or established industry codes and guidelines, including Meta's targeting requirements.

Ads may only promote or offer the sale of CBD in the United States, and must not be targeted to people under 18 years of age. Advertisers can apply for certification with LegitScript here. Advertisers can request permission from Meta using this form.

Ads may only promote or offer the sale of hemp products in Canada, Mexico and the United States, and must comply with all applicable local laws, required or established industry codes and guidelines.

For more information on this policy, visit our Business Help Center.

**Learn more**

# Intellectual property infringement

Content that infringes upon or violates the intellectual property rights of a third party or Meta.

PX0483-025

## Third-Party Infringement

Ads may not contain content that infringes upon or violates the intellectual property rights of any third party, including copyright, trademark or other legal rights. This includes, but is not limited to, the promotion or sale of counterfeit goods, such as products that copy the trademark (name or logo) and/or distinctive features of another company's products to imitate a genuine product.

**Learn more**

## Brand Endorsement

Ads must not imply an endorsement or partnership of any kind with any of Meta's brands, or an endorsement by any other Meta brand, technology or program.

**Learn more**

## Brand Usage in Ads

Ads linking to Facebook or Instagram content (including Pages, groups, events or websites that use Facebook Login) may make limited reference to "Facebook" or "Instagram" in ad text for the purpose of clarifying the destination of the ad.

Ads should not represent any of Meta's brands in a way that makes it the most distinctive or prominent feature of the creative. Meta's brand assets should not be modified in any way, such as by changing the design or color, or for the purpose of special effects or animation.

**Learn more**

PX0483-026

Copyrights and Trademarks

All other ads and destination (landing) pages must not use our copyrights, trademarks, or any confusingly similar marks, except as expressly permitted by the Meta Brand Resource Center, or with our prior written permission.

**Learn more**

User Interface Screenshots

When featuring the user interface (UI) of any Meta brands in an ad, the ad must accurately depict how the UI currently appears and functions in the product. If an action or functionality depicted cannot happen in the current product or within the current UI then it cannot appear to happen in an ad. Depictions of the UI in ads must be featured within the context of a relevant device (for example, mobile or desktop) and as permitted by the Meta Brand Resource Center. The UI may not be modified in any way, including but not limited to: adding special effects, interference or animation. Glyphs (special characters) or elements of the UI may not be used separately or individually.

**Learn more**

---

# Social issue, electoral or political advertising

Content that promotes social issue, electoral or political views.

PX0483-027

Ads about Social Issues, Elections or Politics

Advertisers can run ads about social issues, elections or politics, provided the advertiser complies with all applicable laws and the authorization process required by Meta. Meta may restrict issue, electoral or political ads. In addition, certain content related to elections may be prohibited by local law or removed in specific regions ahead of voting; click here for more.

**Learn more**

---

# Product and format-specific policies

Content associated with additional format-specific requirements.

Non-Functional Landing Page

Ads must not direct people to non-functional landing (destination) pages. This includes landing page content that interferes with a person's ability to navigate away from the page.

**Learn more**

PX0483-028

## Video Ads

Video ads and other dynamic ad types must comply with all of the rules listed in these Advertising Standards, including the Community Standards, as well as the policies below:

1. **Disruptive Content**
   Videos and other similar ad types must not use overly disruptive tactics, such as flashing screens.

2. **Entertainment Related Restrictions**
   Ads for movie trailers, TV shows, video game trailers and other similar content are only allowed with prior written permission from Meta and must target people who are 18 years or older. Excessive depictions of the following content within these ads are not allowed:

   1. Drugs and alcohol use

   2. Adult content

   3. Profanity

   4. Violence and gore

## Lead Ads

Advertisers must not create lead ads questions to request the following types of information without our prior written permission.

∨ **Learn more**

PX0483-029

Introduction to the Advertising Standards | Transparency Center

## Targeting

1. Advertisers must not use targeting options to discriminate against, harass, provoke, or disparage people or to engage in predatory advertising practices.

2. If advertisers target their ads to custom audiences, they must comply with the applicable terms when creating an audience.

## Relevance

1. Ads must clearly represent the company, product, service, or brand that is being advertised.

2. All ad components, including any text, images or other media, must be relevant to the product or service being offered.

3. The products and services promoted in an ad must match those promoted on the landing page. Learn more about ad quality best practices that can improve ad performance.

## Branded Content

Ads promoting branded content must tag the featured third party product, brand or business partner using the branded content tool. Branded content within ads is defined as a creator or publisher's content that features or is influenced by a business partner for an exchange of value. When promoting branded content integrations, advertisers must use the branded content tool (please learn more here on how to tag the featured third party product, brand or business partner).

PX0483-030



## Advertising policies affecting business assets

Beyond rejecting ads that violate our policies, we also review and take action, such as restricting the ability to advertise, on an advertiser's Business Account or its assets, such as ad accounts, Pages and user accounts for violating the below policies. If you believe your ad account, user account, Page or Business Account was incorrectly restricted, you can request a review of the decision in Account Quality

### Violating Content

Advertisers must comply with our advertising policies. If we find that an ad account, Page, user account, or Business Account has violated our policies, an advertiser may face advertising restrictions depending on the type and severity of the violation.

**Learn more**

### Evading Enforcement

Advertisers must not evade or attempt to evade our review process and enforcement actions. If we find that an ad account, Page, user account or Business Account is evading our review process and enforcement actions, an advertiser may face advertising restrictions.

**Learn more**

PX0483-031

## Account Authenticity

Advertisers must use authentic business assets to run ads across our technologies. If we find that an inauthentic user account, ad account, Page or Business Account was used to run ads, an advertiser may face advertising restrictions. Per Facebook's Community Standards, we may restrict or remove inauthentic user accounts.

**Learn more**

## Violating Networks or Associations

Advertisers must not manage business assets that are connected to other abusive business assets or display behavior similar to business assets that we've already taken down. If they do, an advertiser may face advertising restrictions on their associated ad account, Page, user account or Business Account.

**Learn more**

# Data use restrictions

1. Ensure any ad data collected, received or derived from your Facebook or Instagram ad ("Meta advertising data") is only shared with someone acting on your behalf, such as your service provider. You are responsible for ensuring your service providers protect any Meta advertising data or any obtained from us, limit their use of all of that information, and keep it confidential and secure.

2. Don't use Meta advertising data for any purpose (including retargeting, commingling data across multiple advertisers' campaigns, or allowing piggybacking or redirecting with tags), except on an aggregate and anonymous basis (unless authorized by Meta) and only to assess the performance and effectiveness of your Meta advertising campaigns.

3. Don't use Meta advertising data, including the targeting criteria for your ad, to build, append to, edit, influence, or augment user profiles, including profiles associated with any mobile device identifier or other unique identifier that identifies any particular user, browser, computer or device.

PX0483-032

4.  Don't transfer any Meta advertising data (including anonymous, aggregate, or derived data) to any ad network, ad exchange, data broker or other advertising or monetization related service.

# Things you should know

1.  The Advertising Policies apply to (1) ads and commercial content served by or purchased through Meta, on or off the Meta services, including ads purchased under AAAA/IAB Standard Terms and Conditions, (2) ads appearing within apps on Meta, and (3) ads on Instagram. Your use of Meta's advertising products and services is part of "Meta" under Meta's Statement of Rights and Responsibilities ( https://www.facebook.com/legal/terms , the "SRR") and is subject to the SRR. You may be subject to additional terms or guidelines if you use Instagram or certain Meta advertising-related products or services.

2.  Advertisers are responsible for understanding and complying with all applicable laws and regulations. Failure to comply may result in a variety of consequences, including the cancellation of ads you have placed and termination of your account.

3.  We do not use sensitive personal data for ad targeting. Topics you choose for targeting your ad don't reflect the personal beliefs, characteristics or values of the people who use Facebook or Instagram.

4.  Once displayed, ads are public information. Ads may be re-shared and accessed outside of the targeted audience, including from the Facebook Page running the ads or within Meta Products. If users have interacted with your ad, your ad may remain on Meta products (for example, shared until the users delete it or visible to users through their account tools). If your ad is a political ad, it will be displayed in our Ad Library. This means that Meta may display (at no cost to you) and provide access to the ad content and creative, as well as information about the ad campaign (such as total spend and delivery data) for a period of seven (7) years from the completion of your order. Meta may disclose your advertising content, and all information associated with your advertising, to a governmental entity or body if Meta believes that disclosure would assist in a lawful investigation.

5.  If you are managing ads on behalf of other advertisers, each advertiser or client must be managed through separate ad accounts. You must not change the advertiser or client associated with an established ad account; set up a new account. You are responsible for ensuring that each advertiser complies with these Advertising Policies.

6.  As stated in our Community Standards, you must not sell, rent, buy or exchange site privileges, such as administrative access, for assets that belong to you or that you manage. Helping anyone evade or circumvent our enforcement of our policies or terms of service is also prohibited.

PX0483-033

7. We reserve the right to reject, approve or remove any ad for any reason, in our sole discretion, including ads that negatively affect our relationship with our users or that promote content, services, or activities, contrary to our competitive position, interests, or advertising philosophy.

8. For policies that require prior written permission, Meta may grant these permissions.

9. These policies are subject to change at any time without notice.

# Transparency requirements under the EU Digital Services Act

Meta is required by EU law to ensure that its users located in the EU, and associated territories, are able to identify certain information about each ad that they see, including information about the natural or legal person on whose behalf the advertisement is presented and the natural or legal person who is paying for the ad (if different). In order for Meta to be able to meet its obligations, when creating an ad, you are required to provide the following information in the associated text fields:

- **Beneficiary field**: the full legal name of the person, company, business, charity or institution on whose behalf your ad is being presented.

- **Payor field (if different from above)**: the full legal name of the person, company, business, charity or institution who paid for the ad.

You are responsible for ensuring that this information is complete, accurate and up-to-date for each ad that you submit to Meta, and that it remains so for the entirety of the period during which the ad is running.

Learn more.

**NEXT** ⊕

## Other policies

PX0483-034

← **PREVIOUS**

# Facebook Community Standards



**POLICIES**

**ENFORCEMENT**

**SECURITY**

**FEATURES**

**GOVERNANCE**

**REPORTS**

**RESEARCH TOOLS**

Privacy Policy  •  Terms of Service  •  Cookies

PX0483-035

# PX0484

Case 1:20-cv-03590-JEB    Document 347-3    Filed 05/24/24    Page 322 of 714

4/10/24, 6:38 PM    "We're going to kill you all": Death threats against US election workers approved on Facebook | Global Witness

ARTICLE | DEC. 1, 2022

# "We're going to kill you all": Death threats against US election workers approved on Facebook

Share this     

DIGITAL THREATS    UNITED STATES

An investigation by Global Witness and the NYU Cybersecurity for Democracy (C4D) team looked at Facebook, TikTok, and YouTube's ability to detect and remove death threats against election workers in the run up to the US midterm elections.

PX0484-001



ELECTION WORKERS PROCESSING AND COUNTING BALLOTS ON ELECTION NIGHT IN DOWNTOWN DENVER. *KATHRYN SCOTT OSLER/THE DENVER POST VIA GETTY IMAGES*

The investigation revealed starkly contrasting results for the social media giants: YouTube and TikTok suspended our accounts for violating their policies, whereas Facebook accepted 15 of the 20 advertisements containing death threats that we submitted to them for publication.

## Our investigation

We tested the ability of Meta's Facebook, Google's YouTube, and TikTok to enforce their own policies on harmful content. We did this by identifying 10 of the worst examples of death threats issued against election workers in the US and then submitting them to the three platforms in the form of advertisements and recording whether the platforms accepted them for publication or not.

All the death threats were real examples of previous threats against election workers that had been reported in the media. They included statements that people would be killed, hanged, or executed, and that children would be molested [1].

We removed profanity from the death threats and corrected grammatical errors, as in a previous investigation Facebook initially rejected ads containing hate speech for these reasons and then accepted them for publication once we'd edited them.

We submitted the death threats in the form of ads as this enables us to schedule them in the future and, importantly, to remove them before they go live, while still being reviewed by the platforms and undergoing their content moderation processes.

PX0484-002

The death threats we used as sources were all originally in English; we submitted them to the platforms in both English and Spanish.  The adverts consisted of an image of a US election worker with the death threat written in clearly legible text over the top.  All of the death threats were chillingly clear in their language; none were coded or difficult to interpret.  All of the ads violate Meta, TikTok and Google's ad policies.

We submitted the ads on the day of or the day before the 2022 US midterm elections.

Our experimental protocols were reviewed and deemed to not be human subjects research by New York University's Institutional Review Board, which reviews the ethics of experiments involving human research subjects.

## Our findings

After we submitted the ads containing death threats, TikTok and YouTube suspended our accounts for violating their policies.

Facebook, however, behaved very differently.  The platform approved nine of the ten English-language death threats for publication and six of the ten Spanish-language death threats.  Our account was not closed down despite a handful of ads having been identified as violating their policies.

Global Witness approached Facebook's owner, Meta, for comment on these findings and a spokesperson responded: "This is a small sample of ads that are not representative of what people see on our platforms. Content that incites violence against election workers or anyone else has no place on our apps and recent reporting has made clear that Meta's ability to deal with these issues effectively exceeds that of other platforms. We remain committed to continuing to improve our systems."

We asked Meta for the evidence that supports the claim that the platform is better at dealing with incitement to violence than other platforms.  Meta provided quotes from technology experts published in the media that note that Meta has more resources devoted than other platforms and that it does better at moderation than some alt right platforms.

While these assertions may be factual, they don't constitute evidence that Meta is better at detecting incitement to violence than other mainstream platforms. In addition, there should be no tolerance for failure before a major election, when tensions and potential for harm are high.

We have carried out similar investigations into platforms' ability to detect harmful content in Brazil and the US.  In both cases we looked at blatant election disinformation.

In Brazil, we found that both Facebook and YouTube accepted all of the election disinformation we submitted to them (and that Facebook continued to accept some of the ads when we submitted them a second time).  We didn't test TikTok.

In the US, we found that TikTok accepted all of the election disinformation we submitted to the platform, Facebook accepted 20-50% (depending on the day and the language) and, as we found here, YouTube suspended our account.

## What needs to change

PX0484-003

**Platforms need to treat all users, no matter where they are in the world, equally.**  We are encouraged to see that YouTube has successfully detected election disinformation and death threats to election workers in the US, but discouraged to see that they failed to detect election disinformation in Brazil.

**Platforms need to demonstrate that they can enforce their own policies.** In particular, the track record of Facebook in being able to detect and remove the worst kinds of dangerous content is appallingly bad: their policies may look reasonable on paper but they are meaningless unless they are enforced.

The fact that YouTube and TikTok managed to detect the death threats and suspend our account whereas Facebook permitted the majority of the ads to be published shows that what we are asking is technically possible.

While the EU is taking a lead globally to regulate Big Tech companies and force meaningful oversight, platforms should also be acting of their volition to protect their users fully and equally.

We call on Meta to:

- Urgently increase the content moderation capabilities and integrity systems deployed to mitigate risk around elections.
- Properly resource content moderation in all the countries in which they operate around the world, including providing paying content moderators a fair wage, allowing them to unionize and providing psychological support.
- Routinely assess, mitigate and publish the risks that their services impact on people's human rights and other societal level harms in all countries in which they operate.
- Publish information on what steps they've taken in each country and for each language to ensure election safety.
- Include full details of all ads (including intended target audience, actual audience, ad spend, and ad buyer) in its ad library.
- Allow verified independent third party auditing so that they can be held accountable for what they say they are doing.
- Publish their pre-election risk assessment for the United States.

DOWNLOADS

Download a PDF version of this page

(671.1 KB), pdf

Global Witness is a not-for-profit organisation working to hold companies and governments to account for their destruction of the environment, their disregard for the planet and their failure to protect human rights. We have offices in London, Brussels and Washington DC.

NYU Cybersecurity for Democracy is a research-based, nonpartisan, and independent effort to expose online threats to our social fabric – and

PX0484-004

recommend how to counter them. We are part of the Center for Cybersecurity at the NYU Tandon School of Engineering.

[1] Researchers interested in knowing the exact wording of the political ad examples we used are welcome to request this from us by writing to digitalthreats@globalwitness.org

## Related to Digital threats



The Election Commission has disqualified the largest opposition parties from standing in the 2024 election. Their votes will not be counted.

~SAMPLE AD~

PRESS RELEASE | APRIL 02, 2024

**YouTube approves disinformation ads in India ahead of general election**

ARTICLE | APRIL 02, 2024

**"Votes will not be counted": Indian election disinformation ads and YouTube**



PRESS RELEASE | FEBRUARY 01, 2024

**YouTube and Indian social media platform Koo enable misogynistic hate speech, violating platform policies**

     

 

global witness

| Contact us | Press releases | About us | Jobs | Support us | Privacy | Terms of use | Cookie Policy | Feedback | Share information securely with us |

© Global Witness 2024 (Global Witness is not responsible for the content of external sites)

PX0484-005

# PX0485



**User Name:** FSPQS0A
**Date and Time:** Thursday, April 11, 2024 12:29:00PM EDT
**Job Number:** 221715957

## Document (1)

1. *Facebook Failed to Stop Ads Threatening Election Workers*
   **Client/Matter:** -None-

PX0485-001

### *Facebook Failed to Stop Ads Threatening Election Workers*

The New York Times

December 1, 2022 Thursday 10:58 EST

Copyright 2022 The New York Times Company All Rights Reserved

**Section:** TECHNOLOGY

**Length:** 574 words

**Byline:** Stuart A. Thompson
**Highlight:** The ads, submitted by researchers, were rejected by YouTube and TikTok.

## Body

The ads, submitted by researchers, were rejected by YouTube and TikTok.

Facebook says it does not allow content that threatens serious violence. But when researchers submitted ads threatening to "lynch," "murder" and "execute" election workers around Election Day this year, the company's largely automated moderation systems approved many of them.

Out of the 20 ads submitted by researchers containing violent content, 15 were approved by Facebook, according to a new test published by Global Witness, a watchdog group, and New York University's *Cybersecurity for Democracy*. Researchers deleted the approved ads before they were published.

Ten of the test ads were submitted in Spanish. Facebook approved six of those ads, compared with nine of the 10 ads in English.

TikTok and YouTube rejected all the ads and suspended the accounts that attempted to submit them, the researchers said.

The tests underscored the challenges that social networks face in moderating increasingly partisan and violent content around elections, especially as poll workers are facing additional threats from election deniers and far-right extremists. The Justice Department and other federal agencies *warned* ahead of this year's midterm elections that threats against election workers had surged.

In a statement, a spokesman for Meta, Facebook's parent company, said it later disabled several accounts that had submitted the ads. The company also said that ads continue to be reviewed after they go live.

"This is a small sample of ads that are not representative of what people see on our platforms," the spokesman said in a statement. "Content that incites violence against election workers or anyone else has no place on our apps, and recent reporting has made clear that Meta's ability to deal with these issues effectively exceeds that of other platforms."

The research adds to *previous tests* conducted by the same groups, including one this year in which 20 ads were submitted containing political misinformation. In that test, Facebook approved only two of the misleading ads in English from an account in the United States, while TikTok approved about 90 percent of them. YouTube suspended the account that tried to submit the ads.

But this round used more overt language that tested Facebook's largely *automated moderating system*. Those included direct threats of violence, which were sourced from real statements by election deniers and other far-right extremists in the United States. One ad, which was approved by Facebook, read: "We are going to kill you all." Another ad, which threatened to abuse children, was also approved.

PX0485-002

Facebook Failed to Stop Ads Threatening Election Workers

"It was really quite shocking to see the results," said Damon McCoy, an associate professor at N.Y.U. "I thought a really simple keyword search would have flagged this for manual review."

In a statement, researchers also said they wanted to see social networks like Facebook increase content moderation efforts and offer more transparency around the moderation actions they take.

"The fact that YouTube and TikTok managed to detect the death threats and suspend our account, whereas Facebook permitted the majority of the ads to be published shows that what we are asking is technically possible," they wrote.

PHOTO: Ads threatening to "lynch," "murder" and "execute" election workers in recent months were approved by automated moderation systems. (PHOTOGRAPH BY ANNA WATTS FOR THE NEW YORK TIMES) This article appeared in print on page B5.

**Load-Date:** December 2, 2022

---

**End of Document**

# PX0486

**Written Testimony of Arturo Bejar before the Subcommittee on Privacy, Technology, and the Law, November 7, 2023**

Subcommittee Chair Blumenthal, Subcommittee Ranking Member Hawley, and members of the Subcommittee:

My name is Arturo Bejar and I am a dad with firsthand experience of a child who experienced unwanted sexual advances on Instagram and an expert with 20 years of experience working as a senior leader, including leading online security, safety, and protection at Facebook.

From 2009 to 2015, I was the senior engineering and product leader at Facebook responsible for its efforts to keep users safe and supported. I ran a group called Protect & Care. It was responsible for "Site Integrity" – stopping attacks and malicious behavior; "Security Infrastructure" – which engineered resilient systems and worked on compliance; and a group called "Care"– which developed Facebook's user-facing and internal customer care tools. I also oversaw the child-safety tools. I reported directly to CTO Mike Schroepfer, who himself reported to Mark Zuckerberg. For each of these areas I was responsible for the combined effort of engineering, product, user research, data, and design. This included doing strategic product reviews every six months with the Facebook executive team including: Mark Zuckerberg, Sheryl Sandberg, and Chris Cox.

When there was a significant engineering security, site integrity, child safety, or care issue, I was one of the people that the executive team worked with to oversee investigations, help craft accurate responses to external enquiries, and to coordinate engineering and product changes where needed in those areas. For most of that time I was also the manager for Facebook's "Product Infrastructure" team, which built key parts of the product engineering frameworks of Facebook, and developed REACT, one of the core technologies of the web today. Prior to that I had been recruited to Facebook from Yahoo! where I worked from 1998 to 2009. I was hired as Yahoo!'s first product security engineer, eventually becoming head of Information Security reporting to the CTO.

Earlier this year, I was subpoenaed to testify under oath about emails I sent Facebook's executive team as part of a government investigation and I realized that I had written these emails over two years ago and yet nothing had changed.  Meta continues to publicly misrepresent the level and frequency of harm that users, especially children, experience on the platform, And they have yet to establish a goal for actually reducing those harms and protecting children. It's time that the public and parents understand the true level of harm posed by these "products" and it's time that young users have the tools to report and suppress online abuse.

While leading Facebook's Protect & Care group up until 2015, I spent much of my time working on ways to make it easier for users to tell the company when things weren't going right for them on the service. That included building tools to make it easier to report problems, as well as creating survey tools so the company could understand what people were experiencing and how they felt about the service and its features. When I left in 2015, after six years at the company, I felt good that we had built numerous systems that made using our products easier and safer.

I left in part because I wanted more time with my family.  My daughter was entering her teenage years. Like most young Americans she is an avid user of social media, particularly Instagram and Snapchat. But as a result, I got an up-close look at the experience of a real young person's daily experience on these products. While there is plenty of good that comes from her time using social media, frequently she has to deal with awful problems. Since they were 14, my daughter and all of her friends have repeatedly faced unwanted sexual advances, misogyny, and harassment. This has been profoundly distressing to them (and to me). But even though social media services enabled these distressing experiences, the services provided little or no help to her in dealing with them. And their experience is far from unique. In fact it's common. So in 2019, I decided I wanted to see why my kids and their friends were having these problems, and went back to Facebook as an independent consultant. I stayed for two years, working with the team at Instagram that focused on "well-being."

It was not a good experience. Almost all of the work that I and my colleagues had done during my earlier stint at Facebook through 2015 was gone.  The tools we had built for teenagers to get support when they were getting bullied or harassed were no longer available to them. People at the company had little or no memory of the lessons we had learned earlier.

The most important lesson we learned about teens before 2015 was that when one of them asks for help, the content that was involved in the incident does not matter as much as giving them support to help them in the moment. So we built a tool that asked them–using language we tested and developed in partnership with teens–what was happening, what emotion they were experiencing, and how intense it was. Based on that information, we could better offer specific help.

The process worked, at the beginning of this process, when we were giving them tools to deal with 'bullying and harassment,' 11% of 13-14 year olds completed the flow, as we called this series of questions. By the end of it, for a flow with more steps that covered a wider variety of problems, 82% were completing the flow. What that showed us is that if the steps we offer are helpful in a moment of need, teens will take them.

At this time we knew that well over 90% of the issues that people were reporting did not technically violate company policy. Most importantly and initially surprisingly, we learned that

in 50% of the issues teens were flagging as the most intense bad experiences, the content involved was discernibly benign to us, as outside observers.

And our feedback tools also showed that 90% of the time, the people who posted content that got reported by another user, said they did not intend it to be upsetting to someone else.

By the time I left, in 2015, based on experience, we had learned that to obtain the best measure of the success of a support flow, we simply needed to ask 'Did you get help with what you needed?'

When I returned in 2019, I was confounded. There were a great many motivated and talented team members working on online safety. But no one on that team was aware of the work we had done at Facebook and the lessons we had learned four years earlier. The group at Instagram and the talented internal research teams had developed some very troubling evidence that young teens were experiencing great distress and abuse on the Instagram platform. But senior management was externally reporting different data that grossly understated the frequency of harm experienced by users.

I was committed to understanding this gap and began to assemble some of the research in order to convey the problem to senior leaders. Eventually, on October 5, 2021, after having the analysis reviewed internally, I sent a detailed email to Mark Zuckerberg and the other senior leaders detailing what I had found. First, I pointed out how the reporting process grossly understated misconduct on the site. I explained that the number of people reporting to surveys that they had a negative experience on Instagram was 51% *every week* but only 1% of those reported the offending content and only 2% of those succeeded in getting the offending content taken down.

Thereafter, I detailed the staggering levels of abuse that teens aged 13-15 were experiencing every week. The initial data from the research team indicated that as many as 21.8% of 13-15 year olds said they were the target of bullying *in the past seven days*, 39.4% of 13-15 year old children said they had experienced negative comparison, *in the past seven days*, and 24.4% of 13-15 year old responded said they received unwanted advances, all in the prior seven days. Later, the research team revised the survey results to state that the likely number of 13-15 year old children receiving unwanted sexual advances in the past seven days was likely *only* 13 percent, still a shocking number. Obviously, an even higher percentage of these children are receiving unwanted sexual advances on a monthly basis.

The reaction was not constructive. Sheryl Sandberg expressed empathy for my daughter but offered no concrete ideas or action. Adam Mosseri responded with an request for a follow up meeting, Mark Zuckerberg never replied. That was unusual. It might have happened, but I don't

recall Mark ever not responding to me previously in numerous communications, either by email or by asking for an in-person meeting.

## Today, most harm remains unaddressed

Most of the distress people experience online because of unwanted contact and content is not addressed today by Meta and other social media companies. I say that based on my extensive experience working to keep users safe, along with my direct knowledge of extensive research and data about what people experience on Meta's services and elsewhere online. But it's not just that the companies disregard people's distress. The way they respond to problems often makes those problems worse, because it normalizes harmful behavior and encourages unwanted contact and content. In addition, the way companies talk about these problems to regulators, policy makers, and the general public is seriously misleading.

It's been almost two years since I left Instagram, and as it stands right now, I don't believe anything is going to change. All this time there has been extensive harm happening to teenagers, and the leadership has been aware of it, but they have chosen not to investigate or address the problems. I know because I respectfully communicated this directly to the executive team in 2021, and have watched them do essentially nothing in response. One key fact I told company leaders, for example, was that based on carefully-crafted and vetted surveys, we had identified the disturbing fact that 13% of Instagram users aged 13-15 self reported having received unwanted sexual advances via the platform *within the previous seven days*. That is an awful statistic. Looked at over time, it is likely the largest-scale sexual harassment of teens to have ever happened, and one that clearly calls for action.

Instagram's stated mission is to provide a safe and supportive place. As I was preparing these documents, someone wrote to a teenager I know asking them to sell nude photographs of themselves. It is September of 2023, two years after my briefings, and there is still no way, so far as I or teenagers I know can determine, for a minor to flag a conversation in Instagram to indicate it contains unwanted sexual advances. And this is just one of several categories of meaningful harm that teenagers experience. An environment where unwanted sexual advances are normalized is hardly safe and supportive.

There are plenty of things that need to change about how social media systems function in society. A number of states are already introducing laws that impose restrictions on how young people can use such systems. The U.S. Surgeon General recently released a statement underscoring his grave concern about what the services are doing to our children.

## The platforms must change how they identify and measure unwanted contact

But regardless of other reforms, I have realized that in order to begin to reduce the harm they facilitate, social media companies have to be compelled to change how they identify and measure users' exposure to unwanted contact. In addition, the services must be compelled to publicly report these measurements. Doing so will inevitably encourage them to introduce features that enable users to better deal with those harms. For example, public earnings calls or other formal public processes should include a report on the percentage of teenagers who experienced unwanted sexual advances in that quarter.

Social media companies are not going to start addressing the harm they enable for teenagers on their own. They need to be compelled by regulators and policy makers to be transparent about these harms and what they are doing to address them.

In order to support regulatory and transparency efforts, I am proposing, based on my experience as a senior leader who used to manage these areas and respond to regulatory enquiries, a group of measures that I believe are pragmatic and straightforward to implement. These could help start the process of change. These measures do not require significant investments by the platforms in people to review content or in technical infrastructure. However, they do require the leadership of social media companies to prioritize. They will ensure that the companies have enough people, infrastructure, and know-how to implement these recommendations quickly.  This document provides an overview. Below are links to documents with more detailed explanations, which aim to support further action around the different areas.

My goal in all this, as a father and as an engineer who has worked on these problems for many years, is to help regulators, policy-makers, academics, journalists, and the public better understand how companies think about these problems and what it would take to address them. I also want to create a meaningful increase in support for integrity and trust and safety workers at the companies. I am not selling anything, nor will I be looking for work in this field. This is my statement of retirement from the technology industry, which I will make freely available and open for comments. Any work I do in the future to support regulators or others committed to reducing harm on social media will be pro bono.

Meta's current approach to these issues only addresses a fraction of a percent of the harm people experience on the platform. In recent years, repeated examples of harm that has been enabled by Meta and other companies has come to light, through whistleblowing, outside research studies, and many stories of distressing experiences people have there.  Whenever such reports emerge, Meta's response is to talk about 'prevalence', and its investment in moderation and policy, as if that was the only relevant issue. But there is a material gap between their narrow definition of prevalence and the actual distressing experiences that are enabled by Meta's products. However, managers including Meta CEO Mark Zuckerberg do not seem to seek to understand or actually address the harms being discussed. Instead, they minimize or downplay published findings, and

even sometimes the results of their own research. They also try to obfuscate the situation by quoting statistics that are irrelevant to the issues at hand.

## Successful reforms must be based on data

Social media companies, and Meta in particular, manage their businesses based upon a close and ongoing analysis of data. Nothing gets changed unless it is measured, so it is critical that when it comes to unwanted and distressing content, the data gathered and metrics established be based on people's actual experiences. This is a company guided by data. Once Meta establishes metrics for anything, employees are given concrete incentives to drive those metrics in the direction the company deems useful and valuable. Metrics determine, for example, how many people work in a given department. Most of all, metrics establish the companies' priorities.

When outside critics point to harms caused by Facebook or Instagram, I have often observed Meta CEO Mark Zuckerberg and his managers try to change the conversation to the things they measure. If the problems identified are not problems that the company's systems are designed to detect and measure, managers literally have no means to understand them. Zuckerberg is unwilling to respond to criticisms of his services that he feels are not grounded in data. For Meta, a problem that is not measured is a problem that doesn't exist.

When I worked at Facebook, I helped design, introduce, and manage systems that measured important harms as well as methods to reduce those harms, for teens and others. However, many of those systems were later shut down or changed completely in ways that degraded their effectiveness. Meanwhile, the range of unwanted content that people receive has increased in scope, reach, and intensity. So now I believe it is necessary for outsiders–that means governments and regulators–to step in and require metric-based goals based on the harm that teenagers experience, as well as transparent systems of public reporting and disclosure based upon what those tools reveal. I know from experience that this is possible to do methodically and effectively.

I have specific recommendations for regulators, to require any company that operates social media services for teenagers to develop certain metrics and systems. These approaches will generate extensive user experience data, which then should be regularly and routinely reported to the public, probably alongside financial data. I believe that if such systems are properly designed, we can radically improve the experience of our children on social media.  The goal must be to do this without eliminating the joy and value they otherwise get from using such services.

I don't believe such reforms will significantly affect revenues or profits for Meta and its peers. These reforms are not designed to punish companies, but to help teenagers. And over time, they will create a safer environment.

Any of these reforms could have been introduced voluntarily by the companies earlier, and in fact the Protect & Care team successfully implemented measures based on these principles at Facebook as much as 10 years ago. But those were abandoned, along with the entire underlying approach we developed. Now, we are faced with the unwillingness of companies on their own to seek to understand the range of unwanted content they recommend and the unwanted contact they enable. Because of their unwillingness to develop and maintain tools and improvements in the face of material data and evidence of harms, they must be required to do so.

There are many opportunities for impactful and helpful innovation, if companies are required to set their priorities and devote resources with the goal of reducing the amount of unwanted and distressing content that teens experience. Much of that innovation might eventually spring from the companies themselves. But the product features, policies, and punishments Meta and other companies have today are necessary but not sufficient. They are clearly not able to create a safe environment for teens online. These include their existing reporting, policy, and punishment systems, as well as the inadequate tools they offer today to enable users to block or restrict other users.

## What regulators and governments can do right away

Regulators should require changes in three areas:

1. Users ought to be given the ability to signal that they have experienced unwanted contact in messages or comments to their posts. They also need to be able to share with the platform the reason why that contact is unwanted. Currently, platforms make it unnecessarily difficult for people to report unwanted contact, and they often compel users to mischaracterize their experience in order to report it within the narrow categories defined by their policies. The reporting categories they provide do not match what people are experiencing. People, especially teens, need to be presented with options that are relevant, clear, and flexible. For example, the options presented to users for the reason contact may be unwanted could include "because it's gross", "it's harassing me", "it's fake", etc. When we did such work in the past, giving teens options that matched their experience led to meaningful increases in their use of the support tools.

2. People should have a voice about the content they experience. That can be achieved by giving them the ability to curate their own content "feed" to avoid unwanted or unhealthy interactions. This can be done by creating a feedback mechanism to indicate the content

that makes them uncomfortable and the reason why. Such a process would be straightforward to implement, it is already implemented in advertising for Instagram and Facebook. Such a mechanism should also be applied to products like Reels or other algorithmically-controlled recommendation systems. Again, users should be given the ability to share the reason why certain interactions or information they are exposed to makes them uncomfortable. One example of a possible response made available for teens might be "it makes me feel bad about myself."  Information gathered from such responses should be used to improve recommendations, and to improve the community experience over time. Algorithms are only as good as their inputs, and without meaningful feedback and programming adjustments, they will continue recommending unwanted content.

3. Work on addressing these harms needs to be done in partnership with experts in the relevant fields. Company product managers and engineers don't have sufficient knowledge or expertise in social science and other areas of relevance. Policy team members, who often do have more knowledge, do not, however, drive product design. Issues such as self-image, addiction or problematic use, and bullying and harassment ought to be addressed by creating product features in close partnership with people who have experience and are experts in the subject, such as outside academics. Meta has sometimes said that this cannot be done without violating user privacy and security, but that is misleading. As part of my work at Facebook we did this regularly and without impinging on user privacy. The company can bring in third parties and give them access to all the necessary data, while still remaining bound by the privacy and security standards it has promised. There are also processes which appropriately anonymize data in order to share findings.

(I include more detailed thoughts about how to consider regulation below)

## Those who initiate unwanted actions need to be considered, too

When it comes to the people who initiate unwanted messages or post unwanted content, mechanisms should be implemented to give them private feedback so they can understand the impact of their actions. The feedback they receive should explain the reason why that content was not desired or appropriate. Of course, safety is a key consideration in the design of these features. The principle ought to be that all users, even apparent offenders, deserve to be treated with respect and, at least initially, be given sufficient information to enable them to operate as respectful community members. Today, content creators are often surprised when they lose access to their account, or see the distribution of their content restricted, and frequently do not know why it happens. Most creators would in fact appreciate knowing the reasons why they lose

users and what they can do to help their content reach more people. Only if they repeatedly disregard such warnings should they be restricted from features or distribution.

If you give people respectful private feedback, I learned in my work there that many if not most of them will adjust their behavior. Most people who initiate interactions that others don't want do so with what they themselves consider to be positive intentions. Several sociological studies have come to this conclusion, and it corresponds to what I learned at Facebook, where research studies that were conducted multiple times found that, for content other users had reported as problematic, the intent of the content creator was, in their own mind, positive or neutral 90% of the time. Of course, there were 6% of people who posted problematic content who did so despite knowing it could be upsetting, and 4% of them did it with a deliberate intent to provoke. There are trolls on these services, for sure. But if you put yourself in the seat of the people who share content you've seen that is upsetting, you will often find that they have shared it because it was important to them, because they thought it was funny, or maybe because they are afraid of something happening to their friends. Most people who have unintentionally done something that is distressing to someone else would like to know about it, as long as the feedback is delivered privately and respectfully.

Importantly, the process of giving feedback to people who take unwanted actions helps a service then identify those who nonetheless ignore that feedback. People who repeatedly engage in behavior that is distressing to others definitely require further response and restrictions. These measures are intended to separate well-meaning community members from trolls.

## I oppose censorship

It is essential to note that in all of these approaches I'm not advocating for censorship. I believe in the importance of free expression. However, free expression should not allow an individual to send someone direct messages (DMs) that harass them, or to make misogynistic or hateful comments on a teenager's posts. There should be no right to harass.

Underlying this approach is the belief that in order to reduce distressing experiences for people, the most important area social media companies should work on is social norms. The current approach, based on setting legalistic definitions within policies and reactively removing content, is not sufficient. More importantly, it does not address the majority of the distressing experiences people face. What must guide the design of features to make people feel safe with each other in social media should be the actual experience of users.

Social media is unlike most environments where people spend time, because in general it does not have sufficient accepted and maintained social norms. What makes a workplace, school, or park feel safe, by contrast, is mostly not the policing, but rather how people just know how to

behave. We would never tolerate routine sexual advances to teens at our local supermarket. However, on Instagram, Meta, and other social services at the moment, we completely tolerate that happening.

**Real World Standards Should Apply to Social Media**

It has been implicitly argued by many that we must accept unconscionable levels of misogyny, sexually explicit content and unwanted advances, depression, bullying and other harms as an unavoidable cost of having social media. Many at Meta and elsewhere would falsely argue that we must accept it because it is merely a reflection of the "real world." This is wholly false. First, as we have seen, dangerous and harmful experiences occur on Instagram at a rate exponentially greater than the real world. Second, the reverse is actually true. The tools and algorithms that can be applied to our social media mean that Instagram and Facebook should be far safer than the real world. Meta can make these platforms far safer for our children if they were motivated to do so.

**Mandatory Measurement and Transparency Will Drive Accountability**

I have spent my career working in some of the most successful corporations. One thing that is common among any successful company is a discipline of setting quantifiable goals and then holding people accountable for achieving those goals. It works. What works even better is public accountability. Every public company reports its financial results every quarter and the public markets impose swift consequences for companies and executives that fall short of the quantifiable goals. Because of that accountability, the leaders are sharply focused on those results.

The same principle can apply to online safety. Establishing consistent measurements of key harms and then requiring publication of those results every quarter will ensure parents and the public can hold companies accountable. And embarrassing or eroding safety measurements will be something that leaders will want to avoid. Public and measurable accountability is a key element of making these platforms safe for children.

# More Detailed Thoughts about Regulatory Approaches and Processes

The most effective way to regulate social media companies is to require them to develop metrics that will allow both the company and outsiders to evaluate and track instances of harm, as experienced by users. This plays to the strengths of what these companies can do, because data for them is everything. If something cannot be evaluated by data analysis, it is generally very difficult for Meta and other such companies to understand the problem or take action.

PX0486-010

Process-based or policy-based regulations are essential for security and privacy. In order to effectively regulate the safety of a social media environment, the focus should be on metrics based on user experience.

It is critically important that users be given tools inside the product to communicate to the company about their experience of unwanted experiences and harm in the product. These should take the form of a statistically significant rolling survey. Companies have well developed methodologies to create surveys that accurately represent the different populations that use their product. As well as tools to communicate when something goes wrong. And when they use such tools, not only should they get a useful response from the company, but their experience should contribute to anonymized aggregated data that the companies are required to compile and publicly report.

My years of work in engineering, product, security, and compliance have convinced me that the most effective way to regulate the harms that social media enables is to require platforms to use and report different metrics than those they have historically used. (In the past the companies have not sufficiently tracked negative experiences of users.)  If the proper metrics are transparently reported, a societal dialogue can develop which will eventually lead to our teenagers operating in safer online spaces.

We hear often in the press of new kinds of harms being experienced on these services. We also hear about existing harms being handled inappropriately. Whenever that happens, it represents a failure in the design or implementation of the service's tools for reporting problems..

Below, I include a variety of recommendations for specific ways that regulators can require data to be regularly published by social media platforms.

A few notes on the recommendations that follow:

- Social media companies have robust tools and sophisticated processes to do "quantitative surveys". These are surveys that gather enough data to be representative of a population. what's known as "statistically-significant." This surveying approach is sustainable because it reduces the number of people that need to be surveyed, and applies different well-known techniques that can reduce the impact of bias in survey responses.
- I say users ought to be able to "flag" content when it causes them discomfort. By this I mean giving users a simple way to indicate to the service that an interaction or piece of content is unwanted. It could be done by swiping, hitting an 'X' button, or by some other method. Flagging should always be followed by the option to give more context. If the

user does not want to supply this information, that option should be able to be easily ignored by scrolling away. Such interactions should feel rewarding and easy to use.

- The process to follow in order to develop the right options in user dialogues about harms they experience can be based on the document Lessons learned while working on online bullying.
- "Support tools" help people with an issue they encounter, regardless of whether it would properly be "reported" for content review. Depending on the nature of the issue, the support tools might include the option for the user to submit a report.
- "Report flows" are the steps people take to submit content for content moderation review.

Any social media service that is used extensively by teenagers should be required to gather and publicly report the following sorts of data:.

1. Create and deploy a survey process that asks questions of teenagers who have experienced harm. This should be done through a quantitative survey, based upon a statistically-significant population. The survey should be carefully designed in order to understand the experience of harms encountered by teenagers across the service, and be reflective of the demographics of the full population (for example age, location). Results should be disclosed based upon metrics like age, gender, geography, race, etc.

   Example questions:
   - In the last 7 days, did you receive any unwanted sexual advances?
   - In the last 7 days, has someone insulted or disrespected you, spread rumors about you, threatened you, or excluded you?
   - In the last 7 days, have you seen someone saying something discriminatory against someone else because of their body?
   - In the last 7 days, have you felt worse about yourself because of someone else's posts?

   Data should include:
   - The area or feature of the service where the harms have been experienced. Was it in direct messages? In the comment on a post or photograph? In a photograph itself? Each of these categories should be reported.
   - A breakdown of such experiences by the age of the user.
   - What did the person do after they experienced the harm?

2. In order to ensure that teens are always able to report problems or ask for help when they need to, the following quantitative survey should be run routinely, and the results ought to be publicly reported every quarter. It should be a stated goal that 90% of teenagers should answer yes to both of the following questions. If that percentage is not achieved,

penalties should be levied against the company. The goal ought to be to make sure that there is something users can easily do when they have a bad experience, and that users know it.  They also should feel the company's response helps them deal with the issue at hand.

- If something bad happens to me or someone else:
  - I know what to do, and it is helpful.
  - The actions I take help make the community safer.

3. Users ought to be able to flag any content, using tools that give the company information about why that piece of content made them uncomfortable. The results of such interactions ought to be tracked and quantified and reported publicly. Examples include:

- **Unwanted contact in messages.**
  As part of the design of any direct-messaging feature, the user should have an easily-findable "unwanted contact" button. They should be given the option after they click it to provide context. Users should be given choices such as the following, to indicate why the contact was unwanted:
  - It's gross.
  - It's fake.
  - It is harassing me.
- **Unwanted actions on my content.**
  People should be able to flag unwanted comments, regardless of whether the content violates policy. Options should include:
  - It's attacking someone else.
  - It's gross.
  - It is disrespectful.
- **Unwanted content in my feed or in other recommendation areas.**
  The algorithms social media services use to create recommendations often serve up inappropriate suggestions. People should thus be able to flag unwanted content that is recommended to them, and provide a reason why. For example:
  - It's gross.
  - Someone is going to get hurt.
  - It is an inappropriate depiction of body image.
- The options that a user is given to block, restrict, or take other actions on content created by others should be accompanied by secondary options that easily give the person the chance to indicate why they took that action. For example, they may block someone merely to mute an annoying friend for a day, or they may be seeking to keep away a predator. Without having such context, it is very difficult

for a platform to use the information that someone was blocked as a means to make the community safer.

4. Teens should be provided with **support tools** that help them deal with the issue they are experiencing, regardless of whether they submit a report. As part of the support tools, it should be clear how to **submit a report for review**. Support tools should be measured by subsequent surveys.
   a. A significant majority of users should reply "yes" to the following question: "I got help with the issue I am experiencing." The percentage ought to be publicly reported.
   b. There should be an option to submit feedback even if the person chooses to not use the tool. Some sample questions may include:
      ○ There is no option for my issue.
      ○ I don't think reporting this issue will help me.

5. Every quarter, companies should be required to transparently report a variety of statistics regarding the usage of **support and reporting tools**. The following are some of the kinds of information that should be required to be disclosed:
   ● The number of people who enter the report flow (see definition above).
   ● The percentage of users who abandon the flow at each step.
   ● Out of the people who entered the flow, the percentage of those who submitted content for review.
   ● The percentage of report requests that resulted in content or an account being removed, banned, etc.

In making these recommendations I am not necessarily arguing for an increase in the number of people reviewing content. My own experience in following some of these steps during Facebook's Compassion work was that most content sent to review does not violate policy. When we added options that reflected user experience, for example by helping teenagers say that someone else was being annoying, the volume of reports that needed to be reviewed went down. This freed up critical resources and people to focus on the reports for which they could take the most useful actions.

I believe that giving teenagers a voice around the things they experience will, over time, make a safer environment. These recommendations are not a solution. They are a necessary start to the work that is needed in order to create an online environment where teens can express themselves and learn to be respectful to each other. This should be an environment where appropriate teasing and playfulness is welcome, but where unwanted contact and harassment is not. I believe the only way this can happen is through regulation imposed from the outside. Meta has consistently demonstrated that it will not address these issues on its own.

**Biography of Arturo Bejar, Former Director of Engineering for Protect and Care, Facebook.**

From 2009 to 2015, Arturo was the senior engineering and product leader at Facebook responsible for its efforts to keep users safe and supported, reporting to Mike Schroepfer, the CTO. Arturo was responsible for "Site Integrity" – stopping attacks and malicious behavior; "Security Infrastructure" – which engineered resilient systems and worked on compliance; and a group called "Care"– which developed Facebook's user-facing and internal customer care tools, as well as child safety tools. Arturo was responsible for the combined effort of engineering, product, user research, data, and design. This included regularly doing strategic product reviews with the Facebook executive team. Arturo was also the engineering manager for Facebook's "Product Infrastructure" team, which built key parts of the product engineering frameworks of Facebook, and developed REACT, one of the core technologies of the web today

From 2019 to 2021, Arturo returned to Facebook to work as a part-time independent consultant and industry expert for the Well-being team at Instagram.

In 2022, Arturo was a Technical Advisor, for the Facebook Oversight Board.

Prior to that Arturo was recruited to Facebook from Yahoo! where he worked from 1998 to 2009 . Arturo was hired as Yahoo!'s first security engineer, eventually becoming the head of Information Security reporting to the CTO.

Arturo started working for IBM in Mexico City when he was 15, was able to study Mathematics at King's College London thanks to the support of Steve Wozniak, and first started working on security and social systems in Silicon Valley in 1994 as part of a startup called Electric Communities.

# PX0492

10-K 1 d260164d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

(Mark One)

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2011

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number: 000-50726

# Google Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 77-0493581 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

1600 Amphitheatre Parkway
Mountain View, CA 94043
(Address of principal executive offices) (Zip Code)

(650) 253-0000
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A Common Stock, $0.001 par value | Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

Securities registered pursuant to Section 12(g) of the Act:

Title of each class
Class B Common Stock, $0.001 par value
Options to purchase Class A Common Stock

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☐    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

At June 30, 2011, the aggregate market value of shares held by non-affiliates of the registrant (based upon the closing sale price of such shares on the Nasdaq Global Select Market on June 30, 2011) was $114,824,568,582.

PX0492-001

Form 10-K

At January 19, 2012, there were 257,960,636 shares of the registrant's Class A common stock outstanding and 67,175,694 shares of the registrant's Class B common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement for the 2012 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2011.

PX0492-002

**Table of Contents**

Google Inc.

Form 10-K
For the Fiscal Year Ended December 31, 2011

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Note About Forward-Looking Statements | | 1 |
| | | |
| PART I | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 21 |
| Item 2. | Properties | 21 |
| Item 3. | Legal Proceedings | 21 |
| | | |
| PART II | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 22 |
| Item 6. | Selected Financial Data | 25 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 8. | Financial Statements and Supplementary Data | 48 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 83 |
| Item 9A. | Controls and Procedures | 83 |
| Item 9B. | Other Information | 83 |
| | | |
| PART III | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 84 |
| Item 11. | Executive Compensation | 84 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 84 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 84 |
| Item 14. | Principal Accounting Fees and Services | 84 |
| | | |
| PART IV | | |
| Item 15. | Exhibits, Financial Statement Schedules | 85 |

i

Table of Contents

NOTE ABOUT FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements include, among other things, statements regarding:

- the growth of our business and revenue;

- seasonal fluctuations in internet usage and traditional retail seasonality, which are likely to cause fluctuations in our quarterly results;

- our plans to continue to invest in systems, facilities, and infrastructure, increase our hiring, provide competitive compensation programs, and continue our current pace of acquisitions;

- the potential for declines in our revenue growth rate;

- our expectation that growth in advertising revenues from our websites will continue to exceed that from our Google Network Members' websites, which will have a positive impact on our operating margins;

- our expectation that we will continue to pay most of the Google AdSense fees we receive from advertisers to our Google Network Members;

- our expectation that we will continue to take steps to improve the relevance of the ads we deliver and to reduce the number of accidental clicks;

- fluctuations in aggregate paid clicks and average cost-per-click;

- our belief that our foreign exchange risk management program will not fully offset the exposure to fluctuations in foreign currency exchange rates;

- the increase of costs related to hedging activities under our foreign exchange risk management program;

- our expectation that our cost of revenues, research and development expenses, sales and marketing expenses, and general and administrative expenses will increase in dollars and may increase as a percentage of revenues;

- our potential exposure in connection with pending investigations and proceedings;

- our expectations about the timing of the consummation of our proposed acquisition of Motorola Mobility Holdings, Inc. (Motorola);

- our expectation that our traffic acquisition costs will fluctuate in the future;

- continued investments in international markets;

- our future compensation expenses;

- fluctuations in our effective tax rate;

- the sufficiency of our sources of funding;

- our payment terms to certain advertisers, which may increase our working capital requirements; and

- fluctuations in our capital expenditures;

as well as other statements regarding our future operations, financial condition and prospects, and business strategies. Forward-looking statements may appear throughout this report, including without limitation, the following sections: Item 1 "Business," Item 1A "Risk Factors," and Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements generally can be identified by words such as "anticipates," "believes," "estimates," "expects," "intends," "plans," "predicts," "projects," "will be," "will continue," "will likely result," and similar expressions. These forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties, which could cause our actual results to differ materially from those reflected in the forward-looking statements. Factors that could cause or contribute to

1

PX0492-004

Table of Contents

such differences include, but are not limited to, those discussed in this Annual Report on Form 10-K, and in particular, the risks discussed under the caption "Risk Factors" in Item 1A and those discussed in other documents we file with the Securities and Exchange Commission (SEC). We undertake no obligation to revise or publicly release the results of any revision to these forward-looking statements, except as required by law. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.

As used herein, "Google," "we," "our," and similar terms include Google Inc. and its subsidiaries, unless the context indicates otherwise.

"Google" and other trademarks of ours appearing in this report are our property. This report contains additional trade names and trademarks of other companies. We do not intend our use or display of other companies' trade names or trademarks to imply an endorsement or sponsorship of us by such companies, or any relationship with any of these companies.

2

PX0492-005

**Table of Contents**

ITEM 1.    BUSINESS

Overview

Google is a global technology leader focused on improving the ways people connect with information. We aspire to build products that improve the lives of billions of people globally. Our mission is to organize the world's information and make it universally accessible and useful. Our innovations in web search and advertising have made our website a top internet property and our brand one of the most recognized in the world.

We generate revenue primarily by delivering relevant, cost-effective online advertising. Businesses use our AdWords program to promote their products and services with targeted advertising. In addition, the third parties that comprise the Google Network use our AdSense program to deliver relevant ads that generate revenue and enhance the user experience.

We were incorporated in California in September 1998 and reincorporated in Delaware in August 2003. Our headquarters are located at 1600 Amphitheatre Parkway, Mountain View, California 94043, and our telephone number is (650) 253-0000. We completed our initial public offering in August 2004 and our Class A common stock is listed on the Nasdaq Global Select Market under the symbol "GOOG."

Corporate Highlights

On April 4, 2011, Larry Page, our Co-Founder, assumed day-to-day operations as our Chief Executive Officer. Since then, Larry's primary focus has been on "increasing Google's velocity and execution"—making things much simpler for our users and improving the overall Google experience while continually creating new products with the potential to improve the lives of billions of people.

- Android—The growth of our Android operating system in 2011 has been impressive. As of January 2012, over 250 million Android devices have been activated globally.

- Improved Ad Formats—We made a number of ad improvements in 2011. For instance, with visual ads, not only can users find theater times for a new movie, users can watch the trailer directly in the ad. Location-aware search ads can help users find what they are looking for more easily by putting thousands of local businesses on the map—literally. With the +1 button, people can find businesses recommended by their friends. After all, ads are just more answers to users' queries.

- Google+—In June 2011, we launched Google+, a new way to share online just like users do in the real world, sharing different things with different people. Google+ has added new users every week since its launch. As of January 2012, over 90 million people have joined Google+.

- Product Prioritization—In an effort to prioritize our product efforts, we decided to shut down a number of products in 2011, including Google Buzz, Google Desktop, and Google Labs. We learned a lot from these discontinued products and are putting that learning to work every day in new products such as Google+.

- New and Improved Google Experience—Constant revision and improvement is part of our overarching philosophy. In 2011, we began work on improving the Google experience guided by three key design principles:

  - Focus—With the new design changes, we have brought forward the things that matter to users and moved all the other clutter out of their way so that users can better focus on what they need at the moment.

  - Elasticity—The new design allows users to seamlessly transition from one device to another from the various mobile devices, tablets, high-resolution monitors, and TVs to access the web and have a consistent visual experience.

  - Effortlessness—Our design philosophy is to combine power with simplicity. We want to keep our look simple and clean, but behind the seemingly simple design, use technologies like HTML5, WebGL, and the latest, fastest browsers to make sure users have all the power of the web behind them.

3

PX0492-006

Table of Contents

On August 15, 2011, we entered into an Agreement and Plan of Merger (Merger Agreement) with Motorola, a provider of innovative technologies, products and services that enable a range of mobile and wireline digital communication, information and entertainment experiences, under which we will acquire Motorola for $40 per share in cash, or a total of approximately $12.5 billion. The completion of this transaction is subject to customary closing conditions, including the receipt of certain regulatory approvals.

Our business is primarily focused around the following key areas: search, advertising, operating systems and platforms, and enterprise.

Search

We maintain a vast index of websites and other online content, and make it available through our search engine to anyone with an internet connection. Our search technologies sort through an ever-growing amount of information to deliver relevant and useful search results in response to user queries. We integrate innovative features into our search service and offer specialized search services to help users tailor their search. In addition, we are constantly improving and adding to our products and services, to provide users with more relevant results so that users find what they are looking for faster.

In January 2012, we launched Search plus Your World. Now, when a user performs a signed-in search on Google, the user's results page may include Google+ content from people that the user is close to (or might be interested in following). Relevant Google+ profiles and Google+ pages related to a specific topic or area of interest may also appear on a user's results page.

Advertising

*Google Search*. The goal of AdWords, our primary auction-based advertising program, is to deliver ads that are so useful and relevant to search queries or web content that they are a form of information in their own right. With AdWords, advertisers create simple text-based ads that then appear beside related search results or web content on our websites and on thousands of partner websites in our Google Network, which is the network of third parties that use our advertising programs to deliver relevant ads with their search results and content. Most of our AdWords customers pay us on a cost-per-click basis, which means that an advertiser pays us only when a user clicks on one of its ads. We also offer AdWords on a cost-per-impression basis that enables advertisers to pay us based on the number of times their ads appear on our websites and our Google Network Members' websites as specified by the advertiser.

Our AdSense program enables websites that are part of the Google Network to deliver ads from our AdWords advertisers that are relevant to the search results or content on their websites. We share the majority of the revenues generated from these ads with the Google Network Members that display the ads. The AdSense program enables advertisers to extend the reach of their ad campaigns, improves our partners' ability to generate revenue from their content, and delivers relevant ads for their users.

*Google Display*. Display advertising comprises the videos, text, images, and other interactive ads that run across the web on computers and mobile devices, including smart phones and handheld computers such as netbooks and tablets. The Google Display Network provides advertisers services related to the delivery of display advertising across publishers participating in our AdSense program, publishers participating in the DoubleClick Ad Exchange, and Google-owned sites such as YouTube and Google Finance.

Through our DoubleClick advertising technology, we provide to publishers, agencies, and advertisers the ad serving technology, which is the infrastructure that enables billions of ads to be served each day across the web. Our DoubleClick Ad Exchange creates a real-time auction marketplace for the trading of display ad space. We aim to simplify display advertising so it is easier for advertisers and publishers to manage campaigns across different formats, on different websites, and for different devices.

4

PX0492-007

Table of Contents

In addition, YouTube provides a range of video, interactive, and other ad formats for advertisers to reach their intended audience. YouTube's video advertising solutions give advertisers a way to promote their content to the YouTube community, as well as to associate with content being watched by their target audience. YouTube also offers analytic tools to help advertisers understand their audience and derive general business intelligence. In the past year, YouTube has experienced strong growth in mobile viewers and has established key partnerships with content companies to help monetize mobile video.

*Google Mobile.* Mobile advertising is still in relative infancy, though the mobile device is quickly becoming the world's newest gateway to information. Google is focused on developing easy-to-use ad products to help advertisers extend their reach, help create revenue opportunities for our publisher partners, and deliver relevant and useful ads to users on the go.

Google Mobile extends our products and services by providing mobile-specific features to mobile device users. Our mobile-specific search technologies include search by voice, search by sight, and search by location. Google Mobile also optimizes a large number of Google's applications for mobile devices in both browser and downloadable form. In addition, we offer advertisers the ability to run search ad campaigns on mobile devices with popular mobile-specific ad formats, such as click-to-call ads in which advertisers can include a phone number within ad text. In 2010, we acquired AdMob, Inc. (AdMob), which offers effective ad units and solutions for application developers and advertisers. We continue to invest in improving users' access to Google services through their mobile devices.

*Google Local.* Google is committed to providing users with relevant local information. We've organized information around more than 50 million places globally from various sources across the web. Users can find addresses, phone numbers, hours of operation, directions and more for millions of local queries like shops, restaurants, parks and landmarks right on Google.com, on Google Maps and on Google Maps for mobile. They can also discover more places that are right for them by rating the places they've been, and getting customized recommendations based on their tastes and those of their friends directly within Google Maps. Our products and services also help local business owners manage their online presence and connect with potential customers. Millions of business owners have verified their free business listings via Google Places to ensure that users have up-to-date information about their establishments, and to contribute additional details such as photos and products/services offered. Google Offers brings people daily deals from local and national businesses, redeemable for discounted goods or services. From restaurants to spa treatments to outdoor adventures, Google has deals from the best businesses a city has to offer as well as popular national brands.

Operating Systems and Platforms

*Android.* Working closely with the Open Handset Alliance, a business alliance of more than 75 technology and mobile companies, we developed Android, a free, fully open source mobile software platform that any developer can use to create applications for mobile devices and any handset manufacturer can install on a device. We believe Android will drive greater innovation and choice in the mobile device ecosystem, and provide consumers with a more powerful mobile experience.

*Google Chrome OS and Google Chrome.* Google Chrome OS is an open source operating system with the Google Chrome web browser as its foundation. Both the Google Chrome OS and the Google Chrome browser are built around the core tenets of speed, simplicity, and security. Designed for people who spend most of their time on the web, the Google Chrome OS is a new approach to operating systems. We are working with several original equipment manufacturers to bring computers running Google Chrome OS to users and businesses. The Chrome browser runs on Windows, Mac, and Linux computers.

*Google+.* In June 2011, we launched Google+, a new way to share online just like users do in the real world, sharing different things with different people. Google+ has added new users every week since its launch. As of January 2012, over 90 million people have joined Google+.

5

PX0492-008

**Table of Contents**

*Google TV*. Google TV is a platform that gives consumers the power to experience television and the internet on a single screen, with the ability to search and find the content they want to watch. The Google TV platform is based on the Android operating system and runs the Google Chrome browser.

*Google Books.* The Google Books platform (including reading applications, an electronic bookstore (eBookstore), book search, and personal library management) is designed to help people discover, search, and consume content from printed books online. Through the Google eBookstore, we make available for sale popular books in electronic book format to complement our large collection of free public domain books.

Enterprise

Google's enterprise products provide familiar, easy-to-use Google technology for business settings. Through Google Apps, which includes Gmail, Google Docs, Google Calendar, and Google Sites, among other features, we provide hosted, web-based applications that people can use on any device with a browser and an internet connection. In addition, we provide our search technology for use within enterprises through the Google Search Appliance (real-time search of business applications, intranet applications, and public websites), on their public-facing sites with Google Site Search (custom search engine), and Google Commerce Search (for online retail enterprises). We also provide versions of our Google Maps Application Programming Interface (API) for businesses (including fully interactive Google Maps for public and internal websites), as well as Google Earth Enterprise (a behind-the-company-firewall software solution for imagery and data visualization). Our enterprise solutions have been adopted by a variety of businesses, governments, schools, and non-profit organizations. Google Apps is the first cloud computing suite of message and collaboration tools to receive U.S. government security certification.

Research

We continue to develop new products and services and to enhance our existing ones through research and product development and the licensing and acquisition of third-party businesses and technology. Our product development philosophy is to launch innovative products early and often, and then iterate rapidly to make those products even better. We often post early stage products at test locations online or directly on Google.com. We then use data and user feedback to decide if and how to invest further in those products.

Our research and development expenses were $2.8 billion, $3.8 billion, and $5.2 billion in 2009, 2010, and 2011, respectively, which included stock-based compensation expense of $725 million, $861 million, and $1.1 billion, respectively. We expect to continue to invest in building the employee and systems infrastructures needed to support the development of new products and services and to improve existing ones.

Intellectual Property

We rely on a combination of intellectual property laws, as well as confidentiality procedures and contractual provisions, to protect our proprietary technology and our brand. We have registered, and applied for the registration of, U.S. and international trademarks, service marks, domain names, and copyrights. Additionally, we have filed U.S. and international patent applications covering certain of our proprietary technology. Over time, we have assembled a portfolio of patents, trademarks, service marks, copyrights, domain names, and trade secrets covering our products and services. Our proprietary technology is not dependent on any single patent or copyright or groups of related patents or copyrights. We believe the duration of our patents is adequate relative to the expected lives of our products. Although we rigorously protect our proprietary technology, any significant impairment of, or third-party claim against, our intellectual property rights could harm our business or our ability to compete.

Sales and Support

We continue to develop and grow our sales and support infrastructure. We have over 85 offices in over 40 countries, the large majority of which include sales people. Our global sales and support infrastructure has

6

PX0492-009

**Table of Contents**

specialized teams across vertical markets. We bring businesses into our advertising network through direct, remote, and online sales channels, using technology and automation wherever possible to improve our customers' experience and to grow our business cost-effectively. Our direct advertising and sales teams focus on building relationships with the largest advertisers and leading internet companies. We have built a multi-product sales force, with teams selling campaigns that include search, display (including DoubleClick and YouTube), and mobile advertising.

We provide customer service to our advertiser base through our global support organization. Our global support organization concentrates on helping our advertisers and Google Network Members get the most out of their relationship with us.

No individual customer or groups of affiliated customers represented more than 10% of our revenues in 2009, 2010, or 2011.

Government Contracts

No material portion of our business is subject to renegotiation of profits or termination of contracts or subcontracts at the election of the U.S. government.

Marketing

Google's global brand is well known. We believe that building a trusted, highly recognized brand begins with providing high-quality products and services that make a notable difference in people's lives. Marketing is responsible for generating advertiser revenue through marketing campaigns to small businesses, as well as providing thought leadership to chief marketing officers through industry insight, research, and analysis. Our marketing, promotional, and public relations activities are designed to promote Google's brand image and differentiate it from competitors.

Competition

Our business is characterized by rapid change and converging, as well as new and disruptive, technologies. We face formidable competition in every aspect of our business, particularly from companies that seek to connect people with information on the web and provide them with relevant advertising. We face competition from:

- General purpose search engines, such as Yahoo and Microsoft's Bing.

- Vertical search engines and e-commerce websites, such as Kayak (travel queries), Monster.com (job queries), WebMD (for health queries), and Amazon.com and eBay (e-commerce). Some users will navigate directly to such websites rather than go through Google.

- Social networks, such as Facebook and Twitter. Some users are relying more on social networks for product or service referrals, rather than seeking information through general purpose search engines.

- Other forms of advertising, such as television, radio, newspapers, magazines, billboards, and yellow pages, for ad dollars. Our advertisers typically advertise in multiple media, both online and offline.

- Mobile applications on iPhone and Android devices, which allow users to access information directly from a publisher without using search engines.

- Providers of online products and services. A number of our online products and services, including Gmail, YouTube, and Google Docs, compete directly with new and established companies, which offer communication, information, and entertainment services integrated into their products or media properties.

7

PX0492-010

Table of Contents

We compete to attract and retain users, for whom other products and services are literally one click away, primarily on the basis of the relevance and usefulness of our search results and the features, availability, and ease of use of our products and services.

We also compete to attract and retain content providers (Google Network Members, as well as other content providers for whom we distribute or license content), primarily based on the size and quality of our advertiser base, our ability to help these partners generate revenues from advertising, and the terms of our agreements with them.

Government Regulation

We are subject to numerous domestic and foreign laws and regulations covering a wide variety of subject matter. New laws and regulations (or new interpretations of existing laws and regulations) may also impact our business. The costs of compliance with these laws and regulations are high and are likely to increase in the future and any failure on our part to comply with these laws may subject us to significant liabilities and other penalties.

Culture and Employees

We take great pride in our culture. We embrace collaboration and creativity, and encourage the iteration of ideas to address complex technical challenges. Transparency and open dialog are central to us, and we like to ensure that company news reaches our employees first through internal channels.

Despite our rapid growth, we still cherish our roots as a startup and give employees the freedom to act on their ideas regardless of role or function within the company. We strive to hire the best employees, with backgrounds and perspectives as diverse as our global users. We provide an environment where these talented people can have fulfilling careers working on some of the biggest challenges in technology, and have a huge, positive impact on the world.

At December 31, 2011, we had 32,467 full-time employees, consisting of 11,665 in research and development, 11,933 in sales and marketing, 4,651 in general and administrative, and 4,218 in operations. All of Google's full-time employees are also equityholders, with significant collective employee ownership. Although we have works councils and statutory employee representation obligations in certain countries, our employees are not represented by a labor union and we consider our employee relations to be good. Competition for qualified personnel in our industry is intense, particularly for software engineers, computer scientists, and other technical staff.

Global Operations and Geographic Data

We provide our products and services in more than 100 languages and in more than 50 countries, regions, and territories. On www.google.com or one of our other Google domains, users can find information in many different languages and in many different formats. The United States accounted for approximately 46% of our revenues in 2011. Information regarding financial data by geographic areas is set forth in Item 7 and Item 8 of this Annual Report on Form 10-K. See Note 16 of Notes to Consolidated Financial Statements under Item 8.

Seasonality

Our business is affected by both seasonal fluctuations in internet usage and traditional retail seasonality. Internet usage generally slows during the summer months, and commercial queries typically increase significantly in the fourth quarter of each year. These seasonal trends have caused and will likely continue to cause, fluctuations in our quarterly results, including fluctuations in sequential revenue growth rates.

Available Information

Our website is located at www.google.com, and our investor relations website is located at http://investor.google.com. The following filings are available through our investor relations website after we file

8

**Table of Contents**

them with the SEC: Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and our Proxy Statements for our annual meetings of stockholders, for the last three years. These filings are also available for download free of charge on our investor relations website. We also provide a link to the section of the SEC's website at www.sec.gov that has all of our public filings, including Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, all amendments to those reports, our Proxy Statements, and other ownership related filings. Further, a copy of this Annual Report on Form 10-K is located at the SEC's Public Reference Room at 100 F Street, NE, Washington, D.C. 20549. Information on the operation of the Public Reference Room can be obtained by calling the SEC at 1-800-SEC-0330.

We webcast our earnings calls and certain events we participate in or host with members of the investment community on our investor relations website. Additionally, we provide notifications of news or announcements regarding our financial performance, including SEC filings, investor events, press and earnings releases, and blogs as part of our investor relations website. Investors and others can receive notifications of new information posted on our investor relations website in real time by signing up for email alerts and RSS feeds. Further corporate governance information, including our certificate of incorporation, bylaws, governance guidelines, board committee charters, and code of conduct, is also available on our investor relations website under the heading "Corporate Governance." The contents of our websites are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC, and any references to our websites are intended to be inactive textual references only.

ITEM 1A.   RISK FACTORS

*Our operations and financial results are subject to various risks and uncertainties, including those described below, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our Class A common stock.*

Risks Related to Our Business and Industry

*We face intense competition. If we do not continue to innovate and provide products and services that are useful to users, we may not remain competitive, and our revenues and operating results could be adversely affected.*

Our business is rapidly evolving and intensely competitive, and is subject to changing technology, shifting user needs, and frequent introductions of new products and services. We have many competitors in different industries, including general purpose search engines, vertical search engines and e-commerce sites, social networking sites, traditional media companies, and providers of online products and services. Our current and potential competitors range from large and established companies to emerging start-ups. Established companies have longer operating histories and more established relationships with customers and users, and they can use their experience and resources in ways that could affect our competitive position, including by making acquisitions, investing aggressively in research and development, aggressively initiating intellectual property claims (whether or not meritorious) and competing aggressively for advertisers and websites. Emerging start-ups may be able to innovate and provide products and services faster than we can.

Our success depends on providing products and services that make using the internet a more useful and enjoyable experience for our users. Our competitors are constantly developing innovations in web search, online advertising, and web-based products and services. As a result, we must continue to invest significant resources in research and development, including through acquisitions, in order to enhance our web search technology and our existing products and services, and introduce new products and services that people can easily and effectively use. If we are unable to provide quality products and services, then our users may become dissatisfied and move to a competitor's products and services. In addition, these new products and services may present new and difficult technology challenges, and we may be subject to claims if users of these offerings experience service disruptions or failures or other quality issues. Our operating results would also suffer if our innovations are not responsive to the needs of our users, advertisers, and Google Network Members, are not appropriately timed with market

9

PX0492-012

**Table of Contents**

opportunities, or are not effectively brought to market. As search technology continues to develop, our competitors may be able to offer search results that are, or that are seen to be, substantially similar to or better than ours. This may force us to compete in different ways and expend significant resources in order to remain competitive. If our competitors are more successful than we are in developing compelling products or in attracting and retaining users, advertisers, and content providers, our revenues and operating results could be adversely affected.

*Our ongoing investment in new business strategies and new products, services, and technologies is inherently risky, and could disrupt our ongoing businesses.*

We have invested and expect to continue to invest in new business strategies, products, services, and technologies. Such endeavors may involve significant risks and uncertainties, including distraction of management from current operations, insufficient revenues to offset liabilities assumed and expenses associated with these new investments, inadequate return of capital on our investments, and unidentified issues not discovered in our due diligence of such strategies and offerings. Because these new ventures are inherently risky, no assurance can be given that such strategies and offerings will be successful and will not materially adversely affect our reputation, financial condition, and operating results.

*We generate our revenues almost entirely from advertising, and the reduction in spending by or loss of advertisers could seriously harm our business.*

We generated 96% of our revenues in 2011 from our advertisers. Our advertisers can generally terminate their contracts with us at any time. Advertisers will not continue to do business with us if their investment in advertising with us does not generate sales leads, and ultimately customers, or if we do not deliver their advertisements in an appropriate and effective manner. If we are unable to remain competitive and provide value to our advertisers, they may stop placing ads with us, which would negatively affect our revenues and business.

In addition, expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Adverse economic conditions can have a material negative impact on the demand for advertising and cause our advertisers to reduce the amounts they spend on advertising, which could negatively impact our revenues and business.

*Our revenue growth rate could decline over time, and we anticipate downward pressure on our operating margin in the future.*

Our revenue growth rate could decline over time as a result of a number of factors, including increasing competition, the challenges in maintaining our growth rate as our revenues increase to higher levels, and the increasing maturity of the online advertising market and the other markets in which we participate. We believe our operating margin will experience downward pressure as a result of increasing competition and increased expenditures for many aspects of our business. Our operating margin will also experience downward pressure if a greater percentage of our revenues comes from ads placed on our Google Network Members' websites compared to revenues generated through ads placed on our own websites or if we spend a proportionately larger amount to promote the distribution of certain products, including Google Chrome. The margin on revenues we generate from our Google Network Members is significantly less than the margin on revenues we generate from advertising on our websites. Additionally, the margin we earn on revenues generated from our Google Network Members could decrease in the future if we pay an even larger percentage of advertising fees to our Google Network Members.

*We are subject to increased regulatory scrutiny that may negatively impact our business.*

The growth of our company and our expansion into a variety of new fields implicate a variety of new regulatory issues, and we have experienced increased regulatory scrutiny as we have grown. In particular, we are cooperating with the U.S. Federal Trade Commission (FTC), the European Commission (EC) and several state

10

**Table of Contents**

attorneys general in investigations they are conducting with respect to our business and its impact on competition. Legislators and regulators, including those conducting investigations in the U.S. and Europe, may make legal and regulatory changes, or interpret and apply existing laws, in ways that make our products and services less useful to our users, require us to incur substantial costs, expose us to unanticipated civil or criminal liability, or cause us to change our business practices. These changes or increased costs could negatively impact our business and results of operations in material ways.

*We are involved in legal proceedings that may result in adverse outcomes.*

We are regularly subject to claims, suits, government investigations, and other proceedings involving competition and antitrust (such as the pending investigations by the FTC and the EC), intellectual property, privacy, tax, labor and employment, commercial disputes, content generated by our users, goods and services offered by advertisers or publishers using our platforms, and other matters. Such claims, suits, government investigations, and proceedings are inherently uncertain and their results cannot be predicted with certainty. Regardless of the outcome, such legal proceedings can have an adverse impact on us because of legal costs, diversion of management resources, and other factors. Determining reserves for our pending litigation is a complex, fact-intensive process that requires significant judgment. It is possible that a resolution of one or more such proceedings could result in substantial fines and penalties that could adversely affect our business, consolidated financial condition, results of operations, or cash flows in a particular period. These proceedings could also result in criminal sanctions, consent decrees, or orders preventing us from offering certain features, functionalities, products, or services, requiring a change in our business practices, or requiring development of non-infringing products or technologies, which could also adversely affect our business and results of operations.

*Our business depends on a strong brand, and failing to maintain and enhance our brand would hurt our ability to expand our base of users, advertisers, Google Network Members, and other partners.*

The brand identity that we have developed has significantly contributed to the success of our business. Maintaining and enhancing the "Google" brand is critical to expanding our base of users, advertisers, Google Network Members, and other partners. We believe that the importance of brand recognition will increase due to the relatively low barriers to entry in the internet market. Our brand may be negatively impacted by a number of factors, including data privacy and security issues, service outages, and product malfunctions. If we fail to maintain and enhance the "Google" brand, or if we incur excessive expenses in this effort, our business, operating results, and financial condition will be materially and adversely affected. Maintaining and enhancing our brand will depend largely on our ability to be a technology leader and continue to provide high-quality products and services, which we may not do successfully.

*Acquisitions and investments could result in operating difficulties, dilution, and other harmful consequences that may adversely impact our business and results of operations.*

Acquisitions are an important element of our overall corporate strategy and use of capital, and we expect our current pace of acquisitions to continue. These transactions could be material to our financial condition and results of operations. We also expect to continue to evaluate and enter into discussions regarding a wide array of potential strategic transactions. The process of integrating an acquired company, business, or technology has created, and will continue to create, unforeseen operating difficulties and expenditures. The areas where we face risks include:

- Diversion of management time and focus from operating our business to acquisition integration challenges.

- Implementation or remediation of controls, procedures, and policies at the acquired company.

- Integration of the acquired company's accounting, human resource, and other administrative systems, and coordination of product, engineering, and sales and marketing functions.

- Transition of operations, users, and customers onto our existing platforms.

11

Table of Contents

- Failure to obtain required approvals from governmental authorities under competition and antitrust laws on a timely basis, if it all, which could, among other things, delay or prevent us from completing a transaction, or otherwise restrict our ability to realize the expected financial or strategic goals of an acquisition.

- In the case of foreign acquisitions, the need to integrate operations across different cultures and languages and to address the particular economic, currency, political, and regulatory risks associated with specific countries.

- Failure to successfully further develop the acquired technology.

- Cultural challenges associated with integrating employees from the acquired company into our organization, and retention of employees from the businesses we acquire.

- Liability for activities of the acquired company before the acquisition, including patent and trademark infringement claims, violations of laws, commercial disputes, tax liabilities, and other known and unknown liabilities.

- Litigation or other claims in connection with the acquired company, including claims from terminated employees, customers, former stockholders, or other third parties.

Our failure to address these risks or other problems encountered in connection with our past or future acquisitions and investments could cause us to fail to realize the anticipated benefits of such acquisitions or investments, incur unanticipated liabilities, and harm our business generally.

Future acquisitions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities, or amortization expenses, or write-offs of goodwill, any of which could harm our financial condition. Also, the anticipated benefit of many of our acquisitions may not materialize.

*A variety of new and existing U.S. and foreign laws could subject us to claims or otherwise harm our business.*

We are subject to numerous U.S. and foreign laws and regulations covering a wide variety of subject matters. New laws and regulations (or new interpretations of existing laws and regulations) may also impact our business. The costs of compliance with these laws and regulations are high and are likely to increase in the future. Any failure on our part to comply with these laws and regulations can result in negative publicity and diversion of management time and effort and may subject us to significant liabilities and other penalties.

Furthermore, many of these laws were adopted prior to the advent of the internet and related technologies and, as a result, do not contemplate or address the unique issues of the internet and related technologies. The laws that do reference the internet are being interpreted by the courts, but their applicability and scope remain uncertain. For example, the laws relating to the liability of providers of online services are currently unsettled both within the U.S. and abroad. Claims have also been, or may be, threatened and filed against us under both U.S. and foreign laws for defamation, invasion of privacy and other tort claims, unlawful activity, patent, copyright and trademark infringement, or other theories based on the nature and content of the materials searched and the ads posted by our users, our products and services, or content generated by our users. Moreover, recent amendments to U.S. patent laws will become effective in 2012 and may affect our ability to protect our innovations and defend against claims of patent infringement.

In addition, the Digital Millennium Copyright Act has provisions that limit, but do not necessarily eliminate, our liability for caching or hosting, or for listing or linking to, third-party websites that include materials that infringe copyrights or other rights, so long as we comply with the statutory requirements of this act. Any future legislation impacting these safe harbors may adversely impact us. Various U.S. and international laws restrict the distribution of materials considered harmful to children and impose additional restrictions on the ability of online services to

12

PX0492-015

**Table of Contents**

collect information from minors. In the area of data protection, many states have passed laws requiring notification to users when there is a security breach for personal data, such as California's Information Practices Act. We face similar risks and costs as our products and services are offered in international markets and may be subject to additional regulations.

*We are, and may in the future be, subject to intellectual property or other claims, which are costly to defend, could result in significant damage awards, and could limit our ability to use certain technologies in the future.*

Internet, technology, and media companies own large numbers of patents, copyrights, trademarks, and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. In addition, patent holding companies may continue to seek to monetize patents they have purchased or otherwise obtained. As we have grown, the intellectual property rights claims against us have increased and may continue to increase as we develop new products, services, and technologies.

We have had patent, copyright, and trademark infringement lawsuits filed against us claiming that certain of our products, services, and technologies, including Android, Google Search, Google AdWords, Google AdSense, Google Books, Google News, Google Image Search, Google Chrome, Google Talk, Google Voice, and YouTube, infringe the intellectual property rights of others. Adverse results in these lawsuits may include awards of substantial monetary damages, costly royalty or licensing agreements, or orders preventing us from offering certain features, functionalities, products, or services, and may also cause us to change our business practices, and require development of non-infringing products or technologies, which could result in a loss of revenues for us and otherwise harm our business.

In addition, many of our agreements with our customers and partners require us to indemnify them for certain intellectual property infringement claims against them, which would increase our costs as a result of defending such claims, and may require that we pay significant damages if there were an adverse ruling in any such claims. Furthermore, such customers and partners may discontinue the use of our products, services, and technologies, as a result of injunctions or otherwise, which could result in loss of revenues and adversely impact our business.

Regardless of the merits of the claims, intellectual property claims are often time consuming, expensive to litigate or settle, and cause significant diversion of management attention. To the extent such intellectual property infringement claims are successful, they may have an adverse effect on our business, consolidated financial position, results of operations, or cash flows.

*Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our products, services, and brand.*

Our patents, trademarks, trade secrets, copyrights, and other intellectual property rights are important assets for us. Various events outside of our control pose a threat to our intellectual property rights, as well as to our products, services and technologies. For example, effective intellectual property protection may not be available in every country in which our products and services are distributed or made available through the internet. Also, the efforts we have taken to protect our proprietary rights may not be sufficient or effective.

Although we seek to obtain patent protection for our innovations, it is possible we may not be able to protect some of these innovations. Moreover, because of our long-term interests in open source, we may not have adequate patent protection for certain innovations that later turn out to be important. Furthermore, there is always the possibility, despite our efforts, that the scope of the protection gained will be insufficient or that an issued patent may be deemed invalid or unenforceable.

We also seek to maintain certain intellectual property as trade secrets. The secrecy could be compromised by outside parties, or by our employees, which would cause us to lose the competitive advantage resulting from these trade secrets.

13

PX0492-016

**Table of Contents**

We also face risks associated with our trademarks. For example, there is a risk that the word "Google" could become so commonly used that it becomes synonymous with the word "search." If this happens, we could lose protection for this trademark, which could result in other people using the word "Google" to refer to their own products, thus diminishing our brand.

Any significant impairment of our intellectual property rights could harm our business and our ability to compete. Also, protecting our intellectual property rights is costly and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and harm our operating results.

*We may be subject to legal liability associated with providing online services or content.*

We host and provide a wide variety of services and products that enable users to exchange information, advertise products and services, conduct business, and engage in various online activities both domestically and internationally. The law relating to the liability of providers of these online services and products for activities of their users is still somewhat unsettled both within the U.S. and internationally. Claims have been threatened and have been brought against us for defamation, negligence, breaches of contract, copyright or trademark infringement, unfair competition, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information which we publish or to which we provide links or that may be posted online or generated by us or by third parties, including our users. In addition, we have been and may again in the future be subject to domestic or international actions alleging that certain content we have generated or third-party content that we have made available within our services violates laws in domestic and international jurisdictions.

We also arrange for the distribution of third-party advertisements to third-party publishers and advertising networks, and we offer third-party products, services, or content. We may be subject to claims concerning these products, services, or content by virtue of our involvement in marketing, branding, broadcasting, or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services, or content. Defense of any such actions could be costly and involve significant time and attention of our management and other resources, may result in monetary liabilities or penalties, and may require us to change our business in an adverse manner.

*More people are using devices other than personal computers to access the internet. If users do not widely adopt versions of our web search technology, products, or operating systems developed for these devices, our business could be adversely affected.*

The number of people who access the internet through devices other than personal computers, including mobile phones, smart phones, handheld computers such as netbooks and tablets, video game consoles, and television set-top devices, has increased dramatically in the past few years. The lower resolution, functionality, and memory associated with some alternative devices make the use of our products and services through such devices more difficult and the versions of our products and services developed for these devices may not be compelling to users, manufacturers, or distributors of alternative devices. Each manufacturer or distributor may establish unique technical standards for its devices, and our products and services may not work or be viewable on these devices as a result. We have limited experience to date in operating versions of our products and services developed or optimized for users of alternative devices, such as Google Mobile and Android, or in designing alternative devices. As new devices and new platforms are continually being released, it is difficult to predict the problems we may encounter in developing versions of our products and services for use on these alternative devices and we may need to devote significant resources to the creation, support, and maintenance of such devices. If we are unable to attract and retain a substantial number of alternative device manufacturers, distributors, and users to our products and services, or if we are slow to develop products and technologies that are more compatible with alternative devices, we will fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business.

14

PX0492-017

**Table of Contents**

*Privacy concerns relating to our technology could damage our reputation and deter current and potential users from using our products and services.*

From time to time, concerns have been expressed about whether our products and services compromise the privacy of users and others. Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, even if unfounded, could damage our reputation and operating results. While we strive to comply with all applicable data protection laws and regulations, as well as our own posted privacy policies, any failure or perceived failure to comply may result, and has resulted, in proceedings or actions against us by government entities or others, or could cause us to lose users and customers, which could potentially have an adverse effect on our business.

In addition, as nearly all of our products and services are web-based, the amount of data we store for our users on our servers (including personal information) has been increasing. Any systems failure or compromise of our security that results in the release of our users' data could seriously limit the adoption of our products and services, as well as harm our reputation and brand and, therefore, our business. We expect to continue to expend significant resources to protect against security breaches. The risk that these types of events could seriously harm our business is likely to increase as we expand the number of web-based products and services we offer, and operate in more countries.

Regulatory authorities around the world are considering a number of legislative and regulatory proposals concerning data protection. In addition, the interpretation and application of consumer and data protection laws in the U.S., Europe and elsewhere are often uncertain and in flux. It is possible that these laws may be interpreted and applied in a manner that is inconsistent with our data practices. If so, in addition to the possibility of fines, this could result in an order requiring that we change our data practices, which could have an adverse effect on our business and results of operations. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business.

*If our security measures are breached, or if our services are subject to attacks that degrade or deny the ability of users to access our products and services, our products and services may be perceived as not being secure, users and customers may curtail or stop using our products and services, and we may incur significant legal and financial exposure.*

Our products and services involve the storage and transmission of users' and customers' proprietary information, and security breaches could expose us to a risk of loss of this information, litigation, and potential liability. Our security measures may be breached due to the actions of outside parties, employee error, malfeasance, or otherwise, and, as a result, an unauthorized party may obtain access to our data or our users' or customers' data. Additionally, outside parties may attempt to fraudulently induce employees, users, or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data. Any such breach or unauthorized access could result in significant legal and financial exposure, damage to our reputation, and a loss of confidence in the security of our products and services that could potentially have an adverse effect on our business. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures. If an actual or perceived breach of our security occurs, the market perception of the effectiveness of our security measures could be harmed and we could lose users and customers.

*Web spam and content farms could decrease our search quality, which could damage our reputation and deter our current and potential users from using our products and services.*

"Web spam" refers to websites that attempt to violate a search engine's quality guidelines or that otherwise seek to rank higher in search results than a search engine's assessment of their relevance and utility would rank them. Although English-language web spam in our search results has been significantly reduced, and web spam in

15

PX0492-018

**Table of Contents**

most other languages is limited, we expect web spammers will continue to seek ways to improve their rankings inappropriately. We continuously combat web spam, including through indexing technology that makes it harder for spam-like, less useful web content to rank highly. We have also improved our ability to detect hacked websites, a major source of web spam in 2010. We face new challenges from low-quality and irrelevant content websites, including "content farms," which are websites that generate large quantities of low-quality content to help them improve their search rankings. In 2011, we launched several algorithmic changes focused on low-quality websites. If web spam and content farms continue to increase on Google, this could hurt our reputation for delivering relevant information or reduce user traffic to our websites. In addition, as we continue to take actions to improve our search quality and reduce low-quality content, this may in the short run reduce our AdSense revenues, since some of these websites are AdSense partners.

*Interruption or failure of our information technology and communications systems could hurt our ability to effectively provide our products and services, which could damage our reputation and harm our operating results.*

The availability of our products and services depends on the continuing operation of our information technology and communications systems. Our systems are vulnerable to damage or interruption from earthquakes, terrorist attacks, floods, fires, power loss, telecommunications failures, computer viruses, computer denial of service attacks, or other attempts to harm our systems. Some of our data centers are located in areas with a high risk of major earthquakes. Our data centers are also subject to break-ins, sabotage, and intentional acts of vandalism, and to potential disruptions if the operators of these facilities have financial difficulties. Some of our systems are not fully redundant, and our disaster recovery planning cannot account for all eventualities. The occurrence of a natural disaster, a decision to close a facility we are using without adequate notice for financial reasons, or other unanticipated problems at our data centers could result in lengthy interruptions in our service. In addition, our products and services are highly technical and complex and may contain errors or vulnerabilities. Any errors or vulnerabilities in our products and services, or damage to or failure of our systems, could result in interruptions in our services, which could reduce our revenues and profits, and damage our brand.

*Our business and operations are experiencing rapid growth. If we fail to effectively manage our growth, our business and operating results could be harmed.*

We have experienced rapid growth in our headcount and operations, which has placed, and will continue to place, significant demands on our management, operational, and financial infrastructure. If we do not effectively manage our growth, the quality of our products and services could suffer, which could negatively affect our brand and operating results. Our expansion and growth in international markets heighten these risks as a result of the particular challenges of supporting a rapidly growing business in an environment of multiple languages, cultures, customs, legal systems, alternative dispute resolution systems, regulatory systems, and commercial infrastructures. To effectively manage this growth, we will need to continue to improve our operational, financial and management controls, and our reporting systems and compliance procedures. These systems enhancements and improvements will require significant capital expenditures and management resources. Failure to implement these improvements could hurt our ability to manage our growth and our consolidated financial position.

*Our international operations expose us to additional risks which could harm our business, operating results, and financial condition.*

Our international operations are significant to our revenues and net income, and we plan to further expand internationally. International revenues accounted for approximately 54% of our total revenues in 2011 and more than half of our user traffic has been coming from outside the U.S. In certain international markets, we have limited operating experience and may not benefit from any first-to-market advantages or otherwise succeed. In addition to risks described elsewhere in this section, our international operations expose us to additional risks, including the following:

•   Changes in local political, economic, social, and labor conditions, which may adversely harm our business.

16

PX0492-019

Table of Contents

- Restrictions on foreign ownership and investments, and stringent foreign exchange controls that might prevent us from repatriating cash earned in countries outside the U.S.

- Import and export requirements that may prevent us from offering products or providing services to a particular market and may increase our operating costs.

- Currency exchange rate fluctuations and our ability to manage these fluctuations through our foreign exchange risk management program.

- Longer payment cycles in some countries, increased credit risk, and higher levels of payment fraud.

- Uncertainty regarding liability for services and content, including uncertainty as a result of local laws and lack of legal precedent.

- Different employee/employer relationships, existence of workers' councils and labor unions, and other challenges caused by distance, language, and cultural differences, making it harder to do business in certain jurisdictions.

In addition, compliance with complex foreign and U.S. laws and regulations that apply to our international operations increases our cost of doing business. These numerous and sometimes conflicting laws and regulations include internal control and disclosure rules, data privacy and filtering requirements, anti-corruption laws, such as the Foreign Corrupt Practices Act, and other local laws prohibiting corrupt payments to governmental officials, and antitrust and competition regulations, among others. Violations of these laws and regulations could result in fines and penalties, criminal sanctions against us, our officers, or our employees, prohibitions on the conduct of our business and on our ability to offer our products and services in one or more countries, and could also materially affect our brand, our international expansion efforts, our ability to attract and retain employees, our business, and our operating results. Although we have implemented policies and procedures designed to ensure compliance with these laws and regulations, there can be no assurance that our employees, contractors, or agents will not violate our policies.

Furthermore, since we conduct business in currencies other than U.S. dollars but report our financial results in U.S. dollars, we face exposure to fluctuations in currency exchange rates. Although we hedge a portion of our international currency exposure, significant fluctuations in exchange rates between the U.S. dollar and foreign currencies may adversely affect our net income. Additionally, hedging programs are inherently risky and could expose us to additional risks that could adversely affect our financial condition and results of operations.

*If we were to lose the services of Larry, Sergey, Eric, or other key personnel, we may not be able to execute our business strategy.*

Our future success depends in a large part upon the continued service of key members of our senior management team. In particular, Larry Page and Sergey Brin are critical to the overall management of Google and the development of our technology. Along with our Executive Chairman Eric E. Schmidt, they also play a key role in maintaining our culture and setting our strategic direction. All of our executive officers and key employees are at-will employees, and we do not maintain any key-person life insurance policies. The loss of key personnel could seriously harm our business.

*We rely on highly skilled personnel and, if we are unable to retain or motivate key personnel, hire qualified personnel, or maintain our corporate culture, we may not be able to grow effectively.*

Our performance largely depends on the talents and efforts of highly skilled individuals. Our future success depends on our continuing ability to identify, hire, develop, motivate, and retain highly skilled personnel for all areas of our organization. Competition in our industry for qualified employees is intense, and certain of our competitors have directly targeted our employees. In addition, our compensation arrangements, such as our equity award programs, may not always be successful in attracting new employees and retaining and motivating our existing employees. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees.

17

PX0492-020

**Table of Contents**

In addition, we believe that our corporate culture fosters innovation, creativity, and teamwork. As our organization grows, and we are required to implement more complex organizational management structures, we may find it increasingly difficult to maintain the beneficial aspects of our corporate culture. This could negatively impact our future success.

*Our business depends on continued and unimpeded access to the internet by us and our users. Internet access providers may be able to block, degrade, or charge for access to certain of our products and services, which could lead to additional expenses and the loss of users and advertisers.*

Our products and services depend on the ability of our users to access the internet, and certain of our products require significant bandwidth to work effectively. Currently, this access is provided by companies that have significant market power in the broadband and internet access marketplace, including incumbent telephone companies, cable companies, mobile communications companies, and government-owned service providers. Some of these providers have taken, or have stated that they may take, measures that could degrade, disrupt, or increase the cost of user access to certain of our products by restricting or prohibiting the use of their infrastructure to support or facilitate our offerings, or by charging increased fees to us or our users to provide our offerings. Such interference could result in a loss of existing users and advertisers, and increased costs, and could impair our ability to attract new users and advertisers, thereby harming our revenues and growth.

*New technologies could block our ads, which would harm our business.*

Technologies have been developed (including by us) that can block the display of our ads and that provide tools to users to opt out of our advertising products. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages for our users. As a result, such technologies and tools could adversely affect our operating results.

*We are exposed to fluctuations in the market values of our investment portfolio.*

Given the global nature of our business, we have investments both domestically and internationally. Credit ratings and pricing of these investments can be negatively impacted by liquidity, credit deterioration or losses, financial results, or other factors. As a result, the value or liquidity of our cash equivalents and marketable securities could decline and result in a material impairment, which could materially adversely affect our financial condition and operating results.

*We may have exposure to greater than anticipated tax liabilities.*

Our future income taxes could be adversely affected by earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, as a result of gains on our foreign exchange risk management program, or changes in tax laws, regulations, or accounting principles, as well as certain discrete items. We are subject to regular review and audit by both domestic and foreign tax authorities. Any adverse outcome of such a review or audit could have a negative effect on our operating results and financial condition. In addition, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment, and there are many transactions and calculations where the ultimate tax determination is uncertain. Although we believe our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

*Our operating results may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.*

Our operating results may fluctuate as a result of a number of factors, many outside of our control. As a result, comparing our operating results on a period-to-period basis may not be meaningful, and you should not rely

18

PX0492-021

**Table of Contents**

on our past results as an indication of our future performance. Our quarterly, year-to-date, and annual expenses as a percentage of our revenues may differ significantly from our historical or projected rates. Our operating results in future quarters may fall below expectations. Any of these events could cause our stock price to fall. Each of the risk factors listed in this section and the following factors may affect our operating results:

- Our ability to continue to attract users to our websites and satisfy existing users on our websites.
- Our ability to monetize (or generate revenues from) traffic on our websites and our Google Network Members' websites.
- Our ability to attract advertisers to our AdWords program, and our ability to attract websites to our AdSense program.
- The mix in our revenues between those generated on our websites and those generated through our Google Network.
- The amount of revenues and expenses generated and incurred in currencies other than U.S. dollars, and our ability to manage the resulting risk through our foreign exchange risk management program.
- The amount and timing of operating costs and expenses and capital expenditures related to the maintenance and expansion of our businesses, operations, and infrastructure.
- Our focus on long-term goals over short-term results.
- The results of our investments in risky projects, including new business strategies and new products, services, and technologies.
- Our ability to keep our websites operational at a reasonable cost and without service interruptions.
- Our ability to generate significant revenues from services in which we have invested considerable time and resources, such as Google Checkout.

Because our business is changing and evolving, our historical operating results may not be useful to you in predicting our future operating results. In addition, advertising spending has historically been cyclical in nature, reflecting overall economic conditions, as well as budgeting and buying patterns. Also, user traffic tends to be seasonal. Our rapid growth has tended to mask the cyclicality and seasonality of our business. As our growth rate has slowed, the cyclicality and seasonality in our business has become more pronounced and caused our operating results to fluctuate.

Risks Related to Ownership of Our Common Stock

*The trading price for our Class A common stock may continue to be volatile.*

The trading price of our Class A common stock has at times experienced substantial price volatility and may continue to be volatile. For example, in 2011, the price of our Class A common stock ranged from $473.02 per share to $646.76 per share. The trading price of our Class A common stock may fluctuate widely in response to various factors, some of which are beyond our control. These factors include:

- Quarterly variations in our results of operations or those of our competitors.
- Announcements by us or our competitors of acquisitions, new products, significant contracts, commercial relationships, or capital commitments.
- Recommendations by securities analysts or changes in earnings estimates.
- Announcements about our earnings that are not in line with analyst expectations, the risk of which is enhanced because it is our policy not to give guidance on earnings.
- Announcements by our competitors of their earnings that are not in line with analyst expectations.

19

PX0492-022

Table of Contents

- Commentary by industry and market professionals about our products, strategies, and other matters affecting our business and results, regardless of its accuracy.
- The volume of shares of Class A common stock available for public sale.
- Sales of stock by us or by our stockholders (including sales by our directors, executive officers, and other employees).
- Short sales, hedging, and other derivative transactions on shares of our Class A common stock (including derivative transactions under our TSO program).

In addition, the stock market in general, and the market for technology companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. These broad market and industry factors may harm the market price of our Class A common stock, regardless of our actual operating performance.

*The concentration of our stock ownership limits our stockholders' ability to influence corporate matters.*

Our Class B common stock has 10 votes per share and our Class A common stock has one vote per share. As of December 31, 2011, Larry, Sergey, and Eric beneficially owned approximately 92% of our outstanding Class B common stock, representing approximately 66% of the voting power of our outstanding capital stock. Larry, Sergey, and Eric therefore have significant influence over management and affairs and over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets, for the foreseeable future. This concentrated control limits our stockholders' ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

*Provisions in our charter documents and under Delaware law could discourage a takeover that stockholders may consider favorable.*

Provisions in our certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. These provisions include the following:

- Our certificate of incorporation provides for a dual class common stock structure. As a result of this structure, Larry, Sergey, and Eric have significant influence over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets. This concentrated control could discourage others from initiating any potential merger, takeover, or other change of control transaction that other stockholders may view as beneficial.
- Our board of directors has the right to elect directors to fill a vacancy created by the expansion of the board of directors or the resignation, death, or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors.
- Our stockholders may not act by written consent. As a result, a holder, or holders, controlling a majority of our capital stock would not be able to take certain actions without holding a stockholders' meeting.
- Our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect director candidates.
- Stockholders must provide advance notice to nominate individuals for election to the board of directors or to propose matters that can be acted upon at a stockholders' meeting. These provisions may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

20

Table of Contents

- Our board of directors may issue, without stockholder approval, shares of undesignated preferred stock. The ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

As a Delaware corporation, we are also subject to certain Delaware anti-takeover provisions. Under Delaware law, a corporation may not engage in a business combination with any holder of 15% or more of its outstanding voting stock unless the holder has held the stock for three years or, among other things, the board of directors has approved the transaction. Our board of directors could rely on Delaware law to prevent or delay an acquisition of us.

ITEM 1B.   UNRESOLVED STAFF COMMENTS

None.

ITEM 2.    PROPERTIES

Our headquarters are located in Mountain View, California, where we own approximately 3.4 million square feet of office and building space and approximately seven acres of developable land to accommodate anticipated future growth. We also own a 2.9 million square feet office building in New York, New York and 556,000 square feet of office and building space in Paris and Dublin. We also operate and own data centers in the U.S., Europe, and Asia pursuant to various lease agreements and co-location arrangements.

In addition, we lease approximately 3.8 million square feet of office space and approximately 61 acres of undeveloped land in and near our headquarters in Mountain View, California. We also lease additional research and development, and sales and support offices throughout the United States and maintain leased facilities internationally in countries around the world. Larger leased sites include properties located in Dublin, Ireland; Zurich, Switzerland; London, UK; Hyderabad, India; San Francisco, CA; Paris, France; Hamburg, Germany; Sao Paulo, Brazil; Ann Arbor, MI; Bothell, WA; Cambridge, MA; Chicago, IL; Kirkland, WA; Venice, CA; Seattle, WA; Sydney, Australia; Beijing, China; Bangalore, India; Gurgaon, India; Tokyo, Japan; and Singapore.

We believe our existing facilities, both owned and leased, are in good condition and suitable for the conduct of our business.

ITEM 3.    LEGAL PROCEEDINGS

For a description of our material pending legal proceedings, please see Note 12 "Commitments and Contingencies— Legal Matters" of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K, which is incorporated herein by reference.

21

PX0492-024

**Table of Contents**

PART II

ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER
                PURCHASES OF EQUITY SECURITIES

Our Class A common stock has been listed on the Nasdaq Global Select Market under the symbol "GOOG" since
August 19, 2004. Prior to that time, there was no public market for our stock. The following table sets forth for the indicated
periods the high and low sales prices per share for our Class A common stock on the Nasdaq Global Select Market.

| Fiscal Year 2011 Quarters Ended: | High | Low |
|---|---|---|
| March 31, 2011 | $642.96 | $551.28 |
| June 30, 2011 | 595.19 | 473.02 |
| September 30, 2011 | 627.50 | 490.86 |
| December 31, 2011 | 646.76 | 480.60 |

| Fiscal Year 2010 Quarters Ended: | High | Low |
|---|---|---|
| March 31, 2010 | $629.51 | $520.00 |
| June 30, 2010 | 597.84 | 444.72 |
| September 30, 2010 | 536.85 | 433.63 |
| December 31, 2010 | 630.85 | 518.85 |

Our Class B common stock is neither listed nor traded.

Holders of Record

As of December 31, 2011, there were approximately 2,874 stockholders of record of our Class A common stock, and the
closing price of our Class A common stock was $645.90 per share as reported by the Nasdaq Global Select Market. Because
many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are
unable to estimate the total number of stockholders represented by these record holders. As of December 31, 2011, there
were approximately 85 stockholders of record of our Class B common stock.

Dividend Policy

We have never declared or paid any cash dividend on our common stock. We intend to retain any future earnings and do
not expect to pay any dividends in the foreseeable future.

22

**Table of Contents**

Stock Performance Graph

    This performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the Exchange Act), or incorporated by reference into any filing of Google under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

    The following graph shows a comparison from December 31, 2006 through December 31, 2011 of the cumulative total return for our Class A common stock, the S&P 500 Index, the Nasdaq Composite Index, and the RDG Internet Composite Index. Such returns are based on historical results and are not intended to suggest future performance. Data for the S&P 500 Index, the Nasdaq Composite Index, and the RDG Internet Composite Index assume reinvestment of dividends. We have never paid dividends on our Class A common stock and have no present plans to do so.

COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN*
Among Google Inc., the S&P 500 Index, the
NASDAQ Composite Index, and the RDG Internet Composite Index



·········· Google Inc.      ------ S&P 500      —— NASDAQ Composite      — — RDG Internet Composite

*$100 invested on 12/31/06 in stock or index, including reinvestment of dividends. Fiscal year ending December 31.

Copyright© 2012 S&P, a division of The McGraw-Hill Companies Inc. All rights reserved.

23

**Table of Contents**

Results of Google's Transferable Stock Option (TSO) Program

Under our TSO program, which we launched in April 2007, eligible employees are able to sell vested stock options to participating financial institutions in an online auction as an alternative to exercising options in the traditional method and then selling the underlying shares. The following table provides information with respect to sales by our employees of TSOs during the three months ended December 31, 2011:

| Period[1] | Aggregate Amounts | | | Weighted-Average Per Share Amounts | | |
|---|---|---|---|---|---|---|
| | Number of Shares Underlying TSOs Sold | Sale Price of TSOs Sold | TSO Premium[2] | Exercise Price of TSOs Sold | Sale Price of TSOs Sold | TSO Premium[2] |
| | | (in thousands) | | | | |
| October 1 – 31 | 152,594 | $38,884 | $ 2,385 | $351.45 | $254.82 | $ 15.63 |
| November 1 – 30 | 180,140 | 49,500 | 1,958 | 338.42 | 274.79 | 10.87 |
| December 1 – 31 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total (except weighted-average per share amounts) | 332,734 | $88,384 | $ 4,343 | $344.40 | $265.63 | $ 13.05 |

[1] The TSO program is generally active during regular trading hours for the Nasdaq Global Select Market when Google's trading window is open. However, we have the right to suspend the TSO program at any time for any reason, including for maintenance and other technical reasons.

[2] The TSO premium is calculated as the difference between (a) the sale price of the TSO and (b) the intrinsic value of the TSO, which we define as the excess, if any, of the price of our Class A common stock at the time of the sale over the exercise price of the TSO.

In April 2009, we amended our TSO program to allow participation by executive officers (other than Larry Page, Sergey Brin, and Eric E. Schmidt) in our TSO program. The following table provides information with respect to sales by our executive officers of TSOs during the three months ended December 31, 2011:

| Executive Officer | Aggregate Amounts | | |
|---|---|---|---|
| | Number of Shares Underlying TSOs Sold | Sale Price of TSOs Sold | TSO Premium |
| | | (in thousands) | |
| Nikesh Arora | 3,947 | $ 1,097 | $ 3 |
| Total | 3,947 | $ 1,097 | $ 3 |

24

**Table of Contents**

ITEM 6.    SELECTED FINANCIAL DATA

You should read the following selected consolidated financial data in conjunction with Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes appearing in Item 8 "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

The consolidated statements of income data for the years ended December 31, 2009, 2010, and 2011 and the consolidated balance sheet data at December 31, 2010, and 2011 are derived from our audited consolidated financial statements appearing in Item 8 of this Annual Report on Form 10-K. The consolidated statements of income data for the years ended December 31, 2007 and 2008, and the consolidated balance sheet data at December 31, 2007, 2008, and 2009, are derived from our audited consolidated financial statements that are not included in this Annual Report on Form 10-K. The historical results are not necessarily indicative of the results to be expected in any future period.

| | Year Ended December 31, | | | | |
| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| | (in millions, except per share amounts) | | | | |
| Consolidated Statements of Income Data: | | | | | |
| Revenues | $16,594 | $21,796 | $23,651 | $29,321 | $37,905 |
| Income from operations | 5,084 | 6,632 | 8,312 | 10,381 | 11,742 |
| Net income | 4,204 | 4,227 | 6,520 | 8,505 | 9,737 |
| Net income per share of Class A and Class B common stock | | | | | |
| Basic | $ 13.53 | $ 13.46 | $ 20.62 | $ 26.69 | $ 30.17 |
| Diluted | $ 13.29 | $ 13.31 | $ 20.41 | $ 26.31 | $ 29.76 |

| | As of December 31, | | | | |
| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Consolidated Balance Sheet Data: | | | | | |
| Cash, cash equivalents, and marketable securities | $14,219 | $15,846 | $24,485 | $34,975 | $44,626 |
| Total assets | 25,336 | 31,768 | 40,497 | 57,851 | 72,574 |
| Total long-term liabilities | 611 | 1,227 | 1,746 | 1,614 | 5,516 |
| Total stockholders' equity | 22,690 | 28,239 | 36,004 | 46,241 | 58,145 |

25

PX0492-028

Table of Contents

ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis of our financial condition and results of operations should be read together with our consolidated financial statements and related notes included under Item 8 of this Annual Report on Form 10-K.

Overview

Google is a global technology leader focused on improving the ways people connect with information. Our innovations in web search and advertising have made our website a top internet property and our brand one of the most recognized in the world. Our mission is to organize the world's information and make it universally accessible and useful. We serve three primary constituencies:

- *Users.* We provide users with products and services that enable people to more quickly and easily find, create, and organize information that is useful to them.

- *Advertisers.* We provide advertisers with cost-effective ways to deliver online and offline ads to customers across Google-owned websites and through the Google Network, which is the network of third parties that use our advertising programs to deliver relevant ads with their search results and content.

- *Google Network Members and Other Content Providers.* We provide members of our Google Network with our Google AdSense programs. These include programs through which we distribute our advertisers' AdWords ads for display on the websites of our Google Network Members. We share most of the fees these ads generate with our Google Network Members, thereby creating an important revenue stream for them. In addition, we have entered into arrangements with other content providers under which we distribute or license their video and other content, and we may display ads next to or as part of this content on the pages of our websites. We share most of the fees these ads generate with these content providers, thereby creating an important revenue stream for these partners.

Recent Development

On August 15, 2011, we entered into the Merger Agreement with Motorola, a provider of innovative technologies, products and services that enable a range of mobile and wireline digital communication, information and entertainment experiences, under which we will acquire Motorola for $40 per share in cash, or a total of approximately $12.5 billion in cash. The completion of this transaction is subject to customary closing conditions, including the receipt of certain regulatory approvals.

How We Generate Revenue

Advertising revenues made up 97% of our revenues in 2009 and 96% of our revenues in 2010 and 2011. We derive most of our additional revenues from our enterprise products, as well as our display advertising management services to advertisers, ad agencies, and publishers.

Google AdWords is our auction-based advertising program that enables advertisers to place text-based and display ads on our websites and our Google Network Members' websites. Display advertising comprises the videos, text, images, and other interactive ads that run across the web on computers and mobile devices, including smart phones and handheld computers such as netbooks and tablets. Most of our AdWords customers pay us on a cost-per-click basis, which means that an advertiser pays us only when a user clicks on one of its ads. We also offer AdWords on a cost-per-impression basis that enables advertisers to pay us based on the number of times their ads appear on our websites and our Google Network Members' websites as specified by the advertisers. For advertisers using our AdWords cost-per-click pricing, we recognize as revenue the fees charged to advertisers

26

**Table of Contents**

each time a user clicks on one of the ads that appears next to the search results or content on our websites or our Google Network Members' websites. For advertisers using our AdWords cost-per-impression pricing, we recognize as revenue the fees charged to advertisers each time their ads are displayed on our websites or our Google Network Members' websites. Our AdWords agreements are generally terminable at any time by our advertisers.

Google AdSense refers to the online programs through which we distribute our advertisers' AdWords ads for display on our Google Network Members' websites, as well as programs to deliver ads on television broadcasts. Our AdSense programs include AdSense for search and AdSense for content.

AdSense for search is our online service for distributing relevant ads from our advertisers for display with search results on our Google Network Members' websites. To use AdSense for search, most of our AdSense for search partners add Google search functionality to their web pages in the form of customizable Google search boxes. When visitors to these websites search either the website or the internet using these customizable search boxes, we display relevant ads on the search results pages, targeted to match user search queries. Ads shown through AdSense for search are text ads.

AdSense for content is our online service for distributing ads from our advertisers that are relevant to content on our Google Network Members' websites. Under this program, we use automated technology to analyze the meaning of the content on the web page and serve relevant ads based on the meaning of such content. For example, a web page on an automotive blog that contains an entry about vintage cars might display ads for vintage car parts or vintage car shows. These ads are displayed in spaces that our AdSense for content partners have set aside on their websites. AdSense for content allows a variety of ad types to be shown, including text ads, image ads, Google Video Ads, link units (which are sets of clickable links to topic pages related to page content), themed units (which are regular text ads with graphic treatments that change seasonally and by geography), and gadget ads (which are customized "mini-sites" that run as ads on AdSense publisher websites).

For our online AdSense program, our advertisers pay us a fee each time a user clicks on one of our advertisers' ads displayed on our Google Network Members' websites or, for those advertisers who choose our cost-per-impression pricing, as their ads are displayed. To date, we have paid most of these advertiser fees to our Google Network Members, and we expect to continue doing so for the foreseeable future. We recognize these advertiser fees as revenue and the portion of the advertiser fee we pay to our Google Network Members as traffic acquisition costs under cost of revenues. Google Network Members do not pay any fees associated with the use of our AdSense program on their websites.

Our agreements with Google Network Members consist largely of uniform online "click-wrap" agreements that members enter into by interacting with our registration websites. The standard agreements have no stated term and are terminable at will. Agreements with our larger members are individually negotiated. Both the standard agreements and the negotiated agreements require us to share with the Google Network Member most of the advertiser fees generated by users clicking on ads on the Google Network Member's website or, for advertisers who choose our cost-per-impression pricing, as the ads are displayed on the Google Network Member's website. For example, under our standard agreements, we pay 51% and 68% of the fees collected from advertisers to our Google Network Members in AdSense for search and AdSense for content, respectively.

We also offer display advertising management services such as media planning, buying, implementation, and measurement tools for advertisers and agencies, and forecasting and reporting tools for publishers. We recognize the related fees as other revenues in the period advertising impressions are delivered.

In January 2010, we launched, and in July 2010, we discontinued, our direct-to-consumer web store channel for distributing our Nexus One mobile phone. We had recognized fees derived from the sale of these phones as other revenues in the period in which they were delivered.

We have entered into arrangements with certain content providers under which we distribute or license their video and other content. Our agreements with content providers are typically standard agreements with no stated

27

PX0492-030

Table of Contents

term and are terminable at will. Agreements with our larger members are individually negotiated. Both the standard agreements and the negotiated agreements require us to pay the content providers for the content we license. In a number of these arrangements, we display ads on the pages of our websites from which the content is viewed and share most of the fees these ads generate with the content providers. We recognize these advertiser fees as revenue and the fees we pay to our content providers as content acquisition costs under cost of revenues.

We believe the factors that influence the success of our advertising programs include the following:

- The relevance, objectivity, and quality of our search results and the relevance and quality of ads displayed with each search results page.

- The number of searches initiated at our websites and our Google Network Members' websites and the underlying purpose of these searches (for instance, whether they are for academic research, to find a news article, or to find a product or service).

- The number and prominence of ads displayed on our websites and our Google Network Members' websites.

- The number of visits to, and the content of, our Google Network Members' websites and certain of our websites and the relevance and quality of the ads we display next to this content.

- The advertisers' return on investment from advertising campaigns on our websites or our Google Network Members' websites compared to other forms of advertising.

- The total advertising spending budgets of each advertiser.

- The number of advertisers and the breadth of items advertised.

- The amount we ultimately pay our Google Network Members, distribution partners, and our content providers for traffic, access points, and content, compared to the amount of revenues we generate.

- Our ability to increase traffic on our websites and our Google Network Members' websites via new and improved ad formats including the ones on mobile devices.

Trends in Our Business

Advertising transactions continue to shift from offline to online as the digital economy evolves. This has contributed to the rapid growth of our business since inception, resulting in substantially increased revenues, and we expect that our business will continue to grow. However, our revenue growth rate has generally declined over time, and it could do so in the future as a result of a number of factors, including increasing competition, challenges in maintaining our growth rate as our revenues increase to higher levels, and increasing maturity of the online advertising market and other markets in which we participate. In addition, if there is a further general economic downturn, this may result in fewer commercial queries by our users and may cause advertisers to reduce the amount they spend on online advertising, including the amount they are willing to pay for each click or impression, which could negatively affect the growth rate of our revenues. We plan to continue to invest aggressively in our core areas of strategic focus.

The main focus of our advertising programs is to provide relevant and useful advertising to our users, reflecting our commitment to constantly improve their overall web experience. As a result, we expect to continue to take steps to improve the relevance of the ads displayed on our websites and our Google Network Members' websites. These steps include not displaying ads that generate low click-through rates or that send users to irrelevant or otherwise low quality websites and terminating our relationships with those Google Network Members whose websites do not meet our quality requirements. We may also continue to take steps to reduce the number of accidental clicks by our users. These steps could negatively affect the growth rate of our revenues.

Both seasonal fluctuations in internet usage and traditional retail seasonality have affected, and are likely to continue to affect, our business. Internet usage generally slows during the summer months, and commercial

28

PX0492-031

Table of Contents

queries typically increase significantly in the fourth quarter of each year. These seasonal trends have caused, and will likely continue to cause, fluctuations in our quarterly results, including fluctuations in sequential revenues, as well as aggregate paid click and average cost-per-click growth rates.

The operating margin we realize on revenues generated from ads placed on our Google Network Members' websites through our AdSense program is significantly lower than the operating margin we realize from revenues generated from ads placed on our websites because most of the advertiser fees from ads served on Google Network Members' websites are shared with our Google Network Members. For the past five years, growth in advertising revenues from our websites has generally exceeded that from our Google Network Members' websites. This trend has had a positive impact on our operating margins, and we expect that this will continue for the foreseeable future, although the relative rate of growth in revenues from our websites compared to the rate of growth in revenues from our Google Network Members' websites may vary over time.

We also continue to invest aggressively in our systems, data centers, corporate facilities, information technology infrastructure, and employees. We increased our hiring in 2011, and we may continue to do so and to provide competitive compensation programs for our employees. For instance, effective January 1, 2011, we increased base salaries for all of our non-executive employees by 10% and shifted a portion of the bonus into base salary. Our full-time employee headcount was 24,400 at December 31, 2010 and 32,467 at December 31, 2011. Acquisitions will also remain an important component of our strategy and use of capital, and we expect our current pace of acquisitions to continue. We expect our cost of revenues will increase in dollars and may increase as a percentage of revenues in future periods, primarily as a result of forecasted increases in traffic acquisition costs, data center costs, content acquisition costs, credit card and other transaction fees, and other costs. In particular, traffic acquisition costs as a percentage of advertising revenues may increase in the future if we are unable to continue to improve the monetization or generation of revenues from traffic on our websites and our Google Network Members' websites.

As we expand our advertising programs and other products to international markets, we continue to increase our exposure to fluctuations in foreign currency to U.S. dollar exchange rates. We have a foreign exchange risk management program that is designed to reduce our exposure to fluctuations in foreign currency exchange rates. However, this program will not fully offset the effect of fluctuations on our revenues and earnings.

Results of Operations

The following table presents our historical operating results as a percentage of revenues for the periods indicated:

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Consolidated Statements of Income Data: |  |  |  |
| Revenues | 100.0% | 100.0% | 100.0% |
| Costs and expenses: |  |  |  |
| Cost of revenues | 37.4 | 35.5 | 34.8 |
| Research and development | 12.0 | 12.8 | 13.6 |
| Sales and marketing | 8.4 | 9.5 | 12.1 |
| General and administrative | 7.0 | 6.8 | 7.2 |
| Charge related to the resolution of Department of Justice investigation | 0 | 0 | 1.3 |
| Total costs and expenses | 64.8 | 64.6 | 69.0 |
| Income from operations | 35.2 | 35.4 | 31.0 |
| Interest and other income, net | 0.3 | 1.4 | 1.5 |
| Income before income taxes | 35.5 | 36.8 | 32.5 |
| Provision for income taxes | 7.9 | 7.8 | 6.8 |
| Net income | 27.6% | 29.0% | 25.7% |

29

Table of Contents

Revenues

The following table presents our revenues, by revenue source, for the periods presented (in millions):

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Advertising revenues: | | | |
| Google websites | $15,723 | $19,444 | $26,145 |
| Google Network Members' websites | 7,166 | 8,792 | 10,386 |
| Total advertising revenues | 22,889 | 28,236 | 36,531 |
| Other revenues | 762 | 1,085 | 1,374 |
| Revenues | $23,651 | $29,321 | $37,905 |

The following table presents our revenues, by revenue source, as a percentage of total revenues for the periods presented:

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Advertising revenues: | | | |
| Google websites | 67% | 66% | 69% |
| Google Network Members' websites | 30 | 30 | 27 |
| Total advertising revenues | 97 | 96 | 96 |
| Google websites as % of advertising revenues | 69 | 69 | 72 |
| Google Network Members' websites as % of advertising revenues | 31 | 31 | 28 |
| Other revenues | 3% | 4% | 4% |

The increase in our revenues from 2010 to 2011 resulted primarily from an increase in advertising revenues generated by Google websites and Google Network Members' websites. The increase in advertising revenues for Google websites and Google Network Members' websites resulted primarily from an increase in the number of paid clicks through our advertising programs and, to a lesser extent, an increase in the average cost-per-click paid by our advertisers. The increase in the number of paid clicks generated through our advertising programs was due to an increase in aggregate traffic, certain monetization improvements including new ad formats, and the continued global expansion of our products, and our advertiser and user base, as well as an increase in the number of Google Network Members. The increase in the average cost-per-click paid by our advertisers was primarily driven by the increased spending from advertisers and a general weakening of the U.S dollar compared to foreign currencies (primarily the Euro, Japanese yen, and British pound), partially offset by the changes in geographical mix due to traffic growth in emerging markets, where the average cost-per-click is typically lower, compared to more mature markets. In addition, the increase in advertising revenues for Google Network Members' websites from 2010 to 2011 was partially offset by the loss of a search partnership and, to a lesser extent, by a search quality improvement made during the first quarter of 2011.

The increase in our revenues from 2009 to 2010 resulted primarily from an increase in advertising revenues generated by Google websites and Google Network Members' websites and, to a lesser extent, an increase in other revenues, largely as a result of the launch of our mobile phone business in the first quarter of 2010. The increase in advertising revenue for Google websites and Google Network Members' websites from 2009 to 2010 resulted primarily from an increase in the number of paid clicks through our advertising programs and, to a lesser extent, an increase in the average cost-per-click paid by our advertisers. The increase in the number of paid clicks generated through our advertising programs was due to an increase in aggregate traffic, certain monetization improvements including new ad formats, and the continued global expansion of our products, and our advertiser and user base, as well as an increase in the number of Google Network Members. The increase in the average cost-per-click paid by our advertisers was primarily driven by the increased spending from advertisers, partially offset by the changes in geographical mix due to traffic growth in emerging markets, where the average cost-per-click is typically lower, compared to more mature markets.

30

**Table of Contents**

Improvements in our ability to ultimately monetize increased traffic primarily relate to enhancing the end user experience, including providing end users with ads that are more relevant to their search queries or to the content on the Google Network Members' websites they visit. For instance, these improvements include increasing site links to be full size links with the URL (uniform resource locator), moving a portion of the first line of the ad to the heading to better promote the content of the ad, providing an option to preview the ad, and moving the ad's URL to a separate line below the heading for greater page format consistency.

Aggregate paid clicks on Google websites and Google Network Members' websites increased approximately 25% from 2010 to 2011 and approximately 16% from 2009 to 2010. Average cost-per-click on Google websites and Google Network Members' websites increased approximately 3% from 2010 to 2011 and 5% from 2009 to 2010. The rate of change in aggregate paid clicks and average cost-per-click, and their correlation with the rate of change in revenues, has fluctuated and may fluctuate in the future because of various factors, including the revenue growth rates on our websites compared to those of our Google Network Members, advertiser competition for keywords, changes in foreign currency exchange rates, seasonality, the fees advertisers are willing to pay based on how they manage their advertising costs, changes in advertising quality or formats, and general economic conditions. In addition, traffic growth in emerging markets compared to more mature markets and across various advertising verticals and channels also contributes to these fluctuations. Changes in aggregate paid clicks and average cost-per-click may not be indicative of our performance or advertiser experiences in any specific geographic market, vertical, or industry.

We believe that the increase in the number of paid clicks on Google websites and Google Network Members' websites is substantially the result of our commitment to improving the relevance and quality of both our search results and the advertisements displayed, which we believe results in a better user experience, which in turn results in more searches, advertisers, and Google Network Members and other partners.

Revenues by Geography

The following table presents our domestic and international revenues as a percentage of consolidated revenues, determined based on the billing addresses of our customers:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| United States | 47% | 48% | 46% |
| United Kingdom | 13% | 11% | 11% |
| Rest of the world | 40% | 41% | 43% |

The growth in international revenues (other than the United Kingdom) as a percentage of consolidated revenues from 2010 to 2011 resulted largely from increased acceptance of our advertising programs, our continued progress in developing localized versions of our products for these international markets, and, to a lesser extent, a general weakening of the U.S dollar compared to foreign currencies (primarily the Euro and Japanese yen).

The growth in international revenues (other than the United Kingdom) as a percentage of consolidated revenues from 2009 to 2010 resulted largely from increased acceptance of our advertising programs and our continued progress in developing localized versions of our products for these international markets. The growth in revenues from the United States as a percentage of consolidated revenues from 2009 to 2010 resulted largely from the recovery of certain key verticals such as retail, travel, finance, and insurance. The decline in revenues from the United Kingdom as a percentage of consolidated revenues from 2009 to 2010 resulted primarily from a less robust economic recovery relative to the United States and the rest of the world, as well as a decrease in hedging gains recognized during 2010.

The general weakening of the U.S. dollar relative to certain foreign currencies (primarily the Euro, Japanese yen, and British pound) from 2010 to 2011 had a favorable impact on our international revenues. Had foreign

31

PX0492-034

**Table of Contents**

exchange rates remained constant in these periods, our revenues from the United Kingdom would have been $129 million, or 3.2%, lower and our revenues from the rest of the world would have been approximately $834 million, or 5.1%, lower in 2011. This is before consideration of hedging gains of $9 million and $34 million recognized to revenues from the United Kingdom and the rest of the world in 2011.

The general strengthening of the U.S. dollar relative to certain foreign currencies (primarily the Euro) from 2009 to 2010 had an unfavorable impact on our international revenues. Had foreign exchange rates remained constant in these periods, our revenues from the United Kingdom would have been approximately $10 million, or 0.3% higher, and our revenues from the rest of the world would have been approximately $25 million, or 0.2% higher in 2010. This is before consideration of hedging gains of $42 million and $161 million recognized to revenues from the United Kingdom and the rest of the world in 2010.

Although we expect to continue to make investments in international markets, these investments may not result in an increase in our international revenues as a percentage of total revenues in 2012 or thereafter. See Note 16 of Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for additional information about geographic areas.

Costs and Expenses

*Cost of Revenues*

Cost of revenues consists primarily of traffic acquisition costs. Traffic acquisition costs consist of amounts ultimately paid to our Google Network Members under AdSense arrangements and to certain other partners (our distribution partners) who distribute our toolbar and other products (collectively referred to as access points) or otherwise direct search queries to our website (collectively referred to as distribution arrangements). These amounts are primarily based on the revenue share and fixed fee arrangements with our Google Network Members and distribution partners.

Certain distribution arrangements require us to pay our partners based on a fee per access point delivered and not exclusively—or at all—based on revenue share. These fees are non-refundable. Further, these arrangements are terminable at will, although under the terms of certain contracts we or our distribution partners may be subject to penalties in the event of early termination. We recognize fees under these arrangements over the estimated useful lives of the access points (approximately two years) to the extent we can reasonably estimate those lives and they are longer than one year, or based on any contractual revenue share, if greater. Otherwise, the fees are charged to expense as incurred. The estimated useful life of the access points is based on the historical average period of time they generate traffic and revenues.

Cost of revenues also includes the expenses associated with the operation of our data centers, including depreciation, labor, energy, and bandwidth costs, credit card and other transaction fees related to processing customer transactions including Google Checkout transactions, amortization of acquired intangible assets, as well as content acquisition costs. We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements, we display ads on the pages of our websites from which the content is viewed and share most of the fees these ads generate with the content providers. To the extent we are obligated to make guaranteed minimum revenue share payments to our content providers, we recognize as content acquisition costs the contractual revenue share amount or on a straight-line basis, whichever is greater, over the terms of the agreements.

32

PX0492-035

**Table of Contents**

The following tables present our cost of revenues and cost of revenues as a percentage of revenues, and our traffic acquisition costs, and traffic acquisition costs as a percentage of advertising revenues, for the periods presented (dollars in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| Cost of revenues | $8,844 | $10,417 | $13,188 |
| Cost of revenues as a percentage of revenues | 37.4% | 35.5% | 34.8% |

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| Traffic acquisition costs related to AdSense arrangements | $5,265 | $ 6,162 | $ 7,294 |
| Traffic acquisition costs related to distribution arrangements | 904 | 1,155 | 1,517 |
| Total traffic acquisition costs | $6,169 | $ 7,317 | $ 8,811 |
| Traffic acquisition costs as a percentage of advertising revenues | 27.0% | 25.9% | 24.1% |

Cost of revenues increased $2,771 million from 2010 to 2011. The increase was primarily related to an increase in traffic acquisition costs of $1,132 million resulting from more advertiser fees generated through our AdSense program. The increase was also related to an increase in traffic acquisition costs of $362 million from our distribution arrangements as a result of more traffic directed to our websites, as well as more distribution fees paid. The decrease in traffic acquisition costs as a percentage of advertising revenues was primarily due to an increase in the proportion of advertising revenues from our websites compared to our Google Network Members' websites, more revenues realized from Google Network Members to whom we pay less revenue share, and, to a lesser extent, expiration of an AdSense arrangement under which we paid guaranteed minimum revenue share. In addition, there was an increase in data center costs of $784 million, primarily resulting from the depreciation of additional information technology assets and data center buildings and an increase in labor, energy, and bandwidth costs, and an increase in content acquisition costs of $236 million, primarily related to content displayed on YouTube, partially offset by a decrease in mobile phone costs.

Cost of revenues increased $1,573 million from 2009 to 2010. The increase was primarily related to an increase in traffic acquisition costs of $897 million resulting largely from more advertiser fees generated through our AdSense program. The increase was also related to an increase in traffic acquisition costs of $251 million from our distribution arrangements as a result of more traffic directed to our websites, as well as more distribution fees paid. The decrease in traffic acquisition costs as a percentage of advertising revenues was primarily due to more revenues realized from Google Network Members to whom we pay less revenue share, and expiration of an AdSense arrangement under which we paid guaranteed minimum revenue share. In addition, there was an increase in content acquisition costs of $169 million primarily related to content displayed on YouTube and an increase in mobile phone costs.

We expect cost of revenues will increase in dollar amount and may increase as a percentage of revenues in 2012 and in future periods, primarily as a result of forecasted increases in traffic acquisition costs, data center costs, credit card and other transaction fees, content acquisition costs, and other costs. Traffic acquisition costs as a percentage of advertising revenues may fluctuate in the future based on a number of factors, including the following:

•   The relative growth rates of revenues from our websites and from our Google Network Members' websites.

•   Whether we are able to enter into more AdSense arrangements that provide for lower revenue share obligations or whether increased competition for arrangements with existing and potential Google Network Members results in less favorable revenue share arrangements.

•   Whether we are able to continue to improve the monetization of traffic on our websites and our Google Network Members' websites.

<center>33</center>

**Table of Contents**

- The relative growth rates of expenses associated with distribution arrangements and the related revenues generated, including whether we share with certain existing and new distribution partners proportionately more of the aggregate advertising fees that we earn from paid clicks derived from search queries these partners direct to our websites.

*Research and Development*

The following table presents our research and development expenses, and research and development expenses as a percentage of our revenues for the periods presented (dollars in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| Research and development expenses | $2,843 | $3,762 | $5,162 |
| Research and development expenses as a percentage of revenues | 12.0% | 12.8% | 13.6% |

Research and development expenses consist primarily of compensation and related costs for personnel responsible for the research and development of new and existing products and services. We expense research and development costs as they are incurred.

Research and development expenses increased $1,400 million from 2010 to 2011. This increase was primarily due to an increase in labor and facilities-related costs of $875 million, largely as a result of a 23% increase in research and development headcount, including headcount from acquisitions, as well as an increase in employee base salaries of approximately 10%. In addition, there was an increase in stock-based compensation expense of $200 million.

Research and development expenses increased $919 million from 2009 to 2010. This increase was primarily due to an increase in labor-related costs of $578 million, largely as a result of a 28% increase in research and development headcount, including headcount from acquisitions. In addition, there was an increase in stock-based compensation expense of $136 million.

We expect that research and development expenses will increase in dollar amount and may increase as a percentage of revenues in 2012 and future periods because we expect to continue to invest in building the necessary employee and systems infrastructures required to support the development of new, and improve existing, products and services.

*Sales and Marketing*

The following table presents our sales and marketing expenses, and sales and marketing expenses as a percentage of revenues for the periods presented (dollars in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| Sales and marketing expenses | $1,984 | $2,799 | $4,589 |
| Sales and marketing expenses as a percentage of revenues | 8.4% | 9.5% | 12.1% |

Sales and marketing expenses consist primarily of compensation and related costs for personnel engaged in customer service, sales, and sales support functions, as well as advertising and promotional expenditures.

Sales and marketing expenses increased $1,790 million from 2010 to 2011. This increase was primarily due to an increase in labor and facilities-related costs of $787 million, largely as a result of a 36% increase in sales and marketing headcount, including headcount from acquisitions, as well as an increase in employee base salaries of approximately 10%. In addition, there was an increase in advertising and promotional expense of $700 million.

34

**Table of Contents**

Sales and marketing expenses increased $815 million from 2009 to 2010. This increase was primarily due to an increase in advertising and promotional expense of $387 million. In addition, there was an increase in labor-related costs of $254 million, largely as a result of a 20% increase in sales and marketing headcount, and higher commission expense.

We expect that sales and marketing expenses will increase in dollar amount and may increase as a percentage of revenues in 2012 and future periods, as we expand our business globally, increase advertising and promotional expenditures in connection with new and existing products, and increase the level of service we provide to our advertisers, Google Network Members, and other partners.

*General and Administrative*

The following table presents our general and administrative expenses, and general and administrative expenses as a percentage of revenues for the periods presented (dollars in millions):

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2009 | 2010 | 2011 |
| General and administrative expenses | $1,668 | $1,962 | $2,724 |
| General and administrative expenses as a percentage of revenues | 7.0% | 6.8% | 7.2% |

General and administrative expenses consist primarily of compensation and related costs for personnel and facilities, and include costs related to our facilities, finance, human resources, information technology, and legal organizations, and fees for professional services. Professional services are principally comprised of outside legal, audit, information technology consulting, and outsourcing services.

General and administrative expenses increased $762 million from 2010 to 2011. This increase was primarily due to an increase in labor and facilities-related costs of $350 million, primarily as a result of a 37% increase in general and administrative headcount and an increase in employee base salaries of approximately 10%, as well as an increase in expense related to professional services of $260 million, the majority of which were related to consulting services and legal costs. In addition, there was an increase in stock-based compensation of $116 million.

General and administrative expenses increased $294 million from 2009 to 2010. This increase was primarily due to increases in expense related to professional services of $137 million, the majority of which were related to legal and temporary services costs. In addition, there was an increase in labor-related costs of $64 million largely as a result of a 14% increase in general and administrative headcount, and an increase in charitable contributions of $64 million.

As we expand our business and incur additional expenses, we expect general and administrative expenses will increase in dollar amount and may increase as a percentage of revenues in 2012 and future periods.

*Charge Related to the Resolution of Department of Justice Investigation*

In connection with a resolution of an investigation by the United States Department of Justice into the use of Google advertising by certain advertisers, we accrued $500 million during the three months ended March 31, 2011, which was paid in August 2011 upon final resolution of that matter.

*Stock-Based Compensation*

The following table presents our stock-based compensation, and stock-based compensation as a percentage of revenues for the periods presented (dollars in millions):

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2009 | 2010 | 2011 |
| Stock-based compensation | $1,164 | $1,376 | $1,974 |
| Stock-based compensation as a percentage of revenues | 4.9% | 4.7% | 5.2% |

35

PX0492-038

**Table of Contents**

Stock-based compensation increased $598 million from 2010 to 2011. This increase was largely due to additional stock awards issued to existing and new employees.

Stock-based compensation increased $212 million from 2009 to 2010. This increase was largely due to additional stock awards issued to existing and new employees.

We estimate stock-based compensation to be approximately $2.0 billion in 2012 and $2.4 billion thereafter. This estimate does not include expenses to be recognized related to employee stock awards that are granted after December 31, 2011 or non-employee stock awards that have been or may be granted. In addition, to the extent forfeiture rates are different from what we have anticipated, stock-based compensation related to these awards will be different from our expectations.

Interest and Other Income, Net

Interest and other income, net increased $169 million from 2010 to 2011. This increase was primarily driven by an increase in interest income of $233 million due to an increase in our cash and investment balances and higher yields, as well as an increase in net realized gains on sales of available-for-sale investments of $69 million, partially offset by an increase in interest expense of $53 million primarily related to our long-term debt program. In addition, we recorded an impairment charge of $110 million related to certain equity investments during the year ended December 31, 2011.

Interest and other income, net increased $346 million from 2009 to 2010. This increase was primarily driven by an increase in interest income of $349 million due to an increase in our cash and investment balances and higher yields, as well as an increase in net realized gains on sales of available-for-sale investments of $88 million. These increases were partially offset by an increase in net foreign exchange related costs of $95 million primarily related to our foreign exchange risk management program.

The costs of our foreign exchange hedging activities that we recognized to interest and other income, net are primarily a function of the notional amount of the option and forward contracts and their related duration, the movement of the foreign exchange rates relative to the strike prices of the contracts, as well as the volatility of the foreign exchange rates.

As we expand our international business, we believe costs related to hedging activities under our foreign exchange risk management program may increase in dollar amount in 2012 and future periods.

Provision for Income Taxes

The following table presents our provision for income taxes, and effective tax rate for the periods presented (dollars in millions):

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
| --- | --- | --- | --- |
| Provision for income taxes | $1,861 | $2,291 | $2,589 |
| Effective tax rate | 22.2% | 21.2% | 21.0% |

Our provision for income taxes increased from 2010 to 2011, primarily as a result of increases in federal income taxes, driven by higher taxable income year over year, partially offset by proportionately more earnings realized in countries that have lower statutory tax rates. Our effective tax rate decreased from 2010 to 2011, primarily as a result of proportionately more earnings realized in countries that have lower statutory tax rates, a decrease in state income taxes, and an increase in federal research and development credits recognized in 2011, partially offset by recognition of a charge related to the resolution of an investigation by the Department of Justice which is not deductible for tax purposes.

36

**Table of Contents**

Our provision for income taxes increased from 2009 to 2010, primarily as a result of increases in federal and state income taxes, driven by higher taxable income year over year. Our effective tax rate decreased from 2009 to 2010, primarily because we released certain tax reserves as a result of the settlement of our 2005 and 2006 tax audits in 2010. This decrease was partially offset by proportionately higher earnings in countries where we have higher statutory tax rates.

Our effective tax rate could fluctuate significantly on a quarterly basis and could be adversely affected to the extent earnings are lower than anticipated in countries that have lower statutory rates and higher than anticipated in countries that have higher statutory rates. Our effective tax rate could also fluctuate due to the net gains and losses recognized by legal entities on certain hedges and related hedged intercompany and other transactions under our foreign exchange risk management program, by changes in the valuation of our deferred tax assets or liabilities, or by changes in tax laws, regulations, or accounting principles, as well as certain discrete items. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Service (IRS) and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes.

See Critical Accounting Policies and Estimates below for additional information about our provision for income taxes.

A reconciliation of the federal statutory income tax rate to our effective tax rate is set forth in Note 15 of Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

Quarterly Results of Operations

You should read the following tables presenting our quarterly results of operations in conjunction with the consolidated financial statements and related notes included in Item 8 of this Annual Report on Form 10-K. We have prepared the unaudited information on the same basis as our audited consolidated financial statements. You should also keep in mind that our operating results for any quarter are not necessarily indicative of results for any future quarters or for a full year.

37

PX0492-040

**Table of Contents**

The following table presents our unaudited quarterly results of operations for the eight quarters ended December 31, 2011. This table includes all adjustments, consisting only of normal recurring adjustments, that we consider necessary for fair presentation of our consolidated financial position and operating results for the quarters presented. Both seasonal fluctuations in internet usage and traditional retail seasonality have affected, and are likely to continue to affect, our business. Internet usage generally slows during the summer months, and commercial queries typically increase significantly in the fourth quarter of each year. These seasonal trends have caused and will likely continue to cause, fluctuations in our quarterly results, including fluctuations in sequential revenue growth rates.

| | Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2010 | Jun 30, 2010 | Sep 30, 2010 | Dec 31, 2010 | Mar 31, 2011 | Jun 30, 2011 | Sep 30, 2011 | Dec 31, 2011 |
| | (In millions, except per share amounts) (unaudited) | | | | | | | |
| Consolidated Statements of Income Data: | | | | | | | | |
| Revenues | $6,775 | $6,820 | $7,286 | $8,440 | $8,575 | $9,026 | $9,720 | $10,584 |
| Costs and expenses: | | | | | | | | |
| Cost of revenues | 2,452 | 2,467 | 2,552 | 2,946 | 2,936 | 3,172 | 3,378 | 3,702 |
| Research and development | 818 | 898 | 994 | 1,051 | 1,226 | 1,234 | 1,404 | 1,298 |
| Sales and marketing | 607 | 629 | 661 | 902 | 1,026 | 1,091 | 1,204 | 1,268 |
| General and administrative | 410 | 461 | 532 | 559 | 591 | 648 | 676 | 809 |
| Charge related to the resolution of Department of Justice investigation | 0 | 0 | 0 | 0 | 500 | 0 | 0 | 0 |
| Total costs and expenses | 4,287 | 4,455 | 4,739 | 5,458 | 6,279 | 6,145 | 6,662 | 7,077 |
| Income from operations | 2,488 | 2,365 | 2,547 | 2,982 | 2,296 | 2,881 | 3,058 | 3,507 |
| Interest and other income (expense), net | 18 | 69 | 167 | 160 | 96 | 204 | 302 | (18) |
| Income before income taxes | 2,506 | 2,434 | 2,714 | 3,142 | 2,392 | 3,085 | 3,360 | 3,489 |
| Provision for income taxes | 551 | 594 | 547 | 599 | 594 | 580 | 631 | 784 |
| Net income | $1,955 | $1,840 | $2,167 | $2,543 | $1,798 | $2,505 | $2,729 | $2,705 |
| Net income per share: | | | | | | | | |
| Basic | $ 6.15 | $ 5.78 | $ 6.80 | $ 7.95 | $ 5.59 | $ 7.77 | $ 8.44 | $ 8.34 |
| Diluted | $ 6.06 | $ 5.71 | $ 6.72 | $ 7.81 | $ 5.51 | $ 7.68 | $ 8.33 | $ 8.22 |

38

PX0492-041

Table of Contents

The following table presents our unaudited quarterly results of operations as a percentage of revenues for the eight quarters ended December 31, 2011:

| | Quarter Ended | | | | | | | |
| | Mar 31, 2010 | Jun 30, 2010 | Sep 30, 2010 | Dec 31, 2010 | Mar 31, 2011 | Jun 30, 2011 | Sep 30, 2011 | Dec 31, 2011 |
|---|---|---|---|---|---|---|---|---|
| Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Costs and expenses: | | | | | | | | |
|    Cost of revenues | 36.2 | 36.2 | 35.0 | 34.9 | 34.2 | 35.1 | 34.8 | 35.0 |
|    Research and development | 12.1 | 13.2 | 13.6 | 12.5 | 14.3 | 13.7 | 14.4 | 12.3 |
|    Sales and marketing | 9.0 | 9.2 | 9.1 | 10.7 | 12.0 | 12.1 | 12.4 | 12.0 |
|    General and administrative | 6.0 | 6.7 | 7.3 | 6.6 | 6.9 | 7.2 | 6.9 | 7.6 |
|    Charge related to the resolution of Department of Justice investigation | 0 | 0 | 0 | 0 | 5.8 | 0 | 0 | 0 |
| Total costs and expenses | 63.3 | 65.3 | 65.0 | 64.7 | 73.2 | 68.1 | 68.5 | 66.9 |
| Income from operations | 36.7 | 34.7 | 35.0 | 35.3 | 26.8 | 31.9 | 31.5 | 33.1 |
| Interest and other income (expense), net | 0.3 | 1.0 | 2.2 | 1.9 | 1.1 | 2.3 | 3.1 | (0.1) |
| Income before income taxes | 37.0 | 35.7 | 37.2 | 37.2 | 27.9 | 34.2 | 34.6 | 33.0 |
| Provision for income taxes | 8.1 | 8.7 | 7.5 | 7.1 | 6.9 | 6.4 | 6.5 | 7.4 |
| Net income | 28.9% | 27.0% | 29.7% | 30.1% | 21.0% | 27.8% | 28.1% | 25.6% |

Liquidity and Capital Resources

In summary, our cash flows are as follows (in millions):

| | Year Ended December 31, | | |
| | 2009 | 2010 | 2011 |
|---|---|---|---|
| Net cash provided by operating activities | $ 9,316 | $ 11,081 | $ 14,565 |
| Net cash used in investing activities | (8,019) | (10,680) | (19,041) |
| Net cash provided by financing activities | 233 | 3,050 | 807 |

At December 31, 2011, we had $44.6 billion of cash, cash equivalents, and marketable securities. Cash equivalents and marketable securities are comprised of time deposits, money market and other funds, including cash collateral received related to our securities lending program, highly liquid debt instruments of the U.S. government and its agencies, debt instruments issued by foreign governments, and municipalities in the U.S., corporate securities, and mortgage-backed securities.

As of December 31, 2011, $21.2 billion of the $44.6 billion of cash, cash equivalents, and marketable securities was held by our foreign subsidiaries. If these funds are needed for our operations in the U.S., we would be required to accrue and pay U.S. taxes to repatriate these funds. However, our intent is to permanently reinvest these funds outside of the U.S. and our current plans do not demonstrate a need to repatriate them to fund our U.S. operations.

Our principal sources of liquidity are our cash, cash equivalents, and marketable securities, as well as the cash flow that we generate from our operations. At December 31, 2011, we had unused letters of credit for approximately $46 million. We believe that our sources of funding will be sufficient to satisfy our currently anticipated cash requirements through at least the next 12 months. Our liquidity could be negatively affected by a decrease in demand for our products and services. In addition, we may make acquisitions or license products and technologies complementary to our business and may need to raise additional capital through future debt or equity financing to provide for greater flexibility to fund any such acquisitions and licensing activities. Additional financing may not be available at all or on terms favorable to us.

Table of Contents

We have a debt financing program of up to $3.0 billion through the issuance of commercial paper. Net proceeds from this program are used for general corporate purposes. As of December 31, 2011, we had $750 million of commercial paper outstanding recorded as short-term debt, with a weighted-average interest rate of 0.1%. Average commercial paper borrowings during the year were $1.4 billion and the maximum amount outstanding during the year was $3.0 billion. In conjunction with this program, we have a $3.0 billion revolving credit facility expiring in July 2016. The interest rate for the credit facility is determined based on a formula using certain market rates. As of December 31, 2011, we were in compliance with the financial covenant in the credit facility. No amounts were outstanding under the credit facility as of December 31, 2011.

Additionally, as of December 31, 2011, we had a $468 million secured promissory note outstanding recorded as short-term debt, with an interest rate of 1.0% that matures in December 2012.

In May 2011, we issued $3.0 billion of unsecured senior notes in three equal tranches, due in 2014, 2016, and 2021, with stated interest rates of 1.25%, 2.125%, and 3.625%. The net proceeds from the sale of the notes were used to repay a portion of our outstanding commercial paper and for general corporate purposes. As of December 31, 2011, the total carrying value and estimated fair value of these notes were $3.0 billion and $3.2 billion. The estimated fair value was based on quoted prices for our publicly-traded debt as of December 31, 2011. We are not subject to any financial covenants under the notes. During 2011, we paid $35 million in interest payments related to these notes.

In August 2011, we entered into a Merger Agreement with Motorola, a provider of innovative technologies, products and services that enable a range of mobile and wireline digital communication, information and entertainment experiences, under which we will acquire Motorola for $40 per share in cash, or a total of approximately $12.5 billion. The completion of this transaction is subject to customary closing conditions, including the receipt of certain regulatory approvals. In the event the Merger Agreement is terminated due to a failure to obtain certain regulatory approvals, we would be required to pay Motorola a fee of $2.5 billion. The transaction is currently expected to close in early 2012.

Cash provided by operating activities consist of net income adjusted for certain non-cash items, including amortization, depreciation, deferred income taxes, excess tax benefits from stock-based award activities, stock-based compensation expense, and impairment of equity investments, as well as the effect of changes in working capital and other activities. Cash provided by operating activities in 2011 was $14,565 million and consisted of net income of $9,737 million, adjustments for non-cash items of $4,198 million, and cash provided by working capital and other activities of $630 million. Adjustments for non-cash items primarily consisted of $1,974 million of stock-based compensation expense, $1,396 million of depreciation and amortization expense of property and equipment, $455 million of amortization of intangible and other assets, $343 million of deferred income taxes, and $110 million related to impairment of equity investments. In addition, the increase in cash from changes in working capital activities primarily consisted of an increase in accrued expenses and other liabilities of $795 million, a net increase in income taxes payable and deferred income taxes of $731 million, an increase in accrued revenue share of $259 million, an increase of $162 million in deferred revenue, and an increase of $101 million in accounts payable. These increases were partially offset by an increase in accounts receivable of $1,156 million due to the growth in fees billed to our advertisers, and an increase in prepaid revenue share, expenses and other assets of $262 million. The increase in income taxes payable and deferred income taxes reflected primarily additional tax obligations accrued, partially offset by estimated income taxes paid during 2011. In addition, we paid $500 million related to the resolution of a Department of Justice investigation during the year.

Cash provided by operating activities in 2010 was $11,081 million, and consisted of net income of $8,505 million, adjustments for non-cash items of $2,675 million, and cash used in working capital and other activities of $99 million. Adjustments for non-cash items primarily consisted of $1,376 million of stock-based compensation expense, $1,067 million of depreciation and amortization expense on property and equipment, and $329 million of amortization of intangible and other assets, partially offset by $94 million of excess tax benefits from stock-based

40

**Table of Contents**

award activities. In addition, the decrease in cash from changes in working capital activities primarily consisted of an increase of $1,129 million in accounts receivable due to the growth in fees billed to our advertisers and an increase of $414 million in prepaid revenue share, expenses, and other assets. These increases were partially offset by an increase in accrued expenses and other liabilities of $745 million, an increase in accounts payable of $272 million, an increase in accrued revenue share of $214 million, an increase in deferred revenue of $111 million, and a net increase in income tax payable and deferred income taxes of $102 million, which includes the same $94 million of excess tax benefits from stock-based award activities included under adjustments for non-cash items. The increase in accrued expense and other liabilities, accounts payable, accrued revenue share, and deferred revenues are primarily a result of the growth in our business and headcount. The increase in net income taxes payable and deferred income taxes was primarily a result of additional tax obligations accrued, partially offset by the release of certain tax reserves as a result of the settlement of our tax audits for our 2005 and 2006 tax years.

Cash provided by operating activities in 2009 was $9,316 million, and consisted of net income of $6,520 million, adjustments for non-cash items of $2,310 million, and cash provided by working capital and other activities of $486 million. Adjustments for non-cash items primarily consisted of $1,240 million of depreciation and amortization expense on property and equipment, $1,164 million of stock-based compensation expense, and $284 million of amortization of intangible and other assets, partially offset by $268 million of deferred income taxes on earnings and $90 million of excess tax benefits from stock-based award activities. In addition, changes in working capital activities primarily consisted of a decrease of $262 million in prepaid revenue share, expenses, and other assets, an increase in accrued expenses and other liabilities of $243 million which is a direct result of the growth of our business, and a net increase in income taxes payable and deferred income taxes of $217 million, which includes the same $90 million of excess tax benefits from stock-based award activities included under adjustments for non-cash items, and an increase in accrued revenue share of $158 million. These increases were partially offset by an increase of $504 million in accounts receivable due to the growth in fees billed to our advertisers. The increase in net income taxes payable and deferred income taxes was primarily a result of additional tax obligations accrued, partially offset by an increase in the amount of estimated income taxes we paid during the year. The increase in accrued revenue share was due to the growth in our AdSense and distribution programs and the timing of payments made to our partners.

As we expand our business internationally, we have offered payment terms to certain advertisers that are standard in their locales but longer than terms we would generally offer to our domestic advertisers. This may increase our working capital requirements and may have a negative effect on cash provided by our operating activities.

Cash used in investing activities in 2011 of $19,041 million was primarily attributable to net purchases of marketable securities of $12,926 million, capital expenditures of $3,438 million related principally to our facilities, data centers, and related equipment, and cash consideration used in acquisitions and other investments of $2,328 million, including $676 million paid in connection with the acquisition of ITA. Also, in connection with our securities lending program, we returned $354 million of cash collateral. See Note 3 of Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information about our securities lending program.

Cash used in investing activities in 2010 of $10,680 million was primarily attributable to net purchases of marketable securities of $6,886 million, capital expenditures of $4,018 million of which $1.8 billion was for the purchase of an office building in New York City in December 2010, and remaining amounts related principally to our data centers and related equipment, and cash consideration used in acquisitions and other investments of $1,067 million. Also, in connection with our securities lending program, we received $2,361 million of cash collateral which was invested in reverse repurchase agreements. Of the $2,361 million, $1,611 million was classified as cash and cash equivalents, and $750 million was classified as receivable under reverse repurchase agreements in the accompanying Consolidated Balance Sheet.

Cash used in investing activities in 2009 of $8,019 million was primarily attributable to net purchases of marketable securities of $7,036 million and capital expenditures of $810 million.

41

PX0492-044

Table of Contents

In order to manage expected increases in internet traffic, advertising transactions, and new products and services, and to support our overall global business expansion, we expect to make significant investments in our systems, data centers, corporate facilities, information technology infrastructure, and employees in 2012 and thereafter. However, the amount of our capital expenditures has fluctuated and may continue to fluctuate on a quarterly basis.

In addition, we expect to spend a significant amount of cash on acquisitions and other investments from time to time. These acquisitions generally enhance the breadth and depth of our expertise in engineering and other functional areas, our technologies, and our product offerings.

Cash provided by financing activities in 2011 of $807 million was primarily driven by net proceeds of $726 million of debt issued and excess tax benefits from stock-based award activities of $86 million.

Cash provided by financing activities in 2010 of $3,050 million was primarily driven by $3,463 million of net cash proceeds from the issuance of commercial paper and a promissory note. This was partially offset by $801 million in stock repurchases in connection with our acquisitions of AdMob and On2 Technologies, Inc., as well as net proceeds from stock-based award activities of $294 million, and excess tax benefits from stock-based award activities of $94 million.

Cash provided by financing activities in 2009 of $233 million was primarily due to net proceeds related to stock-based award activities of $143 million. In addition, there were excess tax benefits of $90 million from stock-based award activities during the period which represented a portion of the $260 million reduction to income taxes payable that we recorded in 2009 related to the total direct tax benefit realized from the exercise, sale, or vesting of these awards.

Contractual Obligations as of December 31, 2011

|  | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
|  |  |  | (in millions) |  |  |
| Operating lease obligations, net of sublease income amounts | $2,879 | $ 372 | $ 704 | $ 544 | $ 1,259 |
| Purchase obligations | 1,910 | 910 | 860 | 37 | 103 |
| Long-term debt obligations | 3,471 | 70 | 1,134 | 1,104 | 1,163 |
| Other long-term liabilities reflected on our balance sheet | 328 | 106 | 187 | 7 | 28 |
| Total contractual obligations | $8,588 | $ 1,458 | $2,885 | $1,692 | $ 2,553 |

The above table does not include future rental income of $726 million related to the leases that we assumed in connection with our building purchases.

*Operating Leases*

We have entered into various non-cancelable operating lease agreements for certain of our offices, land, and data centers throughout the world with original lease periods expiring primarily between 2012 and 2063. We are committed to pay a portion of the related operating expenses under certain of these lease agreements. These operating expenses are not included in the above table. Certain of these leases have free or escalating rent payment provisions. We recognize rent expense under such leases on a straight-line basis over the term of the lease. Certain leases have adjustments for market provisions.

42

Table of Contents

*Purchase Obligations*

Purchase obligations represent non-cancelable contractual obligations at December 31, 2011. These contracts are primarily related to distribution arrangements, video and other content licensing revenue sharing arrangements, as well as data center operations and facility build-outs. In addition, we had $2.8 billion of open purchase orders for which we have not received the related services or goods at December 31, 2011. This amount is not included in the above table because we have the right to cancel the purchase orders prior to the date of delivery.

*Long-term Debt Obligations*

Long-term debt obligations represent principal and interest payments to be made over the life of our unsecured senior notes issued in May 2011. Please see Note 4 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further details.

*Other Long-Term Liabilities*

Other long-term liabilities consist of cash obligations, primarily the legal settlement with the Authors Guild and the Association of American Publishers (AAP), and milestone and royalty payments owed in connection with certain acquisitions and licensing agreements.

In addition to the amounts above, we recorded additional long-term taxes payable of $438 million in 2011 related to tax positions for which the timing of the ultimate resolution is uncertain. At this time, we are unable to make a reasonably reliable estimate of the timing of payments in individual years beyond 12 months due to uncertainties in the timing of tax audit outcomes. As a result, this amount is not included in the above table.

Off-Balance Sheet Entities

At December 31, 2011, we did not have any off-balance sheet arrangements, as defined in Item 303(a)(4)(ii) of Regulation S-K promulgated by the SEC, that have or are reasonably likely to have a current or future effect on our financial condition, changes in our financial condition, revenues, or expenses, results of operations, liquidity, capital expenditures, or capital resources that is material to investors.

Critical Accounting Policies and Estimates

We prepare our consolidated financial statements in accordance with accounting principles generally accepted in the U.S. (U.S. GAAP). In doing so, we have to make estimates and assumptions that affect our reported amounts of assets, liabilities, revenues, and expenses, as well as related disclosure of contingent assets and liabilities. In some cases, we could reasonably have used different accounting policies and estimates. In some cases, changes in the accounting estimates are reasonably likely to occur from period to period. Accordingly, actual results could differ materially from our estimates. To the extent that there are material differences between these estimates and actual results, our financial condition or results of operations will be affected. We base our estimates on past experience and other assumptions that we believe are reasonable under the circumstances, and we evaluate these estimates on an ongoing basis. We refer to accounting estimates of this type as critical accounting policies and estimates, which we discuss further below. We have reviewed our critical accounting policies and estimates with the audit committee of our board of directors.

*Income Taxes*

We are subject to income taxes in the U.S. and numerous foreign jurisdictions. Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes.

43

PX0492-046

**Table of Contents**

Although we believe we have adequately reserved for our uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different. We adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest.

Our effective tax rates have differed from the statutory rate primarily due to the tax impact of foreign operations, state taxes, certain benefits realized related to stock-based award activities, and research and experimentation tax credits. The effective tax rates were 22.2%, 21.2%, and 21.0% for 2009, 2010, and 2011. Our future effective tax rates could be adversely affected by earnings being lower than anticipated in countries that have lower statutory rates and higher than anticipated in countries that have higher statutory rates, the net gains and losses recognized by legal entities on certain hedges and related hedged intercompany and other transactions under our foreign exchange risk management program, changes in the valuation of our deferred tax assets or liabilities, or changes in tax laws, regulations, or accounting principles, as well as certain discrete items. In addition, we are subject to the continuous examination of our income tax returns by the IRS and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes.

*Loss Contingencies*

We are regularly subject to claims, suits, government investigations, and other proceedings involving competition and antitrust, intellectual property, privacy, tax, labor and employment, commercial disputes, content generated by our users, goods and services offered by advertisers or publishers using our platforms, and other matters. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages. We record a liability when we believe that it is both probable that a loss has been incurred, and the amount can be reasonably estimated. We evaluate, on a monthly basis, developments in our legal matters that could affect the amount of liability that has been previously accrued, and make adjustments as appropriate. Significant judgment is required to determine both likelihood of there being and the estimated amount of a loss related to such matters. Until the final resolution of such matters, there may be an exposure to loss in excess of the amount recorded, and such amounts could be material. Should any of our estimates and assumptions change or prove to have been incorrect, it could have a material impact on our business, consolidated financial position, results of operations, or cash flows. See Note 12 of Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for additional information regarding contingencies.

*Stock-Based Compensation*

Our stock-based compensation expense for stock options is estimated at the grant date based on the award's fair value as calculated by the Black-Scholes-Merton (BSM) option pricing model and is recognized as expense over the requisite service period. The BSM model requires various highly judgmental assumptions including expected volatility and expected term. If any of the assumptions used in the BSM model changes significantly, stock-based compensation expense may differ materially in the future from that recorded in the current period. In addition, we are required to estimate the expected forfeiture rate and only recognize expense for those shares expected to vest. We estimate the forfeiture rate based on historical experience and our expectations regarding future pre-vesting termination behavior of employees. To the extent our actual forfeiture rate is different from our estimate, stock-based compensation expense is adjusted accordingly.

*Impairment of Marketable and Non-Marketable Securities*

We periodically review our marketable securities and our non-marketable equity securities for impairment. If we conclude that any of these investments are impaired, we determine whether such impairment is other-than-temporary. Factors we consider to make such determination include the duration and severity of the impairment,

44

Table of Contents

the reason for the decline in value, the potential recovery period, and our intent to sell, or whether it is more likely than not that we will be required to sell, the investment before recovery. If any impairment is considered other-than-temporary, we will write down the asset to its fair value and take a corresponding charge to our Consolidated Statements of Income.

### Recent Accounting Pronouncements

In June 2011, the Financial Accounting Standards Board (FASB) issued an amendment to an existing accounting standard which requires companies to present net income and other comprehensive income in one continuous statement or in two separate, but consecutive, statements. In addition, in December 2011, the FASB issued an amendment to an existing accounting standard which defers the requirement to present components of reclassifications of other comprehensive income on the face of the income statement. We adopted both standards in the fourth quarter of 2011.

In September 2011, the FASB issued an amendment to an existing accounting standard, which provides entities an option to perform a qualitative assessment to determine whether further impairment testing on goodwill is necessary. Specifically, an entity has the option to first assess qualitative factors to determine whether it is necessary to perform the current two-step test. If an entity believes, as a result of its qualitative assessment, that it is more-likely-than-not that the fair value of a reporting unit is less than its carrying amount, the quantitative impairment test is required. Otherwise, no further testing is required. This standard is effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011. We adopted this standard in the first quarter of 2012 and the adoption will not have a material impact on our financial statements.

In May 2011, the FASB issued a new accounting standard update, which amends the fair value measurement guidance and includes some enhanced disclosure requirements. The most significant change in disclosures is an expansion of the information required for Level 3 measurements based on unobservable inputs. The standard is effective for fiscal years beginning after December 15, 2011. We adopted this standard in the first quarter of 2012 and the adoption will not have a material impact on our financial statements and disclosures.

### ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to financial market risks, including changes in currency exchange rates and interest rates.

### Foreign Currency Exchange Risk

#### Economic Exposure

We transact business in various foreign currencies and have significant international revenues, as well as costs denominated in foreign currencies. This exposes us to the risk of fluctuations in foreign currency exchange rates. We purchase foreign exchange option contracts to reduce the volatility of cash flows related to forecasted revenues denominated in certain foreign currencies. The objective of the foreign exchange contracts is to better ensure that the U.S. dollar-equivalent cash flows are not adversely affected by changes in the U.S. dollar/foreign currency exchange rates. These contracts are designated as cash flow hedges. The gain on the effective portion of a cash flow hedge is initially reported as a component of accumulated other comprehensive income (AOCI) and subsequently reclassified into revenues when the hedged revenues are recorded or as interest and other income, net, if the hedged transaction becomes probable of not occurring. Any gain after a hedge is de-designated or related to an ineffective portion of a hedge is recognized as interest and other income, net, immediately.

At December 31, 2010, the notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with Euros were €3.0 billion (or approximately $4.1 billion) and $227 million; the notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with British pounds were £1.5 billion (or approximately $2.3 billion) and $97 million; and the notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with Canadian dollars were C$407 million (or approximately $382 million) and $6 million. At

45

**Table of Contents**

December 31, 2011, the notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with Euros were €2.8 billion (or approximately $3.8 billion) and $232 million; the notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with British pounds were £1.4 billion (or approximately $2.2 billion) and $80 million; the notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with Canadian dollars were C$504 million (or approximately $490 million) and $17 million. These foreign exchange contracts have maturities of 36 months or less. We may enter into similar contracts in other foreign currencies in the future.

We considered the historical trends in currency exchange rates and determined that it was reasonably possible that changes in exchange rates of 20% for our foreign currencies instruments could be experienced in the near term.

If the U.S. dollar weakened by 20%, the amount recorded in AOCI before tax effect would have been approximately $140 million and $132 million lower at December 31, 2010 and 2011, and the total amount of expense recorded as interest and other income, net, would have been approximately $134 million and $138 million higher in the years ended December 31, 2010 and 2011. If the U.S. dollar strengthened by 20%, the amount recorded in accumulated AOCI before tax effect would have been approximately $1.2 billion higher at both December 31, 2010 and 2011, and the total amount of expense recorded as interest and other income, net, would have been approximately $175 million and $202 million higher in the years ended December 31, 2010 and 2011.

*Transaction Exposure*

Our exposure to foreign currency transaction gains and losses is the result of certain net receivables due from our foreign subsidiaries and customers being denominated in currencies other than the functional currency of the subsidiary, primarily the Euro and the British pound. Our foreign subsidiaries conduct their businesses in local currency. We have entered into foreign exchange contracts to offset the foreign exchange risk on certain monetary assets and liabilities denominated in currencies other than the local currency of the subsidiary.

The notional principal of foreign exchange contracts to purchase U.S. dollars with foreign currencies was $1.0 billion and $2.3 billion at December 31, 2010 and 2011. The notional principal of foreign exchange contracts to sell U.S. dollars for foreign currencies was $84 million and $472 million at December 31, 2010 and December 31, 2011. The notional principal of foreign exchange contracts to purchase Euros with other foreign currencies was €991 million (or approximately $1.3 billion) and €711 million (or approximately $929 million) at December 31, 2010 and 2011. The notional principal of foreign exchange contracts to sell Euros for other foreign currencies was €6 million (or approximately $8 million) at December 31, 2010 and no such contracts were outstanding at December 31, 2011.

We considered the historical trends in currency exchange rates and determined that it was reasonably possible that adverse changes in exchange rates of 20% for all currencies could be experienced in the near term. These changes would have resulted in an adverse impact on income before income taxes of approximately $20 million and $27 million at December 31, 2010 and 2011. The adverse impact at December 31, 2010 and 2011 is after consideration of the offsetting effect of approximately $467 million and $503 million from foreign exchange contracts in place for the months of December 2010 and December 2011. These reasonably possible adverse changes in exchange rates of 20% were applied to total monetary assets and liabilities denominated in currencies other than the local currencies at the balance sheet dates to compute the adverse impact these changes would have had on our income before income taxes in the near term.

Interest Rate Risk

We invest our excess cash primarily in highly liquid debt instruments of the U.S. government and its agencies, municipalities in the U.S., debt instruments issued by foreign governments, time deposits, money market and other funds, mortgage-backed securities, and corporate debt securities. By policy, we limit the amount of credit exposure to any one issuer.

46

PX0492-049

**Table of Contents**

Investments in both fixed rate and floating rate interest earning securities carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than predicted if interest rates fall. Due in part to these factors, our income from investments may decrease in the future. However, we use certain interest rate derivative contracts to hedge interest rate risk of our fixed income securities.

We considered the historical volatility of short-term interest rates and determined that it was reasonably possible that an adverse change of 100 basis points could be experienced in the near term. A hypothetical 1.00% (100 basis points) increase in interest rates would have resulted in a decrease in the fair values of our marketable securities of approximately $895 million and $934 million at December 31, 2010 and 2011, after taking into consideration the offsetting effect from interest rate derivative contracts outstanding as of December 31, 2011.

47

PX0492-050

Form 10-K

---

Table of Contents

ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Google Inc.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|                                                              | Page |
|--------------------------------------------------------------|------|
| Reports of Independent Registered Public Accounting Firm      | 49   |
| Financial Statements:                                         |      |
| Consolidated Balance Sheets                                   | 51   |
| Consolidated Statements of Income                             | 52   |
| Consolidated Statements of Comprehensive Income              | 53   |
| Consolidated Statements of Stockholders' Equity              | 54   |
| Consolidated Statements of Cash Flows                        | 55   |
| Notes to Consolidated Financial Statements                   | 56   |

The supplementary financial information required by this Item 8 is included in Item 7 under the caption "Quarterly Results of Operations."

48

PX0492-051

**Table of Contents**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders of Google Inc.

We have audited the accompanying consolidated balance sheets of Google Inc. as of December 31, 2010 and 2011, and the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2011. Our audits also included the financial statement schedule listed in the Index at Item 15(a)2. These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Google Inc. at December 31, 2010 and 2011, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2011, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Google Inc.'s internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated January 26, 2012 expressed an unqualified opinion thereon.

/s/   ERNST & YOUNG LLP

San Jose, California
January 26, 2012

49

**Table of Contents**

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders of Google Inc.

We have audited Google Inc.'s internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Google Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Google Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Google Inc. as of December 31, 2010 and 2011, and the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2011 of Google Inc. and our report dated January 26, 2012 expressed an unqualified opinion thereon.

/s/   ERNST & YOUNG LLP

San Jose, California
January 26, 2012

50

Table of Contents

Google Inc.

CONSOLIDATED BALANCE SHEETS

(In millions, except share and par value amounts which are reflected in thousands,
and par value per share amounts)

| | As of December 31, 2010 | As of December 31, 2011 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $    13,630 | $     9,983 |
| Marketable securities | 21,345 | 34,643 |
| Total cash, cash equivalents, and marketable securities (including securities loaned of $4,031 and $2,778) | 34,975 | 44,626 |
| Accounts receivable, net of allowance of $101 and $133 | 4,252 | 5,427 |
| Receivable under reverse repurchase agreements | 750 | 745 |
| Deferred income taxes, net | 259 | 215 |
| Prepaid revenue share, expenses and other assets | 1,326 | 1,745 |
| Total current assets | 41,562 | 52,758 |
| Prepaid revenue share, expenses and other assets, non-current | 442 | 499 |
| Deferred income taxes, net, non-current | 265 | 0 |
| Non-marketable equity securities | 523 | 790 |
| Property and equipment, net | 7,759 | 9,603 |
| Intangible assets, net | 1,044 | 1,578 |
| Goodwill | 6,256 | 7,346 |
| Total assets | $    57,851 | $    72,574 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $       483 | $       588 |
| Short-term debt | 3,465 | 1,218 |
| Accrued compensation and benefits | 1,410 | 1,818 |
| Accrued expenses and other current liabilities | 961 | 1,370 |
| Accrued revenue share | 885 | 1,168 |
| Securities lending payable | 2,361 | 2,007 |
| Deferred revenue | 394 | 547 |
| Income taxes payable, net | 37 | 197 |
| Total current liabilities | 9,996 | 8,913 |
| Long-term debt | 0 | 2,986 |
| Deferred revenue, non-current | 35 | 44 |
| Income taxes payable, non-current | 1,200 | 1,693 |
| Deferred income taxes, net, non-current | 0 | 287 |
| Other long-term liabilities | 379 | 506 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Convertible preferred stock, $0.001 par value per share, 100,000 shares authorized; no shares issued and outstanding | 0 | 0 |
| Class A and Class B common stock and additional paid-in capital, $0.001 par value per share: 9,000,000 shares authorized; 321,301 (Class A 250,413, Class B 70,888) and par value of $321 (Class A $250, Class B $71) and 324,895 (Class A 257,553, Class B 67,342) and par value of $325 (Class A $258, Class B $67) shares issued and outstanding | 18,235 | 20,264 |
| Accumulated other comprehensive income | 138 | 276 |
| Retained earnings | 27,868 | 37,605 |
| Total stockholders' equity | 46,241 | 58,145 |
| Total liabilities and stockholders' equity | $    57,851 | $    72,574 |

See accompanying notes.

Form 10-K

51

PX0492-055

Table of Contents

Google Inc.

CONSOLIDATED STATEMENTS OF INCOME

(In millions, except per share amounts)

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| Revenues | $23,651 | $29,321 | $37,905 |
| Costs and expenses: | | | |
| Cost of revenues (including stock-based compensation expense of $47, $67, $249) | 8,844 | 10,417 | 13,188 |
| Research and development (including stock-based compensation expense of $725, $861, $1,061) | 2,843 | 3,762 | 5,162 |
| Sales and marketing (including stock-based compensation expense of $231, $261, $361) | 1,984 | 2,799 | 4,589 |
| General and administrative (including stock-based compensation expense of $161, $187, $303) | 1,668 | 1,962 | 2,724 |
| Charge related to the resolution of Department of Justice investigation | 0 | 0 | 500 |
| Total costs and expenses | 15,339 | 18,940 | 26,163 |
| Income from operations | 8,312 | 10,381 | 11,742 |
| Interest and other income, net | 69 | 415 | 584 |
| Income before income taxes | 8,381 | 10,796 | 12,326 |
| Provision for income taxes | 1,861 | 2,291 | 2,589 |
| Net income | $ 6,520 | $ 8,505 | $ 9,737 |
| Net income per share of Class A and Class B common stock: | | | |
| Basic | $ 20.62 | $ 26.69 | $ 30.17 |
| Diluted | $ 20.41 | $ 26.31 | $ 29.76 |

See accompanying notes.

52

**Table of Contents**

Google Inc.

CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME

(In millions)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2009 | 2010 | 2011 |
| Net income | $6,520 | $8,505 | $9,737 |
| Other comprehensive income (loss): | | | |
|     Change in foreign currency translation adjustment | 77 | (124) | (107) |
|    Available-for-sale investments: | | | |
|     Change in net unrealized gains | 93 | 232 | 348 |
|     Less: reclassification adjustment for net gains included in net income | (91) | (151) | (115) |
|     Net change (net of tax effect of $6, $52, $54) | 2 | 81 | 233 |
|    Cash flow hedges: | | | |
|     Change in unrealized gains | (9) | 196 | 39 |
|     Less: reclassification adjustment for gains included in net income | (192) | (120) | (27) |
|     Net change (net of tax effect of $138, $52, $2) | (201) | 76 | 12 |
| Other comprehensive income (loss) | (122) | 33 | 138 |
| Comprehensive income | $6,398 | $8,538 | $9,875 |

See accompanying notes.

53

Table of Contents

Google Inc.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

(In millions, except for share amounts which are reflected in thousands)

| | Class A and Class B Common Stock and Additional Paid-In Capital | | Accumulated Other Comprehensive Income | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance at January 1, 2009 | 315,114 | $ 14,450 | $ 227 | $13,562 | $ 28,239 |
| Common stock issued | 2,658 | 350 | 0 | 0 | 350 |
| Stock-based compensation expense | | 1,164 | 0 | 0 | 1,164 |
| Stock-based compensation tax benefits | | 60 | 0 | 0 | 60 |
| Tax withholding related to vesting of restricted stock units | | (207) | 0 | 0 | (207) |
| Net income | | 0 | 0 | 6,520 | 6,520 |
| Other comprehensive loss | | 0 | (122) | 0 | (122) |
| Balance at December 31, 2009 | 317,772 | 15,817 | 105 | 20,082 | 36,004 |
| Common stock issued | 5,126 | 1,412 | 0 | 0 | 1,412 |
| Common stock repurchased | (1,597) | (82) | 0 | (719) | (801) |
| Stock-based compensation expense | | 1,376 | 0 | 0 | 1,376 |
| Stock-based compensation tax benefits | | 72 | 0 | 0 | 72 |
| Tax withholding related to vesting of restricted stock units | | (360) | 0 | 0 | (360) |
| Net income | | 0 | 0 | 8,505 | 8,505 |
| Other comprehensive income | | 0 | 33 | 0 | 33 |
| Balance at December 31, 2010 | 321,301 | 18,235 | 138 | 27,868 | 46,241 |
| Common stock issued | 3,594 | 621 | 0 | 0 | 621 |
| Stock-based compensation expense | | 1,974 | 0 | 0 | 1,974 |
| Stock-based compensation tax benefits | | 60 | 0 | 0 | 60 |
| Tax withholding related to vesting of restricted stock units | | (626) | 0 | 0 | (626) |
| Net income | | 0 | 0 | 9,737 | 9,737 |
| Other comprehensive income | | 0 | 138 | 0 | 138 |
| Balance at December 31, 2011 | 324,895 | $ 20,264 | $ 276 | $37,605 | $ 58,145 |

See accompanying notes.

54

Table of Contents

Google Inc.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(In millions)

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Operating activities | | | |
| Net income | $ 6,520 | $ 8,505 | $ 9,737 |
| Adjustments: | | | |
| Depreciation and amortization of property and equipment | 1,240 | 1,067 | 1,396 |
| Amortization of intangible and other assets | 284 | 329 | 455 |
| Stock-based compensation expense | 1,164 | 1,376 | 1,974 |
| Excess tax benefits from stock-based award activities | (90) | (94) | (86) |
| Deferred income taxes | (268) | 9 | 343 |
| Impairment of equity investments | 0 | 0 | 110 |
| Other | (20) | (12) | 6 |
| Changes in assets and liabilities, net of effects of acquisitions: | | | |
| Accounts receivable | (504) | (1,129) | (1,156) |
| Income taxes, net | 217 | 102 | 731 |
| Prepaid revenue share, expenses and other assets | 262 | (414) | (262) |
| Accounts payable | 34 | 272 | 101 |
| Accrued expenses and other liabilities | 243 | 745 | 795 |
| Accrued revenue share | 158 | 214 | 259 |
| Deferred revenue | 76 | 111 | 162 |
| Net cash provided by operating activities | 9,316 | 11,081 | 14,565 |
| Investing activities | | | |
| Purchases of property and equipment | (810) | (4,018) | (3,438) |
| Purchases of marketable securities | (29,139) | (43,985) | (61,672) |
| Maturities and sales of marketable securities | 22,103 | 37,099 | 48,746 |
| Investments in non-marketable equity securities | (65) | (320) | (428) |
| Cash collateral received (returned) from securities lending | 0 | 2,361 | (354) |
| Investments in reverse repurchase agreements | 0 | (750) | 5 |
| Acquisitions, net of cash acquired, and purchases of intangible and other assets | (108) | (1,067) | (1,900) |
| Net cash used in investing activities | (8,019) | (10,680) | (19,041) |
| Financing activities | | | |
| Net proceeds (payments) from stock-based award activities | 143 | 294 | (5) |
| Excess tax benefits from stock-based award activities | 90 | 94 | 86 |
| Repurchase of common stock in connection with acquisitions | 0 | (801) | 0 |
| Proceeds from issuance of debt, net of costs | 0 | 5,246 | 10,905 |
| Repayment of debt | 0 | (1,783) | (10,179) |
| Net cash provided by financing activities | 233 | 3,050 | 807 |
| Effect of exchange rate changes on cash and cash equivalents | 11 | (19) | 22 |
| Net increase (decrease) in cash and cash equivalents | 1,541 | 3,432 | (3,647) |
| Cash and cash equivalents at beginning of year | 8,657 | 10,198 | 13,630 |
| Cash and cash equivalents at end of year | $ 10,198 | $ 13,630 | $ 9,983 |
| Supplemental disclosures of cash flow information | | | |
| Cash paid for interest | $ 0 | $ 0 | $ 40 |
| Cash paid for taxes | $ 1,896 | $ 2,175 | $ 1,471 |
| Non-cash financing activity: | | | |
| Fair value of common stock issued and vested options assumed in connection with acquisitions | $ 0 | $ 750 | $ 0 |

See accompanying notes.

55

PX0492-059

Table of Contents

Google Inc.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Note 1.    Google Inc. and Summary of Significant Accounting Policies

Nature of Operations

We were incorporated in California in September 1998. We were re-incorporated in the State of Delaware in August 2003. We generate revenues primarily by delivering relevant, cost-effective online advertising.

Basis of Consolidation

The consolidated financial statements include the accounts of Google Inc. and our wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated.

Use of Estimates

The preparation of consolidated financial statements in conformity with U.S. Generally Accepted Accounting Principles (GAAP) requires us to make estimates and assumptions that affect the amounts reported and disclosed in the financial statements and the accompanying notes. Actual results could differ materially from these estimates. On an ongoing basis, we evaluate our estimates, including those related to the accounts receivable and sales allowances, fair values of financial instruments, intangible assets and goodwill, useful lives of intangible assets and property and equipment, fair values of stock-based awards, income taxes, and contingent liabilities, among others. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities.

Revenue Recognition

The following table presents our revenues by revenue source (in millions):

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Advertising revenues: | | | |
| Google websites | $15,723 | $19,444 | $26,145 |
| Google Network Members' websites | 7,166 | 8,792 | 10,386 |
| Total advertising revenues | 22,889 | 28,236 | 36,531 |
| Other revenues | 762 | 1,085 | 1,374 |
| Revenues | $23,651 | $29,321 | $37,905 |

Google AdWords is our auction-based advertising program that enables advertisers to place text-based and display ads on our websites and our Google Network Members' websites. Display advertising comprises the videos, text, images, and other interactive ads that run across the web on computers and mobile devices, including smart phones and handheld computers such as netbooks and tablets. Most of our AdWords customers pay us on a cost-per-click basis, which means that an advertiser pays us only when a user clicks on one of its ads. We also offer AdWords on a cost-per-impression basis that enables advertisers to pay us based on the number of times their ads appear on our websites and our Google Network Members' websites as specified by the advertisers.

Google AdSense refers to the online programs through which we distribute our advertisers' AdWords ads for display on our Google Network Members' websites, as well as programs to deliver ads on television broadcasts.

56

Form 10-K

Table of Contents

We recognize as revenues the fees charged to advertisers each time a user clicks on one of the ads that appears next to the search results or content on our websites or our Google Network Members' websites. For those advertisers using our AdWords cost-per-impression pricing, we recognize as revenues the fees charged to advertisers each time their ads are displayed on our websites or our Google Network Members' websites. We report our Google AdSense revenues on a gross basis principally because we are the primary obligor to our advertisers.

We recognize revenues when the services or products have been provided or delivered, the fees we charge are fixed or determinable, we and our advertisers or other customers understand the specific nature and terms of the agreed upon transactions, and collectability is reasonably assured.

We record deferred revenue upon invoicing or when cash payments are received in advance of our performance in the underlying agreement on the accompanying Consolidated Balance Sheets.

Cost of Revenues

Cost of revenues consists primarily of traffic acquisition costs. Traffic acquisition costs consist of amounts ultimately paid to our Google Network members under AdSense arrangements and to certain other partners (our distribution partners) who distribute our toolbar and other products (collectively referred to as access points) or otherwise direct search queries to our website (collectively referred to as distribution arrangements). These amounts are primarily based on the revenue share and fixed fee arrangements with our Google Network Members and distribution partners.

Certain distribution arrangements require us to pay our partners based on a fee per access point delivered and not exclusively—or at all—based on revenue share. These fees are non-refundable. Further, these arrangements are terminable at will, although under the terms of certain contracts we or our distribution partners may be subject to penalties in the event of early termination. We recognize fees under these arrangements over the estimated useful lives of the access points (approximately two years) to the extent we can reasonably estimate those lives and they are longer than one year, or based on any contractual revenue share, if greater. Otherwise, the fees are charged to expense as incurred. The estimated useful life of the access points is based on the historical average period of time they generate traffic and revenues. Further, we review the access points for impairment by distribution partner, type, and geography, and we have not made any impairment to date.

Prepaid revenue share and distribution fees are included in prepaid revenue share, expenses, and other assets on the accompanying Consolidated Balance Sheets.

Cost of revenues also includes the expenses associated with the operation of our data centers, including depreciation, labor, energy, and bandwidth costs, credit card and other transaction fees related to processing customer transactions including Google Checkout transactions, amortization of acquired intangible assets, as well as content acquisition costs. We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements, we display ads on the pages of our web sites from which the content is viewed and share most of the fees these ads generate with the content providers. To the extent we are obligated to make guaranteed minimum revenue share payments to our content providers, we recognize as content acquisition costs the contractual revenue share amount or on a straight-line basis, whichever is greater, over the terms of the agreements.

Stock-based Compensation

We have elected to use the BSM option pricing model to determine the fair value of stock options on the dates of grant. Restricted stock units (RSUs) are measured based on the fair market values of the underlying stock on the dates of grant. Shares are issued on the vesting dates net of the minimum statutory tax withholding requirements to be paid by us on behalf of our employees. As a result, the actual number of shares issued will be fewer than the actual number of RSUs outstanding. Furthermore, we record the liability for withholding amounts to be paid by us as a reduction to additional paid-in capital when paid. Also, we recognize stock-based compensation using the straight-line method.

57

PX0492-061

Table of Contents

We include as part of cash flows from financing activities the benefits of tax deductions in excess of the tax-effected compensation of the related stock-based awards for options exercised and RSUs vested during the period. During the years ended December 31, 2009, December 31, 2010, and December 31, 2011, the amount of cash received from the exercise of stock options was $350 million, $656 million, and $621 million, and the total direct tax benefit realized, including the excess tax benefit, from stock-based award activities was $260 million, $355 million, and $451 million. We have elected to account for the indirect effects of stock-based awards—primarily the research and development tax credit—through the Consolidated Statements of Income.

For the years ended December 31, 2009, December 31, 2010, and December 31, 2011, we recognized stock-based compensation and related tax benefits of $1,164 million and $264 million, $1,376 million and $314 million, and $1,974 million and $413 million.

Certain Risks and Concentrations

Our revenues are principally derived from online advertising, the market for which is highly competitive and rapidly changing. In addition, our revenues are generated from a multitude of vertical market segments in countries around the world. Significant changes in this industry or changes in customer buying or advertiser spending behavior could adversely affect our operating results.

Financial instruments that potentially subject us to concentrations of credit risk consist principally of cash equivalents, marketable securities, foreign exchange contracts, and accounts receivable. Cash equivalents and marketable securities consist primarily of highly liquid debt instruments of the U.S. government and its agencies, municipalities in the U.S., debt instruments issued by foreign governments, mortgage-backed securities, corporate securities, time deposits, and money market and other funds, including cash collateral received related to our securities lending program. Foreign exchange contracts are transacted with various financial institutions with high credit standing. Accounts receivable are typically unsecured and are derived from revenues earned from customers located around the world. In 2009, 2010, and 2011, we generated approximately 47%, 48%, and 46% of our revenues from customers based in the U.S., with the majority of customers outside of the U.S. located in Europe and Japan. Many of our Google Network Members are in the internet industry. We perform ongoing evaluations to determine customer credit and we limit the amount of credit we extend, but generally we do not require collateral from our customers. We maintain reserves for estimated credit losses and these losses have generally been within our expectations.

No individual customer or groups of affiliated customers represented more than 10% of our revenues in 2009, 2010, and 2011.

Fair Value of Financial Instruments

The carrying amounts of our financial instruments, including cash equivalents, accounts receivable, accounts payable, short-term debt, and accrued liabilities, approximate fair value because of their generally short maturities.

Cash, Cash Equivalents, and Marketable Securities

We invest our excess cash primarily in highly liquid debt instruments of the U.S. government and its agencies, municipalities in the U.S., debt instruments issued by foreign governments, mortgage-backed securities, corporate securities, time deposits, and money market and other funds, including cash collateral received related to our securities lending program. We classify all highly liquid investments with stated maturities of three months or less from date of purchase as cash equivalents and all highly liquid investments with stated maturities of greater than three months as marketable securities.

We determine the appropriate classification of our investments in marketable securities at the time of purchase and reevaluate such designation at each balance sheet date. We have classified and accounted for our marketable securities as available-for-sale. We may or may not hold securities with stated maturities greater than

58

**Table of Contents**

12 months until maturity. After consideration of our risk versus reward objectives, as well as our liquidity requirements, we may sell these securities prior to their stated maturities. As we view these securities as available to support current operations, we classify securities with maturities beyond 12 months as current assets under the caption marketable securities in the accompanying Consolidated Balance Sheets. We carry these securities at fair value, and report the unrealized gains and losses, net of taxes, as a component of stockholders' equity, except for unrealized losses determined to be other-than-temporary, which we record as interest and other income, net. We determine any realized gains or losses on the sale of marketable securities on a specific identification method, and we record such gains and losses as a component of interest and other income, net.

Non-Marketable Equity Securities

We have accounted for non-marketable equity securities primarily at cost because we do not have significant influence over the underlying investees.

Impairment of Marketable and Non-Marketable Securities

We periodically review our marketable securities, as well as our non-marketable equity securities, for impairment. If we conclude that any of these investments are impaired, we determine whether such impairment is other-than-temporary. Factors we consider to make such determination include the duration and severity of the impairment, the reason for the decline in value and the potential recovery period, and our intent to sell, or whether it is more likely than not that we will be required to sell, the investment before recovery. If any impairment is considered other-than-temporary, we will write down the asset to its fair value and take a corresponding charge to our Consolidated Statements of Income.

Accounts Receivable

We record accounts receivable at the invoiced amount and we do not charge interest. We maintain an allowance for doubtful accounts to reserve for potentially uncollectible receivables. We review the accounts receivable by amounts due by customers which are past due to identify specific customers with known disputes or collectability issues. In determining the amount of the reserve, we make judgments about the creditworthiness of significant customers based on ongoing credit evaluations. We also maintain a sales allowance to reserve for potential credits issued to customers. We determine the amount of the reserve based on historical credits issued.

Property and Equipment

We account for property and equipment at cost less accumulated depreciation and amortization. We compute depreciation using the straight-line method over the estimated useful lives of the assets, generally two to five years. We depreciate buildings over periods up to 25 years. We amortize leasehold improvements over the shorter of the remaining lease term or the estimated useful lives of the assets. Construction in progress is related to the construction or development of property (including land) and equipment that have not yet been placed in service for our intended use. Depreciation for equipment commences once it is placed in service and depreciation for buildings and leasehold improvements commences once they are ready for our intended use. Land is not depreciated.

Software Development Costs

We expense software development costs, including costs to develop software products or the software component of products to be marketed to external users, before technological feasibility of such products is reached. We have determined that technological feasibility was reached shortly before the release of those products and as a result, the development costs incurred after the establishment of technological feasibility and before the release of those products were not material, and accordingly, were expensed as incurred.

59

PX0492-063

Table of Contents

Long-Lived Assets Including Goodwill and Other Acquired Intangible Assets

We review property and equipment and intangible assets, excluding goodwill, for impairment whenever events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. We measure recoverability of these assets by comparing the carrying amounts to the future undiscounted cash flows the assets are expected to generate. If property and equipment and intangible assets are considered to be impaired, the impairment to be recognized equals the amount by which the carrying value of the asset exceeds its fair market value. We have made no material adjustments to our long-lived assets in any of the years presented. In addition, we test our goodwill for impairment at least annually or more frequently if events or changes in circumstances indicate that this asset may be impaired. Our tests are based on our single operating segment and reporting unit structure. We found no goodwill impairment in any of the years presented.

Intangible assets with definite lives are amortized over their estimated useful lives. We amortize our acquired intangible assets on a straight-line basis with definite lives over periods ranging from one to 12 years.

Income Taxes

We recognize income taxes under the liability method. We recognize deferred income taxes for differences between the financial reporting and tax bases of assets and liabilities at enacted statutory tax rates in effect for the years in which differences are expected to reverse. We recognize the effect on deferred taxes of a change in tax rates in income in the period that includes the enactment date.

Foreign Currency

Generally, the functional currency of our international subsidiaries is the local currency. We translate the financial statements of these subsidiaries to U.S. dollars using month-end rates of exchange for assets and liabilities, and average rates of exchange for revenues, costs, and expenses. We record translation gains and losses in accumulated other comprehensive income as a component of stockholders' equity. We recorded $77 million of net translation gains in 2009, $124 million of net translation losses in 2010, and $107 million of net translation losses in 2011. We record net gains and losses resulting from foreign exchange transactions as a component of interest and other income, net. These gains and losses are net of those realized on foreign exchange contracts. We recorded $8 million of net gains in 2009, $29 million of net losses in 2010, and $38 million of net losses in 2011.

Advertising and Promotional Expenses

We expense advertising and promotional costs in the period in which they are incurred. For the years ended December 31, 2009, December 31, 2010, and December 31, 2011, advertising and promotional expenses totaled approximately $353 million, $772 million, and $1,544 million.

Recent Accounting Pronouncements

In June 2011, the FASB issued an amendment to an existing accounting standard which requires companies to present net income and other comprehensive income in one continuous statement or in two separate, but consecutive, statements. In addition, in December 2011, the FASB issued an amendment to an existing accounting standard which defers the requirement to present components of reclassifications of other comprehensive income on the face of the income statement. We adopted both standards in the fourth quarter of 2011.

In September 2011, the FASB issued an amendment to an existing accounting standard, which provides entities an option to perform a qualitative assessment to determine whether further impairment testing on goodwill is necessary. Specifically, an entity has the option to first assess qualitative factors to determine whether it is necessary to perform the current two-step test. If an entity believes, as a result of its qualitative assessment, that it is more-likely-than-not that the fair value of a reporting unit is less than its carrying amount, the quantitative

60

**Table of Contents**

impairment test is required. Otherwise, no further testing is required. This standard is effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011. We adopted this standard in the first quarter of 2012 and the adoption will not have a material impact on our financial statements.

In May 2011, the FASB issued a new accounting standard update, which amends the fair value measurement guidance and includes some enhanced disclosure requirements. The most significant change in disclosures is an expansion of the information required for Level 3 measurements based on unobservable inputs. The standard is effective for fiscal years beginning after December 15, 2011. We adopted this standard in the first quarter of 2012 and the adoption will not have a material impact on our financial statements and disclosures.

Note 2.    Net Income Per Share of Class A and Class B Common Stock

We compute net income per share of Class A and Class B common stock using the two-class method. Basic net income per share is computed using the weighted-average number of common shares outstanding during the period except that it does not include unvested common shares subject to repurchase or cancellation. Diluted net income per share is computed using the weighted-average number of common shares and the effect of potentially dilutive securities outstanding during the period. Potentially dilutive securities consist of stock options, warrants issued under the TSO program, restricted shares, restricted stock units, and unvested common shares subject to repurchase or cancellation. The dilutive effect of outstanding stock options, warrants, restricted shares, and restricted stock units is reflected in diluted earnings per share by application of the treasury stock method. The computation of the diluted net income per share of Class A common stock assumes the conversion of Class B common stock, while the diluted net income per share of Class B common stock does not assume the conversion of those shares.

The rights, including the liquidation and dividend rights, of the holders of our Class A and Class B common stock are identical, except with respect to voting. Further, there are a number of safeguards built into our certificate of incorporation, as well as Delaware law, which preclude our board of directors from declaring or paying unequal per share dividends on our Class A and Class B common stock. Specifically, Delaware law provides that amendments to our certificate of incorporation which would have the effect of adversely altering the rights, powers, or preferences of a given class of stock (in this case the right of our Class A common stock to receive an equal dividend to any declared on our Class B common stock) must be approved by the class of stock adversely affected by the proposed amendment. In addition, our certificate of incorporation provides that before any such amendment may be put to a stockholder vote, it must be approved by the unanimous consent of our board of directors. As a result, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B common shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as we assume the conversion of Class B common stock in the computation of the diluted net income per share of Class A common stock, the undistributed earnings are equal to net income for that computation.

61

PX0492-065

Table of Contents

The following table sets forth the computation of basic and diluted net income per share of Class A and Class B common stock (in millions, except share amounts which are reflected in thousands and per share amounts):

|  | Year Ended December 31, | | | | | |
|  | 2009 | | 2010 | | 2011 | |
|  | Class A | Class B | Class A | Class B | Class A | Class B |
|---|---|---|---|---|---|---|
| Basic net income per share: | | | | | | |
| Numerator | | | | | | |
| Allocation of undistributed earnings | $ 4,981 | $ 1,539 | $ 6,569 | $ 1,936 | $ 7,658 | $ 2,079 |
| Denominator | | | | | | |
| Weighted-average common shares outstanding | 241,575 | 74,651 | 246,168 | 72,534 | 253,862 | 68,916 |
| Less: Weighted-average unvested common shares subject to repurchase or cancellation | (5) | 0 | 0 | 0 | 0 | 0 |
| Number of shares used in per share computation | 241,570 | 74,651 | 246,168 | 72,534 | 253,862 | 68,916 |
| Basic net income per share | $ 20.62 | $ 20.62 | $ 26.69 | $ 26.69 | $ 30.17 | $ 30.17 |
| Diluted net income per share: | | | | | | |
| Numerator | | | | | | |
| Allocation of undistributed earnings for basic computation | $ 4,981 | $ 1,539 | $ 6,569 | $ 1,936 | $ 7,658 | $ 2,079 |
| Reallocation of undistributed earnings as a result of conversion of Class B to Class A shares | 1,539 | 0 | 1,936 | 0 | 2,079 | 0 |
| Reallocation of undistributed earnings to Class B shares | 0 | (13) | 0 | (26) | 0 | (27) |
| Allocation of undistributed earnings | $ 6,520 | $ 1,526 | $ 8,505 | $ 1,910 | $ 9,737 | $ 2,052 |
| Denominator | | | | | | |
| Number of shares used in basic computation | 241,570 | 74,651 | 246,168 | 72,534 | 253,862 | 68,916 |
| Weighted-average effect of dilutive securities | | | | | | |
| Add: | | | | | | |
| Conversion of Class B to Class A common shares outstanding | 74,651 | 0 | 72,534 | 0 | 68,916 | 0 |
| Unvested common shares subject to repurchase or cancellation | 5 | 0 | 0 | 0 | 0 | 0 |
| Employee stock options, including warrants issued under Transferable Stock Option program | 2,569 | 114 | 3,410 | 71 | 2,958 | 46 |
| Restricted shares and RSUs | 621 | 0 | 1,139 | 0 | 1,478 | 0 |
| Number of shares used in per share computation | 319,416 | 74,765 | 323,251 | 72,605 | 327,214 | 68,962 |
| Diluted net income per share | $ 20.41 | $ 20.41 | $ 26.31 | $ 26.31 | $ 29.76 | $ 29.76 |

The net income per share amounts are the same for Class A and Class B common stock because the holders of each class are legally entitled to equal per share distributions whether through dividends or in liquidation.

62

Table of Contents

Note 3.   Cash and Investments

Cash, cash equivalents, and marketable securities consisted of the following (in millions):

|  | As of December 31, | |
|---|---|---|
|  | 2010 | 2011 |
| Cash and cash equivalents: | | |
| Cash | $ 4,652 | $ 4,712 |
| Cash equivalents: | | |
| Time deposits | 973 | 534 |
| Money market and other funds[1] | 7,547 | 4,462 |
| U.S. government agencies | 0 | 275 |
| U.S. government notes | 300 | 0 |
| Foreign government bonds | 150 | 0 |
| Corporate debt securities | 8 | 0 |
| Total cash and cash equivalents | 13,630 | 9,983 |
| Marketable securities: | | |
| Time deposits | 307 | 495 |
| U.S. government agencies | 1,857 | 6,226 |
| U.S. government notes | 3,930 | 11,579 |
| Foreign government bonds | 1,172 | 1,629 |
| Municipal securities | 2,503 | 1,794 |
| Corporate debt securities | 5,742 | 6,112 |
| Agency residential mortgage-backed securities | 5,673 | 6,501 |
| Marketable equity securities | 161 | 307 |
| Total marketable securities | 21,345 | 34,643 |
| Total cash, cash equivalents, and marketable securities | $34,975 | $44,626 |

[1]   The balances at December 31, 2010 and December 31, 2011 included $1.6 billion and $1.3 billion of cash collateral received in connection with our securities lending program, which was invested in reverse repurchase agreements maturing within three months. See below for further discussion on this program.

The following tables summarize unrealized gains and losses related to our investments in marketable securities designated as available-for-sale (in millions):

|  | As of December 31, 2010 | | | |
|---|---|---|---|---|
|  | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| Time deposits | $   307 | $    0 | $    0 | $   307 |
| U.S. government agencies | 1,864 | 1 | (8) | 1,857 |
| U.S. government notes | 3,950 | 30 | (50) | 3,930 |
| Foreign government bonds | 1,154 | 23 | (5) | 1,172 |
| Municipal securities | 2,492 | 16 | (5) | 2,503 |
| Corporate debt securities | 5,600 | 167 | (25) | 5,742 |
| Agency residential mortgage-backed securities | 5,649 | 56 | (32) | 5,673 |
| Marketable equity security | 150 | 11 | 0 | 161 |
| Total | $21,166 | $   304 | $   (125) | $21,345 |

63

**Table of Contents**

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| Time deposits | $    495 | $    0 | $    0 | $    495 |
| U.S. government agencies | 6,211 | 15 | 0 | 6,226 |
| U.S. government notes | 11,475 | 104 | 0 | 11,579 |
| Foreign government bonds | 1,608 | 32 | (11) | 1,629 |
| Municipal securities | 1,775 | 19 | 0 | 1,794 |
| Corporate debt securities | 6,023 | 187 | (98) | 6,112 |
| Agency residential mortgage-backed securities | 6,359 | 147 | (5) | 6,501 |
| Marketable equity securities | 228 | 79 | 0 | 307 |
| Total | $34,174 | $    583 | $    (114) | $34,643 |

Gross unrealized gains and losses on cash equivalents were not material at December 31, 2010 and December 31, 2011.

We recognized gross realized gains of $212 million and $381 million for the years ended December 31, 2010 and 2011. We recognized gross realized losses of $27 million and $127 million for the years ended December 31, 2010 and 2011. We determine realized gains or losses on the sale of marketable securities on a specific identification method, and we reflect such gains and losses as a component of interest and other income, net, in our accompanying Consolidated Statements of Income.

The following table summarizes the estimated fair value of our investments in marketable securities, excluding the marketable equity securities, designated as available-for-sale and classified by the contractual maturity date of the securities (in millions):

| | As of December 31, 2011 |
| --- | --- |
| Due in 1 year | $    13,242 |
| Due in 1 year through 5 years | 7,482 |
| Due in 5 years through 10 years | 5,525 |
| Due after 10 years | 8,087 |
| Total | $    34,336 |

The following tables present gross unrealized losses and fair values for those investments that were in an unrealized loss position as of December 31, 2010 and 2011, aggregated by investment category and the length of time that individual securities have been in a continuous loss position (in millions):

| | As of December 31, 2010 | |
| --- | --- | --- |
| | Less than 12 Months | |
| | Fair Value | Unrealized Loss |
| U.S. government agencies | $    831 | $    (8) |
| U.S. government notes | 2,225 | (50) |
| Foreign government bonds | 129 | (5) |
| Municipal securities | 962 | (5) |
| Corporate debt securities | 1,061 | (25) |
| Agency residential mortgage-backed securities | 1,675 | (32) |
| Total | $  6,883 | $    (125) |

64

**Table of Contents**

As of December 31, 2010, we did not have any investments in marketable securities that were in an unrealized loss position for 12 months or greater.

| | As of December 31, 2011 | | | | | |
| | Less than 12 Months | | 12 Months or Greater | | Total | |
| | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
|---|---|---|---|---|---|---|
| Foreign government bonds | $ 302 | $ (11) | $ 6 | $ 0 | $ 308 | $ (11) |
| Corporate debt securities | 2,160 | (97) | 17 | (1) | 2,177 | (98) |
| Agency residential mortgage-backed securities | 716 | (3) | 19 | (2) | 735 | (5) |
| Total | $ 3,178 | $ (111) | $ 42 | $ (3) | $ 3,220 | $ (114) |

Investment in a Marketable Equity Security

During the fourth quarter of 2011, we recorded an other-than-temporary impairment charge of $88 million related to our investment in Clearwire Corporation. This amount was included in interest and other income, net in the accompanying Consolidated Statement of Income.

Securities Lending Program

From time to time, we enter into securities lending agreements with financial institutions to enhance investment income. We loan selected securities which are secured by collateral in the form of cash or securities. Cash collateral is invested in reverse repurchase agreements. We classify loaned securities as cash equivalents or marketable securities on the accompanying Consolidated Balance Sheets. We record the cash collateral as an asset with a corresponding liability. We classify reverse repurchase agreements maturing within three months as cash equivalents and those longer than three months as receivable under reverse repurchase agreements on the accompanying Consolidated Balance Sheets. For lending agreements collateralized by securities, we do not record an asset or liability as we are not permitted to sell or repledge the associated collateral.

Note 4.   Debt

Short-Term Debt

We have a debt financing program of up to $3.0 billion through the issuance of commercial paper. Net proceeds from this program are used for general corporate purposes. At December 31, 2010 and 2011, we had $3.0 billion and $750 million of commercial paper outstanding recorded as short-term debt with weighted-average interest rates of 0.3% and 0.1%. In conjunction with this program, we have a $3.0 billion revolving credit facility expiring in July 2016. The interest rate for the credit facility is determined based on a formula using certain market rates. At December 31, 2010 and 2011, we were in compliance with the financial covenant in the credit facility. No amounts were outstanding under the credit facility at December 31, 2010 and December 31, 2011.

In December 2010, we issued a secured promissory note in the amount of $468 million with an interest rate of 1.0% and a one-year maturity date. Proceeds were used for the acquisition of an office building in New York City. In December 2011, we extended the maturity date of the note to December 2012. As of December 31, 2010 and 2011, the outstanding balance was $468 million.

The estimated fair value of the short-term debt approximated its carrying value at December 31, 2010 and December 31, 2011.

65

**Table of Contents**

Long-Term Debt

In May 2011, we issued $3.0 billion of unsecured senior notes in three tranches as described in the table below (collectively, the Notes) (in millions):

|  | Outstanding Balance as of December 31, 2011 |
|---|---|
| 1.25% Notes due on May 19, 2014 | $    1,000 |
| 2.125% Notes due on May 19, 2016 | 1,000 |
| 3.625% Notes due on May 19, 2021 | 1,000 |
| Unamortized discount for the Notes above | (14) |
| Total | $    2,986 |

The effective interest yields of the 2014, 2016, and 2021 Notes were 1.258%, 2.241%, and 3.734%, respectively. Interest on the Notes is payable semi-annually in arrears on May 19 and November 19 of each year. We may redeem the Notes at any time in whole or from time to time in part at specified redemption prices. We are not subject to any financial covenants under the Notes. We used the net proceeds from the issuance of the Notes to repay a portion of our outstanding commercial paper and for general corporate purposes. The total estimated fair value of the Notes was approximately $3.2 billion, which is based on quoted prices for our publicly-traded debt as of December 31, 2011.

At December 31, 2011, future principal payments for the Notes were as follows (in millions):

| Years ended |  |
|---|---|
| 2012 | $    0 |
| 2013 | 0 |
| 2014 | 1,000 |
| 2015 | 0 |
| 2016 | 1,000 |
| Thereafter | 1,000 |
| Total | $3,000 |

Note 5.    Derivative Financial Instruments

We enter into foreign currency contracts with financial institutions to reduce the risk that our cash flows and earnings will be adversely affected by foreign currency exchange rate fluctuations. We use certain interest rate derivative contracts to hedge interest rate exposures on our fixed income securities. Our program is not designated for trading or speculative purposes.

We recognize derivative instruments as either assets or liabilities on the accompanying Consolidated Balance Sheets at fair value. We record changes in the fair value (i.e., gains or losses) of the derivatives in the accompanying Consolidated Statements of Income as interest and other income, net, as part of revenues, or to accumulated other comprehensive income (AOCI) in the accompanying Consolidated Balance Sheets.

Cash Flow Hedges

We use options designated as cash flow hedges to hedge certain forecasted revenue transactions denominated in currencies other than the U.S. dollar. We initially report any gain on the effective portion of a cash flow hedge as a component of AOCI and subsequently reclassify to revenues when the hedged revenues are

66

PX0492-070

**Table of Contents**

recorded or as interest and other income, net, if the hedged transaction becomes probable of not occurring. Further, we exclude the change in the time value of the options from our assessment of hedge effectiveness. We record the premium paid or time value of an option on the date of purchase as an asset. Thereafter, we recognize any change to this time value in interest and other income, net.

At December 31, 2011, the effective portion of our cash flow hedges before tax effect was $154 million, of which $127 million is expected to be reclassified from AOCI to revenues within the next 12 months.

The notional principal of foreign exchange contracts to purchase U.S. dollars with Euros was €3.0 billion (or approximately $4.1 billion) and €2.8 billion (or approximately $3.8 billion) at December 31, 2010 and December 31, 2011; the notional principal of foreign exchange contracts to purchase U.S. dollars with British pounds was £1.5 billion (or approximately $2.3 billion) and £1.4 billion (or approximately $2.2 billion) at December 31, 2010 and December 31, 2011; and the notional principal of foreign exchange contracts to purchase U.S. dollars with Canadian dollars was C$407 million (or approximately $382 million) and C$504 million (or approximately $490 million) at December 31, 2010 and December 31, 2011. These foreign exchange contracts have maturities of 36 months or less.

Fair Value Hedges

We use forward contracts designated as fair value hedges to hedge foreign currency risks for our investments denominated in currencies other than the U.S. dollar. Gains and losses on these contracts are recognized in interest and other income, net, along with the offsetting losses and gains of the related hedged items. We exclude changes in the time value for forward contracts from the assessment of hedge effectiveness and recognize them in interest and other income, net. The notional principal of foreign exchange contracts to purchase U.S. dollars with foreign currencies was $787 million and $1.0 billion at December 31, 2010 and December 31, 2011.

Other Derivatives

Other derivatives not designated as hedging instruments consist of forward and option contracts that we use to hedge intercompany transactions and other monetary assets or liabilities denominated in currencies other than the local currency of a subsidiary. We recognize gains and losses on these contracts as well as the related costs in interest and other income, net, along with the gains and losses of the related hedged items. The notional principal of foreign exchange contracts to purchase U.S. dollars with foreign currencies was $1.0 billion and $2.3 billion at December 31, 2010 and December 31, 2011. The notional principal of foreign exchange contracts to sell U.S. dollars for foreign currencies was $84 million and $472 million at December 31, 2010 and December 31, 2011. The notional principal of foreign exchange contracts to purchase Euros with other foreign currencies was €991 million (or approximately $1.3 billion) and €711 million (or approximately $929 million) at December 31, 2010 and December 31, 2011. The notional principal of foreign exchange contracts to sell Euros for other foreign currencies was €6 million (or approximately $8 million) at December 31, 2010 and no such contracts were outstanding at December 31, 2011.

We also use exchange-traded interest rate futures contracts and "To Be Announced" (TBA) forward purchase commitments of mortgage-backed assets to hedge interest rate risks on certain fixed income securities. The TBA contracts meet the definition of derivative instruments in cases where physical delivery of the assets is not taken at the earliest available delivery date. Our interest rate futures and TBA contracts (together interest rate contracts) are not designated as hedging instruments. We recognize gains and losses on these contracts as well as the related costs in interest and other income, net. The gains and losses are generally economically offset by unrealized gains and losses in the underlying available-for-sale securities, which are recorded as a component of AOCI until the securities are sold or other-than-temporarily impaired, at which time the amounts are moved from AOCI into interest and other income, net. As of December 31, 2011, the total notional amounts of interest rate contracts outstanding were $100 million.

67

**Table of Contents**

The fair values of our outstanding derivative instruments were as follows (in millions):

| | | Fair Value of Derivative Instruments | |
| --- | --- | --- | --- |
| | Balance Sheet Location | As of December 31, 2010 | As of December 31, 2011 |
| Derivative Assets | | | |
| Derivatives designated as hedging instruments: | | | |
|    Foreign exchange contracts | Prepaid revenue share, expenses and other assets, current and non-current | $ 342 | $ 333 |
| Derivatives not designated as hedging instruments: | | | |
|    Foreign exchange contracts | Prepaid revenue share, expenses and other assets, current | 0 | 4 |
| Total | | $ 342 | $ 337 |
| Derivative Liabilities | | | |
| Derivatives designated as hedging instruments: | | | |
|    Foreign exchange contracts | Accrued expenses and other current liabilities | $ 5 | $ 5 |
| Derivatives not designated as hedging instruments: | | | |
|    Foreign exchange contracts | Accrued expenses and other current liabilities | 3 | 1 |
| Total | | $ 8 | $ 6 |

The effect of derivative instruments in cash flow hedging relationships on income and other comprehensive income is summarized below (in millions):

| | Increase (Decrease) in Gains Recognized in AOCI on Derivatives Before Tax Effect (Effective Portion) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| Derivatives in Cash Flow Hedging Relationship | 2009 | 2010 | 2011 |
| Foreign exchange contracts | $ (14) | $ 331 | $ 54 |

| | | Gains Reclassified from AOCI into Income (Effective Portion) | | |
| --- | --- | --- | --- | --- |
| | | Year Ended December 31, | | |
| Derivatives in Cash Flow Hedging Relationship | Location | 2009 | 2010 | 2011 |
| Foreign exchange contracts | Revenues | $ 325 | $ 203 | $ 43 |

| | | Gains (Losses) Recognized in Income on Derivatives (Amount Excluded from Effectiveness Testing and Ineffective Portion)[1] | | |
| --- | --- | --- | --- | --- |
| | | Year Ended December 31, | | |
| Derivatives in Cash Flow Hedging Relationship | Location | 2009 | 2010 | 2011 |
| Foreign exchange contracts | Interest and other income, net | $ (268) | $ (320) | $ (323) |

[1]   Gains (losses) related to the ineffective portion of the hedges were not material in all periods presented.

68

Table of Contents

The effect of derivative instruments in fair value hedging relationships on income is summarized below (in millions):

| | | Gains (Losses) Recognized in Income on Derivatives[2] | | |
| | | Year Ended December 31, | | |
| Derivatives in Fair Value Hedging Relationship | Location | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Foreign exchange contracts | Interest and other income, net | $ 2 | $ (35) | $ (2) |
| Hedged item | Interest and other income, net | (2) | 29 | (12) |
| Total | | $ 0 | $ (6) | $ (14) |

2  Losses related to the amount excluded from effectiveness testing of the hedges were $0, $6 million, and $14 million for the years ended December 31, 2009, December 31, 2010, and December 31, 2011.

The effect of derivative instruments not designated as hedging instruments on income is summarized below (in millions):

| | | Gains (Losses) Recognized in Income on Derivatives | | |
| | | Year Ended December 31, | | |
| Derivatives Not Designated As Hedging Instruments | Location | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Foreign exchange contracts | Interest and other income, net | $ (78) | $ (40) | $ 29 |
| Interest rate contracts | Interest and other income, net | 0 | 0 | (19) |
| | | $ (78) | $ (40) | $ 10 |

Note 6.   Fair Value Measurements

We measure our cash equivalents, marketable securities, auction rate securities (ARS), and foreign currency and interest rate derivative contracts at fair value. Fair value is an exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. As such, fair value is a market-based measurement that should be determined based on assumptions that market participants would use in pricing an asset or a liability. A three-tier fair value hierarchy is established as a basis for considering such assumptions and for inputs used in the valuation methodologies in measuring fair value:

Level 1—Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2—Include other inputs that are directly or indirectly observable in the marketplace.

Level 3—Unobservable inputs that are supported by little or no market activities.

The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

We classify our cash equivalents and marketable securities within Level 1 or Level 2. This is because we value our cash equivalents and marketable securities using quoted market prices or alternative pricing sources and models utilizing market observable inputs. We classify our investments in ARS within Level 3 because they are valued using valuation models with significant unobservable marketable inputs (see below). We classify our foreign currency and interest rate derivative contracts primarily within Level 2 as the valuation inputs are based on quoted prices and market observable data of similar instruments.

69

**Table of Contents**

Assets and liabilities measured at fair value on a recurring basis are summarized below (in millions):

| | | Fair Value Measurement at Reporting Date Using | | |
| Description | As of December 31, 2010 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash equivalents: | | | | |
|    Time deposits | $ 973 | $ 0 | $ 973 | $ 0 |
|    Money market and other funds | 7,547 | 5,936 | 1,611[1] | 0 |
|    U.S. government notes | 300 | 300 | 0 | 0 |
|    Foreign government bonds | 150 | 0 | 150 | 0 |
|    Corporate debt securities | 8 | 0 | 8 | 0 |
| Marketable securities: | | | | |
|    Time deposits | 307 | 0 | 307 | 0 |
|    U.S. government agencies | 1,857 | 0 | 1,857 | 0 |
|    U.S. government notes | 3,930 | 3,930 | 0 | 0 |
|    Foreign government bonds | 1,172 | 0 | 1,172 | 0 |
|    Municipal securities | 2,503 | 0 | 2,503 | 0 |
|    Corporate debt securities | 5,742 | 0 | 5,742 | 0 |
|    Agency residential mortgage-backed securities | 5,673 | 0 | 5,673 | 0 |
|    Marketable equity security | 161 | 161 | 0 | 0 |
| Derivative contracts | 342 | 0 | 342 | 0 |
| Auction rate securities | 153 | 0 | 0 | 153 |
| Total | $ 30,818 | $ 10,327 | $ 20,338 | $ 153 |
| **Liabilities** | | | | |
| Derivative contracts | $ 8 | $ 0 | $ 8 | $ 0 |
| Total | $ 8 | $ 0 | $ 8 | $ 0 |

| | | Fair Value Measurement at Reporting Date Using | | |
| Description | As of December 31, 2011 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash equivalents: | | | | |
|    Time deposits | $ 534 | $ 0 | $ 534 | $ 0 |
|    Money market and other funds | 4,462 | 3,202 | 1,260[1] | 0 |
|    U.S. government agencies | 275 | 0 | 275 | 0 |
| Marketable securities: | | | | |
|    Time deposits | 495 | 0 | 495 | 0 |
|    U.S. government agencies | 6,226 | 0 | 6,226 | 0 |
|    U.S. government notes | 11,579 | 11,579 | 0 | 0 |
|    Foreign government bonds | 1,629 | 0 | 1,629 | 0 |
|    Municipal securities | 1,794 | 0 | 1,794 | 0 |
|    Corporate debt securities | 6,112 | 0 | 6,112 | 0 |
|    Agency residential mortgage-backed securities | 6,501 | 0 | 6,501 | 0 |
|    Marketable equity securities | 307 | 307 | 0 | 0 |
| Derivative contracts | 337 | 0 | 337 | 0 |
| Auction rate securities | 118 | 0 | 0 | 118 |
| Total | $ 40,369 | $ 15,088 | $ 25,163 | $ 118 |
| **Liabilities** | | | | |
| Derivative contracts | $ 6 | $ 0 | $ 6 | $ 0 |
| Total | $ 6 | $ 0 | $ 6 | $ 0 |

70

**Table of Contents**

(1)   This balance represents cash collateral received in connection with our securities lending program, which was invested in reverse repurchase agreements maturing within three months.

At December 31, 2011, we held $118 million of ARS. Historically, these securities have provided liquidity through a Dutch auction process. However, these auctions began to fail in the first quarter of 2008. To estimate their fair values at December 31, 2011, we used a discounted cash flow model based on estimated interest rates, timing and amount of cash flows, the credit quality of the underlying securities, and illiquidity considerations.

At December 31, 2011, the estimated fair value of these ARS was $23 million below their costs. As we have no intent to sell these ARS and it is more likely than not that we will not be required to sell these ARS prior to recovery of our entire cost basis, we concluded the decline in the fair value was temporary and recorded the unrealized loss to AOCI on the accompanying Consolidated Balance Sheet at December 31, 2011. To the extent we determine that any impairment is other-than-temporary, we would record a charge to earnings. In addition, we have concluded that the auctions for these securities may continue to fail for at least the next 12 months and as a result, we classified them as non-current assets on the accompanying Consolidated Balance Sheet at December 31, 2011.

The following table presents reconciliations for our assets measured and recorded at fair value on a recurring basis, using significant unobservable inputs (Level 3) (in millions):

|                                                                      | Level 3 |
|----------------------------------------------------------------------|--------:|
| Balance at January 1, 2009                                           | $ 197   |
| Change in unrealized loss included in other comprehensive income     | 12      |
| Net settlements                                                      | (27)    |
| Balance at December 31, 2009                                         | 182     |
| Change in unrealized loss included in other comprehensive income     | 4       |
| Net settlements                                                      | (33)    |
| Balance at December 31, 2010                                         | 153     |
| Change in unrealized loss included in other comprehensive income     | (3)     |
| Net settlements                                                      | (32)    |
| Balance at December 31, 2011                                         | $ 118   |

Note 7.   Property and Equipment

Property and equipment consisted of the following (in millions):

|                                                | As of December 31, 2010 | As of December 31, 2011 |
|------------------------------------------------|-------------------------:|------------------------:|
| Information technology assets                  | $  4,670                 | $  6,060                |
| Land and buildings                             | 3,969                    | 5,228                   |
| Construction in progress                       | 2,329                    | 2,128                   |
| Leasehold improvements                         | 738                      | 919                     |
| Furniture and fixtures                         | 65                       | 65                      |
| Total                                          | 11,771                   | 14,400                  |
| Less: accumulated depreciation and amortization| 4,012                    | 4,797                   |
| Property and equipment, net                    | $  7,759                 | $  9,603                |

71

PX0492-075

Table of Contents

Note 8.   Acquisitions

In April 2011, we completed the acquisition of ITA Software, Inc. (ITA), a privately-held flight information software company, for $676 million in cash, of which $394 million was attributed to acquired intangible assets, $323 million to goodwill, and $41 million to net liabilities assumed.

During the year ended December 31, 2011, we completed 78 other acquisitions and purchases of intangible assets for a total cash consideration of approximately $1.3 billion, of which $795 million was attributed to goodwill, $593 million to acquired intangible assets, and $86 million to net liabilities assumed. These acquisitions generally enhance the breadth and depth of our expertise in engineering and other functional areas, our technologies, and our product offerings.

Pro forma results of operations for these acquisitions have not been presented because they are not material to the consolidated results of operations, either individually or in the aggregate.

Patents and developed technology have a weighted-average useful life of 6.3 years, customer relationships have a weighted-average useful life of 6.6 years and trade names and other have a weighted-average useful life of 4.2 years. The amount of goodwill expected to be deductible for tax purposes is $29 million.

In August 2011, we entered into a Merger Agreement with Motorola, a provider of innovative technologies, products and services that enable a range of mobile and wireline digital communication, information and entertainment experiences, under which we will acquire Motorola for $40 per share in cash, or a total of approximately $12.5 billion. The completion of this transaction is subject to customary closing conditions, including the receipt of certain regulatory approvals. In the event the Merger Agreement is terminated due to a failure to obtain certain regulatory approvals, we would be required to pay Motorola a fee of $2.5 billion. The transaction is currently expected to close in early 2012.

Note 9.   Goodwill and Other Intangible Assets

The changes in the carrying amount of goodwill for the year ended December 31, 2011 were as follows (in millions):

| | |
|---|---|
| Balance as of December 31, 2010 | $6,256 |
| Goodwill acquired | 1,118 |
| Goodwill adjustment | (28) |
| Balance as of December 31, 2011 | $7,346 |

Information regarding our acquisition-related intangible assets is as follows (in millions):

| | As of December 31, 2010 | | |
|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
| Patents and developed technology | $ 915 | $ 506 | $ 409 |
| Customer relationships | 950 | 400 | 550 |
| Trade names and other | 283 | 198 | 85 |
| Total | $2,148 | $ 1,104 | $1,044 |

| | As of December 31, 2011 | | |
|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
| Patents and developed technology | $1,451 | $ 698 | $ 753 |
| Customer relationships | 1,288 | 573 | 715 |
| Trade names and other | 359 | 249 | 110 |
| Total | $3,098 | $ 1,520 | $1,578 |

72

PX0492-076

Table of Contents

Patents and developed technology, customer relationships, and trade names and other have weighted-average useful lives from the date of purchase of 5.0 years, 6.1 years, and 4.3 years. Amortization expense of acquisition-related intangible assets for the years ended December 31, 2009, 2010, and 2011 was $266 million, $314 million, and $441 million. As of December 31, 2011, expected amortization expense for acquisition-related intangible assets for each of the next five years and thereafter was as follows (in millions):

| | |
|---|---:|
| 2012 | $ 472 |
| 2013 | 364 |
| 2014 | 297 |
| 2015 | 147 |
| 2016 | 99 |
| Thereafter | 199 |
| | $1,578 |

Note 10.   Interest and Other Income, Net

The components of interest and other income, net were as follows (in millions):

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | 2009 | 2010 | 2011 |
| Interest income | $ 230 | $ 579 | $ 812 |
| Interest expense | 0 | (5) | (58) |
| Realized gains on available-for-sale investments, net | 97 | 185 | 254 |
| Impairment of equity investments | 0 | 0 | (110) |
| Foreign currency exchange losses, net | (260) | (355) | (379) |
| Other | 2 | 11 | 65 |
| Interest and other income, net | $ 69 | $ 415 | $ 584 |

Note 11.   Accumulated Other Comprehensive Income

The components of accumulated other comprehensive income are as follows (in millions):

| | As of December 31, | |
|---|---:|---:|
| | 2010 | 2011 |
| Foreign currency translation adjustment | $ (41) | $ (148) |
| Net unrealized gains on available-for-sale investments, net of taxes | 94 | 327 |
| Unrealized gains on cash flow hedges, net of taxes | 85 | 97 |
| Accumulated other comprehensive income | $ 138 | $ 276 |

Note 12.   Commitments and Contingencies

Operating Leases

We have entered into various non-cancelable operating lease agreements for certain of our offices, land, and data centers throughout the world with original lease periods expiring primarily between 2012 and 2063. We are committed to pay a portion of the actual operating expenses under certain of these lease agreements. These operating expenses are not included in the table below. Certain of these arrangements have free or escalating rent payment provisions. We recognize rent expense under such arrangements on a straight-line basis.

73

Table of Contents

At December 31, 2011, future minimum payments under non-cancelable operating leases, net of sublease income amounts, were as follows over each of the next five years and thereafter (in millions):

|  | Operating Leases | Sub-lease Income | Net Operating Leases |
|---|---|---|---|
| 2012 | $ 389 | $ 17 | $ 372 |
| 2013 | 377 | 16 | 361 |
| 2014 | 357 | 14 | 343 |
| 2015 | 311 | 13 | 298 |
| 2016 | 256 | 10 | 246 |
| Thereafter | 1,264 | 5 | 1,259 |
| Total minimum payments | $ 2,954 | $ 75 | $ 2,879 |

Certain leases have adjustments for market provisions. Amounts in the above table represent our best estimates of future payments to be made under these leases. In addition, the above table does not include future rental income of $726 million related to the leases that we assumed in connection with our building purchases. Rent expense under operating leases, including co-location arrangements, was $323 million, $293 million, and $380 million in 2009, 2010, and 2011.

Purchase Obligations

We had $1.9 billion of other non-cancelable contractual obligations, primarily related to payments related to certain of our distribution arrangements and video and other content licensing revenue sharing arrangements, as well as data center operations and facility build-outs at December 31, 2011. In addition, we had $2.8 billion of open purchase orders for which we had not received the related services or goods at December 31, 2011. We have the right to cancel these open purchase orders prior to the date of delivery.

Letters of Credit

At December 31, 2011, we had unused letters of credit for $46 million.

Indemnifications

In the normal course of business to facilitate transactions of our services and products, we indemnify certain parties, including advertisers, Google Network Members, and lessors with respect to certain matters. We have agreed to hold certain parties harmless against losses arising from a breach of representations or covenants, or out of intellectual property infringement or other claims made against certain parties. Several of these agreements limit the time within which an indemnification claim can be made and the amount of the claim. In addition, we have entered into indemnification agreements with our officers and directors, and our bylaws contain similar indemnification obligations to our agents.

It is not possible to make a reasonable estimate of the maximum potential amount under these indemnification agreements due to the unique facts and circumstances involved in each particular agreement. Additionally, we have a limited history of prior indemnification claims and the payments we have made under such agreements have not had a material adverse effect on our results of operations, cash flows, or financial position. However, to the extent that valid indemnification claims arise in the future, future payments by us could be significant and could have a material adverse effect on our results of operations or cash flows in a particular period. As of December 31, 2011, we did not have any indemnification claims that we considered to be probable or reasonably possible.

74

**Table of Contents**

Legal Matters

*Antitrust Investigations*

On June 23, 2011, we received a Civil Investigative Demand (CID) from the U.S. Federal Trade Commission's (FTC) Bureau of Competition and a subpoena from FTC's Bureau of Consumer Protection relating to a review by the FTC of our business practices, including search and advertising. State attorneys general from the states of Texas, Ohio, and Mississippi have issued similar CIDs. We are cooperating with the FTC and the state attorneys general and responding to their information requests.

The European Commission's (EC) Directorate General for Competition has also opened an investigation into various antitrust-related complaints against us. On February 10, 2010, we received notification from the EC about three antitrust complaints filed by Ciao, Ejustice, and Foundem, respectively. On November 30, 2010, the EC formally opened proceedings against us. Since November 2010, 1plusV, parent company of Ejustice, and VfT, an association of business listings providers in Germany, have filed similar complaints against us. On March 31, 2011, Microsoft Corporation submitted a similar complaint to the EC against us. On the same day, the EC notified us of additional complaints filed by Elfvoetbal, Hotmaps, Interactive Labs, and nnpt.it, and on August 30, 2011 of a complaint by dealdujour.pro. On September 16, 2011, we responded to all of the allegations made against us. In addition, in December 2011, the Spanish Association of Daily Newspaper Publishers also submitted a complaint to the EC against us. We are cooperating with the EC and responding to its information requests.

*EPA Investigation*

In February 2009, we learned of a U.S. Environmental Protection Agency (EPA) investigation into an alleged release of refrigerant at one of our smaller data center facilities, which we acquired from DoubleClick, and the accuracy of related statements and records. We are cooperating with the EPA and have provided documents and other materials.

*Department of Justice Investigation (Advertising)*

In connection with the resolution of an investigation by the United States Department of Justice into the use of Google advertising by certain advertisers, we accrued $500 million during the three months ended March 31, 2011, which was paid in August 2011 upon final resolution of that matter.

*Patent and Intellectual Property Claims*

We have had patent, copyright, and trademark infringement lawsuits filed against us claiming that certain of our products, services, and technologies, including Android, Google Search, Google AdWords, Google AdSense, Google Books, Google News, Google Image Search, Google Chrome, Google Talk, Google Voice, and YouTube, infringe the intellectual property rights of others. Adverse results in these lawsuits may include awards of substantial monetary damages, costly royalty or licensing agreements, or orders preventing us from offering certain features, functionalities, products, or services, and may also cause us to change our business practices, and require development of non-infringing products or technologies, which could result in a loss of revenues for us and otherwise harm our business.

In addition, many of our agreements with our customers and partners require us to indemnify them for certain intellectual property infringement claims against them, which would increase our costs as a result of defending such claims, and may require that we pay significant damages if there were an adverse ruling in any such claims. Furthermore, such customers and partners may discontinue the use of our products, services, and technologies, as a result of injunctions or otherwise, which could result in loss of revenues and adversely impact our business.

*Other*

We are also regularly subject to claims, suits, government investigations, and other proceedings involving competition and antitrust (such as the pending investigations by the FTC and the EC described above), intellectual

75

PX0492-079

**Table of Contents**

property, privacy, tax, labor and employment, commercial disputes, content generated by our users, goods and services offered by advertisers or publishers using our platforms, and other matters. Such claims, suits, government investigations, and other proceedings could result in fines, civil or criminal penalties, or other adverse consequences.

Certain of our outstanding legal matters include speculative claims for substantial or indeterminate amounts of damages. We record a liability when we believe that it is both probable that a loss has been incurred, and the amount can be reasonably estimated. We evaluate, on a monthly basis, developments in our legal matters that could affect the amount of liability that has been previously accrued, and make adjustments as appropriate. Significant judgment is required to determine both likelihood of there being and the estimated amount of a loss related to such matters.

With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, consolidated financial position, results of operations, or cash flows. However, the outcome of such legal matters is inherently unpredictable and subject to significant uncertainties.

We expense legal fees in the period in which they are incurred.

Income Taxes

We are under audit by the Internal Revenue Service (IRS) and various other tax authorities. We have reserved for potential adjustments to our provision for income taxes that may result from examinations by, or any negotiated agreements with, these tax authorities, and we believe that the final outcome of these examinations or agreements will not have a material effect on our results of operations. If events occur which indicate payment of these amounts is unnecessary, the reversal of the liabilities would result in the recognition of tax benefits in the period we determine the liabilities are no longer necessary. If our estimates of the federal, state, and foreign income tax liabilities are less than the ultimate assessment, a further charge to expense would result.

Note 13.  Stockholders' Equity

Convertible Preferred Stock

Our board of directors has authorized 100,000,000 shares of convertible preferred stock, $0.001 par value, issuable in series. At December 31, 2010 and December 31, 2011, there were no shares issued or outstanding.

Class A and Class B Common Stock

Our board of directors has authorized two classes of common stock, Class A and Class B. At December 31, 2011, there were 6,000,000,000 and 3,000,000,000 shares authorized and there were 257,552,401 and 67,342,362 shares outstanding of Class A and Class B common stock. The rights of the holders of Class A and Class B common stock are identical, except with respect to voting. Each share of Class A common stock is entitled to one vote per share. Each share of Class B common stock is entitled to 10 votes per share. Shares of Class B common stock may be converted at any time at the option of the stockholder and automatically convert upon sale or transfer to Class A common stock. We refer to Class A and Class B common stock as common stock throughout the notes to these financial statements, unless otherwise noted.

Stock Plans

We maintain the 1998 Stock Plan, the 2000 Stock Plan, the 2003 Stock Plan, the 2003 Stock Plan (No. 2), the 2003 Stock Plan (No. 3), the 2004 Stock Plan, and plans assumed through acquisitions, all of which are collectively referred to as the "Stock Plans." Under our Stock Plans, incentive and nonqualified stock options or rights to purchase common stock may be granted to eligible participants. Options are generally granted for a term

76

**Table of Contents**

of 10 years. Options granted under the Stock Plans other than the 2004 Stock Plan may be exercised prior to vesting. Under the Stock Plans, we have also issued RSUs and restricted shares. An RSU award is an agreement to issue shares of our stock at the time of vest. Except for options granted pursuant to our stock option exchange program completed in March 2009 (the Exchange), options granted and RSUs issued to employees under the Stock Plans generally vest over four years contingent upon employment with us on the vesting date.

At December 31, 2010 and December 31, 2011, there were 27,329,837 and 21,794,492 shares of common stock reserved for future issuance under our Stock Plans.

We estimated the fair value of each option award on the date of grant using the BSM option pricing model. Our assumptions about stock-price volatility have been based exclusively on the implied volatilities of publicly traded options to buy our stock with contractual terms closest to the expected life of options granted to our employees. We estimate the expected term based upon the historical exercise behavior of our employees. The risk-free interest rate for periods within the contractual life of the award is based on the U.S. Treasury yield curve in effect at the time of grant.

The following table presents the weighted-average assumptions used to estimate the fair values of the stock options granted (excluding options granted in connection with the Exchange discussed below) in the periods presented:

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Risk-free interest rate | 2.6% | 1.9% | 2.3% |
| Expected volatility | 37% | 35% | 33% |
| Expected life (in years) | 5.8 | 5.4 | 5.9 |
| Dividend yield | 0 | 0 | 0 |
| Weighted-average estimated fair value of options granted during the year | $160.63 | $216.43 | $210.07 |

The following table summarizes the activities for our options for the year ended December 31, 2011:

|  | Options Outstanding | | | |
|  | Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value (in millions) [1] |
|---|---|---|---|---|
| Balance at December 31, 2010 | 11,525,422 | $ 330.24 |  |  |
| Granted | 718,091 | $ 584.80 |  |  |
| Exercised | (2,181,355) | $ 284.00 |  |  |
| Forfeited/canceled | (254,906) | $ 377.73 |  |  |
| Balance at December 31, 2011 | 9,807,252 | $ 357.92 | 5.7 | $ 2,825 |
| Vested and exercisable as of December 31, 2011 | 6,244,783 | $ 314.38 | 5.4 | $ 2,070 |
| Vested and exercisable as of December 31, 2011 and expected to vest thereafter[2] | 9,437,288 | $ 354.92 | 5.7 | $ 2,746 |

[1] The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying awards and the closing stock price of $645.90 of our Class A common stock on December 31, 2011.

[2] Options expected to vest reflect an estimated forfeiture rate.

77

**Table of Contents**

The following table summarizes additional information regarding outstanding, exercisable, and exercisable and vested stock options at December 31, 2011:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | | Options Exercisable and Vested | |
| | Number of Shares | Weighted-Average Remaining Life (in years) | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price |
|---|---|---|---|---|---|---|---|
| $0.30–$94.80 | 297,360 | 2.6 | $ 28.06 | 296,392 | $ 27.85 | 278,071 | $ 24.73 |
| $117.84–$198.41 | 412,843 | 2.9 | $ 179.21 | 412,843 | $ 179.12 | 412,843 | $ 179.12 |
| $205.96–$298.86 | 505,760 | 3.2 | $ 275.21 | 502,038 | $ 275.12 | 502,038 | $ 275.12 |
| $300.97–$399.00 | 5,478,754 | 5.0 | $ 309.68 | 4,012,895 | $ 309.71 | 4,012,895 | $ 309.71 |
| $401.78–$499.07 | 935,944 | 6.6 | $ 439.16 | 514,417 | $ 437.28 | 514,417 | $ 437.28 |
| $501.27–$595.35 | 1,892,340 | 8.4 | $ 532.44 | 509,780 | $ 524.69 | 509,780 | $ 524.69 |
| $601.17–$699.35 | 284,171 | 9.1 | $ 610.18 | 14,659 | $ 612.09 | 14,659 | $ 612.09 |
| $710.84 | 80 | 6.0 | $ 710.84 | 80 | $ 710.84 | 80 | $ 710.84 |
| $0.30–$710.84 | 9,807,252 | 5.7 | $ 357.92 | 6,263,104 | $ 313.68 | 6,244,783 | $ 314.38 |

The above tables include approximately 1.2 million warrants held by selected financial institutions that were options purchased from employees under our TSO program, with a weighted-average exercise price of $336.64 and a weighted-average remaining life of 1.1 years.

During 2011, the number of shares underlying TSOs sold to selected financial institutions under the TSO program was 635,047 at a total value of $167 million, or an average of $262.74 per share, including an average premium of $11.09 per share. The premium is calculated as the difference between (a) the sale price of the TSO and (b) the intrinsic value of the TSO, which we define as the excess, if any, of the price of our Class A common stock at the time of the sale over the exercise price of the TSO.

The total grant date fair value of stock options vested during 2009, 2010, and 2011 was $690 million, $690 million, and $561 million. The aggregate intrinsic value of all options and warrants exercised during 2009, 2010, and 2011 was $566 million, $794 million, and $674 million. These amounts do not include the aggregate sales price of options sold under our TSO program.

As of December 31, 2011, there was $583 million of unrecognized compensation cost related to outstanding employee stock options. This amount is expected to be recognized over a weighted-average period of 2.1 years. To the extent the actual forfeiture rate is different from what we have estimated, stock-based compensation related to these awards will be different from our expectations.

The following table summarizes the activities for our unvested RSUs for the year ended December 31, 2011:

| | Unvested Restricted Stock Units | |
| | Number of Shares | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| Unvested at December 31, 2010 | 6,671,971 | $ 509.04 |
| Granted | 5,260,421 | $ 531.20 |
| Vested | (2,691,549) | $ 516.22 |
| Forfeited/canceled | (418,195) | $ 538.01 |
| Unvested at December 31, 2011 | 8,822,648 | $ 520.27 |
| Expected to vest after December 31, 2011[1] | 7,903,328 | $ 520.27 |

[1] RSUs expected to vest reflect an estimated forfeiture rate.

78

PX0492-082

Table of Contents

As of December 31, 2011, there was $3,727 million of unrecognized compensation cost related to unvested employee RSUs. This amount is expected to be recognized over a weighted-average period of 2.9 years. To the extent the actual forfeiture rate is different from what we have estimated, stock-based compensation related to these awards will be different from our expectations.

Note 14.    401(k) Plan

We have a 401(k) Savings Plan (401(k) Plan) that qualifies as a deferred salary arrangement under Section 401(k) of the Internal Revenue Code. Under the 401(k) Plan, participating employees may elect to contribute up to 60% of their eligible compensation, subject to certain limitations. Employee and our contributions are fully vested when contributed. We contributed approximately $83 million, $100 million, and $136 million during 2009, 2010, and 2011.

Note 15.    Income Taxes

Income before income taxes included income from domestic operations of $3,579 million, $4,948 million, and $4,693 million for 2009, 2010, and 2011, and income from foreign operations of $4,802 million, $5,848 million, and $7,633 million for 2009, 2010, and 2011. Substantially all of the income from foreign operations was earned by an Irish subsidiary.

The provision for income taxes consists of the following (in millions):

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $1,531 | $1,657 | $1,724 |
| State | 450 | 458 | 274 |
| Foreign | 148 | 167 | 248 |
| Total | 2,129 | 2,282 | 2,246 |
| Deferred: |  |  |  |
| Federal | (273) | (25) | 452 |
| State | 13 | 47 | (109) |
| Foreign | (8) | (13) | (0) |
| Total | (268) | 9 | 343 |
| Provision for income taxes | $1,861 | $2,291 | $2,589 |

The reconciliation of federal statutory income tax rate to our effective income tax rate is as follows (in millions):

|  | Year ended December 31, | | |
|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Expected provision at federal statutory tax rate (35%) | $ 2,933 | $ 3,779 | $ 4,314 |
| State taxes, net of federal benefit | 302 | 322 | 122 |
| Stock-based compensation expense | 63 | 79 | 105 |
| Change in valuation allowance | (41) | (34) | 27 |
| Foreign rate differential | (1,339) | (1,769) | (2,001) |
| Federal research credit | (56) | (84) | (140) |
| Tax exempt interest | (15) | (12) | (10) |
| Non-deductible legal settlement | 0 | 0 | 175 |
| Other permanent differences | 14 | 10 | (3) |
| Provision for income taxes | $ 1,861 | $ 2,291 | $ 2,589 |

79

**Table of Contents**

We have not provided U.S. income taxes and foreign withholding taxes on the undistributed earnings of foreign subsidiaries as of December 31, 2011 because we intend to permanently reinvest such earnings outside the U.S. If these foreign earnings were to be repatriated in the future, the related U.S. tax liability may be reduced by any foreign income taxes previously paid on these earnings. As of December 31, 2011, the cumulative amount of earnings upon which U.S. income taxes have not been provided is approximately $24.8 billion. Determination of the amount of unrecognized deferred tax liability related to these earnings is not practicable.

Deferred Tax Assets

Deferred income taxes reflect the net effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of our deferred tax assets and liabilities are as follows (in millions):

|  | As of December 31, | |
|---|---|---|
|  | 2010 | 2011 |
| Deferred tax assets: |  |  |
| Stock-based compensation expense | $ 299 | $ 288 |
| State taxes | 207 | 138 |
| Capital loss from impairment of equity investments | 292 | 285 |
| Settlement with the Authors Guild and AAP | 39 | 35 |
| Depreciation and amortization | 20 | 0 |
| Vacation accruals | 35 | 52 |
| Deferred rent | 34 | 43 |
| Accruals and reserves not currently deductible | 244 | 268 |
| Acquired net operating losses | 132 | 156 |
| State tax credit | 0 | 55 |
| Other | 0 | 11 |
| Total deferred tax assets | 1,302 | 1,331 |
| Valuation allowance | (292) | (333) |
| Total deferred tax assets net of valuation allowance | 1,010 | 998 |
| Deferred tax liabilities: |  |  |
| Depreciation and amortization | 0 | (479) |
| Identified intangibles | (308) | (398) |
| Unrealized gains on investments and other | (56) | (90) |
| Other prepaids | (95) | (70) |
| Other | (27) | (33) |
| Total deferred tax liabilities | (486) | (1,070) |
| Net deferred tax assets (liabilities) | $ 524 | $ (72) |

80

PX0492-084

Table of Contents

As of December 31, 2011, our federal and state net operating loss carryforwards for income tax purposes were approximately $420 million and $310 million. If not utilized, the federal net operating loss carryforwards will begin to expire in 2018 and the state net operating loss carryforwards will begin to expire in 2014. The net operating loss carryforwards are subject to various annual limitations under Section 382 of the Internal Revenue Code.

As of December 31, 2011, our California research and development credit carryforwards for income tax purposes were approximately $55 million that can be carried over indefinitely. We believe it is more likely than not that a portion of the state tax credit will not be realized. Therefore, we have recorded a valuation allowance on the state tax credit carryforward in the amount of $48 million. We will reassess the valuation allowance quarterly and if future evidence allows for a partial or full release of the valuation allowance, a tax benefit will be recorded accordingly.

As of December 31, 2011, our federal and state capital loss carryforwards for income tax purposes were approximately $165 million and $422 million. We also have deferred tax assets for impairment losses that, if recognized, will be capital in nature. We believe that it is more likely than not that our deferred tax assets for capital losses and impairment losses will not be realized. Therefore, we have recorded a valuation allowance on both our federal and state deferred tax assets for these items in the amount of $285 million. We will reassess the valuation allowance quarterly and if future evidence allows for a partial or full release of the valuation allowance, a tax benefit will be recorded accordingly.

Uncertain Tax Positions

The following table summarizes the activity related to our gross unrecognized tax benefits from January 1, 2009 to December 31, 2011 (in millions):

| | |
|---|---:|
| Balance as of January 1, 2009 | $ 721 |
| Increases related to prior year tax positions | 222 |
| Decreases related to prior year tax positions | (1) |
| Increases related to current year tax positions | 246 |
| Balance as of December 31, 2009 | 1,188 |
| Increases related to prior year tax positions | 37 |
| Decreases related to prior year tax positions | (197) |
| Decreases related to settlement with tax authorities | (47) |
| Decreases as a result of a lapse of applicable statute of limitation | (97) |
| Increases related to current year tax positions | 256 |
| Balance as of December 31, 2010 | 1,140 |
| Increases related to prior year tax positions | 77 |
| Decreases related to prior year tax positions | (9) |
| Increases related to current year tax positions | 361 |
| Decreases related to settlement with tax authorities | (5) |
| Balance as of December 31, 2011 | $1,564 |

Our total unrecognized tax benefits that, if recognized, would affect our effective tax rate were $814 million, $951 million, and $1,350 million as of December 31, 2009, 2010, and 2011.

As of December 31, 2010 and 2011, we had accrued $97 million and $129 million for payment of interest and penalties. Interest and penalties included in our provision for income taxes were not material in all the periods presented.

We and our subsidiaries are routinely examined by various taxing authorities. Although we file U.S. federal, U.S. state, and foreign tax returns, our two major tax jurisdictions are the U.S. and Ireland. During the three months ended December 31, 2007, the IRS completed its examination of our 2003 and 2004 tax years. We have filed an

81

**Table of Contents**

appeal with the IRS for certain issues related to this audit and no resolution of the issues has been achieved at this time, but we believe we have adequately provided for these items and any adverse results would have an immaterial impact on our unrecognized tax benefit balance within the next 12 months. The IRS is currently in examination of our 2007, 2008, and 2009 tax years. We do not expect the examination to be completed within the next 12 months. Therefore, we do not anticipate any significant impact to our unrecognized tax benefit balance in 2012, related to our 2007, 2008, and 2009 tax years.

Our 2010 and 2011 tax years remain subject to examination by the IRS for U.S. federal tax purposes, and our 2003 through 2011 tax years remain subject to examination by the appropriate governmental agencies for Irish tax purposes. There are various other ongoing audits in various other jurisdictions that are not material to our financial statements.

Note 16.    Information about Geographic Areas

Our chief operating decision-makers (i.e., chief executive officer and his direct reports) review financial information presented on a consolidated basis, accompanied by disaggregated information about revenues by geographic region for purposes of allocating resources and evaluating financial performance. There are no segment managers who are held accountable by our chief operating decision-makers, or anyone else, for operations, operating results, and planning for levels or components below the consolidated unit level. Accordingly, we consider ourselves to be in a single reporting segment and operating unit structure.

Revenues by geography are based on the billing addresses of our customers. The following tables set forth revenues and long-lived assets by geographic area (in millions):

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2009 | 2010 | 2011 |
| Revenues: |  |  |  |
| United States | $11,194 | $14,056 | $17,560 |
| United Kingdom | 2,986 | 3,329 | 4,057 |
| Rest of the world | 9,471 | 11,936 | 16,288 |
| Total revenues | $23,651 | $29,321 | $37,905 |

|  | As of December 31, | |
| --- | --- | --- |
|  | 2010 | 2011 |
| Long-lived assets: |  |  |
| United States | $14,000 | $15,963 |
| International | 2,289 | 3,853 |
| Total long-lived assets | $16,289 | $19,816 |

82

PX0492-086

Table of Contents

ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

    None.


ITEM 9A.   CONTROLS AND PROCEDURES

*Evaluation of Disclosure Controls and Procedures*

    Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Exchange Act, as of the end of the period covered by this Annual Report on Form 10-K.

    Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of December 31, 2011, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

*Changes in Internal Control over Financial Reporting*

    There were no changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2011 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Management's Report on Internal Control over Financial Reporting*

    Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) of the Exchange Act. Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2011. Management reviewed the results of its assessment with our Audit Committee. The effectiveness of our internal control over financial reporting as of December 31, 2011 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in its report which is included in Item 8 of this Annual Report on Form 10-K.

*Limitations on Effectiveness of Controls and Procedures*

    In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

ITEM 9B.   OTHER INFORMATION

    None.

83

PX0492-087

**Table of Contents**

PART III

ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this item will be included under the caption "Directors, Executive Officers and Corporate Governance" in our Proxy Statement for the 2012 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2011 (2012 Proxy Statement) and is incorporated herein by reference. The information required by this item regarding delinquent filers pursuant to Item 405 of Regulation S-K will be included under the caption "Section 16(a) Beneficial Ownership Reporting Compliance" in the 2012 Proxy Statement and is incorporated herein by reference.

ITEM 11.   EXECUTIVE COMPENSATION

The information required by this item will be included under the captions "Director Compensation," "Executive Compensation" and "Directors, Executive Officers and Corporate Governance—Corporate Governance and Board Matters— Compensation Committee Interlocks and Insider Participation" in the 2012 Proxy Statement and is incorporated herein by reference.

ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this item will be included under the captions "Common Stock Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" in the 2012 Proxy Statement and is incorporated herein by reference.

ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item will be included under the captions "Certain Relationships and Related Transactions" and "Directors, Executive Officers and Corporate Governance—Corporate Governance and Board Matters— Director Independence" in the 2012 Proxy Statement and is incorporated herein by reference.

ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES

The information required by this item will be included under the caption "Independent Registered Public Accounting Firm" in the 2012 Proxy Statement and is incorporated herein by reference.

84

PX0492-088

**Table of Contents**

PART IV

ITEM 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES

(a)   We have filed the following documents as part of this Annual Report on Form 10-K:

1. Consolidated Financial Statements

Reports of Independent Registered Public Accounting Firm                 49
Financial Statements:
         Consolidated Balance Sheets                                     51
         Consolidated Statements of Income                               52
         Consolidated Statements of Comprehensive Income                 53
         Consolidated Statements of Stockholders' Equity                 54
         Consolidated Statements of Cash Flows                           55
         Notes to Consolidated Financial Statements                      56

2. Financial Statement Schedules

Schedule II: Valuation and Qualifying Accounts

| Allowance for Doubtful Accounts and Sales Credits | Balance at Beginning of Year | Charged to Expenses/ Against Revenue | Write-Offs, Net of Recoveries | Balance at End of Year |
|---|---|---|---|---|
| | | (In millions) | | |
| Year ended December 31, 2009 | $    80 | $   149 | $   (150) | $    79 |
| Year ended December 31, 2010 | $    79 | $   200 | $   (178) | $   101 |
| Year ended December 31, 2011 | $   101 | $   214 | $   (182) | $   133 |

Note:  Additions to the allowance for doubtful accounts are charged to expense. Additions to the allowance for sales credits are charged against revenues.

All other schedules have been omitted because they are not required, not applicable, or the required information is otherwise included.

3. Exhibits

See the Exhibit Index immediately following the signature page of this Annual Report on Form 10-K.

85

PX0492-089

**Table of Contents**

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: January 26, 2012

GOOGLE INC.

By: _____ /S/ LARRY PAGE _____

Larry Page
Chief Executive Officer

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Larry Page and Patrick Pichette, jointly and severally, his or her attorney-in-fact, with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/ LARRY PAGE<br>Larry Page | Chief Executive Officer, Co-Founder and Director (Principal Executive Officer) | January 26, 2012 |
| /S/ PATRICK PICHETTE<br>Patrick Pichette | Senior Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | January 26, 2012 |
| Eric Schmidt | Executive Chairman | |
| /S/ SERGEY BRIN<br>Sergey Brin | Co-Founder and Director | January 26, 2012 |
| /S/ L. JOHN DOERR<br>L. John Doerr | Director | January 26, 2012 |
| /S/ DIANE B. GREENE<br>Diane B. Greene | Director | January 26, 2012 |
| /S/ JOHN L. HENNESSY<br>John L. Hennessy | Director | January 26, 2012 |
| /S/ ANN MATHER<br>Ann Mather | Director | January 26, 2012 |
| /S/ PAUL S. OTELLINI<br>Paul S. Otellini | Director | January 26, 2012 |
| /S/ K. RAM SHRIRAM<br>K. Ram Shriram | Director | January 26, 2012 |
| /S/ SHIRLEY M. TILGHMAN<br>Shirley M. Tilghman | Director | January 26, 2012 |

PX0492-090

**Table of Contents**

EXHIBIT INDEX

| Exhibit Number | Description | Incorporated by reference herein | |
|---|---|---|---|
| | | Form | Date |
| 1.01 | Form of Distribution Agreement, dated April 20, 2007, among Google Inc., Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and UBS Securities LLC (Distribution Agreement) | Current Report on Form 8-K (File No. 000-50726) | April 23, 2007 |
| 1.01.1 | Amendment No. 1 to the Distribution Agreement among Google Inc. and J.P. Morgan Securities Inc. entered into as of July 20, 2007 | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2007 |
| 1.01.2 | Amendment Agreement, dated as of July 12, 2011, among Google Inc., Morgan Stanley & Co. LLC, Citigroup Global Markets Inc., Credit Suisse Management LLC, Credit Suisse Securities (USA) LLC, UBS AG, London Branch, and UBS Securities LLC | Current Report on Form 8-K (File No. 000-50726) | July 12, 2011 |
| 1.02 | Form of Bidding Rules Agreement, dated April 20, 2007, among Google Inc., Morgan Stanley & Co. Incorporated, as Auction Manager and Bidder, Citigroup Global Markets Inc. as Warrant Agent and Bidder and Credit Suisse Securities (USA) LLC and UBS Securities LLC, as Bidders (Bidding Rules Agreement) | Current Report on Form 8-K (File No. 000-50726) | April 23, 2007 |
| 1.02.1 | Amendment No. 1 to the Bidding Rules Agreement among Google Inc. and J.P. Morgan Securities Inc., as Bidder entered into as of July 20, 2007 | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2007 |
| 2.01 | Agreement and Plan of Merger, by and among Google Inc., RB98 Inc., and Motorola Mobility Holdings, Inc., dated as of August 15, 2011 | Current Report on Form 8-K (File No. 000-50726) | August 18, 2011 |
| 3.01 | Third Amended and Restated Certificate of Incorporation of Registrant, as filed on August 24, 2004 | Annual Report on Form 10-K (File No. 000-50726) | February 11, 2011 |
| 3.02 | Amended and Restated Bylaws of Registrant, effective as of August 18, 2004 | Annual Report on Form 10-K (File No. 000-50726) | February 11, 2011 |
| 4.01 | Specimen Class A Common Stock certificate | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 18, 2004 |

PX0492-091

[Table of Contents](#)

| Exhibit Number | | Description | Incorporated by reference herein | |
|---|---|---|---|---|
| | | | Form | Date |
| 4.02 | | Form of Warrant Agreement, dated April 20, 2007, among Google Inc., Citigroup Global Markets Inc. as Warrant Agent, and Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., Credit Suisse Management LLC, and UBS AG, London Branch, as Warrantholders (Warrant Agreement) | Current Report on Form 8-K (File No. 000-50726) | April 23, 2007 |
| 4.02.1 | | Amendment No. 1 to the Warrant Agreement among Google Inc. and J.P. Morgan Securities Inc., as Warrantholder entered into as of July 20, 2007 | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2007 |
| 4.03 | | Indenture, dated as of May 19, 2011 between Google Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee | Current Report on Form 8-K (File No. 000-50726) | May 19, 2011 |
| 4.04 | | Form of 1.250% Note due 2014 | Current Report on Form 8-K (File No. 000-50726) | May 19, 2011 |
| 4.05 | | Form of 2.125% Note due 2016 | Current Report on Form 8-K (File No. 000-50726) | May 19, 2011 |
| 4.06 | | Form of 3.625% Note due 2021 | Current Report on Form 8-K (File No. 000-50726) | May 19, 2011 |
| 4.07 | ♥ | Deferred Compensation Plan | Registration Statement on Form S-8 (File No. 333-175180) | June 28, 2011 |
| 4.07.1 | ♥* | Amendment No. 1 to the Deferred Compensation Plan | | |
| 10.01 | | Form of Indemnification Agreement entered into between Registrant, its affiliates and its directors and officers | Registration Statement on Form S-1, as amended (File No. 333-114984) | July 12, 2004 |
| 10.02 | ♥ | Google Executive Bonus Plan | Current Report on Form 8-K (File No. 000-50726) | March 28, 2007 |
| 10.03 | ♥ | Letter Agreement, dated August 16, 2005, between Shirley M. Tilghman and Google Inc. | Current Report on Form 8-K (File No. 000-50726) | October 6, 2005 |
| 10.04 | ♥ | Offer Letter, dated June 6, 2008, between Patrick Pichette and Google Inc. | Current Report on Form 8-K (File No. 00050726) | June 25, 2008 |
| 10.05 | ♥ | Letter Agreement dated January 11, 2012, between Diane B. Greene and Google Inc. | Current Report on Form 8-K (File No. 00050726) | January 12, 2012 |
| 10.06 | ♥ | 1998 Stock Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.06.1 | ♥ | 1998 Stock Plan—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |

PX0492-092

Table of Contents

| Exhibit Number | | Description | Incorporated by reference herein | |
|---|---|---|---|---|
| | | | Form | Date |
| 10.07 | ♥ | 2000 Stock Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.07.1 | | 2000 Stock Plan—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.08 | | 2003 Stock Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | May 10, 2007 |
| 10.08.1 | | 2003 Stock Plan—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.9 | ♥ | 2003 Stock Plan (No. 2), as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | May 10, 2007 |
| 10.9.1 | | 2003 Stock Plan (No. 2)—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.10 | ♥ | 2003 Stock Plan (No. 3), as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | May 10, 2007 |
| 10.10.1 | | 2003 Stock Plan (No. 3)—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.11 | ♥ | 2004 Stock Plan, as amended | Current Report on Form 8-K (File No. 000-50726) | June 7, 2011 |
| 10.11.1 | | 2004 Stock Plan—Form of stock option agreement | Annual Report on Form 10-K (File No. 000-50726) | March 30, 2005 |
| 10.11.2 | ♥ | 2004 Stock Plan—Form of restricted stock unit agreement | Annual Report on Form 10-K (File No. 000-50726) | March 30, 2005 |
| 10.11.3 | ♥ | 2004 Stock Plan—Amendment to stock option agreements | Registration Statement on Form S-3 (File No. 333-142243) | April 20, 2007 |
| 10.11.4 | ♥ | 2004 Stock Plan—Form of stock option agreement (TSO Program) | Registration Statement on Form S-3 (File No. 333-142243) | April 20, 2007 |
| 10.12 | ♥ | AdMob, Inc. 2006 Stock Plan and UK Sub-Plan of the AdMob, Inc. 2006 Stock Plan | Registration Statement on Form S-8 filed (File No. 333-167411) | June 9, 2010 |
| 10.13 | ♥ | Applied Semantics, Inc. 1999 Stock Option/Stock Issuance Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.14 | ♥ | Click Holding Corp. 2005 Stock Incentive Plan | Registration Statement on Form S-8 (File No. 333-149956) | March 28, 2008 |
| 10.15 | ♥ | Keyhole, Inc. 2000 Equity Incentive Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.16 | ♥ | Picasa, Inc. Employee Bonus Plan | Registration Statement on Form S-8 (File No. 333-119378) | September 29, 2004 |
| 10.17 | ♥ | YouTube, Inc. 2005 Stock Plan | Registration Statement on Form S-8 (File No. 333-138848) | November 20, 2006 |
| 12 | * | Computation of Earnings to Fixed Charge Ratios | | |
| 21.01 | * | Subsidiaries of the Registrant | | |

PX0492-093

[Table of Contents](#)

| Exhibit Number | | Description | Incorporated by reference herein | |
|---|---|---|---|---|
| | | | Form | Date |
| 23.01 | * | Consent of Independent Registered Public Accounting Firm | | |
| 24.01 | * | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) | | |
| 31.01 | * | Certification of Chief Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | |
| 31.02 | * | Certification of Chief Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | |
| 32.01 | ‡ | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | |
| 101.INS | | XBRL Instance Document | | |
| 101.SCH | | XBRL Taxonomy Extension Schema Document | | |
| 101.CAL | | XBRL Taxonomy Extension Calculation Linkbase Document | | |
| 101.DEF | | XBRL Taxonomy Extension Definition Linkbase Document | | |
| 101.LAB | | XBRL Taxonomy Extension Label Linkbase Document | | |
| 101.PRE | | XBRL Taxonomy Extension Presentation Linkbase Document | | |

♥   Indicates management compensatory plan, contract, or arrangement.
*    Filed herewith.
‡    Furnished herewith.

PX0492-094

# PX0496



**Introducing Snap Kit**

Today we're introducing Snap Kit to help developers build products powered by some of the best parts of Snapchat. Snap Kit brings the experiences you love on Snapchat into some of your favorite apps, without compromising your private account data.

Today we're introducing Snap Kit to help developers build products powered by some of the best parts of Snapchat. Snap Kit brings the experiences you love on Snapchat into some of your favorite apps, without compromising your private account data.

Creative Kit helps developers integrate their own stickers, Filters, links, and other highlights — like high scores and workout stats — right into the Snapchat camera, so

PX0496-001

you can add your own touch and share it with friends.

Login Kit lets you unlock new features on Snapchat and other apps — or use your Snapchat account as a quick, secondary way to log in.

Bitmoji Kit lets your conversations come alive with Bitmoji stickers when messaging on other apps.

Story Kit lets developers filter and embed publicly shared Snapchat Stories into their own apps and services.

If you're a developer and interested in trying Snap Kit, you can learn more about it here.

We can't wait to see what you and your community will create with Snap Kit!

**Back To News**

| Company | Community | Advertising | Legal |
|---|---|---|---|
| Snap Inc. | Snapchat Support | Snapchat Ads | Snap Terms |
| Careers | Pixy Support | Advertising Policies | Law Enforcement |
| News | Community Guidelines | Political Ads Library | Cookie Policy |
| Privacy and Safety | | Brand Guidelines | Cookie Settings |
| | | Promotions Rules | Report Infringement |

**Snap Inc.**

Privacy Policy

Terms of Service

PX0496-002

**Language**   English (US)   ⌄

PX0496-003

# PX0497

4/18/24, 5:02 PM                    Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox



TECHNOLOGY
CODE CONFERENCE   SNAPCHAT

# Full video and transcript: Snap CEO Evan Spiegel at Code 2018

"As time goes on, I think it will become clear to more and more people that our values are really hard to copy."

By Recode Staff  |  Updated Jun 8, 2018, 11:05am EDT



Decoder with Nilay Patel
Recode Decode: Snap CEO Evan Spiegel (Liv…

00:44:33

SHARE   SUBSCRIBE   COOKIE POLICY

**Kara Swisher: Social media is important to our country, as it turns out, so we have a lot to talk about in these next two sessions. The first person I'm bringing out is someone who's been at Code before, was here many years ago, he just pointed out to me. Someone I think is really creative, a really interesting entrepreneur, has had a tough time since he went public and lots of issues. But he's here to talk about that.**

**He just got bothered by my 13-year-old explaining what he did and didn't like about the app. My 16-year-old just sent me a whole long list of things, so we're going to get into that. So without further ado, Evan Spiegel, co-founder and CEO of Snap.**

PX0497-001

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

**One of the things, you just, congratulations, you just had a baby. You can just say congratulations to him.**

**How's it going so far?**

**Evan Spiegel**: It is literally the greatest thing in the world.

**Yes, as it turns out, it is. And it's a boy, right?**

Little boy. Yeah.

**Good. Well, you'll like that. I have mine. I like them very much. I'm enjoying them very much. So let's start about that. I'm not kidding. My kids are on Snapchat a lot, especially my 16-year-old. He grew up with Snapchat. I hate to do anecdotal things, but I watch him use it a lot.**

**He was mad about the redesign, like furious. He sent me, he was like, "Tell Evan I'm very upset about this." I'm like, "I think I won't." But he had a whole long list of issues, and yet, he uses it almost every day. He's always on it. He uses it for communication. He uses and he does it so, in such a facile way. So talk a little bit about this redesign, because it was very controversial, impact on your business, so talk about, walk us through what you think happened and the mistakes you made and what you were trying to do to fix it.**

Well, first, please thank him for using the service despite the redesign.

**Yeah. Okay. Good.**

I think fundamentally, if you look at the redesign, it's really important to try and understand the problem that we were trying to solve. When we looked at social media, one of the biggest problems that really stood out to us was this constant conflict between needing to have a small group of friends to feel comfortable expressing yourself, but also needing to have a large group of friends so that you can watch more content.

Traditionally what's happened, especially because social media businesses make their money with advertising, is that those businesses try to encourage you to add as many friends as possible. And then at some point, because you've added all these friends and some of them you don't know and maybe you now have 1,000 friends, you feel uncomfortable actually creating yourself.

PX0497-002

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

That for us was worrisome because our business is all about empowering people to express themselves. That's what we tried to do. That's why we open into the camera. And so we wanted to find a way to empower people to express themselves, to keep that small group of friends but at the same time expose the whole world of content that's on Snapchat that people want to watch.

I think if we look at the execution, in terms of the philosophy, I'm excited about the progress we're making. In terms of the execution, we have to continue to evolve and iterate the product to get the result that we're looking for.

**You and I talked about this. We had a great talk in Venice at your office, which ... Evan has a hard time talking in public, in private, but in public, you're quite private, you're quite passionate about how you were thinking about the theories around what you were doing. You were solving for a problem that these social networks have gotten too big and too anonymous and the behaviors change on them as people use it.**

**When you got this feedback, when you saw it, what did you think and how did you make the decision? Because I think you just made it on your own theories, not on data, which other people tend to ... or not? Explain how you decided to do it.**

We use a combination, obviously, of data and also our own intuition about the underlying problem and our philosophy that guides us there. I think the thing that we always try to do when we release a product, if we believe that that underlying philosophy, that that reasoning is sound, we're willing to push out a product, knowing that that solution may change over time. We try to stay open to the wide solution space effectively and iterate as quickly as possible.

One of the things that I've noticed with our team is that if we lean too heavily on data, we just wait and wait and wait and can get stuck in very small iterations, rather than looking more broadly at new solutions, and so for us to just continually push forward as a company I think is really important, as long as that underlying philosophy is sound.

**So what do you need to do about this redesign? What did you learn from it as an executive? I mean, you're a relatively new executive. We'll get into the IPO part of it in a minute, but what did you learn to do about that because this is your ... You don't have 20 products. You don't have nine different divisions and things like that.**

PX0497-003

Well, one of the things, honestly, that I underestimated at the time was how much it would impact, for example, our investors or our team. You know, if you remember, I think after our Q4 earnings, our stock was up like 50 percent in one day, right? So everyone's like really excited, and they just could not comprehend why we would totally change our product and redesign the service, right, after that amazing blockbuster earnings.

And so for me, that was a really great lesson because to me, it teaches the importance of having that long-term conviction even though it's going to surprise people, even though it'll make people feel uncomfortable, and so we really tried to let people know that we expected some disruption. But despite doing that and despite trying to prepare our community but also the investor community and our team for the disruption that we thought would come with the redesign, it still really had an impact.

I think as people get to know our business over time and as they build trust with us and they see us make more of these decisions ... You know, I think when we were a private company — and we've talked about this a million times — we made a lot of decisions that people thought were totally wild, right? Whether it was ephemeral communications or stories or lenses. These are concepts that were really hard for people to understand at the time, but our conviction and that underlying philosophy that drove the product development is what allowed us to continue to build for the long term.

**Can you upgrade that space in public? You do have public investors. You have the stock. You have the pressure on the stock. Does that make it impossible? Or I mean, you can be in a Jeff Bezos-like position. You did that for years, but do you have that trust in investors to be able to do that?**

It's going to be a process to build that trust. I think the first time we started building that trust was really around the transition in our advertising business. So about 18 months ago, all of our advertising was sold by salespeople, right? Direct sales. We realized that we would be unable to scale the business to reach millions and millions of advertisers if all of our ads were sold by people. We had to create software to do that. We had to take our business through a transition to move from that direct sales force to programmatic advertising. That was another example, I think, where people were worried about it, because with a direct sales force you have fixed prices for your adverting, and with programmatic you have a dynamic auction that determines your pricing.

PX0497-004

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

Because we don't have as many advertisers in our auction yet, that pricing is lower because there aren't as many people competing to buy those ads.

**But it's the right decision?**

And it's the right decision for the long term. We saw that impact on our revenue after we went public, and we took that criticism, and then by Q4, I think people saw how the programmatic business really impacted revenue and got comfortable with that decision. But they punished us for a couple of quarters, and so I think it's going to take a cycle of doing that a few times before we build that trust.

**So you're just going to piss people off for quarter after quarter? Or what? It's funny.**

We're going to try really hard not to piss people off. We really try to be thoughtful and communicate about the decisions we're making, but ultimately, I think people are going to have to see that consistency where we release ephemeral messaging and it doesn't make sense to people, and then several years later it makes sense and it's the dominant behavior.

I think we've done that now with a number of products, and so a couple of years from now, I hope we're sitting here and talking about …

**The design is fantastic.**

Yeah, talking about how great it is.

**Would you go back on the design and some of these things that people didn't like? What don't you think people … What would you change back? Or what do you … that you listen because a part of you doesn't want to, right? "This is the way I want to go."**

We changed one big thing almost right away. One of the mistakes that we had made was combining your communications with the Stories that you wanted to watch. We tried to put that all in one place for your friends because we thought it would make the app feel more familiar. So instead of seeing, for example, opening the app and seeing a celebrity, you always, you saw your friends. We really thought that was important to building deeper relationships with your friends.

I think the mistake that we made was that people think really differently about their communication than they do about watching Stories. Stories is more of a lean-back

PX0497-005

experience. You're bored. You have some time. You're waiting for your friend to reply. And so you start watching content on our service, and so having Stories get in the way of that communication behavior I think was really frustrating to people, so we changed that really quickly. That's already out and I think making a positive impact. We're just going to continue to iterate.

But I think the important thing is really that I think we solved this really challenging problem of being able to maintain a smaller group of your close friends who you feel comfortable expressing yourself and also opening up the world of content on Snapchat.

**All right. Let's talk then about going public since this is about that. How is it going?**

It requires … I would say a bit more grit than being a private company. I think one of things that's interesting, when you're a private company, you can sort of smooth out the ups and downs. In a way, that's harder when you're public because you have to talk about metrics all the time.

But I think the important thing for us is building that muscle of not putting numbers before doing the right thing for the people that use our service. This is a really good time to do that because embedding that culture really early in our business is extremely important, and so for our team to see our commitment to doing the right thing for our community, doing the right thing for people over the long term I think will really serve the business for a long period of time.

**And so do you feel like, do you regret not staying private then, smoothing out things as you do this?**

I think this was the logical step forward in being an independent company. When we raised a lot of money from venture capitalists, I guess our first investor invested at like a $4.25 million valuation, right? The understanding from the venture capitalist was that we were going to provide an exit for them. That was either going to be in the form of an acquisition or that would be in the form of an IPO.

**Right, so you did it for venture capitalists or … because they don't care. You shouldn't care about them, but go ahead.**

To be honest with you, we do care about them, and we do care about our investors. I think for us, this was a really great transition to take what is ultimately short-term capital,

PX0497-006

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

venture investors are short-term investors. They invest for a couple of years, and then they rotate out of their investments, and so we were able to transition inherently short-term investors to long-term investors, and despite that are being — a little volatility that comes with that — ultimately, that's the right thing to do to build our business.

**How do you develop this as CEO? I mean, you started this very young. You're still very young. How is it being a public company and what has it done? Because you spend a lot more time on creativity, on instinct, it seems. Talk about that, how you think you are as a manager, and we'll talk about things that have happened internally. You've lost a lot of executives. Listen, I remember when Facebook went through nine CEOs at once before they settled on the right one. But talk about that, that transition of your ability to move forward.**

For us, this year, the big theme for us, the No. 1 priority in the business was our team performance. Our entire leadership team has really been focused on that. We totally changed a ton of our processes around people. I can speak specifically to the way that I give feedback to our team and sort of how we've evolved in the last year or so.

One of the things that I noticed is that I really needed to spend a lot of time thinking about what works best for my style, like what's the best way that Evan can be a great leader instead of trying to emulate other CEOs or other great ...

**Were there any ones you were trying to emulate?**

Oh, my gosh. There's so many, and tons that are mentors.

**Who? Who?**

John Donahoe is a good example. He's actually the one who inspired me to really focus on coaching, because we went on a walk, and he's like, "Evan, think about how much time athletes spend training for every minute they spend playing." He's like, "Why don't you do more coaching?" It's like, "Great idea. Thank you."

So one of things that we've done is really formalize our coaching practices. At Snap, we actually have coaches that work with every single member of our leadership team, and then I work together with all of those coaches to try and constantly improve.

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

I think outside of that, I've noticed that written feedback works really well for me, so I write letters to our team about — individuals —nspecifically about their performance. We combine that with 360 reviews both for myself and everyone else on the team, so it's not just my perspective, and then everyone develops their own plan and then works with their coach to implement it.

And so I think taking that personal development as a leadership team really, really seriously has made a huge difference for our company in a really short amount of time.

**So what is an Evan management system? Because you seem like a loner comparatively, are you not? That's the perception I think people have, that you … a lot of companies, they operate with two people or something like that. Who is your partner? Do you need one or …**

I am so not a loner. I think there's been strange conflation of my personality … I'm sort of like a private person.

**You are.**

I don't really like talking to media and stuff with the exception being with you here today.

**Oh, thank you. I appreciate it.**

But I think that's been conflated to say that our team works that way, and that's not the case at all. We have a team that works really well together. I'm really proud of that. We all have shared goals. We hold each other accountable. That's had to change. It hasn't always been the case, but that's absolutely critical. Otherwise, we wouldn't be able to execute this quickly.

I think one thing that I help do at the company is really try to set the tone, provide the vision, and tried to guide people back to our philosophy sometimes when we stray. So, I think there are moments when, you know, it can be tempting for someone to look over their shoulder at what everyone else is doing and then try to do that at Snap. I can't tell you how many people I've interviewed that have said, "You should just add 'Likes.'" It's like, "Well, let me tell you why that's not what we do at Snap, and why we think that's really important to self-expression."

**You just eject them out of the room when they do that?**

I try to be really patient and explain. Another one of my mentors said, "Look, your job as a leader is just to explain stuff all the time."

**Right.**

So, I really try to explain our philosophy and how we think about the world in our products. I think for me, as a leader, that's been critical. I think the idea of me as a loner is sort of, it's not ...

**It's interesting. It's there, the idea that you're ... It is. It absolutely is.**

That's a little depressing, I guess.

**Yeah, it is. So, sad loner by himself. No, I think your life is just fine. It seems like it from your Instagram. No, I'm kidding. Teasing.**

**So, talk about ... You've had a loss of upper people in the management. It gets written about, and it may not be completely accurate, it might be accurate. What is happening there when different people leave? Because, ultimately, building the right team is over time. I've seen it happen in a day. I've seen it, like people come and go and they can either cycle up or cycle bad. So, I don't find that that unusual, but you have had a lot of turnover. Talk about what's the problem with people stay or go, what do you need there?**

I think there's a combination of factors. If I were to look at, I guess, maybe the key ones, I think first and foremost, obviously the company has changed so dramatically in a very short period of time. So we now have, I don't know, almost 3,000 people; a couple years ago we had a couple hundred. So, to scale a team that quickly actually requires a changing skillset, because the things that work when you're a really small company don't work when you're a lot larger. That's been on huge factor, I think.

Another one, and it sort of relates to that, I think, is really about adaptability, and that has to do obviously with the rate at which the company is needing to grow faster, but also has to do with how you approach problems at Snap. One of the things I've seen is that people who are absolutely brilliant, who are geniuses, experts in their fields, come to Snap and have a hard time approaching problems in a new way. And they want to continue what they've been doing in the past. For us, that's really challenging, because we really want people to approach problems with almost a blank canvas. That's how we arrived at

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

solutions like Stories or Lenses or ephemeral messaging. I think for us, having that open-mindedness and willingness to approach problems from different angles is really important.

I think the last one — and this has become more important to me over time — in the past, the way we ran the team, people were sort of responsible for their own verticals, and that just doesn't work to be a high-functioning leadership team. You need everyone to be accountable for the same goals and to work together to do that. So, a huge part of that is then making sure you hire people who really work well with other people, and make them better.

**Right, right.**

So, I think across those three, I would say — and I'm sure there are others — those are how I think about building the right team.

**Building the right team. So, let's get to the story today, which ... we talked about diversity. There's a very tough story on Cheddar, a good story, about problems at Snapchat, which just me, is so normal for the whole [industry]. Every single company has this issue, and this was your turn to talk about it. You had someone who left who wrote a pretty tough letter about the culture. Talk about what your reaction to that. Because you guys admitted this was a problem, we've been trying to fix it, this was ... They left last November. The letter that went to everyone, it was a woman engineer there, talked about a toxic male culture, models at a party, which you also objected to, but you're the CEO. All kinds of things where ... a "Game of Throne"-type mentality, too male. Talk about that.**

Yeah, that letter was a really good wake-up call for us because, obviously, we're constantly thinking about how to have the culture that we want and how to reinforce the values that we want. And we're thinking about it even more because, as I mentioned, the company has grown so fast. So, to take on that challenge of a company growing that quickly, hiring people that quickly, then reinforcing the culture and values is really challenging.

I think the wake-up call for us with that letter was that we needed to do even more, and needed to do it faster. Right? So, we reorganized the engineering team, put new leadership in place. We actually hired external consultants to come into the company, talk to people and help show us areas where we could improve. We ran a company-wide survey to identify other issues and act on them. We changed our promotion process.

PX0497-010

So, I'm proud of the progress that our team made in the last six months. I'm glad we started moving a lot faster on these issues. And obviously, there's a lot more to do. So, we're gonna stay focused and keep going.

**And you released the numbers, which are as bad as all of them, but why is that? I want to get to why it is. Because a lot of people are like … Even Facebook is coming out next, "We were surprised by this. We didn't realize this." Why don't you realize this? I know it sounds crazy, you know what I mean? I do feel like sometimes, and you do get that, "We think it's important, we think it's a priority." One, it doesn't change, and two, what is it? Is it an evolving nature of you, or your management team? Or what happens where it comes as such a surprise that is not a surprise to a lot of people?**

Well, I think if we go back a little bit, I'm not sure it was surprise to us. For example, I think the article talks about this female engineer feeling uncomfortable because she overheard something that a senior leader had said. She went to HR, and HR had a conversation with him and talked about it, and said, "Hey, that's not appropriate."

**Right.**

Ultimately, to me, that is the sign of a culture that we want, where people are identifying problems and speaking up about them. So, I think Step One, talking about that problem, having people come forward and talk about it, allows us to fix the problems. So I'm happy that that occurred in our company.

I do think we're aware, and I do think we're working on it. I think the question is always, "What else can we do?" And we're constantly thinking about that and trying to learn.

**Right. Then what do you do as a leader? Because sometimes I think leaders put them as priority No. 7, or priority No. 14, and never priority No. 1. The only thing, when I was reading that story today, they mentioned, as usual, there's a party with scantily clad women. I looked. 10 years ago, I wrote one about Yahoo like that. There was like strippers onstage at a Yahoo event. Or Twitter they had a frat party that was … I'm sort of like, what has to happen from your perspective? Because here you have all the power. What has to happen? I'm holding you totally responsible for all of it. I'm not, because I want to understand.**

PX0497-011

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

I think, Megan, for example, backstage, had a great idea. That, "Hey, at every single one of your leadership meetings, you should just make this a standing item and talk about the progress you made that week." That was a great idea. It's not something we talk about at our leadership meetings. Maybe every other week, but I think just relentlessly repeating and making it a priority for senior leadership is really important, and there's more we can do there. Again, I think people are gonna make mistakes, and I was frustrated to say the least to see people dressed up as deer at a holiday party, or anniversary party, or whatever it was. Just because it's also strange.

**Yeah, it is.**

Yeah.

**But you get the party and get rid of the deer.**

Oh, we did. Literally, like what is this happening? Why?

**Right. Who made that decision?**

That was someone who is on our events team, and she made a mistake and life goes on. I think, again, having a culture where people can make mistakes, we give them feedback and they grow, I think it's really important. I think especially with the younger work force, people are gonna make mistakes, we should expect that, it's part of the learning process. And having that mechanism whereby we turn that into feedback and then change is critical.

**All right, let's move on to another topic. Facebook. Oh, God. Poor Evan, he's being such a good sport here. No, but you are a very creative person. You create these things and they borrow them rather extensively. Tell me how that feels. People borrow my things all the time, it drives me crazy, I want to kill them.**

Yeah, I think it bothers my wife more than it bothers me. Gosh. I think fundamentally it's important to understand that Snapchat is not just a bunch of features. It really has an underlying philosophy that runs directly counter to traditional social media. I think that's why traditional social media feels threatened. Because, fundamentally, if people realize that competing with their friends for "Likes" and attention is kind of unpleasant and really not that great ...

PX0497-012

**Agreed.**

… then I think they're gonna look for alternatives. And what we said at Snapchat is actually, there's this great alternative, which is all about building deeper relationships with people that you're close to. And we believe that empowering that self-expression is really important. I think while, of course … I think what they've done is they've changed their products and changed their mission, but I think fundamentally they're having a really hard time changing the DNA of their company. The DNA of their company is all about having people compete with each other online for attention.

I think sort of, as time goes on, I think it will become clear to more and more people that our values are really hard to copy, and I think the reason why is because values are something that you feel. I think, over time, especially given the relationship that we've built with our community, which I feel is very strong, I think that it will be harder to really copy the essence of what Snapchat is.

**What is the impact when they do? Because I had Kevin Systrom on my thing and I said, "You've just taken this. This is really kind of offensive to me that you've done this." And he goes, "Well, just because Evan invented the car radio doesn't mean I can't do a better one. And yes, that's what we did." Just didn't even bother pretending. And why should he? Because it's obvious what happened. So, how do you then keep … It isn't a feature war, but what is the impact when they do something you do and do a pretty good job copying. People used to accuse Microsoft of that quite a bit. So talk about that, what do you do then?**

I think we do what we've always done, which is just continue to innovate and continue to deliver really great products for our customer. And we've always believed that if we really listen to our customers and provide them with things that they totally love, that they'll use our services.

**Do you feel … What is the pressure like when they do that? What does your wife do then? Tell me what your wife does.**

**I like a good dramatic pause, so it's fine.**

I guess, what I'm saying is that fundamentally …

**It doesn't matter?**

PX0497-013

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

Yeah, fundamentally, we have to stay true to our DNA and who we are as a company. And our desire to empower people to express themselves. I think people are going to continue to follow the innovations that we've created, and that's part of how this industry works.

Ultimately, I think if you want it personally how I feel about it, I think as a designer — and I think the designers on our team would say the same thing — that the No. 1 feeling for a designer, the best thing in the entire world is if you design something that's so simple and so elegant that the only thing other people can do is copy it exactly. That, as a designer, is the most fantastic triumph in the world. So, I think from … thank you. Thanks. It really is the most fantastic thing in the world. So, I think that because our team gets their joy out of changing the world in the right direction, that will continue to be our strategy.

I guess what I'm saying, to take it a step further, is that we would really appreciate it if they copied out data protection practices also.

**I was waiting for that.**

Maybe that's what Sheryl's announcing after.

**Speaking of that, I want to finish up on values, because you said the word value. And I say the word value a lot, and I think values are important, because with values you have to make choices, and you can't be a benign platform that has … no "we're trying to be everything to everyone." You cannot do that. You can try, but it always runs into humanity. So, picking values, I think, is critically important and very few tech people want to do that. They want it always … And that's, to me, where a lot of the problems [arise]. Talk about tech responsibility. You and I have talked … 18 months ago, he was talking about the things that Facebook ran into this year. Which was interesting. I remember that conversation. The inability to control your platform or understand what's on it, if you take the hands off the wheel. Talk about those choices, because I think it really is important.**

Whew. I guess … This is sort of at a high level. I guess what I would say about this, and how I feel … Obviously, life is not about making money, life's not about winning awards, it's not about winning competitions or whatever. Life is really about having an impact on the world, changing the way that people experience the world, changing the way that you experience the world. I think for me, one of the things that I worry about is that businesses very quickly reduce problems to numbers. They think about themselves in terms of numbers and they

PX0497-014

get obsessed with driving numbers. I think the interesting thing about humanity and about values is that these are things that can't actually be quantified.

For me, I think the big red flag for all of us should be when we put more weight on things that can be counted instead of the things that can't be. Because the things that can't be counted are the things that make us human, and the things that are the most important to protect.

**So what happens now with the tech industry? These hearings, these ... I get, I'm gonna ask this question I asked of Tim Cook. What would you do if you were Mark Zuckerberg in this situation? You almost sold your company to him and then you didn't, allegedly. Knock on wood. Is that wood? Okay.**

Fundamentally, I think the changes have to go beyond window dressing to real changes to the ways that these platforms work. I think the thing that concerns me the most, and we've already seen this with GDPR for example, rather than complying with the actual spirit of GDPR and the data privacy practices, some companies just took their data processing practices and jammed them in the terms of service. Then they said, "Because our data processing practices are in the terms of service and that's a contract with the user, we're compliant with GDPR." That's why people got sued on the first day that GDPR was enacted.

I think for me, it's very clear this is a long road. It's a road that's going to be litigated, but I think if you look at the shift and you look at the appreciation that people have for user privacy and how fundamentally important it is to humanity, I think we're just getting started in the way that people are gonna have to change their businesses.

**To what? Because it's all predicated on that.**

I think it's important to point out that there wasn't any Russian manipulation of Snapchat.

**No, they just used the system.**

Right. That there are alternatives, and that the way that you treat user privacy is really important. For us, that goes back to when we were in my dorm room. When it was just me and Bobby, when there were three or four people using our products, we cared about data retention. It's taken seven years for people in the technology industry to take a look at

PX0497-015

what we've done, getting rid of personal information rather than storing it, hoarding it forever. And to say, "Hey, that actually kind of makes sense."

So I think for us … It's exciting to me that seven years later after we built our business on this idea of data minimization, effectively, that the rest of the industry is starting to embrace that and I think that will have a positive impact.

**Do you expect a lot of regulation coming?**

I think that foolishly some big companies want that because they believe they're best equipped to deal with regulation and that there are times in history when regulation has actually entrenched big companies because they're the most capable of complying. I think that's a huge mistake because I think that that would inhibit innovation, but I do think that there are some really great legal frameworks that are developing — like GDPR — that's really well thought out, that puts the user first, that gives the user control and choice, that will make a big difference.

I think there's gonna be a balance. I think there will be some regulation, but I think at the same time, technology companies need to incorporate the spirit of protecting user privacy, and if they're willing to change their businesses to do that then I think we'll be able to find a happy medium.

**All right, questions from the audience, please? For him? We're going to start over here.**

**Speaker 1: Hi. You were so thoughtful about talking about how you brought in business consultants from outside to help you and the leadership team and then Kara pressed you pretty hard on the … for want of a better term, the frat boy culture that appears a lot in tech. How many of those consultants, if you don't mind me asking, that are helping you with your business are women or people of color?**

That's a great question. I don't have the exact breakout, but obviously that's something that we pay attention to because we wanna have a wide variety of perspectives in terms of people who help us. I actually can follow up with you and then figure that out and give you the exact number.

**Kara Swisher: I'll get you in touch with him.**

PX0497-016

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

But I don't have them off the top of my head.

**Speaker 1: Thank you.**

**Josh Topolsky: Hi. Found the tall mic, which is great. I have a question about news. You know, Facebook obviously dealing with a lot of the Russia stuff, a lot of the hate speech. Twitter clearly dealing with a similar problem. You obviously think of Snapchat as a different kind of platform, but you've got Discover, right? Which is kind of this forum for news and information for the broad set of users. How do you curate that? Are you gonna continue to curate that very closely and as the user base grows and more people want in, when the Daily Caller ... maybe they already have a Snapchat channel, the Daily Caller calls up and says, "We wanna do it." Or Stormfront is like, "Hey, we have a big following and we really wanna talk about the issues that are facing white nationalists." Or whatever. How do you guys manage that? How do you curate that? What is your policy, what is your thinking? What is your technical and intellectual thinking around how you manage that as you grow?**

That's a really great question and I can talk a little bit to the foundational elements. First of all, we have humans review all of the people who distribute content on Discover. I think that works because really only like 1 percent of content is good, so we don't have to have zillions of people doing that. We just really try to curate things that people wanna watch.

**Kara Swisher: So you use all humans? It's not an AI?**

You know, I'm sure we use some technology tools, but human beings look at it.

**Kara Swisher: Right.**

So I think that's one piece. I think the second piece you bring up that's really important is it really has a lot to do with how we've structured Discover in the first place, which is to surface a lot of different perspectives and to put the publication front and center.

So I think what's really interesting about Discover is that you start understanding that someone like the Wall Street Journal, for example, has a different point of view than the New York Times or the Economist or whatever when you're reading Discover. Having people making it really clear that those perspectives are different and then providing a wide variety of them I think is really helpful to our user base. I don't think we'd ever include something on our platform that is blatantly hate speech, but as long as we're very clearly

PX0497-017

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

labeling different peoples perspectives, I think we're open to a wide variety of those perspectives.

**Josh Topolsky: So on that, if it is Breitbart or maybe they already have a Snapchat or the Daily Caller. How do you rate the publications, I guess is what I'm saying. Where do you draw the line and how do you draw that line?**

So I personally probably do not have the right skill set to do that so we have people with editorial backgrounds that really think deeply about those things and make those decisions.

**Josh Topolsky: So you're not blatantly just like, "We're the free speech platform, anybody who wants to put news on here can do it." It's gotta be … you guys have to look at it and say, "Yes, we want this. No, we don't."**

Yeah, we've taken a very different approach in that regard.

**Josh Topolsky: Good, thanks.**

**Kara Swisher: So you're not having a crowdsourcing "who's good?"**

No, not on Discover.

**Kara Swisher: Yeah, I think that's fantastic. You? You have one? Okay, right here.**

**Tim Peterson: You said positive things about GDPR. I'm curious what your thoughts are on the California Consumer Privacy Act which is described as mini-GDPR. It's not a perfect analogy. It's something that Facebook and Google have supported the opposition group. Facebook's kind of pulled the support, but not their money. Snap, what are your thoughts? Is it something you support or against and if you do support or are against it, how does that take effect? Are you actively supporting or opposing?**

You know, I'm not familiar enough with the exact specifics of it to give you a thoughtful enough answer, so this is another one we could probably follow up on. But I think if it's consistent with some of the basic principles of GDPR that's something that we'd be supportive of.

PX0497-018

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

**Tim Peterson: It's basically … The foundation of it is right to know. It borrows that from GDPR but it's opt-out by default.**

Can I talk to you about it after?

**Tim Peterson: Okay, cool. Thanks.**

**Kara Swisher: Very quickly, we only have a very short time.**

**Alex Heath: Alex Heath from Cheddar. I'm glad you already talked a lot about the diversity issues. Thanks, Kara, for that.**

**So I wanted to talk about the business. It seems to me that a lot of the wind has been taken out of Stories with the redesign and with Instagram. If you have metrics to share, please correct me. Given that your ad product is so closely tied to Stories now and Snapchat is also a messaging platform, how are you thinking about monetization outside of Stories? You've dabbled in e-commerce, you're dabbling in hardware. What excites you the most about potential other revenue streams? If you could just turn off Story ads, what would you be doing?**

I think I should clarify a little bit about what we did with the redesign because it is actually really closely tied to Stories and about opening up more inventory. If you look at the application before the redesign, the stories pages just had a list of your friends. Sometimes, mixed in there were friends like celebrities that you don't actually know. What we found that over time, influencers, for example people who post really frequently often because it's their job, were ending up at the top of the list because that list was recency based. Our Stories page, at the top of the page a lot of people had content from people they didn't know very well.

What we wanted to do with the redesign was really put your friends first. Make sure when you open the application, your friends are at the top of the page, but then open up this world of content so you don't just see content that you've had to add as a friend. You can see a bunch of content that's personalized just for you but you don't have to make that person your friend. I think for us that was really our way of thinking about how to scale the Stories opportunity, because you're inherently limited if you're only showing Stories that someone's manually added.

PX0497-019

Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

For us, with the redesign we have an infinite scroll now of really, really great content that's personalized for you. I think there may be some misperception about that opportunity for our business. Really, that was one of the big reasons why we wanted to do the redesign: To create that opportunity for our business and also stay true to our mission of empowering people to express themselves. We try to do both at the same time.

I can't speak to future products or opportunities but ...

**Alex Heath: You've dabbled in e-commerce already and hardware. Out of, say, those two things, what excites you the most about those two things or those things we could expect more of?**

Hardware's a really important pillar of our strategy. So if you look at the three things that we're investing a lot in, we have Lens Studio which allows you to create all these great augmented reality experiences, we have the core Snapchat application that a lot of people use all day long and where we can iterate really quickly on those augmented reality experiences. Then we have Spectacles that, while still in its infancy, I think has a lot of potential to overlay computing on the world around you.

I think if you look at Snapchat — and again, it's very early — to just open Snapchat into the camera, into your experience, but to imagine that with the evolution of computing, we've gone from mainframes to people now looking at really small computers in their hands. I think if we look at the evolution of computing over the next several decades, computing's gonna be overlayed on the world around you. I think Spectacles is a really important part of making that happen.

For me, as it pertains to our hardware strategy, I don't think that's gonna generate a ton of revenue for us tomorrow, but I do think it's a really important investment in the future.

**Alex Heath: Thanks.**

**Kara Swisher: Great. I think that's all we have time for. Evan, one last question: As a CEO, would you ever consider selling your company if you had to? You have not.**

I think as a fiduciary we're always required to consider it.

**Kara Swisher: Thank you so much, Evan Spiegel.**

*This article originally appeared on Recode.net.*

PX0497-020

4/18/24, 5:02 PM                    Full video and transcript: Snap CEO Evan Spiegel at Code 2018 - Vox

*You've read 1 article in the last 30 days.*

## Will you support Vox today?

We believe that everyone deserves to understand the world that they live in. That kind of knowledge helps create better citizens, neighbors, friends, parents, and stewards of this planet. Producing deeply researched, explanatory journalism takes resources. **You can support this mission by making a financial gift to Vox today. Will you join us?**

| One-Time | Monthly | Annual |

○ **$5/month**       ○ $10/month
○ $25/month          ○ $50/month
○ Other

**Yes, I'll give $5/month**

We accept credit card, Apple Pay, and Google Pay. You can also contribute via

PayPal

## Today, Explained

Understand the world with a daily explainer plus the most compelling stories of the day.

Email (required)

SUBSCRIBE

By submitting your email, you agree to our Terms and Privacy Notice. You can opt out at any time. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply. For more newsletters, check out our newsletters page.

PX0497-021

# PX0498



**TAILORED SOLUTIONS IN ECONOMICS**

# Ex-post Assessment of Merger Control Decisions in Digital Markets

## Final report

Document prepared by Lear for the Competition and Markets Authority

9 May 2019



**Lear**
Via di Monserrato, 48
00186 – Rome
tel. +39 06 68 300 530
e-mail: lear@learlab.com
web: www.learlab.com

PX0498-001

## AUTHORS

Elena Argentesi, Lear and University of Bologna

Paolo Buccirossi, Lear

Emilio Calvano*, University of Bologna and Toulouse School of Economics

Tomaso Duso, Lear, Deutsches Institut für Wirtschaftsforschung (DIW Berlin), TU Berlin, CEPR, and CESifo

Alessia Marrazzo, Lear

Salvatore Nava, Lear

## OTHER CONTRIBUTORS

Elena Salomone, Lear

Anna Violini, Lear

## ACKNOWLEDGMENTS

The authors would like to thank the team at the Competition and Markets Authority for their assistance and guidance over the course of this study, including in particular Francesca Botti, Alistair Love and Tom Kitchen. Finally, we would like to thank Daniele Michele Ferrari (Lear) for his valuable research assistance.

* Emilio Calvano was not involved in the assessment of the *Facebook/Instagram* merger.

PX0498-002

**Index**

Executive summary ............................................................................................................... i

Recommendations ............................................................................................................. xiv

**PART I. General lessons for merger control in digital markets** ....................................... 1

I.1. Introduction and methodology for Part I ...............................................................2

I.2. Survey of economic literature ..............................................................................3

    I.2.1. Direct and indirect network effects .................................................................3

    I.2.2. Markets for attention ................................................................................6

    I.2.3. Innovation in digital markets .........................................................................7

    I.2.4. Market power, competition and big data ...........................................................8

I.3. Overview of transactions carried out by digital companies ................................. 10

I.4. Past merger assessments in digital markets by competition authorities ................................... 21

    I.4.1. Unilateral effects ToHs ...............................................................................23

    I.4.2. Foreclosure ToHs ...................................................................................36

I.5. General lessons for the assessment of mergers in digital markets ............................. 44

**PART II. Case by case review of past merger decisions taken by UK Authorities**...........................47

II.1. Introduction and methodology for Part II....................................................... 48

II.2. Facebook/Instagram .............................................................................. 51

    II.2.1. Methodology assessment.............................................................................51

    II.2.2. Market outcome assessment .......................................................................57

    II.2.3. Conclusions on Facebook/Instagram..................................................................70

II.3. Google/Waze.......................................................................................... 72

    II.3.1. Methodology assessment..............................................................................72

    II.3.2. Market outcome assessment ........................................................................77

    II.3.3. Conclusions on Google/Waze .........................................................................85

II.4. Priceline/Kayak and Expedia/Trivago........................................................... 87

    II.4.1. Methodology assessment...............................................................................88

    II.4.2. Market outcome assessment .......................................................................92

    II.4.3. Conclusions on Priceline/Kayak and Expedia/Trivago ......................................106

II.5. Amazon/The Book Depository ................................................................. 108

    II.5.1. Methodology assessment................................................................................108

    II.5.2. Market outcome assessment .......................................................................112

    II.5.3. Conclusions on Amazon/The Book Depository ...............................................116

PX0498-003

II.6. Conclusions on case by case review ...................................................................................... 117

A. Survey of economic literature .................................................................................................119

B. List of past transactions .........................................................................................................142

C. Tag cloud analysis for acquisitions carried out by Amazon, Facebook and Google ...................149

D. Case by case review: additional analyses and robustness checks ............................................152

E. Bibliography ...........................................................................................................................158

PX0498-004

## List of tables

Table I.1: Clusters for analysis of past acquisitions by Amazon, Facebook and Google ...................................... 11

Table I.2: List of cases included in review .................................................................................................. 22

Table II.1: Top three referring sites for various OTAs .................................................................... 93

Table II.2: Percentage variation of Amazon prices for a large sample of books titles ........................................ 114

Table II.3: Percentage variation of Amazon prices over time for best-seller titles............................................. 115

Table B.1: List of acquisitions made by Amazon ............................................................................. 142

Table B.2: List of acquisitions made by Facebook............................................................................ 143

Table B.3: List of acquisitions made by Google................................................................................ 144

Table D.1: Example of Kayak's results for the city of Blackpool........................................................... 154

PX0498-005

## List of figures

Figure I.1: Distribution of past acquisitions by cluster .......................................................................... 12

Figure I.2: Number of acquisitions by Amazon over time ..................................................................... 13

Figure I.3: Number of acquisitions by Facebook over time ................................................................... 14

Figure I.4: Number of acquisitions by Google over time ...................................................................... 15

Figure I.5: Distribution of acquisition by Amazon in *Physical goods and services* cluster ..................... 16

Figure I.6: Distribution of acquisition by Facebook in *Communication apps and tools* cluster ............. 17

Figure I.7: Age distribution of Amazon's targets.................................................................................. 18

Figure I.8: Age distribution of Facebook's targets ............................................................................... 19

Figure I.9: Age distribution of Google's targets ................................................................................... 20

Figure I.10: Possible arrangements for the supply of ad intermediation and ad serving services ........ 31

Figure II.1: Timeline of main Instagram's changes............................................................................... 58

Figure II.2: Number of monthly unique users of social networks in the UK (million) .......................... 62

Figure II.3: Share of monthly time spent on social networks in the UK (%)........................................ 63

Figure II.4: Share of monthly time spent on social networks in the UK by age in 2017 (%) ................ 64

Figure II.5: UK advertising revenue for the main social networks (million GBP) ................................. 65

Figure II.6: UK advertising revenue per user for the main social networks (GBP) ............................... 65

Figure II.7: UK advertising revenue per 60 minutes for the main social networks (GBP) .................... 66

Figure II.8: Percentage of Facebook's users that visits the main social networks ............................... 68

Figure II.9: Percentage of other platforms' users that visits Facebook in the UK ............................... 69

████████████████████████████████████████████████████████████ 75

████████████████████████████████████████████████████████████ 80

████████████████████████████████████████████████████████████ 81

Figure II.13: Share of supply in turn-by-turn navigation apps, 2015m1 (% of unique users) .............. 82

Figure II.14: Share of supply in turn-by-turn navigation apps in Android devices, 2015m1 (% of unique users) . 83

Figure II.15: Share of smartphone sales by operating system (%) ...................................................... 83

Figure II.16: Monthly active users of Priceline group and Kayak in the UK (million) ........................... 96

Figure II.17: Monthly active users of Expedia group and Trivago in the UK (million) ........................................... 97

Figure II.18: UK online travel agencies gross booking value (million GBP) ............................................................ 98

Figure II.19: Monthly active users of MSSs in the UK (million) .......................................................................... 99

Figure II.20: Share of booking options for Kayak results ................................................................................. 101

Figure II.21: Share of booking options in "View Deal" position for Kayak results ............................................... 102

Figure II.22: Frequency at which OTAs/TSPs charge the lowest price when listed in "View Deal" for Kayak results (%) ......................................................................................................................................................... 103

Figure II.23: Share of booking options for Trivago results .............................................................................. 104

Figure II.24: Share of booking option in "View Deal" for Trivago results........................................................... 105

Figure II.25: Frequency at which OTAs/TSPs charge the lowest price when listed in "View Deal" for Trivago results (%) ......................................................................................................................................................... 106

Figure II.26: Evolution of Amazon price (GBP) ............................................................................................. 113

Figure C.1: Tag cloud for acquisitions by Amazon........................................................................................ 149

Figure C.2: Tag cloud for acquisitions by Facebook ..................................................................................... 150

Figure C.3: Tag cloud for acquisitions by Google ......................................................................................... 151

Figure D.1: Share of monthly time spent on social media in the UK (%) ........................................................... 152

Figure D.2: Percentage of other platforms' users that visits Instagram in the UK............................................... 153

Figure D.3: Share of booking options in "View Deal" position and search results page for Kayak results ......... 155

Figure D.4: Share of booking options in "View Deal" position for top three hotels for Kayak results .............. 155

Figure D.5: Frequency at which OTAs/TSPs charge the lowest price when listed in "View Deal" and in search results page for Kayak results (%) ................................................................................................................ 156

Figure D.6: Share of booking options in "View Deal" position for top three hotels for Trivago results ............ 157

Figure D.7: Share of booking options in "View Deal" position and in search results page for Trivago results... 157

PX0498-007

## Executive summary

### PART I. GENERAL LESSONS FOR MERGER CONTROL IN DIGITAL MARKETS

#### I.1. INTRODUCTION AND METHODOLOGY FOR PART I

The Competition and Markets Authority (henceforth "CMA") appointed Lear to carry out a study aimed at evaluating past merger decisions in the digital sector ("UK cases") taken by the Office of Fair Trading ("OFT") and the Competition Commission (jointly, the "Authorities"). The objective of the study is threefold:

- review merger cases undertaken by Competition Authorities ("CAs") and the relevant economic literature to identify which Theories of Harm ("ToHs") have been typically pursued by CAs in relation to these mergers, how such ToHs have been evaluated and which relevant economic features should be taken into account when evaluating mergers in the sector (research question 1);
- assess the UK cases and evaluate whether the decision that the Authorities have come to was reasonable based on the evidence that was, or would reasonably have been, available at the time (research question 2, or methodology assessment);
- evaluate market evolution following the mergers to ascertain whether the merger has led to a detrimental outcome (research question 3, or market outcome assessment).

Part I of the report addresses the first research question, drawing on a survey of economic literature, the analysis of past acquisitions undertaken by Amazon, Facebook and Google between 2008 and 2018[1] and on a review of past merger decisions taken by CAs.

#### I.2. SURVEY OF ECONOMIC LITERATURE

Certain features of digital markets create challenges for competition policy, starting with the prevalence of network effects. When the value that consumers derive from a product depends on the number of other consumers who use the same product, as is often the case in the digital sector, markets may have a tendency to take on a concentrated market structure. This implies that competition *for* the market, rather than *in* the market, is often the main mechanism to prevent incumbents of digital markets from exerting market power. In this context, the economic literature on innovation suggests that there may be an incentive for incumbents to carry out pre-emptive buyouts, that is buyouts of entrants with the goal of reducing potential future competition.

Further, a large number of digital products and services are offered free of charge to consumers and paid for with advertising dollars within so-called "markets for attention". Attention is a scarce resource typically monetized through advertising. Advertisers are willing to pay more for "exclusive" eyeballs than for those that can be reached through multiple means. This means that platforms (i.e. content providers) not only care about the *size* of their audiences but also about their *composition*, and that CAs should carefully assess how a merger between platforms can affect both.

Finally, since the quintessential task of many digital platforms is that of making predictions of various sorts, data used to make those predictions ("big data") is becoming increasingly relevant to shaping competition dynamics in digital markets. CAs and practitioners have voiced concerns that big data may be an insurmountable competitive advantage that incumbents naturally enjoy as a by-product of their

---

[1] Amazon, Facebook and Google were chosen for consistency with the analysis undertaken in Part II, where we assess mergers that involved these three companies (*Facebook/Instagram*, *Google/Waze* and *Amazon/The Book Depository*).

PX0498-008

operations, further raising barriers to entry. Mergers may further enrich the data endowments – and thus the competitive advantage – enjoyed by incumbents of digital markets.

### I.3. OVERVIEW OF TRANSACTIONS CARRIED OUT BY DIGITAL COMPANIES

Companies active in digital markets are remarkably active in mergers and acquisitions. We have analysed the publicly disclosed acquisitions carried out by Amazon, Facebook and Google between 2008 and 2018. Over this period, Google has acquired 168 companies, Facebook has acquired 71 companies and Amazon has acquired 60 companies, i.e. around 15, 6 and 5 transactions per year on average.

Our main finding is that acquisitions target companies spanning a wide range of economic sectors and whose products and services are often complementary to those supplied by the acquirers. This highlights the complexity of the business models pursued by digital companies, as several activities seem to enter into their productive process. Transactions that can be characterized as more horizontal in nature would seem to be the minority.

We have also analysed the age of the targets at the time of the acquisition and found that targets are four-year-old or younger in nearly 60% of cases. More specifically, the median age of Amazon's targets is 6.5 years; that of Facebook's targets is 2.5 years; and that of Google's targets is 4 years. This may be problematic to the extent that there are considerable difficulties in understanding the competitive implications of acquiring a young firm, as at that stage in their life cycle their evolution is still uncertain and it is therefore very difficult to determine if the target will grow to become a significant competitive force.

### I.4. PAST MERGER ASSESSMENTS IN DIGITAL MARKETS BY COMPETITION AUTHORITIES

Over the last decade, CAs have evaluated a number of mergers between digital companies. We have reviewed a subset of these decisions to understand which ToHs have typically been pursued in digital mergers and how the relevant economic features of digital markets have been taken into account. Horizontal ToHs pursued by CAs have included the following:

- network effects have been regarded as a barrier to entry or expansion potentially capable of conferring a significant degree of market power to the merged entity and exacerbating the anticompetitive effects stemming from the loss of competition between merging parties. Multi-homing has generally been regarded as a factor potentially mitigating the adverse impact of network effects;

- mergers involving companies in competition with one another for consumer attention may increase their ability to exert market power within fairly broad online advertising markets, even where the services they supplied to consumers were different and not substitutable to one another;

- even when the merging parties did not significantly constrain one another at the time of the merger, CAs investigates whether they would be likely to do so in the future, assessing the likelihood that one of the merging parties will grow into an effective competitive force and whether there would remain a sufficient number of other existing or potential competitors to maintain competitive pressure after the merger;

- when a merger combined two important innovators, or eliminated a firm with promising pipeline products, CAs evaluated whether the transaction could reduce the merged entity's incentive to innovate.

Vertical ToHs pursued by CAs have included the following:

PX0498-009

- network effects, given their potential to represent a barrier to entry or expansion, could increase the likelihood of foreclosure, exacerbating the anticompetitive effects of the merged entity's exclusionary strategies;

- the data a firm owns can enter its productive process in several ways and, depending on how this occurs, the creation of a larger or more diverse dataset resulting from a merger may give the merged entity a competitive advantage potentially capable of foreclosing rivals.

## I.5. GENERAL LESSONS FOR THE ASSESSMENT OF MERGERS IN DIGITAL MARKETS

There is a concern that merger policy has put too much weight on the risk of incorrect intervention (type I error) compared to the risk of incorrect clearance (type II error) when assessing mergers in the digital sector, leading to increased concentration in digital markets.

The nature of competition in many digital markets may change the terms of the usual trade-off between type I and type II errors. Network effects often make the structure of digital markets quite concentrated and barriers to entry rather high. Big data may contribute to such outcomes, to the extent that the data endowments enjoyed by incumbents provide a competitive advantage that makes it even more difficult to challenge them. The main mechanism left to discipline incumbents is that of competition *for* the market, i.e. that potential and actual entry mitigate the ability of incumbents to exert market power. This makes potential competitors even more valuable than they usually are in traditional markets. As a result, type II errors may be particularly costly. In other words, certain features of digital markets may justify some changes in the way mergers in the sector are typically assessed.

Mergers may prevent the development of competitors in two main ways:

- directly, when the incumbent of a digital market acquires an entity that is an actual or potential competitor;

- indirectly, when the incumbent acquires an entity that supplies a complementary product/service, thereby depriving its direct (actual or potential) competitors of the opportunity to improve their products and better challenge the incumbent.

To assess whether a merger will be detrimental to competition, CAs would need to predict the evolution of the target in the absence of the merger, i.e. the counterfactual. This is especially challenging when, as is often the case, targets are young firms at the early stage of their development. In markets as dynamic as digital markets, evolution may be the result of the target's independent decision to change its business model and/or investments made by venture capitalists and/or the decision of other entities in the industry to purchase the target and integrate it in their own operations. In other words, when defining the counterfactual to a merger, CAs may need to consider the ability of the target to develop, on its own or attracting outside resources, as well as the likelihood of an alternative buyer coming along.

Such an exercise is inherently complex. One way to deal with such complexity would be to improve the information set that CAs typically rely on when evaluating mergers. This can be accomplished, *inter alia*, through the following:

- while resource-intensive, it may be helpful in some instances to use dawn raids in the context of merger investigations, as this may uncover valuable evidence such as the future plans of the target and whether the incumbent perceived the target as a threat;

- the value of the transaction will lie somewhere between the current value of the target and the maximum willingness to pay of the acquirer for the target. While incremental profits may derive from both efficiencies and anti-competitive effects, money spent to acquire the target can provide

PX0498-010

an insight into the magnitude of these effects associated to the transaction. When particularly high, the value of the transaction may justify a more in-depth analysis of the merger;

- CAs may benefit from a better understanding of the key markets in the digital sector, such as those for online advertising. The effects of mergers involving companies which compete with one another for consumer attention were typically assessed in a very broad market, comprising all or most providers of online advertising space; and a very fragmented one, with several suppliers active in it. Virtually, no merger would raise competitive concern in such a market. This conflicts with the perception that many firms in the digital sector would appear to be holding significant market power, either in advertising or in related businesses. A comprehensive market study into the digital advertising sector could be a good instrument to gain the necessary knowledge for future enforcement activity in the sector.

Moreover, the time frame of two years, which represents the default for the assessment of some future market developments, such as entry, within merger investigations in the UK, may be somewhat limiting and could be extended when dealing with mergers in digital markets: even in the fast-moving digital landscape, becoming successful can take longer than two years.

Even after reinforcing the tools available to CAs, there will always be a certain degree of uncertainty as to the counterfactual chosen for the assessment of a merger. Future plans, no matter how carefully set out, are always subject to being unmade by unforeseen market events. This may mean that CAs would need to be willing to accept more uncertainty in their counterfactual. However, doing so may then result in CAs falling short of the burden of proof they are required to satisfy to block a merger. In other words, for CAs to be more effective in the enforcement of merger policy, it may be necessary to test the boundaries of the legal tests and constraints that CAs face. The characteristics of digital markets, and the shape that competition takes within them, may justify a more risk-taking approach.

## PART II. CASE BY CASE REVIEW OF PAST MERGER DECISIONS TAKEN BY UK AUTHORITIES

### II.1. INTRODUCTION AND METHODOLOGY FOR PART II

Part II of the report takes stock of the general lessons drawn in Part I to address the two remaining research questions:

- assess the UK cases and evaluate whether the decision that the Authorities have come to was reasonable based on the evidence that was, or would reasonably have been, available at the time (research question 2, or methodology assessment);
- evaluate market evolution following the mergers to ascertain whether the merger has led to a detrimental outcome (research question 3, or market outcome assessment).

The methodology assessment amounts to analysing two key questions:

- were the ToHs pursued by the Authorities addressed correctly?
- was there any other ToH, in addition to those considered by the Authorities, that it would have been reasonable to pursue?

For the market outcome assessment, we evaluate how the markets affected by the mergers have evolved since the merger and rely on qualitative evidence to investigate whether, and to what extent, the merger determined the outcome observed. For each case, we identify the relevant competitive parameters to assess market outcomes and assess their evolution since the merger date. Qualitative evidence coming from industry reports and interviews with merging and third parties are used to appropriately interpret and corroborate the quantitative analyses.

The five UK cases included in the review are *Facebook/Instagram*, *Google/Waze*, *Priceline/Kayak* and *Expedia/Trivago* (analysed jointly) and *Amazon/The Book Depository*.

### II.2. FACEBOOK/INSTAGRAM

The merger between Facebook and Instagram was cleared by the OFT on 14 August 2012. At that time, Instagram provided a free mobile photo app allowing users to take, modify and share photos on Instagram itself or on other social networks, making Instagram also an input to social networks; whereas Facebook was a digital platform supplying social networking services and had recently launched a mobile photo app, Facebook Camera.

The main ToHs investigated by the Authorities are as follows:

- the merger would have made the competitive constraint that the parties exerted on each other in the market for the supply of photo apps disappear. This was dismissed based on the existence of several relatively stronger competitors that constrained Instagram more than Facebook and on the limited attractiveness of photo apps (including Instagram) to advertisers;
- even though at the time of the merger Instagram was not competing with Facebook for advertising revenues and had limited social network functionalities, the Authorities' concern was that this could change in the future. The OFT dismissed this ToH because the available evidence did not show that Instagram was particularly well placed to compete against Facebook in the short run; and there existed other firms that represented the main constraints on Facebook for brand advertising;
- the Authorities were concerned that the merged entity could either prevent or deteriorate the quality of the upload of photographs from Instagram to rival social networks, with the intent of foreclosing Facebook's rivals. This ToH was dismissed as it was assumed that Instagram's appeal was attributable to the possibility to upload photos to other social networks and that therefore limiting this possibility could have caused some users to switch to other photo apps, thus being overall unprofitable for the merged entity.

#### II.2.1. Methodology assessment

Photo apps were not considered by the Authorities to be *per se* attractive to advertisers since users spent a limited amount of time on them; this argument was crucial for the dismissal of the actual competition in the supply of photo apps ToH. However, the opinions collected by the Authorities were not unanimous on this point. The data available shows that Instagram did generate significant user engagement compared to other photo apps and other social networks at the time of the merger.

Given the evidence that was available to them, the Authorities might have also underestimated Instagram's potential to grow into a significant competitive force in the supply of social networking services.

The key argument for the dismissal of the foreclosure of rival social networks ToH was that the incentive to engage in a foreclosing strategy was missing as Instagram's popularity would have likely been negatively affected. However, the Authorities might have sought to ascertain the extent to which Instagram's popularity hinged on the ability of users to interact with other social network.

Most importantly, however, the Authorities failed to analyse the factors that drive the choices of the demand in the online advertising market. This could have affected the assessment of the two unilateral effects ToHs discussed above and made the set of ToHs considered by the Authorities incomplete. We identify three factors that seem to play a particularly important role in making one provider of advertising space more or less attractive from the perspective of advertisers:

PX0498-012

- user base's exclusivity. If certain users can only be reached by advertisers on one platform as they spend most of their time on it, clearly that platform has market power towards the advertisers interested in reaching those users;
- platform's size. Larger platforms are more attractive to advertisers since they reduce the necessary transaction costs to reach a certain number of users and they remove the inefficiencies that might derive from placing ads on two or more independent platforms with potentially overlapping users, which might imply that some users end up being inefficiently over reached;
- ability to target ads. Information on users' behaviour collected by digital platforms provides insight into users' preferences and can be used to better target ads.

The merger could have caused competitive harm to the extent that it could increase the merged entity's ability to exert market power by increasing user base's exclusivity. Moreover, the merger may have deprived other market participants of the opportunity to increase their size and better target ads to compete more effectively in the social network market.

### II.2.2. Market outcome assessment

After the acquisition by Facebook, Instagram has rapidly evolved to a different product, which offers fully-fledged social network functionalities, such as direct messaging, photo tagging, and allows advertisers to place their ads on the platform. Facebook has contributed to Instagram's growth by providing improved physical infrastructures, as well as its expertise in the social networks and advertising market.

The number of Facebook users has been relatively stable over time, while the number of Instagram user has doubled in the same period, moving from 14 million in March 2015 to 26 million in September 2018. In terms of time spent by users, Facebook has lost ground with respect to other social networks: the share of time spent by UK users has fallen from 86% in 2015 to 58% in 2018. Instagram share has instead increased, going from 4% to 11% over the same period. Snapchat is the only other social network that is emerging as the most significant challenger to the merged entity, with a share that has reached 18% in 2018.[2]

On the other side of the market, Facebook's advertising revenue increased significantly despite the drop in time spent, and the gap between Facebook and other social networks has widened. Instagram started to monetize in the UK in 2015, and since then its revenues have increased significantly – as occurred for the number of users – exceeding the revenues earned by other platforms. The advertising revenue per hour spent on Facebook and Instagram is significantly larger than that of their rivals, suggesting that the merged entity is able to command higher prices. This may be a result of the efficiencies achieved through the merger and/or of the exercise of market power by the merged entity.

Indeed, the merger has likely contributed to improving the position of the merged entity across many of the factors relevant to advertisers:

- Facebook uses and merges data from its own website and company-owned services (including Instagram and WhatsApp), obtaining a richer information set that is valuable for targeting of ads;
- Facebook no longer faces the competitive constraint that might have been exerted by Instagram on users who cross-visit the two platforms;

---

[2] The evolution of the merging parties after the merger has been evaluated with respect to a market for social networks which comprises those platforms that (i) enable the connection and interaction among users and, as a result, (ii) can leverage a deep understanding of users, their connections and their preferences when selling advertising space.

PX0498-013

- Facebook is able to reach a very wide set of social network users, as most users of other social networks also use Facebook, whereas the opposite occurs to a lesser extent. Thanks to Instagram, Facebook is still able to reach demographics where it has lost ground over the past years.

Assessing whether this could be interpreted as an effect of the Authorities' decision to clear the merger would require identifying what would have occurred to Instagram in the absence of the merger. Had Instagram become a popular social network on its own, Facebook would have faced a strong competitor in the social network market, which the merger has eliminated. Had Instagram been unable to grow on its own, then the merger may still have helped Facebook grow and compete with existing competitors (e.g. Twitter) and new entrants (e.g. Snapchat). In both scenarios, however, the merger has also generated significant efficiencies to the benefit of users and advertisers. The effects of the Authorities' decision to clear the merger depend on the balance between likely anticompetitive effects and efficiencies, which in turn depend on the selected counterfactual: stronger anticompetitive effects are expected had Instagram become a popular social network alone, and in this case efficiencies would have needed to be significant enough to compensate for the loss of competition.

## II.3. GOOGLE/WAZE

On 11 November 2013, the OFT cleared Google's acquisition of Waze. Google operated an Internet search engine and sold advertising space on its websites and on partner websites; moreover, it offered Google Maps, a free application providing mapping and turn-by-turn navigation services. Waze provided another turn-by-turn navigation app that was only available on mobile devices.

The Authorities investigated the following ToHs:

- the transaction could significantly affect competition in the market for mobile turn-by-turn navigation applications, with the result of reducing the parties' incentives to innovate and the quality of the service offered to users. This ToH was dismissed because Waze had not reached a user base in the UK that was considered sufficient to build a map with coverage and accuracy comparable to Google's; and because of the existence of other turn-by-turn navigation apps exerting relatively stronger constraint on Google, most notably Apple Maps;
- Waze could represent a disruptive force in the market going forward. The Authorities dismissed this ToH because of the uncertainty in Waze's future growth projections; the scale reached by Waze in the UK was not sufficient for it to benefit from significant network effects that could accelerate its growth; there was uncertainty with respect to the effect of the partnerships that Waze was finalising; and there would have remained other strong competitors.

### II.3.1. Methodology assessment

The Authorities may have over relied on the competitive constraint that Apple Maps would have exerted on the merged entity. Apple Maps was only available on iOS devices, which represented 30-31% of smartphone sales in the UK at the time of the merger and could represent an indirect constraint on Google Maps for Android devices only to the extent that Google cannot discriminate between the two OSs. If Google were to lower the quality of Google Maps on Android, for instance by introducing ads (which, being generally considered as a nuisance, would represent a drop in quality) Android users would not be able to switch to Apple Maps. The Authorities could have investigated whether such discrimination was feasible.

Regarding Waze's potential, there were signals that Waze had identified a promising path to growth:

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

PX0498-014



All in all, there may have been enough evidence for the Authorities to conclude that Waze could have become a relevant competitive force.

Most importantly, the range of ToHs analysed in the decision was incomplete. ToHs developed by the Authorities focussed solely on the effect that the merger could have had on the users' side of the market. However, turn-by-turn navigation apps are provided to users for free and are monetized elsewhere. The Authorities could have explored monetization channels and evaluate whether the merger could have had an adverse effect in the markets where monetization occurs.

### II.3.2. Market outcome assessment

Google and Waze both provide turn-by-turn navigation services, which are however fundamentally different in terms of their characteristics. Differently from Google Maps, Waze map is user-generated and is mainly used by heavy drivers. By exploiting their complementarities, the merger between Google and Waze allowed the merging parties to improve their apps and realize some efficiencies.

Since 2012, the number of Waze's active users has increased. Google Maps has remained the main mapping service used, and Waze (now part of Google) represents one of the few alternatives to Google Maps, together with Apple Maps. However, Apple Maps continues to be available only on iOS devices, which may limit the extent to which it provides a competitive constraint on the merged entity.

In its decision to clear the merger, the OFT did not take into account how the services offered through Google Maps and Waze are monetized. However, monetization channels were already relevant then and have arguably increased in their relevance over time. Mapping services can indeed be directly monetized, through advertising displayed in the navigation apps. In addition, mapping services can be monetized indirectly, by collecting, selling or otherwise exploiting location data, which is used by companies also for purposes other than advertising. The merger with Waze might have made Google an even more relevant provider of location data, reinforcing its competitive position for the provision of online advertising across all its services.

There are a number of counterfactuals which could be considered: Waze could have grown on its own, been acquired by other digital companies or would have not been able to survive. However, the evidence gathered on the market outcome evolution after the merger is not sufficient to select one of these counterfactuals as the most likely. In any case, the merger has enabled Google and Waze to exploit their complementarities and generate efficiencies. These efficiencies are clearly merger-specific and should be taken into account when assessing whether the decision has proved to be beneficial or detrimental to consumers.

### II.4. PRICELINE/KAYAK AND EXPEDIA/TRIVAGO

On 9 May 2013, the Authorities cleared Priceline.com Incorporated (Priceline) to complete its acquisition of Kayak Software Corporation (Kayak). Priceline's subsidiaries were online travel agencies (OTAs) that allowed consumers to search and book travel services from travel service providers (TSPs) such as hotels, airlines and car rental companies. Kayak was a meta-search site (MSS) allowing users to search and compare prices for hotel rooms, airline tickets, rental cars and other travel services. The

crucial difference between the parties' businesses was that MSSs did not have a booking functionality; rather, they referred users either to OTAs' or TSPs' websites, where users could complete their booking. This may have limited substitutability between the two types of services.

The Authorities did not conclude on a precise market definition, but on a cautious basis they assessed the transaction with reference to: (i) online advertising services to UK-based hotels and car hire firms by OTAs and MSSs in the UK; and (ii) online travel search services for UK-based consumers relating to hotels and car hire by OTAs and MSSs in the UK. In addition, the OFT noted that besides this potential horizontal overlap, the parties also had a vertical relationship, which may be characterized as MSSs providing advertising services to OTAs.

The main ToHs investigated by the Authorities are as follows:

- the transaction could lead to price increases or degradation of quality in the supply of online advertising services by OTAs and MSSs to hotels and car hire companies, and/or degradation of quality in the supply of online travel search services to consumers. These ToHs were dismissed since the increment in market share or revenue brought about by the transaction was minimal due to Kayak's small share of supply at the time of the merger, according to market shares computed based on net revenue, volume and gross booking value (GBV). In addition, the merging parties were not generally identified by third parties as each other's closest competitors;

- the merger could have provided Priceline with the opportunity to foreclose rivals from both online travel search services to consumers and online advertising services to TSPs using Kayak to bias search results in its favour. The Authorities rejected this ToH arguing that Kayak's usage among consumers would have declined as consumers would have quickly noticed such a bias in Kayak's search results; similarly, OTAs would have abandoned Kayak generating losses that would have likely outweighed gains; finally, Kayak was not a must-have website for other OTAs to generate traffic to their websites, implying that the foreclosing strategy, even if implemented, was not considered sufficient to give rise to an SLC.

The transaction whereby Expedia, an OTA, acquired control of Trivago, an MSS, in March 2013 was not assessed by the Authorities as the transaction did not meet the UK turnover test nor the share of supply test. There is thus limited scope for a methodology assessment of the decision, since this does not include any substantive assessment of the merger. However, due to the similarities between this transaction and the one involving Priceline and Kayak, the transaction will be discussed in the context of the market outcome assessment, jointly with *Priceline/Kayak*.

### II.4.1. Methodology assessment

The dismissal of the unilateral effects ToHs rested mainly on market share evidence. However, the market share analysis as carried out by the Authorities is likely to be affected by a significant measurement problem. Indeed, even if users, or a subset thereof, perceived OTAs and MSSs as substitutes, the range of services they supply would remain different. This difference entails that OTAs' costs are substantially larger, as are the commissions typically charged to TSPs. This makes revenues difficult to compare across the two types of services. Hence, Kayak's small share of the market in terms of revenue may not have corresponded to a likewise minor role vis-à-vis consumers. On top of this, the Authorities could have more thoroughly investigated the nature of the relationship between MSSs and OTAs as horizontal effects can only arise in mergers that involve competitors. A better understanding could have been obtained by simply analysing how users of these services behave, for instance investigating what portion of traffic to OTAs' and TSPs' websites was generated by MSSs.

The dismissal of the foreclosure ToH hinged, *inter alia*, on the ability of users to promptly recognize bias in search results and switch away from a Kayak website favouring Priceline's offers. However, such an assumption does not seem to be supported by the evidence. Indeed, the evidence mentioned by

PX0498-016

the Authorities was consumers' tendency to visit at least three websites when comparing and choosing travel products. On the other hand, there is pervasive evidence that consumers tend to focus their attention, and clicks, on results at the top of search results pages, in particular for travel websites. In addition, the Authorities did not consider that the average consumer might not be aware of the brands that are under the control of the same entity, which is arguably a necessary condition for them to notice that Kayak is favouring Priceline's offerings.

The range of ToHs investigated by the Authorities could have been incomplete had the Authorities found that the prevalent relationship between OTAs and MSSs was of a horizontal nature. In this case, the Authorities might have investigated whether the user bases of Priceline and Kayak were such that their combination created a sizable share of users shopping only through these two suppliers, which would have become exclusive to the merged entity post-merger. The transaction could have then given the merged entity the ability to charge higher prices to TSPs and other OTAs, in line with the economic literature on competitive bottlenecks.

### II.4.2. Market outcome assessment

Although there exist different OTA groups that provide online travel services through several brands, Priceline and Expedia hold a significant position as OTAs, and their positions have reinforced over time. When compared to other OTAs in terms of gross booking value, those in the Priceline and Expedia groups seem to be the largest in the UK: Priceline is the largest OTA and the gap with other operators has increased over time, while Expedia is the second largest operator. These OTAs have also significantly expanded in terms of users: after the merger, Priceline users have increased, going from 5 million in September 2012 to 11.8 million in September 2017, while the number of users of Expedia has witnessed a consistent growth starting from the end of 2015, reaching 12.8 million users in September 2017.

The traffic of MSSs' websites has also increased over time, and all MSSs have experienced a growth in the number of users, showing their growing importance for online travel services. OTAs have realized the importance of MSSs and the role they play in channelling traffic to their websites and in recent years many MSSs have been acquired by OTA groups. The acquisition of Kayak and Trivago may have had their rationale in supporting Priceline's and Expedia's respective growth strategies, and one way for the acquisitions to support such plans could have been that of biasing Kayak's and Trivago's search results towards Priceline and Expedia respectively.

Indeed, the *Priceline/Kayak* data collected points towards the existence of a bias of Kayak's search results favouring Booking.com, the main Priceline brand in the hotel segment. However, such bias is unlikely to amount to a foreclosure for two reasons. First, there is a limit to the extent to which results can be biased as at a certain point this would lower the quality of the service provided and entail foregoing traffic and revenues. Second, Kayak has a relatively small share of the MSS market, so the impact of the practice is likely limited.

### II.5. AMAZON/THE BOOK DEPOSITORY

On 24 October 2011, the Authorities cleared Amazon's acquisition of The Book Depository International Limited (henceforth "The Book Depository"). The OFT's assessment focussed on the parties' businesses in the online retailing of physical books within the UK, considering separately the effects of the merger for "long tail" titles and best sellers. The Book Depository offered its products both through its website and Amazon Marketplace.

Given the horizontal nature of the transaction, the Authorities investigated a number of unilateral effects ToHs. In particular, the OFT assessed whether the merger could lead to an SLC mainly through the following mechanisms:

PX0498-017

- the Authorities were concerned that book prices would increase as a result of the merger. For long-tail titles, this ToH was dismissed based on the observation that Amazon profitably removed The Book Depository from its pricing algorithm and that diversion ratios between the parties were low. For best sellers, the OFT dismissed this ToH since it found evidence of strong competition on Amazon Marketplace where the parties did not seem to be particularly close competitors; and the results of an illustrative price rise (IPR) analysis pointed to a weak incentive to raise prices post-merger;

- the Authorities explored whether Amazon's recent decision to abolish a minimum spend to qualify for free delivery on an order was influenced by The Book Depository's policy implying that the merged entity could decide to remove this benefit following the transaction. However, the Authorities found that Amazon benchmarked its delivery policy against some key competitors which did not include The Book Depository; and Amazon's delivery policy was applied consistently across all of its media products and it wanted its delivery charges to be uniform across all of its product lines;

- the Authorities assessed whether The Book Depository could expand considerably in the foreseeable future but found that its inconsistent growth in recent years made this unlikely and that a significant degree of competition was likely to persist in the Amazon Marketplace.

### II.5.1. Methodology assessment

The assessment of the ToHs pursued by the Authorities seems overall convincing. The evidence collected, indeed, suggested that The Book Depository was not exerting a strong constraint on Amazon, and that other sellers on Amazon Marketplace were likely to exert a stronger competitive pressure.

However, the transaction involved a vertical dimension that was ignored in the OFT's decision. Indeed, Amazon also provided The Book Depository with an important input, i.e. access to a large pool of consumers through the Marketplace. Given the importance of the Marketplace, the Authorities could have investigated whether such vertical relationship could have given scope for strategies aimed at foreclosing the parties' rivals, for instance giving The Book Depository a preferential treatment post-merger, discriminating against other sellers in the Marketplace.

### II.5.2. Market outcome assessment

In order to assess whether competition in the online market for physical books was still vibrant after the merger, and whether Amazon has been able to raise the prices, we have looked at the evolution of prices before and after the merger period:

- for a sample of 7,014 books across different books' categories, ranging from best seller to long-tail, prices appear relatively stable after the merger. In particular, average weekly prices have decreased for four weeks after the merger, and then only slightly increased. Nine weeks after the merger decision the average weekly price was 1.52% higher (with respect to the week of the merger decision);

- for a limited set of best-seller titles, average weekly price slightly decreased in the three weeks immediately following the merger, while later increased. Nine weeks after the merger the average weekly price was 3.13% higher (with respect to the week of the merger decision).

In the attempt to mimic a "difference in differences" analysis to provide an indication of the effects of the merger, the set of best-seller titles can be considered as a control group, while the large sample of books can be considered as a treated group. The latter is indeed composed by titles that have been published before the date of the merger, and are still on sale on Amazon website in 2019. It is hence likely that these include deep-range titles, for which the competitive constraint exerted by The Book

PX0498-018

Depository at the time of the merger is expected to be higher, and for which the merger effects on price – if any – are expected to be stronger. The comparison between the price variation in the treated and control group, before and after the merger, shows that it is unlikely that the merger has harmed consumers through a substantial price increase of physical books. Data available does not allow us to investigate the effects of the merger on other dimension of competition, such as variety.

### II.6. CONCLUSIONS ON CASE BY CASE REVIEW

Despite the depth of the analyses carried out by the Authorities, our evaluation of past merger decisions taken by the UK Authorities has revealed certain gaps in the way these cases were analysed. Such gaps do not undermine the legitimacy of the Authorities' decisions and can be properly perceived today thanks to a better understanding of how digital markets work and the actual behaviour of some market players that was highly uncertain at the time the mergers were investigated.

First, the Authorities have not always consistently framed the competition issues they were looking at in a two-sided setting, focusing their attention on the users' side of the market, somewhat overshadowing other sides of the market. In *Facebook/Instagram*, the Authorities may have placed excessive weight on the functionality offered by the parties' products on the users' side of the market but in a two-sided setting functionalities are not the only important feature: what is also important is the role they perform in platform's monetization strategy. In *Google/Waze*, the Authorities have focussed their ToHs on the users' side of the market, failing to explore the way the services provided by the merging parties were monetized. The sole focus on users may have resulted in the development of an incomplete set of ToHs, overlooking possible ways that the merger could have led to competitive harm.

More generally, current business models and monetization avenues should represent an unavoidable step for the development of a ToH because, quite simply, market power is not exerted for its own sake, but has the ultimate objective of increasing profits. Investigating the monetization strategy is important because it can uncover additional, potentially anti-competitive effects of the merger. Moreover, it can shed light on the rationale of the merger from the parties' perspective, as it will make clear how the target brings value (that is, profits) to the acquirer. However, the Authorities should also investigate the users side of the market as competition problems can lead to non-price effects on users.

Further, the set of decisions analysed has revealed gaps in the Authorities' understanding of digital markets. In *Facebook/Instagram*, the Authorities might have neglected to analyse the factors that drive advertisers' choices, how the merging parties fared with respect to each of them, and how their combination could have resulted in competitive harm. In *Priceline/Kayak*, the Authorities did not determine whether the services supplied by MSSs and OTAs should be regarded as substitutes or complements, which may have led to measurement problems in the assessment of unilateral effects through market share evidence. In *Amazon/The Book Depository*, the Authorities neglected the existence of a possible vertical relationship between the merging parties, which may have called for the investigation of foreclosure ToHs.

In the assessment of potential competition, and most notably in *Facebook/Instagram* and *Google/Waze*, the Authorities identified the correct evidence and found that Instagram and Waze had witnessed constant and significant growth in the years leading up to the merger, had promising business models and plans for an expansion that might have increased their relevance in the markets where their acquirers were active. Yet, the Authorities dismissed this evidence mostly due to the uncertainty surrounding whether Instagram's and Waze's potential would have been realized. Rarely, if ever, will the Authorities find conclusive evidence of future growth: potential competition ToHs will always entail a certain degree of uncertainty. If the Authorities wish to pursue this type of ToH in the future, then they should be willing to accept a greater degree of uncertainty in their evaluations.

PX0498-019

While we have identified some gaps in the way that the Authorities analysed these cases, it is not always clear whether competitive harm has arisen as a result of such gaps. The decisions taken in *Facebook/Instagram* and *Google/Waze* may have represented missed opportunities for the emergence of challengers to the market incumbents but have also likely resulted in efficiencies. The decisions taken in *Priceline/Kayak* and *Amazon/The Book Depository* appear less controversial, as the level of competition in the markets concerned does not seem to have been substantially affected by the mergers.

PX0498-020

## Recommendations

- Network effects often make the structure of digital markets quite concentrated and barriers to entry rather high, making competition *for* the market the main mechanism left to discipline incumbents and potential competitors particularly valuable. Thus, the social costs of an incorrect clearance may be higher in digital markets than they are in traditional markets, which may justify a different approach to digital markets.

- Defining the counterfactual to a merger is always complex, but may be especially so when one of the merging parties is a very young firm at the early stage of their development. Yet, predicting evolution is essential to understand whether the transaction will harm competition. Predicting evolution may benefit from improving the information gathering powers of the Authorities, for instance by using dawn raids in the context of merger investigations.

- The time frame of two years, which represents the default for the assessment of some future market developments, such as entry, within merger investigations in the UK, may be somewhat limiting and could be extended when dealing with mergers in digital markets: even in the fast-moving digital landscape, becoming successful can take longer than two years.

- The Authorities may benefit from a better understanding of the markets for online advertising. These markets are particularly important, as they represent the way many digital services are monetized, yet the competitive dynamics prevailing therein are not well understood. A comprehensive market study into the digital advertising sector could be a good instrument to gain the necessary knowledge for future enforcement activity in the sector.

- There is a large number of transactions being undertaken by digital incumbents. The value of the transaction may help the Authorities screen among those transactions to identify those that may warrant a more in-depth analysis of the merger, since it represents the magnitude of the effects (both beneficial and detrimental) associated to the transaction.

- The Authorities would need to be willing to accept more uncertainty in their counterfactual. Even after reinforcing the tools available, there will always be a certain degree of uncertainty as to the counterfactual chosen for the assessment of a merger. Future plans, no matter how carefully set out, are always subject to being unmade by unforeseen market events.

- A more speculative counterfactual may result in the Authorities falling short of the burden of proof they are required to satisfy to block a merger. However, for the Authorities to be more effective in the enforcement of merger policy, it may be necessary to test the boundaries of the legal tests and constraints that the Authorities face.

- The Authorities have not always consistently framed the competition issues they were looking at in a two-sided setting, focusing their attention on the users' side of the market, somewhat overshadowing other sides of the market. The sides of a market need to be looked at jointly, as as choices made by the platform on the various sides are interdependent.

- Current business models and monetization avenues should represent an unavoidable step for the development of a ToH because, quite simply, market power is not exerted for its own sake, but has the ultimate objective of increasing profits. Investigating the monetization strategy is important also because it can shed light on the rationale of the merger from the parties' perspective, making clear how the target brings value (that is, profits) to the acquirer.

PX0498-021

# PART I. GENERAL LESSONS FOR MERGER CONTROL IN

# DIGITAL MARKETS

PX0498-022

## I.1. INTRODUCTION AND METHODOLOGY FOR PART I

**I.1.** The Competition and Markets Authority (henceforth "CMA") appointed Lear to carry out a study aimed at evaluating past merger decisions in the digital sector ("UK cases") taken by the Office of Fair Trading ("OFT") and the Competition Commission (jointly, the "Authorities"). The objective of the study is threefold:

- review merger cases undertaken by Competition Authorities ("CAs") and the relevant economic literature to identify which Theories of Harm ("ToHs") have been typically pursued by CAs in relation to these mergers, how such ToHs have been evaluated and which relevant economic features should be taken into account (research question 1);
- assess the UK cases and evaluate whether the decision that the Authorities have come to was reasonable, evaluating whether ToHs have been investigated correctly and whether any potentially relevant ToH has been omitted from the Authorities' analysis (research question 2, or methodology assessment);
- evaluate market evolution following the mergers to ascertain whether the merger has led to a detrimental outcome (research question 3, or market outcome assessment).

**I.2.** Part I of the report addresses the first research question, drawing on various sources of evidence. Section I.2 includes a review of the relevant economic literature, highlighting those common features of digital markets that CAs should take into account when dealing with mergers in the sector. Indeed, digital industries create challenges for competition policy, such as how to deal with network effects, multi-sidedness, big data and rapid innovation. All of these features may call for a tailored approach when reviewing mergers in the sector.

**I.3.** Section I.3 looks at past acquisitions undertaken by a selected set of large digital companies, i.e. Amazon, Facebook and Google, regardless of whether such transactions were subject to ex-ante merger control by any CA. Companies active in digital markets are remarkably active in mergers and acquisitions, and in some instances this may have the intention or effect to wipe out potential competitors. This may be especially problematic in digital markets where the competitive constraint on incumbents may often come from smaller market players or potential entrants. Understanding what sort of companies are targeted by large digital companies may provide an insight into whether such transactions should be looked at more carefully by CAs.

**I.4.** Section I.4 reviews a subset of mergers in the digital sector that have been scrutinised by CAs. Merger decisions taken by CAs represent a valuable basis to understand which ToHs may be typically pursued within the context of mergers in the digital sector and how the relevant economic features of digital markets have been taken into account by CAs.

**I.5.** Finally, section I.5 brings all of the above together to draw general lessons for merger control in digital markets.

PX0498-023

## I.2. SURVEY OF ECONOMIC LITERATURE

**I.6.** Digital industries create new challenges for competition policy. The survey of the economic literature dwells on some key characterizing features of digital markets that shape the policy debate: network effects, multi-sidedness, big data and rapid innovation. These characteristics make it efficient and/or more likely to have market concentration. Also, they reduce the beneficial effect of unfettered competition. While there is no one-size-fits-all framework, with different markets characterized by different combinations of the above features, the literature review tackles them in isolation.

**I.7.** This summary includes key concepts, findings and broad economic intuitions. The interested reader is referred to Annex A for an in-depth treatment.

### I.2.1. Direct and indirect network effects

**I.8.** In its simplest incarnation, the term "network effects" refers to the fact that in some markets, a firm's total demand or market share has a *direct* effect on consumption value. For instance, the value of joining a social media platform or a communication service is clearly increasing in the number of other users a consumer can potentially interact with. Digital markets almost always feature network effects. The reason being that firms active in these markets typically leverage on technology to enable users to interact among themselves. For this reason, these firms are typically referred to as "platforms."

**I.9.** In some markets, the link between market share and consumption value is subtler. Network-like effects sometimes arise due to what some economists refer to as demand-driven dynamic economies of scale or "learning by doing." For example, search engines' users typically do not care directly about the engine's market share. However, the quality of search results is intimately connected to the scale of operations. Search engines typically "learn" about relevance of URLs to particular queries by observing and analysing users' behaviour on search result pages. URLs that are clicked more often are obviously more likely to be relevant. More users therefore imply more accurate results and that quality is, in turn, increasing in market share.

**I.10.** In some other markets, typically referred to as "multi-sided markets," network effects are "indirect" in the sense that they link different groups of economic agents. A classic example is that of operating systems ("OSs") such as Google's Android or Apple's IOS. Users value choice. Thus, systems that boast more apps are clearly more attractive. Vice-versa app developers value access to larger users' pools. Nobody wants to incur in the fixed cost of developing an app for a system that only a few adopt. Another important example is that of "attention platforms". These are typically content providers (say online news, portals, blogs, social media etc.) that harvest user attention and resell it to advertisers. Advertisers typically prefer to reach larger pools of users. So, a broader audience increases the advertisers' willingness to pay. Consumers instead typically "dislike ads"; in other words, in this illustration externalities from advertisers to consumers are negative. Markets where the value that users on one side of the market assign to the platform depends on how many users on *other* sides of the market also patronize the platform is called "multi-sided" following a literature pioneered by Caillaud and Jullien (2003); Rochet and Tirole (2003, 2006) and Armstrong (2006).[3]

**I.11.** Network effects are an obvious source of concentration due to a "rich get richer" dynamics, whereby more users enhance the dominant firm's attractiveness leading to even more users. In extreme cases, markets tip to monopoly. Furthermore, concentration is also efficient, but its benefits have to be weighed against its costs due to market power.

---

[3] More policy-oriented early contributions are Evans and Schmalensee (2005) and Evans (2003).

PX0498-024

**I.12.** As the overarching goal of competition is that of alleviating the social harm caused by market power, many papers use the monopoly paradigm as their benchmark. A first observation in the context of a monopolistic platform, as formalized in Box A.3 in annex A.1.1, is that network effects reduce the extent of market power, defined as the ability to raise prices above costs. The reason is that monopolists internalize the positive effect of expanding their installed base on their customers' willingness to pay. To see this via an extreme example, suppose that some service, which is costless to provide, works at all only if some critical mass is reached and that critical mass is 100%. In this case, monopolists would be willing to price down to zero if that is necessary to reach that mass. A very general and robust message in the literature is that network effects lead to smaller mark-ups, thus mitigating the pernicious effects of market power. Classic papers making these points are Liebowitz and Margolis (1994) or, more recently, Levin (2011).

**I.13.** The fact that these services are often offered for free does not mean that concerns over concentration are unfounded. Platforms have incentives to exert their market power in dimensions other than price. For instance, they may fiddle with the quality of the service in order to raise revenues by either distorting consumer choices towards more profitable ones or directing consumer attention away from what is best for them. To fix ideas, think about a search engine that has the ability to manipulate its search results, say by directing user clicks towards affiliated websites or towards advertisers. Similarly think about a streaming service such as YouTube or Spotify, who can use its recommendations, playlists and auto-play features to promote specific titles that are either relatively cheaper to stream or sponsored. Finally, consider a social network manipulating the newsfeed in order to keep consumers engaged. The economic literature has looked at the concept of "intermediation bias" and its consequences. The basic trade-off platforms face is between revenues per interaction and quantity of interactions (Hagiu and Jullien (2011)). Bourreau and Gaudin (2018) and Calvano and Jullien (2018) look at biases within widely used recommender systems. In a series of papers, De Corniere and Taylor (2014, 2016) study the determinants of such bias and its consequences. The first paper looks at search engine bias and its effect on websites' strategies. The latter generalizes some of the ideas, looking at an intermediary who is willing to divert uninformed consumers in exchange for a price. For a more thorough discussion of the impact of network effects on market power see Annex A.1.1.

**I.14.** The more recent academic debate on platform competition takes as given that network effects lead to market tipping and looks at the potential of competition *FOR* the market to discipline incumbents. The idea is that in a world with rapid innovation, potential and actual entry possibly mitigate the social costs of market power.

**I.15.** The more recent literature introduces and studies the notion of "incumbency advantage." It captures the idea that an installed base of consumers may prevent entrants from penetrating the market despite being endowed with better quality products. That is, there is an incumbency advantage if, despite the fact that if all consumers switched to some entrant their willingness to pay would be strictly larger, the entrant fails to conquer the market. Some early contributions refer to this as "excess inertia."

**I.16.** The three key questions that arise in this context are: what is the *source* of the incumbency advantage? How and to what extent can such advantage be *exploited* to extract supra competitive rents? Are there factors that can mitigate the anticompetitive potential of network effects?

**I.17.** Three important early contributions by Farrell and Saloner (1986), Katz and Shapiro (1992) and Fudenberg and Tirole (2000) pointed at switching costs. The basic idea is that consumers cannot change their mind. So those adopting earlier technologies are "stranded" in case a new, perhaps superior technology arises at some later stage. However, switching costs seem less relevant in the online world, where competitors' product are at one's fingertip and installing an app or signing up on a website does not require to invest in new equipment or sink in time to learn new skills. With the

PX0498-025

exception of personal data (treated in detail below),[4] these frictions are very low. Therefore, the more recent literature has been relooking at the incumbency advantage issue in this frictionless context.

**I.18.** A common theme in current work is the idea that consumer "expectations" over who will dominate the market can be thought of as a competitive asset. The idea is that consumers who expect a dominant firm to keep being dominant, might collectively fail to migrate to some "better" entrant's platform, simply because they have a hard time coordinating their choices. That is, simply because they expect others not to migrate. To tackle these issues, Caillaud and Jullien (2003) and, more recently, Halaburda, Jullien and Yehezkel (2016) and Halaburda and Yehezkel (2016) developed the notion of "focality". That is, they explicitly formalize the intuition that incumbents face favourable beliefs. Halaburda, Jullien and Yehezkel (2018), Halaburda and Yehezkel (2016) and Biglaiser and Cremer (2018) recently relooked at this issue embedding dynamic considerations. They look at competition between an incumbent and a sequence of potential entrants over a large number of periods. These papers deliver three clear messages. First, favourable expectations lead to a quantifiable incumbency advantage much as more traditional and well understood sources like switching costs. Incumbency advantage can thus materialize despite frictionless contexts. Second, when one embeds dynamic considerations, competition for the associated "incumbency rents" dissipates most of this advantage. The idea is that higher quality entrants can always bribe consumers to switch to their service by offering some very low (even negative!) introductory prices. The prospect of future incumbency rents is what makes current losses optimal. In short: these long-run considerations make entrants very aggressive. Third, despite being mitigated, the static inefficiency extends to the dynamic setting: focal, lower quality incumbents can stay dominant.

**I.19.** A key mitigating factor often cited in policy debates is multi-homing. The low prices (often nil) and low switching costs to access other service providers in digital markets brought about the widely documented habit of trying out new services *before* quitting the old ones or patronizing two competing platforms at the same time. Consumers who are not required to "abandon" the network of the incumbent to try out new services are obviously easier to persuade to jump onboard an entrant's platform. Armstrong (2006) studied competition in a model where one set of users always multi-homed while the other was assumed to single-home introducing the well-known notion of "competitive bottleneck". Since acquiring single-homers allows to extract fat monopoly rents on the opposite side of the market, there will be fierce competition for single-homers and no competition for multi-homers. The more recent literature on multi-homing in multi-sided markets looks at this issue from different angles. Some recognize that the choice to multi- or single-home is often endogenous (for instance Tremblay and Jeitschko (2018)) and look at the determinants on that choice. Others contrast outcomes in the competitive bottleneck model, with those in the two-sided single-homing model. These latter could be induced by exclusivity clauses (Carroni et al. (2018), Peitz and Bellaflamme (2018)). Annex A.1.2 examines in depth the literature around the notion of incumbency advantage.

**I.20.** Finally, the literature review considers factors that potentially allow more platform to cohabit *despite* network effects: network interconnection and product differentiation. What links these two is the fact that market fragmentation is not necessarily inefficient to start with.

**I.21.** Compatibility and interoperability are not perceived as a viable option in today's digital markets arena as it is difficult to define minimal service standards in digital contexts such as, for example, WhatsApp or Instagram. A notable exception to the view that compatibility is not an option is a recent contribution by Gans (2018). The paper puts forward a notion of "identity portability" as a possible policy response. The idea is that individual users should have a "right" to their identity and to its verification if they change digital platforms. A similar proposal, labelled "graph portability", has been put forward by Zingales and Rolnik (2017).

---

[4] Personal data can be useful to an entrant to provide comparable quality and therefore may be a source of switching costs.

PX0498-026

**I.22.** Horizontal differentiation naturally induces market fragmentation, with multiple outcomes active at the same time. Such fragmentation is clearly not suboptimal as different platforms cater to different preferences. Armstrong (2006) and Rochet and Tirole (2003) look at fragmentation/shared market equilibria in two-sided markets.

**I.23.** More surprisingly, a number of papers show that fragmentation can occur even when platforms are purely vertically differentiated. That is, even in cases where everybody agrees that one platform is "better" than the other and therefore tipping would be socially desirable. Ambrus and Argenziano (2009) show that one can use the "size" of the network in a way akin to quality to screen buyers. Calvano and Polo (2018) go one step further providing a model of strategic differentiation. They show that two otherwise identical platforms can relax competition by cornering different sides of the market. The motivating example are broadcasting markets, where Free-to-Air (FTA) operators cohabit with Pay-TVs. In summary, platform competition may *lead* to endogenous differentiation by business model. This means that platforms apparently catering to clearly different subset of users may be in the same relevant market. For additional details on the factors that allow for competition IN the market in contexts characterised by network effects see Annex A.1.3.

### *I.2.2. Markets for attention*

**I.24.** A large fraction of the internet is basically powered by advertising money with many websites and apps in the business of harvesting and reselling human attention. These firms, sometimes referred to as attention brokers, are essentially platforms operating in multi-sided markets: advertisers wish to place their creatives on outlets that have a large audience while consumers typically dislike ads.

**I.25.** However, these markets received a special treatment in the economics literature for a number of reasons that go beyond their obvious relevance. Human attention is scarce and valuable. There are often no prices on the consumer side of the market, so firms do not internalize consumers' willingness to pay. Multi-homing is widespread, and this makes it difficult to use traditional measures of market power. New technologies that use data to profile users and follow them as they traverse the internet (e.g. cookies) scale down competition for attention at the individual level. Finally, advertising is a key input in product market competition thus allocative inefficiencies in ad markets percolate to product markets.

**I.26.** Earlier papers looked at broadcasting markets and focussed on market power in contexts where consumers are not charged. An early and influential contribution by Anderson and Coate (2005) provided a first model of "competition" for attention. Specifically, they study the allocative properties of a market with two competing attention brokers as free news outlets assuming consumers choose one and only one outlet (i.e. they single-home). In line with Armstrong's "competitive bottleneck" intuition, advertising goes down with competition. To see this notice that since advertising is usually perceived as a nuisance one, can think of the quantity of ads as basically a "shadow price" that consumers need to pay to satisfy their content needs. Competition typically lowers prices and thus the aforementioned result follows.

**I.27.** A more recent wave of papers relooked at outlet competition under the more realistic assumption that consumers satisfy their content needs on multiple outlets (i.e. they multi-home). This simple fact is shown to have profound implications on how competition works. Multi-homing implies that the rents for reaching the attention of eyeballs "shared" by one or more outlets are competed away. Therefore, the more one's audience is "shared" with rivals the lower its value on the advertising side of the market. This means that outlets have preferences not only for the audience "size" (how many?) but also on the audience composition (shared vs exclusive). This has implications, not only for

PX0498-027

prices and quantities (as discussed in Ambrus et al. (2016) and Anderson et al. (2016)), but also for what concerns the incentives over content provision both in terms of quality and in terms of diversity.[5]

**I.28.** Prat and Valletti (2018) look at implications of attention market concentration on product markets. Their starting point is that consumer attention is an essential input for entrants in product markets: entrants need to make consumers aware of their existence. They show that mergers between attention brokers indeed might have important effect on consumers via higher product prices. The interested reader is referred to Annex A.2 for a more detailed discussion on the issue of markets for attention.

### I.2.3. Innovation in digital markets

**I.29.** A significant concern when thinking about innovation in digital markets are the causes and consequences of the widespread incumbents' practice of acquiring start-ups active in the same or adjacent markets. This often occurs at very early stages of the product development process, that is before these firms hit the market with a final product. This phenomenon is known in the literature as "entry for buyout".

**I.30.** In a seminal contribution, Gilbert and Newbery (1982) argued that institutions such as the patent system create incentives for monopoly incumbents to invest in "pre-emptive inventions" in order to protect those monopoly rents. By the same token, monopolists have stronger incentives to acquire entrants than, for instance, venture capitalists, as the opportunity cost of not acquiring is the risk of losing those fat rents. The finding that incumbents have stronger incentives to invest is referred to in the literature as the "efficiency effect".

**I.31.** Now, suppose that the acquired technologies need to be further developed. If the entrant's product is a substitute of the incumbent's, then some of the sales of the new product will come at the expense of the old. This "rent cannibalization" implies that incumbents have lower incentives than the entrant to invest in further development. In the literature this is Arrow's (1972) famous "replacement effect". If the incentives are sufficiently dampened then these buyouts might end up being "killer acquisitions", where new products are discontinued (or never introduced) upon acquisition.

**I.32.** Is "entry-for-buyout" pro- or anti- competitive? The "efficiency effect" obviously suggests that allowing buyouts of potential entrants stimulates innovation. Also, Rasmusen (1988) argues that, on the plus side, the possibility of buying out entrants limits the scope for inefficient entry deterrence strategies. However, because the threat to incumbents is higher when the entrant's product is a close substitute to the incumbent's then entrants will invest in duplicative innovation, which is socially wasteful, since it does not lead to new products or lower prices. Finally, as said above, if new products or technologies require further development before hitting the market, they are less likely to be developed by incumbents.

**I.33.** While the literature provides clear and unambiguous theoretical predictions towards pre-emptive buyouts, there is surprisingly little systematic evidence to date. An exception is a recent paper by Cunningham, Ederer and Ma (2018) that looks at acquisitions in the pharma industry. Because the development of drugs is subject to stringent regulatory requirements, the authors are able to follow it from a very early stage through to launch or discontinuation. Overall, the estimates indicate that 6.4% of all acquisitions in the market are killer acquisitions. Annex A.3.1 contains an in-depth discussion of the literature on for buyout and killer acquisitions.

**I.34.** Following the *Dow/Dupont* case of 2017, a more recent academic debate relooked at the effect of concentration on innovation contributing to a literature built over two influential early contributions

---

[5] See, for instance, Athey et al. (2018) on the theory side and Gentzkow et al. (2014) for an empirical structural application in the US newspaper industry.

PX0498-028

by Shumpeter (1942) and Arrow (1962). Classic papers on competition and innovation do not really illuminate the debate on horizontal mergers for a very simple reason: a merger is not just a reduction in the number of firms. The merged entity *combines* the resources of firms that were previously competing. Thus, it can both reorganize production (for instance, by restructuring the R&D process) and coordinate (previously independent) R&D investment and production choices. Very recent contributions along these lines are Jullien and Lefouili (2018), Denicolò and Polo (2018a,b), Federico, Langus and Valletti (2017, 2018) and Motta and Tarantino (2017).

**I.35.** In theory, when firms use innovation as a way to escape competition, a merger will allow the parties to internalize the negative effects that one's R&D investment has on the expected rival's profit. This internalization trivially leads to a lower overall investment level and therefore to lower innovation rates. In addition, as mergers typically lower the individual firm's output, marginal returns on unit cost-reducing innovations decrease post-merger further strengthening the negative relationship between concentration and innovation.

**I.36.** As with the literature on unilateral price-effects, sufficiently strong efficiency gains or sufficiently strong and positive R&D spillovers may overturn this finding. However, in this context, things are also somewhat different for the following reason. It makes sense to assume that in industries characterized by rapid innovation and sizeable R&D, the merging parties will each boast a stock of knowledge that they would then share if they were to merge. In turn, this inevitable sharing of technological knowledge, and, more broadly, a reorganization of the R&D efforts across previously independent research labs typically leads to higher incentives to invest. Denicolò and Polo (2018) argue that since these "efficiency gains" are undoubtedly more realistic in this context and their existence should be taken explicitly in consideration by the authorities, as opposed to instead relegating them as mere efficiency defence, despite the obvious difficulties due this information residing within firms.

**I.37.** The scarce empirical evidence available (Ornaghi (2009), Haucap et al. (2018) and Cunningham et al. (2018)) supports the conclusion that horizontal mergers have a negative effect on R&D.

**I.38.** By and large the theoretical and empirical literature suggests that the unilateral effects of mergers on innovation, both of the cost-reducing and quality-enhancing types, are anti-competitive. But the nature of R&D makes efficiency gains much more likely to materialize calling for additional scrutiny by the authorities rather than relegating this practice among the "efficiency defences". Annex A.3.2 provides further insights on the debate on the relationship between horizontal mergers and innovation.

### *I.2.4. Market power, competition and big data*

**I.39.** The quintessential task of many digital platforms is that of making prediction of various sort. Search engines need to predict the relevance of URLs to a consumer query. Matchmakers need to predict the value of a match in order to find good prospects for their users (for instance, employees and employers, single men and single women and so on); content distributors, such as Spotify, need to predict their user tastes to keep them entertained; mapping services need to predict traffic conditions and so on.

**I.40.** These predictions are made through statistical models (i.e. algorithms) fed by the vast amount of data on consumers that online businesses harness (i.e. big data). Antitrust authorities and practitioners have voiced concerns that big data may be an insurmountable competitive advantage that incumbents naturally enjoy as a by-product of operations. The literature review surveys some recent contributions on this issue.

**I.41.** The first part of the review introduces the concepts of data substitutability and complementarity in statistical learning theory. Most of the debate hinges on three key issues: (i) returns to scale – that is to what extent increasing the quantity of Data leads to diminishing returns in forecasting accuracy;

PX0498-029

(ii) data complementarity – that is what is the effect on accuracy of combining data diverse in nature (for instance, combining geo location data from mapping services and personal information contained in email accounts) and (iii) data substitutability – that is to what extent the incumbent's data are *essential*.

**I.42.** Lambrecht and Tucker (2015) argue that big data is not inimitable nor rare. They point to the existence of many alternative data sources and to a flourishing marketplace for data that entrants can access in order to power their statistical models.

**I.43.** Needless to say, the above are ultimately empirical questions. Surprisingly, despite the wealth of data, there is little systematic evidence to date. Bajari et al. (2018) use proprietary data of Amazon.com to estimate the effect of data scale for the key strategic task of forecasting consumer demand. They confirm that more data enhances accuracy, however, returns to scale are strongly diminishing. Shaefer et al. (2019) investigate how user data improves the quality of internet search results pages estimating a production function for search result quality using real search traffic data from Yahoo!. Again, they document positive but diminishing returns to scale. To date, there is no paper tackling explicitly the issue of data complementarities. Thus, claims that data diversity enhances accuracy are not based on rigorous systematic evidence.

**I.44.** Finally, the review provides an account of the literature *assuming* that data confers a competitive advantage and looking at the incentives to sell, share or license. In short: what if data is indeed an essential input that only incumbents command? This issue has been extensively studied in papers on vertical restraints (Hart, Tirole, Carlton, & Williamson, 1990; Rey & Tirole, 2007 just to cite a few), in the literature on patent licensing (for instance Gallani, 2002) and in the literature on premium content distribution in media markets (Armstrong, 1999). Chicago-style arguments typically suggest that if data licensing creates value, then absent contractual frictions we should expect firms to share the essential input and bargain over how to share the extra value so created.

**I.45.** More recent contributions look for reasons why the market may fail to efficiently allocate data linked to its peculiar nature. Rubinfeld and Gal (2017), Prufer and Schottmüller (2017) and DeCorniere and Taylor (2019) characterize and discuss inefficient outcomes in data markets. DeCorniere and Taylor (2019) go one step further, focusing on mergers and looking also at how these vertical agreements affect incentives to collect data, say by providing some free service in an unrelated market. The interested reader is referred to Annex A.4 which discusses the crucial role played by big data in digital markets more thoroughly.

PX0498-030

## I.3. OVERVIEW OF TRANSACTIONS CARRIED OUT BY DIGITAL COMPANIES

**I.46.** Companies active in digital markets are remarkably active in mergers and acquisitions ("M&A"), constantly seeking out interesting start-ups and purchasing them. Such acquisitions may have a variety of purposes: for instance, they may have been conducted to secure a technology to be incorporated into the acquirer's product; or to secure highly skilled staff and use their expertise to develop products. However, such acquisitions may also have the intention or effect to wipe out potential competitors, as discussed in section I.2.3 and in Annex A.3.1. Buying out firms at an early stage of their development may effectively prevent them from ever becoming a competitive threat, as the innovation that they were developing will not serve to displace incumbents but will rather be instrumental to maintaining their market leadership or will be discontinued altogether.

**I.47.** This may be especially problematic in digital markets. As discussed in section I.2.1 and in Annex A.1.2, the prevalence of network effects makes it so that often competition is *for* the market rather than *in* the market. The threat exerted by smaller market players or potential entrants is therefore essential to keep market power in check. If such threats can be easily dealt with through targeted acquisitions, they cease to discipline market behaviour and leave room to the exercise of market power. Moreover, most of this M&A activity occurs below the radar of competition authorities, as the large majority of transactions carried out by digital companies do not meet the relevant thresholds for merger control. Indeed, merger control thresholds are often based on merging parties' turnover, which are rarely met when targets are start-ups that in some instances are still trying to figure out a viable path to monetization.

**I.48.** For the reasons outlined above, it is interesting to analyse the characteristics of M&A activity carried out by digital companies to understand whether they reveal any reason for concern. Our analysis covers all the publicly disclosed acquisitions carried out by Amazon, Facebook and Google between 2008 and 2018, listed in Annex A. Amazon, Facebook and Google were chosen for consistency with the analysis undertaken in Part II, where we assess mergers that involved these three companies (*Facebook/Instagram*, *Google/Waze* and *Amazon/The Book Depository*). Over this period, based on the information available, Google has acquired 168 companies, Facebook has acquired 71 companies and Amazon has acquired 60 companies.

**I.49.** The objective is to understand the characteristics of the targets through two main approaches:

- desk research to understand what the main activity of the target was at the time of the merger, based on the description of the target available from Crunchbase[6]. Targets have then been grouped into clusters that convey the general area of economic activity of the target;
- collecting the Crunchbase tags for each transaction. The list of targets has been matched with the Crunchbase database to obtain all the tags that Crunchbase has associated to that company, which provide an insight into the area of economic activity that the target was active in. This analysis is shown in Annex C.

**I.50.** The two approaches are complementary. On the one hand, the Crunchbase tags, while not always accurate, have the advantage of being multi-dimensional, as each target has a number of tags attached to it. On the other, while clustering should be more precise as it is informed by additional desk research, it requires to make a judgment, catching only one dimension of what the target did at the time of the merger. Such a judgment will invariably be somewhat arbitrary.

---

[6] Crunchbase is a platform for finding business information about private and public companies (https://www.crunchbase.com/). Where necessary, information available on Crunchbase has been complemented with other publicly available sources

PX0498-031

**I.51.** Table I.1 below shows the clusters defined for the analysis, along with the number of transactions falling into each cluster.

**Table I.1: Clusters for analysis of past acquisitions by Amazon, Facebook and Google**

| Cluster | Description | Number |
|---|---|---|
| Communication apps and tools | Companies active in the supply of platforms that create or simplify ways of interaction between individuals and/or within organizations. Such ways of interaction include direct communication, such as messaging and emailing, and sharing of content and personal information | 50 |
| Tools for developers | Companies that provide tools and solutions for software developers to create and optimize their digital products. This excludes products and services supplied to final consumers | 40 |
| Physical goods and services | Companies that manufacture, distribute or sell physical goods of any kind or facilitate through services and software such activities, including price comparison websites, marketplaces and online retailers | 51 |
| Digital content | Companies that deliver, create or facilitate the fruition of digital content such as movies, games, digital text and other digital media | 21 |
| Remote storage and file transfer | Companies that provide file storage, cloud, file sharing and related services | 16 |
| Advertising tools and platforms | Companies active in the advertising industry as provider of advertising content, advertising platforms or active as intermediaries between advertisers and consumers or advertisers and suppliers | 17 |
| Artificial intelligence, data science and analytics | Companies active in the creation, distribution or enhancement of self-learning software, image, speech or text recognition software, virtual assistants, analytics and machine learning services for big data | 43 |
| Home, wellbeing and other personal needs | Companies active in the provision of software and applications designed to simplify and/or improve experience for different aspects of daily life such as: transportation, health, learning, entertainment, wellbeing and home automation | 25 |
| Other | | 36 |
| Total | | 299 |

*Source: Lear based on Crunchbase data*

**I.52.** Figure I.1 below shows the distribution of transactions across clusters for each of Amazon, Facebook and Google, excluding the *Other* cluster. Google has been remarkably more active than Amazon and Facebook, having bought out more companies than the other two in each of the cluster. In relative terms, Figure I.1 suggests a relatively strong focus by Amazon and Facebook on *Physical*

PX0498-032

*goods and services* and *Communication apps and tools* respectively, whereas Google's acquisitions are more evenly spread out across clusters.[7]

**Figure I.1: Distribution of past acquisitions by cluster**



*Source: Lear based on Crunchbase data*

**I.53.** This finding is confirmed by the tag cloud analysis shown in Figure C.1, Figure C.2 and Figure C.3 for Amazon, Facebook and Google respectively. Amazon and Facebook especially seem to have acquired companies that were active in the same area of economic activity, respectively: *e-commerce* and *shopping* for Amazon and *social media* and *social network* for Facebook. On the surface, these transactions may be the most problematic from a competition perspective, as they may be more horizontal in nature[8] and are precisely those that may have the intention or effect of preventing competitors from becoming a threat.

**I.54.** However, most transactions do not have a clear horizontal element for each of Amazon, Facebook and Google. Acquisitions target companies spanning a wide range of economic sectors and whose products and services are often complementary to those supplied by Amazon, Facebook and Google. This highlights the complexity of the business models pursued by digital companies, as several activities seem to enter into their productive process.

**I.55.** This is again confirmed by the tag cloud analysis. All of Amazon, Google and Facebook have propelled their push into mobile also through the acquisition of companies that have helped with the development of services optimized for use from mobile devices (*mobile*, *Android* and *iOS* are rather

---

[7] Facebook's distribution would likely be even more skewed towards the *Communication apps and tools* if transactions were weighed using the value of the transaction, due to the high-profile acquisitions of Instagram and WhatsApp. However, information on the value of the transactions is not available in a consistent manner.

[8] This is not necessarily the case as the area of economic activity is at most a proxy of actual or potential substitutability. Products may for instance lie in different steps of the value chain or perform different functions.

PX0498-033

frequent tags). These mergers may have improved their ability to compete as the competitive landscape moved away from desktop and on to mobile. This was while users of digital services progressively shifted from the desktop to the mobile environment with the number of mobile users growing from almost 15 million in 2010 to more than 45 million in 2018 in the UK.[9]

**I.56.** Moreover, all of Amazon, Google and Facebook have invested into companies that have helped them with advanced data analytics techniques (*machine learning*, *artificial intelligence*, *analytics and big data*). This is consistent with the fact that these companies heavily rely on predictions to provide their services (see section I.2.4 and Annex A.4 for a discussion). For instance, Amazon uses them to manage its stock based on expected demand; Facebook to propose targeted content and ads to its users; Google to improve its search algorithms and target ads more accurately. If this is the case, then broadly speaking these mergers may be efficiency-enhancing as they enable incumbents to become better at making such predictions.

**I.57.** Figure I.2, Figure I.3 and Figure I.4 show how the number of acquisitions and their distribution across clusters has evolved over time, for each of Amazon, Facebook and Google.

**Figure I.2: Number of acquisitions by Amazon over time**



*Source: Lear based on Crunchbase data*

**I.58.** Amazon's acquisitions are clustered in the latter part of the period, with a peak in 2017. Between 2008 and 2013 Amazon completed several acquisitions in the *Physical goods* cluster; most of these were acquisitions of retail operators such as Buy VIP in 2010 and LoveFilm and The Book Depository in 2011. Starting in 2015, Amazon acquired companies in the *Remote storage and file transfer* cluster, perhaps with a view to bolster its own operations in this sector, where Amazon is active with Amazon Web Services. Other notable acquisitions by Amazon include Whole Foods Market, a supermarket

---

[9] This is based on data from eMarketer.

PX0498-034

chain, acquired in 2017 for 13.7 billion and Zappos, an online shoes retailer acquired in 2009 for 1.2 billion.



**Figure I.3: Number of acquisitions by Facebook over time**

*Source: Lear based on Crunchbase data*

**I.59.** Facebook has been remarkably active between 2010 and 2016. In the years 2009-2012, Facebook has expanded its presence in the *Communication apps and tools* cluster with the notable acquisitions of the messaging app Beluga (2011), later transformed into Facebook Messenger, and Instagram (2012). Over the period 2014-2016, Facebook has invested in companies related to virtual reality technologies such as Oculus (2014) and Surreal Vision (2015).

PX0498-035

**Figure I.4: Number of acquisitions by Google over time**



*Source: Lear based on Crunchbase data*

**I.60.** Google has been active throughout the whole period with a peak of M&A activity in 2014. Google's acquisitions do not follow a recognizable pattern and seem to be spread evenly across years and clusters. However, the period 2013-2016 was marked by a number of acquisitions in the *Tools for developers* cluster presumably to sustain Google's push into the mobile landscape that was expanding rapidly in those years. Finally, Google invested in *Artificial Intelligence data science and analytics* consistently throughout the period with the most notable acquisition being DeepMind in 2014.

**I.61.** Figure I.5 and Figure I.6 go one step deeper, showing a second-level categorization for, respectively, acquisitions by Amazon in the *Physical goods and services* cluster[10] and acquisitions by Facebook in the *Communication apps and tools* cluster.[11] A similar analysis was not carried out for Google since its acquisitions are not focused on any cluster.

---

[10] *Robotics* is defined as machines and part of machines designed for automated operations of any kind; *Electronic devices and components* are defined as companies that produce, distribute or sell electronics devices of any kind including parts and technology for electronic devices; *Retail* is defined as companies active in the retail sale of physical goods online and offline and companies active as intermediaries or facilitators between final customers and retailers.

[11] *Aggregators* are defined as platforms that combine notifications, news and updates from various social networks or websites into a single feed; *Direct messaging and calls* are defined as applications that enable the exchange of text messages and/or to call other people; *Email and office communication* is defined as software designed to improve or simplify the use of emails and to optimize workplace productivity by means of enhanced communication. *Topic specific platform* are defined as online platforms where users that share a common, specific interest can post content and communicate with each other; *photo apps* are defined as apps that allow taking, sharing and/or editing photos.

PX0498-036

**Figure I.5: Distribution of acquisition by Amazon in *Physical goods and services* cluster**



*Source: Lear based on Crunchbase data*

**I.62.** Amazon's acquisitions in the *Physical goods and services* cluster represent 32% of its total acquisitions. Most of the companies acquired in this cluster were linked to the retail sector, such as Zappos, an online shoes retailer, Whole Food Market, a high-end online and offline groceries retailer, Souq.com, an online retailer active in the Middle-East region and other companies active in the retailing of books and other products (e.g. The Book Depository, Avalon Books, Audible.com). Amazon's interest in *Robotics* may be due to the process of automatization of its distribution centres: for instance, Kiva System, acquired in 2011, provided Amazon with the technology for automated storage and retrieval systems.

PX0498-037



**Figure I.6: Distribution of acquisition by Facebook in *Communication apps and tools* cluster**



*Source: Lear based on Crunchbase data*

**I.63.** Facebook's core business as a social network requires its users to be able to engage between each other and share files and information. Therefore, it is not surprising that Facebook invested heavily in the *Communication apps and tools* cluster, which represents 30% of acquisitions. The most notable acquisitions were Instagram (2012) in the *Photo apps* cluster, WhatsApp (2014) in the *Direct messaging and calls* cluster messaging and Friendster (2010) and Hotpotato (2010) in the *Topic specific platform* cluster.

**I.64.** Another striking feature of acquisitions carried out by Amazon, Facebook and Google is that their targets are often very young firms. Figure I.7, Figure I.8 and Figure I.9 show the distribution of the age of the targets at the time of the acquisition, expressed in years, for Amazon, Facebook and Google respectively. While there are some outliers, targets are four-year-old or younger in nearly 60% of cases.

PX0498-038

**Figure I.7: Age distribution of Amazon's targets**



*Source: Lear based on Crunchbase data*

**I.65.** Amazon's relatively high mean age of companies acquired is the result of three acquisitions of long-established retailers: Avalon Books and Toby Press were publishing houses founded in 1949 and 1950 respectively, Whole Food Market was founded in 1978. Most of the companies acquired by Amazon were between five- and nine-year-old, which suggest the intention of buying relatively more established firms rather than new-born start-ups. Notable exceptions were Lexcycle and Stanza, active in the eBooks sector, which were acquired in 2009 when they were two- and one-year-old respectively.

PX0498-039

**Figure I.8: Age distribution of Facebook's targets**



*Source: Lear based on Crunchbase data*

**I.66.** Facebook's mean age of companies acquired is significantly lower than Amazon's or Google's. The majority of Facebook's acquisitions targeted companies less than four-year-old. This is particularly evident for Facebook's push into virtual reality, accomplished through the acquisition of three companies (Oculus VR, Surreal Vision and Two Big Ears) less than three-year-old. Finally, all acquired companies in the *Photo apps* and *Direct messaging and calls* clusters were less than three-year-old, with the only notable exception being WhatsApp, which was five-year-old.

PX0498-040



Figure I.9: Age distribution of Google's targets

*Source: Lear based on Crunchbase data*

**I.67.** Google's acquisition pattern is more heterogenous than Amazon's or Facebooks's. 88% of Google's acquisitions regards firms younger than nine-year-old, with roughly 55% of these being younger than four-year-old. Each cluster shows a similar pattern to the overall distribution described: this can indicate a diversified expansion strategy aimed at acquiring both young, riskier start-up as well as firms in a later stage of development. As an example, in the *Artificial Intelligence, data science and analytics* cluster Google has acquired Flutter, a young start-up for gesture recognition, for 45 million dollars, and Like.com, a 24-year-old company specialized in image recognition, for 100 million dollars.

**I.68.** To sum up, the analysis of the past acquisitions carried out by Amazon, Facebook and Google reveals the following:

- the volume of transactions is significant. Over the period under analysis, Amazon, Facebook and Google have acquired 5, 6 and 15 companies per year on average;
- most transactions would seem to have a non-horizontal nature, though with notable exceptions;
- targets are typically very young firms, four-year-old or younger in nearly 60% of cases.

**I.69.** As the analysis in Part II will demonstrate, there are considerable difficulties in understanding the competitive implications of acquiring a young firm, as at that stage in their life cycle their evolution is still uncertain and it is therefore very difficult to determine if the target will grow to become a significant competitive force. Moreover, while non-horizontal mergers present significant scope for efficiencies, the realization of these efficiencies may enable incumbents of digital markets to preserve their leadership and preventing other market players from challenging them. This will be discussed further in section I.5.

PX0498-041

## I.4. PAST MERGER ASSESSMENTS IN DIGITAL MARKETS BY COMPETITION AUTHORITIES

**I.70.** Over the last decade, competition authorities have evaluated a number of mergers between digital companies. These mergers represent only a subset of all those that have occurred in digital markets, as can be inferred from the analysis of past transactions presented in section I.3. However, these merger decisions represent a valuable basis to understand which ToHs may be typically pursued within the context of tech mergers and how the relevant economic features of digital markets discussed in section I.2 and in Annex A more thoroughly have been taken into account by competition authorities. In limited cases, the review includes merger decisions which did not concern digital markets but that may nevertheless provide valuable insight into relevant ToHs for the sector.

**I.71.** The discussion is organized around the two main groups of ToHs. In particular, section I.4.1 considers unilateral effects ToHs usually associated with horizontal mergers, while section I.4.2 discusses foreclosure ToHs, which typically arise when there exists some form of complementarity between the products of the merging parties, either because one is an input for the other or because they are consumed together. Within these two groups, we identified sub-categories of ToHs in order to isolate some themes that are recognised as being relevant in the context of digital markets. The other main group of ToHs, i.e. coordinated effects, is not discussed because there are few cases where these were explored by CAs: while digital markets arguably make it easier to coordinate because of greater transparency and of the ability to monitor and punish deviations promptly, the prevalence of network effects leads to market structures characterized by the presence of strong market leaders: in this context, coordinated effects are less relevant.

**I.72.** This review is not meant to be exhaustive; the cases included represent examples of instances where relevant themes in the context of digital markets have played a prominent role in merger assessments. These cases are listed in Table I.2, along with an indication of the sections where they are discussed.

PX0498-042

**Table I.2: List of cases included in review**

| Case | ToH and section |
|------|-----------------|
| Facebook/WhatsApp[12] | Loss of competition with network effects and multi-homing, section I.4.1.1<br>Loss of competition in markets for attention, section I.4.1.2<br>Big data as an essential input to compete, section I.4.2.2 |
| Microsoft/Skype[13] | Loss of competition with network effects and multi-homing, section I.4.1.1<br>Foreclosure with network effects and multi-homing, section I.4.2.1 |
| SeLoger/Logic-Immo[14] | Loss of competition with network effects and multi-homing, section I.4.1.1<br>Foreclosure with network effects and multi-homing, section I.4.2.1 |
| Microsoft/LinkedIn[15] | Loss of competition in markets for attention, section I.4.1.2<br>Foreclosure with network effects and multi-homing, section I.4.2.1<br>Big data as an essential input to compete, section I.4.2.2 |
| Google/DoubleClick[16] | Loss of potential competition, section I.4.1.3<br>Big data as an essential input to compete, section I.4.2.2 |
| IRI/Aztec[17] | Loss of potential competition, section I.4.1.3 |
| Dow/Dupont[18] | Loss of innovation, section I.4.1.4 |
| Bayer/Monsanto[19] | Loss of innovation, section I.4.1.4 |
| Medtronic/Covidien[20] | Loss of innovation, section I.4.1.4 |
| Apple/Shazam[21] | Big data as an essential input to compete, section I.4.2.2 |
| Just Eat/Hungryhouse[22] | Loss of competition with network effects and multi-homing, section I.4.1.1 |
| Verizon/Yahoo[23] | Big data as an essential input to compete, section I.4.2.2 |
| Microsoft/Yahoo! Search Business[24] | Big data as an essential input to compete, section I.4.2.2 |

*Source: Lear*

---

[12] Commission Decision of 3 October 2014 in Case M.7217 – Facebook/WhatsApp.

[13] Commission Decision of 7 October 2011 in Case M.6281– Microsoft/Skype.

[14] Autorité de la Concurrence Decision n° 18-DCC-18 of 1 February 2018 on the acquisition of sole control of the company Concept Multimedia by the Axel Springer Group.

[15] Commission Decision of 6 December 2016 in Case M.8124 – Microsoft/LinkedIn.

[16] Commission Decision of 11 March 2008 in Case M.4731 – Google/DoubleClick.

[17] CMA Decision of 20 October 2014.

[18] Commission Decision of 23 March 2017 in Case M.7932 – Dow/Dupont.

[19] Commission Decision of 21 March 2018 in Case M.8084 – Bayer/Monsanto.

[20] Commission Decision of 28 November 2014 in Case M.7326 – Medtronic/Covidien.

PX0498-043

### I.4.1. *Unilateral effects ToHs*

**I.73.** Unilateral effects typically arise when merging parties are active in same relevant market, thus supplying substitute products. In this context, competition authorities assess the extent to which the removal of the competitive constraint that merging parties exert on one another may lead to the merged entity gaining market power. The nature of digital markets has entered into such assessments:

- network effects may reinforce the loss of competition between merging parties, leading to market tipping. This may be mitigated by multi-homing behaviour by users. This is discussed in section I.4.1.1;
- digital companies often operate in two-sided markets supplying different products to users but potentially competing with one another to raise advertising revenues, and therefore competing to harvest users' attention. This is discussed in section I.4.1.2;
- digital companies are significantly active in M&A, being constantly on the lookout to buy out interesting start-ups, as analysed in section I.3. In some cases, as discussed in section I.4.1.3, this has led competition authorities to consider potential competition ToHs;
- finally, given its importance in digital markets, section I.4.1.4 discusses how mergers can lead to reduced innovation.

### I.4.1.1 *Loss of competition with network effects and multi-homing*

**I.74.** As discussed in section I.2.1 and in Annex A.1, network effects arise when the value of a product or service to its users increases with the number of other users of the product or services: as the network becomes more popular, more people join, making the network further attractive, in a positive feedback loop. Some digital markets that are typically characterised by network effects include social networking services, communications services and online platforms bringing together buyers and sellers. The mere existence of network effects in a market does not *a priori* indicate that a merger in this market raises competitive concerns. Yet, concerns may follow if network effects allow the merged entity to foreclose competitors or make it more difficult for competing providers to expand their customer base, i.e. raising barriers to entry or expansion. For their potential to confer the merged entity a significant degree of market power, network effects are sometimes central to some ToHs considered by competition authorities in their assessment of digital mergers. Multi-homing, i.e. the practice by users of using different services from competing providers at the same time, has generally been regarded as a factor potentially mitigating the adverse impact of network effects on competition (see section I.2.1 and Annex A.1.2 for a discussion).

**I.75.** In *Facebook/WhatsApp*,[25] the Commission explored the role of network effects while assessing the merged entity's ability to exert market power in the market for consumer communications services. At the time of the merger, Facebook was a two-sided platform offering social networking, consumer communications and photo/video sharing functionalities, on one side of the market, and online advertising space on the other, collecting most of its revenue from advertisers interested in reaching Facebook's users. WhatsApp was the provider of a leading mobile app for consumer communications services, and at the time of the merger was not raising advertising revenue. The parties' consumer communications apps, namely Facebook Messenger and WhatsApp, were therefore directly competing with each other. The Commission analysed whether the larger network that would

---

[21] Commission Decision of 6 September 2018 in Case M.8788 – Apple/Shazam.

[22] CMA Decision of 16 November 2017.

[23] Commission Decision of 21 December 2016 in Case M.8180 – Verizon/Yahoo

[24] Commission Decision of 18 February 2010 in Case M.5727 – Microsoft/Yahoo! Search Business.

[25] See section 5.1 of *Facebook/WhatsApp*.

PX0498-044

result from the merger was such that it would substantially increase barriers to entry and confer market power to the merged entity.

**I.76.** The Commission started noting that these services are indeed characterised by significant network effects, as they generate utility to their users only as long as people they want to communicate with are also users of that service. It follows that the larger the user base is, the greater the likelihood that the people of interest are users of the app and the opportunities for contact acquisition and discovery are. Network effects were thus identified by the Commission as:

- a significant barrier to switching for users. Indeed, the need for the users to recreate their network could make it inconvenient for users to switch to an alternative provider of communications services;
- a barrier to entry and expansion for actual or potential competitors. Likewise, the presence of established players with a large user base may represent a significant barrier to entry and expansion as any actual or potential competitor would have to attempt to replicate these networks in order to become attractive to consumers.

**I.77.** Both parties had large networks of users: in July 2014 WhatsApp had close to 600 million users and Facebook Messenger's user base was [250-350] million[26] worldwide. However, the Commission considered that several factors could mitigate this potentially anticompetitive role for network effects:

- consumer communications services were characterised as a fast-moving sector, where any leading market position, even if assisted by network effects, was unlikely to be incontestable. This view was supported by evidence of a track record of entry by new players;
- users' tendency to multi-home limited the impact of network effects. The Commission observed that the market for consumer communication services featured a significant degree of multi-homing: users of these services had installed and used on the same handset several apps at the same time and they chose which app to use on a communication-by-communication basis, depending on the urgency and nature of the communication and the consumer communications app used by the addressee. Facebook Messenger and WhatsApp, the two apps operated by the merging parties, were the two main consumer communications services simultaneously used by the majority of users: between [20-30]% and [50-60]% of WhatsApp users already used Facebook Messenger and between [70-80]% and [80-90]% of WhatsApp users were Facebook users. The Commission considered this data as an indicator of complementarity in the use of the two apps, as opposed to close competition. Moreover, the Commission observed that multi-homing in this sector was facilitated by several factors which made switching between different providers of consumer communications services quite easy and inexpensive for users, a quite common feature of digital markets, as discussed in section I.2.1 and in Annex A.1.2. These factors included: consumer communications apps were typically offered for free or at a very low price; these apps were easily downloadable and could coexist on the same handset without taking up much capacity; once an app was installed on a device, users did not need to log in each time, so that they could switch from one to another seamlessly; and they were normally characterised by simple user interfaces so that switching required minimal learning costs. Multi-homing therefore mitigated the role of network effects as a barrier to entry or expansion in the market for consumer communications services since having a larger user base did not preclude actual or potential competitors from attracting users;[27]

---

[26] The range is due to confidentiality.

[27] Since the market investigation conducted by the EC revealed that some third parties believed that WhatsApp was already competing with Facebook in the provision of social networking services, in section 5.2 of *Facebook/WhatsApp,* the Commission also examined the horizontal effects of the merger on a broader potential market for social networking services. Including consumer communications apps in the potential market for social networking services implies that the number of providers of these services would substantially increase. In such a broad market, the tendency by users to multi-home would

PX0498-045

- whenever anything such as a physical network or a hardware solution needs to be replaced in order to use alternative products, customers may be somewhat locked-in. This was not the case here, as the only factor potentially locking in consumers was the message history they would lose if they changed communications app. However, users typically retain access to message history on their handsets.

**I.78.** The Commission also investigated whether the transaction could significantly strengthen these network effects. This could have occurred only through some form of integration between the parties' services that would have allowed them to combine their separate networks into one larger network. One form of integration suggested by third parties was cross-platform communication, namely enabling WhatsApp and Facebook users to communicate with each other. In this regard, the Commission noted that such integration would likely entail some technical hurdles, since it would likely require both the parties' users' involvement to match/create their profiles on both platform; indeed, matching WhatsApp users' profiles with their Facebook profiles (or *vice versa*) would be a necessary preliminary step for integration, and it would be complicated without the users' involvement since Facebook and WhatsApp used different unique users' identifiers: Facebook ID and mobile phone number, respectively.[28]

**I.79.** Also, enabling cross-platform communication would have required substantial re-engineering of the two services, given their important pre-merger differences. Finally, even if the parties had managed to overcome these difficulties and integrate their services, the net gain in terms of new members to the network would not have been so sizeable given the pre-merger substantial overlap between the parties' networks.

**I.80.** The Commission had previously assessed another merger involving consumer communications services: the *Microsoft/Skype* case.[29] Microsoft, which was active in the design, development and supply of computer software and related services, also operated two communications services: "Windows Live Messenger" (hereinafter "WLM") for consumers and "Lync" for enterprises. Skype offered a software for communications over the Internet. The parties' services presented three main functionalities: instant messaging (IM), voice and video calls. While the Commission did not conclude on whether the market should be fragmented by functionalities, the horizontal assessment focused on video calls since the transaction led to the creation of a market leader only with respect to this service. The Commission considered that network effects represented a barrier to entry and expansion in this market, as suggested by respondents to its market investigation, so that the merged entity's ability to exert market power post-transaction could be strengthened. However, the Commission pointed to the fact that most users make voice and video calls with their "inner circle", usually composed by four to six people, making it easier for these small groups to switch to other providers and mitigating the anticompetitive potential of network effects.[30] Moreover, the Commission observed that users multi-home to a certain degree. In particular, the merging parties submitted evidence revealing that [20-30]% of WLM users were also Skype users and that a significant number of Skype IM users were also connected to Yahoo! Messenger, WLM, and AIM and visited Gmail and Facebook.

---

be reinforced by the high degree of differentiation among the providers of these services, which would make customers use these services in a complementary way, depending on their needs. Based on this, the merging parties were not regarded as close competitors in this broader market encompassing communication apps and social network services.

[28] Note, however, that in August 2016, WhatsApp announced updates to its terms of service and privacy policy, including the possibility of linking WhatsApp users' phone numbers with Facebook users' identities. The Commission found that, contrary to Facebook's statements at the time of the merger investigation, the technical possibility of automatically matching Facebook and WhatsApp users' identities already existed in 2014, and that Facebook staff were aware of such a possibility; therefore, the Commission fined Facebook €110 million for providing misleading information.

[29] See section 2 of *Microsoft/Skype.*

[30] Please see Annex A.1.2 for a discussion on the local nature of network effects.

PX0498-046

Users' tendency to multi-home also mitigated the network effects' potential to confer the merged entity market power, since having a large network did not automatically imply that users would give up using competing consumer communications services.

**I.81.** Network effects play a role also in marketplaces connecting buyers and sellers. In these markets, as discussed in section A.1.1, network effects can be characterised as indirect: these are externalities generated by the intermediation activity carried out by the two-sided platform. In particular, the utility that the buyers derive from using the platform increases with the number of sellers active on the platform, and *vice versa*. The French CA analysed a case involving two such platforms in the *SeLoger/Logic-Immo* decision.[31] These companies overlapped in the online property ads market, where estate agencies[32] interact with Internet users seeking properties for purchase or rental. This market is characterised by cross-side network effects: estate agencies have a preference for portals that have a high audience and visitors have a preference for portals with a large number of property ads. Given the parties' horizontal overlap, the French NCA assessed whether the transaction could lead to horizontal unilateral effects in the online property ads market, in particular through price increases.

**I.82.** The French NCA also observed that the online property ads market is characterised by multi-homing on both sides of the market: estate agencies publish ads on several portals (multi-publication) and internet users perform searches on several websites (multi-consultation). Multi-publication is particularly facilitated for estate agencies who, differently than private individuals, have access to multi-publication software, specific services that enable estate agencies to insert their ads just once and to publish them automatically on several portals. Multi-consultation by internet users is facilitated by the low costs of making searches and by some services the property ads portals offer which also reduce the search time; users can, for instance, set up alerts enabling them to receive ads for the type of properties they are looking for. The French NCA observed that 50% of Logic-Immo users also consulted four other portals, and 50% of SeLoger users also consulted three other portals.

**I.83.** To assess the likelihood of unilateral effects, the French NCA went on to compute diversion ratio between the merging parties, since the higher these diversion ratios, the greater the risk of unilateral effects.[33] It noted that multi-publication reduced diversion ratios between the parties and, therefore, limited the merged entity's incentive to increase prices charged to estate agencies post-transaction. The intuition behind this conclusion is that following a price increase by, for instance, SeLoger, no migration of ads from SeLoger to Logic-Immo will be observed if those ads were already posted on both portals due to estate agencies' tendency to multi-publish; if pre-transaction migration of customers from one merging party to the other is missing or at least very low, the unilateral concerns arising from the transaction are also limited.

**I.84.** Cross-side network effects were also considered for their potential to alter the parties' incentives to increase prices and therefore limit the likelihood of unilateral effects ToHs. Indeed, the French NCA noted that a price increase on one side of the market could alter the attractiveness of the portal on other side. For instance, an increase in the price charged to estate agencies would reasonably lead to a fall in the number of listings published on this portal: cross-side network effects imply that a fall also in the portal's audience should follow. The relevant question was whether this mechanism was in place to such an extent that the price increase would become unprofitable. Therefore, the French NCA tried to assess the extent of these cross-side network effects and noted that:

---

[31] See section III.A.3 of *SeLoger/Logic-Immo*.

[32] Note that in the decision the French NCA refers to the group of agents who post property ads as "advertisers". For the sake of clarity, this is replaced by estate agencies in this report, but the "upstream" side of the market still comprises other categories of agents trying to sell or rent properties such as private individuals, notaries, brokers etc.

[33] The diversion ratio of a product A to product B indicates the fraction of sales lost by product A subsequent to an increase in its price to product B in the case of a low, but permanent price increase.

PX0498-047

- some portals succeeded in capturing a significant number of property listings despite having a limited audience, and they did so by adjusting their prices. An example is provided by Superimmo, a free website for professionals, whose market share in terms of number of ads was estimated at 15%, while that in terms of audience was below 3%. This ability of portals with limited audience to attract a high volume of ads is aided by multi-publication, which allows estate agencies to publish their ads also on portals with limited audience. In other words, multi-publication limited the extent of network effects on the upstream side of the market;

- external shocks leading to a fall in the number of property ads on a portal[34] did not consistently lead to a fall in the number of users. For instance, an approximate 30% fall in the number of property ads on Logic-Immo did not lead to a fall in its audience.

**I.85.** Consequently, while the existence of cross-side feedback effects was not questioned, it was concluded that their extent seemed to be limited on both sides of the market. Therefore, they did not sufficiently limit the merged entity's incentive to increase prices.

**I.86.** Two-sided markets were also prominent in the CMA's assessment of *Just Eat/Hungryhouse*. The parties were both food ordering marketplaces acting as intermediaries between final consumers and restaurants willing to offer home delivery services, and they were the only two such platforms in the UK. However, the CMA found evidence that other operators, such as Deliveroo and UberEATS, offering ordering and logistics services[35] constrained the parties to such an extent that they were to be considered part of the same relevant product market. These two sets of suppliers were jointly referred to as online food platforms and the competitive effects of the transactions were therefore assessed in the market for the supply of online food platforms in the UK. The CMA investigated whether the loss of competition between the parties could allow the merged entity to exert market power at the detriment of both categories of customers, i.e. consumers and restaurants.

**I.87.** The CMA acknowledged that the interaction between indirect network effects and customers' homing behaviour (i.e. whether they single- or multi-homed) on each side of the market had implications on the nature and level of competition in the market. Indeed, network effects alone, if strong enough, could generate feedback loops making it hard for smaller platforms to survive and ultimately leading to a competition *for* the market dynamics, as discussed in section I.2.1 and in annex A.1.2. However, multi-homing could allow more undifferentiated platforms to coexist. The CMA considered that restaurants multi-homed if they were listed on more than one platform; on the other hand, the observation that a consumer had an account on multiple platforms was not considered a sufficient indication of multi-homing. Indeed, the CMA considered that multi-homing on the consumer side only occurred when consumers used more than one platform in making their purchase decisions. This approach is in line with the literature on "multi-homing in usage" discussed in annex A.1.2.

**I.88.** In order to understand customers' behaviour, the CMA looked at the proportion of overlapping restaurants and consumers both between the parties and between Just Eat and third-party ordering and logistics specialists such as Deliveroo and UberEATS. In addition, the CMA commissioned two surveys. The main findings of these analyses were the following: the vast majority (92%) of restaurants listed on Hungryhouse were also listed on Just Eat, while the symmetrical figure was just 46%; the overlap between the parties in terms of restaurants listed was stronger than that between Just Eat and the main ordering and logistics platforms; single-homing was more common among consumers than restaurants. The implication of the latter finding was that competition was expected to be fiercer on

---

[34] Examples of external shocks examined include: changes in pricing strategy adopted by certain portals; and the termination of the "P3 offer", which was a particular offer introduced in 2010 combining the property ads of three portals including Logic-Immo.

[35] The difference between these operators and the parties is in the range of services offered to restaurants: indeed, they also manage the delivery function on behalf of restaurants.

PX0498-048

the consumer side. Indeed, when a high proportion of customers on one side single-home, the platform may exert market power with respect to the other group of customers, as the platform itself becomes the only way to access those single-homing customers. Moreover, the CMA found mixed evidence on the strength of indirect network effects[36] which, together with the widespread multi-homing on the restaurant side, made it reject the parties' argument that competition was *for* the market.

**I.89.** Finally, the CMA considered that when there are strong indirect network effects in both directions, these could generate negative feedback loops if, for instance, the platform increased prices on one side of the market. In other words, similarly to *SeLoger/Logic-Immo*, indirect network effects were regarded as a factor that could potentially limit the parties' incentives to raise prices.

**I.90.** Based on the above, the CMA rejected this ToH since the available evidence suggested that Hungryhouse exerted a limited constraint on Just Eat and there were other significant competitors in the market.

### I.4.1.2 Loss of competition in markets for attention

**I.91.** Many digital companies operate in two-sided markets where they offer their products or services free of charge to consumers while raising revenues on the advertising side of the market. As a consequence, radically different businesses may still compete with one another for consumer attention as the latter is vital to attract advertising revenues. This is discussed more thoroughly in section I.2.2 and in Annex A.2.

**I.92.** *Microsoft/LinkedIn*[37] represents a good example of this issue since, despite the transaction mainly entailed non-horizontal concerns, the Commission also took into account horizontal effects. Through this operation, Microsoft – whose offerings included, among other things, operating systems (OSs) for personal computers, cross-device productivity applications and online advertising (primarily with its web search engine, Bing) – acquired the professional social network (PSN) provider LinkedIn. The transaction created several non-horizontal relationships; yet, the Commission also investigated a horizontal effects ToH since the merging parties overlapped in the supply of online non-search advertising services.[38] Therefore, the Commission investigated whether the merger could raise concerns in this segment of the online advertising market. However, the Commission noted that the parties to the merger were small players in the highly fragmented advertising market led by Facebook and Google. Also, Microsoft's presence was limited to the advertising space offered on its own website,[39] while LinkedIn's was just related to non-search advertising on PSNs, a market where Microsoft was not active. Finally, respondents to the Commission's market investigation did not raise concerns, and the possibility that competition issues could come from data combination was also dismissed as discussed in section I.4.2.2.

**I.93.** Competing to attract consumer attention does not necessarily imply that a company exploits this attention for monetisation purposes. In *Facebook/WhatsApp*,[40] for instance, WhatsApp was neither selling advertising space nor selling user data. Yet, it did receive potentially valuable consumer attention. The Commission thus considered whether, post transaction, the merged entity could

---

[36] In addition, the CMA noted that the strength of network effects may not be constant over time and it is indeed likely to decrease at the margin, as the industry matures.

[37] See section 4.1 of *Microsoft/LinkedIn*.

[38] Indeed, Microsoft provided both search and non-search advertising, while LinkedIn was only active in the market for non-search advertising.

[39] Indeed, Microsoft had outsourced other non-search advertising activities to Verizon's AOL until 2025, thus withdrawing from selling online display ads.

[40] See section 5.3.2 of *Facebook/WhatsApp*.

PX0498-049

analyse WhatsApp users' data and use them to introduce targeted advertising on WhatsApp. This could have enabled Facebook to reinforce its position in the online advertising market with respect to two different possible counterfactuals:

- one where WhatsApp would have stuck to its pre-merger "no ads" strategy. In this scenario, the abovementioned strategy would have allowed the merged entity to publish ads on two outlets, Facebook and WhatsApp, potentially increasing their effectiveness and therefore making the merged entity more attractive to advertisers than Facebook alone would have been absent the merger;

- one where WhatsApp would have started providing advertising space. In this scenario, the transaction would remove a competitive constraint, potentially giving rise to unilateral effects in the market for online advertising as absent the transaction Facebook would have faced competition from WhatsApp. In assessing this ToH, the Commission noted that this strategy was possible, in theory, although it would have required WhatsApp to change its privacy policy. Nevertheless, departing from the pre-merger "no ads" product strategy might not be profitable for WhatsApp, as some users might decide to switch to other consumer communications apps. Furthermore, the Commission's investigation revealed that the vast majority of market participants believed that, post-transaction, there would still remain a sufficient number of alternative providers of advertising space competing with Facebook.

### I.4.1.3 Loss of potential competition

**I.94.** The most straightforward ToH that competition authorities consider in the context of a horizontal merger's assessment is the loss of actual competition: when one firm merges with a competitor, unilateral effects may result, that is, the merged entity may be allowed to exert market power as the competitive constraint that the merging parties exerted on one another is now removed. However, even when the merging parties do not significantly constrain one another at the time of the merger, competition authorities may investigate whether they would be likely to do so in the future. This may occur either because one of the parties is a potential entrant to a market where the other party operates or because one of the parties is a small entrant with significant growth prospects which, if realized, could come to challenge the market position of the other merging party. When a CA finds that merging parties are potential competitors, then it assesses whether the removal of this potential competitive constraint is likely to result in a substantial lessening of competition (SLC).

**I.95.** Following the Commission's Guidelines on the assessment of horizontal mergers, for a merger involving a potential competitor to have significant anti-competitive effects, two basic conditions must be fulfilled. First, the potential competitor must already exert a significant constraining influence or there must be a significant likelihood that it would grow into an effective competitive force. Second, there must not be a sufficient number of other potential competitors, which could maintain sufficient competitive pressure after the merger.[41]

---

[41] The OFT's Merger Assessment Guidelines entail a similar approach to that of the Commission. The OFT envisages two scenarios in which the removal of a potential entrant could lessen competition by weakening the competitive constraint on an incumbent supplier. The first scenario is that of loss of "actual potential competition" and involves a potential entrant that could have increased competition. In assessing whether this scenario leads to an SLC, the Authorities must consider the likelihood of such entry, whether such entry would lead to greater competition, and the existence of other potential entrants. The second scenario is that of loss of "perceived potential competition" where the merger may remove a firm which is not in the market, but which nevertheless imposes an existing constraint because of the threat that it would enter if existing firms in the market raised their prices. Low barriers to entry help make this scenario more likely. In assessing whether a merger involving a perceived potential competitor leads to unilateral effects, the Authorities will consider whether the presence of perceived potential competition resulted in the pre-existing prices of the incumbent firm (or firms) being lower than they would otherwise have been.

PX0498-050

**I.96.** The *Google/DoubleClick*[42] case provides a good example of this ToH. At the time of the merger, both Google and DoubleClick were active in the online advertising sector. The main players of the sector are web publishers, selling advertising space on their internet pages, and advertisers, buying this space to place their advertisements. Online ads can be categorized according to:

- the selection mechanism: search ads appear next to the results of search queries; non-search ads can appear on any web page and can be further divided into contextual, selected according to the context of the web page on which they appear, and non-contextual ads;
- the format: there can be text ads, exclusively composed by text, and display ads which include additional static or dynamic graphical elements;[43]
- the distribution channel: advertising space can be sold either directly by publishers to advertisers or through intermediaries.

**I.97.** Ad intermediaries are platforms that match demand and supply for advertising space. Ad intermediation services are offered by "ad networks" and "ad exchanges". The main difference between these two categories of agents is that ad networks aggregate publishers' inventory and re-sell it to advertisers, whereas ad exchanges are virtual marketplaces where publishers and advertisers conclude transactions.

**I.98.** Once the ad space is sold, advertisers and publishers often rely on ad serving tools to make sure that the correct ad appears (i.e. is served) in the right place of a website and at the right time.[44] Therefore, there is a vertical link between ad intermediation and ad serving services providers. Various combinations of intermediation services and ad serving technology are available to publishers to sell their inventory, giving rise to bundled and unbundled solutions, also referred to as integrated and non-integrated solutions. In sum, publishers can choose:

- direct sale of ad space and purchase of ad serving services;
- intermediated unbundled solutions, where the intermediary offers no ad serving tool or does not oblige customers to use it;
- intermediated bundled solutions, where intermediation services and ad serving tools are jointly supplied by the intermediary;
- direct bundled sale, where publishers which sell the inventory also provide in-house ad serving technology.

**I.99.** Figure I.10 below illustrates these combinations of intermediation services and ad serving technology. While bundled solutions were originally developed for search ads, the Commission noted that there had been a trend towards vertical integration for non-search ads as well.

---

[42] See section 7.2.2 of *Google/DoubleClick*.

[43] Since search ads tend to be almost exclusively text ads, whereas non-search ads can be either text ads or display ads, display is sometimes used interchangeably with non-search advertising, although this terminology is not precise as the two terms relate to different dimensions.

[44] More precisely, advertisers create advertisements and upload them onto an advertiser-side ad server, publishers enter the campaign terms of the ad (location, price and targeting criteria) into a publisher-side ad server, and when a web page is visited by a user the two sides of the server enter into communication with each other and the advertiser-side ad server chooses the appropriate ad to deliver on the web page.

PX0498-051

**Figure I.10: Possible arrangements for the supply of ad intermediation and ad serving services**



*Source: Lear*

**I.100.** At the time of the merger, Google was selling ad space on its search engine website Google.com only for search-based text ads; also, it provided ad intermediation services through its ad network (AdSense), selling both search and contextual text ads on the web pages of the publishers participating in the network; finally, it was offering a bundle encompassing ad space, intermediation services and ad serving tools.[45] Google was the leading provider of online advertising, and in particular of search ad space in the EEA. DoubleClick offered a display ad serving technology and it held a leading position on both the advertiser and publisher side of the market. Thus, in its merger investigation, the Commission assessed: 1) whether DoubleClick could have become a provider of ad intermediation services and, by extension, could have entered the market for the provision of bundled online ad intermediation and ad serving tools; and 2) whether Google could have become a provider of display ad serving tools. Both moves would have made the merging parties direct competitors, making the merger potentially anti-competitive.

**I.101.** The Commission noted that DoubleClick had already planned to enter the market for ad intermediation services. This was evident from DoubleClick's internal documents and the fact that the company had already launched an ad exchange platform that it was testing with some customers. The Commission went on to assess: 1) whether it was likely that DoubleClick would have evolved in an effective competitive force; and 2) whether there would have been an insufficient number of other competitors left to provide competitive pressure after the merger. In order to answer these questions, the Commission analysed in depth whether DoubleClick held unique advantages which could favour such a development. The Commission identified three types of possible advantages.

**I.102.** First, DoubleClick could have leveraged integration between its ad serving technology and ad intermediation services. However, the Commission noted that such a combination would not have been unique to DoubleClick, as the market had witnessed a trend towards vertical integration. In addition, Microsoft and Yahoo!, besides being vertically integrated, also operated a sophisticated ad

---

[45] In particular, Google offered "AdWords" for advertisers and "AdSense" for publishers.

PX0498-052

search business allowing them to offer a larger bundle also including the provision of search ads spaces. DoubleClick would have been unable to replicate such offer absent the merger with Google.

**I.103.** Second, DoubleClick could have leveraged its existing customer base as a key asset that would have allowed it to grow into an effective competitor to Google. However, the Commission first noted that the size of this customer base did not seem to be such that DoubleClick would enjoy a significant advantage relative to its future ad intermediation competitors. Moreover, the Commission noted that there would be difficulties for DoubleClick in converting customers of ad serving tools into exclusive intermediation clients as both publishers and advertisers, especially middle and large companies such as DoubleClick's customers, preferred to use a mix of outlets, i.e. they multi-home. Specifically, the Commission argued that if most of DoubleClick's customers were using several ad intermediation platforms, there was no apparent reasons for them to leave these platforms to start exclusively using DoubleClick's new ad exchange. Rather, it was likely that they would have indeed joined DoubleClick's intermediation platform and see if they could get a better price there than with competing intermediators. Thus, the existing business relations did not constitute a significant competitive advantage.

**I.104.** Third, DoubleClick could have leveraged information about consumer behaviour collected through ad serving services to supply an intermediation service that could not be matched by competitors who do not have access to such data. However, the Commission noted that contractual relations linking DoubleClick with publishers and advertisers severely limited DoubleClick's ability to use this data to deliver services to other advertisers or publishers. The Commission considered that it was unlikely that these contractual restrictions would be removed post transaction: first, DoubleClick probably lacked the ability to impose such changes to its customers, as the available evidence suggested its market power was not sufficient;[46] second, the existence of an incentive to try to do so was also doubtful, since such a fundamental change was considered a factor that could have persuaded many customers to switch to some alternative provider. Finally, such a data endowment would not have been unique and could be replicated by competitors.

**I.105.** The Commission concluded that, while it could not be excluded that DoubleClick would have grown into an effective competitor in the market for ad intermediation services, it was likely that a sufficient number of other competitors would continue to exert a competitive pressure to the merged entity post-merger.

**I.106.** The Commission also considered a second ToH related to the possibility that, absent the merger, Google could have become an effective competitor in the provision of display ad serving tools. In fact, it was working on a new ad serving product which was in the early stages of development. Yet, the Commission found no evidence indicating that Google was likely to grow into an effective competitive force. Indeed, it had no significant experience with display advertising or the advanced metrics required by customers purchasing display advertising.[47] Also, other potential entrants into ad serving, in particular ad agencies and web portals, were better placed in terms of customer relationships, as they also provided their customers with rich media ads. Indeed, the Commission noticed that recent entrants into the ad serving market included agents belonging to these two categories (among which Microsoft and Yahoo!). Thus, even if Google were to succeed in the development of its display ad serving technology, it would be just one of many competitors.

---

[46] Evidence of this kind included the fact that DoubleClick, in the recent past, had had serious difficulties in retaining some customers which were contemplating to switch to other providers, and managed to do so only through substantial price decreases.

[47] Indeed, the software providing ad serving tools also collects information about the user's online behaviour in the context of the placed ad, exploiting browser cookie technology. Therefore, advertisers can obtain information to monitor the effectiveness of their campaigns, and publishers can monitor the financial performance of the ad space sold.

PX0498-053

**I.107.** Similarly to *Google/DoubleClick*, loss of potential competition ToHs were also explored in the *IRI/Aztec* decision by the CMA. The merging parties overlapped in the supply of electronic point of sale[48] (ePOS) data gathered from retailers for fast-moving consumer goods (FMCG) for the purpose of market research. Analyses carried out by the CMA suggested that the parties were not close competitors as they specialised in the provision of different types of data, and this evidence was helpful in dismissing the actual competition ToH. Most of the horizontal assessment focused instead on the extent to which the merger could eliminate potential competition in the supply of disaggregated convenience ePOS data and in the supply of aggregated ePOS data.[49]

**I.108.** The CMA investigated whether, absent the merger, IRI was a potential entrant in the market for the supply of disaggregated convenience ePOS data, where Aztec held a market share of [90-100%]. This ToH was dismissed based on insufficient evidence that IRI would have entered this market: internal documents did not discuss this intention and stressed that IRI's core business was the provision of data relating to the health and beauty sector and it had no interest in the convenience sector. Likewise, the CMA dismissed another potential competition ToH regarding the market for aggregated ePOS data, albeit for different reasons: Aztec had tried in the past to develop a plan to enter this market without success due to the existence of high barriers to entry and was thus considered not to represent a significant competitive challenge going forward.

### I.4.1.4 *Loss of innovation*

**I.109.** Although there are different views on the relationship between product market competition and innovation, for the reasons pointed out in section I.2.3 and in Annex A.3.2, in recent years the European Commission has investigated whether and how mergers hamper innovation. When a merger combines two important innovators, or eliminates a firm with promising pipeline products, the transaction can lead to a significant impediment of effective competition. While the merger decisions reviewed here do not concern digital markets, they still provide useful insights as to how to assess mergers that threaten innovation and on the remedies that can be adopted to remove the related competitive concerns.

**I.110.** The *Medtronic/Covidien* decision provides a clear example of how concerns related to innovation can shape a CA's assessment in the medical equipment industry, which shares several features with the pharma industry. Thus, the literature commonly considers this industry as a sector where the loss of innovation ToH naturally applies. The merging parties were active in the medical devices sector. In particular, Medtronic was the market leader in the market for drug-coated balloons to treat vascular diseases. The Commission noted that few companies were active in this market and all of them exerted limited competitive pressure on Medtronic. The target company Covidien was developing its own drug-coated balloon, called Stellarex; this could be considered a late-stage pipeline product. The development of medical devices also entails a number of steps similar to those that will be described with reference to the *Dow/Dupont* case. Clinical trials represent a useful instrument to assess the stage of innovation of medical devices and pharmaceuticals.

**I.111.** With the first clinical trials ongoing and data available, pipeline products begin to be competitively significant. Clinical trials need to be run with a sufficient number of patients to be reliable. Therefore, they constitute a significant financial investment in the development cost of a new product. In this case, promising clinical trial results suggested to the Commission that Covidien was indeed likely to significantly constrain Medtronic in the near future.

---

[48] ePOS refers to a computerized system for recording sales in retail shops, using a laser scanner at the cash till.

[49] Data from a single retailer, which may help a brand owner understand its sales patterns within that particular retailer, are referred to as disaggregated ePOS data, as opposed to aggregated ePOS data which are useful to provide brand or category level totals for the UK as a whole and are obtained combining data from each retailer.

PX0498-054

**I.112.** The concern was that the transaction could have removed a credible competitor to Medtronic depriving the market of an important innovation; indeed, the merged entity would have had the incentive to discontinue the development of Covidien's pipeline product, making the transaction classifiable as a killer acquisition. The incentive by an incumbent to discontinue the acquired firm's pipeline products is discussed in section I.2.3 and in Annex A.3.1.

**I.113.** In order to ensure that the loss of potential competition and innovation would not materialise, Medtronic committed to selling Covidien's Stellarex business with all the assets necessary to bring the product to the market. Such assets included manufacturing equipment, related IPRs, scientific and regulatory material necessary to complete the clinical trials, and key personnel. In January 2015, Spectranetics Corporation acquired Stellarex.

**I.114.** Some more recent decisions by the Commission concerning the agribusiness sector highlight a different way in which horizontal merger may hamper innovation, that is affecting the merging parties' incentives to innovate post-merger. The *Dow/Dupont* decision formulated this type of loss of innovation ToH for the first time. The transaction involved two large suppliers of crop protection chemicals and would have created a market leader. The parties to the merger competed as vertically integrated developers and manufacturers of pesticides (herbicides, fungicides and insecticides).[50] Innovation is considered of particular importance for the crop protection industry, which is highly concentrated. Indeed, farmers value new products that are less toxic or more efficient against pests, which may become resistant to existing active ingredients over time. Innovation is therefore crucial to capture sales from competitors and to defend existing sales.

**I.115.** The idea behind loss of innovation ToHs is that firms not only compete in relevant product markets, but also in "innovation spaces". The first stage of the innovation space is the "discovery stage", which requires between three and four years at a minimum. This is followed by the "development stage", considered to require between five and six years, during which firms experiment with different formulations of active ingredients, and safety, efficacy as well as biology tests are conducted. Finally, R&D activities related to "early pipeline products" are carried out. Competition moves from innovation spaces to product markets when these products develop into "formulated products" and become subject to regulatory approval by agencies such as the US Environmental Protection Agency, or the European Food Safety Agency in the EU.[51]

**I.116.** The Commission's concern was that the merger threatened innovation competition by:

- removing the parties' incentives to pursue *ongoing parallel innovation efforts*: the Commission found, indeed, that the parties were competing in important innovation areas. Since innovating in this industry is a lengthy and costly process, the parties would have likely had the incentive to discontinue some of their pipeline products.
- removing the parties' incentives to develop and bring to market *new pesticides*: the merged entity's overall incentive to undertake innovation was considered to be lower than the sum of its parts.

**I.117.** This was confirmed by pieces of evidence such as the parties' internal documents and analyst presentations mentioning R&D synergies and the removal of duplication. The Commission found that the second effect was likely to be significantly larger than the first one.

**I.118.** Due to the innovation-related concerns, the Commission conditioned the clearance of the merger on the divestment of DuPont's global pesticides business, including its R&D division. The hypothesis was that the buyer of this divestment package would be enabled to replace the competitive

---

[50] Pesticides are products used in agriculture to control pests that can harm crops. Herbicides are pesticides that control weeds.

[51] The existence and results of the aforementioned tests, as well as the final approval, are all elements that help the reviewer assess the stage of a given innovation and, as a consequence, the potential of the firm producing that product. Such an assessment may be more complicated in other sectors.

PX0498-055

constraint exerted by DuPont so that the number of effective competitors in the innovation spaces where DuPont was active would remain unchanged. Including DuPont's R&D organisation and pipeline products was meant to ensure the viability and competitiveness of the divested business in the long run.

**I.119.** The concern which arose from the *Dow/Dupont* transaction is similar to that assessed by the Commission in the *Bayer/Monsanto* case. This transaction concerned seeds and pesticides. Seeds can be regarded as the most important input for farmers; traits are modifications to the genome of a seed that make the seed tolerant to certain herbicides or resistant to pests. Traits can be found in nature (native traits) or created with the help of biotechnological tools. They qualify as genetically-modified (GM) or non-GM traits depending on the biotechnology used to bring the trait into the seed. Bayer was a diversified company active in the pharmaceuticals, consumer health, agriculture and animal health business. This transaction mainly concerned its agriculture division (the "Bayer Crop Science division"). Bayer Crop Science operated three business segments: (i) Crop Protection (i.e. pesticides); (ii) Seeds and Traits; and (iii) Environmental Science. Bayer was the second largest supplier of pesticides worldwide. Monsanto was an agriculture company producing seeds for broad acre crops, fruits and vegetables as well as plant biotechnology traits. Monsanto was the world number one seeds and traits player. It also supplied pesticide products. The Commission considered that the transaction would have created by some distance the largest global integrated player in the seeds and pesticides sector.

**I.120.** As in *Dow/Dupont*, the Commission's competitive assessment addressed the overlaps between the parties' activities not only in existing products, but also in areas of innovation where both parties had active R&D projects. The Commission considered that both the traits and pesticides industries had features suggesting that a merger between two of only a few important rival innovators would likely lead to a reduction in innovation competition and gathered evidence supporting this view, including:

- evidence that the parties' pre-transaction incentives to innovate were driven by competition in innovation spaces; in particular, by the prospect of gaining valuable sales from rivals by engaging in successful innovation and, conversely, by the risk that successful innovation by rivals could lead to a loss of market share;
- evidence that the parties did take into account cannibalisation when introducing new products;
- evidence, including patent data, that Bayer and Monsanto were important and close innovators in several innovation spaces where few other alternatives were available.

**I.121.** The specific product markets where the Commission found that the transaction would have likely eliminated innovation competition were:

- GM or non-GM traits conferring herbicide tolerance or insect resistance; and
- herbicides or herbicide systems (i.e. herbicide combined with a trait conferring herbicide tolerance to a crop),

**I.122.** The approval of the transaction was conditioned on the divesture of an extensive remedy package. In particular, Bayer committed to divest:

- almost the entirety of its global broadacre seeds and trait business, including its R&D on GM and non-GM traits;
- its glufosinate assets and three important lines of research for herbicides.

**I.123.** The Commission concluded that the divestment package would enable a suitable buyer[52] to sustainably replace Bayer as a competitor after the merger.

---

[52] A buyer was also proposed by Bayer itself.

PX0498-056

### I.4.2. *Foreclosure ToHs*

**I.124.** When mergers bring together complementary products, rather than substitutes, a possible effect that is typically investigated in the context of merger control is that of a foreclosure of actual or potential competitors. A merger may result in foreclosure when actual or potential competitors' access to inputs or markets is hampered or eliminated as a result of the merger, thereby reducing these companies' ability to compete. Ultimately, the result is that of the merged entity being able to exert market power following the merger. In the context of digital markets, competition authorities have investigated:

- whether and to what extent network effects play a role in determining the likelihood of a foreclosure. This is discussed in section I.4.2.1;
- whether mergers that lead to the combination of data may confer such an advantage to the merged entity so as to impede effective competition. This is analysed in section I.4.2.2.

#### I.4.2.1 *Foreclosure with network effects and multi-homing*

**I.125.** As discussed in section I.4.1.1, network effects often characterise digital markets. The market for PSN services analysed by the Commission in *Microsoft/LinkedIn*[53] is no exception. LinkedIn was the leader in the market for PSN services, whereas Microsoft held a strong position in the markets for OSs and productivity software for PCs. The Commission explored whether the merged entity could leverage its strong market position from the markets for OSs and productivity software for PCs to the market for PSN services, thereby reinforcing LinkedIn's competitive advantage in this market and foreclosing its competitors. The strategies that could be pursued by the merged entity were: the pre-installation of a LinkedIn application on Windows PCs; and the integration of LinkedIn features into Office, while at the same time denying the same levels of integration to competing providers of PSN services, for instance through denial of access to Microsoft Application Programming Interfaces (APIs).

**I.126.** Both strategies were considered technically feasible and capable of foreclosing competing providers of PSN services; also, the Commission noted that the merged entity was likely to have the incentive to engage in such strategies, as also suggested by Microsoft's internal documents which explicitly mentioned the opportunities related to implementing these strategies post-transaction. The Commission then went on to assess the overall likely impact on competition of these practices: this is where network effects come into play. According to the Commission, network effects:

- could make foreclosure of existing competing providers of PSN services more credible through the following mechanism: the more LinkedIn's user base would grow, the more additional users would be more willing to join the network and less willing to join instead competing PSN service providers. The Commission envisaged that this trend could have continued up to the point that the market would "tip" in LinkedIn's favour;
- could represent barriers to entry for potential competitors, thereby exacerbating the anticompetitive potential of these foreclosing practices. Indeed, the Commission considered that potential entry of new PSN service providers could have, in principle, mitigated the impact of network effects, but concluded that this was not the case. Indeed, even though launching a new PSN service might not entail significant difficulties, the market investigation supported the view that having to achieve a sizeable user base might represent a high, sometimes unsurmountable, barrier to entry.

**I.127.** Another factor taken into account by the Commission for its potential to mitigate network effects was multi-homing; yet, in this case, it was considered insufficient. Indeed, multi-homing is likely to be more limited in PSN services as compared to consumer communications services: actively

---

[53] See section *4.2.3* of *Microsoft/LinkedIn*.

PX0498-057

engaging on PSN platforms requires time and effort as users need to create their profile and keep it updated, build their network and interact with new contacts. The Commission found through its market investigation that, pre-merger, although many users did have accounts on multiple PSNs, they actively used only one of them or, at least, they viewed one of them as their "main network"; that is, for what concerns competition, they were single-homing as discussed in annex A.1.2. This is because here network effects result from consumers *using* the service. Furthermore, the merger might even make multi-homing decrease for its potential to strengthen LinkedIn's market position and the subsequent reduced incentive for users to invest the effort associated with actively using competing PSNs.

**I.128.** As regards the ultimate impact of these strategies on consumers, the Commission noted that if these strategies were to succeed and marginalise existing competitors offering better privacy protection than LinkedIn, the transaction would have restricted consumer choice with respect to this important non-price parameters of competition. Through its market investigation, the Commission had found that privacy protection was indeed considered by users an important parameter of competition and driver of customer choice in the market for PSN services. Moreover, the Commission noted that there existed competitors offering better privacy terms than LinkedIn. For instance, in Germany and Austria, XING offered a greater degree of privacy protection than LinkedIn. During the registration process, XING asked users to actively accept XING's privacy policy and Terms & Conditions by ticking a box, whereas in LinkedIn this acceptance was automatic as users pressed the button "join now". Also, when XING introduced new services which had an implication on how it collected and/or used its members' data, it explicitly required active consent from the members, without making their ability to continue using the platform as it was subordinated to this consent. In contrast, when LinkedIn made changes to its collection, storing, processing or usage of personal data, it only informed the members of those changes and assumed that they agreed with those changes if they continued to use LinkedIn's services after they had been notified of the changes.

**I.129.** The Commission concluded that these practices, namely the pre-installation of a LinkedIn application on Windows PCs, and the integration of LinkedIn features into Office and denial of access to Microsoft APIs, were likely to foreclose LinkedIn's competitors and have a negative impact on competition. In order to remove these concerns arising from the transaction, the merging parties submitted two sets of commitments.[54] One set of commitments was meant to address the concerns related to the possible pre-installation of a LinkedIn application on Windows PCs; another set of commitments aimed at removing the concerns related to the possible integration of LinkedIn features into Office and denial of access to Microsoft APIs. The initial commitments proposed by the merging parties were revised to take into account the concerns emerging from the market test conducted by the Commission. The main obligations contained in the final version of the commitments included:

- granting access to all Office APIs and the associated Office Add-In Programs[55] to third parties which designed, operated and offered PSN services;

- allowing PC OEMs and distributors[56] not to install the LinkedIn application for Windows PCs, in the case such an application was actually built post-transaction, and not retaliating PC OEMs promoting Windows PC applications for third-party PSN Service Providers;

---

[54] See section 5 of the Commission Decision of 6 December 2016 in Case M.8124 – Microsoft/LinkedIn.

[55] The Initial Commitments proposed by the parties limited the obligation to grant access to the Outlook APIs and the Outlook Add-In Program.

[56] In the Initial Commitments, these obligations were limited to OEMs; the revision extended them to any OEMs' distribution partner who had the right to determine which applications are installed on the PCs manufactured by that OEM.

PX0498-058

- granting users the ability to disable and re-enable the "LinkedIn Features for Office"[57] and to remove the LinkedIn Windows PC application from their Windows PC OS.

**I.130.** The duration of these commitments was five years. The Commission considered that the Final Commitments were sufficient to eliminate the serious doubts as to the compatibility of the transaction with the internal market.

**I.131.** In *Microsoft/Skype*,[58] the Commission investigated a foreclosure ToH similar to that discussed in *Microsoft/LinkedIn*. It assessed whether post-merger Microsoft could have profitably tied Skype with other Microsoft products, leveraging its strong market position in the market for OSs and in that for productivity software, foreclosing alternative providers of communication software. As reported in section I.4.1.1, the Commission noted that the data submitted by the merging parties revealed a significant degree of multi-homing by users. The tendency of users to multi-home limited the benefits that tying would have delivered, as there was evidence that consumers did not simply use whatever communication service was provided with Windows and pre-installation did not prevent alternative providers of communication software from attracting them.

**I.132.** In *SeLoger/Logic-Immo*,[59] the French NCA also investigated the possibility that foreclosure of competing online property ads portals could follow the transaction as a result of the implementation of bundled schemes by the merged entity. Although the exact form that this bundling would have taken was unknown, the French NCA envisaged that such bundled schemes would have likely allowed estate agencies to simultaneously publish their ads on both SeLoger and Logic-Immo at a lower price than the sum of the prices to publish on the two platforms separately. After having concluded that the merged entity had the ability and incentive to pursue this potentially foreclosing strategy, as also suggested by the fact that the parties submitted that they had indeed plans to offer such schemes, the French NCA examined the likely impact on competition of these bundling strategies. It noted that cross-side feedback effects could, in principle, contribute to foreclose the parties' rivals, generating a spiralling negative effect: a fall in the number of ads published on competing portals, likely to result from the bundled schemes, could generate a fall in audience, which could, in turn, exacerbate the fall in the number of ads by reducing the attractiveness of the portals to advertisers. The French NCA considered that these spiralling negative effects could reinforce the position of the main portals and deteriorate that of the smallest players, generating concentration of the audience in a few portals. Yet, an examination of the characteristics and trends in the online property ads market did not support the view that bundled schemes and cross-network effects could have generated such a spiralling negative effect.

**I.133.** In particular, the French NCA noted that, as discussed in section I.4.1.1, a fall in the number of ads did not always lead to a significant fall in audience; and that differentiation among online property ad portals implied that portals with fewer ads could still better respond to some specific users' preferences. In addition, the French NCA noted that past market trends did not point to the existence of such a spiralling phenomenon. Indeed, it was observed that the leading portal, namely Le Bon Coin, had increased its position relative to competing portals without competing portals necessarily losing audience in absolute terms. In any event, the French NCA noted that Le Bon Coin would have continued to exert sufficient competitive pressure on the merged entity.

**I.134.** In *Google/DoubleClick*, the Commission investigated the existence of both direct and indirect network effects in, respectively, the ad intermediation and the ad serving technologies markets involved in the transaction. Direct network effects in the ad serving market imply that DoubleClick

---

[57] The "LinkedIn Features for Office" refer to any new functionality included in Office that involves LinkedIn profile and activity information being displayed in Office and be accessible to Users in Office.

[58] See section 3 of *Microsoft/Skype*.

[59] See section III.A.4 of *SeLoger/Logic-Immo*.

PX0498-059

would become more attractive to advertisers (publishers) because it already served many other advertisers (publishers). Indirect, or cross-side, network effects instead imply that the ad network would become more attractive to advertisers as the number of publisher increased, and *vice versa*; ad networks, indeed, are two-sided platforms connecting sellers and buyers of advertising space, similar to those discussed in *SeLoger/Logic-Immo*.

**I.135.** Direct network effects came into play in the assessment of foreclosure strategies based on DoubleClick's position in the ad serving market. DoubleClick had a wide customer base on both sides of the market which translated into the collection of a large amount of information about internet users' surfing behaviour. This information *as a whole* would be valuable for advertisers as it would allow to better target advertisements; also, it would be valuable for publishers since better targeted ads would entail a better performance of ads on their websites which could be translated into higher prices for the ad space they sold. First, the Commission noted that DoubleClick was contractually allowed to use the data generated by an ad it served only to improve its services to the advertisers whose ad was served when the data in question was first recorded; the same was true for the publisher side. Second, the Commission noted that the type of behavioural targeting that was at the core of these network effects was, at the time of the merger, an emerging technology that neither Google nor DoubleClick had developed. Therefore, it was concluded that in this competitive environment the ad serving tools market was not characterised by direct network effects.

**I.136.** As regards indirect network effects, it was investigated whether they could increase the merged entity's incentives to engage in different types of foreclosing strategies. While the presence of these cross-side network effects was not questioned, their strength was examined. The relevant question was, indeed, whether the network effects were strong enough to make the ad intermediation market "tip" in the merged entity's favour. The Commission observed that its market investigation provided evidence that the ad intermediation market was characterised by significant entry and competition and that ad networks were able to compete even with a small number of publishers participating in the network. Also, the available evidence suggested that customers tended to multi-home: both publishers and advertisers, especially medium and large companies, typically used more than one intermediation platform at the same time. Indeed, both have an incentive to do so: publishers wish to maximise the probability of selling their whole inventory, advertisers wish to buy the desired ad space at the best conditions possible. The data provided by the parties indicated that more than half of DoubleClick's customers used at least two ad networks, and some of them more than five. Multi-homing was facilitated by the low or non-existent cost of joining an ad network; and by the high degree of interoperability characterizing the ad serving tools.[60] For these reasons, indirect network effects were considered unlikely to induce the market tipping and this represented an important argument for the dismissal of the foreclosure ToHs considered by the Commission.

*I.4.2.2 Big data as an essential input to compete*

**I.137.** In traditional merger control, foreclosure ToHs are formulated when the transaction combines products that are complementary with each other and, as a result of the transaction, the merging parties' rivals are refused access to an important input. As discussed in section I.2.4 and in Annex A.4, data represents an increasingly important asset for firms operating in digital markets. This section discusses how, in these markets, foreclosure can result from the combination of two previously independent datasets. The data a firm owns can, indeed, enters its productive process in several ways and, based on how this occurs, the creation of a larger or more diverse dataset resulting from a merger

---

[60] The Commission observed, indeed, that there were no major problems of intercommunication between an advertiser using a provider of "advertising ad serving tools" and a publisher using a different provider of "publisher ad serving tools" or its own in-house technology. See section I.2.1 and Annex A.1.3 for a discussion of the role of network interoperability in restoring competition in markets characterised by network effects.

PX0498-060

may give the merged entity a competitive advantage. However, this potentially negative effect on competition does not result from the mere exertion of market power: rather, it is the result of efficiencies realized by the merging parties that place it ahead of its competitors. In a sense, the restriction to competition comes from the merged entity becoming better at what it does and providing more value to its customers.

**I.138.** This possibility was the main competitive concern raised in relation to the *Apple/Shazam* transaction.[61] Apple and Shazam were active in the digital music industry, albeit with different roles. Other than designing, manufacturing and selling mobile devices and personal computers, and developing the operating systems installed on these devices, Apple operated Apple Music, one of the leading music streaming platforms. Shazam offered a leading music recognition app for mobile devices and personal computers and was also active in the online advertising market. One of the channels through which it generated revenues was the licensing of music data and analytics services.

**I.139.** The Commission investigated two main ways in which data combination could lead to diminished competition. First, the Commission explored whether the transaction would give Apple access to commercially sensitive information about competing music streaming platforms, in particular Spotify,[62] that could put them at a competitive disadvantage in the market for digital music streaming apps and lead to their foreclosure. Indeed, data collected by Shazam included:

- information regarding the user's identity. This information varied depending on whether the individual user decided to register or opted to be anonymous. In particular, it could consist in an email address or Facebook identifier for registered users, and in an advertising identifier generated for anonymous users;

- information about the presence of non-pre-installed digital music streaming apps on the mobile devices where Shazam is installed;

- some additional pieces of information for those users who have connected their Shazam account with their Spotify account, including the user's display name, information about the user's followers, the user's Spotify identifier, as well as (subject to the user's consent) the user's birthdate, country, email address, account type (freemium or premium), top artists and tracks, and currently playing track.

**I.140.** Shazam's customer information was considered commercially sensitive as it could help Apple improve the effectiveness of its customer acquisitions strategies by targeting its rivals' customers through advertising or marketing campaigns. The Commission went on to assess whether Apple would have the ability and incentive to use this information to pursue such a strategy and what the overall impact of the strategy on competition would have been:

- as regards the ability, the Commission considered that, while from a purely technical point of view this strategy would have been feasible for Apple, there might exist legal or contractual limitations to the use of Shazam's customer information post-transaction. Shazam was able to access data about which apps were installed on a user's Android device because the Android Developer Guidelines allowed it, but this could change at any point in time and was beyond Apple's control.

- regarding the incentive, the Commission noted that Apple's submissions and internal documents stressed that marketing efforts target new subscribers rather than switchers. Moreover, Apple submitted that it planned to change Shazam's data collection practices to bring them in line with Apple's policy: this would have entailed that Shazam would no longer collect information on other apps installed on the user's mobile device unless this was consented to by the app developer.

---

[61] See section *8.4.2* of *Apple/Shazam.*

[62] Spotify was, indeed, the market leader in the European Economic Area (EEA), while Apple Music had rapidly become the second largest provider of music streaming services in the EEA since its launch in 2015.

PX0498-061

▪ in any case, the Commission concluded that the overall impact of these practices on competition would have likely been limited. Indeed, it noted that the same customer information would have been available to many other players post-transaction; Facebook and Twitter, for instance, collected information on their users' interests. Apple could have relied upon alternative providers to pursue these targeting strategies also before the transaction. In other words, the customer information in question was not unique to Shazam and it was not considered such that it could materially increase Apple's ability to target music enthusiasts.

**I.141.** Further, the Commission considered whether the data collected by Shazam could have been used to improve existing functionalities, or to offer additional functionalities, on digital music streaming apps, thereby qualifying as an important input with respect to the provision of digital music streaming services. For instance, one such improvement could have been offering better targeted music suggestions to users. If this was the case, denying access to these data to competing providers of digital music streaming services could have significantly impeded competition in this market generating an exclusionary effect. While the Commission considered that the merged entity was likely to have the ability and incentive to use Shazam's data for similar purposes, it also noted that these strategies were unlikely to result in the foreclosure of Apple Music's competitors, and, more generally, to have a significant negative impact on competition. This conclusion was reached based on evidence from the Commission's market investigation which suggested that the type of data collected by music recognition apps did not appear to be an important input. The Commission compared Shazam's data to other available datasets on users of digital music services based on the so-called "four V's":[63] the variety of data composing the dataset; the speed at which the data are collected (velocity); the size of the data set (volume); and the economic relevance (value); and it concluded that Shazam's data was not more comprehensive than other datasets available in the market, it was generated at a lower speed and with lower per user engagement, and had never been considered a strategic asset by the merging parties. In conclusion, even if the merged entity were to deny Apple Music's rivals access to Shazam's data, the impact on their ability to compete would have likely been minimal.

**I.142.** The possibility that a combination of datasets held by merging parties gives them a competitive advantage that may diminish competition was also investigated by the Commission in its *Facebook/WhatsApp* decision[64]. At the time of the merger, Facebook collected user data, although it did neither sell them nor provide data analytics services in any market as a stand-alone product separate from the advertising space itself.[65] Yet, the data it collected was extremely valuable since it could be used to make advertisements as "targeted" as possible for each user, which increases the effectiveness of the ads and, therefore, attractiveness of the advertising space sold by Facebook. The possibility to infer the individuals' interests, indeed, allows advertisers to concentrate their marketing efforts towards users that revealed certain preferences or needs, and that are supposed to be the most receptive audience for the products or services they are promoting.[66]

---

[63] These are four relevant big data metrics as suggested in "Competition Law and Data", 10 May 2016, a joint report of the Bundeskartellamt the German National Competition Authority ("NCA") and the French Autorité de la Concurrence , available at http://www.autoritedelaconcurrence.fr/doc/reportcompetitionlawanddatafinal.pdf.

[64] See section *5.3.3* of *Facebook/WhatsApp*.

[65] Facebook made available certain non-personally identifiable data (aggregate or anonymous data) to advertisers to help measure the effectiveness of their ads. For example, Facebook shared basic ad performance information with advertisers, such as the number of people who saw or clicked on their ads, the cost of those ad placements, and the number of people who "converted," for example, by visiting the advertiser's website after viewing an ad on Facebook.

[66] Online advertising based on "behavioural targeting", in particular, is a form of advertising whereby online ads are served to specific users based on (comprehensive) profiles of the users generated by observing their web surfing habits. Traditionally, search targeting was considered more effective than non-search targeting, as the former is based on self-revealed interests (via the search query) and the latter was derived by an indirect and usually less precise inference of the consumer's interests.

PX0498-062

**I.143.** The Commission explored whether post-merger Facebook could have started collecting data from WhatsApp that could have enabled it to better target advertising for those WhatsApp users that were also Facebook users, thereby making Facebook more attractive to its advertising customers and foreclosing other providers of online advertising space. However, the Commission noted that before the transaction WhatsApp was not collecting user data that could be valuable for advertising purposes (for example, information concerning age, verified name, gender, social group, activities, consuming habits or other characteristics); the only data WhatsApp was storing about its users were their user name, picture, status message, phone number and the phone numbers in their phone book. Yet, it could have started collecting additional valuable data including age, gender, country, and message content. The Commission considered that such a strategy would have required WhatsApp to change its privacy policies, with potentially negative reactions by some users that could limit the economic incentive for the merged entity to pursue it. In particular, the Commission envisaged that users who valued privacy protection might have decided to switch to other messaging application they perceived as less intrusive.[67] In other words, the potential perception by users of their personal data as a price was considered as a driver of competition. Moreover, the Commission noted that most respondents to its market investigation pointed out that, post-transaction, there would remain a sufficient number of alternative providers of advertising services competing with Facebook. The ToH was thus dismissed.

**I.144.** The *Google/DoubleClick* merger[68] also had the potential to produce a similar effect, i.e. that of making the merging parties more attractive to advertisers through the combination of diverse datasets. More specifically, the merger would have combined the search information collected by Google and the browsing information collected by DoubleClick. In dismissing this ToH, it was crucial to note that some clauses in DoubleClick's contracts with advertisers prevented DoubleClick, and hence the merged entity, from using data about users' web surfing behaviour generated by their ads to better target ads from other advertisers and, mostly, that the combination of data about searches and data about users' web surfing behaviour was already available to some of Google's integrated competitors, notably Yahoo! and Microsoft.

**I.145.** In *Microsoft/LinkedIn*[69] the Commission assessed whether data combination could strengthen the merged entity's position in the market for online advertising. Data available to the parties included email or other contact information, users' personal information such as information about an individual's job, career history and professional connections and search behaviour information that could be used for advertising purposes and thus sold to advertisers. The Commission considered that the combination under the same ownership of two previously independent datasets could have increased the merged entity's market power in a hypothetical market for the supply of this data or increased barriers to entry/expansion in the market for online advertising or simply removed the pre-merger competitive constraint the parties were exerting on each other in the market for online advertising based on the data they controlled. This ToH was dismissed mainly based on the evidence that after the transaction there would have still existed a large amount of data valuable for advertising purposes that was not in the merged entity's exclusive control so that it was unlikely to raise barriers to entry/expansion in this market.

---

Non-search advertising was mainly used to create brand awareness. The development of increasingly sophisticated behavioural targeting technologies has been closing the gap between the two in terms of effectiveness.

[67] After the announcement of WhatsApp's acquisition by Facebook and because of privacy concerns, thousands of users downloaded different messaging platforms, in particular Telegram which offers increased privacy protection.

[68] See section 7.3.3 of *Google/DoubleClick*.

[69] See section 4.1 of *Microsoft/LinkedIn*.

PX0498-063

**I.146.** A similar assessment with respect to online advertising was conducted by the Commission in *Verizon/Yahoo*[70]. The transaction gave rise to several horizontal overlaps, among which that in the provision of online advertising services.[71] The activities of the merging parties' users generated somewhat similar data that is valuable for advertising purposes. The Commission investigated whether data combination could result in a restriction to competition. Factors considered to dismiss this ToH included the existence of a large amount of Internet user data available to the parties' competitors after the transaction and evidence emerging from the Commission's market investigation which suggested that the data collected by the parties could not be characterized as unique. One customer, in particular, noted that it expected the increased data capability resulting from the transaction would enable the merged entity to improve its competitiveness against existing stronger competitors.

**I.147.** The cases discussed above mainly concern combination of data regarding consumers, making merging parties more attractive for advertisers. In other cases, data is valuable for firms as it may increase their attractiveness to final consumers, to the extent that owning richer datasets enables them to offer better services/products. This is the case, for instance, of search engines: as explained in sections I.2.1 and I.2.4, data constitutes a key input to train the algorithms necessary to produce an accurate engine, and the more data is used the more accurate search results are. This learning by doing generates "network-like effects" which contribute to making barriers to entry in this market quite high. An important player in this sector such as Microsoft acknowledged that a new entrant would have to bear significant costs related to the necessity of having a large dataset.[72] However, it is also agreed upon that the value of data decreases with scale, i.e. that data has decreasing returns.[73] It is therefore critical to establish what amount of data is enough to credibly compete in the market for the supply of search engines and, as a result, in the market for search advertising. Indeed, search engines are two-sided platforms which connect users and advertisers: they compete to attract users to whom they offer their services for free, and advertisers who pay for their ads to achieve a large audience. For the reasons just outlined, ToHs related to data combination were investigated by the EC in *Microsoft/Yahoo! Search Business*, which was the first merger decision involving two major search engines. The transaction involved the merging parties' Internet search platforms and their search advertising services. The concern was that, following the merger, the costs that existing or potential competitors would have to bear to represent a credible competitive constraint would be even higher, with subsequent unilateral effects in the online advertising market, i.e. higher prices charged to advertisers. However, the Commission concluded that the larger scale achieved thanks to the merger would have allowed the merged entity to represent a more credible competitor to Google and this would have not been possible in the absence of the merger.

---

[70] See section 5.1 of *Verizon/Yahoo*.

[71] Other areas of overlapping included the provision of general search services, consumer communication and email services, and digital content of different types.

[72] See paragraph 111 of *Microsoft/Yahoo! Search Business*.

[73] For contributions on this topic, see section I.2.4 and Annex A.4.

PX0498-064

## I.5. GENERAL LESSONS FOR THE ASSESSMENT OF MERGERS IN DIGITAL MARKETS

**I.148.** There is a concern that merger policy has put too much weight on the risk of incorrect intervention (type I error) compared to incorrect clearance (type II error) when assessing mergers in the digital sector, leading to increased concentration in digital markets.

**I.149.** The nature of competition in many digital markets may change the terms of the usual trade-off between type I and type II errors. Network effects often make the structure of digital markets quite concentrated and barriers to entry rather high. Big data may contribute to such outcomes, to the extent that the data endowments enjoyed by incumbents provide a competitive advantage that makes it even more difficult to challenge them. The main mechanism left to discipline incumbents is that of competition *for* the market, i.e. that potential and actual entry mitigate the ability of incumbents to exert market power. This makes potential competitors even more valuable than they usually are in traditional markets. As a result, type II errors may be particularly costly. In other words, certain features of digital markets may justify some changes in the way mergers in the sector are typically assessed.

**I.150.** The economic literature (see section I.2.3 and Annex A.3.1 in particular) suggests that incumbents may have stronger incentives than, for instance, venture capitalists, to acquire entrants in the process of developing a competing product. Our review of past transactions carried out by Amazon, Facebook and Google has confirmed that incumbents of digital markets employ significant resources to acquire a large number of firms; that such firms are often very young (four-year-old or younger in nearly 60% of cases); and that they are often complementary to the business model of the acquirer.

**I.151.** Mergers may prevent the development of competitors in two main ways:

- directly, when the incumbent of a digital market acquires an entity that is an actual or potential competitor;
- indirectly, when the incumbent acquires an entity that supplies a complementary product/service, thereby depriving its direct (actual or potential) competitors of the opportunity to improve their products and better challenge the incumbent.

**I.152.** To assess whether a merger will be detrimental to competition, CAs would need to predict the evolution of the target in the absence of the merger, i.e. the counterfactual. This is especially challenging when, as is often the case, targets are young firms at the early stage of their development. In markets as dynamic as digital markets, evolution may be the result of the target's independent decision to change its business model and/or investments made by venture capitalists and/or the decision of other entities in the industry to purchase the target and integrate it in their own operations. In other words, when defining the counterfactual to a merger, CAs may need to consider the ability of the target to develop, on its own or attracting outside resources, as well as the likelihood of an alternative buyer coming along. Similarly to what investors do, based on business plans and on the characteristics of the markets concerned by the transactions, CAs should seek to evaluate the prospects of the target.

**I.153.** Such an exercise is inherently complex. One way to deal with such complexity would be to improve the information set that CAs typically rely on when evaluating mergers. First, while very resource-intensive, it may be helpful in some instances to use dawn raids in the context of merger investigations, as this may uncover valuable evidence such as the future plans of the target and whether the incumbent perceived the target as a threat.[74] CAs typically rely on internal documents

---

[74] This would not be unprecedented. The European Commission carried out dawn raids at the premises of merging parties for the purpose of its decisions of 30 January 2008 in Case /M.4734 – *Ineos/Kerling* and of 19 October 2011 in Case M.6106

PX0498-065

supplied by the parties in response to requests for information; such evidence may in some instances be biased by the obvious incentives of the merging parties to have the merger cleared. CAs face relevant information asymmetries compared to the merging parties and need a more reliable source of unbiased information.

**I.154.** Another source of information that can be used by CAs in this context is the value of the acquisition. The value of a company at a given time represents the present value of future profits; the maximum willingness to pay of the acquirer for the target includes this plus the incremental profits of both the acquirer and the target that are due to the merger, i.e. the additional profits realized by the merged entity thanks to the merger. The value of the transaction will lie somewhere in between the current value of the target and the maximum willingness to pay of the acquirer. While incremental profits may derive from both efficiencies and anti-competitive effects, money spent to acquire the target can provide an insight into the relevance of the transaction. Thus, when particularly high, the value of the transaction may justify a more in-depth analysis of the merger.

**I.155.** CAs may benefit from a better understanding of the key markets in the digital sector, such as those for online advertising, which may represent a possible blind spot of CAs. In some cases, CAs have pursued ToHs where, in the absence of significant horizontal overlap between the merging parties, these were found to compete with one another for consumer attention as a means to attract advertising revenue (this was the case, for instance, in *Microsoft/LinkedIn* and in *Facebook/WhatsApp*, described in section I.4.1.2). However, the way this assessment was carried out leaves some doubts: the market where the effect of the merger was assessed was a very broad one, comprising all or most providers of online advertising space; and a very fragmented one, with several suppliers active in it. Virtually, no merger would raise competitive concern in such a market.

**I.156.** Defining such a broad market conflicts with the perception that many firms in the digital sector would appear to be holding significant market power, either in advertising or in related businesses. For instance, Facebook would seem to be commanding higher advertising prices than other social networks (as shown in section II.2.2.3) and has been under intense scrutiny for the way it handles its users' data (which may be viewed as an expression of market power); Google appears to have no credible rivals in search and, as a result, in search advertising.

**I.157.** Moreover, recent academic contributions on the topic of online advertising have put into question key assumptions that have been used to assess mergers in digital markets. Multi-homing has been consistently regarded as a factor that mitigates the anticompetitive effects of mergers in markets characterized by the presence of network effects (as discussed in section I.4.1.1 and I.4.2.1). However, in the online advertising sector, when multi-homing is across the merging parties, this may mean that the subset of such multi-homing users becomes exclusive to, and a source of market power for, the merged entity as a result of the merger since that subset can only be reached through the merged entity (see section I.2.2 and Annex A.2 for a discussion). In this context, multi-homing should be a reason of concern rather than a mitigating factor.

**I.158.** This means that we are probably missing something about how online advertising markets work. The first step in such an assessment would be understanding how advertisers make their choices, i.e. what drives their decision to use one platform over another. To the extent that advertisers place value on certain characteristics of a platform, and inasmuch a merger affects these characteristics, it may be possible for the merged entity to exert market power post-merger. Based on insights from the economic literature, as will be explained in the assessment of the *Facebook/Instagram* decision in section II.2.1.3, we have tentatively identified three potential drivers of demand choices: user base's exclusivity, platform's size and ability to target ads. However, more research is needed on this crucial

---

– *Caterpillar/MWM* in 2011. More recently, the Hungarian Competition Authority was authorized to carry out a dawn raid for the purpose of its decision of 10 May 2018 in the *DIGI/Invitel* case.

PX0498-066

point, and perhaps the best instrument would be that of a comprehensive market study into the digital advertising sector, where the CMA could use its investigatory powers to examine how these markets work.

**I.159.** Finally, the time frame of two years, which represents the default for the assessment of some future market developments, such as entry, within merger investigations in the UK, may be somewhat limiting and could be extended when dealing with mergers in digital markets. For instance, Snapchat, now a significant competitive force in the social network market (see section II.2.2 for more details) was founded in 2011, went through several changes in terms of functionalities supplied to users, and was still operating at a loss in 2018.[75] Even in the fast-moving digital landscape, becoming successful can take more time than two years.

**I.160.** Even after reinforcing the tools available to CAs, there will always be a certain degree of uncertainty as to the counterfactual chosen for the assessment of a merger. As described in section I.4.1.3 (and in Part II of this report), when CAs have evaluated potential competition ToHs in digital markets, they have been quite conservative in their evaluations , often dismissing the fact that the target was on a quite clear growth path and it was planning to adjust its business model in a way that would have put it even more in competition with the acquirer. This was usually in light of uncertainty in growth prospects and in the likelihood that the targets' plans would have come to fruition.

**I.161.** Future plans, no matter how carefully set out, are always subject to being unmade by unforeseen market events. This may mean that CAs would need to be willing to accept more uncertainty in their counterfactual. What we are proposing entails a departure from the current practice of CAs. Assessments to be carried out in the context of merger control would inherently become more speculative than has been the norm so far. On the contrary, the approach requires to be somewhat imaginative with the definition of the counterfactual. The counterfactual may require for instance to predict how companies will evolve their business model and how successful they will be; and whether an alternative, pro-competitive transaction will come along.

**I.162.** Such a change in approach entails some risks. Given its more speculative nature, it is possible that the counterfactual imagined by the CA will never come to pass, increasing the likelihood of over-enforcement, prohibiting mergers that would not have actually resulted in a restriction of competition. Another risk is that of merger control becoming less predictable in its outcomes, with consequences on firms' incentives to invest. It is paramount that CAs seek to minimize these risks: this can be accomplished by relying on a more comprehensive information set and by gaining a better understanding of the key markets in the digital sector, such as those for online advertising.

**I.163.** Another risk is that of CAs falling short of the burden of proof they are required to satisfy to block a merger, thereby having their decisions successfully challenged in court. However, for CAs to be more effective in the enforcement of merger policy, it may be necessary to test the boundaries of the legal tests and constraints that CAs face. The characteristics of digital markets, and the shape that competition takes within them, may justify a more risk-taking approach.

---

[75] https://qz.com/1200008/snapchats-snap-q4-2017-earnings-in-charts/

PX0498-067

# PART II. CASE BY CASE REVIEW OF PAST MERGER DECISIONS

# TAKEN BY UK AUTHORITIES

PX0498-068

## II.1. INTRODUCTION AND METHODOLOGY FOR PART II

**II.1.** Part II of the report takes stock of the general lessons drawn in Part I to address the two remaining research questions:

- assess the UK cases and evaluate whether the decision that the Authorities have come to was reasonable, evaluating whether ToHs have been investigated correctly and whether any relevant ToH has been omitted from the Authorities' analysis (research question 2, or methodology assessment);
- evaluate market evolution following the mergers to ascertain whether the merger has led to a detrimental outcome (research question 3, or market outcome assessment).

**II.2.** The methodology assessment of UK cases involves evaluating whether the Authorities' decision to clear the merger was reasonable based on evidence that was, or would reasonably have been, available at the time. This assessment amounts to analysing two key questions:

- were the ToHs pursued by the Authorities addressed correctly?
- was there any other ToH, in addition to those considered by the Authorities, that it would have been reasonable to pursue?

**II.3.** In order to address these questions, we propose an approach that can be summarised in the following three steps:

- for each case, identify all the ToHs pursued by the Authorities and the key arguments underpinning them;
- discuss the key arguments underpinning the decision;
- analyse the completeness of the ToHs pursued.

**II.4.** The decision to clear or block a merger is based on a series of arguments used by CAs to foresee the likely consequences of the proposed transaction. Only a subset of these arguments is key to the analysis and the first step of the proposed approach consists in identifying these key arguments, namely those arguments that determined the type of decisions made by the CA so that if one of them proved wrong or invalid, the decision reached by the CA might have been inappropriate.

**II.5.** These key arguments may contain factual assertions and logical proposition. A factual assertion is the description of an observable phenomenon. In general, it involves no judgment as it consists in a pure observation of a market characteristic, such as the size of the market shares, the number of competitors, the amount of available production capacity, or the type of competition that prevails in a market. Hence, assessing their validity means verifying whether each one was true or false at the time when the decision was taken, and whether its status has changed since then. However, there are cases in which these characteristics cannot be quantified or described in an uncontroversial manner.

**II.6.** A logical proposition, instead, consists in a reasoning that on the basis of a set of premises, which consists of factual assertions, derives a conclusion. There are two notions of validity that apply to a logical proposition. One refers to the internal consistency of the reasoning: a logical proposition is valid if, when the premises are true, the conclusions are also true. If the conclusions do not logically follow from the premises then the proposition is inconsistent and cannot be relied upon. It is important to verify the internal consistency of each key logical proposition on which a decision is based. The second notion of validity concerns the economic theory that underpins the reasoning: a logical proposition is valid if the conclusion is related to the premises by a valid economic theory.

**II.7.** It is worth highlighting that the validity of a proposition does not necessarily correspond with its truthfulness. Indeed, if one or more factual assertions are false, then the logical proposition based on

PX0498-069

these premises will be false as well. However, it may still be valid if it is internally consistent and relies on a valid economic theory.

**II.8.** The second step of the proposed approach amounts to verifying the truthfulness of the factual assertions, and the validity of the logical propositions contained in the key arguments. For instance, the Authorities may have relied on questionable assumptions when estimating a certain phenomenon or effect; or may have wrongly interpreted evidence, thereby coming to a questionable conclusion.

**II.9.** Finally, the third step entails assessing whether the Authorities have exhaustively addressed all the meaningful ways the merger could have affected competition. The evidence collected in Part I is particularly helpful in this respect, providing indications on the possible ways that a merger can restrict competition in digital markets, some of which might have been overlooked by the Authorities.

**II.10.** While the Authorities carried out detailed analyses aimed at ascertaining the possible effects of the various mergers, in the methodology assessment we only report the key arguments behind the decision. Further, we chose to focus mostly on the gaps in the Authorities' analysis, since highlighting these may represent the best way to contribute to the current debate on how to shape competition enforcement in the digital sector.

**II.11.** The market outcome assessment of a merger case generally aims at understanding whether the decision to clear the merger has harmed consumers, compared to an alternative decision. When the decision is to clear the merger, the market outcome assessment entails the comparison of the market development that followed the merger with the one that would have realized had the merger been prohibited: this is the so-called counterfactual scenario. The standard evaluation techniques estimate the counterfactual by relying on the comparison of the relevant market outcomes before and after the merger and/or across treated and control group of firms (or markets). The effect of the merger is identified as the difference between the factual and counterfactual scenarios.

**II.12.** The standard evaluation techniques outlined above cannot be used for the evaluation of the UK cases for a number of reasons. Potential competition was often the main ToH analysed by the Authorities: the identification of the counterfactual would thus require estimating what would have been the evolution of the target had the merger not realized. As a result, the pre-merger situation cannot be relied upon to get a sense of the situation that would have arisen had the merger been prohibited. Moreover, these mergers were typically global in terms of their geographic scope: this means that there is virtually no geographic market that was unaffected by the merger and that can be used to estimate the counterfactual.

**II.13.** Thus, we evaluate how the markets affected by the mergers have evolved since the merger and rely on qualitative evidence to investigate whether, and to what extent, the merger determined the outcome observed. For each case, we identify the relevant competitive parameters to assess market outcomes and assess their evolution since the merger date. Qualitative evidence coming from industry reports and interviews with merging and third parties are used to appropriately interpret and corroborate the quantitative analyses.

**II.14.** Wherever possible, the market outcome assessment identifies the most appropriate metrics to evaluate market structure and performance, thereby providing guidance to future empirical assessments in similar markets.

**II.15.** The remainder of Part II includes the methodology and market outcome assessment for the five UK cases included in the review, i.e.:

▪ *Facebook/Instagram*,[76] analysed in section II.2;

---

[76] OFT decision of 14 August 2012 on ME/5525/12 – Facebook/Instagram.

PX0498-070

- *Google/Waze*,[77] analysed in section II.3;
- *Priceline/Kayak*[78] and *Expedia/Trivago*,[79] analysed jointly in section II.4;
- *Amazon/The Book Depository*,[80] analysed in section II.5.

**II.16.** For each merger, the methodology and market outcome assessment are preceded by an overview of the case summarising the main elements of the transaction that emerged from the OFT's decision, including the merging parties' activities at the time of the merger and an anticipation of the potential competitive concerns arising from the transaction.

**II.17.** Section II.6 concludes by highlighting common themes arising from the case by case review.

---

[77] OFT decision of 11 November 2013 on ME/6167/13 – Google/Waze.

[78] OFT decision of 9 May 2013 on ME/5882-12 – Priceline/Kayak.

[79] OFT decision of 4 March 2013 on ME/5894/13 – Expedia/Trivago.

[80] OFT decision of 26 October 2011 on ME/5085/11 – Amazon/The Book Depository.

## II.2. FACEBOOK/INSTAGRAM

**II.18.** The merger between Facebook and Instagram was cleared by the OFT on 14 August 2012. At that time, Instagram provided a free mobile photo app allowing users to take, modify and share photos on Instagram itself or on other social networks, making Instagram also an input to social networks; whereas Facebook was a digital platform supplying social networking services and had recently launched a mobile photo app, Facebook Camera.

**II.19.** After having noted that social networks are two-sided businesses competing to attract users and advertisers, the Authorities considered that Facebook was active in the provision of three relevant services: a social networking platform and a photo app to users, and advertising space to advertisers. However, the OFT did not find it necessary to reach a conclusion on the exact boundaries of the relevant product markets.

**II.20.** The Authorities investigated whether a competitive harm could arise from the transaction given the parties' actual overlap in the supply of photo apps and the potential overlap in the supply of social networking services. However, given that the relationship between photo apps and social network was considered to be to some extent complementary, the OFT also investigated vertical ToHs.

**II.21.** The OFT cleared the merger asserting that there was no competitive concern arising in any of the markets that the merging parties were active in.

### II.2.1. Methodology assessment

#### II.2.1.1 Identification of ToHs pursued by the Authorities and of key elements underpinning them

*Actual competition in the supply of photo apps*

**II.22.** The merger would make the competitive constraint that the parties exerted on each other in the market for the supply of photo apps disappear, possibly resulting in unilateral effects post-merger. This ToH was dismissed based on the following pieces of evidence:

- the existence of several relatively stronger competitors that constrained Instagram more than Facebook's recently launched photo app;
- the limited attractiveness of photo apps to advertisers.

**II.23.** In particular, the relative strength of the other competing providers of photo apps was assessed by looking at the number of downloads for these apps relative to Facebook's. Specifically, the Authorities noted that, according to data provided by the parties, Camera Awesome and Hipstamatic had been downloaded over three times more than Facebook's camera app; Camera+ had been downloaded over six times more than Facebook's camera app; and Instagram had been downloaded over 45 more times than Facebook Camera. Also, third parties' submissions pointed to other photo apps as the closest competitors to Instagram. On the other side of the market, competition between Instagram and Facebook's photo app was only potential since at the time of the merger Instagram was not competing for advertising revenue. The Authorities, based on some third parties' submissions, noted that photo apps were not attractive to advertisers on a stand-alone basis; rather they were complementary to social networks. This was because, according to the Authorities, users did not spend a significant amount of time in the app and therefore eyeballs were not on the app for a significant amount of time and limited user data was captured.[81]

---

[81] For instance, one of Facebook's advertising customers that was interviewed by the OFT during its investigation, submitted that Instagram did not provide significant marketing opportunities since it had no inherent advertising capabilities, as it was centred around taking and uploading pictures and users did not spend a significant amount of time in the app.

PX0498-072

*Potential competition in the supply of social networking services*

**II.24.** Even though at the time of the merger Instagram was not competing with Facebook for advertising revenues and it had limited social network functionalities, the Authorities' concern was that this could change in the future. Indeed, Facebook was likely to be aware of Instagram's growing user base and it might have been concerned that if it increased its advertising prices, then Instagram would have the incentive to alter its offering to become a closer competitor in terms of functionality or display advertising inventory. Third parties agreed that it would not have been difficult or expensive for Instagram to expand its services to a website and to add some functionality similar to Facebook's. However, this ToH was dismissed because:

- the available evidence did not show that Instagram was particularly well placed to compete against Facebook in the short run; and

- there existed other firms that represented the main constraints on Facebook for brand advertising, namely Google, Yahoo! and Microsoft, as advised by the third parties interviewed by the Authorities.

*Foreclosure of social networks competing with Facebook*

**II.25.** The Authorities were concerned that the merged entity could (a) prevent Instagram users from uploading their photographs to rival social networks or (b) deteriorate the quality of the connection of the API between Instagram and those social networks, both with the intent of foreclosing Facebook's rivals in the market for the supply of social networking services. The Authorities noted that the merging parties were perceived by third parties to have the technical ability to implement these practices. However, this ToH was dismissed since the economic incentive to foreclose was likely missing: according to the Authorities, at least part of Instagram's appeal was attributable to the possibility to upload photos to other social networks, and such a practice could have caused some users to switch to other photo apps, making the practice unprofitable for the merged entity.

*Foreclosure of competing mobile photo apps*

**II.26.** The Authorities' considered that the parties would have had the technical ability to foreclose other mobile photo apps by reducing their ability to upload to Facebook. However, this ToH was dismissed because, according to the Authorities, Facebook had a strong incentive to allow its users to upload photos from as many sources as possible since this increased user engagement and the volume of user information. The foreclosing strategy, on the other hand, would have likely reduced customer engagement thereby making Facebook less attractive to advertisers. Also, the foreclosing effect would have been limited since users could have continued using competing photo apps to upload photos to other popular outlets.

### *II.2.1.2 Analysis of the key elements underpinning ToHs*

*Actual competition in the supply of photo apps*

**II.27.** The Authorities argued that the merger would not lead to an SLC in the market for the supply of photo apps because:

- Instagram had closer competitors than Facebook Camera on the users' side of the market;
- photo apps in general, and Instagram in particular, were not attractive to advertisers.

**II.28.** The main piece of evidence evaluated by the Authorities to support the conclusion that Instagram and Facebook Camera were not particularly close competitors was the number of downloads of other competing photo apps relative to Facebook Camera. However, using the number of downloads to measure market shares is problematic as this metric does not reflect user engagement: since downloads are usually free and simple, consumers might decide to try more than

PX0498-073

one photo app, but actively use only the one(s) that better responds to their needs. Actual usage data may have provided a better insight into closeness of competition. One common way to consider user engagement is to use the number of unique active users, i.e. those that have used the app at least once over a certain time span, or the time spent using the app.

**II.29.** On the advertising side of the market, photo apps were not considered by the Authorities to be *per se* attractive to advertisers since users spent a limited amount of time on them. To reach this conclusion, the Authorities relied on the opinion of third parties. For instance, one of Facebook's advertising customers believed that Instagram did not provide advertising opportunities. However, the opinions collected by the Authorities were not unanimous on this point:

- another of Facebook's advertising customers observed that Instagram offered potential advertising benefits thanks to its growing user base, pointing to a similarity to Facebook in the period in which it started out its business and was not selling advertising space. Social apps and websites do not always immediately present monetisation opportunities; rather, they develop such monetisation opportunities once they have reached a large and engaged enough user base for them to be attractive to advertisers;

- one of Facebook's competitors submitted that Instagram had already amassed a loyal user base spending considerable amounts of time on the app and its user base growth was unmatched by similar apps.

**II.30.** The importance of this issue and the diverging views of the stakeholders should have prompted the Authorities to collect data and test independently whether users did not spend a significant amount of time on Instagram. This could be false either because users did spend a significant amount of time in photo apps compared to social networks, including Instagram; or because Instagram was different from other photo apps.

**II.31.** The data available shows that Instagram did generate significant user engagement compared to other photo apps and to other social networks. In September 2012, on average, Instagram's users spent over three times more time on the app than Photobucket's users;[82] and the total minutes spent on the Instagram app were thirty times larger than the minutes spent on Photobucket. Moreover, total minutes spent on Instagram by its users, as well the average minutes per user, were not dramatically different from the same figures for Twitter.[83] This indicates that Instagram might have been different from other photo apps in terms of the user attention received and, consequently, potential attractiveness to advertisers.

*Potential competition in the supply of social networking services*

**II.32.** The Authorities indicated that available evidence did not show that Instagram was particularly well placed to compete against Facebook in the supply of social network services. However, the evidence available to the Authorities would not seem to unambiguously support this conclusion. Such evidence includes:

---

[82] Photobucket was chosen for this comparison since it was the only photo app for which it was possible to retrieve data and that already had a significant presence in the market at the time of the merger.

[83] In particular, ComScore data shows that Instagram's users spent 16.4 million minutes on the app and the average minutes spent on the app by each user were 6.54; Photobucket's users spent 0.54 million minutes on the app and the average minutes spent on the app by each user were 1.84; finally, Twitter's users spent 12.23 million minutes on the app and the average minutes spent on the app by each user were 8.03. The data collected from ComScore does not include the time spent by users under Wi-Fi connection: it thus underestimates the time spent on mobile devices. For this reason, time spent on mobile devices cannot be compared to time spent on desktop, limiting a meaningful comparison time spent on mobile devices only. Despite this limitation, these figures still provide an indication of Instagram's relative position. Photobucket was the only photo app for which these metrics were available that already represented a significant constraint on Instagram, as shown by data on registered and unique users provided by the parties at the time of the investigation.

PX0498-074

- the submission of one of Facebook's competitors arguing that it would have not been technically difficult or expensive for Instagram to expand its services to a website and to add functionalities similar to Facebook's. The competitor's view was that it was not the technology behind social networks that was unique, rather it was Facebook's size, scale and social graph that were extremely hard to match. For this reason, the competitor stressed the importance of Instagram's user base and social graph, and the rapidity with which they were achieved,[84] which made Instagram different from other photo apps. The view that Instagram's most important feature was its engaged user base was shared by another of Facebook's competitor in the supply of online advertising space;



**II.33.** On the advertisers' side of the market, the Authorities failed to analyse the factors that drive the choices of the demand, and therefore how attractive Instagram could have been to advertisers as it was and as it was likely to develop. The advertisers' side of the market, and the drivers of the advertisers' choices, are discussed more thoroughly in section II.2.1.3.

*Foreclosure of social networks competing with Facebook*

**II.34.** The key argument for the dismissal of this ToH was that the incentive to engage in a foreclosing strategy was missing as Instagram's popularity would likely be negatively affected. The hypothesis is that those Instagram users that were also, for instance, loyal Twitter users would then decide to switch to another photo app that allowed them to upload their photos from Instagram to their preferred social network.

**II.35.** This was based on the assumption that at least part of Instagram's popularity was due to the possibility of uploading their photos to other social networks. ▮▮▮▮▮▮▮▮▮▮▮▮ The Authorities ▮▮▮▮▮▮▮▮▮▮▮▮ might have sought to collect the same metrics for other social networks to test whether such an assumption was reasonable, and Instagram's popularity actually hinged on users being able to interact with their preferred social network.

**II.36.** In addition, the validity of the Authorities' argument heavily depends on Instagram's popularity among photo apps. For instance, if Instagram was a must-have service then the loss to the merged entity would have been minimal. It might as well be the case that the assumption that users put an extra value on Instagram for the possibility of uploading photos to other social network was true at the time of the merger, but this was likely to change in the future had Instagram's popularity increased. Indeed, the Authorities might have investigated:

- whether the merger itself was likely to make Instagram more popular to such an extent that the number of customers switching to competing photo apps would have been negligible: Facebook helping Instagram managing its growth was one of the declared rationales of the transaction;

---

[84] For instance, a competitor of the merged entity advised that the larger the company, the more advertisers believe that they must be on that company's platform because they perceive that the return for their investment is more guaranteed.

[85] These features were mentioned in Instagram's roadmap for future objectives that was included in an internal presentation.

PX0498-075

- the likelihood of Instagram significantly growing and increasing its popularity among photo apps due to factors independent from the merger: this entails similar considerations to those made with reference to the potential competition in the supply of social networking services ToH.

**II.37.** In addition, incentives to foreclose were not carefully set out. Limiting Instagram's interactions with social networks other than Facebook would likely have resulted in Instagram losing the users that were loyal to those social networks. However, Instagram was not monetising its users' attention at the time and presented, according to the Authorities, limited opportunities for advertising. This means that users lost by Instagram as a result of the foreclosure would not have implied foregoing revenue, whereas any user gained by Facebook would have translated into advertising dollars.[86] As a result, incentives to engage in a foreclosure practice could have been higher than what was estimated by the Authorities.

*Foreclosure of competing mobile photo apps*

**II.38.** The key argument that the merging parties did not have the incentive to pursue a strategy aimed at foreclosing other photo apps rested on the assumption that this would have likely reduced engagement of Facebook's users. This implicitly assumes that the losses for Facebook would have likely outweighed the benefits for Instagram making the strategy overall unprofitable for the merged entity. Again, an assessment of Instagram's post-merger popularity could have been helpful to better understand the parties' incentives. Indeed, had Instagram significantly improved its position in the market for the supply of photo apps, the volume of content uploaded to Facebook from rival photo apps would have been very low. In such a scenario, the losses Facebook would have incurred in terms of user engagement could have been negligible.

**II.39.** However, for the same reasons outlined above, the merged entity could only lose advertising revenue through this strategy. Indeed, any lost content on Facebook could have translated into monetary losses, whereas increasing Instagram's popularity did not bring additional revenue since Instagram was not monetizing at the time. This reinforces the OFT's conclusion that the merged entity lacked the incentive to pursue such a strategy, which appears overall reasonable.

### II.2.1.3 *Analysis of completeness of ToHs pursued*

**II.40.** The Authorities placed significant attention on what the merging parties did, i.e. the particular function that their apps performed. However, even though the apps of the merging parties performed different functions (social networking services and photo apps), they were potential competitors as Facebook was clearly in the business of harvesting consumer attention and selling it to advertisers, in line with the economic literature on markets for attention discussed in section I.2.2 and in Annex A.2; and Instagram was a potential entrant in such a market. To some extent, the existence of unilateral effects may disregard the particular function performed by the apps to assess the extent to which they could have been substitutable from the perspective of advertisers, had Instagram started to monetize its services by selling advertising space.

**II.41.** The first step in such an assessment is understanding how advertisers make their choices, i.e. what drives their decision to use one platform over another, or to use both. To the extent that advertisers place value on certain characteristics of a platform, and inasmuch as a merger affects these characteristics, it may be possible for the merged entity to exert market power post-merger.

**II.42.** Three factors seem to play a particularly important role in making one provider of advertising space more or less attractive from the perspective of advertisers:

---

[86] Although, arguably, engagement on Instagram was likely of value to the merged entity inasmuch it revealed users' preferences and allowed to improve the accuracy of targeted advertising.

PX0498-076

- user base's exclusivity. If certain users can only be reached by advertisers on one platform as they spend most of their time on it, clearly that platform has more bargaining power over the advertisers interested in reaching those users. Prices for the platform's advertising spaces will thus increase with the number of users that are exclusive to the platform. More generally, the degree of exclusivity may also matter: users shared with only one other platform may be worth more than users shared with many other platforms;

- platform's size. Larger platforms are more attractive to advertisers for at least two reasons. First, they reduce the necessary transaction costs to reach a certain number of users, as these users could potentially be reached by contracting with just one instead of many providers of advertising space. Second, they remove the inefficiencies that might derive from placing ads on two or more independent platforms with potentially overlapping users: indeed, it might be the case that some users end up being inefficiently over reached. The importance of the platform's size is confirmed by third parties' submissions received by the OFT at the time of the merger investigation: for instance, one of Facebook's advertising customers considered Facebook as a must-have in its marketing strategy given its high volume of users and significant reach;

- ability to target ads. As explained in more detail in section I.4.2.2, information on users' behaviour collected by digital platforms provides insight into users' preferences and can be used to better target ads. The ability to target ads clearly depends on the quantity and quality of data generated by the platform, which in turn depend on the level of user engagement achieved by the platform.

**II.43.** In assessing the potential sources of competitive harm deriving from the *Facebook/Instagram* merger, the Authorities should have investigated whether the transaction could have affected one or more of the three factors outlined above. While an increase in the user base's exclusivity may exarcebate the merged entity's ability to exert market power, and could be hence considered as a straightforward source of competitive harm, the remaining two mechanisms should be considered as efficiencies. Yet, even in this case, the Authorities may have evaluated whether the transaction could have indirectly harmed competition, by depriving actual or potential competitors of the opportunity to improve their products and compete more effectively. This hinges on whether, in the absence of the transaction, the target would have been acquired by an alternative buyer. When a merger leads to the realization of efficiencies, the Authorities could indeed investigate whether, and to what extent, competition would instead benefit from having another entity realize those efficiencies. Given that efficiencies to be gained from mergers generally decrease with the scale and the number of acquisitions already carried out, the Authorities should carefully consider whether acquisitions are being carried out with a defensive purpose, i.e. to prevent entrants from gaining the efficiencies necessary to more effectively challenge incumbents.

**II.44.** If the transaction made some users, that were previously shared between the merging parties, exclusive to the merged entity, this could increase the merged entity's market power in the market for online advertising. This would have been dependent on the extent of usage overlap: intuitively, the likelihood that the merged entity's user base becomes more exclusive *as a result of the merger* increases as the portion of overlapping users increases.[87] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This represents an imperfect measure of cross usage: first, it does not take into account users' engagement with the two platforms, which is what ultimately matters to advertisers, and second, it does not count those overlapping users which did not connect their accounts. Yet, it could have represented a preliminary indication that such an effect could arise. Furthermore, even if the overlapping users did not become exclusive of the merged entity as they

---

[87] In the extreme situation in which two merging parties have no user in common pre-transaction, the merger clearly would have no effect on user bases' exclusivity.

PX0498-077

could still be reached through another platform, the transaction would lead to a reduction in the competitive constraints faced by the merged entity for those users.

**II.45.** If the transaction led to the creation of a larger platform, or increased the ability of the platform to target ads, this could increase the merged entity's attractiveness to advertisers and deprived competitors of a similar opportunity. As a preliminary step, the Authorities should have explored whether some form of integration between Facebook and Instagram infrastructure was possible to give advertisers the opportunity to design joint ad campaigns reaching the users of both platforms. If this was technically feasible, the Authorities should have assessed whether Instagram's user base represented an increment to the platform's size that was valuable for advertisers. In this respect, collecting data on demographics characteristics of Facebook's and Instagram's users could have revealed whether the transaction allowed the merged entity to reach a more comprehensive audience than Facebook and Instagram did by themselves.

**II.46.** Finally, the Authorities did not explore ToHs related to data combination. The merging parties could have combined their arguably considerable data endowments, enriching their social graph of users. In line with the economic literature reviewed in section I.2.4 and in Annex A.4 and with the ToHs explored by other CAs described in section I.4.2.2, the Authorities could have assessed whether data combination could have resulted in the merged entity gaining a significant competitive advantage that could have led to foreclosure of alternative suppliers. With respect to this, the Authorities could have investigated whether the merging parties had the technical ability to implement such data combination, their incentives to pursue such a strategy and the overall impact on competition. Both depended on the extent to which combining the datasets would have increased the merged entity's ability to target ads, making it more attractive to online advertisers. In this assessment, the Authorities should have considered also that if targeted advertising generally benefits from enriching the platform's dataset, there are diminishing returns to scale; in addition, machine learning technologies have been making collecting extensive datasets less and less necessary.

**II.47.** The three mechanisms outlined above, i.e. an increase in the exclusivity of the user base, an increase in the number of users and an improved ability to target ads, potentially identify three separate ToHs that the Authorities could have explored before clearing the merger.

### II.2.2. *Market outcome assessment*

**II.48.** The market outcome assessment of *Facebook/Instagram* looks at:

- the development of Instagram into a social network (section II.2.2.1);
- the evolution of Facebook and Instagram, and their relative position, in the market for social network services (section II.2.2.2);
- the extent to which the merger has provided Facebook and Instagram with a competitive advantage, compared to the other social networks (section II.2.2.3).

### II.2.2.1 *The development of Instagram into a social network*

**II.49.** At the time of the merger, the Authorities believed that Instagram was not well placed to compete with Facebook in the short run, as Instagram was a mere photo app, with limited social network functionalities and without any revenue from advertising. Indeed, the rationale for the merger stated by Facebook was to help Instagram grow under Facebook umbrella. Since the merger with Facebook, Instagram has rapidly evolved to a different product, which offers fully-fledged social network functionalities and allows advertisers to place their ads on the platform. Figure II.1 shows the timeline of the main changes made to Instagram since it was launched in October 2010.

PX0498-078

**Figure II.1: Timeline of main Instagram's changes**



*Source: Lear*

**II.50.** Some relevant and distinctive Instagram functionalities have been launched before the merger date: for instance, in January 2011, Instagram added hashtags, which is widely used in captions and comments among users. However, typical social networking functionalities (photo tagging[88] and direct messaging) as well as advertising products were introduced after the merger. Based on the evidence provided by Facebook[89], the merger has helped Instagram's development in the following ways:

- introduction of new features to improve user experience, such as direct messaging, live streaming, personalized feeds, tags, threads and comments;

---

[88] In May 2013, Instagram introduced the photo tagging feature – which allows users to tag their "followers" in a picture – and a specific tab ("Photos of you") that allows users to check every picture they are tagged in. Photo tagging is a valuable feature which enables the interaction between users in a social networking-like fashion. Photo-tagging has also been gradually extended to brand advertising, paving the way to the influencers who are nowadays among the main users of Instagram. See www.businessinsider.com/instagram-introduces-photos-of-you-2013-5?IR=T.

[89] This description is based on interviews held with representatives of Facebook.

PX0498-079

- provision of physical infrastructure. Facebook had significant experience in managing high volumes of content and delivering it quickly, and provided the cloud space that Instagram needed to continue its growth while still delivering a smooth user experience;

- expansion into different OSs. Facebook helped Instagram in making its app compatible with different operating systems;

- advertising. Facebook provided Instagram with the expertise to show ads in a non-intrusive way.[90] In addition to Facebook's expertise, Instagram also gained access to a pool of loyal Facebook's advertisers and today the merged entity offers combined advertising campaigns which cover both platforms;

- anti-spam and anti-harassment policy. At the time of the merger, Instagram did not have a consistent content policy and did not have the resources to enforce it properly. Instagram benefited from Facebook's expertise in machine learning and was able to develop and enforce its content policy;

- internationalisation. Facebook helped Instagram to expand globally by providing expertise on language translation. In addition, the desktop version of Instagram was developed, thus facilitating Instagram expansion in those countries were mobile penetration was still lagging behind.

**II.51.** At the end of 2012, Instagram changed the way that it interacts with other social networks such as Twitter.[91] Instagram users were no longer able to embed a content uploaded to Instagram in their feed on social networks other than Twitter; rather, they were only able to share a link driving traffic back to Instagram. This has arguably deteriorated the quality of Twitter's users experience: Instagram photos no longer appeared on their Twitter's feed, but they were just posted as a link back to Instagram. This decision by the merged entity would seem to be consistent with the realization of the foreclosure ToH that was assessed (and dismissed) by the Authorities. However, that ToH entailed the existence of a complementarity between photo apps, such as Instagram at the time of the merger, and social networks. By the time this decision was taken, Instagram was on its path to develop social network functionalities, supplying a service that was arguably a substitute of those supplied by social networks.

**II.52.** Three years after the merger, Instagram started monetizing its services through targeted advertising. For instance, when a particular Instagram user was in the demographics being targeted, she would have seen the advertising post with the label "Sponsored" above it. Starting from that date, Instagram has become more and more advertising friendly, showing links to a retailer's site that land directly on the page that allows to purchase a certain good or service. Further, Instagram has become a breeding ground for influencer marketing, a growing tactic used by marketers to build brand awareness and driving customer engagement.[92]

**II.53.** Currently, Instagram competes with social networks and is at the fore-front of social networking trends. In August 2016, Instagram launched "Instagram stories", a 24-hour photo or video slideshow.[93] Instagram CEO Kevin Systrom openly admitted that the feature was copied from the Snapchat stories.[94]

---

[90] Facebook advised that at the time of the merger Instagram had no advertising infrastructure or a sales team and had no clear plans to develop such infrastructure. Facebook provided Instagram with that infrastructure and with a dedicated sales team.

[91] edition.cnn.com/2012/12/10/tech/social-media/twitter-instagram-photos/.

[92] Influencer marketing involves brands paying social media influencers to mention advertisers' products and services in their social media output. CivicScience in December 2018 found that 34% of daily Instagram users in the US have purchased something from an influencer/blogger recommendation, as reported in the eMarketer article "Can Instagram's Swipe Up Feature Drive Sales" by Blake Droesch.

[93] instagram-press.com/blog/2016/08/02/introducing-instagram-stories/.

[94] www.nytimes.com/2016/08/03/technology/instagram-stories-snapchat-facebook.html.

PX0498-080

In June 2018, Instagram's CEO has announced a new feature called IGTV, which allows to upload videos of up to one-hour length and lets users develop Instagram channels including their videos.[95]

### II.2.2.2 *The evolution of the market for social network services*

**II.54.** Assessing the market structure arising following the *Facebook/Instagram* merger requires defining the markets where the merging parties operate. Facebook and Instagram (i) use information and communication technologies to facilitate interactions between users, (ii) collect and use data about these interactions, (iii) rely on network effects, since the platforms are more valuable to other users as the number of existing users increases, (iv) provide free services to consumers (at least from a monetary point of view) and (v) raise revenue through advertising. The two parties sell access to their users' time and attention to companies for display advertising.[96] To this extent, Facebook and Instagram are often considered attention brokers, operating in a market for attention, together with other online advertising platforms such as Google, Amazon, Bing, Microsoft, Twitter, LinkedIn, Snapchat, YouTube and many others.

**II.55.** However, it may be possible to further distinguish among attention brokers based on the service they provide to users and to the added value they provide to advertisers. Being social networks, Facebook and Instagram allow users to connect and interact. Users' interaction is currently provided through a variety of tools, such as messaging and photo/video sharing. From the users' point of view, this may be considered different from the search engine service provided by Google or Bing, or from the social media content provided by YouTube. From the advertisers' point of view, the added value is related to the social graph, the global mapping of users which reveals how they are related to each other and what are their preferences and the preferences of the other users they interact with. In order to achieve their objectives, advertisers, and in particular display advertisers, needs to target the right people, at the right time and in the right context.[97] They increasingly rely on both demographic (age, gender) and behavioural (interests) data of their customers and, to this end, social networks can leverage social graph information.[98]

**II.56.** On this basis, for the purpose of this evaluation, we adopt a stricter market definition than that of a broad market for attention, by identifying the market where Facebook and Instagram operate as the market for social network services. The distinctive features of social networks are (i) the connection and interaction among users, and (ii) and the ability of mapping users in a social graph of their relationships and preferences.[99] This market definition embraces both sides of the market, i.e. that of users and that of advertisers.

---

[95] instagram-press.com/blog/2018/06/20/welcome-to-igtv/.

[96] Display advertising include banner ads, native ads, sponsored contents, in/out stream video. It is different than search advertising, that is paid-for listing in search results (e.g. sponsored links on Google), and classifieds ads, that involve advertisers paying online companies to list specific products or services, including property, cars (e.g. Autotrader websites). In the UK, search advertising is the largest category of online advertising in terms of digital advertising spend, accounting for 50% of the UK online advertising market in 2017, compared to 36% for display, 13% for classifieds and 1% other formats. Social media accounts for an increasing share of display advertising (in 2017, 57% of online display advertising expenditure in the UK was on social media). This is based on Plum Consulting report commissioned by the Department for Digital, Culture, Media & Sport, Online advertising in the UK, January 2019.

[97] Plum Consulting report commissioned by the Department for Digital, Culture, Media & Sport, Online advertising in the UK, January 2019.

[98] In a phone interview, Telefonica UK confirmed that social graph information makes social networks extremely attractive to advertisers as this offers opportunities for in depth targeting.

[99] Although intuitively simple, selecting which operators, among the hundreds of online platforms operating in digital market, present such features and can be classified as social network is not an easy task. Our analysis relies on the definition used by ComScore, which includes among social networks those online platforms providing (i) a virtual community within Internet

PX0498-081

**II.57.** We do not expect this to be definitive: defining markets in the digital sector is a complex exercise. On the supply side, advertisers may not consider the social graph as a distinctive feature, and still consider the advertising services provided by social media (e.g. YouTube) as a substitute of the service provided by social networks. By the same reasoning, display advertising (which is typically provided by social networks) can be deemed as a substitute for search advertising (which is instead typically provided by search engines).[100] As to the user side, we evaluate the substitutability of the platforms based on the overlap of their functionalities. However, it is hard to define the exact degree of overlap which makes platforms substitutes.

**II.58.** The proposed market definition appears to be much broader than the one recently adopted by the Bundeskartellamt in its investigation on Facebook data handling practices.[101] The Germany Authority has defined the product market where Facebook operates as including Facebook and some smaller providers of social network services. Snapchat, Twitter, Pinterest, LinkedIn and Instagram are not considered to be part of this market, and the main criteria used were the overlaps of functionalities and the presence of networks effects.[102] The Bundeskartellamt has indeed pointed out that direct network effects have proved to be very important in these markets and it is not sufficient to have a critical mass of users to be able to enter neighbouring markets.[103] While being aware of the uncertainties that characterize such markets, the assessment below relies on a tentative, though more conservative, market definition which encompasses all social networks.

**II.59.** Figure II.2 shows the number of monthly unique users of the main social networking platforms over the period 2015-2018 in the UK.[104] The number of Facebook users has been relatively stable over time, while the number of Instagram user has doubled, moving from 14 million in March 2015 to 26 million in September 2018. All of the Instagram updates represented successful moves to increase the number of users and, as a result, Facebook and Instagram are currently the largest players in the market for social networking services. In 2017-2018, Twitter and Snapchat boast a similar number of users to Instagram. Snapchat has more than doubled its users between March and September 2017. Google+ has become less and less appealing and its users have been consistently declining since 2015. Pinterest and Reddit have been relatively stable over time, reaching respectively 14 million and 11 million unique users in September 2018.

---

web sites and applications to help connect people interested in a subject and (ii) a variety of tools, such as email, messaging, photo sharing that allow members to connect.

[100] Plum Consulting report commissioned by the Department for Digital, Culture, Media & Sport, Online advertising in the UK, January 2019.

[101] Bundeskartellamt decision that prohibits Facebook form combining user data from different sources, February 2019. Available                                                                                                                          at https://www.bundeskartellamt.de/SharedDocs/Meldung/EN/Pressemitteilungen/2019/07_02_2019_Facebook.html.

[102] For instance, Snapchat is not considered comparable to social network because its central function is a camera that opens automatically for taking "snaps" that are deleted after a short while.

[103] The decline of Google+ is considered as an example of the importance of direct network effects to succeed in a neighbour digital market.

[104] ComScore defines unique users as the number of users who have visited the platform at least once in a month.

PX0498-082

**Figure II.2: Number of monthly unique users of social networks in the UK (million)**



*Source: Lear based on ComScore data*

**II.60.** Figure II.3 shows the market shares of social networks in terms of time spent by users.[105] Social networks compete to attract users and their attention. Higher users' engagement, which can be measured through the time they spend on the platform, allows the social network to collect more information on users' behaviour, making it possible to better target users for advertising purposes, thereby supplying a better product to advertisers. More engagement also provides more opportunities for the platform to show ads to users.

---

[105] Annex D provides the share of time spent by users in a broader market, which includes all social media platforms (Figure D.1).

PX0498-083

**Figure II.3: Share of monthly time spent on social networks in the UK (%)**



*Source: Lear based on ComScore data*

**II.61.** Considering the time spent on the platform shows a significant decline in Facebook's market position: the share of time spent by UK users on Facebook falls from 86% in 2015 to 58% in 2018; Instagram share is instead increasing, going from 4% to 11% over the same period. The acquisition has arguably allowed Facebook to partially offset the decline in its users' engagement.[106] Snapchat is emerging as the most significant challenger to the merged entity, with a share that has reached 18% in 2018. Twitter only accounts for 5% of total time spent on social networks.

**II.62.** The decline of Facebook's share of supply can be at least partially attributed to its users' demographic. Younger users generally spend more time on online platforms,[107] thereby driving up the share of social networks such as Instagram and Snapchat who are more popular among younger age groups. Figure II.4 shows that, in 2017, only 33% of monthly time spent on Facebook is generated by users aged 18-34 years old, compared to 67% for Instagram. Moreover, Facebook and Twitter have similar demographics, both significantly different from those of Instagram and Snapchat.

---

[106] This is also consistent with a reduction of Facebook's incentive to invest in users' engagement after the merger, due to the lessening of the competitive constraint exerted by the competitors and the success acquired by Instagram, now part of its ecosystem.

[107] UKOM Insights: "*How much time do people spend online each day?*", July 2018. The report shows that the average time the UK adult digital population spends per day online is 3 hours and 8 minutes. This value varies considerably by age, ranging from 4 hours and 5 minutes for user aged 18-24 to 2 hours and 23 minutes for users aged 55+.

PX0498-084

**Figure II.4: Share of monthly time spent on social networks in the UK by age in 2017 (%)[108]**



*Source: Lear based on eMarketer data (extracted on March 18, 2019)*

**II.63.** Social networks monetize their services through advertising and the extent to which Facebook and Instagram growth in terms of usage base and users' engagement has been profitable should be measured through advertising revenues. Figure II.5, Figure II.6 and Figure II.7 show, respectively:

- the digital advertising revenues;[109]
- the digital advertising revenues per user. This indicates how much each user is worth, on average, on the advertising side of the market;
- the digital advertising revenues per hour spent on the platform. This indicates how much each hour spent on a platform is worth, on average, on the advertising side of the market. Assuming that the same volume of ads can be shown in an hour across the various social networks, this metric represents a proxy of the price paid by advertisers to reach users on the various platforms.

---

[108] Data from 2018 does not include Twitter. As to Facebook, Instagram and Snapchat, data from 2018 confirms the main findings from 2017.

[109] Data on digital advertising includes advertising that appears on desktop, laptop computers and mobile phones, tablets and other internet-connected devices, and includes all the various formats of digital advertising on those platforms. Values are net of traffic acquisition costs (TAC) to partner sites.

PX0498-085

**Figure II.5: UK advertising revenue for the main social networks (million GBP)**



*Source: Lear based on eMarketer data (extracted on March 5, 2019)*

**Figure II.6: UK advertising revenue per user for the main social networks (GBP)**



*Source: Lear based on eMarketer data (extracted on March 5, 2019)*

PX0498-086

**Figure II.7: UK advertising revenue per 60 minutes for the main social networks (GBP)**



*Source: Lear based on ComScore and eMarketer data (extracted on March 5, 2019)*

**II.64.** Facebook's revenues have always been higher than the revenues of other social networks, and the gap has increased over time, despite the decline in its share of time spent (as previously shown in Figure II.3).[110] In particular, Facebook's revenues have increased by 103% between 2015 and 2018. The advertising revenues that Facebook is able to extract from each user have also increased (+90% between 2015 and 2018), as well as advertising prices, proxied by revenues per hour spent, which have experienced a significant increase in 2018 compared to the level of 2015 (+300%).

**II.65.** Instagram has started to monetize in the UK in 2015, and since then its revenues have increased significantly – as occurred for the number of users – exceeding the revenues earned by other platforms: in 2018, its advertising revenues was equal to £ 649 million, an increase of 3,349% with respect to the level of 2015. Both revenues per user and revenues per hour spent have also experienced a significant growth: in particular, Instagram seems to be able to charge higher advertising prices than Facebook. Twitter and Snapchat, instead, are positioned significantly behind Facebook and Instagram in terms of advertising revenues. Twitter's revenues have increased over time, but to a lesser extent than Facebook: in 2018, its advertising revenues have increased only by 23% with respect to the level of 2015.

**II.66.** Despite its share in terms of users and time spent, Snapchat advertising revenues remain lower than Facebook, Instagram and Twitter. However, the growth rate of Snapchat's revenues has been the highest, compared to the other social networks. For instance, in 2018, Snapchat reached £ 66 million in total advertising revenues, an increase of 5,297% with respect to the level of 2015. Snapchat revenues per user and per hour also increased significantly (+2,150% and +1,293% respectively between 2015 and 2018). This enormous increase was mainly driven by the growth experienced

---

[110] The time spent on Facebook has declined also in absolute terms: the total minutes spent on Facebook in the UK has decreased from 46 billion in March 2015 to 21 billion in September 2018.

PX0498-087

between 2015 and 2016. The most recent data seems however to indicate that Snapchat growth may have already peaked.[111]

**II.67.** Although data indicates a positive trend in advertising revenues for all the main social networks, Facebook and Instagram seem to have a comparative advantage. In 2018 the prices charged by Facebook and Instagram for advertising, proxied by revenues per hour spent, are the highest: advertisers seem willing to pay a premium for the advertising services provided by the merged entity.

**II.68.** The assessment of the market outcome which has arisen after the merger requires to investigate whether, and to what extent, the merger has contributed to the competitive advantage enjoyed by Facebook and Instagram. This may be a result of the efficiencies achieved through the merger, or the outcome of a distortion of competition which enabled Facebook to exert market power. The following section will perform such assessment, by outlining the mechanisms through which the merger strengthened Facebook's and Instagram's position.

### II.2.2.3 *The competitive advantage Facebook and Instagram acquired after the merger*

**II.69.** As discussed in section II.2.1.3, three factors seem to play a particularly important role in making one provider of advertising space more or less attractive from the perspective of advertisers:

- the ability to target ads, which in turn depends on the quantity and type of information that the platform can collect on its users;
- the extent to which its user base is exclusive to the platform; and
- the size of its user base.

**II.70.** The merger has contributed to improving the position of the merged entity across all dimensions. Regarding data combination, the recent investigation by the Bundeskartellamt has confirmed that Facebook "uses and merge" data from its own website and company-owned services (including Instagram and WhatsApp), thereby obtaining detailed profiles of its users.[112] This provides the merged entity with a richer information set that arguably cannot be matched by its rivals in the social network market.

**II.71.** Regarding exclusivity and size, multi-homing makes social networks' users less exclusive, as cross-visiting users can indeed be reached through different social networks. When selling advertising spaces, each social network competes with the others to target cross-visiting users. In such a context, the merger with Instagram has strengthened the position of Facebook as an advertising platform through the following mechanisms:

- Facebook is not subject to the competitive constraint that might have been exerted by Instagram on users who cross-visit the two platforms. More specifically, for all the users who at least cross-visit Facebook, Instagram and another social network, Facebook faces one competitor less than it would have absent the merger, since it does not compete with Instagram to attract advertisers;
- Facebook and Instagram are a single ecosystem, able to monitor how many times a single user is exposed to a certain ad on each of the two platforms. This makes them able to avoid inefficient ads duplications, which advertisers seek to avoid. Interviews to market participants[113] confirmed that advertisers value Facebook and Instagram being a single ecosystem where to buy advertising

---

[111] Unlocking digital competition, Report of the Digital Competition Expert Panel, March 2019.

[112] See footnote 101. The decision points out that Facebook combines data from its own website, its company-owned services and third-party website and that such conduct represents an exploitative abuse. The Bundeskartellamt established that Facebook-owned services like WhatsApp and Instagram can continue to collect data. However, assigning the data to Facebook user accounts will only be possible subject to the users' voluntary consent. In case the consent is not given, the data must remain with the respective service and cannot be processed in combination with Facebook data.

[113] This is based on an interview with Telefonica UK Limited.

PX0498-088

spaces, and that Facebook allow advertisers to choose on which platform they want to post their ads, and the desired frequency with which consumers are exposed to the ad on Facebook co-platforms;

- data on users and time spent has shown that Facebook has been able to increase its size and boost users' engagement after the merger. In a market where consumers multi-home, the larger is the platform, the higher is the probability that the platform provides access to the greatest part of social network users. Moreover, since time is a scarce resource, the larger is the time spent on that platform, the higher is the users' engagement on that platform compared to the others. Facebook has become the single spot through which advertisers can efficiently reach and target the largest number of social networks users.

**II.72.** Figure II.8 shows the percentage of Facebook users who visits other social networks. In 2015, 29% of Facebook users were also visiting Instagram[114], and the percentage is increasing over time: in 2018 almost 60% of Facebook users is also on Instagram. The overlapping users between Facebook and Instagram foster Facebook's competitive advantage, as these users are more exclusive than they would have been if Facebook and Instagram were two separate entities.

**Figure II.8: Percentage of Facebook's users that visits the main social networks**



*Source: Lear based on ComScore data*

**II.73.** Facebook also shares its users with Twitter, Snapchat and to a lesser extent Pinterest. In 2018, almost 60% of Facebook users were also visiting Twitter and Snapchat. This implies that, although having relaxed the constraint exerted by Instagram, Facebook is still competing with other social networks to attract advertisers.

**II.74.** Figure II.9 shows the percentage of other social networks users that visits Facebook in the UK. In 2015, more than half of the users of the main social networks (Instagram, LinkedIn, Snapchat, Twitter)

---

[114] Please note that the available data only allows to measure overlapping users across pair social networks. However, the percentage of social network users who is cross-visiting a second platform, may also cross-visit an additional third platform.

PX0498-089

were also visiting Facebook. In 2018, almost all the users of these social networks were also visiting Facebook.

**Figure II.9: Percentage of other platforms' users that visits Facebook in the UK**



*Source: Lear based on ComScore data*

**II.75.** By buying advertising spaces on Facebook, advertisers are able to reach almost all of Instagram, Twitter, LinkedIn and Snapchat users.[115] The opposite is not true: Figure II.8 indeed shows that, for instance, when selling advertising space on Twitter, advertisers are only able to reach 59% of Facebook users in 2018. On top of this, Facebook can also provide advertisers with access to users who cross-visits Instagram and other social networks. For instance, in 2018, 60% of Twitter users cross-visited Instagram.[116] This gives the merged entity the ability to reach those Twitter users who do not use Facebook but use Instagram. By enhancing the size of Facebook, and fostering users' engagement, the acquisition of Instagram might have increased attractiveness to advertisers and, in turn, ability to exert market power.

**II.76.** Assessing whether this could be interpreted as an effect of the Authorities' decision to clear the merger would first require identifying what would have occurred to Instagram in the absence of the merger, i.e. in a counterfactual scenario. Two alternative counterfactuals to the clearance can be identified:

---

[115] This could have been more properly measured by observing how consumers allocate time between social networks: for instance, a Twitter user that simply visits Facebook once a month, without spending a significant amount of time on the platform, is much more valuable to an advertiser when he or she is on Twitter rather than on Facebook. Unfortunately, the available data does not allow to measure how consumers spread their time among social networks. Nonetheless, since time is a scarce resource, the share of overlapping users can still reasonably raise the concern that Facebook, by being able to attract the visit of most of the social networks' users, is increasingly able to engage their attention.

[116] Annex D provides the percentage of other social networks that visits Instagram in the UK over time (Figure D.2).

PX0498-090

- Instagram would have become a popular social network and Facebook would have faced a strong competitor in the social network market. The example of Snapchat suggests that it may have been possible for Instagram to continue its growth without help from Facebook;

- Instagram would not have been able to grow further and monetize its users base. Instagram would have struggled to expand its functionalities without Facebook's guidance[117] and its growth would have stalled in absence of the infrastructure needed to manage a growing user base.

**II.77.** In both counterfactual scenarios, Facebook may have encountered some difficulties into targeting the youngest users, and competing with the emerging mobile-first platforms, such as Snapchat. Data indeed seems to suggest that the growth in Facebook and Instagram share of time spent has been driven by Instagram.

**II.78.** Compared to a counterfactual scenario where Instagram would still have become a popular social network, the merger has increased Facebook ability to exert market power, by eliminating a viable and strong competitor in the market of social networks. Compared to a counterfactual scenario where Instagram would have not been able to grow as a social network, the merger may still have provided Facebook the way to strengthen its competitive advantage. The merger may have provided Facebook with the tools to enhance its usage base and engagement and still aggressively compete with existing competitors (e.g. Twitter) and new entrants (e.g. Snapchat).

**II.79.** Compared to both counterfactuals, the merger has generated efficiencies. Being able to monitor consumers behaviour on its platform and on Instagram, Facebook can effectively target advertising and reduce inefficient ads duplications on its platforms. On the one hand, this has fostered the competitive advantage of Facebook and Instagram. Advertisers seem to prefer Facebook and Instagram, and pay a premium for their services, because of, among other factors, their ability to reach nearly all users contracting with a single entity and control the number of ad impressions. On the other hand, this may have generated benefits to consumers, who generally perceive advertising as a nuisance. Such efficiencies are merger specific: they would not have arisen in the absence of the *Facebook/Instagram* merger, or in case Instagram had been acquired by an entity different from a social network.

**II.80.** In conclusion, the effects of the Authorities' decision to clear the merger on consumer welfare depend on the balance between likely anticompetitive effects and efficiencies, which in turn heavily depend on the selected counterfactual. There are no elements to identify which counterfactual would have been more likely. Stronger anticompetitive effects are expected in the case where Instagram would have become a viable competitor alone or if acquired by a third party: in this case, efficiencies would have been high enough to compensate for the loss of competition. However, data suggests that Snapchat has not been able to monetize engagement to the extent that Instagram did, which is perhaps the signal that Facebook's role in the development of Instagram with respect to advertising was significant.

### *II.2.3. Conclusions on Facebook/Instagram*

**II.81.** There are a number of gaps in the way the Authorities have assessed the *Facebook/Instagram* merger:

- using the number of downloads to measure market shares may be problematic in the context of digital markets, including the ones where the merging parties operated. Downloads are usually free and simple, consumers might decide to try more than app, but actively use only the one(s) that better responds to their needs. The metric used should instead reflect actual usage;

---

[117] For instance, according to Telefonica UK, Facebook might have played an important role in Instagram's ability to promptly mimic competitors' functionality such as the stories, which now represent a significant portion of users' experience on Instagram but were originally made popular by Snapchat.

PX0498-091

- differently from what the Authorities argued, at the time of the merger Instagram was generating significant user engagement. This made Instagram different from other photo apps and well placed to start monetizing its services by selling advertising space;

- the Authorities indicated that available evidence did not show that Instagram was particularly well placed to compete against Facebook in the supply of social network services. However, the evidence available to the Authorities would not seem to unambiguously support this conclusion, most notably because of the level of user engagement already generated by Instagram at the time and of its plans to supply social network functionalities;

- the Authorities assumed that a strategy aimed at foreclosing rival social networks would not have been profitable because Instagram's popularity hinged on the ability of its users to interact with their preferred social networks. However, available evidence showed that this was not necessarily the case. Moreover, adopting the pre-merger situation as the counterfactual, any user lost by Instagram would not have resulted in a monetary loss for the merged entity, since Instagram was not raising revenue at the time;

- it may have been appropriate to evaluate the incentive to foreclose in a more dynamic manner. Had Instagram grown as a result of the merger, and become a must-have among photo apps, the incentives to foreclose could have changed.

**II.82.** Moreover, the Authorities placed significant attention to the function that the merging parties' apps performed and whether the range of functionalities they offered made them substitutes or complements. However, even though the apps of the merging parties performed different functions, they may still have competed with each other as both were potentially in the business of harvesting consumer attention and selling it to advertisers. The Authorities' analysis of the advertisers' side of the market might have neglected some factors that drive advertisers' choices: chief among these are exclusivity of the user base, size of the user base and accuracy in targeting. The Authorities could have assessed how the merger could have affected each of these.

**II.83.** The assessment of the market structure which has arisen after the merger shows that the acquisition of Instagram has provided a competitive advantage to the merged entity across all three dimensions, which has resulted in unmatched growth in terms of users and advertising revenues. However, there are reasons to believe that Instagram's growth has significantly benefitted from the integration with Facebook: Snapchat's case shows that transforming users' attention into advertising revenue is no easy task, and Instagram's success in this respect has likely benefitted from Facebook's guidance and expertise.

**II.84.** Finally, whether the decision has ultimately harmed consumers also depends on the benefits accrued through the merger, which may have countervailed anti-competitive effects. Being able to monitor consumers' behaviour on its platform and on Instagram, Facebook can effectively target advertising and reduce inefficient ads duplications on its platforms. This may have generated benefits to consumers, which may have not arisen in the absence of the merger. These efficiencies seem also to be merger-specific, and it is difficult to assume that they would have arisen in a counterfactual scenario where Instagram was not acquired by Facebook or another social network.

PX0498-092

## II.3. GOOGLE/WAZE

**II.85.** On 11 November 2013, the OFT cleared Google's acquisition of Waze. Google operated an Internet search engine offered for free to its users and sold advertising space on its websites and on partner websites; moreover, it offered Google Maps, a free application providing mapping and navigational services that could also be used by third parties on their own applications buying access to Google's API for Google Maps. Note, however, that the Google API offered limited functionalities: turn-by-turn navigation, for instance, was only made available by Google on its own products. Waze provided another map application that was only available for mobile devices. Its distinctive offerings included live maps, real-time traffic updates and turn-by-turn navigation. Turn-by-turn navigation is a feature of navigation devices where directions for a selected route are continually presented to the user in the form of spoken and/or visual instructions. The parties overlapped in the supply of turn-by-turn navigation applications for mobile devices. Therefore, in assessing the competitive impact of the *Google/Waze* merger, the Authorities focused on two horizontal issues, namely whether by removing a growing and innovative competitor to Google such as Waze, actual and/or potential competition in the market for mobile turn-by-turn navigation applications could be significantly affected, with the result of reducing the parties' incentives to innovate and the quality of the service offered to users.

### II.3.1. Methodology assessment

#### II.3.1.1 Identification of ToHs pursued by the Authorities and key elements underpinning them

*Actual competition in the supply of turn-by-turn navigation apps for mobile devices*

**II.86.** The OFT investigated whether an SLC could arise from the removal of the competitive constraint the parties were exerting on each other in the market for turn-by-turn navigation apps for mobile devices. The OFT looked at the closeness of competition between the merging parties and the relative extent of the constraints coming from other competitors. This ToH was dismissed based on the argument that Waze had not reached a sufficient user base in the UK to build a map with coverage and accuracy comparable to Google's;[118] and that there existed other providers of turn-by-turn navigation apps exerting strong competitive constraints on Google, with particular emphasis on the role of Apple Maps. The evidence the OFT relied on to reach these conclusions was a mix of third parties' submissions and the parties' internal documents. In particular, third parties' submissions generally considered that Waze's UK map data did not represent a high standard that could be comparable to Google Maps at the time of the merger, although it had the potential to improve over time due to Waze's data generating process.

*Potential competition in the supply of turn-by-turn navigation apps for mobile devices*

**II.87.** The OFT was concerned that Waze could represent a disruptive force in the market going forward and that the removal of future rivalry between the parties caused by the merger could therefore dampen Google's incentives to innovate and improve product quality. In order to assess the likelihood of this scenario, the Authorities looked at:

- data on Waze's growth, mainly obtained from internal documents, which indicated that, while Waze had witnessed strong growth in a relatively short time,

---

[118] Note, indeed, that, although many suppliers provide their applications for free and earn their revenue from advertisers, attracting enough users is paramount since mapping is a "positive feedback business", where the more users there are the more data is created, which improves the experience attracting yet more users.

PX0498-093

- the extent to which network effects could accelerate future growth. Network effects stemmed from the fact that Waze used a community-based application to develop its maps, entailing that the quality of the product and therefore the value generated for end users increased with the number of users. For instance, Waze's model required a minimum number of registered users for it to have a good understanding of prevailing traffic conditions within a given territory. The parties' internal documents allowed the Authorities to conclude that the scale achieved by Waze in the UK was not enough for Waze to benefit from significant and insuperable network effects;

- the role of partnerships. Indeed, partnerships can make a company grow into a significant competitor. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- the existence of other competitors which would continue to represent strong competitive constraints on Google Maps.

**II.88.** Taken overall, this evidence was not considered sufficient by the Authorities to conclude that Waze could grow into a disruptive force in the UK market.

### *II.3.1.2 Analysis of the key elements underpinning ToHs*

*Actual competition in the supply of turn-by-turn navigation apps for mobile devices*

**II.89.** The dismissal of the actual competition ToH rested on two key elements:

- Waze's limited user base and map coverage/quality in the UK;
- the existence of other providers of turn-by-turn navigation exerting strong competitive constraints on Google, and in particular Apple Maps.

**II.90.** Waze's limited user base and map coverage/quality in the UK was correctly considered by the Authorities as a factor that diminished the competitive relevance of Waze. Given Waze's business model, the two go hand in hand: the larger the user base, the greater is the contribution to the map accuracy by users. While the limited user base in itself diminished Waze's competitive relevance, it was also correctly identified by the Authorities as an indication that map data was of limited quality, further weakening Waze's ability to compete effectively with Google for UK users.

**II.91.** However, there is a question of whether the reliance on the competitive constraint exerted on Google Maps by Apple Maps may have been to some extent overplayed. Apple Maps was only available on iOS devices, which represented 30-31% of smartphone sales in the UK at the time of the merger (as shown in Figure II.15). Apple Maps could represent an indirect constraint on Google Maps for Android devices only to the extent that Google cannot discriminate between the two OSs. If Google were to lower the quality of Google Maps on Android, for instance by introducing ads – which, being generally considered as a nuisance, would represent a drop in quality – Android users would not be able to switch to Apple Maps. This may have meant that Apple Maps was not fully able to exert a competitive constraint on Android devices, which accounted for 55% of smartphone sales in the UK.

**II.92.** It is also unlikely that Apple Maps could have exerted an indirect constraint, as instead argued by the OFT, which observed that "Apple Maps acts as a competitive constraint across platforms because any innovations on one platform will extend to other platforms reflecting competition for the handset".[119] For this to occur, the range and quality of turn-to-turn navigation apps available on the various OSs would have needed to be a factor driving choices of consumers in the smartphone market. Users would then have responded to a drop in the quality of Google Maps, or any other expression of

---

[119] *Google/Waze*, footnote 33.

PX0498-094

market power, by adjusting their choices in the smartphone market, thereby providing an additional, indirect constraint on Google. However, there is no evidence that this was the case: smartphones are complex products and the choice of the OS by users is likely to be informed by a wider range of factors than the turn-to-turn navigation apps available on that OS.

**II.93.** Given the limits to Apple Maps' ability to represent a competitive constraint, at least for Android devices, it is unclear which other app could be characterized as closer competitors to Google Maps than Waze. The other two "native" maps applications were correctly ruled out by the OFT: Bing Maps did not provide turn-by-turn navigation at the time of the merger; Nokia HERE did, yet the OFT considered that, despite being pre-installed on Nokia devices, it could be at a competitive disadvantage having access to a smaller user base than Google and Apple (iOS and Android accounted for over 80 per cent of the sales of new smartphones). Then the Authorities looked at the applications developed by established portable navigation device (PND) and in-car navigation manufacturers such as TomTom, Garmin, Navigon and NNG which had at their disposal high-quality map data. However, the available evidence indicated that these applications had achieved low penetration on mobile devices despite having been available for many years. Finally, the OFT considered that the many application developers licensing map data from the established owners of navigable digital map databases had lower download and usage figures than Waze, with the exception of Navfree.

**II.94.** In addition, there were other pieces of evidence pointing to Waze being a close competitor:

- another developer of a map application submitted that the transaction removed Google's closest competitor for turn-by-turn navigation;
- Waze publicly defined itself as "the only reasonable competition" to Google Maps in real-time traffic information;
- in September 2012, Apple mentioned Waze (along with Bing and MapQuest) among the apps it recommended to iOS users while it improved its own map application.

**II.95.** In conclusion, it remains unclear which turn-by-turn navigation service for mobile devices was the closest competitor to Google Maps on Android devices, which represented the largest slice of the smartphone market in the UK.

**II.96.** More fundamentally, the Authorities, probably in the absence of a price being charged to users for navigation apps, investigated whether the disappearance of a competitor such as Waze could have resulted in diminished incentives to innovate. However, as thoroughly discussed in section I.2.3 and in annex A.3.2, there is no clear link between mergers and innovation. Similar ToHs developed by other competition authorities, discussed in section I.4.1.4, have typically set out why, in the specific market where the merger took place, competition was also in the innovation space. In *Google/Waze*, the relationship between competition and innovation is assumed rather than demonstrated.

*Potential competition in the supply of turn-by-turn navigation apps for mobile devices*

**II.97.** The dismissal of the potential competition ToH rested on:

- the fact that future growth projections were uncertain and the number of downloads in Europe was actually below forecast;
- the limited scale achieved by Waze in the UK, which was not enough for Waze to benefit from significant and insuperable network effects;
- the uncertainty with respect to the effect, in terms of growth, of the partnership with ▮▮▮▮▮▮▮▮
- the existence of other competitors which would continue to exert strong competitive constraints on Google Maps.

**II.98.** While lagging significantly behind Google Maps, Waze was among the most popular navigation apps among Android and iOS users. Future growth is always uncertain, but the evidence collected by

the Authorities with respect to past growth and the opinions of third parties and of the merging parties themselves clearly signalled that there was significant potential to Waze, as did the greater success that Waze had reached in other countries at the time of the merger.



it could have still provided an indication that Waze was perceived as having significant potential.

---

120 This information was provided by Google.

PX0498-096

**II.102.** Waze's business model, based on crowd-sourcing of most information needed to feed the app, was also a relevant factor pointing to possible future growth. Indeed, crowd-sourcing of information not only decreases entry costs by providing a cost-effective alternative to purchasing maps information from third parties; it also makes improvements to the app, in terms of maps accuracy and reliability of live traffic information, relatively less costly to implement.



**II.103.** As explained in section I.2.1 and in Annex A.1.2, the installed user base could constitute a source of competitive advantage for Waze, that the Authorities referred to as first mover advantage. Third parties consulted by the Authorities expressed concerns that it would have been difficult for an entrant to replicate the success achieved by Waze with an equivalent model. The OFT just considered that crowd-sourcing was not unique to Waze,[121] but it did not assess the likelihood with which other operators could have successfully achieved a critical mass.[122] Relatedly, the OFT somewhat misinterpreted the role played by network effects in this market, arguing that it did not "consider that, on the basis of the evidence, Waze had achieved sufficient scale in the UK to the extent that it was benefitting from significant and insuperable network effects, or that this would lead to an acceleration in its future growth". However, the relevant question was not whether Waze already enjoyed insuperable network effects, but rather whether network effects could play a role in accelerating growth. Indeed, Waze had found a way to leverage network effects: the larger the user base, the more contributions to the quality of the maps and of the service in general; since better quality attracts more users, a positive feedback loop is created.

**II.104.** Finally, while the Authorities correctly identified partnerships as a sensible path to growth, they underplayed the significance of Waze's potential partnerships ███████████████. As already mentioned, ████████████████████████████████████████████████ This could have been significant given the advantage enjoyed by native apps. In addition, ████████████████████████████████████████████████████████ This would have given it access, or at least visibility, to a significant number of prospective users. While there was uncertainty as to the effect of these partnership, it was a signal that Waze had identified a promising path to growth.

**II.105.** In conclusion, the Authorities seem to have discarded valuable pieces of evidence signalling that Waze may have become a relevant competitor to Google Maps. At the same time, they may have put too much weight on the existence of other competitors, especially on Android devices. Still, it is hard to say whether such evidence would have been enough for the Authorities to adopt a different decision, meeting the probatory standard needed to block a merger.

### *II.3.1.3 Analysis of completeness of ToHs pursued*

**II.106.** ToHs developed by the Authorities focus solely on the effect that the merger could have had on the users' side of the market. However, turn-by-turn navigation apps are provided to users for free and are monetized elsewhere. The Authorities only briefly mentioned monetization channels,

---

[121] In particular, the OFT noted that OSM and, to a lesser extent, Google itself had used crowd-sourcing to develop map data.
[122] Certain third parties considered that Waze had a significant first mover advantage. The supplier of a rival navigation app submitted that OSM had poor quality control compared to Waze and expected its users to dry up if Waze were to become successful.

PX0498-097

observing that Waze at the time of the merger raised little advertising revenue in the UK; the way that Google monetizes Google Maps is not explored.

**II.107.** This makes the range of ToHs analysed in the decision incomplete. Current business models and monetization avenues should represent an unavoidable step for the development of a ToH because, quite simply, market power is not exerted for its own sake, but has the ultimate objective of increasing profits. The incentives to, for instance, reduce innovation efforts and deliver lower quality to users do not directly depend on the number of users lost, but on the revenue lost due to that drop in users.

**II.108.** As will be discussed more thoroughly in section II.3.2.3, monetization channels for turn-to-turn navigation apps include, *inter alia*, the following:

- ads for local businesses shown when using the navigation app. This is one of the monetization strategies used, for instance, by Waze, which shows pins and/or banners for local businesses while the user is using the app;

- local search ads. When users search for nearby businesses via Google Search (for example, "coffee near me") or on Google Maps, they may see local search ads that feature business locations appearing at the top of search results;

- online advertising in general. Location data represents yet another valuable input for advertisers to better target their ads to the correct eyeballs (please see section I.2.4 and Annex A.4 for a discussion on the role played by data in digital markets);

- access to APIs. For instance, Google provides developers with access to certain maps information in exchange for a fee;

- market intelligence. For instance, offline retailers may use location data as an input to evaluate potential store performance.

**II.109.** The activities listed above potentially identify markets where it was possible, at least in theory, for the merger to produce anti-competitive effects. In particular, as a result of the merger, Google adds yet another source of location data, i.e. that generated by and attributable to Waze users. In this way, users lost to Waze, or gained by Waze at the expense of other navigation apps, continue to provide Google with information that is valuable for a variety of purposes, thereby reinforcing Google's position in the correspondent markets.

### II.3.2. *Market outcome assessment*

**II.110.** The market outcome assessment of the *Google/Waze* merger looks at:

- the complementarity between Google and Waze and how this might have been exploited after the merger (section II.3.2.1);

- the evolution of Google and Waze users before and after the merger, and their relative position in the market compared to other providers of turn-by-turn navigation apps (section II.3.2.2);

- the multiple uses of location data, and how the merger may have contributed to the collection and exploitation of such data (section II.3.2.3).

### II.3.2.1 *The complementarity between Google and Waze*

**II.111.** Google Maps and Waze both provide turn-by-turn navigation services but are fundamentally different in terms of how this service is powered, generating scope for significant synergies. For Google Maps, Google mostly relies on licensed map data and on data gathered through more traditional means such as satellite imagery and street view cars. Waze map data is instead created through crowd-sourcing, i.e. through the contribution of the Waze community; moreover, Waze relies on its users to gather real time data on incidents and traffic conditions.

**II.112.** Both Google Maps and Waze directly monetize mapping services through advertising. Google has introduced map ads in 2016 and offers different types of direct advertising on Google Maps, such as:[123]

- local search ads, that appear in response to queries within Google.com and Google Maps. The advertised content is displayed at the top of results and reports relevant information such as address and opening hours. The advertised result is also shown as a pin on the map;
- Place Page Ads, that appear after a specific location has been selected following local search queries within Google.com and Google Maps;
- Promoted Places, which appear in the form of branded icons on Google Maps when someone is browsing without any specific location query.

**II.113.** Waze has introduced advertising in 2012, offering the following advertising solutions:

- search ads, which are similar to Google Maps local search ads;
- Branded Pins, that appear when someone is using the app without any specific query, as Promoted Places in Google Maps;
- takeovers, which are ads that appear as half-screen pop-ups when a driver is at a full stop (e.g. stop at a red light);
- arrows, which are expandable icons that point to a nearby store or site out of the current field of vision on the map.

**II.114.** The advertising strategy employed by Waze has been to target users around their current location, by showing what is near them while they are in motion. In particular, most of advertisers on Waze have always been fast-food restaurants, gas stations, convenience stores and, in general, companies that have multiple retail outlets throughout the country.[124]

████ The merger of Google and Waze may have allowed the two companies to exploit their complementarity, improve their apps and realize some efficiencies. ████████████████████

████████████████████████████████████████████████████████████████████████████████████

---

[123] Report by eMarketer: "*Maps and navigation apps: discovery, exploration features open up ad opportunities*", July 2018.
[124] Interview with Anasofía Sánchez Juárez, Director General, Operations and Country Manager of Waze in Mexico, 25 July 2018. Available at: content-na1.emarketer.com/why-advertisers-are-flocking-to-waze.

████████████████████████████████████

PX0498-099



**II.116.** The sharing of data and information, the reduction of the costs of entering new geographic areas, the access to a shared cloud infrastructure all represent synergies between Google and Waze that the merger allowed to exploit. Moreover, efficiencies that resulted in the improvement of Google Maps were realized to the benefit of all Google Maps users. Google Maps' high market penetration (shown in Figure II.13 and Figure II.14) means that a large number of users have benefitted from them, making efficiencies quite significant.

### *II.3.2.2 Evolution in the supply of turn-by-turn navigation apps*

**II.117.** The evolution of the number of users of Google Maps can be fully appreciated when separately looking at the main OSs for mobile devices (i.e. Android and iOS). Indeed, Google Maps has always been the native maps application in Android devices, while it has been the preinstalled map in iOS devices only until September 2012.



PX0498-100



**II.119.** The significant decrease experienced by Google Maps on iOS devices before the merger is related to the introduction of iOS 6 in September 2012. Before the launch of this iOS update, Google Maps was the preinstalled map application on all iOS devices. However, after 2012 Apple decided to replace Google Maps with its own map application, therefore preinstalling Apple Maps in its devices. Although Apple Maps encountered some problems when it was introduced[127], it benefitted from being the native mapping services on iOS devices and, as such, it was integrated with other iOS native application (e.g. Siri, Mail). Apple Maps has made major adjustments and improvements over time and, as shown below, has been able to remain the main mapping services used on iOS devices.

**II.120.** Waze has expanded its usage base in the years after the merger. Figure II.12 shows the evolution of the number of Waze users, by operating system, before and after the merger with Google (2012-2018).

---

[127] When Apple Maps was released, consumers complained about its poor accuracy. On 28 September 2012, Tim Cook, Apple's CEO, released a public letter in which he apologized for the poor performance of Apple Maps and suggested alternative maps applications to be used while Apple was fixing the problems and errors of Apple Maps.



**II.121.** In the years after the merger, Waze still represented one of the main alternatives to Google Maps for the provision of turn-by-turn navigation services, together with Apple Maps. Figure II.13 shows the share of the various apps in the supply of turn-by-turn navigation apps, in terms of unique users, at the beginning of 2015 in the UK (the earliest date for which data is available after the merger took place).[129] While substantially smaller than Google Maps and Apple Maps, Waze is the third app for number of unique users.



.

[129] The shares are calculated based on the number of unique users in January 2015 provided by ComScore, which collects data only for navigation applications whose number of users is above a threshold ("Minimum Reporting Standard"). This implies that apps used by a small number of users are not always reported, and the shares reported below may be slightly overestimated. However, we do not expect results to be significantly different if those apps were instead included in the analysis. The Minimum Reporting Standard was equal to 149,000 unique users in January 2015.

PX0498-102

**Figure II.13: Share of supply in turn-by-turn navigation apps, 2015m1 (% of unique users)[130]**



*Source: Lear based on ComScore data*

**II.122.** As outlined in section II.3.1, at the time of its decision, the OFT relied on the fact that there existed other providers of turn-by-turn navigation apps, different from Waze, that would continue to represent strong competitive constraints on Google Maps, particularly Apple Maps. The evidence collected shows that after the merger Google has remained the main provider of turn-by-turn navigation services, with a share of 66%, followed by Apple Maps (30% share) and Waze (2% share).[131]

**II.123.** Few of the existing competitors seem to rely on a crowd-sourced data and they attract very few users.[132] This may be consistent with Waze's first mover advantage and with the concerns expressed by third parties that it would have been difficult for an entrant to replicate the success achieved by Waze with a similar model.

**II.124.** Since Apple Maps is not available on Android devices, the relevance of Google as a supplier of turn-by-turn navigation apps appears blatant for Android users, as shown in Figure II.14. Google Maps represents the main app in terms of usage (95% in terms of unique users). Waze is instead the second main app used for mapping services (4% share). No other provider seems to play a significant role.

---

[130] Please note that the number of unique users for Google Maps and Apple Maps may not be limited to the users of turn-by-turn navigation services, but also of general mapping services such as street views, satellite imagery, directions for non-driving transit (which are instead not available on Waze). This may partially apply also to the other providers shown in Figure II.13 and Figure II.14, and overstate the share of Google Maps, Apple Maps and other providers compared to Waze. In other words, Waze could be a much more relevant provider of turn-by-turn navigation services than it appears from the data collected.

[131] Other navigation apps that were below the Minimum Reporting Standard in January 2015 are, for example: Sygic, Maps.me, TomTom, HERE WeGo, CoPilot, Aponia. However, the inclusion of these applications would not alter significantly the conclusion that Google Maps has remained the most important player.

[132] One of the very few examples is OsmAnd, a navigation application that uses OpenStreetMap map data, whose content is user generated.

PX0498-103

**Figure II.14: Share of supply in turn-by-turn navigation apps in Android devices, 2015m1 (% of unique users)**



*Source: Lear based on ComScore data*

**II.125.** The competitive constraint that Apple Maps exerts on Google Maps is limited by its availability only on iOS devices. Although, as shown in Figure II.15, the share of sales of iOS smartphones has always been higher in UK than in other European countries (31% at the time of the merger and higher in the next years), Apple Maps cannot directly compete with Google Maps for most part of users.

**Figure II.15: Share of smartphone sales by operating system (%)**



*Source: Lear based on eMarketer data (downloaded on February 8, 2019)*

**II.126.** Over the years, the situation observed in the UK market for turn-by-turn navigation apps has not experienced significant changes: Google Maps has remained the main mapping service used, with Apple Maps representing its main competitor – and Waze (now part of Google) being the main alternative for turn-by-turn navigation services for Android users.

PX0498-104

**II.127.** Being Waze part of Google, the market outcome assessment shows there is no other turn-by-turn navigation app able to constrain Google Maps on Android devices. The key question is however whether the decision to clear the merger represented a missed opportunity for the emergence of a competitor. Different counterfactual scenarios can be envisaged:

- Waze could have grown over time, attracted more users and in turn improved its services and the accuracy of its maps;
- Waze could have grown by gaining access to the financial resources of other digital companies interested in its innovative technology;
- Waze could have been acquired by another turn-by-turn navigation service provider such as Apple Maps;
- Waze could have gradually disappeared from the market.

**II.128.** There are few elements that allow to identify the most likely counterfactual. Whilst other large digital incumbents approached Waze, it seems that they all elected not to acquire it, making the counterfactual represented by alternative transactions somewhat less likely. Most of these tentative acquisitions, however, were contemporaneous to the acquisition by Google, and this may have discouraged alternative buyers.

**II.129.** Waze proved to have a very innovative technology, and Google itself labelled it as a "brand worth tracking". This may have allowed it to grow, even in the absence of an alternative buyers. However, while reliance on crowd sourcing enabled Waze to supply accurate and valuable real time traffic information, it may have had some limit when coming to maps' accuracy or coverage.

**II.130.** Moreover, the merger has enabled Google Maps and Waze to exploit their complementarities and generate efficiencies. These efficiencies are clearly merger-specific and should be taken into account when assessing whether the decision has proved to be beneficial or detrimental to consumers.

**II.131.** The evidence gathered on the market evolution is not sufficient to assess which of the above-listed counterfactuals would have been more likely. In any case, the merger assessment would not end up with the selection of the counterfactual, as it would also require to balance the potential anti-competitive harm and the efficiencies generated by the merger.

### *II.3.2.3 Monetization strategies and the relevance of location data*

**II.132.** As highlighted in section II.3.1, at the time of its decision the OFT did not take into account how the services offered through Google Maps and Waze are monetized. However, monetization channels were already relevant then and have arguably increased in their relevance over time.

**II.133.** Mapping services can be monetized both directly, through advertising displayed in the navigation apps, and indirectly, by collecting, selling or otherwise exploiting location data. The merger, and the efficiencies that have resulted from it, may have helped both Google Maps and Waze to enlarge their user base, enhance users' experience and in turn being more attractive for advertisers. While Waze was already monetizing its mapping services, through different forms of local search ads, Google Maps has only started after the merger and may have benefitted from the expertise of Waze.

**II.134.** Mapping services, however, can also be indirectly monetized. Currently, data on users' location gathered through mapping services represents a valuable source of information for multiple uses, not limited to advertising. Through mobile devices and the stream of data they generate, location data have become a powerful tool to identify audiences and observe online (and offline) consumer

PX0498-105

behaviour. Navigation services are nowadays an important component of mobile use[133] and Google Maps is the sixth most important mobile app for UK internet users.[134]

**II.135.** Location data enables a more precise targeting of consumers' preferences by relying on their movement behaviour[135], and can hence be used to improve the effectiveness of advertisement. Location-based advertisement has become particularly relevant on mobile devices, as devices' location represents an instant key indicator of users' intent: real-time information on consumers' location allows to build highly personal mobile campaigns by delivering real-time message based on devices' location.[136] This application has become more and more relevant over time: for example, location targeted mobile advertising is expected to reach $ 39 billion by 2022 in the US market, an increase of 126% compared to the value of 2017.[137]

**II.136.** Advertising represents just one of the possible uses of location data, which are indeed also used by companies for other purposes, such as online-to-offline (O2O) measurement (i.e. the use of location data to assess the movements of customers and assess the impact of online advertising), tracking and planning field activities, benchmarking store/location performance.[138]

**II.137.** Compared to a counterfactual where Waze would have been become a competitive force, yhe merger might have made Google an even more relevant provider of location data by eliminating a potential competitor in the supply of location data. This in turn might have reinforced its competitive position for the provision of online advertising across all its services.

### *II.3.3. Conclusions on Google/Waze*

**II.138.** The Authorities' investigation at the time of the merger uncovered that Waze was a promising application in a market where users did not have many alternatives, with a promising business model and growth strategy. Yet, the Authorities were very cautious in the assessment of the evidence before them dismissing the potential competition ToH in part due to uncertainty in future market developments.

**II.139.** Further, the reliance on Apple Maps as a source of competitive constraints on the merged entity may have been somewhat overstated. If Google were to lower the quality of Google Maps on Android, Android users would not be able to switch to Apple Maps. Apple Maps could constrain Google Maps to the extent that Google cannot discriminate between the two platforms. The Authorities did not investigate whether this was the case, and simply relied on the existence of Apple Maps as a source of competitive constraint. The Authorities could have further investigated the ability of turn-by-turn navigations apps to discriminate across operating system, and the costs users bear to switch from one operating system to another.

**II.140.** Finally, the Authorities omitted to explore the effects of the merger on the several economic activities related to the provision of turn-by-turn navigation services, which represent the way these services are monetized. This is the result of an insufficient understanding of how the services provided by the merging parties are monetized, both directly and indirectly.

---

[133] For example, a third of smartphone users in the US use navigation apps (report by eMarketer: *"Maps and navigation apps. Discovery, Exploration features open up ad opportunities"*, July 2018).

[134] eMarketer chart: *"Most Important Mobile Apps Among UK Internet Users, Q2 2017"*, August 2017.

[135] *"Marketer's Guide to Location Data & Location Based Marketing"*, 16 April 2018. Available at: tamoco.com/blog/marketing-advertising-location-data-intelligence.

[136] *"How Location Data Is Reshaping Mobile Advertising and Attribution"*, available at: www.jeffbullas.com/location-data.

[137] Report by eMarketer: *"Location intelligence 2018: consumer behavior, data quality and targeting tips"*, February 2018.

[138] Report by Local Search Association: *"Market landscape report. Location intelligence"*, February 2018. Available at: www.thelsa.org/Uploads/Public/Documents/FreeReports/2018_Location_Intelligence_Market_Landscape_Report_v2.pdf.

PX0498-106

**II.141.** The market outcome assessment has pointed out the existence of multiple sources of complementarity between the two turn-by-turn navigation apps, which may have been exploited through the merger and contributed to the development the merging parties have witnessed in the years after the merger. However, in terms of choice, there remain few alternatives to the merging parties available to users for turn-by-turn navigation apps, especially for the Android environment. Moreover, the merger may have provided Google with yet another opportunity to reinforce its position in the markets where location data can be exploited, including the advertising markets.

**II.142.** While there may be some gaps in the analysis undertaken by the Authorities, and that has resulted in the clearance of the merger, it is hard to say whether this has led to a detrimental outcome. This depends on the development that Waze would have witnessed in the absence of the merger, i.e. the selected counterfactual. Even when compared to a counterfactual where Waze would have become a strong competitor, the assessment of the decision should also consider the potentially substantial efficiencies arisen from the merger, that may counterbalance the anti-competitive harm.

PX0498-107

## II.4. PRICELINE/KAYAK AND EXPEDIA/TRIVAGO

**II.143.** The OFT's decision of 9 May 2013 allowed Priceline.com Incorporated (Priceline) to complete its acquisition of Kayak Software Corporation (Kayak). Priceline was the holding company of Priceline Group. Priceline's subsidiaries were online travel agencies (OTAs)[139] that allowed consumers to search and book travel services from travel service providers (TSPs) such as hotels, airlines and car rental companies. Kayak was a meta-search site (MSS) allowing users to search and compare prices for hotel rooms, airline tickets, rental cars and other travel services. The crucial difference between the parties' businesses was that MSSs did not have a booking functionality; rather, they referred users either to OTAs' or TSPs' websites, where users could complete their booking.

**II.144.** MSSs often offer a so-called "facilitated booking" functionality: that is, consumers are given the chance to complete the booking on the MSS interface, instead of being referred to an OTA or TSP website. However, these bookings are completed through an affiliate service provided by an OTA and this is clearly signalled to consumers on the MSS website and the financial arrangements between OTAs and MSSs remain unchanged. At the time of the merger, Kayak offered this service through its "Book Kayak" functionality. This could be a factor increasing substitutability between the parties' services. However, the OFT noted that only an insignificant number of bookings were made through "Book Kayak".

**II.145.** OTAs are two-sided platforms as they supply online travel search services to consumers on one side, and online advertising services to TSPs on the other; moreover, OTAs operate as intermediaries in the transactions occurring between consumers that buy travel services and the TSPs that sell them; OTAs receive a commission from TSPs if customers conclude a booking on their website. MSSs are also two-sided platforms, but they do not act as intermediaries between customers on one side, and TSPs or OTAs on the other as they facilitate the transaction between consumers and the other parties but do not enter into a transaction with the buyer. MSSs receive a rate per click by OTAs or a percentage commission of the booking fee by TSPs if customers make a booking on their website.

**II.146.** According to the OFT, from the perspective of TSPs, the substitutability between OTAs and MSSs might have been limited since, in order to make direct use of an MSS, a TSP needed to have its own booking functionality. On the other hand, it was not clear to what extent consumers found the distinction between OTAs and MSSs important. The Authorities did not conclude on the precise relevant market definition, but on a cautious basis they assessed the transaction with reference to: (i) online advertising services to UK-based hotels and car hire firms by OTAs and MSSs in the UK; and (ii) online travel search services for UK-based consumers relating to hotels and car hire by OTAs and MSSs in the UK.

**II.147.** The OFT noted that the parties both competed and had a vertical relationship. In particular, the non-horizontal relationship between OTAs and MSSs may be characterized as MSSs providing advertising services to OTAs. Therefore, the Authorities investigated both horizontal and non-horizontal ToHs.

**II.148.** The transaction whereby Expedia, an OTA, acquired control of Trivago, an MSS, in March 2013 was not assessed by the Authorities as the transaction did not meet the UK turnover test nor the share of supply test. There is thus limited scope for a methodology assessment of the decision, since this does not include any substantive assessment of the merger. However, the transaction will be discussed in the context of the market outcome assessment, jointly with *Priceline/Kayak*, as the two mergers affected the same relevant markets.

---

[139] The Priceline Group operated under four main brands: Booking.com, Priceline.com, Agoda.com and Rentalcars.com.

PX0498-108

### *II.4.1. Methodology assessment*

#### *II.4.1.1 Identification of ToHs pursued by the Authorities and key elements underpinning them*

*Unilateral effects in the UK online hotel sector*

**II.149.** The Authorities were concerned that the transaction could lead to price increases or degradation of quality in the supply of online advertising services by OTAs and MSSs to hotels, and/or degradation of quality in the supply of online travel search services to consumers. The OFT estimated the parties' market shares based on three figures: net revenue, volume and gross booking value (GBV). The assessment of the likelihood of these effects was conducted separately for the two sides of the market, but with similar considerations, therefore they will be discussed jointly. The key evidence that made the OFT dismiss this ToH was the following:

- the increment in market share brought about by the transaction was minimal due to Kayak's small share of supply at the time of the merger;
- there existed more significant competitors to both parties. In particular, the closest competitors to Priceline were generally identified by third parties in other OTAs, such as Expedia and Travelocity, and the closest competitors to Kayak were identified in other MSSs, such as Trivago and TravelSupermarket.

*Unilateral effects in the UK online car hire sector*

**II.150.** The Authorities were concerned that the transaction could lead to price increases or degradation of quality in the supply of online advertising services by OTAs and MSSs to car hire firms, and/or degradation of quality in the supply of online travel search services to consumers. Unlike for the hotels sector, the OFT was unable to estimate market shares. This ToH, however, was dismissed mainly based on the argument that the increment in revenues generated by the transaction was very small due to Kayak's revenue from car hire being negligible. Also, the Authorities noted that the car hire firms they contacted did not raise concerns about the merger.

*Coordinated effects in the UK online hotel sector*

**II.151.** The relevant question the Authorities had to address was whether the conditions for coordination were strengthened as a result of the transaction. The concern in this case was that Priceline could use Kayak's technology to automate detection of rate parity[140] deviations, thus making coordination easier. The key argument on which the dismissal of this ToH was based was that more effective technology for parity checks already existed in the market and was available to Priceline, for instance data scraping technology. This technology would have been better suited than Kayak's for the purpose of detecting parity deviations, as the latter had an important limitation: Kayak would have only provided Priceline with access to pricing information related to the searches carried out by its customers, instead of a full set of an OTA or TSP's prices. Indeed, the parties informed the Authorities that Kayak did not store its counterparties' pricing data on its own systems; rather, when a consumer enters a search into Kayak, the same search is automatically run on various OTAs and TSPs price databases.

*Foreclosure of rival OTAs*

**II.152.** The Authorities assessed whether the merger would have provided Priceline with the opportunity to foreclose rivals from both online travel search services to consumers and online

---

[140] Rate parity agreements are agreements between hotels and OTAs providing that the same rates are charged for the same room on all distribution channels; hotels are therefore prevented from offering their rooms at lower prices on other websites, including their own website.

PX0498-109

advertising services to TSPs using Kayak to bias search results in its favour. The Authorities rejected this ToH claiming that:

- even if Priceline had the technical ability to pursue such a strategy, evidence on consumers' behaviour, in particular the fact that they seemed to visit at least three websites when comparing and choosing travel products, suggested that they would have quickly noticed such an biased picture and Kayak's usage would have declined;

- Kayak's business could have been further damaged as other OTAs would have stopped using Kayak. This implies that the economic incentive to foreclose was likely missing: losses would have likely outweighed gains, particularly given the minimal size of Kayak's share of supply;

- even if implemented, such a foreclosing strategy would have been unlikely to lead to an SLC since Kayak was not a "must have" website for other OTAs to generate traffic to their website. There were several MSSs available to UK consumers and MSSs represent only one of the possible sources of traffic for OTAs.

*Conglomerate effects of Priceline bundling or tying its other portfolio brands*

**II.153.** The concern was that, given the merging parties' increased market share in the hotel sector, Priceline could use Kayak to leverage its other brands through bundling or tying in order to force counterparties to sign up to one or more other Priceline brands. The OFT concluded that this was not a credible ToH based on the following pieces of evidence:

- given the small increment in Priceline's market share brought about by the transaction, the merger did not result in additional leverage with TSPs;

- the majority of Kayak's customers were OTAs with whom there is no opportunity of bundling or tying;

- TSPs were already signing up to multiple OTAs and MSSs.

### II.4.1.2 *Analysis of the key elements underpinning ToHs*

*Unilateral effects in the UK online hotel sector*

**II.154.** The dismissal of the unilateral effects in the hotel segment ToH rested on:

- the observation that the increment in market share brought about by the transaction was minimal due to Kayak's small share of supply at the time of the merger;

- the existence of other, more significant competitors to both merging parties in the provision of both services.

**II.155.** However, more fundamentally, the relevance of horizontal ToHs rests on whether consumers, or at least a subset of them, perceive the services supplied by MSSs and OTAs as substitutes, as only in this case unilateral effects may have arisen as a result of the transaction. This fundamental question is effectively left open in the Authorities' decision, with evidence going both ways:

- on the one hand, MSSs and OTAs have very different business models. OTAs allow users to book directly on their websites, provide customer care, and collect their revenues from TSPs. MSSs only allow users to search and compare the offers of different OTAs for the same TSP, as well as offers for different TSPs, and collect their revenues from both OTAs and TSPs;

- on the other hand, there is some overlap in the range of services supplied by MSSs and OTAs, in that both enable consumers to compare the offers of the various TSPs available for a given request. There was also some evidence of convergence in business models, such as the provision by MSSs of facilitated bookings, which increased the overlap between the range of services supplied by MSSs and OTAs. The availability of booking facilities by TSPs also contributed to making the two services substitutes.

PX0498-110

**II.156.** The Authorities approach was to skip this assessment and go straight to evaluating whether the acquisition of Kayak substantially increased Priceline's share of supply. However, the market share analysis as carried out by the Authorities is likely to be affected by a significant measurement problem. Indeed, even if users, or a subset thereof, perceived OTAs and MSSs as substitutes, as both enable them to search and compare offers of TSPs, the range of services they supply would remain different. This difference entails that OTAs' costs are substantially larger, as are the commissions typically charged to TSPs. This makes revenues difficult to compare across the two types of services. Hence, Kayak's small share of the market in terms of revenue may not have corresponded to a likewise minor role vis-à-vis consumers.

**II.157.** The Authorities could have investigated the nature of the relationship between MSSs and OTAs more thoroughly by simply analysing how users of these services behave. For instance, how common is it for users to use an MSS and then move on to book with the facilitated booking facility or with the TSP itself? How many users, instead, perform their search on MSS and then proceed to book with an OTA? How many users go to an OTA's website directly? All of these questions – relevant to evaluating the nature of the relationship between OTAs and MSSs – could have been answered through a survey or through analysis of traffic data showing points of entry to the OTAs' websites. Such data is routinely collected by OTAs and MSSs to monitor performance and the Authorities could have requested it from the merging parties.

**II.158.** In any case, even if the Authorities had found that OTAs and MSSs could be regarded as substitutes, it is likely that Kayak and Priceline were not close substitutes of one another. It is reasonable to argue that OTAs compete more closely with other OTAs and that MSSs compete more closely with other MSSs, thereby making the conclusion reached by the Authorities substantially correct regardless of the extent of substitutability between the two types of services and of the measurement problems discussed above.

*Unilateral effects in the UK online car hire sector*

**II.159.** The Authorities' assessment of this ToH was similar to the one carried out for the hotel sector, therefore relying on revenue evidence and on the assumption that MSSs and OTAs are not each other's closest competitors. Revenue evidence is likely biased by the same issues described above, but the closeness of competition argument appears robust.

*Coordinated effects in the UK online hotel sector*

**II.160.** The dismissal of the coordinated effects in the hotel segment ToH rested on:

- the observation that the technology offered by Kayak was not an effective detection mechanism; and
- the existence of alternative technologies that could have better served the same purpose pre-merger.

**II.161.** The OFT's arguments seem convincing since the available evidence suggested that the transaction was not likely to strengthen market participants' incentives to coordinate.

*Foreclosure of rival OTAs*

**II.162.** The dismissal of the foreclosure ToH rested on the following key arguments:

- consumers would have quickly noticed a bias in Kayak's search results;
- losses would have likely outweighed gains to the merged entity, particularly given the minimal size of Kayak's share of supply;
- even if implemented, such a foreclosing strategy would have been unlikely to lead to an SLC since Kayak was not a "must have" website for other OTAs to generate traffic to their website.

PX0498-111

**II.163.** The dismissal of this ToH hinged *inter alia* on the ability of users to promptly recognize bias in search results and switch away from a Kayak website favouring Priceline's offers. The only evidence that supported this argument was consumers' tendency to multi-home, and in particular the fact that they visited at least three websites when comparing and choosing travel products. However, this argument does not seem compelling for the following reasons:

- the Authorities did not investigate which types of websites are visited by consumers, i.e. whether they compare travel services among MSSs only or also across OTAs and TSPs' websites: this might have an influence on their ability to notice the possibly biased picture provided by Kayak. The only way for consumers to be able to recognize bias would have been for them to compare the results of different MSSs, as only these allow to compare offers of OTAs and TSPs for a given travel service. Consulting TSPs' or OTAs' websites does not add to their ability to recognize bias in favour of a particular OTA;

- there is evidence that consumers tend to focus their attention, and clicks, on results at the top of search results pages, in particular for travel websites. De Los Santos and Koulayev (2012) analysed consumers' propensity to click on different links using a sample of 23,959 unique search histories on listings from a travel and accommodation website and found that the top three links accounted for 44% of the total clicks, with 22% being concentrated on the very first link. In addition, their study reveals that the first links on any page obtained more clicks than the last link on the previous page: this suggests that consumers may tend to click on certain links just because they are on top of the list rather than because they expect them to be more relevant to their searches;[141]

- the OFT did not consider that the average consumer is likely to be unaware of the brands that are under the control of the same entity: it is therefore hard to imagine that consumers would realise that Kayak is favouring Priceline's offerings, if they do not even know that they are part of the same group;

- different OTAs return different recommendations for the same queries, with some prioritising price and other prioritising quality:[142] therefore, it is harder for consumers to notice a bias in search results by simply visiting multiple websites.

**II.164.** Thus, the OFT's conclusion about the incentives of the merging parties to bias search results in favour of other brands from the Priceline group is not conclusively supported by the evidence collected during the merger assessment. However, the link between such a practice and the foreclosure of rival OTAs is not at all direct: there were several MSSs active in the UK, and the competitive impact of a bias was in any case likely to be limited.

*Conglomerate effects of Priceline bundling or tying its other portfolio brands*

**II.165.** The arguments used by the OFT for rejecting the conglomerate effects ToH are overall convincing. Indeed, it is reasonable to assume that Kayak did not provide incremental leverage with TSPs given that the majority of its customers were OTAs, and that, in any event, this practice would have been unlikely to produce a significant effect on competition given that it was already quite common for TSPs to multi-home, i.e. sign up to multiple OTAs and MSSs.

### II.4.1.3 Analysis of completeness of ToHs pursued

**II.166.** Had the Authorities found that the prevalent relationship between OTAs and MSSs was of a horizontal nature, i.e. that OTAs and MSSs are substitutable from the perspective of consumers, then an additional ToH that could have been explored was whether the combination of Priceline's and

---

[141] For further details see the CMA's report "Online search: consumer and firm behaviour" (2017).

[142] See paragraph 5.19 in CMA's report "Online search: consumer and firm behaviour" (2017).

PX0498-112

Kayak's user bases could have created an exclusive set of users who only shop through these services and that could have been leveraged to exert market power on the other side of the market.

**II.167.** Similarly to what is discussed in section II.2.1.3 in relation to social media platforms, the attractiveness of OTAs and MSSs to TSPs depends, *inter alia,* on the user bases these platforms allow TSPs to reach. If platforms had an exclusive turf of users, this would increase their ability to exert market power with TSPs, in line with the literature about competitive bottlenecks discussed in section I.2.1 and in Annex A.1.2, where single-homing on one side allowed platforms to extract monopoly rents on the other side. In the benchmark model, it is assumed that one set of users of the platform multi-home and the other always single-home.

**II.168.** Whilst such an assumption is quite extreme and does not fully reflect the dynamics of the online travel markets, the conclusion might still provide useful insights. Available evidence suggests that TSPs (and OTAs) multi-home, being present on multiple platforms, and that users do so to a lesser extent; several empirical studies suggest that consumers, when searching for travel services online, seem to compare fewer options than might be expected.[143] The price structure prevailing in the sector is consistent with what suggested by the literature, with users accessing these services for free and TSPs paying commissions to OTAs and MSSs, meaning that platforms seek to attract users which are leveraged on the other side of the market.

**II.169.** In this context, and to the extent that MSSs and OTAs are substitutable to one another (which, as discussed in section II.4.1.2 above, was effectively an open question at the time of the merger) an additional ToH which could have been explored was whether the user bases of Priceline and Kayak were such that their combination created a sizable share of users shopping only through these two suppliers, which would have become exclusive to the merged entity post-merger. The transaction could have then given the merged entity the ability to charge higher prices to TSPs and other OTAs to give access to this exclusive user base. As will be discussed in section II.4.2, however, the available evidence points to a complementary relationship between OTAs and MSSs.

**II.170.** In addition, the Authorities could have explored whether the business models of Booking and Kayak were likely to converge in the future, with Kayak taking steps to increase the degree of substitutability between its services and those provides by OTAs. Indeed, the introduction of facilitated booking was a step in that direction. To explore this ToH, the Authorities would have assessed Kayak's internal documents to evaluate whether there were any plan to do so. However, there were probably other competitors left in the market likely to constrain Priceline more than Kayak could.

### *II.4.2. Market outcome assessment*

**II.171.** The market outcome assessment of the two mergers in the online travel sector, *Priceline/Kayak* and *Expedia/Trivago*, looks at:

- the relationship between the services offered by OTAs and MSSs, and the extent to which they can be considered substitutes or complements (section II.4.2.1);
- how the market and the merging parties have evolved since the mergers took place (section II.4.2.2);
- whether the mergers provided an incentive for Kayak and Trivago to bias their search results in favour of Priceline's and Expedia's offers respectively (section II.4.2.3).

---

[143] In particular, Johnson et al. (2004) found that searched on average 1.8 travel websites; Zhang et al. (2007) documented a higher degree of multi-homing by consumers, with 3.3 travel websites being visited on average; Holland and Jacobs (2014) found that only 26% of consumers consulted more than one airline website before their purchase, and the average number of airline websites visited among those consumers who browsed through more than one was just 2.46. For further details see the CMA's report "Online search: consumer and firm behaviour" (2017).

PX0498-113

*II.4.2.1 The relationship between OTAs and MSSs*

**II.172.** As described in section II.4.1, OTAs allow consumers to search and book travel services from TSPs such as hotels, airlines and car rental companies. MSSs are instead platforms that allow consumers to search and compare prices for hotels, airline tickets, rental cars and other travel services offered by different OTAs and TSPs. The relationship between OTAs and MSSs is not straightforward: there is complementarity between their services since MSSs do not usually offer booking functionalities but refer the customer to the selected OTA. However, there may be some substitutability between the two services, to the extent that both enable consumers to compare the offers of the various TSPs available for a given request.

**II.173.** The evidence collected through the market participants[144] seem to suggest the prevalence of a complementary relationship between OTAs and MSSs.

**II.174.** First, MSSs and OTAs derive the bulk of their revenues in different ways. MSSs' revenues largely come from the traffic referred to the OTAs. Generally, MSSs monetize through cost per click (CPC) and cost per acquisition (CPA). The CPC arrangement requires the OTA/TSP to pay the MSS whenever a referral to the OTA/TSP website is made, regardless of whether the click leads to a booking.[145] The CPA arrangement, instead, entails that the OTA/TSP pays a fixed fee or a percentage of the booking commission when a booking is made by a customer that was referred to its website from the MSS.[146]

**II.175.** OTAs' revenues, instead, are completely generated from TSPs. Revenues are indeed mainly given by the booking commissions paid by the TSPs, when customers conclude a booking through the OTA website.[147] This revenue model is the one employed, for example, by Booking.com, Priceline's main website.[148] Other OTAs, such as Expedia, earn most of their revenues by buying the service from TSPs and then reselling it to customers. The OTA is able to get discounts on the services, such as rooms or flights, by buying them in advance and in bulk, and often offering them to customers in the form of a bundle between different travel services.[149]

**II.176.** Second, market participants define OTAs and TSPs as the main customers of MSSs, and MSSs as an important distribution channel for the services provided by OTAs and TSPs (for some OTAs, MSSs are their major distribution channel).[150] In this perspective, OTAs compete with each other – and with TSPs – to be shown in the MSSs' results page and gain traffic towards their websites.

**II.177.** Market data also seems to point towards the direction of complementarity. Table II.1 shows the top three referring sites for OTAs, which are always MSSs. That is, the main source of traffic for OTAs is represented by links from MSSs to OTAs.

Table II.1: Top three referring sites for various OTAs

| Sites | Top three referring sites |
|---|---|
| Expedia.co.uk | Tripadvisor.co.uk |
| | Trivago.co.uk |
| | Kayak.co.uk |

---

[144] This is based on interviews held with an MSS and eDreams Odigeo.

[145] The cost of the click is usually determined through an auction system.

[146] In addition, MSSs derive part of their revenues from standard advertisement, mainly in the form of banner ads in their websites.

[147] The commissions depend on the types of accommodation and how the TSP wants to rank on the result pages.

[148] https://www.booking.com/content/terms.en-gb.html.

[149] https://www.innovationtactics.com/business-models-tripadvisor-booking-com-expedia/.

[150] This is based on interviews held with an MSS and eDreams Odigeo.

PX0498-114

| Uk.hotels.com | Trivago.co.uk |
| | Tripadvisor.co.uk |
| | Kayak.co.uk |
| Edreams.co.uk | Skyscanner.net |
| | Kayak.co.uk |
| | Cheapflights.co.uk |
| Opodo.co.uk | Cheapflights.co.uk |
| | Kayak.co.uk |
| | Momondo.co.uk |
| Ebookers.com | Kayak.co.uk |
| | Tripadvisor.co.uk |
| | Trivago.co.uk |
| Travelrepublic.co.uk | Tripadvisor.co.uk |
| | Trivago.co.uk |
| | Travelsupermarket.com |

*Source: SimilarWeb, February 2019*

**II.178.** However, facilitated booking agreements between OTAs and MSSs may enhance the substitutability between the services provided by OTAs and MSSs. When relying on a facilitated booking agreement with an OTA, the MSS offers consumers the possibility to proceed with the booking directly on its website. The booking services and the customer care services will be still provided by an OTA, but the consumer will not be referred to the OTA website. In most respects, from the perspective of consumers, the booking service will be supplied by the MSS, with no need for the OTA's intermediation.

**II.179.** For example, Kayak has facilitated booking agreements with several OTAs in the UK, ranging from Expedia brands to Priceline brands, and to other independent OTAs.[151] According to data collected from Kayak on the hotel segment for a sample of destinations[152], the option to book an accommodation directly through Kayak, i.e. using its facilitated booking agreements with OTAs, is available in 97% of cases: for almost every hotel listed in the results page, users have the option to book the accommodation by using the MSS's website instead of be referred to the OTAs'. It should be however considered that the provision of facilitated booking service does not seem very widespread among MSSs in the UK market. Among the largest MSSs[153], other than Kayak, only TripAdvisor provides such service.

**II.180.** In addition, as also noted by the OFT during the investigation, the possible horizontal relationship between OTAs and MSSs arises since MSSs may channel users' traffic directly towards TSPs (those with booking functionalities), preventing users to flow to OTAs' websites and avoiding their intermediation. For instance, data collected on Kayak's website shows that the option to book an accommodation directly through the TSP is available in 41% of cases. In all these cases, consumers can

---

[151] Based on a call held with Kayak, the OTAs providing facilitated booking to Kayak are Hotels.com, Expedia, Amoma, Booking.com, Getaroom and Agoda.

[152] Kayak has provided information on the results obtained for a number of queries made in their website for hotel accommodation. In particular, Kayak has collected information for search results obtained for 49 destinations and, for each destination, the first 15 hotels appearing on the search results page have been considered. Annex D describes how data analyzed in this section was collected and elaborated.

[153] See Section II.4.2.2.

PX0498-115

substitute the service provided by the OTA with the service provided by Kayak in conjunction with the TSP.

**II.181.** The evidence above may not be enough to conclude that OTAs and MSSs are substitute, but may contribute in making the distinction from the users' perspective more blurred. When asked whether facilitated booking agreements can alter the complementary relationship between OTAs and MSSs[154], the stakeholders interviewed stressed that facilitated bookings only represent an additional point of sales for OTAs. Moreover, even in the case of facilitated booking, MSSs still monetize through the standard financial arrangements with OTAs (CPC or CPA). One of the interviewed stakeholders[155] pointed out that the facilitated booking function has been introduced to reduce friction in users experience, especially when users make the booking from their mobile devices, and to raise brand loyalty. For example, through facilitated booking users can use credit card information previously saved on the MSS.

**II.182.** On balance, however, most of the elements collected suggest the existence of a vertical relationship between OTAs and MSS. The assessment of the market structure arising after the merger will thus focus on whether and to what extent the acquisition of an input such as the services provided by the MSSs has enhanced the growth of Priceline and Expedia in the years after the merger.

### II.4.2.2 *The evolution of the merging parties in the markets for travel services*

**II.183.** Figure II.16 shows the number of monthly users in the UK for Priceline and Kayak before and after the years of the merger (the number of Priceline users includes the users of all its travel websites, excluding Kayak). Priceline users have increased over time, going from 5 million in September 2012 to 11.8 million in September 2017. This growth is mainly driven by the Booking.com brand. Kayak users have instead remained stable over the entire period, reaching the level of 1.4 million in September 2017.

---

[154] This is based on interviews held with Kayak and eDreams Odigeo.

[155] This is based on the interviews with Kayak.

PX0498-116

**Figure II.16: Monthly active users of Priceline group and Kayak in the UK (million)[156]**



The vertical line indicates the month of Priceline/Kayak merger (May 2013).

*Source: Lear based on ComScore data*

**II.184.** The evolution of the number of users of Expedia (which includes the users of all its websites, excluding Trivago) and Trivago is shown in Figure II.17. The number of users of Expedia has witnessed a consistent growth starting from the end of 2015, reaching 12.8 million users in September 2017. This growth was mainly driven by the Expedia.com brand and the Hotels.com/Venere.com brand.[157] Trivago's visitors have also increased since the time of the mergers, going from 0.7 million in September 2012 to 3.9 million in September 2017.

---

[156] Starting from 2015, ComScore has changed the methodology employed to measure mobile activities, transitioning from GSMA MMM to Mobile Metrix, in order to take into account more properly the usage deriving from mobile devices (www.comscore.com/Insights/Blog/From-GSMA-MMM-to-Mobile-Metrix). Total Digital Population estimates available in MMX Multi-Platform have been impacted reflecting various factors such as different definition of reportable universe for Mobile data and different scope of reported devices for Mobile data. Due to this transition, a direct comparison between December 2014 and January 2015 MMX Multi-Platform UK data is not recommended by ComScore: the increase in the number of users observed between September 2014 and January 2015 may be due to the change in methodology rather than to a real increase in the platforms' users.

[157] Expedia Group acquired Venere.com in 2008 and fully incorporated it into Hotels.com in 2016.

PX0498-117

**Figure II.17: Monthly active users of Expedia group and Trivago in the UK (million)**



The vertical line indicates the month of Priceline/Kayak merger (March 2013).

*Source: Lear based on ComScore data*

**II.185.** Several factors, other than the mergers, may explain the increasing traffic registered by the Priceline and Expedia groups.

**II.186.** First, Expedia and Priceline made several acquisitions throughout the period 2012-2018. For example, the growth experienced in Priceline users in 2017 may be explained by the acquisition of Momondo (MSS) and Cheapflights (MSS). Instead, during the period analysed Expedia has acquired Travelocity (OTA), HomeAway (OTA), Ebookers (OTA) and Orbitz (OTA).

**II.187.** Second, there is a general increase in the use of online channels to search and book travel services, at the expense of offline channels. The digital travel booker penetration in the UK, measured as the percentage of internet users that have booked travel or accommodation online in the past year, has constantly increased over time, reaching 55% of the Internet users in 2016, one of the highest percentages in Europe.[158] The share of gross booking value (GBV) generated through offline channels has gradually decreased, moving from 48% in 2011 to 38% in 2017, to the advantage of the online channels.[159]

**II.188.** When compared to other OTAs, those in the Priceline and Expedia groups seem to be the largest. Figure II.18 shows the GBV of Priceline, Expedia and the largest OTAs in the UK market.[160]

---

[158] Report by eMarketer: "*Global digital travel platforms 2017. A country-by-country review of the top travel sites*", December 2017.

[159] PhocusWright reports.

[160] Data is based on PhocusWright reports. The GBV is calculated as the total transaction value of the (UK and non-UK) products sold in the UK for leisure and managed business travel, and, as such, refers mainly to OTAs' products. As to the hotels and the car hire firms, data includes the booking value generated by UK-based TSPs and does not include the value generated when UK-based consumers book services from TSPs located outside the UK.

PX0498-118

**Figure II.18: UK online travel agencies gross booking value (million GBP)**



*Source: Lear based on PhocusWright reports*

**II.189.** Priceline appears to be the largest OTA in terms of GBV, and the gap with other operators has increased over time. Expedia is the second largest operator and its GBV is significantly smaller than Priceline's GBV. Other OTAs, On the Beach and Travel Republic, have also grown between 2013 and 2016.

**II.190.** Data on GBV should be interpreted with caution. OTAs may indeed operate in different travel services, whose booking value may be different.[161] Moreover, the penetration of OTAs, compared to TSPs, may be different across travel segment. Data suggests that OTAs penetration is higher in the hotel segment.[162] This may also explain why Priceline's GBV is higher than Expedia, although their number of users is comparable (as shown in Figure II.16 and in Figure II.17). Indeed, Priceline brands mainly deal with hotel bookings, while Expedia is a full-service group, active also in car rentals and flights.

**II.191.** The above data seems to indicate that there exist different OTA groups that provide online travel services through several brands, thus offering consumers a variety of choices. Above all, Priceline and, to a lesser extent, Expedia seem to hold a significant position as OTAs, and their positions have reinforced over time.

**II.192.** Similar conclusions can be drawn when looking at the MSSs. Figure II.19 shows the main MSS in the UK market, including Kayak and Trivago[163], in September 2013 and in September 2016. Since the GBV is not a useful metric to compare MSSs' size, the number of monthly users has been considered.

---

[161] PhocusWright estimates that, in 2013, the value of online gross boking in the flight segment was £ 9.4 billion; in the rental cars segment it was £ 0.3 billion; in the hotel segment it was £ 1.5 billion; and in the rail segment it was £ 0.9 billion. In 2016, the online gross booking value was £ 12.7 billion for flights, £ 1.0 billion for rental cars, £ 5.3 billion for hotels, £ 2.2 billion for rail.

[162] PhocusWright estimates that, in 2013, 21% of the gross booking value generated by the hotels has accrued through the OTAs, while 15% was generated by the TSPs' websites. The GBV of OTAs reached the 27% of the total GBV related to the hotels in 2016.

[163] Based on the number of users on 2017.

PX0498-119

**Figure II.19: Monthly active users of MSSs in the UK (million)[164]**



*Source: Lear based on ComScore data*

**II.193.** The traffic towards MSSs' websites has increased over time, and all the MSSs have experienced a growth in the number of users, showing their growing importance for online travel services. Customers are increasingly relying on their services to compare offers before booking a travel service: in 2015, MSSs have become the second most used source of information, after only family and friends, for researching a trip.[165] Although the number of MSSs visited by UK users has diminished[166], there is still a large range of choices for consumers.

**II.194.** TripAdvisor seems to be the largest MSS in terms of users; however, this figure includes also consumers that use TripAdvisor only for reading and leaving reviews: the number of users consulting TripAdvisor for its MSS's functionalities may therefore be smaller. Trivago and Skyscanner appear to be the largest MSSs after TripAdvisor, and they have both experienced a significant growth in the number of users between 2013 and 2016. Kayak is instead a relatively small MSS and, as the other platforms of comparable size (Cheapflights and Travelsupermarket.com), has not significantly grown over time.

**II.195.** OTAs have realized the importance of MSSs and the role they play in channelling traffic to their websites. In recent years, many MSSs have been acquired by groups offering online travel services. For instance:

- other than Kayak, Priceline has acquired Momondo, Cheapflights, Mundi and HotelsCombined;[167]

---

[164] The category "Others" includes 60 MSSs in 2013 and 33 MSSs in 2016.

[165] *"The future on metasearch 2015: strategize for the metasearch age"*. Report by Eye For Travel, available at: www.eyefortravel.com/sites/default/files/1570_eft_metasearch_report_v6.pdf. The report shows also that the annual revenue for the main MSSs (Trivago, TripAdvisor, Skyscanner) has significantly increased in 2015, compared to the previous year.

[166] From 66 to 39 MSSs, according to ComScore data.

[167] Other than acquiring Trivago, Expedia has consolidated its position by acquiring other OTAs such as Orbitz, HomeAway and Travelocity.

PX0498-120

- eDreams Odigeo has acquired the MSS Liligo;
- Skyscanner has been acquired by Ctrip, a Chinese provider of travel services.

**II.196.** The acquisition of Kayak and Trivago may have had their rationale in supporting Priceline's and Expedia's respective growth strategies. On the one hand, Priceline's main business is in the hotel segment, whereas the main focus of the MSSs that it has acquired is on flights: the transaction may have reflected Priceline's will to expand in the flights segment. On the other hand, Expedia was focused on hotels, as was Trivago, but Expedia's growth strategy was that of focusing on hotels even further, as these were considered the most profitable across its product lines.[168] One way for the acquisitions to support such plans could have been that of biasing Kayak's and Trivago's search results towards Priceline and Expedia respectively, so as to increase their traffic. Whether this has occurred will be explored in section II.4.2.3.

### II.4.2.3 Intermediation bias in the MSSs' search results

**II.197.** As extensively discussed in the economic literature (see section A.1.1 for a review), platforms may have the incentive to use their technology to "direct" user interactions towards particular results rather than others in exchange for, for example, higher revenues per interaction (so-called "intermediation bias"). Vertical integration may have led to intra-group bias: the mergers may have given Kayak and Trivago the incentive to bias search results to favour, respectively, Priceline and Expedia travel offers over the offers made by other OTAs. As discussed in section II.4.1.1, this ToH was also investigated (and dismissed) by the OFT at the time of the *Priceline/Kayak* merger.

**II.198.** The intermediation bias may have been realized by showing Priceline brands and Expedia brands offers in a favourable position in the Kayak and Trivago search results page. When searching for an accommodation on Kayak and Trivago websites, consumers can make their choice among different hotels and booking options. For each hotel, the available booking options may be displayed in different positions, and in particular:

- in the "View Deal" position, which can be considered the most favourable position in their results page. The "View Deal" offer is indeed the prominent booking option suggested by the MSSs;
- in the search results page below the "View Deal" position;
- by clicking on the "More sites" options. These results are not directly visible in the search results page, and consumers may end up not noticing such offers.

**II.199.** In order to investigate whether the mergers may have led to intra-group bias, we have looked at how results are shown on Kayak and Trivago when queries related to the hotel segment[169] are made, and in particular which OTAs/TSPs appear more frequently in the most favourable positions in the results page.

**II.200.** We start by analysing the share of each booking options (OTAs/TSPs) that appear when a number of queries are made on Kayak, including all the display positions [170] (Figure II.20).

---

[168] Expedia, Annual Report, 2013: "From a product perspective in 2013, 72% of our revenue comes from transactions involving the booking of hotel reservations, with 8% of our revenue derived from the sale of airline tickets. We believe that the hotel product is the most profitable of the products we distribute and represents our best overall growth opportunity."

[169] Please note that we conducted the analysis with reference to the hotel segment to make Kayak and Trivago results comparable. Indeed, while Kayak is a full-service MSS, Trivago only allows to search and compare hotels.

[170] Annex D describes how data analyzed in this section was collected and elaborated.

PX0498-121

**Figure II.20: Share of booking options for Kayak results[171]**



*Source: Lear based on Kayak data*

**II.201.** Expedia, together with its brands Hotels.com and Ebookers, is the booking option with the highest share (27.8%). Booking.com, together with its brand Agoda, is the second largest option (18,3%). However, the figure also points out the existence of a variety of offers and a large number of competitors listed on the Kayak website. The category Other indeed includes 24 additional booking options.

**II.202.** The facilitated booking option[172] provided by Kayak itself is one of the options with the largest share. The booking option offered by the TSPs, included in the category "Hotel direct website", represent only 4.5% of the available booking options.

**II.203.** Figure II.21 shows the share of each booking option within the results displayed in the "View Deal" position. Considering all the hotels and destinations in the sample analysed, Kayak appears as "View Deal" in 28.3% of cases, followed by Hotels.com (21%), Expedia (20.7%) and Booking.com (15.9%). However, the share of booking options in the "View Deal" position may be higher for these OTAs, since they may also appear as part of the Kayak option through the facilitated booking agreement.[173] The TSP may also be shown on the "View Deal" position, with a highest share than when considering all the display position.

---

[171] The category "Other" includes 24 booking options.

[172] Kayak appears as one of the booking options in the results page thanks to the facilitated booking agreements held with different OTAs. In particular, Kayak.co.uk has facilitated booking agreements with six different OTAs: Hotels.com, Expedia.co.uk, Booking.com, Amoma.com, Agoda.com, getaroom.com. Therefore, when Kayak appears as a booking option, users can proceed with the reservation by remaining on Kayak's website, while instead the service is provided by one of these OTAs, whose name and logo will appear on Kayak's booking page.

[173] Please note that in this analysis, when Kayak is displayed among the booking options it is not possible to know through with OTAs the reservation would be processed.

PX0498-122

**Figure II.21: Share of booking options in "View Deal" position for Kayak results[174]**



*Source: Lear based on Kayak data*

**II.204.** The shares of the booking options in the "View Deal" position indicate that the operators which are more often listed in such privileged position are also those who have the greatest number of users in the UK market (see Figure II.18). The same findings may be drawn when looking at the share of booking options in both the "View Deal" position and the search results page, which can be both considered as favourable positions to attract consumers.[175] This is indeed related to the mechanism through which MSSs allocate such position to the OTAs.

**II.205.** As described on Kayak's websites[176], when the same hotel is available on several booking sites, Kayak creates a ranking of the different deals for the hotel based on an internal algorithm that takes into account:

- prices;[177]
- whether users prefer a particular booking site, as expressed by the click-through rate;
- Kayak's revenue for the results shown, i.e. how much the OTAs/TSPs pay for clicks or bookings that they get via Kayak;
- whether the booking site pays extra for a promoted placement.

**II.206.** Since there are several parameters that enter the algorithm, and there is the presumption that each parameter is as much relevant as the others, paying an extra-price for the promoted placement does not ensure to be listed in the most favourable position. In other words, OTA cannot buy the "View Deal" position on the Kayak website.

---

[174] The category "Other" includes Amoma, Homeaway and Tripadvisor.

[175] Figure D.3 in Annex D. Expedia, Kayak, Booking.com and Hotels.com are more frequently listed in both the "View Deal" position and the search results page. The same applies when considering only the top three hotels in the search results page, which should have a prominent position compared to the others when consulted by consumers (Figure D.4).

[176] https://www.kayak.co.uk/help.

[177] Indeed, the booking offers listed in the "View Deal" position are not always the cheapest offers for a given hotel: data collected indicates that the "View Deal" offers represent the cheapest alternative only in the 37% of cases.

PX0498-123

**II.207.** The algorithm is such that OTAs that are expected to be more attractive for users (higher click-through rate, lower price), and pay higher commission to the MSSs, are more likely to be shown in the "View Deal" position or in the search results page. To the extent that consumers check with less frequency the options available under the "More sites" button, this may hinder the emergence of new and small players and limit the choice of consumers.

**II.208.** While Priceline (Booking.com) and its brands appear as much as Expedia and its brands in the "View Deal" position, Priceline is rarely the cheapest among the options available. Figure II.22 shows that Booking.com offers the cheapest price only 13% of the times it is listed in the "View Deal" position.[178] Expedia, instead, charges the lowest prices 38% of the times it appears in "View Deal". Booking.com is the OTA that charges the lowest price with less frequency when listed in the "View Deal" position.

**Figure II.22: Frequency at which OTAs/TSPs charge the lowest price when listed in "View Deal" for Kayak results (%)**



*Source: Lear based on Kayak data*

**II.209.** Results may hence indicate the existence of bias towards the main Priceline brands, i.e. Booking.com, at the expense of other OTAs, especially those as attractive to users as Booking.com, and of consumers who may have been better off with the cheapest offer. This also contradicts the OFT's position at the time of the merger that consumers would have noticed such a bias, and that the merged entity would have had no incentive to pursue such strategy. However, a number of caveats should be considered:

- first, Booking.com may offer the cheapest price for a given hotel behind the "View Deal" position filled by Kayak under facilitated booking arrangements. This may increase the frequency it offers the cheapest price when listed in "View Deal";

---

[178] Similar results are obtained when looking at the offers listed both in the "View Deal" position and the search results page. See Annex D (Figure D.5).

- second, prices do not usually vary significantly across booking options. Across all the accommodations analysed, the value of the coefficient of variation is on average equal to 7.6%.

**II.210.** Below we repeat the same analysis for a sample of destinations on the Trivago website. Figure II.23 shows the share of booking options that appear on Trivago, including all the display positions. Differently from Kayak, Trivago does not have any facilitated booking agreement, hence it does not appear among the booking options available to customers.

**Figure II.23: Share of booking options for Trivago results[179]**



*Source: Lear based on Trivago data*

**II.211.** As noted for Kayak's results, Trivago displays the booking options of a wide range of OTAs/TSPs. The category Other includes additional 34 booking options. The most frequent booking option available is Expedia, also with its brands Hotels.com and Ebookers (26.8%), followed by Priceline (Booking.com) and its brand Agoda (18.6%).

**II.212.** Figure II.24 shows the share of each booking option within the results displayed in the "View Deal" position. Expedia is by far the OTA more displayed in such position (40.4% of times), followed by Booking.com (26.5%) and the booking option of the TSPs (15.4%). The share of Expedia in the "View Deal" position on Trivago is much higher than the share registered in the same position on the Kayak website.[180]

---

[179] The category "Other" includes 34 booking options.

[180] The same applies when considering only the top three hotels in the search results page. See Annex D, Figure D.6.

PX0498-125

**Figure II.24: Share of booking option in "View Deal" for Trivago results**[181]



*Source: Lear based on Trivago data*

**II.213.** When looking at the "View Deal" position on the Trivago website, consumers are more often directed to Expedia, rather than other main brands, such as Booking. However, when considering both the "View Deal" position and the search results pages, which can both be deemed more favourable position than the "More sites" position, the share of Expedia is equal to 21.7%, followed by Booking.com (20.4%) and the TSP (14.4%).[182]

**II.214.** Furthermore, data on prices suggest that, when listed in the "View Deal" position, Expedia is the player that charges the lowest price much more often than its main rivals[183] (Figure II.25). It is thus unclear in this case whether Trivago is biasing consumers towards its own brand, as Expedia may have represented the best option for consumers in any case.

---

[181] The category "Other" includes Alpharooms, Ebookers, Japanican, Loveholidays, Otel, Prestigia, Tablethotels, Travelup.

[182] See Annex D, Figure D.7.

[183] When displayed in "View Deal", Expedia charges the lowest price 43% of times, Booking.com charges the lowest price 39% of times, the TSP charges the lowest price 35% of times.

PX0498-126

**Figure II.25: Frequency at which OTAs/TSPs charge the lowest price when listed in "View Deal" for Trivago results (%)**



*Source: Lear based on Kayak data*

**II.215.** In any case, the existence of a bias in the search results is unlikely to amount to a foreclosure. The evidence collected shows that there is clearly the ability to bias results. Moreover, while there may be an incentive to favour the OTA in the group, this is to some extent counterbalanced by other factors. MSSs allow consumers to search and compare travel offers among different OTAs and TSPs. To the extent that results shown in most prominent positions in the search results page are more consulted by consumers, biasing such results in favour of a single OTA may lower the quality of the service provided, and ultimately entail foregoing traffic and revenues. Furthermore, the evidence collected on the evolution of MSSs in the UK market suggest that there exist several MSSs, other than Kayak and Trivago, that consumers may use. In particular, consumers can still search and compare travel services on TripAdvisor and Skyscanner, which are the largest MSSs in the UK market. This may further reduce the incentive of Kayak and Trivago to pursue such a strategy and also limits its foreclosing effect.

### II.4.3. Conclusions on Priceline/Kayak and Expedia/Trivago

**II.216.** The Authorities decided to leave open the question of whether OTAs and MSSs are in a vertical or horizontal relationship with one another. However, this was fundamental in deciding which ToHs should have been explored and may have led to inaccuracy in the assessment of unilateral effects. Indeed, the market share analysis as carried out by the Authorities is likely to be affected by a significant measurement problem: OTAs supply a wider range of services and therefore charge higher commissions, making revenues difficult to compare across the two types of services and market shares calculated on this basis inaccurate. Yet, the conclusion to dismiss unilateral effects ToHs was substantially correct, as OTAs and MSSs are unlikely to be each other's closest competitor.

**II.217.** Further, in assessing the likelihood of a foreclosure, the Authorities relied on the ability of users to recognize a bias in MSSs' search results favouring OTAs in their group. Available evidence shows however that users are heavily influenced by display position in search results and may not promptly recognize a relatively subtle bias such as that of giving certain OTAs a privileged position.

PX0498-127

**II.218.** The assessment of the market structure arising after the mergers suggests that consumers have still a variety of options to search, compare and book their travel services. Priceline and Expedia brands seem however to be the largest brands among the OTAs in the UK market.

**II.219.** Most of the evidence collected points towards the existence of a complementary relationship between OTAs and MSSs, whereby OTAs are the main customers of MSSs. Facilitated booking agreements between OTAs and MSSs may however enhance the overlap between the two platforms, allowing consumers to make the booking on the MSSs website without being referred to the OTAs websites. Data collected on the Kayak website on a sample of accommodation queries and destinations shows that the facilitated booking option is among the most shown options, even when considering results in privileged display position.

**II.220.** The analysis conducted on the Kayak website shows that the merger *Priceline/Kayak* may have provided Kayak with the incentive to favour Booking.com offers. Although appearing as frequently as Expedia in the most favourable position in the search results page, Booking.com represents the cheapest offer less frequently than Expedia when listed in such position. To the extent that consumers heavily rely on the booking options listed in the most favourable display position, this raises the doubt that Kayak is referring customers to Booking.com offers more often than consumers would have desired. Similar conclusions do not seem to apply to the analysis conducted on the Trivago website. Moreover, the anticompetitive effects of such potential intermediation bias may be limited when considering that consumers still have access to several MSSs, other than Kayak and Trivago, and that these include large players such as TripAdvisor and Skyscanner.

PX0498-128

## II.5. AMAZON/THE BOOK DEPOSITORY

**II.221.** On 24 October 2011 the Authorities cleared Amazon's acquisition of The Book Depository International Limited (henceforth "The Book Depository"). Amazon was active in the online retailing of several items, including books, DVDs, CDs, toys and games. The Book Depository was an online retailer of books, although it also offered a small number of other products such as DVDs, CDs and video and PC games. In the UK, The Book Depository offered its products both through its website and in Amazon's store using Amazon's Marketplace services.[184] Despite overlaps in the online retailing of DVDs, CDs, video and PC games, the OFT's decision focused on the retailing of books since the parties submitted that The Book Depository's sales of the other products were small.[185] Both parties offered books in physical, e-book and audio book formats. For the purpose of the OFT's decision, the relevant market was the online retailing of physical books within the UK, considering any competitive constraint exerted by physical "bricks and mortar" retailers where warranted by the evidence. Moreover, the OFT examined the effects of the merger for "long tail" titles and best sellers both separately and together.

**II.222.** Given the horizontal nature of the transaction, the Authorities investigated a number of unilateral effects ToHs. In particular, the OFT considered whether the transaction could result in price increases and in a degradation of quality of the service offered through a reduction in the range of book titles offered; and it investigated whether The Book Depository was likely to expand considerably in the foreseeable future.

### II.5.1. Methodology assessment

#### II.5.1.1 Identification of ToHs pursued by the Authorities and key elements underpinning them

*Price competition in the online retail market for books*

**II.223.** One of the Authorities' concern was that book prices would increase because of the merger. The OFT gathered evidence for its assessment through internal documents and pricing data, including the parties' pricing algorithms showing which competitors were used as benchmarks for pricing decisions. The investigation revealed that in 2010 Amazon unilaterally decided to remove The Book Depository from its pricing algorithm for long tail titles, but not for best sellers. For this reason, together with the Authorities' belief that the competitive conditions varied between the two segments of titles and the existence of evidence pointing to the merging parties' different focuses,[186] the possible effects of the merger in terms of price competition were assessed separately for long tail and best-selling books.

**II.224.** As far as long-tail titles are concerned, this ToH was dismissed based on the following key pieces of evidence:

- Amazon's removal of The Book Depository from the pricing algorithm proved to be a profitable strategy: after removing The Book Depository, Amazon's prices increased for a significant proportion of book titles offered by Amazon; yet, the retail contribution profit[187] for long tail titles rose substantially following this move. This evidence was taken as an indication that The Book Depository did not exert a substantial competitive constraint on Amazon;

---

[184] Amazon Marketplace is Amazon's platform on which third party sellers are offered the opportunity to sell their products.

[185] The largest figure was £ 660,000 for recorded music CDs.

[186] In the financial year previous to the OFT's investigation, almost 75% of The Book Depository's revenues came from long tail titles, whereas two-thirds of Amazon's book revenues were generated by the sale of best sellers.

[187] Contribution profit is a measure of profitability based on direct and variable costs, excluding fixed costs.

PX0498-129

- the majority of customers who switched away from Amazon as a consequence of price increases switched to book retailers other than The Book Depository. This conclusion was based on diversion of sales from Amazon to The Book Depository: only around 12-13% of Amazon's lost sales were diverted to The Book Depository. In particular, the evidence before the OFT showed that it was Amazon Marketplace sellers who provided the strongest competition towards Amazon.

**II.225.** As regards the online retailing of best-sellers, price competition concerns were rejected mainly based on the following:

- The Book Depository's business model was skewed towards the long-tail segment, thus bringing a minimal increment to Amazon's UK turnover;
- evidence of strong competition on Amazon Marketplace. For best sellers, the Book Depository was the cheapest seller on Amazon Marketplace 11% of the time; for those 11% of titles, the next cheapest retailer on Amazon Marketplace was Amazon itself in less than 1% of instances. In almost three-quarters of cases, the next cheapest was another seller on Amazon Marketplace. This analysis was considered an indication of strong competition on Amazon Marketplace and of the fact that the merging parties were not particularly close competitors for titles sold on Amazon Marketplace;
- a natural experiment conducted by The Book Depository consisting of increasing its prices by 10% for one day, which revealed that the decrease in sales was stronger on Amazon Marketplace than it was on The Book Depository's own website;
- the Authorities conducted an illustrative price rise[188] (IPR) analysis and found only a weak incentive to raise prices post-merger. Specifically, the result of the OFT's calculations was an IPR of around 2%.

*Introduction of charges for the delivery of books*

**II.226.** Pre-merger, both parties were offering free delivery in the UK; one third party questioned whether Amazon's more recent decision to abolish a minimum spend to qualify for free delivery on an order was influenced by The Book Depository's policy implying that the merged entity's strategy could change following the Transaction, in particular removing this benefit, as some customers feared. The OFT considered that Amazon's internal documents revealed that:

- Amazon benchmarked its delivery policy against some key competitors which did not include The Book Depository;
- Amazon's delivery policy was applied consistently across all of its media products and it wanted its delivery charges to be uniform across all of its product lines.

**II.227.** This evidence was taken as an indication that The Book Depository did not play any role in Amazon's decision to abolish a minimum spend to qualify for free delivery and was therefore key for the dismissal of this ToH.

*Decrease in the range of books offered*

**II.228.** At the time of the merger, Amazon offered approximately 9.5 million book titles compared to The Book Depository's 6 million titles. To address some concerns received by third parties, the OFT investigated whether the merger could lead the parties to reduce the range of book titles available especially in the deep range. This ToH was discarded noting that:

- online retailers are particularly well placed to offer a large number of titles give that they do not need to hold stocks but can instead access a wide range of titles via book wholesalers. This was

---

[188] The IPR model is one of several models which measure the upward price movements of a merged entity; in particular, it aims at predicting the extent to which the merged entity has both the ability and incentive to implement a price rise.

PX0498-130

supported by evidence, provided by the merging parties, that other online retailers offered a large range of titles;[189]

- the analysis conducted by the Authorities in the assessment of the price competition concerns in the long tail segment suggested that the parties were not close competitors for these book titles, which led the OFT to conclude that it was not the competitive constraint coming from The Book Depository that made Amazon offer a wide range of books. This conclusion was also consistent with the parties' submission that Amazon already offered a wide selection of books before The Book Depository entered the market.

*Potential competition in the online retail market for books*

**II.229.** The OFT was concerned that The Book Depository could expand considerably in the foreseeable future and that therefore the merger would eliminate a potentially strong competitor to Amazon. However, this ToH was dismissed based on the following key evidence:

- The Book Depository's UK turnover in the past years had not witnessed constant year-on-year growth; rather, it had been fluctuating. In particular, the parties submitted that The Book Depository's UK turnover in 2008-09 was £23 million, in 2009-10 it was £18 million and in 2010-11 it was £30 million;
- The Book Depository's recent growth was mainly due to overseas sales.[190] As far as UK sales were concerned, their growth in the previous year came from Amazon Marketplace, where sufficient competition was expected to remain also after the merger, rather than from The Book Depository's own website.

*II.5.1.2* **Analysis of the key elements underpinning ToHs**

*Price competition in the online retail market for books*

**II.230.** The dismissal of the price competition ToH rested on:

- the observation that including The Book Depository in the pricing algorithm for long tail titles was not a profit-maximizing strategy for Amazon;
- the behaviour of switching consumers in cases of a price increase by one of the parties;
- evidence of strong competition on Amazon Marketplace.

**II.231.** The OFT analysis with respect to price competition ToHs would seem to be convincing. The evidence collected suggested that the competitive constraint that the parties exerted on each other was not significant and that, therefore, the removal of such a constraint was not likely to result in an SLC in the form of price increase. In particular, the fact that Amazon's profit margins increased following the removal of The Book Depository from its pricing algorithm represents convincing evidence in this respect: had The Book Depository represented a significant constraint, the move would not have been profitable, as a larger share of Amazon customers would have switched to The Book Depository.

*Introduction of charges for the delivery of books*

**II.232.** This ToH was dismissed based on the following key arguments:

- Amazon benchmarked its delivery policy against some key competitors which did not include The Book Depository;

---

[189] In particular, according to the parties' submissions, Aphrohead offered 7 million titles, Blackwells 6 million titles, Waterstone's 5.8 million titles, and Foyles 3.5 million titles.

[190] Data provided by The Book Depository showed that over 70% of its growth over the previous year came from non-UK sales.

PX0498-131

- Amazon's delivery policy was applied consistently across all of its media products as it wanted its delivery charges to be uniform across all of its product lines.

**II.233.** The second argument might have benefitted from additional evidence on Amazon's revenue share coming from book sales. Indeed, if this share was substantial, it could have been the case that the retailing of books drove Amazon's decisions about all its product lines. However, on balance, it seems reasonable to conclude that the available evidence did not point to a significant risk that the transaction would have led to the removal of free deliveries.

*Decrease in the range of books offered*

**II.234.** The dismissal of this ToH rested on:

- the observation that online retailers, differently to physical stores, are well placed to offer a large range of titles and that, indeed, this was the strategy adopted by a number of online retailers;
- the conclusion that Amazon and The Book Depository were not particularly close competitors in the long tail segment.

**II.235.** The conclusion that the merger would not result in a significantly reduced range of book titles seems well grounded. To the extent that The Book Depository did not constrain Amazon on prices, it is reasonable to expect that it would not constrain Amazon on variety either.

*Potential competition in the online retail market for books*

The key arguments for the dismissal of this ToH were:

- evidence that The Book Depository had not witnessed constant growth in the previous years;
- the observation that a significant degree of competition was likely to persist in the Amazon Marketplace.

**II.236.** Differently from the other cases analysed (see for instance *Facebook/Instagram* and *Google/Waze* in sections II.2 and II.3 respectively), The Book Depository was not on a consistent growth path prior to the merger. This was correctly taken as an indication that it was not likely for The Book Depository to grow strongly in absence of the merger.

### *II.5.1.3 Analysis of completeness of ToHs pursued*

**II.237.** The transaction entailed a vertical dimension that the OFT's decision did not elaborate on. Indeed, Amazon competed with The Book Depository in the online retailing of books, but also supplied an important input to The Book Depository through its Marketplace, i.e. access to a large pool of potential buyers. The importance of being in Amazon Marketplace for a seller was stressed by the Authorities. This vertical relationship between the parties might have given scope for strategies aimed at foreclosing the merging parties' rivals, for instance giving The Book Depository a preferential treatment post-merger, discriminating against other sellers in the Marketplace.

**II.238.** In order to understand whether the merged entity had the technical ability and economic incentive to implement this type of strategies, the Authorities should have investigated the functioning of the Marketplace more thoroughly. This would have been essential to understanding whether and through which mechanism there could have been scope for implementing foreclosing strategies. Amazon, indeed, is active across several product lines, for each of which there may be specific mechanisms for selecting the seller that is shown as the default option to consumers. Being the featured seller is extremely important since arguably the vast majority of customers ignore the other offers. The Authorities could have explored what mechanism was in place for books, whether it left room for favouring The Book Depository and whether there was an incentive for the merged entity to modify such mechanism after the merger. Our interview with Amazon revealed that at the time of the

PX0498-132

merger Amazon was always the default option for the sale of new books on Amazon.co.uk, and that this has not changed since then.

### II.5.2. Market outcome assessment

**II.239.** The market outcome assessment of *Amazon/The Book Depository* looks at:

- the economic rationale of the merger and the efficiencies achieved through it (section II.5.2.1);
- the evolution of prices charged by Amazon for physical books sold in the UK after the merger (section II.5.2.2).

### II.5.2.1 Rationale and efficiencies of the merger

**II.240.** At the time of the merger, The Book Depository was active in several countries[191], including countries where Amazon was not making significant sales or was not present. Moreover, The Book Depository was offering free shipping worldwide, making itself attractive to customers outside the UK and particularly well placed compared to Amazon in many countries ████████████████████████████ ██████████████████████████████████████████████████████████████

**II.241.** Today, The Book Depository is a fully-owned subsidiary of Amazon. The Book Depository has kept its own website and distribution centre; yet, other aspects, such as the billing system and the technology employed, have been integrated. ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████

**II.242.** The Book Depository seems to have benefitted from Amazon expertise and technological background. Indeed, Amazon helped The Book Depository modernize its infrastructure and back-end technology and acquire the appropriate tools to deal with seasonal sale peaks.

### II.5.2.2 The evolution of Amazon prices

**II.243.** At the time of its decision, the OFT ruled out that the merger could have led to a significant lessening of price competition since (i) The Book Depository did not exert a substantial competitive pressure on Amazon in the supply of books pertaining to both the long-tail and the best-seller categories; (ii) third-party sellers on Amazon Marketplace provided the strongest constraint on Amazon. By evaluating the evolution of prices before and after the merger, the following analysis assesses whether competition in the online market for physical books remained vibrant after the merger, and whether Amazon has been able to raise the prices.

**II.244.** Figure II.26 shows the average daily price charged by Amazon for a sample of 7,014 books titles. For each title, we collected the price charged on Amazon.co.uk for each day between 1 August 2011 and 31 December 2012. All the selected titles have been continuously sold by Amazon over the period analysed.[193]

---

[191] Around 100 countries, according to Amazon.

[192] This is based on an interview with Amazon.

[193] The price analysis is based on data extracted from Keepa, a website that tracks the price evolution of different items sold on Amazon. For each title, associated to a unique ASIN (Amazon Standard Identification Number), Keepa provides the historical price data from the time the title has been put on sale on Amazon. Based on the books' sales ranking in January 2019 on Amazon.co.uk, historical price data has been extracted for a subset of the first 500,000 books. In particular, for each batch of 50,000 titles ranking between 1 and 500,000, the first 5,000 books have been selected. The sample has been further

**Figure II.26: Evolution of Amazon price (GBP)[194]**



The vertical line indicates the date of the merger (24 Oct. 2011).

*Source: Lear based on Keepa data*

**II.245.** Amazon prices in the UK online market for physical books appear relatively stable in the years after the merger: the average price ranges from a minimum of £ 11.10 (in March 2012), to a maximum of £ 11.80 in December 2012.[195] This may indicate that competition has remained lively after the merger, and Amazon may not have been able to raise prices.

**II.246.** This analysis, however, provides average price values across different books' categories, ranging from best seller to long-tail. Supply and demand conditions may be different across books' categories, and this may in turn affect their price levels and trends. For instance, the analysis conducted by the OFT at the time of the merger revealed that high street retailers mainly sell new books, best sellers and mainstream titles rather than long-tail titles, since they are restricted by limited retail space on the range they can stock. Competitive dynamics may be heterogenous across books categories, and average price trends may not be informative. However, data available does not allow to identify book categories precisely, as it is based on books' sales ranking on Amazon in January 2019.[196]

**II.247.** Our approach to better measure the evolution of Amazon prices is twofold:

---

refined to include those titles that were published at least three months before the merger decision (i.e. at least in August 2011) and have been continuously sold over one-year time after that date.

[194] Please note that, since 2009, Amazon offers free delivery within the UK without imposing a minimum spend, hence books' prices correspond to the total consumer expenditure for books.

[195] Monthly prices range from £ 11.34 in September (the month before the merger), to £ 11.41 in October (the month in which the merger took place), and finally to £ 11.39 in November and £ 11.55 in December (the months following the merger).

[196] Based on the sales ranking in 2019: 4.1% of the 7,014 titles in our sample are in the ranking 1-5,000; 7.1% in the ranking 50,000-55,000; 9.8% in the ranking 100,000-105,000; 11.2% in the ranking 150,000-155,000; 11.8% in the ranking 200,000-205,000; 11.8% in the ranking 250,000-255,000; 11.3% in the ranking 300,000-305,000; 11.8% in the ranking 350,000-355,000; 10.9% in the ranking 400,000-405,000; 10.2% in the ranking 450,000-455,000. This ranking, however, does not necessarily apply to the period 2011-2012.

PX0498-134

- we first evaluate the trend of average Amazon prices around the merger date, investigating the weekly price variation with respect to the week of the merger. By restricting the analysis to the period shortly after the merger date, the analysis may limit the effect of any confounding factor, other than the merger, which may affect the price trend, such as a change in the book status;
- we evaluate the trend of Amazon prices around the merger date for a single books' category, namely a small set of best-seller books. Although based on very small sample, the analysis does not aggregate prices across different books' categories and may corroborate findings from the first analysis.

**II.248.** Table II.2 shows the percentage changes[197] of Amazon prices for the large (and heterogenous) sample of books titles, in the weeks following the merger, with respect to the price in place in the week right before merger. We alternatively computed the average price Amazon charged before the merger as the price charged in the week in which the decision has been published (third column), or in the week after the decision has been issued (fourth column).

**Table II.2: Percentage variation of Amazon prices for a large sample of books titles**

| Week after the merger | Amazon price | Variation from price in place in the week of the merger decision | Variation from price in place one week after the merger decision |
|:---:|:---:|:---:|:---:|
| 0 | £ 11.42 | - | |
| 1 | £ 11.39 | -0.20% | - |
| 2 | £ 11.39 | -0.27% | -0.07% |
| 3 | £ 11.38 | -0.33% | -0.13% |
| 4 | £ 11.39 | -0.23% | -0.03% |
| 5 | £ 11.42 | 0.04% | 0.24% |
| 6 | £ 11.51 | 0.84% | 1.04% |
| 7 | £ 11.53 | 1.04% | 1.24% |
| 8 | £ 11.57 | 1.38% | 1.58% |
| 9 | £ 11.59 | 1.52% | 1.72% |

*Source: Lear based on Keepa data*

**II.249.** The analysis shows that prices charged by Amazon for physical books in the UK have not substantially increased right after the merger. Prices have indeed decreased for four weeks after the merger, and then slightly increased. Nine weeks after the merger decision – which corresponds to the last week of December 2011 – the average price was 1.52% higher.

**II.250.** Table II.3 replicates the same analysis for a limited set of best-seller titles, the same set of titles used for the analysis that the merging parties submitted to the OFT. Indeed, during the investigation, the parties provided the OFT with pricing data for 40 best seller titles between January and June 2011.[198]

---

[197] The average weekly price has been computed after calculating the average daily price of the books' subset.

[198] The parties provided pricing data for books ranked 1-10, 100-110, 500-510, 5000-5010 based on sales ranking on Amazon.co.uk. Data on price evolution around the merger period for the same sample of books used in the OFT's analysis has been extracted from Keepa. In particular, for 36 out of 43 titles it has been possible to track price evolution over the period between 1 August 2011 and 31 January 2012. For the remaining 7 titles, data was not available.

PX0498-135

**II.251.** Compared to the average prices presented above, best seller prices are lower, ranging from £ 6.34 on 1 August 2011 to £ 6.91 on 31 January 2012.[199] Average weekly price for best-seller titles slightly decreased in the three weeks immediately following the merger, while later increased, reaching the level of £ 6.62 nine weeks after the merger. Amazon prices for the selected best-seller titles show a percentage increase of 3.13% with respect to the price in place in the week of the merger decision, and 3.86% with respect to price in place in the week after the merger decision.

**Table II.3: Percentage variation of Amazon prices over time for best-seller titles**

| Week after the merger | Amazon price | Variation from price in place in the week of the merger decision | Variation from price in place one week after the merger decision |
|---|---|---|---|
| 0 | £ 6.42 | - | |
| 1 | £ 6.37 | -0.70% | - |
| 2 | £ 6.32 | -1.60% | -0.90% |
| 3 | £ 6.41 | -0.07% | 0.63% |
| 4 | £ 6.42 | 0.04% | 0.75% |
| 5 | £ 6.46 | 0.59% | 1.30% |
| 6 | £ 6.54 | 1.82% | 2.54% |
| 7 | £ 6.54 | 1.90% | 2.62% |
| 8 | £ 6.56 | 2.19% | 2.92% |
| 9 | £ 6.62 | 3.13% | 3.86% |

*Source: Lear based on Keepa data*

**II.252.** The evidence collected on best-sellers confirms the results obtained for the larger sample of books: Amazon has not significantly increased prices after the merger. The percentage price increase is at most equal to 3.86%. This is slightly higher than the results of the illustrative price rise (IPR) exercise computed by the OFT at the time of the merger investigation.

**II.253.** In a "difference in differences"[200] logic, the best-sellers sample (Table II.3) can be considered as a control group and the price variation observed within this group as the change in prices physical books would have experienced in the absence of the merger. At the time of the merger, The Book Depository exerted a stronger competitive constraint on books pertaining to the long-tail category, rather than best sellers. Moreover, Amazon faced more competitors, both online and offline, for best-sellers. Therefore, prices of best-seller books were less likely to be affected by the merger and the removal of the competitive constraint exerted by The Book Depository on Amazon.

**II.254.** The large sample of books (Figure II.26 and Table II.2) is instead composed by titles that have been published before the date of the merger, and are still on sale on Amazon website in 2019. It is hence likely that these include deep-range titles. This group can be considered as the treated group, where the competitive constraint exerted by The Book Depository at the time of the merger is

---

[199] The average daily price has been computed as described for the subset of 7,014 titles.

[200] The Difference in Differences approach is an established and widely used methodology in ex-post evaluation studies. It entails looking at one or more market outcomes (e.g. prices) for a group of units affected by a policy intervention and compare them to the outcomes of a control group that was instead not affected. The variation over time in the outcome variables of this control group is then used to establish what would have occurred in the absence of the intervention in the treated group. This approach however relies on the treated and control group to have similar trend, in terms of the market outcomes considered, before the policy intervention.

PX0498-136

expected to be higher. In other words, the price charged for these books is more likely to have been affected by the merger.

**II.255.** Data shows that the best-seller books (control group) experienced a higher price increase than the books included in the large sample (treated group). For the group of titles where the competitive constrained exerted by The Book Depository was weaker, and the merger effects less likely, the observed price variation has been lower. This may be interpreted as additional evidence that consumers have not been harmed after the merger through a substantial price increase for physical books.

**II.256.** This finding seems to be consistent with the fact that the online market for the retail of physical goods in the UK has benefitted from the entrance of several players, such as Hive, which is an online network of 360 independent bookstores in the UK, and Wordery.[201] Wordery has been generally considered as the main competitive threat of The Book Depository and entered the market in 2012.[202] Waterstone, WHSmith and Tesco are still operating online, and competing with Amazon.

### II.5.3. Conclusions on Amazon/The Book Depository

**II.257.** The decision to clear Amazon's acquisition of The Book Depository appears convincing. The evidence collected suggested that The Book Depository was not exerting a strong constraint on Amazon, and that other sellers on Amazon Marketplace were likely to exert a stronger competitive pressure. The empirical analyses indicated that the merger was not likely to result in an SLC via a price increase or a decrease of the range of offer. However, the Authorities might have investigated the vertical relationship between the parties and assessed whether Amazon could have had the incentive to discriminate against rivals by providing The Book Depository with a preferential treatment on its Marketplace.

**II.258.** The assessment of the market performance after the merger revealed that Amazon did not substantially raise books' prices after the merger. Indeed, prices have been decreasing right after the merger, and slightly increased (by 1.5% to 3.8%) in a one-year time span. The highest price increase has been observed for the sample of best-seller titles, where the competitive constraint exerted by The Book Depository was weaker, and is hence less likely to be related to the merger.

**II.259.** Although the estimate of the merger effects would require the identification of a counterfactual, the price evidence collected seems to suggest that the market development after the decision to clear the merger has not harmed consumers. Prices, however, do not represent the unique parameter of competition. The evaluation of the market performance after the merger may have also looked at non-price dimensions such as the range of books offered. Unfortunately, data available did not allow such analysis.

---

[201] This is based on a phone interview with Amazon.

[202] https://www.finder.com.au/wordery-vs-book-depository

PX0498-137

## II.6. CONCLUSIONS ON CASE BY CASE REVIEW

**II.260.** Digital markets pose several challenges to some paradigms of analysis traditionally employed in competition enforcement. Despite the depth of the analyses carried out by the Authorities, our evaluation of past merger decisions taken by the UK Authorities has revealed certain gaps in the way these cases were analysed, which in some cases may have resulted in the realization of market conditions less conducive to a competitive outcome. Such gaps do not by any means undermine the legitimacy of the Authorities' decisions and are only perceivable today thanks to a better understanding of how digital markets work and to the possibility to observe the actual evolution of some market players that was highly uncertain at the time the mergers were investigated.

**II.261.** First, the Authorities have not always consistently framed the competition issues they were looking at in a two-sided setting. The economic literature reviewed in section A.1.1 shows that in two-sided markets characterized by indirect network effects, with one side of the market creating relatively more value for the other, an asymmetric price structure is a typical market outcome: services are often offered for free or even at negative prices to the group of users that create relatively more value for the other, and losses are recouped by the platform on the other side. The two (or more) sides of the market should be looked at jointly, as choices made by the platform on the various sides are interdependent.

**II.262.** Yet, in some cases, the Authorities have focussed their attention on the users' side of the market, somewhat overshadowing other sides of the market. In *Facebook/Instagram*, the Authorities may have placed excessive weight on the functionality offered by the parties' products on the users' side of the market. The Authorities stressed that, at the time of the merger, Instagram had limited social network functionalities, and this helped the Authorities conclude that Instagram was not a significant potential competitor in the supply of social networking services. Of course, what an app allows its users to do matters when carrying out a competitive assessment. However, in two-sided markets where services are provided to users for free and monetized elsewhere, functionalities perhaps are not important *per se*; rather, what matters the most is the role they perform in platform's monetization strategy. Facebook and Instagram could have been substitutable between each other from the perspective of advertisers, regardless of certain differences in the precise functionalities that they supplied to users.

**II.263.** In *Google/Waze*, the Authorities have focussed their ToHs on the users' side of the market, omitting to explore the way the services provided by the merging parties were monetized. Indeed, users' engagement with turn-by-turn navigation apps may produce valuable information to be monetized elsewhere: users of mapping services generate location data which provides value for the supplier of these services as users' movements behaviour reveals additional information on their preferences, allowing better targeted advertising; moreover, location data is used for a variety of other purposes. The sole focus on users may have resulted in the development of an incomplete set of ToHs, overlooking possible ways that the merger could have led to competitive harm.

**II.264.** More generally, current business models and monetization avenues should represent an unavoidable step for the development of a ToH because, quite simply, market power is not exerted for its own sake, but has the ultimate objective of increasing profits. Investigating the monetization strategy is important because it can uncover additional, potentially anti-competitive effects of the merger. Moreover, it can shed light on the rationale of the merger from the parties' perspective, as it will make clear how the target brings value (that is, profits) to the acquirer. However, the Authorities should also investigate the users side of the market as competition problems can lead to non-price effects on users.

**II.265.** Further, the set of decisions analysed has revealed gaps in the Authorities' understanding of digital markets. In Facebook/Instagram, the Authorities might have neglected to analyse the factors

PX0498-138

that drive advertisers' choices, how the merging parties fared with respect to each of them, and how their combination could have resulted in competitive harm. The exclusivity of the user base, the size of the user base and the accuracy that can be delivered in targeting are all relevant dimensions of competition that the merger was likely to affect. However, as discussed in section I.5, more research is needed to better understand how competition works in the sector.

**II.266.** Similar gaps can be found in the way that *Priceline/Kayak* and *Amazon/The Book Depository* were assessed. In *Priceline/Kayak*, the Authorities did not determine whether the services supplied by MSSs and OTAs should be regarded as substitutes or complements, which may have led to measurement problems in the assessment of unilateral effects through market share evidence. In *Amazon/The Book Depository*, the Authorities did not consider the existence of a possible vertical relationship between the merging parties, which may have called for the investigation of foreclosure ToHs.

**II.267.** In the assessment of potential competition, and most notably in *Facebook/Instagram* and *Google/Waze*, the Authorities identified the correct evidence and found that Instagram and Waze had witnessed constant and significant growth in the years leading up to the merger, had promising business models and plans for an expansion that might have increased their relevance in the markets where their acquirers were active. Yet, the Authorities dismissed this evidence mostly due to the uncertainty surrounding whether Instagram's and Waze's potential would have been realized. Rarely, if ever, will the Authorities find conclusive evidence of future growth: potential competition ToHs will always entail a certain degree of uncertainty. If the Authorities wish to pursue this type of ToH in the future, then they should be willing to accept a greater degree of uncertainty in their evaluations.

**II.268.** While we have identified some gaps in the way that the Authorities analysed these cases, it is not always clear whether competitive harm has arisen as a result of such gaps. The decisions taken in *Facebook/Instagram* and *Google/Waze* may have represented missed opportunities for the emergence of challengers to the market incumbents but have also likely resulted in efficiencies. The decisions taken in *Priceline/Kayak* and *Amazon/The Book Depository* appear less controversial, as the level of competition in the markets concerned does not seem to have been substantially affected by the mergers.

PX0498-139

# A. Survey of economic literature

Digital industries create new challenges for competition policy. This survey dwells on some key characterizing features of digital markets that shape the policy debate: network effects, multi-sidedness, big data and rapid innovation. These characteristics make it efficient and/or more likely to have market concentration. Also, they reduce the beneficial effect of unfettered competition.

While there is no one-size-fits-all framework, with different markets characterized by different combinations of the above features, in what follows we tackle them in isolation:

- section A.1 discusses the role played by direct and indirect network effects in shaping competition dynamics;
- section A.2 explores the recent literature on the so-called *markets for attention*, which proposes to consider platforms reselling attention as being in the same relevant market regardless of the particular function they perform;
- section A.3 provides an overview of the link between mergers and innovation in technology markets, discussing *inter alia* the notions of entry for buyout and killer acquisition;
- section A.4 discusses big data and its potential role as a barrier to entry.

## A.1. Direct and indirect network effects

In its simplest incarnation, the term "network effects" refers to the fact that in some markets, a firm's total demand or market share has a *direct* effect on consumption value. For instance, the value of joining a social media platform or a communication service is clearly increasing in the number of other users a consumer can potentially interact with. In other markets, the link is subtler. "Network-like effects" sometimes arise due to demand-driven dynamic economies of scale, i.e. learning by doing. For example, users of search engines typically do not care directly about the engine's market share. However, the quality of search results is intimately connected to the scale of operations.[203]

In many other markets these feedbacks may link one group of economic agents to another group and in this case network effects are said to be *indirect*. A classic example is that of operating systems ("OSs") such as Google's Android or Apple's IOS. Users value choice. Thus, systems that boast more apps are clearly more attractive. Vice-versa app developers value access to larger users' pools. Nobody wants to incur in the fixed cost of developing an app for a system that only a few adopt. Another notable example are content providers such as Yahoo.com. Much like their off-line counterparts (e.g. Free-to-Air broadcasting stations), these harvest the attention of their customers by providing valuable content and then resell that attention to advertisers. Notice that in this illustration externalities from advertisers to consumers are negative as consumers typically prefer ad-free content. As said, these firms are typically referred to as multi-sided platforms. Again, the main idea is to think of multi-sided platforms as economic intermediaries that either enable or facilitate the interaction between market participants. The value that users on one side of the market assign to the platform depends on how many users on *other* sides of the market also patronize the platform. Of course, there is a very large literature on multi-sided markets pioneered by Caillaud and Jullien (2003); Rochet and Tirole (2003, 2006) and Armstrong (2006)[204] and surveying that literature is vastly beyond the scope of this document. The goal of this section is to explain the basic economics of *indirect* network effects and, in particular, how these change the nature of market power, the scope for market tipping, and the effect of competition relative to the "one-sided" markets.

---

[203] Search engines typically "learn" about relevance of URLs to particular queries by observing and analysing users' behaviour on search result pages. URLs that are clicked more often are obviously more likely to be relevant. More users therefore imply more accurate results.

[204] More policy-oriented early contributions are Evans and Schmalensee (2005) and Evans (2003).

PX0498-140

## A.1.1. Overview of market power with network effects

In digital markets the economic surplus derived from trade often directly depends on the other agents' consumption choices. Indeed, network effects are a key distinctive feature of these markets whose firms are typically referred to as "platforms."[205]

As the overarching goal of competition policy is that of alleviating the social harm caused by market power, this section highlights the nature of that harm in a simple context with a monopoly platform. The monopoly paradigm fits particularly well in this context as a "rich get richer" industry dynamics, whereby more users enhance the dominant firm's attractiveness leading to even more users, typically leads to high level of concentration (or market tipping). Furthermore, concentration is efficient, but its benefits have to be weighed against its costs due to market power.

The exposition is divided in four parts. The first part introduces the concept of network effects, distinguishing between direct, indirect and "network like" effects due to demand-driven economies of scale. The second part looks at market power in the context of traditional network businesses. In the third part, we first note that, by lowering a range of costs, the internet has facilitated the creation of new businesses marked by the interaction of various types of economic agents which can be charged different prices. In these markets, referred to as "multi-sided," network effects go across sides: agents of one type care, among other things, about the choices of agents of other types other types. Multi-sided markets are more complex in many ways, so they deserve special treatment.

The last section recognizes that platforms shape economic outcomes by controlling dimensions other than price and reviews the literature on market power and product design choices: algorithms, rankings and search diversion.

### Market power with direct network effects

Market power refers to the ability of a firm to profitably raise prices above marginal cost. Its *extent* depends on how far prices are from these marginal costs. When choosing how much to raise prices, i.e. when choosing mark-ups, firms typically trade off quantity (less units sold) for prices (higher price charged for all other units sold). Of course, whether this trade-off leads to a large or small mark-up depends crucially on the elasticity of consumer demand to price. More elastic demands induce lower mark-ups and vice-versa. That is, market power is inversely related to the elasticity of demand.

A first point is what is the impact of network effects on demand elasticity. To build intuition, consider the following exercise. Starting from any price consider the effect of a 1% price increase. A first direct and familiar consequence is that demand, given consumer expectations about what other consumers will do, goes down as consumers at the margin between buying or not now prefer to drop out. But of course, being this a network good, the lower quantity sold reduces all consumers' willingness to pay, further reducing demand and so on. This second effect is entirely new and goes through consumer expectation over network size. The stronger these network effects, the larger the elasticity. In extreme cases (for instance, goods which work only if some critical mass is reached), small price changes can wipe out demand entirely.

Thus, other things equal, network effects induce *smaller* mark-ups. The larger these effects, the smaller the mark-ups. Box A.1 formalizes this point.

**Box A.1: Consumer expectations and network size**

To formally illustrate the additional role played by consumer expectations over network size, it is convenient to parametrize (somewhat unconventionally) the demand in a way that highlights its dependence on expectations. Let $P(q, q^e)$ denote the inverse demand. Specifically, this is the price at

---

[205]

There is no universally accepted convention of what the term "platform" means, as it has been widely used in at least four disciplines: economics, management, marketing and law.

PX0498-141

which a monopolist can serve $q$ consumers when all market participants operate under the conjecture that $q^e$ consumers will be served (i.e. join the network). Clearly it must be that in equilibrium $q = q^e$. Hence, in principle, one could write $P(\cdot)$ as a function of $q$ only. The advantage of rewriting inverse demand in this way is that it allows to decompose the effect of a quantity increase isolating the role of consumer expectations over network size in price formation. As usual, the monopolist chooses the quantity $q$ that maximizes its profit $(P(q, q^e) - c)q$. It equates marginal revenues to marginal cost assuming that expectations adjust accordingly: $\left(P'_q + P'_{q^e}\right)q + P = c$. This leads to the pricing equation:

$$P = c \underbrace{- P'_q q^\star}_{\substack{classic\ markup \\ > 0}} \underbrace{- P'_{q^e} q^\star}_{\substack{externality\ discount \\ < 0}}.$$

The first two terms are familiar. Price is equal to marginal cost plus a positive markup which reflects market power and depends on the curvature of the inverse demand function (recall that demand is negatively sloped: $P'_q < 0$). The last term captures the effect of network externalities on monopoly prices. Specifically, $P'_{q^e}$ measures the price effect of more optimistic expectations. In other words, it measures the change in the agents' willingness to pay as a result of the increased network size. Since increasing quantity (or equivalently decreasing price) enhances such willingness to pay by increasing network size, the monopolist is more inclined to do so. Therefore, it charges lower prices. The stronger the network effects (as measured by $P'_{q^e}$) the lower the overall markup over price.

*Source: Lear*

The above observation tackles an old and important question in network economics that goes back to Liebowitz and Margolis (1994). Do monopolists internalize network effects? That is, when making their choices, do they take into account the extra value created by increasing quantity for all network participants? The answer is yes, but only up to a point. The reason goes back to the classic contribution of Spence (1975). Recall that the market price reflects the willingness to pay of the "last" consumer; that is, the consumer just indifferent between purchasing or not. So, the effect of a change in quantity (for instance, one less unit sold) on price simply reflects how much that "last" consumer values consumption. However, there is no reason why the marginal consumer should have preferences that are representative of all other consumers served. To see this via a simple illustration consider a social network. It makes sense to assume that heavy users of a social network enjoy more interacting with other users than consumers at the margin. However, if this is the case then the monopolist fails to internalize loyal customers' taste for interactions and thus provides, other things kept equal, a suboptimal quality. In analogy with Spence's work, one could think of network size as a "quality" dimension of the monopolist's product. If marginal consumers care about quality less than infra-marginal ones, then monopoly power would lead to both high prices and suboptimal quality.

While mark-ups in digital markets may be significantly lower due to network effects, there is a sense in which these markets are "doomed to fail." The idea is that because an individual's consumption choice has a positive externality on all the other consumers, in order to induce choices that maximize the overall industry surplus, one would need to charge prices below the marginal cost of production. That is, negative mark-ups. Since no firm would ever find it profitable to charge below cost, markets characterized by network effects are in a sense "doomed to fail" as there is no market structure (i.e. there is no amount of competitive pressure) that would support such an outcome. A notable exception discussed in Box A.2 below is the case of multi-sided platform markets where negative mark-ups can be supported as these losses can be recouped by charging other market participants.

**Box A.2: Adoption externalities and market failure**

Suppose that the economic surplus (i.e. utility) that a consumer gets is equal to some stand-alone value, denoted $B$, plus a component proportional to the size of the network $b \times q$, where $q$ denotes network size. That is: $U = B + bq$. For instance, think about a web-mapping app such as Waze or Google Maps. The stand-alone value refers to the value of having maps and directions at your fingertips. The network component reflects the value of having the stand-alone utility being complemented by crowdsourced information. That could be information about real-time traffic conditions or the opening hours of local shops. Clearly, when making purchase decisions, a consumer takes into account only the *private* benefits $B + bq$. However, the *social* benefits created by having an extra consumer on board equal the private benefit plus the extra surplus that all *other* consumers would get due to the increased network size minus the cost of serving that additional consumer. Thus, when joining, consumers exert a positive "adoption externality" on all other customers as they increase the payoff of others.

A basic consequence of adoption externalities is that even if the price were set at marginal cost (in short $mc$), the outcome would still be inefficient from a total surplus maximizing perspective. To see this, firstly observe that consumers adopt if and only if $B + bq$ is not lower than the price $p = mc$. The "last" consumer adopting is just indifferent as his private benefits are exactly equal to the cost of serving that consumer. However, if this consumer were to join, the overall surplus would exceed the cost of serving that consumer. Thus, even if $p = mc$, there is suboptimal adoption. In other words, there is scope in these markets for *below* marginal cost pricing. The stronger the network effects, the wider the gap between cost and price that would restore efficiency. If one considers consumer surplus (as opposed to total surplus) as the relevant welfare measure, then prices should be even lower as, in that case, the losses incurred by the platform drop out of the equation. In the plausible case with very small marginal costs (a characterizing feature of many digital markets), then efficiency would warrant *negative* prices.

*Source: Lear*

*Market power with indirect network effects*

Next, consider multi-sided markets. A first difference is that adoption externalities due to network effects go *across* sides. As in the one-sided settings, platforms can use prices to account for that, making consumers internalize those externalities. However, assuming a platform is able to discriminate and, therefore, charge different prices to agents belonging to different sides, the problem is more complex. A side-specific price plays a double role here. On the one hand, it allows to extract rents as in traditional settings. On the other hand, by shaping consumption choices on that side, it ends up affecting the value that agents place on joining the platform on *other* sides.

For concreteness, we start by outlining the nature of market power in the simple context introduced above with one platform and constant marginal costs. The only difference here is that network effects are indirect. It is convenient to frame the platform's problem as that of choosing how many consumers to serve on each side; in other words, the platform has to choose a pair of quantities. Total revenues are equal to the sum of the revenues on each side. This problem is similar in spirit to the classic problem of a multi-product monopolist. When choosing whether to serve an extra agent, firms typically trade off price (lower price for all units sold) for quantity (one more unit sold). However, one less unit sold also *changes* the price that agents are willing to pay on *other* sides. That is, the monopolist also takes into account how much value is created (or destroyed in the case of negative network effects) on other sides. Thus, other things equal, indirect network effects induce *smaller* mark-ups if externalities are positive and *larger* mark-ups otherwise. Box A.3 formalizes this point.

PX0498-143

---

**Box A.3: Indirect network effects and mark-ups**

Let $P_i(q_i, q_j^e)$ denote the inverse demand. That is, the price that $q_i$ agents of side $i$ would be willing to pay if they expected $q_j^e$ agents on side $j$ to materialize. The monopolist problem is:

$$max_{q_A, q_B} \; P_A(q_A, q_B^e)q_A + P_B(q_B, q_A^e)q_B - mc_A q_A - mc_B q_B$$

As usual, the monopolist equates marginal revenues to marginal cost on each side assuming that expectations adjust accordingly. Taking the derivative of the above and rearranging leads to the pricing equation:

$$P_i = mc_i \; \overbrace{- \frac{\partial P_i}{\partial q_i} q_i^\star}^{\text{classic markup} > 0} \; + \underbrace{\frac{\partial P_j}{\partial q_i^e} q_j^\star}_{\substack{\text{cross-subsidy for value} \\ \text{created on side B}}}$$

The first two terms are familiar. Price is equal to marginal cost plus a positive markup which reflects market power and depends on the curvature of the inverse demand function. The last term captures the effect of network externalities on monopoly prices. If externalities are positive and strong, then the last term could overcome the second and below cost pricing might occur.

*Source: Lear*

When participation on one side exerts a positive and sufficiently large (in relative terms) externality, then mark-ups could well be negative: sides that create a lot of value for other sides should be subsidized. This means that platforms can sometimes increase profits by making losses on one side while recouping those losses on other sides. An example is a content provider (say a news outlet) financing operations through advertising. If advertisers care more about the number of consumers than consumers care about the quantity of ads, then we would expect consumption to be subsidized (perhaps with a negative or zero price). A key insight is that negative mark-ups or prices are by no means an indicator of low market power as one should evaluate all sides simultaneously.

To further gain insights on the nature of market power, the earlier literature (e.g. Rochet and Tirole (2006)), spelled out the problem of a monopolist as a combination of two sub-problems. A first problem is, given a total price, how to allocate that price across the two sides. A second problem is how high that total price should be. That is, platforms need to pay attention both to the overall price *level* and to the price *structure*. As in the one-sided setting the monopolist has an incentive to choose prices that mitigate the effects of the adoption externalities across groups. In loose terms, it aims to get both sides "on board". So, while market power clearly translates into high price levels, the incentives towards the price structure can be aligned. That is, there is not necessarily a wedge between the private (profit maximizing) and social incentives over the price structure. The intuitive reason is that monopolists capture a fraction of the surplus created in the market, so they obviously have an incentive to increase the size of that surplus. The higher the overall interaction surplus, the larger the monopoly rents, which are a fraction of that. The point that the price structure matters is formalized in Box A.4.

**Box A.4: Price structure in two sided markets**

Let $i$ and $j$ index sides and suppose that the economic surplus that an agent from side $i$ gets is equal to the sum of a stand-alone benefit $B_i$ and a per interaction benefit that increases with the quantity of agents on the opposite side $b_i \times q_j$. That is $U_i = B_i + b_i q_j$. Form the consumers' perspective, $B_i$ is the quality of content while $b_i$ is the marginal value (perhaps negative) of advertising. From the advertisers' perspective, $B_j$ is the value of one's product being associated with this particular content provider (e.g. "as seen on TV") and $b_j$ is the expected present value of informing an additional consumer about the existence of a product. A textbook example is that of a pub where men and

PX0498-144

women hope to find a partner. $B_i$ is then the value of enjoying a drink in a laid down environment while $b_i$ is the value of having one more potential partner entering the bar.

Perhaps the simplest way to show why the price structure matters is to forget about profit maximization for a moment and look at the simple benchmark where prices are set equal to the respective marginal costs, that is $p_i = mc_i$ and $p_j = mc_j$. Would total surplus be maximized? Once more, the answer is no. Again, the reason is that agents do not internalize the basic economic fact that their choices affect the utility of other agents. In particular, when making their adoption choices, they compare their *private* benefit $U_i = B_i + b_i q_j$ to the price, neglecting the fact that an extra agent on side $i$ changes the surplus of all agents on side $j$ by an amount equal to $b_j$. The "last" agent served on each side is just indifferent, equating her *private* benefit to the *social* cost of serving that agent $mc_i$. Thus, if indirect network effects are positive, below marginal cost pricing on at least one side would also be warranted in this context.

So far, no difference with the one-sided setting. However, here one may ask whether it would be possible to increase total surplus by changing the prices in a way that keeps profits equal to zero. That is whether it would be possible to increase the total surplus by making losses on one side while recouping those losses on the other side. The answer to this question is typically yes. To see this, suppose that $b_i < b_j$, so that agents of side $j$ care relatively more than agents of side $i$ about interacting with agents of the opposite side. To simplify the argument let everything else be symmetric on the supply and demand sides. That is let $mc_i = mc_j = mc$. Now, consider starting from a price of $p_i = p_j = mc$. Can one increase the total surplus without incurring losses? Clearly, since $b_i < b_j$ one possibility would be to drop one customer on side $j$ (which is not particularly appreciated by customers on side $i$) and attract one more customer on side $i$. Whether this would be profitable depends on how much it would cost to attract an extra $i$ agent (that is how much should the price $p_i$ be lowered) defrayed by the extra revenues on side $j$ due to above marginal cost pricing. Thus, whether this would be profitable ultimately depends on the relative curvature of the demand functions. However, in a symmetric setup, these two would cancel out. As the total number of agents served does not change, the total cost would stay constant, while $b_i < b_j$ implies that the total surplus would obviously go up. Therefore, the assumption that $b_j > b_i$ suffices to establish that, in first best, side $i$ should be subsidized (i.e. pay a price below cost), while side $j$ should be taxed to recoup those losses. Notice that if $p_i = c - b_j q_j$ then side $i$ agents would fully internalize the adoption externality. That is the marginal agent on side $i$ would equate social benefits to the social costs. This approach captures an intuitive result in this literature, which is that sides that create a lot of value for other sides should be subsidized. If $b_j$ were very large, then $p_i$ could well be negative. In the examples above, if advertisers' care more about consumers than consumers care about advertisers then we would expect consumption to be subsidized (perhaps a negative or zero price). Similarly, in the pub example, if men care about "interacting" with women than women care about "interacting" with men then the pub owner should subsidize women (say allowing them for free) and charge men.

*Source: Lear*

*Market power in dimensions other than price*

Platforms perform their "balancing act" through other instruments besides prices. They also make a number of "design" choices that shape economic interactions. Most notably, they design the technology that allows users to interact. From a public policy perspective, one may wonder if concentration can also lead to suboptimal "design" choices. This section reviews the literature that characterizes the dark side of concentration in dimensions other than prices typical of digital markets.

PX0498-145

The economic literature has looked at the concept of "intermediation bias," whereby the platform uses its technology to "direct" user interactions. For example, search engines provide a ranked list of websites and advertisers relevant for a given query; social media filter content in a way that affects user engagement; e-commerce websites and OTAs, upon being queried, provide a subset of products and services related to the user query and contextual information. Some of these behaviours have already been sanctioned by antitrust authorities such as Google's promotion of its own subsidiary websites in the Google Shopping case. One of the earlier contributions on this issue is Hagiu and Jullien (2011). They show that an intermediary has an incentive to "lower" the quality of the interaction provided by the platform in exchange for higher revenues per interaction. In their model the platform trades off revenues per interaction for quantity of interactions. In a series of papers, De Corniere and Taylor (2014, 2016) study the determinants of such bias and its consequences. The first paper looks at search engine bias and its effect on websites' strategies. The latter generalizes some of the ideas, looking at an intermediary who is willing to divert uninformed consumers in exchange for a price. It is shown under what conditions on preferences and technology a market failure arises. Bourreau and Gaudin (2018) and Calvano and Jullien (2018) look at biases within widely used recommender systems. These are algorithms designed to greet consumers landing on a website with personalized recommendations about goods from the catalogue that they might enjoy or need. Netflix, Amazon, Spotify and many other platforms employ a version of these highly sophisticated algorithms which basically use big data to predict consumer tastes. Recommender systems are extremely popular because they help boosting consumer engagement, a key driver of business retention and creation. Bourreau and Gaudin (2018) look at the issue of biased recommendations in a context where some products/consumer choices are more profitable than others. They explore a trade-off whereby distortion enhances revenues (given participation) but obviously depresses demand as consumers anticipate that the content is not the one that they would have chosen for themselves. Calvano and Jullien (2018) show that recommendation bias is very robust, emerging even in settings where there are no pecuniary incentives. That is, even in contexts where the service provider has no preference over which object ends up being consumed. The idea is that consumer trust in these recommendation systems is very fragile. If a product recommendation (say a movie) turns out to be wrong, then consumers will not trust anymore these recommendations in the future and as a result their willingness to pay will be lower. They show that in these contexts recommender systems engage in inefficient risk taking: they are excessively cautious. That is, they recommend too often products which on average do not risk disappointing.

## A.1.2. Competition FOR the market

If network effects are strong and the products provided by competing platforms are close substitutes, then concentration would be intuitively both the outcome of competition and socially desirable. Indeed, most of the current academic debate takes as given that network effects lead to market tipping and looks at the potential of competition *FOR* the market to discipline incumbents. The idea is that in a world with rapid innovation, potential and actual entry possibly mitigate the social costs of market power.

The main aim of this section is to discuss some recent work on the notion of "incumbency advantage". That is the idea, illustrated below, that an installed base of consumers may prevent entrants from penetrating the market despite better products.

To understand what "incumbency advantage" means, consider the following prototypical situation, reminiscent of many digital markets. There is a monopolist with 10.000 customers who derive the equivalent of 50 dollars of surplus from interacting with the other 9.999 customers. Now, suppose a potential competitor appears on the market. The competitor is endowed with a better technology in the following sense: if all consumers switched, their willingness to pay would be strictly larger than 50 dollars. Biglaiser et al. (2018) say that there is an incumbency advantage whenever the entrant *fails* to conquer the market despite its superior technology. Some early contributions (discussed below) refer to this as "excess inertia."

The three key policy questions in this context are: what is the *source* of the incumbency advantage? How and to what extent can such advantage be *exploited* to extract supra competitive rents? Are there factors that can mitigate the anticompetitive potential of network effects?

PX0498-146

*Switching costs as a competitive asset*

Three important early contributions by Farrell and Saloner (1986), Katz and Shapiro (1992) and Fudenberg and Tirole (2000) pointed at switching costs. In its simplest incarnation, the idea is that once a consumer makes a purchase, she cannot change her mind. That is, consumers adopting earlier technologies are "stranded" in case a new, perhaps superior technology arises at some later stage. Switching costs and more generally "stranded" consumers are an obvious source of incumbency advantage. Importantly, they also imply a different normative benchmark in which entrants need not necessarily conquer the market. The intuition is that if entrants can only offer marginal improvements in quality, it would be more efficient to stick to the old technology. This would allow to save on switching costs while at the same time fully exploit network effects. Following this logic, Farrell and Saloner (1986), Katz and Shapiro (1992), among others, show that there could be *excessive momentum*. That is, incumbents are displaced "too often" from a total surplus maximizing perspective. The intuition is that consumers coming in at a later stage fail to internalize the utility of the "stranded" ones. So, when making their adoption choices they jump too often onboard the entrant. Fudenberg and Tirole (2000) follow up on this thread by looking at the incumbent's incentives pre-entry. They show that switching costs induce incumbents to be aggressive early on. The idea is that establishing a wider user base deters entry of potential competitors in future stages.

While switching costs clearly played an important role in the early development of software, hardware and Telco's industries, today's digital markets are usually characterized by very low switching costs. Subscribing to a service, installing an app or signing up on a website does not require to invest in new equipment or sink in time to learn new skills. With the exception of personal data,[206] these frictions are very low. Therefore, the more recent literature has been relooking at the incumbency advantage issue in this frictionless context. Early on, Katz and Shapiro (1994) pointed to "established reputations, well-known brand names, and ready visible access to capital"[207] as potential other sources of an incumbency advantage. However, these would be a competitive advantage in any industry. The only reason why they would be more relevant in a context with network effects is that tipping is more prevalent.

*Favourable expectations as a competitive asset*

A common theme in recent work is to look at consumer "coordination" (or lack thereof). To fix ideas, consider the following situation. A competitor with a slightly superior technology (in the sense described above) wants to challenge an incumbent. The entrant is a subsidiary of a large firm with a well-established reputation and the services offered are very similar to those of the incumbent. There are no switching costs and the price offered by the entrant is not higher than that offered by the incumbent. This situation seems to better capture the current landscape (of course up to the assumption of higher quality) with several firms failing to displace incumbents despite deep pockets, established reputation, famous brands and frictionless switching. For instance, Microsoft's efforts to challenge Google in the search engines market; Google's effort to challenge Microsoft in office productivity apps or Google's effort to displace Facebook in social networking. In this situation, from a collective standpoint, all consumers would be better off migrating to the entrant. The only reason why an entrant might fail to conquer the market is because of a widespread belief that not enough consumers will migrate. That is everyone believes that all the other consumers believe that no one will migrate. In multi-sided markets this issue is exacerbated. For instance, unestablished OS developers (e.g. Windows phone OS) need to persuade simultaneously consumers and app developers. They thus face a "chicken and egg" problem, with consumers' waiting for app developers to join and app developers waiting for the OS to gain market shares so as to recoup their investments.

Can these "beliefs" be thought of as strategic assets ("coordination capital") that shield incumbents from competition? What strategies will firms use in order to build or exploit this comparative advantage?

To tackle these issues, Caillaud and Jullien (2003) and, more recently, Halaburda, Jullien and Yehezkel (2016) and Halaburda and Yehezkel (2016) developed the notion of "focality". That is, they explicitly formalize the intuition that incumbents face favourable beliefs. They are motivated by the observation that big market

---

[206] Personal data can be useful to an entrant to provide comparable quality and therefore may be a source of switching costs.

[207] Katz and Shapiro (1994), p. 107.

PX0498-147

players are typically expected to dominate the market in future interactions. For example, the pre-orderings of new vintages of iPhones often beat expectations despite the lack of apps that exploit its new functionalities. By pre-ordering such a product, consumers basically bet that Apple would remain dominant and thus that there would be a flurry of apps for the new device. An incumbent is "focal" if consumers make their choices conjecturing that all other consumers will not switch. It can be easily shown that in a static (one shot) model of competition for exclusive services between a relatively inefficient "focal" incumbent and a "non-focal" entrant, the incumbent conquers the market "too often". The reason is that the only way for the entrant to gain market share is to make it a dominant strategy for consumers to migrate. That is, consumers should find it convenient to migrate no matter what other consumers do. Thus, the only way an entrant can gain market share is by offering additional stand-alone (i.e. network independent) services or by charging relatively low (or, if possible, potentially negative) prices. Clearly the entrant would be willing to invest resources to induce consumers to switch only if it expects to recoup those investments in the future. Therefore, entrants will find it profitable to conquer the market only if the quality gap is large enough. This leads to the static inefficiency whereby some higher quality entrants might fail to conquer the market.

Halaburda, Jullien and Yehezkel (2018), Halaburda and Yehezkel (2016) and Biglaiser and Cremer (2018) recently relooked at this issue embedding dynamic considerations. They look at competition between an incumbent and a sequence of potential entrants over a large number of periods. They wonder whether the fact that current success brings focality (and thus future incumbency advantage) could give the entrant an incentive to invest (i.e. incur losses) in the short run to harvest rents in the future. Persuading consumers in the face of unfavourable beliefs is costly but on the other hand allows to recoup those investments through monopoly prices thereafter. Clearly, relative to the static model discussed above, entrants should be willing to invest more (i.e. incur larger losses) in the short run to conquer the market. These papers deliver two clear messages. First, they generally show that the static inefficiency extends to the dynamic setting: focal, lower quality incumbents can stay dominant. Thus, long-term considerations do not necessarily restore efficient outcomes. In particular Halaburda, Jullien and Yehezkel (2018) show that this inefficient outcome occurs when firms are not very patient. Biglaiser and Cremer (2018) further show that the inefficiency is considerably mitigated. Specifically, they show that the incumbent has little ability to leverage its focality advantage to gain rents beyond the rents they would get in a static (one-shot) interaction. The reason is that precisely for these long-run considerations, entrants become very aggressive, charging very low prices thus competing away the dynamic portion of the monopoly rents.

Biglaiser, Cremer and Veiga (2018) identify a different source of incumbency advantage: the incentives of consumers to wait until the entrant's user base is large enough. In their model, consumers do not choose simultaneously whether to migrate to the entrant. Instead, at every point in time, an opportunity to migrate arrives with some positive probability. This equilibrium model captures a well-known fact in the industry, which is consumer reluctance to join entrant platforms early on. Being an "early adopter" comes at the cost of giving up the network effects linked to the incumbent's larger user base. However, their reasoning goes, if every consumer waits for the others to join first, the entrant will find it difficult to penetrate the market despite providing higher quality. To separate this source of incumbency advantage from the "belief-based" one presented above, the authors assume favourable beliefs *for the entrant*. That is, when making their choices, consumers conjecture that all other consumers would migrate as soon as given the opportunity to do so. Yet, despite these beliefs, waiting for those consumers to join first can be optimal, leading to suboptimal adoption. Furthermore, they link the inefficiency to the way consumers become aware about the existence of the entrant.

How do indirect network effects change the nature and outcome of competition? Caillaud and Jullien (2003) and Jullien (2011) show that the static inefficiency due to "focality" or "coordination bias" extends to multi-sided markets. In these papers, "focality" means that agents on one side expect agents on the opposite side to stay with the incumbent. For instance, think about a classic textbook example of a two-sided market like that of videogames. Even though new entrants, such as Microsoft Xbox, might bring to the market a more powerful hardware solution, conquering the market at the expense of incumbents (at that time Sony PlayStation) is still hard under unfavourable expectations. The idea is that if game developers expect consumers to stick with Sony then it would be difficult for Microsoft to persuade them to develop titles for

PX0498-148

the new console. Similarly, if consumers expect game developers to stick with Sony, then they would be reluctant to buy a console that they expect will not carry many titles.

An interesting additional insight of these early models of two-sided platform competition is that the presence of multiple sides *reduces* the focality advantage because it allows to employ "divide and conquer strategies" (Caillaud and Jullien (2003)). That is, the entrant needs only persuade (perhaps heavily subsidizing) one side of the market to switch. Once one side is effectively "on board" the other side will follow. Strictly speaking, this is a consequence of the fact that in a two-sided context a platform can discriminate among agents belonging to different sides. Another consequence of "divide and conquer" strategies is that they greatly reduce the extent of market power. The reason is that competition to secure one side of the market (i.e. the "divide" part of the strategy) tends to be very aggressive, forcing firms to give away a large portion of their rents to users through generous participation subsidies.

*Factors mitigating the anticompetitive potential of network effects: local networks and contingent prices*

A number of papers noted that network effects are often "local" and not "global" in nature (for instance Banerji and Dutta (2010)). That is, consumers typically care only about the adoption choices of other users they want to interact with. For instance, in communication networks, what matters is which service providers friends and acquaintances choose to subscribe to.[208] Similarly, in software industries, the utility to a user of adopting a particular software and thus a particular file format depends on how many other *collaborators* of that user adopt the same software. Local network effects allow for multiple firms to cohabit in the marketplace at the same time. Also, they make a hypothetical entrant's task much simpler.

There is a vast literature on network effects and pricing of network goods. The idea is that entrants might be able to persuade reluctant consumers by either compensating them (i.e. low or negative introductory prices) or by insuring them against coordination failures. That is by charging prices contingent on network size. On the one hand, these instruments may potentially reduce the incumbency advantage. On the other hand, incumbents might react by charging even lower contingent prices to retain their user base. Weyl and White (2018) consider the problem in the context of a multi-sided market. They show that competition in "insulated tariffs" sometimes leads to inefficient fragmentation (too many firms active at the same time) and never leads to excess tipping.

*Factors mitigating the anticompetitive potential of network effects: multi-homing*

In digital markets, switching costs are typically low for a variety of reasons. As noted by Evans (2017), Internet platform businesses typically leverage on OSs for non-core software and hardware functionalities. In contrast with classic network industries, users do not have to make capital investments to access other service providers. For example, switching one's social network does not require buying a new device or learning to operate in a different OS environment. Moreover, usage costs are typically low. In many instances, the products are distributed for free. Consequently, users typically try out new services *before* quitting the old ones and patronize two competing platforms at the same time. This behaviour, usually referred to as "multi-homing", is the norm more than the exception in digital markets. This simple fact has deep consequences. Clearly, the "rich get richer" argument introduced earlier assumes that the opportunity cost of switching to an entrant is giving up the network of the incumbent. This implicitly presumes some friction that does not allow consumers to stay hooked up to both networks at the same time. Without that friction, it is obviously easier to induce consumers to "try out" one's product.

One key distinction put forward by Biglaiser et al. (2019), among others, is whether network effects result as a by-product of consumer *signing up/ installing* on an app or *using* that app. To see why this distinction is crucial, Biglaiser et al. (2019) contrast communication services with social networks. What matters for the success of a communication service is its network. For instance, if a user installs both WhatsApp and Telegram, then she can be reached through either app. On the contrary, social networks on the one hand

---

[208] Intuitively, the smaller the circle of friends and acquaintances the average consumer is interested to reach, the more the network effects characterizing the industry will be local in nature, as observed by the Commission in its *Microsoft/Skype* decision discussed in section I.4.1.1.

PX0498-149

need their users to "sign up" while on the other hand they also need them to curate their profiles and engage with the service. That is what some refer to as "multi-homing in usage". If usage is costly (for instance, since curating one's profile is time-consuming), then the mere act of multi-homing does not change the fact that in practice consumers still use one app.[209] That is, for what concerns competition, they are single-homing. An illustrative case in point is Google+, Google's "me too" social network. Despite Google easily signed up all of its Google account holders, the network has been eventually discontinued due to lack of engagement.

How does the option of multi-homing affect the incumbency advantage? Absent switching costs, there could still be scope for incumbency advantage through focality. The option of multi-homing clearly does not wipe out the focality advantage. However, it makes the marketplace much more contestable. To see this, notice that in the simple theory discussed above, in order to penetrate the market, an entrant needs to guarantee to early adopters a value at least as high as that offered by the focal incumbent. However, with multi-homing, switching occurs whenever the entrant offers non-negative surplus. That could be achieved via negative prices or by bundling the network good with some complimentary service. Indeed, many online platforms offer several freebies (Gmail in Google, news in Yahoo, Messenger in Facebook) to keep their users hooked up.

This reasoning suggests that policies encouraging the extent of multi-homing should increase market efficiency, although more research is needed.

Multi-homing has been mostly studied in the context of platform competition. Armstrong (2006), studied competition in a model where one set of users always multi-homed while the other was assumed to single-home introducing the well-known notion of "competitive bottleneck". To see what that means through an example, consider marketplaces such as Amazon.com or Taobao.com. Suppose, for the sake of illustrating the notion, that there are two or more competing marketplaces and that buyers single-home. That is, they always shop on their preferred website. Then, given consumer behaviour, platforms become the only means through which sellers can access the buyers. Thus, given buyers' choices, platforms can insist on sellers paying the monopoly price for accessing their exclusive turf of buyers. Basically, single-homing on the buyer side shuts down competition on the seller side. To make this more concrete, notice that if buyers segregate in a platform of their choice then a seller's choice of joining one platform (say Amazon.com) does not depend on whether it joins some other Taobao.com. Since the user bases do not intersect, the two choices are separate. But since acquiring buyers allows to extract fat monopoly rents on the opposite side of the market, there will be fierce competition for buyers. Armstrong (2006) concludes that we should observe relatively lower prices (even negative ones) on the single-homing side of the market.

The more recent literature on multi-homing recognizes that the choice to multi- or single-home is often endogenous. Firms can control some of these choices by designing their offers in a way that induces their preferred outcome. The first paper along these lines is Armstrong and Wright (2007). They show that the competitive bottleneck outcome arises endogenously if one side of the market (in their paper, sellers) sees the platforms as homogeneous (of course controlling for the size of the network) while the other side of the market (buyers) has strong preferences for using one particular platform over the other, i.e. there is horizontal differentiation. On the contrary, two-sided single-homing is the natural outcome when agents on both sides have strong preferences. In a similar vein, Tremblay and Jeitschko (2018) characterize competition between platforms in two-sided markets allowing both types of agents to multi-home. In contrast with Armstrong and Wright (2007), they look at a different source of demand heterogeneity. In their model agents differ on how much they value interactions. That is, they look at the effect of heterogeneity in the indirect network effect $b_i$. The paper basically maps consumer preferences (thus demand) and firm technology (thus supply) to platform market outcomes. This model is able to rationalize a wider spectrum of market outcomes. In particular, they provide conditions under which mixed-homing equilibria arise, with some sellers and some buyers dealing with both platforms while others single-homing.

---

[209] This key distinction is one of the factors that made the Commission reach different conclusions about the mitigating potential of multi-homing in past merger decisions regarding consumer communications services, on the one hand, and social networks, on the other hand. These cases are discussed in section I.4.1.1 and I.4.2.1 respectively.

PX0498-150

An important means through which multi-homing can be effectively hindered are exclusive dealing arrangements. If a firm unilaterally insists on exclusivity on one side of the market, then multi-homing outcomes are obviously ruled out. But can a platform profit by doing so? What about end-user surplus?

Armstrong and Wright (2007) look at this issue when platforms are *not* differentiated. They show that two identical platforms can cohabit despite being perfect substitutes if one side of the market multi-homes. They show market outcomes where all sellers join both platforms while buyers divide equally between platforms (a similar insight can be found in Caillaud and Jullien (2003)). Again, being this a competitive bottleneck outcome, competition on the seller side is shut down, so their surplus is fully extracted. On the other hand, buyers are subsidized. In extreme cases, all surplus extracted on the seller side of the market is given back to buyers under the form of low prices attempting to persuade them and profits are zero. They show that the effect of allowing for exclusive contracts is that of inducing market tipping. As discussed, on the one hand this development leads to static efficiencies. Since the two platforms were identical to start with, if there is even a small cost that sellers have to bear to multi-home, then one big platform is obviously more efficient. On the other hand, it creates dynamic inefficiencies due to the incumbency advantage.

Peitz and Bellaflamme (2018) look at this question with a model that allows for idiosyncratic tastes on both sides of the market. They contrast outcomes in the competitive bottleneck world (in their model, sellers multi-home while buyers single-home) with outcomes in the two-sided single-homing world (sellers and buyers single-home). To see how a platform can gain by having sellers sign exclusive deals notice that in the competitive bottleneck world the possibility of exploiting those valuable multi-homing sellers builds a lot of competitive pressure to bring buyers on board. Exclusive contracts help raise profits as follows. On the one hand they create competitive pressure on the seller side. On the other hand, they relax competition on the buyer side. This is profitable if what you give up (i.e. monopoly rents on the seller side) is less than what you get (larger duopoly rents on the buyer side). Indeed, they show that platforms prefer to impose exclusivity to sellers if, other things held constant, the sellers' stand-alone benefit value is small enough.

Carroni et al. (2018) look at platform competition in a context where some users (say a superstar music artist or a blockbuster movie) are more valuable than others. Signing these superstar users on exclusive terms provides a competitive advantage. Of course, these contracts are somewhat expensive since platforms need to compensate superstar users that cannot interact with the consumers of the rival. They show that exclusive contracts arise endogenously whenever the platforms products are close substitutes. Also, and most importantly, exclusive contracts can be procompetitive as they induce more content providers to multi-home and therefore increase the overall content consumption, despite reducing competition downstream.

### A.1.3. Competition IN the market

Here we complement the analysis on competition highlighting two notable cases widely discussed in the literature, where there is competition IN the market *despite* network effects: network interconnection and product differentiation. What links these two is the fact that market fragmentation is not necessarily inefficient to start with. This is linked to either consumer preferences or technology.

Two networks/customer bases are said to be interconnected if their respective members can interact. Under interconnection there is obviously no more network-driven scope for tipping. Indeed, the earlier literature on network effects has focused on the issue of compatibility and interoperability as a way to restore competition in the market while preserving network effects (a good starting point is Laffont and Tirole (2001)). A textbook example is termination in Telcos. Taking mobile operators as an example, customers of operator A can call customers of operator B if there is an agreement between the two on call termination charges or if termination is regulated.

Compatibility and interoperability are not perceived as a viable option in today's digital markets arena. One reason is that interoperability requires an agreement on what standard services should be guaranteed to consumers served by different firms. While it is reasonable to think about agreements detailing what a telephone call "is" and what quality means in that context, it is much more difficult to do so in the context of social media or enhanced communications services such as WhatsApp or Instagram.

PX0498-151

A notable exception to the view that compatibility is not an option is a recent contribution by Gans (2018). The paper puts forward a notion of "identity portability" as a possible policy response. The idea is that individual users should have a "right" to their identity and to its verification if they change digital platforms. The idea is that if a user wants to interact with some other users whose identity is clearly defined, then platforms should allow that interaction by sorting out some way of interconnecting the user bases mitigating switching costs and promoting competition. A similar proposal, labelled "graph portability", has been put forward by Zingales and Rolnik (2017).[210]

If products are sufficiently differentiated, then two or more platforms could obviously cohabit. Consumers with tastes "very close" to an entrant's product will choose that over an incumbent despite the incumbents' installed base. That is, if the extent of horizontal product differentiation is large enough relative to the strength of network effects then the natural tendency to tip can be overcome. Armstrong (2006) and Rochet and Tirole (2003) look at fragmentation/shared market equilibria in two-sided markets. Analogously to the one-sided settings, they show that if platforms differentiate their products, catering to different idiosyncratic tastes, then two or more platform can cohabit in the same market much as in traditional ones. However, despite the absence of tipping, network effects still play an important role in shaping prices and outcomes. For instance, a key insight of Armstrong (2006) is that network effects intensify competition. Stealing business from a side of a rival carries a double dividend. On the one hand, it makes the platform more attractive to all consumers on the opposite side, inducing some consumers to switch. On the other hand, it reduces the rival's attractiveness (whose network shrunk), inducing even more customers to switch. Stronger network effects amplify this channel, greatly limiting the extent of rent extraction as compared to traditional industries. That is, indirect network effects *amplify* the effect of competition on prices. The larger the externalities, the lower the prices charged.

Market fragmentation is not surprising nor necessarily inefficient in settings where consumers disagree as to what is the "best" product due to their own idiosyncratic tastes. Some recent contributions showed that fragmentation can occur *despite* consumers agreeing on which platform provides the "best" service (Ambrus and Argenziano (2009)) and despite consumers perceiving the two platforms as providing identical services (Calvano and Polo (2018)). Ambrus and Argenziano (2009) look at a context in which some consumers value interacting more than others. In jargon, they look at the effect of heterogeneity in the indirect network effect $b_i$. In order to understand their argument, it is useful to draw a parallel with a seminal contribution by Mussa and Rosen (1978) and Shaked and Sutton (1982). These papers endogenize the quality of a consumer product, allowing firms to endogenously provide different "qualities" or "versions" of the same product. Shaked and Sutton (1982) show that if consumers carry different tastes for a marginal increase in "quality," then identical competing firms can successfully relax competition by serving different subset of consumers. They do so by endogenously differentiating in the quality dimension. One firm provides in "high quality" services focusing on those consumers who value quality a lot while the rival provides a "low-quality" product focusing on those with a low willingness to pay for quality. Ambrus and Argenziano (2009) show that one can use the "size" of the network in a way akin to quality. One of their motivating examples are job market matchmakers such as Monster.com. They document that back in 2009 the two major US platforms carried quite distinct groups of agents. One platform was basically free on the job seekers side. So, it carried a large pool of those. On the other hand, it charged a small pool of selected employers a hefty price to post a vacancy and access that large pool. The main rival platform adopted an opposite model. It had many more job postings due to lower prices on the employers' side. However, job seekers had to go through a costlier process to post their resumes. They rationalize this and other anecdotal evidence by providing a model of competition where one platform is cheaper and larger on one side, while the other platform is cheaper and larger on the *other* side. Their argument can be seen as an extension of the classic papers on vertical differentiation once one notices that the quantity of agents on one side is the "quality" of the platform for agents on the opposite side.

Calvano and Polo (2018) go one step further providing a model of strategic differentiation by business model that does *not* rely on users having different tastes for quality but rather on the "two-sided" nature of these markets. They show that two otherwise identical platforms can relax competition by cornering different sides

---

[210] https://www.nytimes.com/2017/06/30/opinion/social-data-google-facebook-europe.html.

PX0498-152

of the market. The motivating example are broadcasting markets, where Free-to-Air (FTA) operators cohabit with Pay-TVs. Their respective business model is to subsidize viewers (providing free content) while charging advertisers for the privilege of accessing those viewers and vice-versa. The key intuition is that business models are strategic substitutes. Loosely speaking, if one operator supplies more advertising and decreases or eliminates subscription fees (i.e., shifts towards the FTA model), it heightens its competitor's incentive to raise fees and reduce advertising (moving towards the Pay-TV model), and vice-versa.

## A.2. Markets for attention

A large number of digital products and services are offered free of charge to consumers and paid for with advertising dollars. In the US alone, the internet advertising industry totalled revenues of almost $90 billion in 2017, with growth rates in the double digits. These firms include the top online businesses. Indeed, 7 of the 10 most visited websites in the US[211] are in the business of harvesting attention by means of content or service provision and resell it to advertisers. Some refer to these firms as "attention brokers". The industry is highly concentrated. For instance, the top 10 online platforms get almost three quarters of all online advertising revenues.[212] Wu (2018) describes and supports the approach of considering platforms reselling attention as being in the same market regardless of their "functional definition" (e.g. search engine) as a way to address the "blind spot" in current Antitrust practice.

Attention brokers are essentially platforms operating in multi-sided markets. Advertisers wish to place their creatives on outlets that have a large audience. Thus, their willingness to pay increases with the number of eyeballs the platform attracts. However, consumers' willingness to pay typically decreases with the amount of advertising supplied. That is, advertising is often seen as a nuisance. So, at first pass, the literature on multi-sided platforms surveyed in previous sections already provides a number of insights on the functioning of these markets.

However, these markets received a special treatment in the economics literature for a number of reasons that go beyond their obvious relevance:

- human attention is a scarce and valuable resource and thus one naturally wonders if the market is inducing any allocative distortions;
- the fact that prices are often not used on the consumer side of the market creates new theoretical and empirical challenges. Competition for eyeballs is in the quality dimension and the absence of price variation makes it hard to estimate the demand system and thus to measure substitutability, which is key in merger cases;
- new technologies allow advertisers to "target" audiences in a number of dimensions: demographics, physical location, time of the day, personal tastes, browsing history and so on. These "new media" are different that "traditional media". Targeting means that competition is scaled at the individual level. In extreme cases, one can think of the attention of a single, identified individual being first contended between media outlets and then auctioned off;
- because multi-homing is a widespread phenomenon, traditional supply-side market shares are not informative of the extent of competition;
- advertising is a key input in product market competition. Thus, the functioning of the advertising markets has consequences for product markets as well.

An early and influential contribution by Anderson and Coate (2005) provided a first model of "competition" for attention. Specifically, they study the allocative properties of a market with two competing attention brokers such as free news outlets. The main focus is on the trade-off between quantity of advertising and number of viewers. Would competing platforms over-supply or under-supply advertising? What is the likely effect of a merger? A key modelling assumption is that the stations compete for the *exclusive* attention of viewers. That is, viewers have to choose where to get their news and cannot patronize both websites. Thus,

---

[211] https://www.alexa.com/topsites/countries/US last accessed in January 2019

[212] Silverman, David. 2017. "IAB Internet Advertising Revenue Report." PwC.

PX0498-153

their model is a special case of the competitive bottleneck model studied before with one less control (consumer price).

Comparing the duopoly outcome with the choices of a hypothetical monopoly owner of both stations, they find that a merger leads to an *increase* in the quantity of advertising. This is very intuitive. Notice that, being a nuisance, advertising can be thought of as some "shadow price" that consumers have to pay in order to satisfy their content needs. Competition typically leads to lower prices. Thus, competing stations reduce the quantity of ads to secure eyeballs. What about efficiency? The normative analysis is more nuanced. Because of the absence of prices on the consumer side of the market, the stations fail to internalize the effect of an extra advertisement on viewer welfare. Concentration therefore leads to inefficient overprovision.

The more recent literature recognizes that users typically satisfy their content needs on multiple platforms. For example, ComScore reports that the largest online advertising networks[213] serve pretty much the same eyeballs. How does the fact that competition is for *shared* users change the conclusion above? Ambrus et al. (2016) consider the incentives of a platform to provide an extra ad in this context, assuming that the platforms provide content that is not substitute. For example, think about a search engine competing with a social media. Clearly, being advertising a nuisance, when quantity goes down, the platform will lure some new users onboard. In the traditional Anderson and Coate's model, that new business is "stolen" from the rival. In this context, the platform will instead "share" some previously unshared business with the rival. A key insight is that these shared eyeballs are less lucrative than exclusive eyeballs. This is because as both platforms can deliver those eyeballs to advertisers, competition leaves more of the rents associated to those eyeballs in the advertisers' pocket. This is referred to as the "incremental pricing principle" in this literature. Thus, the incentives to acquire new eyeballs through lower quantity of ads or higher quality are quite different than those in traditional models. Also, concentration (for instance, through a merger) changes substantially those incentives. This is because some previously shared business becomes post-merger exclusive of the merged entity and thus more lucrative. Broadly speaking, these papers identify novel forces that reflect outlets' incentives to control the *composition* of their customer base. The model can explain several empirical regularities that are difficult to reconcile with existing models.

Athey et al. (2018) and Anderson et al. (2016) look at a similar model with more emphasis on implications for the type of content provided rather than the quantity of ads. The starting point in Athey et al. (2018) is that advertising campaigns on multiple outlets are wasteful when consumers multi-home because some consumers are reached too many times while others are missed entirely. The reason is that while tracking technologies, such as "cookies", allow to control how many times a given consumer has been impressed with a particular ad on a given platform, such as on Facebook.com and the associated websites, there is no way for owners of *other* platforms to know which ads a multi-homing consumer has been exposed to. Advertisers seeking broader "reach" (i.e. more unique users), while avoiding inefficient duplication, anticipate this and tend to prefer *larger* platforms to minimize waste. This has implications for content provision: publishers invest in quality to extend the number of users. Anderson et al. (2016) show, among other things, that due to the incremental pricing principle platforms may bias content against multi-homers. Gentzkow et al (2014 ) provide an empirical structural application in the newspaper industry. They show that preferences over one's audience composition and in particular the fact that multi-homing readers are less valuable can explain the political orientation of hystorical local US newspapers.

Prat and Valletti (2018) look at implications of attention market concentration on product markets. The starting point is that entrants need to make consumer aware of their existence. That is, consumer attention an essential input for entrants in product markets. Clearly, incumbents may foreclose entry by buying large amounts of attention of each user for a large number of users (in the limit, by buying all attention of all users). However, this strategy is profitable as long as the number of competing attention brokers delivering individual users (and thus the quantity of advertising supplied) is not too large. A merger between two attention brokers patronized by a user reduces the supply of attention of that user and makes it easier for incumbents to keep out entrants from the market for that user ultimately hurting consumers. This finding

---

[213] An advertising network is an attention broker that serves ads on multiple websites (some of which are owned and run by independent third parties) and can track users as they move across these websites.

PX0498-154

goes against conventional wisdom. Mergers between attention brokers indeed might have important effect on consumers via higher prices product markets. Clearly the negative effect depends on the extent of usage overlap. If two attention brokers have no user in common, there is no effect. Furthermore, it typically materializes in niche markets not served by traditional media. The paper is able to rationalize apparently puzzling behaviour such as "brand" keyword advertising, a practice used by most major corporations whereby a company advertises for keywords containing their brand, despite organic links obviously appearing on top of the page.[214] The idea is that those ads contribute to push further down competitors' link in organic search and to keep them out from sponsored search.

### A.3. Innovation in digital markets

One of the features of digital markets is rapid innovation both of the drastic type (mainly performed by entrants) and non-drastic/incremental type (mainly performed by market participants).

Start-ups often sell-out to incumbents before even serving their first customers. In section A.3.1 we review the literature on this phenomenon which is known as "entry for buyout" and that on the extreme event where acquirers discontinue the development of the new product known as "killer acquisition".

Another important issue is whether a merger between equal sized competitors would further strengthen or dampen the incentives to innovate. The recent decision by the EU Commission in the *Dow/DuPont* case (discussed in section I.4.1.4) sparked off a debate among scholars. In section A.3.2 we review recent contributions showing that the Commission's hypothesis, namely that mergers *hamper* innovation, is not unambiguously supported by economic theory.

### A.3.1. Entry for buyout and killer acquisitions

A widespread practice in digital markets is that of entrants selling out to incumbents very early in the product life-cycle. This is known as entry for buyout (Rasmusen (1988)).

The theoretical roots of this argument go back to an early seminal article by Richard Gilbert and David Newberry (1982). They argue that institutions such as the patent system create opportunities for existing incumbent firms to maintain their monopoly power by taking pre-emptive actions meant to decrease the prospective profits of potential competitors. One such action is what they refer to as "pre-emptive invention". They show that incumbent firms have incentives to patent new technologies before potential entrants in order to protect their rents. To see this point through a simple model, consider the following situation. There is an incumbent whose profits are $\pi^M$ and a potential entrant whose profits are equal to 0. An innovation opportunity for a substitute variety of the incumbent's product arises. If the innovation is patented by the entrant, then there will be a regime of symmetric duopoly with firms earning a profit of $\pi^D$ each. If the innovation is patented by the incumbent, then the incumbent will jointly sell both varieties and earn a profit $\pi^{JM}$. The maximum willingness to invest to innovate of the potential entrant is equal to the profits he would make in case of innovation minus the profits he expects to make otherwise. That is equal to $\pi^D$. The incumbent's maximum willingness to invest is equal to $\pi^{JM}$ minus the profits he expects to make otherwise. As duopoly profits are larger than zero, it is reasonable to expect that the entrant would invest if the incumbent does not. It follows that the incumbent's maximum willingness to invest is $\pi^{JM} - \pi^D$. The incumbent has thus stronger incentives to invest if and only if $\pi^{JM} - \pi^D > \pi^D$. That is, if and only if $\pi^{JM} > 2\pi^D$. This condition simply states that the incumbent has stronger incentives whenever the total industry profits in regime of monopoly are larger than those in regime of competition. This condition is likely to be satisfied unless there are strong diseconomies of scale. This is what in the literature is referred to as "efficiency effect".

The above argument assumes that there is no further cost beyond patenting to bring a product to the marketplace. Now, suppose that whoever patents the innovation needs to further invest in developing it at

---

[214] Blake et al. (2018) report that "Google searches for the keywords "AT&T", "Macy", "Safeway", "Ford" and "Amazon" resulted in paid ads at the top of the search results page directly above natural (also known as organic) unpaid links to the companies' sites."

PX0498-155

cost $d$. Conditional on patenting, the incumbent develops the new product if and only if $\pi^{JM} - d > \pi^M$. The potential entrant develops the innovation if $\pi^D - d > 0$. If the innovation is a close substitute to the incumbent's product then $\pi^{JM} \approx \pi^M$ which implies that it is never optimal for an incumbent to develop. On the contrary $\pi^D > d$ (as otherwise the innovation would not be viable to start with). This means that if products are close substitutes incumbents have a *weaker* incentive to develop than entrants. This is Arrow's (1972) famous "replacement effect": the incentives of introducing new products are smaller for incumbents since some of those products will end up cannibalizing its own rents.

By the same logic, incumbents have stronger incentives than, say, venture capitalist, to acquire entrants in the process of developing a competing product. Once acquired, by virtue of the "replacement effect" they will also have stronger incentives to discontinue those development processes.

The possibility of buying out entrants obviously stimulates entry through innovation and thus investments. Rasmusen (1988) argues that, on the plus side, this limits the scope for entry deterrence strategies, for instance through excess capacity à la Spence (1977). To deter entry, the incumbent needs to commit to be aggressive post-entry *and* to not buy-out eventual entrants. On the minus side, entry for buyout stimulates inefficient rent-seeking duplicative innovation. For instance, because the threat to incumbents is higher when the entrant's product is a close substitute to the incumbent's then entrants will seek to duplicate existing products rather than creating new ones through diversification. Also, because entrants expect to be bought, they would enter even if expected revenues are less than investment costs, provided of course that the entrant can credibly remain in the market. This occurs whenever production costs are low, and all investments are in R&D (and hence sunk). In limited cases, the prospect of being bought out may stimulate entry of inefficient firms (for example, with higher unit costs)

In summary, from a normative stand-point allowing buy-outs reduces the scope for entry deterrence strategies and thus enhances market contestability. On the other hand, it encourages rent-seeking behaviour.

While the literature provides clear and unambiguous theoretical predictions towards pre-emptive buyouts, there is surprisingly little systematic evidence to date. This is mainly because of significant empirical challenges. Ideally, the econometrician would need to observe how much effort is put in the development phase, before and after acquisition. Also, one needs to observe how close these products would be in product space to be able to quantify the incentives to discontinue their development. Finally, as observational data clearly features non-random M&A choices, there is an endogeneity issue as potential drivers of acquisitions may confound the effect of acquisitions on project development.

An exception is a recent paper by Cunningham, Ederer and Ma (2018). These authors gain traction on the problem by looking at acquisitions in the pharma industry. Because the development of drugs is subject to stringent regulatory requirements, the authors are able to follow the development from a very early stage through to launch or discontinuation. Their dataset provides nearly universal coverage. Importantly it provides two key pieces of information. First, it contains the drug's therapeutic market (e.g. "osteoporosis") and the mechanism of action (e.g. "calcium channel antagonist"), which is used to identify substitute products. Second, it contains information on acquisitions collected from multiple sources. They find that molecules acquired by an incumbent are 40% less likely to be developed compared to those that are not acquired. Overall, the estimates indicate that 6.4% of all acquisitions in the market are killer acquisitions. They also consider and rule out a number of alternative explanations. First, they look at human and physical capital redeployments as potential confounding motives for acquisitions. The idea is that the target is not the firm's molecules but rather its human and physical assets. For instance, talented researchers (in the spirit of Ouimet and Zarutskie (2011)) or superior technologies that can be redeployed within the acquiring firm to a more fruitful use. To rule out the human capital explanation, the authors track inventors over time and across organizations using the Harvard Patent Dataverse. They show that 78% of the inventors from target firms typically move to other firms following acquisitions. Also, the productivity of the 22% staying (as measured by the number of subsequent patents authored) actually drops by 30%. To assess whether and how technologies are redeployed, the authors look at the similarities between the *new* projects of the acquiring firm and the *old* projects of the acquired firm. The idea is that some promising chemical compounds may be used to invent new drugs. To assess similarity, they exploit a measure of distance between chemical

PX0498-156

compounds widely used in the chemical informatics literature. They find no evidence supporting the hypothesis that technologies are redeployed: new projects by the acquirer are not similar to the acquired project.

## A.3.2. Horizontal mergers and innovation

The literature on market structure and innovation built over many decades over two influential early contributions by Shumpeter (1942) and Arrow (1962). The former famously argued that perfect competition comes with strings attached. Zero or low profits reduce the incentives to invest in R&D. That is, the engine of innovation is the prospect of temporary market power to reward the innovative activity. Thus, monopoly power should be evaluated by weighting its short-term costs due to high prices against the long-term benefits of more innovation. Arrow (1962) put forward the opposite hypothesis. Monopolists, because they have a vested interest in preserving the status quo have incentives to "rest on their laurels". The reason is that by introducing new products, they would be basically cannibalizing their own rents. Competition thus spurs innovation. Gilbert and Newbery (1982) added to this debate by showing that Arrow's point rests on the assumption that the monopolist cannot be challenged. As discussed in the previous subsection, the prospect of entry, stimulates incumbents to invest even more than potential competitors. Many papers that followed tried to reconcile these opposite views (two notable efforts in this direction are Aghion et al. (2005) and Shapiro (2012)).

Many have recently pointed out that the classic literature on competition and innovation does not really illuminate the debate on horizontal mergers for a very simple reason: a merger is not just a reduction in the number of firms. That is, the extant literature captures the effect of an increase or a decrease of competitive pressure on the innovative activity. This exercise posits that the change is symmetric across all firms. A merger instead is a different exercise. First, the exercise is not symmetric: the merged entity combines the assets and internalizes the externalities. For instance, in terms of *incentives*, the merged entity takes into account how the activity of one division affects the rents of the other. Instead, in terms of *ability*, the merged entity might have a different R&D technology. This because it can (and should) reorganize production restructuring the R&D process to fully exploit synergies and complementarities. That is, there is an effect on the efficiency of R&D. The rest of this section focuses on a number of papers that have recently contributed to this debate along these lines. We pay particular attention to a number of papers that formalized the discussion following the *Dow/Dupont* decision of the Commission.

By and large the theoretical and empirical economic literature reviewed below suggests that the unilateral effects of mergers on innovation, both of the cost-reducing and quality enhancing types, are anti-competitive. But the nature of R&D makes efficiency gains much more realistic than in traditional unilateral settings calling for additional scrutiny by the authorities rather than relegating this practice among the "efficiency defences." See Jullien and Lefouili (2018), Denicolò and Polo (2018b) and Shapiro (2012) for recent surveys of this debate." Below we report on a number of very recent, selected papers that are at the forefront of the debate and are a good entry point to further dive into the literature.

Federico, Langus and Valletti (2017) study the unilateral "innovation effects" of a merger. That is, they look at whether, other things held constant, the fact that one merged entity can coordinate the R&D choices of two previously separated firms leads to more or less innovation. This exercise is the same in spirit as the unilateral price effects exercise in merger control. Specifically, they look at model in which $N$ identical firms compete to bring a new product to the market. Innovation is modelled as a stochastic process. The probability of succeeding depends positively on investment. Furthermore, the ex-post rents from innovating depend on how many firms successfully innovate. The larger the number of such successful innovators, the lower the rents. Clearly, when investing an extra dollar in R&D, a firm lowers the expected return on investment of all its rivals. The intuition is that the probability of sharing the market with one or more firms goes up for the rivals, which thus get lower rents in expectation. Federico et al. (2017) then consider a merger that would transform the two separate firms in two divisions. Clearly, coordinating the R&D activity of the two divisions here means lowering the amount invested. The intuition goes through the externality discussed above which is now internalized. They also argue that the (equilibrium) reaction of the rivals would lead to more investment but not as much as needed to overturn the initial reduction. All in all, mergers reduce innovation.

PX0498-157

Denicolò and Polo (2018a) argue that the above conclusion relies on the hypothesis that the two divisions R&D efforts do not interact after the merger. If one thinks of R&D as a process that leads to the progressive accumulation of knowledge, then keeping both division active and independent from one another will lead to a lot of duplicative invention. Even absent synergies, the merged entity should typically have incentives to coordinate the innovative activity across labs. Or in an extreme scenario, to kill one lab altogether and divert resources to the other. If having one research lab with twice as many resources is more productive than having two independent labs, then the merger will spur innovation, at least as an initial effect. Which of the two models is more realistic depends on the particular case at hand. Also, is reasonable to assume that in industries characterized by rapid innovation and sizeable R&D, the merging parties will each command a stock of knowledge that they would share post-merger. In turn, this inevitable sharing of technological knowledge typically leads to higher incentives to invest.

As with the literature on unilateral price-effects, sufficiently strong efficiency gains or positive spillovers may overturn this finding. However, in this context, things are somewhat different.  Denicolò and Polo (2018) argue that the fact that the "efficiency gains" are more realistic in these highly innovative industries, suggests that their existence should be taken explicitly in consideration by the authorities as opposed to instead relegating them as mere efficiency defence.

Bourreau, Jullien and Lefouili (2018) also challenge Federico et al. (2017)'s conclusion that concentration hampers innovation. They build a model in which the main objective of the R&D effort is to "escape competition". That is, when one firm innovates, say by creating a new differentiated product, it moves *away* from its rivals in product space thus relaxing competition. This kind of innovation *increases* the demand of one's rivals. Thus, the innovation externality is positive: when investing, a firm does not internalize the *positive* impact of that investment on the rivals' profits. Thus a merger, allowing these firms to internalize the externality, increases the incentives to invest leading to higher R&D both inside the merged party and outside, in the industry at large.

In a more recent contribution, Federico et al. (2018) look at how the above considerations interact with the classical unilateral price effects. Mergers obviously reduce price competition and the fact that pre- and post-innovation margins are different has implications for the incentives to innovate above and beyond the ones described above. The idea is that if price competition is more important in the post-innovation phase and if it is strong enough, then higher prices lead to larger returns from investment and therefore boost the incentives to innovate. They show through simulation that which effect prevails depends on the specific assumption made on the nature of competition and therefore it is ultimately an empirical question.

In a closely related paper, Motta and Tarantino (2017) look at the incentives to invest in process innovation of the unit-cost reducing kind following a merger to monopoly. They find that, absent merger-induced efficiency gains, such a merger leads to a decrease in the overall R&D. The intuition goes as follows. The merged entity has a clear unilateral incentive to reduce quantities, which captures the standard market power effect of mergers. But the benefit of lowering marginal costs is greater the larger the quantity produced. Hence, the merged entity has less to gain from innovating and therefore has weaker incentives. They also consider a more challenging scenario where the merger leaves two or more firms active and the case of quality enhancing innovation. The authors consistently argue that absent important R&D spillovers on competitors  (i.e. appropriability issues) and efficiency gains, a merger reduces the incentives to innovate.

As said, which effect prevails is ultimately an empirical matter. Ornaghi (2009) investigated the effects of mergers on the long run performance of big pharma firms in the period 1988-2004. He shows that these deals have a negative impact on R&D spending in all years following the merger of about 1 percentage point. This decline is shown not to be matched with an increase in productivity. The number of patents goes down relative to the no merger counterfactual by 30%. The most recent attempt to empirically measure the effect of mergers on innovation is Haucap et al. (2018). They also look at a sample of pharmaceutical mergers, focussing on those reviewed by the European Commission between 1991 and 2007. They use expert market definitions of the European Commission to identify substitute products and thus competitors for each merger case. They document a large decline in innovative activity of the merged entity and among non-merging

PX0498-158

competitors. Similarly the paper of Cunningham, Ederer and Ma (2018) discussed at length above supports the same negative conclusion.

## A.4. Market power, competition and big data

Many digital firms' core business is that of making *predictions* of various sorts.

Search engines need to predict the relevance of URLs to a consumer query. The higher the relevance of the URLs shown in consumers' search results page, the more likely it is that they will keep using the same search engine for their future queries. Social media and social networks need to predict how interesting a piece of content is to a particular user to build interesting content feeds. The more engaging those feeds are, the more likely it is that consumers will keep engaging with the app in the future. Matchmakers need to find good matches for their users (for instance, employees and employers, single men and single women and so on). They then charge their users for the service of being matched. E-commerce websites need to forecast consumer demand in order to manage their inventories. Other attention platforms such as online portals, newspapers and blogs monetize user attention through ads. They are paid according to user engagement with those ads (say per click). In order to serve more relevant ads, they need to predict the likelihood that a particular user would click on a particular ad. Better targeting translates in more clicks and higher revenues. Content producers and distributors, such as Netflix or Spotify, need to keep their users entertained. In order to do so they need to predict consumer tastes to make recommendations about items already in the catalogue that users are not aware of. They also need predictions to make production choices. Gans and Goldfarb (2018) discuss a variety of Machine Learning and AI algorithms making predictions of various sorts thus enabling new business propositions.

These predictions are made through statistical models (i.e. algorithms) fed by the vast amount of data that online businesses harness on their consumers. These datasets, characterized by a high *volume,* high *velocity,* high *variety* of formats are typically referred to "Big Data". Big data is generated as a by-product of consumption. By naturally engaging with the service, consumers transmit information that is used to improve the predictive power of the algorithms and therefore the quality of service. Web mapping services (such as Waze or Apple maps) pull information on traffic conditions from users roaming the streets while using their apps. Search engines learn about relevance by observing the behaviour of their users on search results page. Content providers (such as Netflix or Spotify) learn about quality by observing user engagement with titles and songs. Second, data is fed back as a production input.

The use of data as an input is widespread since the emergence of the modern industrial firm. One may think about, for instance, the use of survey data about customer satisfaction to improve one's product. However, because big data is a key input when making predictions and predictions are at the core of the value proposition, data-driven businesses are profoundly different from those that simply use data to marginally improve processes and products.

Antitrust authorities and practitioners have voiced concerns that in digital markets data gives incumbents a competitive advantage. The goal of the remainder of this section is to review recent empirical and theoretical papers contributing to this debate.

As discussed in section A.1, data powered economies of scale are a possible foundation of the "positive feedback loop" hypothesis. That is, the "rich get richer" dynamics in which (i) firms with a larger installed base are able to amass more data; (ii) more data allows to improve service; (iii) improved service commands more customers thus more data and so on.

To understand how data might give that advantage, it is useful to first explain how data is actually used for prediction purposes. Typically, prediction algorithms use data for two different goals. First, data is used to *train* these algorithms. That is, to estimate the parameters of the statistical models used to make those predictions. Second, data is used to actually *use* those statistical models. To understand the difference, consider the task of assessing the relevance of a piece of content (say a news article) on a social media website to a particular audience. By crunching data on how different people behaved with that content in the past (did they click on it? Did the like it? Did they engage with it?), the social media website harnesses

PX0498-159

information on potential appropriate future audiences for that content. When a new consumer logs in, the website feeds the data on that consumer (for example demographic characteristics) to the algorithm which then uses the estimated parameters to output its best prediction on the likelihood that this consumer will find the content interesting.

Given this, the debate revolves around three key issues:

▪ data <u>substitutability</u>: to what extent the incumbent's data can be replicated, dispensed of or purchased on the market by an entrant? That is, to what extent the incumbent data is "essential" to make those predictions?

▪ data <u>complementarity</u>: many contend that combining *diverse* data may give an advantage. For example, Google can improve its search results pages by using the clicks of other users making similar queries. That is, it can learn by leveraging on its scale. Or it could improve / personalize its search results by combining data coming from its email app Gmail or other lines of business;

▪ data <u>returns to scale</u>: that is, whether and up to which scale increasing the size of a dataset increases prediction accuracy. Decreasing returns would suggest that the advantage of a larger and larger sample vanishes at some scale. And if that scale is small enough, even small entrants can challenge incumbents.

Of course, data held by two sources can be both complement and substitute at the same time. Box A.5 below helps clarify the distinction between data substitutability and complementarity in basic statistical learning theory.

**Box A.5: Data substitutability and complementarity in statistical learning theory**

Suppose we are trying to predict the value of some variable Y and there are two datasets X and Z containing relevant information. For instance, if Y is a binary variable telling whether a particular user is interested in purchasing a given product then X could contain the activity of the user on social networks and Z could contain her activity on the world wide web, say her browsing history. Clearly adding Z to X or X to Z allows mechanically for better prediction. But how much? Typically, variables in X and Z are correlated. Individuals tweeting about technology are more likely to visit online electronic retailers. This correlation reflects substitutability among data sets. That is, to some extent both data sets contain the same information when it comes to predict if a consumer would be interested in buying a new product for advertising purposes. If firms are paid on the basis of how accurate their predictions are, substitutability alone means that the willingness to pay for data set Z is lower for firms who already have data set X compared to those who don't. Or, in other words, that the value of the bundle X+Z is lower than the sum of the value of having X and the value of having Z alone. Complementarity, instead, reflects the idea that the willingness to pay for Z is higher for firms who already have X. This may occur, for instance, if the covariates interact somehow. Tweeting about a product maybe a better predictor of the intention to buy it if the consumer has looked up this product on an e-commerce website. X and Z can be both complements and substitutes at the same time. Which one prevails depends on whether the willingness to pay for Z is higher or lower for those who already have X relative to those who don't.  While complementarity is certainly a theoretical possibility, there is no empirical evidence to warrant the claim that complementarity would swamp substitutability.

*Source: Lear*

The theoretical arguments and the empirical evidence available in the literature on the above three key aspects is still scarce and not univocal.

Lambrecht and Tucker (2015) argue that big data is not inimitable nor rare. They point to the existence of many alternative data sources and to a flourishing marketplace for data that entrants can access to in order to power their statistical models. There are plenty of examples of large data brokers (such as Acxiom) offering

PX0498-160

databases which allow, for example, entrants wishing to compete for advertising money to profile users. Also, they point out that often it is the statistical model used (i.e. the algorithm) rather than the size of the data set what enhances prediction accuracy.

Bajari et al. (2018) provide systematic evidence on the scale issue using proprietary data. They look at the effect of "more data" on accuracy in the context of Amazon retail forecasting system. This is a critical task. If demand turns out to be higher than forecasts, Amazon runs out of stock hence leaving money on the table. On the contrary if demand turns out to lower than expected, precious warehouse space is wasted, and there might be a need to markdown these products to free some that space. The specific goal is to predict the weekly sales of each product belonging to 36 different product lines (books, apparel, electronics and so on). They feed their statistical models with data playing with two dimensions: the number of products N in the same category and the number of periods T for which a particular product has been up for sale. They find that the prediction accuracy of their models increases with the time dimension, though with diminishing returns to scale. That is, additional data on previous forecasts and the subsequent realization of retail quantities improves the accuracy of retail forecasts for a particular product. They also find that expanding by adding data on other products in the same category has no effect. Thus, they do not find evidence supporting the "feedback loop" hypothesis wherein big retailers, by selling many products, have a competitive advantage. What matters most is the time dimension (for how long one has been selling a particular product) and the learning curves become quickly flat. Schaefer et al. (2018) provide a similar exercise in spirit in a radically different context. They use observational data from Yahoo.com to assess whether there are economies of scale in internet search. They ask questions such as: how much data is needed for optimal quality? And what type of data? They show that more data enhances predictions as predicted by statistical learning theory and in line with the evidence by Bajari et al. (2018). In addition, they show that personal information (for instance, the ability of the search engine to track the browsing behaviour of specific users) amplifies the speed of learning. Their findings are consistent with an incumbent data advantage due to possession of personal information. Chiou and Tucker (2017) rely on a natural experiment to study whether the amount of historical data affected the accuracy of search results. They surprisingly find little evidence that historical data improves accuracy. Neumann et al. (2018) look at the performance of Data brokers in targeting specific demographics given some data on user behaviour (for instance cookies with their browsing history). Interestingly, they document that brokers that receive bigger datasets do not perform necessarily better.

To date, there is no paper yet tackling explicitly the issue of data complementarities. Thus, claims that diversity enhances accuracy are not based on rigorous systematic evidence.

The rest of this section surveys a recent literature that takes as a given the fact that data gives incumbents a competitive advantage and looks at consequences. To fix ideas, it is useful to think of data as being some essential input that entrants simply lack (the remainder follows closely the analysis of Biglaiser, Calvano and Cremer (2019)).

Clearly, a first, natural question in this context would be: why wouldn't an incumbent which holds such a valuable input be willing to either sell it, share it or license it to other downstream firms? If data is the competitive bottleneck, the argument goes, then the data holder should in principle be able to appropriate all the rents associated. This issue has been extensively studied in the literature on vertical restraints (Hart, Tirole, Carlton, & Williamson, 1990; Rey & Tirole, 2007), in the literature on patent licensing (for instance Gallani, 2002) and in the literature on premium content distribution in media markets (Armstrong, 1999). A very robust "Chicago style" insight coming out of these works is that frictionless markets typically allocate assets in a way that maximizes total surplus. Thus, if data licensing creates value, we should always expect firms to do so, bargaining over their respective share of the surpluses. The literature has thus been looking for reasons for why the market may fail to efficiently allocate data linked to its peculiar nature. For instance, trade could be hindered due to legal barriers such as privacy protection laws. Rubinfeld and Gal (2017) provide a thorough discussion of these peculiarities.

Prufer and Schottmüller (2017) show under which conditions a data advantage leads to market tipping studying a dynamic model of R&D competition. In their model the data advantage of the incumbent is

PX0498-161

modelled as follows: in every period, firms can increase the quality of their product at some cost which is decreasing in market share. The resulting quality advantage makes it impossible for entrants to compete. Furthermore, they show that disadvantaged entrants have an incentive to disengage leading to an overall inefficiently low rate of innovation. Finally, they show that if data collected in the primary market is also useful in lowering marginal costs in other, connected markets then incumbents will have a tendency to expand creating big conglomerates much as we observe in many digital markets.

DeCorniere and Taylor (2019) study data-driven mergers in a context where data owned by the upstream firm is useful for price discrimination purposes in the market downstream. They show that a merger affects both competition in the downstream market and the incentives of upstream firms to collect data. In particular, they show that data trading is often better than vertical mergers, as the merged entity has weaker incentives to collect data. Of course, this can be good or bad for economic efficiency depending on the application. In their model data is collected by the upstream firm by providing low priced services in other markets. Then weaker incentives translate in higher prices and thus lower consumer surplus in those market.

Reimers and Shiller (2018) and Cosconati and Santoro (2019) look at the role of data collected by telematic devices (black boxes) installed on cars in the market for automobile liability insurance. Data on past drivers' behaviour mitigates the effects of adverse selection, as it "reveals" consumer types, and moral hazard, as it "monitors" driving. Their paper quantifies empirically the magnitudes of these effects and the benefits that data portability measures would bring. Interestingly, Reimers and Shiller (2018) show that almost all of the gains are in the moral hazard dimension, providing little supporting evidence for the barrier to entry hypothesis. That is, providing little evidence on the hypothesis that the evidence that insurance companies gather on their drivers' abilities through these devices is a barrier to entry in this market.

PX0498-162

## B. List of past transactions

Table B.1: List of acquisitions made by Amazon

| Name of target | Cluster | Sub-cluster |
|---|---|---|
| 2lemetry | Tools for developers | |
| AbeBooks | Physical goods and services | Retail |
| Amie Street | Digital content | Video/Music |
| Annapurna Labs | Remote storage and file transfer | |
| AppThwack | Physical goods and services | Robotics |
| Audible.com | Digital content | E-books/News |
| Avalon Books | Physical goods and services | Other |
| Biba Systems | Communication apps and tools | Email and office communication |
| Blink Home | Physical goods and services | Electronic devices and components |
| Body Labs | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Box Office Mojo | Other | |
| BuyVIP | Physical goods and services | Retail |
| Cloud9 IDE | Tools for developers | |
| ClusterK | Remote storage and file transfer | |
| comiXology | Digital content | E-books/News |
| Curse, Inc. | Digital content | Games |
| Do.com | Communication apps and tools | Email and office communication |
| Double Helix Games | Digital content | Games |
| Elemental Technologies | Remote storage and file transfer | |
| Emvantage Payments Pvt. Ltd. | Other | |
| Evi | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Fabric.com | Physical goods and services | Retail |
| GameSparks | Tools for developers | |
| Goo Technologies | Other | |
| Goodreads | Communication apps and tools | Topic specific platform |
| Graphiq | Artificial intelligence, data science and analytics | Data science and analytics |
| Harvest.ai | Artificial intelligence, data science and analytics | Artificial Intelligence |
| IVONA Software | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Kiva Systems | Physical goods and services | Robotics |
| Lexcycle | Digital content | E-books/News |
| Liquavista | Physical goods and services | Electronic devices and components |
| LoveFilm | Physical goods and services | Retail |
| More | Physical goods and services | Retail |
| NICE | Remote storage and file transfer | |
| OpenSCG | Remote storage and file transfer | |
| PillPack | Home, wellbeing and other personal needs | |
| Pushbutton | Digital content | Video/Music |
| Quidsi | Physical goods and services | Retail |
| Reflexive Entertainment | Digital content | Games |
| Ring | Physical goods and services | Electronic devices and components |
| Safaba Translation Systems | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Shelfari | Communication apps and tools | Topic specific platform |
| Shoefitr | Home, wellbeing and other personal needs | |
| SnapTell | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Souq.com | Physical goods and services | Retail |
| Sqrrl | Artificial intelligence, data science and analytics | Data science and analytics |

PX0498-163

| | | |
|---|---|---|
| Stanza | Digital content | E-books/News |
| Tapzo | Home, wellbeing and other personal needs | |
| Teachstreet | Home, wellbeing and other personal needs | |
| TenMarks Education, Inc. | Home, wellbeing and other personal needs | |
| The Book Depository | Physical goods and services | Retail |
| Thinkbox Software | Tools for developers | |
| Toby Press | Physical goods and services | Other |
| Touchco | Other | |
| Twitch | Communication apps and tools | Topic specific platform |
| Whole Foods Market | Physical goods and services | Retail |
| Wing.ae | Physical goods and services | Retail |
| Woot | Physical goods and services | Retail |
| Yap | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Zappos | Physical goods and services | Retail |

*Source: Lear based on Crunchbase data*

### Table B.2: List of acquisitions made by Facebook

| Name of target | Cluster | Sub-cluster |
|---|---|---|
| Acrylic Software | Other | |
| Ascenta | Physical goods and services | Robotics |
| Atlas solutions | Advertising tools and platforms | |
| BELUGA | Communication apps and tools | Direct messaging and calls |
| Bloomsbury AI | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Branch | Communication apps and tools | Direct messaging and calls |
| Caffeinatedmind | Remote storage and file transfer | |
| Chai Labs | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Confirm | Artificial intelligence, data science and analytics | Artificial Intelligence |
| ConnectU | Other | |
| CrowdTangle | Artificial intelligence, data science and analytics | Data science and analytics |
| DayTum | Home, wellbeing and other personal needs | |
| Divvyshot | Communication apps and tools | Photo apps |
| Drop.io | Remote storage and file transfer | |
| Face.com | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Faciometrics | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Fayteq | Other | |
| FB.com domain name | Other | |
| Friend.ly | Communication apps and tools | Other |
| FriendFeed | Communication apps and tools | Aggregators |
| Friendster | Communication apps and tools | Topic specific platform |
| Glancee | Communication apps and tools | Other |
| Gowalla | Communication apps and tools | Topic specific platform |
| Hot Potato | Communication apps and tools | Topic specific platform |
| Hot Studio | Tools for developers | |
| Infiniled | Physical goods and services | Electronic devices and components |
| Instagram | Communication apps and tools | Photo apps |
| Jibbigo | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Karma | Home, wellbeing and other personal needs | |
| Lightbox.com | Communication apps and tools | Photo apps |

PX0498-164

| | | |
|---|---|---|
| Little Eye Labs | Tools for developers | |
| Liverail | Advertising tools and platforms | |
| MailRank | Communication apps and tools | Email and office communication |
| Masquerade | Communication apps and tools | Other |
| Monoidics | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Nascent Objects | Physical goods and services | Electronic devices and components |
| Nextstop | Communication apps and tools | Topic specific platform |
| Octazen | Communication apps and tools | Other |
| Oculus VR | Physical goods and services | Other |
| Onavo | Artificial intelligence, data science and analytics | Data science and analytics |
| Osmeta | Other | |
| Ozlo | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Parse | Tools for developers | |
| Pebbles | Tools for developers | |
| PrivateCore | Remote storage and file transfer | |
| ProtoGeo Oy | Home, wellbeing and other personal needs | |
| Pryte | Home, wellbeing and other personal needs | |
| Push Pop Press | Digital content | E-books/News |
| Quickfire | Remote storage and file transfer | |
| RecRec | Tools for developers | |
| Redkix | Communication apps and tools | Email and office communication |
| Refdash | Other | |
| Rel8tion | Advertising tools and platforms | |
| ShareGrove | Communication apps and tools | Direct messaging and calls |
| snaptu | Tools for developers | |
| Sofa | Tools for developers | |
| Spaceport | Tools for developers | |
| Spool | Home, wellbeing and other personal needs | |
| SportStream | Artificial intelligence, data science and analytics | Data science and analytics |
| Strobe | Tools for developers | |
| Surreal Vision | Physical goods and services | Robotics |
| Tagtile | Advertising tools and platforms | |
| tbh(app) | Communication apps and tools | Other |
| TheFind | Physical goods and services | Retail |
| Threadsy | Communication apps and tools | Aggregators |
| Two Big Ears | Physical goods and services | Electronic devices and components |
| Vidpresso | Communication apps and tools | Other |
| WaveGroup Sound | Digital content | Video/Music |
| WhatsApp | Communication apps and tools | Direct messaging and calls |
| Wit.ai | Tools for developers | |
| Zurich eye | Tools for developers | |

*Source: Lear based on Crunchbase data*

**Table B.3: List of acquisitions made by Google**

| Name of target | Cluster | Sub-cluster |
|---|---|---|
| 60db | Digital content | E-books/News |
| Aardvark | Communication apps and tools | Other |
| Admeld | Advertising tools and platforms | |
| AdMob | Advertising tools and platforms | |
| Adometry | Advertising tools and platforms | |
| Agawi | Digital content | Video/Music |
| Agnilux | Physical goods and services | Electronic devices and components |
| AIMatter | Artificial intelligence, data science and analytics | Artificial Intelligence |

PX0498-165

| | | |
|---|---|---|
| Alpental Technologies | Physical goods and services | Electronic devices and components |
| Angstro | Communication apps and tools | Aggregators |
| Anvato | Tools for developers | |
| API.AI | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Apigee | Tools for developers | |
| AppBridge | Remote storage and file transfer | |
| Appetas | Other | |
| AppJet | Tools for developers | |
| Appurify | Tools for developers | |
| Apture | Home, wellbeing and other personal needs | |
| Autofuss | Advertising tools and platforms | |
| BandPage | Communication apps and tools | Topic specific platform |
| BeatThatQuote.com | Physical goods and services | Retail |
| bebop | Remote storage and file transfer | |
| Behavio | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Bitium | Remote storage and file transfer | |
| Bitspin | Home, wellbeing and other personal needs | |
| BlindType | Home, wellbeing and other personal needs | |
| Bot & Dolly | Physical goods and services | Robotics |
| BufferBox | Physical goods and services | Retail |
| Bump | Tools for developers | |
| BumpTop | Home, wellbeing and other personal needs | |
| Cask | Tools for developers | |
| Channel Intelligence | Physical goods and services | Retail |
| Clever Sense | Home, wellbeing and other personal needs | |
| Cronologics | Physical goods and services | Electronic devices and components |
| DailyDeal | Physical goods and services | Retail |
| Dark Blue Labs & Vision Factory | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Dealmap | Physical goods and services | Retail |
| DeepMind Technologies | Artificial intelligence, data science and analytics | Data science and analytics |
| Digisfera | Other | |
| Director | Advertising tools and platforms | |
| Divide | Home, wellbeing and other personal needs | |
| DNNresearch Inc. | Artificial intelligence, data science and analytics | Artificial Intelligence |
| DocVerse | Other | |
| drawElements | Tools for developers | |
| Dropcam | Physical goods and services | Electronic devices and components |
| eBook Technologies | Other | |
| Emu | Communication apps and tools | Email and office communication |
| Episodic | Digital content | Video/Music |
| Eyefluence | Physical goods and services | Other |
| Fabric | Tools for developers | |
| FameBit | Advertising tools and platforms | |
| Firebase | Tools for developers | |
| FlexyCore | Tools for developers | |
| Flutter | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Fly Labs | Other | |
| Fridge | Communication apps and tools | Direct messaging and calls |
| Gecko Design | Other | |
| Gizmo5 | Communication apps and tools | Direct messaging and calls |

PX0498-166

| | | |
|---|---|---|
| Global IP Solutions | Communication apps and tools | Direct messaging and calls |
| GraphicsFuzz | Tools for developers | |
| Green Parrot Pictures | Other | |
| GreenThrottle | Digital content | Games |
| Halli Labs | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Holomni | Physical goods and services | Robotics |
| HTC (portions) | Physical goods and services | Electronic devices and components |
| Impermium | Other | |
| Incentive Targeting Inc. | Advertising tools and platforms | |
| Industrial Perception | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Instantiations | Tools for developers | |
| Invite Media | Advertising tools and platforms | |
| Jambool | Other | |
| Jetpac | Communication apps and tools | Photo apps |
| Jibe Mobile | Communication apps and tools | Direct messaging and calls |
| Kaggle | Artificial intelligence, data science and analytics | Data science and analytics |
| Katango | Communication apps and tools | Other |
| Kifi | Artificial intelligence, data science and analytics | Data science and analytics |
| LabPixies | Other | |
| LaunchKit | Tools for developers | |
| Launchpad Toys | Home, wellbeing and other personal needs | |
| LeapDroid | Tools for developers | |
| Lift Labs | Physical goods and services | Electronic devices and components |
| Like.com | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Limes Audio | Communication apps and tools | Direct messaging and calls |
| Makani Power | Physical goods and services | Other |
| mDialog | Advertising tools and platforms | |
| Meebo | Communication apps and tools | Direct messaging and calls |
| Meka Robotics | Physical goods and services | Robotics |
| Metaweb | Other | |
| Milk, Inc | Tools for developers | |
| Moodstocks | Tools for developers | |
| Motorola Mobility | Physical goods and services | Electronic devices and components |
| MyEnergy | Home, wellbeing and other personal needs | |
| Nest Labs | Home, wellbeing and other personal needs | |
| Next New Networks | Digital content | Video/Music |
| Nik Software, Inc. | Other | |
| Odysee | Communication apps and tools | Photo apps |
| Omnisio | Communication apps and tools | Other |
| On2 | Tools for developers | |
| Onward | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Orbitera | Physical goods and services | Retail |
| Owlchemy Labs | Digital content | Games |
| Oyster | Digital content | E-books/News |
| Phonetic Arts | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Picnik | Communication apps and tools | Photo apps |
| Pie | Communication apps and tools | Email and office communication |
| PittPatt | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Pixate | Tools for developers | |
| Plannr | Communication apps and tools | Email and office communication |

PX0498-167

| | | |
|---|---|---|
| PlinkArt | Artificial intelligence, data science and analytics | |
| Polar | Communication apps and tools | Other |
| Pulse.io | Tools for developers | |
| Punchd | Physical goods and services | Retail |
| PushLife | Remote storage and file transfer | |
| Quest Visual | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Quickoffice | Other | |
| Quiksee | Other | |
| Qwiklabs | Tools for developers | |
| Rangespan | Artificial intelligence, data science and analytics | Data science and analytics |
| reCAPTCHA | Artificial intelligence, data science and analytics | Artificial Intelligence |
| Red Hot Labs | Advertising tools and platforms | |
| Redwood Robotics | Physical goods and services | Robotics |
| RelativeWave | Tools for developers | |
| Relay Media | Tools for developers | |
| reMail | Communication apps and tools | Email and office communication |
| Revolv | Home, wellbeing and other personal needs | |
| RightsFlow | Other | |
| Ruba.com | Home, wellbeing and other personal needs | |
| SageTV | Digital content | Video/Music |
| SayNow | Communication apps and tools | Direct messaging and calls |
| SCHAFT, Inc. | Physical goods and services | Robotics |
| Senosis | Home, wellbeing and other personal needs | |
| Simplify Media | Remote storage and file transfer | |
| Skillman & Hackett | Tools for developers | |
| Skybox Imaging | Artificial intelligence, data science and analytics | Data science and analytics |
| SlickLogin | Other | |
| Slide.com | Communication apps and tools | Other |
| SocialDeck, Inc. | Advertising tools and platforms | |
| SocialGrapple | Artificial intelligence, data science and analytics | Data science and analytics |
| Softcard | Other | |
| Songza | Digital content | Video/Music |
| Sparrow | Communication apps and tools | Email and office communication |
| spider.io | Other | |
| Stackdriver | Remote storage and file transfer | |
| Synergyse | Other | |
| Talaria Technologies | Tools for developers | |
| Tenor | Communication apps and tools | Other |
| Teracent | Advertising tools and platforms | |
| Thrive Audio | Tools for developers | |
| Timeful | Home, wellbeing and other personal needs | |
| Titan Aerospace | Physical goods and services | Robotics |
| TNC | Communication apps and tools | Topic specific platform |
| TxVia | Other | |
| Urban Engines | Artificial intelligence, data science and analytics | Data science and analytics |
| Velostrata | Remote storage and file transfer | |
| Vidmaker | Other | |
| Viewdle | Artificial intelligence, data science and analytics | Artificial Intelligence |
| VirusTotal.com | Other | |
| Wavii | Digital content | E-books/News |

| | | |
|---|---|---|
| Waze | Home, wellbeing and other personal needs | |
| Webpass | Physical goods and services | Other |
| Widevine Technologies | Other | |
| Wildfire Interactive | Advertising tools and platforms | |
| WIMM Labs | Physical goods and services | Electronic devices and components |
| Zagat | Home, wellbeing and other personal needs | |
| Zave Networks | Physical goods and services | Retail |
| Zetawire | Other | |
| Zynamics | Other | |
| Zync Render | Other | |

*Source: Lear based on Crunchbase data*

PX0498-169

## C. Tag cloud analysis for acquisitions carried out by Amazon, Facebook and Google

The tag cloud analysis covers all the publicly disclosed acquisitions carried out by Amazon, Facebook and Google between 2008 and 2018, listed in Annex A. Over this period, based on the information available, Google has acquired 168 companies, Facebook has acquired 71 companies and Amazon has acquired 60 companies.

For each of the companies acquired by Amazon, Facebook and Google, we have collected the tags that Crunchbase uses to describe the company. Crunchbase is a platform for finding business information about private and public companies. The Crunchbase tags are shown in Figure C.1, Figure C.2 and Figure C.3 for acquisitions by Amazon, Facebook and Google respectively. The size of each tag is proportional to the number of times that it appears.

**Figure C.1: Tag cloud for acquisitions by Amazon**



*Source: Lear based on Crunchbase data*

PX0498-170

Figure C.2: Tag cloud for acquisitions by Facebook



*Source: Lear based on Crunchbase data*

PX0498-171

**Figure C.3: Tag cloud for acquisitions by Google**



*Source: Lear based on Crunchbase data*

PX0498-172

# D. Case by case review: additional analyses and robustness checks

## D.1. Facebook/Instagram

Figure D.1 shows the share of time spent by users on Facebook and Instagram, considering a broader market including all the social media platforms[215]. As observed for the market for social networks, the share of time spent on Facebook has declined over time, from 75% in 2015 to 42% in 2018. Instagram's share has instead increased until 2016, and it has remained stable at the level of 8% thereafter. WhatsApp, which is also owned by Facebook, shows the same share of time spent as Instagram.

**Figure D.1: Share of monthly time spent on social media in the UK (%)**



*Source: Lear based on ComScore data*

Figure D.2 shows the percentage of other social networks users that visits Instagram in the UK. Such percentage has increased between 2015 and 2018, reaching the level of 60% for Facebook users, 67% for LinkedIn users, 69% for Pinterest users, 73% for Reddit users and 70% for Twitter users. With respect to Snapchat, the percentage of its users that were visiting Instagram has instead decreased between 2017 and 2018. By selling advertising space on Instagram, advertisers get to reach, on average, almost 70% of the main social networks users.

---

[215] ComScore defines "Social media" all the sites where the creation and consumption of content is user generated.

**Figure D.2: Percentage of other platforms' users that visits Instagram in the UK**



*Source: Lear based on ComScore data*

## D.2. Priceline/Kayak and Expedia/Trivago

The analysis shown in section II.4.2.3 on the existence of a possible intermediation bias has been conducted using data on search results for a number of queries for hotel accommodations extracted from Kayak.co.uk and Trivago.co.uk websites.[216]

The information collected from Kayak pertained to the search results obtained for a list of 49 cities, which were identified based on their popularities on Kayak's websites. Data refers to booking queries for one room and two guests, for the period March 1-March 3, 2019. The queries have been made on February 14, 2019. For each query made for a different city, data is related to the first 15 hotels appearing in search results on Kayak website. Hotels were sorted based on the "recommended" order.

To ensure comparability, the information collected from Trivago referred to the same list of cities used for Kayak[217] and for the same type of query (one room and two guests). The queries have been made on March 14 for the period March 22-March 24, 2019 and, for each destination, data is related to the first 15 hotels appearing in search results, sorted by Trivago's recommended order.

For each hotel listed on Kayak and Trivago results page, the data provided is as follows:

- the name of the hotel and its position in the results page;
- booking options available, including:
  - the name;
  - the price (£);
  - whether the booking option is through an OTA or the TSP;
  - whether they are shown above the "View Deal" button;
  - whether they are shown on the search results page;
  - whether they can be reached by clicking on the "More sites" button.

---

[216] In particular, Kayak's data has been extracted with the help of Kayak.

[217] Results for one city, Fair Play (California), were not available on Trivago.

PX0498-174

Table D.1 shows an example of the results obtained for the query conducted for the city of Blackpool, England, on Kayak's website.

**Table D.1: Example of Kayak's results for the city of Blackpool**

| Hotel name | Ranking | Booking option | Price (£) | OTA/TSP | Display position |
|---|---|---|---|---|---|
| Ellan Vannin | 1 | KAYAK | 56.26 | OTA | View Deal |
| Ellan Vannin | 1 | expedia.com | 58 | OTA | Search results page |
| Ellan Vannin | 1 | booking.com | 58.02 | OTA | Search results page |
| Ellan Vannin | 1 | ebookers.com | 56.26 | OTA | More sites |
| Ellan Vannin | 1 | hotels.com | 56.26 | OTA | More sites |
| Ellan Vannin | 1 | travelrepublic.com | 58.64 | OTA | More sites |
| ... | ... | ... | ... | ... | ... |
| Windsor Park | 15 | KAYAK | 92.79 | OTA | View Deal |
| Windsor Park | 15 | laterooms.com | 92.79 | OTA | Search results page |
| Windsor Park | 15 | expedia.com | 92.79 | OTA | Search results page |
| Windsor Park | 15 | booking.com | 92.83 | OTA | More sites |
| Windsor Park | 15 | ebookers.com | 92.79 | OTA | More sites |
| Windsor Park | 15 | agoda.com | 92.79 | OTA | More sites |
| Windsor Park | 15 | hotels.com | 92.79 | OTA | More sites |
| Windsor Park | 15 | travelrepublic.com | 92.79 | OTA | More sites |

*Source: Kayak*

Below we present further figures that may help to investigate whether Kayak and Trivago may have biased their results to favour Priceline's and Expedia's brands respectively. We repeat the analysis conducted in section II.4.2.3 considering both the "View Deal" and the search results page position as the most favourable position. Moreover, we considered whether the potential bias is more or less clear when limiting the analysis to the top three hotels in the search results page, which are the most prominent among all those listed on the website.

Figure D.3 shows the share of each booking option considering both the "View Deal" position and the search results page of Kayak's website. As happened when considering only the "View Deal" position, Kayak, Hotels.com, Expedia and Booking.com are the booking options that appear more frequently in these favourable positions.

PX0498-175

**Figure D.3: Share of booking options in "View Deal" position and search results page for Kayak results[218]**



*Source: Lear based on Kayak data*

Figure D.4 shows the share of booking options appearing in the "View Deal" position for the top three accommodations ranked in the results page of Kayak's website. The most frequent booking option is Kayak (23.6%), followed by Expedia (21.8%), Booking.com (19%) and Hotels.com (19.7%).

**Figure D.4: Share of booking options in "View Deal" position for top three hotels for Kayak results[219]**



*Source: Lear based on Kayak data*

Figure D.5 shows the frequency at which OTAs and TSPs charges the lowest price when listed in both "View Deal" and search results page in Kayak's website. Considering together these positions, Booking.com appears to offer the cheapest price only in 9% of cases, while Expedia, Kayak, Hotels.com and the TSPs have the lowest

---

[218] The category "Other" includes 17 booking options.

[219] The category "Other" includes Amoma and Homeaway.

PX0498-176

offer in around 40% of cases. As happened when considering the Vied Deal position alone, Booking.com is still the OTAs that charge the lowest price with less frequency when considering both the "View Deal" and the search results page.

**Figure D.5: Frequency at which OTAs/TSPs charge the lowest price when listed in "View Deal" and in search results page for Kayak results (%)**



*Source: Lear based on Kayak data*

Figure D.6 shows the share of booking options appearing in the "View Deal" position for the top three accommodations ranked in the results page on Trivago's website. As observed when considering all the hotels ranked in the first 15 positions, the "View Deal" position for the hotels ranked in the top three positions is largely occupied by Expedia (38.2% of cases), followed by the TSP (30.6% of cases) and Booking.com (18.1% of cases).

PX0498-177

**Figure D.6: Share of booking options in "View Deal" position for top three hotels for Trivago results[220]**



*Source: Lear based on Trivago data*

Figure D.7 shows, for Trivago's website, the share of each booking option considering both the "View Deal" position and the search results page. The result obtained is significantly different from the one shown in Figure II.24: in the "View Deal" position alone, Expedia is shown in 40.4% of case, while this values drops to 21.7% when the "View Deal" position is considered together with the search results page.

**Figure D.7: Share of booking options in "View Deal" position and in search results page for Trivago results[221]**



*Source: Lear based on Trivago data*

---

[220] The category "Other" includes Alpharooms, Hotels.com, Loveholidays, Japanican.

[221] The category "Other" includes 26 booking options.

PX0498-178

# E. Bibliography

Acs, Z. J., & Audretsch, D. B. (1988). Innovation in Large and Small Firms: An Empirical Analysis. *The American Economic Review*, *78*(4), 678–690.

Aghion, P., Bloom, N., & Blundell, R. (2005). Competition and innovation: An inverted-U relationship. *The Quarterly Journal*. Retrieved from https://academic.oup.com/qje/article-abstract/120/2/701/1933966

Agrawal, A., Gans, J., & Goldfarb, A. (2018). *Prediction Machines: The Simple Economics of Artificial Intelligence*. Harvard Business Press.

Ambrus, A., & Argenziano, R. (2009). Asymmetric Networks in Two-Sided Markets. *American Economic Journal: Microeconomics*, *1*(1), 17–52.

Anderson, S. P., & Coate, S. (2005). Market Provision of Broadcasting: A Welfare Analysis. *The Review of Economic Studies*, *72*(4), 947–972.

Anderson, S. P., Foros, Ø., & Kind, H. J. (2018). Competition for Advertisers and for Viewers in Media Markets. *The Economic Journal*, *128*(608), 34–54.

Armstrong, M. (1999). Competition in the Pay-TV Market. *Journal of the Japanese and International Economies*, *13*(4), 257–280.

Armstrong, M. (2006). Competition in two-sided markets. *The Rand Journal of Economics*, *37*(3), 668–691.

Armstrong, M., & Wright, J. (2007). Two-sided Markets, Competitive Bottlenecks and Exclusive Contracts. *Economic Theory*, *32*(2), 353–380.

Arrow, K. J. (1972). Economic Welfare and the Allocation of Resources for Invention. In C. K. Rowley (Ed.), *Readings in Industrial Economics: Volume Two: Private Enterprise and State Intervention* (pp. 219–236). London: Macmillan Education UK.

Athey, S., Calvano, E., & Gans, J. S. (2018). The Impact of Consumer Multi-homing on Advertising Markets and Media Competition. *Management Science*, *64*(4), 1574–1590.

Bajari, P., Chernozhukov, V., Hortaçsu, A., & Suzuki, J. (2018). *The Impact of Big Data on Firm Performance: An Empirical Investigation*. National Bureau of Economic Research. https://doi.org/10.3386/w24334

Banerji, A., & Dutta, B. (2009). Local network externalities and market segmentation. *International Journal of Industrial Organization*, *27*(5), 605–614.

Biglaiser, G., Calvano, E., & Crémer, J. (2019). Incumbency advantage and its value: BIGLAISER et al. *Journal of Economics & Management Strategy*, *28*(1), 41–48.

Biglaiser, G., & Crémer, J. (2016). *The value of incumbency in heterogenous networks* (No. TSE Working Paper, n. 16-630).

Biglaiser, G., Cremer, J., & Veiga, A. (2013). *Migration between Platforms*. https://doi.org/10.2139/ssrn.2336410

Binns, R., Lyngs, U., Van Kleek, M., Zhao, J., Libert, T., & Shadbolt, N. (2018). *Third Party Tracking in the*

PX0498-179

*Mobile Ecosystem. arXiv [cs.CY]*. Retrieved from http://arxiv.org/abs/1804.03603

Blake, T., Nosko, C., & Tadelis, S. (2015). Consumer heterogeneity and paid search effectiveness: A large-scale field experiment. *Econometrica: Journal of the Econometric Society*, *83*(1), 155–174.

Bourreau, M., & Gaudin, G. (2018). Streaming Platform and Stra-tegic Recommendation Bias. Retrieved from https://www.cesifo-group.de/DocDL/cesifo1_wp7390.pdf

Bourreau, M., & Jullien, B. (2018). Mergers, investments and demand expansion. *Economics Letters*, *167*, 136–141.

Bourreau, M., Jullien, B., Lefouili, Y., & Others. (2018). *Mergers and Demand-Enhancing Innovation*. Toulouse School of Economics (TSE). Retrieved from https://www.tse-fr.eu/sites/default/files/TSE/documents/doc/wp/2018/wp_tse_907.pdf

Cabral, L. M. B. (2018). *Standing on the Shoulders of Dwarfs: Dominant Firms and Innovation Incentives*. Centre for Economic Policy Research.

Caillaud, B., & Jullien, B. (2001). Competing cybermediaries. *European Economic Review*, *45*(4), 797–808.

Caillaud, B., & Jullien, B. (2003). Chicken & Egg: Competition among Intermediation Service Providers. *The Rand Journal of Economics*, *34*(2), 309–328.

Calvano, E., & Jullien, B. (2019). Recommender Systems: trust and biased advice. *Unpublished Manuscript*.

Calvano, E., & Polo, M. (2018). Strategic Differentiation by business models: Free-to-Air and Pay-TV. *Economic Journal* , *Forthcoming*.

Chiou, L., & Tucker, C. (2017). *Search Engines and Data Retention: Implications for Privacy and Antitrust*. National Bureau of Economic Research. https://doi.org/10.3386/w23815

Cohen, W. M., & Levin, R. C. (1989). Chapter 18 Empirical studies of innovation and market structure. In *Handbook of Industrial Organization* (Vol. 2, pp. 1059–1107). Elsevier.

Cooper, R., DeJong, D. V., Forsythe, R., & Ross, T. W. (1992). Communication in Coordination Games. *The Quarterly Journal of Economics*, *107*(2), 739–771.

Cunningham, C., Ederer, F., & Ma, S. (2018). *Killer Acquisitions*. https://doi.org/10.2139/ssrn.3241707

de Cornière, A., & Taylor, G. (2014). Integration and search engine bias. *The Rand Journal of Economics*, *45*(3), 576–597.

de Cornière, A., & Taylor, G. (2016). DP11457 A Model of Biased Intermediation. Retrieved from http://www.cepr.org/active/publications/discussion_papers/dp.php?dpno=11457

Decarolis, F., Goldmanis, M., & Penta, A. (2017). *Marketing Agencies and Collusive Bidding in Online Ad Auctions*. National Bureau of Economic Research. https://doi.org/10.3386/w23962

Denicolo, V., & Polo, M. (2018). *The Innovation Theory of Harm: An Appraisal*. https://doi.org/10.2139/ssrn.3146731

Denicolò, V., & Polo, M. (2018a). Duplicative research, mergers and innovation. *Economics Letters*, *166*, 56–

PX0498-180

59.

Denicolò, V., & Polo, M. (2018b). The innovation theory of harm: an appraisal. Retrieved from https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3155015

Ellison, G., & Ellison, S. F. (2018). *Match Quality, Search, and the Internet Market for Used Books*. Retrieved from https://papers.ssrn.com/abstract=3101995

Evans, D. S. (2003). The antitrust economics of multi-sided platform markets. *Yale Journal on Regulation*, *20*, 325.

Evans, D. S., & Noel, M. D. (2008). THE ANALYSIS OF MERGERS THAT INVOLVE MULTISIDED PLATFORM BUSINESSES. *Journal of Competition Law & Economics*, *4*(3), 663–695.

Evans, D. S., & Schmalensee, R. (2005). *The Industrial Organization of Markets with Two-Sided Platforms*. National Bureau of Economic Research. https://doi.org/10.3386/w11603

Farrell, J., & Klemperer, P. (2007). Chapter 31 Coordination and Lock-In: Competition with Switching Costs and Network Effects. In M. Armstrong & R. Porter (Eds.), *Handbook of Industrial Organization* (Vol. 3, pp. 1967–2072). Elsevier.

Farrell, J., & Saloner, G. (1985). Standardization, Compatibility, and Innovation. *The Rand Journal of Economics*, *16*(1), 70–83.

Farrell, J., & Saloner, G. (1986). Installed Base and Compatibility: Innovation, Product Preannouncements, and Predation. *The American Economic Review*, *76*(5), 940–955.

Federico, G., Langus, G., & Valletti, T. (2018). Horizontal mergers and product innovation. *International Journal of Industrial Organization*, *59*, 1–23.

Fjeldstad, Ø., Moen, E. R., & Riis, C. (2010). *Competition with Local Network Externalities*. Retrieved from https://papers.ssrn.com/abstract=1586258

Fudenberg, D., & Tirole, J. (2000). Pricing a network good to deter entry. *The Journal of Industrial Economics*. Retrieved from https://onlinelibrary.wiley.com/doi/abs/10.1111/1467-6451.00129

Gal, M. S., & Rubinfeld, D. L. (2016). Access Barriers to Big Data. *Arizona Law Review*, *59*, 339.

Gans, J. (n.d.). Enhancing Competition with Data and Identity Portability. Retrieved from http://www.hamiltonproject.org/assets/files/Gans_20180611.pdf

Gans, J. S., & Stern, S. (2000). Incumbency and R&D incentives: Licensing the gale of creative destruction. *Journal of Economics & Management Strategy*, *9*(4), 485–511.

Gentzkow, M. (2007). Valuing New Goods in a Model with Complementarity: Online Newspapers. *The American Economic Review*, *97*(3), 713–744.

Gilbert, R. (2006). Looking for Mr. Schumpeter: Where Are We in the Competition--Innovation Debate? *Innovation Policy and the Economy*, *6*, 159–215.

Gilbert, R. (2018). *Competition, Mergers and R&D Diversity*. https://doi.org/10.2139/ssrn.3190478

PX0498-181

Gilbert, R. J., & David M. G. Newbery. (1982a). Preemptive Patenting and the Persistence of Monopoly. *The American Economic Review*, *72*(3), 514–526.

Gilbert, R. J., & David M. G. Newbery. (1982b). Preemptive Patenting and the Persistence of Monopoly. *The American Economic Review*, *72*(3), 514–526.

Hagiu, A., & Jullien, B. (2011). Why do intermediaries divert search? *The Rand Journal of Economics*, *42*(2), 337–362.

Halaburda, H., Jullien, B., & Yehezkel, Y. (2018). *Dynamic Competition with Network Externalities: Why History Matters*. https://doi.org/10.2139/ssrn.2335716

Halaburda, H., & Yehezkel, Y. (2013). Platform Competition under Asymmetric Information. *American Economic Journal: Microeconomics*, *5*(3), 22–68.

Halaburda, H., & Yehezkel, Y. (2018). Focality Advantage in Platform Competition. *Journal of Economics and Management Strategy*. Retrieved from https://www.tau.ac.il/~yehezkel/Halaburda-Yehezkel_focality.pdf

Hałaburda, H., & Yehezkel, Y. (2016). The Role of Coordination Bias in Platform Competition. *Journal of Economics & Management Strategy*, *25*(2), 274–312.

Hart, O., Tirole, J., Carlton, D. W., & Williamson, O. E. (1990). Vertical Integration and Market Foreclosure. *Brookings Papers on Economic Activity. Microeconomics*, *1990*, 205–286.

Hashmi, A. R., & Van Biesebroeck, J. (2016). The Relationship between Market Structure and Innovation in Industry Equilibrium: A Case Study of the Global Automobile Industry. *The Review of Economics and Statistics*, *98*(1), 192–208.

Haucap, J., Rasch, A., & Stiebale, J. (2018). How Mergers Affect Innovation: Theory and Evidence. *International Journal of Industrial Organization*. https://doi.org/10.1016/j.ijindorg.2018.10.003

He, D., Kannan, A., Liu, T.-Y., McAfee, R. P., Qin, T., & Rao, J. M. (2017). Scale Effects in Web Search. In *Web and Internet Economics* (pp. 294–310). Springer International Publishing.

Holland, C. P., Jacobs, J. A., & Klein, S. (2016). The role and impact of comparison websites on the consumer search process in the US and German airline markets. *Information Technology & Tourism*, *16*(1), 127-148.

Hortaçsu, A., & Syverson, C. (2015). The Ongoing Evolution of US Retail: A Format Tug-of-War. *The Journal of Economic Perspectives: A Journal of the American Economic Association*, *29*(4), 89–112.

Jeitschko, T. D., & Tremblay, M. J. (2018). *Platform Competition with Endogenous Homing*. https://doi.org/10.2139/ssrn.2441190

Johnson, E. J., Moe, W. W., Fader, P. S., Bellman, S., & Lohse, G. L. (2004). On the depth and dynamics of online search behavior. *Management science*, 50(2), 299-308.

Jullien, B. (2011). Competition in Multi-sided Markets: Divide and Conquer. *American Economic Journal: Microeconomics*, *3*(4), 186–220.

Jullien, B., & Lefouili, Y. (2018). *Horizontal Mergers and Innovation*. https://doi.org/10.2139/ssrn.3135177

Katz, M. L., & Shapiro, C. (1985). Network externalities, competition, and compatibility. *The American*

PX0498-182

*Economic Review*, *75*(3), 424–440.

Katz, M. L., & Shapiro, C. (1986). Technology Adoption in the Presence of Network Externalities. *The Journal of Political Economy*, *94*(4), 822–841.

Katz, M. L., & Shapiro, C. (1992). Product Introduction with Network Externalities. *The Journal of Industrial Economics*, *40*(1), 55–83.

Katz, M. L., & Shapiro, C. (1994). Systems Competition and Network Effects. *The Journal of Economic Perspectives*, *8*(2), 93–115.

Laffont, J.-J., & Tirole, J. (2001). *Competition in Telecommunications*. MIT Press.

Lambrecht, A., & Tucker, C. E. (2015). *Can Big Data Protect a Firm from Competition?* https://doi.org/10.2139/ssrn.2705530

Lee, R. S. (2013). Vertical Integration and Exclusivity in Platform and Two-Sided Markets. *The American Economic Review*, *103*(7), 2960–3000.

Levin, J. D. (2011). *The Economics of Internet Markets*. National Bureau of Economic Research. https://doi.org/10.3386/w16852

Liebowitz, S. J., & Margolis, S. E. (1994). Network Externality: An Uncommon Tragedy. *The Journal of Economic Perspectives: A Journal of the American Economic Association*, *8*(2), 133–150.

Liu, Y. H. (2018). The Impact of Consumer Multi-homing Behavior on Ad Prices: Evidence from an Online Marketplace. Retrieved from http://labor-research.net/wp-content/uploads/2018/01/Liu_paper.pdf

Markovich, S., & Yehezkel, Y. (2018). Group Hug: Platform Competition with User-groups. Retrieved from https://www.researchgate.net/profile/Sarit_Markovich/publication/328102536_Group_Hug_Platform_Competition_with_User-groups/links/5bb76c0892851c7fde2f0d15/Group-Hug-Platform-Competition-with-User-groups.pdf

Montes, R., Sand-Zantman, W., & Valletti, T. (2018). The Value of Personal Information in Online Markets with Endogenous Privacy. *Management Science*. https://doi.org/10.1287/mnsc.2017.2989

Motta, M., & Tarantino, E. (2017). The effect of horizontal mergers, when firms compete in prices and investments. *Working paper series* , *17-01*.

Mussa, M., & Rosen, S. (1978). Monopoly and product quality. *Journal of Economic Theory*, *18*(2), 301–317.

Neumann, N., Tucker, C. E., & Whitfield, T. (2018). *How Effective Is Black-box Digital Consumer Profiling and Audience Delivery?: Evidence from Field Studies*. https://doi.org/10.2139/ssrn.3203131

Ornaghi, C. (2009). Mergers and innovation in big pharma. *International Journal of Industrial Organization*, *27*(1), 70–79.

Pagano, P., & Schivardi, F. (2003). Firm size distribution and growth. *The Scandinavian Journal of Economics*. Retrieved from https://onlinelibrary.wiley.com/doi/abs/10.1111/1467-9442.t01-1-00008

Prat, A., & Valletti, T. M. (2018). *Attention Oligopoly*. https://doi.org/10.2139/ssrn.3197930

PX0498-183

Prufer, J., & Schottmüller, C. (2017). *Competing with Big Data*. https://doi.org/10.2139/ssrn.2918726

Rasmusen, E. (1988). Entry for Buyout. *The Journal of Industrial Economics*, *36*(3), 281–299.

Reimers, I., & Shiller, B. (2018). *Welfare Implications of Proprietary Data Collection: An Application to Telematics in Auto Insurance*. https://doi.org/10.2139/ssrn.3125049

Rey, P., & Tirole, J. (2007). A primer on foreclosure. *Handbook of Industrial Organization*, *3*, 2145–2220.

Rochet, J.-C., & Tirole, J. (2006). Two-sided markets: a progress report. *The Rand Journal of Economics*, *37*(3), 645–667.

Schäfer, M., Sapi, G., & Lorincz, S. (2018). *The Effect of Big Data on Recommendation Quality: The Example of Internet Search*. https://doi.org/10.2139/ssrn.3161325

Schweitzer, H., Haucap, J., Kerber, W., & Welker, R. (2018). *Modernisierung der Missbrauchsaufsicht für marktmächtige Unternehmen*. Nomos Verlagsgesellschaft mbH & Co. KG.

Shaked, A., & Sutton, J. (1982). Relaxing price competition through product differentiation. *The Review of Economic Studies*, 3–13.

Shapiro, C. (2012). Competition and Innovation: Did Arrow Hit the Bull's Eye? In *The Rate and Direction of Inventive Activity Revisited*. University of Chicago Press.

Shi, C. (n.d.). Catching Exclusive Eyeballs: Multi-Homing and Platform Competition in the Magazine Industry. https://doi.org/10.18130/v3ms3z

Spence, A. M. (1975). Monopoly, Quality, and Regulation. *The Bell Journal of Economics*, *6*(2), 417–429.

Spence, A. M. (1977). Entry, Capacity, Investment and Oligopolistic Pricing. *The Bell Journal of Economics*, *8*(2), 534–544.

Stole, L. A. (2007). Chapter 34 Price Discrimination and Competition. In M. Armstrong & R. Porter (Eds.), *Handbook of Industrial Organization* (Vol. 3, pp. 2221–2299). Elsevier.

White, A., & Weyl, E. G. (2016). *Insulated Platform Competition*. https://doi.org/10.2139/ssrn.1694317

Wu, T. (2018). Blind Spot: The Attention Economy and the Law. *Antitrust Law Journal*. https://doi.org/10.2139/ssrn.2941094

Xu, L. (2014). Platform Competition with Local Network Effects. Retrieved from http://leixu.org/Xu_Platform_Competition.pdf

Zhang, J., Fang, X., & Liu Sheng, O. R. (2006). Online consumer search depth: Theories and new findings. *Journal of Management Information Systems*, 23(3), 71-95.

PX0498-184

# PX0499

NBER WORKING PAPER SERIES

THE DIGITAL WELFARE OF NATIONS:
NEW MEASURES OF WELFARE GAINS AND INEQUALITY

Erik Brynjolfsson
Avinash Collis
Asad Liaqat
Daley Kutzman
Haritz Garro
Daniel Deisenroth
Nils Wernerfelt
Jae Joon Lee

Working Paper 31670
http://www.nber.org/papers/w31670

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
September 2023

A.L., D.K., H.G., and D.D. are employees of Meta Platforms and hold a financial interest in Meta. N.W. was an employee of Meta while this research was conducted though he no longer holds a financial interest in the company. All other authors declare no current competing interests, although E.B. and A.C. have in the past been awarded unrestricted gifts from Meta and receive final support from the Stanford Digital Economy Lab which is in turn partially funded by a variety of entities. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

At least one co-author has disclosed additional relationships of potential relevance for this research. Further information is available online at http://www.nber.org/papers/w31670

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2023 by Erik Brynjolfsson, Avinash Collis, Asad Liaqat, Daley Kutzman, Haritz Garro, Daniel Deisenroth, Nils Wernerfelt, and Jae Joon Lee. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

PX0499-001

The Digital Welfare of Nations: New Measures of Welfare Gains and Inequality
Erik Brynjolfsson, Avinash Collis, Asad Liaqat, Daley Kutzman, Haritz Garro, Daniel Deisenroth,
Nils Wernerfelt, and Jae Joon Lee
NBER Working Paper No. 31670
September 2023
JEL No. O30,O4

## ABSTRACT

Digital goods can generate large benefits for consumers, but these benefits are largely unmeasured
in the national accounts, including GDP and productivity. In this paper, we measure welfare gains
from 10 popular digital goods across 13 countries by conducting large-scale incentivized online
choice experiments on representative samples of nearly 40,000 people. We estimate that these
goods—many of which are free to users—generate over $2.5 trillion in aggregate consumer
welfare across these countries per year, which is roughly equivalent to 6% of their combined GDP.
We find that lower-income individuals and lower-income countries obtain relatively larger welfare
gains from these goods compared to higher-income individuals and countries. This suggests that
digital goods may reduce inequality in welfare within and across countries by disproportionately
benefiting lower-income groups.

Erik Brynjolfsson
Stanford Digital Economy Laboratory
353 Jane Stanford Way, Office 136
Stanford, CA 94305
and NBER
erik.brynjolfsson@gmail.com

Avinash Collis
Carnegie Mellon University
Pittsburgh, PA
avinash.collis@gmail.com

Asad Liaqat
Meta Platforms
1 Hacker Way
Menlo Park, CA 94063
asadliaqat@meta.com

Daley Kutzman
Meta
1 Hacker Way
Menlo Park, CA 94025
dkutzman@meta.com

Haritz Garro
Meta
1 Hacker Way
Menlo Park, CA 94025
haritz.garro@gmail.com

Daniel Deisenroth
Meta Platforms
1 Hacker Way
Menlo Park, CA 94025
dbdeisenroth@meta.com

Nils Wernerfelt
Kellogg School of Management
2211 Campus Drive
Evanston, IL 60208
nils.wernerfelt@gmail.com

Jae Joon Lee
Stanford Digital Economy Lab
353 Jane Stanford Way
Stanford, CA 94305
jaejoonl@stanford.edu

PX0499-002

# The Digital Welfare of Nations:
# New Measures of Welfare Gains and Inequality

**Erik Brynjolfsson**✉
Stanford University
and NBER

**Avinash Collis**✉
Carnegie Mellon
University

**Asad Liaqat**
Meta

**Daley Kutzman**
Meta

**Haritz Garro**
Meta

**Daniel Deisenroth**
Meta

**Nils Wernerfelt**
Northwestern
University

**Jae Joon Lee***
Stanford University

September 2023

### Abstract

Digital goods can generate large benefits for consumers, but these benefits are largely unmeasured in the national accounts, including GDP and productivity. In this paper, we measure welfare gains from 10 popular digital goods across 13 countries by conducting large-scale incentivized online choice experiments on representative samples of nearly 40,000 people. We estimate that these goods—many of which are free to users—generate over $2.5 trillion in aggregate consumer welfare across these countries per year, which is roughly equivalent to 6% of their combined GDP. We find that lower-income individuals and lower-income countries obtain relatively larger welfare gains from these goods compared to higher-income individuals and countries. This suggests that digital goods may reduce inequality in welfare within and across countries by disproportionately benefiting lower-income groups.

# Introduction

Digital technologies create challenges for economic measurement. On one hand, with the spread of the Internet, time spent on digital goods has increased dramatically and these goods are affecting more and more aspects of daily life. For instance, the average person in both the US and UK now spends almost 24 hours a week online (Coyle and Nakamura, 2022) while the

*Authors listed in order of contribution with E.B. and A.C. contributing equally. A.L. and D.K. led the project internally at Meta. A.L., D.K., and H.G designed and implemented the survey, and analyzed and validated the data. A.L. and A.C. wrote the paper, with contributions from E.B., D.K., H.G., D.D., N.W.; E. B. and A. C. were the joint external principal investigators; D. D. and N. W. were the joint internal principal investigators.
Competing interests: A.L., D.K., H.G., and D.D. are employees of Meta Platforms and hold a financial interest in Meta. N.W. was an employee of Meta while this research was conducted though he no longer holds a financial interest in the company. All other authors declare no current competing interests, although E.B. and A.C. have in the past been awarded unrestricted gifts from Meta.

✉Corresponding authors. Email: erikb@stanford.edu; avinashcollis@cmu.edu.

number of photos shared increased from 350 billion to 2.5 trillion between 2010 and 2017 (Brynjolfsson et al., 2019b). On the other hand, the officially-measured size of the information sector as a share of total GDP has remained almost unchanged at around 4-5% for the past four decades. The discrepancy is a reflection of the fact that, regardless of the value they create for consumers, most digital goods are available at zero price (Brynjolfsson and Collis, 2019).[1]

To better understand the welfare effects of digital goods, new metrics are needed to complement existing production-based metrics such as GDP and productivity (Masood, 2022).[2] Recent research has proposed new ways of directly measuring consumer surplus from digital goods using massive online choice experiments (Brynjolfsson et al., 2019a; Brynjolfsson et al., 2019b). However, existing research in this area has only looked at a select few regions and goods using convenience samples that were not representative of the population of digital users.

In this paper, we conduct large-scale incentivized choice experiments involving nearly 40,000 representative users of the Facebook digital service in 13 countries to estimate the welfare gains generated by 10 popular digital goods. While previous research looks at specific digital goods in a single country using smaller non-representative samples (Allcott et al., 2020; Brynjolfsson et al., 2019a), the scale and scope of our sample enable us to estimate valuations for ten leading digital goods with sufficient precision to compare welfare gains from digitization across countries. Similar contingent valuation methods have been used in the past to value non-market goods, including environmental goods (Bishop et al., 2017) and accepted as evidence in legal cases (Lowensohn, 2012).

We find that digital goods generate substantial welfare for consumers across these countries. Specifically, our analysis implies that digital goods create $2.52 trillion of value across all 13 countries, which corresponds to 5.95% of their aggregate GDP.  We also find that lower-income individuals within countries and lower-GDP countries obtain disproportionately more welfare from these digital goods compared to higher-income individuals and higher-GDP countries—not only relative to income, but in some instances even in absolute terms. Because the free digital goods we examine (e.g. search engines or instant messaging platforms) are available for free to both higher- and lower-income individuals, they serve to reduce welfare inequality both within and across countries in our sample.

Since none of the digital goods we examine existed a few decades ago, our findings suggest that economic growth may have been underestimated by conventionally-measured GDP.[3]

---

[1] Most are instead supported by advertising revenues, while others are supported by volunteers.

[2] Production based metrics may also not properly include welfare gains from non-digital goods. For e.g., Nordhaus (1996) calculates that lighting generated $275 billion in consumer surplus between 1800 and 1992, and this is not measured in existing metrics. Jones and Klenow (2016) propose a more comprehensive measure of welfare accounting for consumption, leisure, mortality, and inequality. In this work we focus on digital goods because the changes in welfare over the past few decades may be the highest for digital goods compared to other types of goods.

[3] As discussed in Brynjolfsson et al (2019b), the fact that some of these goods are paid for by advertising or other means does not fundamentally change this fact.  That said, it is also possible, even likely, that

Furthermore, since labor productivity is typically defined as GDP per hour worked, it also fails to reflect the full contribution of digital goods. As the digital economy becomes relatively more important, it will be increasingly important to explicitly measure the trillions of dollars of value created by these sorts of goods. The reduction in inequality is consistent with the idea that greater access to free public goods can be effective in reducing inequality (Fischer, 2017) and that relative price changes have an important effect on inequality (Slottje, 1987). In particular, as argued by Goolsbee and Klenow (2006), low wage workers should be expected to consume relatively higher quantities of free digital goods, not only because they have less money to spend on other goods, but also because their opportunity cost of time may be lower.

# Results

## Measuring welfare gains from digital goods

We surveyed 39,717 Facebook users in 13 countries on the Facebook internal survey platform (see Materials and Methods section in the Supplementary Materials for more details). The two main components of the survey were (i) a best-worst scaling task (N=23,752) where users select their most and least preferred options from a list (Louviere et al., 2015), and (ii) an incentivized willingness-to-accept estimate (N=39,717) using single-binary discrete choice experiments (Brynjolfsson et al., 2019a). The former gives us relative valuations of different goods while the latter gives us valuation for our benchmark good using a revealed preference approach.[4] In this paper, we use Facebook's valuation as the benchmark to calibrate valuations of the other goods.[5]

The survey sample for each component was weighted to be representative of the population of "monthly active" Facebook users in each country (i.e., users who have been active on Facebook within the last 30 days). Facebook has nearly 3 billion monthly active users, and using a sample that is representative of Facebook users in each country is a stark improvement over existing

---

economic growth was misestimated in earlier eras as well, as other unmeasured or poorly measured goods and services entered (and exited) the economy. Our paper is only one in a long line of efforts to improve on past measures.

[4] These are well-established methods for valuing non-market goods. Note that there are other valuation methods available, including, for example, Becker-Degroot-Marschak's willingness-to-pay approach ("BDM" - Becker et al., 1964). Prior to running our main survey we tested several such methods and found that our preferred approach worked best.

[5] These valuations capture the consumer surplus generated by these goods since they measure consumers' valuation of a good beyond the costs associated with consuming the good. In most instances, the costs associated with consuming digital goods are very small or nonexistent as most users have a phone with an internet plan. However, some users might purchase a phone with an internet plan with the main purpose of being able to use Facebook or a similar app. In these cases, the purchase of the phone and internet plan will be reflected in the GDP numbers, and our measure of consumer surplus will be an underestimate.

estimates that were based on laboratory experiments or off-platform surveys of the general public.[6]

## (a) Measuring relative valuations of digital goods using best-worst scaling

We used a best-worst scaling methodology to measure the relative willingness to accept for stopping the use of 10 selected digital goods,[7] as well as not "meeting friends in person", for one month. We included the category "meeting friends in person" to compare the relative valuation of in-person communication versus online social networks. Users are provided with a list of items and asked to select their most valuable and least valuable option from that list (i.e. relative comparison of these items, see Appendix Figure 2 for an example task). The digital goods include Facebook, Twitter, Instagram, WhatsApp, Snapchat, TikTok, Google Search, Google Maps, YouTube, and Amazon Shopping. Using a balanced-incomplete block design to ensure that all pairs of goods are evaluated together sufficiently (Hanani, 1961), we generated 70 questions with the 11 items mentioned above plus 10 monetary amounts. We dropped 7 questions that included *only* monetary amounts, resulting in 63 questions from which we presented three random questions to each respondent.

Figure 1 shows the ranking of items from most preferred to least preferred based on the disutility of giving up access to that item (the omitted category is Snapchat).[8] Google Search is the most preferred good and is even preferred to meeting friends in person. YouTube is also highly ranked, along with Google Maps, WhatsApp, Amazon Shopping, and Facebook. Other apps such as TikTok, Instagram, Twitter, and Snapchat—which is the least preferred digital service and thus the base category—receive the least broad-based appeal among the suite of digital goods.[9]

---

[6] The monthly active user (MAU) population in Facebook in these 13 countries constitutes a large share of the total population. The average Facebook penetration rate (defined as MAU divided by population) among these countries is 59.4%. These users are likely to be fairly representative of the users of digital technologies in each of these countries, though not necessarily of people who don't use any digital goods.

[7] These included three digital goods provided by Meta Platforms, Inc. (Facebook, Whatsapp, Instagram) as well as several other popular apps covering a range of product types.

[8] This approach also allows us to analyze heterogeneity in valuations based on various user characteristics. Appendix Figure 15 analyses relative utility of these goods based on gender.

[9] Some of the digital goods in the list, such as Snapchat, are not broadly used in many countries, which contributes to them being least preferred.

5



**Figure 1: Relative disutility from stopping use, estimated using a conditional logit model. Snapchat is the omitted category.**

**Figure 1 Notes**: The figure depicts the disutility from stopping use of the digital service relative to stopping use of Snapchat, which is the least preferred digital service. For instance, stopping use of Google Search for a month causes the largest disutility—relative to stopping use of Snapchat—among users of the 13 countries.  Note that these figures reflect the valuation of the average Facebook user and not necessarily the valuation of the average user of these other platforms or non-users.  Note also that value to users is different from value to advertisers for these services, the estimation of which would require a different measurement strategy

6

## (b) Calibrating welfare gains using Facebook

In the same survey of Facebook users from 13 countries, we used an incentivized single-binary discrete choice (SBDC) experiment to elicit respondents' willingness to accept to stop using Facebook for one month. We chose Facebook for this study because we can ensure compliance of choices for selected users (we are able to observe their true Facebook usage). Respondents were asked: "Would you be willing to stop using Facebook for one month in exchange for X?", where X was chosen randomly from a set of nine monetary values ranging from $5 to $100. We clarified to the respondents that they could be randomly selected for their choices to be fulfilled, and if so, they would actually be eligible to receive the offer amount if they deactivated their Facebook account for a month. Respondents were given offers in their own currency. For instance, if a respondent in France was chosen to receive an offer equivalent to $50, they were given an offer of 45 Euros, which was equivalent to US$50 at the time of the experiment.

Figure 2a below shows the proportion of respondents that rejected each offer. 81% of users rejected the lowest offer (equivalent to US$5) and 24% of respondents rejected the highest offer (equivalent to US$100). As predicted by the law of demand, the proportion of users rejecting the offer decreases monotonically with increasing offer amounts.



**Figure 2a: Facebook offer rejection rates by offer value across all countries in the sample.**

**Figure 2a Notes:** This figure shows, per each offer value, the proportion of respondents who reject the offer to stop using Facebook for one month. Offer values were randomly assigned. The proportion of respondents who reject the offer decreases as the offer value increases.

The median value of Facebook is the amount of money that half of respondents would accept and half would reject. We first estimate a weighted binary logit model to measure how the probability of rejecting the offer depends on its amount and then solve for the offer amount that sets the probability of rejecting to 50%. To ascertain how the value that users derive from Facebook is distributed, we first examine how the median value varies across surveyed countries (Figure 2b). The overall weighted median value is $31 overall, and ranges from $11 in Romania to $57 in Norway.



**Figure 2b: Facebook median willingness to accept (WTA) by Country**

**Figure 2b Notes:** This figure shows estimates from separate binary logit models for the median WTA value for each country. The estimates and confidence intervals in blue are unweighted, while those in orange are weighted in line with the weighting strategy described in Supplementary Materials Section 1.2. Countries are arranged in order of decreasing weighted median WTA value of Facebook.

## Welfare gains from digital goods across countries

We use data on Facebook valuations to first calculate total welfare generated by Facebook across the 13 countries in our sample. We do this by multiplying the weighted median willingness-to-accept value (shown in Figure 2b) by the number of monthly active Facebook users in that country, and then multiply this number by 12 to annualize it (Appendix Figure 7).[10] Using this approach, Facebook generates a total of $246 billion in welfare across these countries (ranging from $137 billion in the US to $1.2 billion in Ireland).

---

[10] We assume that the willingness-to-accept (WTA) value to stop using Facebook for a year is approximately 12 times as large as the analogous willingness-to-accept for a month. Arguments can be made to support the hypothesis that willingness-to-accept increases more than proportionally or less than proportionally with respect to disconnection time. Previous research (Brynjolfsson et al., 2019a) shows that WTA to stop using Facebook for 1 month (4 weeks) is slightly more than four times WTA to stop using Facebook for 1 week, and WTA to stop using Facebook increases more than proportionally over time (from 1 month to 1 year). Therefore, our assumption might slightly underestimate the welfare generated by Facebook over a period of 12 months.

In turn, using the incentivized single-binary discrete choice (SBDC) Facebook valuations as our benchmark and applying the relative utilities across goods estimated with the best-worst scaling (BWS) method, we calibrate the valuations of other goods and estimate total welfare generated by all these 10 goods in our sample across all countries (Appendix Figure 12 shows the calibrated valuations of each digital good in each country[11]). This is done by multiplying the aggregate annual value of Facebook in each country by the utility of each digital good relative to Facebook—where the utility for Facebook is normalized to 1—obtained through the best-worst scaling (BWS) estimation. Our analysis implies that, among Facebook users, the 10 digital goods selected in this study generate a combined total of $2.52 trillion in welfare across these countries—ranging from $1.29 trillion in the US to $13 billion in Romania (Figure 3a).



**Figure 3a: Aggregate annual value of 10 digital goods by country**

**Figure 3a Notes:** This figure presents country-level estimates of the aggregate annual value of all ten digital goods studied using relative valuations from the best-worst scaling study calibrated with incentivized Facebook valuations using the single-binary discrete choice study. Countries are arranged in order of decreasing weighted median WTA value of Facebook. The y-axis includes a discontinuity in order to visually accommodate the US estimate which is far higher than the estimate for other countries.

To explore whether the welfare gains from digital goods vary across higher-income and lower-income countries we calculate, for each country, the ratio of Facebook users' median valuations of all the digital goods as a percent of GDP per capita (Appendix Figure 8 plots these figures for Facebook and Appendix Figure 10 for all digital goods). We then regress this variable on a country's GDP per capita:

$$\textit{Valuation of Digital Goods (\% of GDPpc)}_i \ = \ \beta \ w \ GDPpc_i + \varepsilon_i$$

---

[11] There is substantial heterogeneity in valuations of digital goods across countries. For example, Google Search is the most valued good in the US, WhatsApp is the most valued good in Mexico and YouTube is the most valued good in South Korea.

Where $\beta$ denotes the parameter to be estimated, and $w$ denotes weights that in this case are the monthly active Facebook users in each country. The rationale for including the weights is to equally consider all Facebook users in the regression.

We find a highly significant negative relationship between users' digital goods valuation as a percent of GDP per capita in a country and GDP per capita in that country (Figure 3b, see Appendix Figure 9 for an analogous plot with the valuation of Facebook alone in the Y axis). A $10,000 increase in a country's GDP per capita is associated with a 2.09 percentage point decrease in users' valuation of the 10 digital goods relative to GDP per capita ($\beta$ = -2.09, p-value < 0.001).[12] In other words, among Facebook users, the welfare gains from digital goods represent a higher share of income in lower income countries compared to higher income countries.[13]



**Figure 3b: Association between GDP per capita and Facebook users' valuation of 10 digital goods as a share of GDP per capita**

---

[12] The unweighted regression gives a β equal to -1.11 with a p-value equal to 0.068. In Section 1.3 of the Appendix we discuss a simulation procedure that accounts for the statistical uncertainty around our estimates of the value of the 10 digital goods as a percent of GDP per capita. The simulation exercise shows that the results of the regression are robust to variations in the country estimates of the value of digital goods as a percent of GDP per capita.

[13] Appendix Figure 8 shows the valuation of Facebook as a percent of GDP per capita in each country. Appendix Figure 9 shows a downward-sloping pattern—consistent with Figure 3b—between the valuation of Facebook as a percent of GDP per capita and GDP per capita.

**Figure 3b Notes**: The figure depicts 2020 GDP per capita (in US dollars) in the X axis and Facebook users' valuation of the 10 digital goods as a percent of 2020 GDP per capita in the Y axis. A weighted regression of Y on X (in $10,000s) with weights given by Facebook monthly active users (MAU) in each country yields a point estimate of -2.09 with a p-value equal to <0.001. An unweighted regression yields a point estimate of -1.11 with a p-value equal to 0.068. The fitted lines in the plot correspond to the weighted regression.

## Welfare gains from digital goods within countries

To analyze heterogeneity in welfare gains across income levels *within* each country, we calculate valuations of Facebook and other digital goods by income levels and education. For income, we use the relative wealth index of the location of a user's residence as a proxy (Chi et al. (2022)).[14] For education, we rely on the responses that users provided in our survey.

We find that the monetary value that users derive from Facebook does not tend to vary by these indicators of material welfare. For instance, users who live in the least wealthy localities classified by the Relative Wealth Index have a value of Facebook that is similar to that of users in the highest wealth localities (Figure 4a).[15] Similarly, users with less than secondary education or with just secondary education (and who therefore tend to earn less on average) have a median value of Facebook that is not statistically distinguishable from the value that users with a college degree derive from Facebook (see Appendix Figure 6).[16]

These findings imply that the value of Facebook represents a higher *share* of their income and wealth for users who currently have lower income and wealth. Extending to other digital goods, we estimate separate conditional logit models on users who are in the bottom, middle, and top tercile of relative wealth in their respective countries in Figure 4b (Appendix Figure 11 plots this for the US alone). Interestingly, we find that the poorest and wealthiest users often have greater value for most digital goods than those in the middle of the relative wealth distribution, though the pattern is inconsistent across digital goods. For some digital goods (e.g. Google Search), users in the top tercile derive the highest absolute welfare in dollar terms while for other digital goods (e.g. TikTok) those in the lowest tercile benefit the most. The differences in valuations are rarely

---

[14] The relative wealth index calculated in Chi et al. (2021) estimates the relative wealth and poverty of an area at 2.4 km resolution. From the paper: "The estimates are built by applying machine-learning algorithms to vast and heterogeneous data from satellites, mobile phone networks, and topographic maps, as well as aggregated and deidentified connectivity data from Facebook. We train and calibrate the estimates using nationally representative household survey data from 56 LMICs and then validate their accuracy using four independent sources of household survey data from 18 countries."

[15] We do not have perfect information about users' locations. The more granular the geographic area, the less accurate the location predictions are. However, the accuracy of Facebook's zip-code level predictions in the US is as high as 68%—although note that the 2.4-km microregions defined in Chi et al. (2022) do not neatly correspond with zip-codes. To the extent that relative wealth index levels are geographically clustered, small imprecisions in the location predictions should not substantially impact the accuracy of the RWI tercile categorizations. That said, any noise in the relative weight indices may bias the relationship between Facebook valuations and the RWI index toward zero.

[16] We also explore heterogeneity in Facebook valuations based on home ownership and gender (Appendix Figure 6), which are both correlated with wealth. Facebook valuations do not significantly vary based on home ownership (owned vs. rented home). Women value Facebook significantly higher than men (and women's wealth is lower than men in all of our sample countries).

11

significantly different from each other across terciles which suggests that, on balance, these digital goods tend to lower welfare inequality within countries.



**Figure 4a: Value of Facebook by relative wealth index**

**Figure 4a Notes:** This figure shows weighted estimates from separate binary logit models for the median WTA value for each relative wealth index tercile within each country.



**Figure 4b: Relative valuation of 10 digital goods by relative wealth index**

**Figure 4b Notes:** This figure shows estimates from three separate conditional logit models (each containing users belonging to the low, medium and high RWI terciles within their respective countries) of the utility of each digital good relative to Facebook (which is the omitted good, with utility set at 0). These results should be interpreted in conjunction with those in Figure 4a.

## Comparing consumer welfare with time spent and firm revenue

Previous research has estimated consumer welfare generated by free digital goods using measures of time spent (Goolsbee and Klenow, 2006; Brynjolfsson and Oh, 2012) and advertising revenues (Nakamura et al., 2017). Do our measures of consumer welfare capture additional

information beyond measures of time spent and advertising revenues? To explore this, we compare our estimates of valuation of Facebook with time spent on Facebook. Figure 5 plots these comparisons for Facebook valuations across all the 13 countries pooled together. We split our study respondents into three terciles—low, medium, and high—based on time spent on Facebook. For each of these terciles, we calculate the median valuation of Facebook.

We find that users in the first tercile—i.e. users who spend the least time on the platform—have a median valuation of $19.72 per month. Users in the second tercile have a median valuation of $32.97 per month. Finally, users in the third tercile have a median valuation of $40.61 per month. Moving from the first tercile to the third tercile, the valuation of Facebook increases by 2.06 times while time spent increases by 12.84 times. Thus, valuation increases much more slowly than time spent, implying that value is distributed across a broad user base rather than concentrated on a few very active users.

We can also compare consumer welfare gains to revenues for the producers. Nordhaus (2005) estimated that only a small portion of the total welfare generated by technological advances in the 1948-2001 time period was ultimately captured by producers. Instead, consumers enjoyed the vast majority of the welfare gains. Our study finds results that are consistent with Nordhaus (2005): when we compare our welfare estimates to advertising revenues, we find that user value for just the Facebook app in the 13 countries studied ($284 billion) is nearly three times the global advertising revenue of Meta Platforms' ($115 billion, including Facebook, Instagram, and WhatsApp). Tadelis et al. (2023) find that each dollar spent on Meta ads leads to over three dollars in revenues for advertisers. Our findings imply that the vast majority of the welfare gains from using Facebook go to consumers and not to Facebook.



**Figure 5: Comparing monthly valuation of Facebook with daily time spent**

# Discussion

Digital goods generate large benefits for consumers, but because most of these goods are free to use, these benefits are largely invisible in standard government statistics such as GDP and productivity. In this paper, we provide estimates of the value digital goods create for users in 13 countries around the world by conducting large-scale incentivized online choice experiments on representative samples of nearly 40,000 people.

We find that the 10 selected digital goods across the 13 countries generate more than $2.5 trillion in aggregate consumer welfare per year, roughly equivalent to 6% of GDP in these countries. We also find that lower-income individuals and countries disproportionately benefit from these digital goods. These findings suggest that digital goods reduce inequality in welfare within and across countries.

Our approach is subject to a number of limitations. Compared to GDP, which can be measured with high precision, our estimates are relatively noisy. We are confident in our qualitative findings that these digital goods create trillions of dollars of value and reduce welfare inequality, but the exact values are not precisely estimated. The large sample size in our study partly mitigates this problem via the law of large numbers, but there may remain systematic biases in our estimates for a variety of reasons.[17] Relatedly, we study a particular sample of countries and of digital goods. While a pattern is evident within this large sample, different effects may occur for other sets of countries and goods. While our sample account for a substantial fraction of the likely value of global GDP and of value from digital goods, the out-of-sample implications can best be addressed by simply expanding the sample.

Furthermore, even when the valuations we obtain are accurate, they may reflect irrational choices that are not in the consumers' genuine self-interest due to "digital addiction" (Allcott et al., 2022) or other errors in judgment (Kahneman et al., 1982). In addition, these goods may create positive or negative externalities on other people — from shared memories and connections to misinformation and polarization — which means that the total welfare gains are not necessarily equal to the sum of individual valuations. While these concerns are important, it should be noted that the same concerns apply to standard measures of GDP, which also reflect consumer values which may be irrational or omit important externalities. Future work should seek to address these concerns, and online choice experiments can also be used to quantify these externalities (e.g., Bishop et al., 2017; Collis and Eggers, 2022).

Having demonstrated the feasibility of running massive online choice experiments to estimate valuations of multiple goods across multiple countries, future work can expand this line of research in at least three dimensions: i) More goods, including non-digital goods like breakfast cereal, improved healthcare, or cleaner water, ii) More countries or regions, and iii) More respondents per item (which will increase the precision of our estimates). Furthermore, by

---

[17] See Brynjolfsson et al. (2019b) for a more detailed discussion of potential biases and shortcomings of massive online choice experiments.

conducting online choice experiments such as this one at a regular cadence, e.g. annually or even more frequently, and with consistent methods, we can better understand not only levels but also changes in welfare as the basket of goods and other variables change over time.

This paper provides a first step toward systematically estimating welfare using massive online choice experiments. Since the contribution of digital goods to welfare is likely to continue to grow in the twenty-first century, establishing a reliable baseline will provide a foundation for understanding the magnitude and nature of future changes in the economy.

# Methods

We surveyed 39,717 Facebook users in 13 countries on the Facebook internal survey platform. The two main components of the survey were (i) a hypothetical willingness to accept measurement for various digital goods using best-worst scaling, and (ii) an incentivized willingness to accept measurement for Facebook using single binary discreet choice. The survey sample for each component was weighted to be representative of the population of active Facebook users in each country. The survey invitation was shown to respondents at the top of their Facebook Feed (Appendix Figure 1).

## Sampling & Weighting

We recruited our sample by sending in-app survey invitations to Facebook users. All 18+ Facebook users in these 13 countries who had been active on the Facebook platform in the month before the start of the survey, and whose accounts had been created at least 30 days ago, were eligible to be included in the sampling frame. The 13 countries included in our study are the United States, Canada, Mexico, Germany, United Kingdom, Ireland, France, Belgium, Norway, Spain, Romania, Japan, and Korea. We selected these 13 countries based on a combination of research interest and the availability of survey pool resources in each country. We use inverse probability weighting models to account for selection in our sample, such that all our estimates are representative of the population of Facebook users in each country. Our ability to weight results to match populations of Facebook users is an improvement over existing work. For all analyses, we account for both unit and item non-response bias. For analyses in which we pool data across countries, we also account for differential probability of inclusion in our sample using design weights. This is necessary since the probability of inclusion in our sample is different across countries. The Appendix provide further details of the weighting methodology.

## Measuring Relative Welfare from Digital Goods

We used a best-worst scaling (BWS) methodology to measure the relative willingness to accept for stopping the use of 10 digital goods or not meeting friends in person for one month. The digital goods include social media / messaging tools (Facebook, Twitter, Instagram, WhatsApp, Snapchat, and TikTok), and other digital tools (Google Search, Google Maps, YouTube, and Amazon Shopping). Using a balanced-incomplete block design, we generated 70 questions with

the 11 items mentioned above plus 10 monetary amounts. We dropped 7 questions that included only monetary amounts, resulting in 63 questions from which we presented 3 random questions to each respondent. Within each question, respondents were asked to indicate their 'best' and 'worst' options from among three options presented to them. These questions were presented to respondents at the end of the survey.

The sample size for best-worst scaling questions is 18,443. A total of 23,752 respondents[18] answered best-worst scaling questions, out of which 18,443 remained after applying quality checks (see below for details). We calculate separate weights for best-worst scaling respondents using a similar methodology to the one outlined in Appendix Section 1.2 to ensure that the best-worst scaling respondents are representative of the Facebook population in each country. Appendix Figure 2 shows an example BWS task.

## Calibrating Welfare Gains Using Facebook

In the same survey of Facebook users from 13 countries, we used an incentivized single binary discreet choice method to elicit respondents' willingness to accept to stop using Facebook for 1 month (Appendix Figures 3 and 4). Respondents were asked: "Would you be willing to stop using Facebook for one month in exchange for X?", where X was chosen randomly from a set of 9 monetary values from $5 to $100. We clarified to the respondents that they could be randomly selected for their choices to be fulfilled, and if so, they would actually be eligible to receive the offer amount if they deactivated their Facebook account for a month.

Respondents were given offers in their own currency. For instance, if a respondent in France was chosen to receive an offer equivalent to $50, they were given an offer of 45 Euros, which was equivalent to US$50 at the time. These offers were incentivized, and participants had to agree to a set of terms and conditions drafted by legal experts to be in compliance with local laws in each country. The amounts paid ranged from US$5 to US$510. A total of approximately US$14,400 were paid out to 113 participants. Each choice made by respondents of whether to accept or reject an offer had a 2% probability of being selected. This probability was not known to respondents.

The Appendix provides additional details about our methods as well as supplementary analyses.

# References

Allcott, H., Braghieri, L., Eichmeyer, S., Gentzkow, M. (2020). The Welfare Effects of Social Media. *American Economic Review, 110(3),* 629-676.

---

[18] The sample size for the BWS questions is slightly lower than the sample size for the Facebook SDBC question due to survey attrition. The BWS questions appeared later in the survey. Respondents could stop answering the survey at any time.

Allcott, H., Gentzkow, M., & Song, L. (2022). Digital addiction. *American Economic Review*, *112*(7), 2424-63.

Becker, G. M., M. H. DeGroot and J. Marschak (1964). Measuring utility by a single-response sequential method. *Behavioral Science, 9(3),* 226-232.

Bishop, R. C., Boyle, K. J., Carson, R. T., Chapman, D., Hanemann, W. M., Kanninen, B., ... & Scherer, N. (2017). Putting a value on injuries to natural assets: The BP oil spill. *Science*, *356*(6335), 253-254.

Brynjolfsson, E., & Collis, A. (2019). How should we measure the digital economy? *Harvard Business Review*, *97*(6), 140-148.

Brynjolfsson, E., Collis, A., & Eggers, F. (2019a). Using massive online choice experiments to measure changes in well-being. *Proceedings of the National Academy of Sciences*, *116*(15), 7250-7255.

Brynjolfsson, E., Collis, A., Diewert, W. E., Eggers, F., & Fox, K. J. (2019b). *GDP-B: Accounting for the value of new and free goods in the digital economy* (No. w25695). National Bureau of Economic Research.

Brynjolfsson, E., & Oh, J. (2012). The attention economy: Measuring the value of free digital services on the internet.

Chi, G., Fang, H., Chatterjee, S., & Blumenstock, J. E. (2022). Microestimates of wealth for all low-and middle-income countries. *Proceedings of the National Academy of Sciences*, *119*(3), e2113658119.

Collis, A., & Eggers, F. (2022). Effects of restricting social media usage on wellbeing and performance: A randomized control trial among students. *Plos one*, *17*(8), e0272416.

Coyle, D., & Nakamura, L. (2022). Time Use, Productivity, and Household-centric Measurement of Welfare in the Digital Economy. *International Productivity Monitor*, *42*, 165-186.

Fischer, C. (2017). Inequality Is About Access to Public Goods, Not Income. *Boston Review*. April.

Goolsbee, A., & Klenow, P. J. (2006). Valuing consumer products by the time spent using them: An application to the Internet. *American Economic Review*, *96*(2), 108-113.

Hanani, H. (1961). The existence and construction of balanced incomplete block designs. *The Annals of Mathematical Statistics*, *32*(2), 361-386.

Jones, C. I., & Klenow, P. J. (2016). Beyond GDP? Welfare across countries and time. *American Economic Review*, *106*(9), 2426-2457.

Kahneman, D., Slovic, S. P., & Tversky, A. (Eds.). (1982). Judgment under uncertainty: Heuristics and biases. *Cambridge University Press.*

18

Louviere, J. J., Flynn, T. N., & Marley, A. A. J. (2015). Best-worst scaling: Theory, methods and applications. *Cambridge University Press.*

Lowensohn, J. (2012) Apple Features worth up to $100 to Samsung Buyers, Witness Says, *CNET*, August 10. https://www.cnet.com/tech/tech-industry/apple-features-worth-up-to-100-to-samsung-buyers-witness-says/

Masood, E. (2022). GDP is getting a makeover—what it means for economies, health and the planet. *Nature (News Feature)*, 611, 224-226.

Nakamura, L. I., Samuels, J., & Soloveichik, R. H. (2017). Measuring the Free Digital Economy within the GDP and productivity accounts. *FRB of Philadelphia Working Paper.*

Nordhaus, W. D. (1996). Do real-output and real-wage measures capture reality? The history of lighting suggests not. In *The economics of new goods* (pp. 27-70). University of Chicago Press.

Nordhaus, W. D. (2005). Schumpeterian profits and the alchemist fallacy. *Yale Economic Applications and Policy Discussion Paper*, (6).

Slottje, D. J. (1987). Relative price changes and inequality in the size distribution of various components of income: A multidimensional approach. *Journal of Business & Economic Statistics*, *5*(1), 19-26.

Tadelis, S., Hooton, C., Manjeer, U., Deisenroth, D., Wernerfelt, N., Greenbaum, L., and N. Dadson (2023) Learning, Sophistication, and the Returns to Advertising: Implications for Differences in Firm Performance, NBER Working Paper.

# Supplementary Materials

# 1 Materials and Methods

## 1.1 Survey Invitation

The survey invitation was shown to respondents at the top of their Facebook Feed. Here is an example of the survey invitation:



**Appendix Figure 1:** Survey invitation

## 1.2 Weighting

We use inverse probability weighting models to account for selection in our sample, such that all our estimates are representative of the population of Facebook users in each country. Our ability to weight results to match populations of Facebook users is an improvement over existing work.

For all analyses, we account for both unit and item non-response bias. For analyses in which we pool data across countries, we also account for differential probability of inclusion in our sample

using design weights. This is necessary since the probability of inclusion in our sample is different across countries.

1. Design weights:

The probability of inclusion in our sample is different across countries. Our weighting strategy adjusts for the different probability of selection into the sample by country (and treatment / control condition) due to the uneven sample allocation across countries:

Weight for responses from country i = 1 / (Number of users included in the sampling frame from country i / monthly active user population from country i)

The weights obtained using this approach can be interpreted as the number of monthly active users (i.e. population) represented by a user included in the sampling frame (i.e. sample).

2. Unit non-response weights within country:

We adjust the weights to account for unit non-response by modeling the probability that a user in the country's sampling frame responds to the survey as a function of observable user characteristics. For each country, the target population is the sampling frame. To account for the possibility that the response model differs across countries, we model this probability separately by country.

Weight = 1 / Est. Pr(user starts survey)

Following internal standard practice by survey scientists, we use the following user characteristics in unit non-response weighting models: Gender, Primary Phone OS, whether the user has a profile picture, age (quartile bins), friend count (quartile bins), the number of days within the last 28 days that the user was active, an indicator for whether the user was active for all days within the last 28 days, and time since the user created their account (quartile bins).

3. Item non-response weights for the valuation questions

We account for item non-response by modeling the probability that a user in the strata who started the survey responds to the relevant survey question (i.e. answered at least one of the best-worst scaling questions, or answered the Facebook incentivized valuation question). For each strata, the target population is the set of users from that cluster who started the survey. To account for the possibility that the response model differs across countries, we model this probability separately by country.

Weight = 1 / Est. Pr(user answers question | user starts survey)

## 1.3 Simulation Procedure to Account for the Statistical Uncertainty Around the Valuation Estimates

In Figure 3b in the main text, we regress Facebook users' median valuation of the 10 digital goods as a percent of 2020 GDP per capita (in the Y axis) on 2020 GDP per capita (on the X axis). We weight country observations according to the number of monthly active users on Facebook. However, our estimates of the users' valuation of digital goods as a percent of GDP per capita are themselves uncertain. To account for this uncertainty, we ran a simulation analysis. The simulation exercise shows that the results of the regression are robust to variations in the country estimates of the value of digital goods as a percent of GDP per capita.

In the simulations, we draw different values of the Y variable (Facebook users' valuation of the 10 digital goods as a percent of GDP per capita) for each country from a Normal distribution with mean and variance matching each country's point estimate and confidence intervals around Y. For each realization, we run a weighted regression that is analogous to the regression in the main text. We then compute the percent of such regressions that yielded a negative and significant $\beta$ coefficient. For the weighted regression, we find that 100 percent of such regressions result in a negative and significant $\beta$. For the unweighted regression, as the number of simulation realizations grows, the percent of significant $\beta$ coefficients converges around 17.1 percent. These two results are not surprising insofar as the p-value associated with the weighted regression in the main text is 0.000, the p-value associated with the unweighted regression in the main text is 0.068, and the confidence intervals around the Y estimates are fairly tight.

## 1.4 Best-Worst Scaling

We used a best-worst scaling methodology to measure the relative willingness to accept for stopping the use of 10 digital goods or not meeting friends in person for one month. Below is an example question:



**Appendix Figure 2:** Example BWS task

To estimate the relative value that respondents place on these digital goods, we fit a conditional logit model on these best-worst scaling responses. The response data is structured such that there is a separate row for each possible response pair (i.e. each possible way in which respondents could have indicated their best and worst options). Since each question includes three choices, there are six possible rows for a single response to a best worst scaling question. Separate variables for each of the 21 items (except for 1 'excluded' category) are included as independent variables in the model. For each row, the best and worst responses for that row are given the values 1 and -1 respectively under the maxdiff model (with the other items being assigned the value 0). The dependent variable in these models is a dichotomous response variable taking on the value 'TRUE' if the row corresponds to the respondent's choice for that question and 'FALSE' otherwise.

We employ an attention check embedded in the research design to exclude respondents who did not rationally evaluate the relative utility of monetary amounts. This attention check appears in questions that have two monetary amounts and one digital good as the two options. Out of 23,752 respondents, 16061 (68%) answered such a question. Out of these, 10,752 (67%) passed the attention check and 5309 (33%) failed. We exclude these 5309 respondents from our analysis, which leaves 18,443 respondents.

23

## 1.5 Incentivized Deactivation Experiment to Calibrate Welfare Gains Using Facebook

In the same survey of Facebook users from 13 countries, we used an incentivized single binary discreet choice method to elicit respondents' willingness to accept to stop using Facebook for 1 month. Respondents were asked: "Would you be willing to stop using Facebook for one month in exchange for X?", where X was chosen randomly from a set of 9 monetary values from $5 to $100. We clarified to the respondents that they could be randomly selected for their choices to be fulfilled, and if so, they would actually be eligible to receive the offer amount if they deactivated their Facebook account for a month.

Respondents were given offers in their own currency. For instance, if a respondent in France was chosen to receive an offer equivalent to $50, they were given an offer of 45 Euros, which was equivalent to US$50 at the time. These offers were incentivized, and participants had to agree to a set of terms and conditions drafted by legal experts to be in compliance with local laws in each country. The amounts paid ranged from US$5 to US$510. A total of approximately US$14,400 were paid out to 113 participants. Each choice made by respondents of whether to accept or reject an offer had a 2% probability of being selected. This probability was not known to respondents.

A total of 379 respondents were selected to deactivate their account. Out of these, 170 (45%) attempted to deactivate, based on log data. 113 (30%) successfully deactivated and were paid. There may be multiple reasons why compliance with deactivation was not higher.  Deactivation was a difficult five-step process, involving at least 8 clicks. Furthermore, we were only able to contact respondents for deactivation via email. Respondents may not have checked their emails in time, they may have missed them, or they may have been filtered as spam.

24

 Facebook Survey

**If you agree to participate, we may offer to pay you to stop using Facebook and to temporarily deactivate this Facebook account for one month.**
**If you temporarily deactivate, you could continue using Messenger, and nothing on your Facebook account would be deleted.\***
**In order to participate, please confirm that you agree to the terms and conditions.**

◯  I agree to the terms and conditions

◯  I do not agree to the terms and conditions

**\*You could reactivate your account at any time, but we would check that your account stays deactivated for the entire month before paying you. View full terms at research.fb.com/dss-epr-survey-terms in a separate browser window.**

Ends 4/7/22 at 11:59:59pm PST. Open to individuals who: (1) are legal residents of US, UK, FR, DE, ES, BE, RO, NO, IE, CA (excl. Quebec), KR, JP, ID, MX, TH; (2) 18+ and age of majority; (3) receive authorized invitation; & (4) are a registered Facebook user with valid email address & Internet access. Subject to full Terms and Conditions. Void where prohibited.

[ Continue ]

**Appendix Figure 3:** Terms and conditions screen

Here is an example of the offer made to respondents after they had agreed to the terms and conditions:

25

 Facebook Survey

**Would you be willing to stop using Facebook for one month in exchange for $40? You may be randomly chosen and offered $40 to stop using Facebook based on your answer to this question.**

○  No, I am not willing to stop using Facebook for one month in exchange for $40

○  Yes, I am willing to stop using Facebook for one month in exchange for $40

Continue

**Appendix Figure 4:** Example Facebook offer screen

To arrive at the median willingness-to-accept value of Facebook, we first estimate a weighted logit model to ascertain how the probability of rejecting the offer depends on the amount of the offer:

$$P(Reject\ Offer) = \Lambda(\beta_0 + \beta_1\ Offer)$$

where Offer is equal to the randomly assigned offer amount from $5 to $100, and RejectOffer is an indicator equal to 1 when a respondent answers that they are not willing to stop using Facebook in exchange for that offer amount.

To find the median, we solve for the offer amount that sets this probability equal to 0.5, which yields:

$$Offer* = -\beta_0/\beta_1$$

We use bootstrapped standard errors for the confidence interval estimation.

# 2 Additional Results and Robustness Checks



**Appendix Figure 5: Relative disutility from stopping use, estimated using a conditional logit model. Snapchat is the omitted category.**

**Figure Notes**: The figure compares BWS estimates under (i) the full sample and (ii) an alternate model including only the observations containing comparisons of non-monetary items. The full sample excludes respondents who failed attention checks. Please see Appendix Section 1.4 (Measuring Relative Welfare from Digital Goods) for a description of the attention checks. This figure shows that the results are robust to the exclusion of non-monetary values.







**Appendix Figure 6:** Median Value of Facebook by Education, Home Ownership & Gender

PX0499-029

28



**Appendix Figure 7:** Facebook aggregate annual value by country from incentivized single binary discrete choice experiments



**Appendix Figure 8:** Valuation of Facebook as a share of GDP per capita

PX0499-030



**Appendix Figure 9:** Association between GDP per capita and valuation of Facebook as a share of GDP per capita

**Appendix Figure 9 Notes**: The figure depicts 2020 GDP per capita (in US dollars) in the X axis and user valuation of Facebook as a percent of 2020 GDP per capita in the Y axis. A weighted regression of Y on X (in $10,000s) with weights given by Facebook monthly active users (MAU) in each country yields a point estimate of -.19 with a p-value equal to 0.001. The unweighted regression yields a point estimate of -.12 with a p-value equal to 0.028. The fitted lines in the plot correspond to the weighted regression.

30



**Appendix Figure 10:** Aggregate annual value of 10 digital goods as share of GDP per capita



**Appendix Figure 11:** Relative utility by relative wealth index, with Facebook as the omitted category (US Only)



PX0499-034

33







PX0499-035







PX0499-036







PX0499-037

36



**Appendix Figure 12:** Implied Median WTA Value of Each Digital Good by Country

37



**Appendix Figure 13:** Relative utility of digital goods by gender. Facebook is the omitted category. This figure should be interpreted in conjunction with Appendix Figure 6 which shows SBDC valuations of Facebook by gender

PX0499-039

# PX0501



Learn more about **LSEG**

 **REUTERS®**                                                    🔍  ☰

⊞ My View        👤 Following        🔖 Saved

Business

## Facebook's Instagram adds new photo sizes to keep users, attract ads

By *Reuters*

August 27, 2015 5:46 PM EDT · Updated 9 years ago

[ Aa ]  [ ⌇ ]

By Yasmeen Abutaleb

SAN FRANCISCO, Aug 27 (Reuters) - Instagram has added new layout options in addition to its signature square for pictures and videos in a bid to attract more advertisers and to stop users defecting to more flexible services such as Snapchat.

The move is the first major alteration to the photo-sharing, social media service since Facebook Inc bought it for $1 billion in 2012, and addresses the wishes of many of its 300 million users, who have been constrained by the square format.



"It boils down to giving advertisers and users more options," said Debra Aho Williamson, a social media marketing and advertising analyst. "You want people to be able to see more of your ad. It's something advertisers are definitely going to be interested in."

One in five photos and videos posted on the service do not fit the square format, Instagram said in a blog post.

"Friends get cut out of group shots, the subject of your video feels cramped and you can't capture the Golden Gate Bridge from end to end," it said.

PX0501-001

4/30/24, 9:07 PM                    Facebook's Instagram adds new photo sizes to keep users, attract ads | Reuters

Advertisement · Scroll to continue

From Thursday, Instagram's web-based service and its mobile apps running on Google Inc's Android system and Apple Inc's iOS will allow portrait and landscape formats, giving both users and paying advertisers more options.

The move should help Instagram in its battle with newer rivals such as Snapchat for users in the fast-moving messaging and media-sharing market.

At the same time, it should attract more advertising revenue for Instagram, which said in June it would open its platform to all advertisers by the end of the year, rather than just to select brands.

Advertisement · Scroll to continue

Instagram is expected to generate nearly $600 million in advertising revenue by the end of this year and $2.8 billion in 2017, according to projections from research firm eMarketer.

By comparison Facebook, the world's most popular online social network, generated more than $12 billion in revenue in 2014. The growing service hit one billion users in a single day for the first time on Monday.

To promote the new formats on Thursday, Walt Disney Co released exclusive footage of its upcoming film, "Star Wars, The Force Awakens," using the new landscape option.

Get a daily digest of breaking business news straight to your inbox with the Reuters Business newsletter.
Sign up here.

Reporting By Yasmeen Abutaleb; Editing by Bill Rigby

Our Standards: **The Thomson Reuters Trust Principles.** ⧉

Purchase Licensing Rights

## Read Next

Technology
**Amazon results beat estimates, revenue forecast misses**
2:39 AM UTC

PX0501-002

4/30/24, 9:07 PM                    Facebook's Instagram adds new photo sizes to keep users, attract ads | Reuters



Markets
**Wall Street stocks fall as markets weigh strong wage data, Fed meeting**
2:54 AM UTC

Technology
**AI fuels cloud computing boom for tech giants**
4:04 AM UTC

Markets
**Pot stocks jump as U.S. DOJ moves to reclassify cannabis as a less dangerous drug**
1:52 AM UTC



Sponsored Content                                                              Dianomi





Capital Ideas: An investing podcast from Capital Group
Capital Group



Quarterly Market Outlook: Our views
on the Market & the Economy

Sponsored by
Nomura Capital Management



Advance Your Career at Johns
Hopkins Carey Business School

Sponsored by
Carey Business School

PX0501-003

## Sponsored Content                                                      Dianomi ▷

A Flexible MBA
Program That Fits Your
Schedule and Lifestyle
Sponsored by JHU Carey
Business School



Protect your wealth –
learn how to minimize
risk in your portfolio
Sponsored by U.S. Bank



Earn up to 175k Bonus
Points with this limited-
time offer ending 5/15.
Sponsored by Chase IHG®
Business Card



Maximize Your Returns
With a 10% Dividend
Yield & 19.4% Sector
Growth
Sponsored by CRE Income
Fund



49% Find Job
Applications Complex—
How To Simplify With
Generative AI
Sponsored by Indeed



Research redefined:
Aramco's centers at
tomorrow's forefront.
Sponsored by Aramco



Business >

Feedback

## Brazil posts strong job figures, signals stronger activity; inflation a concern

Macro Matters · April 30, 2024 · 8:50 PM EDT · 14 min ago

PX0501-004

Brazil released vigorous job market figures on Tuesday, reinforcing views of stronger economic

---

Storage

**Oil falls for a third day as U.S. crude inventories swell**

15 min ago



---

Cybersecurity

**Australia's Qantas probing reports of data breach at frequent flyers app**

17 min ago

---

Finance

**Australia banks face profit squeeze on rising costs, mortgage competition**

18 min ago

---

Markets

**Stocks notch monthly drop, dollar rebounds as data, Fed loom large**

23 min ago

---

## Sponsored Content                                                          Dianomi ▷

A Flexible MBA Program That Fits Your Schedule and Lifestyle
Sponsored by JHU Carey Business School



How we are transforming digitally through our innovation centers
Sponsored by Aramco



Attention Income Investors - Generate a 10% Dividend Yield
Sponsored by CRE Income Fund



Unlocking Alts in a New Era
Sponsored by PGIM



Consider these tactical adjustments to portfolios today.
Sponsored by U.S. Bank



International Stocks—A Bright Spot on the Horizon?
Sponsored by MFS Investment Management®



## Sponsored Content                                                          Dianomi ▷

Schwab Investing Themes™. A new way to invest in ideas you believe in.
Sponsored by Charles Schwab

From TINA to TARA: Investing in the Next Cycle
Sponsored by Goldman Sachs Asset Management

Earn up to 175k Bonus Points with this limited-time offer ending 5/15.
Sponsored by Chase IHG® Business Card



Feedback

7 Retirement Income Strategies Once Your Portfolio Reaches $500k
Sponsored by Fisher Investments

What Are the Top 3 Internet Providers Near You? Check Your ZIP Now.
Sponsored by HighSpeedInternet.com

How the AI-Driven Job Market is Affecting New Grads
Sponsored by Indeed

PX0501-005

4/30/24, 9:07 PM                    Facebook's Instagram adds new photo sizes to keep users, attract ads | Reuters

Latest                                          Browse

Home                                            World
Authors                                         Business
Topic sitemap                                   Markets
                                                Sustainability
Media                                           Legal
                                                Breakingviews
📹 Videos ⬀                                     Technology
📷 Pictures                                     Investigations ⬀
🖼 Graphics ⬀                                   Sports
                                                Science
                                                Lifestyle

About Reuters

About Reuters ⬀
Careers ⬀
Reuters News Agency ⬀
Brand Attribution Guidelines ⬀
Reuters Leadership ⬀
Reuters Fact Check ⬀
Reuters Diversity Report ⬀

Stay Informed

Download the App (iOS) ⬀
Download the App (Android) ⬀
Newsletters ⬀

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching
billions of people worldwide every day. Reuters provides business, financial, national and international news to
professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

Thomson Reuters Products                                                                              Feedback

Westlaw ⬀
Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

Onesource ⬀
The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

Checkpoint ⬀
The industry leader for online information for tax, accounting and finance professionals.

LSEG Products

Workspace ⬀

PX0501-006

4/30/24, 9:07 PM                    Facebook's Instagram adds new photo sizes to keep users, attract ads | Reuters

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**DataCatalogue** ⬈

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**World-Check** ⬈

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

---

**Advertise With Us** ⬈    **Advertising Guidelines** ⬈    **Coupons** ⬈    **Purchase Licensing Rights** ⬈

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ⬈    **Terms of Use** ⬈    **Privacy** ⬈    **Digital Accessibility** ⬈    **Corrections** ⬈    **Site Feedback** ⬈

© 2024 Reuters. All rights reserved

Feedback

PX0501-007

# PX0503

5/1/24, 8:57 AM                Signal >> Blog >> Open Whisper Systems partners with WhatsApp to provide end-to-end encryption



# Open Whisper Systems partners with WhatsApp to provide end-to-end encryption

moxie0 on 18 Nov 2014

At Open Whisper Systems, our goal is to make private communication simple. For the past three years, we've been developing a modern, open source, strong encryption protocol for asynchronous messaging systems, designed to make seamless end-to-end encrypted messaging possible.

Today we're excited to publicly announce a partnership with WhatsApp, the most popular messaging app in the world, to incorporate the TextSecure protocol into their clients and provide end-to-end encryption for their users by default.

## Your messages may already be encrypted

The most recent WhatsApp Android client release includes support for the TextSecure encryption protocol, and billions of encrypted messages are being exchanged daily. The WhatsApp Android client does not yet support encrypted messaging for group chat or media messages, but we'll be rolling out support for those next, in addition to support for more client platforms. We'll also be surfacing options for key verification in clients as the protocol integrations are completed.

WhatsApp runs on an incredible number of mobile platforms, so full deployment will be an incremental process as we add TextSecure protocol support into each WhatsApp client platform. We have a ways to go until all mobile platforms are fully supported, but we are moving quickly towards a world where all WhatsApp users will get end-to-end encryption by default.

PX0503-001

Signal >> Blog >> Open Whisper Systems partners with WhatsApp to provide end-to-end encryption

## This is still the beginning

We're continuing to develop the TextSecure app, and our roadmap for our own products remains unchanged. We've been working with WhatsApp for the past half year, and have learned a lot through the process of deploying the TextSecure protocol at the scale of hundreds of millions of users. We're excited to incorporate what we've learned from this integration into our future design decisions, and to bring this experience to bear on integrations that we do with other companies and products in the future.

We believe that by continuing to advance the state of the art for frictionless private communication with open source software, open protocols, and simple libraries, we'll have additional opportunities to support mass adoption of end-to-end encryption.

WhatsApp deserves enormous praise for devoting considerable time and effort to this project. Even though we're still at the beginning of the roll-out, we believe this already represents the largest deployment of end-to-end encrypted communication in history. Brian Acton and the WhatsApp engineering team have been amazing to work with. Their devotion to the project as well as their thoroughness in getting this done are inspiring in a world where so many other companies are focused on surveillance instead of privacy.

PX0503-002

# PX0505

Growing our Tools for Business - WhatsApp Blog

Search blog...

‹ Back to Blog

## Growing our Tools for Business

As we announced last year, WhatsApp is building new tools to help people and businesses communicate with each other. Since we launched the WhatsApp Business app people have told us that it's quicker and easier to chat with a business than making a call or sending an e-mail. Today we are expanding our support for businesses that need more powerful tools to communicate with their customers.

Here's how people can connect with a business:

- **Request helpful information**: When you need a shipping confirmation or boarding pass, you can give your mobile number to a business on their website, on their app, or in their store to send you information on WhatsApp.

- **Start a conversation**: You may see a click-to-chat button on a website or Facebook ad to quickly message a business.

- **Get support**: Some businesses may provide real-time support on WhatsApp to answer questions about their products or help you resolve an issue.

With this approach, you will continue to have full control over the messages you receive. Businesses will pay to send certain messages so they are selective and your chats don't get cluttered. In addition, messages will remain end-to-end encrypted and you can block any business with the tap of a button.

We will bring more businesses onto WhatsApp over a period of time. To do so, we will work directly with a few hundred businesses and a select number of companies that specialize in managing customer communications.

If you are interested in how a business can start using these new tools, you can learn more here. As always, we will be listening carefully to feedback as we go forward.

August 1, 2018



PX0505-001

# PX0509



Q

Back to Newsroom

Meta

# Open-Sourcing Photo- and Video-Matching Technology to Make the Internet Safer

August 1, 2019



2018 Child Safety Hackathon at Facebook headquarters in Menlo Park, California

PX0509-001

*By <u>Antigone Davis</u>, Global Head of Safety, and <u>Guy Rosen</u>, VP of Integrity*

At Facebook, we rely on a combination of technology and people to help keep our platforms safe. When we identify a harmful piece of content, such as child exploitation, terrorist propaganda, or graphic violence, technology can help us find duplicates and prevent them from being shared.

Today, we are open-sourcing two technologies that detect identical and nearly identical photos and videos — sharing some of the tech we use to fight abuse on our platform with others who are working to keep the internet safe. These algorithms will be open-sourced on <u>GitHub</u> so our industry partners, smaller developers and non-profits can use them to more easily identify abusive content and share hashes — or digital fingerprints — of different types of harmful content. For those who already use their own or other content matching technology, these technologies are another layer of defense and allow hash-sharing systems to talk to each other, making the systems that much more powerful.

"In just one year, we witnessed a 541% increase in the number of child sexual abuse videos reported by the tech industry to the CyberTipline. We're confident that Facebook's generous contribution of this open-source technology will ultimately lead to the identification and rescue of more child sexual abuse victims," said John Clark, President and CEO of the <u>National Center for Missing and Exploited Children (NCMEC)</u>.

Over the years, Facebook has contributed hundreds of open-source projects to share our technology with the wider community, but this is the first time we've shared any photo- or video-matching technology. Building on Microsoft's generous contribution of PhotoDNA to fight child exploitation 10 years years ago and the more recent launch of Google Content Safety API, today's announcement also is part of an industry-wide commitment to building a safer internet.

Known as PDQ and TMK+PDQF, these technologies are part of a suite of tools we use at Facebook to detect harmful content, and there are other algorithms and implementations available to industry such as pHash, Microsoft's PhotoDNA, aHash, and dHash. Our photo-matching algorithm, PDQ, owes much inspiration to pHash although was built from the ground up as a distinct algorithm with

PX0509-002

independent software implementation. The video-matching technology, TMK+PDQF, was developed together by <u>Facebook's Artificial Intelligence Research team</u> and academics from the University of Modena and Reggio Emilia in Italy.

These technologies create an efficient way to store files as short digital hashes that can determine whether two files are the same or similar, even without the original image or video. Hashes can also be more easily shared with other companies and non-profits. For example, when we identify terrorist propaganda on our platforms, we remove it and hash it using a variety of techniques, including the algorithms we're sharing today. Then we share the hashes with industry partners, including smaller companies, through <u>GIFCT</u> so they can also take down the same content if it appears on their services.

PDQ and TMK+PDQF were designed to operate at high scale, supporting video-frame-hashing and real-time applications. We designed these technologies based on our experience detecting abuse across billions of posts on Facebook. We hope that by contributing back to the community we'll enable more companies to keep their services safe and empower non-profits that work in the space. This work is in addition to our ongoing research in these areas, including our <u>partnership</u> with The University of Maryland, Cornell University, Massachusetts Institute of Technology, and The University of California, Berkeley to research new techniques to detect intentional adversarial manipulations of videos and photos to circumvent our systems

We're announcing these technologies today to support our fourth annual cross-industry Child Safety Hackathon at Facebook's headquarters in Menlo Park, California. The two-day event brings together nearly 80 engineers and data scientists from <u>Technology Coalition</u> partner companies and others to develop new technologies that help safeguard children.

This year's event is focused on developing new tools to help our partners, NCMEC and <u>Thorn</u>. For example, some teams will develop a prototype feature that will allow NCMEC's CyberTipline case management tool to query and compare data points within other nonprofit organizations' databases for known hashes and other key information. This will help identify children at risk and highlight high value reports. The open source code released today also will be made available to teams at the hackathon.

Hackathons are an exciting way to bring people together from different organizations with a wide range of expertise to build tools that tackle problems such as the online sexual exploitation of children. All non-open-source code and prototypes developed at the event will be donated back to the Technology Coalition and our partners to be used in their child-safety efforts.

We will continue to expand and improve our own products and features to find harmful content. Read more about how Facebook is using technology to combat child exploitation here.

***Update on August 9, 2019 at 10:45AM PT:*** Here is a video from this year's Child Safety Hackathon.



Child Safety Hackathon 2019
Facebook   · Follow

Share

Facebook Watch

Categories:
Meta, Safety and Expression, Technology and Innovation

Tags:
Artificial Intelligence and Machine Learning, Community Standards and Enforcement, Open Source, Resources, Safety

   

# RELATED NEWS

Meta

# Preserving the World's Language Diversity Through AI

We're open-sourcing AI models that will make it easier for people to use devices in their preferred language.

May 22, 2023

## Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

PX0509-005

Featured News

WhatsApp

New Ways to Organize Events in WhatsApp Communities

May 1, 2024

PX0509-006

Meta

**New Ray-Ban | Meta Smart Glasses Styles and Meta AI Updates**
April 23, 2024



Follow Us



## Virtual reality

## Smart glasses

## About us    ⌄

## Our community    ⌄

## Our actions    ⌄

## Support    ⌄

© 2024 Meta    Community Standards    Data Policy    Terms    Cookie policy

United States

(English)  ▼

PX0509-008