# PX0510

5/2/24, 2:07 PM                    TikTok expands max video length to 10 minutes, up from 3 minutes | TechCrunch

Media & Entertainment

# TikTok expands max video length to 10 minutes, up from 3 minutes

**Aisha Malik** @alishamalik1 / 10:26 AM EST • February 28, 2022                    ☐ Comment





◎ **Image Credits:** Nur Photo / Getty Images

TikTok is starting to roll out the ability for users to upload videos up to 10 minutes in length, the company confirmed to TechCrunch. The official launch comes as Tiktok has been testing the change over the past several months. Previously, TikTok videos could be up to 3 minutes in length following a change in July 2021. Before that, the limit was 60 seconds after initially expanding from 15 seconds.

"We're always thinking about new ways to bring value to our community and enrich the TikTok experience. Last year, we introduced longer videos, giving our community more time to create and be entertained on TikTok," a spokesperson from TikTok said in a statement. "Today, we're excited to start rolling out the ability to upload videos that are up to 10 minutes, which we hope would unleash even more creative possibilities for our creators around the world."

The expanded video length will give creators more time and flexibility when filming things like cooking demos, beauty tutorials, educational content, comedic sketches and more. Prior to the new video length, creators had worked around TikTok limitations by encouraging viewers to follow them for part 2 or more of their video series. Although this works sometimes, it can be frustrating for users to have to scroll through a creator's feed to find the right video in a series.

PX0510-001

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

Today's announcement makes TikTok even more of a competitor to YouTube, which pulled in $28.8 billion in ad revenue in 2021. YouTube, however, has been threatened enough about TikTok's growth to launch its own short-form video rival directly in its own app, YouTube Shorts. However, hosting short videos isn't TikTok's only advantage, as it's known for its combination of features, including its library of special effects, AR tools and music catalog. Other popular features include stitches and duets, which allow creators to collaborate with other users' content.

YouTube wasn't the only social app that's taken notice of the TikTok threat, as Instagram launched its TikTok clone, Instagram Reels, in 2020. Since then, Instagram has rolled out several Reels features that are similar to those on TikTok, such as its duet-like Remix feature. It also expanded Reels to Facebook. Snapchat, too, launched a TikTok-like video feature, as has Pinterest.

But as TikTok chases YouTube's ad dollars, YouTube is focusing on TV ad dollars. The Google-owned video platform recently announced it will host its annual Brandcast advertiser show during the week of the TV Upfronts in May, instead of the digital NewFronts. (Though it will remain a sponsor for the latter.)

TikTok says the option to film longer videos on the app will roll out to global users over the weeks ahead. Users will be notified when they receive the update. They'll also need to ensure that they're using the latest version of TikTok before trying out the feature.

**TechCrunch Disrupt 2024**
**Join 10,000 Startup Leaders**

*Innovation For Every Stage* San Francisco, October 28-30

Register Now

**More TechCrunch**



Rooms, a 3D design app and 'cozy game,' gets a major update as users jump to 250K

Login

Search 🔍

Startups
Venture
Security
AI
Crypto
Apps
Events
Startup Battlefield
More

PX0510-002



**TikTok gets Tay and Billie back with new UMG content licensing deal**



**Marissa Mayer's startup just rolled out photo sharing and event planning apps, and the internet isn't sure what to think**



**Devastated by his videos being posted to a porn site, this founder hit on an AI startup idea**

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

## Sign up for Newsletters

See all newsletters

☐ Daily News

PX0510-003

5/2/24, 2:07 PM                    TikTok expands max video length to 10 minutes, up from 3 minutes | TechCrunch

☐ Week in Review
☐ Startups Weekly
☐ Event Updates
☐ Advertising Updates

By subscribing, you are agreeing to Yahoo's Terms and Privacy Policy.

Email *

[Subscribe]

[X] [f] [in] [reddit] [✉] [🔗]        https://tcrn.ch/3vqPat5        [Copy]

**Tags**

Apps     Instagram     social media     social media apps     TikTok     YouTube

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

Government & Policy
## EU plan to force messaging apps to scan for CSAM risks millions of false positives, experts warn

Natasha Lomas
1:46 PM EDT • May 2, 2024





Featured Article
## They thought they were joining an accelerator — instead they lost their startups

Mary Ann Azevedo, Christine Hall
1:38 PM EDT • May 2, 2024

Startups
## Your AI-native startup ain't the same as a typical SaaS company

Ron Miller
1:38 PM EDT • May 2, 2024



PX0510-004

5/2/24, 2:07 PM                    TikTok expands max video length to 10 minutes, up from 3 minutes | TechCrunch

**Transportation**

### Hyundai is spending close to $1 billion to keep self-driving startup Motional alive

Rebecca Bellan

12:48 PM EDT • May 2, 2024



**Crypto**

### TechCrunch Minute: Where CZ's sentencing leaves the state of crypto

Alex Wilhelm

12:05 PM EDT • May 2, 2024



**Apps**

### Google will now show labels in Play Store to denote official government apps

Ivan Mehta

12:00 PM EDT • May 2, 2024



**TechCrunch Disrupt 2024**

### 1 month left to submit nominations for Startup Battlefield 200

TechCrunch Events

12:00 PM EDT • May 2, 2024



**Apps**

### Spotify quietly moves lyrics behind a paywall

Sarah Perez

11:49 AM EDT • May 2, 2024



**Apps**

### Google expands passkey support to its Advanced Protection Program ahead of the US presidential election

Aisha Malik

11:10 AM EDT • May 2, 2024



**Apps**

### TikTok expands its premium ad slots despite potential US ban

Sarah Perez

11:06 AM EDT • May 2, 2024



**Apps**

### Apple adds more carve-outs to its EU core tech fee after criticism from devs

Natasha Lomas

11:00 AM EDT • May 2, 2024

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

PX0510-005

5/2/24, 2:07 PM                    TikTok expands max video length to 10 minutes, up from 3 minutes | TechCrunch

Media & Entertainment
## Online course platform Kajabi allows creators to build their own branded apps
Lauren Forristal
11:00 AM EDT • May 2, 2024



AI
## Dropbox, Figma CEOs back Lamini, a startup building a generative AI platform for enterprises
Kyle Wiggers
10:00 AM EDT • May 2, 2024



Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

Climate
## Walmart heir Lukas Walton's Builders Vision puts S2G on a path to independence
Tim De Chant
9:30 AM EDT • May 2, 2024



Apps
## SoundCloud takes on Spotify's Discover Weekly feature with new 'Buzzing Playlists'
Ivan Mehta
9:00 AM EDT • May 2, 2024



Space
## Danti's natural language search engine for Earth data soars with $5M in new funding
Aria Alamalhodaei
9:00 AM EDT • May 2, 2024



Transportation
## Acura's new all-electric SUV proves the most expensive model isn't always the best
Emme Hall
9:00 AM EDT • May 2, 2024



Biotech & Health
## Peloton to lay off 400 employees as CEO Barry McCarthy departs
Paul Sawers
7:27 AM EDT • May 2, 2024



Startups
## Renda, which provides order fulfillment for businesses in Africa, takes in $1.9M
Tage Kene-Okafor
7:05 AM EDT • May 2, 2024



PX0510-006

5/2/24, 2:07 PM                    TikTok expands max video length to 10 minutes, up from 3 minutes | TechCrunch

Security

## Digital fraud detection startup BioCatch hits $1.3B valuation as Permira buys majority stake

**Paul Sawers**

6:55 AM EDT • May 2, 2024



Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

**Legal**

Terms of Service

Privacy Policy

RSS

Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

Google Cloud

Kaiser Hack

Noncompete Ban

TikTok Ban

Augment Startup

Tech Layoffs

ChatGPT

 **f** Facebook           **𝕏** X

▶️ YouTube           Instagram

**in** LinkedIn           Mastodon

© 2024 Yahoo.

All rights reserved.

Powered by WordPress VIP.

PX0510-007

# PX0511

 **Menu** +

**CREATORS / TECH / TIKTOK**

## TikTok introduces paywalled content, with videos up to 20 minutes long / Creators will be able to put premium content behind paywalls for fans to purchase.

By **Mia Sato**, platforms and communities reporter with five years of experience covering the companies that shape technology and the people who use their tools.

Mar 7, 2023, 9:00 AM EST

   | 0 **Comments (0 New)**



Illustration by Nick Barclay / The Verge

TikTok is adding another way for creators to make money on the platform: by putting exclusive content behind a paywall. And those videos can be much longer than the typical TikTok, too.

PX0511-001

The company today announced a new program, Series, that allows content creators to make collections of videos that are available for purchase. Each collection can have up to 80 videos in it, and clips can be up to 20 minutes long — a length that feels closer to a YouTube vlog than a bite-size TikTok. Creators will be able to set their rates from $1 to $190, and fans can buy access using direct in-video links or from the creator's profile page.

The paywall monetization model is akin to other creator platforms like Patreon or OnlyFans, but content guidelines on TikTok will remain the same. Paywalls are available to select creators for now, with applications opening up in the coming months.

## Creators haven't been entirely happy with how much they earn on TikTok

At launch, TikTok will let creators keep all of their revenue, minus processing and app store fees, which likely means losing more than a 30 percent cut. TikTok didn't share what the revenue split would look like when it starts taking a cut, too. Purchases have to be made through the TikTok app, but creators will be able to use a new Series website to publish videos and track performance.

TikTok has rolled out a handful of creator tools and monetization options over the past few months, hoping to boost growth in the US and compete with other platforms like YouTube. Helping content creators make money — and thus keep them on TikTok — is a priority, especially as companies like YouTube open up ad revenue sharing options for Shorts, its TikTok competitor.

Historically, creators haven't been entirely happy with how much they earn on TikTok. The original $1 billion creator fund, introduced in 2020, allocated money for three years — and some participants have said they earn just pennies when their content isn't going viral.

The 20-minute video feature is notable, and it's not just your imagination — TikToks are getting longer. The company has gradually upped the maximum video

length to 10 minutes, and now that will double for premium content. The company is incentivizing creators to make longer content, too: last month, TikTok announced a revamped creator fund called the Creativity Program that only rewards videos longer than a minute.

---

💬 0 COMMENTS ( **0 NEW** )

---

**FEATURED VIDEOS FROM THE VERGE**

## Tesla Master Plan 3 in 4 minutes



---

PX0511-003

More from **Creators**

## Interview: Figma's CEO on life after the company's failed sale to Adobe

---

## Here's how dominant YouTube really is in podcasting

---

## YouTube Shorts adds music video remixing as UMG goes silent on TikTok

---

## Meta is passing on the Apple tax for boosted posts to advertisers

## SPONSORED CONTENT                                                                                    Outbrain ▷



| Forget Gabapentin, Use This New... | This Game is So Beautiful, It's Worth... | New Edema Device Leaves Experts... | US Legalizes Potent Pain Reliever After... | Locate Almost Anyone By Entering Their... | 6 Things Not to Do When Selecting a... |
|---|---|---|---|---|---|
| Health Insight Journal | Raid Shadow Legen... | Health Inside Journal | Natures Healing Relief | BeenVerified | SmartAsset |
| Learn More | Play Game | Learn More | Learn More |  | Learn More |

5/2/24, 2:07 PM                                    TikTok introduces paywalled content, with videos up to 20 minutes long - The Verge



TERMS OF USE  /  PRIVACY NOTICE  /  COOKIE POLICY  /  DO NOT SELL OR SHARE MY PERSONAL INFO  /  LICENSING FAQ

/  ACCESSIBILITY  /  PLATFORM STATUS  /  HOW WE RATE AND REVIEW PRODUCTS

CONTACT  /  TIP US  /  COMMUNITY GUIDELINES  /  ABOUT  /  ETHICS STATEMENT

**THE VERGE IS A VOX MEDIA NETWORK**

ADVERTISE WITH US  /  JOBS @ VOX MEDIA

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

PX0511-005

# PX0512

5/2/24, 4:58 PM                              Pinterest CEO Ben Silbermann is stepping down and the stock is up

TECH

# Pinterest CEO Ben Silbermann is stepping down and the stock is up

PUBLISHED TUE, JUN 28 2022·4:10 PM EDT·UPDATED TUE, JUN 28 2022·5:18 PM EDT

 **Jessica Bursztynsky**
@JBURSZ

 **Jennifer Elias**
@JENN_ELIAS



**KEY POINTS**

Longtime Pinterest CEO Ben Silbermann is stepping down, the company announced Tuesday.

Shares jumped in after-hours trading.

Bill Ready, who was previously in charge of Google's commerce business, is taking over the helm, effective Wednesday.

---

**In this article**

PINS  -0.02 (-0.05%) 🌙  ⊞

Follow your favorite stocks
**CREATE FREE ACCOUNT**



PX0512-001

Longtime Pinterest ⊞ CEO Ben Silbermann is stepping down, the company announced Tuesday.

Shares jumped more than 5% in after-hours trading.

Bill Ready, who was previously in charge of Google's commerce business, is taking over the helm, effective Wednesday. Prior to joining Google ⊞, Ready was executive vice president and chief operating officer of PayPal ⊞. He'd been at Google fewer than three years.

Pinterest has more than 400 million monthly active users and has long placed its focus on its advertising business. But in recent years, it has shifted to make e-commerce more of a priority.

Earlier this month, for example, the company announced it was acquiring The Yes, an A.I.-powered shopping platform for fashion brands.

"In our next chapter, we are focused on helping Pinners buy, try and act on all the great ideas they see. Bill is a great leader for this transition. He is a builder who deeply understands commerce and payments," Silbermann said in a statement.

Silbermann, who co-founded the company in 2010 and took it public in April 2019, will serve as the company's first Executive Chairman. Silbermann faced challenges ranging from missed quarterly user expectations to a series of workforce complaints, including two Black former Pinterest employees whose public claims of discrimination and retaliation became the basis of a California workforce non-disclosure law.

"As someone who has spent most of my career in commerce and payments, it's so clear to me that Pinterest has the opportunity to build something unique—something special," Ready said in a LinkedIn post.

Shares of Pinterest are down 45.8% year to date and are nearly 76% off of 52-week highs.

Ready had been tasked with leading Google's most recent efforts to compete in e-commerce against the likes of Amazon ⊞, after prior failed attempts. Earlier this year, for

PX0512-002

example, Ready and his team launched a feature that lets people move from store listings on a Google search page to a merchant's checkout site in a single click.

Google has increasingly tried to incorporate buying opportunities across its verticals over the lasts few years — from testing click-to-buy options on YouTube videos to showing more detailed shopping results on its search results page.

Ready faced an early challenge when he joined, trying to steer the ship toward e-commerce early on in the pandemic while Amazon, Facebook and other rivals reeled in record sales from buyers stuck at home. In October, Google scrapped plans to offer bank accounts with financial partners such as Citigroup after nearly two years.

A Google spokesperson was not immediately available to comment on who will replace Ready.

## TRENDING NOW

 **Apple announces largest-ever $110 billion share buyback as iPhone sales drop 10%**

 **World's largest olive oil producer says the industry faces one of its toughest moments ever**

 **Trump's potential VP picks and major Republican donors are coming to Mar-a-Lago**

 **Long-predicted consumer pullback finally hits restaurants like Starbucks, KFC and McDonald's**

 **McDonald's and other big brands warn that low-income consumers are starting to crack**

PX0512-003



PX0512-004

# PX0513

*Article*

# Millennials' Uses and Gratifications on LinkedIn: Implications for Recruitment and Retention

International Journal of
Business Communication
2023, Vol. 60(2) 560–586
© The Author(s) 2020
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/2329488420973714
journals.sagepub.com/home/job
SAGE

## Stephanie A. Smith[1] and Brandi Watkins[1]

## Abstract

While popular press has examined Millennial's in the workforce, there is limited academic research about Millennials' job searching strategies. This study draws on uses and gratifications theory to examine the motives, uses, and gratifications of U.S. Millennial job seekers for using LinkedIn. Consistent with previous uses and gratifications research, an online survey found Millennials ($N=216$) use LinkedIn to find information, communicate with others, and for surveillance needs. Millennials use about 42.8% of the features available on LinkedIn for professional development, entertainment, and networking. Finally, this research found that Millennials obtain social/functional and hedonic value from using LinkedIn. Collectively, the results indicate that Millennials are using the site regularly, although at less than half of its capacity, regardless of whether or not they are job searching, but in ways that violate the expectations of potential employers and recruiters. Theoretical contributions and business communication implications are discussed.

## Keywords

LinkedIn, uses and gratifications theory, Millennials, Generation Y, job searching, career development

LinkedIn is the leader among professional social networks (Fernández-Alemán et al., 2017) and is commonly used by recruiters and hiring managers to pursue and evaluate potential employees. Today's workforce, particularly the entry and mid-levels of the U.S. workforce, is composed of Millennials, also known as Generation Y, which are the fastest-growing user demographic on LinkedIn (LinkedIn, 2017). Approximately a

[1]Virginia Tech, Blacksburg, USA

**Corresponding Author:**
Stephanie A. Smith, Virginia Tech, 121 Shanks Hall, Blacksburg, VA 24061, USA.
Email: stephasmith1@gmail.com

quarter of LinkedIn users are Millennials, with over 80 million Millennial profiles on the site (Aslam, 2020). The growth of LinkedIn with younger and more diverse audiences continues to expand which is demonstrated by the fact that almost half of the users log in to the website daily (Chaudhary, 2017).

Millennials are distinct from other generations because of their unique career perceptions. Millennials typically look for three primary criteria when job searching: high pay, sense of achievement, and meaningful work experience (Brack & Kelly, 2012). To avoid the often-coined term, "job hoppers" Millennials find greater job satisfaction when they are working on teams, seeing the results of their efforts, and have flexibility and feedback from their employer (Smith, 2018). Unlike previous generations, Millennials have had LinkedIn available to them for the entirety of their job searching experience, which makes the use of the platform unique for Millennials and generations to follow. While Gen Xer's actively use LinkedIn, the platform was not readily available nor as robust as it is today when they were beginning and growing their careers. Although Millennials are a fruitful cohort to study, little research examines exactly how they use social channels like LinkedIn throughout their job search, but what is known indicates that Millennials are using LinkedIn in distinctive ways (Carmack & Heiss, 2018).

Uses and gratifications theory is a goal-oriented framework that is an ideal fit for better understanding how and why Millennials use LinkedIn as a larger part of their career searching and networking behaviors. To date, there is little to no research examining how and why Millennials use LinkedIn for career development, and limited research applying uses and gratifications theory to career development, job searching, and to LinkedIn. Furthermore, communication research about LinkedIn has been relegated to the importance of teaching LinkedIn skills to help students use the site, but limited research has been done to understand the motives of Millennials for using LinkedIn (Carmack & Heiss, 2018). To begin to remedy this gap in the literature, uses and gratifications theory is applied as a theoretical lens to better understand how Millennials use LinkedIn for their job searching and professional needs to provide recommendations for recruitment and retention of Millennial employees.

The purpose of this study is to examine how Millennial job searchers use LinkedIn for their careers. Following the framework of uses and gratifications theory, this study addresses the primary motives for using LinkedIn, how members of this generation use LinkedIn as part of the job search process, and what value these job seekers derive from using LinkedIn. Understanding the motives helps to determine how Millennials actually use the website, including which features they take advantage of and which they do not use. Finally, the gratifications sought by active and non-active Millennial job seekers are examined and it is hypothesized that active job seekers will use more features on LinkedIn than those who are not actively seeking employment.

## Review of Literature

The job search is an inherently communicative process of looking for new work and is a common activity in today's society (Wanberg et al., 2012). Securing employment is

PX0513-002

directly related to both the job search behaviors that a job seeker performs and the amount of effort a job seeker exerts during their job search (Blau, 1993). In the last several years job searching research has expanded to focus on job search predictors and outcomes, including the effect communication has on job searching activity and the strategies used by Millennials to find employment, making this a rich and timely area of research (Doyle, 2014; Gordon, 2010; Holmstrom et al., 2013, 2014; Smith, 2017; Wanberg et al., 2012).

Job searching is a difficult task that "requires the use of complex strategies, substantial self-control, and self-regulation skill" (Price & Vinokur, 1995, p. 192) and relies on a variety of communication skills and strategies. Job searching behavior refers to the specific activities that an individual engages in to acquire knowledge about employment opportunities (Bretz et al., 1994). Job searching behaviors include preparatory efforts such as gathering information and securing leads, as well as active behaviors like applying to jobs and interviewing (Bretz et al., 1994). The process of job searching requires job seekers to continually manage their impressions through communication tactics and LinkedIn can help job seekers do this, but also provides opportunities for both preparatory and active behaviors online.

Granovetter (1995) outlines three primary techniques used to find and apply for jobs: formal means (i.e., advertisements and employment agencies), personal contacts, and direct application. Job searching through personal contacts relies on the help of an individual who is personally known by the job seeker in a context unrelated to job searching (Granovetter, 1995), this strategy is also considered networking. Job searching through personal contacts is beneficial to job seekers but is typically used in tandem with other job searching strategies like direct application (Mau & Kopischke, 2001). However, Millennials do report networking with personal contacts as a primary job searching strategy used for finding post-graduate employment and cite using LinkedIn as an essential tool for networking while job searching and identifying and applying for relevant opportunities (Carmack & Heiss, 2018; Nikolaou, 2014; Smith, 2017). From previous research, we know that job seekers use social media channels to help them find jobs and engage in both preparatory and active job seeking behaviors using social media (Smith, 2018).

### The Uses and Gratifications of LinkedIn

Uses and gratifications theory is an audience-centered theory used to understand how and why people select and use a variety of mediums, including social media. The central premise of uses and gratifications theory is understanding what people do with media, which rests on the assumption that people are active, rather than passive, consumers of media (Katz et al., 1973). Although the roots of uses and gratifications theory centered on radio use (Papcharissi, 2009; Wimmer & Dominick, 1994), research has expanded to include television (Bogart, 1956; Geiger & Sokol, 1959; Macoby, 1954), magazines (Kim et al., 2015; Payne et al., 1988) cell phones (Leung & Wei, 2000), the internet (Jimenez et al., 2012; Leung, 2001; Ko et al., 2005), social media (Wang et al., 2012) and mobile apps (Gerlich et al., 2015; Schmitz Weiss, 2013). This

PX0513-003

extensive application of the theory demonstrates its utility across mediums to better understand the motives and gratifications of media users.

Uses and gratifications theory asserts that people utilize media to fulfill specific needs (Rubin, 1983). Early uses and gratifications research argued that there were three primary reasons for using mass media for gratifications including surveillance, diversion, and personal identity (Blumler, 1979). Surveillance needs are typically cognitive in nature, whereby the user looks for information about something within the world around them. Diversion has a broader definition, which includes relief from boredom, music, comedy, entertainment and excitement. Lastly, personal identity refers to how people use media materials to emphasize something important in their own life or situation (Blumler, 1979).

The internet has particularly rejuvenated the utility of uses and gratifications theory because of its interactive nature and asynchronicity (Ruggiero, 2000). Over the last two decades researchers have studied new media to determine user motivation and gratifications for using new media. For example, Papacharissi and Rubin (2000) demonstrated that entertainment and information seeking were the greatest reported uses of the Internet, followed closely by convenience, passing time, and interpersonal utility. Similarly, Leung (2009) discovered that there were four motives connected to Internet use: recognition needs, social needs, cognitive needs, and entertainment needs. This was further illustrated by Shao's (2009) research which indicated that people participate in online communication by producing their own content as a form of self-expression but also interact with user-generated content for social gratifications. Wang et al.'s (2012) research demonstrated the use of social media among college students for emotional, cognitive, and social reasons, but also added in habitual needs which are defined by Katz et al. (1973) as ritualized needs that help bring structure to one's day. Habitual needs could explain why people check social media websites when they wake up, or respond to emails before going to bed.

Although there are a myriad of social networking websites, LinkedIn reports to be "the world's largest professional network with more than 600 million users in more than 200 countries and territories worldwide" (LinkedIn, 2020). The mission is to connect professionals to enhance their productivity and success (LinkedIn, 2020). In the decade and a half that LinkedIn has been in operation, the site has expanded from a place to park your resume to an interactive social networking site where people can message, share stories, blog, connect, update their credentials, and job search (LinkedIn, 2017). Today, LinkedIn is touted as the primary social media tool used by recruiters, and routinely used by professionals to assist with personnel decisions (Karl & Peluchette, 2013; Kluemper, 2013; Ollington et al., 2013).

Websites like LinkedIn, among other social networking sites, offer opportunities for all three of the theory's foundational gratifications (surveillance, diversion, and personal identity), making it particularly appealing for use. On LinkedIn users can monitor the professional developments of peers and other contacts, read about industry trends, and continue to build and expand their personal identity and network. Similarly, LinkedIn can be used for entertainment and information seeking, as well as for recognition needs, social needs, cognitive and entertainment needs like Leung

PX0513-004

(2009) discovered. Currently, there are approximately two billion Millennials worldwide and roughly 40% of the Millennial population are LinkedIn users (LinkedIn, 2017). Millennials expect to find employment opportunities through networking (Smith, 2017), making the use of LinkedIn ideal for their objectives. Within the context of job searching, Millennial LinkedIn users leverage the site to find employment opportunities (Bradley, 2011; Carmack & Heiss, 2018), establish professional connections (Bradley, 2011; Buck, 2012; Buettner, 2017; Carmack & Heiss, 2018), and advance their careers (Myers et al., 2011). Each of which can be grouped into a larger gratification such as information seeking, social needs, and personal identity.

Using LinkedIn for personal identity and social needs seems to be some of the most significant gratifications among Millennial users. Millennials use LinkedIn to form meaningful connections by keeping their networks fresh and active, strengthening their global connections, and learning more about people they have met or plan to meet (Rynne, 2016), due in large part to the influence of their friends and parents (Carmack & Heiss, 2018). This is consistent with Florenthal's (2015) research indicating that college students see interpersonal communication as a benefit to using LinkedIn. Millennials will continue to use LinkedIn over time when they feel like their parents and friends encourage and approve of their use of the platform (Carmack & Heiss, 2018).

However, LinkedIn also reports that Millennials use the site to self-publish through blog posts and articles about their experiences and in their areas of expertise (Rynne, 2016), demonstrating the uses and gratifications of the site for personal identity. Additionally, Millennials engage with content on LinkedIn related to their interests which broadly include social media and marketing, employee engagement, and recruitment (Rynne, 2016). This information is consistent with the uses and gratifications of college students on LinkedIn set forth by Florenthal (2015) of building an online identity and information seeking, and further demonstrates how LinkedIn can also be used as entertainment and/or diversion, the foundational themes of uses and gratifications theory.

Although LinkedIn is primarily a social networking platform for people to network and make career connections, Millennials stand out in their use when compared with other generations. Research indicates Millennials are using the passive features on LinkedIn to build their personal brands and sell themselves through various strategies on LinkedIn (Carmack & Heiss, 2018; Rynne, 2016). One of the most popular ways to do this is through profile optimization. Profile optimization includes activities such as adding a professional profile picture, creating a distinctive headline, customizing a LinkedIn URL and sharing it, and telling a professional story through a personalized summary and experience (Rynne, 2016). While these recommendations come directly from LinkedIn's Millennial research, they are upheld by empirical studies which indicate that users lacking some of this information could "lose points" compared to job candidates who have optimized their profiles (Roth et al., 2013). Profile optimization is also a primary reason why LinkedIn is taught in the classroom and students are strongly encouraged, often required, to create and optimize a profile (Hutchins, 2016). Furthermore, recruiters report looking for employment history, education, years of

PX0513-005

experience, and self-presentation the most when viewing a profile (Chiang & Suen, 2015; Zide et al., 2014). Recruiters also report wanting to see professional photographs on profiles (Chiang & Suen, 2015; Zide et al., 2014) and LinkedIn data argues that those with professional headshots receive 14 times more views than those without (Chaudhary, 2017). Thus, it is no wonder that Millennials are optimizing their profiles on LinkedIn in greater depth, regularity, and detail than users from other generations.

LinkedIn is commonly used by recruiters and human resources professionals to assist with identifying talent and making hiring decisions. This is due in large part to the variety of features offered on the site. For example, recruiters frequently examine the number of connections that a LinkedIn user has since this type of information cannot be gathered from a traditional resume but can be an indicator of potential success in sales, marketing, public relations and recruiting careers (Gilham, 2011). Research indicates that LinkedIn users with 150–400 contacts have the greatest job searching success (Buettner, 2017). When contacts exceed 400, job seekers are viewed as "collecting contacts" and these connections are viewed as superficial (Buettner, 2017) underscoring the need to strategically use the platform. This is something unique to the Millennial cohort because they are expected to have fewer contacts since their professional experience to date has been shorter than members of Gen X or the Baby Boomers.

Additionally, LinkedIn users can catalog their own skills and have that information verified and "endorsed" by peers and former work colleagues to present a completer and more accurate picture of themselves (Davison et al., 2011). From a recruitment standpoint, LinkedIn is changing the way organizations locate talent and shifting the responsibility onto the job candidate to market themselves. Thus, LinkedIn users who do not take advantage of the various functions on the site (i.e., skills, endorsements, recommendations) are found less often by recruiters which can put them at a disadvantage when job searching (Zide et al., 2014).

Since Millennials are the largest user base of LinkedIn, the largest cohort in the American workforce, and rich with digital wisdom, they are a unique cohort to study. Moreover, knowing that Millennials have distinct career expectations as compared with previous generations, and are in the early stages of their professional careers, make them a robust group to better understand. Additionally, there is little information about why and how Millennials in general (those still attending and graduated from college) use LinkedIn as part of their job searching process. Therefore, to begin to more empirically understand how LinkedIn is used by Millennials, the following research questions are posed:

RQ1a: What are the primary motives of Millennial LinkedIn users?
RQ1b: Do active/non-active Millennial job searchers differ in terms of their motives for using LinkedIn as part of the job/internship search process?
RQ2a: How do Millennial job searchers use LinkedIn as part of their job/internship search process?
RQ2b: Do active/non-active Millennial job searchers differ in terms of how they use LinkedIn as part of the job/internship search process?

PX0513-006

While uses and gratifications theory has been criticized for its inability to produce more than descriptive data and that data cannot discern a difference between gratifications sought versus gratifications obtained, the theory remains important for understanding new media forms that emerge, which can include platforms such as LinkedIn. Now that majority of job searching is done online, including both preparatory and active behaviors, applying uses and gratifications theory is a natural fit. Also, because Millennials use more than one strategy for their job searches (Mau & Kopischke, 2001), uses and gratifications theory can help distinguish their motives and goals for using specific channels like LinkedIn. Drawing on uses and gratifications theory, this study fills that gap in the literature by providing insights into motivations, uses, and gratifications for using LinkedIn among Millennial job seekers. Thus, the following research questions and hypothesis are proposed:

> RQ3a: What gratifications do Millennial job searchers obtain from using LinkedIn as part of the job/internship search process?
> RQ3b Do active/non-active Millennial job searchers differ in terms of the gratifications obtained by using LinkedIn as part of the job/internship search process?
> RQ4a: What features available on LinkedIn do Millennial job seekers use?
> RQ4b: Do active/non-active Millennial job seekers differ in how they use the features available on LinkedIn?
> H1: Millennials actively searching for a job or internship will use more features on LinkedIn than those who are not currently job searching.

## Methods

To answer the research questions and test the hypothesis proposed, survey results of Millennial job seekers are reported. Participants are considered a Millennial if they are born between 1982 and 2004 (PEW, 2014).

### Data Collection

Study participants were recruited using two methods following institutional review board approval. First, the survey was distributed to members of a research participation database at a public research university in the Mid-Atlantic United States. Next in order to get a broader range of Millennial job seekers, respondents were recruited using Amazon Mechanical Turk (MTurk) and compensated ($0.25) for their participation (for reviews regarding M-Turk see Buhrmester et al., 2011; Paolacci et al., 2010). These datasets were combined to look at the broad range of ages represented by the Millennial generation. After removing incomplete questionnaires and those who did not meet the age requirements, the combined datasets yielded a total of $N=216$ responses (80% from research database, 20% from MTurk).

The mean age of respondents was 21.73 years ($SD=3.231$), ranging from 18 to 33 years. The data skewed female with 87% of respondents identifying as female ($n=188$), and 13% identifying as male ($n=28$). The racial demographic of respondents

PX0513-007



**Figure 1.** Industry represented by respondents.

are as follows: Asian ($n=16$, 7.4%), African American ($n=11$, 5.1%), American Indian ($n=3$, 1.4%), Hispanic ($n=11$, 5.1%), Native Hawaiian or Pacific Islander ($n=3$, 1.4%), White/Caucasian ($n=168$, 77.8%), and prefer not to answer ($n=4$, 1.9%).

Among the respondents, 57.9% ($n=125$) indicated they were actively looking for a job and/or internship, while 42.1% ($n=91$) were not actively involved in job or internship searching at the time of the survey. When asked if they were currently using or have used LinkedIn as part of their job and/or internship search strategy 64.4% said yes ($n=139$), while 35.2% ($n=76$) said no. Figure 1 demonstrates the range of industries represented by the respondents in the sample.

Respondents were asked to what extent they found LinkedIn useful for performing specific job-related tasks. Results indicated they found LinkedIn most useful for creating a professional network ($M=3.72$, $SD=1.159$) and least useful for contacting people ($M=3.02$, $SD=1.076$). Table 1 summarizes these findings.

### Measures

*Motivations.* Motivations for using LinkedIn were measured by adapting scales from previous research (Florenthal, 2015; Papacharissi & Rubin, 2000; Zhang et al., 2011). A total of 16 survey items ($\alpha=0.942$) were developed for this analysis. Items measuring motivation were measured using a 5-point Likert Scale ranging from "strongly disagree" to "strongly agree" with each statement. Table 3 summarizes the items and descriptive information for this scale.

*Uses.* To determine how respondents were using or have used LinkedIn in the past, survey items were developed drawing from previous research (Florenthal, 2015;

PX0513-008

**Table 1.** Using LinkedIn.

|                                     | M    | SD    |
| ----------------------------------- | ---- | ----- |
| Create professional network         | 3.72 | 1.159 |
| Up-to-date friends' careers          | 3.60 | 1.177 |
| Maintain professional relationships  | 3.52 | 1.156 |
| Identify employment opportunities    | 3.38 | 1.18  |
| Exchange information                 | 3.12 | 1.114 |
| Contact people                       | 3.02 | 1.076 |

Papacharissi & Rubin, 2000; Zhang et al., 2011). A total of 22-items were developed to measure uses ($\alpha = 0.941$). Items measuring motivation were measured using a 5-point Likert Scale ranging from "strongly disagree" to "strongly agree" with each statement. Table 5 summarizes the items and descriptive information for this scale.

*Gratifications.* Gratifications for using LinkedIn were measured using three values identified by De Vries and Carlson (2014): functional value, hedonic value, and social interaction value. This scale included 12-items ($\alpha = 0.946$) measuring each value were measured using a 5-point Likert Scale ranging from "strongly disagree" to "strongly agree" with each statement. Table 7 summarizes the items and descriptive information for this scale.

### Analysis

A principal component factor analysis was used to answer RQ1a, RQ2a, and RQ3a. A Mann-Whitney *U* test was used to determine if differences existed among active and non-active job seekers (RQ1b, RQ2b, and RQ2c). To address RQ4a, frequencies and percentages are reported, and to answer RQ4b, a chi-square test for association was used. An independent-samples *t*-test was used to test H1.

## Results

### Motivations for LinkedIn Usage

The goal of RQ1 was to understand the motives, or the reasons why Millennials use LinkedIn. To address RQ1a, a principal component analysis (PCA) with direct oblimin rotation was used to assess the motivations for using LinkedIn among Millennials. Solution criteria include eigenvalues greater than 1, explained variance, and factor loading score for each factor ($>0.4$). Despite measuring six motivations, the PCA revealed two components with an eigenvalue greater than one. A third component, with a value of 0.943, was also included in the analysis. The three-components solution explained 68.8% of the total variance, with each factor explaining 53.9%, 9.1%, and 5.9% respectively. Table 2 summarizes the results of the PCA. Each of these items

PX0513-009

**Table 2.** Factor Analysis Results—Motivations.

| Factor item | Factor 1: information | Factor 2: communication | Factor 3: surveillance |
|---|---|---|---|
| I can get information about job/internships for free | 0.856 | | |
| I can find relevant job/internship opportunities | 0.822 | | |
| I am on LinkedIn because companies use it for recruiting and posting jobs | 0.821 | | |
| LinkedIn is easy to use | 0.819 | | |
| I am on LinkedIn to access information about jobs and internships | 0.772 | | |
| LinkedIn provides me with a new way to research job/internship opportunities | 0.77 | | |
| I can see what is happening in my desired industry | 0.65 | | |
| I can give my input about my professional interests | | 0.935 | |
| I can express myself professionally | | 0.838 | |
| I enjoy answering questions from others about my professional interests | | 0.698 | |
| I can get diverse points of view from others about my professional interest | | 0.689 | |
| I like that I can check profiles of professionals working in my desired industry | | 0.500 | |
| I like that I can read articles and gain insights from my desired industry | | 0.430 | |
| I like to use LinkedIn to help others find job/internship opportunities | | | 0.931 |
| I like to encourage others who are going through the job/internship search process | | | 0.697 |
| LinkedIn makes me feel like I belong to a group that shares my professional interest | | | 0.471 |
| Eigenvalue | 8.622 | 1.450 | 0.943 |
| %Variance | 53.89 | 9.06 | 5.89 |
| Cumulative % | 53.89 | 62.95 | 68.84 |

were collapsed to form a new scale to answer RQ1b. Table 3 summarizes the new variables.

Items loading on factor one were related to information, factor two items were related to communication, and factor three items were related to surveillance. Based on the results of this analysis, Millennials are motivated to use LinkedIn to get information, communicate with others about their professional careers, and for surveillance of contacts. A closer look at how this analysis can give us additional insights into why Millennials use LinkedIn. Information seeking was the most important

PX0513-010

570                          *International Journal of Business Communication 60(2)*

**Table 3.** Motivations: Survey Items, Descriptive Information, and Reliability Analysis.

|  |  | M | SD |
|---|---|---|---|
| **Information** | $\alpha = 0.923$ | 3.78 | 0.84556 |
| I can get information about job/internships for free | | 3.91 | 0.989 |
| I can find relevant job/internship opportunities | | 3.82 | 0.955 |
| I am on LinkedIn because companies use it for recruiting and posting jobs | | 3.68 | 1.052 |
| LinkedIn is easy to use | | 3.82 | 1.062 |
| I am on LinkedIn to access information about jobs and internships | | 3.79 | 1.076 |
| LinkedIn provides me with a new way to research job/internship opportunities | | 3.78 | 1.025 |
| I can see what is happening in my desired industry | | 3.69 | 0.986 |
| **Communication** | $\alpha = 0.880$ | 3.66 | 0.78099 |
| I can give my input about my professional interests | | 3.71 | 0.92 |
| I can express myself professionally | | 3.81 | 0.93 |
| I enjoy answering questions from others about my professional interests | | 3.48 | 1.03 |
| I can get diverse points of view from others about my professional interest | | 3.60 | 0.96 |
| I like that I can check profiles of professionals working in my desired industry | | 3.83 | 1.04 |
| I like that I can read articles and gain insights from my desired industry | | 3.50 | 1.03 |
| **Surveillance** | $\alpha = 0.796$ | 3.2388 | 0.9289 |
| I like to use LinkedIn to help others find job/internship opportunities | | 3.09 | 1.098 |
| I like to encourage others who are going through the job/internship search process | | 3.37 | 1.128 |
| LinkedIn makes me feel like I belong to a group that shares my professional interest | | 3.25 | 1.077 |

reason cited for using LinkedIn. Items that loaded highest on this variable include looking for information on jobs and internships and opportunities to apply for jobs and internships. Additionally, surveillance (factor 3), revealed that Millennial LinkedIn users like to use the site to share information about jobs and internships with others. Thus, we can conclude that actual information about jobs and internships drive much of the Millennial interest in using LinkedIn.

The second factor, communication, also provides interesting insights into how Millennials use LinkedIn. Items that loaded higher on this factor tended to be those

PX0513-011

that reflected using LinkedIn as a personal expression tool. For example, the first two items that loaded on this factor included giving input about one's professional interests and expressing oneself professionally. This indicates that Millennial users see LinkedIn as a tool for not only seeking information related to job and internship opportunities but as a way to present themselves professionally.

RQ1b investigates if there are differences between active and non-active job seekers in terms of motivations for using LinkedIn. The presence of outliers in the dataset and non-normal data distribution (assessed by Shapiro-Wilk test $p > .05$) across all three variables (information, communication, and surveillance) required the use of the Mann-Whitney U test to determine if there is a statistically significant difference between the two groups. The analysis did not reveal a statistically significant difference between active job seekers ($Mdn = 3.86$) and non-job seekers ($Mdn = 3.86$) when it comes to motives of using LinkedIn for information, $U = 5513$, $z = -0.011$, $p = .991$, $r = -0.001$; or for communication, $U = 5453$, $z = -0.284$, $p = .777$, $r = -0.019$ between active job seekers ($Mdn = 3.67$) and non-job seekers ($Mdn = 3.83$; or for surveillance $U = 5557$, $z = -0.152$, $p = .879$, $r = -0.01$ between active job seekers ($Mdn = 3.33$) and non-job seekers ($Mdn = 3.17$). Therefore, based on this analysis we can conclude that Millennials, regardless of whether they are actively job searching or not, share the same motives for using LinkedIn to find information, to communicate, and for surveillance. This finding implies that Millennials maintain their LinkedIn profile on a consistent basis regardless of their current job seeking status.

## *Uses for LinkedIn*

RQ2a examined how Millennials use LinkedIn as part of their job search. A second PCA with direct oblimin rotation was used to determine how Millennials used LinkedIn. Solution criteria include eigenvalues greater than 1, explained variance, and factor loading score for each factor ($>0.4$). Despite measuring seven uses, several of the measures were merged during the PCA to provide a three-component solution with an eigenvalue greater than one. The three-components solution explained 67.3% of the total variance, with each factor explaining 45.2%, 16.6%, and 5.5% respectively. Table 4 summarizes the results of the PCA. The three components revealed in the analysis can be characterized as professional development (factor 1), entertainment (factor 2), and networking (factor 3). These items were collapsed into three variables used to determine if there were any differences between how active job seekers and non-job seekers use LinkedIn (RQ2b). Table 5 summarizes the new variables.

Similar to the findings of RQ1, this analysis also points to some of the tendencies of Millennial LinkedIn users. In the case of the professional development factor, items that loaded higher indicated a desire to use LinkedIn as a platform for professional branding, self-expression, and increasing one's visibility in a professional setting. In this case, it appears that Millennials incorporate professional branding into their professional development activities. Similarly, the third factor, networking, respondents indicated that they used the site to overcome offline challenges (e.g., being too shy to

**Table 4.** Factor Analysis Results—Uses.

| Factor item | Factor 1: professional development | Factor 2: entertainment | Factor 3: networking |
|---|---|---|---|
| I use LinkedIn to market myself | 0.934 | | |
| I use LinkedIn to gain visibility in my desired industry | 0.912 | | |
| I use LinkedIn to brand myself | 0.86 | | |
| I use LinkedIn to network with others who share my professional interest | 0.794 | | |
| I use LinkedIn for professional development | 0.763 | | |
| I use LinkedIn because it is easy to share information about my professional interests | 0.761 | | |
| I used LinkedIn to check the profiles of professionals working in my desired industry | 0.747 | | |
| I use LinkedIn to follow companies/organizations that I am interested in working in | 0.722 | | |
| I use LinkedIn to communicate people in my professional network | 0.696 | | |
| I use LinkedIn to occupy my time | | 0.885 | |
| I use LinkedIn to pass time when I'm bored | | 0.880 | |
| I use LinkedIn when I have nothing better to do | | 0.880 | |
| I use LinkedIn because it is entertaining | | 0.803 | |
| I use LinkedIn because I just like to use it | | 0.772 | |
| I use LinkedIn because it is enjoyable | | 0.714 | |
| I use LinkedIn to make contact with people who I am interested in, but am too shy to talk to | | | 0.853 |
| I use LinkedIn to make contacts with people who I am interested in, but have no chance to meet in person | | | 0.715 |
| I use LinkedIn to create groups and ask others to join | | | 0.661 |
| I use LinkedIn to meet new people | | | 0.634 |
| I use LinkedIn to keep interact with my contacts | | | 0.582 |
| I use LinkedIn to make new contacts | | | 0.551 |
| I use LinkedIn to search for or interact with old or forgotten contacts | | | 0.519 |
| Eigenvalue | 9.948 | 3.650 | 1.220 |
| % Variance | 45.22 | 16.59 | 5.55 |
| Cumulative % | 45.22 | 61.81 | 67.36 |

speak to someone and not having an opportunity to network with a person offline). Taken together, these two findings indicate that LinkedIn provides Millennial users with a space to brand themselves and to increase their networking capabilities.

To address RQ2b, a Mann-Whitney $U$ test was used. This test was selected because of the violation of assumptions for an independent samples *t*-test (the presence of outliers and non-normal distribution of data). The analysis did not reveal a statistically significant difference between active job seekers (*Mdn* = 3.89) and non-job seekers (*Mdn* = 3.78) when it comes to using LinkedIn for professional development, $U = 5228$,

PX0513-013

**Table 5.** Uses: Survey Items, Descriptive Information, and Reliability Analysis.

|  |  | M | SD |
|---|---|---|---|
| **Professional development** | $\alpha = 0.944$ | 3.6277 | 0.90122 |
| I use LinkedIn to market myself |  | 3.74 | 1.095 |
| I use LinkedIn to gain visibility in my desired industry |  | 3.69 | 1.07 |
| I use LinkedIn to brand myself |  | 3.66 | 1.096 |
| I use LinkedIn to network with others who share my professional interest |  | 3.61 | 1.076 |
| I use LinkedIn for professional development |  | 3.68 | 1.076 |
| I use LinkedIn because it is easy to share information about my professional interests |  | 3.58 | 1.096 |
| I used LinkedIn to check the profiles of professionals working in my desired industry |  | 3.56 | 1.085 |
| I use LinkedIn to follow companies/organizations that I am interested in working in |  | 3.66 | 1.104 |
| I use LinkedIn to communicate with people in my professional network |  | 3.46 | 1.073 |
| **Entertainment** | $\alpha = 0.925$ | 2.5148 | 1.03947 |
| I use LinkedIn to occupy my time |  | 2.3 | 1.188 |
| I use LinkedIn to pass time when I'm bored |  | 2.39 | 1.192 |
| I use LinkedIn when I have nothing better to do |  | 2.39 | 1.223 |
| I use LinkedIn because it is entertaining |  | 2.62 | 1.215 |
| I use LinkedIn because I just like to use it |  | 2.69 | 1.249 |
| I use LinkedIn because it is enjoyable |  | 2.71 | 1.238 |
| **Networking** | $\alpha = 0.860$ | 2.9382 | 0.85963 |
| I use LinkedIn to make contact with people who I am interested in, but am too shy to talk to |  | 2.74 | 1.209 |
| I use LinkedIn to make contacts with people who I am interested in, but have no chance to meet in person |  | 3.04 | 1.164 |
| I use LinkedIn to create groups and ask others to join |  | 2.54 | 1.187 |
| I use LinkedIn to meet new people |  | 2.79 | 1.124 |
| I use LinkedIn to keep interact with my contacts |  | 3.18 | 1.183 |
| I use LinkedIn to make new contacts |  | 3.32 | 1.108 |
| I use LinkedIn to search for or interact with old or forgotten contacts |  | 2.96 | 1.18 |

$z = -0.824$, $p = .410$, $r = -0.056$ or for entertainment $U = 5432$, $z = -0.369$, $p = .710$, $r = -0.025$ among active job seekers ($Mdn = 2.67$) and non-job seekers ($Mdn = 2.50$), or for networking $U = 5584$, $z = -0.128$, $p = .898$, $r = -0.008$ among active job seekers ($Mdn = 3.00$) and non-job seekers ($Mdn = 3.00$). In response to RQ2a and RQ2b, we can conclude that Millennials are using LinkedIn for professional development,

PX0513-014

**Table 6.** Factor Analysis Results—Gratifications.

| Factor item | Factor 1: social and functional value | Factor 2: hedonic value |
|---|---|---|
| I can find out about potential jobs using LinkedIn | 0.971 | |
| I can interact with potential employers using LinkedIn | 0.945 | |
| I can meet potential employers using LinkedIn | 0.928 | |
| Using LinkedIn is useful for me | 0.854 | |
| I can make new professional contacts using LinkedIn | 0.849 | |
| Using LinkedIn is helpful for me | 0.82 | |
| Using LinkedIn is practical for me | 0.795 | |
| Using LinkedIn is functional for me | 0.727 | |
| Using LinkedIn is exciting for me | | 0.954 |
| Using LinkedIn is fun for me | | 0.952 |
| Using LinkedIn is entertaining for me | | 0.925 |
| Using LinkedIn is pleasant for me | | 0.718 |
| Eigenvalue | 7.672 | 2.072 |
| % Variance | 63.93 | 17.26 |
| Cumulative % | 63.93 | 81.2 |

entertainment, and networking, but the analysis did not reveal a statistically significant difference in how active job seekers and non-job seekers use LinkedIn. This is consistent with the analysis of RQ1b in that LinkedIn usage appears to remain consistent despite job seeking status.

### Gratifications for LinkedIn

RQ3a investigated the gratifications Millennials obtained from using LinkedIn. Three values identified in previous research served as the basis for this analysis: functional value, social interaction value, and hedonic value (see De Vries & Carlson, 2014). A third PCA with direct oblimin rotation was used to determine gratifications for using LinkedIn. Solution criteria include eigenvalues greater than 1, explained variance, and factor loading score for each factor ($>0.4$). The social interaction value and functional value merged during the PCA to form one of the two-component solution. The two-component solution explained 81.2% of the total variance, with each factor accounting for 63.9% and 17.3% of the variance. Table 6 summarizes the results of the analysis. The two components were collapsed to form two new variables: social/functional value and hedonic value. These new variables were used to address RQ3b. Table 7 summarizes the new variables.

RQ3b investigated the potential differences between active job seekers and non-job seekers in terms of the value derived from using LinkedIn. Similar to the previous analyses, the presence of outliers and non-normal distribution of data indicate the Mann-Whitney U test was appropriate to determine if there is a statistically significant difference between the groups. The analysis did not find a statistically significant

PX0513-015

**Table 7.** Gratifications: Survey Items, Descriptive Information, and Reliability Analysis.

|  |  | M | SD |
|---|---|---|---|
| **Social and functional value** | $\alpha = 0.960$ | 3.7961 | 0.92047 |
| I can find out about potential jobs using LinkedIn |  | 3.94 | 1.003 |
| I can interact with potential employers using LinkedIn |  | 3.87 | 0.997 |
| I can meet potential employers using LinkedIn |  | 3.85 | 1.061 |
| Using LinkedIn is useful for me |  | 3.75 | 1.074 |
| I can make new professional contacts using LinkedIn |  | 3.82 | 1.001 |
| Using LinkedIn is helpful for me |  | 3.67 | 1.082 |
| Using LinkedIn is practical for me |  | 3.77 | 1.016 |
| Using LinkedIn is functional for me |  | 3.7 | 1.082 |
| **Hedonic value** | $\alpha = 0.935$ | 2.9073 | 1.05672 |
| Using LinkedIn is exciting for me |  | 2.83 | 1.187 |
| Using LinkedIn is fun for me |  | 2.78 | 1.166 |
| Using LinkedIn is entertaining for me |  | 3.19 | 1.127 |
| Using LinkedIn is pleasant for me |  | 2.83 | 1.142 |

difference between active job seekers ($Mdn = 4.00$) and non-job seekers ($Mdn = 4.00$) when it comes to using LinkedIn for social/functional value, $U = 5103$, $z = -1.033$, $p = .302$, $r = -0.071$; and active job seekers ($Mdn = 3.00$) and non-job seekers ($Mdn = 3.00$) when it comes to using LinkedIn for hedonic value, $U = 5225$, $z = -0.736$, $p = .462$, $r = -0.05$. This is consistent with previous analyses (see RQ1b and RQ2b), Millennial LinkedIn users maintain an online presence on LinkedIn regardless of their job seeking status.

A closer examination of the findings of the RQ3a and RQ3b analyses reveal more about the gratifications Millennials obtain from using LinkedIn (see Table 8). Specifically, the social/functional value reiterates findings of previous analyses that point to LinkedIn being a valuable resource for job and internship information. Millennial LinkedIn users find value in interacting and meeting with potential employers and adding to contacts to their professional networks. Knowing that they could interact with a potential employer socially on LinkedIn is an incentive to maintain their professional brand on the site, which also helps explain why Millennial LinkedIn users are more likely to use the site consistently. This supports previous findings in this analysis that point to LinkedIn as being part of Millennials professional self-branding efforts and maintenance of their LinkedIn profile whether or not they are an active job seeker.

## LinkedIn Features

RQ4a investigates how Millennial job seekers use the features available on LinkedIn. Respondents reported using an average of 5.98 ($SD = 3.344$) of the 14 possible

PX0513-016

**Table 8.** Correlation Matrix of Motivations, Uses, and Gratifications.

| | Communication | Surveillance | Professional development | Entertainment | Networking | Social functional value | Hedonic value |
|---|---|---|---|---|---|---|---|
| Information | 0.697** | 0.696** | 0.793** | 0.298** | 0.525** | 0.861** | 0.517** |
| Communication | | 0.652** | 0.717** | 0.290** | 0.506** | 0.662** | 0.511** |
| Surveillance | | | 0.630** | 0.387** | 0.517** | 0.658** | 0.509** |
| Professional development | | | | 0.354** | 0.612** | 0.840** | 0.553** |
| Entertainment | | | | | 0.638** | 0.256** | 0.695** |
| Networking | | | | | | 0.523** | 0.590** |
| Social functional value | | | | | | | 0.538** |

**Correlation is significant at the .01 level (two-tailed).

576

PX0513-017

**Table 9.** LinkedIn Features and Chi Square Results.

|  | *n* | % | *df, N* | Pearson chi square | *p* |
|---|---|---|---|---|---|
| Profile picture | 169 | 78.2 | 1, 216 | 1.611 | .204 |
| Experience | 165 | 76.4 | 1, 216 | 0.001 | .979 |
| Education | 161 | 74.5 | 1, 216 | 1.279 | .258 |
| Profile summary | 145 | 67.1 | 1, 216 | 0.458 | .499 |
| Endorsed skills and expertise | 124 | 57.4 | 1, 216 | 0.543 | .461 |
| Interests | 108 | 50 | 1, 216 | 1.017 | .313 |
| Volunteer experiences and causes | 101 | 46.8 | 1, 216 | 0.072 | .789 |
| Honors and awards | 91 | 42.1 | 1, 216 | 0.288 | .592 |
| Languages | 60 | 27.8 | 1, 216 | 1.006 | .316 |
| Recommendations | 39 | 18.1 | 1, 216 | 0.354 | .552 |
| Certifications | 47 | 21.8 | 1, 216 | 0.263 | .608 |
| Projects | 28 | 13 | 1, 216 | 0.045 | .832 |
| Publications | 21 | 9.7 | 1, 216 | 1.538 | .215 |
| Discussion posts and comments | 17 | 7.9 | 1, 216 | 3.457 | .063 |

LinkedIn features. Respondents indicated using the profile picture ($n=169$, 78.2%), experience ($n=165$, 76.4%), and education ($n=161$, 74.5%) features the most, and less than 20% reported using the projects ($n=28$, 13%), publications ($n=21$, 9.7%), and discussion posts and comments ($n=17$, 7.9%) features. A series of chi-square tests for association between those actively and not actively searching for jobs and how many LinkedIn features they use (RQ4b) were conducted. All expected cell frequencies were greater than five. Results of these analyses did not find any statistically significant differences (see Table 9). In other words, there was no difference regarding how active and non-active job seekers used specific features on LinkedIn.

Findings of this analysis indicate that the top three LinkedIn profile features used by Millennial LinkedIn users are: profile picture, experience, and education. The use of these features aligns with the previous analyses indicating that LinkedIn is part of their self-branding strategy and the social value they place on using the service. These three features, in particular, allow the user to craft a message tailored to potential and future employers that showcase their professional interests and skills. Providing additional information about experience and education helps Millennial LinkedIn users create a narrative of their credentials and skills they can bring to the workforce.

An independent samples *t*-test was used to determine if active job seekers used LinkedIn features more than non-active job seekers (H1). There were no outliers in the data, as assessed by inspection of a boxplot. LinkedIn features used were normally distributed, as assessed by the skewness and kurtosis values for the outcome variable falling within −2 to 2, and there was homogeneity of variances, as assessed by Levene's test for equality of variance ($p=.373$). Non-active job seekers used more features ($M=6.13$, $SD=3.284$) than active job seekers ($M=5.87$, $SD=3.396$); however, results of the independent samples t-test revealed this difference was not statistically significant, $t(214)=0.563$, $p=.574$, $d=0.07$. As a result, H1 was not supported by the data. This

PX0513-018

**Table 10.** Summary of Research Questions and Hypothesis Findings.

| | | |
|---|---|---|
| RQ1a | What are the primary motives of Millennial LinkedIn users? | Millennials were motivated to use LinkedIn for:<br>(1) Information<br>(2) Communication<br>(3) Surveillance |
| RQ1b | Do active/non-active Millennial job searchers differ in terms of their motives for using LinkedIn as part of the job/internship search process? | There was not a significant difference between active job seekers and non-active job seekers related to using LinkedIn for information, communication, or surveillance. |
| RQ2a | How do Millennial job searchers use LinkedIn as part of their job/internship search process? | Millennials turned to LinkedIn for:<br>(1) Professional development<br>(2) Entertainment<br>(3) Networking |
| RQ2b | Do active/non-active Millennial job searchers differ in terms of how they use LinkedIn as part of the job/internship search process? | There was not a significant difference between active job seekers and non-active job seekers when it comes to using LinkedIn for professional development, entertainment, or networking. |
| RQ3a | What gratifications do Millennial job searchers obtain from using LinkedIn as part of the job/internship search process? | Millennials gratification for using LinkedIn included:<br>(1) Social/functional value<br>(2) Hedonic value |
| RQ3b | Do active/non-active Millennial job searchers differ in terms of the gratifications obtained by using LinkedIn as part of the job/internship search process? | There was not a significant difference between active job seekers and non-active job seekers when it comes to gaining social functional value or hedonic value from using LinkedIn. |
| RQ4a | What features available on LinkedIn do Millennial job seekers use? | Features Millennials most frequently used on LinkedIn:<br>(1) Profile picture<br>(2) Experience<br>(3) Education |
| RQ4b | Do active/non-active Millennial job seekers differ in how they use the features available on LinkedIn? | There was not a significant difference between active job seekers and non-active job seekers when it comes to using the profile picture, experience, or education features of LinkedIn. |
| H1 | Millennials actively searching for a job or internship will use more features on LinkedIn than those who are not currently job searching. | Not supported - non-active job seekers used more features, but the difference was not significant. |

finding is consistent with the aforementioned analyses that indicate Millennials consistently maintain their LinkedIn presence as part of their self-branding strategy regardless of job seeking status. A summary of the research findings can be found in Table 10.

PX0513-019

## **Discussion**

Despite hiring managers and recruiters naming LinkedIn as a main source for identifying potential employees, there is a lack of understanding surrounding how Millennials, the largest cohort in the U.S. workforce, use the social networking platform for job searching and career development. This study is among the first to fill this gap in the literature by surveying Millennials to determine their motives, uses, and gratifications for using LinkedIn. This study extends uses and gratifications theory into a new context and demonstrates why Millennials use LinkedIn, how they are using the site, and the gratifications they obtain from their use. Additionally, the findings provide information about the specific features Millennials take advantage of on LinkedIn, which is beneficial for employers to understand. Most notable are the results that active job seekers and non-active job seekers do not differ in the ways they use LinkedIn or in the gratifications they seek to obtain from using the site, which has various implications for the theory and for hiring managers.

Millennials report three reasons why they use LinkedIn: to find information, for communication, and surveillance needs. Through examining the mean scores for the individual items, respondents use LinkedIn to find free and relevant information about jobs (see Table 4). The findings of this study support those of LinkedIn's research about Millennial users (Rynne, 2016) demonstrating Millennials use LinkedIn for communication (Buettner, 2017). Although the participants in this study did not report using the features of LinkedIn like blogging or self-publishing, they do use LinkedIn to communicate with existing connections and to form new connections. Millennials also reported using LinkedIn to find information, including information not solely related to new job opportunities. This demonstrates that LinkedIn is used for more than just career advancement. Finally, respondents use LinkedIn for surveillance purposes which includes monitoring the career achievements of connections and feeling like they belong to a group. Using social media for surveillance is not novel, however, understanding that Millennials use LinkedIn for surveillance regardless of whether or not they are job searching, is an interesting note with potential for future research. Cumulatively, the researching findings of RQ1 are consistent with previous LinkedIn research findings that demonstrate LinkedIn is useful for finding employment opportunities and establishing professional connections (Bradley, 2011; Buck, 2012). RQ1 findings are also in line with previous uses and gratifications research on social media which describes the motives people have for using social media to include finding information, communication, and surveillance (Papacharissi & Rubin, 2000).

Although LinkedIn offers users a different experience and different features, even being described as "social networking" rather than "social media," this study indicates that Millennials use LinkedIn just as they would any other social media website like Facebook or Instagram. This is generally supportive of uses and gratifications theory by demonstrating that despite the unique characteristics of the site, Millennials use LinkedIn for professional development, entertainment, and/or networking. These needs have both similarities and differences between the needs outlined by uses and gratifications theory and are discussed in what follows.

PX0513-020

Previous studies suggest that Millennials expect to find employment through networking (Smith, 2017), and that interpersonal communication is a benefit to using LinkedIn (Buettner, 2017; Florenthal, 2015). Individual item analysis for the networking factor indicates that respondents use LinkedIn to contact professionals they may not have a chance to meet in person and to interact with existing contacts (see Table 6). Thus, a primary motive and use of LinkedIn among Millennials is to develop their professional network, regardless of whether or not they are actively job searching. This indicates that surveillance of their network is an ongoing activity and use of the site, consistent uses and gratifications theory that people use social media websites for surveillance purposes. The results of this study support the findings that Millennials are more often passive users on the site (Carmack & Heiss, 2018), further upholding the surveillance gratification of site usage. Therefore, LinkedIn plays a role in broader career networking strategies and is one tactic for helping people maintain relationships.

The professional development factor highlights how Millennials use LinkedIn to advance their careers. Respondents reported using LinkedIn to brand and market themselves, increase visibility among recruiters, follow companies they are interested in potentially working for, and making professional connections (see Table 6). This underscores the use of LinkedIn for surveillance, but also demonstrates how the site is used for personal identity purposes, further illustrating the utility of uses and gratifications theory in this context. In order to gain more insight into how Millennials use LinkedIn for professional development, this study also investigated what LinkedIn features Millennials used. Results indicated that Millennials use an average of six LinkedIn features on their profiles, which is about 42.8% of the platform's capabilities. However, this is inconsistent with how employers and recruiters expect Millennials to use LinkedIn.

Recruiters are increasingly turning to LinkedIn to find new talent and make hiring decisions. According to Zide et al. (2014), recruiters look for optimized profiles that make use of all the features available on LinkedIn. Despite using less than half of the features available, the features used by Millennials do touch on three important indicators recruiters look for on LinkedIn profiles: employment history, education, and years of experience (Zide et al., 2014). However, by not utilizing all of the features, including interests, languages, volunteer activities, and projects, Millennials are not providing recruiters with a holistic picture of themselves. Recruiters use LinkedIn to find out additional information about candidates that a resume cannot provide such as endorsements, recommendations, and interests (Zide et al., 2014). When Millennials do not take advantage of these features on LinkedIn, they are putting themselves at a disadvantage with recruiters and may be overlooked in favor of other candidates who are using more of the features that LinkedIn offers.

A common critique of uses and gratifications theory is that it is difficult to discern between gratifications sought and gratifications obtained. In this study, gratifications obtained were measured and two gratifications for using LinkedIn were identified: social/functional value and hedonic value. Social/functional is described as information gratification, or having access to helpful, functional, practical and useful content (Jahn & Kunz, 2012). Previous research argues that when people satisfy social/

PX0513-021

functional values through the use of a platform, they use the platform more often or more intensely (Cvijikj & Michahelles, 2013; De Vries & Carlson, 2014; Jahn & Kunz, 2012). In the analysis, the items for social value and functional value collapsed into one factor indicating that respondents did not differentiate between the social capabilities of LinkedIn and the functional capabilities of the platform. Respondents find value in the ability to learn about potential jobs and meet and interact with others, and find LinkedIn to be a helpful, practical, and functional way to do this. The hedonic value refers to fun and enjoyment obtained by using a particular medium, which is consistent with the gratification of diversion. This could explain why people use LinkedIn to read about organizations, find jobs, and keep up with others; they find these activities fun and enjoyable. These values reinforce the previously discussed motives and uses for LinkedIn, offer a potential explanation as to why there is no difference between active and non-active job seeker's use of the site, and bolster the claim that LinkedIn is part of larger career development efforts.

Finally, this study investigated if active job seekers and non-active job seekers used LinkedIn differently. Results of this analysis found no statistically significant difference when it comes to motivations, uses, and gratifications of using LinkedIn, nor were there any statistically significant differences related to the features used by active and non-active job seekers. In other words, Millennials, whether actively searching for a job or not, tended to use LinkedIn the same way. Through looking at why and how Millennials use LinkedIn, one can deduce that there are three primary strategies Millennials employ on LinkedIn. First, they use the platform to meet information and surveillance needs, which helps them to stay up-to-date on what is happening in their desired field including finding new internship and employment opportunities. Second, the features of LinkedIn allow for continued professional development through personal branding and self-presentation, known through uses and gratifications theory as personal identity. Third, the ability to fulfil hedonic values, otherwise known as diversion within uses and gratifications theory. As demonstrated by this study, these three strategies are useful despite whether or not one is actively searching for a job.

## *Practical Application and Implications*

This study demonstrates that although LinkedIn has an inherently different purpose than other social media websites such as Facebook and Instagram, it is used for the same reasons among Millennials. Therefore, employers should recognize that Millennials expect to see content on LinkedIn that goes beyond job advertisements. Employers can leverage this finding and create groups on LinkedIn, share relevant stories, and engage with connections, in addition to posting information about job openings. The utilization of these features by organizations is proving to be a powerful tactic for content marketing (Singh, 2017), employee engagement (Eghan, 2015) and recruitment of employees.

Secondly, Millennials are not taking advantage of all the features the site has to offer. While the scope of this study did not examine why Millennials are not using many of the features of LinkedIn, the findings from this study demonstrate a

PX0513-022

disconnect between how employers/recruiters expect Millennials to use the site, and how they are actually using it. For example, despite recruiters noting that they look to LinkedIn to find information beyond a resume, cover letter, or that provided in an interview, Millennials are not leveraging the site in the same way. Millennials are using the site to post their resume, connect with others, and find information. The motives of Millennial LinkedIn users do not justify their use of all the individual and unique features of the platform. Employers/recruiters could be more transparent about their reviews of LinkedIn profiles and could ask applicants to utilize specific areas of the site more.

Finally, employers and recruiters can learn from this study that Millennials are regularly using the site regardless of their employment status. Millennials in this study did not report using additional features of the site based on whether or not they were looking for a job or internship. This demonstrates that LinkedIn is likely a secondary job searching strategy for Millennials and that employers should not recruit or advertise jobs solely on LinkedIn. This is consistent with previous research illustrating that Millennials search for jobs using multiple strategies, and networking is reported as one of them, but that networking is not conducted over LinkedIn (Smith, 2017).

### Limitations

The authors made efforts to generalize the findings by recruiting from two sources (research database and MTurk), the sample skewed more toward current college students, females, and those pursuing a career in the communication industry. Related to the recruitment limitation, a post-hoc power analysis of the sample revealed the sample size did not provide enough statistical power, thus more information is needed to draw definitive conclusions. Taken together, the sample size and demographics of respondents does provide a limitation to the study. Future research in this area should seek a more balanced sample, particularly when it comes to gender identification.

The Millennial sample in this study was also limited to only those Millennials living and job searching in the United States. Further, since career expectations may differ in other countries, research could examine Millennial LinkedIn users throughout other countries and compare their use and gratifications with American LinkedIn users. Future research should address Millennial LinkedIn usage from a global perspective.

Another limitation comes from the effects size in the analysis. The effect size analysis for each variable showed that the independent variable (active/non-active job seekers) had a negligible effect across all measures. Thus, there is not enough information to make a clear statement about the relationships between motivations, uses, and gratifications for using LinkedIn among active and non-active job seekers. While the main focus of this study was to understand how and why Millennials use LinkedIn for job searching, it was beyond the scope of this study to uncover the effectiveness of the strategies used by Millennials in the job search process. Future research should provide a more in-depth examination of Millennial profiles on LinkedIn in order to better understand the effectiveness of this job searching strategy.

PX0513-023

A third limitation to consider has to do with age and/or career stage. Older Millennials, who have had more professional experience than those just graduating and beginning their full-time, post-graduate job search, may use LinkedIn in different ways and to fulfill different gratifications. For instance, they might use the site more for surveillance than personal identity, being that their own identity is more established than it was when they graduated college. Certainly, if this study were executed with a different generational cohort, the results could be different as well.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## ORCID iD

Stephanie A. Smith  ⬛ https://orcid.org/0000-0002-0844-6117

## References

Aslam, S. (2020). LinkedIn by the numbers: Stats, demographics, & fun facts. *Omnicore*. https://www.omnicoreagency.com/linkedin-statistics/ Accessed: June 10, 2020

Blau, G. (1993). Further exploring the relationship between job search and voluntary individual turnover. *Personnel Psychology*, *46*, 313–330.

Blumler, J. (1979). The role of theory in uses and gratifications studies. *Communication Research*, *6*, 9–36. https://doi.org/10.1177/009365027900600102

Bogart, L. (1956). *The age of television: A study of viewing habits and the impact of television on American life*. Frederick Ungar Publishing Co.

Bradley, T. (2011). Five ways to use LinkedIn. *PC World*, *29*, 30.

Bretz, R., Boudreau, J., & Judge, T. (1994). Job search behavior of employed managers. *Personnel Psychology*, *47*, 275–301.

Buettner, R. (2017). Getting a job via career-oriented social networking markets. *Electronic Markets*, *27*, 371–385.

Buhrmester, M., Kwang, T., & Gosling, S. (2011). Amazon's Mechanical Turk: A new source of inexpensive, yet high-quality, data? *Perspectives on Psychological Science*, *6*, 3–5.

Buck, S. (2012). The beginner's guide to LinkedIn. *Mashable.com*. http://mashable.com/2012/05/23/Linkedin-beginners/ Accessed on: June 10, 2020.

Carmack, H., & Heiss, S. (2018). Using the theory of planned behavior to predict college students' intent to use LinkedIn for job searches and professional networking. *Communication Studies*, *69*, 145–160.

Chaudhary, M. (2017). LinkedIn by the numbers: 2017 statistics. *LinkedIn*. https://www.linkedin.com/pulse/linkedin-numbers-2017-statistics-meenakshi-chaudhary/ Accessed on: December 1, 2019.

Chiang, J., & Suen, H. (2015). Self-presentation and hiring recommendations in online communities: Lessons from LinkedIn. *Computers in Human Behavior*, *48*, 516–524.

PX0513-024

Cvijikj, I., & Michahelles, F. (2013). Online engagement factors on Facebook brand pages. *Social Network Analysis and Mining*, *3*, 843–861.

Davison, H., Maraist, C., & Bing, M. (2011). Friend or foe? The promise and pitfalls of using social networking sites for HR decisions. *Journal of Business and Psychology*, *26*, 153–159.

De Vries, N. J., & Carlson, J. (2014). Examining the drivers and brand performance implications of customer engagement with brands in the social media environment. *Journal of Brand Management*, *21*(6), 495–515.

Doyle, A. (2014). *How to use job search networking to find a job*. http://jobsearch.about.com/cs/networking/a/networking.htm Accessed on: March 3, 2019.

Eghan, M. (2015). 4 ways to engage employees using LinkedIn. *LinkedIn*. https://business.linkedin.com/talent-solutions/blog/2015/01/4-ways-to-engage-employees-using-linkedin Accessed on: December 2, 2019.

Fernández-Alemán, J., Carrillo de Gea, J., Toval, A., Nicolás, J., & Piattini, M. (2017). Professional social networks: An essential tool for professionals and companies in the global economy. *Journal of Internet Technology*, *18*, 1231–1252.

Florenthal, B. (2015). Applying uses and gratifications theory to students' LinkedIn usage. *Young Consumers*, *16*(1), 17–35. https://doi.org/10.1108/YC-12-2013-00416

Geiger, K., & Sokol, R. (1959). Social norms in television-watching. *American Journal of Sociology*, *65*, 174–181. https://doi.org/10.1086/222659

Gerlich, R., Drumheller, K., Babb, J., & De'Armond, D. (2015). App consumption: An exploratory analysis of the uses and gratifications of mobile apps. *Academy of Marketing Studies Journal*, *19*, 69–79.

Gilham, N. (2011). Are you a member of the 500 club? *A Branded You*. www.abrandedyou.com/2011/08/15/are-you-a-member-of-the-500-club/ Accessed on: March 3, 2019.

Gordon, J. (2010). *50 job search statistics you need to know*. http://careerchangechallenge.com/50-job-search-statistics-you-need-to-know/ Accessed on: March 3, 2019.

Granovetter, M. (1995). *Getting a job: A study of contacts and careers* (2nd ed.). University of Chicago Press.

Holmstrom, A., Clare, D., & Russell, J. (2014). Problem-focused content in the job search: Two tests of the cognitive emotional theory of esteem support messages. *Human Communication Research*, *40*, 161–187.

Holmstrom, A., Russell, J., & Clare, D. (2013). Esteem support messages received during the job search: A test of the CETESM. *Communication Monographs*, *80*, 220–242.

Hutchins, A. (2016). Beyond resumes: LinkedIn for marketing educators. *Journal of Research in Interactive Marketing*, *10*, 137–147.

Jahn, B., & Kunz, W. (2012). How to transform consumers into fans of your brand. *Journal of Service Management*, *23*, 344–361.

Jimenez, A., Lopez, M., & Pisionero, C. (2012). A vision of uses and gratifications applied to the study of internet use by adolescents. *Communication & Society*, *25*, 231–254.

Karl, K., & Peluchette, J. (2013). Possibilities and pitfalls of using online social networking in human resources management. *Psychology for Business Success*, *4*, 119–138.

Katz, E., Haas, H., & Gurevitch, M. (1973). On the use of the mass media for important things. *American Sociological Review*, *38*, 164–181.

Kim, J., Lee, J., Jo, S., Jung, J., & Kang, J. (2015). Magazine reading experience and advertising engagement: A uses and gratifications perspective. *Journalism and Mass Communication Quarterly*, *92*, 179–198. https://doi.org/10.1177/1077699014559914

PX0513-025

Kluemper, D. (2013). Social network screening: Pitfalls, possibilities, and parallels in employment selection. In Bondarouk, T. & Olivas-Lugan, M. (Eds.), *Advanced Series in Management*. Emerald Group Publishing.

Ko, H., Cho, C., & Roberts, M. (2005). Internet uses and gratifications: A structural equation model of interactive advertising. *Journal of Advertising*, *34*, 57–70. https://doi.org/10.108 0/00913367.2005.10639191

Leung, L. (2001). Gratifications, chronic loneliness and internet use. *Asian Journal of Communication*, *11*, 96–119. https://doi.org/10.1080/01292980109364794

Leung, L. (2009). User-generated content on the internet: An examination of gratifications, civic engagement and psychological empowerment. *New Media & Society*, *11*, 1327–1347.

Leung, L., & Wei, R. (2000). More than just talk on the move: Uses and gratifications of the cellular phone. *Journalism & Mass Communication Quarterly*, *77*, 308–320. https://doi.org/10.1177/107769900007700206

*LinkedIn*. (2017). About us. https://press.linkedin.com/about-linkedin Accessed on March 3, 2019.

LinkedIn. (2020). About LinkedIn. https://about.linkedin.com/

Mau, W., & Kopischke, A. (2001). Job search methods, job search outcomes, and job satisfaction of recent college graduates: A comparison of race and sex. *Journal of Employment Counseling*, *38*, 141–149.

Macoby, E. (1954). Why do children watch television? *Public Opinion Quarterly*, *18*, 239–244. https://doi.org/10.1086/266512

Myers, J., Czepiec, H., Roxas, J., & Whitson, D. (2011). Teaching students self-advertising/ marketing skills in the age of social media: Designing an experiential exercise. *Journal of Advertising Education*, *15*, 23–29.

Nikolaou, I. (2014). Social networking web sites in job search and employee recruitment. *International Journal of Selection and Assessment*, *22*, 179–189.

Ollington, N., Gibb, J., & Harcourt, M. (2013). Online social networks: An emergent recruiter tool for attracting and screening. *Personnel Review*, *42*, 248–265.

Paolacci, G., Chandler, J., & Iperiotis, P. (2010). Running experiments on Amazon Mechanical Turk. *Judgement and Decision Making*, *5*, 411–419.

Papacharissi, Z., & Rubin, A. M. (2000). Predictors of Internet Use. *Journal of Broadcasting & Electronic Media*, *44*(2), 175–196.

Payne, G., Severn, J., & Dozier, D. (1988). Uses and gratifications motives as indicators of magazine readership. *Journalism Quarterly*, *65*, 909–913.

*PEW*. (2014). Millennials in adulthood: Detached from institutions, networked with friends. http://www.pewsocialtrends.org/files/2014/03/2014-03-07_generations-report-version-for-web.pdf Accessed on: March 3, 2019.

Price, R., & Vinokur, A. (1995). Supporting career transitions in a time of organizational downsizing. In M. London (Ed.), *Employees, careers, and job creation* (pp. 191–209). Jossey-Bass.

Roth, P., Bobko, P., Van Iddekinge, C., & Thatcher, J. (2013). Social media in employee-selection-related decisions and a research agenda for uncharted territory. *Journal of Management*, *20*, 1–30.

Rubin, A. (1983). Television uses and gratifications: The interactions of viewing patterns and motivations. *Journal of Broadcasting*, *27*, 37–52.

Ruggiero, T. (2000). Uses and gratifications theory in the 21st century. *Mass Communication & Society*, *3*, 3–37.

Rynne, A. (2016). The Linkedin Millennial playbook. *LinkedIn*. https://business.linkedin.com/marketing-solutions/blog/best-practices–thought-leadership/2016/introducing-the-linke-din-millennial-playbook

Schmitz Weiss, A. (2013). Exploring news apps and location-based services on the smart-phone. *Journalism & Mass Communication Quarterly*, *90*, 435–456. https://doi.org/10.1177/1077699013493788

Shao, G. (2009). Understanding the appeal of user-generated media: A uses and gratification perspective. *Internet Research: Networking Applications and Policy*, *19*, 7–25.

Singh, H. (2017). A guide to effective content marketing on LinkedIn. *Entrepreneur*. https://www.entrepreneur.com/article/298409

Smith, S. (2017). Job searching expectations, expectancy violations, and communication strate-gies of recent college graduates. *Business and Professional Communication Quarterly*, *80*, 296–320. https://doi.org/10.1177/2329490617723116

Smith, S.A. (2018). *Recruitment, retention and engagement of a Millennial workforce*. Lanham, MD: Lexington Books.

Wanberg, C., Basbug, G., vanHooft, E., & Samtani, A. (2012). Navigating the black hole: Explicating layers of job search context and adaptational responses. *Personnel Psychology*, *65*, 887–926.

Wang, Z., Tchernev, J., & Solloway, T. (2012). A dynamic longitudinal examination of social media use, needs, and gratifications among college students. *Computers in Human Behavior*, *28*, 1829–1839. https://doi.org/10.1016/j.chb.2012.05.001

Wimmer, R., & Dominick, J. (1994). *Mass media research: An introduction*. Wadsworth.

Zhang, Y., Tang, L. S-T., & Leung, L. (2011). Gratifications, collective self-esteem, online emotional openness and traitlike communication apprehension as predictors of Facebook use. *Cyberpsychology, Behavior, and Social Networking*, *14*(12), 733–739. https://doi.org/10.1089/cyber.2010.0042

Zide, J., Elman, B., & Shahani-Denning, C. (2014). LinkedIn and recruitment: How profiles differ across occupations. *Employee Relations*, *36*, 583–604.

## Author Biographies

**Stephanie A. Smith** is an Assistant Professor of Public Relations in Virginia Tech's School of Communication. She researches the recruitment, retention and engagement of entry-level employees, as well as the role of technology in this context. Her research takes a multi-genera-tional perspective to understanding communication.

**Brandi Watkins** is an Associate Professor of Public Relations in Virginia Tech's School of Communication. Her research explores branding, social media, and sports communication.

PX0513-027

Copyright of International Journal of Business Communication is the property of Association for Business Communication and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# PX0514

# How can I change who can see My Story on Snapchat?

The default privacy setting is that only your Friends (Snapchatters who you've added) can view your Story

**To change who can see My Story...**

1. Tap      in My Profile to open **Settings**
2. Scroll down to **"Privacy Controls"** and tap **'View My Story'**
3. Select either **'My Friends'** or **'Custom'**
   **Please Note**: Some Snapchatters may still have the 'Everyone' setting, which means that the Story is viewable by any Snapchatter.

The privacy settings you have when you send a Snap to your Story will remain for that Snap, even if you change the settings later.

For example, if your privacy was set to **'My Friends'** at the time the Snaps were sent to My Story, then only Snapchatters on your friends list will be able to see those Snaps.

To post publicly, post to your 'My Story · Public' rather than 'My Story · Friends.' Your friends, followers, and anyone on Snapchat can view your public My Story.

### Was this article helpful?

 

**Related articles**

How can I see who viewed My Story on Snapchat?

Who can contact me on Snapchat?

How do Shared Stories on Snapchat work?

What is Snapchat+?

How to Send Photos or Videos from My Camera Roll

**Recently viewed articles**

Where did my 'Everyone' privacy setting option for My Story go?

How do I change my privacy settings on Snapchat?

How to Remove a Friend on Snapchat

How to Block a Friend on Snapchat

PX0514-001

# PX0515

Q  What can we help you with?

Snapchat Support  >  Using Snapchat  >  Public Profile and Creator Features  >  Adding Stories and Lenses

# Where did my 'Everyone' privacy setting option for My Story go?

If you're 18 or older and have a Public Profile, you no longer have the 'Everyone' option under 'View My Story' in your Story settings. Instead, you can post to your new public My Story to share content for all Snapchatters, including your friends and followers, to see instead! You can think of your public My Story as the new My Story with 'Everyone' privacy settings.

You still have the 'Custom' and 'My Friends' options for My Story for friends!

PX0515-001



Post to just your friends using My Story · Friends and post to a wider audience using My Story · Public. Your friends (Snapchatters you have added back) will see your public My Story in the Friends section of the Stories page and your followers (Snapchatters who you haven't added back) will see your public My Story in the 'Following' section of the Stories page. Anyone can see your public Story on your Public Profile. Like your My Story, your public My Story will no longer be viewable by other Snapchatters after it expires.

To see which of your friends viewed your public My Story and see replies from your followers, go to 'My Profile' and tap on your public Story Snap under 'My Public Profile.' Replies to your public My Story from your friends will show up directly in your Chat feed.

**Pro Tip**     You can see more advanced insights about your public Stories, Spotlights, and Audience in 'My Public Profile' > 'Insights.'

### Was this article helpful?

  

PX0515-002

# PX0516

# Five ways Microsoft Teams has transformed Microsoft

Apr 30, 2024    |    Claire Sisson

   

*The flexibility of Microsoft Teams has enabled Microsoft employees to stay productive as they shifted from working in offices, to working from home, to a hybrid setting today, and soon to future of work scenarios.*

*[Editor's note: This content was written to highlight a particular event or moment in time. Although that moment has passed, we're republishing it here so you can see what our thinking and experience was like at the time.]*

Wow, what a run it has been for Microsoft Teams!

When Microsoft Teams was first introduced in late 2016, no one could have anticipated the journey that we—Microsoft's customer zero—would go on over such a short amount of time. The "new chat-based workspace in Office 365" promised an entirely new experience that would bring people, conversations, content, and tools together in ways that empowered users—including our employees—to collaborate and achieve more.

We were eager to start using Microsoft Teams here at Microsoft. Our team—Microsoft Digital Employee Experience—deployed it across the company as soon as it launched. We've learned a ton along the way, lessons that the product group used to make Microsoft Teams even more enterprise ready.

Our employees' ability to collaborate has grown as Microsoft Teams has grown. We've developed an amazing flywheel—embracing new capabilities, collecting feedback from our employees, and funneling them back to our product group partners, which in turn has

fueled more innovation in the product. we've used Microsoft Teams to communicate, share ideas, and get work done.

*Claire Sisson is part of the Microsoft Digital Employee Experience team. Sisson is a principal PM manager leading the next generation of collaboration experiences at Microsoft through Microsoft Teams and the Microsoft Power Platform.*

Fast forward to the onset of the COVID-19 pandemic, Microsoft Teams allowed us to keep working and to stay connected as we shifted to working from home. We were able to come together through meetings, chats, and calls, collaborate, and automate business processes, all within a single app. Microsoft Teams enabled our employees and

customers to successfully work remotely, for students to continue their education, and for all of us to stay connected on a personal level.

Having built a product that is now a staple in our everyday lives, the Microsoft Teams product group continues to innovate, and has taken the learnings from the past five years to improve its user experience. Things like creating more natural and engaging meeting experiences, enabling employees to connect seamlessly with those inside and outside of their networks, and providing ways to make remote presentations richer and more impactful have all helped elevate the Microsoft Teams experience.

In celebration of its fifth birthday, let's look at five ways Microsoft Teams has helped transform the way we work at Microsoft.

**No. 1: Shifting successfully from on-site to remote to hybrid**

While colleagues in China were already home and working with Microsoft Teams, the Seattle area was the first US region to get hit hard by COVID 19. Around 50,000 Microsoft employees were some of the initial US residents to be asked to pack up their desks and work from home. With employees already being heavy Microsoft Teams users, product usage went up significantly on the first day of remote work. Microsoft Teams meetings more than doubled (2.5 times) globally from 2020 to 2021, and we anticipate this will continue to climb in 2022. Real-time connection and collaboration within Microsoft Teams were key components of transitioning from on-site to remote work, with users sending on average 45 percent more chats per week from 2020 to 2021.

As we shift to a new normal of hybrid work, Microsoft Teams will continue to be a critical component of our success. Preparing physical space (conference rooms), expanding capabilities within Microsoft Teams, and adapting to new cultural norms when conducting Microsoft Teams meetings will all be key for an improved hybrid meeting experience.

**No. 2: Making Microsoft Teams a hub for inclusivity**

An unexpected result of remote work has been an unprecedented 20 percent increase in meeting experience satisfaction. In our bi-annual employee survey, our net satisfaction (NSAT) for meeting experience climbed to 149, up from 125 two years prior. The primary reason is simple—universal remote meeting participation created an even playing field. Our more inclusive atmosphere for all meant our formerly remote participants were no longer at a disadvantage relative to their peers who used to attend in person.

A key priority as we shift to hybrid is to retain that inclusive environment and employee satisfaction. One way we can do this is by taking advantage of new features in Microsoft Teams, such as front row, as well as new hardware in meetings rooms such as AI-powered cameras, so everyone can participate in meetings. We will continue to take advantage of Microsoft Teams features that drive interaction and participation, like meeting chat and the "raise hand" feature, as well as reactions, emojis, and integrated GIF support. This ensures our employees will have a more personal and interactive meeting experience, whether they're joining remotely or attending from a conference room.

PX0516-002

[Learn how we're driving inclusive and effective meetings at Microsoft with Microsoft Teams.](#)

### No. 3: Fostering real-time and asynchronous collaboration

Our monthly active use of Microsoft Teams channels has gone up nearly 200 percent. Microsoft Teams continues to be our hub for creating focused spaces for seamless collaboration, and has also helped our employees and their teams better communicate, collaborate, and manage access to files and notes. And as usage has gone up, so has satisfaction in the way we collaborate. We also saw a 42 percent increase in "after hours" Microsoft Teams chats from 2020 to 2021, allowing users to communicate in a more flexible manner and fostering the need for an asynchronous way to collaborate. Additionally, our employees report that they are collaborating more effectively—our collaboration NSAT increased by 10 percent after we started working remotely.

With apps like Yammer and Microsoft Power Platform now integrated into Microsoft Teams, this has further helped users actively engage with their colleagues in several new and exciting ways. And going forward, Microsoft Loop will enhance this real-time collaboration, allowing users to create content by combining a powerful and flexible canvas with portable components that move freely and stay in sync within Microsoft Teams and across other applications.

### No. 4: Boosting your productivity with Microsoft Teams

It's no secret that companies that remained productive during the COVID era used the latest technology to continue working effectively and efficiently. Microsoft Teams has been a large factor in this. Companies like Accenture, Toyota, Kohler, Lumen, Ernst & Young, and Pfizer are just a few of the companies that use Microsoft Teams to keep their global enterprises running successfully.

Microsoft Teams' shift from a tool that was originally focused solely on collaboration, to an application that helps deliver on business process and automation, has enabled enterprises like Microsoft to help their employees stay productive during the unique challenges of remote and now hybrid work. Additionally, alongside the company's use of Microsoft Teams, Microsoft has also seen a sharp increase in the internal use of the Microsoft Power Platform, including a 27 percent increase in Microsoft Power Apps usage and a 93 percent increase in Microsoft Power Apps usage from 2020 to 2021. This growth has been fueled in part by how our employees are increasingly using the two platforms together.

At Microsoft, our employees use a set of helpful tips and tricks to get the most out of Microsoft Teams and keep their workday and usage of the application as productive as possible. While we've introduced several new applications to Microsoft Teams over the past five years, we've also learned and instilled best practices for things like Microsoft Teams meetings. This includes considerations like meeting length and established norms before you start a call, so participants know the expectations and outcomes for a meeting.

[Read these tips from Microsoft for staying productive in an evolving hybrid world.](#)

### No. 5: Learning and evolving

PX0516-003

As Microsoft's customer zero, we're constantly learning from our employees on ways to improve and evolve Microsoft Teams, and this happens on a rapid basis. We share this feedback with our colleagues on the product group, and they use it to shape everything from how they roll out new Microsoft Teams features to the designing Microsoft Teams policies. Staying ahead of employees' and customers' growing needs has never been more important. And while those of us responsible for deploying Microsoft Teams to our 280,000 full-time employees and vendors are in this constant state of listening and learning, we've realized that for our employees, having access to mechanisms that allow them to be more informed is an opportunity as well.

That's why this past year, we integrated Microsoft Viva—an integrated employee experience platform—into Microsoft Teams. Modules like Viva Learning help employees discover learning opportunities and recommended training to help them build their skills through the flow of their workday. And one thing the pandemic and remote work has taught us is that work fatigue and digital overload is real and can be challenging to our well-being. The Viva Insights module built into Microsoft Teams can help employees achieve better balance and reinforce boundaries between work and life.

As we anticipate the future, there is so much excitement in where Microsoft Teams is headed! We're preparing for advancements like Microsoft Mesh, which will enable presence and shared experiences through mixed reality, from anywhere and on any device. This is just one aspect of the continued evolution of the Microsoft Teams experience. There has been so much growth in the past five years for Microsoft Teams, but one thing we know for sure is that our employees will use Microsoft Teams to connect, collaborate, and explore with even more depth and dimension. Here's to the next five years of our Microsoft Teams journey!

Learn more about advancing your meetings with the Microsoft Teams Meeting guide.

Discover reinventing Microsoft's Employee Experience for a hybrid world.

Read more about using Microsoft Teams and ServiceNow to enhance end user support.

Tags: Microsoft Teams

PX0516-004

# PX0517

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**     **Joseph J. Simons, Chairman**
**Noah Joshua Phillips**
**Rohit Chopra**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**

---

| | |
|---|---|
| **In the Matter of** | |
| | **DOCKET NO. 9383** |
| **Cambridge Analytica, LLC,** | |
| **a corporation.** | |

**OPINION OF THE COMMISSION**

By Commissioner Noah Joshua Phillips, for the Commission:

Respondent Cambridge Analytica, LLC ("Cambridge Analytica"), a data analytics and consulting company, is charged with violating the Federal Trade Commission Act ("FTC Act") by employing false and deceptive tactics to harvest personal information from tens of millions of Facebook users through a Facebook application called the "GSRApp," also known as the "thisisyourdigitallife" app. As discussed below, Complaint Counsel move for summary decision. Because Cambridge Analytica has neither opposed Complaint Counsel's motion nor answered the Commission's administrative complaint, we decide this motion based on the undisputed facts as set forth in Complaint Counsel's motion and alleged in the Complaint.

The Complaint alleges that Cambridge Analytica, acting together with Alexander James Ashburner Nix ("Nix"), its Chief Executive Officer, and Aleksandr Kogan ("Kogan"), an applications developer who worked with the company, used the GSRApp to obtain Facebook user profile data from approximately 250,000–270,000 Facebook users who directly interacted with the app ("App Users"), as well as from 50–65 million of the "friends" in those users' social networks. The Complaint charges Cambridge Analytica with obtaining App Users' consent to collect their Facebook profile data by falsely representing that the GSRApp did not collect any personally identifiable information from Facebook users who interacted with it, such as their Facebook User ID. Cambridge Analytica then used the information collected through the

1

Facebook GRSApp for voter-profiling and targeted advertising purposes.[1]

The Complaint also charges Cambridge Analytica with deceptive acts and practices related to its participation in the European Union-United States Privacy Shield framework ("Privacy Shield"). The Complaint alleges that Cambridge Analytica, via its website, disseminated statements that falsely claimed it was a participant in Privacy Shield at a time when it had allowed its certification to lapse, and that it represented that it adhered to Privacy Shield principles despite failing to affirm to the U.S. Department of Commerce that it would continue to apply Privacy Shield protections to personal information collected while it participated in the program.

In May 2018, Cambridge Analytica filed for Chapter 7 bankruptcy, and those proceedings are ongoing. On July 24, 2019, the Commission issued its Complaint which, together with a notice order, was served on both Cambridge Analytica at its corporate headquarters and on its bankruptcy trustee. Cambridge Analytica failed to file an answer within the time required by the Commission's Rules of Practice, *i.e.,* by August 12, 2019. Under the Rules, Cambridge Analytica's failure to file an answer is deemed a waiver of its right to appear and to contest the allegations in the Complaint. 16 C.F.R. § 3.12(c). Rule 3.12(c) authorizes the Commission, without further notice to the Respondent, "to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding." *Id.*

We now have before us Complaint Counsel's Motion for Summary Decision.[2] Cambridge Analytica did not file an opposition to the Motion when due under the Rules, *i.e.,* by September 4, 2019.[3] Complaint Counsel seek a determination that Cambridge Analytica made

---

[1] On July 24, 2019, the Commission accepted for public comment consent settlements with Respondents Nix and Kogan to address their respective roles in the deceptive acts and practices related to the Facebook GSRApp by requiring them, *inter alia,* to destroy information collected through the GSRApp, as well as algorithms derived from such information, and prohibiting them from misrepresenting the extent to which they protect the privacy and confidentiality of personally identifiable information that they collect, use, share, or sell about individual consumers in the future. *Aleksandr Kogan and Alexander Nix,* https://www.ftc.gov/enforcement/cases-proceedings/182-3106-182-3107/aleksandr-kogan-alexander-nix. In a related enforcement action, the Commission settled charges that Facebook, Inc. violated its 2012 FTC order by deceiving Facebook users about their ability to control the privacy of their personal information. The settlement imposed a $5 billion civil penalty on Facebook and contained injunctive relief imposing substantial new changes to its operations. *Facebook, Inc.,* https://www.ftc.gov/enforcement/cases-proceedings/092-3184/facebook-inc.

[2] For purposes of this opinion, we use the following abbreviations:

    Compl.:      Complaint
    CCMSD:       Complaint Counsel's Motion for Summary Decision
    CCCSUF:      Complaint Counsel's Concise Statement of Undisputed Facts

[3] 16 C.F.R. §§ 3.24(a)(2), 4.3(c). Complaint Counsel discussed the Motion with Cambridge Analytica's bankruptcy trustee, who is legally authorized to act on behalf of the company. The bankruptcy trustee did not object to the filing of the Motion, and provided comments on the notice order attached to the Complaint. CCMSD at 2-3. Based on these comments, Complaint Counsel propose certain minor changes to the notice order in a proposed order submitted with the Motion for Summary Decision, which we discuss in connection with our remedy determination in Section IV.

PX0517-002

false or misleading representations in violation of Section 5 of the FTC Act:

- to Facebook users who authorized the GSRApp that it did not collect their personally identifiable information (Count I);

- that it was a participant in Privacy Shield from May to November 2018, even though it had allowed its certification to lapse (Count II); and

- that it would adhere to Privacy Shield principles, even though it failed to affirm to the Department of Commerce, as required, that it would continue to apply those principles to personal information it had acquired while participating in the program (Count III).

As discussed below, we grant Complaint Counsel's Motion for Summary Decision. Because Cambridge Analytica has defaulted and has failed to challenge the facts presented as undisputed by Complaint Counsel's Motion, we find the facts as set forth in the Motion. (Section I). Based on our analysis of the undisputed facts under applicable legal standards and precedent, we conclude that Cambridge Analytica is liable on all three Counts of the Complaint. (Section III). Finally, we discuss the order we issue against Cambridge Analytica and its successors and assigns to remedy Cambridge Analytica's violations of Section 5 of the FTC Act. (Section IV).

## I.    FACTS

Cambridge Analytica is a private Delaware limited liability corporation that was formed in December 2013, and had a principal office or place of business at 597 Fifth Avenue, 7th Floor, New York, NY 10017. CCCSUF ¶ 1; Compl. ¶ 2. Cambridge Analytica is part of the SCL Group Ltd. family of companies, as is SCL Elections Limited ("SCL Elections"),[4] a privately held U.K. Corporation, which has held an ownership interest in Cambridge Analytica. CCCSUF ¶ 2; Compl. ¶ 2. Cambridge Analytica has operated as a data analytics and consulting company that provides voter-profiling and marketing services. Cambridge Analytica describes itself on its website as "a data-science consultancy and marketing agency" that is "politically neutral". CCCSUF ¶ 3; Compl. ¶ 2. In May 2018, Cambridge Analytica filed for bankruptcy, which proceedings are still ongoing. CCCSUF ¶ 4; Compl. ¶ 2.

During the relevant time period, Cambridge Analytica and SCL Elections conducted their business practices through an interrelated network of companies that have common business functions, ownership, officers, and employees. For example, Nix was both the head of SCL Elections and also the Chief Executive Officer of Cambridge Analytica. SCL Elections was placed into liquidation on April 17, 2019. CCCSUF ¶ 5; Compl. ¶ 3.

Cambridge Analytica, together with SCL Elections (Compl. ¶¶ 1-3) and two other relevant parties, Nix and Kogan (Compl. ¶¶ 4-5), engaged in the conduct alleged in Count I of the Complaint (Compl. ¶¶ 38-39). Nix is a British citizen currently residing in the United

---

[4] *See* Complaint ¶ 5, *Aleksandr Kogan and Alexander Nix*, https://www.ftc.gov/enforcement/cases-proceedings/182-3106-182-3107/aleksandr-kogan-alexander-nix.

3

Kingdom. Until April 30, 2018, Nix was the Chief Executive Officer of Cambridge Analytica and a director of SCL Elections. Nix currently resides in London, England, and in connection with the matters alleged herein, transacts or has transacted business throughout the United States. Compl. ¶ 5. Kogan is an American citizen currently residing in New York. Until September 2018, Kogan was a Senior Research Associate and Lecturer at the Department of Psychology at the University of Cambridge in the United Kingdom, where he established and led the Cambridge Prosociality and Well-Being Lab ("CPW Lab"). Kogan was also an owner and co-founder of the now-defunct U.K. corporation, Global Science Research, Ltd. ("GSR"). Compl. ¶ 4.[5]

### A.    The Agreement to Harvest Facebook User Profile Data for Commercial Purposes

In late 2013 or early 2014, Cambridge Analytica, along with Nix and SCL Elections, became aware of research by individuals at the Psychometrics Centre at the University of Cambridge that found that Facebook profile information could be used to successfully predict an individual's personality traits according to the "OCEAN" scale, a psychometric model that measures an individual's openness to experiences, conscientiousness, extraversion, agreeableness, and neuroticism. CCCSUF ¶ 8; Compl. ¶ 7. Specifically, researchers developed an algorithm that could predict an individual's personality based on the individual's "likes" of public Facebook pages. For example, liking Facebook pages related to *How to Lose a Guy in 10 Days*, George W. Bush, and rap and hip-hop could be linked with a conservative and conventional personality. The researchers asserted that their algorithm, which was more accurate for individuals who had more public Facebook page "likes," could potentially predict an individual's personality better than the person's co-workers, friends, family, and even spouse. CCCSUF ¶ 9; Compl. ¶ 8.

Cambridge Analytica, along with Nix and SCL Elections, was interested in this research because Cambridge Analytica intended to offer voter-profiling, microtargeting, and other marketing services to U.S. political campaigns and other U.S.-based clients. CCCSUF ¶ 10; Compl. ¶ 9. Through mutual contacts, representatives of SCL Elections (who had dual roles at Cambridge Analytica) reached out to Kogan and academics affiliated with the Psychometrics Centre in early 2014 to discuss a potential working relationship to commercialize this research. CCCSUF ¶ 11; Compl. ¶ 9. Kogan, who was a Senior Research Associate and Lecturer at the Department of Psychology at the University of Cambridge, had expertise researching and analyzing Facebook data through his work at the CPW Lab. CCSUF ¶ 12; Compl. ¶ 10. In particular, he had prior research collaborations with Facebook through which he analyzed aggregated Facebook data relating to how people worldwide connect and express emotions. *Id.* Kogan was willing to enter into a commercial venture with SCL Elections, and after several months of discussion, the parties reached agreement about the scope of work (the "Project"). CCCSUF ¶ 13; Compl. ¶ 10.

By that point, Kogan already had a Facebook app that was registered on the Facebook platform—the CPW Lab app—and could be repurposed to collect profile data from Facebook

---

[5] Kogan has been known at times by the married name, Aleksandr Spectre. *Id.*

PX0517-004

users and their "friends" through Facebook's developer tool, Graph API (v.1). CCCSUF ¶ 14; Compl. ¶ 11. Facebook's Graph API (v.1) allowed developers to collect Facebook profile data from users who directly installed or otherwise interacted with the developer's application or website through a Facebook Login, as well as from these users' Facebook "friends" ("Affected Friends"). CCCSUF ¶ 15; Compl. ¶ 12. Facebook allowed this data collection even though the Affected Friends did not have any direct interaction with the app or website. CCCSUF ¶ 15; Compl. ¶ 12. While Facebook had announced in April 2014 that it was introducing a new version of the Graph API—v.2—that would allow developers to collect profile data only from the App Users themselves, and not from Affected Friends, existing apps had one year before these limitations went into effect, whereas new apps would automatically be limited. CCCSUF ¶ 15; Compl. ¶ 12. Thus, Kogan's app was "grandfathered" into the more permissive data collection allowable under Graph API (v.1), making Kogan an appealing partner for Cambridge Analytica, Nix, and SCL Elections. CCCSUF ¶ 15; Compl. ¶ 12.

On May 29, 2014, Kogan incorporated a now-defunct U.K. corporation, Global Science Research, Ltd., to carry out the Project, separate and apart from his duties at the University of Cambridge. CCCSUF ¶ 16; Compl. ¶ 13. Kogan was a founder and Chief Executive Officer of GSR, and worked on all aspects of GSR's products and services before it was dissolved in October 2017. CCCSUF ¶ 16; Compl. ¶ 13. On June 4, 2014, GSR and SCL Elections entered into the GS Data and Technology Subscription Agreement (the "June 2014 Agreement"). Nix signed this agreement for SCL Elections. CCCSUF ¶ 17; Compl. ¶ 14. Under this agreement, GSR agreed to harvest Facebook profile data from App Users and Affected Friends in 11 U.S. states, generate personality scores for these individuals, and then match these profiles to U.S. voter records provided to GSR by SCL Elections. CCCSUF ¶ 18; Compl. ¶ 14. GSR would then send these matched records along with the associated personality scores back to SCL Elections. CCCSUF ¶ 19; Compl. ¶ 14. GSR retained the original data set and granted SCL Elections a license to access the data and to use the proprietary GSR personality scores. CCCSUF ¶ 19; Compl. ¶ 14. Following the creation of GSR and the signing of the June 2014 Agreement, Kogan repurposed the CPW Lab app to become the GSRApp. CCCSUF ¶ 20; Compl. ¶ 14.

Although SCL Elections is the entity that entered into the agreement with GSR, it was acting for and on behalf of Cambridge Analytica. CCCSUF ¶ 21; Compl. ¶ 15. SCL Elections entered into a Services Agreement with Cambridge Analytica whereby SCL Elections agreed, among other things, to (a) acquire, for and on behalf of Cambridge Analytica, demographic, transactional, lifestyle, and behavioral data about consumers in target populations; (b) identify and build target voter lists; (c) apply research techniques to understand better the habits and daily lives of target voter groups; and (d) apply psychological profiles to target groups of voters. In a separate agreement, SCL Elections also agreed to license all of its intellectual property to Cambridge Analytica. *Id.*

Cambridge Analytica and SCL Elections played a significant and direct role in the development and implementation of the GSRApp, as well as in the analysis of the data the GSRApp collected. CCCSUF ¶ 22; Compl. ¶ 16. Among other things, Cambridge Analytica and SCL Elections revised the terms of use for the GSRApp from the original CPW Lab app. CCCSUF ¶ 23; Compl. ¶ 16.a. Cambridge Analytica and SCL Elections also paid all costs, totaling over $500,000, related to implementing the GSRApp and analyzing the resulting data,

PX0517-005

including paying U.S.-based survey panel providers specifically to target Facebook users located in the United States to take the GSRApp surveys. CCCSUF ¶ 24; Compl. ¶ 16.b. Cambridge Analytica and SCL Elections also inserted specific questions to be included in some of the surveys, including a number of questions about national security in the United States, as this was a particular topic of interest for one of Cambridge Analytica's U.S.-based clients. CCCSUF ¶ 25; Compl. ¶ 16.c. Cambridge Analytica and SCL Elections also directly communicated with the U.S.-based survey panel provider about the timing and focus of the GSRApp surveys. CCCSUF ¶ 26; Compl. ¶ 16.d. Cambridge Analytica and SCL Elections also actively assisted in the matching of data harvested from App Users and Affected Friends located in the United States and Kogan's personality scores with U.S. voter registration records. CCCSUF ¶ 27; Compl. ¶ 16.e.

Nix was personally involved in the data-harvesting Project. In addition to signing the June 2014 Agreement, he directly communicated and met with Kogan about the Project; personally authorized payment for Project-related costs; reviewed survey questions and specifically requested certain Facebook data or analysis; and directed internal actions within SCL Elections and Cambridge Analytica related to implementing the GSRApp, analyzing the GSRApp data, and using the GSRApp data for Cambridge Analytica clients in the United States. CCCSUF ¶ 28; Compl. ¶ 17.

### B.    The GSRApp Harvested Large Quantities of Facebook Profile Data from App Users and Affected Friends

The GSRApp asked users to answer survey questions and consent to their Facebook profile data being collected, including public Facebook page "likes." Kogan then used the initial participants' survey responses and Facebook "likes" to train his algorithm so that it could predict the users' personality traits based solely on the Facebook "likes" data. This process allowed Kogan to provide personality scores for the Affected Friends, from whom he collected Facebook data but had no survey responses. CCCSUF ¶ 29; Compl. ¶ 18.

Kogan then assigned a confidence level to each personality score based on the number of public page "likes" for each U.S.-based App User and Affected Friend, generally requiring a Facebook user to have "liked" at least 10 public Facebook pages to be confident of the personality score. CCCSUF ¶ 30; Compl. ¶ 19. Cambridge Analytica, Nix, and Kogan then conducted a small trial to determine how well Facebook profile information could be matched with U.S. voter records and information from other public databases. The Project would have had little value to Cambridge Analytica and SCL Elections if the personality scores could not be matched with actual U.S. voters. CCCSUF ¶ 31; Compl. ¶ 20.

The initial trial was a success and showed that the Facebook profile data could be matched with U.S. voter records. Based on this success, Cambridge Analytica, Nix, and Kogan implemented the GSRApp on a wider scale using the Qualtrics survey platform, based in Provo, Utah. CCCSUF ¶ 32; Compl. ¶ 21. Qualtrics recruited U.S.-based consumers through four waves of survey panels during the summer of 2014. Each wave asked different questions of the participants such that Kogan's personality scores covered a broad range of topics, including political enthusiasm, political orientation, frequency in voting, consistency in voting for the same

PX0517-006

political party, and views on particular controversial issues. Survey participants who completed the survey and authorized the GSRApp to harvest their Facebook profile information were paid a nominal fee of a few dollars for participating in the survey. CCCSUF ¶ 33; Compl. ¶ 22.

At the point in every survey in which the GSRApp asked U.S. consumers to authorize the app to collect their Facebook data, the GSRApp made the following representation:

> In this part, we would like to download some of your Facebook data using our Facebook app. We want you to know that we will NOT download your name or any other identifiable information—we are interested in your demographics and likes.

CCCSUF ¶ 34; Compl. ¶ 23. Cambridge Analytica, Nix, and Kogan included this representation after finding that half of the survey participants initially refused to grant the GSRApp permission to collect their Facebook profile data. CCCSUF ¶ 35; Compl. ¶ 24.

Contrary to this representation, the GSRApp collected the Facebook User ID of those App Users who authorized it. CCCSUF ¶ 35; Compl. ¶ 24. A Facebook User ID is a persistent, unique identifier that connects individuals to their Facebook profiles. CCCSUF ¶ 35; Compl. ¶ 24.

Cambridge Analytica, Nix, and Kogan harvested a significant amount of Facebook profile data from App Users and the Affected Friends located in the U.S. through the GSRApp. Specifically, they harvested the following Facebook profile data from App Users: Facebook User ID; gender; birthdate; location ("current city"); friends list; and "likes" of public Facebook pages. They harvested from Affected Friends their Facebook User ID; name; gender; birthdate; location ("current city"); and "likes" of public Facebook pages. CCCSUF ¶ 37; Compl. ¶ 25. Over the course of the Project, Cambridge Analytica, Nix, and Kogan harvested Facebook profile data from approximately 250,000–270,000 App Users located in the U.S., and harvested profile data from approximately 50–65 million Affected Friends, including at least 30 million identifiable U.S. consumers. CCCSUF ¶ 38; Compl. ¶ 26.

In January 2015, GSR and SCL Elections entered into a supplemental agreement ("January 2015 Agreement") regarding additional data from the Project that Cambridge Analytica and SCL Elections wanted. Pursuant to the January 2015 Agreement, GSR provided data and analysis for App Users and Affected Friends for the remaining 39 U.S. states. GSR also provided a more limited set of personality analyses for these consumers than it had provided for consumers in the initial 11 U.S. states. CCCSUF ¶ 39; Compl. ¶ 27.

In April 2015, GSR and SCL Elections entered into an addendum to the January 2015 Agreement ("Addendum"), pursuant to which GSR provided Cambridge Analytica and SCL Elections with the underlying Facebook data used to "train" the algorithm that generated the OCEAN personality scores. GSR also provided Cambridge Analytica and SCL Elections with additional information about whether the App Users and Affected Friends included in the second set of data provided pursuant to the January 2015 Agreement had "likes" for about 500 specific pages identified by Cambridge Analytica and SCL Elections. CCCSUF ¶ 40; Compl. ¶ 28.

Nix, SCL Elections, and Cambridge Analytica reported to Kogan that they had very

PX0517-007

positive feedback from their clients and had expressed an interest in continuing to work with Kogan and GSR on other similar projects. While Kogan and GSR were interested in working on follow-up projects, the parties could not reach an agreement and discontinued their work together after GSR transferred the data agreed to in the Addendum in May 2015. CCCSUF ¶ 41; Compl. ¶ 29.

In December 2015, several news reports were published regarding Cambridge Analytica's use of Facebook data. Following these reports, Facebook demanded that Kogan, Cambridge Analytica, and its SCL affiliates delete all Facebook data in their possession. While Kogan and SCL Elections certified to Facebook that they had deleted the data obtained through the GSRApp, individuals or other entities still possess this data and/or data models based on this data. CCCSUF ¶ 42; Compl. ¶ 30.

### C. Cambridge Analytica's Claims that It Participated in the Privacy Shield Framework and Adhered to its Principles

#### 1. The Privacy Shield Framework

The Privacy Shield framework was designed by the U.S. Department of Commerce ("Commerce") and the European Commission to provide a mechanism for U.S. companies to transfer personal data outside of the EU that is consistent with the requirements of the European Union Directive on Data Protection. Enacted in 1995, the Directive set forth EU requirements for privacy and the protection of personal data. CCCSUF ¶ 43; Compl. ¶ 31. Among other things, the Directive requires EU Member States to implement legislation that prohibits the transfer of personal data outside the EU, with exceptions, unless the European Commission has made a determination that the recipient jurisdiction's laws ensure the protection of such personal data. This determination is referred to commonly as meeting the EU's "adequacy" standard. CCCSUF ¶ 44; Compl. ¶ 31.

To satisfy the EU adequacy standard for certain commercial transfers, Commerce and the European Commission negotiated the Privacy Shield framework, which went into effect in July 2016. CCCSUF ¶ 45; Compl. ¶ 32. The Privacy Shield framework allows companies to transfer personal data lawfully from the EU to the United States. CCCSUF ¶ 45; Compl. ¶ 32. Companies under the enforcement jurisdiction of the Federal Trade Commission, as well as the U.S. Department of Transportation, are eligible to join the Privacy Shield framework. CCCSUF ¶ 46; Compl. ¶ 33. To join the Privacy Shield framework, a company must self-certify to Commerce that it complies with the Privacy Shield principles and related requirements that have been deemed to meet the EU's adequacy standard. CCCSUF ¶ 46; Compl. ¶ 32.

Commerce maintains a public website, https://www.privacyshield.gov/welcome, where it posts the names of companies that have self-certified to the Privacy Shield framework. The listing of companies, https://www.privacyshield.gov/list, indicates whether the company's self-certification is current. CCCSUF ¶ 48; Compl. ¶ 34. Any company that voluntarily withdraws or lets its self-certification lapse must continue to apply the Privacy Shield principles to the personal information it received while a participant in Privacy Shield, and affirm to Commerce on an annual basis its commitment to do so, for as long as it retains such information. CCCSUF

PX0517-008

¶ 47; Compl. ¶ 32.

### 2. Cambridge Analytica's Claims Regarding its Participation in Privacy Shield

On May 11, 2017, Cambridge Analytica joined Privacy Shield. CCCSUF ¶ 50; Compl. ¶ 35. While the Facebook data harvested through the GSRApp predated its participation in Privacy Shield and is therefore not subject to its protections, Cambridge Analytica continued to collect Facebook and other data from or about U.S. and European consumers after it joined Privacy Shield. CCCSUF ¶ 50; Compl. ¶ 35.

Until at least November 27, 2018, Cambridge Analytica disseminated or caused to be disseminated privacy policies and statements on its website at https://cambridgeanalytica.org including, but not limited to, the following statements that it participated in the Privacy Shield framework and that it adhered to the Privacy Shield principles:

### IS CAMBRIDGE ANALYTICA PART OF THE PRIVACY SHIELD FRAMEWORK?

Yes: Cambridge Analytica adheres to the EU-US Privacy Shield Principles for the transfer of EU data we use to provide our services, including the onward transfer liability provisions. With respect to personal data received or transferred pursuant to the Privacy Shield Framework, Cambridge Analytica is subject to the regulatory enforcement powers of the U.S. Federal Trade Commission. More information on the principles are available at the Privacy Shield website: https://www.privacyshield.gov/.

CCCSUF ¶ 51; Compl. ¶ 36.

Cambridge Analytica, however, did not complete the steps necessary to renew its participation in Privacy Shield after that certification expired on or about May 11, 2018. CCCSUF ¶ 52; Compl. ¶ 37. After allowing its certification to lapse, Cambridge Analytica continued to claim on its website that it was participating in Privacy Shield until at least November 27, 2018. CCCSUF ¶ 52; Compl. ¶ 37.

Cambridge Analytica also failed to comply with the Privacy Shield principle that required it to affirm to Commerce, after its certification had lapsed, its commitment to protect any personal information that it had acquired while a participant in Privacy Shield for so long as it retained the data. CCCSUF ¶ 54; Compl. ¶ 37. Notwithstanding its failure to affirm to Commerce its commitment to continue to protect the personal data it had acquired while a participant in Privacy Shield, Cambridge Analytica continued to disseminate or cause to be disseminated privacy policies and statements on its website (https://cambridgeanalytica.org) asserting that it was part of the Privacy Shield framework and that it adhered to the Privacy Shield principles for the transfer of EU data. CCCSUF ¶¶ 51, 54; Compl. ¶¶ 36-37.

PX0517-009

## II.    LEGAL STANDARDS

### A.    Standard for Summary Decision

We review Complaint Counsel's Motion for Summary Decision pursuant to Rule 3.24 of the Commission's Rules of Practice, 16 C.F.R. § 3.24, the provisions of which "are virtually identical to the provisions of Fed. R. Civ. P. 56, governing summary judgment in the federal courts." *Polygram Holding, Inc.*, 2002 WL 31433923, at *1 (F.T.C. Feb. 26, 2002) (order denying motion for summary decision). Consistent with Rule 56(a), a party moving for summary decision must show that "there is no genuine dispute as to any material fact." *Id.*; *see Jerk, LLC*, 159 F.T.C. 885, 889 (2015). We may therefore rely on authority applying the federal summary judgment standard. *See, e.g.*, *Fanning v. FTC*, 821 F.3d 164, 170 (1st Cir. 2016) (under FTC rules, summary decision is reviewed "under the same standard as summary judgment before a district court").

As the moving party, Complaint Counsel bear the initial burden of identifying evidence that demonstrates the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a motion for summary decision is made and supported, the "party opposing the motion may not rest upon the mere allegations or denials of his or her pleading; the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue of material fact for trial." 16 C.F.R. § 3.24(a)(3); *see also Celotex*, 477 U.S. at 323. We are required to resolve all factual ambiguities and draw all justifiable inferences in the light most favorable to Cambridge Analytica.

In this case, there is no material fact at issue by virtue of Cambridge Analytica's default, 16 C.F.R. § 3.12(c), and its failure to oppose Complaint Counsel's Motion for Summary Decision. Accordingly, we base our determination whether Cambridge Analytica violated Section 5 of the FTC Act on an analysis of the undisputed facts as submitted with Complaint Counsel's Motion for Summary Decision and alleged in the Complaint under the legal standards for evaluating deceptive acts and practices.[6]

### B.    Standard for Deception

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C § 45. The Complaint charges Cambridge Analytica only with alleged deception; there are no allegations of unfair acts or practices.

"An act or practice is deceptive if (1) there is a representation, omission, or practice, (2)

---

[6] Respondent does not contest the Commission's jurisdiction over it or over the conduct challenged in the Complaint. CCCSUF ¶¶ 1-5, 7; Compl. ¶¶ 1-3. Nor does Respondent dispute that the acts and practices alleged in the Complaint were in or affecting commerce, as "commerce" is defined in the FTC Act, 15 U.S.C § 44. CCCSUF ¶ 6; Compl. ¶ 6. We therefore find that the Commission has jurisdiction over the Respondent and its conduct as alleged in the Complaint.

PX0517-010

that is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1063 (C.D. Cal. 2012) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)), *aff'd in part, vacated in part, and remanded*, 815 F.3d 593 (9th Cir. 2016); *accord FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (citing, *e.g., FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)); *FTC Policy Statement on Deception*, appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984) ("*Deception Statement*"). Thus, in determining whether a representation is deceptive, we conduct a three-step inquiry, determining: (1) what claims are conveyed; (2) whether those claims are false, misleading, or unsubstantiated; and (3) whether the claims are material. *See ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 609 (6th Cir. 2017) (finding website content deceptive); *Fanning*, 821 F.3d at 170 (same); *POM Wonderful v. FTC*, 777 F. 3d 478, 490 (D.C. Cir. 2015) (finding advertising deceptive).

A representation is considered material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *E.g., FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 960 (N.D. Ill. 2006) (citing *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)), *aff'd*, 512 F.3d 858 (7th Cir. 2008); *Commerce Planet*, 878 F. Supp. 2d at 1063 (citing *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)). The Commission presumes that express claims are material. *ECM Biofilms, Inc.*, 2015 WL 6384951, at \*53 (F.T.C. Oct. 19, 2015), *pet. for review denied*, 851 F.3d 599 (6th Cir. 2017); *Jerk, LLC*, 159 F.T.C. at 906; *POM Wonderful LLC*, 155 F.T.C. 1, 62 (2013) (citing *Novartis Corp.*, 127 F.T.C. 580, 686 (1999) (citing *Deception Statement*, 103 F.T.C. at 182)), *aff'd*, 777 F.3d 478 (D.C. Cir. 2015). Express claims encompass not only the explicit statements in the representation, but also necessary implications derived from the statements. *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 126 n.4 (D. Conn. 2008). [7]

## III.    CAMBRIDGE ANALYTICA'S LIABILITY

Due to Cambridge Analytica's failure to file an answer to the Complaint or to oppose Complaint Counsel's Motion for Summary Decision, there is no genuine issue of material fact in this case. Therefore, summary decision is appropriate. We determine whether, based on the undisputed facts, Cambridge Analytica is liable for engaging in deceptive acts and practices in violation of Section 5 of the FTC Act by analyzing: (1) whether it made the claims alleged in the Complaint; (2) whether those claims were false or misleading; and (3) whether the claims were material.

### A.    Count I: Deceptive Claim by Cambridge Analytica Concerning the Collection of Personally Identifiable Information

There is no dispute that Cambridge Analytica made the claim alleged in the Complaint, namely, that "Cambridge Analytica represented, directly or indirectly, expressly or by implication, that the GSRApp did not collect any identifiable information from Facebook users

---

[7] As discussed in Section III below, the representations at issue are express. Since, in the case of express representations, "we expect consumers to rely on express statements . . . and to interpret such statements as meaning what they say," *California Naturel, Inc.*, 2016 WL 7228668, at \*7 (F.T.C. Dec. 5, 2016), we need not inquire separately into how these claims would be interpreted by reasonable consumers.

PX0517-011

who authorized the app." Compl. ¶ 38. Cambridge Analytica launched the Facebook GSRApp on a wide scale using the Qualtrics survey platform to recruit U.S.-based consumers to participate in surveys and authorize the GSRApp to harvest their Facebook profile information. CCCSUF ¶ 32-33; Compl. ¶ 21-22. At the point in those surveys at which U.S. consumers were asked to authorize the app to collect their Facebook data, Cambridge Analytica, through the GSRApp, made the following representation:

> In this part, we would like to download some of your Facebook data using our Facebook app. We want you to know that we will NOT download your name or any other identifiable information—we are interested in your demographics and likes.

CCCSUF ¶ 34; Compl. ¶ 23. We therefore find that Cambridge Analytica made the claim alleged in the Complaint.

There is also no dispute that this representation was false and misleading. Contrary to Cambridge Analytica's representation, the GSRApp did in fact collect participating users' personally identifiable information, notably including their Facebook User IDs. CCCSUF ¶ 35; Compl. ¶ 24. We find that Cambridge Analytica's representations to App Users who authorized the GSRApp that it would not download their name or any other identifiable information were false and misleading.

Finally, we find that Cambridge Analytica's false and misleading representation to App Users via the GSRApp that it would not download names or other identifiable information was an express claim, and as such is presumptively material. Cambridge Analytica has not rebutted the legal presumption that this express claim is material.[8]

We conclude that Cambridge Analytica's representation to App Users who authorized the GSRApp that it would not collect their identifiable information was a false and material, and hence deceptive, claim. Accordingly, we grant Complaint Counsel's Motion for Summary Decision on Count I.

### B.    <u>Count II</u>: Deceptive Claim by Cambridge Analytica Concerning Its Participation in Privacy Shield

We turn now to Cambridge Analytica's representations regarding its participation in and compliance with the Privacy Shield framework. Cambridge Analytica joined the Privacy Shield program on May 11, 2017. CCCSUF ¶ 50; Compl. ¶ 35. There is no dispute that thereafter, and continuously until at least November 27, 2018, Cambridge Analytica made statements and representations on its website at http://cambridgeanalytic.org that affirmed it was a participant in

---

[8] Other evidence supports this conclusion. Notably, Cambridge Analytica included the representation at the point in the surveys where the GSRApp requested App Users' permission to collect "some" of their Facebook data *after* learning that half of the survey participants had refused to grant any permission to the GSRApp absent such an assurance. CCCSUF ¶¶ 34-35; Compl. ¶¶ 23-24. We can infer from these undisputed facts that Cambridge Analytica subsequently included the false statement, "[w]e want you to know that we will NOT download your name or any other identifiable information," as a means of inducing survey participants to allow the GSRApp to collect their Facebook profile data. We can also infer that the assurances provided by Cambridge Analytica's representation likely affected the choices and changed the decisions of a substantial number of App Users.

PX0517-012

the Privacy Shield program and adhered to the Privacy Shield principles. CCCSUF ¶ 51; Compl. ¶ 36. For example, Cambridge Analytica displayed the following statement on its website:

### IS CAMBRIDGE ANALYTICA PART OF THE PRIVACY SHIELD FRAMEWORK?

Yes: Cambridge Analytica adheres to the EU-US Privacy Shield Principles for the transfer of EU data we use to provide our services, including the onward transfer liability provisions. With respect to personal data received or transferred pursuant to the Privacy Shield Framework, Cambridge Analytica is subject to the regulatory enforcement powers of the U.S. Federal Trade Commission. More information on the principles are available at the Privacy Shield website: https://www.privacyshield.gov/.

CCCSUF ¶ 51; Compl. ¶ 36. We find that, from May 2017 until at least November 27, 2018, Cambridge Analytica made the claim that it was a participant in Privacy Shield.

The undisputed facts further establish that Cambridge Analytica did not complete the steps necessary to renew its participation in Privacy Shield after its certification expired on or about May 11, 2018. CCCSUF ¶ 52; Compl. ¶ 37. We find that Cambridge Analytica's continued representation that it was participating in Privacy Shield from May to November 2018, when it had in fact allowed its Privacy Shield certification to lapse, was a false and misleading claim. Cambridge Analytica has not rebutted the legal presumption that this express claim was material.

We conclude that Cambridge Analytica's express representation that it remained a participant in the Privacy Shield framework after its certification had lapsed was false and material, and hence deceptive. Accordingly, we grant Complaint Counsel's Motion for Summary Decision on Count II.

### C.    Count III: Deceptive Claim by Cambridge Analytica Concerning Its Adherence to Privacy Shield Principles

Among the requirements imposed by Privacy Shield on companies that self-certify as compliant participants in the Privacy Shield program is that, if the company withdraws from the program or allows its self-certification to lapse, it must affirm to the U.S. Department of Commerce on an annual basis its commitment to continue to apply Privacy Shield principles and protections to the personal information it has received while a participant in Privacy Shield for as long as it retains such information.  CCCSUF ¶ 47; Compl. ¶ 32.

The undisputed facts establish that, beginning on or about May 11, 2017, Cambridge Analytica expressly represented on its website that it adhered to Privacy Shield principles. Cambridge Analytica continued to represent on its website that it adhered to Privacy Shield principles even after its certification had lapsed on or after May 11, 2018. CCCSUF ¶¶ 51, 54; Compl. ¶¶ 36-37. We find that, by representing that it was compliant with Privacy Shield principles, Cambridge Analytica necessarily represented that it was complying with the Privacy Shield requirement to affirm to Commerce its commitment to continue to apply Privacy Shield

13

protections to the personal information it had collected for as long as it retained this data. This claim was false and misleading because Cambridge Analytica had, in fact, failed to make the required affirmation to Commerce after its Privacy Shield certification lapsed. CCCSUF ¶ 54; Compl. ¶ 37.[9] Cambridge Analytica has not rebutted the legal presumption that this express claim was material.

We therefore conclude that Cambridge Analytica's representation that it was in compliance with Privacy Shield principles was false and material, and hence deceptive. We grant Complaint Counsel's Motion for Summary Decision on Count III.

## IV.    REMEDY

The FTC Act authorizes the Commission to issue an order that requires the Respondent to cease and desist its deceptive acts or practices. 15 U.S.C. § 45(b); *see also FTC v. Nat'l Lead Co.*, 352 U.S. 419, 428 (1957). Moreover, "[t]he Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (quoting *FTC v. Ruberoid*, 343 U.S. 470, 473 (1952)). The Commission may "frame its order broadly enough to prevent respondents from engaging in similarly illegal practices in [the] future." *Id.* at 395.

The Complaint in this matter attached a notice of the form of order that might issue if the facts were found to be as alleged. We have already found to be established the facts as set forth in Complaint Counsel's Motion for Summary Decision and as alleged in the Complaint. Complaint Counsel observe that Rule 3.12 (c) authorizes the Commission to enter an order consistent with the notice order attached to the Complaint *sua sponte*, but propose several minor changes to the notice order based on comments Complaint Counsel received from Cambridge Analytica's bankruptcy trustee. CCMSD 2-3. Specifically, the proposed order accompanying the Motion incorporates certain changes related to the records access provisions, given the practical and legal constraints imposed by Cambridge Analytica's bankruptcy proceedings. We agree that

---

[9] Neither the Complaint nor Complaint Counsel's Motion expressly allege any facts regarding the status of the data that Cambridge Analytica had collected from consumers while a participant in Privacy Shield after its Privacy Shield certification lapsed on May 11, 2018. However, both the Complaint and Motion allege that Cambridge Analytica received such information (CCCSUF ¶ 50; Compl. ¶ 35), and allege no facts suggesting such information was deleted or returned upon the lapse of its Privacy Shield certification. Indeed, Complaint Counsel's notice order provides that we require the Respondent, defined to include Cambridge Analytica and its successors and assigns, to delete information collected by the Respondent from consumers. Moreover, Cambridge Analytica has not denied Paragraph 43 of the Complaint, which states that Cambridge Analytica's representation of adherence to Privacy Shield principles was false and misleading. In these circumstances, there is an adequate basis for us to find that Cambridge Analytica misrepresented its continued adherence to Privacy Shield principles after its certification had lapsed.

PX0517-014

the changes Complaint Counsel propose are appropriate.[10]

At the outset, we underscore that all of the prohibitions and requirements of our Final Order are binding on the "Respondent," which by definition includes Cambridge Analytica and its successors and assigns, and also that the requirements of Paragraphs I-V of the Final Order expressly apply to Respondent's officers, agents, employees, and all other persons in active concert or participation with any of them, who receive actual notice of the Final Order. That said, for simplification, we refer only to "Respondent" in our discussion of the Final Order's provisions.

Paragraph I of the Final Order prohibits Respondent from making misrepresentations regarding the extent to which it protects the privacy and confidentiality of Covered Information as defined in the Final Order, including: (1) the extent to which it collects, uses, shares, or sells any Covered Information; and (2) the purposes for which it collects, uses, shares, or sells any Covered Information.

Paragraph II prohibits Respondent from making misrepresentations, in connection with any product or service, regarding the extent to which Respondent participates in any privacy or security program sponsored by a government or any self-regulatory or standard-setting organization, including, but not limited to, the EU-U.S. Privacy Shield framework, the Swiss-U.S. Privacy Shield framework, and the APEC Cross-Border Privacy Rules.

Paragraph III imposes additional requirements to address Respondent's unlawful conduct related to its participation in and compliance with the Privacy Shield framework. Specifically, Paragraph III prohibits Respondent from possessing or controlling personal information from European Union residents that Respondent received while it participated in the EU-U.S. Privacy Shield framework unless Respondent complies with the requirements of either Paragraph III.A or Paragraph III.B. Paragraph III.A requires Respondent to affirm to Commerce within specified time limits that it: (1) will continue to apply Privacy Shield protections to the personal information it received while it participated in the Privacy Shield; or (2) will protect such information by another means authorized under EU or Swiss law. Alternatively, Paragraph III.B

---

[10] Thus, we adopt Complaint Counsel's proposals to delete the definition of "Trustee," which appeared in the notice order and substitute "Respondent" for "Trustee" in Paragraph VI of the Final Order, which addresses the Commission's access to Cambridge Analytica's corporate documents and data. This change avoids the need for the Commission to seek leave of the bankruptcy court for any actions that would have been required by Cambridge Analytica's bankruptcy trustee. CCMSD 2-3. *Cf. McIntire v. China MediaExpress Holdings, Inc.*, 113 F. Supp. 3d 769, 772 (S.D.N.Y. 2015) (explaining that under the Barton doctrine, any suit naming and requiring action by a court-appointed receiver personally, rather than the debtor, requires leave of the appointing court); *Barton v. Barbour*, 104 U.S. 126, 136-37 (1881). We also adopt the proposal to delete the language, "and upon the Commission's designation, the Trustee shall transfer such [abandoned corporate] books and records to the Commission" from the third sub-paragraph in Paragraph VI of the notice order, in recognition of the fact that, under bankruptcy regulations, Cambridge Analytica's bankruptcy trustee cannot transfer Cambridge Analytica's abandoned corporate books and records to the Commission. CCMSD 2-3. Bankruptcy regulations require the trustee to return corporate books and records to the estate after the bankruptcy court has entered its final order dissolving the company. *See* 11 U.S.C. § 554(d). These changes are necessary to accommodate Cambridge Analytica's bankruptcy proceedings. We note, however, that the corporate books and records referenced in the provisions of Paragraph VI of the Final Order would not include the data or work product that Respondent is required to delete by Paragraph IV of the Final Order.

PX0517-015

requires Respondent to return or delete such personal information within specified time periods.

Paragraph IV of the Final Order relates to the deletion or destruction of Covered Information collected from consumers through the GSR App, and any information or work product, including any algorithms or equations, derived in whole or in part from such Covered Information. Paragraph V permanently enjoins Respondent from disclosing, using, selling, or receiving any benefit from any Covered Information or any information that derived in whole or in part from it. Paragraph VI imposes access and monitoring requirements, and Paragraph VII provides that the Final Order will remain in effect for twenty years.

## V.    CONCLUSION

For the foregoing reasons, the Commission concludes that Cambridge Analytica violated Section 5 of the FTC Act, 15 U.S.C. § 45, by means of its false and deceptive representations to Facebook users who authorized the GSRApp, and by false and deceptive statements on its website regarding its participation in Privacy Shield and its adherence to Privacy Shield program principles. Accordingly, we enter a Final Order to remedy the Respondent's violations and prevent their recurrence.

ISSUED: November 25, 2019

PX0517-016

# PX0525



**Australian Government**

**Australian Institute of Criminology**

# Trends & issues in crime and criminal justice

**No. 653 July 2022**

**Abstract |** This paper reviewed open-source materials including electronic service provider (ESP) transparency reports to provide an overview of the contemporary problem of child sexual abuse material (CSAM) offending on ESP platforms, examine measures currently used by ESPs to detect and prevent CSAM offending, and explore the potential impact of end-to-end encryption on CSAM distribution and detection. The study found that the platforms with the highest user bases are actively detecting and removing CSAM. However, some are less transparent than others about the methods they use to prevent, detect and remove CSAM, omitting key information that is crucial for future best practice in reducing CSAM offending. Further, the adoption of end-to-end encryption by ESPs that detect and remove large amounts of CSAM from their platforms will likely provide a haven for CSAM offenders. Implications for ESPs and international law reform are discussed.

# Child sexual abuse material and end-to-end encryption on social media platforms: An overview

Coen Teunissen and Sarah Napier

Child sexual abuse material (CSAM) is any material (eg images and/or videos) that depicts the sexual abuse of a child. The production, distribution and viewing of CSAM has detrimental impacts on victims. This can include trauma, psychological harm, fear, guilt, shame and betrayal (Gewirtz-Meydan et al. 2018; Salter et al. 2021). Even after the physical abuse ends, victims depicted in CSAM can feel repeatedly victimised each time someone views the abusive material (Salter & Hanson 2021). The Canadian Centre for Child Protection (2017) surveyed 128 victims of CSAM; 70 percent reported constantly worrying about being recognised by someone who had viewed the CSAM showing their abuse and 30 percent reported that they had been recognised by someone online or in person who had seen images of their abuse.

Advances in technology and the growing number of internet sites and platforms have provided offenders unprecedented levels of access to children, CSAM and like-minded individuals with whom to share CSAM (WeProtect Global Alliance 2019).

Consequently, CSAM has proliferated in recent years (Balfe et al. 2015; Bursztein et al. 2019), and the National Center for Missing and Exploited Children (NCMEC) received over 21 million reports of CSAM in 2020 alone (NCMEC 2021), increasing to over 29 million in 2021 (NCMEC 2022). The problem may have been exacerbated by global events such as the COVID-19 pandemic (Interpol 2020). Law enforcement agencies struggle to keep up with the staggering number of CSAM reports to investigate (NCMEC 2021; Netclean 2020). According to Netclean (2020), which surveyed 470 law enforcement officers in 39 countries, police globally were inundated with CSAM cases in 2020. This affected the mental health of some officers and meant they could investigate only the most high-risk cases. Further, use of end-to-end encryption by communication platforms, while designed for user safety, may present challenges for law enforcement in combatting CSAM offending.

Most relevant research conducted thus far has focused on the characteristics of individuals who view, distribute or produce CSAM (eg Brown & Bricknell 2018; Seto & Eke 2015)—for example, the differences between those who commit online offences and those who sexually abuse children in person (Babchishin, Hanson & VanZuylen 2015). Less research has focused on the specific online platforms where CSAM is shared and the methods these platforms use to detect and remove CSAM. Information is publicly available on the number of reports of CSAM detected on specific electronic service provider (ESP) platforms (eg NCMEC 2021); additionally, transparency reports released by each relevant ESP discuss the prevention, detection and removal measures they adopt. However, this information can be inconsistent, lacking in important details and difficult to find because it is scattered across multiple reports and websites. Given the recent dramatic increase in the amount of CSAM detected by ESPs, the adverse consequences for victims and the dynamic nature of this offence type, it is crucial to fully understand the extent and nature of the problem and the current CSAM detection and removal methods used. This will help us to develop best practice methods to prevent and disrupt CSAM offending.

## Aims and method

The purpose of this study is to provide a valuable resource to inform policy and international law reform by consolidating key information on entities that detect CSAM on their platforms. The paper has three aims:

- to provide an overview of the contemporary problem of CSAM offending on mainstream ESP platforms;
- to investigate the measures ESPs currently use to detect, remove and report CSAM on their platforms; and
- to explore the potential impact of end-to-end encryption on CSAM distribution and detection.

The 10 ESPs that sent the largest number of CSAM reports to NCMEC in 2020 were identified via NCMEC's (2021) report, which was the latest available at the time of data collection. Information sought for each identified ESP included: the number of CSAM reports provided to NCMEC; the company protocols for CSAM prevention, detection and removal; and the end-to-end encryption status of the messaging/chat function. This information was obtained directly from ESP websites— for example, from transparency reports, annual reports and official blogs. This material was

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

supplemented with media releases and news articles (see Figure 1). The search was limited to data from 2015 onwards and ESP transparency reports from 2019 and 2020 due to data availability limitations, the dynamic nature of online communication platforms and the necessity for this review to be as up to date as possible. However, readers should note that NCMEC (2022) has since released its report on notifications received during 2021.

The paper focuses on open web platforms and does not cover darknet sites, nor describe all available types of websites or encryption or anonymisation technologies which offenders have used to share and access CSAM, such as virtual private networks (VPNs) and peer-to-peer networks. Only ESPs that report CSAM to NCMEC were included. From here on, we use the term 'ESP' to describe both social media platforms and search engines (Table 1).

| Table 1: Acronyms and terminology | |
| --- | --- |
| **Acronym or term** | **Explanation** |
| CSAM | Child sexual abuse material (known legally in some countries as child pornography) |
| End-to-end encryption | A system of communication that usually allows only the sender or receiver of a private message or video call to view the content |
| ESP | Electronic service provider (eg Google, Meta) |
| NCMEC | National Center for Missing and Exploited Children |

**Figure 1: Flow diagram of resource selection process**



PX0525-003

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

# CSAM detected on online platforms

## Prevalence of CSAM and growth in reports

It is not possible to know the true amount of CSAM available on the internet. However, police and non-government organisations (NGOs) provide insight into the number of reports of CSAM received from businesses and the public. In 2019, the Australian Federal Police received 450 CSAM reports from members of the public and 13,368 from NCMEC relating to Australian victims, offenders or IP addresses. Both of these figures increased in 2020, to 559 and 21,148 reports respectively (Australian Federal Police personal communication 01 September 2021). Unfortunately, these data were not available for Australia before 2019.

Both NCMEC and the Internet Watch Foundation are NGOs to whom members of the public and ESPs can report suspected online sexual exploitation of children, including CSAM. In 2021, 99 percent of such reports received by NCMEC related to CSAM (NCMEC 2022; herein referred to as CSAM reports). The rapid growth in CSAM availability in recent years is evident in the statistics provided by these two organisations. Figure 2 shows a clear upward trend in the number of CSAM reports to both entities across an eight-year period. The number of reports received by NCMEC increased from 1.1m reports (28m CSAM files) in 2014, to 21.7m reports (65.5m CSAM files) in 2020 and 29.3m reports (84.7m CSAM files) in 2021. The number of reports received by the Internet Watch Foundation of URLs containing CSAM increased from 74,000 URLs in 2014 to 299,619 URLs in 2020 and 361,062 URLs in 2021. This increase in CSAM reports coincided with an increase in users of Facebook (from 1.4b to 2.8b) and Instagram (from 300m to 1.0b). Between 2016 and 2017 there was a clear change to the otherwise sharp upward trend in the number of CSAM reports received by NCMEC. This coincided with the year WhatsApp implemented end-to-end encryption (2016). Between 2018 and 2019, there was a clear drop in the number of CSAM reports received by NCMEC (from 18.4m in 2018 to 17m in 2019), coinciding with the year Skype implemented end-to-end encryption and Yahoo Messenger shut down. There was no drop in the number of CSAM reports following Snap Inc implementing end-to-end encryption in 2019. However, due to the small number of data points, it was not possible to conduct an interrupted time series analysis to determine whether the changes in encryption status were associated with the change in trends. It is also possible that other factors influenced these changes in the trends, including an increase in detection and reporting by ESPs.

PX0525-004

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice



**Figure 2: Number of CSAM reports to NCMEC and Internet Watch Foundation, 2014–2021**

Note: National Center for Missing and Exploited Children (NCMEC) reports relate to online sexual exploitation of children, most of which comprises CSAM images and/or videos, and each report potentially involves multiple files. Internet Watch Foundation (IWF) reports relate to websites or URLs that contain CSAM. It is possible that there is some double-counting where reports were made to both entities. E2EE=end-to-end encryption

Sources: Internet Watch Foundation 2014–2021; NCMEC 2014–21; Statista 2022a, 2022b; Synstrom 2014

## CSAM on specific platforms

NCMEC publishes the number of CSAM reports made by individual ESPs (NCMEC 2021). At the time of data collection, the most recent report related to 2020. Of the 21.7m CSAM reports received by NCMEC in 2020, Meta, who owns Facebook, Messenger, Instagram and WhatsApp, made 93 percent (*n*=20,307,216; see Table 2). The number of reports from this company dwarfed those of the remaining top five companies reporting the most CSAM: Google (546,704), Snap (144,095), Microsoft (96,776) and Twitter (65,062).

PX0525-005

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

| Table 2: CSAM reports to NCMEC in 2020, detection methods and end-to-end encryption status for top 10 reporting ESPs | | | | |
|---|---|---|---|---|
| **ESP** | **CSAM reports 2020 (n)** | **% of reports to NCMEC** | **CSAM detection and information protection** | **End-to-end encryption messaging?** |
| Meta[a] | 20,307,216 | 93.4 | Uses PhotoDNA, proprietary machine learning and artificial intelligence. Commenced using Google's Content Safety API in 2021 (see below). | WhatsApp—yes (since 2016) Facebook Messenger—encryption can be manually enabled Instagram—no |
| Google[a] | 546,704 | 2.5 | Developed/uses CSAI Match and Content Safety API. Data encrypted at rest and in transit. | Messages—yes (since 2020) Gmail—no |
| Snap Inc | 144,095 | 0.7 | Uses PhotoDNA and CSAI Match. | Snapchat—yes (since 2019) |
| Microsoft[a] | 96,776 | 0.4 | Developed/uses PhotoDNA. | Skype—encryption can be manually enabled (since 2018) Teams—yes Outlook—no |
| Twitter | 65,062 | 0.3 | Uses PhotoDNA. | No |
| INHOPE[b] | 57,170 | 0.3 | N/A—not a platform. | N/A—not a platform |
| Imgur | 31,571 | 0.1 | Messages and images can be monitored and accessed. | No |
| TikTok | 22,692 | 0.1 | Uses PhotoDNA and other technologies. Collects and scans information contained in messages being composed, sent or received. | No |
| Dropbox | 20,928 | 0.1 | Public files only viewable by people who have a link to the file/s (and by Dropbox staff). Data encrypted at rest and in transit. | No |
| Omegle | 20,265 | 0.1 | No information available. | No |

a: Aggregate includes the total for all platforms owned by a company. For example, Facebook, Messenger, Instagram and WhatsApp are included under Meta (previously Facebook Inc); Google, Gmail and YouTube are included under Google; Bing, Xbox, Outlook and others are included under Microsoft

b: INHOPE is a global network of CSAM reporting hotlines partnered with Interpol and Microsoft and funded by the European Union. It is likely that these reports sent to NCMEC relate to reports received by a hotline, rather than CSAM activity on INHOPE's website

Sources: Allen 2011; Arthur 2013; Canegallo 2021; Davis 2021a; Deahl 2018; Dropbox nda; Google nda, ndb, ndc, ndd, nde; Gruszczyk 2021; Holt 2021; Imgur 2019; Microsoft nda, ndb; NCMEC 2021; Omegle 2022; Signal 2018; Snap Inc 2021a, 2021b; TikTok 2021, 2022; Titcomb 2019; Vincent 2018

PX0525-006

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

# CSAM detection methods used by platforms

As well as examining the extent of CSAM detected on specific platforms, it is important to look at the methods currently used by the platforms to detect and disrupt this offending. The authors could not locate any information on the methods used by Imgur, Dropbox or Omegle to detect or remove CSAM.

## Microsoft

At the time of writing, one of the main technologies industry use to detect CSAM is 'PhotoDNA', which detects the digital fingerprint ('hash') of an image and compares it against a database of previously identified CSAM. This was developed by Microsoft in 2009, and the video-detection capability was implemented in 2018 (Langston 2018). It is provided freely to eligible organisations and businesses, with over 100 companies currently using the tool (Thorn 2016). Microsoft has also developed technology that can flag suspicious conversations for review by human moderators, to assist companies to detect online grooming on their platforms (Gregoire 2020).

According to Microsoft's 2020 transparency reports (Microsoft 2021a, 2021b), of the 1,079,246 abusive images and videos removed, blocked or delisted through Bing in 2020, 99.5 percent were proactively detected by its PhotoDNA technology. Similarly, 99.9 percent of the 177,000 CSAM files removed or blocked from other Microsoft services (OneDrive, Outlook, Skype, Xbox and others) were proactively detected by its technology, resulting in 33,369 accounts being blocked or suspended (Microsoft 2021a, 2021b).

However, empirical evaluations on the effectiveness of this technology are scarce. While it is clearly responsible for detecting a large amount of CSAM (Farid 2019), a New York Times investigation found vulnerabilities in PhotoDNA in the Bing search engine (Keller & Dance 2019). Further, PhotoDNA only detects known CSAM stored in databases such as NCMEC's; CSAM that is new, substantially altered or not yet known to law enforcement is not detected.

## Meta (previously Facebook Inc)

Meta uses PhotoDNA (Allen 2011; Davis 2020) and unspecified artificial intelligence (AI) to proactively detect CSAM, including previously undetected material (Davis 2018). Meta also commenced using Google's Content Safety API in 2021 (Davis 2021a). However, there is little information available on their proprietary AI, including how it detects new CSAM. Meta also uses pop-up messages and other technologies to prevent online grooming and CSAM by deterring users who enter search terms linked with child sexual exploitation (Davis 2021a). Evidence suggests that pop-up warning messages can be effective in deterring individuals from sharing sexual images of young females online (Prichard et al. 2022), but no studies have measured the success of pop-ups currently used by platforms like Facebook. Meta also provides information about the illegality and harms resulting from online sexual exploitation of children to users whose accounts are flagged, disabled and/or removed and reports these users to NCMEC (Davis 2021a).

Meta's transparency report (Facebook nd) provides statistics relating to Facebook, Messenger and Instagram platforms. Nearly all (99%) of the child nudity and sexual exploitation material found on Facebook in 2019 and 2020 was detected and flagged by Meta's technology, compared to one percent being reported by users. In 2019, 99 percent of the 37.4m child nudity and sexual exploitation files removed by Facebook were proactively found by the technology, with only one percent being reported by users. In 2020, this rate remained at 99 percent across the 35.9m files

PX0525-007

removed. Similar rates were also observed for Instagram: 97 percent of the 3.3m pieces of abusive content (posts, photos, videos or comments) found in 2020 were detected by Meta's technology (Facebook nd). While this demonstrates that Meta's technology is successful in detecting large amounts of CSAM on Facebook and Instagram, these rates do not compare the content detected versus the content available on the platform. In other words, we do not know how much CSAM was overlooked. This rate has also been questioned by experts in the field who call for more transparency around Meta's definitions of CSAM (Gladstone 2019).

WhatsApp states that unencrypted information such as profile and group photos and metadata (eg dates of contact, IP addresses) on the platform is scanned using technology (not specified) to match photos/videos against known CSAM (WhatsApp 2021). WhatsApp bans over 300,000 accounts per month for sharing CSAM (WhatsApp 2021). Due to its use of end-to-end encryption, WhatsApp is unable to detect child sexual exploitation distributed via private messages unless users report it directly.

## Google

Google developed 'Content Safety API', which uses AI to identify and triage CSAM for review by organisations, providing this tool freely to other companies and NGOs including the Internet Watch Foundation and the Canadian Centre for Child Protection (Google nd). Google and YouTube also developed 'CSAI Match', a proprietary technology to detect CSAM videos. Google makes this technology freely available to NGOs and industry (Canegallo 2021). Google also presents warning messages containing links to reporting hotlines to individuals who enter search terms associated with child sexual exploitation (Google nd).

In 2020, Google detected 4,266,308 CSAM files on its platform (Google 2021). Over this period, 542,621 URLs relating to CSAM were removed from Google's search index, and Google identified 1,449,284 new CSAM hashes and shared them with NCMEC. Additionally, 188,955 CSAM reports were submitted by YouTube, and a total of 175,898 YouTube accounts were disabled for CSAM violations (Google 2021).

Steel (2015) found that Google and Bing's efforts to block searches for terms related to CSAM resulted in a 67 percent drop in CSAM searches during a one-year period over 2013 and 2014 in the United States. Yandex, an ESP located in Russia, did not implement similar blocking efforts nor experience a commensurate drop in CSAM searches during this period. However, the study could not distinguish between the effect of blocking and that of other interventions (eg warning messages) or a user shift from clear web to darknet searches.

## Other companies

### Snap, TikTok and Twitter

Snap Inc (Snapchat), TikTok and Twitter use PhotoDNA to detect CSAM images. Snap Inc also uses Google's CSAI Match to detect CSAM videos (Snap Inc 2021a, 2021b). TikTok and Twitter also use other unspecified technologies to detect CSAM. In 2020:

- Twitter suspended 903,613 accounts and removed 19,521 files associated with child sexual exploitation (Twitter 2021a, 2021b);
- Snap Inc deleted 94,686 accounts for suspected child sexual exploitation, including grooming of children, and 1,808 of these accounts belonged to Australian users (Snap Inc 2021a, 2021b); and
- TikTok made 22,692 CSAM reports to NCMEC, compared with 596 in 2019 (TikTok 2021).

## *Apple*

Although Apple was not one of the top 10 ESPs submitting the largest number of CSAM reports, the company developed technology that is important to report in this paper. In August 2021 Apple announced its new technology 'NeuralHash', which scans devices for known CSAM when images are uploaded to iCloud (see Figure 3; Apple 2021a; Nicas 2021). Content that matches a NCMEC hash of known CSAM is flagged for human review and can then be reported to NCMEC and law enforcement for action. This ensures that iCloud content is still encrypted via end-to-end encryption (Apple 2021b), unless it matches known CSAM when it is uploaded (with an error rate of less than one in a trillion per year; Apple 2021a). This technology is innovative in its method of detection; however, it appears to be limited to CSAM images (Apple 2021a), with no indication of being applicable to videos yet. It also has the same limitation as PhotoDNA in that it is unable to detect new or substantially altered CSAM, and is limited to iCloud content.

It remains to be seen how effective this tool will be in detecting and preventing CSAM offending. Other technology company leaders, including the Chief Executive Officer of WhatsApp, have criticised this technology, expressing privacy concerns (Clayton 2021). In September 2021, Apple delayed the implementation of this technology, citing concerns from customers, privacy campaigners and others (Wakefield 2021).

**Figure 3: Explanation of Apple's NeuralHash technology**



Source: Adapted from Apple 2021a

In summary, most ESPs examined are actively detecting and removing CSAM. However, transparency reports relating to CSAM and online sexual exploitation of children are not produced consistently across ESPs. There is also little reliable or detailed information available on definitions of CSAM used and, for some ESPs, the detection and prevention tools used and their effectiveness. Lastly, it is important to note that this study focused on the 10 ESPs who provided the highest number of CSAM reports to NCMEC in 2020. There are many other ESPs for whom the methods of detecting and reporting CSAM were not reviewed in this study.

Australian Institute of Criminology
Trends & issues in crime and criminal justice

## End-to-end encryption

End-to-end encryption ensures that information on a platform is visible only to the individual or entity who has the 'key' to decrypt it (Schiemer 2018), and in almost all cases, this is only the sender and recipient. This is designed to protect sensitive and personal information such as messages and transactions (eSafety Commission 2020), and also to protect users from malicious online activity such as cybercrime (Amnesty International 2016). Data show that apps with security features have more active users (Stevens 2020), which demonstrates the appeal of privacy to the public.

Unfortunately, end-to-end encryption presents significant challenges to law enforcement officers who investigate CSAM offending (Netclean 2019), and limits companies' ability to prevent, detect and report CSAM occurring on their platforms. For example, online chat logs are a key form of evidence in CSAM investigations. In one such Australian case, the offender used several popular platforms to distribute CSAM he had produced, which involved severe abuse of babies (*Commonwealth Director of Public Prosecutions v CCQ* [2021] QCA 4 (22 January 2021); warning: contains highly graphic details of abuse). In this case the offender's chat logs were used as evidence to demonstrate the severity of offending that took place. In another case, Meta detected CSAM in a conversation between an Australian man and a Filipino child, leading to the man's arrest when he travelled to the Philippines (Murdoch 2016). If the platforms used by these offenders had implemented end-to-end encryption at that time, this evidence may not have been available for investigations and the offenders may still be at large.

Currently, four of the companies that send the top 10 number of CSAM reports to NCMEC use end-to-end encryption for private messages on some of their platforms: Meta (used on WhatsApp), Google, Snap and Skype (see Table 2). Snapchat introduced end-to-end encryption for private messages including photos in 2019 (Titcomb 2019). WhatsApp has two billion users (WhatsApp 2020)—more than both Facebook Messenger (988 million; Statista 2022c) and Instagram (1 billion; Statista 2022a). However, given its use of end-to-end encryption, CSAM cannot be detected in WhatsApp conversations unless users report it.

Meta plans to implement universal end-to-end encryption on Facebook Messenger and Instagram's private messages in 2023 (Davis 2021b; Kent 2021). These are two of the largest social media platforms in the world. There are concerns that current CSAM detection technologies (eg PhotoDNA, AI) will not work in an end-to-end encryption environment as they will be unable to decrypt the content and scan it for CSAM (NCMEC 2019). To our knowledge, Meta has not publicly proposed a strategy to maintain its ability to detect and report CSAM on these platforms in the end-to-end encryption environment. As most CSAM on Facebook Messenger is detected using PhotoDNA and AI tools (Facebook nd; Farid 2019), NCMEC has estimated that Meta's implementation of end-to-end encryption across all its major platforms would reduce the number of CSAM reports it receives by more than 50 percent (NCMEC 2019). This would mean that more than 18m CSAM files would potentially be undetected and unreported.

PX0525-010

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

# Discussion

In 2020 the number of CSAM reports received by NCMEC reached 21.7m, relating to approximately 65.5m CSAM files. This increased to 29.3m reports in 2021. In 2020 the overwhelming majority of CSAM reports—93 percent—were made by Meta.

The large amount of CSAM detected by Meta may be due to the immense number of users on its platforms—WhatsApp, Messenger and Instagram each have close to or more than a billion users (Statista 2022a, 2022c; WhatsApp 2020)—as well as the methods it uses to proactively detect and remove CSAM (Thorn 2021) and the access it has to platform content. In contrast, ESPs such as Google provide search tools that direct users to third-party websites. While Google can prevent websites from appearing in its search results, it has no control over the content on the sites except for those that it owns (eg Google Drive and YouTube; Google 2021). It has also been noted that large social media platforms such as Facebook have functions that allow like-minded offenders to easily connect with each other and share CSAM (Andrus, Buckley & Williams 2021). Similarly, offenders may use the functions on social media platforms such as Facebook to coerce children to create self-produced CSAM or to engage in live streamed abuse (eg de Santisteban et al. 2018; Napier, Teunissen & Boxall 2021), whereas the functions of services such as Dropbox, OneDrive, Outlook and Gmail may be less conducive to this type of offending.

If Meta introduces end-to-end encryption on Facebook Messenger and Instagram in 2023 as planned, the amount of CSAM currently detected and reported to NCMEC may be reduced by more than half (NCMEC 2019). This means that most CSAM on Meta's platforms will be invisible even to Meta. In 2020 WhatsApp had two billion users (WhatsApp 2020), almost twice as many as Facebook Messenger or Instagram. Yet, due to its use of end-to-end encryption, it remains unclear how much CSAM is circulated on WhatsApp.

## Implications for ESPs

While most ESPs examined in this study are publicly opposed to CSAM and proactively detect and remove it, they are unfortunately still inadvertently facilitating its distribution. There are also concerns that ESPs are deflecting responsibility for preventing CSAM distribution and focusing on reporting CSAM if they find it (Salter & Hanson 2021). The staggering amount of CSAM reported by ESPs places a huge burden on law enforcement, who struggle to keep up with the workload (NCMEC 2021; Netclean 2020). There are several measures that ESPs should adopt to help address the problem.

Firstly, every company should be consistent in their reporting of CSAM and transparent about their definitions of CSAM and the specific measures they use to prevent, detect and report it. Providing this detailed information will help enforce best practice standards and assist companies to improve their tools for preventing harm to children.

Secondly, more responsibility should be placed on ESPs to prevent CSAM from being uploaded in the first instance. These platforms should adopt evidence-based methods such as pop-up warning messages (Prichard et al. 2022), which can deter engagement with CSAM and refer individuals to sources of support to stop their offending. Deterrence messaging campaigns can potentially also

PX0525-011

reach large numbers of individuals (Grant et al. 2019). These tools should also be evaluated; Meta currently uses pop-up warning messages to deter child sexual exploitation, yet there is no information publicly available on their impact or effectiveness.

Lastly, ESPs should invest in more innovative technology. Currently, NeuralHash, Apple's proposed technology to scan devices for CSAM, is the only publicly described tool that will detect CSAM in an end-to-end encryption environment. Although Apple has delayed the release of this technology (Wakefield 2021), ESPs should similarly invest in developing technology to prevent CSAM from being uploaded onto their platforms in the first instance. This would supplement their current methods of detecting and removing CSAM from their platforms.

## Implications for international law reform

The beginning of this paper outlined the deleterious effects of CSAM offending on victims. The monumental increase in availability of CSAM on major platforms will result in continuing and increased harm to children. Yet debate continues over the importance of protecting children versus the privacy of individuals (Allen 2021). The adoption of end-to-end encryption by more ESPs will likely provide a haven for CSAM offending, rather than preventing it. Further policy discussions are required about the best way forward in terms of end-to-end encryption which consider the impact it would have on current and future child victims.

Secondly, it would be beneficial for countries globally, including the Five Eyes nations and European nations, to introduce legislation requiring communication platforms to report CSAM consistently and adopt evidence-based detection and prevention measures. Additionally, ESPs should be consistent and transparent in how they report:

- definitions of CSAM;
- the amount of CSAM detected and removed;
- the number of accounts banned, suspended and/or deleted due to child sexual exploitation;
- detailed methods for detecting and removing CSAM;
- detailed methods for preventing CSAM offending (eg messaging campaigns, warning messages); and
- evaluations of the effectiveness of these methods in detecting and preventing CSAM offending.

Adopting such legislation will help reduce the sexual abuse and online sexual exploitation of children globally.

## Limitations and future directions

This study had several limitations which should be considered. Firstly, this paper examined reports to NCMEC, which only companies registered in the United States are required to submit under the US Criminal Code. Hence, this paper did not examine CSAM occurring on platforms owned by companies registered in other countries. It is important to note that only detected CSAM was reported and not all CSAM is detected by ESPs or law enforcement. Finally, research has found that offenders use social media platforms to groom children for sexual abuse and exploitation (de Santisteban et al. 2018) including live streaming of child sexual abuse (Napier, Teunissen & Boxall 2021). However, it was beyond the scope of this paper to examine grooming. Future research focused on how offenders use online platforms to groom children for sexual abuse and exploitation and the methods used by platforms to prevent and detect this offending would be a valuable addition to the knowledge base. Lastly, due to the lack of academic research into this topic, this paper relied heavily on grey literature that had not been peer reviewed.

The problem of CSAM offending on online platforms is growing and changing rapidly, exacerbated by global events such as the COVID-19 pandemic. Therefore, despite its limitations, this paper is valuable and timely in providing an overview of this dynamic and harmful crime to help inform industry, policy and law reform.

# Acknowledgements

The authors would like to acknowledge former Australian Institute of Criminology Research Officer Cameron Long for his assistance with data extraction.

PX0525-013

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

# References

*URLs correct as at March 2022*

Allen E 2021. Defending the privacy of child sexual abuse victims online, in the EU and worldwide. https://www.weprotect.org/blog/defending-the-privacy-of-child-sexual-abuse-victims-online-in-the-eu-and-worldwide/

Allen E 2011. *Facebook to use Microsoft's PhotoDNA technology to combat child exploitation*. https://blogs.microsoft.com/on-the-issues/2011/05/19/facebook-to-use-microsofts-photodna-technology-to-combat-child-exploitation/

Amnesty International 2016. *Easy guide to encryption and why it matters*. London: Amnesty International. https://www.amnesty.org/en/latest/campaigns/2016/10/easy-guide-to-encryption-and-why-it-matters/

Andrus M, Buckley J & Williams C 2021. *Understanding the intentions of child sexual abuse material (CSAM) sharers*. https://research.facebook.com/blog/2021/02/understanding-the-intentions-of-child-sexual-abuse-material-csam-sharers/

Apple 2021a. *Expanded protections for children: Technology summary*. https://web.archive.org/web/20210816220924/https://www.apple.com/child-safety/

Apple 2021b. iCloud security overview. https://support.apple.com/en-us/HT202303

Arthur C 2013. Twitter to introduce PhotoDNA system to block child abuse images. *The Guardian*, 22 July. https://www.theguardian.com/technology/2013/jul/22/twitter-photodna-child-abuse

Babchishin KM, Hanson RK & VanZuylen H 2015. Online child pornography offenders are different: A meta-analysis of the characteristics of online and offline sex offenders against children. *Archives of Sexual Behaviour* 44(1): 45–66. https://doi.org/10.1007/s10508-014-0270-x

Balfe M et al. 2015. Internet child sex offenders' concerns about online security and their use of identity protection technologies: A review. *Child Abuse Review* 24: 427–439. https://doi.org/10.1002/car.2308

Brown R & Bricknell S 2018. What is the profile of child exploitation material offenders? *Trends & issues in crime and criminal justice* no. 564. Canberra: Australian Institute of Criminology. https://www.aic.gov.au/publications/tandi/tandi564

Bursztein E et al. 2019. *Rethinking the detection of child sexual abuse imagery on the internet*. International World Wide Web Conference, San Francisco, 13–17 May: 2601–2607. https://doi.org/10.1145/3308558.3313482

Canadian Centre for Child Protection (C3P) 2017. *Survivors' survey: Full report 2017*. Winnipeg: C3P. https://www.protectchildren.ca/en/resources-research/survivors-survey-results/

Canegallo K 2021. Our efforts to fight child sexual abuse online. https://blog.google/technology/safety-security/our-efforts-fight-child-sexual-abuse-online/

Clayton J 2021. Apple criticised for system that detects child abuse. *BBC News*, 7 August. https://www.bbc.com/news/technology-58124495

Davis A 2021a. Preventing child exploitation on our apps. https://about.fb.com/news/2021/02/preventing-child-exploitation-on-our-apps/

Davis A 2021b. We'll protect privacy and prevent harm, writes Facebook safety boss. *The Telegraph*, 20 November. https://www.telegraph.co.uk/business/2021/11/20/people-shouldnt-have-choose-privacy-safety-says-facebook-safety/

Davis A 2020. Facebook joins industry effort to fight child exploitation online. https://about.fb.com/news/2020/06/fighting-child-exploitation-online/

Davis A 2018. New technology to fight child exploitation. https://about.fb.com/news/2018/10/fighting-child-exploitation/

Australian Institute of Criminology
Trends & issues in crime and criminal justice

de Santisteban P, del Hoyo J, Alcázar-Córcoles MÁ & Gámez-Guadix M 2018. Progression, maintenance, and feedback of online child sexual grooming: A qualitative analysis of online predators. *Child Abuse & Neglect* 80: 203–215. https://doi.org/10.1016/j.chiabu.2018.03.026

Deahl D 2018. Skype now offers end-to-end encrypted conversations. *The Verge*, 20 August. https://www.theverge.com/2018/8/20/17725226/skype-private-conversation-end-to-end-encrypted-opt-in

Dropbox nda. *Who can see the stuff in my Dropbox account?* https://help.dropbox.com/accounts-billing/security/file-access

Dropbox ndb. *How Dropbox keeps your files secure.* https://help.dropbox.com/accounts-billing/security/how-security-works

eSafety Commission 2020. *End-to-end encryption trends and challenges – position statement*. Sydney: eSafety Commissioner. https://www.esafety.gov.au/about-us/tech-trends-and-challenges/end-end-encryption

Facebook nd. Community standards enforcement report: Child endangerment: Nudity and physical abuse and sexual exploitation. https://transparency.fb.com/data/community-standards-enforcement/child-nudity-and-sexual-exploitation/facebook

Farid H 2019. *Testimony: House Committee on Energy and Commerce: Fostering a healthier internet to protect consumers*. Washington DC: House Committee on Energy and Commerce. https://energycommerce.house.gov/committee-activity/hearings/hearing-on-fostering-a-healthier-internet-to-protect-consumers

Gewirtz-Meydan A, Walsh W, Wolak J & Finkelhor D 2018. The complex experience of child pornography survivors. *Child Abuse & Neglect* 80: 238–248. https://doi.org/10.1016/j.chiabu.2018.03.031

Gladstone N 2019. Child sexual abuse material spreading 'exponentially' on social media. *Sydney Morning Herald*, 2 July. https://www.smh.com.au/national/child-sexual-abuse-material-spreading-exponentially-on-social-media-20190701-p520nn.html

Google nda. Discover our child safety toolkit. https://protectingchildren.google/tools-for-partners/

Google ndb. Email encryption in transit. https://support.google.com/mail/answer/6330403?hl

Google ndc. Featured policies: Child safety. https://transparencyreport.google.com/youtube-policy/featured-policies/child-safety?hl

Google ndd. Fighting child sexual abuse online. https://protectingchildren.google/intl/en_au/

Google nde. How end-to-end encryption in Messages provides more security. https://support.google.com/messages/answer/10262381?hl

Google 2021. Google's efforts to combat online child sexual abuse material. https://transparencyreport.google.com/child-sexual-abuse-material/reporting

Grant B, Shields B, Tabachnick J & Coleman J 2019. "I didn't know where to go": An examination of Stop It Now!'s sexual abuse prevention helpline. *Journal of Interpersonal Violence* 34(20): 4225–4253. https://doi.org/10.1177/0886260519869237

Gregoire C 2020. Microsoft shares new technique to address online grooming of children for sexual purposes. https://blogs.microsoft.com/on-the-issues/2020/01/09/artemis-online-grooming-detection/

Gruszczyk J 2021. End-to-end encryption for one-to-one Microsoft Teams calls now generally available. https://techcommunity.microsoft.com/t5/microsoft-teams-blog/end-to-end-encryption-for-one-to-one-microsoft-teams-calls-now/ba-p/3037697

Holt K 2021. The Android Messages app now offers end-to-end encryption. *Engadget*, 15 June. https://www.engadget.com/android-messages-end-to-end-encryption-update-191641092.html

Imgur 2019. *Privacy Policy*. https://imgurinc.com/privacy

Internet Watch Foundation 2014–2021. Annual report (various issues). https://www.iwf.org.uk/about-us/who-we-are/annual-report/

PX0525-015

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

Interpol 2020. *Threats and trends: Child sexual exploitation and abuse: COVID-19 impact*. Lyon: Interpol. https://www.interpol.int/News-and-Events/News/2020/INTERPOL-report-highlights-impact-of-COVID-19-on-child-sexual-abuse

Keller MH & Dance GJX 2019. Child abusers run rampant as tech companies look the other way. *New York Times*, 9 November. https://www.nytimes.com/interactive/2019/11/09/us/internet-child-sex-abuse.html

Kent G 2021. Messenger policy workshop: Future of private messaging. https://about.fb.com/news/2021/04/messenger-policy-workshop-future-of-private-messaging/

Langston J 2018. *How PhotoDNA for Video is be ng used to fight online child exploitation*. https://news.microsoft.com/on-the-issues/2018/09/12/how-photodna-for-video-is-being-used-to-fight-online-child-exploitation/

Microsoft nda. Digital safety content report. https://www.microsoft.com/en-us/corporate-responsibility/digital-safety-content-report

Microsoft ndb. Encryption in Outlook. https://support.microsoft.com/en-us/office/encryption-in-outlook-17149eb8-a82e-405b-af5a-4fb89ce4a418

Microsoft 2021a. *Digital safety content report 2020 H1 – January–June 2020*. https://www.microsoft.com/en-us/corporate-responsibility/digital-safety-content-report

Microsoft 2021b. *Digital safety content report 2020 H2 – Jul–Dec 2020*. https://www.microsoft.com/en-us/corporate-responsibility/digital-safety-content-report

Murdoch L 2016. Australian accused of child sex tourism arrested in the Philippines. *Sydney Morning Herald*, 1 September. https://www.smh.com.au/world/australian-accused-of-child-sex-tourism-arrested-in-the-philippines-20160901-gr6x8x.html

Napier S, Teunissen C & Boxall H 2021. How do child sexual abuse live streaming offenders access victims? *Trends & issues in crime and criminal justice* no. 642. Canberra: Australian Institute of Criminology. https://doi.org/10.52922/ti78474

National Centre for Missing and Exploited Children (NCMEC) 2022. CyberTipline 2021 report. https://www.missingkids.org/gethelpnow/cybertipline/cybertiplinedata

National Center for Missing and Exploited Children (NCMEC) 2021. 2020 CyberTipline reports by electronic service providers (ESP). https://www.missingkids.org/gethelpnow/cybertipline/cybertiplinedata#reports

National Center for Missing and Exploited Children (NCMEC) 2019. NCMEC's statement regarding end-to-end encryption. https://www.missingkids.org/blog/2019/post-update/end-to-end-encryption

National Center for Missing and Exploited Children (NCMEC) 2014–2020. Annual report (various issues). https://www.missingkids.org/footer/about/annual-report

Netclean 2020. Netclean report: COVID-19 impact 2020: A report about child sexual abuse crime. https://www.netclean.com/netclean-report-2020/

Netclean 2019. Netclean report 2019: A report about child sexual abuse crime. https://www.netclean.com/netclean-report-2019/

Nicas J 2021. Apple's iPhones will include new tools to flag child sexual abuse. *New York Times*, 5 August. https://www.nytimes.com/2021/08/05/technology/apple-iphones-privacy.html

Omegle 2022. *Omegle Privacy Notice*. https://www.omegle.com/static/privacy.html

Prichard J, Wortley R, Watters P, Spiranovic C, Hunn C & Krone T 2022. Effects of automated messages on internet users attempting to access "barely legal" pornography. *Sexual Abuse* 34(1): 106–124. https://doi.org/10.1177/10790632211013809

Reddit nd. Transparency report 2020. https://www.redditinc.com/policies/transparency-report-2020

PX0525-016

Australian Institute of Criminology
Trends & issues in crime and criminal justice

Salter M et al. 2021. Production and distribution of child sexual abuse material by parental figures. *Trends & issues in crime and criminal justice* no. 616. Canberra: Australian Institute of Criminology. https://doi.org/10.52922/ti04916

Salter M & Hanson E 2021. "I need you all to understand how pervasive this issue is": User efforts to regulate child sexual offending on social media. In J Baily, A Flynn & N Henry (eds), *The Emerald International handbook of technology facilitated violence and abuse*. Emerald Publishing: 729–748. https://doi.org/10.1108/978-1-83982-848-520211053

Schiemer J 2018. Strong and responsible: Can encryption be both? *FlagPost*, 3 October. https://www.aph.gov.au/About_Parliament/Parliamentary_Departments/Parliamentary_Library/FlagPost/2018/October/Encryption

Seto MC & Eke AW 2015. Predicting recidivism among adult male child pornography offenders: Development of the child pornography offender risk tool (CPORT). *Law and Human Behaviour* 39(4): 416–429. https://doi.org/10.1037/lhb0000128

Signal 2018. Signal partners with Microsoft to bring end-to-end encryption to Skype. *Signal*, 11 January. https://signal.org/blog/skype-partnership/

Snap Inc 2021a. Transparency report: January 1, 2020 – June 30, 2020. https://snap.com/en-US/privacy/transparency/2020-6-31

Snap Inc 2021b. Transparency report: July 1, 2020 – December 31, 2020. https://snap.com/en-US/privacy/transparency/2020-12-31

Statista 2022a. Number of Instagram users worldwide from 2019 to 2023 (in millions). https://www.statista.com/statistics/183585/instagram-number-of-global-users/

Statista 2022b. Number of monthly active Facebook users worldwide as of 4th quarter 2021 (in millions). Hamburg: Statista. https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

Statista 2022c. Most popular global mobile messenger apps as of January 2022, based on number of monthly active users (in millions). https://www.statista.com/statistics/258749/most-popular-global-mobile-messenger-apps/

Steel CMS 2015. Web-based child pornography: The global impact of deterrence efforts and its consumption on mobile platforms. *Child Abuse and Neglect* 44: 150–158. https://doi.org/10.1016/j.chiabu.2014.12.009

Stevens D 2020. Consumers seek out apps with enhanced privacy features to keep in touch in our new normal. https://www.data.ai/en/insights/market-data/consumers-seek-enhanced-privacy-app-features/

Synstrom K 2014. 300 million: Sharing real moments. https://web.archive.org/web/20141210200422/http://blog.instagram.com/post/104847837897/141210-300million

Thorn 2021. Why an increase in reports of CSAM is actually a good thing. https://www.thorn.org/blog/why-an-increase-in-reports-of-csam-is-actually-a-good-thing/

Thorn 2016. Microsoft's PhotoDNA: Leading the fight against child sexual abuse imagery. https://www.thorn.org/blog/photodna-leads-fight-against-child-sex-abuse-imagery/

TikTok 2022. Privacy policy. https://www.tiktok.com/legal/privacy-policy

TikTok 2021. Community guidelines enforcement report: July 1, 2020 – December 31, 2020. https://www.tiktok.com/safety/resources/transparency-report-2020-2

Titcomb J 2019. Snapchat adds end-to-end encryption to protect users' messages. *The Telegraph*, 10 January. https://www.telegraph.co.uk/technology/2019/01/09/snapchat-adds-end-to-end-encryption-protect-users-messages/

Twitter 2021a. Rules enforcement Jan–Jun 2020. https://transparency.twitter.com/en/reports/rules-enforcement.html#2020-jan-jun

**Australian Institute of Criminology**
Trends & issues in crime and criminal justice

Twitter 2021b. Rules enforcement Jul–Dec 2020.
https://transparency.twitter.com/en/reports/rules-enforcement.html#2020-jul-dec

Vincent J 2018. Skype starts testing new 'private conversations' with end-to-end encryption. *The Verge*,
11 January.
https://www.theverge.com/2018/1/11/16878596/microsoft-skype-end-to-end-encryption-private-conversations

Wakefield J 2021. Apple delays plan to scan iPhones for child abuse. *BBC News*, 3 September.
https://www.bbc.com/news/technology-58433647

WeProtect Global Alliance 2019. *Global threat assessment 2019*. London: WeProtect Global Alliance.
https://www.weprotect.org/issue/global-threat-assessment/

WhatsApp 2021. How WhatsApp helps fight child exploitation.
https://faq.whatsapp.com/general/how-whatsapp-helps-fight-child-exploitation/

WhatsApp 2020. *Two billion users – Connecting the world privately.*
https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately

PX0525-018

Australian Institute of Criminology
Trends & issues in crime and criminal justice

**Coen Teunissen is a Senior Research Analyst at the Australian Institute of Criminology.**

**Sarah Napier is the Research Manager of the Online Sexual Exploitation of Children Research Program at the Australian Institute of Criminology.**

General editor, *Trends & issues in crime and criminal justice* series: Dr Rick Brown, Deputy Director, Australian Institute of Criminology. Note: *Trends & issues in crime and criminal justice* papers are peer reviewed. For a complete list and the full text of the papers in the *Trends & issues in crime and criminal justice* series, visit the AIC website at: aic.gov.au

ISSN 1836-2206  ISBN 978 1 922478 63 4 (Online)
https://doi.org/10.52922/ti78634

©Australian Institute of Criminology 2022

GPO Box 1936
Canberra ACT 2601, Australia
Tel: 02 6268 7166

*Disclaimer: This research paper does not necessarily reflect the policy position of the Australian Government*

aic.gov.au

# PX0526

# Combatting Online Harms Through Innovation

Federal Trade Commission | Report to Congress



**FEDERAL TRADE COMMISSION**

June 16, 2022

PX0526-001

# COMBATTING ONLINE HARMS THROUGH INNOVATION

## Federal Trade Commission

## Report to Congress

June 16, 2022

PX0526-002

# Table of Contents

I. INTRODUCTION ...................................................................................................... 1

II. EXECUTIVE SUMMARY ........................................................................................ 5

III. USING ARTIFICIAL INTELLIGENCE TO COMBAT ONLINE HARMS ................. 9

   A.   Deceptive and fraudulent content intended to scam or otherwise harm individuals ........................ 9

   B.   Manipulated content intended to mislead individuals, including deepfake videos and fake individual reviews ........................................................................................................... 12

   C.   Website or mobile application interfaces designed to intentionally mislead or exploit individuals 19

   D.   Illegal content online, including the illegal sale of opioids, child sexual exploitation and abuse, revenge pornography, harassment, cyberstalking, hate crimes, the glorification of violence or gore, and incitement of violence.......................................................................................... 20

   E.   Terrorist and violent extremists' abuse of digital platforms, including the use of such platforms to promote themselves, share propaganda, and glorify real-world acts of violence............................ 31

   F.   Disinformation campaigns coordinated by inauthentic accounts or individuals to influence United States elections ..................................................................................................... 35

   G.   Sale of counterfeit products.................................................................................... 37

IV.  RECOMMENDATIONS .......................................................................................... 38

   A.   Avoiding over-reliance .......................................................................................... 41

   B.   Humans in the loop................................................................................................ 48

   C.   Transparency and accountability ............................................................................ 50

   D.   Responsible data science ....................................................................................... 58

   E.   Platform AI interventions ...................................................................................... 61

   F.   User tools.............................................................................................................. 69

   G.   Availability and scalability..................................................................................... 72

   H.   Content authenticity and provenance ...................................................................... 73

   I.   Legislation ........................................................................................................... 74

V. CONCLUSION....................................................................................................... 78

# I. INTRODUCTION

In the 2021 Appropriations Act, Congress directed the Federal Trade Commission to study and report on whether and how artificial intelligence (AI) "may be used to identify, remove, or take any other appropriate action necessary to address" a wide variety of specified "online harms."[1] Congress refers specifically to content that is deceptive, fraudulent, manipulated, or illegal, and to particular examples such as scams, deepfakes, fake reviews, opioid sales, child sexual exploitation, revenge pornography, harassment, hate crimes, and the glorification or incitement of violence. Also listed are misleading or exploitative interfaces, terrorist and violent extremist abuse of digital platforms, election-related disinformation, and counterfeit product sales. Congress seeks recommendations on "reasonable policies, practices, and procedures" for such AI uses and on legislation to "advance the adoption and use of AI for these purposes."[2]

AI is defined in many ways and often in broad terms.[3] The variations stem in part from whether one sees it as a discipline (e.g., a branch of computer science), a concept (e.g., computers performing tasks in ways that simulate human cognition), a set of infrastructures (e.g., the data and computational power needed to train AI systems), or the resulting applications and tools.[4] In a broader sense, it may depend on who is defining it for whom, and who has the power to do so.[5]

---

[1] This language is from a section of the Act known as the American COMPETE Act, which directs the Commission to conduct a "Study to Combat Online Harms Through Innovation." Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Title XV, § 1501(j), https://www.govinfo.gov/app/details/BILLS-116hr133enr/summary.

[2] *Id.*

[3] For example, Congress has defined AI as "a machine-based system that can, for a given set of human-defined objectives, make predictions, recommendations or decisions influencing real or virtual environments." National Defense Authorization Act for Fiscal Year 2021, Div. E, § 5002(3), https://www.govinfo.gov/app/details/BILLS-116hr6395ih. The Organisation for Economic Co-operation and Development (OECD) has used the same definition. *See* OECD, *Recommendation of the Council on Artificial Intelligence* (May 21, 2019), https://legalinstruments.oecd.org/en/instruments/OECD-LEGAL-0449. The National Security Commission on Artificial Intelligence (NSCAI) defined it as the "ability of a computer system to solve problems and to perform tasks that have traditionally required human intelligence to solve." NSCAI Final Report (2021) at 659, https://www.nscai.gov/2021-final-report/. *See also* EDRi, *Beyond Debiasing: Regulating AI and Its Inequalities* at 22 (2021) (defining AI as a "broad set of computational methods that serve to perform a wide range of tasks automatically"), https://edri.org/wp-content/uploads/2021/09/EDRi_Beyond-Debiasing-Report_Online.pdf; Ryan Calo, *Artificial Intelligence Policy: A Primer and Roadmap*, 51 UC Davis L. Rev. 399, 404 (2017) ("AI is best understood as a set of techniques aimed at approximating some aspect of human or animal cognition using machines"), https://lawreview.law.ucdavis.edu/issues/51/2/Symposium/51-2_Calo.pdf.

[4] *See, e.g.*, Matt Chessen, *What is Artificial Intelligence? Definitions for policy-makers and non-technical enthusiasts* (2017), https://medium.com/artificial-intelligence-policy-laws-and-ethics/what-is-artificial-intelligence-definitions-for-policy-makers-and-laymen-826fd3e9da3b. Further, vendors and others often misuse the term in their marketing efforts. *See* Frederike Kaltheuner, *This book is an intervention*, in Fake AI (Frederike Kaltheuner, ed.) (2021), https://meatspacepress.com/.

[5] That power is mostly in the hands of big technology companies. *See* Emily Tucker, *Artifice and Intelligence*, Tech Policy Press (Mar. 17, 2022), https://techpolicy.press/artifice-and-intelligence/. A global group of experts recently stated: "'Artificial' and 'intelligence' are loaded terms, their definitions subject to cultural biases. AI is a technology, a science, a business, a knowledge system, a set of narratives, of relationships, an imaginary." *See* AI

We assume that Congress is less concerned with whether a given tool fits within a definition of AI than whether it uses computational technology to address a listed harm. In other words, what matters more is output and impact.[6] Thus, some tools mentioned herein are not necessarily AI-powered. Similarly, and when appropriate, we may use terms such as automated detection tool or automated decision system,[7] which may or may not involve actual or claimed use of AI. We may also refer to machine learning, natural language processing, and other terms that — while also subject to varying definitions — are usually considered branches, types, or applications of AI.

We note, too, that almost all of the harms listed by Congress are not themselves creations of AI and, with a few exceptions like deepfakes, existed well before the Internet. Greed, hate, sickness, violence, and manipulation are not technological creations, and technology will not rid society of them.[8] While social media and other online environments can help bring people together, they also provide people with new ways to hurt one another and to do so at warp speed and with incredible reach.[9]

No matter how these harms are generated, technology and AI do not play a neutral role in their proliferation and impact. Indeed, in the social media context, the central challenge of the Congressional question posed here should not be lost: the use of AI to address online harm is merely an attempt to mitigate problems that platform technology — itself reliant on AI — amplifies by design and for profit in accord with marketing incentives and commercial surveillance. Harvard University Professor Shoshana Zuboff has explained that platforms'

---

Decolonial Manyfesto, https://manyfesto.ai/index.html?s=03. Computer scientist and Mozilla Fellow Deborah Raji lamented that editors ask her to use the term "AI" so that people will supposedly understand her, when in fact it "means nothing, by design." Deborah Raji, Twitter Post (Sep. 23, 2021), https://twitter.com/rajiinio/status/1441018006390415361?s=03.

[6] *See* Kristian Lum and Rumman Chowdhury, *What Is an "Algorithm"? It Depends on Who You Ask*, MIT Tech. Rev. (Feb. 26, 2021) ("What matters is the potential for harm, regardless of whether we're discussing an algebraic formula or a deep neural network."), https://www.technologyreview.com/2021/02/26/1020007/what-is-an-algorithm/.

[7] Rashida Richardson, a Northeastern University School of Law professor currently working as an Attorney Advisor at the FTC, has explored definitional issues and explained her preference for the term "automated decision systems." Rashida Richardson, *Defining and Demystifying Automated Decision Systems*, 81 Md. L. Rev. ___ (forthcoming 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3811708.

[8] *See* Erin Saltman, *Challenges in Combating Terrorism and Extremism Online*, Lawfare (Jul. 11, 2021) ("We can't simply algorithm our way out of the problem"), https://www.lawfareblog.com/challenges-combating-terrorism-and-extremism-online; Olivia Solon, *Inside Facebook's efforts to stop revenge porn before it spreads*, NBC News (Nov. 19, 2019) (quoting Radha Plumb's observation that bad actors will always "figure out how to hurt people in ways that are very hard to predict or prevent"), https://www.nbcnews.com/tech/social-media/inside-facebook-s-efforts-stop-revenge-porn-it-spreads-n1083631. Both Dr. Saltman, Director of Programming at the Global Internet Forum to Counter Terrorism, and Ms. Plumb, Chief of Staff to the Deputy Secretary at the Department of Defense, used to work at Facebook. *See also* Aspen Institute, *Commission on Information Disorder Final Report* at 15, 18 (Nov. 15, 2021), https://www.aspeninstitute.org/publications/commission-on-information-disorder-final-report/.

[9] Samidh Chakrabati, the former head of Facebook's civic integrity team, has argued that, if the harm at issue is greater than it would be if the content were shared in a chronological feed, via email, or via a subscription-based method, then the platform must bear some responsibility. *See* Samidh Chakrabati, Twitter Post (Dec. 13, 2021), https://twitter.com/samidh/status/1470446900738285569.

PX0526-005

engagement engines — powering human data extraction and deriving from surveillance economics — are the crux of the matter and that "content moderation and policing illegal content" are mere "downstream issues."[10] Platforms do use AI to run these engines, which can and do amplify harmful content. In a sense, then, one way for AI to address this harmful content is simply for platforms to stop using it to spread that content. Congress has asked us to focus here, however, not on the harm that big platforms are causing with AI's assistance but on whether anyone's use of AI can help address any of the specified online harms.

Out of scope for this report are the widely expressed concerns about the use of AI in other contexts, including offline applications. As Congress directed, we focus here only on the use of AI to detect or address the specified online harms. Nonetheless, it turns out that even such well-intended AI uses can have some of the same problems — like bias, discrimination, and censorship — often discussed in connection with other uses of AI.

The FTC's work has addressed AI repeatedly, and this work will likely deepen as AI's presence continues to rise in commerce. Two recent FTC cases — one against Everalbum and the other against Facebook[11] — have dealt with facial recognition technology.[12] Commissioner Rebecca Kelly Slaughter has written about AI harms,[13] as have FTC staff members.[14] A 2016 FTC report, *Big Data: A Tool for Inclusion or Exclusion?*, discussed algorithmic bias in depth.[15] The agency has also held several public events focused on AI issues, including workshops on dark patterns and voice cloning, sessions on AI and algorithmic bias at PrivacyCon 2020 and 2021, a hearing on competition and consumer protection issues with algorithms and AI, a FinTech Forum on AI and blockchain, and an early forum on facial recognition technology (resulting in a 2012 staff

---

[10] Shoshana Zuboff, *You Are the Object of a Secret Extraction Operation*, The New York Times (Nov. 12, 2021), https://www.nytimes.com/2021/11/12/opinion/facebook-privacy html?s=03.

[11] Although Facebook has changed its corporate name to Meta, we continue to use the name Facebook in this report because many cited sources, as well as events and issues discussed therein, were published before the name change.

[12] *See* https://www.ftc.gov/news-events/press-releases/2021/01/california-company-settles-ftc-allegations-it-deceived-consumers and https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions. Important remedies in these cases and a related action include required deletions of certain models, algorithms, data, or other work product. *See id.*; https://www.ftc.gov/news-events/press-releases/2019/12/ftc-grants-final-approval-settlement-former-cambridge-analytica.

[13] *See* Rebecca Kelly Slaughter, *Algorithms and Economic Justice*, Yale J. L. & Tech. (Aug. 2021), https://yjolt.org/sites/default/files/23_yale_j.l._tech._special_issue_1.pdf.

[14] *See* https://www.ftc.gov/news-events/blogs/business-blog/2021/04/aiming-truth-fairness-equity-your-companys-use-ai and https://www.ftc.gov/news-events/blogs/business-blog/2020/04/using-artificial-intelligence-algorithms.

[15] *See* FTC, *Big Data: A Tool for Inclusion or Exclusion* (Jan. 2016), https://www.ftc.gov/system/files/documents/reports/big-data-tool-inclusion-or-exclusion-understanding-issues/160106big-data-rpt.pdf.

PX0526-006

report).[16] Some of these matters and events are discussed in more detail in the 2021 FTC Report to Congress on Privacy and Security.[17]

Reflecting this subject's importance, in November 2021, Chair Khan announced that the agency had hired its first-ever advisors on artificial intelligence.[18] The FTC has also sought to add more technologists to its professional staff. The FTC is not primarily a science agency, however, and is not currently authorized or funded to engage in scientific research beyond its jurisdiction. The FTC has traditionally consisted of lawyers, investigators, economists, and other professionals specializing in enforcement, regulatory, educational,[19] and policy efforts relating to consumer protection and competition. Some other federal agencies and offices do engage in more sustained AI-related work, sometimes as a central part of their mission.

With these agency caveats in mind, it is important to recognize that only a few of the harms Congress specified fall within the FTC's mission to protect consumers from deceptive or unfair commercial conduct. Many others do not, such as criminal conduct, terrorism, and election-related disinformation. It is possible, however, that changes to platforms' advertising-dependent business models, including the incentives for commercial surveillance and data extraction, could have a substantial impact in those categories. Further, some disinformation campaigns are simply disguises for commercially motivated actors.[20] We did consult informally with relevant federal agencies and offices on some issues, including the Department of State, the Department of Homeland Security (DHS), the Defense Advanced Research Projects Agency (DARPA), and the National Artificial Intelligence Initiative Office.[21] Thus, although we discuss each harm Congress lists, we would defer to other parts of the government on the topics as to which they are much more engaged and knowledgeable.

---

[16] *See* https://www.ftc.gov/news-events/events-calendar/bringing-dark-patterns-light-ftc-workshop; https://www.ftc.gov/news-events/events-calendar/you-dont-say-ftc-workshop-voice-cloning-technologies; https://www.ftc.gov/news-events/events-calendar/privacycon-2021; https://www.ftc.gov/news-events/events-calendar/privacycon-2020; https://www.ftc.gov/news-events/events-calendar/fte-hearing-7-competition-consumer-protection-21st-century; https://www.ftc.gov/news-events/events-calendar/2017/03/fintech-forum-blockchain-artificial-intelligence; and https://www.ftc.gov/news-events/events-calendar/2011/12/face-facts-forum-facial-recognition-technology.

[17] *See* FTC Report to Congress on Privacy and Security (Sep. 13, 2021), https://www.ftc.gov/reports/ftc-report-congress-privacy-security.

[18] *See* https://www.ftc.gov/news-events/press-releases/2021/11/ftc-chair-lina-m-khan-announces-new-appointments-agency (announcing the appointments of Professor Meredith Whittaker, Amba Kak, and Sarah Myers West).

[19] Helping people avoid online harm is central to the FTC's consumer education efforts. *See, e.g.*, https://www.consumer.ftc.gov/topics/online-security.

[20] *See* Elise Thomas, *Conspiracy Clickbait: This One Weird Trick Will Undermine Democracy*, Institute for Strategic Dialogue (2022), https://www.isdglobal.org/isd-publications/conspiracy-clickbait-this-one-weird-trick-will-undermine-democracy/#. The FTC is familiar with this kind of trick, having previously sued a company that used a political survey as a front for illegal robocalls that pitched cruise line vacations. *See* https://www.ftc.gov/news-events/press-releases/2015/03/ftc-ten-state-attorneys-general-take-action-against-political.

[21] Online harms and AI issues also being a topic of great interest globally, we have taken note of some of the current efforts that international agencies and organizations are taking to address them.

The scope of the listed harms leads to a few other preliminary observations. First, while that scope is broad, Congress does not ask for a report covering all forms of online harm or the general problem of online misinformation and disinformation. Second, the wide variety of the listed harms means that no one-size-fits-all answers exist as to whether and how AI can or should be used to address them. In some cases, AI will likely never be appropriate or at least not be the best option. Many of the harms are distinct in ways that make AI more or less useful or that would make regulating or mandating its use more or less of a legal minefield. For example, both AI *and* humans have trouble discerning whether particular content falls within certain categories of harm, which can have shifting and subjective meanings. Moreover, while some harms refer to content that is plainly illegal, others involve speech protected by the First Amendment. To the extent a harm *can* be clearly defined, AI tools can help to reduce it, albeit with serious limitations and the caveat that AI will never be able to replace the human labor required to monitor and contend with these harms across the current platform ecosystem.

Finally, we note that Congress does not refer to who may be deploying these tools, requiring their use, or responsible for their outcomes. The use of AI to combat online harm is usually discussed in the context of content moderation efforts by large social media platforms. We do not limit the report strictly to that context, however, because the Congressional language does not mention "social media" at all and refers to "platforms" only in connection with terrorists and violent extremists. Governments and others may deploy these tools, too. Other parts of the online ecosystem or "tech stack" are also fair game, including search engines, gaming platforms, and messaging apps. That said, the body of the report reflects the fact that much of the research and policy discussion in this area focuses on social media, and for good reasons. These platforms and other large technology companies maintain the infrastructure in which these harms have been allowed to flourish, and despite mixed incentives to deal with those harms, they also control most of the resources to develop and deploy advanced mitigation tools.

## II. EXECUTIVE SUMMARY

The deployment of AI tools intended to detect or otherwise address harmful online content is accelerating. Largely within the confines — or via funding from — the few big technology companies that have the necessary resources and infrastructure, AI tools are being conceived, developed, and used for purposes including combat against many of the harms listed by Congress. Given the amount of online content at issue, this result appears to be inevitable, as a strictly human alternative is impossible or extremely costly at scale.

Nonetheless, it is crucial to understand that these tools remain largely rudimentary, have substantial limitations, and may never be appropriate in some cases as an alternative to human judgment. Their use — both now and in the future — raises a host of persistent legal and policy concerns. The key conclusion of this report is thus that governments, platforms, and others must exercise great caution in either mandating the use of, or over-relying on, these tools even for the important purpose of reducing harms. Although outside of our scope, this conclusion implies that, if AI is not the answer and if the scale makes meaningful human oversight infeasible, we must look at other ways, regulatory or otherwise, to address the spread of these harms.

PX0526-008

A central failing of these tools is that the datasets supporting them are often not robust or accurate enough to avoid false positives or false negatives. Part of the problem is that automated systems are trained on previously identified data and then have problems identifying new phenomena (e.g., misinformation about COVID-19). Mistaken outcomes may also result from problems with how a given algorithm is designed. Another issue is that the tools use *proxies* that stand in for some actual type of content, even though that content is often too complex, dynamic, and subjective to capture, no matter what amount and quality of data one has collected. In fact, the way that researchers classify content in the training data generally includes removing complexity and context — the very things that in some cases the tools need to distinguish between content that is or is not harmful. These challenges mean that developers and operators of these tools are necessarily reactive and that the tools — assuming they work — need constant adjustment even when they are built to make their own adjustments.

The limitations of these tools go well beyond merely inaccurate results. In some instances, increased accuracy could itself lead to other harms, such as enabling increasingly invasive forms of surveillance. Even with good intentions, their use can also lead to exacerbating harms via bias, discrimination, and censorship. Again, these results may reflect problems with the training data (possibly chosen or classified based on flawed judgments or mislabeled by insufficiently trained workers), the algorithmic design, or preconceptions that data scientists introduce inadvertently. They can also result from the fact that some content is subject to different and shifting meanings, especially across different cultures and languages. These bad outcomes may also depend on who is using the tools and their incentives for doing so, and on whether the tool is being used for a purpose other than the specific one for which it was built.

Further, as these AI tools are developed and deployed, those with harmful agendas — whether adversarial nations, violent extremists, criminals, or other bad actors — seek actively to evade and manipulate them, often using their own sophisticated tools. This state of affairs, often referred to as an arms race or cat-and-mouse game, is a common aspect of many kinds of new technology, such as in the area of cybersecurity. This unfortunate feature will not be going away, and the main struggle here is to ensure that adversaries are not in the lead. This task includes considering possible evasions and manipulations at the tool development stage and being vigilant about them after deployment. However, this brittleness in the tools — the fact that they can fail with even small modifications to inputs — may be an inherent flaw.

While AI continues to advance in this area, including with existing government support, all of these significant concerns suggest that Congress, regulators, platforms, scientists, and others should exercise great care and focus attention on several related considerations.

First, **human intervention** is still needed, and perhaps always will be, in connection with monitoring the use and decisions of AI tools intended to address harmful content. Although the enormous amount of online content makes this need difficult to fulfill at scale, most large platforms acknowledge that automated tools aren't good enough to work alone. That said, even extensive human oversight would not solve for underlying algorithmic design flaws. In any event, the people tasked with monitoring the decisions these tools make — the "humans in the loop" — deserve adequate training, resources, and protection to do these difficult jobs. Employers should also provide them with enough agency and time to perform the work and

PX0526-009

should not use them as scapegoats for the tools' poor decisions and outcomes. Of course, even the best-intentioned and well-trained moderators will bring their own biases to the work, including a tendency to defer to machines ("automation bias"), reflecting that moderation decisions are never truly neutral. Nonetheless, machines should not be allowed to discriminate where humans cannot.[22]

Second, AI use in this area needs to be meaningfully **transparent**, which includes the need for it to be explainable and contestable, especially when people's rights are involved or when personal data is being collected or used. Some platforms may provide more information about their use of automated tools than they did previously, but it is still mostly hidden or protected as trade secrets. Transparency can mean many things, and exactly what should be shared with which audiences and in what way are all questions under debate. The public should have more information about how AI-based tools are being used to filter content, for example, but the average citizen has no use for pages of code. Platforms should be more open to sharing information about these tools with researchers, though they should do so in a manner that protects the privacy of the subjects of that shared data. Such researchers should also have adequate legal protection to do their important work. Public-private partnerships are also worth exploring, with due consideration of both privacy and civil liberty concerns.

Third, and intertwined with transparency, platforms and other companies that rely on AI tools to clean up the harmful content their services have amplified must be **accountable** both for their data practices and for their results. After all, transparency means little, ultimately, unless we can do something about what we learn from it. In this context, accountability would include meaningful appeal and redress mechanisms for consumers and others — woefully lacking now and perhaps hard to imagine at scale — and the use of independent audits and algorithmic impact assessments (AIAs). Frameworks for such audits and AIAs have been proposed, but many questions about their focus, content, and norms remain. Like researchers, auditors also need protection to do this work, whether they are employed internally or externally, and they themselves need to be held accountable. Possible regulation to implement both transparency and accountability requirements is discussed below, and the import of focusing on these goals cannot be overstated, though they do not stand in for more substantive reforms.

Fourth, **data scientists and their employers** who build AI tools — as well as the firms procuring and deploying them — are responsible for both inputs and outputs. They should all strive to hire and retain diverse teams, which may help reduce inadvertent bias or discrimination, and to avoid using training data and classifications that reflect existing societal and historical inequities. Appropriate documentation of the datasets, models, and work undertaken to create these tools is important in this regard. They should all be concerned, too, with potential impact and actual outcomes, even though those designing the tools will not always know how they will ultimately be used. Further, they should always keep privacy and security in mind, such as in their treatment of the training data. It may be that these responsibilities need to be imposed on

---

[22] As Dr. Chris Gilliard has framed it, "Automating that racist thing is not going to make it less racist." *See* Surveillance Killjoy, Twitter Post (Apr. 20, 2021), https://twitter.com/hypervisible/status/1384502881538166784.

PX0526-010

executives overseeing development and deployment of these tools, not merely pushed as ethical precepts.

Fifth, platforms and others should **use the range of interventions** at their disposal, such as tools that slow the viral spread or otherwise limit the impact of certain harmful content. Automated tools can do more with harmful content than simply identify and delete it. These tools can change how platform users engage with content and are thus internal checks on a platform's own recommendation engines that result in such engagement in the first place.[23] They include, among other things, limiting ad targeting options, downranking, labeling, or inserting interstitial pages with respect to problematic content. How effective any of these tools are — and under what circumstances — is unknown and often still dependent on detection of particular content, which, as noted, AI usually does not do well. In any event, the efficacy of these tools needs more study, which is severely hindered by platform secrecy. AI tools can also help map and uncover networks of people and entities spreading the harmful content at issue. As a corollary, they can be used to amplify content deemed authoritative or trustworthy. Assuming confidence in who is making those determinations, such content could be directed at populations that were targets of malign influence campaigns (debunking) or that may be such targets in the future (prebunking). Such work would go hand-in-hand with other public education efforts.

Sixth, it is possible to give individuals the ability to use AI tools to limit their personal exposure to certain harmful or otherwise unwanted content. Filters that enable people, at their discretion, to block certain kinds of sensitive or harmful content are one example of such **user tools**. These filters may necessarily rely on AI to determine whether given content should pass through or get blocked. Another example is middleware, a tailored, third-party content moderation system that would ride atop and filter the content shown on a given platform. These systems mostly do not yet exist but are the topic of robust academic discussion, some of which questions whether a viable market could ever be created for them.

Seventh, to the extent that any AI tool intended to combat online harm works effectively and without unfair or biased results, it would help for smaller platforms and other organizations to have **access** to it, since they may not have the resources to create it on their own. As noted above, however, these tools have largely been developed and deployed by several large technology companies as proprietary items. On the other hand, greater access to such tools carries its own set of problems, including potential privacy concerns, such as when datasets are transmitted with the algorithm. Indeed, access to user data should be granted only when robust privacy safeguards are in place. Another problem is that the more widely a given tool is in use, the easier it will be to exploit.

Eighth, given the limitations on using AI to detect harmful content, it is important to focus on key complementary measures, particularly the use of **authentication tools** to identify the source

---

[23] Professor Olivier Sylvain, who is now the FTC's Senior Advisor on Technology, has noted that these "design tweaks" ultimately have limited efficacy because they "bump[] up against a far more compelling market incentive to hold and quantify consumer attention for advertisers." Olivier Sylvain, *Platform Realism, Informational Inequality, and Section 230 Reform*, Yale L.J. Forum 131 at 485 (Nov. 16, 2021), https://www.yalelawjournal.org/forum/platform-realism-informational-inequality-and-section-230-reform.

PX0526-011

of particular content and whether it has been altered. These tools — which could involve blockchain, among other things — can be especially helpful in dealing with the provenance of audio and video materials. Like detection tools, however, authentication measures have limits and are not helpful for every online harm.

Finally, in the context of AI and online harms, any **laws or regulations require careful consideration.** Given the various limits of and concerns with AI, explicitly or effectively mandating its use to address harmful content — such as overly quick takedown requirements imposed on platforms — can be highly problematic. The suggestion or imposition of such mandates has been the subject of major controversy and litigation globally. Among other concerns, such mandates can lead to overblocking and put smaller platforms at a disadvantage. Further, in the United States, such mandates would likely run into First Amendment issues, at least to the extent that the requirements impact legally protected speech. Another hurdle for any regulation in this area is the need to develop accepted definitions and norms not just for what types of automated tools and systems are covered but for the harms such regulation is designed to address.

Putting aside laws or regulations that would require more fundamental changes to platform business models, the most valuable direction in this area — at least as an initial step — may be in the realm of transparency and accountability. Seeing and allowing for research behind platforms' opaque screens (in a manner that takes user privacy into account) may be crucial for determining the best courses for further public and private action.[24] It is hard to craft the right solutions when key aspects of the problems are obscured from view.

## III. USING ARTIFICIAL INTELLIGENCE TO COMBAT ONLINE HARMS

### A. Deceptive and fraudulent content intended to scam or otherwise harm individuals

Of the harms specified by Congress, deception is the most central to the Commission's consumer protection mission. Public and private sector use of AI tools to combat online scams is still in its relative infancy, and such tools may be hard to develop. While some scams may be detected by relatively clear and objective markers, many are context-dependent and not obvious on their face. After all, the nature of a scam is to deceive people into thinking it's not a scam. For example, the initial part of a scheme may involve a seemingly legitimate online ad, with key fraud indicators hidden offline and revealed only later. These factors may make it difficult for

---

[24] Commission staff is currently analyzing data collected from several large social media and video streaming companies about their collection and use of personal information as well as their advertising and user engagement practices. *See* https://www.ftc.gov/reports/6b-orders-file-special-reports-social-media-video-streaming-service-providers. In a 2020 public statement about this project, Commissioners Rebecca Kelly Slaughter and Christine S. Wilson remarked that "[i]t is alarming that we still know so little about companies that know so much about us" and that "[t]oo much about the industry remains dangerously opaque." https://www.ftc.gov/system/files/documents/public_statements/1584150/joint_statement_of_ftc_commissioners_chopra_slaughter_and_wilson_regarding_social_media_and_video.pdf.

machines to predict the veracity of claims about a product or service.[25] Automated tools may thus be less likely, at least in the near term, to help address online fraud as opposed to other harms.[26]

Despite the challenges, the use of AI to combat fraud is certainly an area for further research. Perhaps AI-based tools could help law enforcement agencies, researchers, platforms, and others reveal patterns of fraud and hidden connections between bad actors. A few consumer protection agencies have indeed started to look into whether AI can help in specific areas of fraud. For example, Japan's Consumer Affairs Agency sought funds to create an AI tool to identify websites selling products with deceptive COVID-19 prevention claims.[27] Poland's Office of Competition and Consumer Protection began a project to develop an AI tool that automatically detects unlawful clauses in business-to-consumer contracts.[28] Multiple Austrian government agencies have funded the development of an AI tool that would help consumers detect whether a website is a fake online shop.[29]

Facebook states that it uses AI tools to address various types of fraud, though, as the FTC has reported, scams on Facebook and other social media sites have continued to rise.[30] Specifically, Facebook says that it uses machine learning to identify scams and imposters on Messenger[31] and generally that it demotes content associated with fraud, including: links to suspected cloaking domains (which might involve financial scams); pages predicted to be spam (which might involve false ads, fraud, and security risks); and exaggerated health claims.[32] It also uses

---

[25] At the same time, scammers can use their own automated tools to commit fraud or can use the automated systems of social media platforms to amplify and target false advertising. *See, e.g.*, Jon Bateman, *Get Ready for Deepfakes to Be Used in Financial Scams*, Techdirt (Aug. 10, 2020), https://www.techdirt.com/2020/08/10/get-ready-deepfakes-to-be-used-financial-scams/; https://www.ftc.gov/business-guidance/blog/2021/11/ftc-analysis-shows-covid-fraud-thriving-social-media-platforms; https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/01/social-media-gold-mine-scammers-2021.

[26] In contrast, AI is a common feature of anti-fraud measures in the credit card context, in which markers of fraud may be easier to detect. *See* PYMNTS and Brighterion, *AI in Focus: The Rise against Payments Fraud* (2021), https://www.pymnts.com/wp-content/uploads/2021/12/PYMNTS-AI-In-Focus-Waging-Digital-Warfare-Against-Payments-Fraud-December-2021.pdf; https://usa.visa.com/visa-everywhere/security/outsmarting-fraudsters-with-advanced-analytics.html; https://www.paypal.com/us/brc/article/enterprise-solutions-paypal-machine-learning-stop-fraud. Payment firms also have the benefit of robust, accurate data about their customers and strong financial incentives to combat such fraud.

[27] *See* https://www.caa.go.jp/policies/budget/assets/policies_budget_201225_0002.pdf.

[28] *See* https://ec.europa.eu/info/funding-tenders/opportunities/portal/screen/how-to-participate/org-details/949814883/project/899954/program/31061273/details.

[29] *See* https://www.ait.ac.at/en/news-events/single-view/detail/6860?cHash=250795314de77d44fa029af1a1310da2 and Louise Beltzung, et al., *Real-Time Detection of Fake-Shops through Machine Learning*, 2020 IEEE International Conference on Big Data (Dec. 2020), https://doi.org/10.1109/BigData50022.2020.9378204.

[30] *See* https://www.ftc.gov/news-events/press-releases/2022/01/ftc-finds-huge-surge-consumer-reports-about-losing-money-scams; https://www.ftc.gov/news-events/blogs/business-blog/2021/11/ftc-analysis-shows-covid-fraud-thriving-social-media; https://www.ftc.gov/news-events/blogs/data-spotlight/2020/10/scams-starting-social-media-proliferate-early-2020.

[31] *See* https://messengernews.fb.com/2020/05/21/preventing-unwanted-contacts-and-scams-in-messenger/.

[32] *See* https://transparency.fb.com/en-gb/features/approach-to-ranking/types-of-content-we-demote/.

PX0526-013

automated detection systems for scams in the Facebook Marketplace, though their efficacy is uncertain at best.[33]

Other companies reporting similar usage of AI include Google, which uses it to detect online frauds and spam in search results and to filter spam, malware, and phishing in Gmail.[34] Microsoft makes similar use of AI for phishing and spam in Outlook.[35] Representatives of cybersecurity companies state that AI tools can also "track patterns in scam emails using large datasets and delete scam emails from people's inboxes."[36] Third-party vendors may offer AI-based scam detection as well, such as tools to find tax scam websites.[37]

Some academic research has also focused on the use of AI to address this harm, including a publicly funded project in the United Kingdom to detect fake dating profiles,[38] two connected studies on detecting undisclosed influencer affiliations,[39] and studies on detecting email spam.[40]

It is also worth noting that AI tools could aid in the investigation of whether companies are engaged in online conduct that harms competition. In 2021, for example, investigative journalists

---

[33] *See* Craig Silverman, et al., *Facebook Grew Marketplace to 1 Billion Users. Now Scammers Are Using It to Target People Around the World*, ProPublica (Sep. 22, 2021), https://www.propublica.org/article/facebook-grew-marketplace-to-1-billion-users-now-scammers-are-using-it-to-target-people-around-the-world. *See also* Colin Lecher and Surya Mattu, *Facebook Scammers Are Schilling Fake Cryptocurrency Using Big Tech's Biggest Names*, The Markup (Feb. 22, 2022), https://themarkup.org/citizen-browser/2022/02/22/facebook-scammers-are-schilling-fake-cryptocurrency-using-big-techs-biggest-names.

[34] *See* https://developers.google.com/search/blog/2021/04/how-we-fought-search-spam-2020 and https://security.googleblog.com/2020/02/improving-malicious-document-detection.html?m=1.

[35] *See* https://www.microsoft.com/en-us/insidetrack/office-365-helps-secure-microsoft-from-modern-phishing-campaigns; https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/anti-spam-protection?view=o365-worldwide. AlgorithmWatch has documented how some email spam filters using machine learning, including Microsoft's, may seem uncontroversial but could in fact be discriminatory and remain largely unaudited. Nicolas Kayser-Bril, *Spam filters are efficient and uncontroversial. Until you look at them*, AlgorithmWatch (Oct. 22, 2020), https://algorithmwatch.org/en/spam-filters-outlook-spamassassin/.

[36] *See* Social Catfish, *State of Internet Scams 2021* at 52-53, https://spcdnblog.socialcatfish.com/uploads/2021/07/State-of-Internet-Scams-2021-2.pdf.

[37] *See* Louise Matsakis, *Filing Your Taxes? Watch Out for Phishing Scams*, WIRED (Apr. 4, 2019), https://www.wired.com/story/filing-taxes-phishing-scams/.

[38] *See* https://webarchive.nationalarchives.gov.uk/ukgwa/20200930155453/https://epsrc.ukri.org/newsevents/news/aionlinedating/.

[39] *See* Arunesh Mathur et al., *Endorsements on Social Media: An Empirical Study of Affiliate Marketing Disclosures on YouTube and Pinterest*, Proc. of the ACM on Human-Computer Interaction, Vol. 2, CSCW, Art. 119 (Nov. 2018), https://doi.org/10.1145/3274388; Michael Swart, et al., *Is This an Ad?: Automatically Disclosing Online Endorsements on YouTube with AdIntuition*, in CHI '20: Proc. of the 2020 CHI Conf. on Human Factors in Computing Systems (Apr. 2020), http://dx.doi.org/10.1145/3313831.3376178.

[40] *See* Emmanuel Gbenga Dada, et. al., *Machine Learning for Email Spam Filtering*, Heliyon 5(6) (2019), https://www.sciencedirect.com/science/article/pii/S2405844018353404#bib127.

for The Markup used a machine learning tool to examine whether "Amazon routinely ranked its own brands and exclusives ahead of better-known brands with higher star ratings."[41]

One caveat for consumer protection or competition enforcers, however, is that it makes little sense to use limited resources to obtain any AI tools without having already decided what exactly to do with them. It would be more sensible to determine first what an agency wants to find or learn and then see what available tools, AI or not, are best suited and most appropriate for that task. Of course, the agency would also need staff capable of deploying such tools and evaluating their responsible use.

## B. Manipulated content intended to mislead individuals, including deepfake videos and fake individual reviews

### Deepfakes

While most of the Congressionally specified harms predate and exist outside the online environment, deepfakes — and similar forms of synthetic media or media manipulation — are creatures of it. Deepfakes are video, photo, text, or audio recordings that seem real but have been manipulated with AI.[42] It would stand to reason, then, that AI or other sophisticated technology could help with — if not be integral to — detection of deepfakes. Indeed, public and private research on AI solutions to the deepfake problem have been underway for some time. As detection technology continues to improve, however, so will the ability to evade it, meaning that this AI battle will not end soon and that technological mitigation is insufficient.[43] A team overseen by DHS issued a report in 2021 that came to this conclusion and recommended pairing improved and constantly updated detection tools — to be used proactively and open-sourced as appropriate — with new laws, public-private cooperation, scientific responsibility, authentication tools, and education, with due consideration for civil liberties.[44]

---

[41] *See* Julia Angwin, *The Mathematics of Amazon's Advantage*, Hello World #79 (Oct. 16, 2021), https://www.getrevue.co/profile/themarkup/issues/the-mathematics-of-amazon-s-advantage-803575.

[42] In 2020, the Commission explored issues related to voice cloning, a subcategory of deepfakes, in a public workshop. *See* https://www.ftc.gov/news-events/events-calendar/you-dont-say-ftc-workshop-voice-cloning-technologies.

[43] *See* DHS, *Increasing Threat of Deepfake Identities* at 29 (Sep. 2021), https://www.dhs.gov/publication/2021-aep-deliverables; Government Accountability Office, *Science & Tech Spotlight: Deepfakes* (Feb. 2020), https://www.gao.gov/assets/gao-20-379sp.pdf; European Parliamentary Research Service ("EPRS"), *Tackling deepfakes in European policy* at 16-19, 60 (Jul. 2021), https://www.europarl.europa.eu/stoa/en/document/EPRS_STU(2021)690039; Siwei Lyu, *Deepfakes and the New AI-Generated Fake Media Creation-Detection Arms Race*, Scientific American (Jul. 20, 2020), https://www.scientificamerican.com/article/detecting-deepfakes1/; James Vincent, *Facebook develops new method to reverse-engineer deepfakes and track their source*, The Verge (Jun. 16, 2021), https://www.theverge.com/2021/6/16/22534690/facebook-deepfake-detection-reverse-engineer-ai-model-hyperparameters.

[44] DHS, *Increasing Threat of Deepfake Identities*, *supra* note 43 at 3, 29-34.

PX0526-015

For several years, DARPA has been engaged intensively in studies on the automated detection of deepfakes and similarly manipulated content. These substantial efforts include the Semantic Forensics (SemaFor) program, led by Dr. Matt Turek, which seeks to develop tools "capable of automating the detection, attribution, and characterization of falsified media."[45] These last two factors are significant because, along with identifying that content has been manipulated, it is important both to know if it comes from where it claims to originate and to reveal the intent behind the manipulation.

Some big technology firms have been active in this area. The Deepfake Detection Challenge (DFDC), a joint effort involving the Partnership on AI (PAI), was a machine learning competition, launched initially on Facebook, created to incentivize development of technical means to detect AI-generated videos.[46] Separately, Google conducted an experiment, Assembler, that "aimed to advance how new detection technology could help fact-checkers and journalists identify manipulated media."[47] The DFDC and Assembler results reflect, among other things, the need for technology that can better recognize synthetic images in the wild (*i.e.*, in real-world circumstances) and not already in training datasets.[48] Facebook AI and Google AI both released their datasets for researcher use.[49] Many vendors offer tools for deepfake detection, too.[50]

Other research into detection methods, including the work of Professor Hany Farid at the University of California, Berkeley, is also well underway — in some cases with funding from the federal government and big technology companies — and reflects both promise and the need for continual attention and improvement.[51] Further, pursuant to its own studies of deepfake

---

[45] *See* https://www.darpa.mil/news-events/2021-03-02.

[46] *See* Partnership on AI, *The Deepfake Detection Challenge: Insights and Recommendations for AI and Media Integrity* (Mar. 12, 2020), http://partnershiponai.org/wp-content/uploads/2021/07/671004_Format-Report-for-PDF_031120-1.pdf; https://ai.facebook.com/blog/deepfake-detection-challenge-results-an-open-initiative-to-advance-ai/.

[47] *See* https://projectassembler.org.

[48] *See* Will Knight, *Deepfakes Aren't Very Good, Nor Are the Tools to Detect Them*, WIRED (Jun. 12, 2020), https://www.wired.com/story/deepfakes-not-very-good-nor-tools-detect/; https://projectassembler.org/learnings/ (also noting unique challenges involving small or low-resolution images).

[49] *See* Brian Dolhansky, et al., *The DeepFake Detection Challenge (DFDC) Dataset* (Oct. 2020), https://arxiv.org/abs/2006.07397; https://ai.googleblog.com/2019/09/contributing-data-to-deepfake-detection.html. More recently, Facebook has open-sourced models developed pursuant to its Image Similarity Challenge, an attempt to advance at-scale detection of manipulated images. *See* https://ai.facebook.com/blog/detecting-manipulated-images-the-image-similarity-challenge-results-and-winners/?s=03.

[50] *See, e.g.*, https://weverify.eu/tools/deepfake-detector/; https://www.fakenetai.com/; https://sensity.ai/deepfakes-detection/; https://www.mcafee.com/blogs/enterprise/security-operations/the-deepfakes-lab-detecting-defending-against-deepfakes-with-advanced-ai/; https://github.com/resemble-ai/resemblyzer; and https://cyabra.com/industries/.

[51] *See, e.g.*, Shruti Agarwal, et al., *Detecting Deep-Fake Videos from Phoneme-Viseme Mismatches* (2020), https://farid.berkeley.edu/downloads/publications/cvpr20a.pdf, and *Detecting Deep-Fake Videos from Appearance and Behavior* (2020), https://farid.berkeley.edu/downloads/publications/wifs20.pdf; Luisa Verdoliva, *Media Forensics and DeepFakes: An Overview* (2020), https://arxiv.org/abs/2001.06564; Yuezun Li, et al., *Celeb-DF: A Large-scale Challenging Dataset for DeepFake Forensics* (2020), https://arxiv.org/abs/1909.12962; Andreas Rossler, et al., *FaceForensics++: Learning to Detect Manipulated Facial Images* (2019), https://arxiv.org/abs/1901.08971.

detection, PAI concluded that, to improve these tools, developers and deployers need to consider: the quality of detection models (which are not so good as to obviate the need for human review); how these models can be built outside of big platforms; how to agree on what manipulated media is harmful; and how to deal with low-tech manipulations ("cheapfakes") and misleading context.[52] A related challenge explored by PAI's Claire Leibowicz and others involves how to address the trade-offs resulting from adversarial dynamics. Specifically, effective detection tools should be available not only to big tech companies but also to smaller platforms, journalists, researchers, and others who can put them to good use — but the wider such tools are distributed, the easier it is for bad actors to defeat them.[53]

As noted above, while more research and development of detection methods should be encouraged, such technology will not be sufficient on its own. University of Texas Professor Robert Chesney, University of Virginia Professor Danielle Citron, and Professor Farid state that "[e]ven if capable detection technologies emerge … it is not assured that they will prove scaleable, diffusible and affordable to the extent needed to have a dramatic impact on the deepfake threat."[54] Similarly, a report from the Washington University's Center for an Informed Public concludes that a multi-stakeholder approach is necessary in part because "[t]he technology to detect deepfakes, and synthetic media more broadly, is imperfect, super hard to deliver at scale and speed, and still evolving."[55] Reflecting the state of the art in this area, a recent study showed that a leading deepfake detection model did no better than a group of ordinary people, though they made different kinds of mistakes.[56]

A separate, oft-cited concern raised by Professors Chesney and Citron involves what they coined the "Liar's Dividend," a dilemma arising from how increased public knowledge of deepfakes

---

[52] *See* Claire Leibowicz, et al., *Manipulated Media Detection Requires More Than Tools*, Partnership on AI (Jul. 13, 2020), https://www.partnershiponai.org/manipulated-media-detection-requires-more-than-tools-community-insights-on-whats-needed/; Partnership on AI, *The Deepfake Detection Challenge*, *supra* note 46.

[53] *See* Claire Leibowicz, et al., *How to Share the Tools to Spot Deepfakes (Without Breaking Them)*, Partnership on AI Blog (Jan. 13, 2022), https://medium.com/partnership-on-ai/how-to-share-the-tools-to-spot-deepfakes-without-breaking-them-53d45cd615ae (discussing a framework for addressing the issue); Claire Leibowicz, et al., *The Deepfake Detection Dilemma: A Multistakeholder Exploration of Adversarial Dynamics in Synthetic Media* (2021), https://arxiv.org/abs/2102.06109. *See also* Steven Prochaska, et al., *Deepfakes in the 2020 Elections and Beyond*, Wash. U Center for an Informed Public at 6-7 (Oct. 2020), https://cpb-us-e1.wpmucdn.com/sites.uw.edu/dist/6/4560/files/2020/10/CIP_Deepfake_Report_Summary-1.pdf; Sam Gregory, *The World Needs Deepfake Experts to Stem This Chaos*, WIRED (Jun. 24, 2021), https://www.wired.com/story/opinion-the-world-needs-deepfake-experts-to-stem-this-chaos/.

[54] Robert Chesney, Danielle Citron, and Hany Farid, *All's Clear for Deepfakes: Think Again*, Lawfare (May 11, 2020), https://www.lawfareblog.com/alls-clear-deepfakes-think-again.

[55] *See* Prochaska, *supra* note 53, at 1; James Vincent, *Deepfake detection algorithms will never be enough*, The Verge (Jun. 27, 2019), https://www.theverge.com/2019/6/27/18715235/deepfake-detection-ai-algorithms-accuracy-will-they-ever-work; Henry Ajder and Nina Schick, *Deepfake apps are here and we can't let them run amok*, WIRED UK (Mar. 30, 2021) (noting that "no social media platform currently has deepfake detection in their media upload pipelines, and implementing detection on messaging apps like WhatsApp or Telegram would require monitoring users' conversations"), https://www.wired.co.uk/article/deepfakes-security.

[56] *See* Matthew Groh, et al., *Deepfake detection by human crowds, machines, and machine-informed crowds*, PNAS 119:1 (2022), https://doi.org/10.1073/pnas.2110013119.

makes it easier for people to escape accountability for their actions by denouncing authentic content as fake.[57] DHS has also identified this concern as a serious societal threat.[58] It is not a merely theoretical one,[59] and it is a conundrum somewhat analogous to how disseminating detection tools can lead inexorably to their speedier evasion.

Beyond the state of deepfake detection technology and its challenges exist questions about how those who possess that technology are using it. Different platforms may have different policies, with little transparency about their implementation and effect.[60] It is important to know, for example, how platforms determine the context of any given instance of manipulated media to ensure that artistic, satiric, and privacy-forward purposes are protected, and to be able to assess how well their systems work in making those distinctions. Such benign purposes are not theoretical, as manipulated media has a wide variety of legitimate uses.[61]

Given the many challenges of keeping detection technology at a level commensurate with deepfake technology, it is important to focus on the flip side: authentication. In other words, if it is difficult to identify fake content, then also try verifying real content.[62] Reflecting this pairing, Microsoft announced two new technologies in 2020 as part of its Defending Democracy Program: (1) Microsoft Video Authenticator, an AI-based deepfake detection tool; and (2) technology for its Azure cloud service and the BBC's Project Origin allowing content

---

[57] Robert Chesney and Danielle Citron, *Deep Fakes: A Looming Challenge for Privacy, Democracy, and National Security*, 107 Cal. L. Rev. 1753, 1758 (2019) ("As the public becomes more aware of the idea that video and audio can be convincingly faked, some will try to escape accountability for their actions by denouncing authentic video and audio as deep fakes"), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3213954.

[58] *See* DHS, *Increasing Threat of Deepfake Identities*, *supra* note 43 at 36.

[59] *See* Prochaska, *supra* note 53 at 9-10; Drew Harwell, *Top AI researchers race to detect 'deepfake' videos: 'We are outgunned*,*'* The Washington Post (Jun. 12, 2019), https://www.washingtonpost.com/technology/2019/06/12/top-ai-researchers-race-detect-deepfake-videos-we-are-outgunned/.

[60] *See* Amber Frankland and Lindsay Gorman, *Combating the Latest Technological Threat to Democracy: A Comparison of Facebook and Twitter's Deepfake Policies*, German Marshall Fund (Jan. 13, 2020), https://securingdemocracy.gmfus.org/combating-the-latest-technological-threat-to-democracy-a-comparison-of-facebooks-and-twitters-deepfake-policies/; Harwell, *supra* note 59.

[61] Examples abound and include a weekly satire show, *Sassy Justice*, that used deepfakes as part of its premise. *See* Karen Hao, *The creators of South Park have a new weekly deepfake satire show*, MIT Tech. Rev. (Oct. 28, 2020), https://www.technologyreview.com/2020/10/28/1011336/ai-deepfake-satire-from-south-park-creators/. A documentary, *Welcome to Chechnya*, used deepfakes to protect LGBTQ people facing significant persecution. *See* Rebecca Heilweil, *How deepfakes could actually do some good*, Vox recode (Jun. 29, 2020), https://www.vox.com/recode/2020/6/29/21303588/deepfakes-anonymous-artificial-intelligence-welcome-to-chechnya.

[62] *See, e.g.*, DHS, *Increasing Threat of Deepfake Identities*, *supra* note 43 at 31; Prochaska et al., *supra* note 53, at 5-6. Alex Engler, Brookings Institution, *Fighting deepfakes when detection fails* (Nov. 11, 2019), https://www.brookings.edu/research/fighting-deepfakes-when-detection-fails/; *National Security Challenges of Artificial Intelligence, Manipulated Media, and Deepfakes*, H. Perm. Select Comm. on Intelligence, 116th Cong. (2019) (testimony of Clint Watts), https://docs.house.gov/meetings/IG/IG00/20190613/109620/HHRG-116-IG00-Wstate-WattsC-20190613.pdf; Verdoliva, *supra* note 51; Ashish Jaiman, *Technical Countermeasures to Deepfakes*, Towards Data Science (Aug. 27, 2020), https://towardsdatascience.com/technical-countermeasures-to-deepfakes-564429a642d3.

PX0526-018

producers to add digital fingerprints to their content.[63] Like Adobe's Content Credentials, the latter would allow viewers, via browser extensions or other readers, to see the producer's identity and whether the content is authentic and unaltered.[64] Content authenticity goes beyond deepfakes, and broader efforts in this area, like those of the Coalition for Content Provenance and Authenticity, are discussed further below.

### Fake reviews

The Commission has brought several lawsuits alleging fake or deceptive reviews of products and services, a subject that is essentially a subset of consumer fraud, discussed above.[65] This area remains a priority for the Commission, as evidenced by a recent Notice of Penalty Offenses Concerning Deceptive or Unfair Conduct around Endorsements and Testimonials that the FTC distributed to hundreds of businesses.[66]

Many platforms that feature reviews state that they use machine learning tools — usually in conjunction with some level of human review — to identify and remove fake reviews. The list includes large platforms like Google, Amazon, and Apple; review platforms like Yelp, TripAdvisor, and Trustpilot; and vendors like PowerReviews and BazaarVoice, which offer review-related services to major online retailers.[67] Further, several research papers, some developed with public funding, discuss the development of AI tools to detect fake reviews in different online environments, such as app stores.[68]

---

[63] *See* https://blogs.microsoft.com/on-the-issues/2020/09/01/disinformation-deepfakes-newsguard-video-authenticator/; Leo Kelion, *Deepfake detection tool unveiled by Microsoft*, BBC News (Sep. 1, 2020), https://www.bbc.com/news/technology-53984114.

[64] *See id.*; https://blog.adobe.com/en/publish/2021/10/26/adobe-unleashes-content-attribution-features-photoshop-beyond-max-2021#gs.kc3s0g.

[65] *See, e.g.*, https://www.ftc.gov/news-events/press-releases/2022/01/fashion-nova-will-pay-42-million-part-settlement-ftc-allegations; https://www.ftc.gov/news-events/press-releases/2020/02/operators-comparison-shopping-website-agree-settle-ftc-charges; https://www.ftc.gov/news-events/press-releases/2019/02/ftc-brings-first-case-challenging-fake-paid-reviews-independent. Fake reviews are also the subject of FTC guidance for businesses and consumers. *See* https://www.ftc.gov/reviews and https://www.consumer.ftc.gov/articles/how-evaluate-online-reviews.

[66] *See* https://www.ftc.gov/enforcement/penalty-offenses/endorsements.

[67] *See* https://blog.google/products/maps/google-maps-101-how-we-tackle-fake-and-fraudulent-contributed-content/; https://www.aboutamazon.com/news/how-amazon-works/creating-a-trustworthy-reviews-experience; https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020/; https://trust.yelp.com/recommendation-software/; https://www.tripadvisor.com/TripAdvisorInsights/w3690; https://cdn.trustpilot.net/trustsite-consumersite/trustpilot-transparency-report-2021.pdf (at p. 26); https://www.powerreviews.com/blog/human-moderation-reviews/ (noting that all content is reviewed by human moderators after passing through automated filters); and https://knowledge.bazaarvoice.com/wp-content/conversations/en_US/Learn/moderation.html.

[68] *See, e.g.*, Luis Gutierrez-Espinosa, et al., *Ensemble Learning for Detecting Fake Reviews*, 2020 IEEE 44th Annual Computers, Software, and Applications Conference (Jul. 2020), https://www.researchgate.net/publication/345374735; Daniel Martens and Walid Maalej, *Towards understanding*

PX0526-019

Some companies have developed their own, AI-based tools to detect suspicious reviews for the public. FakeSpot and ReviewMeta offer consumers insight into the authenticity of particular reviews on Amazon and other platforms, relying in part on machine learning tools.[69] In 2021, FakeSpot released a report stating that it had used AI to determine the extent of unreliable product reviews on the Amazon, Walmart, eBay, Best Buy, Shopify, and Sephora websites.[70] It found that, in 2020, nearly 31% of the reviews on those sites were unreliable, though the percentage varied significantly between sites, with Walmart faring the worst and Best Buy the best.[71] Similarly, a 2021 report by Uberall and The Transparency Company relied on machine learning to determine review authenticity on Google My Business (GMB), Facebook, Yelp, and TripAdvisor, with GMB having, at 11%, the highest percentage of fake reviews.[72] These results were based on reviews that had already passed through the platforms' own automated filters.

Automated detection efforts in this area are certainly worthwhile endeavors. As with other types of deceptive content, however, fake reviews remain hard to spot by their text alone or even via analysis of metadata. The fact that they remain a marketplace problem[73] indicates that current detection technology — even assuming sufficient investment therein by any given platform along with human oversight — is still not good enough.[74]

---

*and detecting fake reviews in app stores*, Empir. .Software Eng. 24: 3316–3355 (2019), https://doi.org/10.1007/s10664-019-09706-9; Arjun Mukherjee et al., *Fake Review Detection: Classification and Analysis of Real and Pseudo Reviews* (2013), http://www2.cs.uh.edu/~arjun/tr/UIC-CS-TR-yelp-spam.pdf.

[69] *See* https://intercom.help/fakespot/en/articles/2700070-analysis-criteria; https://reviewmeta.com/forum/index.php?/topic/173-why-not-use-a-machine-learning-algo-that-trains-itself-based-on-removed-reviews/.

[70] Fakespot, *US Online Shopping Ratings & Reviews Analysis Report* (2021), https://www.fakespot.com/2021holidayreport.

[71] *Id.*

[72] *See* Uberall, *The State of Online Review Fraud* (2021), https://uberall.com/en-us/resources/blog/how-big-a-problem-are-fake-reviews.

[73] In statements filed with the 2019 announcement of an action against Sunday Riley Modern Skincare, every FTC commissioner at that time recognized the serious harms caused by fake reviews. *See* https://www.ftc.gov/system/files/documents/cases/2020.11.6_sunday_riley_majority_statement_final.pdf and https://www.ftc.gov/system/files/documents/public_statements/1550127/192_3008_final_rc_statement_on_sunday_riley.pdf.

[74] *See, e.g.*, Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (2020) ("the ratings systems across platforms have been gamed, and the proliferation of fake reviews and counterfeit goods on third-party marketplaces now threatens the trust mechanism itself"), https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods; Competition and Markets Authority (United Kingdom), *Algorithms: How they can reduce competition and harm consumers* at 33-34 (2021), https://www.gov.uk/government/publications/algorithms-how-they-can-reduce-competition-and-harm-consumers/algorithms-how-they-can-reduce-competition-and-harm-consumers; CHEQ, *Fake Online Reviews* (2021), https://www.cheq.ai/research; Katie Schoolov, *Amazon is filled with fake reviews and it's getting harder to spot them*, CNBC (Sep. 6, 2000), https://www.cnbc.com/2020/09/06/amazon-reviews-thousands-are-fake-heres-how-to-spot-them.html; George Nguyen, *How Google and Yelp handle fake reviews and policy violations*, Search Engine Land (Aug. 30, 2021), https://searchengineland.com/how-google-and-yelp-handle-fake-reviews-and-policy-violations-374071.

PX0526-020

**Fake accounts**

Fake accounts on online platforms, often driven by bots, are themselves a form of manipulative content and serve the widely varying, manipulative intent of their operators. In 2020, the Commission reported to Congress on the use of social media bots in advertising, citing studies showing that, despite ongoing detection efforts, such bots remain hard to detect and easily capable of conducting widespread social media manipulation.[75]

Some platforms have been developing and using AI tools to detect such accounts and other inauthentic activity, including Facebook and its Instagram and WhatsApp properties.[76] Apple has indicated that it, too, uses machine learning to detect if users are real people.[77] TikTok reports that it uses automated tools to detect fake accounts and engagement.[78] However, as a State Department report, former FTC commissioner Rohit Chopra, and others have argued, social media platforms have strong financial incentives not to police this problem adequately.[79]

Often with federal funding, researchers have also been developing AI-based methods, including publicly available tools, to detect fake social media accounts and bots,[80] as well as state-

---

[75] *See* FTC Report to Congress on Social Media Bots and Advertising (Jul. 16, 2020), https://www.ftc.gov/reports/social-media-bots-advertising-ftc-report-congress. *See also* Sebastian Bay and Rolf Fredheim, *Social Media Manipulation 2021/2022: Assessing the Ability of Social Media Companies to Combat Platform Manipulation*, NATO Strategic Communications Centre of Excellence (Apr. 2022), https://stratcomcoe.org/publications/social-media-manipulation-20212022-assessing-the-ability-of-social-media-companies-to-combat-platform-manipulation/242.

[76] *See* Karen Hao, *How Facebook uses machine learning to detect fake accounts*, MIT Tech. Rev. (Mar. 4, 2020), https://www.technologyreview.com/2020/03/04/905551/how-facebook-uses-machine-learning-to-detect-fake-accounts/; https://research.fb.com/blog/2020/04/detecting-fake-accounts-on-social-networks-with-sybiledge/; https://business.instagram.com/blog/reducing-inauthentic-activity-on-instagram; https://faq.whatsapp.com/general/security-and-privacy/unauthorized-use-of-automated-or-bulk-messaging-on-whatsapp/?lang=en. In 2021, Facebook also disclosed that it demotes content associated with suspected fake accounts, such as instances of inauthentic sharing and posts from pages with artificially inflated distribution, though it does not indicate what tools it uses to identify such content. *See* https://transparency.fb.com/en-gb/features/approach-to-ranking/types-of-content-we-demote/.

[77] *See* https://developer.apple.com/documentation/sign_in_with_apple/sign_in_with_apple_rest_api/authenticating_users_with_sign_in_with_apple/.

[78] *See* https://www.tiktok.com/safety/resources/tiktok-transparency-report-2021-q-2?lang=en.

[79] *See* Christina Nemr and William Gangware, *Weapons of Mass Distraction: Foreign State-Sponsored Disinformation in the Digital Age*, Park Advisors at 26 (Mar. 2019), https://www.park-advisors.com/disinforeport; Rohit Chopra Statement, *Report to Congress on Social Media Bots and Deceptive Advertising* (Jul. 16, 2020), https://www.ftc.gov/public-statements/2020/07/statement-commissioner-rohit-chopra-regarding-report-congress-social-media; Simone Stolzoff, *The Problem with Social Media Has Never Been About Bots. It's Always Been About Business Models*, Quartz (Nov. 16, 2018), https://qz.com/1449402/how-to-solve-social-medias-bot-problem/.

[80] *See, e.g.*, Iacopo Pozzana and Emilio Ferrara, *Measuring Bot and Human Behavioral Dynamics*, Frontiers in Physics (Apr. 22, 2020) (citing the pioneering and extensive research in this area as well as openly accessible detection tools), https://www.frontiersin.org/articles/10.3389/fphy.2020.00125/full; Mohsen Sayyadiharikandeh, et al., *Detection of Novel Social Bots by Ensembles of Specialized Classifiers* (Aug. 14, 2020),

sponsored troll accounts.[81] Unfortunately, many of these tools are limited to Twitter because other platforms, like Facebook, restrict their APIs in ways that prevent access to the data necessary to create and test such tools.[82] The need to increase research access generally is discussed below.

As with deepfakes, one can expect the battle to continue between those seeking to detect fake accounts and those developing ever more sophisticated ways to deploy them for illicit purposes.

### C. Website or mobile application interfaces designed to intentionally mislead or exploit individuals

This category of harm appears to refer principally to so-called "dark patterns," which were the focus of a 2021 Commission public workshop and a later Enforcement Policy Statement.[83] The potential use of AI to detect dark patterns has not been fully explored.[84] It may be that the creation of effective detection tools will remain challenging for the same reasons as noted above with respect to fraudulent and deceptive content generally. Another challenge is the need to resolve complex issues of how to define, identify, and measure dark patterns,[85] which would presumably be a precondition for setting computers to the same task. However, one oft-cited research study used automated tools to help detect dark patterns on shopping sites.[86] Further, the

---

https://arxiv.org/pdf/2006.06867.pdf; Adrian Rauchfleisch and Jonas Kaiser, *The False positive problem of automatic bot detection in social science research*, PLoS ONE 15(10): e0241045 (Oct. 22, 2020), https://doi.org/10.1371/journal.pone.0241045.

[81] *See* Mohammad Hammas Saeed, et al., *TROLLMAGNIFIER: Detecting State-Sponsored Troll Accounts on Reddit* (Dec. 1, 2021), https://arxiv.org/pdf/2112.00443.pdf; Chris Stokel-Walker, *Researchers Have a Method to Spot Reddit's State-Backed Trolls*, WIRED UK (Jan. 12, 2021), https://www.wired.co.uk/article/researchers-reddit-state-trolls.

[82] *See* EPRS, *Automated Tackling of Disinformation* at 33-34 (Mar. 2019), https://www.europarl.europa.eu/RegData/etudes/STUD/2019/624278/EPRS_STU(2019)624278_EN.pdf; Johanna Wild and Charlotte Godart, *Spotting bots, cyborgs and inauthentic activity*, in Verification Handbook for Disinformation and Media Manipulation (Craig Silverman, ed.) (2020), https://datajournalism.com/read/handbook/verification-3.

[83] *See* https://www.ftc.gov/news-events/events-calendar/bringing-dark-patterns-light-ftc-workshop; https://www.ftc.gov/news-events/press-releases/2021/10/ftc-ramp-enforcement-against-illegal-dark-patterns-trick-or-trap. *See also* Arvind Narayanan, et al., *Dark Patterns: Past, Present, and Future*, Queue (Mar.-Apr. 2020), https://dl.acm.org/doi/pdf/10.1145/3400899.3400901.

[84] *See* Competition and Markets Authority, *Online Choice Architecture: How digital design can harm competition and consumers* at 42 (Apr. 5, 2022), https://www.gov.uk/government/publications/online-choice-architecture-how-digital-design-can-harm-competition-and-consumers.

[85] *See* Jennifer King and Adriana Stephan, *Regulating Privacy Dark Patterns in Practice — Drawing Inspiration from California Privacy Rights Act*, 5 Geo. L. Tech. Rev. 250 (2021), https://georgetownlawtechreview.org/wp-content/uploads/2021/09/King-Stephan-Dark-Patterns-5-GEO.-TECH.-REV.-251-2021.pdf. Among other things, it would be difficult to determine what training data one would use to build a dark pattern detection model.

[86] *See* Arunesh Mathur et al., *Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites*, Proc. of the ACM Human-Computer Interaction, Vol. 3, CSCW, Art. 81 (Nov. 2019), https://arxiv.org/abs/1907.07032. *See also*

PX0526-022

German government is funding a project to create an AI-based app for detecting dark patterns.[87] Also worth noting is a project at Stanford University's Institute for Human-Centered AI, in which researchers are collecting and analyzing data on dark patterns and will then try to classify new ones in the wild.[88]

### D. Illegal content online, including the illegal sale of opioids, child sexual exploitation and abuse, revenge pornography, harassment, cyberstalking, hate crimes, the glorification of violence or gore, and incitement of violence

**Illegal sales of opioids and other drugs**

Multiple federal agencies have been looking into developing AI tools as a way to detect illegal opioid sales or disrupt opioid traffickers. The National Institute on Drug Abuse, which is part of the Department of Health and Human Services, has invested in the creation of an AI-based tool to detect illegal opioid sellers.[89] The National Institute of Justice, which is part of the Department of Justice, has invested in AI technology to expose opioid trafficking on the dark web.[90] Further, the Food and Drug Administration has indicated that it uses AI-enabled tools in the context of its criminal investigations.[91]

Social media companies are reportedly using AI and other means to root out opioid and other illegal drug sales,[92] though such drugs can still easily be found for sale on those sites.[93] This

---

OECD, *Roundtable on Dark Commercial Patterns Online: Summary of discussion* at 6 (2021) (suggesting collaboration between consumer protection authorities and academics to develop automated detection tools), https://www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=DSTI/CP(2020)23/FINAL&docLanguage=En.

[87] *See* https://dapde.de/en/project/teilbereich-informatik-en/.

[88] *See* Katherine Miller, *Can't Unsubscribe? Blame Dark Patterns,* Stanford HAI News (Dec. 13, 2021), https://hai.stanford.edu/news/cant-unsubscribe-blame-dark-patterns.

[89] *See* https://www.usaspending.gov/award/CONT_AWD_75N95019C00069_7529_-NONE-_-NONE-.

[90] *See* https://nij.ojp.gov/funding/awards/2018-75-cx-0032.

[91] *See* Rebecca Heilweil, *AI can help find illegal opioid sellers online. And wildlife traffickers. And counterfeits*, Vox recode (Jan. 21, 2020), https://www.vox.com/recode/2020/1/21/21060680/opioids-artificial-intelligence-illegal-online-pharmacies.

[92] *See, e.g.*, https://snap.com/en-US/safety-and-impact/post/expanding-our-work-to-combat-the-fentanyl-epidemic (reporting that Snap also directs people searching for drug content to an educational portal and that it is constantly updating its databases to account for new drug terms that illicit drug sellers employ); https://transparency.fb.com/data/community-standards-enforcement/regulated-goods/facebook/.

[93] *See, e.g.*, Jan Hoffman, *Fentanyl Tainted Pills Bought on Social Media Cause Youth Drug Deaths to Soar*, The New York Times (May 19, 2022), https://www.nytimes.com/2022/05/19/health/pills-fentanyl-social-media.html; Tech Transparency Project, *Spot Check: Instagram's Drug Pipeline for Teens* (May 17, 2022), https://www.techtransparencyproject.org/articles/spot-check-instagrams-drug-pipeline-teens; Olivia Solon and Zoe Schiffer, *Instagram pushes drug content to teens*, NBC News (Dec. 7, 2021), https://www.nbcnews.com/tech/social-

---

situation reflects the huge amount of content to be policed, the fact that drug dealers keep devising sophisticated methods to trick the detection algorithms, and the need for more research into and constant improvement of such detection methods.[94]

Professor Tim Mackey of the University of California, San Diego, has led several government-funded efforts in this area and has published studies on the use of AI to detect illegal sales of online drugs and COVID-19 health products.[95] The tools developed from this work could potentially be used to track drug sales by location, help law enforcement link online and offline investigations, reveal elements of the supply chain, and perhaps redirect those seeking opioids to rehabilitative resources.[96]

### Child sex exploitation and abuse

Several major technology companies collaborate to address child sexual abuse material (CSAM) via the Technology Coalition, which publishes annual reports on industry efforts.[97] These companies use automated tools, including a hash-matching[98] technology from Microsoft called PhotoDNA, to identify and remove CSAM.[99] This process involves organizations like the National Center for Missing & Exploited Children assigning unique, "hash-based" alphanumeric identifiers to images of known CSAM; platforms then compile and use those hashes — which use a common format across industry — to block attempts to upload known CSAM.[100] According to the Technology Coalition, hash-based *video* detection is "less developed," with fewer members using such tools and without "an industry standard hash format."[101] Other joint efforts include the WeProtect Global Alliance, a public-private collaboration that, among other

---

media/instagram-pushes-drug-content-teens-rcna7751; Olivia Solon, *Snapchat boosts efforts to root out drug dealers*, NBC News (Oct. 7, 2021), https://www.nbcnews.com/tech/social-media/snapchat-boosts-efforts-to-root-out-drug-dealers-n1280946?s=03; Rachel Lerman and Gerrit De Vynck, *Snapchat, TikTok, Instagram face pressure to stop illegal drug sales as overdose deaths soar*, The Washington Post (Sep. 28, 2021), https://www.washingtonpost.com/technology/2021/09/28/tiktok-snapchat-fentanyl/; Heilweil, *supra* note 91.

[94] *Id.*

[95] *See, e.g.*, Neal Shah, et al., *An unsupervised machine learning approach for the detection and characterization of illicit drug-dealing comments and interactions on Instagram,* Substance Abuse, https://www.tandfonline.com/doi/abs/10.1080/08897077.2021.1941508; Tim Mackey et al., *Big Data, Natural Language Processing, and Deep Learning to Detect and Characterize Illicit COVID-19 Product Sales*, JMIR Public Health Surveill. 6(3): e20794 (Jul.-Sep. 2020), https://publichealth.jmir.org/2020/3/e20794/; Tim Mackey, et al., *Twitter-Based Detection of Illegal Online Sale of Prescription Opioid*, Am J Public Health 107(12): 1910–1915 (Dec. 2017), https://ajph.aphapublications.org/doi/10.2105/AJPH.2017.303994.

[96] Heilweil, *supra* note 91.

[97] *See* Technology Coalition Annual Report 2021, https://technologycoalition.org/annualreport/.

[98] *See generally* Hany Farid, *An Overview of Perceptual Hashing*, J. Online Trust and Safety (Oct. 2021), https://tsjournal.org/index.php/jots/article/view/24/14.

[99] *See id.*

[100] *See id.* A Canadian effort, Project Arachnid, also uses matching tools. *See* https://projectarachnid.ca/en/#how-does-it-work.

[101] *See* Technology Coalition, *supra* note 97.

PX0526-024

things, surveys companies about their detection efforts and makes recommendations.[102] Thorn, a nonprofit entity, offers a hash-matching tool, Safer, to content-hosting sites.[103]

Hash-matching is not AI, but some companies have developed AI tools as a way to flag new or unhashed CSAM. The Technology Coalition reports that its members use a variety of classifiers – algorithms supported by machine learning — to flag potential CSAM for categorization and human review.[104] These classifiers, which are often open source, include Google's Content Safety API.[105] Facebook also uses AI tools to spot new or unhashed CSAM,[106] and some service providers offer such tools to platforms.[107] Law enforcement around the world also uses third-party AI tools to detect and evaluate CSAM in videos or images.[108]

Separately, in 2021, Apple announced that it will provide an opt-in setting in family iCloud accounts that uses on-device machine learning to detect sexually explicit photos sent in the Messages app.[109] The system can display warnings to children when such photos are being sent or received, but Apple will not get access to the messages.[110] Apple decided to delay rollout of other announced measures to deal with CSAM when security and privacy experts raised concerns about potential misuse of new device-scanning technology.[111]

---

[102] *See* https://www.weprotect.org/.

[103] *See* https://www.thorn.org/. *See also* Caroline Donnelly, *Thorn CEO on using machine learning and tech partnerships to tackle online child sex abuse*, Computer Weekly (Mar. 29, 2017), https://www.computerweekly.com/news/450415609/Thorn-CEO-on-using-machine-learning-and-tech-partnerships-to-tackle-online-child-sex-abuse.

[104] *See* Technology Coalition, *supra* note 97.

[105] *See id.*; https://protectingchildren.google/intl/en/#tools-to-fight-csam.

[106] *See* https://about.fb.com/news/2018/10/fighting-child-exploitation/.

[107] *See, e.g.*, https://www.twohat.com/cease-ai/.

[108] *See, e.g.*, https://www.griffeye.com/griffeye-releases-new-ai-that-can-identify-csa-content-in-videos/#; https://news.microsoft.com/de-de/ki-im-einsatz-gegen-kinderpornografie/; Matt Burgess, *AI is helping UK police tackle child abuse way quicker than before*, WIRED UK (Jul. 17, 2019), https://www.wired.co.uk/article/uk-police-child-abuse-images-ai; Anouk Vleugels, *AI algorithms identify pedophiles for the police — here's how it works*, The Next Web (Nov. 8, 2018), https://thenextweb.com/news/ai-algorithms-identify-sexual-child-abuse-for-the-police.

[109] *See* https://www.apple.com/child-safety/.

[110] *See id.*

[111] *See* Reed Albergotti, *Apple delays the rollout of its plans to scan iPhones for child exploitation images*, The Washington Post (Sep. 3, 2021), https://www.washingtonpost.com/technology/2021/09/03/apple-delay-csam-scanning/; Jonathan Mayer and Anunay Kulshrestha, *Opinion: We built a system like Apple's to flag child sexual abuse material — and concluded the tech was dangerous*, The Washington Post (Aug. 19, 2021), https://www.washingtonpost.com/opinions/2021/08/19/apple-csam-abuse-encryption-security-privacy-dangerous/; Hany Farid, *Opinion: Should we Celebrate or Condemn Apple's New Child Protection Measures?*, Newsweek (Aug. 13, 2021), https://www.newsweek.com/should-we-celebrate-condemn-apples-new-child-protection-measures-opinion-1618828?amp=1&__twitter_impression=true. *See also* Nat Rubio-Licht, *Apple will soon blur nude photos sent to kids' iPhones*, Protocol (Apr. 20, 2022) (Apple using blue feature only in UK for messages with nude images sent to or from children), https://www.protocol.com/apple-message-scan-csam.

Other platform-developed tools deal with the related problem of child grooming.[112] Instagram uses AI tools that prevent adults from sending messages to people under 18 who don't follow them, sends prompts or safety notices to encourage teens to be cautious in conversations with adults to whom they are already connected but who are exhibiting potentially suspicious behavior, and prevent such adults from interacting with teens.[113] A Microsoft tool, Project Artemis, uses machine learning to detect child grooming by reviewing chat features of video games and messaging apps for patterns of communication that predators use to target children; the tool flags that content for human reviewers who decide whether to contact law enforcement.[114]

The research community is also studying CSAM detection methods with the help of AI. One study synthesized this work and concluded that the best results may occur when detection approaches are used in combination, and that deep learning techniques outperform other methods for detecting unknown CSAM.[115] Other researchers are taking different paths, such as the H-Unique project, centered at the United Kingdom's Lancaster University, involving an interdisciplinary study of the anatomical differences of hands.[116] If all hands are truly unique, then computers can be trained to identify someone's hand from a photograph, and algorithms can be designed to link those images to crime suspects.[117] That's especially important for certain child sexual abuse cases, where the only visible features of the abuser may be the backs of their hands seen in photographs.[118]

Detection of this kind of material is obviously important, and development of appropriate and effective tools should continue.[119] As reflected by the examples above, some platforms are actively engaged, taking usually positive though sometimes controversial measures. Other platforms and industry in general have been criticized for moving slowly and unevenly, not using

---

[112] Grooming involves a predator or pornographer fostering a false sense of trust and authority over a child in order to desensitize or break down the child's resistance to sexual abuse. *See* https://www.justice.gov/criminal-ceos/child-pornography.

[113] *See* https://about.instagram.com/blog/announcements/continuing-to-make-instagram-safer-for-the-youngest-members-of-our-community.

[114] *See* https://blogs.microsoft.com/on-the-issues/2020/01/09/artemis-online-grooming-detection/.

[115] *See* Hee-Eun Lee, et al., *Detecting child sexual abuse material: A comprehensive survey*, Forensic Science International: Digital Investigation 34 (Sep. 2020), https://doi.org/10.1016/j.fsidi.2020.301022. *See also* Elie Burzstein et al., *Rethinking the Detection of Child Sexual Abuse Imagery on the Internet*, in Proc. of the 2019 World Wide Web Conference (May 2019), https://doi.org/10.1145/3308558.3313482.

[116] *See* https://www.lancaster.ac.uk/security-lancaster/research/h-unique/.

[117] *See* https://www.lancaster.ac.uk/news/new-app-launched-for-public-to-help-pioneering-hand-identification-research#:~:text=Led%20by%20forensic%20anthropologist%20Professor,the%20environment%20and%20even%20accidents.

[118] *See id.*

[119] Indeed, CSAM may present the case where automated detection is clearly the most useful strategy for detection. Riana Pfefferkorn, *Content-Oblivious Trust and Safety Techniques: Results from a Survey of Online Service Providers* (Sep. 9, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3920031.

PX0526-026

all tools at their disposal, and not being transparent.[120] A 2019 New York Times report describes flaws in search engine filtering of such material and notes that Amazon Web Services does not search for CSAM at all, which appears still to be the case today.[121] More recently, WeProtect issued an annual report expressing hope but highlighting the growing scale of this material online and the need for, among other things, continued technological innovation and collaboration.[122] The extensive report describes the state of detection efforts, technological limits and problems (such as end-to-end encryption), and the failure of some platforms to use available tools.[123]

### Revenge pornography

Automated detection of revenge pornography — the nonconsensual sharing of intimate images — has not received much attention, at least not relative to many other categories of harm discussed here.[124] This fact may reflect the difficulty of training a machine to determine the nonconsensual nature of an image or video — a determination that humans, too, may not always be able to make easily. The need for such determinations also distinguishes this category from CSAM, where context and intent are not at issue. Nonetheless, Facebook has invested in creating an AI tool for this purpose, one that looks at patterns in the language accompanying an image,[125] as well as programs involving reporting by victim advocates and digital fingerprinting of images to prevent malicious upload.[126] We are unaware of whether other platforms or researchers have

---

[120] *See* Internet Watch Foundation, *The Annual Report 2021* at 14 (statement of Hany Farid), https://www.iwf.org.uk/about-us/who-we-are/annual-report-2021/; Michael H. Keller and Gabriel J.X. Dance, *Child Abusers Run Rampant as Tech Companies Look the Other Way*, New York Times (Nov. 9, 2019), https://www.nytimes.com/interactive/2019/11/09/us/internet-child-sex-abuse.html.

[121] *See id.*; Sheila Dang, *Amazon considers more proactive approach to determining what belongs on its cloud service*, Reuters (Sep. 5, 2021) (quoting an AWS spokesperson that it "does not pre-review content hosted by our customers" and stating that it has no intent to scan existing content), https://www.reuters.com/technology/exclusive-amazon-proactively-remove-more-content-that-violates-rules-cloud-2021-09-02/.

[122] *See* WeProtect Global Alliance, *Global Threat Assessment 2021*, https://www.weprotect.org/global-threat-assessment-21/. See also Internet Watch Foundation, *supra* note 120 at 99.

[123] *Id. See also* Broadband Commission for Sustainable Development, *Child Online Safety: Minimizing the Risk of Violence, Abuse and Exploitation Online* 37-38 (Oct. 2019), https://broadbandcommission.org/wp-content/uploads/2021/02/ChildOnlineSafety_Report.pdf.

[124] The FTC has brought actions against companies involved in posting such images and charging takedown fees. *See* https://www.ftc.gov/news-events/press-releases/2018/06/ftc-nevada-obtain-order-permanently-shutting-down-revenge-porn; https://www.ftc.gov/news-events/press-releases/2016/01/ftc-approves-final-order-craig-brittain-revenge-porn-case.

[125] *See* https://about.fb.com/news/2019/03/detecting-non-consensual-intimate-images/; Nicola Henry and Alice Witt, *Governing Image-Based Sexual Abuse: Digital Platform Policies, Tools, and Practices*, in The Emerald International Handbook of Technology-Facilitated Violence and Abuse at 758-59 (Jun. 4, 2021), https://doi.org/10.1108/978-1-83982-848-520211054; Solon, *Inside Facebook's efforts to stop revenge porn before it spreads, supra* note 8.

[126] *See id.*; https://www.facebook.com/safety/notwithoutmyconsent/pilot/how-it-works; Danielle Keats Citron, *Sexual Privacy*, 128 Yale L.J. 1870, 1955-58 (2019), https://digitalcommons.law.yale.edu/ylj/vol128/iss7/2/. It appears that one of these programs was dropped for unknown reasons, *see* Elizabeth Dwoskin and Craig Timberg, *Like whistleblower Frances Haugen, these Facebook employees warned about the company's problems for years.*

engaged in similar work to date, although this harm is often connected with deepfakes, discussed above.

### Hate crimes

As a preliminary matter, we note that Congress lists *hate crimes* as a form of illegal content on which this report should focus but does not include the related category of *hate speech*. Whereas hate crimes refer to criminal offenses intentionally directed at specific individuals, hate speech generally refers to communications about groups or classes of people.[127] This omission likely reflects the fact that, while harmful, hate speech is not illegal unless it amounts to threats or incitement to commit crimes.[128] Its legal status notwithstanding, the spread of online hate and the extent to which AI or other sophisticated technology can address it is the subject of much controversy and research.[129] Less explored is the question of whether such tools can detect or otherwise address hate crimes specifically. As automated tools are generally not proficient at detecting a hard-to-define and context-dependent category like hate speech,[130] though, it is hard

---

*No one listened*, The Washington Post (Oct. 8, 2021), https://www.washingtonpost.com/technology/2021/10/08/facebook-whistleblowers-public-integrity-haugen/, but that another one survived, *see* Olivia Solon, *Meta builds tool to stop the spread of 'revenge porn,'* NBC News (Dec. 2, 2021), https://www.nbcnews.com/tech/social-media/meta-builds-tool-stop-spread-revenge-porn-rcna7231.

[127] *See* https://www.justice.gov/hatecrimes/learn-about-hate-crimes/chart; Department of Justice, *Investigating Hate Crimes on the Internet* (2003), https://www.ojp.gov/ncjrs/virtual-library/abstracts/investigating-hate-crimes-internet; United Nations Strategy and Plan of Action on Hate Speech at 2 (Jun. 2019), https://www.un.org/en/genocideprevention/documents/UN%20Strategy%20and%20Plan%20of%20Action%20on%20Hate%20Speech%2018%20June%20SYNOPSIS.pdf.

[128] *See id.*

[129] *See, e.g.*, Deepa Seetharaman, et al., *Facebook Says AI Will Clean Up the Platform. Its Own Engineers Have Doubts*, Wall St. J. (Oct. 17, 2021) (discussing small percentages of hate speech caught by platform using automated tools), https://www.wsj.com/articles/facebook-ai-enforce-rules-engineers-doubtful-artificial-intelligence-11634338184; Paul Rottger, et al., *HATECHECK: Functional Tests for Hate Speech Detection Models*, (May 27, 2021) (revealing critical weaknesses in detection models including Google Jigsaw's Perspective), https://arxiv.org/abs/2012.15606.

[130] Even putting aside technical limits, a foundational problem is that hate speech is not easily definable, or at least is not amenable to easy agreement on its definition, making it even more difficult to deploy effective detection tools. *See, e.g.*, Adam G. Klein, *Fear, more than hate, feeds online bigotry and real-world violence*, The Conversation, (Dec. 20, 2018), https://theconversation.com/fear-more-than-hate-feeds-online-bigotry-and-real-world-violence-106988; EPRS, *Automated tackling of disinformation*, *supra* note 82 at 39. Similarly, given the difficult contextual judgments required, which involve sensitivity to different cultures and languages, humans and machines can both fail easily when trying to determine if certain posts fit a definition. *See, e.g.*, Facebook Oversight Board, *Case decision 2021-007-FB-UA*, https://www.oversightboard.com/decision/FB-ZWQUPZLZ; Tekla S. Perry, *Q&A: Facebook's CTO Is at War With Bad Content, and AI Is His Best Weapon*, IEEE Spectrum (Jul. 21, 2020) (Mike Schroepfer noting how language and context make it hard to use AI to detect hate speech), https://spectrum.ieee.org/computing/software/qa-facebooks-cto-is-at-war-with-bad-content-and-ai-is-his-best-weapon; Jennifer Young, et al., *Beyond AI: Responses to Hate Speech and Disinformation*, Carnegie Mellon U. (2018), https://jessica-young.com/research/Beyond-AI-Responses-to-Hate-Speech-and-Disinformation.pdf. Definitional and contextual issues are discussed more in Section IV.

PX0526-028

to conceive that such tools could easily distinguish when given hateful content is more or less likely to be criminal.[131]

On the other hand, while AI tools might not be good enough at detecting hateful content,[132] they might help in other ways, such as by predicting when hate speech may lead to violence and crime in the physical world.[133] At least three sets of academics have probed such correlations:

- A New York University research team, with partial federal funding, used machine learning to show that cities with a greater incidence of a certain type of racist post on Twitter reported more hate crimes related to race, ethnicity, and national origin.[134]

- Researchers from Cardiff University's Hatelab project collected Twitter data via an AI tool and compared it to London police data to show that an increase in "hate tweets" from one location corresponded to an increase in racially and religiously aggravated crimes in the same area.[135] The Cardiff researchers, supported in part by the United States Department of Justice, suggested that an algorithm using their method could predict spikes in crimes against members of minority communities in specific areas.[136]

- Researchers from Princeton University and the University of Warwick, using methods including machine learning, found correlations between increases in Twitter usage and anti-Muslim hate crimes in certain United States counties since the 2016 Presidential election.[137] In a separate study, also using a machine learning tool and focused on Germany, they determined that "anti-

---

[131] It is worth noting that hate crime has been a vexed area for enforcement, with statistics indicating that, while hate crimes against racial minorities are under-reported, hate crime laws are enforced disproportionately against those same minorities. *See, e.g.*, Stanford Law School Policy Lab and Brennan Center for Justice, *Exploring Alternative Approaches to Hate Crimes* at 13-14 (Jun. 2021), https://www-cdn.law.stanford.edu/wp-content/uploads/2021/06/Alternative-to-Hate-Crimes-Report_v09-final.pdf; Michael German and Emmanuel Mauleón, *Fighting Far Right Violence and Hate Crimes* at 14, Brennan Center for Justice (Jul. 1, 2019), https://www.brennancenter.org/sites/default/files/2019-08/Report_Far_Right_Violence.pdf; Heather Zaykowski, *Racial Disparities in Hate Crime Reporting*, Violence and Victims 25:3 (Jun. 2010), https://doi.org/10.1891/0886-6708.25.3.378. AI detection systems and platform policies that rely on historical crime data may thus be likely to reflect these disparities.

[132] Of course, the limitations of automated approaches should not diminish continued work in this area, such as the positive efforts of the Anti-Defamation League, *see* https://www.adl.org/resources/reports/the-online-hate-index, and the Alan Turing Institute, *see* https://www.turing.ac.uk/blog/introducing-online-harms-observatory.

[133] *See generally* Cathy Buerger, *Speech as a Driver of Intergroup Violence: A Literature Review*, Dangerous Speech Project (Jun. 16, 2021), https://dangerousspeech.org/wp-content/uploads/2021/06/Speech-and-Violence-Lit-Review.pdf.

[134] *See* Kunal Relia et al., *Race, Ethnicity and National Origin-based Discrimination in Social Media and Hate Crimes Across 100 U.S. Cities* (Jan. 31, 2019), https://arxiv.org/pdf/1902.00119.pdf.

[135] *See* Matthew L. Williams, et al., *Hate in the Machine: Anti-Black and Anti-Muslim Social Media Posts as Predictors of Offline Racially and Religiously Aggravated Crime*, Brit. J. Criminol. 60, 93–117 (Jul. 23, 2019), https://doi.org/10.1093/bjc/azz049.

[136] *See id.*

[137] Karsten Muller and Carlo Schwarz, *From Hashtag to Hate Crime: Twitter and Anti-Minority Sentiment* (Jul. 24, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3149103.

refugee sentiment on Facebook predicts crimes against refugees in otherwise similar municipalities with higher social media usage."[138]

Employees of at least one social media platform have focused on this link, too. Internal Facebook documents show that analysts worried that hateful content on the platform might be inciting real-world violence in connection with Minneapolis protests occurring after the police killing of George Floyd.[139] Although it is not clear what precise tools they used, these analysts discovered that "the largest and most combative demonstrations" took place in two zip codes where users reported spikes in offensive posts, whereas harmful content was only "sporadic" in areas where protests had not yet emerged.[140]

**Harassment and cyberstalking**

The Commission has brought multiple cases against stalkerware app companies.[141] AI tools could aid in detecting similar apps. Researchers at Cornell and New York University worked with NortonLifeLock to create CreepRank, an algorithm that ranks the probability that an app is used as "creepware" — hard-to-detect software that can be used to abuse, stalk, harass and spy on others.[142] NortonLifeLock incorporated it into its mobile security service, and the researchers reported suspect apps to Google, which removed over 800 of them from the Play Store.[143] The study did not use AI, but the researchers note that CreepRank could be a first step in collecting and using data that would train machine learning classifiers to identify these apps.[144]

Building automated tools to detect particular incidents of harassment or cyberstalking is challenging for the same reasons as described above with respect to hate crimes. Professor Citron has noted, both in her seminal work, Hate Crimes in Cyberspace, and thereafter, that, in connection with harassment and threats, computers cannot yet approximate the contextual judgment of humans.[145] A recent Google Research paper delves into this and other challenges of

---

[138] Karsten Muller and Carlo Schwarz, *Fanning the Flames of Hate: Social Media and Hate Crime* (Jun. 8, 2020), https://ssrn.com/abstract=3082972.

[139] *See* Naomi Nix and Lauren Etter, *Facebook Privately Worried About Hate Speech Spawning Violence*, Bloomberg.com (Oct. 25, 2021), https://www.bloomberg.com/news/articles/2021-10-25/facebook-s-fb-hate-speech-problem-worried-its-own-analysts.

[140] *Id.*

[141] *See, e.g.*, https://www.ftc.gov/news-events/press-releases/2021/09/ftc-bans-spyfone-and-ceo-from-surveillance-business; https://www.ftc.gov/news-events/press-releases/2020/03/ftc-gives-final-approval-settlement-stalking-apps-developer.

[142] *See* https://www.nortonlifelock.com/blogs/research-group/what-were-doing-fight-scourge-cyber-stalking.

[143] *See* Kevin A. Roundy, et al., *The Many Kinds of Creepware Used for Interpersonal Attacks*, 2020 IEEE Symposium on Security and Privacy (2020) https://ieeexplore.ieee.org/ielx7/9144328/9152199/09152794.pdf.

[144] *Id. See also* Ingo Frommholz, et al., *On Textual Analysis and Machine Learning for Cyberstalking Detection*, Datenbank Spektrum 16:127–135 (2016), https://link.springer.com/article/10.1007/s13222-016-0221-x.

[145] *See* Danielle Keats Citron, Hate Crimes in Cyberspace at 232 (2014); Danielle Keats Citron, *Section 230's Challenge to Civil Rights and Civil Liberties*, Knight First Amendment Institute, at n.41 (Apr. 6, 2018), https://knightcolumbia.org/content/section-230s-challenge-civil-rights-and-civil-liberties. *See also* Erik Larson, The Myth of Artificial Intelligence: Why Computers Can't Think the Way We Do (2021).

PX0526-030

automating detection of hate and harassment; it reviewed past studies and noted that classifiers can be designed not simply to detect individual instances but also to identify abusive accounts or predict at-risk users, and that "classifier scores can feed into moderation queues, content ranking algorithms, or warnings and nudges."[146] These researchers — and others before them — have explained, however, that all of these strategies struggle with obtaining unbiased and representative datasets of abusive content for training.[147]

Nonetheless, companies have focused some AI-related efforts in at least one closely related area: cyberbullying.[148] For example, IBM has worked with several start-ups and the Megan Meier Foundation on tools that use AI to detect possible child bullying and to find it in social media.[149] Further, in 2019, Instagram began rolling out AI-powered features intended to limit bullying by notifying people before they post comments or captions that may be considered offensive.[150] YouTube and TikTok indicate that they use automation of some kind to detect and remove videos featuring harassment or bullying.[151] Microsoft uses AI-powered content moderation on its Xbox gaming platform to detect cyberbullying and violent threats, among other things.[152]

Current cyberbullying research includes work from the Socio-Technical Interaction Research Lab, led by Dr. Pamela Wisniewski, including projects on detecting cyberbullying and other online sexual risks based on a human-centered approach to the use of AI.[153] One of

---

[146] Kurt Thomas, et al., *SoK: Hate, Harassment, and the Changing Landscape of Online Abuse* at 12, Google Research (2021), https://research.google/pubs/pub49786/.

[147] *Id.* at 12 (noting that biased training data can result in classifiers that consider terms like "gay" and "black" as themselves reflecting hate or harassment); Lindsay Blackwell, et al., *Classification and Its Consequences for Online Harassment: Design Insights from HeartMob,* Proc. of the ACM on Human-Computer Interaction (Dec. 2017) (discussing promise and limits of AI-based detection and how classification of harassment can invalidate the harassment experiences of marginalized people whose experiences aren't considered typical as defined per the morals and values of those creating the classification system), https://www.researchgate.net/publication/321636042. *See also* Rhiannon Williams, *Google is failing to enforce its own ban on ads for stalkerware*, MIT Tech. Rev. (May 12, 2022) (referring to failure of algorithms to stop ads for stalkerware), https://www.technologyreview.com/2022/05/12/1052125/google-failing-stalkerware-apps-ads-ban/.

[148] *See generally* Sameer Hinduja, *How Machine Learning Can Help Us Combat Online Abuse: A Primer*, The Cyberbullying Resource Center (2017), https://cyberbullying.org/machine-learning-can-help-us-combat-online-abuse-primer.

[149] *See* https://www.ibm.com/cloud/blog/ibm-cloud-services-working-together-for-competitive-advantage; https://www.identityguard.com/news/can-ai-solve-cyberbullying.

[150] *See* https://about.instagram.com/blog/announcements/our-progress-on-leading-the-fight-against-online-bullying.

[151] *See* https://transparencyreport.google.com/youtube-policy/removals; https://www.tiktok.com/safety/resources/tiktok-transparency-report-2021-q-2?lang=en.

[152] *See* Tom Warren, *Microsoft acquires Two Hat, a moderation company that helps keep Xbox clean*, The Verge (Oct. 29, 2021), https://www.theverge.com/2021/10/29/22752421/microsoft-two-hat-acquisition-xbox-moderation?scrolla=5eb6d68b7fedc32c19ef33b4&s=03; https://www.twohat.com/solutions/content-moderation-platform/.

[153] *See* https://stirlab.org/; Seunghyun Kim, et al., *A Human-Centered Systematic Literature Review of Cyberbullying Detection Algorithms*, Proc. ACM Hum.-Comput. Interact. 5, CSCW2, Article 325 (Oct. 2021), https://doi.org/10.1145/3476066; Afsaneh Razi, et al., *A Human-Centered Systematic Literature Review of the Computational Approaches for Online Sexual Risk Detection*, Proc. ACM Hum.-Comput. Interact., Vol. 5, No. CSCW2, Article 465 (Oct. 2021), https://doi.org/10.1145/3479609.

PX0526-031

Dr. Wisniewski's research projects also led to the creation of MOSafely.org, an open-source community that leverages AI, evidence, and data to address these online safety issues, supported by a federal grant.[154] Other work includes an EU project called Creep that uses AI to spot cyberbullying and distinguish it from simple disagreement, and that aims to develop prevention techniques via a chatbot.[155] An effort at the University of Exeter's Business School involves development of a tool, LOLA, that uses natural language processing to detect emotional undertones that may indicate cyberbullying.[156] Other researchers, sometimes with public funding, have used varying AI techniques to develop other detection methods.[157] Unsurprisingly, some researchers have raised the same problems with representative datasets, classifications, and definitions noted above.[158]

### Glorification or incitement of violence

Many major tech platforms and companies have developed and use AI tools to attempt to filter different kinds of violent content.[159] For example, YouTube built classifiers in 2011 to identify violent videos and prevent them from being recommended.[160] That platform and TikTok have both indicated more recently that they use automated measures to detect and remove violent and graphic content.[161] Facebook also uses such tools,[162] as does Pinterest.[163] Further, Parler uses a content moderation platform operated by a third party, Hive, which, among other things,

---

[154] *See* https://www.mosafely.org/mission-statement/.

[155] *See* http://creep-project.eu/.

[156] *See* https://business-school.exeter.ac.uk/newsandevents/news/articles/emotiondetectionenginedev.html.

[157] *See, e.g.,* Jacopo De Angelis and Giulia Perasso, *Cyberbullying Detection Through Machine Learning: Can Technology Help to Prevent Internet Bullying?*, Int'l J. Mgmt. and Humanities 4(11) (Jul. 2020), https://www.ijmh.org/wp-content/uploads/papers/v4i11/K10560741120.pdf; Cynthia Van Hee, et al., *Automatic detection of cyberbullying in social media text*, PLoS One 13(10) (Oct. 8, 2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0203794; Despoina Chatzakou, et al., *Mean Birds: Detecting Aggression and Bullying on Twitter* (May 12, 2017), https://arxiv.org/pdf/1702.06877.pdf.

[158] *See, e.g.,* Chris Emmery, et al., *Current limitations in cyberbullying detection: On evaluation criteria, reproducibility, and data scarcity*, Lang. Resources & Eval. (2021) 55:597–633, https://doi.org/10.1007/s10579-020-09509-1; H. Rosa, et al., *Automatic cyberbullying detection: A systematic review*, Computers in Human Behavior, 93 (2019) 333-345, http://rosta-farzan.net/courses/SC2019/readings/Rosa2018.pdf.

[159] This subsection excludes the other specified harms that involve particular types of violence, which are discussed either above (hate crimes) or below (violent extremist content).

[160] *See* https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

[161] *See* https://transparencyreport.google.com/youtube-policy/removals; https://www.tiktok.com/safety/resources/tiktok-transparency-report-2021-q-2?lang=en.

[162] *See, e.g.,* https://ai.facebook.com/blog/how-ai-is-learning-to-see-the-bigger-picture/; Dan Sabbagh, *Facebook trained its AI to block violent live streams after Christchurch attacks*, The Guardian (Oct. 29, 2021), https://www.theguardian.com/technology/2021/oct/29/facebook-trained-its-ai-to-block-violent-live-streams-after-christchurch-attacks.

[163] *See* Vishwakarma Singh and Dan Lee, *How Pinterest fights misinformation, hate speech, and self-harm content with machine learning*, Pinterest Engineering Blog (Mar. 5, 2021), https://medium.com/pinterest-engineering/how-pinterest-fights-misinformation-hate-speech-and-self-harm-content-with-machine-learning-1806b73b40ef.

PX0526-032

removes content appearing to involve violence.[164] Amazon offers its Rekognition APIs to businesses for content moderation, including automated detection of violence and gore.[165]

It is generally unclear whether or to what extent these tools are effective in practice, given the lack of transparency about their use. In Facebook's case, however, leaked internal documents are not encouraging and contrast with its public representations. The Wall Street Journal reported that, in March 2021, a team of Facebook employees found that the company's automated systems removed only "0.6% of all content that violated Facebook's policies against violence and incitement."[166] An internal presentation from April 2020, focusing on prevalence instead of the total amount of content, found that "removals were reducing the overall prevalence of graphic violence by about 19 percent."[167]

One reason for skepticism about the use of AI for accurate detection of violent content is the familiar problem of context, noted already above and explored more below.[168] Nonetheless, worthwhile and varied research on violence detection methods has continued in the academic community, including, for example, a study in Mexico on using deep neural networks for gender-based violence detection in Twitter messages,[169] and development by Notre Dame researchers, with government funding, of an AI "early warning system" for manipulated media that may lead to violence.[170]

### Unsafe or illegal items for sale

It does not appear that companies or researchers have done substantial work yet to develop AI tools to tackle this harm — from which we exclude the more specific categories of the illegal sale of drugs (discussed above) and the sale of counterfeit goods (discussed below). One

---

[164] *See* Kevin Randall, *Social app Parler is cracking down on hate speech — but only on iPhones*, The Washington Post (May 17, 2021), https://www.washingtonpost.com/technology/2021/05/17/parler-apple-app-store/; https://thehive.ai/.

[165] *See* https://docs.aws.amazon.com/rekognition/latest/dg/moderation.html.

[166] Seetharaman, *supra* note 129. *See also* Olivia Little, *A network of TikTok accounts is teaching users how to make pipe bombs and other weapons*, Media Matters for America (May 17, 2022), https://www.mediamatters.org/tiktok/network-tiktok-accounts-teaching-users-how-make-pipe-bombs-and-other-weapons.

[167] Gilad Edelman, *How to Fix Facebook, According to Facebook Employees*, WIRED (Oct. 25, 2021), https://www.wired.com/story/how-to-fix-facebook-according-to-facebook-employees/?s=03.

[168] *See* Desmond U. Patton, et al., *Contextual Analysis of Social Media: The Promise and Challenge of Eliciting Context in Social Media Posts with Natural Language Processing*, Proc. of the 2020 AAAI/ACM Conf. on AI, Ethics, and Society (Feb. 7-8, 2020), https://doi.org/10.1145/3375627.3375841; Rachel Metz, *Why AI is still terrible at spotting violence online*, CNN (Mar. 18, 2019) (explaining contextual problem of AI identifying incitement of violence in speech or violent imagery in video), https://www.cnn.com/2019/03/16/tech/ai-video-spotting-terror-violence-new-zealand/index.html.

[169] Carlos M. Castorena, et al., *Deep Neural Network for Gender-Based Violence Detection on Twitter Messages*, Mathematics 9(8), 807 (2021), https://doi.org/10.3390/math9080807.

[170] Michael Yankoski, et al., *An AI early warning system to monitor online disinformation, stop violence, and protect elections*, Bulletin of the Atomic Scientists 76(2), 85-90 (2020), https://doi.org/10.1080/00963402.2020.1728976.

PX0526-033

exception is Amazon, which developed machine learning tools to detect the sale of banned or unsafe goods in its marketplace, though the Wall Street Journal reported those measures have been ineffective.[171] Some researchers have used AI to detect online sales of particular items, such as illegal wildlife products sold on social media.[172] Another study used AI to detect likely food recalls and predict potentially unsafe food products based on analyses of Amazon customer reviews.[173]

### E. Terrorist and violent extremists' abuse of digital platforms, including the use of such platforms to promote themselves, share propaganda, and glorify real-world acts of violence

DHS and others have recognized the importance of innovative technology in countering the online spread of terrorist and violent extremist content (TVEC). As early as 2017, a DHS advisory committee explained that AI systems "can be deployed in the counter-terror and countering violent extremism arenas to provide improvements to DHS capabilities."[174] In 2021, a DHS official described the agency's consideration of using companies — some of which employ AI tools — to find warning signs of extremist violence on social media.[175] As part of its CP3 initiative, DHS also announced the opening of the National Counterterrorism Innovation, Technology, and Education Center (NCITE), centered at the University of Nebraska.[176] Per a federal grant, NCITE researchers are attempting to create an intelligent chatbot that will improve

---

[171] *See* Alexandra Berzon, et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, Wall St. J. (Aug. 23, 2019), https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990. *See also* Melissa Heikkilä, *Online marketplaces rife with unsafe and illegal items, study shows*, Politico EU (Feb. 24, 2020), https://www.politico.eu/article/online-marketplaces-rife-with-unsafe-and-illegal-items-study-shows/; https://www.aboutamazon.com/news/company-news/product-safety-and-compliance-in-our-store.

[172] *See* Enrico Di Minin and Christoph Fink, *How machine learning can help fight illegal wildlife trade on social media*, The Conversation (Apr. 23, 2019), https://theconversation.com/how-machine-learning-can-help-fight-illegal-wildlife-trade-on-social-media-115021. *See also* Julio Hernandez-Castro and David L. Roberts, *Automatic detection of potentially illegal online sales of elephant ivory via data mining*, PeerJ Comput. Sci. 1:e10 (Jul. 2015), https://peerj.com/articles/cs-10/.

[173] Adyasha Maharana, et al., *Detecting reports of unsafe foods in consumer product reviews*, JAMIA Open 2(3), 330–338 (Oct. 2019), https://academic.oup.com/jamiaopen/article/2/3/330/5543660.

[174] Homeland Security Sci. and Techn. Advis. Comm., *Artificial Intelligence White Paper* (Mar. 10, 2017), https://www.dhs.gov/sites/default/files/publications/Artificial%20Intelligence%20Whitepaper%202017_508%20FINAL_2.pdf. *See also* Jonathan Fischbach, *A New AI Strategy to Combat Domestic Terrorism and Violent Extremism*, Harv. Nat'l Sec. J. Online (May 6, 2020) (discussing need for national security community to reassess effective use of AI in this area), https://harvardnsj.org/wp-content/uploads/sites/13/2020/05/Fischbach_A-New-AI-Strategy.pdf.

[175] *See* Rachael Levy, *Homeland Security Considers Outside Firms to Analyze Social Media After Jan. 6 Failure*, Wall St. J. (Aug. 15, 2021), https://www.wsj.com/articles/homeland-security-considers-outside-firms-to-analyze-social-media-after-jan-6-failure-11629025200?mod=rss_Technology.

[176] *See* https://www.dhs.gov/CP3; https://www.dhs.gov/science-and-technology/news/2020/02/24/news-release-dhs-selects-university-nebraska-omaha-lead-terrorism-research; https://www.unomaha.edu/ncite/. Although it involved network analysis and not AI, prior DHS grants funded development of datasets of terrorist groups that can predict which organizations are likely to increase in lethality. *See* https://www.start.umd.edu/about-baad.

PX0526-034

the reporting of tips regarding terrorist activity.[177] In addition, DARPA's Memex program, which involved online search technology linking terrorists and human trafficking operations, was then used by MIT researchers to develop an AI-based tool.[178]

Such recognition is certainly not limited to the United States. The United Nations issued an in-depth report in 2021 about the use of AI to combat TVEC on social media, describing limits and human rights concerns for such use and identifying applications besides automated detection and takedown, including: (1) predictive analytics for terrorist activity; (2) identifying red flags of radicalization; (3) countering terrorist and violent extremist narratives; and (4) managing heavy data analysis demands.[179] The report provides many examples of public and private efforts in each area, such as the European Union's funding of a project, RED-Alert, to develop new content monitoring and analysis tools,[180] and the United Kingdom's work to develop technology to identify ISIS propaganda videos.[181] A report by the Global Network on Extremism and Technology (GNET), an academic research initiative, also provides examples of how governments in several countries are using AI tools for addressing TVEC online.[182]

As with CSAM, collaborative efforts in this space are significant. The Global Internet Forum to Counter Terrorism (GIFCT) is a non-governmental entity designed to prevent terrorists and violent extremists from exploiting digital platforms. Founded by several large tech firms in 2017, GIFCT created a shared industry database of hashes of terrorist propaganda to support coordinated takedown of such content.[183] GIFCT has expanded its membership, became an independent, non-profit organization, and is now working to broaden its database in line with human rights and privacy considerations.[184] It has also issued reports on, among other things,

---

[177] *See* https://www.unomaha.edu/ncite/news/2021/10/ncite-researchers-win-prevention-grant.php. Sponsored by the State Department, the RAND Corporation delved into the utility and the ethical and legal challenges posed by government use of bots to counter radicalization. *See* William Marcellino, et al., *Counter-Radicalization Bot Research*, RAND Corp. (2020), https://www.rand.org/pubs/research_reports/RR2705.html.

[178] *See* Kylie Foy, *Artificial intelligence shines light on the dark web*, MIT News (May 13, 2019), https://news.mit.edu/2019/lincoln-laboratory-artificial-intelligence-helping-investigators-fight-dark-web-crime-0513.

[179] United Nations Office of Counter-Terrorism, *Countering Terrorism Online with Artificial Intelligence* (2021), https://www.un.org/counterterrorism/sites/www.un.org.counterterrorism/files/countering-terrorism-online-with-ai-unoct-unicri-report-web.pdf. *See also* Kathleen McKendrick, *Artificial Intelligence Prediction and Counterterrorism*, Chatham House (2019), https://www.chathamhouse.org/sites/default/files/2019-08-07-AICounterterrorism.pdf.

[180] *See* https://cordis.europa.eu/project/id/740688.

[181] *See* https://www.gov.uk/government/news/new-technology-revealed-to-help-fight-terrorist-content-online; https://faculty.ai/ourwork/identifying-online-daesh-propaganda-with-ai/.

[182] *See* Marie Schroeter, *Artificial Intelligence and Countering Violent Extremism: A Primer*, Global Network on Extremism and Technology (Sep. 2020), https://gnet-research.org/2020/09/28/artificial-intelligence-and-countering-violent-extremism-a-primer/.

[183] *See* https://gifct.org/tech-innovation/.

[184] *See id.*; GIFCT, *Broadening the GIFCT Hash-Sharing Database Taxonomy: An Assessment and Recommended Next Steps* (Jul. 2021), https://gifct.org/wp-content/uploads/2021/07/GIFCT-TaxonomyReport-2021.pdf. This

PX0526-035

positive online interventions and a gap analysis looking at technical requirements for smaller platforms.[185] Also working closely with GIFCT is Tech Against Terrorism (TAT), a UN-sponsored initiative promoting information-sharing between governments and the tech sector.[186]

Besides using the GIFCT database, most major platforms deploy other automated methods to address TVEC. Facebook reportedly uses AI, combined with manual review, to attempt to understand text that might be advocating for terrorism, find and remove terrorist "clusters," and detect new accounts from repeat offenders.[187] YouTube and TikTok report using machine learning or other automated means to flag extremist videos, and Twitter indicates that it uses machine learning and human review to detect and suspend accounts responsible for TVEC.[188] Moonshot (a tech company) and Google's Jigsaw use the "Redirect Method," which uses AI to identify at-risk audiences and provide them with positive, de-radicalizing content, including pursuant to Google searches for extremist content.[189]

The efficacy and effects of the platforms' AI tools are — once again — dubious or unknown given relative lack of transparency and access to data,[190] and their potential for exacerbating bias

---

expansion effort is intended to deal with the under-representation of far-right extremists in the database, which has been the subject of critique. *See, e.g.*, Bharath Ganesh, *How to Counter White Supremacist Extremists Online*, Foreign Policy (Jan. 28, 2021), https://foreignpolicy.com/2021/01/28/how-to-counter-white-supremacist-extremists-online/.

[185] *See* GIFCT, *Content-Sharing Algorithms, Processes, and Positive Interventions Working Group Part 2* (Jul. 2021), https://gifct.org/wp-content/uploads/2021/07/GIFCT-CAPI2-2021.pdf; Tech Against Terrorism and GIFCT, *Technical Approaches Working Group* (Jul. 2021), https://gifct.org/wp-content/uploads/2021/07/GIFCT-TAWG-2021.pdf. *See also* Erin Saltman, et al., *New Models for Deploying Counterspeech: Measuring Behavioral Change and Sentiment Analysis*, Studies in Conflict & Terrorism (2021), https://doi.org/10.1080/1057610X.2021.1888404.

[186] *See* https://www.techagainstterrorism.org/.

[187] *See* Erin Saltman, *Countering terrorism and violent extremism at Facebook: Technology, expertise and partnerships*, Observer Research Foundation (Aug. 27, 2020), https://www.orfonline.org/expert-speak/countering-terrorism-and-violent-extremism-at-facebook/. The importance of mapping networks of extremists across platforms in order to disrupt their reach has been studied by Google's Jigsaw and others. *See* Beth Goldberg, *Hate "Clusters" Spread Disinformation Across Social Media. Mapping Their Networks Could Disrupt Their Reach*, Jigsaw (Jul. 28, 2021), https://medium.com/jigsaw/hate-clusters-spread-disinformation-across-social-media-995196515ca5.

[188] *See* https://blog.youtube/news-and-events/more-information-faster-removals-more/; https://www.tiktok.com/safety/resources/tiktok-transparency-report-2021-q-2?lang=en; https://blog.twitter.com/en_us/topics/company/2021/an-update-to-the-twitter-transparency-center.

[189] *See, e.g.*, Moonshot CVE, *Social Grievances and Violent Extremism in Indonesia* (2020), https://moonshotteam.com/resource/indonesia-social-grievances-and-violent-extremism/; https://jigsaw.google.com/issues/. *See also* Schroeter, *supra* note 182 (discussing how search engines can adjust algorithms to direct people away from extremist content).

[190] The OECD has issued reports on TVEC-related platform transparency, finding some recent improvement. OECD, *Transparency Reporting on Terrorist and Violent Extremist Content Online* (Jul. 2021), https://www.oecd.org/digital/transparency-reporting-on-terrorist-and-violent-extremist-content-online-8af4ab29-en.htm. GIFCT, too, has been criticized for lack of transparency. *See, e.g.*, Chloe Hadavas, *The Future of Free Speech Online May Depend on This Database*, Slate (Aug. 13, 2020), https://slate.com/technology/2020/08/gifct-

is discussed below in Section IV. As is discussed in that section, a key source of bias is the disparate or unknown performance of natural language processing on languages other than formal English, which may be analyzed as part of these efforts. While these tools, paired with human oversight, do catch some TVEC, in at least some cases these traps are more like sieves. For example, despite Facebook's admitted role in the Myanmar military's genocidal campaign in 2018 against a minority group, and despite corrective steps, its algorithms continued to amplify the military's post-coup propaganda, including incitement to violence; hateful content such as threats of murder and rape have continued into late 2021.[191]

Social media platforms and search engines are not the only places online to find TVEC. Violent extremists also find havens in messaging apps and gaming platforms, which in turn use automated tools for detection.[192] To further evade detection, extremists have also used other online sources of communication, including conference dial-in services, hospitality platforms for room bookings, and transportation applications.[193] Presumably, such services do not have the same capacity as large social media platforms and search engines to detect the presence of extremists, even assuming we would want them to collect detailed information on their users.

Academic researchers have also been studying detection methods for TVEC on social media and elsewhere. A recent literature review found a need for publicly available and unbiased datasets, a need for validation techniques to evaluate the datasets, a current research tendency to focus on ISIS ideology, and that deep learning-based methods outperformed other techniques.[194] Another

---

content-moderation-free-speech-online.html; Brittan Heller, *Combating Terrorist-Related Content Through AI and Information Sharing*, Transatlantic Working Group (Apr. 26, 2019), https://www.ivir nl/publicaties/download/Hash_sharing_Heller_April_2019.pdf.

[191] *See* Global Witness, *Facebook approves adverts containing hate speech inciting violence and genocide against the Rohingya* (Mar. 20, 2022), https://www.globalwitness.org/en/campaigns/digital-threats/rohingya-facebook-hate-speech; Sam Neil and Victoria Milko, *Hate speech in Myanmar continues to thrive on Facebook*, AP News (Nov. 18, 2021), https://apnews.com/article/technology-business-middle-east-religion-europe-a38da3ccd40ffae7e4caa450c374f796; Global Witness, *Algorithm of harm: Facebook amplified Myanmar military propaganda following coup* (Jun. 23, 2021), https://www.globalwitness.org/en/campaigns/digital-threats/algorithm-harm-facebook-amplified-myanmar-military-propaganda-following-coup/; Alexandra Stevenson, *Facebook Admits It Was Used to Incite Violence in Myanmar*, The New York Times (Nov. 6, 2018), https://www.nytimes.com/2018/11/06/technology/myanmar-facebook.html. The problem is not limited to a single country. *See, e.g.*, Jasper Jackson, et al., *Facebook accused by survivors of letting activists incite ethnic massacres with hate and misinformation in Ethiopia*, The Bureau of Investigative Journalism (Feb. 20, 2022), https://www.thebureauinvestigates.com/stories/2022-02-20/facebook-accused-of-letting-activists-incite-ethnic-massacres-with-hate-and-misinformation-by-survivors-in-ethiopia; Mubashar Hasan, et al., *How Facebook Fuels Religious Violence*, Foreign Policy (Feb. 4, 2022), https://foreignpolicy.com/2022/02/04/facebook-tech-moderation-violence-bangladesh-religion/?tpcc=recirc_latest062921.

[192] *See* Carl Miller and Shiroma Silva, *Extremists using video-game chats to spread hate*, BBC News (Sep. 23, 2021), https://www.bbc.com/news/technology-58600181.

[193] *See* Erin Saltman, *Challenges in Combating Terrorism and Extremism Online*, Lawfare (Jul. 11, 2021), https://www.lawfareblog.com/challenges-combating-terrorism-and-extremism-online.

[194] *See* Mayur Gaikwad, et al., *Online Extremism Detection: A Systematic Literature Review With Emphasis on Datasets, Classification Techniques, Validation Methods, and Tools*, IEEE Access, vol. 9, pp. 48364-48404 (2021)

PX0526-037

recent study noted similar concerns and added the lack of a commonly accepted definition of TVEC, the constant evolution of extremist behavior, and the need for ethical guidelines.[195]

Considering that the same extremist group may use multiple types of platforms to recruit and radicalize, that terrorist methods change, and that definitions and datasets are problematic, what seems clear is that automated tools have a long way to go in this area. Per the broader discussion below, they must be coupled with appropriate collaboration, human oversight, and a nuanced understanding of contextual and cultural difference, all while somehow striking the right balance of free speech, privacy, and safety.[196]

## F. Disinformation campaigns coordinated by inauthentic accounts or individuals to influence United States elections

The Technology Engagement Team (TET) of the State Department's Global Engagement Center (GEC) defends against foreign disinformation and propaganda by leading efforts to address the problem via technological innovation. In cooperation with foreign partners, private industry, and academia, its goal is to identify, assess, and test such technologies, which often involve AI and efforts to address election-related disinformation.[197] Further, the Cybersecurity and Infrastructure Security Agency of DHS is responsible for the security of domestic elections and engages in substantial work against election-related disinformation. The Commission suggests that these agencies are best positioned to advise Congress on federal agency efforts in this area.

Several substantial reports have addressed inadequate platform efforts to address election-related disinformation, including the limited assistance of AI tools. In 2021, the Election Integrity Partnership published a lengthy report on misinformation and the 2020 election, concluding, among other things, that platform attempts to use AI to label content were flawed because the AI tools could not "distinguish false or misleading content from general election-related

---

(noting bias in terms of which ideologies, events, or organizations are included in datasets), https://doi.org/10.1109/ACCESS.2021.3068313. *See also* Sara M. Abdulla, *Terrorism, AI, and Social Media Research Clusters*, Center for Security and Emerging Technology (Nov. 2021), https://cset.georgetown.edu/publication/terrorism-ai-and-social-media-research-clusters/.

[195] Miriam Fernandez and Harith Alani, *Artificial Intelligence and Online Extremism: Challenges and Opportunities*, in Predictive Policing and Artificial Intelligence 131-62 (John McDaniel and Ken Pease, eds.) (2021) (also noting biases involving geographical location, language, and terminology), https://oro.open.ac.uk/69799/1/Fernandez_Alani_final_pdf.pdf. The definitional problem and other issues were raised in a 2020 joint letter from human rights groups to GIFCT. *See* https://www.hrw.org/news/2020/07/30/joint-letter-new-executive-director-global-internet-forum-counter-terrorism#.

[196] *See, e.g.*, United Nations Office of Counter-Terrorism, *supra* note 179; Saltman, Lawfare, *supra* note 193; Jonathan Schnader, *The Implementation of Artificial Intelligence in Hard and Soft Counterterrorism Efforts on Social Media*, Santa Clara High Tech. L. J. 36:1 (Feb. 2, 2020), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1647&context=chtlj.

[197] *See* https://www.state.gov/bureaus-offices/under-secretary-for-public-diplomacy-and-public-affairs/global-engagement-center/technology-engagement-team; https://www.state.gov/programs-technology-engagement-team/.

PX0526-038

commentary."[198] Further, a recent ProPublica and Washington Post investigation — for which researchers relied in part on machine learning techniques – found that Facebook played a critical role in spreading false narratives about the election immediately before the January 6, 2021, siege of the United States Capitol.[199] Park Advisors, a State Department contractor working with GEC, issued a 2019 report that discussed the mixed results from platform attempts — including via the use of AI — to counter this problem in connection with recent elections.[200]

For several years, academic researchers such as University of Southern California Professor Emilio Ferrara have been using AI, sometimes with government funding, to study election-related disinformation, despite limited data available from platforms other than Twitter. In one recent study, focused on Twitter and the 2020 Presidential election, the results implied that platform efforts to limit malicious groups were not effective against those groups' evasive actions, such that "rethinking effective platform interventions is needed."[201] Another recent study involving Twitter and the 2020 election found that bots were still responsible for significant manipulation but that, as compared to the 2016 election, a shift had occurred from foreign to domestic sources.[202] Other recent studies propose platform-agnostic techniques to detect coordinated accounts or operations based on social media content or behavior.[203] Another

---

[198] Center for an Informed Public, Digital Forensic Research Lab, Graphika, & Stanford Internet Observatory, *The Long Fuse: Misinformation and the 2020 Election*, Stanford Digital Repository: Election Integrity Partnership v1.2.0 at 212 (2021), https://purl.stanford.edu/tr171zs0069. Further, to the extent that election-related disinformation often involves bots or deepfakes, the same detection problems exist in this context as they do for bots and deepfakes generally.

[199] *See* Craig Silverman, et al., *Facebook groups topped 10,000 daily attacks on election before Jan. 6, analysis shows*, The Washington Post (Jan. 4, 2022), https://www.washingtonpost.com/technology/2022/01/04/facebook-election-misinformation-capitol-riot/; Jeremy B. Merrill, *How ProPublica and The Post researched posts of Facebook groups*, The Washington Post (Jan. 4, 2022), https://www.washingtonpost.com/technology/2022/01/04/facebook-propublica-post-jan6-methodology/. *See also* Tech Transparency Project, *A Year After Capitol Riot, Facebook Remains an Extremist Breeding Ground* (Jan. 4, 2022), https://www.techtransparencyproject.org/articles/year-after-capitol-riot-facebook-remains-extremist-breeding-ground.

[200] *See* Nemr and Gangware, *supra* note 79.

[201] Karishma Sharma, et al., *Characterizing Online Engagement with Disinformation and Conspiracies in the 2020 U.S. Presidential Election* (Oct. 20, 2021), https://arxiv.org/pdf/2107.08319.pdf.

[202] *See* Ho-Chun Herbert Chang, et al., *Social Bots and Social Media Manipulation in 2020: The Year in Review*, (Feb. 16, 2021), https://arxiv.org/pdf/2102.08436.pdf. *See also* William Marcellino, et al., *Human–machine detection of online-based malign information*, RAND Corporation (2020), https://www.rand.org/pubs/research_reports/RRA519-1.html.

[203] Karishma Sharma, et al., *Identifying Coordinated Accounts on Social Media through Hidden Influence and Group Behaviours* (Aug. 2021), https://dl.acm.org/doi/pdf/10.1145/3447548.3467391; Steven T. Smith, et al., *Automatic detection of influential actors in disinformation networks*, PNAS 118 (4) (Jan. 26, 2021), https://www.pnas.org/content/118/4/e2011216118; Meysam Alizadeh, et al., *Content-based features predict social media influence operations*, Sci. Adv. 6: eabb5824 (Jul. 2020), https://www.science.org/doi/10.1126/sciadv.abb5824.

study showed that one can detect disinformation websites by looking not at perceptible content but at a website's infrastructure features.[204]

Besides trying to detect particular individuals and accounts that distribute election-related disinformation, AI can also be harnessed for related goals. For example, it can be used to map out communities responsible for such harm. The social media monitoring company Graphika engages in such efforts,[205] issuing multiple reports on foreign and domestic actors engaged in election-related disinformation campaigns across many platforms.[206] Looking beyond social media and big technology companies, the Wikimedia Foundation acted to support editors and community oversight of Wikipedia by investing in AI tools to counter election-related disinformation.[207] These tools included techniques to categorize and measure new content, identify unverified statements, and detect fake accounts.[208]

## G. Sale of counterfeit products

In January 2020, DHS issued a report finding that private sector efforts, including those of e-commerce platforms, "have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public."[209] The report describes the efforts of the National Intellectual Property Rights Coordination Center (IPR Center) to form the Anti-Counterfeiting Consortium to Identify Online Nefarious Actors (ACTION), which intends to increase "[s]haring of risk automation techniques allowing ACTION members to create and improve on proactive targeting systems that automatically monitor online platform sellers for counterfeits and pirated goods."[210] Information collected later by the IPR Center indicated that some platforms use automated systems to verify third-party seller information and identify prohibited items.[211] Although the efficacy of these systems is unknown, platforms report undertaking some of the following efforts:

---

[204] *See* Austin Hounsel, et al., *Identifying Disinformation Websites Using Infrastructure Features*, USENIX (Sep. 11, 2020), https://www.usenix.org/conference/foci20/presentation/hounsel.

[205] *See* Jean-Baptiste Jeangène Vilmer, *Information Defense* at 24, The Atlantic Council (Jul. 2021), https://www.atlanticcouncil.org/wp-content/uploads/2021/07/Information-Defense-07.2021.pdf.

[206] *See, e.g.*, Graphika, *Posing as Patriots* (Jun. 2021), https://public-assets.graphika.com/reports/graphika_report_posing_as_patriots.pdf; Graphika, *Ants in a Web* (May 2021), https://public-assets.graphika.com/reports/graphika_report_ants_in_a_web.pdf.

[207] *See* https://wikimediafoundation.org/news/2020/10/30/how-wikipedia-is-preparing-for-election/.

[208] *Id.*

[209] Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* at 5 (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.

[210] *Id.* at 31.

[211] *See* Morgan Stevens, *National IPR Center Report Highlights Industry Adoption of Anti-Counterfeit Measures*, Center for Data Innovation (Oct. 13, 2021), https://datainnovation.org/2021/10/national-ipr-center-report-highlights-industry-adoption-of-anti-counterfeit-measures/. The IPR Center report itself is not publicly available.

PX0526-040

- eBay has indicated it uses automated filters, including filters based on keywords, image recognition and machine learning, to flag or block problematic items, as well as to review seller information.[212]

- Etsy has indicated it started increasing its investments into automated tools, including machine learning, to detect counterfeits and other "handmade violations."[213]

- Facebook has indicated it uses automated systems, some based on machine learning, to review ads, Marketplace listings, and other content to block possible counterfeits, looking at "signals such as brand names, logos, keywords, prices, [and] discounts."[214]

- Alibaba has indicated it uses artificial intelligence in its anti-counterfeiting efforts and also started the Alibaba Anti-Counterfeiting Alliance, which includes hundreds of brands.[215]

It is unclear whether and to what extent any other social media platforms — like TikTok — are using AI or other tools to limit facilitation of off-platform sales of counterfeit goods.[216]

At least one research team has proposed an innovative system to catch counterfeits online using a clustering algorithm, among other things.[217] We could not find other academic research on this subject, suggesting that this may be an area for greater focus. Finally, it is also worth noting that some companies have developed AI tools to detect counterfeit items in the physical world.[218]

## IV.   RECOMMENDATIONS

The development and deployment of automated tools to address online harms will continue with or without federal encouragement. But misuse or over-reliance on these tools can lead to poor results that can serve to cause more harm than they mitigate. For this reason, Congress, government agencies, platforms, scientists, and others should focus on appropriate safeguards.

---

[212] *See* https://www.ebaymainstreet.com/issues/ebay-community-protection.

[213] *See* Corrine Pavlovic, *Our Commitment to the Trust and Safety of the Etsy Marketplace*, Etsy News Blog (Apr. 29, 2021), https://blog.etsy.com/news/2021/our-commitment-to-the-trust-and-safety-of-the-etsy-marketplace/.

[214] *See* https://www.facebook.com/business/tools/anti-counterfeiting/guide.

[215] *See* Adam Najberg, *Alibaba, Partners Notched Strong IPR Protection Gains in 2020*, Alizila (Mar. 26, 2021), https://www.alizila.com/alibaba-partners-notched-strong-ipr-protection-gains-in-2020/.

[216] *See, e.g.*, Megan Graham, *TikTok teens are obsessed with fake luxury products*, CNBC News (Mar. 1, 2020), https://www.cnbc.com/2020/02/29/tiktok-teens-are-obsessed-with-fake-luxury-products.html.

[217] *See* Patrick Arnold, et al., *Semi-automatic identification of counterfeit offers in online shopping platforms*, Journal of Internet Commerce 15(1): 59-75 (Jan. 2, 2016), https://dbs.uni-leipzig.de/file/product-counterfeits-15332861.2015.pdf.

[218] *See, e.g.*, Entrupy, *State of the Fake: 2020 Edition* (2020), https://www.mannpublications.com/fashionmannuscript/2020/09/11/entrupy-state-of-the-fake-2020-edition/; Donna Dillenberger, *Pairing AI with Optical Scanning for Real-World Product Authentication*, IBM Research Blog (May 23, 2018), https://www.ibm.com/blogs/research/2018/05/ai-authentication-verifier/.

PX0526-041

That difficult task requires answering a host of questions for any given harm or innovation, such as who built the tool, how, and why. Others involve how the harm is being defined and who is using the tool in what environment and for what reason. Still others involve how well the tool actually works, its real-world impacts, who has authority to get answers to these questions, and who is accountable for unfair, biased, or discriminatory outcomes.

With the intense focus on the role and responsibility of social media platforms, it is often lost that other private actors — as well as government agencies — could use AI to address these harms. Many parts of the online ecosystem provide conduits for illegal or toxic content.[219] These actors include not just search engines, gaming platforms, messaging apps, marketplaces and app stores,[220] but also those at other layers of the tech stack such as internet service providers, content distribution networks, domain registrars, cloud providers, and web browsers. Via automated tools or otherwise, these companies exercise remarkable control, able to block or slow access to websites and other services, change what information consumers see, and warn people or redirect them from certain content.[221] The benefits and risks of having such actors address harmful content are beyond this report's scope, but they demand attention when approaching legal or technical solutions in this area.[222] This attention involves not merely a law's coverage or technological feasibility but also the extent to which we are comfortable with certain public or private actors wielding these powerful tools.[223]

As for the platforms, extensive accounts and in-depth analyses exist regarding their use of automated tools to address harmful content, as well as the problems with and limitations of such

---

[219] *See* Jenna Ruddock and Justin Sherman, *Widening the Lens on Content Moderation*, Joint PIJIP/TLS Research Paper Series 69 (Jul. 2021) (mapping the "online information ecosystem" beyond the "last mile" of social media), https://digitalcommons.wcl.american.edu/research/69.

[220] Yet another example is podcasting. One researcher is using AI to study misinformation, including election-related content, in podcasts, noting that it would be expensive and difficult to use such tools at scale, especially given the way podcasts are distributed. *See* Valerie Wirtschafter, *The challenge of detecting misinformation in podcasting*, Brookings Techstream (Aug. 25, 2021), https://www.brookings.edu/techstream/the-challenge-of-detecting-misinformation-in-podcasting/. *See also* Valerie Wirtschafter and Chris Meserole, *Prominent political podcasters played big role in spreading the 'Big Lie,'* Brookings Techstream (Jan. 4, 2022), https://www.brookings.edu/techstream/prominent-political-podcasters-played-key-role-in-spreading-the-big-lie/.

[221] *See* Ruddock and Sherman, *supra* note 219.

[222] *See* Corrine Cath and Jenna Ruddock, *One Year After the Storming of the US Capitol, What Have We Learned About Content Moderation Through Internet Infrastructure?*, Tech Policy Press (Jan. 6, 2022), https://techpolicy.press/one-year-after-the-storming-of-the-us-capitol-what-have-we-learned-about-content-moderation-through-internet-infrastructure/?s=03; Karl Bode, *Winding Down Our Latest Greenhouse Panel: Content Moderation At The Infrastructure Layer*, Tech Policy Greenhouse (Oct. 8, 2021), https://www.techdirt.com/articles/20211005/06472747699/winding-down-our-latest-greenhouse-panel-content-moderation-infrastructure-layer.shtml; Joan Donovan, *Navigating the Tech Stack: When, Where and How Should We Moderate Content?*, Centre for Int'l Gov. Innovation (2019), https://www.cigionline.org/articles/navigating-tech-stack-when-where-and-how-should-we-moderate-content/; Annemarie Bridy, *Remediating Social Media: A Layer-Conscious Approach*, 24 B.U. J. Sci. & Tech. L. 193 (2018), https://www.bu.edu/jostl/files/2018/10/Bridy-%E2%80%94-FINAL.pdf.

[223] "It's not 'What will AI do to us on its own?' It's 'What will the powerful do to us with the AI?'" Zeynep Tüfekçi, *Coded Bias*, directed by Shalini Kantayya. New York: 7th Empire Media, 2020.

PX0526-042

use.[224] Regardless of the tools at issue, it is important to recognize, as Tarleton Gillespie has explained, that this moderation of harmful and other content is "central to what platforms do, not peripheral" and "is, in many ways, *the* commodity that platforms offer."[225] The platforms each provide an organized, curated experience of online information, often using AI tools to maximize engagement.[226] To focus only on how they may use AI to clean up the resulting mess — to moderate content they allowed users to post — can obscure the commercial reasons why and how that content got there in the first place.[227] Professor Sarah T. Roberts of the University of California, Los Angeles, who coined the phrase "commercial content moderation," called its role "fundamentally a matter of brand protection."[228] Thus, in the words of Professor Olivier Sylvain, the use of AI for content moderation "is more likely an incident of these companies' overt industrial designs on the control and consolidation of the distribution of user information."[229]

No matter who is responsible for these harms, though, the question that Congress has asked us to address is whether AI can help ameliorate them. It seeks recommendations on reasonable policies, practices, and procedures for this use of AI and for any legislation that may advance it. The following sections of this report attempt to provide such recommendations, starting with a discussion of why advancing AI for these purposes is not always the most constructive thing to do.

---

[224] *See, e.g.*, Coalition to Fight Digital Deception ("CFDD"), *Trained for Deception: How Artificial Intelligence Fuels Online Disinformation* (Sep. 2021), https://www.fightdigitaldeception.com/; Carey Shenkman, et al., *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Center for Democracy and Technology (May 2021), https://cdt.org/insights/do-you-*See*-what-i-*See*-capabilities-and-limits-of-automated-multimedia-content-analysis/; Tarleton Gillespie, *Content moderation, AI, and the question of scale*, Big Data & Society (Aug. 21, 2020), https://doi.org/10.1177/2053951720943234; Robert Gorwa, et al., *Algorithmic content moderation: Technical and political challenges in the automation of platform governance*, Big Data & Society (Feb. 28, 2020), https://doi.org/10.1177/2053951719897945; Spandana Singh, *Everything in Moderation: An Analysis of How Internet Platforms Are Using Artificial Intelligence to Moderate User-Generated Content*, New America Open Technology Institute (Jul. 15, 2019), https://www.newamerica.org/oti/reports/everything-moderation-analysis-how-internet-platforms-are-using-artificial-intelligence-moderate-user-generated-content/.

[225] Tarleton Gillespie, Custodians of the Internet at 13 (2018).

[226] *See, e.g.*, Karen Hao, *How Facebook got addicted to spreading disinformation*, MIT Tech. Rev. (Mar. 11, 2021), https://www.technologyreview.com/2021/03/11/1020600/facebook-responsible-ai-misinformation/.

[227] *See* Shoshana Zuboff, *The Coup We Are Not Talking About*, The New York Times (Jan. 29, 2021) (referring to content moderation as "a last resort" and "a public-relations operation" meant to "minimize the risk of user withdrawal or to avoid political sanctions"), https://www.nytimes.com/2021/01/29/opinion/sunday/facebook-surveillance-society-technology.html; Gillespie, Custodians of the Internet, *supra* note 225 at 198 (content moderation improvements "are all are just tweaks" that platforms may be pressured into making "while preserving their ability to conduct business as usual").

[228] Sarah T. Roberts, *Digital detritus: 'Error' and the logic of opacity in social media content moderation*, First Monday 23: 3-5 (Mar. 2018), http://dx.doi.org/10.5210/fm.v23i3.8283.

[229] Olivier Sylvain, *Recovering Tech's Humanity*, 119 Colum. L. Rev. F. 252, 265 (2019), https://ir.lawnet.fordham.edu/faculty_scholarship/1088. *See also* Joan Donovan, *Trolling for Truth on Social Media*, Scientific American (Oct. 12, 2020), https://www.scientificamerican.com/article/trolling-for-truth-on-social-media/.

PX0526-043

## A. Avoiding over-reliance

AI detection tools for the harms discussed here are blunt instruments.[230] For several reasons, their use can result in false positives and false negatives. One can adjust variables to catch more or less of a given type of content, but trade-offs are inevitable. For example, blocking more content that might incite extremist violence (e.g., via detection of certain terms or imagery) can result in also blocking members of victimized communities from discussing how to address such violence. This fact explains in part why each specified harm needs individual consideration; the trade-offs we may be willing to accept may differ for each one.[231] But what the public is willing to accept may not matter if only those developing and deploying these tools get to decide what types and levels of failure are tolerable, whether and how to assess risks and impacts, and what information is disclosed.

### Built-in imprecision

Many of the AI systems built to detect particular kinds of content are "trained" to work by researchers who have fed it a set of examples that they have classified in various ways.[232] These datasets and classifications allow the system to predict whether a new example fits a given classification. For example, researchers might use a database of animal images in which some are labeled as "cats" and others as "not cats." Then the researchers may feed in new images and ask the system to decide which ones are "cats." For the system to work well, the dataset must be sufficiently big, accurate, and representative, so that no types of cats are excluded and no other animals are misbranded as feline. But the AI doesn't actually understand what a "cat" is. It's just trying to do some math. So, if the cats in the dataset include only cats with pointy ears, the system may not identify ones whose ears fold down. And if the system is trained to identify "cats" only by pointy ears and whiskers, then rabbits and foxes may be shocked to learn that they

---

[230] Despite marketing pitches that trumpet the use of AI, some of these tools may not be AI at all and may not even be all that automated, relying instead on something as simple as spreadsheets or on the insertion of an interface that masks underlying human labor.

[231] *See, e.g.*, United Nations, *supra* note 127 at 43; Nafia Chowdhury, *Automated Content Moderation: A Primer*, Stanford Cyber Policy Center (Mar. 19, 2022), https://cyber.fsi.stanford.edu/news/automated-content-moderation-primer; Samidh Chakrabarti, Twitter Post (Oct. 3, 2021) ("This is where the rubber hits the road. What is the acceptable tradeoff between benign and harmful posts? To prevent X harmful posts from going viral, would you be willing to prevent Y benign posts from going viral? No easy answers."), https://twitter.com/samidh/status/1444544160518733824.

[232] This work is not all done by scientists. Some big technology companies use low-paid microworkers, sometimes refugees in other parts of the world, to help with the huge amount of data training needed for these systems to work. *See* Karen Hao and Andrea Paola Hernández, *How the AI industry profits from catastrophe*, MIT Tech. Rev. (Apr. 20, 2022), https://www.technologyreview.com/2022/04/20/1050392; Julian Posada, *Family Units*, Logic (Dec. 25, 2021), https://logicmag.io/beacons/family-units/; Phil Jones, *Refugees help power machine learning advances at Microsoft, Facebook, and Amazon*, Rest of World (Sep. 22, 2021), https://restofworld.org/2021/refugees-machine-learning-big-tech/.

PX0526-044

are "cats," too. A poorly built AI system for identifying cat imagery might thus do worse at this task than a human toddler, but it can do it a whole lot faster.[233]

For an AI tool to recognize particular online content as harmful, the calculus is much more complex than a binary question about an animal. The availability of robust, representative, and accurate datasets is a serious problem in developing these tools, as noted above with respect to harassment and TVEC. Another problem — one more inherent to machine learning — is that these tools are trained on previously identified data and thus are generally bad at detecting new phenomena.[234] Platforms cannot solve this problem merely by adding data over time, because "more data is not the same as more varied data" and because no dataset can ever include all new examples.[235] Many errors with these tools will also occur because of their probabilistic nature.[236] Beyond technological limitations, the operation of these tools is also subject to platform moderation policies that dictate what happens to particular content but that may be flawed in substantial ways.

The theoretical cat detector described above also reflects the fact that an AI tool is measuring data that serves merely as a proxy for what it is really trying to identify.[237] One reason that social media platforms have often failed to detect certain types of harmful content, like harassment, is that their automated tools are built to ignore meaning and context, focusing instead on measurable patterns of data that are based on past content moderation decisions and practices.[238] Such proxies are thus given power to stand in for something real and complex in the world.[239]

---

[233] After FTC staff imagined this system, Google Research introduced StylEx, an approach for visual explanation of classifiers. It allows someone to disentangle attributes and see what leads the model to make its decisions. It demonstrates this ability by showing how it distinguishes cats and dogs; one attribute making it less likely the model will choose "cat" is folded-down ears. *See* https://ai.googleblog.com/2022/01/introducing-stylex-new-approach-for.html.

[234] *See* Gillespie, Custodians of the Internet, *supra* note 225 at 105-110; Nicolas P. Suzor, Lawless: The Secret Rules That Govern Our Digital Lives at 155 (2019). *See also* Cade Metz, The Genius Makers at 268-69 (2021) (describing the failure of Facebook's automated systems to flag the livestreaming of the deadly Christchurch incident "because it didn't look like anything those systems had been trained to recognize"); Neal Mohan, *Inside Responsibility: What's next on our misinfo efforts*, YouTube Blog (Feb. 17, 2022) (discussing YouTube challenges), https://blog.youtube/inside-youtube/inside-responsibility-whats-next-on-our-misinfo-efforts/.

[235] Gillespie, Custodians of the Internet, *supra* note 225 at 107; Cathy O'Neil, Weapons of Math Destruction at 204 (2016) ("Big Data processes codify the past. They do not invent the future. Doing that requires moral imagination, and that's something only humans can provide.").

[236] *See* evelyn douek, *Governing Online Speech: From "Posts-as-Trumps" to Proportionality & Probability*, 121 Colum. L. Rev. 759 (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3679607.

[237] *See* Gillespie, Custodians of the Internet, *supra* note 225 at 105-110.

[238] *Id.* at 104.

[239] *See* Dylan Mulvin, Proxies: The Cultural Work of Standing In at 13, 78, 106 (2021). *See also* Anya E.R. Prince and Daniel Schwarcz, *Proxy Discrimination in the Age of Artificial Intelligence and Big Data*, 105 Iowa L. Rev. 1257 (2020), https://ilr.law.uiowa.edu/print/volume-105-issue-3/proxy-discrimination-in-the-age-of-artificial-intelligence-and-big-data.

PX0526-045

### Context and meaning

That designing AI tools involves the removal of context likely explains, at least in part, why these tools often have yet another serious problem: they aren't good at understanding context, meaning, and intent, which can be key to deciding whether a piece of content is unlawful, against platform policy, or otherwise harmful.[240] An oft-used illustration is the phrase "I'm going to kill you," which could be either a violent threat or a jocular reply to a friend. Automated detection tools are especially poor judges of context for content that has fluid definitions[241] or where meanings may shift depending on regional, cultural, and linguistic differences. As the Surgeon General and others have argued, platforms need to "increase staffing of multilingual content moderation teams and improve the effectiveness of machine learning algorithms in languages other than English since non-English-language misinformation continues to proliferate."[242]

### Bias and discrimination

The problems with automated detection tools described above, including unrepresentative datasets, faulty classifications, failure to identify new phenomena, missing context, and flawed design, can lead to biased,[243] discriminatory, or unfair outcomes. The tools can thus exacerbate some of the very harms they are intended to address and hurt some of the very people they are supposed to help.[244] This well-recognized fact is why it is so important that the use of these tools be more transparent, open to research, and subject to mechanisms for accountability.

---

[240] *See, e.g.*, Slaughter, *supra* note 13 at 13 (discussing facial recognition); Shenkman, *supra* note 224; Hannah Bloch-Wehba, *Automation in Moderation*, 53 Cornell Int'l L. J. 41 (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3521619; Niva Elkin-Koren, *Contesting algorithms: Restoring the public interest in content filtering by artificial intelligence* at 5, Big Data & Society (Jul. 29, 2020), https://doi.org/10.1177/2053951720932296; Gillespie, Custodians of the Internet, *supra* note 225 at 105. CSAM is a counterexample as to which context and intent are irrelevant.

[241] CFDD, *supra* note 224 at 10-13.

[242] Vivek H. Murphy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* at 12 (2021), https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf; *See* United Nations, *supra* note 127 at 44-46 (also noting the problem of detecting sarcasm and irony); Singh, *supra* note 224 at 34.

[243] In this context, "bias" is often used as an umbrella term referring to unfairness or injustice infecting automated systems. Some have argued against focusing too much on technological causes, arguing that all data is biased and that power imbalances shape the data being used in these systems. *See* Milagros Miceli, et al., *Studying Up Machine Learning Data: Why Talk About Bias When We Mean Power?*, Proc. ACM Hum.-Comput. Interact. 6, GROUP, Art. 34 (Jan. 2022), https://doi.org/10.1145/3492853.

[244] It can also hurt the bottom line. A recent survey revealed that tech companies have reported losing revenue and customers because of bias (including bias based on gender, age, and race) in AI models they employed, even though some of them tested for bias in advance. *See* Veronica Combs, *Guardrail failure: Companies are losing revenue and customers due to AI bias*, TechRepublic (Jan. 11, 2022), https://www.techrepublic.com/article/guardrail-failure-companies-are-losing-revenue-and-customers-due-to-ai-bias/.

Reflecting extensive scholarship in this area,[245] several government agencies and officials have recognized generally that AI systems can be infected by bias, have discriminatory impacts, and harm marginalized communities. In October 2021, officials from the White House Office of Science and Technology Policy (WHOSTP) called for an AI bill of rights, stating that "[t]raining machines based on earlier examples can embed past prejudice and enable present-day discrimination."[246] FTC Commissioner Rebecca Kelly Slaughter has described the same problems, pointing to faulty inputs and design as well as a lack of testing.[247] Assistant Attorney General Kristen Clarke, head of the Civil Rights Division, has also spoken about bias and discrimination in AI.[248] The National Institute of Standards and Technology published a report on identifying and managing bias in artificial intelligence, based on the same concerns.[249] In its accountability framework, the Government Accountability Office referred to AI systems developed from data reflecting "preexisting biases or social inequities."[250] These issues have also been acknowledged in Executive Orders and other documents.[251]

Bias and discrimination in AI systems have also been the subject of Congressional inquiry. For example, in a 2019 hearing, Professor Meredith Whittaker testified that bias in AI systems results from "faulty training data, problems in how the system was designed or configured, or bad or biased applications in real world contexts. In all cases it signals that the environments where a given system was created and envisioned didn't recognize or reflect on the contexts within which these systems would be deployed. Or, that those creating and maintaining these systems did not

---

[245] *See, e.g.*, Ruha Benjamin, Race After Technology: Abolitionist Tools for the New Jim Code (2019); Safiya Umoja Noble, Algorithms of Oppression: How Search Engines Reinforce Racism (2018); Rashida Richardson, *Racial Segregation and the Data-Driven Society: How Our Failure to Reckon with Root Causes Perpetuates Separate and Unequal Realities*, Berkeley Tech. L. J. 36:3 (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3850317.

[246] Eric Lander and Alondra Nelson, *Americans Need a Bill of Rights for an AI-Powered World*, WIRED (Oct. 8, 2021), https://www.wired.com/story/opinion-bill-of-rights-artificial-intelligence/?s=03.

[247] Slaughter, *supra* note 13 at 7-14.

[248] *See* https://www.justice.gov/opa/speech/assistant-attorney-general-kristen-clarke-delivers-keynote-ai-and-civil-rights-department.

[249] *See* NIST, *Towards a Standard for Identifying and Managing Bias in Artificial Intelligence*, NIST Special Publication 1270 (Mar. 2022), https://doi.org/10.6028/NIST.SP.1270.

[250] Government Accountability Office, *Artificial Intelligence: An Accountability Framework for Federal Agencies and Other Entities* at 9, GAO-21-519SP (Jun. 2021), https://www.gao.gov/assets/gao-21-519sp.pdf.

[251] In 2020, the White House issued two documents that acknowledged problems of bias, discrimination, fairness, and privacy in AI systems. *See* Exec. Order No. 13960, *Promoting the Use of Trustworthy Artificial Intelligence in the Federal Government*, 85 Fed. Reg. 78939 (Dec. 3, 2020) (on AI systems deployed by government agencies), https://www.govinfo.gov/content/pkg/FR-2020-12-08/pdf/2020-27065.pdf; Office of Management and Budget Memorandum M-21-06, *Guidance for Regulation of Artificial Intelligence Applications* (Nov. 17, 2020) ("OMB Memo") (on AI systems deployed outside the government), https://www.whitehouse.gov/wp-content/uploads/2020/11/M-21-06.pdf. *See also* Select Committee on Artificial Intelligence, National Science and Technology Council, *The National Artificial Intelligence Research and Development Strategic Plan: 2019 Update* at 21-26 (Jun. 2019) ("NAIRD Strategic Plan"), https://www.nitrd.gov/pubs/National-AI-RD-Strategy-2019.pdf; Laurie A. Harris, *Artificial Intelligence: Background, Selected Issues, and Policy Considerations* at 41-42, CRS Report No. R46795 (May 19, 2021), https://crsreports.congress.gov/product/pdf/R/R46795.

PX0526-047

have the experience or background to understand the diverse environments and identities that would be impacted by a given system."[252]

The use of AI in the automated detection of online harms is certainly not immune to these issues.[253] For example, large language models used to moderate online content can result in biased and discriminatory results given the flaws in those models.[254] The problem of biased and unrepresentative datasets are discussed above in connection with harassment and TVEC detection, and at least three studies specifically revealed bias in several hate speech detection models.[255] Internal Facebook documents reportedly show that its hate speech detection model operated in a way that left members of minority communities and people of color more open to abuse than, say, white men.[256] Further, the Brennan Center for Justice and the Coalition for Digital Democracy have each explored these issues and cited examples of platform use of AI in

---

[252] *Artificial Intelligence: Societal and Ethical Implications*, H. Comm. on Science, Space, and Technology, 116th Cong. (2019) (testimony of Meredith Whittaker), https://science house.gov/hearings/artificial-intelligence-societal-and-ethical-implications. *See also* NIST Special Publication 1270, *supra* note 249 at 32-33; Harris, *supra* note 251 at 10, 42; Sendhil Mullainathan and Ziad Obermeyer, *On the Inequity of Predicting A While Hoping for B*, AEA Papers and Proceedings 111: 37–42 (2021), https://doi.org/10.1257/pandp.20211078; Alex V. Cipolle, *How Native Americans Are Trying to Debug A.I.'s Biases*, The New York Times (Mar. 22, 2022), https://www.nytimes.com/2022/03/22/technology/ai-data-indigenous-ivow html.

[253] *See, e.g.*, Suzor, *supra* note 234 at 155; Shenkman, *supra* note 224 at 26-28; Gorwa, *supra* note 224 at 10-11.

[254] *See* Laura Weidinger, et al., *Ethical and social risks of harm from Language Models*, DeepMind (Dec. 2021), https://storage.googleapis.com/deepmind-media/research/language-research/Ethical%20and%20social%20risks.pdf; Emily Bender, et al., *On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?*, in ACM Conf. on Fairness, Accountability, and Transparency, at 613-15 (Mar. 2021) (noting that size doesn't guarantee diversity), https://doi.org/10.1145/3442188.3445922; Karen Hao, *The race to understand the thrilling, dangerous world of language AI*, MIT Tech. Rev. (May 20, 2021), https://www.technologyreview.com/2021/05/20/1025135/ai-large-language-models-bigscience-project/. In late 2021, Microsoft and NVIDIA reported it had developed the largest such model trained to date but acknowledged that it is infected with bias. *See* https://www.microsoft.com/en-us/research/blog/using-deepspeed-and-megatron-to-train-megatron-turing-nlg-530b-the-worlds-largest-and-most-powerful-generative-language-model/. DeepMind also announced a new language model in 2021 and, similarly, acknowledged that eliminating harmful language is an ongoing problem. *See* Will Douglas Heaven, *DeepMind says its new language model can beat others 25 times its size*, MIT Tech. Rev. (Dec. 8, 2021), https://www.technologyreview.com/2021/12/08/1041557/deepmind-language-model-beat-others-25-times-size-gpt-3-megatron/. *See also* Kate Kaye, *OpenAI's new language AI improves on GPT-3, but still lies and stereotypes*, Protocol (Jan. 27, 2022) (despite small improvements, OpenAI's model "still has tendencies to make discriminatory comments and generate false information"), https://www.protocol.com/enterprise/openai-gptinstruct.

[255] *See* Rottger, *supra* note 129; Maarten Sap, et al., *The Risk of Racial Bias in Hate Speech Detection*, in Proc. of the 57th Ann. Meeting of the Ass'n for Computational Linguistics 1668 (2019), https://homes.cs.washington.edu/~msap/pdfs/sap2019risk.pdf; Thomas Davidson, et al., *Racial Bias in Hate Speech and Abusive Language Detection Datasets*, Proc. of the Third Abusive Language Workshop at the Ann. Meeting of the Ass'n for Computational Linguistics 6 (Aug. 1–2, 2019), https://arxiv.org/pdf/1905.12516.pdf. Biased outcomes are a risk generally when natural language processing is applied to languages other than formal English. *See* Patton, *supra* note 168; Su Lin Blodgett and Brendan O'Connor, *Racial Disparity in Natural Language Processing: A Case Study of Social Media African-American English* (Jun. 30, 2017), https://arxiv.org/pdf/1707.00061.pdf; Natasha Duarte, et al., *Mixed Messages? The Limits of Automated Social Media Content Analysis*, Center for Democracy & Technology (2017), https://cdt.org/wp-content/uploads/2017/11/2017-11-13-Mixed-Messages-Paper.pdf.

[256] *See* Elizabeth Dwoskin, et al., *Facebook's race-blind practices around hate speech came at the expense of Black users, new documents show*, The Washington Post (Nov. 21, 2021), https://www.washingtonpost.com/technology/2021/11/21/facebook-algorithm-biased-race/?s=03.

content moderation that produced discriminatory outcomes and hurt already marginalized groups.[257]

When the use of an AI detection tool results in false positives, or overblocking, it may serve to reduce freedom of expression. This problem is especially acute when those silenced are members of historically marginalized communities. Several experts, including Stanford University Professor Daphne Keller and Emma Llansó, have written about these speech effects in connection with TVEC and other content.[258] Weighed against the risks of overblocking, of course, are the risks of underblocking, which can also implicate free expression. As Professor Citron and University of Miami Professor Mary Anne Franks have argued, online harassment acts to silence its targets, who may close social media accounts and not engage in public discourse.[259]

### Evasion and attack

In the previous section, we identified several areas — bot-driven accounts, deepfakes, illegal drug sales, and violent extremism — in which bad actors find ways to avoid automated detection tools. Some of them may use their own technological tools to do so, like sophisticated techniques for media manipulation. Others may find that simpler evasion methods do the trick, such as inserting typos or using innocuous phrases or euphemisms,[260] using new slurs or special icons or

---

[257] *See* Brennan Center for Justice, *Double Standards in Social Media Content Moderation* (Aug. 4, 2021), https://www.brennancenter.org/our-work/research-reports/double-standards-social-media-content-moderation; CFDD, *supra* note 224 at 11-13.

[258] *See* Daphne Keller, *Making Google the Censor*, The New York Times (Jun. 12, 2017) ("no responsible technologist believes that filters can tell what speech is legal," a call even "[s]killed lawyers and judges struggle to make"), https://www.nytimes.com/2017/06/12/opinion/making-google-the-censor.html; Emma J. Llansó, *No amount of "AI" in content moderation will solve filtering's prior-restraint problem*, Big Data & Society 7(1) (2020), https://doi.org/10.1177/2053951720920686. *See also* Tech Against Terrorism, *GIFCT Technical Approaches Working Group Gap Analysis and Recommendations* at 32 (Jul. 2021), https://gifct.org/wp-content/uploads/2021/07/GIFCT-TAWG-2021.pdf.

[259] Danielle Keats Citron and Mary Ann Franks, *The Internet as a Speech Machine and Other Myths Confounding Section 230 Reform*, U. Chi. Legal F. Vol. 2020 (2020), https://chicagounbound.uchicago.edu/uclf/vol2020/iss1/3. *See also* Sophia Smith Galer, *'This Your Girlfriend?': Videos Shaming Women for Sex Jokes Go Viral on TikTok*, Vice World News (Nov. 30, 2021), https://www.vice.com/en/article/v7ddzd/this-your-girlfriend-videos-shaming-women-for-sex-jokes-go-viral-on-tiktok; Amnesty International, *Toxic Twitter – The Silencing Effect* (March 2018), https://www.amnesty.org/en/latest/news/2018/03/online-violence-against-women-chapter-5/.

[260] *See* CFDD, *supra* note 224 at 14; Ana Romero-Vicente, *Word Camouflage to Evade Content Moderation*, EU DisinfoLab (Dec. 2, 2021), https://www.disinfo.eu/publications/word-camouflage-to-evade-content-moderation/; Tommi Gröndahl, et al., *"All You Need is 'Love'": Evading Hate Speech Detection*, Proc. of the 11th ACM Workshop on Artificial Intelligence and Security (Nov. 5, 2018), https://arxiv.org/abs/1808.09115v3; Hao, *How Facebook Got Addicted to Spreading Disinformation*, *supra* note 226.

PX0526-049

logos,[261] altering or covering up images,[262] adding sounds to camouflage audio tracks,[263] using ephemeral features such as Instagram Stories,[264] or switching to unmonitored channels, like some comment sections or audio chat services.[265] This constant arms race demands that those responsible for detection remain vigilant, considering and adjusting for possible and actual evasions throughout the technology's lifecycle.

Another substantial concern is that AI systems are vulnerable to hacking and manipulation.[266] DARPA, NIST, and the Department of Defense's Joint Artificial Intelligence Center are all working on projects that aim to better protect AI systems from attack.[267] But this concern — often discussed using terms like adversarial machine learning and adversarial robustness — is not limited to the military context.

It is perhaps no wonder, taking all of these factors into account, that AI is not the easy answer to addressing online harms. Few people would claim otherwise. For example, Facebook officials and employees have confirmed repeatedly that AI systems do not catch a significant percentage of harmful content. In 2018, Monika Bickert, its Head of Global Policy Management, stated that "we're a long way" from AI solving content moderation problems such as determining whether something amounts to harassment or bullying.[268] The following year, a Facebook engineer commented, "The problem is that we do not and possibly never will have a model that captures

---

[261] *See* Mark Scott, *Islamic State evolves 'emoji' tactics to peddle propaganda online*, Politico EU (Feb. 10, 2022), https://www.politico.eu/article/islamic-state-disinformation-social-media/; Sentropy Technologies, *Why is content moderation so hard?* (Oct. 1, 2020), https://medium.com/sentropy/why-is-content-moderation-so-hard-e1e16433337f.

[262] *See* The Virality Project, *Content moderation avoidance strategies* (Jul. 29, 2021), https://www.viralityproject.org/rapid-response/content-moderation-avoidance-strategies-used-to-promote-vaccine-hesitant-content.

[263] *See* Sophia Smith Galer, *Anti-Vaxxers Are Learning How To Game TikTok's Algorithm — And They're Going Viral*, Vice World News (Sep. 6, 2021), https://www.vice.com/en/article/v7ek3d/anti-vaxxers-are-learning-how-to-game-tiktoks-algorithm-and-theyre-going-viral.

[264] *Id.*

[265] *See* Elizabeth Dwoskin, et al., *Racists and Taliban supporters have flocked to Twitter's new audio service after executives ignored warnings*, The Washington Post (Dec. 10, 2021), https://www.washingtonpost.com/technology/2021/12/10/twitter-turmoil-spaces/; Sam Schechner, et al., *How Facebook Hobbled Mark Zuckerberg's Bid to Get America Vaccinated*, The Wall St. J. (Sep. 18, 2021), https://www.wsj.com/articles/facebook-mark-zuckerberg-vaccinated-11631880296.

[266] *See* Andrew J. Lohn, *Hacking AI: A Primer for Policymakers on Machine Learning Cybersecurity*, Center for Security and Emerging Technology (Dec. 2020), https://cset.georgetown.edu/publication/hacking-ai/; Ryan Calo, et al., *Is Tricking a Robot Hacking?*, U. Wash. Tech Policy Lab Legal Studies Research Paper No. 2018-05 (Mar. 28, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3150530; Pin-Yu Chen, Securing AI systems with adversarial robustness, IBM Research Blog (Dec. 15, 2021), https://research.ibm.com/blog/securing-ai-workflows-with-adversarial-robustness.

[267] *See, e.g.*, https://www.darpa.mil/news-events/2021-12-21; https://www.nccoe.nist.gov/ai/adversarial-machine-learning; Will Knight, *The Pentagon Is Bolstering Its AI Systems—by Hacking Itself*, WIRED (Jul. 19, 2021), https://www.wired.com/story/pentagon-bolstering-ai-systems-hacking-itself/.

[268] *See* Alexis C. Madrigal, *Inside Facebook's Fast-Growing Content-Moderation Effort*, The Atlantic (Feb. 7, 2018), https://www.theatlantic.com/technology/archive/2018/02/what-facebook-told-insiders-about-how-it-moderates-posts/552632/.

---

PX0526-050

even a majority of integrity harms, particularly in sensitive areas."[269] In 2021, an executive, Andrew Bosworth, wrote in an employee memo that moderating people's behavior in the metaverse "at any meaningful scale is practically impossible."[270]

Moreover, even as these tools become better at identifying explicitly harmful content, neither machines nor human moderators may ever be able to deal effectively with "the mass of ordinary and pervasive posts that express discriminatory sentiments in ways that threaten and silence marginalized groups."[271] Queensland University of Technology Professor Nicolas Suzor, who sits on the Facebook Oversight Board, calls such posts "[t]he internet's major abuse problem" and explains that "[u]ltimately, abuse and harassment are not just problems of content classification."[272] It's not clear that automating decisions about certain kinds of harmful content is something to which platforms or others should aspire anyway. Tarleton Gillespie argues that these decisions "are judgments of value, meaning, importance, and offense. They depend both on a human revulsion to the horrific and a human sensitivity to contested cultural values. There is, in many cases, no right answer for whether to allow or disallow, except in relation to specific individuals, communities, or nations that have debated and regulated standards of propriety and legality."[273]

## B. Humans in the loop

If AI tools employed to detect harmful online content are not good or fair enough to work on their own, then an obvious and widely shared conclusion is that they need appropriate human oversight.[274] Professor Sarah T. Roberts explained that the many kinds of harmful content poorly suited for automated filters require humans "called upon to employ an array of high-level cognitive functions and cultural competencies to make decisions about their appropriateness for a site or platform."[275] Their judgment may also be constrained or distorted by the content moderation policies they are required to enforce. Given the amount of online content through which to wade, however, it is entirely implausible to put enough humans in place to monitor all

---

[269] *See* Seetharaman, *supra* note 129.

[270] *See* Adi Robertson, *Meta CTO thinks bad metaverse moderation could pose an 'existential threat,'* The Verge (Nov. 12, 2021), https://www.theverge.com/2021/11/12/22779006/meta-facebook-cto-andrew-bosworth-memo-metaverse-disney-safety-content-moderation-scale. *See also* Emily Baker-White, *Meta Wouldn't Tell Us How It Enforces Its Rules in VR, So We Ran a Test to Find Out*, BuzzFeed News (Feb. 11, 2022), https://www.buzzfeednews.com/article/emilybakerwhite/meta-facebook-horizon-vr-content-rules-test;Tanya Basu, *This group of tech firms just signed up to a safer metaverse*, MIT Tech. Rev. (Jan. 10, 2022) (describing why current AI detection tools for online harms will fare poorly in the metaverse), https://www.technologyreview.com/2022/01/20/1043843/safe-metaverse-oasis-consortium-roblox-meta/.

[271] Suzor, *supra* note 234 at 65.

[272] *Id.*

[273] Gillespie, Custodians of the Internet, *supra* note 225 at 206.

[274] *See, e.g.,*; Gillespie, Custodians of the Internet, *supra* note 225 at 107; Rachel Thomas, *Avoiding Data Disasters* (Nov. 4, 2021), https://www.fast.ai/2021/11/04/data-disasters/; CFDD, *supra* note 224 at 14; Shenkman, *supra* note 224 at 36; Singh, *supra* note 224 at 34; Google, *Removals under the Network Enforcement Law* ("Machine automation simply cannot replace human judgment and nuance."), https://perma.cc/SF24-X6ZK.

[275] Sarah T. Roberts, Behind the Screen: Content Moderation in the Shadows of Social Media (2019) at 34-35.

of it, which is why platforms generally use moderators as part of a triage system. Nonetheless, it would help if more human moderators were at work.[276] It is also true that the risk of harm from some automated tools, like those intended to catch sales of certain illegal or counterfeit goods, may be low enough — at least in terms of false positives — that a relative lack of human review is acceptable.

Simply placing moderators, trust and safety professionals, and other people in AI oversight roles is insufficient. The work is challenging and demands that moderators have adequate training, time, agency to make decisions, and workplace protections.[277] To determine exactly what makes such oversight meaningful will require more research and analysis.[278] Further, humans come with their own implicit biases, which can be exacerbated if they are poorly trained and need to make snap judgments.[279] They can also be subject to automation bias, i.e., a tendency to be overly deferential to automated decisions.[280] Teams of moderators should thus be diverse and, as already noted, understand many different cultures and languages. A report from New York University's Stern Center for Business and Human Rights provides specific recommendations for large platforms, including (1) doubling the number of moderators, (2) making them full-time employees with suitable pay and benefits, (3) expanding efforts in other countries with moderators who know local culture and language, and (4) providing good medical care and sponsoring research on health risks.[281] Some writers have also pointed out that, of course, having

---

[276] *See*, e.g.. Gillespie, <u>Custodians of the Internet</u>, *supra* note 225 at 198; Suzor, *supra* note 234 at 65.

[277] *See* Roberts, <u>Behind the Screen</u>, *supra* note 275; Andrew Strait, *Why content moderation won't save us*, in <u>Fake AI</u>, *supra* note 4 at 147-58 (describing platforms treating moderators as an expendable and undervalued people whose "hidden emotional labour" keeps the automated systems afloat); Ben Wagner, *Liable, but Not in Control? Ensuring Human Agency in Automated Decision-Making Systems*, Policy & Internet 11(1) (2019), https://doi.org/10.1002/poi3.198; Billy Perrigo, *Inside Facebook's African Sweatshop*, TIME (Feb. 14, 2022), https://time.com/6147458/facebook-africa-content-moderation-employee-treatment/?s=03; Parmy Olson, *How Facebook and Amazon Rely on an Invisible Workforce*, The Washington Post (Jan. 20, 2022), https://www.washingtonpost.com/business/how-facebook-and-amazon-rely-on-an-invisible-workforce/2022/01/20/c7305bfa-79c7-11ec-9dce-7313579de434_story.html.

[278] *See* Rebecca Crootof, et al., *Humans in the Loop*, Vand. L. Rev. (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4066781; Ben Green and Amba Kak, *The False Comfort of Human Oversight as an Antidote to A.I. Harm*, Slate (Jun. 15, 2021), https://slate.com/technology/2021/06/human-oversight-artificial-intelligence-laws.html.

[279] *See* Brennan Center for Justice, *supra* note 257 at 10-11; Green and Kak, *supra* note 278.

[280] *See* Ben Green, *The Flaws of Policies Requiring Human Oversight of Government Algorithms*, (Sep. 10, 2021), http://dx.doi.org/10.2139/ssrn.3921216; Linda J. Skitka, et al., *Accountability and automation bias*, Int'l J. of Human-Computer Studies 52:4 (Apr. 2000), https://doi.org/10.1006/ijhc.1999.0349.

[281] *See* Paul M. Barrett, *Who Moderates the Social Media Giants?*, NYU Stern Center for Bus. and Human Rights (Jun. 2021), https://bhr.stern.nyu.edu/tech-content-moderation-june-2020?_ga=2.195456940.1820254171.1645560371-1997396386.1645560371. *See also* Mohan, *supra* note 234 (referring to YouTube hiring moderators with understanding of regional nuances and local languages).

PX0526-052

humans in the loop doesn't correct for harms caused by flawed AI systems; it also shouldn't serve as a way to legitimize such systems or for their operators to avoid accountability.[282]

## C. Transparency and accountability

Calls have increased for more transparency by and accountability for those deploying automated decision systems, particularly when those systems impact people's rights. While these two terms are now mentioned regularly in legal and policy debates about AI, it is not always clear what they mean or how they are distinguished from each other.[283] For our purposes, transparency involves measures that provide more and meaningful information about these systems and that, ideally, enable accountability, which involves measures that make companies more responsible for outcomes and impact.[284] That ideal for transparency will not always be attainable, such as when consumers cannot consent to or opt out of corporate use of these systems.

Many proposals exist for how to attain these intertwined goals, which platforms certainly won't reach on their own. These proposals often cover the use of AI tools to address online harms. Below is a brief overview of these goals, with possible legislation discussed later. A major caveat is that even major success on these goals would not actually prevent the harms discussed herein. But it would provide information on the efficacy and impact of these tools, which would help to prevent over-reliance on them, assess whether and when a given tool is appropriate to use, determine the most needed safeguards for such use, and point to the measures the public and private sectors should prioritize to address those harms.[285]

In *Algorithms and Economic Justice*, Commissioner Slaughter identified fairness, transparency, and accountability as the critical principles for systems designed to address algorithmic harms.[286] Meaningful transparency would mean disclosure of intelligible information sufficient to allow third parties to test for discriminatory and harmful outcomes and for consumers to "vote with their feet."[287] Real accountability would mean "that companies—the same ones that benefit from

---

[282] *See* Austin Clyde, *Human-in-the-Loop Systems Are No Panacea for AI Accountability*, Tech Policy Press (Dec. 1, 2021), https://techpolicy.press/human-in-the-loop-systems-are-no-panacea-for-ai-accountability/; Green, *supra* note 280; Green and Kak, *supra* note 278; Madeleine Clare Elish, *Moral Crumple Zones: Cautionary Tales in Human-Robot Interaction*, Engaging Science, Technology, and Society 5 (2019), https://doi.org/10.17351/ests2019.260.

[283] *See, e.g.*, Heidi Tworek and Alicia Wanless, *Time for Transparency From Digital Platforms, But What Does That Really Mean?*, Lawfare (Jan. 20, 2022), https://www.lawfareblog.com/time-transparency-digital-platforms-what-does-really-mean.

[284] *See, e.g.*, Mike Ananny and Kate Crawford, *Seeing without knowing: Limitations of the transparency ideal and its application to algorithmic accountability*, New Media and Society 20:3, 973-89 (2018), http://mike.ananny.org/papers/anannyCrawford_seeingWithoutKnowing_2016.pdf.

[285] *See, e.g.*, Shenkman, *supra* note 224 at 35-36; Daphne Keller and Paddy Leerssen, *Facts and Where to Find Them: Empirical Research on Internet Platforms and Content Moderation*, in Social Media and Democracy: The State of the Field and Prospects for Reform (Nathan Persily and Joshua A. Tucker, eds.) (Aug. 2020), https://doi.org/10.1017/9781108890960.

[286] Slaughter, *supra* note 13 at 48.

[287] *Id.* at 49. *See also* https://www.ftc.gov/news-events/blogs/business-blog/2021/04/aiming-truth-fairness-equity-your-companys-use-ai.

PX0526-053

the advantages and efficiencies of algorithms—must bear the responsibility of (1) conducting regular audits and impact assessments and (2) facilitating appropriate redress for erroneous or unfair algorithmic decisions."[288]

Other government agencies and officials speaking out on these issues include the WHOSTP, which stated that their proposed AI bill of rights might include: "your right to know when and how AI is influencing a decision that affects your civil rights and civil liberties; your freedom from being subjected to AI that hasn't been carefully audited to ensure that it's accurate, unbiased, and has been trained on sufficiently representative data sets; your freedom from pervasive or discriminatory surveillance and monitoring in your home, community, and workplace; and your right to meaningful recourse if the use of an algorithm harms you."[289] Further, the Government Accountability Office stressed that, to build public trust in the use of AI systems, we need independent mechanisms and auditors to "detect error or misuse and ensure equitable treatment of people affected by AI systems."[290] Other executive officials have also promoted transparency and accountability,[291] as have organizations around the globe.[292]

Two fundamental concepts that underly the basic principles and recommendations above are that AI tools, whether or not used for detecting online harms, be both *explainable* and *contestable*. If they lack these features, then those tools are merely "black boxes" not worthy of trust.[293] One government agency, DARPA, engaged in a four-year project regarding the creation of explainable AI (XAI), focused on ensuring that users can understand, trust, and manage these systems.[294] Separately, an interdisciplinary team of academics explored explainability and found that it should often be technically feasible though sometimes practically difficult, and recommended that AI systems be held to the same standard of explainability as humans.[295] In

---

[288] *Id.* at 51.

[289] *See* Lander and Nelson, *supra* note 246.

[290] GAO, *supra* note 43 at 9. *See also* Exec. Order No. 13960, *supra* note 251; OMB Memo, *supra* note 251; NAIRD Strategic Plan, *supra* note 251; Harris, *supra* note 251 at 11, 42-43.

[291] *See* Exec. Order No. 13960, *supra* note 251; OMB Memo, *supra* note 251; NAIRD Strategic Plan, *supra* note 251; Harris, *supra* note 251 at 11, 42-43.

[292] *See, e.g.,* https://legalinstruments.oecd.org/en/instruments/OECD-LEGAL-0449; https://www.g20-insights.org/wp-content/uploads/2019/07/G20-Japan-AI-Principles.pdf.

[293] Distinct from explainability, which often refers to opening black-box machine learning models to understand their decisions after the fact, is the concept of interpretability, which refers to making these models inherently interpretable and thus both easier to understand and less prone to post-hoc manipulation. *See* Cynthia Rudin, et al., *Interpretable machine learning: Fundamental principles and 10 grand challenges*, Statist. Surv. 16: 1-85 (2022), https://doi.org/10.1214/21-SS133. *See also* NIST Special Publication 1270, *supra* note 249 at 26, 38 (noting the import of explainability and interpretability, in part to counteract the view of AI systems "as magic").

[294] *See* https://www.darpa.mil/program/explainable-artificial-intelligence; David Gunning, et al., *DARPA's explainable AI (XAI) program: A retrospective*, Applied AI Letters (Dec. 4, 2021), https://doi.org/10.1002/ail2.61.

[295] *See* Finale Doshi-Velez, et al., *Accountability of AI Under the Law: The Role of Explanation*, Berkman Center Research Publication (2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3064761.

PX0526-054

contrast, contestability is a design feature by which people "can engage with and challenge" the systems that subject them to automated decisions."[296]

A key document elaborating on all of these themes — and one specifically relevant to addressing online harms — is *The Santa Clara Principles on Transparency and Accountability in Content Moderation*, first issued in 2018 and then revised in 2021.[297] These recommendations, developed by human rights organizations and advocates, are not designed as a regulatory template but reflect "initial steps that companies engaged in content moderation should take to provide meaningful due process to impacted speakers and better ensure that the enforcement of their content guidelines is fair, unbiased, proportional, and respectful of users' rights."[298] Among other things, companies should ensure that users know when automated tools are making moderation decisions and should have "a high level understanding" of the decision-making logic.[299] Companies should publicly disclose in regular reports a variety of numbers involving the decisions of these tools, and they should provide certain information — and well-defined appeal rights — to people whose content has been removed or otherwise "actioned."[300] To ensure that the tools are reliable and effective, companies should pursue and monitor detection methods for accuracy and nondiscrimination, submit to regular assessments, and be "encouraged to publicly share data about the accuracy of their systems and to open their process and algorithmic systems to periodic external auditing."[301]

It would also be helpful to create common definitions and standard metrics so that the public and researchers could make cross-platform comparisons.[302] Other recommended disclosures beyond numbers and metrics include explanations of how algorithms are trained and deployed and

---

[296] *See* Daniel N. Kluttz, et al., *Shaping Our Tools: Contestability as a Means to Promote Responsible Algorithmic Decision Making in the Professions*, in After the Digital Tornado: Networks, Algorithms, Humanity at 137-52 (Kevin Werbach, ed.) (2020), https://www.cambridge.org/core/books/after-the-digital-tornado/shaping-our-tools-contestability-as-a-means-to-promote-responsible-algorithmic-decision-making-in-the-professions/311281626ECA50F156A1DDAE7A02CECB.

[297] *See* https://santaclaraprinciples.org/. Other reports make similar recommendations. *See, e.g.*, Future of Tech Commission, *The Future of Tech: A Blueprint for Action* at 18 (2022), https://www.futureoftechcommission.org/; Caitlin Vogus and Emma Llansó, *Making Transparency Meaningful: A Framework for Policymakers*, Center for Democracy and Technology (Dec. 2021) (describing promises and challenges of different types of transparency), https://cdt.org/insights/report-making-transparency-meaningful-a-framework-for-policymakers/; Singh, *Everything in Moderation*, *supra* note 224 at 33-35; Tech Against Terrorism, *Guidelines on transparency reporting of online counterterrorism efforts*, https://transparency.techagainstterrorism.org. In 2018, Facebook chartered an academic group that made recommendations (some unheeded) on improving the company's public transparency reports. *See* Yale L. S. Justice Collaboratory, *Report of the Facebook Data Transparency Advisory Group* (Apr. 2019), https://law.yale.edu/sites/default/files/area/center/justice/document/dtag_report_5.22.2019.pdf.

[298] *See* https://santaclaraprinciples.org/?s=03.

[299] *Id.*

[300] *Id. See also* Nicolas P. Suzor, et al., *What Do We Mean When We Talk About Transparency? Toward Meaningful Transparency in Commercial Content Moderation*, Int'l J. of Communication 13: 1526–1543 (2019), https://ijoc.org/index.php/ijoc/article/view/9736.

[301] *Id.*

[302] *See* Aspen Institute, *supra* note 8 at 20.

platform policies and procedures for borderline rule-breaking content.[303] A separate category of useful data involves the content that platforms have deleted, via automation or humans, but that may be crucial evidence in, e.g., terrorism or war crime cases.[304] The need for such data thus does not center on how platforms made decisions or whether they were correct, and it could be segmented in separate locations with limited access privileges.[305]

### Researcher access

As expressed above, platforms should provide not only public reports but also researcher access to data on the use of automated decision tools for potentially harmful content. Researcher access to platform data has received much recent attention. In the aftermath of a Facebook action against New York University researchers, Samuel Levine, Director of the FTC's Bureau of Consumer Protection, stated that the agency "supports efforts to shed light on opaque business practices, especially around surveillance-based advertising," including "good-faith research in the public interest."[306] The Surgeon General has advocated for platforms to "[g]ive researchers access to useful data to properly analyze the spread and impact of misinformation."[307] These calls have been echoed repeatedly in civil society and academia.[308] Beyond just providing data,

---

[303] *See* Centre for Data Ethics and Innovation, *The role of AI in addressing misinformation on social media platforms* at 32-36 (Aug. 5, 2021), https://www.gov.uk/government/publications/the-role-of-ai-in-addressing-misinformation-on-social-media-platforms. *See also* Singh, *Everything in Moderation*, *supra* note 224 at 20.

[304] *See, e.g.*, Tech Against Terrorism, *supra* note 258 at 32, 43; Human Rights Watch, *"Video Unavailable": Social Media Platforms Remove Evidence of War Crimes* (Sep. 10, 2020), https://www.hrw.org/report/2020/09/10/video-unavailable/social-media-platforms-remove-evidence-war-crimes; Dia Kayyali, *Human rights defenders are not terrorists, and their content is not propaganda*, WITNESS Blog (Jan. 2, 2020), https://blog.witness.org/2020/01/human-rights-defenders-not-terrorists-content-not-propaganda/; Avi Asher-Shapiro, *YouTube and Facebook Are Removing Evidence of Atrocities, Jeopardizing Cases Against War Criminals*, The Intercept (Nov. 2, 2017), https://theintercept.com/2017/11/02/war-crimes-youtube-facebook-syria-rohingya/.

[305] *See* John Bowers, et al., *Digital Platforms Need Poison Cabinets*, Slate (Aug. 24, 2021), https://slate.com/technology/2021/08/social-media-content-moderation-giftschrank.amp?__twitter_impression=true.

[306] *See* https://www.ftc.gov/news-events/blogs/consumer-blog/2021/08/letter-acting-director-bureau-consumer-protection-samuel. *See also* Gilad Edelman, *Facebook's Reason for Banning Researchers Doesn't Hold Up*, WIRED (Aug. 4, 2021), https://www.wired.com/story/facebooks-reason-banning-researchers-doesnt-hold-up/?mc_cid=45f1595320&mc_eid=6cef77fdd7. Facebook has blocked the work of other researchers, too, as well as failing to give requested data on COVID-19 disinformation to the White House. *See* Elizabeth Dwoskin, et al., *Only Facebook knows the extent of its disinformation problem. And it's not sharing, even with the White House*, The Washington Post (Aug. 19, 2021), https://www.washingtonpost.com/technology/2021/08/19/facebook-data-sharing-struggle/.

[307] *See* Surgeon General, *supra* note 242 at 12.

[308] *See, e.g.*, European Digital Media Observatory and George Washington University Institute for Data, Democracy & Politics, *Report of the Digital Media Observatory's Working Group on Platform-to-Researcher Data Access* (May 31, 2022), https://edmo.eu/2022/05/31/edmo-releases-report-on-researcher-access-to-platform-data/; Renée DiResta, et al., *It's Time to Open the Black Box of Social Media*, Scientific American (Apr. 28, 2022), https://www.scientificamerican.com/article/its-time-to-open-the-black-box-of-social-media/?s=03; Aspen Institute, *supra* note 8 at 20, 28; Singh, *Everything in Moderation*, *supra* note 224 at 34; Susan Benesch, *Nobody Can See Into Facebook*, The Atlantic (Oct. 30, 2021), https://www.theatlantic.com/ideas/archive/2021/10/facebook-oversight-data-independent-research/620557/?s=03; Ethan Zuckerman, *Demand five precepts to aid social-media watchdogs*,

platforms could also allow researchers to perform testing for ecological validity, i.e., real platform users in real-world situations.[309] Such access would allow, e.g., independent analysis of different platform interventions regarding harmful content.[310] Proposed legislation to allow for researcher access is discussed below and may need to wrestle with concerns such as (1) the vetting and protection of researchers, (2) whether investigative journalists or others count as researchers, (3) security and privacy protections for user data,[311] and (4) whether the data was obtained by coercive means, such as the use of dark patterns.

To be clear, it is not that no platforms provide any access to researchers. The issue is that they generally do not provide nearly enough, access is often conditioned on non-disclosure agreements, and some platforms are more open than others. In January 2022, Twitter announced that it is working on privacy-enhancing technology that would allow sharing of more information with researchers, partnering with OpenMined, a non-profit entity.[312] In December 2021, it discussed plans to expand its dataset releases to researchers into areas "including misinformation, coordinated harmful activity, and safety."[313] Other large platforms have either

---

Nature 597, 9 (Aug. 31, 2021), https://doi.org/10.1038/d41586-021-02341-9; Matthias Vermeulen, *The Keys to the Kingdom*, Knight First Amendment Institute (Jul. 27, 2021), https://knightcolumbia.org/content/the-keys-to-the-kingdom. *See also* Harris, *supra* note 251 at 1, 12-13.

[309] *See* Irene V. Pasquetto, et al., *Tackling misinformation: What researchers could do with social media data*, Harvard Kennedy School Misinformation Rev. 1(8) (Dec. 2020), https://doi.org/10.37016/mr-2020-49.

[310] Another way in which expanding researcher access (and public-private cooperation in general) can help achieve meaningful transparency and accountability of relevant AI tools is via examining the extent to which different mechanisms for these ends are working in concert with each other. *See* Spandana Singh and Leila Doty, *Cracking Open the Black Box: Promoting Fairness, Accountability, and Transparency Around High-Risk AI*, New America (Sep. 2021), https://www.newamerica.org/oti/reports/cracking-open-the-black-box/.

[311] The FTC has advised businesses for many years to take privacy and security into account when collecting or using consumers' personal data. Scholars have noted that privacy trade-offs may need to be weighed when considering the value of third-party access to such data, which may derive from people whose information is used to train an AI system or is collected after deployment. *See, e.g., Platform Transparency: Understanding the Impact of Social Media*, S. Comm. on the Judiciary, 117th Cong. (2022) (panelists discussed privacy issues involved in providing access to platform data), https://www.judiciary.senate.gov/meetings/platform-transparency-understanding-the-impact-of-social-media?s=03; Daphne Keller, *User Privacy vs. Platform Transparency: The Conflicts Are Real and We Need to Talk About Them*, Center for Internet and Society Blog (Apr. 6, 2022), https://cyberlaw.stanford.edu/blog/2022/04/user-privacy-vs-platform-transparency-conflicts-are-real-and-we-need-talk-about-them-0?s=03; Sarah Villenueve, et al., *Shedding Light on the Trade-offs of Using Demographic Data for Algorithmic Fairness*, Partnership on AI (Dec. 2, 2021), https://partnershiponai.org/paper/fairer-algorithmic-decision-making-and-its-consequences/; Hongyan Chang and Reza Shokri, *On the Privacy Risks of Algorithmic Fairness* (Apr. 7, 2021), https://arxiv.org/abs/2011.03731; Nathaniel Persily and Joshua A. Tucker, *Conclusion: The Challenges and Opportunities for a Social Media Research*, in Social Media and Democracy, *supra* note 285 at 313-30; Martin Giles, *The Cambridge Analytica affair reveals Facebook's "Transparency Paradox,"* MIT Tech. Rev. (Mar. 20, 2018), https://www.technologyreview.com/2018/03/20/144577/the-cambridge-analytica-affair-reveals-facebooks-transparency-paradox/.

[312] *See* https://blog.twitter.com/engineering/en_us/topics/insights/2022/investing-in-privacy-enhancing-tech-to-advance-transparency-in-ML.

[313] *See* https://blog.twitter.com/en_us/topics/company/2021/disclosing-state-linked-information-operations-we-ve-removed and https://blog.twitter.com/en_us/topics/company/2021/-expanding-access-beyond-information-

PX0526-057

not made such pledges or have blocked such access. Of course, there can be too much transparency, in that some data could be incomprehensible, expose sensitive information, or help bad actors figure out how to evade platform policies and filters.

### Assessments and audits

Algorithmic Impact Assessments (AIAs) are a means of assessing AI systems in the private or public sector and are derived from assessments performed in environmental protection, human rights, privacy, and data security domains. They allow for the evaluation of an AI system's impact before, during, or after its use. Further, they can allow companies to mitigate bad outcomes and, if publicly shared, provide a chance for accountability and safer, better use of the technology.[314] AIAs could also provide the FTC and other regulators with information for investigations into deceptive and unfair business practices. The need for AIAs is recognized broadly, including for content moderation,[315] and many frameworks for implementing them have been proposed, both here and abroad.[316] Legislative attention to them is discussed later.

Major questions for developing these assessments include when they should be conducted, which entities should be subject to them, and whether they should be performed internally or via external auditors. Another fundamental determination is whether such an assessment is conceived as an AIA or as an audit.[317] Although sometimes AIA and audit are used interchangeably, the former may refer more often to a focus on algorithmic design, possible harm, and ultimate responsibility, whereas an audit may refer more often to evaluation of an AI

---

operations-; *See also* Camille Francois, *The Accidental Origins, Underappreciated Limits, and Enduring Promises of Platform Transparency Reporting about Information Operations*, J. of Online Trust and Safety (Oct. 2021), https://tsjournal.org/index.php/jots/article/view/17/8.

[314] *See, e.g.*, *H. Comm. on Science, Space, and Technology* (testimony of Meredith Whittaker), *supra* note 252; *Comments of AI NOW Institute*, FTC Hearings on Competition and Consumer Protection in the 21st Century (Aug. 20, 2018), https://ainowinstitute.org/ainow-ftc-comments-consumer-protection.pdf.

[315] *See, e.g.*, Aspen Institute, *supra* note 8 at 21, 37; United Nations Special Rapporteur, *Report on Artificial Intelligence technologies and implications for freedom of expression and the information environment* (Aug. 29, 2018), https://www.undocs.org/A/73/348; O'Neil, *supra* note 235, at 207, 217; Sylvain, *Recovering Tech's Humanity*, *supra* note 229 at 281.

[316] An October 2021 House hearing focused on AI ethics and transparency, with several witnesses discussing the need for audits and AIAs and referring to proposed and existing frameworks, particularly for bias detection. *See Task Force on Artificial Intelligence: Beyond I, Robot: Ethics, Artificial Intelligence, and the Digital Age*, H. Comm. on Financial Services, 117th Cong. (2021), https://www.congress.gov/event/117th-congress/house-event/114125. *See also* Data & Society, *Assembling Accountability: Algorithmic Impact Assessment for the Public Interest* (Jun. 29, 2021), https://datasociety.net/library/assembling-accountability-algorithmic-impact-assessment-for-the-public-interest/; Ada Lovelace Institute, *Technical methods for regulatory inspection of algorithmic systems* (Dec. 9, 2021), https://www.adalovelaceinstitute.org/report/technical-methods-regulatory-inspection/; United Kingdom Government Digital Service, *Data Ethics Framework* (2020), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/923108/Data_Ethics_Framework_2020.pdf.

[317] *See* Khari Johnson, *The Movement to Hold AI Accountable Gains More Steam*, WIRED (Dec. 2, 2021), https://www.wired.com/story/movement-hold-ai-accountable-steam/?s=03.

PX0526-058

model's output.[318] Further, to ensure that these assessments are meaningful and comparable, standards must be set for how AIAs or audits should be conducted and what they should include.[319] Similarly, the results of any such assessments need to be documented in some standardized way.[320] Recognized standards and documentation would also help to allow for better evaluation of an auditor's work. Again, assessments and audits are important but not a substitute for enforcement and remedies relating to online harms.

### Auditor and employee protections

AIAs and algorithmic audits may also not be successful if the auditors doing the work are not certified, independent, and protected in their work.[321] These concerns may well increase as the small marketplace of outside auditors grows.[322] Workers within tech companies need protection, too, when they seek to report on harm or unfairness that AI tools are facilitating or failing to block, whether in the role of a whistleblower or otherwise.[323] In the words of Timnit Gebru, "[t]he baseline is labor protection and whistleblower protection and anti-discrimination laws.

---

[318] See id.; Danaë Metaxa, et al., *Auditing Algorithms: Understanding Algorithmic Systems from the Outside In*, Foundations and Trends in Human–Computer Interaction 14:4 (2021), http://dx.doi.org/10.1561/1100000083.

[319] See, e.g., UK Digital Regulation Cooperation Forum, *Auditing algorithms: the existing landscape, role of regulators and future outlook* (Apr. 28, 2022), https://www.gov.uk/government/publications/findings-from-the-drcf-algorithmic-processing-workstream-spring-2022/auditing-algorithms-the-existing-landscape-role-of-regulators-and-future-outlook; Andrew D. Selbst, *An Institutional View of Algorithmic Impact Assessments*, 35 Harvard J. of Law & Tech. __ (forthcoming) (Jun. 15, 2021), https://ssrn.com/abstract=3867634; Gregory Falco, et al., *Governing AI safety through independent audits*, Nature Machine Intelligence 3: 566-71 (2021), https://www.nature.com/articles/s42256-021-00370-7; Aspen Institute, *supra* note 8 at 20; Johnson, *supra* note 317; Moana Slone, *The Algorithmic Auditing Trap*, OneZero (Mar. 17, 2021), https://onezero.medium.com/the-algorithmic-auditing-trap-9a6f2d4d461d; Hayden Field, *Seven AI ethics experts predict 2022's opportunities and challenges for the field*, Morning Brew (Jan. 17, 2022) (quoting Deborah Raji and Abhishek Gupta), https://www.morningbrew.com/emerging-tech/stories/2022/01/17/seven-ai-ethics-experts-predict-2022-s-opportunities-and-challenges-for-the-field?s%E2%80%A6; Kate Kaye, *A new wave of AI auditing startups wants to prove responsibility can be profitable*, Protocol (Jan. 3, 2022), https://www.protocol.com/enterprise/ai-audit-2022?s=03#toggle-gdpr.

[320] See, e.g., Selbst, *supra* note 319; Inioluwa Deborah Raji, et al., *Closing the Accountability Gap, Defining an End-to-End Framework for Internal Algorithmic Auditing*, in Conf. on Fairness, Accountability, and Transparency (FAT '20) (Jan. 2020), https://doi.org/10.1145/3351095.

[321] See https://hai.stanford.edu/news/radical-proposal-third-party-auditor-access-ai-accountability?s=03. *See also* NIST Special Publication 1270, *supra* note 249 at 36 (noting concern that technology companies being assessed not "have undue influence on building or using the assessment"); J. Nathan Mathias, *Why We Need Industry-Independent Research on Tech & Society*, CAT Lab (Jan. 2020) (discussing research management of conflicts of interest), https://citizensandtech.org/2020/01/industry-independent-research/.

[322] See Khari Johnson, *What algorithm auditing startups need to succeed*, VentureBeat (Jan. 30, 2021), https://venturebeat.com/2021/01/30/what-algorithm-auditing-startups-need-to-succeed/.

[323] See, e.g., Erie Meyer, *CFPB Calls Tech Workers to Action*, At the CFPB Blog (Dec. 15, 2021), https://www.consumerfinance.gov/about-us/blog/cfpb-calls-tech-workers-to-action/?s=03; Brennan Center, *supra* note 257 at 3; *H. Comm. on Science, Space, and Technology* (testimony of Meredith Whittaker), *supra* note 252.

Anything we do without that kind of protection is fundamentally going to be superficial, because the moment you push a little bit, the company's going to come down hard."[324]

### Other considerations

Other proposals to increase transparency and accountability for AI tools run the gamut from "bug bounties," which are designed to bring out hidden biases,[325] to independent bodies such as the Facebook Oversight Board, made up of 20 outside experts from around the world who consider appeals of Facebook and Instagram content decisions.[326] Some of the Board's recommendations have touched on automated removal of TVEC and the need for the company to be more transparent about such removal decisions and to provide better notice and appeal rights to users.[327]

A crucial issue behind calls for increased disclosure of data is how to do so while maintaining user privacy.[328] Deidentification of such data is one theoretical way to address it,[329] as is user consent, though practical and meaningful ways to obtain them may be challenging if not impossible.[330] The use of differential privacy and synthetic data are other potential solutions, though not ones without any risk of data leakage.[331] The UN has recognized privacy risks while

---

[324] Dina Bass, *Google's Former AI Ethics Chief Has a Plan to Rethink Big Tech*, Bloomberg Businessweek (Sep. 20, 2021), https://www.bloomberg.com/news/articles/2021-09-20/timnit-gebru-former-google-ai-ethics-chief-has-plan-to-rethink-big-tech.

[325] *See, e.g.*, Algorithmic Justice League, *Bug Bounties for Algorithmic Harms?* (Jan. 2022), https://www.ajl.org/bugs; Rumman Chowdhury and Jutta Williams, *Introducing Twitter's first algorithmic bias bounty challenge*, Twitter Engineering Blog (Jul. 30, 2021), https://blog.twitter.com/engineering/en_us/topics/insights/2021/algorithmic-bias-bounty-challenge; Khari Johnson, *AI researchers propose 'bias bounties' to put ethics principles into practice*, VentureBeat (Apr. 17, 2020), https://venturebeat.com/2020/04/17/ai-researchers-propose-bias-bounties-to-put-ethics-principles-into-practice/.

[326] See https://oversightboard.com/.

[327] *See* Dia Kayyali and Jillian C. York, *The Facebook Oversight Board is making good decisions- but does it matter?*, Tech Policy Press (Jul. 28, 2021), https://techpolicy.press/the-facebook-oversight-board-is-making-good-decisions-but-does-it-matter/.

[328] *See, e.g.*, Aspen Institute, *supra* note 8 at 21-22, 28.

[329] *See* Surgeon General, *supra* note 242 at 12.

[330] . *See, e.g.*, Katherine Miller, *De-Identifying Medical Patient Data Doesn't Protect Our Privacy*, Stanford HAI News (Jul. 19, 2021), https://hai.stanford.edu/news/de-identifying-medical-patient-data-doesnt-protect-our-privacy; Gina Kolata, *Your Data Were 'Anonymized'? These Scientists Can Still Identify You*, The New York Times (Jul. 23, 2019), https://www.nytimes.com/2019/07/23/health/data-privacy-protection.html. Deidentification could also make it harder to determine how representative a dataset is. Further, even if one could obtain meaningful user consent, it is possible that the choices of certain users to consent or opt out would affect the representativeness of a dataset.

[331] *See* Nathan Persily, *A Proposal for Researcher Access to Platform Data: The Platform Transparency and Accountability Act* at 4, J. of Online Trust and Safety 1:1 (Oct. 28, 2021) (arguing that laws allowing for research access to platform data should ensure anonymity and encouraging use of differential privacy and construction of synthetic datasets), https://doi.org/10.54501/jots.v1i1.22. *See also* Joseph Near and David Darais, *Differentially Private Synthetic Data*, NIST Cybersecurity Insights (May 3, 2021) (considering value of differentially private synthetic data), https://www.nist.gov/blogs/cybersecurity-insights/differentially-private-synthetic-data#; Meg

---

still supporting explainable and transparent AI systems, including AIAs and grievance mechanisms.[332] Privacy is also one aspect of trustworthy AI that NIST will study and incorporate into a Congressionally mandated Risk Management Framework.[333]

The many challenges of transparency and accountability — and the fact that they don't by themselves prevent harm — highlight the importance of focusing on the entire AI lifecycle, design through implementation. Some scholars have argued that transparency might be less important if algorithms could be designed not to discriminate in the first place.[334] Both designers and users of AI tools must nonetheless continue to monitor the impact of their AI tools, since fair design does not guarantee fair outcomes. In its Online Harms White Paper, the United Kingdom's government indicated it would work with industry and civil society to develop a Safety by Design framework for online services, possibly to include guidance on effective systems for addressing illegal or harmful content via AI and trained moderators.[335] Algorithmic design is not within the scope of this report, though it is referred to again in the discussion below on platform interventions.

## D.  Responsible data science

Those building AI systems, including tools to combat online harms, should take responsibility for both inputs and outputs. Such responsibility includes the need to avoid unintentionally biased or unfair results derived from problems with the training data, classifications, or algorithmic design. In their call for an AI bill of rights, WHOSTP officials note that some AI failings that disproportionately affect already marginalized groups "often result from AI developers not using appropriate data sets and not auditing systems comprehensively, as well as not having diverse perspectives around the table to anticipate and fix problems before products are used (or to kill products that can't be fixed)."[336] Further, the 2021 DHS report on deepfakes stated that scientists

---

Young, et al., *Beyond Open vs. Closed: Balancing Individual Privacy and Public Accountability in Data Sharing*, Proc. of ACM (FAT'19) (Jan. 29, 2019) (advocating for use of synthetic data and a third-party public-private data trust), https://par.nsf.gov/servlets/purl/10111608.

[332] United Nations High Commissioner for Human Rights (UNHCHR), The right to privacy in the digital age (Sep. 13, 2021), https://www.ohchr.org/EN/Issues/DigitalAge/Pages/cfi-digital-age.aspx.

[333] *See* National Defense Authorization Act for Fiscal Year 2021, H.R. 116-617, § 5301, at 2768-2775, https://www.congress.gov/congressional-report/116th-congress/house-report/617/1?overview=closed; *See also* https://hai.stanford.edu/policy/policy-resources/summary-ai-provisions-national-defense-authorization-act-2021.

[334] *See, e.g.,* Joshua A. Kroll, et al., *Accountable Algorithms*, 165 U. Penn. L. Rev. 633 (2017), https://scholarship.law.upenn.edu/penn_law_review/vol165/iss3/3/.

[335] *See* United Kingdom Department for Digital, Culture, Media, and Sport, and Home Office, *Online Harms White Paper* at 8.14 (Dec. 15, 2020), https://www.gov.uk/government/consultations/online-harms-white-paper/online-harms-white-paper. The White Paper informed the pending Online Safety Bill, first introduced in May 2021. *See* https://www.gov.uk/government/publications/draft-online-safety-bill.

[336] Lander and Nelson, *supra* note __.246. *See also* NIST Special Publication 1270, *supra* note 249 at 36-37, 45 (noting benefits of diversity within teams training and deploying AI systems, that "the AI field noticeably lacks diversity," and that team supervisors should be responsible for risks and associated harms of these systems"); Color of Change, *Beyond the Statement: Tech Framework* (also recommending that decision-makers be held responsible for discriminatory outcomes), https://beyondthestatement.com/tech-framework/.

should be considering at the development stage how to mitigate potential misuses of deepfake models.[337]

Developers who fund, oversee, or direct scientific research in this area should appreciate that their work does not happen in a vacuum and address the fact that it could cause harm.[338] This recognition includes the fundamental idea that the data being used has context and often stands in for real people.[339] To move individual scientists in this direction, a large AI conference instituted a requirement that submitting authors include a statement on the broader societal impacts of their research.[340] The Partnership on AI has issued recommendations on how those leading and directing research can anticipate and mitigate any potential negative impacts.[341] One important and practical consideration is having adequate documentation throughout the AI development process.[342] Further, various scholars have proposed reparative approaches to AI development and redress.[343]

Unconscious bias of researchers, or at least a failure to actively consider bias and its mitigation, can also create problems.[344] The MIT Media Lab created a system to help researchers deal with unconscious biases at different stages of a project.[345] A broader and more significant solution is to deal with the lack of diversity in the AI field, including in the ranks of decision-makers as well as in the research teams working on these matters.[346] The inclusion of diverse viewpoints should

---

[337] *See* DHS, *Increasing Threat of Deepfake Identities*, *supra* note 43 at 31.

[338] *See* O'Neil, *supra* note 235 at 205 ("Like doctors, data scientists should pledge a Hippocratic Oath, one that focuses on the possible misuses and misinterpretations of their models."); H. Comm. on Science, Space and Technology (testimony of Joy Buolamwini), *supra* note __.252. Within technology companies, putting the burden of raising or addressing these issues solely on employees, rather than their superiors, can put employees in an untenable position of deciding whether doing the right thing is worth the risk that they could lose their jobs for doing so. *See* Inga Strümke, et al., *The social dilemma in artificial intelligence development and why we have to solve it*, (Dec. 2021) (arguing for creation of professional AI code of ethics), https://doi.org/10.1007/s43681-021-00120-w.

[339] *See* Inioluwa Deborah Raji, *The Discomfort of Death Counts: Mourning through the Distorted Lens of Reported COVID-19 Death Data*, Patterns (N Y) 1(4): 100066 (Jul. 10, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7296309/.

[340] *See* https://blog.neurips.cc/2021/12/03/a-retrospective-on-the-neurips-2021-ethics-review-process/; Carina E. A. Prunkl, et al., *Institutionalizing ethics in AI through broader impact requirements*, Nature Machine Intelligence 3, 104-110 (2021), https://www.nature.com/articles/s42256-021-00298-y.

[341] *See* Partnership on AI, *Managing the Risks of AI Research: Six Recommendations for Responsible Publication* (May 6, 2021), https://partnershiponai.org/paper/responsible-publication-recommendations/.

[342] *See* NIST Special Publication 1270, *supra* note 249 at 44; Selbst, *An Institutional View of Algorithmic Impact Assessments*, *supra* note 319; Raji, *Closing the AI Accountability Gap, supra* note 320 at 37.

[343] *See* Khari Johnson, *A Move for 'Algorithmic Reparation' Calls for Racial Justice in AI*, WIRED (Dec. 23, 2021), https://www.wired.com/story/move-algorithmic-reparation-calls-racial-justice-ai/.

[344] *See* Deborah Raji, *How our data encodes systematic racism*, MIT Tech. Rev. (Dec. 10, 2020), https://www.technologyreview.com/2020/12/10/1013617/racism-data-science-artificial-intelligence-ai-opinion/.

[345] *See* https://aiblindspot.media.mit.edu/.

[346] Several witnesses discussed the importance of researcher diversity in 2021 and 2019 House hearings. *See Task Force on Artificial Intelligence*, *supra* note 316 (testimony of Miriam Vogel and Aaron Cooper); H. Comm. on

PX0526-062

be meaningful and include people with decision-making authority; it should not be used to engage in what amounts to "participation-washing."[347] To get such viewpoints, a strong pipeline of people need to be trained and hired for these roles, something that groups like Black in AI, Queer in AI, and LatinX in AI are working to achieve. Firms need to retain such people, once hired, by striving to create and maintain diverse, equitable, inclusive, and accessible cultures in which such people no longer face marginalization, discrimination, or exclusion.[348] Of course, the composition of the team designing an AI model does not necessarily alter discriminatory or biased outcomes of that model if they stem from problems in the underlying data.[349]

An even larger issue is that only a few big technology companies are funding most of the research in question.[350] They are also able to capture, within their companies or academia, institutions or researchers who may then be likely to work in accord with corporate aims.[351] They can also use their dominant positions and wealth to set the agenda for what AI research the government will and will not fund, again in line with their own incentives.[352] Some prominent researchers, like Timnit Gebru, have started their own AI research centers to deal with these

---

Science, Space and Technology, *supra* note 252 (testimony of Meredith Whittaker and Joy Buolamwini), *supra* note __.252. *See also* UNHCHR, *supra* note 332 at 16; Sue Shellenbarger, *A Crucial Step for Averting AI Disasters*, The Wall St. J. (Feb. 13, 2019), https://www.wsj.com/articles/a-crucial-step-for-avoiding-ai-disasters-11550069865; Sasha Costanza-Chock, *Design Justice: towards an intersectional feminist framework for design theory and practice*, Proc. of the Design Research Society 2018 (Jun. 3, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3189696.

[347] *See* Mona Sloane, *Here's what's missing in the push to make AI fair*, Nature (May 5, 2022), https://www.nature.com/articles/d41586-022-01202-3; Mona Sloane, *Participation-washing could be the next dangerous fad in machine learning*, MIT Tech. Rev. (Aug. 25, 2020), https://www.technologyreview.com/2020/08/25/1007589/participation-washing-ai-trends-opinion-machine-learning/. *See also* NIST Special Publication 1270, *supra* note 249 at 36 (suggesting that different kinds of diversity are important to consider in terms of power and decision-making within technology companies).

[348] *See, e.g.,* Dr. Jeffrey Brown, *After the Offer: The Role of Attrition in AI's 'Diversity Problem,'* Partnership on AI (Apr. 13, 2022), https://partnershiponai.org/paper/after-the-offer-the-role-of-attrition-in-ais-diversity-problem/; Megan Rose Dickey, *Examining the "pipeline problem,"* TechCrunch (Feb. 14, 2021), https://techcrunch.com/2021/02/14/examining-the-pipeline-problem/; *Inclusion in Tech: How Diversity Benefits All Americans*, H. Comm. on Energy and Commerce, 116th Cong. (2019) (testimony of Nicol Turner-Lee), https://docs.house.gov/meetings/IF/IF17/20190306/108901/HHRG-116-IF17-Wstate-Turner-LeeN-20190306.pdf.

[349] *See* Benjamin, *supra* note 245 at 59.

[350] *See* Karen Hao, *Inside the fight to reclaim AI from big tech's control*, MIT Tech. Rev. (Jun. 14, 2021), https://www.technologyreview.com/2021/06/14/1026148/ai-big-tech-timnit-gebru-paper-ethics/; *House Comm. on Science, Space, and Technology*, *supra* note 252 (testimony of Meredith Whittaker), *supra* note 252.

[351] *See* Meredith Whittaker, *The Steep Cost of Capture*, Interactions 28(6), 50 (Nov.-Dec. 2021), https://interactions.acm.org/archive/view/november-december-2021/the-steep-cost-of-capture; Abeba Birhane, et al., *The Values Encoded in Machine Learning Research* (Jun. 2021), https://arxiv.org/pdf/2106.15590.pdf.

[352] *See* Timnit Gebru, *For truly ethical AI, its research must be independent from big tech*, The Guardian (Dec. 6, 2021), https://www.theguardian.com/commentisfree/2021/dec/06/google-silicon-valley-ai-timnit-gebru?s=03; Laurie Clarke, et al., *How Google quietly funds Europe's leading tech policy institutes*, The New Statesman (Jul. 30, 2021), https://www.newstatesman.com/science-tech/big-tech/2021/07/how-google-quietly-funds-europe-s-leading-tech-policy-institutes.

problems; hers will focus on harm to marginalized groups.[353] Congress has asked about how to foster innovative ways to combat online harm, and thus one response, in her words, is that "what truly stifles innovation is the current arrangement where a few people build harmful technology and others constantly work to prevent harm, unable to find the time, space or resources to implement their own vision of the future."[354]

Finally, it is critical that the research community keep privacy in mind. AI development often involves huge amounts of training data, which can be amassed in invasive ways[355] and which is in tension with data minimization principles. As noted above in the transparency context, implementing adequate privacy protections for such data may be difficult in practice and may require creative solutions. Eventually, AI systems may be trained on much less data, as opposed to the current hunger for more, but it is unclear how long it may take for that to happen.[356]

## E. Platform AI interventions

**Mitigation tools**

The use of automated tools to address online harms is most often framed as an issue of detection and removal, whether before or after content is posted. But platforms, search engines, and other technology companies can and do use these tools to address harmful content in other ways. They have a range of interventions or "frictions" to employ, including circuit-breaking, downranking, labeling, adding interstitials, sending warnings, and demonetizing bad actors.[357] Some platforms already use such mitigation measures, but their relative secrecy means few details are known at either a systemic or individual level about their efficacy or impact. These interventions are generally automated and thus many of them would have the same inherent flaws of AI-based detection tools, as they would still be dependent on the ability to identify particular types of

---

[353] *See, e.g.*, Nitasha Tiku, *Google fired its star AI researcher one year ago. Now she's launching her own institute*, The Washington Post (Dec. 2, 2021), https://www.washingtonpost.com/technology/2021/12/02/timnit-gebru-dair/?s=03; Tom Simonite, *Ex-Googler Timnit Gebru Starts Her Own AI Research Center*, WIRED (Dec. 2, 2021), https://www.wired.com/story/ex-googler-timnit-gebru-starts-ai-research-center/?s=03.

[354] Gebru, *supra* note 352.

[355] *See, e.g.*, John McQuaid, *Limits to Growth: Can AI's Voracious Appetite for Data BeTamed?*, Undark (Oct. 18, 2021), https://undark.org/2021/10/18/computer-scientists-try-to-sidestep-ai-data-dilemma/.

[356] *See, e.g.*, Tom Simonite, *Facebook Says Its New AI Can Identify More Problems Faster*, WIRED (Dec. 8, 2021), https://www.wired.com/story/facebook-says-new-ai-identify-more-problems-faster/; H. James Wilson, et al., *The Future of AI Will Be About Less Data, Not More*, Harvard Bus. Rev. (Jan. 14, 2019), https://hbr.org/2019/01/the-future-of-ai-will-be-about-less-data-not-more.

[357] One proffered example of demonetization is for Google to use probability scores that AI assigns to violative content in search results, which results in its blocking or demotion, to penalize misinformation-filled sites "in the algorithmic auctions Google runs in which sites … bid for ad placements." Noah Giansiracusa, *Google Needs to Defund Misinformation*, Slate (Nov. 18, 2021), https://slate.com/technology/2021/11/google-ads-misinformation-defunding-artificial-intelligence.html. *See also* Ryan Mac, *Buffalo gunman's video is surfacing on Facebook, sometimes with ads beside it*, The New York Times (May 19, 2022), https://www.nytimes.com/2022/05/19/technology/buffalo-shooting-facebook-ads.html.

PX0526-064

potentially harmful content.[358] As noted above, such content may need detection only because platform recommendation engines, powered by AI, can spread and amplify it so well. In any event, these interventions need more study, which means much more transparency about their use and effects, with due access for research.

Several major reports on online harm and disinformation discuss the potential value, pitfalls, and lack of transparency regarding various platform interventions, including reports from the Aspen Institute, the Brennan Center for Justice, the Global Disinformation Index, the Coalition to Fight Digital Deception, and the United Kingdom's Royal Society.[359] In addition, the Surgeon General's advisory on health disinformation states that platforms should build in "frictions" such as suggestions, warnings, and early detection of viral content.[360] They are also discussed at length in several academic papers.[361]

One measure gaining traction since its introduction by Rutgers University Professor Ellen P. Goodman is the use of so-called circuit breakers or virality disruptors.[362] This intervention involves platforms' disrupting traffic at a certain threshold of circulation, at which point human reviewers would assess the content to ensure it does not violate the law or platform policy.[363] Doing so could reduce the fast spread of harmful content and is akin to the steps that stock exchanges can take to curb trading volatility.[364] While one benefit of this intervention is that it does *not* require content-based detection, some have proposed that AI could help determine what viral content should be slowed.[365]

---

[358] For example, a European study on deepfakes called for both content providers and content creators to label deepfakes but noted that deepfake detection software might be a prerequisite for such a requirement. *See* EPRS, *Tackling deepfakes in European policy supra* note 43 at 59-62.

[359] *See* Aspen Institute, *supra* note 8, at 66-67; Brennan Center for Justice, *supra* note 257, at 12-15; CFDD, *supra* note 224 at 16-19; Global Disinformation Index, *Disrupting Online Harms: A New Approach* at 14 (Jul. 2021), www.disinformationindex.org; The Royal Society, *The online information environment: Understanding how the internet shapes people's engagement with scientific information* 13-15 (Jan. 2022), https://www.royalsociety.org/online-information-environment.

[360] Surgeon General, *supra* note 242 at 12.

[361] *See, e.g.*, Eric Goldman, *Content Moderation Remedies*, Santa Clara U. Legal Studies Research Paper (Mar. 24, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3810580; Molly K. Land and Rebecca J. Hamilton, *Beyond Takedown: Expanding the Toolkit for Responding to Online Hate*, American U., WCL Research Paper No. 2020-11 (Jan. 31, 2020), https://ssrn.com/abstract=3514234.

[362] *See* Ellen P. Goodman, *Digital Information Fidelity and Friction*, Knight First Amendment Institute (Feb. 26, 2020), https://knightcolumbia.org/content/digital-fidelity-and-friction.

[363] *See id.*

[364] *See id. See also* Center for American Progress, *Fighting Coronavirus Misinformation and Disinformation* at 27-28 (Aug. 2020), https://www.americanprogress.org/article/fighting-coronavirus-misinformation-disinformation/.

[365] *See, e.g.*, Future of Tech Commission, *supra* note 297 at 18; Johns Hopkins University, Imperial College of London, and Georgia Institute of Technology, *Countering disinformation: improving the Alliance's digital resilience*, NATO Review (Aug. 12, 2021), https://www.nato.int/docu/review/articles/2021/08/12/countering-disinformation-improving-the-alliances-digital-resilience/index.html; Young, *supra* note 130 at 5; Christina

PX0526-065

Another set of measures subject to much discussion involves contextual labeling, interstitials, user prompts, and warnings. The point of these interventions — which would more likely be dependent on automated, content-based detection tools — is to advise or warn users about what they are about to see or post. In other words, they could protect users from potentially harmful content already circulating or reduce the chance that a given user will publish such content.

Contextual labeling is a familiar concept to the FTC. In the context of false advertising, the FTC often requires in its orders that companies avoid deception by disclosing certain facts, clearly and conspicuously, in close proximity to certain representations the companies make about their products. Assuming compliance, the value of such disclosures depends largely on whether consumers see and understand them. This is also true for contextual labeling of online content.

One recent study reviews the nascent literature on the efficacy of online content labeling, concluding that it shows promise for helping to correct or limit the impact of misinformation but that certain psychological phenomena are at play.[366] The authors are much more concerned about, for example, the "implied truth effect," whereby people believe that unlabeled content must be truthful, than the "backfire effect," whereby people solidify their beliefs in the opposite of whatever such labels tell them. Other recent studies conclude that interstitial warnings — which appear as separate pages or pop-ups that users cannot miss and must take some action to get past — are more effective that contextual ones.[367] It may be that the greater efficacy has more to do with the fact that they are a source of friction than with the particular information provided.[368]

A related type of intervention is a user prompt or warning — which could be in interstitial form — that appears before a user posts or shares potentially harmful content. Several articles and studies have advocated for platforms to use them more often.[369] One study involves the use of

Pazzanese, *How the government can support a free press and cut disinformation* (Q&A with Martha Minow) (Aug. 11, 2021), https://news.harvard.edu/gazette/story/2021/08/martha-minow-looks-at-ways-government-can-stop-disinformation/.

[366] *See* Garrett Morrow, et al., *The Emerging Science of Content Labeling: Contextualizing Social Media Content Moderation* (Dec. 3, 2020), http://dx.doi.org/10.2139/ssrn.3742120. *See also* Emily Saltz, et al., *Encounters with Visual Misinformation and Labels Across Platforms: An Interview and Diary Study to Inform Ecosystem Approaches to Misinformation Interventions*, Partnership on AI (Dec. 2020), https://arxiv.org/abs/2011.12758.

[367] *See* Ben Kaiser, et al., *Adapting Security Warnings to Counter Online Disinformation* (Aug. 2020), https://www.usenix.org/system/files/sec21summer_kaiser.pdf; Filipo Sharevski, et al., *Misinformation Warning Labels: Twitter's Soft Moderation Effects on COVID-19 Vaccine Belief Echoes* (Apr. 1, 2021), https://arxiv.org/abs/2104.00779.

[368] *See* Kaiser, *supra* note 367 at 14.

[369] *See* Christopher Paul and Hilary Reininger, *Platforms Should Use Algorithms to Help Users Help Themselves*, Carnegie Endowment for International Peace (Jul. 20, 2021), https://carnegieendowment.org/2021/07/20/platforms-should-use-algorithms-to-help-users-help-themselves-pub-84994; Ziv Epstein, et al., *Developing an accuracy-prompt toolkit to reduce COVID-19 misinformation online*, Harvard Kennedy School Misinformation Rev. (May 18, 2021), https://misinforeview.hks.harvard.edu/article/developing-an-accuracy-prompt-toolkit-to-reduce-covid-19-misinformation-online/; Gordon Pennycook, et al., *Shifting attention to accuracy can reduce misinformation online*,

PX0526-066

machine learning to warn users about sharing harmful content in encrypted messaging apps while avoiding privacy and security issues in that context.[370] While some have noted that these measures may avoid censorship concerns, of course they do not block harmful information being spread by people (or bots) with malicious intent.

Many platforms already use or have experimented with interventions beyond blocking and removing content or suspending accounts. In September 2021, Facebook disclosed its Content Distribution Guidelines, which described types of content that it demotes and the rationales for doing so.[371] Such content includes posts with fact-checked and debunked information, with predicted but not confirmed policy violations (e.g., use of hate terms, graphic violence, or fake accounts) and with suspicious virality.[372] Facebook had first announced it would institute policies for borderline content in 2018.[373] In August 2021, its Instagram property announced it would show stronger warnings when users are about to post potentially offensive or harassing content.[374] Other platforms that have indicated some use of such interventions include YouTube, which demotes some borderline content, and WhatsApp, which places a limit on the number of times content can be forwarded.[375] Further, Nextdoor uses a "Kindness Reminder," an interstitial that runs on machine learning, when a user is about to post something potentially harmful.[376]

The most outspoken platform in this space is likely Twitter. In a set of "open internet" principles, the company states that "content moderation is now more than just leaving content up or taking it down. Providing users with context, whether concerning an account, piece of content, or form of engagement, is more informative to the broader public conversation than removing content while providing controls to people and communities to control their own experience is empowering and impactful. Equally, deamplification allows a more nuanced approach to types of speech that may be considered problematic, better striking a balance between freedom of speech and

---

Nature 592, 590 (2021), https://www.nature.com/articles/s41586-021-03344-2.pdf; Andrew Myers, *The best way to counter fake news is to limit person-to-person spread, Stanford study finds*, Stanford News Service (Oct 25, 2021), https://news.stanford.edu/press-releases/2021/10/25/foil-fake-news-fs-infectiousness/; Mustafa Mikdat Yildirim, et al., *Short of Suspension: How Suspension Warnings Can Reduce Hate Speech on Twitter*, Cambridge U. Press (Nov. 22, 2021), https://doi.org/10.1017/S1537592721002589.

[370] *See* Yiqing Hua, *New technology may bridge privacy debate on encrypted messaging*, Tech Policy Press (Oct. 21, 2021), https://techpolicy.press/new-technology-may-bridge-privacy-debate-on-encrypted-messaging/.

[371] *See* https://about.fb.com/news/2021/09/content-distribution-guidelines/; https://transparency.fb.com/en-gb/features/approach-to-ranking/types-of-content-we-demote/.

[372] *Id.; see* Jeff Allan, *The Integrity Institute's Analysis of Facebook's Widely Viewed Content Report [2021-Q4]*, The Integrity Institute (Mar. 30, 2022) (finding that Facebook had failed to block or intervene on popular content failing basic media literacy checks), https://integrityinstitute.org/widely-viewed-content-analysis-tracking-dashboard#other-platforms.

[373] Josh Constine, *Facebook will change algorithm to demote "borderline content" that almost violates policies*, TechCrunch (Nov. 15, 2018), https://techcrunch.com/2018/11/15/facebook-borderline-content/.

[374] *See* https://about.instagram.com/blog/announcements/introducing-new-ways-to-protect-our-community-from-abuse.

[375] *See* https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/; https://faq.whatsapp.com/general/chats/about-forwarding-limits/?lang=en.

[376] *See* https://blog.nextdoor.com/2019/09/18/announcing-our-new-feature-to-promote-kindness-in-neighborhoods/.

PX0526-067

freedom of reach. Long term, how attention is directed is a critical question."[377] Among other things, Twitter prompts users who try to retweet before reading a post or who are about to send a reply using potentially harmful or abusive text, and it adds labels to tweets with potentially misleading information.[378]

Some platforms and search engines also use external fact-checking organizations to determine whether to intervene with respect to potentially harmful or false materials, including election-related content or TVEC. [379] This approach has its detractors, who may point to questions about norms and standards for these organizations, whether they can scale, their impact, and the lack of transparency surrounding their use. [380] It also has proponents, who argue, for example, that platforms can leverage a robust ecosystem of international websites to make better determinations about what content to downrank or label.[381] Most would agree that it needs more study.[382]

---

[377] *See* Twitter, *Protecting the Open Internet*, https://cdn.cms-twdigitalassets.com/content/dam/about-twitter/en/our-priorities/open-internet.pdf. The reference to "freedom of reach" and its distinction from freedom of speech comes from Renée Diresta. *See* Renée Diresta, *Free Speech Is Not the Same as Free Reach*, WIRED (Aug. 30, 2018), https://www.wired.com/story/free-speech-is-not-the-same-as-free-reach/.

[378] *See* https://perma.cc/XM9V-2S8E; https://twitter.com/TwitterSupport/status/1460715806401122305. A recent experiment in which Twitter users were prompted to reconsider before posting potentially offensive content showed some efficacy, including a decrease in later offensive posts from same users. *See* Matthew Katsaros, et al., *Reconsidering Tweets: Intervening During Tweet Creation Decreases Offensive Content*, Int'l AAAI Conf. on Web and Social Media (2022) (also describing the researchers' use of an algorithm that relied on a large language model to determine when to intervene), https://arxiv.org/abs/2112.00773. A recent study on Twitter's election misinformation warning labels indicate that they did not impact engagement with tweeted misinformation but can be more helpful when the label provides a strong rebuttal and uses text similar to the words in the tweet. *See* Orestis Papakyriakopoulos and Ellen P. Goodman, *The Impact of Twitter Labels on Misinformation Spread and User Engagement: Lessons from Trump's Election Tweets*, ACM WWW '22 (forthcoming) (February 22, 2022), https://ssrn.com/abstract=4036042.

[379] *See, e.g.*, https://www.facebook.com/business/help/2593586717571940?id=673052479947730; https://blog.twitter.com/en_us/topics/company/2021/bringing-more-reliable-context-to-conversations-on-twitter; https://blog.google/products/news/fact-checking-misinformation-google-features/; https://blogs.bing.com/Webmaster-Blog/September-2017/Bing-adds-Fact-Check-label-in-SERP-to-support-the-ClaimReview-markup.

[380] *See, e.g.*, DHS Analytic Exchange Program, *Combatting Targeted Disinformation Campaigns, Part Two* at 25-30 (Aug. 2021) (concluding that the impact of fact-checking may be limited but that the efficacy of different methods should be studied), https://www.dhs.gov/publication/2021-aep-deliverables; CFDD, *supra* note 224 at 14 (questioning whether fact-checking efforts can scale and noting that platforms lack transparency about them and apply them inconsistently).

[381] *See, e.g.*, *An open letter to YouTube's CEO from the world's fact-checkers* (Jan. 12, 2022), https://maldita.es/uploads/public/docs/youtube_open_letter_en.pdf; Barrett, *Who Moderates the Social Media Giants?*, *supra* note 281 at 23, 26; Jan Oledan, et al., *Fact-checking networks fight coronavirus infodemic*, Bulletin of the Atomic Scientists (Jun. 25, 2020), https://thebulletin.org/2020/06/fact-checking-networks-fight-coronavirus-infodemic/; Marcus Bösch and Becca Ricks, *Broken Promises: TikTok and the German Election*, Mozilla Foundation (Sep. 2021), https://foundation.mozilla.org/en/campaigns/tiktok-german-election-2021/.

[382] *See, e.g.*, NATO Strategic Communications Centre of Excellence, *Inoculation Theory and Misinformation* (Oct. 2021), https://stratcomcoe.org/publications/inoculation-theory-and-misinformation/217; Mohan, *supra* note 234 (discussing YouTube's ongoing consideration of fact-checking and labeling).

PX0526-068

Sometimes these fact-checking efforts intersect with AI tools, such as via the use of such tools to debunk false claims,[383] determine what content to send to fact checkers for review,[384] develop datasets of debunked information,[385] help match claims across encrypted messages,[386] or develop chatbots, like one developed by a Spanish fact-checking organization to help WhatsApp users get answers to the veracity of information.[387] Others have discussed the potential use of crowdsourcing, rather than professional fact-checkers, noting that machine learning can facilitate such efforts.[388] At least two vendors, Logically and Repustar, have combined the use of AI and human fact-checking on social media, including for identification of election-related disinformation.[389] Logically worked on a government project involving alerting U.S. election officials to online disinformation intended to dissuade voting[390]; it also works with Facebook in the United Kingdom.[391]

The Partnership for AI has done a landscape review of platform interventions, posing fundamental questions about their use, including when each type should be used, who decides, what metrics and goals should inform auditing, and how their use can be made more transparent and trustworthy.[392] Several research reviews and studies on such interventions identified areas for further study and greater transparency, having concluded that we do not yet know what

---

[383] *See, e.g.*, https://debunk.eu/; https://fullfact.org/about/automated/.

[384] *See, e.g.*, Barrett, *Who Moderates the Social Media Giants?*, *supra* note 281 at 5.

[385] *See* Fatemeh Torabi Asr and Maite Taboada, *Big Data and quality data for fake news and misinformation detection*, Big Data and Society (Jan-Jun. 2019) (advocating for higher quality datasets), https://journals.sagepub.com/doi/10.1177/2053951719843310.

[386] *See* Ashkan Kazemi, et al., *Claim Matching Beyond English to Scale Global Fact-Checking* (Jun. 2021), https://arxiv.org/pdf/2106.00853.pdf.

[387] *See* https://maldita.es/uploads/public/docs/disinformation_on_whatsapp_ff.pdf; https://eu.boell.org/en/2021/10/04/inside-your-pocket-grave-threat-disinformation-private-messenger-apps. Similarly, although not involving such sophisticated technology, the encrypted messaging app Line (a popular communication platform in Asia) has partnered for several years with local fact-checking organizations and allows users to report suspicious messages and receive real-time answers about whether they're true, thus allowing for tracking of harmful content without breaking encryption. *See* Andrew Deck and Vittoria Elliott, *How Line is fighting disinformation without sacrificing privacy*, Rest of World (Mar. 7, 2021), https://restofworld.org/2021/how-line-is-fighting-disinformation-without-sacrificing-privacy/.

[388] *See* Jennifer Allen, et al., Scaling up fact-checking using the wisdom of crowds, ScienceAdvances 7:36 (Sep. 1, 2021), https://www.science.org/doi/10.1126/sciadv.abf4393; William Godel, et al., *Moderating with the Mob: Evaluating the Efficacy of Real-Time Crowdsourced Fact-Checking*, J. of Online Trust and Safety (Oct. 2021), https://tsjournal.org/index.php/jots/article/view/15/6.

[389] *See* https://www.logically.ai/about; https://repustar.com/events-resources. *See also* United Nations Development Programme, *In Honduras, iVerify partners with local university to support national elections* (Feb. 10, 2022), https://digital.undp.org/content/digital/en/home/stories/in-honduras--iverify-partners-with-local-university-to-support-n.html.

[390] *See* Rachael Levy, *Homeland Security Considers Outside Firms to Analyze Social Media After Jan. 6 Failure*, Wall St. J. (Aug. 15, 2021), https://www.wsj.com/articles/homeland-security-considers-outside-firms-to-analyze-social-media-after-jan-6-failure-11629025200.

[391] *See* https://www.logically.ai/press/logically-announces-uk-fact-checking-partnership-with-facebook.

[392] *See* Emily Saltz and Claire Leibowicz, *Fact-Checks, Info Hubs, and Shadow-Bans: A Landscape Review of Misinformation Interventions*, Partnership on AI (Jun. 14, 2021), https://www.partnershiponai.org/intervention-inventory/.

PX0526-069

measures work, or work best, in what circumstances.[393] One study explored how multiple types of intervention may work better than one in isolation.[394] Further, University of Washington Professor Kate Starbird has explained that another challenge to the efficacy of a given intervention on one platform, such as the downranking of a YouTube video, is that the reach of that content is often driven by dynamics and engagement occurring on *other* platforms.[395] A similar challenge is that labeling or blocking content on one platform may result in that content proliferating elsewhere, as New York University researchers found with respect to certain election disinformation addressed by Twitter.[396]

The promises of, challenges with, and opacity regarding present use of platform interventions tend to lead naturally to questions of design and the larger social media ecosystem. For example, Professor Ellen P. Goodman has argued for policymakers to put virality disruptors and other types of content moderation into the context of user interface design.[397] Tel Aviv University Professor Niva Elkin-Koren has explored the possible use of "contesting algorithms" that would use adversarial design to mitigate some problems with AI-based content moderation, as well as a "separation of functions" for AI systems that would apply different oversight to systems collecting or labeling information than to those detecting or filtering content.[398] In its report on "information disorder," the Aspen Institute described alternative platform designs worthy of study, including two nonprofit examples that use AI algorithms: Pol.is, which works to bridge

---

[393] *See* Laura Courchesne, et al., *Review of social science research on the impact of countermeasures against influence operations*, Harvard Kennedy School Misinformation Rev. 2:5 (Sep. 2021), https://misinforeview.hks.harvard.edu/article/review-of-social-science-research-on-the-impact-of-countermeasures-against-influence-operations/; Jon Bateman, et al., *Measuring the Efficacy of Influence Operations Countermeasures: Key Findings and Gaps From Empirical Research*, Carnegie Endowment for Int'l Peace (Sep. 2021), https://carnegieendowment.org/2021/09/21/measuring-efficacy-of-influence-operations-countermeasures-key-findings-and-gaps-from-empirical-research-pub-85389; William T. Adler and Dhanaraj Thakur, *A Lie Can Travel: Election Disinformation in the United States, Brazil, and France*, Center for Democracy and Technology, and Konrad Adenauer Stiftung (Dec. 2021), https://cdt.org/insights/cdt-and-kas-report-a-lie-can-travel-election-disinformation-in-the-united-states-brazil-and-france/.

[394] Joseph B. Bak-Coleman, et al., *Combining interventions to reduce the spread of viral misinformation* (May 23, 2021), https://osf.io/preprints/socarxiv/4jtvm.

[395] Kate Starbird, Twitter Post (Aug. 25, 2021), https://twitter.com/katestarbird/status/1430568134927208455?s=03. *See also* Mohan, *supra* note 234 (acknowledging YouTube's challenge to address this issue and suggesting use of interstitials before viewers can watch "a borderline embedded or linked video").

[396] *See* Zeve Sanderson, et al., *Twitter flagged Donald Trump's tweets with election misinformation: They continued to spread both on and off the platform*, Harvard Kennedy School Misinformation Rev. (Aug. 24, 2021), https://misinforeview.hks.harvard.edu/article/twitter-flagged-donald-trumps-tweets-with-election-misinformation-they-continued-to-spread-both-on-and-off-the-platform/.

[397] *See* Ellen P. Goodman, *The Stakes of User Interface Design for Democracy* (Jul. 7, 2021), http://dx.doi.org/10.2139/ssrn.3882012.  *See also* Sanderson, *supra* note 396; Will Oremus, *Facebook and YouTube's misinformation problem is simpler than it seems*, The Washington Post (Jul. 21, 2021), https://www.washingtonpost.com/technology/2021/07/21/facebook-youtube-vaccine-misinfo/.

[398] *See* Niva Elkin-Koren, *Contesting algorithms: Restoring the public interest in content filtering by artificial intelligence*, Big Data & Society (Jul. 29, 2020), https://doi.org/10.1177/2053951720932296; Mayaan Perel and Niva Elkin-Koren, *Separation of Functions for AI: Restraining Speech Regulation by Online Platforms*, 24 Lewis & Clark Law Rev. 857 (2020), http://dx.doi.org/10.2139/ssrn.3439261.

PX0526-070

divided camps rather than maximizing engagement; and Local Voices Network, which helps
community organizations facilitate constructive discussions.[399]

### Uncovering networks and actors

Another way that platforms use AI tools to address online harms focuses not on the approach of
identifying individual pieces of content but on finding the networks and actors behind them.
With the aid of human intelligence about threats like criminal activity, TVEC, and election
disinformation, sophisticated tools can map out patterns, signals, and behavioral indicators across
many pieces of content and even across platforms.[400] For example, the Social Sifter project of
North Carolina State University's Laboratory for Analytic Sciences involves using machine
learning models to identify, track, and model foreign influence operations across social media
platforms.[401] Google's Jigsaw and Facebook both make efforts to map and address coordinated
inauthentic behavior (CIB).[402] Cross-platform mapping of certain communities, like those
spreading online hate, is important because their members don't stay on one platform and move
increasingly to smaller platforms featuring less content moderation.[403] However, tools that
capture CIB may inadvertently ensnare minority groups or others who use protective methods to
communicate on social media or via messaging apps about authoritarian regimes.[404]

---

[399] *See* Aspen Institute, *supra* note 8 at 47. *See also* https://pol.is/home; Audrey Tang, *A Strong Democracy Is a Digital Democracy*, The New York Times (Oct. 15, 2019), https://www.nytimes.com/2019/10/15/opinion/taiwan-digital-democracy.html; https://cortico.ai/local-voices-network/; https://news.mit.edu/2021/center-constructive-communication-0113.

[400] DARPA announced in May 2022 that it will explore the use of AI to map flows and identify patterns of influence operations across platforms. *See* https://sam.gov/opp/a28c282ea87f42568492247671580d0a/view. *See also* Elliott Waissbluth, et al., *Domain-Level Detection and Disruption of Disinformation* (May 6, 2022), https://arxiv.org/pdf/2205.03338v1.pdf; Samuel Woolley, *How Can We Stem the Tide of Digital Propaganda?*, CIGI (Jul. 5, 2021), https://www.cigionline.org/articles/how-can-we-stem-the-tide-of-digital-propaganda/; *Terrorism and Social Media: #IsBigTechDoingEnough?*, Sen. Comm. on Commerce, Science, and Transportation, 115th Cong. (2018) (testimony of Clint Watts), https://www.commerce.senate.gov/services/files/12847244-A89D-4A68-A6A5-CF9CB547E35B.

[401] *See* https://symposium.ncsu-las.net/influence.html. *See also* Diogo Pacheco, et al., *Uncovering Coordinated Networks on Social Media: Methods and Case Studies*, Proc. AAAI Intl. Conf. on Web and Social Media (Apr. 7, 2021) (complementing measures to detect individual bot-driven or abusive accounts by looking at unexpectedly similar behavior of groups of actors, regardless of intent or automation), https://arxiv.org/abs/2001.05658.

[402] *See* Jigsaw, *Hate "Clusters" Spread Disinformation Across Social Media. Mapping Their Networks Could Disrupt Their Reach*, Medium (Jul. 28, 2021), https://medium.com/jigsaw/hate-clusters-spread-disinformation-across-social-media-995196515ca5; Nathaniel Gleicher, *Removing New Types of Harmful Networks*, Facebook (Sep. 16, 2021), https://about.fb.com/news/2021/09/removing-new-types-of-harmful-networks/.

[403] *See, e.g.*, Alexandra T. Evans and Heather J. Williams, *How Extremism Operates Online* at 14, RAND Corp. (Apr. 2022), https://www.rand.org/pubs/perspectives/PEA1458-2.html; Jigsaw, *supra* note 187; Candace Rondeaux, et al., *Parler and the Road to the Capitol Attack*, New America Future Frontlines (Jan. 5, 2022), https://www.newamerica.org/future-frontlines/reports/parler-and-the-road-to-the-capitol-attack/i-introduction. *See also* Drew Harwell and Will Oremus, *Only 22 saw the Buffalo shooting live. Millions have seen it since*, The Washington Post (May 16, 2022), https://www.washingtonpost.com/technology/2022/05/16/buffalo-shooting-live-stream/.

[404] *See* Zelly Martin, et al., *The K-Pop Fans Who Have Become Anti-Authoritarian Activists in Myanmar*, Slate (Oct. 21, 2021), https://slate.com/technology/2021/10/k-pop-fans-myanmar-activists.html.

### Amplification of trustworthy content and counter-disinformation campaigns

An indirect way to address online harms is to increase user engagement with broadly trusted sources. Platforms and others can do so by generally amplifying such sources or specifically targeting those subject to harmful content or disinformation campaigns.[405] The State Department has expressed strong support of counter-disinformation measures, including debunking of false information.[406] The Surgeon General has advocated for technology firms to amplify information from trusted sources,[407] and both Facebook and YouTube have stated that they do so.[408] Dr. Erin Saltman of GIFCT has noted that providing counter-narratives or off-ramps to better information can be especially helpful for people who may be at high risk of succumbing to falsehoods but have not yet been converted to such views.[409] An example of this approach — one that relies in part on machine learning — is the Redirect Method, used by Moonshot and Google Jigsaw and discussed above in connection with TVEC.[410] Jigsaw and others are also studying the efficacy of prebunking, i.e., using technological tools to inoculate people against things like radicalization, extremism, and racism.[411] Two concerns with amplifying trustworthy content — or targeting and redirecting people to it — are who gets to decide what sources are authoritative, and to what extent will users believe them to be so.

## F.  User tools

Some platform design features and third-party services are or could be made available to help individuals avoid harmful or sensitive content on their own. Unlike the back-end interventions

---

[405] While the focus of such measures is often on platforms, others advocate for the primary role of civil society organizations in counter-disinformation measures. *See* Kevin Shieves, *How to Support a Globally Connected Counter-Disinformation Network*, War on the Rocks (Jan. 20, 2022) (noting that some of these groups use algorithms and other advanced tools and that generally they need appropriate data access, training, and funding), https://warontherocks.com/2022/01/how-to-support-a-globally-connected-counter-disinformation-network/.

[406] *See* https://www.state.gov/Disarming-Disinformation/.

[407] *See* Surgeon General, *supra* note 242 at 12.

[408] *See* https://about.fb.com/news/2018/01/trusted-sources/; https://blog.youtube/inside-youtube/tackling-misinfo; https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

[409] Saltman, et al., *New Models for Deploying Counterspeech, supra* note 185.

[410] *See* https://moonshotteam.com/the-redirect-method/; https://jigsaw.google.com/the-current/white-supremacy/countermeasures/; Emily Dreyfuss, *Hacking Online Hate Means Talking to the Humans Behind It*, WIRED (Jun. 8, 2017), https://www.wired.com/2017/06/hacking-online-hate-means-talking-humans-behind/.

[411] *See, e.g.,* Ullrich K. H. Ecker, et al., *The psychological drivers of misinformation belief and its resistance to correction*, Nature Reviews Psychology 1: 13-29 (Jan. 12, 2022), https://www.nature.com/articles/s44159-021-00006-y; NATO Strategic Communications Centre of Excellence, *Inoculation Theory and Misinformation* (Oct. 2021), https://stratcomcoe.org/pdfjs/?file=/publications/download/Inoculation-theory-and-Misinformation-FINAL-digital-ISBN-ebbe8.pdf?zoom=page-fit; Beth Goldberg, *Psychological Inoculation: New Techniques for Fighting Online Extremism*, Jigsaw (Jun. 24, 2021), https://medium.com/jigsaw/psychological-inoculation-new-techniques-for-fighting-online-extremism-b156e439af23; John Roozenbeek, et al., *Prebunking interventions based on "inoculation" theory can reduce susceptibility to misinformation across cultures*, Harvard Kennedy School Misinformation Rev. (Feb. 3, 2020), https://misinforeview.hks.harvard.edu/article/global-vaccination-badnews/.

PX0526-072

described above, we refer here to tools that give users options for content control.[412] To the extent these tools involve identifying such content beyond techniques such as keyword searches or hash-matching, it is possible, if not likely, that AI would be working in the background.

In its open internet principles, Twitter advocated for prioritizing "human choice and control" over algorithms.[413] In 2021, its former CEO advocated for building a "marketplace" of social media algorithms,[414] and it announced that it would allow third-party developers to build programs atop Twitter to help, for example, with promoting healthy conversations.[415] The company has also rolled out and suggested ideas for new tools that would filter and limit potentially harmful replies and comments that users don't want to see.[416] One third-party app currently working on Twitter is Block Party, which attempts to filter harassing comments.[417] Instagram, too, has introduced features to help users hide or block potentially harmful content appearing in comments or direct messages.[418] Frustrated users of the Twitch gaming platform have created their own tools designed to limit harassment and hate in the user chat feature.[419]

Stanford University Professor Francis Fukuyama has proposed that an answer for harms attributable to social media platforms would be an open market in which users choose between independent filtering services, rather than rely on a platform's algorithmic determinations of what one will see.[420] A group of experts debated this "middleware" proposal in a set of articles in the Journal for Democracy and a follow-up conference.[421] Some expressed cautious optimism,

---

[412] *See, e.g.*, CFDD, *supra* note 224 at 18 (advocating for introduction of such tools); Aspen Institute, *supra* note 8 at 66-67 (same).

[413] *See* Twitter, *Protecting the Open Internet*, *supra* note 377 at 3. *See also* Kate Conger, *Twitter Wants to Reinvent Itself, by Merging the Old with the New*, The New York Times (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/technology/twitter-platform-rethink.html; Field, supra note 319 (comments of Twitter's Rumman Chowdhury supporting "algorithmic choice" for consumers despite implementation challenges).

[414] *See* Jacob Kastrenakes, *Twitter's Jack Dorsey wants to build an app store for social media algorithms*, The Verge (Feb. 9, 2021), https://www.theverge.com/2021/2/9/22275441/jack-dorsey-decentralized-app-store-algorithms.

[415] *See* https://blog.twitter.com/developer/en_us/topics/tools/2021/build-whats-next-with-the-new-twitter-developer-platform.

[416] *See* https://blog.twitter.com/en_us/topics/product/2021/introducing-safety-mode; Ian Carlos Campbell, *Twitter seeking input as it explores Filter and Limit controls on tweets*, WIRED (Sep. 24, 2021), https://www.theverge.com/2021/9/24/22692264/twitter-filter-limit-tweet-replies-automatic.

[417] *See* https://www.blockpartyapp.com/.

[418] *See, e.g.*, https://about.instagram.com/blog/announcements/introducing-new-ways-to-protect-our-community-from-abuse; https://about.instagram.com/blog/announcements/introducing-sensitive-content-control.

[419] *See* Ash Parrish, *How to stop a hate raid*, The Verge (Aug. 20, 2021), https://www.theverge.com/22633874/how-to-stop-a-hate-raid-twitch-safety-tools.

[420] *See* Francis Fukuyama, *Making the Internet Safe for Democracy*, Journal of Democracy 32:2 (Apr. 2021), https://muse.jhu.edu/article/787834. *See also* Future of Tech Commission, *supra* note 297 at 31.

[421] *See* Journal of Democracy 32:3 (Jul. 2021), https://muse.jhu.edu/issue/44978; Richard Reisman, *Progress Toward Re-Architecting Social Media to Serve Society*, Tech Policy Press (Dec. 1, 2021), https://techpolicy.press/progress-toward-re-architecting-social-media-to-serve-society/.

pointing to similar ideas in the past,[422] but others see no viable business model, technological impediments, or problems with speech, privacy, and competition.[423] Although middleware may be mostly an idea only, a relatively new third-party service that might qualify is Preamble, an AI-based option for Twitter that adjusts rankings in accord with users' selections of "values providers."[424]

Tools that give users more control and information, along with amplifying trustworthy content and engaging in debunking and prebunking efforts, are all closely aligned with the idea of promoting digital literacy. An important element of a whole-of-society approach to countering online harms, digital literacy is the subject of many projects, policy proposals, and research.[425] Two recent studies indicate that improving digital literacy skills shows promise against different kinds of online disinformation.[426] Further, reports commissioned by DHS stress that building public resilience to such content may ultimately be more effective than focusing on technological solutions.[427] One application, supported by both DHS and the State Department, is a free browser game, Harmony Square, which draws on "inoculation theory" to get people to appreciate techniques used in online misinformation surrounding elections and thus make them

---

[422] *See, e.g.*, Mike Masnick, *Protocols, Not Platforms: A Technological Approach to Free Speech*, Knight First Amendment Institute (Aug. 21, 2019), https://knightcolumbia.org/content/protocols-not-platforms-a-technological-approach-to-free-speech; Stephen Wolfram, *Testifying at the Senate about A.I.-Selected Content on the Internet* (Jun. 25, 2019), https://writings.stephenwolfram.com/2019/06/testifying-at-the-senate-about-a-i-selected-content-on-the-internet/.

[423] *Id.*

[424] *See* https://www.preamble.ai/about-us.

[425] *See, e.g.*, Future of Tech Commission, *supra* note 297 at 14, 20, 23; Royal Society, *supra* note 359 at 21, 84; Aspen Institute, *supra* note 8 at 64-68; Kristin M. Lord and Katya Vogt, *Strengthen Media Literacy to Win the Fight Against Misinformation*, Stanford Soc. Innov. Rev. (Mar. 18, 2021), https://ssir.org/articles/entry/strengthen_media_literacy_to_win_the_fight_against_misinformation#; P.W. Singer and Michael McConnell, *Want to Stop the Next Crisis? Teaching Cyber Citizenship Must Become a National Priority*, TIME (Jan. 21, 2021), https://time.com/5932134/cyber-citizenship-national-priority/. Of course, educational efforts have their limits, as even the most digitally literate consumers cannot reasonably avoid all types of online harms. *See* Monica Bulger and Patrick Davison, *The Promises, Challenges and Futures of Media Literacy*, J. of Media Literacy Education 10(1) (2018), https://digitalcommons.uri.edu/cgi/viewcontent.cgi?article=1365&context=jmle.

[426] *See* Bertie Vidgen, et al., *Understanding vulnerability to online misinformation* 5-6, The Alan Turing Institute (Mar. 2021), https://www.turing.ac.uk/sites/default/files/2021-02/misinformation_report_final1_0.pdf; Andrew M. Guess, et al., *A digital media literacy intervention increases discernment between mainstream and false news in the United States and India*, PNAS 117(27): 15536-45 (Jul. 7, 2020), www.pnas.org/cgi/doi/10.1073/pnas.1920498117.

[427] *See* DHS Analytic Exchange Program, *Combatting Targeted Disinformation Campaigns, Part Two* at 38-43; DHS, *Increasing Threat of Deepfake Identities*, *supra* note 43 at 31. As Lawrence Krauss theorized, the internet will continue to "propagate out of control" no matter what businesses and governments do, so "becoming your own filter will become the challenge of the future." Lawrence Krauss, *Lo and Behold*, directed by Werner Herzog. Chicago: Saville Productions, 2016.

PX0526-074

better able to resist it.[428] Some countries, including the United Kingdom, are incorporating digital literacy as part of concerted national strategies.[429]

## G.  Availability and scalability

We have noted already some of the problems with the fact that only a few large technology companies are responsible for most of the AI tools within the scope of this report. For any such tool that is effective and fair, another problem with this concentration is that others who may need the tool, like smaller platforms or investigative journalists, won't necessarily have access to it or the resources to create their own.[430] Twitter even discusses this problem in its open internet principles, advocating for more accessibility and regretting that such technology remains in "proprietary silos" and that this fact perpetuates the domination of a few companies.[431]

Greater access to these tools does carry risk. For example, while sharing an algorithm may not involve exposure of personal information, sharing the dataset used to create an AI model could implicate privacy concerns. Such concerns may be more acute when the sharing is with other commercial actors as opposed to vetted researchers or certified auditors. Sharing technology and information also risks cross-site censorship.[432] Further, the more widely a detection or mitigation

---

[428] *See* Jon Roozenbeek and Sander Van Der Linden, *Breaking Harmony Square: A game that "inoculates" against political misinformation*, Harvard Kennedy School Misinformation Rev. (Nov. 6, 2020), https://misinforeview.hks.harvard.edu/article/breaking-harmony-square-a-game-that-inoculates-against-political-misinformation/. *See also* Nicholas Micallef, et al., *Fakey: A Game Intervention to Improve News Literacy on Social Media,* Proc. ACM Hum.-Comput. Interact., Vol. 5, No. CSCW1 (Apr. 2021), https://dl.acm.org/doi/10.1145/3449080.

[429] *See* https://www.gov.uk/government/publications/online-media-literacy-strategy; Amy Yee, *The country inoculating against disinformation*, BBC Future (Jan. 30, 2022) (showing the positive effects of such efforts in Estonia), https://www.bbc.com/future/article/20220128-the-country-inoculating-against-disinformation.

[430] *See, e.g.,* UK Dept. for Digital, Culture, Media & Sport, *Understanding how platforms with video-sharing capabilities protect users from harmful content online* (Aug. 2021), https://www.gov.uk/government/publications/understanding-how-platforms-with-video-sharing-capabilities-protect-users-from-harmful-content-online; Royal Society, *supra* note 359 at 18, 82. These needs are often discussed in the TVEC and deepfake contexts. *See, e.g.,* also DHS, *Increasing Threat of Deepfake Identities*, *supra* note 43 at 31; Tech Against Terrorism, *GIFCT Technical Approaches Working Group Gap Analysis and Recommendations* at 24-25; Jacob Berntsson and Maygane Janin, *Online Regulation of Terrorist and Harmful Content*, Lawfare (Oct. 14, 2021), https://www.lawfareblog.com/online-regulation-terrorist-and-harmful-content; OECD, *Transparency Reporting on Terrorist and Violent Content Online*, *supra* note 190 at 12; EPRS, *Tackling deepfakes in European policy*, *supra* note 43 at 59.

[431] *See* Twitter, *Protecting the Open Internet*, *supra* note 377 at 8.

[432] *See* Emma Llansó, *Content Moderation Knowledge Sharing Shouldn't Be a Backdoor to Cross-Platform Censorship*, TechDirt (Aug. 21, 2020), https://www.techdirt.com/articles/20200820/08564545152/content-moderation-knowledge-sharing-shouldnt-be-backdoor-to-cross-platform-censorship.%E2%80%A6.

PX0526-075

tool is shared, the easier it will be for bad actors to exploit, meaning that dissemination should be controlled carefully.[433]

## H. Content authenticity and provenance

Given the many difficulties with using AI or other automated means to detect harmful content, it makes sense to focus on the flip side: authentication. While authentication tools do not necessarily help with every harm listed by Congress, they can be widely used to help determine the true source of content and whether text, images, audio, or video are deepfakes (see above) or have been otherwise manipulated. Indeed, multiple federal government reports state that these tools are key for challenging foreign disinformation and deepfakes.[434] Experts from the State Department and elsewhere have pointed to blockchain technology as a means of determining content authenticity.[435] Authentication could also help counteract the Liar's Dividend, a problem discussed above, in that it would be harder for public figures to claim falsely that audio or video content is fake if one could point to technological markers that it is real and unaltered.

A major collaborative effort to advance authentication tools is the Coalition for Content Provenance for Authenticity (C2PA), formed in early 2021 by merging two other coordinated efforts, the Content Authenticity Initiative (led by Adobe) and Project Origin (led by Microsoft and the BBC). The goal of this coalition is to create an "open technical standard providing publishers, creators, and consumers the ability to trace the origin of different types of media."[436] In January 2022, it released technical specifications and guidance documents.[437]

Of course, proving that content has not been altered and comes from its claimed origin does not prove the truth of the content itself. Further, and just like detection technology, these tools are fallible, and it would be problematic if people were either too distrustful of content that had no authenticity markers or too trusting of content that did. For example, authentication does not help

---

[433] This issue is discussed above in the part of Section I on deepfakes. *See also* Sam Gregory, et al., *Governing Access to Synthetic Media Detection Technology*, Tech Policy Press (Sep. 7, 2021), https://techpolicy.press/governing-access-to-synthetic-media-detection-technology/; EPRS, *Tackling deepfakes in European policy*, *supra* note 43 at 59 .

[434] *See* NSCAI, *Final Report*, *supra* note 3 at 48; DHS, *Increasing Threat of Deepfake Identities*, *supra* note 43 at 31; EPRS, *Tackling deepfakes in European policy*, *supra* note 43 at 20, 65. *See also* Jaiman, *supra* note 62; Engler, *supra* note 62.

[435] *See* J.D. Maddox, et al., *Toward a More Ethical Approach to Countering Disinformation Online*, Public Diplomacy 23(12) (Jul. 1, 2020), https://static1.squarespace.com/static/5be3439285ede1f05a46dafe/t/5efd72972af517215e330cdd/1593668272484/E THICS+IN+DIPLOMACY+Final.pdf. *See also* Kathryn Harrison and Amelia Leopold, *How Blockchain Can Help Combat Disinformation*, Harvard Bus. Rev. (Jul. 19, 2021), https://hbr.org/2021/07/how-blockchain-can-help-combat-disinformation; Haya R. Hasan and Khaled Salah, *Combating Deepfake Videos Using Blockchain and Smart Contracts*, IEEE Access 7:41596 (Feb. 25, 2019), https://ieeexplore.ieee.org/stamp/stamp.jsp?arnumber=8668407. The News Provenance Project is also exploring the use of blockchain as a way to store contextual information about news photos. *See* https://www.newsprovenanceproject.com/a-solution.

[436] *See* https://c2pa.org/.

[437] *See* https://contentauthenticity.org/blog/milestones-in-digital-content-provenance-specification-open-source-projects.

PX0526-076

with "shallowfakes" — when malicious actors upload real and unaltered media but change the context and claim it depicts different people at different places or times.[438] It is also possible that people could abuse these tools, extracting data from them and using them for surveillance.[439]

As authentication tools advance, and especially as they scale, it is important to ensure that they enhance trust and freedom of expression, not harm it. Sam Gregory, Program Director of WITNESS, points out that human rights activists, lawyers, media outlets, and journalists "often depend for their lives on the integrity and veracity of images they share from conflict zones, marginalized communities and other places threatened by human rights violations."[440] Sometimes, however, whether to protect themselves or their subjects, they may need to use pseudonyms, blur faces, or obscure locations.[441] We would not want authentication systems to block the resulting videos or for viewers to ignore them because they lack certain markers.

## I.  Legislation

Legislative efforts around the world may reflect that the only effective ways to deal with online harm are laws that change the business models or incentives allowing harmful content to proliferate. Under debate in Congress are, among other things, proposals involving Section 230 of the Communications Decency Act, data privacy, and competition. Some of these proposals give the FTC new responsibilities. Nonetheless, Congress did not seek recommendations on how to deal with online harm generally, so these proposals are beyond the bounds of this report.

The Congressional request is narrower. It asks the FTC to recommend laws that would "advance the adoption and use of artificial intelligence to address" the listed online harms. In fact, platforms and others already use AI tools to attempt to address most of those harms, but these tools are often neither robust nor fair enough to mandate or encourage their use. We look instead to the development of legal frameworks that would help ensure that such use of AI does not itself cause harm.[442]

---

[438] *See* Bobbie Johnson, *Deepfakes are solvable—but don't forget that "shallowfakes" are already pervasive*, MIT Tech. Rev. (Mar. 25, 2019), https://www.technologyreview.com/2019/03/25/136460/deepfakes-shallowfakes-human-rights/.

[439] *See* Sam Gregory, *Tracing trust: Why we must build authenticity infrastructure that works for all*, WITNESS Blog (May 2020), https://blog.witness.org/2020/05/authenticity-infrastructure/.

[440] *Id.*

[441] *See id.*

[442] While some existing laws may provide guardrails for some harms caused by some AI tools discussed herein, those laws are insufficient. *See, e.g.*, Slaughter, *supra* note 13 at 48; Andrew D. Selbst, *Negligence and AI's Human Users*, 100 B.U. L. Rev. 1315 (2020), https://www.bu.edu/bulawreview/files/2020/09/SELBST.pdf; Yavar Bathaee, *The Artificial Intelligence Black Box and the Failure of Intent and Causation*, Harv. J. L. & Tech. 31:2 (2018), https://jolt.law.harvard.edu/assets/articlePDFs/v31/The-Artificial-Intelligence-Black-Box-and-the-Failure-of-Intent-and-Causation-Yavar-Bathaee.pdf.

PX0526-077

Congress should generally steer clear of laws that require, assume the use of, or require companies to deploy AI tools to detect harmful content.[443] As discussed above, such tools are rudimentary and can result in bias and discrimination. Further, laws that push platforms to rapidly remove certain types of harmful content may not survive First Amendment scrutiny in any event, as they would tend both to result in the overblocking of lawful speech and impinge on platform discretion to determine editorial policies,[444] concerns that do not prevent such laws in countries without that constitutional restriction.[445] We note also that asking platforms and other private actors to make quick decisions about the illegality of content is in jarring contrast to the amount of time and deliberation that courts and agencies use to make similar decisions.[446] On the other hand, some of these concerns are less present for certain categories like CSAM, fraud, and illegal product sales, as to which quick takedown requirements may be desirable and less controversial.

For any law that does address AI use and online harm, three critical considerations are definitions, coverage, and offline effects. First, difficulties arise in defining both technological terms and the harms to be addressed. As explained above, definitions of terms like AI and algorithm are highly problematic because of their ambiguity and breadth. Congress can employ better terminology as applicable, like Rashida Richardson's specific proposal to use "automated

---

[443] *See, e.g.*, Shenkman, *supra* note 224 at 36; Gorwa, *supra* note 224 at 2-3; Bloch-Wehba, *supra* note 240 at 74-87; Duarte, *supra* note 258 at 14-15.

[444] *See, e.g.*, Future of Tech Commission, *supra* note 297 at 19, 21; Daphne Keller, *Amplification and Its Discontents*, Knight First Amendment. Institute (Jun. 8, 2021), https://knightcolumbia.org/content/amplification-and-its-discontents; Emma Llansó, et al., *Artificial Intelligence, Content Moderation, and Freedom of Expression*, Transatlantic Working Group (Feb. 26, 2020) (arguing that governments should "resist simplistic narratives about all-powerful algorithms or AI as being the sole cause of, or solution to, the spread of harmful content online"), https://cdn.annenbergpublicpolicycenter.org/wp-content/uploads/2020/06/Artificial_Intelligence_TWG_Llanso_Feb_2020.pdf; Singh, *Everything in Moderation*, *supra* note 224 at 33; Daphne Keller, *Internet Platforms: Observations on Speech, Danger, and Money*, Hoover Institution Aegis Paper Series (Jun. 3, 2018), https://www.hoover.org/research/internet-platforms-observations-speech-danger-and-money.

[445] Several foreign laws and proposals effectively mandate algorithmic detection methods and quick takedowns for certain types of content. *See, e.g.*, Daphne Keller, *Five Big Problems with Canada's Proposed Regulatory Framework for "Harmful Online Content,"* Tech Policy Press (Aug. 31, 2021), https://techpolicy.press/five-big-problems-with-canadas-proposed-regulatory-framework-for-harmful-online-content/?s=03; evelyn douek, *Australia's "Abhorrent Violent Material" Law: Shouting "Nerd Harder" and Drowning Out Speech*, 94 Australian L. J. 41 (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3443220; Bloch-Wehba, *supra* note 240 at 83-85; Elkin-Koren, *Contesting Algorithms*, *supra* note 240 at 2-3; https://www.article19.org/resources/does-the-digital-services-act-protect-freedom-of-expression/; https://www.liberties.eu/en/stories/terrorist-content-regulation-open-letter-to-meps/43410; Joris van Hoboken, *The Proposed EU Terrorism Content Regulation*, Transatlantic Working Group (May 3, 2019), https://cdn.annenbergpublicpolicycenter.org/wp-content/uploads/2020/05/EU_Terrorism_Regulation_TWG_van_Hoboken_May_2019.pdf.

[446] *See, e.g.*, Jacob Mchangama, *Rushing to Judgment: Examining Government Mandated Content Moderation*, Lawfare (Jan. 26, 2021), https://www.lawfareblog.com/rushing-judgment-examining-government-mandated-content-moderation.

PX0526-078

decision systems," or it can attempt to avoid the issue by focusing on outcomes and impacts.[447] Defining any given harm can also be problematic, however, such as when it has no existing definition in federal law, when a legal definition exists but does not translate to the online context, or when the harm itself is amorphous and subject to different meanings depending on the context. Second, the law's scope is also crucial. What parts of the tech stack are covered? If limited to social media companies, should it distinguish between such companies based on size, and how should size be measured?[448] Any law that effectively mandates automated tools could serve to benefit the few platforms that have the financial and technological means of compliance, increasing the barriers that new entrants would need to overcome.[449] Congress should also consider generational changes in what people use to communicate online and avoid covering only services that a particular generation is using right now and that might diminish in popularity over time.[450] Third, online harms have offline dimensions, not only because harmful events in the physical world serve as the impetus for online content but also because — as noted above in the discussion of hate speech — online content can have serious offline consequences. Legislators should thus avoid treating online harm in isolation.

As previewed above, we believe any initial legislative focus should prioritize the transparency and accountability of platforms and others that build and use automated systems to address online harms. Again, while this approach may not itself solve or reduce those harms, it would allow policymakers, researchers, and the public to understand the use and impact of those tools and provide evidence for what measures should follow.[451] While some platforms provide helpful information, at this point it seems clear that only legislation will allow us to crack open the black boxes of content moderation and the nesting black boxes of AI tools powering it.

The view that we need laws relating to algorithmic transparency and accountability — particularly for social media platforms and other technology companies — typically includes calls for: (1) public disclosure of information, including policies and data on the use and impact of AI systems; (2) researcher access to additional information; (3) protections for whistleblowers, auditors, researchers, and journalists; (4) requirements for audits and impact assessments; and (5) systems for flagging violative content and for notice, appeal, and redress for

---

[447] *See* Richardson, *Defining and Demystifying ADS*, *supra* note 7; Lum and Chowdhury, *What is an algorithm*, *supra* note 6; Spandana Singh, *Regulating Platform Algorithms*, New America (Dec. 1, 2021) (comparing current EU and US approaches to regulating platform algorithms), https://www.newamerica.org/oti/briefs/regulating-platform-algorithms/.

[448] *See* Eric Goldman and Jess Miers, *Regulating Internet Services by Size*, CPI Antitrust Chronicle, Santa Clara Univ. Legal Studies Research Paper (May 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3863015.

[449] *See, e.g.*, Bloch-Wehba, *supra* note 240 at 47, 87.

[450] *See* Mark MacCarthy, *Coming Soon to a Podcast, an App Store and a Metaverse Near You….Content Moderation Rules*, Forbes (Feb. 3, 2022), https://www.forbes.com/sites/washingtonbytes/2022/02/03/coming-soon-to-a-podcast-an-app-store-and-a-metaverse-near-you-content-moderation-rules/.

[451] *See* evelyn douek, *Content Moderation as Administration*, 136 Harv. L. Rev. __ (forthcoming 2022) (arguing that pursuing regulation focusing on accountability is a first, pragmatic step towards any substantive reform), https://ssrn.com/abstract=4005326.

PX0526-079

individuals affected by content removal or non-removal decisions.[452] We agree that each of these elements would be valuable components of any relevant legislation, but we would urge Congress to carefully consider the privacy and security risks that accompany enhanced access to data.[453] Two recent, noteworthy proposals for legislation are from Stanford University Professor Nathan Persily and Deborah Raji and concern mandated but controlled data access for researchers and

---

[452] *See, e.g.*, Slaughter, *supra* note 13 at 48-51; Future of Tech Commission, *supra* note 297 at 13, 22; Competition and Markets Authority, *supra* note 74 at 49-50; CFDD, *supra* note 224 at 26-29; Brennan Center for Justice, *supra* note 257 at 18-23; Paul M. Barrett, et al., *Fueling the Fire: How Social Media Intensifies U.S. Political Polarization —And What Can Be Done About It*, NYU Stern Center for Business and Human Rights at 23-24 (Sep. 2021), https://bhr.stern.nyu.edu/polarization-report-page; Singh and Doty, *Cracking Open the Black Box*, *supra* note 310 at 33-35; Llansó, *Artificial Intelligence, Content Moderation, and Freedom of Expression*, *supra* note 444 at 25; Bloch-Wehba, *supra* note 240 at 87-94; Daphne Keller, *Some Humility about Transparency*, The Center for Internet and Society (Mar. 19, 2021) (referring to effects on midsized or small platforms), http://cyberlaw.stanford.edu/blog/2021/03/some-humility-about-transparency. Amba Kak and Rashida Richardson, *Artificial Intelligence Policies Must Focus on Impact and Accountability* (May 1, 2020), https://www.cigionline.org/articles/artificial-intelligence-policies-must-focus-impact-and-accountability/; evelyn douek, *Facebook's White Paper on the Future of Online Content Regulation: Hard Questions for Lawmakers*, Lawfare (Feb. 18, 2020), https://www.lawfareblog.com/facebooks-white-paper-future-online-content-regulation-hard-questions-lawmakers; Mark MacCarthy, *How online platform transparency can improve content moderation and algorithmic performance*, Brookings TechTank (Feb. 17, 2021), https://www.brookings.edu/blog/techtank/2021/02/17/how-online-platform-transparency-can-improve-content-moderation-and-algorithmic-performance/; Mark McCarthy, *Transparency Requirements for Digital Social Media Platforms: Recommendations for Policy Makers and Industry*, Transatlantic Working Group (Feb. 12, 2020), https://www.ivir.nl/publicaties/download/Transparency_MacCarthy_Feb_2020.pdf; *Task Force on Artificial Intelligence*, *supra* note 316 (testimony of Meredith Broussard, Miriam Vogel, and Aaron Cooper); *H. Comm. on Science, Space, and Technology* (testimony of Meredith Whittaker), *supra* note 252 at 12-15; Twitter, *Protecting the Open Internet* , *supra* note 377 at 5-10 (regulation should focus on "system-wide processes," noting that problems stem from "platform design choices that are dictated by business models," and arguing that transparency and accountability methods would let us know what kind of laws and interventions would actually be effective). *But see* Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 Hastings L. J. __ (2022) (forthcoming) (arguing that laws mandating editorial transparency may violate the First Amendment and that legal reform should focus on certified and independent audits, researcher scraping, and increased digital citizenship education), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4005647.

[453] Several of these elements are key provisions of both the European Union's proposed Digital Services Act and the United Kingdom's Online Safety Bill. *See* https://www.europarl.europa.eu/news/en/press-room/20211210IPR19209/digital-services-act-safer-online-space-for-users-stricter-rules-for-platforms; https://publications.parliament.uk/pa/jt5802/jtselect/jtonlinesafety/129/12902 htm?s=03. *See also* Alex Engler, *Platform data access is a lynchpin of the EU's Digital Services Act*, Brookings TechTank (Jan. 15, 2021), https://www.brookings.edu/blog/techtank/2021/01/15/platform-data-access-is-a-lynchpin-of-the-eus-digital-services-act/.

PX0526-080

auditors, respectively.[454] Definitions and standard-setting are also important in this area and should not be limited to technical disciplines and concepts.[455]

We are aware of, and are encouraged by, Congressional bills that move in these directions, and we would be happy to engage with Congress on any such bills that proceed. Indeed, some of these bills provide roles for the FTC, as to which we express hope that Congress will consider addressing relevant agency resource needs in conjunction with adding any new responsibilities.

## V. CONCLUSION

"Platforms dream of electric shepherds," says Tarleton Gillespie, expressing skepticism that automation can replace humans in addressing harmful online content.[456] Legislators and regulators with similar dreams should remain skeptical as well. Dealing effectively with online harms requires substantial changes in business models and practices, along with cultural shifts in how people use or abuse online services. These changes involve significant time and effort across society and can include, among other things, technological innovation, transparent and accountable use of that technology, meaningful human oversight, global collaboration, digital literacy, and appropriate regulation. AI is no magical shortcut.

---

[454] *See Social Media Platforms and the Amplification of Domestic Extremism and Other Harmful Content*, S. Comm. on Homeland Security and Governmental Affairs, 117th Cong. (2021) (testimony of Nathan Persily), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Persily-2021-10-28.pdf; Deborah Raji, *Third-Party Auditor Access for AI Accountability*, in Policy and AI: Four Radical Proposals for a Better Society, Stanford HAI (Nov. 2021) (also suggesting certifications, auditor oversight board, and national incident reporting system), video available at https://hai.stanford.edu/news/radical-proposal-third-party-auditor-access-ai-accountability.

[455] *See, e.g.*, Brandie Nonnecke and Philip Dawson, *Human Rights Implications of Algorithmic Impact Assessments*, Carr Center for Human Rights Policy, Harvard Kennedy School (Fall 2021), https://carrcenter.hks.harvard.edu/publications/human-rights-implications-algorithmic-impact-assessments-priority-considerations. Dr. Mona Sloane noted that the recent focus on audits means we need to define the term and specify its scope, or else we will "see lots of audit-washing in industry, lots of random audit-labeling in research, and no real change." Mona Sloane, Twitter Post (Dec. 22, 2021), https://twitter.com/mona_sloane/status/1473559128253546501?t=m1tLfxFzMnF373shIKTyKg&s=03.

[456] Gillespie, Custodians of the Internet, *supra* note 225 at 107-08.

PX0526-081

**Acknowledgements**

The drafter of this report is Michael Atleson of the Bureau of Consumer Protection. Additional acknowledgement goes to Sarah Myers West, Amba Kak, and Olivier Sylvain, all of whom are advisors to the Chair, as well as to Elisa Jillson, Robin Wetherill, Ellen Connelly, Daniele Apanaviciute, Tawana Davis, and Serena Viswanathan, all of whom are from the Bureau of Consumer Protection.

PX0526-082

# PX0527



Privacy and Safety Hub

Privacy ⌄    Safety ⌄    Transparency ⌄    News

Secondary Navigation ⌃

Transparency ⌄

## Snapchat Moderation, Enforcement, and Appeals

Community Guidelines Explainer Series
*Updated: August 2023*

Across Snapchat, we're committed to advancing safety while respecting the privacy interests of our community. We take a balanced, risk-based approach to combating harms — combining transparent content moderation practices, consistent and equitable enforcement, and clear communication to hold ourselves accountable for applying our policies fairly.

### Content Moderation

We've designed Snapchat with safety in mind, and this design is key in helping to prevent the spread of harmful content. Snapchat does not offer an open news feed where unvetted publishers or individuals have an opportunity to broadcast hate, misinformation, or violent content.

In addition to these design safeguards, we use a combination of automated tools and human review to moderate our public content surfaces (such as Spotlight, Public Stories, and Maps)––including machine learning tools and dedicated teams of real people––to review potentially inappropriate content in public posts.

On Spotlight, for example, where creators can submit creative and entertaining videos to share with the broader Snapchat community, all content is first reviewed automatically by artificial intelligence before gaining any distribution. Once a piece of content gains more viewership, it's then reviewed by human moderators before it is given the opportunity to reach a large audience. This layered approach to moderating

content on Spotlight reduces the risk of spreading misinformation, hate speech, or other potentially harmful content, in addition to promoting a fun, positive, and safe experience for everyone.

Similarly, editorial content that has been produced by media companies, such as Publisher Stories or Shows, is subject to a set of content guidelines—which prohibit the spread of misinformation, hate speech, conspiracy theories, violence, and many other categories of harmful content, holding these partners to elevated standards for safety and integrity. Additionally, we use proactive harm-detection technology on other public or high-visibility surfaces––such as Stories––to help identify harmful content, and we use keyword filtering to help prevent harmful content (such as accounts trying to advertise illicit drugs or other illegal content) from returning in search results.

Across all of our product surfaces, users can report accounts and content for potential violations of our Community Guidelines. We make it easy for Snapchatters to submit a confidential report directly to our Trust & Safety team, who are trained to evaluate the report; take appropriate action according to our policies; and notify the reporting party of the outcome––typically within a matter of hours. For more information about reporting harmful content or behavior, visit this resource on our Support Site. You can also learn more about efforts to identify and take down harmful content, and promote wellness and safety on Snapchat, here.

**Policy Enforcement @ Snap**

It's important to us at Snap that our policies promote consistent and fair enforcement. For this reason, we consider a combination of factors to determine the appropriate penalties for violations of the Community Guidelines. The most important of these factors are the severity of the harm

and any relevant history by the Snapchatter of previous violations.

We apply a risk-based approach to distinguish the most severe harms from other types of violations that may not rise to the same level of seriousness. For information about our enforcement of severe harms, and the types of violations that fall into that category, we've developed this resource.

Accounts we determine are used primarily to violate our Community Guidelines or to perpetrate serious harms will immediately be disabled. Examples include accounts engaged in serious bullying or harassment, impersonation, fraud, promotion of extremist or terrorist activity, or otherwise using Snap to engage in illegal activity.

For other violations of our Community Guidelines, Snap generally applies a three-part enforcement process:

- Step one: the violating content is removed.
- Step two: the Snapchatter receives a notification, indicating that they have violated our Community Guidelines, that their content has been removed, and that repeated violations will result in additional enforcement actions, including their account being disabled.
- Step three: our team records a strike against the Snapchatter's account.

A strike creates a record of violations by a particular Snapchatter. Every strike is accompanied by a notice to the Snapchatter; if a Snapchatter accrues too many strikes over a defined period of time, their account will be disabled.

This strike system ensures that Snap applies its policies consistently, and in a way that provides warning and education to users who violate our Community Guidelines. The primary goal of our policies is to ensure that everyone can enjoy using Snapchat in ways that reflect our values and mission; we have developed this enforcement framework to help support that goal at scale.

## Notice and Appeals Processes

To ensure that Snapchatters have a clear understanding of why an action has been taken against their account, and to provide an opportunity to meaningfully dispute the enforcement outcome, we have established Notice and Appeals processes that safeguard the interests of our community while protecting Snapchatters' rights.

To better understand why an enforcement action has been taken, please note that we apply our Community Guidelines and Terms of Service when we evaluate whether to enforce penalties against an account, and apply our Community Guidelines, Terms of Service, and Content Guidelines for Recommendation Eligibility to moderate Snaps posted to Discover and Spotlight.

For information about how our appeals processes work, we have developed support articles on account appeals and content appeals.

When Snapchat grants an appeal of an account lock, access to the Snapchatter's account will be restored. Whether or not the appeal is successful, we will notify the appealing party of our decision in a timely manner.

**Back to Community Guidelines**

**Back to Community Guidelines**

---

**Company**                **Community**                **Advertising**                **Legal**

Snap Inc.

Careers

News

Privacy and Safety

Snapchat Support

Pixy Support

Community
Guidelines

Snapchat Ads

Advertising Policies

Political Ads Library

Brand Guidelines

Promotions Rules

Other Terms &
Policies

Law Enforcement

Cookie Policy

Cookie Settings

Report Infringement

## Snap Inc.

Privacy Policy

Terms of Service

**Language**     English (US) ⌄

# PX0530

Help Center ⌃ Platform Use Guidelines ⌃ Report violations

# Report violations

This article provides an overview of how to report potential violations of the X Rules and Terms of Service.

<u>How to report directly from a post, List, or profile</u>

<u>How to report specific content in a Moment</u>

<u>How to report a X Space or person in a Space</u>

<u>How to report a product</u>

<u>How to report specific types of violations</u>

## How to report directly from a post, List, or profile

You can report directly from an individual post, List, or profile for certain violations, including: spam, abusive or harmful content, inappropriate ads, self-harm and impersonation. For information about reporting other types of violations, see the **How to report specific types of violations** section below.

**How to report individual posts for violations:**

Learn <u>how to report posts, Lists, or Direct Messages for violations</u>.

**How to report media for violations:**

PX0530-001

Learn how to report posts for media, and read the X media policy.

**How to report profiles for violations:**

1. Open the profile you'd like to report.

2. Select the **overflow icon** •••

3. Select **Report** and then select the type of issue you'd like to report.

4. If you select **They're being abusive or harmful**, we'll ask you to provide additional information about the issue you're reporting. We may also ask you to select additional posts from the account you're reporting so we have better context to evaluate your report.

5. We will include the text of the posts you reported in our follow-up emails and notifications to you. To opt-out of receiving this information, please uncheck the box next to **Updates about this report can show these posts**.

6. Once you've submitted your report, we'll provide recommendations for additional actions you can take to improve your X experience.

# How to report specific content in a Moment

**How to report a post in a Moment for violations:**

1. Navigate to the post within the Moment that you'd like to report.

2. Click or tap the ••• icon.

3. Click or tap **Report post**.

4. Choose the type of issue you'd like to report to us.

5. Once you've submitted your report, we'll provide recommendations for actions you can take to improve your X experience.

**How to report Moment for violations:**

Depending on what type of violation you're reporting, there are several ways to report a Moment. Below is a list of the types of violations you might see:

- Violation of posting private information

PX0530-002

- <u>Abuse</u>
- <u>Hateful conduct</u>
- <u>Violent threats</u>
- <u>Self harm</u>

Once you've identified the type of violation you need to report, follow the instructions below.

1. Chose one of the forms listed above.

2. Enter the Moment URL that you would like to report.

3. Provide us with up to 5 posts within the Moment that may be in violation.

4. Once you've submitted your report, we'll provide recommendations for actions you can take to improve your X experience.

# How to report a X Space or person in a Space

If you think a Space or someone in a Space violates the <u>X Rules and policies</u>, you can report them. Speakers and listeners can report a Space and any account in a Space.

**How to report a Space for violations:**

1. While in the Space, tap the overflow icon °°°.

2. Tap **Report this Space**.

3. Select the type of issue you'd like to report to us.

4. Once you've reported the Space, you'll have the option to leave or stay.

**How to report an account for violations:**

1. While in the Space, tap on the account's profile photo.

2. Tap **Report**.

3. Select the type of issue you'd like to report to us.

4. Once you've reported the account, you'll have the option to leave or stay in the Space.

# How to report a product

PX0530-003

If you think a product from a merchant on X violates our <u>Shopping Policies</u>, you can report them directly from your X for iOS or Android App.

**How to report a product from a <u>Shop Spotlight</u> :**

1. While on a merchant's profile, find the Shop Spotlight.

2. Select the more icon ••• on the product you wish to report.

3. Select **Report product.**

4. Select **Intellectual property violation** if you're reporting a product for issues with <u>intellectual property rights.</u> You'll need to include the <u>product ID.</u> You can also submit an intellectual property violation directly <u>here</u>.

   Select **Other violation** if you're reporting a product for a different reason.

**How to report a product from a <u>X Shop</u>:**

1. From the X Shop, navigate to the product you wish to report.

2. Long-press on the product tile until the report product button appears.

3. Select **Report product.**

4. Select **Intellectual property violation** if you're reporting a product for issues with <u>intellectual property rights.</u> You'll need to include the <u>product ID.</u> You can also submit an intellectual property violation directly <u>here</u>.

   Select **Other violation** if you're reporting a product for a different reason.

# How to report specific types of violations

The information below outlines the types of violations you can report to us through our Help Center.

- **Unauthorized trademark use:** Learn more about X's <u>trademark policy</u> and <u>file a report here</u>.

- **Unauthorized use of copyrighted materials:** Learn more about X's <u>copyright policy</u> and <u>file a report here</u>.

PX0530-004

- **Sale or promotion of counterfeit goods:** Learn more about X's counterfeit goods policy and file a report here.

- **Privacy policy towards children:** Our Services are not directed to persons under 13. If you become aware that your child has provided us with personal information without your consent, please contact us via our privacy form. Learn more about our policy towards children in our Privacy Policy.

- **Child sexual exploitation:** Learn more about our child sexual exploitation policy and file a report here.

- **Pornography:** To report obscene or pornographic images being used in profile photos and/or header photos on X, follow our instructions on reporting sensitive media.

- **Impersonation of an individual or brand:** Learn more about our impersonation policy and file a report here.

- **Private information posted on X:** Learn more about our private information policy and file a report here.

- **Abusive behavior and violent threats:** Learn more about our abusive behavior policy and file a report here.

- **Spam and system abuse:** If you are experiencing a spam or malware issue that's impacting your use of X, file a report here.

- **Violation of X Ads policy:** Learn how to recognize X Ads and the steps you can take to resolve issues without filing a report. Report a X Ad that may be in violation of our policies.

Note: When reporting potential violations of the X Rules and Terms of Service through the Help Center, you may be asked to allow us to share parts of your report with third parties, such as the affected account.

# How to report on behalf of someone else

You can report violations on behalf of another person. Refer to the categories and instructions listed above or contact us to submit your report. You can also report directly from a post or profile (see above section **How to report directly from a post, List, or profile**).

# Response timeframe

PX0530-005

How to report violations of X Rules and Terms of Service

X acknowledges properly submitted reports within twenty-four hours. Although reports are typically resolved within a few days, resolution times vary and may take thirty days to reach resolution based on factors that are often outside of X's control, such as the need for user input and whether a user chooses to appeal.

PX0530-006

# PX0531

5/8/24, 12:38 PM                    Report inappropriate videos, channels, and other content on YouTube - Android - YouTube Help

# Report inappropriate videos, channels, and other content on YouTube

We rely on YouTube community members to report or flag content that they find inappropriate. Reporting content is anonymous, so other users can't tell who made the report.

## What happens after I report content?

When content is reported, it's not automatically taken down. Reported content is reviewed along these guidelines:

- Content that violates our Community Guidelines    is removed from YouTube.
- Content that may not be appropriate for younger audiences may be age-restricted.

To check if a video that you reported has been removed, you can view your Report history    .



Subscribe to the YouTube Viewers channel    for the latest news, updates, and tips.

## How to report content

**Android**    Computer    iPhone & iPad

Report a video

Report a Short

Report a channel

Report a playlist

Report a thumbnail

Report a comment

Report a live chat message

Report an ad

## Report content on YouTube from your TV

You can report a video directly from the YouTube TV app.

PX0531-001

1. Open the YouTube app ▶.
2. Go to the video that you want to report.
3. Go to Settings ⚙ › **Report**.
4. Select the reason that you want to report the video.
5. After you select the reason, a confirmation message shows.

## Other reporting options

If the reporting process doesn't accurately capture your issue, we have other reporting mechanisms you can use.

Privacy reporting

Legal reporting

For California users: Report content while signed out

PX0531-002

# PX0533

🔍 What can we help you with?

Snapchat Support > Safety and Security > How to Report > Report Abuse

# How do I report abuse or illegal content on Snapchat?

You can report abuse on Snapchat, including harassment, bullying, blackmail, or other safety concerns.

Learn how to report content you see on Snapchat, or report a Snapchat account. Together we can keep Snapchat a safe place and a strong community.

**Please Note**: if you can't report something using the Snapchat app, you can report things to us on the web, instead.

**Click a link below to jump to a specific section:**

- Report a Snap or Story on Snapchat
- Report a Public Profile
- Report a Snapchat Account
- Report a Chat Message
- Report a Story on the Web
- Report or Hide Content in Stories
- Report Lenses
- (EU Users) Report Other Illegal Content per Article 16 of DSA

## Report a Snap or Story on Snapchat

To report a Snap or Story you see on Snapchat, **press and hold** on it and tap '**Report Snap**' to let us know what's going on.

You can report different types of content on Snapchat by pressing and holding this way. You can report:

- Direct Snaps
- My Stories
- Shared Stories
- Public User Stories
- Snaps on the Snap Map

PX0533-001

## Report a Public Profile

**To report a Public Profile on Snapchat...**

1. Go to the Public Profile that you want to report
2. Tap ⬝⬝⬝ at the top
3. Tap '**Report**'
4. Choose the reason you're reporting the Public Profile, then tap '**Submit**'

## Report a Snapchat Account

To report someone's Snapchat account, open the Chat screen, **press and hold** on the Snapchatter's name, tap '**Manage Friendship**,' and tap '**Report**.'

## Report a Chat Message

To report a Chat message, press and hold on a message you'd like to report, then tap '**Report**.'

## Report a Story on the Web

To report a Story from the web (not the Snapchat app), click ⬆ at the bottom of the video and click '**Report Snap**.'

If a place on the Snap Map isn't right, learn how to report it.

## Report or Hide Content in Stories

To report content in Stories, press and hold on the tile and tap '**Report Tile**.'

If you just don't like that kind of content, you can instead tap '**Hide**' to see fewer Stories like that in Stories.

## Report Lenses

You can report Lenses that were created by Snapchatters. Pull up the Lens in the Lens carousel, tap ⓘ above the Lens, and tap 'Report' to report it.

PX0533-002

To report content you see on Snapchat that you believe to be illegal, press and hold on it and tap 'Report Snap' or 'Report Ad' to let us know what's going on. From there, follow the in-app instructions to complete your report and be prepared to give additional information on why you believe the content is illegal.

We highly recommend reporting illegal content through the in-app reporting flow described above. Alternatively, EU residents can report illegal content in accordance with Article 16 of the Digital Services Act by clicking here.

### Was this article helpful?

 

## Related articles

How do I deactivate or delete my Snapchat account?

My Snapchat account is locked

About Reporting Infringement on Snapchat

How to Report an Inaccurate Location or Place on Snap Map

I lost my Snapstreak. How do I restore it?

## Recently viewed articles

How can I change who can see My Story on Snapchat?

Where did my 'Everyone' privacy setting option for My Story go?

How do I change my privacy settings on Snapchat?

How to Remove a Friend on Snapchat

How to Block a Friend on Snapchat

---

**Company**          **Community**          **Advertising**          **Legal**

Other Terms & Policies

PX0533-003



Cookie Settings

News                    Community              Political Ads Library
                        Guidelines                                          Report Infringement
Privacy and Safety                             Brand Guidelines

                                               Promotions Rules

**Snap Inc.**

Privacy Policy

Terms of Service

**Language**    English (US)    ⌄

PX0533-004

# PX0534

# Report something on Pinterest

If you find content that shouldn't be on Pinterest, you can report it anonymously for us to review. You'll still be able to see someone's account, boards, Pins and comments after you report them. To see less of their content, you can unfollow or **block this person**.

You can learn more about what's allowed on Pinterest our Community guidelines.

## Other articles

Account privacy    +

Data privacy    +

 Help Center                    General    Business

  

Age requirements for using Pinterest

Report something on Pinterest

# Report a Pin

Age verification

**Web**    Android    iOS

Report graphic violence

1. Click into the Pin
2. Click ••• at the top of the Pin
3. Click **Report Pin**
4. Pick your reason for reporting, then click **Next**
5. Click **Done**

Report harassment

Report hate speech

Report nudity

# Report an account

Report a mer...

**Web**    Android    iOS

Spam on Pinterest

PX0534-001

Chat

1. Open the profile of the person you'd like to report
2. Click ••• next to **Follow**
3. Click **Report**
4. Select your reason for reporting then click **Next**
5. Click **Report** to confirm

# Report a comment or photo comment

Web    Android    iOS

1. Click into the Pin
2. Click ••• below the comment or photo comment
3. Click **Report this content**
4. Select the reason for your report and click **Next**
5. Click **Report**

To report a photo comment for Intellectual Property rights, contact us. Include the Pin URL and the username of the person who posted the comment in your message.

# Report a message

Web    Android    iOS

1. Click 💬 to open your messages
2. Click on a message thread
3. Click ••• and select **Report**
4. Select the reason for your report and click **Next**
5. Click **Report**

# Report a board

Web    Android    iOS

Manage a parental passcode

Teen safety options

Resources for parents and caregivers of teens

Combating online child exploitation

Suicide, self-harm, and domestic violence prevention

Emotional health resources

Review the Pinner Promise

Review your reports and violations

Legal    +

PX0534-002

5/8/24, 12:41 PM                              Report something on Pinterest | Pinterest help

1. Open the board you'd like to report
2. Click ••• next to the board name
3. Click **Report**
4. Select your reason for reporting then click **Next**
5. Click **Report**

Still need help?    Contact us

# Was this article helpful?

 

## Pinterest

Languages

English (US)

**About us**

What's Pinterest

Our Pinterest page

Engineering blog

Brand guidelines

Careers

Help Center

Pinterest Labs

© Pinterest 2024

**Our policies**

Copyright

Personalized ads

Terms of service

Privacy

**More info**

For businesses

For developers

For press

For investors

PX0534-003

# PX0535

# Suicide and Self-harm policy

---

Overview

**You may not promote or encourage suicide or self-harm.**

At X, we recognize that suicide and self-harm are significant social & public health challenges that require collaboration between all stakeholders – public, private, and civil society – and that we have a role and responsibility to help people access and receive support when they need it.

When developing this policy, we consulted extensively with experts to ensure that people who have engaged in self-harm or experienced suicidal thoughts can share their personal experiences. We also recognized the need to protect people from the potential harm caused by exposure to content that could promote or encourage self-harm – intentionally or inadvertently. That's why our policy prohibits content that promotes or encourages self-harming behaviors and provides support to those undergoing experiences with self-harm or suicidal thoughts.

# What is in violation of this policy?

Under this policy, you can't promote, or

PX0535-002

X's suicide & self-harm policy | X Help

otherwise encourage,
suicide or self-harm. We
define promotion and
encouragement to
include statements such
as "the most effective",
"the easiest", "the best",
"the most successful",
"you should", "why don't
you". Violations of this
policy can occur via Posts,
images or videos,
including live video.

We define suicide to be
the act of taking one's
own life. We define self-
harm to include:

- self-inflicted physical
  injuries e.g., cutting;
  and

- eating disorders e.g.,
  bulimia, anorexia.

Violations of this policy
include, but are not
limited to:

- encouraging someone
  to physically harm or
  kill themselves;

PX0535-003

- asking others for encouragement to engage in self-harm or suicide, including seeking partners for group suicides or suicide games; and

- sharing information, strategies, methods or instructions that would assist people to engage in self-harm and suicide.

# What is not a violation of this policy?

Some examples of behavior that are not considered a violation of this policy include:

- sharing personal stories and experiences related to self-harm or suicide;

- sharing coping mechanisms and resources for addressing self-harm or suicidal thoughts; and

PX0535-004

- discussions that are focused on research, advocacy, and education related to self-harm or suicide prevention.

**Note**: people can share their personal experiences, but should avoid sharing detailed information about specific strategies or methods related to self-harm, as this could inadvertently encourage this behavior.

# Who can report violations of this policy?

Anyone can report content that may encourage or promote suicide or self-harm via our in-app reporting or our underlined specialized reporting form. These reports are routed to a dedicated

team who evaluate each case individually.

Note: if we receive a report that someone has expressed an intention to engage in self-harm or suicide, we will contact them directly, encourage them to seek support, and provide information about dedicated online and hotline resources. We may also work with law enforcement officials where appropriate, for example, if we receive a valid emergency disclosure request as defined in our Law Enforcement Guidelines.

# How to report violations of this policy

To ensure that we handle reports sensitively, our in-app reporting provides separate options for people who may be expressing an intention to harm themselves, and

PX0535-006

X's suicide & self-harm policy | X Help

content that is encouraging or promoting self-harm or suicide.

# Expressing intentions of self-harm or suicide

### In-App

You can report content for review in-app as follows:

1. Select Report Post from drop-down menu

2. Select "It expresses intentions of self-harm or suicide"

3. Submit your report

### Desktop

You can report this content for review on desktop as follows:

1. Select Report Post from drop-down menu

PX0535-007

2. Select "It expresses intentions of self-harm or suicide"

3. Submit your report

### Reporting form

You can also report this content for review via <u>our dedicated report form</u>.

### In-App

You can report content for review in-app as follows:

1. Select Report Post from drop-down menu

2. Select "It expresses intentions of self-harm or suicide"

3. Submit your report

# Encouraging self-harm or suicide

### In-App

X's suicide & self-harm policy | X Help

You can report content for review in-app as follows:

1. Select Report Post from drop-down menu

2. Select "It's abusive or harmful"

3. Select "They're encouraging self-harm or suicide"

4. Submit your report

## Desktop

You can report this content for review on desktop as follows:

1. Select Report Post from drop-down menu

2. Select "It's abusive or harmful"

3. Select "They're encouraging self-harm or suicide"

4. Submit your report

PX0535-009

X's suicide & self-harm policy | X Help

# What happens if you violate this policy?

Our enforcement approach depends on the type of content being shared, whether or not the reported account is encouraging or promoting self-harm or suicide, and the account's previous history of violations.

If you violate this policy by sharing content that intentionally encourages others to harm themselves, ask others to encourage you to harm yourself, or share detailed information or instructions related to self-harm or suicide methods, we will require you to remove this content. We will also temporarily lock you out of your account before you can Post again. If you continue to violate this policy, or if your account

PX0535-010

X's suicide & self-harm policy | X Help

is dedicated to promoting or encouraging self-harm or suicide, your account will be permanently suspended. If cases include images or videos related to self-harm or suicide, we will also evaluate this content under our sensitive media policy. If you believe that your account was suspended in error, you can submit an appeal.

We may also take steps to prevent the spread of instructional material hosted on third-party websites by marking such links as unsafe.

Additional resources

Learn more about our range of enforcement options and our approach to policy development and enforcement.

Learn more about how you can support

PX0535-011

someone experiencing
thoughts of self-harm or
suicide.

Visit our Safety Center for
a list of local <u>mental
health resources</u> and
read <u>our blog on suicide
prevention</u> to learn more
about our work.

PX0535-012

# PX0536



Privacy
and
Safety
Hub

Privacy ⌄    Safety ⌄    Transparency    ⌄    News

Secondary Navigation ⌃

Transparency ⌄

# Threats, Violence & Harm

Community Guidelines Explainer Series
*Updated: January 2023*

- Encouraging or engaging in violent or dangerous behavior is prohibited. Never intimidate or threaten to harm a person, a group of people, or someone's property.
- Snaps of gratuitous or graphic violence, including animal abuse are not allowed.
- We don't allow the glorification of self-harm, including the promotion of self-injury, suicide or eating disorders

## Overview

The safety and wellbeing of our community is a top priority at Snapchat, and we take all instances of threats, violence, and harm seriously. We do not allow content that encourages, threatens, or graphically depicts violent or dangerous behavior, or content that glorifies or encourages self-harm. Imminent threats to human life may be referred to law enforcement.

While our policies and moderation practices help to ensure our platform is safe for all users, we also proactively invest in features and resources to help support the wellbeing of our community. We encourage Snapchatters to report content that indicates self-harm or emotional distress so that our teams can send resources that may be helpful and potentially alert emergency health responders.

## What you should expect

PX0536-001

Our Community Guidelines relating to Threats, Violence, and Harm reflect a commitment to removing content that undermines our community's safety, while also being attentive to urgent expressions of distress on our platform.

To promote safety, these rules prohibit threats on Snapchat, which includes any content expressing an intention to cause serious physical or emotional harm to a person, a group of people, or their property. Where content indicates an imminent threat to human life, our teams may alert law enforcement agencies who may be positioned to intervene.

We also prohibit content that glorifies, or risks inciting, violent or harmful behavior toward people or animals––this includes content that encourages or glorifies self-harm, such as suicide, self-mutilation, or eating disorders.

Where users report content that indicates a risk of self-harm, our teams review these reports with an eye toward providing helpful resources and potentially identifying opportunities for emergency services to intervene, where possible. Additional information about our safety resources is available on our Privacy & Safety Hub.

To further support the wellbeing of our community, our Here For You feature helps to surface resources from expert localized partners when users search for certain topics related to mental health, anxiety, depression, stress, suicidal thoughts, grief and bullying.

Takeaway

Our approach to responding to threats, violence, and harm are tailored to the situation. When it comes to threats to oneself, our teams work to identify the best means of support via safety resources. Where others are under threat, we strive to advance safe outcomes both through the enforcement of

PX0536-002

our policies and, where necessary, in collaboration with law enforcement.

Doing our part to support the safety and wellbeing of our community is a high priority across our company. For more information regarding our work in this space, please visit Snap's Privacy and Safety Hub.

**Back to Community Guidelines**

## Company

Snap Inc.

Careers

News

Privacy and Safety

## Community

Snapchat Support

Pixy Support

Community Guidelines

## Advertising

Snapchat Ads

Advertising Policies

Political Ads Library

Brand Guidelines

Promotions Rules

## Legal

Other Terms & Policies

Law Enforcement

Cookie Policy

Cookie Settings

Report Infringement

# Snap Inc.

Privacy Policy

Terms of Service

PX0536-003

**Language**     English (US)     ⌄

PX0536-004