# PX0557

# Newsroom

**PRESS RELEASE**
June 7, 2010

# Apple Presents iPhone 4

## All-New Design with FaceTime Video Calling, Retina Display, 5 Megapixel Camera & HD Video Recording

## Thinnest Smartphone Ever

SAN FRANCISCO—June 7, 2010—Apple® today presented the new iPhone® 4 featuring FaceTime, which makes the dream of video calling a reality, and Apple's stunning new Retina display, the highest resolution display ever built into a phone, resulting in super crisp text, images and video. In addition, iPhone 4 features a 5 megapixel camera with LED flash, HD video recording, Apple's A4 processor, a 3-axis gyro and up to 40 percent longer talk time—in a beautiful all-new design of glass and stainless steel that is the thinnest smartphone in the world. iPhone 4 comes with iOS 4, the newest version of the world's most advanced mobile operating system, which includes over 100 new features and 1500 new APIs for developers. iOS 4 features Multitasking, Folders, enhanced Mail, deeper Enterprise support and Apple's new iAd mobile advertising platform. iPhone 4 will be available in the US, UK, France, Germany and Japan on June 24, starting in the US at just $199 for qualified buyers with a two year contract.*

"iPhone 4 is the biggest leap since the original iPhone," said Steve Jobs, Apple's CEO. "FaceTime video calling sets a new standard for mobile communication, and our new Retina display is the highest resolution display ever in a phone, with text looking like it does on a fine printed page. We have been dreaming about both of these breakthroughs for decades."

FaceTime is as mobile as your phone, so you can see your loved ones and friends anywhere there is Wi-Fi. Using FaceTime is as easy as making a regular voice call, with no set-up required, and you can instantly switch to the rear camera to show others what you are seeing with just a tap.

Apple's stunning 3.5 inch Retina display has 960 x 640 pixels—four times as many pixels as the iPhone 3GS and 78 percent of the pixels on an iPad™. The resulting 326 pixels per inch is so dense that the

PX0557-001

human eye is unable to distinguish individual pixels when the phone is held at a normal distance, making text, images and video look sharper, smoother and more realistic than ever before on an electronic display.

iPhone 4 is the thinnest smartphone ever—9.3 millimeters—with an all-new design and build quality like no other mobile device. The front and back are made of aluminosilcate glass, chemically strengthened to be 30 times harder than plastic, more scratch resistant and more durable than ever. The front and back glass have an oil-resistant coating that helps keep it clean, and encircling iPhone 4 is a highly finished stainless steel band made of a custom alloy that is forged to be five times stronger than standard steel.

iPhone 4 features a new 5 megapixel autofocus camera with a 5x digital zoom, a backside illuminated sensor and built-in LED flash that allows you to take amazing pictures even in low light and dark environments. iPhone 4 lets you record and edit incredible HD video and the popular tap to focus feature now works while recording video. You can use the iPhone 4's LED flash for both still photography and video recording. The new iMovie® app for iPhone lets you combine movie clips, add dynamic transitions and themes and include photos and music, and users can buy it for just $4.99 through the App Store right on their phone.

iPhone 4 is the best mobile device ever for games and entertainment, with access to tens of thousands of games and entertainment apps on the revolutionary App Store. Every iPhone 4 has a built-in 3-axis gyro that when combined with the accelerometer provides 6-axis motion sensing such as up and down, side to side, forward and backward and pitch and roll, making it perfect for gaming. Developers can access the gyro using the new CoreMotion API to make games and other apps that go well beyond what other mobile devices offer.

iPhone 4 comes with iOS 4, the newest version of the world's most advanced mobile operating system. With over 100 new features, it includes Multitasking, Folders, enhanced Mail, deeper Enterprise support and Apple's new iAd mobile advertising platform. With Multitasking, users can now instantly switch between any of their apps while preserving battery life. With Folders, users can easily organize their apps into collections by simply dragging one app on top of another. A folder is automatically created and named based on the category of apps selected. Users can change the name of any folder at any time. In addition, users can now customize their lock and home screens with an array of supplied wallpapers or with any of the photos on their phone.

The new iBooks® app will be available for iPhone 4 as a free download from the App Store and includes Apple's new iBookstore, the best way to browse, buy and read books on a mobile product. The iBooks app will sync your current place in a book, along with any bookmarks,

highlights and notes you have created, between copies of the same book on your iPad, iPhone or iPod touch®. iBooks users can also now read and store PDFs right in iBooks. There are now over 60,000 books available in the iBookstore, and users have downloaded over five million books in the first two months.

More than five billion apps have been downloaded from the revolutionary App Store and more than 225,000 apps are available to consumers in 90 countries. Almost 100 million iPhone and iPod touch users around the world can choose from an incredible range of apps in 20 categories, including games, business, news, sports, health, reference and travel.

iPhone 4 delivers an amazing seven hours of talk time on 3G networks, up to 10 hours of web browsing on Wi-Fi and up to six hours on 3G, and up to 10 hours of video playback and up to 40 hours of audio playback.** iPhone 4 is powered by Apple's new A4 processor that provides exceptional processor and graphic performance along with long battery life. iPhone 4 features a second microphone and advanced software to suppress unwanted background noise for improved call quality when in loud places. iPhone 4 also offers 802.11n Wi-Fi networking and adds quad-band HSUPA to provide 7.2Mbps downlink and 5.8Mbps uplink capability.***

**Pricing & Availability**
iPhone 4 comes in either black or white and will be available in the US for a suggested retail price of $199 (US) for the 16GB model and $299 (US) for the 32GB model in both Apple and AT&T's retail and online stores, Best Buy and Wal-Mart stores. iPhone 4 will be available in the US, France, Germany, Japan and the UK on June 24 and customers can pre-order their iPhone 4 beginning Tuesday, June 15 from the Apple Online Store or reserve an iPhone 4 to pick up at an Apple Retail Store. iMovie for iPhone will be available on the App Store for just $4.99 (US).

Also on June 24, a new iPhone 3GS 8GB model will be available for just $99 (US). iOS 4 software will be available on June 21 as a free software update via iTunes® 9.2 or later for iPhone and iPod touch customers.****

iPhone 4 will roll out worldwide to 88 countries by the end of September. iPhone 4 will be available by the end of July in Australia, Austria, Belgium, Canada, Denmark, Finland, Hong Kong, Ireland, Italy, Luxembourg, Netherlands, Norway, New Zealand, Singapore, South Korea, Spain, Sweden and Switzerland.

*Qualified customers only. Requires a new two year AT&T rate plan, sold separately.

PX0557-003

**Battery life depends on device settings, usage and other factors. Actual results vary.

***Speed is dependent on cellular network capability.

****iOS 4 is compatible with iPhone 3G, iPhone 3GS, iPhone 4, second and third generation iPod touch (late 2009 models with 32GB or 64GB). Some features may not be available on all products. For example, Multitasking requires iPhone 3GS, iPhone 4 or third generation iPod touch (late 2009 models with 32GB or 64GB).

Apple ignited the personal computer revolution with the Apple II, then reinvented the personal computer with the Macintosh. Apple continues to lead the industry with its award-winning computers, OS X operating system, and iLife, iWork and professional applications. Apple leads the digital music revolution with its iPods and iTunes online store, has reinvented the mobile phone with its revolutionary iPhone and App Store, and has recently introduced its magical iPad which is defining the future of mobile media and computing devices.

---

### Press Contacts

#### Apple Media Helpline
media.help@apple.com

Apple, the Apple logo, Mac, Mac OS, Macintosh, iPhone, iPad, iMovie, iBooks, iPod touch and iTunes are trademarks of Apple. Other company and product names may be trademarks of their respective owners.



 Newsroom

**The latest news and updates, direct from Apple.**

**Read more**

Newsroom        Apple Presents iPhone 4

| Shop and Learn | Account | Apple Store | For Business | Apple Values |
| --- | --- | --- | --- | --- |
| Store | Manage Your Apple ID | Find a Store | Apple and Business | Accessibility |
| Mac | Apple Store Account | Genius Bar | Shop for Business | Education |
| iPad | iCloud.com | Today at Apple | | Environment |
| iPhone | | Apple Camp | **For Education** | Inclusion and Diversity |
| | **Entertainment** | | Apple and Education | |

PX0557-004

5/13/24, 2:57 PM                                        Apple Presents iPhone 4 - Apple

| Watch | Apple One | Apple Store App | Shop for K-12 | Privacy |
| Vision | Apple TV+ | Certified Refurbished | Shop for College | Racial Equity and Justice |
| AirPods | Apple Music | Apple Trade In | | Supplier Responsibility |
| TV & Home | Apple Arcade | Financing | **For Healthcare** | |
| AirTag | Apple Fitness+ | Carrier Deals at Apple | Apple in Healthcare | **About Apple** |
| Accessories | Apple News+ | Order Status | Health on Apple Watch | Newsroom |
| Gift Cards | Apple Podcasts | Shopping Help | Health Records on iPhone | Apple Leadership |
| | Apple Books | | | Career Opportunities |
| **Apple Wallet** | App Store | | **For Government** | Investors |
| Wallet | | | Shop for Government | Ethics & Compliance |
| Apple Card | | | Shop for Veterans and Military | Events |
| Apple Pay | | | | Contact Apple |
| Apple Cash | | | | |

More ways to shop: <u>Find an Apple Store</u> or <u>other retailer</u> near you. Or call 1-800-MY-APPLE.

---

Copyright © 2024 Apple Inc. All rights reserved.     Privacy Policy     Terms of Use     Sales and Refunds     Legal     Site Map                    United States

PX0557-005

# PX0558



 Welcome to the Instagram blog! See what's happening around the world, right now, through **photo features**, **user spotlights**, **photo tips** and **news** from Instagram HQ.

## Instagram and Facebook: Looking Ahead

2 DAYS AGO
873 NOTES



This is an exciting time for us – the community continues to grow and over 5 billion photos have now been shared through Instagram. We're humbled that so many people around the world use Instagram to share their lives with friends through photos. From **weddings** to **epic pilgrimages through the Spanish countryside**, we're constantly amazed by the stories that are shared on Instagram, and we thank you for being a part of this growing community.

What makes this even more exciting is that our **deal** with Facebook has **closed**, which means we can now work together to evolve and build a better Instagram for everyone. While our team is making the short move to the Facebook offices, Instagram isn't going anywhere. The Instagram app and its features will stay the same one you know and love, and we'll keep working together to build a better Instagram for everyone.

The Instagram Team

### 873 notes

**rosieuuu** liked this

**dolcestilnuovo** reblogged this from **instagram**

**kkarina126** liked this

**iluvdoctancredi** reblogged this from **instagram**

**iluvdoctancredi** liked this

PX0558-001

*Instagram*          GET THE FREE APP FOR **IPHONE** OR **ANDROID**

**monsieurmbox** liked this

**ascrumptiousstory** reblogged this from **instagram**

**ascrumptiousstory** liked this

**caleb-10** liked this

**natarincn** liked this

**jmiron97** reblogged this from **instagram**

**prettysmilerudy** liked this

**jaylongj** reblogged this from **instagram**

**alieajo** liked this

**3alya-albloushi** liked this

**jbswagnotes** liked this

**jevonwhite** liked this

**estuardochictiney** liked this

**miiiio** reblogged this from **instagram**

**haykalfikri** reblogged this from **instagram**

**iliamarie** liked this

**legerhardt** liked this

**jtlesa** liked this

**bmidios** liked this

**milicamarkovic12** reblogged this from **instagram**

**aziz-azza** liked this

▢▢n▢▢l.2Z▢▢+ **lucabecattini** liked this

**matzedj** liked this

**assidesi** liked this

**confessionsofamediaholic** reblogged this from **instagram**

**alvinmahendra** reblogged this from **instagram**

**budha-pesht** liked this

**immamustachearmy** reblogged this from **instagram**

**themomentitclicks** liked this

**marcofrausto** liked this

**yeyenesia** liked this

**smokin-the-rainbow** reblogged this from **instagram**

**vimags21** liked this

PX0558-002



PX0558-003

# PX0559

S-1/A 1 d287954ds1a.htm AMENDMENT NO. 2 TO REGISTRATION STATEMENT ON FORM S-1

**Table of Contents**

As filed with the Securities and Exchange Commission on March 7, 2012

Registration No. 333-179287

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Amendment No. 2 to
## Form S-1
## REGISTRATION STATEMENT

*Under*
*The Securities Act of 1933*

# Facebook, Inc.
#### (Exact name of Registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **7370** | **20-1665019** |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (IRS Employer Identification No.) |

**Facebook, Inc.**
**1601 Willow Road**
**Menlo Park, California 94025**
**(650) 308-7300**
**(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)**

**David A. Ebersman**
**Chief Financial Officer**
**Facebook, Inc.**
**1601 Willow Road**
**Menlo Park, California 94025**
**(650) 308-7300**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Please send copies of all communications to:*

| | | |
|---|---|---|
| Gordon K. Davidson, Esq. | Theodore W. Ullyot, Esq. | William H. Hinman, Jr., Esq. |
| Jeffrey R. Vetter, Esq. | David W. Kling, Esq. | Daniel N. Webb, Esq. |
| James D. Evans, Esq. | Michael L. Johnson, Esq. | Simpson Thacher & Bartlett LLP |
| Fenwick & West LLP | Facebook, Inc. | 2550 Hanover Street |
| 801 California Street | 1601 Willow Road | Palo Alto, California 94304 |
| Mountain View, California 94041 | Menlo Park, California 94025 | (650) 251-5000 |
| (650) 988-8500 | (650) 308-7300 | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒   (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

PX0559-001

Table of Contents

The information in this prospectus is not complete and may be changed. Neither we nor the selling stockholders may sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and neither we nor the selling stockholders are soliciting offers to buy these securities in any state where the offer or sale is not permitted.

*PROSPECTUS (Subject to Completion)*
*Dated March 7, 2012*

*Shares*



*CLASS A COMMON STOCK*

---

*Facebook, Inc. is offering          shares of its Class A common stock and the selling stockholders are offering          shares of Class A common stock. We will not receive any proceeds from the sale of shares by the selling stockholders. This is our initial public offering and no public market currently exists for our shares of Class A common stock. We anticipate that the initial public offering price will be between $     and $     per share.*

---

*We have two classes of common stock, Class A common stock and Class B common stock. The rights of the holders of Class A common stock and Class B common stock are identical, except voting and conversion rights. Each share of Class A common stock is entitled to one vote. Each share of Class B common stock is entitled to ten votes and is convertible at any time into one share of Class A common stock. The holders of our outstanding shares of Class B common stock will hold approximately     % of the voting power of our outstanding capital stock following this offering, and our founder, Chairman, and CEO, Mark Zuckerberg, will hold or have the ability to control approximately     % of the voting power of our outstanding capital stock following this offering.*

*We intend to apply to list our Class A common stock on             under the symbol "FB."*

*We are a "controlled company" under the corporate governance rules for publicly-listed companies, and our board of directors has determined not to have an independent nominating function and instead to have the full board of directors be directly responsible for nominating members of our board.*

**Investing in our Class A common stock involves risks. See "Risk Factors" beginning on page 12.**

*PRICE $          A SHARE*

| | Price to Public | Underwriting Discounts and Commissions | Proceeds to Facebook | Proceeds to Selling Stockholders |
|---|---|---|---|---|
| Per share | $ | $ | $ | $ |
| Total | $ | $ | $ | $ |

*We and the selling stockholders have granted the underwriters the right to purchase up to an additional          shares of Class A common stock to cover over-allotments.*

*The Securities and Exchange Commission and state regulators have not approved or disapproved of these securities, or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.*

*The underwriters expect to deliver the shares of Class A common stock to purchasers on          , 2012.*

---

PX0559-002

Amendment No. 2 to Registration Statement on Form S-1

## MORGAN STANLEY    J.P. MORGAN    GOLDMAN, SACHS & CO.

*BofA MERRILL LYNCH*    *BARCLAYS CAPITAL*    *ALLEN & COMPANY LLC*

*CITIGROUP*    *CREDIT SUISSE*    *DEUTSCHE BANK SECURITIES*

*RBC CAPITAL MARKETS*    *WELLS FARGO SECURITIES*

*, 2012*

PX0559-003

Table of Contents



PX0559-004

Table of Contents



PX0559-005

**Table of Contents**

## TABLE OF CONTENTS

| | Page | | | Page |
|---|---|---|---|---|
| Prospectus Summary | 1 | | Management | 101 |
| Risk Factors | 12 | | Executive Compensation | 109 |
| Special Note Regarding Forward-Looking Statements | 34 | | Related Party Transactions | 130 |
| Industry Data and User Metrics | 35 | | Principal and Selling Stockholders | 133 |
| Use of Proceeds | 36 | | Description of Capital Stock | 137 |
| Dividend Policy | 36 | | Shares Eligible for Future Sale | 144 |
| Capitalization | 37 | | Material U.S. Federal Tax Considerations for Non-U.S. | |
| Dilution | 40 | |    Holders of Class A Common Stock | 147 |
| Selected Consolidated Financial Data | 43 | | Underwriting | 151 |
| Management's Discussion and Analysis of Financial | | | Legal Matters | 157 |
|    Condition and Results of Operations | 45 | | Experts | 157 |
| Letter from Mark Zuckerberg | 73 | | Where You Can Find Additional Information | 157 |
| Business | 77 | | Index to Consolidated Financial Statements | F-1 |

---

Neither we, nor the selling stockholders, nor the underwriters, have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We and the selling stockholders are offering to sell, and seeking offers to buy, shares of our Class A common stock only in jurisdictions where offers and sales are permitted. The information in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or any sale of shares of our Class A common stock. Our business, financial condition, results of operations, and prospects may have changed since that date.

The information in this preliminary prospectus is not complete and is subject to change. No person should rely on the information contained in this document for any purpose other than participating in our proposed initial public offering, and only the preliminary prospectus dated              , 2012, is authorized by us to be used in connection with our proposed initial public offering. The preliminary prospectus will only be distributed by us and the underwriters named herein and no other person has been authorized by us to use this document to offer or sell any of our securities.

**Until              , 2012 (25 days after the commencement of our initial public offering), all dealers that buy, sell, or trade shares of our Class A common stock, whether or not participating in our initial public offering, may be required to deliver a prospectus. This delivery requirement is in addition to the obligation of dealers to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.**

For investors outside the United States: Neither we, nor the selling stockholders, nor the underwriters have done anything that would permit our initial public offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the shares of our Class A common stock and the distribution of this prospectus outside of the United States.

i

**Table of Contents**

**PROSPECTUS SUMMARY**

*This summary highlights information contained in greater detail elsewhere in this prospectus. This summary is not complete and does not contain all of the information you should consider in making your investment decision. You should read the entire prospectus carefully before making an investment in our Class A common stock. You should carefully consider, among other things, our consolidated financial statements and the related notes and the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.*

**FACEBOOK, INC.**

Our mission is to make the world more open and connected.

People use Facebook to stay connected with their friends and family, to discover what is going on in the world around them, and to share and express what matters to them to the people they care about.

Developers can use the Facebook Platform to build applications (apps) and websites that integrate with Facebook to reach our global network of users and to build products that are more personalized, social, and engaging.

Advertisers can engage with more than 800 million monthly active users (MAUs) on Facebook or subsets of our users based on information they have chosen to share with us such as their age, location, gender, or interests. We offer advertisers a unique combination of reach, relevance, social context, and engagement to enhance the value of their ads.

We believe that we are at the forefront of enabling faster, easier, and richer communication between people and that Facebook has become an integral part of many of our users' daily lives. We have experienced rapid growth in the number of users and their engagement.



- We had 845 million MAUs as of December 31, 2011, an increase of 39% as compared to 608 million MAUs as of December 31, 2010.

- We had 483 million daily active users (DAUs) on average in December 2011, an increase of 48% as compared to 327 million DAUs in December 2010.

- We had 432 million MAUs who used Facebook mobile products in December 2011.

- There were more than 100 billion friend connections on Facebook as of December 31, 2011.

- Our users generated an average of 2.7 billion Likes and Comments per day during the three months ended December 31, 2011.

1

PX0559-007

Table of Contents

For a description of how we calculate our MAUs and DAUs and factors that can affect these metrics, see "Industry Data and User Metrics" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Trends in Our User Metrics."

**How We Create Value for Users**

Our top priority is to build useful and engaging products that enable you to:

- ***Connect with Your Friends.*** With 845 million MAUs worldwide, our users are increasingly able to find and stay connected with their friends, family, and colleagues on Facebook.

- ***Discover and Learn.*** We believe that users come to Facebook to discover and learn more about what is going on in the world around them, particularly in the lives of their friends and family and with public figures and organizations that interest them.

- ***Express Yourself.*** We enable our users to share and publish their opinions, ideas, photos, and activities to audiences ranging from their closest friends to our 845 million users, giving every user a voice within the Facebook community.

- ***Control What You Share.*** Through Facebook's privacy and sharing settings, our users can control what they share and with whom they share it.

- ***Experience Facebook Across the Web.*** Through apps and websites built by developers using the Facebook Platform, our users can interact with their Facebook friends while playing games, listening to music, watching movies, reading news, and engaging in other activities.

- ***Stay Connected with Your Friends on Mobile Devices.*** Through the combination of our mobile sites, smartphone apps, and feature phone products, users can bring Facebook with them on mobile devices wherever they go.

**Foundations of the Social Web**

We believe that the web, including the mobile web, is evolving to become more social and personalized. This evolution is creating more rewarding experiences that are centered on people, their connections, and their interests. We believe that the following elements form the foundation of the social web:

- ***Authentic Identity.*** We believe that using your real name, connecting to your real friends, and sharing your genuine interests online create more engaging and meaningful experiences. Representing yourself with your authentic identity online encourages you to behave with the same norms that foster trust and respect in your daily life offline. Authentic identity is core to the Facebook experience, and we believe that it is central to the future of the web. Our terms of service require you to use your real name and we encourage you to be your true self online, enabling us and Platform developers to provide you with more personalized experiences.

- ***Social Graph.*** The Social Graph represents the connections between people and their friends and interests. Every person or entity is represented by a point within the graph, and the affiliations between people and their friends and interests form billions of connections between the points. Our mapping of the Social Graph enables Facebook and Platform developers to build more engaging user experiences that are based on these connections.

- ***Social Distribution.*** Over time, people are consuming and creating more kinds of information at a faster pace across a broader range of devices. The growing volume of information makes it challenging to find meaningful and trusted content and to effectively make your voice heard. Facebook organizes and prioritizes content and serves as a powerful social distribution tool delivering to users what we believe they will find most compelling based on their friends and interests.

2

PX0559-008

**Table of Contents**

**How We Create Value for Developers Through the Facebook Platform**

The Facebook Platform is a set of development tools and application programming interfaces (APIs) that enables developers to easily integrate with Facebook to create social apps and websites and to reach our 845 million users. Platform developers build experiences that allow our users to connect and share with friends while engaging in a wide range of activities. Platform developers range from a student on his or her computer at home to teams of programmers at leading websites. We are focused on the growth and success of Platform developers by enabling:

- *Personalized and Social Experiences.* We enable Platform developers to create better products that are personalized and social and that offer new ways for our users to engage with friends and share experiences across the web and on mobile devices. For example, a Facebook user can visit the Pandora website and immediately begin listening to a personalized radio station that is customized based on the bands the user Likes on Facebook.

- *Social Distribution.* We enable Platform developers to reach our global user base and use our social distribution channels to increase traffic to their apps and websites.

- *Payments.* We provide an online payments infrastructure that enables Platform developers to receive payments from our users in an easy-to-use, secure, and trusted environment.

**How We Create Value for Advertisers and Marketers**

We offer advertisers and marketers a unique combination of reach, relevance, social context, and engagement:

- *Reach.* Facebook offers the ability to reach a vast consumer audience of over 800 million MAUs with a single advertising purchase.

- *Relevance.* Advertisers can specify that we show their ads to a subset of our users based on demographic factors and specific interests that they have chosen to share with us on Facebook or by using the Like button around the web. We allow advertisers to select relevant and appropriate audiences for their ads, ranging from millions of users in the case of global brands to hundreds of users in the case of smaller, local businesses.

- *Social Context.* We believe that the recommendations of friends have a powerful influence on consumer interest and purchase decisions. We offer advertisers the ability to include "social context" with their marketing messages. Social context is information that highlights a friends' connections with a particular brand or business, for example, that a friend Liked a product or checked in at a restaurant. We believe that users find marketing messages more engaging when they include social context.

- *Engagement.* We believe that the shift to a more social web creates new opportunities for businesses to engage with interested customers. Any brand or business can create a Facebook Page to stimulate an ongoing dialog with our users.

**Our Market Opportunity**

*Our Advertising Market Opportunity*

Advertisers' objectives range from building long-term brand awareness to stimulating an immediate purchase. We offer advertising solutions that are designed to be more engaging and relevant for users in order to help advertisers better achieve their goals. Facebook's combination of reach, relevance, social context, and engagement gives advertisers enhanced opportunities to generate brand awareness and affiliation, while also creating new ways to generate near-term demand for their products from consumers likely to have purchase

3

**Table of Contents**

intent. According to an IDC report dated August 2011, total worldwide advertising spending in 2010 was $588 billion. Our addressable market opportunity includes portions of many existing advertising markets, including the traditional offline branded advertising, online display advertising, online performance-based advertising, and mobile advertising markets.

Advertising on the social web is a significant market opportunity that is still emerging and evolving. We believe that most advertisers are still learning and experimenting with the best ways to leverage Facebook to create more social and valuable ads.

### *Our Market Opportunity for Payments*

When users purchase virtual and digital goods from our Platform developers using our Payments infrastructure, we receive fees that represent a portion of the transaction value. Currently, substantially all of the Payments transactions between our users and Platform developers are for virtual goods used in social games. According to an In-Stat report dated November 2010, the worldwide revenue generated from the sale of virtual goods on social networking sites, online worlds, and casual games increased from $2 billion in 2007 to $7 billion in 2010, and is forecasted to increase to $15 billion by 2014. We currently require Payments integration in games on Facebook, and we may seek to extend the use of Payments to other types of apps in the future.

## Our Strategy

We are in the early days of pursuing our mission to make the world more open and connected. We have a significant opportunity to further enhance the value we deliver to users, developers, and advertisers. Key elements of our strategy are:

- *Expand Our Global User Community.* We continue to focus on growing our user base across all geographies, including relatively less-penetrated, large markets such as Brazil, Germany, India, Japan, Russia, and South Korea. We intend to grow our user base by continuing our marketing and user acquisition efforts and enhancing our products, including mobile apps, in order to make Facebook more accessible and useful.

- *Build Great Social Products to Increase Engagement.* We prioritize product development investments that we believe will create engaging interactions between our users, developers, and advertisers on Facebook, across the web, and on mobile devices. We continue to invest significantly in improving our core products such as News Feed, Photos, and Groups, developing new products such as Timeline and Ticker, and enabling new Platform apps and website integrations.

- *Provide Users with the Most Compelling Experience.* Facebook users are sharing and receiving more information across a broader range of devices. To provide the most compelling user experience, we continue to develop products and technologies focused on optimizing our social distribution channels to deliver the most useful content to each user by analyzing and organizing vast amounts of information in real time.

- *Build Engaging Mobile Experiences.* We are devoting substantial resources to developing engaging mobile products and experiences for a wide range of platforms, including smartphones and feature phones. In addition, we are working across the mobile industry with operators, hardware manufacturers, operating system providers, and developers to improve the Facebook experience on mobile devices and make Facebook available to more people around the world. We believe that mobile usage of Facebook is critical to maintaining user growth and engagement over the long term.

- *Enable Developers to Build Great Social Products Using the Facebook Platform.* The success of our Platform developers and the vibrancy of our Platform ecosystem are key to increasing user engagement. We continue to invest in tools and APIs that enhance the ability of Platform developers to deliver

4

**Table of Contents**

products that are more social and personalized and better engage users on Facebook, across the web, and on mobile devices. Additionally, we plan to invest in enhancing our Payments offerings and in making the Payments experience on Facebook as convenient as possible for users and Platform developers.

- ***Improve Ad Products for Advertisers and Users.*** We plan to continue to improve our ad products in order to create more value for advertisers and enhance their ability to make their advertising more social and relevant for users. Our advertising strategy centers on the belief that ad products that are social, relevant, and well-integrated with other content on Facebook can enhance the user experience while providing an attractive return for advertisers. We intend to invest in additional products for our advertisers and marketers while continuing to balance our monetization objectives with our commitment to optimizing the user experience.

**Summary Risk Factors**

Our business is subject to numerous risks described in the section entitled "Risk Factors" and elsewhere in this prospectus. You should carefully consider these risks before making an investment. Some of these risks include:

- If we fail to retain existing users or add new users, or if our users decrease their level of engagement with Facebook, our revenue, financial results, and business may be significantly harmed;

- We generate a substantial majority of our revenue from advertising. The loss of advertisers, or reduction in spending by advertisers with Facebook, could seriously harm our business;

- Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results;

- Facebook user growth and engagement on mobile devices depend upon effective operation with mobile operating systems, networks, and standards that we do not control;

- We may not be successful in our efforts to grow and further monetize the Facebook Platform;

- Our business is highly competitive, and competition presents an ongoing threat to the success of our business;

- Improper access to or disclosure of our users' information, or violation of our terms of service or policies, could harm our reputation and adversely affect our business;

- Our business is subject to complex and evolving U.S. and foreign laws and regulations regarding privacy, data protection, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could harm our business;

- Our CEO has control over key decision making as a result of his control of a majority of our voting stock;

- The loss of Mark Zuckerberg, Sheryl K. Sandberg, or other key personnel could harm our business;

- We anticipate that we will expend substantial funds in connection with tax withholding and remittance obligations related to the initial settlement of our restricted stock units (RSUs) approximately six months following our initial public offering;

- The market price of our Class A common stock may be volatile or may decline, and you may not be able to resell your shares at or above the initial public offering price; and

- Substantial blocks of our total outstanding shares may be sold into the market as "lock-up" periods end, as further described in "Shares Eligible for Future Sale." If there are substantial sales of shares of our common stock, the price of our Class A common stock could decline.

5

PX0559-011

**Table of Contents**

**Mr. Zuckerberg's Voting Rights and Our Status as a Controlled Company**

Mr. Zuckerberg, who after our initial public offering will control more than    % of the voting power of our outstanding capital stock, will have the ability to control the outcome of matters submitted to our stockholders for approval, including the election of our directors, as well as the overall management and direction of our company. In the event of his death, the shares of our capital stock that Mr. Zuckerberg owns will be transferred to the persons or entities that he designates.

Because Mr. Zuckerberg controls a majority of our outstanding voting power, we are a "controlled company" under the corporate governance rules for publicly-listed companies. Therefore, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board.

**Corporate Information**

We were incorporated in Delaware in July 2004. Unless expressly indicated or the context requires otherwise, the terms "Facebook," "company," "we," "us," and "our" in this prospectus refer to Facebook, Inc., a Delaware corporation, and, where appropriate, its wholly-owned subsidiaries. The term "Facebook" may also refer to our products, regardless of the manner in which they are accessed. Our principal executive offices are located at 1601 Willow Road, Menlo Park, California 94025, and our telephone number is (650) 308-7300. Our website address is www.facebook.com. The information on or that can be accessed through our website is not part of this prospectus.

Facebook, the Facebook logo, FB, the Like Button, f8, and our other registered or common law trademarks, service marks, or trade names appearing in this prospectus are the property of Facebook, Inc. Other trademarks, service marks, or trade names appearing in this prospectus are the property of their respective owners.

6

PX0559-012

**Table of Contents**

**THE OFFERING**

| | |
|---|---|
| Class A common stock offered | |
| By us | shares |
| By the selling stockholders | shares |
| Total | shares |
| Class A common stock to be outstanding after our initial public offering | shares |
| Class B common stock to be outstanding after our initial public offering | shares |
| Total Class A and Class B common stock to be outstanding after our initial public offering | shares |
| Over-allotment option of Class A common stock offered by us and the selling stockholders | shares |

Use of proceeds

We estimate that our net proceeds from the sale of the Class A common stock that we are offering will be approximately $          billion, assuming an initial public offering price of $        per share, which is the midpoint of the price range on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

The principal purposes of our initial public offering are to create a public market for our Class A common stock and thereby enable future access to the public equity markets by us and our employees, obtain additional capital, and facilitate an orderly distribution of shares for the selling stockholders. We intend to use the net proceeds to us from our initial public offering for working capital and other general corporate purposes; however we do not have any specific uses of the net proceeds planned. We may use some of the net proceeds to us to satisfy a portion of the anticipated tax withholding and remittance obligations related to the initial settlement of our outstanding RSUs, which will become due approximately six months following the completion of our initial public offering. Additionally, we may use a portion of the proceeds to us for acquisitions of complementary businesses, technologies, or other assets.

We will not receive any proceeds from the sale of shares of Class A common stock by the selling stockholders. Mark Zuckerberg, our founder, Chairman, and CEO, will offer and sell            shares in our initial public offering. We expect that substantially all of the net proceeds Mr. Zuckerberg will receive upon such sale will be used to satisfy taxes that he will incur upon his exercise of an outstanding stock option to purchase 120,000,000 shares of our Class B common stock. See "Use of Proceeds."

7

Table of Contents

| | |
|---|---|
| Voting rights | Shares of Class A common stock are entitled to one vote per share. |
| | Shares of Class B common stock are entitled to ten votes per share. |
| | Holders of our Class A common stock and Class B common stock will generally vote together as a single class, unless otherwise required by law. Mr. Zuckerberg, who after our initial public offering will control more than    % of the voting power of our outstanding capital stock, will have the ability to control the outcome of matters submitted to our stockholders for approval, including the election of our directors. See "Description of Capital Stock." |
| Proposed          symbol | "FB" |

The number of shares of Class A and Class B common stock to be outstanding after our initial public offering is based on 117,097,143 shares of our Class A common stock and 1,758,902,390 shares of our Class B common stock outstanding as of December 31, 2011, and reflects the exercise by Mr. Zuckerberg of an outstanding stock option to purchase 120,000,000 shares of our Class B common stock and the automatic conversion of          of those shares into an equivalent number of shares of Class A common stock upon their sale in our initial public offering, and excludes:

- 138,539,434 shares of Class B common stock issuable upon the exercise of options outstanding as of December 31, 2011 under our 2005 Stock Plan, with a weighted-average exercise price of approximately $0.83 per share;

- 378,772,184 shares of Class B common stock subject to RSUs outstanding as of December 31, 2011 under our 2005 Stock Plan;

- 1,947,208 shares of Class B common stock subject to RSUs granted between January 1, 2012 and March 6, 2012 under our 2005 Stock Plan;

- 302,250 shares of Class A common stock and 210 shares of Class B common stock issued between January 1, 2012 and March 6, 2012; and

- 77,123,367 shares of our common stock reserved for future issuance under our equity compensation plans, consisting of 25,000,000 shares of Class A common stock reserved for issuance under our 2012 Equity Incentive Plan, and 52,123,367 shares of Class B common stock reserved as of December 31, 2011 for issuance under our 2005 Stock Plan. On the date of this prospectus, any remaining shares available for issuance under our 2005 Stock Plan will be added to the shares reserved under our 2012 Equity Incentive Plan and we will cease granting awards under the 2005 Stock Plan. Our 2012 Equity Incentive Plan also provides for automatic annual increases in the number of shares reserved thereunder, as more fully described in "Executive Compensation—Employee Benefit Plans."

Unless expressly indicated or the context requires otherwise, all information in this prospectus assumes:

- the conversion of all outstanding shares of our convertible preferred stock into 545,551,391 shares of Class B common stock in connection with our initial public offering;

- the automatic conversion of          shares of our Class B common stock into an equivalent number of shares of our Class A common stock upon their sale by the selling stockholders in our initial public offering;

8

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

- the conversion by certain of our existing stockholders of an aggregate of ___ shares of our Class B common stock into an equivalent number of shares of our Class A common stock in connection with our initial public offering;

- no exercise by the underwriters of their right to purchase up to an additional ___ shares of Class A common stock to cover over-allotments; and

- the filing of our restated certificate of incorporation and the effectiveness of our restated bylaws in connection with our initial public offering.

9

PX0559-015

**Table of Contents**

## SUMMARY CONSOLIDATED FINANCIAL DATA

The following table summarizes our consolidated financial data. We have derived the summary consolidated statements of income data for the years ended December 31, 2009, 2010, and 2011 and the consolidated balance sheets data as of December 31, 2010 and 2011 from our audited consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of our results in any future period. The summary of our consolidated financial data set forth below should be read together with our consolidated financial statements and the related notes, as well as the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," included elsewhere in this prospectus.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2010 | 2011 |
| | (in millions, except per share data) | | |
| **Consolidated Statements of Income Data:** | | | |
| Revenue | $  777 | $ 1,974 | $ 3,711 |
| Costs and expenses[1]: | | | |
|     Cost of revenue | 223 | 493 | 860 |
|     Marketing and sales | 115 | 184 | 427 |
|     Research and development | 87 | 144 | 388 |
|     General and administrative | 90 | 121 | 280 |
| Total costs and expenses | 515 | 942 | 1,955 |
| Income from operations | 262 | 1,032 | 1,756 |
| Other expense, net | 8 | 24 | 61 |
| Income before provision for income taxes | 254 | 1,008 | 1,695 |
| Provision for income taxes | 25 | 402 | 695 |
| Net income | $  229 | $  606 | $ 1,000 |
| Net income attributable to Class A and Class B common stockholders | $  122 | $  372 | $  668 |
| Earnings per share attributable to Class A and Class B common stockholders[2]: | | | |
|     Basic | $  0.12 | $  0.34 | $  0.52 |
|     Diluted | $  0.10 | $  0.28 | $  0.46 |
| Pro forma earnings per share attributable to Class A and Class B common stockholders[2]: | | | |
|     Basic | | | $  0.49 |
|     Diluted | | | $  0.43 |

(1)  Costs and expenses include share-based compensation expense as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2010 | 2011 |
| | (in millions) | | |
| Cost of revenue | $  — | $  — | $  9 |
| Marketing and sales | 2 | 2 | 43 |
| Research and development | 6 | 9 | 114 |
| General and administrative | 19 | 9 | 51 |
|     Total share-based compensation expense | $  27 | $  20 | $  217 |

(2)  See note 2 of the notes to our consolidated financial statements for a description of how we compute basic and diluted earnings per share attributable to Class A and Class B common stockholders and pro forma basic and diluted earnings per share attributable to Class A and Class B common stockholders.

10

PX0559-016

**Table of Contents**

|  | As of December 31, 2011 | | |
|---|---|---|---|
|  | Actual | Pro Forma[1] | Pro Forma As Adjusted[2][3] |
|  |  | (in millions) | |
| **Consolidated Balance Sheet Data:** |  |  |  |
| Cash, cash equivalents, and marketable securities | $3,908 | $3,908 | $ |
| Working capital | 3,705 | 4,034 | |
| Property and equipment, net | 1,475 | 1,475 | |
| Total assets | 6,331 | 6,660 | |
| Total liabilities | 1,432 | 1,432 | |
| Additional paid-in capital | 2,684 | 4,267 | |
| Retained earnings | 1,606 | 967 | |
| Total stockholders' equity | 4,899 | 5,228 | |

(1)  The pro forma consolidated balance sheet data as of December 31, 2011 presents our consolidated balance sheet data to give effect to the automatic conversion of all of our outstanding shares of convertible preferred stock into shares of Class B common stock and to also give effect to a share-based compensation expense of approximately $968 million associated with RSUs granted prior to 2011, for which the service condition was satisfied as of December 31, 2011 and which we expect to record upon completion of our initial public offering, as further described in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Share-based Compensation." The pro forma adjustment related to share-based compensation expense of approximately $968 million has been reflected as an increase to additional paid-in capital and the associated tax effect of $329 million has been netted against this charge, resulting in a net reduction of $639 million to retained earnings. The income tax effects have been reflected as an increase to deferred tax assets included in prepaid expenses and other current assets, to reflect the anticipated future tax benefits upon settlement of these RSUs.

(2)  The pro forma as adjusted consolidated balance sheet data reflects the items described in footnote (1) above and gives effect to our receipt of estimated net proceeds from the sale of shares of Class A common stock that we are offering at an assumed initial public offering price of the Class A common stock of $     per share, the midpoint of the price range on the cover page of this prospectus, after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. A $1.00 increase (decrease) in the assumed initial public offering price of $     per share would increase (decrease) each of cash, cash equivalents, and marketable securities, working capital, total assets, additional paid-in capital, and total stockholders' equity by $     million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions.

(3)  The pro forma as adjusted data discussed above is illustrative only and will be adjusted based on the actual initial public offering price and other terms of our initial public offering determined at pricing.

11

PX0559-017

Table of Contents

# RISK FACTORS

*Investing in our Class A common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below, together with all of the other information in this prospectus, including the consolidated financial statements and the related notes included elsewhere in this prospectus, before deciding whether to invest in shares of our Class A common stock. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. If any of the following risks actually occurs, our business, financial condition, results of operations, and future prospects could be materially and adversely affected. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

**Risks Related to Our Business and Industry**

***If we fail to retain existing users or add new users, or if our users decrease their level of engagement with Facebook, our revenue, financial results, and business may be significantly harmed.***

The size of our user base and our users' level of engagement are critical to our success. We had 845 million monthly active users (MAUs) as of December 31, 2011. Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users. We anticipate that our active user growth rate will decline over time as the size of our active user base increases, and as we achieve higher market penetration rates. To the extent our active user growth rate slows, our business performance will become increasingly dependent on our ability to increase levels of user engagement in current and new markets. If people do not perceive our products to be useful, reliable, and trustworthy, we may not be able to attract or retain users or otherwise maintain or increase the frequency and duration of their engagement. A number of other social networking companies that achieved early popularity have since seen their active user bases or levels of engagement decline, in some cases precipitously. There is no guarantee that we will not experience a similar erosion of our active user base or engagement levels. A decrease in user retention, growth, or engagement could render Facebook less attractive to developers and advertisers, which may have a material and adverse impact on our revenue, business, financial condition, and results of operations. Any number of factors could potentially negatively affect user retention, growth, and engagement, including if:

- users increasingly engage with competing products;

- we fail to introduce new and improved products or if we introduce new products or services that are not favorably received;

- we are unable to successfully balance our efforts to provide a compelling user experience with the decisions we make with respect to the frequency, prominence, and size of ads and other commercial content that we display;

- we are unable to continue to develop products for mobile devices that users find engaging, that work with a variety of mobile operating systems and networks, and that achieve a high level of market acceptance;

- there are changes in user sentiment about the quality or usefulness of our products or concerns related to privacy and sharing, safety, security, or other factors;

- we are unable to manage and prioritize information to ensure users are presented with content that is interesting, useful, and relevant to them;

- there are adverse changes in our products that are mandated by legislation, regulatory authorities, or litigation, including settlements or consent decrees;

- technical or other problems prevent us from delivering our products in a rapid and reliable manner or otherwise affect the user experience;

12

**Table of Contents**

- we adopt policies or procedures related to areas such as sharing or user data that are perceived negatively by our users or the general public;

- we fail to provide adequate customer service to users, developers, or advertisers;

- we, our Platform developers, or other companies in our industry are the subject of adverse media reports or other negative publicity; or

- our current or future products, such as the Facebook Platform, reduce user activity on Facebook by making it easier for our users to interact and share on third-party websites.

If we are unable to maintain and increase our user base and user engagement, our revenue, financial results, and future growth potential may be adversely affected.

***We generate a substantial majority of our revenue from advertising. The loss of advertisers, or reduction in spending by advertisers with Facebook, could seriously harm our business.***

The substantial majority of our revenue is currently generated from third parties advertising on Facebook. In 2009, 2010, and 2011, advertising accounted for 98%, 95%, and 85%, respectively, of our revenue. As is common in the industry, our advertisers typically do not have long-term advertising commitments with us. Many of our advertisers spend only a relatively small portion of their overall advertising budget with us. In addition, advertisers may view some of our products, such as sponsored stories and ads with social context, as experimental and unproven. Advertisers will not continue to do business with us, or they will reduce the prices they are willing to pay to advertise with us, if we do not deliver ads and other commercial content in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. Our advertising revenue could be adversely affected by a number of other factors, including:

- decreases in user engagement, including time spent on Facebook;

- increased user access to and engagement with Facebook through our mobile products, where we do not currently directly generate meaningful revenue, particularly to the extent that mobile engagement is substituted for engagement with Facebook on personal computers where we monetize usage by displaying ads and other commercial content;

- product changes or inventory management decisions we may make that reduce the size, frequency, or relative prominence of ads and other commercial content displayed on Facebook;

- our inability to improve our analytics and measurement solutions that demonstrate the value of our ads and other commercial content;

- decisions by advertisers to use our free products, such as Facebook Pages, instead of advertising on Facebook;

- loss of advertising market share to our competitors;

- adverse legal developments relating to advertising, including legislative and regulatory developments and developments in litigation;

- adverse media reports or other negative publicity involving us, our Platform developers, or other companies in our industry;

- our inability to create new products that sustain or increase the value of our ads and other commercial content;

- the degree to which users opt out of social ads or otherwise limit the potential audience of commercial content;

- changes in the way online advertising is priced;

13

PX0559-019

**Table of Contents**

- the impact of new technologies that could block or obscure the display of our ads and other commercial content; and

- the impact of macroeconomic conditions and conditions in the advertising industry in general.

The occurrence of any of these or other factors could result in a reduction in demand for our ads and other commercial content, which may reduce the prices we receive for our ads and other commercial content, or cause advertisers to stop advertising with us altogether, either of which would negatively affect our revenue and financial results.

***Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results.***

We had 432 million MAUs who used Facebook mobile products in December 2011. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook. We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. In February 2012, we announced plans to include sponsored stories in users' mobile News Feeds. However, we do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. Accordingly, if users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected.

***Facebook user growth and engagement on mobile devices depend upon effective operation with mobile operating systems, networks, and standards that we do not control.***

There is no guarantee that popular mobile devices will continue to feature Facebook, or that mobile device users will continue to use Facebook rather than competing products. We are dependent on the interoperability of Facebook with popular mobile operating systems that we do not control, such as Android and iOS, and any changes in such systems that degrade our products' functionality or give preferential treatment to competitive products could adversely affect Facebook usage on mobile devices. Additionally, in order to deliver high quality mobile products, it is important that our products work well with a range of mobile technologies, systems, networks, and standards that we do not control. We may not be successful in developing relationships with key participants in the mobile industry or in developing products that operate effectively with these technologies, systems, networks, or standards. In the event that it is more difficult for our users to access and use Facebook on their mobile devices, or if our users choose not to access or use Facebook on their mobile devices or use mobile products that do not offer access to Facebook, our user growth and user engagement could be harmed.

***We may not be successful in our efforts to grow and further monetize the Facebook Platform.***

We have made and are continuing to make major investments to enable developers to build applications (apps) and websites that integrate with the Facebook Platform. Existing and prospective Platform developers may not be successful in building apps or websites that create and maintain user engagement. Additionally, developers may choose to build on other platforms, including mobile platforms controlled by third parties, rather than building on the Facebook Platform. We are continuously seeking to balance the distribution objectives of our Platform developers with our desire to provide an optimal user experience, and we may not be successful in achieving a balance that continues to attract and retain Platform developers. From time to time, we have taken actions to reduce the volume of communications from apps to users on Facebook with the objective of enhancing the user experience, and such actions have reduced distribution from, user engagement with, and our monetization opportunities from, apps on Facebook. In some instances, these actions have adversely affected our relationships with Platform developers. If we are not successful in our efforts to grow our Platform or if we are

14

Table of Contents

unable to build and maintain good relations with Platform developers, our user growth and user engagement and our financial results may be adversely affected.

Additionally, we may not be successful in further monetizing the Facebook Platform. We currently monetize the Facebook Platform in several ways, including ads on pages generated by apps on Facebook, direct advertising on Facebook purchased by Platform developers to drive traffic to their apps and websites, and fees from our Platform developers' use of our Payments infrastructure to sell virtual and digital goods to users. Apps built by developers of social games, particularly Zynga, are currently responsible for substantially all of our revenue derived from Payments. In addition, a relatively small percentage of our users have transacted with Facebook Payments. For example, in 2011, approximately 15 million users purchased virtual goods using Facebook Payments. If the Platform apps that currently generate revenue fail to grow or maintain their users and engagement, if Platform developers do not continue to introduce new apps that attract users and create engagement, if Platform developers reduce their advertising on Facebook, if we fail to maintain good relationships with Platform developers or attract new developers, or if Platform apps outside of social games do not gain popularity and generate significant revenue, our financial performance and ability to grow revenue could be adversely affected.

***Our business is highly competitive. Competition presents an ongoing threat to the success of our business.***

We face significant competition in almost every aspect of our business, including from companies such as Google, Microsoft, and Twitter, which offer a variety of Internet products, services, content, and online advertising offerings, as well as from mobile companies and smaller Internet companies that offer products and services that may compete with specific Facebook features. We also face competition from traditional and online media businesses for advertising budgets. We compete broadly with Google's social networking offerings, including Google+, and also with other, largely regional, social networks that have strong positions in particular countries, including Cyworld in Korea, Mixi in Japan, Orkut (owned by Google) in Brazil and India, and vKontakte in Russia. We would also face competition from companies in China such as Renren, Sina, and Tencent in the event that we are able to access the market in China in the future. As we introduce new products, as our existing products evolve, or as other companies introduce new products and services, we may become subject to additional competition.

Some of our current and potential competitors have significantly greater resources and better competitive positions in certain markets than we do. These factors may allow our competitors to respond more effectively than us to new or emerging technologies and changes in market requirements. Our competitors may develop products, features, or services that are similar to ours or that achieve greater market acceptance, may undertake more far-reaching and successful product development efforts or marketing campaigns, or may adopt more aggressive pricing policies. In addition, Platform partners may use information shared by our users through the Facebook Platform in order to develop products or features that compete with us. Certain competitors, including Google, could use strong or dominant positions in one or more markets to gain competitive advantage against us in areas where we operate including: by integrating competing social networking platforms or features into products they control such as search engines, web browsers, or mobile device operating systems; by making acquisitions; or by making access to Facebook more difficult. As a result, our competitors may acquire and engage users at the expense of the growth or engagement of our user base, which may negatively affect our business and financial results.

We believe that our ability to compete effectively depends upon many factors both within and beyond our control, including:

• the usefulness, ease of use, performance, and reliability of our products compared to our competitors;

• the size and composition of our user base;

• the engagement of our users with our products;

15

**Table of Contents**

- the timing and market acceptance of products, including developments and enhancements to our or our competitors' products;

- our ability to monetize our products, including our ability to successfully monetize mobile usage;

- the frequency, size, and relative prominence of the ads and other commercial content displayed by us or our competitors;

- customer service and support efforts;

- marketing and selling efforts;

- our ability to establish and maintain developers' interest in building on the Facebook Platform;

- changes mandated by legislation, regulatory authorities, or litigation, including settlements and consent decrees, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry, which may result in more formidable competitors;

- our ability to attract, retain, and motivate talented employees, particularly software engineers;

- our ability to cost-effectively manage and grow our operations; and

- our reputation and brand strength relative to our competitors.

If we are not able to effectively compete, our user base and level of user engagement may decrease, which could make us less attractive to developers and advertisers and materially and adversely affect our revenue and results of operations.

***Action by governments to restrict access to Facebook in their countries could substantially harm our business and financial results.***

It is possible that governments of one or more countries may seek to censor content available on Facebook in their country, restrict access to Facebook from their country entirely, or impose other restrictions that may affect the accessibility of Facebook in their country for an extended period of time or indefinitely. For example, access to Facebook has been or is currently restricted in whole or in part in China, Iran, North Korea, and Syria. In addition, governments in other countries may seek to restrict access to Facebook if they consider us to be in violation of their laws. In the event that access to Facebook is restricted, in whole or in part, in one or more countries or our competitors are able to successfully penetrate geographic markets that we cannot access, our ability to retain or increase our user base and user engagement may be adversely affected, we may not be able to maintain or grow our revenue as anticipated, and our financial results could be adversely affected.

***Our efforts to expand the Facebook Platform may result in users increasingly engaging with our Platform developers' Facebook-integrated websites instead of engaging on Facebook, which may negatively affect our advertising revenue and harm our business.***

We actively support Platform developers' efforts to develop products that integrate with Facebook on the developers' websites. Our Platform developers may choose to prioritize building or supporting Facebook-integrated websites as opposed to building or supporting apps that run on the Facebook website. When users visit a Platform partner's Facebook-integrated website, we do not deliver advertisements, whereas we would have displayed advertisements to these users if their activity had taken place on the Facebook website. If Facebook-integrated websites draw users away from our website, it may reduce or slow the growth of our user activity that generates advertising opportunities, which could negatively affect our advertising revenue. Although we believe that there are significant long-term benefits to Facebook resulting from increased engagement on Facebook-integrated websites, these benefits may not offset the possible loss of advertising revenue, in which case our business could be harmed.

16

**Table of Contents**

***Our new products and changes to existing products could fail to attract or retain users or generate revenue.***

Our ability to retain, increase, and engage our user base and to increase our revenue will depend heavily on our ability to create successful new products, both independently and in conjunction with Platform developers or other third parties. We may introduce significant changes to our existing products or develop and introduce new and unproven products, including using technologies with which we have little or no prior development or operating experience. If new or enhanced products fail to engage users, developers, or advertisers, we may fail to attract or retain users or to generate sufficient revenue, operating margin, or other value to justify our investments, and our business may be adversely affected. In the future, we may invest in new products and initiatives to generate revenue, but there is no guarantee these approaches will be successful. If we are not successful with new approaches to monetization, we may not be able to maintain or grow our revenue as anticipated or recover any associated development costs, and our financial results could be adversely affected.

***Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results.***

We have a culture that encourages employees to quickly develop and launch new and innovative products. As our business grows and becomes more complex, our cultural emphasis on moving quickly may result in unintended outcomes or decisions that are poorly received by users, developers, or advertisers. Our culture also prioritizes our user engagement over short-term financial results, and we frequently make product decisions that may reduce our short-term revenue or profitability if we believe that the decisions are consistent with our mission and benefit the aggregate user experience and will thereby improve our financial performance over the long term. These decisions may not produce the long-term benefits that we expect, in which case our user growth and engagement, our relationships with developers and advertisers, and our business and results of operations could be harmed.

***If we are not able to maintain and enhance our brand, or if events occur that damage our reputation and brand, our ability to expand our base of users, developers, and advertisers may be impaired, and our business and financial results may be harmed.***

We believe that the Facebook brand has significantly contributed to the success of our business. We also believe that maintaining and enhancing our brand is critical to expanding our base of users, developers, and advertisers. Many of our new users are referred by existing users, and therefore we strive to ensure that our users remain favorably inclined towards Facebook. Maintaining and enhancing our brand will depend largely on our ability to continue to provide useful, reliable, trustworthy, and innovative products, which we may not do successfully. We may introduce new products or terms of service that users do not like, which may negatively affect our brand. Additionally, the actions of our Platform developers may affect our brand if users do not have a positive experience using third-party apps and websites integrated with Facebook. We have in the past experienced, and we expect that in the future we will continue to experience, media, legislative, or regulatory scrutiny of our decisions regarding user privacy or other issues, which may adversely affect our reputation and brand. We also may fail to provide adequate customer service, which could erode confidence in our brand. Our brand may also be negatively affected by the actions of users that are deemed to be hostile or inappropriate to other users, or by users acting under false or inauthentic identities. Maintaining and enhancing our brand may require us to make substantial investments and these investments may not be successful. If we fail to successfully promote and maintain the Facebook brand or if we incur excessive expenses in this effort, our business and financial results may be adversely affected.

***Improper access to or disclosure of our users' information, or violation of our terms of service or policies, could harm our reputation and adversely affect our business.***

Our efforts to protect the information that our users have chosen to share using Facebook may be unsuccessful due to the actions of third parties, software bugs or other technical malfunctions, employee error or malfeasance, or other factors. In addition, third parties may attempt to fraudulently induce employees or users to disclose information in order to gain access to our data or our users' data. If any of these events occur, our users' information could be accessed or disclosed improperly. Our Data Use Policy governs the use of information that

17

**Table of Contents**

users have chosen to share using Facebook and how that information may be used by us and third parties. Some Platform developers may store information provided by our users through apps on the Facebook Platform or websites integrated with Facebook. If these third parties or Platform developers fail to adopt or adhere to adequate data security practices or fail to comply with our terms and policies, or in the event of a breach of their networks, our users' data may be improperly accessed or disclosed.

Any incidents involving unauthorized access to or improper use of the information of our users or incidents involving violation of our terms of service or policies, including our Data Use Policy, could damage our reputation and our brand and diminish our competitive position. In addition, the affected users or government authorities could initiate legal or regulatory action against us in connection with such incidents, which could cause us to incur significant expense and liability or result in orders or consent decrees forcing us to modify our business practices. Any of these events could have a material and adverse effect on our business, reputation, or financial results.

***Unfavorable media coverage could negatively affect our business.***

We receive a high degree of media coverage around the world. Unfavorable publicity regarding, for example, our privacy practices, product changes, product quality, litigation or regulatory activity, or the actions of our Platform developers or our users, could adversely affect our reputation. Such negative publicity also could have an adverse effect on the size, engagement, and loyalty of our user base and result in decreased revenue, which could adversely affect our business and financial results.

***Our financial results will fluctuate from quarter to quarter, which makes them difficult to predict.***

Our quarterly financial results have fluctuated in the past and will fluctuate in the future. Additionally, we have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results. As a result, you should not rely upon our past quarterly financial results as indicators of future performance. You should take into account the risks and uncertainties frequently encountered by companies in rapidly evolving markets. Our financial results in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including:

- our ability to maintain and grow our user base and user engagement;

- our ability to attract and retain advertisers in a particular period;

- seasonal fluctuations in spending by our advertisers;

- the number of ads shown to users;

- the pricing of our ads and other products;

- our ability to increase payments and other fees revenue;

- the diversification and growth of revenue sources beyond current advertising and Payments;

- the development and introduction of new products or services by us or our competitors;

- increases in marketing, sales, and other operating expenses that we may incur to grow and expand our operations and to remain competitive;

- our ability to maintain gross margins and operating margins;

- our ability to obtain equipment and components for our data centers and other technical infrastructure in a timely and cost-effective manner;

- system failures or breaches of security or privacy;

- inaccessibility of Facebook due to third-party actions;

18

PX0559-024

**Table of Contents**

- share-based compensation expense including approximately $      million that we will incur in the quarter of the completion of our initial public offering in connection with the vesting of restricted stock units (RSUs) granted prior to 2011;

- adverse litigation judgments, settlements, or other litigation-related costs;

- changes in the legislative or regulatory environment, including with respect to privacy, or enforcement by government regulators, including fines, orders, or consent decrees;

- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;

- fluctuations in the market values of our portfolio investments and in interest rates;

- changes in U.S. generally accepted accounting principles; and

- changes in business or macroeconomic conditions.

***We currently generate significant revenue as a result of our relationship with Zynga, and, if we are unable to successfully maintain this relationship, our financial results could be harmed.***

In 2011, Zynga accounted for approximately 12% of our revenue, which amount was comprised of revenue derived from payments processing fees related to Zynga's sales of virtual goods and from direct advertising purchased by Zynga. Additionally, Zynga's apps generate pages on which we display ads from other advertisers. Zynga has recently launched games on its own website and on non-Facebook platforms, and Zynga may choose to try to migrate users from existing Facebook-integrated games to other websites or platforms. We may fail to maintain good relations with Zynga or Zynga may decide to reduce or cease its investments in games on the Facebook Platform. If the use of Zynga games on our Platform declines for these or other reasons, our financial results may be adversely affected.

***We expect our rates of growth will decline in the future.***

We believe that our rates of user and revenue growth will decline over time. For example, our annual revenue grew 154% from 2009 to 2010 and 88% from 2010 to 2011. Historically, our user growth has been a primary driver of growth in our revenue. We expect that our user growth and revenue growth rates will decline as the size of our active user base increases and as we achieve higher market penetration rates. As our growth rates decline, investors' perceptions of our business may be adversely affected and the market price of our Class A common stock could decline.

***Our business is subject to complex and evolving U.S. and foreign laws and regulations regarding privacy, data protection, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are subject to a variety of laws and regulations in the United States and abroad that involve matters central to our business, including user privacy, rights of publicity, data protection, content, intellectual property, distribution, electronic contracts and other communications, competition, protection of minors, consumer protection, taxation, and online payment services. Foreign data protection, privacy, and other laws and regulations are often more restrictive than those in the United States. These U.S. federal and state and foreign laws and regulations are constantly evolving and can be subject to significant change. In addition, the application and interpretation of these laws and regulations are often uncertain, particularly in the new and rapidly evolving industry in which we operate. For example, the interpretation of some laws and regulations that govern the use of names and likenesses in connection with advertising and marketing activities is unsettled and developments in this area could affect the manner in which we design our products, as well as our terms of use. A number of proposals are pending before federal, state, and foreign legislative and regulatory bodies that could significantly affect our business. For example, a revision to the 1995 European Union Data Protection Directive is currently being considered by

19

Table of Contents

European legislative bodies that may include more stringent operational requirements for data processors and significant penalties for non-compliance. Similarly, there have been a number of recent legislative proposals in the United States, at both the federal and state level, that would impose new obligations in areas such as privacy and liability for copyright infringement by third parties. These existing and proposed laws and regulations can be costly to comply with and can delay or impede the development of new products, result in negative publicity, increase our operating costs, require significant management time and attention, and subject us to claims or other remedies, including fines or demands that we modify or cease existing business practices.

***We have been subject to regulatory investigations and settlements and we expect to continue to be subject to such proceedings in the future, which could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business.***

From time to time, we receive inquiries from regulators regarding our compliance with laws and other matters. For example, in 2011, we reached agreement with the Federal Trade Commission (FTC) to resolve an investigation into various practices by entering into a 20-year settlement agreement that, among other things, requires us to establish and refine certain practices with respect to treatment of user data and privacy settings and also requires that we complete bi-annual independent privacy audits. As another example, in 2011 the Irish Data Protection Commissioner (DPC) conducted an audit of the data, security, and privacy practices and policies of Facebook Ireland, which is the data controller for Facebook users outside the United States and Canada, and released a report of its conclusions in December 2011. The FTC and DPC have investigated and audited aspects of our products and practices, and we expect to continue to be the subject of regulatory investigations and audits in the future by these and other regulators throughout the world.

It is possible that a regulatory inquiry might result in changes to our policies or practices. Violation of existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations. In addition, it is possible that future orders issued by, or enforcement actions initiated by, regulatory authorities could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business.

***If we are unable to protect our intellectual property, the value of our brand and other intangible assets may be diminished, and our business may be adversely affected.***

We rely and expect to continue to rely on a combination of confidentiality and license agreements with our employees, consultants, and third parties with whom we have relationships, as well as trademark, copyright, patent, trade secret, and domain name protection laws, to protect our proprietary rights. In the United States and internationally, we have filed various applications for protection of certain aspects of our intellectual property, and we currently hold a number of issued patents in multiple jurisdictions. However, third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, and pending and future trademark and patent applications may not be approved. In addition, effective intellectual property protection may not be available in every country in which we operate or intend to operate our business. In any or all of these cases, we may be required to expend significant time and expense in order to prevent infringement or to enforce our rights. Although we have taken measures to protect our proprietary rights, there can be no assurance that others will not offer products or concepts that are substantially similar to ours and compete with our business. In addition, we regularly contribute software source code under open source licenses and have made other technology we developed available under other open licenses, and we include open source software in our products. For example, we have contributed certain specifications and designs related to our data center equipment to the Open Compute Project Foundation, a non-profit entity that shares and develops such information with the technology community, under the Open Web Foundation License. As a result of our open source contributions and the use of open source in our products, we may license or be required to license innovations that turn out to be material to our business and may also be exposed to increased litigation risk. If the protection of our proprietary rights is inadequate to prevent unauthorized use or appropriation by third parties, the value of our brand and other intangible assets may be diminished and competitors may be able to more effectively mimic our service and methods of operations. Any of these events could have an adverse effect on our business and financial results.

20

PX0559-026

Table of Contents

***We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property rights claims that are expensive and time consuming, and, if resolved adversely, could have a significant impact on our business, financial condition, or results of operations.***

Companies in the Internet, technology, and media industries own large numbers of patents, copyrights, trademarks, and trade secrets, and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" that own patents and other intellectual property rights often attempt to aggressively assert their rights in order to extract value from technology companies. Furthermore, from time to time we may introduce new products, including in areas where we currently do not compete, which could increase our exposure to patent and other intellectual property claims from competitors and non-practicing entities.

We presently are involved in a number of lawsuits, and as we face increasing competition and gain an increasingly high profile, including in connection with our initial public offering, we expect the number of patent and other intellectual property claims against us to grow. For example, on February 27, 2012, we received a letter from Yahoo! Inc. that alleged that a number of our products infringe the claims of 13 of Yahoo's patents. We are still in the process of investigating the allegations contained in the letter. To date, Yahoo has not commenced any legal action against us, but it may do so in the future.

Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the final outcome of intellectual property litigation that is currently pending against us will have a material adverse effect on our business, financial condition, or results of operations. However, defending patent and other intellectual property litigation is costly and can impose a significant burden on management and employees, and there can be no assurances that favorable final outcomes will be obtained in all cases. In addition, plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of any such litigation, including potential preliminary injunctions requiring us to cease some or all of our operations. We may decide to settle such lawsuits and disputes on terms that are unfavorable to us. Similarly, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that may not be reversed upon appeal. The terms of such a settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, we may have to seek a license to continue practices found to be in violation of a third party's rights, which may not be available on reasonable terms, or at all, and may significantly increase our operating costs and expenses. As a result, we may also be required to develop alternative non-infringing technology or practices or discontinue the practices. The development of alternative non-infringing technology or practices could require significant effort and expense or may not be feasible. Our business, financial condition, or results of operations could be adversely affected as a result.

***We are involved in numerous class action lawsuits and other litigation matters that are expensive and time consuming, and, if resolved adversely, could harm our business, financial condition, or results of operations.***

In addition to intellectual property claims, we are also involved in numerous other lawsuits, including putative class action lawsuits brought by users and advertisers, many of which claim statutory damages, and we anticipate that we will continue to be a target for numerous lawsuits in the future. Because we have hundreds of millions of users, the plaintiffs in class action cases filed against us typically claim enormous monetary damages even if the alleged per-user harm is small or non-existent. Any litigation to which we are a party may result in an onerous or unfavorable judgment that may not be reversed upon appeal, or we may decide to settle lawsuits on similarly unfavorable terms. Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our products or business practices, and accordingly our business, financial condition, or results of operations could be materially and adversely affected. Although the results of lawsuits and claims cannot be predicted with certainty, we do not believe that the final outcome of those matters that we currently face will have a material adverse effect on our business, financial condition, or results of operations. However, defending these claims is costly and can impose a significant burden on management and employees, and we may receive unfavorable preliminary or interim rulings in the course of litigation, which could adversely affect the market price of our Class A common stock. There can be no assurances that a favorable final outcome will be obtained in all cases.

21

PX0559-027

Table of Contents

***Our CEO has control over key decision making as a result of his control of a majority of our voting stock.***

As a result of voting agreements with certain stockholders, together with the shares he holds, Mark Zuckerberg, our founder, Chairman, and CEO, will be able to exercise voting rights with respect to an aggregate of          shares of common stock, which will represent approximately      % of the voting power of our outstanding capital stock following our initial public offering. As a result, Mr. Zuckerberg has the ability to control the outcome of matters submitted to our stockholders for approval, including the election of directors and any merger, consolidation, or sale of all or substantially all of our assets. This concentrated control could delay, defer, or prevent a change of control, merger, consolidation, or sale of all or substantially all of our assets that our other stockholders support, or conversely this concentrated control could result in the consummation of such a transaction that our other stockholders do not support. This concentrated control could also discourage a potential investor from acquiring our Class A common stock due to the limited voting power of such stock relative to the Class B common stock and might harm the market price of our Class A common stock. In addition, Mr. Zuckerberg has the ability to control the management and major strategic investments of our company as a result of his position as our CEO and his ability to control the election or replacement of our directors. In the event of his death, the shares of our capital stock that Mr. Zuckerberg owns will be transferred to the persons or entities that he designates. As a board member and officer, Mr. Zuckerberg owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, even a controlling stockholder, Mr. Zuckerberg is entitled to vote his shares, and shares over which he has voting control as a result of voting agreements, in his own interests, which may not always be in the interests of our stockholders generally. For a description of these voting agreements, see "Description of Capital Stock—Voting Agreements."

***We anticipate that we will expend substantial funds in connection with the tax liabilities that arise upon the initial settlement of RSUs following our initial public offering and the manner in which we fund that expenditure may have an adverse effect on our financial condition.***

We anticipate that we will expend substantial funds to satisfy tax withholding and remittance obligations on a date approximately six months following our initial public offering, when we will settle a portion of our RSUs granted prior to January 1, 2011 (Pre-2011 RSUs). On the settlement date, we plan to withhold and remit income taxes at applicable minimum statutory rates based on the then-current value of the underlying shares. We currently expect that the average of these withholding tax rates will be approximately 45%. If the price of our common stock at the time of settlement were equal to the midpoint of the price range on the cover page of this prospectus, we estimate that this tax obligation would be approximately $          billion in the aggregate. The amount of this obligation could be higher or lower, depending on the price of our shares on the RSU settlement date. To settle these RSUs, assuming a 45% tax withholding rate, we anticipate that we will net settle the awards by delivering approximately          shares of Class B common stock to RSU holders and simultaneously withholding approximately          shares of Class B common stock. In connection with this net settlement we will withhold and remit the tax liabilities on behalf of the RSU holders in cash to the applicable tax authorities.

To fund the withholding and remittance obligation, we expect to sell equity securities near the settlement date in an amount that is substantially equivalent to the number of shares of common stock that we withhold in connection with the initial settlement of the Pre-2011 RSUs, such that the newly issued shares should not be dilutive. However, in the event that we issue equity securities, we cannot assure you that we will be able to successfully match the proceeds to the amount of this tax liability. In addition, any such equity financing could result in a decline in our stock price. If we elect not to fully fund tax withholding and remittance obligations through the issuance of equity or we are unable to complete such an offering due to market conditions or otherwise, we may choose to borrow funds from our credit facilities, use a substantial portion of our existing cash, or rely upon a combination of these alternatives. In the event that we elect to satisfy tax withholding and remittance obligations in whole or in part by drawing on our credit facilities, our interest expense and principal repayment requirements could increase significantly, which could have an adverse effect on our financial results.

22

**Table of Contents**

***We cannot be certain that additional financing will be available on reasonable terms when required, or at all.***

From time to time, we may need additional financing, whether in connection with our RSU tax obligation or otherwise. Our ability to obtain additional financing, if and when required, will depend on investor demand, our operating performance, the condition of the capital markets, and other factors. To the extent we draw on our credit facilities to fund the RSU tax obligation, we may need to raise additional funds and we cannot assure you that additional financing will be available to us on favorable terms when required, or at all. If we raise additional funds through the issuance of equity, equity-linked or debt securities, those securities may have rights, preferences, or privileges senior to the rights of our Class A common stock, and our existing stockholders may experience dilution.

***Our costs may grow more quickly than our revenue, harming our business and profitability.***

Providing our products to our users is costly and we expect our expenses to continue to increase in the future as we broaden our user base, as users increase the number of connections and amount of data they share with us, as we develop and implement new product features that require more computing infrastructure, and as we hire additional employees. Historically, our costs have increased each year due to these factors and we expect to continue to incur increasing costs, in particular for servers, storage, power, and data centers, to support our anticipated future growth. We expect to continue to invest in our global infrastructure in order to provide our products rapidly and reliably to all users around the world, including in countries where we do not expect significant short-term monetization. Our expenses may be greater than we anticipate, and our investments to make our business and our technical infrastructure more efficient may not be successful. In addition, we may increase marketing, sales, and other operating expenses in order to grow and expand our operations and to remain competitive. Increases in our costs may adversely affect our business and profitability.

***Our business is dependent on our ability to maintain and scale our technical infrastructure, and any significant disruption in our service could damage our reputation, result in a potential loss of users and engagement, and adversely affect our financial results.***

Our reputation and ability to attract, retain, and serve our users is dependent upon the reliable performance of Facebook and our underlying technical infrastructure. Our systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages that could be harmful to our business. If Facebook is unavailable when users attempt to access it, or if it does not load as quickly as they expect, users may not return to our website as often in the future, or at all. As our user base and the amount and types of information shared on Facebook continue to grow, we will need an increasing amount of technical infrastructure, including network capacity, and computing power, to continue to satisfy the needs of our users. It is possible that we may fail to effectively scale and grow our technical infrastructure to accommodate these increased demands. In addition, our business is subject to interruptions, delays, or failures resulting from earthquakes, other natural disasters, terrorism, or other catastrophic events.

A substantial portion of our network infrastructure is provided by third parties. Any disruption or failure in the services we receive from these providers could harm our ability to handle existing or increased traffic and could significantly harm our business. Any financial or other difficulties these providers face may adversely affect our business, and we exercise little control over these providers, which increases our vulnerability to problems with the services they provide.

***We recently began to own and build key portions of our technical infrastructure, and, because of our limited experience in this area, we could experience unforeseen difficulties.***

In 2011, we began serving our products from data centers owned by Facebook using servers specifically designed for us. We plan to continue to significantly expand the size of our infrastructure, primarily through data centers that we design and own. The infrastructure expansion we are undertaking is complex, and unanticipated delays in the completion of these projects or availability of components may lead to increased project costs, operational inefficiencies, or interruptions in the delivery or degradation of the quality of our products. In

23

**Table of Contents**

addition, there may be issues related to this infrastructure that are not identified during the testing phases of design and implementation, which may only become evident after we have started to fully utilize the underlying equipment, that could further degrade the user experience or increase our costs.

***Our software is highly technical, and if it contains undetected errors, our business could be adversely affected.***

Our products incorporate software that is highly technical and complex. Our software has contained, and may now or in the future contain, undetected errors, bugs, or vulnerabilities. Some errors in our software code may only be discovered after the code has been released. Any errors, bugs, or vulnerabilities discovered in our code after release could result in damage to our reputation, loss of users, loss of revenue, or liability for damages, any of which could adversely affect our business and financial results.

***Certain of our user metrics are subject to inherent challenges in measurement, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.***

The numbers of our MAUs and daily active users (DAUs) are calculated using internal company data. While we believe these numbers are reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring usage of our products across large online and mobile populations around the world. For example, there may be individuals who have multiple Facebook accounts in violation of our terms of service, despite our efforts to detect and suppress such behavior. We estimate that false or duplicate accounts may have represented approximately 5-6% of our MAUs as of December 31, 2011. However, this estimate is based on an internal review of a limited sample of accounts and we apply significant judgment in making this determination, such as identifying names that appear to be fake or other behavior that appears inauthentic to the reviewers. As such, our estimation of false or duplicate accounts may not accurately represent the actual number of such accounts. Our metrics are also affected by applications on certain mobile devices that automatically contact our servers for regular updates with no user action involved, and this activity can cause our system to count the user associated with such a device as an active user on the day such contact occurs. We estimate that less than 5% of our estimated worldwide DAUs as of December 31, 2011 and 2010 resulted from this type of automatic mobile activity, and that this type of activity had a substantially smaller effect on our estimate of worldwide MAUs and mobile MAUs. The impact of this automatic activity on our metrics varies by geography because mobile usage varies in different regions of the world. In addition, our data regarding the geographic location of our users is estimated based on a number of factors, such as IP address, which may not always accurately reflect the user's actual location. If advertisers, developers, or investors do not perceive our user metrics to be accurate representations of our user base, or if we discover material inaccuracies in our user metrics, our reputation may be harmed and advertisers and developers may be less willing to allocate their budgets or resources to Facebook, which could negatively affect our business and financial results.

***We cannot assure you that we will effectively manage our growth.***

Our employee headcount and the scope and complexity of our business have increased significantly, with the number of full-time employees increasing from 2,127 as of December 31, 2010, to 3,200 as of December 31, 2011, and we expect headcount growth to continue for the foreseeable future. The growth and expansion of our business and products create significant challenges for our management, operational, and financial resources, including managing multiple relations with users, advertisers, Platform developers, and other third parties. In the event of continued growth of our operations or in the number of our third-party relationships, our information technology systems or our internal controls and procedures may not be adequate to support our operations. In addition, some members of our management do not have significant experience managing a large global business operation, so our management may not be able to manage such growth effectively. To effectively manage our growth, we must continue to improve our operational, financial, and management processes and systems and to effectively expand, train, and manage our employee base. As our organization continues to grow, and we are required to implement more complex organizational management structures, we may find it increasingly difficult to maintain the benefits of our corporate culture, including our ability to quickly develop and launch new and innovative products. This could negatively affect our business performance.

24

Table of Contents

***The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could harm our business.***

We currently depend on the continued services and performance of our key personnel, including Mark Zuckerberg and Sheryl K. Sandberg. Although we have entered into employment agreements with Mr. Zuckerberg and Ms. Sandberg, the agreements have no specific duration and constitute at-will employment. In addition, many of our key technologies and systems are custom-made for our business by our personnel. The loss of key personnel, including members of management as well as key engineering, product development, marketing, and sales personnel, could disrupt our operations and have an adverse effect on our business.

As we continue to grow, we cannot guarantee we will continue to attract the personnel we need to maintain our competitive position. In particular, we intend to hire a significant number of engineering and sales personnel in 2012, and we expect to face significant competition from other companies in hiring such personnel, particularly in the San Francisco Bay Area. As we mature, the incentives to attract, retain, and motivate employees provided by our equity awards or by future arrangements, such as through cash bonuses, may not be as effective as in the past. Additionally, we have a number of current employees whose equity ownership in our company gives them a substantial amount of personal wealth. Likewise, we have a number of current employees whose equity awards are fully vested and shortly after the completion of our initial public offering will be entitled to receive substantial amounts of our capital stock. As a result, it may be difficult for us to continue to retain and motivate these employees, and this wealth could affect their decisions about whether or not they continue to work for us. If we do not succeed in attracting, hiring, and integrating excellent personnel, or retaining and motivating existing personnel, we may be unable to grow effectively.

***We may incur liability as a result of information retrieved from or transmitted over the Internet or posted to Facebook and claims related to our products.***

We have faced, currently face, and will continue to face claims relating to information that is published or made available on Facebook. In particular, the nature of our business exposes us to claims related to defamation, intellectual property rights, rights of publicity and privacy, and personal injury torts. This risk is enhanced in certain jurisdictions outside the United States where our protection from liability for third-party actions may be unclear and where we may be less protected under local laws than we are in the United States. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages. If any of these events occur, our business and financial results could be adversely affected.

***Computer malware, viruses, hacking and phishing attacks, and spamming could harm our business and results of operations.***

Computer malware, viruses, and computer hacking and phishing attacks have become more prevalent in our industry, have occurred on our systems in the past, and may occur on our systems in the future. Because of our prominence, we believe that we are a particularly attractive target for such attacks. Though it is difficult to determine what, if any, harm may directly result from any specific interruption or attack, any failure to maintain performance, reliability, security, and availability of our products and technical infrastructure to the satisfaction of our users may harm our reputation and our ability to retain existing users and attract new users.

In addition, spammers attempt to use our products to send targeted and untargeted spam messages to users, which may embarrass or annoy users and make Facebook less user-friendly. We cannot be certain that the technologies and employees that we have to attempt to defeat spamming attacks will be able to eliminate all spam messages from being sent on our platform. As a result of spamming activities, our users may use Facebook less or stop using our products altogether.

25

**Table of Contents**

***Payment transactions on the Facebook Platform may subject us to additional regulatory requirements and other risks that could be costly and difficult to comply with or that could harm our business.***

Our users can use the Facebook Platform to purchase virtual and digital goods from our Platform developers using our Payments infrastructure. Depending on how our Payments product evolves, we may be subject to a variety of laws and regulations in the United States, Europe, and elsewhere, including those governing money transmission, gift cards and other prepaid access instruments, electronic funds transfers, anti-money laundering, counter-terrorist financing, gambling, banking and lending, and import and export restrictions. In some jurisdictions, the application or interpretation of these laws and regulations is not clear. To increase flexibility in how our use of Payments may evolve and to mitigate regulatory uncertainty, we have applied for certain money transmitter licenses and expect to apply for additional money transmitter licenses in the United States, which will generally require us to demonstrate compliance with many domestic laws in these areas. Our efforts to comply with these laws and regulations could be costly and result in diversion of management time and effort and may still not guarantee compliance. In the event that we are found to be in violation of any such legal or regulatory requirements, we may be subject to monetary fines or other penalties such as a cease and desist order, or we may be required to make product changes, any of which could have an adverse effect on our business and financial results.

In addition, we may be subject to a variety of additional risks as a result of Payments on the Facebook Platform, including:

- increased costs and diversion of management time and effort and other resources to deal with bad transactions or customer disputes;

- potential fraudulent or otherwise illegal activity by users, developers, employees, or third parties;

- restrictions on the investment of consumer funds used to transact Payments; and

- additional disclosure and reporting requirements.

***We plan to continue expanding our operations abroad where we have limited operating experience and may be subject to increased business and economic risks that could affect our financial results.***

We plan to continue the international expansion of our business operations and the translation of our products. We currently make Facebook available in more than 70 different languages, and we have offices or data centers in more than 20 different countries. We may enter new international markets where we have limited or no experience in marketing, selling, and deploying our products. For example, we continue to evaluate entering China. However, this market has substantial legal and regulatory complexities that have prevented our entry into China to date. If we fail to deploy or manage our operations in international markets successfully, our business may suffer. In addition, we are subject to a variety of risks inherent in doing business internationally, including:

- political, social, or economic instability;

- risks related to the legal and regulatory environment in foreign jurisdictions, including with respect to privacy, and unexpected changes in laws, regulatory requirements, and enforcement;

- potential damage to our brand and reputation due to compliance with local laws, including potential censorship or requirements to provide user information to local authorities;

- fluctuations in currency exchange rates;

- higher levels of credit risk and payment fraud;

- enhanced difficulties of integrating any foreign acquisitions;

- burdens of complying with a variety of foreign laws;

- reduced protection for intellectual property rights in some countries;

PX0559-032

**Table of Contents**

- difficulties in staffing and managing global operations and the increased travel, infrastructure, and legal compliance costs associated with multiple international locations;

- compliance with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, and similar laws in other jurisdictions; and

- compliance with statutory equity requirements and management of tax consequences.

If we are unable to expand internationally and manage the complexity of our global operations successfully, our financial results could be adversely affected.

***We plan to continue to make acquisitions, which could require significant management attention, disrupt our business, result in dilution to our stockholders, and adversely affect our financial results.***

As part of our business strategy, we have made and intend to make acquisitions to add specialized employees, complementary companies, products, or technologies. However, we have not made any large acquisitions to date, and, as a result, our ability to acquire and integrate larger or more significant companies, products, or technologies in a successful manner is unproven. In the future, we may not be able to find other suitable acquisition candidates, and we may not be able to complete acquisitions on favorable terms, if at all. Our previous and future acquisitions may not achieve our goals, and any future acquisitions we complete could be viewed negatively by users, developers, advertisers, or investors. In addition, if we fail to successfully integrate any acquisitions, or the technologies associated with such acquisitions, into our company, the revenue and operating results of the combined company could be adversely affected. Any integration process may require significant time and resources, and we may not be able to manage the process successfully. We may not successfully evaluate or utilize the acquired technology or personnel, or accurately forecast the financial impact of an acquisition transaction, including accounting charges. We may have to pay cash, incur debt, or issue equity securities to pay for any such acquisition, any of which could adversely affect our financial results. The sale of equity or issuance of debt to finance any such acquisitions could result in dilution to our stockholders. The incurrence of indebtedness would result in increased fixed obligations and could also include covenants or other restrictions that would impede our ability to manage our operations.

***If we default on our leasing and credit obligations, our operations may be interrupted and our business and financial results could be adversely affected.***

We finance a significant portion of our expenditures through leasing arrangements, some of which are not required to be reflected on our balance sheet, and we may enter into additional similar arrangements in the future. In particular, we have used these types of arrangements to finance some of our equipment and data centers. In addition, we have credit facilities that we may draw upon to finance our operations or other corporate purposes, such as funding our tax withholding and remittance obligations in connection with the settlement of RSUs. If we default on these leasing and credit obligations, our leasing partners and lenders may, among other things:

- require repayment of any outstanding lease obligations or amounts drawn on our credit facilities;

- terminate our leasing arrangements and credit facilities;

- terminate our access to the leased data centers we utilize;

- stop delivery of ordered equipment;

- sell or require us to return our leased equipment; or

- require us to pay significant damages.

If some or all of these events were to occur, our operations may be interrupted and our ability to fund our operations or obligations, as well as our business, financial results, and financial condition, could be adversely affected.

27

PX0559-033

**Table of Contents**

*We may have exposure to greater than anticipated tax liabilities.*

Our income tax obligations are based on our corporate operating structure and intercompany arrangements, including the manner in which we develop, value, and use our intellectual property and the valuations of our intercompany transactions. The tax laws applicable to our international business activities, including the laws of the United States and other jurisdictions, are subject to interpretation. The taxing authorities of the jurisdictions in which we operate may challenge our methodologies for valuing developed technology or intercompany arrangements, which could increase our worldwide effective tax rate and harm our financial position and results of operations. In addition, our future income taxes could be adversely affected by earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, or by changes in tax laws, regulations, or accounting principles. We are subject to regular review and audit by both U.S. federal and state and foreign tax authorities. Any adverse outcome of such a review or audit could have a negative effect on our financial position and results of operations. In addition, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment by management, and there are many transactions where the ultimate tax determination is uncertain. Although we believe that our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

*The enactment of legislation implementing changes in the U.S. taxation of international business activities or the adoption of other tax reform policies could materially affect our financial position and results of operations.*

The current administration has made public statements indicating that it has made international tax reform a priority, and key members of the U.S. Congress have conducted hearings and proposed a wide variety of potential changes. Certain changes to U.S. tax laws, including limitations on the ability to defer U.S. taxation on earnings outside of the United States until those earnings are repatriated to the United States, could affect the tax treatment of our foreign earnings, as well as cash and cash equivalent balances we currently maintain outside of the United States. Due to the large and expanding scale of our international business activities, any changes in the U.S. taxation of such activities may increase our worldwide effective tax rate and harm our financial position and results of operations.

**Risks Related to Our Initial Public Offering and Ownership of Our Class A Common Stock**

*The market price of our Class A common stock may be volatile or may decline regardless of our operating performance, and you may not be able to resell your shares at or above the initial public offering price.*

The initial public offering price for our Class A common stock will be determined through negotiations between the underwriters and us and may vary from the market price of our Class A common stock following our initial public offering. If you purchase shares of our Class A common stock in our initial public offering, you may not be able to resell those shares at or above the initial public offering price. We cannot assure you that the initial public offering price of our Class A common stock, or the market price following our initial public offering, will equal or exceed prices in privately negotiated transactions of our shares that have occurred from time to time prior to our initial public offering. The market price of our Class A common stock may fluctuate significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our revenue and other operating results;

- the financial projections we may provide to the public, any changes in these projections or our failure to meet these projections;

- actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company, or our failure to meet these estimates or the expectations of investors;

28

**Table of Contents**

- additional shares of our common stock being sold into the market by us or our existing stockholders or the anticipation of such sales, including if we issue shares to satisfy RSU-related tax obligations or if existing stockholders sell shares into the market when applicable "lock-up" periods end;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- announcements by us or estimates by third parties of actual or anticipated changes in the size of our user base or the level of user engagement;

- changes in operating performance and stock market valuations of technology companies in our industry, including our Platform developers and competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war or incidents of terrorism, or responses to these events.

In addition, the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many technology companies. Stock prices of many technology companies have fluctuated in a manner unrelated or disproportionate to the operating performance of those companies. In the past, stockholders have filed securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business, and adversely affect our business.

***Substantial blocks of our total outstanding shares may be sold into the market when "lock-up" or "market standoff" periods end. If there are substantial sales of shares of our common stock, the price of our Class A common stock could decline.***

The price of our Class A common stock could decline if there are substantial sales of our common stock, particularly sales by our directors, executive officers, employees, and significant stockholders, or when there is a large number of shares of our common stock available for sale. After our initial public offering, we will have outstanding            shares of our Class A common stock and            shares of our Class B common stock, based on the number of shares outstanding as of December 31, 2011. This includes            shares that we and the selling stockholders are selling in our initial public offering, which shares may be resold in the public market immediately following our initial public offering, and assumes no additional exercises of outstanding options (other than the exercise of the option held by Mr. Zuckerberg described elsewhere in this prospectus). In addition, we expect to issue            shares of our Class B common stock upon the net settlement of RSUs approximately six months following our initial public offering. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. The            shares of our Class A common stock and            shares of our Class B common stock that are not offered and sold in our initial public offering as well as the shares underlying outstanding RSUs will be eligible for sale in the public market in the near future as set forth below.

29

PX0559-035

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

| Date Available for Sale into Public Market | Number of Shares of Common Stock |
|---|---|
| 91 days after the date of this prospectus | shares held by the selling stockholders other than Mr. Zuckerberg |
| Approximately six months after the date of this prospectus | approximately            shares underlying net- settled RSUs |
| 181 days after the date of this prospectus | shares |
| 211 days after the date of this prospectus | shares held by the selling stockholders |
| One year after the date of this prospectus | shares held by Mail.ru Group Limited and DST Global Limited and their respective affiliates |
| 18 months after the date of this prospectus | shares held by Mail.ru Group Limited and DST Global Limited and their respective affiliates |

Of the 138,539,434 shares of our Class B common stock that were subject to stock options outstanding (and not held by Mr. Zuckerberg) as of December 31, 2011, options to purchase 124,848,924 shares of Class B common stock were vested as of December 31, 2011 and the Class B common stock underlying such options will be eligible for sale approximately six months after the date of this prospectus. We expect an additional            shares of Class B common stock to be delivered upon the net settlement of RSUs between the date that is approximately six months after the date of this prospectus and December 31, 2012, which shares would be eligible for sale in the public market immediately following settlement.

After our initial public offering, certain holders of our Class A common stock and Class B common stock will have rights, subject to some conditions, to require us to file registration statements covering their shares or to include their shares in registration statements that we may file for ourselves or our stockholders. All of these shares are subject to market standoff or lock-up agreements restricting their sale for specified periods of time after the date of this prospectus. We also intend to register shares of common stock that we have issued and may issue under our employee equity incentive plans. Once we register these shares, they will be able to be sold freely in the public market upon issuance, subject to existing market standoff or lock-up agreements.

Morgan Stanley & Co. LLC may, in its sole discretion, permit our executive officers, our directors, and the selling stockholders to sell shares prior to the expiration of the restrictive provisions contained in the "lock-up" agreements with the underwriters. In addition, we may, in our sole discretion, permit our employees and current stockholders who are subject to market standoff agreements or arrangements with us and who are not subject to a lock-up agreement with the underwriters to sell shares prior to the expiration of the restrictive provisions contained in those market standoff agreements or arrangements.

The market price of the shares of our Class A common stock could decline as a result of the sale of a substantial number of our shares of common stock in the public market or the perception in the market that the holders of a large number of shares intend to sell their shares.

*In making your investment decision, you should not rely on information in public media that is published by third parties. You should rely only on statements made in this prospectus in determining whether to purchase our shares.*

You should carefully evaluate all of the information in this prospectus. We have in the past received, and may continue to receive, a high degree of media coverage, including coverage that is not directly attributable to statements made by our officers and employees, that incorrectly reports on statements made by our officers or employees, or that is misleading as a result of omitting information provided by us, our officers, or employees. You should rely only on the information contained in this prospectus in determining whether to purchase our shares of Class A common stock.

30

PX0559-036

**Table of Contents**

***We have broad discretion in the use of the net proceeds from our initial public offering and may not use them effectively.***

We cannot specify with any certainty the particular uses of the net proceeds that we will receive from our initial public offering. Our management will have broad discretion in the application of the net proceeds, including working capital, possible acquisitions, and other general corporate purposes, and we may spend or invest these proceeds in a way with which our stockholders disagree. The failure by our management to apply these funds effectively could harm our business and financial condition. Pending their use, we may invest the net proceeds from our initial public offering in a manner that does not produce income or that loses value.

***If securities or industry analysts publish inaccurate or unfavorable research about our business, our stock price could decline.***

The trading market for our Class A common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business. If one or more of the analysts who cover us downgrade our Class A common stock or publish inaccurate or unfavorable research about our business, our Class A common stock price would likely decline.

***We do not intend to pay dividends for the foreseeable future.***

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any dividends in the foreseeable future. As a result, you may only receive a return on your investment in our Class A common stock if the market price of our Class A common stock increases. In addition, our credit facilities contain restrictions on our ability to pay dividends.

***If we are unable to implement and maintain effective internal control over financial reporting in the future, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Class A common stock may be negatively affected.***

As a public company, we will be required to maintain internal controls over financial reporting and to report any material weaknesses in such internal controls. In addition, beginning with our 2013 Annual Report on Form 10-K to be filed in 2014, we will be required to furnish a report by management on the effectiveness of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. We are in the process of designing, implementing, and testing the internal control over financial reporting required to comply with this obligation, which process is time consuming, costly, and complicated. If we identify material weaknesses in our internal control over financial reporting, if we are unable to comply with the requirements of Section 404 in a timely manner or assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Class A common stock could be negatively affected, and we could become subject to investigations by the stock exchange on which our securities are listed, the Securities and Exchange Commission, or other regulatory authorities, which could require additional financial and management resources.

***The requirements of being a public company may strain our resources and divert management's attention.***

As a public company, we will be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (Exchange Act), the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the                    , and other applicable securities rules and regulations. Compliance with these rules and regulations will increase our legal and financial compliance costs, make some activities more difficult, time-consuming, or costly, and increase demand on our systems and resources. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and operating results.

31

**Table of Contents**

As a result of disclosure of information in this prospectus and in filings required of a public company, our business and financial condition will become more visible, which we believe may result in threatened or actual litigation, including by competitors and other third parties. If such claims are successful, our business and operating results could be harmed, and even if the claims do not result in litigation or are resolved in our favor, these claims, and the time and resources necessary to resolve them, could divert the resources of our management and harm our business and operating results.

*If you purchase shares of our Class A common stock in our initial public offering, you will experience substantial and immediate dilution.*

If you purchase shares of our Class A common stock in our initial public offering, you will experience substantial and immediate dilution in the pro forma net tangible book value per share of $      per share as of December 31, 2011, based on an assumed initial public offering price of our Class A common stock of $      per share, the midpoint of the price range on the cover page of this prospectus, because the price that you pay will be substantially greater than the pro forma net tangible book value per share of the Class A common stock that you acquire. This dilution is due in large part to the fact that our earlier investors paid substantially less than the initial public offering price when they purchased their shares of our capital stock. You will experience additional dilution upon exercise of options to purchase common stock under our equity incentive plans, upon vesting of RSUs, if we issue restricted stock to our employees under our equity incentive plans, or if we otherwise issue additional shares of our common stock. For more information, see "Dilution."

*The dual class structure of our common stock and the voting agreements among certain stockholders have the effect of concentrating voting control with our CEO, and also with employees and directors and their affiliates; this will limit or preclude your ability to influence corporate matters.*

Our Class B common stock has ten votes per share, and our Class A common stock, which is the stock we are offering in our initial public offering, has one vote per share. Stockholders who hold shares of Class B common stock, including our executive officers, employees, and directors and their affiliates, will together hold approximately      % of the voting power of our outstanding capital stock following our initial public offering. Because of the ten-to-one voting ratio between our Class B and Class A common stock, the holders of our Class B common stock collectively will continue to control a majority of the combined voting power of our common stock and therefore be able to control all matters submitted to our stockholders for approval so long as the shares of Class B common stock represent at least 9.1% of all outstanding shares of our Class A and Class B common stock. This concentrated control will limit or preclude your ability to influence corporate matters for the foreseeable future.

Future transfers by holders of Class B common stock will generally result in those shares converting to Class A common stock, subject to limited exceptions, such as certain transfers effected for estate planning purposes. The conversion of Class B common stock to Class A common stock will have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term. If, for example, Mr. Zuckerberg retains a significant portion of his holdings of Class B common stock for an extended period of time, he could, in the future, continue to control a majority of the combined voting power of our Class A common stock and Class B common stock. For a description of the dual class structure, see "Description of Capital Stock—Anti-Takeover Provisions."

*We have elected to take advantage of the "controlled company" exemption to the corporate governance rules for publicly-listed companies, which could make our Class A common stock less attractive to some investors or otherwise harm our stock price.*

Because we qualify as a "controlled company" under the corporate governance rules for publicly-listed companies, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and has chosen

32

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

to have the full board of directors be directly responsible for nominating members of our board, and in the future we could elect not to have a majority of our board of directors be independent or not to have a compensation committee. Accordingly, should the interests of our controlling stockholder differ from those of other stockholders, the other stockholders may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance rules for publicly-listed companies. Our status as a controlled company could make our Class A common stock less attractive to some investors or otherwise harm our stock price.

***Delaware law and provisions in our restated certificate of incorporation and bylaws that will be in effect at the closing of our initial public offering could make a merger, tender offer, or proxy contest difficult, thereby depressing the trading price of our Class A common stock.***

Following the closing of our initial public offering, our status as a Delaware corporation and the anti-takeover provisions of the Delaware General Corporation Law may discourage, delay, or prevent a change in control by prohibiting us from engaging in a business combination with an interested stockholder for a period of three years after the person becomes an interested stockholder, even if a change of control would be beneficial to our existing stockholders. In addition, our restated certificate of incorporation and bylaws that will be in effect at the closing of our initial public offering will contain provisions that may make the acquisition of our company more difficult, including the following:

- any transaction that would result in a change in control of our company will require the approval of a majority of our outstanding Class B common stock voting as a separate class;

- we have a dual class common stock structure, which provides Mr. Zuckerberg with the ability to control the outcome of matters requiring stockholder approval, even if he owns significantly less than a majority of the shares of our outstanding Class A and Class B common stock;

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock, certain amendments to our restated certificate of incorporation or bylaws will require the approval of two-thirds of the combined vote of our then-outstanding shares of Class A and Class B common stock;

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of our common stock, vacancies on our board of directors will be able to be filled only by our board of directors and not by stockholders;

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of our common stock, our board of directors will be classified into three classes of directors with staggered three-year terms and directors will only be able to be removed from office for cause;

- when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of our common stock, our stockholders will only be able to take action at a meeting of stockholders and not by written consent;

- only our chairman, our chief executive officer, our president, or a majority of our board of directors will be authorized to call a special meeting of stockholders;

- advance notice procedures will apply for stockholders to nominate candidates for election as directors or to bring matters before an annual meeting of stockholders;

- our restated certificate of incorporation will authorize undesignated preferred stock, the terms of which may be established, and shares of which may be issued, without stockholder approval; and

- certain litigation against us can only be brought in Delaware.

For information regarding these and other provisions, see "Description of Capital Stock—Anti-Takeover Provisions."

33

PX0559-039

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements. All statements contained in this prospectus other than statements of historical fact, including statements regarding our future results of operations and financial position, our business strategy and plans, and our objectives for future operations, are forward-looking statements. The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions are intended to identify forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in the "Risk Factors" section. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this prospectus may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

You should not rely upon forward-looking statements as predictions of future events. The events and circumstances reflected in the forward-looking statements may not be achieved or occur. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance, or achievements. We are under no duty to update any of these forward-looking statements after the date of this prospectus or to conform these statements to actual results or revised expectations.

34

PX0559-040

**Table of Contents**

## INDUSTRY DATA AND USER METRICS

This prospectus contains estimates and information concerning our industry, including market position, market size, and growth rates of the markets in which we participate, that are based on industry publications and reports. This information involves a number of assumptions and limitations, and you are cautioned not to give undue weight to these estimates. We have not independently verified the accuracy or completeness of the data contained in these industry publications and reports. The industry in which we operate is subject to a high degree of uncertainty and risk due to variety of factors, including those described in the "Risk Factors" section. These and other factors could cause results to differ materially from those expressed in these publications and reports.

The numbers of monthly active users (MAUs) and daily active users (DAUs) presented in this prospectus are based on internal company data and we use these numbers in managing our business. We believe that our MAU and DAU numbers are reasonable estimates, and we take measures to improve their accuracy, such as eliminating known false or duplicate accounts. There are inherent challenges in measuring usage across large online and mobile populations around the world. For example, there may be individuals who have multiple Facebook accounts in violation of our terms of service, despite our efforts to detect and suppress such behavior. We estimate that false or duplicate accounts may have represented approximately 5-6% of our MAUs as of December 31, 2011. However, this estimate is based on an internal review of a limited sample of accounts and we apply significant judgment in making this determination, such as identifying names that appear to be fake or other behavior that appears inauthentic to the reviewers. As such, our estimation of false or duplicate accounts may not accurately represent the actual number of such accounts. Our metrics are also affected by applications on certain mobile devices that automatically contact our servers for regular updates with no user action involved, and this activity can cause our system to count the user associated with such a device as an active user on the day such contact occurs. We estimate that less than 5% of our estimated worldwide DAUs as of December 31, 2011 and 2010 resulted from this type of automatic mobile activity, and that this type of activity had a substantially smaller effect on our estimate of worldwide MAUs and mobile MAUs. As such, the calculations of DAUs as a percentage of MAUs presented in this prospectus may be affected by this activity. The impact of this automatic activity on our metrics varies by geography because mobile usage varies in different regions of the world. In addition, our data regarding the geographic location of our users is estimated based on a number of factors, such as IP address, which may not always accurately reflect the user's actual location. We regularly review and may adjust our processes for calculating these metrics to improve their accuracy. In addition, our MAU and DAU estimates will differ from estimates published by third parties due to differences in methodology. For example, some third parties do not count mobile users.

35

PX0559-041

**Table of Contents**

## USE OF PROCEEDS

We estimate that our net proceeds from the sale of the Class A common stock that we are offering will be approximately $
billion, or approximately $      billion if the underwriters exercise in full their right to purchase additional shares to cover over-allotments,
assuming an initial public offering price of $      per share, which is the midpoint of the price range on the cover page of this prospectus,
and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. A $1.00 increase
(decrease) in the assumed initial public offering price of $      per share would increase (decrease) the net proceeds to us from our initial
public offering by $      million, assuming the number of shares offered by us, as set forth on the cover page of this prospectus, remains
the same, after deducting estimated underwriting discounts and commissions.

The principal purposes of our initial public offering are to create a public market for our Class A common stock and thereby enable
future access to the public equity markets by us and our employees, obtain additional capital, and facilitate an orderly distribution of shares
for the selling stockholders. We intend to use the net proceeds to us from our initial public offering for working capital and other general
corporate purposes; however, we do not currently have any specific uses of the net proceeds planned. We may use a portion of the net
proceeds to us to satisfy a portion of the anticipated tax withholding and remittance obligations related to the initial settlement of our
outstanding RSUs, which will become due approximately six months following the completion of our initial public offering. Additionally,
we may use a portion of the proceeds to us for acquisitions of complementary businesses, technologies, or other assets. However, we have
no commitments with respect to any such acquisitions or investments at this time.

Pending other uses, we intend to invest the proceeds to us in investment-grade, interest-bearing securities such as money market
funds, certificates of deposit, or direct or guaranteed obligations of the U.S. government, or hold as cash. We cannot predict whether the
proceeds invested will yield a favorable return. Our management will have broad discretion in the application of the net proceeds we
receive from our initial public offering, and investors will be relying on the judgment of our management regarding the application of the
net proceeds.

We will not receive any proceeds from the sale of shares of Class A common stock by the selling stockholders. Mark Zuckerberg, our
founder, Chairman, and CEO, will offer and sell      shares in our initial public offering. We expect that substantially all of the net
proceeds Mr. Zuckerberg will receive upon such sale will be used to satisfy taxes that he will incur upon his exercise of an outstanding
stock option to purchase 120,000,000 shares of our Class B common stock.

## DIVIDEND POLICY

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings for use in the
operation of our business and do not intend to declare or pay any cash dividends in the foreseeable future. Any further determination to pay
dividends on our capital stock will be at the discretion of our board of directors, subject to applicable laws, and will depend on our
financial condition, results of operations, capital requirements, general business conditions, and other factors that our board of directors
considers relevant. In addition, the terms of our credit facilities contain restrictions on our ability to pay dividends.

36

PX0559-042

**Table of Contents**

## CAPITALIZATION

The following table sets forth our cash, cash equivalents, and marketable securities and capitalization as of December 31, 2011:

- on an actual basis;

- on a pro forma basis to give effect to (i) the automatic conversion of all of our outstanding shares convertible preferred stock into Class B common stock, (ii) the amendment and restatement of our certificate of incorporation in connection with our initial public offering, and (iii) a share-based compensation expense of approximately $639 million, net of income taxes, associated with restricted stock units (RSUs) granted prior to January 1, 2011 (Pre-2011 RSUs) for which the service condition was satisfied as of December 31, 2011, and which we expect to record upon completion of our initial public offering, as described in footnote (1) below; and

- on a pro forma as adjusted basis to give further effect to (i) the issuance and sale by us of              shares of Class A common stock in our initial public offering, and the receipt of the net proceeds from our sale of these shares at an assumed initial public offering price of the Class A common stock of $        per share, the midpoint of the price range on the cover page of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us, (ii) the exercise by Mark Zuckerberg, our founder, Chairman, and CEO, of an outstanding stock option to purchase 120,000,000 shares of our Class B common stock, (iii) the automatic conversion of              shares of our Class B common stock held by the selling stockholders into an equivalent number of shares of our Class A common stock upon their sale by the selling stockholders in our initial public offering, and (iv) the conversion by certain of our existing stockholders of an aggregate of              shares of our Class B common stock into an equivalent number of shares of our Class A common stock in connection with our initial public offering.

The pro forma and pro forma as adjusted information below is illustrative only, and cash, cash equivalents, and marketable securities, additional paid-in capital, retained earnings, total stockholders' equity, and total capitalization following the completion of our initial public offering will be adjusted based on the actual initial public offering price and other terms of our initial public offering determined at pricing. You should read this table in conjunction with the sections entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Description of Capital Stock" and our consolidated financial statements and related notes included elsewhere in this prospectus.

37

**Table of Contents**

| | As of December 31, 2011 | | |
|---|---|---|---|
| | Actual | Pro Forma[(1)] | Pro Forma As Adjusted[(2)(3)] |
| | (in millions, except share and per share data) | | |
| Cash, cash equivalents, and marketable securities | $3,908 | $ 3,908 | $ |
| Stockholders' equity: | | | |
| Convertible preferred stock, $0.000006 par value; 569,001,400 shares authorized, 543,366,110 shares issued and outstanding actual; no shares authorized, issued and outstanding, pro forma and pro forma as adjusted | $ 615 | $ — | $ |
| Preferred stock, $0.000006 par value; no shares authorized, issued and outstanding, actual;          shares authorized, no shares issued and outstanding, pro forma and pro forma as adjusted | — | — | |
| Class A common stock, $0.000006 par value; 4,141,000,000 shares authorized, 117,097,143 shares issued and outstanding, actual;          shares authorized, 117,097,143 shares issued and outstanding, pro forma;          shares authorized,          shares issued and outstanding, pro forma as adjusted | — | — | |
| Class B common stock, $0.000006 par value; 4,141,000,000 shares authorized, 1,213,350,999 shares issued and outstanding, actual;          shares authorized, 1,758,902,390 shares issued and outstanding, pro forma;          shares authorized,          shares issued and outstanding, pro forma as adjusted | — | — | |
| Additional paid-in capital | 2,684 | 4,267 | |
| Accumulated other comprehensive loss | (6) | (6) | |
| Retained earnings | 1,606 | 967 | |
| Total stockholders' equity | 4,899 | 5,228 | |
| Total capitalization | $4,899 | $ 5,228 | $ |

(1) The pro forma data as of December 31, 2011 presents our cash, cash equivalents, and marketable securities, total stockholders' equity, and total capitalization, and gives effect to a share-based compensation expense of approximately $968 million associated with Pre-2011 RSUs, for which the service condition was completed as of December 31, 2011 and which we expect to record upon completion of our initial public offering, as further described in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Share-based Compensation." The pro forma adjustment related to share-based compensation expense of approximately $968 million has been reflected as an increase to additional paid-in capital and the associated tax effect of $329 million has been netted against this charge, resulting in a net reduction of $639 million to retained earnings. The income tax effects have been reflected as an increase to deferred tax assets included in prepaid expenses and other current assets, to reflect the anticipated future tax benefits upon settlement of these RSUs.

(2) A $1.00 increase (decrease) in the assumed initial public offering price of $     per share would increase (decrease) each of cash, cash equivalents, and marketable securities, additional paid-in capital, total stockholders' equity, and total capitalization by $     million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions. If the underwriters' option to purchase additional shares to cover over-allotments is exercised in full, the pro forma as adjusted amount of each of cash, cash equivalents, and marketable securities, additional paid-in capital, total stockholders' equity, and total capitalization would increase by approximately $     million, after deducting estimated underwriting discounts and commissions, and we would have     shares of our Class A common stock and     shares of our Class B common stock issued and outstanding, pro forma as adjusted.

(3) The pro forma as adjusted information discussed above is illustrative only and will be adjusted based on the actual initial public offering price and other terms of our initial public offering determined at pricing.

**Table of Contents**

The table above excludes the following shares:

- 138,539,434 shares of Class B common stock issuable upon the exercise of options outstanding as of December 31, 2011 under our 2005 Stock Plan, with a weighted-average exercise price of approximately $0.83 per share;

- 378,772,184 shares of Class B common stock subject to RSUs outstanding as of December 31, 2011 under our 2005 Stock Plan;

- 1,947,208 shares of Class B common stock subject to RSUs granted between January 1, 2012 and March 6, 2012 under our 2005 Stock Plan;

- 302,250 shares of Class A common stock and 210 shares of Class B common stock issued between January 1, 2012 and March 6, 2012; and

- 77,123,367 shares of our common stock reserved for future issuance under our equity compensation plans, consisting of 25,000,000 shares of Class A common stock reserved for issuance under our 2012 Equity Incentive Plan, and 52,123,367 shares of Class B common stock reserved as of December 31, 2011 for issuance under our 2005 Stock Plan. On the date of this prospectus, any remaining shares available for issuance under our 2005 Stock Plan will be added to the shares reserved under our 2012 Equity Incentive Plan and we will cease granting awards under the 2005 Stock Plan. Our 2012 Equity Incentive Plan also provides for automatic annual increases in the number of shares reserved thereunder, as more fully described in "Executive Compensation—Employee Benefit Plans."

39

PX0559-045

**Table of Contents**

## DILUTION

If you invest in our Class A common stock, your interest will be diluted to the extent of the difference between the initial public offering price per share of our Class A common stock and the pro forma as adjusted net tangible book value per share of our Class A common stock immediately after our initial public offering.

Our pro forma net tangible book value as of December 31, 2011 was $         billion, or $         per share of common stock. Our pro forma net tangible book value per share represents the amount of our total tangible assets reduced by the amount of our total liabilities and divided by the total number of shares of our common stock outstanding as of December 31, 2011, after giving effect to the automatic conversion of all outstanding shares of our convertible preferred stock into Class B common stock in connection with our initial public offering.

After giving effect to (1) our sale in our initial public offering of         shares of Class A common stock at an assumed initial public offering price of the Class A common stock of $         per share, the midpoint of the price range on the cover page of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us and (2) the exercise by Mark Zuckerberg, our founder, Chairman, and CEO, of an outstanding stock option to purchase 120,000,000 shares of our Class B common stock, our pro forma as adjusted net tangible book value as of December 31, 2011 would have been approximately $         billion, or $         per share of common stock. This represents an immediate increase in pro forma as adjusted net tangible book value of $         per share to our existing stockholders and an immediate dilution of $         per share to investors purchasing shares in our initial public offering.

The following table illustrates this per share dilution.

| | | |
|---|---:|---:|
| Assumed initial offering price per share | | $ |
| Pro forma net tangible book value per share as of December 31, 2011 | $ | |
| Increase in pro forma net tangible book value per share attributable to investors purchasing shares in our initial public offering | ____ | |
| Pro forma as adjusted net tangible book value per share after our initial public offering | | |
| Dilution in pro forma net tangible book value per share to investors in this offering | | $ |

A $1.00 increase (decrease) in the assumed initial public offering price of $         per share would increase (decrease) our pro forma as adjusted net tangible book value per share after our initial public offering by $         , assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions payable by us.

If the underwriters' option to purchase additional shares to cover over-allotments is exercised in full, the pro forma net tangible book value per share after giving effect to our initial public offering would be approximately $         per share, and the dilution in pro forma net tangible book value per share to investors in our initial public offering would be approximately $         per share.

40

PX0559-046

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

The following table summarizes, as of December 31, 2011, the differences between the number of shares of our common stock purchased from us, after giving effect to the conversion of our convertible preferred stock into Class B common stock, the total cash consideration paid, and the average price per share paid by our existing stockholders and by our new investors purchasing shares in our initial public offering at the assumed initial public offering price of the Class A common stock of $      per share, the midpoint of the price range on the cover page of this prospectus, before deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
| | Number | Percent | Amount | Percent | |
|---|---|---|---|---|---|
| Existing stockholders | | % | | % | $ |
| New investors | | | | | |
| Total | | 100% | $ | 100% | |

A $1.00 increase (decrease) in the assumed initial public offering price of $      per share would increase (decrease) total consideration paid by new investors by $      million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting estimated underwriting discounts and commissions payable by us.

Sales of shares of Class A common stock by the selling stockholders in our initial public offering will reduce the number of shares of common stock held by existing stockholders to      , or approximately      % of the total shares of common stock outstanding after our initial public offering, and will increase the number of shares held by new investors to      , or approximately      % of the total shares of common stock outstanding after our initial public offering.

If the underwriters' option to purchase additional shares to cover over-allotments is exercised in full, our existing stockholders would own      % and our new investors would own      % of the total number of shares of our common stock outstanding after our initial public offering.

The above table and discussion are based on 117,097,143 shares of our Class A common stock and 1,758,902,390 shares of our Class B common stock outstanding as of December 31, 2011, as well as the exercise by Mark Zuckerberg, our founder, Chairman, and CEO, of an outstanding stock option to purchase 120,000,000 shares of our Class B common stock, and exclude:

- 138,539,434 shares of Class B common stock issuable upon the exercise of options outstanding as of December 31, 2011 under our 2005 Stock Plan, with a weighted-average exercise price of approximately $0.83 per share;

- 378,772,184 shares of Class B common stock subject to RSUs outstanding as of December 31, 2011 under our 2005 Stock Plan;

- 1,947,208 shares of Class B common stock subject to RSUs granted between January 1, 2012 and March 6, 2012 under our 2005 Stock Plan;

- 302,250 shares of Class A common stock and 210 shares of Class B common stock issued between January 1, 2012 and March 6, 2012; and

41

PX0559-047

**Table of Contents**

- 77,123,367 shares of our common stock reserved for future issuance under our equity compensation plans, consisting of 25,000,000 shares of Class A common stock reserved for issuance under our 2012 Equity Incentive Plan, and 52,123,367 shares of Class B common stock reserved as of December 31, 2011 for issuance under our 2005 Stock Plan. On the date of this prospectus, any remaining shares available for issuance under our 2005 Stock Plan will be added to the shares reserved under our 2012 Equity Incentive Plan and we will cease granting awards under the 2005 Stock Plan. Our 2012 Equity Incentive Plan also provides for automatic annual increases in the number of shares reserved thereunder, as more fully described in "Executive Compensation—Employee Benefit Plans."

To the extent that any outstanding options are exercised or RSUs are settled, there will be further dilution to new investors.

42

PX0559-048

**Table of Contents**

## SELECTED CONSOLIDATED FINANCIAL DATA

The consolidated statements of income data for each of the years ended December 31, 2009, 2010, and 2011 and the consolidated balance sheets data as of December 31, 2010 and 2011 are derived from our audited consolidated financial statements that are included elsewhere in this prospectus. The consolidated statements of operations data for the years ended December 31, 2007 and 2008 and the consolidated balance sheets data as of December 31, 2007, 2008, and 2009 are derived from audited consolidated financial statements that are not included in this prospectus.

You should read this information together with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes included elsewhere in this prospectus.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| | | (in millions, except per share data) | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 153 | $ 272 | $ 777 | $1,974 | $3,711 |
| Costs and expenses[1]: | | | | | |
| Cost of revenue | 41 | 124 | 223 | 493 | 860 |
| Marketing and sales | 32 | 76 | 115 | 184 | 427 |
| Research and development | 81 | 47 | 87 | 144 | 388 |
| General and administrative | 123 | 80 | 90 | 121 | 280 |
| Total costs and expenses | 277 | 327 | 515 | 942 | 1,955 |
| Income (loss) from operations | (124) | (55) | 262 | 1,032 | 1,756 |
| Other expense, net | 11 | 1 | 8 | 24 | 61 |
| Income (loss) before provision for income taxes | (135) | (56) | 254 | 1,008 | 1695 |
| Provision for income taxes | 3 | — | 25 | 402 | 695 |
| Net income (loss) | $ (138) | $ (56) | $ 229 | $ 606 | $1,000 |
| Net income (loss) attributable to Class A and Class B common stockholders | $ (138) | $ (56) | $ 122 | $ 372 | $ 668 |
| Earnings (loss) per share attributable to Class A and Class B common stockholders[2]: | | | | | |
| Basic | $(0.16) | $(0.06) | $0.12 | $ 0.34 | $ 0.52 |
| Diluted | $(0.16) | $(0.06) | $0.10 | $ 0.28 | $ 0.46 |
| Pro forma earnings per share attributable to Class A and Class B common stockholders[2]: | | | | | |
| Basic | | | | | $ 0.49 |
| Diluted | | | | | $ 0.43 |

(1)   Costs and expenses include share-based compensation expense as follows:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| | | | (in millions) | | |
| Cost of revenue | $   1 | $   — | $   — | $   — | $   9 |
| Marketing and sales | 3 | 4 | 2 | 2 | 43 |
| Research and development | 56 | 7 | 6 | 9 | 114 |
| General and administrative | 13 | 19 | 19 | 9 | 51 |
| Total share-based compensation expense | $  73 | $  30 | $  27 | $  20 | $ 217 |

(2)   See note 2 of the notes to our consolidated financial statements for a description of how we compute basic and diluted earnings (loss) per share attributable to Class A and Class B common stockholders and pro forma basic and diluted earnings per share attributable to Class A and Class B common stockholders.

43

**Table of Contents**

|  | As of December 31, | | | | |
|---|---|---|---|---|---|
|  | **2007** | **2008** | **2009** | **2010** | **2011** |
|  | | | (in millions) | | |
| **Consolidated Balance Sheets Data:** | | | | | |
| Cash, cash equivalents, and marketable securities | $ 305 | $ 297 | $ 633 | $1,785 | $3,908 |
| Working capital | 250 | 279 | 703 | 1,857 | 3,705 |
| Property and equipment, net | 82 | 131 | 148 | 574 | 1,475 |
| Total assets | 448 | 505 | 1,109 | 2,990 | 6,331 |
| Total liabilities | 174 | 170 | 241 | 828 | 1,432 |
| Total stockholders' equity | 273 | 335 | 868 | 2,162 | 4,899 |

**Free Cash Flow**

In addition to other financial measures presented in accordance with U.S. generally accepted accounting principles (GAAP), we monitor free cash flow (FCF) as a non-GAAP measure to manage our business, make planning decisions, evaluate our performance, and allocate resources. We define FCF as net cash provided by operating activities reduced by purchases of property and equipment and property and equipment acquired under capital leases.

We believe that FCF is one of the key financial indicators of our business performance over the long term and provides useful information regarding whether cash provided by operating activities is sufficient to fund the ongoing property and equipment investments required to maintain and grow our business. We have chosen to subtract both purchases of property and equipment and property and equipment acquired under capital leases in our calculation of FCF because we believe that these two items collectively represent the amount of property and equipment we need to procure to support our business, regardless of whether we finance such property or equipment with a capital lease. The market for financing servers and other technical equipment is dynamic and we expect our use of capital leases could vary significantly from year to year.

We have chosen our definition for FCF because we believe that this methodology can provide useful supplemental information to help investors better understand underlying trends in our business. We present FCF in this document in the same manner it is shared with our senior management and board of directors.

FCF has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of other GAAP financial measures, such as net cash provided by operating activities. Some of the limitations of FCF are:

- FCF does not reflect our future contractual commitments; and

- other companies in our industry present similarly titled measures differently than we do, limiting their usefulness as comparative measures.

Management compensates for the inherent limitations associated with using the FCF measure through disclosure of such limitations, presentation of our financial statements in accordance with GAAP, and reconciliation of FCF to the most directly comparable GAAP measure, net cash provided by operating activities, as presented below.

The following is a reconciliation of FCF to the most comparable GAAP measure, net cash provided by operating activities:

|  | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2007** | **2008** | **2009** | **2010** | **2011** |
|  | | | (in millions) | | |
| Net cash provided by operating activities | $ 11 | $ 8 | $ 155 | $ 698 | $1,549 |
| Purchases of property and equipment | (55) | (70) | (33) | (293) | (606) |
| Property and equipment acquired under capital leases | (11) | (26) | (56) | (217) | (473) |
| Free cash flow | $ (55) | $ (88) | $ 66 | $ 188 | $ 470 |

PX0559-050

**Table of Contents**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
## CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes that appear in this prospectus. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this prospectus, particularly in "Risk Factors." For a discussion of limitations in the measurement of certain of our user metrics, see the section entitled "Industry Data and User Metrics."*

**Overview**

Our mission is to make the world more open and connected. Facebook enables you to express yourself and connect with the world around you instantly and freely.

We build products that support our mission by creating utility for users, developers, and advertisers:

*Users.* We enable people who use Facebook to stay connected with their friends and family, to discover what is going on in the world around them, and to share and express what matters to them to the people they care about.

*Developers.* We enable developers to use the Facebook Platform to build applications (apps) and websites that integrate with Facebook to reach our global network of users and to build products that are more personalized, social, and engaging.

*Advertisers.* We enable advertisers to engage with more than 800 million monthly active users (MAUs) on Facebook or subsets of our users based on information they have chosen to share with us such as their age, location, gender, or interests. We offer advertisers a unique combination of reach, relevance, social context, and engagement to enhance the value of their ads.

We generate substantially all of our revenue from advertising and from fees associated with our Payments infrastructure that enables users to purchase virtual and digital goods from our Platform developers. For the year ended December 31, 2011, we recorded revenue of $3,711 million, operating income of $1,756 million, and net income of $1,000 million. We were incorporated in July 2004 and are headquartered in Menlo Park, California.

Highlights in our history are depicted in the graphic on the next page.

45

PX0559-051

**Table of Contents**

*Our History*



PX0559-052

**Table of Contents**

**Trends in Our User Metrics**

- *Monthly Active Users (MAUs).* We define a monthly active user as a registered Facebook user who logged in and visited Facebook through our website or a mobile device, or took an action to share content or activity with his or her Facebook friends or connections via a third-party website that is integrated with Facebook, in the last 30 days as of the date of measurement. MAUs are a measure of the size of our global active user community, which has grown substantially in the past several years.



Note: Rest of world includes Africa, Latin America, and the Middle East.

As of December 31, 2011, we had 845 million MAUs, an increase of 39% from December 31, 2010. We experienced growth across different geographies, with users in Brazil, India, and the United States representing key sources of growth. We had 37 million MAUs in Brazil as of December 31, 2011, an increase of 268% from the prior year, and we had 46 million MAUs in India as of December 31, 2011, an increase of 132% from the prior year. Additionally, we had 161 million MAUs in the United States as of December 31, 2011, an increase of 16% from the prior year.

There are more than two billion global Internet users, according to an IDC report dated August 2011, and we aim to connect all of them. We have achieved varying levels of penetration within the population of Internet users in different countries. For example, in countries such as Chile, Turkey, and Venezuela we estimate that we have penetration rates of greater than 85% of Internet users; in countries such as India, the United Kingdom and the United States we estimate that we have

47

PX0559-053

**Table of Contents**

penetration rates of approximately 60%; in countries such as Brazil and Germany we estimate that we have penetration rates of approximately 30-40%; in countries such as Japan, Russia, and South Korea we estimate that we have penetration rates of 20% or lower; and in China, where Facebook access is restricted, we have near 0% penetration. We continue to invest in growing our user base, particularly in markets where we are relatively less penetrated. We expect MAU growth will benefit from increases in worldwide Internet users, in particular as a result of increasing broadband penetration and usage of mobile devices in developing markets. Growth in MAUs depends on our ability to retain our current users, re-engage with inactive users, and add new users, including by extending our reach across mobile platforms.

- *Daily Active Users (DAUs).* We define a daily active user as a registered Facebook user who logged in and visited Facebook through our website or a mobile device, or took an action to share content or activity with his or her Facebook friends or connections via a third-party website that is integrated with Facebook, on a given day. We view DAUs, and DAUs as a percentage of MAUs, as measures of user engagement.



*Note: Rest of world includes Africa, Latin America, and the Middle East.*

48

**Table of Contents**

Worldwide DAUs increased 48% to 483 million on average during December 2011 from 327 million during December 2010. We experienced growth in DAUs across major markets including the United States, Brazil, and India. Increased mobile usage was a key contributor to this growth. DAUs as a percentage of MAUs increased from 54% in December 2010 to 57% in December 2011, which we believe was driven entirely by increased mobile usage of Facebook. We believe that increases in DAUs and in DAUs as a percentage of MAUs generally positively affect our revenue because increases in user engagement may enable us to deliver more relevant commercial content to our users and may provide us with more opportunities for monetization.

We believe that we have the opportunity to continue to grow our DAUs around the world. Growth in DAUs depends on our ability to attract new users and increase the frequency of engagement for existing users. We aim to increase DAUs by developing products that are more compelling for our users, increasing the relevance of the information we display for each user, increasing the number of compelling Platform apps and website integrations, and improving the quality of our products across mobile platforms. We also believe that younger users have higher levels of engagement with the web and mobile devices in general and with Facebook specifically. We anticipate that demographic trends over the long term may contribute to growth in engagement as a greater number of users will come from demographic groups that have grown up with the web and mobile devices and who spend more time online every day.

· *Mobile MAUs.* We define a mobile MAU as a user who accessed Facebook via a mobile app or via mobile-optimized versions of our website such as m.facebook.com, whether on a mobile phone or tablet such as the iPad, during the period of measurement.

Worldwide mobile MAUs increased by 76% from 245 million as of December 31, 2010 to 432 million as of December 31, 2011. We estimate that approximately 58 million mobile MAUs accessed Facebook solely through mobile apps or our mobile website during the month ended December 31, 2011, and the remaining 374 million mobile MAUs accessed Facebook from both personal computers and mobile devices during that month. We believe that our mobile MAU growth was also driven by product enhancements across several mobile platforms. For example, we improved our product offerings on feature phones following our acquisition of Snaptu in April 2011 and we launched the Facebook app for the iPad in October 2011. Improving our mobile products and increasing mobile usage of Facebook are key company priorities that we believe are critical to help us maintain and grow our user base and engagement over the long term. We expect consumers around the world will increase the amount of time they spend and the information they share and consume through mobile devices.



Mobile Monthly Active Users
Worldwide
(in millions)

We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. To the extent that increasing usage of Facebook through mobile apps or our mobile website substitutes for the use of Facebook through personal computers where we do show ads, the number of ads that we deliver to users and our revenue may be negatively affected unless and until we are successful with monetization strategies for mobile usage of Facebook, such as the implementation of sponsored stories in users' mobile News Feeds, which we announced in February 2012. We believe that people around the world will continue to increase their mobile usage of Facebook, and that some of this mobile usage has been and will continue to be a substitute for use of Facebook through personal computers.

49

**Table of Contents**

### Trends in Our Monetization by User Geography

We estimate our revenue by user geography based on the geography in which ad impressions are delivered or virtual goods are purchased. Our revenue trends by geography are influenced by a variety of factors including user growth and engagement, the size and maturity of the advertising market in each geography, our sales presence, and payment methods available in each geography. As of December 31, 2011, over half of our revenue was generated by users in the United States and Canada. However, we are experiencing rapid revenue growth in markets such as Brazil and India due to growth in the number of users and their engagement and an increase in our sales efforts in those markets.



*Note: Our revenue by user geography in the charts above is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue by geography disclosure in our consolidated financial statements where revenue is geographically apportioned based on the location of the advertiser or developer.*

50

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**Factors Affecting Our Performance**

*Growth in MAUs, DAUs, and Mobile MAUs*. Growth trends in MAUs, DAUs, and mobile MAUs are critical variables that affect our revenue and financial results by influencing the number of ads we are able to show, the value of those ads, the volume of Payments transactions, as well as our expenses and capital expenditures. As of December 31, 2011, we had 845 million MAUs, an increase of 39% from December 31, 2010. We experienced growth across different geographies, with users in Brazil, India, and the United States representing a key source of growth. Worldwide DAUs increased 48% to 483 million on average during December 2011 from 327 million during December 2010. We expect our user growth rates to decline as the size of our active user base increases and as we achieve higher market penetration rates. Additionally, as we grow our business and expand internationally, we expect to face challenges entering new markets such as China, where access to Facebook is restricted in whole or in part. As user growth rates slow, we expect the rate of growth in revenue, operating income from operations, and net income will likely decline over time.

*User Engagement*. Changes in user engagement also affect our revenue and financial performance. Growth in user engagement may increase the opportunities for us to display advertising and our ability to deliver relevant commercial content to users. Growth in user engagement also generally results in increases in our expenses and capital expenditures required to support user activity. We believe that overall engagement as measured by the percentage of users who create content (such as wall posts, messages, or photos) or generate feedback (such as by Liking or Commenting on the content created) has remained stable or increased as our user base has grown. Moreover, the average amount of content and feedback created by each user has continued to increase over time.

*Increasing Mobile Usage*. Increasing use of Facebook on mobile devices will also affect our performance, particularly if mobile use substitutes for use on personal computers. Historically, we have not shown ads to users accessing Facebook through mobile apps or our mobile website and we cannot be certain that our mobile monetization approaches will be successful in generating meaningful revenue. We cannot quantify the extent to which mobile usage of Facebook is substituting for, rather than incremental to, usage of Facebook through personal computers, but we generally expect mobile usage to increase at a faster rate than usage through personal computers for the forseeable future.

*Value of Advertising Products*. We believe that increasing the value of our advertising products and the consequent return on investment to advertisers from working with Facebook will increase advertiser demand and thereby increase the amount advertisers spend with us. We aim to increase the value of our advertising products through such means as increasing the size and engagement of our user base, improving our ability to select relevant content of interest to individual users, developing new formats and products such as ads with social context, and improving the measurement tools available to advertisers to optimize their campaigns. For example, in 2011, we launched sponsored stories as a new format to leverage social context, and in February 2012, we announced that sponsored stories will be shown in users' mobile News Feeds.

*Management of Ad Inventory*. Our revenue trends are also affected by ad inventory management changes affecting the number, size, or prominence of ads we display. For example, in the fourth quarter of 2010, we significantly increased the number of ads on many Facebook pages. As another example, in the fourth quarter of 2011, we increased the reserve price (i.e., the minimum price threshold) in our advertising auction system in order to reduce the frequency with which low quality ads are displayed to users. This change caused a reduction in the overall number of ads shown and increased the average price per ad as a result of factors including the removal of ads with bids that were below the reserve price and some advertisers raising their bids in response to this change. For this particular change, we estimate that the decrease in the number of ads displayed and the increase in average price per ad approximately offset each other such that the impact on total revenue was minimal.

*Product Innovation*. We make ongoing product changes intended to enhance the user experience. In September 2011, at our f8 conference, we announced the launch of Timeline as an enhanced and updated version

51

PX0559-057

Table of Contents

of the Facebook Profile to enable users to better organize and access the growing quantity of their updates, photos, comments, and other content. We expect Timeline to roll out broadly around the world in the first quarter of 2012. Also in September 2011, we announced the launch of the next iteration of Open Graph APIs, which enables Platform developers to create new types of social apps that facilitate sharing, self-expression, and serendipitous discovery across a broad variety of activities and interests. We expanded the Open Graph to include more types of sharing activities in the first quarter of 2012.

*Investment in Infrastucture.* In 2011, we continued to make significant investments in our technical infrastructure to ensure that our growing user base can access Facebook rapidly and reliably. In April 2011, we began serving user traffic out of our first owned and built data center in Prineville, Oregon. We developed designs for data centers, server hardware, and software that were optimized for use in our new data center facilities, resulting in significant increases in energy efficiency while significantly reducing our server operation costs compared to the usage of traditional servers and leased data centers. We are investing in additional Facebook-owned data centers in the United States and Europe and we aim to deliver Facebook products rapidly and reliably to all users around the world.

*Investment in Talent.* At the end of 2011, we had 3,200 full-time employees, an increase of 50% from the year prior. Our employee headcount has increased significantly and we expect this growth to continue for the foreseeable future. We have also made and intend to make acquisitions with the primary objective of adding software engineers, product designers, and other personnel with certain technology expertise. While our organization is growing rapidly, we are focused on increasing our talent base at a rate that allows us to preserve our culture.

*Share-based Compensation Expense.* We have granted restricted stock units (RSUs) to our employees and members of our board of directors. RSUs granted prior to January 1, 2011 (Pre-2011 RSUs) under our 2005 Stock Plan vest upon the satisfaction of both a service condition and a liquidity condition. The service condition for the majority of these awards is satisfied over four years. The liquidity condition is satisfied upon the occurrence of a qualifying event, defined as a change of control transaction or six months following the effective date of our initial public offering. Pre-2011 RSUs for which the service condition has been satisfied are not forfeited should an employee terminate prior to the liquidity condition being met.

As of December 31, 2011, we have recognized no share-based compensation expense for Pre-2011 RSUs because a qualifying event described above had not occurred. In the quarter in which our initial public offering is completed, we will recognize share-based compensation expense using the accelerated attribution method, net of forfeitures, based on the grant date fair value of the Pre-2011 RSUs. For the Pre-2011 RSUs, if the initial public offering had been completed on December 31, 2011, we would have recognized $968 million of share-based compensation expense for all RSUs that met the service condition as of that date, and would have approximately $239 million of additional future period expense to be recognized over the remaining service periods through 2018.

RSUs granted on or after January 1, 2011 (Post-2011 RSUs) are not subject to a liquidity condition in order to vest. Share-based compensation expense related to these grants is based on the grant date fair value of the RSUs and is recognized on a straight-line basis over the applicable service period. The majority of Post-2011 RSUs are earned over a service period of four to five years. In 2011, we recognized $189 million of share-based compensation expense related to the Post-2011 RSUs, and we anticipate recognizing $1,189 million of future period expense related to Post-2011 RSUs outstanding as of December 31, 2011.

As of December 31, 2011, there was $2,463 million of unrecognized share-based compensation expense, of which $2,396 million is related to RSUs and $67 million is related to restricted shares and stock options. This unrecognized share-based compensation expense is expected to be recognized over a weighted-average period of approximately two years.

52

PX0559-058

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

See "—Critical Accounting Policies and Estimates—Share-based Compensation" for additional information regarding our share-based compensation expense.

**Components of Results of Operations**

*Revenue*

We generate substantially all of our revenue from advertising and from fees associated with our Payments infrastructure that enables users to purchase virtual and digital goods from our Platform developers.

*Advertising.* Our advertising revenue is generated by displaying ad products on our website. Advertisers pay for ad products displayed on Facebook, either directly or through their relationships with advertising agencies, based on the number of impressions delivered or the number of clicks made by our users. We recognize revenue from the display of impression-based ads on our website in the contracted period in which the impressions are delivered. Impressions are considered delivered when an ad appears in pages displayed to users. We recognize revenue from the delivery of click-based ads on our website in the period in which a user clicks on an ad.

*Payments and other fees.* We enable Payments from our users to our Platform developers. Our users can transact and make payments on the Facebook Platform by using credit cards, PayPal or other payment methods available on our website. We receive a negotiated fee from our Platform developers when users make purchases from our Platform developers using our Payments infrastructure. We recognize revenue net of amounts remitted to our Platform developers. We have mandated the use of our Payments infrastructure for game apps on Facebook, and fees related to Payments are generated almost exclusively from games. To date, games from Zynga have generated the majority of our payments and other fees revenue. In addition, we generate other fees revenue in connection with arrangements related to business development transactions and fees from various mobile providers; in recent periods, other fees revenue has been immaterial.

**Cost of Revenue and Operating Expenses**

*Cost of revenue.* Our cost of revenue consists primarily of expenses associated with the delivery and distribution of our products. These include expenses related to the operation of our data centers such as facility and server equipment depreciation, facility and server equipment rent expense, energy and bandwidth costs, support and maintenance costs, and salaries, benefits, and share-based compensation for employees on our operations teams. Cost of revenue also includes credit card and other transaction fees related to processing customer transactions.

*Marketing and sales.* Our marketing and sales expenses consist primarily of salaries, benefits, and share-based compensation for our employees engaged in sales, sales support, marketing, business development, and customer service functions. Our marketing and sales expenses also include user-, developer-, and advertiser-facing marketing and promotional expenditures.

*Research and development.* Research and development expenses consist primarily of salaries, benefits, and share-based compensation for employees on our engineering and technical teams who are responsible for building new products as well as improving existing products. We expense substantially all of our research and development costs as they are incurred.

*General and administrative.* Our general and administrative expenses consist primarily of salaries, benefits, and share-based compensation for our executives as well as our finance, legal, human resources, and other administrative employees. In addition, general and administrative expenses include outside consulting, legal and accounting services, and facilities and other supporting overhead costs. General and administrative expenses also include legal settlements.

53

PX0559-059

Amendment No. 2 to Registration Statement on Form S-1

Table of Contents

### Results of Operations

The following table summarizes our historical consolidated statements of income data:

| Consolidated Statements of Income Data: | Year Ended December 31, 2009 | 2010 (in millions) | 2011 |
|---|---|---|---|
| Revenue | $ 777 | $ 1,974 | $ 3,711 |
| Costs and expenses[1]: | | | |
| Cost of revenue | 223 | 493 | 860 |
| Marketing and sales | 115 | 184 | 427 |
| Research and development | 87 | 144 | 388 |
| General and administrative | 90 | 121 | 280 |
| Total costs and expenses | 515 | 942 | 1,955 |
| Income from operations | 262 | 1,032 | 1,756 |
| Other expense, net | 8 | 24 | 61 |
| Income before provision for income taxes | 254 | 1,008 | 1,695 |
| Provision for income taxes | 25 | 402 | 695 |
| Net income | $ 229 | $ 606 | $ 1,000 |

(1) Costs and expenses include share-based compensation expense as follows:

| | Year Ended December 31, 2009 | 2010 (in millions) | 2011 |
|---|---|---|---|
| Cost of revenue | $ — | $ — | $ 9 |
| Marketing and sales | 2 | 2 | 43 |
| Research and development | 6 | 9 | 114 |
| General and administrative | 19 | 9 | 51 |
| Total share-based compensation expense | $ 27 | $ 20 | $ 217 |

The following table summarizes our historical consolidated statements of income data as a percentage of revenue for the periods shown:

| Consolidated Statements of Income Data: | Year Ended December 31, 2009 | 2010 | 2011 |
|---|---|---|---|
| Revenue | 100% | 100% | 100% |
| Costs and expenses[1]: | | | |
| Cost of revenue | 29 | 25 | 23 |
| Marketing and sales | 15 | 9 | 12 |
| Research and development | 11 | 7 | 10 |
| General and administrative | 12 | 6 | 8 |
| Total costs and expenses | 66 | 48 | 53 |
| Income from operations | 34 | 52 | 47 |
| Other expense, net | 1 | 1 | 2 |
| Income before provision for income taxes | 33 | 51 | 46 |
| Provision for income taxes | 3 | 20 | 19 |
| Net income | 29% | 31% | 27% |

(1) Costs and expenses include the following share-based compensation expense as a percentage of revenue:

| | Year Ended December 31, 2009 | 2010 | 2011 |
|---|---|---|---|
| Cost of revenue | —% | —% | —% |
| Marketing and sales | — | — | 1 |
| Research and development | 1 | — | 3 |
| General and administrative | 2 | — | 1 |
| Total share-based compensation expense | 3% | 1% | 6% |

54

PX0559-060

**Table of Contents**

**Years Ended December 31, 2009, 2010, and 2011**

*Revenue*

| | Year Ended December 31, | | | 2009 to 2010 % Change | 2010 to 2011 % Change |
|---|---|---|---|---|---|
| | 2009 | 2010 (in millions) | 2011 | | |
| Advertising revenue | $ 764 | $1,868 | $3,154 | 145% | 69% |
| Payments and other fees revenue | 13 | 106 | 557 | NM | NM |
| Total revenue | $ 777 | $1,974 | $3,711 | 154% | 88% |

*2011 Compared to 2010.* Revenue in 2011 increased $1,737 million, or 88% compared to 2010. The increase was due primarily to a 69% increase in advertising revenue to $3,154 million. Advertising revenue grew due to a 42% increase in the number of ads delivered and an 18% increase in the average price per ad delivered. The increase in ads delivered was driven primarily by user growth; MAUs grew 39% from December 31, 2010 to December 31, 2011 and average DAUs grew 48% from December 2010 to December 2011. The number of ads delivered was also affected by many other factors including product changes that significantly increased the number of ads on many Facebook pages beginning in the fourth quarter of 2010, partially offset by an increase in usage of our mobile products, where we did not show ads, and by various product changes implemented in 2011 that in aggregate modestly reduced the number of ads on certain pages. The increase in average price per ad delivered was affected by factors including improvements in our ability to deliver more relevant ads to users and product changes that contributed to higher user interaction with the ads by increasing their relative prominence.

Payments and other fees revenue increased to $557 million in 2011 due to the adoption of Facebook Payments, which has been gradually adopted by our Platform developers and began generating significant revenue in the fourth quarter of 2010. Facebook Payments became mandatory for all game developers accepting payments on the Facebook Platform with limited exceptions on July 1, 2011. Accordingly, comparisons of payments and other fees revenue to periods before that date may not be meaningful. In 2011, other fees revenue was immaterial.

In 2011, we generated approximately 56% of our revenue from advertisers and Platform developers based in the United States, compared to 62% in 2010. This change is due to factors including a faster growth rate of international users and the expansion of international sales offices and payment methods. The majority of our revenue outside of the United States came from customers located in western Europe, Canada, and Australia.

*2010 Compared to 2009.* Revenue in 2010 increased $1,197 million, or 154%, compared to 2009. The increase was primarily due to a 145% increase in advertising revenue to $1,868 million in 2010. Advertising revenue grew primarily due to an increase in the number of ads delivered driven by growth in users and engagement as well as the number of ads per page. MAUs grew 69% from December 31, 2009 to December 31, 2010 and average DAUs grew 77% from December 2009 to December 2010. Payments and other fees revenue increased to $106 million in 2010 due to the initial adoption of Facebook Payments during the year. In 2010, we generated approximately 62% of our revenue from advertisers and Platform developers based in the United States, compared to 67% in 2009.

Twelve percent of our total revenue in 2011, and less than 10% in 2010 and 2009, came from a single customer, Zynga. This revenue consisted of payments processing fees related to Zynga's sales of virtual goods and from direct advertising purchased by Zynga. In May 2010, we entered into an addendum to our standard terms and conditions with Zynga pursuant to which it agreed to use Facebook Payments as the primary means of payment within Zynga games played on the Facebook Platform. Under this addendum, we retain a fee of up to 30% of the face value of user purchases in Zynga's games on the Facebook Platform. This addendum expires in May 2015.

55

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

*Cost of revenue*

|  | Year Ended December 31, | | | 2009 to 2010 | 2010 to 2011 |
|  | 2009 | 2010 | 2011 | % Change | % Change |
| --- | --- | --- | --- | --- | --- |
|  | (dollars in millions) | | | | |
| Cost of revenue | $ 223 | $ 493 | $ 860 | 121% | 74% |
| Percentage of revenue | 29% | 25% | 23% | | |

*2011 Compared to 2010.* Cost of revenue in 2011 increased $367 million, or 74%, compared to 2010. The increase was primarily due to expenses related to expanding our data center operations, including a $164 million increase in depreciation and a $35 million increase in data center facility rent. These expenses supported our user growth, the increased usage of our products by users, developers, and advertisers, and the launch of new products. Additionally, credit card and other related revenue processing fees increased by $60 million.

*2010 Compared to 2009.* Cost of revenue in 2010 increased $270 million, or 121%, compared to 2009. The increase was primarily due to expenses related to expanding our data center operations, including a $77 million increase in equipment rent, a $49 million increase in depreciation, and a $33 million increase in data center facility rent. Additionally, credit card and other related revenue processing fees increased by $25 million.

We anticipate that cost of revenue will increase in dollar amount for the foreseeable future as we expand our data center capacity to support user growth, increased user engagement, and the delivery of new products. We expect costs will also rise for payment processing as we increase Payments volumes and add new payment methods. The expected increase in cost of revenue may be partially mitigated if we are able to realize improvements in server performance and the efficiency of our technical operations. We expect cost of revenue as a percentage of revenue to decline modestly over time to the extent we are successful in meeting our objective of efficiently increasing revenue.

*Marketing and sales*

|  | Year Ended December 31, | | | 2009 to 2010 | 2010 to 2011 |
|  | 2009 | 2010 | 2011 | % Change | % Change |
| --- | --- | --- | --- | --- | --- |
|  | (dollars in millions) | | | | |
| Marketing and sales | $ 115 | $ 184 | $ 427 | 60% | 132% |
| Percentage of revenue | 15% | 9% | 12% | | |

*2011 Compared to 2010.* Marketing and sales expenses in 2011 increased $243 million, or 132%, compared to 2010. The increase was primarily due to an increase in payroll and benefits expenses, resulting from a 46% increase in employee headcount to support global sales, business development, and customer service, and to a lesser extent, an increase in our user-, developer-, and advertiser-facing marketing. Additionally, share-based compensation expense increased from $2 million in 2010 to $43 million in 2011 due to recognition of expense related to Post-2011 RSUs.

*2010 Compared to 2009.* Marketing and sales expenses in 2010 increased $69 million, or 60%, compared to 2009. The increase was primarily due to an increase in payroll and benefits expenses, resulting from a 90% increase in employee headcount to support global sales, business development, and customer service. Additionally, we increased our spending to support our user-, developer-, and advertiser-facing marketing as well as our market research and analytics capabilities.

We anticipate that marketing and sales expenses will increase in dollar amount and as a percentage of revenue in 2012 as a result of growth in headcount and headcount-related expenses, including share-based compensation expense related to Post-2011 RSUs. We plan to add sales, business development and customer service employees, open new offices, and continue our investment in user-, developer-, and advertiser-facing marketing. Assuming we complete our initial public offering in 2012, we also anticipate a significant increase in marketing and sales expenses in 2012 due to the initial inclusion of share-based compensation expense from Pre-2011 RSUs as described in "—Critical Accounting Policies and Estimates—Share-based Compensation."

56

**Table of Contents**

### Research and development

|  | Year Ended December 31, | | | 2009 to 2010 % Change | 2010 to 2011 % Change |
|---|---|---|---|---|---|
|  | 2009 | 2010 | 2011 |  |  |
|  | (dollars in millions) | | |  |  |
| Research and development | $ 87 | $ 144 | $ 388 | 66% | 169% |
| Percentage of revenue | 11% | 7% | 10% |  |  |

*2011 Compared to 2010.* Research and development expenses in 2011 increased $244 million, or 169%, compared to 2010. The increase was primarily due to an increase from $9 million in 2010 to $114 million in 2011 for share-based compensation expense related to Post-2011 RSUs. Payroll and benefits expense also increased due to a 57% growth in employee headcount in engineering, design, product management, and other technical functions. This investment supported our efforts to improve existing products and build new products for users, developers, and advertisers.

*2010 Compared to 2009.* Research and development expenses in 2010 increased $57 million, or 66%, compared to 2009. The increase was primarily due to an increase in payroll and benefits expenses, resulting from a 81% increase in employee headcount in engineering and related functions. This investment supported our efforts to improve existing products and build new products for users, developers, and advertisers.

We anticipate that research and development expenses will increase in dollar amount and as a percentage of revenue in 2012 as a result of growth in headcount and headcount-related expenses, including share-based compensation expense related to Post-2011 RSUs. We plan to continue rapidly hiring engineering, design, product management, and other technical employees. Assuming we complete our initial public offering in 2012, we also anticipate a significant increase in research and development expenses in 2012 due to the initial inclusion of share-based compensation expense from Pre-2011 RSUs as described in "—Critical Accounting Policies and Estimates—Share-based Compensation."

### General and administrative

|  | Year Ended December 31, | | | 2009 to 2010 % Change | 2010 to 2011 % Change |
|---|---|---|---|---|---|
|  | 2009 | 2010 | 2011 |  |  |
|  | (dollars in millions) | | |  |  |
| General and administrative | $ 90 | $ 121 | $ 280 | 34% | 131% |
| Percentage of revenue | 12% | 6% | 8% |  |  |

*2011 Compared to 2010.* General and administrative expenses in 2011 increased $159 million, or 131%, compared to 2010. The increase was primarily due to an increase in payroll and benefits expenses, resulting from a 54% increase in employee headcount in finance, legal, human resources, and other functions. Additionally, outside consulting and legal fees contributed to the increase. Share-based compensation expense increased from $9 million in 2010 to $51 million in 2011 due to recognition of expense related to Post-2011 RSUs.

*2010 Compared to 2009.* General and administrative expenses in 2010 increased $31 million, or 34%, compared to 2009. The increase was primarily due to an increase in payroll and benefits expenses, resulting from a 61% increase in employee headcount in general and administrative functions and, to a lesser extent, an increase in outside consulting and legal fees.

We anticipate that general and administrative expenses will increase in dollar amount and increase as a percentage of revenue in 2012 as a result of growth in headcount and headcount-related expenses, including share-based compensation related to the Post-2011 RSUs. We plan to increase general and administrative employee headcount to support our growth. Assuming we complete our initial public offering in 2012, we also anticipate a significant increase in general and administrative expenses in 2012 due to the initial inclusion of share-based compensation expense from Pre-2011 RSUs as described in "—Critical Accounting Policies and Estimates—Share-based Compensation."

57

PX0559-063

**Table of Contents**

*Other expense, net*

| | Year Ended December 31, | | | 2009 to 2010 % Change | 2010 to 2011 % Change |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | | |
| | | (in millions) | | | |
| Interest expense | $(10) | $(22) | $(42) | 120% | 91% |
| Other income (expense), net | 2 | (2) | (19) | NM | NM |
| Other expense, net | $ (8) | $(24) | $(61) | 200% | 154% |

*2011 Compared to 2010.* Other expense, net in 2011 increased $37 million, or 154%, compared to 2010. Interest expense increased by $20 million, driven by an increase in fees related to our credit facility as described in "—Liquidity and Capital Resources," and the payments related to an increased volume of property and equipment financed by capital leases. The change in other expense was primarily due to $29 million in foreign exchange related losses in 2011. Foreign exchange losses in 2011 stemmed from the periodic re-measurement of our intercompany Euro balances. Foreign currency balances were immaterial in 2010. These expenses were partially offset by an increase in interest income driven by larger invested cash balances.

*2010 Compared to 2009.* Interest expense in 2010 increased as a result of an increased use of capital leases and interest payments related to our $250 million credit facility as described in "—Liquidity and Capital Resources." This loan was repaid in full in March 2011.

*Provision for income taxes*

| | Year Ended December 31, | | | 2009 to 2010 % Change | 2010 to 2011 % Change |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | | |
| | | (dollars in millions) | | | |
| Provision for income taxes | $  25 | $ 402 | $ 695 | NM | 73% |
| Effective tax rate | 10% | 40% | 41% | | |

*2011 Compared to 2010.* Our provision for income taxes in 2011 increased $293 million, or 73%, compared to 2010 primarily due to an increase in taxable income. Our effective tax rate increased primarily due to losses arising outside the United States in jurisdictions where we do not receive a tax benefit and the impact of certain non-deductible share-based compensation expense that was recognized during the year.

*2010 Compared to 2009.* Our provision for income taxes in 2010 increased $377 million compared to 2009 primarily due to an increase in taxable income. Our effective tax rate increased primarily due to a benefit recorded in 2009 related to the release of a valuation allowance, which did not recur in 2010.

Our effective tax rate has exceeded the U.S. statutory rate in part because of losses arising outside the United States in jurisdictions where we do not receive a tax benefit. These losses were primarily due to the initial start-up costs incurred by our foreign subsidiaries to operate in certain foreign markets, including the costs incurred by those subsidiaries to license, develop, and use our intellectual property. Our effective tax rate in the future will depend on the portion of our profits earned within and outside the United States, which will also be affected by our methodologies for valuing our intellectual property and intercompany transactions.

Assuming we complete our initial public offering in 2012, we anticipate a significant increase in share-based compensation expense from Pre-2011 RSUs, which may contribute to increasing our effective tax rate because a portion of the share-based compensation expense will not be tax deductible in the United States. In addition, our effective tax rate may fluctuate significantly in any quarter in which there is significant share-based compensation expense or significant exercises or settlements of stock awards.

58

**Table of Contents**

### Quarterly Results of Operations Data

The following tables set forth our quarterly consolidated statements of income data in dollars and as a percentage of total revenue for each of the eight quarters in the period ended December 31, 2011. We have prepared the quarterly consolidated statements of income data on a basis consistent with the audited consolidated financial statements included elsewhere in this prospectus. In the opinion of management, the financial information reflects all adjustments, consisting only of normal recurring adjustments, which we consider necessary for a fair presentation of this data. This information should be read in conjunction with the audited consolidated financial statements and related notes included elsewhere in this prospectus. The results of historical periods are not necessarily indicative of the results for any future period.

| | Three Months Ended | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mar 31, 2010 | Jun 30, 2010 | Sep 30, 2010 | Dec 31, 2010 | Mar 31, 2011 | Jun 30, 2011 | Sep 30, 2011 | Dec 31, 2011 |
| | (in millions) | | | | | | | |
| **Consolidated Statements of Income Data:** | | | | | | | | |
| Revenue: | | | | | | | | |
| Advertising revenue | $ 340 | $ 424 | $ 450 | $ 655 | $ 637 | $ 776 | $ 798 | $ 943 |
| Payments and other fees revenue | 5 | 8 | 17 | 76 | 94 | 119 | 156 | 188 |
| Total revenue | 345 | 431 | 467 | 731 | 731 | 895 | 954 | 1,131 |
| Costs and expenses[(1)]: | | | | | | | | |
| Cost of revenue | 100 | 111 | 131 | 150 | 167 | 210 | 236 | 247 |
| Marketing and sales | 36 | 44 | 45 | 59 | 68 | 103 | 124 | 132 |
| Research and development | 25 | 32 | 41 | 45 | 57 | 99 | 108 | 124 |
| General and administrative | 22 | 26 | 34 | 40 | 51 | 76 | 72 | 80 |
| Total costs and expenses | 183 | 213 | 251 | 294 | 343 | 488 | 540 | 583 |
| Income from operations | 162 | 218 | 216 | 437 | 388 | 407 | 414 | 548 |
| Net income | $ 95 | $ 129 | $ 131 | $ 251 | $ 233 | $ 240 | $ 227 | $ 302 |

(1)   Costs and expenses include share-based compensation expense as follows:

| | Three Months Ended | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mar 31, 2010 | Jun 30, 2010 | Sep 30, 2010 | Dec 31, 2010 | Mar 31, 2011 | Jun 30, 2011 | Sep 30, 2011 | Dec 31, 2011 |
| | (in millions) | | | | | | | |
| Cost of revenue | $ — | $ — | $ — | $ — | $ — | $ 3 | $ 3 | $ 3 |
| Marketing and sales | — | 1 | — | 1 | — | 11 | 16 | 16 |
| Research and development | 2 | 2 | 2 | 3 | 4 | 35 | 33 | 42 |
| General and administrative | 3 | 2 | 2 | 2 | 3 | 15 | 18 | 15 |
| Total share-based compensation | $ 5 | $ 5 | $ 4 | $ 6 | $ 7 | $ 64 | $ 70 | $ 76 |

59

**Table of Contents**

|  | **Three Months Ended** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Mar 31, 2010 | Jun 30, 2010 | Sep 30, 2010 | Dec 31, 2010 | Mar 31, 2011 | Jun 30, 2011 | Sep 30, 2011 | Dec 31, 2011 |
|  | | | | (as a percentage of total revenue) | | | | |
| **Consolidated Statements of Income Data:** | | | | | | | | |
| Revenue: | | | | | | | | |
| Advertising revenue | 99% | 98% | 96% | 90% | 87% | 87% | 84% | 83% |
| Payments and other fees revenue | 1 | 2 | 4 | 10 | 13 | 13 | 16 | 17 |
| Total revenue | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Costs and expenses(1): | | | | | | | | |
| Cost of revenue | 29% | 26% | 28% | 21% | 23% | 23% | 25% | 22% |
| Marketing and sales | 10 | 10 | 10 | 8 | 9 | 12 | 13 | 12 |
| Research and development | 7 | 7 | 9 | 6 | 8 | 11 | 11 | 11 |
| General and administrative | 6 | 6 | 7 | 5 | 7 | 8 | 8 | 7 |
| Total costs and expenses | 53 | 49 | 54 | 40 | 47 | 55 | 57 | 52 |
| Income from operations | 47 | 51 | 46 | 60 | 53 | 45 | 43 | 48 |
| Net income | 28% | 30% | 28% | 34% | 32% | 27% | 24% | 27% |

(1)   Costs and expenses include share-based compensation expense as follows:

|  | **Three Months Ended** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Mar 31, 2010 | Jun 30, 2010 | Sep 30, 2010 | Dec 31, 2010 | Mar 31, 2011 | Jun 30, 2011 | Sep 30, 2011 | Dec 31, 2011 |
|  | | | | (as a percentage of total revenue) | | | | |
| Cost of revenue | —% | —% | —% | —% | —% | —% | —% | —% |
| Marketing and sales | — | — | — | — | — | 1 | 2 | 1 |
| Research and development | 1 | — | — | — | 1 | 4 | 3 | 4 |
| General and administrative | 1 | — | — | — | — | 2 | 2 | 1 |
| Total share-based compensation | 1% | 1% | 1% | 1% | 1% | 7% | 7% | 7% |

*Quarterly Trends*

*Revenue*

Advertising spending is traditionally seasonally strong in the fourth quarter, and we have experienced significantly lower sequential growth rates from the fourth quarter to the first quarter of the following year. The rapid growth in our business may have partially masked these seasonal trends to date and the seasonal impacts may be more pronounced in the future.

*Fourth Quarter 2011 Compared to Fourth Quarter 2010.* Revenue in the fourth quarter of 2011 increased $400 million, or 55%, compared to the fourth quarter of 2010. The increase was primarily due to a 44% increase in advertising revenue to $943 million. Advertising revenue grew due to a 16% increase in the number of ads delivered and a 24% increase in the average price per ad delivered. The increase in ads delivered was primarily driven by user growth, partially offset by an increase in usage of Facebook mobile products where we did not show ads, product changes in 2011 which in aggregate reduced the number of ads on certain Facebook pages, our decision to increase the reserve price for ads in our system thereby reducing the number of ads shown, and a reduction in usage of apps on Facebook which reduced the number of ads shown. The increase in average price per ad for the fourth quarter of 2011 as compared to the fourth quarter of 2010 was driven by factors including changes that contributed to higher user interaction with the ads by increasing their relative prominence on certain pages and the higher reserve price for ads.

Payments and other fees revenue increased to $188 million in the fourth quarter of 2011 due to the adoption of Facebook Payments, which has been gradually adopted by our Platform developers and began generating significant revenue in the fourth quarter of 2010. Facebook Payments became mandatory for all game developers

60

PX0559-066

**Table of Contents**

accepting payments on the Facebook Platform with limited exceptions on July 1, 2011. Accordingly, comparisons of payments and other fees revenue to periods before this date may not be meaningful.

*Cost of revenue and operating expenses*

Cost of revenue and operating expenses increased during every quarter presented, primarily due to increased expenses related to the continued expansion of our technical infrastructure and increases in employee headcount. The increases in marketing and sales, research and development, and general and administrative expenses in the 2011 quarterly periods also reflect significant increases for share-based compensation expense related to Post-2011 RSUs.

For additional information on matters that may affect our quarterly results, see "Risk Factors—Our financial results will fluctuate from quarter to quarter, which makes them difficult to predict."

## Liquidity and Capital Resources

| | Year Ended December 31, | | |
| | 2009 | 2010 (in millions) | 2011 |
|---|---|---|---|
| **Consolidated Statements of Cash Flows Data:** | | | |
| Net cash provided by operating activities | $  155 | $  698 | $ 1,549 |
| Net cash used in investing activities | (62) | (324) | (3,023) |
| Net cash provided by financing activities | 243 | 781 | 1,198 |
| Purchases of property and equipment | (33) | (293) | (606) |
| Depreciation and amortization | 78 | 139 | 323 |
| Share-based compensation | 27 | 20 | 217 |

Our principal sources of liquidity are our cash and cash equivalents, marketable securities, and cash generated from operations. Cash and cash equivalents and marketable securities consist primarily of cash on deposit with banks and investments in money market funds and U.S. government and U.S. government agency securities. Cash and cash equivalents and marketable securities totaled $3,908 million as of December 31, 2011, an increase of $2,123 million from December 31, 2010. This increase primarily reflects $1,549 million of cash generated from operations and $998 million of proceeds from the sale of common stock, partially offset by $606 million used for capital expenditures and repayment of a $250 million credit facility. We currently anticipate that our available funds, credit facilities, and cash flow from operations will be sufficient to meet our operational cash needs for the foreseeable future.

Pre-2011 RSUs vest upon the satisfaction of both a service condition and a liquidity condition. The liquidity condition will be satisfied six months following our initial public offering. We expect that a portion of these RSUs will be settled on a date approximately six months after our initial public offering. On the settlement date, we plan to withhold and remit income taxes at applicable minimum statutory rates based on the then-current value of the underlying shares. We currently expect that the average of these withholding tax rates will be approximately 45%. If the price of our common stock at the time of settlement were equal to the midpoint of the price range on the cover page of this prospectus, we estimate that this tax obligation would be approximately $        billion in the aggregate. The amount of this obligation could be higher or lower, depending on the price of our shares on the RSU settlement date. To settle these RSUs, assuming a 45% tax withholding rate, we anticipate that we will net settle the awards by delivering approximately        shares of Class B common stock to RSU holders and simultaneously withholding approximately        shares of Class B common stock. In connection with this net settlement we will withhold and remit the tax liabilities on behalf of the RSU holders to the relevant tax authorities in cash.

To fund the withholding and remittance obligation, we expect to sell equity securities near the settlement date in an amount substantially equivalent to the number of shares of common stock that we withhold in connection with the initial settlement of the Pre-2011 RSUs, such that the newly issued shares should not be

61

**Table of Contents**

dilutive. However, in the event that we issue equity securities, we cannot assure you that we will be able to successfully match the proceeds to the amount of this tax liability. If we elect not to fully fund tax withholding and remittance obligations through the issuance of equity or we are unable to complete such an offering due to market conditions or otherwise, we may choose to borrow funds from our credit facilities, use a substantial portion of our existing cash, or rely upon a combination of these alternatives.

In 2011, we entered into an agreement for an unsecured five-year revolving credit facility that allowed us to borrow up to $2,500 million, with interest payable on borrowed amounts set at the London Interbank Offered Rate (LIBOR) plus 1.0%. No amounts were drawn down under this agreement as of December 31, 2011. In February 2012, we terminated this credit facility and we entered into a new agreement for an unsecured five-year revolving credit facility that allows us to borrow up to $5,000 million for general corporate purposes, with interest payable on the borrowed amounts set at LIBOR plus 1.0%. Prior to our initial public offering, we can borrow up to $2,500 million under this facility. We paid origination fees at closing and these fees are amortized over the remaining term of the credit facility. Under the terms of the new agreement, we are obligated to pay a commitment fee of 0.10% per annum on the daily undrawn balance.

Concurrent with our entering into the new revolving credit facility, we also entered into a bridge credit facility that allows us to borrow up to $3,000 million to fund tax withholding and remittance obligations related to the settlement of RSUs in connection with our initial public offering, with interest payable on the borrowed amounts set at LIBOR plus 1.0% and an additional 0.25% payable on drawn balances outstanding from and after the 180th day of borrowing. We may make a single borrowing under this bridge facility beginning on the closing date of our initial public offering and ending on the date that is 240 days after that date. Any amounts outstanding under this facility will be due one year after the date we draw on the facility but no later than June 30, 2014. During the term of this bridge facility, the lenders' commitments are subject to reduction and amounts borrowed thereunder are subject to repayment in the event we raise capital through certain asset sales, debt issuances, or equity issuances. We paid origination fees at closing and these fees are amortized over the remaining term of the facility, and we are obligated to pay an additional upfront fee of 0.20% of the aggregate amount of the borrowings requested on any applicable funding date. Under the terms of the agreement, we are obligated to pay a commitment fee of 0.10% per annum on the daily undrawn balance from and after the 90th day following the date we entered into the bridge facility.

As of December 31, 2011, $348 million of the $3,908 million in cash and cash equivalents and marketable securities was held by our foreign subsidiaries. We have provided for the additional taxes that would be due if we repatriated these funds for use in our operations in the United States.

### Cash Provided by Operating Activities

Cash flow from operating activities during 2011 primarily resulted from net income of $1,000 million, adjusted for certain non-cash items, including total depreciation and amortization of $323 million, and share-based compensation expense of $217 million.

Cash flow from operating activities during 2010 primarily resulted from net income of $606 million, adjusted for certain non-cash items, including total depreciation and amortization of $139 million and share-based compensation expense of $20 million, partially offset by cash consumed by working capital of $70 million.

Cash flow from operating activities during 2009 primarily resulted from net income of $229 million, adjusted for certain non-cash items, including total depreciation and amortization of $78 million and share-based compensation of $27 million, partially offset by cash consumed by working capital of $179 million.

### Cash Used in Investing Activities

Cash used in investing activities during 2011 primarily resulted from the use of approximately $2,396 million for the net purchase of marketable securities. Our cash used in investing activities in 2011 also consisted of capital expenditures of $606 million related to the purchase of servers, networking equipment, storage infrastructure, and the construction of data centers.

62

**Table of Contents**

Cash used in investing activities during 2010 and 2009 primarily consisted of capital expenditures related to the purchases of property and equipment and the construction of data centers. Changes in restricted cash and deposits consumed $9 million and $32 million of cash related to security deposits in support of real estate expansion in 2010 and 2009, respectively. Acquisitions, net of cash acquired, also consumed $22 million of cash in 2010.

We anticipate making capital expenditures in 2012 of approximately $1.6 billion to $1.8 billion, a portion of which we will finance through leasing arrangements.

### *Cash Provided by Financing Activities*

Our financing activities have primarily consisted of equity issuances, lease financing, and debt financing. Net cash provided by financing activities was $1,198 million, $781 million, and $243 million, respectively, for 2011, 2010, and 2009. This includes excess tax benefits from stock award activities of $433 million, $115 million, and $51 million, respectively.

In January 2011, we completed an offering of our Class A common stock to certain non-U.S. investors that generated $998 million in net proceeds. In December 2010, we completed an offering of our Class A common stock that generated $500 million in proceeds. In May 2009, we completed an offering of Series E preferred stock that generated $200 million in proceeds.

In March 2010, we entered into a credit facility with certain lenders. This facility allowed for the drawdown of up to $250 million in unsecured senior loans. In April 2010, we drew down the full amount available under the facility, and in March 2011, we repaid the entire $250 million balance.

### Off-Balance Sheet Arrangements

We did not have any off-balance sheet arrangements in 2011, 2010, or 2009.

### Contingencies

We are involved in claims, lawsuits, government investigations, and proceedings arising from the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred, and the amount can be reasonably estimated. Significant judgment is required to determine both probability and the estimated amount. Such legal proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change or prove to be incorrect, it could have a material impact on our results of operations, financial position, and cash flows.

### Commitments

Our principal commitments consist of obligations under capital and operating leases for equipment and office and data center facilities. The following table summarizes our commitments to settle contractual obligations in cash as of December 31, 2011.

| | | Payment Due by Period | | | |
| --- | --- | --- | --- | --- | --- |
| | **Total** | **Less than 1 Year** | **1-3 Years** | **3-5 Years** | **More than 5 Years** |
| Operating lease obligations | $ 945 | $ 180 | $ 243 | $ 197 | $ 325 |
| Capital lease obligations | 817 | 322 | 337 | 28 | 130 |
| Other contractual commitments[1] | 500 | 450 | 25 | 25 | — |
| Total contractual obligations | $2,262 | $ 952 | $ 605 | $ 250 | $ 455 |

(1) Other contractual commitments primarily relate to equipment and supplies for our data center operations, and to a lesser extent, construction of our data center sites.

63

PX0559-069

Table of Contents

In addition, our other liabilities include $60 million related to uncertain tax positions. Due to uncertainties in the timing of the completion of tax audits, the timing of the resolution of these positions is uncertain and we are unable to make a reasonably reliable estimate of the timing of payments in individual years beyond 12 months. As a result, this amount is not included in the above table.

**Recent Accounting Pronouncements**

*Comprehensive Income*

In May 2011, the Financial Accounting Standards Board issued guidance that changed the requirement for presenting "Comprehensive Income" in the consolidated financial statements. The update requires an entity to present the components of other comprehensive income either in a single continuous statement of comprehensive income or in two separate but consecutive statements. The currently available option to disclose the components of other comprehensive income within the statement of stockholders' equity will no longer be available. The update is effective for fiscal years, and interim periods within those years, beginning after December 15, 2011 and should be applied retrospectively. The adoption of the standard will have no impact on our financial position or results of operations, but will result in a change in the presentation of our basic consolidated financial statements.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles (GAAP). The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses, and related disclosures. These estimates form the basis for judgments we make about the carrying values of our assets and liabilities, which are not readily apparent from other sources. We base our estimates and judgments on historical experience and on various other assumptions that we believe are reasonable under the circumstances. On an ongoing basis, we evaluate our estimates and assumptions. Our actual results may differ from these estimates under different assumptions or conditions.

We believe that of our significant accounting policies, which are described in note 1 to our consolidated financial statements, the following accounting policies involve a greater degree of judgment and complexity. Accordingly, these are the policies we believe are the most critical to aid in fully understanding and evaluating our financial condition and results of operations.

*Revenue Recognition for Payments and Other Fees*

We enable Payments from our users to our Platform developers. Our users can make payments on the Facebook Platform by using credit cards or other payment methods available on our website. The primary process for these transactions is through the purchase of our virtual currency. Our users then use this virtual currency to purchase virtual and digital goods in games and apps from developers on the Facebook Platform. Upon the initial sale of the virtual currency, we record consideration received from a user as a deposit.

When a user engages in a payment transaction utilizing the virtual currency for the purchase of a virtual or digital good from a Platform developer, we reduce the virtual currency balance of the user by the price of the purchase, which is a price that is solely determined by the Platform developer. We remit to the Platform developer an amount that is based on the total amount of virtual currency redeemed less the processing fee that we charge the Platform developer for the service performed. Our revenue is the net amount of the transaction representing our processing fee for the transaction. We record revenue on a net basis as we do not consider ourselves to be the principal in the sale of the virtual or digital good to the user. Under GAAP guidance related to reporting revenue gross as a principal versus net as an agent, the indicators used to determine whether an entity is

64

PX0559-070

**Table of Contents**

a principal or an agent to a transaction are subject to judgment. We consider ourselves the agent to these transactions when we apply the indicators to our facts. Should material subsequent changes in the substance or nature of the transactions with Platform developers result in us being considered the principal in such sales, we would reflect the virtual and digital goods sale as revenue and the amounts paid to the Platform developers as an associated cost. This would have no impact upon our operating income, but our revenue and associated costs would increase by a similar amount.

### Income Taxes

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our provision for income taxes and income tax assets and liabilities, including evaluating uncertainties in the application of accounting principles and complex tax laws.

We record a provision for income taxes for the anticipated tax consequences of the reported results of operations using the asset and liability method. Under this method, we recognize deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial reporting and tax bases of assets and liabilities, as well as for operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using the tax rates that are expected to apply to taxable income for the years in which those tax assets and liabilities are expected to be realized or settled. We record a valuation allowance to reduce our deferred tax assets to the net amount that we believe is more likely than not to be realized.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. Although we believe that we have adequately reserved for our uncertain tax positions, we can provide no assurance that the final tax outcome of these matters will not be materially different. We make adjustments to these reserves when facts and circumstances change, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will affect the provision for income taxes in the period in which such determination is made and could have a material impact on our financial condition and operating results. The provision for income taxes includes the effects of any reserves that we believe are appropriate, as well as the related net interest and penalties.

### Share-based Compensation

#### Overview

We have granted RSUs to our employees and members of our board of directors. Pre-2011 RSUs vest upon the satisfaction of both a service condition and a liquidity condition. The service condition for the majority of these awards is satisfied over four years. The liquidity condition is satisfied upon the occurrence of a qualifying event, defined as a change of control transaction or six months following the effective date of an initial public offering. Under the terms of our 2005 Stock Plan, the shares underlying RSUs that satisfy both of these conditions are to be delivered to holders six months following our initial public offering.

Post-2011 RSUs are not subject to a liquidity condition in order to vest. The majority of Post-2011 RSUs are earned over a service period of four or five years.

#### Share-based Compensation Expense

We account for share-based employee compensation plans under the fair value recognition and measurement provisions in accordance with applicable accounting standards, which require all share-based payments to employees, including grants of stock options and RSUs, to be measured based on the grant-date fair value of the awards.

Share-based compensation expense is recorded net of estimated forfeitures in our consolidated statements of income and as such is recorded for only those share-based awards that we expect to vest. We estimate the

65

**Table of Contents**

forfeiture rate based on historical forfeitures of equity awards and adjust the rate to reflect changes in facts and circumstances, if any. We will revise our estimated forfeiture rate if actual forfeitures differ from our initial estimates. We record share-based compensation expense for service-based equity awards such as stock options, restricted shares, and Post-2011 RSUs using the straight-line attribution method over the period during which the employee is required to perform service in exchange for the award. We record share-based compensation expense for performance-based equity awards such as Pre-2011 RSUs using the accelerated attribution method. Upon the effectiveness of our initial public offering, we will recognize a significant cumulative share-based compensation expense for the portion of the Pre-2011 RSUs that had met the service condition as of that date.

We have historically issued unvested restricted shares to employee stockholders of certain acquired companies. As these awards are generally subject to continued post-acquisition employment, we have accounted for them as post-acquisition share-based compensation expense. We recognize compensation expense equal to the grant date fair value of the common stock on a straight-line basis over the employee's required service period, net of estimated forfeitures.

We capitalize share-based employee compensation expense when appropriate. Capitalized share-based compensation expense was not material in the three years ended December 31, 2011.

As of December 31, 2011, no share-based compensation expense had been recognized for Pre-2011 RSUs because the qualifying events described above had not occurred. In the quarter in which our initial public offering is completed, we will begin recording share-based compensation expense using the accelerated attribution method net of forfeitures based on the grant date fair value of the Pre-2011 RSUs. For Pre-2011 RSUs, if our initial public offering had occurred on December 31, 2011, we would have recognized $968 million of cumulative share-based compensation expense on that date.

The following table summarizes, on a pro forma basis, the number of vested and unvested Pre-2011 RSUs outstanding at December 31, 2011 and the share-based compensation expense related to Pre-2011 RSUs that we would have incurred, assuming our initial public offering had occurred on December 31, 2011.

| "Vested" Pre-2011 RSUs as of Dec 31, 2011[1] | | "Unvested" Pre-2011 RSUs as of Dec 31, 2011[2] | Pro Forma Share-based Compensation Expense (in millions) |
|---|---|---|---|
| 224,471 | (in thousands) | 101,929 | $968 |

(1) For purposes of this table, "Vested" RSUs include those RSUs for which the service condition had been fulfilled as of December 31, 2011.
(2) For purposes of this table, "Unvested" RSUs include those RSUs for which the service condition had not been fulfilled as of December 31, 2011 and exclude an estimate of forfeited RSUs.

This table is based on Pre-2011 RSUs outstanding as of December 31, 2011 and is intended to be illustrative only. The actual timing of compensation expense we will recognize related to outstanding Pre-2011 RSU awards will depend on the date of the closing of our initial public offering. The actual amount of compensation expense we will incur will vary because the service condition of additional RSUs will be fulfilled between December 31, 2011 and the closing date of our initial public offering.

We estimate that the remaining unrecognized share-based compensation expense relating to Pre-2011 RSUs would be approximately $239 million, after giving effect to estimated forfeitures and would be recognized in 2012 and thereafter as shown on the table below, if our initial public offering had occurred on December 31, 2011.

In addition, as of December 31, 2011, we had 52 million Post-2011 RSUs outstanding. For these Post-2011 RSUs, $189 million in expense was recognized in 2011 and, after giving effect to estimated forfeitures, a remaining $1,189 million will be recognized in 2012 and thereafter as shown in the table below. This table estimates future share-based compensation expense related to all outstanding equity grants, consisting of RSUs, restricted shares, and stock options through December 31, 2011. The table does not take into account any share-based compensation expense related to future awards that may be granted to employees, directors, or other

66

PX0559-072

**Table of Contents**

service providers. Additionally, the amounts in the table include an estimate of unvested awards that may be forfeited in future periods due to the departure of employees or directors. Our forfeiture estimates are subject to adjustment based on actual experience.

| | 2012 | 2013 | 2014 | 2015 | Beyond 2015 |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Pre-2011 RSUs[1][2] | $143 | $ 63 | $ 23 | $ 6 | $ 4 |
| Post-2011 RSUs | 288 | 291 | 298 | 241 | 71 |
| Restricted shares | 14 | 11 | 10 | 3 | — |
| Stock options | 7 | 7 | 5 | 4 | 6 |
| Total | $452 | $372 | $336 | $254 | $ 81 |

(1)  Assumes our initial public offering was completed on December 31, 2011.
(2)  Excludes the estimated $968 million expense related to Pre-2011 RSUs for which the service condition had been achieved as of December 31, 2011 and which would have been incurred assuming our initial public offering had occurred on December 31, 2011.

The aggregate intrinsic value of vested and unvested stock options and vested and unvested RSUs as of December 31, 2011, based on an assumed initial public offering price of $         per share, the midpoint of the price range set forth on the cover of this prospectus, was $         million, $         million, $         million, and $         million, respectively.

We estimated the fair value of stock option awards included in the table above using the Black-Scholes-Merton single option-valuation model, which requires inputs such as expected term, expected volatility, and risk-free interest rate. The estimated forfeiture rate of stock option awards also affects the amount of aggregate compensation expense we will incur. These inputs are subjective and generally require significant analysis and judgment to develop.

We estimate the expected term for stock option awards based upon the historical behavior of our employees. The expected volatility is based on a study of publicly traded industry peer companies. The forfeiture rate is derived primarily from our historical data, and the risk-free interest rate is based on the yield available on U.S. Treasury zero-coupon issues. Our dividend yield is 0%, since we have not paid, and do not expect to pay, dividends.

We estimated the fair value of employee stock options granted in 2009 and 2010 as of the date of the grant using the following weighted-average assumptions:

| | Year Ended December 31, | |
|---|---|---|
| | 2009 | 2010 |
| Expected term from grant date (in years) | 5.04 | 7.15 |
| Risk-free interest rate | 2.01% | 1.69% |
| Expected volatility | 0.57 | 0.46 |
| Dividend yield | — | — |

The weighted-average grant date fair value of employee stock options granted during 2009 and 2010 was $1.12 and $5.26, respectively, per share. We did not grant any stock options in 2011.

*Tax Withholding and Remittance Obligations*

We estimate that approximately         shares underlying Pre-2011 RSUs will settle approximately six months after our initial public offering. In addition, we estimate that an additional         million Pre-2011 RSUs will settle following such date through the end of 2012. We estimate that an aggregate of         million Pre-2011 RSUs and Post-2011 RSUs will settle in 2013.

RSU holders generally will recognize taxable income based upon the value of the shares on the date they are settled and we are required to withhold taxes on such value at applicable minimum statutory rates. We currently expect that the average of these withholding rates will be approximately 45%. For additional information on our tax withholding and remittance obligations related to RSU vesting, see "—Liquidity and Capital Resources" above.

67

PX0559-073

**Table of Contents**

### Corporate Income Taxes

The RSU activity discussed above, as well as activity from other equity awards including stock options, will also have corporate income tax effects. The most significant effect is that the settlement of awards or exercise of nonstatutory stock options generates a corporate income tax deduction that will reduce our U.S. corporate income tax liability. The exercise of incentive stock options (ISOs) may also result in a corporate income tax deduction, but only in certain circumstances where the holder of the ISOs also sells the acquired shares in a disqualifying disposition. The amount of this corporate income tax deduction will be based on the value of shares at the exercise or settlement date, which differs from the value of the shares at the grant date that is used to determine the share-based compensation expense. Depending on the value of the shares on the date the equity awards are settled or options are exercised, we could generate a corporate income tax deduction that exceeds our other U.S. taxable income in that year, which would result in a taxable loss for U.S. corporate income tax purposes that reduces our U.S. corporate income tax liability to an immaterial amount for that year. In 2012, we expect to settle approximately              million RSUs. In addition, as of December 31, 2011, we had vested nonstatutory options outstanding to purchase approximately 187 million shares of our Class B common stock. As of December 31, 2011, we also had vested ISOs outstanding to purchase approximately 58 million shares of our Class B common stock, but given the uncertainty in predicting whether the ISO holders will choose to make disqualifying dispositions, we are assuming that no corporate income tax deductions will be generated by these ISOs. Assuming all of these vested nonstatutory stock options are exercised during 2012 and assuming the value of our Class B common stock at settlement or upon exercise is the midpoint of the price range on the cover page of this prospectus, we estimate that this settlement and option exercise activity would generate a corporate income tax deduction of approximately $      billion to $      billion. The amount that this deduction exceeds our other U.S. taxable income will result in a net operating loss (NOL) that can be carried back to the preceding two years to offset our taxable income for U.S. federal income tax purposes, as well as in some states, which would allow us to receive a refund of some of the corporate income taxes we paid in those years. Based on the assumptions above, we anticipate that this refund could be up to $500 million and payable to us during the first six months of 2013. Any portion of the NOL remaining after this carryback would be carried forward to offset our other U.S. taxable income generated in future years, which taxable income will also be reduced by deductions generated from new stock award settlement and stock option exercise activity occurring in those future years.

Utilization of our NOL carryforwards may be subject to annual limitations due to the ownership change limitations provided by the Internal Revenue Code and similar state provisions. Such annual limitations could result in the expiration of the NOL carryforwards before their utilization. The events that may cause ownership changes include, but are not limited to, a cumulative stock ownership change of greater than 50% over a three-year period.

The corporate income tax deductions generated by this settlement and exercise activity described above do not reduce our effective tax rate reflected in our consolidated statements of income. Our provision for income taxes reflects the tax benefits that are recorded at the time the share-based compensation is initially recognized as an expense, which is based on the fair value of shares at grant date, and is different than the corporate income tax deduction, which is based on the value of shares at settlement or at exercise. If the reduction in our corporate income tax liability from settlements and exercises is greater than the tax benefits that we recognized when the share-based compensation expense was initially recorded, which will generally occur if our share price has appreciated between grant date and settlement or exercise date, this will create an "excess tax benefit" that is recorded as a component of additional paid-in capital and not as a reduction of our provision for income taxes in our consolidated statements of income. The timing in which these excess tax benefits are reflected on our balance sheet generally matches the timing in which the reduction in prior or future income tax liability occurs. Thus, if we have these types of NOLs remaining after any carryback claims, we would not record a deferred tax asset for such NOLs, but rather we would record an adjustment to additional paid-in capital and a reduction to our corporate income tax liability during the period in which those NOLs are used to reduce our corporate income tax liability. These excess tax benefits would be recorded in our statements of cash flows as cash provided by financing activities.

68

PX0559-074

**Table of Contents**

*Valuation of Our Common Stock*

The valuations of our Class B common stock were determined in accordance with the guidelines outlined in the American Institute of Certified Public Accountants Practice Aid, *Valuation of Privately-Held-Company Equity Securities Issued as Compensation*. We considered numerous objective and subjective factors to determine our best estimate of the fair value of our Class B common stock, including but not limited to, the following factors:

- recent private stock sale transactions;

- our historical financial results and estimated trends and prospects for our future financial performance;

- our performance and market position relative to our competitors and/or similar publicly traded companies;

- the economic and competitive environment, including the industry in which we operate; and

- independent third-party valuations completed as of the end of each quarter.

We have granted the following RSUs since January 1, 2011:

| Grant Date | Shares Underlying RSUs (thousands) | Grant Date Fair Value | Aggregate Grant Date Fair Value (millions) |
|---|---|---|---|
| **First Quarter** | | | |
| February 16, 2011 | 2,022 | $ 24.10 | $ 49 |
| March 25, 2011 | 40,006 | 25.43 | 1,017 |
| **Second Quarter** | | | |
| May 11, 2011 | 2,580 | 27.58 | 71 |
| June 6, 2011 | 1,643 | 28.88 | 47 |
| June 22, 2011 | 1,010 | 29.67 | 30 |
| **Third Quarter** | | | |
| July 21, 2011 | 2,898 | 30.07 | 87 |
| September 1, 2011 | 1,426 | 30.07 | 43 |
| September 6, 2011 | 20 | 30.07 | 1 |
| September 22, 2011 | 1,649 | 30.07 | 50 |
| **Fourth Quarter** | | | |
| November 11, 2011 | 670 | 29.91 | 20 |
| December 22, 2011 | 1,202 | 29.76 | 36 |

We conducted valuations of our Class B common stock as of the end of each quarter. The valuations took into account the factors described above and used a combination of financial and market-based methodologies to determine our business enterprise value (BEV) including the following approaches:

- *Discounted Cash Flow Method (DCFM)*. DCFM involves estimating the future cash flows of a business for a certain discrete period and discounting such cash flows to present value. If the cash flows are expected to continue beyond the discrete time period, then a terminal value of the business is estimated and discounted to present value. The discount rate reflects the risks inherent in the cash flows and the market rates of return available from alternative investments of similar type and quality as of the valuation date.

- *Guideline Public Company Method (GPCM)*. GPCM assumes that businesses operating in the same industry will share similar characteristics and that the subject business's value will correlate to those characteristics. Therefore, a comparison of the subject business to similar businesses whose financial information and public market value are available may provide a reasonable basis to estimate the

69

**Table of Contents**

subject business's value. The GPCM provides an estimate of value using multiples derived from the stock prices of publicly traded companies. In selecting guideline public companies for this analysis, we focused primarily on quantitative considerations, such as financial performance and other quantifiable data, as well as qualitative considerations, such as industry and economic drivers.

- *Market Transaction Method (MTM)*. MTM considers transactions in the equity securities of the business being valued. During 2011, there were private stock sale transactions in our common stock. These transactions are considered if they occur with or among willing and unrelated parties. For our MTM estimates, we evaluate all transactions in the quarter with particular focus on transactions that are closer in proximity to the valuation date. We choose the weighting for the MTM each quarter based on factors such as the volume of transactions in each period, the timing of these transactions, and whether the transactions involved investors with access to our financial information.

We performed all three methodologies for each quarter, and weighted the methodologies based on the facts and circumstances in the quarter. Our indicated BEV at each valuation date was then allocated to the shares of preferred stock, common stock, warrants, options, and RSUs, using the option pricing method (OPM).

*First Quarter 2011*

We determined the fair value of our Class B common stock to be $25.54 per share as of March 31, 2011. We assigned a 50% weighting to the MTM due to the significant volume of third-party private stock sale transactions in March 2011, including a third-party Class B common stock tender offer transaction for employee shares for $25.00 per share which commenced on March 1, 2011 and became binding upon the selling stockholders on March 29, 2011. The tender offer was undertaken by investors who had access to our historical financial information. To calculate the MTM, we used the weighted average price of all transactions originating in March 2011 that were expected to be consummated, including the tender offer. We based our MTM estimate on March 2011 transactions because we believe transactions occurring closer to the quarter-end valuation date are more relevant to fair value than those transactions occurring earlier in the quarter. We assigned a 35% weighting to the GPCM which reflected the stock prices and market multiples of guideline public companies. We assigned a 15% weighting to the DCFM which was based on a weighted average cost of capital of 15% and a perpetual growth rate of 5%. The DCFM received the lowest weight because our financial plan had not been recently updated, and therefore we believed the cash flow assumptions used in the DCFM were less relevant to the determination of fair value as of the measurement date. The BEV resulting from this analysis was then allocated using the OPM and a 7.5% marketability discount was applied.

The fair value of the RSUs granted in February 2011 was determined using a straight-line methodology, with the benefit of hindsight, between the fair value determined as of December 31, 2010 of $20.85 per share and the $25.00 per share offer price for the tender offer described above that commenced on March 1, 2011. The fair value of the RSUs granted in March 2011 was determined using a similar straight-line methodology between the tender offer price of $25.00 per share as of March 1, 2011, and the fair value determined as of March 31, 2011 of $25.54 per share. We determined that the straight-line methodology provides the most reasonable basis for the valuations for the RSUs granted on the interim dates because we did not identify any single event that occurred during this interim period (other than the March 2011 tender offer) that would have caused a material change in fair value.

*Second Quarter 2011*

We determined the fair value of our Class B common stock to be $30.07 per share as of June 30, 2011. We assigned a 50% weighting to the MTM due to the significant volume of third-party private stock sale transactions in June 2011, including transactions involving investors who had access to our historical financial information. To calculate the MTM, we used the weighted average price of all transactions originating in June 2011 that were expected to be consummated. We based our MTM estimate on June 2011 transactions because we believe transactions occurring closer to the quarter-end valuation date are more relevant to the determination of fair value

70

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

than those transactions occurring earlier in the quarter. We made no change to the weightings assigned to the GPCM and DCFM from the previous quarter. In this period, we added certain Internet companies that had recently completed initial public offerings to our set of guideline public companies for use in estimating the GPCM. The DCFM was based on a weighted average cost of capital of 15% and a perpetual growth rate of 5%. The BEV resulting from this analysis was then allocated using the OPM and a 6.5% marketability discount was applied. Significant factors influencing the change in valuation relative to the prior quarter included the foregoing private stock sale transactions and the addition to our set of guideline public companies of newly public companies whose valuation multiples were relatively higher than others in the comparison group.

The fair values of the RSUs granted in May and June 2011 were determined using a straight-line methodology, with the benefit of hindsight, between the fair value determined as of March 31, 2011 of $25.54 per share and the fair value determined as of June 30, 2011 of $30.07 per share. We determined that the straight-line methodology provides the most reasonable basis for the valuations for the RSUs granted on the interim dates because we did not identify any single event that occurred during this interim period that would have caused a material change in fair value.

*Third Quarter 2011*

We determined the fair value of our Class B common stock to be $30.07 per share as of September 30, 2011. We used a combination of the GPCM, the DCFM, and the MTM to determine BEV. We assigned a 50% weighting to the DCFM because we had recently completed a comprehensive update to our financial plan and therefore we believed the assumptions used in the DCFM closely reflected BEV. The BEV resulting from this DCFM analysis was allocated using the OPM and a 6.0% marketability discount was applied. Relative to the first and second quarters, in the third quarter we assigned a lower weighting of 25% to the MTM due to the lower overall volume of third-party private stock sale transactions and the lack of significant transactions with investors that had access to our financial information. To calculate the MTM, we used the weighted average price of all transactions originating in September 2011 that were expected to be consummated. We based our MTM estimate on September 2011 transactions because we believe transactions occurring closer to the quarter-end valuation date are more relevant to the determination of fair value than those transactions occurring earlier in the quarter.

Because there was no change to fair value between the two valuation periods, and because we did not identify any events during the period that would have caused a material change in fair value, we used $30.07 per share as the fair value for all RSU grants during the period.

*Fourth Quarter 2011*

We determined the fair value of our Class B common stock to be $29.73 per share as of December 31, 2011. We assigned a 50% weighting to the MTM due to the significant volume of third-party private stock sale transactions in December 2011, including transactions involving investors who had access to our historical financial information. To calculate the MTM, we used the weighted average price of all transactions originating in December 2011 that were expected to be consummated. We based our MTM estimate on December 2011 transactions because we believe transactions occurring closer to the quarter-end valuation date are more relevant to the determination of fair value than those transactions occurring earlier in the quarter. We assigned a 25% weighting to the GPCM and the DCFM to determine fair value. In this period, we included additional Internet companies that had recently completed initial public offerings to our set of guideline public companies for use in estimating the GPCM. Compared to our valuation as of September 30, 2011, we assigned a lower weight to the DCFM in this period because time had passed since key elements of our financial plan had been updated, and therefore the cash flow assumptions used in the DCFM were less relevant to the determination of fair value as of the measurement date. The DCFM was based on a weighted average cost of capital of 15% and a perpetual growth rate of 5%. The BEV resulting from this analysis was then allocated using the OPM and a 5.5% marketability discount was applied. The primary factor influencing the change in valuation relative to the prior quarter was the foregoing private stock sale transactions.

71

**Table of Contents**

The fair values of the RSUs granted in November and December 2011 were determined using a straight-line methodology, with the benefit of hindsight, between the fair value determined as of September 30, 2011 of $30.07 per share and the fair value determined as of December 31, 2011 of $29.73 per share. We determined that the straight-line methodology provides the most reasonable basis for the valuation for the RSUs granted on the interim dates because we did not identify any single event that occurred during this interim period that would have caused a material change in fair value.

**Qualitative and Quantitative Disclosures about Market Risk**

We are exposed to market risk, including changes to interest rates, foreign currency exchange rates and inflation.

*Foreign Currency Exchange Risk*

International revenue as a percentage of revenue was 33%, 38%, and 44% in 2009, 2010, and 2011, respectively. We have foreign currency risks related to our revenue and operating expenses denominated in currencies other than the U.S. dollar, primarily the Euro. In general, we are a net receiver of currencies other than the U.S. dollar. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, will negatively affect our revenue and other operating results as expressed in U.S. dollars.

We have experienced and will continue to experience fluctuations in our net income as a result of transaction gains or losses related to revaluing certain current asset and current liability balances that are denominated in currencies other than the functional currency of the entities in which they are recorded. We recognized a foreign currency loss of $29 million in 2011. Foreign currency losses were not significant in 2009 or 2010. At this time we do not, but we may in the future, enter into derivatives or other financial instruments in an attempt to hedge our foreign currency exchange risk. It is difficult to predict the impact hedging activities would have on our results of operations.

*Interest Rate Sensitivity*

Our cash and cash equivalents and marketable securities consist of cash, certificates of deposit, time deposits, money market funds and U.S. government treasury and agency debt securities. Our investment policy and strategy are focused on preservation of capital, supporting our liquidity requirements, and compliance with the Investment Company Act of 1940.

Changes in U.S. interest rates affect the interest earned on our cash and cash equivalents and marketable securities and the market value of those securities. A hypothetical 100 basis point increase in interest rates would result in a decrease of approximately $15 million in the market value of our available-for-sale debt securities as of December 31, 2011. Any realized gains or losses resulting from such interest rate changes would only occur if we sold the investments prior to maturity.

*Inflation Risk*

We do not believe that inflation has had a material effect on our business, financial condition, or results of operations.

72

Amendment No. 2 to Registration Statement on Form S-1

Table of Contents

### LETTER FROM MARK ZUCKERBERG

Facebook was not originally created to be a company. It was built to accomplish a social mission — to make the world more open and connected.

We think it's important that everyone who invests in Facebook understands what this mission means to us, how we make decisions and why we do the things we do. I will try to outline our approach in this letter.

At Facebook, we're inspired by technologies that have revolutionized how people spread and consume information. We often talk about inventions like the printing press and the television — by simply making communication more efficient, they led to a complete transformation of many important parts of society. They gave more people a voice. They encouraged progress. They changed the way society was organized. They brought us closer together.

Today, our society has reached another tipping point. We live at a moment when the majority of people in the world have access to the internet or mobile phones — the raw tools necessary to start sharing what they're thinking, feeling and doing with whomever they want. Facebook aspires to build the services that give people the power to share and help them once again transform many of our core institutions and industries.

There is a huge need and a huge opportunity to get everyone in the world connected, to give everyone a voice and to help transform society for the future. The scale of the technology and infrastructure that must be built is unprecedented, and we believe this is the most important problem we can focus on.

**We hope to strengthen how people relate to each other.**

Even if our mission sounds big, it starts small — with the relationship between two people.

Personal relationships are the fundamental unit of our society. Relationships are how we discover new ideas, understand our world and ultimately derive long-term happiness.

At Facebook, we build tools to help people connect with the people they want and share what they want, and by doing this we are extending people's capacity to build and maintain relationships.

People sharing more — even if just with their close friends or families — creates a more open culture and leads to a better understanding of the lives and perspectives of others. We believe that this creates a greater number of stronger relationships between people, and that it helps people get exposed to a greater number of diverse perspectives.

By helping people form these connections, we hope to rewire the way people spread and consume information. We think the world's information infrastructure should resemble the social graph — a network built from the bottom up or peer-to-peer, rather than the monolithic, top-down structure that has existed to date. We also believe that giving people control over what they share is a fundamental principle of this rewiring.

We have already helped more than 800 million people map out more than 100 billion connections so far, and our goal is to help this rewiring accelerate.

**We hope to improve how people connect to businesses and the economy.**

We think a more open and connected world will help create a stronger economy with more authentic businesses that build better products and services.

As people share more, they have access to more opinions from the people they trust about the products and services they use. This makes it easier to discover the best products and improve the quality and efficiency of their lives.

73

PX0559-079

**Table of Contents**

One result of making it easier to find better products is that businesses will be rewarded for building better products — ones that are personalized and designed around people. We have found that products that are "social by design" tend to be more engaging than their traditional counterparts, and we look forward to seeing more of the world's products move in this direction.

Our developer platform has already enabled hundreds of thousands of businesses to build higher-quality and more social products. We have seen disruptive new approaches in industries like games, music and news, and we expect to see similar disruption in more industries by new approaches that are social by design.

In addition to building better products, a more open world will also encourage businesses to engage with their customers directly and authentically. More than four million businesses have Pages on Facebook that they use to have a dialogue with their customers. We expect this trend to grow as well.

**We hope to change how people relate to their governments and social institutions.**

We believe building tools to help people share can bring a more honest and transparent dialogue around government that could lead to more direct empowerment of people, more accountability for officials and better solutions to some of the biggest problems of our time.

By giving people the power to share, we are starting to see people make their voices heard on a different scale from what has historically been possible. These voices will increase in number and volume. They cannot be ignored. Over time, we expect governments will become more responsive to issues and concerns raised directly by all their people rather than through intermediaries controlled by a select few.

Through this process, we believe that leaders will emerge across all countries who are pro-internet and fight for the rights of their people, including the right to share what they want and the right to access all information that people want to share with them.

Finally, as more of the economy moves towards higher-quality products that are personalized, we also expect to see the emergence of new services that are social by design to address the large worldwide problems we face in job creation, education and health care. We look forward to doing what we can to help this progress.

---

**Our Mission and Our Business**

As I said above, Facebook was not originally founded to be a company. We've always cared primarily about our social mission, the services we're building and the people who use them. This is a different approach for a public company to take, so I want to explain why I think it works.

I started off by writing the first version of Facebook myself because it was something I wanted to exist. Since then, most of the ideas and code that have gone into Facebook have come from the great people we've attracted to our team.

Most great people care primarily about building and being a part of great things, but they also want to make money. Through the process of building a team — and also building a developer community, advertising market and investor base — I've developed a deep appreciation for how building a strong company with a strong economic engine and strong growth can be the best way to align many people to solve important problems.

Simply put: we don't build services to make money; we make money to build better services.

And we think this is a good way to build something. These days I think more and more people want to use services from companies that believe in something beyond simply maximizing profits.

74

PX0559-080

**Table of Contents**

By focusing on our mission and building great services, we believe we will create the most value for our shareholders and partners over the long term — and this in turn will enable us to keep attracting the best people and building more great services. We don't wake up in the morning with the primary goal of making money, but we understand that the best way to achieve our mission is to build a strong and valuable company.

This is how we think about our IPO as well. We're going public for our employees and our investors. We made a commitment to them when we gave them equity that we'd work hard to make it worth a lot and make it liquid, and this IPO is fulfilling our commitment. As we become a public company, we're making a similar commitment to our new investors and we will work just as hard to fulfill it.

**The Hacker Way**

As part of building a strong company, we work hard at making Facebook the best place for great people to have a big impact on the world and learn from other great people. We have cultivated a unique culture and management approach that we call the Hacker Way.

The word "hacker" has an unfairly negative connotation from being portrayed in the media as people who break into computers. In reality, hacking just means building something quickly or testing the boundaries of what can be done. Like most things, it can be used for good or bad, but the vast majority of hackers I've met tend to be idealistic people who want to have a positive impact on the world.

The Hacker Way is an approach to building that involves continuous improvement and iteration. Hackers believe that something can always be better, and that nothing is ever complete. They just have to go fix it — often in the face of people who say it's impossible or are content with the status quo.

Hackers try to build the best services over the long term by quickly releasing and learning from smaller iterations rather than trying to get everything right all at once. To support this, we have built a testing framework that at any given time can try out thousands of versions of Facebook. We have the words "Done is better than perfect" painted on our walls to remind ourselves to always keep shipping.

Hacking is also an inherently hands-on and active discipline. Instead of debating for days whether a new idea is possible or what the best way to build something is, hackers would rather just prototype something and see what works. There's a hacker mantra that you'll hear a lot around Facebook offices: "Code wins arguments."

Hacker culture is also extremely open and meritocratic. Hackers believe that the best idea and implementation should always win — not the person who is best at lobbying for an idea or the person who manages the most people.

To encourage this approach, every few months we have a hackathon, where everyone builds prototypes for new ideas they have. At the end, the whole team gets together and looks at everything that has been built. Many of our most successful products came out of hackathons, including Timeline, chat, video, our mobile development framework and some of our most important infrastructure like the HipHop compiler.

To make sure all our engineers share this approach, we require all new engineers — even managers whose primary job will not be to write code — to go through a program called Bootcamp where they learn our codebase, our tools and our approach. There are a lot of folks in the industry who manage engineers and don't want to code themselves, but the type of hands-on people we're looking for are willing and able to go through Bootcamp.

75

PX0559-081

**Table of Contents**

The examples above all relate to engineering, but we have distilled these principles into five core values for how we run Facebook:

**Focus on Impact**

If we want to have the biggest impact, the best way to do this is to make sure we always focus on solving the most important problems. It sounds simple, but we think most companies do this poorly and waste a lot of time. We expect everyone at Facebook to be good at finding the biggest problems to work on.

**Move Fast**

Moving fast enables us to build more things and learn faster. However, as most companies grow, they slow down too much because they're more afraid of making mistakes than they are of losing opportunities by moving too slowly. We have a saying: "Move fast and break things." The idea is that if you never break anything, you're probably not moving fast enough.

**Be Bold**

Building great things means taking risks. This can be scary and prevents most companies from doing the bold things they should. However, in a world that's changing so quickly, you're guaranteed to fail if you don't take any risks. We have another saying: "The riskiest thing is to take no risks." We encourage everyone to make bold decisions, even if that means being wrong some of the time.

**Be Open**

We believe that a more open world is a better world because people with more information can make better decisions and have a greater impact. That goes for running our company as well. We work hard to make sure everyone at Facebook has access to as much information as possible about every part of the company so they can make the best decisions and have the greatest impact.

**Build Social Value**

Once again, Facebook exists to make the world more open and connected, and not just to build a company. We expect everyone at Facebook to focus every day on how to build real value for the world in everything they do.

---

Thanks for taking the time to read this letter. We believe that we have an opportunity to have an important impact on the world and build a lasting company in the process. I look forward to building something great together.



76

PX0559-082

**Table of Contents**

## BUSINESS

### Overview



*A digital display of the Facebook user community and the connections between users. On a blank background, the connections form a picture that approximates a global map.*

Our mission is to make the world more open and connected.

We believe that some of the most important innovations in history have been tools that make it easier or faster for one human being to share something with another.

Facebook enables you to share the things you care about with the people you care about. You can publish your ideas, opinions, pictures and activities to your friends, family, colleagues or the world. We believe that Facebook gives every person a voice—an opportunity to say: I exist, and this is my story.

Facebook also enables you to discover what's going on in the world around you, through the eyes and ears of people you trust. Every day hundreds of millions of people come to Facebook to find out what their friends have to share—the best new music they've listened to, photos from their recent honeymoon, who they plan to vote for in the next election. Each person's experience on Facebook is unique and completely personalized—akin to reading a real-time newspaper of stories compiled just for them that they can carry with them wherever they go.

People connect with Facebook to connect with people. We believe that we are at the forefront of enabling faster, easier and richer communication between people around the world.

77

PX0559-083

**Table of Contents**

**How We Create Value for Users**



Users can share photos with their friends and family

Friends and family can Like or Comment on the photos

Our top priority is to build useful and engaging products that enable you to:

- **Connect with Your Friends.** With 845 million monthly active users (MAUs) worldwide, our users are increasingly able to find and stay connected with their friends, family, and colleagues on Facebook. Users can share major life events such as the birth of a child, upload photos of their latest vacation, congratulate a friend on a new job by Liking or Commenting on the friend's post, and stay in touch through messages and chat.

- **Discover and Learn.** We believe that users come to Facebook to discover and learn more about what is going on in the world around them, particularly in the lives of their friends and family and with public figures and organizations that interest them. Each user's experience on Facebook is unique based on the content shared by his or her friends and connections. This content is personalized for each user in our products such as News Feed and Timeline.

- **Express Yourself.** We enable our users to share and publish their opinions, ideas, photos, and activities to audiences ranging from their closest friends to our 845 million users, giving every user a voice within the Facebook community.

78

PX0559-084

**Table of Contents**

- ***Control What You Share.*** Through Facebook's privacy and sharing settings, our users can control what they share and with whom they share it.

*Example of User Control Over Sharing*



Users can control what they share and with whom they share it. For example, each time a user updates his or her status, he or she can choose to share with everyone, with all friends, or with a subset of friends that the user can customize.

- ***Experience Facebook Across the Web.*** Through applications (apps) and websites built by developers using the Facebook Platform, our users can interact with their Facebook friends while playing games, listening to music, watching movies, reading news, and engaging in other activities.
- ***Stay Connected with Your Friends on Mobile Devices.*** Through the combination of our mobile sites, smartphone apps, and feature phone products, users can bring Facebook with them on mobile devices wherever they go.

**Foundations of the Social Web**

We believe that the web, including the mobile web, is evolving to become more social and personalized. Historically, most people surfed the web anonymously and visited websites where they saw the same content as everyone else. Recent innovations in software development along with advances in large-scale database and computing infrastructure have enabled web experiences that are more personalized to each user's interests and created new ways of real-time sharing and communicating. The social web creates rewarding experiences that are centered on people, their connections, and their interests. We believe that the following elements form the foundation of the social web:

- ***Authentic Identity.*** We believe that using your real name, connecting to your real friends, and sharing your genuine interests online create more engaging and meaningful experiences. Representing yourself with your authentic identity online encourages you to behave with the same norms that foster trust and respect in your daily life offline. Authentic identity is core to the Facebook experience, and we believe that it is central to the future of the web. Our terms of service require you to use your real name and we encourage you to be your true self online, enabling us and Platform developers to provide you with more personalized experiences. We deploy a variety of algorithmic and manual checks to help ensure the integrity of user accounts, however, we cannot verify the identity and authenticity of every one of our users or their actions.
- ***Social Graph.*** The Social Graph represents the connections between people and their friends and interests. Every person or entity is represented by a point within the graph, and the affiliations between people and their friends and interests form billions of connections between the points. Our mapping of the Social Graph enables Facebook and Platform developers to build more engaging user experiences that are based on these connections.

79

PX0559-085

**Table of Contents**

*Illustration of the Social Graph*



- *Social Distribution.* Over time, people are consuming and creating more kinds of information at a faster pace across a broader range of devices. The growing volume of information makes it challenging to find meaningful and trusted content and to effectively make your voice heard. Facebook organizes and prioritizes content and serves as a powerful social distribution tool delivering to users what we believe they will find most compelling based on their friends and interests. Facebook's social distribution enables users, Platform developers, and advertisers to share information with target audiences large or small.

**Our Size and Scale**

Building on our use of authentic identity, the Social Graph, and social distribution, Facebook has grown from our beginnings in a college dorm room in 2004 to a service that is fundamentally changing the way people connect, discover, and share around the world. We believe that Facebook has become an integral part of many of our users' daily lives. Users add value to the overall Facebook ecosystem each time they engage with friends, developers, or advertisers. Increases in user engagement enable us to attract more users, developers, and advertisers. Growth in the number of users, developers, and advertisers and the interactions among them enhances the value we deliver to all of our constituencies.

- We had 845 million MAUs as of December 31, 2011, an increase of 39% as compared to 608 million MAUs as of December 31, 2010.

- We had 483 million daily active users (DAUs) on average in December 2011, an increase of 48% as compared to 327 million DAUs in December 2010.

- We had 432 million MAUs who used Facebook mobile products in December 2011.

- During the month of December 2011, we had on average 360 million users who were active with Facebook on at least six out of the last seven days, providing perspective on the number of people for whom Facebook is essentially an everyday activity.

- There were more than 100 billion friend connections on Facebook as of December 31, 2011.

- On average more than 250 million photos per day were uploaded to Facebook in the three months ended December 31, 2011.

- Our users generated an average of 2.7 billion Likes and Comments per day during the three months ended December 31, 2011. Since users Like and Comment on content they find interesting, we believe that the number of Likes and Comments provides some insight into how engaging users find the content available to them on Facebook and through our Platform developers.

80

PX0559-086

**Table of Contents**

- As of December 31, 2011, there were more than 37 million Pages with ten or more Likes. Anyone, including artists, public figures, businesses, brands, or charities can set up a Facebook Page to engage with our users. Examples of popular Pages on Facebook include Lady Gaga, Disney, and Manchester United, each of which has more than 20 million Likes.

### How We Create Value for Developers Through the Facebook Platform

The Facebook Platform is a set of development tools and application programming interfaces (APIs) that enables developers to easily integrate with Facebook to create social apps and websites and to reach our 845 million users. Platform developers build experiences that allow our users to connect and share with friends while engaging in activities such as playing games, listening to music, watching movies, reading news articles, discovering new recipes, and exploring new running routes. Platform developers range from a student on his or her computer at home to teams of programmers at leading websites. More than seven million apps and websites were integrated with Facebook as of December 31, 2011. We are focused on the growth and success of Platform developers in creating compelling user experiences by enabling:

- *Personalized and Social Experiences.* We enable Platform developers to create better products that are personalized and social and that offer new ways for our users to engage with friends and share experiences across the web and on mobile devices. For example, a Facebook user can visit the Pandora website and immediately begin listening to a personalized radio station that is customized based on the bands the user Likes on Facebook. As another example, a Facebook user can visit *The New York Times* website and see which articles have been recommended by friends. Our Platform developers can only access information that our users agree to share with them.

- *Social Distribution.* We enable Platform developers to reach our global user base and use our social distribution channels to increase traffic to their apps and websites. For example, users can invite their Facebook friends to play a game or see when their friends have achieved a new high score.

- *Payments.* We provide an online payments infrastructure that enables Platform developers to receive payments from our users in an easy-to-use, secure, and trusted environment. In 2011, our Platform developers received more than $1.4 billion from transactions enabled by our Payments infrastructure.

### How We Create Value for Advertisers and Marketers

We offer advertisers and marketers a unique combination of reach, relevance, social context, and engagement:

- *Reach*. Facebook offers the ability to reach a vast consumer audience of over 800 million MAUs with a single advertising purchase. For example, a movie studio seeking to increase awareness of an upcoming film release can reach a broad audience of Facebook users on the day or week before the film's opening. By advertising the release of *Transformers: Dark of the Moon* on Facebook, Paramount Studios reached 65 million users in the United States in a single day.

*Advertising Example—Reach*



81

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

- *Relevance*. Advertisers can specify that we show their ads to a subset of our users based on demographic factors such as age, location, gender, education, work history, and specific interests that they have chosen to share with us on Facebook or by using the Like button around the web or on mobile devices. We allow advertisers to select relevant and appropriate audiences for their ads, ranging from millions of users in the case of global brands to hundreds of users in the case of smaller, local businesses. We believe that users have a better experience when ads are effectively tailored to them. Examples of Facebook ads that allowed advertisers to reach a relevant audience include:

  – Procter & Gamble chose to advertise on Facebook to generate awareness for Secret deodorant's "Mean Stinks" program and selected a female audience likely to be receptive to the campaign. The ad featured a confessional-style video of a girl admitting that she had bullied others, realizing the damage she had caused, and apologizing. In the 26 weeks after the Mean Stinks campaign launched, Secret experienced a 9% increase in U.S. sales and an increase in engagement with its Facebook Page.

  – CM Photographics, a wedding photography business based in Minneapolis, Minnesota, used Facebook ads to reach the users it cared most about: women aged 24 to 30 living near Minneapolis who shared their relationship status on Facebook as "engaged." In 2011, CM Photographics generated a significant increase in revenue after spending $1,544 to purchase advertising on Facebook.

  Because authentic identity is core to the user experience on Facebook and users generally share information that reflects their real interests and demographics, we are able to deliver ads that reach the intended audience with higher accuracy rates compared to online industry averages. For broadly targeted campaigns, for example, adults between the ages of 25 and 49, we were able to reach the desired audience with 95% accuracy, compared to an industry average of 72%, according to a Nielsen study in 2011. For more narrowly targeted campaigns, for example, females between the ages of 25 and 34, Facebook was able to reach the desired audience with 90% accuracy compared to an industry average of 35%, according to this Nielsen study. As our users maintain and expand their authentic identity on Facebook, they are increasingly choosing to share their interests and preferences regarding products and services. We use this information to improve our ability to deliver relevant ads that we believe are more interesting and compelling for each user.

- *Social Context.* We believe that the recommendations of friends have a powerful influence on consumer interest and purchase decisions. We offer advertisers the ability to include "social context" with their marketing messages. Social context is information that highlights a friends' connections with a particular brand or business. We believe that users find marketing messages more engaging when they include social context. Some current examples of social context that we offer include the following:

  – *Social Ads.* We offer tools to advertisers to display social context alongside their ads. As a result, advertisers are able to differentiate their products and complement their marketing messages with trusted recommendations from users' friends. A recent study of 79 advertising campaigns on Facebook, as confirmed by Nielsen, demonstrated a greater than 50% increase in ad recall for Facebook ads with social context as compared to Facebook ads that did not have social context.

82

PX0559-088

**Table of Contents**

*Advertising Example—without Social Context*



*Advertising Example—with Social Context*



–    *Sponsored Stories.* Sponsored stories enable marketers to amplify the distribution of stories that users have already shared that are relevant to their marketing efforts. For example, when a user posts on Facebook that he or she has "checked in" to a Starbucks store, this check-in creates a story that can be shown in the friends' News Feeds. Although all of a user's friends may be eligible to view this check-in story, only a fraction of the user's friends will typically see it (based on factors such as when the user's friends check their News Feeds and our ranking of all the content that is available to show to each of the user's friends). Starbucks can purchase sponsored stories to significantly increase the reach, frequency of distribution, and prominence of this story to the user's friends. Marketers can also use sponsored stories to promote the stories they publish from their Facebook Page to users who have connected with the Page. Sponsored stories are shown on the right hand side of the page, and in January 2012, we began including them in users' News Feeds on personal computers. In February 2012, we also announced plans to include sponsored stories in users' mobile News Feeds.

•    *Engagement.* We believe that the shift to a more social web creates new opportunities for businesses to engage with interested customers. Many of our ad products offer new and innovative ways for our advertisers to interact with our users, such as ads that include polls, encourage comments, or invite users to an event. Additionally, any brand or business can have a presence on Facebook by creating a Facebook Page. Through Pages, we give brands the opportunity to form direct and ongoing relationships with their customers, with the potential to turn them into valuable advocates. When a Facebook user Likes a Page, the Page owner has the opportunity to publish stories to the user's News Feed on an ongoing basis. We believe that this ongoing connection provides a significant advantage for Facebook Pages as compared to traditional business websites. In addition, businesses can use Pages to influence fans and drive referral traffic to their e-commerce websites or physical stores. We do not charge businesses for their Pages, nor do we charge for the resulting organic distribution. However, we believe that Page owners can use Facebook ads and sponsored stories to increase awareness of and engagement with their Pages. Examples of brands utilizing Facebook Pages include:

–    Burberry used its Page and an innovative marketing campaign on Facebook to announce the launch of a new luxury fragrance to its nearly ten million Facebook fans in order to drive traffic to and purchases at Burberry stores globally, including its e-commerce site. When users Liked or Commented on the Burberry Page or the perfume story, the users' actions were shared with their friends via News Feed, driving awareness to a wider circle of users and increasing brand exposure, recognition, and engagement.

83

**Table of Contents**

–   PF Chang's created a coupon offer on its Page for a free Lettuce Wrap appetizer and promoted the offer with a three-week ad campaign. The Facebook ads targeted users who had connected to PF Chang's Page, those users' friends, and users in markets where PF Chang's has a high density of restaurants. Over 50,000 customers, of whom 40% were first-time customers, redeemed the coupon at PF Chang's restaurants.

**Our Market Opportunity**

*Our Advertising Market Opportunity*

Advertisers' objectives range from building long-term brand awareness to stimulating an immediate purchase. We offer advertising solutions that are designed to be engaging for users and personalized to users' demographics and interests in order to help advertisers better achieve their goals. Facebook's combination of reach, relevance, social context, and engagement gives advertisers enhanced opportunities to generate brand awareness and affiliation, while also creating new ways to generate near-term demand for their products from consumers likely to have purchase intent. According to an IDC report dated August 2011, total worldwide advertising spending in 2010 was $588 billion. Our addressable market opportunity includes portions of many existing advertising markets, including the traditional offline branded advertising, online display advertising, online performance-based advertising, and mobile advertising markets.

•   *Traditional Offline Branded Advertising.* Television, print, and radio accounted for $363 billion, or 62% of the total advertising market in 2010 according to an IDC report dated August 2011. Historically, advertisers interested in generating awareness of and demand for their brands have heavily relied on these offline media to reach their audiences at scale. We believe that these brand advertisers will increasingly dedicate a portion of their advertising dollars to Facebook because the broad audiences they are trying to reach are active on Facebook on a daily basis, because we can reach their desired audiences with precision, and because they can spark word of mouth marketing through Facebook. In December 2011, an advertiser could reach an estimated audience of more than 65 million U.S. users in a typical day on Facebook. By comparison, the 2011 season finale of American Idol was viewed by an estimated U.S. audience of 29 million people. In 2011, our advertising customers included each of the 100 largest global advertising spenders, as ranked by Advertising Age. Examples of Facebook advertising campaigns by large brand advertisers include:

–   Nike launched its "Write the Future" campaign on Facebook as an integral part of its 2010 World Cup marketing effort. The launch placement was seen by 140 million users in 20 countries and users engaged with the message more than seven million times by taking actions such as watching the three-minute embedded video, or Liking, clicking, or Commenting on the ad.

–   American Express purchased ads on Facebook and put its Facebook Page at the center of its advertising campaign in November 2010 to introduce and promote "Small Business Saturday," a new local initiative designed to encourage shopping at small businesses on the Saturday after Thanksgiving. The ads reached 84 million Facebook users over the three week campaign. American Express continued the campaign in 2011. The campaign reached 91 million people, including 74 million who were shown an ad that featured a connection with their Facebook friends, successfully leveraging social context at scale. We believe that advertising on Facebook contributed to the successful results of the Small Business Saturday campaign; in 2011 public awareness of Small Business Saturday rose to 65% from 37% in 2010. Additionally, American Express saw a 23% increase in Cardmember transactions at small business merchants on Small Business Saturday.

•   *Online Advertising.* From 2010 to 2015, the worldwide online advertising market, excluding mobile advertising, is projected to increase from $68 billion to $120 billion, representing 12% and 16%, respectively, of the worldwide advertising market according to an IDC report dated August 2011. Currently, the online advertising market is generally divided between display advertising, where the

84

**Table of Contents**

advertiser is seeking impressions, and performance-based advertising, where the advertiser is seeking clicks or conversions.

– *Display Advertising.* Online display advertising typically includes banner ads, interstitials, video ads, and rich media ads that aim to reach large numbers of consumers within a particular audience segment. Display advertisers run impression-based campaigns on Facebook in order to reach our large user base and because of the amount of time that users spend with us. From January 2011 through January 2012, Facebook.com has been the number one online property accessed through personal computers worldwide as measured by total minutes spent and total page views, according to a comScore Media Metrix report dated February 2012. On average, users in the aggregate spent more than 10.5 billion minutes per day on Facebook on personal computers during January 2012. Display advertisers also use Facebook in order to more precisely reach their target audiences among our users and to leverage social context and our social distribution channels to increase engagement. Examples of display advertising campaigns on Facebook include:

– Walmart U.S. purchased advertising on Facebook targeting users in the United States between the ages of 18 and 49 during the days surrounding "Black Friday" in November 2011. The campaign, which encouraged users to download a Black Friday shopping map of their local Walmart U.S. store to help them find great prices faster, reached 60 million Facebook users.

– Diageo, the world's largest producer of spirits, purchased advertising on Facebook for a portfolio of its brands, including Captain Morgan rum and Smirnoff vodka, in order to increase market share for its products by targeting users in the United States over the age of 21. The campaign reached 25 million Facebook households, drove a 20% increase in offline sales, and achieved a significant return on investment as measured by Nielsen.

– *Performance-based Advertising.* Performance-based online advertising has typically involved advertisers seeking a specific user behavior such as a click on a search ad or a keyword-based content ad, a response to an email campaign, or an online purchase. We enable new forms of performance-based advertising, where advertisers can connect with users who are likely to have demand for their products based on the information that our users have chosen to share. We believe that performance-based campaigns on Facebook allow advertisers to offer their products to users with inferred intent and enhance users' experiences by showing them relevant ads tailored to their specific interests. Examples of performance-based advertising on Facebook include:

– A local concert promoter advertised available tickets for an upcoming concert to users who lived in the metropolitan area where the concert was to be held and who had also Liked the artist.

– 1-800-FLOWERS.COM purchased a Mother's Day advertising campaign on Facebook targeted at its fans and friends of its fans in order to drive traffic to its website and increase sales.

– Social game developers including Disney, Electronic Arts, and Zynga purchased performance-based advertising on Facebook to drive player acquisition by promoting new game launches and existing games.

• *Mobile Advertising.* The global mobile advertising market was $1.5 billion in 2010 and is expected to grow at a 64% compound annual rate to $17.6 billion in 2015 according to an IDC report dated August 2011. We had 432 million MAUs who used Facebook mobile products in December 2011. According to a Nielsen report published in January 2012, Facebook is the top app among iOS and Android smartphone users in the United States as measured by unique audience. We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. In February 2012, we announced plans to include sponsored stories in users' mobile News Feeds, but we may not be successful generating meaningful revenue from mobile usage of Facebook.

85

Table of Contents

Advertising on the social web is a significant market opportunity that is still emerging and evolving. We believe that most advertisers are still learning and experimenting with the best ways to leverage reach, relevance, social context, and engagement offered by Facebook. We will continue to balance our efforts to build effective products for advertisers while also prioritizing the overall user experience, and this balancing effort will influence the number of ads we show and the formats and prominence of the ads. Our strategy centers on the belief that more social and relevant ad products are more valuable for both users and advertisers.

Currently the substantial majority of our revenue is generated by advertisers from more developed online advertising markets including the United States, western Europe, Canada, and Australia. There are also many emerging ad markets in which we sell ads and other commercial content, and we expect continued growth in advertiser demand as these markets mature, we achieve increased levels of user penetration and engagement, and we further expand our sales resources dedicated to these markets.

### Our Market Opportunity for Payments

When users purchase virtual and digital goods from our Platform developers using our Payments infrastructure, we receive fees that represent a portion of the transaction value. Currently, substantially all of the Payments transactions between our users and Platform developers are for virtual goods used in social games, for example virtual tractors in the social game FarmVille. According to an In-Stat report dated November 2010, the worldwide revenue generated from the sale of virtual goods on social networking sites, online worlds, and casual games increased from $2 billion in 2007 to $7 billion in 2010, and is forecasted to increase to $15 billion by 2014. Payments integration is currently required in apps on Facebook that are categorized as games, and we may seek to extend the use of Payments to other types of apps in the future. Our future revenue from Payments will depend on many factors, including our success in enabling Platform developers to build experiences that engage users and create user demand for their products, and the fee arrangements we are able to negotiate in the future.

### Our Strategy

We are in the early days of pursuing our mission to make the world more open and connected. We have a significant opportunity to further enhance the value we deliver to users, developers, and advertisers. Key elements of our strategy are:

- **Expand Our Global User Community.** There are more than two billion global Internet users according to an IDC report dated August 2011 and we aim to connect all of them. We had 845 million MAUs globally with approximately 80% accessing Facebook from outside the United States as of December 31, 2011. We continue to focus on growing our user base across all geographies, including relatively less-penetrated, large markets such as Brazil, Germany, India, Japan, Russia, and South Korea. We intend to grow our user base by continuing our marketing and user acquisition efforts and enhancing our products, including mobile apps, in order to make Facebook more accessible and useful.

- **Build Great Social Products to Increase Engagement.** We prioritize product development investments that we believe will create engaging interactions between our users, developers, and advertisers on Facebook, across the web, and on mobile devices. We continue to invest significantly in improving our core products such as News Feed, Photos, and Groups, developing new products such as Timeline and Ticker, and enabling new Platform apps and website integrations.

- **Provide Users with the Most Compelling Experience.** Facebook users are sharing and receiving more information across a broader range of devices. To provide the most compelling user experience, we continue to develop products and technologies focused on optimizing our social distribution channels to deliver the most useful content to each user by analyzing and organizing vast amounts of information in real time.

- **Build Engaging Mobile Experiences.** We are devoting substantial resources to developing engaging mobile products and experiences for a wide range of platforms, including smartphones and feature

86

**Table of Contents**

phones. In addition, we are working across the mobile industry with operators, hardware manufacturers, operating system providers, and developers to improve the Facebook experience on mobile devices and make Facebook available to more people around the world. We had 432 million MAUs who used Facebook mobile products in December 2011. We believe that mobile usage of Facebook is critical to maintaining user growth and engagement over the long term, and we are actively seeking to grow mobile usage, although such usage does not currently directly generate any meaningful revenue.

- ***Enable Developers to Build Great Social Products Using the Facebook Platform.*** The success of Platform developers and the vibrancy of our Platform ecosystem are key to increasing user engagement. Social games have achieved significant levels of adoption by Facebook users, and we are also focused on enabling the development of apps in categories beyond games. For example, our latest enhancements to the Facebook Platform have enabled new types of social apps that facilitate sharing and serendipitous discovery of music, news, movies, television programming, and other everyday interests such as cooking and running. User engagement with our Platform developers' apps and websites creates value for Facebook in multiple ways: our Platform supports our advertising business because apps on Facebook create user engagement that enables us to show ads; our Platform developers purchase advertising on Facebook to drive traffic to their apps and websites; Platform developers use our Payment system to facilitate transactions with users; and users' engagement with Platform apps and websites contributes to our understanding of users' interests and preferences, improving our ability to personalize content. We continue to invest in tools and APIs that enhance the ability of Platform developers to deliver products that are more social and personalized and better engage users on Facebook, across the web, and on mobile devices. Additionally, we plan to invest in enhancing our Payments offerings and in making the Payments experience on Facebook as seamless and convenient as possible for users and Platform developers.

- ***Improve Ad Products for Advertisers and Users.*** We plan to continue to improve our ad products in order to create more value for advertisers and enhance their ability to make their advertising more social and relevant for users. Our advertising strategy centers on the belief that ad products that are social, relevant, and well-integrated with other content on Facebook can enhance the user experience while providing an attractive return for advertisers. We intend to invest in additional products for our advertisers and marketers, such as our recent introduction of sponsored stories in users' News Feeds on personal computers and mobile devices, while continuing to balance our monetization objectives with our commitment to optimizing the user experience. We also continue to focus on analytics and measurement tools to evaluate, demonstrate, and improve the effectiveness of ad campaigns on Facebook.

**Our Products for Users, Developers, and Advertisers**

*Products for Users*

Our product development approach is centered on building the most useful tools that enable users to connect, share, discover, and communicate with each other. Our products for users are free of charge and available on the web, mobile web, and mobile platforms such as Android and iOS.

- ***Timeline.*** We launched Timeline in September 2011 as an enhanced and updated version of the Facebook Profile to add structure and organization to the growing quantities of each user's activities and social content. Timeline allows users to organize and display the events and activities that matter most to them, enabling them to curate their memories in a searchable personal narrative that is organized chronologically. Users choose what information to share on their Timeline, such as their interests, photos, education, work history, relationship status, and contact information, and users can control with whom each piece of content is shared on their Timeline.

87

PX0559-093

**Table of Contents**

- *News Feed.* The Facebook News Feed is the core feature of a user's homepage and is a regularly updating list of stories from friends, Pages, and other entities to which a user is connected on Facebook. It includes posts, photos, event updates, group memberships, app updates, and other activities. Each user's News Feed is personalized based on his or her interests and the sharing activity of the user's friends. Stories in a user's News Feed are prioritized based on several factors, including how many friends have Liked or Commented on a certain piece of content, who posted the content, and what type of content it is. News Feed is a key component of our social distribution capability.



*Example of Facebook News Feed*



- *Photos and Videos.* Facebook is the most popular photo uploading service on the web. On average, more than 250 million photos per day were uploaded to Facebook in the three months ended December 31, 2011. Users can upload an unlimited number of high resolution photos, create photo albums, and share them with their friends or any audience they choose. Users can also upload and share videos. Users can set specific privacy settings for each of their photo albums and videos, making them visible to everyone, or only to certain friends. Users can easily arrange their photos, add captions, and "tag" people in a photo or video. Tagging allows users to identify a person in a photo or video as one of their friends.

- *Messages.* Our messaging products include email, chat, and text messaging. The delivery of messages is optimized for the device through which the user is accessing Facebook. For example, users on their mobile phones will receive messages via text or Facebook mobile messenger, while the conversation is also stored in their Facebook message inbox. We aim to be the fastest and most reliable way for users to communicate through:

  – *Email.* Users can set up a free @facebook.com address.

88

PX0559-094

**Table of Contents**

- *Chat.* Users can send messages to their friends in an instant message format.

- *Text Messaging.* Users can activate text messaging on Facebook, allowing the texts they exchange with friends to be incorporated into their respective conversations along with their message and chat history.

- *Groups.* Groups are shared Facebook pages for groups of users to discuss common interests. For example, members of a soccer team can plan the season's schedule together and share photos with each other. Users are able to customize the privacy settings for each Group they create.

- *Lists.* Lists allow users to organize their friends in order to filter the stories shown in their News Feeds and reach or exclude specific people when they share on Facebook. For example, users can see News Feed posts from a List of just their closest friends or announce a garage sale to a List of friends who reside in the user's current city. Users are able to customize the privacy settings for each List they create.

- *Events.* Through Events, users can organize gatherings, manage invitations, and send event notifications and reminders to their friends. From the Events page, users can create a new event, check out upcoming events of interest to them and their friends, and view previous events. For example, users can use Events to invite their friends to a dinner party or organize a run in the Race for the Cure to raise awareness for breast cancer. There are currently more than 16 million events created on Facebook each month.

- *Places.* Through Places, users can share their location and see where their friends are. They are able to see if any of their friends are nearby and connect with them easily. Users can also check in to Places to tell their friends where they are, tag their friends in the Places they visit, or view Comments their friends have made about the Places they visit.

- *Subscribe.* Using Subscribe, users can sign up to receive public posts in their News Feeds from other Facebook users of interest such as celebrities, thought leaders, and other public figures.

- *Ticker.* Ticker is a live stream of the real-time activities of a user's friends and the Pages and other entities to which the user is connected.

- *Notifications.* On the top of each Facebook page, a highlighted icon is displayed to users when there is relevant and new information available to them, such as a new friend request, a new message from a friend, or an alert that the user has been tagged in a photo posted by a friend. We believe that Notifications are an important part of Facebook's distribution capability.

- *Facebook Pages.* A Facebook Page is a public profile that allows anyone including artists, public figures, businesses, brands, organizations, and charities to create a presence on Facebook and engage with the Facebook community. A Page owner can connect with interested users in order to provide updates, answer questions, receive feedback, or otherwise stimulate interest in the owner's messages, products, and services. When a Facebook user Likes a Page, the Page owner has the opportunity to publish stories to the user's News Feed on an ongoing basis. In addition, when a Facebook user Likes or Comments on a post by a Page owner, that user's action may be shared with the user's friends via News Feed to drive awareness to a wider circle of users, increasing the Page's exposure, recognition, and engagement. We do not charge for Pages, nor do we charge for the resulting organic distribution. However, we believe that awareness of and engagement with Pages can be amplified and complemented by the use of Facebook ads and sponsored stories by Page owners. As of December 31, 2011, there were more than 37 million Pages with ten or more Likes, including Harvard, Lady Gaga, The Metropolitan Museum of Art, Starbucks, and Boo (the World's Cutest Dog), as well as millions of local businesses.

89

**Table of Contents**

### Products for Developers

The Facebook Platform is a set of tools and APIs that developers can use to build social apps on Facebook or to integrate their websites with Facebook. As of December 31, 2011, more than seven million apps and websites were integrated with Facebook. Our goal is to make it easy for Platform developers to integrate with Facebook and build valuable products and businesses. Key elements of the Facebook Platform include:

- *Open Graph.* Our Open Graph is a set of APIs that developers can use to build apps and websites that enable users to share their activities with friends on Facebook. For example, a user who is listening to music through a developer's app or website can publish his or her music selections to Facebook where the music can be shared with friends.

- *Social Plugins.* Social plugins are social features that developers can easily integrate with their websites by incorporating a single line of HTML code. For example, a developer can put a box on its website that shows Facebook users what their friends have Liked and recommended on the site. Social plugins also allow users to easily share interesting content back to Facebook that can be distributed to their friends through News Feed, Timeline, and Ticker. The following features are examples of functionality provided through social plugins:

  - *Like Button.* Allows users to share content from a third-party website to Facebook and their friends with one click.

  - *Recommendations.* Allows a website to display to Facebook users what their friends have recommended.

  - *Single Sign-On Registration and Log-In.* Allows users to easily sign up for access to third-party websites with their Facebook accounts, eliminating the need for users to create another username and password.

  - *Comments.* Allows users to post their views, questions, and critiques on any piece of content on a website.

- *Payments.* Facebook provides an online payments infrastructure that enables developers to receive payments from users through an efficient and secure system. Developers can focus on creating engaging apps and content rather than spending time and resources to build payment processing and fraud management capabilities. Our users can store their payment credentials with Facebook in a trusted and safe environment, facilitating easy and fast purchases across the Facebook Platform rather than having to re-authenticate and re-enter payment information for each developer. We designed our Payments infrastructure to streamline the buying process between our users and developers. Our Payments system enables users to purchase virtual or digital goods from developers and third-party websites by using debit and credit cards, PayPal, mobile phone payments, gift cards or other methods. We have also extended our Payments infrastructure to support mobile web apps on certain mobile platforms.

  Zynga is the largest Platform developer, in terms of revenue generated for Facebook, using our Payments infrastructure. In May 2010, we entered into an addendum to our standard terms and conditions with Zynga pursuant to which it agreed to use Facebook Payments as the primary means of payment within Zynga games played on the Facebook Platform. Under this addendum, we retain a fee of up to 30% of the face value of user purchases in Zynga's games on the Facebook Platform. This addendum expires in May 2015.

Developers have used the Facebook Platform to build a variety of user experiences, including apps on Facebook, desktop apps, mobile apps, and Platform-integrated websites, each of which can take advantage of the capabilities of the Facebook Platform.

- *Apps on Facebook.* Apps on Facebook run within the Facebook website. Social games are currently the most successful apps on Facebook. The Facebook Platform has also enabled new types of social

90

PX0559-096

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

apps on Facebook beyond games to facilitate social sharing and discovery of music, news, television programming, and everyday interests such as cooking, fitness, and travel. For example, *The Washington Post Social Reader* is an app on Facebook that offers a personalized news reading experience in which each user sees a unique set of stories tailored to the user's interests and based on what his or her friends are reading. Assuming the user has given the app permission, stories read by a user are instantly shared with friends, creating a socially powered newswire of relevant articles. Apps on Facebook generally have Facebook ads visible on the right side of the page and can integrate with Facebook Payments.

- *Desktop Apps.* Developers can also build desktop apps that run on the operating system of a personal computer and offer experiences that are integrated with the Facebook Platform. For example, Spotify, an online music service, provides a desktop app integrated with Facebook that offers a social listening experience by giving users the ability to share their playlists, listen to songs with friends, and explore new music through their friends.

- *Mobile Apps.* The Facebook Platform for mobile has enabled developers to create engaging mobile apps that integrate with Facebook's social and personalization capabilities.

- *Platform-Integrated Websites.* Websites can integrate with Facebook using simple social plugins such as the Like button or design more deeply integrated social experiences built around users and their friends. For example, by tapping into our rich social data, TripAdvisor connects users to their friends and shares relevant content about where their friends have traveled and where they would like to visit in the future. While on the TripAdvisor website, friends can discuss their travel plans and recommendations and build out personal profiles of places they have been.

*Example of Platform-Integrated Third-Party Website: TripAdvisor*



91

PX0559-097

**Table of Contents**

### Products for Advertisers and Marketers

Facebook offers products that enable advertisers and marketers to leverage our unique combination of reach, relevance, social context, and engagement.

- *Facebook Ads.* When creating a Facebook ad, advertisers can specify a title, content, image, and destination web page or Facebook Page to which a user is directed if he or she clicks on the ad. Because we have a standard format for Facebook ads, our users benefit from a consistent ad experience, and our advertisers are able to deploy and adjust campaigns rapidly. Advertisers can further engage their intended audiences by incorporating social context with their marketing messages. Social context includes actions a user's friends have taken, such as Liking the advertiser's Facebook Page. Ads with social context are shown only to a user's friends, and the user's privacy settings apply to social ads. We offer a range of ads with social context, from an ad with a single Like button to our Premium Ad paired with social context, which allows advertisers to highlight the interactions of a user's friends with a brand or product.

- *Sponsored Stories.* Sponsored stories enable marketers to promote the stories they publish from their Facebook Page to users who have connected with the Page or to amplify the distribution of stories users are already sharing that are relevant to their marketing efforts. For example, when a user Likes Red Bull, Red Bull can pay to amplify the reach, frequency of distribution, and prominence with which the story is shown to friends of that user.

*Examples of Facebook Products for Advertisers and Marketers*

  

- *Facebook Ad System.* When advertisers create an ad campaign with Facebook, they specify the types of users they would like to reach based on information that users chose to share about their age, location, gender, relationship status, educational history, workplace, and interests. For example, a self-storage company ran a campaign to reach students on college campuses prior to summer break. Additionally, advertisers indicate the maximum price they are willing to pay for their ad and their maximum budget. Advertisers choose to pay for their ads based on either cost per thousand impressions (CPM) on a fixed or bidded basis or cost per click (CPC) on a bidded basis. Our system also supports guaranteed delivery of a fixed number of ad impressions for a fixed price. Facebook's ad serving technology dynamically determines the best available ad to show each user based on the combination of the user's unique attributes and the real-time comparison of bids from eligible ads.

92

PX0559-098

**Table of Contents**

*Examples of How Our Ad System Matches Relevant Ads to Information a User has Chosen to Share*



- *Ad Analytics and Facebook Insights.* Advertisers can use our analytics platform to track and optimize the performance of their campaigns in real time. Facebook ad analytics enable advertisers to gain insights into which ads were displayed and clicked on. These analytics help advertisers make modifications to their ad campaigns in order to maximize results. For advertisers with Facebook Pages, Facebook Insights also provides real-time information about the performance of their Page and related posts whether through paid or organic channels. The data include the number of users who Liked and Commented on the Page as well as a metric, "People Talking About This," which shows how many stories about the advertiser's brand are being created and shared.

**Building and Maintaining User Trust**

Trust is a cornerstone of our business. We dedicate significant resources to the goal of building user trust through developing and implementing programs designed to protect user privacy, promote a safe environment, and assure the security of user data. The resources we dedicate to this goal include engineers, analysts, lawyers, policy experts, and operations specialists, as well as hardware and software from leading vendors and solutions we have designed and built.

- *Privacy and Sharing.* People come to Facebook to connect and share. Protecting user privacy is an important part of our product development process. Our objective is to give users choice over what they share and with whom they share it. This effort is fundamental to our business and focuses on control, transparency, and accountability.

93

PX0559-099

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

–      *Control.* We believe that by providing our users with clear and easy-to-use controls, we will continue to promote trust in our products. For example, when a user posts a status update or uploads a photo to Facebook, our in-line controls allow the user to select his or her audience at the same time that he or she is publishing the post. In addition, we have introduced other personal information control tools and techniques. "Activity Log" was recently introduced and is a unified tool that users can use to review and manage the content they have posted and the actions they have taken on Facebook. For example, using the Activity Log, a user can view his or her activity with a particular app, delete a specific post, change who can see a photo, or remove an app completely. Additionally, our "Download Your Information" tool enables users to remove or store their personal information off of Facebook.

–      *Transparency.* Our Data Use Policy describes in plain language our data use practices and how privacy works on Facebook. We also offer a number of tools and features that provide users with transparency about their information on Facebook. Our application settings feature enables users to view each of the apps they have chosen to use, the information needed by each app, and the audience with whom the user has chosen to share his or her interactions with each app. We believe that this transparency enables users to make more informed decisions about their activities on Facebook.

–      *Accountability.* We continue to build new procedural safeguards as part of our comprehensive privacy program. These include a dedicated team of privacy professionals who are involved in new product and feature development from design through launch; ongoing review and monitoring of the way data is handled by existing features and apps; and rigorous data security practices. We regularly work with online privacy and safety experts and regulators around the world. In November 2011, we announced a 20-year agreement with the Federal Trade Commission to enhance our privacy program. We made a clear and formal long-term commitment to giving users tools to control how they share on Facebook. We also have undergone an audit by the Office of the Irish Data Protection Commissioner. The audit comprehensively reviewed our compliance with Irish data protection law, which is grounded in European data protection principles. As part of the audit process, we agreed to enhance various data protection and privacy practices to ensure compliance with the law and adherence to industry best practices.

·    *Safety.* We design our products to include robust safety tools. These tools are coupled with educational resources and partnerships with online safety experts to offer protections for all users, particularly teenagers. We take into account the unique needs of teenagers who use our service and employ age-appropriate settings that restrict their visibility, limit the audience with whom they can share, and help prevent unwanted contact from strangers.

Our abuse reporting infrastructure allows anyone on Facebook to report inappropriate, offensive, or dangerous content through "report" links found on nearly every page of our site. We have enhanced this reporting system to include "Social Reporting," which gives users the option to report content to us, to report content to a trusted friend, or to block the person who posted the content with one easy-to- use tool. Our Safety Advisory Board, comprised of five leading online safety organizations from around the world, advises us on product design and helps us to create comprehensive safety resources for everyone who uses our service. These resources are located in our multimedia Family Safety Center on our website, which also offers special information for parents, educators, teenagers, and members of the law enforcement community. Additionally, we work with law enforcement to help promote the safety of our users as required by law.

·    *Security.* We invest in technology, processes, and people as part of our commitment to safeguarding our users' information. We use a variety of techniques to protect the data that we are entrusted with, and we rely on multiple layers of network segregation using firewalls to protect against attacks or unauthorized access. We also employ proprietary technologies to protect our users. For example, if we suspect that a user's account may have been compromised, we may use a process that we refer to as "social authentication" to validate that the person accessing the account is the actual account

94

PX0559-100

**Table of Contents**

holder. The process of social authentication may include asking the person accessing the account to identify photos of the account holder's friends. Our security team actively scans for security vulnerabilities using commercial tools, penetration tests, code security reviews, and internal and external audits. We also have a network of geographically distributed single-tenant data centers, and we take measures to protect the information stored in these data centers.

### Competition

We face significant competition in almost every aspect of our business, including from companies such as Google, Microsoft, and Twitter, which offer a variety of Internet products, services, content, and online advertising offerings, as well as from mobile companies and smaller Internet companies that offer products and services that may compete with specific Facebook features. We also face competition from traditional and online media businesses for a share of advertisers' budgets and in the development of the tools and systems for managing and optimizing advertising campaigns. We compete broadly with Google's social networking offerings, including Google+, which it has integrated with certain of its products, including search and Android. In addition, we compete with other, largely regional, social networks that have strong positions in particular countries, including Cyworld in Korea, Mixi in Japan, Orkut (owned by Google) in Brazil and India, and vKontakte in Russia. As we introduce new products, as our existing products evolve, or as other companies introduce new products and services, we may become subject to additional competition.

The areas in which we compete include:

- *Users and Engagement.* We compete to attract, engage, and retain users. Because our products for users are free of charge, we compete based on the utility, ease of use, performance, and quality of our products.
- *Advertising.* We compete to attract and retain advertisers. We distinguish our products by providing reach, relevance, social context, and engagement to amplify the effectiveness of advertisers' messages.
- *Platform.* We compete to attract and retain developers to build compelling apps and websites that integrate with Facebook. We compete in this area primarily based on the value of the tools and APIs we provide to developers to enable them to access our large global base of engaged users and their connections and to drive traffic to their apps and websites.
- *Talent.* We compete to attract and retain highly talented individuals, especially software engineers, designers, and product managers. Competition for employee talent is particularly intense in the San Francisco Bay Area, where we are headquartered. We compete for these potential employees by providing a work environment that fosters and rewards creativity and innovation and by providing compensation packages that we believe will enable us to attract and retain key employees.

While our industry is evolving rapidly and is becoming increasingly competitive, we believe that we compete favorably on the factors described above. For additional information, see "Risk Factors—Our business is highly competitive. Competition presents an ongoing threat to the success of our business."

### Technology

We have assembled a team of highly skilled engineers and computer scientists whose expertise spans a broad range of technical areas. We make significant investments in product and feature development, data management and personalization technologies, large-scale systems and scalable infrastructure, and advertising technologies, as follows:

- *Product and Feature Development.* We aim to continuously improve our existing products and to develop new products for our users, developers, and advertisers. Our product development philosophy is centered on continuous innovation in creating products that are social by design, which means that our products are designed to place our users and their social interactions at the core of the product experience.

95

PX0559-101

**Table of Contents**

- ***Data Management and Personalization Technologies.*** To provide each user with a personalized Facebook experience, we must process and analyze a vast and growing amount of content shared by our users, developers, and advertisers and surface the most relevant content in real time. For example, loading a user's home page typically requires accessing hundreds of servers, processing tens of thousands of individual pieces of data, and delivering the information selected in less than one second. In addition, the data relationships have grown exponentially and are constantly changing. As such, we have invested extensively in developing technologies and analytics in areas including:

  - *Content optimization and delivery.* We use a proprietary distributed system that is able to query thousands of pieces of content that may be of interest to an individual user to determine the most relevant and timely stories and deliver them to the user in milliseconds.

  - *Graph query.* Our graph query technology enables us to efficiently process subjective queries about the Social Graph by utilizing a proprietary set of search indices, query processors, and caching systems.

  - *Media storage and serving.* We store more than 100 petabytes (100 quadrillion bytes) of photos and videos. We have built a number of storage and serving technologies, such as Haystack, which allow us to efficiently serve and store the data.

  - *Large-scale data management.* We developed Apache Hive, a data warehouse infrastructure built on top of Hadoop, to provide tools to enable easy data summarization, ad hoc querying, and analysis of large datasets.

  - *Software performance.* Facebook.com is largely written in PHP, or Hypertext Preprocessor, a widely used, general-purpose scripting language. We developed HipHop, which programmatically transforms PHP source code into highly optimized C++ code. HipHop offers significant performance gains when compared to traditional PHP.

- ***Large-Scale Systems and Scalable Infrastructure.*** Our products are built on a shared computing infrastructure. We use a combination of off-the-shelf and custom software running on clusters of commodity computers to amass substantial computing capability. Our infrastructure has enabled the storage and processing of large datasets and facilitated the deployment of our products on a global scale. As our user base grows, and the level of engagement and sharing from our users continues to increase, our computing needs continue to expand. We aim to provide our products rapidly and reliably to all users around the world, including in countries where we do not expect significant short-term monetization. We expect to benefit if and as the per-unit pricing for computing power, memory and storage capacity continues to decrease. We also intend to continue to develop data center and server architectures that are operationally efficient, scalable, and reliable. By building custom servers and constructing our first owned data center in Prineville, Oregon, we introduced numerous technology advancements that are designed to:

  - eliminate non-essential components, thereby reducing the cost and improving the serviceability of servers;

  - improve server cooling and power distribution across both the data center and servers to minimize power loss; and

  - optimize the power distribution system and server power supplies to operate at significantly higher efficiency and further reduce power loss.

Together, our custom server and data center designs resulted in a significant increase in energy efficiency while significantly reducing our costs compared to the usage of traditional servers and leased data center facilities. We are a founding member of the Open Compute Project through which we make our proprietary data center, server hardware, and certain software designs available to the open source community. This initiative aims to accelerate data center and server innovation and increase computing efficiency through collaboration on relevant best practices and technical specifications.

96

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

- *Advertising Technologies.* We believe that a more valuable advertiser and user experience is created through our ability to match the most relevant ads to each of our users based on his or her connections, demographics, and expressed interests. Our advertising technology serves billions of ad impressions every day, each of which is displayed to selected users based upon the information that they have chosen to share.

  Advertisers specify a bid, which is how much they are willing to pay for clicks or impressions of their ads. The actual price paid for each click or impression is computed using an auction mechanism that automatically calculates the minimum price an advertiser must pay to "win" the auction and have its ad shown. We believe that our specific auction mechanism encourages advertisers to bid the maximum price they are willing to pay, understanding that because of the way our auction works they will be charged a market-determined price that is never higher and typically lower than their bid. Our system also supports guaranteed delivery of a fixed number of ad impressions for a fixed price.

  Our system manages our entire set of ads, the selected audiences, and the advertisers' bids to determine which ads to show each user and how to display them for every page on Facebook. We use an advanced click prediction system that weighs many real-time updated features using automated learning techniques. Our technology incorporates the estimated click-through rate with both the advertiser's bid and a user relevancy signal to select the optimal ads to show.

Our research and development expenses were $87 million, $144 million, and $388 million for 2009, 2010, and 2011, respectively.

## Sales and Operations

Many of our advertisers use our self-service ad platform to establish accounts and to launch and manage their advertising campaigns. We also have a global sales force that is focused on attracting and retaining advertisers and providing support to them throughout the stages of the advertising campaign cycle from pre-purchase decision making to real-time optimizations to post-campaign analytics. We currently operate 30 sales offices around the globe.

We have operations teams to provide support for our users, developers, and advertisers in four regional centers located in Menlo Park, California; Austin, Texas; Dublin, Ireland; and Hyderabad, India. We also invest in and rely on self-service tools to provide customer support to our users, developers, and advertisers.

## Marketing

To date, the Facebook user community has grown virally with users inviting their friends to connect with them, supported by internal efforts to stimulate user awareness and interest. We have been able to build our brand and user base around the world with relatively low marketing costs. We leverage the utility of our products and our social distribution channels as our most effective marketing tools. In addition, we undertake various user acquisition efforts and regularly host events and conferences to engage with developers and advertisers.

## Intellectual Property

Our success depends in part upon our ability to protect our core technology and intellectual property. To establish and protect our proprietary rights, we rely on a combination of patents, patent applications, trademarks, copyrights, trade secrets, including know-how, license agreements, confidentiality procedures, non-disclosure agreements with third parties, employee disclosure and invention assignment agreements, and other contractual rights.

As of December 31, 2011, we had 56 issued patents and 503 filed patent applications in the United States and 33 corresponding patents and 149 filed patent applications in foreign countries relating to social networking,

97

PX0559-103

Table of Contents

web technologies and infrastructure, and related technologies. Our issued patents expire between May 2016 and June 2031. We cannot assure you that any of our patent applications will result in the issuance of a patent or whether the examination process will require us to narrow our claims. In addition, any patents may be contested, circumvented, found unenforceable or invalid, and we may not be able to prevent third parties from infringing them.

We generally control access to and use of our proprietary technology and other confidential information through the use of internal and external controls, including contractual protections with employees, contractors, customers, and partners, and our software is protected by U.S. and international copyright laws. Despite our efforts to protect our trade secrets and proprietary rights through intellectual property rights, licenses, and confidentiality agreements, unauthorized parties may still copy or otherwise obtain and use our software and technology. In addition, we intend to expand our international operations, and effective patent, copyright, trademark and trade secret protection may not be available or may be limited in foreign countries.

Companies in the Internet, technology, and media industries own large numbers of patents, copyrights, trademarks, and trade secrets and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. From time to time, we face, and we expect to face in the future, allegations that we have infringed the trademarks, copyrights, patents, trade secrets and other intellectual property rights of third parties, including our competitors and non-practicing entities. As we face increasing competition and as our business grows, we will likely face more claims of infringement. For example, on February 27, 2012, we received a letter from Yahoo! Inc. that alleged that a number of our products infringe the claims of 13 of Yahoo's patents. For additional information, see "Risk Factors—We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property rights claims that are expensive and time consuming, and, if resolved adversely, could have a significant impact on our business, financial condition, or results of operations."

**Government Regulation**

We are subject to a number of U.S. federal and state, and foreign laws and regulations that affect companies conducting business on the Internet, many of which are still evolving and being tested in courts, and could be interpreted in ways that could harm our business. These may involve user privacy, rights of publicity, data protection, content, intellectual property, distribution, electronic contracts and other communications, competition, protection of minors, consumer protection, taxation and online payment services. In particular, we are subject to federal, state, and foreign laws regarding privacy and protection of user data. Foreign data protection, privacy, and other laws and regulations are often more restrictive than those in the United States. U.S. federal and state and foreign laws and regulations are constantly evolving and can be subject to significant change. In addition, the application and interpretation of these laws and regulations are often uncertain, particularly in the new and rapidly-evolving industry in which we operate. There are also a number of legislative proposals pending before the U.S. Congress, various state legislative bodies, and foreign governments concerning data protection which could affect us. For example, a revision to the 1995 European Union Data Protection Directive is currently being considered by legislative bodies that may include more stringent operational requirements for data processors and significant penalties for non-compliance.

In November 2011, we reached a 20-year settlement agreement with the FTC to resolve an investigation into various practices, by entering into an agreement that, among other things, requires us to establish and refine certain practices with respect to treatment of user data and privacy settings and also requires we complete bi-annual independent privacy audits. Violation of existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.

Various laws and regulations in the United States and abroad, such as the Bank Secrecy Act, the Dodd-Frank Act, the USA PATRIOT Act, and the Credit CARD Act impose certain anti-money laundering

98

**Table of Contents**

requirements on companies that are financial institutions or that provide financial products and services. Under these laws and regulations, financial institutions are broadly defined to include money services businesses such as money transmitters, check cashers, and sellers or issuers of stored value. Requirements imposed on financial institutions under these laws include customer identification and verification programs, record retention policies, and procedures and transaction reporting. We do not believe that we are a financial institution subject to these laws and regulations. However, it is possible that Payments on the Facebook Platform could be considered a financial product and that we could be deemed a financial institution subject to applicable U.S., state, or foreign regulation under certain interpretations of laws governing businesses such as money transmitters, check cashers, and sellers or issuers of stored value. To increase flexibility in how our use of Payments may evolve and to mitigate regulatory uncertainty, we have applied or expect to apply through a subsidiary for certain money transmitter licenses in the United States, which will generally require us to show compliance with many domestic laws relating to money transmission, gift cards and other prepaid access instruments, electronics funds transfers, anti-money laundering, counter-terrorist financing, gambling, banking and lending, and import and export restrictions.

China is a large potential market for Facebook, but users are generally restricted from accessing Facebook from China. We do not know if we will be able to find an approach to managing content and information that will be acceptable to us and to the Chinese government. It is also possible that governments of one or more other countries may seek to censor content available on our website, restrict access, block our website, or impose other restrictions that may affect the accessibility of Facebook for an extended period of time or indefinitely.

We communicate with lawmakers and regulators in the countries and regions in which we do business. We have a dedicated policy team that monitors legal and regulatory developments and works with policymakers and regulators around the world to help ensure that our perspective is heard in matters of importance to us.

**Legal Proceedings**

We are currently parties to multiple lawsuits related to our products, including patent infringement lawsuits brought by both other companies and non-practicing entities as well as class action lawsuits brought by users and advertisers, and we may in the future be subject to additional lawsuits and disputes.

We are also involved in other claims, lawsuits, government investigations, settlements, and proceedings arising from the ordinary course of our business.

Paul D. Ceglia filed suit against us and Mark Zuckerberg on or about June 30, 2010, in the Supreme Court of the State of New York for the County of Allegheny claiming substantial ownership of our company based on a purported contract between Mr. Ceglia and Mr. Zuckerberg allegedly entered into in April 2003. We removed the case to the U.S. District Court for the Western District of New York, where the case is now pending. In his first amended complaint, filed on April 11, 2011, Mr. Ceglia revised his claims to include an alleged partnership with Mr. Zuckerberg, he revised his claims for relief to seek a substantial share of Mr. Zuckerberg's ownership in us, and he included quotations from supposed emails that he claims to have exchanged with Mr. Zuckerberg in 2003 and 2004. On June 2, 2011, we filed a motion for expedited discovery based on evidence we submitted to the court showing that the alleged contract and emails upon which Mr. Ceglia bases his complaint are fraudulent. On July 1, 2011, the court granted our motion and ordered Mr. Ceglia to produce, among other things, all hard copy and electronic versions of the purported contract and emails. On January 10, 2012, the court granted our request for sanctions against Mr. Ceglia for his delay in compliance with that order. We continue to believe that Mr. Ceglia is attempting to perpetrate a fraud on the court and we intend to continue to defend the case vigorously.

The Enforcement Division of the Securities and Exchange Commission (SEC) has been conducting an inquiry into secondary transactions involving the sale of private company securities as well as the number of our stockholders of record. In connection with this inquiry, we have received both formal and informal requests for

99

**Table of Contents**

information from the staff of the SEC and we have been fully cooperating with the staff. We have provided all information requested and there are no requests for documents or information that remain outstanding. We believe that we have been in compliance with the provisions of the federal securities laws relating to these matters.

Although the results of claims, lawsuits, government investigations, and proceedings in which we are involved cannot be predicted with certainty, we do not believe that the final outcome of the matters discussed above will have a material adverse effect on our business, financial condition, or results of operations. However, defending these claims is costly and can impose a significant burden on management and employees, we may receive unfavorable preliminary or interim rulings in the course of litigation, and there can be no assurances that favorable final outcomes will be obtained.

### Culture and Employees

Our employees and our culture are critical to our success. We value our "hacker culture," which we define as a work environment that rewards creative problem solving and rapid decision making. We try to move fast in developing new products and then continually iterate and optimize to further improve our products. We seek employees who are motivated by the ability to have a direct impact on how hundreds of millions of people around the world connect, discover, and express themselves.

We encourage our employees to think boldly. We also have posted the phrase "this journey is 1% finished" across many of our office walls, to remind employees that we believe that we have only begun fulfilling our mission to make the world more open and connected.

We have grown rapidly, but at a rate that we believe will allow us to preserve a culture of collaboration, excellence, and moving fast. We had 1,218 full-time employees, 2,127 full-time employees, and 3,200 full-time employees at the end of 2009, 2010, and 2011, respectively.

### Facilities

As of December 31, 2011, we leased office facilities around the world totaling approximately 1.9 million square feet, including one million square feet for our corporate headquarters in Menlo Park, California. We have data centers in the United States, including data center facilities that we own in North Carolina and Oregon and leased data center facilities in California and Virginia. We believe that our facilities are adequate for our current needs.

100

**Table of Contents**

# MANAGEMENT

**Executive Officers and Directors**

The following table provides information regarding our executive officers and directors as of February 29, 2012:

| Name | Age | Position(s) |
|------|-----|-------------|
| Mark Zuckerberg | 27 | Chairman and CEO |
| Sheryl K. Sandberg | 42 | Chief Operating Officer |
| David A. Ebersman | 42 | Chief Financial Officer |
| David B. Fischer | 39 | Vice President, Marketing and Business Partnerships |
| Mike Schroepfer | 37 | Vice President of Engineering |
| Theodore W. Ullyot | 44 | Vice President, General Counsel, and Secretary |
| Marc L. Andreessen[1][3] | 40 | Director |
| Erskine B. Bowles[1] | 66 | Director |
| James W. Breyer[2] | 50 | Director |
| Donald E. Graham*[2][3] | 66 | Director |
| Reed Hastings[3] | 51 | Director |
| Peter A. Thiel[1] | 44 | Director |

* Lead Independent Director.
(1) Member of the audit committee.
(2) Member of the compensation committee.
(3) Member of the governance committee.

*Mark Zuckerberg* is our founder and has served as our CEO and as a member of our board of directors since July 2004. Mr. Zuckerberg has served as Chairman of our board of directors since January 2012. Mr. Zuckerberg attended Harvard University where he studied computer science. We believe that Mr. Zuckerberg should serve as a member of our board of directors due to the perspective and experience he brings as our founder, Chairman, and CEO, and as our largest and controlling stockholder.

*Sheryl K. Sandberg* has served as our Chief Operating Officer since March 2008. From November 2001 to March 2008, Ms. Sandberg served in various positions at Google, Inc., most recently as Vice President, Global Online Sales & Operations. Ms. Sandberg also is a former Chief of Staff of the U.S. Treasury Department and previously served as a consultant with McKinsey & Company, a management consulting company, and as an economist with The World Bank. In addition to serving as our Chief Operating Officer, Ms. Sandberg has been a member of the boards of directors of Starbucks Corporation since March 2009 and the Walt Disney Company since December 2009. Ms. Sandberg has elected not to stand for re-election at Starbucks' 2012 annual meeting. Ms. Sandberg holds an A.B. in economics from Harvard University and an M.B.A. from Harvard Business School.

*David A. Ebersman* has served as our Chief Financial Officer since September 2009. Prior to joining us, Mr. Ebersman served in various positions at Genentech, Inc., a biotechnology company, including as its Chief Financial Officer from March 2005 and as an Executive Vice President from January 2006 until April 2009, following Genentech's acquisition by F. Hoffmann-La Roche Ltd. in March 2009. Prior to joining Genentech, Mr. Ebersman was a research analyst at Oppenheimer & Company, Inc., an investment company. In addition to serving as our Chief Financial Officer, Mr. Ebersman has been a member of the board of directors of Ironwood Pharmaceuticals, Inc. since July 2009. Mr. Ebersman holds an A.B. in economics and international relations from Brown University.

101

**Table of Contents**

*David B. Fischer* joined us in April 2010 and serves as our Vice President, Marketing and Business Partnerships. From July 2002 to March 2010, Mr. Fischer served in various positions at Google, including most recently as its Vice President, Global Online Sales & Operations. Prior to joining Google, Mr. Fischer served as Deputy Chief of Staff of the U.S. Treasury Department and was an associate editor at the U.S. News World Report, L.P., a news magazine company. Mr. Fischer holds a B.A. in government from Cornell University and an M.B.A. from the Stanford University Graduate School of Business.

*Mike Schroepfer* has served as our Vice President of Engineering since September 2008. From December 2005 to August 2008, Mr. Schroepfer served as Vice President of Engineering at Mozilla Corporation, an Internet company. Prior to Mozilla, Mr. Schroepfer served in various positions at Sun Microsystems, Inc., an information technology company, including as Chief Technology Officer of its data center automation division. He also co-founded CenterRun, Inc., a developer of application provisioning software, which was acquired by Sun Microsystems. In addition to serving as our Vice President of Engineering, Mr. Schroepfer has been a member of the board of directors of Ancestry.com Inc. since January 2011. Mr. Schroepfer holds a B.S. and an M.S. in computer science from Stanford University.

*Theodore W. Ullyot* has served as our Vice President, General Counsel, and Secretary since October 2008. From May 2008 to October 2008, Mr. Ullyot was a partner at Kirkland & Ellis LLP, a law firm. From October 2005 to April 2008, Mr. Ullyot served as Executive Vice President and General Counsel of ESL Investments, Inc., a private investment firm. Prior to joining ESL Investments, Mr. Ullyot served in the federal executive branch under President George W. Bush, including as Chief of Staff at the U.S. Justice Department and as a Deputy Assistant to the President. Earlier in his career, Mr. Ullyot was an associate general counsel at AOL Time Warner, Inc. and served as a law clerk for U.S. Supreme Court Justice Antonin Scalia and for Judge Michael Luttig of the U.S. Court of Appeals for the Fourth Circuit. Mr. Ullyot holds an A.B. in History from Harvard University and a J.D. from the University of Chicago.

*Marc L. Andreessen* has served as a member of our board of directors since June 2008. Mr. Andreessen is a co-founder and has been a General Partner of Andreessen Horowitz, a venture capital firm, since July 2009. Previously, Mr. Andreessen co-founded and served as the Chairman of the board of directors of Opsware, Inc. (formerly known as Loudcloud Inc.), a software company. He also served as Chief Technology Officer of America Online, Inc., an Internet services company. Mr. Andreessen was a co-founder of Netscape Communications Corporation, a software company, serving in various positions, including Chief Technology Officer and Executive Vice President of Products. In addition to serving on our board of directors, Mr. Andreessen currently serves as a member of the boards of directors of eBay Inc. and the Hewlett-Packard Company. Mr. Andreessen holds a B.S. in computer science from the University of Illinois at Urbana-Champaign. We believe that Mr. Andreessen should serve as a member of our board of directors due to his extensive experience as an Internet entrepreneur, venture capitalist, and technologist.

*Erskine B. Bowles* has served as a member of our board of directors since September 2011. Mr. Bowles is President Emeritus of the University of North Carolina and served as President from January 2006 through December 2010. Mr. Bowles has also been a Senior Advisor of BDT Capital Partners, LLC, a private investment firm, since January 2012. From February 2010 until December 2010, he served as Co-Chair of the National Commission on Fiscal Responsibility and Reform. Mr. Bowles has been a Senior Advisor since 2001 and was Managing Director from 1999 to 2001 of Carousel Capital LLC, a private investment firm. He was also a partner of Forstmann Little & Co., an investment firm, from 1999 to 2001. Mr. Bowles began his career in corporate finance at Morgan Stanley and subsequently helped found and ultimately served as Chairman and Chief Executive Officer of Bowles Hollowell Connor & Co., an investment banking firm. He also was a founder of Kitty Hawk Capital, a venture capital firm. Mr. Bowles served as White House Chief of Staff from 1996 to 1998 and Deputy White House Chief of Staff from 1994 to 1995. In addition to serving on our board of directors, Mr. Bowles currently serves as a member of the boards of directors of Morgan Stanley, Belk, Inc., Cousins Properties Incorporated, and Norfolk Southern Corporation. Mr. Bowles has elected not to stand for re-election at Cousins Properties' 2012 annual meeting. Mr. Bowles also served as a member of the board of directors of

102

**Table of Contents**

General Motors Company from June 2005 to April 2009. Mr. Bowles holds a B.S. in business from the University of North Carolina at Chapel Hill and an M.B.A. from Columbia University Graduate School of Business. We believe that Mr. Bowles should serve as a member of our board of directors due to his extensive experience in the financial services industry and academia as well as his distinguished public service.

*James W. Breyer* has served as a member of our board of directors since April 2005. Mr. Breyer has been a Partner of Accel Partners, a venture capital firm, since 1987. Mr. Breyer is also the founder and has been the Chief Executive Officer of Breyer Capital, an investment firm, since July 2006. Mr. Breyer is also a co-founder and has been co-lead on the strategic investment committee since inception of the IDG-Accel China Funds. In addition to serving on our board of directors, Mr. Breyer currently serves as a member of the boards of directors of Brightcove Inc., Dell, Inc., News Corporation, Prosper Marketplace, Inc., and Wal-Mart Stores, Inc., where he is the lead/presiding independent director. Mr. Breyer previously served as a member of the board of directors of Marvel Entertainment Inc. from June 2006 to December 2009 and RealNetworks, Inc. from October 1995 to June 2008. Mr. Breyer holds a B.S. in interdisciplinary studies from Stanford University and an M.B.A. from Harvard University. We believe that Mr. Breyer should serve as a member of our board of directors due to his extensive experience with social media and technology companies, as a venture capitalist, and as one of our early investors.

*Donald E. Graham* has served as a member of our board of directors since March 2009. Mr. Graham has served as the Chief Executive Officer of The Washington Post Company, an education and media company, since 1991 and as Chairman of its board of directors since 1993. Mr. Graham holds an A.B. in English history and literature from Harvard University. We believe that Mr. Graham should serve as a member of our board of directors due to his extensive experience in the media industry, including serving in a variety of senior leadership roles with The Washington Post Company.

*Reed Hastings* has served as a member of our board of directors since June 2011. Mr. Hastings has served as the Chief Executive Officer and Chairman of the board of directors of Netflix, Inc., a provider of an Internet subscription service for movies and television shows, since 1999. Prior to Netflix, Mr. Hastings served as Chief Executive Officer of Technology Network, a political service organization for the technology industry. Mr. Hastings also served as Chief Executive Officer of Pure Atria Software, a maker of software development tools, from 1991 until it was acquired by Rational Software Corporation, a software company, in 1997. In addition to serving on our board of directors, Mr. Hastings currently serves as a member of the board of directors of Microsoft Corporation. Mr. Hastings holds a B.A. in mathematics from Bowdoin College and an M.S.C.S. in computer science from Stanford University. We believe that Mr. Hastings should serve as a member of our board of directors due to his extensive experience with technology companies.

*Peter A. Thiel* has served as a member of our board of directors since April 2005. Since 2005, Mr. Thiel has been a Partner of Founders Fund, a venture capital firm. Mr. Thiel has also served as President of Clarium Capital Management, LLC, a global macro investment manager, since 2002. In 1998, Mr. Thiel co-founded PayPal, Inc., an online payment company, where he served as Chief Executive Officer, President and as Chairman of its board of directors from 2000 until its acquisition by eBay in 2002. Prior to that, Mr. Thiel worked for Credit Suisse, an investment firm, and Sullivan & Cromwell LLP, a law firm. Mr. Thiel holds a B.A. in Philosophy from Stanford University and a J.D. from Stanford Law School. We believe that Mr. Thiel should serve as a member of our board of directors due to his extensive experience as an entrepreneur and venture capitalist, and as one of our early investors.

**Election of Officers**

Our executive officers are elected by, and serve at the discretion of, our board of directors. There are no family relationships among any of our directors or executive officers.

103

**Table of Contents**

### Board Composition

Our board of directors may establish the authorized number of directors from time to time by resolution. Our board of directors currently consists of seven members. Our current certificate of incorporation and amended and restated voting agreements provide for certain members of our board of directors to be elected as designees by Mr. Zuckerberg, the board of directors, or by certain classes of our capital stock. The current members of the board of directors were elected as follows:

- Messrs. Andreessen, Graham, and Zuckerberg were elected as designees of Mr. Zuckerberg, the holder of the majority of the voting power of the outstanding shares of Class A common stock and Class B common stock;

- Mr. Bowles was elected as the designee of the board of directors;

- Mr. Hastings was elected as the designee of Mr. Zuckerberg, the holder of the majority of the voting power of the outstanding shares of our capital stock;

- Mr. Thiel was elected as the designee of stockholders holding a majority of the outstanding shares of our Series A preferred stock, however, pursuant to the amended and restated voting agreement, a majority of the members of our board of directors may designate one member of the board of directors to fill this seat if it becomes vacant; and

- Mr. Breyer was elected as the designee of stockholders who hold a majority of the outstanding shares of our Series B preferred stock.

The amended and restated voting agreement and the provisions of our certificate of incorporation by which the directors were elected will terminate in connection with our initial public offering, and, except as described in "Description of Capital Stock—Voting Agreements," there will be no further contractual obligations regarding the election of our directors. Our current directors will continue to serve as directors until their resignations or until their successors are duly elected by the holders of our common stock.

#### Classified Board

So long as the outstanding shares of our Class B common stock represent a majority of the combined voting power of common stock, we will not have a classified board of directors, and all directors will be elected for annual terms.

When the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock, we will have a classified board of directors consisting of three classes of approximately equal size, each serving staggered three-year terms. Our directors will be assigned by the then-current board of directors to a class.

Upon expiration of the term of a class of directors, directors for that class will be elected for three-year terms at the annual meeting of stockholders in the year in which that term expires. As a result, only one class of directors will be elected at each annual meeting of our stockholders, with the other classes continuing for the remainder of their respective three-year terms. Each director's term continues until the election and qualification of his or her successor, or his or her earlier death, resignation, or removal.

So long as our board of directors is classified, only our board of directors may fill vacancies on our board. Any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the total number of directors.

The classification of our board of directors may have the effect of delaying or preventing changes in our control or management. See "Description of Capital Stock—Anti-Takeover Provisions—Restated Certificate of Incorporation and Bylaw Provisions."

104

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

### Director Independence

We intend to apply to list our common stock on the NASDAQ Global Select Market or the New York Stock Exchange. The listing rules of these stock exchanges generally require that a majority of the members of a listed company's board of directors be independent within specified periods following the closing of an initial public offering. In addition, the listing rules generally require that, subject to specified exceptions, each member of a listed company's audit, compensation, and governance committees be independent.

Audit committee members must also satisfy the independence criteria set forth in Rule 10A-3 under the Securities Exchange Act of 1934, as amended (Exchange Act). In order to be considered independent for purposes of Rule 10A-3, a member of an audit committee of a listed company may not, other than in his or her capacity as a member of the audit committee, the board of directors, or any other board committee: accept, directly or indirectly, any consulting, advisory, or other compensatory fee from the listed company or any of its subsidiaries; or be an affiliated person of the listed company or any of its subsidiaries.

Our board of directors has determined that none of our non-employee directors has a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the rules of the NASDAQ Stock Market and the New York Stock Exchange. Our board of directors has also determined that Messrs. Andreessen, Bowles, and Thiel, who comprise our audit committee, Messrs. Breyer and Graham, who comprise our compensation committee, and Messrs. Andreessen, Graham, and Hastings, who comprise our governance committee, satisfy the independence standards for those committees established by applicable SEC rules and the rules of the NASDAQ Stock Market and the New York Stock Exchange.

## Controlled Company

Because Mr. Zuckerberg controls a majority of our outstanding voting power, we are a "controlled company" under the corporate governance rules for publicly-listed companies. Therefore, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board. Additionally, as described in the section entitled "Description of Capital Stock —Anti-Takeover Provisions—Restated Certificate of Incorporation and Bylaw Provisions," so long as the outstanding shares of our Class B common stock represent a majority of the combined voting power of our common stock, Mr. Zuckerberg will be able to effectively control all matters submitted to our stockholders for a vote, as well as the overall management and direction of our company.

## Board Committees

Our board of directors has established an audit committee, a compensation committee, and a governance committee, each of which will have the composition and responsibilities described below as of the closing of our initial public offering. Members serve on these committees until their resignations or until otherwise determined by our board of directors.

### Audit Committee

Our audit committee is comprised of Messrs. Andreessen, Bowles, and Thiel. Mr. Bowles is the chairman of our audit committee, is our audit committee financial expert, as that term is defined under SEC rules and possesses financial sophistication as defined under the rules of the NASDAQ Stock Market and the New York Stock Exchange. The designation does not impose on Mr. Bowles any duties, obligations or liabilities that are greater than are generally imposed on members of our audit committee and our board of directors. Our audit committee is directly responsible for, among other things:

- selecting the independent registered public accounting firm to audit our financial statements;

105

PX0559-111

**Table of Contents**

- ensuring the independence of the independent registered public accounting firm;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and that firm, our interim and year-end operating results;

- developing procedures to enable submission of anonymous concerns about accounting or audit matters;

- considering the adequacy of our internal accounting controls and audit procedures;

- reviewing related party transactions;

- approving or, as permitted, pre-approving all audit and non-audit services to be performed by the independent registered public accounting firm; and

- overseeing our internal audit function.

*Compensation Committee*

Our compensation committee is comprised of Messrs. Breyer and Graham. Mr. Breyer is the chairman of our compensation committee. Each member of this committee is a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act, and an outside director, as defined under Section 162(m) of the Internal Revenue Code of 1986, as amended. Our compensation committee is responsible for, among other things:

- reviewing and approving, or recommending that our board of directors approve, the compensation of our executive officers;

- reviewing and recommending to our board of directors the compensation of our directors;

- reviewing and approving the terms of any compensatory agreements with our executive officers;

- administering our stock and equity incentive plans;

- reviewing and making recommendations to our board of directors with respect to incentive compensation and equity plans; and

- establishing and reviewing our overall compensation philosophy.

*Governance Committee*

Our governance committee is comprised of Messrs. Andreessen, Graham, and Hastings. Mr. Graham is the chairman of our governance committee. Our governance committee is responsible for, among other things:

- reviewing developments in corporate governance practices;

- developing and recommending our corporate governance guidelines and policies, and evaluating their sufficiency;

- reviewing proposed waivers of the code of conduct;

- overseeing the process of evaluating the performance of our board of directors; and

- advising our board of directors on corporate governance matters.

Each of the above committees has a written charter approved by our board of directors. Following the closing of our initial public offering, copies of each charter will be posted on the Investor Relations section of our website.

**Compensation Committee Interlocks and Insider Participation**

During 2011, our compensation committee consisted of Messrs. Breyer and Graham. Neither of them has at any time in the last fiscal year been one of our officers or employees. During 2009, 2010, and 2011, The Washington Post Company and its related companies purchased $0.6 million, $4.8 million, and $4.2 million,

106

**Table of Contents**

respectively, of advertisements on our website. Mr. Graham is the Chief Executive Officer of The Washington Post Company. The purchases by The Washington Post Company and its related entities were made in the ordinary course of business pursuant to our standard online terms and conditions and were all made through our self-service ad system.

None of our executive officers has served as a member of the board of directors, or as a member of the compensation or similar committee, of any entity that has one or more executive officers who served on our board of directors or compensation committee during 2011.

### Code of Business Ethics and Conduct

In connection with our initial public offering, our board of directors will adopt a code of business ethics and conduct that will apply to all of our employees, officers, and directors. The full text of our code of business conduct will be posted on the Investor Relations section of our website. We intend to disclose future amendments to certain provisions of our code of business conduct, or waivers of these provisions, on our website or in filings under the Exchange Act.

### Director Compensation

In September 2011, our board of directors approved an annual retainer fee of $50,000 for each of our non-employee directors. Our non-employee directors received a prorated fee during 2011. In addition, starting on January 1, 2012, the chairman of our audit committee will receive an annual retainer fee of $20,000. Prior to our initial public offering, there was no formal policy in place to provide our directors with equity compensation for their services as members of our board of directors or any committee of our board of directors. In June 2011, our board of directors approved the grant of 20,000 restricted stock units (RSUs) to Mr. Hastings, as compensation for Mr. Hastings' service as a member of our board of directors. In September 2011, our board of directors approved the grant of 20,000 RSUs to Mr. Bowles, as compensation for Mr. Bowles' service as a member of our board of directors. The RSUs granted to Messrs. Bowles and Hastings are subject to vesting based on their continued services to us through each vesting date, which is more fully described below.

Although there was no formal policy in place relating to the granting of equity awards to our directors, the following table presents the total compensation for each person who served as a member of our board of directors during 2011. Other than as set forth in the table and described more fully below, in 2011 we did not pay any fees to, make any equity awards or non-equity awards to, or pay any other compensation to the members of our board of directors. Mr. Zuckerberg, our founder, Chairman, and CEO, receives no compensation for his service as a director, and is not included in the table below.

| Director Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)[1][2] | Total ($) |
|---|---|---|---|
| Marc L. Andreessen[3] | 16,667 | — | 16,667 |
| Erskine B. Bowles[4] | 16,667 | 601,400 | 618,067 |
| James W. Breyer | 16,667 | — | 16,667 |
| Donald E. Graham[5] | 16,667 | — | 16,667 |
| Reed Hastings[6] | 16,667 | 593,400 | 610,067 |
| Peter A. Thiel | 16,667 | — | 16,667 |

(1)  Amounts reported represent the aggregate grant date fair value of RSUs without regards to forfeitures granted to the independent members of our board of directors during 2011 under our 2005 Stock Plan, computed in accordance with ASC 718. The valuation assumptions used in calculating the fair value of the RSUs is set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Share-based Compensation." This amount does not reflect the actual economic value realized by the director.

(2)  Messrs. Andreessen and Graham hold RSUs granted prior to January 1, 2011 (Pre-2011 RSUs). Pre-2011 RSUs only vest upon the satisfaction of both (i) a service-based vesting condition and (ii) a liquidity-based vesting condition. The liquidity-based vesting condition for Pre-2011 RSUs is: (a) the date that is six months after the effective date of our initial public offering; or (b) a change of control (as defined in our 2005 Stock Plan). The service-based vesting condition for the Pre-2011 RSUs held by Messrs. Andreessen and Graham are further described in footnotes (3) and (5) below. RSUs granted on or after January 1, 2011 (Post-2011 RSUs) vest based on continuous service to us, as further described in footnotes (4) and (6) below.

107

**Table of Contents**

(3)  As of December 31, 2011, Mr. Andreessen held 5,247,490 RSUs. The service-based vesting condition was satisfied as to 1/48th of the total shares underlying the RSUs on July 30, 2008  The remaining shares underlying the RSUs vest at a rate of 1/48th of the total number of shares underlying the RSUs on each month thereafter, subject to continued service to us through each vesting date.

(4)  As of December 31, 2011, Mr. Bowles held 20,000 RSUs. The vesting condition will be satisfied as to 13/48 of the total shares underlying the RSUs on October 15, 2012. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares underlying the RSUs in quarterly installments thereafter, not to exceed eleven quarterly installments, and 2/48th on October 15, 2015, subject to continued service to us through each vesting date. None of Mr. Bowles' RSUs will settle until the earliest to occur of: (i) December 31, 2013; (ii) an earlier date between January 1, 2013 and December 31, 2013 that is specified by us; and (iii) the date of a change of control (as defined in our 2005 Stock Plan).

(5)  As of December 31, 2011, Mr. Graham held 1,000,000 RSUs. The service-based vesting condition was satisfied as to 1/4th of the total shares underlying the RSUs on April 1, 2010. The remaining shares underlying the RSUs vest at a rate of 1/48th of the total number of shares underlying the RSUs on each month thereafter, subject to continued service to us through each vesting date.

(6)  As of December 31, 2011, Mr. Hastings held 20,000 RSUs. The vesting condition will be satisfied as to 1/4 of the total shares underlying the RSUs on July 15, 2012. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares underlying the RSUs in quarterly installments thereafter, subject to continued service to us through each vesting date. None of Mr. Hastings' RSUs will settle until the earliest to occur of: (i) December 31, 2013; (ii) an earlier date between January 1, 2013 and December 31, 2013 that is specified by us; and (iii) the date of a change of control (as defined in our 2005 Stock Plan).

108

PX0559-114

**Table of Contents**

# EXECUTIVE COMPENSATION

## Compensation Discussion and Analysis

### *Overview*

This section explains our executive compensation philosophy, objectives, and design; our compensation-setting process; our executive compensation program components; and the decisions made in 2011 with respect to the compensation of each of our named executive officers. Our named executive officers for 2011, which consist of the executive officers who appear in "—2011 Summary Compensation Table" below, are:

- Mark Zuckerberg, our founder, Chairman and Chief Executive Officer (CEO);
- Sheryl K. Sandberg, our Chief Operating Officer (COO);
- David A. Ebersman, our Chief Financial Officer;
- Mike Schroepfer, our Vice President, Engineering; and
- Theodore W. Ullyot, our Vice President, General Counsel, and Secretary.

### *Executive Compensation Philosophy, Objectives and Design*

*Philosophy.* We are focused on our mission to make the world more open and connected. We believe that Facebook is at the beginning of this journey and that for us to be successful we must hire and retain people who can continue to develop our strategy, quickly innovate and build new products, bolster the growth of our user base and user engagement, and constantly enhance our business model. To achieve these objectives, we need a highly talented team comprised of engineering, product, sales, and general and administrative professionals. We also expect our executive team to possess and demonstrate strong leadership and management capabilities.

*Objectives.* Our compensation programs for our named executive officers are built to support the following objectives:

- attract the top talent in our leadership positions and motivate our executives to deliver the highest level of individual and team impact and results;
- encourage our executives to model the important aspects of our culture, which include moving fast, being bold, communicating openly and building trust with each other and our employees;
- ensure each one of our named executive officers receives a total compensation package that encourages his or her long-term retention;
- reward high levels of performance with commensurate levels of compensation; and
- align the interests of our executives with those of our stockholders in the overall success of Facebook by emphasizing long-term incentives.

*Design.* As a privately-held company, our executive compensation program is heavily weighted towards equity, including stock options and restricted stock units (RSUs), with cash compensation that is considerably below market relative to executive compensation at our peer companies. We believe that equity compensation offers the best vehicle to focus our executive officers on our mission and the achievement of our long-term strategic and financial objectives and to align our executive officers with the long-term interests of our stockholders.

For our executive officers who received a substantial initial equity award in connection with the commencement of their employment, we have granted additional equity awards with service-based vesting conditions where the commencement of vesting is deferred until a date some years in the future, as discussed further in "—Elements of Executive Compensation—Equity Compensation" below. When combined with the executives' initial equity awards, we believe that these additional grants represent a strong long-term retention tool and provide the executive officers with long-term equity incentives.

109

PX0559-115

**Table of Contents**

As we transition from being a privately-held company to a publicly-traded company, we will evaluate our executive compensation programs, including our mix of cash and equity compensation, at least annually or as circumstances require based on our business objectives and the competitive environment for talent. We anticipate continuing our emphasis on pay-for-performance and long-term incentive compensation for our executive officers.

### *Compensation-Setting Process*

*Role of Our Compensation Committee*. The compensation committee is responsible for overseeing all aspects of our executive compensation programs, including executive salaries, payouts under our annual bonus plan, the size and structure of equity awards, and any executive perquisites. The compensation committee is solely responsible for determining the compensation of our CEO and reviews and approves compensation of other executive officers.

*Role of Compensation Consultant*. The compensation committee has the authority to engage its own advisors to assist in carrying out its responsibilities. The compensation committee did not retain the services of an outside compensation consultant to provide advice with respect to our executive compensation programs for 2011. In January 2012, the compensation committee engaged the services of Compensia, Inc., a national compensation consulting firm. Compensia may provide the compensation committee and the board of directors with guidance regarding the amount and types of compensation that we provide to our executives, how our compensation practices compare to the compensation practices of other companies, and other compensation-related matters. Compensia will report directly to the compensation committee, although Compensia may meet with members of management for the purposes of gathering information on proposals that management may make to the compensation committee. The compensation committee may replace Compensia or hire additional advisors at any time. To date, Compensia has not provided any services to us and has received no compensation from us.

*Role of Management*. In setting compensation for 2011, our CEO, our COO, and our Vice President, Human Resources, worked closely with the compensation committee in managing our executive compensation program and attended meetings of the compensation committee. From time to time, our Chief Financial Officer and our General Counsel attended meetings of the compensation committee to present information and answer questions. Our CEO made recommendations to the compensation committee regarding compensation for our executive officers other than himself because of his daily involvement with our executive team. No executive officer participated directly in the final deliberations or determinations regarding his or her own compensation package.

Our management team and the compensation committee each play a role in evaluating and mitigating any risk that may exist relating to our compensation plans, practices and policies for all employees, including our named executive officers, as further described in "— Compensation Risk Assessment" below.

*Use of Comparative Market Data*. We aim to compensate our executive officers at levels that are at least commensurate with the most competitive levels of compensation of executive officers with executives in similar positions at a group of peer companies set forth below with whom we compete for hiring and retaining executive talent (our Peer Group). The compensation committee also considered the scope of responsibility of each executive officer, our current practice of maintaining minimal differentiation between the cash packages of our executive officers, the unvested balances of stock awards for each executive officer, as well as the compensation committee's assessment of each executive officer's performance and impact to the organization. In determining 2011 compensation, we did not use a formula for taking into account these different factors.

Management provides the compensation committee with both cash and equity compensation data for our Peer Group. We analyze market data for executive compensation at least annually using the most relevant published survey sources and public filings. For 2011, our market analysis focused on technology companies with $1 billion to $3 billion in annual revenue in the Radford Global Technology and Global Sales Survey

110

**Table of Contents**

published by AON (Radford Survey). In the first quarter of 2011, the compensation committee also reviewed compensation data from the public filings for the following Peer Group, with annual revenue ranging from $1.7 billion to $108.3 billion in fiscal 2011:

| | |
|---|---|
| Accenture | Google |
| Adobe Systems | Intuit |
| Amazon.com | Microsoft |
| AOL | NetApp |
| Apple | Oracle |
| Cisco Systems | salesforce.com |
| eBay | VMware |
| Electronic Arts | Yahoo! |

The compensation committee expects to periodically review and update this Peer Group.

In the first quarter of 2011, our compensation committee reviewed our executive compensation against this Peer Group, to ensure that our executive officer compensation is competitive and sufficient to recruit and retain our executive officers. Management provided the compensation committee with total cash compensation data (base salaries and cash bonus awards at target) at various percentiles and total compensation data (total cash compensation and equity compensation) at the 90th percentile. However, while the compensation committee considered this data in determining executive officer compensation, we did not seek to benchmark our executive compensation to any particular level. Rather, we sought to compensate our executive officers at a level which would allow us to successfully recruit and retain the best possible talent for our executive team. We relied heavily on the knowledge and experience of the compensation committee and our management in determining the appropriate compensation levels for our executive officers. Overall, based on our Peer Group analysis, total cash compensation for our executive officers was below the 25th percentile of the Radford Survey and Peer Group data. When equity compensation was factored in, without taking into account the effect of the service-based vesting conditions that begin several years in the future and that are applicable to the equity compensation of our executive officers, total compensation for our named executive officers, other than our CEO, significantly exceeded the 90th percentile of the market. The total compensation for our named executive officers was not determined based on any pre-set "target" percentile of market. We believe that in 2011 the total compensation of our named executive officers was competitive with or exceeded the highest levels of Peer Group compensation.

In the second quarter of 2011, the compensation committee further refined our approach to reviewing market compensation data for our named executive officers and approved a set of selection criteria for determining our peer group companies as listed below, with the understanding that the criteria will be revisited as our business and market environment change. Going forward, companies must meet all or some of the following criteria to be included in our compensation peer group:

- high technology or media company;

- key talent competitor;

- minimum revenue of $4 billion; or

- minimum market capitalization of $50 billion.

This set of selection criteria led us to revise the peer group against whom we benchmark our executive compensation. We plan to use the following companies in our peer group for the 2012 executive compensation process: Amazon.com; Apple; Cisco Systems; eBay; Google; LinkedIn; Microsoft; Netflix; Oracle; salesforce.com; VMware; Yahoo!; and Zynga.

111

PX0559-117

**Table of Contents**

*Elements of Executive Compensation*

Our executive officer compensation packages generally include:

- base salary;
- performance-based cash incentives; and
- equity-based compensation in the form of RSUs or other share-based compensation.

We believe that our compensation mix supports our objective of focusing on at-risk compensation having significant financial upside based on company and individual performance. We expect to continue to emphasize equity awards because of the direct link that equity compensation provides between stockholder interests and the interests of our executive officers, thereby motivating our executive officers to focus on increasing our value over the long term.

*Base Salary.* The compensation committee believes base salaries are a necessary element of compensation in order to attract and retain highly qualified executive officers. Historically, our executive officers have received base salaries within a very narrow range that was established when we were a smaller company with cash constraints and based on our desire to maintain internal pay equity between executive officers and also relative to other key employees. As we have grown, we have gradually increased base salaries for our executive officers with the goal of bringing salaries closer to market over time. In 2011, we continued to pay executive base salaries that were below market relative to our Peer Group, both to retain the ethos of a start-up company and because of our emphasis on equity-based compensation. As noted above, in 2011, based on our Peer Group analysis, our total cash compensation for our executive officers was below the 25th percentile of the Peer Group.

The compensation committee reviews base salaries for our executive officers at least annually and may adjust them from time to time, if needed, to reflect changes in market conditions or other factors. In the first quarter of 2011, the compensation committee decided to increase the base salaries of our executive officers in order to continue to bring their salaries closer to those paid by our Peer Group companies for similar positions. Accordingly, our compensation committee increased the base salary of our CEO by $100,000 and of each other executive officer by $25,000. Following this 2011 salary increase, our executive officer salaries were still below the 25th percentile of the salaries provided by our Peer Group companies for executives in similar positions.

In the first quarter of 2012, our compensation committee discussed and approved a request by our CEO to reduce his base salary to $1 per year, effective January 1, 2013.

| Named Executive Officer | 2011 Base Salary |
|---|---|
| Mark Zuckerberg | $500,000 |
| Sheryl K. Sandberg | 300,000 |
| David A. Ebersman | 300,000 |
| Mike Schroepfer | 275,000 |
| Theodore W. Ullyot | 275,000 |

*Cash Bonuses.* Our 2011 Bonus/Retention Plan (Bonus Plan) provides variable cash incentives, payable semi-annually, that are designed to motivate our executive officers to focus on company-wide priorities and to reward them for individual results and achievements. All of our executive officers participate in the Bonus Plan.

For 2011, there were two six-month performance periods under our Bonus Plan, which we refer to as First Half 2011 and Second Half 2011. For each performance period in 2011, the compensation committee approved a set of company-wide priorities in order to focus our executive officers on key areas of performance for the period in question. The First and Second Half 2011 company priorities reflect operational and non-operational objectives established by our compensation committee, in consultation with our CEO and Chief Financial Officer. The company-wide priorities do not have specific targets associated with them for purposes of determining performance under the Bonus Plan, and our compensation committee has complete discretion to determine the level of bonus payout for each performance period.

112

**Table of Contents**

*2011 Goals and Company Performance Multipliers (Bonus Plan Pools).* Our First Half 2011 company-wide priorities were as follows: grow our user base and user engagement, improve our site quality and efficiency, expand the impact of our Platform, continue strong revenue growth, improve our Profile product, build our mobile platform, expand our partnerships, and continue our international expansion. None of these priorities were assigned any specific weighting or dollar amount of bonus. The compensation committee applied discretion in determining the company performance multiplier on a qualitative basis, taking into account our delivery of results in the areas identified by the company-wide priorities approved by the compensation committee, as well as our overall business, engineering, and product development achievements. The compensation committee also did not determine any pre-set ranges for the company performance multiplier. The First Half 2011 company performance multiplier approved by the compensation committee was 105%. In particular, the compensation committee focused on our strong user growth and revenue growth for First Half 2011.

Our Second Half 2011 company-wide priorities were as follows: grow our user base and user engagement, increase distribution of our Platform, and continue strong revenue growth. None of these priorities were assigned any specific weighting or dollar amount of bonus. The compensation committee applied discretion in determining the company performance multiplier on a qualitative basis, taking into account our delivery of results in the areas identified by the company-wide priorities approved by the compensation committee, as well as our overall business, engineering, and product development achievements. The compensation committee also did not determine any pre-set ranges for the company performance multiplier. The Second Half 2011 company performance multiplier approved by the compensation committee was 100%. The compensation committee focused on our performance in all of the areas identified by the company-wide priorities, as well as our introduction of Timeline and other new products in Second Half 2011.

*Bonus Plan Payouts.* We calculate Bonus Plan payouts to each participant using the following formula:

| Base Salary ($) | × | Individual Bonus Target (%) | × | Individual Performance Multiplier (%) | × | Company Performance Multiplier (%) | = | Individual Bonus Payout ($) |
|---|---|---|---|---|---|---|---|---|

In the first quarter of 2011, the compensation committee decided to increase individual bonus targets for each executive officer from 30% to 45% in order to continue to move bonuses closer to market rates paid by our Peer Group. Even following this bonus target increase, in 2011, our executive officer bonuses and total cash compensation was still generally below those provided by our Peer Group companies for executives in similar positions.

*Individual Performance Multiplier.* The individual performance multiplier is based upon each executive's individual performance assessment for the performance period under consideration. In line with our pay-for-performance philosophy, a higher performance assessment drives a higher individual multiplier (and vice-versa) such that it is possible for an executive with a low assessment to get less than their target bonus payout, or no bonus payout whatsoever. In 2011, potential individual performance multipliers under our Bonus Plan were 0%, 85%, 100%, 125%, 200%, or 300%. Executives meeting our expected high level of performance expectations receiving an individual bonus multiplier of 100%.

Individual performance assessments for each executive officer were determined at the discretion of the compensation committee in close consultation with our CEO and our COO (except in each case when their own performance assessment is being determined). The CEO's and COO's executive officer performance assessment recommendations were based on an overall subjective assessment of each officer's performance and no single factor was determinative in setting bonus levels, nor was the impact of any individual factor on the bonus quantifiable. We operate in a rapidly evolving and highly competitive industry and we set a high bar for performance expectations for each one of our executive officers. The compensation committee evaluates our executive officers based on their overall performance, impact and results, as well as their demonstration of strong

113

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

leadership, long-term vision, effective execution and management capabilities. First Half 2011 and Second Half 2011 payout levels and achievements and considerations for each executive were as follows:

*Mark Zuckerberg.* Mr. Zuckerberg received $220,500 for the First Half 2011 bonus, which reflected the impact of his performance in leading our product development efforts, our success in growing Facebook's global user base and developing developer and commercial relationships. Mr. Zuckerberg received $225,000 for the Second Half 2011 bonus, which reflected the impact of his leadership and product vision, which contributed to the development and launch of new products, including Open Graph and Timeline.

*Sheryl K. Sandberg.* Ms. Sandberg received $86,133 for the First Half 2011 bonus, which reflected her contribution to growing revenue, building commercial and developer relationships, growing the Facebook team and excellence in execution in all business-related matters. Ms. Sandberg received $84,375 for the Second Half 2011 bonus, which reflected her leadership in growing our revenue year over year and her strategic guidance on key policy issues both domestically and abroad.

*David A. Ebersman.* Mr. Ebersman received $86,133 for the First Half 2011 bonus, which reflected his contributions in completing our 2010 financial statements, completing our private placement financing, and preparing our financial operations for this offering. Mr. Ebersman received $84,375 for the Second Half 2011 bonus, which reflected his contributions in managing preparations for our initial public offering and his strategic leadership in building a strong financial foundation for our business.

*Mike Schroepfer.* Mr. Schroepfer received $63,000 for the First Half 2011 bonus, which reflected his contribution in developing and overseeing our engineering team, software development efforts, and engineering infrastructure. Mr. Schroepfer received $77,344 for the Second Half 2011 bonus, which reflected his strong leadership of the engineering team, resulting in development of new products for users, developers, and advertisers.

*Theodore W. Ullyot.* Mr. Ullyot received $78,750 for the First Half 2011 bonus and $123,750 for his Second Half 2011 bonus, both of which reflected his role in certain key litigation and regulatory matters involving our company.

The following table summarizes the calculations that were used in determining the cash bonus paid to each of our named executive officers:

| | Performance Period | Base Salary ($)[1] | Individual Bonus Target (%) | Individual Bonus Multiplier (%) | Company Bonus Multiplier (%) | Individual Bonus Payout ($) |
|---|---|---|---|---|---|---|
| Mark Zuckerberg | First Half 2011 | 233,333 | 45 | 200 | 105 | 220,500 |
| | Second Half 2011 | 250,000 | 45 | 200 | 100 | 225,000 |
| | | | | | | 445,500 |
| Sheryl K. Sandberg | First Half 2011 | 145,833 | 45 | 125 | 105 | 86,133 |
| | Second Half 2011 | 150,000 | 45 | 125 | 100 | 84,375 |
| | | | | | | 170,508 |
| David A. Ebersman | First Half 2011 | 145,833 | 45 | 125 | 105 | 86,133 |
| | Second Half 2011 | 150,000 | 45 | 125 | 100 | 84,375 |
| | | | | | | 170,508 |
| Mike Schroepfer | First Half 2011 | 133,333 | 45 | 100 | 105 | 63,000 |
| | Second Half 2011 | 137,500 | 45 | 125 | 100 | 77,344 |
| | | | | | | 140,344 |
| Theodore W. Ullyot | First Half 2011 | 133,333 | 45 | 125 | 105 | 78,750 |
| | Second Half 2011 | 137,500 | 45 | 200 | 100 | 123,750 |
| | | | | | | 202,500 |

(1)  Reflects actual earnings for 2011 which may differ from approved 2011 base salary due to the March 1, 2011 effective date of the salary increase.

114

**Table of Contents**

*Retention Bonus.* As part of our negotiation of his initial employment arrangement and as an inducement for Mr. Ullyot to become our Vice President and General Counsel, we agreed to pay him an annual retention bonus in the amount of $400,000 per year for each of his first five years of employment. He will continue to receive this bonus until 2013, pursuant to the terms of his amended and restated employment agreement.

*Equity Compensation.* Most of our executive officers' compensation is delivered through equity awards. We use equity compensation to align our executive officers' financial interests with those of our stockholders, to attract industry leaders of the highest caliber, and to retain them for the long term. In addition to the equity grant that each executive receives as part of his or her new hire package, the compensation committee has granted our executives additional equity awards in certain of the years after they joined. Additional equity grants for each of our executive officers are determined on a discretionary basis taking into account the following factors:

- delivering equity values that are highly competitive when compared against those our peers would grant to executives with similar responsibility;

- each executive officer's individual performance assessment, the results and contributions delivered during the year, as well as the anticipated potential future impact of each individual executive;

- the size and vesting schedule of existing equity grants in order to maximize the long-term retentive power of all additional grants; and

- the size of each executive officer's total cash compensation (base salary plus cash bonus awards at target), which is generally lower than the cash compensation for executives with similar responsibilities at our peer companies.

Based on the foregoing factors, in 2011, our compensation committee awarded each of our executive officers (other than our CEO) a grant of RSUs with a specific "initial equity value" based on an estimated total value for each grant before taking into account the deferred vesting considerations described below. The compensation committee applied discretion in determining the specific individual equity values and deferred vesting start dates. Based on these qualitative decisions, the compensation committee then calculated the exact number of RSUs to be granted by dividing this initial equity value by $20.85 per share, which was the fair value of our Class B common stock as of the end of 2010.

*Deferred Vesting of 2011 RSU Grants.* The compensation committee deferred the vesting start dates of all 2011 RSU grants made to our executive officers to a future date determined individually for each executive. As a result, the 2011 RSU grants will not begin to vest unless the recipient remains continuously employed by Facebook through future dates as described in "—2011 Grants of Plan-Based Awards Table" below. The compensation committee reviewed the size and vesting schedule for the remaining unvested portion of all outstanding equity award holdings of each of our executive officers and agreed with the recommendation of our CEO and COO (except that our COO did not participate in discussions regarding her own equity compensation) that the existing equity awards appropriately satisfied our retention and incentive goals for the immediate future for each of our executive officers. Accordingly, the additional equity awards granted in 2011 start vesting only after a significant portion of each executive's outstanding equity awards have vested, and these vesting start dates range from the fourth quarter of 2013 to the fourth quarter of 2014. These grants have four-year vesting schedules that result in vesting end dates ranging from the fourth quarter of 2017 to the fourth quarter of 2018. The compensation committee believes that these vesting schedules make the equity awards more valuable for retaining our executive officers for the long term. For more information relating to the vesting schedules of these RSU grants, see "—2011 Grants of Plan-Based Awards Table" below.

*2011 Equity Grants.* Mr. Zuckerberg did not receive any additional equity grants in 2011 because our compensation committee believed that his existing equity ownership position sufficiently aligns his interests with those of our stockholders.

115

**Table of Contents**

Our other named executive officers received the following RSU grants in 2011:

*Sheryl K. Sandberg*. Ms. Sandberg received an additional equity grant in the amount of 1,199,041 RSUs. This grant had an initial equity value of $25.0 million. These RSUs are subject to quarterly vesting based on continued employment over four years with a deferred vesting start date of October 15, 2013.

*David A. Ebersman*. Mr. Ebersman received an additional equity grant in the amount of 719,424 RSUs. This grant had an initial equity value of $15.0 million. These RSUs are subject to quarterly vesting based on continued employment over four years with a deferred vesting start date of October 15, 2014.

*Mike Schroepfer*. Mr. Schroepfer received an additional equity grant in the amount of 959,233 RSUs. This grant had an initial equity value of $20.0 million. These RSUs are subject to quarterly vesting based on continued employment over four years with a deferred vesting start date of October 15, 2013.

*Theodore W. Ullyot*. Mr. Ullyot received an additional equity grant in the amount of 239,808 RSUs. This grant had an initial equity value of $5.0 million. These RSUs are subject to quarterly vesting based on continued employment over four years with a deferred vesting start date of July 15, 2014.

### Compensation Governance

The compensation committee seeks to ensure sound executive compensation practices to adhere to our pay-for-performance philosophy while appropriately managing risk and aligning our compensation programs with long-term stockholder interests. The following practices were in effect during 2011:

- the compensation committee is comprised solely of independent directors;
- the compensation committee conducts an annual review and approval of our compensation strategy, including a review of our compensation-related risk profile to ensure that our compensation-related risks are not reasonably likely to have a material adverse effect on our company;
- the compensation committee retains discretion on bonus payouts to enable it to respond to unforeseen events and adjust bonus payouts as appropriate;
- we do not offer post-employment benefits, except in the case of certain new hires in prior years; and
- our compensation philosophy and related governance features are complemented by several specific practices that are designed to align our executive compensation with long-term stockholder interests, including the following:
  - we offer limited perquisites that are for business-related purposes or necessary for the security of our CEO; and
  - our executives participate in broad-based company-sponsored health and welfare benefits programs on the same basis as our other full-time, salaried employees.

### Post-Employment Compensation

The material terms of post-employment compensation for Ms. Sandberg and Mr. Ullyot are described below in "—Employment Agreements and Offer Letters" and "—Potential Payments upon Termination or Change in Control."

### Perquisites and Other Benefits

Consistent with the practices of many companies in our Peer Group, we provide perquisites to our named executive officers for the reasons described below.

116

**Table of Contents**

Because of the high visibility of our company we have implemented a "comprehensive security program" for Mr. Zuckerberg to address safety concerns resulting from his position as our founder, Chairman, and CEO. We require these security measures for the company's benefit because of the importance of Mr. Zuckerberg to Facebook, and we believe that the costs of this comprehensive security program are appropriate and necessary. We paid for the initial procurement, installation and maintenance of security measures for Mr. Zuckerberg's personal residence, and we pay for the annual costs of security personnel, neither of which constitutes taxable income to Mr. Zuckerberg.

Our compensation committee has also authorized our CEO and COO to use private aircraft for business purposes. This practice maximizes such executives' productive time and ensures their quick availability. In addition, Mr. Zuckerberg may use private aircraft for personal purposes in connection with his comprehensive security program. On certain occasions, Mr. Zuckerberg may be accompanied by family members or others when using private aircraft. For flights involving passengers flying for personal purposes, the aggregate incremental cost of such personal usage is reported as other compensation to Mr. Zuckerberg. The reported aggregate incremental cost is based on costs provided by the applicable charter company, and includes passenger fees, fuel, crew and catering costs. The incremental cost attributable to Mr. Zuckerberg's use of private aircraft in 2011 is disclosed in the "All Other Compensation" column in "—2011 Summary Compensation Table" below.

In addition, we have historically paid for certain of our named executive officers to receive financial, tax and estate planning advice to assist them in obtaining professional advice on managing the compensation they receive. We plan to discontinue this practice as of April 15, 2012.

### 162(m) Tax Deductibility

Section 162(m) of the Internal Revenue Code of 1986, as amended (Code), limits the amount that we may deduct from our federal income taxes for remuneration paid to our named executive officers (other than our Chief Financial Officer) to $1 million dollars per executive officer per year, unless certain requirements are met. Section 162(m) provides an exception from this deduction limitation for certain forms of "performance-based compensation," as well as for the gain recognized by covered executive officers upon the exercise of qualifying compensatory stock options. In addition, "grandfather" provisions may apply to certain compensation arrangements that were entered into by a corporation before it was publicly held. To date, all of our compensation that has been granted has been exempt from the Section 162(m) deduction limitation. While our compensation committee is mindful of the benefit to us of the full deductibility of compensation, our compensation committee believes that it should not be constrained by the requirements of Section 162(m) where those requirements would impair flexibility in compensating our executive officers in a manner that can best promote our corporate objectives. Therefore, our compensation committee has not adopted a policy that requires that all compensation be deductible. Our compensation committee intends to continue to compensate our executive officers in a manner consistent with the best interests of our company and our stockholders.

### Compensation Risk Assessment

Our management team and the compensation committee each play a role in evaluating and mitigating any risk that may exist relating to our compensation plans, practices and policies for all employees, including our named executive officers. In connection with this offering, management conducted a risk assessment of our compensation plans and practices and concluded that our compensation programs do not create risks that are reasonably likely to have a material adverse effect on the company. The compensation committee has reviewed and agrees with management's conclusion. The objective of the assessment was to identify any compensation plans or practices that may encourage employees to take unnecessary risk that could threaten the company. No such plans or practices were identified. The risk assessment process included, among other things, a review of our cash and equity incentive-based compensation plans to ensure that they are aligned with our company performance goals and the overall compensation to ensure an appropriate balance between fixed and variable pay components and between short- and long-term incentives.

117

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**2011 Summary Compensation Table**

The following table presents summary information regarding the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered to us for the year ended December 31, 2011.

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($)[1] | Stock Awards ($)[2] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Mark Zuckerberg, *CEO* | 2011 | 483,333 | 445,500 | — | 783,529[3] | 1,712,362 |
| Sheryl K. Sandberg, *Chief Operating Officer* | 2011 | 295,833 | 170,508 | 30,491,613 | — | 30,957,954 |
| David A. Ebersman, *Chief Financial Officer* | 2011 | 295,833 | 170,508 | 18,294,952 | — | 18,761,293 |
| Mike Schroepfer, *Vice President of Engineering* | 2011 | 270,833 | 140,344 | 24,393,295 | — | 24,804,472 |
| Theodore W. Ullyot, *Vice President, General Counsel and Secretary* | 2011 | 270,833 | 602,500[4] | 6,098,317 | 110,644[5] | 7,082,294 |

(1)  The amounts reported in the bonus column represent discretionary bonuses earned pursuant to our Bonus Plan. For more information about our executive officers' discretionary bonuses, see "—Compensation Discussion and Analysis—Elements of Executive Compensation—Cash Bonuses" above.

(2)  Amounts reflect the aggregate grant date fair value of the RSUs without regards to forfeitures, computed in accordance with ASC 718. The valuation assumptions used in calculating the grant date fair value of these RSUs are set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Share-based Compensation." This amount does not reflect the actual economic value realized by the named executive officer. The RSUs issued to our executive officers during 2011 provide for quarterly vesting based on continued employment over four years with a deferred vesting start date of October 15, 2013 for Ms. Sandberg, October 15, 2014 for Mr. Ebersman, October 15, 2013 for Mr. Schroepfer, and July 15, 2014 for Mr. Ullyot.

(3)  The amount reported represent approximately $692,679 for costs related to personal use of aircraft chartered in connection with his comprehensive security program and on which family and friends flew during 2011. For purposes of reporting the value of such personal usage in this table, we use costs provided by the applicable charter company, which include passenger fees, fuel, crew and catering costs. The amount reported also represents approximately $90,850 for costs related to estate and financial planning during 2011.

(4)  Consists of a discretionary bonus under our Bonus Plan as described in footnote (1) above and an annual retention bonus in the amount of $400,000. Mr. Ullyot's retention bonus is more fully described in "—Compensation Discussion and Analysis—Elements of Executive Compensation—Retention Bonus" above.

(5)  Consists of relocation reimbursements, including a related gross-up for taxes, paid to Mr. Ullyot pursuant to his employment agreement in effect as of December 31, 2011. For more information about Mr. Ullyot's amended and restated employment agreement, see "—Employment Agreements and Offer Letters" below.

118

PX0559-124

**Table of Contents**

**2011 Grants of Plan-Based Awards Table**

     The following table presents, for each of the named executive officers, information concerning each grant of an equity award made during the year ended December 31, 2011. This information supplements the information about these awards set forth in the 2011 Summary Compensation Table.

| Name | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units (#)[1] | Grant Date Fair Value of Stock Awards ($)[2][3] |
|---|---|---|---|
| Mark Zuckerberg | — | — | — |
| Sheryl K. Sandberg | 3/25/2011 | 1,199,041 | 30,491,613 |
| David A. Ebersman | 3/25/2011 | 719,424 | 18,294,952 |
| Mike Schroepfer | 3/25/2011 | 959,233 | 24,393,295 |
| Theodore W. Ullyot | 3/25/2011 | 239,808 | 6,098,317 |

(1)   These awards are subject to vesting, as described in detail in "—2011 Outstanding Equity Awards at Year-End Table" below.
(2)   Amounts reflect the grant date fair value of the RSUs without regards to forfeitures, computed in accordance with ASC 718. The valuation assumptions used in calculating the grant date fair value of these awards are set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Share-based Compensation." This amount does not reflect the actual economic value realized by the named executive officer.
(3)   The RSUs issued to our executive officers during 2011 provide for quarterly vesting based on continued employment over four years with a deferred vesting start date of October 15, 2013 for Ms. Sandberg, October 15, 2014 for Mr. Ebersman, October 15, 2013 for Mr. Schroepfer, and July 15, 2014 for Mr. Ullyot.

119

Amendment No. 2 to Registration Statement on Form S-1

Table of Contents

### 2011 Outstanding Equity Awards at Year-End Table

The following table presents, for each of the named executive officers, information regarding outstanding stock options and RSUs held as of December 31, 2011.

| | | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|---|
| Name | Grant Date[1] | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($)[2] | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#)[3] | Market Value of Shares or Units of Stock That Have Not Vested ($)[4] |
| Mark Zuckerberg | 11/8/2005 | 120,000,000[5] | — | 0.06 | 11/7/2015 | — | — |
| Sheryl K. Sandberg | 8/1/2008 | — | — | — | — | 38,122,000[6] | — |
| | 7/23/2010 | — | 3,500,000[7] | 10.39 | 7/22/2020 | — | — |
| | 10/18/2010 | — | 1,200,000[8] | 15.00[9] | 10/17/2020 | — | — |
| | 3/25/2011 | — | — | — | — | 1,199,041[10] | — |
| David A. Ebersman | 10/26/2009 | 2,025,000 | 2,475,000[11] | 3.23 | 10/25/2019 | — | — |
| | 10/26/2009 | — | — | — | — | 6,750,000[12] | — |
| | 3/25/2011 | — | — | — | — | 719,424[13] | — |
| Mike Schroepfer | 1/12/2009[14] | 1,141,160 | 570,585[15] | 1.85 | 1/11/2019 | — | — |
| | 1/12/2009 | 290,307 | 353,048[16] | 1.85 | 1/11/2019 | — | — |
| | 1/12/2009 | — | — | — | — | 1,497,775[17] | — |
| | 1/12/2009 | — | — | — | — | 1,176,825[18] | — |
| | 8/19/2009 | 543,750 | 581,250[19] | 2.95 | 8/18/2019 | — | — |
| | 8/26/2009 | — | — | — | — | 1,125,000[20] | — |
| | 8/26/2010 | — | — | — | — | 1,385,355[21] | — |
| | 3/25/2011 | — | — | — | — | 959,233[22] | — |
| Theodore W. Ullyot | 1/12/2009[23] | 1,720,331 | 1,184,990[24] | 1.85 | 1/11/2019 | — | — |
| | 1/12/2009 | — | — | — | — | 3,231,780[25] | — |
| | 2/26/2010 | — | — | — | — | 311,230[26] | — |
| | 3/25/2011 | — | — | — | — | 239,808[27] | — |

(1)  With the exception of the stock option granted to Mr. Zuckerberg described in footnote (5) below, which was granted under our 2005 Officers' Stock Plan, all of the outstanding equity awards described below were granted under our 2005 Stock Plan.

(2)  With the exception of the stock option granted to Ms. Sandberg described in footnote (9) below, this column represents the fair value of a share of Class B common stock on the date of grant, as determined by our board of directors.

(3)  RSUs granted prior to January 1, 2011 (Pre-2011 RSUs) issued to our executive officers only vest upon the satisfaction of both (i) a service-based vesting condition and (ii) a liquidity-based vesting condition. The liquidity-based vesting condition for Pre-2011 RSUs is: (a) the date that is six months after the effective date of our initial public offering; or (b) a change of control (as defined in our 2005 Stock Plan).

(4)  The market price for our Class B common stock is based on the assumed initial public offering price of the Class A common stock of $     per share, the midpoint of the price range on the cover page of this prospectus.

(5)  The shares subject to this option were fully vested as of November 1, 2010.

(6)  The service-based vesting condition was satisfied as to 57% of the total shares underlying the RSUs on April 1, 2011. Between April 1, 2011 and April 1, 2012, an additional 1.75% of the total number of shares underlying the RSUs will vest per month, subject to continued service to us through each vesting date. The service-based vesting condition will be satisfied as to all of the shares underlying the RSUs on April 1, 2013.

(7)  1/48th of the total number of shares subject to the option will vest on May 1, 2013 and the remaining shares subject to the option vest at a rate of 1/48th of the total number of shares subject to the option on each month thereafter, subject to continued service to us through each vesting date.

(8)  260,000 of the total number of shares subject to the option will vest on May 1, 2013 in equal monthly installments for a period of 48 months, and, thereafter, the remaining shares subject to the option will vest in equal monthly installments for a period of 12 months, subject to continued service to us through each vesting date.

(9)  The compensation committee set the option exercise price for this grant at $15.00 per share, a premium to the fair market value of a share of Class B common stock on the date of grant which was determined by our compensation committee to be $12.56 per share.

120

**Table of Contents**

(10)  The vesting condition will be satisfied as to 1/16th of the total shares underlying the RSUs on January 15, 2014. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares underlying the RSUs on each quarter thereafter, subject to continued service to us through each vesting date.

(11)  1/5th of the total number of shares subject to the option vested on September 8, 2010 and the remaining shares subject to the option vest at a rate of 1/60th of the total number of shares subject to the option on each month thereafter, subject to continued service to us through each vesting date.

(12)  The service-based vesting condition was satisfied as to 1/5th of the total shares underlying the RSUs on September 15, 2010. The remaining shares underlying the RSUs vest at a rate of 1/60th of the total number of shares underlying the RSUs on each month thereafter, subject to continued service to us through each vesting date.

(13)  The vesting condition will be satisfied as to 1/16th of the total shares underlying the RSUs on January 15, 2015. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares subject to the RSUs on each quarter thereafter, subject to continued service to us through each vesting date.

(14)  In June 2011, in connection with certain estate planning, Mr. Schroepfer transferred options to purchase 400,000 shares of Class B common stock to each of two family trusts.

(15)  1/5th of the total number of shares subject to the option vested on August 25, 2009 and the remaining shares subject to the option vest at a rate of 1/60th of the total number of shares subject to the option on each month thereafter, subject to continued service to us through each vesting date.

(16)  1/5th of the total number of shares subject to the option vested on October 29, 2009 and the remaining shares subject to the option vest at a rate of 1/60th of the total number of shares subject to the option on each month thereafter, subject to continued service to us through each vesting date.

(17)  The service-based vesting condition was satisfied as to 1/5th of the total shares underlying the RSUs on September 1, 2009. The remaining shares underlying the RSUs vest at a rate of 1/60th of the total number of shares underlying the RSUs on each month thereafter, subject to continued service to us through each vesting date.

(18)  The service-based vesting condition was satisfied as to 1/5th of the total shares underlying the RSUs on November 1, 2009. The remaining shares underlying the RSUs vest at a rate of 1/60th of the total number of shares underlying the RSUs on each month thereafter, subject to continued service to us through each vesting date.

(19)  1/5th of the total number of shares subject to the option vested on July 15, 2010 and the remaining shares subject to the option vest at a rate of 1/60th of the total number of shares subject to the option on each month thereafter, subject to continued service to us through each vesting date.

(20)  The service-based vesting condition was satisfied as to 1/5th of the total shares underlying the RSUs on July 15, 2010. The remaining shares underlying the RSUs vest at a rate of 1/60th of the total number of shares underlying the RSUs on each month thereafter, subject to continued service to us through each vesting date.

(21)  The vesting condition will be satisfied as to 1/16th of the total shares underlying the RSUs on August 15, 2014. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares underlying the RSUs on each quarter thereafter, subject to continued service to us through each vesting date.

(22)  The vesting condition will be satisfied as to 1/16th of the total shares underlying the RSUs on January 15, 2014. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares underlying the RSUs on each quarter thereafter, subject to continued service to us through each vesting date.

(23)  In December 2011, in connection with certain estate planning, Mr. Ullyot transferred options to purchase 400,000 shares of Class B common stock to a family trust.

(24)  1/5th of the total number of shares subject to the option vested on October 20, 2009 and the remaining shares subject to the option vest at a rate of 1/60th of the total number of shares subject to the option on each month thereafter, subject to continued service to us through each vesting date.

(25)  The service-based vesting condition was satisfied as to 1/5th of the total shares underlying the RSUs on November 1, 2009. The remaining shares underlying the RSUs vest at a rate of 1/60th of the total number of shares underlying the RSUs on each month thereafter, subject to continued service to us through each vesting date.

(26)  The service-based vesting condition will be satisfied as to 1/4th of the total shares underlying the RSUs on August 15, 2014. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares underlying the RSUs on each quarter thereafter, subject to continued service to us through each vesting date.

(27)  The vesting condition will be satisfied as to 1/16th of the total shares underlying the RSUs on October 15, 2014. The remaining shares underlying the RSUs vest at a rate of 1/16th of the total number of shares underlying the RSUs on each quarter thereafter, subject to continued service to us through each vesting date.

121

PX0559-127

Amendment No. 2 to Registration Statement on Form S-1

Table of Contents

### 2011 Option Exercises

The following table presents, for each of the named executive officers, the number of shares of our common stock acquired upon the exercises of stock options during 2011 and the aggregate value realized upon the exercises. No RSUs vested in 2011.

| | Option Awards | |
|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($)[1] |
| Mark Zuckerberg | — | — |
| Sheryl K. Sandberg | — | — |
| David A. Ebersman | — | — |
| Mike Schroepfer | 319,500 | 7,417,512 |
| Theodore W. Ullyot | 326,459 | 7,579,072 |

(1)  These options were exercised in connection with the sale by Messrs. Schroepfer and Ullyot of certain of these shares to third parties. The aggregate value realized upon the exercise of the options represents the amount by which $25.07, which was the price per share at which Messrs. Schroepfer and Ullyot sold certain of these shares, exceeded the aggregate exercise price of the options, which was $1.854 per share.

### Employment Agreements and Offer Letters

We have entered into employment agreements or offer letters with each of the named executive officers. These agreements provide for at-will employment and generally include the named executive officer's initial base salary, an indication of eligibility for an annual cash incentive award opportunity, and, in some cases, arrangements with respect to the accelerated vesting of equity awards. In addition, each of our named executive officers has executed a form of our standard confidential information and invention assignment agreement. Any potential payments and benefits due upon a termination of employment or a change in control of us are further described and quantified below in "—Potential Payments upon Termination or Change in Control."

#### *Mark Zuckerberg*

We entered into an amended and restated offer letter with Mr. Zuckerberg, our founder, Chairman, and CEO, in January 2012. This offer letter agreement has no specific term and constitutes at-will employment. Mr. Zuckerberg's current annual base salary is $500,000 and he is eligible to receive annual bonus compensation under our Bonus Plan. Effective January 1, 2013, Mr. Zuckerberg's annual base salary will be reduced to $1.

#### *Sheryl K. Sandberg*

We entered into an amended and restated employment agreement with Ms. Sandberg, our Chief Operating Officer, in January 2012. The employment agreement has no specific term and constitutes at-will employment. Ms. Sandberg's current annual base salary is $300,000, and she is eligible to receive annual bonus compensation under our Bonus Plan. In the event Ms. Sandberg is either involuntarily terminated without cause (other than as a result of death or disability) or is constructively terminated, in either case within one month prior to or six months following a change in control, she will be entitled to accelerated vesting of 100% of the unvested RSUs in her initial grant, subject to executing a release of claims. In addition, the employment agreement provides that in the event of a change in control where the RSUs are not assumed or substituted for an equivalent award, any unvested RSUs will vest immediately prior to the consummation of the change in control. The employment agreement also provides that if Ms. Sandberg is terminated without cause (other than as a result of death or disability), and other than in connection with a change in control, she will be entitled to accelerated vesting of the unvested RSUs in her initial grant in an amount equal to the number of RSUs that would have vested had her employment continued for the first half of the months remaining between the date of her termination and April 1, 2013, subject to executing a release of claims, and if she is terminated as a result of death or disability, she will be entitled to continued vesting of her unvested RSUs for one year.

122

PX0559-128

**Table of Contents**

*David A. Ebersman*

We entered into an amended and restated offer letter with Mr. Ebersman, our Chief Financial Officer, in January 2012. The offer letter agreement has no specific term and constitutes at-will employment. Mr. Ebersman's current annual base salary is $300,000, and he is eligible to receive annual bonus compensation under our Bonus Plan.

*Mike Schroepfer*

We entered into an amended and restated offer letter with Mr. Schroepfer, our Vice President, Engineering, in January 2012. The offer letter agreement has no specific term and constitutes at-will employment. Mr. Schroepfer's current annual base salary is $275,000, and he is eligible to receive annual bonus compensation under our Bonus Plan.

*Theodore W. Ullyot*

We entered into an amended and restated employment agreement with Mr. Ullyot, our Vice President, General Counsel, and Secretary, in January 2012. The employment agreement has no specific term and constitutes at-will employment. Mr. Ullyot's current annual base salary is $275,000, and he is eligible to receive annual bonus compensation under our Bonus Plan. In addition, the employment agreement provides that Mr. Ullyot is entitled to an annual retention bonus of $400,000 for the first five years of his employment (Mr. Ullyot's employment commenced in October 2008). In the event that Mr. Ullyot is either involuntarily terminated without cause (other than as a result of death or disability) or is constructively terminated, in either case within one month prior to or six months following a change in control, he will be entitled to accelerated vesting of 100% of the unvested RSUs and options in his initial grants, subject to executing a release of claims. In addition, the employment agreement provides that in the event that if, in connection with a change in control, the RSUs and shares subject to options are not assumed or substituted for equivalent awards, then any unvested RSUs or shares subject to options will vest immediately prior to the consummation of the change in control. The employment agreement also provides that if Mr. Ullyot is involuntarily terminated in the fourth or fifth years of his employment either without cause (other than as a result of death or disability) or is constructively terminated, other than in connection with a change in control, he will be entitled to accelerated vesting of 50% of the remaining unvested RSUs and shares subject to options in his initial grants, subject to executing a release of claims. The employment agreement also provides that he will be entitled to a severance payment equal to one year of base salary and his annual retention bonus if he is involuntarily terminated either without cause (other than as a result of death or disability) or is constructively terminated, in connection with a change in control or otherwise, subject to executing a release of claims.

**Potential Payments upon Termination or Change in Control**

Under the terms and conditions of their individual agreements, as described in detail above, Ms. Sandberg and Mr. Ullyot are eligible to receive certain benefits in connection with his or her termination of employment, depending on the circumstances, including following a change in control of us (such as a sale of all or substantially all of our assets or a merger involving the sale of a majority of the outstanding shares of our voting capital stock).

The actual amounts that would be paid or distributed to these named executive officers as a result of a termination event occurring in the future may be different than those presented below as many factors will affect the amount of any payments and benefits upon a termination of employment. For example, some of the factors that could affect the amounts payable include the named executive officer's base salary and the market price of our common stock. Although we have, in some instances, entered into written arrangements to provide benefits to the named executive officers in connection with a termination of employment under particular circumstances, we, or an acquirer, may mutually agree with the named executive officers on severance terms that vary from those provided in these pre-existing arrangements. For more information about the named executive officers' outstanding equity awards as of December 31, 2011, see "—2011 Outstanding Equity Awards at Year-End Table" above.

PX0559-129

Table of Contents

For purposes of the tables below as to Ms. Sandberg and Mr. Ullyot, an "involuntary termination" generally means the termination of the executive's employment by us without cause or such individual's voluntary resignation following a material adverse change in his or her compensation, responsibility, or the location of his or her services. "Cause" is generally defined to include acts of material dishonesty or gross negligence, failures to comply with our policies or agreements, or any conviction of a felony or crime of moral turpitude.

### Sheryl K. Sandberg

The table below summarizes the value of the vesting acceleration to which Ms. Sandberg would be entitled, assuming a qualifying termination as of December 31, 2011.

| | No Change in Control[3] | Change in Control[4] | |
| --- | --- | --- | --- |
| | Involuntary | No | Involuntary |
| Benefit | Termination | Termination | Termination |
| Vesting Acceleration[1][2] | $ | $ | $ |

(1)  Calculated based on the assumed initial public offering price of $      per share, the midpoint of the price range on the cover page of this prospectus.
(2)  As of December 31, 2011, the service-based vesting condition on 8,258,748 shares underlying Ms. Sandberg's initial RSUs would be accelerated if she was terminated as a result of her death or disability, which is the number of initial RSUs that would have vested if Ms. Sandberg had remained employed for an additional twelve months from the date of her death or disability. The value of this vesting acceleration was $      as of December 31, 2011 when calculated as described in footnote (1) above.
(3)  As of December 31, 2011, the service-based vesting condition on 5,463,644 shares underlying Ms. Sandberg's initial RSUs would be accelerated if she was terminated without cause, other than as a result of her death or disability, which is the number of initial RSUs that would have vested if Ms. Sandberg had remained employed for the first half of the months remaining between the date of termination and April 1, 2013.
(4)  As of December 31, 2011, 11,055,380 shares underlying Ms. Sandberg's initial RSUs would be accelerated if she was either involuntarily terminated, other than as a result of her death or disability, within one month prior to or within six months following a change in control, or her initial RSUs were not assumed or substituted for an equivalent award, such that 100% of the shares underlying Ms. Sandberg's initial RSUs would be vested.

### Theodore W. Ullyot

The table below summarizes the value of vesting acceleration and severance payments to which Mr. Ullyot would be entitled, assuming a qualifying termination as of December 31, 2011.

| | No Change in Control[2] | Change in Control[3] | |
| --- | --- | --- | --- |
| | Involuntary | No | Involuntary |
| Benefit | Termination | Termination | Termination |
| Severance | $ 675,000 | $        — | $ 675,000 |
| Vesting Acceleration[1] | | | |
| Total Value | $ | $ | $ |

(1)  Calculated based on the assumed initial public offering price of the Class A common stock of $      per share, the midpoint of the price range on the cover page of this prospectus.
(2)  As of December 31, 2011, 592,495 shares subject to Mr. Ullyot's initial option and the service-based vesting condition on 619,425 shares underlying Mr. Ullyot's initial RSUs would be accelerated if he was involuntarily terminated, other than as a result of his death or disability, which is 50% of the remaining unvested shares underlying Mr. Ullyot's initial option and RSUs. In addition, Mr. Ullyot would be entitled to severance equal to his base salary of $275,000 and his retention bonus of $400,000.
(3)  As of December 31, 2011, 1,184,990 shares subject to Mr. Ullyot's initial option and 1,238,850 shares underlying Mr. Ullyot's initial RSUs would be accelerated if he was involuntarily terminated, other than as a result of his death or disability, within one month prior to or within six months following a change in control, or if his initial option and RSUs were not assumed or substituted for an equivalent award, such that 100% of the shares underlying Mr. Ullyot's initial option and RSUs would be vested.

124

**Table of Contents**

**Employee Benefit Plans**

*2005 Stock Plan*

Our board of directors adopted our 2005 Stock Plan on January 7, 2005, which our stockholders approved on January 14, 2005. Our 2005 Stock Plan provides for the grant of incentive stock options, within the meaning of Section 422 of the Code, to our employees or any parent or subsidiary's employees, and for the grant of nonstatutory stock options to our employees, directors, and consultants and any parent, subsidiary, or affiliate corporations' employees and consultants. Stock purchase rights and restricted stock units may also be granted under the 2005 Stock Plan. We will cease issuing awards under the 2005 Stock Plan upon the implementation of the 2012 Equity Incentive Plan, which is described below. Likewise, we will not grant any additional awards under our 2005 Stock Plan following our initial public offering. Instead, we will grant equity awards under our 2012 Equity Incentive Plan.

*Share Reserve*. As of December 31, 2011, we had reserved 971,314,985 shares of our Class B common stock for issuance under our 2005 Stock Plan. As of December 31, 2011, options to purchase 427,132,796 of these shares had been exercised, options to purchase 138,539,434 of these shares remained outstanding and 52,123,367 of these shares remained available for future grant. The options outstanding as of December 31, 2011 had a weighted average exercise price of $0.83 per share. In addition, as of December 31, 2011, we had 378,772,184 RSUs outstanding under the 2005 Stock Plan. However, any outstanding awards granted under the 2005 Stock Plan will remain outstanding, subject to the terms of our 2005 Stock Plan and applicable award agreements, until they are exercised or settled or until they terminate or expire by their terms. Shares of Class B common stock available for issuance pursuant to the 2005 Stock Plan will be rolled into our 2012 Equity Incentive Plan on the date of this prospectus as further described below.

*Administration*. Our compensation committee currently administers our 2005 Stock Plan. Our compensation committee has complete discretion to make all decisions implementing the 2005 Stock Plan, including the power to (1) determine who will receive the awards, (2) determine the fair market value of the Class B common stock, (3) interpret the terms of the 2005 Stock Plan and the awards thereunder, and (4) specify the terms and conditions of such awards, such as the exercise price, the number of shares subject to each award, the vesting schedule and exercisability of awards and the form of consideration payable upon exercise.

*Stock Options*. The exercise price of incentive stock options must be at least equal to the fair market value of our Class B common stock on the date of grant and the term of the incentive stock options may not exceed ten years. With respect to incentive stock options granted to any employee who owns 10% or more of the voting power of all classes of our outstanding stock as of the grant date, the term must not exceed five years and the exercise price must equal at least 110% of the fair market value on the grant date.

When an employee ceases to provide continuous services to us (or any parent, subsidiary, or affiliate), he or she may exercise his or her incentive stock option for the period of time stated in the incentive stock option agreement, to the extent his or her incentive stock option is vested on the date of termination. Subject to the requirements of all applicable laws, rules or regulations, each nonstatutory stock option agreement shall contain provisions relating to early termination of the nonstatutory stock option based upon termination of the holder's service to us as determined by our compensation committee. In the event of a termination of a service provider for cause, all options held by such service provider will immediately terminate. In addition, any vested shares that were acquired upon the exercise of a stock option may be repurchased by us. A stock option may never be exercised later than the expiration of its term.

*Stock Purchase Rights*. The compensation committee may offer rights to purchase shares of our Class B common stock under the 2005 Stock Plan and, to the extent permitted by applicable law, shall determine the purchase price of the shares subject to each stock purchase right. The offer to purchase shares underlying this stock purchase right shall be accepted by the offeree's execution of a restricted stock purchase agreement, in the form prescribed by the compensation committee. This restricted stock purchase agreement may subject the

125

**Table of Contents**

acquired shares to a repurchase option, which we could exercise upon the voluntary or involuntary termination of the purchaser's services for any reason. In addition, in the event of a termination of a service provider for cause, vested stock purchased to a stock purchase right may also be repurchased by us.

*Restricted Stock Units*. Our 2005 Stock Plan also permits the issuance of RSUs, to our service providers. RSUs granted under our 2005 Stock Plan represent the right to receive shares of our Class B common stock or cash payment at a specified future date and may be subject to vesting requirements.

*Transferability*. Incentive stock options may not be transferred, except by will or by the laws of descent or distribution. However, the compensation committee may, in its sole discretion, grant nonstatutory stock options or RSUs that may be transferred in the event of death or disability, or to immediate family members.

*Effect of Certain Corporate Transactions*. In the event we experience a sale of all or substantially all of our assets, a merger or certain other corporate transactions including a change in control, all awards granted under the 2005 Stock Plan shall be subject to the agreement evidencing such merger or consolidation and such agreement shall provide for one or more of the following:

- the continuation or assumption of such outstanding awards by the surviving corporation or its parent;

- the substitution by the surviving corporation or its parent of equivalent awards for such outstanding awards; or

- termination of the outstanding awards upon consummation of the corporate transaction.

The 2005 Stock Plan provides for proportional adjustment of awards in the event of a stock split, stock dividend and certain other similar corporate events.

*Payment*. The compensation committee may permit any of the following methods of payments for the exercise of options:

- cash or cash equivalents;

- a promissory note having such recourse, interest, redemption and security provisions as determined by the compensation committee;

- shares of Class B common stock that the optionee already owns;

- cancellation of indebtedness; or

- an immediate sale of the option shares through a broker designated by us in a cashless exercise, provided that such a program is adopted by our compensation committee.

*Additional Provisions*. Our compensation committee has the authority to amend, suspend or terminate the 2005 Stock Plan, provided that no amendment may materially or adversely affect awards already granted without the written consent of the holder of the affected award. Our stockholders approve actions that require stockholder approval under applicable law and approve any increase in the number of shares reserved for issuance under the 2005 Stock Plan.

### *2005 Officers' Stock Plan*

On November 8, 2005, our board of directors adopted the 2005 Officers' Stock Plan (Officers' Plan). The Officers' Plan permits the issuance of shares of our Class B common stock or options to purchase such shares to certain of our employees and officers. The total number of shares of our Class B common stock that may be sold under the Officers' Plan is 120,000,000. All shares under this plan are subject to an outstanding award held by our founder, Chairman, and CEO. We will not grant any additional awards under the Officers' Plan following our initial public offering.

126

**Table of Contents**

Our board of directors, or a committee designated by the board, determines who will receive grants under this Officers' Plan and the terms and conditions of such grants. The rights or options to purchase shares under the Officers' Plan shall be nontransferable, other than by will or by the laws of descent or distribution. Pursuant to the terms of the Officers' Plan, and if required by applicable law, we must provide annual financial statements to each grantee, unless such grantee has access to equivalent information through other means. Shares issued pursuant to this Officers' Plan are subject to our right of repurchase.

### 2012 Equity Incentive Plan

Our board of directors adopted our 2012 Equity Incentive Plan, subject to stockholder approval, which plan will become effective on the date of this prospectus and will serve as the successor to our 2005 Stock Plan.

*Share Reserve.* We have reserved 25,000,000 shares of our Class A common stock for issuance under our 2012 Equity Incentive Plan plus an additional number of shares of Class A common stock equal to any shares reserved but not issued or subject to outstanding awards under our 2005 Stock Plan on the date of this prospectus, plus, on and after the date of this prospectus, (i) shares that are subject to outstanding awards under the 2005 Stock Plan which cease to be subject to such awards, (ii) shares issued under the 2005 Stock Plan which are forfeited or repurchased at their original issue price, and (iii) shares subject to awards under the 2005 Stock Plan that are used to pay the exercise price of an option or withheld to satisfy the tax withholding obligations related to any award. The number of shares reserved for issuance under our 2012 Equity Incentive Plan will increase automatically on the first day of January of each of 2013 through 2022 by a number of shares of Class A common stock equal to (i) the lesser of 2.5% of the total outstanding shares our common stock as of the immediately preceding December 31st or (ii) a number of shares determined by the board of directors. In addition, the following shares of our Class A common stock will again be available for grant or issuance under our 2012 Equity Incentive Plan:

- shares subject to options granted under our 2012 Equity Incentive Plan that cease to be subject to the option for any reason other than exercise of the option;

- shares subject to awards granted under our 2012 Equity Incentive Plan that are subsequently forfeited or repurchased by us at the original issue price;

- shares subject to awards granted under our 2012 Equity Incentive Plan that otherwise terminate without shares being issued; and

- shares surrendered, cancelled, or exchanged for cash.

*Term.* We anticipate that our 2012 Equity Incentive Plan will terminate ten years from the date our board of directors approves the plan, unless it is terminated earlier by our board of directors.

*Eligibility.* We anticipate that our 2012 Equity Incentive Plan will authorize the award of stock options, restricted stock awards, stock appreciation rights, restricted stock units, performance shares and stock bonuses. No person will be eligible to receive more than 2,500,000 shares in any calendar year under our 2012 Equity Incentive Plan other than a new employee of ours, who will be eligible to receive no more than 5,000,000 shares under the plan in the calendar year in which the employee commences employment.

*Administration.* Our 2012 Equity Incentive Plan will be administered by our compensation committee, all of the members of which are non-employee directors under applicable federal securities laws and outside directors as defined under applicable federal tax laws. The compensation committee will have the authority to construe and interpret our 2012 Equity Incentive Plan, grant awards and make all other determinations necessary or advisable for the administration of the plan. Awards under the 2012 Equity Incentive Plan may be made subject to "performance factors" and other terms in order to qualify as performance based compensation for the purposes of 162(m) of the Code.

127

**Table of Contents**

*Stock Options.* Our 2012 Equity Incentive Plan will provide for the grant of incentive stock options that qualify under Section 422 of the Code only to our employees. All awards other than incentive stock options may be granted to our employees, directors, consultants, independent contractors and advisors, provided the consultants, independent contractors and advisors render services not in connection with the offer and sale of securities in a capital-raising transaction. The exercise price of each stock option must be at least equal to the fair market value of our Class A common stock on the date of grant. The exercise price of incentive stock options granted to 10% stockholders must be at least equal to 110% of that value.

Our compensation committee may provide for options to be exercised only as they vest or to be immediately exercisable with any shares issued on exercise being subject to our right of repurchase that lapses as the shares vest. In general, options will vest over a four-year period. The maximum term of options granted under our 2012 Equity Incentive Plan is ten years.

*Restricted Stock.* A restricted stock award is an offer by us to sell shares of our Class A common stock subject to restrictions. The price (if any) of a restricted stock award will be determined by the compensation committee. Unless otherwise determined by the compensation committee at the time of award, vesting will cease on the date the participant no longer provides services to us and unvested shares will be forfeited to or repurchased by us.

*Stock Appreciation Rights.* Stock appreciation rights provide for a payment, or payments, in cash or shares of our Class A common stock, to the holder based upon the difference between the fair market value of our Class A common stock on the date of exercise and the stated exercise price up to a maximum amount of cash or number of shares. Stock appreciation rights may vest based on time or achievement of performance conditions.

*Restricted Stock Units.* An RSU is an award that covers a number of shares of our Class A common stock that may be settled upon vesting in cash, by the issuance of the underlying shares or a combination of both. These awards are subject to forfeiture prior to settlement because of termination of employment or failure to achieve certain performance conditions.

*Performance Shares.* A performance share is an award that covers a number of shares of our Class A common stock that may be settled upon achievement of the pre-established performance conditions in cash or by issuance of the underlying shares. These awards are subject to forfeiture prior to settlement because of termination of employment or failure to achieve the performance conditions.

*Stock Bonus Awards.* Stock bonus awards may be granted as additional compensation for services or performance, and therefore, may not be issued in exchange for cash.

*Additional Provisions.* Awards granted under our 2012 Equity Incentive Plan may not be transferred in any manner other than by will or by the laws of descent and distribution, or as determined by our compensation committee. Unless otherwise restricted by our compensation committee, awards that are nonstatutory stock options may be exercised during the lifetime of the optionee only by the optionee, the optionee's guardian or legal representative, or a family member of the optionee who has acquired the option by a permitted transfer. Awards that are incentive stock options may be exercised during the lifetime of the optionee only by the optionee or the optionee's guardian or legal representative. Options granted under our 2012 Equity Incentive Plan generally may be exercised for a period of three months after the termination of the optionee's service to us, except in the case of death or permanent disability, in which case the options may be exercised for up to 12 months or six months, respectively, following termination of the optionee's service to us.

If we experience a change in control transaction, outstanding awards, including any vesting provisions, may be assumed or substituted by the successor company. Outstanding awards that are not assumed or substituted will be exercisable for a period of time and will expire upon the closing of a change in control transaction. In the discretion of our compensation committee, the vesting of these awards may be accelerated upon the occurrence of these types of transactions.

128

**Table of Contents**

**Limitations on Liability and Indemnification Matters**

Our restated certificate of incorporation that will be in effect at the closing of our initial public offering contains provisions that limit the liability of our directors for monetary damages to the fullest extent permitted by the Delaware General Corporation Law. Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for:

- any breach of the director's duty of loyalty to us or our stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or

- any transaction from which the director derived an improper personal benefit.

Our restated certificate of incorporation and restated bylaws that will be in effect at the closing of our initial public offering require us to indemnify our directors, executive officers and other key employees to the maximum extent not prohibited by the Delaware General Corporation Law or any other applicable law and allow us to indemnify other officers, employees and other agents as set forth in the Delaware General Corporation Law or any other applicable law.

We have entered, and intend to continue to enter, into separate indemnification agreements with our directors, executive officers and other key employees, in addition to the indemnification provided for in our restated bylaws. These agreements, among other things, require us to indemnify our directors, executive officers and other key employees for certain expenses, including attorneys' fees, judgments, penalties fines and settlement amounts actually and reasonably incurred by a director or executive officer in any action or proceeding arising out of their services as one of our directors or executive officers, or any of our subsidiaries or any other company or enterprise to which the person provides services at our request, including liability arising out of negligence or active or passive wrongdoing by the officer or director. We believe that these charter provisions and indemnification agreements are necessary to attract and retain qualified persons such as directors, officers and key employees. We also maintain directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our restated certificate of incorporation and restated bylaws may discourage stockholders from bringing a lawsuit against our directors and officers for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions.

At present, there is no pending litigation or proceeding involving any of our directors or executive officers as to which indemnification is required or permitted, and we are not aware of any threatened litigation or proceeding that may result in a claim for indemnification.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (Securities Act), may be permitted to directors, executive officers or persons controlling us, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

129

Table of Contents

## RELATED PARTY TRANSACTIONS

In addition to the executive officer and director compensation arrangements discussed in "Executive Compensation," below we describe transactions since January 1, 2009, to which we have been a participant, in which the amount involved in the transaction exceeds or will exceed $120,000 and in which any of our directors, executive officers or holders of more than 5% of our capital stock, or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

### Amended and Restated Investors' Rights Agreement

We have entered into an investors' rights agreement with certain holders of our convertible preferred stock and common stock, including entities affiliated with Mr. Andreessen, Mr. Thiel, Mr. Breyer and Accel Partners, and DST Global Limited. Certain holders of shares of our Class A common stock and Class B common stock are entitled to rights with respect to the registration of their shares following our initial public offering under the Securities Act. For a description of these registration rights, see "Description of Capital Stock—Registration Rights."

### Series E Preferred Stock Financing

In May 2009, we sold an aggregate of 44,037,540 shares (after giving effect to a 5-for-1 stock split effected in October 2010) of our Series E preferred stock to Mail.ru Group Limited (f/k/a Digital Sky Technologies Limited), at a purchase price per share of $4.54 (after giving effect to a 5-for-1 stock split effected in October 2010), for an aggregate purchase price of approximately $200 million. Following this sale, and the purchase of additional shares from our existing stockholders, Mail.ru Group Limited and its affiliates beneficially owned more than 5% of our outstanding capital stock. We have no ongoing obligations under the Series E preferred stock purchase agreement.

### Conversion Agreement

In connection with their purchase of shares from certain existing stockholders in February 2010, Mail.ru Group Limited and DST Global Limited and their respective affiliates entered into a conversion agreement with us. The conversion agreement contains the following provisions:

#### *Lock-up*

Pursuant to this agreement, Mail.ru Group Limited and DST Global Limited and their respective affiliates have agreed not to sell shares of our capital stock, other than any shares they may sell in our initial public offering, for certain periods of time following the date of this prospectus. As to shares held by them as of the date of this prospectus, this agreement will expire as follows: (1) as to 50% of the shares six months after the effective date of the registration statement, (2) as to an additional 25% of the shares one (1) year after the effective date of the registration statement, and (3) as to an additional 25% of the shares 18 months after the effective date of the registration statement, such that all of the shares held by Mail.ru Group Limited and DST Global Limited and their respective affiliates will be freely tradable 18 months after the effective date of the registration statement.

#### *Automatic Conversion of Shares upon the Occurrence of Certain Events*

In addition, Mail.ru Group Limited and DST Global Limited have agreed, pursuant to the conversion agreement, that if either of their respective voting agreements with Mr. Zuckerberg is terminated because of his death or his failure to be actively engaged in our management, that they and their respective affiliates shall automatically convert their Class B common stock to Class A common stock pursuant to the optional conversion provision of our restated certificate of incorporation. For information regarding Mr. Zuckerberg's voting agreements, see "Description of Capital Stock—Voting Agreements."

130

Table of Contents

Mail.ru Group Limited, which was affiliated with DST Global Limited on the date the parties entered into the conversion agreement, underwent a corporate restructuring in November 2010 in connection with its initial public offering on the London Stock Exchange. Following the corporate restructuring, Mail.ru Group Limited was no longer affiliated with DST Global Limited and its affiliates DST Global II, L.P., DST Global III, L.P., DST USA Limited, and DST USA II Limited. Mail.ru Group Limited no longer beneficially owns more than 5% of our outstanding capital stock. For additional information regarding beneficial ownership of our capital stock as of December 31, 2011, see "Principal and Selling Stockholders."

**Class B Common Stock Restriction Agreement**

In 2004 and 2005, Mr. Zuckerberg's father provided us with initial working capital. In consideration for this assistance, we issued him an option to purchase 2,000,000 shares, as adjusted for splits and reclassifications, of our Class B common stock. The option initially expired by its terms one year following the date of grant without having been exercised. Our board of directors (without Mr. Zuckerberg) determined that the option did not reflect the intent of the parties with respect to the equity to be issued to him in consideration of the financial assistance and a release from potential related claims. Accordingly, in December 2009, we issued an aggregate of 2,000,000 shares of our Class B common stock to Glate LLC, an entity owned by Mr. Zuckerberg's father. We have no ongoing obligations under this agreement.

**Right of First Refusal**

Pursuant to our bylaws and certain agreements with our stockholders, we or our assignees have the right to purchase shares of our capital stock, including shares of Class B common stock issued under our 2005 Stock Plan, which these stockholders propose to sell to other parties. These rights are customary for venture capital-backed companies in our industry and will terminate upon the completion of our initial public offering. In 2009 and 2010, in connection with proposed sales by certain stockholders, we assigned our right to purchase 28,403,845 shares of our Class B common stock to certain entities affiliated with Mail.ru Group Limited and DST Global Limited. Mail.ru Group Limited and DST Global Limited purchased 27,182,595 shares of our Class B common stock in connection with such assignments. For additional information regarding beneficial ownership of our capital stock as of December 31, 2011, see "Principal and Selling Stockholders."

**Class A Common Stock Financing**

In December 2010, we sold an aggregate of 2,398,081 shares of our Class A common stock to DST Global Limited at a purchase price per share of $20.85, for an aggregate purchase price of approximately $50 million.

**Equity Awards, Employment Agreements and Offer Letters**

We have granted stock options or RSUs to our executive officers and our directors. For a description of these equity awards, see "Executive Compensation—2011 Outstanding Equity Awards at Year-End Table" and "Management—Director Compensation."

We have entered into employment agreements or offer letters with each of our named executive officers. For more information regarding these agreements, see "Executive Compensation—Employment Agreements and Offer Letters."

**Employment Arrangements With Immediate Family Members of Our Executive Officers and Directors**

Molly Graham, the daughter of Donald E. Graham, a member of our board of directors, is employed by us. During 2009, 2010, and 2011, Ms. Graham had total cash compensation, including base salary, bonus and other compensation, of $98,058, $133,620, and $189,168.

Randi Zuckerberg, the sister of Mark Zuckerberg, our founder, Chairman, and CEO, was employed by us until August 2011. During 2009, 2010, and 2011, Ms. Zuckerberg had total cash compensation, including base salary, bonus and other compensation, of $128,750, $139,578, and $89,536.

131

**Table of Contents**

The compensation levels of Mmes. Graham and Zuckerberg were based on reference to external market practice of similar positions or internal pay equity when compared to the compensation paid to employees in similar positions that were not related to our executive officers and directors. They were also eligible for equity awards on the same general terms and conditions as applicable to other employees in similar positions who were not related to our executive officers and directors.

#### Indemnification Agreements

We have entered into indemnification agreements with each of our directors, executive officers and other key employees. The indemnification agreements and our amended and restated bylaws will require us to indemnify our directors to the fullest extent permitted by Delaware law. For more information regarding these agreements, see "Executive Compensation—Limitations on Liability and Indemnification Matters."

#### Commercial Agreements

During 2009, 2010, and 2011, The Washington Post Company and its related companies purchased $0.6 million, $4.8 million, and $4.2 million, respectively, of advertisements on our website. Mr. Graham, a member of our board of directors, is the Chief Executive Officer of The Washington Post Company. The purchases by The Washington Post Company and its related entities were made in the ordinary course of business pursuant to our standard online terms and conditions and were all made through our self-service ad system. In addition, Social Code LLC, a wholly-owned subsidiary of The Washington Post Company, is an advertising agency that has clients that do business with us.

During 2009, 2010, and 2011, Netflix purchased $1.9 million, $1.6 million, and $3.8 million, respectively, of advertisements on our website. Mr. Hastings, a member of our board of directors, is the Chief Executive Officer of Netflix. The purchases by Netflix were made in the ordinary course of business pursuant to our standard terms and conditions.

During 2010 and 2011, we made payments to GMG Lifestyle Entertainment Inc. (GMG) of $0.9 million and $0.7 million, respectively, for certain sales and marketing services. Rob Goldberg, the founder and Chief Executive Officer of GMG, is the brother-in-law of Ms. Sandberg, our Chief Operating Officer. The GMG relationship was entered into in the ordinary course of business pursuant to a negotiated agreement after we evaluated other commercial alternatives and concluded that GMG was the most suitable alternative. Ms. Sandberg did not participate in the decision to negotiate with GMG or in the negotiations themselves. GMG was acquired by The Topps Company in July 2011.

#### Review, Approval or Ratification of Transactions with Related Parties

Our policy and the charter of our audit committee will require that any transaction with a related party that must be reported under applicable rules of the SEC must be reviewed and approved or ratified by our audit committee, unless the related party is, or is associated with, a member of that committee, in which event the transaction must be reviewed and approved by our governance committee. These committees have not adopted policies or procedures for review of, or standards for approval of, these transactions.

132

**Table of Contents**

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of December 31, 2011, and as adjusted to reflect the sale of Class A common stock offered by us and the selling stockholders in our initial public offering, for:

- each stockholder known by us to be the beneficial owner of more than 5% of our outstanding shares of Class A common stock or Class B common stock;

- each of our directors;

- each of our named executive officers;

- all of our directors and executive officers as a group; and

- each selling stockholder.

We have determined beneficial ownership in accordance with the rules of the SEC. Except as indicated by the footnotes below, we believe, based on the information furnished to us, that the persons and entities named in the table below have sole voting and investment power with respect to all shares of Class A common stock or Class B common stock that they beneficially own, subject to applicable community property laws.

Applicable percentage ownership is based on 117,097,143 shares of Class A common stock and 1,758,902,390 shares of Class B common stock outstanding at December 31, 2011, assuming conversion of all outstanding shares of preferred stock in to an aggregate of 545,551,391 shares of our Class B common stock. For purposes of computing percentage ownership after our initial public offering, we have assumed that           shares of Class A common stock will be issued by us in our initial public offering, that 120,000,000 shares of Class B common stock will be issued by us in connection with the exercise of an outstanding stock option by Mark Zuckerberg, our founder, Chairman, and CEO, and that certain of our existing stockholders will convert an aggregate of           shares of our Class B common stock into an equivalent number of shares of our Class A common stock in connection with our initial public offering. In computing the number of shares of common stock beneficially owned by a person and the percentage ownership of that person, we deemed to be outstanding all shares of common stock subject to options, RSUs or other convertible securities held by that person or entity that are currently exercisable or releasable or that will become exercisable or releasable within 60 days of December 31, 2011. We did not deem these shares outstanding, however, for the purpose of computing the percentage ownership of any other person. Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o Facebook, Inc., 1601 Willow Road, Menlo Park, California 94025.

133

PX0559-139

Table of Contents

| Name of Beneficial Owner | Shares Beneficially Owned Prior to this Offering | | | | % of Total Voting Power Before Our Initial Public Offering(2) | Number of Shares Being Offered | Shares Beneficially Owned After this Offering | | | | % of Total Voting Power After Our Initial Public Offering(2) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Class A | | Class B | | | | Class A | | Class B | | |
| | Shares | % | Shares(1) | % | | | Shares | % | Shares | % | |
| **Named Executive Officers and Directors:** | | | | | | | | | | | |
| Mark Zuckerberg(3) | — | | 533,801,850 | 28.4 | 28.2 | (4) | | | | | |
| Shares subject to voting proxy(5) | 42,245,203 | 36.1 | 538,332,591 | 30.6 | 30.6 | | | | | | |
| Total(3)(5) | 42,245,203 | 36.1 | 1,072,134,441 | 57.1 | 56.9 | | | | | | |
| Sheryl K. Sandberg(6) | — | — | 1,899,986 | * | * | | | | | | |
| David A. Ebersman(7) | — | — | 2,174,999 | * | * | | | | | | |
| Mike Schroepfer(8) | — | — | 2,101,870 | * | * | | | | | | |
| Theodore W. Ullyot(9) | — | — | 1,863,656 | * | * | | | | | | |
| Marc L. Andreessen(10) | — | — | 6,607,131 | * | * | | | | | | |
| Erskine B. Bowles(11) | — | — | — | * | * | | | | | | |
| James W. Breyer(12) | — | — | 201,378,349 | 11.4 | 11.4 | | | | | | |
| Donald E. Graham(13) | — | — | — | * | * | | | | | | |
| Reed Hastings(14) | — | — | — | * | * | | | | | | |
| Peter A. Thiel(15) | — | — | 44,724,100 | 2.5 | 2.5 | | | | | | |
| All executive officers and directors as a group (12 persons)(16) | 42,245,203 | 36.1 | 1,322,341,423 | 70.2 | 69.9 | | | | | | |
| **Other 5% Stockholders:** | | | | | | | | | | | |
| Entities affiliated with Accel Partners(12) | — | — | 201,378,349 | 11.4 | 11.4 | | | | | | |
| Entities affiliated with DST Global Limited(17) | 36,711,928 | 31.4 | 94,567,945 | 5.4 | 5.5 | | | | | | |
| Dustin Moskovitz(18) | — | — | 133,763,645 | 7.6 | 7.6 | | | | | | |
| Entities affiliated with Goldman Sachs(19) | 65,947,241 | 56.3 | — | * | * | | | | | | |
| T. Rowe Price Associates, Inc.(20) | 6,033,630 | 5.2 | 12,158,743 | * | * | | | | | | |
| **Other Selling Stockholders:** | | | | | | | | | | | |

\*    Less than 1%.

(1) There are currently no RSUs which will become releasable within 60 days of December 31, 2011 to the benefit of the individuals and entities listed in the table above.

(2) Percentage of total voting power represents voting power with respect to all shares of our Class A and Class B common stock, as a single class. The holders of our Class B common stock are entitled to ten votes per share, and holders of our Class A common stock are entitled to one vote per share. For more information about the voting rights of our Class A and Class B common stock, see "Description of Capital Stock—Common Stock."

(3) Consists of (i) 407,265 shares of Class B common stock held of record by Mr. Zuckerberg; (ii) 3,642,323 shares of Class B common stock held of record by Mark Zuckerberg, Trustee of The Mark Zuckerberg 2008 Annuity Trust dated March 13, 2008; (iii) 409,752,262 shares of Class B common stock held of record by Mark Zuckerberg, Trustee of The Mark Zuckerberg Trust dated July 7, 2006; and (iv) 120,000,000 shares of Class B common stock issuable upon exercise of options exercisable within 60 days of December 31, 2011.

(4) We expect that Mark Zuckerberg, our founder, Chairman and CEO, will offer and sell          shares in our initial public offering. We expect that substantially all of the net proceeds Mr. Zuckerberg will receive upon such sale will be used to satisfy taxes that he will incur upon the exercise of an outstanding stock option to purchase 120,000,000 shares of our Class B common stock.

(5) Consists of shares of our Class A and Class B common stock held by other stockholders over which, except under limited circumstances, Mr. Zuckerberg holds an irrevocable proxy, pursuant to voting agreements between Mr. Zuckerberg, us and such stockholders, including certain of our directors and holders of more than 5% of our capital stock with respect to certain matters, as indicated in the footnotes below. We do not believe that the parties to these voting agreements constitute a "group" under Section 13 of the Securities Exchange Act of 1934, as amended, as Mr. Zuckerberg exercises voting control over these shares. For more information about the voting agreements, see "Description of Capital Stock—Voting Agreements."

(6) Consists of 1,899,986 shares of Class B common stock held of record by Sheryl K. Sandberg, Trustee of the Sheryl K. Sandberg 2008 Annuity Trust dated April 15, 2008. Ms. Sandberg also holds 39,321,041 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

(7) Consists of 2,174,999 shares of Class B common stock issuable upon exercise of options exercisable within 60 days of December 31, 2011. Mr. Ebersman also holds 7,469,424 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

(8) Consists of 2,101,870 shares of Class B common stock issuable upon exercise of options exercisable within 60 days of December 31, 2011. Mr. Schroepfer also holds 6,144,188 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

(9) Consists of (i) 35,600 shares of Class B common stock held of record by Mr. Ullyot; and (ii) 1,828,056 shares of Class B common stock issuable upon exercise of options exercisable within 60 days of December 31, 2011. Mr. Ullyot also holds 3,782,818 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

134

**Table of Contents**

(10)  Consists of 3,571,431 shares of Class B common stock held of record by Andreessen Horowitz Fund II, L.P., as nominee (AH Fund), and 3,035,700 shares of Class B common stock held of record by FBAH, L.P (FBAH). AH Equity Partners I, L L C (AHEP) is the general partner of AH Fund and has sole voting and investment power over the securities held by AH Fund and FBAH. Mr. Andreessen is one of the Managing Members of AHEP, and, therefore, may be deemed to share voting and investment power over the securities held in AH Fund and FBAH. The address of AHEP, AH Fund, and FBAH is 2865 Sand Hill Road, Suite 101, Menlo Park, California 94025. Mr. Andreessen also holds 5,247,490 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

(11)  Mr. Bowles holds 20,000 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

(12)  Consists of (i) 11,703,132 shares of Class B common stock held of record by James W. Breyer, Trustee of James W. Breyer 2005 Trust dated March 25, 2005 (Breyer 2005 Trust); (ii) 149,527,730 shares of Class B common stock held of record by Accel IX L.P. (Accel IX); (iii) 15,931,653 shares of Class B common stock held of record by Accel IX Strategic Partners L.P. (Accel SP); (iv) 13,939,214 shares of Class B common stock held of record Accel Investors 2005 L.L.C. (Accel 2005); (v) 9,949,820 shares of Class B common stock held of record by Accel Growth Fund L.P. (Accel Growth); (vi) 194,230 shares of Class B common stock held of record by Accel Growth Fund Strategic Partners L.P. (Accel Growth SP); and (vii) 132,570 shares of Class B common stock held of record by Accel Growth Fund Investors 2009 L.L.C. (Accel Growth 2009). We have been advised by the holders of record that in connection with our initial public offering 11,548,527 of the shares of our Class B common stock held of record by the Breyer 2005 Trust, 149,527,730 of the shares of our Class B common stock held of record by Accel IX, 15,931,653 of the shares of our Class B common stock held of record by Accel SP, and 13,939,214 of the shares of our Class B common stock held of record by Accel 2005 will be converted into an equivalent number of shares of our Class A common stock. Accel IX Associates L.L.C. (A9A) is the general partner of Accel IX and Accel SP and has sole voting and investment power over the shares held by these limited partnerships. Accel Growth Fund Associates L.L.C. (AGFA) is the general partner of Accel Growth and Accel Growth SP and has sole voting and investment power over the shares held by these limited partnerships. Mr. Breyer is one of the managing members of A9A, AGFA, Accel 2005, and Accel Growth 2009, and, therefore, may be deemed to share voting and investment power over the securities held by these entities. The address of A9A and AGFA and their affiliated entities is 428 University Avenue, Palo Alto, California 94301. Mr. Breyer is trustee of the Breyer 2005 Trust. 10,431,225 shares of Class B common stock are subject to a voting agreement in favor of Mr. Zuckerberg referred to in footnote (5) above.

(13)  Mr. Graham holds 1,000,000 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

(14)  Mr. Hastings holds 20,000 RSUs which are subject to vesting conditions not expected to occur within 60 days of December 31, 2011.

(15)  Consists of (i) 32,875,670 shares of Class B common stock held of record by Rivendell One LLC (Rivendell); (ii) 5,978,140 shares of Class B common stock held of record by The Founders Fund, LP (FF); (iii) 740,960 shares of Class B common stock held of record by The Founders Fund II, LP (FF II); (iv) 36,640 shares of Class B common stock held of record by The Founders Fund II Principals Fund, LP (FFPF); (v) 22,400 shares of Class B common stock held of record by The Founders Fund II Entrepreneurs Fund, LP (FFEF); and (vi) 5,070,290 shares of Class B common stock held of record by Lembas, LLC (Lembas). We have been advised by Rivendell that in connection with our initial public offering all of the shares of our Class B common stock held of record by Rivendell will be converted into an equivalent number of shares of our Class A common stock. Mr. Thiel is the beneficial owner of Rivendell and has voting and investment power over the securities held by Rivendell. Mr. Thiel is a managing member of the general partner of each of FF, FF II, FFPF, and FFEF, and, therefore, may be deemed to have voting and investment power over the shares held by these entities. Mr. Thiel is the managing member of Lembas and has voting and investment power over the securities held by Lembas. 111,884 shares of Class B common stock are subject to a voting agreement in favor of Mr. Zuckerberg referred to in footnote (5) above.

(16)  Consists of (i) 42,245,203 shares of Class A common stock; (ii) 1,196,236,498 shares of Class B common stock; and (iii) 126,104,925 shares of Class B common stock issuable upon exercise of options exercisable within 60 days of December 31, 2011.

(17)  Consists of (i) 17,213,540 shares of Class B common stock held of record by DST Global Limited; (ii) 5,995,203 shares of Class A common stock held of record by DST Global II, L.P.; (iii) 1,697,217 shares of Class A common stock held of record by DST Global III, L.P.; (iv) 3,945,582 shares of Class A common stock and 24,290,447 shares of Class B common stock held of record by DST USA Limited; and (v) 25,073,926 shares of Class A common stock and 53,063,958 shares of Class B common stock held of record by DST USA II Limited. Yuri Milner holds ultimate voting and investment power over the securities held by these entities. The address of DST Global Limited, DST Global II, L.P., DST Global III, L.P., DST USA Limited, and DST USA II Limited is c/o Tulloch & Co., 4 Hill Street, London W1J 5NE, United Kingdom. 36,711,928 shares of Class A common stock and 94,567,945 shares of Class B common stock are subject to a voting agreement in favor of Mr. Zuckerberg referred to in footnote (5) above. DST Global Limited and its affiliates are no longer affiliated with Mail.ru Group Limited (f/k/a Digital Sky Technologies Limited). For more information, see "Related Party Transactions—Conversion Agreement."

(18)  Consists of (i) 239,165 shares of Class B common stock held of record by Dustin A. Moskovitz, Trustee of The Justin M. Rosenstein 2009 Trust, a trust established pursuant to the Justin M. Rosenstein 2009 Trust Agreement; (ii) 114,256,629 shares of Class B common stock held of record by Dustin Moskovitz, Trustee of The Dustin A. Moskovitz Trust dated December 27, 2005; (iii) 14,404,516 shares of Class B common stock held of record by Dustin Moskovitz, Trustee of The Dustin Moskovitz 2008 Annuity Trust dated March 10, 2008; and (iv) 4,863,335 shares of Class B common stock held of record by Justin M. Rosenstein, Trustee of The Dustin A. Moskovitz 2009 Trust, a trust established pursuant to the Dustin A. Moskovitz 2009 Trust Agreement dated January 1, 2009. Mr. Moskovitz is trustee or beneficiary of The Justin M. Rosenstein 2009 Trust, The Dustin A. Moskovitz Trust dated December 27, 2005, The Dustin Moskovitz 2008 Annuity Trust dated March 10, 2008, and The Dustin A. Moskovitz 2009 Trust. The address of Mr. Moskovitz is P.O. Box 2929, San Francisco, California 94126. 133,763,645 shares of Class B common stock are subject to a voting agreement in favor of Mr. Zuckerberg referred to in footnote (5) above.

135

**Table of Contents**

(19)    Consists of (i) 14,214,807 shares of Class A common stock held of record by The Goldman Sachs Group, Inc.; (ii) 2,598,652 shares of Class A common stock held of record by Goldman Sachs Investment Partners Master Fund, L.P.; (iii) 1,010,587 shares of Class A common stock held of record by Goldman Sachs Investment Partners Private Opportunities Holdings, L.P.; and (iv) 48,123,195 shares of Class A common stock held of record by FBDC Investors Offshore Holdings, L.P. ((i)-(iv), collectively, the Goldman Sachs Limited Partnerships). Affiliates of The Goldman Sachs Group, Inc. are the general partners of the Goldman Sachs Limited Partnerships. GS Investment Strategies, LLC is the investment manager of the Goldman Sachs Limited Partnerships. GS Investment Strategies, LLC is a wholly-owned subsidiary of The Goldman Sachs Group, Inc. Decisions regarding the voting or disposition of shares held by The Goldman Sachs Group, Inc. are made by the management and various other professionals within The Goldman Sachs Group, Inc. GS Investment Strategies, LLC exercises voting and investment power with respect to the shares held by the Goldman Sachs Limited Partnerships. The address of The Goldman Sachs Group, Inc., GS Investment Strategies, LLC, and the Goldman Sachs Limited Partnerships is 200 West Street, New York, NY 10282.

(20)    Consists of (i) 6,033,630 shares of Class A common stock held of record by 81 funds and accounts advised or sub-advised by T. Rowe Price Associates, Inc.; and (ii) 12,158,743 shares of Class B common stock held of record by 77 funds and accounts advised or sub-advised by T. Rowe Price Associates, Inc. T. Rowe Price Associates, Inc. serves as investment adviser with power to direct investments and/or sole power to vote the securities owned by these funds and accounts. The T. Rowe Price Proxy Committee develops the firm's positions on all major proxy voting issues, creates guidelines, and oversees the voting process. Ultimately, the T. Rowe Price portfolio managers of the funds and accounts decide how to vote on the proxy proposals of companies in their portfolios. For purposes of reporting requirements of the Securities Exchange Act of 1934, T. Rowe Price Associates, Inc. may be deemed to be the beneficial owner of all the shares listed. T. Rowe Price Associates, Inc. is the wholly owned subsidiary of T. Rowe Price Group, Inc., which is a publicly traded financial services holding company. The address for T. Rowe Price Associates, Inc. is 100 East Pratt Street, Baltimore, MD 21202. T. Rowe Price Investment Services, Inc. (TRPIS), a registered broker-dealer, is a subsidiary of T. Rowe Price Associates, Inc. TRPIS was formed primarily for the limited purpose of acting as the principal underwriter of shares of the funds in the T. Rowe Price fund family. TRPIS does not engage in underwriting or market-making activities involving individual securities.

136

**Table of Contents**

## DESCRIPTION OF CAPITAL STOCK

Upon the completion of our initial public offering, our authorized capital stock will consist of        shares of Class A common stock, $0.000006 par value per share,        shares of Class B common stock, $0.000006 par value per share, and shares of undesignated preferred stock, $0.000006 par value per share. A description of the material terms and provisions of our restated certificate of incorporation and restated bylaws that will be in effect at the closing our initial public offering and affecting the rights of holders of our capital stock is set forth below. The description is intended as a summary, and is qualified in its entirety by reference to the form of our restated certificate of incorporation and the form of our restated bylaws to be adopted in connection with our initial public offering that will be filed with the registration statement relating to this prospectus.

As of December 31, 2011, and after giving effect to the automatic conversion of all of our outstanding preferred stock into Class B common stock in connection with our initial public offering, there were outstanding:

- 117,097,143 shares of our Class A common stock held by approximately 110 stockholders;

- 1,758,902,390 shares of our Class B common stock held by approximately 1,070 stockholders;

- 258,539,434 shares issuable upon exercise of outstanding stock options; and

- 378,772,184 shares subject to outstanding restricted stock units (RSUs).

### Common Stock

#### *Dividend Rights*

Subject to preferences that may apply to shares of preferred stock outstanding at the time, the holders of outstanding shares of our common stock are entitled to receive dividends out of funds legally available if our board of directors, in its discretion, determines to issue dividends and only then at the times and in the amounts that our board of directors may determine. See "Dividend Policy" for more information.

#### *Voting Rights*

The holders of our Class B common stock are entitled to ten votes per share, and holders of our Class A common stock are entitled to one vote per share. The holders of our Class A common stock and Class B common stock vote together as a single class, unless otherwise required by law. Delaware law could require either holders of our Class A common stock or our Class B common stock to vote separately as a single class in the following circumstances:

- if we were to seek to amend our certificate of incorporation to increase the authorized number of shares of a class of stock, or to increase or decrease the par value of a class of stock, then that class would be required to vote separately to approve the proposed amendment; and

- if we were to seek to amend our certificate of incorporation in a manner that alters or changes the powers, preferences or special rights of a class of stock in a manner that affected its holders adversely, then that class would be required to vote separately to approve the proposed amendment.

Stockholders do not have the ability to cumulate votes for the election of directors. Our restated certificate of incorporation and restated bylaws that will be in effect at the closing of our initial public offering will provide for a classified board of directors consisting of three classes of approximately equal size, each serving staggered three-year terms, when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock. Our directors will be assigned by the then-current board of directors to a class when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock.

137

**Table of Contents**

### No Preemptive or Similar Rights

Our common stock is not entitled to preemptive rights and is not subject to conversion, redemption or sinking fund provisions.

### Right to Receive Liquidation Distributions

Upon our dissolution, liquidation or winding-up, the assets legally available for distribution to our stockholders are distributable ratably among the holders of our common stock, subject to prior satisfaction of all outstanding debt and liabilities and the preferential rights and payment of liquidation preferences, if any, on any outstanding shares of preferred stock.

### Conversion

The outstanding shares of Class B common stock are convertible at any time as follows: (1) at the option of the holder, a share of Class B common stock may be converted at any time into one share of Class A common stock or (2) upon the election of the holders of a majority of the then outstanding shares of Class B common stock, all outstanding shares of Class B common stock may be converted into shares of Class A common stock. In addition, each share of Class B common stock will convert automatically into one share of Class A common stock upon any transfer, whether or not for value, which occurs after the closing of our initial public offering, except for certain transfers described in our restated certificate of incorporation, including transfers to family members, trusts solely for the benefit of the stockholder or their family members, and partnerships, corporations, and other entities exclusively owned by the stockholder or their family members. Once converted or transferred and converted into Class A common stock, the Class B common stock will not be reissued.

## Preferred Stock

Upon the closing of our initial public offering, no shares of preferred stock will be outstanding, but we will be authorized, subject to limitations prescribed by Delaware law, to issue preferred stock in one or more series, to establish from time to time the number of shares to be included in each series and to fix the designation, powers, preferences and rights of the shares of each series and any of its qualifications, limitations or restrictions. Our board of directors also can increase or decrease the number of shares of any series, but not below the number of shares of that series then outstanding, without any further vote or action by our stockholders. Our board of directors may authorize the issuance of preferred stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of the common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring or preventing a change in control of our company and may adversely affect the market price of our Class A common stock and the voting and other rights of the holders of common stock. We have no current plan to issue any shares of preferred stock.

## Options

As of December 31, 2011, we had options to purchase 258,539,434 shares of our Class B common stock outstanding pursuant to our 2005 Stock Plan and the Officers' Plan.

## RSUs

As of December 31, 2011, we had 378,772,184 shares of Class B common stock subject to RSUs outstanding pursuant to our 2005 Stock Plan.

138

Table of Contents

**Voting Agreements**

Our CEO has entered into voting agreements with certain of our stockholders, which voting agreements will remain in effect after the completion of this offering. These voting agreements cover approximately 42,245,203 shares of Class A common stock and 485,199,231 shares of Class B common stock, which will represent approximately     % of the outstanding voting power of our capital stock after our initial public offering.

Under one type of voting agreement (which is filed as an exhibit to the registration statement of which this prospectus is a part as a "Type 1" Holder Voting Agreement), stockholders agreed to vote all of their shares as directed by, and granted an irrevocable proxy to, Mr. Zuckerberg at his discretion on all matters to be voted upon by stockholders. The following individuals and entities hold shares of our capital stock that are subject to this type of voting agreement: ARPI 2, LLC; Matt Cohler and certain affiliated entities; Gregory Druckman; Michael Druckman; Richard Druckman; Steven Druckman; The Founders Fund, LP; Glynn Partners; Hommels Holding GmbH; Adam Moskovitz; Dustin Moskovitz and certain affiliated entities; Nancy and Richard Moskovitz and certain affiliated entities; Sean Parker and certain affiliated entities; Cara & Robert Scudder; Silicon Valley Community Foundation; certain entities affiliated with Technology Crossover Ventures; Valiant Capital Opportunities, LLC; and VHPI 2, LLC.

Under a second type of voting agreement (which is filed as an exhibit to the registration statement of which this prospectus is a part as a "Type 2" Holder Voting Agreement), Mr. Zuckerberg has the authority (and irrevocable proxy) to vote these investors' shares at his discretion on all matters to be voted upon by stockholders, except for issuances of capital stock by us in excess of 20% of our then outstanding stock and matters which would disproportionately, materially and adversely affect such stockholder. This type of voting agreement also provides that the investor shall not: (1) acquire any ownership of any of our assets or business, (2) make any solicitation of proxies with respect to the voting of any of our securities, (3) form any "group" within the meaning of Section 13(d) of the Exchange Act, (4) nominate any person as director who is not nominated by the then incumbent directors, propose any matter to be voted upon by our stockholders or initiate or vote in favor of or call for a special meeting of the stockholders, or (5) publicly announce an intention to do any of the above. Following the completion of our initial public offering, a transferee of the shares currently subject to this type of voting agreement shall no longer be subject to the terms of the voting agreement if we have a two-class capital stock structure and a party to the agreement is transferring Class B common stock that, upon completion of the transfer, becomes Class A common stock or is transferring Class A common stock. DST Global Limited and certain affiliated entities and Mail.ru Group Limited hold shares of our capital stock that are subject to this type of voting agreement.

The third type of voting agreement (which is filed as an exhibit to the registration statement of which this prospectus is a part as a "Type 3" Holder Voting Agreement) contains the same substantive provisions as the second type of agreement. For some of the parties to this type of voting agreement, the provisions of the agreement do not apply to shares held by the investors prior to their secondary purchases. The following entities hold shares of our capital stock that are subject to this type of voting agreement: certain entities affiliated with Accel Partners and James W. Breyer, a member of our board of directors; certain entities affiliated with Elevation Partners; Felarmon Group Limited; certain entities affiliated with Greylock Partners; Li Ka Shing (Canada) Foundation; certain entities affiliated with Meritech Capital Partners; certain entities affiliated with Anand Rajaraman; Tiger Global FB Holdings, LLC; and certain entities affiliated with Venkatesh Harinarayan.

With the exception of up to 232,542,558 shares of Class B common stock, which will remain subject to the provisions of a voting agreement until Mr. Zuckerberg's death, if an investor sells, transfers, assigns, pledges or otherwise disposes of or encumbers the shares subject to these voting agreements after the completion of our initial public offering, the shares would no longer be subject to the provisions of the voting agreement. Voting agreements covering 42,245,203 shares our Class A common stock and 215,919,085 shares of our Class B common stock will terminate if Mr. Zuckerberg is no longer a director, no longer devoting substantially all of his business efforts to our company, and he holds less than 210,758,960 shares of our capital stock.

We do not believe that the parties to these voting agreements constitute a "group" under Section 13 of the Exchange Act, as Mr. Zuckerberg exercises voting control over the shares held by these stockholders.

139

PX0559-145

**Table of Contents**

**Registration Rights**

After our initial public offering, holders of up to approximately           shares of our common stock outstanding will be entitled to certain rights with respect to registration of such shares under the Securities Act. These shares are referred to as registrable securities. The holders of these registrable securities possess registration rights pursuant to the terms of our Sixth Amended and Restated Investors' Rights Agreement dated as of December 27, 2010 (IRA) and are described in additional detail below. We, along with entities affiliated with Mr. Andreessen, Mr. Thiel, Mr. Breyer and Accel Partners, and DST Global Limited, as well as certain other parties, are parties to the IRA. We originally entered into the IRA in connection with our Series A financing in 2005 and it was amended in each of our future preferred stock financing rounds. The IRA was most recently amended in December 2010.

*Demand Registration Rights*

Under our IRA, upon the written request of the holders of a majority of the registrable securities then outstanding that we file a registration statement under the Securities Act with an anticipated aggregate price to the public of at least $10 million, we will be obligated to use our commercially reasonable efforts to register the sale of all registrable securities that holders may request in writing to be registered within 20 days of the mailing of a notice by us to all holders of such registration. The demand registration rights may not be exercised until six months after our initial public offering. We are required to effect no more than three registration statements which are declared or ordered effective. We may postpone the filing of a registration statement for up to 120 days once in a 12-month period if in the good faith judgment of our board of directors such registration would be detrimental to us, and we are not required to effect the filing of a registration statement during the period beginning 60 days prior to our good faith estimate of the date of the filing of, and ending on a date 90 days following the effective date of, a registration initiated by us (unless such offering is our initial public offering, in which case such ending date is 180 days following such registration).

*Piggyback Registration Rights*

If we register any of our securities for public sale, we will have to use all commercially reasonable efforts to register all registrable securities that the holders of such securities request in writing be registered within 20 days of mailing of notice by us to all holders of the proposed registration. However, this right does not apply to a registration relating to any of our stock plans, the offer and sale of debt securities, a corporate reorganization or other transaction under Rule 145 of the Securities Act, or a registration on any registration form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the registrable securities. The managing underwriter of any underwritten offering will have the right to limit, due to marketing reasons, the number of shares registered by these holders to 30% of the total shares covered by the registration statement, unless such offering is our initial public offering, in which case, these holders may be excluded if the underwriters determine that the sale of their shares may jeopardize the success of the offering.

*Form S-3 Registration Rights*

The holders of at least 30% of the registrable securities can request that we register all or a portion of their shares on Form S-3 if we are eligible to file a registration statement on Form S-3 and the aggregate price to the public of the shares offered is at least $2 million. We are required to file no more than two registration statements on Form S-3 upon exercise of these rights per 12-month period. We may postpone the filing of a registration statement for up to 120 days once in a 12-month period if in the good faith judgment of our board of directors such registration would be detrimental to us.

140

**Table of Contents**

### Registration Expenses

We will pay all expenses incurred in connection with each of the registrations described above, except for underwriting discounts and commissions. However, we will not pay for any expenses of any demand or Form S-3 registration if the request is subsequently withdrawn at the request of a majority of the holders of the registrable securities to be registered, subject to limited exceptions.

### Expiration of Registration Rights

The registration rights described above will survive our initial public offering and will terminate as to any stockholder at such time as all of such stockholders' securities (together with any affiliate of the stockholder with whom such stockholder must aggregate its sales) could be sold without compliance with the registration requirements of the Securities Act pursuant to Rule 144 or following a deemed liquidation event under our current restated certificate of incorporation, but in any event no later than the five-year anniversary of our initial public offering.

## Anti-Takeover Provisions

So long as the outstanding shares of our Class B common stock represent a majority of the combined voting power of common stock, Mark Zuckerberg will effectively control all matters submitted to our stockholders for a vote, as well as the overall management and direction of our company, which will have the effect of delaying, deferring or discouraging another person from acquiring control of our company.

After such time as the shares of our Class B common stock no longer represent a majority of the combined voting power of our common stock, the provisions of Delaware law, our restated certificate of incorporation and our restated bylaws may have the effect of delaying, deferring or discouraging another person from acquiring control of our company.

### Delaware Law

Upon the closing of our initial public offering, we will be governed by the provisions of Section 203 of the Delaware General Corporation Law regulating corporate takeovers. This section prevents some Delaware corporations from engaging, under some circumstances, in a business combination, which includes a merger or sale of at least 10% of the corporation's assets with any interested stockholder, meaning a stockholder who, together with affiliates and associates, owns or, within three years prior to the determination of interested stockholder status, did own 15% or more of the corporation's outstanding voting stock, unless:

- the transaction is approved by the board of directors prior to the time that the interested stockholder became an interested stockholder;

- upon consummation of the transaction which resulted in the stockholder's becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding stock owned by directors who are also officers of the corporation; or

- subsequent to such time that the stockholder became an interested stockholder the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders by at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

A Delaware corporation may "opt out" of these provisions with an express provision in its original certificate of incorporation or an express provision in its certificate of incorporation or bylaws resulting from a stockholders' amendment approved by at least a majority of the outstanding voting shares. We have not opted out of these provisions. As a result, mergers or other takeover or change in control attempts of us may be discouraged or prevented.

141

PX0559-147

**Table of Contents**

### Restated Certificate of Incorporation and Bylaw Provisions

Our restated certificate of incorporation and our restated bylaws will include a number of provisions that may have the effect of deterring hostile takeovers or delaying or preventing changes in control of our company, even after such time as the shares of our Class B common stock no longer represent a majority of the combined voting power of our common stock, including the following:

- *Separate Class B Vote for Certain Transactions.* Any transaction that would result in a change in control of our company will require the approval of a majority of our outstanding Class B common stock voting as a separate class. This provision could delay or prevent the approval of a change in control that might otherwise be approved by a majority of outstanding shares of our Class A and Class B common stock voting together on a combined basis.

- *Dual Class Stock.* As described above in "—Common Stock—Voting Rights," our restated certificate of incorporation provides for a dual class common stock structure, which provides Mark Zuckerberg, our founder, Chairman, and CEO, with the ability to control the outcome of matters requiring stockholder approval, even if he owns significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets.

- *Supermajority Approvals.* Our restated certificate of incorporation and restated bylaws do not provide that certain amendments to our restated certificate of incorporation or restated bylaws by stockholders will require the approval of two-thirds of the combined vote of our then-outstanding shares of Class A and Class B common stock. However, when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock, certain amendments to our restated certificate of incorporation or restated bylaws by stockholders will require the approval of two-thirds of the combined vote of our then-outstanding shares of Class A and Class B common stock. This will have the effect of making it more difficult to amend our certificate of incorporation or restated bylaws to remove or modify certain provisions.

- *Board of Directors Vacancies.* Our restated certificate of incorporation and restated bylaws provide that stockholders may fill vacant directorships. When the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock, our restated certificate of incorporation and restated bylaws authorize only our board of directors to fill vacant directorships. In addition, the number of directors constituting our board of directors is set only by resolution adopted by a majority vote of our entire board of directors. These provisions restricting the filling of vacancies will prevent a stockholder from increasing the size of our board of directors and gaining control of our board of directors by filling the resulting vacancies with its own nominees.

- *Classified Board.* Our board of directors will not initially be classified. Our restated certificate of incorporation and restated bylaws provide that when the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock, our board of directors will be classified into three classes of directors each of which will hold office for a three-year term. In addition, thereafter, directors may only be removed from the board of directors for cause. The existence of a classified board could delay a successful tender offeror from obtaining majority control of our board of directors, and the prospect of that delay might deter a potential offeror.

- *Stockholder Action; Special Meeting of Stockholders.* Our restated certificate of incorporation provides that stockholders will be able to take action by written consent. When the outstanding shares of our Class B common stock represent less than a majority of the combined voting power of common stock, our stockholders will no longer be able to take action by written consent, and will only be able to take action at annual or special meetings of our stockholders. Stockholders will not be permitted to cumulate their votes for the election of directors. Our restated bylaws further provide that special meetings of our stockholders may be called only by a majority of our board of directors, the chairman of our board of directors, our chief executive officer or our president.

142

PX0559-148

**Table of Contents**

- *Advance Notice Requirements for Stockholder Proposals and Director Nominations.* Our restated bylaws provide advance notice procedures for stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at any meeting of stockholders. Our restated bylaws also specify certain requirements regarding the form and content of a stockholder's notice. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our meetings of stockholders.

- *Issuance of Undesignated Preferred Stock.* Our board of directors has the authority, without further action by the stockholders, to issue up to        shares of undesignated preferred stock with rights and preferences, including voting rights, designated from time to time by the board of directors. The existence of authorized but unissued shares of preferred stock enables our board of directors to render more difficult or to discourage an attempt to obtain control of us by means of a merger, tender offer, proxy contest or otherwise.

## Choice of Forum

Our restated certificate of incorporation will provide that the Court of Chancery of the State of Delaware will be the exclusive forum for any derivative action or proceeding brought on our behalf; any action asserting a breach of fiduciary duty; any action asserting a claim against us arising pursuant to the Delaware General Corporation Law, our restated certificate of incorporation or our restated bylaws; or any action asserting a claim against us that is governed by the internal affairs doctrine. The enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that a court could find these types of provisions to be inapplicable or unenforceable.

## Listing

We intend to apply to list our common stock on          under the symbol "FB."

## Transfer Agent and Registrar

The transfer agent and registrar for our common stock is Computershare Trust Company, N.A.

143

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**SHARES ELIGIBLE FOR FUTURE SALE**

Before our initial public offering, there has not been a public market for shares of our Class A common stock. Future sales of substantial amounts of shares of our common stock, including shares issued upon the settlement of RSUs and exercise of outstanding options, in the public market after our initial public offering, or the possibility of these sales occurring, could cause the prevailing market price for our common stock to fall or impair our ability to raise equity capital in the future.

After our initial public offering, we will have outstanding          shares of our Class A common stock and          shares of our Class B common stock, based on the number of shares outstanding as of December 31, 2011. This includes          shares that we and the selling stockholders are selling in our initial public offering, which shares may be resold in the public market immediately following our initial public offering, and assumes no additional exercise of outstanding options (other than the exercise of the option held by Mr. Zuckerberg described elsewhere in this prospectus). In addition, we expect to issue          shares of our Class B common stock upon the net settlement of restricted stock units (RSUs) approximately six months following our initial public offering. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer.

The          shares of common stock that were not offered and sold in our initial public offering as well as shares underlying outstanding RSUs will be upon issuance, "restricted securities," as that term is defined in Rule 144 under the Securities Act. These restricted securities are eligible for public sale only if they are registered under the Securities Act or if they qualify for an exemption from registration under Rule 144 or Rule 701 under the Securities Act, which are summarized below.

As a result of the lock-up agreements and market standoff provisions described below and subject to the provisions of Rules 144 and 701 under the Securities Act, these restricted securities will be available for sale in the public market as follows:

- on the date of this prospectus, none of these restricted securities will be available for sale in the public market;

- 91 days after the date of this prospectus,          shares held by the selling stockholders other than Mr. Zuckerberg;

- approximately six months after the date of this prospectus, approximately          shares underlying net-settled RSUs;

- 181 days after the date of this prospectus,          shares;

- 211 days after the date of this prospectus,          shares held by the selling stockholders;

- beginning one year after the date of this prospectus,          shares held by Mail.ru Group Limited and DST Global Limited and their respective affiliates; and

- beginning 18 months after the date of this prospectus,          shares held by Mail.ru Group Limited and DST Global Limited and their respective affiliates.

Of the 138,539,434 shares of our Class B common stock that were subject to stock options outstanding (and not held by Mr. Zuckerberg) as of December 31, 2011, options to purchase 124,848,924 shares of Class B common stock were vested as of December 31, 2011 and the Class B common stock underlying such options will be eligible for sale approximately six months after the date of this prospectus. We expect an additional          shares of Class B common stock to be delivered upon the net settlement of RSUs between the date that is approximately six months after the date of this prospectus and December 31, 2012, which shares would be eligible for sale in the public market immediately following settlement.

144

PX0559-150

Table of Contents

### Rule 144

In general, under Rule 144 as currently in effect, once we have been subject to public company reporting requirements for at least 90 days, a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least six months, including the holding period of any prior owner other than our affiliates, is entitled to sell those shares without complying with the manner of sale, volume limitation or notice provisions of Rule 144, subject to compliance with the public information requirements of Rule 144. If such a person has beneficially owned the shares proposed to be sold for at least one year, including the holding period of any prior owner other than our affiliates, then that person is entitled to sell those shares without complying with any of the requirements of Rule 144.

In general, under Rule 144, as currently in effect, our affiliates or persons selling shares on behalf of our affiliates are entitled to sell upon the expiration of the lock-up agreements described below, within any three-month period beginning 90 days after the date of this prospectus, a number of shares that does not exceed the greater of:

- 1% of the number of shares of common stock then outstanding, which will equal approximately          shares immediately after our initial public offering, or

- the average weekly trading volume of the common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to such sale.

Sales under Rule 144 by our affiliates or persons selling shares on behalf of our affiliates are also subject to certain manner of sale provisions and notice requirements and to the availability of current public information about us.

### Rule 701

In general, under Rule 701 as currently in effect, any of our employees, consultants or advisors who purchase shares from us in connection with a compensatory stock or option plan or other written agreement in a transaction before the effective date of our initial public offering that was completed in reliance on Rule 701 and complied with the requirements of Rule 701 will, subject to the lock-up restrictions described below, be eligible to resell such shares 90 days after the date of this prospectus in reliance on Rule 144, but without compliance with certain restrictions, including the holding period, contained in Rule 144.

### Lock-Up Agreements and Market Standoff Provisions

Our officers, directors, employees, and substantially all of our stockholders have agreed with the underwriters or us, not to dispose of any of our common stock or securities convertible into or exchangeable for shares of our common stock for specified periods of time after the date of this prospectus, except with the prior written consent of Morgan Stanley & Co. LLC or us, as applicable. Under the terms of their lock-up agreements with the underwriters, the selling stockholders, other than Mr. Zuckerberg, are eligible to sell up to          shares of our common stock in the aggregate on the date that is 91 days after the date of this prospectus, up to          shares of our common stock in the aggregate on the date that is 181 days after the date of this prospectus, and the remaining shares of our common stock held by them 211 days after the date of this prospectus. Under the terms of their lock-up agreement with the underwriters, our directors, our executive officers, and certain stockholders not selling shares in this offering are eligible to sell shares of our common stock 181 days after the date of this prospectus. All other holders of our common stock, RSUs and options have previously entered into market standoff agreements with us not to sell or otherwise transfer any of their common stock or securities convertible into or exchangeable for shares of common stock for a period that extends through 180 days after the date of this prospectus. In addition, Mail.ru Group Limited and DST Global Limited and their respective affiliates have entered into an agreement with us to not sell their shares for certain periods of time ranging from six to 18 months following the date of this prospectus. See "Related Party Transactions—Conversion Agreement" for additional information about this agreement.

145

**Table of Contents**

In addition, we have agreed with our underwriters not to sell any shares of our common stock or securities convertible into or exchangeable for shares of our common stock for a period of 180 days after the date of this prospectus, subject to certain customary exceptions. Morgan Stanley & Co. LLC may, in their sole discretion, at any time, release all or any portion of the shares from these restrictions.

See "Underwriting" for a more complete description of the lock-up agreements our directors, executive officers and the selling stockholders have entered into with the underwriters.

**Registration Rights**

Upon the closing of our initial public offering, certain holders of shares of our Class A common stock (including such shares of Class A common stock issuable upon conversion of our Class B common stock) will be entitled to rights with respect to the registration of the sale of these shares under the Securities Act. Registration of the sale of these shares under the Securities Act would result in these shares becoming fully tradable without restriction under the Securities Act immediately upon the effectiveness of the registration, except for shares purchased by affiliates. See "Description of Capital Stock—Registration Rights" for additional information.

**Registration Statement**

We intend to file a registration statement on Form S-8 under the Securities Act covering all of the shares of common stock subject to RSUs and options outstanding, as well as reserved for future issuance, under our stock plans. We expect to file this registration statement as soon as practicable after our initial public offering. However, none of the shares registered on Form S-8 will be eligible for resale until the expiration of the lock-up agreements to which they are subject.

146

**Table of Contents**

## MATERIAL U.S. FEDERAL TAX CONSIDERATIONS
## FOR NON-U.S. HOLDERS OF CLASS A COMMON STOCK

This section summarizes the material U.S. federal income and estate tax considerations relating to the acquisition, ownership and disposition of our common stock by "non-U.S. holders" (defined below) pursuant to this offering. This summary does not provide a complete analysis of all potential U.S. federal income tax considerations relating thereto. The information provided below is based upon provisions of the Code, Treasury regulations promulgated thereunder, administrative rulings, and judicial decisions currently in effect. These authorities may change at any time, possibly retroactively, or the Internal Revenue Service (IRS), might interpret the existing authorities differently. In either case, the tax considerations of owning or disposing of our common stock could differ from those described below.

For purposes of this summary, a "non-U.S. holder" is any holder of our Class A common stock, other than a partnership, that is not:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation, created or organized under the laws of the United States, any state therein or the District of Columbia;

- a trust if it (1) is subject to the primary supervision of a U.S. court and one of more U.S. persons have authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person; or

- an estate whose income is subject to U.S. income tax regardless of source.

If you are an individual, you may, in many cases, be deemed to be a resident alien, as opposed to a nonresident alien, by virtue of being present in the United States for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three-year period ending in the current calendar year. For these purposes, all the days present in the current year, one-third of the days present in the immediately preceding year, and one-sixth of the days present in the second preceding year are counted. Resident aliens are subject to U.S. federal income tax as if they were U.S. citizens. Such an individual is urged to consult his or her own tax advisor regarding the U.S. federal income tax consequences of the ownership or disposition of our common stock. If a partnership or other pass-through entity is a beneficial owner of our common stock, the tax treatment of a partner in the partnership or an owner of the entity will depend upon the status of the partner or other owner and the activities of the partnership or other entity. Any partner in a partnership or owner of a pass-through entity holding shares of our common stock should consult its own tax advisor.

This discussion assumes that a non-U.S. holder will hold our common stock as a capital asset (generally, property held for investment). The summary generally does not address tax considerations that may be relevant to particular investors because of their specific circumstances, or because they are subject to special rules, including, without limitation, if the investor is a former citizen or long-term resident of the United States, "controlled foreign corporation," "passive foreign investment company," corporation that accumulates earnings to avoid U.S. federal income tax, real estate investment trust, regulated investment company, dealer in securities or currencies, financial institution, tax-exempt entity, insurance company, person holding our common stock as part of a hedging, integrated, conversion or constructive sale transaction or a straddle, trader in securities that elects to use a mark-to-market method of accounting, person liable for the alternative minimum tax, person who acquired our common stock as compensation for services, or partner in a partnership or beneficial owner of a pass-through entity that holds our common stock. Finally, the summary does not describe the effects of any applicable foreign, state or local laws, or, except to the extent discussed below, the effects of any applicable gift or estate tax laws.

147

**Table of Contents**

INVESTORS CONSIDERING THE PURCHASE OF OUR CLASS A COMMON STOCK SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE APPLICATION OF THE U.S. FEDERAL INCOME AND ESTATE TAX LAWS TO THEIR PARTICULAR SITUATIONS AND THE CONSEQUENCES OF FOREIGN, STATE OR LOCAL LAWS, AND TAX TREATIES.

**Dividends**

We do not expect to declare or pay any dividends on our Class A common stock in the foreseeable future. If we do pay dividends on shares of our Class A common stock, however, such distributions will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of our current and accumulated earnings and profits will constitute a return of capital that is applied against and reduces, but not below zero, a non-U.S. holder's adjusted tax basis in shares of our common stock. Any remaining excess will be treated as gain realized on the sale or other disposition of our Class A common stock. See "—Sale of Class A Common Stock."

Any dividend paid to a non-U.S. holder on our Class A common stock will generally be subject to U.S. withholding tax at a 30% rate. The withholding tax might not apply, however, or might apply at a reduced rate, under the terms of an applicable income tax treaty between the United States and the non-U.S. holder's country of residence. You should consult your tax advisors regarding your entitlement to benefits under a relevant income tax treaty. Generally, in order for us or our paying agent to withhold tax at a lower treaty rate, a non-U.S. holder must certify its entitlement to treaty benefits. A non-U.S. holder generally can meet this certification requirement by providing a Form W-8BEN (or any successor form) or appropriate substitute form to us or our paying agent. If the non-U.S. holder holds the stock through a financial institution or other agent acting on the holder's behalf, the holder will be required to provide appropriate documentation to the agent. The holder's agent will then be required to provide certification to us or our paying agent, either directly or through other intermediaries. For payments made to a partnership or other pass-through entity, the certification requirements generally apply to the partners or other owners rather than to the partnership or other entity, and the partnership or other entity must provide the partners' or other owners' documentation to us or our paying agent. If you are eligible for a reduced rate of U.S. federal withholding tax under an income tax treaty, you may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a refund with the IRS in a timely manner.

Dividends received by a non-U.S. holder that are effectively connected with a U.S. trade or business conducted by the non-U.S. holder, and if required by an applicable income tax treaty between the United States and the non-U.S. holder's country of residence, are attributable to a permanent establishment maintained by the non-U.S. holder in the United States, are not subject to such withholding tax. To obtain this exemption, a non-U.S. holder must provide us with an IRS Form W-8ECI properly certifying such exemption. Such effectively connected dividends, although not subject to withholding tax, are taxed at the same graduated rates applicable to U.S. persons, net of certain deductions and credits. In addition to the graduated tax described above, dividends received by corporate non-U.S. holders that are effectively connected with a U.S. trade or business of the corporate non-U.S. holder may also be subject to a branch profits tax at a rate of 30% or such lower rate as may be specified by an applicable tax treaty.

**Sale of Class A Common Stock**

Non-U.S. holders will generally not be subject to U.S. federal income tax on any gains realized on the sale, exchange or other disposition of our Class A common stock unless:

- the gain (1) is effectively connected with the conduct by the non-U.S. holder of a U.S. trade or business and (2) if required by an applicable income tax treaty between the United States and the non-U.S. holder's country of residence, is attributable to a permanent establishment (or, in certain cases involving individual holders, a fixed base) maintained by the non-U.S. holder in the United States (in which case the special rules described below apply);

148

**Table of Contents**

- the non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of the sale, exchange or other disposition of our common stock, and certain other requirements are met (in which case the gain would be subject to a flat 30% tax, or such reduced rate as may be specified by an applicable income tax treaty, which may be offset by U.S. source capital losses, even though the individual is not considered a resident of the United States); or

- the rules of the Foreign Investment in Real Property Tax Act (FIRPTA) treat the gain as effectively connected with a U.S. trade or business.

The FIRPTA rules may apply to a sale, exchange or other disposition of our common stock if we are, or were within the shorter of the five-year period preceding the disposition and the non-U.S. holder's holding period, a "U.S. real property holding corporation," or USRPHC. In general, we would be a USRPHC if interests in U.S. real estate comprised at least half of our business assets. We do not believe that we are a USRPHC and we do not anticipate becoming one in the future. Even if we become a USRPHC, as long as our common stock is regularly traded on an established securities market, such common stock will be treated as U.S. real property interests only if beneficially owned by a non-U.S. holder that actually or constructively owned more than 5% of our outstanding common stock at some time within the five-year period preceding the disposition.

If any gain from the sale, exchange or other disposition of our Class A common stock, (1) is effectively connected with a U.S. trade or business conducted by a non-U.S. holder and (2) if required by an applicable income tax treaty between the United States and the non-U.S. holder's country of residence, is attributable to a permanent establishment (or, in certain cases involving individuals, a fixed base) maintained by such non-U.S. holder in the United States, then the gain generally will be subject to U.S. federal income tax at the same graduated rates applicable to U.S. persons, net of certain deductions and credits. If the non-U.S. holder is a corporation, under certain circumstances, that portion of its earnings and profits that is effectively connected with its U.S. trade or business, subject to certain adjustments, generally would be subject also to a "branch profits tax." The branch profits tax rate is generally 30%, although an applicable income tax treaty between the United States and the non-U.S. holder's country of residence might provide for a lower rate.

**U.S. Federal Estate Tax**

The estates of nonresident alien individuals generally are subject to U.S. federal estate tax on property with a U.S. situs. Because we are a U.S. corporation, our Class A common stock will be U.S. situs property and therefore will be included in the taxable estate of a nonresident alien decedent, unless an applicable estate tax treaty between the United States and the decedent's country of residence provides otherwise.

**Backup Withholding and Information Reporting**

The Code and the Treasury regulations require those who make specified payments to report the payments to the IRS. Among the specified payments are dividends and proceeds paid by brokers to their customers. The required information returns enable the IRS to determine whether the recipient properly included the payments in income. This reporting regime is reinforced by "backup withholding" rules. These rules require the payors to withhold tax from payments subject to information reporting if the recipient fails to cooperate with the reporting regime by failing to provide his taxpayer identification number to the payor, furnishing an incorrect identification number, or failing to report interest or dividends on his returns. The backup withholding tax rate is currently 28%. The backup withholding rules do not apply to payments to corporations, whether domestic or foreign.

Payments to non-U.S. holders of dividends on Class A common stock generally will not be subject to backup withholding, so long as the non-U.S. holder certifies its nonresident status (and we or our paying agent do not have actual knowledge or reason to know the holder is a U.S. person or that the conditions of any other exemption are not, in fact, satisfied) or otherwise establishes an exemption. The certification procedures to claim treaty benefits described in "—Dividends" will satisfy the certification requirements necessary to avoid the

149

**Table of Contents**

backup withholding tax as well. We must report annually to the IRS any dividends paid to each non-U.S. holder and the tax withheld, if any, with respect to these dividends. Copies of these reports may be made available to tax authorities in the country where the non-U.S. holder resides.

Under the Treasury regulations, the payment of proceeds from the disposition of shares of our Class A common stock by a non-U.S. holder made to or through a U.S. office of a broker generally will be subject to information reporting and backup withholding unless the beneficial owner certifies, under penalties of perjury, among other things, its status as a non-U.S. holder (and the broker does not have actual knowledge or reason to know the holder is a U.S. person) or otherwise establishes an exemption. The payment of proceeds from the disposition of shares of our Class A common stock by a non-U.S. holder made to or through a non-U.S. office of a broker generally will not be subject to backup withholding and information reporting, except as noted below. Information reporting, but not backup withholding, will apply to a payment of proceeds, even if that payment is made outside of the United States, if you sell our common stock through a non-U.S. office of a broker that is:

- a U.S. person (including a foreign branch or office of such person);
- a "controlled foreign corporation" for U.S. federal income tax purposes;
- a foreign person 50% or more of whose gross income from certain periods is effectively connected with a U.S. trade or business; or
- a foreign partnership if at any time during its tax year (a) one or more of its partners are U.S. persons who, in the aggregate, hold more than 50% of the income or capital interests of the partnership or (b) the foreign partnership is engaged in a U.S. trade or business;

unless the broker has documentary evidence that the beneficial owner is a non-U.S. holder and certain other conditions are satisfied, or the beneficial owner otherwise establishes an exemption (and the broker has no actual knowledge or reason to know to the contrary).

Backup withholding is not an additional tax. Any amounts withheld from a payment to a holder of Class A common stock under the backup withholding rules can be credited against any U.S. federal income tax liability of the holder and may entitle the holder to a refund, provided that the required information is furnished to the IRS in a timely manner.

Recent legislation and administrative guidance generally imposes withholding at a rate of 30% on payments to certain foreign entities of dividends on and the gross proceeds of dispositions of U.S. common stock, unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied. These withholding requirements are expected to be phased in for dividend payments made on or after January 1, 2014, and for payments of gross proceeds of dispositions of U.S. common stock made on or after January 1, 2015. Non-U.S. holders should consult their tax advisors regarding the possible implications of this legislation on their investment in our common stock.

THE PRECEDING DISCUSSION OF U.S. FEDERAL TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY. IT IS NOT TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE PARTICULAR U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF PURCHASING, HOLDING AND DISPOSING OF OUR CLASS A COMMON STOCK, INCLUDING THE CONSEQUENCES OF ANY PROPOSED CHANGE IN APPLICABLE LAWS.

150

**Table of Contents**

## UNDERWRITING

Under the terms and subject to the conditions contained in an underwriting agreement dated the date of this prospectus, the underwriters named below, for which Morgan Stanley & Co. LLC is acting as representative, have severally agreed to purchase, and we and the selling stockholders have agreed to sell to them, severally, the number of shares indicated below:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | |
| J.P. Morgan Securities LLC | |
| Goldman, Sachs & Co. | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| Barclays Capital Inc. | |
| Allen & Company LLC | |
| Citigroup Global Markets Inc. | |
| Credit Suisse Securities (USA) LLC | |
| Deutsche Bank Securities Inc. | |
| RBC Capital Markets, LLC | |
| Wells Fargo Securities, LLC | |
| Blaylock Robert Van LLC | |
| BMO Capital Markets Corp. | |
| C.L. King & Associates, Inc. | |
| Cabrera Capital Markets, LLC | |
| CastleOak Securities, L.P. | |
| Cowen and Company, LLC. | |
| Lazard Capital Markets LLC | |
| Lebenthal & Co., LLC | |
| Loop Capital Markets LLC | |
| M.R. Beal & Company | |
| Macquarie Capital (USA) Inc. | |
| Muriel Siebert & Co., Inc. | |
| Oppenheimer & Co. Inc. | |
| Pacific Crest Securities LLC | |
| Piper Jaffray & Co. | |
| Raymond James & Associates, Inc. | |
| Samuel A. Ramirez & Company, Inc. | |
| Stifel, Nicolaus & Company, Incorporated | |
| The Williams Capital Group, L.P. | |
| William Blair & Company, L.L.C. | |
| Total: | |

The underwriters and the representative are collectively referred to as the "underwriters" and the "representative," respectively. The underwriters are offering the shares of Class A common stock subject to their acceptance of the shares from us and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the shares of Class A common stock offered by this prospectus are subject to the approval of certain legal matters by their counsel and to certain other conditions. The underwriters are obligated to take and pay for all of the shares of Class A common stock offered by this prospectus if any such shares are taken. However, the underwriters are not required to take or pay for the shares covered by the underwriters' over-allotment option described below. If an underwriter defaults, the

151

**Table of Contents**

underwriting agreement provides that the purchase commitments of the non-defaulting underwriters may be increased.

The underwriters initially propose to offer part of the shares of Class A common stock directly to the public at the initial public offering price listed on the cover page of this prospectus and part to certain dealers at a price that represents a concession not in excess of $          a share under the public offering price. After the initial offering of the shares of Class A common stock, the offering price and other selling terms may from time to time be varied by the representative.

We and the selling stockholders have granted to the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase up to          additional shares of common stock at the public offering price listed on the cover page of this prospectus, less underwriting discounts and commissions. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with the offering of the shares of Class A common stock offered by this prospectus. To the extent the option is exercised, each underwriter will become obligated, subject to certain conditions, to purchase about the same percentage of the additional shares of Class A common stock as the number listed next to the underwriter's name in the preceding table bears to the total number of shares of Class A common stock listed next to the names of all underwriters in the preceding table.

The following table shows the per share and total public offering price, underwriting discounts and commissions, and proceeds before expenses to us and the selling stockholders. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase up to an additional          shares of common stock.

|  | | Total | |
| --- | --- | --- | --- |
|  | Per Share | No Exercise | Full Exercise |
| Public offering price | $ | $ | $ |
| Underwriting discounts and commissions to be paid by: | | | |
|    Us | $ | $ | $ |
|    The selling stockholders | $ | $ | $ |
| Proceeds, before expenses, to us | $ | $ | $ |
| Proceeds, before expenses, to the selling stockholders | $ | $ | $ |

The underwriters have agreed to reimburse us for certain expenses in connection with our initial public offering. The estimated offering expenses payable by us, exclusive of the underwriting discounts and commissions, are approximately $          million, which includes legal, accounting, and printing costs and various other fees associated with the registration and listing of our Class A common stock.

The underwriters have informed us that they do not intend sales to discretionary accounts to exceed 5% of the total number of shares of Class A common stock offered by them.

We intend to apply to have our Class A common stock quoted on          under the trading symbol "FB."

We, all of our directors and executive officers, and the selling stockholders have agreed that, without the prior written consent of Morgan Stanley & Co. LLC on behalf of the underwriters, we and they will not, during specified periods of time after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase lend or otherwise transfer or dispose of, directly or indirectly, any shares of common stock or other securities convertible into or exercisable or exchangeable for common stock;

152

**Table of Contents**

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the common stock; or

- make a demand for, or in our case file, a registration statement with the SEC relating to the offering of any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock.

The restrictions described in the immediately preceding paragraph are subject to customary exceptions.

In order to facilitate our initial public offering of the Class A common stock, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the Class A common stock. Specifically, the underwriters may sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is covered if the short position is no greater than the number of shares available for purchase by the underwriters under the over-allotment option. The underwriters can close out a covered short sale by exercising the over-allotment option or purchasing shares in the open market. In determining the source of shares to close out a covered short sale, the underwriters will consider, among other things, the open market price of shares compared to the price available under the over-allotment option. The underwriters may also sell shares in excess of the over-allotment option, creating a naked short position. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in our initial public offering. As an additional means of facilitating our initial public offering, the underwriters may bid for, and purchase, shares of Class A common stock in the open market. The underwriting syndicate also may reclaim selling concessions allowed to an underwriter or a dealer for distributing the Class A common stock in the offering, if the syndicate repurchases previously distributed Class A common stock to cover syndicate short positions or to stabilize the price of the common stock. These activities may raise or maintain the market price of the Class A common stock above independent market levels or prevent or retard a decline in the market price of the common stock. The underwriters are not required to engage in these activities and may end any of these activities at any time.

We, the selling stockholders, and the underwriters have agreed to indemnify each other against certain liabilities, including liabilities under the Securities Act.

A prospectus in electronic format may be made available on websites maintained by one or more underwriters, or selling group members, if any, participating in our initial public offering. The representative may agree to allocate a number of shares of common stock to underwriters for sale to their online brokerage account holders. Internet distributions will be allocated by the representative to underwriters that may make Internet distributions on the same basis as other allocations.

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for us, for which they received or will receive customary fees and expenses.

In 2010 and 2011, certain entities affiliated with Morgan Stanley & Co. LLC purchased shares of our Class B common stock from certain existing stockholders. In addition, Erskine B. Bowles, a member of our board of directors, also serves as a member of the board of directors of Morgan Stanley.

In February 2011, we entered into a credit agreement with five lenders, including affiliates of Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith

153

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

Incorporated, and Barclays Capital Inc., to borrow up to $1,500 million in revolving loans. In September 2011, the credit agreement was amended to increase the borrowing capacity to $2,500 million. In February 2012, we terminated the credit facility provided for by this agreement and we entered into a new agreement for an unsecured five-year revolving credit facility with these lenders, as well as affiliates of Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., RBC Capital Markets, LLC, and Wells Fargo Securities, LLC, that allows us to borrow up to $5,000 million for general corporate purposes. Concurrent with our entering into the new revolving credit facility, we entered into a bridge credit facility with the lenders that are parties to our new revolving credit facility. This bridge credit facility allows us to borrow up to $3,000 million to fund tax withholding and remittance obligations related to the settlement of RSUs in connection with our initial public offering. For additional information on our credit facilities, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

In December 2010 and January 2011, affiliates of Goldman, Sachs & Co., one of the underwriters, purchased an aggregate of 69,544,363 shares of our Class A common stock for an aggregate purchase price of $1,450 million. As part of the transaction, the affiliates entered into the Sixth Amended and Restated Investors' Rights Agreement. Pursuant to the purchase agreement, one of the affiliates had an option to sell 3,597,122 shares of Class A common stock to DST Global Limited at the same price, and on the same terms, set forth in the purchase agreement. The affiliate exercised its option in January 2011.

In the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve our securities and instruments. The underwriters and their respective affiliates may also make investment recommendations or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long or short positions in such securities and instruments.

Lazard Frères & Co. LLC referred this transaction to Lazard Capital Markets LLC and will receive a referral fee from Lazard Capital Markets LLC in connection therewith.

**Pricing of the Offering**

Prior to our initial public offering, there has been no public market for our Class A common stock. The initial public offering price will be determined by negotiations among us, the selling stockholders, and the representative of the underwriters. Among the factors considered in determining the initial public offering price were our future prospects and those of our industry in general, our sales, earnings and certain other financial and operating information in recent periods, and the price-earnings ratios, price-sales ratios, market prices of securities, and certain financial and operating information of companies engaged in activities similar to ours. The estimated initial public offering price range set forth on the cover page of this preliminary prospectus is subject to change as a result of market conditions and other factors. Neither we nor the underwriters can assure investors that an active trading market for the shares will develop, or that after the offering the shares will trade in the public market at or above the initial public offering price.

**Selling Restrictions**

*European Economic Area*

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive, with effect from and including the date on which the Prospectus Directive is implemented in that Member State, an offer of securities may not be made to the public in that Member State, other than:

(a) to any legal entity that is a qualified investor as defined in the Prospectus Directive;

154

PX0559-160

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

(b) to fewer than 100 or, if that Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150 natural or legal persons (other than "qualified investors" as defined in the Prospectus Directive) subject to obtaining the prior consent of the representative; or

(c) in any other circumstances that do not require the publication of a prospectus pursuant to Article 3 of the Prospectus Directive;

provided that no such offer of securities shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of the above, the expression an "offer of securities to the public" in relation to any securities in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe for the securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in that Member State), and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in that Member State, and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

### United Kingdom

This prospectus and any other material in relation to the shares described herein is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospective Directive ("qualified investors") that also (i) have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or the Order, (ii) who fall within Article 49(2)(a) to (d) of the Order or (iii) to whom it may otherwise lawfully be communicated (all such persons together being referred to as "relevant persons"). The shares are only available to, and any invitation, offer or agreement to purchase or otherwise acquire such shares will be engaged in only with, relevant persons. This prospectus and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other person in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this prospectus or any of its contents.

### Hong Kong

The shares may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), and no advertisement, invitation or document relating to the shares may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571 Laws of Hong Kong) and any rules made thereunder.

### Singapore

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (SFA), (ii) to a relevant person, or any person pursuant to

155

**Table of Contents**

Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the shares are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or that trust has acquired the shares under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

*Japan*

The securities have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (the Financial Instruments and Exchange Law) and may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

*Notice to Prospective Investors in Switzerland*

The shares may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange (SIX) or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the shares or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, the Company, or the shares have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of shares will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA (FINMA), and the offer of shares has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes (CISA). The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of the shares.

*Notice to Prospective Investors in the Dubai International Financial Centre*

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority (DFSA). This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The shares to which this prospectus relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the shares offered should conduct their own due diligence on the shares. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

156

PX0559-162

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

## LEGAL MATTERS

The validity of the shares of Class A common stock offered hereby will be passed upon for us by Fenwick & West LLP, Mountain View, California. Simpson Thacher & Bartlett LLP, Palo Alto, California is acting as counsel to the underwriters.

## EXPERTS

Ernst & Young LLP, independent registered public accounting firm, has audited our consolidated financial statements at December 31, 2010 and 2011, and for each of the three years in the period ended December 31, 2011, as set forth in their report. We have included our financial statements in the prospectus and elsewhere in the registration statement in reliance on Ernst & Young LLP's report, given on their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of Class A common stock offered hereby. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits filed therewith. For further information about us and the common stock offered hereby, reference is made to the registration statement and the exhibits filed therewith. Statements contained in this prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and in each instance we refer you to the copy of such contract or other document filed as an exhibit to the registration statement. We currently do not file periodic reports with the SEC. Upon closing of our initial public offering, we will be required to file periodic reports, proxy statements and other information with the SEC pursuant to the Exchange Act. A copy of the registration statement and the exhibits filed therewith may be inspected without charge at the public reference room maintained by the SEC, located at 100 F Street, NE, Washington, DC 20549, and copies of all or any part of the registration statement may be obtained from that office. Please call the SEC at 1-800-SEC-0330 for further information about the public reference room. The SEC also maintains a website that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC. The address of the website is www.sec.gov.

157

PX0559-163

**Table of Contents**

**FACEBOOK, INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Report of Ernst & Young LLP, Independent Registered Public Accounting Firm                          F-2

Consolidated Financial Statements:

Consolidated Balance Sheets                          F-3

Consolidated Statements of Income                          F-4

Consolidated Statements of Stockholders' Equity                          F-5

Consolidated Statements of Cash Flows                          F-6

Notes to Consolidated Financial Statements                          F-7

F-1

Table of Contents

**Report of Ernst & Young LLP, Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Facebook, Inc.

We have audited the accompanying consolidated balance sheets of Facebook, Inc. as of December 31, 2010 and 2011, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Facebook, Inc. at December 31, 2010 and 2011, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2011, in conformity with U.S. generally accepted accounting principles.

/s/ Ernst & Young LLP

San Francisco, California
February 1, 2012

F-2

PX0559-165

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**FACEBOOK, INC.**
**CONSOLIDATED BALANCE SHEETS**
*(In millions, except for number of shares and par value)*

| | December 31, | | Pro Forma December 31, 2011 (unaudited) |
|---|---|---|---|
| | 2010 | 2011 | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $1,785 | $1,512 | $ 1,512 |
| Marketable securities | — | 2,396 | 2,396 |
| Accounts receivable, net of allowances for doubtful accounts of $11 and $17 as of December 31, 2010 and 2011, respectively | 373 | 547 | 547 |
| Prepaid expenses and other current assets | 88 | 149 | 478 |
| Total current assets | 2,246 | 4,604 | 4,933 |
| Property and equipment, net | 574 | 1,475 | 1,475 |
| Goodwill and intangible assets, net | 96 | 162 | 162 |
| Other assets | 74 | 90 | 90 |
| **Total assets** | $2,990 | $6,331 | $ 6,660 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 29 | $ 63 | $ 63 |
| Platform partners payable | 75 | 171 | 171 |
| Accrued expenses and other current liabilities | 137 | 296 | 296 |
| Deferred revenue and deposits | 42 | 90 | 90 |
| Current portion of capital lease obligations | 106 | 279 | 279 |
| Total current liabilities | 389 | 899 | 899 |
| Capital lease obligations, less current portion | 117 | 398 | 398 |
| Long-term debt | 250 | — | — |
| Other liabilities | 72 | 135 | 135 |
| Total liabilities | 828 | 1,432 | 1,432 |
| Commitments and contingencies | | | |
| Stockholders' equity: | | | |
| Convertible preferred stock, $0.000006 par value, issuable in series: 569 million shares authorized, 541 million and 543 million shares issued and outstanding at December 31, 2010 and 2011, respectively (aggregate liquidation preference of $615 million as of December 31, 2011); no shares authorized, issued and outstanding, pro forma (unaudited) | 615 | 615 | — |
| Common stock, $0.000006 par value: 4,141 million Class A shares authorized, 60 million shares issued and outstanding at December 31, 2010, and 117 million shares issued and outstanding, including 1 million outstanding shares subject to repurchase at December 31, 2011 and pro forma (unaudited); 4,141 million Class B shares authorized, 1,112 million, 1,213 million and 1,759 million shares issued and outstanding, including 5 million, 2 million and 2 million outstanding shares subject to repurchase, at December 31, 2010, 2011 and pro forma (unaudited), respectively | — | — | — |
| Additional paid-in capital | 947 | 2,684 | 4,267 |
| Accumulated other comprehensive loss | (6) | (6) | (6) |
| Retained earnings | 606 | 1,606 | 967 |
| Total stockholders' equity | 2,162 | 4,899 | 5,228 |
| **Total liabilities and stockholders' equity** | $2,990 | $6,331 | $ 6,660 |

*See Notes to Consolidated Financial Statements.*

F-3

Table of Contents

**FACEBOOK, INC.**
**CONSOLIDATED STATEMENTS OF INCOME**
*(In millions, except per share amounts)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2009 | 2010 | 2011 |
| **Revenue** | $ 777 | $1,974 | $3,711 |
| **Costs and expenses:** | | | |
| Cost of revenue | 223 | 493 | 860 |
| Marketing and sales | 115 | 184 | 427 |
| Research and development | 87 | 144 | 388 |
| General and administrative | 90 | 121 | 280 |
| Total costs and expenses | 515 | 942 | 1,955 |
| **Income from operations** | 262 | 1,032 | 1,756 |
| Other expense, net: | | | |
| Interest expense | (10) | (22) | (42) |
| Other income (expense), net | 2 | (2) | (19) |
| Income before provision for income taxes | 254 | 1,008 | 1,695 |
| Provision for income taxes | 25 | 402 | 695 |
| **Net income** | $ 229 | $ 606 | $1,000 |
| Net income attributable to participating securities | 107 | 234 | 332 |
| **Net income attributable to Class A and Class B common stockholders** | $ 122 | $ 372 | $ 668 |
| **Earnings per share attributable to Class A and Class B common stockholders:** | | | |
| Basic | $ 0.12 | $ 0.34 | $ 0.52 |
| Diluted | $ 0.10 | $ 0.28 | $ 0.46 |
| **Pro forma earnings per share attributable to Class A and Class B common stockholders (unaudited):** | | | |
| Basic | | | $ 0.49 |
| Diluted | | | $ 0.43 |
| **Share-based compensation expense included in costs and expenses:** | | | |
| Cost of revenue | $ — | $ — | $ 9 |
| Marketing and sales | 2 | 2 | 43 |
| Research and development | 6 | 9 | 114 |
| General and administrative | 19 | 9 | 51 |
| Total share-based compensation expense | $ 27 | $ 20 | $ 217 |

*See Notes to Consolidated Financial Statements.*

F-4

PX0559-167

Table of Contents

**FACEBOOK, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
*(In millions)*

| | Convertible Preferred Stock Shares | Amount | Class A and Class B Common Stock Shares | Par Value | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Retained Earnings (Accumulated Deficit) | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| Balances at December 31, 2008 | 499 | $ 415 | 1,007 | $ — | $ 147 | $ — | $ (229) | $ 333 |
| Issuance of Series E convertible preferred stock, net of issuance costs | 44 | 200 | — | — | — | — | — | 200 |
| Issuance of common stock for cash upon exercise of stock options | — | — | 57 | — | 9 | — | — | 9 |
| Issuance of common stock to nonemployees for past services | — | — | 2 | — | 9 | — | — | 9 |
| Issuance of common stock related to acquisition | — | — | 4 | — | 20 | — | — | 20 |
| Share-based compensation, related to employee share-based awards | | | | | 16 | | | 16 |
| Share-based compensation, related to nonemployee share-based awards | — | — | — | — | 2 | — | — | 2 |
| Excess tax benefit from share-based award activity | — | — | — | — | 50 | — | — | 50 |
| Net income and comprehensive income | — | — | — | — | — | — | 229 | 229 |
| Balances at December 31, 2009 | 543 | $ 615 | 1,070 | $ — | $ 253 | $ — | $ — | $ 868 |
| Issuance of common stock, net of issuance costs | — | — | 24 | — | 500 | — | — | 500 |
| Issuance of common stock for cash upon exercise of stock options | — | — | 70 | — | 6 | — | — | 6 |
| Issuance of common stock related to acquisitions | — | — | 6 | — | 60 | — | — | 60 |
| Conversion of Series A preferred stock to common stock | (2) | — | 2 | | | | | |
| Reclassification of option liability to additional paid-in capital | — | — | — | — | 3 | — | — | 3 |
| Share-based compensation, related to employee share-based awards | — | — | — | — | 17 | — | — | 17 |
| Share-based compensation, related to nonemployee share-based awards | — | — | — | — | 1 | — | — | 1 |
| Excess tax benefit from share-based award activity, net of deferred tax impact | — | — | — | — | 107 | — | — | 107 |
| Comprehensive income, net of tax: | | | | | | | | |
| Foreign currency translation adjustments | — | — | — | — | — | (6) | — | (6) |
| Net income | — | — | — | — | — | — | 606 | 606 |
| Total comprehensive income, net of tax | | | | | | | | 600 |
| Balances at December 31, 2010 | 541 | $ 615 | 1,172 | $ — | $ 947 | $ (6) | $ 606 | $ 2,162 |
| Issuance of common stock, net of issuance costs | — | — | 48 | — | 998 | — | — | 998 |
| Issuance of common stock for cash upon exercise of stock options | — | — | 102 | — | 28 | — | — | 28 |
| Issuance of common stock to nonemployees for past services | — | — | — | — | 3 | — | — | 3 |
| Issuance of common stock related to acquisitions | — | — | 2 | — | 58 | — | — | 58 |
| Exercise of preferred stock warrants | 8 | — | — | — | — | — | — | — |
| Conversion of Series B preferred stock to common stock | (2) | — | 2 | — | — | — | — | — |
| Conversion of Series C preferred stock to common stock. | (4) | — | 4 | — | — | — | — | — |
| Share-based compensation, related to employee share-based awards | — | — | — | — | 217 | — | — | 217 |
| Excess tax benefit from share-based award activity | — | — | — | — | 433 | — | — | 433 |
| Net income and comprehensive income | — | — | — | — | — | — | 1,000 | 1,000 |
| Balances at December 31, 2011 | 543 | $ 615 | 1,330 | $ — | $ 2,684 | $ (6) | $ 1,606 | $ 4,899 |

*See Notes to Consolidated Financial Statements.*

F-5

Amendment No. 2 to Registration Statement on Form S-1

Table of Contents

**FACEBOOK, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In millions)*

|  | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
|  | **2009** | **2010** | **2011** |
| **Cash flows from operating activities** |  |  |  |
| Net income | $ 229 | $ 606 | $ 1,000 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |  |
| Depreciation and amortization | 78 | 139 | 323 |
| Loss on write-off of equipment | 1 | 3 | 4 |
| Share-based compensation | 27 | 20 | 217 |
| Tax benefit from share-based award activity | 50 | 115 | 433 |
| Excess tax benefit from share-based award activity | (51) | (115) | (433) |
| Changes in assets and liabilities: |  |  |  |
| Accounts receivable | (112) | (209) | (174) |
| Prepaid expenses and other current assets | (30) | (38) | (31) |
| Other assets | (59) | 17 | (32) |
| Accounts payable | (7) | 12 | 6 |
| Platform partners payable | — | 75 | 96 |
| Accrued expenses and other current liabilities | 27 | 20 | 38 |
| Deferred revenue and deposits | 1 | 37 | 49 |
| Other liabilities | 1 | 16 | 53 |
| **Net cash provided by operating activities** | 155 | 698 | 1,549 |
| **Cash flows from investing activities** |  |  |  |
| Purchases of property and equipment | (33) | (293) | (606) |
| Purchases of marketable securities | — | — | (3,025) |
| Maturities of marketable securities | — | — | 516 |
| Sales of marketable securities | — | — | 113 |
| Investments in non-marketable equity securities | — | — | (3) |
| Acquisitions of business, net of cash acquired, and purchases of intangible and other assets | 3 | (22) | (24) |
| Change in restricted cash and deposits | (32) | (9) | 6 |
| **Net cash used in investing activities** | (62) | (324) | (3,023) |
| **Cash flows from financing activities** |  |  |  |
| Net proceeds from issuance of convertible preferred stock | 200 | — | — |
| Net proceeds from issuance of common stock | — | 500 | 998 |
| Proceeds from exercise of stock options | 9 | 6 | 28 |
| Proceeds from (repayments of) long-term debt | — | 250 | (250) |
| Proceeds from sale and lease-back transactions | 31 | — | 170 |
| Principal payments on capital lease obligations | (48) | (90) | (181) |
| Excess tax benefit from share-based award activity | 51 | 115 | 433 |
| **Net cash provided by financing activities** | 243 | 781 | 1,198 |
| Effect of exchange rate changes on cash and cash equivalents | — | (3) | 3 |
| Net increase (decrease) in cash and cash equivalents | 336 | 1,152 | (273) |
| Cash and cash equivalents at beginning of period | 297 | 633 | 1,785 |
| **Cash and cash equivalents at end of period** | $ 633 | $1,785 | $ 1,512 |
| **Supplemental cash flow data** |  |  |  |
| Cash paid during the period for: |  |  |  |
| Interest | $ 9 | $ 23 | $ 28 |
| Income taxes | $ 42 | $ 261 | $ 197 |
| Non-cash investing and financing activities: |  |  |  |
| Property and equipment additions included in accounts payable and accrued expenses and other liabilities | $ 5 | $ 47 | $ 135 |
| Property and equipment acquired under capital leases | $ 56 | $ 217 | $ 473 |

PX0559-169

| Fair value of shares issued related to acquisitions of business and other assets | $ | 20 | $ | 60 | $ | 58 |
|---|---|---|---|---|---|---|

*See Notes to Consolidated Financial Statements.*

F-6

PX0559-170

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1.    Summary of Significant Accounting Policies**

*Organization and Description of Business*

Facebook was incorporated in Delaware in July 2004. Our mission is to make the world more open and connected. We build products that support our mission by providing utility to Facebook users, Platform developers, and advertisers. We generate substantially all of our revenue from advertising and from fees associated with our Payments infrastructure that enables users to purchase virtual and digital goods from our Platform developers.

*Basis of Presentation*

We prepared the consolidated financial statements in accordance with U.S. generally accepted accounting principles (GAAP). The consolidated financial statements include the accounts of Facebook, Inc. and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated.

*Use of Estimates*

Conformity with GAAP requires the use of estimates and judgments that affect the reported amounts in the consolidated financial statements and accompanying notes. These estimates form the basis for judgments we make about the carrying values of our assets and liabilities, which are not readily apparent from other sources. We base our estimates and judgments on historical information and on various other assumptions that we believe are reasonable under the circumstances. GAAP requires us to make estimates and judgments in several areas, including, but not limited to, those related to revenue recognition, collectability of accounts receivable, contingent liabilities, fair value of share-based awards, fair value of financial instruments, fair value of acquired intangible assets and goodwill, useful lives of intangible assets and property and equipment, and income taxes. These estimates are based on management's knowledge about current events and expectations about actions we may undertake in the future. Actual results could differ materially from those estimates.

*Cash and Cash Equivalents, and Marketable Securities*

We hold investments in short-term and long-term marketable securities, consisting of U.S. government and government agency securities. We classify our marketable securities as available-for-sale investments in our current assets because they represent investments of cash available for current operations. Our available-for-sale investments are carried at estimated fair value with any unrealized gains and losses, net of taxes, included in accumulated other comprehensive income/(loss) in stockholders' equity. Unrealized losses are charged against other income (expense), net when a decline in fair value is determined to be other-than-temporary. We have not recorded any such impairment charge in any period presented. We determine realized gains or losses on sale of marketable securities on a specific identification method, and record such gains or losses as a component of other income (expense), net.

We classify certain restricted cash balances within prepaid expenses and other current assets and other assets on the accompanying consolidated balance sheets based upon the term of the remaining restrictions.

*Non-Marketable Securities*

We invest in certain investment funds that are not publicly traded. We carry these investments at cost because we do not have significant influence over the underlying investee. We assess for any other-than-temporary impairment at least on an annual basis. No impairment charge has been recorded to-date on our non-marketable securities.

F-7

PX0559-171

**Table of Contents**

## FACEBOOK, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

*Fair Value of Financial Instruments*

We apply fair value accounting for all financial assets and liabilities and non-financial assets and liabilities that are recognized or disclosed at fair value in the financial statements on a recurring basis. We define fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities, which are required to be recorded at fair value, we consider the principal or most advantageous market in which we would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as risks inherent in valuation techniques, transfer restrictions and credit risk. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

*Level 1*—Quoted prices in active markets for identical assets or liabilities.

*Level 2*—Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

*Level 3*—Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

Our valuation techniques used to measure the fair value of money market funds and marketable debt securities were derived from quoted prices in active markets for identical assets or liabilities.

*Foreign Currency*

Generally the functional currency of our international subsidiaries is the local currency. We translate the financial statements of these subsidiaries to U.S. dollars using month-end rates of exchange for assets and liabilities, and average rates of exchange for revenue, costs, and expenses. Translation gains and losses are recorded in accumulated other comprehensive income (loss) as a component of stockholders' equity. Net losses resulting from foreign exchange transactions were insignificant for the year ended December 31, 2009, and were $1 million and $29 million, respectively, for the years ended December 31, 2010 and 2011. These losses were recorded as a component of other income (expense), net.

*Property and Equipment*

Property and equipment, which includes amounts recorded under capital leases, are stated at cost. Depreciation is computed using the straight-line method over the estimated useful lives of the assets or the remaining lease term, in the case of a capital lease, whichever is shorter.

The estimated useful lives of property and equipment are described below:

| Property and Equipment | Useful Life |
| --- | --- |
| Network equipment | Three to four years |
| Computer software, office equipment and other | Two to five years |
| Buildings | 15 to 20 years |
| Leased equipment and leasehold improvements | Lesser of estimated useful life or remaining lease term |

F-8

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Land and assets held within construction in progress are not depreciated. Construction in progress is related to the construction or development of property and equipment that have not yet been placed in service for their intended use.

The cost of maintenance and repairs is expensed as incurred. When assets are retired or otherwise disposed of, the cost and related accumulated depreciation and amortization are removed from their respective accounts, and any gain or loss on such sale or disposal is reflected in income from operations.

*Long-Lived Assets, Including Goodwill and Other Acquired Intangible Assets*

We evaluate the recoverability of property and equipment and amortizable intangible assets for possible impairment whenever events or circumstances indicate that the carrying amount of such assets may not be recoverable. Recoverability of these assets is measured by a comparison of the carrying amounts to the future undiscounted cash flows the assets are expected to generate. If such review indicates that the carrying amount of property and equipment and intangible assets is not recoverable, the carrying amount of such assets is reduced to fair value. In addition, we test goodwill for impairment at least annually or more frequently if events or changes in circumstances indicate that this asset may be impaired. These tests are based on our single operating segment and reporting unit structure. No indications of impairment of goodwill were noted during the years presented.

Acquired amortizable intangible assets, which are included in goodwill and intangible assets, net, are amortized on a straight-line basis over the estimated useful lives of the assets. The estimated remaining useful lives for intangible assets range from less than one year to 16 years.

In addition to the recoverability assessment, we routinely review the remaining estimated useful lives of property and equipment and amortizable intangible assets. If we reduce the estimated useful life assumption for any asset, the remaining unamortized balance would be amortized or depreciated over the revised estimated useful life.

*Lease Obligations*

We lease office space, data centers, and equipment under non-cancelable capital and operating leases with various expiration dates through 2027. Certain of the operating lease agreements contain rent holidays, rent escalation provisions, and purchase options. Rent holidays and rent escalation provisions are considered in determining the straight-line rent expense to be recorded over the lease term. The lease term begins on the date of initial possession of the leased property for purposes of recognizing lease expense on a straight-line basis over the term of the lease. We do not assume renewals in our determination of the lease term unless the renewals are deemed to be reasonably assured at lease inception.

*Unaudited Pro Forma Balance Sheet Information*

Upon the completion of our initial public offering, all outstanding convertible preferred stock will automatically convert into shares of our Class B common stock. The unaudited pro forma balance sheet information gives effect to the conversion of the convertible preferred stock as of December 31, 2011. Additionally, as described in detail in "—Share-based Compensation" below, we grant restricted stock units (RSUs) that generally vest upon the satisfaction of a service condition, and with respect to RSUs granted prior to January 1, 2011 (Pre-2011 RSUs), six months after the completion of our initial public offering. The vesting condition that will be satisfied six months following our initial public offering does not affect the expense attribution period for the RSUs for which the service condition has been met as of the date of our initial public offering. Accordingly, the unaudited pro forma balance sheet information at December 31, 2011, gives effect to share-based compensation expense of approximately $968 million associated with Pre-2011 RSUs, for which the service condition was met as of December 31, 2011, which we expect to record upon the completion of our

F-9

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

initial public offering. This pro forma adjustment related to share-based compensation expense of approximately $968 million has been reflected as an increase to additional paid-in capital and the associated tax effect of $329 million has been netted against this charge, resulting in a net reduction of $639 million to retained earnings. The income tax effects have been reflected as an increase to deferred tax assets included in prepaid expenses and other current assets, to reflect the anticipated future tax benefits upon settlement of the RSUs, as adjusted for any RSUs that will not result in a tax benefit because they are related to foreign employees or foreign operations. Payroll tax expenses and other withholding obligations have not been included in the pro forma adjustment. We estimate that approximately shares underlying Pre-2011 RSUs will vest and settle approximately six months after our initial public offering. RSU holders generally will recognize taxable income based upon the value of the shares on the date they are settled and we are required to withhold taxes on such value at applicable minimum statutory rates. We currently expect that the average of these withholding rates will be approximately 45%. We are unable to quantify the obligations as of December 31, 2011 and we will remain unable to quantify this amount until the settlement of the RSUs, as the withholding obligation will be based on the value of the shares six months after the date of our initial public offering.

*Share-based Compensation*

We account for share-based employee compensation plans under the fair value recognition and measurement provisions of GAAP. Those provisions require all share-based payments to employees, including grants of stock options and RSUs, to be measured based on the grant-date fair value of the awards, with the resulting expense generally recognized in our consolidated statements of income over the period during which the employee is required to perform service in exchange for the award.

We estimate the fair value of stock options granted using the Black-Scholes-Merton single option valuation model, which requires inputs such as expected term, expected volatility and risk-free interest rate. Further, the estimated forfeiture rate of awards also affects the amount of aggregate compensation. These inputs are subjective and generally require significant analysis and judgment to develop.

We estimate the expected term based upon the historical behavior of our employees for employee grants. We estimate expected volatility based on a study of publicly traded industry peer companies. The forfeiture rate is derived primarily from our historical data, and the risk-free interest rate is based on the yield available on U.S. Treasury zero-coupon issues. Our dividend yield is 0%, since we have not paid, and do not expect to pay, dividends.

The fair values of employee options granted during 2009 and 2010 have been estimated as of the date of grant using the following weighted-average assumptions.

|  | Year Ended December 31, | |
|---|---|---|
|  | **2009** | **2010** |
| Expected term from grant date (in years) | 5.04 | 7.15 |
| Risk-free interest rate | 2.01% | 1.69% |
| Expected volatility | 0.57 | 0.46 |
| Dividend yield | — | — |

The weighted-average fair value of employee options granted during 2009 and 2010 was $1.12 and $5.26 per share, respectively. There were no option grants in 2011.

We have granted RSUs to our employees and members of our board of directors. Pre-2011 RSUs granted under our 2005 Stock Plan vest upon the satisfaction of both a service condition and a liquidity condition. The service condition for the majority of these awards is satisfied over four years. The liquidity condition is satisfied

F-10

PX0559-174

Table of Contents

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

upon the occurrence of a qualifying event, defined as a change of control transaction or six months following the completion of our initial public offering. Pre-2011 RSUs for which the service condition has been satisfied are not forfeitable should employment terminate prior to the liquidity condition being met. As of December 31, 2011, no share-based compensation had been recognized for Pre-2011 RSUs, because the qualifying events (described above) had not occurred. The vesting condition that will be satisfied six months following our initial public offering does not affect the expense attribution period for the RSUs for which the service condition has been met as of the date of our initial public offering. This six-month period is not a substantive service condition and, accordingly, upon the effectiveness of our initial public offering, we will recognize a significant cumulative share-based compensation expense for the portion of the RSUs that had met the service condition as of that date, following the accelerated attribution method (net of estimated forfeitures). The remaining unrecognized share-based compensation expense related to the Pre-2011 RSUs will be recorded over the remaining requisite service period, using the accelerated attribution method (net of estimated forfeitures). For the Pre-2011 RSUs, if the initial public offering had occurred on December 31, 2011, we would have recognized $968 million of share-based compensation expense on that date, and would have approximately $239 million of additional future period expense to be recognized over a weighted-average period of approximately two years.

RSUs granted on or after January 1, 2011 (Post-2011 RSUs) are not subject to a liquidity condition in order to vest, and compensation expense related to these grants is based on the grant date fair value of the RSUs and is recognized on a straight-line basis over the applicable service period. The majority of Post-2011 RSUs are earned over a service period of four to five years. In 2011, we recognized $189 million of share-based compensation expense related to the Post-2011 RSUs, and we anticipate $1,189 million of future period expense related to such RSUs to be recognized over a weighted-average period of approximately three years.

There was no capitalized share-based employee compensation expense as of December 31, 2010 and December 31, 2011. During the years ended December 31, 2009, 2010, and 2011, we realized excess tax benefits of $51 million, $115 million and $433 million, respectively, related to tax deductions from share-based award activity. Excess tax benefits were recorded as an adjustment to stockholders' equity in each period and were not recognized in our consolidated statements of income.

As of December 31, 2011, there was $2,463 million of unrecognized share-based compensation expense, of which $2,396 million is related to RSUs, and $67 million is related to restricted shares and stock options. This unrecognized compensation expense is expected to be recognized over a weighted-average period of approximately two years.

*Income Taxes*

We recognize income taxes under the asset and liability method. We recognize deferred income tax assets and liabilities for the expected future consequences of temporary differences between the financial reporting and tax bases of assets and liabilities. These differences are measured using the enacted statutory tax rates that are expected to apply to taxable income for the years in which differences are expected to reverse. We recognize the effect on deferred income taxes of a change in tax rates in income in the period that includes the enactment date.

We record a valuation allowance to reduce our deferred tax assets to the net amount that we believe is more likely than not to be realized. We consider all available evidence, both positive and negative, including historical levels of income, expectations and risks associated with estimates of future taxable income and ongoing tax planning strategies in assessing the need for a valuation allowance.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. We make adjustments to these reserves when facts and circumstances change, such as the closing of a

F-11

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

tax audit or the refinement of an estimate. The provision for income taxes includes the effects of any reserves that are considered appropriate, as well as the related net interest and penalties.

*Revenue Recognition*

We generate substantially all of our revenue from advertising and payment processing fees. We recognize revenue once all of the following criteria have been met:

- persuasive evidence of an arrangement exists;
- delivery of Facebook's obligations to our customer has occurred;
- the price is fixed or determinable; and
- collectability of the related receivable is reasonably assured.

Revenue for the years ended December 31, 2009, 2010, and 2011 consists of the following (in millions):

|  | Year Ended December 31, | | |
|  | 2009 | 2010 | 2011 |
| Revenue | | | |
| Advertising | $ 764 | $ 1,868 | $ 3,154 |
| Payments and other fees | 13 | 106 | 557 |
| Total revenue | $ 777 | $ 1,974 | $ 3,711 |

*Advertising*

Advertising revenue is generated from the display of advertisements on our website. The arrangements are evidenced by either online acceptance of terms and conditions or contracts that stipulate the types of advertising to be delivered, the timing and the pricing.

We recognize revenue from the display of impression-based advertisements on our website in the contracted period when the impressions are delivered. Impressions are considered delivered when an advertisement appears in pages delivered to users.

We also recognize revenue from the delivery of click-based advertisements on our website. Revenue associated with these advertisements is recognized in the period that a user clicks on an advertisement.

*Payments and Other Fees*

We enable Payments between our users and developers on the Facebook Platform. Our users can purchase virtual or digital goods on the Facebook Platform by using credit cards or other payment methods available on our website. The primary method for users to transact with the developers on the Facebook Platform is via the purchase of our virtual currency, which enables our users to purchase virtual and digital goods in games and apps. Upon the initial sale of our virtual currency, we record consideration received from a user as a deposit.

When a user engages in a payment transaction utilizing our virtual currency for the purchase of a virtual or digital good from a Platform developer, we reduce the user's virtual currency balance by the price of the purchase, which is a price that is solely determined by the Platform developer. We remit to the Platform developer an amount that is based on the total amount of virtual currency redeemed less the processing fee that we charge the Platform developer for the transaction. Our revenue is the net amount of the transaction, representing our processing fee for the service performed. We record revenue on a net basis as we do not consider ourselves to be the principal in the sale of the virtual or digital good to the user.

F-12

**Table of Contents**

### FACEBOOK, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Other fees have not been material in all periods presented in our financial statements.

All revenue is recognized net of applicable sales and other taxes, where appropriate.

*Cost of Revenue*

Our cost of revenue consists primarily of expenses associated with the delivery and distribution of our products. These include expenses related to the operation of our data centers such as facility and server equipment depreciation, facility and server equipment rent expense, energy and bandwidth costs, support and maintenance costs, and salaries, benefits and share-based compensation for certain personnel on our operations teams. Cost of revenue also includes credit card and other transaction fees related to processing customer transactions.

*Deferred Revenue and Deposits*

Deferred revenue consists of billings in advance of revenue recognition. Deposits relate to unused virtual currency held by our users. Once this virtual currency is utilized by a user, approximately 70% of this amount would then be payable to the Platform developer and the balance would be recognized as revenue.

Deferred revenue and deposits consists of the following (in millions):

|  | December 31, | |
|  | **2010** | **2011** |
| --- | --- | --- |
| Deferred revenue | $ 35 | $ 75 |
| Deposits | 7 | 15 |
| Total deferred revenue and deposits | $ 42 | $ 90 |

*Credit Risk and Concentration*

Financial instruments owned by the company that are potentially subject to concentrations of credit risk consist primarily of cash, cash equivalents, restricted cash, marketable securities, and accounts receivable. Cash equivalents consist of short-term money market funds and U.S. government and agency securities, which are deposited with reputable financial institutions. Marketable securities consist of investments in U.S. government and government agency securities. Our cash management and investment policy limits investment instruments to investment-grade securities with the objective to preserve capital and to maintain liquidity until the funds can be used in business operations. Bank accounts in the United States are insured by the Federal Deposit Insurance Corporation (FDIC) up to $250,000. Our operating accounts significantly exceed the FDIC limits.

Accounts receivable are typically unsecured and are derived from revenue earned from customers across different industries and countries. We generated 67%, 62%, and 56% of our revenue for the years ended December 31, 2009, 2010, and 2011, respectively, from advertisers and Platform developers based in the United States, with the majority of revenue outside of the United States coming from customers located in western Europe, Canada, and Australia.

We perform ongoing credit evaluations of our customers, and generally do not require collateral. An allowance for doubtful accounts is determined using the specific-identification method for doubtful accounts and an aging of receivables analysis based on invoice due dates. Uncollectible receivables are written off against the allowance for doubtful accounts when all efforts to collect them have been exhausted, and recoveries are recognized as an increase to the allowance when they are received. During the years ended December 31, 2009,

F-13

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

2010, and 2011, our bad debt expenses were $1 million, $9 million, and $8 million respectively. In the event that accounts receivable collection cycles deteriorate, our operating results and financial position could be adversely affected.

Revenue from one customer, Zynga, represented 12% of total revenue for the year ended December 31, 2011. No customer represented 10% or more of total revenue during the years ended December 31, 2009 or 2010.

*Advertising Expense*

We expense our costs of advertising in the period in which they are incurred. Advertising expense, which is included in marketing and sales expenses, totaled $5 million, $8 million, and $28 million for the years ended December 31, 2009, 2010, and 2011, respectively.

*Segments*

Our chief operating decision-maker is our Chief Executive Officer who reviews financial information presented on a consolidated basis. There are no segment managers who are held accountable by the chief operating decision-maker, or anyone else, for operations, operating results, and planning for levels or components below the consolidated unit level. Accordingly, we have determined that we have a single reporting segment and operating unit structure.

**Note 2.   Earnings per Share**

We compute earnings per share (EPS) of Class A and Class B common stock using the two-class method required for participating securities. Our participating securities include all series of our convertible preferred stock and restricted stock awards. Undistributed earnings allocated to these participating securities are subtracted from net income in determining net income attributable to common stockholders. Basic EPS is computed by dividing net income attributable to common stockholders by the weighted-average number of shares of our Class A and Class B common stock outstanding, adjusted for outstanding shares that are subject to repurchase.

For the calculation of diluted EPS, net income attributable to common stockholders for basic EPS is adjusted by the effect of dilutive securities, including awards under our equity compensation plans. In addition, the computation of the diluted EPS of Class A common stock assumes the conversion from Class B common stock, while the diluted EPS of Class B common stock does not assume the conversion of those shares. Diluted EPS attributable to common stockholders is computed by dividing the resulting net income attributable to common stockholders by the weighted-average number of fully diluted common shares outstanding.

Dilutive securities in our diluted EPS calculation do not include Pre-2011 RSUs. Vesting of these RSUs is dependent upon the satisfaction of both a service condition and a liquidity condition. The liquidity condition is satisfied upon the occurrence of a qualifying event, defined as a change of control transaction or six months following the completion of our initial public offering. As of December 31, 2011, such a qualifying event had not occurred and until it occurs, the holders of these RSUs have no rights in our undistributed earnings. Therefore, they are excluded from the effect of dilutive securities. Post-2011 RSUs are not subject to a liquidity condition in order to vest, and are thus included in the calculation of diluted EPS. We excluded 4 million and 2 million shares issuable upon exercise of employee stock options for the years ended December 31, 2009 and 2010, respectively, and 3 million Post-2011 RSUs for the year ended December 31, 2011 because the impact would be antidilutive.

Basic and diluted EPS are the same for each class of common stock because they are entitled to the same liquidation and dividend rights.

F-14

PX0559-178

Table of Contents

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The numerators and denominators of the basic and diluted EPS computations for our common stock are calculated as follows (in millions, except per share amounts):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2009 | | 2010 | | 2011 | |
| | Class A | Class B | Class A | Class B | Class A | Class B |
| **Basic EPS:** | | | | | | |
| Numerator: | | | | | | |
| Net income | $ — | $ 229 | $ 18 | $ 588 | $ 85 | $ 915 |
| Less: Net income attributable to participating securities | — | 107 | 7 | 227 | 28 | 304 |
| Net income attributable to common stockholders | $ — | $ 122 | $ 11 | $ 361 | $ 57 | $ 611 |
| Denominator: | | | | | | |
| Weighted average shares outstanding | — | 1,026 | 32 | 1,081 | 110 | 1,189 |
| Less: Shares subject to repurchase | — | 6 | — | 6 | — | 5 |
| Number of shares used for basic EPS computation | — | 1,020 | 32 | 1,075 | 110 | 1,184 |
| Basic EPS | $ — | $ 0.12 | $ 0.34 | $ 0.34 | $ 0.52 | $ 0.52 |
| **Diluted EPS:** | | | | | | |
| Numerator: | | | | | | |
| Net income attributable to common stockholders | $ — | $ 122 | $ 11 | $ 361 | $ 57 | $ 611 |
| Reallocation of net income attributable to participating securities | 12 | — | 30 | — | 31 | — |
| Reallocation of net income as a result of conversion of Class B to Class A common stock | 122 | — | 361 | — | 611 | — |
| Reallocation of net income to Class B common stock | — | 12 | — | 32 | — | 37 |
| Net income attributable to common stockholders for diluted EPS | $ 134 | $ 134 | $ 402 | $ 393 | $ 699 | $ 648 |
| Denominator: | | | | | | |
| Number of shares used for basic EPS computation | — | 1,020 | 32 | 1,075 | 110 | 1,184 |
| Conversion of Class B to Class A common stock | 1,020 | — | 1,075 | — | 1,184 | — |
| Weighted average effect of dilutive securities: | | | | | | |
| Employee stock options | 334 | 334 | 295 | 295 | 204 | 204 |
| RSUs | — | — | — | — | 5 | 5 |
| Shares subject to repurchase | 5 | 5 | 4 | 4 | 3 | 3 |
| Warrants | 7 | 7 | 8 | 8 | 2 | 2 |
| Number of shares used for diluted EPS computation | 1,366 | 1,366 | 1,414 | 1,382 | 1,508 | 1,398 |
| Diluted EPS | $ 0.10 | $ 0.10 | $ 0.28 | $ 0.28 | $ 0.46 | $ 0.46 |

F-15

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Pro Forma EPS (unaudited)*

The following unaudited calculation of the numerators and denominators of basic and diluted EPS gives effect to the automatic conversion of all outstanding shares of our convertible preferred stock (using the as if-converted method) into Class B common stock as though the conversion had occurred as of the beginning of the period or the original date of issuance, if later. In addition, the pro forma share amounts give effect to Pre-2011 RSUs that have satisfied the service condition as of December 31, 2011. These RSUs will vest and settle upon the satisfaction of a qualifying event, as previously defined. Share-based compensation expense associated with these Pre-2011 RSUs is excluded from this pro forma presentation. If the qualifying event had occurred on December 31, 2011, we would have recorded $968 million of share-based compensation expense on that date related to these RSUs, net of associated tax effect of $329 million, resulting in a net reduction of $639 million to net income.

| | Year Ended December 31, 2011 | |
| --- | --- | --- |
| | Class A | Class B |
| Pro Forma Basic EPS | | |
| Numerator: | | |
| Net income as reported | $ 85 | $ 915 |
| Reallocation of net income due to pro forma adjustments | (31) | 31 |
| Net income attributable to participating securities | — | (2) |
| Net income attributable to common stockholders for pro forma basic EPS computation | $ 54 | $ 944 |
| Denominator: | | |
| Weighted average shares used for basic EPS computation | 110 | 1,184 |
| Pro forma adjustment to reflect assumed conversion of preferred stock to Class B common stock | — | 548 |
| Pro forma adjustment to reflect assumed vesting of Pre-2011 RSUs | — | 188 |
| Number of shares used for pro forma basic EPS computation | 110 | 1,920 |
| Pro forma basic EPS | $ 0.49 | $ 0.49 |
| Pro Forma Diluted EPS: | | |
| Numerator: | | |
| Net income attributable to common stockholders for pro forma basic EPS computation | $ 54 | $ 944 |
| Reallocation of net income attributable to participating securities | 2 | — |
| Reallocation of net income as a result of conversion of Class B to Class A common stock | 944 | — |
| Reallocation of net income to Class B common stock | — | 9 |
| Net income attributable to common stockholders for pro forma diluted EPS computation | $ 1,000 | $ 953 |
| Denominator: | | |
| Number of shares used for pro forma basic EPS computation | 110 | 1,920 |
| Conversion of Class B to Class A common stock | 1,920 | — |
| Weighted average effect of dilutive securities: | | |
| Employee stock options | 204 | 204 |
| RSUs | 93 | 93 |
| Shares subject to repurchase | 3 | 3 |
| Warrants | 2 | 2 |
| Number of shares used for pro forma diluted EPS computation | 2,332 | 2,222 |
| Pro forma diluted EPS | $ 0.43 | $ 0.43 |

F-16

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

**Note 3.   Property and Equipment**

Property and equipment consists of the following (in millions):

|  | December 31, | |
| --- | --- | --- |
|  | 2010 | 2011 |
| Network equipment | $  478 | $1,016 |
| Land | 29 | 34 |
| Buildings | — | 355 |
| Leasehold improvements | 58 | 120 |
| Computer software, office equipment and other | 61 | 73 |
| Construction in progress | 194 | 327 |
| Total | 820 | 1,925 |
| Less accumulated depreciation and amortization | (246) | (450) |
| Property and equipment, net | $  574 | $1,475 |

Property and equipment at December 31, 2010 and 2011 includes $298 million and $881 million, respectively, acquired under capital lease agreements. Accumulated amortization under capital leases totaled $85 million and $210 million at December 31, 2010 and 2011, respectively. Amortization of assets under capital leases is included in depreciation and amortization expense.

Construction in progress includes costs primarily related to the construction and network equipment of data centers in Oregon and North Carolina in the United States and in Sweden, and our new corporate headquarters in Menlo Park, California. Interest capitalized during the years presented was not material.

**Note 4.   Goodwill and Intangible Assets**

Goodwill and intangible assets consist of the following (in millions):

|  | December 31, | |
| --- | --- | --- |
|  | 2010 | 2011 |
| Acquired patents | $   33 | $   51 |
| Acquired non-compete agreements | 11 | 18 |
| Acquired technology and other | 27 | 43 |
| Accumulated amortization | (12) | (32) |
| Net acquired intangible assets | 59 | 80 |
| Goodwill | 37 | 82 |
| Goodwill and intangible assets | $   96 | $  162 |

Acquired patents have estimated useful lives ranging from four to 18 years at acquisition. The average term of acquired non-compete agreements is generally two years. Acquired technology and other have estimated useful lives of two to ten years. Amortization expense of intangible assets for the years ended December 31, 2009, 2010, and 2011 was $2 million, $9 million, and $20 million, respectively.

During the year ended December 31, 2011, we completed business acquisitions for total consideration of $68 million. These acquisitions were not material to our consolidated financial statements individually or in the aggregate. Our acquisitions prior to 2011 were also not material individually or in the aggregate.

F-17

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table presents the aggregated estimated fair value of the assets acquired for all acquisitions completed during the year ended December 31, 2011 (in millions):

| | |
|---|---|
| Acquired technology and other | $16 |
| Acquired non-compete agreements | 7 |
| Net assets acquired | 4 |
| Deferred income tax liabilities | (7) |
| Goodwill | 48 |
| Total | $68 |

Pro forma results of operations related to our 2011 acquisitions have not been presented because they are not material to our consolidated statements of income, either individually or in the aggregate. For all acquisitions completed during the year ended December 31, 2011, acquired technology and other had a weighted-average useful life of three years and the term of the non-compete agreements is generally two years.

The changes in carrying amount of goodwill for the years ended December 31, 2010 and 2011 are as follows (in millions):

| | |
|---|---|
| Balance as of December 31, 2009 | $11 |
| Goodwill acquired | 26 |
| Balance as of December 31, 2010 | 37 |
| Goodwill acquired | 48 |
| Effect of currency translation adjustment | (3) |
| Balance as of December 31, 2011 | $82 |

Expected amortization expense for the unamortized acquired intangible assets for the next five years and thereafter is as follows (in millions):

| | |
|---|---|
| 2012 | $21 |
| 2013 | 11 |
| 2014 | 7 |
| 2015 | 7 |
| 2016 | 6 |
| Thereafter | 28 |
| Total | $80 |

**Note 5.   Long-term Debt**

In March 2010, we entered into a senior unsecured term loan facility with certain lenders. This facility allowed for the drawdown of up to $250 million in unsecured senior loans with a maturity of five years. In April 2010 we drew down the full amount available under the facility at an interest rate of 4.5%, payable quarterly. The loan could be repaid by us at any time without penalty. Debt issuance costs of approximately $1 million were recorded in other non-current assets and were being amortized to interest expense over the contractual term of the loan. On March 2, 2011, we repaid in full the long-term debt balance of $250 million, and expensed the remaining unamortized debt issuance costs.

F-18

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

In 2011, we entered into an agreement for an unsecured five-year revolving credit facility that allowed us to borrow up to $2,500 million, with interest payable on borrowed amounts set at the London Interbank Offered Rate (LIBOR) plus 1.0%. No amounts were drawn down under this agreement as of December 31, 2011. We paid origination fees at closing and these fees are amortized over the remaining term of the credit facility. Subsequent to December 31, 2011, we terminated this revolving credit facility. For more information, see "—Note 13. Subsequent Events (unaudited)."

**Note 6.   Fair Value Measurements**

Assets measured at fair value on a recurring basis are summarized below (in millions):

| | | | Fair Value Measurement at Reporting Date Using | | |
| Description | December 31, 2011 | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|---|
| Cash equivalents: | | | | | |
| Money market funds | $ | 892 | $ 892 | $ — | $ — |
| U.S. government and agency securities | | 110 | 110 | — | |
| Total cash equivalents | | 1,002 | 1,002 | | |
| Marketable securities: | | | | | |
| U.S. government and agency securities | | 2,396 | 2,396 | | |
| Total cash equivalents and marketable securities | $ | 3,398 | $ 3,398 | $ — | $ — |

| | | | Fair Value Measurement at Reporting Date Using | | |
| Description | December 31, 2010 | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|---|
| Cash equivalents: | | | | | |
| Money market funds | $ | 1,450 | $ 1,450 | $ — | $ — |
| Total cash equivalents | $ | 1,450 | $ 1,450 | $ — | $ — |

Gross unrealized gains or losses for cash equivalent and marketable securities as of December 31, 2010 and 2011 were not material.

The following table classifies our marketable securities by contractual maturities as of December 31, 2011 (in millions):

| | December 31, 2011 |
|---|---|
| Due in one year | $ 1,964 |
| Due in one to five years | 432 |
| Total | $ 2,396 |

F-19

Amendment No. 2 to Registration Statement on Form S-1

Table of Contents

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

**Note 7.   Commitments and Contingencies**

*Leases*

We entered into various capital lease arrangements to obtain property and equipment for our operations. Additionally, on occasion we have purchased property and equipment for which we have subsequently obtained capital financing under sale-leaseback transactions. These agreements are typically for three years except for building leases which are for 15 years, with interest rates ranging from 2% to 13%. The leases are secured by the underlying leased buildings, leasehold improvements, and equipment. We have also entered into various non-cancelable operating lease agreements for certain of our offices, equipment, land and data centers with original lease periods expiring between 2012 and 2027. We are committed to pay a portion of the related actual operating expenses under certain of these lease agreements. Certain of these arrangements have free rent periods or escalating rent payment provisions, and we recognize rent expense under such arrangements on a straight-line basis.

The following is a schedule, by years, of the future minimum lease payments required under non-cancelable capital and operating leases as of December 31, 2011 (in millions):

|  | Capital Leases | Operating Leases |
|---|---|---|
| 2012 | $ 322 | $   180 |
| 2013 | 228 | 130 |
| 2014 | 109 | 113 |
| 2015 | 17 | 102 |
| 2016 | 11 | 95 |
| Thereafter | 130 | 325 |
| Total minimum lease payments | 817 | $   945 |
| Less amount representing interest and taxes | (140) | |
| Less current portion of the present value of minimum lease payments | (279) | |
| Capital lease obligations, net of current portion | $ 398 | |

Operating lease expense totaled $69 million, $178 million, and $219 million for the years ended December 31, 2009, 2010, and 2011, respectively.

We also have $500 million of non-cancelable contractual commitments as of December 31, 2011, primarily related to equipment and supplies for our data center operations, and to a lesser extent, construction of our data center sites. The majority of these commitments are due in the next twelve months.

*Contingencies*

*Legal Matters*

We are party to various legal proceedings and claims which arise in the ordinary course of business. In the opinion of management, as of December 31, 2011, there was not at least a reasonable possibility that we had incurred a material loss, or a material loss in excess of a recorded accrual, with respect to loss contingencies.

F-20

PX0559-184

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Indemnifications*

In the normal course of business, to facilitate transactions of services and products, we have agreed to indemnify certain parties with respect to certain matters. We have agreed to hold certain parties harmless against losses arising from a breach of representations or covenants, or out of intellectual property infringement or other claims made by third parties. In addition, we have also agreed to indemnify certain investors with respect to representations made by us in connection with the issuance and sale of preferred stock. These agreements may limit the time within which an indemnification claim can be made and the amount of the claim. In addition, we have entered into indemnification agreements with our officers, directors, and certain employees, and our certificate of incorporation and bylaws contain similar indemnification obligations.

It is not possible to determine the maximum potential amount under these indemnification agreements due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each particular agreement. Historically, payments made by us under these agreements have not had a material impact on our consolidated financial position, results of operations or cash flows. In our opinion, as of December 31, 2011, there was not at least a reasonable possibility we had incurred a material loss with respect to indemnification of such parties. We have not recorded any liability for costs related to indemnification through December 31, 2011.

**Note 8.    Stockholders' Equity**

*Convertible Preferred Stock*

Our certificate of incorporation, as amended and restated, authorizes the issuance of 569,001,400 shares of $0.000006 par value convertible preferred stock. The following table summarizes the convertible preferred stock outstanding as of December 31, 2011, and the rights and preferences of the respective series:

| | Shares | | Aggregate Liquidation Preference (in millions) | Dividend Per Share Per Annum | Conversion Ratio Per Share |
|---|---|---|---|---|---|
| | Authorized (in thousands) | Issued and Outstanding (in thousands) | | | |
| Series A | 134,747 | 133,055 | $      1 | $0.00036875 | 1.000000 |
| Series B | 226,032 | 224,273 | 13 | 0.00456 | 1.004910 |
| Series C | 95,768 | 91,410 | 26 | 0.02297335 | 1.004909 |
| Series D | 67,454 | 50,590 | 375 | 0.593 | 1.012561 |
| Series E | 45,000 | 44,038 | 200 | 0.3633264 | 1.000000 |
| Total | 569,001 | 543,366 | $  615 | | |

As of December 31, 2011, the rights, preferences, and privileges of the preferred stockholders were as follows:

*Dividends*

The holders of shares of Series A, Series B, Series C, Series D, and Series E convertible preferred stock are entitled to receive non-cumulative dividends, out of any assets legally available for such purpose, prior and in preference to any declaration or payment of any dividend on the Class A common stock or Class B common stock, payable quarterly when, as and if, declared by our board of directors. After payment of such dividend to the preferred stockholders, outstanding shares of preferred stock shall participate with shares of Class A common stock and Class B common stock on an as-converted to Class B common stock basis as to any additional dividends. As of December 31, 2011, we had not declared any dividends.

F-21

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Conversion*

Each share of Series A, Series B, Series C, Series D, and Series E preferred stock is convertible, at the option of the holder thereof, at any time after the date of issuance of such share, into such number of fully paid and non-assessable shares of Class B common stock as is determined by dividing the applicable original issue price by the conversion price applicable to such share in effect on the date of conversion.

The conversion price of each series of preferred stock may be subject to adjustment from time to time under certain circumstances. The convertible preferred stock issued to date was sold at prices ranging from $0.004605 to $7.412454 per share, which, in all cases, exceeded the then most recent reassessed fair value of our Class B common stock. Accordingly, there was no intrinsic value associated with the issuance of the convertible preferred stock through December 31, 2011, and there were no other separate instruments issued with the convertible preferred stock, such as warrants. Therefore, we have concluded that there was no beneficial conversion option associated with the convertible preferred stock issuances.

Each share of Series A, Series B, Series C, Series D, and Series E convertible preferred stock shall automatically be converted into fully paid, non-assessable shares of Class B common stock immediately upon the earlier of: (i) the sale by us of our Class A common stock or Class B common stock in a firm commitment underwritten public offering pursuant to a registration statement under the Securities Act of 1933, as amended (Securities Act), the public offering price of which results in aggregate cash proceeds to us of not less than $100 million (net of underwriting discounts and commissions), or (ii) the date specified by written consent or agreement of the holders of a majority of the then-outstanding shares of preferred stock, voting together as a single class on an as-converted basis, provided, however, that if (a) the holders of a majority of the then-outstanding shares of Series D convertible preferred stock do not consent or agree or (b) the holders of a majority of the then-outstanding shares of Series E convertible preferred stock do not consent or agree, then in either such case the conversion shall not be effective as to any shares of preferred stock until 180 days after the date of the written consent of the majority of the then-outstanding shares of preferred stock.

*Liquidation Preferences*

In the event we liquidate, dissolve, or wind up our business, either voluntarily or involuntarily, the holders of our Series A, Series B, Series C, Series D, and Series E convertible preferred stock shall be entitled to receive, prior and in preference to any distribution of any of our assets to the holders of Class A common stock or Class B common stock, an amount per share equal to $0.004605, $0.0570025, $0.2871668, $7.412454, and $4.54158 per share (as adjusted for stock splits, stock dividends, reclassifications, and the like), respectively, plus any declared but unpaid dividends.

If, upon the occurrence of any of these events, the assets and funds distributed among the holders of the Series A, Series B, Series C, Series D, and Series E convertible preferred stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then our entire assets and funds legally available for distribution shall be distributed ratably among the holders of the Series A, Series B, Series C, Series D, and Series E convertible preferred stock in proportion to the preferential amount each such holder is otherwise entitled to receive.

If there are any remaining assets upon the completion of the liquidating distribution to the Series A, Series B, Series C, Series D, and Series E convertible preferred stockholders, the holders of our Class A common stock and Class B common stock will receive all our remaining assets. The merger or consolidation of us into another entity in which our stockholders own less than 50% of the voting stock of the surviving company, or the sale, transfer, or lease of substantially all our assets, shall be deemed a liquidation, dissolution, or winding up of us. As the "redemption" events are within our control for all periods presented, all shares of preferred stock have been presented as part of permanent equity.

F-22

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Voting Rights*

The holder of each share of Series A, Series B, Series C, Series D, and Series E convertible preferred stock shall have the same voting rights as the holders of Class B common stock, is entitled to notice of any stockholders' meeting in accordance with our bylaws, and together with the holders of Class A common stock and Class B common stock, the Series A, Series B, Series C, Series D, and Series E convertible preferred stock will vote together as a single class on all matters which holders of Class A common stock and Class B common stock have the right to vote, unless otherwise stated. Each holder of Class A common stock is entitled to one vote for each share of Class A common stock held; each holder of Class B common stock is entitled to ten votes for each share of Class B common stock held; and each holder of Series A, Series B, Series C, Series D, and Series E convertible preferred stock is entitled to ten votes for each share of Class B common stock into which such convertible preferred stock could be converted.

*Common Stock*

Our certificate of incorporation authorizes the issuance of Class A common stock and Class B common stock. We are authorized to issue 4,141,000,000 shares of Class A common stock and 4,141,000,000 shares of Class B common stock, each with a par value of $0.000006 per share. Holders of our Class A common stock and Class B common stock are entitled to dividends when, as and if, declared by our board of directors, subject to the rights of the holders of all classes of stock outstanding having priority rights to dividends. As of December 31, 2011, we had not declared any dividends. The holder of each share of Class A common stock is entitled to one vote, while the holder of each share of Class B common stock is entitled to ten votes. After our initial public offering, a transfer of shares of Class B common stock will generally result in those shares converting to Class A common stock. Class A common stock and Class B common stock are referred to as common stock throughout the notes to these financial statements, unless otherwise noted.

*Share-based Compensation Plans*

We maintain two share-based employee compensation plans. In January 2005, our board of directors and stockholders adopted and approved the 2005 Stock Plan, as amended, which provides for the issuance of incentive and nonstatutory stock options and RSUs to qualified employees, directors, and consultants. In November 2005, our board of directors adopted and approved the 2005 Officers' Stock Plan (together with the 2005 Stock Plan, the Stock Plans), which provides for the issuance of incentive and nonstatutory stock options to certain employees or officers.

The term of stock options issued under the 2005 Stock Plan may not exceed ten years from the date of grant. Under the 2005 Stock Plan, incentive stock options and nonstatutory stock options are granted at an exercise price that is not to be less than 100% of the fair market value of our Class B common stock on the date of grant, as determined by our compensation committee. Stock options become vested and exercisable at such times and under such conditions as determined by our compensation committee on the date of grant.

The 2005 Officers' Stock Plan provides for the issuance of up to 120,000,000 shares of incentive and nonstatutory stock options to certain of our employees or officers. The 2005 Officers' Stock Plan will terminate ten years after its adoption unless terminated earlier by our compensation committee. Stock options become vested and exercisable at such times and under such conditions as determined by our compensation committee on the date of grant. In November 2005, we issued a nonstatutory stock option to our CEO to purchase 120,000,000 shares of our Class B common stock under the 2005 Officers' Stock Plan. At December 31, 2011, the option was outstanding and fully vested, and no options were available for future issuance under the 2005 Officers' Stock Plan.

F-23

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table summarizes the stock option and RSU award activity under the Stock Plans between January 1, 2009 and December 31, 2011:

| | Shares Available for Grant[1] (in thousands) | Number of Shares (in thousands) | Weighted Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value[2] (in millions) | Outstanding RSUs (in thousands) | Weighted Average Grant Date Fair Value |
|---|---|---|---|---|---|---|---|
| | | Shares Subject to Options Outstanding | | | | Outstanding RSUs | |
| Balance as of December 31, 2008 | 15,257 | 479,811 | $ 0.17 | | $ — | 136,833 | $ 1.72 |
| Increase in shares authorized | 251,969 | — | | | | — | |
| RSUs granted | (159,167) | — | | | | 159,167 | 2.35 |
| Stock options granted | (13,885) | 13,885 | 2.54 | | | — | |
| Stock options exercised | — | (57,459) | 0.15 | | | — | |
| Stock options forfeited/cancelled | 5,996 | (5,996) | 0.80 | | | — | |
| RSUs forfeited and cancelled | 10,511 | — | | | | (10,511) | 1.81 |
| Balance as of December 31, 2009 | 110,681 | 430,241 | 0.25 | 6.39 | 1,780 | 285,489 | 2.07 |
| Increase in shares authorized | 25,000 | — | | | | — | |
| RSUs granted | (68,058) | — | | | | 68,058 | 10.56 |
| Stock options granted | (4,706) | 4,706 | 11.57 | | | — | |
| Stock options exercised | — | (69,910) | 0.09 | | | — | |
| Stock options forfeited/cancelled | 2,066 | (2,066) | 0.22 | | | — | |
| RSUs forfeited and cancelled | 11,399 | — | | | | (11,399) | 13.12 |
| Balance as of December 31, 2010 | 76,382 | 362,971 | 0.42 | 5.37 | 7,415 | 342,148 | 3.39 |
| Increase in shares authorized | 10,000 | — | | | | — | |
| RSUs granted | (55,126) | — | | | | 55,126 | 26.32 |
| Stock options exercised | — | (101,872) | 0.27 | | | — | |
| Stock options forfeited/cancelled | 2,560 | (2,560) | 1.60 | | | — | |
| RSUs forfeited and cancelled | 18,502 | — | | | | (18,502) | 7.97 |
| Balance as of December 31, 2011 | 52,318 | 258,539 | $ 0.47 | 4.38 | $ 7,360 | 378,772 | 6.83 |
| Vested and expected to vest as of December 31, 2011 | | 258,468 | $ 0.47 | 4.38 | $ 7,359 | — | |
| Exercisable as of December 31, 2011 | | 244,849 | $ 0.19 | 4.19 | $ 7,040 | — | |

(1)   After excluding 195 thousand restricted stock awards not included in the table above, 52,123 thousand shares are available for grant under the Stock Plans as of December 31, 2011.

(2)   The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying stock option awards and the assessed fair value of our common stock as of December 31, 2009, 2010, and 2011.

F-24

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table summarizes additional information regarding outstanding and exercisable options under the Stock Plans at December 31, 2011:

| Exercise Price (Range) | Options Outstanding | | | | Options Exercisable | |
|---|---|---|---|---|---|---|
| | Number of Shares (in thousands) | Weighted-Average Remaining Life (in years) | Weighted-Average Exercise Price | | Number of Shares (in thousands) | Weighted-Average Exercise Price |
| $0.00 - 0.04 | 27,694 | 3.14 | $ 0.01 | | 27,694 | $ 0.01 |
| 0.06 | 135,863 | 3.85 | 0.06 | | 135,863 | 0.06 |
| 0.10 - 0.18 | 34,186 | 4.38 | 0.13 | | 34,186 | 0.13 |
| 0.29 - 0.33 | 37,665 | 5.30 | 0.31 | | 37,665 | 0.31 |
| 1.78 | 5,328 | 6.58 | 1.78 | | 2,637 | 1.78 |
| 1.85 | 5,715 | 7.03 | 1.85 | | 3,423 | 1.85 |
| 2.95 | 2,888 | 7.63 | 2.95 | | 1,356 | 2.95 |
| 3.23 | 4,500 | 7.82 | 3.23 | | 2,025 | 3.23 |
| 10.39 | 3,500 | 8.56 | 10.39 | | — | — |
| 15.00 | 1,200 | 8.80 | 15.00 | | — | — |
| | 258,539 | 4.38 | $ 0.47 | | 244,849 | $ 0.19 |

The aggregate intrinsic value of the options exercised in 2009, 2010, and 2011, was $149 million, $492 million, and $2,380 million respectively. The total grant date fair value of stock options vested during 2009, 2010, and 2011 was $16 million, $16 million, and $6 million, respectively. The total number of unvested shares subject to options and RSUs outstanding as of December 31, 2009, 2010, and 2011 was 395 million, 374 million, and 392 million, respectively.

*Shares Reserved for Future Issuance*

We have the following shares of Class B common stock reserved for future issuance as of December 31, 2011 (in thousands):

| | |
|---|---|
| 2005 Stock Plan: | |
| Shares subject to options outstanding | 138,539 |
| Restricted stock units outstanding | 378,772 |
| Shares available for future grants | 52,123 |
| 2005 Officers' Stock Plan shares subject to options outstanding | 120,000 |
| Convertible preferred stock, all series | 545,551 |
| | 1,234,985 |

In addition, we have reserved shares of Class A common stock for future issuance pursuant to the conversion of any shares of Class B common stock that are currently outstanding or that may be issued in the future.

F-25

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

**Note 9.   Income Taxes**

The components of income before provision for income taxes for the years ended December 31, 2009, 2010, and 2011 are as follows (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2009** | **2010** | **2011** |
| Domestic | $   260 | $ 1,027 | $ 1,819 |
| Foreign | (6) | (19) | (124) |
| Total income before provision for income taxes | $   254 | $ 1,008 | $ 1,695 |

The provision for income taxes consisted of the following (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2009** | **2010** | **2011** |
| Current: |  |  |  |
| Federal | $     83 | $   325 | $   664 |
| State | 14 | 57 | 60 |
| Foreign | 1 | 1 | 8 |
| Total current tax expense | 98 | 383 | 732 |
| Deferred: |  |  |  |
| Federal | (60) | 13 | (34) |
| State | (13) | 6 | (3) |
| Total deferred tax expense (benefit) | (73) | 19 | (37) |
| Provision for income taxes | $     25 | $   402 | $   695 |

A reconciliation of the U.S. federal statutory income tax rate of 35% to our effective tax rate is as follows (in percentages):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2009** | **2010** | **2011** |
| U.S. federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | 0.2 | 4.0 | 1.9 |
| Research tax credits | (1.2) | (0.8) | (1.0) |
| Share-based compensation | 0.8 | 0.3 | 1.5 |
| Foreign losses not benefited | 1.1 | 0.8 | 3.3 |
| Change in valuation allowance | (25.6) | — | 0.3 |
| Other | (0.3) | 0.6 | — |
| Effective tax rate | 10.0% | 39.9% | 41.0% |

Excess tax benefits associated with stock option exercises and other equity awards are credited to stockholders' equity. The income tax benefits resulting from stock awards that were credited to stockholders' equity were $50 million, $107 million and $433 million for the years ended December 31, 2009, 2010, and 2011.

F-26

PX0559-190

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Our deferred tax assets (liabilities) are as follows (in millions):

|  | December 31, | |
| --- | --- | --- |
|  | 2010 | 2011 |
| Deferred tax assets: | | |
| Net operating loss carryforward | $ 2 | $ 3 |
| Tax credit carryforward | — | 9 |
| Share-based compensation | 28 | 79 |
| Accrued expenses and other liabilities | 38 | 58 |
| Total deferred tax assets | 68 | 149 |
| Less: valuation allowance | — | (9) |
| Deferred tax assets, net of valuation allowance | 68 | 140 |
| Deferred tax liabilities: | | |
| Depreciation and amortization | (21) | (69) |
| Purchased intangible assets | (8) | (10) |
| Deferred foreign taxes | — | (1) |
| Total deferred tax liabilities | (29) | (80) |
| Net deferred tax assets | $ 39 | $ 60 |

The valuation allowance was approximately $9 million as of December 31, 2011, related to state tax credits that we do not believe will ultimately be realized. There was no change to the valuation allowance for the year ended December 31, 2010. The valuation allowance decreased by approximately $76 million for the year ended December 31, 2009.

As of December 31, 2011, we had U.S. federal and California net operating loss carryforwards of $7 million and $17 million, which will expire in 2027 and 2021, respectively, if not utilized. We also have state tax credit carryforwards of $9 million, which carry forward indefinitely.

Utilization of our net operating loss and tax credit carryforwards may be subject to substantial annual limitations due to the ownership change limitations provided by the Internal Revenue Code and similar state provisions. Such annual limitations could result in the expiration of the net operating loss and tax credit carryforwards before their utilization. The events that may cause ownership changes include, but are not limited to, a cumulative stock ownership change of greater than 50% over a three-year period.

Our net foreign pretax losses include jurisdictions with both pretax earnings and pretax losses. Our consolidated financial statements provide taxes for all related tax liabilities that would arise upon repatriation of earnings in the foreign jurisdictions where we do not intend to indefinitely reinvest those earnings outside the United States, and the amount of taxes provided for has been insignificant.

F-27

PX0559-191

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table reflects changes in the gross unrecognized tax benefits (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| Gross unrecognized tax benefits—beginning of period | $ 3 | $ 9 | $ 18 |
| Increase related to prior year tax positions | 6 | 1 | 5 |
| Decreases related to prior year tax positions | — | (2) | (2) |
| Increases related to current year tax positions | — | 10 | 42 |
| Gross unrecognized tax benefits—end of period | $ 9 | $ 18 | $ 63 |

During all years presented, we recognized interest and penalties related to unrecognized tax benefits within the provision for income taxes on the consolidated statements of income. For the year ended December 31, 2011, we recognized interest of $1 million and penalties of $3 million. The amount of interest and penalties accrued as of December 31, 2010 and 2011 was $1 million and $6 million, respectively.

If the remaining balance of gross unrecognized tax benefits of $63 million as of December 31, 2011 was realized in a future period, this would result in a tax benefit of $51 million within our provision of income taxes at such time.

We are subject to taxation in the United States and various other state and foreign jurisdictions. The material jurisdictions in which we are subject to potential examination by taxing authorities include the United States and Ireland. In 2011, the Internal Revenue Service (IRS) commenced its examinations of our 2008 and 2009 tax years. We believe that adequate amounts have been reserved for any adjustments that may ultimately result from these examinations and we do not anticipate a significant impact to our gross unrecognized tax benefits within the next 12 months related to these years. Our 2010 and 2011 tax years remain subject to examination by the IRS and all tax years starting in 2008 remain subject to examination in Ireland. We remain subject to possible examinations or are undergoing audits in various other jurisdictions that are not material to our financial statements.

Although the timing of the resolution, settlement, and closure of any audits is highly uncertain, it is reasonably possible that the balance of gross unrecognized tax benefits could significantly change in the next 12 months. However, given the number of years remaining that are subject to examination, we are unable to estimate the full range of possible adjustments to the balance of gross unrecognized tax benefits.

**Note 10.    Geographical Information**

Revenue by geography is based on the billing address of the advertiser or Platform developer. The following table sets forth revenue and long-lived assets by geographic area (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
| Revenue: |  |  |  |
| United States | $ 518 | $ 1,223 | $ 2,067 |
| Rest of the world[1] | 259 | 751 | 1,644 |
| Total revenue | $ 777 | $ 1,974 | $ 3,711 |

---

(1)  No individual country exceeded 10% of our total revenue for any period presented.

F-28

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

|  | December 31, | |
|---|---|---|
|  | 2010 | 2011 |
| Long-lived assets: | | |
| United States | $ 567 | $ 1,444 |
| Rest of the world | 7 | 31 |
| Total long-lived assets | $ 574 | $ 1,475 |

**Note 11.  Related Party Transactions**

During 2009, our board of directors authorized us to award two million shares of Class B common stock to a family member of our CEO. This award was made in satisfaction of funds provided for our initial working capital and potential related claims. We recorded share-based compensation expense of $9 million related to this stock award for the year ended December 31, 2009.

**Note 12.  Subsequent Events**

We have evaluated subsequent events through February 1, 2012, which is the date the financial statements were available to be issued.

In January 2012, our board of directors adopted our 2012 Equity Incentive Plan, subject to stockholder approval, which plan will become effective on the effective date of our initial public offering. The 2012 Equity Incentive Plan will succeed our 2005 Stock Plan and we will cease granting awards under the 2005 Stock Plan. We have reserved 25 million shares of Class A common stock for issuance under our 2005 Stock Plan, plus an additional number of shares of Class A common stock equal to any shares reserved but not issued or subject to outstanding awards under our 2005 Stock Plan on the effective date of our initial public offering, plus, (i) shares that are subject to outstanding awards under the 2005 Stock Plan which cease to be subject to such awards, (ii) shares issued under the 2005 Stock Plan which are forfeited or repurchased at their original issue price, and (iii) shares subject to awards under the 2005 Stock Plan that are used to pay the exercise price of an option or withheld to satisfy the tax withholding obligations related to any award. The 2012 Equity Incentive Plan provides for automatic increases in the number of shares reserved for issuance on January 1 of each year.

**Note 13.  Subsequent Events (unaudited)**

In February 2012, we terminated our prior credit facility and we entered into a new agreement for an unsecured five-year revolving credit facility that allows us to borrow up to $5,000 million for general corporate purposes, with interest payable on the borrowed amounts set at LIBOR plus 1.0%. Prior to our initial public offering, we can borrow up to $2,500 million under this facility. We paid origination fees at closing and these fees are amortized over the remaining term of the credit facility. Under the terms of the new agreement, we are obligated to pay a commitment fee of 0.10% per annum on the daily undrawn balance.

Concurrent with our entering into the new revolving credit facility, we also entered into a bridge credit facility that allows us to borrow up to $3,000 million to fund tax withholding and remittance obligations related to the settlement of RSUs in connection with our initial public offering, with interest payable on the borrowed amounts set at LIBOR plus 1.0%, and an additional 0.25% payable on drawn balances outstanding from and after the 180th day of borrowing. We may make a single borrowing under this bridge facility beginning on the closing date of our initial public offering and ending on the date that is 240 days after that date. Any amounts outstanding under this facility will be due one year after the date we draw on the facility but no later than June 30, 2014. During the term of this bridge facility, the lenders' commitments are subject to reduction and amounts

F-29

Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

**FACEBOOK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

borrowed thereunder are subject to repayment in the event we raise capital through certain asset sales, debt issuances, or equity issuances. We paid origination fees at closing and these fees are amortized over the remaining term of the facility, and we are obligated to pay an additional upfront fee of 0.20% of the aggregate amount of the borrowings requested on any applicable funding date. Under the terms of the agreement, we are obligated to pay a commitment fee of 0.10% per annum on the daily undrawn balance from and after the 90th day following the date we entered into the bridge facility.

F-30

Table of Contents



**Table of Contents**



Amendment No. 2 to Registration Statement on Form S-1

**Table of Contents**

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 13.   *Other Expenses of Issuance and Distribution***

The following table sets forth all expenses to be paid by the Registrant, other than estimated underwriting discounts and commissions, in connection with our initial public offering. All amounts shown are estimates except for the SEC registration fee and the FINRA filing fee:

| | |
|---|---|
| SEC registration fee | $573,000 |
| FINRA filing fee | 75,500 |
| Stock Exchange Listing fee | * |
| Printing and engraving | * |
| Legal fees and expenses | * |
| Accounting fees and expenses | * |
| Blue sky fees and expenses (including legal fees) | * |
| Transfer agent and registrar fees | * |
| Miscellaneous | * |
| Total | $      * |

_____
\*   To be completed by amendment.

**Item 14.   *Indemnification of Directors and Officers***

Section 145 of the Delaware General Corporation Law authorizes a court to award, or a corporation's board of directors to grant, indemnity to directors and officers under certain circumstances and subject to certain limitations. The terms of Section 145 of the Delaware General Corporation Law are sufficiently broad to permit indemnification under certain circumstances for liabilities, including reimbursement of expenses incurred, arising under the Securities Act of 1933, as amended (the Securities Act).

As permitted by the Delaware General Corporation Law, the Registrant's restated certificate of incorporation that will be in effect at the closing of the offering contains provisions that eliminate the personal liability of its directors for monetary damages for any breach of fiduciary duties as a director, except liability for the following:

- any breach of the director's duty of loyalty to the Registrant or its stockholders;

- acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law;

- under Section 174 of the Delaware General Corporation Law (regarding unlawful dividends and stock purchases); or

- any transaction from which the director derived an improper personal benefit.

As permitted by the Delaware General Corporation Law, the Registrant's restated bylaws that will be in effect at the closing of our initial public offering, provide that:

- the Registrant is required to indemnify its directors and executive officers to the fullest extent permitted by the Delaware General Corporation Law, subject to very limited exceptions;

- the Registrant may indemnify its other employees and agents as set forth in the Delaware General Corporation Law;

II-1

PX0559-197

**Table of Contents**

- the Registrant is required to advance expenses, as incurred, to its directors and executive officers in connection with a legal proceeding to the fullest extent permitted by the Delaware General Corporation Law, subject to very limited exceptions; and

- the rights conferred in the bylaws are not exclusive.

The Registrant has entered, and intends to continue to enter, into separate indemnification agreements with its directors and executive officers to provide these directors and executive officers additional contractual assurances regarding the scope of the indemnification set forth in the Registrant's restated certificate of incorporation and restated bylaws and to provide additional procedural protections. At present, there is no pending litigation or proceeding involving a director or executive officer of the Registrant regarding which indemnification is sought. Reference is also made to the underwriting agreement to be filed as Exhibit 1.1 to this registration statement, which provides for the indemnification of executive officers, directors and controlling persons of the Registrant against certain liabilities. The indemnification provisions in the Registrant's restated certificate of incorporation, restated bylaws and the indemnification agreements entered into or to be entered into between the Registrant and each of its directors and executive officers may be sufficiently broad to permit indemnification of the Registrant's directors and executive officers for liabilities arising under the Securities Act.

The Registrant currently carries liability insurance for its directors and officers.

**Item 15.** *Recent Sales of Unregistered Securities*

Since February 1, 2009, we have made the following sales of unregistered securities (after giving effect to a 5-for-1 stock split effected in October 2010):

*Preferred Stock Issuances*

- On May 26, 2009, we sold 44,037,540 shares of our Series E preferred stock to one accredited investor at a purchase price of $4.54 per share.

- On February 2, 2011, we issued 3,257,280 shares of our Series A preferred stock and 2,960,240 shares of our Series B preferred stock to one accredited investor at per share purchase prices ranging from $0.00 to 0.06 pursuant to exercises of warrants.

- On December 29, 2011, we issued 1,750,827 shares of our Series B preferred stock to one accredited investor at a per share purchase price of $0.06 pursuant to exercise of a warrant.

*Plan-Related Issuances*

- From February 1, 2009 through March 6, 2012, we granted to our directors, officers, employees, consultants and other service providers options to purchase 14,263,370 shares of our Class B common stock with per share exercise prices ranging from $1.78 to $15.00 under our 2005 Stock Plan.

- From February 1, 2009 through March 6, 2012, we issued to our directors, officers, employees, consultants, and other service providers an aggregate of 247,994,481 shares of our Class B common stock at per share purchase prices ranging from $0.00 to $2.95 pursuant to exercises of options granted under our 2005 Stock Plan.

- From February 1, 2009 through March 6, 2012, we granted to our directors, officers, employees, consultants, and other service providers an aggregate of 257,697,957 RSUs to be settled in shares of our Class B common stock under our 2005 Stock Plan.

- From February 1, 2009 through March 6, 2012, we sold to our directors, officers, employees, consultants, and other service providers an aggregate of 214,724 shares of our Class B common stock at per share purchase prices ranging from $0.00 to $30.03 granted under our 2005 Stock Plan.

II-2

**Table of Contents**

*Other Common Stock Issuances*

- On May 26, 2009, we issued 48,065 shares of our Class B common stock to one existing investor pursuant to the anti-dilution terms of such investor's original investment.
- On December 30, 2009, we issued 2,000,000 shares of our Class B common stock to a family member of our CEO. This award was made in satisfaction of funds provided for our initial working capital and a potential release of claims.
- On June 2, 2010, we issued 5,000 shares of our Class B common stock to one accredited investor at a purchase price of $7.27 per share.
- On December 27, 2010, we sold 21,582,733 shares of our Class A common stock to three accredited investors at a purchase price of $20.85 per share.
- On December 31, 2010, we sold 2,398,081 shares of our Class A common stock to one accredited investor at a purchase price of $20.85 per share.
- On January 21, 2011, we sold 47,961,630 shares of our Class A common stock to one accredited investor at a purchase price of $20.85 per share.
- On September 15, 2011, we issued 29,640 shares of our Class B common stock as consideration to a former employee for services provided.

*Acquisitions*

- On August 14, 2009, we issued 11,052,955 shares of our Class B common stock as consideration to ten individuals and one entity in connection with our acquisition of all the outstanding shares of a company.
- On May 18, 2010, we issued 3,625,000 shares of our Class B common stock as consideration to a company in connection with our purchase of patents from the company.
- On June 16, 2010, we issued 238,000 shares of our Class B common stock as consideration to a company in connection with our purchase of certain assets from the company.
- On July 7, 2010, we issued 590,900 shares of our Class B common stock as consideration to a company in connection with our purchase of certain assets from the company.
- On August 18, 2010, we issued 289,350 shares of our Class B common stock as consideration to two individuals in connection with our acquisition of all the outstanding shares of a company.
- On October 29, 2010, we issued 1,309,284 shares of our Class B common stock as consideration to a company in connection with our purchase of certain assets from the company.
- On November 12, 2010, we issued 350,000 shares of our Class B common stock as consideration to a company in connection with our purchase of certain assets from the company.
- On December 15, 2010, we issued 1,030,000 shares of our Class B common stock as consideration to two individuals in connection with our acquisition of all the outstanding shares of a company.
- On February 28, 2011, we issued 681,357 shares of our Class A common stock as consideration to a company in connection with our purchase of certain assets from the company.
- On April 5, 2011, we issued 1,659,430 shares of our Class A common stock as consideration to 13 individuals and six entities in connection with our acquisition of all the outstanding shares of a company.
- On August 1, 2011, we issued 75,426 shares of our Class A common stock as consideration to three individuals in connection with our acquisition of all the outstanding shares of a company.

II-3

**Table of Contents**

- On October 7, 2011, we issued 360,883 shares of our Class A common stock as consideration to 21 individuals and eight entities in connection with our acquisition of all the outstanding shares of a company.

- On October 10, 2011, we issued 183,750 shares of our Class B common stock as consideration to a company for a license of certain technology from the company.

- On January 3, 2012, we issued 90,000 shares of our Class A common stock as consideration to four individuals and 13 entities in connection with our purchase of certain assets from a company.

- On February 1, 2012, we issued 212,250 shares of our Class A common stock as partial consideration to two entities in connection with our purchase of certain assets from a company.

Unless otherwise stated, the sales of the above securities were deemed to be exempt from registration under the Securities Act in reliance upon Section 4(2) of the Securities Act (or Regulation D or Regulation S promulgated thereunder), or Rule 701 promulgated under Section 3(b) of the Securities Act as transactions by an issuer not involving any public offering or pursuant to benefit plans and contracts relating to compensation as provided under Rule 701. The recipients of the securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof, and appropriate legends were placed upon the stock certificates issued in these transactions.

II-4

PX0559-200

**Table of Contents**

**Item 16.**   *Exhibits and Financial Statement Schedules*

(a) *Exhibits.* The following exhibits are included herein or incorporated herein by reference:

| Exhibit Number | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement. |
| 3.1# | Eleventh Amended and Restated Certificate of Incorporation of Registrant. |
| 3.2# | Bylaws of Registrant. |
| 3.3* | Form of Restated Certificate of Incorporation of Registrant, to be in effect at the closing of Registrant's initial public offering. |
| 3.4* | Form of Restated Bylaws of Registrant, to be in effect at the closing of Registrant's initial public offering. |
| 4.1# | Form of Registrant's Class A common stock certificate. |
| 4.2# | Sixth Amended and Restated Investors' Rights Agreement, dated December 27, 2010, by and among Registrant and certain security holders of Registrant. |
| 4.3# | Form of "Type 1" Holder Voting Agreement, between Registrant, Mark Zuckerberg, and certain parties thereto. |
| 4.4# | Form of "Type 2" Holder Voting Agreement, between Registrant, Mark Zuckerberg, and certain parties thereto. |
| 4.5# | Form of "Type 3" Holder Voting Agreement, between Registrant, Mark Zuckerberg, and certain parties thereto. |
| 5.1* | Opinion of Fenwick & West LLP. |
| 10.1# | Form of Indemnification Agreement. |
| 10.2# | 2005 Stock Plan, as amended, and forms of award agreements. |
| 10.3# | 2005 Officers' Stock Plan, and amended and restated notice of stock option grant and stock option agreement. |
| 10.4* | 2012 Equity Incentive Plan, to be in effect upon the effectiveness of Registrant's initial public offering, and forms of award agreements. |
| 10.5# | 2011 Bonus/Retention Plan. |
| 10.6# | Amended and Restated Offer Letter, dated January 27, 2012, between Registrant and Mark Zuckerberg. |
| 10.7# | Amended and Restated Employment Agreement, dated January 27, 2012, between Registrant and Sheryl K. Sandberg. |
| 10.8# | Amended and Restated Offer Letter, dated January 27, 2012, between Registrant and David A. Ebersman. |
| 10.9# | Amended and Restated Offer Letter, dated January 27, 2012, between Registrant and Mike Schroepfer. |
| 10.10# | Amended and Restated Employment Agreement, dated January 27, 2012, between Registrant and Theodore W. Ullyot. |
| 10.11#† | Lease, dated February 7, 2011, between Registrant and Wilson Menlo Park Campus, LLC. |
| 10.12#† | Developer Addendum, dated May 14, 2010, between Registrant and Zynga Inc., as amended by Amendment No. 1 to Developer Addendum, dated October 1, 2011. |
| 10.13#† | Developer Addendum No. 2, dated December 26, 2010, between Registrant and Zynga Inc. |

II-5

**Table of Contents**

| Exhibit Number | Description |
|---|---|
| 10.14 | Credit Agreement, dated February 28, 2012, between Registrant, the Lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent. |
| 10.15 | Bridge Loan Agreement, dated February 28, 2012, between Registrant, the Lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent. |
| 10.16# | Conversion Agreement, dated February 19, 2010, between Registrant, Digital Sky Technologies Limited, and DST Global Limited. |
| 21.1# | List of Subsidiaries of Registrant. |
| 23.1 | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm. |
| 23.2* | Consent of Fenwick & West LLP (included in Exhibit 5.1). |
| 24.1# | Power of Attorney. |

| | |
|---|---|
| # | Previously filed. |
| * | To be filed by amendment. |
| † | Registrant has omitted portions of the referenced exhibit pursuant to a request for confidential treatment under Rule 406 promulgated under the Securities Act. |

(b) *Financial Statement Schedules.* All financial statement schedules are omitted because they are not applicable or the information is included in the Registrant's consolidated financial statements or related notes.

**Item 17.   *Undertakings***

The undersigned Registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement, certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-6

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this Amendment No. 2 to the Registration Statement on Form S-1 (Amendment No. 2) to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Menlo Park, State of California, on this 7th day of March 2012.

**FACEBOOK, INC.**

/S/   MARK ZUCKERBERG
**Mark Zuckerberg**
**Chairman and Chief Executive Officer**

Pursuant to the requirements of the Securities Act of 1933, this Amendment No. 2 has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/   MARK ZUCKERBERG<br>**Mark Zuckerberg** | Chairman and Chief Executive Officer<br>*(Principal Executive Officer)* | March 7, 2012 |
| /S/   DAVID A. EBERSMAN<br>**David A. Ebersman** | Chief Financial Officer<br>*(Principal Financial Officer)* | March 7, 2012 |
| /S/   DAVID M. SPILLANE<br>**David M. Spillane** | Director of Accounting<br>*(Principal Accounting Officer)* | March 7, 2012 |
| *<br>**Marc L. Andreessen** | Director | March 7, 2012 |
| *<br>**Erskine B. Bowles** | Director | March 7, 2012 |
| *<br>**James W. Breyer** | Director | March 7, 2012 |
| *<br>**Donald E. Graham** | Director | March 7, 2012 |
| *<br>**Reed Hastings** | Director | March 7, 2012 |
| *<br>**Peter A. Thiel** | Director | March 7, 2012 |

*By:     /S/   DAVID A. EBERSMAN
**David A. Ebersman**
**Attorney-in-fact**

II-7

PX0559-203

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 1.1* | Form of Underwriting Agreement. |
| 3.1# | Eleventh Amended and Restated Certificate of Incorporation of Registrant. |
| 3.2# | Bylaws of Registrant. |
| 3.3* | Form of Restated Certificate of Incorporation of Registrant, to be in effect at the closing of Registrant's initial public offering. |
| 3.4* | Form of Restated Bylaws of Registrant, to be in effect at the closing of Registrant's initial public offering. |
| 4.1# | Form of Registrant's Class A common stock certificate. |
| 4.2# | Sixth Amended and Restated Investors' Rights Agreement, dated December 27, 2010, by and among Registrant and certain security holders of Registrant. |
| 4.3# | Form of "Type 1" Holder Voting Agreement, between Registrant, Mark Zuckerberg, and certain parties thereto. |
| 4.4# | Form of "Type 2" Holder Voting Agreement, between Registrant, Mark Zuckerberg, and certain parties thereto. |
| 4.5# | Form of "Type 3" Holder Voting Agreement, between Registrant, Mark Zuckerberg, and certain parties thereto. |
| 5.1* | Opinion of Fenwick & West LLP. |
| 10.1# | Form of Indemnification Agreement. |
| 10.2# | 2005 Stock Plan, as amended, and forms of award agreements. |
| 10.3# | 2005 Officers' Stock Plan, and amended and restated notice of stock option grant and stock option agreement. |
| 10.4* | 2012 Equity Incentive Plan, to be in effect upon the effectiveness of Registrant's initial public offering, and forms of award agreements. |
| 10.5# | 2011 Bonus/Retention Plan. |
| 10.6# | Amended and Restated Offer Letter, dated January 27, 2012, between Registrant and Mark Zuckerberg. |
| 10.7# | Amended and Restated Employment Agreement, dated January 27, 2012, between Registrant and Sheryl K. Sandberg. |
| 10.8# | Amended and Restated Offer Letter, dated January 27, 2012, between Registrant and David A. Ebersman. |
| 10.9# | Amended and Restated Offer Letter, dated January 27, 2012, between Registrant and Mike Schroepfer. |
| 10.10# | Amended and Restated Employment Agreement, dated January 27, 2012, between Registrant and Theodore W. Ullyot. |
| 10.11#† | Lease, dated February 7, 2011, between Registrant and Wilson Menlo Park Campus, LLC. |
| 10.12#† | Developer Addendum, dated May 14, 2010, between Registrant and Zynga Inc., as amended by Amendment No. 1 to Developer Addendum, dated October 1, 2011. |
| 10.13#† | Developer Addendum No. 2, dated December 26, 2010, between Registrant and Zynga Inc. |
| 10.14 | Credit Agreement, dated February 28, 2012, between Registrant, the Lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent. |

Table of Contents

| Exhibit Number | Description |
| --- | --- |
| 10.15 | Bridge Loan Agreement, dated February 28, 2012, between Registrant, the Lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent. |
| 10.16# | Conversion Agreement, dated February 19, 2010, between Registrant, Digital Sky Technologies Limited, and DST Global Limited. |
| 21.1# | List of Subsidiaries of Registrant. |
| 23.1 | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm. |
| 23.2* | Consent of Fenwick & West LLP (included in Exhibit 5.1). |
| 24.1# | Power of Attorney. |

#   Previously filed.
\*   To be filed by amendment.
†   Registrant has omitted portions of the referenced exhibit pursuant to a request for confidential treatment under Rule 406 promulgated under the Securities Act.

PX0559-205

# PX0560

Facebook For Android Finally Has More Daily Active Users Than Facebook For iPhone
Josh Constine3:53 PM PST • December 17, 2011

☐Comment



For the first time, the Facebook for Android mobile app has eclipsed the daily active user count of Facebook for iPhone. The Android app launched in September 2009 more than a year after its iPhone sister and has been playing catch-up ever since. Both are developed internally by Facebook. This week the two were briefly tied, but the Android app is now pulling away with 58.3 million DAU compared to the iPhone app's 57.4 million, according to the AppData tracking service.

With the Android device base growing at 550,000 activations per day and Timeline now available for Android but not yet for iPhone, I expect this gap to widen. [**Update**: Facebook released Facebook for iPhone 4.1 that supports Timeline access on December 18th.]

PX0560-001

5/13/24, 6:40 PM                    Facebook For Android Finally Has More Daily Active Users Than Facebook For iPhone | TechCrunch



# Facebook for Android

**58,300,000** DAU    **85,400,000** MAU

+1,400,000 last 7 days    +1,900,000 last 7 days



Facebook for Android's monthly user count of 85.4 million still lags behind the iPhone app's 99.1 million MAU. However, this stat isn't as important as DAU, or stickiness — the percentage of monthly active users that return daily. Android's stickiness is 68.2%, compaed to iPhone's 57.9%. This could indicate that Android devices appeal to a younger, more Facebook-engaged audience, or to more hardcore technology users in general. The iPhone's role as a fashion and status symbol may be drawing less engaged users.

Another explanation for the Android app taking the lead is that Facebook released an official iPad app in October which now has 5.5 million DAU. Though many users likely switched from using the unoptimized iPhone app on their iPad, some probably came from unofficial third-party apps.

Until Facebook for iPhone is updated to support Timeline (which it was on Dec. 18th), some of the app's users some may stray to the HTML5 mobile site and slow the app's growth.
Meanwhile, Facebook for Android 1.8.1's ability to access Timeline can help the app grow its lead. For reference, Facebook for BlackBerry has 29.9 million DAU, and Facebook for Windows Phone has 360,000 DAU according to AppData.

User counts of the Facebook apps matter because they can influence where Facebook devotes mobile development resources. For years, features were first released for the iPhone version, possibly because its higher user count made it more of a priority. If the Android app becomes significantly more popular, Timeline might be the first of many features it gets early. [**Update**: This could set an example for other companies to develop for Android first as well.] And that could sway people choosing what phone to buy.

This is a coming of age moment for Android.

PX0560-002

### TechCrunch Disrupt 2024
## Join 10,000 Startup Leaders

**Innovation For Every Stage** San Francisco, October 28-30

Register Now



# Facebook for iPhone

**57,400,000** DAU          **99,100,000** MAU

+600,000 last 7 days          +700,000 last 7 days

### Facebook for iPhone - DAU



■ November - December 2011

PX0560-003

# PX0561





 Comment

# After Months Of Buzz, Path Launches: It's Photo Sharing Where You Can Be Yourself

**Jason Kincaid**

/ 9:06 PM PST • November 14, 2010

PX0561-001



Over the last few months there's been plenty of buzz and speculation about Path, a hitherto "stealthish" company that was founded by long time Facebook employee Dave Morin, along with Shawn Fanning and Dustin Mierau. The company has raised funding from a very impressive list of investors that includes Ron Conway, Paul Buchheit, Keith Rabois, Ashton Kutcher, and a laundry list of Facebook alumni. And tonight, it's ready for its big debut. You can grab the free app on the App Store right here.

So what is Path? In short, it's a private photo sharing network — think Instagram, but without the filters and with a privacy model that takes away any anxiety associated with sharing photos with people you don't know. It's based around email addresses and phone numbers, rather than a public database of users. And compared to other popular social applications, Path is going against the grain: there's no follow system and the friend system is also quite different from what you're used to on Facebook.

PX0561-002

Path is using a system where *you* specify who exactly you want to share your photos with. After firing up the app, you'll be asked to select contacts from your phone's address book — tap a few, and from then on, those contacts will see your shared photo items in their feed automatically (they don't have to accept anything, but they can block or temporarily 'mute' you if they don't want to see your content). Path wants the entire experience to be personal enough that you won't feel nervous about sharing your photos, so it's limiting the maximum number of friends to 50.

And note that there isn't a request system to speak of — it's up to you to take the initiative to share photos with the people you care about. Of course, you can still pester your friends in real life should they forget to share their content with you.

Path is taking a unique approach to a few other areas of photo sharing. The first is a feature called 'Seen'. If I share a photo with my friends, I'll be able to see which of them has actually seen my photo. Yes, that sounds a little weird, but remember that the idea is that these photos are being shared with close personal friends. Morin says that this helps skip the initial "Hey did you see that photo?" question that's common when friends talk about content shared on social networks — this way you can just jump right into a conversation about the content.

PX0561-003





The application is also omitting comments and captioning for now, in favor of tags. After posting an image, you'll be asked to associate tag it with the people in the photo (pretty standard), its location (again, standard), and finally with a *Thing* the photo is associated with. This *Thing* component can be anything that's associated with what you were doing. Taking a photo of your graduation dinner? The Thing would be Graduation. Eating dinner at a thai restaurant? The thing could be the dish you ordered.

Path's restrictive friending system is going to hamper its virality to some extent (the app won't spam your whole address book of friends with an invite). But Morin contends that it will still spread between circles of friends. And there still is *some* virality — when you add a friend to your Path who isn't on the service yet, they'll get an invitation in their email inbox.

PX0561-004



I think Path could find a solid niche — there are certainly plenty of photos that I'm not comfortable posting on Twitter (usually because they're boring if you don't know the people in the photos). And Path would be perfect for that. But it's going to have to rely more on word-of-mouth than any of its competitors — you won't be seeing any tweets to photo on Path, for example — which may make growth tricky.



# More TechCrunch



**GV's youngest partner has launched her own firm**



**ChatGPT's new face is a black hole**

PX0561-005





**Apple and Google agree on standard to alert people when unknown Bluetooth devices may be tracking them**

**OpenAI debuts GPT-4o 'omni' model now powering ChatGPT**

## Get the industry's biggest tech news

**Explore all newsletters ↗**

PX0561-006

### TechCrunch Daily News 

Every weekday and Sunday, you can get the best of TechCrunch's coverage.

### Startups Weekly 

Startups are the core of TechCrunch, so get our best coverage delivered weekly.

### TechCrunch Fintech 

The latest Fintech news and analysis, delivered every Sunday.

### TechCrunch Mobility 

TechCrunch Mobility is your destination for transportation news and insight.

**Email address (required)**

| Email address | Subscribe |

*By submitting your email, you agree to our* *Terms* *and* *Privacy Notice*.

# Tags

[path](path)

---

Venture

## OpenAI Startup Fund raises additional $5M

**Marina Temkin**
36 mins ago



---

Venture

## Accel has a fresh $650M to back European early-stage startups

**Ingrid Lunden**
1 hour ago



PX0561-007

Robotics

## Cruise founder Kyle Vogt is back with a robot startup



**Kirsten Korosec**
1 hour ago

Venture

## From Miles Grimshaw to Eva Ho, venture capitalists continue to play musical chairs



**Rebecca Szkutak**
2 hours ago

AI

## Anthropic is expanding to Europe and raising more money



**Ingrid Lunden**
3 hours ago

Space

## TechCrunch Space: You rock(et) my world, moms



**Aria Alamalhodaei**
3 hours ago

Hardware

## Apple iPad Pro M4 vs. iPad Air M2: Reviewing which is right for most



**Brian Heater**



PX0561-008

4 hours ago

---

Venture

## GV's youngest partner has launched her own firm



**Dominic-Madori Davis**
5 hours ago

---

AI

## ChatGPT's new face is a black hole



**Devin Coldewey**
6 hours ago

---

Hardware

## Apple and Google agree on standard to alert people when unknown Bluetooth devices may be tracking them



**Aisha Malik**
7 hours ago

---

AI

## OpenAI's ChatGPT announcement: Watch here



**Anthony Ha**
7 hours ago

5/13/24, 9:01 PM    After Months Of Buzz, Path Launches: It's Photo Sharing Where You Can Be Yourself | TechCrunch

Transportation

## GM's Cruise ramps up robotaxi testing in Phoenix



**Kirsten Korosec**
7 hours ago

AI

## OpenAI debuts GPT-4o 'omni' model now powering ChatGPT



**Kyle Wiggers**
8 hours ago



Bryce Durbin / TechCrunch

Featured Article

## The women in AI making a difference

**Kyle Wiggers, Dominic-Madori Davis**
8 hours ago

PX0561-010

Government & Policy

## White House proposes up to $120M to help fund Polar Semiconductor's chip facility expansion



**Aisha Malik**
8 hours ago

AI

## Google's 3D video conferencing platform, Project Starline, is coming in 2025 with help from HP



**Kyle Wiggers**
10 hours ago

Apps

## Instagram expands its creator marketplace to 10 new countries



**Ivan Mehta**
11 hours ago

Enterprise

## Google I/O 2024: What to expect



**Brian Heater**
11 hours ago

AI

## Google I/O 2024: How to watch



**Brian Heater**
11 hours ago

PX0561-011

Fintech

## Aplazo is using buy now, pay later as a stepping stone to financial ubiquity in Mexico



**Anna Heim**
11 hours ago

Startups

## Vote for your Disrupt 2024 Audience Choice favs



**TechCrunch Events**
12 hours ago

Startups

## Healthy growth helps B2B food e-commerce startup Pepper nab $30 million led by ICONIQ Growth



**Christine Hall**
12 hours ago

Government & Policy

## Booking.com latest to fall under EU market power rules



**Natasha Lomas**
13 hours ago

PX0561-012

5/13/24, 9:01 PM                    After Months Of Buzz, Path Launches: It's Photo Sharing Where You Can Be Yourself | TechCrunch



**Featured Article**

# 'Got that boomer!': How cybercriminals steal one-time passcodes for SIM swap attacks and raiding bank accounts

**Zack Whittaker**
13 hours ago

---

**Enterprise**

## Permira is taking Squarespace private in a $6.9 billion deal

**Paul Sawers**
14 hours ago



---

**Apps**

## Buy Me a Coffee's founder has built an AI-powered voice note app

**Ivan Mehta**
17 hours ago



AI

## Google partners with Airtel to offer cloud and GenAI products to Indian businesses



**Manish Singh**
17 hours ago

AI

## Women in AI: Rep. Dar'shun Kendrick wants to pass more AI legislation



**Dominic-Madori Davis**
1 day ago

## A reckoning is coming for emerging venture funds, and that, VCs say, is a good thing



**Christine Hall**
1 day ago

## Workers at a Maryland Apple store authorize strike



**Anthony Ha**
1 day ago

**TechCrunch Disrupt 2024**    Innovation For Every Stage

**LEARN MORE**

PX0561-014

## About

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

## Legal

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

## Trending Tech Topics

Google I/O 2024

OpenAI Event

Project Starline

Squarespace

Bumble

Tech Layoffs

ChatGPT

f  Facebook                              X  X

▶  Youtube                               Instagram

in  LinkedIn                            Mastodon

© 2024 Yahoo. All rights reserved. Powered by WordPress VIP

PX0561-015

# PX0562







# Picplz Launches Revamped Mobile Apps For iPhone And Android (With Free Effects)

**Jason Kincaid**

/ 2:21 PM PDT • October 13, 2010

Comment

PX0562-001



Over the last six months we've been tracking the progress of Picplz, a service that aims to make sharing your photos as easy as possible: point, shoot, upload and you're done. The service was created by former imeem executives Dalton Caldwell and Bryan Berg and launched an early Android app in May, followed by an iPhone app in August — between them the apps have over 100,000 downloads. You can download the iPhone app here; Android users can just search the Market for Picplz.

But while both of these apps made it easy to take a snapshot and quickly upload it to the web, they were missing something that's all the rage in mobile photography: effects. Yes, just like Instagram, Hipstamatic, and a bevy of others, Picplz now allows users to add a variety of effects to their photos. But the apps are doing it in a way that CEO Dalton Caldwell says makes Picplz better than the competition.

For one, the effects are free (some competitors charge you for each filter as in-app purchases). And the effects are also non-destructive: Picplz uploads

PX0562-002

a copy of your original photo in its original high-resolution to its server, and applies whatever filter you want server-side. This means that you can log back into the site a few months down the line and remove the filter, or, should Picplz come out with an effect you like more, you can apply it retroactively. Caldwell says that Picplz is the only mainstream app to upload photos non-destructively, and he also says that the upload resolution is much higher than the competition's (Picplz can upload an image that's 2048 pixels wide from an iPhone 4 while Instagram currently has a max of 612 pixels, though that company plans to boost their limit).

Aside from the new effects, the mobile apps are getting an improved interface. Before now iPhone users who wanted to view their photo stream would get kicked into an instance of mobile Safari — now Picplz has improved this so you can view the photos in a native viewer and easily swap back to your camera. The iPhone app is also getting improved photo upload speeds and Push notifications.

PX0562-003





# More TechCrunch



**Motional cut about 550 employees, around 40%, in recent restructuring, sources say**



**GV's youngest partner has launched her own firm**

PX0562-004



**ChatGPT's new face is a black hole**



**Cruise founder Kyle Vogt is back with a robot startup**

# Get the industry's biggest tech news

**Explore all newsletters** ↗

**TechCrunch Daily News**    

Every weekday and Sunday, you can get the best of TechCrunch's coverage.

**Startups Weekly**    

Startups are the core of TechCrunch, so get our best coverage delivered weekly.

PX0562-005

**TechCrunch Fintech** 

The latest Fintech news and analysis, delivered every Sunday.

**TechCrunch Mobility** 

TechCrunch Mobility is your destination for transportation news and insight.

**Email address (required)**

Email address

Subscribe

*By submitting your email, you agree to our* Terms *and* Privacy Notice.

# Tags

picplz

---

Venture

## OpenAI Startup Fund raises additional $5M

**Marina Temkin**
42 mins ago



---

Venture

## Accel has a fresh $650M to back European early-stage startups

**Ingrid Lunden**
1 hour ago



PX0562-006

Robotics

# Cruise founder Kyle Vogt is back with a robot startup



**Kirsten Korosec**
1 hour ago

---

Venture

# From Miles Grimshaw to Eva Ho, venture capitalists continue to play musical chairs



**Rebecca Szkutak**
2 hours ago

---

 AI

# Anthropic is expanding to Europe and raising more money



**Ingrid Lunden**
3 hours ago

---

Space

# TechCrunch Space: You rock(et) my world, moms



**Aria Alamalhodaei**
3 hours ago

---

Hardware

# Apple iPad Pro M4 vs. iPad Air M2: Reviewing which is right for most



**Brian Heater**

PX0562-007

4 hours ago

---

Venture

# GV's youngest partner has launched her own firm



**Dominic-Madori Davis**
5 hours ago

---

AI

# ChatGPT's new face is a black hole



**Devin Coldewey**
6 hours ago

---

Hardware

# Apple and Google agree on standard to alert people when unknown Bluetooth devices may be tracking them



**Aisha Malik**
7 hours ago

---

AI

# OpenAI's ChatGPT announcement: Watch here



**Anthony Ha**
7 hours ago

PX0562-008

Transportation

## GM's Cruise ramps up robotaxi testing in Phoenix



**Kirsten Korosec**
7 hours ago

AI

## OpenAI debuts GPT-4o 'omni' model now powering ChatGPT



**Kyle Wiggers**
8 hours ago



Bryce Durbin / TechCrunch

Featured Article

## The women in AI making a difference

**Kyle Wiggers, Dominic-Madori Davis**
8 hours ago

PX0562-009

5/13/24, 9:07 PM    Picplz Launches Revamped Mobile Apps For iPhone And Android (With Free Effects) | TechCrunch

Government & Policy

## White House proposes up to $120M to help fund Polar Semiconductor's chip facility expansion



**Aisha Malik**
8 hours ago

---

AI

## Google's 3D video conferencing platform, Project Starline, is coming in 2025 with help from HP



**Kyle Wiggers**
10 hours ago

---

Apps

## Instagram expands its creator marketplace to 10 new countries



**Ivan Mehta**
11 hours ago

---

Enterprise

## Google I/O 2024: What to expect



**Brian Heater**
11 hours ago

---

AI

## Google I/O 2024: How to watch



**Brian Heater**
11 hours ago

PX0562-010

Fintech

## Aplazo is using buy now, pay later as a stepping stone to financial ubiquity in Mexico



**Anna Heim**
11 hours ago

Startups

## Vote for your Disrupt 2024 Audience Choice favs



**TechCrunch Events**
12 hours ago

Startups

## Healthy growth helps B2B food e-commerce startup Pepper nab $30 million led by ICONIQ Growth



**Christine Hall**
12 hours ago

Government & Policy

## Booking.com latest to fall under EU market power rules

**Natasha Lomas**
13 hours ago

PX0562-011



**Featured Article**

# 'Got that boomer!': How cybercriminals steal one-time passcodes for SIM swap attacks and raiding bank accounts

**Zack Whittaker**
13 hours ago

---

**Enterprise**

## Permira is taking Squarespace private in a $6.9 billion deal

**Paul Sawers**
14 hours ago



---

**Apps**

## Buy Me a Coffee's founder has built an AI-powered voice note app

**Ivan Mehta**
17 hours ago



AI

## Google partners with Airtel to offer cloud and GenAI products to Indian businesses



**Manish Singh**
17 hours ago

AI

## Women in AI: Rep. Dar'shun Kendrick wants to pass more AI legislation



**Dominic-Madori Davis**
1 day ago

## A reckoning is coming for emerging venture funds, and that, VCs say, is a good thing



**Christine Hall**
1 day ago

## Workers at a Maryland Apple store authorize strike



**Anthony Ha**
1 day ago

**TechCrunch Disrupt 2024**    Innovation For Every Stage

**LEARN MORE**

PX0562-013

Picplz Launches Revamped Mobile Apps For iPhone And Android (With Free Effects) | TechCrunch

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

**Legal**

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

Google I/O 2024

OpenAI Event

Project Starline

Squarespace

Bumble

Tech Layoffs

ChatGPT

f   Facebook                          X   X

▶   Youtube                          ◉   Instagram

in   LinkedIn                        m   Mastodon

© 2024 Yahoo. All rights reserved. Powered by WordPress VIP

PX0562-014

# PX0563





 Comment

# PicPlz Founder Dalton Caldwell: All This Gossip About The Instagram Sale Is 'A Waste Of Time'

**Colleen Taylor**

/ 4:15 PM PDT • April 20, 2012

PX0563-001



Apparently lots of people are still talking about Instagram's sale to Facebook (last week seems like ages ago to those of us in the attention-deficit-disordered world of blogging, but I guess a $1 billion pricetag will tend to keep tongues wagging for a while.)

The latest Instagram/Facebook detail the chattering classes are seizing on? Silicon Valley venture capital firm Andreessen Horowitz's position in the deal. Basically, Andreessen Horowitz pitched seed funding into Instagram in its earliest days but ultimately opted to place more of its money and support behind PicPlz, a

PX0563-002

competing mobile photo sharing app. Today the *New York Times* published an article about the situation — the not-so-delicately titled "How Andreessen Horowitz Bunted on an Instagram Investment" — that tells the story in all its *schadenfreude*-inducing glory.

Well at least one person has had enough of the snark: PicPlz co-founder Dalton Caldwell. In a comment today on the Hacker News thread about the aforementioned *New York Times* piece, he defended PicPlz (which was eventually pivoted into being a part of into Mixed Media Labs, a broader smartphone app development company that has since spawned mobile platform App.net) and encouraged other entrepreneurs to ignore the score-keeping perpetuated by the media and tech industry gossip.

His whole comment is kind of awesome, so we're reposting it in its entirety here:

> "Anyone reading this article needs to remember to never be afraid of putting yourself out there because you are afraid of failure.
>
> I saw the market first, I created picplz, and I went for it. I was a huge believe in the mobile photo sharing opportunity, and I went for it with all of my heart. Clearly, picplz didn't win, but I have ZERO shame or regret for doing my best.
>
> When I read articles like these, which are about myself, my company and people that I know well, I can't help but feel vitriol aimed at me for DARING to create, launch and raise funding for picplz. I am not clear on what exactly people want, an apology for trying?
>
> The fact is, I saw the writing on the wall that we wouldn't win early and pivoted out of photo sharing which I had ~90% of my series A cash still in the bank. It certainly seems like that was the right move, but all of this press makes it look like pivoting was the wrong call(?) The press I read is written in such a way that it assumed that the A16Z investment is dead and my entire company should just be written off to zero today. That is bullshit. If I started to take press like this too seriously I might as well just dissolve my company and stop coming into work.
>
> I say this to the hn comminity: never be afraid of failure. No one knows what will happen. All of this arm-chair quarterbacking is a waste of time. Stop reading this kind of crap and instead put your energy into doing your best work. Sometimes you win, and sometimes you lose, but if you give yourself the opportunity to win enough times, you WILL be successful."

Marc Andreessen also weighed in on the thread, writing:

> "I'd like to add that all of us at AH are very proud of Dalton and his team, and we are highly excited about the new plan (including all the parts that aren't public yet :-)."

In all it serves as an important reminder that for all the fun that we have buzzing about the tech industry on blogs and Twitter, the people who are hard at work building things are the real reason we're all here in the space at all. It's always going to be easier to pick things apart than to put them together — but in the end, those who stay focused on being productive and positive usually wind up better off than the others, in one way or another.

PX0563-003

5/13/24, 9:10 PM                    PicPlz Founder Dalton Caldwell: All This Gossip About The Instagram Sale Is 'A Waste Of Time' | TechCrunch



# More TechCrunch



Motional cut about 550 employees, around 40%, in recent restructuring, sources say



ChatGPT's new face is a black hole



Cruise founder Kyle Vogt is back with a robot startup



GV's youngest partner has launched her own firm

## Get the industry's biggest tech news

Explore all newsletters ↗

**TechCrunch Daily News**
Every weekday and Sunday, you can get the best of TechCrunch's coverage. ⊕

**Startups Weekly**
Startups are the core of TechCrunch, so get our best coverage delivered weekly. ⊕

PX0563-004

5/13/24, 9:10 PM                 PicPlz Founder Dalton Caldwell: All This Gossip About The Instagram Sale Is 'A Waste Of Time' | TechCrunch



**TechCrunch Fintech**

The latest Fintech news and analysis, delivered every Sunday.

**TechCrunch Mobility**

TechCrunch Mobility is your destination for transportation news and insight.

**Email address (required)**

| Email address | Subscribe |

*By submitting your email, you agree to our* Terms *and* Privacy Notice.

# Tags

Andreessen Horowitz, Instagram, mixed media labs, picplz

---

Venture

## OpenAI Startup Fund raises additional $5M

**Marina Temkin**
44 mins ago



---

Venture

## Accel has a fresh $650M to back European early-stage startups

**Ingrid Lunden**
1 hour ago



---

Robotics

## Cruise founder Kyle Vogt is back with a robot startup

**Kirsten Korosec**
2 hours ago



---

Venture

## From Miles Grimshaw to Eva Ho, venture capitalists continue to play musical chairs

**Rebecca Szkutak**
2 hours ago



PX0563-005

AI

## Anthropic is expanding to Europe and raising more money

**Ingrid Lunden**
3 hours ago



Space

## TechCrunch Space: You rock(et) my world, moms

**Aria Alamalhodaei**
3 hours ago



Hardware

## Apple iPad Pro M4 vs. iPad Air M2: Reviewing which is right for most

**Brian Heater**
4 hours ago



Venture

## GV's youngest partner has launched her own firm

**Dominic-Madori Davis**
5 hours ago



AI

## ChatGPT's new face is a black hole

**Devin Coldewey**
6 hours ago



Hardware

## Apple and Google agree on standard to alert people when unknown Bluetooth devices may be tracking them

**Aisha Malik**
7 hours ago



PX0563-006

5/13/24, 9:10 PM                    PicPlz Founder Dalton Caldwell: All This Gossip About The Instagram Sale Is 'A Waste Of Time' | TechCrunch

AI

## OpenAI's ChatGPT announcement: Watch here

**Anthony Ha**
7 hours ago



Transportation

## GM's Cruise ramps up robotaxi testing in Phoenix

**Kirsten Korosec**
7 hours ago



AI

## OpenAI debuts GPT-4o 'omni' model now powering ChatGPT

**Kyle Wiggers**
8 hours ago





Bryce Durbin / TechCrunch

Featured Article

## The women in AI making a difference

PX0563-007

Kyle Wiggers, Dominic-Madori Davis
8 hours ago

---

Government & Policy

## White House proposes up to $120M to help fund Polar Semiconductor's chip facility expansion

Aisha Malik
8 hours ago



---

AI

## Google's 3D video conferencing platform, Project Starline, is coming in 2025 with help from HP

Kyle Wiggers
10 hours ago



---

Apps

## Instagram expands its creator marketplace to 10 new countries

Ivan Mehta
11 hours ago



---

Enterprise

## Google I/O 2024: What to expect

Brian Heater
11 hours ago



---

AI

## Google I/O 2024: How to watch

Brian Heater
11 hours ago



PX0563-008

5/13/24, 9:10 PM                    PicPlz Founder Dalton Caldwell: All This Gossip About The Instagram Sale Is 'A Waste Of Time' | TechCrunch

Fintech

## Aplazo is using buy now, pay later as a stepping stone to financial ubiquity in Mexico

**Anna Heim**
11 hours ago



Startups

## Vote for your Disrupt 2024 Audience Choice favs

**TechCrunch Events**
12 hours ago



Startups

## Healthy growth helps B2B food e-commerce startup Pepper nab $30 million led by ICONIQ Growth

**Christine Hall**
12 hours ago



Government & Policy

## Booking.com latest to fall under EU market power rules

**Natasha Lomas**
13 hours ago



PX0563-009

5/13/24, 9:10 PM    PicPlz Founder Dalton Caldwell: All This Gossip About The Instagram Sale Is 'A Waste Of Time' | TechCrunch



**Featured Article**

## 'Got that boomer!': How cybercriminals steal one-time passcodes for SIM swap attacks and raiding bank accounts

**Zack Whittaker**
13 hours ago

---

**Enterprise**

## Permira is taking Squarespace private in a $6.9 billion deal

**Paul Sawers**
14 hours ago



---

**Apps**

## Buy Me a Coffee's founder has built an AI-powered voice note app

**Ivan Mehta**
17 hours ago



PX0563-010

AI

## Google partners with Airtel to offer cloud and GenAI products to Indian businesses

**Manish Singh**
17 hours ago



AI

## Women in AI: Rep. Dar'shun Kendrick wants to pass more AI legislation

**Dominic-Madori Davis**
1 day ago



## A reckoning is coming for emerging venture funds, and that, VCs say, is a good thing

**Christine Hall**
1 day ago



## Workers at a Maryland Apple store authorize strike

**Anthony Ha**
1 day ago



**TechCrunch Disrupt 2024**                    Innovation For Every Stage

**LEARN MORE**

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

PX0563-011

5/13/24, 9:10 PM                    PicPlz Founder Dalton Caldwell: All This Gossip About The Instagram Sale Is 'A Waste Of Time' | TechCrunch

**Legal**

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

Google I/O 2024

OpenAI Event

Project Starline

Squarespace

Bumble

Tech Layoffs

ChatGPT

f  Facebook                          X  X

▶  Youtube                           ⊡  Instagram

in  LinkedIn                         ⓜ  Mastodon

© 2024 Yahoo. All rights reserved. Powered by WordPress VIP

PX0563-012

# PX0564

                                                                                               

# A Mobile Photo Sharing Casualty, Treehouse Hits The Deadpool; Founder Off To Google

**MG Siegler**
/ 4:11 PM PST • March 1, 2011

Comment



In terms of hot spaces at the moment, you'd be hard-pressed to find anything hotter than the mobile photo sharing space. Instagram, PicPlz, and Path all have gotten huge amounts of funding recently. And the latter even turned down a massive $100 million+ offer from Google. So the space is just minting money and everyone is riding high, right? Well, not exactly.

It can be easy to forget that despite the early success stories (or irrational hype, depending on how you perceive it), there are many more startups out there that aren't taking off for one reason or another. And one of the earlier players in this latest wave, Treehouse, is sadly no more. The service has entered the Deadpool.

We first covered Treehouse in June of last year as perhaps the perfect app for capturing "bros icing bros". And while it lasted longer than that trend, Treehouse is now shut down, co-founder Chrys Bader has confirmed to us.

But it's not all sad news. One of the reasons Bader decided to shutter the service now is because he got recruited by Google to help them build out whatever it is they're building in the social space. Bader declined to give details, but says he's leading an "exciting new project" alongside the Slide team that Google acquired last August.

PX0564-001



"*I'm really excited about working with some proven entrepreneurs and to see what we'll be able to accomplish as a small team within Google*," he says.

Treehouse was technically a part of Fliggo, a Y Combinator-backed startup that had originally set out to be one of the "Twitter for video" plays. They had also been known as Vidly. But Bader correctly predicted that mobile photo sharing was poised to take off, and thus we got Treehouse. The service was well executed, and had an interesting sharing model that was sort of a hybrid of Path and Instagram. But again, for whatever reason, it just didn't catch on in the same way.

Perhaps Bader will be able translate some of what he learned in the space to whatever Google releases.

**Update**: In an email, Bader had a bit more to share, looking back on Treehouse and the overall space:

> We were indeed the first to really identify the market for mobile photo sharing. It all started when we asked the question "What if you could see your friends' camera rolls?" So many people take pictures on their iPhones that never see the light of day, so by being able to see your friends' camera rolls, then you can see what your friends are up to.

> At first, we decided to focus on privacy and creating a comfortable environment for people to share photos without worrying who sees them. Initially we had great traction in small groups, but quickly reached the realization that private sharing is difficult in groups of friends that do not all have iPhones. This is a problem that Path is facing right now. Hyper-privacy does not work and moves against the natural motion of social products now, which is to be more open.

> I'm happy to see Instagram's success because it will bring forward the possibility of mobile photo sharing in people's minds which will pave the way for new apps to have a chance to blow the lid off of the space. We've barely scratched the surface of the potential of the mobile photo space, and I'm excited to see Instagram lock-down a long-term vision and watch Path slowly become more open.



# More TechCrunch

PX0564-002

5/13/24, 9:11 PM                    A Mobile Photo Sharing Casualty, Treehouse Hits The Deadpool; Founder Off To Google | TechCrunch



**Motional cut about 550 employees, around 40%, in recent restructuring, sources say**



**ChatGPT's new face is a black hole**



**GV's youngest partner has launched her own firm**



**Apple and Google agree on standard to alert people when unknown Bluetooth devices may be tracking them**

---

**Get the industry's biggest tech news**                              Explore all newsletters ↗

**TechCrunch Daily News**                          ⊕
Every weekday and Sunday, you can get the best of
TechCrunch's coverage.

**Startups Weekly**                                ⊕
Startups are the core of TechCrunch, so get our best
coverage delivered weekly.

**TechCrunch Fintech**                             ⊕
The latest Fintech news and analysis, delivered every
Sunday.

**TechCrunch Mobility**                            ⊕
TechCrunch Mobility is your destination for transportation
news and insight.

**Email address (required)**

PX0564-003

| Email address | Subscribe |
|---|---|

*By submitting your email, you agree to our Terms and Privacy Notice.*

# Tags

Google, DEADPOOL, Fliggo, Slide, treehouse, vidly

---

Venture

## OpenAI Startup Fund raises additional $5M

**Marina Temkin**
46 mins ago



---

Venture

## Accel has a fresh $650M to back European early-stage startups

**Ingrid Lunden**
1 hour ago



---

Robotics

## Cruise founder Kyle Vogt is back with a robot startup

**Kirsten Korosec**
2 hours ago



---

Venture

## From Miles Grimshaw to Eva Ho, venture capitalists continue to play musical chairs

**Rebecca Szkutak**
2 hours ago



---

PX0564-004

AI

## Anthropic is expanding to Europe and raising more money

**Ingrid Lunden**
3 hours ago



Space

## TechCrunch Space: You rock(et) my world, moms

**Aria Alamalhodaei**
3 hours ago



Hardware

## Apple iPad Pro M4 vs. iPad Air M2: Reviewing which is right for most

**Brian Heater**
4 hours ago



Venture

## GV's youngest partner has launched her own firm

**Dominic-Madori Davis**
5 hours ago



AI

## ChatGPT's new face is a black hole

**Devin Coldewey**
6 hours ago



Hardware

## Apple and Google agree on standard to alert people when unknown Bluetooth devices may be tracking them

**Aisha Malik**
7 hours ago



AI

## OpenAI's ChatGPT announcement: Watch here

**Anthony Ha**
7 hours ago



Transportation

## GM's Cruise ramps up robotaxi testing in Phoenix

**Kirsten Korosec**
7 hours ago



AI

## OpenAI debuts GPT-4o 'omni' model now powering ChatGPT

**Kyle Wiggers**
8 hours ago





Bryce Durbin / TechCrunch

Featured Article

## The women in AI making a difference

PX0564-006

Kyle Wiggers, Dominic-Madori Davis
8 hours ago

---

Government & Policy

## White House proposes up to $120M to help fund Polar Semiconductor's chip facility expansion

**Aisha Malik**
8 hours ago



---

AI

## Google's 3D video conferencing platform, Project Starline, is coming in 2025 with help from HP

**Kyle Wiggers**
10 hours ago



---

Apps

## Instagram expands its creator marketplace to 10 new countries

**Ivan Mehta**
11 hours ago



---

Enterprise

## Google I/O 2024: What to expect

**Brian Heater**
11 hours ago



---

AI

## Google I/O 2024: How to watch

**Brian Heater**
11 hours ago



PX0564-007

5/13/24, 9:11 PM                 A Mobile Photo Sharing Casualty, Treehouse Hits The Deadpool; Founder Off To Google | TechCrunch

Fintech

## Aplazo is using buy now, pay later as a stepping stone to financial ubiquity in Mexico

**Anna Heim**
11 hours ago



Startups

## Vote for your Disrupt 2024 Audience Choice favs

**TechCrunch Events**
12 hours ago



Startups

## Healthy growth helps B2B food e-commerce startup Pepper nab $30 million led by ICONIQ Growth

**Christine Hall**
12 hours ago



Government & Policy

## Booking.com latest to fall under EU market power rules

**Natasha Lomas**
13 hours ago





**Featured Article**

## 'Got that boomer!': How cybercriminals steal one-time passcodes for SIM swap attacks and raiding bank accounts

**Zack Whittaker**
13 hours ago

---

**Enterprise**

## Permira is taking Squarespace private in a $6.9 billion deal

**Paul Sawers**
14 hours ago



---

**Apps**

## Buy Me a Coffee's founder has built an AI-powered voice note app

**Ivan Mehta**
17 hours ago



PX0564-009

AI

## Google partners with Airtel to offer cloud and GenAI products to Indian businesses

**Manish Singh**
17 hours ago



AI

## Women in AI: Rep. Dar'shun Kendrick wants to pass more AI legislation

**Dominic-Madori Davis**
1 day ago



## A reckoning is coming for emerging venture funds, and that, VCs say, is a good thing

**Christine Hall**
1 day ago



## Workers at a Maryland Apple store authorize strike

**Anthony Ha**
1 day ago



| TechCrunch Disrupt 2024 | Innovation For Every Stage |
|---|---|
| **LEARN MORE** | |

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

A Mobile Photo Sharing Casualty, Treehouse Hits The Deadpool; Founder Off To Google | TechCrunch

**Legal**

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

Google I/O 2024

OpenAI Event

Project Starline

Squarespace

Bumble

Tech Layoffs

ChatGPT

Facebook                                X

Youtube                                 Instagram

LinkedIn                                Mastodon

© 2024 Yahoo. All rights reserved. Powered by WordPress VIP

PX0564-011

# PX0565

Learn more about **LSEG**

India

## India adds 54 more Chinese apps to ban list; Sea says it complies with laws

By Reuters

February 15, 2022 8:47 AM EST · Updated 2 years ago



[1/2] Smartphone with Chinese applications is seen in front of a displayed Indian flag and a "Banned app" sign in this illustration picture taken July 2, 2020. REUTERS/Dado Ruvic/Illustration *Purchase Licensing Rights* 

Feb 15 (Reuters) - India has blocked access to 54 mobile apps, mainly Chinese but also including Singapore-based Sea Ltd's (SE.N) "Free Fire" mobile game, over security concerns, government sources said on Tuesday.

Since the start of political tension with China in 2020 following a border clash, India's ban list, which initially had 59 Chinese apps, including TikTok, has expanded to cover 321 apps. read more

India believes user data was being sent via the apps to servers in China, one of the government sources, who sought anonymity in line with policy, told Reuters.

PX0565-001

Such collection would allow the data to be mined, collated, analysed and profiled, potentially by "elements hostile to the sovereignty and integrity of India and for activities detrimental to national security," the source said.

Sea, a consumer internet firm in which Chinese gaming giant Tencent (0700.HK) ☐ holds an 18.7% stake, said on Tuesday it complies with Indian laws and does not transfer or store any data of the country's users in China.

---

Advertisement · Scroll to continue

---

Tencent did not immediately respond to a request for comment.

Sea had on Monday told its shareholders that it was "working through it" (the ban), according to a person who attended its annual general meeting and declined to be named.

Shareholder concerns followed an 18.4% slide in its U.S.-listed shares on Monday following reports that its popular mobile game "Free Fire" is part of India's list of banned apps.

---

Advertisement · Scroll to continue

---

The rout wiped off more than $16 billion from its market value, while investment firms like Cathie Wood's ARK Invest took advantage of the slump to scoop up $19 million worth of shares.

The ban spells trouble for Sea as its e-commerce app Shopee already faces boycott calls by traders in India, who have accused it of practices that hurt offline traders.

"Free Fire ban could deliver a double whammy to Sea with lower digital entertainment profitability limiting Sea's ability to bankroll Shopee's expansion," said LightStream Research analyst Oshadhi Kumarasiri, who publishes on Smartkarma research platform.

---

Advertisement · Scroll to continue

---

PX0565-002

5/14/24, 11:24 AM                        India adds 54 more Chinese apps to ban list; Sea says it complies with laws | Reuters

The "Free Fire" ban could have a revenue impact of between $78 million and $104 million per quarter, he said, adding that it was difficult to rule out the possibility of a similar ban on Shopee.

The Confederation of All India Traders had said on Monday it was "surprised" at Shopee's absence from the ban list.

On Tuesday, shares of Sea were up about 4% in premarket trading and if gains hold through the session, they could recoup some losses.

Advertisement · Scroll to continue

 **REUTERS®**                                                                            🔍    ☰

Coming soon. Get the latest news and expert analysis about the state of the global economy with Reuters
Econ World. Sign up here.

Reporting by Sneha Bhowmik, Maria Ponnezhath and Nivedita Balu in Bengaluru, Munsif Vengattil in New Delhi and Fanny Potkin in Singapore; Editing by Clarence Fernandez, Bernadette Baum and Arun Koyyur

Our Standards: **The Thomson Reuters Trust Principles.** ⧉

> **Purchase Licensing Rights**

## Read Next

India
**India's Modi denies stoking divisions to win election, files nomination**
4:17 PM UTC

India
**Mumbai billboard collapse crushes homes and cars, kills at least 14**
ago

Regulatory Oversight
**India regulator plans tighter rules for listing of small businesses, sources say**
9:24 AM UTC

India

PX0565-003

5/14/24, 11:24 AM                    India adds 54 more Chinese apps to ban list; Sea says it complies with laws | Reuters

**Foreign equity investors turn to hedging on India election jitters**

11:45 AM UTC

LSEG Workspace    The next-generation human interface for financial professionals.

## Sponsored Content                                                    Dianomi ▷



**Are You Saving Enough for Retirement?**

Sponsored by Charles Schwab



**3 Alternatives to Cash Gifts for Graduation**

Sponsored by Charles Schwab



**Leverage TradeStation's platform to trade across asset classes.**

Sponsored by TradeStation

## Sponsored Content                                                    Dianomi ▷

**Roth vs. Traditional IRAs: Which is Right for You?**

Sponsored by Charles Schwab



**Schwab's Take on Today's Markets**

Sponsored by Charles Schwab



**Schwab Investing Themes™. A new way to invest in ideas you believe in.**

Sponsored by Charles Schwab



**Vanguard's 3 Steps to Maximizing Your Medicare Coverage**



**Leverage TradeStation's platform to trade**



**CEO Cuts Salary to $1 and Takes Advantage of**



World ›

## Two men in UK court accused of machine gun plot to kill Jewish people

United Kingdom · 17 min ago

PX0565-004

5/14/24, 11:24 AM                India adds 54 more Chinese apps to ban list; Sea says it complies with laws | Reuters

United States

**Trump Trial Live: Michael Cohen said he lied on Trump's behalf**

22 min ago

---

United Kingdom

**Britain rejects call to ban gagging orders in finance**

26 min ago

---

Asia Pacific

**France sends more police, seeks talks, to quell New Caledonia riots**

26 min ago

---

India

**Mumbai billboard collapse crushes homes and cars, kills at least 14**

33 min ago

---

## Sponsored Content                                                Dianomi ▷



**Trading and Social Media**
Sponsored by Charles Schwab

**What is an IRA?**
Sponsored by Charles Schwab



**Start a Schwab financial plan today and help get more from your money.**
Sponsored by Charles Schwab





**Leverage a powerful platform designed for self-directed traders.**
Sponsored by TradeStation

**7 Retirement Income Strategies Once Your Portfolio Reaches $500k**
Sponsored by Fisher Investments



**Vanguard's 3 Steps to Maximizing Your Medicare Coverage**
Sponsored by smartasset



## Sponsored Content                                                Dianomi ▷

**Man Who Called Bitcoin: AI Will Be 10x Bigger Than Crypto**
Sponsored by Paradigm Press

**Time to Sell NVDA? 50-Yr Wall Street Legend Weighs In**
Sponsored by Chaikin Analytics

**CEO Cuts Salary to $1 and Takes Advantage of America's New Money**
Sponsored by Stansberry Research

**5 Things That are Ripping Us Off Every Month**
Sponsored by The Penny Hoarder

**Are You Getting The Best Internet Deal? Compare Providers And Save.**
Sponsored by HighSpeedInternet.com

**Don't Miss Out: Our Top AI Pick Could Exceed 40 Amazons**
Sponsored by The Motley Fool

Latest

Home
Authors
Topic sitemap

Media

📹 Videos ⧉
📷 Pictures
🖼 Graphics ⧉

Browse

World
Business
Markets
Sustainability
Legal
Breakingviews
Technology
Investigations ⧉
Sports
Science
Lifestyle

About Reuters

About Reuters ⧉
Careers ⧉
Reuters News Agency ⧉
Brand Attribution Guidelines ⧉
Reuters Leadership ⧉
Reuters Fact Check ⧉
Reuters Diversity Report ⧉

Stay Informed

Download the App (iOS) ⧉
Download the App (Android) ⧉
Newsletters ⧉

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

[X] [Facebook] [Instagram] [YouTube] [LinkedIn]

Thomson Reuters Products

**Westlaw** ⧉
Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⧉
The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⧉
The industry leader for online information for tax, accounting and finance professionals.

LSEG Products

**Workspace** ⧉

PX0565-006

5/14/24, 11:24 AM    India adds 54 more Chinese apps to ban list; Sea says it complies with laws | Reuters

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**DataCatalogue** ⬈

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**World-Check** ⬈

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

---

**Advertise With Us** ⬈    **Advertising Guidelines** ⬈    **Coupons** ⬈    **Purchase Licensing Rights** ⬈

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ⬈    **Terms of Use** ⬈    **Privacy** ⬈    **Digital Accessibility** ⬈    **Corrections** ⬈    **Site Feedback** ⬈

© 2024 Reuters. All rights reserved

PX0565-007

# PX0566

On the Misuse of Accounting Rates of Return to Infer Monopoly Profits

Author(s): Franklin M. Fisher and John J. McGowan

Source: *The American Economic Review*, Mar., 1983, Vol. 73, No. 1 (Mar., 1983), pp. 82-97

Published by: American Economic Association

Stable URL: https://www.jstor.org/stable/1803928

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



is collaborating with JSTOR to digitize, preserve and extend access to *The American Economic Review*

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-001

# On the Misuse of Accounting Rates of Return to Infer Monopoly Profits

*By* Franklin M. Fisher and John J. McGowan*

Accounting rates of return are frequently used as indices of monopoly power and market performance by economists and lawyers.[1] Such a procedure is valid only to the extent that profits are indeed monopoly profits, accounting profits are in fact economic profits, and the accounting rate of return equals the economic rate of return.

The large volume of research investigating the profits-concentration relationship uniformly relies on accounting rates of return, such as the ratio of reported profits to total assets or to stockholders' equity as the measure of profitability to be related to concentration.[2] Many users of accounting rates of return seem well aware that profits as reported by accountants may not be consistent from firm to firm or industry to industry and may not correspond to economists' definitions of profits. Likewise, they recognize that accountants' statements of assets, hence also stockholders' equity, may fail to correspond to economically acceptable definitions, because accounting practices do not provide for the capitalization of certain activities such as research and development and do not incorporate al-

lowances for inflation. This is to say they are well aware of certain measurement problems which arise in using available accounting information to measure profitability. They seem, however, totally unaware of a much deeper conceptual problem, namely, that accounting rates of return, even if properly and consistently measured, provide almost no information about economic rates of return.[3]

The economic rate of return on an investment is, of course, that discount rate that equates the present value of its expected net revenue stream to its initial outlay. Putting aside the measurement problems referred to above, it is clear that it is the economic rate of return that is equalized within an industry in long-run industry competitive equilibrium and (after adjustment for risk) equalized everywhere in a competitive economy in long-run equilibrium. It is an economic rate of return (after risk adjustment) above the cost of capital that promotes expansion under competition and is produced by output restriction under monopoly. Thus, the economic rate of return is the only correct measure of the profit rate for purposes of economic analysis.[4] Accounting rates of return are useful only insofar as they yield information as to economic rates of return.[5]

*Fisher is professor of economics, Massachusetts Institute of Technology. McGowan was Vice-President, Charles River Associates. He died on April 7, 1982. This paper is based on work done for Fisher's testimony as a witness for IBM in *U.S. v. IBM* (69 Civ. 200, U.S. District Court, Southern District of New York). We are indebted to Larry Brownstein, Steven Hendrick, and especially Karen Larson and Leah Hutten for computational and programming assistance. Any errors are our responsibility.

[1] Aside from *U.S. v. IBM*, see, for example, Joseph Cooper, p. 15; the various industry studies in Walter Adams; and the discussion in Philip Areeda and Donald Turner, Vol. II, pp. 331–41.

[2] See the comprehensive reviews of this literature by Leonard Weiss and more recently by F. M. Scherer, pp. 267–95. Additional accounting problems raised by attempting to measure profitability by line of business are discussed extensively in George Benston.

[3] A referee suggests that even the crudest accounting information tells us IBM is more profitable than American Motors (AMC), but we disagree. Surely accounting information tells us IBM generates more dollars of profits per dollar of assets than does AMC but, as the examples below demonstrate, that information alone does not tell us which firm is more profitable in the sense of having a higher economic rate of return.

[4] This is literally true only if the cost of capital is first subtracted. In what follows below, we follow the usual empirical practice of measuring all rates of return before such subtraction.

[5] The existence of a uniquely defined economic rate of return—which we now assume for the theoretical analysis below and which occurs in all the examples—is

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-002

Now, it should be obvious that only by the merest happenstance will the accounting rate of return on a given investment, taken as the ratio of net revenue to book value in a particular year,[6] be equal to the economic rate of return that makes the present value of the entire net revenue stream equal to the initial capital cost. Indeed, as we shall see below, accounting rates of return on individual investments generally vary all over the lot. Hence, only if such fluctuations are somehow averaged out by a firm's investment behavior over time will its accounting rate of return even be roughly constant—let alone approximate the economic rate of return.[7]

It is easy to show that such averaging requires that the firm grow exponentially, investing in the same mix of investment types each year—an investment type being defined by a time shape of net revenues. Even in such an unrealistically favorable case, the accounting rate of return will generally depend on the rate of growth, equalling the economic rate of return only by accident. Furthermore, the relationship between the accounting and economic rates of return depends on the time shape of net revenues.

Hence, only by accident will accounting rates of return be in one-to-one correspondence with economic rates of return. We show by example below that the effects involved cannot be assumed to be small—indeed, they can be large enough to account for the entire interfirm variation in accounting rates of return among the largest firms in the United States.

The plan of the paper is as follows. Section I summarizes the theoretical results which are proved and elucidated in the Appendix. These results establish the relationships among the various rates of return, time shapes, and rates of growth, and demonstrate in principle that accounting rates of return are not informative. The balance of the paper analyzes a series of relatively simple examples to show that the theoretical effects are not so small that they can be neglected in practice. Indeed, they are very large. A ranking of firms by accounting rates of return can easily invert a ranking by economic rates of return.

Before proceeding, we note that some of the theoretical results given below are not new. Ezra Solomon wrote a number of articles culminating in one dealing with the case of exponential growth in 1970. Thomas Stauffer published various theorems a year later (1971) and also attempted to make adjustments to accounting rates of return to correct for alternative cash flow profiles in testimony for the FTC in the Ready to Eat Cereal Litigation.[8] J. Leslie Livingstone and Gerald Salamon (1971) have also studied and attempted to determine a relationship between the accounting and internal rates of return. Yet, perhaps because Solomon's focus was on the correct concepts of rate of return and cost of capital for rate regulation, or perhaps because none of the studies cited makes clear just how large the effects involved can be, the importance of these matters for more general industrial organization research appears to have gone largely unnoticed. It is our hope that the self-contained discussion of the present paper and, especially, the mag-

---

guaranteed only if the net revenue stream stemming from an investment has any negative terms occurring before the positive ones. If the economic rate of return fails to be unique, then, while present value calculations using the cost of capital remain the correct method for analyzing profitability, profitability cannot be summarized correctly by *any* rate of return, including accounting rates of return.

[6] Throughout this paper we work with accounting rates of return defined as ratios of profits to book values of capital. Similar (but not identical in detail) results apply to accounting rates of return on stockholders' equity. The precise relations involved can, in principle, be inferred from the results given below. (Such results do apply directly to accounting rates of return on stockholders' equity even in detail if we consider the firms being analyzed to hold neither debt nor retained earnings.)

[7] For discussion purposes—and in our examples below—we assume that the firm achieves the same economic rate of return on all its investments, and thus speak of "the" economic rate of return for the firm without worrying about differences between average and marginal rates. This is, of course, the most favorable case for the accounting rate of return for the firm as a whole.

[8] The proofs given below are different from Stauffer's proofs, and, we think, more suitable for our present purposes than his where the propositions coincide.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-003

nitudes of the effects exhibited in the examples below will remedy this.

## I. Summary of Theoretical Results

The main theoretical results, which are proved and elucidated in the Appendix, are as follows:

(a) Unless depreciation schedules are chosen in a particular way, so that the value of the investment is calculated as the present value at the economic rate of return of the stream of benefits remaining in it[9]—a choice which is exceptionally unlikely to be made—the accounting rate of return on a particular investment will differ from year to year, and will not in general equal the economic rate of return on that investment in any year.

(b) The accounting rate of return for the firm as a whole will be an average of the accounting rates of return for individual investments made in the past. The weights in that average will consist of the book value of those different investments which in turn depend on the depreciation schedule adopted, and, particularly, on the amount and timing of such investments.

(c) Unless the proportion of investments with a given time shape remains fixed every year, and unless the firm simply grows exponentially, increasing investments in each and every type of asset[10] by the same proportion for every year, the accounting rate of return to the firm as a whole cannot even be expected to be constant, let alone be equal to the economic rate of return.

(d) Even where the firm does operate in such an unrealistic manner—the case most favorable to the accounting rate of

return—the accounting rate of return will vary with the rate of growth of the firm, and will not generally equal the economic rate of return.

(e) The only reliable inferences concerning the economic rate of return that can be drawn (and only in such an unrealistically favorable case) from examination of the accounting rate of return stem from the fact that the accounting rate of return and the economic rate of return will be on the same side of the firm's exponential growth rate. If the accounting rate of return is higher than the growth rate, then the economic rate of return is also higher than the growth rate. If the accounting rate of return is lower than the growth rate, then the economic rate of return is lower than the growth rate. If the accounting rate of return equals the growth rate, and in this case *alone*, the economic rate of return is guaranteed to be equal to the accounting rate of return.[11]

(f) Even in the unrealistically favorable exponential growth case, the accounting rate of return depends *crucially* on the time shape of benefits, and the effect of growth on the accounting rate of return also depends on that time shape. In particular, it is not true that rapidly growing firms tend to understate their profits and slowly growing firms tend to overstate them. The effect can go the other way.[12]

(g) All these results apply both to before- and after-tax rates of return.

## II. The Likely Size of the Effects

We now show by example that differences between the accounting and economic rates of return can be quite large indeed. For the sake of economy we examine only differences in after-tax rates of return. We as-

---

[9]Such a "natural" depreciation formula—which we shall term "economic depreciation"—was first suggested by Harold Hotelling in 1925. It is somewhat misleading, however, to say that the fundamental conceptual problems discussed in the present paper are basically matters of depreciation accounting. Rather, there exists a particular form of depreciation which will correct those problems which stem from a fundamental difference between the economic and accounting rates of return. These problems arise even where machines never wear out. An example is given in Fisher (1979).

[10]Two assets are said to be of the same "type" if they yield the same time shape of benefits.

[11]It is worth pointing out that these results apply to accounting rates of return on total assets, not directly to accounting rates of return on stockholders' equity. Further, they apply to accounting rates of return on beginning-of-year, not end-of-year or yearly average assets. As the examples below show, the problem of making inferences from accounting rates of return on end-of-year (or average) assets is even worse—if possible—than when beginning-of-year assets are used.

[12]Compare Cooper, pp. 132–33.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-004

Case 1:20-cv-03590-JEB    Document 347-6    Filed 05/24/24    Page 290 of 501

TABLE 1—AFTER-TAX ACCOUNTING RATES OF RETURN[a]
(Percent for the *Q*-Profile; Six-Year Life; No Delay)

| | Gross Profits (Cash Flow Before-Tax) | Depreciation | After-Tax Profits | Beginning-of-Year Assets | | End-of-Year Assets | |
|---|---|---|---|---|---|---|---|
| Year | | | | Net | Accounting Rate of Return | Net | Accounting Rate of Return |
| 1 | 23.3 | 28.6 | (5.3) | 100.0 | (5.3) | 71.4 | (7.4) |
| 2 | 44.1 | 23.8 | 11.2 | 71.4 | 15.7 | 47.6 | 23.5 |
| 3 | 51.9 | 19.0 | 18.1 | 47.6 | 38.0 | 28.6 | 63.3 |
| 4 | 40.5 | 14.3 | 14.4 | 28.6 | 50.3 | 14.3 | 100.7 |
| 5 | 20.2 | 9.5 | 5.9 | 14.3 | 41.3 | 4.8 | 122.9 |
| 6 | 7.8 | 4.8 | 1.7 | 4.8 | 35.4 | 0 | Infinite |

[a]Tax rate: 45 percent; After-tax economic rate of return: 15 percent; Sum-of-the-years' digits depreciation.

sume a corporate tax rate of 45 percent, and (for most examples) fix the after-tax economic rate of return at 15 percent while varying growth rates and depreciation methods and the time shape of benefits.[13] Enormous variations in the accounting rates of return are readily generated.

### A. The "Q-Profile"

We start with an investment whose benefits begin immediately and last for six years, and follow the time shape exhibited in column 2 of Table 1. For convenience we refer to this shape as the *Q*-profile.[14] The figures in column 2 are scaled to produce an after-tax economic rate of return of 15 percent on an

[13]Fifteen percent was roughly the average *accounting* rate of return in U.S. manufacturing corporations in 1978 (*Economic Report of the President*, 1979, pp. 279–91). If accounting and economic rates of return tended to coincide, 15 percent would be a reasonable choice for our purpose. Since the rates do not generally coincide, the choice is immaterial. Choosing a lower economic rate of return would reduce the range of accounting rates of return in the results below (for the *same* examples), but would not affect the conclusions.

With a fixed capital investment, a given time shape of gross profits before depreciation and taxes results in different after-tax economic rates of return for different depreciation methods. To fix the after-tax economic rate of return for a given time shape, therefore, we adjust the height of the gross profit benefit stream proportionally to produce the desired after-tax economic rate of return.

[14]This shape was (erroneously) suggested during *U.S. v. IBM* as being typical of IBM's experience. We use it for convenience.

initial investment of $100 when sum-of-the-years' digits depreciation over a six-year life is used. The remainder of the table shows the calculation of the corresponding accounting rate of return each year.

Plainly, the after-tax accounting rates of return vary substantially. They never equal the after-tax economic rate of return (15 percent), and exceed it in every year with positive net profits. Real-life firms do not generally exhibit such variation in their accounting rates of return because the averaging effects of growth, as it were, attribute profits from past investment to the book value of investments whose profit results are yet to come, rather than to the declining book value of such past investment.

While such an averaging effect tends to stabilize the accounting rate of return, it becomes a hodgepodge devoid of information about the economic rate of return. This point is illustrated by Table 2, which presents asymptotic accounting rates of return assuming constant exponential growth for three different versions of the *Q*-profile, each with the same tax rate (45 percent) and after-tax economic rate of return (15 percent).[15] The first version (the case of Table 1)

[15]In this context, exponential growth takes place by repeated investment in the same type of project; i.e., all investments have the same time-shape of benefits. This is obviously an unrealistic assumption, but one which is more likely to produce equality between accounting and economic rates of return than more realistic assumptions.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-005

TABLE 2—ASYMPTOTIC ACCOUNTING RATES OF RETURN (%) ON THREE VERSIONS OF THE $Q$-PROFILE[a]

| Growth Rate | Six-Year Life (No Delay) | | | Seven-Year Life (One-Year Delay) | | | Eight-Year Life (Two-Year Delay) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Straight Line | Declining Balance | Sum-of-Years' Digits | Straight Line | Declining Balance | Sum-of-Years' Digits | Straight Line | Declining Balance | Sum-of-Years' Digits |
| A. Beginning-of-Year Assets | | | | | | | | | |
| 0 | 15.2 | 17.8 | 18.1 | 18.1 | 21.3 | 22.0 | 21.0 | 24.7 | 25.9 |
| 5 | 15.2 | 16.9 | 17.0 | 17.0 | 19.1 | 19.4 | 18.9 | 21.1 | 21.7 |
| 10 | 15.1 | 15.9 | 15.9 | 16.0 | 17.0 | 17.1 | 16.9 | 17.9 | 18.1 |
| 15 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| 20 | 14.8 | 14.1 | 14.1 | 14.0 | 13.2 | 13.1 | 13.3 | 12.4 | 12.3 |
| 25 | 14.7 | 13.3 | 13.3 | 13.1 | 11.5 | 11.4 | 11.7 | 10.1 | 9.9 |
| 30 | 14.5 | 12.5 | 12.6 | 12.2 | 10.0 | 9.9 | 10.3 | 8.0 | 7.8 |
| B. End-of-Year Assets | | | | | | | | | |
| 0 | 15.2 | 17.8 | 18.1 | 18.1 | 21.3 | 22.0 | 21.0 | 24.7 | 25.9 |
| 5 | 14.5 | 16.1 | 16.2 | 16.2 | 18.1 | 18.5 | 18.0 | 20.1 | 20.7 |
| 10 | 13.7 | 14.5 | 14.5 | 14.6 | 15.4 | 15.5 | 15.3 | 16.3 | 16.5 |
| 15 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 |
| 20 | 12.4 | 11.8 | 11.8 | 11.7 | 11.0 | 10.9 | 11.1 | 10.3 | 10.2 |
| 25 | 11.7 | 10.6 | 10.7 | 10.5 | 9.2 | 9.2 | 9.4 | 8.1 | 7.9 |
| 30 | 11.1 | 9.6 | 9.7 | 9.4 | 7.7 | 7.6 | 7.9 | 6.2 | 6.0 |

[a]See Table 1.

has no delay between investment and the beginning of the benefit stream, and depreciation is taken over the resulting six-year life. The second version has a seven-year life including a one-year's delay between investment and initial return. The third has an eight-year life including a two-year delay between investment and initial return. Except for the lag at the beginning and differences in scale, the gross benefit stream is the same in each case. Panel A of the table gives accounting rates of return on beginning-of-year assets; Panel B gives those on end-of-year assets.

Several things are apparent from Table 2. First, the accounting rates of return only equal the economic rate of return of 15 percent when the growth rate is also 15 percent and when the accounting rate of return is measured on beginning-of-year assets. Otherwise, the accounting rates vary from seven points below to almost eleven points above the economic rate of return.

Second, it is not true (as is sometimes stated) that more rapid depreciation, other things equal, tends to understate accounting rates of return. In this example, when the rate of growth is below 15 percent, declining balance and sum-of-the-years' digits depreciation produces a higher accounting rate of return than straightline depreciation for given

growth rates, time profiles, and economic rates of return. The effect is reversed when the growth rate exceeds the economic rate of return of 15 percent. This illustrates a general proposition: more rapid depreciation *increases* the accounting rate of return (measured on beginning-of-year assets) when the growth is less than the economic rate of return, and *decreases* the accounting rate of return when the growth rate exceeds the economic rate of return.[16] Since this is the only point about depreciation which we wish to demonstrate, we provide only results for sum-of-the-years' digits depreciation in the rest of this paper.[17]

In all the examples in Table 2, firms growing at rates greater than the economic rate of

[16] By Theorem 1, the changeover point is also where the growth rate equals the accounting rate of return on beginning-of-year assets.

[17] There is one additional point about depreciation which we shall not bother to exemplify. Since the depreciation method chosen affects the time shape of the after-tax benefit stream, the relationship of after-tax accounting rates to the growth rate is particularly sensitive to the depreciation method. It can even happen that faster growth increases accounting rates of return for one choice of depreciation method and decreases them for another—all for the same pre-tax benefit time shape and the same after-tax economic rate of return. This makes adjustments for growth even harder to make than appears from the examples below.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-006

TABLE 3—ASYMPTOTIC ACCOUNTING RATES OF RETURN (%) ON FOUR VERSIONS OF THE $Q$-PROFILE[a]

| Growth Rate | Ten-Year Life (No Delay, Last Year Spread) | Six-Year Life (No Delay) | Seven-Year Life (One-Year Delay) | Eight-Year Life (Two-Year Delay) |
|---|---|---|---|---|
| A. Beginning-of-Year Assets | | | | |
| 0 | 13.9 | 18.1 | 22.0 | 25.9 |
| 5 | 14.5 | 17.0 | 19.4 | 21.7 |
| 10 | 14.8 | 15.9 | 17.1 | 18.1 |
| 15 | 15.0 | 15.0 | 15.0 | 15.0 |
| 20 | 15.1 | 14.1 | 13.1 | 12.3 |
| 25 | 15.1 | 13.3 | 11.4 | 9.9 |
| 30 | 15.0 | 12.6 | 9.9 | 7.8 |
| B. End-of-Year Assets | | | | |
| 0 | 13.9 | 18.1 | 22.0 | 25.9 |
| 5 | 13.8 | 16.2 | 18.5 | 20.7 |
| 10 | 13.5 | 14.5 | 15.5 | 16.5 |
| 15 | 13.0 | 13.0 | 13.0 | 13.0 |
| 20 | 12.6 | 11.8 | 10.9 | 10.2 |
| 25 | 12.0 | 10.7 | 9.2 | 7.9 |
| 30 | 11.5 | 9.7 | 7.6 | 6.0 |

[a]See Table 1.

return of 15 percent have accounting rates of return on beginning-of-year assets less than the economic rate of return, while those growing at rates less than the economic rate of return all have accounting rates of return on beginning-of-year assets greater than the economic rate of return.[18] Contrary to what might be expected, this qualitative relationship provides no practical basis for adjusting accounting rates of return so that they will accurately reflect economic rates of return.

Table 2, for example, shows that firms which use sum-of-the-years' digits depreciation and grow at 5 percent have accounting rates of return on beginning-of-year assets which range from 17.0 to 21.7 percent. Thus, even for firms with the same growth rate and depreciation method, the required adjustment varies from 2 to 6.7 percentage points depending upon the time profile. Clearly, the time profile, depreciation method, and growth rate must all be known before accounting rates of return can be adjusted to reflect economic rates of return.

In the foregoing examples, for a given time shape, faster-growing firms have lower

[18]So simple a relationship does not hold if the accounting rate of return is based on end-of-year assets.

accounting rates of return than slower-growing ones with the same economic rate of return. We have seen that even if this were a universal phenomenon, it would not provide a way to adjust accounting rates of return to reflect economic rates of return, since different firms will generally have different time shapes and therefore require different adjustments. The difficulties are even worse in practice, because the accounting rate of return can actually *rise* with the growth rate, causing *slower*-growing firms to have their economic rates of return *under*stated. Thus, even the strong assumption that firms have the same time profile is insufficient to permit adjustment of accounting rates of return; the specific profile must also be known in order to make inferences about the ranking of economic rates of return.

We demonstrate this phenomenon by taking the original $Q$-profile (six-year life and no delay) and spreading the last year's gross profits out evenly over five years (years 6–10) instead of having them all in year 6. Table 3 shows that this small change in the profile produces an increasing relationship between the growth rate and the accounting rate of return. The original results for sum-of-the-year's digits depreciation are reproduced for ease of comparison.

This content downloaded from
136.226.70.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-007

Focusing on the first column (10-Year Life), we see that the accounting rate of return on beginning-of-year assets actually begins by rising with the growth rate, reaching the value of the economic rate of return (as it must) at a 15 percent growth rate, and then going slightly above it before falling back again. (It is a special feature of this particular example that these values are all close to the economic rate of return of 15 percent.) The behavior of the accounting rate of return on end-of-year assets is different. This magnitude falls with the growth rate (in this example), but it exhibits still another phenomenon. As opposed to the previous example, where the accounting rates of return on both beginning- and end-of-year assets were above the economic rate of return of 15 percent for low growth rates and below it for large ones, here the accounting rate of return on end-of-year assets starts *and finishes* below the economic rate of return of 15 percent. There is *no* rate of growth for which the accounting rate of return on end-of-year assets equals the economic rate of return of 15 percent.

The impossibility of making inferences about relative profit rates should be obvious even within the confines of these examples, all of which represent only relatively slight variations on the same profile. *Every one of the firms exhibited in Table 3 has the same underlying after-tax economic rate of return. Yet their after-tax accounting rates of return on end-of-year assets vary from 6.0 to 25.9 percent.*[19]

Further, it is impossible to infer anything about relative profitability by attempting to adjust for growth rates. For example, each row of Table 3 involves firms with the same growth rate, so that there is nothing to adjust for in comparing them; yet, except for the special row corresponding to the point where the growth rate is equal to the true after-tax economic rate of return, the after-tax accounting rates of return continue to vary. For the row corresponding to 5 percent growth, for example, after-tax accounting

---

[19]Here and later, the results for beginning-of-year assets are similar.

TABLE 4—BEFORE-TAX BENEFIT STREAMS FROM AN INVESTMENT OF $100[a]

| Year | X Firm ($) | Y Firm ($) |
|------|-----------|-----------|
| 1 | 90.2 | 107.0 |
| 2 | 27.1 | 10.7 |
| 3 | 18.0 | 10.7 |
| 4 | 9.0 | 10.7 |
| 5 | 9.0 | 10.7 |
| 6 | 9.0 | 10.7 |

[a]See Table 1.

rates of return vary between 13.8 and 20.7 percent. For the row corresponding to 25 percent, they vary between 7.9 and 12.0 percent. Further, it is not correct to say that slow-growing firms have accounting rates of return that overstate their economic rate, while fast-growing firms have accounting rates of return that understate them. Continuing to use accounting rates of return on end-of-year assets, the firm just introduced (10-Year Life) has an accounting rate of return which understates its economic rate of return at all levels of growth. If one uses beginning-of-year assets, it has accounting rates of return which tend to understate its economic rate of return at low rates of growth and (slightly) overstate it at higher ones.

Moreover, the phenomenon of accounting rates of return increasing with the growth rate can be considerably more marked if we use other profiles. Table 4 shows the before-tax benefit stream (corresponding to an initial investment of $100, an economic rate of return of 15 percent, and sum-of-the-years' digits depreciation over a six-year life) for two other profiles ( *X* firm and *Y* firm). Table 5 shows the after-tax accounting rates of return for these firms when they grow exponentially at various rates. The after-tax accounting rates of return on beginning-of-year assets rise rather rapidly with the growth rate. The after-tax accounting rate of return on end-of-year assets also rises with the growth rate. However, as was also the case for the variation on the *Q*-profile examined earlier, it does not rise by enough to get to the economic rate of return of 15 percent.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-008

Case 1:20-cv-03590-JEB   Document 347-6   Filed 05/24/24   Page 294 of 501

TABLE 5—ASYMPTOTIC ACCOUNTING RATES OF RETURN (%)
FOR $X$-FIRMS AND $Y$-FIRMS[a]

| Growth Rate | Beginning-of-Year Assets | | End-of-Year Assets | |
|---|---|---|---|---|
| | $X$ Firm | $Y$ Firm | $X$ Firm | $Y$ Firm |
| 0 | 12.9 | 12.5 | 12.9 | 12.5 |
| 5 | 13.6 | 13.3 | 13.0 | 12.7 |
| 10 | 14.3 | 14.2 | 13.0 | 12.9 |
| 15 | 15.0 | 15.0 | 13.0 | 13.0 |
| 20 | 15.7 | 15.8 | 13.0 | 13.2 |
| 25 | 16.3 | 16.6 | 13.0 | 13.3 |
| 30 | 16.9 | 17.3 | 13.0 | 13.3 |

[a]See Table 1.

### III. Conclusions

That the accounting rate of return—after tax as well as before tax—is a misleading measure of the economic rate of return is evident from examining cases of single projects such as in Table 1. The cases shown in later tables are unduly *favorable* to the accounting rate of return in that they mask its behavior by averaging. That averaging effect is achieved by the quite unrealistic assumption that investment by the firm always brings in the same time shape of returns, and that the firm grows each year by increasing its investments at the same percentage rate. Even on such favorable terms, it is impossible to infer either the magnitude or direction of differences in economic rates of return from differences in accounting rates of return. This is because such inferences require not only correction for growth rates, but *also* knowledge of the time shapes of returns.

The level and behavior of the accounting rate of return are both sensitive to the type of time shape used. Even within the $Q$-profile example, the rates vary depending on when the time shape begins and how the last few years are spread out. There is every reason to suppose that firms differ in the time shapes of their investments, and that a particular firm's investments will also differ among themselves. Thus, comparisons of accounting rates of return to make inferences about monopoly profits is a baseless procedure.

This conclusion can be most dramatically demonstrated by juxtaposing accounting rates of return for firms with different time shapes and *different* economic rates of return. When this is done, it is easy to see that firms with *higher* accounting rates of return can have *lower* economic rates of return. Table 6 gives after-tax economic rates of return and after-tax accounting rates of return on end-of-year assets for three growth rates (0, 5, and 10 percent), and for each of the six time shapes already discussed as well as two other "one-hoss shay" time shapes.[20] For *each* growth rate, the examples are chosen so that the eight firms represented are ranked in *ascending* order of economic rates of return and in *descending* order of accounting rates of return—a complete reversal even with growth rates constant.

Examination of Table 6 shows again that no inference about relative after-tax economic rates of return is possible from after-tax accounting rates of return. For example, the lowest after-tax economic rate of return in the table is that for the $Q$-profile with an eight-year life at a zero growth rate. For that firm, the after-tax economic rate of return is 13 percent. Yet, its after-tax accounting rate

[20]The one-hoss shay time shapes have a constant return (no lag) for four and six years, respectively, and zero returns thereafter.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-009

Case 1:20-cv-03590-JEB    Document 347-6    Filed 05/24/24    Page 295 of 501

TABLE 6—AFTER-TAX ECONOMIC RATES OF RETURN ($E$) AND ASYMPTOTIC
ACCOUNTING RATES OF RETURN ON END-OF-YEAR
ASSETS ($A$) FOR EIGHT TIME SHAPES[a]

| | Growth Rate | | | | | |
|---|---|---|---|---|---|---|
| | 0 Percent | | 5 Percent | | 10 Percent | |
| Growth Rate | E | A | E | A | E | A |
| Q-Profile | | | | | | |
|   8-Year Life | 13.0 | 21.6 | 16.0 | 22.6 | 17.8 | 21.2 |
|   (2-year delay) | | | | | | |
|   7-Year Life | 14.0 | 20.2 | 17.0 | 21.6 | 18.8 | 20.9 |
|   (1-year delay) | | | | | | |
| One-Hoss Shay | | | | | | |
|   6-Year Life | 15.0 | 20.0 | 18.1 | 21.4 | 19.7 | 20.7 |
|   (no delay) | | | | | | |
|   4-Year Life | 16.0 | 19.8 | 19.0 | 21.3 | 20.0 | 20.289 |
|   (no delay) | | | | | | |
| Q-Profile | | | | | | |
|   6-Year Life | 16.1 | 19.6 | 19.05 | 21.2 | 20.05 | 20.287 |
|   (no delay) | | | | | | |
|   10-Year Life | 18.0 | 16.9 | 20.0 | 18.5 | 22.0 | 19.8 |
|   (no delay: last | | | | | | |
|   year spread) | | | | | | |
| X Firm | 19.0 | 16.2 | 21.0 | 17.8 | 23.0 | 19.2 |
| Y Firm | 19.2 | 15.8 | 21.2 | 17.4 | 23.2 | 18.9 |

[a] Tax rate: 45 percent; Sum-of-the-years' digits depreciation.

of return on end-of-year assets is 21.6 percent, the second *highest* accounting rate of return in the table, and a value well above that of 15.8 percent for the $Y$ firm at zero growth, corresponding to a 19.2 percent economic rate of return. The 21.6 percent accounting rate of return so encountered is even above the 18.9 percent figure obtained for the $Y$ firm at 10 percent growth—a figure which corresponds to an economic rate of return of 23.2 percent, the highest in the table, and more than 10 percentage points above the economic rate of return of 13 percent for the $Q$-profile with an eight-year life at zero growth. Similar examples of reversals occur throughout the table.

Nor can one eliminate these effects by correcting somehow for differences in rates of growth. The table as constructed exhibits a reversal of the ordering of economic and accounting rates of return with the rate of growth held constant. Rate of growth effects have thus *already* been removed from each pair of columns to an extent beyond that which one could hope to achieve in practice.

Moreover, it is not true that faster-growing firms should have their accounting rates of return adjusted upwards relative to slower growing ones. Consider the comparison between the $Q$-profile with a ten-year life at zero growth and the $Q$-profile with an eight-year life at 5 percent growth. The faster-growing firm has an accounting rate of return (22.6 percent) already greater than that of the slower-growing firm (16.9 percent), but its economic rate of return (16.0 percent) is *below* that of the slower-growing firm (18.0 percent). Adjusting the faster-growing firm's accounting rate of return *upwards* relative to that of the slower-growing one will make things *worse*, not better.

As all of this makes clear, there is no way in which one can look at accounting rates of return and infer anything about relative economic profitability or, a fortiori, about the presence or absence of monopoly profits. The economic rate of return is difficult—perhaps impossible—to compute for entire firms. Doing so requires information about both the past and the future which

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-010

outside observers do not have, if it exists at all.[21] Yet it is the economic rate of return which is the magnitude of interest for economic propositions. Economists (and others) who believe that analysis of accounting rates of return will tell them much (if they can only overcome the various definitional problems which separate economists and accountants) are deluding themselves. The literature which supposedly relates concentration and economic profit rates does no such thing, and examination of absolute or relative accounting rates of return to draw conclusions about monopoly profits is a totally misleading enterprise.

## Appendix
## I: Before-Tax Analysis

### A. *The Accounting Rate of Return on Individual Investments*

We begin our analysis of the problem by considering the before-tax accounting and economic rates of return on a single investment. Later we shall consider the firm as being made up of a series of such investments which may be (but need not always be) of the same type. The after-tax case is treated below and shown to be isomorphic, although more complex.

An investment may be thought of for heuristic purposes as a "machine" costing one dollar. If this is invested at time 0, the firm experiences a stream of net benefits as a result. Such benefits include all changes in revenues and costs (other than the initial capital cost) which accrue to the firm as a result of making the investment. The flow of such benefits at time $\theta$ is denoted by $f(\theta)$.[22]

The economic rate of return on a machine, $r$, is that discount rate which makes the discounted value of the benefit stream equal to the capital costs of the investment. In other words, $r$ satisfies

$$(A1) \qquad \int_0^\infty f(\theta) exp(-r\theta) \, d\theta = 1.$$

We assume that the integral in (A1) is monotonically decreasing in $r$ so that (A1) has a unique positive solution. This will be true if the negative portion of the net benefit stream (if any) precedes the positive portion. This is the usual case.[23]

Now the firm adopts a depreciation schedule for this machine. Let $V(\theta)$ denote the book value of the machine as of time $\theta$. Then $-V'(\theta)$ is the rate of depreciation at $\theta$, where the prime denotes differentiation. Plainly, $V(0) = 1$, and it makes sense to suppose that $V(\infty) = 0$, although this latter condition is not really needed.

Accounting profits attributable to this machine at time $\theta$ will be equal to net benefits less depreciation. We can think of the accounting rate of return for this machine as the accounting rate of return which the firm would have if this were its only asset. Denoting that rate by $b(\theta)$,

$$(A2) \quad b(\theta) = (f(\theta) + V'(\theta))/V(\theta).$$

The first question which comes immediately to mind is that of when $b(\theta) = r$ for all $\theta$ within the life of the machine. We prove this will occur if and only if the depreciation schedule adopted by the firm always values the machine as the discounted value of the future benefit stream, discounting at the economic rate of return, $r$ (see Hotelling).

THEOREM 1: $b(\theta) \equiv r$ *if and only if*

$$(A3) \quad V(\theta) = \int_\theta^\infty f(u) exp(-r(u-\theta)) \, du.$$

---

[21] If one made the strong assumption that the same time shape of returns held for all investments made by a given firm throughout its life, then it might be possible to recover that time shape by regression of gross returns on a distributed lag of past investment. We are indebted to Zvi Griliches for this suggestion.

[22] The time origin is arbitrary. The flow of benefits is assumed to depend on the age of the machine only. Thus an investment at time $t$ brings in benefits of $f(\theta - t)$ at time $\theta \geq t$. Time dependence of the benefit stream can be handled below by thinking of it as equivalent to investment in different kinds of machines at different times.

[23] If (A1) has more than one solution, then the economic rate of return is ill-defined and there is even less point in considering whether the accounting rate of return yields information about it.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-011

PROOF:

(a) Suppose (A3) holds. Differentiating with respect to $\theta$, we obtain

$$(A4) \qquad V'(\theta) = -f(\theta) + rV(\theta),$$

which when substituted in equation (A2) yields $b(\theta) = r$.

(b) Suppose $b(\theta) \equiv r$. Then, from (A2),

$$(A5) \qquad V'(\theta) \equiv rV(\theta) - f(\theta).$$

This is a linear differential equation with an additive forcing function $(-f(\theta))$. Its solution is therefore in the form

$$(A6) \qquad V(\theta) = C \exp(r\theta) + z(\theta),$$

where $z(\theta)$ is any particular solution of (A5) and $C$ is a constant to be determined by the initial conditions. However, by part (a) of the proof, the integral on the right-hand side of (A3) is a particular solution of (A5). Hence $z(\theta)$ can be taken as that integral. Do this and note that $z(0) = 1$ by (A1), the definition of the economic rate of return. Since we have $V(0) = 1$, setting $\theta = 0$ in (A6) yields $C = 0$, and the theorem is proved.

Thus even where the firm has a single simple investment with no ambiguity about marginal vs. economic rates of return, the accounting rate of return will not equal the economic rate of return except for a particular choice of a depreciation schedule—which choice we may term "economic depreciation."

The reason for this is not hard to find. The book value of the firm's assets reflects the investment expenditures made in the past less the depreciation already taken on them. The benefits for which such investments were made are at least partly in the future. Yet the accounting rate of return takes gross profits before depreciation as the benefit flow which happens to be currently occurring. Unless depreciation is chosen so as to reflect the change in *future* benefits in the appropriate way, there is no reason to suppose that such a calculation should equal the economic rate of return, and Theorem 1 shows that the two will generally not be equal.

Will firms tend to adopt an "economic depreciation" schedule yielding book value as in equation (A3)? This is pathologically unlikely. Except in the simple "Santa Claus" case of $f(\theta) = k \exp(-\lambda \theta)$ which corresponds to exponential depreciation or other similarly special cases corresponding to straightline or other standard depreciation methods, the benefit stream from investment when plugged into (A3) will not yield depreciation schedules anything like those used by real-life firms to optimize after-tax profits given IRS rules or those schedules used for nontax purposes. Real investments will almost invariably have complicated time shapes for their benefit streams. Further, even relatively simple shapes yield economic depreciation schedules which are quite far from actual ones. To see this, one need only observe that if $V(\theta)$ satisfies equation (A3), there is no reason that $V'(\theta)$ must always be negative. Indeed, if the time stream of benefits starts low and then has a hump a few years out, taking economic depreciation would require writing up the value of assets for the first few years. Yet there is nothing bizarre about such an example.

We must, therefore, with pathologically unlikely exceptions, expect that the accounting rate of return on a particular machine, $a(\theta)$, will generally not equal the economic rate of return $r$. (How far off it can be is demonstrated by examples.) This should make us suspect that the same thing will generally be true of the firm as a whole, and we now go on to explore that question.

B. *The Accounting Rate of Return for the Firm as an Average*

It is fairly plain that the best hope for an accounting rate of return equal to the economic rate of return will occur if all investments made by the firm are exactly alike, since otherwise (as shown below), changes in the mix of investment types will change the accounting rate. So we begin by considering the case in which all machines are like the machine above.

It now becomes necessary to distinguish calendar time, denoted by $t$, from the age of a machine, denoted by $\theta$. We let $I(t)$ be the

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

value of investment made at $t$ (equals the number of machines purchased). Let $K(t)$ denote the book value of the firm's assets at $t$ and $\pi(t)$ the value of its accounting profits at $t$. Then,

$$(A7) \quad K(t) = \int_{-\infty}^{t} I(u)V(t-u)\,du$$

$$= \int_{0}^{\infty} I(t-\theta)V(\theta)\,d\theta,$$

where $\theta = t - u$. Similarly,

$$(A8)$$
$$\pi(t) = \int_{-\infty}^{t} I(u)\{f(t-u)+V'(t-u)\}\,du$$

$$= \int_{0}^{\infty} I(t-\theta)\{f(\theta)+V'(\theta)\}\,d\theta$$

$$= \int_{0}^{\infty} I(t-\theta)V(\theta)b(\theta)\,d\theta,$$

using (A2).

Hence, letting $a(t)$ be the firm's accounting rate of return at $t$:

$$(A9) \quad a(t) \equiv \pi(t)/K(t)$$

$$= \left[\int_{0}^{\infty}\{I(t-\theta)V(\theta)\}b(\theta)\,d\theta\right]$$

$$\Big/\left[\int_{0}^{\infty}\{I(t-\theta)V(\theta)\}d\theta\right];$$

so that we have proved

LEMMA 1: *At any time $t$, the accounting rate of return for the firm as a whole is a weighted average of the individual accounting rates for its individual past investments, the weights being the book values of those past investments.*

It should be obvious that this result would also be true if machines were not always of one type.

We now ask whether such an average will equal the economic rate of return. First consider whether the average can even be independent of $t$. This can happen in two ways. First, $b(\theta)$ might be independent of $\theta$. We know from Theorem 1 that this will happen for $b(\theta) \equiv r$ only for the cases of economic depreciation already discussed which we rule

out. It is easy to show that $b(\theta) \equiv q \neq r$ is impossible.[24]

The other way in which $a(t)$ might be independent of $t$ would be if the relative weights in the average did not change over time.[25]

$$(A10) \quad \frac{I(t_1-\theta)V(\theta)}{I(t_2-\theta)V(\theta)} = k,$$

whence

$$(A11) \quad \frac{I'(t_1-\theta)}{I(t_1-\theta)} = \frac{I'(t_2-\theta)}{I(t_2-\theta)},$$

for all $(t_1, t_2)$. Evidently it must then be the case that

$$(A12) \quad I(t) = M\exp(gt)$$

for some constant growth rate $g$.

The remainder of our investigation will concern the case of exponential growth with the scale factor, $M$, set equal to unity. This case is the most favorable to accounting rates of return approximating economic rates of return, since in its absence accounting rates of return will not even be constant, even though the economic rate of return is well defined and constant.

### C. *The Effect of the Growth Rate in Exponential Growth*

We are now dealing with a case in which the accounting rate of return is (at least

---

[24] To see this, observe that a proof essentially the same as that of Theorem 1 would show that $b(\theta) \equiv q$ if and only if

(a)        $V(\theta) = C\exp(q\theta) + z(\theta),$

where

(b)        $z(\theta) = \int_{\theta}^{\infty} f(u)\exp(-q(u-\theta))\,du,$

but $V(0) = 1$ so that $C = 1 - z(0) \neq 0$ if $q \neq r$. Then (A4) yields $V(\infty) = \pm\infty$ depending on $q \gtrless r$ and this is not possible.

[25] For a *given* distribution of $b(\theta)$ there might be other possibilities, but these would be even more special than the case of economic depreciation already discussed. The statement in the text is true if $a(t)$ is to be constant despite unknown variations in $b(\theta)$ with $\theta$.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-013

Case 1:20-cv-03590-JEB    Document 347-6    Filed 05/24/24    Page 299 of 501

asymptotically) constant and given as

$$(A13) \quad a = \frac{\int_0^\infty \{exp(g(t-\theta))V(\theta)\}b(\theta)\, d\theta}{\int_0^\infty \{exp(g(t-\theta))V(\theta)\}\, d\theta}$$

where $a$ denotes the (asymptotic) constant value. This is still a weighted average of the accounting rates of return on individual investments. Plainly, the growth rate $g$ affects the weights. Since the accounting rates of return on individual investments will almost always not be constant in view of Theorem 1, changes in the weights will usually affect the average.

The present section studies such effects and asks, in particular, what inferences can be drawn concerning the economic rate of return $r$, from knowledge of the accounting rate of return $a$, and the growth rate $g$, without information on the time shape of benefits, $f(\cdot)$, since the latter information is plainly never available from the books of the firm—even assuming it is known in detail to the firm's forecasters.

The first thing to say in this regard is that while (as we shall show) there exist values of $g$ for which $a = r$, these values will be the exception. One cannot expect accounting and economic rates of return to coincide even in the most favorable case of exponential growth and a single investment type except by the merest accident. What information *can* be gleaned from the accounting rate of return is analyzed in this section.

It will be convenient to set up the problem a little differently from the analyses above. Let $\pi^*(t)$ denote the gross profits of the firm before depreciation. Let $\delta(t)$ denote total depreciation taken at time $t$. Let $K^*(t)$ denote the *undepreciated* value of the firm's capital stock. Let $D(t)$ denote the total depreciation already taken on that stock. Finally, let $a^* = \pi^*(t)/K^*(t)$, so that $a^*$ is the accounting rate of return which would be observed if there were no depreciation. The following relationships hold:

$$(A14) \quad a = \frac{\pi^*(t) - \delta(t)}{K^*(t) - D(t)},$$

$$(A15) \quad \pi^*(t) \equiv \int_{-\infty}^{t} exp(gu)f(t-u)\, du$$

$$= \int_0^\infty exp(g(t-\theta))f(\theta)\, d\theta$$

$$= exp(gt)\int_0^\infty exp(-g\theta)f(\theta)\, d\theta$$

$$= exp(gt)\pi^*(0),$$

$$(A16) \quad K^*(t) \equiv \int_{-\infty}^{t} exp(gu)\, du$$

$$= exp(gt)/g$$

$$(A17) \quad \delta(t) = \int_{-\infty}^{t} exp(gu)V'(t-u)\, du$$

$$= \int_0^\infty exp(g(t-\theta))V'(\theta)\, d\theta$$

$$= exp(gt)\delta(0),$$

$$(A18) \quad D(t) = \int_{-\infty}^{t} \delta(u)\, du$$

$$= \int_{-\infty}^{t} exp(gu)\delta(0)\, du$$

$$= \delta(0)exp(gt)/g.$$

Evidently, we have proved:

LEMMA 2: $\delta(t)/D(t) = g.$

We now study the effects of $g$ on $a^*$.

LEMMA 3: (a) *If $g = r$, then $a^* = r = g$.*
(b) *$d\log a^*/d\log g < 1$.*
(c) *$a^*$ and $r$ are always on the same side of $g$. That is, $a^* < g \leftrightarrow r < g$; $a^* = g \leftrightarrow r = g$; $a^* > g \leftrightarrow r > g$.*

PROOF:
(a) Using equations (A15) and (A16),

$$(A19) \quad a^* = g\pi^*(0)$$

$$\equiv g\int_0^\infty exp(-g\theta)f(\theta)\, d\theta.$$

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-014

If $g = r$, then $\pi^*(0) = 1$ by the definition of the economic rate of return (A1), whence $a^* = g = r$.

(b) From (A19),

$$(A20) \quad \log a^* = \log g + \log \pi^*(0),$$

but examination of $\pi^*(0)$ shows that it is necessarily decreasing in $g$ since it is the discounted integral of future benefits from a single machine discounted at the rate $g$. Thus $d \log a^* / d \log g < 1$.

(c) These statements follow directly from (a) and (b).

Using Lemmas 2 and 3, we can now proceed to the main result of this section for the magnitude of interest, the accounting rate of return $a$, itself.

THEOREM 2: *a and r are always on the same side of g. That is,*

$$a < g \leftrightarrow r < g; \qquad a = g \leftrightarrow r = g;$$
$$a > g \leftrightarrow r > g.$$

PROOF:

By definition, $\pi^*(t) = a^* K^*(t)$. By Lemma 2, $\delta(t) = gD(t)$. Substituting in (A14)

$$(A21) \quad a = \frac{a^* K^*(t) - gD(t)}{K^*(t) - D(t)} \gtreqless g,$$

accordingly as $a^* \gtreqless g$. The desired result now follows from Lemma 3.

A diagram may be illuminating here. In Figure 1, the growth rate is measured on the horizontal axis and rates of return on the vertical axis. The 45° line indicates where growth rates and rates of return are equal. Theorem 2 states that the accounting rate of return must be above the 45° line to the left of the dashed line at $g = r$; it must pass through $H$, the point of intersection of the dashed line and the 45° line; and it must be below the 45° line to the right of the dashed line.

Can we say more than this? The answer is in the negative without information on the time shape of benefits $f(\cdot)$. In particular, it is



FIGURE 1

*not* the case that the direction of change of $a$ with respect to $g$ is signed. Nor is it true that $r$ must lie between $a$ and $g$. These facts are exemplified in the text.

## II. AFTER-TAX ANALYSIS

These same results apply to the analysis of the relationship between the after-tax economic rate of return and the after-tax accounting rate of return. This is obvious if the depreciation schedule used is not that used for tax purposes; in that case, the effect of taxes is just to change the benefit profile with the analysis the same as before, given the new benefit profile $f(\cdot)$. Moreover, the same thing is true if tax depreciation is used. To see this, let $\alpha$ be the tax rate $0 < \alpha < 1$ (assumed constant for simplicity). Let $r'$ denote the after-tax economic rate of return. Then $r'$ satisfies

$$(A22) \quad \int_0^\infty \{(1-\alpha)f(\theta) + \alpha d(\theta)\}$$
$$\times \exp(-r'\theta) \, d\theta = 1,$$

where $d(\theta)$ denotes depreciation on an asset of age $\theta$ and $f(\theta)$ denotes its *before*-tax benefits, as before.

This reflects the fact that the choice of a depreciation schedule, $d(\cdot)$, affects after-tax

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-015

returns. Define

$$(A23) \quad f^*(\theta) \equiv \{(1-\alpha)f(\theta) + \alpha d(\theta)\}.$$

We now show that the analysis of the before-tax case applies directly to the after-tax case with $f^*(\cdot)$, the after-tax benefit schedule, replacing $f(\cdot)$, the before-tax benefit schedule.[26]

To see this, observe that the denominator of the accounting rate-of-return (whether total capitalization or stockholder's equity) will be the same before and after taxes. The numerator in the after-tax case, after-tax profits less depreciation, will be:

$$(A24)$$

$$\int_{-\infty}^{t} (1-\alpha)\{f(t-\theta) - d(t-\theta)\}I(\theta)\, d\theta,$$

$$= \int_{-\infty}^{t} \{(1-\alpha)f(t-\theta) + \alpha d(t-\theta)\}I(\theta)\, d\theta$$

$$- \int_{-\infty}^{t} d(t-\theta)I(\theta)\, d\theta$$

$$= \int_{-\infty}^{t} f^*(t-\theta)I(\theta)\, d\theta - \int_{-\infty}^{t} d(\theta)I(\theta)\, d\theta.$$

But this is the *same* numerator as would be encountered in the before-tax analysis for a firm with the same depreciation schedule, but *before*-tax benefits $f^*(\cdot)$. For such a firm, $r'$ would be the before-tax economic rate of return. Hence analysis of the after-tax case is

---

[26] A word about the treatment of inflation seems appropriate here. In the before-tax analysis it does not matter whether we work in real or nominal dollars (so long as we are consistent). In the after-tax case, however, the fact that depreciation which is deductible for tax purposes must be in nominal terms appears to raise some difficulty. That difficulty is only apparent however. Suppose that we begin by working in real terms. The nominal nature of the depreciation deduction plus the effects of inflation affect the depreciation schedule measured in real terms. We show, however, that any after-tax case with *any* depreciation schedule is isomorphic to a before-tax case. The effects being considered will, of course, influence *what* that before-tax case is, but they will not alter the existence of such a case. Hence, while the nominal nature of depreciation (like any other factor affecting the depreciation schedule) will affect what the numerical value of the real after-tax accounting rate of return is, it will not change our results.

---

identical to that of the before-tax case with an appropriate adjusted definition of the benefit schedule. All previous results apply to it.[27]

---

[27] It is interesting (and revealing of the full unity of the before- and after-tax analyses) to note what happens in the case of "economic depreciation" examined above. In that case, it turns out that the (pathologically unlikely) choice of an economic depreciation schedule involves the *same* depreciation schedule whether economic depreciation is chosen before or after tax. Assets are valued at the present value of all remaining benefits either before or after tax; it makes no difference. Further, that choice of depreciation schedule makes the after-tax economic rate of return $r'$ relate to the before-tax economic rate of return $r$, in the natural (but—except with this depreciation schedule—not inevitable) way: $r' = r(1-\alpha)$. To show these things, return to the differential equation (equation (A5)) from which we derived the formula for economic depreciation in the before-tax case.

(a) $$V'(\theta) = rV(\theta) - f(\theta).$$

Consideration of the before-tax analysis shows that if and only if $V(\cdot)$ satisfies this and $V(0) = 1$, then

(b) $$V(\theta) = \int_{\theta}^{\infty} f(u)\exp(-r(u-\theta))\, du$$

the present value of future benefits. Now, choose $V(\cdot)$ and hence $d(\cdot)$ to satisfy (b) and therefore (a). Then

(c) $$(1-\alpha)V'(\theta) = r(1-\alpha)V(\theta) - (1-\alpha)f(\theta),$$

(d) $$V'(\theta) = r(1-\alpha)V(\theta)$$
$$- \{(1-\alpha)f(\theta) + \alpha d(\theta)\} = r(1-\alpha)V(\theta) - f^*(\theta),$$

since $d(\theta) \equiv -V'(\theta)$. But this is in the same form as (a). Hence, as in (A6):

(e)

$$V(\theta) = \int_{\theta}^{\infty} f^*(u)\exp(-r'(u-\theta))\, du + C\exp(r'\theta),$$

with $r' \equiv r(1-\alpha)$. Here, $C$ is a constant of integration; however $C = 0$, since (b) shows that $V(\infty)$ is finite. Since $V(0) = 1$, we have

(f) $$1 = \int_{0}^{\infty} f^*(u)\exp(-r'u)\, du,$$

which shows that $r'$ is the after-tax economic rate of return. From (b) and (e) with $C = 0$, $V(\theta)$ is both the before- and the after-tax present value of the remaining benefit stream at $\theta$, whence economic depreciation is the same in both cases. See Paul Samuelson.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-016

Thus, in after-tax analysis as in before-tax analysis, there is no reason to believe that differences in the accounting rate of return correspond to differences in economic rates of return. Our computer examples show the effects can be very large; the belief that they are small enough in practice to make accounting rates useful for analytic purposes rests on nothing but wishful thinking.

# REFERENCES

**Adams, Walter,** *The Structure of American Industry,* New York: Macmillan, 1970.

**Areeda, Philip and Turner, Donald F.,** *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* Boston: Little, Brown and Co., 1978.

**Benson, George J.,** "The FTC's Line of Business Program: A Benefit-Cost Analysis," in Harvey Goldschmid, ed., *Business Disclosure: Government's Need to Know,* New York: McGraw-Hill, 1979, 58–118.

**Cooper, Joseph D.,** *Proceedings of the Second Seminar on Economics of Pharmaceutical Innovation,* Washington: American University, 1976.

**Fisher, Franklin M.,** "Diagnosing Monopoly," *Quarterly Review of Economics and Business,* Summer 1979, *19,* 7–33.

**Hotelling, Harold,** "A General Mathematical Theory of Depreciation," *Journal of the American Statistical Association,* September 1925, *20,* 340–53.

**Livingstone, J. Leslie and Salamon, Gerald L.,** "Relationship Between the Accounting and the Internal Rate of Return Measures: A Synthesis and Analysis," in J. Leslie Livingstone and Thomas J. Burns, eds., *Income Theory and Rate of Return,* Columbus: Ohio State University, 1971, 161–78.

**Samuelson, Paul A.,** "Tax Deductibility of Economic Depreciation to Insure Investment Valuations," *Journal of Political Economy,* December 1964, *72,* 604–06.

**Scherer, F. M.,** *Industrial Market Structure and Economic Performance,* Chicago: Rand McNally, 1980.

**Solomon, Ezra,** "Alternative Rate of Return Concepts and Their Implications for Utility Regulation," *Bell Journal of Economics,* Spring 1970, *1,* 65–81.

**Stauffer, Thomas R.,** "The Measurement of Corporate Rates of Return: A Generalized Formulation," *Bell Journal of Economics,* Autumn 1971, *2,* 434–69.

**Weiss, Leonard W.,** "The Concentration-Profits Relationship and Antitrust," in Harvey J. Goldschmid et al., *Industrial Concentration: The New Learning,* Boston, Little, Brown and Co., 1974.

**U.S. Council of Economic Advisers,** *Economic Report of the President,* Washington: USGPO, 1979.

This content downloaded from
136.226.12.70 on Tue, 14 May 2024 19:56:12 +00:00
All use subject to https://about.jstor.org/terms

PX0566-017

# PX0567

Excerpt

**GLOBAL EDITION**

# MICROECONOMICS

## Daron Acemoglu
Massachusetts Institute of Technology

## David Laibson
Harvard University

## John A. List
University of Chicago

**PEARSON**

Boston  Columbus  Indianapolis  New York  San Francisco  Hoboken
Amsterdam  Cape Town  Dubai  London  Madrid  Milan  Munich  Paris  Montréal  Toronto
Delhi  Mexico City  São Paulo  Sydney  Hong Kong  Seoul  Singapore  Taipei  Tokyo

Excerpt

**Vice President, Product Management:** Donna Battista
**Executive Acquisitions Editor:** Adrienne D'Ambrosio
**Executive Development Editor:** Mary Clare McEwing
**Senior Acquisitions Editor, Global Editions:** Steven Jackson
**Project Editor, Global Editions:** Suchismita Ukil
**Editorial Project Manager:** Sarah Dumouchelle
**Editorial Coordinator:** Elissa Senra-Sargent
**Executive Field Marketing Manager:** Lori DeShazo
**Product Marketing Manager:** Alison Haskins
**Product Testing and Learning Validation:** Kathleen McLellan
**Managing Editor:** Jeff Holcomb
**Production Project Manager:** Nancy Freihofer
**Media Production Manager, Global Editions:** M. Vikram Kumar
**Senior Production Controller, Global Editions:** Trudy Kimber
**Operations Specialist:** Carol Melville
**Art Director:** Jonathan Boylan
**Text Designer:** Jonathan Boylan
**Digital Publisher, Economics:** Denise Clinton
**Digital Studio Content Integration Team Lead:** Noel Lotz
**Executive Media Producer:** Melissa Honig
**Full-Service Project Management:** S4Carlisle Publishing Services
**Composition:** S4Carlisle Publishing Services

Credits and acknowledgments borrowed from other sources and reproduced, with permission, in this textbook appear on the appropriate page within text and on pp. 439–440.

Pearson Education Limited
Edinburgh Gate
Harlow
Essex CM20 2JE
England

and Associated Companies throughout the world

*Visit us on the World Wide Web at:* www.pearsonglobaleditions.com

© Pearson Education Limited 2016

The rights of Daron Acemoglu, David Laibson, and John A. List to be identified as the authors of this work have been asserted by them in accordance with the Copyright, Designs and Patents Act 1988.

*Authorized adaptation from the United States edition, entitled Microeconomics, 1st edition, ISBN 978-0-321-39157-5, by Daron Acemoglu, David Laibson, and John A. List, published by Pearson Education, Inc. © 2015.*

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without either the prior written permission of the publisher or a license permitting restricted copying in the United Kingdom issued by the Copyright Licensing Agency Ltd, Saffron House, 6–10 Kirby Street, London EC1N 8TS.

All trademarks used herein are the property of their respective owners. The use of any trademark in this text does not vest in the author or publisher any trademark ownership rights in such trademarks, nor does the use of such trademarks imply any affiliation with or endorsement of this book by such owners.

ISBN 10: 1-292-07957-6
ISBN 13: 978-1-292-07957-8

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library

10 9 8 7 6 5 4 3 2 1
14 13 12 11

Typeset in Times LT Std by S4Carlisle Publishing Services

Printed and bound by CPI Digital in the United Kingdom

# Dedication

*With love for Asu, Nina, and Jennifer,*
*who inspire us every day.*

# About the Authors



**Daron Acemoglu** is Elizabeth and James Killian Professor of Economics in the Department of Economics at the Massachusetts Institute of Technology. He has received a B.A. in economics at the University of York, 1989, M.Sc. in mathematical economics and econometrics at the London School of Economics, 1990, and Ph.D. in economics at the London School of Economics in 1992.

He is an elected fellow of the National Academy of Sciences, the American Academy of Arts and Sciences, the Econometric Society, the European Economic Association, and the Society of Labor Economists. He has received numerous awards and fellowships, including the inaugural T. W. Shultz Prize from the University of Chicago in 2004, and the inaugural Sherwin Rosen Award for outstanding contribution to labor economics in 2004, Distinguished Science Award from the Turkish Sciences Association in 2006, and the John von Neumann Award, Rajk College, Budapest in 2007.

He was also the recipient of the John Bates Clark Medal in 2005, awarded every two years to the best economist in the United States under the age of 40 by the American Economic Association, and the Erwin Plein Nemmers prize awarded every two years for work of lasting significance in economics. He holds Honorary Doctorates from the University of Utrecht and Bosporus University.

His research interests include political economy, economic development and growth, human capital theory, growth theory, innovation, search theory, network economics, and learning.

His books include *Economic Origins of Dictatorship and Democracy* (jointly with James A. Robinson), which was awarded the Woodrow Wilson and the William Riker prizes, *Introduction to Modern Economic Growth*, and *Why Nations Fail: The Origins of Power, Prosperity, and Poverty* (jointly with James A. Robinson), which has become a *New York Times* bestseller.



**David Laibson** is the Robert I. Goldman Professor of Economics at Harvard University. He is also a member of the National Bureau of Economic Research, where he is Research Associate in the Asset Pricing, Economic Fluctuations, and Aging Working Groups. His research focuses on the topic of behavioral economics, and he leads Harvard University's Foundations of Human Behavior Initiative. He serves on several editorial boards, as well as the boards of the Health and Retirement Study (National Institutes of Health) and the Pension Research Council (Wharton). He serves on Harvard's Pension Investment Committee and on the Academic Research Council of the Consumer Financial Protection Bureau. He is a recipient of a Marshall Scholarship and a Fellow of the Econometric Society and the American Academy of Arts and Sciences. He is also a recipient of the TIAA-CREF Paul A. Samuelson Award for Outstanding Scholarly Writing on Lifelong Financial Security. Laibson holds degrees from Harvard University (A.B. in Economics, Summa), the London School of Economics (M.Sc. in Econometrics and Mathematical Economics), and the Massachusetts Institute of Technology (Ph.D. in Economics). He received his Ph.D. in 1994 and has taught at Harvard since then. In recognition of his teaching, he has been awarded Harvard's Phi Beta Kappa Prize and a Harvard College Professorship.

PX0567-004



**John A. List** is the Homer J. Livingston Professor in Economics at the University of Chicago, and Chairman of the Department of Economics. List received the Kenneth Galbraith Award, Agricultural and Applied Economics Association, 2010. He is a Member of the American Academy of Arts and Sciences, 2011; Editor, *Journal of Economic Perspectives*; Associate Editor, *American Economic Review*; and Associate Editor, *Journal of Economic Literature*. His research focuses on questions in microeconomics, with a particular emphasis on the use of experimental methods to address both positive and normative issues. Much of his time has been spent developing experimental methods in the field to explore economic aspects of environmental regulations, incentives, preferences, values, and institutions. Recently, he has focused on issues related to the economics of charity, exploring why people give, plus optimal incentive schemes for first-time as well as warm-list donors.

PX0567-005

Excerpt

PX0567-006

Excerpt

# Brief Contents

**Chapter 1**   The Principles and Practice of Economics   34

**Chapter 2**   Economic Methods and Economic Questions   52

**Chapter 3**   Optimization: Doing the Best You Can   74

**Chapter 4**   Demand, Supply, and Equilibrium   92

**Chapter 5**   Consumers and Incentives   118

**Chapter 6**   Sellers and Incentives   146

**Chapter 7**   Perfect Competition and the Invisible Hand   176

**Chapter 8**   Trade   202

**Chapter 9**   Externalities and Public Goods   230

**Chapter 10**   The Government in the Economy: Taxation and Regulation   258

**Chapter 11**   Markets for Factors of Production   284

**Chapter 12**   Monopoly   306

**Chapter 13**   Game Theory and Strategic Play   332

**Chapter 14**   Oligopoly and Monopolistic Competition   354

**Chapter 15**   Trade-offs Involving Time and Risk   380

**Chapter 16**   The Economics of Information   398

**Chapter 17**   Auctions and Bargaining   416

**Chapter 18**   Social Economics   436

PX0567-007

Excerpt

Excerpt

# Contents

## Chapter 1: The Principles and Practice of Economics  34

**1.1** The Scope of Economics  35
Economic Agents and Economic Resources  35
Definition of Economics  36
Positive Economics and Normative Economics  37
Microeconomics and Macroeconomics  38
**1.2** Three Principles of Economics  38
**1.3** The First Principle of Economics: Optimization  39
Trade-offs and Budget Constraints  40
Opportunity Cost  40
Cost-Benefit Analysis  41
**Evidence-Based Economics:** Is Facebook free?  42
**1.4** The Second Principle of Economics: Equilibrium  45
The Free-Rider Problem  46
**1.5** The Third Principle of Economics: Empiricism  46
**1.6** Is Economics Good for You?  47
Summary  48
Key Terms  48
Questions  49
Problems  49

## Chapter 2: Economic Methods and Economic Questions  52

**2.1** The Scientific Method  53
Models and Data  53
An Economic Model  55
**Evidence-Based Economics:** How much more do workers with a college education earn?  56
Means  57
Argument by Anecdote  57
**2.2** Causation and Correlation  58
The Red Ad Campaign Blues  58
Causation versus Correlation  59
Experimental Economics and Natural Experiments  60
**Evidence-Based Economics:** How much do wages increase when an individual is compelled by law to get an extra year of schooling?  61
**2.3** Economic Questions and Answers  62

Summary  64
Key Terms  64
Questions  64
Problems  65
**Appendix:** Constructing and Interpreting Graphs  66
A Study About Incentives  66
Experimental Design  66
Describing Variables  67
Cause and Effect  69
Appendix Problems  72
Appendix Key Terms  73

## Chapter 3: Optimization: Doing the Best You Can  74

**3.1** Two Kinds of Optimization: A Matter of Focus  75
**Choice & Consequence:** Do People Really Optimize?  77
**3.2** Optimization in Levels  78
Comparative Statics  80
**3.3** Optimization in Differences: Marginal Analysis  82
Marginal Cost  82
**Evidence-Based Economics:** How does location affect the rental cost of housing?  85
Summary  88
Key Terms  88
Questions  89
Problems  89

## Chapter 4: Demand, Supply, and Equilibrium  92

**4.1** Markets  93
Competitive Markets  94
**4.2** How Do Buyers Behave?  95
Demand Curves  96
Willingness to Pay  96
From Individual Demand Curves to Aggregated Demand Curves  97
Building the Market Demand Curve  98
Shifting the Demand Curve  99

11

Excerpt

**Evidence-Based Economics:** How much more gasoline would people buy if its price were lower? ..... 101

**4.3 How Do Sellers Behave?** ..... **103**
Supply Curves ..... 103
Willingness to Accept ..... 104
From the Individual Supply Curve to the Market Supply Curve ..... 104
Shifting the Supply Curve ..... 104
**4.4 Supply and Demand in Equilibrium** ..... **107**
Curve Shifting in Competitive Equilibrium ..... 109
**4.5 What Would Happen If the Government Tried to Dictate the Price of Gasoline?** ..... **111**
**Choice & Consequence:** The Unintended Consequences of Fixing Market Prices ..... 113
*Summary* ..... *114*
*Key Terms* ..... *115*
*Questions* ..... *115*
*Problems* ..... *116*

**Chapter 5: Consumers and Incentives** ..... **118**

**5.1 The Buyer's Problem** ..... **119**
What You Like ..... 119
Prices of Goods and Services ..... 120
**Choice & Consequence:** Absolutes vs. Percentages ..... 120
How Much Money You Have to Spend ..... 121
**5.2 Putting It All Together** ..... **122**
Price Changes ..... 124
Income Changes ..... 125
**5.3 From the Buyer's Problem to the Demand Curve** ..... **125**
**5.4 Consumer Surplus** ..... **127**
An Empty Feeling: Loss in Consumer Surplus When Price Increases ..... 128
**Evidence-Based Economics:** Would a smoker quit the habit for $100 per month? ..... 129
**5.5 Demand Elasticities** ..... **132**
The Price Elasticity of Demand ..... 132
Moving Up and Down the Demand Curve ..... 133
Elasticity Measures ..... 134
Determinants of the Price Elasticity of Demand ..... 135
The Cross-Price Elasticity of Demand ..... 137
The Income Elasticity of Demand ..... 137
**Letting the Data Speak:** Should McDonald's Be Interested in Elasticities? ..... 138
*Summary* ..... *139*
*Key Terms* ..... *139*
*Questions* ..... *140*
*Problems* ..... *141*

**Appendix:** Representing Preferences with Indifference Curves: Another Use of the Budget Constraint ..... **143**
*Appendix Questions* ..... *145*
*Appendix Key Terms* ..... *145*

**Chapter 6: Sellers and Incentives** ..... **146**

**6.1 Sellers in a Perfectly Competitive Market** ..... **147**
**6.2 The Seller's Problem** ..... **147**
Making the Goods: How Inputs Are Turned into Outputs ..... 148
The Cost of Doing Business: Introducing Cost Curves ..... 150
**Choice & Consequence:** Average Cost Versus Marginal Cost ..... 152
The Rewards of Doing Business: Introducing Revenue Curves ..... 152
Putting It All Together: Using the Three Components to Do the Best You Can ..... 154
**Choice & Consequence:** Maximizing Total Profit, Not Per-Unit Profit ..... 156
**6.3 From the Seller's Problem to the Supply Curve** ..... **156**
Price Elasticity of Supply ..... 157
Shut Down ..... 158
**6.4 Producer Surplus** ..... **159**
**6.5 From the Short Run to the Long Run** ..... **161**
Long-Run Supply Curve ..... 162
**Choice & Consequence:** Visiting a Car Manufacturing Plant ..... 162
**6.6 From the Firm to the Market: Long-Run Competitive Equilibrium** ..... **163**
Firm Entry ..... 163
Firm Exit ..... 164
Zero Profits in the Long Run ..... 165
Economic Profit versus Accounting Profit ..... 166
**Evidence-Based Economics:** How would an ethanol subsidy affect ethanol producers? ..... 167
*Summary* ..... *170*
*Key Terms* ..... *171*
*Questions* ..... *171*
*Problems* ..... *172*
**Appendix:** When Firms Have Different Cost Structures ..... **174**

**Chapter 7: Perfect Competition and the Invisible Hand** ..... **176**

**7.1 Perfect Competition and Efficiency** ..... **177**
Social Surplus ..... 178
Pareto Efficiency ..... 180

PX0567-010

Excerpt

**7.2** Extending the Reach of the Invisible Hand: From the Individual to the Firm     **180**

**7.3** Extending the Reach of the Invisible Hand: Allocation of Resources Across Industries     **184**

**7.4** Prices Guide the Invisible Hand     **187**

Deadweight Loss     188

The Command Economy     189

  **Choice & Consequence:** FEMA and Walmart After Katrina     190

The Central Planner     191

  **Choice & Consequence:** Command and Control at Kmart     193

**7.5** Equity and Efficiency     **193**

  **Evidence-Based Economics:** Can markets composed of only self-interested people maximize the overall well-being of society?     194

*Summary*     *198*

*Key Terms*     *198*

*Questions*     *198*

*Problems*     *199*

**Chapter 8: Trade**     **202**

**8.1** The Production Possibilities Curve     **203**

Calculating Opportunity Cost     205

**8.2** The Basis for Trade: Comparative Advantage     **206**

Specialization     207

Absolute Advantage     207

  **Choice & Consequence:** An Experiment on Comparative Advantage     208

The Price of the Trade     209

**8.3** Trade Between States     **210**

  **Choice & Consequence:** Should LeBron James Paint His Own House?     211

Economy-Wide PPC     211

Comparative Advantage and Specialization Among States     213

**8.4** Trade Between Countries     **214**

Determinants of Trade Between Countries     216

  **Letting the Data Speak:** Fair Trade Products     217

Exporting Nations: Winners and Losers     217

Importing Nations: Winners and Losers     218

Where Do World Prices Come From?     219

Determinants of a Country's Comparative Advantage     219

**8.5** Arguments Against Free Trade     **220**

National Security Concerns     220

Fear of Globalization     220

Environmental and Resource Concerns     220

Infant Industry Arguments     221

The Effects of Tariffs     221

  **Evidence-Based Economics:** Will free trade cause you to lose your job?     223

*Summary*     *225*

*Key Terms*     *225*

*Questions*     *226*

*Problems*     *226*

**Chapter 9: Externalities and Public Goods**     **230**

**9.1** Externalities     **231**

A "Broken" Invisible Hand: Negative Externalities     232

A "Broken" Invisible Hand: Positive Externalities     234

  **Choice & Consequence:** Positive Externalities in Spots You Never Imagined     236

Pecuniary Externalities     237

**9.2** Private Solutions to Externalities     **237**

Private Solution: Bargaining     238

The Coase Theorem     238

Private Solution: Doing the Right Thing     239

**9.3** Government Solutions to Externalities     **240**

Government Regulation: Command-and-Control Policies     240

Government Regulation: Market-Based Approaches     241

Corrective Taxes and Subsidies     241

  **Letting the Data Speak:** How To Value Externalities     242

  **Letting the Data Speak:** Pay As You Throw: Consumers Create Negative Externalities Too!     243

**9.4** Public Goods     **244**

Government Provision of Public Goods     245

  **Choice & Consequence:** The Free-Rider's Dilemma     246

Private Provision of Public Goods     248

**9.5** Common Pool Resource Goods     **250**

  **Choice & Consequence:** Tragedy of the Commons     251

  **Choice & Consequence:** The Race to Fish     251

  **Evidence-Based Economics:** How can the Queen of England lower her commute time to Wembley Stadium?     252

*Summary*     *254*

*Key Terms*     *254*

*Questions*     *254*

*Problems*     *255*

PX0567-011

Excerpt

## Chapter 10: The Government in the Economy: Taxation and Regulation — 258

### 10.1 Taxation and Government Spending in the United States — 259
Where Does the Money Come From? — 260
Why Does the Government Tax and Spend? — 262
Letting the Data Speak: Understanding Federal Income Tax Brackets — 264
Taxation: Tax Incidence and Deadweight Losses — 266
Choice & Consequence: The Deadweight Loss Depends on the Tax — 269

### 10.2 Regulation — 271
Direct Regulation — 271

### 10.3 Government Failures — 274
The Direct Costs of Bureaucracies — 274
Corruption — 275
Underground Economy — 276

### 10.4 Equity Versus Efficiency — 276

### 10.5 Consumer Sovereignty and Paternalism — 277
The Debate — 278
Evidence-Based Economics: What is the optimal size of government? — 278
Letting the Data Speak: The Efficiency of Government Versus Privately Run Expeditions — 280
Summary — 281
Key Terms — 281
Questions — 281
Problems — 282

## Chapter 11: Markets for Factors of Production — 284

### 11.1 The Competitive Labor Market — 285
The Demand for Labor — 286

### 11.2 The Supply of Labor: Your Labor-Leisure Trade-off — 288
Choice & Consequence: Producing Web Sites and Computer Programs — 290
Labor Market Equilibrium: Supply Meets Demand — 290
Letting the Data Speak: "Get Your Hot Dogs Here!" — 290
Labor Demand Shifters — 291
Labor Supply Shifters — 291
Letting the Data Speak: Do Wages Really Go Down if Labor Supply Increases? — 293

### 11.3 Wage Inequality — 293
Differences in Human Capital — 294

Choice & Consequence: Paying for Worker Training — 295
Differences in Compensating Wage Differentials — 295
Discrimination in the Job Market — 295
Choice & Consequence: Compensating Wage Differentials — 296
Changes in Wage Inequality Over Time — 298

### 11.4 The Market for Other Factors of Production: Physical Capital and Land — 299
Evidence-Based Economics: Is there discrimination in the labor market? — 300
Summary — 302
Key Terms — 302
Questions — 302
Problems — 303

## Chapter 12: Monopoly — 306

### 12.1 Introducing a New Market Structure — 307

### 12.2 Sources of Market Power — 308
Legal Market Power — 308
Natural Market Power — 309
Choice & Consequence: Cleaning Up While Cleaning Up — 309
Control of Key Resources — 310
Economies of Scale — 310

### 12.3 The Monopolist's Problem — 311
Revenue Curves — 312
Price, Marginal Revenue, and Total Revenue — 314

### 12.4 Choosing the Optimal Quantity and Price — 316
Producing the Optimal Quantity — 316
Setting the Optimal Price — 316
How a Monopolist Calculates Profits — 318
Does a Monopoly Have a Supply Curve? — 318

### 12.5 The "Broken" Invisible Hand: The Cost of Monopoly — 319

### 12.6 Restoring Efficiency — 320
Three Degrees of Price Discrimination — 321
Letting the Data Speak: Third-Degree Price Discrimination in Action — 323

### 12.7 Government Policy Toward Monopoly — 324
The Microsoft Case — 324
Price Regulation — 325
Evidence-Based Economics: Can a monopoly ever be good for society? — 326
Summary — 328
Key Terms — 328
Questions — 328
Problems — 329

PX0567-012

Excerpt

## Chapter 13: Game Theory and Strategic Play — 332

**13.1 Simultaneous Move Games** — 333
Best Responses and the Prisoners' Dilemma — 334
Dominant Strategies and Dominant Strategy Equilibrium — 335
Games without Dominant Strategies — 335
**13.2 Nash Equilibrium** — 337
Finding a Nash Equilibrium — 338
Choice & Consequence: Work or Surf? — 339
**13.3 Applications of Nash Equilibria** — 340
Tragedy of the Commons Revisited — 340
Zero-Sum Games — 341
**13.4 How Do People Actually Play Such Games?** — 342
Game Theory in Penalty Kicks — 342
**13.5 Extensive-Form Games** — 343
Backward Induction — 344
First-Mover Advantage, Commitment, and Vengeance — 345
Evidence-Based Economics: Is there value in putting yourself into someone else's shoes? — 346
Choice & Consequence: There Is More to Life than Money — 349
Summary — 349
Key Terms — 349
Questions — 350
Problems — 350

## Chapter 14: Oligopoly and Monopolistic Competition — 354

**14.1 Two More Market Structures** — 355
**14.2 Oligopoly** — 356
The Oligopolist's Problem — 357
Oligopoly Model with Homogeneous Products — 357
Doing the Best You Can: How Should You Price to Maximize Profits? — 358
Oligopoly Model with Differentiated Products — 359
Letting the Data Speak: Airline Price Wars — 361
Collusion: One Way to Keep Prices High — 361
Letting the Data Speak: To Cheat or Not to Cheat: That Is the Question — 363
Choice & Consequence: Collusion in Practice — 364
**14.3 Monopolistic Competition** — 364
The Monopolistic Competitor's Problem — 364
Doing the Best You Can: How a Monopolistic Competitor Maximizes Profits — 365
Letting the Data Speak: Why Do Some Firms Advertise and Some Don't? — 366

How a Monopolistic Competitor Calculates Profits — 366
Long-Run Equilibrium in a Monopolistically Competitive Industry — 367
**14.4 The "Broken" Invisible Hand** — 369
Regulating Market Power — 370
**14.5 Summing Up: Four Market Structures** — 371
Evidence-Based Economics: How many firms are necessary to make a market competitive? — 372
Summary — 375
Key Terms — 375
Questions — 375
Problems — 376

## Chapter 15: Trade-offs Involving Time and Risk — 380

**15.1 Modeling Time and Risk** — 381
**15.2 The Time Value of Money** — 382
Future Value and the Compounding of Interest — 382
Borrowing Versus Lending — 384
Present Value and Discounting — 385
**15.3 Time Preferences** — 387
Time Discounting — 387
Preference Reversals — 388
Choice & Consequence: Failing to Anticipate Preference Reversals — 389
Evidence-Based Economics: Do people exhibit a preference for immediate gratification? — 389
**15.4 Probability and Risk** — 390
Roulette Wheels and Probabilities — 390
Independence and the Gambler's Fallacy — 391
Expected Value — 392
Choice & Consequence: Is Gambling Worthwhile? — 393
Extended Warranties — 393
**15.5 Risk Preferences** — 394
Summary — 395
Key Terms — 396
Questions — 396
Problems — 396

## Chapter 16: The Economics of Information — 398

**16.1 Asymmetric Information** — 399
Hidden Characteristics: Adverse Selection in the Used Car Market — 400
Hidden Characteristics: Adverse Selection in the Health Insurance Market — 401
Market Solutions to Adverse Selection: Signaling — 402

Contents     **15**

PX0567-013

Excerpt

**Choice & Consequence:** Are You Sending
a Signal Right Now? ..... 403

**Evidence-Based Economics:** Why do new
cars lose considerable value the minute they
are driven off the lot? ..... 403

**Choice & Consequence:** A Tale of a Tail ..... 405

**16.2** Hidden Actions: Markets with
Moral Hazard ..... 405

**Letting the Data Speak:** Moral Hazard
on Your Bike ..... 406

Market Solutions to Moral Hazard in the Labor
Market: Efficiency Wages ..... 406

Market Solutions to Moral Hazard in the Insurance
Market: "Putting Your Skin in the Game" ..... 407

**Letting the Data Speak:** Designing Incentives
for Teachers ..... 408

**Evidence-Based Economics:** Why is private
health insurance so expensive? ..... 409

**16.3** Government Policy in a World
of Asymmetric Information ..... 410

Government Intervention and Moral Hazard ..... 411

The Equity-Efficiency Trade-off ..... 411

Crime and Punishment as a Principal–Agent
Problem ..... 411

**Letting the Data Speak:** Moral Hazard
Among Job Seekers ..... 412

Summary ..... 413

Key Terms ..... 413

Questions ..... 413

Problems ..... 414

**Chapter 17: Auctions
and Bargaining ..... 416**

**17.1** Auctions ..... 417

Types of Auctions ..... 419

Open-Outcry English Auctions ..... 419

**Letting the Data Speak:** To Snipe
or Not to Snipe? ..... 420

Open-Outcry Dutch Auctions ..... 421

Sealed Bid: First-Price Auction ..... 422

Sealed Bid: Second-Price Auction ..... 423

The Revenue Equivalence Theorem ..... 425

**Evidence-Based Economics:** How should
you bid in an eBay auction? ..... 426

**17.2** Bargaining ..... 427

What Determines Bargaining Outcomes? ..... 427

Bargaining in Action: The Ultimatum Game ..... 428

Bargaining and the Coase Theorem ..... 430

**Evidence-Based Economics:** Who determines
how the household spends its money? ..... 431

**Letting the Data Speak:** Sex Ratios Change
Bargaining Power Too ..... 433

Summary ..... 433

Key Terms ..... 433

Questions ..... 433

Problems ..... 434

**Chapter 18: Social Economics ..... 436**

**18.1** The Economics of Charity
and Fairness ..... 437

The Economics of Charity ..... 437

**Letting the Data Speak:** Do People Donate
Less When It's Costlier to Give? ..... 439

**Letting the Data Speak:** Why Do People
Give to Charity? ..... 440

The Economics of Fairness ..... 441

**Letting the Data Speak:** Dictators in the Lab ..... 444

**Evidence-Based Economics:** Do people
care about fairness? ..... 444

**18.2** The Economics of Trust and Revenge ..... 446

The Economics of Trust ..... 447

The Economics of Revenge ..... 448

**Choice & Consequence:** Does Revenge
Have an Evolutionary Logic? ..... 450

**18.3** How Others Influence Our Decisions ..... 450

Where Do Our Preferences Come From? ..... 450

The Economics of Peer Effects ..... 450

**Letting the Data Speak:** Is Economics
Bad for You? ..... 451

Following the Crowd: Herding ..... 452

**Letting the Data Speak:** Your Peers
Affect Your Waistline ..... 453

**Choice & Consequence:** Are You an Internet
Explorer? ..... 454

Summary ..... 454

Key Terms ..... 454

Questions ..... 455

Problems ..... 455

Endnotes ..... 459

Glossary ..... 463

Credits ..... 471

Index ..... 473

| CHAPTERS ON THE WEB |
| --- |

Web chapters are available on MyEconLab.

**WEB Chapter 1**   Financial Decision Making

**WEB Chapter 2**   Economics of Life, Health,
and the Environment

**WEB Chapter 3**   Political Economy

PX0567-014

Excerpt

# Preface

We love economics. We marvel at the way economic systems work. When we buy a smartphone, we think about the complex supply chain and the hundreds of thousands of people who played a role in producing an awe-inspiring piece of technology that was assembled from components manufactured across the globe.

The market's ability to do the world's work without anyone being in charge strikes us as a phenomenon no less profound than the existence of consciousness or life itself. We believe that the creation of the market system is one of the greatest achievements of humankind.

We wrote this book to highlight the simplicity of economic ideas and their extraordinary power to explain, predict, and improve what happens in the world. We want students to master the *essential* principles of economic analysis. With that goal in mind, we identify the three key ideas that lie at the heart of the economic approach to understanding human behavior: optimization, equilibrium, and empiricism. These abstract words represent three ideas that are actually highly intuitive.

# Our Vision: Three Unifying Themes

The first key principle is that people try to choose the best available option: *optimization*. We don't assume that people always successfully optimize, but we do believe that people try to optimize and often do a relatively good job of it. Because most decision makers try to choose the alternative that offers the greatest net benefit, optimization is a useful tool for predicting human behavior. Optimization is also a useful prescriptive tool. By teaching people how to optimize, we improve their decisions and the quality of their lives. By the end of this course, every student should be a skilled optimizer—without using complicated mathematics, simply by using economic intuition.

The second key principle extends the first: economic systems operate in *equilibrium*, a state in which everybody is simultaneously trying to optimize. We want students to see that they're not the only ones maximizing their well-being. An economic system is in equilibrium when each person feels that he or she cannot do any better by picking another course of action. The principle of equilibrium highlights the connections among economic actors. For example, Apple stores stock millions of iPhones because millions of consumers are going to turn up to buy them. In turn, millions of consumers go to Apple stores because those stores are ready to sell those iPhones. In equilibrium, consumers and producers are simultaneously optimizing and their behaviors are intertwined.

Our first two principles—optimization and equilibrium—are conceptual. The third is methodological: *empiricism*. Economists use *data* to test economic theories, learn about the world, and speak to policymakers. Accordingly, data play a starring role in our book, though we keep the empirical analysis extremely simple. It is this emphasis on matching theories with real data that we think most distinguishes our book from others. We show students how economists use data to answer specific questions, which makes our chapters concrete, interesting, and fun. Modern students demand the evidence behind the theory, and our book supplies it.

For example, we begin every chapter with an empirical question and then answer that question using data. One chapter begins by asking:

*Would a smoker quit the habit for $100 per month?*

17

PX0567-015

Excerpt

Later in that chapter, we describe how smoking fell when researchers paid smokers to quit.

In our experience, students taking their first economics class often have the impression that economics is a series of theoretical assertions with little empirical basis. By using data, we explain how economists evaluate and improve our scientific insights. Data also make concepts more memorable. Using evidence helps students build intuition, because data move the conversation from abstract principles to concrete facts. Every chapter sheds light on how economists use data to answer questions that directly interest students. Every chapter demonstrates the key role that evidence plays in advancing the science of economics.

# Features

All of our features showcase intuitive empirical questions.

- In **Evidence-Based Economics (EBE)**, we show how economists use data to answer the question we pose in the opening paragraph of the chapter. The EBE uses actual data from field experiments, lab experiments, or naturally occurring data, while highlighting some of the major concepts discussed within the chapter. This tie-in with the data gives students a substantive look at economics as it plays out in the world around them.

  The questions explored aren't just dry intellectual ideas; they spring to life the minute the student sets foot outside the classroom—*Is Facebook free? Is college worth it? Will free trade cause you to lose your job? Is there value in putting yourself into someone else's shoes? What is the optimal size for government?*

 **Evidence-Based Economics**

**Q:** Would a smoker quit the habit for $100 per month?



At the beginning of this chapter, we posed a question concerning whether *a smoker would quit the habit for $100 a month*. Within the economics literature, an approach that is gaining popularity is to *pay* people to quit smoking. The tools of this chapter can help us begin to think about whether such an incentive can work, and why it might work.

In thinking about such a reward, we have learned that the impact of an increase in income leads to changes in the consumer budget constraint and subsequently the demand for goods and services. To see these tools in action, we return to the shopping-spree example. Exhibit 5.5 shows the mechanics behind the effects of an increase in what we have available to spend.

With that foundation laid, we can return to the question of quitting smoking for a month. Given our economic framework, the very same principle that was at work in the shopping-spree problem applies when considering the smoker's problem. By providing $100 for not smoking, we create a trade-off between the current benefits of smoking and the benefits obtained by $100 of increased income. There is also another saving: by not smoking, you save the money otherwise spent on cigarettes or cigars (shifting your budget constraint outward even more). For simplicity, let's assume that is another $100 per month. Thus the comparison that we need to make is whether, at the margin, $200 of additional monthly income provides more benefits than the current benefits you gain from smoking. If they do, then you quit smoking. If they do not, then you continue smoking and miss out on the $200 incentive.

PX0567-016

Excerpt

- **Letting the Data Speak** is another feature that analyzes an economic question by using real data as the foundation of the discussion. Among the many issues we explore are such questions as *Should McDonald's be interested in elasticities? Do wages really go down if labor supply increases? Why do some firms advertise and some don't?*

---

**LETTING THE DATA SPEAK**

### Airline Price Wars

Airlines have always been known for their rather cutthroat brand of competition. In this business, competition is fierce. When a new, low-price competitor called Southwest Airlines entered the industry and shook it up, economists sat back and watched the price wars begin.

In fact, economists Austan Goolsbee and Chad Syverson have found in their research that price wars began well before Southwest entered the market.[1] These economists studied the three quarters after Southwest announced that it would create flights but before it actually started selling tickets (so, for example, after Southwest announced it would serve Dallas-to-Chicago flights but before it began to sell Dallas-to-Chicago tickets). They found that prices were 24 percent lower in this three-quarter time period—before actual entry could be suspected as a contributing factor.

Why would airlines respond to a competitor before the competitor is actually competing? One reason may be that airlines attempt to "capture" as many consumers as possible. For example, by selling special frequent-flyer deals and luring new customers into a long-term relationship, airlines may be able to compete with new entrants like Southwest. Before Southwest entered the market, it



was not worthwhile for airlines to offer such deals, but faced with new competition, the airlines might have decided that enticing new customer loyalty was worth it.

Another reason why prices might have fallen before Southwest entered the market is because the long-term value of the market had decreased, making collusion less profitable. We discuss economic elements of collusion next.

---

- In keeping with the optimization theme, from time to time we ask students to make a real economic decision or evaluate the consequences of past real decisions in a feature entitled **Choice & Consequence**. We then explain how an economist might analyze the same decision. Among the choices investigated are such questions as *Do people really optimize? Should LeBron James paint his own house? Does revenge have an evolutionary logic?*

---

 **CHOICE & CONSEQUENCE**

### The Race to Fish

Imagine that you are a fisherman who owns a private pond fully stocked with 100 bluegill fish. Because you own the property rights to the pond, you are the only one who can fish at the pond. Therefore, you can catch as many bluegill as you want. But you know that in the late spring in 70°F water, the female deposits around 40,000 eggs in a shallow nest near the sandy shore. Two to six days later, the eggs hatch and the male guards the young fry during their first days.

Knowing this, how many fish will you catch?

You will likely not decide to catch all of the bluegill, instead leaving many in the pond to restock your supply for the next season.

Now imagine that this pond is a common pool resource—anyone and everyone can fish from it, and one more fish on another angler's line means one less fish on yours. Would you still be careful to leave a lot of fish in the pond for next season?

Both real-world situations and lab experiments conducted by Nobel Laureate Elinor Ostrom have shown us that you probably wouldn't.[4,5] After all, if you decide to leave, say, 50 fish in the pond, who is to stop another fisherman from catching those fish?

This line of thinking may lead everyone to keep fishing until there is absolutely nothing left. As you just learned, this

type of situation is referred to as the *tragedy of the commons*; a dilemma in which multiple individuals acting in their own self-interest deplete a shared limited resource when in the long run it isn't in anyone's best interest to do so.

How might the fishermen in our example prevent this from happening?



PX0567-017

Excerpt

# Organization

**Part I: Introduction to Economics** lays the groundwork for understanding the economic way of thinking about the world. In **Chapter 1**, we show that the principle of *optimization* explains most of our choices. In other words, we make choices based on a consideration of benefits and costs, and to do this we need to consider trade-offs, budget constraints, and opportunity cost. We then explain that *equilibrium* is the situation in which everyone is simultaneously trying to individually optimize. In equilibrium, there isn't any perceived benefit to changing one's own behavior. We introduce the free-rider problem to show that individual optimization and social optimization do not necessarily coincide.

Because data plays such an entire central role in economics, we devote an entire chapter—**Chapter 2**—to economic models, the scientific method, empirical testing, and the critical distinction between correlation and causation. We show how economists use models and data to answer interesting questions about human behavior. For the students who want it, there is an appendix on constructing and interpreting graphs, which is presented in the context of an actual experiment on incentive schemes designed by one of us.

**Chapter 3** digs much more deeply into the concept of optimization, including an intuitive discussion of marginal analysis. We use a single running example of choosing an apartment, which confronts students with a trade-off between the cost of rent and the time spent commuting. We demonstrate two alternative approaches—optimization in levels and optimization in differences—and show why economists often use the latter technique.

**Chapter 4** introduces the demand and supply framework via a running example of the market for gasoline. We show how the price of gasoline affects the decisions of buyers, like commuters, and sellers, like ExxonMobil. As we develop the model, we explore how individual buyers are added together to produce a market demand curve and how individual sellers are added together to generate a market supply curve. We then show how buyers and sellers jointly determine the equilibrium market price and the equilibrium quantity of goods transacted in a perfectly competitive market. Finally, we show how markets break down when prices aren't allowed to adjust to equate the quantity demanded and the quantity supplied.

**Part II: Foundations of Microeconomics** anchors Micro with a deeper exploration of the sources of demand and supply. One important thing that we have learned as teachers, is that even after a year of economics, most students really have no idea about the underpinnings of the demand and supply curves—specifically, where the curves actually come from. Most textbooks do not illuminate these issues.

When crafting Chapters 5 and 6, our goal was to provide two stand-alone chapters that show students that consumption and production are really two sides of the same coin, "glued" together by the idea of incentives. We gather consumer and producer concepts under their own respective umbrellas, and merge material that is spread out over several chapters in other texts. The goal is to show the commonalities and linkages between consumers' and producers' optimization decisions. With this setup, the student is able to view the whole picture in one place and understand how concepts tie together without flipping back and forth between several chapters.

In **Chapter 5**, we look "under the hood" to show where the demand curve actually comes from. We frame the question of how consumers decide what to buy as "the buyer's problem" and discuss the three key ingredients of tastes and preferences, prices, and the budget set. The discussion is intuitive: once these three pieces are in place, the demand curve naturally falls out. This approach leads fluidly to a discussion of consumer surplus, demand elasticities, and how consumers predictably respond to incentives. In this way, the student can readily see holistically why policymakers and business people should concern themselves with the demand side of economics. For the students who want it, there is an appendix on income and substitution effects, which is presented as an extension of the text.

In **Chapter 6**, we use the same holistic approach, but here we follow a single company (The Wisconsin Cheeseman, which a coauthor worked at for two high school summers) to showcase "the seller's problem." The seller's problem also has three parts: production, costs, and revenues. In thinking through the seller's problem, it is natural to treat these

PX0567-018

Excerpt

three components together rather than strew them over separate chapters as in other books. They need to be simultaneously considered by the firm when making optimal choices, so why not present them jointly? The running theme of The Wisconsin Cheeseman makes the chapter quite cohesive, and what was once a difficult puzzle to sort through becomes clear when presented under a single continuous example. For the more inquisitive students there is an appendix showing that for firms with different cost structures, economic profits can exist in long-run equilibrium.

*Chapter 7* takes an aerial view by considering what happens when we put together the buyers of Chapter 5 and the sellers of Chapter 6 in a perfectly competitive market. The chapter begins by asking: can markets composed of only self-interested people maximize the overall well-being of society? The beauty of economics is on full display in this chapter, as it shows that in a perfectly competitive market, the invisible hand creates harmony between the interests of the individual and those of society. Prices guide the invisible hand and incentivize buyers and sellers, who in turn maximize social surplus by allocating resources efficiently within and across sectors of the economy. The chapter uses Vernon Smith's seminal laboratory experiments to provide the evidence that prices and quantities converge to the intersection of supply and demand.

In *Chapter 8* we first walk through a discussion of the production possibilities curve, comparative advantage, and the gains from trade. We move the discussion from individuals trading with each other to trade between states (an innovation in a principles text) and finally to trade between countries. Students can thus see that the principles motivating them to trade are the same as those motivating states and nations to trade. They develop an understanding that there are sometimes winners and losers in trade, but that overall, the gains from trade are larger than the losses. The key policy issue becomes: can we shift surplus to make trade a win–win for everyone?

If students stopped reading the book at this point, they would be rabid free-market proponents. This is because the beauty of the free market is unparalleled. *Chapter 9* begins a discussion of important cases that frustrate the workings of the invisible hand. When some firms produce, they pollute the air and water. There are some goods that everyone can consume once they are provided, such as national defense. Chapter 9 probes three cases of market failure—externalities, public goods, and common pool resources—and highlights an important link: in all three cases, there is a difference between social and private benefits or social and private costs. The student learns that the invisible hand of Chapter 7 can become "broken" and that government can enact policies in regard to externalities to improve social well-being, provide public goods, and protect common pool resources.

But government intervention can be a two-edged sword, and in *Chapter 10* we ask the question, "How much government intervention is necessary and how much is desirable?" We provide an aerial view of taxation and spending, and study how regulation—the main tool that governments use to deal with the externalities and other market failures of Chapter 10—has its costs and limitations. We see that the trade-off between equity and efficiency represents the nub of the conflict between those who support big government and those who argue for smaller government. The Evidence-Based Economics feature at the end of the chapter tackles the thorny question of the optimal size of government by exploring the deadweight loss of income taxation.

*Chapter 11* motivates the importance of factor markets—the inputs that firms use to make their goods and services—by asking if there is discrimination in the labor market. This question is couched within a general discussion about why people earn different wages in the labor market. This approach allows the student to seamlessly transition from being a demander (as in Chapter 5 as a buyer) to being a supplier (of labor). The economics behind the other major factors of production—physical capital and land—naturally follow from the labor discussion. The chapter concludes by showing several interesting data sets measuring whether discrimination exists in labor markets.

**Part III: Market Structure** introduces the alternatives to the perfectly competitive market: monopolies, oligopolies, and monopolistic competition. This section also provides the tools necessary to understand these market structures.

*Chapter 12* on monopoly connects the student's thinking to Chapter 6 where the seller's problem was introduced and shows that all of the production and cost concepts learned earlier apply here: production should be expanded until marginal cost equals marginal

PX0567-019

revenue. To illustrate the "monopolist's problem," we use a running example of the allergy drug Claritin and its 20-year patent to show how a monopoly optimizes. Once again, we use the metaphor of the broken invisible hand to illustrate how a monopoly reallocates resources toward itself and thereby sacrifices social surplus. At this point, the student might wonder why legal market power is ever granted by the government. The opening question, *Can a monopoly ever be good for society?* discusses the other side of the coin by presenting evidence that a monopoly *can* sometimes be good for society.

At this point in the book, we have covered many of the topics that are treated in existing texts. ***Chapter 13*** is a point of major departure, as we devote an entire chapter to game theory, which is a source of some of the most powerful economic insights. We emphasize that it helps us better understand the world when we place ourselves in the shoes of someone else. In so doing, the student develops a deeper understanding of how to choose a strategy that is a best response to the strategies of others. We apply game theory to many situations, including pollution, soccer, and advertising, to name a few.

In ***Chapter 14***, we present the two market structures that fall between the extremes of perfect competition and monopoly: oligopoly and monopolistic competition. We develop the chapter around the motivating question of how many firms are necessary to make a market competitive. Throughout, we emphasize how oligopolist firms and monopolistically competitive firms set their prices and quantities by considering the choices of their competitors. We connect with previous chapters by framing the discussion in terms of the optimization problem of these firms: the "oligopolist's problem" and the "monopolistic competitor's problem." We show how in the short run it is identical to the monopolist's problem and in the long run to the perfectly competitive model.

**Part IV: Extending the Microeconomic Toolbox** provides a selection of special-topic, optional chapters, depending on the individual instructor's course emphasis. We have included these chapters because we feel that too often the student doesn't get to see the myriad of interesting applications that follow from all those months of learning basic economic principles!

***Chapter 15*** studies trade-offs involving time and risk. The chapter begins by asking how the timing of a reward affects its economic value. We show how compound interest causes an investment's value to grow over time. We also show how to discount future financial flows and how to make financial decisions using the net present value framework. The second half of the chapter discusses probability and risk and explains how to calculate expected value. We apply these ideas to the study of gambling, extended warranties, and insurance.

Why does a new car lose considerable value the minute it is driven off the lot? ***Chapter 16*** examines markets we are all familiar with—ones in which one side of the market has more information than the other. The chapter examines the informational disparities between buyers and sellers in terms of hidden characteristics (for example, a sick person is more likely to apply for health insurance) and hidden actions (for example, an insured person is more likely to drive recklessly). Along the way, we look at many timely topics such as lemons in the used-car market, adverse selection in the health insurance market, and moral hazard in risk and insurance markets.

In ***Chapter 17*** we explore situations that students sometimes face: auctions and bargaining. Our optimization theme continues, as we discuss best strategies and bargaining principles in a variety of settings. We explore the four common types of auctions and provide insights into how economics can help the student bid in auctions—from eBay to estate auctions to charity auctions. We then shift gears and examine bargaining situations that affect our lives daily. To show the power of the bargaining model, we present empirical evidence of who in the household determines how money is spent.

Perhaps the most unusual chapter for a principles textbook is ***Chapter 18***, which is on social economics. Here we introduce new variants of *homo economicus*. We explore two different areas of human behavior: the economics of charity and fairness and the economics of revenge. We then revisit the concept and origin of preferences—do we take satisfaction from contributing to a charity or from exacting revenge on a perceived enemy? This last chapter drives home the fact that economic principles can be extended to every corner of our world. And it teaches us that we can considerably extend our understanding of the world around us by adding insights from our sister sciences—psychology, history, anthropology, sociology, and political science—to name a few.

PX0567-020

Excerpt

# MyEconLab®

MyEconLab is an extraordinary online course management, homework, quizzing, testing, activity, and tutorial resource.

## For Instructors

With comprehensive homework, quiz, test, activity, practice, and tutorial options, instructors can manage all their assessment and online activity needs in one program. MyEconLab saves time by automatically grading questions and activities and tracking results in an online gradebook.

Each chapter contains two preloaded homework exercise sets that can be used to build an individualized study plan for each student. These study plan exercises contain tutorial resources, including instant feedback, links to the appropriate chapter section in the eText, pop-up definitions from the text, and step-by-step guided solutions, where appropriate. Within its rich assignment library, instructors will find a vast array of assessments that ask the students to draw graph lines and shifts, plot equilibrium points, and highlight important graph areas, all with the benefit of instant, personalized feedback. This feedback culminates, when needed, with the correct graph output alongside the student's personal answer, creating a powerful learning moment.

After the initial setup of the MyEconLab course for Acemoglu/Laibson/List, there are two primary ways to begin using this rich online environment. The first path requires no further action by the instructor. Students, on their own, can use MyEconLab's adaptive Study Plan problems and tutorial resources to enhance their understanding of concepts. The online gradebook records each student's performance and time spent on the assessments, activities, and the study plan and generates reports by student or chapter.

Alternatively, instructors can fully customize MyEconLab to match their course exactly: reading assignments, homework assignments, video assignments, current news assignments, digital activities, experiments and quizzes and tests. Assignable resources include:

- Preloaded exercise assignment sets for each chapter that include the student tutorial resources mentioned earlier
- Preloaded quizzes for each chapter
- Interactive Reading Assignments for core chapters allow instructors the flexibility of assigning select text reading, organized by main headings, and Evidence-Based Economics features, with integrated assessment and practice.
- Assignable and gradable exercises that are similar to the end-of-chapter questions and problems and numbered exactly as in the book to make assigning homework easier
- *Real-Time Data Analysis Exercises* allow students and instructors to use the very latest data from the Federal Reserve Bank of St. Louis's FRED site. By completing the exercises, students become familiar with a key data source, learn how to locate data, and develop skills in interpreting data.
- In the eText available in MyEconLab, select figures labeled MyEconLab Real-Time Data allow students to display a pop-up graph updated with real-time data from FRED.
- *Current News Exercises* provide a turnkey way to assign gradable news-based exercises in MyEconLab. Each week, Pearson scours the news, finds current economics articles, creates exercises around the news articles, and then automatically adds them to MyEconLab. Assigning and grading current news-based exercises that deal with the latest economics events and policy issues has never been more convenient.
- *Econ Exercise Builder* allows you to build customized exercises. Exercises include multiple-choice, graph drawing, and free-response items, many of which are generated algorithmically so that each time a student works them, a different variation is presented.
- Test Item File questions that allow you to assign quizzes or homework that will look just like your exams

MyEconLab grades every problem type (except essays), even problems with graphs. When working homework exercises, students receive immediate feedback, with links to additional learning tools.

- *Experiments in MyEconLab* are a fun and engaging way to promote active learning and mastery of important economic concepts. Pearson's Experiments program is flexible and easy for instructors and students to use.

PX0567-021

Excerpt

- Single-player experiments allow your students to play against virtual players from anywhere at any time so long as they have an Internet connection.
- Multiplayer experiments allow you to assign and manage a real-time experiment with your class.

  Pre- and post-questions for each experiment are available for assignment in MyEconLab.

  For a complete list of available experiments, visit **www.myeconlab.com**.

- *The Digital Interactive Library* facilitates experiential learning through a set of interactive online activities focused on core economic concepts. Fueled by data, decision making, and personal relevance, each interactive progresses through a series of levels that build on foundational concepts, enabling a new immersive learning experience. The flexible and modular setup of each interactive makes digital interactives suitable for classroom presentation, auto-graded homework, or both. To learn more, and for a complete list of digital interactives, visit **www.myeconlab.com**.

*Learning Catalytics*™ is a technology that has grown out of twenty years of cutting-edge research, innovation, and implementation of interactive teaching and peer instruction. Learning Catalytics, now seamlessly accessible from MyEconLab, is a "bring your own device" student engagement and classroom intelligence system. With Learning Catalytics you can:

- Engage students in real time, using open-ended tasks to probe student understanding.
- Promote student participation using any modern Web-enabled device they already have—laptop, smartphone, or tablet.
- Eighteen different question types include:
  - Word clouds
  - Graphing
  - Short answer
  - Matching
  - Multiple choice
  - Highlighting
  - Image upload
- Address misconceptions before students leave the classroom.
- Understand immediately where students are and adjust your lecture accordingly.
- Improve your students' critical-thinking skills.
- Engage with and record the participation of every student in your classroom.
- Learning Catalytics gives you the flexibility to create your own questions to fit your course exactly or choose from a searchable question library Pearson has created.

For more information, visit **learningcatalytics.com**.

**Customization and Communication** MyEconLab in MyLab/Mastering provides additional optional customization and communication tools. Instructors who teach distance-learning courses or very large lecture sections find the MyLab/Mastering format useful because they can upload course documents and assignments, customize the order of chapters, and use communication features such as Document Sharing, Chat, ClassLive, and Discussion Board.

## For Students

MyEconLab puts students in control of their learning through a collection of testing, practice, and study tools tied to the online, interactive version of the textbook and other media resources.

Students can study on their own or can complete assignments created by their instructor. In MyEconLab's environment, students practice what they learn, test their understanding, and pursue a personalized and adaptive study plan generated from their performance on sample tests and from quizzes created by their instructor. In Homework or Study Plan mode, students have access to a wealth of tutorial features, including:



- Instant feedback on exercises that helps students understand and apply the concepts
- Links to the eText to promote reading of the text just when the student needs to revisit a concept or an explanation
- Animations of most of the textbook's figures provide step by step animation and audio to help students develop intuition in reading and interpreting graphs. The animations are accessible directly from the eText or from the Multimedia Library.

PX0567-022

Excerpt

- Step-by-step guided solutions that force students to break down a problem in much the same way an instructor would do during office hours
- Pop-up key term definitions from the eText to help students master the vocabulary of economics
- A graphing tool that is integrated into the various exercises to enable students to build and manipulate graphs to better understand how concepts, numbers, and graphs connect

### Additional MyEconLab Resources

- *Enhanced eText*—In addition to the portions of eText available as pop-ups or links, a fully searchable enhanced eText is available for students who wish to read and study in a fully electronic environment. The enhanced eText includes all of the animations and embedded links to all of the end-of-chapter questions and problems, enabling students to read, review, and immediately practice their understanding. The embedded exercises are auto-graded exercises and feed directly into MyEconLab's adaptive Study Plan.
- *Print upgrade*—For students who wish to complete assignments in MyEconLab but read in print, Pearson offers registered MyEconLab users a loose-leaf version of the print text at a significant discount.

### MyEconLab and Adaptive Learning

MyEconLab's Study Plan is now powered by a sophisticated adaptive learning engine that tailors learning material to meet the unique needs of each student. MyEconLab's new Adaptive Learning Study Plan monitors students' performance on homework, quizzes, and tests and continuously makes recommendations based on that performance.

If a student is struggling with a concept such as supply and demand or having trouble calculating a price elasticity of demand, the Study Plan provides customized remediation activities—a pathway based on personal proficiencies, number of attempts, or difficulty of questions—to get the student back on track. Students will also receive recommendations for additional practice in the form of rich multimedia learning aids such as an interactive eText, Help Me Solve This tutorials, and graphing tools.

The Study Plan can identify a student's potential trouble spots and provide learning material and practice to avoid pitfalls. In addition, students who are showing a high degree of success with the assessment material are offered a chance to work on future topics based on the professor's course coverage preferences. This personalized and adaptive feedback and support ensures that students are optimizing their current and future course work and mastering the concepts, rather than just memorizing and guessing answers.

*Dynamic Study Modules*, which focus on key topic areas and are available from within MyEconLab, are an additional way for students to obtain tailored help. These modules work by continuously assessing student performance and activity on discrete topics and provide personalized content in real time to reinforce concepts that target each student's particular strengths and weaknesses.

Each Dynamic Study Module, accessed by computer, smartphone, or tablet, promotes fast learning and long-term retention. Because MyEconLab and Dynamic Study Modules help students stay on track and achieve a higher level of subject-matter mastery, more class time is available for interaction, discussion, collaboration, and exploring applications to current news and events. Instructors can register, create, and access all of their MyEconLab courses at **www.pearsonmylab.com**.

# Instructor Resources

The **Instructor's Manual** for *Microeconomics* was prepared by James Hornsten of Northwestern University and includes:

- An overview from the author team that introduces the vision and organization of the book and provides suggestions on how to organize a syllabus for both semester and quarter programs.
- A chapter-by-chapter outline of the text

PX0567-023

Excerpt

- Lecture notes highlighting the big ideas and concepts from each chapter
- Teaching Tips on how to motivate the lecture
- Common Mistakes or Misunderstandings students often make and how to correct them
- Short, real-world Alternative Teaching Examples, different from those in the text

**Active Learning Exercises**, included online and at the end of each Instructor's Manual chapter, were prepared by Timothy Diette of Washington and Lee University and include:

- 5–10 Active Learning Exercises per chapter that are ideal for in-class discussions and group work

The **Solutions Manual**, prepared by Robert Schwab of the University of Maryland, includes solutions to all end-of-chapter Questions and Problems in the text. It is available in print and downloadable PDFs.

Three flexible **PowerPoint Presentation** packages make it easy for instructors to design presentation slides that best suit their style and needs:

- Lecture notes with some animated text figures and tables, as well as alternative examples with original static figures
- Figures from the text with step-by-step animation
- Static versions of all text figures and tables

Each presentation maps to the chapter's structure and organization and uses terminology used in the text. Julia Heath of the University of Cincinnati created the Lecture PowerPoint presentation. Paul Graf of Indiana University, Bloomington, and Eric Nielsen of St. Louis Community College prepared the step-by-step instructions for the animated figures.

The **Test Bank** for *Microeconomics* was written by Anuradha Gupta and Julia Paul, and edited and reviewed by Robert Harris of Indiana University–Purdue University Indianapolis, John W. Dawson of Appalachian State University, Phillip K. Letting of Harrisburg Area Community College, and Heather Luea of Kansas State University. The Test Bank contains approximately 2,400 multiple-choice, numerical, short-answer, and essay questions. These have been edited and reviewed to ensure accuracy and clarity, and include terminology used in the book. Each question can be sorted by difficulty, book topic, concept covered, and AACSB learning standard to enhance ease of use. The Test Bank is available in Word, PDF, and TestGen formats.

The Test Bank is available in test generator software (TestGen with QuizMaster). TestGen's graphical interface enables instructors to view, edit, and add questions; transfer questions to tests; and print different forms of tests. Instructors also have the option to reformat tests with varying fonts and styles, margins, and headers and footers, as in any word-processing document. Search and sort features let the instructor quickly locate questions and arrange them in a preferred order. QuizMaster, working with your school's computer network, automatically grades the exams, stores the results on disk, and allows the instructor to view and print a variety of reports.

## Instructor's Resource Disk

This disk contains the Instructor's Manual, Solutions Manual, and Test Bank in Word and PDF formats. It also contains the Computerized Test Bank (with a TestGen program installer) and PowerPoint resources. It is compatible with both Windows and Macintosh operating systems.

For your convenience, all instructor resources are also available online via our centralized supplements Web site, the Instructor Resource Center (**www.pearsonglobaleditions.com**). For access or more information, contact your local Pearson representative or request access online at the Instructor Resource Center.

PX0567-024

# Acknowledgments

As the three of us worked on this project, we taught each other a lot about economics, teaching, and writing. But we learned even more from the hundreds of other people who helped us along the way. For their guidance, we are thankful and deeply humbled. Their contributions turned out to be critical in ways that we never imagined when we started, and our own ideas were greatly improved by their insights and advice.

Our reviewers, focus group participants, and class testers showed us how to better formulate our ideas and helped us sharpen our writing. Through their frequently brilliant feedback, they corrected our economic misconceptions, improved our conceptual vision, and showed us how to write more clearly. Their contributions appear in almost every paragraph of this book. All of their names are listed below.

Our research assistants—Alec Brandon, Justin Holz, Josh Hurwitz, Xavier Jaravel, Angelina Liang, Daniel Norris , Yana Peysakhovich, and Jan Zilinsky—played a critical role at every phase of the project, from analyzing data to editing prose to generating deep insights about pedagogical principles that are woven throughout the book. These research assistants played many roles. We learned to trust their instincts on every element of the book, and quickly realized that their contributions were indispensable to the project's success. We are especially indebted to Josh, who has earned our eternal gratitude for many late work nights and for his brilliant editorial and economic insights.

We are also deeply grateful to the many inspiring economists who contributed major components of the project. Robert M. Schwab, University of Maryland, Anuradha Gupta, and Julia Paul contributed extensively to the development of the end of chapter questions and problems, which stand out as examples of inspiring pedagogy. James Hornsten, Northwestern University, and Timothy Diette, Washington and Lee University, wrote the innovative and intuitive Instructor's Manual and Active Learning Exercises. Julia Heath, University of Cincinatti, Paul Graf, Indiana University, Bloomington, and Eric Nielsen, St. Louis Community College, created outstanding PowerPoint slides and animations that illuminate and distill the key lessons of the book. Anuradha Gupta and Julia Paul created the expansive test bank.

Most importantly, we acknowledge the myriad contributions of our editors and all of our amazing colleagues at Pearson. They have marched with us every step of the way. We wouldn't dare count the number of hours that they dedicated to this project—including evenings and weekends. Their commitment, vision, and editorial suggestions touched every sentence of this book. Most of the key decisions about the project were made with the help of our editors, and this collaborative spirit proved to be absolutely essential to our writing. Dozens of people at Pearson played key roles, but the most important contributions were made by Adrienne D'Ambrosio, Executive Editor, Mary Clare McEwing, Executive Development Editor, Nancy Freihofer, Production Manager, Sarah Dumouchelle, Andra Skaalrud, and Diane Kohnen, our Project Managers, Kathleen McLellan, Product Testing and Learner Validation Manager, Lori DeShazo, Executive Field Marketing Manager, Alison Haskins, Product Marketing Manager, Noel Lotz, Digital Studio Content Integration Team Lead, Melissa Honig, Executive Media Producer, and Margaret E. Monahan-Pashall.

We are particularly grateful to Adrienne who has been deeply committed to our project from the first day and has tirelessly worked with us at every key decision. We wish to thank Denise Clinton, Digital Publisher, who first got us started, and Donna Battista, Vice President Product Management, who championed the project along the way. All of these publishing professionals transformed us as writers, teachers, and communicators. This book is a testimony to their perseverance, their dedication, and their brilliant eye for good (and often bad!) writing. Their commitment to this project has been extraordinary and inspirational. We are profoundly grateful for their guidance and collaboration.

27

Excerpt

Finally, we wish to thank our many other support networks. Our own professors, who first inspired us as economists and showed, through their example, the power of teaching and the joy that one can take from studying economics. Our parents, who nurtured us in so many ways and gave us the initial human capital that made our entire careers possible. Our kids, who implicitly sacrificed when our long hours on this book ate into family life. And, most profoundly, we thank our spouses, who have been supportive, understanding, and inspirational throughout the project.

This book is the product of many streams that have flowed together and so many people who have contributed their insights and their passion to this project. We are deeply grateful for these myriad collaborations.

# Reviewers

The following reviewers, class test participants, and focus group participants provided invaluable insights.

Adel Abadeer, Calvin College

Ahmed Abou-Zaid, Eastern Illinois University

Temisan Agbeyegbe, City University of New York

Carlos Aguilar, El Paso Community College

Rashid Al-Hmoud, Texas Tech University

Sam Allgood, University of Nebraska, Lincoln

Neil Alper, Northeastern University

Farhad Ameen, Westchester Community College

Catalina Amuedo-Dorantes, San Diego State University

Lian An, University of North Florida

Samuel Andoh, Southern Connecticut State University

Brad Andrew, Juniata College

Len Anyanwu, Union County College

Robert Archibald, College of William and Mary

Ali Arshad, New Mexico Highlands University

Robert Baden, University of California, Santa Cruz

Mohsen Bahmani-Oskooee, University of Wisconsin, Milwaukee

Scott L. Baier, Clemson University

Rita Balaban, University of North Carolina

Mihajlo Balic, Harrisburg Area Community College

Sheryl Ball, Virginia Polytechnic Institute and State University

Spencer Banzhaf, Georgia State University

Jim Barbour, Elon University

Hastin Bastin, Shippensburg University

Clare Battista, California State Polytechnic University, San Luis Obispo

Jodi Beggs, Northeastern University

Eric Belasco, Montana State University

Susan Bell, Seminole State College

Valerie Bencivenga, University of Texas, Austin

Pedro Bento, West Virginia University

Derek Berry, Calhoun Community College

Prasun Bhattacharjee, East Tennessee State University

Benjamin Blair, Columbus State University

Douglas Blair, Rutgers University

John Bockino, Suffolk County Community College

Andrea Borchard, Hillsborough Community College

Luca Bossi, University of Pennsylvania

Gregory Brock, Georgia Southern University

Bruce Brown, California State Polytechnic University, Pomona

David Brown, Pennsylvania State University

Jaime Brown, Pennsylvania State University

Laura Bucila, Texas Christian University

Don Bumpass, Sam Houston State University

Chris Burkart, University of West Florida

Colleen Callahan, American University

Fred Campano, Fordham University

Douglas Campbell, University of Memphis

Cheryl Carleton, Villanova University

Scott Carrell, University of California, Davis

Kathleen Carroll, University of Maryland, Baltimore

Regina Cassady, Valencia College, East Campus

Shirley Cassing, University of Pittsburgh

Suparna Chakraborty, University of San Francisco

Catherine Chambers, University of Central Missouri

Chiuping Chen, American River College

Susan Christoffersen, Philadelphia University

Benjamin Andrew Chupp, Illinois State University

David L. Cleeton, Illinois State University

Cynthia Clement, University of Maryland

Marcelo Clerici-Arias, Stanford University

Rachel Connelly, Bowdoin College

William Conner, Tidewater Community College

Patrick Conway, University of North Carolina

Jay Corrigan, Kenyon College

Antoinette Criss, University of South Florida

Sean Crockett, City University of New York

Patrick Crowley, Texas A&M University, Corpus Christi

Kelley Cullen, Eastern Washington University

Scott Cunningham, Baylor University

Muhammed Dalgin, Kutztown University

David Davenport, McLennan Community College

Stephen Davis, Southwest Minnesota State University

John W. Dawson, Appalachian State University

Pierangelo De Pace, California State University, Pomona

David Denslow, University of Florida

Arthur Diamond, University of Nebraska, Omaha

Timothy Diette, Washington and Lee University

Isaac Dilanni, University of Illinois, Urbana-Champaign

Oguzhan Dincer, Illinois State University

Ethan Doetsch, Ohio State University

Murat Doral, Kennesaw State University

Tanya Downing, Cuesta College

Gary Dymski, University of California, Riverside

Kevin Egan, University of Toledo

PX0567-026

Excerpt

Eric Eide, Brigham Young University, Provo

Harold Elder, University of Alabama, Tuscaloosa

Harry Ellis, University of North Texas

Noha Emara, Columbia University

Lucas Engelhardt, Kent State University, Stark

Hadi Esfahani, University of Illinois, Urbana-Champaign

Molly Espey, Clemson University

Jose Esteban, Palomar College

Hugo Eyzaguirre, Northern Michigan University

Jamie Falcon, University of Maryland, Baltimore

Liliana Fargo, DePaul University

Sasan Fayazmanesh, California State University, Fresno

Bichaka Fayissa, Middle Tennessee State University

Virginia Fierro-Renoy, Keiser University

Donna Fisher, Georgia Southern University

Paul Fisher, Henry Ford Community College

Todd Fitch, University of California, Berkeley

Mary Flannery, University of Notre Dame

Hisham Foad, San Diego State University

Mathew Forstater, University of Missouri, Kansas City

Irene Foster, George Mason University

Hamilton Fout, Kansas State University

Shelby Frost, Georgia State University

Timothy Fuerst, University of Notre Dame

Ken Gaines, East-West University

John Gallup, Portland State University

William Galose, Lamar University

Karen Gebhardt, Colorado State University

Gerbremeskel Gebremariam, Virginia Polytechnic Institute and State University

Lisa George, City University of New York

Gregory Gilpin, Montana State University

Seth Gitter, Towson University

Rajeev Goel, Illinois State University

Bill Goffe, State University of New York, Oswego

Julie Gonzalez, University of California, Santa Cruz

Paul Graf, Indiana University, Bloomington

Philip Graves, University of Colorado, Boulder

Lisa Grobar, California State University, Long Beach

Fatma Gunay Bendas, Washington and Lee University

Michael Hammock, Middle Tennessee State University

Michele Hampton, Cuyahoga Community College

Moonsu Han, North Shore Community College

F. Andrew Hanssen, Clemson University

David Harris, Benedictine College

Robert Harris, Indiana University-Purdue University Indianapolis

Julia Heath, University of Cincinnati

Jolien Helsel, Youngstown State University

Matthew Henry, Cleveland State University

Thomas Henry, Mississippi State University

David Hewitt, Whittier College

Wayne Hickenbottom, University of Texas, Austin

Michael Hilmer, San Diego State University

John Hilston, Brevard College

Naphtali Hoffman, Elmira College and Binghamton University

Kim Holder, University of West Georgia

Robert Holland, Purdue University

James A. Hornsten, Northwestern University

Gail Hoyt, University of Kentucky

Jim Hubert, Seattle Central Community College

Scott Hunt, Columbus State Community College

Kyle Hurst, University of Colorado, Denver

Ruben Jacob-Rubio, University of Georgia

Joyce Jacobsen, Wesleyan University

Kenneth Jameson, University of Utah

Andres Jauregui, Columbus State University

Sarah Jenyk, Youngstown State University

Robert Jerome, James Madison University

Deepak Joglekar, University of Connecticut

Paul Johnson, Columbus State University

Ted Joyce, City University of New York

David Kalist, Shippensburg University

Lilian Kamal, University of Hartford*

Leonie Karkoviata, University of Houston, Downtown

Kathy Kelly, University of Texas, Arlington

Colin Knapp, University of Florida

Yilmaz Kocer, University of Southern California

Ebenezer Kolajo, University of West Georgia

Janet Koscianski, Shippensburg University

Robert Krol, California State University, Northridge

Daniel Kuester, Kansas State University

Patricia Kuzyk, Washington State University

Sumner La Croix, University of Hawaii

Rose LaMont, Modesto Community College

Carsten Lange, California State University, Pomona

Vicky Langston, Columbus State University

Susan Laury, Georgia State University

Sang Lee, Southeastern Louisiana University

Phillip K. Letting, Harrisburg Area Community College

John Levendis, Loyola University

Steven Levkoff, University of California, San Diego

Dennis P. Leyden, University of North Carolina, Greensboro

Gregory Lindeblom, Brevard College

Alan Lockard, Binghamton University

Joshua Long, Ivy Technical College

Linda Loubert, Morgan State University

Heather Luea, Kansas State University

Rita Madarassy, Santa Clara University

James Makokha, Collin County Community College

Liam C. Malloy, University of Rhode Island

Paula Manns, Atlantic Cape Community College

Vlad Manole, Rutgers University

Hardik Marfatia, Northeastern Illinois University

Lawrence Martin, Michigan State University

Norman Maynard, University of Oklahoma

Katherine McClain, University of Georgia

Scott McGann, Grossmont College

Kim Marie McGoldrick, University of Richmond

Shah Mehrabi, Montgomery Community College

Saul Mekies, Kirkwood Community College

Kimberly Mencken, Baylor University

Diego Mendez-Carbajo, Illinois Wesleyan University

Catherine Middleton, University of Tennessee, Chattanooga

Nara Mijid, Central Connecticut State University

Laurie A. Miller, University of Nebraska, Lincoln

Edward Millner, Virginia Commonwealth University

Ida Mirzaie, Ohio State University

David Mitchell, Missouri State University, Springfield

Michael Mogavero, University of Notre Dame

Robert Mohr, University of New Hampshire

Barbara Moorem, University of Central Florida

Thaddeaus Mounkurai, Daytona State College

Lee Myoung, University of Missouri, Columbia

Usha Nair-Reichert, Emory University

Excerpt

Camille Nelson, Oregon State University

Michael Nelson, Oregon State University

John Neri, University of Maryland

Andre Neveu, James Madison University

Jinlan Ni, University of Nebraska, Omaha

Eric Nielsen, St. Louis Community College

Jaminka Ninkovic, Emory University

Chali Nondo, Albany State University

Richard P. Numrich, College of Southern Nevada

Andrew Nutting, Hamilton College

Grace O, Georgia State University

Norman Obst, Michigan State University

Scott Ogawa, Northwestern University

Lee Ohanian, University of California, Los Angeles

Paul Okello, Tarrant County College

Ifeakandu Okoye, Florida A&M University

Alan Osman, Ohio State University

Tomi Ovaska, Youngstown State University

Caroline Padgett, Francis Marion University

Peter Parcells, Whitman College

Cynthia Parker, Chaffey College

Mohammed Partapurwala, Monroe Community College

Robert Pennington, University of Central Florida

Kerk Phillips, Brigham Young University

Goncalo Pina, Santa Clara University

Michael Podgursky, University of Missouri

Greg Pratt, Mesa Community College

Guangjun Qu, Birmingham-Southern College

Fernando Quijano, Dickinson State University

Joseph Quinn, Boston College

Reza Ramazani, Saint Michael's College

Ranajoy Ray-Chaudhuri, Ohio State University

Mitchell Redlo, Monroe Community College

Javier Reyes, University of Arkansas

Teresa Riley, Youngstown State University

Nancy Roberts, Arizona State University

Malcolm Robinson, Thomas More College

Randall Rojas, University of California, Los Angeles

Sudipta Roy, Kankakee Community College

Jared Rubin, Chapman University

Jason C. Rudbeck, University of Georgia

Melissa Rueterbusch, Mott Community College

Mariano Runco, Auburn University at Montgomery

Nicholas G. Rupp, East Carolina University

Steven Russell, Indiana University-Purdue University-Indianapolis

Michael Ryan, Western Michigan University

Ravi Samitamana, Daytona State College

David Sanders, University of Missouri, St. Louis

Michael Sattinger, State University of New York, Albany

Anya Savikhin Samek, University of Wisconsin, Madison

Peter Schuhmann, University of North Carolina, Wilmington

Robert M. Schwab, University of Maryland

Jesse Schwartz, Kennesaw State University

James K. Self, Indiana University, Bloomington

Mark Showalter, Brigham Young University, Provo

Dorothy Siden, Salem State University

Mark V. Siegler, California State University, Sacramento

Timothy Simpson, Central New Mexico Community College

Michael Sinkey, University of West Georgia

John Z. Smith, Jr., United States Military Academy, West Point

Thomas Snyder, University of Central Arkansas

Joe Sobieralski, Southwestern Illinois College

Sara Solnick, University of Vermont

Martha Starr, American University

Rebecca Stein, University of Pennsylvania

Liliana Stern, Auburn University

Adam Stevenson, University of Michigan

Cliff Stone, Ball State University

Mark C. Strazicich, Appalachian State University

Chetan Subramanian, State University of New York, Buffalo

AJ Sumell, Youngstown State University

Charles Swanson, Temple University

Tom Sweeney, Des Moines Area Community College

James Swofford, University of South Alabama

Vera Tabakova, East Carolina University

Emily Tang, University of California, San Diego

Mark Tendall, Stanford University

Jennifer Thacher, University of New Mexico

Charles Thomas, Clemson University

Rebecca Thornton, University of Houston

Jill Trask, Tarrant County College, Southeast

Steve Trost, Virginia Polytechnic Institute and State University

Ty Turley, Brigham Young University

Nora Underwood, University of Central Florida

Mike Urbancic, University of Oregon

Don Uy-Barreta, De Anza College

John Vahaly, University of Louisville

Ross Van Wassenhove, University of Houston

Don Vandegrift, College of New Jersey

Nancy Virts, California State University, Northridge

Cheryl Wachenheim, North Dakota State College

Jeffrey Waddoups, University of Nevada, Las Vegas

Donald Wargo, Temple University

Charles Wassell, Jr., Central Washington University

Matthew Weinberg, Drexel University

Robert Whaples, Wake Forest University

Elizabeth Wheaton, Southern Methodist University

Mark Wheeler, Western Michigan University

Anne Williams, Gateway Community College

Brock Williams, Metropolitan Community College of Omaha

DeEdgra Williams, Florida A&M University

Brooks Wilson, McLennan Community College

Mark Witte, Northwestern University

Katherine Wolfe, University of Pittsburgh

William Wood, James Madison University

Steven Yamarik, California State University, Long Beach

Bill Yang, Georgia Southern University

Young-Ro Yoon, Wayne State University

Madelyn Young, Converse College

Michael Youngblood, Rock Valley College

Jeffrey Zax, University of Colorado, Boulder

Martin Zelder, Northwestern University

Erik Zemljic, Kent State University

Kevin Zhang, Illinois State University

PX0567-028

Excerpt

Pearson would like to thank and acknowledge the following people for their work on the Global Edition:

# Contributors

Tan Khay Boon, SIM University, Singapore
Yuka Chan, The Open University of Hong Kong
Touchanun Komonpaisarn, Chulalongkorn University, Thailand
Madhav Raghavan, Indian Statistical Institute, India

# Reviewers

Ng Huey Chyi, Taylor's University, Malaysia
Erkan Ilgun, International Burch University, Bosnia and Herzgovina
Simone Salotti, Oxford Brookes University, U.K.

PX0567-029

Excerpt

PX0567-030

Excerpt

# Microeconomics: Flexibility Chart

| Traditional Approach | Theoretical Approach | Applied Approach |
|---|---|---|
| **Chapter 1:** The Principles and Practice of Economics | **Chapter 1:** The Principles and Practice of Economics | **Chapter 1:** The Principles and Practice of Economics |
| **Chapter 2:** Economic Methods and Economic Questions (optional) | **Chapter 2:** Economic Methods and Economic Questions | **Chapter 2:** Economic Methods and Economic Questions (optional) |
| **Chapter 2 Appendix:** Constructing and Interpreting Graphs | **Chapter 2 Appendix:** Constructing and Interpreting Graphs | **Chapter 2 Appendix:** Constructing and Interpreting Graphs |
| **Chapter 3:** Optimization: Doing the Best You Can (optional) | **Chapter 3:** Optimization: Doing the Best You Can | **Chapter 3:** Optimization: Doing the Best You Can (optional) |
| **Chapter 4:** Demand, Supply, and Equilibrium | **Chapter 4:** Demand, Supply, and Equilibrium | **Chapter 4:** Demand, Supply, and Equilibrium |
| **Chapter 5:** Consumers and Incentives | **Chapter 5:** Consumers and Incentives<br><br>**Chapter 5 Appendix:** Representing Preferences with Indifference Curves | **Section 5.4:** Consumer Surplus (optional)<br><br>**Section 5.6:** Demand Elasticities (optional) |
| **Chapter 6:** Sellers and Incentives | **Chapter 6:** Sellers and Incentives<br><br>**Chapter 6 Appendix:** When Firms Have Different Cost Structures | **Section 6.4:** Producer Surplus (optional) |
| **Chapter 7:** Perfect Competition and the Invisible Hand | **Chapter 7:** Perfect Competition and the Invisible Hand | **Chapter 7:** Perfect Competition and the Invisible Hand |
| **Chapter 8:** Trade | **Chapter 11:** Markets for Factors of Production | **Chapter 8:** Trade |
| **Chapter 9:** Externalities and Public Goods | **Chapter 12:** Monopoly | **Chapter 9:** Externalities and Public Goods |
| **Chapter 10:** The Government in the Economy: Taxation and Regulation | **Chapter 13:** Game Theory and Strategic Play | **Chapter 10:** The Government in the Economy: Taxation and Regulation |
| **Chapter 11:** Markets for Factors of Production | **Chapter 14:** Oligopoly and Monopolistic Competition | **Chapter 11:** Markets for Factors of Production (optional) |
| **Chapter 12:** Monopoly | **Chapter 8:** Trade | **Chapter 12:** Monopoly |
| **Chapter 13:** Game Theory and Strategic Play | **Chapter 9:** Externalities and Public Goods | **Chapter 13:** Game Theory and Strategic Play |
| **Chapter 14:** Oligopoly and Monopolistic Competition | **Chapter 10:** The Government in the Economy: Taxation and Regulation | **Chapter 14:** Oligopoly and Monopolistic Competition |
| **Chapter 15:** Trade-offs Involving Time and Risk (optional) | **Chapter 15:** Trade-offs Involving Time and Risk (optional) | **Chapter 15:** Trade-offs Involving Time and Risk (optional) |
| **Chapter 16:** The Economics of Information (optional) | **Chapter 16:** The Economics of Information (optional) | **Chapter 16:** The Economics of Information (optional) |
| **Chapter 17:** Auctions and Bargaining (optional) | **Chapter 17:** Auctions and Bargaining (optional) | **Chapter 17:** Auctions and Bargaining (optional) |
| **Chapter 18:** Social Economics (optional) | **Chapter 18:** Social Economics (optional) | **Chapter 18:** Social Economics (optional) |

12.1

12.2

12.3

**12.4**

12.5

12.6

12.7

# 12.4 Choosing the Optimal Quantity and Price

We learned in Chapter 6 that a perfectly competitive firm must consider both marginal cost and marginal revenue when making its production decision. A monopolist is no different. Thus, to help in your Claritin pricing decision, columns 5–8 in Exhibit 12.5 include production cost information alongside Claritin revenue information.

## Producing the Optimal Quantity

Let's begin by looking just at marginal revenue and marginal cost, as depicted in Exhibit 12.8. Assume that you choose to produce at quantity level $Q_L$ which is 300 million. At this level of production, $MR > MC$, specifically, \$3 > \$1. Thus, if you produce one more unit of Claritin, your additional revenue exceeds the additional cost of making the allergy pill. So you should definitely produce one more pill at $Q_L$ because your profits will be enhanced by doing so. With this same reasoning, you can see that you should continue to expand production provided that $MR > MC$. You stop increasing production when you reach the point of $MR = MC$, or at 500 million units. Similar logic can be applied if you initially begin producing at $Q_H$ in Exhibit 12.8. Because $MC > MR$ at this point, the last unit costs more to produce than the additional revenue it brought in, serving to lower profits. You can do better by decreasing production to the point of $MR = MC$.

This reasoning shows that your profit-maximizing level of output produced is given by the intersection of the $MR$ and $MC$ curves. As we learned in Chapter 6, this rule is identical for sellers in a perfectly competitive industry, who produce at the point of $MC = MR = P$. There is one important difference, though: whereas firms in a perfectly competitive industry are *price-takers*, monopolists are *price-makers*—they set the price for their goods or services because there are no competitors. In this sense, after you determine how much to produce, you as a monopolist need to determine where to set Claritin's price.

## Setting the Optimal Price

Now that you have figured out the optimal quantity, how do you start to think about where to set the price for Claritin? Your intuition tells you that if millions of people desperately want Claritin, you should set a very high price, whereas if only a few thousand people are vaguely interested in Claritin, you should set a low price. This intuition is spot-on in that



**Exhibit 12.8 Marginal Revenue and Marginal Cost for Claritin**

If Schering-Plough produces at $Q_L$ then the 300 millionth pill will earn \$3 in additional revenue (marginal revenue) and cost \$1 to produce. At this point Schering-Plough should expand production. Why? It will earn more profits! By the same logic, consider $Q_H$, where Schering-Plough is producing so many units that the marginal cost exceeds the marginal revenue. The last unit of production costs more to produce than it generate in revenue.

PX0567-032



One way for you to ease the pain of allergy season is to purchase allergy drugs, such as Claritin.

12.1
12.2
12.3
**12.4**
12.5
12.6
12.7

your pricing decision is, in fact, critically linked to the nature of the market demand curve.

In Exhibit 12.9, we graph the demand curve, the *MR* curve, and the *MC* curve. Once we have found the quantity level where $MR = MC$, your job as the monopolist is to choose the highest possible price that permits you to sell the entire quantity that you have produced. Graphically, you can find this price by using the demand curve.

As shown by the vertical arrow in Exhibit 12.9, you determine Claritin's price by looking at the demand curve to see what price consumers are willing to pay for the quantity you put on the market. Following the arrows in Exhibit 12.9, you see that you maximize your firm's profits by setting a price of $3.50 because this is the highest price that you can charge and still sell the 500 million pills that you have produced (if you search the Web, you might find that Internet prices for a Claritin pill are currently around $0.50 per pill; for illustrative purposes, we chose our equilibrium price to be in the range of observed prices over the lifetime of the Claritin patent).

The following simple flow chart provides the steps to the production and pricing decisions facing the monopolist:



You will likely note that this approach is quite similar to the decision making of our perfectly competitive firm in Chapter 6, but with one major difference: price is set at a level higher than marginal cost for a monopolist, whereas price is equal to marginal cost for a perfectly competitive firm.

In sum, the optimal pricing decision rules are as follows:

Monopolist: Set $P > MR = MC$;   Perfectly competitive firm: $P = MR = MC$.

**Price is set at a level higher than marginal costs for a monopolist, whereas price is equal to marginal cost for a perfectly competitive firm.**

Note that the marginal decision making concerning the level of production is identical across these two market structures: expand production until $MC = MR$. The major difference arises from the fact that the firm in a competitive industry does not set its price (the market does), whereas the monopolist sets price based on the market demand curve. By inspection of Exhibit 12.9, we can see that the monopolist sets a price that is on the elastic portion of the demand curve (recall from Chapter 5 that the top half of a linear demand curve is elastic).

**Exhibit 12.9 Choosing the Profit-Maximizing Price for Claritin**

Schering-Plough expands production until $MC = MR$. To determine the price that maximizes profits, it goes directly upward to the demand curve and over to the y-axis (the pr ce axis) to determine the profit-maximizing price. In this case, a price of $3.50 is the profit-maximizing price for Schering-Plough.



12.1

12.2

12.3

**12.4**

12.5

12.6

12.7

### How a Monopolist Calculates Profits

How much will your company earn in economic profits from Claritin if you follow this optimal decision rule? Computing economic profits for a monopoly works exactly the same as computing economic profits for a perfectly competitive firm:

Profits = Total revenue − Total cost = $(P \times Q) - (ATC \times Q) = (P - ATC) \times Q$.

Taking the numbers from Exhibit 12.5, we can compute monopoly profits in equilibrium. Exhibit 12.10 graphically depicts the total profits with the green-shaded area. To summarize how we obtain this green-shaded area, we begin by finding the point where $MC = MR$. This gives us the profit-maximizing output of 500 million units. Moving upward from this point to the demand curve, we find the profit-maximizing price of $3.50. At that quantity, subtracting the average total cost of $1.02 from the $3.50 price gives us $2.48 of profits per unit sold. We then multiply this number by 500 million units to obtain total economic profits of $1.24 billion or

$1,240,000,000 = Total revenue − Total cost = ($3.50 − $1.02) × 500,000,000.

As we discussed earlier, in perfectly competitive markets entry causes long-run economic profits to be zero. With a monopoly, economic profits remain. This is because there is no threat of entry from competitors because of barriers to entry. Therefore, there are no new entrants to increase supply and push price down to eliminate economic profits.

### Does a Monopoly Have a Supply Curve?

At this point, you may have found it curious that there has been no mention of monopoly supply curves. After all, Exhibit 12.9 shows the price and quantity combination at which a monopolistic firm will produce by using only the marginal revenue, marginal cost, and demand curves. No supply curve! The reason is simple: monopolists, unlike sellers in competitive markets, do not have a supply curve.

To understand why this is the case, first consider what the supply curve of a competitive market represents. To create a supply curve under perfect competition, it is necessary for firms to be price-*takers*, whose production is based on the *given* market price. Under this assumption, we simply determine the quantity at which the marginal cost of producing the last unit of a good is equal to the market price. Thus, in a competitive market, a supply curve shows all of the price and quantity combinations at which firms will produce.

Monopolists, as price-*makers*, do not vary their production based on market price because *they set the price*; it makes no sense to ask how much of a good a monopolist will produce at a given price. Like sellers in competitive markets, monopolists will produce at



**Exhibit 12.10 Computing Profits for a Monopolist**

Similar to the perfectly competitive firm, Schering-Plough computes profits as quantity times the difference between price and *ATC* [profits = quantity × (*P* − *ATC*)]. In this case, the green rectangle shows profits, which equals the difference between the price of each pill ($3.50) and the *ATC* ($1.02), multiplied by 500 million.

the point where their marginal revenue is equal to their marginal cost. But as you have just learned, marginal revenue is dependent upon the negatively sloped demand curve that the monopolist faces. Because a monopolist's production decision is based on demand, it cannot be depicted as an independent supply curve.

## 12.5 The "Broken" Invisible Hand: The Cost of Monopoly

In Chapter 7, we learned that the invisible hand creates harmony between individual and social interests. Such synchronization has the very attractive feature that social surplus is maximized in the competitive equilibrium. The power of the invisible hand is such that even in markets composed of only self-interested people, the overall well-being of society is maximized. One important factor that can "break" the powerful result of the invisible hand is market power. A firm that exercises market power causes a reallocation of resources toward itself, thereby sacrificing social surplus.

> **A firm that exercises market power causes a reallocation of resources toward itself, thereby sacrificing total surplus.**

One way to think about this is to consider the market for Claritin before and after Schering-Plough's patent expired. In 1981, Schering-Plough was awarded a monopoly, in the form of a patent, on Claritin. Twenty years later, Schering-Plough's monopoly rights expired, and generic prescription drug companies could suddenly enter the market and sell close substitutes, such as Allegra.[2] This entry process drastically changed the market for Claritin in a number of ways.

Panel (a) of Exhibit 12.11 shows the long-run equilibrium of the market after entry by competitive firms when Claritin's patent expired. Firms have a constant marginal cost curve, so $ATC = MC$. You might wonder about fixed costs. Recall that since we are in the long run there are no fixed costs.



**Exhibit 12.11 Surplus Allocations: Perfect Competition Versus Monopoly**

Panel (a) shows the consumer surplus from a perfectly competitive market, which is the area under the demand curve and above the market price. Panel (b) shows what happens to consumer surplus when the monopoly maximizes its profits: consumer surplus is substantially reduced, with some of it going to the monopoly, and another large piece that is a deadweight loss (DWL).

PX0567-035

# PX0568

5/15/2024 10:50 PM                                              Spam-Fighting Startup Impermium Joins Google, Discontinues Third-Party Services | TechCrunch

Startups

# Spam-Fighting Startup Impermium Joins Google, Discontinues Third-Party Services

**Kim-Mai Cutler** / 3:33 PM PST • January 15, 2014

💬 Comment



Impermium, a cybersecurity startup that was backed by top funds like Accel and Greylock, is joining Google. They had raised $9 million in funding from Highland Capital Partners, the Social+Capital Partnership, AOL Ventures, Charles River Ventures, Freestyle, Greylock and angels like Matt Ocko.

We are trying to figure out whether this was an acquisition, an acqui-hire or whether Impermium's employees are just joining Google. Google has not returned a request for comment, although vice president of Google+ Bradley Horowitz posted a status update earlier today that said, "Google's spam and abuse teams are industry-leading and world-class. Impermium should fit right in."

The company had been building a risk-evaluation platform that would improve account management by identifying fraudulent registrations, compromised logins, and risky transactions. Impermium sent out a message to its customers saying that it will shut down offering services to third-party websites. But we hear that the team will still be working on the same core problems and technology over at Google.

This is a statement that appeared on their website just minutes ago:

When we founded Impermium three years ago, our mission was to help rid the web of spam, fraud, and abuse. As sites gain in popularity, criminals and miscreants are never far behind, and Impermium has worked hard to defend some of the largest and fastest-

further our mission and help make the Internet a safer place. We're excited about the possibilities.

We'd like to extend a special thank you to all of our customers and partners. Your support and feedback were invaluable, and we're glad to have been a part of your growth. We'd also like to thank our invaluable investors, advisors, and supporters, including Accel Partners, AOL Ventures, Charles River Ventures, Data Collective, Freestyle Capital, Greylock Partners, Highland Capital Partners, Morado Ventures, and the Social+Capital Partnership.



**TechCrunch Disrupt 2024**
**Join 10,000 Startup Leaders**

Innovation For Every Stage San Francisco, October 28–30

**Register Now**

PX0568-001

# PX0569

# Fighting spam at Pinterest



**Pinterest Engineering** · Follow
Published in **Pinterest Engineering Blog** · 3 min read · Feb 20, 2015

👏 4        💬 1                              🔖⁺   ▶   ⬆

Marty Weiner | Pinterest engineering manager, BlackOps

Spammers used to love us, but not anymore.

Pinterest is a great platform to spam because of the large amount of traffic we drive to other sites. Spammers want to divert traffic to their sites so Pinners will fall for scams. To do this, they'll disguise Pins as promising weight loss products, work-from-home opportunities, cheap designer handbags and more. This is where the Pinterest BlackOps team comes in. Our mission isn't to fight spam, but to make it so we don't need to.

To be successful, spammers must make lots of spam and get lots of people to see and click, and all the while without us knowing. A typical spammer will try to look like a good user by making realistic accounts from computers spread all over the world or by hijacking accounts. There are always several subtle flaws that make these spammers stand out, and once we find one, we're able to shut them down. They then evolve their tactics and the race

PX0569-001

begins again. Our job is to be one step ahead of them at all times and make spamming Pinterest unlucrative.





with economic modeling.

To successfully execute against this strategy, we need systems that allow us to observe and respond to an attack quickly and effectively while also not harming good users.

Last year, we began building a new system called Stingray that our spam analysts can use to quickly observe attacks, write rules to respond to them, stop the attack, clean up and evolve, all within minutes. Stingray is a distributed stream processor and rule engine that enables us to react to known malicious behavior in milliseconds. We can even pre-empt attacks if they match signatures along hundreds of different dimensions and stop the

PX0569-002

attack before it starts. Because we architected Stingray with certain fundamental distributed systems guarantees, we'll soon be able to write a rule and easily apply it in the past completely annihilating an attack and the mess it leaves.



Over the last six months we've added a strong integration test environment and comprehensive monitoring everywhere to help us speedily develop and easily detect problems. We made major gains in our operational strategy faster than ever before, and in just a few months:

- The amount of spam reported on Pinterest has nose dived to the point where it's not a useful metric

- Our system now responds twice as fast to internal spam requests

- The number of Pinners who click on spam has dropped in half (from few to even fewer)

- Our system's ability to successfully respond to bad behavior improved from 95 percent to 99.99 percent

PX0569-003

We can dismantle entire attacks in milliseconds, whereas 12 months ago it would have taken us four hours to a day

We fight spam so Pinners can enjoy their experience, but spammers will keep trying to improve as long as we're a great platform for them to showcase their content. As you're reading this, they're mounting a new and improved attack!

If you'd like to learn more about how we fight spam day-to-day, I made a short documentary. For more information on staying safe on Pinterest as a Pinner, check out our Help Center.

If you'd like to wage war with us, we always need very strong generalists with a passion for building and architecting large complex distributed systems. Join our Black Ops team!

PX0569-004

*Marty Weiner is a manager on the Black Ops team*

*For Pinterest engineering news and updates, follow our engineering Pinterest, Facebook and Twitter. Interested in joining the team? Check out our Careers site.*

Pinterest    Startup    Security



## Written by Pinterest Engineering

Follow

55K Followers · Editor for Pinterest Engineering Blog

https://medium.com/pinterest-engineering | Inventive engineers building the first visual discovery engine https://careers.pinterest.com/

**More from Pinterest Engineering and Pinterest Engineering Blog**

PX0569-005



  

Ⓟ **Pinterest Engineering** in **Pinterest Engineering Blog**

Ⓟ **Pinterest Engineering** in **Pinterest Engineering Blog**

## How we built Text-to-SQL at Pinterest

## HBase Deprecation at Pinterest

Adam Obeng | Data Scientist, Data Platform Science; J.C. Zhong | Tech Lead, Analytics...

Alberto Ordonez Pereira | Senior Staff Software Engineer; Lianghong Xu | Senior...

8 min read · Apr 2, 2024

6 min read · 2 days ago

🖐 1.7K   💬 18

🖐 104   💬 1







Ⓟ **Pinterest Engineering** in **Pinterest Engineering Blog**

Ⓟ **Pinterest Engineering** in **Pinterest Engineering Blog**

## User Action Sequence Modeling for Pinterest Ads Engagement...

## Web Performance Regression Detection (Part 1 of 3)

Yulin Lei | Senior Machine Learning Engineer; Kaili Zhang | Staff Machine Learning Enginee...

Michelle Vu | Web Performance Engineer

10 min read · Mar 5, 2024

3 min read · Apr 22, 2024

 124   💬 2

🖐 102   💬

PX0569-006

5/15/24, 10:54 PM                    Fighting spam at Pinterest | by Pinterest Engineering | Pinterest Engineering Blog | Medium

See all from Pinterest Engineering    See all from Pinterest Engineering Blog

## Recommended from Medium



 Pinterest Engineering  in Pinterest Engineering Blog

### Pacer: Pinterest's New Generation of Asynchronous Computing...

Qi Li | Software Engineer, Core-Services;
Zhihuang Chen | Software Engineer, Core-...

8 min read · May 23, 2023

83



 Malay Haldar in The Airbnb Tech Blog

### Learning To Rank Diversely

by Malay Haldar, Liwei He & Moose Abdool

6 min read · Jan 30, 2023

293    11

## Lists


**Business 101**
25 stories · 926 saves


**Growth Marketing**
11 stories · 135 saves


**Intro to People Ops: Not Your Mama's HR**


**How to Find a Mentor**
11 stories · 543 saves

https://medium.com/pinterest-engineering/fighting-spam-at-pinterest-78f4e7dc4727

PX0569-007

8 stories · 81 saves









Ching (Chingis)

## ML for Ranking System in Search System: Comprehensive Overview

Learning to Rank

✦ · 8 min read · Nov 27, 2023

👏 26    💬

Theo Wolf in Towards Data Science

## Kolmogorov-Arnold Networks: the latest advance in Neural Network...

The new type of network that is making waves in the ML world.

✦ · 9 min read · 3 days ago

👏 760    💬 11

PX0569-008





 Stewart Butterfield

Avi Siegel in Entrepreneurship Handbook

## We Don't Sell Saddles Here

The memo below was sent to the team at Tiny Speck, the makers of Slack, on July 31st, 201...

12 min read · Feb 17, 2014

## Everybody Hates the Product Manager—Good

If people like you, you're doing it wrong

✦ · 12 min read · 5 days ago

✋ 25K   ○ 80                                          🔖⁺

✋ 378   ○ 6                                           🔖⁺

See more recommendations

PX0569-009

# PX0570

5/15/24, 10:55 PM                    Industry leading IP Geolocation databases and web services | MaxMind



# IP Geolocation and Intelligence Databases and Web Services

## Leverage the power of GeoIP® data to gain a deeper understanding of your online visitors and tailor their experience.

Personalize location-specific content and ads, analyze web traffic, and optimize internet routing. Obtain valuable insights into connection speeds, ISPs, and more. GeoIP data is available in multiple formats, easily integrated into existing systems, applications, and workflows.



PX0570-001

Industry leading IP Geolocation databases and web services | MaxMind



# GeoIP Databases

Access GeoIP data as a database that you can host locally. Eliminate network latency and per-query charges. The databases offer valuable data points for a variety of use cases, and are updated regularly.

Learn more



PX0570-002

# GeoIP Web Services 

Access our most accurate GeoIP data available, hosted, maintained, and updated regularly on secure MaxMind servers. Available through an API with a 99.99% uptime for 9 years straight, with low latency and high reliability.

Learn more



## GeoIP Enterprise Database

A comprehensive solution tailored for today's enterprise. Access highly accurate and in-depth geolocation data, for content personalization targeted advertising, and compliance. Access all the information available in our standard database, plus confidence data for location values, and the user type associated with an IP address such as business, residential, cellular, traveler, government entity, and more. The database is available in multiple formats and can be integrated into various applications and systems.

Learn more

PX0570-003



# GeoLite Free IP Geolocation Data

Access IP geolocation databases and web services free of charge. Our free GeoLite services have the same integration steps as our paid databases and web services, making it extremely easy to upgrade to our paid data.

Learn more

## Did you know?

If you're building an integration or application that uses MaxMind's GeoIP for IP geolocation and proxy detection, or MaxMind's minFraud services for fraud detection, you can apply to become a MaxMind affiliate and earn a commission from customers you refer.

Learn more

PX0570-004

Industry leading IP Geolocation databases and web services | MaxMind

# Explore more from MaxMind

## How accurate is IP geolocation?

Common assumptions about how IP geolocation works

Learn more

## IP intelligence data

The different kinds of IP intelligence data offered by MaxMind

Learn more

## Proxy detection

Detect proxy users, manage access, and prevent online fraud

Learn more

 

**PRODUCTS**

minFraud Services

**SUPPORT**

Knowledge Base

minFraud

**DEVELOPERS**

Developer Portal

minFraud

**COMPANY**

About MaxMind

Working at MaxMind

PX0570-005

GeoIP2 Commercial Licensing

GeoIP2 Anonymous IP Database

GeoIP2 Enterprise Database

GeoIP2 Web Services

GeoIP2 Databases

GeoLite2 Free Geolocation Data

Affiliate Program

GeoIP

System Status ✅

GeoIP Data Correction Request

Your Privacy Choices                    ✕

Notice of Collection

GeoIP

Affiliate Program

Commitment to Security

Charitable Giving

Contact Us

© 2024 MaxMind, Inc. MaxMind, GeoIP, minFraud, and related trademarks belong to MaxMind, Inc.

Terms of Use  |  Privacy Policy

PX0570-006

# PX0571



**New Feature**   Fraud Guard

# Multichannel authentication at scale with Verify

A fully managed turnkey API that verifies users over multiple channels at scale — handling 3.5M+ verifications each year.

Start for free

Talk to sales

COOKIE PREFERENCES

PX0571-001











# A multi-channel user verification solution in one turnkey API

Add seamless two-factor authentication to your onboarding and login flow with a single API that does the work of a full one-time password (OTP) delivery solution.

COOKIE PREFERENCES

PX0571-002

5/15/24, 10:56 PM    Verify API | Twilio





**New Feature**

# 100% Protection from SMS pumping fraud with Fraud Guard

Fraud Guard has already saved customers over $45.5 million by blocking over 398 million* fraud attempts. With first-to-market innovation, Fraud Guard offers 100% protection against SMS pumping fraud.

Learn more about Fraud Guard

# Reduce fraud at scale without the workload



PX0571-003





## Build with out-of-the-box convenience

Quickly integrate a ready-use solution that handles all your connectivity, channels, code generation, fraud monitoring, and more using native software—so you don't have to.

## Mitigate fraud seamlessly

Reduce fraud across your multi-channel user experience with phone number verification that uses one API endpoint to validate users and detect fraud with minimal friction.

## Optimize OTP conversions



PX0571-004



Use cases

# Seamless user authentication for your whole customer journey



## Onboarding and signup

Offer a seamless, secure experience across channels that prevents fake account creation and drives conversions.



## Logging in

Protect your authentication flows to prevent account takeovers, and bolster end-user trust and loyalty.

PX0571-005



## Transacting



## Managing accounts

Validate password resets, device changes, user reactivation, and other account changes to boost retention.



## Confirming number and email owners

Confirm possession of phone numbers and emails to ensure reliable end-user communication at scale.



## Fraud Guard

Block fraud by detecting artificially-inflated SMS traffic with automated, built-in fraud detection tools.



PX0571-006



Scalable    Secure    Simple

## Scalable

Skip the challenges of scaling with an API that validates over 4.5 billion users per year—including for Black Friday and the Super Bowl.

✓ Send personalized messages globally using a certified pool of high-capacity numbers pre-provisioned for Verify API.

✓ Improve delivery rates with carrier-approved messages templates that automatically translate across 42 languages.

✓ Optimize customer experience, conversions, and security using built-in tools for compliance, analytics, and reporting.

Explore Verify API docs

COOKIE PREFERENCES

PX0571-007





COOKIE PREFERENCES

PX0571-008

5/15/24, 10:56 PM                                        Verify API | Twilio





# Offer users a convenient security experience with Twilio Authy

Simplify your users' verification process with the top consumer authentication app, Twilio Authy. Works with Verify API to support multi-device syncing, cloud backups, and fast account recovery across channels, including push and TOTP.

[Download for Android, iOS, and desktop.](Download for Android, iOS, and desktop.)

*"Twilio Verify greatly reduces our own support costs, over other verific methods. It's a no brainer … having Twilio as the backend for our authe just allows us to keep growing without any concern"*

COOKIE PREFERENCES

PX0571-009



←  →

**Pricing**

# Reduce fraud and overhead with a fully-managed verification API

Sign up for free to start building without commitments. Only pay for each successful verification with Twilio's flexible pay as you go pricing.

See pricing

Start for free

*based on Twilio's publicly available price list as of 7/14/2023

COOKIE PREFERENCES

PX0571-010

# PX0572

# Sign in with Google

## What Sign in with Google does

**Important:** To use Sign in with Google, you need a Google Account. Your Google Account is the same account you use for Gmail, Drive, and other Google apps.

Sign in with Google helps you easily and securely sign in to third-party apps or services with your Google Account. When you use Sign in with Google, you don't have to enter a username and password repeatedly across different services.

**Tips:**

- Third parties are companies or developers that aren't Google. Only share your data with third parties you trust.
- If you have trouble with access to your Google Account, you can learn more about how to recover your Google Account or Gmail.

## Different ways to sign in

You can use your Google Account to sign into third-party apps or services in 3 ways. These are all methods to use your Google Account to sign in:

- Sign in with Google button
- Google sign-in prompt
- Automatic Sign-in

Sign in with Google button

Google sign-in prompt

Automatic Sign-in

## Why use Sign in with Google

Sign in with Google makes it easy for you to sign in and sign up to websites and apps across the internet with the trusted security of your Google Account. It eliminates your dependency on passwords, which reduces the frustrations and security risks associated with them.

Improved security

Easy to use

Preserve your privacy

Sign In Everywhere

## How Sign in with Google works

Sign in with Google offers an easier way to log into different sites across the internet. If you have questions on what Sign in with Google offers, learn more with the questions below.

PX0572-001

Sign in with Google - Google Account Help

How do I disable the Sign in with Google sign-in prompts?

Can I use Sign in with Google if I don't have a Google Account?

What if I'm logged out of my Google Account when I want to use Sign in with Google?

If I have more than one Google Account, how does Sign in with Google work?

Does it matter if I already have an account on the third-party app?

What happens if I delete my Google Account?

What happens if I delete my third party account?

How do I keep track of where I use Sign in with Google?

How do I stop using Sign in with Google?

What happens when I use Sign in with Google?

---

### Need more help?
Try these next steps:

**Post to the help community**
Get answers from community members

PX0572-002

# PX0573



Documentation / ⋯ / Authenticating users with Sign in with Apple                    API Changes: None

**Article**

# Authenticating users with Sign in with Apple

Securely authenticate users and create accounts for them in your app.

## Overview

Sign in with Apple lets users log in to your app across all of your platforms using their two-factor authentication Apple ID. After the user chooses to use Sign in with Apple to log in, your app receives tokens and user information that you can verify from a server.

When the user attempts to sign in using Sign in with Apple, the sequence in the following diagram begins:



You may group apps in your developer account for Sign in with Apple so an app only requests information the first time the user logs in. A simple confirmation to continue appears even if the app bundle IDs are different across systems, such as iOS, macOS, and the web.

PX0573-001

# Authenticate the user and request information

Initialize an authentication session with your app server and associate a client session with an ID token using the `nonce` value. You can request to receive the user's information, such as name and email address. If the user approves accessing this information, your authorization request includes the requested information.

Sign in with Apple protects user accounts by using two-factor authentication. Users that log in to an Apple device can quickly sign in to your app in the following ways:

- With Face ID or Touch ID on passcode-protected devices

- With a passcode, if Touch ID or Face ID isn't available

- With an Apple ID password, if the passcode isn't set

Native apps only allow the signed-in iCloud user to use Sign in with Apple. Web-based interactions allow logins using any Apple ID.

> **Note**
>
> On non-Apple devices, users must log in with their Apple ID, password, and two-factor authentication code.

Apple determines whether a user is a real person by combining on-device machine learning, account history, and hardware attestation using privacy-preserving mechanisms. There are three possible values when determining whether a user is a real person:

**2** (or `LikelyReal`)

The user appears to be a real person, and you can treat this account as a valid user. You can skip any additional fraud verification checks or CAPTCHAs that your app normally uses. For more information, see `ASUserDetectionStatus.likelyReal`.

**1** (or `Unknown`)

The system can't determine whether the user is a real person. The server may return this value if status determination takes too long. Treat this user as any other account with limited information that requires additional verification steps. Don't block service, because the user may be a real person. For more information, see `ASUserDetectionStatus.unknown`.

**0** (or `Unsupported`)

Real user status is only available in iOS 14 and later, macOS 11 and later, watchOS 7 and later, and tvOS 14 and later. Previous versions of iOS, macOS, watchOS, tvOS return

PX0573-002

Unsupported. For more information, see `ASUserDetectionStatus.unsupported`.

This system for detecting whether the user is real is tuned for high-precision and moderate recall time. You may also use it as a feature in your own machine-learning models for detecting account fraud.

When someone uses your app and Sign in with Apple for the first time, the identification servers return the user status. Subsequent attempts don't return the user status.

After the user logs in to your app using Sign in with Apple on one of their devices, they can sign in on all of their devices. Deleting your app from a device doesn't affect this capability. If the user reinstalls your app, they can continue to use Sign in with Apple on any of their devices to sign in with their existing account.

# Retrieve the user's information from Apple ID servers

The information you retrieve must include the credentials required to verify the user's identity. The server returns the credentials and user information based on the initial request. The information that returns can include user identity, full name, verified email address, and real user status.

After successfully authenticating the user, the server returns an identity token, authorization code, and user identifier to your app.

The identity token is a JSON Web Token (JWT) and contains the following claims:

`iss`

> The issuer registered claim identifies the principal that issues the identity token. Because Apple generates the token, the value is `https://appleid.apple.com`.

`sub`

> The subject registered claim identifies the principal that's the subject of the identity token. Because this token is for your app, the value is the unique identifier for the user.

`aud`

> The audience registered claim identifies the recipient of the identity token. Because the token is for your app, the value is the `client_id` from your developer account.

`iat`

> The issued at registered claim indicates the time that Apple issues the identity token, in the number of seconds since the Unix epoch in UTC.

`exp`

PX0573-003

The expiration time registered claim identifies the time that the identity token expires, in the number of seconds since the Unix epoch in UTC. The value must be greater than the current date and time when verifying the token.

### nonce

A string for associating a client session with the identity token. This value mitigates replay attacks and is present only if you pass it in the authorization request.

### nonce_supported

A Boolean value that indicates whether the transaction is on a nonce-supported platform. If you send a nonce in the authorization request, but don't see the nonce claim in the identity token, check this claim to determine how to proceed. If this claim returns true, treat nonce as mandatory and fail the transaction; otherwise, you can proceed treating the nonce as optional.

### email

A string value that represents the user's email address. The email address is either the user's real email address or the proxy address, depending on their private email relay service. This value may be empty for Sign in with Apple at Work & School users. For example, younger students may not have an email address.

### email_verified

A string or Boolean value that indicates whether the service verifies the email. The value can either be a string (`"true"` or `"false"`) or a Boolean (`true` or `false`). The system may not verify email addresses for Sign in with Apple at Work & School users, and this claim is `"false"` or `false` for those users.

### is_private_email

A string or Boolean value that indicates whether the email that the user shares is the proxy address. The value can either be a string (`"true"` or `"false"`) or a Boolean (`true` or `false`).

### real_user_status

An Integer value that indicates whether the user appears to be a real person. Use the value of this claim to mitigate fraud. The possible values are: 0 (or `Unsupported`), 1 (or `Unknown`), 2 (or `LikelyReal`). For more information, see `ASUserDetectionStatus`. This claim is present only in iOS 14 and later, macOS 11 and later, watchOS 7 and later, tvOS 14 and later. The claim isn't present or supported for web-based apps.

### transfer_sub

A string value that represents the transfer identifier for migrating users to your team. This claim is present only during the 60-day transfer period after you transfer an app. For more

PX0573-004

information, see Bringing new apps and users into your team.

> **Note**
>
> If the user signs in with a managed Apple ID, the value of the `email` claim is a real email address, not a proxy address. Alternatively, if the managed Apple ID is in Apple School Manager, the `email` claim may be empty. Students, for example, often don't have an email that the school issues.

Use the authorization code to verify the token claims with Apple servers, and exchange them for refresh tokens. For more information, see Generate and validate tokens.

The user identifier has the following characteristics:

- Consists of a unique, stable string, and serves as the primary identifier of the user

- Uses the same identifier across all of the apps in the development team associated with your Apple Developer account

- Differs for the same user across different development teams, and can't identify a user across development teams

- Doesn't change if the user stops using Sign in with Apple with your app and later starts using it again

- Typically stores alongside the user's primary key in your database

Use the user identifier instead of an email address to identify the user. If you request the user's full name, Sign in with Apple collects the information to pass along to your app. The name defaults to the user's name from their Apple ID, but the user can change their name.

> **Important**
>
> Apple doesn't receive the user's full name shared with the system UI. The raw data is passed directly to your app from the browser and is not included in the user's identity token. To help prevent cross-site scripting attacks, validate and sanitize the user-submitted first and last name values before storing on your app servers.

If you request the user's verified email address, Sign in with Apple prompts the user to share it with your app. The user may choose to share their real email address or an anonymous one that

PX0573-005

uses the private email relay service. In both cases, Apple verifies that the email address works and is ready for use.

For more information, see Communicating using the private email relay service.

# Send information to app servers and verify tokens

Ensure that your app relays the credentials and user information to your app servers. The API collects this information and shares it with your app the first time the user logs in using Sign in with Apple. If the user then uses Sign in with Apple on another device, the API doesn't ask for the user's name or email again. It collects the information again only if the user stops using Sign in with Apple and later reconnects to your app.

Although Apple provides the user's email address in the identity token on all subsequent API responses, it doesn't include other information about the user, such as their name. When you receive user information from the API response, immediately store it locally so your app can access it again in the event of a process or network failure.

Your app servers verify the validity of the token credentials with Apple ID servers. For more information, see Verifying a user.

# Prevent duplicate accounts

A user may already have an account in your system, but may attempt to use Sign in with Apple to log in to that account. Sharing the real email address that's associated with the user's Apple ID may not help because it may not be the same email the user uses to create the account with your system. There are a couple of ways you can mitigate this issue:

- Implement the `ASAuthorizationPasswordProvider` class to detect and offer keychain credentials that the system already knows about. This works seamlessly to detect and use existing accounts, and prevents creating new accounts using Sign in with Apple.

- For new accounts that use Sign in with Apple, let the user know that they're creating a new account, and ask if they have any existing accounts to link to.

# See Also

## Authentication and verification of users

PX0573-006

Verifying a user

Check the validity and integrity of a user's identity token.

PX0573-007

# PX0574

**Facebook files** | Facebook

🕐 This article is more than **6 years old**

# Facebook moderators: a quick guide to their job and its challenges

**As the Guardian reveals Facebook's manuals for moderators, find out about who they are and the decisions they make**



📷 Facebook Composite: alamy

**Nick Hopkins**

Sun 21 May 2017 13.00 EDT

Facebook has 4,500 "content moderators" – and recently announced plans to hire another 3,000.

Though Facebook has its own comparatively small in-house moderating team, most of them work for subcontractors. There are moderating hubs around the world, but Facebook refuses to disclose their exact number or locations.

Moderators get two weeks' training plus prescriptive manuals devised by Facebook executives based at the company

PX0574-001

headquarters in Menlo Park, California.

It is these documents that have been leaked to the Guardian.

They show the breadth of the issues being dealt with by Facebook – from graphic violence to terrorism and cannibalism. If Facebook users are talking about a controversial issue, the company has to have a policy on it to guide moderators.

Facebook has automatic systems for rooting out extreme content before it hits the site, particularly on child sexual abuse and terrorism, but its moderators do not get involved in this proactive work.

We aim to allow as much speech as possible but draw the line at content that could credibly cause real world harm.

People commonly express disdain or disagreement by threatening or calling for violence in generally facetious and unserious ways.

We aim to disrupt potential real world harm caused from people inciting or coordinating harm to other people or property by requiring certain details to be present in order to consider the threat credible.

In our experience, it's this detail that helps establish that a threat is more likely to occur.

📷 A slide from Facebook's guidance for moderators on threats of violence. Photograph: Guardian

Instead, they review millions of reports flagged to them by Facebook users and use the manuals to decide whether to ignore, "escalate" or delete what they see. When they escalate a report, it usually means it is sent to a more senior manager to decide what to do.

## The Guardian's moderation policy

The Guardian's moderation approach is bound by guidelines, which we have published here, and our moderators are all directly employed by the Guardian and work within our editorial team. The moderation team regularly receives training on issues such as race, gender or religious issues, and applies that training in service of those public guidelines. When making decisions, our moderators consider the community standards, wider context and purpose of discussions, as well as their relationship to the article on which they appear. We post-moderate most discussions, and rely on a

PX0574-002

mixture of targeted reading, community reports and tools to identify comments that go against our standards. We have an appeals process and anyone wanting to discuss specific moderation decisions can email moderation@theguardian.com. When requested, reasons for removal may be shared with those affected by the decision.

All discussions on the Guardian site relate to articles we have published; this means we have specific responsibilities as a publisher, and also that we aim to take responsibility for the conversations we host. We make decisions about where to open and close comments based on topic, reader interest, resources and other factors.

This is particularly important when the content relates to potential suicides and self-harm, because Facebook has a team that liaises with support agencies and charities to try to get people help.

For comments that seem cruel or insensitive, moderators can recommend a "cruelty checkpoint"; this involves a message being sent to the person who posted it asking them to consider taking it down.

If the user continues to post hurtful material, the account can be temporarily closed.

The files also show Facebook has developed a law enforcement response team, which deals with requests for help from police and security agencies.

The company has designed a special page to help moderators, called the single review tool (SRT). On the right-hand side of the SRT screen, which all moderators have, there is a menu of options to help them filter content into silos.

While this has speeded up the process of moderation, the Guardian has been told moderators often feel overwhelmed by the number of posts they have to review – and they make mistakes, particularly in the complicated area of permissible sexual content.

PX0574-003

## Sexual activity

**Allowed**

- Engaging in moderate displays of sexuality
    - Clothed simulated sex
    - Open mouth kissing
- Black-barred/pixelated sexual activity **(only adults)**

📷 Part of Facebook's guidance for moderators on sexual activity. Photograph: Guardian

The manuals seen by the Guardian are occasionally updated – with new versions sent to moderators. But small changes in policy are dealt with by a number of subject matter experts (SMEs), whose job is tell moderators when Facebook has decided to tweak a rule. The SMEs also oversee the work of moderators, who have to undergo regular performance reviews.

The Guardian has been told this adds to the stress of the job and has contributed to the high turnover of moderators, who say they suffer from anxiety and post-traumatic stress.

Facebook acknowledged the difficulties faced by its staff and said moderators "have a challenging and difficult job. A lot of the content is upsetting. We want to make sure the reviewers are able to gain enough confidence to make the right decision, but also have the mental and emotional resources to stay healthy. This is another big challenge for us."

PX0574-004

## Most viewed

PX0574-005

# PX0575



Cybersecurity  >  Engineering Center  >  How hash matching technology helps NCMEC

# NCMEC, Google and Image Hashing Technology

In the United States, the National Center for Missing & Exploited Children (NCMEC) receives millions of reports of online child

PX0575-001

5/15/24, 11:03 PM                    How Image Hashing Technology Helps NCMEC - Google Safety Center

Safety Center

every year. NCMEC's Senior Vice President and Chief Operating Officer, Michelle DeLaune, talks about the organization's evolution, how tech companies are stepping up to tackle CSAM, and Google's Hash Matching API.

    

## Can you tell us about NCMEC and what your role is?

I've been at NCMEC for more than 20 years, so I've witnessed first-hand the evolution of the organization and the challenges and threats to our children and their safety. I began my career here as a CyberTipline analyst.

The CyberTipline was created and launched in 1998 as a way for members of the public to report potential incidents of child exploitation. At that time we were receiving reports from parents who were concerned that an adult was talking inappropriately to their child online and people who encountered websites that contained CSAM. Then a federal law was passed in the United States that required US tech companies to report to the CyberTipline any apparent incidents of CSAM on their systems.

PX0575-002

Safety Center

we receive approximately 70,000 new reports every day. Some of these are from the public, but the majority of our reports are being submitted by tech companies.



PX0575-003

Safety Center

# How does NCMEC help online companies fight CSAM?

The law does not require that there be any proactive effort made by companies. Simply, if they detect CSAM content or they become aware of it, they must report it. That is really the impetus for the instrumental growth that we've seen in the CyberTipline over the years. But within the last five years there's been the most significant jump in reports. That explosion can be attributed to the efforts that many tech companies are voluntarily taking to proactively detect, remove, and report CSAM.

One of the flagship programmes we operate at the National Center for Missing & Exploited Children are hash sharing platforms, both for industry to contribute and another for select NGOs to contribute. Via the NGO hash sharing platform, NCMEC provides interested tech companies with more than five million hash values of confirmed, triple-vetted CSAM to assist them with their efforts to combat CSAM on their networks. Many large companies, including Google, have availed themselves of this list and are taking proactive steps to remove CSAM from their platforms. This list also enables other reputable NGOs who serve children to provide their hashes to the tech industry through NCMEC's hash platform, to try to minimize the need for a tech company to go individually to each NGO.

We also offer an Industry Hash Sharing platform, which enables select companies to share their own CSAM hashes with each other. We are ensuring that any company that is willing and able to proactively detect this material has all of the tools it needs to do so and that companies can share their own CSAM hashes with each other. Google is the largest contributor to this platform with approximately 74% of the total number of hashes on the list.

As you can imagine with the volume of reports we get now, we are seeing many of the same pictures being reported multiple times. That is completely understandable as companies are using hash values to detect known material, but as known material increases, it's more important to NCMEC to be able to identify new material that has been produced and shared online.

PX0575-004

Safety Center



# Google's Hash Matching API has helped NCMEC prioritize CyberTipline reports. Can you tell us more about how this project began?

The success of the hash sharing programme has created a completely new challenge: a volume that presented immense challenges. A non-profit like NCMEC doesn't have the computational power to scale to this volume. That's why we were so eager and grateful for Google's assistance in helping build the Hash Matching API tool.

PX0575-005

Safety Center

actually included close to 70 million child sexual abuse images and videos. Clearly there is duplication within that volume, and while it's easy for NCMEC to detect exact matches, we would be unable to detect visually similar matches at scale and in real time in order to identify and prioritize never before seen images. And that is key when we're trying to identify children who are being actively sexually abused.

# What benefits has the Hash Matching API brought to NCMEC?

We have a really important job, which is to take this critical information and turn it around as quickly as possible to law enforcement. One of the advantages of this tool is it gives us a new way of adding tremendous value to the CyberTipline reports.

We have a programme of work where we're going through every child sexual abuse image and video and labelling it. For example, 'This is CSAM', 'This is not CSAM', or 'This is hard to identify the age of the child or person.' But, as you can imagine, with 70 million files last year alone, we're never going to be able to label them all. This API enables us to do a comparison. When we tag one file the API allows us to identify all visually similar files which we then tag accordingly in real time. As a result, we've been able to tag more than 26 million images.

This helps us add more value to reports we're sending to law enforcement so they can prioritize which reports they're going to review first. It also helps us identify which images have never been seen before. Those images often contain a child somewhere in the world who is being sexually abused. If we're looking at the haystack with the proverbial needle, in this case that needle is a child who needs to be rescued. Google's tool has allowed us to zero in on those images that contain children who need immediate help.

PX0575-006

Safety Center

# And how has it impacted the well-being of NCMEC human reviewers who process reports from the CyberTipline and analyze CSAM content?

This CSAM detection tool has reduced the need for our staff to look at the same images over and over again. There are images of children being sexually abused where the children may now be well into their adult years. These images live online perpetually and contribute to the ongoing victimization of those individuals. So being able to tag those images allows them to focus on those children depicting recent sexual abuse whilst at the same time removing the illegal images from view.

That's why our staff is here; they want to help those children. This was a ground-breaking improvement in the ability of our staff to practise wellness and not be confronted with the same harmful known material over and over again.

PX0575-007

Safety Center



# How does this work help tech companies as a whole fighting this type of material online?

We know that Google provides CSAM detection technology to companies to help support the global fight against CSAM and the Hash Matching API itself has a direct impact on many beyond NCMEC. All tech companies are enjoying the benefit of a more streamlined, efficient process at the National Center. CyberTipline reports are being addressed and handled in a timelier manner and with more value added than if we didn't have this tool.

NCMEC is a central resource for tech companies, law enforcement, survivors, and their families. We have an incredibly unique lens through which we look at problems and solutions. Because of the CyberTipline, we are very aware of newly-created and existing CSAM that is circulating online. All of these reports are

PX0575-008

Safety Center

We know of more than 20,000 identified children who have been sexually abused and their abuse memorialised, whether in a video or an image. These survivors, some are still children of course and some are now adults, are keenly aware of the ongoing victimization they're facing. That's why it's so important for us to do what we can to minimize and reduce the circulation of these images.

One thing that may not be clear to the public is that there can be a tendency to dismiss known CSAM, because the images may be considered "old" or "recirculated". We constantly beat the drum to remind people that these are real children – that those more than 20,000 individuals are trying to heal and regain control of their lives. They take great solace knowing that companies like Google are taking every effort to remove images depicting the worst moments of their lives.

If you encounter child sexual abuse images or material online, you can report it to the National Center for Missing and Exploited Children (NCMEC), or to an appropriate authority around the world.

Google is committed to fighting online child sexual abuse and exploitation and preventing our services from being used to spread child sexual abuse material (CSAM).You can learn more about this on our Protecting Children website.

Back to top ⬆

PX0575-009

 Safety Center

# Cybersecurity

Learn how we keep more people safe online
than anyone else in the world.

Learn more

Follow us   



About Google     Google products     Privacy Policy     Terms     Partners

Transparency Center     Families     Principles

Help

PX0575-010

# PX0577

NEWS AND EVENTS

# An update on our commitment to fight violent extremist content online

By The YouTube Team

Oct.17.2017

  

In June, we announced four steps we're taking to combat terrorist content on YouTube:

1. Better detection and faster removal powered by machine learning;
2. More expert partners to help identify violative content;
3. Tougher standards for videos that are controversial but do not violate our policies; and
4. Amplified voices speaking out against hate and extremism.
   We shared our progress across these steps in August and wanted to update you again on where things are today.

**Better detection and faster removal**

We've always used a mix of human flagging and human review together with technology to address controversial content on YouTube. In June, we introduced machine learning to flag violent extremism content and escalate it for human review. We continue to get faster here:

PX0577-001

**points** since August.

- Our teams have manually reviewed **over a million videos** to improve this flagging technology by providing large volumes of training examples.
  Inevitably, both humans and machines make mistakes, and as we have increased the volume of videos for review by our teams, we have made some errors. We know we can get better and we are committed to making sure our teams are taking action on the right content. We are working on ways to educate those who share video meant to document or expose violence on how to add necessary context.

**More experts**

Outside experts are essential to advising us on our policies and flagging content for additional inputs that better train our systems. Our partner NGOs bring expert knowledge of complex issues like hate speech, radicalization, and terrorism.

We have **added 35 NGOs** to our Trusted Flagger program, which is 70 percent of the way towards our goal. These new partner NGOs represent **20 different countries** and include NGOs like the International Center for the Study of Radicalization at King's College London and The Wahid Institute in Indonesia, which is dedicated to promoting religious freedom and tolerance.

**Tougher standards**

We started applying tougher treatment to videos that aren't illegal and don't violate our Guidelines, but contain controversial religious or supremacist content. These videos remain on YouTube, but they are behind a warning interstitial, aren't recommended, monetized, and don't have key features including comments, suggested videos, and likes. This is working as intended and helping us strike a balance between upholding free expression, by providing a historical record of content in the public interest, while also keeping these videos from being widely spread or recommended to others.

PX0577-002

We continue to support programs that counter extremist messages. We are researching expansion for Jigsaw's Redirect Method to apply this model to new languages and search terms. We're heavily investing in our YouTube Creators for Change program to support Creators who are using YouTube to tackle social issues and promote awareness, tolerance and empathy. Every month these Creators release exciting and engaging new videos and campaigns to counter hate and social divisiveness:

- In September, three of our fellows, from Australia, the U.K., and the U.S., debuted their videos on the big screen at the Tribeca TV festival, tackling topics like racism, xenophobia, and experiences of first generation immigrants.
- Local YouTube Creators in Indonesia partnered with the MAARIF Institute and YouTube Creators for Change Ambassador, Cameo Project, to visit ten different cities and train thousands of high school students on promoting tolerance and speaking out against hate speech and extremism.
- We're adding two new local Creators for Change chapters, in Israel and Spain, to the network of chapters around the world.
In addition to this work supporting voices to counter hate and extremism, last month Google.org announced a $5 million innovation fund to counter hate and extremism. This funding will support technology-driven solutions, as well as grassroots efforts like community youth projects that help build communities and promote resistance to radicalization.

Terrorist and violent extremist material should not be spread online. We will continue to heavily invest to fight the spread of this content, provide updates to governments, and collaborate with other companies through the Global Internet Forum to Counter Terrorism. There remains more to do so we look forward to continuing to share our progress with you.

*The YouTube Team*

PX0577-003

5/15/24, 11:04 PM                    An update on our commitment to fight violent extremist content online - YouTube Blog

Policy

Explore the latest company news, creator and artist profiles, culture and trends analyses, and behind-the-scenes insights on the YouTube Official Blog.

**Our Channels**

**X (Twitter)**

**Connect**

About YouTube

YouTube Products

For Business

For Creators

PX0577-004

An update on our commitment to fight violent extremist content online - YouTube Blog

Policy & Safety        Copyright        Brand Guidelines        Privacy        Terms

Help        English

PX0577-005

# PX0578



Privacy and Safety Hub

Privacy ⌄        Safety ⌄        Transparency ⌄        News

Secondary Navigation ⌃

Transparency ⌄

# Hateful Content, Terrorism, and Violent Extremism

Community Guidelines Explainer Series
*Updated: January 2024*

- Terrorist organizations, violent extremists, and hate groups are prohibited from using our platform. We have no tolerance for content that advocates or advances violent extremism or terrorism.
- Hate speech or content that demeans, defames, or promotes discrimination or violence on the basis of race, color, caste, ethnicity, national origin, religion, sexual orientation, gender identity, disability, or veteran status, immigration status, socio-economic status, age, weight or pregnancy status is prohibited.

## Overview

Hateful content and activities that support terrorism or violent extremism have no place on Snapchat. Our policies operate to create an environment that supports and prioritizes the safety of Snapchatters, and to protect communities from violence and discrimination.

It is never acceptable to engage in hateful conduct, including the use of hate speech or hate symbols. Activities that support or advocate for acts of terrorism or violent extremism are similarly prohibited and, if warranted, may be reported to law enforcement.

To help ensure these policies are enforced responsibly, our teams consult the expertise and work of civil rights organizations, human rights experts, law enforcement agencies, NGOs, and safety advocates. We are constantly

PX0578-001

learning, and will calibrate wherever necessary to ensure that our products and policies function to keep Snapchatters safe. To help us, we encourage users to promptly report any hateful content or activity that may violate our policies against terrorism and violent extremism.

What you should expect

Snapchatters should feel safe and respected when using our products. Our policies against hateful content prohibit hate speech, which includes any content that demeans, or promotes discrimination towards, an individual or group of individuals on the basis of their race, color, caste, ethnicity, national origin, religion, sexual orientation, gender, gender identity, disability, veteran status, immigration status, socio-economic status, age, weight, or pregnancy status. These rules prohibit, for example, the use of racial, ethnic, misogynistic, or homophobic slurs; memes that ridicule or call for discrimination against a protected group; and any abuse in the form of intentional deadnaming or misgendering. Hate speech also extends to the valorization of perpetrators––or the denigration of victims––of human atrocities (such as genocide, apartheid, or slavery). Other prohibited hateful content includes the use of hate symbols, which means any imagery that is intended to represent hatred or discrimination toward others.

Our prohibitions against Terrorism and Violent Extremism extend to all content that promotes terrorism or other violent, criminal acts committed by individuals or groups to further ideological goals. These rules also prohibit any content that promotes or supports foreign terrorist organizations or extremist hate groups––as designated by credible, third-party experts––as well as recruitment for such organizations or violent extremist activities.

PX0578-002

How we enforce these policies

Our in-app reporting tool allows users to directly report hateful content or activities that support terrorism or violent extremism. On our high-reach surfaces, like Spotlight and Discover, we take a proactive approach to moderating any content that may violate these rules. We nonetheless encourage users to report any harmful content you might encounter on these surfaces––this helps alert us to any breakdowns in our processes for keeping these spaces safe.

When hateful content is reported, our teams will remove any violating content and users who engage in repeated or egregious violations will have their account access locked. As an additional measure, we encourage Snapchatters to block any users who make them feel unsafe or uncomfortable.

Users engaged in terrorist activities or violent extremism will lose account privileges. In addition, certain information related to violations of these policies may be referred to law enforcement. For more information about how Snapchat responsibly engages with law enforcement agencies, visit Snap's Privacy and Safety Hub.

Takeaway

We do not tolerate hateful content, terrorism, or violent extremism on Snapchat. Through both our policies and our product design, we work diligently to maintain an environment that supports and prioritizes the safety of Snapchatters.

Users can help us protect our community by reporting any content that violates our policies. We are also committed to working with diverse leaders from across the safety

PX0578-003

Hateful Content, Terrorism, and Violent Extremism | Community Guidelines Explainer

community to ensure we are advancing our safety objectives responsibly. For more information about our safety efforts, please visit our Safety Center.

Back to Community Guidelines

**Company**

Snap Inc.

Careers

News

Privacy and Safety

**Community**

Snapchat Support

Pixy Support

Community Guidelines

**Advertising**

Snapchat Ads

Advertising Policies

Political Ads Library

Brand Guidelines

Promotions Rules

**Legal**

Other Terms & Policies

Law Enforcement

Cookie Policy

Cookie Settings

Report Infringement

**Snap Inc.**

Privacy Policy

Terms of Service

**Language**    English (US)    ⌄

PX0578-004

# PX0579



| All | News | Product | Community | Safety | Company |
|-----|------|---------|-----------|--------|---------|

# Partnering to prevent violent extremism

## Share this post

*By Julie de Bailliencourt, Global Head of Product Policy, TikTok*

TikTok takes an uncompromising stance against enabling violent extremism on or off our platform. Our mission is to inspire creativity and bring joy to people, and any attempt to promote violence runs counter to that mission and our values. To further strengthen our commitment to user safety and human rights, today we're announcing our membership with Tech Against Terrorism and bringing more transparency to the steps we take to protect our community from violent extremism.

### Standing together against violent extremism

At TikTok, we believe that collaboration is critical to solving today's most pressing challenges, including violent extremism. We are proud to be members of Tech Against Terrorism, which brings together technology companies, civil society, and academics over the shared goal of countering violent extremism. Coming together with others in the industry reflects our desire to engage with the wider community of experts in a responsible way. Our aim is to help eradicate terrorist content online and share learnings with others along the way.

Joining Tech Against Terrorism means we've earned their Trustmark, proof that we adhere to membership requirements, which include commitments to exploring new technical solutions and working with civil society on combating violent extremism. The Trustmark also demonstrates our strict policies and enforcement against violent extremism and our commitments to human rights and transparency. For instance, we publish regular Community Guidelines Enforcement Reports that bring visibility to the content and accounts removed for violating our policies. And we recently announced plans to provide researchers with API access to study the TikTok platform and moderation system.

There's no finish line when it comes to keeping people safe. Through our membership, we're eager to continue to learn from others as we strive to meet and exceed best practices in tackling this issue. It will also provide access to

PX0579-001



| All | News | Product | Community | Safety | Company |
|---|---|---|---|---|---|

groups that threaten violence or attempt to incite violence risk the safety of our community. Our Community Guidelines clearly outline that we do not allow people to use our platform to threaten or incite violence, or to promote violent extremist organizations, individuals, or acts.

We use a combination of technology, safety and security professionals, and threat detection partners to help us enforce our policies. If an account attempts to promote or glorify off-platform violence or threaten public safety, we ban the account. When warranted, we will report threats to relevant legal authorities. We may consider off-platform behavior to identify violent extremist organizations and individuals and take action on their accounts.

In addition, our trust and safety teams partner with local experts and civil society organizations to understand the unique cultures and experiences of communities affected by violent extremism. We take into account publicly available information from experts, including the United Nations Security Council and Southern Poverty Law Center, to designate dangerous or hateful individuals and organizations. Our goal is to prevent our platform from being used to perpetrate harm.

TikTok is an entertainment-first platform, and today only a small portion of videos - less than 1% of the total removed - violate our violent extremism policy. Nevertheless, we will continue to work towards doing our part to help eradicate this kind of content online and off.

Safety    Sep 8, 2022

## Read More:

PX0579-002



| All | News | Product | Community | Safety | Company |
|-----|------|---------|-----------|--------|---------|

Safety    May 9, 2024

## Partnering with our industry to advance AI transparency and literacy

Today, we're sharing updates on our continued efforts to help creators safely and responsibly express their creativity with AI-generated content (AIGC). TikTok is startin...

Community    May 8, 2024

## TikTok Goes to The Met Gala

Every year on the first Monday in May, fashion, art and culture lovers around the world get ready for one of the most iconic nights of the year: The Met Gala. This year, as th...

PX0579-003

5/15/24, 11:40 PM                    Partnering to prevent violent extremism | TikTok Newsroom

 **TikTok**

All            News            Product            Community            Safety            Company

News    May 7, 2024

## Court Filing on TikTok Ban

Today we filed a petition in federal court seeking to overturn the unconstitutional TikTok ban. Read our petition here.

United States

Download now

QR CODE



PX0579-004



| All | News | Product | Community | Safety | Company |
|-----|------|---------|-----------|--------|---------|

Company

About TikTok

Newsroom

Contact

Careers

Programs

TikTok for Good

TikTok for Developers

Effect House

Advertise on TikTok

TikTok Rewards

TikTok Browse

TikTok Embeds

Resources

Help Center

Safety Center

Creator Portal

Community Guidelines

Transparency

Accessibility

Legal

Terms of Service

PX0579-005



All          News          Product          Community          Safety          Company

PX0579-006

# PX0580

 **TikTok**

Home    🔍

## Keeping people safe

---

# Engaging our Advisory Councils

At TikTok, we prioritize the safety and well-being of our community. As we work to provide a safe and inclusive place for everyone, we actively seek input and advice from individual experts and nonprofit organizations. Through ongoing engagement, we work to ensure our policies and processes are informed by a diversity of perspectives, expertise, and lived experiences. By bringing together different voices, we aim to create a safe platform for everyone, especially those who may be more vulnerable to online harm.

## TikTok's Content and Safety Advisory Councils

Our Regional Safety Advisory Councils and U.S. Content Advisory Council bring together groups of independent experts who help us develop forward-looking policies and processes that not only address the challenges of today, but also plan ahead for the next set of issues that our industry will face. These councils are an important way to bring outside perspectives into our company and onto our platform.

Our council members represent a diverse array of backgrounds and perspectives, and are made up of experts

PX0580-001

in youth safety, free expression, hate speech, and other safety topics. They work collaboratively with us to inform and strengthen our policies, product features, and safety processes.

We have established eight regional Safety Advisory Councils in Asia Pacific, Brazil, Europe, Latin America, MENAT (Middle East, North Africa, Turkey), and a U.S. Content Advisory Council. We aim to continue expanding our regional presence. Focusing on regions allows us to better understand local challenges and trends and develop informed solutions that consider unique local context and cultures. This commitment to localization enables us to create a more targeted, responsive approach to safety and enables us to stay up-to-date with the latest developments in each region.

## Australia & New Zealand

- **Hon. Pru Goward AO,** Western Sydney University, (Australia)
- **Crystal Abidin,** Curtin University, Australia

## Brazil

- **Fabricio Benevenuto**, Federal University of Minas Gerais
- **Emiliano de Camargo David**, AMMA Psique e Negritude Institute
- **Clarissa Gross,** Law Professor at Fundação Getulio Vargas and Coordinator of the Platform for Freedom of Expression and Democracy
- **Nina da Hora**, Director of Da Hora Institute
- **Isabela Kalil**, São Paulo School of Sociology and Political Science
- **Dr. Jadi Pedrosa**, Pediatrician
- **Carlos Affonso Souza**, Institute for Technology & Society of Rio de Janeiro

PX0580-002

- **Fabiana Vasconcelos**, Boston Graduate School of Psychoanalysis
- **Kananda Eller**, Content Creator Diversity, Science

## Europe

- **Seyi Akiwowo**, Author, Founder and CEO of Glitch (*United Kingdom*)
- **Justine Atlan**, Association e-Enfance (*France*)
- **Kristine Evertz**, Senior Policy Advisor on Domestic Violence and Child Abuse (*The Netherlands*)
- **Maja Heban**, Transgender Rights Activist (*Poland*)
- **Alex Holmes**, The Diana Award (*United Kingdom*)
- **Judy Korn**, Violence Prevention Network (*Germany*)
- **Ian Power**, SpunOut (*Ireland*)
- **Joan Barata**, Freedom of Expression Expert (*Romania/Spain*)
- **Max Klymenko**, Content Creator (*United Kingdom/Ukraine*)

## Latin America

- **Lionel Brossi**, Artificial Intelligence and Society Hub at the Faculty of Communication and Image, University of Chile (*Chile*)
- **Daniela Calvillo**, Fundación PAS / Te Protejo México (*Mexico*)
- **Daniel Castaño**, Mokzy / Externado University of Colombia (*Colombia*)
- **Janvieve Williams Comrie**, AfroResistance / New York University (*Panama & USA*)
- **Angélica Contreras**, Cultivando Género AC (*Mexico*)
- **Carlos Cortés**, Linterna Verde (*Colombia*)
- **Eugenia Mitchelstein**, University of San Andrés (*Argentina*)
- **Mariana Ruenes**, Sintrata AC (*Mexico*)

PX0580-003

- **Andrea Urbas**, Asociación Chicos.net (*Argentina*)
- **Juan Cristobal Concha**, PrideMe (*Chile*)

## Northeast Asia

- **Seungwoo Son,** Chung-Ang University (South Korea)
- **Shinichi Yamaguchi,** Centre for Global Communications, International University of Japan (Japan)
- **Young Sub Shim,** Kyung Hee Cyber University (South Korea)
- **Chisato Kitanaka,** Hiroshima University (Japan)

## South Asia

- **Jehan Ara,** Katalyst Labs *(Pakistan)*
- **Dhananath Fernando,** Advocata Institute *(Sri Lanka)*
- **Kiran Chapagain,** Co-Founder and Executive Director, Kathmandu Policy House *(Nepal)*
- **Hera Hussain,** Founder Chayn *(Pakistan)*
- **Nobonita Chowdhury,** Gender Expert and Equality Activist *(Bangladesh)*

## Southeast Asia

- **Yuhyun Park,** DQ Institute *(Singapore)*
- **Nguyen Phuong Linh,** Management and Sustainable Development Institute *(Vietnam)*
- **Anita A. Wahid,** Masyarakat Anti Fitnah Indonesia *(Indonesia)*
- **Jerald Joseph,** Pusat Komas *(Malaysia)*
- **Mona Magno-Veluz (Mighty Magulang),** Autism Society *(Philippines)*
- **Arthit Suriyawongkul,** AI Ethics and Data Governance Researcher *(Thailand)*
- **Varoth Chotpitayasunondh,** Thailand Institute for Mental Health Sustainability *(Thailand)*

PX0580-004

## United States

- **Rob Atkinson**, Information Technology and Innovation Foundation

- **Dorothy Espelage**, University of North Carolina School of Education

- **Mary Anne Franks**, University of Miami Law School, Cyber Civil Rights Initiative

- **Vicki Harrison**, Stanford Psychiatry Center for Youth Mental Health and Wellbeing

- **Mutale Nkonde**, AI For the People

- **Dawn Nunziato**, George Washington University Law School

- **David Ryan Polgar**, All Tech Is Human

- **Dan Schnur**, University of Southern California Annenberg Center on Communication Leadership & Policy

## Was this helpful?

Yes                    No

  

**Company**

About TikTok

TikTok Browse

PX0580-005

Newsroom

Contact

Careers

ByteDance

**Programs**

TikTok for Good

TikTok Embeds

Effect House

TikTok for Developers

Advertise on TikTok

TikTok Rewards

**Resources**

Help Center

Safety Center

Creator Academy

Community Guidelines

Transparency

Accessibility

**Legal**

Cookies Policy

Privacy Policy for Younger Users

Intellectual Property Policy

Law Enforcement

Privacy Policy

Terms of Service

English (United States)

©**2024 TikTok**

PX0580-006

# PX0581

 Take the power of AI on the go with the free Copilot app Create images, get help with writing, and search faster

No, thanks    Get the Copilot app

    Blog

**On the Issues**

Topics∨

CYBERSECURITY

# Digital Crimes Unit: Leading the fight against cybercrime

May 3, 2022

Cybercrime is globally disruptive and economically damaging, causing trillions of dollars in financial losses impacting both individual and business victims, while threatening national security and diminishing trust in the digital economy and the Internet.

Microsoft's Digital Crimes Unit (DCU) is an international team of technical, legal and business experts that has been fighting cybercrime, protecting individuals and organizations, and safeguarding the integrity of Microsoft services since 2008. Our expertise and unique insights into online criminal networks enable us to uncover evidence

PX0581-001

used in our criminal referrals to law enforcement. The DCU also works to increase the operational cost of cybercrime by disrupting the infrastructure used by cybercriminals through civil legal actions and technical measures.

No single entity can fight cybercrime alone; the DCU has developed deep relationships with security teams across Microsoft, and with law enforcement, security firms, researchers, NGOs and customers to increase both our scale and impact when fighting cybercrime.

The DCU also shares insights to assist with victim remediation, support education campaigns and allow for the development of technical countermeasures that strengthen the security and safety of Microsoft's products and services. We also use our voice and expertise to inform cybercrime legislation and advocate for public-private partnerships that accelerate cross-border cooperation to combat cybercrime.

# Our Areas of Focus

**Business Email Compromise**

Business Email Compromise (BEC) occurs when business email account credentials are unlawfully used to compromise accounts and facilitate email fraud against targeted organizations and individuals.

BEC is one of the most prolific and costly forms of cybercrime in the world today. According to a 2021 FBI report, BEC attacks resulted in $2.4B in losses and represented almost 35% of all losses due to cybercrime. The DCU utilizes cutting-edge legal and technical strategies to fight BEC crime, enabling us to identify, map and disrupt the complex infrastructure used to launch BEC attacks. In 2021 the DCU secured court orders to block malicious homoglyph domains targeting and impersonating customers. The DCU also directed the removal of more than 596,000 unique phishing URLs and 7,700 phish kits, which led to the identification and closure of over 2,200 malicious email accounts used to collect stolen customer credentials.

**Malware**

Cybercriminals and nation-state actors rely on botnets – networks of malware-infected computers controlled by cybercriminals – to dramatically, and anonymously, scale their reach. For over a decade the DCU has identified, investigated, and disrupted these actors' ability to conduct their criminal activities by targeting their distribution and communications infrastructure.

To date the DCU has disrupted the infrastructure of 25 botnets or nation-state actors, preventing them from distributing additional malware, controlling victims' computers, and targeting additional victims. In partnership with governments and Internet Service

PX0581-002

Providers, the DCU has identified and shared information to remediate approximately 500 million victims worldwide while using the intelligence gained in these operations to better secure Microsoft's products and services against these cyber threats.

### Ransomware

Ransomware is a high-profit, low-cost business that has increased dramatically worldwide over the last several years. In 2020 cybercriminals transitioned from automatically spreading ransomware like NotPetya or WannaCry to human-operated targeted attacks where adversaries deliberately target critical assets with an interest in extracting significantly higher ransoms from their victims. Microsoft is in a unique position to reduce the profitability of this crime while increasing the cost of entry. The DCU has invested in technical and legal resources to address making ransomware less profitable and more difficult to deploy by disrupting infrastructure and payment systems that enable ransomware attacks, and by preventing the use of Microsoft products and services to attack our customers.

### Tech Support Fraud

According to a [2021 Microsoft global online survey](), approximately 3 out of 5 people globally have encountered a tech support scam. Scammers convince victims to provide access to their devices by impersonating reputable technology companies such as Apple, Google and Microsoft.

The DCU leverages data analytics and direct customer complaints to investigate criminal networks engaged in tech support fraud and to refer them to law enforcement. The DCU also works to disrupt the flow of money to the scammers by providing financial institutions and payment processors with information relating to the scammers' fraudulent transactions, and to educate the public on avoiding these scams.

### Malicious Use of Azure

Cybercriminals sometimes launch attacks directly from Microsoft's network using the power of our Azure Cloud Services to target legitimate Microsoft customers, global business and governments. The DCU works to identify and investigate cybercriminals maliciously using Azure to launch these cybercrime attacks.

With the threat landscape constantly evolving, the DCU partners with security teams across the company to identify and disable cybercriminals hosting malicious technical infrastructure used in BEC, tech support fraud, malware distribution and ransomware attacks.

In addition to enforcement actions, the DCU's disruption of cybercriminal networks using Azure provides insights that strengthen Azure security, protect customer cloud capacity

PX0581-003

and help support our Azure team to deliver a world-class customer experience.

## Technological Advances: Machine Learning

Over the course of our investigations, the DCU has amassed a significant amount of data, and the challenge is how to analyze and use this intelligence to protect our customers. During the course of our daily work, we use machine learning clustering techniques to assist in our analysis, identifying patterns to more accurately detect and learn from criminal activities online. With these tools, we have been able to develop new and more efficient ways of identifying the most prolific criminal networks to target for investigation, disrupting criminal infrastructure at scale and partnering with our engineering teams to improve the security of our products and services.

## Payment Disruption

According to Cybersecurity Ventures, the annual cost of cybercrime globally is expected to reach $10.5 trillion by 2025 as the world witnesses a surge in hacking activities by hostile nation-state sponsored and organized crime groups. To combat this alarming trend, the DCU is building a comprehensive payment disruption strategy in partnership with public and private sector stakeholders including banks, payment processing providers, crypto exchanges and law enforcement. Our goal is to stop the money flow from victims to cybercriminals and to prevent cybercriminals from collecting and enjoying the proceeds of their crimes.
SOURCE: Cybersecurity Ventures

*Note: This page was first published on April 30, 2020 and updated on May 3, 2022.*

**Follow us:**    📶

**Share this page:**    f    𝕏    in

| What's new | Microsoft Store | Education | Business | Developer & IT | Company |
|---|---|---|---|---|---|
| Surface Laptop Studio 2 | Account profile | Microsoft in education | Microsoft Cloud | Azure | Careers |
| Surface Laptop Go 3 | Download Center | Devices for education | Microsoft Security | Developer Center | About Microsoft |
| Surface Pro 9 | Microsoft Store support | Microsoft Teams for Education | Dynamics 365 | Documentation | Company news |
| Surface Laptop 5 | Returns | Microsoft 365 Education | Microsoft 365 | Microsoft Learn | Privacy at Microsoft |
| Microsoft Copilot | Order tracking | | Microsoft Power Platform | Microsoft Tech Community | Investors |
| Copilot in Windows | | | Microsoft Teams | | Diversity and |

PX0581-004

| | | | | | |
|---|---|---|---|---|---|
| Explore Microsoft products | Certified Refurbished | How to buy for your school | Copilot for Microsoft 365 | Azure Marketplace | inclusion |
| Windows 11 apps | Microsoft Store Promise | Educator training and development | Small Business | AppSource | Accessibility |
| | Flexible Payments | Deals for students and parents | | Visual Studio | Sustainability |
| | | Azure for students | | | |

🌐 English (United States)    ✓✗ Your Privacy Choices    Consumer Health Privacy

Sitemap    Contact Microsoft    Privacy    Terms of use    Trademarks    Safety & eco    Recycling

About our ads    © Microsoft 2024

PX0581-005

# PX0582

 Meta

Back to Newsroom

Meta

# Facebook Publishes Enforcement Numbers for the First Time

May 15, 2018



By *Guy Rosen, VP of Product Management*

PX0582-001

We're often asked how we decide what's allowed on Facebook — and how much bad stuff is out there. For years, we've had Community Standards that explain what stays up and what comes down. Three weeks ago, for the first time, we published the internal guidelines we use to enforce those standards. And today we're releasing numbers in a Community Standards Enforcement Report so that you can judge our performance for yourself.

Alex Schultz, our Vice President of Data Analytics, explains in more detail how exactly we measure what's happening on Facebook in both this Hard Questions post and our guide to Understanding the Community Standards Enforcement Report. But it's important to stress that this is very much a work in progress and we will likely change our methodology as we learn more about what's important and what works.

This report covers our enforcement efforts between October 2017 to March 2018, and it covers six areas: graphic violence, adult nudity and sexual activity, terrorist propaganda, hate speech, spam, and fake accounts. The numbers show you:

- How much content people saw that violates our standards;

- How much content we removed; and

- How much content we detected proactively using our technology — before people who use Facebook reported it.



Keeping fake accounts off Facebook
January – March 2018

Every day, we prevent millions of fake accounts from being created.

Between January and March 2018, 583 million additional fake accounts were disabled, usually within minutes of registration.

Fake accounts represent approximately 3 – 4% of monthly active users.

Most of the action we take to remove bad content is around spam and the fake accounts they use to distribute it. For example:

- We took down 837 million pieces of spam in Q1 2018 — nearly 100% of which we found and flagged before anyone reported it; and

- The key to fighting spam is taking down the fake accounts that spread it. In Q1, we disabled about 583 million fake accounts — most of which were disabled within minutes of registration. This is in addition to the millions of fake account attempts we prevent daily from ever registering with Facebook. Overall, we estimate that around 3 to 4% of the active Facebook accounts on the site during this time period were still fake.

In terms of other types of violating content:

- We took down 21 million pieces of adult nudity and sexual activity in Q1 2018 — 96% of which was found and flagged by our technology before it was reported. Overall, we estimate that out of every 10,000 pieces of content viewed on Facebook, 7 to 9 views were of content that violated our adult nudity and pornography standards.

- For graphic violence, we took down or applied warning labels to about 3.5 million pieces of violent content in Q1 2018 — 86% of which was identified by our technology before it was reported to Facebook.

- For hate speech, our technology still doesn't work that well and so it needs to be checked by our review teams. We removed 2.5 million pieces of hate speech in Q1 2018 — 38% of which was flagged by our technology.

As Mark Zuckerberg said at F8, we have a lot of work still to do to prevent abuse. It's partly that technology like artificial intelligence, while promising, is still years away from being effective for most bad content because context is so important. For example, artificial intelligence isn't good enough yet to determine whether someone is pushing hate or describing something that happened to them so they can raise awareness of the issue. And more generally, as I explained two weeks ago, technology needs large amounts of training data to recognize meaningful patterns of behavior, which we often lack in less widely used languages or for cases that are not often reported. In addition, in many areas — whether it's spam, porn or fake accounts — we're up against sophisticated adversaries who continually change tactics to circumvent our controls, which means we must continuously build and adapt our efforts. It's why we're investing heavily in more people and better technology to make Facebook safer for everyone.

It's also why we are publishing this information. We believe that increased transparency tends to lead to increased accountability and responsibility over time, and publishing this information will push us to improve more quickly too. This is the

same data we use to measure our progress internally — and you can now see it to judge our progress for yourselves. We look forward to your feedback.

Categories:
Company News, Meta, Safety and Expression

Tags:
Community Standards and Enforcement,
Community Standards Enforcement Report

   

## RELATED NEWS

Meta

## Integrity and Transparency Reports, Fourth Quarter 2022

We're releasing our fourth quarter reports that provide an update on our progress across multiple integrity efforts.

February 23, 2023

### Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

Featured News

## Meta

How Companies Are Using Meta Llama

May 7, 2024

PX0582-005

## Instagram

New Stickers in Instagram Stories

May 3, 2024



Follow Us



## Virtual reality

## Smart glasses

PX0582-006

## About us

⌄

---

## Our community

⌄

---

## Our actions

⌄

---

## Support

⌄

---

© 2024 Meta        Community Standards        Data Policy        Terms        Cookie policy        United States (English)  ⌄

# PX0583

 Meta

Back to Newsroom

Meta

# Community Standards Enforcement Report, November 2019 Edition

November 13, 2019
By Guy Rosen, VP Integrity

Today we're publishing the fourth edition of our Community Standards Enforcement Report, detailing our work for Q2 and Q3 2019. We are now including metrics across ten policies on Facebook and metrics across four policies on Instagram.

These metrics include:

- Prevalence: how often content that violates our policies was viewed

- Content Actioned: how much content we took action on because it was found to violate our policies

- Proactive Rate: of the content we took action on, how much was detected before someone reported it to us

- Appealed Content: how much content people appealed after we took action

- Restored Content: how much content was restored after we initially took action

PX0583-001

We also launched a <u>new page</u> today so people can view examples of how our Community Standards apply to different types of content and see where we draw the line.

## Adding Instagram to the Report

For the first time, we are sharing data on how we are doing at enforcing our policies on Instagram. In this first report for Instagram, we are providing data on four policy areas: child nudity and child sexual exploitation; regulated goods — specifically, illicit firearm and drug sales; suicide and self-injury; and terrorist propaganda. The report does not include appeals and restores metrics for Instagram, as appeals on Instagram were only launched in Q2 of this year, but these will be included in future reports.

While we use the same proactive detection systems to find and remove harmful content across both Instagram and Facebook, the metrics may be different across the two services. There are many reasons for this, including: the differences in the apps' functionalities and how they're used – for example, Instagram doesn't have links, re-shares in feed, Pages or Groups; the differing sizes of our communities; where people in the world use one app more than another; and where we've had greater ability to use our proactive detection technology to date. When comparing metrics in order to see where progress has been made and where more improvements are needed, we encourage people to see how metrics change, quarter-over-quarter, for individual policy areas within an app.

## What Else Is New in the Fourth Edition of the Report

- **Data on suicide and self-injury:** We are now detailing how we're taking action on suicide and self-injury content. This area is both sensitive and complex, and we work with experts to ensure everyone's safety is considered. We remove content that depicts or encourages suicide or self-injury, including certain graphic imagery and real-time depictions that <u>experts tell us</u> might lead others to engage in similar behavior. We place a sensitivity screen over content that doesn't violate our policies but that may be upsetting to some, including things like healed cuts or other non-graphic self-injury imagery in a context of recovery. We also recently strengthened our policies around self-harm and made improvements to our technology to find and remove more violating content.

PX0583-002

- On Facebook, we took action on about 2 million pieces of content in Q2 2019, of which 96.1% we detected proactively, and we saw further progress in Q3 when we removed 2.5 million pieces of content, of which 97.3% we detected proactively.

- On Instagram, we saw similar progress and removed about 835,000 pieces of content in Q2 2019, of which 77.8% we detected proactively, and we removed about 845,000 pieces of content in Q3 2019, of which 79.1% we detected proactively.

- **Expanded data on terrorist propaganda:** Our Dangerous Individuals and Organizations policy bans all terrorist organizations from having a presence on our services. To date, we have identified a wide range of groups, based on their behavior, as terrorist organizations. Previous reports only included our efforts specifically against al Qaeda, ISIS and their affiliates as we focused our measurement efforts on the groups understood to pose the broadest global threat. Now, we've expanded the report to include the actions we're taking against all terrorist organizations. While the rate at which we detect and remove content associated with Al Qaeda, ISIS and their affiliates on Facebook has remained above 99%, the rate at which we proactively detect content affiliated with any terrorist organization on Facebook is 98.5% and on Instagram is 92.2%. We will continue to invest in automated techniques to combat terrorist content and iterate on our tactics because we know bad actors will continue to change theirs.

- **Estimating prevalence for suicide and self-injury and regulated goods:** In this report, we are adding prevalence metrics for content that violates our suicide and self-injury and regulated goods (illicit sales of firearms and drugs) policies for the first time. Because we care most about how often people may see content that violates our policies, we measure prevalence, or the frequency at which people may see this content on our services. For the policy areas addressing the most severe safety concerns — child nudity and sexual exploitation of children, regulated goods, suicide and self-injury, and terrorist propaganda — the likelihood that people view content that violates these policies is very low, and we remove much of it before people see it. As a result, when we sample views of content in order to measure prevalence for these policy areas, many times we do not find enough, or sometimes any, violating samples to reliably estimate a metric. Instead, we can estimate an upper limit of how often someone would see content that violates these policies. In Q3 2019, this upper limit was 0.04%. Meaning that for each of these policies, out of every 10,000 views on Facebook or Instagram in Q3 2019, we estimate that no more than 4 of those views contained content that violated that policy.

  - It's also important to note that when the prevalence is so low that we can only provide upper limits, this limit may change by a few hundredths of a percentage point between reporting periods, but changes that small do not mean there is a real difference in the prevalence of this content on the platform.

# Progress to Help Keep People Safe

Across the most harmful types of content we work to combat, we've continued to strengthen our efforts to enforce our policies and bring greater transparency to our work. In addition to suicide and self-injury content and terrorist propaganda, the metrics for child nudity and sexual exploitation of children, as well as regulated goods, demonstrate this progress. The investments we've made in AI over the last five years continue to be a key factor in tackling these issues. In fact, <u>recent advancements in this technology</u> have helped with rate of detection and removal of violating content.

For **child nudity and sexual exploitation of children**, we made improvements to our processes for adding violations to our internal database in order to detect and remove additional instances of the same content shared on both Facebook and Instagram, enabling us to identify and remove more violating content.

On Facebook:

- In Q3 2019, we removed about 11.6 million pieces of content, up from Q1 2019 when we removed about 5.8 million. Over the last four quarters, we proactively detected over 99% of the content we remove for violating this policy.

While we are including data for Instagram for the first time, we have made progress increasing content actioned and the proactive rate in this area within the last two quarters:

- In Q2 2019, we removed about 512,000 pieces of content, of which 92.5% we detected proactively.

- In Q3, we saw greater progress and removed 754,000 pieces of content, of which 94.6% we detected proactively.

For **our regulated goods policy** prohibiting illicit firearm and drug sales, continued investments in our proactive detection systems and advancements in our enforcement techniques have allowed us to build on the progress from the last report.

On Facebook:

- In Q3 2019, we removed about 4.4 million pieces of drug sale content, of which 97.6% we detected proactively — an increase from Q1 2019 when we removed about 841,000 pieces of drug sale content, of which 84.4% we detected proactively.

- Also in Q3 2019, we removed about 2.3 million pieces of firearm sales content, of which 93.8% we detected proactively — an increase from Q1 2019 when we removed about 609,000 pieces of firearm sale content, of which 69.9% we detected proactively.

On Instagram:

- In Q3 2019, we removed about 1.5 million pieces of drug sale content, of which 95.3% we detected proactively.

- In Q3 2019, we removed about 58,600 pieces of firearm sales content, of which 91.3% we detected proactively.

## New Tactics in Combating Hate Speech

Over the last two years, we've invested in proactive detection of hate speech so that we can detect this harmful content before people report it to us and sometimes before anyone sees it. Our detection techniques include text and image matching, which means we're identifying images and identical strings of text that have already been removed as hate speech, and machine-learning classifiers that look at things like language, as well as the reactions and comments to a post, to assess how closely it matches common phrases, patterns and attacks that we've seen previously in content that violates our policies against hate.

Initially, we've used these systems to proactively detect potential hate speech violations and send them to our content review teams since people can better assess context where AI cannot. Starting in Q2 2019, thanks to continued progress in our systems' abilities to correctly detect violations, we began removing some posts automatically, but only when content is either identical or near-identical to text or images previously removed by our content review team as violating our policy, or where content very closely matches common attacks that violate our policy. We only do this in select instances, and it has only been possible because our automated systems have been trained on hundreds of thousands, if not millions, of different examples of violating content and common attacks. In all other cases when our systems proactively detect potential hate speech, the content is still sent to our review teams to make a final determination. With these evolutions in our detection

PX0583-005

systems, our proactive rate has climbed to 80%, from 68% in our last report, and we've increased the volume of content we find and remove for violating our hate speech policy.

While we are pleased with this progress, these technologies are not perfect and we know that mistakes can still happen. That's why we continue to invest in systems that enable us to improve our accuracy in removing content that violates our policies while safeguarding content that discusses or condemns hate speech. Similar to how we review decisions made by our content review team in order to monitor the accuracy of our decisions, our teams routinely review removals by our automated systems to make sure we are enforcing our policies correctly. We also continue to review content again when people appeal and tell us we made a mistake in removing their post.

## Updating our Metrics

Since our last report, we have improved the ways we measure how much content we take action on after identifying an issue in our accounting this summer. In this report, we are updating metrics we previously shared for content actioned, proactive rate, content appealed and content restored for the periods Q3 2018 through Q1 2019.

During those quarters, the issue with our accounting processes did not impact how we enforced our policies or how we informed people about those actions; it only impacted how we counted the actions we took. For example, if we find that a post containing one photo violates our policies, we want our metric to reflect that we took action on one piece of content — not two separate actions for removing the photo and the post. However, in July 2019, we found that the systems logging and counting these actions did not correctly log the actions taken. This was largely due to needing to count multiple actions that take place within a few milliseconds and not miss, or overstate, any of the individual actions taken.

We'll continue to refine the processes we use to measure our actions and build a robust system to ensure the metrics we provide are accurate. We share more details about these processes here.

PX0583-006

Downloads

Community Standards Enforcement Report Highlights

Press Call Audio Recording

Press Call Transcript

Categories:
Integrity and Security, Meta, Public Policy,
Safety and Expression

Tags:
Community Standards and Enforcement,
Community Standards Enforcement Report,
Facebook app, Instagram

   

## RELATED NEWS

Meta

# Integrity and Transparency Reports, First Quarter 2023

Today marks five years since publishing our first Community Standards Enforcement Report.

May 17, 2023

Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

PX0583-007

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

## Featured News

## Meta

## How Companies Are Using Meta Llama

May 7, 2024

## Instagram

New Stickers in Instagram Stories

May 3, 2024

 Meta

Follow Us



## Virtual reality

## Smart glasses

PX0583-009

About us    ⌄

---

Our community    ⌄

---

Our actions    ⌄

---

Support    ⌄

---

© 2024 Meta    Community Standards    Data Policy    Terms    Cookie policy

United States

(English)  ⌄

# PX0584

Big Tech Is Spending Billions on AI Research. Investors Should Keep an Eye Out - WSJ
5/16/2024 9:23 AM

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/big-tech-is-spending-billions-on-ai-research-investors-should-keep-an-eye-out-11646740800

**CIO JOURNAL**

# Big Tech Is Spending Billions on AI Research. Investors Should Keep an Eye Out

If the past is any guide, the immense amount of research—this time in artificial intelligence—will spawn new products across medicine, new materials, climate and other areas. Investors would do well to stay tuned

*By Steven Rosenbush* [Follow]

*March 8, 2022 7:00 am ET*



Meta Platforms' AI Research SuperCluster. The company claims that by midsummer the SuperCluster will be the fastest computer of its kind in the world. PHOTO: META PLATFORMS INC.

Research labs at big companies are pushing the horizons of what artificial intelligence can do in areas like image recognition, natural language processing and more. And several of the big firms are allocating ever more capital in a race to build out these capabilities.

For instance, Meta Platforms Inc. says that by midsummer its AI Research SuperCluster system will house 16,000 **Nvidia** Corp. graphics processing units, a

PX0584-001

massive engine that Meta claims will be the fastest of its kind in the world. As well, the DeepMind Technologies lab, owned by Google parent Alphabet Inc., has announced the development of a new language model, commenting, "The high-school reading comprehension level approaches human-rater performance."

While these companies take different tacks, both have the potential to catalyze tomorrow's advances in drug discovery, new materials, remedies to climate change, closer analysis of military-drone footage and more.

And they are hardly the only ones: Microsoft Corp., Amazon.com Inc., Oracle Corp., International Business Machines Corp. and others are also in the AI marathon.

Consumers and investors, more focused on spasms in the stock market, may not be paying attention to projects not directly connected to lines of business or quarterly results. But research and development often hatch products that vault beyond a lab's original aims. Xerox Holdings Corp.'s Parc lab, for instance, was a pioneer of personal computing. Researchers at Bell Labs, then part of what is now AT&T Inc., developed the transistor and prototyped an early cellphone.

The amounts of money being spent are massive. At Alphabet, R&D expenses rose to $31.562 billion last year from $27.573 billion in 2020; Meta spent $24.655 billion on R&D last year, rising from $18.447 billion the previous year, company filings show. Alphabet said R&D spending in 2021 amounted to 12.3% of revenue, while Meta reported it was 21% of its sales.

In contrast, S&P 500 companies spent an average 2.82% of revenue on R&D, according to Morningstar Inc., which calculated a revenue-weighted average for index constituents in each of their latest fiscal years.

Facebook parent Meta occupies the lane in the AI race dedicated to scaling data and computing power. Deep learning is a form of AI designed to mimic aspects of human neurons. It took off in 2010 when the ImageNet project proved it was possible to use two GPUs developed by Nvidia to train a large AI model to recognize labeled images, said Kyunghyun Cho, a co-founder of the startup Prescient Design and an associate professor of computer and data science at New York University.

Big Tech Is Spending Billions on AI Research. Investors Should Keep an Eye Out. - WSJ
5/16/2024 9:23 AM

Meta said its AI Research SuperCluster houses 6,080 Nvidia GPUs at present, a number that will rise to 16,000. The computing power will be used for language-processing and computer-vision research, with an eye toward creating the immersive world the company calls the metaverse, said Shubho Sengupta, a software engineer involved in the project.

The supercomputer will help Meta researchers build AI models that can work across hundreds of languages, analyze text, images and video together, and develop augmented-reality tools and rich, multidimensional experiences in the metaverse, the company said. The technology also will help it more easily identify harmful content, Meta said.

Alphabet's DeepMind, which is based in London, employs a technique called reinforcement learning. In this approach, an algorithm learns through a process of trial and error.

Last month, DeepMind announced a new AI system called AlphaCode, which competes with human software developers. In December, DeepMind announced the development of a new language model that it says reduces scale without compromising performance. This comes on top of DeepMind's claim that it has provided a leap in understanding protein structures, critical to drug discovery.

"It demonstrates that creative AI approaches can result in radical improvements in performance without having to do heavier number-crunching," said Shuman Ghosemajumder, head of AI at F5 Inc. and a Google veteran.

It is too early to foresee what the commercial application of this research will be.

NYU's Dr. Cho, whose startup Prescient was sold to Genentech Inc., a subsidiary of Roche, says big corporate labs represent much of the research in AI.

That work won't drive corporate results over the short term. But longer term, it might.

"Such investment from top-tier tech companies who are heavily vested in AI technology will naturally encourage and compel other companies, both tech and non-tech, such as pharmaceuticals," Dr. Cho said.

**Write to** Steven Rosenbush at steven.rosenbush@wsj.com

# PX0585

# 4th Quarter and FY2015 Results

**February 5, 2016 | Investor Relations**

kakao

© Kakao Corp.

PX0585-001

# Disclaimer

Financial information contained in this document is based on consolidated K–IFRS that have not been audited by an independent auditor: therefore, the information and financial data contained in this document are subject to change upon an independent auditor's audit.

Also, this document contains the unaudited pro–forma combined financial information of the Daum Communications and the Kakao Corp., for the pre-merger periods, solely for the convenience of the investors. Please note that such financial information are not subject to an independent auditor's audit.

The company does not make any representation or accept liability, as to the accuracy or completeness of the information contained in this material. The format and contents of this document are subject to change for future filings and reports. Kakao is not liable for providing future updates on all figures included in this document.

PX0585-002

## Milestone



© Kakao Corp.

PX0585-003

# Service Portfolio



**Contents**
·Kakao Page
·Kakao Music
·Kakao TV
·Daum News

**Commerce**
·Kakao Style
·Kakao Talk Gift Shop
·Kakao Friends

**O2O**
·Kakao Taxi
·Kakao Taxi Black
·Kidz Note

**Communication**
·Kakao Talk (#, Channel)
·Kakao Story
·Daum Café
·Plain
·Brunch

**Game**
·Kakao Game
·Kakao Game Shop
·Daum Game

**Fintech**
·Kakao Pay
·Kakao Bank
·Bank Wallet Kakao

**Investment**
·K Ventures Group
·K Cube Ventures

**Global**
·Path

kakao

4

© Kakao Corp.

PX0585-004

## Kakao Talk Monthly Active Users (MAUs)

- Continue to grow our domestic active users: qoq +846K
- Total countries serviced: 230+ (based on country codes), in 15 languages



| (000) | 1Q13 | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Korea** | 32,490 | 33,669 | 34,626 | 35,729 | 36,350 | 36,489 | 37,212 | 37,417 | 38,158 | 38,660 | 39,209 | 40,055 |
| **Global** | 40,096 | 46,132 | 48,916 | 50,619 | 50,386 | 48,769 | 48,411 | 48,254 | 48,207 | 48,073 | 48,464 | 48,321 |

Average of monthly MAUs. Global includes domestic MAUs.

.

kakao

5

© Kakao Corp.

# Summary Results

- 4Q Mobile revenue was 137.2bn Won, accounted for 57% of total revenue, up 7% yoy and up 1% qoq
- FY2015 mobile revenue was 521.2bn Won, accounted for 55% of total revenue, up 12% yoy

(in million KRW)

| | 4Q15 | 3Q15 | QoQ | 4Q14 | YoY | FY2015 | FY2014 | YoY |
|---|---|---|---|---|---|---|---|---|
| Total Revenue | 241,706 | 229,580 | 12,126 | 254,046 | -12,339 | 932,161 | 898,386 | 33,775 |
| Advertising | 148,403 | 142,949 | 5,455 | 165,363 | -16,959 | 583,841 | 583,409 | 432 |
| Game | 57,019 | 51,383 | 5,636 | 68,289 | -11,270 | 232,378 | 257,601 | -25,223 |
| Commerce | 22,698 | 15,339 | 7,359 | 14,284 | 8,414 | 67,241 | 36,664 | 30,577 |
| Others | 13,586 | [1] 19,909 | -6,323 | 6,110 | 7,476 | 48,701 | 20,712 | 27,989 |
| Operating Expense | 221,318 | 213,396 | 7,922 | 188,632 | 32,686 | 843,803 | 689,491 | 154,312 |
| Operating Income | 20,388 | 16,184 | 4,205 | 65,414 | -45,025 | 88,358 | 208,895 | -120,537 |
| *% of Revenue* | 8% | 7% | 1%p | 26% | -18%p | 9% | 23% | -14%p |
| EBIT | 23,920 | 21,782 | 2,138 | 62,551 | -38,631 | 111,909 | 178,320 | -66,411 |
| Net Income | [2] 10,225 | 14,767 | -4,542 | 51,743 | -41,518 | [3] 77,207 | 141,465 | -64,258 |
| EBITDA | 40,694 | 35,657 | 5,037 | 81,702 | -41,008 | 163,773 | 263,039 | -99,266 |

1) Non-recurring revenue of 10.3bn Won from the change in revenue recognition methods of Kakao Page and Kakao Music reflected in 3Q

2) Include the 4.7bn Won gift tax applied to the transfer by gift of 28.6% stakes of the 'PodoTree' and additional 1.5bn income tax due to 2014 Amendments to the Tax Act which included the taxation of corporate reserves.

3) Effective Income Tax Rate for FY2015 is 31%

PX0585-006

## Revenue



■ Advertising   ■ Game   ■ Commerce   ■ Others

(in million KRW)

|        | 1Q14    | 2Q14    | 3Q14    | 4Q14    | 1Q15    | 2Q15    | 3Q15    | 4Q15    |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|
| Total  | 197,365 | 225,172 | 221,803 | 254,046 | 234,392 | 226,482 | 229,580 | 241,706 |
| Online | 106,622 | 118,825 | 111,247 | 119,143 | 105,550 | 109,272 | 100,643 | 104,482 |
| Mobile | 90,743  | 106,347 | 110,556 | 134,903 | 128,842 | 117,210 | 128,937 | 137,224 |

| | |
|---|---|
| Advertising | Daum online•mobile ad.<br>Plus Friend(Kakao Talk)<br>Yellow ID(Kakao Talk)<br>Brand Emoticon(Kakao Talk)<br>Kakao Story ad.<br>Kakao Talk PC version ad. |
| Game | Kakao Game(Kakao Talk)<br>Daum Game<br>Kakao Game Shop |
| Commerce | Gift Shop(Kakao Talk)<br>Kakao Style<br>Kakao Friends Brand |
| Others | B2C Emoticon(Kakao Talk)<br>Kakao Music<br>Kakao Page<br>Kakao Pay(Kakao Talk)<br>& Miscellaneous |

kakao

© Kakao Corp.

PX0585-007

# Revenue: Advertising platforms



**Total Ad** Down 10% yoy  Up 4% qoq
**Online** Down 16% yoy  Up 1% qoq
**Mobile** Up 0.4% yoy  Up 8% qoq

- Increase in mobile advertising revenue and the seasonal effect resulted in sequential growth despite the decrease in PC traffic

- [NEW] 'ChoongJunSo', an ad platform embedded within Kakao Talk, that has been visited by more than 12 million Kakao Talk users since the opening on December 22, 2015

(in million KRW)

| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|---|---|---|
| Total | 128,688 | 147,443 | 141,915 | 165,363 | 141,753 | 150,736 | 142,949 | 148,403 |
| Online | 96,728 | 108,424 | 101,928 | 109,822 | 93,961 | 96,382 | 91,359 | 92,637 |
| Mobile | 31,960 | 39,019 | 39,987 | 55,541 | 48,092 | 54,354 | 51,589 | 55,766 |

kakao

© Kakao Corp.

PX0585-008

# Revenue: Game platforms



■ Mobile    ■ Online

(in million KRW)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total | 59,273 | 62,574 | 67,464 | 68,289 | 69,991 | 53,984 | 51,383 | 57,019 |
| Online | 7,813 | 7,003 | 7,845 | 7,710 | 11,225 | 10,996 | 8,114 | 8,784 |
| Mobile | 51,460 | 55,571 | 59,619 | 60,579 | 58,766 | 42,989 | 43,269 | 48,235 |

**Total Game** Down 17% yoy  Up 11% qoq
  **Mobile** Down 20% yoy  Up 11% qoq
  **Online** Up 14% yoy  Up 8% qoq

- Improved performance of the existing 'for Kakao' games, and strong performance of new games including '100 Shots 100 Hits', 'The King of Fighters' and our own brand IP utilized game 'Friends Pop' contributed to the sequential growth

- Increased competition and the disposal of shares in Onnet resulted in yoy decrease in game revenue

- [NEW] 'Mobile Game Board Zone', a new game zone within Kakao Game

kakao

9

© Kakao Corp.

PX0585-009

## Revenue: Commerce platforms



■ Mobile

**Commerce   Up 59% yoy  Up 48% qoq**

– In addition to the seasonal effect, upward trend continues throughout the platforms due to the increased product lineup, diversifying commerce channels and ongoing effort to enhance the UX/ UI(User Experience and User Interface)

(in million KRW)

| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|---|---|---|
| Mobile | 5,818 | 8,806 | 7,756 | 14,284 | 15,526 | 13,678 | 15,339 | 22,698 |

kakao

**10**

© Kakao Corp.

PX0585-010

# Revenue: Other platforms



■ Mobile    ■ Online

| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (in million KRW) |
| **Total** | 3,586 | 6,349 | 4,668 | 6,110 | 7,122 | 8,084 | 19,909 | 13,586 |
| **Online** | 2,081 | 3,397 | 1,475 | 1,611 | 1,540 | 1,895 | 2,435 | 3,060 |
| **Mobile** | 1,505 | 2,952 | 3,193 | 4,499 | 5,582 | 6,189 | 17,474 | 10,526 |

**Total Others  Up 122% yoy  Down 32% qoq**
**Mobile  Up 134% yoy  Down 40% qoq**

- Sequential decrease was due to the non-recurring revenue recognized in 3Q, for the revenue recognition method changes in Kakao Page and Kakao Music

- Continued organic growth in mobile content business including emoticon sales to Kakao Talk users, Kakao Music and Kakao Page

- [NEW] 'AlrimTalk', a notification messaging service that is already being used by 70 companies and 1,500 local stores.

kakao

11

© Kakao Corp.

PX0585-011

# Expense

- Total operating expenses for 4Q2015 was 221.3bn Won, up 17% yoy and up 4% qoq

- Total operating expenses for FY2015 was 843.8bn Won, up 22% yoy

(in million KRW)

| | 4Q15 | 3Q15 | QoQ | 4Q14 | YoY | FY2015 | FY2014 | YoY |
|---|---|---|---|---|---|---|---|---|
| **OP Expenses** | 221,318 | 213,396 | 7,922 | 188,632 | 32,686 | 843,803 | 689,491 | 154,312 |
| Labor costs | 55,694 | 56,455 | -761 | 47,242 | 8,452 | 218,542 | 195,154 | 23,388 |
| Fringe benefits | 10,964 | 12,813 | -1,849 | 8,782 | 2,182 | 51,083 | 35,275 | 15,808 |
| Depreciation | 12,960 | 12,375 | 585 | 10,596 | 2,364 | 49,122 | 38,653 | 10,469 |
| Rental fees | 4,531 | 4,666 | -135 | 4,287 | 244 | 18,594 | 15,237 | 3,357 |
| Commissions | 64,957 | 62,876 | 1) 2,081 | 55,865 | 9,092 | 236,859 | 189,837 | 47,022 |
| Advertising | 13,074 | 6,843 | 2) 6,231 | 9,116 | 3,958 | 56,800 | 40,122 | 16,678 |
| Bad Debt Exp. | 1,123 | 8 | 1,115 | 1,583 | -460 | 1,504 | 470 | 1,034 |
| Amortization | 7,345 | 7,099 | 246 | 5,692 | 1,653 | 26,292 | 15,491 | 10,801 |
| Content fees | 12,698 | 15,626 | 3) -2,928 | 7,111 | 5,587 | 48,174 | 29,879 | 18,295 |
| Ad agency fees | 27,553 | 27,068 | 485 | 30,154 | -2,601 | 105,615 | 103,394 | 2,221 |
| Event fees | 560 | 148 | 412 | 1,833 | -1,273 | 1,190 | 2,830 | -1,640 |
| Others | 9,859 | 7,420 | 2,439 | 6,371 | 3,488 | 30,028 | 23,148 | 6,880 |

1) Increase in professional fee and outsourcing fee
2) Seasonal events for Kakao Talk Gift Shop, and promotional marketing for Kakao Taxi Black and Kakao Pay
3) Decreased mainly due to the non-recurring cost related to the Kakao Music recognized in 3Q

kakao

© Kakao Corp.

PX0585-012

## Profits

### Operating Profits

4Q2015 20.4bn Won, Down 69% yoy  Up 26% qoq
FY2015 88.4bn Won, Down 58% yoy



### Net Profits

4Q2015 10.2bn Won, Down 80% yoy Down 31% qoq
FY2015 77.2bn Won, Down 45% yoy



kakao

13

© Kakao Corp.

PX0585-013

## CapEx



PX0585-014

# Consolidated Financial Statements

## Consolidated Statements of Income

| (in million KRW) | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|
| **Sales Revenues** | **254,046** | **234,392** | **226,482** | **229,580** | **241,706** |
| Advertising Platform | 165,363 | 141,753 | 150,736 | 142,949 | 148,403 |
| Game Platform | 68,289 | 69,991 | 53,984 | 51,383 | 57,019 |
| Commerce Platform | 14,284 | 15,526 | 13,678 | 15,339 | 22,698 |
| Others | 6,110 | 7,122 | 8,084 | 19,909 | 13,586 |
| **Operating Expenses** | **188,632** | **194,040** | **215,049** | **213,396** | **221,318** |
| Labor Costs | 47,242 | 51,803 | 54,590 | 56,455 | 55,694 |
| Fringe Benefits | 8,782 | 9,970 | 17,337 | 12,813 | 10,964 |
| Depreciation | 10,596 | 11,455 | 12,333 | 12,375 | 12,960 |
| Rental Fees | 4,287 | 5,034 | 4,363 | 4,666 | 4,531 |
| Commissions | 55,865 | 52,645 | 56,381 | 62,876 | 64,957 |
| Advertising | 9,116 | 17,221 | 19,662 | 6,843 | 13,074 |
| Bad Debt Expenses | 1,583 | -21 | 394 | 8 | 1,123 |
| Amortization | 5,692 | 5,937 | 5,911 | 7,099 | 7,345 |
| Content Fees | 7,111 | 8,452 | 11,398 | 15,626 | 12,698 |
| Ad Agency Fees | 30,154 | 24,418 | 26,576 | 27,068 | 27,553 |
| Event Fees | 1,833 | 171 | 312 | 148 | 560 |
| Others | 6,371 | 6,955 | 5,794 | 7,420 | 9,859 |
| **Operating Profit** | **65,414** | **40,352** | **11,434** | **16,184** | **20,388** |
| *Operating Profit Margin* | *25.7%* | *17.2%* | *5.0%* | *7.0%* | *8.4%* |
| **Other Revenues** | 485 | 1,339 | 9,822 | 6,706 | 10,020 |
| **Other Expenses** | 6,345 | 2,715 | 12,925 | 4,611 | 5,711 |
| **Financial Income** | 3,574 | 3,252 | 18,240 | 3,543 | 4,936 |
| **Financial Expenses** | 69 | 330 | 951 | 325 | 2,427 |
| **Equity-method Income** | -508 | -553 | -756 | 284 | -3,286 |
| Gains on Equity Method Invest. | 181 | 35 | 591 | 2,972 | -147 |
| Losses on Equity Method Invest. | 689 | 588 | 1,346 | 2,688 | 3,139 |
| **Profit before Income Tax Expenses** | **62,551** | **41,344** | **24,863** | **21,782** | **23,920** |
| Income Tax Expenses | 10,809 | 10,498 | 3,494 | 7,015 | 13,695 |
| Net Profit from Continued Operations | 51,743 | 30,846 | 21,369 | 14,767 | 10,225 |
| **Net Profit** | **51,743** | **30,846** | **21,369** | **14,767** | **10,225** |
| Net Profit of Controlling Interests | 51,914 | 31,097 | 20,556 | 13,004 | 9,534 |
| Net Profit of Non-controlling Int. | -171 | -250 | 814 | 1,762 | 691 |

## Consolidated Statements of Financial Position

| (in million KRW) | 2014.12.31 | 2015.12.31 |
|---|---|---|
| **Current Assets** | **798,291** | **975,035** |
| Cash and Cash Equivalents | 451,228 | 397,179 |
| Short-term Financial Instruments | 184,548 | 373,389 |
| Accounts Receivable | 108,431 | 88,829 |
| Other Current Financial Assets | 25,843 | 59,671 |
| Other Current Assets | 24,709 | 45,373 |
| Others | 3,532 | 10,594 |
| **Non-Current Assets** | **1,969,734** | **2,215,188** |
| Long-term Available for Sales | 25,258 | 30,892 |
| Equity Method Investments | 18,712 | 68,543 |
| Tangible Assets | 196,894 | 219,052 |
| Intangible Assets | 1,688,974 | 1,856,691 |
| Other Non-current Financial Assets | 33,702 | 33,177 |
| Other Non-current Assets | 6,194 | 6,832 |
| **Total Assets** | **2,768,025** | **3,190,223** |
| **Liabilities** | **227,487** | **298,160** |
| Trade Payables and Non-trade Payables | 109,126 | 89,297 |
| Accrued Expenses | 5,443 | 6,949 |
| Advances from Customers | 34,488 | 109,397 |
| Income Taxes Payable | 20,680 | 29,236 |
| Other Current Liabilities | 57,751 | 63,280 |
| **Non-Current Liabilities** | **77,309** | **304,183** |
| Bonds | – | 199,383 |
| Defined Benefit Liabilities | 3,362 | 8,344 |
| Deferred Income Tax Liabilities | 50,083 | 47,951 |
| Other Non-Current Liabilities | 23,864 | 48,505 |
| **Total Liabilities** | **304,797** | **602,343** |
| **Paid-in Capital** | **29,121** | **30,098** |
| **Capital Surplus** | **2,258,974** | **2,279,510** |
| **Capital Adjustments** | **-26,268** | **-9,032** |
| **Accum. Other Comprehen. Inc.** | **2,114** | **753** |
| **Retained Earnings** | **190,678** | **254,838** |
| **Non-controlling Interests** | **8,609** | **31,714** |
| **Total Equity** | **2,463,228** | **2,587,880** |
| **Total Liabilities & Equity** | **2,768,025** | **3,190,223** |

kakao

© Kakao Corp.

PX0585-015

## Employees / Subsidiaries

(in person)

| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|---|---|---|
| **Kakao** | **2,162** | **2,272** | **2,250** | **2,262** | **2,255** | **2,271** | **2,299** | **2,375** |
| L Daum | 1,589 | 1,593 | 1,525 | | | | | |
| L Kakao | 573 | 679 | 725 | | | | | |
| **Kakao Subsidiaries** | 1,059 | 1,089 | 1,217 | 1,269 | 1,348 | 1,413 | 1,447 | 1,725 |
| **Consolidated total** | **3,221** | **3,361** | **3,467** | **3,531** | **3,603** | **3,684** | **3,746** | **4,100** |

- Above number of employees include full-time and part-time employees

- Subsidiaries:  Daum Global Holdings Corp, Kakao Singapore PTE. Ltd., DK CHINA Co., Ltd., DK CHINA YanJiao Co., Ltd., ImageOn Corp, Daum Game Co., Ltd., Dialod Corp., TNK Factory Co., Ltd., Buzzpia Co., Ltd. Thinkreals Corp., Lotiple Inc., Kakao Lab Corp., Sunnyloft Corp., Beijing Kakao Co., Ltd., Ultra Caption Corp., Ltd., Kakao JAPAN Corp., Kids Note Inc., K-cube Venture Fund, Kakao Venture Fund, K-cube Ventures, K Venture Group, Sellit Inc., LOCNALL Inc., KakaoFriends Inc., Daum Games Europe B.V., Ultra Interactive, Inc., Tangram Design Lab., Tangram Factory, Tangram Factory America, Inc., DK Business, DK Service, DK Techin, Path Mobile Inc., Valuepotion, Nzin, Cadac, Valuepotion Pte. LTD, Zinny Labs Corp., Aina, Supernova Eleven, Co., Ltd., Black Star Games, Co., Ltd., Red Star Games, Co., Ltd., Mmagnet Corporation, NGLE Corporation, BULLHOCsoft Corp., Podotree, Inc., About Time Corp. (Total **47** subsidiaries as of December 31, 2015)

kakao

16

© Kakao Corp.

PX0585-016

# PX0586

# Our approach to responsible AI innovation

BY **JENNIFER FLANNERY O'CONNOR AND EMILY MOXLEY,** *VICE PRESIDENTS, PRODUCT MANAGEMENT, YOUTUBE*

NOV 14, 2023   —   7 MINUTE READ

 



Generative AI has the potential to unlock creativity on YouTube and transform the experience for viewers and creators on our platform. But just as important, these opportunities must be balanced with our responsibility to protect the YouTube community. All content uploaded to YouTube is subject to our Community Guidelines—regardless of how it's generated—but we also know that AI will introduce new risks and will require new approaches.

We're in the early stages of our work, and will continue to evolve our approach as we learn more. Here's a look at what

PX0586-001

YouTube will roll out over the coming months and into the new year.

# "We'll introduce updates that inform viewers when the content they're seeing is synthetic."

## Disclosure requirements and new content labels

We believe it's in everyone's interest to maintain a healthy ecosystem of information on YouTube. We have long-standing policies that prohibit technically manipulated content that misleads viewers and may pose a serious risk of egregious harm. However, AI's powerful new forms of storytelling can also be used to generate content that has the potential to mislead viewers—particularly if they're unaware that the video has been altered or is synthetically created.

PX0586-002

5/15/24, 11:12 PM                              Our approach to responsible AI innovation - YouTube Blog



Mock showing label added to the description panel

To address this concern, over the coming months, we'll introduce updates that inform viewers when the content they're seeing is synthetic. Specifically, we'll require creators to disclose when they've created altered or synthetic content that is realistic, including using AI tools. When creators upload content, we will have new options for them to select to indicate that it contains realistic altered or synthetic material. For example, this could be an AI-generated video that realistically depicts an event that never happened, or content showing someone saying or doing something they didn't actually do.

PX0586-003

5/15/24, 11:12 PM                                    Our approach to responsible AI innovation - YouTube Blog



Mock showing label added to the video player

This is especially important in cases where the content discusses sensitive topics, such as elections, ongoing conflicts and public health crises, or public officials. Creators who consistently choose not to disclose this information may be subject to content removal, suspension from the YouTube Partner Program, or other penalties. We'll work with creators before this rolls out to make sure they understand these new requirements.

We'll inform viewers that content may be altered or synthetic in two ways. A new label will be added to the description panel indicating that some of the content was altered or synthetic. And for certain types of content about

PX0586-004

sensitive topics, we'll apply a more prominent label to the video player.



Mock showing label added to content generated by
YouTube AI Dream Screen

There are also some areas where a label alone may not be enough to mitigate the risk of harm, and some synthetic media, regardless of whether it's labeled, will be removed from our platform if it violates our Community Guidelines. For example, a synthetically created video that shows realistic violence may still be removed if its goal is to shock or disgust viewers.

And moving forward, as these new updates roll out, content created by YouTube's generative AI products and features

PX0586-005

will be clearly labeled as altered or synthetic.

## More like this

News and Events

An artist-centric
approach to AI…

# New options for creators, viewers, and artists

We've heard continuous feedback from our community, including creators, viewers, and artists, about the ways in which emerging technologies could impact them. This is especially true in cases where someone's face or voice could be digitally generated without their permission or to misrepresent their points of view.

So in the coming months, we'll make it possible to request the removal of AI-generated or other synthetic or altered content that simulates an identifiable individual, including their face or voice, using our privacy request process. Not

all content will be removed from YouTube, and we'll consider a variety of factors when evaluating these requests. This could include whether the content is parody or satire, whether the person making the request can be uniquely identified, or whether it features a public official or well-known individual, in which case there may be a higher bar.

We're also introducing the ability for our music partners to request the removal of AI-generated music content that mimics an artist's unique singing or rapping voice. In determining whether to grant a removal request, we'll consider factors such as whether content is the subject of news reporting, analysis or critique of the synthetic vocals. These removal requests will be available to labels or distributors who represent artists participating in YouTube's early AI music experiments. We'll continue to expand access to additional labels and distributors over the coming months.

# Deploying AI technology to power content moderation

YouTube has always used a combination of people and machine learning technologies to enforce our Community Guidelines, with more than 20,000 reviewers across Google operating around the world. In our systems, AI classifiers help detect potentially violative content at scale, and reviewers work to confirm whether content has actually crossed policy lines. AI is continuously increasing both the speed and accuracy of our content moderation systems.

PX0586-007

One clear area of impact has been in identifying novel forms of abuse. When new threats emerge, our systems have relatively little context to understand and identify them at scale. But generative AI helps us rapidly expand the set of information our AI classifiers are trained on, meaning we're able to identify and catch this content much more quickly. Improved speed and accuracy of our systems also allows us to reduce the amount of harmful content human reviewers are exposed to.

More like this

Inside YouTube

Our AI principles for partnering...

# Building responsibility into our AI tools and features

As we continue to develop new AI tools for creators, our approach remains consistent with how we've tackled some of our biggest responsibility challenges: we believe in

PX0586-008

taking the time to get things right, rather than striving to be first.

We're thinking carefully about how we can build upon years of investment into the teams and technology capable of moderating content at our scale. This includes significant, ongoing work to develop guardrails that will prevent our AI tools from generating the type of content that doesn't belong on YouTube.

We also recognize that bad actors will inevitably try to circumvent these guardrails. We'll incorporate user feedback and learning to continuously improve our protections. And within our company, dedicated teams like our intelligence desk are specifically focused on adversarial testing and threat detection to ensure our systems meet new challenges as they emerge.

# The AI transformation is at our doorstep

We're still at the beginning of our journey to unlock new forms of innovation and creativity on YouTube with generative AI. We're tremendously excited about the potential of this technology, and know that what comes next will reverberate across the creative industries for years to come. We're taking the time to balance these benefits with ensuring the continued safety of our community at this pivotal moment—and we'll work hand-in-hand with creators,

PX0586-009

Case 1:20-cv-03590-JEB    Document 347-6    Filed 05/24/24    Page 478 of 501

artists and others across the creative industries to build a future that benefits us all.

PX0586-010

# PX0587

5/15/24, 11:13 PM    Augmenting our content moderation efforts through machine learning and dynamic content prioritization

 Engineering Blog 

# Augmenting our content moderation efforts through machine learning and dynamic content prioritization

**Abhishek Chandak**

Data Science and Machine Learning | Trust and Safety at LinkedIn

November 27, 2023

Co-Authors: **Abhishek Chandak** and **Ritish Verma**

We recognize that our 1 billion members and their over 10 billion years' worth of collective knowledge and insights bring tremendous value to the LinkedIn community. That's why we're committed to enabling our members and customers to safely engage and connect with content. Our Trust & Safety team works diligently to keep harmful content off the platform, allowing members to tap into the real-life, meaningful insights and information shared by their peers.

We do this through a **multi-layer defense system** that includes AI models, member reports, and human reviewers to swiftly identify and remove content that violates our **Professional Community Policies**. To help our team review content faster and with more focus, we created a new framework for content review prioritization, which uses AI models to score each piece of content in the review queue based on how likely it is to have broken our policies. This helps our reviewers prioritize which content needs immediate attention.

In this blog, we will discuss how this new framework makes it easier for reviewers to find and handle content that needs a human touch, while reducing the average time it takes to detect content that doesn't align with our policies by 60%. Through a combination of human and technology review systems, this new framework helps ensure that content that doesn't align to our policies does not make it onto the platform and into our members' feeds.

# How We Designed the New System

PX0587-001

 Engineering Blog

First Out (FIFO) manner (see Figure 1).

However, this approach has two notable drawbacks. First, not all content that is reviewed by humans violates our policies - a sizable portion is evaluated as non-violative (i.e., cleared). This takes valuable reviewer bandwidth away from reviewing content that is actually violative. Second, when items are reviewed on a FIFO basis, violative content can take longer to detect if it is ingested after non-violative content.

## Intelligent review queue prioritization

We developed a new framework for content review prioritization, which uses AI and automation to address these limitations. With this framework, content entering review queues is scored by a set of AI models to calculate the probability that  it likely violates our policies. Content with a high probability of being non-violative is deprioritized, saving human reviewer bandwidth and content with a higher probability of being policy-violating is prioritized over others so it can be detected and removed quicker.

PX0587-002

 Engineering Blog 

# The ML models

The new content review prioritization framework uses a set of XGBoost models, to predict the probability of a piece of content being violative or clear. XGBoost provides better recall at set precision for us compared to architectures like TF2-based neural networks as our training data is tabular and there is large variation in violation patterns over time. These models are trained on a representative sample of past human labeled data from the content review queue and tested on another out-of-time sample. We leverage random grid search for hyperparameter selection and the final model is chosen based on the highest recall at extremely high precision (R@P). We use this success metric because LinkedIn has a very high bar for trust enforcements quality so it is important to maintain very high precision.

The models leverage a set of real-time signals, orthogonal to those used by existing AI services for automated content restriction. These models are built on **ProML** which is the company-wide machine learning productivity platform for training, developing, and serving ML models.

# Model Hosting and Decision Layer

The ML models are packed and made available as ML artifacts for consumption. We created a dedicated scoring layer (decision workflow) based on top of **ProML** which hosts the models and is triggered every time an item enters the review queue. This scorer continuously updates the score of an item in the review queue every time there is a new member report until the item has

PX0587-003

5/15/24, 11:13 PM                    Augmenting our content moderation efforts through machine learning and dynamic content prioritization

 **Engineering Blog**                                                                                          

1. Fetch the features required by the models using **Frame** from different downstreams and prepare it in a model interpretable format

2. Run inference on the models, prepare results and return back to upstream i.e., content review queue for consumption

3. Generate tracking data for analysis, debugging, and precision measurement

This decision layer for serving the ML models results is integrated within the existing review assignment and prioritization tooling at LinkedIn. The content review queue uses an intelligent review assignment framework which uses these scores and few other static parameters to intelligently prioritize human review items.

## Advantages of the new approach

Our legacy framework used high-level static buckets with varied SLAs to prioritize the content in the review queue. However, with this new content review prioritization framework, we are using a new and technically complex approach to review prioritization which has the following hallmarks.

1. This approach to prioritization is completely dynamic where content in the review queue can be moved up or down based on the probability of it being policy-violating.

2. The scores for a piece of content are updated continuously and the final decision between prioritization or de-prioritization is based on the sum

PX0587-004

 **Engineering Blog**    

---

3. The probability scores are calculated using AI models, which makes the entire framework probabilistic and provides more flexibility for optimization, as compared to a static framework with rigid rules.

4. The models are triggered at the time a piece of content is reported for review instead of at the time of creation like existing content classification services. As a result, they can make use of additional information that was not available at the time of content creation.

5. This framework also augments the capacity of human reviewers so it can scale non-linearly with the help of automation and machine intelligence, instead of just expanding linearly as we hire more team members. This will enable us to better scale and keep up with the ever growing content and review volumes on LinkedIn.

## Impact

This new content review prioritization framework is able to make auto-decisions on ~10% of all queued content at our established (extremely high) precision standard, which is better than the performance of a typical human reviewer. Due to these savings, we are able to reduce the burden on human reviewers, allowing them to  focus on content that requires their review due to severity and ambiguity. With the dynamic prioritization of content in the review queue, this framework is also able to reduce the average time taken to catch policy-violating content by ~60%. Due to this faster identification and subsequent removal of such content, we are able to reduce the number of unique members exposed to violative content significantly each week.

# Looking ahead

PX0587-005

 Engineering Blog                                                                    

LinkedIn products. We are also leveraging the foundational capabilities of this framework to enhance other review processes, like reviewer assignment. These steps will help us further strengthen our content moderation practices and ensure LinkedIn's position as among the most trusted professional networks.

## Acknowledgements

Multiple teams across LinkedIn have come together to make this framework a reality and make the platform a safer place for our members. Teams including Trust Data Science, Trust ML Infrastructure, Trust Tools Engineering, Transparency Engineering, Trust Product, Trust AI, Trust and Safety, have all contributed to the development of this framework.

Topics:   Machine Learning

## Related articles

PX0587-006

 **Engineering Blog**    ☰

**Gonzalo Aniano Porcile, PhD** | Mar 21, 2024

Open Source

## Open Sourcing FlyteInteractive: Saving thousands of AI enginee...

**Byron (Pin-Lun) Hsu** | Feb 15, 2024

## Building a Large-Scale Recommendation System: People You May Know

PX0587-007

in  **Engineering Blog**

☰

© 2024                                          About

Accessibility                                   User Agreement

Privacy Policy                                  Cookie Policy

Copyright Policy                                Brand Policy

Guest Controls                                  Community Guidelines

Language

PX0587-008

# PX0588

ADVERTISEMENT

BUSINESS • MEDIA

# TikTok CEO Shou Zi Chew Increasing Use of AI in Content Moderation

He recently discussed artificial intelligence, community and more at the TED2023 conference in Vancouver.

By Rachyl Jones • 04/21/23 12:53pm



**Shou Zi Chew elaborated on TikTok's algorithm at TED.** Jason Redmond / TED

TikTok is planning on building out its artificial intelligence (AI) tools that can moderate content, CEO Shou Zi Chew said at TED2023 yesterday (April 20). The company currently employs "tens of thousands" of workers to moderate user content, in addition to using AI, he said.



### Sign Up For Our Daily Newsletter

| Email Address | SIGN UP |

See all of our newsletters

"The tech will become more precise, more specific and handle a larger scale with content moderation," he said.

PX0588-001

Chew took the stage in Vancouver, British Columbia in Canada for TED's annual event. He spoke for 20 minutes with Chris Anderson, head of the conference organization.

Content moderation was top of mind for U.S. legislators when Chew testified in front of Congress last month. Rep. Cathy McMorris Rodgers, a Washington Republican, accused the company of presenting harmful content to users, including content that promotes self-harm, eating disorders and dangerous challenges. At the hearing, Chew repeated how that content violates TikTok's guidelines, which didn't seem to appease legislators. But at the TED conference, he shed light on how TikTok's content moderation actually works and what the company is doing to improve it.

TikTok's Irish content moderation team is one of the company's "most important cost items," Chew said in the interview. He didn't elaborate on how much the company spends on content moderation, which as a private company, it isn't required to disclose.

Chew's five-year vision for TikTok includes increasing the number of small businesses that profit from the app and promoting the discovery of new ideas, he said.

ADVERTISEMENT

## How TikTok's algorithm works

At the conference, Shew also explained the basics of TikTok's algorithm, which Anderson pointed out is unlike any other social media recommendation engine. The technology learns what users are interested in based on what they've liked in the past, and it finds others who have liked the same videos, or who have the same "interest signals," Chew said. The algorithm then recommends what those users individually like to each other, which is how the app can predict what users are interested in before they might know it themselves.

The algorithm isn't unlike Meta's, which owns Facebook and Instagram. But TikTok's quick growth and high viewership could be attributed to the vision it was founded with, Chew said. It always intended to recommend posts based on what users like rather than who they know, while other apps were built on something different, he said. Meta (META) began as a company to connect friends online before pivoting to recommend content based on interests.

PX0588-002



entitled "Make Instagram Instagram Again" that has <u>2.3 million likes</u> on the app.

"You can't just shift it halfway," Chew said. "The community comes in and expects something different."

ADVERTISEMENT

But that's what Instagram seems to be doing. "We're also going to need to evolve, because the world is changing quickly, and we're going to have to change along with it," said Adam Mosseri, head of Instagram, in a video posted on Twitter last year.

**Filed Under:** Business, Digital Media, Media, Content Moderation, Shou Zi Chew, Algorithm, Meta, TikTok

**SEE ALSO**: What Melinda French Gates's Philanthropy Could Look Like Post-Gates Foundation

Recommended for you

Recommended by Outbrainl



**Urologist: Building Muscle After 50 Comes Down To One Thing**

Sponsored | AHF



**Windows Users Didn't Know This Simple Trick To Block All Ads (Do It Now)**

Removing ads is the first step in having a faster, safer and hassle-free browsing...

Sponsored | Safe Tech Tips



**Top Podiatrist: If You Have Toenail Fungus Try This Tonight (It's Genius!)**

Sponsored | WellnessGuide101.com



**Bill Gates's Image Crisis Worsens As Divorce Exposes More Scandals**



**How the Porn Site TrenchcoatX Turns-On Users By Filtering Out Turn-offs**



**Elon Musk Launched His Red Tesla Roadster Into Space 6 Years Ago—Where Is It Now?**

PX0588-003



**New Edema Device Leaves Experts Speechless (Discover the Comfort You Deserve).**

Sponsored | healthinsightjournal.com

**The 5 stocks Set to Double - Not the ones you expect**

Expert who Compounded $10,000 into $21.9M Picks next stock to buy

Sponsored | Zacks Research



**Forget Furosemide, Use This Household Item To Help Drain Edema Fluid**

Sponsored | healthlabnews.com

**Dermatologist Warns: Stop Lasering Dark Spots! Do This Instead (It's Genius!)**

Sponsored | Miami MD



**Sleep Apnea: Ingenious Pillow Takes The US By Storm**

Sponsored | myhealthyhabit.co



**Why Americans Are Going Crazy For The Affordable Meal Kit**

Sponsored | Dinnerly



**4 Worst Blood Pressure Meds**

Sponsored | Home - Blood Pressure Solution : Bloo...



**Cardiologist: How To Quickly Lose a Hanging Belly With Ice Method**

Sponsored | getfittoday.online



**All Inclusive Train Tour Deals for Seniors**

Sponsored | Search Ads

PX0588-004

# PX0589

Data Management

# Detecting and preventing abuse on LinkedIn using isolation forests



James Verbus
Senior Staff Machine Learning Engineer at
LinkedIn
August 13, 2019

The Anti-Abuse AI Team at LinkedIn creates, deploys, and maintains models that detect and prevent various types of abuse, including the creation of fake accounts, member profile scraping, automated spam, and account takeovers. There are several unique challenges we face when using machine learning to prevent abuse on a large professional network, including:

- **Labels:** few/poor "ground truth" labels, or sometimes none at all

- **Adversarial:** attackers are quick to adapt and evolve

- **Unbalanced:** the abusive traffic is a very small fraction of total traffic

- **Many surfaces:** there are many dynamically-changing heterogeneous surfaces to monitor

To help solve these challenges, we've created a Spark/Scala implementation of the Isolation Forest unsupervised outlier detection algorithm. Today, we are announcing that our Isolation Forest library is now open sourced and available on GitHub.

In this post, we provide a technical overview of the Isolation Forest algorithm. Then, we describe our Spark/Scala Isolation Forest library, as well as describing the above challenges in more detail and outlining how Isolation Forests provide a solution.

PX0589-001

Finally, we share some concrete potential use cases
for this algorithm.

# Isolation Forests

The Isolation Forest algorithm was first proposed in
2008 by Liu et al. It is a type of unsupervised outlier
detection that leverages the fact that outliers are
"few and different," meaning that they are fewer in
number and have unusual feature values compared
to the inlier class. Liu et al.'s innovation was to use a
randomly-generated binary tree structure to non-
parametrically capture the multi-dimensional feature
distribution of the training dataset.

Each isolation tree is created using the following
steps:

  1. Randomly sample $N$ instances from your
training dataset.

At each node:

  2. Randomly choose a feature to split upon.

  3. Randomly choose a split value from a uniform
distribution spanning from the minimum value to
the maximum value of the feature chosen in Step 2.

Steps 2 and 3 are repeated recursively until, in
principle, all $N$ instances from your sample are
"isolated" in leaf nodes of your isolation tree—one
training instance per leaf node. In practice, we don't
need to build the tree so deeply and can apply a
height limit.

PX0589-002



*An example isolation tree*

The intuition is that outliers—due to being few and different—are easier to isolate in leaf nodes and thus require fewer random splits to achieve this, on average. The result is a shorter expected path length from the root node to the leaf node for outlier data points. The outlier score for a particular instance is a function of the path length from the root node to the leaf node and the total number of training instances used to build the tree.

If a height limit is applied when building the tree, some leaf nodes will end up with more training instances than others. This is useful additional information that should be incorporated into the outlier score. The average depth for an unsuccessful search in a binary search tree created with $N$ instances is given by

$$c\left(N\right) = 2H\left(N - 1\right) - \left(\frac{2(N-1)}{N}\right),$$

where $H(i) \approx \ln(i) + 0.5772156649$. Due to the similar structure of binary search trees and isolation trees, the value $c(N)$ provides the average depth of an isolation tree created using $N$ training instances. For leaf nodes containing $M > 1$ training instances, we

PX0589-003

can add $c(M)$ to the measured path length from the root to the leaf node to account for the number of instances terminating in the leaf node; this sum yields the effective path length for a particular instance, $h(x_i)$.

We can train an ensemble of isolation trees, an Isolation Forest, and average across their output to reduce the variance of the model. Once an Isolation Forest model is trained, the outlier score for an instance $x_i$ is given by

$$s(x_i, N) = 2^{\frac{-E(h(x_i))}{c(N)}},$$

where $E(h(x_i))$ is the effective path length for that instance, $h(x_i)$, averaged across all trees in the ensemble, and $c(N)$ is the expected depth of an isolation tree given $N$ training instances discussed previously. This uncalibrated score, $s(x_i, N)$, ranges from 0 to 1. Higher scores are more outlier-like.

## Isolation Forest Spark/Scala library

We created a Spark/Scala implementation of the Isolation Forest algorithm for use at LinkedIn. Our implementation supports distributed training and scoring using Spark data structures. We inherit Spark ML's Estimator and Model classes in order to take advantage of Spark ML machinery such as Pipelines. Our implementation supports model persistence on Hadoop Distributed File System (HDFS).

Here is an example demonstrating how to import the library, create a new IsolationForest instance, set the model hyperparameters, train the model, and

PX0589-004

then score the training data. In this example, data is a Spark DataFrame with a column named features that contains a Vector of the attributes to use for training. In this example, the DataFrame data also has a labels column; it is not used in the training process, but could be useful for model evaluation.

*How to train and score data in Scala using our Isolation Forest library*

The output DataFrame, dataWithScores, is identical to the input data DataFrame but has two additional result columns appended with their names set via model parameters; in this example, these are named predictedLabel and outlierScore.

# Why use Isolation Forests?

We chose the Isolation Forest algorithm for multiple reasons. Isolation Forests are a top-performing unsupervised outlier detection algorithm. Isolation Forests are also scalable, as their computational and memory requirements are low compared to common alternatives. There are fewer assumptions (e.g., non-parametric, no need for a distance metric) than other candidate algorithms. Finally, Isolation Forests are actively used in academia and industry, which allows us to leverage best practices and new developments shared by others in the field.

**Labels**

For some types of abuse, such as spam, it is possible to have a scalable review process where humans label training examples as spam or not spam. There are other types of abuse, such as scraping, where this kind of scalable human labeling is much more difficult, or impossible. Often, the labels you are able to obtain for training and evaluation are fuzzy; the precision may be less than ideal and there may be poor recall for some types of abusive behavior.

PX0589-005

Unsupervised techniques such as Isolation Forests are designed for problems with few or no labels, so they help to circumnavigate these label-based challenges.

### Adversarial

The lack of good labels for training is further complicated by the fact that the problem is adversarial. Bad actors are often quick to adapt and evolve in sophisticated ways. Even if we are able to obtain some labels for abusive behavior identified today, the labels may not be representative of what abusive activity looks like tomorrow.

Isolation Forests can be used to overcome this challenge. As long as new abusive behavior is located in a different region of the feature space than normal, organic user behavior, we often can detect it using outlier detection—even if we did not have labeled examples when the model was trained.

### Unbalanced

Abusive behavior is a very small fraction of all member activity on LinkedIn. This is a natural use case for outlier detection, where the outlier class is expected to be fewer in number compared to the inlier class.

### Many surfaces

The Anti-Abuse Team at LinkedIn detects and prevents a wide variety of abuse across a diverse set of product surfaces. Our models often use features calculated using events from tracking infrastructure owned by other teams. This is a heterogeneous, dynamic environment that requires the use of a generalizable modeling strategy that supports easy retraining as the infrastructure changes underneath our models. Isolation Forests are easy to retrain if

PX0589-006

feature distributions shift, which helps to satisfy this requirement.

## Potential uses for Isolation Forests

There are many uses for unsupervised outlier detection in the abuse detection domain and other related areas at large internet companies, including:

- **Automation detection:** Identify abusive accounts that are using automation to scrape data, send spam, or generate fake engagement

- **Advanced persistent threats:** Identify and prioritize sophisticated fake accounts for review by human experts

- **Insider threats/intrusion detection:** Detect compromised employee machines via anomalous network traffic

- **ML health assurance:** Automatically detect anomalous feature values and shifts in feature distributions

- **Account takeover:** Increase recall for account takeover detection

- **Alerting on time-series data:** Find anomalies in multi-dimensional time-series data

- **Payment fraud:** Flag suspicious payments to prevent fraud

- **Data center monitoring:** Automatically detect anomalies in data center infrastructure

## The Isolation Forest library is now open source

As a result of the successful use of the library across multiple abuse verticals at LinkedIn, we have released it as open source software. You can find our Isolation Forest library on GitHub.

PX0589-007

# Acknowledgements

Special thanks to Jenelle Bray, Shreyas
Nangalia, Romer Rosales, and Ram Swaminathan for
their support of this project. Thank you to Frank
Astier and Ahmed Metwally for providing advice and
performing code reviews. Finally, thank you to Will
Chan, Jason Chang, Milinda Lakkam, and Xin
Wang for providing useful feedback as the first users
of this library.

PX0589-008