**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

        Plaintiff,

        v.

META PLATFORMS, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

**META PLATFORMS, INC.'S**
**REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**AND OPPOSITION TO THE FEDERAL TRADE COMMISSION'S**
**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

ARGUMENT:

I.     THE FTC'S CASE FAILS BECAUSE THE ARTIFICIAL FOUR-APP
"PSNS" MARKET DEFINITION HAS NO SUPPORT IN THE EVIDENCE ................. 4

II.    THE FTC'S CASE FAILS BECAUSE THERE IS NO EVIDENCE OF
META POWER TO RAISE PRICE ABOVE OR RESTRICT OUTPUT
OR QUALITY BELOW COMPETITIVE LEVELS ......................................................... 28

     A.     There Is No Indirect Evidence of Monopoly Power ............................................... 28

     B.     There Still Is No "Rarely Available" Direct Evidence of Monopoly
          Power ........................................................................................................................ 32

III.    THE FTC'S CASE FAILS BECAUSE THERE IS NO EVIDENCE OF
EXCLUSIONARY CONDUCT ........................................................................................ 37

     A.     The FTC Urges Adoption of an Incorrect Legal Standard ..................................... 37

          1.     *The FTC misstates the law – it must prove anticompetitive
               effects* ......................................................................................................... 38

          2.     *Acquisitions are not per se unlawful – the FTC must prove
               harm to consumers* ..................................................................................... 42

     B.     There Is No Evidence of Anticompetitive Effects from the Acquisitions ............. 47

     C.     The Cleared Past Acquisitions Should Be Presumptively Lawful ......................... 55

IV.    THE FTC'S CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT FAILS .......................................................................................................... 58

     A.     Meta's Acquisitions Generated Substantial Procompetitive Benefits ................... 58

     B.     The FTC's Rebuttals to Meta's Affirmative Defenses Fail .................................... 60

CONCLUSION ............................................................................................................................... 65

# TABLE OF AUTHORITIES[*]

Page

**CASES**

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946)................................................44

*AMR Corp.*, *In re*, 625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897
    (2d Cir. Mar. 20, 2023)................................................................................46

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................15

*\*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406
    (7th Cir. 1995)................................................................................................50

*\*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .................34, 39,
    40, 46, 47, 55

*\*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..............................7, 20, 21, 22, 23, 27, 45

*\*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)...........................................43

*California Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ....................................................58

*Capitol Ice Cream Wholesalers, Inc. v. Mid-Atl. Coca-Cola Bottling Co.*,
    1982 WL 1918 (D.D.C. Oct. 19, 1982) ..........................................................22

*Carbon Black Antitrust Litig.*, *In re*, 2005 WL 2323184 (D. Mass. Sept. 8, 2005).......................56

*Carlson Cos. v. Sperry & Hutchinson Co.*, 507 F.2d 959 (8th Cir. 1974)...................................46

*CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816 (D.C. Cir. 2001) ......................................33

*Clarett v. NFL*, 306 F. Supp. 2d 379 (S.D.N.Y.), *rev'd and remanded*,
    369 F.3d 124 (2d Cir. 2004)...........................................................................65

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)......................................................43

*Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380 (8th Cir. 2007) .............................22

*Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F. Supp. 780
    (S.D. Tex. 1971), *aff'd*, 476 F.2d 989 (5th Cir. 1973) ......................................45

*DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332 (Fed. Cir. 2014).......................................22

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016),
    *aff'd*, 724 F. App'x 556 (9th Cir. 2018) ..........................................................43

---

[*] Authorities principally relied upon are marked with an asterisk.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ...........................................21

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP,*
    612 F. Supp. 2d 330 (S.D.N.Y. 2009)..................................................................................24

*\*Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849 (1st Cir. 2016)............................................................22

*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006)..........................................................50

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ............................................ 16-17, 56

*FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977)................................................................53

*\*FTC v. Facebook, Inc.*:

    560 F. Supp. 3d 1 (D.D.C. 2021) ........................................................4, 28, 33, 38, 56

    581 F. Supp. 3d 34 (D.D.C. 2022) ......................................28, 38, 42, 47, 49, 54

*\*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001)..................................................................63

*FTC v. IQVIA Holdings, Inc.*, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) ...............................21, 22

*FTC v. Lab'y Corp. of Am.*, 2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) ..................................58

*FTC v. Meta Platforms, Inc.*, 2022 WL 4078930 (D.D.C. Sept. 6, 2022).....................................57

*FTC v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986) ............................................................24

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ...........................................................16

*\*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997)...........................................................9, 21

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ...............................................................9

*FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2020)........................................................40

*\*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ....................................................9, 21, 27

*\*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008)...........................1, 7, 8, 9, 13, 21

*Golan v. Pingel Enter., Inc.*, 310 F.3d 1360 (Fed. Cir. 2002) .......................................................22

*Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C. Cir. 1977) .........................................................40

*High Fructose Corn Syrup Antitrust Litig., In re*, 295 F.3d 651 (7th Cir. 2002) .........................56

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997).........................61

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) ..........................................22

*Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009) ...............................21

*Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710 (7th Cir. 2006)..........................32

*Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012) ...............................................8

*Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998)...........................................................................65

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ......................................................................42

*Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993) .....................................30

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762 (9th Cir. 2001)................21

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) .....................................10, 11, 17, 34, 35, 40

*Miller v. Saxbe*, 403 F. Supp. 1314 (D.D.C. 1975).......................................................................62

*Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851 (2d Cir. 1974)...............................53

*NCAA Student-Athlete Name & Likeness Licensing Litig.*, *In re*, 37 F. Supp. 3d 1126
    (N.D. Cal. 2014)........................................................................................................................65

*NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614 (D.D.C. 1991)..................................40, 47, 48, 55

*New York v. Actavis, PLC*, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014),
    *aff'd sub nom. New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).....................................................................................................61

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2010) ................................63

*New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom.*
    *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ...........................................48

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).........................................36, 57

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ............................60

*NorthShore Univ. HealthSystem Antitrust Litig.*, *In re*, 657 F. Supp. 3d 1077
    (N.D. Ill. 2023)........................................................................................................................65

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013).........................34, 48, 54, 60, 62

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018).................................................... 34, 39-40, 46, 55

*PepsiCo, Inc. v. Coca-Cola Co.*:

    114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) ...............10, 35

    315 F.3d 101 (2d Cir. 2002).............................................................................................22

*Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208 (11th Cir. 2012) ........................................... 46

\*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ............................ 22

\*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ................................................... 39, 40, 45, 55

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ........................................... 34

\*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210
 (D.C. Cir. 1986) ................................................................................... 10, 21, 22, 43

*SEC v. Lavin*, 111 F.3d 921 (D.C. Cir. 1997) ................................................................. 57

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ........................................................ 43-44

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021) .................................... 56, 57

*Sumotext Corp. v. Zoove, Inc.*, 2020 WL 6544410 (N.D. Cal. Nov. 6, 2020),
 *aff'd*, 2021 WL 4988024 (9th Cir. Oct. 27, 2021) ......................................................... 17

*Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 1983 WL 1853 (D. Neb.
 June 14, 1983), *aff'd in part, modified in part*, 713 F.2d 428 (8th Cir. 1983) ................. 45

*Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987) ............................ 45

*Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*, 594 F. Supp. 2d 76 (D.D.C. 2009) .................... 62

*Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810 (N.D. Cal. 2021), *appeal pending*,
 No. 23-16065 (9th Cir.) ........................................................................................ 10

\*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989) ................. 16, 21

*Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir. 1990) ......................................... 56

*U.S. Horticultural Supply, Inc. v. Scotts Co.*, 2009 WL 89692 (E.D. Pa. Jan. 13,
 2009), *aff'd*, 367 F. App'x 305 (3d Cir. 2010) ................................................................ 23

*United States v. Aetna, Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ................................................. 20

*United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911) ........................................................ 43

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ............................................. 63, 65

\*United States v. AT&T Inc.*:

    310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ................... 59

    916 F.3d 1029 (D.C. Cir. 2019) .......................................................................... 46

*United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) .........................9

*United States v. Carilion Health Sys.*, 707 F. Supp. 840 (W.D. Va. 1989), *aff'd*, 1989 WL 157282 (4th Cir. Nov. 29, 1989) ..........................................65

*United States v. Connecticut Nat'l Bank*, 418 U.S. 656 (1974).................................15

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ..................35, 36, 42

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) .................................35

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ...................................46

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993) ......................................10

*United States v. Google LLC*, 687 F. Supp. 3d 48 (D.D.C. 2023)................................42

\*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ...................................44, 45, 57

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ..................20, 21

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ..........................53

\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................4, 31, 32, 34, 38, 40, 41, 45, 48, 54, 60

\*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004)...............20, 22

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) ......................................53

\*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990)..............................31, 43

\*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..........................................................................37, 56

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)..................................58

*Walker v. Life Ins. Co. of the Southwest*, 2014 WL 12577139 (C.D. Cal. Apr. 3, 2014) ..............................................................................58

*Wireless Tel. Servs. Antitrust Litig., In re*, 385 F. Supp. 2d 403 (S.D.N.Y. 2005).......................50

## STATUTES

Clayton Act, 15 U.S.C. § 12 *et seq.* ................................................................45

    § 7, 15 U.S.C. § 18..........................................................................7, 8, 22, 45, 46,
    53, 56, 58, 63, 65

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435,
    90 Stat. 1383 ...............................................................................................56

Sherman Act, 15 U.S.C. § 1 *et seq.* ................................................................37

    § 2, 15 U.S.C. § 2.............................................................................1, 34, 36, 38, 43,
    44, 45, 46, 53, 62, 63

## OTHER MATERIALS

Br. of the Fed. Trade Comm'n, *McWane, Inc. v. FTC*, 783 F.3d 814
    (11th Cir. 2015) (No. 14-11363, Dkt. No. 64 (Aug. 29, 2014)) ........................................11

Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated
    Mergers Under Section 2*, Competition Pol'y Int'l (May 2020),
    https://www.competitionpolicyinternational.com/wp-content/uploads/
    2020/05/North-America-Column-May-2020-4-Full.pdf ...................................................40

## INTRODUCTION

Mistaking quantity for quality, the Federal Trade Commission ("FTC") presents a grab bag of legal and factual contentions. But the door-stopping heft of its 1,500+ page submission cannot disguise the empty core of its unprecedented and belated case against Meta Platforms, Inc. ("Meta"). On the necessary elements of its Section 2 monopoly-maintenance claim, the FTC has no evidence.

***There is no evidence to support a "PSNS" market consisting of all time spent on just four services.*** The FTC's shifting story on relevant market began with its initial complaint. The FTC claimed that only *part* of the time spent on Facebook and Instagram is "personal social networking." But the FTC pivoted in response to a Court order and revised its theory: the market includes *all* the time people spend on Facebook and Instagram (except Dating) because it is *all* personal social networking – but only when the time is spent on Facebook, Instagram, Snapchat, and MeWe. The changed definition necessarily sweeps in "passive" consumption of video and other entertainment, and time spent using features that also are available on apps like TikTok, YouTube, and Twitter, on web browsers, and on messaging products like Apple iMessage. A price increase for the Meta services, or an equivalent "quality" degradation, would drive many users away to those other services, as the FTC's expert witnesses admit.

The FTC attempts to sidestep that obvious problem by citing *Whole Foods* and claiming that Meta identifies and then "price discriminates" against the consumers who seek to share with friends and family and who supposedly have no acceptable alternatives for *that*. But the FTC does not make it past theory. In *Whole Foods*, and the other cases the FTC cites, there was objective, data-based evidence showing that the defendants could and did identify and then charge a supracompetitive price to a particular group of consumers, because their demand for a distinctive product made them vulnerable to exploitation. Here there is no such evidence.

As the FTC's lead expert witness conceded, he found no evidence that Meta identifies the friends-and-family sharers for purposes of differential treatment and likewise no evidence that it charges them a higher price or discriminates against them in any other way.

*There is no evidence to support the FTC's claim that Meta has monopoly power to charge prices above or hold output and quality below a competitive level.* Meta has never charged a price, it provides its services in unlimited amounts, and it has spent billions to improve quality – all of this is undisputed.

The FTC's "indirect" evidence of power rests on the quicksand foundation of a contrived market that counts all the time spent by consumers on four apps, including time spent on features that are *not* friends-and-family sharing, but ignores the large amounts of time spent on the many competitors for that same time. The FTC's lead expert witness conceded that Meta does not come close to a plausible monopoly market share (above 60%) when time spent on substitutes like TikTok and YouTube are included in the calculation. The FTC itself says that Meta's share of the litigation-driven three-firm (four-app) market has declined; and the undisputed facts confirm that Meta is *not* protected by buzzword barriers that did not prevent entry at all.

The FTC's fallback resort to the "rarely available" direct evidence of power fares no better. It claims that Meta has power because it shows a lot of ads, or has had issues of various kinds, or makes a lot of money on advertising. The FTC does not even try to claim that these legally untested "quality" arguments are supported by the required *evidence*. To do so, it would need proof that Meta has fallen short of a competitive total quality benchmark. That is the only way to establish that Meta is doing something a firm facing effective competition could not do. But the FTC's lead expert witness admitted there is no net measure of quality in the record.

*There is no evidence that Meta's acquisitions harmed competition and consumers.* For obvious reasons, the FTC fights the legions of cases that restrict "exclusionary conduct" to that

which actually (not speculatively) harms competition and consumers.  Did the acquisitions deprive consumers of better services they would otherwise have today?  That is the relevant question, as this Court previously instructed.  But there is *no evidence* that either the Instagram or the WhatsApp acquisition harmed competition and consumers in any way.  The FTC accordingly asks the Court to plow new legal ground – worse, to ignore settled and binding authority – and enact a retroactive ban on large-firm acquisitions of "nascent" (Instagram) or "potential" (WhatsApp) competitors regardless of competitive effects, even for acquisitions like these that produced objectively demonstrable consumer-welfare benefits.  No court has ever adopted this theory, and this Court should not be the first.

The FTC needs to seek this sweeping departure from precedent because its backup argument – that Meta's acquisitions *did* harm consumers – falls flat on the facts.  There is no evidence, not even dream-world speculation, that consumers would have something different and better today if the acquisitions had been blocked.  Having "more competitors" may be the regulator's preference, but that preference is not the law.  None of the eight expert witnesses the FTC retained could posit any respect in which consumers would have something better today if the acquisitions had not occurred.  Prices could not be lower for users, who pay nothing. There is no evidence that they would use more of these services.  The FTC's lead expert witness could offer no opinion that market-wide output would be higher in a "but-for" world without the acquisitions.  And there is likewise no evidence consumers would have superior services in any measurable respect.  That lack of evidence is fatal to the FTC's claim that Meta engaged in exclusionary conduct by making those acquisitions, which concededly resulted in price *reductions*, massive output *increases*, and billions spent on admitted quality *enhancements*.

**The FTC's summary judgment motion is a makeweight.**  The FTC's challenge to Meta's affirmative defenses based on the procompetitive benefits of the transactions fails even

if the Court reaches it.  The benefits to consumers from the sustained growth and innovation

of Instagram and WhatsApp are the very sort of merger-specific benefits to be expected from

vertical transactions that combined promising apps with Meta's unparalleled infrastructure and

engineering expertise.  The actual benefits for consumers are undisputed.  Speculation that the

same benefits could have been achieved without the acquisitions cannot overcome that evidence,

let alone do so as a matter of law as the FTC argues.

## I.    THE FTC'S CASE FAILS BECAUSE THE ARTIFICIAL FOUR-APP "PSNS" MARKET DEFINITION HAS NO SUPPORT IN THE EVIDENCE

The FTC does not dispute the legal standard.  *See* FTC Br. 8-9.  Without a properly

defined relevant market, the case falls at the first hurdle.  *See* Meta Br. 12-14.  A relevant antitrust

market must include "*all* products reasonably interchangeable by consumers for the same

purposes."  *United States v. Microsoft Corp.*, 253 F.3d 34, 51-52 (D.C. Cir. 2001) (en banc) (per

curiam) (emphasis added).  That turns on "whether two products can be used for the same purpose"

and "to what extent purchasers are willing to substitute one for the other" because "the ability of

consumers to turn to other suppliers restrains a firm from raising prices above the competitive

level."  *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 13-14 (D.D.C. 2021) ("*Facebook I*").

