# Volume 33: Exhibits 496-513

No. 1:20-CV-03590-JEB

# Exhibit 496

The Wayback Machine - https://web.archive.org/web/20121031210315/https://www.facebook.com/full_data_use_policy

**For a better experience on Facebook, enable JavaScript in your browser, or switch to our mobile site.**

| Email or Phone | Password | |
|---|---|---|
| | | Log In |

☐ Keep me logged in     Forgot your password?

**Sign Up**   Connect and share with the people in your life.

---

**Data Use Policy**

Date of Last Revision: June 8, 2012

Information we receive and how it is used
- Information we receive about you
- Public information
- Usernames and User IDs
- How we use the information we receive
- Deleting and deactivating your account

Sharing and finding you on Facebook
- Control each time you post
- Control over your timeline
- Finding you on Facebook
- Access on phones and other devices
- Activity log
- What your friends share about you
- About Pages

Other websites and applications
- About Facebook Platform
- Controlling what information you share with applications
- Controlling what is shared when the people you share with use applications
- Logging in to another site using Facebook
- About social plugins
- About instant personalization
- Public search engines

How advertising and Sponsored Stories work
- Personalized ads
- Ads + social context
- Sponsored stories
- Facebook content

Cookies, pixels and other similar technologies
Some other things you need to know

**I. Information we receive and how it is used**

**Information we receive about you**

We receive a number of different types of information about you, including:

**Your information**

Your information is the information that's required when you sign up for the site, as well as the information you choose to share.

- **Registration information**: When you sign up for Facebook, you are required to provide your name, email address, birthday, and gender.

- **Information you choose to share**: Your information also includes the information you choose to share on Facebook, such as when you post a status update, upload a photo, or comment on a friend's story.

It also includes the information you choose to share when you take an action, such as when you add a friend, like a Page or a website, add a place to your story, find friends using our contact importers, or indicate you are in a relationship.

💡 Your name, profile pictures, cover photos, gender, networks, username and User ID are treated just like information you choose to make public.

💡 Your birthday allows us to do things like show you age-appropriate content and advertisements.

**Information others share about you**

We receive information about you from your friends and others, such as when they upload your contact information, post a photo of you, tag you in a photo or status update, or at a location, or add you to a group.

💡 When people use Facebook, they may store and share information about you and others that they have, such as when they upload and manage their invites and contacts.

**Other information we receive about you**

We also receive other types of information about you:

- We receive data about you whenever you interact with Facebook, such as when you look at another person's timeline, send or receive a message, search for a friend or a Page, click on, view or otherwise interact with things, use a Facebook mobile app, or purchase Facebook Credits or make other purchases through Facebook.
- When you post things like photos or videos on Facebook, we may receive additional related data (or metadata), such as the time, date, and place you took the photo or video.
- We receive data from the computer, mobile phone or other device you use to access Facebook, including when multiple users log in from the same device. This may include your IP address and other information about things like your internet service, location, the type (including identifiers) of browser you use, or the pages you visit. For example, we may get your GPS or other location information so we can tell you if any of your friends are nearby.
- We receive data whenever you visit a game, application, or website that uses Facebook Platform or visit a site with a Facebook feature (such as a social plugin), sometimes through cookies. This may include the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use; and, if you are logged in to Facebook, your User ID.
- Sometimes we get data from our advertising partners, customers and other third parties that helps us (or them) deliver ads, understand online activity, and generally make Facebook better. For example, an advertiser may tell us information about you (like how you responded to an ad on Facebook or on another site) in order to measure the effectiveness of - and improve the quality of - ads.

We also put together data from the information we already have about you and your friends. For example, we may put together data about you to determine which friends we should show you in your News Feed or suggest you tag in the photos you post. We may put together your current city with GPS and other location information we have about you to, for example, tell you and your friends about people or events nearby, or offer deals to you that you might be interested in. We may also put together data about you to serve you ads that might be more relevant to you.

When we get your GPS location, we put it together with other location information we have about you (like your current city). But we only keep it until it is no longer useful to provide you services, like keeping your last GPS coordinates to send you relevant notifications.

We only provide data to our advertising partners or customers after we have removed your name or any other personally identifying information from it, or have combined it with other people's data in a way that it is no longer associated with you.

### Public information

When we use the phrase "public information" (which we sometimes refer to as "Everyone information"), we mean the information you choose to make public, as well as information that is always publicly available.

**Information you choose to make public**

Choosing to make your information public is exactly what it sounds like: **anyone**, including people off of Facebook, will be able to see it.

Choosing to make your information public also means that this information:

- can be associated with you (i.e., your name, profile picture, cover photos, timeline, User ID, username, etc.) even off Facebook;
- can show up when someone does a search on Facebook or on a public search engine;
- will be accessible to the Facebook-integrated games, applications, and websites you and your friends use; and
- will be accessible to anyone who uses our APIs such as our Graph API.

Sometimes you will not be able to select an audience when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

When others share information about you, they can also choose to make it public.

**Information that is always publicly available**

The types of information listed below are always publicly available, and are treated just like information you decided to make public.

- **Name**: This helps your friends and family find you. If you are uncomfortable sharing your real name, you can always delete your account.
- **Profile Pictures and Cover Photos**: These help your friends and family recognize you. If you are uncomfortable making any of these photos public, you can always delete it. Unless you delete them, when you add a new profile picture or cover photo, the previous photo will remain public in your profile picture or cover photo album.
- **Network**: This helps you see whom you will be sharing information with before you choose "Friends and Networks" as a custom audience. If you are uncomfortable making your network public, you can leave the network.
- **Gender**: This allows us to refer to you properly.
- **Username and User ID**: These allow you to give out a custom link to your timeline or Page, receive email at your Facebook email address, and help make Facebook Platform possible.

### Usernames and User IDs

A Username (or Facebook URL) is a custom link to your timeline that you can give out to people or post on external websites. Usernames appear in the URL on your timeline. We also use your User ID to identify your Facebook account.

If someone has your Username or User ID, they can use it to access information about you through the facebook.com website. For example, if someone has your Username, they can type facebook.com/Username into their browser and see your public information as well as anything else you've let them see. Similarly, someone with your Username or User ID can access information about you through our APIs, such as our Graph API. Specifically, they can access your public information, along with your age range, language and country.

If you do not want your information to be accessible to Platform applications, you can turn off all Platform applications from your Privacy Settings. If you turn off Platform you will no longer be able to use any games or other applications until you turn Platform back on. For more information about the information that apps receive when you visit them, see Other websites and applications.

If you want to see information available about you through our Graph API, just type **https://graph.facebook.com/[User ID or Username]?metadata=1** into your browser.

Your Facebook email address includes your public username like so: username@facebook.com. You can control who can start a message thread with you using your "How You Connect" settings. If they include others on that message, the others can reply too.

### How we use the information we receive

We use the information we receive about you in connection with the services and features we provide to you and other users like your friends, our partners, the advertisers that purchase ads on the site, and the developers that build the games, applications, and websites you use. For example, we may use the information we receive about you:

- as part of our efforts to keep Facebook products, services and integrations safe and secure;
- to protect Facebook's or others' rights or property;
- to provide you with location features and services, like telling you and your friends when something is going on nearby;
- to measure or understand the effectiveness of ads you and others see, including to deliver relevant ads to you;
- to make suggestions to you and other users on Facebook, such as: suggesting that your friend use our contact importer because you found friends using it, suggesting that another user add you as a friend because the user imported the same email address as you did, or suggesting that your friend tag you in a picture they have uploaded with you in it; and
- for internal operations, including troubleshooting, data analysis, testing, research and service improvement.

Granting us this permission not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways.

While you are allowing us to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:

- received your permission;
- given you notice, such as by telling you about it in this policy; or
- removed your name or any other personally identifying information from it.

Of course, for information others share about you, they control how it is shared.

We store data for as long as it is necessary to provide products and services to you and others, including those described above. Typically, information associated with your account will be kept until your account is deleted. For certain categories of data, we may also tell you about specific data retention practices.

We are able to suggest that your friend tag you in a picture by scanning and comparing your friend's pictures to information we've put together from the other photos you've been tagged in. This allows us to make these suggestions. You can control whether we suggest that another user tag you in a photo using the "How Tags work" settings. Learn more at: https://www.facebook.com/help/tag-suggestions

### Deleting and deactivating your account

If you want to stop using your account, you can either **deactivate** or **delete** it.

### Deactivate

Deactivating your account puts your account on hold. Other users will no longer see your timeline, but we do not delete any of your information. Deactivating an account is the same as you telling us not to delete any information because you might want to reactivate your account at some point in the future. You can deactivate your account at: https://www.facebook.com/editaccount.php

💡 Your friends will still see you listed in their list of friends while your account is deactivated.

### Deletion

When you delete an account, it is permanently deleted from Facebook. It typically takes about one month to delete an account, but some information may remain in backup copies and logs for up to 90 days. You should only delete your account if you are sure you never want to reactivate it. You can delete your account at: https://www.facebook.com/help/contact.php?show_form=delete_account

Learn more at: https://www.facebook.com/help/?faq=356107851084108

💡 Certain information is needed to provide you with services, so we only delete this information after you delete your account. Some of the things you do on Facebook aren't stored in your account, like posting to a group or sending someone a message (where your friend may still have a message you sent, even after you delete your account). That information remains after you delete your account.

## II. Sharing and finding you on Facebook

### Control each time you post

Whenever you post content (like a status update, photo or check-in), you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

🌐   Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.

👥 Choose this icon if you want to share with your Facebook **Friends**.

⚙ Choose this icon if you want to **Customize** your audience. You can also use this to hide your story from specific people.

If you tag someone, that person and their friends can see your story no matter what audience you selected. The same is true when you approve a tag someone else adds to your story.

Always think before you post. Just like anything else you post on the web or send in an email, information you share on Facebook can be copied or re-shared by anyone who can see it.

💡 Although you choose with whom you share, there may be ways for others to determine information about you. For example, if you hide your birthday so no one can see it on your timeline, but friends post "happy birthday!" on your timeline, people may determine your birthday.

💡 When you comment on or "like" someone else's story, or write on their timeline, that person gets to select the audience. For example, if a friend posts a Public story and you comment on it, your comment will be Public. Often, you can see the audience someone selected for their story before you post a comment; however, the person who posted the story may later change their audience.

💡 You can control who can see the Facebook Pages you've "liked" by visiting your timeline, clicking on the Likes box on your timeline, and then clicking "Edit."

💡 Sometimes you will not see a sharing icon when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

### Control over your timeline

Whenever you add things to your timeline you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

🌐   Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.

👥 Choose this icon if you want to share with your Facebook **Friends**.

⚙ Choose this icon if you want to **Customize** your audience. You can also use this to hide the item on your timeline from specific people.

When you select an audience for your friend list, you are only controlling who can see the entire list of your friends on your timeline. We call this a timeline visibility control. This is because your friend list is always available to the games, applications and websites you use, and your friendships may be visible elsewhere (such as on your friends' timelines or in searches). For example, if you select "Only Me" as the audience for your friend list, but your friend sets her friend list to "Public," anyone will be able to see your connection on your friend's timeline.

Similarly, if you choose to hide your gender, it only hides it on your timeline. This is because we, just like the applications and your friends use, need to use your gender to refer to you properly on the site.

When someone tags you in a story (such as a photo, status update or check-in), you can choose whether you want that story to appear on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can remove it from your timeline.

💡 People on Facebook may be able to see mutual friends, even if they cannot see your entire list of friends.

💡 Some things (like your name, profile pictures and cover photos) do not have sharing icons because they are always publicly available. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

### Finding you on Facebook

To make it easier for your friends to find you, we allow anyone with your contact information (such as email address or telephone number) to find you through the Facebook search bar at the top of most pages, as well as other tools we provide, such as contact importers - even if you have not shared your contact information with them on Facebook.

You can choose who can look up your timeline using the email address or telephone number you added to your timeline through your privacy settings. But remember, if you choose Friends, only your current Facebook friends will be able to find you this way.

💡 Your "How You Connect" settings do not control whether people can find you or a link to your timeline when they search for content you have permission to see, like a photo or other story you've been tagged in.

### Access on phones and other devices

Once you share information with your friends and others, they may be able to sync it with or access it via their mobile phones and other devices. For example, if you share a photo on Facebook, someone viewing that photo could save it using Facebook tools or by other methods offered by their device or browser. Similarly, if you share your contact information with someone or invite someone to an event, they may be able to use Facebook or third party applications or devices to sync that information. Or, if one of your friends has a Facebook application on one of their devices, your information (such as the things you post or photos you share) may be stored on or accessed by their device.

💡 You should only share information with people you trust because they will be able to save it or re-share it with others, including when they sync the information to a device.

### Activity log

Your activity log is a place where you can go to view most of your information on Facebook, including things you've hidden from your timeline. You can use this log to manage your content. For example, you can do things like delete stories, change the audience of your stories or stop an application from publishing to your timeline on your behalf.

💡 When you hide something from your timeline, you are not deleting it. This means that the story may be visible elsewhere, like in your friends' News Feed. If you want to delete a story you posted, choose the delete option.

### What your friends share about you

#### Links and Tags

Anyone can add a link to a story. Links are references to something on the Internet; anything from a website to a Page or timeline on Facebook. For example, if you are writing a story, you might include a link to a blog you are referencing or a link to the blogger's Facebook timeline. If someone clicks on a link to another person's timeline, they'll only see the things that they are allowed to see.

A tag is a special type of link to someone's timeline that suggests that the tagged person add your story to their timeline. In cases where the tagged person isn't included in the audience of the story, it will add them so they can see it. Anyone can tag you in anything. Once you are tagged, you and your friends will be able to see it (such as in News Feed or in search).

You can choose whether a story you've been tagged in appears on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can always remove it from your timeline.

If you do not want someone to tag you, we encourage you to reach out to them and give them that feedback. If that does not work, you can block them. This will prevent them from tagging you going forward.

💡 If you are tagged in a private space (such as a message or a group) only the people who can see the private space can see the tag. Similarly, if you are tagged in a comment, only the people who can see the comment can see the tag.

#### Groups

Once you are in a Group, anyone in that Group can add you to a subgroup. When someone adds you to a Group, you will be listed as "invited" until you visit the Group. You can always leave a Group, which will prevent others from adding you to it again.

### About Pages

Facebook Pages are public pages. Companies use Pages to share information about their products. Celebrities use Pages to talk about their latest projects. And communities use pages to discuss topics of interest, everything from baseball to the opera.

Because Pages are public, information you share with a Page is public information. This means, for example, that if you post a comment on a Page, that comment may be used by the Page owner off Facebook, and anyone can see it.

When you "like" a Page, you create a connection to that Page. The connection is added to your timeline and your friends may see it in their News Feeds. You may be contacted by or receive updates from the Page, such as in your News Feed and your messages. You can remove the Pages you've "liked" through your timeline or on the Page.

Some Pages contain content that comes directly from the Page owner. Page owners can do this through online plugins, such as an iframe, and it works just like the games and other applications you use through Facebook. Because this content comes directly from the Page owner, that Page may be able to collect information about you, just like any website.

💡 Page administrators may have access to insights data, which will tell them generally about the people that visit their Page (as opposed to information about specific people). They may also know when you've made a connection to their Page because you've liked their Page or posted a comment.

### III. Other websites and applications

### About Facebook Platform

Facebook Platform (or simply Platform) refers to the way we help you share your information with the games, applications, and websites you and your friends use. Facebook Platform also lets you bring your friends with you, so you can connect with them off of Facebook. In these two ways, Facebook Platform helps you make your experiences on the web more personalized and social.

Remember that these games, applications and websites are created and maintained by other businesses and developers who are not part of Facebook, so you should always make sure to read their terms of service and privacy policies.

### Controlling what information you share with applications

When you connect with a game, application or website - such as by going to a game, logging in to a website using your Facebook account, or adding an app to your timeline - we give the game, application, or website (sometimes referred to as just "Applications" or "Apps") your basic info, which includes your User ID, as well your friends' User IDs (or your friend list) and your public information.

Your friend list helps the application make your experience more social because it lets you find your friends on that application. Your User ID helps the application personalize your experience because it can connect your account on that application with your Facebook account, and it can access your basic info, which includes your public information and friend list. This includes the information you choose to make public, as well as information that is always publicly available. If the application needs additional information, such as your stories, photos or likes, it will have to ask you for specific permission.

The "Apps you use" setting lets you control the applications you use. You can see the permissions you have given these applications, the last time an application accessed your information, and the audience on Facebook for your timeline stories and activity the application posts on your behalf. You can also remove applications you no longer want, or turn off all Platform applications. When you turn all Platform applications off, your User ID is no longer given to applications, even when your friends use those applications. But you will no longer be able to use any games, applications or websites through Facebook.

💡 When you first visit an app, Facebook lets the app know your language, your country, and whether you are under 18, between 18-20, or 21 and over. Age range lets apps provide you with age-appropriate content. If you install the app, it can access, store and update the information you've shared. Apps you've installed can update their records of your basic info, age range, language and country. If you haven't used an app in a while, it won't be able to continue to update the additional information you've given them permission to access. Learn more at: https://www.facebook.com/help/how-apps-work

💡 Sometimes a game console, mobile phone, or other device might ask for permission to share specific information with the games and applications you use on that device. If you say okay, those applications will not be able to access any other information about you without asking specific permission from you or your friends.

💡 Sites and apps that use Instant Personalization receive your User ID and friend list when you visit them.

💡 You always can remove apps you've installed by using your app settings at: https://www.facebook.com/settings/?tab=applications. But remember, apps may still be able to access your information when the people you share with use them. And, if you've removed an application and want them to delete the information you've already shared with them, you should contact the application and ask them to delete it. Visit the application's page on Facebook or their own website to learn more about the app.

### Controlling what is shared when the people you share with use applications

Just like when you share information by email or elsewhere on the web, information you share on Facebook can be re-shared. This means that if you share something on Facebook, anyone who can see it can share it with others, including the games, applications, and websites they use.

Your friends and the other people you share information with often want to share your information with applications to make their experiences on those applications more personalized and social. For example, one of your friends might want to use a music application that allows them to see what their friends are listening to. To get the full benefit of that application, your friend would want to give the application her friend list – which includes your User ID – so the application knows which of her friends is also using it. Your friend might also want to share the music you "like" on Facebook. If you have made that information public, then the application can access it just like anyone else. But if you've shared your likes with just your friends, the application could ask your friend for permission to share them.

You can control most of the information other people can share with applications they use from the "Ads, Apps and Websites" settings page. But these controls do not let you limit access to your public information and friend list.

If you want to completely block applications from getting your information when your friends and others use them, you will need to turn off all Platform applications. This means that you will no longer be able to use any third-party Facebook-integrated games, applications or websites.

💡 If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else.

**Logging in to another site using Facebook**

Facebook Platform lets you log into other applications and websites using your Facebook account. When you log in using Facebook, we give the site your User ID (just like when you connect with any other application), but we do not share your email address or password with that website through this process.

If you already have an account on that website, the site may also be able to connect that account with your Facebook account. Sometimes it does this using what is called an "email hash", which is similar to searching for someone on Facebook using an email address. Only the email addresses in this case are hashed so no email addresses are actually shared between Facebook and the website.

**How it works**
The website sends over a hashed version of your email address, and we match it with a database of email addresses that we have also hashed. If there is a match, then we tell the website the User ID associated with the email address. This way, when you log into the website using Facebook, the website can link your Facebook account to your account on that website.

**About social plugins**

Social plugins are buttons, boxes, and stories (such as the Like button) that other websites can use to present Facebook content to you and create more social and personal experiences for you. While you view these buttons, boxes, and stories on other sites, the content comes directly from Facebook.

Sometimes plugins act just like applications. You can spot one of these plugins because it will ask you for permission to access your information or to publish information back to Facebook. For example, if you use a registration plugin on a website, the plugin will ask your permission to share your basic info with the website to make it easier for you to register for the website. Similarly, if you use an Add To Timeline plugin, the plugin will ask your permission to publish stories about your activities on that website to Facebook.

If you make something public using a plugin, such as posting a public comment on a newspaper's website, then that website can access your comment (along with your User ID) just like everyone else.

💡 If you post something using a social plugin and you do not see a sharing icon, you should assume that story is Public. For example, if you post a comment through a Facebook comment plugin on a site, your story is Public and everyone, including the website, can see your story.

💡 Websites that use social plugins can sometimes tell that you have engaged with the social plugin. For example, they may know that you clicked on a Like button in a social plugin.

💡 We receive data when you visit a site with a social plugin. We keep this data for a maximum of 90 days. After that, we remove your name or any other personally identifying information from the data, or combine it with other people's data in a way that it is no longer associated with you. Learn more at: https://www.facebook.com/help/social-plugins

**About instant personalization**

Instant personalization is a way for Facebook to help partners (such as Bing and Rotten Tomatoes) on and off Facebook create a more personalized and social experience for logged in users than a social plugin can offer. When you visit a site or app using instant personalization, it will know some information about you and your friends the moment you arrive. This is because sites and apps using instant personalization can access your User ID, your friend list, and your public information.

The first time you visit a site or app using instant personalization, you will see a notification letting you know that the site or app has partnered with Facebook to provide a personalized experience.

The notification will give you the ability to disable or turn off instant personalization for that site or app. If you do that, that site or app is required to delete all of the information about you it received from Facebook as part of the instant personalization program. In addition, we will ensure that site from accessing your information in the future, even when your friends use that site.

If you decide that you do not want to experience instant personalization for all partner sites and apps, you can disable instant personalization from the "Ads, Apps and Websites" settings page.

If you turn off instant personalization, partner third party sites and apps will not be able to access your public information, even when your friends visit those sites.

💡 If you turn off an instant personalization site or app after you have been using it or visited it a few times (or after you have given it specific permission to access your data), it will not automatically delete your data received through Facebook. But the site is contractually required to delete your data if you ask it to.

**How it works**
To join the instant personalization program, a potential partner must enter into an agreement with us designed to protect your privacy. For example, this agreement requires that the partner delete your data if you turn off instant personalization when you first visit the site or app. It also prevents the partner from accessing your information about you until you or your friends visit its site.

Instant personalization partners sometimes use an email hash process to see if any of their users are on Facebook and get those users' User IDs. This process is similar to searching for someone on Facebook using an email address, except in this case the email addresses are hashed so no actual email addresses are exchanged. The partner is also contractually required not to use your User ID for any purpose (other than associating it with your account) until you or your friends visit the site.

When you visit a site or app using instant personalization, we provide the site or app with your User ID and your friend list (as well as your age range, locale, and gender). The site or app can then connect your account with your information about your friends' accounts to make the site or app instantly social. The site can also access public information associated with any of the User IDs it receives, which it can use to make them instantly personalized. For example, if the site is a music site, it can access your music interests to suggest songs you may like, and access your friends' music interests to let you know what they are listening to. Of course it can only access your or your friends' music interests if they are public. If the site or app wants any additional information, it will have to get your specific permission.

**Public search engines**

Your public search setting controls whether people who enter your name on a public search engine may see your public timeline (including in sponsored results). You can find your public search setting on the "Ads, Apps and Websites" settings page.

💡 This setting does not apply to search engines that access your information as an application using Facebook Platform.

💡 If you turn your public search setting off and then search for yourself on a public search engine, you may still see a preview of your timeline. This is because some search engines cache information for a period of time. You can learn more about how to request a search engine to remove you from cached information at: https://www.facebook.com/help/?faq=13323

**IV. How advertising and Sponsored Stories work**

**Personalized ads**

We do not share any of your information with advertisers (unless, of course, you give us permission). As described in this policy, we may share your information when we have removed from it anything that personally identifies you or combined it with other information so that it no longer personally identifies you.

We use the information we receive to deliver ads and to make them more relevant to you. This includes all of the things you share and do on Facebook, such as the Pages you like or key words from your stories, and the things we infer from your use of Facebook. Learn more at: https://www.facebook.com/help/?page=226611954016283

When an advertiser creates an ad, they are given the opportunity to choose their audience by location, demographics, likes, keywords, and any other information we receive or can tell about you and other users. For example, an advertiser can choose to target 18 to 35 year-old women who live in the United States and like basketball. An advertiser could also choose to target certain topics or keywords, like "music" or even people who like a particular song or artist.

Try this tool yourself to see one of the ways advertisers target ads and what information they see at: https://www.facebook.com/ads/create/

If the advertiser chooses to run the ad (also known as placing the order), we serve the ad to people who meet the criteria the advertiser selected, but we do not tell the advertiser who any of those people are. So, for example, if a person views or otherwise interacts with the ad, the advertiser might infer that the person is an 18-to-35-year-old woman who lives in the U.S. and likes basketball. But we would not tell the advertiser who that person is.

After the ad runs, we provide advertisers with reports on how their ads performed. For example we give advertisers reports telling them how many users saw or clicked on their ads. But these reports are anonymous. We do not tell advertisers who saw or clicked on their ads.

📍 Advertisers sometimes place cookies on your computer in order to make their ads more effective. Learn more about cookies, pixels and other system technologies.

📍 Sometimes we allow advertisers to target a category of user, like a "moviegoer" or a "sci-fi fan." We do this by bundling characteristics that we believe are related to the category. For example, if a person "likes" the "Star Trek" Page and mentions "Star Wars" when they check into a movie theater, we may conclude that this person is likely to be a sci-fi fan. Advertisers of sci-fi movies, for example, could ask us to target "sci-fi fans" and we would target that group, which may include you. Or if you "like" Pages that are car-related and mention a particular car brand in a post, we might put you in the "potential car buyer" category and let a car brand target to that group, which would include you.

### Ads + social context

Facebook Ads are sometimes paired with social actions your friends have taken. For example, an ad for a sushi restaurant may be paired with a news story that one of your friends likes that restaurant's Facebook page.

This is the same type of news story that could show up in your News Feed, only we place it next to a paid advertisement to make that ad more relevant and interesting.

When you show up in one of these news stories, we will only pair it with ads shown to your friends. If you do not want to appear in stories paired with Facebook Ads, you can opt out using your "Edit social ads" setting.

📍 Learn what happens when you click "Like" on an advertisement or an advertiser's Facebook Page at: https://www.facebook.com/help/?faq=19399

📍 We may serve ads, including those with social context (or serve just social context), on other sites. These work just like the ads we serve on Facebook - the advertisers do not receive any of your information. Only people that could see the Facebook action (like on your timeline) would see it paired in this way.

📍 Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.

📍 Games, applications and websites can serve ads directly to you or help us serve ads to you or others if they have information like your User ID or email address.

### Sponsored stories

Many of the things you do on Facebook (like "liking" a Page) are posted to your timeline and shared in News Feed. But there's a lot to read in News Feed. That's why we allow people to "sponsor" your stories to make sure your friends see them. For example, if you RSVP to an event hosted by a local restaurant, that restaurant may want to make sure your friends see it so they can come too.

If they do sponsor a story, that story will appear in the same place ads usually do or in your News Feed under the heading "Sponsored" or something similar. Only people that could originally see the story can see the sponsored story, and no personal information about you (or your friends) is shared with the sponsor.

📍 Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.

### Facebook content

We like to tell you about some of the features and tools your friends and others use on Facebook, to help you have a better experience. For example, if your friend uses our friend finder tool to find more friends on Facebook, we may tell you about it to encourage you to use it as well. This of course means your friend may similarly see suggestions based on the things you do. But we will try to only show it to friends that could benefit from your experience.

📍 Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.

### V. Cookies, pixels and other similar technologies

Cookies are small pieces of data that are stored on your computer, mobile phone or other device. Pixels are small blocks of code on webpages that do things like allow another server to measure viewing of a webpage and often are used in connection with cookies.

We use technologies like cookies, pixels, and local storage (like on your browser or device, which is similar to a cookie but holds more information) to provide and understand a range of products and services. Learn more at: https://www.facebook.com/help/cookies

We use these technologies to do things like:

- make Facebook easier or faster to use;
- enable features and store information about you (including on your device or in your browser cache) and your use of Facebook;
- deliver, understand and improve advertising;
- monitor and understand the use of our products and services; and
- to protect you, others and Facebook.

For example, we may use them to know you are logged in to Facebook, to help you use social plugins and share buttons, or to know when you are interacting with our advertising or Platform partners.

We may ask advertisers or other partners to serve ads or services to computers, mobile phones or other devices, which may use a cookie, pixel or other similar technology placed by Facebook or the third party (although we would not share any other information that identifies you with an advertiser).

Most companies on the web use cookies (or other similar technological tools), including our advertising and Platform partners. For example, our Platform partners, advertisers or Page administrators may use cookies or similar technologies when you access their apps, ads, Pages or other content.

📍 Cookies and things like local storage help make Facebook work, like allowing pages to load faster because certain content is stored on your browser or by helping us authenticate you to deliver personalized content.

📍 To learn more about how advertisers generally use cookies and the choices advertisers provide, visit the Network Advertising Initiative at http://www.networkadvertising.org/managing/opt_out.asp, the Digital Advertising Alliance at http://www.aboutads.info/, the Internet Advertising Bureau (US) at http://www.iab.net or the Internet Advertising Bureau (EU) at http://youronlinechoices.eu/.

📍 You can remove or block cookies or other similar technologies or block or remove other data stored on your computer or device (such as by using the various settings in your browser), but it may affect your ability to use Facebook or other websites and apps.

### VI. Some other things you need to know

**Safe harbor**

Facebook complies with the U.S.-EU and U.S.-Swiss Safe Harbor frameworks as set forth by the Department of Commerce regarding the collection, use, and retention of data from the European Union. To view our certification, visit the U.S. Department of Commerce's Safe Harbor website at: https://safeharbor.export.gov/list.aspx. As part of our participation in the Safe Harbor program, we agree to resolve disputes you have with us in connection with our policies and practices through TRUSTe. If you would like to contact TRUSTe, visit:https://feedback-form.truste.com/watchdog/request

**Contact us with questions or disputes**

If you have questions or complaints regarding our Data Use Policy or practices, please contact us by mail at 1601 Willow Road, Menlo Park, CA 94025 if you reside in the U.S. or Canada, or at Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland if you live outside the U.S. or Canada. Anyone may also contact us through this help page: https://www.facebook.com/help/contact_us.php?id=173545232710000

**Responding to legal requests and preventing harm**

We may access, preserve and share your information in response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. This may include responding to legal requests from jurisdictions outside of the United States where we have a good faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards. We may also access, preserve and share information when we have a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect ourselves, you and others, including as part of investigations; and to prevent death or imminent bodily harm. Information we receive about you, including financial transaction data related to purchases made with Facebook Credits, may be accessed, processed and retained for an extended period of time when it is the subject of a legal request or obligation, governmental investigation, or investigations concerning possible violations of our terms or policies, or otherwise to prevent harm.

**Access requests**

You can access and correct most of your personal data stored by Facebook by logging into your account and viewing your timeline and activity log. You can also download a copy of your personal data by visiting your "Account Settings", clicking on "Download a copy of your Facebook data" and then clicking on the link for your expanded archive. Learn more at: https://www.facebook.com/help/?faq=226281544049399

**Notifications and Other Messages**

We may send you notifications and other messages using the contact information we have for you, like your email address. You can control most of the notifications you receive, including ones from Pages you like and applications you use, using your "Notifications" settings.

**Friend finder**

We offer tools to help you upload your friends' contact information so that you and others can find friends on Facebook, and invite friends who do not use Facebook to join. If you do not want us to store this information, visit this help page at: https://www.facebook.com/contact_importer/remove_uploads.php

If you give us your password, we will delete it after you upload your friends' contact information.

**Invitations**

When you invite a friend to join Facebook, we send a message on your behalf using your name, and up to two reminders. We may also include names and pictures of other people your friend might know on Facebook. The invitation will also give your friend the opportunity to opt out of receiving other invitations to join Facebook.

**Memorializing accounts**

We may memorialize the account of a deceased person. When we memorialize an account, we keep the timeline on Facebook, but limit access and some features. You can report a deceased person's timeline at: https://www.facebook.com/help/contact.php?show_form=deceased

We also may close an account if we receive a formal request that satisfies certain criteria.

**Service Providers**

We give your information to the people and companies that help us provide, understand and improve the services we offer. For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, measure the effectiveness of ads, or provide search results. In some cases we provide the service jointly with another company, such as the Facebook Marketplace. In all of these cases our partners must agree to only use your information consistent with the agreement we enter into with them, as well as this Data Use Policy.

**Security and bugs**

We do our best to keep your information secure, but we need your help. For more detailed information about staying safe on Facebook, visit the Facebook Security Page. We try to keep Facebook up, bug-free and safe, but can't make guarantees about any part of our services or products.

**Change of Control**

If the ownership of our business changes, we may transfer your information to the new owner so they can continue to operate the service. But they will still have to honor the commitments we have made in this Data Use Policy.

**Notice of Changes**

If we make changes to this Data Use Policy we will notify you by publication here and on the Facebook Site Governance Page. If the changes are material, we will provide you additional, prominent notice as appropriate under the circumstances. You can make sure that you receive notice directly by liking the Facebook Site Governance Page.

**Opportunity to comment and vote**

Unless we make a change for legal or administrative reasons, or to correct an inaccurate statement, we will give you seven (7) days to provide us with comments on the change. If we receive more than 7000 comments concerning a particular change, we will put the change up for a vote. The vote will be binding on us if more than 30% of all active registered users as of the date of the notice vote.

**Information for users outside of the United States and Canada**

Company Information: The website under www.facebook.com and the services on these pages are being offered to users outside of the U.S. and Canada by Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland. The company Facebook Ireland Ltd. has been established and registered in Ireland as a private limited company, Company Number: 462932, and is the data controller responsible for your personal information.

Directors: Cipora Herman (American), Theodore Ullyot (American).

**Your California privacy rights**

California law permits residents of California to request certain details about what personal information a company shares with third parties for the third parties' direct marketing purposes. Facebook does not share your information with third parties for the third parties' own and independent direct marketing purposes unless we receive your permission. Learn more about the information we receive and how it is used and other websites and applications. If you have questions about our sharing practices or your rights under California law, please write us at 1601 Willow Road, Menlo Park, CA 94025 or contact us through this help page: https://www.facebook.com/help/contact_us.php?id=173545232710000

---

# Exhibit 497

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
_____
(202) 326-7900
FACSIMILE:
(202) 326-7999

May 31, 2023

*Via Electronic Mail*

Nathan Brenner
Federal Trade Commission
Bureau of Competition
400 Seventh Street SW
Washington, D.C. 20024

      Re:    *FTC v. Meta Platforms, Inc.*, Case No. 1:20-cv-03590-JEB

Counsel,

      Enclosed are data responsive to Request for Production No. 86 in the FTC's Third Set of Requests for Production.  The production volume is FTC-META-224 and includes 5 data files, which bear Bates numbers FTC-META-012489088 to FTC-META-012489092.

      This letter and its enclosures are being provided pursuant to the Protective Order in this case and include data designated as Highly Confidential under that Order.  This production includes business information, the release or publication of which could substantially harm the business of Meta and is to be treated as Highly Confidential in accordance with the terms of the Protective Order, and all applicable statutes and regulations including protection from any disclosure pursuant to the Freedom of Information Act.  By this production, Meta does not intend to waive, and is not waiving, any claim of privilege to which it is entitled.  *See* Stipulated FRE 502(d) Order, ECF No. 107.  Accordingly, any production of privileged information does not preclude the subsequent assertion of a claim of attorney-client privilege, work product, or any other applicable privilege or protection in the future with respect to that information.

      Sincerely,

      */s/ Lillian V. Smith*

      Lillian V. Smith
      Counsel for Meta

Enclosures

# Exhibit 498

**X**

🏠 Home
🔍 Explore
🔔 Notifications
✉️ Messages
☑️ Grok
🗒️ Lists
🔖 Bookmarks
👥 Communities
✖️ Premium
👤 Profile
⊝ More

**Post**

← **Post**

**Arvind Narayanan** @random_walker · Sep 3, 2019
A big reason for the ad tech backlash is retargeting—the creepy ads that follow you around. The irony is that retargeting is just about the least worrying thing about the surveillance economy. We notice it because it's in our faces. But by being so obvious, it's a mere annoyance.
💬 3    ↻ 103    ♡ 222    📊         🔖 ⬆️

**Arvind Narayanan** @random_walker · Sep 3, 2019
The truly harmful targeted ads aren't the ones trying to sell us something we've already searched for. It's the ones that undermine our autonomy by covertly manipulating us into new desires and behaviors, molding our consumption patterns to maximize long-term revenue extraction.
💬 7    ↻ 76    ♡ 147    📊         🔖 ⬆️

**Arvind Narayanan** @random_walker · Sep 3, 2019
Retargeting a fashion product? That's one sale. Exploiting someone's vulnerabilities to create insecurities about appearance and instill a negative body image? That's a lifelong stream of sales. Here's a striking & depressing example of what that looks like

**New Co**
shift.newco.co
Towards a Bra-free Instagram Experience
Hey Instagram. I was just wondering, does your company collect any user feedback from women? I …

💬 2    ↻ 37    ♡ 114    📊         🔖 ⬆️

**Arvind Narayanan** @random_walker · Sep 3, 2019
Ads have always exploited stereotypes but online ads are more powerful by tailoring messages to individual vulnerabilities. Say you've recently quit an addiction. Your past behavior is still reflected in your behavioral profile, and your ads will probably still try to trigger it.
💬 2    ↻ 16    ♡ 58    📊         🔖 ⬆️

**Arvind Narayanan** @random_walker · Sep 3, 2019
It isn't easy to prohibit this type of exploitation, because it may not even have been explicitly intended in the first place. Today's ad targeting uses machine learning, designed to automatically discover and exploit patterns that lead to an increase in clicks and purchases.
💬 2    ↻ 8    ♡ 37    📊         🔖 ⬆️

**Arvind Narayanan** @random_walker · Sep 3, 2019
Ad targeting isn't the only covert use of personal data to shape behavior. Addictive apps, filter bubbles, algorithmic radicalization all exploit the same idea: automatically discover and reinforce existing tendencies to create feedback loops that maximize engagement and revenue.
💬 1    ↻ 15    ♡ 59    📊         🔖 ⬆️

This Post was deleted by the Post author. Learn more

**Sinan Aral** ✅ @sinanaral · Sep 3, 2019
What a straw man. There's a serious reasoned discussion to be had here and I don't disagree that privacy is a very important value to be preserved. But, the shallow talk undermines the seriousness. It's ironic that this thread is about stereotyping given this tweet tag. 🤷
💬    ↻    ♡    📊         🔖 ⬆️

This Post was deleted by the Post author. Learn more

🔍 Search

**Relevant people**

**Sinan Aral** ✅          [ Follow ]
@sinanaral
David Austin Professor @MIT; Director @MIT_IDE; Founding Partner, Manifest & Millemark Capital; Author, The Hype Machine, ex-Chief Scientist @SocialAmp @Humin

**Ewout ter Haar**          [ Follow ]
@ewout
Technology for Education, University of São Paulo "inclusão bátava nas terras tropicais" @ewout@mastodon.social

**Arvind Narayanan**          [ Follow ]
@random_walker
Princeton CS prof. Director @PrincetonCITP. I write about the societal impact of AI, tech ethics, & social media platforms. BOOK: AI Snake Oil. Views mine.

**What's happening**

**Stars at Maple Leafs**
NHL · LIVE

Workplace comedy · Trending
**#AbbottElementary**
11.7K posts

Sports · Trending
**Jordan Poole**
2,083 posts

Entertainment · Trending
**Toy Story 5**
13.6K posts

Workplace comedy · Trending
**Juvenile**
4,383 posts

Show more

Terms of Service  Privacy Policy  Cookie Policy
Accessibility  Ads info  More ···  © 2024 X Corp.





**Sinan Aral** ✓ @sinanaral · Sep 3, 2019
That's funny. I thought I treated your query with respect and tried to engage in a meaningful discussion. While I see threats to privacy as real and important, I don't believe banning surveillance capitalism is a realistic or even a net beneficial response. 1/

💬 1          ↻          ♡          ⊪          🔖 ⬆

**Sinan Aral** ✓ @sinanaral · Sep 3, 2019
I believe (and research shows) that the model creates a tremendous amount of consumer surplus. The information age is characterized by a scarcity of attention. Personalization matches the right people with the right information, dramatically reducing dead weight loss. 2/

💬 1          ↻          ♡          ⊪          🔖 ⬆

**Sinan Aral** ✓ @sinanaral · Sep 3, 2019
Furthermore, I was serious when I asked what the alternative was (to which you did not reply). I asked that because I have considered the alternatives that have been proposed and see major problems with most of them. 3/

💬 1          ↻          ♡          ⊪          🔖 ⬆

**Sinan Aral** ✓
@sinanaral

For example, FB floated implementing a monthly fee model. But, FB creates value for users which has to do with access to knowledge, network resources, economic opportunity etc. Making it pay to play will impose inequality in access to those resources - rich get richer. 4/

11:05 AM · Sep 3, 2019

💬 1          ↻          ♡          🔖          ⬆

Ⓝ Post your reply                                    Reply

**Sinan Aral** ✓ @sinanaral · Sep 3, 2019
They also floated "pay for privacy" meaning pay a monthly fee and we won't track you... I'm assuming you see the problem with that: Now the rich have privacy and the poor experience surveillance. So, my question remains: what's the alternative that preserves the benefits? 5/

💬 1          ↻          ♡          ⊪          🔖 ⬆

**Sinan Aral** ✓ @sinanaral · Sep 3, 2019
I'm an advocate for and believe in well designed privacy regulation. But many (though not all) social media (and ad targeting) critics have not thought deeply about the implications of the proposed alternatives. 6/

💬 1          ↻          ♡          ⊪          🔖 ⬆

**Sinan Aral** ✓ @sinanaral · Sep 3, 2019
With respect. ~ Sinan 7/

💬          ↻          ♡          ⊪          🔖 ⬆

This Post was deleted by the Post author. Learn more

This Post was deleted by the Post author. Learn more

This Post was deleted by the Post author. Learn more

Sinan Aral ✔ @sinanaral · Sep 3, 2019

Lots of people want targeted advertising and research shows they value free access to FB. Also, FB creates tons of non-monetary value, like the ability to solve collective action problems (for free) 1/

1

Sinan Aral ✔ @sinanaral · Sep 3, 2019

They enable social movements and generated disaster relief that exceeded that of the US and Europe combined during the Nepalese earthquake of 2015 not to mention contributions to organ donation and vast amounts of charitable giving on a scale we've never seen (for free) 2/

1

Sinan Aral ✔ @sinanaral · Sep 3, 2019

Plus lots of small businesses depend on it. Research shows many especially small publishers would disappear without targeted ads revenue dramatically concentrating the information market and reducing the diversity of opinion in publishing. 3/

1

Sinan Aral ✔ @sinanaral · Sep 3, 2019

I'm *not* saying give them free reign or that privacy is not valuable. I'm just saying let's be smart about it.

# Exhibit 499

**Meta Platforms, Inc. (META)**
**First Quarter 2024 Results Conference Call**
**April 24th, 2024**

**Ken Dorell, Director, Investor Relations**

Thank you. Good afternoon and welcome to Meta Platforms first quarter 2024 earnings conference call. Joining me today to discuss our results are Mark Zuckerberg, CEO and Susan Li, CFO.

Before we get started, I would like to take this opportunity to remind you that our remarks today will include forward-looking statements. Actual results may differ materially from those contemplated by these forward-looking statements.

Factors that could cause these results to differ materially are set forth in today's earnings press release, and in our annual report on form 10-K filed with the SEC. Any forward-looking statements that we make on this call are based on assumptions as of today and we undertake no obligation to update these statements as a result of new information or future events.

During this call we will present both GAAP and certain non-GAAP financial measures. A reconciliation of GAAP to non-GAAP measures is included in today's earnings press release. The earnings press release and an accompanying investor presentation are available on our website at investor.fb.com.

And now, I'd like to turn the call over to Mark.

**Mark Zuckerberg, CEO**

Thanks Ken, and hey everyone -- thanks for joining.

It's been a good start to the year -- both in terms of product momentum and business performance. We estimate that more than 3.2 billion people use at least one of our apps each day, and we're seeing healthy growth in the US. I want to call out WhatsApp specifically, where the number of daily actives and message sends in the US keeps gaining momentum and I think we're on a good path there. We've also made good progress on our AI and metaverse efforts, and that's where I'm going to focus most of my comments today.

So let's start with AI. We're building a number of different AI services, from Meta AI, our AI assistant that you can ask any question across our apps and glasses, to creator AIs that help creators engage their communities and that fans can interact with, to business AIs that we think every business eventually on our platform will use to help customers buy things and get customer support, to internal coding and development AIs, to hardware like glasses for people to interact with AIs, and a lot more.

Last week we had the major release of our new version of Meta AI that is now powered by our latest model, Llama 3. And our goal with Meta AI is to build the world's leading AI service both in quality and usage.

The initial rollout of Meta AI is going well. Tens of millions of people have already tried it. The feedback is very positive and, when I first checked in with our teams, the majority of feedback we were getting was people asking us to release Meta AI for them, wherever they are. We've started launching Meta AI

1

in some English-speaking countries, and we'll roll out in more languages and countries over the coming months.

You all know our product development playbook by this point. We release an early version of a product to a limited audience to gather feedback and start improving it, and then once we think it's ready then we make it available to more people. That early release was last fall and with this release we're now moving to that next growth phase of our playbook. We believe that Meta AI with Llama 3 is now the most intelligent AI assistant that you can freely use. And now that we have the superior quality product, we're making it easier for lots of people to use it within WhatsApp, Messenger, Instagram, and Facebook.

Now in addition to answering more complex queries, a few other notable and unique features from this release: Meta AI now creates animations from still images, and now generates high quality images so fast that it can create and update them as you're typing, which is pretty awesome. I've seen a lot of people commenting about this experience online and how they've never seen or experienced anything like it before.

In terms of the core AI model and intelligence that's powering Meta AI, I'm very pleased with how Llama 3 has come together so far. The 8B and 70B parameter models that we released are best-in-class for their scale. The 400+B parameter model that we're still training seems on track to be industry-leading on several benchmarks. And I expect that our models are just going to improve further from open source contributions.

Overall, I view the results our teams have achieved here as another key milestone in showing that we have the talent, data, and ability to scale infrastructure to build the world's leading AI models and services. And this leads me to believe that we should invest significantly more over the coming years to build even more advanced models and the largest scale AI services in the world. As we're scaling capex and energy expenses for AI, we'll continue focusing on operating the rest of our company efficiently. But realistically, even with shifting many of our existing resources to focus on AI, we'll still grow our investment envelope meaningfully before we make much revenue from some of these new products.

I think it's worth calling out that we've historically seen a lot of volatility in our stock during this phase of our product playbook -- where we're investing in scaling a new product but aren't yet monetizing it. We saw this with Reels, Stories, as News Feed transitioned to mobile and more. And I also expect to see a multi-year investment cycle before we've fully scaled Meta AI, business AIs, and more into the profitable services I expect as well. Historically, investing to build these new scaled experiences in our apps has been a very good long term investment for us and for investors who have stuck with us. And the initial signs are quite positive here too. But building the leading AI will also be a larger undertaking than the other experiences we've added to our apps, and this is likely going to take several years.

On the upside, once our new AI services reach scale, we have a strong track record of monetizing them effectively. There are several ways to build a massive business here, including scaling business messaging, introducing ads or paid content into AI interactions, and enabling people to pay to use bigger AI models and access more compute. And on top of those, AI is already helping us improve app engagement which naturally leads to seeing more ads, and improving ads directly to deliver more value. So if the technology and products evolve in the way that we hope, each of those will unlock massive amounts of value for people and business for us over time.

2

We are seeing good progress on some of these efforts already. Right now, about 30% of the posts on Facebook feed are delivered by our AI recommendation system. That's up 2x over the last couple of years. And for the first time ever, more than 50% of the content people see on Instagram is now AI recommended. AI has also always been a huge part of how we create value for advertisers by showing people more relevant ads, and if you look at our two end-to-end AI-powered tools, Advantage+ Shopping and Advantage+ App Campaigns, revenue flowing through those has more than doubled since last year.

We're also going to continue to be very focused on efficiency as we scale Meta AI and other AI services. Some of this will come from improving how we train and run models. Some improvements will come from the open source community -- where improving cost efficiency is one of the main areas I expect that open sourcing will help us improve, similar to what we saw with Open Compute. We'll also keep making progress on building more of our own silicon. Our Meta Training and Inference Accelerator chip has successfully enabled us to run some of our recommendations-related workloads on this less expensive stack, and as this program matures over the coming years we plan to expand this to more of our workloads as well. And of course as we ramp these investments, we will also continue to carefully manage headcount and other expense growth throughout the company.

In addition to our work on AI, our other long term focus is the metaverse. It's been interesting to see how these two themes have come together.

This is clearest when you look at glasses. I used to think that AR glasses wouldn't really be a mainstream product until we had full holographic displays -- and I still think that will be awesome and is mature state of the product. But now it seems pretty clear that there's also a meaningful market for fashionable AI glasses without a display. Glasses are the ideal device for an AI assistant because you can let them see what you see and hear what you hear, so they have full context on what's going on around you as they help you with whatever you're trying to do. Our launch this week of Meta AI with Vision on the glasses is a good example where you can now ask questions about things you're looking at.

One strategy dynamic that I've been reflecting on is that an increasing amount of our Reality Labs work is going towards serving our AI efforts. We currently report on our financials as if Family of Apps and Reality Labs were two completely separate businesses, but strategically I think of them as fundamentally the same business with the vision of Reality Labs to build the next generation of computing platforms in large part so that way we can build the best apps and experiences on top of them. Over time, we'll need to find better ways to articulate the value that's generated here across both segments so it doesn't just seem like our hardware costs increase as our glasses ecosystem scales but all the value flows to a different segment.

The Ray-Ban Meta glasses that we built with Essilor Luxottica continue to do well and are sold out in many styles and colors, so we're working to make more and release additional styles as quickly as we can. We just released the new cat-eye Skyler design yesterday, which is more feminine, and in general, I'm optimistic about our approach of starting with classics and expanding with an increasing diversity of options over time. If we want everyone to be able to use wearable AI, I think eyewear is a bit different from phones or watches in that people are going to want very different designs. So I think our approach of partnering with leading eyewear brands will help us serve more of the market.

I think a similar open ecosystem approach will help us expand the mixed reality headset market over time as well. We announced that we're opening up Meta Horizon OS, the operating system we've built

to power Quest. As the ecosystem grows, I think there will be sufficient diversity in how people use mixed reality that there will be demand for more designs than we'll be able to build. For example, a work-focused headset may be slightly less designed for motion but may want to be lighter by connecting to your laptop. A fitness-focused headset may be lighter with sweat-wicking materials. An entertainment-focused headset may prioritize the highest-resolution displays over everything else. A gaming-focused headset may prioritize peripherals and haptics, or a device that comes with Xbox controllers and a Game Pass subscription out of the box.

To be clear, I think that our first-party Quest devices will continue to be the most popular headsets as we see today, and we'll continue focusing on advancing the state-of-the-art tech and making it accessible to everyone. But I also think that opening our ecosystem and opening our operating system will help grow the ecosystem even faster.

In addition to AI and the metaverse, we're seeing good improvements across our apps. I touched on some of the most important trends with WhatsApp growth in the US and AI-powered recommendations in our feeds and Reels already, but I wanted to mention that video continues to be a bright spot. This month we launched an update full-screen video player on Facebook that brings together Reels, longer videos, and live content into a single experience with a unified recommendation system. On Instagram, Reels and video continue to drive engagement, with Reels alone now making up 50% of the time that's spent within the app.

Threads is growing well too. There are now more than 150M monthly actives, and it continues to generally be on the trajectory I hoped to see. My daughters would want me to mention that Taylor Swift is now on Threads -- that was a big deal in my house.

Okay, that's what I wanted to cover today. I'm proud of the progress we've made so far this year. We've got a lot more execution ahead to fulfill the opportunities ahead of us. A big thank you to our teams driving all these advances, and to all of you for being on this journey with us. And now, here is Susan.

**Susan Li, CFO**

Thanks Mark and good afternoon everyone.

Let's begin with our consolidated results. All comparisons are on a year-over-year basis unless otherwise noted.

Q1 total revenue was $36.5 billion, up 27% on both a reported and constant currency basis.

Q1 total expenses were $22.6 billion, up 6% compared to last year.

In terms of the specific line items:

Cost of revenue increased 9%, as higher infrastructure-related costs were partially offset by lapping Reality Labs inventory-related valuation adjustments.

R&D increased 6%, driven mostly by higher headcount-related expenses and infrastructure costs, which were partially offset by lower restructuring costs.

4

Marketing & Sales decreased 16%, due mainly to lower restructuring costs, professional services and marketing spend.

G&A increased 20%, as higher legal-related expenses were partially offset by lower restructuring costs.

We ended the first quarter with over 69,300 employees, up 3% from Q4.

First quarter operating income was $13.8 billion, representing a 38% operating margin.

Our tax rate for the quarter was 13%.

Net income was $12.4 billion or $4.71 per share.

Capital expenditures, including principal payments on finance leases, were $6.7 billion, driven by investments in servers, data centers and network infrastructure.

Free cash flow was $12.5 billion. We repurchased $14.6 billion of our Class A common stock and paid $1.3 billion in dividends to shareholders, ending the quarter with $58.1 billion in cash and marketable securities and $18.4 billion in debt.

Moving now to our segment results.

I'll begin with our Family of Apps segment.

Our community across the Family of Apps continues to grow, with approximately 3.2 billion people using at least one of our Family of Apps on a daily basis in March.

Q1 Total Family of Apps revenue was $36.0 billion, up 27% year over year.

Q1 Family of Apps ad revenue was $35.6 billion, up 27% or 26% on a constant currency basis.

Within ad revenue, the online commerce vertical was the largest contributor to year-over-year growth, followed by gaming and entertainment and media.

On a user geography basis, ad revenue growth was strongest in Rest of World and Europe at 40% and 33%, respectively. Asia-Pacific grew 25% and North America grew 22%.

In Q1, the total number of ad impressions served across our services increased 20% and the average price per ad increased 6%. Impression growth was mainly driven by Asia-Pacific and Rest of World.

Pricing growth was driven by advertiser demand, which was partially offset by strong impression growth, particularly from lower-monetizing regions and surfaces.

Family of Apps other revenue was $380 million in Q1, up 85%, driven by business messaging revenue growth from our WhatsApp Business Platform.

We continue to direct the majority of our investments toward the development and operation of our Family of Apps. In Q1, Family of Apps expenses were $18.4 billion, representing approximately 81% of

our overall expenses. Family of Apps expenses were up 7% due mainly to higher legal and infrastructure costs that were partially offset by lower restructuring costs.

Family of Apps operating income was $17.7 billion, representing a 49% operating margin.

Within our Reality Labs segment, Q1 revenue was $440 million, up 30% driven by Quest headset sales. Reality Labs expenses were $4.3 billion, down 1% year-over-year as higher headcount-related expenses were more than offset by lapping inventory-related valuation adjustments and restructuring costs.

Reality Labs operating loss was $3.8 billion.

Turning now to the business outlook. There are two primary factors that drive our revenue performance: Our ability to deliver engaging experiences for our community, and our effectiveness at monetizing that engagement over time.

On the first - we remain pleased with engagement trends and have strong momentum across our product priorities.

Our investments in developing increasingly advanced recommendation systems continue to drive incremental engagement on our platforms, demonstrating that people are finding added value by discovering content from accounts they're not connected to. The level of recommended content in our apps has scaled as we've improved these systems, and we see further opportunity to increase the relevance and personalization of recommendations as we advance our models.

Video also continues to grow across our platform, and it now represents more than 60% of time on both Facebook and Instagram. Reels remains the primary driver of that growth, and we're progressing on our work to bring together Reels, longer-form video and Live video into one experience on Facebook. In April, we rolled out this unified video experience in the US and Canada, which is increasingly powered by our next generation ranking architecture that we expect will help deliver more relevant video recommendations over time.

We're also introducing deeper integrations of generative AI into our apps in the US and more than a dozen other countries. Along with using Meta AI within our chat surfaces, people will now be able to use Meta AI in Search within our apps, as well as Feed and Groups on Facebook. We expect these integrations will complement our social discovery strategy as our recommendation systems help people to discover and explore their interests while Meta AI enables them to dive deeper on topics they're interested in.

Threads also continues to see good traction as we continue to ship valuable features and scale the community.

Now to the second driver of our revenue performance: increasing monetization efficiency. There are two parts to this work.

The first is optimizing the level of ads within organic engagement. Here, we continue to advance our understanding of users' preferences for viewing ads to more effectively optimize the right time, place and person to show an ad to. For example, we are getting better at adjusting the placement and number of ads in real time, based on our perception of a user's interest in ad content and to minimize disruption

from ads, as well as innovating on new and creative ad formats. We expect to continue that work going forward, while surfaces with relatively lower levels of monetization, like video and messaging, will serve as additional growth opportunities.

The second part of improving monetization efficiency is enhancing marketing performance. Similar to our work with organic recommendations, AI is playing an increasing role in these efforts.

First, we are making ongoing ads modeling improvements that are delivering better performance for advertisers. One example is our new ads ranking architecture, Meta Lattice, which we began rolling out more broadly last year. This new architecture allows us to run significantly larger models that generalize learnings across objectives and surfaces in place of numerous, smaller ads models that have historically been optimized for individual objectives and surfaces. This is not only leading to increased efficiency as we operate fewer models, but also improving ad performance.

Another way we're leveraging AI is to provide increased automation for advertisers. Through our Advantage+ portfolio, advertisers can automate one step of the campaign set up process - such as selecting which ad creative to show - or automate their campaign completely using our end-to-end automation tools, Advantage+ Shopping and Advantage+ App ads. We're seeing growing use of these solutions, and we expect to drive further adoption over the course of the year while applying what we learn to our broader ads investments.

Next, I'd like to discuss our approach to capital allocation.

We continue to see compelling investment opportunities to both improve our core business in the near-term and capture significant longer-term opportunities in generative AI and Reality Labs. As we develop more advanced and compute-intensive recommendation models and scale capacity for our generative AI training and inference needs, we expect that having sufficient infrastructure capacity will be critical to realizing many of these opportunities. As a result, we expect that we will invest significantly more in infrastructure over the coming years.

Our other long-term initiative that we're continuing to make significant investments in is Reality Labs. We are also starting to see our AI initiatives increasingly overlap with our Reality Labs work. For example, with RayBan Meta smart glasses, people in the US & Canada can now use our multimodal Meta AI assistant for daily tasks without pulling out their phone. Longer-term, we expect generative AI to play an increasing role in our mixed reality products, making it easier to develop immersive experiences. Accelerating our AI efforts will help ensure we can provide the best version of our services as we transition to the next computing platform.

We expect to pursue these opportunities while maintaining a focus on operating discipline, and believe our strong financial position will allow us to support these investments while also returning capital to shareholders through share repurchases and dividends.

In addition, we continue to monitor an active regulatory landscape, including the increasing legal and regulatory headwinds in the EU and the US that could significantly impact our business and our financial results. We also have a jury trial scheduled for June in a suit brought by the State of Texas regarding our use of facial recognition technology, which could ultimately result in a material loss.

Turning now to the revenue outlook.

7

We expect second quarter 2024 total revenue to be in the range of $36.5-39 billion. Our guidance assumes foreign currency is a 1% headwind to year-over-year total revenue growth, based on current exchange rates.

Turning now to the expense outlook.

We expect full-year 2024 total expenses to be in the range of $96-99 billion, updated from our prior outlook of $94-99 billion due to higher infrastructure and legal costs. For Reality Labs, we continue to expect operating losses to increase meaningfully year-over-year due to our ongoing product development efforts and our investments to further scale our ecosystem.

Turning now to the capex outlook.

We anticipate our full-year 2024 capital expenditures will be in the range of $35-40 billion, increased from our prior range of $30-37 billion as we continue to accelerate our infrastructure investments to support our AI roadmap. While we are not providing guidance for years beyond 2024, we expect capex will continue to increase next year as we invest aggressively to support our ambitious AI research and product development efforts.

On to tax. Absent any changes to our tax landscape, we expect our full-year 2024 tax rate to be in the mid-teens.

In closing, Q1 was a good start to the year. We're seeing strong momentum within our Family of Apps and are making important progress on our longer-term AI and Reality Labs initiatives that have the potential to transform the way people interact with our services over the coming years.

With that, Krista, let's open up the call for questions.

| | |
|---|---|
| Operator: | Thank you. We will now open the lines for a question and answer session. To ask a question, please press star one on your touch tone phone. To withdraw your question, again press star one. Please limit yourself to one question. Please pick up your handset before asking your question to ensure clarity. If you are streaming today's call, please mute your computer speakers. And your first question comes from the line of Eric Sheridan from Goldman Sachs. Please go ahead. |
| Eric Sheridan: | Thank you so much for taking the questions. Maybe I'll ask a two-parter. Mark, you used the analogy of other investment cycles you've been through around products like Stories and Reels. |
| | I know you're not giving long-term guidance today, but using those analogies, how should investors think about the length and depth of this investment cycle with respect to either AI and/or Reality Labs more broadly and mixed reality? |
| | And you both talked about the impact AI is having on the advertising ecosystem. What are you watching for in terms of adoption or utility on the consumer side to know that AI adoption is tracking along with the investment cycle? Thank you. |

Mark Zuckerberg:    Yes. In terms of the timing, I think it's somewhat difficult to extrapolate from previous cycles. But I guess like the main thing that we see is that we will usually take, I don't know a couple of years, could be a little more, could be less, to focus on building out and scaling the products.

And we typically don't focus that much on monetization of the new areas until they reach significant scale because it's so much higher leverage for us just to improve monetization on other things before these new products are at scale.

So you enter this period where I think kind of smart investors see that the product is scaling and that there's a clear monetizable opportunity there even before the revenue materializes. And I think we've seen that with Reels and with Stories and with the shift to mobile and all these things, where basically, we build out the inventory first for a period of time and then we monetize it.

And during that time, when it's scaling, it's -- sometimes it's not just the case that we're not making money from that thing.

It can often actually be the case that it displaces other revenue from other things. So like you saw with Reels, I mean it scaled and there was a period where it was not profitable for us as it was scaling before it became profitable. So I think that's more the analogy that I'm making on this.

But I think it's -- what that suggests is that what we should all be focused on for the next period is as the consumer products scale, Meta AI really just launched in a meaningful way so we don't have any kind of hard stats to share on that.

But I'd say that's the main thing that I'm focused on for this year and probably a lot of next year is growing that product and the other AI products and the engagement around them. And I think we should all have quite a bit of confidence that if those are on a good track to scale, then they're going to end up being very large businesses. So that's the main point that I was trying to make there.

Operator:          Your next question comes from the line of Brian Nowak from Morgan Stanley. Please go ahead.

Brian Nowak:       Great, thanks for taking my questions. I have two. The first one is on sort of the recommendation engine improvements and even, Susan, when you talked about further opportunities to increase the relevance of the models.

Could you just unpack that a little bit for us? Can you give us examples of where you're still running the model in a suboptimal basis or opportunities for improved signal capture use or data you're not using? Where are sort of the areas of improvement you see from here?

And then the second one, when you talk about driving incremental adoption of AI tools for advertisers, what are sort of some of the main gating factors you've

encountered to get advertisers to test these tools? And how do you think about sort of addressing that throughout '24 and '25? Thanks.

Susan Li:    Thanks, Brian. So to your first question, where are there more opportunities for us to leverage and improve our recommendations models to drive engagement.

One of the things I would say is, historically, each of our recommendation products including Reels, in-feed recommendations, et cetera, has had their own AI model.

And recently, we've been developing a new model architecture with the aim for it to power multiple recommendations products.

We started partially validating this model last year by using it to power Facebook Reels. And we saw meaningful performance gains, 8% to 10% increases in watch time, as a result of deploying this.

This year, we're actually planning to extend the singular model architecture to recommend content across not just Facebook Reels, but also Facebook's video tab as well.

So while it's still too early to share specific results, we're optimistic that the new model architecture will unlock increasingly relevant video recommendations over time. And if it's successful, we'll explore using it to power other recommendations.

An analog exists, I would say, on the ads side. We've talked a little bit about the new model architecture, Meta Lattice, that we deployed last year that consolidates smaller and more specialized models into larger models that can better learn what characteristics improve ad performance across multiple services, like Feed and Reels and multiple types of ads and objectives at the same time. And that's driven improved ad performance over the course of 2023 as we deployed it across Facebook and Instagram to support multiple objectives.

And over the course of 2024, we expect to further enhance model performance and include support for even more objectives like web and app and ROAS.

So there's a lot of work that we're investing in, in the underlying model architecture for both organic engagement and ads that we expect is going to continue to deliver increasing ads performance over time.

The second question you asked was around getting advertisers to test and adopt GenAI tools. There are two flavors of this. The more near-term version is around the GenAI ad creative features that we have put into our ads creation tools. And it's early, but we're seeing adoption of these features across verticals and different advertiser sizes.

In particular, we've seen outsized adoption of image expansion with small businesses, and this will remain a big area of focus for us in 2024, and I expect that

improvements to our underlying foundation models will enhance the quality of the outputs that are generated and support new features on the roadmap.

But right now we have features supporting text variations, image expansion, and background generation, and we're continuing to work to make those more performant for advertisers to create more personalized ads at scale.

The longer-term piece here is around business AIs. We have been testing the ability for businesses to set up AIs for business messaging that represent them in chats with customers, starting by supporting shopping use cases such as responding to people asking for more information on a product or its availability.

So this is very, very early. We've been testing this with a handful of businesses on Messenger and WhatsApp, and we're hearing good feedback with businesses saying that the AIs have saved them significant time while customer -- consumers noted more timely response times.

And we're also learning a lot from these tests to make these AIs more performant over time as well. So, we'll be expanding these tests over the coming months, and we'll continue to take our time here to get it right before we make it more broadly available.

| | |
|---|---|
| Operator: | Your next question comes from the line of Mark Shmulik from Bernstein Research. Please go ahead. |
| Mark Shmulik: | Yes, hi thanks for taking the question. I guess back to that product playbook that we talked about a few times, with kind of Reels now such a large share of kind of time spent on Instagram and Facebook, how do we think about the next leg of kind of monetization growth from here? In particular, as we kind of get back to kind of shopping on platform or other ways to monetize, any color there on the roadmap kind of just beyond ad insertion from here? |
| | And then, Susan, just on the ad market, in particular, previously we've heard a lot about kind of Chinese-based advertiser contribution. Any color you could share there on kind of how that spend is trending? Thank you. |
| Susan Li: | Sure. Thanks, Mark. So Reels revenue continued to grow across Instagram and Facebook in Q1, and that's driven both by higher engagement and increased monetization efficiency through our ad ranking and delivery improvements. |
| | And we -- as we've mentioned before, we don't plan on quantifying the impact from Reels going forward, but it remains a positive contributor to overall revenue. And we expect that there are going to be opportunities for us to continue improving performance and growing supply. |
| | So on the performance improvements, we are investing in ongoing ranking improvements. We're continuing to make ads easier and more intuitive to interact with through work like optimizing call-to-actions and post-click experiences, which |

11

are especially important for DR performance. And we're also optimizing ads to feel more native to Reels.

In Q1, we rolled out our GenAI image expansion tools across Facebook and Instagram Reels after having introduced it to Instagram Feed in Q4, and we're seeing, again, outsized adoption with small businesses.

So we're excited about the opportunities to continue making these ads more performant. And even though ads -- the Reels ad load, sorry, has increased over the last year, it remains lower on a per time basis than both Feed and Stories.

So we're going to continue to look for opportunities to thoughtfully grow it in the future and invest in creative ways to address the structural supply constraints of the Reels format being more video-heavy including higher density experiences and formats and increasingly personalizing ad loads, which we think will make sure that we're really putting ads in front of people when they're most likely to be interested and engaged with them.

The second question you asked was around China. Growth in spend from China advertisers remained strong in Q1. This was driven by online commerce and gaming, and it's reflected in our Asia Pacific advertiser segment, which remained the fastest-growing region at 41% year-over-year in Q1.

Now we did see strength across other geographies as well including a 6-point acceleration in total revenue growth from North America advertisers.

So I would say that we aren't quantifying the Q1 contribution from China, and we don't have forward-looking expectations to share on quarterly China-based ad revenue, but I will say that we are lapping periods of increasingly strong demand over the course of 2024 given the recovery of China-based advertisers in 2023 from their prior pandemic-driven headwinds.

Operator:         Your next question comes from the line of Doug Anmuth from JPMorgan. Please go ahead.

Douglas Anmuth:   Thanks for taking the questions. Can you just talk about what's changed most in your view in the business and the opportunity now versus three months ago? And is there anything you're more cautious about in revenue in the ad market? And is the AI opportunity just even bigger, and therefore, requiring more investment than expected?

And then, Susan, can you also just comment on how you're thinking about that ability to sustain growth rates over the next few quarters as you face tougher comps off a big base of ad dollars? Thanks.

Mark Zuckerberg:  Yes. I can speak to the first one. I think we've gotten more optimistic and ambitious on AI. So previously I think that our work in this -- I mean when you were looking at last year, when we released Llama 2, we were very excited about the model and

thought that that was going to be the basis to be able to build a number of things that were valuable that integrated into our social products.

But now I think we're in a pretty different place. So with the latest models, we're not just building good AI models that are going to be capable of building some new good social and commerce products.

I actually think we're in a place where we've shown that we can build leading models and be the leading AI company in the world. And that opens up a lot of additional opportunities beyond just ones that are the most obvious ones for us.

So that's -- this is what I was trying to refer to in my opening remarks where I just view the success that we've seen with the way that Llama 3 and Meta AI have come together as a real validation technically that we have the talent, the data, and the ability to scale infrastructure to do leading work here.

And with Meta AI, I think that we are on our path to having Meta AI be the most used and best AI assistant in the world, which I think is going to be enormously valuable. So all of that basically encourages me to make sure that we're investing to stay at the leading edge of this.

And we're doing that at the time when we're also scaling the product before it is making money. So that's the analogy that I was making before, which is we've gone through some of those cycles before.

But fundamentally, I think if you look at the facts of what our team is able to produce, I think it just -- our optimism and ambition have just grown quite a bit, and I think that this is just going to end up being quite an important set of products for us. It was already going to be. Now I think it has the potential to be even more important.

Susan Li:         And I can take that second question, Doug. So we aren't giving full year 2024 guidance. And obviously our revenue for the full year will be influenced by many factors including macro conditions and things that are harder to predict the further out you go.

And of course, over the course of 2024, we will also be lapping periods of increasingly strong demand. With that said, we expect to see good opportunities to continue growing engagement across our products, driven by the investments we made in AI-based content recommendations, our ongoing video work. And we also expect that we will continue to drive ads performance gains and continue to make our ads sort of more effective and deliver increasing value to advertisers.

One thing I'd share, for example, is that we actually grew conversions at a faster rate than we grew impressions over the course of this quarter. So we are -- we're expecting to -- which basically suggests that our conversion grade is growing and is one of the ways in which our ads are becoming more performant.

So I feel like there's a lot of opportunity for us, both with our organic engagement growth and with -- and with continuing to make the ads better and to continue driving more results for advertisers.

Operator:          Your next question comes from the line of Justin Post from Bank of America. Please go ahead.

Justin Post:       Great, thank you. First on the CapEx, mostly, you're kind of talking about an investment cycle here. Is there any way you could kind of use some of the Metaverse spend over into AI? Are they converging? And kind of use some of the money from the other areas to kind of fund the AI? And then second, longer-term investors are very focused on returns on capital.

Obviously great returns on CapEx in the past with your margins today. How do we think about the returns on the capital you're spending? How are you thinking about it, I guess, going forward two, three years out? Thank you.

Susan Li:         So on the -- I would say -- well I can start with the second part, and then I'll defer to Mark on the first one. In terms of measuring the ROI on our CapEx investments, we've broadly categorized our AI investments into two buckets.

I think of them as sort of core AI work and then strategic bets, which would include GenAI and the advanced research efforts to support that. And those are just really at different stages as it relates to being able to measure the return and drive revenue for our business.

So with our core AI work, we continue to have a very ROI-driven approach to investment, and we're still seeing strong returns as improvements to both engagement and ad performance have translated into revenue gains.

Now the second area, strategic bets, is where we are much earlier. Mark has talked about the potential that we believe we have to create significant value for our business in a number of areas including opportunities to build businesses that don't exist on us today.

But we'll need to invest ahead of that opportunity to develop more advanced models and to grow the usage of our products before they drive meaningful revenue. So while there is tremendous long-term potential, we're just much earlier on the return curve than with our core AI work.

What I'll say though is we're also building our systems in a way that gives us fungibility in how we use our capacity, so we can flex it across different use cases as we identify what are the best opportunities to put that infrastructure toward.

Mark Zuckerberg:   Sure. And then on the question of shifting resources from other parts of the company. I would say broadly, we actually are doing that in a lot of places in terms of shifting resources from other areas, whether it's compute resources or different things in order to advance the AI efforts.

14

For Reality Labs specifically, I'm still really optimistic about building these new computing platforms long term. I mentioned in my remarks up front, that one of the bigger areas that we're investing in Reality Labs is glasses. We think that that's going to be a really important platform for the future.

Our outlook for that, I think, has improved quite a bit because previously we thought that that would need to wait until we have these full holographic displays to be a large market. And now we're a lot more focused on the glasses that we're delivering in partnership with Ray-Ban, which I think are going really well. And -- so that, I think, has the ability to be a pretty meaningful and growing platform sooner than I would have expected.

So it is true that more of the Reality Labs work, like I said, is sort of focused on the AI goals as well. But I still think that we should focus on building these long-term platforms, too.

| | |
|---|---|
| Operator: | Your next question comes from the line of Youssef Squali from Truist Securities. Please go ahead. |
| Youssef Squali: | Great, thank you very much. Mark, with the upcoming ban or sale of TikTok signed into law earlier today, how do you think that will impact the U.S. social media landscape and Meta in particular? And what do you say to people who believe that this is potentially a slippery slope in terms of the government picking winners and losers? And Susan, how big is Advantage+ in terms of the spend on the platform, and just in terms of its impact on overall CPMs stabilizing? Thank you very much. |
| Susan Li: | Thanks, Youssef. We've obviously been following the events related to TikTok closely, but at this stage, it is just too early, I think, to assess its impact or what it would mean for our business. To your second question on Advantage+, we're continuing to see good traction across our Advantage+ portfolio including both with solutions, I mentioned this, that automate individual steps of a campaign creation setup as well as ones that automate the full end-to-end process. |

So on the single-step automation, Advantage+ Audience, for example, has seen significant growth in adoption since we made it the default audience creation experience for most advertisers in Q4, and that enables advertisers to increase campaign performance by just using audience inputs as a suggestion rather than a hard constraint. And based on tests that we ran, campaigns using Advantage+ Audience targeting saw, on average, a 28% decrease in cost per click or per objective compared to using our regular targeting.

On the end-to-end automation products like Advantage+ Shopping and Advantage+ App Campaigns, we're also seeing very strong growth. Mark mentioned the combined revenue flowing through those two has more than doubled since last year. And we think there's still significant runway to broaden adoption, so we're trying to enable more conversion types for Advantage+ Shopping.

In Q1, we began expanding the list of conversions that businesses could optimize for. So previously it only supported purchase events, and now we've added 10 additional conversion types. And we're continuing to see strong adoption now across verticals.

So generally, I would say we are building a lot more functionality into the Advantage+ tools over time. It's also where a lot of our GenAI ads creative features have been introduced and where advertisers have the opportunity to experiment with those. And we'll keep looking to apply what we learn from these products more broadly to our ads investments over the course of the year.

Operator:               Your next question comes from the line of Ken Gawrelski from Wells Fargo. Please go ahead.

Kenneth Gawrelski: Thank you very much. As you look out through the coming period of product investment, how should we think about the relationship between Family of Apps revenue and cost growth? Is there any insight you can give us there?

And then maybe just one that's a little bit more specific to the G&A growth in 1Q. You called out legal expenses. Just wanted to see if there's anything one-time in there that would cause the elevated growth in 1Q? Thank you.

Susan Li:               Yes. On the second part of your question first, so on the G&A side, that was really driven by legal expenses. We recognized some accruals in Q1 related to ongoing legal matters, and you'll see more detail on that in the 10-Q.

On the first part of your question, which is really about sort of the kind of long-term margin profile of Family of Apps, we aren't giving guidance on that per se.

But one of the things that we really have been very disciplined about over the course of 2023 and continuing is really operating the business in a very efficiency oriented way.

So we're being very disciplined with allocation of new resources. This is a muscle that we really built over 2023 that we believe is important for us to keep carrying forward. And I think you'll see us continue to emphasize that, especially with the Family of Apps business being at the scale that it is.

Operator:               Your next question comes from the line of Ross Sandler from Barclays. Please go ahead.

Ross Sandler:         Great. Mark, you partnered with Google and Bing for Meta AI organic search citations. So I guess stepping back, do you think that Meta AI longer term could bring in search advertising dollars at some point? Or do you view this as what others are doing, where you kind of attach a premium subscription tier once people kind of get going on it?

And then the second question is, you mentioned that you guys are working on building AI tools for businesses and creators.

So just, I guess, how do you see the business model evolving when we all get to the stage of interacting with something like Taylor Swift's custom AI for merchandise or tickets or something like that? How is that going to play out? Thank you.

Mark Zuckerberg:    All right. So yes, on the Google and Microsoft partnerships, yes, I mean we work with them to have real-time information in Meta AI. It's useful. I think it's pretty different from search. We're not working on search ads or anything like that. I think this will end up being a pretty different business.

I do think that there will be an ability to have ads and paid content in Meta AI interactions over time as well as people being able to pay for, whether it's bigger models or more compute or some of the premium features and things like that. But that's all very early in fleshing out.

The thing that I actually think is probably the biggest clear opportunity is all the work around business messaging. That's in addition to the stuff that we're already doing, just generally to increase engagement and ads quality in the apps.

But the business messaging thing, I mean whether it's a creator or one of the 100-plus million businesses on our platform, we basically want to make it very easy for all of these folks to set up an AI to engage with their community.

For a business, that's going to be, to be able to do sales and commerce and customer support. And I think it will be similar for creators, although there will be more of a kind of just fun and engaging part there, but a lot of creators are on the platform because they see this as a business too, whether they're trying to sell concert tickets or products or whatever it is that their business goal is.

And a lot of these folks either aren't advertising as much as they could or, in business, the business messaging parts, I think, are still relatively under-monetized compared to where they will be. And I think a lot of that is because the cost of engaging with people in messaging is still very high.

But AI should bring that down just dramatically for businesses and creators. And I think that that has the potential. That's probably the -- beyond just increasing engagement and increasing the quality of the ads, I think that that's probably one of the nearer-term opportunities, even though that will -- it's not like a next quarter or the quarter after that scaling thing, but it's -- but that's not like a five-year opportunity either.

So I think -- that is one that I think is going to be pretty exciting to look at. But yes, I mean as Meta AI scales too, I think that that will have its own opportunities to monetize, and we'll build that out over time.

But like I tried to emphasize, we're in the phase of this where the main goal is getting many hundreds of millions or billions of people to use Meta AI as a core part of what they do. That's the kind of next goal, building something that is super valuable.

We think this has the potential to be at a very large scale. And that's sort of the next step on the journey.

Kenneth Dorell:     Krista, we have time for one last question.

Operator:           And that question comes from the line of Ron Josey from Citi. Please go ahead.

Ronald Josey:       Great, thanks for taking the question. Mark, I want to follow up on a prior question that you mentioned optimism has grown internally quite a bit just with all the improvements and investments and innovations you're making. And we're seeing that in the experience just from a few days of Meta AI.

So can you just talk to us maybe how the 400 billion parameter model just might evolve the experience on Meta or how you think things might change over the next, call it, months, years, et cetera, as maybe messaging becomes a greater focus and things along those lines? So just a vision longer term? Thank you.

Mark Zuckerberg:    Yes. I mean I think that the next phase for a lot of these things are handling more complex tasks and becoming more like agents rather than just chatbots, right? So when I say chatbot, what I mean is if you send it a message and it replies to your message, right? So it's almost like a, almost a 1:1 correspondence.

Whereas what an agent is going to do is you give it an intent or a goal, and it goes off and probably actually performs many queries on its own in the background in order to help accomplish your goal, whether that goal is researching something online or eventually finding the right thing that you're looking to buy.

There's a lot of complexity and sort of different things that I think people don't even realize that they will be able to ask computers to do for them. And I think basically, the larger models and then the more advanced future versions that will be smaller as well are just going to enable much more interesting interactions like that.

So I mean if you think about this, I mean even some of the business use cases that we talked about, you don't really just want like a sales or customer support chatbot that can just respond to what you say.

If you're a business, you have a goal, right? You're trying to support your customers well and you're trying to position your products in a certain way and encourage people to buy certain things that map to their interests and what they'd be interested in. And that's more of like a multiturn interaction, right?

So the type of business agent that you're going to be able to enable with just a chatbot is going to be very naive compared to what we're going to have in a year

18

even, but beyond that, too, is just the reasoning and planning abilities if these things grow to be able to just help guide people through the business process of engaging with whatever your goals are as a creator or a business.

So I think that that's going to be extremely powerful. And I think the opportunity is really big. So -- and on top of that, I think what we've shown now is that we have the ability to build leading models in our company.

So I think it makes sense to go for it, and we're going to. And I think it's going to be a really good long-term investment. But I did just want to spell out on this call today, the extent to which we're focusing on this and investing in this for the long term because that's what we do.

Kenneth Dorell:     Great. Thank you for joining us today. We appreciate your time. And we look forward to speaking with you again soon.

Operator:           This concludes today's conference call. Thank you for your participation. And you may now disconnect.

# Exhibit 500

7/7/24, 9:38 PM
Case 1:20-cv-03590-JEB  Document 369-7  Filed 07/12/24  Page 37 of 497
Path's Competitors Aren't Facebook And Twitter, They're Email And SMS Says Dave Morin | TechCrunch

Sorry, this page was not found in this archive.

https://74ec403411de40118e4395fce749d3d7.safeframe.googlesyndication.com/safeframe/1-0-40/html/container.html?n=3

Load the live page in a new tab (or download the file, if this URL points to a file).



Media & Entertainment

# Path's Competitors Aren't Facebook And Twitter, They're Email And SMS Says Dave Morin

Josh Constine

1:45 PM PDT • September 10, 2012

💬 Comment



"50 is the perfect number of friends" Dave Morin found when looking at the usage of his personal networking app Path, as he explained in his talk at TechCrunch Disrupt SF. Add more than that and people start asking to be able to share to certain subsets of friends — the exact privacy controls that confuse and slow down other social networks.

With that audience size in mind, Morin created Path. There was LinkedIn for professionals Twitter for sharing with the world, and Facebook for communicating with all your friends. "But the one thing that was missing was something focused on family, on your closest friends." These people were opting to share photos through older mediums instead of the newfangled tools. That's why Morin told us "Our competition isn't anyone else in the social networking world, it's SMS and email."

## Staying Intimate

On stage, Morin explained how people are more comfortable sharing personal moments when they aren't broadcasting to distant acquaintances. "Path is the home inside Facebook's city." Championing Path's respect for privacy, Morin noted "when you go outside, you're under a different set of rules."

In Path version one, people were limited to just 50 friends, and most had far fewer. But when it launched Path 2.0 and upped the limit to 150, most users settled at around 50 of the most important people in their lives, and sharing ramped up. He told me afterwards that this follows Dunbar's theory of how many relationships we can maintain. There's your 5 best friends, 15 closest friends, your 50-person personal network you can really trust. Next is the much noisier and anonymous 150 friend group.

The 50-friend formula seems to be working, as Path now has over 3 million downloads with half of those users actively using the service. It's also a hit abroad in China, which has become Path's second biggest country.



📣 DISRUPT

Series A to B Startup? Join the ScaleUp Program At Disrupt 2024.

LEARN MORE

✕





**Disrupt 2024**
**Got Laid Off? Find Your Next Job At Disrupt.**

**Get 50% Off The Disrupt Expo+ Pass**  San Francisco, October 28-30

**Book Now & Save**

The message was clear. Mobile is no passing fad. It's completely transformative, and everyone from startups to city leaders can't afford to make it an afterthought.

And it's not just about your phone. Morin observed "we've gone from carrying one computer to carrying multiple computers — your iPhone, iPad, Jawbone Up on your wrist, what Google's doing with glasses. There's an incredible opportunity with the amount of data being generated to give people an understanding of their lives and [help them] make better decisions".

By creating a compelling and frankly beautiful way to share, Path is gaining access to a uniquely intimate data set, from how far they can run to when they fall asleep. Maybe it will be Path, maybe it will be a hub that aggregates quantified self measurements from a variety of devices, but someone's going to turn all this data into life-changing realizations for the user, and industry-changing insights for businesses.



## More TechCrunch



Zuckerberg disses closed-source AI competitors as trying to 'create God'



Rohlik rolls up $170M to expand in European grocery delivery and sell its tech to others



Rainforest lands $20M to challenge Stripe with embedded payments for SaaS providers



Axelera lands new funds as the AI chip market heats up



**Get the industry's biggest tech news**

Explore all newsletters ↗

**TechCrunch Daily News** ⊕
Every weekday and Sunday, you can get the best of TechCrunch's coverage.

**Startups Weekly** ⊕
Startups are the core of TechCrunch, so get our best coverage delivered weekly.

**TechCrunch Fintech** ⊕
The latest Fintech news and analysis, delivered every Tuesday.

**TechCrunch Mobility** ⊕
TechCrunch Mobility is your destination for transportation news and insight.

**Email address (required)**

Email address

Subscribe

⬡ **DISRUPT**
**Series A to B Startup? Join the ScaleUp Program At Disrupt 2024.**

LEARN MORE

7/7/24, 9:38 PM
Case 1:20-cv-03590-JEB Document 369-7 Filed 07/12/24 Page 39 of 497
Rohlik's founder Area on adtech and Twitter, Tired loan A16Z AI's Saying Startup | TechCrunch



Fintech

### Feather raises €6 million to go pan-European with its insurance platform for expats

Anna Heim
4 hours ago



Fundraising

### Rohlik rolls up $170M to expand in European grocery delivery and sell its tech to others

Ingrid Lunden
6 hours ago



Robotics

### Robotics investments are gaining speed after post-pandemic slowdown

Brian Heater
16 hours ago



Startups

### Hebbia raises nearly $100M Series B for AI-powered document search led by Andreessen Horowitz

Marina Temkin
16 hours ago



Robotics

### Agility's humanoid robots are going to handle your Spanx

Brian Heater
17 hours ago



Fundraising

### Will AI get an A+ in edtech? MagicSchool raises $15M to find out

Ingrid Lunden
19 hours ago



AI

### Zuckerberg disses closed-source AI competitors as trying to 'create God'

Sarah Perez
19 hours ago



Fundraising

### Andrew Ng plans to raise $120M for next AI Fund

Kyle Wiggers
19 hours ago



🔗 DISRUPT

Series A to B Startup? Join the ScaleUp Program At Disrupt 2024.

LEARN MORE

Varo's 'Consumer-First Approach' To Banking Matters, The Neobank's CEO Says | TechCrunch



Kirsten Korosec
20 hours ago



---

Hardware

## FCC rule would make carriers unlock all phones after 60 days

Devin Coldewey
20 hours ago



---

Transportation

## As battery startups fail, Sila snaps up $375M in new funding

Rebecca Bellan
20 hours ago



---

Security

## Startups scramble to assess fallout from Evolve Bank data breach

Lorenzo Franceschi-Bicchierai, Mary Ann Azevedo
20 hours ago



---

Apps

## Meta starts testing user-created AI chatbots on Instagram

Ivan Mehta
20 hours ago



---

Climate

## Rondo Energy funding shows a new way across the climate startup 'valley of death'

Tim De Chant
21 hours ago



---

Biotech & Health

## Amazon consolidates Amazon Clinic into the One Medical brand

Lauren Forristal
21 hours ago



---

Apps

## Just in time for the debates, Meta fixes bug impacting users' political content settings on Instagram and Threads

Sarah Perez
21 hours ago



---

🔵 DISRUPT

**Series A to B Startup? Join the ScaleUp Program At Disrupt 2024.**

LEARN MORE



**picture mode for Shorts**

Ivan Mehta
22 hours ago



TechCrunch Disrupt 2024

### TechCrunch Disrupt joins forces with Google Cloud for Startup Battlefield 200

TechCrunch Events
22 hours ago



Apps

### Character.AI now allows users to talk with AI avatars over calls

Ivan Mehta
22 hours ago



Apps

### TikTok to challenge Amazon Prime Day with its own sales event in July

Aisha Malik
23 hours ago



Media & Entertainment

### Reliance Jio, Airtel kick off Indian telecom price hike

Manish Singh
23 hours ago



Biotech & Health

### SoftBank forms AI healthcare JV in Japan with Tempus

Kate Park
24 hours ago



Venture

### As Spain gets its latest VC fund, Southern Europe appears to be on a roll

Mike Butcher
24 hours ago



Startups

### Illumex is using GenAI to ease pain of getting good data into LLMs

Ron Miller
24 hours ago



DISRUPT

Series A to B Startup? Join the ScaleUp Program At Disrupt 2024.

LEARN MORE



### extension

Sarah Perez
24 hours ago



AI

### Axelera lands new funds as the AI chip market heats up

Kyle Wiggers
24 hours ago



AI

### ChatGPT: Everything you need to know about the AI-powered chatbot

Kyle Wiggers, Cody Corrall, Alyssa Stringer
24 hours ago



AI

### Orby is building AI agents for the enterprise

Kyle Wiggers
1 day ago



Security

### PortSwigger, the company behind the Burp Suite of security testing tools, swallows $112M

Ingrid Lunden
1 day ago



Commerce

### Amazon hit with fresh class action-style suit in UK — $3.4B in competition damages sought for 200,000+ sellers

Natasha Lomas
1 day ago



Host A Side Event At Disrupt 2024

Raise brand awareness & reach 10,000 tech leaders

LEARN MORE

DISRUPT

Series A to B Startup? Join the ScaleUp Program At Disrupt 2024.

LEARN MORE



archive.

```
https://74ec403411de40118e4395fce7
49d3d7.safeframe.googlesyndicatio
n.com/safeframe/1-0-40/html/contai
ner.html?n=3
```

Load the live page in a new tab (or download the file, if this URL points to a file).

---

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

**Legal**

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

Evolve Bank Data Breach

Meta AI

Fisker

Character.AI

Phone Unlocks

Tech Layoffs

ChatGPT

Facebook      X      YouTube      Instagram      LinkedIn      Mastodon      Threads

© 2024 Yahoo. All rights reserved. Powered by WordPress VIP

DISRUPT

**Series A to B Startup? Join the ScaleUp Program At Disrupt 2024.**

LEARN MORE

# Exhibit 501



Load the live page

**HUFFPOST**

THE BLOG    TECHNOLOGY    FACEBOOK FRIENDS    DIGITAL CONNECTIONS

## Be My Friend: The Staggering Number of Young People's Cell Phone Contacts

A survey in 2011 by the Pew Research Internet Project found that "the average cell phone user has 664 social ties," but a survey done the same year in Great Britain found that the average person had 152 mobile phone contacts.

**By Julie Dobrow, Contributor**
Director, Center for Interdisciplinary Studies, Tufts University; Senior Fellow, Media & Civic Engagement, Tisch College of Civic Life

Sep 22, 2014, 02:39 PM EDT
**Updated** Nov 22, 2014

*This post was published on the now-closed HuffPost Contributor platform. Contributors control their own work and posted freely to our site. If you need to flag this entry as abusive, send us an email.*

  

After her six year-old flip phone had lost keys and was literally falling apart, my parsimonious and independent 20-something daughter finally agreed to let me get her a new one. It seemed to be taking forever to transfer the data from her old phone to her new one. Finally, she asked the Verizon salesman what was going on. "Well," he said, "It does take some time to transfer all of your 623 contacts." 623 contacts! Really? My daughter was nonplussed. "That has to be wrong," she said. But later she checked. There were 623 contacts. Then it was my turn to be nonplussed. I only have 62.

It may be that the number of contacts on my daughter's phone is quite average, but there's an awful lot of variability. A survey in 2011 by the Pew Research Internet Project found that "the average cell phone user has 664 social ties," but a survey done the same year in Great Britain found that the average person had 152 mobile phone contacts.

In a very un-scientific poll with a very un-representative sample, I asked my class of thirty college seniors to take out their cell phones and write down for me the number of contacts they had. While there was some variation in the distribution, the class average was 485. That's a lot of contacts.

I wondered if the larger number of contacts had more to do more with the ever-greater proliferation of cell phones in the past few years (according to Pew, 53 percent of American adults had a cell phone in 2011 and last year that percentage had grown to 97 percent) or with the age of the respondents (Pew reported last year a staggering 78% of American teens owned a cell phone, a far higher concentration in a ten year age bracket than other brackets).

But what's even more interesting than the numbers of kids with phones or the numbers of contacts they have are the reasons young people give for having and retaining them.

One of my students mused that many of the contacts on her cell phone were the numbers of people who had been friends in middle school or at camp. "It's not like I'm in touch with them anymore or would even call them," she said, "but I won't delete them. It's a part of my history. It would be like deleting my past."

Another student suggested that the number of contacts on her phone could be thought of as a measure of social success. "They're not all close friends," she said, "but they all are people I know."

ADVERTISEMENT

But the number of cell phone contacts can also reflect social awkwardness in a few ways. "There are the numbers of women I once dated, or wanted to date," stated one of my male students. Then he hurriedly admitted, "it's mostly women I wanted to date or dated just a couple of times. There aren't actually a lot of them." Why does he keep them on his cell phone? "I'm not sure, maybe to remind me of my own social ineptitude" he said, sheepishly.

The number of cell phone contacts has also been used as a measure of something -- it's not clear just what - by respondents to a poll sponsored by Socialanxietysupport.com. The majority in this poll reported having fewer than 20 contacts. So my student was certainly not alone in talking about the number of his contacts as a metric of social difficulty.

Once upon a time, when these college students were younger, many of them took measure of their social status by their AOL Instant Messenger Buddy List. Complete with its own jargon, spellings, emoticons and the ubiquitous door slam sound, many pre-teens delighted in adding to, categorizing and comparing the number of friends on their lists. Today you can find innumerable online reminiscences by 20somethings reflecting on AIM or MSN Messenger were seminal social experiences of their (earlier) youth. These technologies got supplanted by Facebook, and soon young people began posting, discussing and comparing the numbers of their "Facebook friends."

But what all of this makes me wonder is whether preteens and adolescents have a different sense of what it means to call someone a "friend" and how friendships get referenced, maintained and sustained through their media technologies. The often quoted research by Robin Dunbar suggests that humans have the capacity to have about 150 meaningful relationships. But when a young person reports a few hundred Facebook friends, or says that she or he has over 600 cell phone contacts, does he or she really mean that these are "friends," someone with whom they have a meaningful relationship? Probably not.

In a pair of studies reported in *Psychology Today,* researchers found that young people tended to rank the Facebook profiles of those with larger numbers of Facebook friends (over 300) as less appealing than those who had fewer. The researchers speculated that students viewed those with more Facebook friends as people who spend too much time in the cyber world and not able to make real face-to-face connections.

ADVERTISEMENT

And danah boyd has concluded in her significant research about how teens use media to navigate, reinforce and maintain friendships and determine social hierarchies that while social media have given teens other ways to reach out to others, especially outside of school, that the friendship groups made in school are still the most profound.

"Part of what makes the negotiation of Friendship on social network sites tricky is that it's deeply connected to participant's offline social life," she suggests.

> "Their choice of friends online is not a set of arbitrary personal decisions; each choice has the potential to complicate relationships with friends, colleagues, schoolmates, and lovers. Social network sites are not digital spaces disconnected from other social venues -- it is a modeling of one aspect of participants' social worlds and that model is evaluated in other social contexts."

So what does having 623 cell phone contacts mean? "Probably that it's time to reevaluate " says my daughter.

**RELATED**



TECHNOLOGY    FACEBOOK FRIENDS    DIGITAL CONNECTIONS

< GO TO HOMEPAGE

Suggest a correction    Submit a tip

**FROM OUR PARTNER**



**Nancy Sinatra Destroys Donald Trump With Her Kickass Tweets**

HuffPost



**Britney Spears Turns Up The Heat With Topless Bikini Photo**

HuffPost



**A Braless Kim Kardashian Stole The Show At Kanye's Concert (NSFW)**

HuffPost

Recommended by Outbrain

## WHAT'S HOT

**5 Things To Know About Britain's New Prime Minister**



**Mandy Moore Shares Health Update While She Awaits Her Third Child**



**Liz Truss, Shortest-Serving PM In British History, Loses Seat In U.K. Election**



**The 1 Food You Should Eat More Of As You Age**



## MORE IN TECH

**Elon Musk Says He'll Ban iPhones For Staff If Apple Integrates ChatGPT Into Its Devices**



**Why Donald Trump Decided To Join TikTok**



Case 1:20-cv-03590-JEB   Document 369-7   Filed 07/12/24   Page 50 of 497

**Major Social Media Sites Are Failing LGBTQ+ People: Report**



**Scarlett Johansson 'Shocked, Angered' After OpenAI Bot Has Voice Eerily Like Hers**



**Billionaire Frank McCourt Planning Bid To Acquire TikTok's U.S. Operations**



**Bumble Apologizes For Billboard Ad Saying 'A Vow Of Celibacy Is Not The Answer'**



**Neuralink Reveals Issues With First Human Brain Implant After Surgery**



**First Amendment Law Firm Recruiting TikTok Creators To Challenge Possible Ban: Report**



**China Orders Apple To Remove WhatsApp, Threads From App Store**



**X.com Gives Free Blue Checks To Some Users, But Not Everyone Is Happy**



### HUFFPOST

NEWS                          POLITICS
ENTERTAINMENT                 LIFE
VOICES                        HUFFPOST PERSONAL
SHOPPING                      NEWSLETTERS

ABOUT US                      ADVERTISE
CONTACT US                    RSS
FAQ                           CAREERS
USER AGREEMENT                COMMENT POLICY

| | |
|---|---|
| DMCA POLICY | HUFFPOST PRESS ROOM |
| ACCESSIBILITY STATEMENT | PRIVACY POLICY |
| CONSENT PREFERENCES | DO NOT SELL OR SHARE MY PERSONAL INFORMATION |

Part of HuffPost News. ©2024 BuzzFeed, Inc. All rights reserved.

The Huffington Post

# Exhibit 502

**Bundeskartellamt**

**6th Decision Division**

B6-22/16

---

**ADMINISTRATIVE PROCEEDINGS**

**Decision under Section 32(1) German Competition Act (GWB)**

**- Public version -**

---

# Decision

In the administrative proceedings

1.  Facebook Inc., […], Menlo Park, […], U.S.A.

- Party under 1. -

2.  Facebook Ireland Ltd., […], Dublin, Ireland,

- Party under 2. -

3.  Facebook Deutschland GmbH, […], Hamburg

- Party under 3. -

Authorised representatives of 1. -3.:
[…]

4.  Verbraucherzentrale Bundesverband e.V., […] Berlin

- Third parties admitted to the proceedings -

the 6th Decision Division of the Bundeskartellamt has decided on 6 February 2019:

1. The parties 1-3, including any associated companies pursuant to Section 36(2) GWB, are prohibited from using terms of service including specific provisions of data and cookie policies and similar contractual terms which stipulate that the private use by users[1] residing in Germany of the service available under the web addresses facebook.com and facebook.de and via the mobile "Facebook" app (both offers hereinafter referred to as *Facebook.com*) is conditional on the following:

   a.  *Facebook.com*'s operating company can collect user and device-related data collected and saved from private users residing in Germany when using *WhatsApp, Oculus* and *Masquerade* and – without the user's consent - combine these data with their data collected and saved while using Facebook.com and use the data;

   b.  *Facebook.com*'s operating company can – without the user's consent - combine user and device-related data collected from private users residing in Germany when using *Instagram* with their data collected and saved while using Facebook.com and use the combined data;

   c.  Facebook.com's operating company or a corporate provider of the programming interfaces (*Facebook Business Tools*) can – without the user's consent - collect any user or device-related data from users residing in Germany via programming interfaces that are integrated into websites or apps to create *social plugins*, *Facebook Login* and *Account Kit*, as well as measurement and analysis services based on *Facebook Pixel* and *Facebook SDK*, when users use websites or mobile apps by third-party providers, combine the data with data collected in the context of the use of Facebook.com and use the data *;*

   where, in particular, the first paragraph of section 2 of the current terms of service ("*Our Data Policy and Your Privacy Choices*"), which contains provisions stating that personal data is collected and used to provide the services and that the user can refer to the data policy to learn how his data is collected and used, is specified by the following guidelines:

   -   the provision which is currently section I of the printable version of the Facebook Data Policy ("What kinds of information do we collect?") explains that the collection of information provided by the user, device-related information and information provided by partners applies to all so-called "Facebook Products", which include, according to the given definition, all products of the Facebook

---
[…]

group including corporate services and Facebook Business Tools, which are used by so-called "Facebook Partners" to send information;

- the provision currently contained in section II of the printable version of Facebook's Data Policy under the headline "*How do we use this information? - Provide, personalize and improve our Products*", bullet point "*Information across Facebook Products and devices*", explains that the data collected are used across all Facebook Products for provision and personalisation, including information on the users' activities on various Facebook Products and devices, to provide the user with a tailored and consistent experience on all Facebook Products wherever they are used;

- the provision currently contained in section II of Facebook's Data Policy under the headline "*How do we use this information? Provide measurement, analytics, and other business services*" explains that the available information including activities outside of Facebook Products, e.g. websites visited and ads viewed is used to help advertisers and other partners measure the effectiveness and distribution of their ads and services and understand the types of people who use their services and how people interact with their websites, apps, and services;

- the provision currently contained in section II of Facebook's Data Policy under the headline "*Promote safety, integrity and security*", "*Communicate with you*", "*Research and innovate for social good*" explains that the available information is used to promote protection, integrity and security, to communicate with the user and to research and innovate for social good;

- the provision currently contained in section IV of the printable version of Facebook's Data Policy under the headline "*How do the Facebook Companies work together?*" explains that information on the user is processed across the so-called "Facebook Companies" as permitted by applicable law and in accordance with their terms and policies to provide an innovative, relevant, consistent and safe experience across all products provided by the Facebook Companies, which, pursuant to this provision, include Oculus and Oculus Ireland Ltd., WhatsApp Inc. and WhatsApp Ireland Ltd., and Masquerade;

- the provision currently contained in Facebook's Cookies Policy under the headline "*Where do we use cookies*", which is referred to in the Data Policy ("*What kinds of information do we collect - Device Information*"), explains that Facebook places cookies on the computers or devices to receive information stored in cookies when the user uses or visits Facebook Products, Products provided by other members of the Facebook Companies and websites and apps provided by other

companies that use the Facebook Products including Facebook Business Tools, and stipulates that Facebook receives this information including device-related information and information on the user's activities without any further user action once the user visits websites and apps meeting the criteria specified above;

- the definition currently given in Facebook's Cookies Policy under the headline "*Cookies & Other Storage Technologies*" extending the aforementioned provisions on the use of cookies to other technologies, including the data saved by Facebook on the user's web browser or device, identifiers linked to that device and other software.

2. The parties 1-3, including any affiliated companies pursuant to Section 36(2) GWB, are prohibited from implementing the Facebook terms of service including the Facebook data and cookies policies within the meaning of paras 1.a. to c., in particular as far as the following aspects are concerned:

   a. Collection of the phone number indicated by private users upon registration for *WhatsApp*, their device identifications, operating system versions, app versions, platform information, country code, network code, identifiers allowing to track the user's agreement with updates and control options and information on when WhatsApp was last used, information on when the account was registered and how and how frequently features were used, and other user and device-related information, and combination of this information with data collected and saved while the users were using Facebook.com, e.g. via a family device ID and matching the information with the users' Facebook IDs, and use of that information.

   b. Collection of the user and device-related information of private users of *Oculus* and *Masquerade*, e.g. account information, content created, meta data, transaction data, payment information, device information, device IDs, cookie and pixel information, information on the use of third-party websites or apps and location data and combination of this information with data collected during their use of Facebook.com, e.g. via Facebook Login, the user's email address or device IDs, and matching this information with their Facebook IDs, and use of that information.

   c. The combination of information and content provided by private users of *Instagram*, their networks and connections on *Instagram*, information on their use of Instagram, transactions carried out on *Instagram*, other people's activities and information others provided on a user, information on the terminal device used for accessing Instagram including device attributes, processes on the device, identifiers, device signals, data from the device settings, network and connections, cookie data and information provided by partners of Instagram with data collected and stored during

their use of Facebook.com, e.g. via a family device ID and matching this information with the users' Facebook IDs, and use of that information.

d. Collection of private users' device information, information on websites visited, purchases made, advertisements viewed and information on usage collected via *Facebook Business Tools* which are used by advertisers, app developers and publishers ("Facebook Partners") via the following APIs,

– If *social plugins* are integrated by Facebook Partners to collect, in particular, the IP address, the browser type, the URL, the website visited and the time of visit, as well as the user ID, which is retrieved from the cookie, the website, date and time; if an app is integrated the collection of information on the app provider, the app ID, the operating system used, the device model, screen size, processor cores, total storage space, name and version of the app used, the so-called "User-Agent-String" (browser information), IP address, time zone and the corresponding "SDK events".

– If *Facebook Login* and *Account Kit* are integrated by Facebook Partners to collect the same amount of data as with social plugins for websites and mobile apps plus, in particular, login information the users enter manually, as well as error messages containing the user ID.

– If *pixel and SDK-based measurement and analysis services* are integrated by Facebook Partners to collect, in particular, the http header's data set, IP addresses, browser information, site storage location, document information, referrer (website via which the user accessed the current website), information on the user, pixel-specific data like the pixel ID and the Facebook cookie, click data and configured "events", device information including the advertising ID, cookie data and hashed user identifiers

and its combination with data collected and saved while these users were using Facebook.com, e.g. via cookie data, device IDs, a comparison of further device-related data, hashed user IDs in the context of "advanced matching" by matching this information with the Facebook ID, and its use.

3. The parties 1-3, including any affiliated companies pursuant to Section 36(2) GWB, are obliged to implement the following remedies to terminate the conduct prohibited in paragraphs 1 and 2:

a. Terminate or adjust the contractual terms prohibited in paragraph 1 and the implementation of contractual terms prohibited in paragraph 2 within 12 (twelve) months.

b. Within 12 (twelve) months after the date of enforceability of the decision, when adjusting the terms and conditions, also in the Facebook terms of service and data policies or similar documents specifying them, expressly clarify the following:

- Collection of private and device-related user data from WhatsApp, Oculus and Masquerade and combination with data collected and stored from their use of Facebook is subject to the user's consent and will not take place without it.

- Collection of private and device-related user data from *Instagram* and combination with data collected and stored from their use of Facebook and use for *Facebook.com* is subject to the user's consent and will not take place without it.

- Collection of private user and device-related data from websites or mobile apps via *Facebook Business Tools* and combination with the data collected and stored from their use of Facebook and use for *Facebook.com* is subject to the user's consent and will not take place without it.

c. Present within 4 (four) months an implementation plan detailing which measures the parties intend to take to fulfil the obligations under paragraph 3 and in which steps and at which points in time these measures will be implemented.

4. Users are not deemed to have given their consent within the meaning of paragraphs 1 to 3 if the provision of the Facebook.com service is conditional on the users' consent to the collection and combination of data.

5. If a request to restore the suspensive effect of the appeal pursuant to Section 65(3) sentence 3 GWB is filed within a period of 2 (two) months upon receipt of the decision, the deadlines for implementation stipulated in paragraphs 3.a. to c. are extended once by 2 months. The suspension begins upon receipt of the request by the appeal court and ends upon termination of the expedited proceedings on this request at first instance.

6.  The administrative fee for the proceedings, including this decision, amounts to […] and is payable by the parties to the proceedings.

7. The Bundeskartellamt reserves the right to revoke paragraphs 1 to 6 of this decision in full or in part.

<u>**Reasons:**</u>

**A.  Statement of facts**

**I.  Facebook**

**1.  The Facebook group**

1    The Facebook group develops and operates various digital products, online services and applications for smartphones (hereinafter: **apps**). Facebook's parent company is Facebook Inc., which is headquartered in Menlo Park/USA. Hamburg-based Facebook Germany GmbH and Dublin-based Facebook Ireland Ltd. are wholly-owned subsidiaries of Facebook Inc. (all companies together are hereinafter referred to as **Facebook**).

2    Facebook Inc. is owned by a large number of different investors. The largest share (28%) is held by the company's co-founder and chairman of the Board of Directors, Mark Zuckerberg. Further shareholders are Facebook co-founders Dustin Moskovitz and Eduardo Saverin. Facebook employees hold another large part of (free float) shares. The remaining shares are also held by a large number of investors.

3    The company's products include the "Facebook" service, which was developed by Mark Zuckerberg and is financed through advertising. It comprises the "Facebook Messenger" communication service and other products offered under www.facebook.com (also accessible in Germany via www.facebook.de, which forwards the query to www.facebook.com). The service is hereinafter referred to as **Facebook.com, which is specified under 2.** According to the impressum, the European provider of the Facebook.com services is Facebook Ireland Ltd.[2]

4    Besides Facebook.com, Facebook also offers the **Instagram** service, which was previously operated by the separate group Instagram Inc., San Francisco/USA.[3] Facebook acquired Instagram Inc. in 2012. Since 25 May 2018 Instagram has been operated by Facebook Ireland Ltd. too. Instagram is a mostly mobile service for sharing photos and videos (see details under **3.**).

5    The business purpose of Facebook Germany GmbH is to support Facebook Ireland Ltd. in the areas of advertising, communications and public relations work.[4] Facebook

---

[2]   https://www.facebook.com/legal/terms?ref=pf , […]

[3]   […]

[4]   Excerpt from the German register of companies, ref. HRB 111963: "The purpose of this company is to support the online network platform Facebook by providing any type of services in the areas of sales, marketing, commercial development, technology research and development, public relations and communications as well

Payments Inc., Menlo Park/USA[5], which supports payments made in various Facebook services, is part of the Facebook group too.

6    In addition to that, the Facebook group owns further subsidiaries, which also offer online services and apps:

7    First of all, **WhatsApp Inc.**, Menlo Park/USA offers the "WhatsApp" mobile app via its Irish subsidiary WhatsApp Ireland Ltd., Dublin. The WhatsApp communication service was launched in 2010 and acquired by Facebook Inc. in 2014. WhatsApp users can exchange text messages, pictures, videos, audio files, locations, documents and contacts, both between individual users and in groups (see details under **4** below).

8    In 2016 Facebook acquired Minsk-based **Masquerade Technologies Inc.**, which offers the "Masquerade" (MSQRD) app for editing and sharing pictures with filters and masks. Masquerade is used by […] people in Germany each month.[6]

9    Facebook Technologies LLC (formerly **Oculus** VR, LLC), Menlo Park/USA[7] specialises in developing "Virtual Reality" headsets. It manufactures the hardware required for virtual reality products like the VR headsets Rift and Gear VR and operates a platform for users to upload or download contents like virtual reality games. In Europe these products are provided by Facebook Technologies Ireland Ltd. […] people in Germany use Oculus Rift and Oculus Gear each month.[8]

10   Facebook Inc. has owned the Israeli company **Onavo Inc.**[9] since 2013. The latter offers mobile apps optimising the use of memory and data plans ("Onavo Extend") by identifying the apps which require the largest data volume, and mobile apps to protect private data when using public WiFi networks ("Onavo Protect", hereinafter: **Onavo**). The company also offers "Onavo Insights", which provides companies with analytical data on the use of apps and consumer trends in the areas of online gaming, social networks, finances and entertainment.

11   Facebook Inc. acquired the analysis service **CrowdTangle Inc.** in 2016. Among other things, the service shows companies how to spread their content online and how such content becomes "viral".[10]

---

as any other commercial, administrative or IT-related service to the Facebook group" (Bundeskartellamt unofficial translation, original version accessed on 21 March 2017, […].

[5]   cf. https://www.facebook.com/payments_terms/privacy Version: 30 December 2013, […]

[6]   […]

[7]   https://www.oculus.com/ ; […]

[8]   […]

[9]   Cf. http://www.onavo.com/privacy_policy/ , Version of 14 December 2018,[…]; the data policy having been modified, data processing from this service is no longer subject of the proceedings.

[10]  http://www.crowdtangle.com/features, […]

12    In 2014 Facebook Inc. acquired the Finnish company ProtoGeo Oy, which operated
      the mobile fitness app **Moves** with a patented algorithm. The app created an exact
      motion profile of each user and gave an overview of the calories used and distances
      covered. According to Facebook's statements, this app was withdrawn from the market
      effective 31 July 2018.[11]

13    The total turnover of Facebook Inc., 98%[12] of which was generated through advertising,
      amounted to approx. 55 billion US dollars in 2018[13].

### 2.  Facebook.com

14    Under the umbrella of Facebook.com, the Facebook group provides a range of
      products and services addressing various groups.[14] Its offers include the social network
      Facebook, which primarily addresses private users and publishers (see a.). For
      advertisers Facebook offers various products linked to the social network and other
      services of the Facebook group (see b). In addition, Facebook.com includes the
      Facebook developer platform ("Facebook for Developers"), which offers third-party
      companies further software products and programming interfaces for developing their
      services, i.a. via "Facebook Business Tools" (see c.).

### a.  Social network

15    Facebook's core product is its social network, which can be accessed in Germany via
      www.facebook.de and www.facebook.com. Facebook's social network was founded in
      2004 by a group of students including Mark Zuckerberg. It has been available in
      Germany since 2008.

16    The network's user numbers have been rising continuously since its foundation.
      Facebook has various ways of determining its user numbers: It indicates both its daily
      active users (DAU) and its monthly active users (MAU). Daily active users are defined
      as registered Facebook users logging on to Facebook.com either via the website or a
      mobile device to browse the site, or as registered Facebook users using the Facebook
      Messenger App, on a given day.[15] Monthly active users are defined as registered
      Facebook users who in the last 30 days have logged on to Facebook.com either via

---

[11]  https://newsroom.fb.com/news/2018/07/hello-tbh-moving-on/ , […]

[12]  Facebook, 2017 Annual Report, p. 9 (downloadable from
      https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/FB_AR_2017_FINAL.pdf, […]

[13]  Facebook, Facebook Reports Fourth Quarter and Full Year 2018 Results , […]

[14]  […]

[15]  […]

the website or a mobile device to browse the site, or as registered Facebook users using the Facebook Messenger App.[16]

17   In December 2018 Facebook had 1.52 billion daily active users and 2.32 billion monthly active users.[17] In November 2018 the number of users in Germany was still increasing, with 23 million daily active users and 32 million monthly active users.[18]

18   The network and its various functions are mostly used by private users (see (1). It is also used by commercial publishers (see (2).

**(1) Private user applications**

19   German users can access Facebook.com either via their browsers, typing in the address www.facebook.com or www.facebook.de, or via the Facebook app on their mobile devices. The company does not charge a monetary fee for using Facebook.com or downloading the app.

20   Facebook.com offers private users a range of functions to connect with their friends and acquaintances and share contents with them. Facebook describes the key functions of its social network as "connect", "communicate", "share", and "discover".[19]

21   Private Facebook.com use is subject to registration by creating a user profile. Users create their own profiles which are the basis for their personal Facebook sites. Using their real names, users can enter information on themselves and set a profile picture. Additionally, users can enter information on their relationship status, current place of residence, past and present workplaces, interests and religious and political views. Based on this information, Facebook.com creates a personalised site for each user, which is subdivided into three subsites: the profile page, the start page and the "find friends" page.

22   Besides the personal information users enter, the profile page also contains the "timeline", which has been available in Germany since 2011. It lists and displays all activities of each user in an inverted chronological order along a timeline. It also contains a list of "friends", i.e. a list of people with their real names and profile pictures with whom the user is connected in the social network. Users can determine which type of information is visible for whom.

---

[16]   […]

[17]   Facebook, Facebook Reports Fourth Quarter and Full Year 2018 Results , […]

[18]   https://allfacebook.de/zahlen_fakten/offiziell-facebook-nutzerzahlen-deutschland (in German, last accessed on 10 January 2019); […]

[19]   […]

23    The "find friends" page allows users to find people by applying targeted search parameters (name, place of residence, school, employer). Facebook.com also applies an algorithm to suggest people the user probably knows as potential new "friends". Users can also upload their e-mail directories or the contact lists on their smartphones to find registered Facebook users. To connect with other Facebook users, they have to send a friendship request which the respective user can accept or decline.

24    Users can also found or join groups. Groups are networks which have been set up to discuss mutual interests or to meet specific communication requirements. Their visibility can be restricted to members (secret groups), group membership can be subject to approval by a moderator and any comment made in such a group is not publicly visible (closed groups), or they can be open to everyone and all comments are public (open groups). Each group belongs to a certain category, e.g. hobbies and interests, sports, school and education, buy and sell, etc.

25    The start page is the central communication area. It contains the "news feed" displaying recent information ("posts") provided by the users' friends or by publishers and companies (see (2) below) which the user either subscribed to or which he marked by clicking on the "like" button. An algorithm sorts the posts in the news feed by relevance for each user based on his data.

26    The users' own "status reports" are a key feature of the news feed. Users can choose to share their own posts with friends (and messenger contacts) or the general public. Depending on their relevance, these posts then appear either in the friends' news feeds or across the entire network. Users can share their thoughts and include, e.g., a picture, a video or their current location. They can also select an activity (e.g. "feeling", "watching", "reading", "listening to" etc.) from a long list and further illustrate their mood by choosing from a large variety of "emoticons" (smileys to match their current mood). Users can also integrate third-party content by clicking on a "social plugin" (e.g. "Like" or "Share") on external websites or apps. By doing so, they create a hyperlink with website preview in their friends' personal newsfeed for them to comment on or share with others.

27    Users can also communicate bilaterally or in small groups in real time via the **Facebook Messenger** ("chats" and "chat rooms") exchanging text messages, photos, videos or audio files. The Messenger can also be used for voice and video calls. Since 2011 Facebook Messenger has been offered as a messaging tool for Facebook.com users as part of the social network. It is a part of the service which is pre-installed in the desktop version of the Facebook website and exclusively accessible via

Facebook.com. The Messenger has been available as a separate app for mobile devices since 2014[20], also for users who do not have a Facebook account.

28    Since August 2017 Facebook has also been offering Facebook Marketplace as a sales platform which can be accessed via the social network's start page. Users can create free classifieds to buy or sell (used) things.[21] Facebook Marketplace is a supplement to users' sales activities in the buy and sell groups mentioned above.

29    Facebook offers further functionalities through its social network, e.g. event organisation, job search, weather forecasts or fundraisers. There are plans to include a dating function and a video-on-demand platform (Facebook Watch) in future. Facebook Watch is already available in the USA.

30    Private users are also offered a variety of apps created by third-party providers on the basis of a developer platform. Apps developed for Facebook by third-party providers are available to users of the social network via the "App Center". Such apps are mostly games of all kinds which can be played as "Instant Games" on Facebook.com, some of them interactively with other users. There is also a separate app, "Gameroom", which can be installed on computers or mobile devices to continue the game with the achieved score on several devices. A Facebook account is required for using the app.

31    Any payment required by Facebook.com, e.g. in-app purchases in games or fundraisers, is to be made with "Facebook Payments". Facebook Payments supports various forms of payment like credit or debit cards, Facebook coupons or payments via the mobile virtual network operator.[22] In return for its services Facebook receives a share of the revenues from the providers.

### (2) Publisher applications

32    Facebook offers **publishers** the opportunity to use the social network as a space for publishing their own contents. For this purpose, companies, associations or individuals can create their own Facebook "pages" free of charge. Publishers can spread their contents on Facebook, connect with users through "subscriptions" and "likes", and increase their reach as a result.

33    Operating a Facebook business page is subject to registration with either a personal Facebook account or a "Business Manager" account[23]. When creating its site, a

---

[20]  […]

[21]  https://www.heise.de/newsticker/meldung/Facebook-Flohmarkt-Marketplace-startet-in-Deutschland-3801730.html (last accessed on 10 January 2019).

[22]  Cf. https://www.facebook.com/payments_terms, […]

[23]  Cf. https://www.facebook.com/business/learn/how-business-manager-works/guide , [...]

business can choose from the categories "company or brand" and "community or public figure", each with various subcategories, and set up its page in a way that is similar to users' personal pages. By communicating on Facebook.com, e.g. by "sharing" contents with the personal network, site contents can be spread.

34   Users who have subscribed to a business site receive the contents published by that business in their newsfeeds. Publishers can use "Instant Articles" to host their contents directly on Facebook.com, making it unnecessary to redirect users to the general website Facebook.com in order to read an article or watch a video. The content is therefore readily and quickly available to users, and the users stay on the Facebook platform.

35   Publishers can also advertise and monetise their content by using the Facebook ads manager for Facebook.com or the Facebook Audience Network (see b. below) for their websites. By integrating "Facebook Analytics" and using further Facebook measurement and analysis tools (see c. below), companies can access the information Facebook collected on user behaviour with regard to their contents[24] and thus optimise their interactions and advertising activities.

36   According to publicly available figures, approx. 70 million companies worldwide used the Facebook pages in the fourth quarter of 2017.[25]

b.  **Online advertising**

37   Facebook uses online advertising to fund its social network. Advertisements can be published on Facebook.com, Facebook Messenger, Instagram or on third-party websites which are part of Facebook's advertising network (the "Facebook Audience Network") via the so-called Audience Network SDK. The ads match a user's individual profile. The aim is to present the user with ads that are potentially interesting to him based on his personal commercial behaviour, his interests, purchasing power and living conditions ("targeting", "targeted advertising", "interest-based advertising", "personalised advertising"). In December 2018 the "Average Revenue per User" (ARPU) per quarter was 10.98 US dollars in Europe and 7.37 US dollars worldwide.[26]

---

[24]  [...]

[25]  Cf. https://allfacebook.de/toll/state-of-facebook ; figures relating to Germany are confidential.

[26]  Facebook, Facebook Reports Fourth Quarter and Full Year 2018 Results, https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q4/Q4-2018-Earnings-Presentation.pdf, [...]

### (1) Advertising on Facebook

38    Advertising on Facebook.com is subject to registration with a personalised Facebook account or a Business Manager account and a Facebook "page". Advertising customers can create their ad campaign using the "Ads Manager". They can specify their advertising objectives and audience.

39    Via the ads manager advertisers can decide where to place their ads or rely on Facebook.com to place the advertisement automatically wherever it is most likely to achieve the best results.[27] Advertising space is available on Facebook's social network and the Messenger. Advertisements are displayed both in the users' newsfeeds, where they are marked as "sponsored", and in the right column of the users' start page. If requested, users can be redirected directly to the online shop by clicking on the advertisement.

40    Since 2014 there have been additional advertising opportunities on Instagram, and further opportunities will be available on WhatsApp as of 2019.[28] Advertisements can also be spread via third-party websites and apps outside Facebook if they are connected to the Facebook Audience Network. Facebook acts as an agent between advertisers and third-party websites or apps and thus expands the Facebook group's scope of advertising with this network. Facebook's agency services are subject to a commission paid by the advertisers.

41    Further advertising space is available in the form of **instant articles** and **in-stream videos** displaying advertisements when users view media contents.[29] In addition to that, **Facebook App Ads** gives mobile app providers the opportunity to advertise their apps on Facebook.com, Instagram or the Facebook Audience Network. The advertisement contains a direct link to Apple's app store, Google's PlayStore or Kindle's Fire Store, where the mobile app can be downloaded. App Ads can also be used to once again specifically contact those users who have already downloaded an app to entice them to carry out further activities in the app.[30]

42    Advertisers can set the budget and timeline for their campaigns and create their contents by selecting a format, uploading photos and deciding on the content. The decision of which advertising space to allocate to whom is made in an auction

---

27    […]

28    https://www.heise.de/newsticker/meldung/Werbung-bei-WhatsApp-Jetzt-wird-Geld-verdient-4128652.html , in German, last accessed on 10 January 2019).

29    see information provided by Facebook in its advertising manager under "Placements for an Ad".

30    https://de-de.facebook.com/business/learn/facebook-create-ad-app-install-engagement, […]

process.[31] Advertising products are paid for based on "cost per click", "cost per action" or "cost per thousand impressions (CPM)".[32]

### (2) Targeting and refining audiences

43   Facebook offers various options to refine the criteria for a target audience for each ad.

44   Audiences can be specified based on their location, age, sex, language and other demographic data, interests and behaviour in the **Ads Manager**. The location can be further specified based on the following criteria: „Everyone in this location", „People who live in this location", „People recently in this location", „People travelling in this location". Age can be specified by exact age categories, with 13 being the minimum age and 65+ being the highest age category. The following subcategories are available for demographic data: "Education", "Financial", "Generation", "Home", "Life Events", "Parents", "Politics", "Relationship". "Interests" are further specified as "Business and Industry", "Shopping and fashion", "Food and drink", "Family and relationships", "Fitness and wellness", "Hobbies and activities", "Sports and outdoors", "Technology", and "Entertainment". "Behaviours" are categorised as "Automotive", "Digital activities", "Expats", "Financial", "Anniversary", "Purchase behaviour", "Consumer classification", "Multicultural affinity", "Mobile device user", "Travel", "Residential profiles", "Seasonal and events", "Home owners", etc. Each of these categories can be further specified, e.g. as "In a Civil Union", "Divorced", "Separated", "In a relationship", "It's complicated", "In a Domestic Partnership", "Open relationship", "Single", "Engaged", "Married", "Widowed", etc. in the case of the "Relationship" category.

45   By using **Custom Audiences**, advertisers can target an audience which matches precise criteria. The customer data they upload to the Facebook server are matched with data collected on the social network to create their own target group, which consists of users identified as relevant to their campaigns. They can save their target group in the Ad Manager and use it for campaigns on Facebook.com, Instagram or the Facebook Audience Network. Facebook offers various types of Custom Audiences.[33]

46   A special Facebook interface ("Facebook Pixel", see details under c. below) allows advertisers to use their list of customers as a basis for a Custom Audience. It shares the data with Facebook in encrypted form. The data contains different pieces of information on the target person (e.g. first and last name, phone number, e-mail address, town, country, date of birth, age, sex, Facebook ID or mobile advertising IDs

---

[31]   […]

[32]   […]

[33]   […]

to identify smartphones, e.g. Android's Advertising ID (AAID) or Google's "Apple's Advertising Identifier (IDFA).[34]

47   Custom Audiences can also be based on information about which users have visited the advertiser's website[35] or app[36], allowing them to address Facebook users who have visited the advertiser's website in the last 30 days or who have viewed specific products.

48   Another option is to build a Custom Audience based on data on Facebook users' engagement with the advertiser's content ("Engagement Custom Audiences").[37] "Engagement" refers to activities on Facebook.com like viewing a video or an advertisement.

49   Advertisers can also create **Lookalike Audiences** with Facebook users who are "similar" to their customers and are thus potentially interested in their products.[38] Lookalike Audiences are based on a "source audience", which can consist of a list of existing customers, a Custom Audience of the advertiser, a list of users of a particular Facebook site or users having been determined as potential buyers on one of the advertiser's websites.[39] Facebook analyses the source audience with regard to commonalities between the members of the target group (personal aspects like age, employer, industry, region, etc. or online behaviour, response to advertising, etc.). Facebook then looks for users sharing these characteristics. These users are the "Lookalike Audience", which is added to the advertiser's target group and which can be further specified by applying the targeting options described above.[40]

c.   **Developer platform and Facebook Business Tools**

50   Under the umbrella of "Facebook Business Tools", Facebook offers businesses a variety of tools and products to utilise the network's reach and information as well as the access to Facebook users for various business purposes. Facebook claims that these products are meant to help businesses "integrate, use and exchange information with Facebook."[41] The products address website owners, developers, advertisers and other companies, who can incorporate Facebook's pre-defined Application

---

[34]   https://www.facebook.com/business/help/570474483033581?helpref=page_content, […]

[35]   https://www.facebook.com/business/help/449542958510885/?helpref=hc_fnav , […]

[36]   https://www.facebook.com/business/help/1472206006327390/?helpref=hc_fnav , […]

[37]   https://www.facebook.com/business/help/1707329062853572/?helpref=hc_fnav , […]

[38]   […]

[39]   https://www.facebook.com/business/learn/facebook-ads-lookalike-audiences) […]

[40]   […]

[41]   Facebook Business Tools Terms under https://www.facebook.com/legal/terms/businesstools [...]

Programming Interfaces (APIs) into their own websites, apps and online offers or offers on the Facebook platform via a configurator. Facebook does not charge a monetary fee for this service.

51    Facebook describes various tools on the "Facebook for Developers" site: Currently these are "Account Kit", "App Ads", "App Links", "Audience Network" "Facebook Analytics", "Facebook Business SDK", "Facebook-Login", "Facebook Pixel", "Groups API", "Instagram Graph API", "Marketing Graph API", "Messenger Platform", "Pages API", "Places Graph" and "Workplace". The products "Audience Network", "Instagram Graph API", "Instant Articles", and "Live Video API" are listed under "Publishing". The tab *Social Integrations* lists the "Group Plugin", "Instagram Graph API" again, "Sharing" and the subcategory "Social Plugins" with the tools "Group Plugin", "Save", "Like, Share, Send & Quote", "Embedded content and video player", "Page Plugin", "Comments" and the "Messenger Plugin". There is also a Gaming tab listing "Facebook Gameroom", "Game Payment", "Games on Facebook", "Instant Games", "PC Games SDK" and "Unity SDK". The site also lists "AR Studio" (formerly "Camera Effects Platform" and the artificial intelligence service "wit.ai").

52    There are various applications of Facebook Business Tools. Essentially businesses can use the products to interact with Facebook users on the company website (outside Facebook.com) and initiate actions both on the social network and on their own websites or apps (especially social plugins, Facebook Login, Account Kit). Businesses can also use the products to develop and/or incorporate contents and apps on the Facebook platform or their own Facebook company pages (e.g. Pages API, Live Video API, Graph API, Games on Facebook). Facebook Business Tools also inform companies about different kinds of Facebook user behaviour with regard to the company (measurement and analysis tools like Facebook Analytics or Facebook Pixel).

53    The products Facebook describes as individual tools overlap in some aspects and can, for example, be part of another tool. The APIs, SDKs, Pixel and Plugins described above are normally the technical basis for the products which are based on them, e.g. by linking the business website to Facebook and giving access to the Facebook platform. Facebook Analytics, for instance, requires Facebook Pixel, Facebook login requires Facebook SDK, Games on Facebook can be realised with Unity SDK or other tools, and the Facebook Payment API is available for games payments.

54    For the present proceeding especially the tools linking Facebook.com with companies operating websites or apps outside of and independently from Facebook.com are relevant. Of the products described above, these are mostly the **social plugins** (see

(1) **Facebook Login** and **Account Kit** (see (2), Facebook Analytics and other measurement and analysis tools requiring **Facebook Pixel** or **SDK** (see 3).

### (1) Social plugins

55  With incorporated social plugins companies allow users of their apps or websites to integrate and share their contents in the Facebook.com social network in various ways. Plugins serve to create buttons in a website or app which allow users different types of "social actions". The following social plugins are available from the Facebook for Developers website: "Comments", "Embedded comments", "Embedded posts", "Embedded video player", "Group Plugin", "Like" button, "Page Plugin", "Quote Plugin", "Save" button, "Share" button.

56  The best-known and most used plugin is the "**Like**" button. When activated on third-party websites or apps, the button connects the user's "Like" of the site and displays the website or content in the Newsfeeds of his/her Facebook friends.

57  The "**Share**" button is also a widely used plugin. Users can share content of websites or apps outside of Facebook.com with their Facebook friends and at the same time publish a status report containing a comment on that content.

58  Many websites and some apps also contain Facebook's "**Page plugin**". With this plugin the publisher's Facebook page can be incorporated into the company website in full or in part. Depending on the configuration, visitors can also use the Like and Share functions via this plugin and subscribe to (or "follow") the company on Facebook via its website.

59  The **"Comment" plugin** is also used on many websites and in some apps. Using their Facebook accounts including the profile picture users can discuss topics on the website and mark postings as "Liked". The "**Embedded comments**" plugin serves to transfer comments made on Facebook.com regarding the website or app or its respective content to the website or app and display them there as well. Public posts can be transferred to and displayed on websites or apps with the "**Embedded content**" plugin. The "**Embedded video player**" serves to show Facebook videos on other websites or in apps. The "Quote" button is less significant. It can be used to share a text passage selected on a website on Facebook.com. The "**Save**" button lets users save articles or services on a private list on Facebook.com. They can also share it there and receive notifications. The "**Group plugin**" is a new feature allowing users to join a Facebook group via a link contained in an e-mail or on a website.

60  From a technological point of view, social plugins can be implemented via coding interfaces for websites or apps. The essential tool required is a "Software Development

Kit" (SDK). An SDK is a collection of programming tools and libraries required for developing a software in a specific environment. Facebook provides various SDKs for download on its website. The "Facebook SDK" is intended for integrating social plugins into apps for the mobile platforms iOS and Android. The "Facebook SDK for JavaScript" or so-called iFrames (inline frames) serve to incorporate social plugins on a website. An iFrame is an element of Hypertext Markup Language (HTML) which is used to structure websites with links, pictures and other content types.

61    All interfaces support data flows from the user to Facebook.com, which do not depend on the actual activation of the plugin's functionality by the users of the website or app (for details see para. 139ff.).

### (2) Facebook Login and Account Kit

62    "Facebook Login" and "Account Kit" are widely-used tools supporting the login process on third-party websites and apps.

63    Users identify themselves with their Facebook registration data (e-mail address or mobile phone number and Facebook password) on third-party websites with "Facebook Login".[42] They can also transfer personal data to the app to avoid having to create a new user profile when registering with a new app or website.

64    Facebook Login is available for all standard platforms and operating systems: For iOS, Android, Web and Windows Phones, for desktop apps and for smart TVs, "Internet-of-Things" objects and similar devices. Users logging in via the Facebook Login can use the service on several devices and platforms as their user ID remains the same.[43] The "Account Kit" complements Facebook Login by enabling users to create a user profile on a third-party website or app simply by entering their phone numbers or e-mail addresses without having to enter a password.[44] This product is available to both registered and non-registered Facebook users.[45] It can be used for the web and mobile iOS and Android platforms.

65    From a technological point of view Facebook Login and Account Kit are implemented when the corresponding Facebook SDK is implemented, which can only be done with Facebook JavaScript SDK for websites. Again, the SDKs supply Facebook with information on which users create an account using which data on a third-party website even though the button was not actually used (see details in para. 143ff.).

---

[42]   […]

[43]   https://developers.facebook.com/docs/facebook-login/overview/, […]

[44]   […]

[45]   https://developers.facebook.com/docs/accountkit/overview/ , […]

**(3) Analysis and measurement tools**

66    There are further Facebook Business Tools which primarily serve to analyse and measure the customers' behaviour. These can be further categorised as tools for measuring the performance of a paid advertisement (see a) on the one hand or as Facebook Analytics for third-party websites and apps to analyse their sites or apps (see b) on the other hand.

(a) **Ads reporting**

67    Part of Facebook's offer for advertisers in the area of online advertising is a variety of functions to measure the performance of their advertisements. The Ads Manager contains various reporting functions to create statistics and analyses on users' interaction with Facebook advertisements (Ads Reporting).[46] These functions allow advertisers to see, for example, how many people viewed their advertisement. They can also see details on the users' demographics and the location where the advertisement was viewed, and they can adjust the settings accordingly (audience, placement, budget), or stop or rerun the advertisement.[47]

68    The Ads Manager's "Audience Insights" function shows advertisers detailed information on the audience they reached with their advertisements. The statistics contain demographic information (age, relationship status, sex, education, job, etc.), information on interests and lifestyle of the users, pages they "liked" and purchase information on their online shopping behaviour, location data etc.

69    The reporting options go even further than just monitoring users while on Facebook.com. They can also comprise user "events" on third-party websites and apps, which can then be attributed to the advertisement under review. This information cannot flow unless Facebook Pixel has been installed on the websites or apps. Facebook Pixel is a tracking pixel, which is incorporated in a service as an often invisible graphic and loaded by the browser whenever the website is accessed. It is a snippet of JavaScript code that allows advertisers to track users' opening the website and to collect other data. Advertisers can select from a pre-defined list of nine types of "events" and configure up to 100 further events themselves. Facebook tracks these events via the interface to third-party websites and apps and analyses them for the

---

[46]   https://de-de.facebook.com/business/learn/facebook-ads-measuring-results, [...]

[47]   https://de-de.facebook.com/business/learn/facebook-ads-reporting-ads-manager , [...]

advertisers.[48] User activities within 28 days after clicking on an advertisement are normally attributed to the ad.[49]

70    The "Attributions" tool also allows advertisers to measure the performance of their campaign across several channels and to compare several campaigns. "Facebook brand lift studies" help advertisers understand how well their brand campaign resonated with people and raise brand awareness.[50] "Audience Insights" is a tool for businesses which have created Custom Audiences.[51] Audience Insights is a Facebook service providing companies with aggregated demographic and interest-based information on the Custom Audience.[52] "Sharing Insights" gives third-party providers of apps and websites an insight into how users share their content on Facebook.com. They receive (aggregated) statistics on the audiences (by sex, age, town, country) and how (by post or comment) and what with (content of the shared comments) they interacted with their content on Facebook.com. "Page Insights" is a free function for companies having a company page on Facebook.com. It provides an analysis of page usage. Facebook also cooperates with third-party providers like Nielsen to measure the users' consumer behaviour on other channels like TV, search engines, etc.[53]

(b) **Facebook Analytics**

71    Facebook Analytics is a free tool for operators of websites and apps enabling them to analyse their own online services and obtain aggregated statistics on their audience. Its use is subject to creating a Facebook account and a "Business Manager Account". It is not necessary to have a Facebook Page to use the tool.[54] The company does not have to run advertisements on Facebook to use Facebook Analytics. Technologically speaking, Facebook Pixel incorporates Facebook Analytics into websites while Facebook SDK incorporates the tool into apps.[55]

72    Facebook Analytics provides third-party companies with aggregated data on how users interact with their services across several devices, platforms and websites. The third-party company can track and optimise the entire "customer journey" on mobile devices, online and offline and in other channels.[56] Facebook offers a large number of

---

[48]  […]
[49]  […]
[50]  […]
[51]  […]
[52]  […]
[53]  […]
[54]  […]
[55]  For details please refer to https://developers.facebook.com/docs/analytics/quickstart, […]
[56]  https://analytics.facebook.com/) […]

measurement tools, e.g. audiences or audience statistics and analyses of user behaviour (aggregated statistics, audiences grouped by sex, age, household income, language, town, country).[57] Third-party companies can select the "channels" they wish to analyse (e.g. their website, their app, their Facebook Page, etc.) and specify the "events" they want to analyse. They can choose from a list of up to 1000 different events.[58] Since February 2018 it has been possible to combine several sources (e.g. a website and an app) in an "Analytics Dashboard" to measure the company's performance across various sources.

73   "Facebook Analytics" is a free analysis tool which is used by more than […] third-party companies worldwide each month.[59]

### 3. Instagram

74   Instagram is a service for sharing photos and short video clips and is often referred to as a "photo network" or "photo blogging" service. It was founded by Kevin Systrom and Mike Krieger in 2010. Facebook bought the service in 2012 for 1 billion US dollars. The service has been growing continuously, reaching 1 billion monthly active users and more than 500 million daily active users in 2018[60], […] of them in Germany.[61] The service is financed through advertising and available free of charge. While most users use it via a mobile app and mobile devices with an integrated camera, a simplified desktop version is also available.

75   Private users have to register via the mobile app. To register, they have to enter an email address, a user name and, as an optional but recommended piece of information, a phone number. They can also upload a profile picture and enter further personal information under "About". While they can link their profile to their Facebook account, there is no obligation to do so.

76   Users create a contact list for using Instagram either by using their address books or lists of friends from Facebook.com or Twitter (via the Twitter API) or by looking for people they know on the network. Instagram also suggests potential users to "follow". When following other users, users can see their photos and posts on the "Home" page, which displays content in an order generated by an algorithm in a central and constant

---

[57]   https://analytics.facebook.com/ , […]

[58]   […]

[59]   […]

[60]   https://business.instagram.com/ , […]

[61]   […]

stream. There are filters available to alter pictures and users can comment on them using emoticons.

77   They can use the Instagram camera to take pictures or record videos and edit them using filters, texts, drawings or special effects before sharing them with other users. In addition to that, they can add hashtags to pictures. The hashtag symbol (#) serves to mark key words to make sure messages labelled with certain contents or topics can be found. Instagram copied this functionality from Twitter, which introduced it as a characteristic of its service (see para. 203 below). Photos can also be marked with a location.

78   Posts can either appear as "Stories" or as status reports on the "Home" page. In summer 2016 Instagram introduced the "Story" function which is similar to a function of the same name offered by "Snapchat" (see para. 196). Users can compile photos and videos in a "slideshow", which is visible for 24 hours before it is deleted automatically. Figures published in the 2nd quarter of 2018 suggest that 400 million people worldwide use Instagram's Story function.[62] Postings to the "Home" page are displayed permanently.

79   Every user profile, and hence the postings it contains, are public by default on Instagram. Users can change this setting to "private", making postings visible to approved subscribers only. The stories will then only be visible to users who subscribed to the profile. It is possible to explicitly exclude individual users from that circle. A chat function for direct communication with individual users is available too.

80   There is also a search function for areas of interest (music, sports, style, humour, film and television, science, beauty), media and users.

81   Further users of the service include companies and celebrities who can be followed by other users. Companies have to set up a business account to use the service. More than 25 million company profiles existed worldwide in July 2018.[63] Celebrity accounts are often used for marketing purposes ("Influencers").

82   Instagram is integrated into Facebook.com's Ad Manager. Companies wishing to advertise on Instagram must have both a Facebook page and an Instagram company profile. Advertisements can be placed in different formats on the Instagram feed or in Instagram Stories.[64]

---

62   https://allfacebook.de/toll/state-of-facebook [...]
63   https://business.instagram.com/getting-started/ , [...]
64   https://www.facebook.com/business/ads-guide, [...]

### 4. WhatsApp

83   WhatsApp Inc. was founded by Jan Koum and Brian Acton in California/USA in 2009. Facebook bought the company for 19 billion US dollars in 2014. The company's Irish subsidiary WhatsApp Ireland Ltd. provides the service to German users.[65] More than 1 billion people used the service worldwide in 2018, […] of whom were in Germany.[66] WhatsApp is a free service which was originally developed as a free internet-based alternative to short message services (SMS). WhatsApp is available as an app and as a desktop version.

84   WhatsApp is an instant messaging service which uses a network protocol for data exchanges between computers. This protocol is proprietary ("XMPP"). To communicate with one another, users need the app and an internet connection.

85   Users have to register with WhatsApp providing their own mobile phone number after installing the app. The registration of a WhatsApp account is concluded by verifying the mobile phone number with an access code that is sent via SMS. Users are asked to allow access to their contacts upon registration. WhatsApp then compares all the phone numbers from the contact list with the list of registered WhatsApp users to create the WhatsApp contact list.

86   Using the service, users can send and receive a multitude of media like text messages, photos, videos, documents, locations, voice messages and voice calls.[67] Both group chats and bilateral messages are possible. WhatsApp emphasises that messages sent and calls made via its service are "end-to-end encrypted" for security reasons. The encryption was developed in cooperation with Open Whisper Systems to ensure that content is only available to the desired contacts.[68] Since 2016 WhatsApp has been offering a "Status" function displaying status reports with photos, videos, emoticons, texts or drawings for all contacts, similar to the "Story" function. Figures published in the 2nd quarter of 2018 suggest that 450 million people worldwide use WhatsApp's Status function.[69]

87   WhatsApp has not been monetised through advertising so far. In September 2017 WhatsApp announced that it would develop functions in future which would make it

---

[65]   […]

[66]   […]

[67]   https://www.whatsapp.com/about/ , […]

[68]   https://www.whatsapp.com/security/ includes a link to a "Technical White Paper" explaining the technical details of encryption, […]

[69]   https://www.giga.de/unternehmen/whatsapp-inc/news/wtf-der-whatsapp-status-ist-ein-weltweiter-hit/ (in German, last accessed on 15 January 2019).

easier for businesses to communicate with private users.[70] The WhatsApp Business App was launched in early 2018.[71] It offers additional functions like business profiles, away messages or the registration of landline phone numbers.[72] While chats with customers are free of charge for businesses, they have to pay for real-time notifications.[73] WhatsApp Business provides businesses with aggregated statistics, e.g. on the number of messages sent, delivered or read.[74] Running ads in the WhatsApp will probably also be possible as of 2019.[75]

## II. Facebook's Terms of Service and Data Policy

88   Use of the social network's various areas and functionalities is subject to specific conditions which Facebook stipulates in comprehensive sets of conditions and policies.

Upon registration, private and business users (advertisers, publishers, businesses, developers, etc.) have to agree to these conditions before they start using Facebook.com.



89   **Facebook's Terms of Service**[76] (see 1) are the starting point for all user groups and Facebook products.

90   In addition, Facebook refers to the "**Data Policy**"[77] (see 2.) and the "**Cookies Policy**"[78] (see 3.). Furthermore, the **terms and conditions of other Facebook products are significant** (see 4).

---

70   https://blog.whatsapp.com/10000633/Wir-entwickeln-f%C3%BCr-Menschen-%E2%80%93-und-jetzt-auch-Unternehmen? […]

71   https://www.whatsapp.com/business , [...]

72   See app description in Google Play Store: https://play.google.com/store/apps/details?id=com.whatsapp.w4b, […]

73   https://www.heise.de/newsticker/meldung/WhatsApp-Business-oeffnet-sich-fuer-grosse-Firmen-4127059.html (in German, last accessed on 8 January 2019).

74   https://www.whatsapp.com/business/ , […]

75   https://www.heise.de/newsticker/meldung/Werbung-bei-WhatsApp-Jetzt-wird-Geld-verdient-4128652.html , in German, last accessed on 8 January 2019).

76   https://www.facebook.com/legal/terms/update , […]

77   https://www.facebook.com/about/privacy/update, […]

78   https://www.facebook.com/policies/cookies/, […]

### 1. Facebook Terms of Service

91    Facebook's terms of service generally apply to the use of all products, features, apps, services, technologies and software that Facebook defines as "**Facebook Products**" or "Products". There are further terms of service that apply to specific areas and which are referred to in the Facebook Terms of Service. In some cases they are intended to complement the general Terms of Service and in others to replace them. These are the "Community Standards"[79], "Commercial Terms"[80], "Ads Policy"[81], "Terms for Self-Serve Ads"[82], "Pages, Groups and Events Policy"[83], "Facebook Platform Policy"[84], "Developer Payment Terms"[85], "Community Payment Terms"[86], "Commerce Policies"[87], "Facebook Brand Resources"[88] and "Music Guidelines"[89]. In addition, the "Facebook Business Tools Terms", which are not mentioned in the Terms of Service, entered into force on 25 May 2018.[90]

92    The term "Facebook Products" is explained in more detail via a hyperlink.[91] According to this information, *"the Facebook Products include Facebook (including the Facebook mobile app and in-app browser), Messenger, Instagram (including apps like Direct and Boomerang), Portal-branded devices, Moments, Bonfire, Facebook Mentions, Spark AR Studio, Audience Network, and any other features, apps, technologies, software, products, or services offered by Facebook Inc. or Facebook Ireland Limited under our Data Policy." The Facebook Products also include Facebook Business Tools, which are tools used by website owners and publishers, app developers, business partners (including advertisers) and their customers to support business services and exchange information with Facebook, such as social plugins (like the "Like" or "Share" button) and our SDKs and APIs.*[92]

93    The Terms of Service define the range of services provided by Facebook in Paragraph 1 "Our Services". There is a headline for each service Facebook provides with examples for each of them. The following headlines are listed: *We "Provide a*

---

[79]   https://www.facebook.com/communitystandards/ , [...]
[80]   https://www.facebook.com/legal/commercial_terms , [...]
[81]   https://www.facebook.com/policies/ads/ , [...]
[82]   https://www.facebook.com/legal/self_service_ads_terms , [...]
[83]   https://www.facebook.com/policies/pages_groups_events/ , [...]
[84]   https://developers.facebook.com/policy/, [...]
[85]   https://developers.facebook.com/policy/credits , [...]
[86]   https://www.facebook.com/payments_terms , [...]
[87]   https://www.facebook.com/policies/commerce , [...]
[88]   https://en.facebookbrand.com , [...]
[89]   https://www.facebook.com/legal/music_guidelines , [...]
[90]   https://www.facebook.com/legal/technology_terms, [...]
[91]   https://www.facebook.com/help/1561485474074139?ref=tos , [...]
[92]   https://www.facebook.com/help/1561485474074139?ref=tos , [...]

*personalized experience for you", "Connect you with people and organizations you care about", "Empower you to express yourself and communicate about what matters to you", "Help you discover content, products, and services that may interest you", "Combat harmful conduct and protect and support our community", "Use and develop advanced technologies to provide safe and functional services for everyone", "Research ways to make our services better", "Provide consistent and seamless experiences across the Facebook Company Products", "Enable global access to our services".*

94    The Terms of Service contain data processing regulations regarding the content users create and share (Paragraph 3.3.1.) and the use of the user name, profile picture and information about users' actions with ads and sponsored contents (Paragraph 3.3.2.). In all other respects, Paragraph 2 of the Terms of Service indicates under the heading "*Our Data Policy and your privacy choices*": "*We collect and use your personal data in order to provide the services described above to you. You can learn about how we collect and use your data in our Data Policy [hyperlink]. We also encourage you to review the privacy choices [hyperlink] in your settings. They determine how we use data*".

95    The Terms of Service also contain provisions regarding the general use of the social network, imposing certain obligations on users, for instance, to use the name they use in everyday life, provide accurate information on themselves, be at least 13 years old (Paragraph 3.1), or not to do or share anything that is unlawful (Paragraph 3.2).

96    According to Paragraph 5, these terms make up the entire agreement between the users and Facebook Ireland Limited regarding the use of Facebook Products. The terms further state that if the user is a "consumer" and habitually resides in a Member State of the European Union, the laws of that Member State apply to any claim. Consumers may resolve their claims in any competent court in that Member State that has jurisdiction over the claim. In cases where the user is not a consumer, the claim must be resolved in a competent court in the Republic of Ireland and Irish law governs the terms.

## 2. Data Policy

97    The Data Policy is supposed to inform Facebook users about how their data are handled. It describes which kind of data ("information") is "collected" by Facebook and how it is "processed" and "shared". As for the Terms of Service, the Data Policy applies

to all Facebook Products unless stated otherwise. The Data Policy contains many hyperlinks to other documents.[93]

98      The Data Policy provides an overview of the data Facebook collects under Paragraph I. Facebook collects all data associated with the use of any of the Facebook Products. Other than the information actively shared by the users, this also includes data automatically transmitted to Facebook by the browser or device while the network is used. It includes, for example, information on people, pages or groups the users are connected to or interact with ("Networks and connections"). The contact information the user uploads, synchronises or imports from a device is collected. Facebook collects information on which content users view and how they interact with this content or which transactions they carry out.

99      Facebook indicates what information it collects on the computers, phones, connected TVs and other web-connected devices used if they integrate with Facebook Products under the headline "Device Information". Facebook combines this information across the devices and services used by the user. This includes a large number of device attributes (operating system, hardware and software, browser type etc.), information about operations and activities performed on the device, identifiers (device IDs and other identifiers, such as from games, apps or accounts and Family Device IDs ), device signals (Bluetooth, WLAN signals etc.) data from device settings ("information that you allow us to receive through device settings that you turn on, such as access to your GPS location, camera or photos etc."), network and connections ("information such as the name of your mobile operator or ISP, IP address, mobile phone number") and "data from cookies stored on your device, including cookie data that refers to Facebook and Instagram Cookies Policy".

100     Pursuant to the Data Policy, Facebook.com can also collect data on user activities off Facebook.com from advertisers, app developers and publishers (referred to as "**partners**") who use Facebook Business Tools. Facebook states in its Data Policy that partners *"provide information about your activities off Facebook—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have a Facebook account or are logged into Facebook"*. Facebook also registers information on online and offline actions and purchases from third-party data providers.

101     Under IV. Facebook explains how the "**Facebook Companies**" work together. It includes a hyperlink to further information on "Facebook Company Products". It is explained that the Facebook Company Products are, together, the Facebook Products.

---

[93]   https://www.facebook.com/about/privacy/update, version of 19 April 2018, […]

"They also include *other products provided by the Facebook Companies that are subject to a separate, stand-alone terms of service and privacy policy, including the WhatsApp, Oculus, Masquerade, and CrowdTangle websites, products, or apps*". Facebook says it also processes user data "*across the Facebook Companies for these purposes, as permitted by applicable law and in accordance with their terms and policies*". Facebook claims this is to "*provide an innovative, relevant, consistent and safe experience*" across all Facebook Company Products used.

102   Paragraph II of the Data Policy indicates that Facebook uses the information as described in the following and "*to provide and support the Facebook Products and related services described in the Facebook Terms and Instagram Terms*".

103   The information is used to "*provide, personalize and improve our products*". Facebook explains that the information is used to personalise features and content and make suggestions for the user on and off the Facebook Products (e.g. groups or events users may be interested in or topics they may want to follow). Facebook states that it uses the connections, preferences, interests and activities to create personalised products that are unique and relevant to the users based on the data it collects on them and others including any data with special protections they choose to provide where they have given their explicit consent, how they use and interact with the Facebook Products, and the people, places or things they are connected to and interested in on and off the Facebook Products.

104   To this end, it uses information across Facebook Products and devices in order to provide a more tailored and "consistent experience" on all Facebook Products used. Location-related information and face recognition are also used when activated. Facebook indicates that it uses the information for product research and development and to personalise ads. Users find additional information on the choices they can make in their private settings by clicking on a hyperlink.

105   In their private settings, users have the option, in addition to the privacy settings relating to the use of the social network itself (e.g. settings as to who can see the users' content), to change settings in their "Ad preferences" and to block certain targeted advertisements there.[94] Users can choose not to use partner information - that is, information collected through Facebook Business Tools and third-party data providers - to personalise advertisements on Facebook.com.

106   Facebook says it also uses information to "*provide measurement, analytics and other business services*". Facebook says it uses the information it has (including users'

---

[94]   https://www.facebook.com/ads/preferences/?entry_product=ad_settings_screen […]

activity off Facebook Products, such as the websites users visit and ads they see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, to understand the types of people who use their services and how people interact with their websites, apps and services. Facebook also says it uses information to promote safety, integrity and security, to send users marketing communications and also to research and innovate for social good.

107   Facebook explains in Paragraph III how it "shares" its information with other people or businesses. In addition to sharing on Facebook Products, this also includes sharing with "third-party partners". The third-party partners also include partners who use Facebook analytics services. Facebook says it aggregates statistics and insights to show how people are engaging with their posts, listings, pages, videos and other content on and off Facebook Products. Information is also shared with advertisers who are provided with reports about the kinds of people seeing their ads and how their ads are performing. However, it does not share information such as names or e-mail addresses that identifies individuals.

108   Facebook explains the following under Paragraph V. "What is our legal basis for processing data?":

"We collect, use and share the data that we have in the ways described above:

- as necessary to fulfil our Facebook Terms of Service or Instagram Terms of Use;

- consistent with your consent, which you may revoke at any time through the Facebook settings and Instagram settings;

- as necessary to comply with our legal obligations;

- to protect your vital interests, or those of others;

- as necessary in the public interest and

- as necessary for our (or others') legitimate interests, including our interests in providing an innovative, personalised, safe and profitable service to our users and partners, unless those interests are overridden by your interests or fundamental rights and freedoms that require protection of personal data".

109   A hyperlink ("Learn more") takes the reader to another detailed document in which Facebook explains the legal bases.[95] For all people who have the legal capacity to enter into an enforceable contract, Facebook says it processes data "as necessary to perform our contracts with you". Facebook describes the contractual services for which this data processing is necessary in "Our Services". Consent is provided as a legal basis for processing data with special protections, the use of face recognition technology, the use of partner data and for personalised ads. Facebook asserts legitimate interests vis-à-vis people under the age of majority (under 18) - vis-à-vis all

---

[95]   https://www.facebook.com/about/privacy/legal_bases , [...]

users- for providing measurement, analytics and other business services, for marketing communications, to research and innovate for social good, to comply with legal obligations, to protect vital user interests, and to perform tasks carried out in the public interest. Last but not least, Facebook points out that when it processes users' data as necessary for a task carried out in the public interest, users have the right to object to, and seek restriction of, its processing.

### 3. Cookies policy

110   The Cookies Policy[96] complements the Data Policy and addresses the use of cookies and other storage technologies.

111   The Cookies Policy defines cookies under the heading "*Cookies and other storage technologies*" as small pieces of text used to store information on web browsers. It says cookies are used to store and receive identifiers and other information on computers, phones and other devices. "Other technologies, including data we store on your web browser or device, identifiers associated with your device, and other software, are used for similar purposes. In this policy, we refer to all of these technologies as "cookies".

112   Facebook uses cookies if users have a Facebook account or visit websites and apps that use Facebook Products (including the "Like" button or other Facebook Technologies). Cookies enable Facebook to offer the Facebook Products to users and to understand the information it receives about them, including information about their use of other websites and apps, whether or not they are registered or logged in.

113   Under the heading *"Why do we use cookies"?*, Facebook refers to authentication, security, advertising and measuring purposes and the improvement of Facebook services.

114   Under the heading *"Where Do We Use Cookies"?* Facebook states that cookies may be placed on the users' computer when they use the Facebook Products and the products provided by other members of the Facebook Companies and websites and apps provided by other companies that use the Facebook Products, including companies that incorporate the Facebook Technologies into their websites and apps. Facebook obtains device-related information and information about user activity on the third-party websites from websites and apps that use Facebook Products via the use of cookies without requiring any further action on the part of the user. This occurs whether or not the user has a Facebook account or is logged in.[97]

---

[96]   https://www.facebook.com/policies/cookies/ version of 4 April 2018, […]

[97]   https://de-de.facebook.com/policies/cookies/ , […]

115   The Cookies policy also makes renewed reference to the above-mentioned "*Ad Settings*" under the heading *"How can you control Facebook's use of cookies to show you ads"?* that enable users to opt out of using partner information to personalise ads. Furthermore, the possibility of preventing interest-based online advertising from being displayed via the "European Interactive Digital Advertising Alliance"[98] or via mobile phone settings is pointed out, as well as the possibility of relevant settings in the users' own browser. In doing so, Facebook indicates that certain parts of Facebook products may not function properly if browser cookies are disabled.

### 4.   Terms and conditions for other Facebook Products

116   Facebook refers to further conditions for Facebook Products in the Facebook Terms of Service. These include in particular the terms and conditions that apply to the other Facebook-owned services WhatsApp, Instagram, Oculus and Masquerade (see a.). In addition, the conditions for the use of Facebook Business Tools are relevant (see b.).

### a.   Facebook-owned services

117   The Terms of Service of WhatsApp (see (1), Instagram (see (2) and the other retail services Oculus and Masquerade (see (3) are relevant to the subject matter of these abuse proceedings.

### (1) WhatsApp

118   The Terms of Service, Privacy Policy and other cookie usage provisions[99] are similar to those of the Facebook.com service. The WhatsApp Terms of Service contain a comprehensive description of what the service offers under the heading *"Our Services"* as well as user obligations, limitations of liability, jurisdiction and arbitration agreements and other provisions. The Privacy Policy explains what information is collected, recorded, used, and shared and sets out the legal basis on which these procedures are based.

119   As such, WhatsApp's privacy policy points out that WhatsApp is one of the "Facebook Companies" and provides a hyperlink to the Facebook page for a definition of the term. It subsequently says:

*"As part of the Facebook Companies, WhatsApp receives information from, and shares information with, the Facebook Companies. We may use the information we receive from them, and they may use the information we share with them, to help operate, provide,*

---

[98]   http://www.youronlinechoices.eu/ , […]

[99]   The full text is available at https://www.whatsapp.com/legal/#terms-of-service, in the version of 24 April 2018, […]

*improve, understand, customize, support, and market our Services and their offerings. This includes helping improve infrastructure and delivery systems, understanding how our Services or theirs are used, helping us provide a way for you to connect with businesses, and securing systems. We also share information to fight spam, threats, abuse, or infringement activities and promote safety and security across the Facebook Company Products. However, your WhatsApp messages will not be shared onto Facebook for others to see. In fact, Facebook will not use your WhatsApp messages for any purpose other than to assist us in operating and providing our Services".*

120   A hyperlink (Learn more) takes users to the WhatsApp "FAQ" page, where WhatsApp explains:

*"Today, Facebook does not use your WhatsApp account information to improve your Facebook product experiences or provide you more relevant Facebook ad experiences on Facebook".*

121   If users scroll down, they find the information:

*"Today, Facebook does not use your WhatsApp account information to improve your Facebook product experiences or provide you more relevant Facebook ad experiences on Facebook". This is a result of discussions with the Irish Data Protection Commissioner and other Data Protection Authorities in Europe. We're always working on new ways to improve how you experience WhatsApp and the other Facebook Company Products you use. Should we choose to share such data with the Facebook Companies for this purpose in the future, we will only do so when we reach an understanding with the Irish Data Protection Commissioner on a future mechanism to enable such use".[100]*

122   If users scroll down a bit further, they are advised that:

*"WhatsApp currently shares limited categories of information with the Facebook Companies. This consists of the phone number you verified when you signed up for WhatsApp, some of your device information (your device identifier, operating system version, app version, platform information, your mobile country code and network code, and flags to enable tracking of the update acceptance and control choices), and some of your usage information (when you last used WhatsApp, and the date you first registered your account, and the types and frequency of your features usage)".[101]*

123   If users scroll down further, they will find the information:

*"Importantly, WhatsApp does not share your WhatsApp contacts with Facebook or any other members of the Facebook Companies, and there are no plans to do so. WhatsApp also does not share your messages with Facebook. In addition, WhatsApp cannot read your messages because they are end-to-end encrypted by default when you and the people you message with use the latest version of our app. Only the people you message with can read your messages – not WhatsApp, Facebook, or anyone else". [102]*

124   The data collected and stored by WhatsApp is assigned to Facebook user accounts via the so-called Family Device ID, which is installed on whatever mobile device users

---

[100] https://faq.whatsapp.com/general/26000112/?eea=1&lang=en, [...]

[101] https://faq.whatsapp.com/general/26000112/?eea=1&lang=en, [...]

[102] https://faq.whatsapp.com/general/26000112/?eea=1&lang=en, [...]

are using[103]. This is a unique identifier for each user, which is also installed when using Facebook and which identifies the user when data are matched.

### (2) Instagram

125   Instagram's Terms of Use, Data Policy and Cookies Policy are very similar to those of Facebook and have been tailored to Instagram's specific services and offerings. Many of the hyperlinks to the definition of terms in the documents take users to the relevant Facebook pages. They include explanations of the legal bases on which Instagram relies for data processing.

126   Instagram's privacy policy is identical to Facebook's.[104] This means the same amount of information on Instagram users is collected and used. Accordingly, the wording of Instagram's Privacy Policy in Paragraph IV *"How do the Facebook Companies work together"?* contains the same wording as the Facebook Privacy Policy that Facebook and Instagram share infrastructure, systems and technology with other Facebook Companies (which include WhatsApp and Oculus), "*to provide an innovative, relevant, consistent and safe experience across all Facebook Company* Products". *It says "We also process information about you across the Facebook Companies for these purposes as permitted by applicable law and pursuant to their terms and policies".*[105]

127   The data collected and stored by Instagram, as well as the WhatsApp data, can be assigned to Facebook user accounts because a Family Device ID is installed on the users' device. Unlike WhatsApp, the Privacy Policy does not include a restriction to certain information that is actually assigned to and combined with Facebook user accounts. In these legal proceedings, Facebook indicated in relation to Instagram's actual data processing before the service was transferred to Facebook Ireland Ltd. that the data collected in any event includes the users' contact details (mobile phone number, e-mail address), data about the content generated by the user on Instagram and data about the users' Instagram via the users' "contact graph", for instance about the persons whom the user "follows" on Instagram".[106] This includes "log file information", (IP address, browser type, referring pages/exit pages and URLs, the number of clicks, interactions with the Service's links as well as domain name, landing page, viewed pages, information from e-mails sent to Instagram users), device IDs,

---

[103] […]

[104] https://www.facebook.com/policies/cookies/ version of 19 February 2018, […]

[105] https://help.instagram.com/519522125107875?helpref=page_content under Paragraph IV. "How the Facebook Companies work together", […]

[106] […]

metadata (e.g. hash tags, geotags), and data about usage behaviour through cookies used.

### (3) Oculus and Masquerade

128   The Facebook-owned services Oculus and Masquerade also indicate in their Terms of Service and Data Policy that they share data with Facebook.

129   **Oculus** has strongly aligned its Terms of Use and Privacy Policy with Facebook. The wording under the heading "How the Facebook Companies work together" is identical to the wording of Facebook's Data policy[107], that Oculus shares infrastructure, systems and technology with other Facebook Companies (which include Facebook, Instagram, and WhatsApp), to provide users with an innovative, relevant, consistent and safe experience across all Facebook Company Products. For these purposes, Oculus processes information about users and their devices across Facebook Companies as far as permitted by applicable law and its Terms of Service and policies.

130   When using Oculus, Facebook Technologies Ltd. collects data provided by Oculus users, pursuant to the Privacy Policy, and automatically collects data on user behaviour with all Oculus offerings and services, as well as device-related information, device IDs, location-related information, physical movements and dimensions (when using an XR device), photos and audio content when accessed with permission, information from cookies, pixels, and more.[108]

131   Assignment to Facebook user accounts is made, according to Facebook - if the user uses a Facebook login - via the login, otherwise via the users' e-mail address (which users have to provide when they sign up with Oculus).[109]

132   **MSQRD/Masquerade's** Privacy Policy is posted directly on a Facebook page and explains from the outset:

> *"Depending on which services you use, we share information within the family of related companies that are legally part of the same group of companies that MSQRD is part of, or that become part of that group, such as Facebook. For a list of our related companies, please see: "Facebook and the other companies in the Facebook family may use information from us to improve your experiences within their services such as making product suggestions (for example, of friends or connections, or of interesting content), and to show relevant offers and ads".*

133   Data collected by Masquerade includes information that users provide when they create an account and content users create or provide through the app, including

---

[107]   cf. Data policy at https://www.oculus.com/legal/privacy-policy/ in the version of 4 September 2018, […]

[108]   https://www.oculus.com/legal/privacy-policy/ version of 4 September 2018, […]

[109]   […]

photos, videos or masks. Masquerade also collects information that is part of the things users share, such as the location of a photo or the date on which a file was created. In addition, it also collects data such as payment information (debit or credit card information in relation to transactions), use of third-party websites or apps that integrate Masquerade and device-related information.[110]

134   Assignment takes place according to the information provided by Facebook - if the user uses a Facebook login - via the login, or via a device ID.[111]

### b. Facebook Business Tools

135   Since 25 May 2018, Facebook Business Tools have been subject to separate Terms of Service, which apply to website operators and website owners, developers, advertisers, business partners (and their customers) and other persons. The Facebook Terms of Service do not contain any explicit reference to these terms of use.

### (1) Provisions set forth in the Terms of Service

136   The term Facebook Business Tools is defined comprehensively in the Terms of Service and includes

*"APIs and SDKs, the Facebook pixel, social plugins such as the "Like" and "Share" buttons, Facebook Login and Account Kit, as well as other platform integrations, plugins, codes, specifications, documentation, technology and services".*

137   Paragraph 1 of Facebook Business Tools Terms says that Facebook Business Tools can be used to send personal data to Facebook about customers and users ("Customer Data"). Depending on the Facebook Products used, Customer Data may include:

a. ***"Contact Information"*** *consists of information that personally identifies individuals, such as names, email addresses and phone numbers that we use for matching purposes only. We will hash Contact Information that you send to us via a Facebook JavaScript pixel for matching purposes prior to transmission. When using a Facebook image pixel or other Facebook Business Tools, you or your service provider must hash Contact Information in a manner specified by us before transmission.*

b. ***"Event Data"*** *includes other information that you share about your customers and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps and purchases of your products.*

138   Paragraph 2. of Facebook Business Tools Terms regulates the use of customer data:

---

[110] https://www.facebook.com/msqrd/privacy version of 28 June 2018, […]

[111] […]

*"a. We will use Customer Data for the following purposes depending on which Facebook Company Products you choose to use:*

***i. Contact information for matching***

*1. You instruct us to process the Contact Information solely to match the Contact Information against Facebook's or Instagram's user IDs* **("Matched user IDs"),** *as well as to combine those user IDs with corresponding Event Data. We will delete Contact Information following the matching process.*

***ii. Event Data for measurement and analytics services***

*2. You instruct us to process Event Data: (a) to prepare reports on your behalf on the impact of your advertising campaigns and other online content (***"Campaign Reports"***) and (b) to generate analytics and insights about your customers and their use of your apps, websites, products and services (***"Analytics"***).*

*3. We grant to you a non-exclusive and non-transferable licence to use the Campaign Reports and Analytics for your internal business purposes only and solely on an aggregated and anonymous basis for measurement purposes. You will not disclose the Campaign Reports or Analytics, or any portion thereof, to any third party, unless otherwise agreed to in writing by us. We will not disclose the Campaign Reports or Analytics, or any portion thereof, to any third party without your permission, unless (i) they have been combined with Campaigns Reports and Analytics from numerous other third parties and (ii) your identifying information is removed from the combined Campaign Reports and Analytics. (…)"*

## (2) Data collected

139   The integration of Facebook Business Tools gives Facebook a direct connection to the website or app so that user data goes directly to the Facebook server when the website or app is called up or used, even when the person visiting the website or using the app does not activate the interfaces.

140   **Social plugins** are integrated into websites via Java Script SDK or I-Frame.[112] This means that the moment users load the web page in their browser, an HTTP request is automatically generated[113] and sent to Facebook. With every integrated interface, the IP address, the browser type, the URL of the visited website and the time of the visit are transmitted to the Facebook servers as a minimum data record when the page is accessed via a standard Internet protocol. If Facebook has additionally placed cookies on the user's browser, the browser transmits additional data to the Facebook server.[114]

---

[112] […]

[113] HTTP is the communication protocol in the World Wide Web (WWW). The most important functions are to request files from the web server and to load them into the browser. The browser then displays texts and images and takes care of the display of audio and video data. Communication takes place according to the client-server principle. The HTTP client (browser) sends its request (HTTP request) to the HTTP server (Web server). This processes the request and returns its response (HTTP response). After the server has sent a response, this connection is terminated. Typically, several HTTP connections take place simultaneously; cf. https://www.elektronik- kompendium.de/sites/net/0902231.htm (last accessed on 8 January 2019).

[114] […] See also https://developers.facebook.com/docs/plugins/faqs (last accessed on 11 January 2019,[…]): *"What information does Facebook get when I implement a Social Plugin and how is it used?: If a person has*

This includes data such as the URL of the website that the user visited prior to the relevant website or the transmission of a "unique identification number", via which Facebook users can automatically be assigned to their Facebook user account.[115]

141    Social plugins are integrated into apps via the Facebook Sharing SDK. Via the SDK, Facebook receives information such as the Facebook App ID (an ID that Facebook assigns to the mobile app) and metadata of the device used. This includes, inter alia, the operating system used, device model, vendor, screen size, processor cores, total storage space, free storage space, name and version of the app used, the http header record and IP address as well as the time zone.[116]

142    In addition, the SDK logs and captures certain "Events" in the Facebook Analytics app. Facebook makes a distinction here between "Automatically Logged Events", "Implicit Events" and "Explicit Events". "Automatically Logged Events" include basic user interactions in the app such as app installation or app starts, and system events such as SDK loading or SDK performance. This data is automatically sent to Facebook unless the app operator has explicitly disabled it.[117] If the app operator uses the integration, such as the "Like" button, further data, the so-called "Implicit Events" are sent to Facebook. In addition to these preset events, the app operator can also configure additional app "Event" types, so-called "Explicit Events".[118] Here, app operators can choose from a wide range of event types: These events can be data about an app being launched, payment data being added, a level being reached, goods being placed in the shopping cart or added to a wish list, a registration or tutorial being completed, a purchase being started or completed, a rating being given, a product being searched for, credits being issued, a success being achieved or a content being displayed.[119] App operators can track actions within their apps by selecting such events to receive the corresponding analysis data.

143    By integrating the **Facebook Login** or **Facebook Account Kit**, Facebook receives information from third-party websites and apps about which websites/apps a Facebook

---

visited Facebook and visits your website with a social plugin, the browser sends us information in order to load Facebook content on that page. The data we receive may include info like the person's user ID, the website they're visiting, the date and time, and other browser-related information. We record some of this info and may use it to improve our products and services and to show people more interesting and useful ads", [...]

[115]  [...]

[116]  FAQs on the GDPR "What data does Facebook collect via the SDK?", available at https://www.facebook.com/business/m/one-sheeters/gdpr-developer-faqs , [...]

[117]  FAQs on the GDPR, "What data does Facebook collect via the SDK?", available at https://www.facebook.com/business/m/one-sheeters/gdpr-developer-faqs, [...]

[118]  FAQs on the GDPR "What data does Facebook collect via the SDK?", available at https://www.facebook.com/business/m/one-sheeters/gdpr-developer-faqs, [...]

[119]  https://developers.facebook.com/docs/app-events/android (using Android devices as an example, similar to other operating systems, [...]

user registers with and how the user uses each website/app. The amount of data that Facebook currently receives is basically the same as the data record that can be captured with social plugins, since the Facebook Login is also implemented via the SDK. In addition, further data is collected. This includes "Error Information", which includes the user IDs of people logged into Facebook. According to Facebook, the company also receives the login information which users enter directly and manually - without using the Facebook Login - on the website of the provider who has the Facebook Login embedded.[120]

144   **Measurement and analytics tools** are on the one hand the SDK, which produces the data flows shown above. The **"Facebook pixel"** is the relevant interface that can be integrated into websites for this very purpose. The pixel is initially used to send the data record of the http header collected during the integration of each interface to Facebook. When the website is accessed, a standard web protocol is created by default that includes IP addresses, information about the web browser, page location, document, referrer (the web page from which the user has accessed the current website), and the person using the website. Via the pixel, Facebook receives pixel-specific data, including the pixel ID and the Facebook cookie. Facebook also receives "click data" for buttons ("button-click data") by default, namely any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks.[121]

145   In addition, the website operator can configure certain user actions ("Events") regarding the use of the third-party website or app. In this case, Facebook receives additional information about user behaviour on Facebook.[122] The pre-configured fifteen "Standard Events" include information about a purchase made on the website, a registration, the placing of goods in the shopping cart or a search query made by the user.[123] Depending on the website operator's wishes, further "event types" can be configured in addition to these standard events, for instance information on whether the user has scrolled down to the end of a page or how many articles have been read in a session.[124]

### (3) Assignment to the individual Facebook user accounts

146   The collected data is assigned to the Facebook accounts of the relevant users. There are a number of ways in which the data collected can be assigned.

---

[120]   […]

[121]   https://de-de.facebook.com/business/learn/facebook-create-ad-app-install-engagement, […]

[122]   […]

[123]   https://de-de.facebook.com/business/help/402791146561655?helpref=faq_content; Standard-Events: Add to cart, Add Payment Infor, Add To Wishlist, Complete Registration, Contact, Customize Product, Donate, Find Location, Initiate Checkout, Lead, Purchase, Schedule, Search, Start Trial, Submit Application.

[124]   https://developers.facebook.com/docs/facebook-pixel/advanced, […]

147   In the case of websites, the **cookies** stored on the users' browser in particular allow the observed user behaviour to be assigned to the individual Facebook user account. Facebook sets cookies on the browser of all Internet users when they visit a Facebook domain (such as www.facebook.de) for the first time.[125] If the user subsequently accesses a third-party website, the user browser also establishes a connection to Facebook and Facebook can read the cookie in the user's browser. If Facebook cookies are stored on the user's browser, the user's browser transmits additional information to Facebook - depending on what kind of cookies have been stored.[126] In order to enable the data collected, for instance Facebook pixels to be assigned to Facebook user accounts, Facebook transmits the "pixel ID" via a Facebook cookie.[127] If the cookie is not already present on the browser, it is set at the time the website is accessed.[128]

148   If cookies cannot be stored in the user's browser - e.g. due to relevant user settings - there is the possibility of "**Advanced Matching**" through the use of "identifiers" in order to assign user behaviour to Facebook user accounts. This is where the third-party company has the option of sending its own customer lists, so-called "custom identifiers" to Facebook. The customer list is encrypted locally on the user's browser by means of "hashing" and is then transmitted to Facebook. The data is hashed before it is transmitted. A so-called "hash value" is assigned to the data with a certain algorithm, ensuring the data is no longer recognisable in plain text during transmission. According to Facebook, the data is matched with Facebook users, with the hashed value being assigned to the individuals. This is possible because data records that have been hashed using the same algorithm or the same hash function also have the same identity hash value. Facebook then matches the transmitted data and adds the "matched" data to the advertiser's custom audience.[129] According to Facebook, all hashes sent are deleted, unless Facebook needs the data for fault clearance or product improvement purposes.[130] Facebook claims, however, that these data records are not used to permanently update Facebook user data.[131]

149   Cookies are no longer used for mobile apps; Facebook identifies the user via the SDK reading the advertising ID of the operating system on the terminal (Identifier for

---

[125] […]

[126] Facebook provides an overview of cookies via a hyperlink in its Cookies Policy.

[127] […]

[128] […]

[129] https://www.facebook.com/business/help/112061095610075?helpref=faq_content, […]

[130] […]

[131] […]

Advertising ("IDFA") for iOS or Android Advertising ID ("AAID") for Android). It is therefore possible to identify users without having to use an additional cookie.[132]

150   Facebook also uses other metadata, in particular various device-related data, to assign the data to a Facebook user.[133]


## III.  Progress of the proceedings

151   The Bundeskartellamt instituted proceedings in a letter addressed to Facebook Inc., Facebook Ireland and Facebook Germany on 1 March 2016[134]. As part of the investigations, the Decision Division sent decisions requesting information to Facebook[135] and companies potentially competing with Facebook[136]. On 14 July 2016[137], the Federation of German Consumer Organisations (Verbraucherverband Bundeszentrale, VZBV) was invited to join the proceedings upon their application filed on 13 June 2016[138]. From 19 to 28 October 2016, the market research company Marplan/Forsa conducted a consumer survey on the use of social media among a total of 1,117 consumers on behalf of the Bundeskartellamt.[139] The Bundeskartellamt granted the parties to the proceedings access to the file on the results of the survey.[140]

152   The Bundeskartellamt carried out further investigations between December 2016 and February 2017 by issuing decisions requesting information from media agencies[141] and advertisers.[142] In a letter dated 22 May 2017[143] and an e-mail dated 28 July 2017[144], the Bundeskartellamt asked Facebook further questions about its advertising activities and data processing practices.

---

[132] […]
[133] […]
[134] […]
[135] […]
[136] […]
[137] […]
[138] […]
[139] […]
[140] […]
[141] […]
[142] […]
[143] […]
[144] […]

153   The Bundeskartellamt held talks with Facebook and its legal representatives on 21 March 2016[145], 12 May 2016[146], 25 January 2017[147], 5 April 2017[148], 14 July 2017[149] and 7 November 2017[150]. In addition, it held talks with the Federation of German Consumer Organisations[151] on 22 April 2016 and on 12 May 2017 and with Hamburg's Commissioner for Data Protection and Freedom of Information on 5 May 2017[152]. It also held talks with representatives of media agencies[153] and representatives of Google Inc.

154   Facebook submitted a White Paper on "Relevant Markets and Lack of Dominance"[154] on 18 November 2016 in which it essentially states that Facebook does not have the characteristics of a norm addressee. It is assumed the relevant market for the product concerned is a "market for attention" on which countless competitors compete for the attention of users on the Internet in addition to Facebook. Even if one were to assume there is a market for social networks, which is not the case, it would at least include the competitors Instagram, YouTube, Google+, Twitter, Snapchat, Pinterest, LinkedIn, Xing and StudiVZ and would be defined as a global market. The White Paper says Facebook is not dominant in the market given that competitors exert considerable competitive pressure on Facebook through technical innovations. It says switching costs are low and users practice multi-homing on a large scale and there are still no significant barriers to market entry.

155   In a written observation dated 5 May 2017, Facebook reiterated its view that Snapchat and YouTube should be considered to be part of the relevant product market. In addition, it called the validity of the user survey commissioned by the Bundeskartellamt into question.[155]

156   In a letter dated 16 October 2017[156] Facebook commented on the theory of harm put forward by the Bundeskartellamt. It says this contravenes European data protection law, as it imposes a higher data protection standard on Facebook as the market leader than on other market players. Also, since the 9th Amendment to the German

---

[145] […]
[146] […]
[147] […]
[148] […]
[149] […]
[150] […]
[151] […]
[152] […]
[153] […]
[154] […]
[155] […]
[156] […]

Competition Act (Gesetz gegen Wettbewerbsbeschränkungen (GWB)) entered into force, the Bundeskartellamt had only been responsible for sector inquiries in the area of consumer protection, but not for enforcement of any other consumer law provisions. It claims the Bundeskartellamt was circumventing the statutory requirements for a comparative market analysis pursuant to Section 19 (2) no. 2 GWB if it bases abusive terms on the general clause of Section 19 (1) GWB. It says there was no causality between the alleged abusive conduct by Facebook and a dominant position in the market, as numerous other companies behaved in a similar way when handling personal data. And finally, it says the Bundeskartellamt has disregarded an effect-based approach. In this context, Facebook submitted an economic expertise by Prof. Dr. Haucap (DICE Consult GmbH). This argues that the combination of "on-Facebook data" and "off-Facebook data" is efficient as it improves both the product itself and the quality of targeted advertising. Furthermore, it says that intervention by the cartel authority strengthened the market structures, as users would have no reason to switch to a competitor if the dominant company behaved in a data protection-friendly manner.

157   In a letter dated 19 December 2017 ("preliminary assessment notice")[157], the Bundeskartellamt informed Facebook that based on its current assessment, it intended to prohibit Facebook from making the personal use of the social network Facebook.com in its Terms of Service contingent on Facebook being able to amass any type of user information from Facebook-owned services and programming interfaces, to assign this data to Facebook user accounts, and to use it for any purpose with any data processing procedures mentioned in Facebook's Privacy Policy. The Bundeskartellamt gave Facebook the opportunity in the preliminary assessment notice to submit justifications for the data collection and assignment provided for in its Terms of Service.

158   Facebook responded to the preliminary assessment notice issued by the Bundeskartellamt in a letter dated 19 April 2018[158]. It says Facebook is not dominant in the market since the Bundeskartellamt had defined the market incorrectly. Furthermore, Facebook claims it did not have a dominant position in the market because it faced high innovation-driven competitive pressure and the Bundeskartellamt had incorrectly analysed the implications of network effects. It also says Facebook did not engage in abusive practices, adding that the Bundeskartellamt did not prove the conditions necessary for an abuse, in particular it did not take the conduct of undertakings in comparable markets into account pursuant to Section 19 (2) no. 2 GWB, nor did it sufficiently prove the causality between abusive conduct and the

---

[157] […]
[158] […]

Group's market position. As a result, Facebook claims the Bundeskartellamt, as the competition authority, was enforcing data protection law for which it had no substantive competence. In addition, the letter says that Facebook was acting pursuant to German and European data protection law since users had given their effective consent and Facebook's data processing was necessary for performance of the contract and was justified by overriding interests. Facebook submitted an economic analysis carried out by David S. Evans on the subject "*Economic Analysis of Exploitative Abuse involving Attention Platforms and the Implications for Facebook's Use of Data*" on 22 May 2018.[159]

159   In the spring of 2018, the Bundeskartellamt conducted further investigations, issuing decisions requesting information from Facebook[160] and companies potentially competing with Facebook[161]. It engaged in further discussions with Facebook's competitors and with companies in the advertising, publishing and online retail industries. Members of the case team have talked to representatives of the VZBV[162] on 5 March 2018, representatives of the Hamburg data protection commissioner on 23 April 2018, representatives of the Federal data protection commissioner on 5 June 2018 [163] as well as representatives of the IDPC on 29 November 2018[164].

160   In a written statement dated 1 June 2018, Facebook announced the development of a new "clear history" function that was currently in the pipeline [...].[165]

161   In a written observation dated 17 October 2018[166], Facebook submitted a commitment proposal [...].

162   On 5 November 2018, the Bundeskartellamt once again informed Facebook of its antitrust concerns in a statement of objections and granted Facebook access to files. Facebook responded to the statement of objections in a letter dated 11 January 2019, elaborating on its previous submission and commenting on the suspension of immediate enforcement pursuant to Section 65 (3) sentence 1 no. 3, sentence 2 GWB.[167] The Federation of German Consumer Organisations[168], Hamburg's

---

[159] [...]
[160] [...]
[161] [...]
[162] [...]
[163] [...]
[164] [...]
[165] [...]
[166] [...]
[167] [...]
[168] [...]

Commissioner for Data Protection and Freedom of Information[169] and the Federal Commissioner for Data Protection and Freedom of Information[170] have also responded to the statement of objections.

---

[169] […]
[170] […]

**B. Legal assessment**

163   The use and implementation of the terms of service which are specified in the data and cookies policies or comparable contractual documents, as described in detail in the operative part, constitutes an abuse of a dominant position on the market for social networks for private users in the form of imposing abusive business terms pursuant to the general clause of Section 19(1) GWB.

164   Facebook is the addressee of Section 19(1) GWB for private users on the national market for social networks due to its dominant market position within the meaning of Section 18 GWB (see I.). The data processing conditions specified in the operative part constitute abusive terms within the meaning of the general clause of Section 19(1) GWB as far as data processing by the corporate services WhatsApp, Oculus, Masquerade and Instagram as well as Facebook Business Tools are concerned. These services are offered as services separate from Facebook.com (see II.). This section applies irrespective of whether the conduct also constitutes an abuse pursuant to Art. 102 TFEU (see III.).

**I. Addressee of the provisions**

165   On the national social network market for private users, Facebook is the dominant undertaking within the meaning of Section 18(1) in conjunction with Section 18(3a) and (3) GWB. It can be left open whether market dominance has to be assumed for other affected markets.

**1. Markets concerned**

166   In the broadest sense, the conduct affects the competitive environment of social media (see a.). The national social network market for private users is affected as a separate market in the context of social media markets (see b.). Generally speaking, the market for online advertising which is not linked to search queries (see c.) is also affected; however, the exact market definition can be left open. The service also has further market sides which can be attributed to various separate markets, which especially applies to the user sides of the so-called developers (see d.). Again, the exact market definition can be left open in this case.

**a. Social media in Germany**

167   With its services Facebook.com, Facebook Messenger, Instagram and WhatsApp, Facebook operates in the area of "social media" in the broadest sense. The competitive environment attributed to "social media" typically comprises various services (see (1). For these proceedings, the Bundeskartellamt's Decision Division will consider the

company-owned services Facebook.com, Facebook Messenger, Instagram and WhatsApp and approx. 30 other services for the market definition (see (2), taking into account a user survey which was previously conducted.

**(1) Relevant competitive environment**

168   The terms "social media" and "social networks" are vague and the details of the various definitions of these terms vary considerably. Basically, the term "social media" refers to all media used by internet users for the purpose of communication, with interactivity playing a key role. An uncountable multitude of services is often summarised by this term. Facebook itself states […] as its competitors.[171]

169   According to a definition by the German Association for the Digital Economy (Bundesverband Digitale Wirtschaft, bvdw)[172], social media are "*a multitude of digital media and technologies enabling users to exchange information between themselves and to design media contents either individually or as a community. The interactions include mutual exchanges of information, opinions, impressions and experiences, and the participation in content creation. Users actively refer to contents through comments, ratings and recommendations. In doing so, they establish a social connection to each other. (…)*"[173] Another definition reads as follows: "*Social media are internet platforms on which users can build relationships with other users and communicate. Communication does not merely comprise the exchange of verbal messages, but also involves many multimedia formats like photos, videos, music and speech recordings and games. The user community of such a social media platform is referred to as a "community"*".[174] (Bundeskartellamt unofficial translation)

170   In the public discussion, the various forms of social media are classified according to various criteria. From a marketing perspective, for instance, "social networks" (e.g. Facebook, LinkedIn, Xing, WhatsApp and dating portals) are differentiated from "content sharing & entertainment platforms" (e.g. YouTube, FlickR, Instagram, Pinterest), "knowledge communities" or "blogging platforms" (e.g. Twitter, which is often classified as a "microblog"), and "consumer communities (e.g. rating portals).[175] Other marketing representatives, however, distinguish "social networking" from "social sharing". According to them, social networking is offered by services linking people with

---

[171] […]

[172] Bundesverband digitale Wirtschaft, www.bvdw.org (last accessed on 8 January 2019).

[173] "Social Media Kompass 2017/2018" of the BVDW, https://www.bvdw.org/fileadmin/bvdw/upload/publikationen/social_media/kompass_social_media_2017_2018.pdf, (last accessed on 8 January 2019), see glossary on page 80.

[174] Heymann-Reder, Social Media Marketing, 2011, p. 20.

[175] http://www.tourismuszukunft.de/2015/12/world-of-social-media-plattformen/ (last accessed on 8 January 2019)

similar interests, generating opinions of many people and enabling users to get quick information on various topics and thus benefit from the knowledge and experience of other users, e.g. Facebook.com, Twitter, Tumblr, Xing, Google+, LinkedIn. Social sharing platforms, by contrast, are platforms for the provision, administration, description, classification, indexing, linking and exchanging of multimedia content between users. FlickR, Instagram and YouTube are given as examples.[176] Scientists, for their part, sometimes differentiate according to the intensity of social presence as achieved through the rich media content and the users' self-presentation/self-disclosure.[177]

171   Market statistics and market research institutes mostly name a certain selection of major social media platforms when talking about social networks. Among them are normally Facebook.com, Twitter, Google+, YouTube, Instagram, Pinterest, Snapchat and/or WhatsApp, Tumblr, Xing and/or LinkedIn.[178]

172   To define Facebook's competitive environment and market, the Bundeskartellamt enquired with Facebook.com and other networks, in particular Google+, Stayfriends, StudiVZ, Xing, LinkedIn, Twitter, YouTube, Yahoo Messenger, Skype, Snapchat, Yelp, Jappy, WizeLife and Lokalisten. When asked about their competitors, these companies also named a few other close competitors, among them Vimeo, Flickr, Apple Foto, Skype, WhatsApp, WeChat, Viber, Line, Seniorbook (now WizeLife), Stepstone, Indeed, Instagram, Pinterest, Facebook Messenger, Google Hangouts and Facetime.

173   To define Facebook's market and major competitor relations, the Bundeskartellamt also commissioned a representative social media survey.

174   The user survey started by posing an open question regarding the definition of services as "social networks" from the users' point of view. Question 4 read as follows: *"When it comes to social networks, which services do you use? Please state all services you use, even if you rarely use them."*

175   The respondents gave the following answers:

---

[176] cf. e.g. https://webconsulting-stuhec.com/blog/social-media-plattformen (last accessed on 10 January 2019)

[177] Kaplan/Haenlein, Users of the world, unite! The challenges and opportunities of Social Media, Business Horizons (2010) 53, 59, 62. https://de.slideshare.net/Twittercrisis/kaplan-and-haenlein-2010-social-media (last accessed on 10 January 2019).

[178] Cf. e.g. ARD/ZDF online survey (in German), Mediaperspektiven 9/2016, p. 434 - http://www.ard-zdf-onlinestudie.de/fileadmin/Onlinestudie_2016/0916_Koch_Frees.pdf (last accessed on 10/01/2019).

| Which services do you use? | | |
|---|---|---:|
| **Named at least one** | | **79%** |
| *of which:* | *Facebook* | *75%* |
| | *WhatsApp* | *37%* |
| | *Twitter* | *15%* |
| | *Instagram* | *13%* |
| | *Xing* | *11%* |
| | *LinkedIn* | *5%* |
| | *Snapchat* | *4%* |
| | *YouTube* | *4%* |
| | *Google+* | *4%* |
| | *Stayfriends* | *4%* |
| | *Pinterest* | *2%* |
| | *Tumblr* | *2%* |
| | *Threema* | *2%* |
| **Named no service** | | **21%** |
| Statistical population n =1041, includes alternative spellings (e.g. FB, whats up, etc.) | | |

176   Less than 1.5% of the respondents stated the following services: archive of our own, blogger, brieffreunde.de, change.org, dbna, deviantart, ello, evernote, Finya, Flirttown, FutureNet, FragMutti, GayRomeo, Google Allo, gmx.de, grindr, GROWLr, Hotmail, ICQ, idealo, I-Message, Jappy, jodel, kik Messenger, kwick, Lovoo, MySpace, Nasza klasa, LINE, Lokalisten, Microsoft Cloud, medium, Moodle, Odnoklassniki, Periscope, Platinnetz, Plaxo, researchgate, Signal, Skype, spin, Sportstracker, Spotify, Steam Discord, reddit, Strngrz, StudiVZ/MeinVZ/SchülerVZ, stumbleupon, Telegram Messenger, Viber, Vine, VK, Wattpad, WeChat, Weheartit, Wer-kennt-wen, Wurzelwerk, Twitch, zazeni, VK, 500px und 9GAG.

177   The following multiple-choice question referred to services, which were shown to each respondent in random order. It contained the term "social media" and read as follows: "Please find below a list of various social media services. *Please state whether you use them, and how frequently you use them.*

- *Facebook*
- *Google+*
- *LinkedIn*
- *Xing*
- *My Space*
- *Stayfriends*
- *WhatsApp*

- *Threema*
- *Telegram*
- *iMessage*
- *YouTube*
- *Snapchat*
- *Instagram*
- *Twitter*
- *Pinterest*
- *Tumblr*
- *Viber*
- *Reddit*
- *Odnoklassniki.ru*
- *ok.ru"*

178   The list of services is largely identical with the list of most frequently stated services in open questions and only contains a few services more than previously stated.

### (2) Services considered

179   On this basis, the Bundeskartellamt considered in particular the following services besides **Facebook.com**, **Facebook Messenger** (see para. 15 above), **Instagram** and **WhatsApp** (see paras. 74ff. and 83ff.) when defining the market as an environment of services:

180   Apple Foto is a photo management program for Mac OS X (Desktop) operating systems and the mobile iOS system by the US-based company Apple Inc. It has been pre-installed on iPad and iPhone devices as a standard since 2014 and on Macintosh computers with Mac OS X since 2015. Besides organising, editing and presentation functions, Apple Foto also has a sharing function enabling bilateral sharing of Fotos via Mail, the iCloud cloud service or wireless sharing via AirDrop, and posting of pictures on Twitter, Facebook, LinkedIn, Vimeo and Flickr for users who have an account with these services.

181   FaceTime was launched by Apple Inc. in 2010. The service offers IP telephony and video conferences via its own application software for the Apple MacOS and iOS operating systems. It is a standard pre-installation on Macintosh computers and iPad and iPhone devices.

182   **Flickr** ([www.flickr.com](http://www.flickr.com)) has been available in Germany since 2007. It is a service free of charge originally founded by the US-based company Yahoo Inc. and was sold to SlugMug in April 2018.[179] Besides photo management, editing and organisation, Flickr allows users to shoot short videos with a maximum duration of three minutes, add comments and notes to them, load them onto the website and share them with other

---

[179] https://www.heise.de/foto/meldung/Yahoo-verkauft-Flickr-an-SmugMug-4028953.html (in German, last accessed on 10 January 2019).

users. Users can also search for key words and look at photo streams (photo blogs as user profiles) by other users and comment on photos by adding picture sections. Use of the service is subject to registration. With their profile, users can use the service both as a web-based service and via a mobile app for standard mobile operating systems (Android and iOS).

183  **Google+** (www.googleplus.de) was launched as a free service in 2011. Friends, relatives and other acquaintances can connect via this platform. Google+ was also offered as part of the "G-Suite", a paid service, in spring 2018. The Google+ enterprise version is part of a range of software and office applications for internal company organisation. Formerly known as "Apps for work", these apps are now part of the "G Suite" brand, and cost between €4 and €23 per employee of the company.[180] Within G Suite, Google+ is supposed to offer social networking functions to support personal networks within the company.[181] Depending on the settings, the visibility of contents can be limited to staff members of the company or extended to public circles. In October 2018 Google announced that the service would be discontinued for private users.[182] However, in assessing the dominant position, the Bundeskartellamt considers the market position Google+ used to hold.

184  **Google Hangouts** (www.hangouts.google.com) is a service launched by Google in 2013. Users who have a Google account can use it via an app, a website, or as a function of Gmail, Google+ or Inbox. Hangouts allows users to share text messages, photos, videos, stickers or locations either bilaterally or in groups. Video conferences are also possible.

185  **iMessage** is a service by Apple Inc. for devices with Apple Mac OS X and iOS operating systems. Users have to register once with their Apple ID or phone number. It is a standard pre-installation on Mac computers and iPhone and iPad devices. The service offers a bilateral exchange of photos, texts, videos and other files. iMessage is linked to iPhone's messages app and starts automatically if the recipient also uses an iPhone and has it switched on.

186  **Indeed** (http://www.indeed.com) is an online job search portal which was founded in 2004. The service is now also available as an app for smartphones. It is part of the Japanese Recruit Holdings & Co. Ltd. and offers a platform for publishing job adverts free of charge in a simple version and subject to payment in various premium options.

---

[180]  […] https://gsuite.google.com/intl/de/pricing.html (last accessed on 10 January 2019).
[181]  https://www.cloudcomputing-insider.de/apps-fuers-business-was-ist-google-g-suite-a-691517/ (in German, last accessed on 10 January 2019).
[182]  https://www.blog.google/technology/safety-security/project-strobe/ (last accessed on 10 January 2019).

Companies can build their own recruiting sites. Job seekers can register for free and create and upload their CVs.

187 **Jappy** (www.jappy.de) is a free contact and communication service in Germany which has been operated by Jappy GmbH since 2001. To participate, users need a user profile containing basic data like user name, place of residence, age and sex. They can add further data (occupation, relationship status, name, etc.) or pictures and share it with other users if they wish to. Users can befriend other users or subscribe to the contents of other users. Unwanted contacts can be blocked via contact filters or blocking functions. Users find other users via the exploration system (public status messages suggested by the system), the recommendation system ("People you may know") or active research via the user search function. Communication can take various forms, e.g. chats, status messages, guestbook entries, group forums, comments, and feedback icons. Users are rewarded for their activity on the platform and receive a credit voucher depending on their rank every Sunday. A member's rank will rise and fall according to his activity. With these credits, users can make virtual gifts or share emoticons or unlock further functions (e.g. new status pictures, new emoticons). Additionally, every member can activate a flirting option. Jappy is financed through advertising and offers targeted advertising services.

188 **Lokalisten** was a service provided by Unterföhring-based Lokalisten Media GmbH, which was majority-owned by ProSiebenSat.1 Media. The focus of this service was to connect users from the same region. Founded in 2005, the service was discontinued in September 2016 after a significant amount of members had left the platform. For this reason, the service is no longer taken into account when defining the market.

189 **Line** is a free service provided by the Japanese Line Corporation (Tokyo), which belongs to the Korean Naver Corporation (Seongnam). The service has been on the market since 2011. The mobile app is available in several languages and for various operating systems. Users can make voice and video calls and send text messages. The app has a timeline function to communicate with friends through texts, pictures, films, stickers and other message forms.

190 **LinkedIn** (www.linkedin.com) is operated by the US-based company LinkedIn Inc. and has been owned by Microsoft Corp. since December 2016. Since 2003, LinkedIn has been offering an international online platform for maintaining existing business contacts and making new ones. Most functions of the platform are fee-based. The service is available via the web or a mobile app. Its focus is on creating a professional online identity and linking in with other users and companies for career development and training opportunities. Personal and corporate profiles can be created in several

languages. Users can make new contacts and recommend other members. They can also enter links to their own websites and found or become members of groups for certain topics. The company also offers search and recruiting tools. A premium membership costs between €26 and €90 per month. The free standard account offers some basic functions for setting up a profile and receiving messages.

191 **MySpace** (www.myspace.com) is a service of the US advertising company Specific Media Inc., which acquired the service from the US-based News Corp. media group in 2011. MySpace has been on the market since 2003 and has been available in Germany since 2007. It was relaunched in 2012. Users had to re-register as a result. MySpace is a free multilingual service offering its users to set up profiles containing photos, videos, blogs, groups, lists of friends, etc. The service has a clear focus on music and was originally also created for unknown artists and bands enabling them to reach a potential audience. The musicians published information about new albums and tour dates. Most bands also offered audio samples of their music. Additionally, users can create individual sites to provide information on themselves. The service is available via the web or a mobile app for the standard operating systems.

192 **Odnoklassniki** (English: classmates, www.ok.ru) is a Russian service of the Russian Mail.Ru Group investment company and was launched in 2006. Users can set up profiles in various eastern European languages and in English free of charge. Profiles can contain various pieces of personal information as well as photos, lists of friends, groups, forums, etc. They can look for friends and make contact with other members. Schools from all over the world can be entered. Users can play online games together, link YouTube videos and listen to music for free.

193 **Pinterest** (www.pinterest.com) is a service of the US company Pinterest Inc., Palo Alto, which was launched in 2010 and describes itself as a "catalogue of ideas people use to plan the big and small projects of their lives". Besides pictures on various topics (e.g. cooking, travel, beauty), users can find additional information (e.g. the provider's e-mail address). Users have to register. Their profile allows them to create their own contents by creating their own "boards" to post "pins" on. The standard privacy setting for pictures is "public". However, users can create "secret boards" for their own use only. Users can "follow" other users and generate "followers" themselves. The service is available via the web or a mobile app for the standard operating systems.

194 **Reddit** (www.reddit.com) is a mostly English-language service provided by the US-based Reddit Inc. It was launched in 2005 and is used for exchanging news. Users have to register. With their profile, they can post external links or their own postings on Reddit. Postings the users create themselves contain texts on selected topics. Other

users can comment and vote on their postings. Authors receive rating points for postings or comments which other users rate as positive. The service is available via the web or a mobile app for the standard operating systems.

195 **Skype** (www.skype.com) is a service launched in 2003. It was purchased by Microsoft Corp. in 2011. Skype customers can use the service to make free phone calls on Skype. Phone calls to landline or mobile phone numbers ("skype out") can be made for a fee. Skype supports videoconferences and exchanges of text messages and other files.[183] The service is available via the web or a mobile app for the standard operating systems.

196 **Snapchat** is a service of the US-based company Snap Inc. and was launched in 2012. The service offers a mobile app for smartphones enabling users to send photos and videos ("snaps") to friends free of charge. The pictures and videos are only visible for a limited amount of time. Photos and videos can be edited with filters and stickers. Users register with a simple profile. Only contacts specified by user name or snap code, or users from the address book can be searched and found. Individual snaps can be joined together in an album which is called a "story". A story can contain photos, videos and pictures and is visible to friends for up to 24 hours. Users can also save snaps in their "memories" to be able to access them on a permanent basis.

197 **Stayfriends**, (www.stayfriends.de) is a service available under that name in Germany, Austria, Switzerland, and Sweden. In France, it is known as Trombi (www.trombi.com). It was launched in 2000 and acquired by Ströer SE & Co. KGaA in 2016. The service helps users find former classmates and offers a virtual space for users to reconnect with people they knew at school, assemble memories and photos and stay in touch with these people.[184] Users set up their profiles and lists of contacts and contact others bilaterally via an integrated messenger service. The service is offered as a "freemium" service, i.e. a basic version of it is free while additional services or the whole service package are available for a fee. Most functionalities of StayFriends are only available for gold members who pay an annual fee of approx. €30.

198 **Stepstone** (www.stepstone.de) was launched in 1996 and known as "Jobshop" until 2000. It has been owned by Axel Springer SE since 2008. The service offers an online job market for experts and leaders. Companies can post job adverts for a fee. Posting

---

[183] […]
[184] […]

a job advert for 30 days costs between €900 and €1700.[185] The service is available free of charge for job seekers. The site offers various search filters for job adverts.

199   **StudiVZ** (www.studivz.de) is a German portal financed through advertising. It was founded as a subsidiary of the Holtzbrinck publishing house in 2005 and designed as an online community for students. Related platforms, SchülerVZ (for pupils) and MeinVZ (general social network) were founded in 2007 and 2008, respectively, to reach further target groups. The services expanded to other European countries. The service has focused on the German market since 2009 and now belongs to Poolworks (Germany) Ltd. SchülerVZ was discontinued in 2013. While Poolworks disclosed its bankruptcy in September 2017, the services StudiVZ and MeinVZ are to stay in business.[186] The service offers users to connect with each other free of charge by setting up a profile which can contain various pieces of information. They can search other students and see links to other contacts. Users can form discussion groups, create "photo albums" and upload photos. Its functions include a chat function called "Plauderkasten", a video series and a messaging function called "Buschfunk". The service is available as a web service and as a mobile app for standard operating systems.

200   **Telegram** (www.telegram.org) was founded in 2013 by the Russian entrepreneur Pavel Durov, who also used to own the popular Russian social network vk.ru which has been taken over by the Mail.ru Group in the meantime. Telegram's affiliation is unclear. The providers Telegram Messenger LLP, Telegram LLP, Telegram LLC or Digital Fortress LLC are stated as the providers in app stores. All of them are considered phantom companies and associated with various offshore companies.[187] The service is available free of charge as a web service, PC application software, and as a mobile app for various operating systems. Users can exchange text messages, encrypted messages, photos, videos and documents. They can define a period of time after which the end-to-end encrypted "Secret Chats" disappear automatically (messages and media). Several people can chat simultaneously about a certain topic via public and private "channels" without their names appearing as authors of the messages.

201   **Threema** (www.threema.ch) is a service based in Switzerland, which is operated by Threema GmbH and was launched in 2012. Via the service, users can exchange texts, videos and voice messages. It also offers group functions, surveys, and a voting

---

[185] https://www.stepstone.de/content/de/de/downloads/StepStone_Produkte&Preise.pdf   (in German, last accessed on 10 January 2019).

[186] https://www.heise.de/newsticker/meldung/StudiVZ-Betreiber-Poolworks-ist-insolvent-3825444.html (last accessed on 10 January 2019).

[187] Cf. e.g. https://www.gruenderszene.de/allgemein/telegram-berlin-oder-nicht (available in German only, last accessed on 10 January 2019).

function. The service can be used with a payable smartphone app, but it is also available as a desktop version.

202  **Tumblr** ([www.tumblr.com](www.tumblr.com)) was launched in 2007. It is a mostly English language service provided by the US-based Tumblr Inc., which was acquired by Yahoo Inc. in 2013. The service is available as a smartphone app and as a web application. Upon registration, Tumblr users automatically get their own blog. A blog can be filled with various content formats (photos, GIFs, links, Spotify tracks, MP3s, videos, etc.). Users can design their blog individually and operate several blogs simultaneously. Tumblr blogs are always public. In their "Tumblr Backend", users can see the blogs they subscribed to. Tumblr does not have a comments section. Users interact with other users by tagging them as "favorite" and by "reblogging" posts (i.e. posting them in their own blog with a link to the original source). Blogs can include a hashtag (#) to make sure they can be found via the search function.

203  **Twitter** ([www.twitter.com](www.twitter.com)) is an international service by the US company Twitter Inc., which was launched in 2006. Users can post telegram-style short messages of a maximum length of 280 characters ("tweets") for free. The service is therefore often categorised as a "microblogging" service.[188] Tweets can also include photos and videos.[189] Users can link individual words in a tweet using the hashtag (**#**) symbol. Other users can share ("re-tweet") a user's tweet and subscribe to a user's content by becoming his "follower". They will see a chronological list of tweets by users they follow. All users must register and can set up a user profile. Twitter is available via the web or a mobile app for the standard operating systems.

204  **Viber** is a service of Viber Media S.à.r.l. Founded in 2010, it has belonged to the Japanese Rakuten K.K. company since 2014. The service offers IP telephony services in particular. For this purpose, Viber does not require user names. Instead, it uses the available mobile phone numbers. The service is only available to users who have the corresponding Viber software, either as a mobile app or on their desktop computer. With Viber, users can also send text messages, photos, videos and locations.[190]

205  **Vimeo** ([www.vimeo.com](www.vimeo.com)) is a video portal of the US-based InterActive Corp., which was launched in 2004. Vimeo is considered a portal for professionals offering a "freemium" model. Its main target group are film makers. Other than artistic videos, there are also many professionally produced video tutorials and online courses, which

---

[188] [http://www.faz.net/aktuell/feuilleton/twitter-hebt-das-zeichenlimit-auf-15221037.html](http://www.faz.net/aktuell/feuilleton/twitter-hebt-das-zeichenlimit-auf-15221037.html) (in German, last accessed on 10 January 2019).

[189] [http://www.spiegel.de/netzwelt/web/twitter-erlaubt-etwas-mehr-als-140-zeichen-a-1112992.html](http://www.spiegel.de/netzwelt/web/twitter-erlaubt-etwas-mehr-als-140-zeichen-a-1112992.html) (in German, last accessed on 10 January 2019).

[190] [http://www.viber.com/about](http://www.viber.com/about) (last accessed on 10 January 2019).

can only be viewed for a fee. Users exclusively wishing to use Vimeo for looking at videos do not need to register. To actively use the portal, a registration including the name, e-mail address and a password is necessary. A user profile can contain additional information on the users' CV or places of residence. Users can also upload a profile picture. Vimeo's basic version is free. The basic version contains advertising banners and has a data limit for video uploads. Vimeo's Plus membership (approx. €50 per year) and Pro account (approx. €160 per year) do not display advertisements. Users have to produce the content they upload themselves, at least to a significant extent, i.e. users have to be the creators of any video they upload. As a general rule, the content must not contain advertisements. Users can set up their own channels and blogs, join groups on certain topics and subscribe to channels of others and comment on them.

206 **WeChat** is a free Chinese service operated by the Chinese company Tencent since 2011, which is also used by international users. WeChat serves to share audio and video files. It also contains further functions, e.g. for ordering taxis, groceries or food and paying via a payment function.[191] The app has its own app store. Users can look for people near them, play games, buy stickers, pay their restaurant and electricity bills, look for a job, book doctor's appointments or operate their own mobile stores.

207 **WizeLife** (formerly: "Seniorbook", www.wize.life) is an advertising-funded service which was launched in 2012 and is operated by Munich-based Seniorbook AG. The service addresses users aged 40 or older and is an online contact and communication service for exchanging experiences and meeting people with shared or similar interests. Users can enter a detailed profile on WizeLife or the mobile app. The service recommends using the real name and place of residence for that purpose. By entering topics, using the chat function and entering counties/places in which the members live, they can find like-minded people online and meet them in person too. Members can communicate via local groups, get information on events or make appointments.

208 **Xing** (www.xing.com/en) is operated by Xing AG and majority-owned by Burda Digital GmbH in Hamburg, which is a subsidiary of Hubert Burda Media Holding KG in Offenburg. The company's online service for making and maintaining business contacts has been available in Germany, Austria and Switzerland from different websites since 2003 (initially under the name OpenBC), mostly for a fee.[192] Users can develop a professional network, find job adverts matching their profile and information relevant to their industry or profession to keep up to speed with developments in their

---

[191] https://web.archive.org/web/20160310160456/http://www.digitalkompakt.de/uebersicht/wechat-messenger/ (in German, last accessed on 10 January 2019).

[192] […]

professional lives.[193] Membership is subject to registration. The (basic) membership is available free of charge and offers very limited functionalities compared to the premium membership which is available for a fee. Users can set up a detailed profile containing both professional and private information. The profile includes an overview of a user's degree, vocational training and career path, similar to a CV. Users can stay in touch, use XING's public event calendar and an appointment function. A multitude of discussion fora is available, some of which are public, and some of which are only accessible for a limited circle of users. In addition to the online offer, users can join regional groups organising local meetings for personal contacts.

209   US-based Yahoo Inc. had offered **Yahoo Messenger** as a service free of charge since 1998, which could be used as an app or as a function of the Yahoo!Mail service as a desktop version.[194] The service has been discontinued since 17 July 2018[195] and is therefore not taken into account for this assessment.

210   **Yelp** (www.yelp.com) has been on the market since 2004 and belongs to the US-based company Yelp Inc. It is a review and recommendation portal for restaurants and shops which focuses on reviews entered by users. Users can enter a postcode and a key word and look for regional suppliers from various categories (e.g. food and drink, shopping, beauty, healthcare and doctors). They can also review services, add their own photos or share entries with other users. To do so, they have to register and create a user profile. Finally, the platform also allows users to book a table at a restaurant or to buy a gift voucher.[196] The service is available via the web or a mobile app for the standard operating systems.

211   **YouTube** (www.youtube.com) is a video portal founded in 2005 by YouTube, LLC, San Bruno/USA, which was acquired by Google Inc., Mountainview/USA in 2006. The portal is available as a web service or app for all standard operating systems, and as an app for smart TVs. Users can upload their own videos to this platform and set up their own "channel" containing a playlist of all videos a particular user has uploaded. They can select an individual design for their channel, e.g. by changing the title image, the channel title, or by adding or deleting modules like playlists. Other users can view the videos and subscribe to channels. They can comment and rate individual videos. While YouTube can be used without registration, its use is then restricted to viewing videos. The service is financed through advertising. Advertising is in most cases part of the

---

[193] […]

[194] […]

[195] https://www.heise.de/newsticker/meldung/Yahoo-Messenger-wird-eingestellt-4075455.html   (in German, last accessed on 10 January 2019).

[196] […]

videos themselves ("in-stream ads"), displayed as so-called "pre rolls" prior to starting the video or as "mid rolls" while the video is playing. The channel has to be made a member of the YouTube partner program if it is to contain advertisements. Since spring 2017, membership of the YouTube partner program is conditional on the channel having 10,000 views. Further ads are displayed next to the running video and in the search results. The advertisements are targeted and matched individually based on the videos the user has previously watched, according to YouTube. The interests and advertising settings of registered users are considered. Once a user is registered, the apps on his/her device and the way these are used, the websites visited, the linked mobile device ID, geo data, age, sex and previous interaction with videos and Google adverts are evaluated.

### b. National market for social networks

212   Facebook's activities for private users take place on the national market for social networks. As a network and market side of a multi-sided market within the meaning of Section 18(3a) GWB (see 1), the service Facebook.com is attributable to a separate social network market as a submarket of social media (see 1), which is defined as national (see 3).

### (1) Network and multi-sided market pursuant to Section 18(3a) GWB

213   With its service Facebook.com Facebook offers an intermediary product by way of its service content, which is a combination of a network and a multi-sided market pursuant to Section 18(3a) GWB.

### (a) Core product: Advertising-financed network

214   The product Facebook.com is a network financed through targeted advertising, which forms a multi-sided market as a result.

215   Network effects and its intermediary function as a product definition are particularly relevant when it comes to defining the market. Typically, *multi-sided markets* are thus services facilitating, as intermediaries, direct interaction between two or more user groups between which network effects exist.[197] *Networks* are thus typically companies

---

[197]  Legislative intent on the 9th amendment to the German Competition Act (GWB), Bundestag printed paper 18/10207, p. 49. For a detailed definition of platforms, see BKartA Working paper on the market power of platforms and networks ("Arbeitspapier Marktmacht von Plattformen und Netzwerke"), June 2016, p. 8 ff. downloadable from *https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Berichte/Think-Tank-Bericht-Langfassung.pdf?__blob=publicationFile&v=2*; examples from relevant literature include: *Caillaud/Jullien*, "Chicken & egg: competition among intermediation service providers" RAND Journal of Economics, 2003, 34(2), 309-328; *Armstrong*, "Competition in two-sided markets", RAND Journal of Economics, 2006, 37(3), 668-691; *Rochet/Tirole*, "Two-sided markets: a progress report", RAND Journal of Economics, 2006, 37(3), S.

acting as intermediaries providing services that enable interaction between users of the same group, which results in the creation of direct network effects.[198] However, it is not always possible to strictly separate both forms of intermediation services, as is also shown by the present case. In practice, business models often combine platform and network elements.

216   Key user groups include mostly private users, who use Facebook.com without any monetary payment, and advertisers who pay a fee to place targeted advertisements based on the users' data on user websites or in the Facebook app.

217   For private users, Facebook.com's main service is to offer functions for finding friends and acquaintances and for sharing various types of content in specifically defined private user groups, as is outlined under para. 19ff. above. As Facebook acts as an intermediary by enabling interactions between its users and positive direct network effects occur within the private user group, the service constitutes a network within the meaning of Section 18(3a) GWB. Direct network effects exist where members of a group directly benefit from either a higher (positive direct network effects) or a lower (negative direct network effects) representation of members of their group on the platform.[199]

218   The group of Facebook.com users directly benefits from more members using Facebook.com because of effects occurring between the individual private users within a group. The connection between the users that leads to the network effects can be both direct and indirect. Social networks are mainly characterised by direct network effects developing between their members. They primarily serve to connect friends and acquaintances and to enable communication between them. The more private users are active on Facebook.com, the higher the benefits for this user group as the options for users to interact and find friends and acquaintances increase with an increasing number of users in the social network. The network effects are "identity-based" because the users' identity rather than just the number of users is relevant in this context.

219   Facebook.com offers the scope, attention and data generated by its private end consumers and the advertising space available within the service as a key service to

---

645-667. *Hagiu/Wright*, "Multi-sided platforms", Working Paper, 2015, Harvard Business School, http://www.hbs.edu/faculty/Publication%20Files/15-037_cb5afe51-6150-4be9-ace2-39c6a8ace6d4.pdf. (last accessed on 10 January 2019).

[198] Working paper, government reasoning and literature: Cf. for example Katz/Shapiro, "Network Externalities, Competition, and Compatibility", The American Economic Review, 1985, 75(3), p. 424-440; Farrell/Saloner, "Standardization, Compatibility, and Innovation", The RAND Journal of Economics, 1985, 16(1), p. 70-83; Shy, "A Short Survey of Network Economics", Review of Industrial Organization, 2011, 38, p. 119-149.

[199] see also: Bundeskartellamt, working paper "Market Power of Platforms and Networks", June 2016, p. 9 ff., downloadable from https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Berichte/Think-Tank-Bericht-Langfassung.pdf?__blob=publicationFile&v=2 (last accessed on 10 January 2019).

advertisers. The company's offer is financed through advertising and thus constitutes a multi-sided market pursuant to Section 18(3a) GWB, because Facebook acts as an intermediary facilitating the direct interaction between advertisers and private users between whom indirect network effects exist.

220   Based on the user data and the users' awareness while using the social network, users and advertisers can directly interact via Facebook, e.g. when following up the users' response to an advertisement (by clicking on the advertisement, for example). As the platform provides advertisers with an audience, i.e. its other user group, it can be referred to as an audience providing platform.[200] As a result, indirect network effects occur between the group of private users and the group of advertisers. Indirect network effects exist where the benefit or gain of users in one group depends on the number of users from another group. Looking at the effects, it makes sense to differentiate between cases where the members of one user group benefit whenever the membership of the other group on the platform increases (positive indirect network effects), and cases where they benefit whenever the other group's membership is smaller (negative indirect network effects).[201]

221   Audience providing platforms like Facebook.com typically show intensive positive indirect network effects for advertisers. The benefits of a social network for advertisers increase with an increasing number of users. The larger the group of users in the right target group, the more sales opportunities exist for an advertiser. With its many users, Facebook.com represents a large number of different target groups. However, the two sides have different notions of the desirability of an interaction between the advertiser and the user and of being provided with an audience or being the audience, respectively. The indirect network effects are thus less positive or even negative. Private users of a social network typically want to use the network functionalities and either merely accept targeted advertising or even find it annoying. The benefits for users of social networks do not increase with an increasing amount of (targeted) advertising to an extent that would be comparable to the benefits of a large user base for advertisers. This statement is supported by the outcome of a user survey according to which the large majority of users consider targeted advertising either as negative or as neutral.[202]

222   Graphically, the core platform can be illustrated as follows:

---

[200] Cf. BKartA, Working paper "Market Power of Platforms and Networks", June 2016, p. 24f.

[201] Cf. BKartA, Working paper "Market Power of Platforms and Networks", June 2016, p. 9f.

[202] […]



(b) **Further market sides**

223   With the social network functions for publishers (cf. para. 32) above) and the developer platform (cf. para. 150 ff. above), Facebook has added further market sides to its core product of an advertising-financed network, which are also part of the multi-sided market from an economic point of view.

224   **Publishers** use Facebook.com's social network, as described, to make their own company or business known among Facebook users by creating a page in the network. On their Facebook pages, operators can publish their editorial content, connect with users, monetise their websites and gather information on user behaviour.[203]

225   Again, Facebook acts as an intermediary between private users and publishers to facilitate direct contact via the social network. Indirect network effects exist between the user groups of publishers and private users with regard to the marketing purpose. On Facebook.com, commercial site operators benefit from an increased scope and higher awareness due to the growth of the private user group.

---

[203]  [...]

226  For **developers**, Facebook offers, as described above, the opportunity to integrate their web-based offers (websites or apps) into Facebook.com to increase their user base and to monetise their service.

227  The products of Facebook's developer platform (cf. para. 150ff. above) have to be considered multi-sided markets or market sides added to the social network as an audience providing platform. Customers of the developer platform and the Facebook Business Tools use Facebook's large scope and its database to pursue the objectives they set out to achieve when integrating the tools. Facebook thus acts as an intermediary again when it comes to the tools, as it facilitates direct interaction between private users and developers. Depending on what the interfaces allow, various types of interactions can take place. Developers of Facebook apps can use Facebook as an interface, e.g. to make their apps available for use to Facebook users. Users of social plug-ins can share contents on Facebook.com by clicking the "Share" or "Like" buttons on the developer's website.

228  Indirect network effects exist between developers and private users; their exact nature depends on the respective tool. The developers' benefits always increase with a growing number of private users in the social network. Conversely, positive indirect network effects exist for a large number of products, e.g. the tools for developing Facebook apps. The social network's attractiveness for private users increases with a growing number of apps. As far as other interfaces, e.g. the Marketing API, are concerned, the benefits for private users of a growing number of developers using them are less pronounced, which is similar in the case of advertisers.

229  Taking these sides into account, Facebook's role can be illustrated as follows:



**(2) Definition of the product market**

230  Based on the criterion of demand-side substitution, the investigations have shown that, from the private users' perspective, there is a market for social networks in terms of characteristics, application and price. The relevant opposite market side are private users (see a). A market can be defined although the service is available to private users free of charge (see b). In the context of social media, social networks meet a specific demand private users have (see c). Only StudiVZ, Jappy and, until it was discontinued, Google+ can be included in the market, whereas all the other services represent competition from substitutes (see d).

(a) **Relevant opposite market side: private users**

231  The relevant opposite market side to determine the substitutability of social networks with Facebook.com is represented by the private end consumers. They form a separate market side apart from the other user groups of the social network, i.e. advertisers, publishers and developers.

232  The market sides of the multi-sided market are **not a uniform opposite market side**. For the user groups of advertisers, publishers and developers, Facebook meets different requirements than for private users.

233   Generally speaking, the Bundeskartellamt considers it possible to carry out a uniform market definition which does not differentiate between different user groups, especially if the product, which is an intermediary product, does not exist unless several user groups use it to a sufficient extent.[204] A uniform market definition that comprises several or all market sides has to consider the criterion of demand-side substitutability. It can only be assumed to apply if all the user groups have essentially the same view of the service's functional substitutability, i.e. if they have mostly similar requirements.[205]

234   Facebook.com's various user groups are not essential to creating a social network as a service. The groups' requirements are not largely similar to those of private users either.

235   In particular **advertisers** using Facebook.com for targeted advertising have different requirements and thus generate the market side of an audience providing platform. Audience providing platforms generally cannot be defined as a uniform market. As the product, i.e. the social network, is not conditional on the other side being represented as well, this side is not required for the product. By adding the advertisers' side, the company rather monetarises an existing product, i.e. its service, by offering advertising space within that service. The advertising side is added on the basis of a decision to generate funding through advertising rather than being a result of the social network's intermediary function. A uniform market definition is not required for taking into account the indirect network effects, either. As has been shown, the platform is characterised by asymmetrical indirect network effects: Clearly positive indirect network effects emanate in particular from the (free) user side to the benefit of the advertising side, as the platform's benefits for advertisers increase with an increasing number of users on the other side. Conversely, an increasing number of adverts on the platform do not normally increase the benefits for the other user group; the indirect network effects are hence less pronounced or even negative. Additionally, the requirements of private users on the one hand and advertisers on the other cannot be assumed to be identical. While advertisers use Facebook.com for marketing purposes, private users intend to use the social network functionalities to fulfil other requirements. It can also be assumed that the two user groups have different views on their options for substitution, although the advertising side is oriented towards their target group, which can lead to

---

[204] So-called matching platforms, cf. Bundeskartellamt, Working paper "Market Power of Platforms and Networks",  June 2016, p. 22 ff., available at https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Berichte/Think-Tank-Bericht-Langfassung.pdf?__blob=publicationFile&v=2 (last accessed on 10 January 2019).

[205] BKartA – Parship/Elitepartner, B6-57/15, decision of 22 October 2015, para. 71 ff.; BKartA – Immonet/Immowelt, B6-39/15, case summary of 20 April 2015; BKartA – P7S1/Verivox, B8-67/15, case summary of 5 August 2015; BKartA – HRS, B9-66/10, decision of 20 December 2013; cf. Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 31 ff.

similar market definitions as the advertisements are mostly in line with the target group's expectations.[206]

236   The same is true for **publishers**, who also use Facebook.com to fulfil other requirements than private users. Publishers use Facebook.com in a way that is closely linked to private use in many ways. From the private users' perspective, this constitutes part of the functionalities of a social network. However, it cannot be assumed that the two user groups have the same requirements. Publishers use Facebook for other purposes than private users, namely to make their own company or business known among Facebook's users through their own "page". They thus first and foremost pursue marketing objectives and constitute a user group which has its own characteristics. Again, the options for substitution are different for each user group.

237   And finally, **developers** have completely different requirements than private individuals when using the APIs. The different APIs are special software products which primarily serve to grant technical access to the social network and its users, hence its scope, in order to improve or monetise a product. For this reason, uniform demand from private users and developers cannot be assumed.

## (b) A service free of charge for users

238   The service can be considered part of a social network market despite the fact that private users do not pay for using it.

### i.   Market activity with free user services within the meaning of Section 18(2a) GWB

239   Despite the fact that private users do not pay a fee for using the social network, this service is to be considered a market activity as it fulfils the requirements of Section 18(2a) GWB as far as the advertising side, which is payable, is concerned.

240   Previous (national) case law had not recognised free platform use as a market because it considered monetary turnover and price-setting essential competitive parameters without which a market did not exist. The Düsseldorf Higher Regional Court also confirmed this with regard to an online transaction platform.[207] By including Section 18(2a) in the German Competition Act, the legislator basically acknowledged the possibility for free services to be classified as a market activity; however, the exact conditions for such a classification were left open.

---

[206] Cf. Bundeskartellamt, Case decision of 25 April 2015, ref. B6-98/13 – Funke/Springer (TV programme magazines), available at www.bundeskartellamt.de.
[207] Düsseldorf Higher Regional Court, decision of 9 January 2015, file ref VI-Kart 1/14 (V), para. 43 - *HRS* (juris).

241    The Bundeskartellamt holds that, from an economic and antitrust perspective, a user group that uses the platform service for free should at least be considered a market under competition law terms if it is connected to a paying user group. This is based on the consideration that there is a close connection between the activities of the platform on the advertising side and on the "audience" side. The activities of the platform therefore pursue one and the same business purpose irrespective of the side towards which they are directed.[208]

242    This view is also reflected in the legislative intent[209] which holds that this applies in particular in the case of platforms with varying degrees of indirect network effects between the market sides. According to this reasoning, this could lead to a situation where one side of a platform offered services free of charge which does not benefit from the size of the other platform sides at all or only to a limited extent. Advertising-financed services are cited as the typical example of a service available to one user group free of charge while the platform is financed through advertising.

243    This view is also reflected in the European practice. In its more recent case practice (e.g. the *Facebook/WhatsApp*[210] merger decision) the Commission examined several online markets, including (ad-funded) social networks, although users can use practically all of the services offered without any direct monetary compensation.[211] The Commission had already followed a similar approach in the *Microsoft/Skype* case.[212] In the abuse proceedings against *Microsoft* regarding the tying of a web browser or media player to its PC operating system Windows, the *Commission* and the *General Court* confirmed the existence of markets for both components despite the fact that they were at least to some extent offered for free.[213] In the Commission's abuse decision of 27 June 2017 against *Google* for giving illegal advantage to its own price comparison engine[214], the Commission assumed Google was abusing its dominant position on the markets for general internet search engines in Europe even though such search engines are always offered to users free of charge.[215] For the sake of homogeneous

---

[208]  Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 36ff.

[209]  Legislative intent of the Federal Government on the draft of the 9th amendment to the German Competition Act, Bundestag printed paper 18/10207, p. 48.

[210]  European Commission, decision of 3 October 2014, Ref. COMP/M.7217 – Facebook/WhatsApp.

[211]  See also para. 31 of the decision.

[212]  European Commission, decision of 7 October 2011, Ref. COMP/M.6281 – Microsoft/Skype, para. 75

[213]  European Commission, decision of 24 March 2004, Ref. COMP/C-3/37.792 – Microsoft, para. 402; European Commission, decision of 16 December 2009, Ref. COMP/C-3/39.530 – Microsoft, para 17ff; General Court, decision of 17 September 2007, Ref. T-201/04 – Microsoft, para. 927ff, 1088.

[214]  Available at   http://ec.europa.eu/competition/antitrust/cases/dec_docs/39740/39740_14996_3.pdf   (last accessed on 10 January 2019), para. 157ff.

[215]  European Commission, decision of 27 June 2017, Ref. AT.39740, available under http://ec.europa.eu/competition/antitrust/cases/dec_docs/39740/39740_14996_3.pdf, para. 158-160.

competition rules within Europe, a change of the current practice in Germany therefore seems to be called for.

244   As, pursuant to Facebook's terms of service, a contract is concluded between Facebook.com and the private users, it can be left open whether Facebook.com's service can be classified as a market within the meaning of Section 18(2a) GWB solely because its free service is part of a multi-sided market, or whether a contract or other exchange relationship has to exist. In addition, private users giving away their data can be considered part of an exchange relationship.[216]

ii.   **Applicability of demand-side substitutability**

245   Private users can be considered customers in the context of the concept of demand-side substitutability, even if the services are available free of charge. Contrary to Facebook's view[217], the users' time and attention which, according to the company, all internet services compete for, are not the defining market elements in this case.

246   The fact that the users do not pay a monetary compensation for the private use of Facebook does not change the fact that they use the service to satisfy a certain economic demand, which makes them customers of Facebook's product in an economic sense. In contrast to that, defining the market as a market for the users' time or attention turns the users into the product. While many online services share this economic point of view and frequently make statements to this effect, competition law takes a different approach by looking at the demand of the opposite market side to define the relevant product market. There is thus no difference to paid services all of which ultimately compete for their customers' incomes while budgets are limited, which does not make their market a "market for income". The user remains a customer, even if the service is available for free. In this respect, time or attention and the data the users enter replace the fee and can be seen as a compensation for the service. This applies in particular to ad-funded services, which offer their users' time, attention and data to advertisers in return for revenues. Ultimately, advertising markets are "markets for time" which consider the users' time and attention to be a product. However, this point of view is restricted to the side of a platform which is only available for a fee. Section 18(2a) GWB has been set up precisely to eliminate this restriction.

247   Facebook's claim is not based on the necessary demand-oriented view and criticises the Bundeskartellamt's position, which is based on competition law, for ignoring the

---

[216] Cf. European Commission, decision of 27 June 2017, ref. AT.39740, para. 158-160.

[217] […]

view of third-party companies that know the market well.[218] Aside from the fact that, contrary to Facebook's claim, most of the competitor survey does not support this point of view, the concept of demand-side substitutability is a concept to be considered under competition law when defining a market, irrespective of the companies' expertise. The Bundeskartellamt also has no doubt that Facebook views its customers as the (data) centre on which its commercial interests are focused. Still, this view does not justify putting customers in the position of suppliers of time and attention.

248   The demand-side oriented market concept is also perfectly suitable for determining the demand for free market services. From the customers' perspective, the products can thus be differentiated by their properties and applications. Additionally, when defining the market, the "price amounting to zero" and the general significance of the willingness to pay can be considered. Facebook is therefore wrong in claiming that a price-oriented approach is impossible in the case of "free" services.[219] The fact that the SSNIP test as a methodological characteristic of the demand-side oriented market concept, which is only rarely applicable in practice anyway, does not apply to free services does not make the demand-side oriented market concept inapplicable. As a matter of fact, the factors of time and temporal intensity of use are product characteristics, especially when it comes to social media, and thus have to be considered when defining the market.

(c) **Specific demand for social networks**

249   Having investigated competitors and users, it can be assumed that there is a specific demand for social networks, which is fundamentally different from the demand for other social media. The key purpose of social networks is finding and networking with people the users already know, and to exchange on a daily basis experiences, opinions and contents among specific contacts which the users define based on identity. Providers meet this demand by offering the corresponding core functionalities which grant users a "rich social experience".

250   The competitors emphasise this rich social experience through communication and exchange with other users when explaining what social networks do for users.[220] The intention of social networks is to provide users with a comprehensive personalised "virtual space".[221] The network is to enable users to develop "authentic interpersonal relationships".[222] The users' own "virtual identities" are supposed to be at the heart of

---

[218] […]

[219] […]

[220] European Commission, decision of 3 October 2014, "Facebook/WhatsApp", Comp/M. 7121, para. 54.

[221] […]

[222] […]

their user experiences and can be set up by creating a personal profile and starting a list of friends. The purpose of a user's online identity is supposed to be a virtual reflection of real life.[223] All activities of users in a social network are related to their personal networks of friends and acquaintances, which creates a "highly personalised experience."[224] Value is added to any contents shared among the personal contacts within the social networks because it is embedded in the personal network of friends and acquaintances. Depending on their preferences, users can develop all kinds of activities in this virtual space. Such activities include entering and staying in touch with friends and finding people users used to know, sharing contents (either generated by the social network or by third-party websites), information on events, playing online games or buying and selling goods, e.g. via Facebook Marketplace. Facebook describes the key functions of its social network as "connect", "communicate", "share", and "discover".[225]

251   The outcome of the user survey confirms this description of demand. Contrary to Facebook's view[226], this description is in particular also based on the replies received from its competitors. In its user survey the Decision Division asked for reasons *why* social media are used (question 7), how *frequently* the services are used and *how much time* is spent using the services (questions 5 and 5.3). It also enquired which reasons would be needed to switch from one service to another (questions 10 and 11).

252   The survey shows that most users use social media to stay in touch with friends (90%), to write messages (90%), as a pastime (83%), to read contents provided by others (77%), to share their own contents (72%), to look for people they know (65%) and to organise events (52%). Less than half of the users use social media to follow companies or celebrities (50%), for professional contacts (41%), for news updates (36%), to meet new people (24%), to promote their own website (15%) or to play games (13%).[227]

253   The survey showed that users basically use Facebook.com for all the listed applications. Users said Facebook.com was either the most frequently or second most frequently used service for looking for people they know (52%), reading contents provided by others (53%), finding information on events and products (36%), following brands and celebrities (39%) as well as for entertainment and their pastime (44%).[228]

---

[223] […]
[224] […]
[225] […]
[226] […]
[227] […]
[228] […]

Compared to other social media, a key element of Facebook.com usage is looking for people the users know. The fact that Facebook.com is used for a wider range of applications than other services shows that comprehensive social exchanges take place on Facebook.com. The comprehensive use of the personal "virtual space" is a testament to this.

254   The survey also showed that the frequency of use is also an important element when it comes to determining the demand for a social network. The frequency of use varies considerably from one service to another: 84% of WhatsApp users use WhatsApp at least once per day, 65% of the Facebook users access Facebook.com every day, and 40% of users of Instagram and Snapchat use these services at least once per day. In contrast to that, only 23% of the Google+ users, 19% of the Twitter users and 17% of the YouTube users said they used the service at least once per day.

255   Those users who said they used individual services several times a day were asked for the average time they *spend using these services* per day. The answers users gave varied considerably. On the one hand, the reason for this could be that users find it difficult to estimate the average amount of time they spend using a network per day; on the other hand, their replies suggest that some users have understood the question to refer to their readiness to use the network. Some users, for example, said they used the service every day for 1440 minutes. The considerable variation in stated average daily usage duration makes the median[229] more meaningful than the mean value. Facebook.com's median value is 50 minutes. The other services, in particular those which are used daily, have median values of 30 minutes (Google+, WhatsApp, Threema and Snapchat), or 15 minutes (Telegram and iMessage).

256   In Facebook.com's case, multiple daily access and the large amount of time spent on the network combined with the wide range of applications the network provides, support the social network's function as a comprehensive personal "virtual space" for an in-depth social user experience.

257   The market investigations have shown that this demand is reflected by the typical basic functions of a social network. It must be noted that there is no standard range of social network functionalities. Facebook's view that the Bundeskartellamt had deduced a certain range of functionalities, in particular from the replies to the question referring to applications, is therefore inexplicable.[230] A range of features and functions, however, can be regarded as characteristics of a social network, as they constitute the basis for

---

[229]  The median is the value at the centre of a list of numeric values sorted by value.

[230]  […]

the described comprehensive personal "virtual space".[231] Typically, these include the obligation to register, a detailed personal profile, a personal contact list, functionalities to find others ("friend finding"), communication options with other users and the customised presentation of contents in a newsfeed. The European Commission's market investigations in the "Microsoft/LinkedIn" merger case had a similar outcome.[232] Details of the case:

258   To use a social network, its users must **register** by at least entering a user name and e-mail address or mobile phone number.[233] Based on their registration, users can be found in the network and contact other users they know.

259   Another typical characteristic of a social network is the possibility to set up a **personal user profile**.[234] Users can enter information on their places of residence, marital status, vocational qualification, occupation and hobbies, interests and political views. A user's virtual identity is supposed to be a reflection of his/her real life, and thus to constitute an "online identity". For this reason, the user's true identity can often be deduced from his/her social network profile, which at least gives enough details for other users to imagine what the personality of the actual person behind the online profile is like.

260   Users can develop a far-reaching personal network through social networks. A **contact list** is therefore a typical part of social networks. Users can connect with the listed members of the network community, e.g. friends, acquaintances and family, and manage and expand their contact lists. Most networks allow their users to control through privacy settings who can see what content of their profiles and who may contact them. They can adjust the social network to fit their own personal network and usage habits and to only include their specifically defined circle of friends and acquaintances.[235] Social networks also offer "**friend finding**" functionalities to look for new contacts in the network. Most services offer extended search functions, filters or active "friend finding" functionalities. Users are suggested as contacts to other users who could know them or be interested in getting to know them.[236]

---

[231] […]

[232] European Commission, COMP/M. 8124, "Microsoft/LinkedIn", decision of 6 December 2016, para. 98 In this investigation the market players stated that the following functions were vital for a social network: *"creation of a user profile and the possibility to send/receive messages, closely followed by several others (search for other people in the network, send/accept invitations to connect with new contacts, post/share content, post comments on items posted by others, interact with other users through private or public groups and have a newsfeed displaying news from the user's connections"*.

[233] […]

[234] […]

[235] On Facebook, for instance, users can define their own privacy settings, deciding whether their content is displayed to friends or "close" friends only or whether it is publicly visible to all users. See Facebook's "privacy check", www.facebook.de , […]

[236] […]

261   Typically, social networks have a **newsfeed** which filters the network content based on a user's prior behaviour, displaying and ranking potentially relevant contents for each user.[237] […][238] […][239]

262   Further typical functionalities of social networks include various **communication tools**[240] for sending or receiving contents or news to various groups of contacts. Users can communicate through texts or photos. Video and voice messages can also be exchanged through Facebook.com.[241] A social network can also include chat or messenger functions for bilateral or group contact in real time. Other than communication options through posts or comments on Facebook pages, Facebook.com also offers Facebook Messenger, which can be used both as a part of Facebook.com and, separately, as a (especially mobile) application. Facebook Messenger can be used for sending messages and for making telephone and video calls.

263   All in all the use of social networks does **not depend on the terminal or operating system** used. The user survey has shown that most users of online services use both desktop and mobile applications for these services, with an increasing tendency to use mobile apps.[242] There are other studies confirming this tendency towards mobile social media usage.[243] As most services are compatible with all operating systems, the type of operating system a user has (Windows, MacOS, Android, iOS, Blackberry or Linux) is not relevant in this context. This result matches with the Commission's decisional practice. It did not differentiate between the terminal devices or operating systems used in the "Facebook/WhatsApp" and "Microsoft/LinkedIn" cases after having conducted its own market research.[244]

(d)   **Services to be considered**

264   Besides Facebook.com, the only other services to be included in the market for social networks are StudiVZ and Jappy, as they offer similar functionalities and fulfil the same

---

[237] […]

[238] […]

[239] […]

[240] […]

[241] […]

[242] […]

[243] See for instance BITKOM study (in German), "Jung und vernetzt – Kinder und Jugendliche in der digitalen Wirtschaft", 2014, p. 14, according to which particularly users between 16 and 18 years mostly use the internet through their smartphones. https://www.bitkom.org/noindex/Publikationen/2014/Studien/Jung-und-vernetzt-Kinder-und-Jugendliche-in-der-digitalen-Gesellschaft/BITKOM-Studie-Jung-und-vernetzt-2014.pdf (last accessed on 10 January 2019) […]

[244] European Commission, COMP/M. 8124, "Microsoft/LinkedIn", decision of 6 December 2016, para. 96., COMP/M. 7217, "Facebook/WhatsApp", decision of 3 October 2014, para. 57-59

purpose, albeit with limited scope for substitutability. Google+ used to be part of the market where the service was offered to private users (see i). Professional networks and career portals (Xing, LinkedIn, Indeed, Stepstone - see ii) are not part of the market for private social networks. A separate market has to be defined for messaging services (SnapChat, WhatsApp, Telegram, Skype, Threema, FaceTime, WeChat, iMessage, Line, Viber, Yahoo Messenger, see iii). YouTube, Twitter, Pinterest (see iv.) and other social media (see v.) are not social networks.

i.   **StudiVZ, Jappy and (formerly) Google+,**

265   StudiVZ, Jappy and, until its discontinuation, Google+ are the only services to be included in the market, with the possible exceptions of StayFriends and WizeLife. They offer(ed) typical social network functionalities. However, due to the direct network effects emanating from Facebook.com, their substitutability is limited.

●   **Classification as social networks**

266   The **Google+** service in particular could be classified as a social network. The version for private users served to find and connect with people the users knew and to exchange opinions, experiences and contents on a daily basis among groups defined and identified by each user. The company considered itself a social network and entered the market in 2010, opening its network to all users in 2011, to directly compete with Facebook.com. The network addressed private users wishing to participate in an extensive social exchange via a personalised virtual space. For this purpose, Google+ offered the corresponding core functionalities (see above, para. 258), which were to grant users an intensive social user experience. The Google+ business version, which is available for a fee as part of the "G-Suite", however, is not part of the market, as it focuses on professional use (see ii below).

267   The private user version of Google+ was not directly monetised through advertising or other sales. All users, including companies, could use the network for free. There was no direct advertising on Google+. Although the service was not directly linked to a market side subject to payment, it was to be classified as a market service pursuant to Section 18(2a) GWB. The service was linked to advertising-financed Google services, particularly the Google search engine. User data generated from the use of various Google services was accumulated and used for advertising purposes.[245] Combined with the remaining Google services, particularly the search engine, Google+ served a

---

[245]   see Google's privacy policy, section "Why Google collects data": "We may combine the information we collect among our services and across your devices for other Google services." This feature makes it easier to share things with people you know. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.", to be found on https://policies.google.com/privacy (last accessed on 10 January 2019).

common purpose to generate profit[246] and thus constituted a market service pursuant to Section 18(2a) GWB.

268   The ad-funded **VZ services** (**StudiVZ** and **MeinVZ**) (see above, para. 199) and **Jappy** (see above para. 187) are also classified as social networks and offer the typical functionalities. **StayFriends** (see above, para. 197) basically also serves to connect with people the users know, but the target group is considerably smaller.

269   The platform serves to find friends from school and stay in touch with them. Users have to register naming the schools they went to and state their names at the time they studied there. However, the user survey has shown that StayFriends is used less intensively. In contrast to a large number of other services, 66% of StayFriends users log on to the service less than once per month, staying logged on for approx. 10 minutes, which is a comparatively short period of use.[247] The network is thus unlikely to create a virtual social space, but rather a service offering occasional contact with former classmates and enabling personal contacts via the organisation of class reunions. In addition to that, only StayFriend's very limited basic version is available free of charge. Its most important functions, including communication options, are only available to gold members, who pay an annual fee of €30.[248]

270   The user survey has shown that this "Freemium" business model does not generally exclude the network from the social network market. Users of private social networks tend to be unwilling to pay for the services. Most social networks are thus free of charge for their users and mostly funded through advertising.[249] According to the user survey, 84% of the respondents[250] currently do not use a service that has to be paid for.[251] Some users said they were willing to pay for additional services like premium functions or an advertising-free service.[252] It could therefore be considered to include StayFriends in the list of possible substitutes as it offers an advertising-free service for a small annual fee.[253] However, the percentage of StayFriends users who are gold members, which is the prerequisite for using all functions, is comparatively low. For this reason, the service is not a substitute for advertising-financed social networks like Facebook.com, Google+ or Jappy. This question, however, can ultimately be left open.

---

[246] For more information, please refer to the Bundeskartellamt's Working paper "Market Power of Platforms and Networks" of June 2016, p. 36; Government reasoning to 9th amendment to the German Competition Act, Bundestag printed paper 18/10207, p. 48.

[247] […]

[248] […]

[249] […]

[250] German internet users aged 14 or older who use selected social media.

[251] […]

[252] […]

[253] […]

The same applies to the **"Odnoklassniki"** service, which offers all the functions of a social network, albeit not in German.

271   The **Wize.Life** service (see para. 207 above) also has typical social network functionalities. However, the service also addresses the small "best ager" target group aged 40 or older and emphasises the option to meet like-minded people on the platform, both online and in person.[254] Due to its focus on older users, Wize.Life does not consider itself a competitor of Facebook.com, but rather of www.feierabend.de or www.platinnetz.de, which also address senior citizens.[255] Its users also do not log on frequently enough for the network to be a substitute for the social user experience offered by other social networks. Ultimately, this question can be left open.

- **Direct network effects limit substitutability**

272   Despite the fact that the products Facebook.com and (until recently) Google+, StudiVZ, Jappy and other services are basically similar, their substitutability is limited due to the direct network effects existing with Facebook.com. As was outlined above (see para. 217), there are positive direct network effects among private users of Facebook.com, as users of this group directly benefit from more members of their own user group being on Facebook.com.

273   The connection between the users that leads to the network effects can be either direct or indirect. Social networks are mainly characterised by direct network effects developing between their members. They primarily serve to connect friends and acquaintances and to enable communication between them. The more private users are active on Facebook.com, the higher the benefits for everyone in this user group as the options for users to interact and find friends and acquaintances increase with an increasing number of users in the social network. The network effects are "identity-based" because the users' identity rather than just the number of users is relevant in this context. Individual consumers practically only benefit from the virtual social community rather than the functionalities of the social network. The network's value for individual consumers increases with an increasing number of people from their social context who join the network.[256]

274   A social network's size is thus a key criterion for the substitutability of services from the customers' perspective. When it comes to identity-based network effects, it is particularly important that users find exactly the people they are looking for in the

---

[254] The same applies to the services provided by "Platinnetz" and "Feierabend" (both services belong to Feierabend Online Dienste für Senioren AG based in Frankfurt am Main and have a maximum of […] members), which, like Wize.Life, are often perceived as dating platforms as they offer people to meet each other.

[255] […]

[256] Dewenter/Rösch, Einführung in die neue Ökonomie der Medienmärkte (available in German only), 2015, p. 27.

network. The user survey has also shown that the decisive criterion for users is whether their friends use the network too. Approx. 85% of the respondents said they found it at least important that their friends also use the network.[257] 75% of the Facebook users would thus make more use of a service other than Facebook.com if their friends were using that service.[258] Some companies emphasise that the likelihood of finding friends and acquaintances on a network increases proportionally to the network's absolute size.[259] According to them, all companies aimed at expanding their networks to an extent that allows users to find and contact the "right people" there.[260] Another factor of interest, according to the companies, was the members' activity on the network, i.e. the intensity with which they use the network and the quality of the contents provided.[261] The quality of the contents provided depended on the network's data width and depth in terms of personal data and data on user interests and behaviour.[262] The network's size and intensity of use are two mutually reinforcing factors.[263]

275   With users selecting a network based on information from public sources, there is reason to doubt that they would replace Facebook with smaller networks like StudiVZ or Jappy in view of Facebook.com's absolute user numbers in Germany, which have been publicly communicated[264]. Facebook.com has 23 million daily a*ctive users*, whereas less than a million users are *registered* with StudiVZ (2016) and Jappy. The number of daily active users for the latter is even lower, i.e. these networks are merely a supplement to other social networks.[265]

276   The substitutability of Google+ under this aspect was limited, too. While the user numbers of Google+ were larger than those of its German competitors, they still did not come near the user numbers achieved by Facebook.com.[266] However, Google+ had an absolute size for a while that made it likely for friends and acquaintances to find each other there. Users ultimately select the network on which they actually find their friends for their daily activities, as was shown by the user survey. Connections to friends on Facebook.com cause a strong lock-in effect, which makes it difficult to switch networks, as friends (and friends of friends, etc.) would have to be convinced to switch

---

[257] […]

[258] […]

[259] […]

[260] […]

[261] […]

[262] […]

[263] […]

[264] https://allfacebook.de/zahlen_fakten/offiziell-facebook-nutzerzahlen-deutschland, […]

[265]   Considering their small user communities, the services "Kwick" and "Spin", which could also be considered social networks, although the latter is primarily used for its chat functionalities, will hardly replace Facebook.

[266] […]

networks, too. As a consequence, even a "market for Facebook" (single-platform market) can be considered. However, the outcome of this consideration can be left open as Google+ has left the market and the competitive assessment will not change, even if other services are considered as well.

ii.   **Professional networks like LinkedIn, Xing, Indeed are no substitutes**

277   Professional networks like LinkedIn and Xing, or job search portals like Indeed[267] or Stepstone are not part of the private social network market.[268] While, like private social networks, they serve for developing personal networks, these networks focus on professional contacts, which is why, in terms of their purpose of use and their functionalities, they are not interchangeable with private social networks. Also, their users are more willing to pay for the service provided, as professional networks are often designed as "freemium" services where essential functionalities are subject to relatively high fees.

278   Professional networks are mostly used for networking purposes in the professional context.[269] While private networking mostly serves to keep in touch with personal contacts, professional networks are mainly used for fostering the users' careers. The European Commission has reached the same conclusion in its market investigations in the context of the "Microsoft/LinkedIn" merger proceeding. The market players questioned said they used professional social networks for other applications than private social networks. The focus of their user profiles was on professional networking, and in some cases it was mandatory for users to include their key career steps. The Commission's decision in particular refers to a LinkedIn study ("The Mindset Divide") investigating the different motivations for using a private or professional network. While users wanted to "*socialize, stay in touch, be entertained, kill time, share content*" with private social networks, their aim was to "*maintain professional identity, make useful contacts, search for opportunities, stay in touch, keep up to date for career*" with professional networks.[270]

279   The market participants have confirmed this point of view in the current proceedings. Xing said private and professional networks were "separating". Whereas Facebook had clearly positioned itself as a network for private users (contacts = friends, holiday

---

[267] https://www.indeed.com/ (last accessed on 10 January 2019), […]

[268] Cf. European Commission, COMP/M. 8124, "Microsoft/LinkedIn", decision of 6 December 2016, para. 115ff.

[269] […]

[270] European Commission, COMP/M. 8124, "Microsoft/LinkedIn", decision of 6 December 2016, para. 109 with reference to https://business.linkedin.com/content/dam/business/marketing-solutions/global/en_US/site/pdf/wp/linkedin-marketing-solutions-mindset-divide.pdf (last accessed on 10 January 2018), […]

pictures, primarily private messages and groups), Xing had always focused on its function as a professional network, with its target group being professionals.[271] The user survey confirms this finding as it has shown that Facebook.com is used for professional purposes to a limited extent only. Only 6% of Facebook's users said they used Facebook.com (also) for professional purposes. Facebook.com's attempt to attract professional users by offering a job seeker function[272] does not mean that all professional networks have to be included in its market.

280   In terms of their functionalities, professional networks have been designed for professional networking. Besides general functions which are also offered by private social networks, they offer targeted functions for professional purposes like a detailed job search function, a job portal and recommendations for new professional contacts.[273] Users of professional networks also post different contents and connect with different people. They are more cautious about posting "private" content like family pictures, holiday posts, political views, etc. and instead select content of interest for (potential) employers, head hunters and colleagues.[274]

281   In addition, the user fees are comparatively high, especially on Xing and LinkedIn, which also decreases the likelihood of substitution. While private networks offer their services for free, or, like StayFriends, for a small fee, Xing's and LinkedIn's business model offers key functions only for paying members. Targeted search and connection with other users for professional purposes is only available to these members.[275]

282   Xing for instance offers its premium membership for EUR 7.95 per month (or EUR 9.95 for three months) and an additional "ProJobs" membership for EUR 24.95 to EUR 38.95 per month, depending on the duration. Xing's basic membership offers only limited functionalities and no communication options, i.e. the key network functions are only available for a fee.[276] LinkedIn also offers various premium packages for a monthly fee. Besides a simple premium membership, the price of which is similar to Xing, a "job seeker" membership is available for EUR 26.17 per month, a "business plus" membership for better professional networking for 41.64 per month, and a corporate membership for finding qualified staff ("recruiter lite") for EUR 89.19 per month. The free basic membership offers some communication options.

---

[271] […]

[272] […]

[273] Outcome of the European Commission's market investigations, COMP/M. 8124, "Microsoft/LinkedIn", decision of 6 December 2016, para. 101.

[274] European Commission, COMP/M. 8124, "Microsoft/LinkedIn", decision of 6 December 2016, para. 104-106.

[275] […] www.likedin.com (last accessed on 10 January 2019), under "Premium", […]

[276] […]

283   The Stepstone job portal also offers the possibility to post job adverts or search them for a fee. Besides, based on their functions such job portals are not to be considered as a social network, but rather as a brokering platform for employers and job seekers which is paid for by one side of the market. The job portal Indeed also requires employers to pay for job adverts.

284   Where professional networks and Facebook.com are used in parallel, this does not indicate substitutability and the existence of a uniform market. In particular, this does not represent a parallel use of several services which limits market power pursuant to Section 18(3a) no. 2 GWB. The underlying assumption of Section 18(3a) GWB was developed by Evans/Schmalensee[277]. It holds that multi-homing has a limiting effect on concentration on platform and network markets. However, this can only apply if users use several platforms and networks in parallel to satisfy the same requirements, i.e. services of the same markets.[278] Multi-homing itself is not an indication of uniform requirements. Parallel use of various differentiated platforms can, by contrast, be an expression of the fact that the platforms fulfil different requirements from the user's perspective, so that the different offers are imperfect substitutes to one another.[279]

285   In this case, market investigations have shown that professional and private networks are used for different applications and are therefore no functional substitutes for one another.

### iii.   Messaging services excluded

286   According to the investigations, the services WhatsApp, Google Hangouts, Snapchat, Telegram, Threema, iMessage, Skype, FaceTime, Line, WeChat and Viber and the Facebook Messenger app, which is used separately, cannot be attributed to the social network market, as they serve to fulfil complementary requirements from the users' perspective. However, this does not rule out the possibility that substitute competition emanates from these services on Facebook.com, including the corporate service WhatsApp.

287   These services are classified as messaging services, which are not substitutable for social networks based on their applications and characteristics. The investigations have shown that these services are mostly used in addition to social networks to complement their range of services. While messaging services, like social networks, serve to communicate with friends and acquaintances, messaging services do not

---

[277]   See outline of the Status of discussion at the Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 57ff.

[278]   Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016 , p. 62

[279]   Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016 , p. 61

allow the creation of a virtual social space in which users have an intensive social experience by being able to exchange opinions, experiences and messages. Their functionalities and use also differ accordingly.

288   Services like WhatsApp, Snapchat, Telegram, Google Hangouts, Threema, Skype, etc. are often summarised as **"Messaging"** or **"Instant Messaging"** services. In its decision on Facebook/WhatsApp, the European Commission refers to these and other services by using the general term "consumer communication services"[280], which to a certain extent associates them with telecommunications services like SMS (Short Message Services) or e-mail.

289   "Instant Messaging" refers to real-time text message chats between two or more participants which comprise photo, video or audio files. The messaging services also offer voice and video messaging options and each have a different focus regarding to the functionalities they offer. Skype for example is particularly known for its video chat ("Skype") function, but it also offers all other chat functionalities. From a technological point of view, these services are based on the "push messaging procedure", which directly sends ("pushes") the messages to the recipient's device. The services use a network protocol which facilitates an exchange of data between computers. Like WhatsApp and Skype, many services use a proprietary protocol. Users connect with each other through a computer program or an app (client) via a network, which is normally the internet.

290   Messaging services are primarily used for rapid communication. They serve for point-to-point bilateral or group communication. Groups are set up and managed by an administrator. The content of such communications quickly loses its relevance as the communication takes place in real time and is thus not normally saved. For this reason, the services put their emphasis on functionalities facilitating communication between two people or small groups.[281] When registering with the service, users grant the application access to the list of mobile phone numbers saved on their smartphones, which it uses to set up a list of contacts that normally includes the users' principal contacts. Users generally cannot add new contacts unless they know their mobile phone numbers. There is no option to set up a detailed user profile including personal data like date of birth, marital status, occupation and hobbies, so there is no "online identity".[282] Users also cannot comment or rate the contents posted by others as part of a bigger community or post contents themselves.[283] There is no newsfeed, and users

---

[280] European Commission, "Facebook/WhatsApp", decision of 3 October 2014, COMP/M. 7217, para. 13 ff.
[281] […]
[282] […]
[283] […]

cannot see other people's networks by checking their lists of friends, as the list of contacts can normally only be viewed by the user it belongs to.

291   As a result, messaging services lack the comprehensive user experience as facilitated by social networks with regard to their application and relating characteristics. Skype and Yahoo Messenger do not consider themselves social networks.[284] In its notification for the Facebook/WhatsApp procedure with the European Commission, Facebook pointed to this difference itself.[285] Facebook upholds the view in the present proceeding that users consider WhatsApp the key service for quick, personal and direct communication with friends and family ("*WhatsApp in many way was considered the de facto way to communicate*"), whereas Facebook.com to them is a service for obtaining information about friends, companies and other contents.[286] The user survey conducted in the context of this procedure confirms this result. It showed that there is a strong focus on messaging (76%) and contacts to friends (69%), in particular when it comes to WhatsApp.[287] […] Snapchat studies also see only partial overlaps.[288]

292   As is the case with professional networks, a **parallel use** of social networks and messaging services does not rule out the existence of a uniform market. For the purposes of the market definition, nothing can be deduced from a parallel use as such. Social networks and messaging services complement each other with their different applications, even though they both aim at communication with friends. The fact that Facebook.com offers Facebook Messenger, and Google+ offered Google Hangouts in addition to the communication options of their social networks also suggests that the services are used as complements to one another.

293   By defining separate applications for messaging services and social networks, one does not rule out the possibility of substitute competition between the services when it comes to some of their functions. However, direct network effects act as a limiting factor of competition, as is outlined above for social networks. Instead of suggesting that messaging services are similar products to social networks, the fact that messaging services also develop direct network effects further limits the range of potential (substitution) competitors. Messaging services are also marked by identity-based direct network effects, as their purpose is direct communication with specified friends and acquaintances who have to use the same messenger service as there is no compatibility or interconnectivity of the services. For this reason, a service's

---

[284] […]

[285] […]

[286] […]

[287] […]

[288] […]

attractiveness is higher if it has a large number of users. The user survey for example shows that this applies to the services named above too, of which WhatsApp has the largest number of users.

294   Parallel use of the services cannot reduce the direct network effects existing for each of the services unless exactly the same users stay in touch with the same circles of friends who have the same contacts on the services. Substitute competition can be assumed to increase with increasing overlaps between the circles of users. In this regard, substitute competition could merely be assumed to exist between Facebook and its WhatsApp service […][289] However, the figures on parallel use do not prove that the lists of friends and contacts are identical in both services.

### iv.   Snapchat excluded

295   Contrary to Facebook's view[290], the Snapchat service in particular cannot be considered a direct competitor. The service cannot be considered a social network despite the fact that it has further developed its functionalities. This service in particular cannot be included under the aspect of its supply-side substitution, either.

296   The Decision Division holds that Facebook is incorrect in claiming that Snapchat is to be considered a social network.[291] […][292] While Snapchat differs from other messaging services in certain aspects, it does not compare to a social network as a comprehensive personal virtual space.[293]

297   Snapchat's key function is its smartphone camera which opens automatically once the user starts the app. The user is thus motivated to become active immediately by creating and sharing with his friends and family so-called "snaps", which are mostly photos or videos creatively enhanced through lenses or filters. Snaps are automatically deleted a short while after being viewed and are thus ephemeral. Besides ephemeral "snaps", users can create "stories" which consist of a sequence of snaps (photos, videos). A user's own contacts can see these stories by default. They will be available for 24 hours before being deleted automatically. However, users can save them as "memories" before they are deleted. Commercial users can use Snapchat as a platform for their own "channels" to spread their editorial content via the "discover" function. Users can view and follow these channels. Snapchat also has a function permitting users to find friends whose mobile phone number is unknown to them via a Snapchat

---

[289] […]
[290] […]
[291] […]
[292] […]
[293] […]

code (see above, para.196). Real names are not required on Snapchat. Users can enter a user name and a "bitmoji" profile picture. Bitmoji is a functionality that has been included in Snapchat since 2016[294]. It allows users to create personalised "avatars" (non-identifiable picture of a person). Snapchat does not provide its users with the possibility to enter a differentiated profile containing information about their relationship status, occupation, place of residence or interests.[295]

298   It cannot be assumed that Snapchat could substitute the social network Facebook.com, even though it has functionalities which come closer to those of social networks. However, the described functions do not provide for a virtual space allowing a comprehensive social user experience using an online identity. The country manager of Snapchat Germany, Marianne Bullwinkel, thus rightly considers Snapchat *"a camera app facilitating a particularly creative way of communicating with friends and family"* rather than as "social media".[296] Snapchat's competitors are Facebook's services WhatsApp and particularly Instagram rather than Facebook.com. […][297] Instagram is particularly successful […] and attacks Snapchat's position.[298] There is, however, no similarly successful competition to Facebook.com's social network. While Facebook states that the "Stories" function was launched for Facebook.com in 2017, Snapchat's reaction refers to Instagram […].[299] In addition, German users have been reluctant to use these functionalities so far. The actual focus of Snapchat users continues to be on sharing pictures with integrated filters.[300]

299   Snapchat cannot be included in the social network market with a view to its supply-side substitution either […][301].

300   Pursuant to the Federal Court of Justice's case-law, the definition of the relevant market generally also include products which are no functional substitutes for those on the market in question, but which form the basis for manufacturers to offer a competitor product if the competitive conditions in the market allow for it. Supply-side substitution,

---

[294] Bitmoji is a separate mobile app by Bitstrip Inc., a subsidiary of Snapchat, available since 2016.

[295] […]

[296] http://www.horizont.net/tech/nachrichten/Marianne-Bullwinkel-So-snappen-die-Deutschen-161163 (in German, last accessed on 10 January 2019).

[297] Comparison of "Snapchat Stories" with "Instagram Stories" available (in German) at http://www.futurebiz.de/artikel/snapchat-instagram-stories/ (last accessed on 10 January 2019), […]

[298] Snap, B6-22/16, competitor survey, p. 3149 of the file, cf. https://www.basicthinking.de/blog/2017/06/21/whatsapp-snapchat-stories/ (in German, last accessed on 10 January 2019).

[299] […]

[300] Study by Düsseldorf University of Applied Sciences (in German), Gerhards, Claudia et al. (2017), "Wie snappt Deutschland? Nutzung von Inhalten und Wahrnehmung von Werbung auf Snapchat." User survey study in cooperation with whylder agency, press release of 16 January 2017, https://wiwi.hs-duesseldorf.de/aktuelles/meldungen/20170116?showarrows=1&sid=2oe3cu3dgbpft50bywkhsllw (last accessed on 10 January 2019), […]

[301] […]

however, can only be assumed to exist if the providers of similar products are willing and able to modify their offer at short notice and at reasonable economic cost.[302] Unless these preconditions are met, it cannot be assumed that the competitive pressure currently existing is sufficient to influence the conduct of companies active on the market in a way that would justify treating providers of similar products like current competitors.[303] Unlike potential competition, which is assessed on the basis of the likelihood and possibility of entering the market in the medium term[304], the relevant criteria for defining the market are that other companies can switch their supply at short notice and low cost. Treating companies which are active on similar markets as current competitors is therefore only justified if they can switch their supply immediately at no significant additional cost. Such companies cannot be considered competitors if their change of supply would entail considerable adjustments of existing tangible and intangible assets, additional investments, strategic decisions or delays. This view corresponds to the European Commission's guidelines for market definition.[305]

301   It has to be considered, in addition, that the market has to be defined for abuse control purposes. Unlike merger control, abuse control assesses current, immediate or past market behaviour towards individual market players rather than the future market structure. Pursuant to the Federal Court of Justice's case-law, each individual case must be carefully examined when applying abuse control of powerful or dominant market positions with regard to whether the addressees' current competitive behaviour at the time of assessment is controlled by competitors' general supply-side substitution.[306]

302   On this basis, Snapchat is not included in this case. Leaving technological aspects and the required investments aside, which could make supply-side substitution at short notice difficult, there is also reason to doubt that Snapchat would be willing and able to change its product and company philosophy to turn itself into a social network offering a user experience similar to Facebook.com. Snapchat's service became successful because it offered ephemeral snaps which were deleted by default after a short while. Snapchat founder Evan Spiegel said that Snapchat was all about "showing who I am

---

[302] Federal Court of Justice, decision of 16 January 2007, ref. KVR 12/06 , BGHZ 170, 299-311 – *National Geographic II,* para. 20 (juris).

[303] cf. in particular Commission Notice on the definition of relevant market for the purposes of Community competition law, OJ of 9 December 1997, C 372/5, para. 20.

[304] Federal Court of Justice, decision of 21 December 2004, ref. KVR 26/03 – *Deutsche Post/Trans-o-flex,* para. 28 (juris).

[305] European Commission, Notice on the definition of relevant market for the purposes of Community competition law, OJ of 9 December 1997, C 372/5, para. 20, 22, 23.

[306] Federal Court of Justice, judgement of 24 January 2017, ref. KZR 47/14, "VBL Gegenwert II", para. 25.

now".[307] The fact that the snaps are ephemeral lowers users' inhibitions to share unfavourable photos of themselves. According to Snapchat, it is part of the company's philosophy to facilitate real time communication which is as realistic as possible. The company holds that real-life conversations are also ephemeral, which would lead to more casual behaviour than in recorded conversations.[308] With its short-lived contents, Snapchat is particularly popular among young users.[309]

303   In contrast to that, a social network requires long-term user relationships rather than short-lived posts. Long-standing active users use their social network like a diary. They save photos and contents permanently and can display them in chronological order if they wish, which is supported by the fact that Facebook.com's newsfeed displays both current and selected past posts ("rediscover shared contents and posts"). Not even Snapchat's new functions "Snapchat Memories" or "Snapchat Stories" are aimed at providing users with a similar kind of experience. Like snaps, Snapchat stories are "ephemeral" and disappear 24 hours after publication. Snap Inc. deliberately focuses its service on its users' "closest" friends and thus, according to its own statements, does not plan on expanding its network functions to "friends of friends" or "social hooks" like "Like" buttons. The service is to focus on active communication with the users' "real" friends.[310] That being said, it is not to be expected that Snapchat will simply modify its service and add further functions to turn it into a social network that is used in a completely different way. As outlined above, the service is rather a competitor of WhatsApp and Instagram.

304   Contrary to Facebook's view, a "critical mass" of users or technological, financial or personal skills are not an indication of supply-side substitution. It cannot generally be assumed that large platforms and services are capable any time of entering closely related markets and being as successful as on the first market, making them current competitors in various internet-related markets. Conversely, the services' scope cannot be "transferred" to other services. While it may be technically feasible to switch or expand to another product, the service starts from scratch in terms of the "critical mass", as was illustrated by the example of Google+. This is especially true for products completely changing their underlying philosophy, as would be the case here.[311] In

---

[307]   http://www.n-tv.de/wirtschaft/Das-ist-der-Mann-der-Facebook-narrt-article19683262.html   (in   German,   last accessed on 10 January 2019), […]

[308]   […] Snapchat, Form S-1 Registration Statement of 2 February 2017, p. 65, https://www.sec.gov/Archives/edgar/data/1564408/000119312517029199/d270216ds1.htm#rom270216_4 (last accessed on 10 January 2019), […]

[309]   http://www.faz.net/aktuell/finanzen/soziales-netzwerk-snapchat-plant-boersengang-14780859.html   (in German, last accessed on 10 January 2019), […]

[310]   […]

[311]   Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 43.

addition, this also applies in particular with regard to the strong direct network effects which keep users with Facebook.com and WhatsApp and which form a considerable barrier to market entry, as a newly formed service would have to convince current Facebook users to switch. Facebook had developed the "Poke" app […], which served to share contents that disappeared within seconds after being read. Poke […] discontinued in 2014.[312] According to Facebook, the company has unsuccessfully tried to compete in further markets, but discontinued these efforts[313], which shows that not even Facebook can transfer its user base to another closely related network market.

305   Facebook gave a few examples of successful developments by other services, namely of photo service Flickr successfully developing an online game, or gaming platform Slack successfully developing communication software and YouTube successfully developing a video dating platform. However, none of these examples are relevant in the context of social networks.[314] In individual cases, a good service can quickly become successful, which is a characteristic feature of internet dynamics. However, internet dynamics and innovative power as such cannot be used to justify supply-side substitution, which can actually be limited in individual cases. This applies in particular to the lock-in effect on the targeted user group due to direct network effects (see also 460ff.). There is reason to doubt that Snapchat already has a "critical mass" of users in Germany, which would enable the company to switch its offer towards a social network. According to press information, approx. 5 million users in Germany use Snapchat (June 2017). The number of daily active Facebook users is considerably higher and amounted to approx. 23 million in 2017.[315] 5% of the users questioned during the user survey commissioned by the Bundeskartellamt said they use Snapchat on a regular basis.

306   It can ultimately be left open whether Snapchat is to be included in the market, as the competitive assessment would not change as a result. However, to be consistent, the Facebook services Instagram and WhatsApp would have to be included as well. These have considerably larger user numbers than Snapchat. Contrary to Facebook's[316] view, the fact that the European Commission classified WhatsApp as a messaging service in 2014 does not substantiate the view that Snapchat and WhatsApp belong to separate markets. Like the Bundeskartellamt, the Commission distinguished between social networks and messaging services based on the comprehensive social user experience,

---

312 […]

313 […]

314 […]

315 http://www.horizont.net/tech/nachrichten/Hansestadt-Snapchat-Mutter-bezieht-ihren-Deutschlandsitz-in-Hamburg-158683; (in German, last accessed on 10 January 2019); […]

316 […]

real-time communication and social functionalities in a larger user group.[317] These differences continue to apply to Snapchat despite the additional functionalities, which is why the Bundeskartellamt holds that the service is a photo-based messenger service like WhatsApp.

> ### v.   YouTube, Twitter

307   Contrary to Facebook's view[318], YouTube and Twitter are not part of the social network market, either.

308   While there are some overlaps with Facebook.com when it comes to functionalities, there are major differences with regard to the purposes for which the services are used, the providers' positioning and the functionalities offered to this end, which contradict substitutability with Facebook.com from the users' perspective.

> ### •   YouTube

309   Contrary to Facebook's view[319], this primarily applies to the **YouTube** service, which is first and foremost a video platform for watching and exchanging videos. YouTube considers itself primarily a "video-on-demand" platform which offers some "social" functions, as users can watch, rate and share videos.[320] The strategic orientation of video platforms like YouTube is completely different from social networks which emphasise interactive communication between users in a virtual social space. Only 4% of the users questioned counted YouTube among the services they use as "social networks", also 79% of them actually use YouTube.[321]

310   The fact that the exchange of videos and the communication processes take place between two separate user groups rather than within each user group shows YouTube's strategic orientation as a video platform. The focus is on its platform characteristics, which enable direct interaction between the users uploading the videos (the "creators") and the users who watch the videos. Users can subscribe to the creators' "channels". The service is mainly characterised by the indirect network effects which exist between these user groups. YouTube has turned into a marketing platform for artists which generates its own stars. Artists post their videos, which in turn generate considerable advertising revenue. A central element of YouTube's business model is to have the largest possible number of "creators" on the platform. YouTube offers special partnership models to support particularly successful "creators" for this

---

[317]  European Commission, decision of 3 October 2014, Ref. COMP/M.7217 - para. 53 ff. – *Facebook/WhatsApp*
[318]  […]
[319]  […]
[320]  […]
[321]  […]

purpose.[322] Besides, YouTube has a special incentive structure which also attracts private users. Unlike social networks for private networking with friends, they can potentially generate significant advertising revenue with their own videos on YouTube.

311  On YouTube, communication between the channel subscribers is limited to public comments to which everyone can post a public reply. Until August 2017, however, sharing videos on YouTube was not possible. Users had to share them via e-mail or interfaces with other services like Facebook.com and WhatsApp before that date. In August 2017 YouTube launched its own messaging service and integrated it into the mobile YouTube smartphone app which facilitates sharing and chatting about videos with contacts from the users' contact lists, either bilaterally or in groups. This app was created to modernise the process of sharing YouTube contents. Users can now share videos directly with their friends while continuing to watch, browse, discover new contents or add their own videos. A desktop version of the app was launched in June 2018.[323] However, this chat function does not make the platform part of the social network market. Instead, it gives access to the messaging services market. As outlined above, the fact that some social network providers also offer messaging services, e.g. the Facebook Messenger, WhatsApp or Google Hangouts, does not make these services substitutes of social networks.

312  Based on the indicated applications, the user survey has shown that YouTube thus does not work like a virtual social space digitally reflecting the user's social relationships. Many users mostly use YouTube for "entertainment and pastime".[324] YouTube is hardly ever used for other purposes (e.g. contacts to friends, messaging, looking for people the user knows, share contents) [...][325] All in all, this shows that YouTube is an imperfect substitute for Facebook.com. YouTube primarily serves to find relevant contents and entertainment, while entertainment only accounts for a small fraction of the applications for which Facebook.com is used.

313  The time spent on YouTube compared to Facebook.com confirms this statement: Providing a virtual social space, Facebook.com's daily usage is high, while YouTube is used less often. Users gave the following information on their usage times in the survey:

---

[322] [...]

[323] https://youtube.googleblog.com/2017/08/introducing-new-way-to-share-youtube.html (last accessed on 10 January 2019); reply to the Decision Division's questions of 12 June 2018, [...]

[324] [...]

[325] [...]

|  |  | YouTube |  | Facebook |  |
|---|---|---|---|---|---|
| **Is used** |  | 79% |  | 58% |  |
| *of which:* | *more than once per day* |  | *10%* |  | *49%* |
|  | *once per day* |  | *8%* |  | *16%* |
|  | *several times a week* |  | *23%* |  | *11%* |
|  | *once a week* |  | *12%* |  | *6%* |
|  | *several times a month* |  | *16%* |  | *5%* |
|  | *approx. once a month* |  | *15%* |  | *6%* |
|  | *less often than that* |  | *17%* |  | *8%* |

314   Viewing YouTube videos is normally not subject to registration. A significant number of daily active YouTube users use the service without registration, which means that they can view all the videos, but cannot use any further functionalities.[326] This also demonstrates that the passive consumption of videos clearly takes priority. YouTube refers to its users as "viewers" and registers usage figures classified according to the categories "daily active viewers" (DAV) and "monthly active viewers" (MAV). Consequently, videos are the only type of media which can be uploaded. YouTube has no upload functions for audio files or photos. Upon registration, users can start their own YouTube channel, including a channel icon, and enter a detailed channel description under "About". However, there are normally no detailed user profiles.

315   The assessment that YouTube is not a social network[327] is not changed by the fact Facebook.com launched the "Facebook Watch" (US only) and "Facebook for Creators" functions in 2017, which have certain overlaps with YouTube's business model.[328] Video functionalities only account for a fraction of Facebook.com's overall network functions as part of a comprehensive user experience, i.e. an offer of video contents. Facebook.com's entering the video platform market does not make YouTube a part of the social network market.

316   Neither can YouTube be included in the market in view of possible supply-side substitution. The arguments on Snapchat (para. 295ff) apply. In addition, it cannot be

---

[326] […]
[327] […]
[328] […]

expected that YouTube will be successful on the social network market in the short term with reasonable economic effort, as it developed its large user basis with a completely different underlying philosophy. Google's own company history has shown this: In 2013, Google tried to link the use of YouTube to the use of its social network Google+. A Google+ registration including a user profile was required for posting comments on YouTube. YouTube users massively protested against this.[329] In autumn 2015, Google reversed the practice.[330]

317   It also has to be considered that Google already had its own social network, Google+, which was set up to compete with Facebook.com but failed. As stated above, Google now operates Google+ as a business product only. It is not evident that Google could intend to develop YouTube into a second social network, which would potentially put YouTube's recipe for success as a video platform at risk. As described in para. 276, the problem of direct network effects has to be taken into account. YouTube rather pursues the audio-visual development of its platform and now offers subscription models subject to fees. In June 2018, YouTube launched its music streaming service "YouTubeMusic" in Germany.[331] There are two options to use the service: either for free with advertising or as a premium service for a monthly fee of 9.99 euros. At the same time, "YouTube Premium", an advertising-free premium version of YouTube that had already been available in the US, was launched in Germany for a monthly fee of 11.99 euros.[332] With this strategy, YouTube moves even further away from social networks.

318   Contrary to Facebook's view, parallel use (multi-homing) of Facebook.com and YouTube does not support the argument of a single product market. […][333][…][334] […] Facebook.com and YouTube are increasingly used in parallel, […][335]. That being said, the parallel use does not take place for direct communication processes with friends and acquaintances. As stated earlier, a large number of "DAVs" uses YouTube without registration and thus solely for viewing videos.

---

[329]  https://youtube.googleblog.com/2015/07/youtube-comments.html  (in German, last accessed on 10 January 2019), […]

[330]  […]https://googleblog.blogspot.de/2015/07/everything-in-its-right-place.html (last accessed on 10 January 2019), […]

[331]  Cf.     https://www.heise.de/newsticker/meldung/Musik-Streaming-YouTube-Music-startet-  in-Deutschland-4084187.html  (available in German only, last accessed on 10 January 2019).

[332]  Cf.  https://www.heise.de/newsticker/meldung/Google-startet-Streaming-Dienst-YouTube-Music-4050846.html (available in German only, last accessed on 10 January 2019).

[333]  […]

[334]  […]

[335]  […]

● **Twitter**

319   From the users' perspective and based on the application and form of use, the Twitter service is not part of the market for social networks, but can at most be considered as substitute competition.

320   While Twitter users can set up a detailed profile stating their age, sex, occupation and general interests[336], and also check their contact list against the service to see which of their contacts are active there[337], they cannot develop an online identity or connect with friends or people they know to exchange experiences, opinions and contents among a group of people defined by themselves.

321   Twitter is often categorised as a so-called "microblogging" (short message) service. A "blog" is a journal which is typically kept on a website and normally publicly accessible. A person referred to as "blogger" uses the blog as a log or enters contents such as photos or videos, or simply makes notes of his/her thoughts. "Microblogging" means blogging by posting short status messages which typically do not exceed a length of 200 characters. As described above (see para. 203), registered users can use Twitter to share short, telegram-style messages ("tweets") not exceeding a length of 280 characters (excluding attached files or quoted tweets). The service thus has similar functions as a messaging service due to the real-time tweets and its overall quickness of response. […] Twitter focuses on real-time information on current developments […][338]

322   Unlike social networks, the service is also characterised by highly visible public tweets. Tweets are public by default. While users can also decide to share their information bilaterally or in a small group of users, the service considers itself primarily a platform for public self-promotion and real-time exchange […].[339] Twitter emphasises that, in contrast to the service provided by its competitors, users can also see tweets from users they do not know.[340] A key feature of Twitter is the hashtag (#) which serves to find public tweets. Frequently used hashtags are potential "trending topics" in public debate.

323   Another area of focus of this service is content sharing.[341] As detailed above, the "content-sharing services" category is often found among the various social media

---

[336] […]

[337] Twitter, https://twitter.com/who_to_follow/import (last accessed on 27 July 2018); similar procedure with the services Weheartit and Instagram.

[338] […]

[339] […]

[340] […]

[341] […]

definitions.[342] Internet platforms are focused on the publication of contents and interactions between users and contents.[343] The (smaller) group of "creators" is normally confronted with a larger user group which consumes and comments on the contents published by the creators. However, content-sharing platforms lack social functions exceeding the scope of comments/likes.[344] On Twitter, users who do not know each other frequently exchange opinions and contents. The users' identity does not matter to the same extent as it does on social networks. The volume and relevance of the contents posted on the platform are the important criterion.[345]

324  As a content platform, Twitter is thus comparable to YouTube, which is also often classified as "content-sharing" platform. As on YouTube, users can look at contents without registration on Twitter.[346] Users only have to register if they want to interact with other users, e.g. to comment on certain contents or to "follow" them.

325  Twitter also cannot be classified as a social network on the basis of the time spent on the service:

|  |  | YouTube |  | Facebook |  | Twitter |  |
|---|---|---|---|---|---|---|---|
| **Is used** |  | 79% |  | 58% |  | 15% |  |
| *of which:* | *more than once per day* |  | *10%* |  | *49%* |  | *12%* |
|  | *once per day* |  | *8%* |  | *16%* |  | *6%* |
|  | *several times a week* |  | *23%* |  | *11%* |  | *15%* |
|  | *once a week* |  | *12%* |  | *6%* |  | *10%* |
|  | *several times a month* |  | *16%* |  | *5%* |  | *9%* |
|  | *approx. once a month* |  | *15%* |  | *6%* |  | *18%* |
|  | *less often than that* |  | *17%* |  | *8%* |  | *31%* |

326  The users' replies show that Twitter is used in a way that rather compares to YouTube, although it has considerably fewer users who more frequently said they would rarely use the service. This is another aspect under which this service cannot be considered

---

[342]  See for example the definition by the German Association for the Digital Economy (BVDW), https://www.bvdw.org/fileadmin/bvdw/upload/publikationen/social_media/Kompass_Social_Media_2016_2017.pdf (in German, last accessed on 10 January 2018): Content-sharing services allow users to share content, e.g. photos, videos or music, with other users, who can rate, recommend or link it.

[343]  […]

[344]  […]

[345]  […]

[346]  www.twitter.de (in German, last accessed on 10 January 2019),[…]; www.youtube.de (in German, last accessed on 10 January 2019),[…]; similar for WeHeartit; the use of Pinterest and Tumblr is subject to registration.

a virtual social space for users that would enable them to gather and interact with various friends and groups.

327   Another indication that there is no substitutability with Facebook.com is […] that Facebook's market entry did not have any influence on Twitter's market position in Germany […].[347] Like Snapchat and YouTube, Twitter cannot be included under the assumption of potential supply-side substitution. As detailed above, it cannot be assumed that the service intends to change its application in the short term, expecting to keep its user base.

### vi.   Pinterest, Instagram

328   Contrary to Facebook's view, Pinterest and Instagram are not part of the social network market.

#### ● Pinterest

329   On its German website, Pinterest describes itself as a "catalogue of ideas people use to plan the big and small projects of their lives".[348] Pinterest claims to be a "visual bookmark" helping users find and organise creative ideas.[349]

330   Online media classify the service as a "social network of pictures" that is counted among the microblogging platforms. Users can pin pictures, photos and drawings to their virtual boards and make them available either to the public or to defined groups. The service's name is a composition of the verb "to pin" and "interest". To register, they need to enter their name and e-mail address and select from a variety of different areas of interest (photography, fashion, shoes, food and drink, home and living etc.). Use of the service is subject to registration. The "home" page ("start" feed) shows various photos made available by commercial or private boards on the selected topics. Pins can be saved to the users' boards, which can be marked as "secret" if required. Pins can be shared ("repinned") and commented on in other social media. (Real-time) conversations can also take place via the message function. Other users can be invited to jointly collect pins on a separate board. Users can follow all or selected boards of other users.

331   Based on its application and characteristics, Pinterest is not part of the social network market. The service rather focuses on collecting, organising and viewing commercial and private photos, with relatively limited communication on them. Commercial pins appear in large numbers on the start feed based on the interests the user indicated.

---

[347] […]
[348] Cf. description of the smartphone app in Apple's app store, accessed on 21 August 2017.
[349] Cf. (German) description in Pinterest's help centre, https://help.pinterest.com/de/guide/all-about-pinterest, […]

They serve to collect shopping ideas and as product advertisements. In the area of private interests, Pinterest can be used for "photo blogging", which is a mixture of blogging and content sharing.

332   The user survey confirms this view. Only 2% of the users said they used Pinterest as a "social network", while 11% actually used Pinterest.[350] This is already an indication that users do not consider the service a social network. When it comes to the various applications, the respondents named Pinterest at best as their second most frequently used service, and only a small share of them ranked the service that high. Only 4% of the Pinterest users said Pinterest was their second most used service for "entertainment and pastime". An even smaller share of Pinterest users named Pinterest their second most used service for following "brands and celebrities" or "obtaining information on events or products" (less than 1% in each case). The time spent on Pinterest is similar to other content platforms like YouTube or Twitter:

| | | YouTube | | Facebook | | Pinterest | |
|---|---|---|---|---|---|---|---|
| **Is used** | | 79% | | 58% | | 11% | |
| *of which:* | *more than once per day* | | 10% | | 49% | | 9% |
| | *once per day* | | 8% | | 16% | | 11% |
| | *several times a week* | | 23% | | 11% | | 13% |
| | *once a week* | | 12% | | 6% | | 6% |
| | *several times a month* | | 16% | | 5% | | 15% |
| | *approx. once a month* | | 15% | | 6% | | 19% |
| | *less often than that* | | 17% | | 8% | | 28% |

333   All in all, this service thus cannot be considered a virtual social space for users to gather and interact with various friends and groups. As with other services, Pinterest cannot be included under the assumption of potential supply-side substitution either. As detailed above, it cannot be assumed that the service would be willing or able to change its application in the short term while expecting to keep its user base.

- **Instagram**

334   Contrary to Facebook's view, Instagram is not a social network which could be considered a potential substitute for Facebook.com, despite the fact that there are

---

[350] […]

certain overlaps and links between the two services. Instead, it is a mobile photo service with a microblogging function, putting the service in a competitive position to Snapchat on the one hand and YouTube on the other.

335   Instagram contains some key elements of a social network, e.g. the obligation to register and options to create a relatively comprehensive user profile. Users can look for people they want to follow and "followers" can follow them. Contacts from their address books can be uploaded to see if they use the service too. If Instagram users also use Facebook, their Facebook friends can follow them on Instagram if they also use that service. With its "Discover People" function, Instagram suggests other users and also accesses Facebook data for this purpose. The service also has a start page listing the photos and videos posted by the people a user follows. The service is also used by a significant number of companies and celebrities, and users can follow them too.

336   With communication being limited to photos and videos, the service cannot be classified as a social network. The service is rather to be placed among the content platforms, as its attractiveness is mostly based on the number and relevance of the posted contents and to a lesser extent on the private users' identities. While it is now possible to create a "private account" which is only visible to users the owner approved, Instagram has been created for public use which generates more "followers". Instagram's incentive structure is similar to YouTube's, as users can make their accounts available as advertising channels. If they generate enough followers, they receive advertising revenues. "Product placement", for example, can generate advertising revenue. Users take pictures of a certain product and upload them to their Instagram account. Such potential advertising revenue is a significant incentive for having a public account.

337   As on YouTube, some Instagram stars are only known on this specific platform. The large number of celebrities on Instagram makes the service interesting for so-called influencer advertising. Influencers are active in social media and have the potential to generate revenue with advertising and marketing due to the influence they have gained on their followers with their strong presence and reputation, content product and distribution. They are also used for marketing purposes in the respective social media.

338   In a private context, the service functions as an online photo diary and, like Snapchat, it has a photo chat function including options to edit photos before sending them. Additionally, Instagram "stories" can be created. The service can also be used

exclusively as a mobile app or mobile website. 37% of Instagram users are 14 to 19 years old.[351]

### vii.   Other services

339   Other services considered, e.g. Apple Photos, Flickr, MySpace, Reddit, Tumblr, Vimeo and Yelp are not to be included in the relevant market for social services either.

340   **Flickr** is a photo service with blogging function offering similar functionalities and applications to Pinterest and Instagram. It is thus not to be categorised as a social network. The explanations on Pinterest also apply in this case. **Apple Photos** is not to be included either. There is reason to doubt that the service actually is a social medium at all as the only communication option it offers is sharing photos via other social media.

341   **Tumblr** is also a blogging service focusing on photos. However, like **Reddit**, its applications and functions are comparable to Twitter. The services are used for public communication only, with Tumblr lacking a comments function. Both services are also mostly in English and cannot be attributed to the social network market for the same reasons applying to Twitter.

342   Like YouTube, the **Vimeo** portal cannot be attributed to the same market as Facebook.com. The explanations on YouTube also apply in this case. What is more, most parts of the service are subject to fees and address a professional user group. **My Space** is not attributable to the social network market either. The service has a clear focus on music and mostly serves for marketing and raising awareness for musicians and bands as well as helping musicians stay in touch across borders. The applications of MySpace mostly include elements of content platforms like YouTube, but also elements of a professional network for musicians.

343   Finally, the online business guide **Yelp** and similar services are not part of the market either. Users use these services for other purposes than those of social networks. They mostly look for and compare service or product offers to book or buy them. Other users' ratings help them decide which offer to choose. The providers' information is complemented by the perception of those who have already used the product or service. Many users benefit from these ratings as these potentially offer an independent and subjective assessment as a basis for comparing one product offer to another. Some of the services' characteristics are similar to Pinterest, which is not part of the relevant market either.

---

[351]   https://www.crowdmedia.de/social-media/instagram-nutzerzahlen-in-deutschland-2018/   (in   German,   last accessed on 10 January 2019).

### (3) Geographic market definition

344   The geographic social network market area is Germany, which is supported by the outcome of the investigations into the actual use of social networks in Germany (see a) and the existing special characteristics in Germany (see b). Additionally, the market affected by the conduct does not extend beyond Germany's borders for reasons of supply-side substitution (see c).

### (a) **Actual national use**

345   With the **actual use** of social networks being mostly limited to users based in Germany, defining the market as Germany-wide seems appropriate.

346   Social networks are available worldwide and both Facebook.com and, while the service was on the market, Google+, are designed for international use. 53% of the users said in the Bundeskartellamt's user survey that their decision to use a network was based, among other aspects, on the criterion that "people from various regions or countries" use the network too.[352] Facebook.com and the former Google+ service are attributable to the respective domestic markets, irrespective of the fact that there are also networks (Stayfriends, StudiVZ, Jappy.de) which basically focus on the German market. In fact, German users mostly use the network to connect with their Germany-based friends.

347   However, according to the user survey, for approx. 85% of the users the decision to use a social network is based on the fact that their friends also use the social network.[353] In addition, the user survey showed that, with respect to Facebook.com, approx. 80% of the users said most of their friends lived in Germany, approx. 15% have friends both in Germany and abroad and less than 2% said most of their friends lived abroad.[354] The identity-based network effects mentioned above, which are a typical characteristic of social networks, thus mostly take effect within the national borders, as the relevant friends of more than three quarters of all users are located within these borders. Network effects work in favour of social network providers whose networks have a large user base in Germany, as their users are highly likely to find their friends.

### (b) **National specifics**

348   For international social networks like Facebook.com and formerly Google+, the user interface has the same design worldwide. However, their services are offered under a national domain in each country. Language settings also vary according to user region.

---

[352] […]

[353] […]

[354] […]

Services like Odnoklassniki (see para. 192) are not to be included in the market as German users would not find other users mostly communicating in their language on that network, so social interaction, which is a key element of social networks, would not be possible. Content users share on Facebook.com, e.g. by clicking "Like" or "Share", is often in German as it refers to regional or national topics based on the users' interests. The same applies for German-language advertising that matches the interests of German users.

349 German users use Facebook.com in a way that differs from other European countries. […][355]

### (c) Service providers unable to perform supply-side substitution

350 Supply-side substitution from other national markets cannot be assumed as it is not possible to successfully enter the German market from other geographic markets in the short term and at reasonable economic cost due to the identity-based direct network effects in place. The users' national focus when using a network makes it difficult to expand the network's geographic orientation and, for social media which previously had a different market position, it is equally difficult to expand their scope of functions. This type of market entry would require to build up a network with an entirely new user base. As is the case when it comes to transferring a network's scope to a newly developed service, it is not possible to expand the existing geographic scope with reasonable economic effort in the short term, due to the direct network effects.

351 The national networks Stayfriends and StudiVZ have thus not been very successful in their attempts to grow in other European countries: StudiVZ tried to expand to other European countries but discontinued its efforts in 2009.[356] Stayfriends is only active in the German-speaking area. While the company does have a Swedish (Stayfriends.se) and a French branch (Trombi.com), these are separate services with very small user numbers.[357]

### c. Online advertising markets

352 The market side of advertisers on Facebook.com is also affected by the conduct under review. The advertisers mainly provide targeted advertising for which a considerable amount of data has to be processed. As has been outlined, the market side of the advertisers has to be considered separately from the other market sides of the social

---

[355] […]

[356]  http://www.chip.de/news/StudiVZ-schliesst-fremdsprachige-Ableger_34078550.html  [...]

[357] […]

network. The affected market is the national market for non-search online advertising. It can be left open whether a submarket for non-search social media advertising exists.

### (1) Definition of the product market

353 According to the Bundeskartellamt's investigations, online advertising and offline advertising are separate markets (a). When it comes to online advertising, product markets for search and non-search online advertising have to be differentiated (b). According to the Bundeskartellamt's investigations, there are indications that non-search online advertising can be broken down further into advertising on social media or networks, particularly Facebook.com, and other non-search advertising (c).

### (a) Online vs. offline advertising

354 The Decision Division's investigations have confirmed what the Commission and the Bundeskartellamt have been implementing, namely that, from the customers' perspective, online and offline advertising need to be differentiated. [358]

355 From the perspective of the advertisers and media agencies questioned, online advertising has some significant advantages over offline advertising, one of them being that online advertising provides considerably better opportunities to address the target groups. The respondents said it was easier to identify and address target groups online. Additionally, they found online advertising to be beneficial from an economic point of view and said it offered a better return on investment and, all in all, was often cheaper than offline advertising. Additionally, online advertising was considered to be particularly flexible, quick and easily scalable. In the respondents' view, online advertising also offered better opportunities to measure and track success. Companies with a high visibility online emphasised that online advertising facilitated direct interaction with customers without having to switch media. [359]

356 As to the disadvantages of online advertising compared to offline advertising, some of the companies questioned stated the fact that not all relevant target groups could be reached online to a sufficient extent (e.g. women over 65). In addition it was also stated that the environment in which online advertising appears is difficult to control. Some

---

[358] Cf. e.g. BKartA, decision of 11 June 2015 – B6-22/15 – *Funke/Springer/Media Impact* – para. 213 ff.; European Commission, decision of 18 February 2010 - COMP/M.5727 - *Microsoft/Yahoo! Search Business*, para.61; decision of 11 March 2008 - COMP/M.4731 - *Google/DoubleClick*, para. 44 ff.

[359] […]

companies also pointed out that the scope of online advertising was not as wide as that of offline campaigns. Fraud issues ("ad fraud"[360]) were also often mentioned.[361]

357   There is also only very little tendency to shift online advertising budgets to offline advertising, which also contradicts the argument that one form of advertising can substitute the other.[362]

### (b) Search and non-search advertising

358   The Bundeskartellamt's investigations have also shown that search and non-search online advertising have to be considered as separate markets. The Commission had previously left this question open in its decisions.[363] A large majority of the advertising companies surveyed consider search advertising a form of advertising that is separate from online advertising in general.[364] According to the surveyed companies, search advertising has a number of specific benefits compared to other forms of online advertising. Search advertising plays a particular role when it comes to generating and measuring conversions, i.e. the number of users of a website that actually buy the product. They also underline the high relevance search advertising has for customers. In addition, several companies surveyed consider search advertising a particularly efficient form of online advertising.[365]

359   Some companies said that the different types of online advertising addressed different "funnels", i.e. different stages of a customer's buying process. Search advertising is especially relevant at the last stage of the funnel, i.e. at the end of the buying process, while non-search advertising, especially display and social media advertising, rather takes place at the first stages ("at the beginning of the customer journey"). Other companies consider search advertising an especially effective "pull" channel for selling goods to customers who already have a specific demand. Several companies also point out that search advertising was hardly suitable for developing brand awareness or generating demand for a certain product ("push marketing").[366]

360   The companies surveyed also see hardly any options to substitute search advertising, in particular advertising on Google search, which is considered the most important

---

[360] https://www.die-webseitenverbesserer.de/blog/betrug-der-online-werbung-ad-fraud-als-unterschaetztes-problem (in German, last accessed on 10 January 2019).

[361] […]

[362] […]

[363] Cf. COMP/M.4731 – *Google/DoubleClick*, para. 48 ff.; COMP/M.5727 – *Microsoft/Yahoo! Search Business*, para. 62ff.

[364] […]

[365] […]

[366] […]

online advertising option.[367] The investigations have also shown that price increases for search advertising do not lead to budget shifts to other forms of advertising. Hence, the price sensitivity for search advertising and the fact that providers of search advertising are not replaced by providers of non-search advertising also support the argument that separate markets exist.

(c) **Possible separate market for non-search advertising on social media or social networks**

361    The Bundeskartellamt's investigations have revealed strong indications suggesting that non-search advertising on social media and search advertising outside social media could represent separate product markets. The primary reason for this is that, according to the surveyed companies, the two forms of advertising fulfil different advertising purposes. The companies said that social media advertising was better suited for targeted approaches to certain target groups and for linking advertising to social and emotional elements. Further benefits indicated include the minimisation of scatter losses and opportunities for cross-device tracking. There are also indications to suggest that there is a separate market for social network advertising within the overall social media advertising market.

362    The assumption that a relevant product market exists for non-search advertising on social networks, in this case Facebook in particular, is supported by the fact that the companies surveyed said the data Facebook collected were an advantage of Facebook advertising as opposed to advertising on other social media sites. The Bundeskartellamt's investigations have shown that the data Facebook collected and made available for advertising purposes were considered an important advantage of advertising on Facebook besides the service's wide coverage. 11 out of 13 media agencies which responded to the questionnaire said that advertising on Facebook offered good targeting opportunities or very detailed user data, which was an advantage over other social media services.[368] A large number of advertisers considers the good targeting options and comprehensive user data a benefit of advertising on Facebook.[369] They often mentioned as advantages that data specified users' interests, offered very fine-grained details and user-based profile information.

---

[367] […]

[368] […]

[369] […]

363   The exact market definition of non-search advertising, however, can be left open as Facebook's exact position on these markets is irrelevant for the purposes of abuse control.

### (2) Geographic market definition

364   Based on the general practice of competition authorities, advertising markets are defined as national markets. This makes sense in view of language aspects and consumers' national preferences.

### d.   Markets for social plug-ins, central log-ins and measurement and analysis services

365   Facebook's data processing from Facebook Business Tools also affects markets on which Facebook offers social plug-ins, Facebook log-in, measurement and analysis services and other developer tools.

366   As detailed above (see para. 365ff.), the services stated have to be separated from the other market sides (private users, publishers and advertisers). It seems reasonable that with regard to the individual tools and products, further submarkets can be assumed to exist. These are also to be defined as national in view of the fact that private users use the social networks in a national context, and the products are linked to them.

367   The fact that the services are available free of charge does not disqualify them as market services. Rather, these services qualify as markets pursuant to Section 18(2a) GWB as each of them constitutes a market side of the platform, which serves a single business purpose with its advertising revenue and fees. They all utilise the wide coverage generated by the offer of their social media or other services for private and professional users, which makes it attractive for websites and apps to use the tools connected to them. When using the tools, in particular the Facebook Business Tools, data will flow, which can be considered a compensation for using the tools.

368   It seems reasonable to assess **social plug-ins** which are integrated into websites and apps via interfaces and and allow their users to publish and spread their contents on social media, as a market. Especially the "Like", "Follow" and "Share" buttons serve a single purpose and are offered by various social media. Twitter offers tools which are similar to Facebook's plug-ins (particularly the "Tweet" and "Follow" buttons)[370], and so

---

[370] https://developer.twitter.com/en/docs/twitter-for-websites/overview.html (last accessed on 10 January 2019).

do Pinterest ("Pin it" button)[371], Xing ("Share" button)[372], LinkedIn ("Share", "Follow")[373] and many other services. Many websites feature more than one of these interfaces.

369   It is not clear whether social plug-ins are in competition with one another or whether they complement each other. The social plug-ins, e.g. the "Follow" button, are also often a link to the publishers' market side on social media. In individual cases, this could be an argument in favour of treating these market sides as one. The technical platform on which the plug-in is to be included, i.e. whether it is designed for a website or an app, could be another differentiating criterion. However, the exact market definition can be left open in this case.

370   It also seems obvious that there is a separate market for **single-sign-on services**, on which Facebook is active with the "Facebook Log-in". Websites and apps can use them to facilitate registration with their own services.

371   Websites and apps have a specific interest in registered users, as their registration provides them with identifying user data which can be complemented by further data through cookies. With this data websites and apps can create larger user profiles themselves and offer them to their advertising customers. Users benefit from a very simple registration process which does not require any further data once the data on the existing accounts has been entered. Besides social media (e.g. "Google Sign In"[374]), such log-in services are provided by major trading platforms like Amazon Log-in and Amazon Pay, and by cooperations of web services like the "European Net ID Foundation"[375] or "Verimi"[376].

372   It can also be left open whether further submarkets can be assumed to exist. Such markets could be defined according to the different services providing the user base, which can have completely different registration data sets.

373   There is obviously also a market for measurement and analysis services on which Facebook is active, in particular with Facebook Analytics, but also with Facebook Pixel and the analyses offered by this tool. Further submarkets could be defined, e.g. based on the criterion of whether the product analyses the effect and success of the specific ad published by the respective supplier. Facebook offers, for example, "conversion

---

[371]  http://www.addthis.com/social-buttons/pinterest/ , […]

[372]  https://dev.xing.com/plugins/share_button  (last accessed on 10 January 2019).

[373]  https://developer.linkedin.com/plugins, last accessed on 10 January 2019.

[374]  https://developers.google.com/+/web/signin/ , last accessed on 10 January 2019.

[375]  Cf. https://enid.foundation/ (last accessed on 10 January 2019) and
https://www.wuv.de/medien/rtl_prosiebensat_1_und_united_internet_gruenden_european_net_id_foundation
(last accessed on 10 January 2019).

[376]  https://www.verimi.de/ , cf. also https://t3n.de/news/login-dienst-verimi-typisch-1014010/ (last accessed on 10 January 2019).

tracking" via Facebook Pixel. Another possible submarket could be defined for products that offer websites and apps statistics on the use of their services regardless of the advertisements they include. The latter describes the activity of "Facebook Analytics" and "Google Analytics". When measuring advertising success, each affected online advertising market could also be taken into account as offers are often bundled. Again, the exact market definition can be left open.

## 2. Market dominance

374   Facebook is the dominant company in the national market for social networks for private users pursuant to Section 18(1) in conjunction with (3) and (3a) GWB as, based on an overall assessment of all factors of market power, the company has a scope of action in this market that is not sufficiently controlled by competition.

375   The question of whether and to what extent market dominance is to be assumed to exist on the other markets affected can remain open.

### a.  The concept of market dominance in the case of markets for free services

376   In the case of services provided free of charge which constitute markets in accordance with Section 18(2a) GWB (as applicable for most sides of the market of the social networks relevant in this context), it is still decisive for determining whether market dominance exists pursuant to Section 18(1) GWB to establish whether the company has a scope of action that is not sufficiently controlled by competition. According to the case-law, this scope exists if its position in the market enables the company to prevent effective competition being maintained on the relevant market by giving it the power to behave to an appreciable extent independently of its competitors, customers and, ultimately, consumers.[377]

377   It cannot be argued here that the harm caused by market power is, in economic terms, primarily due to the scope for price increases it creates, and that this scope would not play any role in the case of markets for free services. The scope for setting prices is not the only relevant factor in defining market power. Apart from resulting in excessive prices, unconstrained scope of action can also lead to diminished product volume and quality, less variety as well as less dynamic innovation.[378]

378   Moreover, market power can actually create scope for raising the prices of services previously provided free of charge, an opportunity which would not exist in competitive

---

[377] Established case-law, e.g. Federal Court of Justice, judgment of 12 December 1978, "Erdgas Schwaben", WuW/E 1533, 1536; ECJ, judgment 14 February 1978, "United Brands", case 27/76, para. 65.

[378] Cf. Bundeskartellamt, Guidance on Substantive Merger Control, p. 2.

markets. In economic terms the price of zero must also be considered to be a price. Also, price competition is not only about the amount of a monetary payment but is also complemented by the conditions the other side of the market takes into account when choosing a service and assessing the price charged. This is reflected by the legal concept of imposing abusive business terms. Even a low price or a price of zero which, however, involves other disadvantageous business terms, can have indirect effects on price competition and possible differentiations of the business model. As market power restricts the options to negotiate such business terms with the other side of the market, such a restriction is covered by the concept of market dominance even if services are provided free of charge.

379     In particular in the case of advertising-funded internet platforms, where direct monetary payments by users of the services are replaced by attention marketing and the marketing of user data to advertisers in the form of targeted advertising, the *scope for processing user data* which users cannot avoid because of the services' market power, is also a relevant factor in defining market power. This applies irrespective of the question of whether the user data themselves are to be considered as payment for a service[379] or as a contractual condition serving to maintain a price of zero. Besides, the extent of data processing can also be seen as an element of the quality of the service.

380     The commercial use of the personal data of customers, users and third parties is a significant factor for competition on all sides of the markets, in particular in digital markets. Businesses therefore strive to gain as much information as possible about their (potential) customers in order to improve their products on the respective sides of the market, offer personalised services and enable targeted advertising. Digitalisation and particularly the internet have made it possible to collect and analyse particularly large amounts of data ("volume") from different sources and formats (variety) as fast as possible (velocity).[380] Among other things, this enables businesses to build customer and interest profiles which are highly relevant for their competitive performance.

381     Furthermore, the multi-sided character of the market, resulting from funding by advertising, leads to different interests being pursued by different groups of demand-side users. The advertisers providing funding are strongly interested in very detailed or even granular data sets (as well as in gaining the attention and time of the respective user). The incentive to make as much use as possible of existing scope for data

---

[379] See Commission proposal for a directive "on certain aspects concerning contracts for the supply of digital content" of 9 December 2015, https://ec.europa.eu/transparency/regdoc/rep/1/2015/DE/1-2015-634-DE-F1-1.PDF (last accessed on 10 January 2019).

[380] These three terms are predominantly used to describe the characteristics of "big data". They stem from a research report by Doug Laney, analyst at Gartner Consulting; see also Monopolies Commission, Special Report on "Competition Policy: The challenge of digital markets", 2015, p. 44 with further references.

processing is extremely strong as, on the advertising side, the market success of a service will increase with the processing of more, and more detailed, user data. Apart from the elimination of the opposite market side's self-determination and possibilities for negotiation, the exploitation of a company's scope for data processing based on market power also threatens to result in a transfer of market power from one market side to the other.

382   It cannot be argued that market power will not significantly increase the scope for processing data and that this scope already exists without market power. In this respect the legislator has come to a different decision and, in view of the relevance of data for competition and the risks posed by market power, stipulated in Section 18(3a) GWB (new) that access to such data was a stand-alone criterion in the assessment of market power. The users' willingness to share their personal data seems to be stronger than their willingness to pay. Personal data are a non-rivalling good which cannot be used up. There is no limited budget which would determine the consumers' willingness to pay and force them to economise. For this reason the consumers' sensitivity with regard to sharing their data is perhaps generally weaker than their price sensitivity.

383   However, scope for data processing still remains a relevant problem with regard to market power. This is due to the fact that even on markets where consumers are less sensitive to price differences (e.g. in the case of relatively low-cost fees for products such as telephone charges), there is still scope for price increases based on market power. Furthermore, a typical area where companies have room for manoeuvre in their interaction with end consumers is the negotiation of contractual and general terms and conditions. It is undisputed that market power expands a company's opportunities to behave independently of customers and end consumers.

384   The primary problem is that when consumers share their personal data, they are hardly able to judge which and how much data are being collected by which company, to whom their data will be transmitted and what are the implications of giving consent to process their data. This could partially explain the privacy paradox which describes the phenomenon that users attach great value to the protection of their privacy, but generously share their personal data when using internet services.[381]

385   This lack of transparency in data processing is considerably exacerbated by market power. Market power makes it possible to process data even against the will of users, thus clearly increasing the extent to which data is processed. If, on account of the

---

[381] Cf. e.g. the article „Das Privacy Paradox: Digitalisierung versus Privatsphäre" by Institut der deutschen Wirtschaft, Cologne at https://blog.iwmedien.de/das-privacy-paradox-digitalisierung-versus-privatsphaere/ (accessed on 27July 2018); Taddicken, M., „Selbstoffenbarung im Social Web", Publizistik (2011) Issue No. 56, p. 281 ff.

market dominance of the company, users have no choice but to consent to their data being processed, the investigations have shown that they will skip reading the data processing policy since they have to give their consent anyway.[382] It is thus impossible for individual users to identify which data a company has actually collected about them and to understand the importance of the personal data added by a user to the personal data already collected. Due to market power users cannot avoid the processing of their data.

### b. Overall assessment of the factors of market power pursuant to Section 18(3) and (3a) GWB

386   Based on an overall assessment of the factors of market power under Section 18(3) and (3a) GWB, Facebook, as the dominant company in the market for social networks, has a scope for action and data processing which is not sufficiently controlled by competition.

387   As this case involves a multi-sided market and a network, the criteria under Section 18(3a) GWB are relevant factors apart from the market structure and the current competitors. These are factors that focus on the special characteristics of multi-sided markets and networks as well as on the role played by the digital economy that must be taken account of in the context of the assessment of market power. While generally irrelevant in other markets, these characteristics constitute additional elements of market power to be considered when assessing market power pursuant to Section 18(3) GWB. However, they also specify the factors listed in Section 18(3) GWB, in particular with regard to market entry barriers. The factors listed also describe the threat of monopolisation through "tipping" which exists in multi-sided markets and networks in certain cases.[383] According to the investigations the market structure (see (1) and the other factors of market power under Section 18(3a) and (3) GWB (see (2) indicate that the market for social networks is such a tipping market which has seen Facebook emerging as a monopolist or quasi-monopolist.

### (1) Market structure and competitors of social networks

388   According to the Bundeskartellamt's investigations Facebook has a user share of more than […] on a narrowly defined market for social networks including Facebook.com, Jappy, Stayfriends, StudiVZ and WizeLife as well as formerly Google+ (see (a). Even if the user numbers of the services YouTube, Twitter and Snapchat (which are only to

---

[382] […]

[383]   Legislative intent on the 9th amendment to the German Competition Act (GWB), Bundestag printed paper 18/10207, p. 50.

be considered as competition from substitutes) are completely included in the calculation as well as Instagram which belongs to the Facebook group, this will not significantly reduce Facebook's user-based market share (see (b).

(a) **Market shares**

389  A factor indicating that Facebook has a dominant position in the market is first of all the company's high level of user-based market shares which, based on the Bundeskartellamt's investigations and several metrics available, amount to between 50 and almost 100% (see i.). Apart from the special characteristics of the market for social networks, the share of *daily active users* of social networks is the most significant metric in the assessment of the market position. According to this indicator, Facebook achieved a user-based market share of more than [...] in 2017 (see ii.).

   i.   **Determined shares of users**

390  In order to determine the structure of the market for social networks for private users, which is characterised by mostly free services, the Bundeskartellamt examined several key figures on which an initial assessment of market shares can be based. These are in particular several shares of users which can be expressed on the basis of the numbers of daily active users (DAUs), monthly active users (MAUs) and the number of registered users of the services.

391  The social networks Facebook.com, (formerly) Google+, Stayfriends, StudiVZ, Jappy and Wize.Life were asked to state their quarterly user numbers achieved during the previous years. The companies surveyed were able to provide such data for the period between the first quarter of 2014 (Q1, 2014) and the first quarter of 2018 (Q1, 2018). According to these figures Facebook's user-based market share in Germany amounts to between [...] and [...] % in the first quarter of 2018, depending on the factor measured.[384]

392  Based on the **daily active users**, the calculation of user shares provides the following result[385]:

---

[384]  If an attempt was made to deduct from the total market volume any users who potentially use more than one service, Facebook's user-based market share might even be higher.

[385]  [...]

| | Shares of users based on daily active users (DAUs) | | | | | |
|---|---|---|---|---|---|---|
| | Facebook | Google+ | Stayfriends | StudiVZ | Jappy | Wize.Life |
| Q1 2012 | [>90%] | [0-5%] | [0-5%] | no information provided | [0-5%] | [0-5%] |
| Q1 2013 | [>95%] | [0-5%] | [0-5%] | no information provided | [0-5%] | [0-5%] |
| Q1 2014 | [>95%] | [0-5%] | [0-5%] | [0-5%] | [0-5%] | [0-5%] |
| Q1 2015 | [>95%] | [0-5%] | [0-5%] | [0-5%] | [0-5%] | [0-5%] |
| Q1 2016 | [>95%] | [0-5%] | [0-5%] | [0-5%] | [0-5%] | [0-5%] |
| Q1 2017 | [>95%] | [0-5%] | [0-5%] | no information provided | [0-5%] | [0-5%] |
| Q1 2018 | [>95%] | [0-5%] | [0-5%] | no information provided | [0-5%] | [0-5%] |

393   "Daily active users" are users who use the network at least once a day. With an increasing user-based market share, Facebook's share of the market affected comes close to a monopolistic position. In the period under review no competitor has thus been able to achieve a user-based market share higher than 5%.

394   Looking at the development over the last 5 years it becomes evident that Facebook's user-based market share has continued to increase in the period under review at the very high level that the company had already reached in 2012. In contrast, the user-based market shares of Stayfriends and Jappy have been constantly decreasing. As StudiVZ has become insolvent, current user figures are not available. It can be assumed, however, that the company's user numbers have stagnated at the level reached in 2016 or have even decreased further. Jappy's and Wize.Life's user-based market shares are hardly perceptible at a very low level and have marginally increased over the last two years. Google+ had temporarily been able to increase its user-based market share, albeit at a very low level. It increased slightly during the period between the 1st quarter of 2014 and the 1st quarter of 2015. In the following quarters, however, its share continuously dropped and finally reached a level of […].

395   The market shares based on the number of **monthly active users** (MAUs) are as follows:[386]

---

[386]   […]

| | Shares of users based on monthly active users (MAU) | | | | | |
|---|---|---|---|---|---|---|
| | Facebook | Google+ | Stayfriends | StudiVZ | Jappy | Wize.Life |
| Q1 2012 | [80-85%] | [0-5%] | [10-15%] | no information provided | [0-5%] | [0-5%] |
| Q1 2013 | [80-85%] | [5-10%] | [5-10%] | no information provided | [0-5%] | [0-5%] |
| Q1 2014 | [75-80%] | [9-14%] | [5-10%] | [0-5%] | [0-5%] | [0-5%] |
| Q1 2015 | [73-78%] | [15-20%] | [1-6%] | [0-5%] | [0-5%] | [0-5%] |
| Q1 2016 | [73-78%] | [15-20%] | [1-6%] | [0-5%] | [0-5%] | [0-5%] |
| Q1 2017 | [79-88%] | [10-15%] | [0-5%] | no information provided | [0-5%] | [0-5%] |
| Q1 2018 | [82-87%] | [7-12%] | [0-5%] | no information provided | [0-5%] | [0-5%] |

396   Monthly active users are defined as users who used the respective service at least once a month within a set timeframe.[387]

397   With […], Facebook's user-based market shares are high in this area as well. They are currently on the rise again after a marginal decrease in 2015 and 2016. Google+, which, until the autumn of 2016, showed an upward trend reaching a share of between […], still had a market share of merely […] in the 1st quarter of 2018.

398   The market shares based on the number of registered users are as follows:[388]

| | Market shares based on the number of registered users | | | | | |
|---|---|---|---|---|---|---|
| | Facebook | Google+ | Stayfriends | StudiVZ | Jappy | Wize.Life |
| Q1 2012 | [60-65%] | [5-10%] | [13-18%] | [13-18%] | [0-5%] | [0-5%] |
| Q1 2013 | [52-57%] | [20-25%] | [11-16%] | [9-14%] | [0-5%] | [0-5%] |
| Q1 2014 | [46-51%] | [31-36%] | [9-14%] | [7-12%] | [0-5%] | [0-5%] |
| Q1 2015 | [45-50%] | [35-40%] | [8-13%] | [5-10%] | [0-5%] | [0-5%] |
| Q1 2016 | [45-50%] | [40-45%] | [7-12%] | [5-10 %] | [0-5%] | [0-5%] |
| Q1 2017 | [50-55%] | [35-40%] | [6-11%] | no information provided | [0-5%] | [0-5%] |
| Q1 2018 | [52-57%] | [36-41%] | [6-11%] | no information provided | [0-5%] | [0-5%] |

399   Registered users are users who have registered for a service by creating an account. Despite an increasing user base in absolute numbers, Facebook's user-based shares

---

[387] […]

[388] […]

dropped from an overall increasing total market volume of more than […] in the 1st quarter of 2012 to between […] in the 1st quarter of 2016, but rose again to reach a level of […] in the 1st quarter of 2018. On this basis, Google+ reached a considerably higher share than based on the other user-based metrics, as does Stayfriends. The market shares of these competitors have, however, been decreasing over the last three years, also when considering the number of their registered users.

ii.   **Daily active users as a key metric in the assessment of market power**

400   In the Bundeskartellamt's opinion, and contrary to the view held by Facebook[389], it is primarily Facebook's share of daily active users of social networks which represents an important indicator of the network's competitive significance and market success.

401   From the Bundeskartellamt's point of view, in cases involving internet services and platforms, market shares can at best be considered as an indicator for the presumption of market dominance. In general, a sufficiently meaningful indication of market power cannot solely be based on market shares as it is always required to carry out an overall assessment of all circumstances of a case. This applies all the more to internet platforms and networks within the meaning of Section 18(3a) GWB where, in the assessment of market shares, account must be taken of the general tendency towards concentration of platform markets with pronounced indirect network effects as well as networks with pronounced direct network effects.[390]

402   In the Bundeskartellamt's view, the consideration of market shares is nevertheless an important element of the concept for examination under competition law as it enables the authority to describe the market structure and market positions of the competitors in their relationship with one another. For the assessment of the market position of a leading company in a specific market, its relative market share, i.e. its market share lead over its competitors, has always been a more relevant indicator than any absolute values. Furthermore, the development of market shares as a dynamic element plays an important role in assessing the sustainability of a company's market position.

403   This generally also applies to internet services such as social networks, in particular with regard to the threat of tipping, i.e. the monopolisation of the market as a consequence of self-reinforcing network effects which, if specific factors are present, can result in a gradual exit of the remaining competitors from the market and create a significant entry barrier. It is precisely the threat of tipping which is covered by the

particular criteria detailed in Section 18(3a) GWB.[391] Where a strong market share lead over competitors which are potentially already gradually leaving the market is developing over a long period of time, this can provide a first indication of a tipping process or a competitive advantage that competitors cannot catch up on.[392]

404   With regard to the mechanisms of network effects that depend in particular on the *number of users*, the intensity of use and also the identity of users, the number of users, as a kind of quantity-based market share, plays a much more important role than an assessment in terms of turnover volume. A calculation of market shares based on turnover figures, a common practice in many cases, will reach its limits in an assessment under competition law of online platforms like Facebook, because one or several sides of the platform are available free of charge. A purely value-based calculation would neglect competition from free or ad-financed services. In the present case, practically all competitors included in the assessment (with the exception of Stayfriends which was only included as a precautionary measure) offer their services free of charge to private users of social networks as this market is predominantly based on financing through advertising. A turnover-based assessment thus cannot be carried out on the users' side of market, but only on the advertising side. However, as the user side of a platform must be considered to qualify as a market based on Section 18(2a) GWB, market dominance cannot only be established on the basis of the adverting side. In what is already current practice, a volume-based assessment of market shares must in any case be carried out if it is not possible to determine turnover-related market shares.[393]

405   Furthermore, in economic terms, the "**installed base**" of a network is very important, as the consequences of the network effect or the value of the network, respectively, depend, among other factors, on this base. Although several definitions exist in the literature, the installed base generally depends on the number of users of a service or technology and their opportunities to switch.[394] In determining whether a tipping process is imminent, the Bundeskartellamt considers the installed base of a network to be significant for the assessment of the competitive lead of a specific company. The

---

[391] Legislative intent on the 9th amendment to the German Competition Act (GWB), Bundestag printed paper 18/10207, p. 50.

[392] Bundeskartellamt, Working paper Market Power of Platforms and Networks, June 2016, p. 68 for indirect network effects, and p. 101 for direct network effects.

[393] Cf. Bechtold, GWB, Section 18, para. 34.

[394] Cf. e.g. Farrell/Saloner, "Installed Base and Compatibility: Innovation, Product Preannouncements, and Predation", The American Economic Review, 1986, Vol. 76(5), p. 940-955, who define the previous number of users using the old technology as installed base; Malueg/Schwartz, "Compatibility Incentives of a Large Network Facing Multiple Rivals", Journal of Industrial Economics, 2006, 54(4), p. 527-567, on the other hand, only consider those users of the old technology as installed base who, due to contractual obligations cannot switch to the new technology and where competition can thus only affect new customers; Working paper, p. 93 ff.

value of the network often only shows if the installed base is sufficiently large, as the network effect can be minimal with small user numbers and increases disproportionally as the number of users increases, which is a further argument in favour of giving precedence to the analysis of user numbers.

406   However, contrary to Facebook's view, the number of monthly active users cannot simply be used as a so-called "industrial standard".[395] From the Bundeskartellamt's point of view, the user-based indicator which determines the "use" of a service in an individual case must be determined for each individual market and on the basis of the specific product in question. The fact that it can be necessary to take into account different indicators depending on each individual case scenario is reflected in the economic literature some of which differentiates between whether users already benefit from (positive) network effects if members of the other user group are present on the platform ("membership externalities" or "membership values") or whether this benefit only becomes effective in the case of usage, e.g. when a certain interaction takes place ("usage externalities" or "interaction values").[396]

407   In the case of social networks it is above all the above-mentioned purpose of finding persons the user already knows and connecting with them as well as the daily exchange of experiences, opinions and content within specifically identified groups of contacts defined by the user which indicates that the number of daily active users is the primary indicator of the value of a network and its market success. As described, the users' requirements are determined by the great intensity of use of social networks as a virtual social space. Also in the assessment of market shares, the intensive activity in terms of time spent by users thus also provides an important indication of the competitors' actual market positions.

408   For the assessment of the direct network effects present in this case (s. para. 218 above) and a tipping process, and with regard to the defined requirements, it is extremely important for a social network whether users can expect to be sufficiently able to interact with their friends. Daily use can thus also cover a qualitative aspect of the network effects. This is also reflected by the result of the user survey in which 62% of the respondents stated that the regular activity of the other users was at least an important criterion for their decision to use a network.[397]

---

[395] […]

[396] Cf. e.g. Weyl, "A Price Theory of Multi-Sided Platforms", American Economic Review, 2010, 100(4), p. 1642-1672; Rochet/Tirole, "Two-sided markets: a progress report", RAND Journal of Economics, 2006, 37(3), p. 645-667.

[397] […]

409   In comparison with the daily active users the measurement of monthly active users is less significant as it does not reflect the typical requirements of the users and their typical behaviour. Many operators of social networks which participated in the survey stated that they also measure their market success on the basis of "daily active users"[398] and consider a great frequency of usage ("user engagement", "virality", "activity on the platform") to be the key element in the success of a social network.[399] The monthly active users metric thus cannot be referred to as an "industrial standard". Facebook itself also regularly states the number of its daily active users (DAUs) in its annual reports and considers this metric to be the relevant basis for measuring intensity of use, whereas the number of monthly active users is seen as the basis for measuring the global active user community.[400]

410   The success of the business model, which is financed by highly individual targeted advertising, is due above all to the strong daily user engagement, the user data this involves and the possibility this creates for exposing users to advertisements over a long period. The service's options for monetisation are thus also indicated by daily user engagement.

411   The calculation of user-based shares on the basis of registered users is, however, not a significant metric that could indicate the actual market success of a social network.[401] Although mandatory registration is a typical feature of social networks, there are misjudgements regarding the overall number of users (more than […] in Germany) as well as the individual user shares under several aspects. It is not evident whether registration is always followed by use of the social network. An explicit termination resulting in the deletion of the registration or the user account is not possible at all in some cases, or at least this functionality is difficult to find. From the users' perspective, simply not using an account could be seen as an alternative to termination as the use of social networks is free of charge on the market concerned, which is why users have no monetary incentive to explicitly terminate an account if they do not use the network.

412   Moreover, the increasing share of users registered with Google+ would have been highly overestimated. This share resulted in particular from the connection of Google+ with other Google services. From 2013 to 2015 users had to have a Google+ account in order to be able to register for YouTube. At least until September 2014, users wishing

---

[398] […]

[399] […]

[400] Facebook Inc., Annual Report 2017, p. 33/ 34: "We view DAUs, and DAUs as a percentage of MAUs, as measures of user engagement"; "MAUs are a measure of the size of our global active user community." (available for download at https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/FB_AR_2017_FINAL.pdf), […]

[401] […]

to set up a GMail account had to set up a Google+ account as well.[402] And at least for a short while, Google+ was pre-installed on many Android devices.[403] While Google had terminated this compulsory connection between different Google services in response to continuous criticism, it is doubtful whether this has led any significant numbers of, e.g., YouTube users to delete their Google+ account.

413   The Bundeskartellamt therefore bases its assessment of market power on a user-based market share of Facebook that has continuously exceeded 90% since 2012, with an upward trend.

(b) **Substitute competition by YouTube, Twitter and Snapchat does not significantly relativise Facebook's market share**

414   The company's market share of more than […] is not significantly relativised by substitute competition from other social media, in particular YouTube, Twitter and Snapchat. This would even apply if these services were included in the market as genuine competitors, as called for by Facebook.[404]

415   In the Bundeskartellamt's view, substitute competition between other social media and social networks is not strong enough to actually justify a representation of market shares in the market for social networks.

416   As illustrated by the market definition, other social media do not serve the same purpose as social networks. The fact that these media also pursue the purposes of communication and online information exchange in the broadest sense does not mean that the differences can be seen as a wide variety of product differentiations -, e.g. similar to a geographic chain of substitution [405] or as "closest competitors". When it comes to options for substitution these exist exclusively for one party in terms of product overlaps in some features.

417   Twitter and Snapchat, in particular, can be replaced by the relevant functionalities of Facebook.com, including the Facebook Messenger, in many aspects. On the other hand, however, Twitter and Snapchat can (and are intended to) replace the functionalities of Facebook.com only in limited partial areas and cannot offer a full social user experience. Only Facebook.com offers all functionalities that are necessary to represent a virtual social space. As a consequence, there is in fact a competitive

---

[402]   http://www.cnet.de/88137220/gmail-konto-setzt-keine-google-anmeldung-mehr-voraus/?inf_by=5a002dd5671db8487b8b4b3a (last accessed on 10 January2019).

[403]   https://www.smartdroid.de/android-weniger-apps-muessen-vorinstalliert-sein-google-faellt-weg/   (in German, last accessed on 10 January 2019).

[404]   […]

[405]   Commission Notice on the definition of relevant market for the purposes of Community competition law, OJ of 9 December1997, C 372/5, para. 57f.

relationship between Facebook.com and the other services. However, this relationship does not exist on the market for social networks, but on the markets for the other services that must be defined separately. Although Facebook.com also enables video upload there is not much overlap with YouTube with regard to the video platform function, because on Facebook video uploads are only a tool for social user experience within a circle of friends.

418 Ultimately, however, the market is highly concentrated to the benefit of Facebook, even if the daily active users of YouTube, Snapchat and Twitter, in particular, are to be included in the market, as claimed by Facebook. If YouTube, Twitter and Snapchat are to be included in the relevant market according to the degree of overlaps in some of the features, it is not justified to consider WhatsApp and Instagram, important services which are parts of the Facebook group, as belonging to different markets. Facebook's reasoning that Snapchat and Instagram belong to the market affected, but not WhatsApp[406], cannot be followed. If Snapchat, whose services focus on photos as well as messaging, is included in the market, so must WhatsApp as the widest-reaching messaging service whose functionalities overlap with services such as Snapchat in many aspects.

With regard to this competitive environment, the shares of daily active users in the 1st quarter of 2018 are as follows:[407]

| Service | DAUs 1st quarter 2018 |
|---|---|
| WhatsApp | [40-50%] |
| Facebook | [20-30%] |
| YouTube[408] | [10-20%] |
| Instagram | [10-20%] |
| Snapchat | [0-10%] |
| Twitter | [0-10%] |
| Google+ | [0-5%] |
| Stayfriends | [0-5%] |
| StudiVZ | [0-5%] |
| Jappy | [0-5%] |
| Wize.Life | [0-5%] |

---

[406] […]

[407] […]

[408] […]

419  The above figures illustrate that with the WhatsApp, Facebook.com and Instagram services, the Facebook group has a registered daily user share of more than […], and thus a significant market share lead over its next largest competitors YouTube and Snapchat. Even if the monthly active users were considered, the result would not be significantly different.

420  Even if WhatsApp were to be excluded from the market, as called for by Facebook[409], Facebook would still achieve a very high share of daily active users with its services Facebook.com and Instagram.

| Service | DAUs 1st quarter 2018 |
|---|---|
| Facebook | [30-40%] |
| YouTube[410] | [20-30%] |
| Instagram | [20-30%] |
| Snapchat | [8-13%] |
| Twitter | [0-5%] |
| Google+ | [0-5%] |
| StudiVZ | [0-5%] |
| Stayfriends | [0-5%] |
| Jappy | [0-5%] |
| Wizelife | [0-5%] |

421  Even if analysed on this basis, Facebook, together with Instagram, would still achieve a market share of […] with a significant market share lead over YouTube and Snapchat.

**(2) Criteria defining market power pursuant to Section 18(3) and (3a) GWB**

422  Based on the criteria defining market power pursuant to Section 18(3) and (3a) GWB, the high user-based market share of more than […] is a manifestation of market power. Due to the network effects (see (a) and the lock-in effect caused by a high degree of incompatibility and the lack of multi-homing by Facebook users within the market (see (b), the development of the market conditions on the narrow market for social networks suggests that monopolisation due to market tipping can reasonably be assumed to

---

409  […]
410  […]

exist. Economies of scale (c) as well as the company's superior access to competition-relevant data (see d) and the limited extent of innovation-driven competitive pressure (e) are further elements of Facebook's dominant position in the market.

(a) **Network effects (Section 18(3a) no.1 GWB)**

423   In view of the significant market share lead over its competitors, market dominance is indicated in particular by the identity-based positive direct network effects emerging among the private users of the social network of Facebook.com. A significant concentration process has been developing in the market for social networks which can be attributed to the self-reinforcing feedback loop that can be regularly observed in positive direct network effects. The indirect network effects occurring at the same time due to the multi-sided character of the market lead to a further consolidation of this trend.

i.   **Direct network effects and self-reinforcing feedback loops**

424   With a product such as social networks, competition is threatened by the so-called market tipping effect which is based on the self-reinforcing feedback loops of direct network effects. Market tipping means that if the market-specific size of a network is exceeded due to the self-reinforcing feedback loop for this network, almost no customers will be left for competing networks, and users who previously used other networks will switch to the larger one. During this process, most of the current competitors will lose out as their shrinking networks are becoming unattractive ("winner takes most" or "winner takes all")[411], which will result in a monopoly or quasi-monopoly situation. Until the market tips, the competitive relationship between the providers of networks will be characterised by a competition for the market.

425   This process starts because in direct network effects, as described above in para. 214ff., the benefit or profit of users depends on the overall number of network users. A differentiation must be made as to whether users benefit from a large number of co-users (positive direct network effects) or from the fact that the number of co-users is less significant (negative direct network effects). The self-reinforcing feedback effect is only inherent in positive direct network effects where the growth in user numbers gives other users the incentive to use the network. Due to the benefit provided by network effects users tend to prefer large networks and, in the long term, can gather in a single large network.[412] In choosing a network new users will tend to opt for the network which

---

[411] Dewenter/Rösch, Einführung in die neue Ökonomie der Medienmärkte, 2015, p. 197 ff. refers to a trend towards a "natural monopoly" ("natürliches Monopol").

[412] Cf. Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 100

most of their friends are using (identity of users) or which they expect to be used by most of their friends (size of the network). The larger a network, the more attractive it will be for new users.

426   Direct network effects and their self-reinforcing feedback loop thus represent a significant market entry barrier. It is of key importance for new suppliers entering the market to quickly reach a *critical mass* which will enable them to benefit from direct network effects that create or increase their networks' benefit.[413] A supplier must convince users that the new network will have a permanent, high market presence. The new supplier cannot present an existing, sufficiently large network in which users can find their communication partners. Suppliers thus depend on the subjective expectations of users.[414]

427   The user behaviour described is confirmed in the present case by the user survey carried out by the Bundeskartellamt: Users of social media were asked how important several specified reasons had been for their choice of a social network. 86% of the users said it was important or very important for them that friends, family members and colleagues used the network. The overall number of persons using the network was referred to by 47% of the users as an important or very important reason for their choice of a social network, whereas 62% of the users said it was important or very important to them that persons in their geographic vicinity (e.g. city or district) use the network.[415] 62% of the respondents considered the activity of users to be important or very important for their choice of a network.

428   The self-reinforcing feedback effect is clearly reflected by the development of the user numbers of Facebook.com based on daily active users as well as monthly active users. Although there has not been any established method so far for calculating the self-reinforcing feedback process of direct network effects, the development of user numbers as from a network's market entry can be used as an approximation. The "installed base" is a key indicator for the significance of the network effect in a market.[416]

429   The user numbers of Facebook.com have continuously increased since the network's market entry in Germany in 2008:[417]

---

[413] See also European Commission, "Microsoft/LinkedIn", decision of 6 December 2016, Comp/M. 8124, para. 346.

[414] Cf. e.g. Sailer, Regulierungsbedarf in Netzwerken? Implikationen für die Internetökonomie, Die Weltwirtschaft 2001, 352 f.; also Farrell/Saloner, "Standardization, Compatibility, and Innovation", The RAND Journal of Economics, 1985, 16(1), p. 70-83; Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 92.

[415] […]

[416] Cf. Bundeskartellamt, 'Working paper "Market Power of Platforms and Networks", June 2016, p. 93f.; see also e.g. Farrel/Saloner, "Installed Base and Compatibility: Innovation, Product Preannouncements, and Predation", The American Economic Review, 1986, Vol. 76(5), p. 940-955.

[417] […]

| Quarter | DAUs (in thousands) | MAUs (in thousands) |
|---------|---------------------|---------------------|
| Q1 2009 | [...] | [...] |
| Q1 2010 | [...] | [...] |
| Q1 2011 | [...] | [...] |
| Q1 2012 | [...] | [...] |
| Q1 2013 | [...] | [...] |
| Q1 2014 | [...] | [...] |
| Q1 2015 | [...] | [...] |
| Q1 2016 | [...] | [...] |
| Q2 2016 | [...] | [...] |
| Q3 2016 | [...] | [...] |
| Q4 2016 | [...] | [...] |
| Q1 2017 | [...] | [...] |
| Q2 2017 | [...] | [...] |
| Q3 2017 | [...] | [...] |
| Q4 2017 | [...] | [...] |
| Q1 2018 | [...] | [...] |

430   In the first year, Facebook.com already had more than […] daily active users. Within one year the installed base increased to more than […] daily active users, and to more than […] daily active users by 2011. In the following years the numbers of daily active users as well as monthly active users continued to increase. In the 1st quarter of 2017, the user base of Facebook.com rose to 23 million daily active users.[418] Although there was a slight decline in the number of daily active users in the 1st quarter of 2018, this does not reflect a trend for the year 2017. The user numbers have continued to increase over the entire year. The number of monthly active users has also remained at a high level.

431   With regard to the significance of intensity of use for network effects, it is useful to look at the development of the number of monthly active users in comparison to the daily active users. Even if, as called for by Facebook[419], the services mentioned above were included in the market as genuine competitors, this would not much affect the significance of the trend towards concentration in the market for social networks. It can

---

[418] See the figures published by Facebook (in German) on 1 June 2017 at https://de.newsroom.fb.com/news/2017/06/eine-community-von-30-millionen-facebook-sagt-danke/, […]

[419] […]

be observed that, after strong growth during the first few years, Facebook.com continued to win over […] monthly active users per year in the following years. Over time these users have been using the network more and more actively, as is illustrated by the fact that, in relative terms, the number of daily active users has increased more significantly than the number of monthly active users. The share of daily active users in the number of monthly active users has increased from initially approx. […] to approx. […]. Only in the 1st quarter of 2018 did the intensity of use slightly decrease.

ii.    **Likelihood of market tipping process**

432    The fact that competitors can be seen to exit the market and that there is a downward trend in the user-based market shares of the remaining competitors strongly indicate a market tipping process likely to result in Facebook.com becoming a monopolist.

433    Initially, according to press reports, Facebook.com had made a poor start in 2008 and clearly lagged behind the market leaders in Germany, StudiVZ and SchülerVZ as well as the MySpace music network. Despite its technical superiority, doubts were expressed publicly about whether Facebook.com would be able to succeed in the competition against the network effects of the incumbents.[420]

434    At least from 2011, however, the user-based market shares of the competitors operating in Germany strongly decreased. According to the Bundeskartellamt's investigations, StudiVZ activities declined at the end of 2010, a trend that rapidly accelerated in 2011.[421] In 2011, Facebook.com overtook StudiVZ in terms of user numbers. SchülerVZ discontinued its operations on 30 April 2013. In the autumn of 2012, StudiVZ was sold to a financial investor and its user numbers continued to decline.[422] On 7 September 2017 its owner, Poolworks, filed for insolvency.[423] It is unclear whether the network's operations can continue.

435    A similar development could be observed in the cases of Lokalisten, Stayfriends and MySpace.[424] Despite significant investments by the then owner of Lokalisten, ProSiebenSat.1, the intensity of use also declined by the turn of the year 2009/2010.[425]

---

[420] FAZ.NET of 27 April 2008 http://blogs.faz.net/netzwirtschaft-blog/2008/04/27/facebook-verpatzt-den-deutschland-start-249(in German, accessed on 10 January 2019).

[421] […]

[422] […]

[423] Cf. http://www.spiegel.de/wirtschaft/unternehmen/studivz-ist-pleite-a-1166735.html (in German, last accessed on 10 January 2019).

[424] Cf. articles by the German magazine Focus of 2013 http://www.focus.de/digital/myspace-studivz-lokalisten-lokalisten-langsamer-aber-sicherer-niedergang_id_3474203.html (last accessed on 10 January 2019); and by the German daily Süddeutsche Zeitung of 6 March 2012. https://web.archive.org/web/20120306030551/http://newsticker.sueddeutsche.de/list/id/1273471 (last accessed on 10 January 2019).

[425] […]

User numbers were in decline as from 2011 and could not be stabilised by attempts to diversify through the introduction of gaming or dating features.[426] The Lokalisten network discontinued its operations on 30 September 2016.[427] The reasons given for this included Facebook's market position in the market for social networks which was described as a "winner takes all" market.[428] The Jappy social network also initially reported a considerable decline in user activity[429] between 2011 and the summer of 2012, followed by a continuous decline in user numbers. Stayfriends was able to increase its user numbers up until 2011 when, according to Stayfriends, […]. After this, user numbers have plunged […].[430] Facebook.com's user numbers continue to rise.

436   These developments reflect the competitive effect of direct network effects and the market tipping process: Initially there was intensive competition for the market resulting in the creation of a powerful network or a monopolist. The decrease in user numbers experienced by all competitors from 2011 onwards gives reason to suggest that a market tipping process had already started at that time which caused the then market leader StudiVZ as well as Lokalisten to exit the market or to be likely to exit the market.

437   Competition for the market also included the market entry of Google+ in 2011. In Germany, Google+ was also able to attract a significant number of daily active users. However, its user numbers remained at a relatively low level[431] and have meanwhile been declining. Its limited initial success can be explained by the subjective expectations users have about the potential market presence of the Google service. Such expectations play a decisive role in the market entry of network products, as described above.[432] Until its market exit, however, there had been no direct monetisation of the private service through advertising. Also, in order to differentiate its social network from Facebook.com, Google+ repositioned the network and put more emphasis on the common interests of users and the possibility to find people to connect with. With the launch of the corporate version of Google+ in spring 2018 and the shutdown of the consumer version, the business model was changed into a free-of-

---

[426] […]

[427] Cf. heise-online, "Lokalisten und die Crux mit dem Netzwerkeffekt" of 30 September 2016, https://www.heise.de/newsticker/meldung/Lokalisten-und-die-Crux-mit-dem-Netzwerkeffekt-3338475.html(in German, last accessed on 10 January 2019); […]

[428] […]

[429] […] https://www.gruenderszene.de/interviews/jappy-matthias-vogl (in German, last accessed on 10 January 2019).

[430] […]

[431] […]

[432] Cf. e.g. Sailer, Regulierungsbedarf in Netzwerken? Implikationen für die Internetökonomie, Die Weltwirtschaft 2001, 352f.; also Farrell/Saloner, "Standardization, Compatibility, and Innovation", The RAND Journal of Economics, 1985, 16(1), p. 70-83; Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 92.

charge service for internal corporate communications. The exit of Google+ from the market gives rise to the assumption of an unrestricted trend towards monopolisation.

438    From the Bundeskartellamt's point of view, the market success of YouTube and Snapchat cannot be used as an argument against the market's trend towards tipping. As discussed, these services are not part of the market. If they were to be included in the market, this would not make much difference to the high market shares and Facebook.com's lead. YouTube is a product which differs from Facebook.com in many aspects and, if it were included in the product market, it would not be a close competitor in terms of private users, but rather a competitor on the online advertising market, as was ultimately confirmed by Facebook's statements regarding the "competition for the users' time".

439    Even if these services can be seen as product differentiations in comparison to Facebook.com, it seems likely that the different user preferences have resulted in a splitting of the market resulting in monopolisation trends emerging in the individual sub-markets. This has also been shown e.g. in the *Microsoft/LinkedIn* merger control proceeding in which the Commission considered professional social networks to be an independent product market where the threat of market tipping was assumed to exist in several geographic markets where competitors were still active (Austria, Germany and Poland) because of an expansion of LinkedIn's user base. The concentration was only cleared subject to conditions.[433] The Bundeskartellamt's investigations in the present case have also shown that LinkedIn's user base has continually grown since 2008.

440    Similar developments are likely to take place in the case of video sharing platforms with user-generated content, such as YouTube, in the German market. According to public statistics, YouTube had a user share[434] of more than 80% in the sector of video platforms in Germany in 2016. The next closest competitors, according to this statistic, were DailyMotion and Clipfish, each with less than 5%.[435] The video platform MyVideo, which had been YouTube's most significant competitor in Germany for a long stretch of time, was given up by its operator ProSiebenSat.1 Media SE in September 2017 and had already ceased to be relevant in the 2016 statistics. The platform Clipfish which belongs to the RTL group was transformed into the platform "Watchbox" which no longer allows user-generated content.

---

[433] European Commission, "Microsoft/LinkedIn", decision of 6 December 2016, Comp/M. 8124, para. 339ff.

[434] On the basis of the "monthly unique visitor", a metric essentially comparable to the "monthly active user".

[435] Cf. https://de.statista.com/statistik/daten/studie/209329/umfrage/fuehrende-videoportale-in-deutschland-nach-nutzeranteil/ (in German, last accessed on 10 January 2019).

### iii.   Indirect network effects raising market entry barriers

441   In the assessment of market dominance, account must also be taken of indirect network effects many of which are created by the fact that Facebook is characterised as a multi-sided market. The indirect network effects that are combined with the direct network effects increase the market entry barriers for social networks even further and thus strengthen the trend towards tipping.

442   Indirect network effects occur in advertising-financed services which can also be referred to as "audience providing platforms" (see para. 221 above) because the benefit the advertising side derives from the platform depends on the number and composition of the service's users. Positive indirect network effects for advertisers are generated as they will profit from large numbers of users and different target groups using a service. The indirect network effects of audience providing platforms are often asymmetric as enhanced advertising is not necessarily an advantage from the users' perspective.

443   For an advertising-financed platform product, sustainable market entry is already more difficult right from the start as suppliers must be successful in entering at least two sides of the market,[436] in this case the user market for social networks and the online advertising market. In the present case, Facebook.com's high user-based market share indicates that advertising-financed business models are successful in the market. A payment-based business model going beyond freemium models will have difficulties entering the market as users are unwilling to pay for the service.[437] In view of the indirect network effects, a critical mass of users representing an attractive target group for advertisers must be achieved in order to be able to monetise a product through advertising. However, due to direct network effects, such a critical mass is difficult to achieve.

444   Sustainable market entry is therefore considerably more difficult even with a non-monetised, free product that is usually required to achieve a critical mass online. There are also very little chances for achieving monetisation independently, i.e. not through the takeover of the free service by a company active in the market. Only Google+ was able to enter the market with a network that was not directly monetised and to stay in the market over a considerable stretch of time with more than only marginal user numbers. This was possible because the service could be integrated into the broad advertising-financed portfolio with a strong market presence and because the overall

---

[436] Cf. Caillaud/Jullien, "Chicken & Egg: competition among intermediation service providers", RAND Journal of Economics, 2003, 34(2), p. 309ff.

[437] […]

portfolio could benefit from the service in terms of data processing by combining Google+ data with those collected by the group's other services, e.g. YouTube.

445   The "Vero" product whose market entry is pointed out by Facebook[438], confirms this monetisation problem in the market for social networks. "Vero" is a mobile app which describes itself as a "true social network" and which, according to public reports, has been available in app stores free of charge since 2015. It is owned by Vero Labs, Inc. whose CEO is the Filipino billionaire Ayman Hariri. In early 2018 the app suddenly became popular as one of the top downloads of Apple App Store. This is mainly attributed to Vero's advertising claim that it will always be free of advertising, not collect any data and not use any sorting algorithms. Vero promised the first million users lifetime free accounts. After reaching the one million user mark the service was to be transferred into a paid-for business model the costs of which are unclear. Also, turnover was to be achieved through commissions on the sale of products. The service has meanwhile reached the one million user mark. The free-of-charge offer has been extended indefinitely. After two months the rush to sign up with Vero was over.[439]

446   What has been shown by Vero is that it is relatively easy at first to win over users within a relatively short period of time for a completely free online product without any monetisation. This is a very typical form of market entry in the internet, which, however, in contrast to Facebook's claim[440], does not give any indication as to its sustainability. The service must prove itself when it comes to its first monetisation, which has not even been attempted yet by Vero, particularly if it is to develop into a paid-for business model.

447   In the present case, however, the indirect network effects are not suitable to put into perspective the high market shares on the user side in view of the market structure and competition on what potentially has to be defined as a larger online advertising market. It has to be generally assumed that, due to the indirect network effects, suppliers of advertising-financed products will take the effects on each sides of the market into account in their strategic decisions. If users leave the platform because of disadvantageous strategic decisions made by the supplier on the user side, this can have direct negative effects on the advertising side as advertisers consider the wide reach of platforms such as Facebook.com to be a great advantage.[441] In the present case, however, it cannot be concluded from this that Facebook's scope of action on the

---

[438] […]

[439] Cf. https://www.giga.de/extra/social-media/specials/was-ist-vero-die-social-app-erklaert/ (available in German only, last accessed on 10 January 2019).

[440] […]

[441] […]

user side is sufficiently controlled by indirect network effects affecting the advertisers' side of the market or by competitive pressure on the advertisers' side. Contrary to Facebook's view[442], a detailed investigation and consideration of the competitive activity on the advertisers' side is not required as this cannot be assumed to have positive effects on the services' side even if a competitive market were assumed to exist.

448   The possibility of users leaving the network is considerably restricted due to the combination of indirect and direct network effects. Users switching to another network would lose their contacts as it is unlikely that their friends and other contacts will switch as well (see para. 460 ff. below for details on obstacles preventing consumers from switching due to the lock-in-effect). In view of the role played by the social network as the online reflection of their social environment and activities, users often cannot even refrain from using the network as this would isolate them from their contacts and the exchange of information.[443]

449   Furthermore, as discussed above, competition on the advertisers' side precisely creates a strong incentive to use the scope for data processing as the market success of a service will increase on the advertisers' side if more and more detailed user data can be processed. It is generally difficult for users to track how their data are being processed which makes it unlikely that a significant number of users will leave the network, irrespective of the direct network effects. A restriction of the scope for processing data by a competitive advertisers' side can therefore not be assumed. Due to the fact that the markets are connected, indirect network effects threaten to result in the transfer of market power towards the online advertising market.

450   This has also been confirmed by the investigations which have shown that Facebook's overall advertising revenue massively increased. According to statistics published by Facebook[444], its (worldwide) turnovers doubled in 2017 and 2018 (approx. 100 % rate of increase over two years).

---

[442] [...]

[443] According to a 2016 study by the California State University, the use of Facebook and other social networks can even lead to addiction, cf. http://www.independent.co.uk/news/science/facebook-could-affect-brain-in-similar-way-to-cocaine-study-finds-a6877236.html (last accessed on 10 January 2019).

[444] Cf.   Facebook,   presentation   Q4   Results,   slide   4,   available   at https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q4/Q4-2018-Earnings-Presentation.pdf, [...]



451 Based on a national online advertising market for social media, for which the investigations have produced some indications, Facebook has meanwhile become the market leader in terms of turnover.[445]

(b) **Parallel use of services and high barriers for switching, Section 18(3a) no. 2 GWB**

452 The assumption of market dominance and a monopolisation trend on the user market for social networks resulting from direct network effects is supported by a clear lack of parallel use of services (multi-homing) on the market concerned. Moreover, due to the identity-based direct network effects and the high degree of incompatibility with other services, the significant lock-in effect creates high barriers for users wishing to switch, and thus ties users to Facebook, which also supports the assumption of a market tipping process.

i. **Multi-homing**

453 There is no significant parallel use of social networks in the market which could prevent the elimination of competitors and facilitate new market entries.

454 In general, multi-homing can counteract the imminent tipping of a market which is likely to occur due to direct network effects. If users extensively use several networks, this can prevent the elimination of competitors from the market even if the market shows a

---

[445] [...]

trend towards concentration. This can also lower the high barrier to market entry as extensive multi-homing helps new entrants to win over customers even if these are already using a large network.[446]

455   According to the economic literature, multi-homing is closely connected to product differentiation caused by heterogeneous user preferences. In the case of multi-sided markets, multi-homing can result from a horizontal platform differentiation in which platforms differentiate themselves from their competitors by targeting specific user groups. A horizontal platform differentiation, according to the literature, could thus result in the emergence of several specialised platforms offering special features. This can lead to multi-homing on one or both sides of the platforms, e.g. because users on one side of the platform would like to address different user groups on the other side. Multi-homing will then tend to have a deconcentration effect, in particular in combination with platform differentiation.[447] This concept is generally also used for (incompatible) networks.[448]

456   An intensive product differentiation in social networks resulting in multi-homing and deconcentration is not evident. In particular, it cannot be decisive whether Facebook.com users also use other social media that do not belong to the market for social networks. According to the Bundeskartellamt's investigations, users often use several social media in parallel. […], Twitter users e.g. often also use Facebook.com, Instagram, WhatsApp and Snapchat.[449] However, as described above, these services are used to fulfil different requirements and therefore belong to different markets.

457   If there is a large number of differentiated social media which offer products that are more or less different from one another, it must first of all be investigated in accordance with the demand-side substitutability concept whether the differentiated social media are functional substitutes and thus fulfil the same requirements. If these differentiated products are predominantly used in parallel to complement each other and if they are not substitutable for one another, they belong to separate markets. From the Bundeskartellamt's point of view, the concept of multi-homing as relevant under competition law only applies if networks are used in parallel on the same market. Only in this way it can be determined whether the relevant market's trend towards tipping

---

[446] B6-57/15, OCPE II/EliteMedianet, decision of 22 October 2015, para. 151 […]

[447] Cf. above all Evans/Schmalensee, "The Industrial Organisation of Markets with Two-Sided Platforms", Competition Policy International, 2007, Vol. 3, No. 1, p. 151-179; Katz, "Competition policy in network industries", Keynote Lecture, Annual Conference of the German association of economists Verein für Socialpolitik, 2013.

[448] Katz/Shapiro, "Systems Competition and Network Effects", Journal of Economic Perspectives, 1994, 8(2), p. 93-115; Doganoglu/Wright, "Multihoming and compatibility", International Journal of Industrial Organization, 2006, 24, p. 45-67; cf. Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 95.

[449] […]

can be slowed down and whether the high entry barriers to this specific market can be lowered. The parallel use of a product that fulfils different requirement is of no competitive relevance for the respective markets, apart from limited fringe competition due to the users' limited time and monetary budget.[450]

458    The parallel use of Facebook.com and YouTube or other social media is thus not directly relevant for Facebook's market position and the monopoly position. All in all, due to the direct network effects, a product differentiation in the case of networks can precisely lead to the splitting of the market as described above. Monopolisation trends will again occur in such cases on the individual submarkets.[451]

459    Multi-homing by Facebook users with (formerly) Google+ and Jappy and possibly with the differentiated networks Stayfriends and Wize.Life would be required for a relevant effect on Facebook's market position. Such a parallel user behaviour is not at all evident in view of the quasi-monopoly Facebook has established with more than 90 percent of the user-based market shares. Effective multi-homing in the market would have to be reflected by lower market share leads. Where 90 percent of the users use a specific service without any significant overlaps, this can only be qualified as single-homing and indicates a market tipping process that has in fact not been prevented by multi-homing.

### ii.    Lock-in effect creates high barriers for switching

460    The high barriers for users wishing to switch which can be observed in the market for social networks also support the assumption of market dominance and a market tipping process. The identity-based network effects, in particular, lead to a lock-in effect which makes it difficult for users or prevents them from switching to another social network. The incompatibility between Facebook.com and other social networks, i.e. the technological basis of the network effect, is not reduced by the existing features and interfaces to other services.

### • Lock-in through incompatibility and identity-based network effects

461    The high barrier for users wishing to switch is created by the identity-based direct network effects that cannot exist across all networks due to the (technological) incompatibility of the social networks in the market. Compatibility would neutralise the importance of network effects in competition.[452] Products are compatible if they are

---

[450] Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 62 and p. 101.

[451] On the market for online dating platforms, high platform differentiation resulted in intensive multi-homing as, according to the investigations, all the platforms fulfilled the same requirements from the point of view of users and were thus substitutable for each other.

[452] Katz & Shapiro, "Network Externalities, Competition, and Compatibility", American Economic Review, 1985, Vol. 75(3), p. 424-440.

designed in such a way that they can cooperate or interact with each other[453] and if they are thus substitutable with regard to their function.[454] In most cases this is not applicable to social networks as all their features are customised for one specific network which therefore represents a "universe" of its own. In this respect and in terms of economics, social networks are comparable to systems of goods or services which represent a bundle of mutually compatible, complementary goods or services, that are used in the same context and are jointly considered by consumers making a choice.[455] It is possible that, based on interfaces, individual functions can achieve a certain degree of compatibility. However, elements of the system of network cannot be substituted by elements of the other system or network.[456]

462    Users wishing to switch to such an incompatible network face several different barriers. Based on the purpose of using social networks, users will only find it useful to switch to an alternative network if they can meet their friends and acquaintances there as well. Users wishing to switch would therefore have to convince their contacts in the original network to switch to another network as well. As these contacts also have further contacts in the previous network, these would also have to be persuaded to switch. The more contacts a user has in the previous network, and the more closely these contacts are connected with other users, the more difficult or even impossible will it be to transfer these contacts to a new network. Users wishing to switch will be faced with the question of whether they should still switch to another network if a significant share of their previous contacts will not do the same. The incentive to switch to another social network therefore decreases with higher intensity of use of the previous network.

463    It has to be taken into account that the use of social networks can involve much more connections than e.g. the use of communication and messaging services. Communication services enable direct communication between two users who know each other or within a specific group of users. If users of messaging services only communicate with a small circle of friends, their address books stored in their devices can be uploaded and the group can thus switch to a competing company.[457] Social networks enable not only direct communication between two users, but also indirect interaction where a user can participate, and benefit from, the communication between other users. Sharing or passing on posts in social networks thus also enables a tiered,

[453] Farrell/Saloner, Competition, Compatibility and Standards: The Economics of Horses, Penguins and Lemmings, 1987, p. 1; Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 92.

[454] Cf. Pfeiffer, Kompatibilität und Markt, 1989, p. 23.

[455] Cf. Stelzer, Digitale Güter und ihre Bedeutung in der Internet-Ökonomie, p. 8 f, https://www.tu-ilmenau.de/fileadmin/public/iwm/diggut.pdf (last accessed on 26 October 2018).

[456] Cf. Economides, Networks and compatibility: Implications for antitrust, European Economic Review 1994, 655; id., Desirability of compatibility in absence of network externalities, The American Economic Review, 1165ff.

[457] […]

indirect interaction which in many cases is also intended. In this way connections are established between users who do not know each other.[458] If users switch to another social network, these connections will also be lost if their friends cannot be persuaded to switch as well.

464   In the case of a supplier with a dominant installed base, such as Facebook's, attempting to transfer contacts to a new network and refraining from using the network will both cause high switching costs (so-called opportunity costs), which leads to users being less willing to switch. Where the installed base of the original network is very large, switching to another network will only be attractive for users if the benefit created by the new network clearly outweighs the switching costs. The larger the installed base of the original network, the higher the benefit of the new network will have to be.[459]

465   This cannot be called into question by Facebook's claim that switching suppliers was a gradual process which in most cases did not involve any "clear break" where users "moved out" of one network and "moved into" another network (Bundeskartellamt unofficial translation).[460] This does not change the fact that switching will only create a benefit if, at the end of this process, all connections will actually switch to another supplier. In this respect, the gradual process means that switching typically involves a temporary process of multi-homing. Such multi-homing, however, is not evident because, as described above, practically all the competitors' user numbers are in decline, which is why the figures cannot be interpreted as showing a switching process. As explained above, multi-homing with products belonging to other markets cannot be taken into account in this respect either.

466   Contrary to the view held by Facebook[461], the "Vero" product mentioned above is not an example that would be able to disprove the problem of direct network effects and the high barrier to switching created by these effects. On the contrary, this is a good example for proving the very existence of the problem. Facebook's statement that network effects can easily be overcome by simple information and calls for a switch or additional use of the previously used networks, does not hold. Facebook refers to a tweet on Twitter in which a user states he would no longer be using Instagram if Vero were to remain in the market.[462] It is extremely doubtful whether this can be a real option for convincing one's friends to switch to another network, particularly since the networks referred to provide different services. Moreover, Vero, and in particular its

[458] Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 100 f.

[459] Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 100.

[460] […]

[461] […]

[462] […]

CEO Hariri, have come under criticism due to accusations of corruption, exploitation and abuse of power in connection with business operations in Saudi Arabia, which has resulted in negative reactions by Twitter users: Tweets marked #deletevero became a trend on Twitter.[463] This does not appear to be suitable for reducing the barriers for switching.

467  The finding that there are high barriers to market entry is also supported by the Bundeskartellamt's investigations and user survey: According to the investigations, a Facebook user has an average of […] friends[464], each of whom also has an average of […] friends, etc. In individual cases the number of friends on Facebook.com is much higher and could include several thousand contacts that are more or less important. Even if not all of these […] friends are equally important for the user, the number of users that would have to be persuaded to switch in order to achieve a similarly high level of benefit is extremely high.

468  The fact that users of social networks are reluctant to switch supplier is also reflected in the responses received from the Facebook users who participated in the user survey. Asked to indicate reasons in favour of making more use of a different service, 76% of the Facebook users surveyed stated they would consider this if friends, family members and acquaintances used a different service. Only a (in some cases very clear) minority of users surveyed indicated they would consider any of the other reasons for switching listed by the survey. Only 23% thought a higher activity level in another service was a reason for switching, and only 34% referred to better functionalities as a possible reason. This shows that, if their contacts do not switch as well, most of the Facebook users surveyed consider the costs of switching to another service to be too high to make this worthwhile, even if the new service is a more active or better one. These figures illustrate that, unless they succeed to attract the users' friends as well, it will be difficult for alternative services to entice users away from Facebook.com by offering better features or less advertisements. .

- **No data portability**

469  Switching is also made difficult because of the lack of data portability. Switching from one network to another, incompatible network not only requires users to leave behind or transfer friends and connections; they must also set up the new service, a profile and, in particular, the information stored in the previous network. Depending on the focus of their activities, users actively published their own content and consumed, shared or commented on content from other users. Over time their user activities will

---

[463] Cf.      https://www.horizont.net/tech/nachrichten/DeleteVero-Warum-der-Social-Media-Hype-schnell-wieder-vorbei-sein-koennte-165249 (available in German only, last accessed on 10 January 2019).

[464] […]

thus result in the creation of small or large data sets. The amount of time involved in building up a new identity in a different network can deter users from using a different network.[465]

470   There are only limited possibilities to port the profile and information related thereto to other networks. While it is possible to attribute lists of friends and published contents to the users, it is more complicated to attribute to users their reactions to the activities of other users, e.g. by sharing or commenting on their contents, or conversely, responses of others to the contents shared by a particular user. In this case the activity of users cannot in any meaningful way be separated from the content on which these activities were based or which refer to these activities. Extracting the activities of the users is therefore hardly reconcilable with the underlying idea of a social network which precisely enables interaction between its users. It is because of the fundamental structure of a social network that the transfer of one's own activities from one social network to another is only possible to a limited extent.

471   Facebook.com offers an export function in its social network which enables users to export their own activities in a file ("download your information" function). If users request a download, Facebook.com will send them an e-mail with a file which includes the user-related content in a browser-compatible list.[466] However, only the users' own content, as published by the users themselves, can be exported. Reactive activities of a user cannot be exported, i.e. in particular likes or comments on content published by third parties as well as reactions by third parties on contributions published by the respective user. The export function offered by Facebook.com is thus not a comprehensive feature.

472   An export or transfer of activities that refer to other users is in fact hardly conceivable. A pure export of the content a user created in reaction to e.g. posts by other users, would, on its own, be taken out of context. An alternative would be to export the entire context in which the user was active as well to ensure that the user's activity is embedded within its context. In particular in the case of very active users, however, this would pose not only technical challenges. Also from the perspective of data protection law it is doubtful whether users can be allowed at all to transfer third-party content their own activities refer to within the context of an export. Furthermore, the data that can be extracted by means of Facebook.com's export function practically cannot be used as

---

[465] E.g. for professional social networks, European Commission, "Microsoft/LinkedIn", decision of 6 December 2016, Comp/M. 8124, para. 345.
[466] [...]

there is no possibility to import them into other networks. The exported data can thus rather be used for archiving purposes instead of offering portability.

- **No relevant reduction of lock-in effects through share feature in other networks**

473 The connection between Facebook.com and other networks or other social media made possible by the share feature (share button) also does not put the significance of the network effects into perspective or reduce in any relevant way the lock-in effects.

474 Via the joint interface defined by Facebook users can post content from other services such a Twitter, Pinterest or WhatsApp on Facebook.com by using a sharing functionality. Where services have implemented this feature it can be easily and comfortably used. Sharing content from Facebook.com with other services, for example on iPhones[467], is, however, only possible via an additional tool, the AddToAny share plugin. This plugin must be actively installed by the user; it is not an integrated feature in Facebook.com's share button. If users click on Facebook.com's share button, a menu will appear with options for sharing only with Facebook.com itself or the Facebook Messenger. For other services, including WhatsApp, users must copy a link and insert this in the other service.

475 Moreover, the share feature requires the parallel use of services in which posts are to be made. This also applies to Facebook's login feature which allows users to register in other services with their Facebook profiles. As described above, such multi-homing does not take place with Facebook's competitors to any relevant extent in the market for social networks.

476 The implementation of the share button and the Facebook login involves a considerable amount of data being shared with Facebook.com. This means that e.g. data on the user behaviour on the implementing website will also be shared with Facebook.com. The data shared strengthens Facebook's data base. Also, Facebook receives information on its competitors' user base which can be used in product competition to the benefit of Facebook.

(c) **Economies of scale arising in connection with network effects, Section 18(3a) no. 3 GWB**

477 The supply-side economies of scale enjoyed by Facebook combined with the direct network effects and lock-in effects support the assumption of market dominance and also indicate a market tipping process.

---

[467] No such tool is available for Android systems.

478   Supply-side economies of scale are particularly significant in the internet economy because the development costs of digital goods are in general considerably higher than their variable running costs. The higher the fixed costs, the more the costs per user will decrease with increasing user numbers. In particular in combination with network effects, its lower average costs per user result in Facebook gaining a significantly larger strategic scope for action than its competitors, and this scope continues to increase.

479   The lock-in effect described above aggravates this development and leads to cost disadvantages for the competitors. Due to the high switching costs the competitors' prices not only have to be at least as favourable as Facebook's, but also have to compensate for the switching costs if users are to be motivated to switch. This cost effect also provides Facebook with more scope of action vis-a-vis its competitors. And finally those economies of scale must be considered which result from the joint monetisation of Facebook's services, in particular Facebook.com and Instagram, within the context of Facebook's advertising network.

480   The joint effect of network effects, lock-in effects and economies of scale ultimately leads to a situation where the leading competitor becomes increasingly stronger and its competitors become more and more insignificant.[468] This corresponds to the development of the relevant user-based market shares in the market for social networks described above and indicates a market tipping process.

(d)   **Access to competition-related data, Section 18(3a) no. 4 GWB**

481   Facebook has superior access to data relevant for competition, in particular the personal data of its users. In view of its superior installed base, Facebook has a very large data base. The data's level of detail is very high as well because Facebook has access to a large number of different data sources. The superior access to user data creates an additional barrier to market entry which, in connection with the direct and indirect network effects, contributes to the further consolidation of the tipping process. The practically unlimited scope of data processing as such already indicates an uncontrolled scope of processing user data which represents a competitively significant scope of action in the market for social networks covered by the provisions of Section 18(3a) no. 4 GWB.

482   From the Bundeskartellamt's point of view, access to competitively relevant data is an important aspect in the assessment of market power of social networks because the

---

[468] The economic literature also refers to this joint effect as "increasing returns", cf. Arthur, Increasing Returns and the New World of Business, https://hbr.org/1996/07/increasing-returns-and-the-new-world-of-business (last accessed on 10 January 2019).

product in question is a strongly data-driven product whose characteristics and financial sustainability depend to a significant degree on the personal user data available. A large data base of a market participant as such is not an indication of market power. It can, however, play an important role in the overall assessment of all circumstances.[469] The high competitive relevance of the data base to a supplier of social networks will, however, create an additional barrier to market entry as most competitors, with the exception of Google, cannot collect comparable amounts of data, or data with a comparable level of detail, as Facebook. This entry barrier further increases the lock-in effect created by the direct network effects.

### i.   Data sources

483   As described above, Facebook can use a large number of different data sources. First of all the company has access to user data which are created directly when using a social network in accordance with its purpose. Via the registration, login and the mobile or desktop use of Facebook.com's start page users already generate a large amount of data about themselves to which Facebook has access. In order to create their profiles users actively provide data including their real name (real name policy), age, sex, relationship status, place of residence, education, occupation, employer, interests and hobbies. Users have a strong incentive to provide comprehensive and correct data as they mainly use a social network to search for specific other users, interact with them and present themselves. Finding other users is considerably facilitated by the provision of comprehensive and correct profile information (e.g. real names).

484   The activities on the social network, e.g. posts and other interactions, provide Facebook with information on the persons the user communicates with and the topics the user is interested in. The live location feature on mobile devices and technical options for the geographic mapping of IP addresses enable Facebook to track the locations and movements of users. As users are obliged to create an account Facebook can track registered users across devices and see on which devices the social network is used. If users upload contact lists to the social network to find friends, Facebook will gain further information on the users' friends and the persons they communicate with.

485   Facebook also has access to data of persons using other social media owned by the Facebook group. These data are based on the personal data of users which are combined and matched against Facebook's data. WhatsApp with 1 billion users worldwide and […] daily active users in Germany, […], and Instagram with more than

---

[469]  Bundeskartellamt, Working paper "Market power of Platforms and Networks", June 2016, p. 84, Joint paper by the Autorité de la concurrence and the Bundeskartellamt on competition law and data, May 2016.

[…] daily active users worldwide and […] daily active users in Germany, are services with a large reach in the neighbouring market for messaging services.

486   As described above, Facebook also receives detailed data on the user behaviour of Facebook users from third-party providers which use the developer interfaces offered by Facebook. Via the integration of Facebook interfaces (APIs) which involves the placement of cookies on users' browsers, Facebook can track the users' behaviour on these websites, even if they are not logged into or registered with Facebook. The social plugins (e.g. the "Like" and "Share" buttons), in particular, and the Facebook login are integrated and used in third-party websites or apps in millions of cases[470] in Germany. The measuring and analysis tools for third-party providers also represent an important data source. These tools transmit to the Facebook servers the IP address, type of browser, the URLs of the websites visited, the time at which a website was visited and other information by means of combining the integrated interface and cookies. The ID integrated in the cookies makes it possible to identify the Facebook.com user profile. Facebook cookies contain e.g. the user's specific ID, the browser ID, the timestamp and several other data. In mobile apps Facebook can also identify users by capturing the advertising ID of the operating system without the use of cookies. In this way Facebook gains further information such as the Facebook App ID and metadata such as the operating system used, the name and version of the app used, etc.

487   And finally the advertisers represent a further source of data for Facebook. As described above, the identification of target groups ("custom audiences", "Facebook Offline Events") requires an upload of the advertisers' hashed customer data which will be matched against Facebook data. For this purpose advertisers use their own customer lists that include data collected by themselves, e.g. first and last name, telephone number, e-mail addresses, city and country of residence, date of birth, age, sex, purchasing behaviour, purchase price and several IDs of their customers.

ii.   **Competitive relevance of data**

488   Facebook's data sources are highly relevant for competition because the product of a social network is driven by personal data in particular, and the algorithms used for interaction ultimately define the product as a provision of data to the users. Superior access to these data makes it possible to continuously adapt the products by further technical developments and improved personalisation and to achieve other strategic business goals. Data sources also secure funding through advertising which, if based

---

[470] […]

on these data, can be precisely targeted and continuously refined. In turn, advertising generates new user data.

489   Personal data are first of all used for personalised content in the *News Feed*. The news feed, which most of the current networks are now using in similar form, is a personalised stream of content and activities relating to the user. For an optimum user experience, users should mainly be able to see content most relevant to them when they scroll down their news feed. All posts are therefore ranked by an algorithm and sorted according to this ranking. In order to continuously improve the news feed algorithm it is subject to a permanent complex process of adjustment and modification based on different influencing factors, for example the data collected. For each individual user the algorithm calculates a score for each possible post to the news feed on the basis of all factors that have a positive or negative influence on the presumed relevance of a post. On this basis the content in each user's personal news feed is sorted.

490   Three of the main factors influencing the score are affinity, weight and decay. Affinity means the user's affinity to the acting person. It is defined on the basis of the interaction with the respective users and their posts. Indicators include contact in the form of posts to the timeline, likes, comments, mutual tags, visit to websites, etc. Overlaps with regard to the users' interests, friends and action patterns are also relevant. Weight means the significance of a post from the users' perspective. The assessment is based on the interaction of others with the respective post in the form of clicks, likes, shares and comments and even the content of the interaction. Personal factors such as the relevance of the persons who interacted with the post play a role as well as the click/like or click/share quotas. These quotas have a negative influence on the post's relevance and, among many other factors, they are meant to counteract the spread of spam and click baits. If the same content was also shared by other persons (friends or third parties), this indicates higher weight. Decay refers to the expiration time of a post. Recent posts are seen as potentially more interesting than older ones. It will also be taken into account, however, whether a post is only interesting in the present situation or whether it will remain relevant for a longer period. This is assessed e.g. by looking at the reaction (short-term and intensive or long-term and constant). The type of content is also important, e.g. whether the post consists of an image, video, text, link, etc. If users can be observed to react intensively to images, but rarely click on links, images seem to be more interesting to them and will be ranked higher.

491   The list of influencing factors can be easily extended. Apart from a user's own behaviour, the behaviour of the users who post or interact is also highly significant. Interactions of persons who rarely use Facebook.com are potentially more relevant

than those of power users. In addition to these factors, non-behavioural factors also play a role, e.g. the quality of internet connectivity. Facebook.com's focus and the corporate policy can also have an influence on the algorithm and the position of posts in the news feed. It is possible, for example, to control whether posts by friends (personal character) or posts by commercial websites (news character) should generally be ranked higher. Also, the algorithm generally ranks new Facebook.com features higher and thus promotes them.

492   Moreover, the data collected particularly serve to provide targeted advertising. The diverse data sources make it possible to carry out very detailed targeting procedures by establishing target groups according to specific personal criteria or consisting of individually identified persons (custom audiences and lookalike audiences). Important targeting methods such as technical targeting, so-called behavioral targeting, semantic targeting and re-targeting can be combined and granular data sets can be used.

493   Contrary to Facebook's view it is unlikely that the marginal utility of the data volume will always decrease with increasing data collection.[471] This may be somewhat different in the case of targeted advertising where the benefit ultimately depends on the customer's decision on which product is to be advertised. As far as the further development of the service and future business purposes and technologies are concerned, a diminishing marginal utility of the data volume is not evident, as stated by Facebook itself. This applies in view of the further development of the possibilities to analyse large amounts of data, such as in particular Artificial Intelligence[472], so-called Deep Learning or, more generally, Machine Learning[473], which provide possibilities for new business purposes and areas of application, and which in return require large amounts of data.[474] In its data processing guidelines for Facebook.com Facebook states that the information is used for the further development of the products, product research and development as well as research and innovations on, e.g., issues regarding technological progress which is presented as a general welfare issue. In another context Facebook also argues that the exactness and degree of personalisation of a social network depended on the number and variety of the signals received - the broader the database, the more effective the service.[475]

---

[471] […]

[472] Artificial intelligence is generally defined as the ability of machines to not only control mechanical processes but also perform complex mental processes; an early foundation of AI is considered to have been laid by the paper of Alan M. Turing, Computing Machinery and Intelligence, 1950, published in the journal *Mind*, 1 October 1950, p. 433-460.

[473] Deep Learning and Machine Learning are different methods by which adaptive algorithms can be "trained" to improve in the course of their application.

[474] See also Bundeskartellamt/Autorité de la Concurrence, "Competition Law and Data", May 2016, p. 50.

[475] […]

### iii.   Establishment of a further barrier to market entry

494   In the context of the direct and indirect network effects and the ensuing lock-in effect, superior access to competitively relevant data establishes a further barrier for entry to the market for social networks and thus also contributes to a market tipping process.

495   Due to the direct and indirect network effects, Facebook has already achieved a huge data advantage which most of its competitors, particularly new entrants, cannot catch up with. This is mainly due to the superior installed base which is the foundation of the data sources described above and which none of the competitors was able to achieve. Its installed base of 23 million daily active users[476] enables Facebook to collect a huge amount of data. It is a special characteristic of these data that their usability and value are not merely a product of the data themselves, but mainly result from their combination and formation of patterns. The value of each single data element and the possibility of gaining insights from these data increases with an increasing amount of other data elements available. By means of algorithms the behaviour or the interests of a user can thus be predicted. With an increasing amount of data available (user-based data, but also data on the overall community) the prediction can be made more and more precisely and to the point. The benefit continuously increases with larger amounts of data available, especially if they are derived from different sources.

496   Facebook has a significant advantage over its competitors in the optimisation of its news feed algorithm and thus in the development and improvement of its product, and this advantage increases as the installed base grows. This can also be seen as a further aspect of the self-reinforcing feedback loop as an increased installed user base improves the data base which generally further increases the benefit each user derives from the network, which in turn attracts new users.[477] The increasing benefit of the network increases the lock-in effect resulting from the direct network effects and incompatibility.

497   Moreover, via indirect network effects, the increasing installed base and the ensuing amount of data have an impact on the advertisers' side of the market. If a large number of highly interactive users spend much time on the Facebook website, this improves targeting options which in turn attracts a large number of advertisers who contribute their own data sources, generate further data by means of the Facebook measurement tool and make these available to Facebook. The Bundeskartellamt's investigations have shown that the data Facebook collected and made available for advertising

---

[476] https://de.newsroom.fb.com/news/2017/06/eine-community-von-30-millionen-facebook-sagt-danke/ (in German, last accessed on 10 January 2019).

[477] Cf. Joint paper by the French Autorité de la concurrence and the Bundeskartellamt on competition law and data, May 2016, p. 13.

purposes were considered an important advantage of advertising on Facebook by the companies surveyed, besides the service's wide coverage. 11 out of 13 media agencies which responded to the questionnaire said that advertising on Facebook offered good targeting opportunities or very detailed user data, which was an advantage over other social media services. A large number of advertisers also consider the good targeting options and comprehensive "granular" user data to be an advantage of advertising on Facebook as compared to other media.[478]

498   Competitors are largely unable to duplicate this data collection. This applies in particular to smaller competitors that only have limited options for pooling data from different relevant sources. All internet companies use cookie technologies and acquire data from third party providers. However, the competitors' sources are not comparable to the data sources available to Facebook through the user base of the social network and its own services. According to the investigations, the Facebook's competitors, with the exception of Google, cannot pool data from company-owned services. In the sector of social networks, Google was the only company apart from Facebook to offer third party websites the share and like buttons and a log-in button.

499   The Bundeskartellamt's investigations in the sector of advertisers have also shown that Facebook has a unique treasure trove of data: 12 of 13 of the media agencies that replied to this question said Facebook possessed data relevant for advertising that other providers of online advertising could not deliver. Most agencies stated that Facebook had more detailed data than other providers. Some agencies also said that Facebook possessed unique data about the interests of users. A large majority of the advertising companies also share the opinion that Facebook possesses more data than other publishers. They often referred to data about the users' interests, very fine-grained details and user-based profile information.[479]

500   The fact that the Google group, which included Google+ in its portfolio, also has extensive access to data does not change the significance of Facebook's access to data with regard to its market position in the market for social networks. Data access is connected with the network effects and represents a further aspect in the overall assessment. The collection of data available to the Google group, i.e. data from Google Search, YouTube, G-Mail, Google Maps, Android and other services, which is also pooled based on Google's respective data processing policies[480], is on the whole at least comparable with Facebook's collection of data in terms of volume and level of

---

[478] […]

[479] […]

[480] https://www.google.de/intl/de_de/policies/privacy/?fg=1#infouse (last accessed on 10 January 2019).

detail. However, in the case of the private social network Google+, this data base has not led to market success as it was not linked with strong, self-reinforcing direct network effects. In contrast to Facebook, Google+ was not the central Google service for which data from other services and sources were combined for the benefit of its algorithms and funding through advertising. Google+ was rather one of the data sources the company tapped into in order to provide online advertising in the other, considerably more important Google services. Google+ users did not receive any ads.

(e) **Innovation-driven competitive pressure, Section 18(3a) no. 5 GWB**

501   Facebook's market position is currently not threatened by sufficient innovation-driven competitive pressure. Under Section 18(3a) no. 5 GWB, account must be taken of innovation-driven competitive pressure in the assessment of an undertaking's market position, in particular in the case of multi-sided markets and networks. In contrast to merger control, the issue here is not whether and to what extent the innovation-driven competition between companies is threatened[481], but to what extent innovations can put into perspective the market power of a company.[482]

502   The Internet is generally highly dynamic and characterised by a large amount of innovations. Innovative products and services can create and establish new digital markets within a short period of time. However, these dynamics can also result in online services rapidly losing their significance. Crucial factors in this process are characteristic features of the internet, i.e. global networking and accessibility as well as high-speed innovations.[483] The user behaviour of private users is also subject to change, in particular in view of technical innovations.[484]

503   The innovative and disruptive potential of the internet cannot be used as a general argument against the market power of internet companies. If a strong market position exists which has been established according to further criteria defining market power, this position can only be effectively put into perspective on the basis of concrete

---

[481]  See Commission, "Dow/Dupont", Comp./M. 7932, decision of 27 March 2017 in which the Commission held that the merger would result in a significant reduction of innovation competition in the markets for pesticides. The merger was only cleared subject to conditions.

[482]  See Bundeskartellamt, Series of papers on Competition and Consumer Protection in the Digital Economy, "Innovations – Challenges for competition law practice", November 2017, in particular p. 16ff., https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Schriftenreihe_Digitales_II.pdf?__blob=publicationFile&v=3 (last accessed on 10 January 2019).

[483]  Evans, "Multisided Platforms, Dynamic Competition and the Assessment of Market Power for Internet-based firms", 2016, http://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=2468&context=law_and_economics, p. 10 (last accessed on 10 January 2019).

[484]  Bundeskartellamt, decision of 22 October 2015 – B6-57/15 – *Parship/Elitepartner*, para. 174; Working paper, p. 74f.; See Bundeskartellamt, Series of papers on Competition and Consumer Protection in the Digital Economy, "Innovations – Challenges for competition law practice", November 2017, in particular p. 24

indications in each individual case of a dynamic or disruptive process which could also originate from markets other than the relevant one. An abstract challenge expected to take place at some unspecified point in the future will not be sufficient. This applies in particular to the control of abuse of dominant positions which focuses on the current situation. Also in the digital economy it is possible to establish market positions that are largely secured over long periods of time, in particular by direct and indirect network effects. During these periods the abuse of a dominant position cannot be accepted only because the situation can be assumed to change in the future.[485]

504   There is no sufficient innovation-driven competitive pressure, also from other, neighbouring markets, that would, currently or in the near future, be able to effectively put into perspective Facebook's market position in the market for social networks. The high market shares and market share leads described above already indicate that neither technical disruptions such as the "mobile revolution" initiated by the development of smartphones nor competitive moves by competitors have built up innovation-driven pressure on Facebook's market position. The innovative impulses provided in particular by competition from substitutes from neighbouring markets where competitors innovated and extended their own social media, could be counteracted by Facebook by integrating the innovation into its own portfolio.

505   The recent development of mobile internet use has brought about an important and fundamental change of user behaviour in almost all areas. The fast growing and massive use of smartphones, which has rapidly developed since the introduction of the iPhone in 2007, is generally used as a typical example of a "disruption" which has been threatening business models and products. However, Facebook has not been affected by this development although the social network was originally designed to be used on desktop computers. With the introduction of the iPhone in 2007 the company merely launched a mobile version of the website optimised for small displays, and mobile apps for iOS and Android were only available on the market from 2012.[486] StudiVZ had already made a mobile app available in 2008. Nevertheless the mobile use of Facebook has been increasing continuously[487] and, according to public statistics, already reached more than 50% (worldwide) in the year it was launched.[488]

---

[485] Bundeskartellamt, decision of 22 October 2015 – B6-57/15 – *Parship/Elitepartner*, para. 176; Bundeskartellamt working paper "Market Power of Platforms and Networks", June 2016, p. 74f.

[486] […]

[487] […]

[488] Cf. https://de.statista.com/infografik/1077/facebooks-mobile-nutzer/?utm_campaign=9b9cd60d6e-Cold_Camp_InfographTicker_DE_pm_36&utm_medium=email&utm_source=Infographic%20Newsletter&utm_term=0_666fe64c5d-9b9cd60d6e-295265921 (available in German only, last accessed on 10 January 2019).

506   The company's own innovations […][489] do not indicate any competitive pressure that would have been able to challenge Facebook's market position so far either.

507   Facebook points out product innovations launched during the last 5 years which, according to the company, included the successful transformation of a "web company" into a "mobile first company" (2012/13), the successful decoupling of the Facebook Messenger in April 2014, the launch of "live video" in April 2016, and the introduction of the privacy settings at the level of individual objects as well as ads settings ("ad preferences"). […]

508   In the area of photos, Facebook claims […]. According to Facebook it launched "Poke" […] and discontinued the feature in May 2014. In August 2016, […], Facebook had introduced "Stories" on Instagram. According to the company, its "Camera" app had been introduced in May 2012 and discontinued in 2014. Facebook.com had launched photo filters and 360 Photo in June 2016 […]. In June 2015, it had published the "Moments" app which organised photos and turned them into clips. In June 2016, Facebook.com added "Slideshow" which creates mini-movies from photos.

509   As to the communications sector, Facebook […] developing the Facebook Messenger as a stand-alone app. Further features, such as following brands, persons or event as well as order and/or payments features had been offered by the Facebook Messenger. Chatbots had been introduced in the market as new developments. "Lite" versions of services had been introduced for slower internet access, especially in developing countries.

510   In the area of content sharing, Facebook claims that innovations had been introduced with the so-called Pinboard instead of a news feed by Pinterest and that a re-design of YouTube had been carried out based on Facebook.com. In September 2011, Facebook had launched its Timeline which many other services also offered today. In September 2006, the News Feed had been introduced. Facebook states that "Trending" had been introduced in January 2014 […]. The "Subscribe" function had been introduced in September […]. The "Paper" app, a separate news app for iOS, had been launched in February 2014 and discontinued in June 2016.

511   In 2010, Facebook had introduced its social plugins to enable interaction between users; in 2016 the "Like" button had been revamped. Furthermore, Facebook states that it had entered the area of services for publishers in 2015, […]. Facebook also states that several different innovations had been introduced for the developer platform and advertising services, such as the introduction of the App Center, the "Home" meta

---

[489] […]

app, the 2012 introduction of the developer platform for the Facebook Messenger and Facebook Custom Audiences, and the Lookalike Audiences tool introduced in 2013, including integrated information gained from tracking.

512   In the Bundeskartellamt's view, the further developments described above in fact represent a competitive activity which, however, does not go further than competition from substitutes by means of some individual marginal features. A substantial part of Facebook's statements describe competitive activities in other markets to which Facebook has reacted by introducing innovations on Instagram and the Facebook Messenger as stand-alone app, as well as via WhatsApp or other separate apps such as "Poke", "Paper", "Moments" or "Facebook Camera" rather than in the area of the social network. In contrast to Facebook's claim, this represents different reactions in the individual separate markets concerned, in some cases market entries such as the introduction of the separate Facebook Messenger app, rather than a reaction taking place in the social network market. These reactions are rather attributable to Facebook's substantial scope for expansion which arises precisely from its strong market position in the social networks.

513   Where Facebook claims that relatively fundamental developments and features of the social network took place in 2006 and 2011, as e.g. the Newsfeed that was launched in 2006, the social plugins introduced in 2010 or the timeline in 2011, this shows that Facebook successfully entered the market. The Bundeskartellamt does not dispute that there has been intensive competition for this market.

514   Where Facebook refers to recent developments in the social network, in particular the streaming of videos via Facebook Live, the upload of 360° videos and photos, Trending or the revamp of the Like button, […]. Although this demonstrates competitive pressure on some partial functions of a social network, the developments still represent competition from substitutes at the margins of the market which, contrary to the view held by Facebook, cannot challenge Facebook's position in the market. In the opinion of the Bundeskartellamt it is not justified to refer to competition on video features as a "video revolution" that would be comparable to the "mobile revolution". Also in the video sector Facebook is able to implement the same or similar features very quickly, which ultimately means that the innovation resulting from competition from substitutes will only have a minor effect in the market for social networks. This also indicates a market position which is hard to challenge and which can immediately fend off competitive moves by YouTube, the leading competitor in this sector, even those addressing partial features.

515    Facebook's statements on innovations in online advertising and the developer platform are only indirectly relevant to the user market. The innovations mainly represent a better possibility for monetisation and data collection as a reflection of market success on the user side. The development of additional apps users can use within the social network is certainly an advantageous development of the network. However, this does not depend on Facebook, but above all on the creativity of the developers. For Facebook, the success of such interfaces is closely connected with the intensive network effect achieved which makes the development of additional apps by third party suppliers attractive, and which in turn makes the network more attractive for users. The quality or innovations achieved by apps for Facebook and the existing network effects thus reinforce each other, a circumstance which makes it even more difficult to challenge Facebook's market position.[490]

516    Against this background it is not convincing that Facebook points out its investments in research and development[491] as the Bundeskartellamt does not deny that the company has reacted to innovations by competitors in neighbouring markets. The nature of these investments is not evident from the statement either, except in the case of the product developments already mentioned by Facebook in the course of the proceedings.

517    Contrary to the view held by Facebook, the mere possibility of Facebook having to react to innovations by competitors in some features and the fact that it cannot remain stagnant at a certain product level of the social network, cannot refute market dominance. To prove market dominance it is not necessary to demonstrate lower technical quality, less investment in research and development and delay in market launch.[492] Particularly in view of the provisions of Section 18(3a) GWB, the ability to immediately counter competitive moves from outside is also a manifestation of market power in the online sector. What is decisive in this respect is the pressure that competitors in the area of the innovations can actually exert on the market position. This pressure is weak if the innovative activity, which was in fact noticeable, ultimately cannot take effect because of a rapid response. For this reason alone it is not convincing that Facebook refers to Myspace which had failed to introduce innovations in 2009 and exited the market because of this failure. Besides, social media were still in development at that time and exposed to competition for the market (see above 432ff.).

---

[490] Cf. Shy, „Technology revolutions in the presence of network externalities", International Journal of Industrial Organization, 1996, 14, p. 785-800; Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 72f.

[491] […]

[492] […]

518   Furthermore, the scope of action which characterises market dominance not only includes the scope for innovation or investment activities. As described above (para. 379ff.), the scope for data processing, which is not affected by the innovation activity and product improvement described in the statement, is also part of the scope of action a dominant advertising-funded social network has vis-à-vis private users.

519   This does not mean that a monopoly in a network market, as represented by the social networks, cannot be challenged at all. In the case of direct network effects with the lock-in effect described above, an attack can only succeed if the users are prepared to incur high switching costs. This can only be achieved by innovations if they are substitutable with the network effects.[493] From the users' perspective, however, the improvement of individual features, which can also be easily reproduced, cannot substitute the network effect. This was also confirmed by the user survey.

520   As described above, Facebook users were asked to state reasons for which they might consider using services other than Facebook. It was possible to list several reasons. The reason indicated by 76% of the users was that their friends were using the other service. Only 35% of the users would be inclined to make more use of the other service if it provided "better features".[494]

521   Nevertheless, in the opinion of the Bundeskartellamt it cannot be excluded that future innovations and product developments could challenge Facebook's position or even start a process of replacement. At this point, however, there are no specific indications of such a development. Despite the substantial innovative power of the internet and the dynamics this can involve, there have been no indications during the last seven years of any replacement trends or any relevant market share losses for Facebook.

---

[493] Cf. Shy, "Technology revolutions in the presence of network externalities", International Journal of Industrial Organization, 1996, 14, p. 785-800; Bundeskartellamt, Working paper "Market Power of Platforms and Networks", June 2016, p. 72f.

[494] [...] Cf. also the statement by Paul Adams, former Google+ employee: "*What people failed to understand was Facebook had network effects," says Adams, the former Google+ user experience employee. "It's like you have this grungy night club and people are having a good time and you build something next door that's shiny and new, and technically better in some ways, but who wants to leave? People didn't need another version of Facebook.*" at http://mashable.com/2015/08/02/google-plus-history/#pZVT825xesgH (last accessed on 10 January 2019).

## II.  Imposing abusive business terms pursuant to Section 19(1) GWB

522   As explained in the operative part of the decision, the assessment of abuse of a dominant position focuses on conditions which make the use of the social network by users residing in Germany conditional on Facebook being able to gather user-related and device-related data that were gathered and saved during the use of the services WhatsApp, Oculus, Masquerade and Instagram, as well as user-related and device-related data on Facebook Business Tools, and combine them without the users' consent with those data that were gathered and saved during their use of Facebook.com. The question remains open as to whether it is also inappropriate to collect and use user data which result from the use of Facebook services for which private users are obliged to register under Facebook's terms and conditions. The conditions relating to the data processing procedures in the context of Facebook accounts due to mandatory registration with Facebook.com are not the subject of the present assessment of abuse of a dominant position. Apart from Facebook.com this also includes the Facebook Messenger. After due consideration of the circumstances the Bundeskartellamt exercises its discretion to refrain from carrying out an assessment of abuse of a dominant position pursuant to Section 19 GWB.

523   The use and implementation of the terms of service, which are specified in the data and cookies policies or comparable contractual documents and as described in detail in the operative part, constitutes an abuse of a dominant position on the market for social networks for private users in the form of abusive business terms pursuant to the general clause of Section 19(1) GWB because, as a manifestation of market power, these terms violate the principles of the GDPR.

524   Based on the case-law of the Federal Court of Justice, in particular its decision in the *VBL-Gegenwert* cases, Section 19(1) GWB is also applicable to the use of data processing terms which, as a manifestation of market power, violate data protection rules. It is not blocked by the provisions of the GDPR (see 1.). Facebook's data processing terms are terms within the meaning of Section 19 (1) and (2) no. 2 GWB. They must not be assessed on the basis of the criteria of the prohibition of abusive pricing (see 2.). The data processing terms violate, to the extent described above, the principles of data protection law as expressed by the GDPR (see 3.). As a manifestation of Facebook's market power they are deemed to be abusive practices, also after a process of weighing up interests under competition law (see 4.).

**1. Violation of data protection principles represents abusive practice**

525 According to the case-law of the Federal Court of Justice, the abuse of a dominant position pursuant to Section 19(1) GWB, which also covers the protection of consumers[495], must be assumed to exist where the data processing terms used by a norm addressee, as a manifestation of market power, violate the principles of the GDPR. (see a.). Along with the data protection law and its enforcement system, Section 19(1) GWB is fully applicable (see b.).

### a. Taking the GDPR into account within the framework Section 19(1) GWB

526 Abusive business terms can also be examined based on the general clause of Section 19(1) GWB. According to the case-law of the Federal Court of Justice, principles from provisions of the legal system that regulate the appropriateness of conditions agreed upon in unbalanced negotiations can be used as concepts for appropriateness in the assessment of abusive practices under Section 19(1) GWB. The principles of data protection law underlying the GDPR are thus a suitable standard for measuring the appropriateness of the data processing terms of a dominant supplier, all the more so since they must be taken into account anyway as a higher-ranking constitutional law that specifies constitutionally guaranteed rights.

527 According to the Federal Court of Justice, terms and conditions are not only subject to the specific standard example of Section 19(2) no. 2 GWB and the concept of comparable markets it includes. As held by the Federal Court of Justice in the *VBL-Gegenwert* cases, an abusive practice can also be found based on the general clause of Section 19(1) GWB, e.g. where general business terms are used that are inadmissible under the legal principles of Sections 307ff. of the German Civil Code (BGB), and in particular where these practices also represent a manifestation of market power or superior market power.[496] In the *Pechstein* case the Court left open whether the business terms used were abusive under Section 19(1) or (2) no. 2 GWB, but considered an extensive balancing of interests to be necessary which should also take into account constitutionally protected rights. Accordingly, to safeguard constitutionally protected rights, Section 19 GWB must be applied in cases where one contractual party is so powerful that it would be practically able to dictate contractual terms, thus eliminating the other party's contractual autonomy. If in such a case constitutionally

---

[495] Federal Court of Justice, judgment of 07.12.2010 – KZR 5/10 – *Entega II*, WuW/E DE-R 3145, 3155f., para. 24 (juris); Bechtold, GWB, 8th edition, Section 19 para. 5.

[496] Federal Court of Justice, judgment of 6 November 2013, file KZR 58/11, *VBL Gegenwert I*, para. 65 (juris); Federal Court of Justice, judgment of 24 January 2017, file KZR 47/14, *VBL Gegenwert II*, para.35 (juris); in the same direction also Federal Court of Justice, judgment of 7 June 2016, file KZR 6/15, *Pechstein/International Skating Union*, para. 48 (juris).

guaranteed legal positions are interfered with, the court held that state regulations, in particular general clauses under civil law (Sections 138, 242, 307, 315 BGB) which also included Section 19 GWB, had to intervene to uphold the protection of constitutional rights.[497] According to the Court these clauses should be applied in compliance with the fundamental rights and by balancing and restricting the conflicting positions in such a way that the constitutional rights of all parties were, as far as possible, effectively maintained.[498]

528   With this case-law, the Federal Court of Justice has introduced an 'appropriateness' principle which complements the comparable markets principle of Section 19(2) no. 2 GWB[499] and is based on constitutional values, the principles of the legislation on unfair contract terms and other civil law general clauses.[500] The key element here is an appropriate balance of interests in unbalanced negotiations where one party unilaterally imposes business terms, as shown in particular by the legislation on unfair contract terms. The legal provisions are to prevent a contractual party from losing its constitutionally protected right to self-determination in business affairs (contractual freedom) because the other party is able to unilaterally determine the terms of the contract.[501] Contract terms that are deemed inadmissible according to the balancing of interests under the legal principles laid down e.g. in the legislation on unfair contract terms are also to be considered abusive in the context of an assessment to be carried out in each case under Section 19 GWB where a sufficient degree of market power is involved.[502]

529   This case-law, which was developed to take into account the appropriateness concepts of Sections 307ff. of the German Civil Code (BGB) within the framework of Section 19(1) GWB, can be applied to all other principles of legal provisions, if a sufficient degree of market power is involved and to the extent that the principles concern the appropriateness of conditions agreed upon in unbalanced negotiations. It can be applied in particular to constitutional principles that protect the right to informational self-determination and the fundamental right to data protection. For the same reason, the principles of data protection legislation relating to the appropriateness of data use must also be directly applied, as they are based on the fundamental right to data

---

[497] Federal Court of Justice, judgment of 7 June 2016, file KZR 6/15, *Pechstein*, para. 55 (juris) with reference to Federal Constitutional Court 81, 242, 255.

[498] Federal Court of Justice, judgment of 7 June 2016, file KZR 6/15, *Pechstein*, para. 57 (juris) with reference to Federal Constitutional Court 89, 214, 232.

[499] Federal Court of Justice, decision of 6 November 1984, KVR 13/83, Favorit, para. 23 (juris).

[500] See also Langen/Bunte/Nothdurft, Section 19 GWB, para. 186ff.

[501] Federal Constitutional Court, decision of 7 September 2010, file ref. 1 BvR 2160/09, *Gasag*, para. 34.

[502] Federal Court of Justice, decision of 6 November 2013 – KZR 58/11, *VBL Gegenwert I*; Federal Court of Justice, decision of 24 January 2017 – KZR 47/14 – *VBL Gegenwert II*.

protection under Article 8(2) EU Charter and weigh up the fundamental right to data protection against the rights and interests of the data processor.

530   It is one of the objectives of data protection law to counter power asymmetries between organisations and individuals and to carry out an appropriate balancing of the interests between data controllers and data subjects.[503] In order to protect the fundamental right to informational self-determination, data protection law provides the individual with the right to decide freely and without coercion on the processing of his or her personal data. This not only applies to the relationship between the individual and the State ("public sector") but also between the individual and private sector companies ("non-public sector"). In data-driven industries it is thus the objective of data protection law to protect individuals from existing power asymmetries.[504] The design of online offers in the high-volume digital business sector increasingly involves decision-making processes which the average consumer cannot realistically be expected to be able to deal with. The "negotiation processes" between suppliers and users are often asymmetrical processes, to the detriment of consumers.[505] In the non-public sector, data protection law can therefore be considered as a special economic law as it strives to achieve a balancing of interests between data processors and the consumers, i.e. the persons affected by the processing of data for business purposes.

531   In the present case the conditions are to be assessed on the basis of the data protection law principles laid down in the General Data Protection Regulation (GDPR)[506] which came into force in May 2016 and has taken effect from 25 May 2018 (Art. 99 GDPR). The GDPR replaced the previously applicable Data Protection Directive 95/46/EC[507]. The relevant provisions of the GDPR are mandatory law which leave the Member States only limited scope for their implementation at national level. As a European regulation the GDPR is binding in its entirety and directly applicable in all Member States pursuant to Article 288(2) sentence 2 TFEU. The GDPR contains some saving clauses addressing the Member States and enabling them to adopt national provisions

---

[503] Costa-Cabral/Lynskey, "Family ties: the intersection between data protection law and competition in EU law", CMLR 2017, 11 (18).

[504] The case-law rightly considers e.g. Section 4(1) of the German Federal Data Protection Act (BDSG) or Sections 12, 13 of the German Telemedia Act (TMG) as "a statutory provision which is also intended to regulate market conduct" within the meaning of Section 4(11) of the German Act Against Unfair Competition (UWG, old version, now Section 3a UWG), as, according to the case-law, the Federal Data Protection Act protects citizens not only in their personal sphere as individuals, but also in the same way in their economic activities as consumers. Berlin Higher Regional Court, decision of 24 January 2014, para 158 (juris); Berlin Regional Court, decision of 28 October 2014 (Facebook Onlinespiele), file ref. 16 O 60/13, para 53 (juris).

[505] Rothmann/Buchner, "Der typische Facebook-Nutzer zwischen Recht und Realität", DuD 2018, p. 342 (346).

[506] Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC.

[507] Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data.

in individual cases.[508] However, these clauses concern in particular data protection rules relating to the processing of data for the purpose of fulfilling a legal obligation or public tasks; this is to ensure that sector-specific provisions remain possible in the public data protection law of the Member States. These rules are not relevant in the present case. A violation of data protection principles can thus be investigated directly on the basis of the GDPR.[509]

532   In view of the balancing of interests in a situation of imbalances of power, terms and conditions that violate the legal principles of data protection laws, and also conditions that are inappropriate under the legal principles of provisions on unfair contract terms, constitute an abuse of a dominant position under Section 19(1) GWB where a sufficient degree of market power is involved.[510] Also, both cases share similar characteristics due to the fact that most violations of data protection rules, as in the case in question, are committed and accompanied by the use of pre-formulated declarations of a contracting party (see also 2. below). The practical options private end consumers have for becoming aware of the content of the terms and conditions for the collection of data and effectively objecting to them do not in principle differ from the practical options consumers have under the legal provisions on unfair contract terms. This is a further argument in favour of treating the provisions applying to terms and conditions for data collection with regard to the application of Section 19 GWB in the same way as was already stipulated by the abovementioned case-law of the Federal Court of Justice for the legal provisions on unfair contract terms.

533   The objections raised by the parties, claiming that the provisions on unfair contract terms and data protection law are fundamentally different, are not sustainable. According to the parties, the differences are essentially based on the fact that data processing was not subject to contractual freedom but had to comply with data protection legislation, whereas the provisions on unfair contract terms merely limited the scope of contractual freedom.[511] This view fails to recognise that data protection law does not make any stipulations about the data processing procedures to be carried out, but places restrictions on the freedom of the responsible organisation in choosing possible data processing procedures, thus achieving a balancing of interests between the various data protection principles and the justifications.

---

[508] Sydow, Europäische Datenschutzgrundverordnung, 2017, Introduction, para. 45ff.; on the legislative history see Ehmann/Selmayr, Datenschutzgrundverordnung, 2017, Art. 6, para. 30ff.

[509] See also Berlin Higher Regional Court on the assessment under the legal provisions on general terms and conditions: judgment of 27 December 2018, 23 U 196/13, p. 5f. […]

[510] […]

[511] […]

534   The Federation of German Consumer Organisations (VZBV), which was admitted to the proceeding as a third party, is right in pointing out that, according to the case-law, data policies also fulfil the elements of general business terms because, from the perspective of users, they have a regulatory character.[512] The ensuing question as to the appropriateness of data policies within the framework of the test of reasonableness of contents under Section 307(1) and (2) of the German Civil Code (BGB) is based on the provisions of the GDPR whose mandatory principles, according to the case-law, are directly applicable in this respect as a concept of appropriateness of general business terms.[513] On this basis, abusive business terms pursuant to Section 19(1) GWB could also be examined in the present case with respect to a violation of Section 307 BGB which in turn refers to the mandatory principles of the GDPR. This would be the concept used by the Federal Court of Justice for the application of the legal provisions on unfair contract terms in the *VBL-Gegenwert* cases. It is not evident why the direct application of the GDPR's principles within the context of the stipulation of Section 19(1) GWB should not be covered by this concept or even be impossible.

b.   **Relationship between competition law and data protection law**

535   The application of data protection principles in an assessment under Section 19(1) GWB is not inhibited by the European and German data protection laws. The Bundeskartellamt's decision is not in violation of any rules on competence and consistency stipulated by the GDPR (see (1)), nor does the GDPR contain final, substantive provisions with respect to Section 19 GWB (see (2)).

**(1) No violation of the rules on competence and consistency**

536   The application of data protection principles in the enforcement of the prohibition of abusive practices is first of all not excluded because of the fact that the competition authority is not a competent data protection authority pursuant to Sections 55, 56 GDPR. Contrary to the view held by Facebook[514], the Bundeskartellamt does not operate to enforce data protection rules as a national data protection officer, but merely applies the European law principles as important indications for its assessment under competition law of whether the conduct of a dominant company is appropriate.[515] The

---

[512] Comment by the VZBV dated 1 January 2019, p. 13, […]; Berlin Higher Regional Court, judgment of 27 December 2018, 23 U 196/13, judgment, p. 5, […]

[513] Berlin Higher Regional Court, judgment of 27 December 2018, 23 U 196/13, judgment, p. 5f. […]

[514] […]

[515] Cf. also the decision of the Italian consumer protection authority AGCM, Bolletino 46/2018 of 10 December 2018, p. 22ff., http://www.agcm.it/pubblicazioni/bollettino-settimanale/2018/46/Bollettino-46-2018; […] available in Italian only , which states in para. 48 (Bundeskartellamt unofficial translation): "And finally the reference made by FB to findings of the *Irish Data Protection Commissioner* (IDPC) following the examination carried out from 2011-2012 is completely irrelevant as the IDPС's examination was carried out on the basis of different legal

Bundeskartellamt only considers itself competent to intervene under competition law concerning companies which are norm addressees of the German Competition Act's prohibitions of abusive practices. In no way does the authority consider itself competent to intervene under data protection law, neither concerning norm addressees of the German Competition Act nor concerning any other companies that are subject to the GDPR. It is thus irrelevant which data protection authority is locally competent for the enforcement of data protection law as a supervisory authority, and whether or not a German authority could intervene.

537   Contrary to Facebook's opinion, no restriction of the enforcement of the prohibition of abusive practices based on data protection law can be seen to arise from the GDPR provisions on cooperation and consistency.

538   According to the GDPR, in the case of companies with several establishments in the EU, the supervisory authority of the main establishment is competent to act as lead supervisory authority (Art. 56(1) GDPR). The lead supervisory authority shall submit to the other competent supervisory authorities its draft decision and give them the opportunity to comment. If an authority objects to this draft, the "consistency mechanism" under Article 63ff. GDPR will be initiated. The European Data Protection Board (a body composed of the Member States' supervisory authorities, Art. 68 GDPR) will adopt a binding decision pursuant to Art. 65(1a), (2) GDPR by a two-thirds majority of the members of the Board. The lead supervisory authority will then have to make the final decision as adopted by the Data Protection Board. The consistency mechanism for the cooperation between the supervisory authorities is to safeguard the consistent application of the law and a consistent level of protection in the supervision of data protection. The mechanism is without prejudice to any measures the Commission may take in the exercise of its powers under the Treaties, e.g. bringing a matter before the Court of Justice of the European Union if a Member State has failed to fulfil an obligation under the Treaties (Art. 258 TFEU).[516]

539   It cannot be concluded from the consistency provisions that authorities have a monopoly on the application and interpretation of data protection law.[517] The consistency mechanism is evidently restricted to the cooperation between the European data protection authorities which are to safeguard the uniform application of

---

norms (data protection rules). This means that there are no "overlapping competences" because the respective areas of competence are specific areas and because, in the present case, the authority [AGCM] only investigated and penalised the existence of unfair business practices ex-post and in application of the *Codice del Consumo*, without contradicting in any way the findings of the IDPC. The IDPC also stated that the solutions [chosen by Facebook] had not eliminated all the critical problems in respect of "user profiling" and that rapid technological innovation required a permanent monitoring of the way in which user data are processed."

[516] Recital 135 GDPR.

[517] […]

the law at a uniform level of protection which had not been achieved within the EU despite a previous, fully harmonised data protection standard under the Data Protection Directive 95/49/EC[518]. The mechanism is thus to be considered as a measure which aims at raising the level of protection, and not at restricting the application and interpretation of the data protection law by the European Data Protection Board and thus restricting all enforcement activities involved in the protection of data as a fundamental right. Neither will the power of the European Data Protection Board to develop guidelines be restricted by the application of data protection principles in an incidental manner within the context of competition law.[519]

540   This can be seen from the fact that direct data protection law enforcement is not limited to the supervisory authorities; action can be taken under the civil law without any restrictions. This applies to individuals whose fundamental rights as data subjects are affected (e.g. Art. 82 GDPR), but also, in particular, to consumer protection associations as well as competitors and their associations which can enforce data protection based on stipulations of the Act against Unfair Competition (UWG) or regulations on business terms under the Civil Code linked to data protection (cf. e.g. Section 2(1), (2) sentence 1 no. 11, sentence 2 of the German Act relating to Actions for Injunctions in the case of Violations of Consumer Protection Law and other Violations, UKlaG). Extensive enforcement action has been and will continue to be taken.[520] Most of the ECJ's case-law that can be found on the already completely harmonised data protection law based on Data Protection Directive 95/46/EC has, in fact, resulted from civil law actions. The ECJ's judgment on the "Safe Harbour" agreement was based on a private action by the Austrian citizen Maximilian Schrems who had lodged a complaint with the *Irish Data Protection Commissioner* (hereinafter: **IDPC**) against the transfer of his personal data to the United States and brought an action before the High Court. The High Court referred the matter to the ECJ for a preliminary ruling.[521] The ECJ's judgment on the classification of dynamic IP addresses as personal data within the meaning of Art. 2 a) and Art. 7 f) Directive 95/46/EC was based on an action brought by Patrick Breyer and a request for a preliminary ruling

---

[518]   ECJ, judgment of 24 November 2011, case C-469/10 and 469/10, joined cases 2011, I-12181-12208, para. 1, summary.

[519]   […]

[520]   Cf. Annual Report of the Federation of German Consumer Organisations (vzbv) 2017/18, p. 61; VZBV/Facebook on account of inadmissible dispatch of friend-finder emails, Berlin Higher Regional Court , judgment of 24 January 2014, Federal Court of Justice, judgment of 14 January 2016, Ref. I ZR 65/14; VZBV/Facebook on account of inadmissible transfer of data in the use of online games (Berlin District Court, judgment of 28 October 2014, Ref. 16 O 60/13, Berlin Higher Regional Court, judgment of 22 September 2017, Ref. 5 U 155/14); VZBV/Facebook on account of inadmissible general terms and conditions (Berlin District Court, judgment of 16 January 2018, Ref. 16 O 341/15); see also Podszun/deToma, Die Durchsetzung des Datenschutzes durch Verbraucherrecht, Lauterkeitsrecht und Kartellrecht, Neue Juristische Wochenschrift (NJW) 2016, p. 2987ff.

[521]   ECJ, judgment of 6 October 2015, Ref. C-362/14 (Safe Harbour).

submitted by the Federal Court of Justice.[522] Currently a request for a preliminary ruling has been submitted to the ECJ by the Düsseldorf Higher Regional Court regarding a case involving the question of who is responsible under data protection law for data processing triggered by "Like" buttons that are integrated into third-party websites. The action had been brought by the VZBV.[523]

541   The substantive application of data protection law through competition law stipulations does not in any way threaten the consistent interpretation of data protection law, but rather promotes consistency. Consistent interpretation is achieved under civil law through the successive stages of appeal which, due to the application of European law, end up before the ECJ, just as the cases pursued by data protection authorities. The ECJ can be requested at an early stage to give a preliminary ruling pursuant to Art. 267 TFEU. There is no doubt that this type of law enforcement has remained unaffected by the GDPR. Furthermore, the guidelines of the European Data Protection Board must also comply with the ECJ's case-law.

542   In this respect the consistency mechanism for data protection law applicable to supervisory authorities is not different from the procedure for the coherent interpretation of the European competition rules carried out by the European Competition Network (ECN). This procedure, which enables the European Commission to initiate antitrust proceedings for the adoption of a decision pursuant to Article 11(6) of Regulation 1/2003, also does not involve civil proceedings which undoubtedly represent an important pillar of competition law enforcement which is characterised by civil law relationships. Apart from its competences under the Treaties, the European Commission can participate in civil law disputes in the area of competition law as *amicus curiae*. In civil proceedings concerning data protection law cases, there are no provisions for such a participation either by the European Data Protection Board or the European Commission. The consistency mechanism under the GDPR thus contributes to safeguarding the consistent application of the law - a contribution which ultimately remains below the framework of possibilities provided by the ECN.

543   In view of the fact that Section 19 GWB is also one of the direct civil law prohibitions which, within the framework of the generally required balancing of interests, must also take into account non-competition law principles, in particular mandatory, higher-ranking constitutional principles including data protection rules, it is not evident why this should be treated differently than a civil claim based on the Act Against Unfair Competition (UWG) or on stipulations on unfair contract terms under the Civil Code

---

[522] ECJ, judgment of 19 October 2016, Ref. C-582/14.

[523] Düsseldorf Higher Regional Court, judgment of 19 January 2017, Ref. I-20 U 40/16; pending before the ECJ under C-40/17.

(BGB). In particular, it is not evident why, in view of the consistency mechanism, only the competition authority should be prevented from applying and interpreting data protection law based on Section 19 GWB while civil claims can, in fact, be brought based on Section 19 GWB with regard to data protection law.[524]

### (2) GDPR does not include any final, substantive provisions

544   Data protection regulations do not suspend abuse control, which is more specific, either. The regulations do not include final provisions regarding dominant companies, i.e. they only allow data processing policies by dominant companies to be examined by data protection authorities based on the direct data protection regulations, or the existing enforcement options under civil law (UWG or legislation on business terms). However, this does not include an examination based on the prohibition of abusive practices pursuant to Section 19 GWB which applies in particular to dominant companies.

545   Data processing has great relevance for the competitive performance of a company. The commercial use of the personal data of customers, users and third parties is a significant factor in competition (see above 481ff.). Businesses therefore strive to gain as much information as possible about their (potential) customers in order to improve their products, offer personalised services and enable targeted advertising. Digital technology has made it possible to analyse particularly large amounts of data from different sources and formats as fast as possible.[525] Among other things, this enables companies to build customer and interest profiles which are highly relevant for their competitive performance.

546   Under the GWB it is an essential task of the Bundeskartellamt to monitor the competitive behaviour of dominant companies and put an end to abusive practices that have an effect within the scope of application of the German Competition Act (Section 185(2) GWB). Under the national as well as the European legal framework there is a strong public interest in public enforcement of the prohibition of abuse of a dominant position in cases where the practices of dominant companies cause a high degree of harm and have wide-reaching effects.

547   It is evident that the GDPR has neither called into question the competence of competition authorities nor the importance of competition law when it comes to the data

---

[524]   […]

[525]   The three terms volume, variety, velocity are predominantly used to describe the characteristics of "big data". They stem from a research report by Doug Laney, analyst at Gartner Consulting; see also Monopolies Commission, Special Report on "Competition Policy: The challenge of digital markets", 2015, p. 44 with further references.

processing activities of a dominant company. This cannot be assumed to be the case as the data protection law does not include any provision declaring that its rules are exhaustive (cf. e.g. Section 111 (1) and (2) of the German Energy Industry Act, EnWG). Also the data protection authorities have acknowledged the important role of competition law enforcement as a reaction to violations of data protection rules. According to the resolution of the Conference of Independent Data Protection Authorities of the German Federal Government and the Länder (Konferenz der unabhängigen Datenschutzbehörden des Bundes und der Länder), the enforcement of data protection law is not the sole response to violations of data protection rules. Competition and antitrust law, according to the conference, are also applicable in this respect. Even divestiture is mentioned as an option to punish the systematic circumvention of data protection for the purpose of gaining anti-competitive advantages in the markets.[526]

548   In his comment on the present proceeding, Hamburg's Commissioner for Data Protection and Freedom of Information emphasises the importance of the prohibition of abusive practices under competition law (Bundeskartellamt unofficial translation): "*Abusive market behaviour which violates data protection rules and leads to a situation where fair competition is no longer possible in digital markets, must be stopped. In this respect, data protection and competition law are two sides of the same coin. The activities of the Bundeskartellamt strive to ensure that it will no longer pay off to violate data protection rules in order to gain market power. The authority can be sure of the support of the Hamburg Commissioner for Data Protection and Freedom of Information.*"[527]

549   […][528]

550   In line with this, in Section 18(3a) GWB new version, the German legislator made access to such data a stand-alone criterion in the assessment of market power, thus expressly emphasizing the relevance of data processing for competition law, and pointed out its intention of facilitating abuse control.[529] Particularly for those companies which operate a multi-sided market or a network within the meaning of Section 18(3a) GWB, there is a direct legislative link between their data processing activities and market power within the meaning of the GWB. The market power of a dominant

---

[526] Resolution of the Conference of Independent Data Protection Authorities of the German Federal Government and the Länder (Konferenz der unabhängigen Datenschutzbehörden des Bundes und der Länder, DSK) of 26 April 2018, "Facebook-Datenskandal – Neues Europäisches Datenschutzrecht bei Sozialen Netzwerken durchsetzen!" […]

[527] […]

[528] […]

[529] Cf. legislative intent on the 9th amendment to the GWB with regard to Section 18(3a) no. 4, Bundestag printed paper no. 18/10207, p. 51.

company with a data-driven digital business model provides it with extended data processing capabilities which the company will have a high incentive to use, in particular with a view to the competitive relevance of user data for advertising funding. Also and particularly in this area, abuse control plays a vital and independent role which the competition authorities fulfils in line with the provisions of the GWB.

551   However, the stipulated control of data processing policies cannot mean that, in its task of monitoring the scope of data processing, the competition authority should disregard the principles of general data protection law and develop its own benchmark or other tools instead. This is already impossible in view of the constitutional duty of the competition authority to apply the general clauses in such a way that the higher-ranking fundamental rights under the EU Charter and the German Basic Law are taken into account. The development of other benchmarks or tools would ultimately even contravene the GDPR's efforts to safeguard consistency. As shown by the case-law on *VBL-Gegenwert*, an abuse of a dominant position can be caused by the fact that a company did not even comply with the general legal framework. The control of abusive practices with respect to the scope for data processing must therefore also include compliance with data protection law.

552   Furthermore, the fact that the GDPR only provides a general legal data protection framework applicable in equal measure to all the responsible parties does not mean that the market position would be irrelevant in the assessment of its data processing policies under the GDPR. In this respect, the question of whether the individuals concerned were forced to accept the data processing terms due to a lack of alternative offers can play an important role in clarifying whether consent was freely given (cf. Art. 7(4) in conjunction with Recital 43 GDPR which requires a clear imbalance between the controller and the data subject). Moreover, the list of other reasons justifying processing in Art. 6 GDPR includes the criterion of necessity and proportionality in view of the business purposes and legitimate interests pursued by the company. The examination of these reasons must also take into account the market position of the data controller.[530]

553   Conversely, from the fact that data protection law also takes into account the examination of a dominant position it cannot be concluded that the dominant position would have to be investigated and determined exclusively by the data protection authorities. Determining whether market dominance exists is a key element of competition law as a part of economic law, and the task of a competition authority which

---

[530] Article 29 Data Protection Working Party, Opinion 6/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC, available at https://ec.europa.eu/justice/article-29/documentation/opinion-recommendation/files/2014/wp217_en.pdf (last accessed on 10.01.2019), p. 40, 55.

161

has the relevant powers and acts within a differentiated legal and coherence framework. Based on the European legal and coherence framework, parallel abuse control by the competition authority is necessary and will be carried out in line with the data protection rules.

554   It is therefore not evident that the application of national abuse control by the competition authority could be in violation of the principle of sincere cooperation under Art. 4(3) TEU.[531] The rules on competence and consistency have not called into question the competence of the competition authority, nor has a final, substantive provision been established. There is no obligation for a competition authority not to apply competition law in order to have the GDPR provisions become final.

555   Furthermore, in order to facilitate the application of competition law in this area, the German legislator has paved the way for cooperation with the German data protection authorities by introducing Section 50c GWB. The Bundeskartellamt conducts the proceeding in close coordination with the Hamburg data protection commissioner, a competent authority pursuant to Art. 55 ff. GDPR in respect to Facebook's subsidiary in Hamburg. Contact has also been made with the Federal Commissioner for Data Protection and Freedom of Information (Bundesbeauftragter für den Datenschutz und die Informationsfreiheit, BfDI) who is the joint representative on the European Data Protection Board in accordance with Section 17 of the Federal Data Protection Act (BDSG), and with the Belgian data protection authority.[…][532]

556   The Bundeskartellamt has therefore consulted the relevant data protection authorities and none of the authorities has objected to the proceeding. These consultations eliminated the threat of an allegedly imminent "highly problematic" conflict with the enforcement efforts of the originally competent data protection authorities[533]. According to the documents on their discussions with the competent data protection authority submitted by the parties in response to the Bundeskartellamt's decision requesting information, there was no such threat.

557   Finally, no concerns can be raised about an alleged lack of expertise of the competition authority, as referred to by Facebook. The Bundeskartellamt must take into account and apply the general legal frameworks applicable in each sector of the economy. The statement that the Bundeskartellamt had incorrectly applied European data protection

---

[531] […]
[532] […]
[533] […]

law and that Facebook had acted in line with the applicable provisions of data protection law, is incorrect.[534]

558   Furthermore, the Bundeskartellamt refers to the numerous proceedings conducted by German and European data protection and consumer protection authorities which, inter alia, concerned inadmissible processing of data from company-owned services or Facebook Business Tools. Hamburg's Commissioner for Data Protection and Freedom of Information and also many other European data protection authorities have conducted proceedings against Facebook on account of the inadmissible combination of WhatsApp data with Facebook.com.[535] Belgian and French data protection officers have conducted proceedings against Facebook on account of the inadmissible collection of data on third-party websites and their combination with Facebook accounts on Facebook.com by means of identifying cookies.[536] On the basis of consumer protection law, the Italian competition authority AGCM recently imposed a fine against Facebook amounting to 10 million euros on account of aggressive business practices by violations of data protection law.[537]

## 2.   Data processing terms as (other) contract terms

559   The relevant provisions on the processing of data collected from Facebook-owned services and Facebook Business Tools in Facebook's Terms of Service, Data Policy, Cookies Policy and the implementation thereof are to be classified as terms and conditions within the meaning of Section 19 GWB.

560   The location of the specific data processing intended and carried out by the parties in the Data Policy or Cookies Policy required for data protection reasons does not mean that the feature of the business terms can be superseded (see a.). The provision of data does not constitute a "price" within the meaning of the prohibition of anti-competitive behaviour (see b.).

---

[534] […]

[535] Decision of the Hamburg Commissioner for Data Protection and Freedom of Information of 23 September 2016 (followed up by Hamburg Administrative Court, decision of 24 April 2017, Ref. 13 E 5912/16, and Hamburg Higher Administrative Court, decision of 26 February 2018, Ref. 5 Bs 93/17; Decision of the French CNIL of 18 December 2017, https://www.cnil.fr/en/data-transfer-whatsapp-facebook-cnil-publicly-serves-formal-notice-lack-legal-basis (last accessed on 10 January 2019); Fine imposed on 15 March 2018 by the Spanish data protection authority AEDP, see https://www.heise.de/newsticker/meldung/Hoechststrafe-Spanische-Datenschuetzer-bitten-Facebook-und-WhatsApp-zur-Kasse-3996469.html (German news report, last accessed on 10 January 2019).

[536] Recommendation by the Belgian CBPL of 16 May 2017,[…].; judgment of the Brussels Court of First Instance of 16 February 2018, […]; fine proceedings of the French CNIL, see press release of 16 May 2017, https://www.cnil.fr/en/facebook-sanctioned-several-breaches-french-data-protection-act (last accessed on 10.01.2019).

[537] AGCM, Bolletino 46/2018 of 10 December 2018, p. 22ff., http://www.agcm.it/pubblicazioni/bollettino-settimanale/2018/46/Bollettino-46-2018 ;[...] (available in Italian only).

### a.  Data policies as part of the Terms of Service

561   Contrary to Facebook's view, the Terms of Service in conjunction with the Data Policy and Cookies Policy are indeed terms and conditions as defined by Section 19 GWB. The explanations in the Data and Cookie Directive specify Paragraph 2 of the Terms of Use. The requirement of transparency under data protection law, which obliges the parties to provide information on their data processing by issuing a data policy, does not alter the nature of the business terms.

562   The antitrust term "business term", as used in Section 19(1), (2) nos. 2 and 3 GWB, for instance, needs to be interpreted broadly in order to make the entire supplier-customer relationship, which is characterised by an imbalance of power, subject to the prohibition of abuse in addition to pricing.[538] As such, with regard to the market quality of the relationship between Facebook and the users of Facebook.com (para. 239ff. above), the following needs to be taken into consideration, namely that it can certainly be assumed that a "business" relationship exists.

563   Business terms must first include the expressly regulated terms and conditions which customers must consent to and which are therefore the subject of the contractual arrangement. They include the factual terms and conditions which are carried out without the customers' consent. Business terms also include any actual transactions that may be the subject matter of a contractual arrangement.[539]

564   Contrary to Facebook's opinion,[540] the data processing procedures at issue are all part of the contractual arrangement, since users must agree to the Terms of Service before they can use the service (see above para. 88). For the Terms of Service indicate the following in Paragraph 2 under the heading "*Our Data Policy and your privacy settings*" (above para. 94): *"We collect and use your personal data in order to provide the services described above to you. You can learn about how we collect and use your data in our Data Policy [hyperlink]. […]"* This means the Terms of Service themselves contain a completely unrestricted regulation for the processing of each user's personal data which users have to agree to. According to Paragraph 5, these terms make up the entire agreement between the users and Facebook Ireland Limited regarding the use of Facebook Products. The processing of personal data is therefore, according to Facebook's own Terms of Service, expressly part of the agreement and is therefore the subject matter of the agreement. Whether this consent is deemed consent under

---

[538] cf. the concept of business terms (in German) Langen/Bunte-Nothdurft, Section 19 GWB, para. 142

[539] Cf. Bechtold, GWB, 8th edition, Section 19, para. 53; Langen/Bunte-Nothdurft, Section 19 GWB, para. 142

[540] […]

data protection law and can provide a sufficient legal basis is irrelevant for the contractual inclusion of the Terms of Service for data processing.

565    The Data Policy is expressly referred to in Paragraph 2 and, together with the Cookies Policy, to which the Data Policy refers, therefore sets out the concrete terms of use with regard to the processing of personal data. In any case, the Data Policy and Cookies Policy have become part of the contract due to the refererence in Paragraph 2 Terms of Service as they specify the Terms of Service governing the processing of personal data. In addition, the Data Policy and Cookies Policy themselves have regulatory character because from the customer's viewpoint they contain binding provisions that are supposed to correspond to the conclusion of the contract.[541] This also applies in view of the fact that, under the heading "*What is our legal basis for processing data?*" the parties rely to a large extent on the fulfilment of the Terms of Service in the Data Policy and invoke performance of the contract as the legal basis. Yet the question of the regulatory nature of the contract is not determined by whether or not it is a permissible legal basis under data protection law. This is because from the users' point of view, which is the only perspective relevant in this context, these provisions lay down a contractual meaning if not a contractual obligation that is imposed unilaterally, just like the rest of the content of the contract.

566    The open wording of the Data Policy and Cookies Policy must therefore also be taken into account as part of the contractual terms. The objection raised by the parties that the wording of the policies ensues from the obligation under data protection law to transmit the information in a concise, transparent, intelligible and easily accessible form, using clear and plain language[542], is not convincing. However, this open wording is also used in particular with regard to the processing of data from Facebook-owned services and Facebook Business Tools. In this respect, the related policies each use the same open stipulation that data is processed across all Facebook Products and Companies. A limitation of the data record and the intended use can only be found in the WhatsApp FAQs.

567    Additionally, it is therefore quite common to clarify in the data policies, for instance, which data is *not* processed for what purposes, assuming any such restriction exists in the first place. The WhatsApp policy states in one place for instance that the contents of encrypted messages are not read. The alleged limited actual data processing which is not specifically substantiated at any stage is not reflected in Facebook's Terms of Service. From the user's perspective, Facebook's Data Policy and Cookies Policy

---

[541] cf. judgment of Higher Regional Court of 27 December 2018, 23 U 196/13, copy of the judgment, p. 5f., […] For this reason, they need to be classified as general terms and conditions.

[542] […]

therefore allow for virtually unlimited data processing from sources outside the social network. The vagueness of the wording also implies that Facebook at the very least intends to process data from third-party sources. The fact that Facebook uses a data-driven business model is common knowledge and is acknowledged by the company itself. In this respect, extensive use of existing data is economically expedient and commercially reasonable and is expected to be predictable at least for the future[543], especially if a contractual basis for it has been created.

568   The transparency requirement under data protection law that obliges the data controller to provide the data subject with information about data processing pursuant to Article 12(1), Article 13 and Article 14 GDPR does not mean the Data Policy and Cookies Policy cannot be classified as business terms.[544] This obligation does not mean that the policies would only have purely informative character which would exclude the quality of contractual regulation. General terms and conditions of business are also subject to a transparency requirement pursuant to Article 307 para. 1 sentence 2 of the German Civil Code (Bürgerliches Gesetzbuch). The Bundeskartellamt takes into account the informative nature of the Data Policy and Cookies Policy, including those of Facebook-owned services, to the extent that they document how data processing terms are actually implemented. In that regard, contrary to the view taken by the parties, the actual processing of the data is also the focus of investigation, although it is not limited to that.

b.   **No price within the meaning of antitrust law**

569   The possible fee-like function of providing data does not mean that the data processing terms are to be regarded as prices within the meaning of Section 19(2) nos. 2 and 3 GWB.

570   From the company's point of view, data processing has a monetisation and indirect financing function, and data are generally perceived as a kind of "currency" on the Internet. From the Facebook users' point of view, however, the impression remains that the service is free of charge and it says precisely this in a Facebook advertising slogan ("Facebook is and will remain free of charge"). When paying for a specific service, consumers have a clear idea of how much they are spending and they can influence the costs they incur by adapting their demand behaviour according to the limits of their budget. When it comes to handing over their data, the situation is completely different.

---

[543] cf. for instance, Federal Court of Justice of 8 May 2001, KVR 12/99, WuW/E DE-R 711, 717 – Ost-Fleisch; judgment of 29 October 1985, KVR 1/84, WuW Federal Court of Justice 2211, 2218 – *Morris-Rothmans*.

[544] […]

571   Personal data represent an unlimited commodity that is not used up by sharing and even consumers on a limited budget do not need to determine how much they are willing to pay. Rather, the main problem - similar to terms and general terms and conditions - is that when consumers share their personal data, they are not really able to judge which and how many data are being collected by which company, to whom their data is being transmitted and what the implications of giving consent to data processing are. As the investigations in the present case show, the large number of conditions and provisions governing data processing regularly involved in the massive use of personal data means private users are hardly aware, if not fully unaware, of the individual provisions, as is typical of pre-formulated general terms and conditions dictated by the provider.[545]

572   These characteristics justify the examination of inappropriate agreements and provisions on data processing by the dominant undertaking under the aspect of abusive business terms. In addition, the new provisions of Section 18(2a) GWB state that the assumption of a market is not invalidated by the fact that a good or service is provided free of charge. Otherwise, there would have been no need to clarify that a market within the meaning of the law is still a market even if a service is provided "free of charge". According to the explanatory memorandum, business models such as the one at issue here are precisely what provided the background to the regulation.[546] The genesis and terminology of the new regulation thus confirm the outcome that provisions governing data sharing are not regulations governing payment within the meaning of Section 19(1), (2), nos. 2 and 3 GWB, but rather contractual terms.

### 3. Violation of GDPR data protection values

573   The data processing from other Facebook-owned services and from Facebook Business Tools, which is imposed by Facebook and is presented in detail in the operative part of the decision, breaches European data protection values pursuant to GDPR. For, the collection of user and device-related data and combining these data by assigning them to the respective Facebook user accounts and the use of this information actually involves the processing of personal data including special data categories and profiling (see a.). Facebook is responsible for the imposed processing of personal data under data protection law (see b.) There is no sufficient justification pursuant to Article 6 (1), Article 9 (2) GDPR (see c.) for the imposed processing of data from Facebook-owned services or Facebook Business Tools.

---

[545]   […]

[546]   Legislative intent of the 9th Amendment to the German Competition Act 2017, Bundestag printed paper 18/10207, p. 47f.

### a. Processing of special categories of personal data and profiling (Articles 4 and 9 GDPR)

574   Both the user and device-related data from other Facebook-owned services and from Facebook Business Tools are personal data within the meaning of Article 4 GDPR (see (1). This includes special categories within the meaning of Article 9 (1) GDPR (see (2). The "recording", "combination" and "use" of the data provided for and carried out in the Data Policy fulfil the definition of procedures defined as "data processing" in Article 4(2) GDPR and include the "profiling" defined as "data processing" in Article 4(4) GDPR (see (3).

### (1) Personal data

575   All user- and device-related data described and actually processed in the Data Policy comprise information relating to identified or identifiable natural persons pursuant to Article 4 para. 1 GDPR. According to this provision an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person.

576   All data that Facebook processes from its own services or from Facebook Business Tools designated in the operative part of the decision therefore comprise personal data because Facebook can and actually does assign them to Facebook user accounts and combines this data within the framework of the social network. In order to create a Facebook account, users have to provide at least their first and last name, their birthday, gender, mobile phone number or e-mail address. Users are given a Facebook user ID when they create a Facebook account. When using Facebook.com, users disclose a large amount of other personal information. The data processed from other sources can be assigned to these identifying data, so that each user- and device-related data can also be classified as personal data.

577   "User-related data" can be categorised as information which, according to its content, refers directly to the person, such as identity, interests, living conditions, communication content or the user's behaviour. "Device-related data" can be defined as technical data in the broadest sense relating to the terminal devices used by the user as well as to the software and other content stored on these devices. This "device-related data" can indirectly reveal information about the user, such as location-related information, physical movements which are generated via the positioning data or mobile device sensors, creating a user movement profile.

578   In addition, device-related information in particular plays a very important role for user identification and the individual assignment of data collected. This includes, for instance, the unique device information such as the advertising ID, MAC address or the IMEI (International Mobile Equipment Identity) of the mobile device. Further information on the devices used by users, the software installed on them and technical configurations, including browser information, can also be used to identify the respective users on the basis of their unique device configuration. Facebook […] uses metadata to assign the data to Facebook users.[547] This is also indicated in the Cookies Policy. It says that Facebook uses other technologies, including data it stores on users' web browser or device, identifiers associated with users' device, and other software, for similar purposes as cookies.

579   The device-related data collected in particular facilitate the process of so-called "browser fingerprinting" or "device fingerprinting". As such, a distinction is made between passive and active fingerprinting. Passive fingerprinting involves the reading of information that is transmitted when a website is accessed via the technical protocols used. This includes the browser type, browser version, browser settings, IP address, if applicable the manufacturer and type designation of the smartphone, tablet or other mobile device. Active fingerprinting involves a program code which is executed directly on the device. Information can be read specifically, for instance, via JavaScript. This allows a variety of other pieces of device-related information, such as screen resolution, time zone, system colours, plugin versions, installed fonts, languages, processor cores, window size and much more to be captured.

580   The information is stored on the Facebook server when users visit the website, and is then captured again the next time the page is accessed and is matched with the stored data - the fingerprint. Owing to the large number of individual users' setting options that can be customised, the fingerprint allows the user to be identified with considerable accuracy. A unique user profile is created by combining these different pieces of information. The more information there is available and the more individual the settings are, the more accurately unambiguous identification can be achieved. This explains how a user can be identified even if the fingerprint has been slightly modified in the meantime. According to a scientific test conducted by Lehigh University Pennsylvania/USA, users can be identified with a reliability of 99.24% via browser or device fingerprinting, without having to resort to IP addresses, cookies or similar techniques.[548]

---

[547] […]

[548] https://www.heise.de/newsticker/meldung/Web-Browser-Fingerprinting-Erkennbar-auch-ohne-Cookie-3597078.html (in German, last accessed on 10 January 2019).

581   Facebook also collects and stores this identifying information when Facebook.com is used. The data collected from other Facebook-owned services and from Facebook Business Tools can then be matched with the data already assigned to the Facebook user account in question. There are a number of ways in which data can be assigned. If the data source is a third-party website, a cookie set by Facebook containing the Facebook user ID or other information uniquely associated with the user can be transmitted when the website is accessed. If the website has Facebook Business Tools embedded, the user information collected can be assigned by passive or active fingerprinting based on the browser and device information. This applies in particular to the tools executed by default via JavaScript SDKs, which are directly installed on the respective (third-party) app on the terminal device. The Facebook pixel is also a JavaScript code that can capture a large amount of information about website visitors and their devices.

582   In addition, a (hashed) data record with identifying characteristics ("identifiers") can be sent from the website via the pixel by way of "Advanced Matching" if no cookie has been set. Facebook also recommends the websites to use "Advanced Matching", which involves direct transmission of the e-mail address, telephone number, first name, surname, city, state, zip code, gender and date of birth that the website receives, for instance when users log in, register or shop online. In this regard, Facebook expressly points out that this allows more activity on the website to be matched with Facebook users, even if no cookies have been set.[549] As with the other interfaces, Facebook reserves the right to analyse the data from third-party pages/apps for "any purpose, including commercial purposes" in respect of the information transmitted about user behaviour on the websites or apps associated with the hashed data.[550]

583   Due to the multitude of data and the possibility of assigning data to Facebook user accounts using a unique identification number, ID or device fingerprint, the data on the use of the third-party website or app including the various configuration data, therefore always refers to a "specific" or "identified" person within the meaning of Article 4 (1) GDPR regardless of the meaning and content of the individual pieces of information.

---

[549] Cf. https://developers.facebook.com/docs/facebook-pixel/advanced/advanced-matching, […]

[550] see Paragraph 6.1 to 3 of Facebook Platform Policy, https://developers.facebook.com/policy/: "Things you should know: 6.1: We can analyze your app, website, content, and data for any purpose, including commercial", 6.2: We can monitor or collect data related to your use of SDKs; 6.3: We will use information we receive from you or in connection with your Platform integration pursuant to our Data Policy. (…).", […]

**(2) Special data categories**

584   The processing of data collected from Facebook-owned services and Facebook Business Tools imposed by Facebook also includes without distinction special data categories pursuant to Article 9 (1) GDPR.

585   The special categories of data within the meaning of Article 9 (1) GDPR include all data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs or trade union membership, as well as genetic data, biometric data, health data or data relating to an individual's sex life or sexual orientation.

586   Contrary to Facebook's view, it is sufficient for the sensitivity of data arising from the information collected for it to qualify as a "special data category". It cannot be assumed that this information is merely information from which sensitive information *might be derived* and that this is not sufficient for it to be classified as sensitive information.[551] At the latest when the information about the page visited is assigned to a Facebook user account do sensitive data arise as a special data category, since it can be clearly assigned to a natural person. In accordance with the wording of Article 9 (1) GDPR, it is sufficient for classification as a special data category that data *"reveal"* a certain property. This does not mean that the data itself must reveal the characteristic. It is sufficient for the content of the data to at least indirectly reveal the mentioned characteristic to an average, objective third party.[552] The prohibition thus concerns the starting date that can reveal the above-mentioned characteristics through processing and, if applicable, interpretation.[553]

587   The collection of data on third-party websites and apps can easily generate data on racial and ethnic origin, political opinions or ideological convictions. Through the mass integration of Facebook Business Tools and APIs such as social plugins, Facebook Login or the Facebook pixel, Facebook collects data that identify specific characteristics of the user. The flirting app "Tinder", for instance, offers a Facebook login and the homosexual partner exchange "Queer" (www.queer.de) has an integrated "Share" on Facebook button. Even political parties such as CDU, SPD, Linke and AfD and healthcare websites such as www.onmeda.de or www.netdoctor.de have integrated "Share" on Facebook buttons. This enables Facebook, which has further

---

[551] […]

[552] Ehmann/Selmayr, GDPR, Art. 9 GDPR, para. 10 with further references; "Does Article 9 GDPR rule out the permissibility of processing with big data?" ("Schließt Art. 9 DSGVO die Zulässigkeit der Verarbeitung bei Big Data aus"?), ZD 2017, p. 303 (305).

[553]  Schneider, "Schließt Art. 9 DSGVO die Zulässigkeit der Verarbeitung von Big Data aus?", ZD 2017, p. 303 (304); Data Protection Committee guidelines on automated case-by-case decisions including profiling for the purposes of Regulation 2016/679 most recently amended and adopted on 6 February 2018, p. 16, 17, available at http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=612053, (last accessed on 10 January 2019)

information about the user based on its existing data record, to create detailed profiles also using sensitive user data.

588   Contrary to Facebook's view, this does not involve objectively neutral data that only become special data categories if they are combined with the other data available on Facebook but which, regardless of whether they are combined or not, can be inferred indirectly as sensitive data. The view of the UK data protection authority ICO (Information Commissioner's Office) which Facebook refers to, on the other hand, deals only with information that "may allow special categories of personal data to be derived as a potential option".[554]

### (3)  Data processing including profiling pursuant to Article (4) GDPR

589   After all, "recording", "combining", and "using" means data processing within the meaning of Article 4 (2) GDPR (see (a), which also includes profiling pursuant to Article 4 (4) GDPR (see (b).

### (a)  Relevant data processing procedures pursuant to Article 4 (2) GDPR

590   The conditions set out in detail in the operative part of the decision and their implementation relate to different data processing procedures and phases within the meaning of Article 4 (2) GDPR, which are summarised in the categories "recording", "combining" and "using" as the essential processing phases.

591   Facebook uses the general terms of "recording", "combining" and "using" in the conditions at issue here. These broadly conceived terms facilitate a very wide range of data processing procedures, each of which fulfils the definition of data processing pursuant to Article 4 (2) GDPR. For Article 4 (2) GDPR says the generic term "data processing" means any operation or set of operations which is performed on personal data or on sets of personal data, whether or not by automated means. This includes collection, recording, organisation, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction.

592   The "recording" of data collected from other Facebook Companies and from Facebook Business Tools refers to the data processing procedures associated with the receipt of data from Facebook Companies or via Facebook Business Tools from third parties by the operating company. At the very least, it encompasses collection, recording, organisation, structuring, storage, adaptation or alteration, retrieval, consultation and if

---

[554] [...]

applicable, also the matching of the data, in order to examine the usefulness of the data. As regards Instagram, there is no need for Facebook.com's operating company to "receive" user and device-related data as Instagram is meanwhile being provided by the same operating company.

593   In addition, the "combining" of data mentioned in Facebook's Terms of Service is to be construed within the meaning of Article 4 (2) GDPR as "combining" data, which includes in particular assigning the available data from the sources outside Facebook.com to the respective Facebook user accounts via the Facebook ID. Matching data from the above-mentioned sources with the existing data in order to find the Facebook account of the respective user via the various matching options and assigning in particular the Facebook ID, is a key procedure that represents the combining and permanent combination of data.

594   This is based on Facebook's claim that the company does not create "profiles" within the meaning of individual data records, which are each expanded by adding data.[555] Rather, based on the current database structure, the individual data are provided with the Facebook ID after the above-mentioned device-related data in particular has been matched such as the so-called Family Device ID or other characteristics of the devices, have been stored throughout the entire database and are, if necessary, retrieved for a specific purpose during its implementation, depending on the task of the algorithm.

595   The "use" of the data involves the use of the data for the purposes pursued in each case. In this respect, Facebook mentions a variety of purposes such as the personalisation of services, advertisements, security purposes and research. According to Facebook's Terms of Service, "use" is defined as any use of data collected from other Facebook Companies and from Facebook Business Tools by the operating company of Facebook.com.

596   Each of these processing steps requires a legal basis pursuant to Article 6 (1) and Article 9 GDPR. The extension of the catalogue of processing procedures in Article 4 (2) GDPR vis-à-vis Article 2 (b) Directive 46/95/EC has not brought about any changes in the legal situation. The definition of processing in Article 4 (2) GDPR also covers the individual processing phases, which are subject to a prohibition with reservation of consent.[556]

---

[555] […]
[556] Auernhammer, GDPR, Art. 4 para. 18; Ehmann/Selmayr, GDPR, Art. 6, para. 1.

(b) **Profiling, Article 4 (4) GDPR**

597   The use of the data imposed consists of "profiling" in accordance with Art. 4 No. 4 GDPR, in particular with regard to personalisation and advertising purposes. Facebook processes all personal data, including data generated from Facebook-owned services and Facebook Business Tools, by combining them with the data collected when the social network is used in order to analyse or predict personal aspects relating to a natural person. This also includes aspects concerning that natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behaviour, location or movements. In general, according to the guidelines issued by the Article 29 Data Protection Working Party adopted by the European Data Protection Board, profiling refers to the gathering of information about an individual (or group of individuals) and the evaluation of their characteristics or patterns of behaviour for the purpose of dividing them into a particular category or group, in particular for analysis and/or forecasting in relation to their ability to perform a task, interests or likely behaviour.[557] As such, the data collected are also automatically analysed and correlations are identified which are applied to an individual for the purpose of identifying characteristics of current or future behaviour.

598   This demonstrates that Facebook carries out detailed profiling on the basis of a large volume of data on a variety of personal aspects for the purposes of personalising the service and for customising (targeting) advertising.

599   As indicated above, Facebook's News Feed in particular is created and individualised using a relevance algorithm. News Feed is a personalised stream of content and activities relating to the user. For an optimum user experience, the aim is for users to see content most relevant to them when News Feed is displayed. The algorithm calculates individually for each individual user in particular on the basis of the influencing factors "Affinity", "Weight" and "Expiry" a value for any post for the News Feed that has a positive or negative impact on the supposed relevance of a post. This is the basis on which the contents of each user's personal News Feed is sorted. "Affinity" is determined based on interaction with the respective users and their posts. Indicators include contact in the form of posts to the chronicle, pages liked, comments, mutual tags, visits to websites, etc. Overlapping user interests, friends and action patterns are also relevant. The basis of the "Weight" assessment is the interaction of others (friends or third parties) with the post in the form of clicks, like tags, shared content, comments and even the contents of the interactions. Personal factors such as

---

[557]   cf. Guidelines on automated decisions in individual cases including profiling for the purposes of Regulation 2016/679 of 3 October 2017, most recently amended and adopted on 6 February 2018, p. 7; [...]

the relevance of the individuals who interacted with the post play a role as well as the click/likes/share quotas. It is also taken into account for the expiry period, however, whether a post is only interesting in the present situation or whether it will continue to be relevant in the long term. This is assessed, for instance by looking at the reaction to the post (short-term and intensive or long-term and constant). The type of content is also important, e.g. whether the post consists of an image, video, text, link, etc. If users can be observed to react intensively to images, but rarely click on links, images seem to be more interesting to them and will be ranked higher.

600   Facebook also performs profiling for the purposes of targeted advertising. In the advertising manager, as described above, target groups are formed on the basis of detailed personal characteristics and preferences according to location, age, gender and language as well as according to further demographic data, interests and behaviour, evaluating the user data. The location can be further specified based on the following criteria: "Everyone in this location", "People who live in this location", "People recently in this location", "People travelling in this location". Age can be specified by exact age categories, with 13 being the minimum age and 65+ being the highest age category. The following subcategories are available for demographic data: "Education", "Financial", "Generation", "Home", "Life Events", "Parents", "Politics", „Relationship". "Interests" are further specified as "Business and Industry", "Shopping and fashion", "Food and drink", "Family and relationships", "Fitness and wellness", "Hobbies and activities", "Sports and outdoors", "Technology", and "Entertainment". "Behaviours" are categorised as "Automotive", "Digital activities", "Financial", "Anniversary", "Purchase behaviour", "Consumer classification", "Multicultural affinity", "Mobile device user", "Travel", "Residential profiles", "Seasonal and events", "Home owners", etc. Tailor-made target groups are put together, including "lookalike" target groups, for which certain detailed aspects are again decisive.

601   It is also expressly stated in the Facebook Data Policy that data collected from other Facebook-owned services and Facebook Business Tools may be used for the purposes of profiling and may be assigned to the respective Facebook accounts when data are combined. It says that the information obtained from these sources is used to personalise features and content and make suggestions for users on and off the Facebook Products (e.g. groups or events users may be interested in or topics they may wish to follow). Facebook states that it uses the connections, preferences, interests and activities to create personalised products that are unique and relevant to users. Based on the data it collects on them and others including any data with special protections they choose to provide to which they have given their explicit consent and "*how they use and interact with the Facebook Products, and the people, places or*

*things they are connected to and interested in on and off the Facebook Products...".* In relation to *"Information across different Facebook Products and devices"* Facebook explains*: "We connect information about your activities on different Facebook Products and devices to provide a more tailored and consistent experience on all Facebook Products that you use, wherever you use them. For example, we can suggest that you join a group on Facebook that includes people you follow on Instagram or communicate with using Messenger…."* [558] Facebook also indicates in relation to ads that it uses "the information we have about you" – including information about "your interests, actions and connections" – to select and personalise ads.

602    In this respect, Facebook's Terms of Service and Data Policy do not make any distinction whatsoever between the individual sources of data even with regard to the purpose of personalisation. According to this information, the Facebook Products include Facebook (including the Facebook mobile app and in-app browser), Messenger, Instagram (including apps like Direct and Boomerang), tbh, Moments, Bonfire, Facebook Mentions, AR Studio, Audience Network, and any other features, apps, technologies, software, products, or services offered by Facebook Inc. or Facebook Ireland Limited. The Facebook Products also include Facebook Business Tools such as plugins (for example "Like" and "Share" buttons) and the SDKs and APIs, used by website owners and publishers, app developers, business partners (including advertisers) and their customers to support business services and share information with Facebook.

603    In addition, the "Facebook Companies" are mentioned without distinction, including Facebook Payments Inc., Onavo, Oculus, WhatsApp, Masquerade and CrowdTangle. Facebook's Data Policy states *"that it processes information about users across the Facebook Companies to provide an innovative, relevant, consistent and safe experience across all Facebook Company Products".*

604    The Bundeskartellamt assumes that the information collected by WhatsApp is not currently being used for profiling purposes on Facebook. However, Facebook's Terms of Service do not seem to contain any limitation similar to that outlined in WhatsApp FAQs regarding WhatsApp data and any information can only be found via several links to WhatsApp's Help Centre. It must therefore be assumed that Facebook continues to reserve this right vis-à-vis Facebook users and that this is also the subject matter of the contractual terms.

---

[558]   cf. Facebook's Data Policy of 19 April 2018 under heading II. "How do we use this information"? […]

b. **Responsibility for data processing**

605   Facebook and Facebook Ireland Ltd. are "responsible" under data protection law for the processing of data generated from Facebook-owned services and Facebook Business Tools described in detail above (Article 4 (7) GDPR) and are therefore responsible for compliance with the principles governing the processing of personal data (Article 5(2) GDPR), as Facebook alone or jointly with others decides why and how personal data are processed.

606   Facebook cannot invoke group privileges (see (1)) for the processing of data generated from Facebook-owned services WhatsApp, Oculus, Masquerade, and Instagram services, or any other Facebook-owned services for that matter.

607   Facebook is at the very least jointly responsible for the processing of data generated from access to third-party services via Business Tools and other interfaces (Articles 24 and 26 GDPR). This does not involve processing of data on behalf of the controller within the meaning of Article 4(8) GDPR as far as individual services are concerned (see (2)).

**(1) Group privilege does not apply**

608   With regard to the processing of data collected by other Facebook Companies for their services, such as WhatsApp, Oculus, and Masquerade in particular, the company operating Facebook.com in Europe - Facebook Ireland Ltd. - has a separate responsibility under data protection law for the transfer of personal data of users resident in Germany and their assignment to the respective Facebook user accounts as well as for the further use and other processing of the data for the purposes of Facebook.com. These data processing procedures are also subject in each case to the data protection principles including the lawfulness of processing pursuant to Article 6(1) GDPR. Facebook cannot therefore invoke any justification for data processing by Facebook Companies.

609   On the contrary, Facebook Companies are deemed to be separate responsible entities. This ensues from Article 4(7) GDPR, according to which the legal person is regarded as the responsible party, so that the respective companies belonging to the group remain responsible for data processing and are therefore to be regarded as third parties in relation to each other. The GDPR does not make any provision for group privileges. The exchange of data between companies belonging to the same group is therefore not permitted just because the companies involved are affiliated. Each company must

continue to be regarded as a separate entity under data protection law, with the result that data transfers within the group must also be justified in each case.[559]

610   The GDPR does define a term "group of undertakings" in Article 4(19) GDPR. According to Recital 48, controllers that are part of a group of undertakings or institutions affiliated to a central body may have a legitimate interest in transmitting personal data within the group of undertakings for "internal administrative purposes", including the processing of clients' or employees' personal data. However, Recital 48 itself does not provide a legal basis for the transmission of data. On the contrary, this regulation refers to the balancing of interests in the assessment of the lawfulness of data processing, as it needs to be carried out in particular pursuant to Article 6(1) sentence 1f) GDPR.[560] This shows that even data flows within group undertakings require justification and the companies must be regarded as third parties vis-à-vis one another in each case.

611   This means each company belonging to the Facebook Group is responsible for the processing of personal data. This is also justified from the users' perspective, since some users of a service provided by a company belonging to the Facebook Group may not even be aware that the service is part of the Group. Furthermore, the possibility of combining different data sources enables the processed data to achieve a different data quality, which also means a different quality of invasion into the privacy of the individual and therefore requires independent justification.

612   Contrary to Facebook's view[561], no group privilege can be derived from Section 36(2) GWB in this particular case. Even though Section 19 GWB provides the legal basis for the assessment, the proportionality of data processing depends first and foremost on the principles governing data protection law. However, Section 36(2) GWB has no bearing on the question of the proportionality and admissibility of data processing under data protection law.

613   The judgment handed down by the Federal Court of Justice in the Entega case[562] cannot be transferred to this particular case either. The proceedings instituted against Entega for abusive pricing specifically involved a price split pursuant to Section 19(2) no. 3 GWB (Section 19(4) no. 3 GWB old). Here, too, the very fact that pricing can be strategically aligned by companies belonging to the group shows that they should be considered to be a single entity. Section 19(2) no. 3 GWB would be meaningless if

---

[559] Plath, GDPR, Article. 6 GDPR, para. 77

[560] Voigt, "Konzerninterner Datentransfer – Praxisanleitung zur Schaffung eines Konzernprivilegs", (available in German only) CR 2017, 428 (429).

[561] […]

[562] […] Federal Court of Justice, judgment dated 7 December 2010, "Entega", KZR 4/10, para. 17 (iuris).

Section 36(2) GWB did not apply since the dominant company could arbitrarily use legally independent subsidiaries to enforce the price split.[563] No group privilege was assumed here either. Moreover, intra-group transactions are not generally exempt from abuse control if they have restrictive effects on competition. This applies, for instance to the classic cases of bundling products within the same group resulting in the transfer of market power or exploitation of the opposite side of the market.[564] Facebook's view that group privileges are recognised fully and unanimously in antitrust law[565], is therefore incorrect.

614  This means that in view of the Facebook Group's current structure, it is assumed that Facebook Ireland Ltd. has an independent data protection responsibility for the recording, combining and use of user and device-related data by WhatsApp Ireland Ltd. and WhatsApp Inc., Masquerade Technologies Inc. and Oculus VR, LLC. respectively, with the accounts of the online services Facebook.com operated by Facebook Ireland Ltd. at Facebook Ireland Ltd.

615  This also means that Facebook Ireland Ltd. was responsible for each assignment of user and device-related data from the previous operating company Instagram Inc. to the user accounts held at Facebook Ireland Ltd. for Facebook.com, including the transfer of the Instagram service to Facebook Ireland Ltd. on 25 May 2018 and that it required justification under data protection law for all data processing.

616  For a start, the merger of the Facebook.com and Instagram services under the operating company Facebook Ireland Ltd. means that Facebook Ireland Ltd. is now solely responsible under data protection law for the processing of personal data of both Facebook users and Instagram users. The merger does not mean that combining user and device-related data by Facebook.com and Instagram as well as the use of this data are no longer subject to the lawfulness requirements of the GDPR. The only difference between it and combining data from other companies that are part of the Group is the additional transfer and receipt process, which is described in this context by the term "recording", because Instagram's operating company already records the relevant user and device-related data when Instagram is used. Both the combination of Instagram user data and device-related data with the data of users registered under the Facebook account ("combining"), as well as their combined use by the operating company of the services are subject to a GDPR assessment.

---

[563] Munich Commentary on European and German Competition Law, 2nd edition, Section 19 GWB, para. 133
[564] cf. for instance Langen/Bunte-Nothdurft, Section 19 GWB, para. 355
[565] […]

**(2) No effective processing on behalf of the controller**

617   Facebook also has at the very least joint responsibility for the processing of data from the Facebook Business Tools described in detail in the operative part of the decision (Articles 24 and 26 GDPR). Facebook cannot invoke data processing on behalf of the controller within the meaning of Article 4 no. 8 or Article 28 GDPR with regard to data processing, in particular for measuring the effect of advertisements and Facebook Analytics on the use of the Facebook pixel, SDKs or other interfaces.

618   Facebook is –[…][566] -at the very least jointly responsible with the third-party providers within the meaning of Article 4 no. 7 and Article 26 GDPR[567] because Facebook determines the purposes and means of processing at least jointly with the third-party providers. The data collected from Facebook Business Tools only become relevant when they are assigned to Facebook user accounts. In addition, the assignment to Facebook user accounts leads to further data processing procedures on Facebook (storing, combining, organising, using), which the third-party providers themselves are unable to keep track of. It therefore cannot be assumed that the third-party providers are solely responsible for this essential part of the data processing.[568] Facebook does not dispute its own responsibility for data processing for the most part either.

619   Contrary to the opinion of the parties,[569] Facebook cannot invoke "data processing on behalf of the controller"[570] within the meaning of Article 4 no. 8, 28 GDPR as far as measuring the effect of ads and Facebook Analytics via the use of the Facebook pixel, SDKs or other interfaces is concerned.

620   Pursuant to Article 4 no. 8 GDPR, "processor" means a natural or legal person (...), which processes personal data on behalf of the controller. This relationship is regulated in more detail in Article 28 GDPR. Data processing on behalf of the controller is characterised by the fact that a client outsources data processing, which he would otherwise have had to carry out himself, to a body bound by instructions, whereby the

---

[566] […]

[567] […]

[568] This corresponds to the case law of the European Court of Justice, judgment handed down on 5 June 2018 ("Fan page"),case C-210/16, para. 26, 27., according to which "the "controller" in Article 2 d) of Directive 95/64/EC needs to be broadly defined. This ensues from the fact that the Directive seeks to ensure a high level of protection of the fundamental freedoms of natural persons, in particular their privacy, with regard to the processing of personal data; this was also the opinion of Advocate-General Bobek of 19 December 2018, case C-40/17, para. 65. Since Recital 9 of the GDPR says objectives and principles of Directive 95/46/EC are to remain sound, these considerations can also be extended the term "controller" within the meaning of the GDPR.

[569] […]

[570] S. Sydow, General Data Protection Regulation 2017, Article 28, para. 11

client bears full responsibility under data protection law for the lawful handling of personal data in external relations.[571]

621   On this basis, transferring the role of the solely responsible data processor in the "Facebook Business Tools Terms"[572] to the third-party companies does not constitute effective processing on behalf of the controller.

622   Paragraph 5 of Facebook Business Tools Terms says "To the extent the Customer Data contain personal data which you process subject to the (…) GDPR, the parties acknowledge and agree that for purposes of providing matching, measurement, and analytics services described in Paragraphs 2.a.i and 2.a.ii above, that you are the data controller in respect of such personal data, and you have instructed Facebook Ireland Limited to process such personal data on your behalf as your data processor pursuant to these terms and Facebook's Data Processing Terms, which are incorporated herein by reference".

623   Paragraphs 2.a.i, 2.a.ii and 2.a.v. read as follows:

"2. Use of Customer Data
*We will use Customer Data for the following purposes depending on which Facebook Company Products you choose to use:*

   i.  ***Contact information for matching***
   1.  *You instruct us to process the Contact Information solely to match the Contact Information against Facebook's or Instagram's user IDs **("Matched user IDs"),** as well as to combine those user IDs with corresponding Event Data. We will delete Contact Information following the matching process.*
   ii. ***Event Data for measurement and analytics services***
   1.  *You instruct us to process Event Data: (a) to prepare reports on your behalf on the impact of your advertising campaigns and other online content ("**Campaign Reports**") and (b) to generate analytics and insights about your customers and their use of your apps, websites, products and services ("**Analytics**").*
   2.  *(…)*

624   These regulations do not fulfil the requirements regarding processing of data on behalf of the controller being governed by a contract pursuant to Article 28 GDPR. Here, the processing of data on behalf of the controller is justified by future processors using standard clauses that are unilaterally imposed by the alleged controller.

625   As such, it is doubtful whether standard contractual clauses imposed unilaterally can even be regarded as a permissible form of contract under the GDPR. Pursuant to Article 28(6) to (8) GDPR, admissible standard contractual clauses are defined either by the Commission or by the European Data Protection Board. Recital 81 says the

---

[571] […]
[572] Facebook Business Tools terms, item 5.a, B […]

controller and processor may choose to use an individual contract or standard contractual clauses.

626    Regardless of this, the unilateral definition of processing on behalf of the controller and the conditions imposed by Facebook are not compatible with the processing of those data except on instructions from the controller pursuant to Article 29 GDPR. This means the data processor and any person subordinate to the processor who has access to personal data may process any such data only on the instructions of the controller. This is contradicted by a unilateral specification defined by Facebook in Paragraph 5, 2.a.i and 2.a.ii of the Facebook Business Tools Terms which stipulate the limits within which the users of Facebook Business Tools are to issue instructions. The terms do not give those users the right to issue instructions. Instead, these third-party providers are instructed by Facebook.

627    In addition, the data recorded through the use of the Facebook pixel, SDKs or other interfaces on third-party websites are not used by Facebook solely to provide aggregated analysis to third-party companies, but are used for Facebook's own commercial purposes. In accordance with Paragraph (2) of Facebook Business Tools Terms, customer data are also used to personalise features and content on Facebook, to improve Facebook Products and to promote the safety and security of these products. […][573] Data processors can certainly pursue their own interests. Nevertheless, the processing must be carried out at the instruction of the controller, who alone also determines the purposes of data processing.[574] Pursuant to Article 28(10) GDPR, if a processor infringes this Regulation by determining the purposes and means of processing, the processor is considered to be a controller in respect of that processing.

628    Facebook therefore does not play the role of a subordinate processor in the agreed relationship with the third-party providers which does not have its own decision-making scope with regard to the purposes of data processing. It therefore cannot be compared to service providers such as letter shops or call centres.[575] Facebook does not act like an "extended arm" for third-party providers[576] and its activities are not limited to merely

---

[573] […]

[574] Auernhammer, GDPR/Federal Data Protection Act (Bundesdatenschutzgesetz, BDSG), Article 28 GDPR, para.11

[575] The Data Protection Conference cites these examples as services in the form of processing on behalf of the controller, see Data Protection Conference; short paper no. 13, status 16 January 2018, p.4, accessible at https://datenschutz- hamburg.de/pages/kurzpapiere-dsgvo/ (last accessed on 10 January 2019).

[576] see Bayreuth Administrative Court, judgment handed down on 8 May 2018, ref. B 1 p. 28.105, para. 50 (juris) in relation to Facebook Custom Audiences.

providing technical support.[577] As the provider of Facebook Business Tools, Facebook itself determines the purposes for which the collected data is used. Third-party companies that integrate the tools cannot instruct Facebook that the data can only be used for the preparation of analyses and not also for Facebook commercial purposes. Third-party companies do not have any insight into what actually happens to the data uploaded or transmitted either. They receive aggregated measurement analyses and statistics as the "end product", yet on the basis of the contract they have no influence on how Facebook has processed the data in the meantime, for instance to what extent the data is assigned to Facebook user accounts and what additional information Facebook receives by comparing user behaviour.

c. **No justification under Article 6 and Article 9 GDPR**

629 The processing of data collected from Facebook-owned services and Facebook Business Tools imposed, described in detail in the operative part of the decision, is not justified.

630 Facebook invokes all data protection legal bases provided for in the GDPR (see (1)) for the data processing procedures imposed. Facebook cannot invoke the user consent it is asserting pursuant to Article 6(1a), Article 9(2a) GDPR (see (2)). Data processing is not necessary for the performance of the contract pursuant to Article 6(1b), Article 9(2b) GDPR either (see (3)). Finally, data processing is not justified by any overriding interests of Facebook or third-party providers vis-à-vis the interests and rights of the data subject pursuant to Article 6 (1 f) GDPR (see (4)).

**(1) Legal bases invoked**

631 In Facebook's Data Policy, Facebook declares the following under the heading "What is our legal basis for processing data?:

  *"We collect, use and share the data that we have in the ways described above:*

- *as necessary to fulfil our Facebook Terms of Service or Instagram Terms of Use;*

- *consistent with your consent, which you may revoke at any time through the Facebook settings and Instagram settings;*

- *as necessary to comply with our legal obligations;*

- *to protect your vital interests, or those of others;*

- *as necessary in the public interest and*

---

[577] Bayreuth Administrative Court, loc. cit. with reference to Düsseldorf Higher Regional Court, judgment handed down on 13 February 2015, ref. no. I 16 U 41/14, para. 36 (collection service but not data processing on behalf of the controller).

- *as necessary for our (or others') legitimate interests, including our interests in providing an innovative, personalised, safe and profitable service to our users and partners, unless those interests are overridden by your interests or fundamental rights and freedoms that require protection of personal data".*

632   Facebook therefore invokes all six available legal bases set forth in Article 6 (1 a) to f) GDPR as well as Article 9(2) GDPR to justify data processing.

633   A hyperlink ("*Learn more about these legal bases…*") takes the reader to another more detailed document, in which Facebook provides further explanations for the legal bases.[578] In particular, three of the legal bases are mentioned and explained here: the processing as necessary for the performance of the contract. (Article 6(1b) GDPR), consent (Article 6(1 a) and Article 9 (2a) GDPR), and the legitimate interests pursued by the controller or by a third party, except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject (Article 6(1f) GDPR). Furthermore reference is made to the legal basis pursuant to Article 6(1c to e) GDPR. Facebook points out that when it processes users' data as necessary for a task carried out in the public interest, users have the right to object to, and seek restriction of, its processing.

634   On this basis, with respect to all persons who have the legal capacity to enter into an enforceable contract, Facebook initially invokes the processing of data "to the extent necessary for the performance of the contracts (Facebook Terms of Service and Instagram Terms of Service)". The most important data uses for the provision of contractual services are the "provision, personalisation, and enhancement of our Facebook Products". "To promote safety, integrity and security" "To transfer, transmit, store or process your data outside the EEA, including to within the United States and other countries" to "To communicate with users, for example, on product-related issues" and "To provide a consistent and seamless experiences across the Facebook Company Products" are also mentioned.

635   In addition, Facebook invokes users' consent for, among other things, the processing of data with special protection for sharing with selected individuals and personalising content, the use of face recognition technology, but also for the use of data provided by advertisers and other Facebook partners regarding the user's activity outside Facebook Company Products, so that Facebook can personalise the advertisements shown to the user on Facebook Company Products and on websites, apps and devices that use Facebook advertising services.

---

[578] Cf. https://www.facebook.com/business/learn/how-business-manager-works/guide , [...]

636   Facebook initially invokes overriding legitimate interests in relation to people under the age of majority who have a limited ability to enter into an enforceable contract and whose data on Facebook cannot be processed on the grounds of necessity for performance of the contract. In this case, Facebook claims, the provision, personalisation and improvement of Facebook Products, the promotion of protection, integrity and security, the provision of non-marketing communications were legitimate interests, although Facebook specifically targeted people under the age of majority.

637   Facebook also asserts legitimate interests with respect to all individuals and their data for the provision of measurements, analytics and other business services when Facebook processes data as the data controller. Facebook highlights the provision of accurate and reliable reporting to its advertisers, developers and other partners, to ensure accurate pricing and statistics on performance and to demonstrate the value that its partners realise using Facebook Company Products and in the interests of advertisers, developers and other partners to help them understand their customers and improve their businesses, validate Facebook pricing models and evaluate the effectiveness of their online content and advertising on and off the Facebook Company Products.

638   It also refers to marketing communications, research and innovation, social purposes, sharing information with others and responding to legal requests as legitimate interests. The latter help to prevent and address fraud, unauthorised use of the Facebook Company Products, breaches of Facebook's terms and policies, or other harmful or illegal activity.[579]

### (2) No effective consent

639   Users do not give their effective consent within the meaning of Article 6(1a), Article 9(2a) GDPR to the processing of personal data pursuant to Facebook's Data Policy in respect of processing of data collected from Facebook-owned services and Facebook Business Tools.

640   The consent that needs to be given to Facebook when users sign up with the social network is not to be regarded as voluntary consent within the meaning of Article 6(1a) GDPR (see (a)). In relation to the special data categories covered by data processing pursuant to Article 9 (1) GDPR, no explicit consent is given within the meaning of Article 9(2a) GDPR (see (b)). Even the disable (opt-out) options provided for in Facebook's privacy settings and the reference made in the Cookies Policy to the browser's or user's device settings do not constitute a form of voluntary consent to the processing of data

---

[579] [...]

from Facebook-owned services and Facebook Business Tools, their assignment to Facebook user accounts or use of this data, in particular, for personalised ads (see (c)).

**(a) Agreeing to the Terms of Service does not constitute consent**

641    Agreeing to the Terms of Service which users are required to do in order to be able to use the social network does not constitute voluntary consent pursuant to Article 6(1a) GDPR.

642    Facebook's explanation in the amended Terms of Service and Data Policy shows that - since the GDPR came into force in May 2018 - Facebook still makes use of the social network dependent on users "agreeing" to the Terms of Service by clicking on the "Register" button. However, Facebook no longer invokes the users' consent which needs to be obtained during the registration process as the legal basis under data protection law for all data processing procedures.[580] Consent is only mentioned as the legal basis for data protection in the Data Policy and in the legal bases - as described above - for certain data processing procedures and is obtained in a number of ways. In addition, Facebook refers to legal justifications.[581] Facebook justifies this by claiming it has checked the extent to which it relied in the past on consent to data processing within the framework of the transposition of the GDPR. Yet Facebook only came to the conclusion in certain cases that consent under the GDPR was the most suitable legal basis. In other cases, however, Facebook says different legal bases, in particular the legal basis enshrined in Article 6(1b) GDPR, were more suitable for justifying its data processing practices.[582]

643    Nevertheless, Facebook claims that users voluntarily consent to the service provided by Facebook within the meaning of data protection law.[583] As a precautionary measure, the Bundeskartellamt therefore points out that it cannot be assumed that individuals give their consent voluntarily since users are forced to consent to data processing terms when they sign up for a service provided by a company that has a dominant position in the market.[584]

644    An essential basis for lawful and appropriate data processing is that data subjects have given their consent *voluntarily* (Article 6(1a) GDPR, Article 7 a) of the Data Protection

---

[580] […]

[581] […], https://de-de.facebook.com/about/privacy/update (last accessed on 10 January 2019), […]; Facebook, "Legal Bases", https://www.facebook.com/about/privacy/legal_bases (last accessed on 10 January 2019), […]

[582] […]

[583] […]

[584] […]

Directive 95/46/EC). This principle of voluntariness is a core element of data protection law, which can be derived from Article 8 of the Charter of Fundamental Rights. If consent is not given voluntarily, it is ineffective. Otherwise the right to data protection would be undermined.[585] Consent must fulfil the conditions of Article 7 GDPR and Article 7 a) of the Data Protection Directive 95/46/EC. It is important for the concept of "voluntariness" according to Article 2 h) of the current Data Protection Directive 95/46/EC that the data subjects' consent is freely given to their data being processed in the context at hand and in full knowledge of the facts. Article 4 (11) of the GDPR says that "consent" of the data subject means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her.

645   Furthermore, in the case of consent being freely given (voluntary consent), pursuant to Article 7 (4) GDPR, it must be taken into account whether the prohibition of making provision of a service conditional on data subjects giving their consent to processing of their personal data has been observed. For it says that when assessing whether consent is freely given, utmost account shall be taken of whether, inter alia, the performance of a contract, including the provision of a service, is conditional on consent to the processing of personal data that is not necessary for the performance of that contract. Making the provision of service conditional on consent to the processing of data, according to Recital 43, would eliminate consent being freely given if there was a "clear imbalance" between the data subject and the organisation. Furthermore, according to Recitals 42 and 43 of the GDPR, consent should not be regarded as freely given if the data subject has no genuine or free choice or is unable to refuse or withdraw consent without detriment.

646   As far as the consent obtained upon registration is concerned, there is no real or free choice within the meaning of the above-mentioned Recitals of the GDPR. As such, it can remain open whether consent can generally no longer be regarded as being freely given if it is required for the provision of service.[586] In any case, Facebook's dominant market position creates a "clear imbalance" vis-à-vis users. As outlined above, Facebook has a quasi-monopolistic position on the market for social networks vis-à-vis users with a user share of more than 90 percent, with the monopolisation trend continuing. The direct network effects prevent users from switching to other services,

---

[585] Ehmann/Selmayer, General Data Protection Regulation, 2017, Article 7, para. 45

[586] see Article 29 Data Protection Working Party, Guidelines on consent under Regulation 2016/679 of 28 November 2017, p. 8ff.; cf., for instance, Härting, General Data Protection Regulation, para. 396f. Ehmann/Selmayer, General Data Protection Regulation, 2017, Article 7, para. 53.

so it cannot be assumed that users have a free choice within the meaning of data protection law. Deciding not to use Facebook would have considerable disadvantages for users because they would no longer be able to fulfil their need to participate in the social network.

### (b) No explicit consent for special data categories

647   However, effective consent cannot be deemed to be given in the present case also due to the lack of explicit (voluntary) consent to the processing of special data categories pursuant to Article 9 (1) a) GDPR within the framework of the "profiling" carried out by Facebook, insofar as any such user data are collected from Facebook-owned services and from Facebook Business Tools and are subsequently assigned to Facebook user accounts.

648   Facebook obtains explicit consent only with respect to those specific categories of data that users have provided voluntarily in their Facebook profile under the headings "Life Events" or "Interests".[587] Users can object to face recognition which was introduced in the spring. In this case, Facebook does not match photos and videos with the users' profile photo or other photos and videos on which users have been tagged.

649   Whether or not explicit voluntary consent has been given with regard to this information provided on the social network is debatable.

650   In any event, no explicit and voluntary consent pursuant to Article 9(2a) GDPR has been given with regard to the imposed collection of special data categories from Facebook-owned services and Facebook Business Tools, the combination of any such data by assigning them to Facebook user accounts or to the use of any such data. In this regard, Facebook - as outlined above - is wrongly of the opinion that this does not involve special data categories within the meaning of Article 9(1) GDPR.

### (c) Privacy settings and browser settings do not constitute consent

651   Finally, the limited options available in Facebook's ad settings (see i.) and the reference made to browser and device settings used to block cookies or ad IDs on mobile devices (see ii.) do not constitute voluntary consent to the recording of data from Facebook-

---

[587] cf. Facebook Data Policy, "What is our Legal Basis for processing data?", https://de-de.facebook.com/about/privacy/update, [...]; Facebook, "Legal Bases", https://www.facebook.com/about/privacy/legal_bases, [...] If the users click the link "data with special protections", they are taken to the heading "What kinds of information do we collect?" in the Data Policy. Here it says in relation to "Data with special protections": "You can choose to provide information in your Facebook profile fields or "life events" about your religious views, political views, your health or who you are "interested in". This and other information (such as racial or ethnic origin, philosophical beliefs or trade union membership) is subject to special protections under EU law", [...]

owned services and Facebook Business Tools or to the combination of this data with Facebook user accounts.

### i.   Settings for personalised advertising

652   The options available in Facebook ad settings do not mean voluntary consent justifies the collection of data from Facebook Business Tools or the combination of this data with Facebook user accounts.

653   Facebook users can control their "ad preferences" in their "Ad settings".[588]   However, these control options only apply to the *display* of ads.



Among other things, users have the option to also see ads "on the basis of partner data".

654   If users decide not to have ads displayed on the basis of partner data, ads that are no longer based on the partner data will continue to be displayed. Opting out of various settings does not affect the collection of data from Facebook Business Tools or prevent any such data being combined with Facebook user accounts. In this respect, users have no control mechanisms whatsoever.[589] They have no way of controlling what data is recorded or combined with data from other Facebook-owned services.

655   Even though the user's consent to the display of advertisements based on partner data is now structured in the form of an "opt-in", this does not constitute voluntary consent to the processing of data by combining it with Facebook user accounts or to using this data for all other purposes of the social network. The opt-out possibility only prevents personalised ads from being displayed, but it does not prevent all other data processing procedures, namely data recording, data matching, combination and linking, storage, organisation, etc., all of which take place anyway. This also ensues from the legal bases described above which Facebook invokes. It says that consent "*...for using data that advertisers and other partners provide us with about your activity off Facebook Company Products, so we can personalise ads that we show you on Facebook Company Products, and on websites, apps and devices that use our advertising services...*" In Facebook's own words, consent therefore does not cover the term "recording", which describes all data processing procedures that do not consist of use

---

[588]   Screenshot at https://www.facebook.com/ads/preferences/?entry_product=ad_settings_screen (last accessed on 8 January 2019), [...]

[589]   [...]

for advertising purposes. Facebook itself only invokes (all) legal justifications in this respect. Users can only influence one purpose in relation to use of their data. Conversely, consent to use of data for advertising purposes cannot be construed as consent to the collection and combination of data. This is because users giving their consent have the impression that the data is already available on Facebook and will be used for other purposes.

### ii.   Blocking of cookies and advertising IDs

656   The ability to block cookies in the browser or disable ad tracking on mobile devices does not constitute voluntary consent to all data processing procedures regarding the recording, combination and use of data collected from Facebook-owned services and Facebook Business Tools and assigned to Facebook user accounts either. Incidentally, it is not clear to what extent Facebook is actually invoking consent in this respect. In connection with consent, the above comments on the legal bases also mention "*For collecting information that you allow us to receive through the device-based settings you enable* …". The Cookies Policy does not make any reference to the legal basis. Regardless of this, sufficient consent is not evident here either.

657   Facebook sets various cookies on the users' computer the first time they visit the social network before they register, when they use a web browser. Cookies regularly contain information that allows users to be tracked online. The browser also connects to Facebook any time users visit websites with their browser, and transmits user and device-related information as well as information about the website. The first time users visit a Facebook page, a so-called cookie banner is displayed, which refers to the cookie setting for the processing purposes Facebook specified in its Data Policy and which users agree to by further scrolling or navigating on the page. The cookie banner also contains a reference to the Cookies Policy to which users are directed via a hyperlink.

658   The last paragraph of the Cookies Policy says under the heading "Browser cookie controls" that the browser or device may offer settings that allow users to choose whether to set browser cookies or to delete them. The Cookies Policy refers to the help functions of the browser or the device. Facebook also points out in this paragraph of the Cookies Policy that certain parts of the Facebook Products may not work properly if users have disabled browser cookie use.

659    However, in the vast majority of cases, the Facebook.com social network is not accessed via a web browser, but with the mobile app on a mobile device. Mobile cookies have not been used for some time now and users are identified by means of other "identifiers". In its Data Policy, Facebook indicates that it uses these kind of identifiers in order to obtain information about users.[590] This means users and their devices can be tracked, inter alia, via the advertising ID assigned to the mobile device when using the apps installed on the device and when interacting online with the device. The advertising ID is, as shown, a unique identifier alongside other device IDs. However, unlike the fixed MAC address or the IEMI, users can choose settings regarding the use of the advertising IDs and "reset" the advertising ID at the level of the operating system of the mobile device. This means the advertising ID is replaced by a new, randomly selected, unique number.[591]



660    Neither the ability to disable cookies in browser settings nor the settings on the mobile device can provide the basis for voluntary consent to the comprehensive collection of data from Facebook-owned services and Facebook Business Tools, the combination of this data to Facebook user accounts, or the use of this data.

661    The currently applicable Directive 2002/58/EC ("e-Privacy Directive") indicates in Article 5 (3) that the storage of information or access to information is only allowed on condition that the subscriber or user concerned is provided with clear and comprehensive information pursuant to Directive 95/46/EC, inter alia about the purposes of the processing, and is offered the right to refuse such processing by the data controller.[592] It is therefore questionable whether it is sufficient for consent to the setting of cookies that users are made aware of the possibility of choosing browser settings that define standards for the permission of cookies. In this respect, Recital 32 sentence 2 GDPR approves the selection of technical settings as a means of consent.

---

[590] Data Policy, "What kinds of information do we collect?" (…) **Identifiers**: Unique identifiers, device IDs and other identifiers, such as from games, apps or accounts that you use, and Family Device IDs (or other identifiers unique to Facebook Company Products associated with the same device or account)", […]

[591] cf.                          also                          https://www.checked4you.de/app_tracking_deaktivieren; https://mobilsicher.de/hintergrund/smartphone-nutzer-sollten-jetzt-ihre-werbe-id-aendern (in German, last accessed on 10 January 2019).

[592] Directive 2002/58/EC of the European Parliament and of the Council of 12 July 2002 concerning the processing of personal data and the protection of privacy in the electronic communications sector (Directive on privacy and electronic communications), Official Journal no. L 201of 31 July 2002 p. 37 – 47.

However, voluntary (freely given) consent according to the GDPR requires an "Opt-in" configuration. Yet no such "Opt-in" configuration is available here.

662   For cookies are set the first time users visit a Facebook page unless they leave it again immediately. Users must then delete the cookies after visiting a Facebook page for the first time, using the option to disable the cookies via their device or browser settings. At best, this represents an opt-out function, although Facebook does not offer an actual opt-out function, but instead refers to other services.

663   Even if consent could be considered to have been given to the setting of cookies by not selecting the blocking options, this consent cannot extend to comprehensive recording of data from Facebook-owned services and Facebook Business Tools via the respective interfaces that are assigned to Facebook user accounts using the cookie data which facilitate comprehensive profiling. In addition, there are other ways in which data can be combined with Facebook user accounts even when cookies have been disabled.

664   Facebook collects a large amount of device-related data both when Facebook.com and Facebook-owned services and Facebook Business Tools are used. In their entirety, these represent an almost unique fingerprint of individual users, meaning there is no need to assign data to Facebook user accounts via cookies in the first place. The possibilities users have of preventing fingerprinting are limited and difficult to access due to the technical complexity involved. By installing browser "add-ons", such as "NoScript", users can block JavaScript or Flash, meaning that less information can be collected. This can mean that websites are no longer displayed correctly. In addition, they represent a user setting that can enable personalisation, especially if only a small group of people block fingerprinting.

665   This explains why setting options on mobile devices with regard to the advertising ID certainly do not provide a basis for voluntary consent. The device setting also leads to the advertising ID being recorded by Facebook via the mobile interface. This results, for instance from Facebook's code instruction for the integration of the "App Events API". This means the advertising ID is transmitted every time users access the app and is merely supplemented with information on the users' settings for advertising tracking.[593] The setting is therefore only relevant for the display of interest-based advertising. Resetting the advertising ID does not prevent further assignment of data to Facebook user accounts either. When users open the Facebook app, the advertising ID for their device is again sent to Facebook and is directly assigned to their Facebook

---

[593] Cf. https://www.facebook.com/business/learn/how-business-manager-works/guide , [...]

user account. Users would then need to manually reset the advertising ID each time in order to make it more difficult to collect this information.

### (3) Data processing is not necessary for performance of the contract, Article 6 (1 b) GDPR

666    The processing of data collected from Facebook-owned services and Facebook Business Tools imposed is not justified pursuant to Article 6(1b) GDPR contrary to the opinion Facebook[594] expressed in the proceedings.

667    For a start, the need to process data collected from other Facebook-owned services or Facebook Business Tools for the performance of the contract concluded with private users cannot be justified on the basis of the contents of the Terms of Service that are imposed unilaterally (see (a)). It cannot be argued that there is a contractual link between all Facebook Products. (See (b)). Data processing from all sources is not necessary for the claimed contractual purposes either (see(c)).

### (a) Article 6 (1b) GDPR does not apply when the contractual contents are imposed unilaterally by the dominant company

668    The justification set forth in Article 6(1b) GDPR is not applicable on the basis of the statement issued by the Article 29 Data Protection Working Party when a dominant company dictates the contractual contents.

669    In describing its legal basis for performance of the contract, Facebook refers to the description of the contents of the contract defined in the Terms of Service under the heading "Our services". Facebook uses a headline followed by a few examples to describe what users are offered. The following headlines are listed: We *"Provide a personalized experience for you", "Connect you with people and organizations you care about", "Empower you to express yourself and communicate about what matters to you", "Help you discover content, products, and services that may interest you", "Combat harmful conduct and protect and support our community", "Use and develop advanced technologies to provide safe and functional services for everyone", "Research ways to make our services better", "Provide consistent and seamless experiences across the Facebook Company Products", "Enable global access to our services".*

---

[594] […]

670    In the present proceedings, Facebook refers in connection with Article 6(1b) GDPR in particular to the provision of personalised services and the display of personalised advertising, for which it claims all data processing from all sources is necessary.[595]

671    Neither Facebook's claim in the present proceedings nor the one-sided definition of the services in its Terms of Service can justify a contractual requirement for data processing conditions that facilitate comprehensive processing even of data collected from Facebook-owned services and Facebook Business Tools for profiling purposes, among other things. With regard to the required narrow interpretation of the justification set forth in Article 6(1b) GDPR, not all conceivable data processing procedures associated with the service can be covered by the economic interest of a self-defined data-driven business model that uses personalised services and personalised advertising. The Article 29 Data Protection Working Party has always represented the view in relation to Article 7 of Directive 75/46/EC b) which is identical to Article 6 (1b) GDPR that the term "necessary" for the performance of the contract needs to be narrowly construed.[596] Contrary to Facebook's view, case law also requires a narrow interpretation of these grounds for justification.[597]

672    This means that data processing is only necessary for the performance of the contract if, on reasonable grounds, the company's reliance on the specific means in question can be affirmed and it is unreasonable or inacceptable to refrain from using the data.[598] However, the provision does not apply to situations where processing is not really necessary for the performance of the contract, but where the contents of the contract and data processing are unilaterally imposed on the data subject by the controller.[599]

673    Facebook's claim that the - strongly fact-driven - examination required by the guidelines issued by the Article 29 Data Protection Working Party must first determine the exact purposes of the contract, i.e. its content and fundamental objective, and whether these purposes are crucial for assessing the balance of interests and whether the data processing is necessary for contractual performance, is therefore irrelevant.[600] For the

---

[595] […]

[596] "Opinion 06/2014 on the concept of "legitimate interest of the controller pursuant to Article 7 of Directive 95/46/EC" of 9 April 2014, https://www.bfdi.bund.de/SharedDocs/Publikationen/DokumenteArt29Gruppe_EDSA/Stellungnahmen/WP217_Opinion62014LegitimateInterest.html, [...]

[597] cf. for German law Hamburg Administrative Court, judgment handed down on 24 April 2017, p. 32 with reference to Gola/Schomerus, Federal Data Protection Act, Section 28, para. 15 and 25.

[598] Hamburg Administrative Court, judgment of 24 April 2017, p. 32.

[599] Opinion 06/2014 on the concept of legitimate interest of the controller pursuant to Article 7 of Directive 95/46/EC" of 9 April 2014, https://www.bfdi.bund.de/SharedDocs/Publikationen/DokumenteArt29Gruppe_EDSA/Stellungnahmen/WP217_Opinion62014LegitimateInterest.html, [...]

[600] […]

"fact-driven" assessment which Facebook refers to - for which, incidentally, Facebook bears the burden of proof - would be limited solely to the purposes pursued by Facebook if the content of the contract was determined unilaterally. Facebook's statement in this particular case clearly shows this too.

674   There is no evidence to suggest that under the GDPR another, in particular broader interpretation of the justification than under the Directive 46/95/EG is required.[601] The substantive legal situation, which was already fully harmonised with the justifications in Article 7 of Directive 95/46/EC in all Member States, has not changed as a result of the GDPR. Also the Article 29 Data Protection Working Party reaffirmed the previous narrow interpretation of the justification in the context of the "Guidelines on automated decisions in individual cases including profiling for the purposes of Regulation 2016/679" for Article 6 (1) (b) GDPR.[602]

675   This also holds true most particularly when taking the prohibition of making the provision of a service conditional on consent to the processing of personal data into account that is now governed by Article 7 (4) GDPR. Until now, it had to be denied that voluntary consent exists if a dominant company has made the provision of its service dependent on consent to all data processing procedures - as has been the case with Facebook for years[603]. The explicit provision governing the prohibition of making the provision of a service conditional on consent to the processing of personal data set forth in Article 7 (4) 4 GDPR, if there is a clear imbalance between the data subject and the organisation[604], therefore does not expand the legal justifications, the wording of which has remained unchanged, in order to compensate for the limited possibility of obtaining consent.

676   Rather, the unilateral imposition of contractual contents and data processing must also be taken into account within the framework of assessing whether they are necessary and whether a company has a dominant position in the market, as can be clearly seen from the above-mentioned arguments put forward by the Article 29 Data Protection Working Party. It cannot be assumed that all of Facebook's data processing procedures, for which consent upon registration has hitherto been invoked as the primary legal basis, are now necessary owing to the extensive and unlimited definition

---

[601] In its guidelines on consent under the GDPR, the Article 29 Data Protection Working Party refers explicitly to WP 06/2014, see Art. 29 Data Protection Working Party, "Guidelines in relation to consent under Regulation 2016/679, https://iapp.org/media/pdf/resource_center/20180416_Article29WPGuidelinesonConsent_publishpdf.pdf, [...]

[602] Guidelines on automated decisions in individual cases including profiling for the purposes of Regulation 2016/679 of 3 October 2017, most recently revised and adopted on 6 February 2018; https://www.facebook.com/legal/terms?ref=pf , [...]

[603] [...]

[604] cf. Recitals 42 and 43 GDPR

of services in the Terms of Use for the performance of the contract. Facebook continues to invoke the agreement to the Terms of Service which users are still required to give when they sign up with the service that forms the contract between Facebook and users, and which unilaterally make all of Facebook's possible interests part of the contents of the contract with users who must then agree to comprehensive data processing. The former mandatory consent to data processing has simply been replaced by the mandatory agreement to the Terms of Service which freely determine the contractual necessity.

677   When determining the contractual necessity, it is essential that the company's dominant position in the market also be taken into account within the framework of the assessment. For users cannot exert any influence on the contents of the contract that have been unilaterally specified in the Terms of Service, nor can they evade the Terms of Service resulting in such extensive data processing by switching providers, since Facebook is the dominant company in this market. In this respect, the dominant company has a special responsibility when defining the product characteristics in its Terms of Service and its strategic product decisions, which completely contradicts the need for data processing as defined by a performance promise unilaterally given in the Terms of Service. This is why the justification grounds according to Article 6(1b) GDPR cannot be invoked. In any such case, it is instead the voluntary consent pursuant to Article 6(1a) GDPR that provides the relevant and necessary legal basis for data processing.

(b) **No contractual link between all Facebook Products**

678   Even if Article 6(1b) GDPR applied to unilaterally determined contractual contents, the Facebook-owned services offered separately by Facebook.com and Facebook Business Tools cannot be made the subject matter of the contract by making the provision of service conditional on the processing of personal data for Facebook users, for instance by referring in the Terms of Service to a "more personalised and consistent experience in all Facebook Products used".

679   On the contrary, taking into account the assessment of fundamental rights as well as the fact that a market-dominating company is involved means the subject matter of the contract needs to be limited and the necessity of data processing for performance of the contract must be subject to narrow interpretation. In this respect, data processing can, in principle, only be considered necessary for a narrowly-defined main purpose of the contract, beyond which not all data processing that is useful is actually

necessary.[605] This was also clearly expressed by the Article 29 Data Protection Working Party. Accordingly, the fact that some data processing is covered by a contract does not automatically mean that the processing is necessary for the performance of the contract. The Article 29 Data Protection Working Party gives the necessity of providing a delivery address when ordering goods online for the delivery of the goods as an example. Article 7 b) of Directive 95/46/EC does not provide any basis in this case for creating a user profile regarding their product preferences.[606]

680   The use of Facebook.com does not include the use of the other **Facebook-owned services**, for which independent registration processes are required and separate user contracts are concluded. Facebook itself contends that users are not forced to use the company's other services in addition to Facebook.[607] It is not clear either why, however, these products should nonetheless be part of the user experience on Facebook.com as the main purpose of providing the service Facebook.com and why users do not have the possibility of deciding for themselves on the cross-product processing of their data by way of voluntary consent.

681   This applies not only to the services operated by other companies belonging to the Facebook Group, such as *WhatsApp*, *Oculus* and *Masquerade*. Contrary to Facebook's claim[608] it applies equally to the combination of data collected from *Instagram* with Facebook data. Neither the fact that Instagram is operated by the same company belonging to the Group as Facebook.com, nor the identical wording of Terms of Use and data policies are sufficient to substantiate a common contractual purpose.

682   Instagram is also a predominantly mobile service that is still offered separately from Facebook.com, requiring independent registration and login, which also establishes independent contractual relationships. Facebook also highlights the fact that users must conclude two separate contracts in order to use Instagram and Facebook.com. Contrary to Facebook's view, it therefore cannot be assumed that providing a consistent experience of use across both services is the subject matter of the two contracts.[609] Instagram has not been integrated into Facebook.com in the sense that Instagram is a photo service that is part of Facebook.com's offering, which would be

---

[605] […]

[606] Opinion 06/2014 on the concept of legitimate interest of the controller pursuant to Article 7 of Directive 95/46/EC" of                              9                              April                              2014, https://www.bfdi.bund.de/SharedDocs/Publikationen/DokumenteArt29Gruppe_EDSA/Stellungnahmen/WP217 _Opinion62014LegitimateInterest.html, [...]

[607] […]

[608] […]

[609] […]

problematic under antitrust aspects. This also applies to WhatsApp and other Facebook-owned services.

683    The fact that users are informed on Facebook.com, for example, if friends are also active on Instagram and that they can access the Facebook.com service via a link, does not lead to the integration of services that pursue a common contractual purpose under data protection law with all the data processing requirements this entails. Rather, this is primarily a marketing communication for Facebook-owned products aimed at encouraging Facebook users to use a corresponding photo service provided by Facebook.

684    That the Facebook.com Terms of Service stipulate they govern the "use of Facebook and the products, features, apps, services, technologies and software that we offer (the Facebook Products or Products)", "except where we expressly state that separate Terms (and not these) apply" does not create a common contractual purpose, but only identical terms of use with separate contracts being concluded.

685    **Facebook Business Tools** are also integrated and used on a separate contractual basis with the "Facebook partners". Facebook Terms of Service do not refer to the Facebook Business Tools Terms either. The subject matter of the contract for use of a social network by consumers cannot, regardless of this, extend to Facebook Products offered to third parties.

686    This also applies to *social plugins* such as the "Like" button or the "Share" button as well as to the *Facebook Login*. These are directly related to the features of a social network, as they allow Facebook users to communicate directly with their network on Facebook.com from third-party websites or apps, and to log into third-party websites or apps using Facebook registration data. However, the provision of these functionalities depends on whether the third-parties enter into a contract with Facebook as Facebook partners meaning they cannot be a mandatory part of the social network functionalities.

687    The *measurement and analytics services implemented via the Facebook pixel and SDK* are also available to third parties. Facebook summarises a number of different services that fulfil different functions under the term "measurement and analytics services" (see above para. 66ff). Essentially, a distinction can be made between the measurement and analysis of the success of ads placed on Facebook and the measurement and analysis of user behaviour on websites or apps, regardless of whether they are currently Facebook advertisers. Both variants are offered on the basis of contracts with third parties. Users can only see a correlation with the functionalities of a social network indirectly, if at all, with regard to ads on Facebook. The "pure" measurement and

analytics services have no visible correlation for users. In this respect, Facebook is obviously relying on Article 6(1f) GDPR in the legal bases it invokes.

(c) **Data processing is not necessary for contractual purposes**

688 Finally, data processing cannot be deemed necessary for the purposes indicated.

689 The subject matter of the contract with the provision of a "personalised experience" and of "consistent and seamless experiences across the Facebook Company Products" or combating "harmful conduct" and protection and support community, research ways to make services better, etc. are phrased so vaguely that it is virtually impossible to assess whether or not they are necessary. It is not clear either which data is specifically necessary for which subject matter of the contract. Facebook has not submitted any detailed explanation. The above-mentioned required narrow interpretation of Article 6(1b) GDPR does not permit the assertion of such vaguely phrased contractual purposes.

i.   **Personalised user experience**

690 The fact that data processing from other Facebook-owned services and from Facebook Business Tools might be useful or efficient for personalising the service cannot be justified as being necessary for contract purposes either.

691 In the present proceedings, Facebook claims primarily that the data provides the basis for a personalised Facebook user experience, consisting of the fact that users can find the individuals, groups and content that interest them personally. It is only data which users share about themselves and the information which Facebook collects about individual user behaviour that enable Facebook to offer users this personalised user experience in the first place.[610] According to Facebook, the very essence of the Facebook service is therefore that it is tailored to the individual user.[611] Data processing was therefore a key element of the service and not merely a side effect. The offer of targeted advertising was also part of this personalised user experience. Since advertising is necessary to finance the provision of the network free of charge, Facebook claims it is an added value for users, instead of seeing 'random' advertising, to see personalised advertising that interests them more. It says the comprehensive collection of personal data is necessary to provide the product. Facebook says the broader the database, the more effective a service it can provide.[612] It claims that

---

[610] […]

[611] […]

[612] […]

limiting data processing is always unreasonable because it interferes with Facebook's product design.

692     This view means the company would be entitled to unlimited data processing solely on the grounds of its business model and product properties as well as the company's idea of product quality. Any kind of data processing would then have to be deemed "necessary for contractual performance" as all data would in some way lead to knowledge being obtained about the individual user, users' personal profiles being specified and, by means of technical algorithms, the social user experience on Facebook being improved and users being shown targeted ads. This means everything that is technically possible within the framework of progressive digital technology could be deemed necessary for performance of the contract.[613]

693     The possibility of comprehensive data processing from all sources as the only effective performance of a contract would not represent a "balancing" of the interests concerned, which Facebook also considers to be necessary within the framework of Article 6(1b) GDPR[614], but would merely serve Facebook's own commercial interests. For the mere usefulness for the business model with personalised services and personalised advertising means the justification according to Article 6(1 b) GDPR and thus ultimately the data protection lawfulness would be completely open to interpretation by the company. The company would not need to assert any overriding interest in data processing with regard to the business purpose pursued vis-à-vis the fundamental rights of the data subjects pursuant to Article 6(1f) GDPR or even to obtain their consent. This is tantamount to relinquishing the fundamental right to data protection or to informational self-determination.

694     The limited possibilities users currently have of influencing the level of personalisation of the service cannot, contrary to Facebook's view, be used as "protective measures" to ensure data processing is balanced and proportionate. Facebook points out in this regard that users can influence the product properties via the ad settings, by giving feedback on their content and by using the News Feed settings.[615] However, these setting options have no impact whatsoever on the data processing terms at issue here and certainly do not lead to a relevant limitation of data processing. In some cases, the above-mentioned options actually generate additional interest-based user data. The very fact that users can choose not to be shown personalised ads based on partner

---

[613] Weichert, Datenschutzverstoß als Geschäftsmodell – der Fall Facebook (available in German only), DuD 2012, p. 716 (719) with reference to Lawrence Lessig, "Code is law – On liberty in Cyberspace", http://harvardmagazine.com/2000/01/code-is- law-html (last accessed on 10 January 2019), […]

[614] […]

[615] […]

data instead shows that data processing for the personalisation of ads is not necessary for performance of the contract.

695   Furthermore, the Bundeskartellamt considers it to be incorrect that Facebook would be unable to provide a personalised service with Facebook.com and the personalisation based on it unless it processed data collected from Facebook-owned services and Facebook Business Tools.[616] It is true that the service and the ads shown might be less accurate and effective by Facebook's own standards if data was not processed from other Facebook-owned services and from Facebook Business Tools.[617] However, contrary to Facebook's view, it does not mean Facebook would be unable to provide the service outlined in the user contract if it refrained from using these sources.[618] Given the amount of data associated with Facebook user accounts that Facebook already processes when the social network is used, it is not clear what significant value the data from these sources have that can justify a personalised use of the social network in the first place.

696   These proceedings specifically do not involve the data processing procedures that occur when the social network is used under the Facebook user account. It remains to be seen how the conflict between efficient "big data" business models and users' right to informational self-determination can be resolved in this respect. It is however also extremely doubtful in the Bundeskartellamt's opinion whether data processing on the basis of Article 6(1b) GDPR which is practically unlimited can be justified by claiming it is necessary for performance of the contract using Terms of Service that are imposed unilaterally. Here, however, in individual cases Facebook could possibly be considered to have an overriding interest pursuant to Article 6(1f) GDPR in processing data generated by the users themselves through active use or generated automatically in the social network regarding the potential efficiencies of data processing for the service and its users as well as independent use of social media by users. Here, users have considerable possibilities of controlling the data generated about them in terms of extent and nature of their activities on Facebook.

697   Facebook's Data Policy says that all content, communications, and other information users provide when using Facebook.com is collected and used. This includes information users provide when they sign up for an account, content and messages written to and exchanged with others, the metadata of content such as location or what users see when they look through the Facebook camera. Facebook records all

---

[616] […]

[617] […]

[618] […]

networks and connections on the social network, the address book data uploaded, the contacts, people, Pages, accounts, hashtags and groups that users are connected to. Facebook collects information about how users use the social network, such as the types of content they view or engage with, how long they spend looking at a video or advertisement, the frequency and duration of their activities as well as financial transactions carried out via Facebook.com.

698   Regardless of whether this amount of user and device-related data that is processed when using the social network Facebook.com is actually necessary for contractual performance, it is utterly incomprehensible why sufficient personalisation of the use of Facebook.com can only be safeguarded if data collected from other Facebook-owned services and Facebook Business Tools are processed. It is not clear from the Terms of Service or the policies, the Data Policy in particular, or indeed from the arguments put forward by Facebook, what information and data collected from the individual Facebook-owned services and Facebook Business Tools is necessary for performance of the contract, and why it is even necessary in the first place.

699   This initially applies to the **Facebook-owned services** *Oculus* and *Masquerade* that are offered separately, that have a comparatively low penetration rate and whose contribution to personalisation for all Facebook users is thought to be relatively small. The *WhatsApp* user information that is not currently used to "improve the product experience" or to "display more interesting advertising" on Facebook according to the WhatsApp FAQs[619] is not necessary for the purposes claimed either. However, this also applies to *Instagram* data, large volumes of which are collected. Given that Facebook.com has a much larger user base and higher usage intensity, it is not clear what Instagram's contribution to Facebook.com is. The example given by Facebook that information indicating users are following an event on Instagram is also used to personalise the News Feed on Facebook.com, meaning it is essential for contractual performance[620], is not convincing either. The mere usefulness of information about user behaviour obtained from other services is precisely not sufficient to justify that this information is necessary to provide Facebook.com.[621]

700   The same applies to **Facebook Business Tools.** In these proceedings, Facebook argues that data collected from these sources are necessary for personalising the service as a whole.[622] In addition, Facebook refers to other legal bases for data

---

[619] Cf. https://faq.whatsapp.com/general/26000112/?eea=1 (available in German only, last accessed on 10 January 2019).

[620] […]

[621] […]

[622] […]

processing via Facebook Business Tools, in particular involving consent to the processing of data for personalised advertising, processing of data on behalf of the data controller and the legitimate interests in providing measurements, analytics and other corporate services when Facebook is the data controller processing data.[623]

701　However, the processing of data collected from Facebook Business Tools imposed is not necessary to create a "personalised user experience" or for the associated range of functionalities, insofar as they are connected with use of the social network.

702　This applies first and foremost to the *social plugins*, which enable Facebook users to communicate directly with their network on Facebook from third-party websites or apps. The social plugins make it possible to track user activities on the website and the URL of the previously visited website. When the website or app is accessed, the Facebook server automatically receives at least the IP address, the browser type, the URL of the website and the time at which the website was visited, as well as the user ID or ad ID via a previously set cookie that transmits the user ID or ad ID without the button having to be pressed by the user.

703　Providing a "Like" or "Share" button or another social plugin for Facebook users and third parties does not require any flow of data to Facebook about the use of the website if the user does not interact with the button.[624] Only when the user clicks on the button does a certain data record become necessary, which enables data to be assigned to the Facebook user account under which it is to be distributed on Facebook.com. The correct display of the website taking the browser configuration into account, for which some standard data are useful, does not require a direct data flow to Facebook either, but to the website operator. It is obvious that it is not necessary for the functionality to be assigned to and combined with the data already stored on Facebook under the Facebook user account.

704　Data processing via the *Facebook Login and Account Kit* when accessing the website or app without the user pressing the button is not necessary to offer the functionality in connection with use of the social network is not necessary for social plugins for the same reasons. Similar to social plugins, by integrating the Facebook login, Facebook receives information from third-party websites and apps about the websites/apps Facebook users have signed up with and how they use the respective website/app. As such, it is just as unnecessary for the user to activate the Facebook Login to initiate a

---

[623] […]

[624] Cf. also the Court of First Instance Belgium, judgment handed down on 16 February 2018, p. 65 of the English translation, […]: *"The court concurs with the point of view of the Privacy Commission, that the systematic collection of the personal data of users and non-users via social plugins on the websites of third parties is not essential (let alone „strictly essential" in the sense of Art. 129 ECA), or at least not proportional to the achievement of the safeguarding objectives (…)"*

data flow as it is for the social plugins. For a start, the volume of data that Facebook currently receives is the same as for social plugins. The company also receives the login information the user enters directly and manually - without having to use the Facebook Login - with the provider who has embedded the Facebook Login.[625]

705   There is no need for data to flow to Facebook about the use of the website or even the user's login data without the user interacting with the button in order to provide a convenient log-in option for Facebook users or the use of social plugins. Only when users click the button does a limited data record have to be sent to Facebook for the login data to be transferred to the website.

706   The comprehensive data processing which combines data *from the measurement and analytics services implemented via the Facebook pixel and SDKs* which is carried out via comprehensive web tracking across millions of websites and apps is not necessary for performance of the contract either. What these services have in common is that in technical terms the Facebook pixel, SDKs or another interface need to be embedded in a third-party website or app. These facilitate a massive amount of data processing for a wide variety of data, which are then assigned to Facebook user accounts - also by means of active fingerprinting (see in detail above para. 139ff.) Any such massive web tracking, which affects users' internet usage, cannot, in view of the need for narrow interpretation of the concept of necessity, be justified pursuant to Article 6 1 b) GDPR.

707   Furthermore, as regards measuring the success of advertising, the argument that the data processing imposed is necessary in order to be able to display personalised advertisements effectively […][626], cannot be used to explain why data processing is necessary for the financing of Facebook advertising either. The fact that Facebook makes use of data collected from Facebook partners for personalised advertising conditional on users' consent mitigates against this.

ii.   **Other contractual purposes**

708   It cannot be deemed necessary for contractual performance for other purposes designated as the subject matter of the contract either.

709   The processing of data collected from Facebook-owned services and Facebook Business Tools imposed, as set forth in the Data Policy, is not necessary to provide "*consistent and seamless experiences across all Facebook Company Products*" or for any other purposes that are the subject matter of the contract as part of contractual performance.

---

[625] […]

[626] […]

710   For a start, the reservations expressed about the poorly specified terms indicate that this purpose of the contract should not be considered. For instance, it does not say specifically what *"consistent and seamless experiences across all Facebook Company Products"* actually means or what data is necessary to provide this experience. Integration with Facebook.com in the sense that Instagram or WhatsApp and other products are perceived as part of Facebook.com's offering would also be questionable under antitrust law as it makes the provision of the service conditional on the processing of users' personal data of those other services. In addition to de facto integration, there is a risk that market power could be transferred to Instagram and other services by combining data into a de facto uniform user account with associated and shared user data and by transferring friends and subscriber lists to Instagram. This would further secure Facebook's existing market power despite competition from Snapchat or other messenger services on the market's periphery. Within the framework of the concept of "necessity" and the consideration that needs to be given in this context, Facebook's dominant position in the market must therefore also be taken into account.

711   It is not clear what importance Facebook Business Tools have for this contractual purpose. As far as the functionalities of the social plugins and the Facebook Login are concerned, it cannot be assumed that a data flow is necessary for this purpose if and when the functionalities are not used.

712   Nor is it clear with regard to the alleged *user and network security*, including the security aspects presented by Facebook such as the prevention of child abuse or terrorist activities, why, irrespective of any concrete suspicion, a partially unlimited collection and use of data from other Facebook-owned services and from Facebook Business Tools should be necessary.[627] Facebook did not indicate what data and data processing procedures are necessary to mitigate the general dangers associated with using the Internet, both for services and for users, and which are used solely for this purpose. Preventative defence purposes such as the prevention of fraud and attacks on computer and communication systems, as presented by Facebook, for instance in relation to the prevention of automated software programmes (so-called "bots")[628], are at best recognised as legitimate interests in Recitals 47, 49 of the GDPR (see below (5).

---

[627] cf. also with regard to the comparison between WhatsApp and Facebook data Hamburg Administrative Court, judgment handed down on 24 April 2017, p. 32.

[628] […]

713   The same applies ultimately to the *research purposes* mentioned in the Terms of Service. It is not clear here either that data collected from other Facebook services or Facebook Business Tools are essential for research purposes.

### (4) No justification for special purposes pursuant to Article 6 (1 c)-e) GDPR

714   The possibility of collecting personal data of users of the social network from Facebook-owned services and Facebook Business Tools pursuant to the Data Policy, including the combination of data with Facebook user accounts as well as use of any such data, is not justified under Article 6(1 c)-e) GDPR either.

715   This applies if only because data processing may not take place in advance in the event that any of the situations or tasks governed by Article 6(1 c)-e) GDPR may occur or be transferred. Rather the respective special purpose must apply when the respective data processing is carried out. This is clearly not the case.

### (a) No legal justification pursuant to Article 6 (1 c) GDPR

716   There is no legal obligation pursuant to Article 6(1 c) GDPR, for which the processing of data collected from Facebook-owned services or Facebook Business Tools is necessary pursuant to the Data Policy.

717   It appears that Facebook's published legal bases and Data Policy require it to respond to legal requests from regulators, law enforcement authorities, and other executing authorities. Facebook then accesses and stores user data and shares them with the above-mentioned authorities in response to legal requests if Facebook believes in good faith that it has a legal obligation to do so. Facebook says it may also respond to legal requests if it believes in good faith that the response is mandatory under the law of the jurisdiction concerned, affects users in that jurisdiction and corresponds to internationally accepted standards.

718   However, any required response to legal requests and an obligation to respond to these requests may not justify data being collected from Facebook-owned services or Facebook Business Tools or data being combined with Facebook user accounts. This data processing is not even covered by Facebook's own wording in the Terms of Service, which deals with data access, storage and transfer to the authorities, but not with the collection and combination of data.

719   Article 6(1 c) GDPR also calls for a clear, precise and predictable legal basis for data processing, which must be in the public interest. No such legal basis is apparent here.

Data processing would have to be carried out only to the extent required by the legal obligation,[629] meaning that even "good faith" in a legal obligation is not sufficient.

(b) **No vital interests, Article 6 (1 d) GDPR**

720   It is not clear either that the collection and processing of personal data from Facebook-owned services and Facebook Business Tools on the basis of Article 6 (1d) GDPR could be justified in order to protect vital interests of the person concerned or another natural person.

721   Facebook claims in the published legal basis that the "*vital interests*" it relies on for this processing include "*protection of your life or physical integrity or that of others*".

722   This legal basis calls for a situation posing a concrete risk for life and limb in which the data subject is unable to give consent for physical or legal reasons.[630] Here, too, data processing cannot take place in advance in order to cover the abstract eventuality of any such situation occurring.

(c) **No public interest, Article 6 (1 e) GDPR**

723   The same applies to invoking public interests pursuant to Article 6 (1e) GDPR, of which there is no evidence here either.

724   Facebook refers in the published legal bases to tasks carried out in the public interest including "*research for the benefit of society and to promote protection, integrity and security*" where this is necessary in the public interest as laid down by Union law or Member State law to which it is subject.[631] In its Data Policy, Facebook says that it uses the information it has to verify accounts and activity, combat harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of its products, and promote safety and security on and off Facebook Products. For instance, Facebook uses data to investigate suspicious activity or breaches of its Terms or Policies, or to detect when someone needs help.

725   Furthermore, Facebook indicates in its Data Policy that it uses the information that it has (including from research partners it collaborates with) to conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health and well-being. For example, Facebook says it analyses the information it has about migration patterns during crises to aid relief

---

[629] Ehmann/Selmayr, GDPR, Article 6, para. 16;

[630] Auernhammer, GDPR, Art. 6 recital 22; Ehmann/Selmayr, GDPR, Art. 6, recital 17.

[631] […]

efforts. A hyperlink takes users to an English-language page on Facebook's research programmes.

726   This does not justify the processing of data imposed that is collected from Facebook-owned services and Facebook Business Tools pursuant to Article 6(1e) GDPR. The justification presupposes that the processing is necessary for a *public task* which is in the public interest. The data controller must be assigned a task by law the performance of which is in the public interest.[632] This is not apparent in any of the above-mentioned "public interests". Neither can it be assumed that the data processing imposed is necessary in the public interest.

### (5) No justification because of overriding interests pursuant to Article 6 (1 f) GDPR

727   Contrary to Facebook's view, the processing of data collected from Facebook-owned services and via Facebook Business Tools imposed in Facebook's Terms of Services[633] is not justified for the balancing of interests pursuant to Article 6 (1 f) GDPR.

728   Data processing is permissible pursuant to Article 6 (1 f) GDPR for the purposes of the legitimate interests pursued by the controller or by a third party, taking the data processing principles governed by Article 5 GDPR into account, except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data.

729   The wording of the standard has not changed since Article 7(f) of Directive 46/95/EC. The entry into force of Article 6(1f) GDPR does not bring about any substantive change in the facts at hand. The guidelines issued by the Article 29 Data Protection Working Party on the concept of the legitimate interest of the controller pursuant to Article 7 of Directive 95/47/EC[634] may therefore also be used as a basis for the examination of Article 6(1f) GDPR. These guidelines are also referred to in the guidelines issued by the Article 29 of the Data Protection Working Party on automated decisions in individual cases, including profiling for the purposes of Regulation 2016/679, drawn up for the GDPR.[635]

730   According to the guidelines issued by the Article 29 Data Protection Working Party, the justification calls for comprehensive examination of the balance between the legitimate

---

[632] Auernhammer-Kramer, GDPR, Article 6, para. 14

[633] […]

[634] Opinion 06/2014 on the concept of legitimate interest of the controller pursuant to Article 7 of Directive 95/46/EC" of 9 April 2014, https://www.bfdi.bund.de/SharedDocs/Publikationen/DokumenteArt29Gruppe_EDSA/Stellungnahmen/WP217_Opinion62014LegitimateInterest.html, [...]

[635] http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=612053, S. 15 f., […]

interests of the controller or of a third party and the interests or fundamental rights of the data subject. In addition to determining the respective interests and rights concerned and their justification, the guidelines for further consideration also require key factors to be taken into account which are described in the evaluation of the balancing of the legitimate interests of the controller or third parties and the necessity of data processing for the representation of those interests

- the evaluation of the balancing of the legitimate interests of the controller or third parties and the necessity of data processing for the representation of those interests,[636]

- the consequences for data subjects, taking into account the nature of the data to be processed, the legitimate expectations of the data subjects, the position of the controller and of the data subject, including any dominant position,[637]

- any additional measures which, if interests and rights are not clearly balanced, are capable of striking a balance, including user-friendly appeals, additional transparency, data minimisation and data protection-friendly alternatives.[638]

731   On this basis, a justification of the data processing imposed based on the factors to be included in the consideration is neither apparent for the data from Facebook-owned services (see (a), nor for the data from Facebook Business Tools (see (b).

### (a) Facebook-owned services

732   The data processing for the recording of user data from the Facebook-owned companies WhatsApp, Oculus and Masquerade, that is possible according to Facebook's Terms of Service, and the combination of data generated when using Facebook.com with data generated using Facebook user accounts and the use of any such data is not justified by overriding legitimate interests of Facebook or third parties vis-à-vis the interests and rights of the user. This also applies to the combination data obtained through the use of the Instagram service offered by Facebook Ireland Ltd. with the data generated through the use of Facebook.com under Facebook user accounts, as well as their combined use.

---

[636] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 43 ff., […]

[637] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 47ff., 51.; […]

[638] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 52 ff., […]

733   The processing of data collected from Facebook-owned services imposed is for the most part not covered by legitimate interests as they have been neither clearly articulated nor are they necessary (see i.). In weighing up the consequences for the users concerned, the key factors that need to be considered are the interest and right of users to the protection of their privacy and autonomy (see ii.). There are no protective measures apparent that strike a fair balance of interests (see iii.).

### i.   Legitimate interests

734   Both Facebook and third parties can, in principle, assert legitimate interests in relation to data processing within the Facebook Group. However, to a large extent, Facebook has neither sufficiently explained nor otherwise made clear why internal data processing within the group is necessary for the representation of these interests.

### ● Facebook's interests

735   The goals Facebook has mentioned in these proceedings, namely Facebook.com's personalisation, including targeted advertising, measurement and analytics purposes, user and network security as well as the research purposes and responses to legal requests referred to in the legal bases published, can in principle represent legitimate interests pursuant to Article 6(f) GDPR. According to the guidelines issued by the Article 29 Data Protection Working Party, the term covers a broad spectrum of legitimate interests, ranging from interests that are null and void right up to very compelling interests, uncomplicated or contentious interests.[639] However, the key issue is whether the legitimate interest has been sufficiently clearly articulated to weigh up the balance of interests and whether legitimate interests apply in the present situation.

### ○ Legitimate interests have not been articulated clearly enough

736   The legitimate interests have not been articulated clearly enough on this basis. In the present proceedings, Facebook presents legitimate interests only in general terms and merely repeats the information about legitimate interests in the legal bases referred to in its Data Policy.[640]

737   Accordingly, Facebook (also) refers to its legitimate interests with respect to Facebook-owned services for persons under the age of majority and persons who have a limited ability to enter into an enforceable contract, since the justifications of necessity for contractual performance and consent cannot be invoked in relation to them. In the case of minors, Facebook claims that personalisation and targeted advertising, as well as protection, integrity and security, and the provision of non-marketing communications

---

[639] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 31; […]

[640] […]

are indeed legitimate interests. In addition, Facebook claims marketing interests for the promotion of Facebook-owned products and direct advertising as well as research interests necessitate the processing of data collected from Facebook-owned services. It says the processing of data collected from Facebook Business Tools is necessary for the interests in providing measurements, analytics and other company services when Facebook is the data controller.[641]

738  This statement does not represent a sufficiently clear articulation of the legitimate interests that could be used to balance the interests and rights of the data subject. For it does not substantiate in detail Facebook's own interests, such as security interests or provide a differentiated explanation as to why data needs to be collected and recorded specifically from Facebook-owned services or why this data needs to be assigned to Facebook user accounts. Facebook does not explain what type of data processing is involved either, in particular the profiling used to personalise the service and for advertising purposes or what contribution the data collected from Facebook-owned services make. In this respect, Facebook merely claims in this particular case that the Decision Division refers to data processing as "profiling".[642] However, according to the guidelines issued by the Article 29 Data Protection Working Party, legitimate interests can only be asserted for certain data and certain types of data processing. Facebook declares in this respect that all data processing serves its overriding legitimate interests. Accordingly, Facebook's data processing terms also reserve the right to process any data, including data processing within the Group.

739  Facebook carries the burden of proof in relation to the prerequisites of justification pursuant to Article 6 (1 f) GDPR. The Bundeskartellamt does not need to determine ex officio the interests possibly pursued by the company within its sphere or the individual data processing procedures ascribed to them or even their significance for the company in order to prove that no justification exists. This ensues both from the legal prohibition subject to permission under data protection law which all processing of personal data is subject to, and from the principle of the accountability enshrined in Article 5 (2) GDPR, which makes the controller responsible for compliance with the regulations governing lawful data processing. Article 24 (1) GDPR explicitly emphasises that the controller is obliged to demonstrate that processing is performed pursuant to the GDPR. Art. 30 GDPR says that the controller must maintain a record of processing activities under its responsibility in order to prove compliance with the provisions set forth in the GDPR. The controller himself must therefore not only ensure

---

[641] […]

[642] […]

that the processing complies with the GDPR, he must also be in a position to prove that he has undertaken everything necessary to achieve the objective and has taken suitable measures accordingly.[643] But also the antitrust provisions set forth in Section 19 GWB do not oblige the antitrust authority to prove the justifications for anti-competitive behaviour within the framework of the principle of ex-officio investigation. Here, too, the norm addressee is responsible for explaining the circumstances within the company's sphere. To this end, the Bundeskartellamt has expressly requested Facebook to explain the circumstances on several occasions, in particular with the preliminary assessment notice sent to Facebook in December 2017, with previously submitted documents and in discussions.

740   Facebook wrongly believes in this regard that the Decision Division assumes "abuse due to lack of justification" and that it did not investigate the conduct.[644] In particular, Facebook fails to recognise that the conduct in this case is the actual, comprehensive data processing that has been imposed and carried out pursuant to the Terms of Service and the Data Policy and that it is this very conduct that requires objective justification.

   o **The data processing imposed is not necessary**

741   It cannot be assumed following the investigations carried out by the Bundeskartellamt, regardless of Facebook's explanations, that the extent of data processing possible under the Terms of Service and the data processing actually implemented are necessary for the above-mentioned purposes.

742   The guidelines issued by the Article 29 Data Protection Working Party say in relation to legitimate interests that data processing must be *necessary* for the intended purposes.[645] The term also needs to be narrowly interpreted within the framework of legitimate interests and does not apply just because it is useful or expedient. Rather, data processing must be essential for achieving the purposes, and the purposes must not be achievable by any other means. According to the guidelines issued by the Article 29 Data Protection Working Party, it needs to be considered whether there are any other data protection-friendly alternatives available – such as voluntary user options. In this respect, the definition of necessity does not need to be more broadly construed than in the previous justifications pursuant to Article 6 (1 b)-e) GDPR. On the contrary, the Article 29 Data Protection Working Party points out that the need for "necessity" is particularly relevant for Article 6 (1f) GDPR in order to ensure that the processing of

---

[643] Plath, GDPR/Federal Data Protection Act, 3rd edition 2018, Article 24, para. 19

[644] […]

[645] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 37; […]

data based on legitimate interests does not lead to an inappropriately broad interpretation of the necessity of data processing in the first place.[646]

743   On this basis, the processing of data collected from Facebook-owned services is not necessary for the *personalisation or individualisation of Facebook.com.* It is true that the interest in high-quality personalisation and individualisation of the service provided by social networks is, in principle, important and that the quality and efficiency argument should be taken into consideration from the antitrust perspective. It is also acknowledged that each individual data is also beneficial (see above para. 702). However, data processing is not necessary for usefulness and efficiency.

744   With regard to the special meaning of necessity, in the context of the legitimate interest pursuant to Article 6 (1f) GDPR just as with Article 6 (1b) GDPR, the interests in the chosen business model of a personalised service financed with targeted advertising cannot lead to all data processing procedures that provide additional information about the individual user being necessary (see above para.692). It also needs to be pointed out in this context that Facebook can achieve a high degree of personalisation and individualisation with the data generated from Facebook.com itself. It has not been argued nor is it apparent what crucial contribution user data collected from other Facebook-owned services make towards accomplishing this goal that rules out a less intrusive measure - such as a user option.

745   In the case of the Oculus and Masquerade services, the fact that they currently have a comparatively low level of penetration indicates that the processing of data is not necessary for personalisation purposes. However, the additional device-related data associated with these services, which can provide information about user behaviour on the devices with regard to online websites and apps, including those of competitors, is of great value even for a relatively small user base, since successful applications can be identified by competitors at an early stage. Irrespective of whether this circumstance is covered by the purpose of personalisation and individualisation, it is doubtful whether this can be regarded as a legitimate interest under antitrust law. In any case, however, it must be taken into account in the balancing of interests that competitive user data are also collected.

746   The WhatsApp user information that is not currently used to "improve the product experience" or to "display more interesting advertising" on Facebook according to the WhatsApp FAQs,[647] is not necessary for the purposes claimed either. Even though the

---

[646] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 37; […]

[647] Cf.  https://www.facebook.com/business/learn/how-business-manager-works/guide , [...]

scope and purpose of the data transfer and the use of this data are ultimately unclear, also with regard to a potential integration of the services, for a start the current actual data processing shows there is no reason to assume that the data used for personalisation and individualisation purposes is absolutely necessary. This also applies to Instagram data which, after the service was transferred to Facebook Ireland Ltd., is not subject to any restrictions on combination or combined use of data under the identical Facebook and Instagram policies particularly for profiling. As indicated above, the existing connections between Instagram and Facebook.com do not mean it is necessary to process Instagram user and device-related data for the personalisation of the service and advertising on Facebook.com unless users have control (para.699).

747   Insofar as in the present case the vaguely defined interest in the "*consistency of the user experience*" and in further integrating both services is to be claimed[648], the "justification" of this interest must be called into question under antitrust law. For integrating services - also de facto by integrating functionalities and shared user accounts including shared user data assigned to Facebook user accounts - is problematic under antitrust law. Integration can transfer and safeguard market power, can exclude other market players and create barriers to market entry for competitors such as Snapchat.

748   For example, enabling users to communicate directly between the Facebook.com, WhatsApp, and Instagram services would create economies of scale by harnessing the direct network effects of each service. The creation of compatibility and an "end-to-end connection" neutralises the effect of direct network effects limited to the compatible networks. Switching to services is facilitated or becomes unnecessary, which greatly enhances the lock-in effect for all services and is a major barrier to switching from compatible services to alternative incompatible services. This results in the transfer of market power between the compatible services and to securing Facebook's market position.

749   The combination of all user data associated with this would therefore constitute a significant competitive risk by creating further barriers to market entry and major obstacles for switching providers. Any such risk must in any case be taken into account in the balancing of interests vis-à-vis the interests and rights of users. From this point of view, the interests of *marketing, the promotion of Facebook Products and direct advertising* mentioned in Facebook's legal bases must also be deemed at the very least

---

[648] Cf. insofar the plans which have become known on the further integration of Facebook, WhatsApp and Instagram (source available in German only)https://www.welt.de/wirtschaft/webwelt/article187738456/Zuckerberg-plant-Verknuepfung-von-WhatsApp-Instagram-und-Facebook.html

sensitive under antitrust law. The extent of potential data processing, in particular with regard to Instagram and WhatsApp, but also with regard to the Group's other services, therefore cannot be deemed necessary for this purpose.

750   Furthermore, it is not clear with regard to the alleged *user and network security* including the security aspects presented by Facebook such as the prevention of child abuse or terrorist activities why, irrespective of any concrete suspicion, a partially unlimited collection and use of data from other Facebook-owned services is necessary.[649] Preventative defence purposes, such as the fight against fraud and the prevention of attacks on computer and communication systems, are recognised as legitimate interests in the Recitals of the GDPR. However, it can be clearly inferred from the Recitals to the GDPR that data processing which pursues preventative defence purposes is only permissible if it is limited to compellingly necessary measures and does not reach an intensity that is disproportionate to the purposes pursued.[650] Facebook did not indicate, as outlined above, which data and data processing procedures are necessary for the individual general dangers it mentions in relation to use of the Internet, both for services and for users, and which are only used for this purpose. As such, it is extremely doubtful that the unlimited combination of Instagram data and data generated with Oculus and Masquerade is necessary for security purposes.

751   The Bundeskartellamt does not see either why the data WhatsApp currently transfers to Facebook is necessary for the alleged security purposes. It remains unclear what contribution the phone number provided to WhatsApp upon registration and the device-related information, the "last seen" information and the login data and features used to identify security threats or "malicious users"[651] make. It is not clear either why an event-driven combination is not sufficient for identification purposes. In a notice issued by Hamburg's Data Protection Commissioner on 23 September 2016 - confirmed by Hamburg Administrative Court and Hamburg Higher Regional Court[652] in summary proceedings - Facebook Ireland Ltd. is prohibited the aforementioned data collection and storage on the basis of the previously applicable Federal Data Protection Act for lack of overriding interest, unless consent is given.[653] The additional processing of data

---

[649] cf. also with regard to the comparison between WhatsApp and Facebook data Hamburg Administrative Court, judgment handed down on 24 April 2017, p. 32.

[650] cf. Recital 47 sentence. 6 GDPR on fraud prevention: "strictly necessary", Recital 49 on data and information security "strictly necessary and proportionate";cf. also Härting, General Data Protection Regulation para. 439

[651] Facebook's submission in the proceedings before Hamburg Administrative Court, see judgment handed down on 24 April 2017, ref. 13 E 5912/16, p. 14, […]

[652] Hamburg Administrative Court, judgment of 24 April 2017, ref. 13 E 5912/16, […], Hamburg Higher Regional Court, judgment of 26 February 2018, ref. 5 Bs 93/17

[653] Statement of the Hamburg Commissioner for Data Protection and Freedom of Information of 23 September 2016, […]

generated from WhatsApp reserved in Facebook's Terms of Service for security purposes is even less necessary.

752   The largely unrestricted data processing from corporate services is not necessary for internal *Group measurement and analytics* purposes either. In particular, Facebook cannot invoke the privilege of intra-group data exchanges for this purpose (see above, para. 608ff.). It is true that the GDPR recognises a limited "group privilege" in Recital 48 in the context of the legitimate interests of Article 6(1f) GDPR. It says controllers that are part of a group of undertakings or institutions affiliated to a central body may have a legitimate interest in transmitting personal data within the group of undertakings for internal administrative purposes, including the processing of clients' or employees' personal data. The European Data Protection Legislation therefore for the first time expressly recognises the necessity of internal data transfers within groups of companies and expressly emphasises the interest data controllers have in such transfers. However, it is still necessary to carry out a case-by-case examination and to balance the legitimate interests of the company in the intra-group transfer of data vis-à-vis the interests of data subjects in ensuring that their data are not transferred within groups of companies.[654]

753   The data exchange possible under the Terms of Service is not limited to internal administrative purposes according to Facebook's own statement but serves mainly other interests. It is not clear why data processing of this magnitude is needed for internal analytics purposes. This also applies to the data that Facebook collects from WhatsApp and which, according to Facebook[655], is only used for internal analytics purposes, for instance, to determine the number of users. Apart from the fact that this statement is not reflected in the Terms of Service, it is not clear either why data need to be collected and assigned to Facebook user account at Facebook Ireland Ltd in order to determine the number of users. Hamburg's Data Protection Commissioner prohibited Facebook Ireland Ltd. from collecting and storing WhatsApp data on the basis of the previous Federal Data Protection Act (BDSG) with judicial confirmation and made this subject to the requirement of consent.[656]

754   The asserted *research interests* are only mentioned in general terms in the legal bases. It is not clear why, in addition to the Facebook data, the data of other Facebook-owned services are absolutely necessary for this purpose. The same applies to the *legal*

---

[654] Voigt, Konzerninterner Datentransfer – Praxisanleitung zur Schaffung eines Konzernprivilegs (available in German only), CR 2017, 428 (429).

[655] […]

[656] Statement of the Hamburg Commissioner for Data Protection and Freedom of Information of 23 September 2016, […]

*requests* mentioned in the legal bases. In this respect, too, it is not apparent why data need to be collected from Facebook-owned services - which are collected for no particular event.

- **Legitimate interests of third parties**

755   Pursuant to Article 6(1f) GDPR, not only the legitimate interests of Facebook, but also the legitimate interests of third parties need to be considered when balancing interests. In this respect, Facebook points out that not only the legitimate interests of the commercial partners, but also those of the broader community of Facebook users need to be taken into account. This would lend more weight to Facebook's legitimate interests. The wider community of Facebook users, for instance, has a strong interest in the security and protection of the Facebook network and in ensuring that other users do not abuse the network.[657]

756   From the Bundeskartellamt's perspective, in particular advertisers who want to buy targeted advertising from Facebook, as well as other partners who are active on the other market sides of the personalised service Facebook.com, may have legitimate interests as third parties. The same applies to a possible interest of the general public according to the guidelines issued by the Article 29 Data Protection Working Party.[658] However, Facebook users, who Facebook refers to in this context as the "wider community", are hardly to be regarded as third parties, since the entire broad community is affected by data processing. They can therefore only be taken into account when assessing the interests and rights of the data subjects. However, it is extremely doubtful that the users have to subordinate themselves to the community interest defined by Facebook with regard to the protection of their privacy and their right to self-determination.

757   All in all, the interests of third parties claimed here are identical to those claimed by Facebook itself. Therefore the same applies to the question whether the third parties have the same legitimate interests as Facebook. In particular, data processing must also be necessary for the interests of third parties. This is not the case in view of the congruence of interests for data processing from the Group's own services with regard to the interests of third parties in personalised advertising. Reference is made to the information above.

758   Finally, this also applies to a public interest in the prevention of illegal or punishable acts, such as child abuse, frequently mentioned by Facebook. In its guidelines on

---

[657] […]

[658] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 36; […]

legitimate interests, the Article 29 Working Party draws attention to situations in which a controller goes beyond his specific legal obligations under laws and regulations in order to contribute to law enforcement or support private actors in their efforts to combat illegal activities, such as money laundering, grooming of children for sexual purposes or illegal online file sharing. In such cases, however, in the view of the Article 29 Data Protection Working Party, it is particularly important to ensure that the boundaries of Article 6(1f) GDPR are fully respected. It is not evident why intra-group data processing is necessary to safeguard this interest.

- **Interests and rights of users**

759   Finally, the interests and rights of the data subjects, in this case Facebook users, must be taken into account and balanced.

760   This includes in particular users' interest and right to maintaining their informational self-determination and their privacy. In its opinion on legitimate interests, the Article 29 Data Protection Working Party also emphasises this in particular, since in times of increasing distortions in the field of "information sovereignty", in which governments and business institutions amass unprecedented amounts of data on individuals and are increasingly able to create detailed profiles predicting their behaviour (thereby exacerbating information imbalances and undermining personal autonomy) it is all the more important to ensure that the interests of individuals in the protection of their privacy and autonomy are safeguarded.[659]

761   In addition, all other relevant user interests that are affected by data processing must be taken into account.[660] In this respect, Facebook points out that users' interest in being offered the most effective and high-quality service possible that is free of charge because it is financed by advertising, must be taken into account first and foremost.[661] The Bundeskartellamt also regards this as a legitimate interest and takes this into account when balancing interests. However, Facebook's statement does not indicate that users must be denied the right to influence representation of their own interests in order to be able to use the effective and high-quality service offered in their own interest with regard to the data processing procedures from Facebook-owned services affected here. In this case too, data protection-friendly alternatives that include, for instance, corresponding voluntary options for users, are not deemed necessary.

---

[659] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 38; […]

[660] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 38; […]

[661] […]

762   And if the user community is to be regarded as an interest group which has an interest in user and network security that needs to be taken into account, it has neither been claimed nor is it apparent that data processing is necessary for this interest for the assessment under Article 6(1f) GDPR - as outlined above.

763   In all other respects, the interests of the data subject do not need to be "legitimate", contrary to the interests pursued by the controller or by a third party, as highlighted by the wording of Article 6(1f) GDPR. This means, for instance, that even persons acting unlawfully or "maliciously" cannot be subject to disproportionate interference with their rights.[662]

   ii.   **Balancing of interests with regard to the consequences for the affected users**

764   The legitimate interests claimed by Facebook in the processing of data from Facebook-owned services cannot outweigh the legitimate interests and rights of Facebook users.

765   Although Facebook's commercial interests are relevant to fundamental rights in the context of entrepreneurial freedom, this only applies if it can be assumed data processing is necessary for interests allegedly pursued.[663] However, even if it could be assumed that data processing was necessary, the data processing in the Group is not sufficiently balanced pursuant to Article 6 (1 f) GDPR, considering how it affects the interests and fundamental rights of data subjects.

766   Contrary to Facebook's view, "actual" negative effects are not the only decisive factor here. In this respect, it cannot be argued that the only negative effect for users is the fact that advertisements are shown and that this, which can at best be described as a nuisance, does not cause any harm.[664] On the contrary, Facebook demonstrates the gross imbalance that exists between the nature and extent of data processing carried out without users' consent and the purpose pursued by this, above all, which is to display granular personalised advertisements on a service that is also personalised.

767   According to the guidelines issued by the Article 29 Data Protection Working Party, specifically foreseeable adverse results are significant as the term "consequences" used by the Working Party is much broader than "harm" or "disadvantage" for one or more specifically several data subjects. Rather, this refers to all possible (potential or

---

[662] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 38 [...]

[663] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 44 [...]

[664] [...]

actual) consequences of data processing.[665] The Article 29 Data Protection Working Party has therefore developed further key factors for the impact assessment in order to identify and assess the impact on the interests and rights of data subjects and thus the seriousness of the invasion of privacy and self-determination. They include in particular

- o   the type of data

- o   how the data is processed,

- o   data subjects' justified expectations and

- o   the position of the controller and the data subjects.[666]

768   In its Recitals, the GDPR also emphasised in particular the "reasonable expectation of the data subjects" based on the "relevant and appropriate relationship with the controller".

769   When these key factors are considered as a whole, the disadvantageous consequences for users' privacy and self-determination outweigh the largely unjustified and therefore less important interests of Facebook.

- • **Type of data**

770   This initially applies to the data affected by intra-group data processing, which are to be classified as sensitive data. This includes sensitive data because the data processing imposed also involves special categories of data, communication data and location data.[667] Users are also tracked across services and devices as data from all corporate services are used, which includes the particularly popular services WhatsApp and Instagram, i.e. the Facebook services involve a large amount of sensitive data. The protection of privacy and autonomy takes on a high priority in view of the special sensitivity of this data.

771   Sensitive data are also affected in relation to the individual services examined. All of the above data categories are initially affected when data is collected from the Facebook-owned Oculus and Masquerade services. In particular, these services collect and store a wide range of device-related information, including location data. This can also easily affect special categories of data generated from websites visited, apps used and locations. As outlined above (584ff.) it is therefore sufficient that this

---

[665] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 47 […]

[666] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 43ff. […]

[667] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 49.

feature results indirectly from the data. In balancing interests, it must, however, also be taken into account that the data is combined with the user data which Facebook.com already has, thus providing a full profile including special data categories.

772     WhatsApp data are also closely associated with the communication behaviour of users which means these data too are potentially sensitive. This holds true despite the unclear information provided by WhatsApp on the extent to which WhatsApp messages are shared and used and therefore completely vague wording of Facebook's Terms of Service. Data are also collected by Facebook Ireland Ltd. on the type and frequency of WhatsApp features used. This includes the communication contents of the "Status" function in which users can post news about their current activity, location etc. including photos for all their contacts. This cannot be deemed "published" and therefore less sensitive since the recipients consistently comprise a limited group of persons. Features also include the telephone number and a large number of other device-identifying data that ensure users can be traced on the Internet and that the data can be assigned to their Facebook user account.

773     Last but not least, the processing of personal data generated from Instagram involves sensitive data for the most part. This applies to all communication data and contents of users, contacts, device-related information, location information, signal information, to name but a few. The large volume of browser- and device-related data makes it possible to identify users and ensures they can be tracked on the Internet even though the relevant users have no control mechanisms.

774     With Instagram, users' consent to the processing of special data categories is incidentally only obtained for data they actively enter themselves. However, data on users' online behaviour are collected via cookies and device-related data, indicating that this also involves special data categories. Instagram's Data Policy which is identical to Facebook's Data Policy does not contain any limitations whatsoever regarding the use of data for purposes pursued by Facebook.com but describes the services as a shared offering.

- **Type of data processing**

775     This type of data processing represents a serious invasion of the data subject's privacy. This is because data processing already reaches a very high level in terms of type and quantity with the user- and device-related data that Facebook-owned services account for.

776     Another particularly problematic aspect is that the vast majority of the data is collected, combined and used for detailed profiling aimed at personalising and individualising the Facebook.com service and the ads displayed. Although the provision of a personalised

social network may usefully involve profiling, the processing of data from Facebook-owned services leads to a massive additional invasion of privacy, given that profiling is supplemented by tracking the users concerned across a vast number of websites, locations, devices and services.[668] To this end, the data collected are also used for the purpose of browser and device fingerprinting.

777    The investigations carried out by the Bundeskartellamt show that the combination of data from Facebook-owned services is of major significance because […] people use Facebook.com and Instagram as well as Facebook.com and WhatsApp in parallel. In the first quarter of 2018, more than […] % of the monthly and daily active Facebook users were also using WhatsApp and more than […] % of the daily Facebook users were also using Instagram. In addition, there are less widespread services, each of which is also used in parallel to Facebook.com, and there is a high probability that Masquerade, for example, is being used in parallel with Instagram. This makes it clear that users are tracked en masse across all websites, devices and services used, particularly for marketing and advertising purposes. In any such case, the Article 29 Data Protection Working Party also thinks that this can only be justified under data protection law by means of voluntary consent.[669]

- **Users' reasonable expectations**

778    The processing of data collected from Facebook-owned services imposed does not correspond to the reasonable expectations of data subjects based on their relationship with the controller either, which are particularly emphasised in Recital 47 of the GDPR. The "reasonable" expectations users have regarding stricter confidentiality, already regarded as a key factor by the Article 29 Data Protection Working Party, must be assessed in particular on the basis of the nature of the relationship and on the service provided. Contrary to the view held by Facebook[670], it cannot be assumed with regard to the Facebook Business Tools either that Facebook.com users are aware that a large amount of data from their entire Internet usage behaviour is assigned to their Facebook user accounts and are used for personalisation and other purposes.

779    For a start, the relationship between users and the various Facebook services is determined in particular by the log-in to the service-related account. At the time the

---

[668] See also Article 29 Data Protection Working Party, Guidelines on Automated individual decision-making and Profiling for the purposes of Regulation 2016/679, p. 16; Article 29 Data Protection Working Party, Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC, p. 75-77, […]

[669] See also Article 29 Data Protection Working Party, Guidelines on Automated individual decision-making and Profiling for the purposes of Regulation 2016/679, p. 16; Article 29 Data Protection Working Party, Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC, p. 75-77, […]

[670] […]

data is collected from the social network by another Facebook-owned service, such as WhatsApp or Instagram, for which users log in with a separate account, users need not reasonably expect the data to also be combined with the Facebook user account and to be used for all purposes pursued by the social network.

780   No such expectation can be derived solely from the fact that the services are part of the same group of undertakings. Not all users know precisely what services belong to Facebook. This applies in particular to lesser-known services such as Oculus and Masquerade. Facebook does mention these services in its Data Policy. However, users regularly only take fleeting notice of them - as is to be assumed with general terms and conditions. In this particular case, users must also press a hyperlink in the Data Policy which takes them to another page listing the companies belonging to the group. These include in particular the services WhatsApp and Instagram and a large number of other companies.[671] If users click on any of these services, they are taken to the terms of use of these services.[672] However, in order to understand which of their data is being processed, users must read the terms of use of each individual service in order to assess what data are collected under that service and are combined with their Facebook usage data. The Article 29 Data Protection Working Party therefore rightly points out that instead of relying on the "small print", the factual context must be taken into account.[673]

781   The specific WhatsApp and Instagram services, by their very nature and presentation, also create an expectation of greater confidentiality. This is because Instagram and WhatsApp are communication services that regularly send content and messages to a narrower audience defined by the user. WhatsApp also sends messages in encrypted form, conveying the impression of a high level of confidentiality for all other data. As a communication service, Instagram also creates expectations as to how any such data and contacts are handled. There is a high level of publicity on Instagram, but this is not consistent, as here too users can limit the circle of recipients.

782   All things considered, the extent of possible data processing from all services of the Facebook Group does not correspond to users' reasonable expectations. This is especially true in view of the fact that users are unable to assess what data are processed on Facebook in which combination with what meaning or what the

---

[671] List of the "Facebook companies" available under https://de-de.facebook.com/help/111814505650678 (last accessed on 27 July 2018), […]

[672] https://de-de.facebook.com/about/privacy, […], under "*What kind of information do we collect?*": *We receive information about you from companies owned or operated by Facebook pursuant to their terms and policies. Learn more about these companies and their Data Policies.*"

[673] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 51; […]

assessment options are. Even if it can be assumed that the average Internet user can reasonably expect some form of tracking to take place with other services for most online services, they need not expect the level of intensity, which is possible according to the Terms of Service, nor need they expect their data to be continuously combined with Facebook user accounts.[674]

- **Position of the controller and users**

783   After all, Facebook's position vis-à-vis users means that the need for protection against the massive invasion of privacy associated with internal data processing within the Group is particularly high and must take precedence over Facebook's interests. As a multinational company with a dominant position in the market, Facebook has the negotiating power to impose extensive data processing unilaterally on users.

784   According to the opinion of the Article 29 Data Protection Working Party, the dominant position must definitely be taken into account in respect of the balancing of interests. It is important to consider whether the controller is an individual, a smaller organisation, a large multinational or a public body. Depending on the particular circumstances involved, its position may be more or less dominant in relation to the data subject. A large multinational may, for instance, have more resources and bargaining power than the individual data subject; it may therefore be in a better position to impose on the data subject what, in its view, is in his or her "legitimate interests". This may be all the more true if the company holds a dominant position in the market. Just as consumer protection and competition law help to ensure that this power is not abused, data protection law can also play an important role in ensuring that the rights and interests under data protection law are linked to the assessment of abuse under antitrust law.[675]

785   On this basis, it is obvious that Facebook has a monopoly-like position on the market for social networks in this particular case (see para. 374ff.) and that the scope it has for data processing gives it special bargaining power, meaning it can assert its interests unilaterally. Facebook's statement also shows that the company imposes unilaterally on users what it considers to be in their "legitimate interest". Facebook, for example, repeatedly emphasises in its submission that the personalisation and individualisation of the service and advertising are in the users' interest and that users benefit from them.[676] It is also evident from shifting the legal basis from the provision of the service subject to consent to the alleged necessity for the extensive contractual objects unilaterally imposed by Facebook in the Terms of Service that the company is making

---

[674] cf. Härting, General Data Protection Regulation, para. 437

[675] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 51; […]

[676] […]

extensive use of the existing scope for negotiation and data processing in order to pursue its own interests. Facebook does not accord users the right of self-determination over their own interests regarding processing within the Group. It must also be taken into consideration, as outlined above, that intra-group data processing from other services involves the risk of further strengthening Facebook's market power vis-à-vis users by transferring this market power to other services - Instagram in particular - by spying out user behaviour in the case of competitive offers in order to ward off aggressive competition. This would strengthen the bargaining power and the possibility of imposing data processing terms unilaterally.

786   It must also be taken into consideration in relation to Facebook's dominant position in the market that the majority of persons using Facebook.com, Instagram and WhatsApp but also Masquerade are adolescents or young, inexperienced people who frequently have no reservations about and have full faith in online services and are unable to assert their interests vis-à-vis a multinational undertaking that has a dominant position in the market. An online study conducted by the broadcasting corporations ARD/ZDF in 2017 showed that 14 to 19-year-olds (90 percent of all respondents) make up the largest group of WhatsApp users followed by 14 to 29-year-olds (87 percent of all respondents). In the group of 30 to 49-year-olds, only 72 percent of the respondents are still using the service; 41 percent of 50 to 69-year-olds and 13 percent of the over 70s said they were using WhatsApp.[677] The number of under-19-year-olds using Instagram is also rising sharply. Around 37 percent of Instagram users are aged between 14 and 29. Instagram is showing a strong growth trend. Whereas Instagram had around 9 million users in Germany in 2016, the number of users had risen to 15 million by 2017. According to public statistics, the strongest growth trend is among the group of 14-19-year-olds at 16 percent.[678]

iii.   **Lack of protective measures**

787   And last but not least, Facebook has neither claimed nor is there any evidence to suggest that additional protective measures have been taken in relation to the processing of data collected from Facebook-owned services in a bid to create a fair balance of interests.

788   As such, it is initially about observing the so-called horizontal provisions set forth in the GDPR consisting in general data protection obligations, inter alia, regarding

---

[677] http://www.ard-zdf-onlinestudie.de/files/2017/Artikel/917_Koch_Frees.pdf (last accessed on 10 January 2019), p.444.

[678] https://www.crowdmedia.de/social-media/instagram-nutzerzahlen-in-deutschland-2018/ (in German, last accessed on 10 January 2019).

transparency and proportionality.[679] However, this does not mean that in itself it is always sufficient to observe these horizontal requirements in order to ensure processing is necessary for the purposes of legitimate interests pursuant to Article 6 (1 f) GDPR. Rather, in cases in which it is not clear which legitimate interests are overriding, *additional* measures that extend beyond observance of the horizontal requirements may need to be taken in order to balance interests. According to the guidelines issued by the Article 29 Data Protection Working Party, one of these additional measures could, for instance, be providing a user-friendly, accessible mechanism that would enable the data subjects to object unreservedly to the processing of their data.[680]

789   The Article 29 Data Protection Working Party also points out technical and organisational measures for ensuring that the data cannot be used for measures associated with individuals ("functional separation"), increased use of anonymisation systems, aggregation of data, technologies for strengthening privacy, privacy by design, assessing the consequences for privacy and data protection, increased transparency, a general, unconditional right to refuse data processing, data portability and similar measures.

790   On this basis, the Bundeskartellamt sees in this case no relevant data processing in which the balance of interests is unclear. On the contrary, on the basis of the key factors outlined above, there is a gross imbalance between the extent of data processing and the largely non-legitimate interests of Facebook. Another aspect worth noting in this case is that there is no evidence that protective measures have been taken in connection with the processing of data collected from Facebook-owned services. From the Decision Division's perspective, this shows that the horizontal requirements are not being met either.

791   This applies in particular to the transparency obligation regulated in Article 5 (1 a) GDPR with regard to the processing of data collected from Facebook Business Tools, which also applies to the extent to which personal data are processed and will continue to be processed in the future. The principle of transparency also presupposes that all information and messages on the processing of these personal data are given in transparent, intelligible and easily accessible form, using clear and plain language.[681]

---

[679] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 52; […]

[680] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 53; […]

[681] cf. Recital 37 GDPR.

792   The Data Policy governing Facebook-owned services provides some information about the collection and processing of data for the purposes of Facebook.com. However, it takes several clicks to access this information and it is not provided in Facebook's Data Policy itself. Users need to switch back and forth between the Data Policies in order to receive information about all of the data Facebook combines with Facebook-owned services. It is not clear from WhatsApp's Data Policy either to what extent WhatsApp messages are used to enhance the product experience on Facebook.com. Instagram does not provide any information about the extent to which data are used for Facebook.com. In this respect, mutual reference is made to the same general formula which says that data are processed across the Facebook Companies.

793   There are no user-friendly options available enabling users to object to the processing of data from Facebook-owned services. It is even hard for users to exercise their right to object to the processing of their data based on Article 6 (1e) and 1f) GDPR pursuant to Article 21 GDPR in this case since it is unclear in the legal bases published by Facebook what data processing procedures are based on what legal basis. All objections – with the exception of minors - can be refuted according to Facebook's Terms of Service by claiming data processing is necessary for performance of the contract.

794   There do not seem to be any provisions governing retention periods or any other data minimisation measures. Unlike Facebook partners, users do not even have the option of disabling targeted advertising regarding data collected from Facebook-owned services. There are therefore no mechanisms available whatsoever that give users effective control over the cross-service combination of their data.[682] In this respect, Facebook merely points out that users are not compelled to use the services of Facebook Companies. In addition, Facebook even states in the present proceedings that refraining from using Facebook is the only reasonable response for users who do not wish to avail themselves of a personalised service. Facebook therefore explicitly rejects the possibility of self-determination and control on the part of users.

795   Facebook's legal bases only refer to protective measures for minors, which, however, only relate to one aspect of the consideration and ultimately cannot be used as justification for data processing from other services that are not absolutely necessary for the purpose indicated.

---

[682] cf. in this context also example 26 provided by the Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC , p. 86 […]

(b) **Facebook Business Tools**

796 On the basis of the principles outlined above, the collection and combination of personal data from third-party websites and apps that use Facebook Business Tools offered by Facebook, is not justified pursuant to Article 6 (1 f) GDPR.

797 The data processing imposed by third-parties via Facebook Business Tools is for the most part not covered by legitimate interests since it has neither been clearly articulated nor it is necessary (see i.). In weighing up the consequences for the users concerned, the key factors that need to be considered are the interest and right of users to the protection of their privacy and autonomy (see ii.). No protective measures have been implemented so far that strike a fair balance of interests (see iii.).

    i.   **Legitimate interests**

798 Facebook has for the most part failed to clearly articulate legitimate interests that might be considered necessary for data processing via Facebook Business Tools to the extent possible according to the Terms of Service.

    ●  **Facebook's interests**

799 The personalisation goals pursued by Facebook.com and invoked in the present case in relation to the processing of data collected from Facebook Business Tools, including targeted advertising, measurement and analytics purposes, user and network security, as well as the provision of "accurate and reliable reporting to our advertisers, developers and other partners, to ensure accurate pricing and statistics on performance and to demonstrate the value that our partners realise using Facebook Company Products",[683] may, in principle, represent legitimate interests under Article 6(1f) GDPR. However, as outlined above, the key issue is whether the legitimate interest has been sufficiently clearly articulated to weigh up the balance of interests and whether legitimate interests apply in the present situation. Facebook has not clearly articulated its interests although it is required to do so nor is it assumed in relation to the individual Facebook Business Tools that data processing is necessary in the first place.

    o   **Legitimate interests have not been articulated clearly enough**

800 In the present proceedings, Facebook merely states, as explained above, that the data processing carried out by Facebook, including the processing of data collected from Facebook Business Tools, was not only necessary for the performance of the contract, but was also justified by Facebook's overriding interests. Facebook says it had a legitimate interest in processing data also from third-party sources for the purpose of

---

[683] Facebook legal bases, https://www.facebook.com/about/privacy/legal_bases, [...]

personalising its service and for advertising and analytics purposes in order to safeguard financing of the service. Furthermore, it says the collection and processing of data from third-party sources was indeed justified by legitimate interests in so far as they serve to promote network and user security. Facebook claims data processing for security purposes was essential in order to guarantee general operability.

801   The processing of data collected from Facebook Business Tools is justified in the legal bases published, as outlined above (para. 631), in addition to the necessity for the performance of the contract and consent to the use for personalised advertising, with the provision of measurement and analytics services as a legitimate interest, but only to the extent to which Facebook is the data controller. The Facebook Business Tools Terms provide, as outlined above (para. 136), that Facebook processes data on behalf of the controller although this has not been effectively agreed upon, in order to measure the effectiveness of advertisements and Facebook Analytics through the use of the Facebook pixel, SDKs or other interfaces. This assigns sole data responsibility to the third-party providers for the purposes of providing campaign reports and analyses and providing insight into customers and their use of apps, websites, products and services.

802   Facebook also invokes a legitimate interest in "providing accurate and reliable reporting to our advertisers, developers and other partners, to ensure accurate pricing and statistics on performance and to demonstrate the value that our partners realise using Facebook Company Products" in its legal bases for the processing of data collected from the same tools and regarding "other business services". The Facebook Business Tools Terms indicate in Paragraph 5 iii-v that Facebook uses the data collected via the Facebook Business Tools consistently for personalisation purposes, security aspects, and research and development purposes and to improve Facebook products.[684] Under the Facebook Platform Policy, which Facebook also refers to, Facebook is given the option of analysing the third-party website and app specifically indicating "We can analyze your app, website, content, and data for any purpose, including commercial" when using social plugins, for example.[685]

803   Even this statement by Facebook does not represent a sufficiently clear articulation of the legitimate interests that could be used to balance the interests and rights of data subjects. For Facebook does not specifically substantiate its own interests – such as the content or relevance of "pricing" or "performance statistics" for any of the above-

---

[684] https://www.facebook.com/legal/technology_terms, [...]

[685] see Paragraph 7.1 to 3 of Facebook Platform Policy, https://developers.facebook.com/policy/: *"Things you should know: 7.1: We can analyze your app, website, content, and data for any purpose, including commercial", 7.2: We can monitor or collect data related to your use of SDKs; 7.3: We will use information we receive from you or in connection with your Platform integration pursuant to our Data Policy. (…).",* [...]

mentioned services nor does it provide a differentiated explanation as to why data needs to be collected from the various Facebook Business Tools or why the data needs to be assigned to Facebook user accounts for these purposes. Facebook does not explain the type of data processing involved either, in particular the profiling used to personalise the service and for advertising purposes or indeed what contribution the data collected from Facebook Business Tools makes.

804   Rather, Facebook declares once again for all Facebook Business Tools, both in its statements in the present proceedings and in its various related policies, that all data processing is possible and necessary for a variety of generally defined legitimate interests.

> o   **The data processing imposed is not necessary**

805   It cannot be assumed in relation to Facebook Business Tools based on the investigations carried out by the Bundeskartellamt that the extent of data processing possible under the Terms of Service and the data processing actually implemented are necessary for the above-mentioned purposes.

806   As outlined above (para. 139ff.) the integration of Facebook Business Tools gives Facebook direct access to comprehensive data about users and their usage behaviour from the respective providers who use Facebook services. A "Like" button, the "Share" or the "Facebook Login" button shows users that Facebook Business Tools have been embedded. However, the interface does not necessarily have to be visible to users, as is usually the case, for example, when the Facebook pixel is embedded on the website in the measurement and analytics tools.

807   In the opinion of the Bundeskartellamt, no data flow is necessary at all or to the extent imposed and practiced when users access the website or app without being able to exercise any control. This data does not need to be assigned to the respective Facebook user account or used for the interests and purposes asserted by Facebook.

*Social plugins*

808   This applies first and foremost to the social plugins, which enable Facebook users to communicate directly with their network on Facebook from third-party websites or apps. On the opposite (market) side, Facebook gives the operators of websites or apps the opportunity to increase their own reach through advertising by using plugins which promote the website on Facebook.com. What is more, third companies can use the Facebook analytics product "Sharing Insight" to obtain information about the websites' performance on Facebook.com when users click the "Like" of "Share" button. They make it possible to track user activities on the website and the URL of the previously visited website.

809    The provision of a "Like" or "Share" button or any other social plugin for Facebook users and third party companies does not (see above 703), require any data flow to Facebook about the use of the website unless the user interacts with the button. Only when the user clicks on the button does a certain data record become necessary, which enables data to be assigned to the Facebook user account under which it is to be distributed on Facebook.com. Only then are the measurement and analytics purposes of the social plugins affected. The analytics product "Sharing Insights", which is crucial in this respect, requires the user to interact with the plugin in order to trigger measurable communication on Facebook.com. The fact that a social plugin has been embedded does not imply the simultaneous use of measurement and analytics products within Facebook Analytics or the use of advertisements on Facebook. There is hence no reason to assume it is necessary for the functionalities of social plugins.

810    Facebook cannot justify direct access to data on third-party websites and apps, in addition to the above-mentioned interests and purposes, with the fact that it can keep the plugin technically up-to-date without any need for the third-party websites or apps to do anything. It is not clear to what extent a large amount of data assigned to the Facebook user account about user behaviour on a third-party website needs to flow each time a user accesses the website. The same applies to the direct data flow to Facebook without a detour via the embedded website or app. Facebook cannot claim that this prevents third-party websites and apps from receiving the personal data Facebook obtains through the data-combining process.[686] No protective function is discernible in view of the data collected and used by Facebook for its own commercial purposes, which are not necessary for the purposes of the functionality for users or third-party providers.

811    Nor do the other social networking purposes mentioned in the Data Policy and in the various documents referred to for which this data can be used indicate the extent to which additional extensive data collection is necessary for an unlimited number of websites and apps via social plugins and why this cannot already be achieved with the extensive data processing on Facebook.com itself. The same applies to security and research purposes. In this respect, reference is made to the statement on Facebook-owned services (see above para. 750ff.). To claim it is useful for the purposes of the social network - as outlined above – is not sufficient.

*Facebook Login and Account Kit*

812    Data processing via the *Facebook Login and Account Kit* when accessing the website or app without the user having to press the button is not required either for the purposes

---
[686] […]

indicated by Facebook. Essentially the same considerations apply as for the social plugins.

813   This is because the functionality of these interfaces is essentially identical: Third-party websites may offer a "Facebook Login" on their site that enables users to log in to the website using their Facebook registration data or by entering their mobile phone number or e-mail address (so-called "Account Kit").[687] This means that users do not have to register with a new login name and password each time they sign up with a website. Users can also transfer personal data to the app to avoid having to create a new user profile when they sign up with a new website or app.

814   By integrating the Facebook Login, Facebook offers the following advantages to websites or apps: First of all, embedding the Facebook Login makes it easier to attract new users who can register quickly and easily on the respective website/app.[688] One particular advantage for companies is that users log on to Facebook.com using their "real identity" and not under a pseudonym.[689] The Facebook Login also gives the third-party website/app access to additional usage data. This means the website/app has access to the "public profile", the primary e-mail address and the users' list of friends[690] as well as about 30 additional pieces of user information after going through Facebook's internal "review process". Facebook advertises the "Facebook Login" product on the Internet so that the company can collect information about the user that would otherwise „be complex or arduous to collect via your own registration form".[691]

815   Furthermore, the Facebook login can be combined with other functionalities, in particular various other social plugins and the so-called "Graph API" due to the requirement of the Facebook SDK (also for websites in the form of the SDK for JavaScript). The latter allows third-party providers to access Facebook's so-called "social graph". This comprises all the user data stored on the Facebook servers as well

---

[687] […]

[688] https://developers.facebook.com/docs/facebook-login/overview/, […], cf. "Cross-platform login: *Facebook Login is available on the most popular platforms for mobile and desktop apps. Users who create accounts on a platform via Facebook can also quickly and easily log into their app on another platform. Individuals always have the same user ID anywhere, ensuring a seamless, cross-platform app experience. Facebook Login is available for iOS, Android, Web and Windows Phone, for desktop apps and for Smart-TVs, Internet of Things objects and similar devices.*"

[689] https://developers.facebook.com/docs/facebook-login/overview/ , […]

[690] See under https://developers.facebook.com/docs/facebook-login/overview/, […]: "Social *Many highly retentive apps let people connect with their friends in order to enable shared in-app experiences. Facebook Login lets you know which of your app's users are also friends on Facebook so you can build value by connecting people together.*"

[691] See under https://developers.facebook.com/docs/facebook-login/overview/, […]: "*Personalized experiences are more engaging and lead to higher retention. Facebook Login lets you access information which would be complex or arduous to collect via your own registration form., for instance what users have marked with "Like" in relation to birthdays, hometowns, current places of residence or careers. Even just importing someone's profile picture imported from Facebook gives them a stronger sense of connection with your app.*"

as their relationships and interactions. Third-party providers can include data from the social graph in their web service or app, such as "Likes" or ratings. The third party may also write data into the social graph. This occurs in particular when users perform "social actions" with the third-party provider, such as sharing, commenting or - for instance in the case of social games – posting certain actions for Facebook friends.

816   Similar to social plugins, by integrating the Facebook Login, Facebook receives information from third-party websites/apps about the websites/apps Facebook users have registered with and users' interaction with each website/app. It also receives browser and device-related information. As such, it is just as unnecessary for the user to activate the Facebook Login to initiate a data flow as it is for the social plugins. For a start, the volume of data that Facebook currently receives is the same as for social plugins. According to Facebook, the company also receives the login information which users enter directly and manually - without using the Facebook Login - on the website of the provider who has the Facebook Login embedded.[692]

817   The provision of a convenient login functionality for Facebook users, as with the use of social plugins, as shown above, (para. 703) does not require any data flow to Facebook about the use of the website or even the users' registration data unless the user clicks the button. Only when the user clicks the button does a limited data record need to be sent to Facebook for the login data to be transmitted to the website. The integration of a Facebook Login does not imply the use of measurement and analytics products within Facebook Analytics or the use of advertisements on Facebook either. There is hence no reason to assume a data flow not controlled by the user is necessary for the functionalities of the Facebook Login or Account Kit.

818   Also the other social networking purposes mentioned in the Data Policy and the various referenced documents for which this data may be used do not indicate the extent to which additional data collection is required for an unlimited number of websites and apps via the Facebook Login and Account Kit and why this cannot already be achieved by the extensive data processing on Facebook.com itself. The same applies to security and research purposes. In this respect, reference is once again made to the statement on Facebook's own suite of services (see above para. 750ff.).

*Pixel and SDK-based measurement and analytics services*

819   In relation to the measurement and analytics services offered on the basis of the *Facebook pixel and SDKs*, the extensive data processing that takes place involving the

---

[692] […]

assignment of the data collected back to the respective Facebook user account is not necessary either for the pursuit of legitimate interests.

820  For a start, as explained above, the pixel is used to send the data record of the "http header" collected during the integration of each interface to Facebook. When the website is accessed, a standard web protocol is created by default that includes IP addresses, information about the web browser, page location, document, referrer (the web page from which the user has accessed the current website), and the person using the website. Facebook records the "pixel-specific data" via the pixel, including the pixel ID and the Facebook cookie once the pixel-base code is implemented. Facebook also receives "click data" for buttons ("button-click data") by default, namely any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks.[693]

821  In addition, the website operator can configure certain user actions ("Events") regarding the use of the third-party website or app. In this case, Facebook receives additional information about user behaviour on third-party websites and apps.[694] The pre-configured fifteen "Standard Events" include information about a purchase made on the website, a registration, the placing of goods in the shopping cart or a search query made by the user.[695] Depending on the website operator's wishes, further "event types" can be configured in addition to these standard events, for instance information on whether the user has scrolled down to the end of a page or how many articles have been read in a session.[696] As soon as a user takes corresponding action, this is recorded by Facebook and is assigned to the Facebook user account via identifiers. Facebook then provides the website operator with aggregated analyses of its target group.[697]

822  If - as with mobile apps - the analytics functions are implemented via the SDK, similar data is captured by Facebook. This includes the Facebook app ID, the mobile advertising ID and other metadata such as the device-related ID, the SDK version, app information, IP address and other device-related information.[698] By integrating the SDK, certain event types are automatically logged unless the app operator has deactivated this setting. These preset events ("Automatically Logged Events") include "App Install"

---

[693] https://de-de.facebook.com/business/learn/facebook-create-ad-app-install-engagement, […]

[694] […]

[695] https://de-de.facebook.com/business/help/402791146561655?helpref=faq_content; standard events: Add to cart, Add Payment Info, Add To Wishlist, Complete Registration, Contact, Customize Product, Donate, Find Location, Initiate Checkout, Lead, Purchase, Schedule, Search, Start Trial, Submit Application.

[696]  https://developers.facebook.com/docs/facebook-pixel/advanced, […]

[697] See https://de-de.facebook.com/business/help/898185560232180?helpref=faq_content, […]

[698] […]

(data about the first time a user activates an app), "App Launch" (data about the launch of an app) and "In-App-Purchase" (data about the purchase of a product via the app).[699] In addition to these preset events, the app operator can also configure additional app "Event" types, so-called "Explicit Events". Here, users can choose from a wide range of event types: These events can be data about an app being launched, payment data being added, a level being reached (e.g. in an online game), goods being placed in the shopping cart or added to a wish list, a registration or tutorial being completed, a purchase being started or completed, a rating being given, a product being searched for, credits being issued, a success being achieved or a content being displayed.[700] The App Operators can add the above-mentioned Events in order to receive analytics data about user actions within their app or website.

823  This extremely extensive data collection, and in particular the assignment of data to Facebook user accounts, is for the most part not necessary for Facebook's own purposes and interests.

824  In this respect, Facebook has argued in the present proceedings that […].[701] […][702][…].[703] […].[704]

825  The need for narrow interpretation of the term also suggests the data collection and assignment to the respective Facebook user account are not necessary as otherwise the conclusion could be drawn that all data processing from all sources would be necessary for the personalisation of ads. The argument that the data processing imposed is necessary in order to effectively display personalised ads […],[705] cannot be used as a generalisation to explain why data processing is necessary. The fact that Facebook makes use of data collected from Facebook partners for personalised advertising conditional on users' consent mitigates against this. It is not clear why the collection of data and assignment to Facebook user accounts should nevertheless be necessary for the personalisation of ads, even if the respective users do not consent to the use of the data for this purpose. The high reach that Facebook has due to its user base and the analysis possibilities that exist based on the use of the social network alone are a sufficient basis for displaying targeted advertising and measuring the

---

[699]  https://developers.facebook.com/docs/app-events/automatic-event-collection-detail, […]

[700]  https://developers.facebook.com/docs/app-events/best-practices with numerous examples of configurable apps for the e-commerce, retail, travel and gaming industries, […]

[701]  […]

[702]  […]

[703]  […]

[704]  […]

[705]  […]

success of advertising and are in fact seen as one of the main attractions of Facebook's advertising network.[706]

826   Insofar as measurement and analytics services are offered independently of paid advertising, the collection of data on third-party websites and assignment to Facebook user accounts as stipulated in the Terms of Service are not necessary either. In order to provide analytics services, data on user behaviour must of course be collected and evaluated on the websites and apps to be analysed. It is not necessary for the provision of any such service to give access to the entire database on the social network's users with which the data are collected and combined. In fact, personal data are not even needed for the reports and statistics produced and provided by measurement and analytics services. Even the market leader Google Analytics offers website owners the possibility of anonymising the IP addresses of its users. In this case, only an abbreviated version of the user's IP address is transmitted to Google Analytics, which does not enable Google Analytics to identify individual users.[707]

827   Moreover, in the case of measurement and analytics services, the required data largely depend on the individual needs of the users of these services, so that such analytics services are ultimately subject to consent to effective processing on behalf of the controller, in which only the website or app as the data controller can determine in detail the extent, type and intended use of the data by the provider. Here, too, reference is made to Google Analytics, which, following consultation with the data protection authorities, can only offer the service in the form of processing on behalf of the controller and in the context of which anonymisation can be arranged.[708]

828   Processing on behalf of the controller has not been effectively agreed in the case of Facebook. This cannot be replaced by a legitimate interest in the provision of analytics services, which is intended to require virtually unlimited collection and combination of data with other data from all other Facebook-owned services.

829   The other social networking purposes listed in the Data Policy and the various referenced documents for which this data may be used, do not indicate the extent to which additional data processing is necessary for an unlimited number of websites and apps via the Facebook pixel or SDKs and why this cannot be achieved with the extensive data processing on Facebook.com itself. The same applies to security and

---

[706] […]

[707] see https://support.google.com/analytics/answer/2763052?hl=en; […]

[708] https://www.lfd.niedersachsen.de/themen/internet/google_analytics/google-analytics--hinweise-fuer-website-betreiber-in-niedersachsen-98936.html (last accessed on 10 January 2019).

research purposes. In this respect, reference is once again made to the statement on Facebook's own suite of services (see above para. 741ff.).

- **Legitimate interests of third parties**

830 Also to be included in the balancing of interests are the legitimate interests of the advertisers, developers and websites integrating Facebook Business Tools and whose interests Facebook invokes, particularly in the legal bases published. Accordingly, Facebook also bases the provision of measurement, analytics and other corporate services on the *"interest of advertisers, developers and other partners to help them gain insights about their customers and improve their businesses, validate our pricing models and evaluate the effectiveness of their online content and advertising in and outside of Facebook companies' products"*.

831 Hence, as already indicated with regard to Facebook-owned services, the interests of third parties at least partially overlap with those of Facebook, so that the massive extent of data processing possible under the Terms of Service for private users through intensive web tracking via a vast number of websites and apps with comprehensive recording of user behaviour and the assignment to Facebook user accounts cannot be covered by the legitimate interests of third parties either.

832 According to the investigations carried out by the Bundeskartellamt, however, this extent of data processing also runs counter to the interests of third parties in respect of Facebook Business Tools. This is because the tools do not allow them to fully control the extent of data processing and the level of data protection they impose on their own website visitors or app users when they use Facebook Business Tools. At the same time, however, the Terms of Service require the users of Facebook Business Tools to provide the legal basis for the disclosure and use of customer data. When using the pixel or SDKs, the website or app is required to display a stable and sufficiently visible notice providing a minimum amount of information about data processing.[709] However, those using Facebook Business Tools can only determine the extent of data processing to a very limited degree. This applies both to the Facebook data collected via the interfaces and to the assignment of data to Facebook user accounts and the use of any such for Facebook's business purposes.

833 This means the users of social plugins and the Facebook Login cannot prevent data from flowing to Facebook even if visitors to the website do not press the buttons. The only exception is the "Like" button, for which the so-called "two-click solution" was developed by third-party providers, where either just an icon of the button is initially

---

[709] https://www.facebook.com/legal/technology_terms, [...]

displayed and a connection is not established with Facebook until the second click, or a hyperlink takes users to a separate page and only there is the "Like" button integrated. This is far less convenient for visitors and Facebook users. There is no alternative solution available for other social plugins.

834   With regard to the use of the Facebook pixel and SDKs for measurement and analytics purposes, third parties have a particular interest in function designs that are permitted under data protection law and in the option, for example, as part of effective processing on behalf of the controller or at least by concluding individual agreements as joint controllers pursuant to Article 26 para. 1 sentence 2 GDPR, of being able to (co-)determine the extent of data processing themselves.[710]

- **Interests and rights of users**

835   Finally, the interests and rights of users must be taken into account. In this respect, users' interest in and right to the protection of informational self-determination and their privacy are also paramount here. All other relevant legitimate interests of users must also be taken into account. Reference is made to the statement on Facebook-owned services (para. 759ff.) above.

ii.   **Balancing of interests with regard to the consequences for the affected users**

836   Based on the nature of the data and data processing, and Facebook's reasonable expectation and position vis-à-vis users, the interests and rights of users with regard to their privacy and autonomy ultimately also outweigh Facebook's interests in the processing of data collected from Facebook Business Tools that are already less important because they are not necessary. They also outweigh the interests of third parties insofar as they coincide with the interests of Facebook.

- **Type of data**

837   This initially applies to the data affected by the processing of data collected from Facebook Business Tools, which, like data from Facebook-owned services, also include sensitive data.

838   This includes sensitive data because the data processing imposed also involves special categories of data, device-identifying data and location data. The extensive harvest of browser and device-related data makes it possible to identify users, ensuring they can be fully traced on the Internet, while the users concerned have virtually no control mechanisms. By integrating Facebook Business Tools, users are tracked

---

[710] […]

across all services and devices in addition to the Facebook-owned services, so that a significant amount of sensitive data is affected out of all the data collected and assigned via the identifying device-related information.[711]

839   Through the mass integration of Facebook Business Tools and APIs such as social plugins, Facebook Login or the Facebook pixel, Facebook collects and processes special data categories. The flirting app "Tinder", for instance, offers a Facebook login and the homosexual partner exchange "Queer" (www.queer.de) has an integrated "Share" on Facebook button. Even political parties such as CDU, SPD, Linke and AfD and healthcare websites such as www.onmeda.de or www.netdoctor.de have integrated "Share" on Facebook buttons.

840   Furthermore, data processing can include users' purchasing behaviour, transaction data and, ultimately, on their financial resources. This enables Facebook, which has further information about users based on its existing data record, to create detailed profiles even for particularly sensitive user data.

841   The protection of privacy and autonomy takes on a high priority in view of the special sensitivity of this data.

- **Type of data processing**

842   In addition, the type of data processing performed via Facebook Business Tools represents a serious invasion of data subjects' privacy.

843   The intensity of web tracking is completely disproportionate to the legitimate purposes pursued by Facebook because it involves detailed tracking of a significant proportion of users' Internet behaviour.

844   The total number of Facebook Business Tools embedded in Germany runs into the high millions. The Bundeskartellamt questioned Facebook about the integration of individual interfaces into the 100 most visited websites and apps.

845   Facebook provided high integration numbers, pointing out that these may be incorrect due to referrer spoofing. Of the 100 most visited websites in Germany in spring 2018 […] had a "Like" button or a "Share" button, at least on their subpages and in many cases even on their homepage. Over […] of the 100 most visited websites had an integrated Facebook pixel.[712]

---

[711] cf. also the Court of First Instance Brussels, judgment handed down on 16 February 2018, p. 69, English translation, […] (in relation to non-Facebook users): *"Moreover, the extent of the violations in question is massive (…) the number of websites that contain Facebook social plugins amounts to several million, rendering them practically unavoidable. The information in question is frequently of a very sensitive nature, allowing, for example, health-related, religious, sexual and political preferences to be gauged. (…)"*

[712] […]

846   Because it had been pointed out that the information might be incorrect, the Bundeskartellamt checked the respective homepage and some subpages of the most-visited websites for visible "Like", "Share" and "Page" button interfaces. Despite the fact that not all subpages were fully browsed, approximately 75 percent of the pages turned out to have one of the above-mentioned interfaces embedded. Hence, most of the data provided by Facebook is accurate. On this basis, the Bundeskartellamt assumes that, of the 100 most frequently visited websites in Germany, around […] have integrated at least one of the interfaces on their homepage or subpages.

847   Another particularly problematic aspect, as with Facebook-owned services, is that the majority of the data is used for the purposes of personalisation and individualisation of the Facebook.com service and covers the displayed ads, - also by enabling active fingerprinting -and is used for the detailed profiling that takes place in this respect.[713] This leads to a massive additional invasion of privacy, since profiling tracks the affected users via an immense number of websites and apps, and the captured data is combined both with the data from Facebook-owned services and with the Facebook user data.[714]

- **Users' reasonable expectations**

848   The processing of data collected from Facebook Business Tools imposed does not correspond to the reasonable expectations of the data subjects either based on their relationship with the controller, which are particularly emphasised in Recital 47 of the GDPR. Contrary to the view held by Facebook[715], it cannot be assumed with regard to the Facebook Business Tools that Facebook.com users are aware that a large amount of data from their entire Internet usage behaviour is being assigned to their Facebook user account and used for other purposes.

849   For users need not reasonably expect that when visiting websites or installing and opening an app with Facebook Business Tools embedded, Facebook will gain direct access to a large amount of user and device-related data flowing to Facebook that is assigned to their Facebook user account in order to use the data for the social network's own purposes.

---

[713] See also German Data Protection Conference (Datenschutzkonferenz, DSK), Short Paper No. 3 on the processing of personal advertising, current as of 29 June 2017, accessible at https://datenschutz-hamburg.de/pages/kurzpapiere-dsgvo/, p. 2: "More intrusive measures such as profiling rather suggest that the data subject's interest in the exclusion of data processing is overriding".

[714] See also Article 29 Data Protection Working Party, Guidelines on Automated individual decision-making and profiling for the purposes of Regulation 2016/679, p. 16; Article 29 Data Protection Working Party, Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC, pp. 75-77.

[715] […]

850   Users cannot expect the data flow if only because it already occurs the first time they visit the website or open the app, where often users have no way of telling if the website has integrated an interface. Even after that, they can only tell this if they see a button as in the case of social plugins or the Facebook Login. However, the Facebook pixel is usually not visible to users. This also applies if it is made visible as a graph, because the average user will not be able to recognise the meaning of the graph.

851   The specific design of the social plugins and the Facebook Login, which significantly influences the relationship with users and visitors, also creates the expectation that no direct connection, including any data flow, is established with Facebook unless the button is pressed. Thus, the buttons present a significant risk of being misleading. This applies, in particular, to the Facebook Login, where the registration data manually entered by users is recorded even when they do no press the button. Hence, this can already be regarded as data processing undertaken in bad faith.[716]

852   Furthermore, when the Login button is pressed, users must above all expect data to flow from Facebook to the website or app that they are about to log into using their Facebook data. Only after the button has been pressed can a data flow from the website or app to Facebook also be expected for the transfer of login data, requiring assignment to the Facebook user account. Even if the Facebook Login is linked to other social plugins and the Graph API, users will only expect data to flow to Facebook if the corresponding "social actions" are triggered on the website or in the app.

853   In terms of the integration of the Facebook pixel and SDKs, when visiting a third-party website or app, users need not reasonably expect their usage behaviour to be tracked online and assigned to their Facebook account to this extent for all of the social networking purposes pursued by Facebook involving comprehensive data collection. Nor can this be assumed to be part of the relationship between Facebook and its users given that the social network is financed by advertising. The Bundeskartellamt is also of the opinion that users must generally expect their interactions with advertising on Facebook to be tracked and used for advertising products when using an advertising-funded service. However, this does not automatically refer to behaviour off Facebook.com or to actions that are not carried out at the time the advertising displayed. Nor does the expectation include the data being assigned to Facebook user accounts for all social networking purposes.

854   Insofar as the Facebook pixel and SDKs are used without reference to an advertisement for measurement and analytics services, there is no relationship at all

---

[716] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 56; […]

between Facebook.com and users that would justify the expectation of extensive data processing and assignment to Facebook user accounts or indeed any processing of personal data at all.

855   Users should not expect data records obtained via the Facebook pixel to be assigned to Facebook user accounts by transferring a hashed data set - for instance as part of advanced matching. Based on its own description of the Facebook pixel, Facebook uses this option even if no cookie has been set. If no cookies have been set, any such data collection and user tracking takes place contrary to the expectations of Facebook users who have blocked cookies and thus objected to web tracking. The same applies to the comprehensive browser and device-related information that allows users to be tracked and identified without cookies.

856   Even if users have deselected "Ad Tracking" for personalised advertising in the settings of their mobile device, nothing else can apply. In this case, users can assume that the advertising ID for measurement and analytics services aimed at enhancing the efficiency of personalised advertising, will no longer be used. Users cannot reasonably expect Facebook to continue collecting the advertising ID throughout, merely adding the information that users have disabled ad tracking.

857   After all, the millions of times Facebook Business Tools are integrated on German websites also exceeds users' reasonable expectations regarding the amount of web tracking that generally takes place on the Internet. It is reasonable to assume that the average user can expect Internet use to involve a certain amount of web tracking. In the opinion of the Bundeskartellamt, however, it exceeds expectations that a single visit to the social network Facebook.com, setting cookies or collecting the advertising ID and browser and device-related data that takes place in the process will actually result in the user being tracked by Facebook on millions of other third-party websites or apps in Germany alone and the user data on Facebook being combined with an ID used.

- **Facebook's position vis-à-vis users**

858   Finally, Facebook's position vis-à-vis users means that the need for protection against the massive invasion of privacy associated with the processing of data collected from Facebook Business Tools is particularly high and must take precedence over Facebook's interests. As a multinational company with a dominant position in the market, Facebook has the relevant bargaining power to impose extensive data processing unilaterally on users via Facebook Business Tools. The need for protection is also evident, as already mentioned above in relation to Facebook-owned services, in view of Facebook's monopoly-like position and the scope of data processing, which

Facebook also reserves in its Data Policy with regard to the Facebook Business Tools. Reference is made to the information above (para. 785).

859   In addition, Facebook's dominant position in the market means that data processing from a variety of sources cannot be prevented simply by switching social networks. This is because market dominance means that there are not sufficient alternatives available to switch to another provider. Users would therefore have to refrain from using other Facebook-owned services as well as from visiting websites if they did not want to add any additional data to their extensive Facebook database.

860   This applies only to the extent to which users are aware that this level of data processing is implemented via Facebook Business Tools. If users were to try to prevent this, it would mean that Facebook users would practically have to stop using the internet, given the unpredictable millions of times the tools have been integrated into German websites.

### iii.   Lack of protective measures

861   In connection with the processing of data collected from Facebook Business Tools, contrary to Facebook's claim[717], there are currently no protective measures in place to achieve a fair balance of interests. The Bundeskartellamt also points out with regard to Facebook Business Tools that no such case exists which is unclear with regard to the question of balance. On the contrary, on the basis of the key factors outlined above, there is a gross imbalance between the extent of data processing at the expense of users' self-determination and the largely non-legitimate interests of Facebook. The interest third parties have in controlling data processing in relation to visitors to their websites and apps also needs to be taken into account.

862   It is therefore also important to note, with regard to data processing via Facebook Business Tools, that no adequate protective measures are currently in place. To what extent the "clear history functionality" announced […] by Facebook is capable of balancing interests, including the interests of third parties, is very questionable and can remain open here as it has not yet been implemented.

863   From the Bundeskartellamt's point of view, the horizontal provisions are not being complied with either in relation to Facebook Business Tools. This applies first of all to the transparency obligation regulated in Article 5 (1 a) GDPR with regard to the processing of data collected from Facebook Business Tools, which, as described above, also exists with regard to the extent to which personal data are processed and will continue to be processed in the future. Facebook points out in the Data Policy under

---

[717] […]

the heading "Information from partners" that data is processed via Facebook Business Tools and explicitly mentions the "Like" button and Facebook Login. The Cookies Policy also refers to the use of cookies in connection with the Facebook Business Tools, specifically the social plugins. However, this only indirectly indicates that data processing takes place even when these buttons are not pressed (whether or not users have a Facebook account or are logged in).

864   What is problematic in this context is the unclear assignment of data processing to the legal bases invoked. Facebook makes some of the processing of data collected from Facebook Business Tools dependent on consent whereas other elements of data processing are attributed both to Article 6(1b) GDPR and Article 6(1f) GDPR. This also only applies if Facebook perceives itself as the data controller, meaning that it remains unclear to users what rights they have. In particular, there is little point in advising users that they can object to their data being processed if Facebook then argues that data processing is either necessary for contractual performance or that Facebook is not the data controller.

865   Users do not have any other control mechanisms to prevent the collection and combination of data from Facebook Business Tools. In particular, the possibility users have of using the relevant browser settings to prevent Facebook cookies from being set and thus data from being assigned to their Facebook user account cannot be deemed an effective control mechanism. This is already true because cookies are only assigned to websites, but not to mobile apps where the data is assigned via the advertising ID. This type of assignment cannot be effectively prevented as outlined above (para. 656ff.), since the advertising ID is collected anyway and users can be identified even if the advertising ID is reset.

866   Moreover, a browser setting that can only block the Facebook cookies for all possible uses would also eliminate or at least impair users' ability to use the social plugins. As outlined above, Facebook points this out in very general terms in the last sentence of its Cookies Policy: *"Certain parts of the Facebook Products may not work properly if you have disabled browser cookie use"* .Users would deprive themselves of the "Like" and "Share" functions of the interface, which, according to Facebook, does not work unless it can be assigned unequivocally to Facebook user accounts via cookies. From the users' point of view, it is not apparent either that although disabling cookies prevents the assignment to Facebook user accounts via the user ID, it does not prevent the data flow as such, which could also be assigned in other ways - for instance through advanced matching or device fingerprinting.

867   There are currently no privacy settings either - as Facebook itself indicates - that enable users to control the collection of data on third-party websites via Facebook Business Tools or the combination of data with Facebook user accounts.[718] The reference to the possibility users have to opt out of the use of this data for the purposes of personalised advertising[719], is not sufficient here. As explained above, this refers only to the use of data for personalised advertising and is limited to displaying advertising to user. It does not exclude the collection, combining or use of the data.

868   The newly introduced possibility for third-party websites to delay data collection by Facebook until the third-party provider has obtained the users' consent,[720] does not represent a sufficient control mechanism for users. Facebook itself is responsible for the data processing. Users' consent vis-à-vis third-party providers cannot justify data processing by Facebook. Third parties do not have sufficient insight into the data processing procedures that Facebook performs in relation to Facebook Business Tools. Since the data flows directly to the Facebook servers, third-party providers are unable to identify the amount of data collected or how the data is combined and used. There is no point in referring the third-party providers obtaining consent unless effective data processing on behalf of the controller is involved. However, this is not the case here (see above para. 617ff.).

869   There is no evidence that any other measures have been taken such as technical or organisational measures like separating Facebook Analytics from the operation of the social network.

(c) **Outcome of the balancing of interests**

870   In the final analysis, there is a gross imbalance between the interests of Facebook, only some of which are legitimate, and the protection of users' fundamental rights when processing data from Facebook-owned services and Facebook Business Tools, especially when a holistic view is taken. The interests of third parties are not taken into account when data is processed from Facebook Business Tools either. As a result, Article 6(1f) GDPR cannot be invoked as a legal basis for the processing of data collected from Facebook-owned services or Facebook Business Tools.

---

[718] […]

[719] […]

[720] […]

### 4. Infringement as a manifestation of market power

871 These data processing conditions are also abusive within the meaning of Section 19(1) GWB. In the present case, their agreement and practice are the result of Facebook's special market power, which gives rise to the anti-competitive effects (see (a) above). At the same time, it is clear that they are to be regarded as abusive when taking into account all interests and the objective of the Act on Restraints of Competition, which is aimed at promoting free competition. Even if a more far-reaching balancing of interests was required under antitrust law, the conclusion would be the same as an assessment under the relevant provisions of data protection law (see b.).

### a. "Manifestation of market power" and causality

872 According to the review concept of the case law of the Federal Court of Justice on the Supplementary Pensions Agency for Federal and Länder Employees (*VBL*) the prerequisite that the violation of legal adequacy provisions "must take place as a manifestation market power or a great superiority of power" is a *sufficient* condition for linking an objective accusation of abuse under antitrust law to the violation of antitrust law norms; it can be inferred from the wording "in particular" in the relevant Federal Court of Justice rulings that the Federal Court of Justice has deliberately refrained from making the "manifestation" clause a *necessary* prerequisite for any allegation of abuse under antitrust law.[721] If the prerequisite is met, it provides sufficient evidence to make the infringement of non-antitrust regulations simultaneously subject to antitrust law by the required reference to market power. At the same time, however, this feature does not constitute a more far-reaching requirement than the wording of Section 19(1) GWB which refers to the "abuse" of a dominant market position.

873 Contrary to Facebook's argument, the required link with market power is therefore not to be construed within the meaning of a strict causality of market power, requiring proof that data processing conditions could be formulated in such a way precisely and solely because of market power.[722] For the "abuse" of a dominant market position, according to general rules, it is sufficient for there to be "normative causality" between market dominance and the conduct.[723] It is sufficient if the conduct proves to be anti-

---

[721] Federal Court of Justice, decision of 6 November 2013 – KZR 58/11, *VBL Gegenwert I*; Federal Court of Justice, judgment of 24 January 2017 – KZR 47/14 para. 35 (juris).

[722] […]

[723] *Fuchs* in Immenga/Mestmäcker, GWB, 5th edition 2014, Section 19 para. 82b; further details on the prohibition to demand unjustified benefits from suppliers ("Anzapfverbot") Section 19 (1), (2) no. 5 GWB: not even normative causality required according to Federal Court of Justice, decision of 23 January 2018, KVR 3/17, WuW 2018, 209 para. 81, 83ff. – *Wedding discounts.*

competitive as a result of market dominance, which does not require strict causality but rather a causality in relation to the outcome.[724]

874    In the *VBL Gegenwert II* judgment, the Federal Court of Justice indicated in its guiding principle that inappropriate terms and conditions which make it more difficult to terminate a long-term contractual relationship with a norm addressee of Section 19(1) GWB regularly constitute abuse of market power.[725] This clearly refers to the potential effect of the clause in connection with market power. The Federal Court of Justice did not consider it necessary to examine whether competitors are using a similar clause. In view of the fact that VBL had a dominant position on the relevant market for supplementary public service pensions with market share of 37 percent, taking into account that the Federal Government and most of the Länder are involved by way of a collective agreement, VBL would still have been considered to have a dominant position in the market even though it has competitors.[726] Instead, the Federal Court of Justice has ruled that it is sufficient for a condition which makes it more difficult to terminate a long-term relationship with a dominant undertaking to involve the risk of further strengthening market power by creating an additional barrier to market entry. Accordingly, it is not necessary in the present case to review the clauses on the basis of a historical, geographic or cross-service comparison.[727]

875    A "normative-causal" connection in this respect between the norm addressee status and the infringement and the consequences of this infringement is therefore sufficient pursuant to the above-mentioned principles. Any such connection is to the detriment of private users considering there is a legal connection in the form of normative causality between antitrust law and data protection assessments (see (1) below). Unlawful data processing also has the potential effect of obstructing competitors through the risk of transferring market power (see (2).

### (1) Normative-causal connection with infringement of data protection law

876    First of all, there is a normative-causal connection in the vertical relationship with private users between the existence of a dominant position in the market and the violation of the relevant assessments under data protection law. In this particular case, the infringement of data protection rules exists given that the restriction of private users'

---

[724] OLG Düsseldorf, judgment of 12 July 2017, "Kabeleinspeiseentgelte", para. 131 (iuris); Frankfurt Higher Regional Court, Götting in Loewenheim/Meessen/Riesenkampf, vol. 2, GWB, Section 19, para. 61; Bechthold, GWB, 8th edition, Section 19, para. 5; Wiedemann, Handbuch des Kartellrechts, 3rd edition, Section 23, para. 55.

[725] Federal Court of Justice, decision of 24 January 2017, "VBL-Gegenwert II", file ref. KZR 47/14 (juris).

[726] Federal Court of Justice, decision of 24 January 2017, "VBL-Gegenwert II", file ref. KZR 47/14 (juris).

[727] […]

right to self-determination is clearly linked to Facebook's dominant position in the market.

877   For a start, this applies to the lack of voluntary consent. Recital 43 of the GDPR says that in order to ensure that consent is freely given, consent should not provide a valid legal ground for the processing of personal data in a specific case where there is a "clear imbalance" between the data subject and the controller. Furthermore, according to Recitals 42 and 43 of the GDPR, it should only be presumed that data subjects have given their consent voluntarily if they have a genuine or free choice or are able to refuse or withdraw consent without detriment. In any event, the very fact that the company has a dominant position in the market means consent is not given voluntarily.[728]

878   Furthermore, the market-dominating position also plays a role in the context of the legal bases governing data protection set forth in Article 6(1b) GDPR (in the context of the necessity for performance of the contract) and Article 6(1f) GDPR (in the context of the balancing of interests). It means that Article 6(1 b) GDPR can be invoked in view of the monopolistic position and the fact that a dominant undertaking can dictate data processing conditions (cf. above para. 677). In addition, the Art. 29 Data Protection Working Party emphasises, as indicated above, that the dominant position of the data controller is a key factor when balancing interests in Article 6(1f) GDPR (see above para. 730).[729]

879   The violation of data protection requirements established in this case is a manifestation of Facebook's market power. Data protection law considers corporate circumstances such as market dominance, the concrete purpose and the amount of data processed in its justifications. This means that companies behaving in a similar way that do not have a dominant position in the market would need to be assessed differently.

880   Therefore, there would be a correlation with market power in this particular case even if this was understood within the meaning of strict causality. The violation of data protection law in this case was only possible in the first place because other market participants did not have a chance to behave in a similar way. Just because other Internet companies such as Yahoo, Bing Oracle or Google collect data via interfaces[730] does not mean the same conduct by Facebook is permissible under data protection law.

---

[728] […]

[729] Article 29 Data Protection Working Party, Opinion 06/2014 on the legitimate interests of the data controller pursuant to Article 7 of Directive 95/46/EC, p. 51, 71; […]

[730] […]

881   In this respect, the concerns expressed by the DICE Consult expert in the report "An Economic Analysis of the Role of Data Collection in Social Networks"[731] are not relevant. One of the assumptions voiced in the expert opinion is that if Facebook were to restrict the processing of "off-Facebook" data, it would be forced to compete less effectively with its competitors by offering less innovative and poorer-quality services, especially vis-à-vis Google. One of the reasons for this is that Facebook is subject to discriminatory data protection requirements with regard to market dominance. In addition, users would be doing themselves a disservice if they refused to consent to data processing that certainly offers benefits.

882   To assume that data protection law does not take the individual circumstances of the company, including market dominance, into account and that these aspects are only introduced via antitrust law, would be to disregard the legal bases and standards of data protection as a whole, as well as the method of examining abusive business terms developed by the Federal Court of Justice. It obviously assumes that the company's market position does not constitute an aspect of the assessment of data protection standard that needs to be met. However, as stated above, this is incorrect. The data protection standard phrased in the GDPR may certainly appear debatable from the economic expert's perspective. However, this does not alter the fact that this is the applicable standard for defining the right of informational self-determination enshrined in the constitution, which accepts that economic advantages may be restricted within the framework of balancing of interests.

883   It seems reasonable and appropriate to take a company's market position into consideration under data protection law. This not only has implications for the extent and consequences of data collection. Above all, it plays a key role in deciding whether users have options available and can thus decide for themselves what level of data protection they want, or whether they only accept data processing because they would otherwise be unable to avail themselves of a particular service. The fact that in the latter case users may not have a free choice and the ability to determine how data is processed is also indicated by the studies in this case. According to the user survey, 75% of respondents consider the handling of data to be an important factor in their choice of social network (see above, para. 427). If, on account of the company's market position, users have no alternative but to consent to their data being processed, they are unlikely to read the data policy as they have to give their consent anyway. Due to the lack of alternatives and the strong lock-in effects (para. 460ff.) users are unlikely to be able to switch to another provider even if they later become dissatisfied with how

---

[731] […]

their data are being used. This means users have little or no possibility of switching to alternative providers in order to avoid the dominant undertaking's conduct.[732]

884    Finally, the present assessment of data protection law and the determination of Facebook as a company that has a dominant position in the market says nothing about whether and to what extent other market-dominating companies may be violating data protection laws on their relevant markets with the individual data processing they carry out. If Facebook claims that other companies also exchange data within their groups[733] or combine data from third-party sources with their groups' own data[734], this cannot be used as a benchmark for assessing the impropriety of Facebook's conduct: Contrary to Facebook's view, the behaviour of third parties, which may also be violating data protection law cannot be conventionalised to become the "established industrial standard"[735], as this means the wrong-doing of others would become the criterion that condemns the norm addressee. This could lead to the paradoxical outcome that smaller competitors - similar to umbrella effects in cartel agreements[736] - might be tempted to act in violation of data protection law under the "umbrella" of the dominant undertaking and the dominant undertaking could then refer to competitors' conduct to justify its own behaviour.

### (2) Causality with regard to impeding effects on competitors

885    In addition, there is a causal relationship between the unlawful data processing conditions and market dominance with regard to the actual and potential impediment effects to the detriment of competitors.

886    With Internet platforms that are financed by advertising, such as Facebook, the incentive is very high to exploit the data processing scope in order to ensure the market success of advertising. Due to unlawful data processing conditions that give access to the user data of potential advertising customers - such as social plugins, Facebook Login and the interface for measurement and analytics products - the risk of transferring market power is also particularly virulent. The information gained from this allows Facebook to make attractive offers to third-party operators in the form of targeted advertising tailored specifically to their users.

887    As outlined in the foregoing, this also applies to the processing of data collected from Facebook-owned services, in particular from WhatsApp and Instagram. The de facto

---

[732] Langen/Bunte/Nothdurft, Section 19 GWB, para. 195

[733] […]

[734] […]

[735] […]

[736] For the phenomenon of umbrella effects, see Inderst et al., "Umbrella Effects", WuW 2014, p.1043 ff.

integration of services through interrelated functionalities and de facto shared user accounts that data processing can bring involves the risk of transferring market power to markets on which these services operate. WhatsApp, for instance, already has a strong position in the market for messenger services, which could expand further if the service is further integrated with Facebook. It is important in this respect that WhatsApp and Instagram are also characterised by direct network effects and that data processing for the purpose of consistent personalisation with the possibility of standardising lists of friends and contacts makes it more difficult for users to migrate to other services, parts of which are competing with Facebook. In this context, the competition between Instagram and Snapchat for photo services is worth noting. Instagram has a major advantage by standardising the "product experience" with Facebook.com, making it more difficult for users to switch providers.

888   Moreover, inappropriate data processing also leads to an increase in barriers to market entry for potential competitors in the market for social networks. By introducing the criterion of market dominance regarding access to data relevant for competition in Section 18 (3a) no. 4 GWB, the legislator expressly acknowledged that access to data relevant for competition can be of paramount importance for market entry and market success. Since the collection and processing of data is essential to the business model of social networks, they are always keen to collect as many data as possible. This is because detailed knowledge about users enables them to target the kind of advertising Facebook wants to offer. Access to data is therefore an important market dominance factor when assessing a company's position in the market. The competitive edge Facebook already has owing to its excellent access to data relevant for competition will be further expanded by inappropriate and thus unlawful processing of data from other sources assigned to Facebook user accounts, thereby further raising the existing barriers to market entry as a result of direct network effects. In this respect, too, there is a direct correlation between the actual effect of the Terms of Service and market power.[737] Competitors who have lawfully handled the collection and processing of personal data in the past are therefore at a competitive disadvantage vis-à-vis Facebook.[738]

---

[737] Weichert said this in "Violations of Data Protection Law as a Business Model - the Case of Facebook" (Datenschutzverstoß als Geschäftsmodell – der Fall Facebook), DuD 2012, 716ff. listing Facebook's data protection violations and claiming that acquisition of personal data which contravenes data protection law gives Facebook an inadmissible competitive edge over competitors who behave in a legally compliant manner.

[738] […]

b. **Balancing of interests under antitrust law**

889   If terms of business violate data protection values as a result of market power, the comprehensive balancing of interests required within the framework of control of abusive practices, taking into account the objective of the German Competition Act, which is to promote free competition, does not have any independent significance (see (1) according to case law of the Federal Court of Justice in the *VBL* proceedings. Balancing interests under antitrust law as a precaution in this particular case also leads to the same outcome as the balancing of interests under data protection law (see (2) above).

### (1) Necessity according to case law

890   The case law of the Federal Court of Justice in the proceedings *VBL-Gegenwert II shows* there is no need to balance interests under antitrust law as well. In this case, the Federal Court of Justice ruled that legislation on general terms and conditions had been breached by contractual conditions as a manifestation of market power and no further balancing of interests was carried out. From the point of view of the Decision Division, this is also consistent on the basis of the *VBL* assessment concept.

891   This follows first of all from the consideration that if a company with a dominant position in the market has been found to infringe legal provisions, the balancing of interests cannot, for legal reasons, lead to the conclusion being drawn that the undertaking has an overriding interest in breaching antitrust law. If an infringement is the result of market power as outlined above, the abusiveness can no longer be called into question by a further balancing of interests.

892   This ensues from the examination concept itself, which for the interpretation of the antitrust concept of the appropriateness of conditions relies on comparable concepts of appropriateness defined in other legal areas in similarly unbalanced negotiation situations such as legislation on general terms and conditions or data protection law. The appropriateness rules of other legal areas are themselves the result of a balancing of interests with regard to the necessary reconciliation of interests in the negotiation of terms and conditions. This becomes particularly clear in relation to the data protection assessments used here that are based, by and large, on a balancing of interests as per Article 6(1f) GDPR for the justification of the data processing conditions, also taking into account the data controller's dominant position in the market.

893   The case law of the Federal Court of Justice in the *Pechstein* case concurs with this finding. In the proceedings, the Federal Court of Justice did indeed focus primarily on a balancing of interests which was also deemed necessary in the context of Section

19(1) GWB.[739] This was preceded, however, by the fact that no objection could be raised against the arbitration clause to be examined in this case pursuant to the provisions set forth in the Code of Civil Procedure, which are also intended to prevent a party from being placed at a disadvantage.[740] The further balancing of interests under antitrust law carried out by the Federal Court of Justice, taking into account the constitutional rights of both parties, served only to clarify the question of whether the invalidity of the arbitration clause could result from the more far-reaching legal requirements that the norm addressees of Section 19 GWB have to fulfil beyond the general requirements (of the Code of Civil Procedure). The decision in the *Pechstein* case therefore does not prove it is necessary to balance interests in a case in which the norm addressee is already violating the regulations of the legal system that also apply to non-norm addressees.

### (2) Balancing interests simultaneously under antitrust law and data protection law

894   In the present case, the balancing of interests under antitrust law to be carried out merely as a precautionary measure leads to the same outcome as an assessment under data protection law. This is because in view of the unbalanced negotiation position represented by data protection law, the assessment must be based on similar balancing factors, one of which is market dominance.

895   This corresponds to the case law of the Federal Court of Justice on antitrust law in the Pechstein case. According to this, the fact that the user did not ask for individual contractual terms and conditions does not initially preclude a self-determined conclusion of a contract as a matter of principle, since the contractual agreement as a whole can represent a balancing of interests which also regularly involves relinquishing one's own positions. If, however, one of the contracting parties has such a dominant position that it can actually impose contractual provisions unilaterally, this means conditions are being dictated by the other contracting party. This applies in particular if a monopoly or quasi-monopoly exists. It is precisely this circumstance that requires the application of the general clauses of civil law such as Section 19 (1) GWB which must bring about a balance of interests while taking the parties' constitutional rights into account.[741]

---

[739] Federal Court of Justice, judgment of 7 June 2016, KZR 6/15 – *Pechstein*, para. 48 (juris).

[740] loc. cit., para. 23 to 39.

[741] Federal Court of Justice, judgment of 7 June 2016, KZR 6/15 – *Pechstein*, para. 57 (juris).

896    The narrow interpretation of Article 6 (1 b) GDPR is based on the same idea. It cannot be up to the data controller alone to define what is necessary for the performance of a contract, since this would undermine the protection against third-party control and the need to weigh up interests. Also the balancing of interests required pursuant to Article 6(1f) GDPR is being consistently implemented, taking all the relevant organisations involved, the data subjects and third parties into account on the basis of principles governing data protection law. The relevant aspects are also of paramount importance when balancing interests solely under antitrust law.

897    This applies first of all to the fact that the comprehensive collection and allocation of user data from Facebook-owned services and Facebook Business Tools and their use outlined above are unnecessary. It is certainly acknowledged that Facebook has an interest in processing data to improve its product and the commercial basis formed by personalised advertising. The processing of data is necessary in such "big data" business models. However, this does not mean, that scope of data processing can be freely determined by the company and is not subject to antitrust review. However, it must be ensured that the interests of the opposite market side are sufficiently taken into consideration if a provider is a dominant company that is not subject to sufficient competitive control. This means that the provider must not place any unnecessary burdens on the opposite market side.

898    According to the data protection assessment, the extent to which a company that is dominant in the market can impose terms and conditions unilaterally must be taken into account as outlined above. The same applies to the balancing of interests under antitrust law.

899    On the users' side, the data protection standard of users' "reasonable expectation" corresponds to the specific problem of market power in relation to the Terms of Service and in particular the data processing scope. This can be attributed to the very fact that users have no overview of the scope of the terms and conditions and the extent, significance and sources of data processing. The benchmark is therefore also meaningful for an assessment under antitrust law, taking the objective of promoting free competition into account. For the freedom of competition is aimed specifically at giving the opposite market side the opportunity to decide freely on the agreement of contractual terms.

900    In addition, pursuant to the *Pechstein* case law, assessments with regard to constitutional rights have to be included in assessments of interests under competition law.[742] According to this, it would also be conceptually possible in the present case, to

---

[742]  Federal Court of Justice, judgment of 7 June 2016, KZR 6/15 – *Pechstein*, para. 55 (juris).

determine the abuse directly by comprehensively balancing interests, taking the constitutional rights of the contracting parties into account with regard to the exclusion of voluntary self-determination as a result of market dominance. In this respect, it needs to be considered, however, that the GDPR also makes a statutory decision on the balancing of fundamental rights, in particular in the form of justifications pursuant to Article 6(1) GDPR. It is basically assumed that this technical substantiation applies to the antitrust perspective in view of the conflicting positions regarding fundamental rights. In the present case, this also unifies the balancing framework.

901   Essentially, therefore, reference can be made to the assessments under data protection law for the balancing of interests under antitrust law. From the point of view of the Bundeskartellamt, the essential aspect in balancing of antitrust interests is the significance of Facebook's dominant position on the market for social networks for continued use of the internet by users if they have to accept the above-mentioned data processing conditions in order to use of the social network in the first place.

902   In addition, Facebook's market dominance means that unlimited data processing from a variety of sources cannot be prevented simply by switching social networks. Users would have to refrain from using a variety of services if they did not want to add any more data to their extensive Facebook database which lacks transparency. This would greatly reduce the choice of internet services for users.

903   WhatsApp and Instagram, for example, are widely used services with a high user base, which in turn have direct network effects. As such, it is questionable whether users will be able to do without these services at all in view of the network effects and the market position achieved particularly by WhatsApp. Even if this were the case, it would represent a major and disproportionate limitation of general use of the internet if Facebook users were no longer able to avail themselves of all other Facebook services in order to prevent data collected by these services from being added to the already detailed user profile which Facebook has. What is more, over […] of the monthly active Facebook.com users also use WhatsApp and in excess of […] use Instagram.[743] All things considered, this means that Facebook.com users could only prevent their data from being collected outside the social network if they ceased using the internet to a large extent and stopped using widespread services such as WhatsApp.

904   Corporate efficiency cannot be used as an argument from the antitrust perspective. It is true that a common strategy within a group to leverage potential internal synergies and to develop efficient database structures can represent legitimate interests. However, a general group privilege that would rule out any such group efficiency by

---

[743] […]

consistent abuse pursuant to Section 19 (1) GWB does not exist in antitrust law either[744] – for instance in cases where the provision of a service is conditional on consent to data processing. Contrary to Facebook's opinion, no such group privilege can be derived from Section 36 (2) GWB. The protection interests of users are predominant here particularly in view of the fact that it is not apparent why the comprehensive combination of data is necessary.

905 With the social plugins, Facebook Login and the measurement and analytics tools for third-party providers, the aim of the German Competition Act to promote freedom of competition implies that users have an overriding interest in controlling their data from these sources. Users would basically have to stop using the internet given the millions of integrated social plugins, Facebook Logins and other interfaces that exist in Germany which users are unaware of before they call up the website and which are not visible.in many cases. When using third-party services, users are thus forced to hand over data beyond the social network and Facebook-owned services which is then assigned to their Facebook user account. This constitutes an abusive enforcement of further access to data collected from third-party services, also by antitrust standards.

906 Finally, contrary to Facebook's view[745], the lack of an economic quantification of the abusive conduct based on a comparison between the resulting net consumer benefit and the harm to consumers in order to prove that the consumer benefit decreases as a result of the conduct at issue cannot be used as a justification.

907 Facebook submitted an economic private opinion by Professor Evans[746] to this end, which comes to the conclusion on the basis of rough calculations drawn up as an example that Facebook as a whole offers a net benefit to German consumers and that here is no evidence of harm to users. The expert opinion suggests the following approximate measurements […]

908 Apart from the fact that the expert opinion does not make any distinction between an examination of data from Facebook-owned services and Facebook Business Tools on the one hand and the data collected through use of the social network Facebook.com itself on the other, meaning that at best it relates indirectly to the subject matter of the proceedings, an economic quantification of abusive behaviour hardly seems possible.[747]

---

[744] Cross-subsidisation of products within the group is, for instance, subject to abuse control, cf. e.g. for European law Langen/Bunte, Europäisches Kartellrecht, 12th edition, Article 102 TFEU, para. 315

[745] […]

[746] […]

[747] […]

909    Contrary to the premise of the expert opinion, it can be assumed that the conduct contested can also lead to potential user harm in economic terms. Even the collection of data itself can lead to behavioural changes among users, for instance, to avoid adverse reaction among friends or public bodies.[748] In addition, the extensive transfer of Facebook users' personal data by the Facebook Group to Cambridge Analytica[749] and various smartphone manufacturers[750] shows that from the users' perspective unwanted data flows even on Facebook do not merely pose risks in theory.

910    Users might potentially suffer material (financial) harm if Facebook discloses data to third parties, whether intentionally or unintentionally, for instance, leading to identity theft, extortion or fraud. Users might also suffer non-material damage. The collection of data may reveal information which the user considers worthy of protection and which is not provided voluntarily such as income, location, diseases, political views or sexual orientation.[751] The potential for damage increases with the scope and quality of the data, if Facebook data from Facebook-owned services or Facebook Business Tools allow conclusions to be drawn about the history of sensitive websites accessed by users. Due to the particular depth of detail of the data, from the user's point of view this involves a data pool with particularly high damage potential.

911    In this context, scientists point out that any negative external effects of data collection are to the detriment of users. While more extensive data collection offers the company collecting the data increased monetisation potential, users bear the bulk of the potential financial (and intangible) costs incurred. This creates a false incentive for the companies collecting the data, which harvest "too much" data from the consumer welfare point of view.[752]

912    Nonetheless, it is difficult to quantify the effects of the damage, since it is not clear whether, when and how potential material or, in particular, immaterial consumer damage will occur and which users will be affected. It is not possible to predict either what damage potential the data may have as a result of possibilities for combination or

---

[748] cf. Marthews, A., Tucker, C. (2017). Government Surveillance and Internet Search Behaviour. Accessible at http://dx.doi.org/10.2139/ssrn.2412564 (last accessed on 10 January 2019).

[749] cf. New York Times of 4 April 2018, "Facebook Says Cambridge Analytica Harvested Data of Up to 87 Million users", accessible at https://www.nytimes.com/2018/04/04/technology/mark-zuckerberg-testify- congress.html (last accessed on 10 January 2019).

[750] cf. New York Times of 3 June 2018, "Facebook Gave Device Makers Deep Access to Data on users and Friends", https://www.nytimes.com/interactive/2018/06/03/technology/facebook-device-partners-users-friends-data.html (last accessed on 10 January 2019).

[751] cf. Jin, G., "Artificial Intelligence and Consumer Privacy" in: Agrawal A., Gans, J, Goldfarb, A. (publisher), The Economics of Artificial Intelligence: An Agenda, Chicago: University of Chicago Press, 2018, accessible at https://www.nber.org/chapters/c14034.pdf (last accessed on 10 January 2019).

[752] cf. Jin, G., "Artificial Intelligence and Consumer Privacy" in: Agrawal A., Gans, J, Goldfarb, A. (publisher), The Economics of Artificial Intelligence: An Agenda, Chicago: University of Chicago Press, 2018, https://www.nber.org/chapters/c14034.pdf (last accessed on 10 January 2019).

technical analysis that may not be available currently but could well be in the future.[753] This also concurs with the assessments of the Article 29 Data Protection Working Party, which refer to justification pursuant to Article 6(1f) GDPR not just to take into account the actual disadvantages of data processing for data subjects, but also, for the same reasons, the potential risks of data processing (see above para. 767).

913   Above all, however, the balanced consideration of welfare effects within the framework of the balancing of interests under antitrust law must be countered by the fact that the breach of legal protection provisions which are intended to benefit users cannot be justified. The provisions set forth in data protection law provide users not with mere economic assets but with fundamental rights of freedom which personal data they are willing to disclose. If this personal responsibility is not guaranteed as a result of a dominant company's conduct, this company should not claim that the loss of personal responsibility (from its own perspective) is offset by the benefit of its own performance, making it acceptable.

## III.  Abuse pursuant to Article Art. 102 TFEU

914   Pursuant to Article 3 para. 1 sentence 2 of Regulation 1/2003, where the competition authorities of the Member States or national courts apply national competition law to any abuse prohibited by Article 102 of the TFEU, they shall also apply Article 102 of the Treaty. According to the catalogue of facts set forth in Article 102 sentence 2 lit. a TFEU, any abuse may consist in directly or indirectly imposing unfair purchase or selling prices or other unfair trading conditions. However, the examination has shown that the concept of protection developed by German case law on the general clause of Section 19(1) GWB, which relies heavily on decisions about values based on both fundamental rights and ordinary law in order to determine abusive conduct, has so far found no equivalent in European case law or application practice. The intended prohibition is therefore based on Section 19(1) GWB in conjunction with the relevant domestic case law. Pursuant to Article 3(2) sentence 2 of Regulation 1/2003, the Member States are not precluded from adopting or applying stricter national provisions in their territory in order to prevent or punish unilateral actions by undertakings.[754]

---

[753] cf. Tucker, C., "Privacy, Algorithms, and Artificial Intelligence" in: Agrawal A., Gans, J, Goldfarb, A. (publisher), The Economics of Artificial Intelligence: An Agenda, Chicago: University of Chicago Press, 2018, https://www.nber.org/chapters/c14011.pdf (last accessed on 10 January 2019).

[754] cf. Federal Court of Justice, judgment of 6 November 2013, "VBL-Gegenwert", KZR 58/11 para. 76 (juris).

## C.  Decision based on Section 32 of the German Competition Act

915   The decision is lawful on the basis of Section 32 GWB. The main statements made in Paragraphs 1 to 4 in the operative part of the decision relate to the infringing conduct and the elimination thereof (see I.). They are necessary and proportionate in their scope, taking into account the ancillary decisions under Paragraph 5 to 7 (see II). The decision also corresponds in all other respects to the dutiful exercise of discretion (see III.).

### I.  Main statements

916   The operative part of the decision contains in the basic structure of the main statements the prohibition of the use of certain contractual Terms of Service, explained by the documents currently used by the parties (Paragraph 1, see 1), and their implementation by the actual data processing (Paragraph 2, see 2), as well as the obligation to designate and implement the concrete remedial measures required to terminate the abusive conduct (Paragraph 3, see 3). Paragraph 4 relating to paragraphs 1-3 clearly states that the provision of the service must not be conditional on consent to data processing.

### 1.  Prohibition of the use of provisions in the Terms of Service specified by Paragraph 1 in the Data Policy and Cookies Policy

917   For a start, Paragraph 1 prohibits the use of Terms of Service, including their specification in data and cookies policies, which users must agree to before they can begin using the service and which document the intended contractual content.[755] First of all, the abusive behaviour is described in variants a) to c) (see a.) and is further explained with the current wording of the Facebook Terms of Service and Data Policy in the following indents (see b.).

#### a.  Terms of Service an act of infringement

918   Abusive conduct consists essentially in the use and implementation of terms of use specified by guidelines vis-à-vis a particular group of users ("private users"), the provisions of which define certain categories of data processing ("collection", combining", "use") with regard to certain types of data ("user and device-related data") from certain sources outside the *Facebook.com* service (Facebook-owned services and Facebook Business Tools) and thus results in the combination of largely unlimited

---

[755] cf. item 5 of Facebook Terms of Service, according to which the Terms of Service constitute the entire agreement.

personal data from the above-mentioned sources and their use, in particular the combined use by the Facebook.com operating company.

919   With the reference made in Paragraph 1 of the operative part of the decision to the Terms of Service "including the specification in the Data Policy, Cookies Policy or similar contractual terms", the Bundeskartellamt has taken into account the current practice that the Terms of Service contain only a broad general provision governing the processing of personal data, and refers to explanations in a range of other documents (para. 95). The documents are usually referred to as "Data Policy" or "Data protection guidelines", "Privacy Policy" or the like. There is no standard practice in the internet industry with regard to the designation of these documents and the distribution of contractual regulatory materials among them. In terms of content, internet companies have broad scope for distributing regulations for different types of documents (e.g. terms of use, data policy, cookies policy, FAQs, licensing conditions).

920   There is also wide scope for continuously changing such terms of use, as online business models also distribute documents in electronic form, which provides centralised, rapid and straightforward opportunities for amendments. Last but by no means least, it should be noted that terms of use are often intended to record and safeguard certain behaviours without specifying them vis-à-vis the user (see also b.). Paragraph 1 of the operative part of the decision therefore covers "comparable contractual terms" which is meant to refer to these above-mentioned circumstances. In this respect, the prohibition goes beyond the concrete current form of infringement and extends to all documents with provisions corresponding to Paragraph 1, irrespective of how they are designated and which provisions or explanations are listed in which documents. In addition, Paragraph 1 establishes the connection between the concrete designation of the abusive conduct and the current contractual provisions intended to cover and safeguard it. In this respect, the reference made to the current contractual provisions explains the prohibition (see b. for more details) without actually restricting it. Restricting the operative part of the decision to the concrete type of infringement would, as outlined above, create considerable possibilities for circumvention.

921   "Private users" are the natural persons who use Facebook.com with a personal profile page and a personal Facebook user account (para. 21). It is not relevant whether the users also use the personal profile page for professional or commercial purposes or whether they also operate a company website. The term does not cover use of a Business Manager account (para. 34, 38). Users are resident in Germany if they have their permanent residence in Germany (Section 7 of the German Civil Code). In connection with the use of services other than Facebook.com, the term "private user" refers to any user who is also a private user of the Facebook.com service, i.e. who

operates a personal profile page. This also includes cases in which a user of Facebook-owned end customer services and of websites that have integrated Facebook Business Tools is not yet a private user of Facebook.com when the data is collected and stored, but this data is subsequently combined with a personal profile following registration with Facebook.

922    The data processing procedures imposed, namely "collection, "combining" and "use" describe data processing categories involving individual data processing procedures and phases, each of which is associated with the receipt, analysis, and usable storage of data ("collection"), the assignment, in various forms, to existing Facebook data ("combining"), and "use" of this data (see above para. 580). The Bundeskartellamt has used these terms, some of which have been coined under data protection law, to describe the conduct objectively and in accordance with the principle of certainty, in order to clearly reflect the essence of the infringing conduct, in particular with regard to the merging and combination of data. To this end, it was imperative to depart from the often much less clear nomenclature of the terms of use, which record and safeguard the relevant procedures without giving the user any details (see also b.). In particular, the assignment of data to Facebook user accounts via common identifiers in itself is to be understood as "combination". Facebook claims it does not create profiles within the meaning of individual data records which are each expanded when additional data are added.[756] Rather, according to the current database structure, the individual data is provided with identifiers such as the Facebook ID or other unequivocal characteristics that are stored throughout the entire database and is, if necessary, retrieved for a specific use during implementation, based on whatever task the algorithm is to perform.

923    The prohibition also covers any limited use of data from the above-mentioned sources by the operating company of Facebook.com, unless the order - as in the case of data collected from Instagram (see below for more details) - expressly prohibits "combined use". Moreover, the Bundeskartellamt did not specify any specific uses. Rather, the collection and combination of data is not justified by any of Facebook's purposes and interests that were not specified in detail at the time of the decision, thus ruling out an ex officio restriction. This means the collection of data including the assignment to Facebook user accounts is already prohibited, as is the case with regard to, but not limited to, all other uses which the assignment of data might lead to. The mere non-use of data collected and assigned for specific purposes, such as profiling (para. 582) - does not, according to the justification at the time of the decision, lead to admissibility of the collection and combination of data, in particular with regard to the necessity of

---

[756] […]

the data processing subject to examination in each case, without users' consent, unless new facts are presented for this purpose in the implementation proceedings.

924   The "operating company of Facebook.com" is the company owned by Facebook, which offers the Facebook.com service according to the imprint in Germany. This is currently Facebook Ireland Ltd., Dublin. This dynamic designation, which can be determined from the imprint in Germany in each case, serves to ensure the order applies also to intra-group restructuring.

925   The reference made to "user and device-related data" highlights the fact that this not only involves information which, according to its content, relates directly to the person, such as identity, interests, living conditions, communication contents or behaviour of the user ("user-related data"), but also technical data in the broadest sense, that refer to the terminal devices used by the user as well as software and other contents stored on them. This "device-related data" can indirectly reveal information about the user, such as location-related information, physical movements which are generated via the positioning data or mobile device sensors, creating a user movement profile. In addition, device-related data can be used to uniquely identify the device itself and assign it to a specific user (para. 570). Device-related data therefore encompass all information about the properties of a mobile device (such as screen size, other elements of the hardware configuration such as processor cores) about the software on the mobile device (such as information about the operating system and application software installed, browser information) or information stored - even briefly - on the mobile device (e.g. browser history, address book, cookies etc.) or data that are emitted by the mobile device (e.g. information about the type of signal output such as WLAN, Bluetooth etc.).

926   According to Paragraphs 1.a. and b., data sources are Facebook-owned end customer services, which Facebook provides in addition to Facebook.com. In that regard, the Bundeskartellamt no longer included the Onavo service in its decision after it amended its data processing conditions. In addition, a distinction had to be made for Facebook-owned retail services between the WhatsApp, Oculus, and Masquerade services, on the one hand, and Instagram, on the other. The former services are all offered by a company belonging to the Facebook Group other than Facebook.com (para.6ff.). Instagram like Facebook.com, on the other hand, is offered by Facebook Ireland Ltd. This distinction was addressed by the Bundeskartellamt in that, contrary to Paragraph 1.b., Paragraph 1.a. is based on the fact that the operating company of Facebook.com also collects the data categories concerned using an internal transfer process between companies belonging to the group that is relevant in terms of data protection law. Data processing procedures involving the transmission and receipt of data from other

companies belonging to the group are also subject to justification (para. 593ff). In the case of Instagram, there is no such processing as the data categories concerned, which are collected by Facebook Ireland Ltd., are also collected when using Instagram and no additional intra-group reception process takes place. The combination with Facebook data, on the other hand, is covered by the operative part of the decision. The prohibition of the imposed use of Instagram data has been limited to combined use, since the use of Instagram data is not the subject matter of the proceedings, in particular for the operation of Instagram by the joint operating company. By contrast, the prohibition also applies to the use of data imposed together with the Facebook data obtained on the basis of Facebook's dominant position in the market.

927     Paragraph 1.c. relates to the processing of data collected from Facebook Business Tools imposed, if it is carried out via social plugins (para. 56ff.), Facebook Login and Account Kit (para. 63ff.) and via the Facebook pixel or Facebook SDKs for measurement and analytics services (para. 67ff.). The fact that Paragraph 1 c) also addresses the group's own provider of Facebook Business Tools as the data processing recipient of user and device-related data ensures that organisational restructuring involving Facebook Business Tools will not lead to data collected from third-party sources being combined with the data collected and stored when Facebook.com is used. The Bundeskartellamt has thus addressed the possibility of having separate systems[757] within the framework of considerations to introduce a "clear history" function although it is not clear whether this would involve separation in organisational terms.

928     The main statement of Paragraph 1 in all variants is limited to the data processing imposed "without the consent" of the data subject. The Bundeskartellamt has therefore taken the fact into consideration that the actual extent of the data processing imposed can only be justified if users give their consent voluntarily. In addition, there is generally no violation under antitrust or data protection law if the data processing is based on sufficient self-determination on the part of the user. This is because the actual act of infringement involves conditions that are imposed unilaterally on the opposite market side and these terms have also been externally determined by a company that has a dominant position in the market. Under the GDPR, an objective justification of data processing is to be examined in principle under the aspect whether the data processing is permissible without voluntary consent on the basis of legal justification, by way of exception. The right of informational self-determination does not provide a basis for an absolute prohibition of data processing even if the data subjects have given their

effective consent. The rulings submitted by the national data protection authorities are therefore also limited to the prohibition of certain data processing procedures implemented without users' consent.

929   In understanding the notion of consent, it should be taken into account that the consent currently obtained from data subjects within the framework of their privacy settings for the limited use of data collected from Facebook partners (para. 642ff.) and the blocking of cookies and advertising IDs (para. 646ff.) does not represent sufficient consent. The Bundeskartellamt also defines consent in Paragraph 4 as meaning that the parties referred to in Paragraphs 1-3 may not make the provision of the Facebook.com service conditional on the granting of consent. For when the provision of service is made conditional on consent to data processing as in this particular case, there is reason to assume that consent is not given voluntarily particularly in view of the fact that Facebook has a dominant position in the market (para. 634ff.). The Bundeskartellamt has refrained from issuing further specifications in the current order with regard to the specific structure of consent - for instance in terms of special data categories. They would need to be examined in separate proceedings.

930   It was not an option to impose an additional restriction on the reach of Paragraph 1.c. to the case in which Facebook acts as the data controller pursuant to the GDPR. This would not apply to effectively agreed processing on behalf of the controller. It is sufficiently clear from the reasons given for the decision that the prohibited infringement is based on the data protection assessments and that - in addition to other prerequisites such as personal data and data processing - Facebook must be held accountable. The Bundeskartellamt did not consider the agreement referred to as "processing on behalf of the controller" to be effective (para. 602ff.).

b.  **Current conditions and guidelines**

931   The Bundeskartellamt explains the variants described in Paragraphs 1.a. to c. with the indents a to c below based on examples of the Terms of Service and policy contents used by the parties at the time the decision was taken in relation to the processing of data collected from Facebook-owned services and the Facebook Business Tools that is relevant in this context.

932   First of all, it describes the current regulatory system in which the parties use a broadly formulated regulation on data processing in the Terms of Service (Paragraph 2 (1) and refer to the Data Policy for further details, which in turn refers to the Cookies Policy. The data processing procedures imposed by Facebook that are affected by the decree currently result exclusively from these policies.

933   As such, the first indent says that the parties stipulate in the Data Policy that they can collect user- and device-related data from the data sources mentioned in Paragraphs 1 a. to c., which are designated "Facebook Products" and "Facebook partners".

934   The facts outlined in the second indent make it clear that according to Facebook's Data Policy, all data collected can be used and "combined" across all Facebook Products. This reflects the combination and also combined use of data, which the Bundeskartellamt paraphrases as "combining" and as part of the "use" of data in Paragraph 1. It also becomes clear that information about users' activities "on devices" can also be used and combined (cf. Indents 6. and 7. below).

935   The third indent makes it clear that according to Facebook's Data Policy, all available data can be combined and also used for the company's measurement and analytics services.

936   The fourth indent says that, according to the Data Policy, all the available data - also combined - can be used for the purposes specified therein, including for security and research purposes.

937   The fifth indent shows, albeit limited to the data sources mentioned in Paragraph a. ("Facebook Companies"), that the data collected and stored there during use are collected and combined in accordance with Facebook's Data Policy. Here it says "as permitted by applicable law and pursuant to their Terms and Policies". The actual implementation - in this connection reference is made to Paragraph 2 - shows Facebook's understanding of legal permissibility. A restriction on the transfer and use of data based on an agreement with the Information and Data Protection Commissioner is found only with respect to the WhatsApp service, which is described in WhatsApp's "FAQs," but not in WhatsApp's Terms of Service, Facebook's Terms of Service, Data Policy or Cookies Policy (para. 122).

938   The sixth indent indicates that according to the Cookies Policy, user and device-related data can be collected from the data sources mentioned in Paragraph 1 ("Facebook Products", "Facebook Companies") and, in the case of the Facebook Business Tools, this takes place without any action on the part of the user. This also shows that with the social plugins as well as Facebook Login and Account Kit a data flow also occurs even if the user does not press the corresponding buttons on the website or app in which they are embedded (para. 144).

939   The seventh indent indicates that under the Cookies Policy, data collection is not limited to reading cookie data, but that it includes device-related information, including the software used and user activity on users' own devices off Facebook.com. This shows that it is also possible to track users without setting a cookie via the other device

identifiers (see para. 155) and that the Terms of Service permit identification of the user and matching with existing data via browser or device fingerprinting para. 570).

### 2. Prohibition of the implementation of the Terms of Service, Paragraph 2

940   Paragraph 2 prohibits the actual implementation of the Terms of Service, which at the same time shows the parties' understanding of their own Data Policies and further substantiates the intended contractual contents. Investigations show in particular that this concerns the specific data collected from Facebook-owned services and Facebook Business Tools that are linked in various ways to Facebook user accounts and are available for use.

941   The user data listed for the individual services, which are the subject of the implementation of the Terms of Service, are based on the Data Policies of the services and on the answers of the parties to the question posed in the information decisions regarding the data collected specifically from internal group services and Facebook Business Tools. The list is not exhaustive, but serves as an explanation […]. Facebook's claim that the Bundeskartellamt is not taking actual data processing into account is incorrect. The very fact that Facebook provides user and device-related data as examples clearly shows the wide scope of the Terms of Service and Data Policies. In addition, the Bundeskartellamt determined in each case how the data is assigned to the respective Facebook accounts. In this respect, too, the Bundeskartellamt has limited itself to creating a list of examples, as there are a number of possibilities available and the aim is to record each assignment procedure in order to avoid circumvention.

942   The data listed in paragraph 2.a. for the WhatsApp service are derived from the "FAQs" provided by WhatsApp (see para. 123) and from the investigations carried out at Facebook. According to Facebook, the data is currently assigned to the respective Facebook user accounts via the Family Device ID that WhatsApp installs on the users' devices (see para. 125 above). The latter is reflected particularly by the placement of cookies on the users' computer described in the Cookies Policy (above 6th and 7th indent) including data stored by Facebook on the users' web browser or device, identifiers associated with the users' device, and other software.

943   The data listed in Paragraph 2.b. for the Oculus and Masquerade services are derived from the respective Data Policies and from the investigations at Facebook. The above-mentioned data, according to Facebook, is assigned to Facebook user accounts either via the Facebook Login, e-mail addresses or device IDs (see above para. 134ff.).

944   The Instagram data listed in item 2.c. are based on Instagram's Data Policy and investigations at Facebook (para. 127f.) According to Facebook, the data are assigned via the Family Device ID.

945   The data listed in Paragraph 2.d. on Facebook Business Tools are based in particular on Facebook's replies (see above para. 144ff.). According to Facebook, they represent "minimum data records" or "standard information" and are therefore not exhaustive, but have merely been given as examples. On the one hand, this involves a large number of device-related data and device IDs as described above. User-related data is collected in particular via SDKs or the Facebook pixel with the so-called "Events", which relate to the user interactions with the mobile app or website and can be configured in a variety of ways (see para. 70, 73, 147, 150 above). The data collected are assigned to Facebook accounts in various ways. It is currently done via cookie data that contain various identifiers, such as a pixel ID or Facebook ID (see above para. 152), via device identifiers, advertising IDs and other device-related metadata (para. 154, 155) or via hashed identifying plain user data within the scope of so-called "advanced matching" (para. 153). Here, too, the list of assignment procedures is by no means exhaustive.

### 3. Obligation to terminate the infringement, Paragraph 3

946   The Bundeskartellamt also requires the parties to implement various measures to terminate the antitrust infringement.

947   Paragraph 3.a. contains an obligation to terminate the infringement, to remove and amend the Terms of Service and to implement them within a period of 12 months.

948   Paragraph 3.b. contains a few specifications for the amendment of the Terms of Service, including the Data Policies that specify these terms of use, within the same period of time, requiring the parties to expressly clarify vis-à-vis private users that user-related data from the sources concerned will not be collected, combined or used without their consent. The Bundeskartellamt hereby uses a common practice in the privacy statements, which WhatsApp also uses, for instance, in relation to reading encrypted data or Onavo. This obligation is also based on the justification available at the time the decisions were taken. Insofar as solutions conforming to antitrust law are put forward in the implementation procedure, the Bundeskartellamt will consider these as new facts and adjust the clarification obligation accordingly.

949   Paragraph 3.c. finally contains the obligation to submit an implementation road map within 4 months of the decision being served, which describes and explains in detail the solution proposals as well as the individual elements and steps involved, indicating the planned date of implementation. In this respect, the Bundeskartellamt is responding

to the parties' submission that the solution in the previously envisaged solution scenarios presents a technical challenge that would take several months to resolve. The implementation road map must include a detailed description of the solution, the necessity thereof and the technical steps involved. This also includes the press release of the parties' plan to integrate Facebook, WhatsApp, and Instagram more closely.[758]

## II. Necessity and proportionality according to Section 32 of the Act on Restraints of Competition

950   The obligations to terminate the infringement are necessary and proportionate to the extent outlined in the operative part of the decision.

951   In particular, the obligations were not to be limited to an acceptable level of data or categories of data, taking into account the different data uses listed by the parties. Nor can they be limited to individual data processing procedures - for example, use of data only for certain purposes. This is because the Terms of Service and the policies specifying them refer to all the information about the user and device-related data the parties collect from the above-mentioned sources and that can be collected, combined and used without restriction for all the of the above-mentioned purposes. However, such comprehensive data processing can only be justified if users give their consent voluntarily.

952   In addition, it had to be taken into account that at the time the decision was taken the parties had not provided sufficiently objective justifications for any of the data processing procedures imposed for all of the user- and device-related data at issue here and the explanations they put forward had no objective justification. It was not substantiated either what data is necessary for what purposes or what the purposes specifically involve. Facebook's statement is limited to claiming that all data are necessary for all purposes from all data sources at issue here, in particular for the personalisation of the service and advertising. Since according to the case law of the European Court of Justice objective justification is required for all data processing procedures - as the parties themselves argue - the parties who are subject to the burden of proof, at least in terms of explanation and data protection law, did not have objective justifications available at the time of the decision. This means the data processing at issue here infringes the prohibition of abusive practices with regard to all user- and device-related data in the data processing categories described, irrespective of the purposes mentioned, taking into account the data protection assessments. In

---

[758]   https://www.welt.de/wirtschaft/webwelt/article187738456/Zuckerberg-plant-Verknuepfung-von-WhatsApp-Instagram-und-Facebook.html

order to terminate the infringement, the extent imposed in the prohibition is therefore necessary - limited to the lack of consent.

953   The open obligation to terminate the infringement, to amend the Terms of Service set out in Paragraph 3.a. and to implement them under Paragraph 3.b. and c. that extend beyond the obligation to amend the Terms of Service are also necessary for the effective termination of the infringement and are permissible under Section 32(2) GWB.

954   It would not be sufficient for effective termination of the infringement on the one hand or proportionate on the other to merely prohibit implementation. The open wording is necessary because the parties involved can choose at their own entrepreneurial discretion the remedy to terminate the infringement that conforms to antitrust law. The antitrust authority is unable and is not permitted to impose a specific solution. The order is therefore limited to specifying an implementation period of 12 months for termination of the infringement. The timeframe of 12 months takes the parties' statement into consideration that the technical challenge could take several months to complete.[759]

955   The obligation to clarify the issues according to Paragraph 3.b ensures that the restriction of data processing from sources outside Facebook.com will be made sufficiently transparent vis-à-vis users and that a clear, binding and enforceable agreement will be reached with the user in this respect. The decision is necessary and appropriate as a means of eliminating the consequences, especially since the users concerned are private individuals who would otherwise continue to be affected by the old Terms of Service to an even greater extent. Here, too, the Bundeskartellamt considers it necessary to take into account a consent solution with the requirements set out in Paragraph 4, as it does for Paragraph 1. If the parties involved in the proceedings implement further solutions that comply with antitrust law and submit objective justifications, in advance and in detail, the Bundeskartellamt will take this into account as a new fact.

956   Furthermore, with regard to possible solutions that comply with antitrust law, it is necessary and proportionate for the effective termination of the infringement to oblige the parties involved in Paragraph 3.c to submit an implementation road map as an initial step within the overall implementation period, which describes and explains in detail the solution proposals as well as the individual elements, steps and timeline involved. This is also necessary in order to be able to take into account the changed circumstances and/or to adjust deadlines within the scope of the revocation

[759] […]

reservation. The four-month deadline for this is appropriate and necessary in order to ensure speedy and structured implementation.

957   Contrary to Facebook's view, the prohibition and the obligation to terminate the infringement to the extent outlined in the operative part of the decision are by no means disproportionate. The extent to which there is a risk of fundamental, irrevocable and entirely disproportionate consequences if Facebook has to amend unacceptable Terms of Service and Data Policies within a reasonable period of time is not evident. Facebook apparently argued as much in the event that it had been obliged to terminate the infringement without any implementation deadline.[760]

958   The assumption made in Facebook's statement in response to the statement of objections that the Bundeskartellamt is imposing prohibitions that are disproportionate to the concerns expressed is incorrect. Restricting the prohibition or the obligation to terminate the infringement to an extent permissible under data protection law based on various parameters (extent of the data, type of data, type of data processing, purpose limitation, anonymisation, effective processing on behalf of the controller, user control options, retention periods, protective measures, etc.) is, as described above, out of the question and would actually constitute an infringement of the principle of proportionality. Unlike quantitative abusive pricing, it is inconceivable to specify an "abuse limit" in the case of qualitative abusive terms due to infringements of the law. On the contrary, in relation to Paragraphs 1-3 the parties bear full responsibility for the lawfulness of their data processing and thus also for the termination of the infringement. It is not true either that the Bundeskartellamt is prohibiting "on Facebook" data processing. During the entire proceedings, the Bundeskartellamt made it clear, also in the preliminary assessment of 19 December 2017, that Facebook-owned services are deemed to be "third-party sources". Furthermore, limiting the subject-matter of the proceedings to off-Facbook data sources is a matter of discretion for the Bundeskartellamt and is not the result of any legal considerations.

959   Paragraph 5 of the operative part of the decision allows the parties in relation to 1 to 3 to apply for interim proceedings before they have to start preparing to implement the order. Once the interim proceedings have been brought to a conclusion at a court of first instance, the parties still have almost the entire implementation period of 12 months provided for in the order if they file an application for suspensive effect pursuant to Section 65 (3) sentence 3 GWB when they file an appeal in the main proceedings. In that regard, by giving two months' notice, the Bundeskartellamt has taken into account the statutory time-limit for substantiating reasons for an appeal in the main

---

[760] […]

proceedings. Paragraph 5 sentence 2 of the operative part of the decision covers all cases of dismissal of the interim proceedings by the court of first instance. If the interim proceedings are terminated by a court decision on the merits, the date of that decision shall be authoritative. Where the summary proceedings are terminated by process declarations, the date of receipt by the court of the process declaration bringing about the termination will be authoritative. The reservation of complete or partial revocation in Paragraph 7 also extends to Paragraph 5 of the operative part of the decision and allows the regulation to be adjusted if this appears to be appropriate during the course of the interim proceedings, in the light of appreciable interests of the parties involved or in the public interest in enforcement. An adjustment of the provision is particularly worth considering if preliminary rulings pursuant to Article 267 para.2 TFEU are to be delivered in interim proceedings.

960    The Bundeskartellamt does not see any need for the antitrust authorities to suspend the order pursuant to Section 65 (3) sentence 2 GWB at this point in time. The basic issues raised by the parties particularly regarding the competency of the Bundeskartellamt and the basic issues of abusive business terms can be sufficiently clarified as legal issues in advance within the framework of interim proceedings based on summary examination. It is not assumed, however, that this case is a "pilot judgment procedure" that could be subject to serious legal doubts in view of the recent case law of the Federal Court of Justice in the *VBL Gegenwert* and *Pechstein* cases.

961    Paragraph 7 regulates a reservation of full or partial revocation that applies to all rules of the order. The reservation of revocation means the decision can be adapted flexibly to changed circumstances. This includes, in particular, the taking into account of various solution possibilities that cannot be imposed within the framework of the decision for reasons of proportionality. In addition, the possibility of adjusting the implementation deadlines and suspending them, in particular with regard to the solutions proposed by Facebook, adjusting the different time frames required in each case, as the case may be, and with regard to the lodging of further legal remedies, is necessary and proportionate. After all, this allows for a flexible and rapid response to changing market conditions and innovations in Internet services, the technical and commercial dynamics of which are unpredictable. The Bundeskartellamt has therefore refrained from ordering a fixed period of validity for the order.

## III.  Other discretionary powers

962    The Bundeskartellamt exercised its discretionary power by prohibiting abusive practices pursuant to Section 32 GWB. The Bundeskartellamt thus considers it to be in

the public interest to enforce antitrust measures to terminate the infringement of data protection law resulting from market power.

963   As such, in the Bundeskartellamt's opinion, the public interest in carrying out an antitrust review of Facebook's data processing is limited to the imposed collection of personal user data from Facebook's own services and Facebook Business Tools described above, together with the assignment of these data to respective Facebook user accounts and the use of any such data. These terms and conditions have considerable reach since the market power Facebook has by collecting data extends beyond the social network, affecting consumers' use of the internet.

964   The Bundeskartellamt also thinks there is a limit to the importance for consumers of the efficiencies of a business model based on personal data and personalised advertising in respect of the processing of data from sources outside Facebook.com. The provision of a social network free of charge that is funded by advertising is also of high benefit for consumers. Both the functionalities of a social network and the fact that it is financed through advertising, in principle, imply a high degree of processing of personal data.

965   However, the Bundeskartellamt holds that the efficiencies in a business model based on personalised advertising do not outweigh the interests of the users when it comes to processing data from sources outside of the social network. This applies in particular where users have insufficient control over the processing of their data and the assignment of this data to their Facebook user accounts. As far as this part of data processing is concerned, intervention from a competition law perspective is appropriate from the Bundeskartellamt's point of view because the data protection boundaries set forth in the GDPR were clearly overstepped, also in view of Facebook's dominant position.

966   In the present case, this does not conflict with the fact that data protection authorities and consumer associations can also take action against Facebook's infringements based on their legal bases. Rather, it makes sense for market dominance to be determined and established by the Bundeskartellamt itself leveraging its powers to provide information and within the differentiated framework of antitrust law. This approach is welcomed by the Federation of German Consumer Organisations (VZBV) as well as by the data protection authorities [...].[761]

---

[761] [...]

**D. Fees**

[…]

**Instruction on rights of appeal:**

This decision is subject to appeal. The appeal should be submitted in writing to the Bundeskartellamt, Kaiser-Friedrich-Straße 16, 53113 Bonn within one month upon service of the decision. Receipt of the appeal by the appellate court, the Düsseldorf Higher Regional Court, within this time limit is, however, also sufficient.

The reasons for the appeal should be presented in a written statement and submitted to the Bundeskartellamt or the appellate court. The time limit for filing the statement of appeal is two months. It shall begin upon receipt of the decision under appeal and may, upon application, be extended by the presiding judge of the appellate court. The statement of appeal must state the extent to which the decision is being appealed and its modification or revocation sought and indicate the facts and evidence (if applicable, also new facts) on which the appeal is based.

The notice of appeal and the statement of the reasons of appeal must be signed by a lawyer.

The appeal has no suspensive effect. The appellate court may, upon application, entirely or partly restore the suspensive effect of the appeal.


Topel                              Judith                              Dr Sewczyk

A.   Statement of facts ...................................................................................................... 7

I.   Facebook ................................................................................................................ 7

1.   The Facebook group ..................................................................................... 7

2.   Facebook.com ............................................................................................... 9

a.   Social network ...................................................................................... 9

(1)   Private user applications ............................................................. 10

(2)   Publisher applications ................................................................. 12

b.   Online advertising .............................................................................. 13

(1)   Advertising on Facebook ............................................................. 14

(2)   Targeting and refining audiences ............................................... 15

c.   Developer platform and Facebook Business Tools ............................ 16

(1)   Social plugins .............................................................................. 18

(2)   Facebook Login and Account Kit ................................................. 19

(3)   Analysis and measurement tools ............................................... 20

(a)   Ads reporting ....................................................................... 20

(b)   Facebook Analytics .............................................................. 21

3.   Instagram .................................................................................................... 22

4.   WhatsApp .................................................................................................... 24

II.   Facebook's Terms of Service and Data Policy ..................................................... 25

1.   Facebook Terms of Service ......................................................................... 26

2.   Data Policy .................................................................................................. 27

3.   Cookies policy ............................................................................................. 31

4.   Terms and conditions for other Facebook Products ................................... 32

a.   Facebook-owned services ................................................................... 32

(1)   WhatsApp .................................................................................... 32

(2)   Instagram .................................................................................... 34

(3)   Oculus and Masquerade .............................................................. 35

b.   Facebook Business Tools .................................................................... 36

(1)   Provisions set forth in the Terms of Service ............................... 36

(2)   Data collected ............................................................................. 37

(3)   Assignment to the individual Facebook user accounts ............... 39

III.   Progress of the proceedings ................................................................................ 41

B.   Legal assessment ....................................................................................................... 46

I.   Addressee of the provisions ................................................................................ 46

1.   Markets concerned ...................................................................................... 46

a.   Social media in Germany ..................................................................... 46

(1)   Relevant competitive environment ............................................. 47

(2) Services considered .................................................................................................. 50

b. National market for social networks ........................................................................ 59

(1) Network and multi-sided market pursuant to Section 18(3a) GWB ...................... 59

(a) Core product: Advertising-financed network ...................................................... 59

(b) Further market sides ........................................................................................ 62

(2) Definition of the product market .......................................................................... 64

(a) Relevant opposite market side: private users ..................................................... 64

(b) A service free of charge for users ...................................................................... 66

i. Market activity with free user services within the meaning of Section 18(2a) GWB......... 66

ii. Applicability of demand-side substitutability................................................ 68

(c) Specific demand for social networks .................................................................. 69

(d) Services to be considered ................................................................................. 73

i. StudiVZ, Jappy and (formerly) Google+,............................................... 74

● Classification as social networks ........................................................... 74

● Direct network effects limit substitutability ............................................. 76

ii. Professional networks like LinkedIn, Xing, Indeed are no substitutes ............ 78

iii. Messaging services excluded .............................................................. 80

iv. Snapchat excluded ............................................................................. 83

v. YouTube, Twitter ............................................................................... 88

● YouTube ............................................................................................. 88

● Twitter ................................................................................................. 92

vi. Pinterest, Instagram .......................................................................... 94

● Pinterest ............................................................................................. 94

● Instagram ........................................................................................... 95

vii. Other services .................................................................................. 97

(3) Geographic market definition ............................................................................ 98

(a) Actual national use .......................................................................................... 98

(b) National specifics ........................................................................................... 98

(c) Service providers unable to perform supply-side substitution ............................ 99

c. Online advertising markets .................................................................................... 99

(1) Definition of the product market ........................................................................ 100

(a) Online vs. offline advertising .......................................................................... 100

(b) Search and non-search advertising .................................................................. 101

(c) Possible separate market for non-search advertising on social media or social networks .. 102

(2) Geographic market definition ............................................................................ 103

d. Markets for social plug-ins, central log-ins and measurement and analysis services.................. 103

2. Market dominance .................................................................................................... 105

a. The concept of market dominance in the case of markets for free services ................................. 105

b. Overall assessment of the factors of market power pursuant to Section 18(3) and (3a) GWB .... 108

(1)    Market structure and competitors of social networks ........................................ 108

(a)    Market shares .......................................................................................... 109

i.    Determined shares of users ................................................................. 109

ii.    Daily active users as a key metric in the assessment of market power .......................... 112

(b)    Substitute competition by YouTube, Twitter and Snapchat does not significantly relativise

Facebook's market share ................................................................................. 116

(2)    Criteria defining market power pursuant to Section 18(3) and (3a) GWB ........................ 118

(a)    Network effects (Section 18(3a) no.1 GWB) ....................................................... 119

i.    Direct network effects and self-reinforcing feedback loops ............................................. 119

ii.    Likelihood of market tipping process ................................................... 122

iii.    Indirect network effects raising market entry barriers ..................................................... 125

(b)    Parallel use of services and high barriers for switching, Section 18(3a) no. 2 GWB ........ 128

i.    Multi-homing .......................................................................................... 128

ii.    Lock-in effect creates high barriers for switching ....................................................... 130

●    Lock-in through incompatibility and identity-based network effects ............................ 130

●    No data portability ............................................................................... 133

●    No relevant reduction of lock-in effects through share feature in other networks ....... 135

(c)    Economies of scale arising in connection with network effects, Section 18(3a) no. 3 GWB 135

(d)    Access to competition-related data, Section 18(3a) no. 4 GWB ...................................... 136

i.    Data sources .......................................................................................... 137

ii.    Competitive relevance of data ............................................................... 138

iii.    Establishment of a further barrier to market entry ......................................... 141

(e)    Innovation-driven competitive pressure, Section 18(3a) no. 5 GWB.............................. 143

II.    *Imposing abusive business terms pursuant to Section 19(1) GWB* ........................................ *149*

1.    Violation of data protection principles represents abusive practice ................................... 150

a.    Taking the GDPR into account within the framework Section 19(1) GWB .................... 150

b.    Relationship between competition law and data protection law ................................ 154

(1)    No violation of the rules on competence and consistency ................................... 154

(2)    GDPR does not include any final, substantive provisions .................................... 158

2.    Data processing terms as (other) contract terms ......................................................... 162

a.    Data policies as part of the Terms of Service ...................................................... 163

b.    No price within the meaning of antitrust law ...................................................... 165

3.    Violation of GDPR data protection values ............................................................... 166

a.    Processing of special categories of personal data and profiling (Articles 4 and 9 GDPR) ........... 167

(1)    Personal data............................................................................................ 167

(2)    Special data categories ........................................................................... 170

(3)    Data processing including profiling pursuant to Article (4) GDPR ...................... 171

(a)    Relevant data processing procedures pursuant to Article 4 (2) GDPR .................. 171

(b)      Profiling, Article 4 (4) GDPR ........................................................................ 173

b.    Responsibility for data processing ........................................................................ 176

(1)    Group privilege does not apply ........................................................................ 176

(2)    No effective processing on behalf of the controller ............................................ 179

c.    No justification under Article 6 and Article 9 GDPR .................................................. 182

(1)    Legal bases invoked ........................................................................................ 182

(2)    No effective consent ........................................................................................ 184

(a)      Agreeing to the Terms of Service does not constitute consent ........................... 185

(b)      No explicit consent for special data categories .............................................. 187

(c)      Privacy settings and browser settings do not constitute consent ....................... 187

i.     Settings for personalised advertising ...................................................... 188

ii.    Blocking of cookies and advertising IDs .................................................. 189

(3)    Data processing is not necessary for performance of the contract, Article 6 (1 b) GDPR.... 192

(a)      Article 6 (1b) GDPR does not apply when the contractual contents are imposed unilaterally

by the dominant company .................................................................................. 192

(b)      No contractual link between all Facebook Products ......................................... 195

(c)      Data processing is not necessary for contractual purposes ................................ 198

i.     Personalised user experience................................................................. 198

ii.    Other contractual purposes ................................................................... 203

(4)    No justification for special purposes pursuant to Article 6 (1 c)-e) GDPR .......................... 205

(a)      No legal justification pursuant to Article 6 (1 c) GDPR ....................................... 205

(b)      No vital interests, Article 6 (1 d) GDPR.......................................................... 206

(c)      No public interest, Article 6 (1 e) GDPR.......................................................... 206

(5)    No justification because of overriding interests pursuant to Article 6 (1 f) GDPR .............. 207

(a)      Facebook-owned services ........................................................................... 208

i.     Legitimate interests .............................................................................. 209

●   Facebook's interests.......................................................................... 209

●   Legitimate interests of third parties..................................................... 216

●   Interests and rights of users............................................................... 217

ii.    Balancing of interests with regard to the consequences for the affected users ............ 218

●   Type of data..................................................................................... 219

●   Type of data processing ..................................................................... 220

●   Users' reasonable expectations ........................................................... 221

●   Position of the controller and users ..................................................... 223

iii.   Lack of protective measures ................................................................... 224

(b)      Facebook Business Tools ............................................................................ 227

i.     Legitimate interests .............................................................................. 227

●   Facebook's interests.......................................................................... 227

●   Legitimate interests of third parties..................................................... 236

● Interests and rights of users .................................................................. 237

ii.    Balancing of interests with regard to the consequences for the affected users ........... 237

● Type of data ........................................................................................... 237

● Type of data processing .......................................................................... 238

● Users' reasonable expectations ............................................................... 239

● Facebook's position vis-à-vis users .......................................................... 241

iii.   Lack of protective measures ....................................................................... 242

(c)   Outcome of the balancing of interests ............................................................ 244

4.   Infringement as a manifestation of market power ........................................................ 245

a.   "Manifestation of market power" and causality ................................................... 245

(1)   Normative-causal connection with infringement of data protection law ........................ 246

(2)   Causality with regard to impeding effects on competitors .................................. 249

b.   Balancing of interests under antitrust law .......................................................... 251

(1)   Necessity according to case law ................................................................ 251

(2)   Balancing interests simultaneously under antitrust law and data protection law .............. 252

*III.*   *Abuse pursuant to Article Art. 102 TFEU* ............................................................... *257*

**C.**   **Decision based on Section 32 of the German Competition Act** ............................................ **258**

*I.*   *Main statements* ................................................................................................ *258*

1.   Prohibition of the use of provisions in the Terms of Service specified by Paragraph 1 in the Data

Policy and Cookies Policy ............................................................................................. 258

a.   Terms of Service an act of infringement ............................................................ 258

b.   Current conditions and guidelines ................................................................... 263

2.   Prohibition of the implementation of the Terms of Service, Paragraph 2 ........................ 265

3.   Obligation to terminate the infringement, Paragraph 3 ............................................. 266

*II.*   *Necessity and proportionality according to Section 32 of the Act on Restraints of Competition* ......... *267*

*III.*   *Other discretionary powers* ................................................................................ *270*

**D.**   **Fees** ....................................................................................................... **272**

# Exhibit 503

Share photos or videos | LinkedIn Help

in    LinkedIn ⌄       How can we help?          🔍

# Share photos or videos

Last updated: 4 months ago

---

You can share photos and videos with your network using the share box at the top of the LinkedIn homepage, a Group, or a LinkedIn Page.

**Desktop**     Mobile

To share a photo or video:

1    Click the 🖼 **Media** icon in the share box at the top of your LinkedIn homepage.

      **Here's a tip**
      You can also directly drag and drop or copy and paste photo/s or a video into the share box.

2    Click **Upload from computer** to select files.

      •   Choose which files you'd like to upload (you can select up to 20 images) or a single video.

3    After uploading a photo or multiple photos, you can:

      •   **Edit**: Click ✏ **Edit** to crop, straighten, apply filters, or adjust the photo.

      •   **Tag**: Click 👤 **Tag** to tag another member or organization.

      •   **Alternative text**: Click **ALT** to add alternative text for members using voice-over screen readers.

      •   **Duplicate**: Click 📄 **Duplicate** to duplicate an image.

      •   **Delete**: Click 🗑 **Delete** to delete an image.

      •   **Add image**: Click ➕ **Add** to add/upload more images.

4    After uploading a video, you can:

      •   **Video thumbnail**: Select 🖼 **Video thumbnail** to **Upload video thumbnail** for your video.

      •   **Captions**: Select 🆑 **Captions** to upload a **Add auto captions (English-only)**, or **Review captions** before adding it, or add a **Video Caption File** for your video.

      •   **Delete**: Click 🗑 **Delete** to delete an image.

5    Click **Next**.

6    Click the dropdown next to your name in the post pop-up window.

      From here, you can:

      •   **Visibility**: Select who you want to share the post with

      •   **Comment control**: Select who can comment on your posts

      Click **Done** after selecting your post settings.

7    Type the content of your post in the **What do you want to talk about?** field (optional).

8    Click **Post**.

---

The photo requirements are:

•   The size limit for an upload is 5 MB

•   Photo must be at least 552 (w) x 276 (h) pixels, but we recommend 1080 (w) pixels to better connect with your audience

- The photo's aspect ratio can range from 3:1 to 4:5 (width:height). If the ratio is larger, the image will be centered and cropped to fit the max ratio.

- Uploaded photos can't be resized after they have been posted

- Uploaded photos/videos can't be edited after they have been posted

- Small, low-resolution photos may appear in a low-quality

For multi-photo posts,

- Images will render a max ratio of 4:5 (e.g., 640 (w) x 800 (h) pixels) and the post will have a greater visual emphasis on the first image

- The layout of these posts will depend on the height and orientation of the first image uploaded

- Posts with two images will appear side by side and will retain their aspect ratios

- When posts contain three or more images, the way they appear depends on the height and orientation of the first image. If the first image is landscape, it will be shown at the top, with the other images displayed side-by-side below the first image. If the first image is portrait or square, it will be shown in the left column, with the other images stacked vertically to the right of the first image.

- You can add a max of 20 photos in a multi-photo post

The video requirements are:

- Maximum file size: 5GB

   **Note**: Video quality may be lower if your video is close to maximum file size. We recommend reducing your file size for better results.

- Minimum file size: 75KB

- Maximum video duration: 15 minutes when uploading from desktop and 10 minutes when uploading from the LinkedIn mobile app.

- Minimum video duration: 3 seconds

- Resolution range: 256x144 to 4096x2304

- Aspect ratio: 1:2.4 - 2.4:1

- Frame rates: 10fps - 60 fps

- Bit rates: 192 kbps - 30 Mbps

**Note:** You can share either a URL link or an image in a post, but not both at the same time. For URL links, we create a preview image taken from the site being shared.

**Learn more**

- Video sharing troubleshooting

- Post and share content on LinkedIn

- Share videos on LinkedIn FAQs

- Visibility of shared posts



Was this answer helpful?

Yes    No

**Tagged in**

Share Content    Post    Media

**Related articles**

📄 Choose if you want to see less political content in your LinkedIn feed

📄 Add images and other rich media to your article

📄 Post analytics for your content

Linked**in**

Contact us

English (English)

About     Transparency Center     Privacy and Terms ▼     LinkedIn Corporation © 2024

# Exhibit 504



☰                                     Log in

# Welcome to IGTV, our New Video App

By Kevin Systrom, Co-Founder & CEO    ⏱ June 20, 2018



*Update: We launched IGTV at an event in San Francisco featuring many of the Instagram creators who'll make IGTV great. Check out the* video of the event *to learn what IGTV is, how it works and see it come to life.*

Today, we have two big announcements to share. First, Instagram is now a global community of one billion! Since our launch in 2010, we've watched with amazement as the community has flourished and grown. This is a major accomplishment — so from all of us at Instagram, thank you!

Second, we're announcing our most exciting feature to date: IGTV, a new app for watching long-form, vertical video from your favorite Instagram creators, like LaurDIY posting her newest project or King Bach sharing his latest comedy skit.

While there's a stand-alone IGTV app, you'll also be able to watch from within the Instagram app so the entire community of one billion can use it from the very start.




IGTV is different in a few ways. First, it's built for how you actually use your phone, so videos are full screen and vertical. Also, unlike on Instagram, videos aren't limited to one minute. Instead, each video can be up to an hour long.

We've made it simple, too. Just like turning on the TV, IGTV starts playing as soon as you open the app. You don't have to search to start watching content from people you already follow on Instagram and others you might like based on your interests. You can swipe up to discover more — switch between "For You," "Following," "Popular" and "Continue Watching." You can also like, comment and send videos to friends in Direct.




 

Also like TV, IGTV has channels. But, in IGTV, the creators are the channels. When you follow a creator on Instagram, their IGTV channel will show up for you to watch. Anyone can be a creator — you can upload your own IGTV videos in the app or on the web to start your own channel.

 

Instagram has always been a place to connect with the people who inspire, educate and entertain you every day. With your help, IGTV begins a new chapter of video on Instagram. We hope it brings you closer to the people and things you love.

*Kevin Systrom, Co-Founder & CEO*

IGTV will be rolling out globally over the next few weeks on Android and iOS. You can learn more by visiting the Instagram Help Center.

## RELATED ARTICLES

# Check out more announcements about product





#PRODUCT  #ANNOUNCEMENTS

## Introducing New Ways to Verify Age on Instagram

#PRODUCT  #INSTAGRAM  #ANNOUNCEMENTS

## New Tools and Resources for Parents and Teens in VR and on Instagram



#PRODUCT  #ANNOUNCEMENTS

## Updates to the Sensitive Content Control

About Us

Features

Community

Business

Safety

Careers

Reels

Anti-Bullying

Advertising

Creators

Brand Assets

Stories

Parents

Partners

Messenger

Programs

Success Stories

Blog

Video

Help

Shopping

Search & Explore

Instagram Engineering

English (US)    Instagram from Meta    API    Privacy    Terms    Sitemap

# Exhibit 505



YouTube Help Describe your issue Sign in

Help Center Community Creator Tips YouTube

Fix a problem | Watch videos | Manage your account & settings | Supervised experience on YouTube | YouTube Premium | Create & grow your channel | Monetize with the YouTube Partner Program | Policy, safety

Customize & manage your channel > Manage your channel branding

# Manage your channel branding

Brand your YouTube channel's identity by updating your profile picture, channel banner, and video watermark.

Computer | Android | iPhone & iPad

Change your profile picture

Change your banner image

Add your video watermark

Get channel banner and profile picture tips for creators.

## Watch how to manage your channel branding

Watch the following video from the YouTube Creators channel on how to update your profile picture, channel banner, and video watermark.

Subscribe to the YouTube Creators channel for the latest news, updates, and tips.

Give feedback about this article

Was this helpful? Yes No

## Customize & manage your channel

- Channel customization
- Customize YouTube channel layout
- Manage your channel branding
- Manage your YouTube channel's basic info
- Custom URL overview
- Understand your YouTube channel's URLs

©2024 Google - Privacy Policy - YouTube Terms of Service English

# Exhibit 506



YouTube Help | Describe your issue | Sign in

Help Center | Community | Creator Tips | YouTube

Fix a problem | Watch videos | Manage your account & settings | Supervised experience on YouTube | YouTube Premium | Create & grow your channel | Monetize with the YouTube Partner Program | Policy, safety

Customize & manage your channel > Manage your YouTube channel's basic info

# Manage your YouTube channel's basic info

You can manage basic info about your YouTube channel such as channel name and description, translations, and links.

Computer | Android | iPhone & iPad

- Name
- Handle
- Description
- Add or change your pronouns
- Translation for channel name & description
- Channel URL
- Channel profile links
- Contact info

## Watch how to manage your channel's basic info

Watch the following video from the YouTube Creators channel on how to change your channel name and description, translations, and links.

×

Subscribe to the YouTube Creators channel for the latest news, updates, and tips.

Give feedback about this article

Was this helpful? Yes No

Customize & manage your channel

- Channel customization
- Customize YouTube channel layout
- Manage your channel branding
- Manage your YouTube channel's basic info
- Custom URL overview
- Understand your YouTube channel's URLs

©2024 Google - Privacy Policy - YouTube Terms of Service English

# Exhibit 507

6/27/24, 3:23 PM                                    screenshot.png (1585×2616)



Manage privacy settings > Change video privacy settings

**Manage privacy settings**

Change playlist privacy setting

Change video privacy settings

# Change video privacy settings

Update the privacy settings of your video to control where your video can appear and who can watch it.

Android     **Computer**     iPhone & iPad

1. Sign in to YouTube Studio ↗ .
2. From the left-hand menu, select **Content**.
3. Point to the video that you'd like to update. To see your live uploads, select the **Live** tab.
4. Click the down arrows under 'Visibility' and choose **Public**, **Private** or **Unlisted**.
5. **Save**.

*Note: The default video privacy setting for creators aged 13–17 is private. If you're 18 or older, your default video privacy setting is set to public. Everyone can change this setting to make their video public, private or unlisted.*





that might have been placed on a video

Subscribe to the YouTube Creators channel ↗ for the latest news, updates and tips.

## About privacy settings

### Public videos ⌃

**Anyone on YouTube can see public videos**. **They can also be shared with anyone using YouTube**. They're posted on your channel when you upload them and can show in search results and related video lists.

### Private videos ⌃

Private videos and playlists can only be **seen by you and whomever you choose**. Your private videos won't appear on the **Videos** tab on your channel homepage. They also won't appear in YouTube's search results. YouTube systems and human reviewers may review private videos for ad suitability, copyright and other abuse prevention mechanisms.

To share a private video:

1. Sign in to YouTube Studio ↗ .
2. From the left menu, select **Content**.
3. Click the video that you'd like to edit.
4. Click the **Visibility** box and select **Share privately**.
5. Enter the emails that you'd like to share your video with, then select **SAVE**.

Comments are not available on private videos. If you want to allow comments on a video that's not publicly available, change the privacy setting to unlisted.

### Unlisted videos ⌃

Unlisted videos and playlists can be **seen and shared by anyone with the link**. Your unlisted videos won't appear on the **Videos** tab on your channel homepage. They won't appear in YouTube's search results unless someone adds your unlisted video to a public playlist.

You can share an unlisted video's URL. Those that you share the video with don't need a Google Account to see the video. Anyone with the link can also reshare it.

| Feature | Private | Unlisted | Public |
|---|---|---|---|
| Can share URL | No | Yes | Yes |
| Can be added to a channel section | No | Yes | Yes |
| Can show in search, related videos and recommendations | No | No | Yes |

screenshot.png (1585×2616)

| | | | |
|---|---|---|---|
| Posted on your channel | No | No | Yes |
| Shows in the subscriber feed | No | No | Yes |
| Can be commented on | No | Yes | Yes |
| Can show up in a public playlist | No | Yes | Yes |

⚠ Give feedback about this article

Was this helpful?   Yes   No

©2024 Google - Privacy Policy - YouTube Terms of Service

English (United Kingdom) ▾   ✦

# Exhibit 508

6/27/24, 4:24 PM
Case 1:20-cv-03590-JEB Document 369-7 Filed 07/12/24 Page 350 of 497
Differences between public and private accounts on Instagram | Instagram Help Center

 Help Center

Instagram Features

Manage Your Account

Staying Safe

Privacy, Security and Reporting

Terms and Policies

Threads

## Differences between public and private accounts on Instagram

Copy link

Note: If you are under 16 when you sign up for an Instagram account, you'll have the option to choose between a public or private account, but Private is selected by default.

If you're over 16, your Instagram account is public by default and you can choose to make your account private at any time. Learn more about how to make your account private.

Learn more about how to make your account private.

### The differences between public and private accounts on Instagram:

| | Public | Private |
|---|---|---|
| Who can follow you? | Anyone on Instagram | Only people you approve |
| Who can see public accounts you follow and who follow you? | Anyone on Instagram | Anyone on Instagram |
| Who can see private accounts you follow and private accounts that follow you? | Anyone on Instagram | Your followers |
| Who can see your photos and videos on your profile or in feed? | Anyone on Instagram | Your followers |
| Who can see your photos and videos in search results, Explore, and hashtag and location pages? | Anyone on Instagram | No one |
| Who can see your profile information, including your profile photo, name, username and bio? | Anyone on or off Instagram | Anyone on or off Instagram |
| Who can share your photos and videos with other people on Instagram and see what's shared? | Anyone on Instagram, unless you update your settings | Your followers, unless you update your settings |
| Who can download your reel? | Anyone on Instagram, unless you update your settings | No one |
| Who can remix your videos? | Anyone on Instagram, unless you update your settings | No one |
| Who can embed your photos and videos off Instagram? | Anyone on or off Instagram, unless you update your setting | No one |

Things to keep in mind if you have a public account and are over 16:

- Anyone on Instagram can reshare and remix your videos (unless you're under 16 and you've changed your settings to allow this). This may include downloading part of your original photo or video as part of the remix. You can turn this off in privacy settings.

- Anyone on Instagram can share your photos and videos, including adding your posts to their story. You can change who can share your photos and videos in privacy settings.

Things to keep in mind if you have a private account and are over 16:

- Follow requests appear in Activity, where you can approve or ignore them.

- If someone was already following you before you set your posts to private and you don't want them to see your posts, you can remove them from your followers list or block them.

- Your followers can share your photos and videos in messages unless you update your settings. Only people who follow you can see what's shared.

- Private posts you share to social networks may be visible to the public depending on your privacy settings for those networks. For example, a post you share to Twitter that was set to private on Instagram may be visible to the people who can see your Twitter posts.

Was this helpful?

 Help Center

- Your public account may be recommended for other people on Instagram to follow.
- Content from and information about your public account may be accessible to third-parties who use our research tools.
- Your account may appear in search results on Instagram.
- Anyone on Instagram can tag, mention, request to message you, and add you to group messages unless you change this in your privacy settings.
- Your account may appear in search engine results but only your profile picture and bio will be visible.

Keep in mind that business profiles aren't able to make their accounts private. If you want to make your business account private, first switch back to a personal account.

## Related Articles

Make your Instagram account private

Differences between public and private profiles on Threads

About professional accounts on Instagram

Manage privacy on Instagram

Switch your Threads profile to public or private

About Us                     API                          Jobs

Terms                        Privacy

from ⚭ Meta                                               © 2024 Meta

Was this helpful?

# Exhibit 509

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

May 18, 2023

*Via Electronic Mail*

Nathan Brenner
Federal Trade Commission
Bureau of Competition
400 Seventh Street SW
Washington, D.C. 20024

      Re:    *FTC v. Meta Platforms, Inc.*, Case No. 1:20-cv-03590-JEB

Counsel,

      Enclosed are data responsive to Request for Production No. 86 in the FTC's Third Set of Requests for Production. The production volume is FTC-META-203 and includes 20 data files, which bear Bates numbers FTC-META-012468437 to FTC-META-012468456.

      This letter and its enclosures are being provided pursuant to the Protective Order in this case and include data designated as Highly Confidential under that Order. This production includes business information, the release or publication of which could substantially harm the business of Meta and is to be treated as Highly Confidential in accordance with the terms of the Protective Order, and all applicable statutes and regulations including protection from any disclosure pursuant to the Freedom of Information Act. By this production, Meta does not intend to waive, and is not waiving, any claim of privilege to which it is entitled. *See* Stipulated FRE 502(d) Order, ECF No. 107. Accordingly, any production of privileged information does not preclude the subsequent assertion of a claim of attorney-client privilege, work product, or any other applicable privilege or protection in the future with respect to that information.

      Sincerely,

      */s/ Matthew D. Reade*

      Matthew D. Reade
      Counsel for Meta

Enclosures

# Exhibit 510

 Help Center

Send Messages | Facebook Help Center

Using Facebook  ›  Messaging

## Send Messages

### Send Messages

Send a message on Facebook ▾

Edit a message on Facebook ▾

Remove a message you've sent on Facebook ▾

**Who can I send messages to on Facebook** ▴

> This is about using messages on Facebook. For help with the Messenger app or messenger.com, visit the Messenger Help Center.

You can send messages to anyone on Facebook. Messages you send to people you're not friends with may arrive in their Message Requests folder.

Your messages also won't reach people who may have blocked you on Facebook chat or Messenger.

**Was this helpful?**  ✕

| ☹ Yes | ☺ No |

How messages on Facebook work ▾

How do I know if a friend has seen a message I sent on Facebook? ▾

Add a file to your message on Facebook ▾

Send a photo, emoji or sticker to someone on Facebook ▾

### Deleting

Delete sticker packs for my Facebook messages ▾

Can I retrieve deleted messages on Facebook ▾

### Group Conversations

How many people can I message at once on Facebook ▾

Chat with more than one friend at once on Facebook ▾

Leave a group chat on Facebook ▾

### Messaging Pages, Events and Groups

Send a message to your Facebook event guest list ▾

Send a private message to a Facebook Page ▾



# Exhibit 511

# The Welfare Effects of Social Media

Hunt Allcott, Luca Braghieri, Sarah Eichmeyer, and Matthew Gentzkow[*]

November 8, 2019

## Abstract

The rise of social media has provoked both optimism about potential societal benefits and concern about harms such as addiction, depression, and political polarization. In a randomized experiment, we find that deactivating Facebook for the four weeks before the 2018 US midterm election (i) reduced online activity, while increasing offline activities such as watching TV alone and socializing with family and friends; (ii) reduced both factual news knowledge and political polarization; (iii) increased subjective well-being; and (iv) caused a large persistent reduction in post-experiment Facebook use. Deactivation reduced post-experiment valuations of Facebook, suggesting that traditional metrics may overstate consumer surplus.

**JEL Codes:** D12, D90, I31, L86, O33.

**Keywords:** Social media, political polarization, subjective well-being, consumer surplus from digital technologies.

[*]Allcott: New York University and NBER. hunt.allcott@nyu.edu. Braghieri: Stanford University. lucabrag@stanford.edu. Eichmeyer: Stanford University. saraeich@stanford.edu. Gentzkow: Stanford University and NBER. gentzkow@stanford.edu. We thank Nancy Baym, Moira Burke, Annie Franco, Alex Leavitt, Todd Rogers, Joel Waldfogel, and seminar participants at Berkeley, Centro de Investigación y Docencia Económicas, Chicago, Columbia, Instituto Tecnológico Autónomo de México, Microsoft, NBER Digitization, NYU, Stanford, the Technology Policy Institute, UCLA, UC Santa Cruz, and University of Washington for helpful comments. We thank Raj Bhargava, Zong Huang, and Kelly B. Wagman for exceptional research assistance. We are grateful to the Sloan Foundation and the Knight Foundation for generous support. The study was approved by Institutional Review Boards at Stanford (eProtocol #45403) and NYU (IRB-FY2018-2139). This RCT was registered in the American Economic Association Registry for randomized control trials under trial number AEARCTR-0003409. Replication files and survey instruments are available from https://sites.google.com/site/allcott/research. Disclosures: Allcott is a paid employee of Microsoft Research. Gentzkow does paid consulting work for Amazon and is a member of the Toulouse Network for Information Technology, a research group funded by Microsoft. Braghieri and Eichmeyer have no relevant or material disclosures.

# 1   Introduction

Social media have had profound impacts on the modern world. Facebook, which remains by far the largest social media company, has 2.3 billion monthly active users worldwide (Facebook 2018). As of 2016, the average user was spending 50 minutes per day on Facebook and its sister platforms Instagram and Messenger (Facebook 2016). There may be no technology since television that has so dramatically reshaped the way people get information and spend their time.

Speculation about social media's welfare impact has followed a familiar trajectory, with early optimism about potential benefits giving way to widespread concern about possible harms. At a basic level, social media dramatically reduce the cost of connecting, communicating, and sharing information with others. Given that interpersonal connections are among the most important drivers of happiness and well-being (Myers 2000; Reis, Collins, and Berscheid 2000; Argyle 2001; Chopik 2017), this could be expected to bring widespread improvements to individual welfare. Many have also pointed to wider social benefits, from facilitating protest and resistance in autocratic countries, to encouraging activism and political participation in established democracies (Howard et al. 2011; Kirkpatrick 2011).

More recent discussion has focused on an array of possible negative impacts. At the individual level, many have pointed to negative correlations between intensive social media use and both subjective well-being and mental health.[1] Adverse outcomes such as suicide and depression appear to have risen sharply over the same period that the use of smartphones and social media has expanded.[2] Alter (2018) and Newport (2019), along with other academics and prominent Silicon Valley executives in the "time well-spent" movement, argue that digital media devices and social media apps are harmful and addictive. At the broader social level, concern has focused particularly on a range of negative political externalities. Social media may create ideological "echo chambers" among like-minded friend groups, thereby increasing political polarization (Sunstein 2001, 2017; Settle 2018). Furthermore, social media are the primary channel through which misinformation spreads online (Allcott and Gentzkow 2017), and there is concern that coordinated disinformation campaigns can affect elections in the US and abroad.

In this paper, we report on a large-scale randomized evaluation of the welfare impacts of Facebook, focusing on US users in the run-up to the November 2018 midterm elections. We recruited a sample of 2,743 users through Facebook display ads, and elicited their willingness-to-accept (WTA) to deactivate their Facebook accounts for a period of four weeks ending just after the election. We then randomly assigned the 61 percent of these subjects with WTA less than $102 to either a Treatment group that was paid to deactivate, or a Control group that was not. We verified compliance

---

[1]See, for example, Abeele et al. (2018), Burke and Kraut (2016), Ellison, Steinfield, and Lampe (2007), Frison and Eggermont (2015), Kross et al. (2013), Satici and Uysal (2015), Shakya and Christakis (2017), and Tandoc, Ferrucci, and Duffy (2015). See Appel, Gerlach, and Crusius (2016) and Baker and Algorta (2016) for reviews.

[2]See, for example, Twenge, Sherman, and Lyubomirsky (2016), Twenge and Park (2017), Twenge, Martin, and Campbell (2018), and Twenge et al. (2018).

with deactivation by regularly checking participants' public profile pages. We measured a suite of outcomes using text messages, surveys, emails, direct measurement of Facebook and Twitter activity, and administrative voting records. Less than two percent of the sample failed to complete the endline survey, and the Treatment group's compliance with deactivation exceeded 90 percent.

Our study offers the largest-scale experimental evidence available to date on the way Facebook affects a range of individual and social welfare measures. We evaluate the extent to which time on Facebook substitutes for alternative online and offline activities, with particular attention to crowd out of news consumption and face-to-face social interactions. We study Facebook's broader political externalities via measures of news knowledge, awareness of misinformation, political engagement, and political polarization. We study the impact on individual utility via measures of subjective well-being, captured through both surveys and text messages. Finally, we analyze the extent to which forces like addiction, learning, and projection bias may cause sub-optimal consumption choices, by looking at how usage and valuation of Facebook change after the experiment.

Our first set of results focuses on substitution patterns. A key mechanism for effects on individual well-being would be if social media use crowds out face-to-face social interactions and thus deepens loneliness and depression (Twenge 2017). A key mechanism for political externalities would be if social media crowds out consumption of higher-quality news and information sources. We find evidence consistent with the first of these but not the second. Deactivating Facebook freed up 60 minutes per day for the average person in our Treatment group. The Treatment group actually spent less time on both non-Facebook social media and other online activities, while devoting more time to a range of offline activities such as watching television alone and spending time with friends and family. The Treatment group did not change its consumption of any other online or offline news sources and reported spending 15 percent less time consuming news.

Our second set of results focuses on political externalities, proxied by news knowledge, political engagement, and political polarization. Consistent with the reported reduction in news consumption, we find that Facebook deactivation significantly reduced news knowledge and attention to politics. The Treatment group was less likely to say they follow news about politics or the President, and less able to correctly answer factual questions about recent news events. Our overall index of news knowledge fell by 0.19 standard deviations. There is no detectable effect on political engagement, as measured by voter turnout in the midterm election and the likelihood of clicking on email links to support political causes. Deactivation significantly reduced polarization of views on policy issues and a measure of exposure to polarizing news. Deactivation did not statistically significantly reduce affective polarization (i.e. negative feelings about the other political party) or polarization in factual beliefs about current events, although the coefficient estimates also point in that direction. Our overall index of political polarization fell by 0.16 standard deviations. As a point of comparison, prior work has found that a different index of political polarization rose by 0.38 standard deviations between 1996 and 2018 (Boxell 2018).

Our third set of results looks at subjective well-being. Deactivation caused small but significant improvements in well-being, and in particular in self-reported happiness, life satisfaction, depression, and anxiety. Effects on subjective well-being as measured by responses to brief daily text messages are positive but not significant. Our overall index of subjective well-being improved by 0.09 standard deviations. As a point of comparison, this is about 25-40 percent of the effect of psychological interventions including self-help therapy, group training, and individual therapy, as reported in a meta-analysis by Bolier et al. (2013). These results are consistent with prior studies suggesting that Facebook may have adverse effects on mental health. However, we also show that the magnitudes of our causal effects are far smaller than those we would have estimated using the correlational approach of much prior literature. We find little evidence to support the hypothesis suggested by prior work that Facebook might be more beneficial for "active" users—for example, users who regularly comment on pictures and posts from friends and family instead of just scrolling through their news feeds.[3]

Our fourth set of results considers whether deactivation affected people's demand for Facebook after the study was over, as well as their opinions about Facebook's role in society. As the experiment ended, participants reported planning to use Facebook much less in the future. Several weeks later, the Treatment group's reported usage of the Facebook mobile app was about 11 minutes (22 percent) lower than in Control. The Treatment group was more likely to click on a post-experiment email providing information about tools to limit social media usage, and five percent of the Treatment group still had their accounts deactivated nine weeks after the experiment ended. Our overall index of post-experiment Facebook use is 0.61 standard deviations lower in Treatment than in Control. In response to open-answer questions several weeks after the experiment ended, the Treatment group was more likely to report that they were using Facebook less, had uninstalled the Facebook app from their phones, and were using the platform more judiciously. Reduced post-experiment use aligns with our finding that deactivation improved subjective well-being, and it is also consistent with the hypotheses that Facebook is habit forming in the sense of Becker and Murphy (1988) or that people learned that they enjoy life without Facebook more than they had anticipated.

Deactivation caused people to appreciate Facebook's both positive and negative impacts on their lives. Consistent with our results on news knowledge, the Treatment group was more likely to agree that Facebook helps people to follow the news. About 80 percent of the Treatment group agreed that deactivation was good for them, but they were also more likely to think that people would miss Facebook if they used it less. In free response questions, the Treatment group wrote more text about how Facebook has both positive and negative impacts on their lives. The opposing effects on these specific metrics cancel out, so our overall index of opinions about Facebook is unaffected.

Our work also speaks to an adjacent set of questions around how to measure the economic

---

[3]Correlation studies on active vs. passive Facebook use include Burke, Marlow, and Lento (2010), Burke, Kraut, and Marlow (2011), Burke and Kraut (2014), and Krasnova et al. (2013), and randomized experiments include Deters and Mehl (2012) and Verduyn et al. (2015).

gains from free online services such as search and media.[4]  In standard models with consumers who correctly optimize their allocation of time and money, researchers can approximate the consumer surplus from these services by measuring time use or monetary valuations, as in Brynjolfsson and Oh (2012), Brynjolfsson, Eggers, and Gannamaneni (2018), Corrigan et al. (2018), and others. But if users do not understand the ways in which social media could be addictive or make them unhappy, these standard approaches could overstate consumer surplus gains.  Sagioglu and Greitemeyer (2014) provide suggestive evidence: while their participants predicted that spending 20 minutes on Facebook would make them feel better, it actually caused them to feel worse.  Organizations such as Time to Log Off argue that a 30-day "digital detox" would help people align their social media usage with their own best interest.

To quantify the possibility that deactivation might help the Treatment group to understand ways in which their use had made them unhappy, we elicited willingness-to-accept at three separate points, using incentive-compatible Becker-DeGroot-Marschak (1964, "BDM") mechanisms.  First, on October 11th, we elicited WTA to deactivate Facebook for weeks 1-4 of the experiment, between October 12th and November 8th.  We immediately told participants the amount that they had been offered to deactivate ($102 for the Treatment group, $0 for Control), and thus whether they were expected to deactivate over that period.  We then immediately elicited WTA to deactivate Facebook for the next four weeks *after* November 8th, i.e. weeks 5-8.  When November 8th arrived, we then re-elicited WTA to deactivate for weeks 5-8.  The Treatment group's change in valuation for weeks 5-8 reflects a time effect plus the effect of deactivating Facebook.  The Control group's parallel valuation change reflects only a time effect.  Thus, the difference between how Treatment vs. Control change their WTAs for deactivation for weeks 5-8 reflects projection bias, learning, or other unanticipated experience effects from deactivation.[5]

After weighting our sample to match the average US Facebook user on observables, the median and mean willingness-to-accept to deactivate Facebook for weeks 1-4 were $100 and $180, respectively.  These valuations are larger than most estimates in related work by Brynjolfsson, Eggers, and Gannamaneni (2018), Corrigan et al. (2018), Mosquera et al. (2018), and Sunstein (2019).  A standard consumer surplus calculation would aggregate the mean valuation across the estimated 172 million US Facebook users, giving $31 billion in consumer surplus from four weeks of Facebook.  However, consistent with our other results that deactivation reduced demand for Facebook, deactivation caused WTA for weeks 5-8 to drop by up to 14 percent.  This suggests that traditional consumer surplus metrics overstate the true welfare gains from social media, though a calculation that adjusts for the downward WTA revision would still imply that Facebook generates enormous

---

[4]See, for example, Brynjolfsson and Saunders (2009), Byrne, Fernald, and Reinsdorf (2016), Nakamura, Samuels, and Soloveichik (2016), Brynjolfsson, Rock, and Syverson (2018), and Syverson (2017).

[5]This measurement connects to the literature on habit formation and projection bias, including Acland and Levy (2015), Becker and Murphy (1988), Becker, Grossman, and Murphy (1991), Busse et al. (2015), Charness and Gneezy (2009), Conlin, O'Donoghue, and Vogelsang (2007), Fujiwara, Meng, and Vogl (2016), Gruber and Kőszegi (2001), Hussam et al. (2016), Loewenstein, O'Donoghue, and Rabin (2003), and Simonsohn (2010).

flows of consumer surplus.

What do our results imply about the overall net welfare impact of Facebook? On the one hand, Facebook deactivation increased subjective well-being, and 80 percent of the Treatment group reported that deactivation was good for them. On the other hand, participants were unwilling to give up Facebook unless offered fairly large amounts of money—even after they had deactivated for four weeks, which should have allowed at least some learning or "detox" from addiction. It is not entirely clear whether one should prioritize the survey measures or monetary valuations as normative measures of consumer welfare. Benjamin et al. (2012) suggest that subjective well-being measures like ours are not a complete measure of what people are trying to maximize when they make decisions, but Bohm, Lindén, and Sonnegård (1997), Mazar, Koszegi, and Ariely (2014), and other studies make clear that monetary valuations are not closely held and can be easily manipulated. We think of these tensions as fodder for future research.

Our results should be interpreted with caution, for several reasons. First, effects could differ with the duration, time period, or scale of deactivation. A longer period without Facebook might have less impact on news knowledge as people find alternative news sources, and either more or less impact on subjective well-being. Effects might be different for our pre-election deactivation than for deactivation in other periods. Furthermore, the effects of deactivating a large share of Facebook users would likely be different due to network effects, so our parameters are most relevant for individuals independently determining their own Facebook use. Second, our sample is not fully representative. Our participants are relatively young, well-educated, and left-leaning compared to the average Facebook user; we included only people who reported using Facebook more than 15 minutes per day; and people willing to participate in our experiment may also differ in unobservable ways. Third, many of our outcome variables are self-reported, adding scope for both measurement error and experimenter demand effects. However, Section 5.6 finds no evidence of demand effects, and our non-self-reported outcomes paint a similar picture to the survey responses.

The causal impacts of social media have been of great interest to researchers in economics, psychology, and other fields. We are aware of 12 existing randomized impact evaluations of Facebook.[6] The most closely related is the important paper by Mosquera et al. (2018), which was made public the month before ours. They also use Facebook deactivation to study news knowledge and well-being, finding results broadly consistent with those reported here. Appendix Table A1 details these experiments in comparison to ours. Our deactivation period is substantially longer and our sample size an order of magnitude larger than most prior experimental work, including Mosquera

---

[6]These studies sit within a broader media effects literature that uses experimental and quasi-experimental methods to quantify the effects of media technologies such as television, media providers such as Fox News, and content such as political advertising (Bartels 1993; Besley and Burgess 2001; DellaVigna and Kaplan 2007; Enikolopov, Petrova, and Zhuravskaya 2011; Gentzkow 2006; Gerber and Green 2000; Gerber et al. 2011; Gerber, Karlan, and Bergan 2009; Huber and Arceneaux 2007; Martin and Yurukoglu 2017; Olken 2009; and Spenkuch and Toniatti 2016); for reviews, see DellaVigna and Gentzkow (2010), Napoli (2014), Strömberg (2015), Enikolopov and Petrova (2015), and DellaVigna and La Ferrara (2015).

et al. (2018). We measure impacts on a relatively comprehensive range of outcomes, and we are the only one of these randomized trials to have submitted a pre-analysis plan. Given the effect sizes and residual variance in our sample, we would have been unlikely to have sufficient power to detect any effects if limited to the sample sizes in previous experiments. Our work also relates to quasi-experimental estimates of social media effects by Muller and Schwarz (2018) and Enikolopov, Makarin, and Petrova (2018).

Sections 2 through 4 present the experimental design, descriptive statistics, and empirical strategy. Section 5 presents the impact evaluation, and Section 6 discusses measurement of the consumer surplus generated by Facebook.

## 2   Experimental Design

### 2.1   Experiment Overview

Figure 1 summarizes our experimental design and timeline. We timed the experiment so that the main period of Facebook deactivation would end shortly after the 2018 US midterm elections, which took place on November 6th. The experiment has eight parts: recruitment, pre-screen, baseline survey, midline survey, endline survey, post-endline survey, post-endline emails, and daily text messages.

Between September 24th and October 3rd, we recruited participants using Facebook ads. Our ad said, "Participate in an online research study about internet browsing and earn an easy \$30 in electronic gift cards." Appendix Figure A1 presents the ad. To minimize sample selection bias, the ad did not hint at our research questions or suggest that the study was related to social media or Facebook deactivation. We targeted the ads by demographic cells in an attempt to gather an initial sample that was approximately representative of Facebook users on gender, age, college completion, and political ideology. 1,892,191 unique users were shown the ad, of whom 32,201 clicked on it. This 1.7 percent click-through rate is about twice the average click-through rate on Facebook ads across all industries (Irvine 2018).

Clicking on the ad took the participant to a brief pre-screen survey, which included several background demographic questions and the consent form. 17,335 people passed the pre-screen, by reporting being a US resident born between the years 1900 and 2000 who uses Facebook more than 15 minutes and no more than 600 minutes per day. Of those people, 7,455 consented to participate in the study.

After completing the consent form, participants began the baseline survey. The baseline recorded email addresses, additional demographics, and a range of outcome variables. We also asked for each participant's name, zip code, Twitter handle, and phone number ("in order for us to send you text messages during the study"), as well as the URL of their Facebook profile page (which we would use "solely to observe whether your Facebook account is active"). Finally, we

informed people that we would later ask them to deactivate their accounts for two 24-hour periods, and confirmed their willingness to do so. (We required all participants regardless of treatment status to deactivate for these 24-hour periods to minimize selective attrition and to ensure that the valuations described below reflect value of Facebook access, not the fixed cost of the deactivation process.)

In all, 3,910 people finished the baseline survey and were willing to deactivate. Of those, 1,013 were dropped from the experiment because of invalid data (for example, invalid Facebook profile URLs) or low-quality baseline responses (for example, discrepancies between average daily Facebook usage reported in the pre-screen vs. baseline survey, completing the survey in less than ten minutes, no text in short-answer boxes, and other patterns suggesting careless responses). The remaining 2,897 participants had valid baseline data, were included in our stratified randomization, and were invited to take the midline survey.

On October 11th, we sent an email invitation to the midline survey. The survey first asked participants to deactivate their Facebook accounts for 24 hours and guided them through the process. The survey clearly explained what deactivation entailed and how we would monitor deactivation. Facebook allows users to deactivate and reactivate their accounts at any time. We informed participants that they could continue to use Facebook Messenger while deactivated, and that their profile and friend network would be unchanged when they reactivated. We emphasized that Facebook would automatically reactivate their account if they logged into the Facebook website or app, or if they actively logged into any *other* app using their Facebook login credentials.[7] We informed participants that "We will verify whether or not you deactivated your account by pinging the Facebook URL" that they had provided in the baseline survey.

The midline survey then used a Becker-DeGroot-Marschak (BDM) mechanism to elicit willingness-to-accept (WTA) to stay deactivated for four weeks rather than 24 hours.[8] We then revealed the BDM price offer. An additional 154 participants had dropped out before this point of the midline survey, leaving 2,743 who received their price offer. Participants whose WTA was strictly less than the price draw were informed that they should deactivate for the full four weeks after midline. Finally, the midline survey reminded people that we would again ask them to deactivate for 24 hours

---

[7] A user's Facebook account automatically reactivates whenever the user actively logs into any other app using their Facebook login credentials. However, this does not fully preclude people from using other apps for which they had used Facebook to log in. People can continue using other apps if they are already logged in, can set up non-Facebook logins, or can log in with Facebook and then again deactivate their Facebook account.

[8] The survey explained, "The computer has randomly generated an amount of money to offer you to deactivate your Facebook account for the next 4 weeks. Before we tell you what the offer is, we will ask you the smallest offer you would be willing to accept. If the offer the computer generated is above the amount you give, we will ask you to deactivate for 4 weeks and pay you the offered amount if you do. If the offer is below that amount, we will not ask you to deactivate." We then asked several comprehension questions to make sure that participants understood the mechanism. We did not tell participants the distribution or support of the offer prices, both because we did not want to artificially truncate the distribution of elicited WTA and because prior studies have found that providing information on the bounds of the offer price distribution can affect BDM valuations (Bohm, Lindén, and Sonnegård 1997; Mazar, Koszegi, and Ariely 2014).

after the endline survey, and used a second BDM mechanism to elicit WTA to stay deactivated for the four weeks after endline instead of just 24 hours. We refer to the four weeks after midline as "weeks 1-4," and the four weeks after endline as "weeks 5-8."

On November 8th, two days after the midterm election, we sent an email invitation to the endline survey. The endline survey first measured the same outcome variables as the baseline survey. All questions were identical, with the exception of cases discussed in Section 2.3 below, such as using updated news knowledge questions and rephrasing questions about the midterm election to be in the past tense. We then asked all participants to again deactivate their Facebook accounts for the next 24 hours, and again elicited WTA to stay deactivated for the next four weeks (i.e., weeks 5-8) instead of the next 24 hours. Participants were told, "With a 50% chance we will require you to abide by the decision you made 4 weeks ago; with 50% chance we will ignore the decision you made 4 weeks ago and we will require you to abide by the decision you make today."

We gathered data from two post-endline emails. On November 20th, we sent an email with links to information on ways to limit smartphone social media use, and on November 25th, we sent an email with links to donate to, volunteer for, or sign petitions related to political causes. Clicks on these emails provide additional non-self-reported measures of interest in reducing social media use and political engagement. Appendix Figures A2 and A3 present the two emails.

On December 3rd, we invited participants to a short post-endline survey in which we asked how many minutes per day they had used the Facebook app on their smartphones in the past seven days. We asked participants with iPhones to report the Facebook app time reported by their phone's Settings app, and we asked other participants to estimate. We also asked several open-answer questions, such as "How has the way you use Facebook changed, if at all, since participating in this study?"

For the approximately six weeks between baseline and endline, we sent daily text message surveys to measure several aspects of subjective well-being in real time rather than retrospectively. We rotated three types of questions, measuring happiness, the primary emotion felt over the past ten minutes, and loneliness. Appendix Figure A4 presents the three questions.

We verified deactivation by checking each participant's Facebook profile page URL regularly at random times. While a user can limit how much content other people can see in their profiles, they cannot hide their public profile page, and the public profile URL returns a valid response if and only if their account is active.[9] This is thus our measure of deactivation. For all participants,

---

[9]By default, Facebook profile URLs end in a unique number, which is the numeric ID for that person in the Facebook system. Users can update their default URL to be something customized, and they can change their customized URL as often as they want. In the baseline survey, participants reported their profile URLs, which could have been either the default or customized version. Shortly after the baseline survey, we checked if each participant's Facebook profile URL was valid by pinging it and looking in the page source for the string containing the person's numeric ID. If the numeric ID existed, we knew that the URL was valid. After that point, we used participants' numeric IDs to construct their default numeric URLs, which allowed us to correctly measure deactivation even if they changed their customized URL.

we verified deactivation approximately once per day for the seven days before midline and all days between endline and the end of January 2019. Between midline and endline, we verified deactivation approximately four times per day for people who were supposed to be deactivated (i.e. the Treatment group) and once every four days for everyone else. During the post-midline and post-endline 24-hour deactivation periods, we generally verified deactivation within about six hours of when each participant completed the survey. If participants were not deactivated when they were supposed to be, our program immediately sent an automated email informing them that they should again deactivate as soon as possible, along with a survey asking them to explain why they were not deactivated.

All participants received $5 per completed survey, paid via gift card immediately upon completion. All participants were told that they would receive a $15 "completion payment" if they completed all surveys, responded to 75 percent of text messages, kept their accounts deactivated for the 24 hours after midline and endline, and, if the deactivation offer price was above their reported WTA, kept their accounts deactivated for the full period between midline and endline. The latter requirement (making the completion payment contingent on complying with the BDM's deactivation assignment) makes it a strictly dominant (instead of weakly dominant) strategy to truthfully report valuations in the BDM.[10] These payments were in addition to the $102 that the Treatment group received in exchange for deactivation.

## 2.2   Randomization

We used the BDM mechanism described above to randomly assign participants to Facebook deactivation. Figure 1 illustrates the randomization. Participants with valid baseline data were randomized into three groups that determined the BDM offer price $p$ for deactivation in weeks 1-4 (i.e., the weeks between midline and endline): $p = \$102$ (approximately 33 percent of the sample), $p = \$0$ (approximately 67 percent), and $p$ drawn from a uniform distribution on [$0, \$170$] (approximately 0.2 percent).[11] We balanced the $p = \$102$ and $p = \$0$ group assignments within 48 strata defined by age, average daily Facebook use, heavy vs. light news use (those who get news from Facebook fairly often or very often vs. never, hardly ever, or sometimes), active vs. passive Facebook use, and Democrat, Republican, or independent party affiliation.

The effects of Facebook deactivation in weeks 1-4 are identified in the sample of participants who were allocated to $p = \$102$ or $p = \$0$ and were willing to accept less than $102 to deactivate

---

[10]As discussed above, we did not inform participants of the BDM offer price distribution. Thus, more precisely, truthfully reporting valuations is a strictly dominant strategy only within the support of the offer price distribution that participants expected us to use.

[11]We chose $102 because our pilot data correctly suggested that there would be a point mass of WTAs at $100 and that it would maximize statistical power per dollar of cost to set an offer price just high enough to induce those participants to deactivate. We chose $170 as the top of the uniform distribution because it was the maximum that we could pay participants without requiring tax-related paperwork.

in weeks 1-4. We call this the "impact evaluation sample." Within the impact evaluation sample, we call $p = \$102$ the "Treatment" group, and $p = \$0$ the "Control" group.

For deactivation in weeks 5-8 (i.e., the four weeks after endline), 0.2 percent of participants were randomly selected to a BDM offer price drawn randomly from $p' \in [0, 170]$, while the remaining 99.8 percent received offer $p' = 0$. We balanced this weeks 5-8 offer price $p'$ between the weeks 1-4 offer price groups, so two participants who were offered $p = \$102$ and four participants who were offered $p = \$0$ were assigned to positive weeks 5-8 offers $p' \in [0, 170]$.

This approach allows us to maintain incentive compatibility in the BDM mechanism, have balance between Treatment and Control groups, and use a straightforward regression to estimate treatment effects of post-midline deactivation.

## 2.3   Outcome Variables

For the impact evaluation, we consider the outcome variables in the nine families described below. Appendix B presents survey question text and descriptive statistics for each outcome variable and moderator, grouped by family. We also construct indices that combine the outcome variables within each family, weighting by the inverse of the covariance between variables at endline, as described in Anderson (2008). In constructing these indices, we orient the variables so that more positive values have the same meaning—for example, more positive means "more polarized" in all cases. Outcomes to be multiplied by -1 are followed by "× (-1)" in Appendix B.1.

**Substitute time uses**

At baseline and endline, we asked participants how many minutes per day they spent on Facebook on the average day in the past four weeks. At baseline, we also asked participants to report how much of their free time on the average day in the past four weeks they spent on various activities, ranging from using social media apps other than Facebook to spending time with friends and family in person. At endline, we asked how much time they spent on the same activities, "relative to what is typical for you." We phrased the questions in this way in order to more precisely detect changes in self-reported time use caused by the deactivation.

**Social interaction**

We have three measures of social interaction. The *friends met in person* variable is the natural log of one plus the number of friends seen in person in the last week, as measured by a survey question that asked participants to "list the first names of as many friends you met in person last week that you can think of in 1 minute." *Offline activities* is the number of offline activities (such as going out to dinner, spending time with your kids, etc.) that the person did at least once last week. *Diverse interactions* is an indicator for whether the respondent interacted with someone who

voted the opposite way in the last presidential election plus an indicator for whether the respondent interacted with someone from another country in the last week.

**Substitute news sources**

At baseline, we asked participants how often they got news from different sources over the past four weeks, including Facebook, cable TV, print, and radio news, borrowing a standard survey question from the Pew Research Center (2018a). At endline, we again asked how often they got news from those same sources, "relative to what is typical for you." For the participants who reported having a Twitter handle, we gathered data on number of tweets in the four weeks before baseline began and in the four weeks between midline and endline. This allows a non-self-reported measure of one kind of potential substitution away from Facebook.[12]

**News knowledge**

In order to detect broad changes in news exposure, we asked participants how closely they followed politics, how closely they followed news about President Trump, and how many minutes per day they spent watching, reading, or listening to the news (including on social media) over the past four weeks.

In order to measure specific news knowledge, we included a 15-question news knowledge quiz. For each question, we gave a statement from the news in the past four weeks and asked participants to indicate if they thought the statement was true or false, or whether they were unsure. The order of the 15 statements was randomized. Seven of the statements were from news stories covered in the past four weeks in six news websites: New York Times, Wall Street Journal, Fox News, CNN, MSNBC, and US News & World Report, such as "The Trump administration set the maximum number of refugees that can enter the country in 2019 to 30,000." Three of the headlines were false modifications of articles from those same six news websites, such as "President Trump spoke at the funeral of former Arizona Senator John McCain, honoring the late McCain's wish." (In reality, it had been reported that President Trump was not invited to McCain's funeral.) The *news knowledge* variable is the count of true statements rated as true plus the count of false statements rated as false, plus one-half for every statement about which the respondent was "unsure." The final five statements were from fake news stories—rated false by third-party fact-checkers snopes.com and factcheck.org—that circulated heavily within a four-week period before the survey. The *fake news knowledge* variable is the count of fake statements correctly rated as "false" plus one-half for every statement about which the respondent was unsure. Appendix B.1 presents the full news knowledge quizzes from both baseline and endline.

---

[12]In our pre-analysis plan, we grouped this *number of tweets* variables in the substitute news sources family, but one might also think of it as a "substitute time use" because Twitter is not only used to read news.

## Political engagement

We have two measures of political engagement. First, we measure whether participants voted in the 2018 midterm election, by matching participants on name, birth year, and zip code to a voting database supplied to Stanford by L2, a voting data provider. See Appendix C for details on the match process. Second, we measure whether participants clicked on any of the links in the post-endline politics email.

## Political polarization

There are a variety of ways to measure political polarization (see, for example, Gentzkow 2016), and we use both standard and novel measures. First, we included standard "feeling thermometer" questions capturing how "warm or cold" participants felt toward the Demoratic and Republican Parties and President Trump over the past four weeks. The *party affective polarization* variable is the respondent's thermometer warmth toward her own party minus her warmth toward the other party. For this and all other polarization variables, we include independents who lean toward a party, and we drop independents who do not lean toward either party.

Second, the *Trump affective polarization* variable is the thermometer warmth toward President Trump for Republicans, and minus one times the thermometer warmth toward President Trump for Democrats. Third, we asked respondents to list recent news events that made them angry at the Republican or Democratic Party. *Party anger* is the natural log of one plus the length (in characters of text) of her response about the other party minus the natural log of one plus the length of her response about her own party. Fourth, we asked people how often they saw news that made them better understand the point of view of the Republican Party, and a parallel question for news about the Democratic Party. *Congenial news exposure* is the respondent's answer about her own political party minus her answer for the other party.

Fifth, we asked opinions about nine current political issues, such as "To what extent do you think that free trade agreements between the US and other countries have been a good thing or a bad thing for the United States?" These nine questions were all adapted from recent Pew Center and Gallup opinion polls. The *issue polarization* variable reflects the extent to which the respondent's issue opinions align with the average opinion in her own party instead of the other party. Sixth, *belief polarization* reflects the extent to which the respondent's beliefs about current news events (from the news knowledge quiz described above) align with the average belief in her own party instead of the other party.[13] Finally, *vote polarization* measures the strength of preferences for the

---

[13]Specifically, for each issue or belief question $q$, we normalize responses by the standard deviation in the Control group, determine Democrats' and Republicans' average responses $\mu_q^D$ and $\mu_q^R$, re-center so that $\mu_q^D + \mu_q^R = 0$, and re-sign so that $\mu^R > 0$. Define $\tilde{y}_{iq}$ as individual $i$'s normalized, re-centered, and re-signed response to question $q$, multiplied by -1 if $i$ is a Democrat. $\tilde{y}_{iq}$ thus reflects the strength of individual $i$'s agreement with the average view of her party instead of the other party. For *issue polarization*, further define $\sigma_q$ as the Control group within-person standard deviation of $\tilde{y}_{iq}$ for question $q$. This measures how much people's views change between baseline and endline,

13

congressional candidate of the respondent's party in the midterm election.[14]

### Subjective well-being

There is a vast literature on measuring subjective well-being (see, for example, Kahneman et al. 2006), and we use standard measures from the literature. We modified existing scales in two ways. First, we asked questions in reference to the past four weeks, so as to increase our ability to detect changes as a result of Facebook deactivation. Second, in some cases we chose a subset of questions from standard multi-question scales in order to focus on areas of subjective well-being that might be most affected by Facebook.

The *happiness* variable is the average response to two questions from the Subjective Happiness Scale (Lyubomirsky and Lepper 1999), asking how happy participants were over the past four weeks and how happy they were compared to their peers. *Life satisfaction* is the sum of responses to three questions from the Satisfaction with Life Scale (Diener et al. 1985), such as the level of agreement with the statement, "During the past 4 weeks, I was satisfied with my life." *Loneliness* is the Three-Item Loneliness Scale (Hughes et al. 2004). Finally, *depressed*, *anxious*, *absorbed*, and *bored* reflect how much of the time during the past four weeks respondents felt each emotion, using questions from the European Social Survey well-being module (Huppert et al. 2009).

The daily text messages allowed us to measure the aspects of subjective well-being that are most important to record in the moment instead of retrospectively. This approach builds on the Experience Sampling Method of Csikszentmihalyi and Larson (2014) and Stone and Shiffman (1994). The variable *SMS happiness* is the answer to the question, "Overall, how happy do you feel right now on a scale from 1 (not at all happy) to 10 (completely happy)?" The variable *SMS positive emotion* is an indicator variable for whether the participant reports a positive emotion when asked, "What best describes how you felt over the last ten minutes?", with possible responses such as "angry," "worried," "loving/tender," etc. Finally, *SMS not lonely* uses the answer to the question, "How lonely are you feeling right now on a scale from 1 (not at all lonely) to 10 (very lonely)?"

---

and allows us to place higher weight on issues about which views are malleable over the deactivation period. For belief polarization, let $\sigma_q = 1$. The issue and belief polarization measures are $Y_i = \sum_q \tilde{y}_{iq}\sigma_q$. Appendix Table A15 shows that the *issue polarization* results are nearly identical if we set $\sigma_q = 1$.

[14]Specifically, we asked "In the recent midterm elections, did you vote for the Republican Party's or for the Democratic Party's candidate for Congress in your district? (If you did not vote, please tell us whom you would have voted for.)" We code vote polarization as 0 for "other/don't know." For people who responded that they had (or would have) voted for the Republican or Democratic candidate, we then asked, "How convinced were you about whether to vote for the Republican candidate or the Democratic candidate?" In these cases, we code vote polarization on a scale from -1 (very convinced to vote for the Democratic candidate) to +1 (very convinced to vote for the Republican candidate), and then multiply by -1 for Democrats.

**Post-experiment Facebook use**

We have four measures of planned and actual post-experiment Facebook use. First, *planned post-study use change* is the extent to which participants plan to use Facebook more or less than they had before they started the study. (This was included only in the endline survey.) Second, *clicked time limit email* is an indicator for whether the respondent clicked any of the links in the post-endline social media time limit email. Third, *speed of reactivation* is minus one times the natural log of one plus the number of days that the participant's account remained deactivated between the post-endline 24-hour deactivation period and our most recent measurement on December 17th. Fourth, *Facebook mobile app use* is the natural log of one plus the number of minutes per day that the participant reported using Facebook on their phone in the post-endline survey.

**Opinions about Facebook**

We asked eight questions eliciting people's opinions about Facebook, such as "To what extent do you think Facebook is good or bad for society?" and "To what extent do you think Facebook makes people more or less politically polarized?" Each of these eight responses was on a ten-point scale. In the endline survey only, we also asked *deactivation bad*: "As part of this study, you were asked to deactivate your Facebook account for [24 hours/4 weeks]. To what extent do you think that deactivating your account was good or bad for you?" Finally, we also included two open answer text boxes in which we asked people to write out the most important positive and negative impacts that Facebook has on their lives. The *positive impacts* and *negative impacts* variables are the natural log of one plus the count of characters in the respective text box.

**Secondary outcomes**

We also consider the following two outcomes, which we labeled as "secondary" in our pre-analysis plan. First, we consider the standard generic ballot question. At baseline, we asked "If the elections for US Congress were being held today, would you vote for the Republican Party's candidate or the Democratic Party's candidate for Congress in your district?" To increase precision, we then asked, "How convinced are you about whether to vote for the Republican or Democratic candidate?" At endline, we asked these questions in past tense, about whom the respondent did vote for in the 2018 midterm (or whom the respondent would have voted for had she voted, to avoid potentially selective non-response). The *voted Republican* variable is the strength of preferences for the Republican candidate. We labeled this outcome as secondary because we expected the estimates to be too imprecise to be of interest.

Second, we asked people to report whether they had voted (at endline) and planned to vote (at baseline) in the 2018 midterm. We labeled this as secondary because it is superseded by the administrative voting data from L2.

We also gathered contributions to political campaigns from the Federal Election Commission database. In our pre-analysis plan, we labeled this as secondary because very few Americans contribute to political campaigns, and we did not expect to be able to detect effects from four weeks of deactivation. Indeed, only one person in the impact evaluation sample donated to a political party between the October 2018 midline survey and July 2019. As a result, we deviate from the pre-analysis plan by dropping this from our analysis.

# 3   Descriptive Statistics

Table 1 shows sample sizes at each step of our experiment, from the 1.9 million Facebook users who were shown our ads, to the 1,661 subjects in the impact evaluation sample. Table 2 quantifies the representativeness of our sample on observables, by comparing the demographics of our impact evaluation sample to our estimate of the average demographics of adult Facebook users and to the US adult population. Comparing column 1 to columns 2 and 3, we see that our sample is relatively high-income, well-educated, female, young, and Democratic, and uses Facebook relatively heavily.[15] Appendix Table A14 shows that Treatment and Control are balanced on observables.

Table 3 documents very high response rates to the endline and post-endline surveys and subjective well-being text messages. Of the 580 people in the Treatment group, only seven failed to complete the endline survey. Of the 1,081 people in the Control Group, only 17 failed to complete endline. The average participant responded to 92 percent of daily text messages, well above the 75 percent required in order to receive the completion payment.[16] Treatment and Control have statistically equal response rates to the endline survey and subjective well-being text messages. A marginally significantly larger share of the Treatment group responded to the post-endline survey; this is less worrisome because Facebook mobile app use is the only variable from that survey for which we calculate treatment effects, and we show in Appendix Table A13 that using Lee (2009) bounds to account for attrition does not change the conclusions. Finally, Table 3 also reports the high level of compliance with our deactivation treatment: Treatment group participants were deactivated on 90 percent of checks between October 13th (the first day after the 24-hour post-midline deactivation period) and November 7th (the day before endline), against two percent for Control.

As described above, if Treatment group members were found to have active accounts, we sent an email informing them of this and asking them to promptly deactivate, along with a survey asking

---

[15]In Appendix Figures A17, A18, A19, and A20, we find that the two demographic variables that we pre-specified as moderators, age and political party, do not appear to systematically moderate treatment effects. Furthermore, Figure 9 provides no systematic evidence that the effects vary for people who use Facebook more vs. less heavily before baseline. This suggests that re-weighting the sample for representativeness on these observables would not substantively change the estimated effects, although it would increase the standard errors.

[16]Appendix Figure A26 shows the text message response rate by day (response rates declined slightly over the course of the experiment) and shows that Treatment and Control response rates are statistically balanced in all days of the deactivation period.

why they were not deactivated. From these surveys, along with email interactions and formal qualitative interviews following our summer 2018 pilot study, we conclude that most Treatment group members who did reactivate fall into one of two groups. The first group consists of a small number of users who changed their mind about participating in the experiment and reactivated intentionally. The second group consists of users who briefly reactivated by accident, for example because they logged in to another app or online service using their Facebook account credentials.

Appendix Figure A27 shows the cumulative distribution of the share of time deactivated for the Treatment group, and Appendix Figure A28 shows the distribution of reasons for deactivation among those for whom this share was less than one. Together, these figures suggest that the small group of intentional reactivators accounts for the vast majority of Treatment group non-compliance. Given this, combined with the fact that the Control group was also found to be deactivated for a small share of weeks 1-4, we will analyze the experiment as a randomized encouragement design.

## 4   Empirical Strategy

### 4.1   Pre-Analysis Plan

We submitted our pre-analysis plan on October 12, as this was the final day before the Treatment and Control groups could have begun to differ. We submitted a slightly updated pre-analysis-plan on November 7, the day before endline, with only one substantive change: on the basis of data on reasons for non-compliance described above, we specified that our primary specifications would use IV estimates instead of intent-to-treat estimates. The pre-analysis plan specified three things. First, it specified the outcome variables and families of outcome variables as described above, including which specific variables are included in the index for each family and which outcomes are "secondary." Versions of Figures 2, 3, 5, 6, 7, and 12 appear as figure shells in the pre-analysis plan, although we changed some variable labels as well as the order in which we present the families of outcome variables for expositional purposes. Second, the pre-analysis plan specified the moderators we use when testing for heterogeneous treatment effects, including which moderators are "secondary." Third, it specified the two regression specifications and the estimation sample as described below.

### 4.2   Empirical Strategy

To estimate the local average treatment effect (LATE) of Facebook deactivation, define $Y_i$ as some outcome measured at endline, and $\boldsymbol{Y}_i^b$ as a vector including the baseline value of the outcome and the baseline value of the index that includes the outcome.[17] Define $D_i$ as the percent of deactivation

---

[17]$\boldsymbol{Y}_i^b$ excludes the baseline value of the outcome for outcomes such as clicks on post-endline emails that do not have a baseline value. $\boldsymbol{Y}_i^b$ excludes the baseline index when $Y_i$ is not included in an index. When $Y_i$ is an index, $\boldsymbol{Y}_i^b$ is simply the baseline value of the index.

checks between October 13th and November 7th that person $i$ is observed to be deactivated. Define $T_i \in \{1, 0\}$ as a Treatment group indicator, and $\nu_s$ as the vector of the 48 stratum dummies. We estimate local average treatment effects of deactivation using the following regression:

$$Y_i = \tau D_i + \rho \boldsymbol{Y}_i^b + \nu_s + \varepsilon_i, \tag{1}$$

instrumenting for $D_i$ with $T_i$. In Equation (1), $\tau$ measures the local average treatment effect of deactivation for people induced to deactivate by the promised \$102 payment.[18]

The base sample for all regressions is the "impact evaluation sample"—again, participants who were willing to accept less than \$102 to deactivate in weeks 1-4 (the four weeks after midline) and were offered $p = \$102$ or $p = \$0$ to do so. For the political polarization outcomes, the sample includes only Democrats and Republicans, as well as independents who lean toward one party or the other. Sample sizes sometimes differ across outcomes due to missing data: for example, the post-endline survey has higher non-response than the endline survey, and many participants do not have Twitter accounts.

We use robust standard errors in all regressions.

## 5   Impact Evaluation

This section presents treatment effects of Facebook deactivation. The following subsections present estimates for four groups of outcomes: substitution, news and political outcomes, subjective well-being, and post-experiment Facebook use and opinions. We then present heterogeneous treatment effects. Finally, we provide evidence on experimenter demand effects.

In the body of the paper, we present figures with local average treatment effects and 95 percent confidence intervals from estimates of Equation (1), with outcome variables $Y_i$ normalized so that the Control group standard deviation equals one. Appendix Tables A10 and A11 provide numerical regression results for all individual outcome variables in both normalized (standard deviation) units, as in the figures, and un-normalized (original) units. Appendix Table A12 provides numerical regression results for all nine summary indices. These appendix tables also provide unadjusted

---

[18]Facebook deactivation might have a larger impact for people who use Facebook more. Define $H_i$ as person $i$'s average daily hours of Facebook use reported at baseline, winsorized at 120 minutes. We can also estimate the local average treatment effect of deactivation *per hour of daily Facebook use avoided* using the following regression:

$$Y_i = \tau D_i H_i + \beta H_i + \rho \boldsymbol{Y}_i^b + \nu_s + \varepsilon_i, \tag{2}$$

analogously instrumenting for $D_i H_i$ with $T_i H_i$.

If effects of deactivation are indeed linear in avoided hours of Facebook use, then Equation (2) could provide more statistical power than Equation (1). On the other hand, if effects are closer to constant in baseline usage and/or $H_i$ is measured with error, then Equation (1) will offer more power. In our pre-analysis plan, we specified that we would make either Equation (1) or Equation (2) our primary specification, depending on which delivered more power. In reality, the results are very similar. Therefore, we focus on Equation (1) because it is simpler. Appendix E presents results using Equation (2).

p-values and "sharpened" False Discovery Rate (FDR)-adjusted p-values following the procedure of Benjamini, Krieger, and Yekutieli (2006), as outlined by Anderson (2008). The unadjusted p-values are appropriate for readers with a priori interest in one specific outcome. The FDR-adjusted p-values for the individual outcomes limit the expected proportion of false rejections of null hypotheses across all individual outcomes reported in the paper, while the FDR-adjusted p-values for the indices limit the expected proportion of false rejections of null hypotheses across the nine indices. The sharpened FDR-adjusted p-values are less conservative than the unadjusted p-values for p-values greater than about 0.15, and more conservative for unadjusted p-values less than that.

## 5.1   Substitutes for Facebook

Figure 2 presents treatment effects on substitutes for Facebook: substitute time uses, social interactions, and substitute news sources. Substitution is of interest for two reasons. First, our treatment entails deactivating Facebook *and* also re-allocating that time to other activities. Understanding that re-allocation is thus crucial for conceptually understanding the "treatment." Second, this substitution helps to understand mechanisms for key effects. One central mechanism through which Facebook might affect psychological well-being is by crowding out face-to-face interactions. However, it's also possible that when people deactivate, they primarily devote their newly available time to other solitary pursuits. Furthermore, a central mechanism for possible political externalities is that social media use crowds out consumption of higher-quality news. However, it's also possible that when people deactivate, they simply get less news overall instead of substituting to other news sources.

The top group of outcomes in Figure 2 measures self-reported time use. Facebook usage was reported in minutes. For all other activities, the endline survey asked respondents how much time they spent on the activity in the last four weeks relative to what is typical for them, on a five-point scale from "A lot less" to "A lot more." For all time use outcomes, "Same" is the average answer in the Control group.

The first row confirms that the treatment indeed reduced Facebook use as intended. At endline, the Control group reported that they had used Facebook for an average of 59.53 minutes per day over the past four weeks, and the local average treatment effect of deactivation is 59.58 minutes per day.[19] As shown on Figure 2, this corresponds to a reduction of 1.59 standard deviations.

We find that Facebook deactivation *reduced* time devoted to other online activities. Time using non-Facebook social media falls by a quarter point on our five-point scale (0.27 SD), and time on non-social online activities falls by 0.12 points (0.14 SD). Thus, Facebook appears to be a

---

[19]Appendix Table A5 reports baseline means of our time use variables. The mean of self-reported Facebook minutes at baseline is 74.5 minutes per day, and the mean of reported minutes using the Facebook mobile app at baseline is 60 minutes per day.

complement rather than a substitute for other online activities. This makes sense to the extent that deactivating Facebook makes people less likely to be using their phones or computers in the first place, and less likely to follow Facebook links that direct to non-Facebook sites (e.g., a news website or Twitter post). Furthermore, the Treatment group may have avoided logging into other apps such as Spotify and Tinder because we had informed participants that using Facebook to actively log into other apps would reactivate Facebook.

Rows 4-7 of Figure 2 suggest that the 60 minutes freed up by not using Facebook, as well as the additional minutes from reductions in other online activities, were allocated to both solitary and social activities offline. Solitary television watching increases by 0.17 points on our scale (0.17 SD), other solitary offline activities increase by 0.23 points (0.25 SD), and time devoted to spending time with friends and family increases by 0.14 points (0.16 SD). The substitute time uses index, which does not include *Facebook minutes*, shows an increase in overall non-Facebook activities. All of the online and offline time use effects are highly significant with and without adjustment for multiple hypothesis testing.

The middle group of outcomes in Figure 2 contains measures of social interaction. Deactivation increased the count of offline activities that people reported doing at least once last week by about 0.18 (0.12 SD). Appendix Figure A29 shows that the specific activities with the largest point estimates are going out to dinner, getting together with friends, and spending time with parents. The point estimates for the other offline activities we measure (going to the cinema, talking to friends on the phone, going to a party, going shopping, and spending time with your kids) are all very close to zero. Notwithstanding the positive effects on *offline activities*, there are no statistically significant effects on the number of friends that participants listed as having met in person last week, or on *diverse interactions* (whether or not they interacted with someone who voted differently in the last presidential election or interacted with someone from another country). We find no effects on the social interaction index, although the point estimate is positive.

The bottom group of outcomes in Figure 2 measures news consumption. As with the substitute time uses, the endline survey asked participants how much time they spent getting news from each source in the last four weeks relative to what is typical for them; "Same" is again the average answer in the Control group. As expected, Facebook deactivation substantially reduced the extent to which people said they relied on Facebook as a news source. Consistent with the time use results, the Treatment group also got substantially less news from non-Facebook social media sites (0.36 SD). The point estimates for print, radio, and TV news are all positive but statistically insignificant. Facebook deactivation has a positive but insignificant effect on Twitter use. As we discuss below in the news knowledge results, deactivation reduced the total time subjects report spending consuming news by eight minutes per day, or 15 percent of the Control group mean of 52 minutes.

Overall, these results suggest that Facebook is a substitute for offline activities but a complement

to other online activities. This suggests the possibility that Facebook could reduce subjective well-being by reducing in-person interactions, but also impose positive political externalities by increasing news knowledge. Below, we test these possibilities more directly.

## 5.2   Effects on News and Political Outcomes

Figure 3 presents treatment effects on news and political outcomes: news knowledge, political engagement, and political polarization. News knowledge and political engagement are of interest because well-functioning democratic societies fundamentally rely on well-informed voters who actually show up to the polls to vote. Political polarization is of interest because it is may make democratic decision making less efficient, and may lead citizens to perceive democratic outcomes as less legitimate (Iyengar, Sood, and Lelkes 2012; Iyengar and Westwood 2015).

Deactivation caused substantial reductions in both self-reported attention to news and directly measured news knowledge. The top three rows show that deactivation reduced how much people reported they followed news about politics and about President Trump (by 0.14 and 0.11 SD, respectively), as well as the average minutes per day spent consuming news (a drop of eight minutes per day, or 15 percent of the control group mean). Accuracy on our news knowledge quiz fell by 0.12 standard deviations.[20] Tangibly, the Control group answered an average of 7.26 out of the 10 news knowledge questions correctly (counting "unsure" as 1/2 correct), and deactivation reduced this average by 0.14. There is no detectable effect on fake news knowledge, possibly reflecting the limited reach of even the highly shared fake news items included in our survey. Overall, deactivation reduced the news knowledge index by about 0.19 standard deviations.

There are no statistically detectable effects on political engagement. As reported in Appendix Tables A10 and A11, the point estimates suggest that deactivation increased turnout by three percentage points according to the administrative data and decreased turnout by three percentage points according to the self-reported data, and neither estimate is statistically different from zero. Similarly, the Treatment and Control groups are statistically equally likely to have clicked on any link in the post-endline politics email. Appendix Figure A35 does show a marginally significant negative effect on *voted Republican*, suggesting that deactivation may have reduced support for Republican congressional candidates. The unadjusted p-value is 0.06, the sharpened FDR-adjusted p-value is 0.08, and we had labeled this as a "secondary outcome" in our pre-analysis plan.

Prior research has shown that people tend to be exposed to ideologically congenial news content in general (Gentzkow and Shapiro 2011) and on Facebook in particular (Bakshy, Messing, and

---

[20]Appendix G presents more analysis of the effects on news knowledge, including effects on each individual news knowledge and fake news knowledge question. All but one of the point estimates for the 10 news knowledge questions is negative. The news knowledge questions with the largest effects involve correctly responding that Elizabeth Warren's DNA test had revealed Native American ancestry and that Jeff Sessions had resigned at President Trump's request. There was also a statistically significant difference in knowledge about one fake news story: the Treatment group was less likely to correctly respond that Cesar Sayoc, the suspect in an act of domestic terrorism directed at critics of President Trump, was not a registered Democrat.

Adamic 2015). Thus, the above finding that deactivation reduced news exposure naturally suggests that deactivation might have also reduced political polarization.

Indeed, deactivation did reduce political polarization. Point estimates are negative for all polarization measures. The largest and most significant individual effect is on *congenial news exposure*: deactivation decreased the number of times that people reportedly saw news that made them better understand the point of view of their own political party relative to the other party. Deactivation also decreased issue polarization, which Fiorina and Abrams (2008) single out as the "most direct" way of measuring polarization.[21] Appendix Table A10 shows that both of these effects are highly significant after adjusting for multiple hypothesis testing. The other measures with the largest point estimates are *party anger* and *party affective polarization*, although these individual effects are not statistically significant. Overall, deactivation reduced the political polarization index by about 0.16 standard deviations.[22]

Figure 4 illustrates how deactivation reduced issue polarization, by plotting the distribution of "issue opinions" for Democrats and Republicans in Treatment and Control at endline. Our *issue opinions* measure exactly parallels the *issue polarization* variable used in the regressions, except that we keep opinions on a left-to-right scale, with more negative indicating more agreement with the average Democratic opinion, and more positive indicating more agreement with the average Republican opinion. (By contrast, the *issue polarization* variable multiplies Democrats' responses by -1, so that a more positive value reflects more agreement with the average opinion in one's political party.) We then normalize *issue opinions* to have a standard deviation of one in the Control group. The figure shows that deactivation moves both Democrats and Republicans visibly toward the center. In the Control group, the issue opinions of the average Democrat and the average Republican differ by 1.47 standard deviations. In the Treatment group, this difference is 1.35 standard deviations—about eight percent less.

Are these polarization effects large or small? As one benchmark, we can compare these effects to the increase in political polarization in the US since 1996, well before the advent of social media. Using data from the American National Election Studies, Boxell (2018) calculates that the change in a different index of polarization measures increased by 0.38 standard deviations between 1996 and 2016. The 0.16 standard deviation effect of Facebook deactivation on political polarization in our sample is about 42 percent as large as this increase.[23]

---

[21]Appendix Figure A30 presents results for each of the issue polarization questions. The issues for which deactivation caused the largest decrease in polarization were the direction of racial bias in policing and whether the Mueller investigation is biased.

[22]Like all of our outcome families, the polarization index includes a range of different outcomes with different interpretations. Exposure to congenial news is conceptually different from affective polarization and issue polarization. Appendix Table A16 shows that the effect on the political polarization index is robust to excluding each of the seven individual component variables in turn, although the point estimate moves toward zero and the unadjusted p-value rises to 0.09 when omitting *congenial news exposure*.

[23]Specifically, Boxell's polarization index increased by 0.269 units from 1996-2016, and the standard deviation of Boxell's polarization index across people in 2016 is 0.710 units, so political polarization increased by $0.269/0.71 \approx$

Overall, these results suggest that Facebook plays a role in helping people stay informed about current events, but also increases polarization, particularly of views on political issues.

## 5.3   Effects on Subjective Well-Being

Figure 5 presents estimates of effects on subjective well-being (SWB). These outcomes are of interest because, as discussed in the introduction, many studies show cross-sectional or time-series correlations between social media use and well-being, and on this basis researchers have speculated that social media may have serious adverse effects on mental health. The outcomes are re-signed so that more positive represents better SWB—for example, the "depressed" variable is multiplied by (-1).

We find that deactivation indeed significantly increases SWB. All but one of the ten point estimates are positive. The magnitudes are relatively small overall, with the largest and most significant effects on *life satisfaction* (0.12 SD), *anxiety* (0.10 SD), *depression* (0.09 SD), and *happiness* (0.08 SD).[24] All of these effects remain significant after adjusting for multiple hypothesis testing. The text message based measures of happiness are not significantly different from zero, with positive point estimates ranging from 0.01 SD to 0.06 SD. Deactivation improved our overall SWB index by 0.09 standard deviations.

Are these subjective well-being effects large or small? As one benchmark, we can consider the effect sizes in their original units, focusing on the measures with the largest effects. *Happiness* is the average response to two questions (for example, "Over the last 4 weeks, I think I was ...") on a scale from 1 (not a very happy person) to 7 (a very happy person). The Control group endline average is 4.47 out of a possible 7, and deactivation caused an average increase of 0.12. *Life satisfaction* is the extent of agreement with three questions (for example, "During the past four weeks, I was satisfied with my life") on seven-point Likert scales from "strongly disagree" "Strongly agree." The Control group endline average is 12.26 out of a possible 21, and deactivation caused an average increase of 0.56. *Depressed* and *anxious* are responses to the question, "Please tell us how much of the time during the past four weeks you felt [depressed/anxious]," where 1 is "None or almost none of the time" and 4 is "All or almost all of the time." The average responses are 2.99 and 2.60, respectively, and deactivation caused average increases of 0.08 and 0.09.

As a second benchmark, a meta-analysis of 39 randomized evaluations finds that positive psy-

---

0.379 standard deviations over that period. Of course, this benchmarking exercise does not imply that political polarization in the US would have increased by one-third less in the absence of Facebook, for many reasons. For example, the treatment effects in our sample from a four-week deactivation are unlikely to generalize to the US population over Facebook's 15-year life. Furthermore, some of our polarization measures are unique to our study. The one measure that appears in both Boxell's index and our index, *party affective polarization*, rose by 0.18 standard deviations between 1996 and 2016. Our point estimate of -0.06 standard deviations is about one-third of this amount, although this estimate is not statistically different from zero.

[24]Appendix Figure A34 presents results for the individual questions within the *happiness*, *life satisfaction*, and *loneliness* scales.

23

chology interventions (i.e. self-help therapy, group training, and individual therapy) improve subjective well-being (excluding depression) by 0.34 standard deviations and reduce depression by 0.23 standard deviations (Bolier et al. 2013). Thus, deactivating Facebook increased our subjective well-being index by about 25-40 percent as much as standard psychological interventions.

As a third benchmark, Appendix Table A17 presents a regression of our baseline SWB index on key demographics (income, college completion, gender, race, age, and political party). College completion is conditionally associated with 0.23 standard deviations higher SWB. Thus, the effect of deactivating Facebook is just over one-third of the conditional difference in subjective well-being between college grads and everyone else. The table also shows that a $10,000 increase in income is conditionally associated with a 0.027 standard deviation increase in SWB. Thus, the effect of deactivating Facebook is equal to the conditional difference in subjective well-being from about $30,000 additional income. This income equivalent is large because "money doesn't buy happiness": although income is correlated with SWB, the slope of that relationship is not very steep.

Appendix Figure A31 presents effects on the SMS outcomes by week of the experiment, to test whether the effects might have some trend over time. None of the effects on any of the three outcomes is statistically significant in any of the four weeks. The point estimates do not systematically increase or decrease over time, and if anything, the point estimates are largest in the first week. This suggests that the effects of a longer deactivation might not be different.

We can also compare our SWB effects to what we would have estimated using the kind of correlational approach taken by many previous non-experimental studies. These studies often have specific designs and outcomes that don't map closely to our paper, so it is difficult to directly compare effect sizes with other papers. We can, however, replicate the empirical strategy of simple correlation studies in our data, and compare our cross-sectional correlations to the experimental results. To do this, we regress SWB outcomes at baseline on daily average Facebook use over the past four weeks as of baseline, divided by the local average treatment effect of deactivation on daily average Facebook use between midline and endline, so that the coefficients are both in units of average use per day over the past four weeks.[25]

The baseline correlation between our SWB index and Facebook use is about three times larger than the experimental estimate of the treatment effect of deactivation (about 0.23 SD compared to 0.09 SD), and the point estimates are highly statistically significantly different. Controlling for basic demographics brings down the non-experimental estimate somewhat, but it remains economically

---

[25]Specifically, the non-experimental estimates are from the following regression:

$$Y_i^b = \tau \tilde{H}_i + \beta \boldsymbol{X}_i + \epsilon_i, \tag{3}$$

where $Y_i^b$ is participant $i$'s value of some outcome measured in the baseline survey, $\boldsymbol{X}_i$ is a vector of basic demographic variables (household income, age, and college, male, white, Republican, and Democrat indicators), and $\tilde{H}_i$ is baseline average daily Facebook use over the past four weeks (winsorized at 120 minutes per day) divided by the local average treatment effect on average daily Facebook use between midline and endline.

and statistically larger than our experimental estimate. Appendix Figure A32 presents the full results for all SWB outcomes.[26] These findings are consistent with reverse causality, for example if people who are lonely or depressed spending more time on Facebook, or with omitted variables, for example if lower socio-economic status is associated with both heavy use and lower well-being. They could also reflect a difference between the relatively short-term effects measured in our experiment and the longer-term effects picked up in the cross-section. However, the lack of a detectable trend in treatment effects on the text message outcomes over the course of our experiment (as noted above and seen in Appendix Figure A31) points away from this hypothesis.

Subjects' own descriptions in follow-up interviews and free-response questions are consistent with these quantitative findings, while also highlighting substantial heterogeneity in the effects. Many participants described deactivation as an unambiguously positive experience. One said in an interview,

> I was way less stressed. I wasn't attached to my phone as much as I was before. And I found I didn't really care so much about things that were happening [online] because I was more focused on my own life... I felt more content. I think I was in a better mood generally. I thought I would miss seeing everyone's day-to-day activities... I really didn't miss it at all.

A second wrote, "I realized how much time I was wasting. I now have time for other things. I've been reading books and playing the piano, which I used to do daily until the phone took over."

A third wrote, "I realized I was using it too much and it wasn't making me happy. I hate all of the interactions I had with people in comment sections."

Many others highlighted ways in which deactivation was difficult. One said in an interview,

> I was shut off from those [online] conversations, or just from being an observer of what people are doing or thinking... I didn't like it at first at all, I felt very cut off from people that I like... I didn't like it because I spend a lot of time by myself anyway, I'm kind of an introvert, so I use Facebook in a social aspect in a very big way.

Others described the difficulty of not being able to post for special events such as family birthdays and not being able to participate in online groups.

Overall, our data suggest that Facebook does indeed have adverse effects on SWB. However, the magnitude of these effects is moderate and may be smaller than correlation studies would suggest, and our qualitative interviews suggest that the average effect likely masks substantial heterogeneity.

---

[26]One could also do similar experimental vs. non-experimental comparisons for other outcomes, but we have done this only for SWB because SWB is the focus of the non-experimental literature in this area.

## 5.4   Post-Experiment Facebook Use and Opinions

Figure 6 presents effects of deactivation on post-experiment demand for Facebook as well as participants' subjective opinions about Facebook. These results are closely related to the findings on subjective well-being, as we might expect participants who found deactivation increased their happiness would choose to use Facebook less in the future. They also speak more directly to the popular debate over whether social media are addictive and harmful. If deactivation reduces post-experiment Facebook use, this is consistent with standard habit formation models such as Becker and Murphy (1988), or with learning models in which experiencing deactivation caused people to learn that they would be better off if they used Facebook less.[27]

Deactivation clearly reduced post-experiment demand for Facebook. These effects are very stark, with by far the largest magnitude of any of our main findings. The effect on reported intentions to use Facebook as of the endline survey is a reduction of 0.78 standard deviations: while the average Control group participant planned to reduce future Facebook use by 22 percent, deactivation caused the Treatment group to plan to reduce Facebook use by an additional 21 percent relative to Control. In our post-endline survey a month after the experiment ended, we measured whether people actually followed through on these intentions, by asking people how much time they had spent on the Facebook mobile app on the average day in the past week. Deactivation reduces this post-endline Facebook mobile app use by 12 minutes per day, or 0.31 standard deviations. This is a 23 percent reduction relative to the Control group mean of 53 minutes per day, lining up almost exactly with the planned reductions reported at endline. However, Appendix Table A13 shows that the reduction is less than half as large (8 percent of the Control group mean) and not statistically significant (with a t-statistic of -1.16) if we limit the sample to iPhone users who reported their usage as recorded by their Settings app, thereby excluding participants who were reporting personal estimates of their usage.

As a different (and non-self-reported) measure of post-experiment use, we can look at the speed with which people reactivated their Facebook accounts following the 24-hour post-endline period in which both Control and Treatment were deactivated. Figure 7 presents the share of our deactivation checks in which the Treatment and Control groups were deactivated, by day of the experiment.[28] By day 35, one week after the end of the experiment, 11 percent of the Treatment group was still deactivated, compared to three percent of the Control group. By day 91, nine weeks after the end

---

[27]Appendix Figure A33 presents histograms of participants' opinions about Facebook at baseline. People are evenly divided on whether Facebook is good or bad for themselves and for society and whether Facebook makes people more or less happy. Consistent with our results, people tend to think that Facebook helps people to follow the news better and makes people more politically polarized.

[28]There is a slight dip in deactivation rates for the Treatment group seven days after the deactivation period began. This was caused by the fact that some participants failed to turn off a default setting in which Facebook reactivates users' profiles after seven days of deactivation. For technical reasons, our deactivation checking algorithm checked the entire Control group once every few days between midline and endline in order to check the Treatment group four times per day. After endline, we returned to checking all participants approximately once per day.

of the experiment, five percent of the Treatment group was still deactivated, against 2.5 percent of Control. As Figure 6 shows, the local average treatment effect on the speed of reactivation is a highly significant 0.59 standard deviations. Overall, deactivation clearly decreased post-experiment use, reducing the index by 0.61 standard deviations. As introduced above, is consistent with models of habit formation or learning.

The bottom group of outcomes in Figure 6 supplement the post-experiment use outcomes by measuring participants' qualitative opinions about Facebook. These are re-signed so that more positive means more positive opinions, so agreement with the statement that "Facebook exposes people to clickbait or false news stories" and the length of text about Facebook's negative impacts are both multiplied by (-1). The results are mixed. Deactivation increases the extent to which participants think Facebook helps them follow the news better, and it also makes participants agree more that people would miss Facebook if they stopped using it. On the other hand, participants who deactivated for four weeks instead of 24 hours were more likely to say that their deactivation was good for them.[29] Deactivation increases both the *positive impacts* and *negative impacts* variables, i.e. it makes people write more about both positive and negative aspects of Facebook. Overall, deactivation had no statistically significant effect on the Facebook opinions index.

Figure 8 presents the distributions of Treatment and Control responses to two key questions reflecting opinions about Facebook. Both Treatment and Control tended to agree that "if people spent less time on Facebook, they would soon realize that they don't miss it," but deactivation weakened that view. On this figure, the Treatment group's average response on the scale from -5 to +5 was -1.8, while the Control group's average response is -2.0. The bottom right panel shows that both Treatment and Control tended to think that deactivation was good for them, but the Treatment group is more likely to think that their (longer) deactivation was good for them. On this figure, the Treatment group's average response on the scale from -5 to +5 is -2.3, while the Control group's average response is -1.9. Remarkably, about 80 percent of the Treatment group thought that deactivation was at least somewhat good for them, and the modal response was the strongest possible agreement that deactivation was good (the left-most bar on the histogram). In both panels, the Treatment group has a wider dispersion of responses, with more people strongly agreeing *and* more people strongly disagreeing. This highlights the importance of testing for treatment effect heterogeneity, which we will do in the next section.

To give a richer sense of how deactivation affected Facebook use, the post-endline survey included a free-response question in which we asked people to write how they had changed their Facebook use since participating in the study. We then use standard text analysis tools to determine how the Treatment and Control groups responded differently. Specifically, we processed

---

[29]One should be cautious in interpreting this effect, as it could result both from a change of opinion about Facebook and from the difference in length of the deactivation they were evaluating. As we shall see below, the Control group also tends to believe that deactivation was good for them, but the modal answer was 0 (i.e., neither good nor bad), suggesting that many people were indifferent to such a short deactivation.

the text by stemming words to their linguistic roots (for example, "changes," "changing," and "changed" all become "chang"), removing common "stop words" (such as "the" and "that"), and making lists of all one, two, three, and four word phrases that appeared five or more times in the sample. We then constructed Pearson's $\chi^2$ statistic, which measures the extent of differential usage rates between Treatment and Control; the phrases with the highest $\chi^2$ are especially unbalanced between the two groups. This parallels Gentzkow and Shapiro's (2010) approach to determining which phrases are used more by Republicans vs. Democrats, except we determine which phrases are used more by Treatment vs. Control.

The two panels of Table 4 present the 20 highest-$\chi^2$ phrases that were more common in Treatment and in Control. The Treatment group was relatively likely to write that they were using Facebook less or not at all ("use much less," "not use facebook anymor," "stop use facebook") or more judiciously—the phrase "use news app" is mostly from people saying that they have switched to getting news from their phone's news app instead of Facebook. By contrast, while a few of the Control group's most common phrases indicate lower use (variants of "more aware much time spend" and "use facebook slightli less"), the great majority of their relatively common phrases indicate that their Facebook use has not changed.

To more deeply understand the ways in which deactivation changed people's relationship to Facebook, we partnered with a team of qualitative researchers who analyzed our survey data and additional participant interviews (Baym, Wagman, and Persaud 2019). They find that many participants emphasized that their time off of Facebook led them to use the platform more "consciously," aligning their behavior with their desired use. For example, some participants discussed avoiding their news feed and only looking at their Facebook groups, while others removed the Facebook app from their phones and only accessed the site using their computers.

## 5.5   Heterogeneous Treatment Effects

### 5.5.1   Individual Moderators

In our pre-analysis plan, we specified that we would present separate estimates for subgroups defined by four primary moderators. Figure 9 presents those estimates. The top panel presents estimates for *heavy users* vs. *light users*—that is, people whose baseline reported Facebook use was above vs. below median. There is no consistent evidence that the effects are different for people who report being heavier users, perhaps because Facebook use is measured with noise.

The second panel presents estimates for *heavy news users* vs. *light news users*—that is, those who get news from Facebook fairly often or very often vs. never, hardly ever, or sometimes. As one might expect, the estimated effects for news knowledge are larger for people who get more news from Facebook, but this difference is not statistically significant. The pre-analysis plan specified that we would limit these tests to only the news and political outcomes in Section 5.2,

28

The third panel presents separate estimates for *active users vs. passive users*. We measure this using two questions: share of active vs. passive browsing using a question based on the Passive and Active Facebook Use Measure (Gerson, Plagnol, and Corr 2017), and "what share of your time on Facebook do you spend interacting one-on-one with people you care about." Active vs. passive users are defined as having above- vs. below-median sum of their two responses to these questions. This moderator is of interest because of a set of papers cited in the introduction suggesting that passive Facebook use can be harmful to subjective well-being, while active use might be neutral or beneficial. Perhaps surprisingly, we see no differences in the effects of deactivation on the subjective well-being index. The pre-analysis plan specified that we would limit these tests to the four families reported in the figure.

Finally, the fourth panel presents separate estimates of effects on subjective well-being text message surveys for text messages sent during the time of day when the respondent reported using Facebook the most. We see no clear differences in the effects on subjective well-being.

The pre-analysis plan also specified two secondary moderators: age (for all outcomes) and political party (limited to the news and political outcomes). We considered these secondary because we did not have a strong prior that we would be able to detect heterogeneous effects. Appendix Figure A9 presents estimates of effects on these outcomes. There are no systematic patterns.

Appendix Figure A9 also includes heterogeneity by above vs. below-median valuation of Facebook. While we added this moderator only after the pre-analysis plan was submitted, it is important because our impact evaluation sample only includes participants with WTA less than $102. Under the assumption that marginal treatment effects are monotonic in WTA, treatment effect heterogeneity within our impact evaluation sample would be informative about treatment effects for the full population. The effects for above- vs. below-median WTA differ statistically for only one index: the effects on political polarization are driven by above-median WTA participants. The above-median WTA point estimate is larger and statistically indistinguishable for two indices, smaller and statistically indistinguishable for four indices, and opposite-signed for the final index. This provides some support for the view that effect sizes would not be systematically different in the full Facebook user population including users with higher valuations.

Appendix Figure A9 presents one additional test of external validity that was suggested by a referee after the pre-analysis plan was submitted. We construct sample weights that match the impact evaluation sample to the observable characteristics of Facebook users in Table 2. Appendix Figure A9 shows that participants with below- vs. above-median sample weights—that is, the types of people who were especially likely vs. unlikely to participate in the study—do not have systematically different treatment effects. This provides some further support for the view that effect sizes would be similar in the full Facebook user population.

Appendix F presents heterogeneous treatment effects on each individual outcome.

### 5.5.2   All Possible Moderators

Many factors other than the specific variables we specified above might moderate treatment effects of Facebook deactivation. To search for additional possible moderators, we test whether any of the demographics or outcome variable indices collected at baseline might moderate treatment effects on the key outcomes of interest. We consider six outcomes: the latter five indices (news knowledge, political polarization, subjective well-being, post-experiment use, and Facebook opinions) plus the variable *deactivation bad*, which we add because of the heterogeneity displayed in Figure 8. We consider 13 potential moderators: all six demographic variables listed in Table 2 (income, years of education, gender, race, age, and political party affiliation, which is on a seven-point scale from strongly Democratic to strongly Republican) and the baseline values of all seven relevant indices.[30] We normalize each potential moderator to have a standard deviation of one, and we denote normalized moderator $k$ by $X_i^k$.

For all outcomes other than *deactivation bad*, we estimate the following modified version of Equation (1):

$$Y_i = \tau D_i + \alpha^k D_i X_i^k + \zeta X_i^k + \rho \boldsymbol{Y}_i^b + \nu_s + \varepsilon_i, \tag{4}$$

instrumenting for $D_i$ and $D_i X_i^k$ with $T_i$ and $T_i X_i^k$. For *deactivation bad*, we simply estimate $Y_i = \alpha^k X_i^k + \varepsilon_i$ in the Treatment group only; this identifies what types of people in the Treatment group thought that deactivation was particularly good or bad. In total, we carry out 78 tests in 78 separate regressions: 13 potential moderators for each of the six outcomes.

There are many ways to estimate heterogeneous treatment effects, including causal forests Athey, Tibshirani, and Wager (2019) and lasso procedures. We chose this approach because it delivers easily interpretable estimates.

Figure 10 presents the interaction coefficients $\hat{\alpha}^k$ and 95 percent confidence intervals for each of the six outcomes. To keep the figures concise, we plot only the five moderators with the largest absolute values of $\hat{\alpha}^k$, so there are another eight smaller unreported $\hat{\alpha}^k$ coefficients for each outcome.

We highlight three key results. First, deactivation may reduce polarization more (i.e., Facebook use may increase polarization more) for older people, white people, and men. Second, Facebook deactivation has less positive effect on subjective well-being for people who have more offline social interactions and are already more happy at baseline. This suggests that Facebook use may have the unfortunate effect of reducing SWB more for people with greater social and psychological need. In our sample, these "higher-need" people also use Facebook more heavily. Third, people may have some intuition about whether they will like deactivation: people with more positive baseline opinions about Facebook are less likely to decrease their post-experiment use and less likely to

---

[30]There are originally nine indices. We exclude the baseline substitute time uses index because it is not easily interpretable, and we exclude the baseline post-experiment use index because this only includes *Facebook mobile app use*.

think that deactivation was good for them.

## 5.6   Experimenter Demand Effects

Most of our outcomes are self-reported, and it would have been difficult to further conceal the intent of the randomized experiment. This raises the possibility of experimenter demand effects, i.e. that survey responses depend on what participants think the researchers want them to say. To test for demand effects, the endline survey asked, "Do you think the researchers in this study had an agenda?" Table 5 presents the possible responses and shares by treatment group.

For demand effects to arise, participants must believe that the researchers want a particular pattern of responses. Table 5 shows that 62 percent of both Treatment and Control groups thought we had no particular agenda or were not sure. This suggests that demand effects would not arise for a solid majority of our sample. However, demand effects could arise for the remaining 38 percent.

For experimenter demand effects to bias our treatment effects, either (i) the Treatment and Control groups must have different beliefs about what the researchers want, or (ii) participants must sense what treatment group they are in and change their answers to generate the treatment effect that they think the researchers want (or don't want). Table 5 shows that possibility (i) is not true: perceived researcher agenda is closely balanced between Treatment and Control. To test for possibility (ii), we can estimate treatment effects separately for the subsample that thought that we "wanted to show that Facebook is bad for people" vs. all other participants. If (ii) is true, then our results should be different in these two subsamples. Appendix Figure A36 shows that this is not the case: the effects on outcome indices that look "good" or "bad" for Facebook (e.g. news knowledge, political polarization, subjective well-being, and post-experiment use) are not statistically different, and there is no pattern of point estimates to suggest that the results are generally more "good" or "bad" in one of the two subsamples.

Of course, these tests are only suggestive. But combined with the fact that the non-self-reported outcomes paint a similar picture to the self-reports, these tests suggest that demand effects are unlikely to be a major source of bias in our results.

## 6   Measuring the Consumer Surplus from Facebook

Quantifying the economic gains from free online services such as search and media is particularly important given that these services represent an increasingly large share of the global economy. This measurement has been particularly challenging because the lack of price variation (or any price at all) makes it impossible to use standard demand estimation to measure consumer surplus.[31] In this section, we present two back-of-the-envelope consumer surplus calculations. First, we employ

---

[31]As mentioned in the introduction, see Brynjolfsson and Saunders (2009), Byrne, Fernald, and Reinsdorf (2016), Nakamura, Samuels, and Soloveichik (2016), Brynjolfsson, Rock, and Syverson (2018), and Syverson (2017).

the standard assumption that willingness-to-accept identifies consumer surplus. Second, we adjust consumer surplus to account for the possibility that deactivation might help people learn their true valuation of Facebook. This adjustment highlights the challenges in using willingness-to-accept as a measure of consumer welfare.

## 6.1   Standard Consumer Surplus Estimate

In a standard model, willingness-to-accept to abstain from Facebook equals consumer surplus. Figure 11 presents the histogram of WTA to deactivate Facebook for the four weeks after midline instead of only the 24 hours after midline. The median is $100, and almost 20 percent had valuations greater than $500. After winsorizing valuations at $1000, the mean is $203. After re-weighting the sample to match the observable characteristics of Facebook users in Table 2, the median is still $100, and the winsorized mean is $180. Multiplying the mean by the estimated 172 million US Facebook users would imply that 27 days of Facebook generates $31 billion of consumer surplus.

Our sample's WTA for Facebook abstention is larger than in most other studies, but not all. In an online panel weighted for national representativeness, Brynjolfsson, Eggers, and Gannamaneni (2018) estimate that the mean WTA to not use Facebook for one month is $48, and that the median WTA to hypothetically stop using social media for one year was $205 in 2016 and $322 in 2017. In their sample of European college students, Brynjolfsson, Eggers, and Gannamaneni (2018) find a median WTA of $175 for one month.[32] In samples of college students, residents of a college town, and Amazon MTurk workers, Corrigan et al. (2018) estimate that the mean annualized WTA to deactivate Facebook ranges from $1,139 to $1,921, depending on the sample and the length of deactivation. In a sample of college students, Mosquera et al. (2018) estimate that the median (mean) WTA to not use Facebook for one week is $15 ($25). In an unincentivized (stated preference) survey of MTurk workers, Sunstein (2019) found a $1 per month median willingness-to-pay for Facebook and a $59 per month median willingness-to-accept to not use Facebook.

There are many caveats to using this type of stylized calculation to approximate the consumer surplus from Facebook. First, we (and Corrigan et al.) required participants to deactivate their Facebook accounts instead of simply abstaining from logging in. For people who planned to avoid using other apps with Facebook logins in order to avoid reactivating their Facebook accounts, WTA overstates the value of Facebook access. Second, participants must believe the experimenter will in fact enforce deactivation; WTA could naturally be lower for a partially enforced or unenforced deactivation compared to an enforced deactivation. In some other studies, the method of enforcement was either not made clear *ex ante*, or enforcement was not fully carried out *ex post*.[33]

---

[32]Appendix Figure A37 compares our demand curve to the Brynjolfsson, Eggers, and Gannamaneni (2018) demand curves.

[33]Mosquera et al. told participants that they would "require" that they "not use their Facebook accounts" but did not give additional details. Brynjolfsson et al.'s WTA elicitation stated that the experimenters "will randomly pick 1 out of every 200 respondents and her/his selection will be fulfilled," and that they could enforce deactivation by

Third, any survey sample is unlikely to be representative of the Facebook user population on both observable and unobservable characteristics. For example, we screened out people who reported using Facebook 15 minutes or less per day, and while we re-weight the average WTAs to match the average observables of Facebook users (including average daily usage), this re-weighting may implicitly overstate the WTA of people who don't use Facebook very much. Fourth, we (and all other existing studies) estimate people's Facebook valuations holding their networks fixed. Due to network externalities, valuations could be quite different if participants' friends and family also deactivated. Fifth, one should be careful in annualizing these estimates or comparing WTAs for different durations of abstention, as our study and several others find that the average per-day valuation varies with the duration. Sixth, as we will see below, in practice people's WTA may not be closely held and could be easily anchored or manipulated, even in incentive compatible elicitations such as ours. Finally, this calculation fails to speak to the possibility that people misperceive Facebook's value. We turn to that issue now.

## 6.2   How Deactivation Affects Valuations

It is often argued that social media users do not correctly perceive the ways in which social media could be addictive or make them unhappy. If this is the case, people's willingness-to-accept to abstain from Facebook would overstate "true" consumer surplus. For example, Alter (2018), Newport (2019), many popular media articles (e.g. Ciaccia 2017; Oremus 2017), and organizations such as the Center for Humane Technology and Time to Log Off argue that Facebook and other digital technologies can be harmful and addictive. The Time to Log Off website argues that "everyone is spending too much time on their screens" and runs "digital detox campaigns." Sagioglu and Greitemeyer (2014) document an "affective forecasting error": people predicted that spending 20 minutes on Facebook would make them feel better, but a treatment group randomly assigned to 20 minutes of Facebook browsing actually reported feeling worse.

Some of our results are also consistent with this argument. In the baseline survey, two-thirds of people agreed at least somewhat that "if people spent less time on Facebook, they would soon realize that they don't miss it." As reported earlier, about 80 percent of the Treatment group thought that deactivation was good for them, and both qualitative and quantitative data suggest that deactivation caused people to re-think and re-optimize their use.

The core of this argument is that people's social media use does not maximize their utility, and a "digital detox" might help them align social media demand with their own best interests. This idea is related to several existing economic models. In a model of projection bias (Loewenstein, O'Donoghue, and Rabin 2003), people might not correctly perceive that social media are habit forming or that their preferences might otherwise change after a "digital detox." In an experience

---

observing subjects' time of last login, "given your permission." In practice, the deactivation was mostly not enforced: of the ten subjects randomly selected for enforcement, one gave permission.

good model, a "digital detox" might help consumers to learn their valuation of social media relative to other uses of time. Of course, both of these mechanisms could also affect demand after a period of deactivation, so it is not clear whether the WTA before deactivation or after deactivation is more normatively relevant.

To provide evidence on these issues, we elicited WTA at three points, as described earlier. First, on the midline survey, we elicited WTA to deactivate Facebook in "weeks 1-4" (the four weeks after midline). We call this WTA $w_1$. Second, just after telling people their BDM offer price on the midline survey, and thus whether they were expected to deactivate in weeks 1-4, we elicited WTA to deactivate in "weeks 5-8" (the four weeks after endline). We call this $w_{2,1}$. Third, on the endline survey, we elicited WTA to deactivate in weeks 5-8, after the Treatment group had experienced deactivation in weeks 1-4, but the Control group had not. We call this $w_{2,2}$.

The Control group's change in WTA for weeks 5-8, $\Delta w_2 := w_{2,2} - w_{2,1}$, captures any unpredicted time effect. The Treatment group's WTA change $\Delta w_2$ reflects both the time effect and the unexpected change in valuation caused by deactivation. If the time effect is the same in both groups, then the difference in differences measures the effect of deactivation on valuations due to projection bias, learning, and similar mechanisms.

Figure 12 presents the average of WTA in Treatment and Control of $w_1$, $w_{2,1}$, and $w_{2,2}$. Recall that the impact evaluation sample includes only people with $w_1 < \$102$, so these averages are less than the unconditional means discussed above and presented in Figure 11. Because of outliers in the WTAs for weeks 5-8, we must winsorize WTA. We winsorize at \$170 for this figure and our primary regression estimates, as this is the upper bound of the distribution of BDM offers that we actually made for deactivation.

The Treatment group's valuation for weeks 5-8 jumps substantially relative to its valuation for weeks 1-4, while the Control group's valuation for weeks 5-8 does not. We used open-answer questions in the post-endline survey and qualitative interviews to understand this change. Some of the large gap may be due to costs of deactivation being convex in the length of deactivation: some people in the Treatment group wrote that they were much less comfortable deactivating for eight weeks instead of four, as they would have to make much more extensive arrangements to communicate with friends, co-workers, and schoolmates during a longer deactivation. However, participants' open-answer responses suggest that that the Treatment group's WTA increase is also affected by anchoring on the \$102 BDM offer that was revealed after the elicitation of $w_1$ but before the elicitation of $w_{2,1}$. Such anchoring is consistent with prior results showing that valuations elicited using the BDM method can be affected by suggested prices or other anchors (Bohm, Lindén, and Sonnegård (1997), Mazar, Koszegi, and Ariely (2014)). Thus, we do not believe this increase is relevant for a consumer welfare calculation, and we do not draw any substantive conclusion from it.

Figure 12 also illustrates $\Delta w_2$, the change in valuation of weeks 5-8 between midline and endline.

34

The Control group's valuation increases, reflecting an unpredicted time effect. In open-answer questions, some people wrote that they were less willing to deactivate during the Thanksgiving holiday, and they may not have foreseen this as of the midline survey on October 11th. By contrast, the Treatment group's valuation for weeks 5-8 decreases. Thus, the difference in differences $\Delta w_2$ is negative.

We can estimate the difference in differences using the following regression:

$$\Delta w_{2,i} = \gamma D_i + \rho w_{1,i} + \nu_s + \varepsilon_i, \tag{5}$$

instrumenting for $D_i$ with $T_i$. Table 6 presents results, winsorizing all WTAs at \$170 in column 1 and at \$1,000 in column 2. Relative to the Control group, the Treatment group reduced its post-endline valuation by by \$14 to \$18, or about 14 percent of the Treatment group's average $w_{2,1}$. This suggests that deactivation eliminated projection bias or facilitated learning that reduced demand for Facebook by 14 percent. In turn, this suggests that the traditional estimates might somewhat overstate consumer surplus.

This result is consistent with our finding in Section 5.4 that deactivation reduced post-experiment Facebook use. However, because the WTA update $\Delta w_2$ is unexpected, it suggests that the results from Section 5.4 may not be entirely explained by a "rational" habit formation model such as Becker and Murphy (1988), in which people foresee how consumption affects future marginal utility. Instead, these results suggest that at least some of the reduced Facebook demand caused by deactivation is driven by unexpected factors such as projection bias and learning.

One caveat is that the anchoring effect described above could affect our estimate of $\gamma$. If anchoring has the same effects on $w_{2,1}$ and $w_{2,2}$ in the Treatment group, then $\Delta w_2$ is unaffected, and our estimate of $\gamma$ is unbiased. If the anchoring effects decay between midline and endline, this would bias $\hat{\gamma}$ away from zero, meaning that the true $\gamma$ would be less than our estimate.[34] This would further strengthen our result that the valuation update caused by deactivation equals only a small share of valuations.

One interpretation of these results is that they reinforce the standard model calculation that Facebook generates many billions of dollars in consumer surplus. Another interpretation is that they further highlight why standard consumer surplus calculations based on elicited valuations can be problematic.

---

[34]An alternative experimental design choice we considered was to elicit $w_{2,1}$ *before* revealing the weeks 1-4 offer price, separately for the case in which the participant would be paid to deactivate for weeks 1-4 and the case in which the participant would not be paid to deactivate. In this case, however, any anchoring effect would have appeared on $w_{2,2}$ but not $w_{2,1}$, generating an unambiguous spurious treatment effect on $\Delta w_2$.

# 7   Conclusion

Our results leave little doubt that Facebook provides large benefits for its users. Even after a four week "detox," our participants spent substantial time on Facebook every day and needed to be paid large amounts of money to give up Facebook. Our results on news consumption and knowledge suggest that Facebook is an important source of news and information. Our participants' answers in free response questions and follow-up interviews make clear the diverse ways in which Facebook can improve people's lives, whether as a source of entertainment, a means to organize a charity or an activist group, or a vital social lifeline for those who are otherwise isolated. Any discussion of social media's downsides should not obscure the basic fact that it fulfills deep and widespread needs.

Notwithstanding, our results also make clear that the downsides are real. We find that four weeks without Facebook improves subjective well-being and substantially reduces post-experiment demand, suggesting that forces such as addiction and projection bias may cause people to use Facebook more than they otherwise would. We find that while deactivation makes people less informed, it also makes them less polarized by at least some measures, consistent with the concern that social media have played some role in the recent rise of polarization in the US. The estimated magnitudes imply that these negative effects are large enough to be real concerns, but also smaller in many cases than what one might have expected given prior research and popular discussion.

The trajectory of views on social media—with early optimism about great benefits giving way to alarm about possible harms—is a familiar one. Innovations from novels to TV to nuclear energy have had similar trajectories. Along with the important existing work by other researchers, we hope that our analysis can help move the discussion from simplistic caricatures to hard evidence, and provide a sober assessment of the way a new technology affects both individual people and larger social institutions.

# References

Abeele, Mariek M. P. Vanden, Marjolijn L. Antheunis, Monique M. H. Pollmann, Alexander P. Schouten, Christine C. Liebrecht, Per J. van der Wijst, Marije A. A. van Amelsvoort, Jos Bartels, Emiel J. Krahmer, and Fons A. Maes. 2018. "Does Facebook Use Predict College Students' Social Capital? A Replication of Ellison, Steinfield, and Lampe's (2007) Study Using the Original and More Recent Measures of Facebook Use and Social Capital." *Communication Studies* 69 (3):272–282.

Acland, Dan and Matthew Levy. 2015. "Naivete, Projection Bias, and Habit Formation in Gym Attendance." *Management Science* 61 (1):146–160.

Allcott, Hunt and Matthew Gentzkow. 2017. "Social Media and Fake News in the 2016 Election." *Journal of Economic Perspectives* 31 (2):211–236.

Alter, Adam. 2018. *Irresistible: The Rise of Addictive Technology and the Business of Keeping Us Hooked*. Penguin Random House.

American National Election Studies. 2016. "2016 Time Series Study." https://electionstudies.org/data-center/2016-time-series-study/.

Anderson, Michael L. 2008. "Multiple Inference and Gender Differences in the Effects of Early Intervention: A Reevaluation of the Abecedarian, Perry Preschool, and Early Training Projects." *Journal of the American Statistical Association* 103 (484):1481–1495.

Appel, Helmut, Alexander L. Gerlach, and Jan Crusius. 2016. "The Interplay Between Facebook Use, Social Comparison, Envy, and Depression." *Current Opinion in Psychology* 9:44–49.

Argyle, Michael. 2001. *The Psychology of Happiness*. Routledge.

Athey, Susan, Julie Tibshirani, and Stefan Wager. 2019. "Generalized Random Forests." *Annals of Statistics* 47 (2):1148–1178.

Baker, David A. and Guillermo Perez Algorta. 2016. "The Relationship Between Online Social Networking and Depression: A Systematic Review of Quantitative Studies." *Cyberpsychology, Behavior, and Social Networking* 19 (11):638–648.

Bakshy, Eytan, Solomon Messing, and Lada Adamic. 2015. "Exposure to Ideologically Diverse News and Opinion on Facebook." *Science* 348 (6239):1130–1132.

Bartels, Larry M. 1993. "Messages Received: The Political Impact of Media Exposure." *American Political Science Review* 87 (2):267–285.

Baym, Nancy K., Kelly B. Wagman, and Christopher J. Persaud. 2019. "Mindfully Scrolling: Rethinking Facebook after Time Deactivated." In *Media in Transition 10: Democracy and Digital Media.* Forthcoming May 2019.

Becker, Gary S., Michael Grossman, and Kevin M. Murphy. 1991. "Rational Addiction and the Effect of Price on Consumption." *The American Economic Review* 81 (2):237–241.

Becker, Gary S. and Kevin M. Murphy. 1988. "A Theory of Rational Addiction." *Journal of Political Economy* 96 (4):675–700.

Becker, Gordon M., Morris H. DeGroot, and Jacob Marschak. 1964. "Measuring Utility by a Single-Response Sequential Method." *Economic Information, Decision, and Prediction* 9 (3):226–232.

Belli, Robert F., Michael W. Traugott, Margaret Young, and Katherine A. McGonagle. 1999. "Reducing Vote Overreporting in Surveys: Social Desirability, Memory Failure, and Source Monitoring." *Public Opinion Quarterly* 63.

Benjamin, Daniel J., Ori Heffetz, Miles S. Kimball, and Alex Rees-Jones. 2012. "What Do You Think Would Make You Happier? What Do You Think You Would Choose?" *American Economic Review* 102 (5):2083–2110.

Benjamini, Yoav, Abba M. Krieger, and Daniel Yekutieli. 2006. "Adaptive linear step-up procedures that control the false discovery rate." *Biometrika* 93 (3):491–507.

Besley, Timothy and Robin Burgess. 2001. "Political Agency, Government Responsiveness and the Role of the Media." *European Economic Review* 45 (4-6):629–640.

Bohm, Peter, Johan Lindén, and Joakim Sonnegård. 1997. "Eliciting Reservation Prices: Becker–DeGroot–Marschak Mechanisms vs. Markets." *The Economic Journal* 107 (443):1079–1089.

Bolier, Linda, Merel Haverman, Gerben J. Westerhof, Heleen Riper, Filip Smit, and Ernst Bohlmeijer. 2013. "Positive Psychology Interventions: A Meta-Analysis of Randomized Controlled Studies." *BMC Public Health* 13 (1):119.

Boxell, Levi. 2018. "Demographic Change and Political Polarization in the United States." Available at SSRN 3148805.

Brynjolfsson, Erik, Felix Eggers, and Avinash Gannamaneni. 2018. "Using Massive Online Choice Experiments to Measure Changes in Well-being." NBER Working Paper.

Brynjolfsson, Erik and Joo Hee Oh. 2012. "The Attention Economy: Measuring the Value of Free Digital Services on the Internet." In *Proceedings of the 33rd International Conference on Information Systems.*

Brynjolfsson, Erik, Daniel Rock, and Chad Syverson. 2018. "Artificial intelligence and the modern productivity paradox: A clash of expectations and statistics." In *The Economics of Artificial Intelligence: An Agenda*. University of Chicago Press.

Brynjolfsson, Erik and Adam Saunders. 2009. "What the GDP Gets Wrong (Why Managers Should Care)." *MIT Sloan Management Review* 51 (1):95.

Burke, Moira and Robert E. Kraut. 2014. "Growing Closer on Facebook: Changes in Tie Strength Through Social Network Site Use." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*. 4187–4196.

———. 2016. "The Relationship Between Facebook Use and Well-Being Depends on Communication Type and Tie Strength." *Journal of Computer-Mediated Communication* 21 (4):265–281.

Burke, Moira, Robert E. Kraut, and Cameron Marlow. 2011. "Social Capital on Facebook: Differentiating Uses and Users." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*. 571–580.

Burke, Moira, Cameron Marlow, and Thomas Lento. 2010. "Social Network Activity and Social Well-Being." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*. 1909–1912.

Busse, Meghan R., Devin G. Pope, Jaren C. Pope, and Jorge Silva-Risso. 2015. "The Psychological Effect of Weather on Car Purchases." *Quarterly Journal of Economics* 130 (1):371–414.

Byrne, David M., John G. Fernald, and Marshall B. Reinsdorf. 2016. "Does the United States have a productivity slowdown or a measurement problem?" *Brookings Papers on Economic Activity* 2016 (1):109–182.

Charness, Gary and Uri Gneezy. 2009. "Incentives to Exercise." *Econometrica* 77 (3):909–931.

Chopik, William J. 2017. "Associations among relational values, support, health, and well-being across the adult lifespan." *Personal Relationships* 24 (2):408–422.

Ciaccia, Chris. 2017. "Facebook, cocaine, opioids: How addictive is the social network?" Fox News. https://www.foxnews.com/tech/facebook-cocaine-opioids-how-addictive-is-the-social-network.

Conlin, Michael, Ted O'Donoghue, and Timothy J. Vogelsang. 2007. "Projection Bias in Catalog Orders." *American Economic Review* 97 (4):1217–1249.

Corrigan, Jay R., Saleem Alhabash, Matthew Rousu, and Sean B. Cash. 2018. "How much is social media worth? Estimating the value of Facebook by paying users to stop using it." *PloS one* 13 (12):e0207101.

39

Csikszentmihalyi, Mihaly and Reed Larson. 2014. "Validity and Reliability of the Experience-Sampling Method." In *Flow and the Foundations of Positive Psychology*. Springer, 35–54.

DellaVigna, Stefano and Matthew Gentzkow. 2010. "Persuasion: Empirical Evidence." *Annual Review of Economics* 2 (1):643–669.

DellaVigna, Stefano and Ethan Kaplan. 2007. "The Fox News Effect: Media Bias and Voting." *Quarterly Journal of Economics* 122 (3):1187–1234.

DellaVigna, Stefano and Eliana La Ferrara. 2015. "Economic and Social Impacts of the Media." In *Handbook of Media Economics*, vol. 1. Elsevier, 723–768.

DellaVigna, Stefano, John A. List, Ulrike Malmendier, and Gautam Rao. 2017. "Voting to Tell Others." *Review of Economic Studies* 84.

Deters, Fenne Große and Matthias R. Mehl. 2012. "Does Posting Facebook Status Updates Increase or Decrease Loneliness? An Online Social Networking Experiment." *Social Psychological and Personality Science* 4 (5):579–586.

Diener, Ed, Robert A. Emmons, Randy J. Larsen, and Sharon Griffin. 1985. "The Satisfaction With Life Scale." *Journal of Personality Assessment* 49 (1):71–75.

Duff, Brian, Michael J. Hanmer, Won-Ho Park, and Ismail K. White. 2007. "Good Excuses: Understanding who Votes with an Improved Turnout Question." *Public Opinion Quarterly* 71 (1).

Ellison, Nicole B., Charles Steinfield, and Cliff Lampe. 2007. "The Benefits of Facebook "Friends:" Social Capital and College Students' Use of Online Social Network Sites." *Journal of Computer-Mediated Communication* 12 (4):1143–1168.

Enikolopov, Ruben, Alexey Makarin, and Maria Petrova. 2018. "Social Media and Protest Participation: Evidence from Russia." SSRN Working Paper.

Enikolopov, Ruben and Maria Petrova. 2015. "Media Capture: Empirical Evidence." In *Handbook of Media Economics*, vol. 1. Elsevier, 687–700.

Enikolopov, Ruben, Maria Petrova, and Ekaterina Zhuravskaya. 2011. "Media and Political Persuasion: Evidence from Russia." *American Economic Review* 101 (7):3253–85.

Facebook. 2016. "Facebook Q1 2016 Results - Earnings Call Transcript." https://seekingalpha.com/article/3968783-facebook-fb-mark-elliot-zuckerberg-q1-2016-results-earnings-call-transcript.

———. 2018. "Facebook Reports Third Quarter 2018 Results." Press Release. https://investor.fb.com/investor-news/press-release-details/2018/Facebook-Reports-Third-Quarter-2018-Results/default.aspx.

Fardouly, Jasmine and Lenny R. Vartanian. 2015. "Negative Comparisons About One's Appearance Mediate the Relationship Between Facebook Usage and Body Image Concerns." *Body Image* 12:82–88.

Fiorina, Morris P. and Samuel J. Abrams. 2008. "Political Polarization in the American Public." *Annual Review Political Science* 11:563–588.

Frison, Eline and Steven Eggermont. 2015. "Toward an Integrated and Differential Approach to the Relationships Between Loneliness, Different Types of Facebook Use, and Adolescents' Depressed Mood." *Communication Research*. doi:10.1177/0093650215617506.

Fujiwara, Thomas, Kyle Meng, and Tom Vogl. 2016. "Habit Formation in Voting: Evidence from Rainy Elections." *American Economic Journal: Applied Economics* 8 (4):160–188.

Gallup. 2018a. "Americans' Views of Donald Trump's Personal Characteristics (Trends)." https://news.gallup.com/poll/235916/americans-views-donald-trump-personal-characteristics-trends.aspx.

———. 2018b. "Opposition to Kavanaugh Had Been Rising Before Accusation." https://news.gallup.com/poll/242300/opposition-kavanaugh-rising-accusation.aspx.

———. 2018c. "Ten Takeaways About Americans' Views of Guns." https://news.gallup.com/opinion/polling-matters/233627/ten-takeaways-americans-views-guns.aspx.

Gentzkow, Matthew. 2006. "Television and Voter Turnout." *Quarterly Journal of Economics* 121 (3):931–972.

———. 2016. "Polarization in 2016." Toulouse Network for Information Technology Whitepaper.

Gentzkow, Matthew and Jesse Shapiro. 2011. "Ideological Segregation Online and Offline." *Quarterly Journal of Economics* 126 (4):1799–1839.

Gerber, Alan S., James G. Gimpel, Donald P. Green, and Daron R. Shaw. 2011. "How Large and Long-lasting Are the Persuasive Effects of Televised Campaign Ads? Results from a Randomized Field Experiment." *American Political Science Review* 105 (1):135–150.

Gerber, Alan S. and Donald P. Green. 2000. "The Effects of Canvassing, Telephone Calls, and Direct Mail on Voter Turnout: A Field Experiment." *American Political Science Review* 94 (3):653–663.

Gerber, Alan S., Dean Karlan, and Daniel Bergan. 2009. "Does the Media Matter? A Field Experiment Measuring the Effect of Newspapers on Voting Behavior and Political Opinions." *American Economic Journal: Applied Economics* 1 (2):35–52.

Gerson, Jennifer, Anke C. Plagnol, and J. Corr, Philip. 2017. "Passive and Active Facebook Use Measure (PAUM): Validation and Relationship to the Reinforcement Sensitivity Theory." *Personality and Individual Differences* 117:81–90.

Gonzales, Amy L. and Jeffrey T. Hancock. 2011. "Mirror, Mirror on my Facebook Wall: Effects of Exposure to Facebook on Self-Esteem." *Cyberpsychology, Behavior, and Social Networking* 14 (1-2):79–83.

Gruber, Jonathan and Botond Köszegi. 2001. "Is Addiction "Rational"? Theory and Evidence." *Quarterly Journal of Economics* 116 (4):1261–1303.

Howard, Philip N., Aiden Duffy, Deen Freelon, Muzammil M. Hussain, Will Mari, and Marwa Maziad. 2011. "Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?" Available at SSRN 2595096.

Huber, Gregory A. and Kevin Arceneaux. 2007. "Identifying the Persuasive Effects of Presidential Advertising." *American Journal of Political Science* 51 (4):957–977.

Hughes, Mary Elizabeth, Linda J. Waite, Louise C. Hawkley, and John T. Cacioppo. 2004. "A Short Scale for Measuring Loneliness in Large Surveys: Results From Two Population-Based Studies." *Research on Aging* 26 (6):655–672.

Hunt, Melissa G., Rachel Marx, Courtney Lipson, and Jordyn Young. 2018. "No More FOMO: Limiting Social Media Decreases Loneliness and Depression." *Journal of Social and Clinical Psychology* 37 (10):751–768.

Huppert, Felicia A., Nic Marks, Andrew Clark, Johannes Siegrist, Alois Stutzer, Joar Vittersø, and Morten Wahrendorf. 2009. "Measuring Well-being Across Europe: Description of the ESS Well-being Module and Preliminary Findings." *Social Indicators Research* 91:301–315.

Hussam, Reshmaan, Atonu Rabbani, Giovanni Reggiani, and Natalia Rigol. 2016. "Handwashing and Habit Formation." Yale University, Economic Growth Center.

Irvine, Mark. 2018. "Facebook Ad Benchmarks for YOUR Industry." https://www.wordstream.com/blog/ws/2017/02/28/facebook-advertising-benchmarks.

Iyengar, Shanto, Gaurav Sood, and Yphtach Lelkes. 2012. "Affect, Not Ideology: Social Identity Perspective on Polarization." *Public Opinion Quarterly* 76 (3):405–431.

Iyengar, Shanto and Sean J. Westwood. 2015. "Fear and Loathing across Party Lines: New Evidence on Group Polarization." *American Journal of Political Science* 59 (3):690–707.

Kahneman, Daniel, Alan B. Krueger, David Schkade, Norbert Schwarz, and Arthur A. Stone. 2006. "Would You Be Happier If You Were Richer? A Focusing Illusion." *Science* 312:1908–1910.

Kirkpatrick, David. 2011. *The Facebook Effect: The Inside Story of the Company That Is Connecting the World.* Simon & Schuster.

Krasnova, Hannah, H. Wenninger, T. Widjaja, and Peter Buxmann. 2013. "Envy on Facebook: A Hidden Threat to Users' Life Satisfaction." In *11th International Conference on Wirtschaftsinformatik.*

Kross, Ethan, Philippe Verduyn, Emre Demiralp, Jiyoung Park, David Seungjae Lee, Natalie Lin, Holly Shablack, John Jonides, and Oscar Ybarra. 2013. "Facebook Use Predicts Declines in Subjective Well-being in Young Adults." *PloS one* 8 (8):e69841.

Lee, David Seungjae. 2009. "Training, Wages, and Sample Selection: Estimating Sharp Bounds on Treatment Effects." *The Review of Economic Studies* 76 (3):1071–1102.

Loewenstein, George, Ted O'Donoghue, and Matthew Rabin. 2003. "Projection Bias in Predicting Future Utility." *Quarterly Journal of Economics* 118 (4):1209–1248.

Lyubomirsky, Sonja and Heidi S. Lepper. 1999. "A Measure of Subjective Happiness: Preliminary Reliability and Construct Validation." *Social Indicators Research* 46:137–155.

Mabe, Annalise G., K. Jean Forney, and Pamela K. Keel. 2014. "Do You "Like" My Photo? Facebook Use Maintains Eating Disorder Risk." *International Journal of Eating Disorders* 47 (5):516–523.

Marotta, Veronica and Alessandro Acquisti. 2017. "Online Distractions, Website Blockers, and Economic Productivity: A Randomized Field Experiment." Preliminary Draft.

Martin, Gregory J. and Ali Yurukoglu. 2017. "Bias in Cable News: Persuasion and Polarization." *American Economic Review* 107 (9):2565–99.

Mazar, Nina, Botond Koszegi, and Dan Ariely. 2014. "True Context-dependent Preferences? The Causes of Market-dependent Valuations." *Journal of Behavioral Decision Making* 27 (3):200–208.

Molla, Rani and Kurt Wagner. 2018. "People spend almost as much time on Instagram as they do on Facebook." Recode. https://www.recode.net/2018/6/25/17501224/instagram-facebook-snapchat-time-spent-growth-data.

Mosquera, Roberto, Mofioluwasademi Odunowo, Trent McNamara, Xiongfei Guo, and Ragan Petrie. 2018. "The Economic Effects of Facebook." Available at SSRN 3312462.

Muller, Karsten and Carlo Schwarz. 2018. "Fanning the Flames of Hate: Social Media and Hate Crime." SSRN Working Paper.

Myers, David G. 2000. "The Funds, Friends, and Faith of Happy People." *American Psychologist* 55 (1):56.

Nakamura, Leonard I., Jon Samuels, and Rachel H. Soloveichik. 2016. "Valuing "Free" Media in GDP: An Experimental Approach." FRB of Philadelphia Working Paper No. 16-24.

Napoli, Philip M. 2014. "Measuring Media Impact." The Norman Lear Center. http://www.learcenter.org/pdf/measuringmedia.pdf.

Newport, Cal. 2019. *Digital Minimalism: Choosing a Focused Life in a Noisy World.* Penguin Random House.

Olken, Benjamin A. 2009. "Do Television and Radio Destroy Social Capital? Evidence from Indonesian Villages." *American Economic Journal: Applied Economics* 1 (4):1–33.

Oremus, Will. 2017. "Addiction for Fun and Profit." Slate. https://slate.com/technology/2017/11/facebook-was-designed-to-be-addictive-does-that-make-it-evil.html.

Pew Research Center. 2016. "On Views of Race and Inequality, Blacks and Whites Are Worlds Apart." http://www.pewsocialtrends.org/2016/06/27/on-views-of-race-and-inequality-blacks-and-whites-are-worlds-apart/.

———. 2017. "American Trends Panel, Wave 25 March, Final Topline, March 13 - March 27, 2017." http://www.journalism.org/wp-content/uploads/sites/8/2017/05/PJ_2017.05.10_media-attitudes_topline.pdf.

———. 2018a. "News Use Across Social Media Platforms 2018." http://www.journalism.org/2018/09/10/news-use-across-social-media-platforms-2018/.

———. 2018b. "Political Survey, Final Topline, April 25 - May 1, 2018." http://assets.pewresearch.org/wp-content/uploads/sites/5/2018/05/10094104/05-10-18-foreign-policy-topline-for-release.pdf.

———. 2018c. "Public Is Skeptical of the Iran Agreement - and Trump's Handling of the Issue." http://www.people-press.org/2018/05/08/public-is-skeptical-of-the-iran-agreement-and-trumps-handling-of-the-issue/.

———. 2018d. "Sexual Harassment at Work in the Era of #MeToo." http://www.pewsocialtrends.org/2018/04/04/sexual-harassment-at-work-in-the-era-of-metoo/.

———. 2018e. "Shifting Public Views on Legal Immigration Into the U.S." http://www.people-press.org/2018/06/28/shifting-public-views-on-legal-immigration-into-the-u-s/.

———. 2018f. "Social Media Use in 2018." http://www.pewinternet.org/2018/03/01/social-media-use-in-2018/.

Reis, Harry T., W. Andrew Collins, and Ellen Berscheid. 2000. "The Relationship Context of Human Behavior and Development." *Psychological Bulletin* 126 (6):844.

Sagioglu, Christina and Tobias Greitemeyer. 2014. "Facebook's emotional consequences: Why Facebook causes a decrease in mood and why people still use it." *Computers in Human Behavior* 35:359–363.

Satici, Seydi Ahmet and Recep Uysal. 2015. "Well-being and problematic Facebook use." *Computers in Human Behavior* 49:185–190.

Settle, Jamie E. 2018. *Frenemies: How Social Media Polarizes America.* Cambridge University Press.

Shakya, Holly B. and Nicholas A. Christakis. 2017. "Association of Facebook Use With Compromised Well-being: A Longitudinal Study." *American Journal of Epidemiology* 185 (3):203–211.

Silver, Brian D., Barbara A. Anderson, and Paul R. Abramson. 1986. "Who Overreports Voting?" *American Political Science Review* 80 (2).

Simonsohn, Uri. 2010. "Weather to go to college." *The Economic Journal* 120 (543):270–280.

Spenkuch, Jörg L and David Toniatti. 2016. "Political advertising and election outcomes." CESifo Working Paper Series 5780.

Stone, Arthur A. and Saul Shiffman. 1994. "Ecological Momentary Assessment (EMA) in Behavorial Medicine." *Annals of Behavioral Medicine* 16 (3):199–202.

Strömberg, David. 2015. "Media and Politics." *Annual Review of Economics* 7 (1):173–205.

Sunstein, Cass. 2001. *Republic.com.* Princeton University Press.

———. 2017. *Republic: Divided Democracy in the Age of Social Media.* Princeton University Press.

———. 2019. "Valuing Facebook." *Behavioural Public Policy* Forthcoming.

Syverson, Chad. 2017. "Challenges to Mismeasurement Explanations for the US Productivity Slowdown." *Journal of Economic Perspectives* 31 (2):165–86.

Tandoc, Edson C., Patrick Ferrucci, and Margaret Duffy. 2015. "Facebook use, envy, and depression among college students: Is facebooking depressing?" *Computers in Human Behavior* 43:139–146.

Theocharis, Yannis and Will Lowe. 2016. "Does Facebook increase political participation? Evidence from a field experiment." *Information, Communication, and Society* 19 (10):1465–1486.

Tromholt, Morten. 2016. "The Facebook Experiment: Quitting Facebook Leads to Higher Levels of Well-Being." *Cyberpsychology, Behavior, and Social Networking* 19 (11):661–666.

Twenge, Jean M. 2017. *iGen: Why Today's Super-Connected Kids Are Growing Up Less Rebellious, More Tolerant, Less Happy–and Completely Unprepared for Adulthood–and What That Means for the Rest of Us.* Simon and Schuster.

Twenge, Jean M., Thomas E. Joiner, Megan L. Rogers, and Gabrielle N. Martin. 2018. "Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time." *Clinical Psychological Science* 6 (1):3–17.

Twenge, Jean M., Gabrielle N. Martin, and W. Keith Campbell. 2018. "Decreases in psychological well-being among American adolescents after 2012 and links to screen time during the rise of smartphone technology." *Emotion* 18 (6):765–780.

Twenge, Jean M. and Heejung Park. 2017. "The Decline in Adult Activities Among U.S. Adolescents, 1976–2016." *Child Development.* Advance online publication. doi:10.1111/cdev.12930.

Twenge, Jean M., Ryne A. Sherman, and Sonja Lyubomirsky. 2016. "More Happiness for Young People and Less for Mature Adults: Time Period Differences in Subjective Well-Being in the United States, 1972–2014." *Social Psychological and Personality Science* 7 (2):131–141.

United States Census Bureau. 2017. "2017 American Community Survey 1-Year Estimates." https://www.census.gov/newsroom/press-kits/2018/acs-1year.html.

———. 2018. "Voting and Registration in the Election of November 2018." https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html.

Vanman, Eric J., Rosemary Baker, and Stephanie J. Tobin. 2018. "The Burden of Online Friends: The Effects of Giving Up Facebook on Stress and Well-Being." *The Journal of Social Psychology* 158 (4):496–507.

Verduyn, Phuluppe, David Seungjae Lee, Jiyoung Park, Holly Shablack, Ariana Orvell, Joseph Bayer, Oscar Ybarra, John Jonides, and Ethan Kross. 2015. "Passive Facebook Usage Undermines Affective Well-Being: Experimental and Longitudinal Evidence." *Journal of Experimental Psychology* 144 (2):480–488.

Table 1: **Sample Sizes**

| Phase | Sample size |
|---|---|
| Recruitment and baseline | N=1,892,191 were shown ads |
| | N=32,201 clicked on ads |
| | N=22,324 completed pre-screen survey |
| | N=20,959 were from US and born between 1900 and 2000 |
| | N=17,335 had 15 < daily Facebook minutes ≤ 600 |
| | N=7,455 consented to participate |
| | N=3,910 finished baseline |
| | N=2,897 had valid baseline and were randomized, of which: |
| Midline | N=2,897 began midline |
| | N=2,743 received a price offer, of which: |
| | N=1,661 were in impact evaluation sample |
| Endline | N=2,710 began endline |
| | N=2,684 finished endline, of which: |
| | N=1,637 were in impact evaluation sample |
| Post-endline | N=2,067 reported Facebook mobile app use, of which: |
| | N=1,219 were in impact evaluation sample |

Table 2: **Sample Demographics**

| | (1) Impact evaluation sample | (2) Facebook users | (3) US population |
|---|---|---|---|
| Income under $50,000 | 0.40 | 0.41 | 0.42 |
| College | 0.51 | 0.33 | 0.29 |
| Male | 0.43 | 0.44 | 0.49 |
| White | 0.68 | 0.73 | 0.74 |
| Age under 30 | 0.52 | 0.26 | 0.21 |
| Republican | 0.13 | | 0.26 |
| Democrat | 0.42 | | 0.20 |
| Facebook minutes | 74.52 | 45.00 | |

Notes: Column 1 presents average demographics for the impact evaluation sample: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$102$ or $p = \$0$ to do so. Column 2 presents our estimate of average demographics of American adults with a Facebook account. The top five numbers in Column 2 are inferred from a Pew Research Center (2018f) survey of social media use by demographic group. The bottom number in Column 2 (the average of 45 minutes of Facebook use per day) is approximated on those basis of sources such as Facebook (2016) and Molla and Wagner (2018). Column 3 presents average demographics of American adults. The top five numbers are from the 2017 American Community Survey (United States Census Bureau 2017), and the Republican and Democrat shares are from the 2016 American National Election Study (American National Election Studies 2016).

Table 3: **Survey Response and Treatment Compliance Rates**

| Variable | (1) Treatment Mean/SD | (2) Control Mean/SD | T-test P-value (1)-(2) |
|---|---|---|---|
| Completed endline survey | 0.99 (0.11) | 0.98 (0.12) | 0.54 |
| Share of text messages completed | 0.92 (0.20) | 0.93 (0.18) | 0.45 |
| Completed post-endline survey | 0.95 (0.23) | 0.92 (0.26) | 0.07* |
| Share days deactivated | 0.90 (0.29) | 0.02 (0.13) | 0.00*** |
| N | 580 | 1081 | |

Notes: Columns 1 and 2 present survey response and treatment compliance rates for the Treatment and Control groups in the impact evaluation sample: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$102$ or $p = \$0$ to do so. Column 3 presents p-values of tests of differences in response rates between the two groups.

Table 4: **Most Common Descriptions of Facebook Use Changes**

| Phrases Used More Often by Treatment | | | Phrases Used More Often by Control | | |
|---|---|---|---|---|---|
| Phrase | % Treatment | % Control | Phrase | % Treatment | % Control |
| not use facebook anymor | 0.90 | 0 | ha not chang | 6.63 | 16.76 |
| not spend much time | 1.08 | 0.36 | not chang sinc particip | 0 | 0.99 |
| spend less time facebook | 0.90 | 0.27 | ha not chang sinc | 0.18 | 1.53 |
| have not use facebook | 0.72 | 0.18 | chang sinc particip studi | 0 | 0.81 |
| not use facebook much | 0.72 | 0.18 | way use facebook ha | 0.18 | 1.35 |
| spend lot less time | 0.72 | 0.27 | usag ha not chang | 0 | 0.72 |
| use much less | 2.87 | 0.63 | chang way use facebook | 0.18 | 1.26 |
| definit use facebook less | 0.54 | 0.18 | not chang | 7.17 | 18.65 |
| use facebook lot less | 0.54 | 0.18 | awar much time spend | 0 | 0.63 |
| use facebook much less | 0.54 | 0.18 | ha not | 8.24 | 19.64 |
| not use facebook | 3.05 | 1.17 | not much ha chang | 0 | 0.54 |
| use littl bit less | 0.54 | 0.27 | way use facebook | 0.54 | 2.70 |
| have not use | 1.25 | 0.18 | not think chang much | 0 | 0.45 |
| ha not chang use | 0.72 | 0.45 | not chang much use | 0 | 0.45 |
| use facebook anymor | 0.90 | 0.09 | use facebook slightli less | 0 | 0.45 |
| think use less | 1.61 | 0.45 | more awar much time | 0.18 | 0.99 |
| no ha not chang | 0.54 | 0.36 | chang sinc particip | 0 | 1.08 |
| use news app | 0.72 | 0.09 | much time spend | 0.18 | 1.53 |
| still have not | 0.90 | 0.18 | facebook ha not chang | 0.72 | 2.07 |
| much less | 4.84 | 1.17 | use slightli less | 0 | 0.90 |

Notes: The post-endline survey included the following question with an open response text box: "How has the way you use Facebook changed, if at all, since participating in this study?" For all responses, we stemmed words, filtered out stop words, then constructed all phrases of length $l = \{1, 2, 3, 4\}$ words. For each phrase $p$ of length $l$, we calculated the number of occurrences of that phrase in Treatment and Control group responses ($f_{plT}$ and $f_{plC}$) and the number of occurrences of length-$l$ phrases that are *not* phrase $p$ in Treatment and Control responses ($f_{\sim plT}$ and $f_{\sim plC}$). We then constructed Pearson's $\chi^2$ statistic:

$$\chi^2 = \frac{(f_{plT} f_{\sim plC} - f_{plC} f_{\sim plT})^2}{(f_{plT} + f_{plC})(f_{plT} + f_{\sim plT})(f_{plC} + f_{\sim plC})(f_{\sim plT} + f_{\sim plC})}.$$

This table presents the 20 phrases with the highest $\chi^2$ that were most commonly written by the Treatment and Control groups. The % Treatment and % Control columns present the share of people in the respective group whose responses included each phrase.

Table 5: **Perceived Researcher Agenda in Treatment and Control**

| Variable | (1) Treatment Mean/SD | (2) Control Mean/SD | T-test P-value (1)-(2) |
|---|---|---|---|
| I don't think they had a particular agenda | 0.43 (0.49) | 0.44 (0.50) | 0.59 |
| Yes, wanted to show that Facebook is good for people | 0.03 (0.18) | 0.04 (0.19) | 0.79 |
| Yes, wanted to show that Facebook is bad for people | 0.35 (0.48) | 0.35 (0.48) | 0.79 |
| I am not sure | 0.19 (0.39) | 0.18 (0.38) | 0.62 |
| N | 573 | 1064 | |

Notes: The endline survey asked, "Do you think the researchers in this study had an agenda?" Columns 1 and 2 present the share of the Treatment and Control groups who gave each possible response. Column 3 presents p-values of tests of differences in means between the two groups.

Table 6: **Change in Facebook Valuation after Deactivation**

| | (1) | (2) |
|---|---|---|
| Share of time deactivated | -14.36 (2.60) | -18.22 (7.73) |
| Observations | 1,634 | 1,634 |
| Winsorized maximum WTA | 170 | 1,000 |
| Treatment mean weeks 5-8 WTA at midline | 103 | 135 |

Notes: This table presents estimates of Equation (5). The dependent variable is the change in WTA for post-endline deactivation measured at endline versus midline. Standard errors are in parentheses.

Figure 1: **Experimental Design**



Figure 2: **Substitutes for Facebook**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions. *Facebook minutes* is not included in the substitute time uses index, and *Facebook news* is not included in the substitute news sources index, so we visually separate these two variables from the other variables in their respective families. We also visually separate online and offline time uses and news sources, although all online and offline substitutes enter their respective indexes.

Figure 3: **Effects on News and Political Outcomes**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure 4: **Issue Opinions by Party at Endline**



Notes: This figure presents kernel density plots of issue opinions for Democrats and Republicans in Treatment and Control at endline. Issue opinions are attitudes about nine current political issues on a scale from -5 to +5, such as "To what extent do you think that free trade agreements between the US and other countries have been a good thing or a bad thing for the United States." See Appendix B.1 for a list of all nine issue questions. To construct the *issue opinions* measure, for each issue question $q$, we normalize responses by the standard deviation in the Control group, determine Democrats' and Republicans' average responses $\mu_q^D$ and $\mu_q^R$, re-center so that $\mu_q^D + \mu_q^R = 0$, and re-sign so that $\mu^R > 0$. Define $\tilde{y}_{iq}$ as individual $i$'s normalized, re-centered, and re-signed response to question $q$. $\tilde{y}_{iq}$ thus reflects the strength of individual $i$'s agreement with the average Republican. Define $\sigma_q$ as the Control group within-person standard deviation of $\tilde{y}_{iq}$ for question $q$. This measures how much people's views change between baseline and endline, and allows us to place higher weight on issues about which views are malleable over the deactivation period. The preliminary *issue opinion* measure is $Y_i = \sum_q \tilde{y}_{iq}\sigma_q$, and the final *issue opinion* measure plotted in the figure is $Y_i$ divided by the Control group standard deviation.

Figure 5: **Effects on Subjective Well-Being**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure 6: **Effects on Post-Experiment Facebook Use and Opinions**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure 7: **Probability of Being Deactivated**



Notes: This figure shows the share of the Treatment and Control groups that had their Facebook accounts deactivated, by day of the experiment, for the impact evaluation sample: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$102$ or $p = \$0$ to do so. The vertical gray areas reflect the 24 hour periods after midline and endline during which both Treatment and Control were instructed to deactivate.

Figure 8: **Key Opinions about Facebook in Treatment and Control**



Notes: This figure presents the distribution of responses in Treatment and Control for two key measures of opinions about Facebook. See Section 2.3 for variable definitions.

Figure 9: **Heterogeneous Treatment Effects**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1), for subgroups defined by the primary moderators in our pre-analysis plan. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

60

Figure 10: **Heterogeneous Treatment Effects for All Moderators**



Notes: This figure presents the moderators of local average treatment effects of Facebook deactivation estimated using Equation (4). For each of the six outcomes, we present the five moderators with the largest moderation coefficients $\hat{\alpha}^k$. All outcome variables are normalized so that the Control group endline distribution has a standard deviation of one, and all moderators are also normalized to have a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure 11: **Distribution of Willingness-to-Accept to Deactivate Facebook After Midline**



Notes: This figure presents the distribution of willingness-to-accept to deactivate Facebook between midline and endline. All responses above $525 are plotted at $525.

Figure 12: **Average Valuation of Facebook in Treatment and Control**



Notes: This figure presents the mean willingness-to-accept (WTA) to deactivate Facebook in Treatment and Control, for the impact evaluation sample: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$102$ or $p = \$0$ to do so. The first pair of bars is the mean WTA for deactivation in weeks 1-4, the four weeks after the midline survey. The second pair of bars is mean WTA for deactivation in weeks 5-8, the four weeks after the endline survey, as elicited in the midline survey. The third pair of bars is mean WTA for deactivation in weeks 5-8, as elicited in the endline survey.

# Online Appendix: Not for Publication

The Welfare Effects of Social Media

*Hunt Allcott, Luca Braghieri, Sarah Eichmeyer, and Matthew Gentzkow*

Table A1: **Literature: Randomized Impact Evaluations of Facebook**

| Paper | N | Population | Intervention | Length | Enforcement | Outcomes | PAP |
|---|---|---|---|---|---|---|---|
| Gonzales and Hancock (2011) | 63 | College | Look at profile vs. mirror | 3 minutes | None | Self-esteem | No |
| Deters and Mehl (2012) | 86 | College | Post more status updates | 1 week | Scrape profile* | SWB | No |
| Mabe, Forney, and Keel (2014) | 84 | College women | Browse Facebook vs. research ocelots | 20 minutes | None | Eating disorder risk | No |
| Sagioglu and Greitemeyer (2014) | 263 | MTurk | Browse Facebook | 20 minutes | None | SWB | No |
| Fardouly and Vartanian (2015) | 112 | College women | Browse Facebook vs. other website | 10 minutes | None | Body image, mood | No |
| Verduyn et al. (2015) | 84 | College | Active vs. passive use | 10 minutes | Screen monitoring* | SWB | No |
| Theocharis and Lowe (2016) | 197 | Greek, without accounts | Sign up | 6 months | Payment sent to Facebook account* | Voting, civic engagement | No |
| Tromholt (2016) | 886** | Danish | Not log in | 1 week | Self-report | SWB | No |
| Marotta and Acquisti (2017) | 455 | MTurk | Block Facebook and YouTube during work hours | 2 weeks | Install blocking software | Work productivity | No |
| Hunt et al. (2018) | 111 | College | Limit social media to 10 minutes/day | 4 weeks | Weekly time use screen shots | SWB | No |
| Vanman, Baker, and Tobin (2018) | 123 | Australian | Not use Facebook | 5 days | None | Stress, SWB | No |
| Mosquera et al. (2018) | 151† | College | Not log in | 1 week | Check "last active" | News, SWB, WTA*** | No |
| Allcott, Braghieri, Eichmeyer, and Gentzkow (2018) | 1,637 | US Facebook ads | Deactivate | 4 weeks | Check URLs | News, voting, polarization, SWB, WTA, WTA changes | Yes |

Notes: "N" is the number of people in the main empirical analysis, after attrition. †1,765 people began this study, but 151 people were randomized and completed the endline survey. *Instead of analyzing as a randomized encouragement design, these studies dropped participants who did not comply with the treatment conditions. **This study had an 12 percent attrition rate in treatment and a 26 percent attrition rate in control. ***This study elicited WTA to participate in the experiment, which involved a 50 percent chance of Facebook deactivation plus completing a survey, and a 50 percent chance of only completing a survey.

Online Appendix                                    Allcott, Braghieri, Eichmeyer, and Gentzkow

# A   Experimental Design Appendix

Figure A1: **Facebook Advertisement Used for Recruitment**



Online Appendix                                      Allcott, Braghieri, Eichmeyer, and Gentzkow

Figure A2: **Post-Endline Social Media Time Limit Email**



Dear ,

Thank you for participating in our study about Facebook use!

With the end of the study, we wanted to provide resources that can help you manage the technology in your life. We know how difficult it can be to stay away from or limit the time you spend on social media and other technologies.

There are tools that can help you track and limit your social media usage on your smartphone. If you would like to learn about them, click here if you have an iPhone and click here if you have an Android device. If you would like further information about other ways to curb smartphone use, here is a TIME magazine article we hope you find useful:

<div style="text-align:center; background:#6aa0cc; color:white; padding:10px; font-weight:bold;">Learn more about ways to limit smartphone use</div>

Thanks again for your participation in the study, and we wish you all the best.

Sarah, Luca, Kelly, Hunt, Matt, and Raj

**The Stanford Online Experience Research Study Research Team**

Figure A3: **Post-Endline Politics Email**



The 2018 midterm elections are over, but you can still participate and make your voice heard in important national, state, and local issues. There are many ways you might make a difference in future elections.

If you support Democratic candidates you might:

- Volunteer to help Democratic candidates in your community here.
- Sign a petition denouncing recent voter ID laws here.

**Donate to the Democratic Party to help prepare for future elections**

If you support Republican candidates you might:

- Volunteer to help Republican candidates in your community here.
- Sign a petition to encourage people to stand for the National Anthem here.

**Donate to the Republican Party to help prepare for future elections**

We hope you find these resources useful and engage with issues that matter to you.

The Stanford Online Experience Research Study Research Team

Figure A4: **Subjective Well-Being Text Messages**

(a) **Happiness**

Overall, how happy do you feel right now on a scale from 1 (not at all happy) to 10 (completely happy)?

   

(b) **Primary Emotion**

What best describes how you felt over the last 10 minutes? Please text back the corresponding number.
1: Lonely/left out
2: Shameful/guilty
3: Absorbed in doing something worthwhile
4: Sad
5: Loving/tender
6: Bored
7: Happy
8: Angry
9: Worried
10: Other positive feeling
11: Other negative feeling
12: Other neutral feeling

   

(c) **Loneliness**

How lonely are you feeling right now on a scale from 1 (not at all lonely) to 10 (very lonely)?

   

6

# B    Variable Definitions and Descriptive Statistics

## B.1    Variable Definitions by Family

| Variable name | Question text |
|---|---|
| | *Substitute time uses* |
| Facebook minutes | On an average day in the past 4 weeks, how many minutes would you say you spent on Facebook, including through the Facebook app on your phone? *(not included in substitute time uses index)* |
| (At baseline) | On an average day in the last 4 weeks, how much free time (i.e. excluding work) did you spend... [0 minutes, Between 1 and 30 minutes, Between 31 minutes and 1 hour, Between 1 and 2 hours, Between 2 and 3 hours, More than 3 hours] |
| (At endline) | In the last 4 weeks, relative to what is typical for you, would you say you spent more or less of your free time (i.e. excluding work)... [A lot less, A little less, Same, A little more, A lot more] |
| Non-FB social media time | ...using social media apps other than Facebook? |
| Non-social online time | ...online (on your computer, tablet, smartphone, etc.) for things other than social media? |
| TV alone time | ...watching TV or movies by yourself? |
| Non-screen alone time | ...on non-screen activities (e.g. cooking, reading books, exercising – anything without an electronic screen in front of you) by yourself? |
| Friends and family time | ...doing anything with friends and family (in person)? |
| | *Social interaction* |
| Friends met in person | List the first names of as many of the friends you met in person last week that you can think of in 1 minute (if none, enter "none"). Separate the names using commas (","). |
| Offline activities | Which of the following activities did you do at least once last week? Check all that apply |
| | Go out for dinner |
| | Go to the cinema |
| | Talk to friends on the phone |
| | Go to a party |
| | Get together with friends |
| | Go to a shopping mall |

|                            | Spend time with your parents |
|----------------------------|------------------------------|
|                            | Spend time with your kids    |
| Diverse interactions       | Interact with someone who voted the opposite way as you in the last presidential election |
|                            | Interact with someone from another country |

| *Substitute news sources* | |
|---|---|
| (At baseline) | Over the past four weeks, how often did you... [Never, Hardly Ever, Sometimes, Fairly Often, Very Often] |
| (At endline) | In the last 4 weeks, relative to what is typical for you, would you say you spent more or less time... [A lot less, A little less, Same, A little more, A lot more] |
| Facebook news | ...get news from Facebook *(not included in substitute news sources index)* |
| Print news | ...read any newspapers in print? |
| Radio news | ...listen to the news on the radio? |
| Local TV news | ...watch local television news? |
| Network TV news | ...watch national evening network television news (such as ABC World News, CBS Evening News, or NBC Nightly News)? |
| Cable TV news | ...watch cable television news (such as CNN, the Fox News cable channel, or MSNBC)? |
| Non-FB social media news | ...get news from social media sites other than Facebook (e.g. Twitter or Snapchat)? |
| Non-social online news | ...get news from news websites or apps other than social media? |
| Number of tweets | ln(1+number of tweets in past four weeks) |

| *News knowledge* | |
|---|---|
| Follow politics | Thinking back over the last 4 weeks, how closely did you follow US politics? [Not at all closely, somewhat closely, rather closely, very closely] |
| Follow Trump | Thinking back over the last 4 weeks, how closely did you follow news about President Trump? [Not at all closely, somewhat closely, rather closely, very closely] |
| News minutes | On an average day of the last 4 weeks, how many minutes did you spend watching, reading or listening to the news (including news via social media)? [text box] |
| News knowledge | Of the following news events, which ones do you think are true, and which ones do you think are false? [True, False, Unsure] |

| | |
|---|---|
| (At baseline) | Tension in trade negotiations escalated between the United States and China, |
| *True statements* | with President Trump announcing tariffs on $200 billion worth of goods. |
| | An off-duty Dallas police officer entered the apartment of an |
| | African-American neighbor and shot and killed the unarmed neighbor. |
| | Deputy Attorney General Rod Rosenstein early in his tenure suggested |
| | secretly recording President Trump and recruiting cabinet members to |
| | remove him from office. |
| | The Trump administration set the maximum number of refugees that can |
| | enter the country in 2019 to 30,000. |
| | Michael Cohen, President Donald Trump's former personal attorney, agreed |
| | to cooperate with the Mueller investigation team and discuss Trump's |
| | business dealings with Russia. |
| | President Trump blasted Attorney General Jeff Sessions for the indictments |
| | of two lawmakers who supported Trump during the 2016 election. |
| | CBS chief executive Les Moonves resigned after multiple sexual misconduct |
| | allegations. |
| *False statements* | President Trump's former campaign chairman Paul Manafort refused deal to |
| | cooperate with the Mueller investigation team in exchange for legal charges |
| | against him being dropped. |
| | President Trump spoke at the funeral of former Arizona Senator John |
| | McCain, honoring the late McCain's wish. |
| | Hurricane Florence caused more than 300 deaths. |
| (At endline) | A prominent Saudi Arabian journalist who was critical of the country's |
| *True statements* | government was killed inside the Saudi Arabian consulate in Istanbul. |
| | In the weeks preceding the midterm elections, several high-profile Democrats, |
| | including Barack Obama and Hillary Clinton, were sent packages containing |
| | explosive devices. |
| | A mass shooting fueled by anti-Semitic sentiment took place in a synagogue |
| | in Pittsburgh. |
| | President Trump announced he plans to sign an executive order to prevent |
| | second-generation immigrants born in the United States from automatically |
| | being granted US citizenship. |
| | The Department of Justice charged a Russian national allegedly involved in a |
| | wide-ranging online disinformation campaign aimed at influencing the |
| | Midterm elections. |
| | One of the women who made allegations against Supreme Court Justice Brett |
| | Kavanaugh has admitted to investigators that the allegations were fabricated. |

| | |
|---|---|
| *False statements* | Attorney General Jeff Sessions resigned at President Trump's request. |
| | Harvard University recently stood trial for allegedly discriminating against African-American applicants in its admission process. |
| | Far-right candidate Jair Bolsonaro recently won an election to become the President of Argentina. |
| | Senator Elizabeth Warren's DNA test results show that she has no native American ancestry. |
| Fake news knowledge (At baseline) | After researcher Dr. Christine Blasey Ford accused Supreme Court nominee Brett Kavanaugh of sexual assault, it is revealed that Kavanaugh's mother once ruled against Dr. Blasey Ford's parents in a foreclosure case. |
| | CNN's Anderson Cooper reported deceptively on Hurricane Florence, standing in a ditch to create the misleading impression that he was filming amidst waist-deep floodwaters. |
| | Mayor Carmen Yulín Cruz of San Juan was arrested for misappropriating $3 million in disaster relief funds intended for the victims of Hurricane Maria in Puerto Rico. |
| | Clerk refused to sell gas to a man fleeing hurricane Florence over a Trump bumper sticker. |
| | WikiLeaks released an email showing that Hillary Clinton's presidential campaign bribed prominent Republicans to oppose Donald Trump during the 2016 election. |
| (At endline) | Billionaire George Soros was revealed to be one of the funders of a caravan of Central American emigrants traveling through Mexico to the US border. |
| | A Russian feminist activist poured bleach on men who were "manspreading" on the train ("manspreading" refers to men sitting in public transport with legs wide apart, thereby covering more than one seat). |
| | In a recent vote, all Democrats in Congress voted against a 2.8% cost of living allowance in Social Security benefits. |
| | Cesar Sayoc, suspect in an act of domestic terrorism directed at vocal critics of President Trump, was a registered Democrat. |
| | None of the 154 mass shootings in 2018 was committed by a black man, illegal alien, or woman. |

| *Political engagement* | |
|---|---|
| Voted | Takes value 1 if recorded as having voted in 2018 midterm, and 0 otherwise |

| Clicked politics email | Takes value 1 if clicked on any link in the post-endline politics email, and 0 otherwise |
|---|---|

| | *Political polarization* |
|---|---|
| Party affective polarization | Thinking back over the last 4 weeks, how warm or cold did you feel towards the parties and the president on the feeling thermometer? |
| Trump affective polarization | Thinking back over the last 4 weeks, how warm or cold did you feel towards the parties and the president on the feeling thermometer? |
| Party anger | List as many recent (last 4 weeks) news events you can think of that made you angry at the [Republican/Democratic] Party. (If more than 5, just list those 5 that left you most angry. If less than 5, list less. If none, enter "none" in the first textbox.) |
| Congenial news exposure | Thinking back over the last 4 weeks, how often did you see news that made you better understand the point of view of the [Republican/Democratic] Party? [Never, Once, Two or three times, Four times or more] |
| Issue polarization | To what extent do you think that free trade agreements between the US and other countries have been a good thing or a bad thing for the United States? (Pew Research Center 2018b) |
| | Overall, would you say that blacks or whites are treated more fairly in dealing with the police? (Pew Research Center 2016) |
| | Do you think that employers firing men who have been accused of sexual harassment or assault before finding out all the facts is a major or a minor problem? (Pew Research Center 2018d) |
| | As you may know, Brett Kavanaugh is a federal judge who has been nominated to serve on the Supreme Court. Would you like to see the Senate vote in favor of Kavanaugh serving on the Supreme Court, or not? (Gallup 2018b) |
| | On the whole, do you think immigration is a good thing or a bad thing for this country today? (Pew Research Center 2018e) |
| | How confident, if at all, are you that the Justice Department special counsel Robert Mueller will conduct a fair investigation into Russian involvement in the 2016 election? (Pew Research Center 2018c) |
| | In general, do you feel that the laws covering the sale of firearms should be made less strict, more strict, or kept as they are now? (Gallup 2018c) |
| | In presenting the news dealing with political and social issues, do you think that news organizations deal fairly with all sides, or do they tend to favor one side? (Pew Research Center 2017) |

|  | To what extent do you think President Trump is honest and trustworthy? (Gallup 2018a) |
| Belief polarization | Level of agreement with co-partisans on beliefs questions |
| Vote polarization | Strength of generic ballot preference for co-partisan candidate (see Voted Republican question) |

*Subjective well-being*

| Happiness | Over the last 4 weeks, I think I was [1 (not a very happy person) ... 7 (a very happy person)] |
|  | Over the last 4 weeks, compared to most of my peers, I think I was [1 (less happy) ... 7 (more happy)] |
| Life satisfaction | Below are three statements that you may agree or disagree with. Indicate your agreement with each item and please be open and honest in your responding. [Strongly disagree, Disagree, Slightly disagree, Neither agree nor disagree, Slightly agree, Agree, Strongly agree] |
|  | In most ways my life during the past 4 weeks was close to ideal. |
|  | The conditions of my life during the past 4 weeks were excellent. |
|  | During the past 4 weeks, I was satisfied with my life. |
| Loneliness × (-1) | How often did you feel that you lacked companionship over the past four weeks [Hardly ever, Some of the time, Often] |
|  | How often did you feel left out over the past four weeks [Hardly ever, Some of the time, Often] |
|  | How often did you feel isolated from others over the past four weeks [Hardly ever, Some of the time, Often] |
|  |  |
|  | Below are some ways you might have felt or behaved in the past 4 weeks. Please tell us how much of the time during the past 4 weeks: [1 None or almost none of the time, 2, 3, 4 All or almost all of the time] |
| Depressed × (-1) | ... you felt depressed. |
| Anxious × (-1) | ... you felt anxious. |
| Absorbed | ... you were absorbed in doing something worthwhile. |
| Bored × (-1) | ... you felt bored. |
| SMS happiness | Overall, how happy do you feel right now on a scale from 1 (not at all happy) to 10 (completely happy)? |

| SMS positive emotion | What best describes how you felt over the last 10 minutes? Please text back the corresponding number. [1: Lonely/left out 2: Shameful/guilty 3: Absorbed in doing something worthwhile 4: Sad 5: Loving/tender 6: Bored 7: Happy 8: Angry 9: Worried 10: Other positive feeling 11: Other negative feeling 12: Other neutral feeling |
|---|---|
| SMS not lonely | How lonely are you feeling right now on a scale from 1 (not at all lonely) to 10 (very lonely)? |

### *Post-experiment use*

| Planned post-study use change | After going through this study, how much more or less time do you plan to spend on Facebook compared to before you started the study? |
|---|---|
| Clicked time limit email × (-1) | Takes value 1 if clicked on any link in the post-endline social media time limit email, and 0 otherwise |
| Speed of reactivation | (-1) × ln(1+number of days deactivated after 24-hour post-endline deactivation period) |
| Facebook mobile app use | [if have an iPhone] Please write down the amount of screen time you spent on the Facebook app according to your battery report. <br><br> [if do not have an iPhone] How many hours would you say you spent on the Facebook app on your phone in the past seven days, in total? |

### *Facebook opinions*

| Improves social life | To what extent do you think Facebook improves or worsens people's social lives? |
|---|---|
| Good for you | To what extent do you think Facebook is good or bad for you? |
| Good for society | To what extent do you think Facebook is good or bad for society? |
| Makes people happy | To what extent do you think using Facebook makes people more or less happy? |
| People would miss Facebook | To what extent do you agree or disagree with the following statement: "If people spent less time on Facebook, they would soon realize that they don't miss it."? *(We multiply responses by -1, so more agreement with the statement is more negative.)* |
| Helps follow news | To what extent do you think Facebook helps people follow the news better? |
| Clickbait, fake news × (-1) | To what extent do you think Facebook exposes people to clickbait or false news stories? |
| Less polarized | To what extent do you think Facebook makes people more or less politically polarized? |

13

| | |
|---|---|
| Deactivation bad | As part of this study, you were asked to deactivate your Facebook account for [24 hours/4 weeks]. To what extent do you think that deactivating your account was good or bad for you? *(We multiply responses by -1, so responding that deactivation was good is more negative.)* |
| Positive impacts | What are the most important positive impact(s) that Facebook has on your life? [text box] |
| Negative impacts × (-1) | What are the most important negative impact(s) that Facebook has on your life? [text box] |

<div align="center">*Secondary outcomes*</div>

| | |
|---|---|
| Voted Republican | If the elections for US Congress were being held today, would you vote for the Republican Party's candidate or the Democratic Party's candidate for Congress in your district? [Republican candidate, Democratic candidate, Other/don't know] |
| | [If would vote for Republican or Democratic candidate] How convinced are you about whether to vote for the Republican candidate or the Democratic candidate? [slider from 0 to 100] |
| Voted (self-report) | Did you [midline: Do you plan to] vote in the midterm elections on November 6th, 2018? |

<div align="center">*Moderators*</div>

| | |
|---|---|
| Time of day | At what times of day do you usually use Facebook the most? [Morning (6AM-12 noon), Afternoon (12 noon-5PM), Evening (5-9PM), Night (9PM-midnight), Late night/early morning (midnight-6AM) |
| Active browsing | People talk about two different ways to use Facebook:<br>"Active" users often post status updates, comment on other people's walls and pictures, post photos, etc.<br>"Passive" users mostly check out their news feeds and/or other people's photos and profiles but don't comment or interact much with others on the site.<br>Which would you say describes your Facebook use best?<br>What share of your time on Facebook do you spend interacting one-on-one with people you care about (for example, commenting on their posts or sending them private messages)? |
| Get news from Facebook | Over the past four weeks, how often did you ... get news from Facebook [Never, Hardly Ever, Sometimes, Fairly Often, Very Often] |

| Facebook minutes | On an average day in the past 4 weeks, how many minutes would you say you spent on Facebook, including through the Facebook app on your phone? |
| --- | --- |

## B.2   Descriptive Statistics

Table A3: **Descriptive Statistics: Substitutes for Facebook and News and Political Outcomes**

|  | Mean | Standard deviation | Minimum value | Maximum value | N in regression |
|---|---|---|---|---|---|
| Facebook minutes | 59.53 | 37.38 | 0 | 120 | 1,639 |
| Non-FB social media time | 2.97 | 0.93 | 1 | 5 | 1,639 |
| Non-social online time | 3.28 | 0.88 | 1 | 5 | 1,639 |
| TV alone time | 3.10 | 1.02 | 1 | 5 | 1,639 |
| Non-screen alone time | 3.23 | 0.92 | 1 | 5 | 1,639 |
| Friends and family time | 3.24 | 0.91 | 1 | 5 | 1,639 |
| Friends met in person | 1.44 | 0.74 | 0 | 3 | 1,639 |
| Offline activities | 3.06 | 1.53 | 0 | 8 | 1,639 |
| Diverse interactions | 0.99 | 0.79 | 0 | 2 | 1,639 |
| Facebook news | 2.98 | 1.05 | 1 | 5 | 1,639 |
| Number of tweets | 1.18 | 1.48 | 0 | 6 | 433 |
| Non-FB social media news | 3.04 | 1.03 | 1 | 5 | 1,639 |
| Non-social online news | 3.40 | 1.01 | 1 | 5 | 1,639 |
| Local TV news | 3.00 | 0.95 | 1 | 5 | 1,639 |
| Network TV news | 2.93 | 0.98 | 1 | 5 | 1,639 |
| Cable TV news | 2.93 | 1.01 | 1 | 5 | 1,639 |
| Print news | 2.72 | 0.95 | 1 | 5 | 1,639 |
| Radio news | 2.86 | 1.00 | 1 | 5 | 1,639 |
| Follow politics | 2.32 | 0.98 | 1 | 4 | 1,639 |
| Follow Trump | 2.09 | 0.92 | 1 | 4 | 1,639 |
| News minutes | 52.10 | 38.72 | 0 | 120 | 1,639 |
| News knowledge | 7.26 | 1.19 | 3 | 10 | 1,639 |
| Fake news knowledge | 2.72 | 0.74 | 0 | 5 | 1,639 |
| Voted | 0.71 | 0.45 | 0 | 1 | 1,341 |
| Clicked politics email | 0.02 | 0.15 | 0 | 1 | 1,651 |
| Party affective polarization | 53.21 | 34.37 | -86 | 100 | 1,455 |
| Trump affective polarization | 32.73 | 26.72 | -50 | 50 | 1,455 |
| Party anger | 1.48 | 1.81 | -5 | 6 | 1,450 |
| Congenial news exposure | 1.00 | 1.54 | -4 | 4 | 1,450 |
| Issue polarization | 2.89 | 2.97 | -8 | 15 | 1,450 |
| Belief polarization | 2.16 | 5.21 | -15 | 17 | 1,450 |
| Vote polarization | 0.63 | 0.48 | -1 | 1 | 1,450 |

Notes: This table presents descriptive statistics for the dependent variables used in Equations (1) and (2). Survey outcomes were recorded in the endline or post-endline surveys. The mean, standard deviation, minimum, and maximum are for the prepared variables as used in the regressions, before normalizing to standard deviation of one, for the Control group: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$0$ to do so. See Section 2.3 for variable definitions. *Facebook minutes* and *news minutes* are winsorized at 120. *Number of tweets* is the natural log of one plus the number of tweets.

Table A4: **Descriptive Statistics: Subjective Well-Being, Post-Experiment Facebook Use and Opinions, and Secondary Outcomes**

|  | Mean | Standard deviation | Minimum value | Maximum value | N in regression |
|---|---|---|---|---|---|
| Happiness | 4.47 | 1.41 | 1 | 7 | 1,639 |
| Life satisfaction | 12.26 | 4.78 | 3 | 21 | 1,639 |
| Loneliness × (-1) | -5.19 | 1.89 | -9 | -3 | 1,639 |
| Depressed × (-1) | 2.99 | 0.97 | 1 | 4 | 1,639 |
| Anxious × (-1) | 2.60 | 0.94 | 1 | 4 | 1,639 |
| Absorbed | 2.82 | 0.80 | 1 | 4 | 1,639 |
| Bored × (-1) | 2.93 | 0.88 | 1 | 4 | 1,639 |
| SMS happiness | 6.48 | 1.52 | 1 | 10 | 1,603 |
| SMS positive emotion | 0.53 | 0.25 | 0 | 1 | 1,606 |
| SMS not lonely | 7.60 | 1.70 | 1 | 10 | 1,604 |
| Planned post-study use change | -0.22 | 0.28 | -1 | 1 | 1,637 |
| Clicked time limit email × (-1) | -0.09 | 0.28 | -1 | 0 | 1,660 |
| Speed of reactivation | -0.41 | 0.69 | -4 | 0 | 1,661 |
| Facebook mobile app use | 52.80 | 38.76 | 0 | 120 | 1,219 |
| Improves social life | -0.39 | 1.93 | -5 | 5 | 1,639 |
| Good for you | -0.28 | 1.76 | -5 | 5 | 1,639 |
| Good for society | -0.53 | 1.86 | -5 | 5 | 1,639 |
| Makes people happy | -0.82 | 1.81 | -5 | 5 | 1,639 |
| Less polarized | -2.48 | 1.76 | -5 | 5 | 1,639 |
| Helps follow news | 0.31 | 2.41 | -5 | 5 | 1,639 |
| Clickbait, fake news × (-1) | -2.71 | 2.06 | -5 | 5 | 1,639 |
| People would miss Facebook | -1.97 | 1.99 | -5 | 5 | 1,639 |
| Deactivation bad | -1.91 | 1.93 | -5 | 5 | 1,639 |
| Positive impacts | 3.74 | 0.75 | 0 | 8 | 1,639 |
| Negative impacts × (-1) | -3.48 | 0.92 | -7 | 0 | 1,639 |
| Voted Republican | -0.36 | 0.68 | -1 | 1 | 1,639 |
| Voted (self-report) | 0.77 | 0.42 | 0 | 1 | 1,639 |

Notes: This table presents descriptive statistics for the dependent variables used in Equations (1) and (2). Survey outcomes were recorded in the endline or post-endline surveys. The mean, standard deviation, minimum, and maximum are for the prepared variables as used in the regressions, before normalizing to standard deviation of one, for the Control group: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$0$ to do so. See Section 2.3 for variable definitions. *Facebook mobile app use* is winsorized at 120. *Positive impacts* and *negative impacts* are the natural log of one plus number of characters the participant wrote in the text box. Speed of reactivation is negative one times the natural log of one plus the number of days that the participant remained deactivated after 24-hour post-endline deactivation period), top-coded at the last day of measurement. *Contributions* is the natural log of one plus the dollar amount of FEC contributions made between October 12 and November 10, 2018.

Table A5: **Descriptive Statistics: Pre-Experiment Time Use**

|  | Mean | Standard deviation | Minimum value | Maximum value |
|---|---|---|---|---|
| Facebook minutes | 74.5 | 35.5 | 20 | 120 |
| News minutes | 53.0 | 37.9 | 0 | 120 |
| Non-FB social media time | 75.7 | 76.3 | 0 | 240 |
| Non-social online time | 135.9 | 83.7 | 0 | 240 |
| TV alone time | 95.5 | 82.8 | 0 | 240 |
| Non-screen alone time | 105.9 | 79.2 | 0 | 240 |
| Friends and family time | 130.4 | 83.4 | 0 | 240 |
| Facebook mobile app use | 60.0 | 38.9 | 0 | 120 |

Notes: This table presents descriptive statistics for pre-experiment time use, for the impact evaluation sample: participants who were willing to accept less than \$102 to deactivate Facebook for the four weeks after midline and were offered $p = \$102$ or $p = \$0$ to do so. These survey outcomes were recorded in the baseline and midline surveys. See Section 2.3 for variable definitions. *Facebook minutes*, *news minutes*, and *Facebook mobile app use* are winsorized at 120.

# C   Voting Behavior

In order to study the effect of our treatment on voting behavior in the 2018 midterm elections, we matched the participants in our experiment to a voting database supplied to Stanford by L2, a voting data provider.

We performed multiple rounds of merging, relaxing the merging criteria in each round in order to increase the number of participants matched. Each round of merging was based on a different combination of variables that included first name, middle initial, last name, birth year, zip code, and state. Table A6 describes the criteria used in each round of merging and the number of participants in the impact evaluation sample who were matched for the first time in that round.

Approximately 93 percent of the matches are one-to-one: a participant in our experiment was matched to one and only one individual in the L2 database. The remaining seven percent of the matches are one-to-many: a participant in our experiment was matched to more than one individual in the L2 database. Whenever the match was one-to-many, we constructed the voting variables by taking an average of the voting behavior of the multiple individuals in the L2 database that the participant in our experiment was matched to.

The overall match rate was 81 percent. Since the L2 database only contains records of registered voters and since, according to the Census Bureau, the fraction of the total citizen population over 18 who reports not being registered to vote is around 15 percent, an 81 percent match rate is close to the maximum that might be expected (United States Census Bureau 2018). Match rates are not statistically different between Treatment and Control, as shown in Table A7.

Table A8 shows local average treatment effects estimated from the standard regression model described in Equation (1), estimated off of three different samples. Column 1 includes the subset of participants in the impact evaluation sample who could be matched to entries in the L2 database. This is our primary specification reported in Appendix Table A10. Column 2 includes the entire impact evaluation sample, assuming that participants who could not be matched to entries in the L2 database did not vote. Finally, column 3 includes the subset of participants in the impact evaluation sample who could be matched to a unique entry in the L2 database based on the most strict match criterion—merge round 1 as described in Appendix Table A7. In all three columns, we cannot reject the null hypothesis that deactivation does not affect voting.

We also examined the relationship between self-reported voting behavior and voting behavior according to the L2 database. Appendix Table A9 presents statistics for participants in the impact evaluation sample who had unique matches in the L2 database. Almost everyone (98 percent) who voted in the 2018 midterm elections according to the L2 database also reported on the endline survey that they had voted. Conversely, only 57 percent of the people who did not vote in the 2018 midterm elections according to the L2 database elections reported not having voted. The results are in line with prior literature showing that around 25-50 percent of non-voters tend to incorrectly

report on surveys that they voted (Belli et al. 1999; DellaVigna et al. 2017; Duff et al. 2007; Silver, Anderson, and Abramson 1986).

Table A6: **Criteria for Matching Participants to the L2 Voting Database**

| Merge round (most to least strict) | First name | Middle initial | Last name | Birth year | Zip code | State | Number of participants matched (out of 1,661) | Cumulative fraction (out of 1,661) |
|---|---|---|---|---|---|---|---|---|
| 1 | x | x | x | x | x |   | 818 | 0.49 |
| 2 | x | x | x | x |   | x | 88 | 0.55 |
| 3 | x | x | x |   | x |   | 50 | 0.58 |
| 4 | x |   | x | x | x |   | 150 | 0.67 |
| 5 | x |   | x |   | x |   | 16 | 0.68 |
| 6 | x | x | x |   |   | x | 64 | 0.71 |
| 7 | x | x | x | x |   |   | 66 | 0.75 |
| 8 | x |   | x | x |   |   | 89 | 0.81 |

Notes: This table describes the criteria used to match the participants in our experiment to entries in the L2 voting database. It also shows the number of participants in the impact evaluation sample (N=1,661) who were matched to an L2 record for the first time in that round.

Table A7: **Test of Differential Match Rates in Treatment vs. Control**

|  | Found a match |
|---|---|
| Treatment | -0.02 |
|  | (0.02) |
| Constant | 0.81 |
|  | (0.01) |
| Observations | 1,661 |

Notes: This table presents the results of a regression of a binary variable indicating whether a participant in the impact evaluation sample was matched to at least one record in the L2 database on a Treatment indicator. Standard errors are in parentheses.

Table A8: **Treatment Effect of Deactivation on Voting Behavior**

|  | (1) Those with match | (2) Full sample | (3) Those with high quality match |
|---|---|---|---|
| Share of time deactivated | 0.03 | 0.02 | 0.02 |
|  | (0.03) | (0.02) | (0.03) |
| Observations | 1,341 | 1,661 | 818 |
| Control group mean | 0.71 | 0.57 | 0.79 |

Notes: This table presents the local average treatment effects of deactivation on voter turnout estimated using Equation (1), for three different samples. Column 1 includes the subset of participants in the impact evaluation sample who could be matched to entries in the L2 database. Column 2 includes the entire impact evaluation sample; the turnout outcome variable is set to zero for participants who could not be matched to any entry in the L2 database. Column 3 includes the subset of participants in the impact evaluation sample who could be matched to the L2 database using the strictest merge criteria (based on first name, middle initial, last name, birth year, and zip code). Standard errors are in parentheses.

Table A9: **Voting Behavior According to Self-Reports and the L2 Database**

|  | Mean self-reported voting |
|---|---|
| Administrative records: | |
| Didn't vote | 0.43 |
| Administrative records: | |
| Did vote | 0.98 |

Notes: This table presents statistics for participants in the impact evaluation sample who had unique matches in the L2 database. It gives the fraction of participants who reported on the endline survey that they had voted, separately for people who voted and who didn't vote according to the administrative voting records.

# D    Tables of Treatment Effect Estimates

Table A10: **Treatment Effects: Substitutes for Facebook and News and Political Outcomes**

| | Treatment effect (original units) | Standard error (original units) | Treatment effect (SD units) | Standard error (SD units) | P-value | Sharpened FDR-adjusted q-value |
|---|---|---|---|---|---|---|
| Facebook minutes | -59.58 | 1.43 | -1.59 | 0.04 | 0.00 | 0.00 |
| Non-FB social media time | -0.25 | 0.07 | -0.27 | 0.07 | 0.00 | 0.00 |
| Non-social online time | -0.12 | 0.06 | -0.14 | 0.06 | 0.03 | 0.05 |
| TV alone time | 0.17 | 0.05 | 0.17 | 0.05 | 0.00 | 0.00 |
| Non-screen alone time | 0.23 | 0.05 | 0.25 | 0.05 | 0.00 | 0.00 |
| Friends and family time | 0.14 | 0.05 | 0.16 | 0.06 | 0.00 | 0.01 |
| Friends met in person | 0.04 | 0.03 | 0.05 | 0.04 | 0.25 | 0.23 |
| Offline activities | 0.18 | 0.08 | 0.12 | 0.05 | 0.02 | 0.03 |
| Diverse interactions | -0.04 | 0.04 | -0.05 | 0.05 | 0.32 | 0.28 |
| Facebook news | -1.90 | 0.05 | -1.81 | 0.04 | 0.00 | 0.00 |
| Number of tweets | 0.23 | 0.13 | 0.16 | 0.09 | 0.08 | 0.09 |
| Non-FB social media news | -0.37 | 0.07 | -0.36 | 0.07 | 0.00 | 0.00 |
| Non-social online news | -0.02 | 0.06 | -0.02 | 0.06 | 0.79 | 0.49 |
| Local TV news | 0.04 | 0.05 | 0.04 | 0.06 | 0.42 | 0.35 |
| Network TV news | 0.06 | 0.05 | 0.06 | 0.05 | 0.23 | 0.21 |
| Cable TV news | 0.02 | 0.05 | 0.02 | 0.05 | 0.70 | 0.45 |
| Print news | 0.02 | 0.05 | 0.02 | 0.05 | 0.72 | 0.45 |
| Radio news | 0.08 | 0.05 | 0.08 | 0.05 | 0.16 | 0.17 |
| Follow politics | -0.14 | 0.04 | -0.14 | 0.04 | 0.00 | 0.00 |
| Follow Trump | -0.10 | 0.04 | -0.11 | 0.04 | 0.01 | 0.02 |
| News minutes | -7.92 | 1.83 | -0.20 | 0.05 | 0.00 | 0.00 |
| News knowledge | -0.14 | 0.06 | -0.12 | 0.05 | 0.02 | 0.04 |
| Fake news knowledge | -0.04 | 0.04 | -0.06 | 0.05 | 0.26 | 0.23 |
| Voted | 0.03 | 0.03 | 0.06 | 0.06 | 0.32 | 0.28 |
| Clicked politics email | 0.01 | 0.01 | 0.06 | 0.06 | 0.36 | 0.31 |
| Party affective polarization | -1.98 | 1.40 | -0.06 | 0.04 | 0.16 | 0.17 |
| Trump affective polarization | -0.04 | 0.71 | -0.00 | 0.03 | 0.96 | 0.56 |
| Party anger | -0.13 | 0.10 | -0.07 | 0.05 | 0.18 | 0.17 |
| Congenial news exposure | -0.31 | 0.08 | -0.20 | 0.05 | 0.00 | 0.00 |
| Issue polarization | -0.29 | 0.11 | -0.10 | 0.04 | 0.01 | 0.02 |
| Belief polarization | -0.22 | 0.27 | -0.04 | 0.05 | 0.43 | 0.35 |
| Vote polarization | -0.00 | 0.02 | -0.01 | 0.05 | 0.91 | 0.56 |

Notes: This table presents local average treatment effects of Facebook deactivation estimated using Equation (1). Column 1 and Column 2 present the effect and standard error on un-normalized outcomes. Columns 3 and 4 present the effect and standard error on normalized outcomes, where outcomes are normalized so that the Control group endline distribution has a standard deviation of one. Columns 5 and 6 present the unadjusted p-value and sharpened False Discovery Rate-adjusted two-stage q-value, respectively.

Table A11: **Treatment Effects: Subjective Well-Being, Post-Experiment Facebook Use and Opinions, and Secondary Outcomes**

| | Treatment effect (original units) | Standard error (original units) | Treatment effect (SD units) | Standard error (SD units) | P-value | Sharpened FDR-adjusted q-value |
|---|---|---|---|---|---|---|
| Happiness | 0.12 | 0.06 | 0.08 | 0.04 | 0.04 | 0.06 |
| Life satisfaction | 0.56 | 0.20 | 0.12 | 0.04 | 0.00 | 0.01 |
| Loneliness × (-1) | 0.05 | 0.08 | 0.03 | 0.04 | 0.54 | 0.40 |
| Depressed × (-1) | 0.08 | 0.04 | 0.09 | 0.04 | 0.03 | 0.05 |
| Anxious × (-1) | 0.09 | 0.04 | 0.10 | 0.05 | 0.03 | 0.05 |
| Absorbed | -0.01 | 0.04 | -0.01 | 0.05 | 0.82 | 0.50 |
| Bored × (-1) | 0.06 | 0.04 | 0.07 | 0.05 | 0.17 | 0.17 |
| SMS happiness | 0.09 | 0.07 | 0.06 | 0.04 | 0.18 | 0.17 |
| SMS positive emotion | 0.01 | 0.01 | 0.05 | 0.05 | 0.31 | 0.28 |
| SMS not lonely | 0.01 | 0.09 | 0.01 | 0.05 | 0.88 | 0.54 |
| Planned post-study use change | -0.21 | 0.02 | -0.78 | 0.07 | 0.00 | 0.00 |
| Clicked time limit email × (-1) | -0.04 | 0.02 | -0.15 | 0.06 | 0.02 | 0.04 |
| Speed of reactivation | -0.41 | 0.06 | -0.59 | 0.08 | 0.00 | 0.00 |
| Facebook mobile app use | -12.15 | 2.19 | -0.31 | 0.06 | 0.00 | 0.00 |
| Improves social life | -0.00 | 0.09 | -0.00 | 0.05 | 0.98 | 0.56 |
| Good for you | -0.01 | 0.09 | -0.00 | 0.05 | 0.93 | 0.56 |
| Good for society | -0.04 | 0.09 | -0.02 | 0.05 | 0.62 | 0.40 |
| Makes people happy | 0.14 | 0.09 | 0.08 | 0.05 | 0.13 | 0.15 |
| Less polarized | -0.06 | 0.09 | -0.03 | 0.05 | 0.53 | 0.40 |
| Helps follow news | 0.31 | 0.11 | 0.13 | 0.05 | 0.01 | 0.02 |
| Clickbait, fake news × (-1) | -0.03 | 0.11 | -0.01 | 0.05 | 0.79 | 0.49 |
| People would miss Facebook | 0.26 | 0.12 | 0.13 | 0.06 | 0.03 | 0.05 |
| Deactivation bad | -0.45 | 0.12 | -0.23 | 0.06 | 0.00 | 0.00 |
| Positive impacts | 0.21 | 0.04 | 0.28 | 0.05 | 0.00 | 0.00 |
| Negative impacts × (-1) | -0.21 | 0.05 | -0.23 | 0.05 | 0.00 | 0.00 |
| Voted Republican | -0.04 | 0.02 | -0.07 | 0.04 | 0.06 | 0.08 |
| Voted (self-report) | -0.03 | 0.02 | -0.06 | 0.05 | 0.18 | 0.17 |

Notes: This table presents local average treatment effects of Facebook deactivation estimated using Equation (1). Column 1 and Column 2 present the effect and standard error on un-normalized outcomes. Columns 3 and 4 present the effect and standard error on normalized outcomes, where outcomes are normalized so that the Control group endline distribution has a standard deviation of one. Columns 5 and 6 present the unadjusted p-value and sharpened False Discovery Rate-adjusted two-stage q-value, respectively.

Table A12: **Treatment Effects: Indices**

|  | Treatment effect | Standard error | P-value | Sharpened FDR-adjusted q-value |
|---|---|---|---|---|
| Substitute time uses index | 0.14 | 0.06 | 0.03 | 0.03 |
| Social interaction index | 0.05 | 0.04 | 0.28 | 0.17 |
| Substitute news sources index | 0.03 | 0.06 | 0.63 | 0.39 |
| News knowledge index | -0.19 | 0.04 | 0.00 | 0.00 |
| Political engagement index | 0.07 | 0.06 | 0.27 | 0.17 |
| Political polarization index | -0.16 | 0.04 | 0.00 | 0.00 |
| Subjective well-being index | 0.09 | 0.04 | 0.02 | 0.03 |
| Post-experiment use index | -0.61 | 0.06 | 0.00 | 0.00 |
| Facebook opinions index | 0.07 | 0.06 | 0.21 | 0.17 |

Notes: This table presents local average treatment effects of Facebook deactivation on index outcomes estimated using Equation (1). Columns 1 and 2 present the effect and standard error, with indices normalized so that the Control group endline distribution has a standard deviation of one. Columns 3 and 4 present the unadjusted p-value and sharpened False Discovery Rate-adjusted two-stage q-value, respectively.

Table A13: **Treatment Effects: Post-Experiment Facebook Mobile App Usage**

|  | (1) Full sample LATE | (2) Full sample ITT | (3) iPhone only LATE | (4) iPhone only ITT |
|---|---|---|---|---|
| Share of time deactivated | -11.46 | | -3.40 | |
|  | (2.26) | | (2.92) | |
|  |  |  |  |  |
| Treatment | | -10.13 | | -3.05 |
|  | | (2.02) | | (2.63) |
| Observations | 1,219 | 1,219 | 526 | 526 |
| Control group endline mean | 52.8 | 52.8 | 42.3 | 42.3 |
| Lee (2009) treatment effect lower bound | | -8.73 | | -2.04 |
| Lee (2009) treatment effect upper bound | | -7.76 | | -1.63 |
| Lee (2009) 95% confidence interval lower bound | | -13.77 | | -10.31 |
| Lee (2009) 95% confidence interval upper bound | | -3.18 | | 5.16 |

Notes: This table presents treatment effects of Facebook deactivation on post-experiment Facebook mobile app use in units of minutes per day, as measured in the December 3rd post-endline survey. Columns 1 and 2 include all observations, while columns 3 and 4 limit the sample to iPhone users who reported their Facebook mobile app usage as recorded by their System app, excluding participants who had reported personal estimates. Columns 1 and 3 present local average treatment effects estimated using Equation (1), while columns 2 and 4 present intent-to-treat effects and Lee (2009) bounds that account for attrition.

# E   Treatment Effect Estimates Using Equation (2)

Figure A5: **Substitutes for Facebook Using Equation (2)**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (2). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A6: **Effects on News and Political Outcomes Using Equation (2)**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (2). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A7: **Effects on Subjective Well-Being Using Equation (2)**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (2). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A8: **Effects on Post-Experiment Facebook Use and Opinions Using Equation** (2)



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (2). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

# F   Heterogeneous Treatment Effects

## F.1   Secondary Moderators

Figure A9: **Heterogeneous Treatment Effects for Secondary and Ex-Post Moderators**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). Age and political party were the "secondary" moderators in our pre-analysis plan. Willingness-to-accept and sample weight were not defined as moderators of interest in our pre-analysis plan. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

## F.2   Light and Heavy Users

Figure A10: **Substitutes for Facebook for Light and Heavy Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 75 daily minutes, the median amount of Facebook use in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A11: **Effects on News and Political Outcomes for Light and Heavy Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 75 daily minutes, the median amount of Facebook use in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A12: **Effects on Subjective Well-Being for Light and Heavy Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 75 daily minutes, the median amount of Facebook use in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A13: **Effects on Post-Experiment Facebook Use and Opinions for Light and Heavy Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 75 daily minutes, the median amount of Facebook use in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

## F.3   Light and Heavy News Users

Figure A14: **Effects on News and Political Outcomes for Light and Heavy News Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for heavy news users vs. light news users (those who get news from Facebook fairly often or very often vs. never, hardly ever, or sometimes). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

## F.4   Active and Passive Users

Figure A15: **Effects on Subjective Well-Being and Social Interactions for Active and Passive Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for active users vs. passive users. We measure this using two questions: share of active vs. passive browsing using a question based on the Passive and Active Facebook Use Measure (Gerson, Plagnol, and Corr 2017), and "what share of your time on Facebook do you spend interacting one-on-one with people you care about." Active vs. passive users are defined as having above- vs. below-median sum of their two responses to these questions. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A16: **Effects on Post-Experiment Use and Opinions about Facebook for Active and Passive Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for active users vs. passive users. We measure this using two questions: share of active vs. passive browsing using a question based on the Passive and Active Facebook Use Measure (Gerson, Plagnol, and Corr 2017), and "what share of your time on Facebook do you spend interacting one-on-one with people you care about." Active vs. passive users are defined as having above- vs. below-median sum of their two responses to these questions. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

## F.5   Democrats and Republicans

Figure A17: **Effects on News and Political Outcomes for Democrats and Republicans**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for Democrats vs. Republicans. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

## F.6   Younger and Older Users

Figure A18: **Substitutes for Facebook for Younger and Older Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 31.5 years, the median age in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A19: **Effects on News and Political Outcomes for Younger and Older Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 31.5 years, the median age in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A20: **Effects on Subjective Well-Being for Younger and Older Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 31.5 years, the median age in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A21: **Effects on Post-Experiment Facebook Use and Opinions for Younger and Older Users**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants above vs. below 31.5 years, the median age in the impact evaluation sample. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

# G   News Knowledge

Appendix Figure A22 presents treatment effects on the probability of correct answers for each individual news knowledge question. Recall that we code a value of 1 for true statements correctly rated as true or incorrect statements correctly rated as false, 0.5 for any statement rated as "unsure," and 0 for true statements incorrectly rated as false or incorrect statements incorrectly rated as true.

To unpack these results, Appendix Figures A23, A24, and A25 present local average treatment effects of Facebook deactivation on indicators for answering true, false or unsure to our sets of true news, false news, and fake news questions respectively. By true news, we refer to the seven statements about news events reported by major outlets in which we did not insert factual inaccuracies. By false news, we refer to the three statements about news events reported by major news outlets in which we did insert substantial factual inaccuracies. By fake news, we refer to the five statements summarizing news articles that were deemed false on fact-checking websites and that circulated heavily within the four-week period before the survey. At the bottom of each block of news questions, we present treatment effects on the average across the questions in that block.

Most of the estimates are not statistically significant at any conventional level. Notwithstanding, the pattern of point estimates for true and false news statements is cohesive: in eight out of ten questions, deactivation induced people to move away from the correct answer and towards either the incorrect answer or "unsure" (or both). This paints a richer picture of how Facebook deactivation might reduce news knowledge: Treatment group participants are more likely to answer "unsure" and, if they do not answer "unsure" and take a guess as to whether the news event is true or false, they are more likely to answer incorrectly.

For the fake news questions, Facebook deactivation appears to have made people more likely to answer "unsure" instead of "false." This explains the negative point estimate of the effect of deactivation on fake news knowledge presented in Figure 3. Although not nearly statistically significant, one explanation for these point estimates is that Facebook circulates fake news but, at least for the major fake news stores in our survey, provides corrective information that helps users to correctly identify these stories as fake.

Case 1:20-cv-03590-JEB Document 369-7 Filed 07/12/24 Page 463 of 497

Figure A22: **Effects on News Knowledge and Fake News Knowledge**

Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A23: **Effects on Knowledge of True News Items**

Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). The left-hand side variables are indicators for answering true, false or unsure to each of our true news items. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals.

Figure A24: **Effects on Knowledge of False News Items**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). The left-hand side variables are indicators for answering true, false or unsure to each of our false news items. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals.

Figure A25: **Effects on Knowledge of Fake News Items**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). The left-hand side variables are indicators for answering true, false or unsure to each of our fake news items. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals.

# H   Additional Empirical Results

Table A14: **Balance**

| Variable | (1) Treatment Mean/SD | (2) Control Mean/SD | T-test P-value (1)-(2) |
|---|---|---|---|
| Income ($000s) | 71.27 (50.22) | 72.69 (51.80) | 0.59 |
| College | 0.52 (0.50) | 0.50 (0.50) | 0.61 |
| Male | 0.44 (0.50) | 0.42 (0.49) | 0.60 |
| White | 0.68 (0.47) | 0.68 (0.46) | 0.77 |
| Age | 33.04 (12.54) | 32.34 (11.71) | 0.27 |
| Republican | 0.13 (0.34) | 0.14 (0.34) | 0.85 |
| Democrat | 0.41 (0.49) | 0.42 (0.49) | 0.53 |
| Facebook minutes | 75.20 (35.58) | 74.15 (35.49) | 0.57 |
| Get news from Facebook | 3.47 (1.12) | 3.43 (1.06) | 0.45 |
| Active browsing | 0.14 (0.98) | 0.16 (0.97) | 0.73 |
| N | 580 | 1081 | |
| F-test of joint significance (p-value) | | | 0.95 |
| F-test, number of observations | | | 1661 |

Notes: Columns 1 and 2 present demographics for the Treatment and Control groups in the impact evaluation sample: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$102$ or $p = \$0$ to do so. Column 3 presents p-values of tests of differences in means between the two groups.

Figure A26: **Response Rates to Daily Text Messages**



Notes: The figure shows response rates to the SMS survey and the difference in response rates between Treatment and Control, for the impact evaluation sample: participants who were willing to accept less than $102 to deactivate Facebook for the four weeks after midline and were offered $p = \$102$ or $p = \$0$ to do so. The vertical red line reflects the date of the midline survey.

Figure A27: **Treatment Group Distribution of Share of Time Deactivated**



Notes: For each individual in the Treatment group who was willing to accept less than $102 to deactivate Facebook for the four weeks after midline, we calculate the share of the deactivation checks in which that person was deactivated. This figure presents the cumulative distribution of the share of the time deactivated across people.

Figure A28: **Reasons for Failure to Deactivate**



Notes: This figure presents reasons for failure to deactivate for Treatment group participants. Data were gathered from an optional survey that we emailed to participants who were not deactivated when they were supposed to be under the experiment protocols. The survey asked, "Why did your Facebook account get reactivated? Your answer won't affect your payment – we're just trying to figure out what problems people are having." Possible responses were, "I logged into my account using the Facebook website or the Facebook app," "somebody else logged into my account," "I used an app (other than the Facebook app or the Facebook messenger app) that uses my Facebook credentials to log in," "Other (please specify)," and "I don't know." We coded an individual as having reactivated "on purpose" if they ever clicked the first answer ("I logged into my account"). We coded an individual as having reactivated "accidentally" if they ever clicked on the second, third, or fifth answers. We also manually coded text that respondents wrote in the "Other (please specify)" box as either "on purpose" or "accidental." The bars display the share of all participants in the subgroup (including participants who never responded to a survey) who ever responded that they reactivated on purpose or accidentally.

Figure A29: **Effects on Offline Activities and Diverse Interactions**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A30: **Effects on Issue Polarization**

Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

49

Table A15: **Effects on Issue Polarization Using Unweighted Index**

|  | (1) Primary specification (standard deviation weighted) | (2) Robustness check (equally weighted) |
|---|---|---|
| Share of time deactivated | -0.10 | -0.09 |
|  | (0.04) | (0.03) |
| Observations | 1,450 | 1,450 |

Notes: This table presents local average treatment effects of Facebook deactivation on *issue polarization* estimated using Equation (1). Column 1 presents the specification described in footnote 13 and presented in the body of the paper. In this primary specification, *issue polarization* is constructed by weighting each of the nine issues by $\sigma_q$, the standard deviation of within-person changes on issue $q$, which allows us to place higher weight on issues about which views are malleable over the deactivation period. This is how we had originally analyzed the data. Column 2 presents a robustness check in which *issue polarization* is constructed by weighting each issue equally. In both columns, *issue polarization* is normalized so that the Control group endline distribution has a standard deviation of one.

Table A16: **Robustness to Omitting Each Individual Variable from the Political Polarization Index**

|  | Treatment effect | Standard error | P-value |
|---|---|---|---|
| Party affective polarization | -0.15 | 0.04 | 0.00 |
| Trump affective polarization | -0.14 | 0.04 | 0.00 |
| Party anger | -0.15 | 0.04 | 0.00 |
| Congenial news exposure | -0.07 | 0.04 | 0.09 |
| Issue polarization | -0.14 | 0.04 | 0.00 |
| Belief polarization | -0.14 | 0.04 | 0.00 |
| Vote polarization | -0.16 | 0.04 | 0.00 |
| Observations | 1455 |  |  |

Notes: This table presents local average treatment effects of Facebook deactivation on the political polarization index estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Each row omits the variable listed from the index. See Section 2.3 for variable definitions.

Table A17: **Correlation Between Subjective Well-Being Index and Demographics at Baseline**

|                  | (1)      |
|------------------|----------|
| Income ($000s)   | 0.0027   |
|                  | (0.0005) |
| College          | 0.2335   |
|                  | (0.0488) |
| Male             | 0.2033   |
|                  | (0.0482) |
| White            | -0.0066  |
|                  | (0.0531) |
| Age              | 0.0154   |
|                  | (0.0021) |
| Republican       | 0.2136   |
|                  | (0.0723) |
| Democrat         | -0.0492  |
|                  | (0.0507) |
| Observations     | 1,661    |

Notes: This table presents estimates of a regression of the baseline subjective well-being index on demographic variables. The subjective well-being index is normalized to have a standard deviation of one.

Figure A31: **Effects on Subjective Well-Being Measured in Text Messages, By Week**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A32: **Comparing Experimental and Non-Experimental Estimates of Effects on Subjective Well-Being**



Notes: The solid markers present local average treatment effects of Facebook deactivation estimated using Equation (1). The empty markers present non-experimental estimates from the following regression:

$$Y_i^b = \tau \tilde{H}_i + \beta \boldsymbol{X}_i + \epsilon_i,$$

where $Y_i^b$ is participant $i$'s value of some outcome measured in the baseline survey, $\boldsymbol{X}_i$ is a vector of controls (household income, age, and college, male, white, Republican, and Democrat indicators), and $\tilde{H}_i$ is baseline average daily Facebook use over the past four weeks (winsorized at 120 minutes per day) divided by the local average treatment effect on average daily Facebook use between midline and endline. This division makes experimental and non-experimental estimates comparable in the sense that they are both in units of average use per day over the past four weeks. The empty diamond markers present unconditional correlations (excluding $\boldsymbol{X}_i$ from the regressions), while the empty square markers present estimates conditional on $\boldsymbol{X}_i$. All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A33: **Baseline Opinions about Facebook**



Note: Long-dashed line is mean, short-dashed line is median



Note: Long-dashed line is mean, short-dashed line is median

Notes: These figures present histograms of Facebook opinions from the baseline survey. Variables are re-signed so that "positive" views about Facebook are positive, "negative" views about Facebook are negative, and zero is neutral. See Section 2.3 for variable definitions.

Figure A34: **Effects on Subjective Well-Being Components**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. Each variable is one of the components that comprise the outcomes Happiness, Life satisfaction, and Loneliness × (-1) respectively.

Figure A35: **Effects on Secondary Outcomes**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1). All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A36: **Effects on Outcome Indices by Perceived Researcher Agenda**



Notes: This figure presents local average treatment effects of Facebook deactivation estimated using Equation (1) for participants who did vs. did not think that the researchers had an "agenda" to "show that Facebook is bad for people." All variables are normalized so that the Control group endline distribution has a standard deviation of one. Error bars reflect 95 percent confidence intervals. See Section 2.3 for variable definitions.

Figure A37: **Comparison to Demand Curves from Brynjolffson et al. (2018)**



Notes: This figure compares our demand curve (based on the distribution of willingness-to-accept to deactivate for the four weeks after midline) to demand curves for one month of Facebook use from Brynjolfsson, Eggers, and Gannameneni (2018). "TIOLI" refers to their "take it or leave it" elicitation, whereas "BDM" refers to their BDM elicitation. For their European student sample, valuations were elicited in Euros; we transform these to dollars using the exchange rate when the elicitation was carried out in July 2017.

# Exhibit 512



*The Washington Post*

*Democracy Dies in Darkness*

**TECHNOLOGY**

# 'Hello literally everyone': Twitter flooded with users during Facebook, Instagram outage

By [Annabelle Timsit](#) and [Sofia Diogo Mateus](#)

October 5, 2021 at 9:16 a.m. EDT

For several hours on Monday, Facebook and its apps Instagram and WhatsApp were down, giving social media users some time to read a book, spend time with loved ones or go outside.

Droves flocked to Twitter instead — to the point where the company was forced to issue an apology for technical issues it said were due to the flood of traffic.

Within two hours of Facebook-owned apps going dark around 11:40 a.m. Eastern time on Monday, the official Twitter account welcomed "literally everyone" to its platform in a tweet liked by more than 3 million people.



The cause of the outage was a "faulty configuration change" that affected how information flows between routers and data centers, Facebook said in a statement.

The company added it found "no evidence that user data was compromised as a result of this downtime." Online tracker Downdetector received some 14 million reports of an outage, and Facebook apps started to come back up by 6 p.m. Eastern time.

During that time, the Internet — and especially Twitter — lit up as brands jockeyed for visibility and Facebook's competitors went after new users.

It was a marketing opportunity for open-source messaging platforms like Signal and Telegram, which have criticized Facebook's use of its users' data, and claim to offer a more secure alternative.



The CEO of Twitter, Jack Dorsey, who has clashed with Facebook CEO Mark Zuckerberg over the social responsibility of Big Tech and how to handle user data, endorsed a call from former National Security Agency contractor-turned-whistleblower Edward Snowden to switch from WhatsApp to open-source apps like Signal during the outage.



**jack**
@jack · **Follow**

Signal is WhatsUp

UP! signal.org/en/

**Edward Snowden** @Snowden
Facebook-owned Whatsapp being down is a reminder that you and your friends should probably be using a more private, non-profit alternative like @Signalapp anyway (or another open-source app of your choice).

It's just as free, and takes like 30 seconds to switch.

#facebookdown

2:57 PM · Oct 4, 2021

19.9K Reply Share

Read 862 replies

Twitter noted the impact of the rush of new users:

**Twitter Support**
@TwitterSupport · **Follow**

Sometimes more people than usual use Twitter. We prepare for these moments, but today things didn't go exactly as planned. Some of you may have had an issue seeing replies and DMs as a result. This has been fixed. Sorry about that! 💙

4:55 PM · Oct 4, 2021

148.7K Reply Share

Read 5.7K replies

So did Signal:



**Signal** · Oct 4, 2021
@signalapp · **Follow**
Signups are way up on Signal (welcome everyone!) We also know what it's like to work through an outage, and wish the best for the engineers working on bringing back service on other platforms #mondays

**Signal**
@signalapp · **Follow**

Millions of new people have joined Signal today and our messaging and calling have been up and running but some people aren't seeing all of their contacts appear on Signal. We're working hard to fix this up.

7:10 PM · Oct 4, 2021

2.8K Reply Share

**Read 60 replies**

Twitter users poked fun at Facebook — and themselves.

**Julius Sharpe**
@juliussharpe · **Follow**

With Facebook and Instagram down, everyone is getting a taste of what it was like pre-2000 when the only thing you could do at work was your job. It sucked.

4:50 PM · Oct 4, 2021

444 Reply Share

**Read 7 replies**

Meanwhile, celebrities and other brands joined in on the fun.

**Netflix** ✅
@netflix · **Follow**

When Instagram & Facebook are down.



12:20 PM · Oct 4, 2021                                          ⓘ

❤️ **639.4K**      💬 Reply      ⬆️ Share

**Read 3.6K replies**

---

**McDonald's** ✅ · Oct 4, 2021
@McDonalds · **Follow**
Replying to @Twitter
hi what can i get u

**Twitter** ✅
@Twitter · **Follow**

59.6 million nuggets for my friends

2:03 PM · Oct 4, 2021                                           ⓘ

❤️ **396K**      💬 **Reply**      ⬆️ **Share**

**Read 4K replies**



**Oscar Mayer** ✅ · Oct 4, 2021
@oscarmayer · **Follow**
Replying to @Twitter
You were made for this moment

**Twitter** 🟡
@Twitter · **Follow**

can we have the keys to the hot dog car

2:33 PM · Oct 4, 2021

♥ 93.1K       💬 Reply       ⬆ Share

Read 411 replies



**Twitter** 🟡 · Oct 4, 2021
@Twitter · **Follow**
hello literally everyone

**Adele** ✅
@Adele · **Follow**

Hiya babes!

5:49 PM · Oct 4, 2021

♥ 236.7K       💬 Reply       ⬆ Share

Read 6.9K replies



**chrissy teigen** · Oct 4, 2021
@chrissyteigen · **Follow**
everything's down!! honestly take it all away from us

**chrissy teigen**
@chrissyteigen · **Follow**

who is this mysterious hero

4:23 PM · Oct 4, 2021

♥ 9K       💬 Reply       ⬆ Share

Read 199 replies

While the Facebook and WhatsApp outage was a humorous moment for the Internet, and little more than a momentary inconvenience for some, for millions of people in developing countries it was a devastating and even life-threatening interruption in a platform that has become central to businesses, community life and even the administration of government services.

Maritza L. Félix, the Phoenix-based founder of Conecta Arizona, a Spanish-language news provider on WhatsApp that is read by Hispanic immigrant families, said that many in her audience felt that the outage was akin to having one's umbilical cord severed.

"WhatsApp is the messaging platform that my community prefers," Félix said in an interview. "We use WhatsApp for business, pleasure, [family] ... even to fall in love."

Facebook alluded to the added importance of the outage in many countries where WhatsApp is central to life in its statement about the outage: "To all the people and businesses around the world who depend on us, we are sorry for the inconvenience caused by today's outage across our platforms."

*Rachel Lerman and Amy Cheng contributed to this report.*

# Exhibit 513



# Deal Dive: BeReal got its best-case scenario exit

Rebecca Szkutak
9:00 AM PDT • June 15, 2024

 Comment



**Image Credits:** Voodoo

There has been a lot of bad news about social media startups lately. Multiple companies, including Twitter alternative Post News, and IRL have shut down. And ShareChat's valuation has dropped more than 50% after a recent funding round. But amid the negative headlines, the recent exit of French social network BeReal looks like a bright spot.

BeReal, which alerts users that they have two minutes to "be real" by taking both a front-facing photo and a selfie, was acquired by Voodoo, a French mobile game and app unicorn, for €500 million ($537 million) this week.

This deal values BeReal at a minor haircut off its last valuation of $587 million in April 2022. BeReal raised capital from venture firms, including Accel, Andreessen Horowitz and Coatue, among others. The startup currently has 40 million active users, half of whom use the app at least six days a week, according to a press release regarding the acquisition. Reports peg daily users to be around 25 million.

Despite the company's popularity, its user growth has largely plateaued in recent months, and BeReal was not in great financial shape leading up to this deal. In March, at an all-hands meeting, BeReal employees were told that the company only had about 10 months of runway left and would either need to raise more or be acquired to keep going, according to Business Insider.



U.S., Voodoo co-founder and CEO Alexandre Yazdi told TechCrunch. Yazdi added that BeReal is currently the only social media platform that he uses.

He also said that he is aware of the company's recent struggles to grow its users, especially amid a drop-off in the U.S., but he's confident that the base product is good enough to sustain the company — it just needs some new features and a little help, he says.

**Disrupt 2024**
**Got Laid Off? Find Your Next Job At Disrupt.**

**Get 50% Off The Disrupt Expo+ Pass** San Francisco, October 28-30

Book Now & Save

## Archived Page Not Found

Sorry, this page was not found in this archive:

https://1ceff9a15d9d54348de21d73f5c4fb37.safeframe.googlesyndication.com/safeframe/1-0-40/html/container.html?n=3

[Load the live page](#) in a new tab (or download the file, if this URL points to a file).

"BeReal is the most successful social media that has been created in the last eight years," Yazdi said. "They have really created something unique. Their success showed that users really craved more authenticity. They have 40 million users and the vast majority post six days a week. That's a strong baseline and basis to build on."

Yazdi said that Voodoo, which has built three social networks of its own, is the perfect partner to "write the next page of the story." Yazdi said they plan to roll out features like messaging and video to the platform as a way to boost user engagement.

He also said that they plan to incorporate ads into users' feeds. BeReal had yet to monetize thus far, but Yazdi said they will fit BeReal's mission of authenticity and be designed to not be disruptive to users.

There is a lot of good about this deal. For one, it's likely the only way BeReal would be able to keep operating, and as someone who still uses it on the regular, that is worth celebrating on its own. So anything that gives BeReal the capital and support it needs to tackle some issues and potentially get back on the path of growing users, while also starting to take in revenue, seems like the best-case scenario for a startup that very easily could have just had to close up shop.

Plus, Voodoo seems like a nice home for the app. The company has built and run social platforms of its own, and Yazdi is passionate about the actual product. This is not what a typical acquisition looks like, where a company is seeing stalled growth and financial struggles.

I'm a little more hesitant on the company's plans to monetize, however. Making money through ads is a natural choice for social media companies, but I worry about how existing users will feel about ads, the exact

BeReal got its best release months later...



While I get that social media startups have only so many ways to monetize, most people aren't willing to pay for it, as X has repeatedly found out. And users don't seem to love the growing number of ads on X or Instagram either. I'm also not sure the addition of chat or the ability to post video will be enough to persuade users to come back, especially if they return to a feed threaded with ads.

But Yazdi is confident that the company will get back to growing because of how differentiated its strategy really is. He says that it will be a challenge to get BeReal to where they want it, but a worthy one, while keeping the "mission" of the startup at heart.

"We are never going to break that DNA of authenticity," Yazdi said. "This is the BeReal. We are not going to touch that DNA."

Users will be the judge of that.



## More TechCrunch



| TechCrunch Daily News | ○ | Startups Weekly | ○ |
|---|---|---|---|
| Every weekday and Sunday, you can get the best of TechCrunch's coverage. | | Startups are the core of TechCrunch, so get our best coverage delivered weekly. | |
| **TechCrunch Fintech** | ○ | **TechCrunch Mobility** | ○ |
| The latest Fintech news and analysis, delivered every Tuesday. | | TechCrunch Mobility is your destination for transportation news and insight. | |

**Email address (required)**

| Email address | Subscribe |
|---|---|

*By submitting your email, you agree to our* *Terms* *and* *Privacy Notice.*

## Tags

social media, M&A, venture capital, consumer startups, bereal

---

Climate

### Google's environmental report pointedly avoids AI's actual energy cost

**Devin Coldewey**
2 hours ago



---

Space

### SpaceX wants to launch up to 120 times a year from Florida — and competitors aren't happy about it

**Aria Alamalhodaei**
3 hours ago

---

Fintech

### Newsletter writer covering Evolve Bank's data breach says the bank sent him a cease and desist letter

**Mary Ann Azevedo, Lorenzo Franceschi-Bicchierai**
4 hours ago

---

Apps

### Twitter/X alternative Mastodon appeals to journalists with new 'byline' feature

**Sarah Perez**
7 hours ago

---



**it doesn't want to emulate Reddit**

**Sarah Perez**
7 hours ago

---

Security

**Yieldstreet says some of its customers were affected by the Evolve Bank data breach**

**Lorenzo Franceschi-Bicchierai**
8 hours ago

---

Fintech

**Evolve hack fallout continues, fintech M&A heats up and Plaid talks enterprise push**

**Mary Ann Azevedo**
8 hours ago

---

TechCrunch Disrupt 2024

**What You Need to Raise a Series A Today at TechCrunch Disrupt 2024**

**TechCrunch Events**
9 hours ago

---

Apps

**Snapchat's latest features help users personalize their accounts**

**Aisha Malik**
9 hours ago

---

AI

**Meta plans to bring generative AI to metaverse games**

**Kyle Wiggers**
9 hours ago

---



**Featured Article**

## News outlets are accusing Perplexity of plagiarism and unethical web scraping

**Rebecca Bellan**
10 hours ago

---

Apps

## Figma disables its AI design feature that appeared to be ripping off Apple's Weather app

**Sarah Perez**
10 hours ago

![Figma disables its AI design feature that appeared to be ripping off Apple's Weather app]

---

Space

## Computing and shielding startups join forces to put AI-capable chips in space

**Aria Alamalhodaei**
11 hours ago

![Computing and shielding startups join forces to put AI-capable chips in space]

---

Venture

## Industry Ventures raises a $900M fund for investing in small, early-stage VCs and their breakout startups

**Marina Temkin**
12 hours ago

![Industry Ventures raises a $900M fund for investing in small, early-stage VCs and their breakout startups]

---

Venture

## Husband-and-wife former Olympians target $50M for new fund to invest in influencer-led consumer brands

**Christine Hall**

![Husband-and-wife former Olympians target $50M for new fund to invest in influencer-led consumer brands]



Fundraising

### As the AI boom gobbles up power, Phaidra is helping companies manage datacenter power more efficiently

**Kyle Wiggers**
12 hours ago

Climate

### Sensorita uses digital twins to help waste management companies streamline construction waste

**Rebecca Szkutak**
12 hours ago

Startups

### Beauty tech startup BoldHue raises capital to ship its 'Keurig for makeup'

**Lauren Forristal**
12 hours ago

Startups

### Indian edtech Unacademy cuts another 250 jobs

**Manish Singh**
13 hours ago

Apps

### Apple adds support for new languages across lock screen, keyboard and search on iOS 18

**Ivan Mehta**
16 hours ago

AI

### Anthropic looks to fund a new, more comprehensive generation of AI benchmarks

**Kyle Wiggers**
1 day ago

Fintech

### Senators urge owners, partners and VC backers of fintech Synapse to restore customers' access to their money

**Mary Ann Azevedo**
1 day ago



**Aria Alamalhodaei**
1 day ago

---

Media & Entertainment

## Spotify tests emergency alerts in Sweden



**Sarah Perez**
1 day ago

---

AI

## YouTube now lets you request removal of AI-generated content that simulates your face or voice

YouTube now lets you request removal of AI-generated content that simulates your face or voice

**Sarah Perez**
1 day ago

---

Security

## Fintech company Wise says some customers affected by Evolve Bank data breach

Fintech company Wise says some customers affected by Evolve Bank data breach

**Lorenzo Franceschi-Bicchierai**
1 day ago

---

Government & Policy

## Supreme Court sends Texas and Florida social media regulation laws back to lower courts

Supreme Court sends Texas and Florida social media regulation laws back to lower courts

**Aisha Malik**
1 day ago

---

Startups

## Gifting on-demand startup Afloat goes nationwide

Gifting on-demand startup Afloat goes nationwide

**Lauren Forristal**
1 day ago

---

TechCrunch Disrupt 2024

## Drive brand impact with a Side Event at TechCrunch Disrupt

Drive brand impact with a Side Event at TechCrunch Disrupt

**TechCrunch Events**
1 day ago

---



## info' to indicate use of AI in photos

**Ivan Mehta**
1 day ago

Raise brand awareness & reach 10,000 tech leaders

**LEARN MORE**

## Archived Page Not Found

Sorry, this page was not found in this archive:

```
https://1ceff9a15d9d54348de21d73f5
c4fb37.safeframe.googlesyndicatio
n.com/safeframe/1-0-40/html/contai
ner.html?n=3
```

Load the live page in a new tab (or download the file, if this URL points to a file).

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

**Legal**

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

Figma

Anthropic

Unacademy Layoffs



© 2024 Yahoo. All rights reserved. Powered by WordPress VIP