The case began with the FTC's claim that there is a "personal social networking services"

relevant antitrust market consisting of unidentified services competing for time spent on a

particular activity – sharing with friends and family.  *See* FTC Opp. to Mot. To Dismiss Initial

Compl. (Dkt. 59) at 8-9 (describing market allegations).  After one FTC false start, the Court

permitted the FTC to proceed on this theory, recognizing that there were issues regarding the

time spent on Meta apps that was outside the claimed market – i.e., time spent doing things *other*

than sharing.  *See* Meta Br. 7, 20-21 (citing this Court's decisions).  But when the Court ordered

the FTC to disclose the actual contours of the market it claimed, it pivoted – *everything* on

Facebook and Instagram (except Dating) is PSNS, and the competitors for that all-in time are four apps only:  Facebook and Instagram plus Snapchat and MeWe.  *See* Meta Br. 6-10.

There are more than 250 features or "use cases" available on Facebook and Instagram. *See* SMF ¶¶ 578, 581-584.  The majority of them do *not* involve sharing with friends and family. The FTC committed in discovery to the position that all time counts, not just time spent on the "core" sharing feature.  That litigation decision is fatal:  the FTC has no evidence that only Snapchat and MeWe – and not TikTok or YouTube or iMessage or many other obvious competitors – compete for time spent on all of the many things that users can do on Meta's apps. *See* Meta Br. 15, 18-20.  It is undisputed that a significant price increase (or the equivalent) would cause many users, including those seeking features other than supposedly "core" friends-and-family sharing, to reduce usage of Facebook and Instagram and increase usage of competitive products like TikTok, YouTube, Twitter, iMessage, and many more.  *See* Meta Br. 15-17.  The FTC's lead expert witness acknowledged that fact.  *See* SMF ¶¶ 630-632, 636-639. He also acknowledged that the risk of losing marginal time spent (and the corresponding ad revenue) disciplines Meta, including by forcing it to innovate new features.  *See* SMF ¶¶ 127, 262, 637; *see also id.* ¶ 61.

After years of extensive pre-complaint investigation and litigation discovery, the FTC can point the Court to **_zero_** quantitative evidence that only Snapchat and MeWe give consumers acceptable substitutes for all the features on Facebook and Instagram.  *See* Meta Br. 15.  Indeed, the FTC admits it has no such quantitative evidence.  *See* SMF ¶¶ 633-635 (Hemphill); *see also id.* ¶ 613 (Lampe), ¶ 652 (Malkiewicz).  The FTC's expert witnesses actually admitted that there is substitution outside the four-app PSNS set, as to both "core" and non-core features.  *See*, *e.g.*, SMF ¶¶ 209-211, 242, 260 (TikTok).  And the only substitution evidence in the record shows that they are correct:

- Consumers can do everything that Facebook and Instagram offer using apps outside the four claimed PSN services.  *See* SMF ¶¶ 607, 612 (Lampe admissions); Meta Br. 7-10, 18-20; *see also*, *e.g.*, FTC Br. 5 (admitting that "messaging" provides "ways other than a PSN app to communicate with friends and family").

- There is conceded competition with many other substitute services seeking to attract user time in order to monetize by selling ads.  *See* SMF ¶¶ 636-639 (Hemphill admissions).

- The only quantitative evidence of substitution confirms that consumers switch more to YouTube, TikTok, and others than to Snapchat and MeWe, which would not occur if the latter two were closer substitutes than the excluded services.  *See* SMF ¶¶ 533-536, 543-547, 555-560, 562-566 (substitution and diversion rates in response to economic stimuli).

Moreover, what the FTC calls the "core" feature of the Meta services – sharing with friends and family – represents a small and declining share of time spent on Facebook and Instagram, recently measured at ██ of time spent on Facebook and ██ of time spent on Instagram.  *See* SMF ¶¶ 11-16, 56-57, 59-64.  Interest-based and entertainment content, such as watching long- and short-form video from public or unconnected sources, has surged in popularity.  *See* SMF ¶¶ 13-16, 58-60 (████████ time spent on Reels is consuming content from public sources).  Approximately half of all the user time on Instagram is spent consuming Reels, *see* Counter SMF ¶ 1060, which the FTC's lead expert acknowledged was Meta's competitive response to TikTok, *see* SMF ¶ 127.  For consumers engaging with the Meta app features that now command the vast majority of time spent, the FTC does not even argue a lack of acceptable substitutes.  *See*, *e.g.*, SMF ¶ 612 (Lampe), ¶¶ 630-632 (Hemphill).  Put simply, consumers have a vibrant array of choices; the supposed walled garden of PSNS is a figment of enforcer imagination.

The FTC makes three arguments as to why there is a material issue of fact as to market definition.  *First*, the FTC says that there *is* a PSNS market, defined by a distinct demand for

"core" friends-and-family sharing, notwithstanding the availability of many services that are acceptable substitutes for the features that are not core sharing. *Second*, it tries to dodge its burden of proof by criticizing the quantitative data that disprove the FTC's hypotheses about lack of substitution. *Third*, the FTC backpedals to a do-it-yourself *Brown Shoe* analysis based on qualitative factors that it did not even ask its expert witnesses to evaluate – leaving only lawyer arguments unsupported by economic analysis. All three arguments lack support in the evidence.

        1.    ***The FTC cannot proceed to trial on a "core" friends-and-family sharing theory that lacks evidentiary support.*** Recognizing that most of what people do on the Meta apps is *not* friends-and-family sharing and that there is competition for that time, the FTC stakes its claim on an asserted subgroup of Facebook and Instagram users who come to Meta's services to share with friends and family. *See* FTC Br. 4-6, 12-13, 15, 18-21 (*Whole Foods* argument). To proceed on such a claim, the FTC needs *evidence* that Meta identifies and discriminates against these consumers (Point (a) *infra*). That requirement cannot be satisfied here. Even if objective evidence supported the FTC's argument that Facebook and Instagram (and Snapchat and MeWe) offer a unique friends-and-family-sharing functionality – they do not, *see* Meta Br. 19-20; *see also*, *e.g.*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ – there is *no* evidence that Meta *identifies* and *exploits* those supposedly captive "core" sharers with higher prices or inferior service (Point (b) *infra*), even assuming quality arguments could support the FTC's price-discrimination theory as a matter of law.

        a.    **The FTC's theory requires evidence of price discrimination against "core" users.** The FTC attempts to rely (at 17-21) on *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008), and a few other Section 7 cases that recognized relevant antitrust markets (or "submarkets") based on a defendant's ability to raise prices above competitive levels for a distinct set of consumers. But in all those cases there was objective evidence that the defendant

actually *charged* higher prices to those particular "core" consumers, where it could not charge higher prices to other consumers who had acceptable substitutes. *Whole Foods* – a Section 7 decision without a controlling opinion of the court, over a dissent from then-Judge Kavanaugh – does not help the FTC in the least; it shows why the FTC loses. Judge Brown's opinion demonstrates that the FTC must have *evidence* that the defendant first *identifies* consumers who lack acceptable substitutes and then *targets* them with supracompetitive prices. This Court's decision illustrates exactly what is required and what is missing here. *See Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 18 (D.D.C. 2012) (describing *Whole Foods*).

In *Whole Foods*, the FTC challenged a merger of "premium" grocery stores Whole Foods and Wild Oats. The FTC claimed that the merger would create a monopoly in an alleged market for "premium, natural, and organic supermarkets" or "PNOS" – grocery stores focused on specialty organic perishables. *See Whole Foods*, 548 F.3d at 1032 (opinion of Brown, J.). The defendants argued that Whole Foods also sold nonperishable "dry" goods that were available at and faced price competition from many grocery stores – e.g., Giant and Safeway – not just Wild Oats. *See id.* at 1039-40. Moreover, the evidence showed that Whole Foods charged competitive market prices for those nonperishable dry goods. But critically, Whole Foods charged supracompetitive prices for specialty organic perishables *unless* a Wild Oats (that is, another PNOS) was nearby. *See id.* at 1040. Judge Brown explained that competition for dry goods – "where Whole Foods and Wild Oats compete on the margins with conventional supermarkets" – did not undermine the PNOS market because "the FTC documented exactly the kind of price discrimination that enables a firm to profit from core customers for whom it is the sole supplier." *Id.* at 1039-40 (explaining the results of a pricing study based on empirical data). This price discrimination was profitable because the specialty organic-perishable products comprised "nearly 70% of Whole

Foods sales," i.e., only around 30% of Whole Foods' sales faced price competition beyond Wild Oats. *Id.* at 1039 (cleaned up).

The same is true of *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) (cited at FTC Br. 12, 15, 21). In that case, the court recognized the existence of a separate market for "office supply superstores" because "pricing evidence [of] low cross-elasticity of demand" between superstores and other sellers of office supplies showed "non-superstore sellers . . . are not able to effectively constrain the superstore prices." *Id.* at 1080. There, as in *Whole Foods*, the objective pricing evidence proved that the defendant was able to charge supracompetitive prices where there was no competition from another superstore. *See Whole Foods*, 548 F.3d at 1039 (explaining the price discrimination against "core customers" in the *Staples* case). Similarly, in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) (cited at FTC Br. 10, 12, 14, 19, 21), the FTC demonstrated – including by using data developed in an "aggregate diversion analysis" – that regional and specialized food distributors could not adequately constrain the pricing of national broadline distributors for "targeted" customers. *Id.* at 34-40; *see also id.* at 31-32 (citing *Whole Foods* and *Staples* as the "key decisions" that "support this conclusion").

And in *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) (cited at FTC Br. 15), the court reviewed empirical evidence (pricing data on competitive bidding) and accepted that "the broader publishing market for all trade books" contained a relevant antitrust "submarket" for purchasing rights to "top-selling books" *because* the government presented evidence that publication of such books required resources that most publishers lack, allowing a sole publisher of top sellers to reduce advances notwithstanding competition for other publishing rights. *Id.* at 24-25; *see also FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 119 (D.D.C. 2016) (evidence that large "B-to-B" customers demanded distinct prices

9

and required specialized vendors supported relevant market finding).  In all these cases, it was data-based economic *evidence* (not theory) that mattered.

But where (as here) there is no objective evidence that "core" consumers are identified and targeted with supracompetitive prices, courts in this Circuit and outside it *reject* the "submarket" theory the FTC has now adopted.  In *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986), the D.C. Circuit rejected the claimed geographic "submarkets" because there was no evidence "these cities were segregable markets in which [the defendant] could raise prices appreciably without attracting competitors' [products]."  *Id.* at 219. In *United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993), the court rejected a claimed market for "premium fountain pens" instead of "all premium writing instruments" because there was no evidence of "captive" customers who were charged higher prices.  *Id.* at 83-84.  And in *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) (per curiam), the court granted the defendant's motion for summary judgment on the ground that no evidence supported a market for selling fountain soda syrup to foodservice distributors – which provide "one-stop shopping" to downstream customers – but not other intermediary suppliers.  *Id.* at 249-50.  Even though the former were "distinguishable" in a subjective sense, *id.* at 251, the plaintiff had no evidence that the defendant "can charge foodservice distributor customers more than it charges others," *id.* at 257.  Other cases are in accord.  *See*, *e.g.*, *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 841 (N.D. Cal. 2021) (granting summary judgment where there was no "evidence of actual current price discrimination against large customers"), *appeal pending*, No. 23-16065 (9th Cir.).

The law in this area is so well-settled that the FTC has previously stated it, succinctly and correctly, in the *McWane* appeal (repeatedly cited, e.g., at FTC Br. 21, 23):

> When a substantial group of customers can be identified, segregated, and charged monopoly prices for a significant period, sales to that group constitute a relevant market. The federal enforcement agencies term this a "price discrimination" market. Here, projects with domestic-only specifications can be targeted for higher pricing, and a hypothetical monopolist could raise prices by reducing its output because imported fittings cannot satisfy domestic-only specifications. *See generally FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (discussing the "hypothetical monopolist" construct for market-definition purposes).

FTC *McWane* Br. 25 n.9, No. 14-11363, Dkt. No. 64 (11th Cir. Aug. 29, 2014) (citations omitted).

Applying that law here, the FTC must show that the "core" friends-and-family sharing consumers have been "targeted for higher pricing." *Id.*

**b.**      **The FTC theory is unsupported because there is no evidence of price discrimination.** The FTC *admittedly* lacks the evidence that courts have required for its "submarket" theory – nothing shows Meta identifies and discriminates against "core" sharers.

**i.**      <u>**There is no evidence that Meta identifies "core" sharing consumers and "charges" them a higher ad load**</u>: With no pricing evidence – Meta's services are free for every user no matter the use case, *see* SMF ¶¶ 5, 825 – the FTC proceeds on the theory that "ad load" (seeing ads) is a valid proxy for price. No court has accepted this assumption. It is at best debatable given the many and varied reactions consumers have to ads (some like them; some scroll past them). *See* Counter SMF ¶¶ 1466, 1468, 1481, 1546(b), 1951. In addition, ad load is, as the FTC concedes, just one quality dimension among many. *See* SMF ¶ 146.

Whether or not the comparison to price holds water, the FTC's ad-load theory falls flat.

 . However, the FTC sought but

could not find evidence that there was price discrimination that could support its theory – i.e., that this ad load "price" is higher for the friends-and-family sharers.  The FTC's principal expert witness claimed to have investigated this issue, exhaustively.  But he admitted that *there is no evidence* Meta shows more ads to users who are engaged in friends-and-family sharing:

- **Question:**  "So it's correct to say that you don't have any claim that Meta discriminates in ad load based directly on a user's demand for friends and family sharing?"

- **Answer:**  "I don't know whether they do or not, but I've not seen evidence of Meta, for example, internally calculating, you know, some numerical value of inelasticity and responding with a change in ad load."

*See* SMF ¶ 640; Counter SMF ¶ 1504; *see also id.* ¶ 1506.  The FTC's industry expert similarly testified that he is aware of no evidence that Meta "identif[ies] specific people using Facebook and Instagram for the purpose of maintaining relationships with weak ties and tries to extract more value from them by charging them a fee or showing them more ads."  *See* SMF ¶ 613.

In the wake of those failed efforts, the FTC (at 20) points to evidence that, on average,



Nothing ties these data to the "core use" that supposedly makes some users vulnerable to exploitation.  Critically, the FTC does *not* claim and has no evidence to suggest that a ▮▮▮▮▮▮ Facebook user who frequently posts family updates (sharing) sees more ads than a ▮▮▮▮▮▮ user who spends time on Facebook, e.g., passively scrolling through posts about sports trivia and aging movie stars or watching unconnected videos about fashion or comedy.  *See* Counter SMF ¶ 1504.  The FTC's lead expert witness expressly admitted that no data support a claim that Meta shows more ads ▮▮▮▮▮ users who engage in friends-and-family sharing than ▮▮▮▮▮▮ engaged in non-sharing activity.  *See* Counter SMF ¶ 1530; *see also id.* ¶ 1506.  The same is true for ▮▮▮▮▮.  *See* SMF ¶ 640.

And *that* is what the FTC would need to show – exploitation of the supposedly distinctive demand for Facebook's core use, ███████████████████████████.  It is not enough to argue, as the FTC baldly asserts (at 20), that "███████████████ . . . tend to have a greater demand for friends and family sharing."  There is no evidence that use of the asserted "core" sharing feature triggers a higher ad load.  *See* Counter SMF ¶ 1531(b).  It is undisputed that ████████ do *not* see more ads when they share with friends and family than when they watch cat videos.  *See* Counter SMF ¶ 1504.  It also is undisputed that Facebook users ██████ ████████████████████████████████████████ – as the FTC's own lead expert witness found.  *See* Counter SMF ¶ 1525.  The FTC therefore cannot establish a connection ███████████ and the "core" sharing feature that supposedly makes users captive.

It is significant that the FTC *tried* to correlate ad load with users engaging in the "core" sharing feature that purportedly matters here, but it failed.  *See* Counter SMF ¶ 1528.  The FTC conveniently omits this failure in its brief.  In his opening report, Professor Hemphill tried to use a regression analysis to show that █████████████████████████████████████ █████████████████████████.  *See* Counter SMF ¶ 1528(b)(i)-(ii).  In other words, he sought evidence that might support a theory of price discrimination somewhat akin to what the FTC employed in *Whole Foods*.  But his effort was unmasked by Professor Carlton, who showed in his rebuttal report that Professor Hemphill's result depended entirely on the way he had arbitrarily grouped users: █████████████████████████████████████ █████████████████████████████████████████████.  *See* Counter SMF ¶ 1528(b)(i)-(ii).  Professor Carlton re-ran the *same* regression using ████████████████ █████████████████████████ as a continuous variable without groupings ████████████ ████████  Using this more precise information avoided giving undue weight to tiny groups of users (e.g., ███████████████████████████).  *See* Counter SMF

¶ 1528(b)(i)-(ii).  This resulted in a *negative* correlation between █████████████ ███████

████ and ad load; users ████████████████████ see *fewer* ads, not more – the opposite

of what the FTC is arguing.  *See* Counter SMF ¶ 1528(b)(i)-(ii).

The FTC's expert witness made additional concessions that underscore the agency's

failure to come up with evidence of price discrimination against supposed friends-and-family-

sharers.  Professor Hemphill recognized that Meta ███████████████████████████████.

*See* Counter SMF ¶ 1524.  ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████  But there is no evidence that Meta *does* identify

"friends-and-family sharers" for this purpose and no evidence that it "charges" them a higher ad

load.  *See* Counter SMF ¶ 1504.  Nor does it vary any other aspect of service, such as "privacy"

or "integrity" or anything else, based on which feature a consumer is using, *see* Counter SMF

¶ 1531(a) – as the FTC's expert witness admitted, *see* SMF ¶ 641 (privacy settings apply evenly

across different features).  A rational monopolist has every incentive to take advantage of its

market power by charging a supracompetitive price.  *See* Counter SMF ¶ 954.  The undisputed

fact that Meta ██████████████████████ does *not* load more ads on the supposedly captive

friends-and-family sharers, should end any debate about price discrimination in this case.

**ii.**     **There is no evidence of "underinvestment":**  Lacking any evidence of price

discrimination (or some proxy), the FTC suggests (at 20) that "underinvest[ment]" in friends-

and-family sharing is close enough to price discrimination to establish a relevant market defined

by that feature.  The FTC cites no case that has accepted such an attenuated proposition.  And no

record evidence permits a comparison of investment in one use case with another, either within

Meta or across the industry.  Meta has invested billions to release scores of features on Facebook

and Instagram, *see* SMF ¶¶ 17, 126, 710, 739 – all of them PSNS, according to the FTC, *see*

Meta Br. 6-10, and therefore all PSNS innovations.  For example, the FTC claims that consumers engage in friends-and-family sharing using Stories, which Meta innovated for Facebook and Instagram (and a similar feature for WhatsApp called Status) years after the acquisitions.  *See* SMF ¶¶ 127, 743, 847-850.  Similarly, the FTC contends that some consumers can use Reels – which Meta innovated – for friends-and-family sharing.  *See* Counter SMF ¶ 1501.

The FTC is left to argue that executives jostled internally at Meta for resources.  The documents it cites do not even hint that investment in any feature was restricted, and certainly intramural discussion of priorities provides no support for any argument that Meta believed it was free from competition for sharing or anything else and could rest on its oars.  *See* Counter SMF ¶ 1502(a)-(i).  Competition for resources and corporate attention is inevitable even in large and profitable companies – no fact-finder could find that to be evidence of targeted underinvestment in "friends-and-family sharing."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007) (stating that a failure to expand some aspect of business does not without more support an antitrust claim because firms "do not expand without limit").

c. **There is no evidence of a "cluster" market.**  Finally, the FTC glosses its theory with another theory:  *all* Facebook and Instagram features are distinctive, even where they have obvious and FTC-conceded competitors, because they are all somehow associated with the "friends-and-family sharing" feature.  *See* FTC Br. 13, 19 (citing *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 664 (1974) ("cluster" market for banking services)).  Hence, the short-form video feature Reels does not really compete with TikTok (voluminous evidence to the contrary and an admission from the FTC's lead expert witness notwithstanding, *see* SMF ¶¶ 637-638, 745) because Reels is part of the same app as Feed.  But beyond hinting at a theory, the FTC does not develop the argument.  It does not explain what evidence supports it, because there is no more evidence of a "cluster" than there is of a captive and exploited "submarket."  *See*

15

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1377 (9th Cir. 1989) (rejecting cluster market theory as well as "submarket" theory – no pricing evidence).  There is no plausible argument, much less evidence, that watching a public Saturday Night Live clip on Facebook or Instagram has no substitute when the same clip is available for free on TikTok or YouTube, only a tap away.  *See* Meta Br. 7-10, 18-20; *see also* SMF ¶¶ 162, 171, 212, 228, 285.

The FTC's lead expert witness agreed that non-PSNS firms provide effective competition for this and other non-sharing use cases.  *See* SMF ¶¶ 630-632, 636-639.  If the theory is that something about the experience of consuming non-friends content (like watching an NBA highlight) is different on Facebook, no witness or document provides evidence of that – much less evidence that consumers would suffer supracompetitive prices or degraded quality below competitive levels just to watch the same clip on Facebook.  *See* SMF ¶¶ 630-639.  The "cluster" theory is an 11th-hour throwaway that conflicts with the opinions of the witnesses hired by the FTC, one of whom agreed that consumers can and do engage in activities on Facebook and Instagram that have nothing to do with friends, *see* SMF ¶¶ 621-624, 628; another who admitted that non-friends features are not friends-and-family sharing, *see* SMF ¶¶ 604-608.  And the FTC's survey expert witness found that users have many and varied "most important" reasons for using Meta's services.  *See* SMF ¶¶ 645-652.  Once again, the FTC's shifting theories not only lack evidentiary support; they conflict with the evidence the FTC itself has offered.

**2.      *The FTC's misguided challenges to the evidence that Meta presented do nothing to carry the FTC's burden of proof.***  Without empirical evidence to support its artificial PSNS market, the FTC occupies itself (at 23-29) with scattershot attacks on the only empirical evidence of substitution in the case.  The FTC gets the burdens upside down.  *Compare FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) (defendant has no obligation to disprove the claimed relevant market), *with FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 120-21 (D.D.C.

16

2004) (FTC must come forward with economic evidence to support its proposed relevant market). But there is evidence in the record of substitution, all of which demonstrates that the PSNS market fails to account for all acceptable substitutes. Whatever weight one gives that evidence, it is greater than zero – which is what the FTC musters.

a.     *First*, the FTC chides Meta (at 23-27) for not conducting a "hypothetical monopolist test," which the FTC claims its expert witness *did* conduct. It cites (at 21-23) an oxymoronic "qualitative" HMT. *Cf. Sumotext Corp. v. Zoove, Inc.*, 2020 WL 6544410, at *7-9 (N.D. Cal. Nov. 6, 2020) (rejecting "natural" or qualitative HMT), *aff'd*, 2021 WL 4988024 (9th Cir. Oct. 27, 2021). But this was something theorized by a law professor who concededly did no econometric work to support it. *See* SMF ¶¶ 633-635. The claimed test was nothing more than the repackaged assertion that, because consumers lack reasonable substitutes for Facebook and Instagram, a single firm owning Facebook, Instagram, Snapchat, and MeWe would impose a price increase. *See* Counter SMF ¶ 1302. That is a circular argument, not empirical evidence. *Cf.* Counter SMF ¶¶ 955-956. It is entitled to no weight, as the cases the FTC cites (at 21-23) indicate. *See*, *e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 830 (11th Cir. 2015) (relying not on qualitative HMT but on "price differences between domestic fitting and imported fittings").

The economists Meta retained did something directly relevant to the FTC's claims. They undertook large-scale studies, involving thousands of users (or more), and closely examined actual marketplace evidence to evaluate how users actually react to a change in the effective price of Facebook and Instagram – that is, what services they treat as the closest available substitutes when they reduce usage of Facebook and Instagram. *See* SMF ¶¶ 533-536. This tested the FTC's assertion that Snapchat *is* in the market while TikTok, YouTube, and many others are not. *See* Meta Br. 15-17. One such experiment was supervised by leading behavioral economist John List, former Chair of the University of Chicago's economics department. The

study demonstrated that Facebook and Instagram users substitute more to TikTok and YouTube (among others) than to Snapchat and MeWe in response to a small payment for reduction of time spent on Facebook and Instagram.  *See* SMF ¶¶ 537-547.  The FTC nitpicks this evidence at the edges (at 23-26) without a substantive response for what it shows.  More important, it has no quantitative evidence of its own to support its various theories.

The FTC points in passing (at 23) to a "de-merger" analysis that Professor Hemphill cribbed from Professor List.  In partial response to Professor Hemphill's unjustified assumption that more competition among so-called PSNS apps would lead to lower ad loads, Professor List created a "de-merger" simulation that found the opposite:  ad load would not be lower on Facebook or Instagram if Instagram was not part of Meta today; a break up *today* would result in *higher* ad loads.  *See* Counter SMF ¶ 1953(c) (describing de-merger analysis).  Unsurprisingly, when Professor Hemphill made materially different assumptions, he caused the model to produce a different result.  *See* Counter SMF ¶ 1304.  But he did no modeling of his own, and his unrealistic assumptions produced absurd results alongside his desired outcome.  *See* Counter SMF ¶ 1953(a) (Hemphill version of de-merger simulation showing that Meta would generate revenue from users of free service even if *no* ads are shown).  In all events, this manipulation does not address consumer substitution and is therefore not relevant to market definition.

The Court can and should credit the empirical evidence of substitution Meta provided.  But it need not do so to grant the instant motion.  The only relevant empirical evidence points in one direction:  Meta competes with TikTok, YouTube, and many other substitutes.  Whatever weight one gives that evidence, the FTC's *lack* of quantitative evidence about substitution to support its shape-shifting theories is fatal to its claims.

**b.**     *Second*, the FTC seeks refuge in more theory to support its theories and explain why the actual evidence should not matter.  Citing the "*Cellophane* fallacy," it argues (at 26) that

the Court should conclude Meta is a monopolist because . . . Meta is a monopolist. It theorizes that consumers might switch to out-of-market products at a monopoly price but not at a competitive price, such that the substitution evidence Professors List and Carlton presented should be disregarded and the FTC's lack of substitution evidence should be excused. But the *Cellophane* fallacy does not help the FTC to explain away the *order* of substitution, i.e., why more consumers switch to TikTok and YouTube (supposedly out of the market) than to Snapchat (supposedly in). *See* Counter SMF ¶¶ 1363, 1364(a); *see also id.* ¶ 1298(a)-(b). Simply hypothesizing that *maybe* this evidence is the result of a monopoly, and that things would be different in a competitive market, gets the FTC nowhere. It is guesswork on top of speculation.

In an effort to make lemonade from lemons, the FTC also claims (at 28) that Professor Carlton's outage analysis showed that some users switched more to Snapchat than to TikTok and YouTube. But only Meta users *who were also active Snapchat users* based on arbitrary FTC-determined usage thresholds (not Meta users with a Snapchat account, as the FTC says) switched more to Snapchat. The behavior of this subset – ███ of all users in the study, *see* Counter SMF ¶ 1370(c) – is the tail wagging the dog. For ████████ of Facebook and Instagram users in the study, there was much more substitution to TikTok, YouTube, and others than to Snapchat and MeWe. *See* SMF ¶ 565. Professor Carlton's work confirms that empirical studies show the FTC's market definition is wrong. *See* SMF ¶¶ 562-566. The FTC's construct fails because actual consumer behavior demonstrates that it does not account for acceptable substitutes. *Compare* SMF ¶¶ 533-536 (describing what Meta did) *with id.* ¶¶ 633-635 (admitting to what the FTC did not do).

At the last ditch, the FTC makes the curious argument (at 27) that the Court should disregard a long-accepted rule of thumb in the agency's prior guidelines that it now finds inconvenient. *Cf.* Counter SMF ¶ 952. The "Circle Principle" included in the 2010 Merger

Guidelines advised that a market must account for relative diversion by including the closest substitutes. *See* Counter SMF ¶ 1353. That guideline is sensible, and courts have regularly found it so. *See United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 39 (D.D.C. 2017) (application of the Circle Principle "can be powerful evidence" when applied properly); *cf. United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 65-66 (D.D.C. 2011) (expert misapplied the Circle Principle by "lump[ing] . . . together" "large, aggregated" categories); *see also United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1120 (N.D. Cal. 2004) (rejecting an unduly "narrow market definition" and relying on diversion to closest substitutes). Whatever the current FTC may think of its own prior non-binding guidance, it is black-letter law that all acceptable substitutes, and in particular the *closest* substitutes, must be included in any valid market definition. *See* Meta Br. 12-14. The FTC has no evidence that it has included them here. The about-face as to its own longstanding recognition of that settled authority is both inappropriate and telling.

    **3.**    ***The FTC cannot create a triable issue of fact with its do-it-yourself* Brown Shoe *argument.*** Lacking the hard empirical evidence that courts in this Circuit have found necessary for many years, the FTC (at 4-6, 11-16) cobbles together a claim based entirely on qualitative "factors" listed in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). The FTC presents this via lawyer argument, arguing that Facebook and Instagram (and Snapchat and MeWe) are *different* from other services that consumers can use to do the same or similar things. But the FTC's misapplication of *Brown Shoe* cannot get it to a trial, for at least three separate reasons:

    **a.**    *First*, while *Brown Shoe* can be a helpful adjunct to an appropriate analysis of economic substitution, lawyer arguments about the *Brown Shoe* factors are, without more, insufficient as a matter of law. The FTC does not cite any case in which a court in this Circuit relied *entirely* on such qualitative arguments to define a relevant market. Those courts (and all other appellate decisions cited) have uniformly required economic analysis of pricing evidence

(*cf. Whole Foods* and *Staples*) or switching data (*cf. H&R Block*) or diversion ratios (*cf. Sysco*). The FTC has none of this evidence. The D.C. Circuit has instructed that the *Brown Shoe* criteria are "evidentiary proxies for direct proof of substitutability," *Rothery Storage*, 792 F.2d at 218, for which "economic criteria are *primary*," *Whole Foods*, 548 F.3d at 1039 (opinion of Brown, J.) (emphasis added). *Brown Shoe* does not excuse a failure to present pricing or substitution data as part of that analysis, nor does it permit freewheeling reliance on anecdotes and snipped quotes from yellowing documents. *See Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 917-19 (6th Cir. 2009) ("[T]hese practical indicia come into play *only* after the outer boundaries of a product market are determined by evaluating the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.") (emphasis added; cleaned up); *Thurman Indus.*, 875 F.2d at 1375-77 (rejecting proposed market notwithstanding plaintiff's *Brown Shoe* showing in the absence of a "price differential," without which the qualitative factors lack "economic significance").

In the cases the FTC cites (at 12), the courts married *Brown Shoe* with *pricing data* that could determine the metes and bounds of a market. For example, in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), the Court accepted a single-firm aftermarket because there was pricing evidence that "very high" costs – installing expensive new machines, nothing like flipping between apps – enabled Kodak to "price discriminate between its locked-in customers and potential new customers." *Id.* at 476. In *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762 (9th Cir. 2001), the court reversed summary judgment because there was evidence that certain consumers "have a preference or strong preference" for the differentiated product *and* that those consumers "generally are not concerned with price" and so are willing to pay more for the differentiated product. *Id.* at 767-68. And in *FTC v. IQVIA Holdings, Inc.*, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024), the court enjoined a merger under

Section 7 using *Brown Shoe* criteria because "economic evidence" – a hypothetical monopolist test – showed prices would increase. *Id.* at *13; *see also id.* at *25.

In all these cases, there was quantitative pricing or substitution evidence. *Cf.* SMF ¶¶ 633-635. Merely claiming product "differences" without economic evidence leads nowhere, as courts have consistently held. *See Oracle*, 331 F. Supp. 2d at 1159 ("[m]ore is required"); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (similar). The D.C. Circuit requires the plaintiff to connect supposed product distinctions to evidence from "the economic criteria that make one market distinct from another." *Rothery Storage*, 792 F.2d at 218 n.4. That is why, in the absence of pricing data or quantitative evidence to support the exclusion of products as substitutes, courts in this Circuit and beyond routinely grant and affirm summary judgment on market definition. *See*, *e.g.*, *id.* at 218-19; *Capitol Ice Cream Wholesalers, Inc. v. Mid-Atl. Coca-Cola Bottling Co.*, 1982 WL 1918, at *2 (D.D.C. Oct. 19, 1982); *see also*, *e.g.*, *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1344-45 (Fed. Cir. 2014); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 389 (8th Cir. 2007); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 106-07 (2d Cir. 2002) (per curiam); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1369 (Fed. Cir. 2002). The statement that a product is "better suited" than others for some purpose is not enough – such "evidence has no bearing on the key questions of product interchangeability and cross-elasticity of demand from the perspective of consumers." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854-55 (1st Cir. 2016) (affirming summary judgment).

**b.** *Second*, the lawyer arguments are a mismatch for the market the FTC is trying to support. To start, the FTC did not ask its expert witnesses to fully analyze the *Brown Shoe* factors or to explain why they are an appropriate economic proxy for substitutability. *See* Meta Br. 17. The witness the FTC identifies as an "industry" expert disclaimed *Brown Shoe* analysis

22

of the candidate market.  *See* SMF ¶ 614.  And while 600+ pages of opinion from Professor

Hemphill – a law professor with an economics Ph.D. – make some faint stabs in the direction

of one or two of the factors, he has no expertise that would qualify him as an industry expert

capable of these kinds of assessments.  Professor Hemphill admitted he doesn't "use Instagram,"

had not logged into Instagram at all in "probably a year," and had not used TikTok more than

"[a] little bit."  *See* Counter SMF ¶ 884 (suggesting he had never used Reels on Instagram).

Worse, the FTC lawyers try to support a market that is different from the "all in" PSNS

market to which the agency committed in discovery.  *See* Meta Br. 6-10.  The FTC's main

*Brown Shoe* argument is that, because Meta apps offer some users distinctive tools for friends-

and-family sharing, there are no acceptable substitutes other than Snapchat and MeWe.  *See* FTC

Br. 5, 15 (citing internal emails on this particular use case).  But internal documents touting how

great Facebook is for "friends-and-family sharing" do nothing to support the all-in market that

includes 250+ use cases, most of which do not involve such sharing.  *See* SMF ¶¶ 11-16, 56-66.

More than this is required.  *See U.S. Horticultural Supply, Inc. v. Scotts Co.*, 2009 WL 89692,

at *18-19 (E.D. Pa. Jan. 13, 2009) (granting summary judgment; rejecting *Brown Shoe* analysis

proffered by argument via internal documents where economist did not provide data "relating

to price increases or price stability in other products in response to a rise in the price of

[defendant's products]"), *aff'd*, 367 F. App'x 305 (3d Cir. 2010).

     **c.**    *Third*, the arguments about the *Brown Shoe* factors are unsupported by evidence.

Properly applied, the factors undermine rather than support the proposed market.

     **i.**    <u>**No Industry Recognition**</u>:  The vast trove of evidence in this case discloses not a

single industry witness or document that supports the FTC's claim that Facebook and Instagram

compete against Snapchat and MeWe but not against TikTok, YouTube, Twitter, iMessage, and

others.  *See* Meta Br. 18-19.  On the contrary, *all* of the relevant evidence reveals recognition

that Facebook and Instagram compete with *many* services that the FTC tries to fence out of its

PSNS market.  *See* Counter SMF ¶ 1105.  The FTC concedes (at 15) that the industry recognizes

competition for usage among Facebook and Instagram and a broad set of services.  When

companies compete head-to-head, that shows they are in the *same* market, as cases cited by the

FTC hold.  *See FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1505 (D.C. Cir. 1986) (cited at FTC

Br. 4) (evidence that companies "compete head on" puts them in the same market).  So the FTC

resorts (at 16) to nomenclature: ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████Not a single document or witness limited

competition to the FTC's artificial four-app set.  *See* SMF ¶¶ 476-477. ██████████████

███████████████████████████████████████████. And mere statements in

documents that Meta touts appealing features of its services – competition, not its absence – is

not "industry recognition" of a four-app PSNS market.  *See Emigra Grp., LLC v. Fragomen,*

*Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 356 (S.D.N.Y. 2009) (granting summary

judgment; statement touting "capabilities" to attract "prospective clients" does "not support the

notion that there is industry or public recognition of a distinct market").

    **ii.**    <u>**No Peculiar Characteristics**</u>**:**  The FTC cannot point to a characteristic that only

Facebook, Instagram, Snapchat, and MeWe share.  On the contrary, many apps outside of the

FTC's four-app market share the same features, including those the FTC highlights as the "core"

friends-and-family features.  *See, e.g.*, SMF ¶¶ ████████████████████. The FTC calls out

(at 13) "a social graph"; "tools to foster building network connections with friends and family"; and "a shared social space for sharing personal information and content with friends and family." But multiple apps outside the proposed PSNS market share every one of these characteristics,

████████████████████████████████████████████████████████████████

████████████████████████████████████████.  FTC expert witnesses Professors Hemphill and Lampe conceded that messaging services like iMessage allow users to create a social graph and engage in one-to-many communications in a shared social space (e.g., group chats) with friends and family.  *See* SMF ¶¶ 431-432, 457-459, 612(a).  Professor Lampe acknowledged that users can engage in personal social networking on TikTok and Twitter.  *See* SMF ¶¶ 209, 280-281.  The claim (at 13) that "norms" and "motivations" are peculiar to four apps speaks to something other than the *characteristics* of the services.  In any event, the FTC's expert witness on industry norms disavowed any opinion that his analysis has anything to do with economic substitution.  *See* SMF ¶ 613.  Nor does the fact that messaging services (like Messenger) are maintained separately provide support for the argument that such services (like Apple's iMessage) have distinct characteristics.  *See* FTC Br. 5.  Meta also maintains Facebook and Instagram as separate apps, yet both remain in the FTC's alleged PSNS market.  *See* Meta Br. 6.  And too many companies to list have multiple products with distinct brands that compete in the same market, in industries like apparel, retail, candy, automobiles, and more.

**iii.**   **No Distinctive Uses:**  The FTC has no coherent argument that the myriad uses of Facebook and Instagram are "distinct" from the similar (if not identical) uses of many other services it omits from the market.  *See* Meta Br. 7-10, 19-20.  The FTC does not dispute that Facebook and Instagram *do* share uses with many supposedly non-PSNS apps.  For example:

- ████████████████████████████████████████████████████████████

  ████████████████████████████████████████████████;



For each of these examples, consumers actually do the same things on Facebook and Instagram and many other services – not just on Snapchat and MeWe.  *See* Meta Br. 7-10, 19-20; *see also*, *e.g.*, SMF ¶ 612 (Lampe admissions), ¶¶ 631-632 (Hemphill admissions).

The FTC states (at 18) that Meta has not provided evidence that these features on other services are "identical" to the features on Meta services.  *But see* SMF ¶¶ 162, 171, 212, 228, 283, 285, 388, 428.  But it is the FTC – which bears the burden of proof – that provides no evidence that those features, despite their obvious similarities, are *not* used by consumers for the same purposes.  You can watch the *same* video on multiple services.  *See* Meta Br. 8-9; *see also*, *e.g.*, SMF ¶¶ 162, 171, 212.  Were there doubts, the FTC's expert witnesses put them to rest:

- The FTC's proffered industry expert witness agreed that many of the services that the FTC excludes from its PSNS market – including at least TikTok, Twitter, iMessage, and other messaging apps – can be used to serve the very demand that the FTC claims as distinctive:  friends-and-family sharing.  *See* SMF ¶ 209 (TikTok), ¶¶ 280-281 (Twitter), ¶¶ 457-460, 612(a) (messaging); *cf. id.* ¶ 508 (Lampe admission contrasting Snapchat).

- The FTC's principal expert witness conceded that TikTok provides "a social graph of friends and family"; enables "one-to-many [broadcast] communications"; and includes

a "shared social space within which content delivery and interaction occur[s]." *See* SMF ¶ 210; *cf. id.* ¶¶ 616-617 (defining so-called "PSNS"). ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

The FTC's claimed market includes more than 250 different Meta features; it does not even argue that more than a few of them are distinctive. *See* Meta Br. 6-10, 19-20. Calling one of those uses "core" does not make it distinctive, particularly where that use case is only a small and decreasing percentage of the time spent on the apps. *See* SMF ¶¶ 11-16, 56-66.

iv.    **No Unique Production Facilities:** The FTC's claim (at 17) that Meta's infrastructure is analogous to *Brown Shoe*'s "unique production facilities" is baffling. It said just the opposite when it alleged that WhatsApp could pivot into the claimed PSNS market notwithstanding that it had only "messaging" infrastructure. And the expert witness it hired to discuss infrastructure opined that Instagram could have acquired the necessary infrastructure off the shelf. *See*, *e.g.*, Counter SMF ¶¶ 2296(b), 2297. While Meta has *better* infrastructure, *see*, *e.g.*, SMF ¶¶ 151-154, its "production facilities" are not so different that rivals cannot offer the same features. *Cf. Sysco*, 113 F. Supp. 3d at 28 (this *Brown Shoe* factor turns on actual physical differences and ability to make products that could constrain rivals, not quality).

v.    **No Other Factors:** Finally, the FTC asserts (at 17) that PSNS users are not sensitive to price changes because Facebook usage was largely unaffected by the Cambridge Analytica incident, which was an alleged misuse of data by an outside actor. *See* Counter SMF ¶ 1995; *see also* SMF ¶ 54. But the argument makes no sense as a matter of textbook economics. If Cambridge Analytica actually involved a quality hit equivalent to a price increase, then Meta would have lost usage – even if it was a monopolist. *See* Counter SMF ¶ 2001(c) (even a monopolist loses consumers from price increases). An increase in price causes consumers to

use less of a service whether the increase is from a competitive price or a monopoly price, as the FTC itself acknowledged (at 10) in discussing the *Cellophane* fallacy. The FTC's expert witness agreed. *See* Counter SMF ¶ 1995. The only conclusion to be drawn from the muted response to Cambridge Analytica is that users did *not* perceive the incident as an increase in price or a material reduction in quality to the extent quality can be analogized to price.

## II.   THE FTC'S CASE FAILS BECAUSE THERE IS NO EVIDENCE OF META POWER TO RAISE PRICE ABOVE OR RESTRICT OUTPUT OR QUALITY BELOW COMPETITIVE LEVELS

Like its "price discrimination" theory, the FTC's theories about monopoly power in a free PSNS "use" market lack any support in the evidence. The FTC's "indirect" theory is based on a shifting and artificial market with correspondingly artificial numbers. *See* Part II.A *infra.* And it cannot find "direct" evidence of power in a scatter pattern of unsupported claims that do not provide any evidence that Meta has exercised or can exercise such power. *See* Part II.B *infra.*

### A.   There Is No Indirect Evidence of Monopoly Power

After initially trying and failing to plead a plausible claim of power in a well-defined antitrust market, *see Facebook I*, 560 F. Supp. 3d at 17-20, the FTC came back with a new theory in its amended complaint. It committed to the Court that it could establish a *presumption* of power based on Meta's supposed monopoly share (60% plus) of time spent on PSNS-only features. The Court allowed the case to proceed on that basis. *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 48 (D.D.C. 2022) ("*Facebook II*") ("While Defendant is correct that data capturing time spent on platforms providing PSN services includes more than time spent just using such services, that imperfection is not fatal at this stage.").

The FTC returns with a very different theory. It now claims that Meta's share of *all* time spent on Facebook, Instagram, Snapchat, and MeWe is what counts, and that Meta has a high share of that time. Most of that time concededly consists of time spent not on "friends-and-

family sharing" but on entertainment, like viewing videos from "unconnected" sources, playing games, shopping, viewing interest-based content, and much more. *See* Meta Br. 3-4; *see also* SMF ¶¶ 11-16, 56-66. There is undisputed competition for that time, yet the FTC includes all that time on Facebook and Instagram while excluding all of the time spent with the many effective competitors for the same time. But as demonstrated above (*see* Part I *supra*), there is no justification for this exclusion. It is artificial and unsupported by any evidence. Meta showed (at Meta Br. 22-23) that the FTC's new fraction falls apart once time spent on a few obvious – indeed the closest – competitors is properly included in the denominator. It is undisputed that including ███████████████ time spent alone drives Meta's share far below anything close to a plausible monopoly level. *See* SMF ¶¶ 643-644 (█████████████). The FTC's principal expert witness conceded that these services *are* effective competitors for time, at least for the time that is spent on consumption of non-friends content – and even for some part of the time spent on friends content as well. *See* SMF ¶ 627 (friends content), ¶¶ 260, 262, 628-632 (non-friends content); *see also id.* ████████████, ████████; ¶ 612 (Lampe admissions).

The FTC attempts to salvage its changed market theory by making (at 30-31) various on-the-fly adjustments. For example, one manipulation looks at cherry-picked Meta features the FTC believes to be sharing-focused. *See* Counter SMF ¶ 1402. One is Facebook Feed, but that includes non-friends content like Reels and video posts from public accounts like the NBA. *See* SMF ¶¶ 62, 75, 639. Indeed, only ██ of time spent on Feed is ████████████ ███. *See* SMF ¶ 11; *see also id.* ¶ 56 (██████ of time spent on Instagram Feed is █████ █████████). And this calculation still omits obvious competitors that constrain those same Meta features (YouTube, Twitter, and TikTok, among many others). It also excludes all time spent messaging on apps like iMessage, even though the FTC admits that messaging *is* sharing "in a shared social space," the asserted *sine qua non* of PSNS. *See* FTC Br. 3-5; *see also* SMF

¶¶ 431-432, 457-459.  In all events, it defies reality to ignore the admitted facts that ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████.

Even further afield, the FTC claims (at 31) to measure "incidental friends and family usage of non-PSNS applications" based on a survey that asked a group of users for the "most important reason" they use an app or service.  The FTC illogically contends that the percentage of surveyed users who claim that sharing is the most important reason corresponds to the percentage of time spent by all users on that activity.  *See* Counter SMF ¶ 1405.  Thus, Professor Hemphill assumed that, if 37% of respondents say the primary reason they use Instagram is to keep up with friends and family, then 37% of all time spent on Instagram must be friends-and-family sharing.  *See* SMF ¶¶ 646, 650.  But that makes no sense and conflicts with the survey sponsor's own testimony admitting that the survey *doesn't* measure time spent.  *See* SMF ¶ 652.  Moreover, the survey conflicts with the FTC's thesis that "sharing" is what distinguishes its four-app market construct:  a majority of the surveyed users do *not* say friends-and-family sharing is the "most important reason" to use Instagram, Snapchat, or MeWe.  Whatever this survey may or may not indicate, it surely cannot be used to calculate market shares based on time spent.

And whatever Meta's share of a valid market might be, the FTC lacks evidence that significant entry barriers shield Meta from competition.  *See* Meta Br. 23-24.  The FTC argues (at 31-32) that it costs money to enter a market, which is true in every case and not unusually true here.  *See Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993).  There is no evidence that money is no longer available for investment in promising companies.  *See* Counter SMF ¶ 1424.  The FTC tosses out buzzwords like "network effects" and "switching

costs" (at 31-32).  But undisputed evidence of actual entry trumps internal documents ruminating about these theories.  New rivals concededly entered and expanded after 2012.  *See* SMF ¶¶ 729-732.  According to the FTC, Snapchat *started* as a PSNS after the Instagram acquisition and ██████████████████████████████████.  *See* Meta Br. 23; *see also* SMF ¶ 729.  And also according to the FTC (at 30), this real-world entry eroded Meta's share of the imagined market (which its expert witness calculated near 100% in 2012).  *See* Counter SMF ¶ 1397.

The FTC's "barriers" argument also cannot explain the dramatic U.S. surge of TikTok from nothing in 2018 to massive Meta rival today.  The FTC dismisses this phenomenon (at 32) *without* disputing that TikTok exerts significant competitive pressure on Meta.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████.  ████████████████████████████████████████████

██████████████████████████████.  Even if this were true (and it is not, *see* SMF ¶¶ 177-182, 217-225, 237-245), that does not make ████████████████████████

████████.  It does, however, disprove the FTC's theory that WhatsApp was the only firm that could enter the claimed PSNS market by adding friends-and-family features.

The FTC cites (at 33) an inapposite passage from *Microsoft* stating that, when calculating shares, an antitrust market need not include all potential competitors that could pivot into the market.  But that sidesteps Meta's point:  the evidence shows that entry barriers are low because some *did* pivot (e.g., TikTok) and many *could* pivot (e.g., iMessage – which the FTC has no explanation for and therefore ignores).  *See* Meta Br. 24.  Supposed failure by some, nowhere attributed to Meta, does not establish a barrier to entry; it is the threat of entry and the knowledge that a superior product will succeed that keeps competitors on their toes.  *See United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990).

**B.      There Still Is No "Rarely Available" Direct Evidence of Monopoly Power**

The FTC was prescient in its early warning that it would not be able to find direct evidence of monopoly power.  *See* Meta Br. 24 (quoting FTC brief quoting *Microsoft*).  Before and after 2011 (when the FTC says Meta acquired a monopoly), Meta charged nothing for its apps.  *See* SMF ¶¶ 5, 825.  Output similarly refutes a claim of power:  Meta provides its apps without restriction, and output has concededly and dramatically increased.  *See* SMF ¶¶ 10, 724-725, 833-836.  Non-Meta output has also increased since the acquisitions.  *See* SMF ¶¶ 729-732; *see also id.* ¶ 207.  And while the FTC's entire case – on power as well as exclusionary conduct – rests on various arguments about quality, the FTC's lead expert witness admitted that the dramatic increase in output is consistent with *increasing* quality as a matter of economics.  *See* SMF ¶ 130.  But with its indirect case in tatters, the FTC is left to argue about subjective quality anyway.  The FTC cites no decision in which a court has relied solely on claims of impaired perceived quality as sufficient evidence of monopoly power.  *See* Meta Br. 26 (citing *Kochert*).  And complaints about quality are meaningless without *total* quality benchmarks, which the FTC did not even try to develop.  *See* SMF ¶ 129 (Hemphill admission); *see also id.* ¶ 146; Counter SMF ¶ 1474.  The FTC has only *theories*, none of which provides direct evidence of anything approximating monopoly power:

1.      *First*, the FTC repeats its unsupported allegation (at 34) that Meta can charge some users a supracompetitive ad load.  But as already shown (*see* Part I(1)(b) *supra*), this is just another FTC theory with no evidentiary support.  The FTC's expert witness *tried* to find evidence of relevant price discrimination and was forced to admit on examination that he had not come up with any.  *See* SMF ¶ 640; Counter SMF ¶ 1504.  And even if the FTC had come up with some such evidence, it would also need evidence that the "price" was above a competitive level.  *See* Meta Br. 26.  Nothing like that is in the record.  *See* SMF ¶¶ 129, 146.

**2.**     *Second*, the FTC says (at 35-36) that Meta's profits from digital advertising are proof of power in the *separate* claimed PSNS "use" market.  The Court has already rejected the asserted equivalence between these separate markets.  *See Facebook I*, 560 F. Supp. 3d at 19. The gambit doubly fails because the FTC *does not dispute* that Meta has to compete in the separate advertising market, which concededly is *not* monopolized.  *See* SMF ¶¶ 144-145; *see also* FTC Br. 35 (not claiming Meta has "power over advertisers").  Meta can succeed only by means of superior efficiency, skill, and innovation.  *See CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816, 824 n.13 (D.C. Cir. 2001) (high profits alone do not prove monopoly power). The FTC says (at 35-36) that advertising profits are consistent with power in a use market and that *Meta* cannot prove advertising innovation drives advertising profits.  But the shoe is on the other foot.  The *FTC* has the burden of proving, with evidence, that Meta has power in the claimed PSNS market (where it charges no price), that such power is responsible for advertising profitability, and that innovations in the separate market for advertising do *not* drive profits there. The FTC made no effort to develop evidence that could carry any part of that burden and points to none.  *See* SMF ¶¶ 135-145 (describing advertising competition and innovation).

In any event, Meta can earn profits only by continuing to attract and retain usage.  It is undisputed that the *vast majority* of that usage – about ██ for Instagram, *see* SMF ¶¶ 56-66 – is not the friends-and-family use case that the FTC claims is distinctive.  And for that vast majority of time Meta needs to attract and keep for purposes of its advertising business, Meta admittedly competes with many services outside the claimed PSNS market.  *See* Meta Br. 7-10, 18-20.  If Meta's profits demonstrate anything with respect to user-side competition, it is that Meta has managed to innovate successfully in response to competitive pressure from services old and new. The profits certainly cannot be attributed to exploitation of a small subset of "captive" sharers, and the FTC has no evidence – or even a coherent theory – that there is any such connection.

**3.**    *Third*, the centerpiece of the FTC's "direct evidence" theory is the allegation that Meta's services have subjective quality deficiencies.  *See* FTC Br. 33-34.  This theory fails as a matter of law because the FTC did not even attempt to develop a "quality" competitive benchmark, *see* SMF ¶ 129, without which the FTC cannot show that Meta fell below a competitive level or had "*supra*competitive" quality declines.  Mere quality issues, like mere price increases, prove nothing about power in the absence of evidence the defendant can do something that firms facing competition cannot.  *See* Meta Br. 26-27.

The FTC disputes this legal principle (at 33-34) for evident reasons:  it has no proof of any competitive level.  But it is simply wrong about the law.  Controlling precedent requires evidence that the claimed monopolist has the power to raise price above "the competitive level." *Microsoft*, 253 F.3d at 51; *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) (same); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) (same); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013) (Gorsuch, J.) (same). The cases cited by the FTC (at 37-38) all involved price increases, which could be demonstrated and quantified.  The requirement of an objective benchmark, like price, is particularly important here because the alleged quality issues are inherently subjective.  User preferences for things like receptivity to advertising and "privacy" settings vary, as the FTC expert witnesses admitted. *See* SMF ¶ 148 (addressing advertising); *see also* Counter SMF ¶ 1966 (addressing privacy).

The FTC reaches out of Circuit (at 35) but finds no support there.  In *Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), the Sixth Circuit confirmed that Section 2 requires a competitive benchmark, which the plaintiffs established by comparing prices across geographic markets.  *See id.* at 1018-19.  The other cases the FTC cites (at 36) likewise relied on a competitive benchmark.  In *McWane*, the plaintiff showed that the defendant sold "domestic-only products at prices that earned significantly higher gross profits than for

non-domestic fittings, which faced greater competition." *McWane*, 783 F.3d at 832 (cleaned up).

And in *United States v. Dentsply International, Inc.*, 399 F.3d 181 (3d Cir. 2005), the government

showed that the monopolist "did not reduce its prices when competitors elected not to follow its

increases." *Id.* at 190-91.

In all these cases, the courts adhered to the requirement that plaintiffs prove power by

demonstrating supracompetitive pricing, which requires comparison with a competitive

benchmark. The FTC's expert witness admitted there is no evidence to permit such a

comparison here. *See* SMF ¶ 129 ("[I]t's not something that I have done, I don't see how one

would do that."). That should be the end of the "quality degradation as proof of power" theory.

Lacking authority, the FTC again resorts (at 36) to theory – a reprise of the "*Cellophane*

fallacy." *See* pp. 18-19 *supra*. But that is a theory about substitution at monopoly prices and has

no relevance to whether a party can establish a competitive level of price or output or quality.

*See Dentsply*, 399 F.3d at 190-91 (benchmark for competitive price established notwithstanding

allegedly monopolized market). The FTC does not cite a single decision in which a court has

accepted the FTC's argument about its inability to carry its burden of proof. *See*, *e.g.*, *United*

*States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995) (affirming district court decision

rejecting the government's argument about the *Cellophane* fallacy); *PepsiCo*, 114 F. Supp. 2d

at 257-58 (rejecting argument premised on *Cellophane* fallacy *because* plaintiff had "not

submitted any evidence to show that Coca-Cola's prices are supracompetitive").

The FTC finally resorts (at 37) to another flimsy excuse, claiming that it does not need

objective evidence as to quality because scattered surveys show that Meta has declining "user

sentiment" scores. Whatever those surveys of "sentiment" might represent, they do not even

purport to demonstrate that Meta degraded the quality of its apps below a competitive level.

*See* Counter SMF ¶¶ 1495, 1499; *see also id.* ¶¶ 973, 1492(c)(vi), 1493. The "sentiment" of

35

consumers – how they feel about Meta's brand at any point in time – is undoubtedly a function of myriad factors the FTC does not even try to address, as its expert witness acknowledged. *See* Counter SMF ¶¶ 1495-1496.  No evidence even suggests these surveys actually measure objective service quality.  *See* Counter SMF ¶¶ 1498-1500.  The FTC's expert witness admitted that he made no effort to tie user sentiment scores to any actual change in the quality of the services.  *See* Counter SMF ¶ 1498.  And no court has ever relied on such ambiguous material as direct proof of monopoly power or held such thin gruel sufficient to create an issue for trial.

Ultimately, the FTC's own evidence eviscerates its "bad quality" theory of power.  The FTC's expert witness admitted that there was no evidence that Meta degraded net quality – let alone brought it below a competitive level.  *See* SMF ¶ 129.  And at the same time he found that Meta has dramatically increased output and use across its apps, without any price increase.  *See* SMF ¶¶ 10, 724-725, 731-732.  That evidence is proof that quality is *increasing* as a matter of textbook economics, *see* Meta Br. 26-27, as the FTC's lead expert witness admitted.  *See* SMF ¶ 130.  While the FTC *lawyers* wave away that concession with belated hypotheses about other possible reasons why output has increased so dramatically (at 37-38), the record has no evidence to support *those* 11th-hour theories.  Professor Hemphill admittedly did not even consider them as possibilities in forming his opinions about the output explosion.  *See* SMF ¶ 131.

4.     *Finally*, the FTC (at 34) makes the throw-away argument that Meta has the "[p]ower to exclude" competitors, referencing Meta's distribution platform and the FTC's own invalid Section 2 claim based on denial of access to that facility.  Firms could and did succeed without Meta's help, *see* SMF ¶ 729, which it had no obligation to provide as a matter of law. *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023).  By contrast, in the cases the FTC cites (at 35), monopolists did not grow rivals through acquisition, but instead denied rivals access to *third-party* distribution.  *Cf. Dentsply*, 399 F.3d at 196 (exclusive dealing

to deny rival manufacturers access to third-party distribution contracts).  Beyond the echoes of its dismissed platform claim, the FTC has only a strange retelling of the Instagram success story as proof of power to exclude.  Meta did indeed provide resources, distribution, and expertise to Instagram.  *See* Meta Br. 39-40.  But it stands logic on its head to suggest that Meta's procompetitive expansion of Instagram is proof that Meta had the power to *exclude* others.

## III.    THE FTC'S CASE FAILS BECAUSE THERE IS NO EVIDENCE OF EXCLUSIONARY CONDUCT

It is not unlawful to attain or maintain a monopoly; it is unlawful only to do so through predatory or "exclusionary conduct" that harms competition and consumers with no beneficial purpose.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004).  Extensive precedent from the Supreme Court, this Circuit, and this Court defines the boundaries of this prohibited conduct.  *See* Meta Br. 32-34.  No such conduct can be found in the extensive record here.  There is not a single case in the history of the Sherman Act that has condemned acquisitions similar to the Instagram and WhatsApp transactions.  *See* Part III.A *infra*.  The FTC's lukewarm backup argument about consumer harm fares no better than its attempt to change the law.  Under the correct legal standard, the FTC must come forward with evidence that Meta's acquisitions actually harmed competition and consumers in ways that matter to antitrust law – higher prices, lower output, or (maybe) reduced overall quality by some objective measure.  There is no evidence to support any such claim.  *See* Meta Br. 36-37 (Instagram), 42-43 (WhatsApp).  The acquisitions have been rousing consumer-welfare success stories, which is what antitrust law celebrates, not condemns.  *See* Part III.B *infra*.

### A.    The FTC Urges Adoption of an Incorrect Legal Standard

The FTC has both an invented market and an invented legal theory:  if a firm with monopoly power acquires another firm that in retrospect can be characterized as a "nascent" or

"potential" competitive threat, it violates Section 2 – no matter how beneficial the transaction has

proven to be.  Worse, the FTC seeks to make law that all such acquisitions (even with regulatory

clearance) subject firms to a potential break up years or even decades after the fact.  But settled

authority stands in the way.  As *Microsoft* and other controlling precedent instruct – and as the

FTC's principal expert witness conceded as a matter of economics, *see* SMF ¶ 715 – Section 2

condemns only conduct that *actually* harmed consumers, requiring evidence of effects.

       **1.**     ***The FTC misstates the law – it must prove anticompetitive effects.***

       **a.**     As the Court previously made clear, by this stage of the case, the FTC needs

to come forward with evidence of effects.  *See Facebook II*, 581 F. Supp. 3d at 54-55.  "[T]o

be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'"

*Microsoft*, 253 F.3d at 58.  For there to be an "anticompetitive effect," the conduct "must

harm the competitive *process* and thereby harm consumers."  *Id.*  "[M]ergers **may** constitute"

exclusionary conduct "whenever a threat of Section 2's prohibited ***effects*** is evident."

*Facebook I*, 560 F. Supp. 3d at 31 (cleaned up; emphases added to words FTC's brief omits).

But now, evidence is required:  "While the FTC has not yet *proven* the requisite anticompetitive

effect," it "will need to substantiate these allegations at later stages in the litigation."  *Facebook*

*II*, 581 F. Supp. 3d at 56.  The bar was clearly set:  "[T]he FTC down the road will have to prove

its allegations about how the acquisitions affected market conditions and competition."  *Id.*

(reviewing and discussing claim that Meta "has been able to provide lower levels of service

quality . . . than it would have to provide in a competitive market").

       The FTC laid out its theory of effects and acknowledged its burden of proof.  *See* Am.

Compl. ¶¶ 221-222, 228; *see also* Mot. Hr'g Tr. 3:12-4:3 (May 15, 2023) (the Court noting that

the FTC's claim that consumers would be better off in tangible respects without the acquisitions

is "the fundamental point of [the] suit"); *id.* at 4:4-17 (FTC:  "But for Meta's illegal conduct

there would have been – consumers would have benefited from competition.").  Its principal expert witness admitted "the relevant question here is the actual world that we live in compared to the but-for world."  *See* SMF ¶ 715.  And he agreed that the FTC needed to show "what . . . usage look[s] like relative to a but-for world."  *See* SMF ¶ 715 ("I would agree that if consumer welfare for personal social networking users is higher in the actual world than in the but-for world, that, you know, that would be adverse to a conclusion about competitive effects.").

**b.**      Now, having failed to develop evidence of effects, *see* Meta Br. 36-46, the FTC reverses course and attempts to shirk the burden the law imposes and the agency acknowledged. But it makes only tortured legal arguments that misread the relevant cases.  Contrary to the FTC's assertion (at 58), *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008), is on point.  There, the FTC asserted that the outcome would have been different – and better for consumers – "but for" the alleged exclusionary conduct.  But the FTC had no evidence that any competition-reducing aspect of the conduct had produced such an effect.  *See id.* at 466-67 (finding no evidence of any difference between competition in the real world and in "the world that would have existed" without the conduct).  The court expressly rejected the FTC's argument that "any conduct that permits a monopolist to avoid constraints on the exercise of that power must be anticompetitive," regardless of actual effects.  *Id.* at 466.

The Supreme Court's decision in *Brooke Group* also stands in the way of the FTC's efforts to avoid its burden of proving actual effects.  There, the plaintiff claimed that conduct was anticompetitive because it reduced output below the level that would have been attained in the but-for world (i.e., without such conduct).  The Supreme Court held that this theory failed in the absence of "*concrete evidence*" of what that level would have been.  *Brooke Grp.*, 509 U.S. at 233-34 (emphasis added).  To "speculate" without such evidence is not enough.  *See* Meta Br. 35-36 (collecting cases forbidding speculation about effects); *see also Am. Express*, 585 U.S.

39

at 547-48 (requiring "evidence that the price of credit-card transactions was higher than the price one would expect to find in a competitive market" to prove anticompetitive effects).

The lone case the FTC cites (at 49) supposedly on the issue of the but-for comparison has nothing to say about that requirement.  In *Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C. Cir. 1977), the court held "merely that when, as here, a defendant seeks to avoid a charge of monopolization by asserting that it has a natural monopoly owing to the market's inability to support two competitors, the defendant, and not the plaintiff, bears the burden of proof on that score."  *Id.* at 991.  And the FTC's remarkable argument (at 56) that it should not be required to prove effects because it can't prove them makes no sense, is contrary to established law (in *Brooke Group*, *Rambus*, *NCTA*, and others), and also has no support in the cases the FTC cites. In *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2020), the court held allegations that exclusivity contracts had locked up "70-80%" of the market – increasing "net price" – were sufficient to *plead* anticompetitive effects that would survive a motion to dismiss.  *Id.* at 102-03. And in *McWane*, a monopolist cut off rivals from distribution, allowing it to continue charging "supracompetitive prices."  *McWane*, 783 F.3d at 839.  That was proof of anticompetitive effects because the conduct made "a significant contribution" to the monopolist's "price behavior" even if it was not "the sole cause."  *Id.*

c.      Now, as before, the FTC urges on the Court an incorrect reading of the D.C. Circuit's decision in *Microsoft*.  *See* FTC Br. 50-52; *see also id.* at 42.  Simply put, *Microsoft* does *not* hold that the government is relieved of a burden to prove harm to competition and consumers; it holds the opposite.  *See* Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated Mergers Under Section 2*, Competition Pol'y Int'l (May 2020) (discussing the very "misreading" of the *Microsoft* decision that the FTC asserts here). Conduct is exclusionary *only* where it is shown to have produced harmful effects.

*First*, the *Microsoft* court started its analysis with anticompetitive effects, explaining that "[t]he challenge for an antitrust court" is "distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it." *Microsoft*, 253 F.3d at 58. Applying that rule, the D.C. Circuit confirmed the district court's findings that squashing Netscape and Sun's version of Java was anticompetitive – it reduced output – with no redeeming benefit. *See id.* at 61-62 (effect of licensing), 66 (effect of integration conduct), 70-71 (effect of IAP agreements), 72 (effect of exclusive dealing), 76-77 (effect of deception). Microsoft did not even defend some of its conduct as beneficial, e.g., "proffer[ing] no justification" for "closing rival browsers out of one of the two primary channels of distribution." *Id.* at 64-67.

*Second*, after confirming that the conduct had caused harmful effects and with no beneficial purpose, the court addressed Microsoft's argument that, even if it had a monopoly in the alleged market and had engaged in exclusionary conduct, the government still needed to prove that, but for the exclusionary conduct, Microsoft would have lost its monopoly. The court rejected that argument and held that liability for conduct already found to be anticompetitive does not "turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's *anticompetitive conduct.*" *Id.* at 79 (emphasis added). A court "may infer causation [of the maintained monopoly] when *exclusionary conduct* is aimed at producers of nascent competitive technologies." *Id.* (emphasis added).

But the court required the government to *prove* that the conduct was harmful to competition and consumers. In each instance, there was compelling proof that Microsoft squashed a rival and thereby reduced output. The court did *not* hold or even suggest that an antitrust court can deem conduct *per se* exclusionary on the government's say-so without evidence that the conduct actually had harmful effects. It held the opposite. Accordingly, *Microsoft* confirms that the FTC must prove that the conduct it challenges is anticompetitive

41

because it harmed consumers, as this Court has already held.  *See Facebook II*, 581 F. Supp.

3d at 54-55; *see also United States v. Google LLC*, 687 F. Supp. 3d 48, 81 (D.D.C. 2023)

(stating that "[s]peculation" "conduct" " 'might' or 'could' " have an effect "is not evidence

of anticompetitive effects" and the government is "required to show with proof that the

monopolist's conduct *indeed* has the requisite anticompetitive effect").

      **d.**      With no support from the Supreme Court, the Circuit, or this Court, the FTC

ranges out of Circuit in search of authority.  But every case the FTC cites (at 56) fails to support

its argument; in each, courts found that conduct was anticompetitive precisely because it *did*

have harmful effects.  For example, in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003)

(en banc), the court held that using exclusive dealing to foreclose a rival's distribution was

anticompetitive because there was sufficient evidence the conduct had "eliminat[ed] . . . the

lower priced private label tape" option in order to "channel consumer selection to the higher

priced Scotch brand," *id.* at 162, as a result of which the defendant had "increased" the "price of

Scotch-brand tape," *id.* at 163 (tying conduct to prices).  The same court reached the same result

in *Dentsply*, where exclusive dealing "choked off the market" and killed rival entry, 399 F.3d

at 196, allowing the defendant to raise prices with "no benefit to consumers," *id.* at 191.  These

non-acquisition cases have no application here.  Each involved conduct that made competition

impossible through exclusive dealing and other predatory tactics.  The evidence proved that this

conduct had no beneficial purpose, killed rivals, and thereby reduced output and increased price.

      **2.**      ***Acquisitions are not per se unlawful – the FTC must prove harm to consumers.***

      **a.**      In seeking to avoid its burden of proof, the FTC asks the Court to accept the

theory that acquisitions by an allegedly dominant firm are necessarily harmful to competition

and consumers.  Thus, it argues (at 39), in tension with its lead expert witness, that the loss of

Instagram and WhatsApp as "independent" firms is sufficient evidence that the transactions

were anticompetitive.  *Cf.* SMF ¶ 715.  But Instagram and WhatsApp were not lost at all.  Meta

acquired two firms and dramatically increased their output, reduced prices to zero (WhatsApp),

and spent billions on quality improvements and innovations.  *See* Meta Br. 36-37, 42; *see also*

*id.* at 5-6.  No court has ever condemned any such acquisition under Section 2.  *See*, *e.g.*, *Syufy*

*Enters.*, 903 F.2d at 673 (rejecting retrospective Section 2 acquisition challenge); *Eastman v.*

*Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) (rejecting Section 2

acquisition claim, noting that "plaintiffs cannot rely on the fact of the acquisitions alone"), *aff'd*,

724 F. App'x 556 (9th Cir. 2018); *see also Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36,

50 n.16 (1977) (antitrust courts should evaluate "anticompetitive consequences" and avoid "the

creation of per se rules," which risk "unintended and undesirable rigidity in the law").

   The Supreme Court and the D.C. Circuit forbid the reductive merger analysis urged by

the FTC, because past acquisitions are *not* subject to categorical condemnation simply because

they allegedly removed rivals from the field.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,

429 U.S. 477, 487 (1977) ("Every merger of two existing entities into one, whether lawful or

unlawful, has the potential for producing economic readjustments that adversely affect some

persons.  But Congress has not condemned mergers on that account; it has condemned them only

when they may produce anticompetitive effects."); *Rothery Storage*, 792 F.2d at 223 ("From the

inception of antitrust policy, the Supreme Court has recognized that the elimination of rivalry by

the joinder of rivals into a larger economic unit is not, per se, an unlawful restraint of trade.").

   **b.**   That is not to say acquisitions can never have anticompetitive effects.  In the

distant past, actual monopolists used acquisitions as part of brass-knuckle tactics that courts

rightly condemned.  *See*, *e.g.*, *United States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911)

(condemning "expenditure of millions upon millions of dollars in buying out plants, not for the

purpose of utilizing them, but in order to close them up and render them useless"); *Standard Oil*

*Co. v. United States*, 221 U.S. 1, 32-33, 42-43 (1911) (condemning a conglomerate's multifaceted conduct, including acquiring refiners that it shut down and "dismantled to limit production"); *cf. Am. Tobacco Co. v. United States*, 328 U.S. 781, 797-98 (1946) (cited at FTC Br. 56) (condemning a conspiracy "to fix and control prices," a classic *per se* offense).

But nothing of the sort happened here:  Meta did not shut down Instagram or WhatsApp to restrict output and thereby increase prices.  It did the opposite, investing billions to grow both services, leading to conceded output increases, innovative new features, and lower prices.  As a result, consumers gained hundreds of billions of dollars in consumer-welfare benefits.  *See* Meta Br. 36-37, 42; *see also id.* at 5-6.  The FTC's claim (at 56) that an "anticompetitive acquisition . . . *is itself* harmful to consumers" is a tautology.  By the same token, an acquisition that is *not* harmful to consumers is not anticompetitive.  Enforcers must *prove* anticompetitive effects, i.e., consumer harm.  The FTC's say-so is not enough.

This is what courts have required for decades without exception – as every Section 2 acquisition case the FTC cites (at 57) reveals.  Far from supporting the FTC's "nascent" acquisition theory, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), demonstrates that the FTC needs to prove harmful effects.  There, a conglomerate engaged in multiple anticompetitive "[p]ricing practices," including territorial divisions, and acquired three service providers to maintain those territorial divisions.  *Id.* at 568-70.  The Court reviewed the overall sufficiency of the evidence and concluded (in one relevant paragraph) that there was sufficient evidence this combined conduct had anticompetitive effects because it allowed the conglomerate to "exclude competitors and *fix prices*."  *Id.* at 576 (emphasis added).  Elsewhere, the Court expressly considered the evidence of pricing effects.  For example, there was evidence that prices would be lower in the but-for world without the territorial divisions that the defendant's challenged conduct had enabled.  *Id.* at 570 (observing evidence of "substantially increased rates" in

territorially divided "cities" compared to other geographies with competition). The contrast between this case and *Grinnell* (like *Microsoft* and *Rambus*) reveals how far the FTC seeks to go in rejecting settled law.

So do the other Section 2 acquisition cases the FTC cites (at 56-57), from many decades ago. In *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987), the court based its ruling on evidence of actual harmful effects via "defendants' post-acquisition pricing," which showed "an across-the-board increase in prices." *Id.* at 1267. In *Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 1983 WL 1853 (D. Neb. June 14, 1983), the court in an unpublished decision held that a local newspaper monopolist's "mere acquisition of [its rival] would *not* have been enough by itself to find improper conduct." *Id.* at *13 (emphasis added). But the court imposed Section 2 liability based on evidence that the acquisition had harmful effects, i.e., "suppress[ed] . . . competition without any corresponding benefits." *Id.* at *14. That is the opposite of what happened here. The FTC's principal expert witness *agreed* that Meta has improved its acquisitions by innovating new features. *See* SMF ¶ 127. And in *Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F. Supp. 780 (S.D. Tex. 1971), the defendant engaged in multiple acts (including predatory pricing, *see id.* at 791-93) that together allowed it to "control the price" consumers were charged. *Id.* at 791. That conduct included acquiring "in excess of 100 credit bureaus" – the customers for whom the defendant and the plaintiff were competing – in order to stop them from contracting with the plaintiff, thereby depriving the plaintiff of "the life blood" of its business. *Id.* at 793-94. The court found a violation not because the defendant acquired competitors, but because it was using acquisitions to foreclose a rival; the court made clear this "vertical" – not horizontal – aspect of the acquisitions was the problem. *Id.* at 794-95.

      **c.**      Finally, the FTC seeks but does not find support in cases involving application of the lower standard of Section 7 of the Clayton Act. *See Brown Shoe*, 370 U.S. at 318 n.32

(Section 7 "was intended to reach incipient" conduct "outside the scope of the Sherman Act," citing congressional reports noting the "intent" was for Section 7 to address conduct in its "incipiency" before it "attained such effects as would justify a Sherman Act proceeding"). Under that lowered bar, the FTC is not required to prove that an acquisition has actually harmed competition – the Section 7 inquiry calls for prediction as to the effects of unconsummated transactions.  But here, under settled Section 2 authority, the FTC has a greater burden to show actual harm to consumers, particularly where the acquisitions were made many years ago.

Even so, cases decided under the more relaxed standards of Section 7 have refused to accept the kinds of arguments untethered to facts that the FTC is making here.  *See Carlson Cos. v. Sperry & Hutchinson Co.*, 507 F.2d 959, 961-62 (8th Cir. 1974) (Section 7 less demanding than Section 2).  For example, the court in *In re AMR Corp.*, 625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023), found that the merger – which had been consummated five years earlier – "did not have an anticompetitive impact" because "output expansions" indicated "reductions in quality-adjusted fares and a lack of anticompetitive effects." *Id.* at 254 (footnote omitted).  That precluded Section 7 liability because "[i]mpacts on prices, market output and capacity are generally considered indicators of a merger's competitive impact." *Id.* at 255 (citing *American Express* and *Brooke Group*).

By contrast, the Section 7 cases the FTC cites (at 58) do not support its argument.  *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531 (1973) (remanding case; ultimately, FTC challenge to acquisition rejected); *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1215-16 (11th Cir. 2012) (Section 7 liability based on presumption plus evidence of price increases as "anticompetitive effect").  More recent authority, including from this Circuit, is more instructive as to the predictive Section 7 exercise.  *See United States v. AT&T Inc.*, 916 F.3d 1029 (D.C. Cir. 2019).  But no such predictions need or should be made here; we *know* what happened.  And *no*

case, under any statute or from any court, supports the FTC's effort to bypass its burden of proof as to harm to competition and consumers from the challenged acquisitions.

### B.     There Is No Evidence of Anticompetitive Effects from the Acquisitions

The Court put the matter plainly:  the question is whether "consumers had access to inferior products and less choice in the market for PSN services than they *would have had* in the absence of [Meta's] acquisitions." *Facebook II*, 581 F. Supp. 3d at 55 (emphasis added). In response, the FTC offers nothing but speculation that things could be better.  Meta *actually* improved its acquisitions by adding new features, which the FTC's expert witnesses conceded. *See*, *e.g.*, SMF ¶¶ 127, 262; *see also id.* ¶¶ 739-747 (Instagram), ¶¶ 839-854 (WhatsApp).  But the FTC nonetheless makes a half-hearted stab at *speculating* quality might be even better.  In so doing, the FTC does not even cite, much less confront, *Brooke Group* – or the fact that no antitrust court has ever relied on such a speculative argument as proof of anticompetitive effects. *See NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614, 642 (D.D.C. 1991) (requiring "concrete evidence" of but-for acquisition effects to impose antitrust liability).

Indeed, no court has relied on quality claims at all without corresponding changes in price or output.  *See* Meta Br. 26 (undisputed by the FTC's brief).  And, as previously noted, the FTC has not even attempted to measure overall quality; it has not assayed a competitive standard for total quality or any aspect of quality.  *See* SMF ¶ 129.  The agency does not argue, and its expert witnesses do not express the opinion, that the level of quality for consumers would be any higher today if the two acquisitions had not been made.  *See* SMF ¶¶ 722, 733-734, 754, 762. Speculating that things could be better was not enough in *Brooke Group*, and it is not enough here.  The FTC trots out irrelevant facts about Instagram and WhatsApp – an attempt to manufacture a material dispute where there is none (Point 1 *infra*); and it makes vague assertions of speculative consumer harm that are not supported by any evidence (Point 2 *infra*).

1.      ***The FTC asserts facts about Instagram and WhatsApp that do not and cannot
prove harmful effects of either acquisition.***  The centerpiece of the FTC's fact presentation is
that Meta viewed Instagram and WhatsApp as threats (true of many companies then and now).
*See*, *e.g.*, Counter SMF ¶ 1653 (time of acquisitions); ████████████████████████████

███████████████.  That is irrelevant to proving anticompetitive effects of past conduct –
where we now know the actual effects of the transaction – as a matter of law.  *See Microsoft*,
253 F.3d at 59; *see also Novell*, 731 F.3d at 1078; *New York v. Facebook, Inc.*, 549 F. Supp. 3d
6, 27 (D.D.C. 2021).  And as to the actual effects of the acquisitions, the FTC has nothing.

a.      **Instagram:**  There is no dispute that Instagram prospered as part of Meta after the
acquisition.  Meta enhanced Instagram's innovation and drove its growth.  *See* Meta Br. 4, 36-37.
The FTC's brief does not question that.  The FTC claims (at 40-42, 53-54) that Instagram in
2012 was growing and had no "critical" infrastructure flaws.  Even if that is true, *but see* SMF
¶¶ 679-694, whether and to what extent Instagram would have continued to grow is undeniably
a matter of speculation.  *See* SMF ¶¶ 733-734.  The FTC marshaled no evidence that establishes
Instagram's chances of success, much less success that would provide consumers with something
better than what actually has been attained in the real world.  *See* SMF ¶¶ 722, 733-734, 754,
762.  Speculation on those questions cannot substitute for evidence of harm.  *See* Meta Br. 34-36
(collecting cases prohibiting speculation about effects, including *NCTA*).

This is not a failing-firm affirmative defense, as the FTC tries to repackage it (at 52-54).
Rather, it is a failure of the FTC's affirmative case.  The FTC has only speculation about what
might have happened with Instagram and *no evidence* that, on its own, Instagram would have
grown larger than it is today and offered or prompted better services for consumers, such that
its "loss" as an independent firm actually harmed consumers.  That is the FTC's burden, and
the FTC has shrugged it off.  *See* Meta Br. 33-35.  Indeed, the FTC's principal expert witness

conceded that he had not even considered that dispositive question (nor did any of its other expert witnesses).  *See* SMF ¶ 734; *see also id.* ¶¶ 722, 733, 754, 762; *cf. id.* ¶ 129.

The FTC argues harm from three discrete actions regarding Instagram.  But none is an anticompetitive effect, much less a consumer harm that can be attributed to the acquisition:

**i.**      *First*, the FTC says (at 59) that Meta increased Instagram's ad load.  It argues that increased ad load harms consumers because "sentiment surveys" indicate that consumers do not like ads.  *But see* Counter SMF ¶ 1493; *see also id.* ¶¶ 1468, 1480, 1482, 1483(a).  It is true that Instagram showed no ads before being acquired, that the advertising market for mobile services was still developing in 2012, and that Meta developed a successful advertising business for Instagram as well as Facebook, *see* SMF ¶¶ 716-722 – which dramatically increased advertising market output, itself a demonstrable benefit in antitrust terms.  Of course, the FTC also says (at 53) it was inevitable that Instagram would have started showing ads to survive, because it had no source of revenue before it was acquired.  *Cf.* SMF ¶¶ 654-656.  And regarding the List "de-merger" simulation, as discussed above (at 18), the model showed that ad load would be *higher* on Facebook and Instagram if they were broken apart **_today_**.  *See* Counter SMF ¶ 1953(c).  Professor Hemphill manipulated the model to produce a different outcome, using assumptions that produced absurd results.  But in any event, the model makes no attempt to predict what would have happened in the but-for world, without the acquisitions that occurred in 2012 and 2014; it therefore cannot be used to prove harmful effects.  *See* Counter SMF ¶ 1304.

Moreover, whether or not ad load would have been higher, there is no evidence accounting for all of the *other* factors that comprise app quality.  Professor Hemphill admitted that ad load alone is not enough.  *See* SMF ¶ 146; *see also* Counter SMF ¶¶ 1466, 1474.  That is, to claim consumers have a service that is "inferior," *see Facebook II*, 581 F. Supp. 3d at 55, the FTC would have to prove that net quality is worse overall – not that one particular aspect is

worse.  *See*, *e.g.*, *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406,

1412 (7th Cir. 1995); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427-28

(S.D.N.Y. 2005) (failure to account for "improvements in [product] quality" makes claim of

price increase "essentially worthless"); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 149 (S.D.N.Y.

2006) (same).  The FTC does not even *claim* a decline in overall quality.  Its lead expert witness

*disavowed* that view because there is no net measure of app quality in the record.  *See* SMF

¶ 129.  The FTC concedes that many aspects of the Meta apps have *improved*.  *See* SMF ¶ 127.

So, on a net basis, there is no evidence that the services are "inferior" to what could have been.

    **ii.**    *Second*, the FTC says (at 59) that Meta at one point "removed growth engineers

from Instagram" and in 2018 "deprived Instagram of resources to innovate and improve features."

*But see* SMF ¶¶ 735-737, 745-747.  Meta indisputably invested billions to grow Instagram,

including building the Instagram growth team from scratch, distributing Instagram on Meta's

infrastructure, releasing dozens of innovative features that today account for ██████ user time

spent on the service, and erecting many "growth bridges" to promote Instagram via Facebook.

*See* Meta Br. 40-41.  The FTC's principal expert witness conceded that Meta improved

Instagram's quality, including by innovating features like Stories and Reels.  *See* SMF ¶ 127.

Today, ███████████████ U.S. consumers enjoy the Instagram app that Meta has built and

improved.  *See* SMF ¶ 724.  No witness has even speculated that Instagram would have attained

this level of success *without* Meta's commitment of resources and expertise.  *See*, *e.g.*, SMF

¶¶ 733-734.  Consequently, it cannot logically have been *harm* to consumers when Meta

temporarily scaled back its on-Facebook promotion of the Instagram *it* created in order to boost

overall Meta output.  *See* Counter SMF ¶¶ 1864-1867; *see also id.* ¶¶ 1920, 1940-1942.  There is

no evidence that Instagram would have received anything close to the same amount of support,

much less *greater* support, from other quarters.

iii.    *Third*, the FTC asserts (at 42) that Meta "abandoned its Facebook Camera efforts" as a "direct result of acquiring Instagram."  Even if that were the case, there would be no cognizable harm to consumers from a decision to promote Instagram instead of developing a separate Camera app, any more than the loss of one firm among others is cognizable harm.  *See* Meta Br. 38-39.  There were *many* photo-sharing apps at the time of the Instagram acquisition. *See* Counter SMF ¶ 1674.  But there also is no evidence that Meta ever intended to maintain a separate Camera app without the acquisition.  The FTC simply misapprehends the facts.  Camera was a feature to improve photo capture on Facebook.  *See* Counter SMF ¶ 1673.  Camera was briefly a standalone app during a transition period:  Meta was overhauling its Facebook mobile app, and it was easier to develop the Camera feature on its own before reintegrating it into Facebook.  *See* Counter SMF ¶ 1686.  Meta did not "abandon" Camera.  The Meta executive responsible for Camera testified that Meta continued to develop Camera *after* the Instagram acquisition and then integrated Camera back into Facebook, all as planned before Instagram was a contemplated acquisition.  *See* Counter SMF ¶ 1850.  The Camera tools continue to be available to consumers who take pictures from the Facebook mobile app.  *See* Counter SMF ¶¶ 1854-1855.  Nothing but speculation supports the claim that Meta would have vigorously promoted a separate Camera app into prominence and that this would have given consumers something better than what they have today.

*Finally*, the FTC faults Meta (at 54) for correctly noting that Instagram depended on access to Meta's proprietary platform and that Meta had no obligation to continue to provide that or any other assistance without the acquisition.  Instagram's founders gave sworn and undisputed testimony that Instagram chose a growth strategy that relied on Meta's facilities and distribution. *See* SMF ¶¶ 659-669.  That of course made Instagram's independent success more uncertain. *See* Meta Br. 40-41.  The FTC can only speculate about Instagram's likely trajectory

notwithstanding that and the many other obstacles it would have faced.  *See* SMF ¶ 656

(monetization), ¶¶ 667, 670 (growth), ¶¶ 679-684 (integrity), ¶¶ 685-694 (infrastructure).  There

is irony in the FTC's observation (at 55) that "evidence indicates that consumers valued some of

the mechanisms that Meta suggests it might have cut off in the but-for world."  What the FTC

backhandedly admits is that Meta provided benefits to consumers by providing those valued

"mechanisms," which consumers might *not* have enjoyed without the acquisition.

  **b.** **WhatsApp:**  The FTC posits (at 42-48) that WhatsApp – a pure SMS

replacement circa 2014, *see* SMF ¶¶ 785-789 – was a "significant threat" to Meta, based on Meta

documents expressing concern about WhatsApp's growth outside the United States.  Meta

executives expressed concern about *many* services, *see*, *e.g.*, Counter SMF ¶ 979, but intent is

not a substitute for effects.  As to effects, the evidence is undisputed:  there is none to support

the FTC's argument that WhatsApp would have changed its messaging-only business to become

what the FTC calls PSNS, and no evidence – or even speculation – as to how a WhatsApp PSNS

offering would have provided something better for U.S. consumers.  *See* Meta Br. 43-46.

  By 2014, WhatsApp had not even dipped a toe into "PSNS" or significantly penetrated

the U.S. market.  *See* Meta Br. 42.  ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████  *See* Meta Br. 44-45 (collecting exemplary testimony and documents); *see also*

SMF ¶ 799 (FTC's expert declining to opine when WhatsApp might have pivoted but for the

acquisition).  The FTC offers the weak response (at 45) that ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ .

The FTC tries to leapfrog the evidence with layers of speculation:  maybe investor pressure would have overcome the WhatsApp owners/managers, or maybe another firm – ▮▮▮▮▮▮▮▮▮▮▮ – would have acquired and then pivoted WhatsApp.  *See* FTC Br. 46.  The FTC ignores sworn testimony disavowing those spectral possibilities.  *See* SMF ¶¶ 779-781, 786-789.  There is no evidence that notional suitors could have successfully acquired and pivoted WhatsApp – the founder controlling shareholders were opposed, among other reasons.  *See* SMF ¶¶ 808-809 (testimony concerning a potential non-Meta acquisition).  The FTC's speculation ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would not even make a colorable "potential competition claim" under the lower Section 7 standard; it is not remotely close to evidence of actual harm that could make a difference in this Section 2 case.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 639 (1974) (evidence of planned entry required); *United States v. Siemens Corp.*, 621 F.2d 499, 506-07 (2d Cir. 1980) (calling for "clear proof" of entry); *FTC v. Atl. Richfield Co.*, 549 F.2d 289, 294 (4th Cir. 1977) (requiring "unequivocal proof" of entry but for the acquisition); *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 861 (2d Cir. 1974) (Friendly, J.) (evidence of a "permanent commitment" to entry required).

Fantasy entry stories aside, the FTC's claim also fails for lack of evidence as to how consumers would have benefited beyond the real-world benchmark the acquisition actually achieved.  *See* Meta Br. 5-6, 42.  The FTC does not dispute that Meta's acquisition expanded WhatsApp's output, added features – including social features like Status (similar to Stories) that WhatsApp had spurned pre-acquisition, *see* SMF ¶¶ 847-850 – and made it *free*, saving consumers billions of dollars.  *See* SMF ¶¶ 825-826.  The FTC has, once again, some theories – e.g., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.  Even wilder is the speculation (at 48) that maybe *another* firm altogether

could have emerged from the shadows, but was denied existence because of a "moat" created by the WhatsApp acquisition.  But the undisputed evidence is that no such moat prevented the actual increase in non-Meta output of "PSNS," *see* SMF ¶¶ 731-732, or blocked entirely new "PSNS" firms from entering, *see* SMF ¶¶ 729-730, or stopped new mobile messengers from entering and flourishing, *see* SMF ¶¶ 836-838.  The "moat" is not even a shallow ford.

The FTC resorts to the argument (at 45) that the WhatsApp acquisition *must* have had harmful effects because Meta overpaid out of fear.  This intent-based theory is a legal non sequitur because it sheds no light on the *effects* of the acquisition, which are what matter.  *See Microsoft*, 253 F.3d at 53; *accord Facebook II*, 581 F. Supp. 3d at 53; *see also Novell*, 731 F.3d at 1078.  Nor does a subjective claim of "overpayment" get the FTC anywhere.  While the FTC asserts (at 45) that there was no contemporaneous total price valuation that supported what Meta paid, in fact there was a Meta board valuation showing that the price Meta paid was *less* than other companies paid in peer transactions on a per-user basis.  *See* Counter SMF ¶ 1838.  Whether or not Meta "paid too much" – a claim not even made by the FTC staff economist who offered testimony on this issue, *see* Counter SMF ¶ 909(a) (stating a different opinion) – the acquisition price does not bear on whether consumers were harmed by the acquisition.  *See also* SMF ¶¶ 825-832 (Meta successfully monetized WhatsApp without showing users display ads and while cutting price to zero, saving consumers billions of dollars in fees).

**2.      *Anecdotal assertions unconnected to the acquisitions cannot carry the FTC's burden of proving harm to competition and consumers from the acquisitions*.**  Finally, and even farther from the undisputed facts, the FTC attempts (at 59-60) to attribute a parade of claimed woes to the acquisitions that have no connection to them whatsoever.  For example, it claims the Cambridge Analytica incident – unauthorized use of data by a third party – can somehow be tied to the acquisitions.  *But see* SMF ¶ 54 (FTC's expert contradicting this theory);

Counter SMF ¶ 1995.  The suggestion is farfetched and only demonstrates how far the FTC has to reach in search of something to say about harmful effects.  *See* Counter SMF ¶ 1966.

It claims "privacy" might be better, but there is no need to consider this because the expert witnesses retained by the FTC conceded that "privacy" did not degrade.  *See* SMF ¶ 51.  No witness even suggested that privacy would be "better" in some sense today if the acquisitions had not been made.  *Cf.* SMF ¶¶ 45-50, 851-854 (Meta released new privacy features after the acquisitions).  The same is true for all the other supposed ways in which Meta's apps have supposedly fallen short, whether by failure to remove offensive content or failure to invest "more" than the scores of billions actually invested, or some other cavil.  *See* Meta Br. 38; *see also id.* at 27-29.  Nothing but speculation says those things would be different today absent the two acquisitions.  And none of the eight expert witnesses retained by the FTC even offered an opinion that could support an argument on that point.  *See* SMF ¶¶ 722, 733-734, 754, 762 (FTC experts disavowing any but-for comparison); *see also id.* ¶¶ 738, 796 (interrogatory responses).

Ultimately, the FTC has only the repetitive, conclusory refrain that "things could be better," problems would not exist, consumers would be happier.  But that is fantasyland.  And it is exactly the kind of speculation forbidden by *Brooke Group*, *American Express*, *Rambus*, *NCTA*, and many more decisions.  All of the FTC's theories fail because they are only *theories*, storytelling unconnected to the acquisitions, unsupported by evidence, and typically disclaimed by the expert witnesses the FTC *could* have asked to support them (and it is telling that they did not).  *Cf.* SMF ¶¶ 714, 728.  Absent evidence that consumers would be demonstrably better off without the Meta acquisitions, the FTC cannot raise a triable issue as to exclusionary conduct.

### C.   The Cleared Past Acquisitions Should Be Presumptively Lawful

Finally, the FTC takes offense (at 60) at Meta's showing that the FTC itself reviewed and considered the acquisitions it now challenges, necessarily finding no basis for attacking them as

anticompetitive.  *See* Meta Br. 47-50.  As far back as 2012 and 2014, the FTC had emails on

which it now relies, *see* SMF ¶¶ 702-706, but it does not cite to any new revelation or claim that

the law has changed since then.  In this unprecedented action, the past clearances should count

for something.  *See Arch Coal*, 329 F. Supp. 2d at 132 (noting "novel" challenge "makes [the

FTC's] burden to establish anticompetitive effects in the post-merger [product] market more

difficult").  Specifically, the fact of clearance should create a presumption the acquisitions are

lawful, for three reasons, as Meta explained.  *See* Meta Br. 48-50.  This Court recognized the

need to take the past reviews into account.  *See Facebook I*, 560 F. Supp. 3d at 32 (past review

may warrant "adjustment in certain burdens of proof").

   *First*, the existence of FTC review and clearance under the lower Section 7 statutory

standard *is* of evidentiary value in assessing the acquisitions today.  *See* Meta Br. 48.  The FTC

attacks a strawman (at 60, 62, 64), claiming that Meta seeks to foreclose a subsequent challenge.

And in each case the FTC cites (at 61), the court held only that prior review is not exculpatory,

full stop.  *Cf. Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021); *In re

High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002); *In re Carbon

Black Antitrust Litig.*, 2005 WL 2323184, at *1 (D. Mass. Sept. 8, 2005).  Meta does not argue

that post-review challenge is foreclosed.  But the fact that post-review challenge is not prohibited

does *not* mean that the prior review is irrelevant to any such challenge.  It necessarily *is* relevant.

   *Second*, the presence of a regulatory regime – here, Hart-Scott-Rodino review – increases

the risk that after-the-fact antitrust scrutiny will condemn procompetitive conduct.  *See Trinko*,

540 U.S. at 412.  The approach the FTC takes here accentuates that risk:  it argues that the

agency can retrospectively condemn procompetitive transactions because, with the benefit of

hindsight, it is possible to characterize the acquisition target as a budding competitor.  The FTC

observes (at 62) that *Trinko* and *Town of Concord* involved "ongoing regulatory oversight."

That is no distinction – the conduct in those cases was ongoing (platform access and rate tariffing), so the regulatory regime was ongoing.  Here, the FTC admits it challenges only the acquisitions themselves (from 2012 and 2014) and no subsequent conduct.  *See* SMF ¶ 653. Accordingly, regulatory review in 2012 and 2014 addressed the only conduct at issue.

*Third*, the FTC downplays the practical and economic consequences of its Rip Van Winkle approach to acquisition challenges long after regulatory clearance.  Meta *did* rely on the fact of clearance in spending billions integrating, innovating, and growing its acquisitions.  *See* Meta Br. 49-50.  The D.C. Circuit has already rejected the claim made here by the FTC (at 63) that Meta has no "reliance interest," explaining that acquisitions "normally lead to progressive integration of the assets and operations of the merged firms, and to investment and other business decisions that are contingent on the new situation."  *Meta Platforms*, 66 F.4th at 301.  The FTC's attempt to claim precedent (at 63) is wrong.  It cites a *private* action (*JELD-WEN*) and a complaint that was not even litigated (*Cardinal Health*).  It also invokes *Grinnell*, which shows exactly what is missing here.  In that case, the government sought to divest past acquisitions *because* of contemporaneous evidence that the defendant was using those assets as part of a coordinated scheme to maintain territorial division and inflate prices.  *See* pp. 44-45 *supra*.

The FTC previously and successfully sought to prevent inquiry into the facts of its prior reviews.  *See FTC v. Meta Platforms, Inc.*, 2022 WL 4078930, at *1 (D.D.C. Sept. 6, 2022).  It surprisingly now wants to argue those facts (at 64) based on no evidence.  The FTC suggests that it narrowed its investigations at Meta's request – absurd on its face – or that it might have been resource constrained, or that additional documents somehow change its analysis in ways it does not even try to explain.  Those arguments are out of bounds.  After successfully blocking discovery into its review process, the FTC cannot now assert facts about that review process. *Cf. SEC v. Lavin*, 111 F.3d 921, 933 (D.C. Cir. 1997) (explaining the rule against selective

disclosure); *Walker v. Life Ins. Co. of the Southwest*, 2014 WL 12577139, at *11-12 (C.D. Cal.

Apr. 3, 2014).  In any event, the FTC makes no claim that Meta (or Instagram or WhatsApp or

any third party) improperly withheld a single document or interview the FTC requested.  *See*

SMF ¶¶ 702-708, 815-820.  After its investigations, the FTC decided *not* to challenge either

acquisition, even under the more FTC-friendly Section 7 standard.  *See* Meta Br. 47.  That should

be a presumptive starting point for analyzing the acquisitions today.

Meta does not *need* any presumption or any change in burdens of proof; the FTC's case

fails on its own, under the usual standards.  But to say that the undisputed fact of prior FTC

reviews and clearances counts for nothing is to ignore reality.

## IV.   THE FTC'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT FAILS

The Court does not need to reach Meta's affirmative defenses because the FTC has no

evidence sufficient to support its claim, as explained above.  *See California Dental Ass'n v. FTC*,

526 U.S. 756, 775 n.12 (1999) ("[B]efore a theoretical claim of anticompetitive effects can

justify shifting to a defendant the burden to show empirical evidence of procompetitive

effects, . . . there must be some indication . . . whether the effects actually are anticompetitive.").

But, in any event, the Court should deny the FTC's motion because Meta has proffered evidence

that the consumer benefits of its investments are substantial, verifiable, and merger-specific.

### A.   Meta's Acquisitions Generated Substantial Procompetitive Benefits

The FTC does not dispute that acquiring a firm and improving it to increase output and

innovate quality enhancements constitutes a legally cognizable procompetitive benefit.  *See*, *e.g.*,

*FTC v. Lab'y Corp. of Am.*, 2011 WL 3100372, at *20 (C.D. Cal. Feb. 22, 2011) (discussing

acquisition benefits); *cf. Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 478 (7th Cir. 2020)

(cited at FTC Br. 67) ("procompetitive benefits typically recognized in antitrust law include

evidence of higher output, improved product quality, . . . [and] successful research and

development").  That should foreclose the FTC's motion, because there is no dispute that

Instagram and WhatsApp actually grew (massively) and added features (dozens), even as Meta

eliminated WhatsApp's subscription fee (a concrete pecuniary benefit worth billions of dollars

to users) and kept Instagram free to use in unlimited quantities.  *See* Meta Br. 36-37, 42.

These benefits are no surprise:  although the FTC stresses the horizontal aspects of the

acquisitions, it ignores the undisputed evidence that both acquisitions have important *vertical*

aspects as well.  *See* Counter SMF ¶ 1893.  A vertical merger – which combines firms at

different and complementary levels of the production chain – offers inherent benefits.  *See*

*United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C.

Cir. 2019).  Here, Meta had an extraordinarily sophisticated global infrastructure for the storage

and delivery of content, a cutting-edge advertising business with state-of-the-art capabilities,

and teams of engineers to address spam and other integrity issues.  *See*, *e.g.*, SMF ¶¶ 134, 143

(advertising), ¶¶ 151-153 (infrastructure), ¶¶ 748-754 (integrity).  All of these resources were

complementary to the consumer-facing apps that Instagram and WhatsApp had developed.  *See*,

*e.g.*, SMF ¶¶ 755-761 (Instagram infrastructure), ¶¶ 825-832 (WhatsApp monetization); *see also*

*id.* ¶¶ 45-50, 851-854 (privacy features).  Economics – and applicable precedent – recognize a

general presumption that vertical mergers are desirable.  *See* Counter SMF ¶ 1893.

There is a mountain of evidence that Meta realized such vertical efficiencies to the

benefit of consumers.  For example, post-acquisition Instagram chose to migrate off Amazon

Web Services – which was expensive and limited – to Meta's infrastructure, with substantial

gains in performance and efficiency.  *See* SMF ¶¶ 685-694, 755-761.  Meta likewise enabled

Instagram to launch dozens of new features, relying on Meta's infrastructure and other resources

dedicated to Meta's services, including messaging, video, Stories, Reels, and ranked feed.  *See*

SMF ¶¶ 739-747.  Meta's infrastructure also allowed WhatsApp to avoid relying on third-party

supplier Softlayer and provided WhatsApp with significant and unique benefits that facilitated WhatsApp's addition of voice- and video-calling capabilities quickly, reliably, and at massive scale.  *Compare* SMF ¶¶ 801-804 *with id.* ¶¶ 839-846, 855-865, 869.  And there is much more.

      **B.**      **The FTC's Rebuttals to Meta's Affirmative Defenses Fail**

      **1.**      ***Meta's procompetitive benefits are real-world improvements, not pretext.***  The claim that Meta's procompetitive benefits are pretextual – because its subjective motive was to eliminate independent competitors – fails for three separate reasons:

      *First*, Facebook has proffered ample evidence that both Instagram and WhatsApp *actually realized* procompetitive benefits from their combination with Meta – more output, improved service quality, new features, and lower prices.  *See* Meta Br. 36-37, 42; *see also id.* at 5-6.  Developments over the many years between the acquisitions and the FTC's belated challenge thus provide ample evidence for the "nonpretextual claim that [the] conduct is indeed a form of competition on the merits because it involves . . . greater efficiency or enhanced consumer appeal."  *Microsoft*, 253 F.3d at 59.  It would upend established law to contemplate imposing liability because Meta's motives were (supposedly) impure.  As then-Judge Gorsuch observed, "e-mail" suggesting an "intent to undo a competitor . . . should hardly surprise," but it is not enough.  *Novell*, 731 F.3d at 1078.  "[T]he intent behind the conduct of a monopolist is relevant *only* to the extent it helps us understand *the likely effect* of the monopolist's conduct."  *Microsoft*, 253 F.3d at 59 (emphases added).  Here, there is no need to speculate about likely effects, because it is undisputed that Meta *actually* grew and improved its acquisitions.

      The evidence of actual benefits distinguishes every case the FTC cites (at 74), in which the courts found – after a trial – that the defendant had harmed consumers and that the justifications they offered for their conduct were *not real*, i.e., the claimed benefits *did not exist*.  For example, in *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) – in

which a pharmaceutical company forced users to switch to a drug formulation protected by a later-expiring patent to avoid competition from generics – the district court determined that the defendant had made up prospective benefits from *forcing* (rather than persuading) users to switch to the new drug formulation.  *See New York v. Actavis, PLC*, 2014 WL 7015198, at *40 (S.D.N.Y. Dec. 11, 2014).  And in *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), the Ninth Circuit agreed that the defendant could lawfully protect its IP by declining to license patented products, but that justification "played no part in the decision" to enact "a blanket refusal" to license thousands of products *not* patented.  *Id.* at 1219-20.  The FTC cites no case where a court disregards or discounts *proven* benefits on the ground that the defendant acted with supposed bad intent – which is exactly what the FTC asks this Court to do.

*Second*, even if subjective intent mattered, there is ample record evidence that Meta acquired both Instagram and WhatsApp to grow and expand them.  If intent can cast light on likely effects, then evidence of effects casts light on actual intent:  Meta invested heavily in developing and growing Instagram and WhatsApp from day one, adding features, speeding Instagram's monetization, and making WhatsApp free.  *See* Meta Br. 36-37, 42; *see also id.* at 5-6.  The notion that these possibilities somehow revealed themselves to Meta only after the deals had closed – even if that mattered – is hardly plausible and legally irrelevant.  Substantial evidence precludes the FTC's motion in any event:

**Instagram:**  Meta contemporaneously stated that its goal pre-acquisition was to grow Instagram and broaden its distribution.  *See* SMF ¶ 698; Counter SMF ¶ 1706(g).  Regarding the "neutralize a potential competitor" email, *see* FTC Br. 72-73, Mr. Zuckerberg also wrote in the same correspondence that Meta would acquire Instagram and then "incorporate" it into Meta's "products."  *See* Counter SMF ¶ 1694.  He has testified his message conveyed that "[Meta] thought it would be useful and put our weight behind growing them and making them better than

we thought that they could be independently." *See* Counter SMF ¶ 1694.  And regarding the

purchase price, the FTC cites emails (at 73) in which Mr. Zuckerberg reasoned it was worth

$1 billion to bet on sustaining growth via Instagram – not shutting it down.  That became one

of the best entrepreneurial bets in modern history.  *See* SMF ¶ 670; *see also id.* ¶¶ 714, 733.

> **WhatsApp:**  Meta contemporaneously stated that its goal pre-acquisition was to grow

WhatsApp.  Before the acquisition, Meta's board – which had to approve the transaction, *see*

SMF ¶ 813 – discussed its "Strategic Rationale" for the transaction, including that Meta "can help

[WhatsApp] grow by using our distribution, infrastructure, etc."  *See* Counter SMF ¶ 1836;

*see also id.* ¶ 1885.  In contrast to that contemporaneous document, the FTC relies (at 77) on

an email (the "competitive moat" statement) from a *year earlier* (in 2013) and *not* about the

WhatsApp acquisition.  *See* Counter SMF ¶ 1885.  The claim that Meta overpaid (*see* p. 54

*supra*) ignores that WhatsApp is ██████████████████████████ – plus tens of billions

in consumer surplus, *see* SMF ¶ 824 – all because of Meta innovations.  *See* SMF ¶¶ 827-831;

*see also id.* ¶ 832 (FTC advertising expert failing to identify a better-monetized messenger).

> *Third*, the pretext argument rests on the FTC repeating (at 71, 73, 74, 77) that it knows

the "genuine reason" and motives for Meta's conduct – which are "issues peculiarly not

susceptible to resolution by summary judgment."  *Miller v. Saxbe*, 403 F. Supp. 1314, 1316

(D.D.C. 1975).  "It is well-established that it is inappropriate to resolve issues of credibility,

motive, and intent on motions for summary judgment."  *Tech 7 Sys., Inc. v. Vacation Acquisition,*

*LLC*, 594 F. Supp. 2d 76, 85-86 (D.D.C. 2009).  The question of *why* Meta acquired Instagram

and WhatsApp – although irrelevant because this is a Section 2 case where effects are known – is

particularly ill-suited to summary judgment in this context.  *See Novell*, 731 F.3d at 1077-78.

> **2.**      ***The procompetitive acquisition benefits are merger-specific.***  The FTC does not

dispute that there is ample evidence that the growth and quality improvements Meta achieved by

investing in Instagram and WhatsApp were not achievable for those apps in the absence of the acquisitions. *Those* are the affirmative defenses Meta brings, and the FTC does not challenge them here. *See* Counter SMF ¶¶ 2606-2607. Instead, the FTC suggests that Meta should have improved its own camera app (Camera) and messaging service (Messenger). In addition to missing the mark on Meta's actual defenses – reason enough to deny the FTC's motion – the agency's claim that Section 2 invites plaintiffs to act as central planners has no support:

*First*, the FTC cites only Section 7 cases (at 75-76, 79-80) where no evidence showed that a *prospective* acquisition would achieve claimed efficiencies (improvements to the *acquirer* in both cases) that the acquirer could not achieve on its own. *Cf. United States v. Anthem, Inc.*, 855 F.3d 345, 357-58 (D.C. Cir. 2017); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 721-22 (D.C. Cir. 2001). Here, by contrast, Meta *achieved* the procompetitive benefits (improvements to the *acquired* firms in both transactions) via the acquisitions; ample record evidence shows that Instagram and WhatsApp could not have achieved those outcomes otherwise, and the FTC does not challenge that for purposes of its motion. *See* FTC Br. 49.

*Second*, the FTC's theory that Meta could have achieved the same outcomes by investing in Camera instead of Instagram and Messenger instead of WhatsApp is insufficient as a matter of law. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 210-11 (S.D.N.Y. 2010) (rejecting speculative argument that efficiencies were not merger-specific because "alternate means of increasing capacity" were "uncertain"). The FTC has only speculation as to both:

**Instagram / Camera:** As explained above (at 51), the FTC misunderstands the facts. Meta did not "cancel" Camera, *cf.* FTC Br. 76, as Meta employees testified. *See* Counter SMF ¶ 1686. It continued investing and innovating the tool following the acquisition. *See* Counter SMF ¶ 1919(b). And for the intervening *years* where Meta operated Camera as its own app while also owning Instagram – because it was easier to develop the camera tools off the

63

Facebook app that Meta was then updating – Camera was not an app for housing the dozens of non-camera features Meta introduced to Instagram like direct messaging, video, Reels, Stories, Shop, and more.  *See* Counter SMF ¶ 1850; *cf.* SMF ¶¶ 68-92 (identifying Instagram features).

**WhatsApp / Messenger:**  The acquisition allowed Meta to expand output and cut prices in ways that Messenger alone could not, despite Meta's substantial and ongoing investment in Messenger.  The Messenger social graph is Facebook connections, *see* Counter SMF ¶ 1291; the WhatsApp social graph is built on phone numbers, *see* Counter SMF ¶¶ 1285(a), 1287(c).  And because of WhatsApp's success as an SMS replacement service internationally, by 2014 it had substantially outpaced Messenger in terms of global usage.  *See* SMF ¶ 778; Counter SMF ¶¶ 1726-1727.  Meta used the acquisition to leverage its global distribution and increase international output, *see* SMF ¶¶ 833-835, while Messenger continued its U.S. growth.  That is precisely what Mr. Zuckerberg confirmed contemporaneously in discussing Meta's acquisition plan for WhatsApp (and Messenger).  *See* Counter SMF ¶ 1885.  Tellingly, none of the FTC's experts opines that Meta could or should have invested in Messenger instead, let alone that this would achieve comparable benefits to what Meta actually achieved in the real world.

> **3.** ***The de-platforming efficiency benefited competition in the alleged market.***

Finally, the FTC attacks by mischaracterization (at 80) the de-platforming efficiency:  Meta expanded its app portfolio to insulate itself from Google and Apple – two of its fiercest competitors, including for "PSNS" specifically at the time, *see* SMF ¶ 568 (Google+ was in the FTC's claimed market) – de-platforming Meta products from the mobile operating systems those rivals control.  Mr. Zuckerberg testified that this was an intended benefit, *see* Counter SMF ¶ 1836, and contemporaneous board materials explain it as an express rationale for the WhatsApp acquisition, *see* SMF ¶ 813.  The FTC's brief does not dispute that de-platforming was a material risk to Meta, that this would reduce "PSNS" output for consumers and harm "PSNS"

competition (e.g., leaving Google+ as the only "PSNS" on Android), or that the acquisitions specifically were capable of reducing those risks.  *See United States v. Carilion Health Sys.*, 707 F. Supp. 840, 849 (W.D. Va. 1989) (acquisition "in order to strengthen" offering is legitimate benefit), *aff'd*, 1989 WL 157282 (4th Cir. Nov. 29, 1989) (per curiam) (judgment noted at 892 F.2d 1042 (table)).  The FTC instead asserts (at 80) that Meta's claimed benefit is "to improve its 'strategic positioning' to maintain its monopoly."  That mischaracterizes not only the actual procompetitive benefit – avoiding de-platforming and the output collapse that would follow – but also the case the FTC quotes (at 80), which cited decisions that *had* balanced prospective anticompetitive effects against procompetitive benefits.  *See Anthem*, 855 F.3d at 354-55.

*     *     *

No law supports the FTC's motion.  It cites cases (at 66, 68, 71) granting summary judgment where the claimed benefit was *legally* invalid – which the FTC *does not even argue* here.  *Cf. In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1102 (N.D. Ill. 2023) (quality-of-care efficiency legally dubious); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1149-50, 1152 (N.D. Cal. 2014) (education-related benefit not legally cognizable); *Clarett v. NFL*, 306 F. Supp. 2d 379, 408-09 (S.D.N.Y.) (benefits were not "legitimate" efficiency "as a matter of law"), *rev'd and remanded*, 369 F.3d 124 (2d Cir. 2004); *see also Law v. NCAA*, 134 F.3d 1010, 1021-23 (10th Cir. 1998) (similar).  Twisting this Section 7 law about *projected* efficiencies (that were legally invalid) cannot elide that Meta *actually achieved* the efficiencies here.  The Court should deny the FTC's motion.

**CONCLUSION**

For the foregoing reasons, the Court should grant Meta's motion – awarding it summary judgment as to all claims and dismissing the FTC's lawsuit – and deny the FTC's motion (on its own merits, as moot, or both).

Dated: July 12, 2024

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Lillian V. Smith (D.C. Bar No. 252516)
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*