# Volume 34: Exhibits 514-543

# Exhibit 514

10-K 1 d442073d10k.htm FORM 10-K

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2012**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File Number 000-28018**

# Yahoo! Inc.
#### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0398689** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**701 First Avenue**
**Sunnyvale, California 94089**
(Address of principal executive offices, including zip code)

**Registrant's telephone number, including area code: (408) 349-3300**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $.001 par value | The NASDAQ Stock Market LLC (NASDAQ Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act: None**
(Title of Class)

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☑    No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a  smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the Registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑

As of June 29, 2012, the last business day of the Registrant's most recently completed second fiscal quarter, the aggregate market value of voting stock held by non-affiliates of the Registrant, based upon the closing sales price for the Registrant's common stock, as reported on the NASDAQ Global Select Market was $15,665,361,526. Shares of common stock held by each officer and director and by each person who owns 10 percent or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for any other purpose.

The number of shares of the Registrant's common stock outstanding as of February 15, 2013 was 1,101,295,389.

**DOCUMENTS INCORPORATED BY REFERENCE**

The following documents (or parts thereof) are incorporated by reference into the following parts of this Form 10-K:

Proxy Statement for the 2013 Annual Meeting of Shareholders—Part III Items 10, 11, 12, 13, and 14.

Table of Contents

**YAHOO! INC.**
**Form 10-K**
**Fiscal Year Ended December 31, 2012**

**INDEX**

| ITEM | | | Page |
|---|---|---|---|
| | **PART I** | | |
| ITEM 1 | Business | | 3 |
| ITEM 1A | Risk Factors | | 12 |
| ITEM 1B | Unresolved Staff Comments | | 27 |
| ITEM 2 | Properties | | 27 |
| ITEM 3 | Legal Proceedings | | 28 |
| ITEM 4 | Mine Safety Disclosures | | 28 |
| | **PART II** | | |
| ITEM 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 29 |
| ITEM 6 | Selected Financial Data | | 31 |
| ITEM 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 33 |
| ITEM 7A | Quantitative and Qualitative Disclosures About Market Risk | | 60 |
| ITEM 8 | Financial Statements and Supplementary Data | | 63 |
| ITEM 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | | 115 |
| ITEM 9A | Controls and Procedures | | 115 |
| ITEM 9B | Other Information | | 115 |
| | **PART III** | | |
| ITEM 10 | Directors, Executive Officers and Corporate Governance | | 116 |
| ITEM 11 | Executive Compensation | | 116 |
| ITEM 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 116 |
| ITEM 13 | Certain Relationships and Related Transactions, and Director Independence | | 116 |
| ITEM 14 | Principal Accounting Fees and Services | | 116 |
| | **PART IV** | | |
| ITEM 15 | Exhibits, Financial Statement Schedules | | 117 |
| | Signatures | | 118 |

*The trademarks and/or registered trademarks of Yahoo! Inc. and its subsidiaries referred to herein include, but are not limited to, Yahoo!, Y!, IntoNow, interclick, Flickr, Right Media, omg!, Shine, Sportacular, Cocktails, Mojito, Genome, Stamped, Rivals, MarketDash, Yahoo! Search BOSS, Citizen Sports and their respective logos. Other names are trademarks and/or registered trademarks of their respective owners.*

2

Table of Contents

**Part I**

**Item 1.**     *Business*

**OVERVIEW**

Yahoo! Inc., together with its consolidated subsidiaries ("Yahoo!," the "Company," "we," or "us"), is a global technology company focused on making the world's daily habits inspiring and entertaining. We provide a variety of products and services, many of them personalized, including search, content, and communications tools—all daily habits for hundreds of millions of users, on the Web and on mobile devices. The majority of our product offerings are available in more than 45 languages and in 60 countries, regions, and territories.

We create value for advertisers and their brands by connecting them with targeted audiences of users through their daily habits. Advertisers can build their businesses through advertising to these targeted audiences on our online properties and services ("Yahoo! Properties"), or through our distribution network of third-party entities ("Affiliates") who integrate our advertising offerings into their Websites or other offerings (those Websites and other offerings, "Affiliate sites").

We generate revenue principally from display advertising on Yahoo! Properties and some Affiliate sites and from search advertising on Yahoo! Properties and Affiliate sites. Additionally, we generate revenue from other sources including listings-based services, facilitating commercial transactions, royalties, and consumer and business fee-based services.

Yahoo! has a storied history that has evolved with the Internet, beginning in 1994 when our founders, Jerry Yang and David Filo, then graduate students at Stanford University, created *Jerry and Dave's Guide to the World Wide Web*, a simple directory of websites to help people navigate the Internet. Yahoo! was incorporated in 1995 and is a Delaware corporation. We completed our initial public offering on April 12, 1996, and our stock is listed on the Nasdaq Global Select Market under the symbol "YHOO." Yahoo! is headquartered in Sunnyvale, California, and is a global company—with offices in more than 30 countries, regions and territories.

**EXECUTIVE LEADERSHIP**

Since the beginning of 2012, we have made key changes to enhance our executive leadership team. Marissa Mayer became our Chief Executive Officer and President on July 17, 2012. Today, the management team reporting to the Chief Executive Officer is:

- Ron Bell—became General Counsel and Secretary on August 13, 2012;

- Jackie Reses—became Executive Vice President of People and Development on September 7, 2012;

- Kathy Savitt—became Chief Marketing Officer on September 14, 2012;

- Ken Goldman—became Chief Financial Officer on October 22, 2012;

- Adam Cahan—became Senior Vice President of Mobile & Emerging Products on October 25, 2012;

- Henrique de Castro—became Chief Operating Officer on November 12, 2012;

- Jay Rossiter—became Executive Vice President of Cloud Platforms on November 13, 2012;

- David Filo—Co-Founder and Chief Yahoo;

- David Dibble—Executive Vice President of Central Technology;

- Scott Burke—Senior Vice President, Display Advertising and Advertising Technology; and

- Laurence Mann—Senior Vice President, Search.

3

**Table of Contents**

Since the beginning of 2012, we also made significant additions to our Board of Directors. Currently, our Board of Directors is composed of:

- Marissa Mayer, our CEO; Alfred Amoroso, our Chairman of the Board; John Hayes; Susan James; Max Levchin; Peter Liguori; Daniel Loeb; Thomas McInerney; Harry Wilson; Maynard Webb; and Michael Wolf.

## 2012 BUSINESS HIGHLIGHTS

During 2012, we focused our attention on people and products—laying the foundation that we believe will make Yahoo! an incredible place to work, and a company known for product excellence. Selected highlights of 2012 are:

- Products. We launched a new and improved version of Yahoo! Mail, making it faster, easier to use and available across the Web and on Windows 8, iPhone/iPod touch and Android. We also redesigned the Flickr application for iPhone and iPod touch, making it easier to capture, share and discover photos. The new Flickr application allows users to share photos by e-mail, with the Flickr community and via your social network of choice, including Facebook, Twitter or Tumblr.

- Talent. We focused on hiring top talent, including a new talented and experienced management team. We also acquired two mobile application developers, Stamped and OnTheAir, accelerating our efforts to build an exceptional team of mobile engineers, product managers and designers. Our employees and culture are fundamental to our success, and attracting the best people to Yahoo! is critical. We are focused on a number of initiatives aimed at making Yahoo! the absolute best place to work. In 2012, we introduced rigorous hiring protocols; quarterly performance reviews for all employees; aggressive quarterly and annual goals for the company, for teams, and for individuals; a new product-readiness process for launches; internal feedback tools for new products; smartphones and higher performance laptops for all employees; free food worldwide; an employee-driven system for improving processes and efficiency; and weekly all-hands meetings to communicate transparently and accountably on the most important issues facing the company. These efforts have been executed quickly and we believe improved our culture and made Yahoo! a better place to work.

- Advertising Solutions. We launched Genome from Yahoo!, an online advertising solution that combines data from Yahoo! and other online sources to help marketers more directly target the audiences who matter most to their businesses.

- Content Partnerships. We signed a number of deals to bring our users the most compelling content on the Web, across categories and devices. We announced cross-platform content distribution and promotion agreements with Clear Channel, CNBC, NBC Sports, Spotify and Wenner Media. Yahoo! also launched *omg! Insider*, a multi-platform entertainment news series that combines the popularity of CBS Television's *The Insider* with the online reach of *omg!*. Yahoo!'s agreements with Facebook launched a new advertising partnership, extended and expanded distribution arrangements, and settled all pending patent claims between Yahoo! and Facebook.

- Compelling Original Content. We continued to innovate on Yahoo! Screen, introducing new programming such as *Electric City* (created by and starring Tom Hanks), comedy hit series *Burning Love* (produced by Ben Stiller's Red Hour Digital) and *Cybergeddon* (by Anthony Zuiker, creator of CSI).

- Shareholder Value. We closed the initial sale of our shares of Alibaba Group Holding Limited ("Alibaba Group"). At the closing, we received approximately $7.1 billion in total consideration for the 523 million ordinary shares we sold to Alibaba Group. Approximately $6.3 billion of our consideration was received in cash and $800 million was received in Alibaba Group preference shares. At the closing, we also received a payment of $550 million in satisfaction of certain future royalty payments under our existing Technology and Intellectual Property License Agreement with Alibaba Group. We previously announced plans to return to our shareholders $3.65 billion in after-tax proceeds, or approximately 85 percent of the net cash proceeds we received. We have returned $2.1 billion to our shareholders through share repurchases from May 20, 2012, the date we announced the share repurchase agreement, through December 31, 2012.

4

[Table of Contents](#)

We strive to create great value for our users, advertisers and publishers, and developers—the three primary groups that we serve with our products and services.

## USER OFFERINGS

Yahoo! is positioning its products and services to be at the center of the world's digital daily habits—everyday activities our users perform for all kinds of reasons: information, education, entertainment, amusement, discovery or even an improved quality of life. We are focused on building excellent products that not only enable these daily activities, but also make them more inspiring and entertaining. Our user offerings include:

### Yahoo.com

Yahoo! is a starting point that brings together the most relevant content and functionality from across the Web, including original Yahoo! content. We offer a majority of these services free of charge to our users around the world. On our content properties, we generate revenue from display and search advertising, as well as fee-based services. Many of our properties are also available in mobile-optimized versions for display on mobile phones and tablet devices, or available as native applications for iOS, Android and Windows phones.

*Yahoo! Search* is available free to our users and often serves as the starting point from which they navigate the Internet to find and discover information that matters to them. Yahoo! Search provides users with a free search capability, offering rich search results ranked and organized based on relevance to each user's search query. Sponsored search results are a subset of the overall search results and provide links to paying advertisers' Web pages.

Under our Search and Advertising Services and Sales Agreement ("Search Agreement") with Microsoft Corporation ("Microsoft"), Microsoft is the exclusive algorithmic and paid search services provider on Yahoo! Properties and non-exclusive provider of such services on Affiliates sites. Yahoo! continues to develop and launch features around the results to enhance the search experience for our users. These features include Search Direct, rich results, contextual search results, site filters, related topic suggestions and more.

Yahoo! Search is evolving to allow users to find the right information at the right time, whether by entering keywords in a search box or by discovering search-powered experiences wherever they are online. Yahoo! currently offers Yahoo! Search experiences and applications across connected devices, including PCs, tablets and mobile phones.

*Yahoo! News* provides original, premium, partner, and syndicated news via text, photos, and video to engage users with wide-ranging, up-to-the-minute coverage and analysis into topical news events. In addition, we have a number of key content partnerships in place, including partnerships with ABC News, CNBC, and NBC Sports.

*Yahoo! Sports* serves one of the largest audiences of digital sports enthusiasts in the world. Yahoo! Sports is anchored by Fantasy Sports, editorial reporting, real-time scores, statistics and breaking news, coverage of the biggest global sports events, and premium college sports coverage through our Rivals publisher network. With award-winning writers, a leading fantasy platform and live game tracking, Yahoo! Sports delivers experiences for every fan, every day. Our coverage of the 2012 London Games yielded more page views than we received for any of our prior coverage of the Olympic Games. During 2012 we also released several new products and innovations, including:

- A rebuilt Sportacular application for mobile, which brings fans scores, statistics and play-by-play for their favorite teams; and
- New mobile products for MLB, NFL and NBA Fantasy (as well as a new relationship with the NBA as the official Fantasy game of NBA.com).

*Yahoo! Finance* provides a comprehensive set of financial data, information, and tools that helps users make informed financial decisions. Yahoo! Finance features a robust content offering that is a mix of original editorial

5

**Table of Contents**

and syndicated news via relationships with several third-party providers. Yahoo! Finance offers mobile solutions, including our dedicated Yahoo! Finance iPhone and Android applications and MarketDash for iPad.

***Yahoo! Entertainment and Lifestyles*** is a collection of properties focused on emerging trends and information in popular culture, women's issues, and media. Yahoo! *omg!*, Movies, TV and Music are leading destinations for celebrity gossip, movie, music, and TV premieres, and awards coverage. Yahoo Shine! is targeted to women and provides tips, features and in-depth analysis in areas such as health, fashion, careers and parenting.

***Yahoo! Video*** provides original, premium and third-party news, finance, sports, entertainment, and lifestyle video content distributed in contextually relevant experiences across the Yahoo! network. Yahoo! Video includes Yahoo! Screen, a video destination site where videos from across the Yahoo! network are aggregated and watched.

***Yahoo! Toolbar*** is a Web browser add-on that conveniently enables users to access and preview Yahoo! Properties and third-party content via applications from anywhere on the Web.

### Communications

In addition to bringing together personalized content and information consumed by hundreds of millions of users, we also provide communications tools to connect the world. These include:

***Yahoo! Mail*** provides users with e-mail, instant messaging, and mobile text messaging as well as integrated Contacts and Calendar functionality. In addition to our free e-mail service, for a subscription fee, we offer Yahoo! Mail Plus, a premium e-mail service that provides features such as an interface free of display advertising. Yahoo! Mail is available on PCs, mobile phones and tablets.

***Yahoo! Messenger*** is an instant messaging service that provides an interactive and personalized way for users to connect, communicate and share experiences on a real-time basis. Yahoo! also offers mobile applications for Yahoo! Messenger, including real-time video chat on mobile devices.

### User-Generated Content

Our User-Generated Content products allow our users to create, share, and discover ideas, interests, and photography with the world.

***Yahoo! Groups*** allows users to join groups based on shared interests and to access information such as message archives, photo albums, event calendars, and polls.

***Yahoo! Answers*** is a service that enables users to discover and share opinions, experiences and knowledge around shared interests on both PCs and mobile devices.

***Flickr*** is an online photo management and sharing service that makes it easy for users to upload, store, organize, and share their photos. In addition to the basic service, Flickr offers a fee-based service that includes unlimited storage and an advertising-free browsing and sharing interface. Yahoo! offers mobile applications for Flickr on both iPhone and Android devices.

### Mobile & Emerging Products

With the rapid platform shift to mobile devices including phones and tablets, Yahoo! is focused on product excellence on both PCs and mobile devices. Many of our products are available across the mobile Web and as native mobile applications for iPhone, Android, and Windows 8. These offerings enable users to engage in their daily habits across devices, wherever they are and whenever they want. The monetization of these mobile

6

**Table of Contents**

offerings is driven primarily by display and search advertisements that users engage with during their mobile activities, an area where we are committed to innovation. In addition, we have invested in other early-stage emerging products, including:

***IntoNow from Yahoo!*** makes watching TV more engaging, social, and fun with the touch of a button. IntoNow is a free, advertising-supported application available for iPhone, Android and iPad devices that identifies what users are watching (whether live or recorded) and enables commentary and discussions.

***Yahoo! Connected TV*** is a software platform that enhances television through engaging interactive experiences. Yahoo! Connected TV is accessible on certain televisions of major manufacturers including Samsung and VIZIO. We generate revenue from this offering through advertising and an application store.

### ADVERTISERS AND PUBLISHER OFFERINGS

Yahoo! recognizes that advertisers are looking for immersive digital experiences that allow them to make emotional connections with users. Advertisers seek partners that can provide smart solutions that address their business objectives, from high-impact branding campaigns that generate awareness among consumers to tactical campaigns that drive specific audiences to action. We have aligned our resources to move to an approach that focuses more on creating solutions to solve the challenges of each vertical advertiser category and drive results.

As one of the Web's largest publishers and the owner of leading properties across multiple content categories, Yahoo! provides a canvas of contextually-relevant content and experiences where advertisers can connect with users in a meaningful way. We combine the engagement of these environments with a suite of offerings, which include precision targeting solutions, high-impact display opportunities, video and interactive advertising units, and reach across screens. We also provide advertisers with valuable insights about their customer base, and tools that leverage those insights for optimized program performance.

We pioneered digital ad formats such as the Yahoo! Mail Login Page, and have introduced new innovations this year with the launch of Smart Ads for Video, which dynamically tailor video ad content to users to optimize relevance and results. We also provide advertisers access to one of the largest concentrations of audiences and premium content on the Web. We do this by bringing quality publishers together through Yahoo! Network Plus (including AT&T, Verizon, Rogers, Monster, and Comcast) and the Right Media Exchange. The Right Media Exchange is Yahoo!'s ad platform for digital advertising companies, including differentiated ad networks, direct advertisers in our non-guaranteed marketplace, data providers, technology innovators, and global agencies. Our agreements with Microsoft and AOL allow ad networks operated by Yahoo!, Microsoft and AOL to offer each other's premium non-guaranteed online display inventory to their respective advertising customers.

We work with high-quality publishers to attract new audiences and create engaging experiences across the Web. We monetize these experiences with a set of application programming interfaces ("APIs") and tools to grow partner businesses. With these offerings, publishers are able to participate in the Yahoo! Search and Bing Unified Search Marketplaces as well as the Right Media Exchange for display advertising.

We generate revenue by providing marketing services to advertisers across a majority of Yahoo! Properties and Affiliate sites. Our marketing services include display advertising, search advertising, listing-based services, and commerce-based transactions.

### DEVELOPER OFFERINGS

Powerful infrastructure and platforms help developers innovate and add new features rapidly and efficiently, delivering a fast and reliable experience across devices to our users around the world.

7

Table of Contents

We provide many APIs that enable third-party developers, advertisers, agencies, publishers and designers to use Yahoo! products and services for their own software and application development. We believe that our open platforms enable developers and partners to build and incorporate new products and innovations that users want into their daily experiences.

We are committed to providing the developer community with solutions that solve their problems, enhance the development experience, and help them build products that become a central part of people's daily digital habits. In doing so, we help position Yahoo! as a technical leader. To further support our developer community, Yahoo! hosts Hackdays and Hack U's (for universities), where technicians can learn from each other, share code, and build the future. Since Yahoo! pioneered these events in 2006, we have held more than 65 events across eight countries.

Our product offerings for developers include:

*Yahoo! Developer Network ("YDN")*. The mission of the YDN is to inspire developers and to accelerate their innovation. Over 600,000 developers, including independent software vendors, publishers, advertisers, agencies, and designers, have joined YDN. The YDN site allows the developer community to interact, build and learn by leveraging Yahoo!'s platforms, APIs, tools, documentation, support and resources.

*Cocktails* (including *Yahoo!'s Mojito*), Yahoo!'s development platform for connected devices, is built on open industry standards (HTML5, CSS3, Node.JS, JavaScript). Its cross-platform programming environment enables a new class of multi-screen applications with native-like performance, built with minimal resource usage and maximum speed.

*Yahoo! Query Language ("YQL")* is a simple but powerful language that enables developers to query, filter, and join data across different Web services. Traditionally, developers must locate the correct URLs and documentation for every Web service needed by an application, which is time consuming and complex. With YQL, developers can access and shape data across the Internet with one simple syntax, eliminating the need to learn how to access different APIs and making it possible for applications to run faster with fewer lines of code and a smaller network footprint.

*Yahoo! User Interface ("YUI")* is a free, open source JavaScript and cascading style sheets (CSS) framework for building richly interactive Web applications. YUI is provided to users under a free license and is available on GitHub, which allows developers to maintain their own versions of the software as well as contribute to its further development.

*Search BOSS* is an open search Web services platform that enables developers, startups, and large Internet companies to build Web-scale search products. We have recently added BOSS Geo, which allows developers to make their applications more location-aware.

*Yahoo! Flickr API* provides programmatic access to the Flickr photo-sharing community. The Flickr API provides access to view, manipulate and search photo tags, display photos from a specific user or group and retrieve tags to construct URLs to particular photos or photo groups. Flickr also provides an Authentication API for applications that need to perform restricted actions.

**PRODUCT DEVELOPMENT**

Yahoo! continually launches, improves, and scales products and features to meet evolving user, advertiser, publisher, and developer needs. Most of our software products and features are developed internally by our employees. In some instances, however, we might purchase technology and license intellectual property rights if the opportunity is strategically aligned, operationally compatible, and economically advantageous. While it may be necessary in the future to seek or renew licenses relating to various aspects of our products, we believe based on past experience and industry practice that such licenses generally could be obtained on commercially-

8

Table of Contents

reasonable terms. We believe our continuing innovation and product development are not materially dependent upon any single license or other agreement with a third party relating to the development of our products.

Yahoo!'s Product Development organization includes a broad array of engineering talent that spans the breadth of our technology infrastructure. This includes deep expertise in scalable platforms, networking and communications technologies and presentation layer frameworks.

The Platforms organization provides much of the core technology that powers Yahoo!'s experiences worldwide and supports customer-facing products and properties. This core technology includes Cloud Services, Hadoop, Personalization and Targeting, Mobile and Presentation platform technologies, Consumer Platforms, Membership and all supporting development tools. The goal of our Platforms technology is to enable Yahoo! to create long-term differentiation by true personalization and relevance, built on top of a scalable, agile cloud infrastructure that unlocks value for our consumers and advertisers through our ability to collect, process, analyze and algorithmically transform large amounts of data into business value.

Yahoo!'s product teams include a broad array of engineering and product talent and support a large portion of the Yahoo! product portfolio and technology infrastructure. Our product teams have expertise in consumer applications (Web/Mobile), scalable software platforms, information retrieval, machine learning and science, editorial, networking/communications technologies, and presentation layer frameworks. Many of our teams use agile planning methodologies during the product development lifecycle and place a premium on product excellence and technology innovation.

Our product teams also include the Mobile & Emerging Products group that is responsible for our portfolio of mobile applications and services delivered across the globe. The Mobile & Emerging Products group includes Yahoo! Mail, Flickr and our other more popular products.

Our engineering and production teams are primarily located in our Sunnyvale, Calif. headquarters, Bangalore, India, and Beijing, China. Product development expenses for 2010, 2011, and 2012 totaled approximately $1 billion, $919 million, and $886 million, respectively, which included stock-based compensation expense of $107 million, $90 million, and $74 million, respectively.

## GLOBAL OPERATIONS

We manage our business geographically. The primary areas of measurement and decision-making are Americas, EMEA (Europe, Middle East, and Africa), and Asia Pacific. Additional information required by this item is incorporated herein by reference to Note 17 —"Segments" of the Notes to the consolidated financial statements, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

We provide services in more than 45 languages and in 60 countries, regions, and territories, including localized versions of Yahoo! in Argentina, Australia, Austria, Brazil, Canada, Chile, China, Colombia, Egypt, France, Germany, Greece, Hong Kong, India, Indonesia, Ireland, Italy, Japan, Jordan, Kuwait, Malaysia, Mexico, the Netherlands, New Zealand, Peru, the Philippines, Russia, Saudi Arabia, Scandinavia (Denmark, Finland, Norway, and Sweden), Singapore, Spain, Switzerland, Taiwan, Thailand, Turkey, the United Arab Emirates, the United Kingdom, the United States, Venezuela, and Vietnam.

Outside of native English speaking countries, we provide some of our most popular user services through Yahoo! Asia (our English language portal to Southeast Asia), Yahoo! Canada En Français (French Canadian Website), and Yahoo! En Espanol (United States Hispanic Website).

We own a majority or 100 percent of all of these international operations (except in Australia and New Zealand, China, and Japan where we have joint ventures and/or noncontrolling interests). We support these businesses through a network of offices worldwide.

Revenue is primarily attributed to individual countries according to the international online property that generated the revenue.

9

Table of Contents

Information regarding risks involving our international operations is included in Part I, Item 1A "Risk Factors" of this Annual Report on Form 10-K and is incorporated herein by reference.

## SALES

We maintain three primary channels for selling our advertising services: field, mid-market, and reseller/small business. Our field advertising sales team sells display advertising in all markets and search advertising services in non-transitioned markets to leading advertisers and agencies. Under the Search Agreement with Microsoft, our field advertising team also sells search advertising to premium advertisers in transitioned markets. Our mid-market channel sells our services to medium-sized businesses, while our reseller/small business channel enables us to sell advertising services to additional regional and small business advertisers. In 2013, we reorganized our U.S. sales force to provide one, customer-centric solution to our customers. We believe that this will allow us to provide the best solutions across all of our products based on a deeper understanding of our customers' businesses.

In the U.S., we employ sales professionals in multiple locations, including Atlanta, Boston, Chicago, Dallas, Detroit, Hillsboro, Los Angeles, Miami, New York, Omaha, San Francisco, and Sunnyvale. In international markets, we either have our own internal sales professionals or rely on our established sales agency relationships in more than 50 countries, regions, and territories.

No individual customer represented more than 10 percent of our revenue in 2010, 2011, or 2012. Revenue under the Search Agreement represented more than 10 percent of our revenue during 2011 and 2012.

Internet usage is subject to seasonal fluctuations, typically declining during customary summer vacation periods and increasing during the fourth quarter holiday period due to higher online retail activity. These seasonal patterns have affected, and we expect will continue to affect, our business and quarterly sequential revenue growth rates.

## MARKETING

Yahoo! is one of the most recognized brands in the world. Our products, services, and content enable us to attract, retain, and engage users, advertisers, publishers, and developers. Our marketing teams engage in each step of the development, deployment, and management of products and services, and in content design. Our marketing team will help shape our offerings to better market them to our potential and existing users.

## COMPETITION

We face significant competition from integrated online media companies, social networking sites, traditional print and broadcast media, search engines, and various e-commerce sites. Our competitors include Google, Facebook, Microsoft, and AOL. Several of our competitors offer an integrated variety of Internet products, advertising services, technologies, online services and/or content that may compete for the attention of our users, advertisers, developers, and publishers. We also compete with these companies to obtain agreements with third parties to promote or distribute our services. In addition, we compete with social media and networking sites which are attracting an increasing share of users, users' online time and online advertising dollars.

We compete with advertising networks, exchanges, demand side platforms and other platforms, such as Google AdSense, DoubleClick Ad Exchange, AOL's Ad.com and Microsoft Media Network, as well as traditional media companies for a share of advertisers' marketing budgets and in the development of the tools and systems for managing and optimizing advertising campaigns.

In a number of international markets, especially those in Asia, Europe, the Middle East and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications, and other commercial services and often have a competitive advantage due to dominant market share in their territories, greater local brand recognition, focus on a single market, familiarity with local tastes and preferences, or greater regulatory and operational flexibility.

10

Table of Contents

Yahoo!'s competitive advantage centers on the fact that we make people's daily digital habits more entertaining —this includes daily activities like communicating, searching, reading and sharing information. We believe our principal competitive strengths include the usefulness, accessibility, integration, and personalization of the online services that we offer; the quality, personalization, and presentation of our search results; and the overall user experience on our leading premium content properties and other Yahoo! Properties. Our principal competitive strengths relating to attracting advertisers and publishers are the reach, effectiveness, and efficiency of our marketing services as well as the creativity of the marketing solutions that we offer. "Reach" is the size of the audience and/or demographic that can be accessed through the Yahoo! network. "Effectiveness" for advertisers is the achievement of marketing objectives, which we support by developing campaigns, measuring the performance of these campaigns against their objectives, and optimizing their objectives across the Yahoo! network. "Effectiveness" for publishers is the monetization of their online audiences. "Efficiency" is the simplicity and ease of use of the services we offer advertisers and publishers.

Additional information regarding competition is included in Part I, Item 1A "Risk Factors" of this Annual Report on Form 10-K and is incorporated herein by reference.

## INTELLECTUAL PROPERTY

We create, own, and maintain a wide array of intellectual property assets that we believe are among our most valuable assets. Our intellectual property assets include patents and patent applications related to our innovations, products and services; trademarks related to our brands, products and services; copyrights in software and creative content; trade secrets; and other intellectual property rights and licenses of various kinds. We seek to protect our intellectual property assets through patents, copyrights, trade secrets, trademarks and laws of the U.S. and other countries, and through contractual provisions. We enter into confidentiality and invention assignment agreements with our employees and contractors, and utilize non-disclosure agreements with third parties with whom we conduct business in order to secure and protect our proprietary rights and to limit access to, and disclosure of, our proprietary information. We consider the Yahoo! trademark and our many related company brands to be among our most valuable assets, and we have registered these trademarks in the U.S. and other countries throughout the world and actively seek to protect them. We have licensed in the past, and expect that we may license in the future, certain of our technology and proprietary rights, such as trademark, patent, copyright, and trade secret rights, to third parties.

Additional information regarding certain risks related to our intellectual property is included in Part I, Item 1A "Risk Factors" of this Annual Report on Form 10-K and is incorporated herein by reference.

## EMPLOYEES

As of December 31, 2012, we had approximately 11,700 full-time employees. Our future success is substantially dependent on the performance of our senior management and key technical personnel, as well as our continuing ability to attract, maintain the caliber of, and retain highly qualified technical, executive, and managerial personnel. Additional information regarding certain risks related to our employees is included in Part I, Item 1A "Risk Factors" of this Annual Report on Form 10-K and is incorporated herein by reference.

## AVAILABLE INFORMATION

Our Website is located at http://www.yahoo.com. Our investor relations Website is located at http://investor.yahoo.net. We make available free of charge on our investor relations Website under "SEC Filings" our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to those reports as soon as reasonably practicable after we electronically file or furnish such materials to the U.S. Securities and Exchange Commission ("SEC"). The SEC maintains a Website that contains reports, proxy and information statements, and other information regarding our filings at *http://www.sec.gov.*

11

**Table of Contents**

## Item 1A.    *Risk Factors*

***We face significant competition for users, advertisers, publishers, developers, and distributors.***

We face significant competition from integrated online media companies, social networking sites, traditional print and broadcast media, search engines, and various e-commerce sites. In a number of international markets, especially those in Asia, Europe, the Middle East and Latin America, we face substantial competition from local Internet service providers and other portals that offer search, communications, and other commercial services.

Several of our competitors offer an integrated variety of Internet products, advertising services, technologies, online services and content in a manner similar to Yahoo!. We compete against these and other companies to attract and retain users, advertisers, developers, and third-party Website publishers as participants in our Affiliate network, and to obtain agreements with third parties to promote or distribute our services. We also compete with social media and networking sites which are attracting a substantial and increasing share of users, users' online time, and online advertising dollars.

In addition, several competitors offer products and services that directly compete for users with our offerings, including e-mail, search, sports, news and finance. Similarly, the advertising networks operated by our competitors or by other participants in the display marketplace offer advertising exchanges, ad networks, demand side platforms, ad serving technologies, sponsored search offerings, and other services that directly compete for advertisers with our offerings. We also compete with traditional print and broadcast media companies to attract domestic and international advertising spending. Some of our existing competitors and possible entrants may have greater brand recognition for certain products and services, more expertise in particular market segments, and greater operational, strategic, technological, financial, personnel, or other resources than we do. Many of our competitors have access to considerable financial and technical resources with which to compete aggressively, including by funding future growth and expansion and investing in acquisitions, technologies, and research and development. Further, emerging start-ups may be able to innovate and provide new products and services faster than we can. In addition, competitors may consolidate or collaborate with each other, and new competitors may enter the market. Some of our competitors in international markets have a substantial competitive advantage over us because they have dominant market share in their territories, are owned by local telecommunications providers, have greater local brand recognition, are focused on a single market, are more familiar with local tastes and preferences, or have greater regulatory and operational flexibility due to the fact that they may be subject to both U.S. and foreign regulatory requirements.

If our competitors are more successful than we are in developing and deploying compelling products or in attracting and retaining users, advertisers, publishers, developers, or distributors, our revenue and growth rates could decline.

***We generate the majority of our revenue from display and search advertising, and the reduction in spending by or loss of current or potential advertisers would cause our revenue and operating results to decline.***

For the twelve months ended December 31, 2012, 81 percent of our total revenue came from display and search advertising. Our ability to retain and grow display and search revenue depends upon:

- maintaining and growing our user base and popularity as an Internet destination site;

- maintaining the popularity of our existing products and introducing engaging new products;

- maintaining and expanding our advertiser base on PCs and mobile devices;

- broadening our relationships with advertisers to small- and medium-sized businesses;

- successfully implementing changes and improvements to our advertising management platforms and obtaining the acceptance of our advertising management platforms by advertisers, Website publishers, and online advertising networks;

- successfully acquiring, investing in, and implementing new technologies and strategic partnerships;

12

**Table of Contents**

- successfully implementing changes in our sales force, sales development teams, and sales strategy;

- continuing to innovate and improve the monetization capabilities of our display advertising and mobile products;

- effectively monetizing mobile and other search queries;

- continuing to innovate and improve users' search experiences;

- maintaining and expanding our Affiliate program for search and display advertising services; and

- deriving better demographic and other information about our users to enable us to offer better experiences to both our users and advertisers.

In most cases, our agreements with advertisers have a term of one year or less, and may be terminated at any time by the advertiser or by us. Search marketing agreements often have payments dependent upon usage or click-through levels. Accordingly, it is difficult to forecast display and search revenue accurately. In addition, our expense levels are based in part on expectations of future revenue, including occasional guaranteed minimum payments to our Affiliates in connection with search and/or display advertising, and are fixed over the short-term in some categories. The state of the global economy, growth rate of the online advertising market, and availability of capital has impacted and could further impact the advertising spending patterns of our existing and potential advertisers. Any reduction in spending by, or loss of, existing or potential advertisers would negatively impact our revenue and operating results. Further, we may be unable to adjust our expenses and capital expenditures quickly enough to compensate for any unexpected revenue shortfall.

*If we do not manage our operating expenses effectively, our profitability could decline.*

We plan to continue to manage costs to better and more efficiently manage our business. However, our operating expenses might increase from their reduced levels as we expand our operations in areas of desired growth, continue to develop and extend the Yahoo! brand, fund product development, build data centers or acquire real property, and acquire and integrate complementary businesses and technologies. Our operating costs might also increase if we do not effectively manage costs as we transition markets under the Search Agreement and reimbursements from Microsoft under the Search Agreement decline or cease. In addition, weak economic conditions or other factors could cause our business to contract, requiring us to implement cost cutting measures. If our expenses increase at a greater pace than our revenue, or if we fail to effectively manage costs, our profitability will decline.

*If we are unable to provide innovative search experiences and other products and services that generate significant traffic to our Websites, our business could be harmed, causing our revenue to decline.*

Internet search is characterized by rapidly changing technology, significant competition, evolving industry standards, and frequent product and service enhancements. We currently deploy our own technology to provide paid search results on our network, except in markets where we have transitioned those services to Microsoft's platform. Even after we complete the transition to Microsoft's platform in all markets, we will need to continue to invest and innovate to improve our users' search experience to continue to attract, retain, and expand our user base and paid search advertiser base.

We also generate revenue through other online products and services, such as Yahoo! Mail, and continue to innovate the products and services that we offer. The research and development of new, technologically advanced products is a complex process that requires significant levels of innovation and investment, as well as accurate anticipation of technology, market and consumer trends. If we are unable to provide innovative products and services which generate significant traffic to our Websites, our business could be harmed, causing our revenue to decline.

13

Table of Contents

***Risks associated with our Search Agreement with Microsoft may adversely affect our business and operating results.***

Under our Search Agreement with Microsoft, Microsoft is the exclusive algorithmic and paid search services provider on Yahoo! Properties and non-exclusive provider of such services on Affiliate sites for the transitioned markets. Implementation of our Search Agreement with Microsoft commenced on February 23, 2010. We have completed the transition of our algorithmic search platform to the Microsoft platform in all markets, and have completed transition of paid search in several markets. We are continuing to work with Microsoft on transitioning paid search in the remaining markets. The market-by-market transition of our paid search platform to Microsoft's platform and the migration of paid search advertisers and publishers to Microsoft's platform are expected to continue through 2013, and possibly into 2014. The transition process is complex and requires the expenditure of significant time and resources by us. Delays, difficulties, disruptions or inconveniences resulting from the transition process could result in the loss of advertisers, publishers, Affiliates, and employees, as well as delays in recognizing or reductions in the anticipated benefits of the transaction, any of which could negatively impact our business and operating results.

Under the Search Agreement, Microsoft generally guarantees Yahoo!'s revenue per search ("RPS Guarantee") on Yahoo! Properties for 18 months after the transition of paid search services to Microsoft's platform in a particular market. In the fourth quarter of 2011, Microsoft agreed to extend the RPS Guarantee in the U.S. and Canada through March 2013. The RPS Guarantee is calculated based on the difference in revenue per search between the pre-transition and post-transition periods and certain other factors. To date, there has been a gap in revenue per search between pre-transition and post-transition periods and Microsoft has been making payments under the RPS Guarantee to compensate for the difference. To the extent the RPS Guarantee payments we receive do not fully offset any shortfall relating to revenue per search in transitioned markets or the RPS Guarantee in transitioned markets expires before the gap in revenue per search is closed, our search revenue and profitability would decline. If the RPS Guarantee in the U.S. and Canada is not renewed prior to its expiration on March 31, 2013, we currently anticipate that our revenue, cash flows and income will be negatively impacted. Notwithstanding any RPS Guarantee payments that we may receive, our competitors may increase revenue, profitability, and market share at a higher rate than us.

***More people are using devices other than a PC to access the Internet and are accessing new platforms to make search queries, and versions of our services developed for these devices might not gain widespread adoption by the devices' users, manufacturers, or distributors or might fail to function as intended on some devices.***

The number of people who access the Internet through devices other than a PC, including mobile telephones, smartphones, personal digital assistants, handheld computers such as tablets and netbooks, video game consoles, televisions, and set-top box devices has increased dramatically, and the trend is likely to continue. Our services were originally designed for rich, graphical environments such as those available on PCs. Limitations on the memory, resolution, functionality and display associated with many alternative devices may make the use of our products and services through such devices more difficult and versions of our products and services developed for those devices may not be compelling to users, manufacturers and distributors of alternative devices. Similarly, the licenses we have negotiated to present third-party content to PC users may not extend to users of alternative devices. In those cases, we may need to enter into new or amended agreements with the content providers in order to present a similar user-experience on the new devices. The content providers may not be willing to enter into such new or amended agreements on reasonable terms or at all. In addition, search queries are increasingly being undertaken via applications tailored to particular devices or social media platforms, which could affect our share of the search market over time.

As new devices and platforms are introduced, it is difficult to predict the problems we may encounter in adapting our services and developing creative new products and services. We expect to continue to devote significant resources to the creation, support, and maintenance of mobile products and services. If we are unable to successfully innovate new forms of Internet advertising for alternative devices, to attract and retain a substantial number of alternative device manufacturers, distributors, content providers, and users to our services, to develop

14

**Table of Contents**

products and technologies that are more compatible with alternative devices and platforms, or to earn adequate margins on revenues derived from these products and services, we will fail to capture opportunities as consumers and advertisers transition to a dynamic, multi-screen environment.

A key to our strategy is focusing on mobile devices. If we are unable to generate and grow our revenue on mobile or other alternative devices or incur excessive expenses attempting to attract such revenue, our financial condition and operating results could be harmed. If monetization stays at current levels and we see an increase in mobile search queries and deceleration of the growth of or decrease in desktop queries, our results may be adversely impacted.

To the extent that an access provider or device manufacturer enters into a distribution arrangement with one of our competitors, or as our competitors design, develop, or acquire control of alternative connected devices or their operating systems, we face an increased risk that our users will favor the services or properties of that competitor. The manufacturer or access provider might promote a competitor's services or might impair users' access to our services by blocking access through their devices or by not making our services available in a readily-discoverable manner on their devices. If competitive distributors impair access to our services, or if they simply are more successful than our distributors in developing compelling products that attract and retain users or advertisers, then our revenue could decline.

In the future, as new methods for accessing the Internet and our services become available, including through alternative devices, we may need to enter into amended distribution agreements with existing access providers, distributors, and manufacturers to cover the new devices and new arrangements. We face a risk that existing and potential new access providers, distributors, and manufacturers may decide not to offer distribution of our services on reasonable terms, or at all.

***If we are unable to license or acquire compelling content and services at reasonable cost or if we do not develop or commission compelling content of our own, the number of users of our services may not grow as anticipated, or may decline, or users' level of engagement with our services may decline, all or any of which could harm our operating results.***

Our future success depends in part on our ability to aggregate compelling content and deliver that content through our online properties. We license from third parties much of the content and services on our online properties, such as news items, stock quotes, weather reports, music videos, music radio, and maps. We believe that users will increasingly demand high-quality content and services, including music videos, film clips, news footage, and special productions. We may need to make substantial payments to third parties from whom we license or acquire such content or services. Our ability to maintain and build relationships with such third-party providers is critical to our success. In addition, as new methods for accessing the Internet become available, including through alternative devices, we may need to enter into amended agreements with existing third-party providers to cover the new devices. We may be unable to enter into new, or preserve existing, relationships with the third-parties whose content or services we seek to obtain. In addition, as competition for compelling content increases both domestically and internationally, our third-party providers may increase the prices at which they offer their content and services to us, and potential providers may not offer their content or services to us at all, or may offer them on terms that are not agreeable to us. An increase in the prices charged to us by third-party providers could harm our operating results and financial condition. Further, because many of our content and services licenses with third parties are non-exclusive, other media providers may be able to offer similar or identical content. This increases the importance of our ability to deliver compelling editorial content and personalization of this content for users in order to differentiate Yahoo! from other businesses. If we are unable to license or acquire compelling content at reasonable cost, if other companies distribute content or services that are similar to or the same as that provided by us, or if we do not develop or commission compelling editorial content or personalization services, the number of users of our services may not grow as anticipated, or may decline, or users' level of engagement with our services may decline, all or any of which could harm our operating results.

15

Table of Contents

***Our business depends on a strong brand, and failing to maintain or enhance the Yahoo! brands in a cost-effective manner could harm our operating results.***

Maintaining and enhancing our brands is an important aspect of our efforts to attract and expand our user, advertiser, and Affiliate base. We believe that the importance of brand recognition will increase due to the relatively low barriers to entry in certain portions of the Internet market. Maintaining and enhancing our brands will depend largely on our ability to provide high-quality, innovative products and services, which we might not do successfully. We have spent and expect to spend considerable money and resources on the establishment and maintenance of our brands, as well as advertising, marketing, and other brand-building efforts to preserve and enhance consumer awareness of our brands. Our brands may be negatively impacted by a number of factors such as service outages, product malfunctions, data protection and security issues, exploitation of our trademarks by others without permission, and poor presentation or integration of our search marketing offerings by Affiliates on their sites or in their software and services.

Further, while we attempt to ensure that the quality of our brands is maintained by our licensees, our licensees might take actions that could impair the value of our brands, our proprietary rights, or the reputation of our products and media properties. If we are unable to maintain or enhance our brands in a cost-effective manner, or if we incur excessive expenses in these efforts, our business, operating results and financial condition could be harmed.

***Our intellectual property rights are valuable, and any failure or inability to sufficiently protect them could harm our business and our operating results.***

We create, own, and maintain a wide array of copyrights, patents, trademarks, trade dress, trade secrets, rights to domain names and other intellectual property assets which we believe are collectively among our most valuable assets. We seek to protect our intellectual property assets through patent, copyright, trade secret, trademark, and other laws of the U.S. and other countries of the world, and through contractual provisions. However, the efforts we have taken to protect our intellectual property and proprietary rights might not be sufficient or effective at stopping unauthorized use of those rights. Protection of the distinctive elements of Yahoo! might not always be available under copyright law or trademark law, or we might not discover or determine the full extent of any unauthorized use of our copyrights and trademarks in order to protect our rights. In addition, effective trademark, patent, copyright, and trade secret protection might not be available or cost-effective in every country in which our products and media properties are distributed or made available through the Internet. Changes in patent law, such as changes in the law regarding patentable subject matter, could also impact our ability to obtain patent protection for our innovations. In particular, recent amendments to the U.S. patent law may affect our ability to protect our innovations and defend against claims of patent infringement. Further, given the costs of obtaining patent protection, we might choose not to protect (or not to protect in some jurisdictions) certain innovations that later turn out to be important. There is also a risk that the scope of protection under our patents may not be sufficient in some cases or that existing patents may be deemed invalid or unenforceable. To help maintain our trade secrets, we have entered into confidentiality agreements with most of our employees and contractors, and confidentiality agreements with many of the parties with whom we conduct business, in order to limit access to and disclosure of our proprietary information. If these confidentiality agreements are breached it could compromise our trade secrets and cause us to lose any competitive advantage provided by those trade secrets.

If we are unable to protect our proprietary rights from unauthorized use, the value of our intellectual property assets may be reduced. In addition, protecting our intellectual property and other proprietary rights is expensive and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and consequently harm our operating results.

16

Table of Contents

***We are regularly involved in claims, suits, government investigations, and other proceedings that may result in adverse outcomes.***

We are regularly involved in claims, suits, government investigations, and proceedings arising from the ordinary course of our business, including actions with respect to intellectual property claims, privacy, consumer protection, information security, data protection or law enforcement matters, tax matters, labor and employment claims, commercial claims, as well as actions involving content generated by our users, stockholder derivative actions, purported class action lawsuits, and other matters. Such claims, suits, government investigations, and proceedings are inherently uncertain and their results cannot be predicted with certainty. Regardless of the outcome, such legal proceedings can have an adverse impact on us because of legal costs, diversion of management and other personnel, and other factors. In addition, it is possible that a resolution of one or more such proceedings could result in reputational harm, liability, penalties, or sanctions, as well as judgments, consent decrees, or orders preventing us from offering certain features, functionalities, products, or services, or requiring a change in our business practices, products or technologies, which could in the future materially and adversely affect our business, operating results, and financial condition. See Note 11—"Commitments and Contingencies" in the Notes to the condensed consolidated financial statements.

On November 28, 2012, the 49th Civil Court of the Federal District of Mexico City entered a non-final judgment of U.S. $2.75 billion against the Company and our subsidiary, Yahoo! Mexico, in a lawsuit brought by plaintiffs Worldwide Directories S.A. de C.V. and Ideas Interactivas, S.A. de C.V. We believe the plaintiffs' claims are without legal or factual merit and the Company and Yahoo! Mexico have filed appeals from the judgment. We do not believe that it is probable the judgment will be sustained on appeal, and accordingly, we have not recorded an accrual for the judgment. The Company cannot predict the timing of a decision or assure the ultimate outcome of the appeals. The Company intends to vigorously pursue all of its appeals. If all of our appeals are ultimately unsuccessful, however, and we are required to pay all or a significant portion of the judgment, together with any potential additional damages, interests and costs, it would have a material adverse effect on our financial condition, results of operations and cash flows. We will also be required to record an accrual for the judgment if we should determine in the future that it is probable that we will be required to pay the judgment.

***We are, and may in the future be, subject to intellectual property infringement or other third-party claims, which are costly to defend, could result in significant damage awards, and could limit our ability to provide certain content or use certain technologies in the future.***

Internet, technology, media, and patent holding companies often possess a significant number of patents. Further, many of these companies and other parties are actively developing or purchasing search, indexing, electronic commerce, and other Internet-related technologies, as well as a variety of online business models and methods.

We believe that these parties will continue to take steps to protect these technologies, including, but not limited to, seeking patent protection. In addition, patent holding companies may continue to seek to monetize patents they have purchased or otherwise obtained. As a result, disputes regarding the ownership of technologies and rights associated with online businesses are likely to continue to arise in the future. From time to time, parties assert patent infringement claims against us. Currently, we are engaged in a number of lawsuits regarding patent issues and have been notified of a number of other potential disputes.

In addition to patent claims, third parties have asserted, and are likely in the future to assert, claims against us alleging infringement of copyrights, trademark rights, trade secret rights or other proprietary rights, or alleging unfair competition, violation of federal or state statutes or other claims, including alleged violation of international statutory and common law. In addition, third parties have made, and may continue to make, infringement and related claims against us over the display of content or search results triggered by search terms, including the display of advertising, that include trademark terms.

As we expand our business and develop new technologies, products and services, we may become increasingly subject to intellectual property infringement and other claims, including those that may arise under international laws. In the event that there is a determination that we have infringed third-party proprietary rights such as

17

**Table of Contents**

patents, copyrights, trademark rights, trade secret rights, or other third-party rights such as publicity and privacy rights, we could incur substantial monetary liability, or be required to enter into costly royalty or licensing agreements or be prevented from using such rights, which could require us to change our business practices in the future, hinder us from offering certain features, functionalities, products or services, require us to develop non-infringing products or technologies, and limit our ability to compete effectively. We may also incur substantial expenses in defending against third-party claims regardless of the merit of such claims. In addition, many of our agreements with our customers or Affiliates require us to indemnify them for some types of third-party intellectual property infringement claims, which could increase our costs in defending such claims and our damages. Furthermore, such customers and Affiliates may discontinue the use of our products, services, and technologies either as a result of injunctions or otherwise. The occurrence of any of these results could harm our brands or have an adverse effect on our business, financial position, operating results, and cash flows.

*A variety of new and existing U.S. and foreign government laws and regulations could subject us to claims, judgments, monetary liabilities and other remedies, and to limitations on our business practices.*

We are subject to numerous U.S. and foreign laws and regulations covering a wide variety of subject matters. New laws and regulations, changes in existing laws and regulations or the interpretation of them, our introduction of new products, or an extension of our business into new areas, could increase our future compliance costs, make our products and services less attractive to our users, or cause us to change or limit our business practices. We may incur substantial expenses to comply with laws and regulations or defend against a claim that we have not complied with them. Further, any failure on our part to comply with any relevant laws or regulations may subject us to significant civil or criminal liabilities, penalties, and negative publicity.

The application of existing domestic and international laws and regulations to us relating to issues such as user privacy and data protection, security, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, billing, real estate, consumer protection, accessibility, content regulation, quality of services, law enforcement demands, telecommunications, mobile, television, and intellectual property ownership and infringement in many instances is unclear or unsettled. Further, the application to us or our subsidiaries of existing laws regulating or requiring licenses for certain businesses of our advertisers can be unclear. U.S. export control laws and regulations also impose requirements and restrictions on exports to certain nations and persons and on our business. Internationally, we may also be subject to laws regulating our activities in foreign countries and to foreign laws and regulations that are inconsistent from country to country.

The Digital Millennium Copyright Act ("DMCA") is intended, in part, to limit the liability of eligible online service providers for caching, hosting, listing or linking to, third-party Websites or user content that include materials that infringe copyrights or other rights of others. Portions of the Communications Decency Act ("CDA") are intended to provide statutory protections to online service providers who distribute third-party content. We rely on the protections provided by both the DMCA and the CDA in conducting our business, and may be adversely impacted by future legislation and future judicial decisions altering these safe harbors or if international jurisdictions refuse to apply similar protections. The Children's Online Privacy Protection Act is intended to impose restrictions on the ability of online services to collect some types of information from children under the age of 13. In addition, Providing Resources, Officers, and Technology to Eradicate Cyber Threats to Our Children Act of 2008 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. Other federal, state or international laws and legislative efforts designed to protect children on the Internet may impose additional requirements on us.

*Changes in regulations or user concerns regarding privacy and protection of user data, or any failure to comply with such laws, could adversely affect our business.*

Federal, state, and international laws and regulations govern the collection, use, retention, disclosure, sharing and security of data that we receive from and about our users. The use of consumer data by online service providers and advertising networks is a topic of active interest among federal, state, and international regulatory bodies, and the regulatory environment is unsettled. Many states have passed laws requiring notification to users where

18

**Table of Contents**

there is a security breach for personal data, such as California's Information Practices Act. We face similar risks in international markets where our products and services are offered. Any failure, or perceived failure, by us to comply with or make effective modifications to our policies, or to comply with any federal, state, or international privacy, data-retention or data-protection-related laws, regulations, orders or industry self-regulatory principles could result in proceedings or actions against us by governmental entities or others, a loss of user confidence, damage to the Yahoo! brands, and a loss of users, advertising partners, or Affiliates, any of which could potentially have an adverse effect on our business.

In addition, various federal, state and foreign legislative or regulatory bodies may enact new or additional laws and regulations concerning privacy, data-retention and data-protection issues, including laws or regulations mandating disclosure to domestic or international law enforcement bodies, which could adversely impact our business, our brand or our reputation with users. The interpretation and application of privacy, data protection and data retention laws and regulations are often uncertain and in flux in the U.S. and internationally. These laws may be interpreted and applied inconsistently from country to country and inconsistently with our current policies and practices, complicating long-range business planning decisions. If privacy, data protection or data retention laws are interpreted and applied in a manner that is inconsistent with our current policies and practices we may be fined or ordered to change our business practices in a manner that adversely impacts our operating results. Complying with these varying international requirements could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business.

*If our security measures are breached, our products and services may be perceived as not being secure, users and customers may curtail or stop using our products and services, and we may incur significant legal and financial exposure.*

Our products and services involve the storage and transmission of Yahoo!'s users' and customers' personal and proprietary information in our facilities and on our equipment, networks and corporate systems. Security breaches expose us to a risk of loss of this information, litigation, remediation costs, increased costs for security measures, loss of revenue, damage to our reputation, and potential liability. Our user data and corporate systems and security measures have been and may in the future be breached due to the actions of outside parties (including cyber attacks), employee error, malfeasance, a combination of these, or otherwise, allowing an unauthorized party to obtain access to our data or our users' or customers' data. Additionally, outside parties may attempt to fraudulently induce employees, users, or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data.

Any breach or unauthorized access could result in significant legal and financial exposure, increased remediation and other costs, damage to our reputation and a loss of confidence in the security of our products, services and networks that could potentially have an adverse effect on our business. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently or may be designed to remain dormant until a predetermined event and often are not recognized until launched against a target, we may be unable to anticipate these techniques or implement adequate preventative measures. If an actual or perceived breach of our security occurs, the market perception of the effectiveness of our security measures could be harmed and we could lose users and customers.

*Interruptions, delays, or failures in the provision of our services could damage our reputation and harm our operating results.*

Delays or disruptions to our service, or the loss or compromise of data, could result from a variety of causes, including the following:

- Our operations are susceptible to outages and interruptions due to fire, flood, earthquake, tsunami, other natural disasters, power loss, equipment or telecommunications failures, cyber attacks, terrorist attacks, political or social unrest, and other events over which we have little or no control. We do not have multiple site capacity for all of our services and some of our systems are not fully redundant in the event of delays or disruptions to service, so some data or systems may not be fully recoverable after such events.

19

**Table of Contents**

- The systems through which we provide our products and services are highly technical, complex, and interdependent. Design errors might exist in these systems, or might be introduced when we make modifications, which might cause service malfunctions or require services to be taken offline while corrective responses are developed.

- Despite our implementation of network security measures, our servers are vulnerable to computer viruses, worms, hacking, physical and electronic break-ins, router disruption, sabotage or espionage, and other disruptions from unauthorized access and tampering, as well as coordinated denial-of-service attacks. We may not be in a position to promptly address attacks or to implement adequate preventative measures if we are unable to immediately detect such attacks. Such events could result in large expenditures to investigate or remediate, to recover data, to repair or replace networks or information systems, including changes to security measures, to deploy additional personnel, to defend litigation or to protect against similar future events, and may cause damage to our reputation or loss of revenue.

- We rely on third-party providers over which we have little or no control for our principal Internet connections and co-location of a significant portion of our data servers, as well as for our payment processing capabilities and key components or features of certain of our products and services. Any disruption of the services they provide us or any failure of these third-party providers to handle higher volumes of use could, in turn, cause delays or disruptions in our services and loss of revenue. In addition, if our agreements with these third-party providers are terminated for any reason, we might not have a readily available alternative.

Prolonged delays or disruptions to our service could result in a loss of users, damage to our brands, legal costs or liability, and harm to our operating results.

***Our international operations expose us to additional risks that could harm our business, operating results, and financial condition.***

In addition to uncertainty about our ability to continue to generate revenue from our foreign operations and expand our international market position, there are additional risks inherent in doing business internationally (including through our international joint ventures), including:

- tariffs, trade barriers, customs classifications and changes in trade regulations;

- difficulties in developing, staffing, and simultaneously managing a large number of varying foreign operations as a result of distance, language, and cultural differences;

- stringent local labor laws and regulations;

- longer payment cycles;

- credit risk and higher levels of payment fraud;

- profit repatriation restrictions and foreign currency exchange restrictions;

- political or social unrest, economic instability, repression, or human rights issues;

- geopolitical events, including natural disasters, acts of war and terrorism;

- import or export regulations;

- compliance with U.S. laws such as the Foreign Corrupt Practices Act, and local laws prohibiting bribery and corrupt payments to government officials;

- antitrust and competition regulations;

- potentially adverse tax developments;

- seasonal volatility in business activity and local economic conditions;

- economic uncertainties relating to European sovereign and other debt;

20

Table of Contents

- laws, regulations, licensing requirements, and business practices that favor local competitors or prohibit foreign ownership or investments;

- different, uncertain or more stringent user protection, content, data protection, privacy, intellectual property and other laws; and

- risks related to other government regulation, required compliance with local laws or lack of legal precedent.

We are subject to numerous and sometimes conflicting U.S. and foreign laws and regulations which increase our cost of doing business. Violations of these complex laws and regulations that apply to our international operations could result in damage awards, fines, criminal actions, sanctions, or penalties against us, our officers or our employees, prohibitions on the conduct of our business and our ability to offer products and services, and damage to our reputation. Although we have implemented policies and procedures designed to promote compliance with these laws, there can be no assurance that our employees, contractors, or agents will not violate our policies. These risks inherent in our international operations and expansion increase our costs of doing business internationally and could result in harm to our business, operating results, and financial condition.

***We may be subject to legal liability associated with providing online services or content.***

We host and provide a wide variety of services and technology products that enable and encourage individuals and businesses to exchange information; upload or otherwise generate photos, videos, text, and other content; advertise products and services; conduct business; and engage in various online activities both domestically and internationally. The law relating to the liability of providers of online services and products for activities of their users is currently unsettled both within the U.S. and internationally. As a publisher and producer of original content, we may be subject to claims such as copyright, libel, defamation or improper use of publicity rights, as well as other infringement claims such as plagiarism. Claims have been threatened and brought against us for defamation, negligence, breaches of contract, plagiarism, copyright and trademark infringement, unfair competition, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information which we publish or to which we provide links or that may be posted online or generated by us or by third parties, including our users. In addition, we have been and may again in the future be subject to domestic or international actions alleging that certain content we have generated or third-party content that we have made available within our services violates laws in domestic and international jurisdictions. We arrange for the distribution of third-party advertisements to third-party publishers and advertising networks, and we offer third-party products, services, or content, such as stock quotes and trading information, under the Yahoo! brand or via distribution on Yahoo! Properties. We may be subject to claims concerning these products, services, or content by virtue of our involvement in marketing, branding, broadcasting, or providing access to them, even if we do not ourselves host, operate, provide, or provide access to these products, services, or content. While our agreements with respect to these products, services, and content may provide that we will be indemnified against such liabilities, the ability to receive such indemnification may be disputed, could result in substantial costs to enforce or defend, and depends on the financial resources of the other party to the agreement, and any amounts received might not be adequate to cover our liabilities or the costs associated with defense of such proceedings. Defense of any such actions could be costly and involve significant time and attention of our management and other resources, may result in monetary liabilities or penalties, and may require us to change our business in an adverse manner.

It is also possible that if any information provided directly by us contains errors or is otherwise wrongfully provided to users, third parties could make claims against us. For example, we offer Web-based e-mail services, which expose us to potential risks, such as liabilities or claims, by our users and third parties, resulting from unsolicited e-mail, lost or misdirected messages, illegal or fraudulent use of e-mail, alleged violations of policies, property interests, or privacy protections, including civil or criminal laws, or interruptions or delays in e-mail service. We may also face purported consumer class actions or state actions relating to our online services, including our fee-based services (particularly in connection with any decision to discontinue a fee-based service). In addition, our customers, third parties, or government entities may assert claims or actions against us if our online services or technologies are used to spread or facilitate malicious or harmful code or applications.

21

Table of Contents

Investigating and defending these types of claims are expensive, even if the claims are without merit or do not ultimately result in liability, and could subject us to significant monetary liability or cause a change in business practices that could negatively impact our ability to compete.

***Acquisitions and strategic investments could result in adverse impacts on our operations and in unanticipated liabilities.***

We have acquired, and have made strategic investments in, a number of companies (including through joint ventures) in the past, and we expect to make additional acquisitions and strategic investments in the future. Such transactions may result in dilutive issuances of our equity securities, use of our cash resources, and incurrence of debt and amortization expenses related to intangible assets. Our acquisitions and strategic investments to date were accompanied by a number of risks, including:

- the difficulty of assimilating the operations and personnel of acquired companies into our operations;

- the potential disruption of our ongoing business and distraction of management;

- the incurrence of additional operating losses and expenses of the businesses we acquired or in which we invested;

- the difficulty of integrating acquired technology and rights into our services and unanticipated expenses related to such integration;

- the failure to successfully further develop an acquired business or technology and any resulting impairment of amounts currently capitalized as intangible assets;

- the failure of strategic investments to perform as expected;

- the potential for patent and trademark infringement and data privacy and security claims against the acquired companies, or companies in which we have invested;

- litigation or other claims in connection with acquisitions, acquired companies, or companies in which we have invested;

- the impairment or loss of relationships with customers and partners of the companies we acquired or in which we invested or with our customers and partners as a result of the integration of acquired operations;

- the impairment of relationships with, or failure to retain, employees of acquired companies or our existing employees as a result of integration of new personnel;

- our lack of, or limitations on our, control over the operations of our joint venture companies;

- the difficulty of integrating operations, systems, and controls as a result of cultural, regulatory, systems, and operational differences;

- in the case of foreign acquisitions and investments, the impact of particular economic, tax, currency, political, legal and regulatory risks associated with specific countries; and

- the impact of known potential liabilities or liabilities that may be unknown, including as a result of inadequate internal controls, associated with the companies we acquired or in which we invested.

We are likely to experience similar risks in connection with our future acquisitions and strategic investments. Our failure to be successful in addressing these risks or other problems encountered in connection with our past or future acquisitions and strategic investments could cause us to fail to realize the anticipated benefits of such acquisitions or investments, incur unanticipated liabilities, and harm our business generally.

22

Table of Contents

***If we are unable to recruit, hire, motivate, and retain key personnel, we may not be able to execute our business plan.***

Our business is dependent on our ability to recruit, hire, motivate, and retain talented, highly skilled personnel. Achieving this objective may be difficult due to many factors, including the intense competition for such highly skilled personnel in the San Francisco Bay Area and other metropolitan areas where our offices are located; fluctuations in global economic and industry conditions; competitors' hiring practices; and the effectiveness of our compensation programs. If we do not succeed in retaining and motivating our existing key employees and in attracting new key personnel, we may be unable to meet our business plan and as a result, our revenue and profitability may decline.

***Any failure to manage expansion and changes to our business could adversely affect our operating results.***

If we are unable to effectively manage a large and geographically dispersed group of employees or to anticipate our future growth and personnel needs, our business may be adversely affected.

As we expand our business, we must also expand and adapt our operational infrastructure. Our business relies on data systems, billing systems, and financial reporting and control systems, among others. All of these systems have become increasingly complex in the recent past due to the growing complexity of our business, acquisitions of new businesses with different systems, and increased regulation over controls and procedures. To manage our business in a cost-effective manner, we will need to continue to upgrade and improve our data systems, billing systems, and other operational and financial systems, procedures, and controls. In some cases, we are outsourcing administrative functions to lower-cost providers. These upgrades, improvements and outsourcing changes will require a dedication of resources and in some cases are likely to be complex. If we are unable to adapt our systems and put adequate controls in place in a timely manner, our business may be adversely affected. In particular, sustained failures of our billing systems to accommodate increasing numbers of transactions, to accurately bill users and advertisers, or to accurately compensate Affiliates could adversely affect the viability of our business model.

***Any failure to scale and adapt our existing technology architecture to manage expansion of user-facing services and to respond to rapid technological change could adversely affect our business.***

As some of the most visited sites on the Internet, Yahoo! Properties deliver a significant number of products, services, page views, and advertising impressions to users around the world. We expect our products and services to continue to expand and change significantly and rapidly in the future to accommodate new technologies and Internet advertising solutions, and new means of content delivery.

In addition, widespread adoption of new Internet, networking or telecommunications technologies, or other technological changes, could require substantial expenditures to modify or adapt our services or infrastructure. The technology architectures and platforms utilized for our services are highly complex and may not provide satisfactory security features or support in the future, as usage increases and products and services expand, change, and become more complex. In the future, we may make additional changes to our existing, or move to completely new, architectures, platforms and systems, or our users may increasingly access our sites through devices that compel us to invest in new architectures, platforms and systems. Such changes may be technologically challenging to develop and implement, may take time to test and deploy, may cause us to incur substantial costs or data loss, and may cause changes, delays or interruptions in service. These changes, delays, or interruptions in our service may cause our users, Affiliates and other advertising platform participants to become dissatisfied with our service or to move to competing providers or seek remedial actions or compensation. Further, to the extent that demands for our services increase, we will need to expand our infrastructure, including the capacity of our hardware servers and the sophistication of our software. This expansion is likely to be expensive and complex and require additional technical expertise. As we acquire users who rely upon us for a wide variety of services, it becomes more technologically complex and costly to retrieve, store, and integrate data that will enable us to track each user's preferences. Any difficulties experienced in

23

**Table of Contents**

adapting our architectures, platforms and infrastructure to accommodate increased traffic, to store user data, and track user preferences, together with the associated costs and potential loss of traffic, could harm our operating results, cash flows from operations, and financial condition.

***We rely on third parties to provide the technologies necessary to deliver content, advertising, and services to our users, and any change in the licensing terms, costs, availability, or acceptance of these formats and technologies could adversely affect our business.***

We rely on third parties to provide the technologies that we use to deliver content, advertising, and services to our users. There can be no assurance that these providers will continue to license their technologies or intellectual property to us on reasonable terms, or at all. Providers may change the fees they charge users or otherwise change their business model in a manner that slows the widespread acceptance of their technologies. In order for our services to be successful, there must be a large base of users of the technologies necessary to deliver our content, advertising, and services. We have limited or no control over the availability or acceptance of those technologies, and any change in the licensing terms, costs, availability, or user acceptance of these technologies could adversely affect our business.

***If we are unable to attract, sustain, and renew distribution arrangements on favorable terms, our revenue may decline.***

We enter into distribution arrangements with third parties such as operators of third-party Websites, online networks, software companies, electronics companies, computer manufacturers, Internet service providers and others to promote or supply our services to their users. For example:

- We maintain search and display advertising relationships with Affiliate sites, which integrate our advertising offerings into their Websites.

- We enter into distribution alliances with Internet service providers (including providers of cable and broadband Internet access) and software distributors to promote our services to their users.

- We enter into agreements with mobile, tablet, netbook, television, and other device manufacturers, electronics companies and carriers to promote our software and services on their devices.

In some markets, we depend on a limited number of distribution arrangements for a significant percentage of our user activity. A failure by our distributors to attract or retain their user bases would negatively impact our user activity and, in turn, reduce our revenue. In some cases, device manufacturers may be unwilling to pay fees to Yahoo! in order to distribute Yahoo! services.

Distribution agreements often involve revenue sharing. Over time competition to enter into distribution arrangements may cause our traffic acquisition costs to increase. In some cases, we guarantee distributors a minimum level of revenue and, as a result, run a risk that the distributors' performance (in terms of ad impressions, toolbar installations, etc.) might not be sufficient to otherwise earn their minimum payments. In other cases, we agree that if the distributor does not realize specified minimum revenue we will adjust the distributor's revenue-share percentage or provide make-whole arrangements.

Some of our distribution agreements are not exclusive, have a short term, are terminable at will, or are subject to early termination provisions. The loss of distributors, increased distribution costs, or the renewal of distribution agreements on significantly less favorable terms may cause our revenue to decline.

Table of Contents

***Technologies, tools, software, and applications could block our advertisements, impair our ability to deliver interest-based advertising, or shift the location in which advertising appears, which could harm our operating results.***

Technologies, tools, software, and applications (including new and enhanced Web browsers) have been developed and are likely to continue to be developed that can block display, search, and interest-based advertising and content, delete or block the cookies used to deliver such advertising, or shift the location in which advertising appears on pages so that our advertisements do not show up in the most monetizable places on our pages or are obscured. Most of our revenue is derived from fees paid by advertisers in connection with the display of graphical advertisements or clicks on search advertisements on Web pages. As a result, the adoption of such technologies, tools, software, and applications could reduce the number of display and search advertisements that we are able to deliver and/or our ability to deliver interest-based advertising and this, in turn, could reduce our advertising revenue and operating results.

***Proprietary document formats may limit the effectiveness of our search technology by preventing our technology from accessing the content of documents in such formats, which could limit the effectiveness of our products and services.***

A large amount of information on the Internet is provided in proprietary document formats. These proprietary document formats may limit the effectiveness of search technology by preventing the technology from accessing the content of such documents. The providers of the software applications used to create these documents could engineer the document format to prevent or interfere with the process of indexing the document contents with search technology. This would mean that the document contents would not be included in search results even if the contents were directly relevant to a search. The software providers may also seek to require us to pay them royalties in exchange for giving us the ability to search documents in their format. If the search platform technology we employ is unable to index proprietary format Web documents as effectively as our competitors' technology, usage of our search services might decline, which could cause our revenue to fall.

***We have dedicated considerable resources to provide a variety of premium products and services, which might not prove to be successful in generating significant revenue for us.***

We offer fee-based enhancements for many of our free services. The development cycles for these technologies are long and generally require significant investment by us. We have invested and will continue to invest in premium products and services. Some of these premium products and services might not generate anticipated revenue or might not meet anticipated user adoption rates. We have previously discontinued some non-profitable premium services and may discontinue others. General economic conditions as well as the rapidly evolving competitive landscape may affect users' willingness to pay for such premium services. If we cannot generate revenue from our premium services that are greater than the cost of providing such services, our operating results could be harmed.

***Fluctuations in foreign currency exchange rates may adversely affect our operating results and financial condition.***

Revenue generated and expenses incurred by our international subsidiaries and equity method investees are often denominated in the currencies of the local countries. As a result, our consolidated U.S. dollar financial statements are subject to fluctuations due to changes in exchange rates as the financial results of our international subsidiaries and equity method investees are translated from local currencies into U.S. dollars. Our financial results are also subject to changes in exchange rates that impact the settlement of transactions in non-local currencies. The carrying values of our equity investments in our equity investees are also subject to fluctuations in the exchange rates of foreign currencies.

25

Table of Contents

We use derivative instruments, such as foreign currency forward contracts, to partially offset certain exposures to fluctuations in foreign currency exchange rates. The use of such instruments may not offset any, or more than a portion, of the adverse financial effects of unfavorable movements in foreign currency exchange rates. Any losses on these instruments that we experience may adversely impact our financial results, cash flows and financial condition. See Item 7A—"Quantitative and Qualitative Disclosures About Market Risk" of this Annual Report.

### We may be required to record a significant charge to earnings if our goodwill, amortizable intangible assets, investments in equity interests, including investments held by our equity method investees, or other investments become impaired.

We are required under generally accepted accounting principles to test goodwill for impairment at least annually and to review our amortizable intangible assets and investments in equity interests, including investments held by our equity method investees, for impairment when events or changes in circumstance indicate the carrying value may not be recoverable. Factors that could lead to impairment of goodwill and amortizable intangible assets include significant adverse changes in the business climate (affecting our company as a whole or affecting any particular segment) and declines in the financial condition of our business. Factors that could lead to impairment of investments in equity interests include a prolonged period of decline in the stock price or operating performance of, or an announcement of adverse changes or events by, the companies in which we invested or the investments held by those companies. Factors that could lead to an impairment of U.S. government securities, which constitute a significant portion of our assets, include any downgrade of U.S. government debt or concern about the creditworthiness of the U.S. government. We have recorded and may be required in the future to record additional charges to earnings if our goodwill, amortizable intangible assets, investments in equity interests, including investments held by our equity investees, or other investments become impaired. Any such charge would adversely impact our financial results.

### We may have exposure to additional tax liabilities which could negatively impact our income tax provision, net income, and cash flow.

We are subject to income taxes and other taxes in both the U.S. and the foreign jurisdictions in which we currently operate or have historically operated. The determination of our worldwide provision for income taxes and current and deferred tax assets and liabilities requires judgment and estimation. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. We earn a significant amount of our operating income from outside the U.S., and any repatriation of funds in foreign jurisdictions to the U.S. may result in higher effective tax rates for us. There have been proposals from Congress to change U.S. tax laws that could significantly impact how U.S. multinational corporations are taxed on foreign earnings. We cannot predict the form or timing of potential legislative changes, but any newly enacted tax law could have a material adverse impact on our tax expense and cash flow. We are subject to regular review and audit by both domestic and foreign tax authorities as well as subject to the prospective and retrospective effects of changing tax regulations and legislation. Although we believe our tax estimates are reasonable, the ultimate tax outcome may materially differ from the tax amounts recorded in our consolidated financial statements and may materially affect our income tax provision, net income, or cash flows in the period or periods for which such determination and settlement is made.

### Adverse macroeconomic conditions could cause decreases or delays in spending by our advertisers and could harm our ability to generate revenue and our results of operations.

Advertising expenditures tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Since we derive most of our revenue from advertising, adverse macroeconomic conditions have caused, and future adverse macroeconomic conditions could cause, decreases or delays in advertising spending and negatively impact our advertising revenue and short-term ability to grow our revenue. Further, any decreased collectability of accounts receivable or early termination of agreements, whether resulting from customer bankruptcies or otherwise due to adverse macroeconomic conditions, could negatively impact our results of operations.

26

Table of Contents

***Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance.***

The trading price of our common stock has been and may continue to be subject to broad fluctuations. During the year ended December 31, 2012, the closing sale price of our common stock on the NASDAQ Global Select Market ranged from $14.42 to $19.90 per share and the closing sale price on February 15, 2013 was $21.02 per share. Our stock price may fluctuate in response to a number of events and factors, such as variations in quarterly operating results or announcements of technological innovations, significant transactions, or new features, products or services by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of, or other developments involving, other companies that investors may deem comparable to us; trends in our industry; general economic conditions; and the current and anticipated future operating performance and equity valuation of Alibaba Group and Yahoo Japan Corporation in which we have equity investments, including changes in equity valuation due to fluctuations in foreign currency exchange rates.

In addition, the stock market in general, and the market prices for companies in our industry, have experienced volatility that often has been unrelated to operating performance. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees who have been granted stock options or other stock-based awards. A sustained decline in our stock price and market capitalization could lead to an impairment charge to our long-lived assets.

***Delaware statutes and certain provisions in our charter documents could make it more difficult for a third-party to acquire us.***

Our Board has the authority to issue up to 10 million shares of preferred stock and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders. The rights of the holders of our common stock may be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock may have the effect of delaying, deterring or preventing a change in control of Yahoo! without further action by the stockholders and may adversely affect the voting and other rights of the holders of our common stock.

Some provisions of our charter documents, including provisions eliminating the ability of stockholders to take action by written consent and limiting the ability of stockholders to raise matters at a meeting of stockholders without giving advance notice, may have the effect of delaying or preventing changes in control or changes in our management, which could have an adverse effect on the market price of our stock. In addition, our charter documents do not permit cumulative voting, which may make it more difficult for a third-party to gain control of our Board. Further, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which will prohibit us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, even if such combination is favored by a majority of stockholders, unless the business combination is approved in a prescribed manner. The application of Section 203 also could have the effect of delaying or preventing a change in control of us.

## Item 1B.    *Unresolved Staff Comments*

None.

## Item 2.    *Properties*

Our headquarters is located in Sunnyvale, California and consists of owned space aggregating approximately one million square feet. We also lease office space in Argentina, Australia, Belgium, Brazil, Canada, China, Egypt, France, Germany, Hong Kong, Hungary, India, Indonesia, Ireland, Israel, Italy, Japan, Jordan, Malaysia,

27

**Table of Contents**

Mexico, Morocco, New Zealand, Norway, the Philippines, Singapore, South Korea, Spain, Switzerland, Taiwan, the United Arab Emirates, the United Kingdom, and Vietnam. In the United States, we lease offices in various locations, including Atlanta, Boston, Champaign, Chicago, Dallas, Denver, Detroit, Hillsboro, the Los Angeles Area, Miami, New York, Omaha, San Diego, San Francisco, and Washington, D.C. Our data centers are operated in locations in the United States, Brazil, Europe, and Asia.

We believe that our existing facilities are adequate to meet current requirements, and that suitable additional or substitute space will be available as needed to accommodate any further physical expansion of operations and for any additional sales offices.

**Item 3.**    *Legal Proceedings*

For a description of our material legal proceedings, see Note 11—"Commitments and Contingencies" in the Notes to the consolidated financial statements, which is incorporated herein by reference.

**Item 4.**    *Mine Safety Disclosures*

Not applicable.

28

**Table of Contents**

## Part II

**Item 5.**    *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Market Information for Common Stock**

Yahoo! Inc. common stock is quoted on the NASDAQ Global Select Market under the symbol "YHOO." The following table sets forth the range of high and low per share sales prices as reported for each period indicated:

|  | 2011 | | 2012 | |
|---|---|---|---|---|
|  | **High** | **Low** | **High** | **Low** |
| First quarter | $17.84 | $15.41 | $16.39 | $14.35 |
| Second quarter | $18.84 | $14.50 | $16.35 | $14.73 |
| Third quarter | $15.95 | $11.09 | $16.37 | $14.59 |
| Fourth quarter | $16.79 | $13.37 | $19.97 | $15.65 |

**Stockholders**

We had 9,681 stockholders of record as of February 15, 2013.

**Dividends**

We have not declared or paid any cash dividends on our common stock. We presently do not have plans to pay any cash dividends in the near future.

**Issuer Repurchases of Equity Securities**

Share repurchase activity during the three months ended December 31, 2012 was as follows:

| Period | Total Number of Shares Purchased[(*)] | Average Price Paid per Share | Total Number of Shares Purchased as Part of a Publicly Announced Program | Approximate Dollar Value of Shares that May Yet be Purchased Under the Program (in 000s)[(*)] |
|---|---|---|---|---|
| October 1—October 31, 2012 | 5,000,000 | $ 16.68 | 5,000,000 | $ 4,805,549 |
| November 1—November 30, 2012 | 42,218,186 | $ 17.72 | 42,218,186 | $ 4,057,414 |
| December 1—December 31, 2012 | 32,367,208 | $ 19.15 | 32,367,208 | $ 3,437,506 |
| Total | 79,585,394 | $ 18.24 | 79,585,394 | $ |

(*) The share repurchases in the three months ended December 31, 2012 were made under our stock repurchase program announced in May 2012, which authorizes the repurchase of up to $5 billion of our outstanding shares of common stock from time to time. This program, according to its terms, will expire in June 2015 unless revoked earlier by the Board. Repurchases under this program may take place in the open market or in privately negotiated transactions, including derivative transactions, and may be made under a Rule 10b5-1 plan.

See Part II, Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Annual Report on Form 10-K for additional information regarding share repurchases. See also Note 12—"Stockholders' Equity" in the Notes to the consolidated financial statements for additional information.

29

**Table of Contents**

**Performance Graph**

This performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities under that section and shall not be deemed to be incorporated by reference into any filing of Yahoo! Inc. under the Securities Act of 1933, as amended, or the Exchange Act.

The following graph compares, for the five-year period ended December 31, 2012, the cumulative total stockholder return for Yahoo!'s common stock, the NASDAQ 100 Index, the Standard & Poor's North American Technology-Internet Index (the "SPGIINTR"), and the Standard & Poor's 500 Stock Index (the "S&P 500 Index"). Measurement points are the last trading day of each of Yahoo!'s fiscal years ended December 31, 2008, December 31, 2009, December 31, 2010, December 31, 2011, and December 31, 2012. The graph assumes that $100 was invested at the market close on December 31, 2007 in the common stock of Yahoo!, the NASDAQ 100 Index, the SPGIINTR, and the S&P 500 Index and assumes reinvestment of any dividends. The stock price performance on the following graph is not necessarily indicative of future stock price performance.



30

**Table of Contents**

**Item 6.**    *Selected Financial Data*

The following selected consolidated financial data should be read in conjunction with the consolidated financial statements and notes thereto and "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing elsewhere in this Annual Report on Form 10-K. The consolidated statements of income data and the consolidated balance sheets data for the years ended, and as of, December 31, 2008, 2009, 2010, 2011, and 2012 are derived from our audited consolidated financial statements.

**Consolidated Statements of Income Data:**

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2008[3] | 2009[4] | 2010[5] | 2011[6] | 2012[7] |
| | (In thousands, except per share amounts) | | | | |
| Revenue | $7,208,502 | $6,460,315 | $6,324,651 | $4,984,199 | $ 4,986,566 |
| Total operating expenses | $7,195,539 | $6,073,623 | $5,552,127 | $4,183,858 | $ 4,420,198 |
| Income from operations[1] | $ 12,963 | $ 386,692 | $ 772,524 | $ 800,341 | $ 566,368 |
| Other income, net[2] | $ 73,750 | $ 187,528 | $ 297,869 | $ 27,175 | $ 4,647,839 |
| Provision for income taxes | $ (259,006) | $ (219,321) | $ (221,523) | $ (241,767) | $(1,940,043) |
| Earnings in equity interests | $ 596,979 | $ 250,390 | $ 395,758 | $ 476,920 | $ 676,438 |
| Net income attributable to Yahoo! Inc. | $ 418,921 | $ 597,992 | $1,231,663 | $1,048,827 | $ 3,945,479 |
| Net income attributable to Yahoo! Inc. common stockholders per share—basic | $ 0.31 | $ 0.43 | $ 0.91 | $ 0.82 | $ 3.31 |
| Net income attributable to Yahoo! Inc. common stockholders per share—diluted | $ 0.29 | $ 0.42 | $ 0.90 | $ 0.82 | $ 3.28 |
| Shares used in per share calculation—basic | 1,369,476 | 1,397,652 | 1,354,118 | 1,274,240 | 1,192,775 |
| Shares used in per share calculation—diluted | 1,391,230 | 1,415,658 | 1,364,612 | 1,282,282 | 1,202,906 |
| [1]   Includes: | | | | | |
|    Stock-based compensation expense | $ 437,843 | $ 438,087 | $ 223,478 | $ 203,958 | $ 224,365 |
|    Restructuring charges, net | $ 106,854 | $ 126,901 | $ 57,957 | $ 24,420 | $ 236,170 |
| [2]   Includes: | | | | | |
|    Gain related to sale of Alibaba Group Shares | $ — | $ — | $ — | $ — | $ 4,603,322 |

[3]   Our net income attributable to Yahoo! Inc. for the year ended December 31, 2008 included a non-cash gain of $401 million, net of tax, related to Alibaba Group's initial public offering ("IPO") of Alibaba.com Limited ("Alibaba.com"), the business to business e-commerce subsidiary of Alibaba Group, and a non-cash loss of $30 million, net of tax, related to the impairment of our direct investment in Alibaba.com. In addition, in the year ended December 31, 2008, we recorded a goodwill impairment charge of $488 million related to our European reporting unit and net restructuring charges of $107 million related to our strategic workforce realignment and cost reduction initiatives, and a tax benefit for these two items of $42 million. In the aggregate, these items had a net negative impact of $182 million on net income attributable to Yahoo! Inc., or $0.13 for both basic and diluted share, for the year ended December 31, 2008.

[4]   Our net income attributable to Yahoo! Inc. for the year ended December 31, 2009 included a pre-tax gain of $67 million in connection with the sale of our Gmarket shares and a gain on the sale of our direct investment in Alibaba.com of $98 million. In addition, in the year ended December 31, 2009, we recorded net restructuring charges of $127 million related to our cost reduction initiatives. In the aggregate, these items had a net positive impact of $18 million on net income attributable to Yahoo! Inc., or $0.01 per both basic and diluted share, for the year ended December 31, 2009.

Table of Contents

(5)  Our revenue declined in 2010 due to the Search Agreement with Microsoft, which beginning during the fourth quarter of 2010 required a change in revenue presentation and a sharing of search revenue with Microsoft in transitioned markets. Our net income attributable to Yahoo! Inc. for the year ended December 31, 2010 included a pre-tax gain of $66 million in connection with the sale of Zimbra, Inc. and a pre-tax gain on the sale of HotJobs of $186 million. In addition, in the year ended December 31, 2010, we recorded net restructuring charges of $58 million related to our cost reduction initiatives. In the aggregate, these items had a net positive impact of $204 million on net income attributable to Yahoo! Inc., or $0.15 per both basic and diluted share, for the year ended December 31, 2010. In addition, in the year ended December 31, 2010, we recorded $43 million pre-tax for the reimbursement of transition costs incurred in 2009 related to the Search Agreement. See Note 18—"Search Agreement with Microsoft Corporation" in the Notes to the consolidated financial statements for additional information. Our income tax provision was also reduced by the effect of certain tax benefits as discussed in Note 15—"Income Taxes" in the Notes to the consolidated financial statements.

(6)  Our revenue declined in 2011 due to the Search Agreement with Microsoft, which beginning during the fourth quarter of 2010 required a change in revenue presentation and a sharing of search revenue with Microsoft in transitioned markets. Our net income attributable to Yahoo! Inc. for the year ended December 31, 2011 included a non-cash gain of $25 million, net of tax related to the dilution of our ownership interest in Alibaba Group and a non-cash loss of $33 million related to impairments of assets held by Yahoo Japan. In addition, in the year ended December 31, 2011, we recorded net restructuring charges of $24 million related to our cost reduction initiatives. In the aggregate, these items had a net negative impact of $24 million on net income attributable to Yahoo! Inc., or $0.02 per both basic and diluted share, for the year ended December 31, 2011.

(7)  Our net income attributable to Yahoo! Inc. for the year ended December 31, 2012 included a pre-tax gain of approximately $4.6 billion and an after-tax gain of $2.8 billion related to the sale to Alibaba Group of 523 million of our ordinary shares of Alibaba Group ("Shares"). See Note 8—"Investments in Equity Interests" in the Notes to the consolidated financial statements for additional information. In addition, in the year ended December 31, 2012, we recorded net restructuring charges of $236 million related to our cost reduction initiatives. In the aggregate, these items had a net positive impact of $2.6 billion on net income attributable to Yahoo! Inc., or $2.15 per basic share and $2.13 per diluted share, for the year ended December 31, 2012.

**Consolidated Balance Sheets Data:**

|  | December 31, | | | | |
|---|---|---|---|---|---|
|  | 2008(1) | 2009 | 2010 | 2011 | 2012(2) |
|  |  |  | (In thousands) |  |  |
| Cash and cash equivalents | $ 2,292,296 | $ 1,275,430 | $ 1,526,427 | $ 1,562,390 | $ 2,667,778 |
| Marketable debt securities | $ 1,229,677 | $ 3,242,574 | $ 2,102,255 | $ 967,527 | $ 3,354,600 |
| Alibaba Group Preference Shares | $ — | $ — | $ — | $ — | $ 816,261 |
| Working capital | $ 3,040,483 | $ 2,877,044 | $ 2,719,676 | $ 2,245,175 | $ 4,362,481 |
| Investments in equity interests | $ 3,177,445 | $ 3,496,288 | $ 4,011,889 | $ 4,749,044 | $ 2,840,157 |
| Total assets | $13,689,848 | $14,936,030 | $14,928,104 | $14,782,786 | $17,103,253 |
| Long-term liabilities | $ 715,872 | $ 699,666 | $ 705,822 | $ 994,078 | $ 1,207,418 |
| Total Yahoo! Inc. stockholders' equity | $11,250,942 | $12,493,320 | $12,558,129 | $12,541,067 | $14,560,200 |

(1)  During the year ended December 31, 2008, our $750 million of outstanding zero coupon senior convertible notes were converted into 36.6 million shares of Yahoo! common stock. During the year ended December 31, 2008, we received a $350 million, one-time payment from AT&T Inc., of which $129 million was recorded in short-term deferred revenue and $221 million was recorded in long-term deferred revenue.

(2)  During the year ended December 31, 2012, we received $13.54 per Share, or approximately $7.1 billion in total consideration, for the 523 million Shares we sold to Alibaba Group. Approximately $6.3 billion of the

32

[Table of Contents](#)

consideration was received in cash and $800 million was received in Alibaba Group Preference Shares. See Note 8—"Investments in Equity Interests" in the Notes to the consolidated financial statements for additional information.

### Item 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

#### Forward-Looking Statements

*In addition to current and historical information, this Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements relate to our future operations, prospects, potential products, services, developments, and business strategies. These statements can, in some cases, be identified by the use of terms such as "may," "will," "should," "could," "would," "intend," "expect," "plan," "anticipate," "believe," "estimate," "predict," "project," "potential," or "continue," the negative of such terms, or other comparable terminology. This Annual Report on Form 10-K includes, among others, forward-looking statements regarding our:*

- expectations about revenue, including display, search, and other revenue;

- expectations about growth in users;

- expectations about operating expenses;

- anticipated capital expenditures;

- expectations about the implementation and the financial and operational impacts of our Search Agreement with Microsoft;

- impact of recent acquisitions on our business and evaluation of, and expectations for, possible acquisitions of, or investments in, businesses, products, intangible assets and technologies;

- projections and estimates with respect to our restructuring activities and changes to our organizational structure;

- expectations about the closure of our Korea business;

- expectations about the amount of unrecognized tax benefits, the adequacy of our existing tax reserves and future tax expenditures;

- expectations about positive cash flow generation and existing cash, cash equivalents, and investments being sufficient to meet normal operating requirements; and

- expectations regarding the outcome of legal proceedings in which we are involved, including the outcome of our efforts to overturn a judgment entered against us and one of our subsidiaries in a proceeding in Mexico.

*These statements involve certain known and unknown risks and uncertainties that could cause our actual results to differ materially from those expressed or implied in our forward-looking statements. Such risks and uncertainties include, among others, those listed in Part 1, Item 1A "Risk Factors" of this Annual Report on Form 10-K. We do not intend, and undertake no obligation, to update any of our forward-looking statements after the date of this Annual Report on Form 10-K to reflect actual results or future events or circumstances.*

#### Overview

Yahoo! Inc., together with its consolidated subsidiaries ("Yahoo!," the "Company," "we," or "us"), is a global technology company focused on making the world's daily habits inspiring and entertaining. We provide a variety of products and services, many of them personalized, including search, content, and communications tools—all daily habits for hundreds of millions of users, on the Web and on mobile devices. We create value for advertisers and their brands by connecting them with targeted audiences of users through their daily habits. Advertisers can build their businesses through advertising to these targeted audiences on our online properties and services

33

Table of Contents

("Yahoo! Properties"), or through our distribution network of third party entities ("Affiliates") who integrate our advertising offerings into their Websites or other offerings (those Websites and other offerings, "Affiliate sites").

Our offerings to users on Yahoo! Properties currently fall into four categories: Yahoo.com; Communications; User-Generated Content; and Mobile & Emerging Products. The majority of our offerings are available in more than 45 languages and in 60 countries, regions, and territories. We manage and measure our business geographically, principally in the Americas, EMEA (Europe, Middle East, and Africa) and Asia Pacific.

In the following Management's Discussion and Analysis, we provide information regarding the following areas:

- Key Financial Metrics;
- Non-GAAP Financial Measures;
- Significant Transactions;
- Results of Operations;
- Liquidity and Capital Resources;
- Critical Accounting Policies and Estimates; and
- Recent Accounting Pronouncements.

**Key Financial Metrics**

The key financial metrics we use are as follows: revenue; revenue less traffic acquisition costs ("TAC"), or revenue ex-TAC; income from operations; adjusted EBITDA; net income attributable to Yahoo! Inc.; net cash provided by (used in) operating activities; and free cash flow. Revenue ex-TAC, adjusted EBITDA and free cash flow are financial measures that are not defined in accordance with U.S. generally accepted accounting principles ("GAAP"). We use these non-GAAP financial measures for internal managerial purposes and to facilitate period-to-period comparisons. See "Non-GAAP Financial Measures" below for a description of, and limitations specific to, each of these non-GAAP financial measures.

|  | Years Ended December 31, | | |
|  | 2010 | 2011 | 2012 |
|---|---|---|---|
|  | (dollars in thousands) | | |
| Revenue | $6,324,651 | $4,984,199 | $4,986,566 |
| Revenue ex-TAC | $4,588,228 | $4,380,828 | $4,467,660 |
| Income from operations[1] | $ 772,524 | $ 800,341 | $ 566,368 |
| Adjusted EBITDA | $1,710,355 | $1,654,583 | $1,698,839 |
| Net income attributable to Yahoo! Inc | $1,231,663 | $1,048,827 | $3,945,479 |
| Net cash provided by (used in) operating activities | $1,240,190 | $1,323,806 | $ (281,554) |
| Free cash flow[2] | $ 596,255 | $ 725,801 | $ (834,865) |

[1]    Includes:

| | | | | |
|---|---|---|---|---|
| Stock-based compensation expense | | $ 223,478 | $ 203,958 | $ 224,365 |
| Restructuring charges, net | | $ 57,957 | $ 24,420 | $ 236,170 |

[2]    Excluding the impact of the cash taxes paid of $2.3 billion related to the Initial Repurchase described under "Significant Transactions" below, free cash flow for the year ended December 31, 2012 would have been $1.4 billion.

34

Table of Contents

### Revenue ex-TAC (a Non-GAAP financial measure)

| | Years Ended December 31, | | | 2010-2011 % Change | 2011-2012 % Change |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | | |
| | (dollars in thousands) | | | | |
| Revenue | $6,324,651 | $4,984,199 | $4,986,566 | (21)% | 0% |
| Less: TAC | 1,736,423 | 603,371 | 518,906 | (65)% | (14)% |
| Revenue ex-TAC | $4,588,228 | $4,380,828 | $4,467,660 | (5)% | 2% |

For the year ended December 31, 2012, revenue ex-TAC increased $87 million, or 2 percent, due to an increase in search revenue ex-TAC offset by a decline in display revenue ex-TAC.

For the year ended December 31, 2011, revenue ex-TAC declined $207 million, or 5 percent, due to a decline in search revenue ex-TAC.

### Adjusted EBITDA (a Non-GAAP financial measure)

| | Years Ended December 31, | | | 2010-2011 % Change | 2011-2012 % Change |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | | |
| | (dollars in thousands) | | | | |
| Net income attributable to Yahoo! Inc. | $1,231,663 | $1,048,827 | $ 3,945,479 | (15)% | N/M |
| Costs associated with the Korea business and its closure | — | — | 99,485 | 0% | 100% |
| Deal-related costs related to the sale of Alibaba shares | — | — | 6,500 | 0% | 100% |
| Depreciation and amortization | 656,396 | 625,864 | 649,267 | (5)% | 4% |
| Stock-based compensation expense | 223,478 | 203,958 | 224,365 | (9)% | 10% |
| Restructuring charges, net, as adjusted[1] | 57,957 | 24,420 | 152,742 | (58)% | N/M |
| Other income, net | (297,869) | (27,175) | (4,647,839) | (91)% | N/M |
| Provision for income taxes | 221,523 | 241,767 | 1,940,043 | 9% | N/M |
| Earnings in equity interests | (395,758) | (476,920) | (676,438) | 21% | 42% |
| Net income attributable to noncontrolling interests | 12,965 | 13,842 | 5,123 | 7% | (63)% |
| Adjusted EBITDA | $1,710,355 | $1,654,583 | $ 1,698,727 | (3)% | 3% |
| Percentage of Revenue ex-TAC[2][3] | 37% | 38% | 38% | | |

N/M = Not Meaningful

[1]  For the year ended December 31, 2012, this amount excludes the restructuring charges related to the Korea business and its closure of $83 million, which is included under Costs associated with the Korea business and its closure.

[2]  Revenue ex-TAC is calculated as revenue less TAC.

[3]  Net income attributable to Yahoo! Inc. as a percentage of revenue in 2010, 2011, and 2012 was 19 percent, 21 percent, and 79 percent, respectively.

For the year ended December 31, 2012, adjusted EBITDA increased $44 million, or 3 percent, compared to 2011, primarily due to an increase in Net Income attributable to Yahoo!. Excluding the impact of the Alibaba Group Initial Repurchase described under "Significant Transactions" below, the increase was primarily attributable to increased revenue in the Americas region and a decline in TAC in the EMEA region.

35

**Table of Contents**

For the year ended December 31, 2011, adjusted EBITDA decreased $56 million, or 3 percent, compared to 2010, due to a decline in revenue year-over-year offset by a decline in operating costs. The decrease in revenue was primarily attributable to a decline in search revenue. The decline in operating costs year-over-year was attributable to a decline in search TAC resulting from the required change in revenue presentation for transitioned markets in the fourth quarter of 2010 due to the Search Agreement with Microsoft described under "Significant Transactions" below as we no longer incur search TAC for transitioned markets.

***Free Cash Flow (a Non-GAAP financial measure)***

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2011** | **2012** |
| | (dollars in thousands) | | |
| Net cash provided by (used in) operating activities | $1,240,190 | $1,323,806 | $(281,554) |
| Acquisition of property and equipment, net | (714,078) | (593,294) | (505,507) |
| Dividends received from Yahoo Japan | (60,918) | (75,391) | (83,648) |
| Excess tax benefits from stock-based awards | 131,061 | 70,680 | 35,844 |
| Free cash flow(*) | $ 596,255 | $ 725,801 | $(834,865) |

(*) Excluding the impact of the cash taxes paid of $2.3 billion related to the Initial Repurchase described under "Significant Transactions" below, free cash flow for the year ended December 31, 2012 would have been $1.4 billion.

For the year ended December 31, 2012, free cash flow decreased $1.6 billion, compared to 2011. Excluding the impact of the cash taxes paid of $2.3 billion related to the Initial Repurchase described under "Significant Transactions" below, free cash flow increased $705 million due to an increase in net cash provided by operating activities. Free cash flow for the year ended December 31, 2012 included a payment of $550 million from Alibaba Group in satisfaction of certain future royalty payments under the existing technology and intellectual property license agreement with Alibaba Group.

For the year ended December 31, 2011, free cash flow increased $130 million, or 22 percent, compared to 2010. The increase was primarily attributable to a decline in capital expenditures and an increase in net cash provided by operating activities.

**Non-GAAP Financial Measures**

*Revenue ex-TAC*. Revenue ex-TAC is a non-GAAP financial measure defined as GAAP revenue less TAC. TAC consists of payments made to Affiliates that have integrated our advertising offerings into their sites and payments made to companies that direct consumer and business traffic to Yahoo! Properties. Based on the terms of the Search Agreement with Microsoft described under "Significant Transactions" below, Microsoft retains a revenue share of 12 percent of the net (after TAC) search revenue generated on Yahoo! Properties and Affiliate sites in transitioned markets. We report the net revenue we receive under the Search Agreement as revenue and no longer present the associated TAC. Accordingly, for transitioned markets we report GAAP revenue associated with the Search Agreement on a net (after TAC) basis rather than on a gross basis. For markets that have not yet transitioned, revenue continues to be recorded on a gross basis, and TAC is recorded as a part of operating expenses.

We present revenue ex-TAC to provide investors a metric used by us for evaluation and decision-making purposes during the Microsoft transition and to provide investors with comparable revenue numbers when comparing periods preceding, during and following the transition period. A limitation of revenue ex-TAC is that it is a measure which we have defined for internal and investor purposes that may be unique to us, and therefore it may not enhance the comparability of our results to other companies in our industry who have similar business arrangements but address the impact of TAC differently. Management compensates for these limitations by also relying on the comparable GAAP financial measures of revenue and total operating expenses, which include TAC in non-transitioned markets.

36

Table of Contents

*Adjusted EBITDA*. Adjusted EBITDA is a non-GAAP financial measure defined as net income attributable to Yahoo! Inc. before taxes, depreciation, amortization of intangible assets, stock-based compensation expense, other income, net (which includes interest), earnings in equity interests, net income attributable to noncontrolling interests and certain gains, losses, and expenses that we do not believe are indicative of our ongoing results.

We present adjusted EBITDA because the exclusion of certain gains, losses, and expenses facilitates comparisons of the operating performance of our Company on a period to period basis. Adjusted EBITDA has limitations as an analytical tool and should not be considered in isolation or as a substitute for results reported under GAAP. These limitations include: adjusted EBITDA does not reflect tax payments and such payments reflect a reduction in cash available to us; adjusted EBITDA does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues in our businesses; adjusted EBITDA does not include stock-based compensation expense related to our workforce; adjusted EBITDA also excludes other income, net (which includes interest), earnings in equity interests, net income attributable to noncontrolling interests and certain gains, losses, and expenses that we do not believe are indicative of our ongoing results, and these items may represent a reduction or increase in cash available to us. Adjusted EBITDA is a measure that may be unique to us, and therefore it may not enhance the comparability of our results to other companies in our industry. Management compensates for these limitations by also relying on the comparable GAAP financial measure of net income attributable to Yahoo! Inc., which includes taxes, depreciation, amortization, stock-based compensation expense, other income, net (which includes interest), earnings in equity interests, net income attributable to noncontrolling interests and the other gains, losses and expenses that are excluded from adjusted EBITDA.

*Free Cash Flow*. Free cash flow is a non-GAAP financial measure defined as net cash provided by (used in) operating activities (adjusted to include excess tax benefits from stock-based awards), less acquisition of property and equipment, net and dividends received from equity investees.

We consider free cash flow to be a liquidity measure which provides useful information to management and investors about the amount of cash generated by the business after the acquisition of property and equipment, which can then be used for strategic opportunities including, among others, investing in our business, making strategic acquisitions, strengthening the balance sheet, and repurchasing stock. A limitation of free cash flow is that it does not represent the total increase or decrease in the cash balance for the period. Management compensates for the limitation of free cash flow by also relying on the net change in cash and cash equivalents as presented in our consolidated statements of cash flows prepared in accordance with GAAP which incorporates all cash movements during the period.

**Significant Transactions**

***Initial Repurchase of Alibaba Group Holding Limited Ordinary Shares***

On September 18, 2012 (the "Repurchase Closing Date"), Alibaba Group Holding Limited ("Alibaba Group") repurchased (the "Initial Repurchase") 523 million of the 1,047 million ordinary shares of Alibaba Group ("Shares") owned by us. The Initial Repurchase was made pursuant to the terms of the Share Repurchase and Preference Share Sale Agreement entered into by Yahoo! Inc., Alibaba Group and Yahoo! Hong Kong Holdings Limited, a Hong Kong corporation and wholly-owned subsidiary of Yahoo! Inc. ("YHK") on May 20, 2012 (as amended on September 11, 2012, the "Repurchase Agreement"). We received $13.54 per Share, or approximately $7.1 billion in total consideration, for the 523 million Shares sold to Alibaba Group. Approximately $6.3 billion of the consideration was received in cash and $800 million was received in Alibaba Group preference shares (the "Alibaba Group Preference Shares"). This Initial Repurchase resulted in a pre-tax gain of approximately $4.6 billion for the year ended December 31, 2012 which is included in other income, net on our consolidated statements of income.

On the Repurchase Closing Date, Alibaba Group paid us $550 million in satisfaction of certain future royalty payments under our existing Technology and Intellectual Property License Agreement ("TIPLA") with Alibaba Group. In addition, certain existing contractual limitations on our ability to compete in the People's Republic of China were terminated.

37

Table of Contents

Net cash proceeds after the payment of taxes and fees from the Initial Repurchase and the $550 million TIPLA payment were approximately $4.3 billion. We intend to return $3.65 billion of the after-tax proceeds to shareholders. This amount includes approximately $2.1 billion we returned to shareholders through share repurchases from May 20, 2012, the date we announced the Repurchase Agreement, through December 31, 2012.

At the time of an initial public offering of Alibaba Group meeting certain specified criteria ("Qualified IPO"), Yahoo! and YHK will sell, at Alibaba Group's election (either directly to Alibaba Group or in the Qualified IPO), up to an additional 261.5 million of our remaining Shares. If Shares are sold back to Alibaba Group in the Qualified IPO, the purchase price per Share will be equal to the per share price in the Qualified IPO less specified fees and underwriter discounts.

See Note 8—"Investments in Equity Interests" in the Notes to our consolidated financial statements for additional information.

### *Search Agreement with Microsoft Corporation*

On December 4, 2009, we entered into a Search and Advertising Services and Sales Agreement (the "Search Agreement") with Microsoft Corporation ("Microsoft"), which provides for Microsoft to be the exclusive algorithmic and paid search services provider on Yahoo! Properties and non-exclusive provider of such services on Affiliate sites. We also entered into a License Agreement with Microsoft pursuant to which Microsoft acquired an exclusive 10-year license to our core search technology that it will be able to integrate into its existing Web search platforms. The global transition of our algorithmic and paid search platforms to Microsoft's platform and the migration of paid search advertisers and publishers to Microsoft's platform are being done on a market by market basis.

During the first five years of the Search Agreement, in transitioned markets we are entitled to receive 88 percent of the revenue generated from Microsoft's services on Yahoo! Properties. We are also entitled to receive 88 percent of the revenue generated from Microsoft's services on Affiliate sites after the Affiliate's share of revenue. In the transitioned markets, for search revenue generated from Microsoft's services on Yahoo! Properties and Affiliate sites, we report as revenue the 88 percent revenue share, as we are not the primary obligor in the arrangement with the advertisers and publishers. The underlying search advertising services are provided by Microsoft. For new Affiliates during the term of the Search Agreement, and for all Affiliates after the first five years of such term, we will receive 88 percent of the revenue generated from Microsoft's services on Affiliate sites after the Affiliate's share of revenue and certain Microsoft costs are deducted. On the fifth anniversary of the date of implementation of the Search Agreement, Microsoft will have the option to terminate our sales exclusivity for premium search advertisers. If Microsoft exercises its option, the Revenue Share Rate will increase to 93 percent for the remainder of the term of the Search Agreement, unless we exercise our option to retain our sales exclusivity, in which case the Revenue Share Rate would be reduced to 83 percent for the remainder of the term. If Microsoft does not exercise such option, the Revenue Share Rate will be 90 percent for the remainder of the term of the Search Agreement.

Under the Search Agreement, for each market, Microsoft generally guarantees Yahoo!'s revenue per search ("RPS Guarantee") on Yahoo! Properties only for 18 months after the transition of paid search services to Microsoft's platform in that market. In the fourth quarter of 2011, Microsoft agreed to extend the RPS Guarantee in the U.S. and Canada through March 31, 2013. The RPS Guarantee is calculated based on the difference in revenue per search between the pre-transition and post-transition periods and certain other factors. We record the RPS Guarantee as search revenue in the quarter the amount becomes fixed, which is typically the quarter in which the associated shortfall in revenue per search occurred. If the RPS Guarantee in the U.S. and Canada is not renewed prior to its expiration on March 31, 2013, we currently anticipate that our revenue, cash flows and income will be negatively impacted.

38

Table of Contents

Under the Search Agreement, Microsoft agreed to reimburse us for certain transition costs up to an aggregate total of $150 million during the first three years of the Search Agreement. During the third quarter of 2011, our cumulative transition costs exceeded Microsoft's $150 million reimbursement cap under the Search Agreement. Transition costs we incur in excess of the $150 million reimbursement cap are not subject to reimbursement. Our results for the year ended December 31, 2011 reflect transition cost reimbursements from Microsoft under the Search Agreement of $26 million. During the year ended December 31, 2010, we recorded transition cost reimbursements from Microsoft under the Search Agreement of $81 million. During the year ended December 31, 2010, we also recorded reimbursements of $43 million for transition costs incurred in 2009. The 2009 transition cost reimbursements were recorded in the first quarter of 2010 after regulatory clearance in the U.S. and Europe was received, implementation of the Search Agreement commenced, and Microsoft became obligated to make such payments.

From February 23, 2010 until the applicable services are fully transitioned to Microsoft in all markets, Microsoft will also reimburse us for the costs of operating algorithmic and paid search services subject to specified exclusions and limitations. Our results reflect search operating cost reimbursements from Microsoft under the Search Agreement of $67 million, $212 million, and $268 million for the years ended December 31, 2012, 2011, and 2010, respectively. Search operating cost reimbursements are expected to decline as we fully transition all markets and, in the long term, the underlying expenses are not expected to be incurred under our cost structure.

We completed the transition of our algorithmic and paid search platforms to the Microsoft platform in the U.S. and Canada in the fourth quarter of 2010. In 2011, we completed the transition of algorithmic search in all other markets and the transition of paid search in India. In 2012, we completed the transition of paid search in most of the EMEA markets as well as six markets in Latin America. We are continuing to work with Microsoft on transitioning paid search in the remaining markets. The market-by-market transition of our paid search platform to Microsoft's platform and the migration of paid search advertisers and publishers to Microsoft's platform are expected to continue through 2013, and possibly into 2014.

In the year ended December 31, 2010, $17 million was recorded for reimbursements for employee retention costs incurred in 2010, and $5 million for employee retention costs incurred in 2009. These employee retention cost reimbursements are separate from and in addition to the $150 million of transition cost reimbursement payments and the search operating cost reimbursements.

We record receivables for the reimbursements as costs are incurred and apply them against the operating expense categories in which the costs were incurred. Of the total amounts incurred during the year ended December 31, 2011, total reimbursements of $16 million not yet received from Microsoft were classified as part of prepaid expenses and other current assets on our consolidated balance sheets as of December 31, 2011. Of the total amounts incurred during the year ended December 31, 2012, the total reimbursements not yet received from Microsoft of $5 million were classified as part of prepaid expenses and other current assets on our consolidated balance sheets as of December 31, 2012.

See Note 18—"Search Agreement with Microsoft Corporation" in the Notes to our consolidated financial statements for additional information.

39

Table of Contents

**Results of Operations**

| | Years Ended December 31, | | | 2010-2011 % Change | 2011-2012 % Change |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | | |
| | (dollars in thousands) | | | | |
| Revenue for groups of similar services: | | | | | |
| Display | $2,154,886 | $2,160,309 | $2,142,818 | 0% | (1)% |
| Search | 3,161,589 | 1,853,110 | 1,885,860 | (41)% | 2% |
| Other | 1,008,176 | 970,780 | 957,888 | (4)% | (1)% |
| Total revenue | $6,324,651 | $4,984,199 | $4,986,566 | (21)% | 0% |
| Cost of revenue—TAC | 1,736,423 | 603,371 | 518,906 | (65)% | (14)% |
| Cost of revenue—other | 945,651 | 983,626 | 1,101,660 | 4% | 12% |
| Sales and marketing | 1,263,992 | 1,122,193 | 1,101,572 | (11)% | (2)% |
| Product development | 1,028,716 | 919,368 | 885,824 | (11)% | (4)% |
| General and administrative | 487,762 | 497,288 | 540,247 | 2% | 9% |
| Amortization of intangibles | 31,626 | 33,592 | 35,819 | 6% | 7% |
| Restructuring charges, net | 57,957 | 24,420 | 236,170 | 58% | N/M |
| Total operating expenses | $5,552,127 | $4,183,858 | $4,420,198 | (25)% | 6% |
| Income from operations | $ 772,524 | $ 800,341 | $ 566,368 | 4% | (29)% |
| Includes: | | | | | |
| Stock-based compensation expense | $ 223,478 | $ 203,958 | $ 224,365 | (9)% | 10% |
| Costs associated with the Korea business and its closure | $ — | $ — | $ 99,485 | 0% | 100% |

N/M = Not Meaningful

40

Table of Contents

*Management Reporting*

We continue to manage our business geographically. The primary areas of measurement and decision making are currently the Americas, EMEA and Asia Pacific. Management relies on an internal reporting process that provides revenue ex-TAC, direct costs excluding TAC by segment, and consolidated income from operations for making decisions related to the evaluation of the financial performance of, and allocating resources to, our segments.

| | Years Ended December 31, | | | 2010-2011 % Change | 2011-2012 % Change |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | | |
| | (dollars in thousands) | | | | |
| Revenue by segment: | | | | | |
| Americas | $4,425,457 | $3,302,989 | $3,461,633 | (25)% | 5% |
| EMEA | 579,145 | 629,383 | 472,061 | 9% | (25)% |
| Asia Pacific | 1,320,049 | 1,051,827 | 1,052,872 | (20)% | 0% |
| Total revenue | $6,324,651 | $4,984,199 | $4,986,566 | (21)% | 0% |
| TAC by segment: | | | | | |
| Americas | $ 957,608 | $ 160,110 | $ 182,511 | (83)% | 14% |
| EMEA | 210,261 | 221,916 | 114,230 | 6% | (49)% |
| Asia Pacific | 568,554 | 221,345 | 222,165 | (61)% | 0% |
| Total TAC | $1,736,423 | $ 603,371 | $ 518,906 | (65)% | (14)% |
| Revenue ex-TAC by segment: | | | | | |
| Americas | $3,467,849 | $3,142,879 | $3,279,122 | (9)% | 4% |
| EMEA | 368,884 | 407,467 | 357,831 | 10% | (12)% |
| Asia Pacific | 751,495 | 830,482 | 830,707 | 11% | 0% |
| Total revenue ex-TAC | $4,588,228 | $4,380,828 | $4,467,660 | (5)% | 2% |
| Direct costs by segment[1]: | | | | | |
| Americas | 704,858 | 696,103 | 733,316 | (1)% | 5% |
| EMEA | 149,594 | 165,750 | 161,990 | 11% | (2)% |
| Asia Pacific | 175,589 | 225,417 | 224,114 | 28% | (1)% |
| Global operating costs[2][3] | 1,847,832 | 1,638,975 | 1,672,070 | (11)% | 2% |
| Depreciation and amortization | 656,396 | 625,864 | 649,267 | (5)% | 4% |
| Stock-based compensation expense | 223,478 | 203,958 | 224,365 | (9)% | 10% |
| Restructuring charges, net | 57,957 | 24,420 | 236,170 | (58)% | N/M |
| Income from operations | $ 772,524 | $ 800,341 | $ 566,368 | 4% | (29)% |

N/M = Not Meaningful

[1]   Direct costs for each segment include cost of revenue—other, as well as other operating expenses that are directly attributable to the segment such as employee compensation expense (excluding stock-based compensation expense), local sales and marketing expenses, and facilities expenses. Beginning in 2012, marketing and customer advocacy costs are managed locally and included as direct costs for each segment. Prior period amounts have been revised to conform to the current presentation.

[2]   Global operating costs include product development, service engineering and operations, general and administrative, and other corporate expenses that are managed on a global basis and that are not directly attributable to any particular segment. Prior to 2012, marketing and customer advocacy costs were managed on a global basis and included as global operating costs. Prior period amounts have been revised to conform to the current presentation.

[3]   The net cost reimbursements from Microsoft pursuant to the Search Agreement are primarily included in global operating costs. Operating costs and expenses consist of cost of revenue—TAC; cost of revenue—other; sales and marketing, product development; general and administrative; amortization of intangible

41

**Table of Contents**

assets; and restructuring charges, net. Cost of revenue—other consists of bandwidth costs and other expenses associated with the production and usage of Yahoo! Properties, including amortization of acquired intellectual property rights and developed technology.

*Revenue*

We generate revenue principally from display advertising on Yahoo! Properties and some Affiliate sites and from search advertising on Yahoo! Properties and Affiliate sites. Additionally, we generate revenue from other sources including listings-based services, facilitating commercial transactions, royalties, and consumer and business fee-based services.

Display revenue is generated from the display of graphical advertisements ("display advertising"). We earn revenue from guaranteed or "premium" display advertising by delivering advertisements according to advertisers' specified criteria, such as number of impressions during a fixed period on a specific placement. Also, we earn revenue from non-guaranteed or "non-premium" display advertising by delivering advertisements for advertisers purchasing inventory on a preemptible basis, which means that the advertisement may or may not appear, inventory is not reserved and position placement is not assured. Generally, we make our non-guaranteed display inventory available through the Right Media Exchange.

We recognize revenue from display advertising on Yahoo! Properties and Affiliate sites as impressions are delivered. Impressions are delivered when a sold advertisement appears in pages viewed by users. Arrangements for these services generally have terms of up to one year, and in some cases the terms may be up to three years. For display advertising on Affiliate sites, we pay TAC to Affiliates for the revenue generated from the display of these advertisements on the Affiliate sites. The display revenue derived from these arrangements that involve traffic supplied by Affiliates is reported on a gross basis including TAC paid to Affiliates as we are the primary obligor to the advertisers who are the customers of the display advertising service.

Search revenue is generated from the placement of links to advertisers' Websites ("search advertising"). We recognize revenue from search advertising on Yahoo! Properties and Affiliate sites. Search revenue is recognized based on Paid Clicks. A Paid Click occurs when an end-user clicks on a sponsored listing on Yahoo! Properties or Affiliate sites for which an advertiser pays on a per click basis. Under the Search Agreement with Microsoft, in the transitioned markets, we report as revenue our 88 percent revenue share as we are not the primary obligor in the arrangement with the advertisers. See "Significant Transactions—Search Agreement with Microsoft Corporation" above for a description of our Search Agreement with Microsoft. In non-transitioned markets, we pay Affiliates TAC for the revenue generated from the search advertisements on the Affiliates' Websites. The revenue derived from these arrangements is reported on a gross basis including TAC paid to Affiliates, as we continue to be the primary obligor to the advertisers in non-transitioned markets and record the related revenue as it is earned. We also generate search revenue from a revenue sharing arrangement with Yahoo Japan for search technology and services.

Other revenue includes listings-based services revenue, transaction revenue, royalties, and fees revenue. Listings-based services revenue is generated from a variety of consumer and business listings-based services, including classified advertising such as Yahoo! Autos and other services. We recognize listings-based services revenue when the services are performed. Transaction revenue is generated from facilitating commercial transactions through Yahoo! Properties, principally from Yahoo! Small Business, Yahoo! Travel, and Yahoo! Shopping. We recognize transaction revenue when there is evidence that qualifying transactions have occurred. We also receive royalties from joint venture partners that are recognized when earned. Fees revenue consists of revenue generated from a variety of consumer and business fee-based services as well as services for small businesses. We recognize fees revenue when the services are performed.

*Display and Search Metrics*. We present information below regarding the "Number of Ads Sold" and "Price-per-Ad" for display and the number of "Paid Clicks" and "Price-per-Click" for search. This information is derived

42

Table of Contents

from internal data. We periodically review and refine our methodologies for monitoring, gathering, and counting Numbers of Ads Sold and Paid Clicks. Based on this process, from time to time we update such methodologies.

"Number of Ads Sold" is defined as the total number of ads displayed, or impressions, for paying advertisers on Yahoo! Properties. "Price-per-Ad" is defined as display revenue from Yahoo! Properties divided by our Number of Ads Sold. Our price and volume metrics for display are based on display revenue which we report on a gross basis including TAC. Our price and volume metrics for display exclude both the Number of Ads Sold and the related revenue for certain regions where we did not retain historical information in a manner that would support period-to-period comparison on these metrics. The countries and regions included in our display metrics are: the United States, the United Kingdom, France, Germany, Spain, Italy, Taiwan, Hong Kong, Southeast Asia, and India.

"Paid Clicks" are defined as the total number of times an end-user clicks on a sponsored listing on Yahoo! Properties and Affiliate sites for which an advertiser pays on a per click basis. "Price-per-Click" is defined as search revenue divided by our Paid Clicks. Although Paid Clicks and Price-per-Click are predominantly search metrics, we include Paid Clicks and the related revenue from certain display advertisements that are sold on a price-per-click basis. The revenue associated with display Paid Clicks is not material and is excluded from our display price volume metrics. Our price and volume metrics for search are based on gross search revenue in all markets in which we operate, including TAC and any Microsoft RPS guarantee payments.

*Display Revenue*

Display revenue for the year ended December 31, 2012 decreased by 1 percent, compared to 2011. This decrease can be attributed to a decline in display revenue on Yahoo! Properties in the EMEA region.

For the year ended December 31, 2012, Number of Ads Sold decreased 13 percent and Price-per-Ad increased 11 percent, compared to 2011. The decrease in Number of Ads Sold year-over-year was attributable to a decline in Number of Ads Sold on Yahoo! Properties in the Americas and Asia Pacific regions. The increase in Price-per-Ad was due to a change in the mix of our ads sold.

Display revenue for the year ended December 31, 2011 remained flat compared to 2010, due to growth in guaranteed and non-guaranteed advertising in the EMEA and Asia Pacific regions and increases in non-guaranteed advertising in the Americas region offset by declines in the Americas region in guaranteed advertising.

For the year ended December 31, 2011, Number of Ads Sold was flat and Price-per-Ad increased 2 percent, compared to 2010. The Number of Ads Sold remained flat year-over-year due to growth in the Number of Ads Sold on Yahoo! Properties in the Asia Pacific and EMEA regions offset by a decline in the Americas region. The Increase in Price-per-Ad was driven by guaranteed and non-guaranteed advertising in the EMEA region and by a change in the mix of our ads sold in the Americas region.

*Search Revenue*

Search revenue for the year ended December 31, 2012 increased by 2 percent compared to 2011. Search revenue increased due to increased search revenue in the Americas region which resulted from an increase in sponsored searches on Yahoo! Properties, as well as higher revenue per search. The increase was partially offset by decreased search revenue in the EMEA region and other markets due to the required change in revenue presentation for transitioned markets from a gross to a net (after TAC) basis.

For the year ended December 31, 2012, Paid Clicks and Price-per-Click increased 7 percent and 1 percent, respectively, compared to 2011. The increase in Paid Clicks was primarily attributable to the optimization of the user interface. The increase in Price-per-Click was due to a change in the mix of Paid Clicks on our sponsored listings.

43

Table of Contents

Search revenue for the year ended December 31, 2011 decreased by 41 percent, compared to 2010. Search revenue decreased primarily due to the required change in revenue presentation for transitioned markets from a gross to a net (after TAC) basis, which began in the fourth quarter of 2010, the associated revenue share with Microsoft for the U.S. and Canada, and the loss of an Affiliate in the Asia Pacific region.

For the year ended December 31, 2011, Paid Clicks decreased 25 percent and Price-per-Click increased 6 percent, compared to 2010. The decrease in Paid Clicks and increase in Price-per-Click was primarily attributable to the transition to Microsoft's platform due to differences in the ad serving platform.

*Other Revenue*

Other revenue for the year ended December 31, 2012 decreased by 1 percent, compared to 2011. There was a decrease in fees revenue from certain of our broadband access partnerships and a decline in listings revenue in the Americas region. This decrease was partially offset by an increase in the Americas region due to new and amended partner deals, as well as an increase in royalty revenue resulting from the amended TIPLA agreement.

Other revenue for the year ended December 31, 2011 decreased by 4 percent, compared to 2010. The decrease was attributable to changes in certain of our broadband access partnerships, our shift from a fee-paying user structure to other fee structures, and to the divestiture of certain business lines during the year ended December 31, 2010. In addition, revenue from other premium services declined year-over-year as we continue to outsource various offerings to commercial partners.

### Revenue ex-TAC by segment

*Americas*

Americas revenue ex-TAC for the year ended December 31, 2012 increased $136 million, or 4 percent, compared to 2011. Our year-over-year increase in Americas revenue ex-TAC was primarily attributable to increased search revenue ex-TAC from increases in sponsored search on Yahoo! Properties, which was partially offset by a decline in display revenue ex-TAC.

Americas revenue ex-TAC for the year ended December 31, 2011 decreased $325 million, or 9 percent, compared to 2010. Search revenue ex-TAC decreased year-over-year due to the revenue share with Microsoft associated with the Search Agreement as well as declines in our Affiliate search revenue as a result of the Microsoft transition. Display revenue ex-TAC decreased year-over-year due to declines in guaranteed advertising. Other revenue decreased year-over-year due to changes in certain of our broadband access partnerships, a shift from a fee-paying user structure to other fee structures, and the divestiture of certain business lines during the year ended December 31, 2010.

Revenue ex-TAC in the Americas accounted for approximately 73 percent of total revenue ex-TAC for the year ended December 31, 2012, compared to 72 percent and 76 percent in 2011 and 2010, respectively.

*EMEA*

EMEA revenue ex-TAC for the year ended December 31, 2012 decreased $50 million, or 12 percent, compared to 2011. The year-over-year declines in EMEA revenue ex-TAC were primarily related to decreased search and display revenue ex-TAC. Search revenue ex-TAC declined due to the revenue share with Microsoft associated with the Search Agreement. Display revenue ex-TAC on Yahoo! Properties also declined due to a decrease in guaranteed advertising related to a decline in supply which was partially offset by increased pricing.

EMEA revenue ex-TAC for the year ended December 31, 2011 increased $39 million, or 10 percent, compared to 2010. Our year-over-year increase in revenue ex-TAC was primarily driven by increases in our display advertising business and the favorable effects of foreign currency exchange rate fluctuations.

44

**Table of Contents**

Revenue ex-TAC in EMEA accounted for approximately 8 percent of total revenue ex-TAC for the year ended December 31, 2012, compared to 9 percent and 8 percent in 2011 and 2010, respectively.

*Asia Pacific*

Asia Pacific revenue ex-TAC for year ended December 31, 2012 was flat compared to 2011 due to an increase in display revenue ex-TAC offset by a decline in search revenue ex-TAC.

Asia Pacific revenue ex-TAC for the year ended December 31, 2011 increased $79 million, or 11 percent, compared to 2010. The increase in Asia Pacific revenue ex-TAC was primarily driven by an increase in our display advertising business, fee-based services and the favorable effects of foreign currency exchange rate fluctuations.

Revenue ex-TAC in Asia Pacific accounted for approximately 19 percent of total revenue ex-TAC for the year ended December 31, 2012, compared to 19 percent and 16 percent in 2011 and 2010, respectively.

### Direct Costs by Segment

*Americas*

For the year ended December 31, 2012, direct costs attributable to the Americas segment increased $37 million, or 5 percent, compared to 2011. The increase in direct costs was primarily due to higher compensation and content costs partially offset by lower marketing costs and bandwidth and other cost of revenue.

For the year ended December 31, 2011, direct costs attributable to the Americas segment decreased $9 million, or 1 percent, compared to 2010. The decrease was primarily due to lower compensation and marketing costs partially offset slightly by higher content costs.

*EMEA*

For the year ended December 31, 2012, direct costs attributable to the EMEA segment decreased $4 million, or 2 percent, compared to 2011. The decline was primarily due to decreased compensation costs and marketing expenses in the region. This was partially offset by increased content costs in the region.

For the year ended December 31, 2011, direct costs attributable to the EMEA segment increased $16 million, or 11 percent, compared to 2010. The increase was primarily due to higher compensation costs driven by higher headcount and an increase in content costs.

*Asia Pacific*

For year ended December 31, 2012, direct costs attributable to the Asia Pacific segment decreased $1 million, or 1 percent, compared to 2011. The decrease was primarily due to decreased marketing expenses offset by higher bandwidth and other cost of revenue.

For the year ended December 31, 2011, direct costs attributable to the Asia Pacific segment increased $50 million, or 28 percent, compared to 2010. The increase was primarily due to higher compensation costs driven by higher headcount and an increase in bandwidth and other cost of revenue.

Table of Contents

### Operating costs and expenses

*Traffic Acquisition Costs for Non-transitioned Search Markets and All Display Markets*

TAC consists of payments made to third-party entities that have integrated our advertising offerings into their Websites or other offerings and payments made to companies that direct consumer and business traffic to Yahoo! Properties. We enter into agreements of varying duration that involve TAC. There are generally two economic structures of the Affiliate agreements: fixed payments based on a guaranteed minimum amount of traffic delivered, which often carry reciprocal performance guarantees from the Affiliate, or variable payments based on a percentage of our revenue or based on a certain metric, such as number of searches or paid clicks. We expense TAC under two different methods. Agreements with fixed payments are expensed ratably over the term the fixed payment covers, and agreements based on a percentage of revenue, number of searches, or other metrics are expensed based on the volume of the underlying activity or revenue multiplied by the agreed-upon price or rate.

TAC for the year ended December 31, 2012 decreased $84 million, or 14 percent, compared to 2011. The decrease for the year ended December 31, 2012, compared to 2011, was primarily attributable to the required change in the presentation of TAC in EMEA associated with the transition of paid search in the EMEA region to Microsoft's search platform. This decline was partially offset by an increase in display TAC in the Americas region resulting from an acquisition we completed in the fourth quarter of 2011.

TAC for the year ended December 31, 2011 decreased $1.1 billion, or 65 percent, compared to 2010. The decrease for the year ended December 31, 2011, compared to 2010, was primarily due to the required change in the presentation of TAC in the fourth quarter of 2010 due to the Search Agreement with Microsoft as we no longer incur TAC for transitioned markets. In addition, the decrease in TAC for the year ended December 31, 2011, compared to 2010, was due to the loss of an Affiliate in the Asia Pacific region in late 2010.

*Cost of Revenue—Other*

Cost of revenue—other consists of bandwidth costs, and other expenses associated with the production and usage of Yahoo! Properties, including amortization of acquired intellectual property rights and developed technology. Cost of revenue—other also includes costs for Yahoo!'s technology platforms and infrastructure, including depreciation expense and other operating costs, directly related to revenue generating activities.

Cost of revenue—other increased $118 million, or 12 percent, for the year ended December 31, 2012, compared to 2011. The increase for the year ended December 31, 2012, compared to 2011, was primarily attributable to increases of $67 million in bandwidth costs, $38 million in content costs, and $10 million in incremental depreciation of server equipment.

Cost of revenue—other increased $38 million, or 4 percent, for the year ended December 31, 2011, compared to 2010. The increase for the year ended December 31, 2011, compared to 2010, was due to increased bandwidth costs.

*Sales and Marketing*

Sales and marketing expenses consist primarily of advertising and other marketing-related expenses, compensation-related expenses (including stock-based compensation expense), sales commissions, and travel costs.

Sales and marketing expenses for the year ended December 31, 2012 decreased $21 million, or 2 percent, as compared to 2011. The year-over-year decrease was primarily due to a decline in marketing and public relations expenses as well as a decline in third-party service provider expenses. This was offset by higher salaries of $29 million and higher stock-based compensation expense of $14 million in the sales and marketing function. The increase in salaries was due to higher sales commissions. The increase in stock-based compensation expense was due primarily to increased award grants and vesting accelerations upon executive terminations.

46

**Table of Contents**

Sales and marketing expenses for the year ended December 31, 2011 decreased $142 million, or 11 percent, as compared to 2010. The year-over-year decrease was primarily due to decreased marketing-related expenses. Marketing-related expenses decreased during the year ended December 31, 2011, compared to 2010, due to the launch of various 2010 marketing campaigns, including our global branding campaign, for which there were no similar campaigns in 2011. The decrease in the sales and marketing function was also attributable to a decline in both sales commissions and third-party service provider expenses.

*Product Development*

Product development expenses consist primarily of compensation-related expenses (including stock-based compensation expense) incurred for the development of, enhancements to and maintenance of Yahoo! Properties, classification and organization of listings within Yahoo! Properties, research and development, and Yahoo!'s technology platforms and infrastructure. Depreciation expense and other operating costs are also included in product development.

Product development expenses for the year ended December 31, 2012 decreased $34 million, or 4 percent, as compared to 2011. For the year ended December 31, 2012, the decline was primarily attributable to a decline in salaries of $22 million and a decline in stock based compensation expense of $10 million in the product development function as a result of reduced headcount related to the Q2'12 Restructuring Plan described below.

Product development expenses for the year ended December 31, 2011 decreased $109 million, or 11 percent, as compared to 2010. The decrease in product development expenses was primarily due to decreased stock-based compensation expense and the capitalization of otherwise expensed compensation costs in product development associated with increased efforts in the development of our technology platform and specific products. The decrease in stock-based compensation expense was primarily due to increased cancellations for stock options and increased forfeitures for stock-based awards in the year ended December 31, 2011, compared to 2010.

*General and Administrative*

General and administrative expenses consist primarily of compensation-related expenses (including stock-based compensation expense) related to other corporate departments and fees for professional services.

General and administrative expenses for the year ended December 31, 2012 increased $43 million, or 9 percent, as compared to 2011. The increase in the general and administrative function was due to increases of $16 million in professional services expense, $19 million in legal costs associated with the closure of our Korea business, and $12 million in stock-based compensation expense primarily due to vesting accelerations upon executive terminations.

General and administrative expenses for the year ended December 31, 2011 increased $10 million, or 2 percent, as compared to 2010. The increase was primarily due to increases in stock-based compensation expense, professional services expense, and travel and entertainment expense for the year ended December 31, 2011, compared to the prior year.

*Amortization of Intangibles*

We have purchased, and expect to continue purchasing, assets and/or businesses, which may include the purchase of intangible assets. Amortization of developed technology and acquired intellectual property rights is included in the cost of revenue and not in amortization of intangibles.

Amortization of intangibles for the year ended December 31, 2012 increased $2 million, or 7 percent, as compared to 2011. The year-over-year increase in amortization of intangibles from 2012 to 2011 was primarily driven by the inclusion of intangibles related to an acquisition in the fourth quarter of 2011. This is offset by a decrease in amortization expense for fully amortized assets acquired in prior years.

47

**Table of Contents**

Amortization of intangibles for the year ended December 31, 2011 increased $2 million, or 6 percent, as compared to 2010. The year-over-year increase in amortization of intangibles from 2011 to 2010 was primarily driven by additional amortization expense incurred due to the inclusion of intangibles related to an acquisition in the fourth quarter of 2011.

***Restructuring Charges, Net.*** For the years ended December 31, 2010, 2011, and 2012, restructuring charges, net was comprised of the following (dollars in thousands):

| | Year Ended December 31, 2010 Restructuring Plans Prior to 2012 | Year Ended December 31, 2011 Restructuring Plans Prior to 2012 | Year Ended December 31, 2012 | | | |
| | | | Restructuring Plans Prior to 2012 | Q2'12 Restructuring Plan | Q4'12 Korea Business Closure | Total |
|---|---|---|---|---|---|---|
| Employee severance pay and related costs | $ 39,652 | $ 12,965 | $ 1,169 | $ 96,537 | $ 4,998 | $102,704 |
| Non-cancelable lease, contract terminations, and other charges | 19,737 | 10,251 | 8,462 | 9,541 | 8,996 | 26,999 |
| Other non-cash charges, net | 2,779 | 990 | — | 40,462 | 69,434 | 109,896 |
| Sub-total before (reversals) accelerations of stock-based compensation expense | 62,168 | 24,206 | 9,631 | 146,540 | 83,428 | 239,599 |
| (Reversals) accelerations of stock-based compensation expense | (4,211) | 214 | — | (3,429) | — | (3,429) |
| Restructuring charges, net | $ 57,957 | $ 24,420 | $ 9,631 | $ 143,111 | $ 83,428 | $236,170 |

*Restructuring Plans Prior to 2012.* Prior to 2012, we implemented workforce reductions, a strategic realignment, and consolidation of certain real estate facilities and data centers to reduce our cost structure, align resources with our product strategy and improve efficiency. During the year ended December 31, 2010, we incurred total pre-tax cash charges of $59 million in severance, facility and other related costs, net of reversal for adjustments to original estimates totaling $9 million. In addition to the pre-tax cash charges, we recorded a non-cash charge of $3 million related to asset impairment and a $4 million credit related to non-cash stock-based compensation expense reversals for unvested stock awards that were forfeited. Of the $58 million in restructuring charges, net, recorded in the year ended December 31, 2010, $39 million related to the Americas segment, $17 million related to the EMEA segment and $2 million related to the Asia Pacific segment. During the year ended December 31, 2011, we incurred total pre-tax cash charges of $23 million in severance, facility and other related costs, net of reversal for adjustments to original estimates totaling $12 million. In addition to the pre-tax cash charges, we recorded a non-cash charge of $1 million related to asset impairment. Of the $24 million in restructuring charges, net recorded in the year ended December 31, 2011, $22 million related to the Americas segment, $1 million related to the EMEA segment and $1 million related to the Asia Pacific segment.

48

**Table of Contents**

During the year ended December 31, 2012, we recorded total pre-tax cash charges of $10 million in severance, facility, and other related costs, net of reversal for adjustments to original estimates totaling $5 million. The majority of the $10 million in restructuring charges, net recorded in the year ended December 31, 2012, related to the Americas segment.

As of December 31, 2012, the aggregate outstanding restructuring liability related to the Restructuring Plans Prior to 2012 was $28 million, most of which relates to non-cancelable lease costs that we expect to pay over the terms of the related obligations, which extend to the second quarter of 2017.

*Q2'12 Restructuring Plan.* During the second quarter of 2012, we began implementing the Q2'12 Restructuring Plan to reduce our worldwide workforce by approximately 2,000 employees and to consolidate certain real estate and data center facilities. During the year ended December 31, 2012, we recorded total pre-tax cash charges of $139 million in severance and facility related costs and $40 million in non-cash facility and other asset impairment charges. The total pre-tax charges were offset by changes to original estimates of $33 million in severance related costs recognized throughout 2012, primarily as a result of redeployments and voluntary resignations of employees prior to their planned severance dates and a $3 million credit related to non-cash stock-based compensation expense reversals for unvested stock awards that were forfeited. Of the $143 million in restructuring charges, net recorded in the year ended December 31, 2012, $93 million related to the Americas segment, $46 million related to the EMEA segment, and $4 million related to Asia Pacific segment.

As of December 31, 2012, the aggregate outstanding restructuring liability related to the Q2'12 Restructuring Plan was $35 million, most of which relates to severance-related costs that we expect to be substantially paid by the fourth quarter of 2013. The remaining liability relates to non-cancelable lease costs that we expect to pay over the terms of the related obligations, which extend to the fourth quarter of 2021.

*Q4'12 Korea Business Closure.* During the fourth quarter of 2012, we decided to close our Korea business to streamline our operations and focus our resources. During the year ended December 31, 2012, we incurred total pre-tax cash charges of $13 million in severance and contract termination costs. In addition to the pre-tax cash charges, we recorded a non-cash charge of $86 million related to goodwill and other asset impairments and a non-cash credit of approximately $16 million related to the reversal of previously recorded cumulative foreign currency translation adjustment. As a result, we recorded a net $83 million in restructuring charges, which all related to the Asia Pacific segment, for the year ended December 31, 2012.

As of December 31, 2012, the aggregate outstanding restructuring liability related to the Q4'12 Korea Business Closure was $10 million, most of which relates to contract termination costs that we expect to be substantially paid by the second quarter of 2013.

See Note 14—"Restructuring charges, net" in the Notes to our consolidated financial statements for additional information.

***Other Income, Net.*** Other income, net was as follows (dollars in thousands):

| | Years Ended December 31, | | | 2010-2011 Dollar Change | 2011-2012 Dollar Change |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | | |
| Interest and investment income | $ 23,062 | $18,920 | $ 41,673 | $ (4,142) | $ 22,753 |
| Gain on sale of Zimbra, Inc. | 66,130 | — | — | (66,130) | — |
| Gain on sale of HotJobs | 186,345 | — | — | (186,345) | — |
| Gain related to the sale of Alibaba Group Shares | — | — | 4,603,322 | — | 4,603,322 |
| Other | 22,332 | 8,255 | 2,844 | (14,077) | (5,411) |
| Total other income, net | $297,869 | $27,175 | $4,647,839 | $ (270,694) | $ 4,620,664 |

49

**Table of Contents**

Interest and investment income consists of income earned from cash in bank accounts, investments made in marketable debt securities, money market funds, and dividend income on the Alibaba Group Preference Shares.

In February 2010, we sold Zimbra, Inc., for net proceeds of $100 million and recorded a pre-tax gain of $66 million. In August 2010, we sold HotJobs for net proceeds of $225 million and recorded a pre-tax gain of $186 million. In September 2012, we recorded a pre-tax gain of approximately $4.6 billion related to the sale of Alibaba Group Shares. See Note 8—"Investments in Equity Interests" for additional information.

Other consists of gains and losses from sales or impairments of marketable debt securities and/or investments in privately held companies, foreign exchange gains and losses due to re-measurement of monetary assets and liabilities denominated in non-functional currencies, foreign exchange gains and losses on balance sheet hedges, and other non-operating items.

Other income, net may fluctuate in future periods due to changes in our average investment balances, changes in interest and foreign exchange rates, changes in the fair value of foreign currency forward contracts, realized gains and losses on investments, and impairments of investments.

***Income Taxes.*** The provision for income taxes for the year ended December 31, 2012 differs from the amount computed by applying the federal statutory income tax rate to income before provision for income taxes and earnings in equity interests as follows (dollars in thousands):

| | **Years Ended December 31,** | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | **(*)** | **2011** | **(*)** | **2012** | **(*)** |
| Income tax at the U.S. federal statutory rate of 35 percent | $ 374,638 | 35% | $289,630 | 35% | $1,824,973 | 35% |
| State income taxes, net of federal benefit | 54,268 | 5% | 4,627 | 1% | 237,637 | 5% |
| Change in valuation allowance | (1,315) | — | (5,975) | (1)% | (82) | — |
| Stock-based compensation expense | 4,404 | — | 18,213 | 2% | 17,703 | — |
| Research tax credits | (10,345) | (1)% | (10,499) | (1)% | — | — |
| Effect of non-U.S. operations | (17,344) | (2)% | (42,806) | (5)% | (135,753) | (3)% |
| Resolution with tax authorities | (159,168) | (14)% | (14,685) | (2)% | (4,711) | — |
| Tax gain in excess of book gain from sales of Zimbra, Inc. and HotJobs due to basis differences | 23,184 | 2% | — | — | — | — |
| Tax restructuring | (43,361) | (4)% | — | — | — | — |
| Other | (3,438) | — | 3,262 | — | 276 | — |
| Provision for income taxes | $ 221,523 | 21% | $241,767 | 29% | $1,940,043 | 37% |

(*)  Percent of income before income taxes and earnings in equity interests.

Significant variances year over year as shown above are further explained as follows:

- In 2012, we made a one-time distribution of foreign earnings resulting in an overall net benefit of approximately $117 million. The benefit is primarily due to excess foreign tax credits. Of the $117 million, $102 million is included above within "effect of non-U.S. operations."

- State taxes were higher in 2010 due to a reduction of deferred tax assets associated with an effective tax rate reduction in California that started in 2011.

- In 2010, we had a favorable resolution of certain issues in an IRS examination of our 2005 and 2006 U.S. federal income tax returns resulting in a reduction of reserves for tax uncertainties and the availability of capital loss carryforwards to offset the tax on the gain from the sales of Zimbra, Inc. and HotJobs.

- During 2010, in connection with tax restructuring activities, we reached a formal agreement with the IRS through a pre-filing agreement to treat certain intercompany bad debts as deductible business expenses on the 2009 federal income tax return.

50

Table of Contents

During the fourth quarter of 2011, we commenced discussions with the IRS Appeals Division to settle the contested adjustments for certain intercompany transfer-pricing matters from the 2005 and 2006 income tax examination. A tentative agreement has been reached and if the matter is resolved on the basis that is currently being discussed with the IRS, then the settlement will not cause us to have tax exposure beyond what has already been provided. We have protested similar transfer-pricing adjustments to our 2007 and 2008 income tax returns. No hearings with the IRS Appeals Division have been held. Our 2009 and 2010 U.S. income tax returns are currently under IRS examination.

As of December 31, 2012, our 2005 through 2008 tax returns are also under various stages of audit by the California Franchise Tax Board. While the Franchise Tax Board has not reached any conclusions on the 2007 and 2008 returns, we have protested the proposed adjustments to the 2005 and 2006 returns. We are also in various stages of examination and appeal in connection with our taxes in foreign jurisdictions, which generally span tax years 2005 through 2010.

While it is difficult to determine when these examinations will be settled or what their final outcomes will be, certain audits in various jurisdictions related to multinational income tax issues are expected to be resolved in the foreseeable future. As a result, it is reasonably possible that the unrecognized tax benefits could be reduced by up to approximately $90 million in the next twelve months. We believe that we have adequately provided for any reasonably foreseeable adjustment and that any settlement will not have a material adverse effect on our consolidated financial position, results of operations, or cash flows. Our gross amount of unrecognized tax benefits as of December 31, 2012 is $727 million, of which $644 million is recorded on the consolidated balance sheets.

The federal research and development credit expired on December 31, 2011. On January 2, 2013, the American Taxpayer Relief Act of 2012 was signed into law. Under this act, the federal research and development credit was retroactively extended for amounts paid or incurred after December 31, 2011 and before January 1, 2014. The effects of these changes in the tax law will result in a tax benefit which will be recognized in the first quarter of 2013, which is the quarter in which the law was enacted.

We may have additional tax liabilities in China related to the sale to Alibaba Group of 523 million ordinary shares of Alibaba Group that took place during the year ended December 31, 2012. Any taxes assessed and paid in China are expected to be ultimately offset and recovered in the U.S.

During the year ended December 31, 2012, tax authorities from the Brazilian State of Sao Paulo assessed certain indirect taxes against our Brazilian subsidiary, Yahoo! do Brasil Internet Ltda., related to online advertising services. The assessment totaling approximately $85 million is for calendar years 2008 and 2009. We currently believe the assessment is without merit. We do not believe that it is probable the assessment will be sustained upon appeal and, accordingly, have not recorded an accrual for the assessment.

***Earnings in Equity Interests.*** Earnings in equity interests for the year ended December 31, 2012 were approximately $676 million, compared to $477 million and $396 million for 2011 and 2010, respectively.

Earnings in equity interests increased during the year ended December 31, 2012 compared to 2011 due to Yahoo Japan and Alibaba Group's continued improved financial performance in the year ended December 31, 2012 despite our reduced ownership interest (24 percent) in the fourth quarter of 2012 for Alibaba Group. Going forward we will record our share of the results of Alibaba Group in the consolidated statements of income based on a reduced percentage of ownership of 24 percent.

Earnings in equity interests increased during the year ended December 31, 2011 compared to 2010 due primarily to Yahoo Japan and Alibaba Group's continued improved financial performance and the recognition of a dilution gain of $25 million, net of tax in the third quarter of 2011, related to our ownership interest in Alibaba Group offset by $33 million in non-cash losses related to the impairment of assets held by Yahoo Japan.

51

Table of Contents

We record our share of the results of earnings in equity interests, one quarter in arrears, within earnings in equity interests in the consolidated statements of income. See Note 8—"Investments in Equity Interests" in the Notes to our consolidated financial statements for additional information.

***Noncontrolling Interests.*** Noncontrolling interests represent the noncontrolling holders' percentage share of income or losses from the subsidiaries in which we hold a majority, but less than 100 percent, ownership interest and the results of which are consolidated in our consolidated financial statements. Noncontrolling interests were approximately $5 million in 2012, compared to $14 million and $13 million in 2011 and 2010, respectively. Noncontrolling interests recorded in 2012, 2011, and 2010 were mainly related to the Yahoo! 7 venture in Australia.

## Liquidity and Capital Resources

As of and for each of the years ended December 31 (dollars in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Cash and cash equivalents | $1,562,390 | $2,667,778 |
| Short-term marketable debt securities | 493,189 | 1,516,175 |
| Long-term marketable debt securities | 474,338 | 1,838,425 |
| Total cash, cash equivalents, and marketable debt securities | $2,529,917 | $6,022,378 |
| Percentage of total assets | 17% | 35% |

| Cash Flow Highlights | 2010 | 2011 | 2012 |
|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 1,240,190 | $ 1,323,806 | $ (281,554) |
| Net cash provided by investing activities | $   509,915 | $   202,362 | $ 3,362,044 |
| Net cash used in financing activities | $(1,501,706) | $(1,455,958) | $(1,979,457) |

Our operating activities for 2010, 2011, and 2012 have generated adequate cash to meet our operating needs.

As of December 31, 2012, we had cash, cash equivalents, and marketable debt securities totaling $6.0 billion, compared to $2.5 billion as of December 31, 2011. The increase was due to cash proceeds, net of fees, of $6.2 billion received from the sale of Alibaba Group Shares and $550 million from the TIPLA payment. This was partially offset by the repurchase of approximately 126 million shares of our outstanding common stock for $2.2 billion during the year ended December 31, 2012 and cash taxes paid of $2.3 billion in 2012 related to the sale of Alibaba Group Shares. After the payment of taxes and fees, net cash proceeds from the Initial Repurchase and the $550 million TIPLA payment were approximately $4.3 billion. We intend to return $3.65 billion of the after-tax proceeds to shareholders. We have returned approximately $2.1 billion to shareholders through share repurchases from May 20, 2012, the date we announced the Repurchase Agreement, through December 31, 2012.

As of December 31, 2011, we had cash, cash equivalents, and marketable debt securities totaling $2.5 billion, compared to $3.6 billion as of December 31, 2010. This was due primarily to the repurchase of approximately 110 million shares of our outstanding common stock for $1.6 billion during the year ended December 31, 2011.

Our foreign subsidiaries held $567 million of our total $6.0 billion of cash and cash equivalents and marketable debt securities as of December 31, 2012. During the year ended December 31, 2012, we recorded the tax effect of a one-time distribution of earnings from certain foreign subsidiaries. We made a one-time repatriation of foreign earnings and return of basis of foreign subsidiaries of $962 million from certain of our consolidated foreign subsidiaries in 2012. After this distribution, cumulative earnings remaining in our consolidated foreign subsidiaries and the related potential tax effect of repatriation is not material to our consolidated financial statements.

52

**Table of Contents**

On October 19, 2012, we entered into a credit agreement (the "Credit Agreement") with Citibank, N.A., as Administrative Agent, and the other lenders party thereto from time to time. The Credit Agreement provides for a $750 million unsecured revolving credit facility for a term of 364 days, subject to extension for additional 364-day periods in accordance with the terms and conditions of the Credit Agreement. We may elect to increase the revolving credit facility by up to $250 million if existing or new lenders provide additional revolving commitments in accordance with the terms of the Credit Agreement. The proceeds from borrowings under the Credit Agreement, if any, are expected to be used for general corporate purposes. Borrowings under the Credit Agreement will bear interest at a rate equal to, at our option, either (a) a customary London interbank offered rate (a "Eurodollar Rate"), or (b) a customary base rate (a "Base Rate"), in each case plus an applicable margin. The applicable margin for borrowings under the Credit Agreement will be based upon the leverage ratio of the Company and range from 1.25 percent to 1.50 percent with respect to Eurodollar Rate borrowings and 0.25 percent to 0.50 percent with respect to Base Rate borrowings. As of December 31, 2012, we were in compliance with the financial covenants in the credit facility and no amounts were outstanding.

We invest excess cash predominantly in marketable debt securities, money market funds, and time deposits that are liquid, highly rated, and the majority of which have effective maturities of less than one year. Our marketable debt and equity securities are classified as available-for-sale and are reported at fair value, with unrealized gains and losses, net of tax, recorded in accumulated other comprehensive income. Realized gains or losses and declines in value judged to be other-than-temporary, if any, on available-for-sale securities are reported in other income, net. The fair value for securities is determined based on quoted market prices of the historical underlying security or from readily available pricing sources for the identical underlying securities that may not be actively traded as of the valuation date. As of December 31, 2012, certain of our marketable debt securities had a fair value below cost due primarily to the changes in market rates of interest and yields on these securities. We evaluate these investments periodically for possible other-than-temporary impairment. We have no current requirement or intent to sell these securities. We expect to recover up to (or beyond) the initial cost of the investment.

We monitor our exposure to European markets, and as of December 31, 2012 we do not have any material direct exposure to European sovereign debt securities. We invest a portion of excess operating cash in money market funds denominated in Euros and British pounds, and through some of these funds we may have immaterial indirect exposure to high-credit quality European sovereign debt securities.

We currently hedge our net investment in Yahoo Japan with forward contracts to reduce the risk that our investment in Yahoo Japan will be adversely affected by foreign currency exchange rate fluctuations. The forward contracts are required to be settled in cash and the amount of cash payment we receive or could be required to pay upon settlement could be material.

We expect to continue to evaluate possible acquisitions of, or strategic investments in, businesses, products, and technologies that are complementary to our business, which acquisitions and investments may require the use of cash.

We expect to generate positive cash flows from operations in 2013. We use cash generated by operations as our primary source of liquidity, since we believe that internally generated cash flows are sufficient to support our business operations and capital expenditures. We believe that existing cash, cash equivalents, and investments in marketable debt securities, together with any cash generated from operations and borrowings under the Credit Agreement, will be sufficient to meet normal operating requirements including capital expenditures for the next twelve months.

See Note 2—"Investments and Fair Value Measurements" in the Notes to our consolidated financial statements for additional information.

53

Table of Contents

*Cash flow changes*

Cash provided by operating activities is driven by our net income, adjusted for non-cash items, working capital changes and dividends received from equity investees. Non-cash adjustments include depreciation, amortization of intangible assets, stock-based compensation expense, non-cash restructuring charges, tax benefits from stock-based awards, excess tax benefits from stock-based awards, deferred income taxes, and earnings in equity interests. We had a net use of cash in the year ended December 31, 2012 primarily due to a cash tax payment of $2.3 billion related to the sale of Alibaba Group Shares. Offsetting this use, we generated adjusted EBITDA of $1.7 billion, received a payment from Alibaba Group of $550 million in satisfaction of certain future royalty payments, and received dividends from Yahoo Japan of $84 million. Cash provided by operating activities was higher than net income in the year ended December 31, 2011 mainly due to non-cash items included in net income. Cash provided by operating activities was slightly lower than net income in the year ended December 31, 2010 due to non-cash items included in net income and changes in working capital, including lower collections on accounts receivable, higher tax payments, and Microsoft reimbursements not yet received as cash.

Cash provided by investing activities is primarily attributable to capital expenditures, purchases, sales and maturities of marketable debt securities, purchases of intangible assets, sales of other assets, as well as acquisitions including our strategic investments. Our capital expenditures, including capitalized software and labor, totaled $506 million in 2012, $593 million in 2011, and $714 million in 2010. Our capital expenditures have been primarily used for purchases and internal development of software to support our offerings and our increased number of users as well as the build out of our owned and operated data centers. During the year ended December 31, 2012, we utilized approximately $2.4 billion for net purchases of marketable debt securities which was offset by cash proceeds, net of fees, of $6.2 billion received from the sale of our Shares to Alibaba Group. In each of 2011 and 2010, we received net proceeds from sales, maturities, and purchases of marketable debt securities of $1.1 billion. In 2010, we received net proceeds of $325 million from sales of divested businesses for which there were no similar transactions in 2011. We invested a net $6.0 million in acquisitions in 2012, compared to $324 million and $157 million in 2011 and 2010, respectively. Acquisition investments in 2011 included the cash outlay for an acquisition in the Americas region.

Cash used in financing activities is driven by stock repurchases offset by employee stock option exercises and employee stock purchases. Our cash proceeds from employee option exercises and employee stock purchases made through our employee stock purchase plan were $218 million in 2012, compared to $156 million and $167 million in 2011 and 2010, respectively. During the year ended December 31, 2012, we used approximately $2.2 billion in the direct repurchase of 126 million shares of common stock at an average price of $17.20 per share and $61 million for tax withholding payments related to net share settlements of restricted stock units. During the year ended December 31, 2011, we used approximately $1.6 billion in the direct repurchase of 110 million shares of common stock at an average price of $14.75 per share and $45 million for tax withholding payments related to net share settlements of restricted stock units. During the year ended December 31, 2010, we used approximately $1.7 billion in the direct repurchase of 119 million shares of common stock at an average price of $14.68 per share and $49 million for tax withholding payments related to net share settlements of restricted stock units and tax withholding-related reacquisition of shares of restricted stock. In 2012, 2011, and 2010, $36 million, $71 million, and $131 million, respectively, of excess tax benefits from stock-based awards for options exercised in current and prior periods were included as a source of cash flows from financing activities. These excess tax benefits represent the reduction in income taxes otherwise payable during the period, attributable to the actual gross tax benefits in excess of the expected tax benefits for options exercised in current and prior periods. We have accumulated excess tax deductions relating to stock options exercised prior to January 1, 2006 available to reduce income taxes otherwise payable. To the extent such deductions reduce income taxes payable in the current year, they are reported as financing activities in the consolidated statements of cash flows. See Note 13—"Employee Benefits" in the Notes to our consolidated financial statements for additional information.

54

Table of Contents

*Stock repurchases*

In June 2010, the Board authorized a stock repurchase program allowing us to repurchase up to $3 billion of our outstanding shares of common stock from time to time. That repurchase program, which by its terms would have expired in June 2013, was exhausted during the third quarter of 2012. In May 2012, the Board authorized a stock repurchase program allowing us to repurchase up to an additional $5 billion of our outstanding shares of common stock from time to time (this amount includes the $3.65 billion we committed to return to our shareholders from the Initial Repurchase proceeds). The May 2012 repurchase program, according to its terms, will expire in June 2015 unless revoked earlier by the Board. Repurchases under the repurchase programs may take place in the open market or in privately negotiated transactions, including derivative transactions, and may be made under a Rule 10b5-1 plan. During the year ended December 31, 2012, we repurchased approximately 126 million shares of our common stock under the June 2010 and May 2012 stock repurchase programs at an average price of $17.20 per share for a total of approximately $2.2 billion.

*Shares available for repurchase*

|  | October 2006 Program | June 2010 Program | May 2012 Program | Total |
|---|---|---|---|---|
|  |  | (dollars in millions) |  |  |
| January 1, 2010 | $ 973 | $ — | $ — | $ 973 |
| Authorized Share Repurchase amount under June 2010 Program |  | 3,000 | — | 3,000 |
| Total 2010 Repurchases | (973) | (776) | — | (1,749) |
| December 31, 2010 | $ — | $ 2,224 | $ — | $ 2,224 |
| Total 2011 Repurchases | — | (1,619) | — | (1,619) |
| December 31, 2011 | $ — | $ 605 | $ — | $ 605 |
| Authorized Share Repurchase amount under May 2012 Program | — | — | 5,000 | 5,000 |
| Total 2012 Repurchases | — | (605) | (1,562) | (2,167) |
| December 31, 2012 | $ — | $ — | $ 3,438 | $ 3,438 |

*Capital expenditures*

Capital expenditures are generally comprised of purchases of computer hardware, software, server equipment, furniture and fixtures, real estate, and capitalized software and labor. Capital expenditures, net were $714 million, $593 million and $506 million in 2010, 2011, and 2012, respectively.

*Contractual obligations and commitments*

The following table presents certain payments due under contractual obligations with minimum firm commitments as of December 31, 2012 (dollars in millions):

|  | Payments Due by Period | | | | |
|---|---|---|---|---|---|
|  | Total | Due in 2013 | Due in 2014-2015 | Due in 2016-2017 | Thereafter |
| Operating lease obligations[1] | $ 438 | $135 | $ 188 | $ 77 | $ 38 |
| Capital lease obligation[2] | 55 | 9 | 16 | 17 | 13 |
| Affiliate commitments[3] | 76 | 76 | — | — | — |
| Non-cancelable obligations[4] | 178 | 98 | 49 | 13 | 18 |
| Uncertain tax positions, including interest and penalties[5] | 694 | — | — | — | 694 |
| Total contractual obligations | $1,441 | $318 | $ 253 | $ 107 | $ 763 |

[1]  We have entered into various non-cancelable operating lease agreements for our offices throughout the Americas, EMEA, and Asia Pacific regions with original lease periods up to 12 years, expiring between 2012 and 2022. See Note 11—"Commitments and Contingencies" in the Notes to the consolidated financial statements for additional information.

55

Table of Contents

(2) During the year ended December 31, 2008, we entered into an 11 year lease agreement for a data center in the western U.S. Of the total expected minimum lease commitment of $105 million, $21 million was classified as an operating lease for real estate and $84 million was classified as a capital lease for equipment.

(3) We are obligated to make minimum payments under contracts to provide sponsored search and/or display advertising services to our Affiliates, which represent TAC.

(4) We are obligated to make payments under various arrangements with vendors and other business partners, principally for marketing, bandwidth, and content arrangements.

(5) As of December 31, 2012, unrecognized tax benefits and potential interest and penalties resulted in accrued liabilities of $694 million, classified as deferred and other long-term tax liabilities, net on our consolidated balance sheets. As of December 31, 2012, the settlement period for the $694 million income tax liabilities cannot be determined. See Note 15—"Income Taxes" in the Notes to our consolidated financial statements for additional information.

*Intellectual Property Rights.* We are committed to make certain payments under various intellectual property arrangements of up to $31 million through 2023.

*Other Commitments.* In the ordinary course of business, we may provide indemnifications of varying scope and terms to customers, vendors, lessors, joint ventures and business partners, purchasers of assets or subsidiaries and other parties with respect to certain matters, including, but not limited to, losses arising out of the our breach of agreements or representations and warranties made by us, services to be provided by us, intellectual property infringement claims made by third parties or, with respect to the sale of assets or a subsidiary, matters related to our conduct of the business and tax matters prior to the sale. In addition, we have entered into indemnification agreements with our directors and certain of our officers that will require us, among other things, to indemnify them against certain liabilities that may arise by reason of their status or service as directors or officers. We have also agreed to indemnify certain former officers, directors, and employees of acquired companies in connection with the acquisition of such companies. We maintain director and officer insurance, which may cover certain liabilities arising from its obligation to indemnify our directors and officers, and former directors and officers of acquired companies, in certain circumstances. It is not possible to determine the aggregate maximum potential loss under these indemnification agreements due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each particular agreement. Such indemnification agreements might not be subject to maximum loss clauses. Historically, we have not incurred material costs as a result of obligations under these agreements and it has not accrued any liabilities related to such indemnification obligations in our consolidated financial statements.

### Off Balance Sheet Arrangements

As of December 31, 2012, we did not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. Accordingly we are not exposed to any financing, liquidity, market, or credit risk that could arise if we had engaged in such relationships. In addition, we identified no variable interests currently held in entities for which we are the primary beneficiary. In addition, as of December 31, 2012, we had no off-balance sheet arrangements that have, or are reasonably likely to have, a current or future material effect on our consolidated financial condition, results of operations, liquidity, capital expenditures or capital resources.

### Critical Accounting Policies and Estimates

Our discussion and analysis of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires us to make estimates, judgments, and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses, and the related disclosure of contingent assets and

56

Table of Contents

liabilities. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about, among other things, the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates.

An accounting policy is considered to be critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time the estimate is made, and if different estimates that reasonably could have been used, or changes in the accounting estimate that are reasonably likely to occur, could materially impact the consolidated financial statements. We believe that the following critical accounting policies reflect the more significant estimates and assumptions used in the preparation of our consolidated financial statements.

Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of our Board, and the Audit Committee has reviewed the disclosure below. In addition, there are other items within our financial statements that require estimation, but are not deemed critical as defined above. Changes in estimates used in these and other items could have a material impact on our consolidated financial statements.

*Revenue Recognition.* Our revenue is generated from display, search, and other. Display revenue is generated from the display of graphical advertisements and search revenue is generated from the display of text-based links to an advertiser's Website and from revenue sharing arrangements with partners for search technology and services. Other revenue consists of listings-based services revenue, transaction revenue, and fees revenue. While the majority of our revenue transactions contain standard business terms and conditions, there are certain transactions that contain non-standard business terms and conditions. In addition, we enter into certain sales transactions that involve multiple elements (arrangements with more than one deliverable). We also enter into arrangements to purchase goods and/or services from certain customers. As a result, significant contract interpretation is sometimes required to determine the appropriate accounting for these transactions including: (1) whether an arrangement exists; (2) whether fees are fixed or determinable; (3) how the arrangement consideration should be allocated among potential multiple elements; (4) establishing selling prices for deliverables considering multiple factors; (5) when to recognize revenue on the deliverables; (6) whether all elements of the arrangement have been delivered; (7) whether the arrangement should be reported gross as a principal versus net as an agent; (8) whether we receive a separately identifiable benefit from the purchase arrangements with certain customers for which we can reasonably estimate fair value; and (9) whether the consideration received from a vendor should be characterized as revenue or a reimbursement of costs incurred. In addition, our revenue recognition policy requires an assessment as to whether collection is reasonably assured, which inherently requires us to evaluate the creditworthiness of our customers. Changes in judgments on these assumptions and estimates could materially impact the timing or amount of revenue recognition.

*Income Taxes.* Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes. See Note 15—"Income Taxes" in the Notes to our consolidated financial statements for additional information. We establish reserves for tax-related uncertainties based on estimates of whether, and the extent to which, additional taxes will be due. These reserves are established when we believe that certain positions might be challenged despite our belief that our tax return positions are in accordance with applicable tax laws. We adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit, new tax legislation, or the change of an estimate based on new information. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will affect the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the effect of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest and penalties.

We record a valuation allowance against certain of our deferred income tax assets if it is more likely than not that those assets will not be realized. In evaluating our ability to realize our deferred income tax assets we consider all

57

Table of Contents

available positive and negative evidence, including our operating results, ongoing tax planning, and forecasts of future taxable income on a jurisdiction by jurisdiction basis. In the event we were to determine that we would be able to realize these deferred income tax assets in the future, we would make an adjustment to the valuation allowance, which would reduce the provision for income taxes.

*Goodwill.* Goodwill is not amortized, but is tested for impairment on an annual basis and between annual tests in certain circumstances. The performance of the goodwill impairment test involves a two-step process. The first step involves comparing the fair value of our reporting units to their carrying values, including goodwill. If the carrying value of the reporting unit exceeds its fair value, the second step of the test is performed by comparing the carrying value of the goodwill in the reporting unit to its implied fair value. An impairment charge is recognized for the excess of the carrying value of goodwill over its implied fair value.

Our reporting units are based on geography, either at the operating segment level or one level below operating segments. The fair values of our reporting units are estimated using an average of a market approach and an income approach as this combination is deemed to be the most indicative of our fair value in an orderly transaction between market participants and is consistent with the methodology used for the goodwill impairment test in prior years. In addition, we ensure that the fair values estimated under these two approaches are comparable with each other. Under the market approach, we utilize publicly-traded comparable company information to determine revenue and earnings multiples that are used to value our reporting units adjusted for an estimated control premium. Under the income approach, we determine fair value based on estimated future cash flows of each reporting unit discounted by an estimated weighted-average cost of capital, reflecting the overall level of inherent risk of a reporting unit and the rate of return an outside investor would expect to earn. Determining the fair value of a reporting unit is judgmental in nature and requires the use of significant estimates and assumptions, including selection of market comparables, estimated future cash flows, and discount rates.

These components are discussed below:

- **Market comparables**

  We select comparable companies in the specific regions in which our reporting units operate based on similarity of type of business, primarily those involved in online advertising, relative size, financial profile, and other characteristics of those companies compared to our reporting units. Trailing and forward revenue and earnings multiples derived from these comparable companies are applied to financial metrics of each reporting unit to determine their estimated fair values, adjusted for an estimated control premium.

- **Estimated future cash flows**

  We base cash flow projections for each reporting unit using a five-year forecast of cash flows and a terminal value based on the Perpetuity Growth Model. The five-year forecast and related assumptions were derived from the most recent annual financial forecast for which the planning process commenced in our fourth quarter. Key assumptions in estimating future cash flows include, among other items, revenue and operating expense growth rates, terminal value growth rate, and capital expenditure and working capital levels.

- **Discount rates**

  We employ a Weighted Average Cost of Capital ("WACC") approach to determine the discount rates used in our cash flow projections. The determination of the discount rates for each reporting unit includes factors such as the risk-free rate of return and the return an outside investor would expect to earn based on the overall level of inherent risk. The determination of expected returns includes consideration of the beta (a measure of risk) of traded securities of comparable companies and risk premiums of reporting units based on international cost of capital methods.

The sum of the fair values of our reporting units is reconciled to our market capitalization after considering an estimated control premium.

58

**Table of Contents**

We conducted our annual goodwill impairment test as of October 31, 2012 and determined that the fair values of our reporting units exceeded their carrying values and therefore goodwill in those reporting units was not impaired.

Significant management judgment is involved in determining these estimates and assumptions. Changes in these estimates and assumptions could materially affect the determination of fair value for each reporting unit which could trigger future impairment.

*Long-lived Assets.* We amortize long-lived assets over their estimated useful lives. Identifiable long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Determination of recoverability is based on the lowest level of identifiable estimated undiscounted future cash flows resulting from use of the asset and its eventual disposition. Measurement of any impairment loss is based on the excess of the carrying value of the asset over its fair value. Fair value is determined based on the lowest level of identifiable estimated future cash flows using discount rates determined by our management to be commensurate with the risk inherent in our business model. Our estimates of future cash flows attributable to our long-lived assets require significant judgment based on our historical and anticipated results and are subject to many factors. Different assumptions and judgments could materially affect estimated future cash flows relating to our long-lived assets which could trigger impairment. No impairments of long-lived assets were identified during any of the periods presented.

*Investments in Equity Interests.* We account for investments in the common stock of entities in which we have the ability to exercise significant influence but do not own a majority equity interest or otherwise control using the equity method. In accounting for these investments we record our proportionate share of the entities' net income or loss, one quarter in arrears.

We review our investments in equity interests for impairment whenever events or changes in business circumstances indicate that the carrying value of the investment may not be fully recoverable. Investments identified as having an indication of impairment are subject to further analysis to determine if the impairment is other-than-temporary and this analysis requires estimating the fair value of the investment. The determination of fair value of the investment involves considering factors such as the stock prices of public companies in which we have an equity investment, current economic and market conditions, the operating performance of the companies, including current earnings trends and forecasted cash flows, and other company and industry specific information. The fair value determination, particularly for investments in privately-held companies, requires significant judgment to determine appropriate estimates and assumptions. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments and the determination of whether any identified impairment is other-than-temporary.

*Stock-Based Compensation Expense.* We recognize stock-based compensation expense net of an estimated forfeiture rate and therefore only recognize compensation expense for those shares expected to vest over the service period of the award. Calculating stock-based compensation expense requires the input of highly subjective assumptions, including the expected term of the stock-based options, stock price volatility, and the pre-vesting award forfeiture rate. We estimate the expected life of options granted based on historical exercise patterns, which we believe are representative of future behavior. We estimate the volatility of our common stock on the date of grant based on the implied volatility of publicly traded options on our common stock, with a term of one year or greater. We believe that implied volatility calculated based on actively traded options on our common stock is a better indicator of expected volatility and future stock price trends than historical volatility.

Therefore, expected volatility for the year ended December 31, 2012 was based on a market-based implied volatility. The assumptions used in calculating the fair value of stock-based awards represent our best estimates, but these estimates involve inherent uncertainties and the application of management judgment. As a result, if factors change and we use different assumptions, our stock-based compensation expense could be materially different in the future. In addition, we are required to estimate the expected pre-vesting award forfeiture rate, as

59

**Table of Contents**

well as the probability that performance conditions that affect the vesting of certain awards will be achieved, and only recognize expense for those shares expected to vest. We estimate this forfeiture rate based on historical experience of our stock-based awards that are granted and cancelled before vesting. If our actual forfeiture rate is materially different from our original estimates, the stock-based compensation expense could be significantly different from what we have recorded in the current period. Changes in the estimated forfeiture rate can have a significant effect on reported stock-based compensation expense, as the effect of adjusting the forfeiture rate for all current and previously recognized expense for unvested awards is recognized in the period the forfeiture estimate is changed. In addition, because many of our stock-based awards have vesting schedules of two or three year cliff vests, a significant change in our actual or expected forfeiture experience will result in the adjustment of stock-based compensation which was recorded in prior years for all unvested awards. If the actual forfeiture rate is higher than the estimated forfeiture rate, then an adjustment will be made to increase the estimated forfeiture rate, which will result in a decrease to the expense recognized in the consolidated financial statements. If the actual forfeiture rate is lower than the estimated forfeiture rate, then an adjustment will be made to lower the estimated forfeiture rate, which will result in an increase to the expense recognized in the consolidated financial statements. See Note 13—"Employee Benefits" in the Notes to our consolidated financial statements for additional information.

**Recent Accounting Pronouncements**

See Note 1—"The Company and Summary of Significant Accounting Policies" in the Notes to our consolidated financial statements, which is incorporated herein by reference.

**Item 7A.**    *Quantitative and Qualitative Disclosures About Market Risk*

We are exposed to financial market risks, including changes in currency exchange rates and interest rates and changes in the market values of our investments. We may use derivative financial instruments to mitigate certain risks in accordance with our investment and foreign exchange policies. We do not use derivatives or other financial instruments for trading or speculative purposes.

**Interest Rate Exposure**

Our exposure to market risk for changes in interest rates impacts our costs associated with hedging, and primarily relates to our cash and marketable debt securities portfolio. We invest excess cash in money market funds, time deposits, and liquid debt instruments of the U.S. and foreign governments and their agencies, U.S. municipalities, and high-credit corporate issuers which are classified as marketable debt securities and cash equivalents.

Investments in fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectations due to changes in interest rates or we may suffer losses in principal if forced to sell securities that have declined in market value due to changes in interest rates. A hypothetical 100 basis point increase in interest rates would result in a $33 million and $7 million decrease in the fair value of our available-for-sale debt securities as of December 31, 2012 and 2011, respectively.

**Foreign Currency Exposure**

Our foreign currency exposure continues to increase as we grow internationally. The objective of our foreign exchange risk management program is to identify material foreign currency exposures and identify methods to manage these exposures to minimize the potential effects of currency fluctuations on our reported consolidated cash flows and results of operations. Counterparties to our derivative contracts are all major institutions.

We transact business in various foreign currencies and have significant international revenue, as well as costs denominated in foreign currencies. This exposes us to the risk of fluctuations in foreign currency exchange rates.

60

Table of Contents

Our objective is to identify material foreign currency exposures and to manage these exposures to minimize the potential effects of currency fluctuations on our reported consolidated cash flow and results of operations. We had net realized and unrealized foreign currency transaction losses of $1 million for the year ended December 31, 2012. Our net realized and unrealized foreign currency transaction gains were $9 million and $13 million for the years ended December 31, 2011 and 2010, respectively.

We categorize our foreign currency exposure as follows: 1) net investment, 2) balance sheet, and 3) translation.

*Net Investment Exposure.* In December 2012, we began hedging, on an after-tax basis, our net investment in Yahoo Japan with forward contracts to reduce the risk that our investment in Yahoo Japan will be adversely affected by foreign currency exchange rate fluctuations. The forward contracts have maturities ranging from 9 to 15 months. If the Japanese yen appreciates at maturity from the forward contract execution rates, the forward contracts will require us to pay a cash settlement, which may be material. If the Japanese yen depreciates at maturity from the forward contract execution rates, we will receive a cash settlement, which may be material. We have elected to apply net investment hedge accounting and expect the hedges to be effective, allowing changes in fair value of the derivative instrument to be recorded in accumulated other comprehensive income on our consolidated balance sheet. The notional amounts of the foreign currency forward contracts related to our net investment hedge were $3 billion as of December 31, 2012. The fair value of the foreign currency contracts was $3 million as of December 31, 2012 and is included in prepaid expenses and other current assets on the consolidated balance sheet. A gain of $3 million was recorded for the year ended December 31, 2012 and is included in accumulated other comprehensive income on our consolidated balance sheet.

*Balance Sheet Exposure.* We hedge our net recognized foreign currency assets and liabilities with foreign exchange forward contracts to reduce the risk that our earnings and cash flows will be adversely affected by changes in foreign currency exchange rates. These derivative instruments hedge assets and liabilities, including intercompany transactions that are denominated in foreign currencies. The balance sheet hedges are carried at fair value with changes in the fair value recorded in other income, net on our consolidated statements of income. These derivative instruments do not subject us to material balance sheet risk due to exchange rate movements because gains and losses on these derivatives are intended to offset gains or losses on the assets and liabilities being hedged. The notional amounts of the foreign currency forward contracts were $356 million and $92 million as of December 31, 2012 and 2011, respectively. We did not enter into any derivative instruments in fiscal year 2010. The fair value of the foreign currency forward contract liability was $5 million and $3 million as of December 31, 2012 and 2011, respectively, and was recorded as a gain of $4 million and loss of $3 million for the years ended December 31, 2012 and 2011, respectively.

*Translation Exposure.* We are also exposed to foreign exchange rate fluctuations as we convert the financial statements of our foreign subsidiaries and our investments in equity interests into U.S. dollars in consolidation. If there is a change in foreign currency exchange rates, the conversion of the foreign subsidiaries' financial statements into U.S. dollars results in a gain or loss which is recorded as a component of accumulated other comprehensive income which is part of stockholders' equity. We do not hedge our exposure to foreign currency risks arising from translation, except for the Japanese yen forward contracts entered into related to our investment in Yahoo Japan.

A Value-at-Risk ("VaR") sensitivity analysis was performed on all of our foreign currency derivative positions as of December 31, 2012 and December 31, 2011 to assess the potential impact of fluctuations in exchange rates. The VaR model uses a Monte Carlo simulation to generate thousands of random price paths assuming normal market conditions. The VaR is the maximum expected one day loss in fair value, for a given statistical confidence level, to our foreign currency derivative positions due to adverse movements in rates. The VaR model is used as a risk management tool and is not intended to represent either actual or forecasted losses. Based on the results of the model using a 99 percent confidence interval, we estimate the maximum one-day loss in fair value is $2.8 million on the notional value of our balance sheet hedges at December 31, 2012 compared to a $0.7 million loss at December 31, 2011. The maximum one-day loss in fair-value is $27.7 million on the notional value of the net investment hedges at December 31, 2012. There were no net investment hedges outstanding at December 31, 2011.

61

**Table of Contents**

Actual future gains and losses associated with our derivative positions may differ materially from the sensitivity analysis performed as of December 31, 2012 due to the inherent limitations associated with predicting the timing and amount of changes in foreign currency exchange rates and our actual exposures and positions. In addition, the VaR sensitivity analysis may not reflect the complex market reactions that may arise from the market shifts modeled within this VaR sensitivity analysis.

Revenue ex-TAC and related expenses generated from our international subsidiaries are generally denominated in the currencies of the local countries. Primary currencies include Australian dollars, British pounds, Euros, Japanese yen, Korean won, and Taiwan dollars. The statements of income of our international operations are translated into U.S. dollars at exchange rates indicative of market rates during each applicable period. To the extent the U.S. dollar strengthens against foreign currencies, the translation of these foreign currency-denominated transactions results in reduced consolidated revenue and operating expenses. Conversely, our consolidated revenue and operating expenses will increase if the U.S. dollar weakens against foreign currencies. Using the foreign currency exchange rates from the year ended December 31, 2011, revenue ex-TAC for the Americas segment for the year ended December 31, 2012 would have been higher than we reported by $9 million; revenue ex-TAC for the EMEA segment would have been higher than we reported by $17 million; and revenue ex-TAC for the Asia Pacific segment would have been higher than we reported by $7 million. Using the foreign currency exchange rates from the year ended December 31, 2011, direct costs for the Americas segment for the year ended December 31, 2012 would have been higher than we reported by $5 million; direct costs for the EMEA segment would have been higher than we reported by $8 million; and direct costs for the Asia Pacific segment would have been higher than we reported by $2 million.

**Investment Exposure**

We are exposed to investment risk as it relates to changes in the market value of our investments. We have investments in marketable debt securities and equity instruments of public and private companies.

Our cash and marketable debt securities investment policy and strategy attempts primarily to preserve capital and meet liquidity requirements. A large portion of our cash is managed by external managers within the guidelines of our investment policy. We protect and preserve invested funds by limiting default, market, and reinvestment risk. To achieve this objective, we maintain our portfolio of cash and cash equivalents and short-term and long-term investments in a variety of liquid fixed income securities, including both government and corporate obligations and money market funds. As of December 31, 2011 and 2012, net unrealized gains and losses on these investments were not material.

*Alibaba Group Preference Shares Exposure.* To estimate the fair value of the Alibaba Group Preference Shares, we performed benchmarking by comparing the terms and conditions of the Alibaba Group Preference Shares to dividend rates, subordination terms, and credit ratings of those of similar type instruments. The credit rating of Alibaba Group, general business conditions, and market rates could materially affect the fair value of the Alibaba Group Preference Shares.

Table of Contents

**Item 8.**      *Financial Statements and Supplementary Data*

*Index to Consolidated Financial Statements*

|  | **Page** |
|---|---|
| Consolidated Financial Statements: | |
| Report of Independent Registered Public Accounting Firm | 64 |
| Consolidated Balance Sheets as of December 31, 2011 and 2012 | 65 |
| Consolidated Statements of Income for each of the three years in the period ended December 31, 2012 | 66 |
| Consolidated Statements of Comprehensive Income for each of the three years in the period ended December 31, 2012 | 67 |
| Consolidated Statements of Stockholders' Equity for each of the three years in the period ended December 31, 2012 | 68 |
| Consolidated Statements of Cash Flows for each of the three years in the period ended December  31, 2012 | 69 |
| Notes to Consolidated Financial Statements | 70 |
| Financial Statement Schedules: | |
| II—Valuation and Qualifying Accounts for each of the three years in the period ended December  31, 2012 | 113 |
| All other schedules are omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto | |
| Supplementary Financial Data: | |
| Selected Quarterly Financial Data (unaudited) for the two years ended December 31, 2012 | 114 |

63

Table of Contents

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Yahoo! Inc.:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Yahoo! Inc. and its subsidiaries at December 31, 2011 and December 31, 2012, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2012 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

San Jose, California
February 28, 2013

64

Table of Contents

**Yahoo! Inc.**

**Consolidated Balance Sheets**

| | December 31, | |
| | 2011 | 2012 |
|---|---|---|
| | (In thousands, except par values) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,562,390 | $ 2,667,778 |
| Short-term marketable debt securities | 493,189 | 1,516,175 |
| Accounts receivable, net of allowance of $30,142 and $32,635 as of December 31, 2011 and 2012, respectively | 1,037,474 | 1,008,448 |
| Prepaid expenses and other current assets | 359,483 | 460,312 |
| Total current assets | 3,452,536 | 5,652,713 |
| Long-term marketable debt securities | 474,338 | 1,838,425 |
| Alibaba Group Preference Shares | — | 816,261 |
| Property and equipment, net | 1,730,888 | 1,685,845 |
| Goodwill | 3,900,752 | 3,826,749 |
| Intangible assets, net | 254,600 | 153,973 |
| Other long-term assets | 220,628 | 289,130 |
| Investments in equity interests | 4,749,044 | 2,840,157 |
| Total assets | $14,782,786 | $17,103,253 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $    166,595 | $    184,831 |
| Accrued expenses and other current liabilities | 846,044 | 808,475 |
| Deferred revenue | 194,722 | 296,926 |
| Total current liabilities | 1,207,361 | 1,290,232 |
| Long-term deferred revenue | 43,639 | 407,560 |
| Capital lease and other long-term liabilities | 134,905 | 124,587 |
| Deferred and other long-term tax liabilities, net | 815,534 | 675,271 |
| Total liabilities | 2,201,439 | 2,497,650 |
| Commitments and contingencies (Note 11) | — | — |
| Yahoo! Inc. stockholders' equity: | | |
| Preferred stock, $0.001 par value; 10,000 shares authorized; none issued or outstanding | — | — |
| Common stock, $0.001 par value; 5,000,000 shares authorized; 1,244,956 shares issued and 1,217,481 shares outstanding as of December 31, 2011 and 1,189,816 shares issued and 1,115,233 shares outstanding as of December 31, 2012 | 1,242 | 1,187 |
| Additional paid-in capital | 9,825,899 | 9,563,348 |
| Treasury stock at cost, 27,475 shares as of December 31, 2011 and 74,583 shares as of December 31, 2012 | (416,237) | (1,368,043) |
| Retained earnings | 2,432,294 | 5,792,459 |
| Accumulated other comprehensive income | 697,869 | 571,249 |
| Total Yahoo! Inc. stockholders' equity | 12,541,067 | 14,560,200 |
| Noncontrolling interests | 40,280 | 45,403 |
| Total equity | 12,581,347 | 14,605,603 |
| Total liabilities and equity | $14,782,786 | $17,103,253 |

The accompanying notes are an integral part of these consolidated financial statements.

65

**Table of Contents**

**Yahoo! Inc.**

**Consolidated Statements of Income**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2011** | **2012** |
| | (In thousands, except per share amounts) | | |
| Revenue | $6,324,651 | $4,984,199 | $ 4,986,566 |
| Operating expenses: | | | |
| Cost of revenue—Traffic acquisition costs | 1,736,423 | 603,371 | 518,906 |
| Cost of revenue—Other | 945,651 | 983,626 | 1,101,660 |
| Sales and marketing | 1,263,992 | 1,122,193 | 1,101,572 |
| Product development | 1,028,716 | 919,368 | 885,824 |
| General and administrative | 487,762 | 497,288 | 540,247 |
| Amortization of intangibles | 31,626 | 33,592 | 35,819 |
| Restructuring charges, net | 57,957 | 24,420 | 236,170 |
| Total operating expenses | 5,552,127 | 4,183,858 | 4,420,198 |
| Income from operations | 772,524 | 800,341 | 566,368 |
| Other income, net | 297,869 | 27,175 | 4,647,839 |
| Income before income taxes and earnings in equity interests | 1,070,393 | 827,516 | 5,214,207 |
| Provision for income taxes | (221,523) | (241,767) | (1,940,043) |
| Earnings in equity interests | 395,758 | 476,920 | 676,438 |
| Net income | 1,244,628 | 1,062,669 | 3,950,602 |
| Less: Net income attributable to noncontrolling interests | (12,965) | (13,842) | (5,123) |
| Net income attributable to Yahoo! Inc. | $1,231,663 | $1,048,827 | $ 3,945,479 |
| Net income attributable to Yahoo! Inc. common stockholders per share—basic | $    0.91 | $    0.82 | $    3.31 |
| Net income attributable to Yahoo! Inc. common stockholders per share—diluted | $    0.90 | $    0.82 | $    3.28 |
| Shares used in per share calculation—basic | 1,354,118 | 1,274,240 | 1,192,775 |
| Shares used in per share calculation—diluted | 1,364,612 | 1,282,282 | 1,202,906 |
| Stock-based compensation expense by function: | | | |
| Cost of revenue—Other | $    3,275 | $    3,489 | $    10,078 |
| Sales and marketing | 71,154 | 65,120 | 82,115 |
| Product development | 106,665 | 89,587 | 74,284 |
| General and administrative | 42,384 | 45,762 | 57,888 |
| Restructuring expense (reversals) accelerations, net | (4,211) | 214 | (3,429) |

The accompanying notes are an integral part of these consolidated financial statements.

66

Table of Contents

**Yahoo! Inc.**

**Consolidated Statements of Comprehensive Income**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2011** | **2012** |
| | | **(In thousands)** | |
| **Comprehensive income** | | | |
| Net income | $1,244,628 | $1,062,669 | $3,950,602 |
| Available-for-sale securities: | | | |
| Unrealized gains (losses) on available-for-sale securities, net of taxes of $(1,214), $8,518, and $(86) for 2010, 2011, and 2012, respectively | 3,987 | (17,244) | 7,571 |
| Reclassification adjustment for realized (gains) losses on available–for-sale securities included in net income, net of taxes of $116, $(648), and $(5,197) for 2010, 2011, and 2012, respectively | (174) | 972 | 9,088 |
| Net change in unrealized gains (losses) on available-for-sale securities, net of tax | 3,813 | (16,272) | 16,659 |
| Foreign currency translation adjustments: | | | |
| Foreign currency translation adjustments ("CTA"), net of tax | 131,205 | 209,887 | (9,334) |
| Net investment hedge CTA, net of tax | — | — | 3,241 |
| Reclassification adjustments for CTA, net of tax | — | — | (137,186) |
| Net foreign currency translation adjustments, net of tax | 131,205 | 209,887 | (143,279) |
| Other comprehensive income | 135,018 | 193,615 | (126,620) |
| Comprehensive income | 1,379,646 | 1,256,284 | 3,823,982 |
| Less: Comprehensive income attributable to noncontrolling interests | (12,965) | (13,842) | (5,123) |
| Comprehensive income attributable to Yahoo! Inc. | $1,366,681 | $1,242,442 | $3,818,859 |

The accompanying notes are an integral part of these consolidated financial statements.

67

Table of Contents

**Yahoo! Inc.**

**Consolidated Statements of Stockholders' Equity**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2010 | 2011 | 2012 |
| | (In thousands) | | |
| **Common stock** | | | |
| Balance, beginning of year | $ 1,410 | $ 1,306 | $ 1,242 |
| Common stock issued (retired), net | (104) | (64) | (55) |
| Balance, end of year | 1,306 | 1,242 | 1,187 |
| **Additional paid-in capital** | | | |
| Balance, beginning of year | 10,640,367 | 10,109,913 | 9,825,899 |
| Common stock and stock-based awards issued | 167,368 | 156,211 | 218,349 |
| Stock-based compensation expense | 235,558 | 226,270 | 244,653 |
| Tax benefits (detriments) from stock-based awards | 43,119 | 33,497 | (31,440) |
| Tax withholdings related to net share settlements of restricted stock units | (48,600) | (44,593) | (60,939) |
| Retirement of treasury stock | (977,970) | (643,401) | (630,639) |
| Other | 50,071 | (11,998) | (2,535) |
| Balance, end of year | 10,109,913 | 9,825,899 | 9,563,348 |
| **Treasury stock** | | | |
| Balance, beginning of year | (117,331) | — | (416,237) |
| Repurchases of common stock | (1,749,311) | (1,618,741) | (2,167,841) |
| Tax withholdings related to net share settlements of restricted stock awards | (100) | (168) | — |
| Retirement of treasury stock | 1,866,742 | 1,202,672 | 1,216,035 |
| Balance, end of year | — | (416,237) | (1,368,043) |
| **Retained earnings** | | | |
| Balance, beginning of year | 1,599,638 | 1,942,656 | 2,432,294 |
| Net income attributable to Yahoo! Inc. | 1,231,663 | 1,048,827 | 3,945,479 |
| Retirement of treasury stock | (888,645) | (559,189) | (585,314) |
| Balance, end of year | 1,942,656 | 2,432,294 | 5,792,459 |
| **Accumulated other comprehensive income** | | | |
| Balance, beginning of year | 369,236 | 504,254 | 697,869 |
| Net change in unrealized gains (losses) on available-for-sale securities, net of tax | 3,813 | (16,272) | 16,659 |
| Foreign currency translation adjustment, net of tax | 131,205 | 209,887 | (143,279) |
| Balance, end of year | 504,254 | 697,869 | 571,249 |
| Total Yahoo! Inc. stockholders' equity | $12,558,129 | $12,541,067 | $14,560,200 |

| | Number of Outstanding Shares | | |
| --- | --- | --- | --- |
| | (In thousands) | | |
| **Common stock** | | | |
| Balance, beginning of year | 1,406,075 | 1,308,836 | 1,217,481 |
| Common stock and restricted stock issued | 21,946 | 18,371 | 23,773 |
| Repurchases of common stock | (119,179) | (109,716) | (126,021) |
| Tax withholdings related to net share settlements of restricted stock awards | (6) | (10) | — |
| Balance, end of year | 1,308,836 | 1,217,481 | 1,115,233 |

The accompanying notes are an integral part of these consolidated financial statements.

68

**Table of Contents**

**Yahoo! Inc.**

**Consolidated Statements of Cash Flows**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2011** | **2012** |
| | | (In thousands) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 1,244,628 | $ 1,062,669 | $ 3,950,602 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation | 555,216 | 530,516 | 549,235 |
| Amortization of intangible assets | 127,293 | 117,723 | 105,366 |
| Stock-based compensation expense, net | 219,267 | 204,172 | 220,936 |
| Non-cash restructuring charges | 2,813 | 990 | 109,896 |
| Accrued dividend income related to Alibaba Group Preference Shares | — | — | (20,000) |
| Tax benefits (detriments) from stock-based awards | 43,119 | 33,497 | (31,440) |
| Excess tax benefits from stock-based awards | (131,061) | (70,680) | (35,844) |
| Deferred income taxes | 112,582 | 70,392 | (769,320) |
| Earnings in equity interests | (395,758) | (476,920) | (676,438) |
| Dividends received from Yahoo Japan | 60,918 | 75,391 | 83,648 |
| Gain from sale of Alibaba Group Shares | — | — | (4,603,322) |
| (Gain) loss from sales of investments, assets, and other, net | (222,347) | 4,405 | (11,840) |
| Changes in assets and liabilities, net of effects of acquisitions: | | | |
| Accounts receivable, net | (31,419) | 38,100 | 34,752 |
| Prepaid expenses and other | (168,183) | 97,849 | 78,529 |
| Accounts payable | 23,593 | (316) | 12,747 |
| Accrued expenses and other liabilities | (74,505) | (290,070) | 255,799 |
| Deferred revenue | (125,966) | (73,912) | 465,140 |
| Net cash provided by (used in) operating activities | 1,240,190 | 1,323,806 | (281,554) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Acquisition of property and equipment, net | (714,078) | (593,294) | (505,507) |
| Purchases of marketable debt securities | (2,502,652) | (1,708,530) | (3,520,327) |
| Proceeds from sales of marketable debt securities | 1,525,330 | 1,508,948 | 741,947 |
| Proceeds from maturities of marketable debt securities | 2,074,592 | 1,316,197 | 381,403 |
| Proceeds related to sale of Alibaba Group Shares, net | — | — | 6,247,728 |
| Acquisitions, net of cash acquired | (157,442) | (323,830) | (5,716) |
| Purchases of intangible assets | (21,443) | (11,819) | (3,799) |
| Proceeds from sales of divested businesses | 325,000 | | |
| Proceeds from the sale of investments | — | 21,271 | 26,132 |
| Other investing activities, net | (19,392) | (6,581) | 183 |
| Net cash provided by investing activities | 509,915 | 202,362 | 3,362,044 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from issuance of common stock | 167,388 | 156,226 | 218,371 |
| Repurchases of common stock | (1,749,311) | (1,618,741) | (2,167,841) |
| Excess tax benefits from stock-based awards | 131,061 | 70,680 | 35,844 |
| Tax withholdings related to net share settlements of restricted stock awards and restricted stock units | (48,700) | (44,761) | (60,939) |
| Other financing activities, net | (2,144) | (19,362) | (4,892) |
| Net cash used in financing activities | (1,501,706) | (1,455,958) | (1,979,457) |
| Effect of exchange rate changes on cash and cash equivalents | 2,598 | (34,247) | 4,355 |
| Net change in cash and cash equivalents | 250,997 | 35,963 | 1,105,388 |
| Cash and cash equivalents at beginning of year | 1,275,430 | 1,526,427 | 1,562,390 |
| Cash and cash equivalents at end of year | $ 1,526,427 | $ 1,562,390 | $ 2,667,778 |

See Note 8—"Investments in Equity Interests" for information about the non-cash proceeds of $800 million in Alibaba Group Preference Shares.

The accompanying notes are an integral part of these consolidated financial statements.

69

Table of Contents

**Yahoo! Inc.**

**Notes to Consolidated Financial Statements**

**Note 1    THE COMPANY AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*The Company.* Yahoo! Inc., together with its consolidated subsidiaries ("Yahoo!" or the "Company"), is a global technology company focused on making the world's daily habits inspiring and entertaining. The Company provides a variety of products and services, many of them personalized, including search, content, and communication tools—all daily habits for hundreds of millions of users, on the Web and on mobile devices. The majority of the Company's product offerings are available in more than 45 languages and in 60 countries, regions, and territories.

The Company creates value for advertisers and their brands by connecting them with targeted audiences of users through their daily habits. Advertisers can build their businesses through advertising to these targeted audiences on the Company's online properties and services ("Yahoo! Properties"), or through a distribution network of third-party entities ("Affiliates") who integrate the Company's advertising offerings into their Websites or other offerings (those Websites and other offerings, "Affiliate sites").

*Basis of Presentation.* The consolidated financial statements include the accounts of Yahoo! Inc. and its majority-owned or otherwise controlled subsidiaries. All significant intercompany accounts and transactions have been eliminated. Investments in entities in which the Company can exercise significant influence, but does not own a majority equity interest or otherwise control, are accounted for using the equity method and are included as investments in equity interests on the consolidated balance sheets. The Company has included the results of operations of acquired companies from the date of acquisition. Certain prior period amounts have been reclassified to conform to the current period presentation. To conform to the current period presentation, the Company corrected the classification of $55 million and $84 million of costs principally included in product development expenses to cost of revenue—other for the years ended December 30, 2010 and December 31, 2011, respectively.

The preparation of consolidated financial statements in conformity with generally accepted accounting principles ("GAAP") in the United States ("U.S.") requires management to make estimates, judgments, and assumptions that affect the reported amounts of assets, liabilities, revenue, and expenses and the related disclosure of contingent assets and liabilities. On an ongoing basis, the Company evaluates its estimates, including those related to revenue, the useful lives of long-lived assets including property and equipment and intangible assets, investment fair values, stock-based compensation, goodwill, income taxes, contingencies, and restructuring charges. The Company bases its estimates of the carrying value of certain assets and liabilities on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, when these carrying values are not readily available from other sources. Actual results may differ from these estimates.

*Concentration of Risk.* Financial instruments that potentially subject the Company to significant concentration of credit risk consist primarily of cash, cash equivalents, marketable debt securities, accounts receivable, and derivative financial instruments. The primary focus of the Company's investment strategy is to preserve capital and meet liquidity requirements. A large portion of the Company's cash is managed by external managers within the guidelines of the Company's investment policy. The Company's investment policy addresses the level of credit exposure by limiting the concentration in any one corporate issuer or sector and establishing a minimum allowable credit rating. To manage the risk exposure, the Company maintains its portfolio of cash and cash equivalents and short-term and long-term investments in a variety of fixed income securities, including U.S. and foreign government, agency, municipal and highly rated corporate debt obligations and money market funds. The Company's derivative instruments expose the Company to credit risk to the extent that its counterparties may be unable to meet the terms of the agreements. The Company seeks to mitigate this risk by limiting its counterparties to major financial institutions and by spreading the risk across several major financial institutions. In addition, the potential risk of loss with any one counterparty resulting from this type of credit risk is monitored

70

**Table of Contents**

on an ongoing basis. See "Note 9—Derivative Instruments" for additional information related to the Company's derivative instruments. Accounts receivable are typically unsecured and are derived from revenue earned from customers. The Company performs ongoing credit evaluations of its customers and maintains allowances for potential credit losses. Historically, such losses have been within management's expectations. As of December 31, 2011 and 2012, no one customer accounted for 10 percent or more of the accounts receivable balance and no one customer accounted for 10 percent or more of the Company's revenue for 2010, 2011, or 2012. Revenue under the Company's Search and Advertising Services and Sales Agreement (the "Search Agreement") with Microsoft Corporation ("Microsoft") represented more than 10 percent of the Company's revenue during 2011 and 2012.

*Comprehensive Income.* Comprehensive income consists of two components, net income and other comprehensive income. Other comprehensive income refers to revenue, expenses, and gains and losses that under GAAP are recorded as an element of shareholders' equity but are excluded from net income. The Company's other comprehensive income consists of foreign currency translation adjustments from those subsidiaries not using the U.S. dollar as their functional currency, unrealized gains and losses on marketable securities classified as available-for-sale, net changes in fair value of derivative instruments related to our net investment hedges, as well as the Company's share of its equity investees' other comprehensive income.

*Foreign Currency.* The functional currency of the Company's international subsidiaries is evaluated on a case-by-case basis and is often the local currency. The financial statements of these subsidiaries are translated into U.S. dollars using period-end rates of exchange for assets and liabilities, historical rates of exchange for equity, and average rates of exchange for the period for revenue and expenses. Translation gains (losses) are recorded in accumulated other comprehensive income (loss) as a component of stockholders' equity. In addition, the Company records translation gains (losses) related to its foreign equity method investments in accumulated other comprehensive income (loss). The Company records foreign currency transaction gains and losses, realized and unrealized in other income, net in the consolidated statements of income. The Company recorded $13 million and $9 million of net gains in 2010 and 2011, respectively, and $1 million of net losses in 2012.

*Cash and Cash Equivalents, Short- and Long-Term Marketable Debt and Equity Securities.* The Company invests its excess cash in money market funds, time deposits, and liquid debt instruments of the U.S. and foreign governments and their agencies, U.S. municipalities, and high-credit corporate issuers which are classified as marketable debt securities and cash equivalents. All investments with an original maturity of three months or less are considered cash equivalents. Investments with maturities of less than 12 months from the balance sheet date are classified as current assets. Investments with maturities greater than 12 months from the balance sheet date are classified as long-term assets.

Operating cash deposits held with banks may exceed the amount of insurance provided on such deposits. Generally, these deposits may be redeemed upon demand and are maintained with financial institutions with reputable credit and therefore bear minimal credit risk. The Company seeks to mitigate its credit risk by spreading such risk across multiple counterparties and monitoring the risk profiles of these counterparties.

The Company's marketable debt and equity securities are classified as available-for-sale and are reported at fair value, with unrealized gains and losses, net of tax, recorded in accumulated other comprehensive income (loss). Realized gains or losses and declines in value judged to be other-than-temporary, if any, on available-for-sale securities are reported in other income, net. The Company evaluates the investments periodically for possible other-than-temporary impairment. A decline of fair value below amortized costs of debt securities is considered an other-than-temporary impairment if the Company has the intent to sell the security or it is more likely than not that the Company will be required to sell the security before recovery of the entire amortized cost basis. In those instances, an impairment charge equal to the difference between the fair value and the amortized cost basis is recognized in earnings. Regardless of the Company's intent or requirement to sell a debt security, an impairment is considered other-than-temporary if the Company does not expect to recover the entire amortized cost basis; in those instances, a credit loss equal to the difference between the present value of the cash flows expected to be

71

Table of Contents

collected based on credit risk and the amortized cost basis of the debt security is recognized in earnings. The Company has no current requirement or intent to sell a material portion of debt securities as of December 31, 2012. The Company expects to recover up to (or beyond) the initial cost of investment for securities held. In computing realized gains and losses on available-for-sale securities, the Company determines cost based on amounts paid, including direct costs such as commissions to acquire the security, using the specific identification method. During the years ended December 31, 2010, 2011 and 2012, gross realized gains and losses on available-for-sale debt and equity securities were not material.

*Allowance for Doubtful Accounts.* The Company records its allowance for doubtful accounts based upon its assessment of various factors. The Company considers historical experience, the age of the accounts receivable balances, the credit quality of its customers, current economic conditions, and other factors that may affect customers' ability to pay to determine the level of allowance required.

*Derivative Financial Instruments.* The Company uses derivative financial instruments, primarily foreign currency forward contracts, to mitigate certain foreign currency exposures. The Company has designated certain foreign currency forward contracts as net investment hedges, which are accounted for in accordance with ASC 815 "Derivatives and Hedging" ("ASC 815") with the effective portion of changes in fair value recorded in accumulated other comprehensive income on the Company's consolidated balance sheet and any ineffective portion is recorded in other income, net on the Company's consolidated statements of income. The Company expects the net investment hedges to be effective, on an after-tax basis, as described in ASC 815. Effectiveness will be assessed each quarter. Should any portion of the net investment hedge become ineffective, the ineffective portion will be reclassified to other income, net on the Company's consolidated statements of income. The fair values of the net investment hedges are determined using quoted observable inputs. Gains and losses reported in accumulated other comprehensive income will not be reclassified into earnings until a sale of the Company's underlying investment.

The Company has designated certain foreign currency forward contracts as balance sheet hedges to mitigate foreign currency balance sheet exposures. These balance sheet hedges are used to partially offset the foreign currency exchange gains and losses generated by the re-measurement of certain assets and liabilities denominated in non-functional currency. Changes in the fair value of these derivatives are recorded in other income, net on the Company's consolidated statements of income. The fair values of the balance sheet hedges are determined using quoted observable inputs.

The Company recognizes all derivative instruments as other assets or liabilities on the Company's consolidated balance sheets at fair value. The Company's derivative financial instruments are not used for trading or speculative purposes. See Note 9—"Derivative Financial Instruments" for a full description of the Company's derivative financial instrument activities and related accounting.

*Property and Equipment.* Buildings are stated at cost and depreciated using the straight-line method over the estimated useful lives of 25 years. Leasehold improvements are amortized over the lesser of their expected useful lives and the remaining lease term. Computers and equipment and furniture and fixtures are stated at cost and depreciated using the straight-line method over the estimated useful lives of the assets, generally three to five years.

Property and equipment to be held and used are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of the assets may not be recoverable. Determination of recoverability is based on the lowest level of identifiable estimated undiscounted future cash flows resulting from the use of the asset and its eventual disposition. Measurement of any impairment loss for long-lived assets that management expects to hold and use is based on the excess of the carrying value of the asset over its fair value. No impairments of such assets were identified during any of the periods presented.

*Capitalized Software and Labor.* The Company capitalized certain software and labor costs totaling approximately $110 million, $192 million, and $180 million during 2010, 2011, and 2012, respectively. The estimated useful life of costs capitalized is evaluated for each specific project and ranges from one to three years.

72

Table of Contents

During 2010, 2011, and 2012, the amortization of capitalized costs totaled approximately $108 million, $114 million, and $142 million, respectively. Capitalized software and labor costs are included in property and equipment, net. Included in the capitalized amounts above are $16 million, $22 million, and $24 million, respectively, of stock-based compensation expense in the years ended December 31, 2010, 2011, and 2012.

*Goodwill.* Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired in a business combination. Goodwill is not amortized, but is tested for impairment on an annual basis and between annual tests in certain circumstances. The performance of the goodwill impairment test involves a two-step process. The first step involves comparing the fair value of the Company's reporting units to their carrying values, including goodwill. The Company's reporting units are based on geography, either at the operating segment level or one level below the operating segments level. The fair values of the reporting units are estimated using an average of a market approach and an income approach as this combination is deemed to be the most indicative of the Company's fair value in an orderly transaction between market participants. In addition, the fair values estimated under these two approaches are validated against each other to ensure consistency. Under the market approach, the Company utilizes publicly-traded comparable company information, specific to the regions in which the reporting units operate, to determine revenue and earnings multiples that are used to value the reporting units adjusted for an estimated control premium. Under the income approach, the Company determines fair value based on estimated future cash flows of each reporting unit discounted by an estimated weighted-average cost of capital, which reflects the overall level of inherent risk of a reporting unit and the rate of return an outside investor would expect to earn. If the carrying value of the reporting unit exceeds its fair value, the second step of the goodwill impairment test is performed by comparing the carrying value of the goodwill in the reporting unit to its implied fair value. An impairment charge is recognized for the excess of the carrying value of goodwill over its implied fair value. The Company conducted its annual goodwill impairment test as of October 31, 2012 and determined that the fair values of its reporting units exceeded their carrying values and therefore goodwill in those reporting units was not impaired. See Note 5—"Goodwill" for additional information.

*Intangible Assets.* Intangible assets are carried at cost and amortized over their estimated useful lives, generally on a straight-line basis over one to eight years. The Company reviews identifiable amortizable intangible assets to be held and used for impairment whenever events or changes in circumstances indicate that the carrying value of the assets may not be recoverable. Determination of recoverability is based on the lowest level of identifiable estimated undiscounted cash flows resulting from use of the asset and its eventual disposition. Measurement of any impairment loss is based on the excess of the carrying value of the asset over its fair value.

*Investments in Equity Interests.* Investments in the common stock of entities in which the Company can exercise significant influence but does not own a majority equity interest or otherwise control are accounted for using the equity method and are included as investments in equity interests on the consolidated balance sheets. The Company records its share of the results of these companies one quarter in arrears within earnings in equity interests on the consolidated statements of income. The Company reviews its investments for other-than-temporary impairment whenever events or changes in business circumstances indicate that the carrying value of the investment may not be fully recoverable. Investments identified as having an indication of impairment are subject to further analysis to determine if the impairment is other-than-temporary and this analysis requires estimating the fair value of the investment. The determination of fair value of the investment involves considering factors such as the stock prices of public companies in which the Company has an equity investment, current economic and market conditions, the operating performance of the companies including current earnings trends and forecasted cash flows, and other company and industry specific information.

*Operating and Capital Leases.* The Company leases office space and data centers under operating leases and certain data center equipment under a capital lease agreement with original lease periods up to 12 years. Assets acquired under capital leases are amortized over the shorter of the remaining lease term or its estimated useful life which is generally 10 to 15 years. Certain of the lease agreements contain rent holidays and rent escalation provisions. For purposes of recognizing these lease incentives on a straight-line basis over the term of the lease,

73

Table of Contents

the Company uses the date of initial possession to begin amortization. Lease renewal periods are considered on a lease-by-lease basis and are generally not included in the period of straight-line recognition. For each of the years ended December 31, 2010, 2011 and 2012, the Company expensed $5 million of interest, which approximates the cash payments made for interest. As of December 31, 2011 and 2012, the Company had net lease commitments included in capital lease and other long-term liabilities in the consolidated balance sheets of $41 million and $37 million, respectively.

*Income Taxes*. Deferred income taxes are determined based on the differences between the financial reporting and tax bases of assets and liabilities and are measured using the currently enacted tax rates and laws. The Company records a valuation allowance against particular deferred income tax assets if it is more likely than not that those assets will not be realized. The provision for income taxes comprises the Company's current tax liability and change in deferred income tax assets and liabilities.

Significant judgment is required in evaluating the Company's uncertain tax positions and determining its provision for income taxes. The Company establishes reserves for tax-related uncertainties based on estimates of whether, and the extent to which, additional taxes will be due. These reserves are established when the Company believes that certain positions might be challenged despite its belief that its tax return positions are in accordance with applicable tax laws. The Company adjusts these reserves in light of changing facts and circumstances, such as the closing of a tax audit, new tax legislation, or the change of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will affect the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the effect of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest and penalties. Income taxes paid were $232 million, $96 million, and $2.3 billion in the years ended December 31, 2010, 2011, and 2012, respectively. Interest paid was not material in any of the years presented. See Note 15—"Income Taxes" for additional information.

*Revenue Recognition*. Revenue is generated from several offerings including the display of graphical advertisements ("display advertising"), the placement of links to advertisers' Websites ("search advertising"), and other sources. For revenue arrangements with multiple deliverables, the consideration is allocated based on the relative selling price for each deliverable. The selling price for each arrangement deliverable can be established based on vendor specific objective evidence ("VSOE") or third-party evidence ("TPE") if VSOE is not available. An estimate of selling price ("ESP") is used if neither VSOE nor TPE is available.

The Company recognizes revenue from display advertising on Yahoo! Properties and Affiliate sites as impressions are delivered. Impressions are delivered when a sold advertisement appears in pages viewed by users. Arrangements for these services generally have terms of up to one year and in some cases the terms may be up to three years. For display advertising on Affiliate sites, the Company pays Affiliates for the revenue generated from the display of these advertisements on the Affiliate sites. Traffic acquisition costs ("TAC") are payments made to third-party entities that have integrated the Company's advertising offerings into their Websites or other offerings and payments made to companies that direct consumer and business traffic to Yahoo! Properties. The display revenue derived from these arrangements that involve traffic supplied by Affiliates is reported gross of the TAC paid to Affiliates as the Company is the primary obligor to the advertisers who are the customers of the display advertising service.

From time-to-time, the Company may offer customized display advertising solutions to advertisers. These customized display advertising solutions combine the Company's standard display advertising with customized content, customer insights, and campaign analysis. Due to the unique nature of these products, the Company may not be able to establish selling prices based on historical stand-alone sales or third-party evidence; therefore, the Company may use its best estimate to establish selling prices. The Company establishes best estimates within a range of selling prices considering multiple factors including, but not limited to, class of advertiser, size of transaction, seasonality, margin objectives, observed pricing trends, available online inventory, industry pricing strategies, and market conditions. The Company believes the use of the best estimates of selling price allows revenue recognition in a manner consistent with the underlying economics of the transaction.

74

Table of Contents

The Company recognizes revenue from search advertising on Yahoo! Properties and Affiliate sites. Search revenue is recognized based on Paid Clicks. A Paid Click occurs when a user clicks on a sponsored listing on Yahoo! Properties and Affiliate sites for which an advertiser pays on a per click basis. The Company's Search Agreement with Microsoft provides for Microsoft to be the exclusive algorithmic and paid search services provider on Yahoo! Properties and non-exclusive provider of such services on Affiliate sites. In transitioned markets, the Company reports as revenue the 88 percent share of revenue generated from Microsoft's services on Yahoo! Properties and Affiliate sites, as the Company is not the primary obligor in the arrangement with the advertisers. See Note 18—"Search Agreement with Microsoft Corporation" for a description of the Search Agreement with Microsoft.

In non-transitioned markets, the Company pays Affiliates TAC for the revenue generated from the search advertisements on the Affiliates' Websites. The revenue derived from these arrangements is reported on a gross basis including TAC paid to Affiliates, as the Company continues to be the primary obligor to the advertisers. The Company also generates search revenue from a revenue sharing arrangement with Yahoo Japan for search technology and services and records the related revenue as it is earned.

Other revenue includes listings-based services revenue, transaction revenue, royalties, and fees revenue. Listings-based services revenue is generated from a variety of consumer and business listings-based services, including classified advertising such as Yahoo! Autos and other services. The Company recognizes listings-based services revenue when the services are performed. Transaction revenue is generated from facilitating commercial transactions through Yahoo! Properties, principally from Yahoo! Small Business, Yahoo! Travel, and Yahoo! Shopping. The Company recognizes transaction revenue when there is evidence that qualifying transactions have occurred. We also receive royalties from joint venture partners that are recognized when earned. Fees revenue consists of revenue generated from a variety of consumer and business fee-based services as well as services for small businesses. The Company recognizes fees revenue when the services are performed.

In all cases, revenue is recognized only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed, and collectability of the related fee is reasonably assured. The Company's arrangements generally do not include a provision for cancellation, termination, or refunds that would significantly impact revenue recognition.

The Company accounts for cash consideration given to customers, for which it does not receive a separately identifiable benefit or cannot reasonably estimate fair value, as a reduction of revenue rather than as an expense. Cash consideration received in an arrangement with a provider may require consideration of classification of amounts received as revenue or a reimbursement of costs incurred.

Current deferred revenue is comprised of contractual billings in excess of recognized revenue and payments received in advance of revenue recognition. Long-term deferred revenue includes amounts received from customers for which services will not be delivered within the next 12 months.

*TAC.* TAC consists of payments made to third-party entities that have integrated the Company's advertising offerings into their Websites or other offerings and payments made to companies that direct consumer and business traffic to Yahoo! Properties. The Company enters into agreements of varying duration that involve TAC. There are generally two economic structures of the Affiliate agreements: fixed payments based on a guaranteed minimum amount of traffic delivered, which often carry reciprocal performance guarantees from the Affiliate; or variable payments based on a percentage of the Company's revenue or based on a certain metric, such as the number of searches or paid clicks. The Company expenses, as cost of revenue, TAC under two different methods. Agreements with fixed payments are expensed ratably over the term the fixed payment covers. Agreements based on a percentage of revenue, number of searches, or other metrics are expensed based on the volume of the underlying activity or revenue multiplied by the agreed-upon price or rate.

*Product Development.* Product development expenses consist primarily of compensation related expenses (including stock-based compensation expense) incurred for research and development, the development of,

75

Table of Contents

enhancements to, and maintenance and operation of Yahoo! Properties, advertising products, technology platforms, and infrastructure. Depreciation expense, third-party technology and development expense, and other operating costs are also included in product development.

*Advertising Costs.* Advertising production costs are recorded as expense the first time an advertisement appears. Costs of advertising are recorded as expense as advertising space or airtime is used. All other advertising costs are expensed as incurred. Advertising expense totaled approximately $237 million, $148 million, and $103 million for 2010, 2011, and 2012, respectively.

*Restructuring Charges.* The Company has developed and implemented restructuring initiatives to improve efficiencies across the organization, reduce operating expenses, and better align its resources to market conditions. As a result of these plans, the Company has recorded restructuring charges comprised principally of employee severance and associated termination costs related to the reduction of its workforce, office closures, losses on subleases, and contract termination costs. Liabilities for costs associated with an exit or disposal activity are recognized when the liability is incurred, as opposed to when management commits to an exit plan. In addition, (i) liabilities associated with exit and disposal activities are measured at fair value; (ii) one-time termination benefits are expensed at the date the entity notifies the employee, unless the employee must provide future service, in which case the benefits are expensed ratably over the future service period; and (iii) costs to terminate a contract before the end of its term are recognized when the entity terminates the contract in accordance with the contract terms. In addition, a portion of the Company's restructuring costs related to international employees whose termination benefits are recognized when the amount of such termination benefits becomes estimable and payment is probable.

These restructuring initiatives require management to make estimates in several areas including: (i) expenses for severance and other employee separation costs; (ii) realizable values of assets made redundant, obsolete, or excessive; and (iii) the ability to generate sublease income and to terminate lease obligations at the estimated amounts.

*Stock-Based Compensation Expense.* The Company recognizes stock-based compensation expense net of an estimated forfeiture rate and therefore only recognizes compensation costs for those shares expected to vest over the service period of the award. Stock-based awards are valued based on the grant date fair value of these awards; the Company records stock-based compensation expense on a straight-line basis over the requisite service period, generally one to four years.

Calculating stock-based compensation expense related to stock options requires the input of highly subjective assumptions, including the expected term of the stock options, stock price volatility, and the pre-vesting forfeiture rate of stock awards. The Company estimates the expected life of options granted based on historical exercise patterns, which the Company believes are representative of future behavior. The Company estimates the volatility of its common stock on the date of grant based on the implied volatility of publicly traded options on its common stock, with a term of one year or greater. The Company believes that implied volatility calculated based on actively traded options on its common stock is a better indicator of expected volatility and future stock price trends than historical volatility. The assumptions used in calculating the fair value of stock-based awards represent the Company's best estimates, but these estimates involve inherent uncertainties and the application of management judgment. As a result, if factors change and the Company uses different assumptions, the Company's stock-based compensation expense could be materially different in the future. In addition, the Company is required to estimate the expected pre-vesting award forfeiture rate, as well as the probability that performance conditions that affect the vesting of certain awards will be achieved, and only recognizes expense for those shares expected to vest. The Company estimates the forfeiture rate based on historical experience of the Company's stock-based awards that are granted and cancelled before vesting. See Note 13—"Employee Benefits" for additional information.

The Company uses the "with and without" approach in determining the order in which tax attributes are utilized. As a result, the Company only recognizes a tax benefit from stock-based awards in additional paid-in capital if an

Table of Contents

incremental tax benefit is realized after all other tax attributes currently available to the Company have been utilized. When tax deductions from stock-based awards are less than the cumulative book compensation expense, the tax effect of the resulting difference ("shortfall") is charged first to additional paid-in capital to the extent of the Company's pool of windfall tax benefits with any remainder recognized in income tax expense. The Company has determined that it had a sufficient windfall pool available through the end of 2012 to absorb any shortfalls. In addition, the Company accounts for the indirect effects of stock-based awards on other tax attributes, such as the research tax credit, through the consolidated statements of income.

**Recent Accounting Pronouncements**

In January 2013, the Financial Accounting Standards Board ("FASB") amended its guidance on the presentation of comprehensive income. Under the amended guidance, an entity must present information regarding reclassification adjustments from accumulated other comprehensive income in a single note or on the face of the financial statements. This is required for both annual and interim reporting. The amendment becomes effective for reporting periods beginning after December 15, 2012 and is applied prospectively. Early adoption is permitted. The Company has elected to adopt this guidance during the year ended December 31, 2012. This guidance did not have an impact on the Company's consolidated financial position, results of operations or cash flows as it is disclosure-only in nature.

**Note 2   INVESTMENTS AND FAIR VALUE MEASUREMENTS**

The following tables summarize the investments in available-for-sale securities (in thousands):

|  | December 31, 2011 | | | |
|---|---|---|---|---|
|  | Gross Amortized Costs | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Government and agency securities | $599,582 | $ 1,054 | $ (172) | $600,464 |
| Corporate debt securities, commercial paper, and bank certificates of deposit | 366,264 | 1,025 | (226) | 367,063 |
| Corporate equity securities | 2,761 | — | (1,978) | 783 |
| Total investments in available-for-sale securities | $968,607 | $ 2,079 | $ (2,376) | $968,310 |

|  | December 31, 2012 | | | |
|---|---|---|---|---|
|  | Gross Amortized Costs | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Government and agency securities | $1,312,876 | $ 985 | $ (45) | $1,313,816 |
| Corporate debt securities, commercial paper, and bank certificates of deposit | 2,039,809 | 1,597 | (622) | 2,040,784 |
| Corporate equity securities | 230 | — | (33) | 197 |
| Alibaba Group Preference Shares | 816,261 | — | — | 816,261 |
| Total investments in available-for-sale securities | $4,169,176 | $ 2,582 | $ (700) | $4,171,058 |

|  | December 31, | |
|---|---|---|
|  | 2011 | 2012 |
| Reported as: | | |
| Short-term marketable debt securities | $493,189 | $1,516,175 |
| Long-term marketable debt securities | 474,338 | 1,838,425 |
| Alibaba Group Preference Shares | — | 816,261 |
| Other assets | 783 | 197 |
| Total | $968,310 | $4,171,058 |

77

Table of Contents

Available-for-sale securities included in cash and cash equivalents on the consolidated balance sheets are not included in the table above as the gross unrealized gains and losses were immaterial for both 2011 and 2012 as the carrying value approximates fair value because of the short maturity of those instruments. Realized gains and losses from sales of marketable securities were not material for the years ended December 31, 2011 and 2012.

The contractual maturities of available-for-sale marketable debt securities were as follows (in thousands):

|  | December 31, | |
|  | 2011 | 2012 |
|---|---|---|
| Due within one year | $493,189 | $1,516,175 |
| Due after one year through five years | 474,338 | 1,838,425 |
| Total available-for-sale marketable debt securities | $967,527 | $3,354,600 |

The following tables show all investments in an unrealized loss position for which an other-than-temporary impairment has not been recognized and the related gross unrealized losses and fair value, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position (in thousands):

|  | December 31, 2011 | | | | | |
|  | Less than 12 Months | | 12 Months or Greater | | Total | |
|  | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
|---|---|---|---|---|---|---|
| Government and agency securities | $138,755 | $ (172) | $ — | $ — | $138,755 | $ (172) |
| Corporate debt securities, commercial paper, and bank certificates of deposit | 123,574 | (226) | — | — | 123,574 | (226) |
| Corporate equity securities | — | — | 783 | (1,978) | 783 | (1,978) |
| Total investments in available-for-sale securities | $262,329 | $ (398) | $ 783 | $ (1,978) | $263,112 | $ (2,376) |

|  | December 31, 2012 | | | | | |
|  | Less than 12 Months | | 12 Months or Greater | | Total | |
|  | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
|---|---|---|---|---|---|---|
| Government and agency securities | $165,025 | $ (45) | $ — | $ — | $165,025 | $ (45) |
| Corporate debt securities, commercial paper, and bank certificates of deposit | 729,046 | (622) | — | — | 729,046 | (622) |
| Corporate equity securities | 197 | (33) | — | — | 197 | (33) |
| Total investments in available-for-sale securities | $894,268 | $ (700) | $ — | $ — | $894,268 | $ (700) |

The Company's investment portfolio consists of liquid high-quality fixed income government, agency, and corporate debt securities, money market funds, time deposits with financial institutions, and preference shares. Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Fixed income securities may have their fair market value adversely impacted due to a deterioration of the credit quality of the issuer. The longer the term of the securities, the more susceptible they are to changes in market rates. Investments are reviewed periodically to identify possible other-than-temporary impairment. The Company has no current requirement or intent to sell these securities. The Company expects to recover up to (or beyond) the initial cost of investment for securities held.

78

Table of Contents

The Company's investment in the Alibaba Group preference shares ("Alibaba Group Preference Shares") is presented as an asset carried at fair value on the Company's consolidated balance sheets. To estimate the fair value, the Company performed benchmarking by comparing the terms and conditions of the Alibaba Group Preference Shares to dividend rates, subordination terms, and credit ratings of those of similar type instruments. As of December 31, 2012, the total fair value of the Alibaba Group Preferences Shares is $822 million and includes $6 million of accrued dividend income recorded within prepaid expenses and other current assets and $16 million of accrued dividend income recorded as part of the carrying value of the Alibaba Group Preference Shares. For the year ended December 31, 2012, the Company has recorded approximately $23 million in dividend income related to the Alibaba Group Preference Shares within other income, net on the consolidated statements of income.

The following table sets forth the financial assets, measured at fair value, by level within the fair value hierarchy as of December 31, 2011 (in thousands):

| | Fair Value Measurements at Reporting Date Using | | |
| Assets | Level 1 | Level 2 | Total |
|---|---|---|---|
| Money market funds[1] | $418,338 | $        — | $   418,338 |
| Available-for-sale securities: | | | |
| Government and agency securities[1] | — | 617,316 | 617,316 |
| Commercial paper and bank certificates of deposit[1] | — | 47,904 | 47,904 |
| Corporate debt securities[1] | — | 318,805 | 318,805 |
| Time deposits | — | 216,505 | 216,505 |
| Corporate equity securities[2] | 783 | — | 783 |
| Available-for-sale securities at fair value | $419,121 | $1,200,530 | $1,619,651 |
| Liabilities | | | |
| Foreign currency derivative contracts[3] | — | (2,817) | (2,817) |
| Total assets and liabilities at fair value | $419,121 | $1,197,713 | $1,616,834 |

The following table sets forth the financial assets and liabilities, measured at fair value, by level within the fair value hierarchy as of December 31, 2012 (in thousands):

| | Fair Value Measurements at Reporting Date Using | | | |
| Assets | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Money market funds[1] | $685,707 | $        — | $        — | $   685,707 |
| Available-for-sale securities: | | | | |
| Government and agency securities[1] | — | 2,464,227 | — | 2,464,227 |
| Commercial paper and bank certificates of deposit[1] | — | 892,769 | — | 892,769 |
| Corporate debt securities[1] | — | 1,298,123 | — | 1,298,123 |
| Time deposits | — | 84,555 | — | 84,555 |
| Alibaba Preference Shares | — | — | 816,261 | 816,261 |
| Corporate equity securities[2] | 197 | — | — | 197 |
| Foreign currency derivative contracts[3] | — | 5,007 | — | 5,007 |
| Available-for-sale securities at fair value | $685,904 | $4,744,681 | $816,261 | $6,246,846 |
| Liabilities | | | | |
| Foreign currency derivative contracts[3] | — | (6,662) | — | (6,662) |
| Total assets and liabilities at fair value | $685,904 | $4,738,019 | $816,261 | $6,240,184 |

[1]   The money market funds, government and agency securities, commercial paper and bank certificates of deposit, and corporate debt securities are classified as part of either cash and cash equivalents or investments in marketable debt securities in the consolidated balance sheet.

79

Table of Contents

(2)   The corporate equity securities are classified as part of the other long-term assets in the consolidated balance sheet.

(3)   Foreign currency derivative contracts are classified as part of either other current assets or other current liabilities in the consolidated balance sheet. The notional amounts of the foreign currency derivative contracts are $92 million as of December 31, 2011 and $3.4 billion, including contracts designated as net investment hedges of $3 billion, as of December 31, 2012.

The amount of cash and cash equivalents as of December 31, 2011 and 2012 includes $911 million and $597 million, respectively, in cash deposits.

The fair values of the Company's Level 1 financial assets and liabilities are based on quoted market prices of the identical underlying security. The fair values of the Company's Level 2 financial assets and liabilities are obtained from readily-available pricing sources for the identical underlying security that may not be actively traded. The Company utilizes a pricing service to assist in obtaining fair value pricing for the majority of this investment portfolio. The Company classifies its investment in the Alibaba Group Preference Shares within Level 3 because it is valued using significant unobservable inputs. To estimate the fair value, the Company performed benchmarking by comparing the terms and conditions of the Alibaba Group Preference Shares to dividend rates, subordination terms, and credit ratings of those of similar type instruments. The credit rating of Alibaba Group Holding Limited ("Alibaba Group"), general business conditions, and market rates could materially affect the fair value of the Alibaba Group Preference Shares. The Company conducts reviews on a quarterly basis to verify pricing, assess liquidity, and determine if significant inputs have changed that would impact the fair value hierarchy disclosure.

### Activity between Levels of the Fair Value Hierarchy

During the years ended December 31, 2012 and 2011, the Company did not make any transfers between Level 1, Level 2, or Level 3 assets or liabilities. During the year ended December 31, 2012, the Company recognized $23 million as interest income related to its investment in Alibaba Group Preference Shares. Interest income is included within other income, net on the consolidated statements of income. There was no other activity related to our Level 3 assets. As of December 31, 2011, the Company did not have any significant Level 3 financial assets or liabilities.

### Note 3   CONSOLIDATED FINANCIAL STATEMENT DETAILS

### Prepaid expenses and other current assets

As of December 31, prepaid expenses and other current assets consisted of the following (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Prepaid expenses | $ 81,880 | $ 74,268 |
| Deferred income taxes | 128,581 | 249,936 |
| Other receivables non-trade | 5,292 | 41,748 |
| Other | 143,730 | 94,360 |
| Total prepaid expenses and other current assets | $359,483 | $460,312 |

80

**Table of Contents**

*Property and equipment, net*

As of December 31, property and equipment, net consisted of the following (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Land | $ 217,970 | $ 213,838 |
| Buildings | 611,033 | 639,658 |
| Leasehold improvements | 313,925 | 304,440 |
| Computers and equipment[1] | 1,621,977 | 2,040,381 |
| Capitalized software and labor | 393,504 | 595,366 |
| Furniture and fixtures | 74,357 | 75,559 |
| Assets not yet in use | 169,998 | 81,979 |
|  | 3,402,764 | 3,951,221 |
| Less: accumulated depreciation and amortization[2] | (1,671,876) | (2,265,376) |
| Total property and equipment, net | $ 1,730,888 | $ 1,685,845 |

[1]   Includes data center equipment acquired under a capital lease of approximately $41 million and $37 million, respectively, as of December 31, 2011 and 2012.

[2]   Includes $13 million and $20 million of accumulated depreciation and $4 million and $6 million of accumulated amortization related to the capital lease as of December 31, 2011 and 2012, respectively.

*Other long-term assets*

As of December 31, other long-term assets consisted of the following (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Deferred income taxes | $ 42,392 | $139,183 |
| Investments in privately-held companies | 30,846 | 27,022 |
| Investments in publicly-held companies | 783 | 197 |
| Other | 146,607 | 122,728 |
| Total other long-term assets | $220,628 | $289,130 |

*Accrued expenses and other current liabilities*

As of December 31, accrued expenses and other current liabilities consisted of the following (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Accrued content, connection, traffic acquisition, and other costs | $140,147 | $116,951 |
| Deferred income taxes | 1,812 | 200 |
| Accrued compensation and related expenses | 330,593 | 337,727 |
| Accrued taxes payable | 10,891 | 10,619 |
| Accrued professional service expenses | 70,769 | 67,736 |
| Accrued sales and marketing related expenses | 19,058 | 11,988 |
| Accrued restructuring costs | 27,453 | 58,718 |
| Current liability for uncertain tax contingencies | — | 30,484 |
| Other | 245,321 | 174,052 |
| Total accrued expenses and other current liabilities | $846,044 | $808,475 |

81

Table of Contents

*Deferred and other long-term tax liabilities, net*

As of December 31, deferred and other long-term tax liabilities, net consisted of the following (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Deferred income taxes | $407,847 | $ 11,310 |
| Long-term liability for uncertain tax contingencies(*) | 407,687 | 663,961 |
| Total deferred and other long-term tax liabilities, net | $815,534 | $675,271 |

(*)  Includes interest and penalties.

*Accumulated other comprehensive income*

As of December 31, the components of accumulated other comprehensive income were as follows (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Unrealized (losses) gains on available-for-sale securities, net of tax | $ (7,538) | $ 9,121 |
| Foreign currency translation, net of tax | 705,407 | 562,128 |
| Accumulated other comprehensive income | $697,869 | $571,249 |

*Noncontrolling interests*

As of December 31, noncontrolling interests were as follows (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Beginning noncontrolling interests | $ 38,281 | $40,280 |
| Distributions to noncontrolling interests | (11,843) | — |
| Net income attributable to noncontrolling interests | 13,842 | 5,123 |
| Ending noncontrolling interests | $ 40,280 | $45,403 |

*Other income, net*

Other income, net for 2010, 2011, and 2012 were as follows (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| Interest and investment income | $ 23,062 | $18,920 | $ 41,673 |
| Gain on sale of Zimbra, Inc. | 66,130 | — | — |
| Gain on sale of HotJobs. | 186,345 | — | — |
| Gain related to sale of Alibaba Group Shares | — | — | 4,603,322 |
| Other | 22,332 | 8,255 | 2,844 |
| Total other income, net | $297,869 | $27,175 | $4,647,839 |

Interest and investment income consists of income earned from cash in bank accounts and investments made in marketable debt securities, money market funds, and dividend income on the Alibaba Group Preference Shares.

In February 2010, the Company sold Zimbra, Inc. for net proceeds of $100 million and recorded a pre-tax gain of $66 million. In August 2010, the Company sold HotJobs for net proceeds of $225 million and recorded a pre-tax gain of $186 million.

82

**Table of Contents**

In September 2012, the Company recorded a pre-tax gain of approximately $4.6 billion related to the sale of Alibaba Group Shares. See Note 8—"Investments in Equity Interests" for additional information.

Other consists of gains and losses from sales or impairments of marketable debt securities and/or investments in privately-held companies, foreign exchange gains and losses due to re-measurement of monetary assets and liabilities denominated in non-functional currencies, foreign exchange gains and losses on balance sheet hedges, and other non-operating items.

### Reclassifications Out of Accumulated Other Comprehensive Income

Reclassifications out of accumulated other comprehensive income for the period ended December 31, 2012 were as follows (in thousands):

| | Amount Reclassified from Accumulated Other Comprehensive Income | Affected Line Item in the Statement of Income |
|---|---|---|
| Realized losses on available-for-sale securities, net of tax | $ 9,088 | Yahoo!'s share of earnings in equity method investments and Other income, net |
| Foreign currency translation adjustments ("CTA"): | | |
| Korea business closure CTA reclassification | $ (16,208) | Restructuring charges net |
| Alibaba Group Initial Repurchase related CTA reclassification, net of $68 million in tax | (120,978) | Other income, net |
| Total foreign currency translation adjustments, net of tax | $ (137,186) | |
| Total reclassifications for the period | $ (128,098) | |

### Note 4   ACQUISITIONS

The following table summarizes acquisitions (including business combinations and asset acquisitions) completed during the three years ended December 31, 2012 (in millions):

| | Purchase Price | Goodwill | Amortizable Intangibles |
|---|---|---|---|
| 2010 | | | |
|     All acquisitions | $ 159 | $ 105 | $ 50 |
| 2011 | | | |
|     interclick | $ 259 | $ 172 | $ 79 |
|     Other acquisitions | $ 72 | $ 49 | $ 26 |
| 2012 | | | |
|     All acquisitions | $ 7 | $ 6 | $ — |

### Transactions completed in 2010

*All Acquisitions—Business Combinations.* During the year ended December 31, 2010, the Company acquired four companies, which were accounted for as business combinations. The total purchase price for these acquisitions was $159 million. The total cash consideration of $159 million less cash acquired of $2 million resulted in a net cash outlay of $157 million. Of the total purchase price, $105 million was allocated to goodwill, $50 million to amortizable intangible assets, $27 million to tangible assets, $2 million to cash acquired, and $25 million to net assumed liabilities. Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired and is not deductible for tax purposes.

83

Table of Contents

The Company's business combinations completed in 2010 did not have a material impact on the Company's consolidated financial statements, and therefore pro forma disclosures have not been presented.

### Transactions completed in 2011

*interclick.* On December 14, 2011, the Company completed the acquisition of interclick, inc. ("interclick") through an all cash tender offer for all outstanding shares of common stock of interclick at $9.00 per share. With interclick, the Company acquired innovative data targeting capabilities, optimization technologies and new premium supply, as well as a team experienced in selling audiences across disparate sources of pooled supply. The purchase price exceeded the fair value of the net tangible and identifiable intangible assets acquired from interclick and, as a result, the Company recorded goodwill in connection with this transaction. Under the terms of the agreement, the Company acquired all of the equity interests (including all outstanding options) in interclick. interclick stockholders and vested option holders were paid in cash, and outstanding interclick unvested options and restricted stock awards were assumed. Assumed options are exercisable for shares of Yahoo! common stock.

The total purchase price of $259 million consisted of cash consideration. In connection with the acquisition, the Company issued stock-based awards valued at $9 million which is being recognized as stock-based compensation expense as the awards vest over a period of up to 4 years.

The allocation of the purchase price of the assets acquired and liabilities assumed based on their fair values was as follows (in thousands):

| | |
|---|---:|
| Cash acquired | $    4,369 |
| Other tangible assets acquired | 71,711 |
| Amortizable intangible assets: | |
|     Customer contracts and related relationships | 42,700 |
|     Developed technology and patents | 35,600 |
|     Trade name, trademark, and domain name | 600 |
| Goodwill | 171,641 |
|     Total assets acquired | 326,621 |
| Liabilities assumed | (68,120) |
|     Total | $258,501 |

The amortizable intangible assets have useful lives not exceeding six years and a weighted average useful life of five years. No amounts have been allocated to in-process research and development and $172 million has been allocated to goodwill. Goodwill represents the excess of the purchase price over the fair value of the net tangible and identifiable intangible assets acquired and is not deductible for tax purposes. The goodwill recorded in connection with this acquisition is included in the Americas segment.

*Other Acquisitions—Business Combinations.* During the year ended December 31, 2011, the Company acquired three other companies, which were accounted for as business combinations. The total purchase price for these acquisitions was $72 million. The total cash consideration of $72 million less cash acquired of $3 million resulted in a net cash outlay of $69 million. Of the total purchase price, $49 million was allocated to goodwill, $26 million to amortizable intangible assets, $3 million to cash acquired, and $6 million to net assumed liabilities. Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired and is not deductible for tax purposes.

The Company's business combinations completed in 2011 did not have a material impact on the Company's consolidated financial statements, and therefore pro forma disclosures have not been presented.

84

Table of Contents

*Transactions completed in 2012*

*All Acquisitions—Business Combinations.* During the year ended December 31, 2012, the Company acquired two companies, which were accounted for as business combinations. The total purchase price for these acquisitions was $7 million. The total cash consideration of $7 million less cash acquired of $1 million resulted in a net cash outlay of $6 million. Of the total purchase price, $6 million was allocated to goodwill and $1 million to cash acquired. Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired and is not deductible for tax purposes.

The Company's business combinations completed in 2012 did not have a material impact on the Company's consolidated financial statements, and therefore pro forma disclosures have not been presented.

## Note 5    GOODWILL

The changes in the carrying amount of goodwill for the years ended December 31, 2011 and 2012 were as follows (in thousands):

|  | Americas[1] | EMEA[2] | Asia Pacific[3] | Total |
|---|---|---|---|---|
| Net balance as of January 1, 2011 | $2,671,306 | $585,060 | $425,279 | $3,681,645 |
| Acquisitions and other[4] | 197,654 | — | 22,294 | 219,948 |
| Foreign currency translation adjustments | (2,595) | (3,537) | 5,291 | (841) |
| Net balance as of December 31, 2011 | $2,866,365 | $581,523 | $452,864 | $3,900,752 |
| Acquisitions and other[5] | 5,616 | — | — | 5,616 |
| Korea goodwill write-off | — | — | (85,642) | (85,642) |
| Foreign currency translation adjustments | (1,950) | 12,090 | (4,117) | 6,023 |
| Net balance as of December 31, 2012 | $2,870,031 | $593,613 | $363,105 | $3,826,749 |

[1]   Gross goodwill balances for the Americas segment were $2.7 billion as of January 1, 2011 and $2.9 billion as of December 31, 2012.

[2]   Gross goodwill balances for the EMEA segment were $1.1 billion as of both January 1, 2011 and December 31, 2012. The EMEA segment includes accumulated impairment losses of $488 million as of both January 1, 2011 and December 31, 2012.

[3]   Gross goodwill balances for the Asia Pacific ("APAC") segment were $0.5 billion as both of January 1, 2011 and December 31, 2012. The APAC segment includes accumulated impairment losses of $64 million as of January 1, 2011 and $151 million as of December 31, 2012.

[4]   Acquisitions and other for the year ended December 31, 2011 includes additions of $198 million and $22 million, respectively, of goodwill in the Americas and Asia Pacific segments.

[5]   Acquisitions and other for the year ended December 31, 2012 includes additions of $6 million of goodwill in the Americas segment.

## Note 6    INTANGIBLE ASSETS, NET

The following table summarizes the Company's carrying amount of intangible assets, net (in thousands):

|  | December 31, 2011 | | |
|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization(*) | Net |
| Customer, affiliate, and advertiser related relationships | $   178,489 | $     (84,806) | $  93,683 |
| Developed technology and patents | 376,561 | (238,893) | 137,668 |
| Trade names, trademarks, and domain names | 71,685 | (48,436) | 23,249 |
| Total intangible assets, net | $   626,735 | $   (372,135) | $254,600 |

85

**Table of Contents**

|  | December 31, 2012 | | |
|  | Gross Carrying Amount | Accumulated Amortization(*) | Net |
|---|---|---|---|
| Customer, affiliate, and advertiser related relationships | $ 162,389 | $ (99,996) | $ 62,393 |
| Developed technology and patents | 270,485 | (198,851) | 71,634 |
| Trade names, trademarks, and domain names | 50,382 | (30,436) | 19,946 |
| Total intangible assets, net | $ 483,256 | $ (329,283) | $153,973 |

(*) Cumulative foreign currency translation adjustments, reflecting movement in the currencies of the underlying entities, increased total intangible assets by approximately $18 million and $19 million as of December 31, 2011 and 2012, respectively.

The intangible assets have estimated useful lives as follows:

- Customer, affiliate, and advertiser related relationships—two to eight years;

- Developed technology and patents—one year to eight years; and

- Trade names, trademarks, and domain names—one year to an indefinite life.

The Company recognized amortization expense of intangible assets of approximately $127 million, $118 million, and $105 million for 2010, 2011, and 2012, respectively, including $96 million, $84 million, and $70 million, respectively, included in cost of revenue-other. Based on the current amount of intangibles subject to amortization, the estimated amortization expense for each of the succeeding years is as follows: 2013: $62 million; 2014: $42 million; 2015: $22 million; 2016: $7 million; and 2017: $5 million.

## Note 7   BASIC AND DILUTED NET INCOME ATTRIBUTABLE TO YAHOO! COMMON STOCKHOLDERS PER SHARE

Basic and diluted net income attributable to Yahoo! common stockholders per share is computed using the weighted average number of common shares outstanding during the period, excluding net income attributable to participating securities (restricted stock awards granted under the Company's 1995 Stock Plan and restricted stock units granted under the Company's 1996 Directors' Stock Plan (the "Directors' Plan")). Diluted net income per share is computed using the weighted average number of common shares and, if dilutive, potential common shares outstanding during the period. Potential common shares are calculated using the treasury stock method and consist of unvested restricted stock and shares underlying unvested restricted stock units, the incremental common shares issuable upon the exercise of stock options, and shares to be purchased under the Company's 1996 Employee Stock Purchase Plan (the "Employee Stock Purchase Plan"). The Company calculates potential tax windfalls and shortfalls by including the impact of pro forma deferred tax assets.

The Company takes into account the effect on consolidated net income per share of dilutive securities of entities in which the Company holds equity interests that are accounted for using the equity method.

For 2010, 2011, and 2012, potentially dilutive securities representing approximately 80 million, 56 million, and 39 million shares of common stock, respectively, were excluded from the computation of diluted earnings per share for these periods because their effect would have been anti-dilutive.

86

Table of Contents

The following table sets forth the computation of basic and diluted net income per share (in thousands, except per share amounts):

| | Years Ended December 31, | | |
| | 2010 | 2011 | 2012 |
|---|---|---|---|
| **Basic:** | | | |
| Numerator: | | | |
| Net income attributable to Yahoo! Inc. | $1,231,663 | $1,048,827 | $3,945,479 |
| Less: Net income allocated to participating securities | (178) | (15) | (56) |
| Net income attributable to Yahoo! Inc. common stockholders—basic | $1,231,485 | $1,048,812 | $3,945,423 |
| Denominator: | | | |
| Weighted average common shares | 1,354,118 | 1,274,240 | 1,192,775 |
| Net income attributable to Yahoo! Inc. common stockholders per share—basic | $ 0.91 | $ 0.82 | $ 3.31 |
| **Diluted:** | | | |
| Numerator: | | | |
| Net income attributable to Yahoo! Inc. | $1,231,663 | $1,048,827 | $3,945,479 |
| Less: Net income allocated to participating securities | (94) | (14) | (55) |
| Less: Effect of dilutive securities issued by equity investees | (2,928) | (2,698) | (4,920) |
| Net income attributable to Yahoo! Inc. common stockholders—diluted | $1,228,641 | $1,046,115 | $3,940,504 |
| Denominator: | | | |
| Denominator for basic calculation | 1,354,118 | 1,274,240 | 1,192,775 |
| Weighted average effect of Yahoo! Inc. dilutive securities: | | | |
| Restricted stock and restricted stock units | 5,169 | 5,347 | 8,403 |
| Stock options and employee stock purchase plan | 5,325 | 2,695 | 1,728 |
| Denominator for diluted calculation | 1,364,612 | 1,282,282 | 1,202,906 |
| Net income attributable to Yahoo! Inc. common stockholders per share—diluted | $ 0.90 | $ 0.82 | $ 3.28 |

**Note 8   INVESTMENTS IN EQUITY INTERESTS**

As of December 31, investments in equity interests consisted of the following (dollars in thousands):

| | 2011 | 2011 Percent Ownership | 2012 | 2012 Percent Ownership |
|---|---|---|---|---|
| Alibaba Group | $2,521,825 | 42% | $ 276,389 | 24% |
| Yahoo Japan | 2,219,946 | 35% | 2,555,717 | 35% |
| Other | 7,273 | 35% | 8,051 | 24% |
| Total | $4,749,044 | | $2,840,157 | |

*Equity Investment in Alibaba Group.* On October 23, 2005, the Company acquired approximately 46 percent of the outstanding common stock of the Alibaba Group, which represented approximately 40 percent on a fully diluted basis, in exchange for $1.0 billion in cash, the contribution of the Company's China-based businesses ("Yahoo! China"), and direct transaction costs of $8 million. Another investor in Alibaba Group is Softbank Corp., a Japanese corporation ("Softbank"). Alibaba Group is a privately-held company.

87

**Table of Contents**

The Company's initial purchase price was based on acquiring a 40 percent equity interest in Alibaba Group on a fully diluted basis; however, the Company acquired a 46 percent interest based on outstanding shares. In allocating the initial excess of the carrying value of the investment in Alibaba Group over its proportionate share of the net assets of Alibaba Group, the Company allocated a portion of the excess to goodwill to account for the estimated reductions in the carrying value of the investment in Alibaba that may occur as the Company's equity interest is diluted to 40 percent based on specific events anticipated at the time. As of December 31, 2011 and 2012, the Company's ownership interest in Alibaba Group was approximately 42 percent and 24 percent, respectively.

The investment in Alibaba Group is being accounted for using the equity method, and the total investment, including net tangible assets, identifiable intangible assets and goodwill, is classified as part of investments in equity interests on the Company's consolidated balance sheets.

The Company's accounting policy is to record its share of the results of Alibaba Group, and any related amortization expense, one quarter in arrears, within earnings in equity interests in the consolidated statements of income. As of December 31, 2012, Alibaba Group's common shareholders' equity is a net deficit as a result of the repurchase of its ordinary shares from the Company at fair value, which was significantly in excess of the book value per share. The Company's remaining investment balance represents excess cost largely attributable to goodwill.

*Framework Agreement with Alibaba Group regarding Alipay.* Alibaba Group restructured the ownership of Alipay.com Co., Ltd. ("Alipay") and deconsolidated Alipay in the first quarter of 2011. The impact of the deconsolidation of Alipay was not material to the Company's financial statements. On July 29, 2011, the Company entered into a Framework Agreement (the "Framework Agreement") with Alibaba Group, Softbank, Alipay, APN Ltd., a company organized under the laws of the Cayman Islands ("IPCo"), Zhejiang Alibaba E-Commerce Co., Ltd., a limited liability company organized under the laws of the People's Republic of China ("HoldCo"), Jack Ma Yun, Joseph C. Tsai and certain security holders of Alipay or HoldCo as joinder parties. The Framework Agreement establishes the ongoing financial and other arrangements between Alibaba Group and Alipay. The transactions under the Framework Agreement closed on December 14, 2011.

Pursuant to the terms of the Framework Agreement: (1) Alibaba Group will receive certain payments ("Liquidity Event Payment") upon a liquidity event related to Alipay, such as an initial public offering or sale of Alipay; (2) Alibaba Group received a non-interest bearing promissory note in the principal amount of $500 million with a seven year maturity (the "IPCo Promissory Note"); (3) upon payment in full of the Liquidity Event Payment certain assets used in the Alipay business that were retained by Alibaba Group will be transferred to Alipay; (4) Alibaba Group and Alipay entered into a long-term agreement pursuant to which Alibaba Group will receive payment processing services on preferential terms from Alipay and its subsidiaries; and (5) Alibaba Group licensed to Alipay certain intellectual property and technology and performs certain software technology services for Alipay and in return Alipay pays to Alibaba Group a royalty and software technology services fee.

The royalty and software technology services fee and the payment processing services fees discussed above approximate the estimated fair values of such services and are recognized in Alibaba Group's financial statements as income or expense, as applicable, as the services are rendered. The Company will record its share, if any, of the results of these transactions as they are recorded by Alibaba Group within Yahoo!'s earnings in equity interests in the condensed consolidated statements of income. Alibaba Group will recognize the Liquidity Event Payment, the payment of the IPCo Promissory Note, and any impact from the transfer of assets, described above, if and when such payments or transfers occur. The Company will record its share, if any, of the results of these transactions as they are recorded by Alibaba Group within the Company's earnings in equity interests in the consolidated statements of income.

88

Table of Contents

*Initial Repurchase by Alibaba Group.* On September 18, 2012 (the "Repurchase Closing Date"), Alibaba Group repurchased 523 million of the 1,047 million Alibaba Group Shares owned by the Company (the "Initial Repurchase"). The Initial Repurchase was made pursuant to the terms of the Share Repurchase and Preference Share Sale Agreement entered into by Yahoo! Inc., Alibaba Group and Yahoo! Hong Kong Holdings Limited, a Hong Kong corporation and wholly-owned subsidiary of Yahoo! Inc. ("YHK") on May 20, 2012 (as amended on September 11, 2012, the "Repurchase Agreement"). Yahoo! received $13.54 per Share, or approximately $7.1 billion in total consideration, for the 523 million Shares sold to Alibaba Group. Approximately $6.3 billion of the consideration was received in cash and $800 million was received in Alibaba Group Preference Shares. The Initial Repurchase resulted in a pre-tax gain of approximately $4.6 billion for the year ended December 31, 2012. The Company will continue to account for its remaining approximately 24 percent ownership interest in Alibaba Group under the equity method.

The Alibaba Group Preference Shares yield semi-annual dividends at a rate per annum of up to 10 percent, with at least 3 percent payable in cash and the remainder accruing and resulting in an increase to the liquidation preference. The dividend rate is subject to certain adjustments. The Alibaba Group Preference Shares will be freely transferable by Yahoo! after 18 months from the Repurchase Closing Date, are callable by Alibaba Group at any time at the liquidation preference, will not be convertible, and are mandatorily redeemable at the liquidation preference (including accrued dividends) by Alibaba Group on the earlier of the tenth anniversary of the Repurchase Closing Date and the occurrence of certain specified events. The Alibaba Group Preference Shares are classified as available for sale securities.

The Repurchase Agreement provides that at the time Alibaba Group completes an initial public offering meeting certain specified criteria (a "Qualified IPO"), Yahoo! and YHK will sell, at Alibaba Group's election (either directly to Alibaba Group or in the Qualified IPO), up to 261.5 million of their remaining Shares. If Shares are sold back to Alibaba Group in the Qualified IPO, the purchase price per Share will be equal to the per share price in the Qualified IPO less specified fees and underwriter discounts.

On the Repurchase Closing Date, the Company and Alibaba Group entered into an amendment of their existing Technology and Intellectual Property License Agreement (the "TIPLA") pursuant to which Alibaba Group made a payment to the Company of $550 million in satisfaction of certain future royalty payments under the existing TIPLA. The Company will recognize this revenue over the remaining four-year term. For the year ended December 31, 2012, the Company recognized approximately $39 million in revenue related to the TIPLA. Alibaba Group will continue making royalty payments until the earlier of the fourth anniversary of the effective date of the amendment and a Qualified IPO. Pursuant to the terms of the TIPLA, the Company also recognized revenue of approximately $28 million, $44 million, and $86 million for the years ended December 31, 2010, 2011, and 2012, respectively.

The following table presents Alibaba Group's U.S. GAAP financial information, as derived from the Alibaba Group financial statements (in thousands):

| | Twelve Months Ended September 30, | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Operating data(*): | | | |
| Revenue | $1,298,229 | $2,344,973 | $4,082,838 |
| Gross profit | $ 986,455 | $1,557,392 | $2,764,314 |
| (Loss) income from operations | $ (14,346) | $ 325,334 | $ 687,632 |
| Net income | $ 42,463 | $ 339,552 | $ 536,050 |
| Net (loss) income attributable to Alibaba Group | $ (10,743) | $ 268,004 | $ 484,511 |

89

**Table of Contents**

| | September 30, 2011 | September 30, 2012 |
|---|---|---|
| Balance sheet data(*): | | |
| Current assets | $ 3,491,753 | $ 4,062,823 |
| Long-term assets | $ 2,993,329 | $ 3,204,144 |
| Current liabilities | $ 1,562,840 | $ 2,624,656 |
| Long-term liabilities | $ 134,160 | $ 4,705,347 |
| Convertible preferred shares | $ 1,415 | $ 1,317,526 |
| Noncontrolling interests | $ 406,805 | $ 65,907 |

(*) In the period ended June 30, 2012, Alibaba Group purchased the remaining noncontrolling interest in Alibaba.com for total consideration of approximately $2.5 billion. The purchase was primarily financed by the issuance of debt. The excess of consideration over book value of the noncontrolling interest was recorded as a reduction to the shareholders' equity of Alibaba Group, which increased the Company's excess cost related to its investment in Alibaba Group.

Since acquiring its interest in Alibaba Group, the Company has recorded, in retained earnings, cumulative earnings in equity interests, net of tax, of $440 million and $661 million as of December 31, 2011 and 2012, respectively.

*Equity Investment in Yahoo Japan.* During April 1996, the Company signed a joint venture agreement with Softbank, which was amended in September 1997, whereby Yahoo Japan Corporation ("Yahoo Japan") was formed. Yahoo Japan was formed to establish and manage a local version of Yahoo! in Japan.

The investment in Yahoo Japan is being accounted for using the equity method and the total investment, including net tangible assets, identifiable intangible assets and goodwill, is classified as part of the investments in equity interests balance on the Company's consolidated balance sheets. The Company records its share of the results of Yahoo Japan and any related amortization expense, one quarter in arrears, within earnings in equity interests in the consolidated statements of income.

Yahoo Japan's financial statements are prepared in accordance with accounting principles generally accepted in Japan ("Japanese GAAP"). The Company makes adjustments to its earnings in equity interests line in the consolidated statements of income for any differences between U.S. GAAP and Japanese GAAP.

During the year ended December 31, 2011, the Company recorded $33 million in U.S. GAAP adjustments to Yahoo Japan's net income to reflect the Company's 35 percent share of non-cash losses related to impairments of assets held by Yahoo Japan. The $33 million recorded during the year ended December 31, 2011 primarily includes $7 million related to the Company's share of a non-cash loss in connection with an impairment of assets held by Yahoo Japan in the second quarter of 2011 and a $26 million, U.S. GAAP adjustment to Yahoo Japan's net income in the first quarter of 2011 to reflect the Company's share of an other-than-temporary impairment of a cost method investment of Yahoo Japan that resulted primarily from reductions in the projected operating results of the Yahoo Japan investee.

The fair value of the Company's ownership in the common stock of Yahoo Japan, based on the quoted stock price, was approximately $7 billion as of December 31, 2012.

During the years ended December 31, 2010, 2011 and 2012, the Company received cash dividends from Yahoo Japan in the amounts of $61 million, $75 million, and $84 million, net of tax, respectively, which were recorded as reductions in the Company's investment in Yahoo Japan.

The following tables present summarized financial information derived from Yahoo Japan's consolidated financial statements. The Company has made adjustments to the Yahoo Japan financial information to address differences between Japanese GAAP and U.S. GAAP that materially impact the summarized financial

90

**Table of Contents**

information below. Due to these adjustments, the Yahoo Japan summarized financial information presented below is not materially different than such information presented on the basis of U.S. GAAP.

| | Twelve Months Ended September 30, | | |
| --- | --- | --- | --- |
| | 2010 | 2011 | 2012 |
| Operating data: | | | |
|     Revenue | $3,563,989 | $3,988,377 | $4,265,824 |
|     Gross profit | $2,882,992 | $3,311,357 | $3,594,633 |
|     Income from operations | $1,679,221 | $1,963,924 | $2,189,323 |
|     Net income | $ 981,388 | $1,114,637 | $1,313,494 |
|     Net income attributable to Yahoo Japan | $ 975,715 | $1,108,390 | $1,308,539 |

| | September 30, | |
| --- | --- | --- |
| | 2011 | 2012 |
| Balance sheet data: | | |
|     Current assets | $3,622,833 | $5,752,826 |
|     Long-term assets | $2,907,062 | $1,837,829 |
|     Current liabilities | $1,117,773 | $1,167,772 |
|     Long-term liabilities | $ 36,009 | $ 49,461 |
|     Noncontrolling interests | $ 31,102 | $ 31,034 |

Since acquiring its equity interest in Yahoo Japan, the Company has recorded cumulative earnings in equity interests, net of dividends received and related taxes on dividends, of $1.9 billion and $2.3 billion as of December 31, 2011 and 2012, respectively.

Under technology and trademark license and other commercial arrangements with Yahoo Japan, the Company records revenue from Yahoo Japan based on a percentage of advertising revenue earned by Yahoo Japan. The Company recorded revenue from Yahoo Japan of approximately $308 million, $287 million, and $281 million, respectively, for the years ended December 31, 2010, 2011, and 2012. As of December 31, 2011 and 2012, the Company had net receivable balances from Yahoo Japan of approximately $42 million and $43 million, respectively.

**Note 9   DERIVATIVE FINANCIAL INSTRUMENTS**

The Company uses derivative financial instruments, primarily forward contracts, to mitigate risk associated with adverse movements in foreign currency exchange rates. The Company evaluates the foreign currency risk and whether to apply hedge accounting using ASC 815.

*Net Investment Hedges.* In December 2012, the Company started hedging, on an after-tax basis, its net investment in Yahoo Japan with forward contracts to reduce the risk that its investment in Yahoo Japan will be adversely affected by foreign currency exchange rate fluctuations. The forward contracts have maturities ranging from 9 months to 15 months. The Company elected to apply hedge accounting on its forward contracts for the net investment hedge of Yahoo Japan. There was no ineffectiveness recorded for the net investment hedge for the year ended December 31, 2012. The Company recognizes net investment derivative instruments as either an asset or a liability on the Company's consolidated balance sheets at fair value. The notional amounts of the foreign currency forward contracts were $3 billion as of December 31, 2012. The fair value of the foreign currency forward contract assets were $3 million as of December 31, 2012, and are included in prepaid expenses and other current assets on the Company's consolidated balance sheet. A gain of $3 million was recorded for the year ended December 31, 2012 and was included in accumulated other comprehensive income on the Company's consolidated balance sheet. The Company did not enter into any net investment hedges in the years ended December 31, 2010 and 2011.

*Balance Sheet Hedges.* The Company recognizes balance sheet derivative instruments as either an asset or a liability on the Company's consolidated balance sheets at fair value. Changes in the fair value of these

91

[Table of Contents](#)

derivatives are recorded in other income, net on the Company's consolidated statements of income. The notional amounts of these foreign currency forward contracts were $92 million and $356 million as of December 31, 2011 and 2012, respectively. The fair value of the foreign currency forward contract liabilities were $3 million and $5 million as of December 31, 2011 and 2012, respectively, and a loss of $3 million and a gain of $4 million were recorded for the years ended December 31, 2011 and 2012, respectively. The Company did not enter into any balance sheet hedges in the year ended December 31, 2010.

## Note 10    CREDIT FACILITY

On October 19, 2012, the Company entered into a credit agreement (the "Credit Agreement") with Citibank, N.A., as Administrative Agent, and the other lenders party thereto from time to time. The Credit Agreement provides for a $750 million unsecured revolving credit facility for a term of 364 days, subject to extension for additional 364-day periods in accordance with the terms and conditions of the Credit Agreement. The Company may elect to increase the revolving credit facility by up to $250 million if existing or new lenders provide additional revolving commitments in accordance with the terms of the Credit Agreement. The proceeds from borrowings under the Credit Agreement, if any, are expected to be used for general corporate purposes. Borrowings under the Credit Agreement will bear interest at a rate equal to, at the Company's option, either (a) a customary London interbank offered rate (a "Eurodollar Rate"), or (b) a customary base rate (a "Base Rate"), in each case plus an applicable margin. The applicable margin for borrowings under the Credit Agreement will be based upon the leverage ratio of the Company and range from 1.25 percent to 1.50 percent with respect to Eurodollar Rate borrowings and 0.25 percent to 0.50 percent with respect to Base Rate borrowings.

As of December 31, 2012, the Company was in compliance with the financial covenants in the credit facility and no amounts were outstanding.

## Note 11    COMMITMENTS AND CONTINGENCIES

*Lease Commitments.* The Company leases office space and data centers under operating and capital lease agreements with original lease periods up to 12 years which expire between 2012 and 2022.

In 2008, the Company entered into an 11-year lease agreement for a data center in the western U.S. Of the total expected minimum lease commitment of $105 million, $21 million was classified as an operating lease for real estate and $84 million was classified as a capital lease for equipment. As of December 31, 2012, the Company had total expected and remaining minimum lease commitments of approximately $69 million over the lease term. The Company has the option to renew this lease for up to an additional 10 years.

During the second quarter of 2010, the Company acquired certain office space for a total of $72 million ($7 million in cash and the assumption of $65 million in debt). In the first quarter of 2010, the property was reclassified from an operating lease to a capital lease as a result of a commitment to purchase the property. Accordingly, in the second quarter the Company reduced the capital lease obligation for the $7 million cash outlay and reclassified the remaining $65 million as assumed debt in its consolidated balance sheets.

Rent expense for all operating leases was approximately $81 million, $84 million, and $76 million for 2010, 2011, and 2012, respectively.

Many of the Company's leases contain one or more of the following options which the Company can exercise at the end of the initial lease term: (i) renewal of the lease for a defined number of years at the then fair market rental rate or at a slight discount to the fair market rental rate; (ii) purchase of the property at the then fair market value; or (iii) right of first offer to lease additional space that becomes available.

Table of Contents

Gross and net lease commitments as of December 31, 2012 can be summarized as follows (in millions):

| Years ending December 31, | Gross Operating Lease Commitments | | Sublease Income | | Net Operating Lease Commitments | |
|---|---|---|---|---|---|---|
| 2013 | $ | 135 | $ | (13) | $ | 122 |
| 2014 | | 106 | | (11) | | 95 |
| 2015 | | 82 | | (7) | | 75 |
| 2016 | | 46 | | (2) | | 44 |
| 2017 | | 31 | | — | | 31 |
| Due after 5 years | | 38 | | — | | 38 |
| Total gross and net lease commitments | $ | 438 | $ | (33) | $ | 405 |

| Years ending December 31, | Capital Lease Commitment | |
|---|---|---|
| 2013 | $ | 9 |
| 2014 | | 8 |
| 2015 | | 8 |
| 2016 | | 8 |
| 2017 | | 9 |
| Due after 5 years | | 13 |
| Gross lease commitment | $ | 55 |
| Less: interest | | (18) |
| Net lease commitment included in capital lease and other long-term liabilities | $ | 37 |

*Affiliate Commitments.* In connection with contracts to provide advertising services to Affiliates, the Company is obligated to make payments, which represent TAC, to its Affiliates. As of December 31, 2012, these commitments totaled $78 million and will be payable in 2013.

*Non-cancelable Obligations.* The Company is obligated to make payments under various non-cancelable arrangements with vendors and other business partners, principally for marketing, bandwidth, co-location, and content arrangements. As of December 31, 2012, these commitments totaled $178 million, of which $98 million will be payable in 2013, $34 million will be payable in 2014, $15 million will be payable in 2015, $10 million will be payable in 2016, $3 million will be payable in 2017, and $18 million will be payable thereafter.

*Intellectual Property Rights.* The Company is committed to make certain payments under various intellectual property arrangements of up to $31 million through 2023.

*Other Commitments.* In the ordinary course of business, the Company may provide indemnifications of varying scope and terms to customers, vendors, lessors, joint ventures and business partners, purchasers of assets or subsidiaries and other parties with respect to certain matters, including, but not limited to, losses arising out of the Company's breach of agreements or representations and warranties made by the Company, services to be provided by the Company, intellectual property infringement claims made by third parties or, with respect to the sale of assets or a subsidiary, matters related to the Company's conduct of the business and tax matters prior to the sale. In addition, the Company has entered into indemnification agreements with its directors and certain of its officers that will require the Company, among other things, to indemnify them against certain liabilities that may arise by reason of their status or service as directors or officers. The Company has also agreed to indemnify certain former officers, directors, and employees of acquired companies in connection with the acquisition of such companies. The Company maintains director and officer insurance, which may cover certain liabilities arising from its obligation to indemnify its directors and officers, and former directors and officers of acquired

93

**Table of Contents**

companies, in certain circumstances. It is not possible to determine the aggregate maximum potential loss under these indemnification agreements due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each particular agreement. Such indemnification agreements might not be subject to maximum loss clauses. Historically, the Company has not incurred material costs as a result of obligations under these agreements and it has not accrued any liabilities related to such indemnification obligations in the Company's consolidated financial statements.

As of December 31, 2012, the Company did not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As such, the Company is not exposed to any financing, liquidity, market, or credit risk that could arise if the Company had engaged in such relationships. In addition, the Company identified no variable interests currently held in entities for which it is the primary beneficiary.

See Note 18—"Search Agreement with Microsoft Corporation" for a description of the Company's Search Agreement and License Agreement with Microsoft.

*Legal Contingencies.*

Intellectual Property Matters. From time to time, third parties assert patent infringement claims against the Company. Currently, the Company is engaged in lawsuits regarding patent issues and has been notified of other potential patent disputes. In addition, from time to time, the Company is subject to other legal proceedings and claims in the ordinary course of business, including claims of alleged infringement of trademarks, copyrights, trade secrets, and other intellectual property rights, claims related to employment matters, and a variety of other claims, including claims alleging defamation, invasion of privacy, or similar claims arising in connection with the Company's e-mail, message boards, photo and video sites, auction sites, shopping services, and other communications and community features.

Stockholder and Securities Matters. On June 14, 2007, a stockholder derivative action was filed in the United States District Court for the Central District of California by Jill Watkins against members of the Board and selected officers. The complaint filed by the plaintiff alleged breaches of fiduciary duties and corporate waste, similar to the allegations in a former class action relating to stock price declines during the period April 2004 to July 2006, and alleged violation of Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). On July 16, 2009, the plaintiff Watkins voluntarily dismissed the action against all defendants without prejudice. On July 17, 2009, plaintiff Miguel Leyte-Vidal, who had substituted in as plaintiff prior to the dismissal of the federal Watkins action, re-filed a stockholder derivative action in Santa Clara County Superior Court against members of the Board and selected officers. The Santa Clara County Superior Court derivative action purports to assert causes of action on behalf of the Company for violation of specified provisions of the California Corporations Code, for breaches of fiduciary duty regarding financial accounting and insider selling and for unjust enrichment. On September 19, 2011, the Court sustained Yahoo!'s demurrer to plaintiff's third amended complaint without leave to amend. Plaintiff has appealed.

Since May 31, 2011, several related stockholder derivative suits were filed in the Santa Clara County Superior Court ("California Derivative Litigation") and the United States District Court for the Northern District of California ("Federal Derivative Litigation") purportedly on behalf of the Company against certain officers and directors of the Company and third parties. The California Derivative Litigation was filed by plaintiffs Cinotto, Lassoff, Zucker, and Koo, and consolidated under the caption *In re Yahoo! Inc. Derivative Shareholder Litigation* on June 24, 2011 and September 12, 2011. The Federal Derivative Litigation was filed by plaintiffs Salzman, Tawila, and Iron Workers Mid-South Pension Fund and consolidated under the caption *In re Yahoo! Inc. Shareholder Derivative Litigation* on October 3, 2011. The plaintiffs allege breaches of fiduciary duties, corporate waste, mismanagement, abuse of control, unjust enrichment, misappropriation of corporate assets, or contribution and seek damages, equitable relief, disgorgement and corporate governance changes in connection

94

Table of Contents

with Alibaba Group's restructuring of its subsidiary Alipay and related disclosures. On June 7, 2012, the courts approved stipulations staying the California Derivative Litigation pending resolution of the Federal Derivative Litigation, and deferring the Federal Derivative Litigation pending a ruling on the motion to dismiss filed by the defendants in the related stockholder class actions, which are discussed below.

Since June 6, 2011, two purported stockholder class actions were filed in the United States District Court for the Northern District of California against the Company and certain officers and directors of the Company by plaintiffs Bonato and the Twin Cities Pipe Trades Pension Trust. In October 2011, the District Court consolidated the two actions under the caption *In re Yahoo! Inc. Securities Litigation* and appointed the Pension Trust Fund for Operating Engineers as lead plaintiff. In a consolidated amended complaint filed December 15, 2011, the lead plaintiff purports to represent a class of investors who purchased the Company's common stock between April 19, 2011 and July 29, 2011, and alleges that during that class period, defendants issued statements that were materially false or misleading because they did not disclose information relating to Alibaba Group's restructuring of Alipay. The complaint purports to assert claims for relief for violation of Section 10(b) and 20(a) of the Exchange Act and for violation of Rule 10b-5 thereunder, and seeks unspecified damages, injunctive and equitable relief, fees and costs. On August 10, 2012, the court granted defendants' motion to dismiss the consolidated amended complaint. Plaintiffs have appealed.

Mexico Matter. On November 16, 2011, plaintiffs Worldwide Directories, S.A. de C.V. ("WWD"), and Ideas Interactivas, S.A. de C.V. ("Ideas") filed an action in the 49th Civil Court of Mexico against the Company, Yahoo! de Mexico, S.A. de C.V. ("Yahoo! Mexico"), Yahoo International Subsidiary Holdings, Inc., and Yahoo Hispanic Americas LLC. The complaint alleged claims of breach of contract, breach of promise, and lost profits in connection with various commercial contracts entered into among the parties between 2002 and 2004, relating to a business listings service, and alleged total damages of approximately $2.75 billion. On December 7, 2011, Yahoo! Mexico filed a counterclaim against WWD for payments of approximately $2.6 million owed to Yahoo! Mexico for services rendered. On April 10, 2012, plaintiffs withdrew their claim filed against Yahoo International Subsidiary Holdings, Inc. and Yahoo Hispanic Americas LLC.

On November 28, 2012, the 49th Civil Court of Mexico entered a non-final judgment against the Company and Yahoo! Mexico in the amount of USD $2.75 billion and a non-final judgment in favor of Yahoo! Mexico on its counterclaim against WWD in the amount of $2.6 million. The judgment against the Company and Yahoo! Mexico purports to leave open for determination in future proceedings certain other alleged damages that were not quantified in the judgment. The judgment was issued by a law clerk to the trial court judge who presided over the entire case during the trial court proceedings but stepped down from his position shortly before the judgment was entered.

On December 12, 2012 and December 13, 2012, respectively, Yahoo! Mexico and the Company appealed the judgment to a three-magistrate panel of the Superior Court of Justice for the Federal District (the "Superior Court"). The appeals must be heard as a matter of law and are pending.

The Company believes the plaintiffs' claims are without legal or factual merit. First, the plaintiffs' claims are based on agreements that were either terminated by agreement with releases or had expired or terminated in accordance with their terms, a non-binding letter of intent pursuant to which no definitive agreements were ever entered into by the parties, and correspondence that did not constitute agreements. Second, the loss of profits of the type claimed by plaintiffs are not awardable under Mexico law because they were not a direct and immediate consequence of a breach of contract. Of the $2.75 billion in total damages alleged by plaintiffs, more than $2.4 billion were for loss of profits. Third, the plaintiffs' alleged damages and loss of profits were further precluded by the agreements at issue through, among other things, contractual and legal limitations of liability. Fourth, the plaintiffs' pleadings in the complaint, as well as documentary evidence filed by the plaintiffs in support of their allegations, were generally deficient to support or establish plaintiffs' claims. Fifth, the decision failed to consider substantially all of the defenses asserted by the Company and Yahoo! Mexico. Finally, the Company believes that the law clerk who entered the judgment lacked the requisite authority to issue the judgment.

Table of Contents

The Company does not believe that it is probable that the judgment will be sustained on appeal and, accordingly, has not recorded an accrual for the judgment.

The Company cannot predict the timing of a decision or assure the ultimate outcome of its appeals. The Company intends to vigorously pursue all of its appeals. If the current appeals were to be unsuccessful, the Company and Yahoo! Mexico may file a petition with the Mexican Federal Civil Collegiate Court for the First Circuit (the "Civil Collegiate Court") to challenge the decision of the Superior Court as unconstitutional, unlawful, or both. If filed, this petition also must be heard as a matter of law. The parties may then petition for review of any decision of the Civil Collegiate Court to the Supreme Court of Justice of the Nation of Mexico (the "Mexico Supreme Court"). A petition to the Mexico Supreme Court, if filed, is granted at the discretion of the Mexico Supreme Court and its review is limited to interpretations of the Constitution of Mexico or the constitutionality of a provision of Mexico law.

The Company has determined, based on current knowledge, that the amount or range of reasonably possible losses, including reasonably possible losses in excess of amounts already accrued, is not reasonably estimable with respect to certain matters described above. The Company has also determined, based on current knowledge, that the aggregate amount or range of losses that are estimable with respect to the Company's legal proceedings, including the matters described above other than the Mexico matter, would not have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows. Amounts accrued as of December 31, 2011 and December 31, 2012 were not material. The ultimate outcome of legal proceedings involves judgments, estimates and inherent uncertainties, and cannot be predicted with certainty. In the event of a determination adverse to Yahoo!, its subsidiaries, directors, or officers in these matters including in the Mexico matter, however, the Company may incur substantial monetary liability and/or be required to change its business practices. Either of these events could have a material adverse effect on the Company's financial position, results of operations, or cash flows. The Company may also incur substantial legal fees, which are expensed as incurred, in defending against these.

## Note 12   STOCKHOLDERS' EQUITY

The Board has the authority to issue up to 10 million shares of preferred stock and to determine the price, rights, preferences, privileges, and restrictions, including voting rights, of those shares without any further vote or action by the stockholders.

*Stock Repurchases.* The Company repurchases its common stock from time to time in part to reduce the dilutive effects of its stock options, awards, and employee stock purchase plan.

In June 2010, the Board authorized a stock repurchase program allowing the Company to repurchase up to $3 billion of its outstanding shares of common stock from time to time. That repurchase program, which by its terms, would have expired in June 2013, was exhausted during the third quarter of 2012. In May 2012, the Board authorized a stock repurchase program allowing the Company to repurchase up to an additional $5 billion of its outstanding shares of common stock from time to time. The May 2012 repurchase program, according to its terms, will expire in June 2015 unless revoked earlier by the Board. Repurchases under the repurchase programs may take place in the open market or in privately negotiated transactions, including derivative transactions, and may be made under a Rule 10b5-1 plan.

Under the October 2006 program, in the year ended December 31, 2010, 63 million shares were repurchased under the October 2006 program for a total of $973 million, which exhausted the repurchase under the October 2006 program, and 56 million shares were repurchased under the June 2010 program for a total of $776 million, resulting in aggregate repurchases during the period of 119 million shares for a total of $1.7 billion at an average price of $14.68 per share. During the year ended December 31, 2011, 110 million shares were repurchased under the June 2010 program for a total of $1.6 billion at an average price of $14.75 per share. During the year ended December 31, 2012, the Company repurchased approximately 126 million shares of its common stock under the

96

**Table of Contents**

June 2010 and May 2012 stock repurchase programs at an average price of $17.20 per share for a total of $2.2 billion. The June 2010 program was exhausted during 2012. As of December 31, 2012, the May 2012 program had remaining authorized purchase capacity of $3.4 billion.

During the year ended December 31, 2011, the Company retired 82 million shares, resulting in reductions of $82 thousand in common stock, $643 million in additional paid-in capital, and $559 million in retained earnings. During the year ended December 31, 2012, the Company retired 79 million shares, resulting in reductions of $79 thousand in common stock, $631 million in additional paid-in capital, and $585 million in retained earnings. Treasury stock is accounted for under the cost method.

## Note 13   EMPLOYEE BENEFITS

*Benefit Plans.* The Company maintains the Yahoo! Inc. 401(k) Plan (the "401(k) Plan") for its full-time employees in the U.S. The 401(k) Plan allows employees of the Company to contribute up to the Internal Revenue Code prescribed maximum amount. Employees may elect to contribute from 1 to 50 percent of their annual compensation to the 401(k) Plan. The Company matches employee contributions at a rate of 25 percent, up to the IRS prescribed amount. Both employee and employer contributions vest immediately upon contribution. During 2010, 2011, and 2012, the Company's contributions to the 401(k) Plan amounted to approximately $21 million, $20 million, and $19 million, respectively. The Company also contributed approximately $23 million, $24 million, and $22 million to its other defined contribution retirement benefit plans outside of the U.S. for 2010, 2011, and 2012, respectively.

*Stock Plans.* The 1995 Stock Plan provides for the issuance of stock-based awards to employees, including executive officers, and consultants. The 1995 Stock Plan permits the granting of incentive stock options, non-statutory stock options, restricted stock, restricted stock units, stock appreciation rights, and dividend equivalents.

Options granted under the 1995 Stock Plan before May 19, 2005 generally expire 10 years after the grant date, and options granted after May 19, 2005 generally expire seven years after the grant date. Options generally become exercisable over a four-year period based on continued employment and vest either monthly, quarterly, semi-annually, or annually.

The 1995 Stock Plan permits the granting of restricted stock and restricted stock units (collectively referred to as "restricted stock awards"). The restricted stock award vesting criteria are generally the passing of time, meeting certain performance-based objectives, or a combination of both, and continued employment through the vesting period (which varies but generally does not exceed four years). Restricted stock award grants are generally measured at fair value on the date of grant based on the number of shares granted and the quoted price of the Company's common stock. Such value is recognized as an expense over the corresponding service period.

The 1995 Stock Plan provides for the issuance of a maximum of 754 million shares of which 109 million shares were still available for award grant purposes as of December 31, 2012. Each share of the Company's common stock issued in settlement of "full-value awards" (which include all awards other than options and stock appreciation rights) granted on or after June 25, 2009 under the 1995 Stock Plan is counted as 1.75 shares against the 1995 Stock Plan's share limit.

The Directors' Plan provides for the grant of nonqualified stock options and restricted stock units to non-employee directors of the Company. The Directors' Plan provides for the issuance of up to 9 million shares of the Company's common stock, of which approximately 5 million were still available for award grant purposes as of December 31, 2012. Each share of the Company's common stock issued in settlement of restricted stock units granted after the Company's 2006 annual meeting of shareholders under the Directors' Plan is counted as 1.75 shares against the Directors' Plan's share limit.

Options granted under the Directors' Plan before May 25, 2006 generally become exercisable, based on continued service as a director, for initial grants to new directors, in equal monthly installments over four years,

97

Table of Contents

and for annual grants, with 25 percent of such options vesting on the one year anniversary of the date of grant and the remaining options vesting in equal monthly installments over the remaining 36-month period thereafter. Such options generally expire seven to 10 years after the grant date. Options granted on or after May 25, 2006 become exercisable, based on continued service as a director, in equal quarterly installments over one year. Such options generally expire seven years after the grant date.

Restricted stock units granted under the Directors' Plan generally vest in equal quarterly installments over a one-year period following the date of grant and, once vested, are generally payable in an equal number of shares of the Company's common stock on the earlier of the end of the one-year vesting period or the date the director ceases to be a member of the Board (subject to any deferral election that may be made by the director).

Non-employee directors are also permitted to elect an award of restricted stock units or a stock option under the Directors' Plan in lieu of a cash payment of fees for serving as chairperson of a committee of the Board. Such stock options or restricted stock unit awards granted in lieu of cash for chairperson fees are fully vested on the grant date.

*Employee Stock Purchase Plan.* The Employee Stock Purchase Plan allows employees to purchase shares of the Company's common stock through payroll deductions of up to 15 percent of their compensation subject to certain Internal Revenue Code limitations. Prior to November 2012, the price of common stock purchased under the plan was equal to 85 percent of the lower of the fair market value of the common stock on the commencement date of each 24-month offering period or the specified purchase date. Beginning in November 2012, the Employee Stock Purchase Plan was modified to consist of three-month offering periods. The price of the common stock purchased under the plan after November 2012 will be equal to 90 percent of the lower of the fair market value of the common stock on the commencement date of each three-month offering period or the specified purchase date.

The Employee Stock Purchase Plan provides for the issuance of a maximum of 75 million shares of common stock of which 19 million shares were available as of December 31, 2012. For the years ended December 31, 2010, 2011, and 2012, stock-based compensation expense related to the activity under the plan was $26 million, $46 million, and $31 million, respectively. As of December 31, 2012, there was $19 million of unamortized stock-based compensation cost related to the Employee Stock Purchase Plan which will be recognized over a weighted average period of 1.1 years.

The Company's 1995 Stock Plan, the Directors' Plan, and other stock-based award plans assumed through acquisitions are collectively referred to as the "Plans." Stock option activity under the Company's Plans is summarized as follows (in thousands, except years and per share amounts):

| | Shares | Weighted Average Exercise Price per Share | Weighted Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at December 31, 2011 | 62,439 | $ 21.94 | 3.07 | $ 80,211 |
| Options granted | 19,235 | $ 17.05 | | |
| Options exercised[1] | (11,212) | $ 12.76 | | |
| Options cancelled/forfeited | (11,040) | $ 14.85 | | |
| Options expired | (21,330) | $ 26.94 | | |
| Outstanding at December 31, 2012 | 38,092 | $ 21.42 | 4.19 | $ 78,387 |
| Vested and expected to vest at December 31, 2012[2] | 35,317 | $ 21.34 | 3.93 | $ 73,082 |
| Exercisable at December 31, 2012 | 21,079 | $ 24.16 | 2.02 | $ 34,315 |

[1]  The Company issued new shares to satisfy stock option exercises.

[2]  The expected to vest options are the result of applying the pre-vesting forfeiture rate assumptions to total outstanding options.

**Table of Contents**

The weighted average grant date fair value of options granted in the years ended December 31, 2010, 2011, and 2012 was $5.27, $5.04, and $4.36 per share, respectively.

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value (the aggregate difference between the closing stock price of the Company's common stock on December 31, 2012 and the exercise price for in-the-money options) that would have been received by the option holders if all in-the-money options had been exercised on December 31, 2012.

The total intrinsic value of options exercised in the years ended December 31, 2010, 2011, and 2012 was $49 million, $46 million, and $45 million, respectively.

As of December 31, 2012, there was $30 million of unamortized stock-based compensation expense related to unvested stock options, which is expected to be recognized over a weighted average period of 1.5 years.

Cash received from option exercises and purchases of shares under the Employee Stock Purchase Plan for the year ended December 31, 2012 was $218 million.

The total net tax benefit attributable to stock options exercised in the year ended December 31, 2012 was $14 million.

The fair value of option grants is determined using the Black-Scholes option pricing model with the following weighted average assumptions:

|  | Stock Options | | | Purchase Plans[5] | | |
|  | Years Ended December 31, | | | Years Ended December 31, | | |
|  | 2010 | 2011 | 2012 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Expected dividend yield[1] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Risk-free interest rate[2] | 1.6% | 1.3% | 0.6% | 1.2% | 0.4% | 0.4% |
| Expected volatility[3] | 34.7% | 36.9% | 31.9% | 60.5% | 35.6% | 33.7% |
| Expected life (in years)[4] | 4.06 | 4.03 | 4.02 | 0.55 | 1.04 | 1.21 |

[1]    The Company currently has no history or expectation of paying cash dividends on its common stock in the near future.

[2]    The risk-free interest rate is based on the U.S. Treasury yield for a term consistent with the expected term of the awards in effect at the time of grant.

[3]    The Company estimates the volatility of its common stock at the date of grant based on the implied volatility of publicly traded options on its common stock, with a term of one year or greater.

[4]    The expected life of stock options granted under the Plans is based on historical exercise patterns, which the Company believes are representative of future behavior. New grants issued by the Company had an expected life of 4.5 years in 2010, 4.25 years in 2011, and 4.00 years in 2012. Options assumed in acquisitions had expected lives of less than 4 years.

[5]    Assumptions for the Employee Stock Purchase Plan relate to the annual average of the enrollment periods. During the year ended December 31, 2012, enrollment was permitted in May and November of each year. Beginning in 2013, enrollment will be permitted in February, May, August, and November of each year.

Restricted stock awards activity for the year ended December 31, 2012 is summarized as follows (in thousands, except per share amounts):

|  | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Awarded and unvested at December 31, 2011 | 38,775 | $ | 17.28 |
| Granted | 25,023 | $ | 15.67 |
| Assumed | 351 | $ | 16.61 |
| Vested | (10,715) | $ | 15.96 |
| Forfeited | (19,633) | $ | 15.35 |
| Awarded and unvested at December 31, 2012 | 33,801 | $ | 17.63 |

99

Table of Contents

As of December 31, 2012, there was $281 million of unamortized stock-based compensation cost related to unvested restricted stock awards, which is expected to be recognized over a weighted average period of 2.5 years. The total fair value of restricted stock awards vested during the years ended December 31, 2010, 2011, and 2012 was $195 million, $136 million, and $171 million, respectively.

During the year ended December 31, 2012, 10.7 million shares subject to previously granted restricted stock awards vested. A majority of these vested restricted stock awards were net share settled. The Company withheld 3.9 million shares based upon the Company's closing stock price on the vesting date to settle the employees' minimum statutory obligation for the applicable income and other employment taxes. The Company then remitted cash to the appropriate taxing authorities.

Total payments for the employees' tax obligations to the relevant taxing authorities were $61 million for the year ended December 31, 2012 and are reflected as a financing activity within the consolidated statements of cash flows. The payments were used for tax withholdings related to the net share settlements of restricted stock units. The payments had the effect of share repurchases by the Company as they reduced the number of shares that would have otherwise been issued on the vesting date and were recorded as a reduction of additional paid-in capital.

In 2010, 2011, and 2012, $131 million, $71 million, and $36 million, respectively, of excess tax benefits from stock-based awards for options exercised and restricted stock awards that vested in current and prior periods were included as a source of cash flows from financing activities. These excess tax benefits represent the reduction in income taxes otherwise payable during the period, attributable to the actual gross tax benefits in excess of the expected tax benefits for options exercised and restricted stock awards that vested in current and prior periods. The Company has accumulated excess tax deductions relating to stock options exercised and restricted stock awards that vested prior to January 1, 2006 available to reduce income taxes otherwise payable. To the extent such deductions reduce income taxes payable in the current year, they are reported as financing activities in the consolidated statements of cash flows.

*CEO 2012 Annual Equity Awards.* Marissa A. Mayer, the Company's Chief Executive Officer, received an equity award for 2012 that will vest over three years. A total of $6 million of this equity award was granted as restricted stock units on July 26, 2012 and will vest over three years. The remaining portion of this equity award was granted in November 2012 as a performance-based stock option that will vest over the two and a half years after July 26, 2012, subject to satisfaction of performance criteria. See below for additional discussion of the performance-based stock options.

After 2012, Ms. Mayer will be eligible to receive annual equity grants when such grants are made to senior executives. Subject to the discretion of the Compensation and Leadership Development Committee of the Board of Directors (the "Compensation Committee"), the Company contemplates that the target value of such awards will not be less than the target value of her 2012 annual grant.

*CEO One-Time Retention Award.* Ms. Mayer received a one-time retention equity award that will vest over five years. A total of $15 million of this equity award was granted as restricted stock units on July 26, 2012 and will vest over five years. The remaining $15 million portion of this equity award was granted in November 2012 as a performance-based stock option that will vest over the four and a half years after July 26, 2012, subject to satisfaction of performance criteria. See below for additional discussion of the performance-based stock options.

*CEO Make-Whole Restricted Stock Units.* To partially compensate Ms. Mayer for forfeiture of compensation from her previous employer, on July 26, 2012 she was granted restricted stock units with a grant-date value of $14 million (the "Make-Whole RSUs"). The Make-Whole RSUs are scheduled to vest on the following schedule, based on grant date values: $7 million in 2013 and $3 million in 2014. $4 million of the Make-Whole RSUs vested in 2012.

*Former CEO Inducement and Make-Up Equity.* On January 27, 2012, Mr. Scott Thompson, former Chief Executive Officer, was granted an award of restricted stock units under the 1995 Stock Plan with an aggregate

100

**Table of Contents**

value of $6.5 million on the date of grant (the "Thompson Make-Whole RSUs"). On February 10, 2012, Mr. Thompson received a make-whole cash bonus of $1.5 million (the "Make-Whole Cash Bonus"). The Thompson Make-Whole RSUs and the Make-Whole Cash Bonus compensated Mr. Thompson for the forfeiture of the value of his cash bonus and equity awards from his previous employer. The Thompson Make-Whole RSUs vested as to a number of stock units with a grant date value of $5.5 million on March 15, 2012 and the remaining stock units were forfeited upon Mr. Thompson's resignation as Yahoo!'s Chief Executive Officer and President effective May 12, 2012.

The Company recorded total stock-based compensation expense of $6 million for year ended December 31, 2012 in connection with the equity grants made to Mr. Thompson pursuant to the terms of his employment letter agreement with the Company.

*Performance-Based Executive Incentive Equity Awards.* In November 2012, the Compensation Committee approved long-term performance-based stock options to Ms. Mayer and other senior officers that vest based on the Company's achievement of certain performance goals. The number of stock options which ultimately vest will range from 0 percent to 100 percent of the target amount stated in each executive's award agreement based on the attainment of performance targets. The stock options generally will vest in equal installments over periods ranging from six months to four and a half years based on the Company's attainment of certain financial performance targets as well as the executive's continued employment through the vesting period. The financial performance metrics (and their weightings) are revenue ex-TAC (50 percent), operating income (30 percent) and free cash flow (20 percent), in each case subject to adjustments specified in the award agreements. The financial performance targets for each metric are established at the beginning of each performance period and, accordingly, the tranche of the award subject to each target is treated as a separate annual grant for accounting purposes. In January 2013, financial performance targets were established for the first performance period (the six months ending June 30, 2013) and the second performance period (the full year ending December 31, 2013). The fair values of the first and second tranche of the November 2012 financial performance stock option grant were $12 million and $14 million, respectively. The Company began recording stock-based compensation expense in January 2013, when the financial performance targets were established and approved.

**Note 14    RESTRUCTURING CHARGES, NET**

Restructuring charges, net consists of costs associated with the Restructuring Plans Prior to 2012, the Q2'12 Restructuring Plan, and the Q4'12 Korea Business Closure. These charges include employee severance pay and related costs, accelerations and reversals of stock-based compensation expense, facility restructuring costs, contract termination and other non-cash charges associated with the exit of facilities, as well as reversals of restructuring charges arising from changes in estimates.

For the years ended December 31, 2010, 2011, and 2012, restructuring charges, net was comprised of the following (in thousands):

101

**Table of Contents**

| | Year Ended December 31, 2010 | Year Ended December 31, 2011 | Year Ended December 31, 2012 | | | |
| | Restructuring Plans Prior to 2012 | Restructuring Plans Prior to 2012 | Restructuring Plans Prior to 2012 | Q2'12 Restructuring Plan | Q4'12 Korea Business Closure | Total |
|---|---|---|---|---|---|---|
| Employee severance pay and related costs | $ 39,652 | $ 12,965 | $ 1,169 | $ 96,537 | $ 4,998 | $102,704 |
| Non-cancelable lease, contract terminations, and other charges | 19,737 | 10,251 | 8,462 | 9,541 | 8,996 | 26,999 |
| Other non-cash charges, net | 2,779 | 990 | — | 40,462 | 69,434 | 109,896 |
| Sub-total before (reversals) accelerations of stock-based compensation expense | 62,168 | 24,206 | 9,631 | 146,540 | 83,428 | 239,599 |
| (Reversals) accelerations of stock-based compensation expense | (4,211) | 214 | — | (3,429) | — | (3,429) |
| Restructuring charges, net | $ 57,957 | $ 24,420 | $ 9,631 | $ 143,111 | $83,428 | $236,170 |

Although the Company does not allocate restructuring charges to its segments, the amounts of the restructuring charges relating to each segment are presented below. For the years ended December 31, 2010, 2011, and 2012, restructuring charges, net consists of the following (in thousands):

| | Year Ended December 31, 2010 Restructuring Plans Prior to 2012 |
|---|---|
| Americas | $ 38,965 |
| EMEA | 16,735 |
| Asia Pacific | 2,257 |
| Restructuring charges, net | $ 57,957 |

| | Year Ended December 31, 2011 Restructuring Plans Prior to 2012 |
|---|---|
| Americas | $ 22,244 |
| EMEA | 952 |
| Asia Pacific | 1,224 |
| Restructuring charges, net | $ 24,420 |

| | Year Ended December 31, 2012 | | | |
| | Restructuring Plans Prior to 2012 | Q2'12 Restructuring Plan | Q4'12 Korea Business Closure | Total |
|---|---|---|---|---|
| Americas | $ 9,834 | $ 92,789 | $ — | $102,623 |
| EMEA | (617) | 45,977 | — | 45,360 |
| Asia Pacific | 414 | 4,345 | 83,428 | 88,187 |
| Restructuring charges, net | $ 9,631 | $ 143,111 | $83,428 | $236,170 |

102

**Table of Contents**

*Restructuring Plans Prior to 2012.* Prior to 2012, the Company implemented workforce reductions, a strategic realignment, and consolidation of certain real estate facilities and data centers to reduce its cost structure, align resources with its product strategy, and improve efficiency. During the year ended December 31, 2010, the Company incurred total pre-tax cash charges of $59 million in severance, facility and other related costs, net of reversal for adjustments to original estimates totaling $9 million. In addition to the pre-tax cash charges, the Company recorded a non-cash charge of $3 million related to asset impairment and a $4 million credit related to non-cash stock-based compensation expense reversals for unvested stock awards that were forfeited. Of the $58 million in restructuring charges, net, recorded in the year ended December 31, 2010, $39 million related to the Americas segment, $17 million related to the EMEA segment and $2 million related to the Asia Pacific segment. During the year ended December 31, 2011, the Company incurred total pre-tax cash charges of $23 million in severance, facility and other related costs, net of reversal for adjustments to original estimates totaling $12 million. In addition to the pre-tax cash charges, the Company recorded a non-cash charge of $1 million related to asset impairment. Of the $24 million in restructuring charges, net, recorded in the year ended December 31, 2011, $22 million related to the Americas segment, $1 million related to the EMEA segment, and $1 million related to the Asia Pacific segment. During the year ended December 31, 2012, the Company recorded total pre-tax cash charges of $10 million in severance, facility, and other related costs, net of reversal for adjustments to original estimates totaling $5 million. The majority of $10 million in restructuring charges, net, recorded in the year ended December 31, 2012, related to the Americas segment.

*Q2'12 Restructuring Plan.* During the second quarter of 2012, the Company began implementing the Q2'12 Restructuring Plan to reduce its worldwide workforce by approximately 2,000 employees and to consolidate certain real estate and data center facilities. During the year ended December 31 2012, the Company recorded total pre-tax cash charges of $139 million in severance and facility related costs and $40 million in non-cash facility and other asset impairment charges. The total pre-tax charges were offset by changes to original estimates of $33 million in severance related costs recognized throughout 2012, primarily as a result of redeployments and voluntary resignations of employees prior to their planned severance dates and a $3 million credit related to non-cash stock-based compensation expense reversals for unvested stock awards that were forfeited. Of the $143 million in restructuring charges, net, recorded in the year ended December 31, 2012, $93 million related to the Americas segment, $46 million related to the EMEA segment, and $4 million related to the Asia Pacific segment.

*Q4'12 Korea Business Closure.* During the fourth quarter of 2012, the Company decided to close its Korea business by the end of 2012 to streamline its operations and focus its resources. During the year ended December 31, 2012, the Company incurred total pre-tax cash charges of $13 million in severance and contract termination costs. In addition to the pre-tax cash charges, the Company recorded a non-cash charge of $86 million related to goodwill and other asset impairment and a non-cash credit approximately $16 million related to the reversal of previously recorded cumulative foreign currency translation adjustment. As a result, the Company recorded a net $83 million in restructuring charges all related to the Asia Pacific segment for the year ended December 31, 2012.

Restructuring Accruals. The $73 million restructuring liability as of December 31, 2012 consists of $35 million for employee severance pay expenses, which the Company expects to pay out by the end of the fourth quarter of 2013 and $38 million relates to non-cancelable lease and contract termination costs that the Company expects to pay over the terms of the related obligations which extend to the fourth quarter of 2021.

103

**Table of Contents**

The activity in the Company's restructuring accruals for the years ended December 31, 2011 and 2012 is summarized as follows (in thousands):

| | Restructuring Plans Prior to 2012 | Q2'12 Restructuring Plan | Q4'12 Korea Business Closure | Total |
|---|---|---|---|---|
| Balance as of January 1, 2011 | $ 87,102 | $ — | $ — | $ 87,102 |
| Employee severance pay and related costs | 22,151 | — | — | 22,151 |
| Non-cash reversals of stock-based compensation expense | 214 | — | — | 214 |
| Non-cancelable lease, contract termination, and other charges | 13,025 | — | — | 13,025 |
| Other non-cash charges | 990 | — | — | 990 |
| Changes in estimates and reversals of previous charges | (11,960) | — | — | (11,960) |
| Restructuring charges, net for the year ended December 31, 2011 | $ 24,420 | $ — | $ — | $ 24,420 |
| Cash paid | (62,205) | — | — | (62,205) |
| Non-cash reversals of stock-based compensation expense | (214) | — | — | (214) |
| Other non-cash charges | (270) | — | — | (270) |
| Foreign currency | 294 | — | — | 294 |
| Balance as of December 31, 2011 | $ 49,127 | $ — | $ — | $ 49,127 |
| Employee severance pay and related costs | 5,924 | 128,701 | 4,998 | 139,623 |
| Non-cash reversals of stock-based compensation expense | — | (3,429) | — | (3,429) |
| Non-cancelable lease, contract termination, and other charges | 8,792 | 9,997 | 8,996 | 27,785 |
| Other non-cash charges | — | 40,462 | 69,434 | 109,896 |
| Changes in estimates and reversals of previous charges | (5,085) | (32,620) | — | (37,705) |
| Restructuring charges, net for the year ended December 31, 2012 | $ 9,631 | $ 143,111 | $ 83,428 | $ 236,170 |
| Cash paid | (30,746) | (68,018) | (4,307) | (103,071) |
| Non-cash reversals of stock-based compensation expense | — | 3,429 | — | 3,429 |
| Other non-cash charges | (232) | (40,148) | (69,157) | (109,537) |
| Foreign currency | (64) | (3,325) | 138 | (3,251) |
| Balance as of December 31, 2012 | $ 27,716 | $ 35,049 | $ 10,102 | $ 72,867 |

As of December 31, restructuring accruals were included in the Company's consolidated balance sheets as follows (in thousands):

| | 2011 | 2012 |
|---|---|---|
| Accrued expenses and other current liabilities | $26,743 | $57,642 |
| Capital lease and other long-term liabilities | 22,384 | 15,225 |
| Total restructuring accruals | $49,127 | $72,867 |

104

**Table of Contents**

As of December 31, restructuring accruals by segment consisted of the following (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Americas | $41,199 | $42,689 |
| EMEA | 6,948 | 18,144 |
| Asia Pacific | 980 | 12,034 |
| Total restructuring accruals | $49,127 | $72,867 |

### Note 15   INCOME TAXES

The components of income before income taxes and earnings in equity interests are as follows (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| United States | $ 872,042 | $533,262 | $5,056,643 |
| Foreign | 198,351 | 294,254 | 157,564 |
| Income before income taxes and earnings in equity interests | $1,070,393 | $827,516 | $5,214,207 |

The provision for income taxes is composed of the following (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| Current: |  |  |  |
| United States federal | $ 26,342 | $141,922 | $2,278,759 |
| State | 39,258 | (11,037) | 361,788 |
| Foreign | 43,341 | 40,490 | 68,816 |
| Total current provision for income taxes | 108,941 | 171,375 | 2,709,363 |
| Deferred: |  |  |  |
| United States federal | 67,621 | 77,012 | (741,628) |
| State | 37,438 | (4,437) | (29,470) |
| Foreign | 7,523 | (2,183) | 1,778 |
| Total deferred provision (benefit) for income taxes | 112,582 | 70,392 | (769,320) |
| Provision for income taxes | $221,523 | $241,767 | $1,940,043 |

The provision for income taxes differs from the amount computed by applying the federal statutory income tax rate to income before income taxes and earnings in equity interests as follows (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| Income tax at the U.S. federal statutory rate of 35 percent | $ 374,638 | $289,630 | $1,824,973 |
| State income taxes, net of federal benefit | 54,268 | 4,627 | 237,637 |
| Change in valuation allowance | (1,315) | (5,975) | (82) |
| Stock-based compensation expense | 4,404 | 18,213 | 17,703 |
| Research tax credits | (10,345) | (10,499) | — |
| Effect of non-U.S. operations | (17,344) | (42,806) | (135,753) |
| Resolution with tax authorities | (159,168) | (14,685) | (4,711) |
| Tax gain in excess of book gain from sales of Zimbra, Inc. and HotJobs due to basis differences | 23,184 | — | — |
| Tax restructuring | (43,361) | — | — |
| Other | (3,438) | 3,262 | 276 |
| Provision for income taxes | $ 221,523 | $241,767 | $1,940,043 |

Table of Contents

Significant variances year over year as shown above are further explained as follows:

- In 2012, the Company made a one-time distribution of foreign earnings resulting in an overall net benefit of approximately $117 million. The benefit is primarily due to excess foreign tax credits. Of the $117 million, $102 million is included above within "effect of non-U.S. operations."

- State taxes were higher in 2010 due to a reduction of deferred tax assets associated with an effective tax rate reduction in California that started in 2011.

- In 2010, the Company had a favorable resolution of certain issues in an IRS examination of its 2005 and 2006 U.S. federal income tax returns resulting in a reduction of reserves for tax uncertainties and the availability of capital loss carryforwards to offset the tax on the gain from the sales of Zimbra, Inc. and HotJobs.

- During 2010, in connection with tax restructuring activities, the Company reached a formal agreement with the IRS through a pre-filing agreement to treat certain intercompany bad debts as deductible business expenses on the 2009 federal income tax return.

Deferred income taxes reflect the tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The components of deferred income tax assets and liabilities are as follows (in thousands):

|  | December 31, | |
|  | 2011 | 2012 |
| --- | --- | --- |
| Deferred income tax assets: | | |
|     Net operating loss and tax credit carryforwards | $ 152,810 | $219,054 |
|     Stock-based compensation expense | 143,799 | 81,910 |
|     Non-deductible reserves and expenses | 79,240 | 161,782 |
|     Unrealized investment gains | 3,497 | 3,584 |
|     Intangible assets | 6,632 | 5,861 |
|         Gross deferred income tax assets | 385,978 | 472,191 |
|         Valuation allowance | (53,140) | (51,503) |
|         Deferred income tax assets | $ 332,838 | $420,688 |
| Deferred income tax liabilities: | | |
|     Purchased intangible assets | (36,127) | (29,960) |
|     Investments in equity interests | (535,396) | (13,120) |
|         Deferred income tax liabilities | $(571,523) | $ (43,080) |
| Net deferred income tax assets (liabilities) | $(238,685) | $377,608 |

As of December 31, 2012, the Company's federal and state net operating loss carryforwards for income tax purposes were approximately $143 million and $127 million, respectively. The federal and state net operating loss carryforwards are subject to various limitations under Section 382 of the Internal Revenue Code and applicable state tax law. If not utilized, the federal and state net operating loss carryforwards will begin to expire in 2021. The Company's state research tax credit carryforward for income tax purposes is approximately $167 million and it can be carried forward indefinitely. Tax credit carryforwards that result from the exercise of employee stock options are not recorded on the Company's consolidated balance sheets and are accounted for as a credit to additional paid-in capital if and when realized through a reduction in income taxes payable.

The Company has a valuation allowance of approximately $52 million as of December 31, 2012 against certain deferred income tax assets that are not more likely than not to be realized in future periods. In evaluating the Company's ability to realize its deferred income tax assets, the Company considers all available positive and negative evidence, including operating results, ongoing tax planning, and forecasts of future taxable income on a jurisdiction by jurisdiction basis. The valuation allowance as of December 31, 2012 relates to foreign net operating loss carryforwards that will reduce the provision for income taxes if and when recognized.

106

**Table of Contents**

In connection with a review of the Company's cash position and anticipated cash needs for investment in the Company's core business, including potential acquisitions and capital expenditures, and stock repurchases, the Company made a one-time repatriation of foreign earnings and return of basis of foreign subsidiaries of $962 million from certain of its consolidated foreign subsidiaries in 2012. The distribution resulted in a net tax benefit of approximately $117 million during the twelve months ended December 31, 2012 since the foreign tax credits associated with the distribution are greater than the tax due on the distribution of the foreign earnings. The remaining undistributed foreign earnings of approximately $2 billion, principally related to Yahoo Japan, will continue to be indefinitely reinvested going forward. If these earnings were to be repatriated in the future, the Company may be subject to additional U.S. income taxes (subject to an adjustment for foreign tax credits). It is not practicable to determine the income tax liability that might be incurred if these earnings were to be repatriated.

The total amount of gross unrecognized tax benefits was $727 million as of December 31, 2012, of which up to $523 million would affect the Company's effective tax rate if realized. A reconciliation of the beginning and ending amount of unrecognized tax benefits in 2011 and 2012 is as follows (in thousands):

|  | 2011 | 2012 |
|---|---|---|
| Unrecognized tax benefits balance at January 1 | $ 597,055 | $532,862 |
| Gross increase for tax positions of prior years | 21,001 | 9,441 |
| Gross decrease for tax positions of prior years | (111,597) | (32,513) |
| Gross increase for tax positions of current year | 37,966 | 231,525 |
| Settlements | (9,617) | (10,520) |
| Lapse of statute of limitations | (1,946) | (3,428) |
| Unrecognized tax benefits balance at December 31 | $ 532,862 | $727,367 |

The total unrecognized tax benefits as of December 31, 2011 and 2012 include approximately $139 million and $84 million, respectively, of unrecognized tax benefits that have been netted against the related deferred tax assets. The remaining balances are recorded on the Company's consolidated balance sheets as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2011 | 2012 |
| Total unrecognized tax benefits balance | $ 532,862 | $727,367 |
| Amounts netted against related deferred tax assets | (139,258) | (83,635) |
| Unrecognized tax benefits recorded on consolidated balance sheets | $ 393,604 | $643,732 |
| Amounts classified as accrued expenses and other current liabilities | $  — | $ 30,484 |
| Amounts classified as deferred and other long-term tax liabilities, net | 393,604 | 613,248 |
| Unrecognized tax benefits recorded on consolidated balance sheets | $ 393,604 | $643,732 |

The Company recognizes interest and/or penalties related to uncertain tax positions in income tax expense. To the extent accrued interest and penalties do not ultimately become payable, amounts accrued will be reduced and reflected as a reduction of the overall income tax provision in the period that such determination is made. During 2011 and 2012, interest and penalties recorded in the consolidated statements of income were a credit of $2 million and a charge of $37 million, respectively. The amounts of accrued interest and penalties recorded on the consolidated balance sheets as of December 31, 2011 and 2012 were approximately $14 million and $51 million, respectively.

The Company files income tax returns in the U.S. federal jurisdiction and in many U.S. state and foreign jurisdictions. The tax years 1995 to 2010 remain open to examination by the major taxing jurisdictions in which the Company is subject to tax.

107

[Table of Contents](#)

During the last quarter of 2011, the Company commenced discussions with the IRS Appeals Division to settle the contested adjustments for certain intercompany transfer- pricing matters from the 2005 and 2006 income tax examination. A tentative agreement has been reached and if the matter is resolved on the basis that is currently being discussed with the IRS, then the settlement will not cause the Company to have tax exposure beyond what has already been provided. The Company has protested similar transfer-pricing adjustments to our 2007 and 2008 income tax returns. No hearings with the IRS Appeals Division have been held. The Company's 2009 and 2010 U.S. income tax returns are currently under IRS examination.

As of December 31, 2012, the Company's 2005 through 2008 tax returns are also under various stages of audit by the California Franchise Tax Board. While the Franchise Tax Board has not reached any conclusions on the 2007 and 2008 returns, the Company has protested the proposed adjustments to the 2005 and 2006 returns. The Company is also in various stages of examination and appeal in connection with its taxes in other U.S. states and in foreign jurisdictions, which generally span tax years 2005 through 2010

While it is difficult to determine when the examinations will be settled or their final outcomes, certain audits in various jurisdictions related to multinational income tax issues are expected to be resolved in the foreseeable future. As a result, it is reasonably possible that the unrecognized tax benefits could be reduced by up to approximately $90 million in the next twelve months. The Company believes that it has adequately provided for any reasonably foreseeable adjustment and that any settlement will not have a material adverse effect on the Company's consolidated financial position, results of operations, or cash flows.

The Company may have additional tax liabilities in China related to the sale to Alibaba Group of 523 million ordinary shares of Alibaba Group that took place during the year ended December 31, 2012. Any taxes assessed and paid in China are expected to be ultimately offset and recovered in the U.S.

During the year ended December 31, 2012, tax authorities from the Brazilian State of Sao Paulo assessed certain indirect taxes against the Company's Brazilian subsidiary, Yahoo! do Brasil Internet Ltda., related to online advertising services. The assessment totaling approximately $85 million is for calendar years 2008 and 2009. The Company currently believes the assessment is without merit. The Company does not believe that it is probable the assessment will be sustained upon appeal and, accordingly, has not recorded an accrual for the assessment.

## Note 16   RELATED PARTY TRANSACTIONS

Revenue from related parties, excluding Yahoo Japan and Alibaba Group, represented approximately 1 percent of total revenue for the years ended December 31, 2010, 2011, and 2012. Management believes that the terms of the agreements with these related parties are comparable to the terms obtained in arm's-length transactions with unrelated similarly situated customers of the Company.

See Note 8—"Investments in Equity Interests" for additional information related to transactions involving Yahoo Japan and Alibaba Group.

## Note 17   SEGMENTS

The Company manages its business geographically. The primary areas of measurement and decision-making are the Americas, EMEA (Europe, Middle East and Africa) and Asia Pacific. Management relies on an internal reporting process that provides revenue ex-TAC, which is defined as revenue less TAC, direct costs excluding TAC by segment, and consolidated income from operations for making decisions related to the evaluation of the financial performance of, and allocating resources to, the Company's segments.

108

**Table of Contents**

The following tables present summarized information by segment (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2011** | **2012** |
| Revenue by segment: | | | |
| Americas | $4,425,457 | $3,302,989 | $3,461,633 |
| EMEA | 579,145 | 629,383 | 472,061 |
| Asia Pacific | 1,320,049 | 1,051,827 | 1,052,872 |
| Total revenue | 6,324,651 | 4,984,199 | 4,986,566 |
| TAC by segment: | | | |
| Americas | 957,608 | 160,110 | 182,511 |
| EMEA | 210,261 | 221,916 | 114,230 |
| Asia Pacific | 568,554 | 221,345 | 222,165 |
| Total TAC | 1,736,423 | 603,371 | 518,906 |
| Revenue ex-TAC by segment: | | | |
| Americas | 3,467,849 | 3,142,879 | 3,279,122 |
| EMEA | 368,884 | 407,467 | 357,831 |
| Asia Pacific | 751,495 | 830,482 | 830,707 |
| Total revenue ex-TAC | 4,588,228 | 4,380,828 | 4,467,660 |
| Direct costs by segment[1]: | | | |
| Americas | 704,858 | 696,103 | 733,316 |
| EMEA | 149,594 | 165,750 | 161,990 |
| Asia Pacific | 175,589 | 225,417 | 224,114 |
| Global operating costs[2][3] | 1,847,832 | 1,638,975 | 1,672,070 |
| Depreciation and amortization | 656,396 | 625,864 | 649,267 |
| Stock-based compensation expense | 223,478 | 203,958 | 224,365 |
| Restructuring charges, net | 57,957 | 24,420 | 236,170 |
| Income from operations | $ 772,524 | $ 800,341 | $ 566,368 |

[1]   Direct costs for each segment include cost of revenue-other, as well as other operating expenses that are directly attributable to the segment such as employee compensation expense (excluding stock-based compensation expense), local sales and marketing expenses, and facilities expenses. Beginning in 2010, marketing and customer advocacy costs are managed locally and included as direct costs for each segment. Prior period amounts have been revised to conform to the current presentation.

[2]   Global operating costs include product development, service engineering and operations, general and administrative, and other corporate expenses that are managed on a global basis and that are not directly attributable to any particular segment. Prior to 2012, marketing and customer advocacy costs were managed on a global basis and included as global operating costs. Prior period amounts have been revised to conform to the current presentation.

[3]   The net cost reimbursements from Microsoft pursuant to the Search Agreement are primarily included in global operating costs.

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2011** | **2012** |
| Capital expenditures, net: | | | |
| Americas | $563,129 | $437,804 | $437,978 |
| EMEA | 58,533 | 49,371 | 27,074 |
| Asia Pacific | 92,416 | 106,119 | 40,455 |
| Total capital expenditures, net | $714,078 | $593,294 | $505,507 |

109

**Table of Contents**

| | December 31, | |
|---|---|---|
| | **2011** | **2012** |
| Property and equipment, net: | | |
| Americas: | | |
| U.S. | $1,486,596 | $1,483,225 |
| Other. | 2,500 | 1,869 |
| Total Americas | $1,489,096 | $1,485,094 |
| EMEA | 79,955 | 59,416 |
| Asia Pacific | 161,837 | 141,335 |
| Total property and equipment, net | $1,730,888 | $1,685,845 |

See also Note 5—"Goodwill" and Note 14—"Restructuring Charges, Net" for additional information regarding segments.

Enterprise Wide Disclosures:

The following table presents revenue for groups of similar services (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2011** | **2012** |
| Display | $2,154,886 | $2,160,309 | $2,142,818 |
| Search | 3,161,589 | 1,853,110 | 1,885,860 |
| Other | 1,008,176 | 970,780 | 957,888 |
| Total revenue | $6,324,651 | $4,984,199 | $4,986,566 |

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2011** | **2012** |
| Revenue: | | | |
| U.S. | $4,259,157 | $3,112,998 | $3,294,206 |
| International | 2,065,494 | 1,871,201 | 1,692,360 |
| Total revenue | $6,324,651 | $4,984,199 | $4,986,566 |

Revenue is attributed to individual countries according to the online property that generated the revenue. No single foreign country was material to revenue in 2010, 2011, and 2012, respectively.

**Note 18   SEARCH AGREEMENT WITH MICROSOFT CORPORATION**

On December 4, 2009, the Company entered into the Search Agreement with Microsoft, which provides for Microsoft to be the exclusive algorithmic and paid search services provider on Yahoo! Properties and non-exclusive provider of such services on Affiliate sites. The Company also entered into a License Agreement with Microsoft. Under the License Agreement, Microsoft acquired an exclusive 10-year license to the Company's core search technology and will have the ability to integrate this technology into its existing Web search platforms. The Company received regulatory clearance from both the U.S. Department of Justice and the European Commission on February 18, 2010 and commenced implementation of the Search Agreement on February 23, 2010. Under the Search Agreement, the Company will be the exclusive worldwide relationship sales force for both companies' premium search advertisers, which include advertisers meeting certain spending or other criteria, advertising agencies that specialize in or offer search engine marketing services and their clients, and resellers and their clients seeking assistance with their paid search accounts. The term of the Search Agreement is 10 years from February 23, 2010, subject to earlier termination as provided in the Search Agreement.

110

**Table of Contents**

During the first five years of the term of the Search Agreement, in the transitioned markets the Company is entitled to receive 88 percent of the revenue generated from Microsoft's services on Yahoo! Properties (the "Revenue Share Rate") and the Company is also entitled to receive 88 percent of the revenue generated from Microsoft's services on Affiliate sites after the Affiliate's share of revenue. For new Affiliates during the term of the Search Agreement, and for all Affiliates after the first five years of such term, the Company will receive 88 percent of the revenue generated from Microsoft's services on Affiliate sites after the Affiliate's share of revenue and certain Microsoft costs are deducted. On the fifth anniversary of the date of implementation of the Search Agreement, Microsoft will have the option to terminate the Company's sales exclusivity for premium search advertisers. If Microsoft exercises its option, the Revenue Share Rate will increase to 93 percent for the remainder of the term of the Search Agreement, unless the Company exercises its option to retain the Company's sales exclusivity, in which case the Revenue Share Rate would be reduced to 83 percent for the remainder of the term. If Microsoft does not exercise such option, the Revenue Share Rate will be 90 percent for the remainder of the term of the Search Agreement. In the transitioned markets, the Company reports as revenue the 88 percent revenue share as the Company is not the primary obligor in the arrangement with the advertisers and publishers. The underlying search advertising services are provided by Microsoft.

As of December 31, 2011 and December 31, 2012, the Company had collected a total amount of $66 million and nil, respectively, on behalf of Microsoft and Affiliates, which was included in cash and cash equivalents as of December 31, 2011 and December 31, 2012, respectively, with a corresponding liability in accrued expenses and other current liabilities. The Company's uncollected 88 percent share in connection with the Search Agreement was $203 million and $258 million, which is included in accounts receivable, net, as of December 31, 2011 and December 31, 2012, respectively.

Under the Search Agreement, for each market, Microsoft generally guarantees Yahoo!'s revenue per search ("RPS Guarantee") on Yahoo! Properties only for 18 months after the transition of paid search services to Microsoft's platform in that market. In the fourth quarter of 2011, Microsoft agreed to extend the RPS Guarantee in the U.S. and Canada through March 2013. The RPS Guarantee is calculated based on the difference in revenue per search between the pre-transition and post-transition periods and certain other factors. The Company records the RPS Guarantee as search revenue in the quarter the amount becomes fixed, which would typically be the quarter in which the associated shortfall in revenue per search occurred.

The Company completed the transition of its algorithmic and paid search platforms to the Microsoft platform in the U.S. and Canada in the fourth quarter of 2010. In 2011, the Company completed the transition of algorithmic search in all other markets and the transition of paid search in India. In 2012, the Company completed the transition of paid search in most EMEA markets as well as six markets in Latin America. We are continuing to work with Microsoft on transitioning paid search in the remaining markets. The market-by-market transition of the Company's paid search platform to Microsoft's platform and the migration of paid search advertisers and publishers to Microsoft's platform are expected to continue through 2013, and possibly into 2014.

From February 23, 2010 until the applicable services are fully transitioned to Microsoft in all markets, Microsoft will also reimburse the Company for the costs of operating algorithmic and paid search services subject to specified exclusions and limitations. The Company's results for the years ended December 31, 2010, 2011 and 2012 reflect $268 million, $212 million, and $67 million, respectively, in search operating cost reimbursements from Microsoft under the Search Agreement. Search operating cost reimbursements began during the quarter ended March 31, 2010 and will, subject to specified exclusions and limitations, continue until the Company has fully transitioned to Microsoft's platform.

The Company's results for the year ended December 31, 2010 also reflect transition cost reimbursements from Microsoft under the Search Agreement, which were equal to the transition costs of $81 million incurred by Yahoo! related to the Search Agreement in the year ended December 31, 2010. In addition, in the year ended December 31, 2010, $43 million was recorded for reimbursement of transition costs incurred in 2009. The 2009 transition cost reimbursements were recorded in 2010 after regulatory clearance in the U.S. and Europe was

111

Table of Contents

received, implementation of the Search Agreement commenced, and Microsoft became obligated to make such payments. The Company's results for the year ended December 31, 2011 reflect transition cost reimbursements from Microsoft under the Search Agreement, which were equal to the transition costs of $26 million incurred by Yahoo! related to the Search Agreement in the year ended December 31, 2011. During the third quarter of 2011, the Company's cumulative transition costs exceeded Microsoft's $150 million reimbursement cap under the Search Agreement. Transition costs the Company incurs in excess of the $150 million reimbursement cap are not subject to reimbursement.

Reimbursement receivables are recorded as the reimbursable costs are incurred and are applied against the operating expense categories in which the costs were incurred. As of December 31, 2011, a total of $238 million of reimbursable expenses related to 2011 had been incurred by the Company related to the Search Agreement. Of that amount, $16 million had not been received from Microsoft and was classified as part of prepaid expenses and other current assets on the Company's consolidated balance sheets as of December 31, 2011. As of December 31, 2012, a total of $67 million of search operating cost reimbursable had been incurred by the Company related to the Search Agreement. Of that amount, $5 million had not been received from Microsoft and was classified as part of prepaid expenses and other current assets on the Company's consolidated balance sheets as of December 31, 2012.

**Note 19    SUBSEQUENT EVENTS**

***Stock Repurchase Transactions.*** From January 1, 2013 through February 28, 2013, the Company repurchased approximately 33 million shares of its common stock at an average price of $20.23 per share, for a total of $663 million.

***Net Investment Hedge.*** On January 22, 2013, the Company entered into an additional forward contract to further hedge its net investment in Yahoo Japan. The forward contract has a term of 9 months, a notional amount of $200 million and is accounted for as a net investment hedge under ASC 815.

112

Table of Contents

**Schedule II—Valuation and Qualifying Accounts**
**Years Ended December 31, 2010, 2011, and 2012**

| | Balance at Beginning of Year | Charged to Expenses | Write-Offs Net of, Recoveries | Balance at End of Year |
|---|---|---|---|---|
| | | | (In thousands) | |
| Accounts receivable | | | | |
| Allowance for doubtful accounts | | | | |
| 2010 | 41,003 | 4,944 | (22,972) | 22,975 |
| 2011 | 22,975 | 18,147 | (10,980) | 30,142 |
| 2012 | 30,142 | 12,868 | (10,375) | 32,635 |

| | Balance at Beginning of Year | Charged to Expenses | Charged (Credited) to Other Accounts(*) | Balance at End of Year |
|---|---|---|---|---|
| | | | (In thousands) | |
| Deferred tax asset valuation allowance | | | | |
| 2010 | 63,364 | (1,315) | (1,873) | 60,176 |
| 2011 | 60,176 | (5,975) | (1,061) | 53,140 |
| 2012 | 53,140 | (82) | (1,555) | 51,503 |

(*)  Amounts not charged (credited) to expenses are charged (credited) to stockholders' equity, deferred tax assets (liabilities), or goodwill.

113

**Table of Contents**

**Selected Quarterly Financial Data**
**(Unaudited)**

|  | Quarters Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | March 31, 2011[1] | June 30, 2011[2] | September 30, 2011[3] | December 31, 2011[4] | March 31, 2012[5] | June 30, 2012[6] | September 30, 2012[7] | December 31, 2012[8] |
|  | (In thousands, except per share amounts) | | | | | | | |
| Revenue | $1,214,357 | $1,229,024 | $1,216,665 | $1,324,153 | $1,221,233 | $1,217,794 | $ 1,201,732 | $1,345,807 |
| Total operating expenses | $1,024,612 | $1,038,129 | $1,039,411 | $1,081,706 | $1,051,857 | $1,162,981 | $ 1,049,543 | $1,155,817 |
| Income from operations | $ 189,745 | $ 190,895 | $ 177,254 | $ 242,447 | $ 169,376 | $ 54,813 | $ 152,189 | $ 189,990 |
| Other income (expense), net | $ 5,027 | $ (5,666) | $ 18,046 | $ 9,768 | $ 2,278 | $ 20,175 | $ 4,607,656 | $ 17,730 |
| Provision for income taxes | $ (52,120) | $ (55,629) | $ (55,731) | $ (78,287) | $ (56,419) | $ (26,523) | $(1,774,094) | $ (83,007) |
| Earnings in equity interests | $ 82,180 | $ 108,902 | $ 158,775 | $ 127,063 | $ 172,243 | $ 179,991 | $ 175,265 | $ 148,939 |
| Net income attributable to Yahoo! Inc. | $ 222,992 | $ 236,972 | $ 293,291 | $ 295,572 | $ 286,343 | $ 226,631 | $ 3,160,238 | $ 272,267 |
| Net income attributable to Yahoo! Inc. common stockholders per share—basic | $ 0.17 | $ 0.18 | $ 0.23 | $ 0.24 | $ 0.24 | $ 0.19 | $ 2.66 | $ 0.24 |
| Net income attributable to Yahoo! Inc. common stockholders per share—diluted | $ 0.17 | $ 0.18 | $ 0.23 | $ 0.24 | $ 0.23 | $ 0.18 | $ 2.64 | $ 0.23 |
| Shares used in per share calculation— basic | 1,309,064 | 1,299,947 | 1,253,044 | 1,234,904 | 1,215,783 | 1,213,320 | 1,186,046 | 1,155,950 |
| Shares used in per share calculation— diluted | 1,320,185 | 1,308,359 | 1,259,576 | 1,241,009 | 1,226,486 | 1,221,719 | 1,195,085 | 1,168,336 |

[1]   Net income attributable to Yahoo! Inc. for the quarter ended March 31, 2011 includes Yahoo!'s non-cash loss related to an impairment of an investment held by Yahoo Japan, net of taxes, which is included in earnings in equity interests of $26 million and net restructuring charges of $11 million.

[2]   Net income attributable to Yahoo! Inc. for the quarter ended June 30, 2011 includes Yahoo!'s share of the non-cash loss related to impairments of assets held by Yahoo Japan, which is included in earnings in equity interests of $7 million and net restructuring charges of less than $1 million.

[3]   Net income attributable to Yahoo! Inc. for the quarter ended September 30, 2011 includes non-cash gain related to the dilution of the Company's ownership interest in Alibaba Group, which is included in earnings in equity interests of $25 million and net restructuring reversal of $3 million.

[4]   Net income attributable to Yahoo! Inc. for the quarter ended December 31, 2011 includes net restructuring charges of $16 million.

[5]   Net income attributable to Yahoo! Inc. for the quarter ended March 31, 2012 includes net restructuring charges of $6 million.

[6]   Net income attributable to Yahoo! Inc. for the quarter ended June 30, 2012 includes net restructuring charges of $129 million.

114

**Table of Contents**

(7)   Net income attributable to Yahoo! Inc. for the quarter ended September 30, 2012 includes net restructuring charges of $25 million and pre-tax gain of $4.6 billion related to the sale of Alibaba Group Shares, which is included in other income, net.

(8)   Net income attributable to Yahoo! Inc. for the quarter ended December 31, 2012 includes a one-time distribution of foreign earnings resulting in an overall net benefit of approximately $117 million and net restructuring charges of $77 million.

### Item 9.    *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

None.

### Item 9A.    *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's principal executive officer and principal financial officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on such evaluation, the Company's principal executive officer and principal financial officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures were effective.

**Management's Report on Internal Control Over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on criteria established in the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, the Company's management concluded that its internal control over financial reporting was effective as of December 31, 2012.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's independent registered public accounting firm has issued an attestation report regarding its assessment of the Company's internal control over financial reporting as of December 31, 2012, which appears on page 64.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in Yahoo!'s internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2012 that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting.

### Item 9B.    *Other Information*

Not applicable.

115

**Table of Contents**

**Part III**

**Item 10.**      *Directors, Executive Officers and Corporate Governance*

The information required by this item is incorporated by reference to Yahoo!'s Proxy Statement for its 2013 Annual Meeting of Shareholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2012.

In addition, the Board has adopted a code of ethics, which is posted on the Company's website at www.yahoo.com. The code of ethics may be found as follows: From our main web page, first click on "About Yahoo!" at the bottom of the page, then on "Corporate Governance" under the "Investor Relations" heading and then click on "Yahoo! Code of Ethics" under the "Document" heading.

The Company's code of ethics applies to the Company's directors and employees, including our Chief Executive Officer, Chief Financial Officer, Principal Accounting Officer and Global Controller, and to contractors of the Company. The code of ethics sets forth the fundamental principles and key policies and procedures that govern the conduct of the Company's business. The Company's employees receive training on the code of ethics. We intend to disclose any amendment to, or waiver from, certain provisions of the code of ethics for our directors and executive officers, including our Principal Executive Officer, Principal Financial Officer, Principal Accounting Officer or Global Controller or persons performing similar functions, by posting such information on our website, at the address and location specified above.

**Item 11.**      *Executive Compensation*

The information required by this item is incorporated by reference to Yahoo!'s Proxy Statement for its 2013 Annual Meeting of Shareholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2012.

**Item 12.**      *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The information required by this item is incorporated by reference to Yahoo!'s Proxy Statement for its 2013 Annual Meeting of Shareholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2012.

**Item 13.**      *Certain Relationships and Related Transactions, and Director Independence*

The information required by this item is incorporated by reference to Yahoo!'s Proxy Statement for its 2013 Annual Meeting of Shareholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2012.

**Item 14.**      *Principal Accounting Fees and Services*

The information required by this item is incorporated by reference to Yahoo!'s Proxy Statement for its 2013 Annual Meeting of Shareholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2012.

116

**Table of Contents**

**Part IV**

**Item 15.**      *Exhibits, Financial Statement Schedules*

(a) The following documents are filed as part of this report:

1. *Consolidated Financial Statements:*

| | **Page** |
|---|---|
| *Index To Consolidated Financial Statements* | |
| Consolidated Financial Statements: | |
| Report of Independent Registered Public Accounting Firm | 64 |
| Consolidated Balance Sheets as of December 31, 2011 and 2012 | 65 |
| Consolidated Statements of Income for each of the three years in the period ended December 31, 2012 | 66 |
| Consolidated Statements of Comprehensive Income for each of the three years in the period ended December 31, 2012 | 67 |
| Consolidated Statements of Stockholders' Equity for each of the three years in the period ended December 31, 2012 | 68 |
| Consolidated Statements of Cash Flows for each of the three years in the period ended December 31, 2012 | 69 |
| Notes to Consolidated Financial Statements | 70 |

2. *Financial Statement Schedules:*

| | |
|---|---|
| Financial Statement Schedules: | |
| II—Valuation and Qualifying Accounts for each of the three years in the period ended December 31, 2012 | 113 |
|     All other schedules are omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto | |
| Supplementary Financial Data: | |
| Selected Quarterly Financial Data (unaudited) for the two years ended December 31, 2012 | 114 |

3. *Exhibits:*

The exhibits listed in the Exhibit Index (following the signatures page of this report) are filed with, or incorporated by reference in, this report.

117

**Table of Contents**

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 28th day of February 2013.

YAHOO! INC.

By:    /S/   KEN GOLDMAN

**Ken Goldman**
*Chief Financial Officer*

## Power of Attorney

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Ken Goldman and Ronald S. Bell, his or her attorneys-in-fact, each with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with Exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /S/   MARISSA A. MAYER <br> **Marissa A. Mayer** | Chief Executive Officer, President and Director <br> (Principal Executive Officer) | February 28, 2013 |
| /S/   KEN GOLDMAN <br> **Ken Goldman** | Chief Financial Officer <br> (Principal Financial Officer) | February 28, 2013 |
| /S/   AMAN S. KOTHARI <br> **Aman S. Kothari** | SVP, Global Controller and Chief Accounting Officer <br> (Principal Accounting Officer) | February 28, 2013 |
| /S/   ALFRED J. AMOROSO <br> **Alfred J. Amoroso** | Chairman of the Board | February 28, 2013 |
| **John D. Hayes** | Director | |
| /S/   SUSAN M. JAMES <br> **Susan M. James** | Director | February 28, 2013 |
| /S/   MAX R. LEVCHIN <br> **Max R. Levchin** | Director | February 28, 2013 |
| **Peter Liguori** | Director | |
| /S/   DANIAL S. LOEB <br> **Daniel S. Loeb** | Director | February 28, 2013 |

118

**Table of Contents**

| Signature | Title | Date |
|---|---|---|
| /S/   THOMAS J. MCINERNEY | Director | February 28, 2013 |
| Thomas J. McInerney | | |
| /S/   MAYNARD G. WEBB, JR. | Director | February 28, 2013 |
| Maynard G. Webb, Jr. | | |
| /S/   HARRY L. WILSON | Director | February 28, 2013 |
| Harry L. Wilson | | |
| /S/   MICHAEL J. WOLF | Director | February 28, 2013 |
| Michael J. Wolf | | |

119

Table of Contents

## EXHIBIT INDEX

The following exhibits are included, or incorporated by reference, in this Annual Report on Form 10-K (and are numbered in accordance with Item 601 of Regulation S-K). Pursuant to Item 601(a)(2) of Regulation S-K, this exhibit index immediately precedes the exhibits.

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Share Repurchase and Preference Share Sale Agreement, by and between Alibaba Group Holding Limited, the Registrant, and Yahoo! Hong Kong Holdings Limited, dated as of May 20, 2012 (previously filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed May 24, 2012 and incorporated herein by reference). |
| 2.2 | First Amendment to Share Repurchase and Preference Share Sale Agreement, by and between Alibaba Group Holding Limited, the Registrant, and Yahoo! Hong Kong Holdings Limited, dated as of September 11, 2012 (previously filed as Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed September 19, 2012 and incorporated herein by reference). |
| 3.1(A) | Amended and Restated Certificate of Incorporation of the Registrant (previously filed as Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q filed July 28, 2000 and incorporated herein by reference). |
| 3.1(B) | Certificate of Designation, Preferences and Rights of Series A Junior Participating Preferred Stock of the Registrant (included as Exhibit A within the Amended and Restated Rights Agreement, dated as of April 1, 2005, by and between the Registrant and Equiserve Trust Company, N.A., as rights agent (previously filed as Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed April 4, 2005 and incorporated herein by reference)). |
| 3.2 | Amended and Restated Bylaws of the Registrant (previously filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K/A filed December 20, 2010 and incorporated herein by reference). |
| 4.1 | Form of the Registrant's Common Stock certificate (previously filed as Exhibit 4.1 to the Registrant's Quarterly Report on Form 10-Q filed November 8, 2012 and incorporated herein by reference). |
| 10.1+ | Form of Indemnification Agreement between the Registrant and each of its directors and executive officers (previously filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed November 6, 2009 and incorporated herein by reference). |
| 10.2(A)+ | Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 13, 2012 and incorporated herein by reference). |
| 10.2(B)+ | Form of Stock Option Agreement, including Notice of Stock Option Grant, under the Yahoo! Inc.1995 Stock Plan (previously filed as Exhibit 10.2(B) to the Registrant's Quarterly Report on Form 10-Q filed November 6, 2009 and incorporated herein by reference). |
| 10.2(C)+ | Form of Stock Option Agreement for Executives, including Notice of Stock Option Grant to Executive, under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(C) to the Registrant's Annual Report on Form 10-K filed February 28, 2011 and incorporated herein by reference). |
| 10.2(D)+ | Form of Restricted Stock Unit Award Agreement under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(D) to the Registrant's Quarterly Report on Form 10-Q filed November 6, 2009 and incorporated herein by reference). |
| 10.2(E)+ | Form of Restricted Stock Unit Award Agreement for Executives under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(E) to the Registrant's Annual Report on Form 10-K filed February 28, 2011 and incorporated herein by reference). |

120

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.2(F)+ | Form of Restricted Stock Unit Award Agreement for Executives (version 2) under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(F) to the Registrant's Annual Report on Form 10-K filed February 29, 2012 and incorporated herein by reference). |
| 10.2(G)+ | Form of Performance Restricted Stock Unit Award Agreement (TSR version) under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(F) to the Registrant's Annual Report on Form 10-K filed February 26, 2010 and incorporated herein by reference). |
| 10.2(H)+ | Form of Performance Restricted Stock Unit Award Agreement (2010 AFP version) under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(I) to the Registrant's Annual Report on Form 10-K filed February 26, 2010 and incorporated herein by reference). |
| 10.2(I)+ | Form of Letter Amendment (2011) to Performance Restricted Stock Unit Award Agreement (2010 AFP version) under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(K) to the Registrant's Annual Report on Form 10-K filed February 28, 2011 and incorporated herein by reference). |
| 10.2(J)+ | Form of Second Letter Amendment (2012) to Performance Restricted Stock Unit Award Agreement (2010 AFP version) under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(M) to the Registrant's Annual Report on Form 10-K filed February 29, 2012 and incorporated herein by reference). |
| 10.2(K)+ | Form of Performance Restricted Stock Unit Award Agreement under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.2(L) to the Registrant's Annual Report on Form 10-K filed February 28, 2011 and incorporated herein by reference). |
| 10.2(L)+ | Form of Restricted Stock Award Agreement under the Yahoo! 1995 Stock Plan (previously filed as Exhibit 10.2(F) to the Registrant's Quarterly Report on Form 10-Q filed November 6, 2009 and incorporated herein by reference). |
| 10.2(M)+ | Form of Stock Appreciation Rights Award Agreement under the Yahoo! Inc. 1995 Stock Plan (previously filed as Exhibit 10.23(D) to the Registrant's Quarterly Report on Form 10-Q filed August 8, 2007 and incorporated herein by reference). |
| 10.3(A)+ | Yahoo! Inc. 1996 Employee Stock Purchase Plan (previously filed as Exhibit 10.3(A) to the Registrant's Quarterly Report on Form 10-Q filed November 8, 2012 and incorporated herein by reference). |
| 10.3(B)+ | Form of Enrollment Agreement under the Yahoo! Inc. 1996 Employee Stock Purchase Plan (previously filed as Exhibit 10.3(B) to the Registrant's Quarterly Report on Form 10-Q filed November 8, 2012 and incorporated herein by reference). |
| 10.4(A)+ | Yahoo! Inc. 1996 Directors' Stock Plan (previously filed as Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed July 13, 2012 and incorporated herein by reference). |
| 10.4(B)+ | Form of Director Nonstatutory Stock Option Agreement, including Notice of Grant, under the Yahoo! Inc. 1996 Directors' Stock Plan (previously filed as Exhibit 10.4(B) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2010 and incorporated herein by reference). |
| 10.4(C)+ | Form of Notice of Restricted Stock Unit Grant and Director Restricted Stock Unit Award Agreement under the Yahoo! Inc. 1996 Directors' Stock Plan (previously filed as Exhibit 10.4(C) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2010 and incorporated herein by reference). |
| 10.5 | Joint Venture Agreement dated April 1, 1996 by and between the Registrant and SOFTBANK Corporation (previously filed as Exhibit 10.7 to the Registrant's Annual Report on Form 10-K filed March 21, 2003 and incorporated herein by reference). |

121

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.6 | Amendment Agreement dated September 17, 1997 by and between Registrant and SOFTBANK Corporation (previously filed as Exhibit 10.11 to the Registrant's Annual Report on Form 10-K filed March 21, 2003 and incorporated herein by reference). |
| 10.7 | Yahoo Japan License Agreement dated April 1, 1996 by and between the Registrant and Yahoo Japan Corporation (previously filed as Exhibit 10.43 to Amendment No. 2 to the Registrant's Registration Statement on Form S-3, Registration No. 333-100298, filed on December 23, 2002 and incorporated herein by reference). |
| 10.8 | Amendment to Yahoo Japan License Agreement dated September 12, 1997 by and between the Registrant and Yahoo Japan Corporation (previously filed as Exhibit 10.40 to Amendment No. 1 of the Registrant's Registration Statement on Form S-3, Registration No. 333-100298, filed on November 27, 2002 and incorporated herein by reference). |
| 10.9 | Amendment No. 2 to Yahoo Japan License Agreement dated January 31, 2005 by and between the Registrant and Yahoo Japan Corporation (previously filed as Exhibit 10.30 to the Registrant's Annual Report on Form 10-K filed March 11, 2005 and incorporated herein by reference). |
| 10.10+ | Summary of Compensation Payable to Named Executive Officers (previously filed as Exhibit 10.10 to the Registrant's Quarterly Report on Form 10-Q filed November 8, 2012 and incorporated herein by reference). |
| 10.11+ | 2012 Yahoo! Inc. Executive Incentive Plan (previously filed as Exhibit 10.11 to the Registrant's Annual Report on Form 10-K filed February 29, 2012 and incorporated herein by reference). |
| 10.12+ | Form of Severance Agreement (previously filed as Exhibit 10.14 to the Registrant's Annual Report on Form 10-K filed February 28, 2011 and incorporated herein by reference). |
| 10.13+ | Yahoo! Inc. Change in Control Employee Severance Plan for Level I and Level II Employees, as amended on December 10, 2008 (previously filed as Exhibit 10.15 to the Registrant's Annual Report on Form 10-K filed February 27, 2009 and incorporated herein by reference). |
| 10.14(A)+ | Employment Letter Agreement, dated June 5, 2009, between the Registrant and Timothy R. Morse (previously filed as Exhibit 10.20 to the Registrant's Quarterly Report on Form 10-Q filed August 7, 2009 and incorporated herein by reference). |
| 10.14(B)+ | Separation Agreement, dated October 16, 2012, between Yahoo! Inc. and Timothy R. Morse (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 17, 2012 and incorporated herein by reference). |
| 10.15(A)† | Letter Agreement, dated July 29, 2009, between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.21(A) to the Registrant's Quarterly Report on Form 10-Q filed November 6, 2009 and incorporated herein by reference). |
| 10.15(B)† | Search and Advertising Services and Sales Agreement, dated December 4, 2009, between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(B) to the Registrant's Annual Report on Form 10-K filed February 26, 2010 and incorporated herein by reference). |
| 10.15(C)† | License Agreement, dated December 4, 2009, between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(C) to the Registrant's Annual Report on Form 10-K filed February 26, 2010 and incorporated herein by reference). |
| 10.15(D)† | First Amendment to Search and Advertising Services and Sales Agreement, dated as of July 14, 2010, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(D) to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2011 and incorporated herein by reference). |

122

| Exhibit Number | Description |
|---|---|
| 10.15(E)† | Second Amendment to Search and Advertising Services and Sales Agreement, dated as of October 10, 2010, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(E) to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2011 and incorporated herein by reference). |
| 10.15(F)† | Third Amendment to Search and Advertising Services and Sales Agreement, dated as of March 31, 2011, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(F) to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2011 and incorporated herein by reference). |
| 10.15(G)† | Amendment No. 1 to License Agreement, dated as of October 10, 2010, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(G) to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2011 and incorporated herein by reference). |
| 10.15(H)† | Fourth Amendment to Search and Advertising Services and Sales Agreement, dated as of December 13, 2010, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(H) to Amendment No. 1 to the Registrant's Quarterly Report on Form 10-Q filed December 2, 2011 and incorporated herein by reference). |
| 10.15(I)† | Fifth Amendment to Search and Advertising Services and Sales Agreement, dated as of July 2, 2011, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(I) to Amendment No. 1 to the Registrant's Quarterly Report on Form 10-Q filed December 2, 2011 and incorporated herein by reference). |
| 10.15(J)† | Sixth Amendment to Search and Advertising Services and Sales Agreement, dated as of October 14, 2011, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.18(J) to the Registrant's Quarterly Report on Form 10-Q filed November 7, 2011 and incorporated herein by reference). |
| 10.15(K)† | Seventh Amendment to Search and Advertising Services and Sales Agreement, dated as of January 1, 2012, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.16(K) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2012 and incorporated herein by reference). |
| 10.15(L)† | Eighth Amendment to Search and Advertising Services and Sales Agreement, dated as of June 6, 2012, by and between the Registrant and Microsoft Corporation (previously filed as Exhibit 10.16(L) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2012 and incorporated herein by reference). |
| 10.16+ | Employment Offer Letter, dated May 28, 2010, between the Registrant and Blake Irving (previously filed as Exhibit 10.20 to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2011 and incorporated herein by reference). |
| 10.17(A)+ | Employment Offer letter, dated October 27, 2010, between the Registrant and Ross Levinsohn (previously filed as Exhibit 10.21 to the Registrant's Quarterly Report on Form 10-Q filed May 10, 2011 and incorporate herein by reference). |
| 10.17(B)+ | Notice of Stock Option Grant and Stock Option Award Agreement, dated July 26, 2012, between the Registrant and Ross B. Levinsohn (previously filed as Exhibit 10.18(B) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2012). |
| 10.17(C)+ | Restricted Stock Unit Award Agreement, dated July 26, 2012, between the Registrant and Ross B. Levinsohn (previously filed as Exhibit 10.18(C) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2012). |
| 10.17(D)+ | Separation Agreement, dated July 30, 2012, between the Registrant and Ross B. Levinsohn (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 30, 2012 and incorporated herein by reference). |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.18(A)† | Framework Agreement, dated as of July 29, 2011, by and among the Registrant, Alibaba Group Holding Limited, Softbank Corp., Alipay.com Co., Ltd., APN Ltd., Zhejiang Alibaba E-Commerce Co., Ltd., Jack Ma Yun, Joseph C. Tsai and certain joinder parties (previously filed as Exhibit 10.1 to Amendment No. 1 to the Registrant's Current Report on Form 8-K filed August 12, 2011 and incorporated herein by reference). |
| 10.18(B)* | Amendment to Framework Agreement, dated as of November 15, 2012, by and among the Registrant, Alibaba Group Holding Limited, Softbank Corp., Alipay.com Co., Ltd., APN Ltd., Zhejiang Alibaba E-Commerce Co., Ltd., Jack Ma Yun, Joseph C. Tsai and certain joinder parties. |
| 10.19(A)+ | Letter Agreement, dated January 3, 2012, between the Registrant and Scott Thompson (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 3, 2012 and incorporated herein by reference). |
| 10.19(B)+ | Form of Restricted Stock Unit Award Agreement (CEO Make-Whole Grant) between the Registrant and Scott Thompson (previously filed as Exhibit 10.20(B) to the Registrant's Annual Report on Form 10-K filed February 29, 2012 and incorporated herein by reference). |
| 10.19(C)+ | Form of Restricted Stock Unit Award Agreement (CEO Inducement Grant) between the Registrant and Scott Thompson (previously filed as Exhibit 10.20(C) to the Registrant's Annual Report on Form 10-K filed February 29, 2012 and incorporated herein by reference). |
| 10.19(D)+ | Form of Restricted Stock Unit Award Agreement (CEO Annual Grant) between the Registrant and Scott Thompson (previously filed as Exhibit 10.20(D) to the Registrant's Annual Report on Form 10-K filed February 29, 2012 and incorporated herein by reference). |
| 10.19(E)+ | Separation Agreement, dated May 12, 2012, between the Registrant and Scott Thompson (previously filed as Exhibit 99.02 to the Registrant's Current Report on Form 8-K filed May 14, 2012 and incorporated herein by reference). |
| 10.20 | Settlement Agreement, dated May 13, 2012, among the Registrant, Third Point LLC and each of the other persons set forth on the signature pages thereto (previously filed as Exhibit 99.01 to the Registrant's Current Report on Form 8-K filed May 14, 2012 and incorporated herein by reference). |
| 10.21(A)+ | Employment Offer Letter, dated July 16, 2012, between the Registrant and Marissa A. Mayer (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 19, 2012 and incorporated herein by reference). |
| 10.21(B)+ | Restricted Stock Unit Award Agreement (CEO Make-Whole Grant), dated July 26, 2012, between the Registrant and Marissa A. Mayer (previously filed as Exhibit 10.22(B) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2012). |
| 10.21(C)+ | Form of Restricted Stock Unit Award Agreement (CEO Retention and Annual Grants), between the Registrant and Marissa A. Mayer (previously filed as Exhibit 10.22(C) to the Registrant's Quarterly Report on Form 10-Q filed August 9, 2012). |
| 10.21(D)+* | Performance Stock Option Agreement (Retention Grant), including Notice of Performance Stock Option Grant, dated November 29, 2012, between the Registrant and Marissa A. Mayer. |
| 10.21(E)+* | Performance Stock Option Agreement (Annual Grant), including Notice of Performance Stock Option Grant, dated November 29, 2012, between the Registrant and Marissa A. Mayer. |
| 10.22(A)+ | Employment Offer Letter, dated September 23, 2012, between the Registrant and Ken Goldman (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed September 26, 2012 and incorporated herein by reference). |

124

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.22(B)+* | Performance Stock Option Agreement, including Notice of Performance Stock Option Grant, dated November 29, 2012, between the Registrant and Ken Goldman. |
| 10.23(A)+ | Employment Offer Letter, dated October 15, 2012, between the Registrant and Henrique de Castro (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 15, 2012 and incorporated herein by reference). |
| 10.23(B)+* | Restricted Stock Unit Award Agreement (Make-Whole Grant), dated November 29, 2012, between the Registrant and Henrique de Castro. |
| 10.23(C)+* | Restricted Stock Unit Award Agreement (Initial Grant), dated November 29, 2012, between the Registrant and Henrique de Castro. |
| 10.23(D)+* | Performance Stock Option Agreement, including Notice of Performance Stock Option Grant, dated November 29, 2012, between the Registrant and Henrique de Castro. |
| 10.24 | Credit Agreement, dated as of October 19, 2012, by and among the Registrant, the initial lenders named therein, Citibank, N.A., as Administrative Agent, HSBC Bank USA, National Association as Syndication Agent and Citigroup Global Markets Inc. and HSBC Securities (USA) Inc., as Joint Lead Arrangers and Joint Bookrunners (previously filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 22, 2012 and incorporated herein by reference). |
| 21.1* | List of Subsidiaries. |
| 23.1* | Consent of Independent Registered Public Accounting Firm. |
| 24.1 | Power of Attorney (see the signature page of this Annual Report on Form 10-K.) |
| 31.1* | Certificate of Chief Executive Officer Pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, dated February 28, 2013. |
| 31.2* | Certificate of Chief Financial Officer Pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, dated February 28, 2013. |
| 32* | Certificate of Chief Executive Officer and Chief Financial Officer Pursuant to Securities Exchange Act Rules 13a-14(b) and 15d-14(b) and 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, dated February 28, 2013. |
| 101.INS* | XBRL Instance |
| 101.SCH* | XBRL Taxonomy Extension Schema |
| 101.CAL* | XBRL Taxonomy Extension Calculation |
| 101.DEF* | XBRL Taxonomy Extension Definition |
| 101.LAB* | XBRL Taxonomy Extension Labels |
| 101.PRE* | XBRL Taxonomy Extension Presentation |

\*   Filed herewith.

+   Indicates a management contract or compensatory plan or arrangement.

†   Portions of this exhibit have been omitted and filed separately with the U.S. Securities and Exchange Commission pursuant to a request for confidential treatment.

125

# Exhibit 515

10-K 1 sfly-12312012x10k.htm 10-K

*Table of Contents*

---

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549
# Form 10-K

**(Mark One)**

☒        **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
         **For the fiscal year ended December 31, 2012**

                                                 **or**

☐        **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF
         1934**
         **For the transition period from            to**
                                **Commission file number 001-33031**

# SHUTTERFLY, INC.
*(Exact Name of Registrant as Specified in Its Charter)*

| **Delaware** | **94-3330068** |
|---|---|
| *( State or Other Jurisdiction of Incorporation or Organization)* | *(IRS Employer Identification No.)* |

| **2800 Bridge Parkway** | |
| **Redwood City, California** | **94065** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

Registrant's Telephone Number, Including Area Code
**(650) 610-5200**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T ( § 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).  Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Rule 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "accelerated filer," "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (check one)

*Table of Contents*

Large accelerated Filer ☒    Accelerated Filer ☐

Non-accelerated Filer ☐    Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐    No ☒

As of June 29, 2012, the last business day of our most recently completed second fiscal quarter, the aggregate market value of our Common Stock held by non-affiliates based on the closing price or our Common Stock on June 29, 2012 as reported on the NASDAQ Global Select Market was $1,103,549,240.

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at February 8, 2013 |
|---|---|
| Common stock, $0.0001 par value per share | 36,331,407 |

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the documents listed below have been incorporated by reference into the indicated parts of this report, as specified in the responses to the item numbers involved:

Designated portions of the Proxy Statement relating to the 2013 Annual Meeting of the Stockholders (the "Proxy Statement"): Part III (Items 10, 11, 12, 13 and 14). Except with respect to information specifically incorporated by reference in the Form 10-K, the Proxy Statement is not deemed to be filed as part hereof.

---

**Shutterfly, Inc.**
**Table of Contents**

|  |  | Page Number |
|---|---|---|
| **PART I** | | |
| ITEM 1. | Business | 4 |
| ITEM 1A. | Risk Factors | 12 |
| ITEM 1B. | Unresolved Staff Comments | 28 |
| ITEM 2. | Properties | 28 |
| ITEM 3. | Legal Proceedings | 29 |
| ITEM 4. | Mine Safety Disclosures | 29 |
| **PART II** | | |
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 30 |
| ITEM 6. | Selected Financial Data | 31 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| ITEM 7A. | Quantitative and Qualitative Disclosures about Market Risk | 47 |
| ITEM 8. | Financial Statements and Supplementary Data | 48 |
| ITEM 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 77 |
| ITEM 9A. | Controls and Procedures | 77 |

| ITEM 9B. | Other Information | 78 |
| | PART III | |
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 79 |
| ITEM 11. | Executive Compensation | 79 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 79 |
| ITEM 13. | Certain Relationships and Related Transactions, and Director Independence | 79 |
| ITEM 14. | Principal Accounting Fees and Services | 79 |
| | PART IV | |
| ITEM 15. | Exhibits and Financial Statement Schedule | 80 |

*Table of Contents*

## PART I

*Except for historical financial information contained herein, the matters discussed in this Form 10-K may be considered forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and subject to the safe harbor created by the Securities Litigation Reform Act of 1995. Such statements include declarations regarding our intent, belief, or current expectations and those of management. Prospective investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve a number of risks, uncertainties and other factors, some of which are beyond our control; actual results could differ materially from those indicated by such forward-looking statements. Important factors that could cause actual results to differ materially from those indicated by such forward-looking statements include, but are not limited to: (i) that the information is of a preliminary nature and may be subject to further adjustment; (ii) those risks and uncertainties identified under "Risk Factors;" and (iii) the other risks detailed from time-to-time in our reports and registration statements filed with the Securities and Exchange Commission, or SEC. Except as required by law, we undertake no obligation to revise or update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.*

## ITEM 1. BUSINESS.

### Overview

Shutterfly, Inc. was incorporated in Delaware in 1999. In September 2006, we completed our initial public offering and our common stock is listed on the NASDAQ Global Select Market under the symbol "SFLY." Our principal corporate offices are located in Redwood City, California.

We are the leading manufacturer and digital retailer of high-quality personalized products and services offered through a family of lifestyle brands. Our vision is to make the world a better place by helping people share life's joy. Our mission is to build an unrivaled service that enables deeper, more personal relationships between our customers and those who matter most in their lives. Our primary focus is on helping consumers manage their memories through the powerful medium of photography. We provide a full range of personalized photo-based products and services that make it easy, convenient and fun for consumers to upload, edit, enhance, organize, find, share, create, print, and preserve their memories in a creative and thoughtful manner.

We are building four trusted lifestyle brands: Shutterfly, Tiny Prints, Wedding Paper Divas, and Treat. We have operated the Shutterfly.com brand since inception in 1999. In 2011, we acquired Tiny Prints, Inc. a privately-held company based in Sunnyvale, California that operated tinyprints.com and weddingpaperdivas.com, two growing ecommerce brands primarily offering stylish cards, invitations and personalized stationery. On April 16, 2012, we launched Treat.com, a destination that enables users to easily personalize and send unique greeting cards. Our Treat launch signifies our focused expansion into the one-to-one U.S. greeting card market, to complement our existing one-to-many card business. And in May 2012, we acquired the customer accounts and images of Kodak Gallery's online photo service through a bankruptcy court supervised auction. In July 2012, we began the process to transfer the more than five billion Kodak Gallery customer photos onto the Shutterfly technology platform, which was completed in September 2012.

On May 25, 2012, we acquired Photoccino Ltd., a privately-held company based in Haifa, Israel, which has developed innovative technologies for photo ranking, analysis and organization which will allow customers to more efficiently organize and select the best

photos from their ever-increasing archives so they can quickly and easily create photo books, calendars, cards, and photo gifts. Photoccino's technology applies proprietary algorithms to analyze and evaluate the quality and content of photos, ranks them, and automatically creates photo products using the customer's best images. During the fourth quarter of 2012, we began to integrate the Photoccino technology by offering smart product creation capabilities to a select set of customers. We expect to further integrate the Photoccino technology into the products and services that our brands offer.

On September 14, 2012, we acquired Penguin Digital, Inc., a mobile application development company that has an iPhone application that allows users to access their photos from iPhones or their Facebook or Instagram accounts and create customized products and gifts from their mobile devices. We subsequently introduced our new Shutterfly iPhone Photo App which combines storage, viewing and photo gift creation right from one's phone.

On December 28, 2012, we acquired ThisLife.com, Inc. ("ThisLife") a cloud-based service provider for protecting, organizing, storing and sharing photos and videos which will strengthen our photo and video storage and sharing capabilities, as well as the ability to intelligently organize across devices and mobile platforms and enable the more efficient creation of products across the web and on mobile devices. In 2013, we expect to integrate this technology into the products and services that our Shutterfly brand offers.

4

*Table of Contents*

We generate the majority of our revenues by producing and selling professionally-bound photo books, greeting and stationery cards, personalized calendars, other photo-based merchandise and high-quality prints ranging in size from wallet-sized to jumbo-sized 20x30 enlargements. We manufacture most of these items in our Charlotte, North Carolina and Phoenix, Arizona production facilities. In 2012, we entered into a lease for a new facility in Fort Mill, South Carolina that will replace our Charlotte, North Carolina facility, and is expected to be operational in 2013. By controlling the production process in our own facilities, we are able to produce high-quality products, innovate rapidly, maintain a favorable cost structure and ensure timely shipment to customers, even during peak periods of demand. Additionally, we sell a variety of photo-based merchandise that is currently manufactured for us by third parties, such as calendars, mugs, canvas prints, mouse pads, magnets, and puzzles. We generate substantially all of our revenue from sales originating in the United States and our sales cycle has historically been highly seasonal as we generate more than 50% of our total net revenues during our fiscal fourth quarter.

Our high-quality products and services and the compelling online experience we create for our customers, combined with our focus on continuous innovation, have allowed us to establish premium brands. We realize the benefits of premium brands through high customer loyalty, low customer acquisition costs and premium pricing.

Our customers are a central part of our business model. They generate most of the content on our service by uploading their photos and preserving their memories. In addition, they share their photos electronically with their friends and families, extending and endorsing our brand and creating a sense of community. Finally, by giving our branded products to colleagues, friends and loved ones throughout the year, customers reinforce our brands. Through these various activities, our customers create a viral network of new users and customers.

In addition to driving lower customer acquisition costs through viral marketing, our customers provide input on new features, functionalities and products. Close, frequent customer interactions, coupled with significant investments in sophisticated integrated marketing programs, enable us to fine-tune and tailor our promotions and website presentation to specific customer segments. Consequently, customers are presented with a highly personalized shopping experience, which helps foster a unique and deep relationship with our brands.

The Company operates in one geographic area, the United States. Our operations and financial performance depend on general economic conditions in the United States. The U.S. economy is experiencing a slow economic recovery from a deep recession and concerns about that recovery could further impact consumer sentiment and consumer discretionary spending. We closely monitor these economic measures as their trends are indicators of the health of the overall economy and are some of the key external factors that impact our business.

## Business and Marketing Strategy

We drive business and marketing strategies within two key categories: Consumer and Enterprise. To support our business strategies within these categories, we use a variety of integrated marketing programs, including advertising, direct marketing technologies, and strategic alliances. These methods include direct marketing over the Internet, e-mail marketing to prospects and existing customers, search engine marketing, strategic marketing relationships, and traditional direct marketing mailings such as postcards and seasonal catalogs and more recently with a national cable TV campaign during the holiday season. In addition, because many of our products are either shared over the Internet or given as gifts, the appearance of our brands on the products and packaging provides ongoing viral advertising. We place targeted advertisements on websites and in publications, contract for targeted e-mail marketing services and contract for advertising placement on leading search engines.

In addition, to support our Enterprise category, we have hired a small sales force to engage with marketing fulfillment organizations and advertisers for Enterprise services.

The following paragraphs summarize our business strategies within these two categories:

### Consumer

Our Consumer revenues include sales from all of our brands and are derived from the sale of photo-based products, such as photo books, stationery and greeting cards, other photo-based merchandise, photo prints, and the related shipping revenues. Included in our photo-based merchandise are items such as mugs, mouse pads, desktop plaques and puzzles. Photo prints consist of wallet, 4x6, 5x7, 8x10, and large format sizes. In addition, Consumer revenues also includes revenues from advertising and sponsorship activities. We also provide website services which include our share platform called Share Sites. Consumer revenues as a percentage of total net revenues were 96% in 2012, 97% in 2011 and 98% in 2010. Within this category, we seek to drive the following strategies:

*Table of Contents*

• *Continue to grow and optimize our core brands.*

We have a primary strategy to grow our core Shutterfly and Tiny Prints brands by acquiring new customers, expanding the lifetime value of our existing customers, and improving conversion rates. In 2012, we acquired over five billion of Kodak Gallery customer photos and migrated those customers onto the Shutterfly platform. Also in 2012, we offered SeeHere.com customers an opportunity to transfer photos from their SeeHere.com accounts to our Shutterfly platform. Our Share Sites platform is also a significant source of our new customer registrations.

We intend to increase repeat orders per customer by expanding our products and services, tailoring our offerings to encourage additional purchases for different holidays and life events and increasing our cross-selling and up-selling activities. In 2012, we added more styles and introduced premium content across our brands. We also introduced new products in 2012, such as a 6x8 sized flat stationery card and iPhone cases, which add to our existing variety of photo-based merchandise. We have specifically focused on features that make it easier for customers to personalize products, such as our Custom Path photo book creation solution which we launched in 2011; as well as the integration of advanced image analysis and selection technologies from our acquisition of Photoccino into some of our product creation solutions to a select set of customers. Finally, we intend to continue our efforts to promote and cross-sell products across our various brands, such as Shutterfly photo books and calendars on the Tiny Prints brand website.

• *Invest in early stage strategic growth initiatives.*

We have made investments in key, early stage initiatives. We intend to continue our efforts to develop products and services for Treat, within the Wedding and Mobile categories, and to continue our efforts to develop our new enhanced cloud service. In addition, we plan to make continued improvements in our platform and infrastructure including our big data strategy and analytics, e-commerce development, and manufacturing automation.

During 2012, we introduced a wide range of premium designer stationery for many occasions, including weddings. Also during 2012, we launched Treat.com, a destination that enables customers to easily personalize and send unique greeting cards. We expect to continue our efforts to highlight Treat.com as the online destination where customers can create one-of-a-kind personalized greeting cards in minutes. Our recent acquisitions of Photoccino Ltd., Penguin Digital Inc., and ThisLife.com, Inc. represent our commitment to increase the rate of innovation and invest in future products and services that lessen the friction in product creation experiences and solutions. We intend to integrate the products and services acquired in these transactions with our mobile and cloud service offerings.

Finally, we expect to continue our back-end efforts to manage and analyze the large amounts of customer data that we store, build technologies based on widely accepted platforms (such as HTML5), and continue our efforts to automate production in our manufacturing facilities. During 2012, for example, we invested approximately $9 million dollars in additional printing presses and automation technologies.

• *Expand and enhance our brand equity.*

We seek to delight our customers by offering robust solutions and to expand and enhance our brand equity through all consumer touch points - marketing, business development, multi-brand site experiences and customer service. During 2012, we partnered with various companies to offer our products through multiple nationwide flash promotions to those companies' members, and partnered with retailers, like Best Buy, to promote Shutterfly products at retail outlets. We recently launched a ship-to-store relationship with Costco for our Tiny Prints and Wedding Paper Divas' brands. And we continue to expand alternate sales channels for our products in retail outlets through our relationships with Target, Inc., CVS/pharmacy, and Walgreens stores. These relationships provide our customers with the option to pick up 4x6 prints at many of these retail locations across the United States. We have run limited, direct response television campaigns targeting new customers from our core demographic on various cable channels. We believe these efforts will drive increased awareness of our brands and our product offerings, as well as increase the engagement of existing customers.

• *Attract, retain, and grow our leadership team.*

In order to successfully execute our strategies, we require a talented leadership team. As a result, we intend to continue our focus to attract, retain, and grow our team; and to build continuity and pursue executional excellence in our daily operations everywhere. By providing our employees with a great place to work, we believe that we continue to strengthen our high performance culture.

*Table of Contents*

- *Maintain financial discipline.*

We manage our business activities with a focus on continued revenue and profitability growth. Our financial strategy involves growing revenues across our brands and initiatives to take advantage of the multi-billion dollar social expression and personal publishing markets, but in a way that generates continued net income and adjusted EBITDA growth.

*Enterprise*

In order to use available manufacturing capacity during low volume periods and to leverage our large installed base of digital presses, we provide Enterprise services primarily to the direct marketing industry. Our Enterprise revenues are derived from the printing and shipping of direct marketing and other variable data print products and formats. We continue to focus our efforts in expanding our presence in this market. For example, in November 2010, we acquired certain assets and liabilities of WMSG, Inc. to enable a complete solution for variable digital print marketers and other print-on-demand opportunities. Enterprise revenues as a percentage of total net revenues were 4% in 2012, 3% in 2011 and 2% in 2010.

**Technology and Production Systems**

We use a combination of proprietary and third-party technology, including the following:

*Customer relationship management, or CRM, system.* Our integrated CRM system is composed of various tools designed to convert first-time customers into repeat buyers. We seek to increase average order sizes by expanding customer awareness, providing targeted, segmented offers to customers, and encouraging cross- and up-selling. The system uses a variety of data, including website usage patterns, order size, order frequency, products purchased, seasonality factors, image upload, and share usage, as well as customer satisfaction information. This data is continually updated and refreshed in a data warehouse, from which different customer segments are identified and monitored on a continuing basis for targeted marketing communications.

By using this deep customer intelligence and ongoing analysis, we are able to offer customers a more personalized website experience and to target them with specific website promotions, discounts, specialized e-mail, and direct mail offers. Our promotion engine generates special offers that are account specific and applied automatically at checkout.

We are also able to dynamically assign visitors to test and control groups who are shown different versions of our service. This form of A-B testing enables us to continuously optimize products, pricing, promotions, and user interaction with our websites.

*Website system.* We have designed our website systems to be highly available, secure and cost-effective. We can scale to increasing numbers of customers by adding relatively inexpensive industry-standard computers and servers. We have a strong commitment to our privacy policy, and we utilize technologies such as firewalls, encryption technology for secure transmission of personal information between customers' computers and our website system and intrusion detection systems.

*Image archive.* We store our customers' images in our image archive. Once a customer uploads a photo to our website, it is copied to multiple redundant systems, including an off-site copy. We continue to expand our storage capacity to meet increasing customer demand. Our innovative storage architecture provides low storage costs, facilitates the safe, secure archiving of customers' images and delivers the speed and performance required to enable customers to access, enhance and edit their images in real-time.

*Render farm.* Once a customer orders a photo or any photo-based product, our render farm technology performs fully automated image processing on the image prior to production. The customer's original uploaded image is retrieved from the image archive, and automatic algorithms enhance the color, contrast and sharpness of the image. The render farm also performs customer-requested edits such as crop, borders, customized back-printing and red-eye removal.

To ensure that output is of consistent quality, we apply our proprietary ColorSure technology during this render stage. ColorSure creates an automated mapping of the image's specific attributes to the printer's specific print calibrations and attributes, prior to production. For example, this technology allows a 4x6 print to look the same as a photo printed on an enlargement or in a photo book, even if they are ordered at separate times.

*Production system.* We operate our own production facilities in Charlotte, North Carolina and Phoenix, Arizona. Our automated production system controls our production processes, including order management and pick, pack and ship operations. Using proprietary algorithms, the production system analyzes tens of thousands of orders daily and automates the workflow into our high-volume silver halide photofinishing machines and our state-of-the-art digital presses.

7

*Table of Contents*

**Competition**

The market for digital photography products and services is large, evolving, and intensely competitive, and we expect competition to increase in the future. We face intense competition from a wide range of companies, including the following:

- Online digital photography services companies such as Snapfish, which is a service of Hewlett-Packard, American Greetings' Webshots brand, Vistaprint, SmugMug, and many others;

- "Big Box" retailers such as Wal-Mart, Costco, Sam's Club, and others that are seeking to offer low cost digital photography products and services. These competitors provide in-store fulfillment and self-service kiosks for printing, and may, among other strategies, offer their customers heavily discounted in-store products and services that compete directly with our offerings;

- Drug stores such as Walgreens, CVS/pharmacy, and others that offer in-store pick-up from their photo website internet orders;

- Mobile digital photography services companies such as Instagram, Woven, and iPhoto;

- Self-publishing companies and services such as Lulu, CafePress, and Zazzle;

- Cloud-based storage services and file-syncing services such as Dropbox, SugarSync, Box, Amazon Cloud Drive, and iCloud;

- Specialized companies in the photo book and stationery business such as Hallmark, Cardstore by American Greetings, Minted, Picaboo, Blurb, MyPublisher, Mixbook, MOO, Smilebox, Creative Memories, and Photobook America;

- Photo-related software companies such as Apple, Microsoft, Corel, and FotoFlexer;

- Internet portals and search engines such as Yahoo!, AOL, and Google that offer broad-reaching digital photography and related products and services to their large user bases;

- Home printing service providers such as Hewlett-Packard, Epson, Canon, and Kodak that are seeking to expand their printer and ink businesses by gaining market share in the digital photography marketplace;

- Social media companies that host images such as Facebook, Twitter, and Myspace;

- Photo hosting websites that allow users to upload and share images at no cost such as Picasa, Flickr, and Photobucket; and

- Regional photography companies such as Ritz Camera that have established brands and customer bases in existing photography markets.

We believe the primary competitive factors in attracting and retaining customers are:

- brand recognition and trust;

- quality of products and services;

- breadth of products and services;

- user affinity and loyalty;

- customer service;

- ease of use;

- convenience; and

- price.

8

Table of Contents

We believe that we compete favorably with respect to many of these factors, particularly customer trust and loyalty, quality and breadth of products and services, and customer service. Many of our competitors promote their products on the basis of low prices or the convenience of same-day availability for digital photos printed in drugstores or other retail outlets. Generally, we distinguish ourselves from such competitors principally on the basis of product quality and innovation, rather than price or same-day delivery.

**Intellectual Property**

Protecting our intellectual property rights is part of our strategy for continued growth and competitive differentiation. We seek to protect our proprietary rights through a combination of patent, copyright, trade secret and trademark law. We enter into confidentiality and proprietary rights agreements with our employees, consultants and business partners, and control access to and distribution of our proprietary information. We have licensed in the past, and expect that we may license in the future, certain of our proprietary rights to third parties.

As of December 31, 2012, we had 55 issued patents, which expire at various dates between 2019 and 2031, and more than 40 patent applications pending in the United States. Our issued patents and patent applications relate primarily to intelligent production creation; image uploading, sharing, and editing; ordering and sharing products; cloud image storage infrastructure; manufacturing optimization; and mobile and social media technologies. We intend to pursue corresponding patent coverage in additional countries to the extent we believe such coverage is appropriate and cost efficient. However, we cannot be certain that any of our pending or any future applications will be granted. In addition, third parties could bring invalidity, co-inventorship or similar claims with respect to any of our currently issued patents or any patents that may be issued to us in the future.

Our primary brands are "Shutterfly," "Tiny Prints," "Wedding Paper Divas," and "Treat." We hold applications and/or registrations for the Shutterfly, Tiny Prints, Wedding Paper Divas and Treat trademarks in our major markets of the United States and Canada, as well as in the European Community. We also hold applications and registrations for the Shutterfly mark in Mexico, Japan and China, and for the Shutterfly and Tiny Prints marks in Australia and New Zealand. We own the domains Shutterfly.com, TinyPrints.com, WeddingPaperDivas.com and Treat.com among others. We have other marks that we use and for which we have applications on file or have obtained registrations in the United States including among others, "Cardworthy," "Tell Your Story," "Storyboard," "Custom Path," "Bookworthy," "Smart Autofill," and "Photoworks."

**Government Regulation**

The legal environment of the Internet is evolving rapidly in the United States and elsewhere. The manner in which existing laws and regulations will be applied to the Internet in general, and how they will relate to our business in particular, is unclear in many cases. Accordingly, we often cannot be certain how existing laws will apply in the online context, including with respect to such topics as privacy, defamation, pricing, credit card fraud, advertising, taxation, sweepstakes, promotions, content regulation, net neutrality, quality of products, and services and intellectual property ownership and infringement. In particular, legal issues relating to the liability of providers of online services for activities of their users are currently unsettled both within the United States and abroad.

Numerous laws have been adopted at the national and state level in the United States that could have an impact on our business. These laws include the following:

- The CAN-SPAM Act of 2003 and similar laws adopted by a number of states. These laws are intended to regulate unsolicited commercial e-mails, create criminal penalties for unmarked sexually-oriented material and e-mails containing fraudulent headers and control other abusive online marketing practices.

- The Communications Decency Act, which gives statutory protection to online service providers who distribute third-party content.

- The Digital Millennium Copyright Act, which is intended to reduce the liability of online service providers for listing or linking to third-party websites that include materials that infringe copyrights or other rights of others.

9

*Table of Contents*

- The Children's Online Privacy Protection Act and the Prosecutorial Remedies and Other Tools to End Exploitation of Children Today Act of 2003, which are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances.

- Statutes adopted in the State of California and other states, require online services to report certain breaches of the security of personal data, and to report to consumers when their personal data might be disclosed to direct marketers.

- The federal Credit Card Accountability Responsibility and Disclosure Act of 2009 (the "CARD Act"), which was signed into law May 22, 2009, includes new provisions governing the use of gift cards, including specific disclosure requirements and a prohibition or limitation on the use of expiration dates and fees. A recent statute adopted in the State of New Jersey would enforce escheat of the entire remaining gift card balance when the card is redeemable only for goods and services and would include all gift cards sold after January 1, 2003.

- The Patient Protection and Affordable Care Act (the "Patient Act"), as well as other healthcare reform legislation being considered by Congress and state legislatures. While the significant costs of the recent healthcare legislation enacted will occur after 2013 due to provisions of the legislation being phased in over time, changes to our healthcare costs structure could increase our employee healthcare-related costs.

To resolve some of the remaining legal uncertainty, we expect new U.S. and foreign laws and regulations to be adopted over time that will be directly or indirectly applicable to the Internet and to our activities. In addition, government agencies may begin regulating previously unregulated Internet activities or applying existing laws in new ways to providers of online services. Moreover, the law relating to the liability of providers of online services for activities of their users and business partners is currently unsettled both within the United States and abroad. Any existing or new legislation applicable to us could expose us to government investigations or audits, prosecution for violations of applicable laws and/or substantial liability, including penalties, damages, significant attorneys' fees, expenses necessary to comply with such laws and regulations or the need to modify our business practices. For example, we were a party to an Assurance of Discontinuance entered into on September 13, 2010 with the New York Attorney General's office, which related to our business activities in New York regarding discount programs offered by Webloyalty, Inc., one of our former business partners. In addition, from time to time claims may be threatened against us for aiding and abetting, defamation, negligence, copyright or trademark infringement, or other theories based on the nature and content of information to which we provide links or that we or others post online. On a more general level, government regulation of the Internet could dampen the growth in the use of the Internet, have the effect of discouraging innovation and investment in Internet-based enterprises or lead to unpredictable litigation.

We post on our websites our privacy policies and practices concerning the use and disclosure of user data. Any failure by us to comply with our posted privacy policies, Federal Trade Commission requirements or other privacy-related laws and regulations could result in proceedings that could potentially harm our business, results of operations and financial condition. In this regard, there are a large number of federal and state legislative proposals before the United States Congress and various state legislative bodies regarding privacy issues related to our business. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, such as required use of disclaimers, if adopted, could harm our business through a decrease in user registrations and revenues.

10

*Table of Contents*

**Employees**

As of December 31, 2012, we had 1,107 full time employees. Below is a summary of employees by function:

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Cost of revenue | 453 | 422 | 293 |
| Technology and development | 327 | 264 | 168 |
| Sales and marketing | 213 | 166 | 79 |
| General and administrative | 114 | 104 | 71 |
| **Total** | **1,107** | **956** | **611** |

During the peak holiday season, we hire contract workers on a temporary basis from third-party outsourcing firms. For example, during our peak production period in the fourth quarter of 2012, we used approximately 1,101 temporary workers to assist in our production and fulfillment operations. None of our employees are represented by a labor union or are covered by a collective bargaining agreement. We have never experienced any employment-related work stoppages and consider our employee relations to be good.

**Available Information**

Our Internet website is located at http://www.shutterfly.com. The information on our website is not a part of this annual report on Form 10-K. We make available free of charge on our website our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission. Our SEC reports can be accessed through the investor relations section of our Internet website.

The public may also read and copy any materials we file with the Securities and Exchange Commission at the Securities and Exchange Commission's Public Reference Room at 100 F Street, NE, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the Securities and Exchange Commission at 1-800-SEC-0330. The Securities and Exchange Commission also maintains an Internet website that contains reports, proxy and information statements and other information regarding issuers that file electronically with the Securities and Exchange Commission. The Securities and Exchange Commission's Internet website is located at http://www.sec.gov.

11

*Table of Contents*

**ITEM 1A. RISK FACTORS**

*Our net revenues, operating results and cash requirements are affected by the seasonal nature of our business and cyclical fluctuations in the U.S. economy.*

Our business is highly seasonal, with a high proportion of our net revenues, net income and operating cash flows generated during the fourth quarter. For example, we generated more than 50% of our 2012 net revenues in the fourth quarter of 2012, and the net income that we generated during the fourth quarter of 2012 was necessary for us to achieve profitability on an annual basis. In addition, we incur significant additional expenses in the period leading up to the fourth quarter holiday season including expenses related to the hiring and training of temporary workers to meet our seasonal needs, additional inventory and equipment purchases and increased advertising. If we are unable to accurately forecast and respond to consumer demand for our products during the fourth quarter, our financial results, reputation and brands will suffer and the market price of our common stock would likely decline.

We also base our operating expense budgets on expected net revenue trends. A portion of our expenses, such as office, production facility, and various equipment leases and personnel costs, are largely fixed and are based on our expectations of our peak levels of operations. We may be unable to adjust spending quickly enough to offset any unexpected revenue shortfall. Accordingly, any shortfall in net revenues may cause significant variation in operating results in any quarter.

In addition, our operations and financial performance depend on general economic conditions. The U.S. economy is experiencing a slow economic recovery from a deep recession, concerns about inflation, low consumer confidence, high unemployment rate and other

adverse business conditions. Fluctuations in the U.S. economy such as the recent recession could cause, among other conditions, a prolonged decline in consumer spending and an increase in the cost of labor and materials. These conditions could exacerbate variability in our forecasting and could negatively affect our results of operations.

***If we are unable to meet our production requirements, our net revenues and results of operations would be harmed.***

We believe that we must continue to grow our current production capability to meet our projected net revenue targets. Our capital expenditures were approximately 9% of total net revenues for the year ended December 31, 2012 and approximately 7% of net revenues for the years ended December 31, 2011 and 2010. We anticipate that total 2013 capital expenditures will range from 9.4% to 10.4% of 2013 net revenues. Operational difficulties, such as a significant interruption in the operations of either our Charlotte, North Carolina or Phoenix, Arizona production facilities, could delay production or shipment of our products. Our inability to meet our production requirements could lead to customer dissatisfaction and damage our reputation and brands, which would result in reduced net revenues. Moreover, if the costs of meeting production requirements, including capital expenditures, were to exceed our expectations, our results of operations would be harmed.

In addition, we face significant production risks at peak holiday seasons, including the risk of obtaining sufficient qualified seasonal production personnel. A majority of our workforce during the fourth quarter of 2012 was seasonal, temporary personnel. We have had difficulties in the past finding a sufficient number of qualified seasonal employees, and our failure to obtain qualified seasonal production personnel at any of our production facilities could harm our operations.

***Economic trends could adversely affect our financial performance.***

We are subject to macro-economic fluctuations in the U.S. economy. Macro-economic issues involving the broader financial markets, including the housing and credit system, have negatively impacted the economy and our financial performance and may have further negative impact in the future.

Weak economic conditions, low consumer spending and decreased consumption may harm our operating results. Purchases of our products are often discretionary. If the economic climate does not improve, customers or potential customers could delay, reduce or forego their purchases of our products and services, which could impact our business in a number of ways, including lower prices for our products and services and reduced sales. In addition, adverse economic conditions may lead to price increases by our suppliers or increase our operating expenses due to, among others, higher costs of labor, energy, equipment and facilities. A prolonged and slow economic recovery or a renewed recession may also lead to additional restructuring actions and associated expenses. Due to reduced consumer spending and increased competitive pressures in the current economic environment, we may not be able to pass these increased costs on to our customers. The resulting increased expenses and/or reduced income would negatively impact our operating results.

If the economic recovery continues to be slow, or if the economy experiences a prolonged period of decelerating or negative growth, our results of operations may be further harmed.

12

*Table of Contents*

***Competitive pricing pressures, particularly with respect to pricing and shipping, may harm our business and results of operations.***

Demand for our products and services is sensitive to price, especially in times of recession, slow economic growth and consumer conservatism. Many external factors, including our production and personnel costs, consumer sentiment and our competitors' pricing and marketing strategies, can significantly impact our pricing strategies. If we fail to meet our customers' price expectations, we could lose customers, which would harm our business and results of operations.

Changes in our pricing strategies have had, and may continue to have, a significant impact on our net revenues and net income. From time to time, we have made changes to our pricing structure, specifically for 4x6 prints, in order to remain competitive. Most of our other products, including photo books, calendars, cards and stationery and other photo merchandise are also offered by our competitors. During the fourth quarter of 2011, many of these competitors discounted those products at an unprecedented level. As a result, we also changed our discounting strategy, which impacted our acquisition of new customers, average order value, net revenues, gross margin, and our adjusted EBITDA and net income profitability measures. If in the future, due to competitor discounting or other marketing strategies, we significantly reduce our prices on our products without a corresponding increase in volume, it would negatively impact our net revenues and could adversely affect our gross margins and overall profitability.

We generate a significant portion of our net revenues from the fees we collect from shipping our products. For example, shipping revenue for the Shutterfly brand website represented approximately 16%, 15% and 14% of our net revenues in 2012, 2011 and 2010, respectively. We offer discounted or free shipping, with a minimum purchase requirement, during promotional periods to attract and retain customers. If free shipping offers extend beyond a limited number of occasions, are not based upon a minimum purchase requirement or become commonplace, our net revenues and results of operations would be negatively impacted. In addition, we occasionally offer free or discounted products and services to attract and retain customers. In the future, if we increase these offers to respond to actions taken by our competitors, our results of operations may be harmed.

***We face intense competition from a range of competitors and may be unsuccessful in competing against current and future competitors.***

The digital photography products and services industries are intensely competitive, and we expect competition to increase in the future as current competitors improve their offerings, including developing, acquiring and expanding mobile offerings, and as new participants enter the market or as industry consolidation further develops. Competition may result in pricing pressures, reduced profit margins or loss of market share, any of which could substantially harm our business and results of operations. We face intense competition from a wide range of companies, including the following:

- Online digital photography services companies such as Snapfish, which is a service of Hewlett-Packard, American Greetings' Webshots brand, Vistaprint, SmugMug, and many others;

- "Big Box" retailers such as Wal-Mart, Costco, Sam's Club and others that are seeking to offer low cost digital photography products and services. These competitors provide in-store fulfillment and self-service kiosks for printing, and may, among other strategies, offer their customers heavily discounted in-store products and services that compete directly with our offerings;

- Drug stores such as Walgreens, CVS/pharmacy, and others that offer in-store pick-up from their photo website internet orders;

- Mobile digital photography services companies such as Instagram, Woven, and iPhoto;

- Self-publishing companies and services such as Lulu, CafePress, and Zazzle;

- Cloud-based storage services and file-syncing services such as Dropbox, SugarSync, Box, Amazon Cloud Drive, and iCloud;

- Specialized companies in the photo book and stationery business such as Hallmark, Cardstore by American Greetings, Minted, Picaboo, Blurb, MyPublisher, Mixbook, MOO, Smilebox, Creative Memories, and Photobook America;

- Photo-related software companies such as Apple, Microsoft, Corel, and FotoFlexer;

- Internet portals and search engines such as Yahoo!, AOL, and Google that offer broad-reaching digital photography and related products and services to their large user bases;

13

*Table of Contents*

- Home printing service providers such as Hewlett-Packard, Epson, Canon, and Kodak that are seeking to expand their printer and ink businesses by gaining market share in the digital photography marketplace;

- Social media companies that host and enable mobile access to and posting of images such as Facebook, Twitter, and Myspace;

- Photo hosting websites that allow users to upload and share images at no cost such as Picasa, Flickr, and Photobucket; and

- Regional photography companies such as Ritz Camera that have established brands and customer bases in existing photography markets.

Many of our competitors have significantly longer operating histories, larger and broader customer bases, greater brand and name recognition and greater financial, research and development and distribution resources, and operate in more geographic areas than we do. Well-funded competitors may be better able to withstand economic downturns and periods of slow economic growth and the associated periods of reduced customer spending and increased pricing pressures. The numerous choices for digital photography services can cause confusion for consumers, and may cause them to select a competitor with greater name recognition. Some competitors are able to devote substantially more resources to website and systems development or to investments or partnerships with traditional and online competitors. Well-funded competitors, particularly new entrants, may choose to prioritize growing their market share and brand awareness instead of profitability. Competitors and new entrants in the digital photography products and services

industries may develop new products, technologies or capabilities that could render obsolete or less competitive many of our products, services and content. We may be unable to compete successfully against current and future competitors, and competitive pressures could harm our business and prospects.

***Our quarterly financial results may fluctuate, which may lead to volatility in our stock price.***

Our future revenues and operating results may vary significantly from quarter to quarter due to a number of factors, many of which are difficult for us to predict and control. Factors that could cause our quarterly operating results to fluctuate include:

- general economic conditions, including recession and slow economic growth in the U.S. and worldwide and higher inflation, as well as those economic conditions specific to the Internet and e-commerce industries;

- demand for our products and services, including seasonal demand;

- our pricing and marketing strategies and those of our competitors;

- our ability to attract visitors to our websites and convert those visitors into customers;

- our ability to retain customers and encourage repeat purchases;

- the costs of customer acquisition;

- our ability to manage our production and fulfillment operations;

- the costs to produce our prints and photo-based products and merchandise and to provide our services;

- the costs of expanding or enhancing our technology or websites;

- a significant increase in returns and credits, beyond our estimated allowances, for customers who are not satisfied with our products;

- declines or disruptions to the travel industry;

- variations in weather, particularly heavy rain and snow which tend to depress travel and picture taking;

- the timing of holidays;

- volatility in our stock price, which may lead to higher stock-based compensation expense;

- consumer preferences for digital photography services;

- improvements to the quality, cost and convenience of desktop printing of digital pictures and products; and

14

*Table of Contents*

- global and geopolitical events with indirect economic effects such as pandemic disease, hurricane and other natural disasters, war, threat of war or terrorist actions.

Based on the factors cited above, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance. It is possible that in one or more future quarters, our operating results may be below the expectations of public market analysts and investors. In that event, the trading price of our common stock may decline.

***We have incurred operating losses in the past and may not be able to sustain profitability in the future.***

We have periodically experienced operating losses since our inception in 1999. In particular, we make investments in our business that generally result in operating losses in each of the first three quarters of our fiscal year. This typically has enabled us to generate the majority of our net revenue during the fourth quarter and to achieve profitability for the full fiscal year. If we are unable to produce our products and provide our services at commercially reasonable costs, if customer demand decreases and revenues decline or if our expenses exceed our expectations, we may not be able to achieve, sustain or increase profitability on a quarterly or annual basis.

***We face many risks, uncertainties, expenses and difficulties relating to increasing our market share and growing our business.***

To address the risks and uncertainties of increasing our market share and growing our business, we must do the following:

- maintain and increase the size of our customer base;

- maintain and enhance our brands;

- enhance and expand our products and services;

- maintain and grow our websites and customer operations;

- successfully execute our business and marketing strategy;

- continue to develop and upgrade our technology and information processing systems;

- continue to enhance our service to meet the needs of a changing market;

- provide superior customer service;

- respond to competitive developments; and

- attract, integrate, retain and motivate qualified personnel.

We may be unable to accomplish one or more of these requirements, which could cause our business to suffer. Accomplishing one or more of these requirements might be very expensive, which could harm our financial results.

***If we are not able to reliably meet our data storage and management requirements, customer satisfaction and our reputation could be harmed.***

As a part of our current business model, we offer our customers free unlimited online storage and sharing of photographs and, as a result, must store and manage many petabytes of data. This policy results in immense system requirements and substantial ongoing technological challenges, both of which are expected to continue to increase over time. If we are not able to reliably meet these data storage and management requirements, we could have disruptions in services which could impair customer satisfaction and our reputation and lead to reduced net revenues and increased expenses. Moreover, if the cost of meeting these data storage and management requirements exceeds our expectations, our results of operations would be harmed. For example, after massive flooding shut down major hard disk drive production sites in Thailand, our ability to timely acquire data storage products was adversely affected.

Our data storage system could suffer damage or interruption from human error, fire, flood, power loss, telecommunications failure, break-ins, terrorist attacks, acts of war and similar events. In addition, our primary storage facilities are located near a major fault line, increasing our susceptibility to the risk that an earthquake could significantly harm our data storage system. If we experience disruption to our redundant systems located at our data storage center, such disruption could result in the deletion or corruption of customers' stored images.

15

*Table of Contents*

***Interruptions to our websites, information technology systems, print production processes or customer service operations could damage our reputation and brands and substantially harm our business and results of operations.***

The satisfactory performance, reliability and availability of our websites, information technology systems, printing production processes and customer service operations are critical to our reputation, and our ability to attract and retain customers and maintain adequate customer satisfaction. Any interruptions that result in the unavailability of our websites or reduced order fulfillment performance or customer service could result in negative publicity, damage our reputation and brands and cause our business and results of operations to suffer. This risk is heightened in the fourth quarter, as we experience significantly increased traffic to our websites during the holiday season. Any interruption that occurs during such time would have a disproportionately negative impact than if it occurred during a different quarter.

We depend in part on third parties to implement and maintain certain aspects of our communications and printing systems. Therefore many of the causes of system interruptions or interruptions in the production process may be outside of our control. As a result, we may not be able to remedy such interruptions in a timely manner, or at all. Our business interruption insurance policies do

not address all potential causes of business interruptions that we may experience, and any proceeds we may receive from these policies in the event of a business interruption may not fully compensate us for the revenues we may lose.

***We may have difficulty managing our growth and expanding our operations successfully.***

We have website operations, offices and customer support centers in Redwood City, California, Sunnyvale, California, and Tempe, Arizona and production facilities in Charlotte, North Carolina and Phoenix, Arizona and a new facility in Fort Mill, South Carolina that will replace our Charlotte, North Carolina facility, and is expected to be operational in 2013. Our growth has placed, and will continue to place, a strain on our administrative and operational infrastructure. Our ability to manage our operations and growth will require us to continue to refine our operational, financial and management controls, human resource policies and reporting systems.

If we are unable to manage future expansion, we may not be able to implement improvements to our controls, policies and systems in an efficient or timely manner and may discover deficiencies in existing systems and controls. Our ability to provide a high-quality customer experience could be compromised, which would damage our reputation and brands and substantially harm our business and results of operations.

***If we are unable to adequately control the costs associated with operating our business, our results of operations will suffer.***

The primary costs in operating our business are related to producing and shipping products, acquiring customers, compensating our personnel, acquiring equipment and technology and leasing facilities. If we are unable to keep these costs aligned with the level of revenues that we generate, our results of operations would be harmed. Controlling our business costs is challenging because many of the factors that impact these costs are beyond our control. For example, the costs to produce prints, such as the costs of photographic print paper, could increase due to a shortage of silver or an increase in worldwide energy prices. In addition, we may become subject to increased costs by the third-party shippers that deliver our products to our customers, and we may be unable to pass along any increases in shipping costs to our customers. The costs of online advertising and keyword search could also increase significantly due to increased competition, which would increase our customer acquisition costs.

***We may undertake acquisitions to expand our business, which may pose risks to our business and dilute the ownership of our existing stockholders.***

A key component of our business strategy includes strengthening our competitive position and refining the customer experience on our websites through internal development. However, from time to time, we may selectively pursue acquisitions of complementary businesses, such as our 2012 acquisitions of ThisLife, Inc., Penguin Digital, Inc. and Photoccino, Ltd., our 2011 acquisition of Tiny Prints, Inc., and our 2010 acquisition of WMSG, Inc. The identification of suitable acquisition candidates can be time-consuming and expensive, and we may not be able to successfully complete identified acquisitions. Furthermore, even if we successfully complete an acquisition, we may not achieve the anticipated benefits we expect due to a number of factors including the loss of management focus on and the diversion of resources from existing businesses; difficulty retaining key personnel of the acquired company; cultural challenges associated with integrating employees from an acquired company into our organization; difficulty integrating acquired technologies into our existing systems; difficulty integrating data systems; and the need to implement or remediate the controls, procedures or policies of the acquired company. Failure to achieve the anticipated benefits of such acquisitions or the incurrence of debt, contingent liabilities, amortization expenses, or write-offs of goodwill in connection with such acquisitions could harm our operating results.

16

*Table of Contents*

In addition, we may issue equity securities to complete an acquisition, which would dilute our existing shareholders' ownership, perhaps significantly depending on the terms of such acquisitions and could adversely affect the price of our common stock. In connection with our Tiny Prints acquisition, we issued approximately 5.4 million shares of our common stock as transaction consideration. To finance any future acquisitions, it may also be necessary for us to raise additional funds through public or private debt and equity financings. Additional funds may not be available on terms that are favorable to us, and, in the case of equity financings, would result in dilution to our stockholders. Also, the value of our stock may be insufficient to attract acquisition candidates.

***The loss of key personnel and an inability to attract and retain additional personnel could affect our ability to successfully grow our business.***

We are highly dependent upon the continued service and performance of our senior management team and key technical, marketing and production personnel. The loss of these key employees, each of whom is "at will" and may terminate his or her employment relationship with us at any time, may significantly delay or prevent the achievement of our business objectives. For

example, our former chief financial officer resigned effective February 24, 2012 and our chief technology officer resigned effective July 10, 2012. A lack of management continuity could result in operational and administrative inefficiencies and added costs, which could adversely impact our results of operations and stock price and may make recruiting for future management positions more difficult. In addition, we must successfully integrate our new chief financial officer who began in August 2012, and changes in this and other key management positions may temporarily affect our financial performance and results of operations as new management becomes familiar with our business.

We believe that our future success will also depend in part on our continued ability to identify, hire, train and motivate qualified personnel. We face intense competition for qualified individuals from numerous technology, marketing, financial services, manufacturing and e-commerce companies. In addition, competition for qualified personnel is particularly intense in the San Francisco Bay Area, where our headquarters are located. We may be unable to attract and retain suitably qualified individuals who are capable of meeting our growing operational and managerial requirements, or we may be required to pay increased compensation in order to do so. Our failure to attract and retain qualified personnel could impair our ability to implement our business plan.

*If we do not obtain shareholder approval for the issuance of additional shares under the 2006 Equity Incentive Plan, our ability to attract and retain key personnel may be adversely affected.*

At the 2010 annual meeting, our stockholders approved an amendment to our 2006 Equity Incentive Plan (the "2006 Plan") to renew its "evergreen" provision. According to the amendment, the number of shares available for issuance under the 2006 Plan automatically increased as follows: (i) on January 1, 2011 by 3.5% of the number of the Company's common stock issued and outstanding on December 31, 2010; (ii) on January 1, 2012 by 3.3% of the number of the Company's common stock issued and outstanding on December 31, 2011, and (iii) on January 1, 2013 by 3.1% of the number of the Company's common stock issued and outstanding on December 31, 2012. In addition, in order to attract key personnel, the Board authorized 380,000, 135,100, 200,000, and 736,573 additional inducement stock option grants and restricted stock unit awards to supplement our 2006 Plan, which were granted in 2007, 2008, 2009, and 2012 respectively. As of January 1, 2013, we no longer have automatic increases in the shares issued under the 2006 Plan, and plan to seek shareholder approval for additional shares so that we can continue to attract and retain key personnel. Although we obtained approval to increase the authorized number of shares available for issuance under the 2006 Plan at our 2010 annual meeting, there can be no assurances that our stockholders will approve further increases.

*In order to attract new personnel, we will need to grant inducement equity awards outside of our 2006 Equity Incentive Plan, which dilutes the ownership of our existing shareholders.*

Inducement stock options and restricted stock unit awards granted to new employees upon hire in accordance with NASDAQ Listing Rule 5635(c)(4) do not require stockholder approval. In 2012, inducement equity awards outside of our 2006 Plan were issued to our new Chief Financial Officer and new Chief Marketing Officer. In addition, inducement equity awards outside of our 2006 Plan were issued to the new employees that we acquired as part of our purchase of Photoccino, Ltd., Penguin Digital, Inc., and ThisLife, Inc. The issuance of additional shares of common or preferred stock may significantly dilute the equity interest of our stockholders, could cause a change in control if a substantial number of shares of common stock are issued, which may affect, among other things, our ability to use our net operating loss carryforwards, if any, and may adversely affect prevailing market prices for our common stock.

17

*Table of Contents*

*If we are unable to attract customers in a cost-effective manner, or if we were to become subject to e-mail blacklisting, traffic to our websites would be reduced and our business and results of operations would be harmed.*

Our success depends on our ability to attract customers in a cost-effective manner. We rely on a variety of methods to bring visitors to our websites and promote our products, including paying fees to third parties who drive new customers to our websites, purchasing search results from online search engines, e-mail and direct mail. We pay providers of online services, search engines, directories and other websites and e-commerce businesses to provide content, advertising banners and other links that direct customers to our websites. We also use e-mail and direct mail to offer free products and services to attract customers, and we offer substantial pricing discounts to encourage repeat purchases. Our methods of attracting customers, including acquiring customer lists from third parties, can involve substantial costs, regardless of whether we acquire new customers. Even if we are successful in acquiring and retaining customers, the cost involved in these efforts impacts our results of operations. Customer lists are typically recorded as intangible assets and may be subject to impairment charges if the fair value of that list exceeds its carrying value. These potential impairment charges could harm our results from operations. If we are unable to enhance or maintain the methods we use to reach consumers, if the costs of attracting customers using these methods significantly increase, or if we are unable to develop new cost-effective means to obtain customers, our ability to attract new customers would be harmed, traffic to our websites would be reduced and our business and results of operations would be harmed.

In addition, various private entities attempt to regulate the use of e-mail for commercial solicitation. These entities often advocate standards of conduct or practice that significantly exceed current legal requirements and classify certain e-mail solicitations that comply with current legal requirements as unsolicited bulk e-mails, or "spam." Some of these entities maintain blacklists of companies and individuals, and the websites, Internet service providers and Internet protocol addresses associated with those entities or individuals that do not adhere to what the blacklisting entity believes are appropriate standards of conduct or practices for commercial e-mail solicitations. If a company's Internet protocol addresses are listed by a blacklisting entity, e-mails sent from those addresses may be blocked if they are sent to any Internet domain or Internet address that subscribes to the blacklisting entity's service or purchases its blacklist. From time to time we are blacklisted, sometimes without our knowledge, which could impair our ability to market our products and services, communicate with our customers and otherwise operate our business. In addition, we have noted that unauthorized "spammers" utilize our domain name to solicit spam, which increases the frequency and likelihood that we may be blacklisted.

***Our business could be negatively affected by changes in search engine algorithms and dynamics, or search engine disintermediation.***

We rely on Internet search engines such as Google, including through the purchase of keywords related to photo-based products, to generate traffic to our websites. We obtain a significant amount of traffic via search engines and, therefore, utilize techniques such as search engine optimization and search engine marketing to improve our placement in relevant search queries. Search engines, including Google, frequently update and change the logic that determines the placement and display of results of a user's search, such that the purchased or algorithmic placement of links to our websites can be negatively affected. Moreover, a search engine could, for competitive or other purposes, alter its search algorithms or results causing our websites to place lower in search query results. If a major search engine changes its algorithms in a manner that negatively affects our paid or unpaid search ranking, or if competitive dynamics impact the effectiveness of search engine optimization or search engine marketing in a negative manner, our business and financial performance would be adversely affected, potentially to a material extent.

***We may not succeed in promoting, strengthening and continuing to establish the Shutterfly, Tiny Prints, Wedding Paper Divas and Treat brands, which would prevent us from acquiring new customers and increasing revenues.***

A component of our business strategy is the continued promotion and strengthening of the Shutterfly, Tiny Prints, Wedding Paper Divas and Treat brands. Due to the competitive nature of the digital photography products and services markets, if we are unable to successfully promote our brands, we may fail to substantially increase our net revenues. Customer awareness and the perceived value of our brands will depend largely on the success of our marketing efforts and our ability to provide a consistent, high-quality customer experience. To promote our brands, we have incurred, and will continue to incur, substantial expense related to advertising and other marketing efforts.

Our ability to provide a high-quality customer experience also depends, in large part, on external factors over which we may have little or no control, including the reliability and performance of our suppliers and third-party Internet and communication infrastructure providers. For example, some of our products, such as select photo-based merchandise, are produced and shipped to customers by our third-party vendors, and we rely on these vendors to properly inspect and ship these products. In addition, we rely on third-party shippers, including the U.S. Postal Service, United Parcel Service and FedEx, to deliver our products to customers. Strikes, furloughs, reduced operations or other service interruptions affecting these shippers could impair our ability

18

*Table of Contents*

to deliver merchandise on a timely basis. Our products are also subject to damage during delivery and handling by our third-party shippers. Our failure to provide customers with high-quality products in a timely manner for any reason could substantially harm our reputation and our efforts to develop trusted brands. The failure of our brand promotion activities could adversely affect our ability to attract new customers and maintain customer relationships, which would substantially harm our business and results of operations.

***If we are unable to develop, market and sell new products and services that address additional market opportunities, our results of operations may suffer. In addition, we may need to expand beyond our current customer demographic to grow our business.***

Although historically we have focused our business on consumer markets for silver halide prints, such as 4x6 prints, and photo-based products, such as photo books, stationery cards and calendars, we continually evaluate the demand for new products and services and the need to address these trends. In addition, we believe we may need to address additional markets and expand our customer demographic in order to further grow our business. We may not successfully expand our existing services or create new products and services, address new market segments or develop a significantly broader customer base. Any failure to address additional market opportunities could result in loss of market share, which would harm our business, financial condition and results of operations.

*If we do not successfully develop and maintain a relevant multichannel experience for our customers, our results of operations may suffer.*

Our customers are increasingly using computers, tablets, mobile phones, and other devices to produce photos and photo-based products online. As part of our multichannel strategy, we are making technology investments in our websites and recently launched a mobile application for mobile phones and other electronic devices. If we are unable to make, improve, or develop relevant customer-facing technology in a timely manner, our ability to compete could be adversely affected and may result in the loss of market share, which could harm our results of operations. In addition, if our technology systems do not function as designed, we may experience a loss of confidence, data security breaches or lost sales, which could adversely affect our reputation and results of operations.

*If either facility where our computer and communications hardware is located fails or if any of our production facilities fails, our business and results of operations would be harmed.*

Our ability to successfully receive and fulfill orders and to provide high-quality customer service depends in part on the efficient and uninterrupted operation of our computer and communications systems. Substantially all of the computer hardware necessary to operate our websites is located at one third-party hosting facility in Santa Clara, California, and our production facilities are located in Charlotte, North Carolina and Phoenix, Arizona. Our systems and operations could suffer damage or interruption from human error, fire, flood, power loss, insufficient power availability, telecommunications failure, break-ins, terrorist attacks, acts of war and similar events. In addition, Santa Clara is located near a major fault line increasing our susceptibility to the risk that an earthquake could significantly harm the operations of these facilities. We maintain business interruption insurance; however, this insurance may be insufficient to compensate us for losses that may occur, particularly from interruption due to an earthquake which is not covered under our current policy. We do not presently have redundant systems in multiple locations. In addition, the impact of any of these disasters on our business may be exacerbated by the fact that we are still in the process of developing our formal disaster recovery plan and we do not have a final plan in place.

*Capacity constraints and system failures could prevent access to our websites, which could harm our reputation and negatively affect our net revenues.*

Our business requires that we have adequate capacity in our computer systems to cope with the high volume of visits to our websites. As our operations grow in size and scope, we continually need to improve and upgrade our computer systems and network infrastructure to ensure reliable access to our websites, in order to offer customers enhanced and new products, services, capacity, features and functionality. The expansion of our systems and infrastructure may require us to commit substantial financial, operational and technical resources before the volume of our business increases, with no assurance that our net revenues will increase.

Our ability to provide high-quality products and service depends on the efficient and uninterrupted operation of our computer and communications systems. If our systems cannot be expanded in a timely manner to cope with increased website traffic, we could experience disruptions in service, slower response times, lower customer satisfaction, and delays in the introduction of new products and services. Any of these problems could harm our reputation and cause our net revenues to decline.

19

*Table of Contents*

*Our technology, infrastructure and processes may contain undetected errors or design faults that could result in decreased production, limited capacity or reduced demand.*

Our technology, infrastructure and processes may contain undetected errors or design faults. These errors or design faults may cause our websites to fail and result in loss of, or delay in, market acceptance of our products and services. If we experience a delay in a website release that results in customer dissatisfaction during the period required to correct errors and design faults, we would lose revenue. In the future, we may encounter scalability limitations, in current or future technology releases, or delays in the commercial release of any future version of our technology, infrastructure and processes that could seriously harm our business.

*We currently depend on third party suppliers for our photographic print paper, printing machines and other supplies, which expose us to risks if these suppliers fail to perform under our agreements with them.*

We have historically relied on an exclusive supply relationship with Fuji Photo Film U.S.A. to supply all of our photographic paper for silver halide print production, such as 4x6 prints. In August 2012, we renewed our supply agreement with Fuji which now expires in August 2015. If that agreement is not renewed before it expires in August 2015, or if Fuji fails to perform in accordance with the terms of our agreement and if we are unable to secure a paper supply from a different source in a timely manner, we would likely fail to meet

customer expectations, which could result in negative publicity, damage our reputation and brands and harm our business and results of operations. We purchase other photo-based supplies from third parties on a purchase order basis, and, as a result, these parties could increase their prices, reallocate supply to others, including our competitors, or choose to terminate their relationship with us. In addition, we purchase or rent a substantial portion of the machines used to produce certain of our photo-based products from Hewlett-Packard, which is one of our primary competitors in the area of online digital photography services. This competition may influence their willingness to provide us with additional products or services. If we were required to switch vendors of machines for photo-based products, we may incur delays and incremental costs, which could harm our operating results.

***We currently outsource some of our off-line and on-line marketing, our customer service activities and some of our production of print and photo-based products to third parties, which exposes us to risks if these parties fail to perform under our agreements with them.***

We currently outsource some of our off-line and on-line marketing, our customer service activities and the production of some of our print and photo-based products to third parties. If these parties fail to perform in accordance with the terms of our agreements and if we are unable to secure another outsource partner in a timely manner, we would likely fail to meet customer expectations, which could result in negative publicity, damage our reputation and brands and harm our business and results of operations.

***Our net revenues and results of operations are affected by the level of vacation and other travel by our customers, and any declines or disruptions in the travel industry could harm our business.***

Because vacation and other travel is one of the primary occasions in which our customers utilize their digital cameras, our net revenues and results of operations are affected by the level of vacation and other travel by our customers. Accordingly, downturns or weaknesses in the travel industry could harm our business. Travel expenditures are sensitive to business and personal discretionary spending levels and tend to decline during general economic slowdowns such as those experienced in the U.S. and worldwide. Events or weaknesses that could negatively affect the travel industry include price escalation in the airline industry or other travel-related industries, airline or other travel related strikes, safety concerns, including terrorist activities, pandemic disease (including the influenza virus), inclement weather and airline bankruptcies or liquidations. In addition, high gasoline prices may lead to reduced travel in the United States. Any decrease in vacation or travel could harm our net revenues and results of operations.

***Failure to adequately protect our intellectual property could substantially harm our business and results of operations.***

We rely on a combination of patent, trademark, trade secret and copyright law and contractual restrictions to protect our intellectual property. These protective measures afford only limited protection. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our website features and functionalities or to obtain and use information that we consider proprietary, such as the technology used to operate our websites, our production operations and our trademarks.

As of December 31, 2012, Shutterfly had 55 patents issued, and had more than 40 patent applications pending in the United States. We intend to pursue corresponding patent coverage in other countries to the extent we believe such coverage is appropriate and cost efficient. We cannot ensure that any of our pending applications will be granted. In addition, third parties have in the past and could in the future bring infringement, invalidity, co-inventorship or similar claims with respect to any of our currently issued patents or any patents that may be issued to us in the future. Any such claims, whether or not successful, could be extremely costly

20

*Table of Contents*

to defend, divert management's time and attention, damage our reputation and brands and substantially harm our business and results of operations.

Our primary brands are "Shutterfly," "Tiny Prints," "Wedding Paper Divas," and "Treat." We hold applications and/or registrations for the Shutterfly, Tiny Prints, Wedding Paper Divas and Treat trademarks in our major markets of the United States and Canada as well as in the European Community. We also hold applications and registrations for the Shutterfly mark in Mexico, Japan and China, and for the Shutterfly and Tiny Prints marks in Australia and New Zealand. The Shutterfly and Tiny Prints brands are critical components of our marketing programs. If we lose the ability to use these marks in any particular market, we could be forced to either incur significant additional marketing expenses within that market, or elect not to sell products in that market.

From time to time, third parties have adopted names similar to ours, have applied to register trademarks similar to ours, and we believe have infringed or misappropriated our intellectual property rights and impeded our ability to build brand identity and possibly leading to customer confusion. In addition, we have been and may continue to be subject to potential trade name or trademark infringement claims brought by owners of marks that are similar to Shutterfly, Tiny Prints, Wedding Paper Divas, Treat or one of our other marks.

We respond on a case-by-case basis and where appropriate may send cease and desist letters or commence opposition actions and litigation. However, we cannot ensure that the steps we have taken to protect our intellectual property rights are adequate, that our intellectual property rights can be successfully defended and asserted in the future or that third parties will not infringe upon or misappropriate any such rights. In addition, our trademark rights and related registrations may be challenged in the future and could be canceled or narrowed. Failure to protect our trademark rights could prevent us in the future from challenging third parties who use names and logos similar to our trademarks, which may in turn cause consumer confusion or negatively affect consumers' perception of our brands, products, and services. Any claims or customer confusion related to our marks could damage our reputation and brands and substantially harm our business and results of operations.

***If we become involved in intellectual property litigation or other proceedings related to a determination of rights, we could incur substantial costs, expenses or liability, lose our exclusive rights or be required to stop certain of our business activities.***

From time to time, we have received, and likely will continue to receive, communications from third parties inviting us to license their patents or accusing us of infringement. There can be no assurance that a third party will not take further action, such as filing a patent infringement lawsuit, including a request for injunctive relief to bar the manufacture and sale of our products and services in the United States or elsewhere. We may also choose to defend ourselves by initiating litigation or administrative proceedings to clarify or seek a declaration of our rights. Additionally, from time to time, we have to defend against infringement of our intellectual property by bringing suit against other parties. As competition in our market grows, the possibility of patent infringement claims against us or litigation we will initiate increases.

For example, in January 2013, a patent infringement lawsuit was filed against us by Express Card Systems, LLC. In September 2011, two patent infringement lawsuits were filed against us and both were dismissed with prejudice. In 2010, two more patent infringement lawsuits were filed against us, one by Express Card Systems, LLC was dismissed without prejudice of all claims and the other, filed by Eastman Kodak Company ("Kodak"), was stayed pending the outcome of the sale of the Kodak patents at issue in the lawsuit. On February 5, 2013, Kodak filed a stipulation and order lifting the stay and dismissing the case with prejudice.

The cost to us of any litigation or other proceeding relating to intellectual property rights, whether or not initiated by us and even if resolved in our favor, could be substantial, and the litigation would divert our management's efforts from growing our business. Some of our competitors may be able to sustain the costs of complex intellectual property litigation more effectively than we can because they have substantially greater resources. Uncertainties resulting from the initiation and continuation of any litigation could limit our ability to continue our operations.

Alternatively, we may be required to, or decide to, enter into a license with a third party. Any future license required under any other party's patents may not be made available on commercially acceptable terms, if at all. In addition, such licenses are likely to be non-exclusive and, therefore, our competitors may have access to the same technology licensed to us. If we fail to obtain a required license and are unable to design around a patent, we may be unable to effectively conduct certain of our business activities, which could limit our ability to generate revenues and harm our results of operations and possibly prevent us from generating revenues sufficient to sustain our operations.

***Various governmental legal proceedings, investigations or audits may adversely affect our business and financial performance.***

We may be subject to investigations or audits by governmental authorities and regulatory agencies, which can occur in the ordinary course of business or which can result from increased scrutiny from a particular agency towards an industry, country or

*Table of Contents*

practice. The resolution of such legal proceedings, investigations or audits could require us to pay substantial amounts of money or take actions that adversely affect our operations. In addition, defending against these claims may involve significant time and expense. For example, we were a party to an Assurance of Discontinuance entered into on September 13, 2010 with the New York Attorney General's office, which related to our business activities in New York regarding discount programs offered by Webloyalty, Inc., one of our former business partners. Given the visibility of our brands, we may regularly be involved in legal proceedings, government investigations or audits that could adversely affect our business and financial performance.

***We may be subject to past or future liabilities for collection of sales and use taxes, and the payment of corporate level taxes.***

Our policies concerning the collection of sales and use taxes and the payment of certain corporate level taxes have been based upon decisions of the U.S. Supreme Court that determine when a taxpayer is deemed to have nexus with a state sufficient to impose tax obligations under the Commerce Clause of the U.S. Constitution. Those Supreme Court decisions require that the taxpayer be

physically present before a state can require the collection of sales and use taxes. States are currently attempting to expand the definition of what constitutes physical presence for sales and use taxes. At the same time, the standard governing the imposition of other taxes, for instance, corporate income taxes, is less established and a number of state courts have concluded that the Commerce Clause definition of nexus should be expanded to include either "physical" or "economic" presence (essentially marketing activities) which is a broader definition than is used for sales and use tax.

We collect sales and use taxes in jurisdictions where we have employees and/or property and in other states where we have implemented joint sales efforts with Target Corporation.

While we believe the U.S. Supreme Court decisions support our policies concerning the collection and payment of taxes, tax authorities could disagree with our interpretations. If sustained, those authorities might seek to impose past as well as future liability for taxes and/or penalties. Such impositions could also impose significant administrative burdens and decrease our future sales. Moreover, the U.S. Congress has been considering various initiatives that could limit or supersede the U.S. Supreme Court's position regarding sales and use taxes.

***Our effective tax rate may be subject to fluctuation from federal and state audits, and stock-based compensation activity.***

Future tax audits by taxing agencies for the open tax years could lead to fluctuations in our effective tax rate because the taxing authority may disagree with certain assumptions we have made regarding appropriate credits and deductions in filing our tax returns.

Under current stock option tax regulations, our effective tax rate is subject to fluctuations as a result of stock-based compensation activity. This includes items such as shortfalls associated with the vesting of restricted stock units and restricted stock awards, disqualifying dispositions when employees exercise and sell their incentive stock options within a two year period, and cancellation of vested non-qualified stock options.

***Government regulation of the Internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.***

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and e-commerce. Existing and future laws and regulations may impede the growth of the Internet or other online services. These regulations and laws may cover taxation, restrictions on imports and exports, customs, tariffs, user privacy, data protection, pricing, content, copyrights, distribution, electronic contracts and other communications, consumer protection, the provision of online payment services, broadband residential Internet access and the characteristics and quality of products and services. It is not clear how existing laws governing issues such as property use and ownership, sales and other taxes, fraud, libel and personal privacy apply to the Internet and e-commerce as the vast majority of these laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or e-commerce. Those laws that do reference the Internet are only beginning to be interpreted by the courts and their applicability and reach are therefore uncertain. For example:

- The Digital Millennium Copyright Act, or DMCA, is intended, in part, to limit the liability of eligible online service providers for including (or for listing or linking to third-party websites that include) materials that infringe copyrights or other rights of others. Portions of the Communications Decency Act, or CDA, are intended to provide statutory protections to online service providers who distribute third-party content. We rely on the protections provided by both the DMCA and CDA in conducting our business. Any changes in these laws or judicial interpretations narrowing their protections will subject us to greater risk of liability and may increase our costs of compliance with these regulations or limit our ability to operate certain lines of business.

22

*Table of Contents*

- The Children's Online Protection Act and the Children's Online Privacy Protection Act are intended to restrict the distribution of certain materials deemed harmful to children and impose additional restrictions on the ability of online services to collect user information from minors. In addition, the Protection of Children From Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances.

- The Credit Card Accountability, Responsibility and Disclosure Act ("CARD Act") is intended to protect consumers from unfair credit card billing practices and adds new regulations on the use of gift cards, limiting our ability to expire them. In addition, several states are also attempting to pass new laws regulating the use of gift cards and amending state escheatment laws to try and obtain unused gift card balances.

- The Restore Online Shoppers' Confidence Act ("ROSCA") prohibits and prevents Internet-based post-transaction third party sales and imposes specific requirements on negative option features.

The costs of compliance with these regulations may increase in the future as a result of changes in the regulations or the interpretation of them. Further, any failures on our part to comply with these regulations may subject us to significant liabilities. Those current and future laws and regulations or unfavorable resolution of these issues may substantially harm our business and results of operations.

***Legislation regarding copyright protection or content interdiction could impose complex and costly constraints on our business model.***

Because of our focus on automation and high volumes, our operations do not involve, for the vast majority of our sales, any human-based review of content. Although our websites' terms of use specifically require customers to represent that they have the right and authority to reproduce the content they provide and that the content is in full compliance with all relevant laws and regulations, we do not have the ability to determine the accuracy of these representations on a case-by-case basis. There is a risk that a customer may supply an image or other content that is the property of another party used without permission, that infringes the copyright or trademark of another party, or that would be considered to be defamatory, pornographic, hateful, racist, scandalous, obscene or otherwise offensive, objectionable or illegal under the laws or court decisions of the jurisdiction where that customer lives. There is, therefore, a risk that customers may intentionally or inadvertently order and receive products from us that are in violation of the rights of another party or a law or regulation of a particular jurisdiction. If we should become legally obligated in the future to perform manual screening and review for all orders destined for a jurisdiction, we will encounter increased production costs or may cease accepting orders for shipment to that jurisdiction. That could substantially harm our business and results of operations.

***Our practice of offering free products and services could be subject to judicial or regulatory challenge.***

We regularly offer free products and free shipping as an inducement for customers to try our products. Although we believe that we conspicuously and clearly communicate all details and conditions of these offers — for example, that customers are required to pay shipping, handling and/or processing charges to take advantage of the free product offer — we may be subject to claims from individuals or governmental regulators that our free offers are misleading or do not comply with applicable legislation. These claims may be expensive to defend and could divert management's time and attention. If we become subject to such claims in the future, or are required or elect to curtail or eliminate our use of free offers, our results of operations may be harmed.

***Any failure by us to protect the confidential information of our customers and networks against security breaches and the risks associated with credit card fraud could damage our reputation and brands and substantially harm our business and results of operations.***

A significant prerequisite to online commerce and communications is the secure transmission of confidential information over public networks. Our failure to prevent security breaches could damage our reputation and brands and substantially harm our business and results of operations. For example, a majority of our sales are billed to our customers' credit card accounts directly, orders are shipped to a customer's address, and customers log on using their e-mail address. We rely on encryption and authentication technology licensed from third parties to effect the secure transmission of confidential information, including credit card numbers. Advances in computer capabilities, new discoveries in the field of cryptography or other developments may result in a compromise or breach of the technology used by us to protect customer transaction data. In addition, any party who is able to illicitly obtain a user's password could access the user's transaction data, personal information or stored images. Any compromise of our security could damage our reputation and brands and expose us to a risk of loss or litigation and possible liability, which would substantially harm our business and results of operations. In addition, anyone who is able to circumvent our security measures could

23

---

*Table of Contents*

misappropriate proprietary information or cause interruptions in our operations. We may need to devote significant resources to protect against security breaches or to address problems caused by breaches.

In addition, contractors that we hire as well as other employees have access to confidential information, including credit card data. Although we take steps to limit this access, this data could be compromised by these contractors or other employee personnel. Under current credit card practices, we are liable for fraudulent credit card transactions because we do not obtain a cardholder's signature. We do not currently carry insurance against this risk. To date, we have experienced minimal losses from credit card fraud, but we continue to face the risk of significant losses from this type of fraud. Our failure to adequately control fraudulent credit card transactions and use of confidential information could damage our reputation and brands and substantially harm our business and results of operations.

*The inability to acquire or maintain domain names for our brands could substantially harm our business and results of operations.*

We currently are the registrant of the Internet domain name for Shutterfly.com, TinyPrints.com, WeddingPaperDivas.com and Treat.com as well as various related domain names. Domain names generally are regulated by Internet regulatory bodies and are controlled also by trademark and other related laws. The regulations governing domain names could change in ways that block or interfere with our ability to use relevant domains. Also, we might not be able to prevent third parties from registering or retaining domain names that interfere with our consumer communications, or infringe or otherwise decrease the value of our trademarks and other proprietary rights. Recently, regulatory bodies have approved expanded generic top-level domain names, which involves substantial costs and may lead to an increase in cybersquatting. Regulatory bodies also may establish additional generic or country-code top-level domains or modify the requirements for holding domain names. As a result, we might not be able to acquire or maintain the domain names that utilize the name Shutterfly, TinyPrints, WeddingPaperDivas or Treat in all of the countries in which we currently or intend to conduct business. This could substantially harm our business and results of operations.

*Changes in regulations or user concerns regarding privacy and protection of user data could harm our business.*

Federal, state and international laws and regulations may govern the collection, use, sharing and security of data that we receive from our customers. In addition, we have and post on our websites our own privacy policies and practices concerning the collection, use and disclosure of customer data. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any data-related consent orders, Federal Trade Commission requirements or other federal, state or international privacy-related laws and regulations could result in proceedings or actions against us by governmental entities or others, which could potentially harm our business. Further, failure or perceived failure to comply with our policies or applicable requirements related to the collection, use or security of personal information or other privacy-related matters could damage our reputation and result in a loss of customers.

*International expansion will require management attention and resources and may be unsuccessful, which could harm our future business development and existing domestic operations.*

To date, we have conducted limited international operations, but we intend to expand into international markets in order to grow our business. These expansion plans will require significant management attention and resources and may be unsuccessful. We have limited experience adapting our products to conform to local cultures, standards and policies. We may have to compete with established local or regional companies which understand the local market better than we do. In addition, to achieve satisfactory performance for consumers in international locations it may be necessary to locate physical facilities, such as production facilities, in the foreign market. We do not have experience establishing, acquiring or operating such facilities overseas. We may not be successful in expanding into any international markets or in generating revenues from foreign operations. In addition, different privacy, censorship and liability standards and regulations and different intellectual property laws in foreign countries may cause our business to be harmed.

*The success of our business depends on our ability to adapt to the continued evolution of digital photography.*

The digital photography market is rapidly evolving, characterized by changing technologies, intense price competition, additional competitors, evolving industry standards, frequent new service announcements and changing consumer demands and behaviors. To the extent that consumer adoption of digital photography does not continue to grow as expected, our revenue growth would likely suffer. Moreover, we face significant risks that, if the market for digital photography evolves in ways that we are not able to address due to changing technologies or consumer behaviors, pricing pressures, or otherwise, our current products and services may become less attractive, which would result in the loss of customers, as well as lower net revenues and/or increased expenses.

24

---

*Table of Contents*

*Purchasers of digital photography products and services may not choose to shop online, which would harm our net revenues and results of operations.*

The online market for digital photography products and services is less developed than the online market for other consumer products. If this market does not gain widespread acceptance, our business may suffer. Our success will depend in part on our ability to attract customers who historically have used traditional retail photography services or who have produced photographs and other products using self-service alternatives, such as printing at home. Furthermore, we may have to incur significantly higher and more sustained advertising and promotional expenditures or reduce the prices of our products and services in order to attract additional online consumers to our websites and convert them into purchasing customers. Specific factors that could prevent prospective customers from purchasing from us include:

- the inability to physically handle and examine product samples;

- delivery time associated with Internet orders;

- concerns about the security of online transactions and the privacy of personal information;

- delayed shipments or shipments of incorrect or damaged products; and

- inconvenience associated with returning or exchanging purchased items.

If purchasers of digital photography products and services do not choose to shop online, our net revenues and results of operations would be harmed.

***The third party software systems that we utilize to assist us in the calculation and reporting of financial data may contain errors that we may not identify in a timely manner.***

We use numerous third party licensed software packages, most notably our equity software and our enterprise resource planning software, which are complex and fully integrated into our financial reporting. Such third party software may contain errors that we may not identify in a timely manner. If those errors are not identified and addressed timely, our financial reporting may not be in compliance with generally accepted accounting principles.

***If our internal controls are not effective, there may be errors in our financial information that could require a restatement or delay our SEC filings, and investors may lose confidence in our reported financial information, which could lead to a decline in our stock price.***

It is possible that we may discover significant deficiencies or material weaknesses in our internal control over financial reporting in the future. Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could cause us to fail to meet our periodic reporting obligations, or result in material misstatements in our financial information. Any such delays or restatements could cause investors to lose confidence in our reported financial information and lead to a decline in our stock price.

***Maintaining and improving our financial controls and the requirements of being a public company may strain our resources, divert management's attention and affect our ability to attract and retain qualified board members.***

As a public company, we are subject to the reporting requirements of the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002 and the rules and regulations of The NASDAQ Stock Market. In addition, the recently passed Dodd-Frank Wall Street Reform and Consumer Protection Act contains various provisions applicable to the corporate governance functions of public companies. Additional or new regulatory requirements may be adopted in the future. The requirements of existing and potential future rules and regulations will likely continue to increase our legal, accounting and financial compliance costs, make some activities more difficult, time-consuming or costly and may also place undue strain on our personnel, systems and resources.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and effective internal control over financial reporting. Significant resources and management oversight are required to design, document, test, implement and monitor internal control over relevant processes and to remediate any deficiencies. As a result, management's attention may be diverted from other business concerns, which could harm our business, financial condition and results of operations. These efforts also involve substantial accounting related costs. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on The NASDAQ Global Select Market.

25

---

*Table of Contents*

Under the Sarbanes-Oxley Act and the rules and regulations of The NASDAQ Stock Market, we are required to maintain a board of directors with a majority of independent directors. These rules and regulations may make it more difficult and more expensive for us to maintain directors' and officers' liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to maintain coverage. If we are unable to maintain adequate directors' and officers' insurance, our ability to recruit and retain qualified directors and officers, especially those directors who may be considered independent for purposes of NASDAQ rules, will be significantly curtailed.

***If affordable broadband access does not become widely available to consumers, our revenue growth will likely suffer.***

Because our business currently involves consumers uploading and downloading large data files, we are highly dependent upon the availability of affordable broadband access to consumers. Many areas of the country still do not have broadband access, and broadband access may be too expensive for many potential customers. To the extent that broadband access is not available or not adopted by consumers due to cost, our revenue growth would likely suffer.

***Our stock price may be volatile or may decline regardless of our operating performance.***

The market price of our common stock may fluctuate significantly in response to numerous factors, many of which are beyond our control. In particular, the stock market as a whole recently has experienced extreme price and volume fluctuations that have affected the market price of many technology companies in ways that may have been unrelated to those companies' operating performance. Factors that could cause our stock price to fluctuate include:

- slow economic growth, and market conditions or trends in our industry or the macro-economy as a whole;

- price and volume fluctuations in the overall stock market;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- the financial projections we may provide to the public, any changes in these projections or our failure to meet these projections;

- changes in financial estimates by any securities analysts who follow our company, our failure to meet these estimates or failure of those analysts to initiate or maintain coverage of our stock;

- ratings downgrades by any securities analysts who follow our company;

- the public's response to our press releases or other public announcements, including our filings with the SEC;

- announcements by us or our competitors of significant technical innovations, acquisitions, strategic partnerships, joint ventures or capital commitments;

- introduction of technologies or product enhancements that reduce the need for our products;

- the loss of key personnel;

- lawsuits threatened or filed against us;

- future sales of our common stock by our executive officers, directors and significant stockholders; and

- other events or factors, including those resulting from war, incidents of terrorism or responses to these events.

***Some provisions in our restated certificate of incorporation and restated bylaws and Delaware law may deter third parties from acquiring us.***

Our restated certificate of incorporation and restated bylaws contain provisions that may make the acquisition of our company more difficult without the approval of our board of directors, including the following:

- our board is classified into three classes of directors, each with staggered three-year terms;

- only our chairman, our chief executive officer, our president, or a majority of our board of directors is authorized to call a special meeting of stockholders;

26

*Table of Contents*

- our stockholders may take action only at a meeting of stockholders and not by written consent;

- vacancies on our board of directors may be filled only by our board of directors and not by stockholders;

- our certificate of incorporation authorizes undesignated preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval; and

- advance notice procedures apply for stockholders to nominate candidates for election as directors or to bring matters before an annual meeting of stockholders.

These anti-takeover defenses could discourage, delay or prevent a transaction involving a change in control of our company. These provisions could also discourage proxy contests and make it more difficult for stockholders to elect directors of their choosing and to cause us to take other corporate actions they desire.

In addition, we are subject to Section 203 of the Delaware General Corporation Law, which, subject to some exceptions, prohibits "business combinations" between a Delaware corporation and an "interested stockholder," which is generally defined as a stockholder who becomes a beneficial owner of 15% or more of a Delaware corporation's voting stock, for a three-year period following the date that the stockholder became an interested stockholder. Section 203 could have the effect of delaying, deferring or preventing a change in control that our stockholders might consider to be in their best interests.

27

---

*Table of Contents*

### ITEM 1B. *UNRESOLVED STAFF COMMENTS.*

Not applicable.

### ITEM 2. *PROPERTIES.*

We maintain our primary corporate headquarters facilities in Redwood City, California. In 2010, we renewed the lease for our corporate headquarters in two buildings totaling approximately 100,000 square feet. This lease will expire in 2017, and we have an option to extend the lease for two additional periods of three years each. The lease provides for a $2.1 million tenant improvement reimbursement allowance which was fully utilized as of December 31, 2011.

In 2011, in conjunction with our acquisition of Tiny Prints, we assumed the remaining term of a lease in Sunnyvale, California for office space totaling approximately 37,500 square feet. This lease will expire in 2014, and we have an option to extend the lease for one additional period of one year. We also assumed a lease in Tempe, Arizona which is approximately 25,400 square feet of office space used primarily for customer service. This lease will expire in 2014, and we have an option to extend the lease for one additional period of five years.

We maintain our west coast production and fulfillment operations in Phoenix, Arizona, totaling approximately 101,200 square feet. The lease for this facility commenced in March 2009, and will continue through 2016. We have an option to extend the lease for three additional periods of five years each, and a right of first offer to lease space in adjacent buildings.

We maintain our east coast production and fulfillment operations in Charlotte, North Carolina in leased facilities totaling approximately 102,400 square feet. The lease for this facility commenced on May 31, 2007. We have an option to extend the lease for three additional periods of either three or five years in length, and first rights of refusal to lease space in certain adjacent buildings. We terminated this lease early and expect to move to our newly leased South Carolina production facility during 2013.

In 2012, we executed a lease for a new 300,000 square foot east coast production and customer service facility in Fort Mill, South Carolina with the right to expand the facility by an additional 100,000 square feet. We also have the right of first offer for adjacent parcels as well as with respect to any outright sale of the premises to an unrelated third party. This facility will replace our current east coast production facility in Charlotte, North Carolina and is expected to open during 2013. In order for the facility to meet our operating specifications, we and our landlord are making structural changes as part of the uplift of the building. The lease expires in 2023, and we have an option to extend the lease for one additional period of five years.

We believe that our existing facilities are adequate to meet our current needs.

28

---

*Table of Contents*

### ITEM 3. LEGAL PROCEEDINGS

On January 4, 2013, Express Card Systems, LLC filed a complaint for alleged patent infringement against us in Express Card Systems, LLC. v. Shutterfly, Inc. et. al., Civ. No. 6:13-cv-18, in the Eastern District of Texas, Tyler Division. The complaint asserts infringement of U.S. Patents Nos., 5,748,484 and 5,552,994, which claim among other things a system for printing social expression cards in response to electronically transmitted orders. The complaint asserts that we directly or indirectly infringe the patents without providing any details concerning the alleged infringement, and it seeks unspecified damages. We believe the suit is without merit and will defend ourselves vigorously.

On December 10, 2010, Eastman Kodak Company ("Kodak") filed a complaint for alleged patent infringement against us in Eastman Kodak Company v. Shutterfly, Inc., C.A. No. 10-1079-SLR, in the U.S. District Court for the District of Delaware. The complaint asserted infringement of U.S. Patents Nos. 6,549,306; 6,600,572; 7,202,982; 6,069,712; and 6,512,570, which claimed among other things, methods for selecting photographic images using index prints, an image handling system incorporating coded instructions, and processing a roll of exposed photographic film into corresponding visual prints and distributing such prints. The complaint asserted that we directly or indirectly infringed the patents without providing any details concerning the alleged infringement, and it sought unspecified damages and injunctive relief.   On February 5, 2013, Kodak filed a stipulation and order lifting the stay and dismissing the case with prejudice.

On January 31, 2011, we filed a complaint for patent infringement against Eastman Kodak Company and Kodak Imaging Network, Inc. in Shutterfly, Inc. v. Eastman Kodak Company and Kodak Imaging Network, Inc., C.A. No. 11-099-SLR, in the U.S. District Court for the District of Delaware. The complaint asserted infringement of U.S. Patents Nos. 6,583,799; 7,269,800; 6,587,596; 6,973,222; 7,474,801; 7,016,869; and 7,395,229, which claimed among other things, methods for image uploading, image cropping, automatic generation of photo albums, and changing attributes of an image-based product. The complaint asserted that Kodak directly or indirectly infringed the patents, and it sought unspecified damages and injunctive relief. On February 5, 2013, we filed a stipulation and order lifting the stay and dismissing the case with prejudice.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable

29

---

*Table of Contents*

## PART II

## ITEM 5. *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.*

Shutterfly's common stock is traded on the NASDAQ Global Select Market under the symbol "SFLY." As of February 8, 2013, there were approximately 93 stockholders of record, excluding stockholders whose shares were held in nominee or street name by brokers. We have never paid cash dividends on our capital stock and we do not anticipate paying any cash dividends in the foreseeable future.

The following table sets forth the high and low sales price per share for Shutterfly's common stock for the periods indicated:

| Year Ended December 31, 2011 | | High | | Low |
|---|---|---|---|---|
| First Quarter | $ | 52.39 | $ | 32.54 |
| Second Quarter | $ | 63.49 | $ | 49.40 |
| Third Quarter | $ | 63.10 | $ | 41.18 |
| Fourth Quarter | $ | 48.78 | $ | 22.54 |

| Year Ended December 31, 2012 | | High | | Low |
|---|---|---|---|---|
| First Quarter | $ | 33.76 | $ | 22.70 |
| Second Quarter | $ | 31.66 | $ | 23.75 |
| Third Quarter | $ | 34.18 | $ | 28.68 |
| Fourth Quarter | $ | 31.51 | $ | 25.39 |

**Issuer Purchases of Equity Securities**

The following table provides information about our repurchase of shares of our common stock during the fourth quarter of the fiscal year ended December 31, 2012:

| Period (1) | Total Number of Shares Purchased (2) | | Average Price Paid per Share | Total Number of Shares Purchased Under Publicly Announced Plans or Programs (2) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans Or Programs (in thousands) | |
|---|---|---|---|---|---|---|
| October 1, 2012 to October 31, 2012 | — | $ | — | — | $ | 60,000 |
| November 1, 2012 to November 30, 2012 | 5,400 | | 28.09 | 5,400 | | 59,848 |
| December 1, 2012 to December 31, 2012 | 131,862 | | 27.31 | 131,862 | | 56,247 |
| Total | 137,262 | $ | 27.34 | 137,262 | $ | 56,247 |

(1) All shares were purchased pursuant to the publicly announced share repurchase program described in footnote 2 below. Shares are reported in a period based on the settlement date of the applicable repurchase.

(2) On November 1, 2012, we announced a share repurchase program authorized by our Board of Directors and approved by our Audit Committee to repurchase up to $60 million of our common stock. The program expires in November 2014.

30

*Table of Contents*

## ITEM 6. *SELECTED FINANCIAL DATA.*

The consolidated statements of income data for the years ended December 31, 2012, 2011 and 2010 and the consolidated balance sheet data as of December 31, 2012 and 2011 have been derived from our audited consolidated financial statements included elsewhere in this annual report on Form 10-K. The consolidated statements of income data for the years ended December 31, 2009 and 2008 and the consolidated balance sheet data as of December 31, 2010, 2009 and 2008 have been derived from our audited consolidated financial statements not included in this annual report on Form 10-K. The following selected consolidated financial data should be read in conjunction with our "Management's Discussion and Analysis of Financial Condition and Results of Operations" and consolidated financial statements and related notes to those statements included elsewhere in this annual report on Form 10-K.

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2012** | | **2011** | | **2010** | | **2009** | | **2008** |
| | (In thousands, except per share amounts) | | | | | | | | |
| Consolidated Income Statement Data: | | | | | | | | | |
| Net revenues | $ | 640,624 | $ | 473,270 | $ | 307,707 | $ | 246,432 | $ 213,480 |
| Cost of net revenues | | 294,857 | | 219,542 | | 134,491 | | 111,648 | 96,214 |
| Gross profit | | 345,767 | | 253,728 | | 173,216 | | 134,784 | 117,266 |
| Operating expenses: | | | | | | | | | |
| Technology and development | | 85,746 | | 65,675 | | 48,393 | | 46,003 | 39,707 |
| Sales and marketing | | 148,806 | | 113,952 | | 59,284 | | 44,870 | 42,212 |
| General and administrative | | 70,502 | | 58,710 | | 40,764 | | 35,201 | 32,741 |
| Total operating expenses | | 305,054 | | 238,337 | | 148,441 | | 126,074 | 114,660 |
| Income from operations | | 40,713 | | 15,391 | | 24,775 | | 8,710 | 2,606 |
| Interest expense | | (597) | | (64) | | (42) | | (157) | (273) |
| Interest and other income, net | | 42 | | 35 | | 482 | | 814 | 2,898 |

| | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| Income before income taxes | 40,158 | 15,362 | 25,215 | 9,367 | 5,231 |
| Provision for income taxes | (17,160) | (1,314) | (8,088) | (3,514) | (1,571) |
| Net income | $ 22,998 | $ 14,048 | $ 17,127 | $ 5,853 | $ 3,660 |
| Net income per share: | | | | | |
| Basic | $ 0.64 | $ 0.43 | $ 0.63 | $ 0.23 | $ 0.15 |
| Diluted | $ 0.61 | $ 0.40 | $ 0.59 | $ 0.22 | $ 0.14 |
| Weighted average shares: | | | | | |
| Basic | 35,826 | 32,788 | 27,025 | 25,420 | 25,036 |
| Diluted | 37,432 | 35,007 | 29,249 | 26,810 | 25,787 |

The chart above includes the following stock-based compensation amounts:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2011** | **2010** | **2009** | **2008** |
| | | | (In thousands) | | |
| Cost of net revenues | $ 1,696 | $ 2,138 | $ 508 | $ 416 | $ 372 |
| Technology and development | 8,635 | 8,201 | 3,069 | 3,340 | 2,404 |
| Sales and marketing | 11,559 | 11,350 | 3,923 | 3,577 | 2,452 |
| General and administration | 15,432 | 12,181 | 8,866 | 6,940 | 4,522 |
| | $ 37,322 | $ 33,870 | $ 16,366 | $ 14,273 | $ 9,750 |

31

Table of Contents

The chart below includes selected data from our balance sheet:

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2011** | **2010** | **2009** | **2008** |
| | | | (In thousands) | | |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents, and short term investments | $ 245,088 | $ 179,915 | $ 252,244 | $ 180,737 | $ 88,164 |
| Property and equipment, net | 92,667 | 54,123 | 39,726 | 41,845 | 48,108 |
| Working capital | 148,855 | 130,259 | 200,282 | 141,410 | 58,232 |
| Total assets | 865,124 | 709,886 | 343,830 | 271,313 | 233,297 |
| Capital lease obligations, less current portion | — | — | 6 | 10 | 17 |
| Total stockholders' equity | 691,286 | 608,997 | 269,607 | 215,164 | 186,802 |

**ITEM 7. *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.***

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

*This report, including the following Management's Discussion and Analysis of Financial Condition and Results of Operations, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 that are based upon our current expectations. These forward-looking statements include statements related to*

*our business strategy and plans, expectations regarding the seasonality and growth of our business, the impact on us of general economic conditions, trends in key metrics such as total number of customers and orders and average order value, the decline in average selling prices for prints, our capital expenditures for 2013, the sufficiency of our cash and cash equivalents and cash generated from operations for the next 12 months, our operating expenses remaining a consistent percentage of our net revenues, mergers and acquisitions and the ability to successfully integrate technologies, our new production facility, as well as other statements regarding our future operations, financial condition and prospects and business strategies. In some cases, you can identify forward-looking statements by terminology such as "project," "believe," "anticipate," "plan," "expect," "estimate," "intend," "continue," "should," "would," "could," "potentially," "will," or "may," or the negative of these terms or other comparable terminology. Forward-looking statements involve risks and uncertainties. Our actual results and the timing of events could differ materially from those anticipated in our forward-looking statements as a result of many factors, including but not limited to, the seasonality of our business, whether we are able to expand our customer base and increase our product and service offering, competition in our marketplace and the other risks set forth below under "Risk Factors" in Part I, Item 1A of this report. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. We assume no obligation to update any of the forward-looking statements after the date of this report or to compare these forward-looking statements to actual results.*

## Overview

We are the leading manufacturer and digital retailer of high-quality personalized products and services offered through a family of lifestyle brands. Our vision is to make the world a better place by helping people share life's joy. Our mission is to build an unrivaled service that enables deeper, more personal relationships between our customers and those who matter most in their lives. Our primary focus is on helping consumers manage their memories through the powerful medium of photography. We provide a full range of personalized photo-based products and services that make it easy, convenient and fun for consumers to upload, edit, enhance, organize, find, share, create, print, and preserve their memories in a creative and thoughtful manner.

We are building four trusted lifestyle brands: Shutterfly, Tiny Prints, Wedding Paper Divas, and Treat. We have operated the Shutterfly.com brand since inception in 1999. In 2011, we acquired Tiny Prints, Inc. a privately-held company based in Sunnyvale, California that operated tinyprints.com and weddingpaperdivas.com, two growing ecommerce brands primarily offering stylish cards, invitations and personalized stationery. On April 16, 2012, we launched Treat.com, a destination that enables users to easily personalize and send unique greeting cards. Our Treat launch signifies our focused expansion into the one-to-one U.S. greeting card market, to complement our existing one-to-many card business. In May 2012, we acquired the customer accounts and images of Kodak Gallery's online photo service through a bankruptcy court supervised auction. In July 2012, we began the process to

32

Table of Contents

transfer the more than five billion Kodak Gallery customer photos onto the Shutterfly technology platform, which was completed in September 2012.

On May 25, 2012, we acquired Photoccino Ltd., a privately-held company based in Haifa, Israel, which has developed innovative technologies for photo ranking, analysis and organization which will allow customers to more efficiently organize and select the best photos from their ever-increasing archives so they can quickly and easily create photo books, calendars, cards, and photo gifts. Photoccino's technology applies proprietary algorithms to analyze and evaluate the quality and content of photos, ranks them, and automatically creates photo products using the customer's best images. During the fourth quarter of 2012, we began to integrate the Photoccino technology by offering smart product creation capabilities to a select set of customers. We expect to further integrate the Photoccino technology into the products and services that our brands offer.

On September 14, 2012, we acquired Penguin Digital, Inc., a mobile application development company that has an iPhone application that allows users to access their photos from iPhones or their Facebook or Instagram accounts and create customized products and gifts from their mobile devices. We subsequently introduced our new Shutterfly iPhone Photo App which combines storage, viewing and photo gift creation right from one's phone.

On December 28, 2012, we acquired ThisLife.com, Inc. ("ThisLife") a cloud-based service provider for protecting, organizing, storing and sharing photos and videos which will strengthen our photo and video storage and sharing capabilities, as well as the ability to intelligently organize across devices and mobile platforms and enable the more efficient creation of products across the web and on mobile devices. In 2013, we expect to integrate this technology into the products and services that our Shutterfly brand offers.

We generate the majority of our revenues by producing and selling professionally-bound photo books, greeting and stationery cards, personalized calendars, other photo-based merchandise and high-quality prints ranging in size from wallet-sized to jumbo-sized 20x30 enlargements. We manufacture most of these items in our Charlotte, North Carolina and Phoenix, Arizona production facilities. By controlling the production process in our own production facilities, we are able to produce high-quality products, innovate rapidly, maintain a favorable cost structure and ensure timely shipment to customers, even during peak periods of demand. Additionally, we sell a variety of photo-based merchandise that is currently manufactured for us by third parties, such as calendars, mugs, canvas prints, mouse pads, magnets, and puzzles. We generate substantially all of our revenue from sales originating in the United States and our sales cycle has historically been highly seasonal as we generate more than 50% of our total net revenues during our fiscal fourth quarter.

Our high-quality products and services and the compelling online experience we create for our customers, combined with our focus on continuous innovation, have allowed us to establish premium brands. We realize the benefits of premium brands through high customer loyalty, low customer acquisition costs and premium pricing.

Our customers are a central part of our business model. They generate most of the content on our service by uploading their photos and storing their memories. In addition, they share their photos electronically with their friends and families, extending and endorsing our brand and creating a sense of community. Finally, by giving our branded products to colleagues, friends and loved ones throughout the year, customers reinforce our brands. Through these various activities, our customers create a viral network of new users and customers.

In addition to driving lower customer acquisition costs through viral marketing, our customers provide input on new features, functionalities and products. Close, frequent customer interactions, coupled with significant investments in sophisticated integrated marketing programs, enable us to fine-tune and tailor our promotions and website presentation to specific customer segments. Consequently, customers are presented with a highly personalized shopping experience, which helps foster a unique and deep relationship with our brands.

Our operations and financial performance depend on general economic conditions in the United States. The U.S. economy is experiencing a slow economic recovery from a deep recession and concerns about that recovery could further impact consumer sentiment and consumer discretionary spending. We closely monitor these economic measures as their trends are indicators of the health of the overall economy and are some of the key external factors that impact our business.

**Basis of Presentation**

*Net Revenues.* In the second quarter of 2012, we changed the categories within net revenues by consolidating our Personalized Products and Services (PPS) and Prints revenue into a single category called Consumer. We also renamed our Commercial Printing net revenue category as Enterprise. Our net revenues are now comprised of sales generated from Consumer and Enterprise categories. All prior periods included below now reflect the new presentation of net revenues categories.

*Table of Contents*

*Consumer.* Our Consumer revenues include sales from all of our brands and are derived from the sale of photo-based products, such as photo books, stationery and greeting cards, other photo-based merchandise, photo prints, and the related shipping revenues. Included in our photo-based merchandise are items such as mugs, iPhone cases, mouse pads, desktop plaques and puzzles. Photo prints consist of wallet, 4x6, 5x7, 8x10, and large format sizes. Revenue from advertising displayed on our websites is also included in Consumer revenues.

*Enterprise.* Our Enterprise revenues are primarily from variable, four-color direct marketing collateral manufactured and fulfilled for business customers. We continue to focus our efforts in expanding our presence in this market.

Our business is subject to seasonal fluctuations. In particular, we generate a substantial portion of our revenues during the holiday season in the fourth quarter. We also typically experience increases in net revenues during other shopping-related seasonal events, such as Easter, Mother's Day, Father's Day, and Halloween. We generally experience lower net revenues during the first, second and third calendar quarters and have incurred and may continue to incur losses in these quarters. Due to the relatively short lead time required to fulfill product orders, usually one to three business days, order backlog is not material to our business.

To further understand net revenue trends in our Consumer category, we monitor several key metrics including, total customers, total number of orders, and average order value. In the second quarter of 2012, we changed our disclosures of these metrics to be the aggregate of all customers and orders across all our Consumer brands, instead of our previous, separate disclosures of Shutterfly and Tiny Prints customers and orders. As a result, our average order value metric is also presented in the aggregate for all brands.

*Total Customers.* We closely monitor total customers as a key indicator of demand. Total customers represents the number of transacting customers in a given period. We seek to expand our customer base by empowering our existing customers with sharing and collaboration services (such as Shutterfly Share Sites), and by conducting integrated marketing and advertising programs. Total customers have increased on an annual basis for each year since inception and we expect this trend to continue.

*Total Number of Orders.* We closely monitor total number of orders as a leading indicator of net revenue trends. We recognize net revenues associated with an order when the products have been shipped and all other revenue recognition criteria have been met. Orders are typically processed and shipped within two business days after a customer places an order. Total number of orders has increased on an annual basis for each year since 2000, and we anticipate this trend to continue in the future.

*Average Order Value.* Average order value is Consumer net revenues for a given period divided by the total number of customer orders recorded during that same period. Beginning in 2011, the level of competitive discounting significantly increased which impacted our average order value. We believe that these competitor actions are not sustainable, but it is impractical to predict if or when they will cease. As a result, we expect that our average order values may fluctuate on an annual basis.

The table below highlights the trends of each of these aggregated metrics, as they are now presented, for the last seven quarters covering the period since the Tiny Prints acquisition. We have provided pro forma metrics covering the three month period ended June 30, 2011 as the acquisition of Tiny Prints closed on April 25, 2011.

| | Three Months Ended | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jun. 30, 2011 | Sep. 30, 2011 | Dec. 31, 2011 | Mar. 31, 2012 | Jun. 30, 2012 | Sep. 30, 2012 | Dec. 31, 2012 |
| | *(Pro-Forma)* | | | | | | |
| | *(in thousands, except AOV amounts)* | | | | | | |
| Customers | 1,668 | 1,600 | 3,246 | 1,880 | 1,894 | 2,247 | 4,227 |
| Orders | 2,597 | 2,577 | 5,190 | 2,840 | 2,978 | 3,606 | 6,898 |
| Average order value | $ 30.33 | $ 28.18 | $ 49.93 | $ 29.97 | $ 31.70 | $ 25.06 | $ 49.80 |

We believe the analysis of these metrics and others described below provides us with important information on our overall net revenue trends and operating results. Fluctuations in these metrics are not unusual and no single factor is determinative of our net revenues and operating results.

*Table of Contents*

*Cost of Net Revenues.*    Cost of net revenues consists primarily of direct materials (the majority of which consists of paper, ink, and photo book covers), payroll and related expenses for direct labor, shipping charges, packaging supplies, distribution and fulfillment activities, rent for production facilities, depreciation of production equipment, and third-party costs for photo-based merchandise. Cost of net revenues also includes payroll and related expenses for personnel engaged in customer service, any third-party software or patents licensed, as well as the amortization of acquired developed technology, capitalized website and software development costs, and patent royalties.  Cost of net revenues also includes certain costs associated with facility closures and restructuring.

*Operating Expenses.*    Operating expenses consist of technology and development, sales and marketing, and general and administrative expenses. We anticipate that each of the following categories of operating expenses will increase in absolute dollar amounts, but remain relatively consistent as a percentage of net revenues.

Technology and development expense consists primarily of personnel and related costs for employees and contractors engaged in the development and ongoing maintenance of our websites, infrastructure and software. These expenses include depreciation of the computer and network hardware used to run our websites and store the customer data, as well as amortization of purchased software. Technology and development expense also includes co-location, power and bandwidth costs.

Sales and marketing expense consists of costs incurred for marketing programs, and personnel and related expenses for our customer acquisition, product marketing, business development, and public relations activities. Our marketing efforts consist of various online and offline media programs, such as e-mail and direct mail promotions, the purchase of keyword search terms and various strategic alliances. We depend on these efforts to attract customers to our service.

General and administrative expense includes general corporate costs, including rent for our corporate offices, insurance, depreciation on information technology equipment, and legal and accounting fees. Transaction costs are also included in general and administrative expense. In addition, general and administrative expense includes personnel related expenses of employees involved in executive, finance, accounting, human resources, information technology and legal roles. Third-party payment processor and credit card fees are also included in general and administrative expense and have historically fluctuated based on revenues during the period. All of the payments we have received from our intellectual property license agreements have been included as an offset to general and administrative expense.

*Interest Expense.*    Interest expense consists of costs associated with our five-year syndicated credit facility that became effective in November 2011.

*Interest and Other Income, Net.*   Interest and other income, net primarily consists of the interest earned on our cash and investment accounts.

*Income Taxes.*    We account for income taxes under the liability method. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis of assets and liabilities. Historically, we have only been subject to taxation in the United States because we only operate within the United States. In the current year, we have become subject to taxation in Israel as a result of a corporate acquisition.

## Critical Accounting Policies and Estimates

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States, or GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. In many instances, we could have reasonably used different accounting estimates, and in other instances, changes in the accounting estimates are reasonably likely to occur from period to period. Accordingly, actual results could differ significantly from the estimates made by our management. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation of our financial condition or results of operations will be affected.

In many cases, the accounting treatment of a particular transaction is specifically dictated by GAAP and does not require management's judgment in its application, while in other cases, management's judgment is required in selecting among available alternative accounting standards that allow different accounting treatment for similar transactions. We believe that the accounting policies discussed below are the most critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

*Table of Contents*

*Revenue Recognition.* We recognize revenue from Consumer and Enterprise product sales, net of applicable sales tax, upon shipment of fulfilled orders, when persuasive evidence of an arrangement exists, the selling price is fixed or determinable and collection of resulting receivables is reasonably assured. Customers place Consumer product orders through our websites and pay primarily using credit cards. Enterprise customers are invoiced upon fulfillment. Shipping charged to customers is recognized as revenue at the time of shipment.

For gift card sales and flash deal promotions through group buying websites, we recognize revenue on a gross basis, as we are the primary obligor, when redeemed items are shipped. Revenues from sales of prepaid orders on our websites are deferred until shipment of fulfilled orders or until the prepaid period expires. Our share of revenue generated from our print to retail relationships, is recognized when orders are picked up by our customers at the respective retailer.

We provide our customers with a 100% satisfaction guarantee whereby products can be returned within a 30-day period for a reprint or refund. We maintain an allowance for estimated future returns based on historical data. The provision for estimated returns is included in accrued expenses. During the year ended December 31, 2012, returns totaled approximately 1% of net revenues and have been within management's expectations.

We periodically provide incentive offers to our customers in exchange for setting up an account and to encourage purchases. Such offers include free products and percentage discounts on current purchases. Discounts, when accepted by customers, are treated as a reduction to the purchase price of the related transaction and are presented in net revenues. Production costs related to free products are included in cost of revenues upon redemption.

Our advertising revenues are derived from the sale of online advertisements on our websites. Advertising revenues are recognized as "impressions" (i.e., the number of times that an advertisement appears in pages viewed by users of the Company's websites) are delivered; as "clicks" (which are generated each time users of our websites click through the advertisements to an advertiser's designated website) are provided to advertisers; or ratably over the term of the agreement with the expectation that the advertisement will be delivered ratably over the contract period.

*Inventories.* Our inventories consist primarily of paper, photo book covers and packaging supplies and are stated at the lower of cost on a first-in, first-out basis or net realizable value. The value of inventories is reduced by an estimate for excess and obsolete inventories. The estimate for excess and obsolete inventories is based upon management's review of utilization of inventories in light of projected sales, current market conditions and market trends.

*Fair Value.* We record our financial assets and liabilities at fair value. The accounting standard for fair value provides a framework for measuring fair value, clarifies the definition of fair value and expands disclosures regarding fair value measurements. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants at the reporting date. The accounting standard establishes a three-tier hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value:

   *Level 1* – Quoted prices in active markets for identical assets or liabilities

   *Level 2* – Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

   *Level 3* – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

*Goodwill and Intangible Assets.* Goodwill represents the excess of the purchase price over the fair value of the net tangible and identifiable intangible assets acquired in a business combination. Intangible assets resulting from the acquisition of entities accounted for using the purchase method of accounting are estimated by management based on the fair value of assets received. Intangible assets are amortized on a straight-line basis over the estimated useful lives which range from one to sixteen years, and the amortization is allocated between cost of net revenues and operating expenses. Goodwill and intangible assets with indefinite lives are not subject to amortization, but are tested for impairment on an annual basis during our fourth quarter or whenever events or changes in circumstances indicate the carrying amount of these assets may not be recoverable.

*Software and Website Development Costs.* We capitalize costs associated with website development and software developed or obtained for internal use. Accordingly, payroll and payroll-related costs and stock-based compensation incurred in the development phase are capitalized and amortized over the product's estimated useful life, which is generally three years. Costs associated with minor enhancements and maintenance for our website are expensed as incurred.

*Table of Contents*

*Income Taxes.* We use the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are recognized by applying the statutory tax rates in effect in the years in which the differences between the financial reporting and tax filing bases of existing assets and liabilities are expected to reverse. We have considered future taxable income and ongoing prudent and feasible tax planning strategies in assessing the need for a valuation allowance against our deferred tax assets. In 2012, we recorded a valuation allowance against certain California deferred tax assets totaling $2.2 million. We believe that all other net deferred tax assets shown on our balance sheet are more likely than not to be realized in the future and no additional valuation allowance is necessary. In the event that actual results differ from those estimates or we adjust those estimates in future periods, we may need to record a valuation allowance, which will impact deferred tax assets and the results of operations in the period the change is made.

We report a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return. The application of income tax law is inherently complex. Laws and regulations in this area are voluminous and are often ambiguous. We are required to make subjective assumptions and judgments regarding our income tax exposures. Interpretations and guidance surrounding income tax laws and regulations change over time. As such, changes in our subjective assumptions and judgments can materially affect amounts recognized in the consolidated balance sheets and statements of income.

Our policy is to recognize interest and/or penalties related to all tax positions in income tax expense. To the extent that accrued interest and penalties do not ultimately become payable, amounts accrued will be reduced and reflected as a reduction of the overall income tax provision in the period that such determination is made.

*Stock-Based Compensation Expense.* We measure our stock based awards at fair value and recognize compensation expense for all share-based payment awards made to our employees and directors, including employee stock options and restricted stock awards.

We estimate the fair value of stock options granted using the Black-Scholes valuation model. This model requires us to make estimates and assumptions including, among other things, estimates regarding the length of time an employee will retain vested stock options before exercising them, the estimated volatility of our common stock price using historical and implied volatility and the number of options that will be forfeited prior to vesting. The fair value is then amortized on a straight-line basis over the requisite service periods of the awards, which is generally the vesting period. Changes in these estimates and assumptions can materially affect the determination of the fair value of stock-based compensation and consequently, the related amount recognized in our consolidated statements of income.

The cost of restricted stock awards and performance based restricted stock awards is determined using the fair value of our common stock on the date of grant. Compensation expense is recognized for restricted stock awards on a straight-line basis over the vesting period. Compensation expense associated with performance based restricted stock awards is recognized on an accelerated attribution model, and ultimately based on whether or not satisfaction of the performance criteria is probable. If in the future, situations indicate that the performance criteria are not probable, then no further compensation cost will be recorded, and any previous costs will be reversed.

37

*Table of Contents*

### Results of Operations

The following table presents the components of our income statement as a percentage of net revenues:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2012** | **2011** | **2010** |
| Net revenues | 100 % | 100 % | 100 % |
| Cost of net revenues | 46 | 46 | 44 |
| Gross profit | 54 | 54 | 56 |
| Operating expenses: | | | |
| Technology and development | 13 | 14 | 16 |
| Sales and marketing | 23 | 24 | 19 |

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| General and administrative | 11 | 13 | 13 |
| Total operating expenses | 47 | 51 | 48 |
| Income from operations | 7 | 3 | 8 |
| Interest expense | — | — | — |
| Interest and other income, net | — | — | — |
| Income before income taxes | 7 | 3 | 8 |
| Provision for income taxes | (3) | — | (3) |
| Net Income | 4 % | 3 % | 6 % |

### Comparison of the Years Ended December 31, 2012 and 2011

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2012** | **2011** | **$ Change** | **% Change** |
| | *(in thousands)* | | | |
| Net revenues | | | | |
| Consumer | $ 613,445 | $ 459,725 | $ 153,720 | 33% |
| Enterprise | 27,179 | 13,545 | 13,634 | 101% |
| Total net revenues | 640,624 | 473,270 | 167,354 | 35% |
| Cost of net revenues | 294,857 | 219,542 | 75,315 | 34% |
| Gross profit | $ 345,767 | $ 253,728 | $ 92,039 | 36% |
| *Percentage of net revenues* | *54%* | *54%* | — | — |

Net revenues increased $167.4 million, or 35%, in 2012 compared to 2011. Revenue growth was attributable to increases in both revenue categories and driven by strong customer acquisition and an increased number of transacting customers and orders. Consumer net revenues increased $153.7 million, or 33%, in 2012 compared to 2011, and represented 96% of total net revenues in 2012 compared to 97% in 2011.  The increase in Consumer net revenues is primarily a result of increased sales of greeting and stationery cards and photo books with a smaller contribution from increased sales of other photo-based merchandise.  Enterprise revenues increased $13.6 million, or 101%, in 2012 compared to 2011, and represented 4% of total net revenues in 2012 compared to 3% in 2011. The increase is a combination of new Enterprise customers as well as increased sales to existing customers.

38

*Table of Contents*

Consumer net revenue increases were also the result of year-over-year increases in total transacting customers and orders as outlined below. Average order value was flat year-over-year.

|  | Year Ended December 31, | | | |
|  | 2012 | 2011 | $ Change | % Change |
| --- | --- | --- | --- | --- |
|  | *(in thousands, except AOV amounts)* | | | |
| Customers |  | 7,062 |  | 5,388 |  | 1,674 | 31% |
| Orders |  | 16,322 |  | 12,340 |  | 3,982 | 32% |
| Average order value | $ | 37.58 | $ | 37.25 | $ | 0.33 | 1% |

On a pro forma basis, including the orders and revenue of Tiny Prints for the period prior to the acquisition date, total orders for the year ended December 31, 2011 was 12,676,000 resulting in an average order value of $38.30, a decrease of 2%.

Cost of net revenues increased $75.3 million, or 34%, in 2012 compared to 2011, however, it remained flat as a percentage of net revenues at 46%, with gross margin remaining flat at 54%. Overall, the increase in cost of net revenues was primarily the result of the increased volume of shipped products, increased headcount and greater third-party fulfillment costs associated with Tiny Prints products. Gross margin percentage was benefited by scale efficiencies, but offset by increased volumes of lower margin Enterprise sales.

|  | Year Ended December 31, | | | |
|  | 2012 | 2011 | $ Change | % Change |
| --- | --- | --- | --- | --- |
|  | *(in thousands)* | | | |
| Technology and development | $ | 85,746 | $ | 65,675 | $ | 20,071 | 31% |
| *Percentage of net revenues* |  | *13%* |  | *14%* |  | — | — |
| Sales and marketing | $ | 148,806 | $ | 113,952 | $ | 34,854 | 31% |
| *Percentage of net revenues* |  | *23%* |  | *24%* |  | — | — |
| General and administrative | $ | 70,502 | $ | 58,710 | $ | 11,792 | 20% |
| *Percentage of net revenues* |  | *11%* |  | *13%* |  | — | — |

Our technology and development expense increased $20.1 million, or 31%, in 2012, compared to 2011. As a percentage of net revenues, technology and development expense decreased to 13% in 2012 from 14% in 2011. The increase in technology and development expense was primarily due to an increase of $10.9 million related to personnel and related costs, reflecting additional hires during 2012, as well as the inclusion of the Tiny Prints development team for the entire year 2012. There was also an increase of $5.6 million related to incremental costs associated with our acquisition of Photoccino and Kodak Gallery's accounts. The overall increase was also due to an increase of $3.5 million in depreciation expense, an increase of $2.2 million in professional fees, and an increase of $0.8 million in stock based compensation. These factors were partially offset by an increase of $3.1 million in website development costs capitalized in the current period compared to the same period in the prior year.

During 2012, headcount in technology and development increased by 24% compared to 2011, reflecting our strategic focus to increase the rate of innovation in our product and services offerings, to generate greater differentiation from our competitors, and improve our long-term operating efficiency. In 2012, we capitalized $12.4 million in eligible salary and consultant costs, including $0.9 million of stock-based compensation, associated with software developed or obtained for internal use, compared to $9.2 million, which included $0.5 million of stock-based compensation capitalized in 2011.

Our sales and marketing expense increased $34.9 million, or 31%, in 2012 compared to 2011. As a percentage of net revenues, total sales and marketing expense decreased to 23% in 2012 from 24% in 2011. The increase in sales and marketing expense was primarily due to an increase of $18.1 million related to direct response, expanded online and performance marketing campaigns, and TV advertising, such as our first national cable TV campaign. The increase is also attributable to an increase of $9.2 million in personnel and related costs associated with the expansion of our internal marketing team and an increase of $7.0 million in intangible asset amortization primarily from the Kodak Gallery customer list and a full year of intangible asset amortization from the Tiny Prints acquisition.

Our general and administrative expense increased $11.8 million, or 20%, in 2012 compared to 2011. As a percentage of net revenues, general and administrative expense decreased to 11% in 2012 from 13% for 2011. The increase in general and administrative expense is primarily due to an increase in personnel related costs of $4.5 million and an increase in stock-based

*Table of Contents*

compensation of $3.3 million as a result of increased headcount. There was also an increase in credit card fees of $3.2 million which was driven by the increase in Consumer net revenues as compared to the prior year, an increase in depreciation of $0.8 million, and an increase in facilities of $0.8 million. The increases were partially offset by a decrease in professional fees of $0.7 million which are largely due to transaction costs related to our acquisition of Tiny Prints incurred in 2011, and gains on disposition of assets of $0.6 million in 2012.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | Change | |
| | *(in thousands)* | | | | | |
| Interest expense | $ | (597) | $ | (64) | $ | (533) |
| Interest and other income, net | $ | 42 | $ | 35 | $ | 7 |

Interest expense increased in 2012 compared to 2011 primarily due to origination and ongoing commitment fees from our five-year syndicated credit facility that became effective in November 2011.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2012 | | 2011 | |
| | *(in thousands)* | | | |
| Income tax provision | $ | (17,160) | $ | (1,314) |
| Effective tax rate | | 43% | | 9% |

The provision for income taxes was $17.2 million for 2012, compared to a provision of $1.3 million for 2011. Our effective tax rate was 43% in 2012 and 9% in 2011. This increase in our effective tax rate was primarily the result of fewer disqualifying dispositions of incentive stock option awards in the current year, a delay in the extension of the federal research credit, and a valuation allowance on certain California deferred tax assets.

| | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | $ Change | | % Change |
| | *(in thousands)* | | | | | | |
| Income before income taxes | $ | 40,158 | $ | 15,362 | $ | 24,796 | 161% |
| Net income | $ | 22,998 | $ | 14,048 | $ | 8,950 | 64% |
| *Percentage of net revenues* | | *4%* | | *3%* | | — | — |

Net income increased by $9.0 million for 2012 compared to 2011. As a percentage of net revenues, net income increased to 4% in 2012 from 3% in 2011.

*Table of Contents*

**Comparison of the Years Ended December 31, 2011 and 2010**

| | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | $ Change | | % Change |
| | *(in thousands)* | | | | | | |
| Net Revenues | | | | | | | |
| Consumer | $ | 459,725 | $ | 302,599 | $ | 157,126 | 52% |

| | | | | |
|---|---|---|---|---|
| Enterprise | 13,545 | 5,108 | 8,437 | 165% |
| Total net revenues | 473,270 | 307,707 | 165,563 | 54 |
| Cost of net revenues | 219,542 | 134,491 | 85,051 | 63 |
| Gross profit | $ 253,728 | $ 173,216 | $ 80,512 | 46% |
| *Percentage of net revenues* | *54%* | *56%* | — | — |

Net revenues increased $165.6 million, or 54%, in 2011 compared to 2010. Revenue growth was attributable to increases in both revenue categories. The increase in Consumer net revenues was primarily a result of increased sales of photo books and greeting and stationery cards; including $93.0 million of net revenues from the sales of Tiny Prints products from the acquisition date through December 31, 2011. The increase in Consumer net revenues was also due to an increase in large format print revenue offset by a decrease in photocard revenue and 4x6 print revenue which represented 7% of total net revenues versus 10% in the prior year. Revenue from Enterprise increased $8.4 million, or 165%, to $13.5 million for 2011, and represented 3% of our total net revenues in 2011 compared to 2% in 2010. This increase is primarily the result of sales to customers acquired in the WMSG acquisition.

For the Shutterfly brand, Consumer net revenue increases were also the result of year-over-year increases in customers and orders. Average order value was down 1% year-over-year reflecting a discount intensive environment in 2011, primarily during the fourth quarter.

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | **2011** | **2010** | **Change** | **% Change** |
| **Shutterfly** | *(In thousands, except AOV amounts)* | | | |
| Customers | 4,864 | 4,069 | 795 | 20 % |
| Orders | 11,259 | 9,204 | 2,055 | 22 % |
| Average order value (excluding Enterprise revenues) | $ 32.57 | $ 32.88 | $ (0.31) | (1)% |

Also in the Consumer category, on a pro forma basis, comparing the full year ended December 31, 2011 to the year ended December 31, 2010, Tiny Prints brand's Consumer key metrics increased as noted below:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | **2011** | **2010** | **$ Change** | **% Change** |
| **Tiny Prints** | *(in thousands, except AOV amounts)* | | | |
| Customers | 1,030 | 759 | 271 | 36% |
| Orders | 1,417 | 920 | 497 | 54% |
| Average order value (excluding one-to-one greeting cards) | $ 110.63 | $ 102.40 | $ 8.23 | 8% |

Cost of net revenues increased $85.1 million, or 63%, in 2011 compared to 2010. As a percentage of net revenues, cost of net revenues increased to 46% in 2011 from 44% in 2010, which decreased gross margin to 54% in 2011 from 56% in 2010. Overall, the increase in cost of net revenues was primarily the result of the increased volume of shipped products, increased headcount and greater third-party fulfillment costs associated with Tiny Prints products. These costs were partially offset by favorable improvements from product mix and unit cost synergies associated with Tiny Prints incremental volume.

41

*Table of Contents*

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | **2011** | **2010** | **$ Change** | **% Change** |
| | *(in thousands)* | | | |
| Technology and development | $ 65,675 | $ 48,393 | $ 17,282 | 36% |
| *Percentage of net revenues* | *14%* | *16%* | — | — |
| Sales and marketing | $ 113,952 | $ 59,284 | $ 54,668 | 92% |
| *Percentage of net revenues* | *24%* | *19%* | — | — |
| General and administrative | $ 58,710 | $ 40,764 | $ 17,946 | 44% |

| | | | | |
|---|---|---|---|---|
| *Percentage of net revenues* | *13%* | *13%* | — | — |

Our technology and development expense increased $17.3 million, or 36%, in 2011 compared to 2010, primarily as a result of our acquisition of Tiny Prints in April 2011. As a percentage of net revenues, technology and development expense decreased to 14% in 2011 from 16% for the same period in 2010. The increase in technology and development expense was primarily composed of an increase of $9.7 million related to personnel and related costs for employees, an increase in stock-based compensation of $5.3 million, an increase of $3.1 million related to professional and outside services consultants involved with website development and website infrastructure support teams, and an increase in facility related costs of $2.3 million largely related to co-location and other support contracts. These factors were partially offset by a decrease in depreciation expense of $1.5 million and an increase of $1.9 million in website development costs capitalized in the current period compared to the same period in the prior year.

During 2011 headcount in technology and development increased by 57% compared to 2010, reflecting our strategic focus to increase the rate of innovation in our product and services offerings, to generate greater differentiation from our competitors, and improve our long-term operating efficiency. In addition, the increase in headcount is also the result of the completion of the Tiny Prints acquisition during the year. For the year ended December 31, 2011, we capitalized $9.2 million in eligible salary and consultant costs, including $0.5 million of stock based compensation, associated with software developed or obtained for internal use, compared to $7.3 million, which included $0.3 million of stock based compensation capitalized, in 2010. We expect this trend to continue in 2012, further increasing capitalized website and software development costs as a percentage of our total capital expenditures.

Our sales and marketing expense increased $54.7 million, or 92%, in 2011 compared to 2010, primarily as a result of our acquisition of Tiny Prints in April 2011. As a percentage of net revenues, total sales and marketing expense increased to 24% in 2011 from 19% in 2010. The increase in sales and marketing expense was primarily composed of an increase of $31.0 million related to expanded online media, direct response, and partner marketing campaigns. The increase is also attributable to a $8.0 million increase in personnel and related costs associated with the expansion of our internal marketing team including the addition of Tiny Prints headcount, an increase of $7.4 million in stock based compensation, a $7.1 million increase in amortization which is mostly a result of intangible asset amortization from the Tiny Prints acquisition, and $0.9 million in professional fees.

Our general and administrative expense increased $17.9 million, or 44%, in 2011 compared to 2010, primarily as a result of our acquisition of Tiny Prints in April 2011, however, it remained flat as a percentage of net revenues at 13%. The increase in general and administrative expense is primarily composed of an increase in personnel related costs of $5.5 million as a result of increased headcount, an increase in stock based compensation of $3.3 million, $2.2 million in transaction costs related to our acquisition of Tiny Prints, and $1.3 million related to facility costs. In 2011, we also incurred an increase in credit card fees of $3.4 million which was driven by the increase in consumer product revenue as compared to the prior year. During 2010, we received the final installment from a cross-licensing agreement, while in 2011 we received no installments. These payments were recognized as reductions of general and administrative expense.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | **2010** | | **Change** | |
| | *(in thousands)* | | | | | |
| Interest expense | $ | (64) | $ | (42) | $ | 22 |
| Interest and other income, net | $ | 35 | $ | 482 | $ | (447) |

Interest expense increased slightly for 2011 compared to 2010 primarily due to origination costs incurred as a result of the closing of our 5-year syndicated line of credit facility that became effective in November 2011.

Table of Contents

Interest and other income, net decreased by $0.5 million for 2011 compared to 2010. The decrease was primarily due to the liquidation of our ARS investments on July 1, 2010, which yielded higher returns and were subsequently invested in Treasury securities, which yielded lower returns.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2011** | | **2010** | |
| | *(in thousands)* | | | |
| Income tax provision | $ | (1,314) | $ | (8,088) |
| Effective tax rate | | 9% | | 32% |

The provision for income taxes was $1.3 million for 2011, compared to a provision of $8.1 million for 2010. Our effective tax rate was 9% in 2011, down from 32% in 2010. This decrease in our effective tax rate is primarily the result of disqualifying dispositions of incentive stock option awards largely related to assumed Tiny Prints options and from Research and Development tax credits.

At December 31, 2011, we had approximately $41.1 million, $55.1 million, and $20.3 million of federal, California, and other state jurisdictions net operating loss carryforwards, respectively, to reduce future taxable income, $39.5 million, $29.9 million and $20.3 million of which is associated with windfall tax benefits, respectively, that will be recorded as additional paid-in capital when realized. These carryforwards will expire beginning in the year 2028 and 2013 for federal and California purposes, respectively, and no sooner than 2022 for the portion related to 15 other state jurisdictions, if not utilized.

| | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2011** | | **2010** | | **$ Change** | | **% Change** |
| | *(in thousands)* | | | | | | |
| Income before income taxes | $ | 15,362 | $ | 25,215 | $ | (9,853) | (39)% |
| Net income | $ | 14,048 | $ | 17,127 | $ | (3,079) | (18)% |
| *Percentage of net revenues* | | *3%* | | *6%* | | — | — |

Net income decreased by $3.1 million, or 18%, from 2010 to 2011. As a percentage of net revenue, net income was 3% of net revenue for 2011 compared to 6% for 2010.

### Liquidity and Capital Resources

At December 31, 2012, we had $245.1 million of cash and cash equivalents. In addition, to supplement our overall liquidity position, we entered into a five-year senior secured syndicated credit facility in November 2011 to provide up to $125.0 million in additional capital resources. In addition, we may request to increase the credit facility by $75.0 million. As of December 31, 2012, no amounts have been drawn against this facility.

Below is our cash flow activity for the years ended December 31, 2012, 2011 and 2010:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | | **2011** | | **2010** |
| | *(in thousands)* | | | | |
| **Consolidated Statements of Cash Flows Data:** | | | | | |
| Purchases of property and equipment | $ | 40,535 | $ 23,149 | $ | 14,405 |
| Capitalization of software and website development costs | | 12,528 | 10,050 | | 7,405 |
| Depreciation and amortization | | 50,109 | 34,452 | | 25,972 |
| Acquisition of business and intangible assets, net of cash acquired | | 57,212 | 133,705 | | 5,981 |
| Cash flows provided by operating activities | | 151,381 | 63,248 | | 76,161 |
| Cash flows provided by (used in) investing activities | | (109,289) | (166,228) | | 22,610 |
| Cash flows provided by financing activities | | 23,081 | 30,651 | | 20,661 |

We anticipate that our current cash and cash equivalents balances and cash generated from operations will be sufficient to meet our strategic and working capital requirements, lease obligations, technology development projects, and to fund any repurchases of shares of our common stock under our Share Repurchase Program announced in November 2012 for at least the

43

*Table of Contents*

next twelve months. Whether these resources are adequate to meet our liquidity needs beyond that period will depend on our growth, operating results and the capital expenditures required to meet possible increased demand for our products. If we require additional capital resources to grow our business internally or to acquire complementary technologies and businesses at any time in the future, we may seek to sell debt or additional equity. The sale of additional equity could result in additional dilution to our stockholders. Financing arrangements may not be available to us, or may not be in amounts or on terms acceptable to us.

We anticipate that total 2013 capital expenditures will range from 9.4% to 10.4% of our expected net revenues in 2013, which includes additional investments related to our Fort Mill, South Carolina production facility which we expect will be operational in 2013. These expenditures will be used to purchase technology and equipment to support the growth in our business and to increase our production capacity, and help enable us to respond more quickly and efficiently to customer demand. A smaller but significant component of these expenditures includes costs associated with capitalized software and website development, as we continue to support our innovative engineering and product development strategies. This range of capital expenditures is not outside the ordinary course of our business or materially different from how we have expanded our business in the past.

The following table shows total capital expenditures including amounts accrued but not yet paid by category for the years ended December 31, 2012, 2011 and 2010:

|  | Year Ended December 31, | | | | | |
|  | 2012 | | 2011 | | 2010 | |
|  | *(in thousands)* | | | | | |
| Technology equipment and software | $ | 28,386 | $ | 13,956 | $ | 11,585 |
| *Percentage of total capital expenditures* | | *47%* | | *42%* | | *34%* |
| Manufacturing equipment and building improvements | | 19,843 | | 9,605 | | 3,376 |
| *Percentage of total capital expenditures* | | *33%* | | *29%* | | *10%* |
| Capitalized technology and development costs | | 12,528 | | 10,050 | | 7,405 |
| *Percentage of total capital expenditures* | | *21%* | | *30%* | | *22%* |
| **Total Capital Expenditures** | **$** | **60,757** | **$** | **33,611** | **$** | **22,366** |
| *Percentage of net revenues* | | *9%* | | *7%* | | *7%* |

*Operating Activities.* For 2012, net cash provided by operating activities was $151.4 million, primarily due to our net income of $23.0 million and the net change in operating assets and liabilities of $43.8 million. Net cash provided by operating activities was adjusted for non-cash items including $50.1 million of depreciation and amortization expense and $37.3 million of stock-based compensation.

For 2011, net cash provided by operating activities was $63.2 million, primarily due to our net income of $14.0 million and the net change in operating assets and liabilities of $13.1 million, adjusted for non-cash items including $34.5 million of depreciation and amortization expense, $33.9 million of stock-based compensation, and $5.8 million provision from deferred income taxes.

For 2010, net cash provided by operating activities was $76.2 million, primarily due to our net income of $17.1 million and the net change in operating assets and liabilities of $15.0 million, adjusted for non-cash items including $26.0 million of depreciation and amortization expense, $16.4 million of stock-based compensation, and $2.0 million benefit from deferred income taxes.

*Investing Activities.* For 2012, net cash used in investing activities was $109.3 million. We used $24.4 million in the acquisition of Kodak Gallery's customer accounts and images and 32.8 million in the acquisitions of Photoccino Ltd, Penguin Digital, Inc., and ThisLife, Inc., net of cash acquired. We used $40.5 million for capital expenditures for computer and network hardware and production equipment for our manufacturing operations, and $12.5 million of capitalized software and website development. Additionally, we received proceeds of $1.0 million from the sale of equipment.

For 2011, net cash used in investing activities was $166.2 million. We used $133.1 million in the acquisition of Tiny Prints net of cash acquired, $23.1 million for capital expenditures for computer and network hardware and production equipment for our manufacturing operations and $10.1 million of capitalized software and website development.

For 2010, net cash provided by investing activities was $22.6 million due to the liquidation of $47.9 million (at par value) of our remaining ARS investments as a result of exercising the UBS Right and $2.5 million proceeds from the sale of fixed assets. This increase was offset by $14.4 million for capital expenditures for computer and network hardware and production equipment for our

manufacturing operations and $7.4 million of capitalized software and website development. We also paid $5.8 million in cash to acquire WMSG, Inc. and $0.2 million to settle an escrow liability related to our 2009 TinyPictures acquisition.

44

*Table of Contents*

*Financing Activities.* For 2012, net cash provided by financing activities was $23.1 million, primarily from $16.6 million from excess tax benefits from stock-based compensation and $10.2 million of proceeds from issuance of common stock from the exercise of options. This was partially offset by repurchases of common stock of $3.8 million.

For 2011, net cash provided by financing activities was $30.7 million, primarily from $22.3 million of proceeds from issuance of common stock upon exercise of stock options and $8.4 million excess tax benefit from stock-options.

For 2010, net cash provided by financing activities was $20.7 million, primarily from $14.7 million of proceeds from issuance of common stock upon exercise of stock options and $6.0 million excess tax benefit from stock-options.

### Non-GAAP Financial Measures

Regulation G, conditions for use of Non-Generally Accepted Accounting Principles ("Non-GAAP") financial measures, and other SEC regulations define and prescribe the conditions for use of certain Non-GAAP financial information. We closely monitor two financial measures, adjusted EBITDA and free cash flow which meet the definition of Non-GAAP financial measures. We define adjusted EBITDA as earnings before interest, taxes, depreciation, amortization, and stock-based compensation. Free cash flow is defined as adjusted EBITDA less purchases of property and equipment and capitalization of software and website development costs. Management believes these Non-GAAP financial measures reflect an additional way of viewing our profitability and liquidity that, when viewed with our GAAP results, provides a more complete understanding of factors and trends affecting our earnings and cash flows. Refer below for a reconciliation of both adjusted EBITDA and free cash flow to the most comparable GAAP measure.

To supplement our consolidated financial statements presented on a GAAP basis, we believe that these Non-GAAP measures provide useful information about our core operating results and thus are appropriate to enhance the overall understanding of our past financial performance and our prospects for the future. These adjustments to our GAAP results are made with the intent of providing both management and investors a more complete understanding of our underlying operational results and trends and performance. Management uses these Non-GAAP measures to evaluate our financial results, develop budgets, manage expenditures, and determine employee compensation. The presentation of additional information is not meant to be considered in isolation or as a substitute for or superior to net income (loss) or net income (loss) per share determined in accordance with GAAP. Management strongly encourages shareholders to review our financial statements and publicly-filed reports in their entirety and not to rely on any single financial measure.

The table below shows the trend of adjusted EBITDA and free cash flow as a percentage of net revenues for the years ended December 31, 2012, 2011, and 2010 (in thousands):

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | **2012** | | **2011** | | **2010** |
| Net revenues | $ | 640,624 | $ | 473,270 | $ | 307,707 |
| | | | | | | |
| Non-GAAP Adjusted EBITDA | $ | 128,144 | $ | 83,713 | $ | 67,113 |
| *Percentage of net revenues* | | *20%* | | *18%* | | *22%* |
| | | | | | | |
| Free cash flow | $ | 67,387 | $ | 50,102 | $ | 44,747 |
| *Percentage of net revenues* | | *11%* | | *11%* | | *15%* |

We carefully manage our operating costs and capital expenditures, in order to make the strategic investments necessary to grow and strengthen our business, while at the same time increasing our adjusted EBITDA profitability and improving our free cash flows. Over the last three years, our full year adjusted EBITDA profitability has improved to $128.1 million in 2012 from $67.1 million in 2010. This continued growth in adjusted EBITDA profitability resulted from increased demand for our products and services, scale efficiencies, and improvements from product mix. The increase in adjusted EBITDA is also driven by higher Consumer revenue in 2012 as compared to prior years. We also increased our free cash flow to $67.4 million in 2012 from $44.7 million in 2010.

Free cash flow has limitations due to the fact that it does not represent the residual cash flow for discretionary expenditures. For example, free cash flow does not incorporate payments made on capital lease obligations or cash requirements to comply with

45

Table of Contents

debt covenants. Therefore, we believe that it is important to view free cash flow as a complement to our reported consolidated financial statements.

The following is a reconciliation of adjusted EBITDA and free cash flow to the most comparable GAAP measure, for the years ended December 31, 2012, 2011, and 2010 (in thousands):

**Reconciliation of Net Income to Non-GAAP Adjusted EBITDA**

|  | Year Ended December 31, | | |
|  | **2012** | **2011** | **2010** |
|---|---|---|---|
| **Net income** | $ 22,998 | $ 14,048 | $ 17,127 |
| Add back: | | | |
| Interest expense | 597 | 64 | 42 |
| Interest and other income, net | (42) | (35) | (482) |
| Tax provision | 17,160 | 1,314 | 8,088 |
| Depreciation and amortization | 50,109 | 34,452 | 25,972 |
| Stock-based compensation expense | 37,322 | 33,870 | 16,366 |
| **Non-GAAP Adjusted EBITDA** | $ 128,144 | $ 83,713 | $ 67,113 |

**Reconciliation of Cash Flow from Operating Activities to Non-GAAP Adjusted EBITDA and Free Cash Flow**

|  | Year Ended December 31, | | |
|  | **2012** | **2011** | **2010** |
|---|---|---|---|
| **Net cash provided by operating activities** | $ 151,381 | $ 63,248 | $ 76,161 |
| Add back: | | | |
| Interest expense | 597 | 64 | 42 |
| Interest and other income, net | (42) | (35) | (482) |
| Tax provision | 17,160 | 1,314 | 8,088 |
| Changes in operating assets and liabilities | (43,762) | 13,066 | (15,014) |
| Other adjustments | 2,810 | 6,056 | (1,682) |
| **Non-GAAP Adjusted EBITDA** | 128,144 | 83,713 | 67,113 |
| Less: | | | |
| Purchases of property and equipment, including accrued amounts | (48,229) | (23,561) | (14,961) |
| Capitalized technology & development costs | (12,528) | (10,050) | (7,405) |
| **Free cash flow** | $ 67,387 | $ 50,102 | $ 44,747 |

**Contractual Obligations**

The following are contractual obligations at December 31, 2012, associated with lease obligations and other arrangements:

|  | **Total** | **Less Than 1 Year** | **1-3 Years** | **3-5 Years** | **More Than 5 Years** |
|---|---|---|---|---|---|
|  | | | *(in thousands)* | | |
| **Contractual Obligations** | | | | | |
| Operating lease obligations (1) | $ 37,729 | $ 11,499 | $ 19,122 | $ 7,108 | $ — |
| Build-to-suit lease obligations (2) | 11,203 | 512 | 2,087 | 2,172 | 6,432 |
| Purchase obligations (3) | 22,806 | 9,963 | 12,843 | — | — |
| Total contractual obligations | $ 71,738 | $ 21,974 | $ 34,052 | $ 9,280 | $ 6,432 |

(1) Includes office space in Redwood City, California, Sunnyvale, California, and Tempe, Arizona and production facilities in Charlotte, North Carolina and Phoenix, Arizona under non-cancelable operating leases that expire in 2017, 2014, 2014, 2014, and 2016, respectively. We also have various non-cancelable operating leases for certain production equipment. Specifically, in 2012, 2011, and 2010, we entered into multiple non-cancelable operating leases for new digital presses and finishing equipment with terms that expire in up to five years.

46

*Table of Contents*

(2) Includes the estimated timing and amount of payments for rent for our newly leased production facility space in Fort Mill, South Carolina. See *"Notes to Consolidated Financial Statements - Note 5 - Commitments and Contingencies"* for further discussion.

(3) Includes co-location agreements with third-party hosting facilities that expire in 2015 as well as minimums under marketing agreements.

Other than the obligations, liabilities and commitments described above, we have no significant unconditional purchase obligations or similar instruments. We are not a guarantor of any other entities' debt or other financial obligations.

**Off-Balance Sheet Arrangements**

We do not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. In addition, we do not have any undisclosed borrowings or debt and we have not entered into any synthetic leases. We are, therefore, not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

**Recent Accounting Pronouncements**

In September 2011, the Financial Accounting Standards Board issued new accounting guidance intended to simplify goodwill impairment testing. Entities will be allowed to perform a qualitative assessment on goodwill impairment to determine whether a quantitative assessment is necessary. This guidance is effective for our interim and annual periods beginning January 1, 2012. Adoption of this guidance did not have a material impact on our consolidated financial statements.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

*Interest Rate and Credit Risk.*    We have exposure to interest rate risk that relates primarily to our investment portfolio and our syndicated credit facility. All of our cash equivalents are carried at market value. We may draw funds from our syndicated credit facility under interest rates based on either the Federal Funds Rate or the Adjusted London Interbank Offered Rate ("LIBO rate"). If these rates increase significantly, our costs to borrow these funds will also increase. To date, we have not borrowed any funds under our syndicated credit facility. As a result, we do not believe that a 10% change in interest rates will have a significant impact on our interest income and expense, operating results, or liquidity.

*Inflation.*    We do not believe that inflation has had a material effect on our current business, financial condition or results of operations. If our costs were to become subject to significant inflationary pressures, for example, if the cost of our materials or the cost of shipping our products to customers were to incur substantial increases as a result of the rapid rise in the cost of oil, we may not be able to fully offset such higher costs through price increases. Our inability or failure to do so could harm our business, financial condition and results of operations.

47

*Table of Contents*

**ITEM 8.** *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

**SHUTTERFLY, INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 49 |
| Consolidated Balance Sheets | 50 |
| Consolidated Statements of Income | 51 |
| Consolidated Statements of Stockholders' Equity | 52 |
| Consolidated Statements of Cash Flows | 53 |
| Notes to Consolidated Financial Statements | 55 |

48

*Table of Contents*

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Shutterfly, Inc.

In our opinion, the accompanying consolidated balance sheets and related statements of income, shareholders equity, and cash flows present fairly, in all material respects, the financial position of Shutterfly, Inc., and its subsidiaries at December 31, 2012 and December 31, 2011, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2012 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

San Jose, California
February 13, 2013

49

*Table of Contents*

**SHUTTERFLY, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except par value amounts)**

|  | December 31, | |
|---|---|---|
|  | **2012** | **2011** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 245,088 | $ 179,915 |
| Accounts receivable, net | 13,574 | 12,997 |
| Inventories | 5,032 | 3,726 |
| Deferred tax asset, current portion | 7,713 | 598 |
| Prepaid expenses and other current assets | 15,268 | 13,870 |
| Total current assets | 286,675 | 211,106 |
| Property and equipment, net | 92,667 | 54,123 |
| Intangible assets, net | 122,269 | 95,016 |
| Goodwill | 358,349 | 340,408 |
| Deferred tax asset, net of current portion | 854 | 3,785 |
| Other assets | 4,310 | 5,448 |
| Total assets | $ 865,124 | $ 709,886 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 31,503 | $ 9,470 |
| Accrued liabilities | 88,472 | 59,271 |
| Deferred revenue | 17,845 | 12,106 |
| Total current liabilities | 137,820 | 80,847 |
| Deferred tax liability | 24,298 | 13,948 |
| Other liabilities | 11,720 | 6,094 |
| Total liabilities | 173,838 | 100,889 |
| Commitments and contingencies (Note 5) | | |
| Stockholders' equity: | | |
| Common stock, $0.0001 par value; 100,000 shares authorized; 36,358 and 34,839 shares issued and outstanding on December 31, 2012 and December 31, 2011, respectively | 4 | 4 |
| Additional paid-in capital | 652,110 | 589,067 |
| Accumulated earnings | 39,172 | 19,926 |
| Total stockholders' equity | 691,286 | 608,997 |
| Total liabilities and stockholders' equity | $ 865,124 | $ 709,886 |

The accompanying notes are an integral part of these consolidated financial statements.

50

*Table of Contents*

**SHUTTERFLY, INC.**
**CONSOLIDATED STATEMENTS OF INCOME**
**(In thousands, except per share amounts)**

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| Net revenues | $ 640,624 | $ 473,270 | $ 307,707 |
| Cost of net revenues | 294,857 | 219,542 | 134,491 |
| Gross profit | 345,767 | 253,728 | 173,216 |
| Operating expenses: | | | |
| Technology and development | 85,746 | 65,675 | 48,393 |
| Sales and marketing | 148,806 | 113,952 | 59,284 |
| General and administrative | 70,502 | 58,710 | 40,764 |
| Total operating expenses | 305,054 | 238,337 | 148,441 |
| Income from operations | 40,713 | 15,391 | 24,775 |
| Interest expense | (597) | (64) | (42) |
| Interest and other income, net | 42 | 35 | 482 |
| Income before income taxes | 40,158 | 15,362 | 25,215 |
| Provision for income taxes | (17,160) | (1,314) | (8,088) |
| Net income | $ 22,998 | $ 14,048 | $ 17,127 |
| | | | |
| Net income per share: | | | |
| Basic | $ 0.64 | $ 0.43 | $ 0.63 |
| Diluted | $ 0.61 | $ 0.40 | $ 0.59 |
| Weighted average shares: | | | |
| Basic | 35,826 | 32,788 | 27,025 |
| Diluted | 37,432 | 35,007 | 29,249 |
| | | | |
| Stock-based compensation is allocated as follows (Notes 2 and 6): | | | |
| Cost of net revenues | $ 1,696 | $ 2,138 | $ 508 |
| Technology and development | 8,635 | 8,201 | 3,069 |
| Sales and marketing | 11,559 | 11,350 | 3,923 |
| General and administrative | 15,432 | 12,181 | 8,866 |

The accompanying notes are an integral part of these consolidated financial statements.

51

*Table of Contents*

**SHUTTERFLY, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(In thousands)**

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| Common stock (par value) | | | |
| Balance, beginning of year | $ 4 | $ 3 | $ 3 |
| Issuance of common stock in connection with acquisition and upon | 1 | 1 | — |

exercise of options and vesting of restricted stock units

|  |  |  |  |
|---|---:|---:|---:|
| Common stock repurchased and retired | (1) | — | — |
| Balance, end of year | 4 | 4 | 3 |
| | | | |
| **Additional paid-in capital** | | | |
| Balance, beginning of year | 589,067 | 263,726 | 226,410 |
| Issuance of common stock upon exercise of options and vesting of restricted stock units | 10,210 | 22,277 | 14,703 |
| Stock based compensation, net of estimated forfeiture | 38,214 | 34,351 | 16,640 |
| Issuance of common stock in connection with acquisition | — | 260,322 | — |
| Tax benefit of stock options | 14,619 | 8,391 | 5,973 |
| Balance, end of year | 652,110 | 589,067 | 263,726 |
| | | | |
| **Accumulated earnings (deficit)** | | | |
| Balance, beginning of year | 19,926 | 5,878 | (11,249) |
| Common stock repurchased and retired | (3,752) | — | — |
| Net income | 22,998 | 14,048 | 17,127 |
| Balance, end of year | 39,172 | 19,926 | 5,878 |
| Total stockholders' equity | $ 691,286 | $ 608,997 | $ 269,607 |
| | | | |
| **Number of shares** | | | |
| Common stock | | | |
| Balance, beginning of year | 34,839 | 27,957 | 25,909 |
| Issuance of common stock upon exercise of options and vesting of restricted stock units | 1,656 | 2,882 | 2,048 |
| Common stock repurchased and retired | (137) | — | — |
| Issuance of common stock in connection with acquisition | — | 4,000 | — |
| Balance, end of year | 36,358 | 34,839 | 27,957 |

The accompanying notes are an integral part of these consolidated financial statements.

52

*Table of Contents*

**SHUTTERFLY, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | **2012** | **2011** | **2010** |
| **Cash flows from operating activities:** | | | |
| Net income | $ 22,998 | $ 14,048 | $ 17,127 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 29,424 | 22,316 | 23,429 |
| Amortization of intangible assets | 20,685 | 12,136 | 2,543 |
| Stock-based compensation, net of forfeitures | 37,322 | 33,870 | 16,366 |
| Gain on disposal of property and equipment | (861) | (301) | (345) |
| Deferred income taxes | 54 | (5,766) | 2,021 |

| | | | |
|---|---:|---:|---:|
| Tax benefit from stock-based compensation | 14,619 | 8,391 | 5,973 |
| Excess tax benefits from stock-based compensation | (16,622) | (8,380) | (5,967) |
| Gain on auction rate securities Rights | — | — | (6,266) |
| Loss on auction rate securities | — | — | 6,266 |
| Changes in operating assets and liabilities: | | | |
|    Accounts receivable, net | (577) | (7,205) | 688 |
|    Inventories | (1,306) | 766 | (558) |
|    Prepaid expenses and other current assets | (1,399) | (5,667) | (2,402) |
|    Other assets | 212 | (1,402) | 2 |
|    Accounts payable | 15,230 | (16,458) | 8,652 |
|    Accrued and other liabilities | 26,610 | 12,255 | 5,817 |
|    Deferred revenue | 5,739 | 1,870 | 1,128 |
|    Other non-current liabilities | (747) | 2,775 | 1,687 |
|     Net cash provided by operating activities | 151,381 | 63,248 | 76,161 |
| **Cash flows from investing activities:** | | | |
| Acquisition of business and intangibles, net of cash acquired | (57,212) | (133,705) | (5,981) |
| Purchases of property and equipment | (40,535) | (23,149) | (14,405) |
| Capitalization of software and website development costs | (12,528) | (10,050) | (7,405) |
| Proceeds from sale of equipment | 986 | 676 | 2,476 |
| Proceeds from the sale of auction rate securities | — | — | 47,925 |
|     Net cash provided by (used in) investing activities | (109,289) | (166,228) | 22,610 |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of common stock upon exercise of stock options | 10,211 | 22,277 | 14,703 |
| Repurchases of common stock | (3,752) | — | — |
| Excess tax benefits from stock-based compensation | 16,622 | 8,380 | 5,967 |
| Principal payments of capital lease obligations | — | (6) | (9) |
|     Net cash provided by financing activities | 23,081 | 30,651 | 20,661 |
| Net increase (decrease) in cash and cash equivalents | 65,173 | (72,329) | 119,432 |
| Cash and cash equivalents, beginning of period | 179,915 | 252,244 | 132,812 |
| Cash and cash equivalents, end of period | $ 245,088 | $ 179,915 | $ 252,244 |

The accompanying notes are an integral part of these consolidated financial statements.

53

Table of Contents

**SHUTTERFLY, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |

**Supplemental disclosures of cash flow information:**

Cash paid during the period for:

| | | | | | | |
|---|---|---|---|---|---|---|
| Interest | $ | — | $ | — | $ | 1 |
| Income taxes | | 618 | | 140 | | 663 |

**Supplemental schedule of non-cash investing activities:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Net increase in accrued purchases of property and equipment | $ | 7,694 | $ | 412 | $ | 556 |
| Estimated fair market value of building under build-to-suit lease | | 6,372 | | — | | — |
| Amount due for acquisition of business | | 963 | | — | | — |

The accompanying notes are an integral part of these consolidated financial statements.

54

*Table of Contents*

## SHUTTERFLY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 1 — Description of Business

Shutterfly, Inc., (the "Company") was incorporated in the state of Delaware in 1999 and began its services in December 1999. The Company is the leading manufacturer and digital retailer of high-quality personalized products and services offered through a family of lifestyle brands. The Company provides customers a full range of products and services to organize and archive digital images; share pictures; order prints and create an assortment of personalized items such as photo books, greeting cards and stationery and calendars. The Company also provides enterprise services; printing and shipping of direct marketing and other variable data print products and formats. The Company is headquartered in Redwood City, California.

### Note 2 — The Company and Summary of Significant Accounting Policies

#### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All intercompany transactions and balances have been eliminated.

#### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting period. Significant items subject to such estimates and assumptions include, among others, intangible assets valuation, useful lives, excess and obsolete inventories, restructuring, legal contingencies, valuation allowances, provision for sales returns, and allowance for doubtful accounts. Actual results could differ from these estimates.

#### Cash and Cash Equivalents

The Company considers all highly liquid investments purchased with original maturities of three months or less to be cash equivalents. Management determines the appropriate classification of cash equivalents at the time of purchase and reevaluates such designations at each balance sheet date. Cash equivalents consist of money market funds, primarily invested in U.S. Treasury and U.S. agency securities.

#### Fair Value

The Company records its financial assets and liabilities at fair value. The accounting standard for fair value provides a framework for measuring fair value, clarifies the definition of fair value, and expands disclosures regarding fair value measurements. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants at the reporting date. The accounting standard establishes a three-tier hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value:

***Level 1*** – Quoted prices in active markets for identical assets or liabilities

***Level 2*** – Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

***Level 3*** – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

As of December 31, 2012 and 2011, the Company had cash of $186.3 million and $121.2 million, respectively, and cash equivalents of $58.8 million and $58.7 million, respectively, which are classified in the Level 1 hierarchy.

55

---

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### Concentration of Credit Risk

Financial instruments that potentially subject the Company to credit risk consist principally of cash, cash equivalents, and accounts receivable. As of December 31, 2012, the Company's cash and cash equivalents were maintained by financial institutions in the United States and its deposits may be in excess of insured limits. The Company believes that the financial institutions that hold its investments are financially sound and, accordingly, minimal credit risk exists with respect to these investments.

The Company's accounts receivable are derived primarily from sales to customers located in the United States who make payments through credit cards, sales of the Company's products in retail stores, sales of enterprise services, and revenue generated from online advertisements posted on the Company's websites. Credit card receivables settle relatively quickly and the Company's historical experience of credit card losses has not been material and have been within management's expectations. Excluding amounts due from credit cards of customers, as of December 31, 2012, two Enterprise customers accounted for 26% and 12% of the Company's net accounts receivable, respectively. No other customers accounted for more than 10% of net accounts receivable as of December 31, 2012. As of December 31, 2011, one Enterprise customer accounted for 40% of the Company's net accounts receivable. No other customers accounted for more than 10% of net accounts receivable as of December 31, 2011.

### Inventories

Inventories are stated at the lower of cost on a first-in, first-out basis or net realizable value. The value of inventories is reduced by estimates for excess and obsolete inventories. The estimate for excess and obsolete inventories is based upon management's review of utilization of inventories in light of projected sales, current market conditions and market trends. Inventories are primarily raw materials and consist principally of paper, photo book covers and packaging supplies.

### Property and Equipment

Property and equipment are stated at historical cost, less accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the estimated lives of the assets, generally three to five years, and are allocated between cost of net revenues and operating expenses. Leasehold improvements are amortized over their estimated useful lives, or the lease term if shorter, generally three to seven years. Upon retirement or sale, the cost and related accumulated depreciation are removed from the balance sheet and the resulting gain or loss is reflected in operating expenses. Major additions and improvements are capitalized, while replacements, maintenance and repairs that do not extend the life of the asset are charged to expense as incurred.

### Software and Website Development Costs

The Company capitalizes eligible costs associated with website development and software developed or obtained for internal use. Accordingly, the Company expenses all costs that relate to the planning and post implementation phases. Payroll and payroll related costs and stock based compensation incurred in the development phase are capitalized and amortized over the product's estimated useful life, generally three years. Costs associated with minor enhancements and maintenance for the Company's websites are expensed as incurred.

### Long-Lived Assets

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability is measured by comparison of the carrying amount to the future net cash flows which the assets are expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the projected discounted future cash flows arising from the asset using a discount rate determined by management to be commensurate with the risk inherent to the Company's current business model.

### Goodwill and Intangible Assets

Goodwill represents the excess of the purchase price over the fair value of the net tangible and identifiable intangible assets acquired in a business combination. Intangible assets resulting from the acquisition of entities accounted for using the purchase method of accounting are estimated by management based on the fair value of assets received. Intangible assets are amortized on a straight-line basis over the estimated useful lives which range from two to sixteen years, and the amortization is allocated between cost of net revenues and operating expenses. Goodwill and intangible assets with indefinite lives are not subject to amortization,

56

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

but are tested for impairment on an annual basis during the fourth quarter or whenever events or changes in circumstances indicate the carrying amount of these assets may not be recoverable.

For the Company's annual goodwill impairment analysis, the Company operates under one reporting unit. The Company determined the fair value of its reporting unit based on its enterprise value. This reporting unit was not at risk of failing step one of the annual goodwill impairment test for years ended December 31, 2012 and 2011.

*Intellectual Property Prepaid Royalties*

The Company has patent license agreements with various third parties. The Company has accounted for these agreements as prepaid royalties that are amortized over the remaining life of the patents. Amortization expense is recorded as a component of cost of revenue. The current portion of the prepaid royalty is recorded as a component of prepaid expenses and the long term portion is recorded in other assets.

*Revenue Recognition*

The Company recognizes revenue from Consumer and Enterprise product sales, net of applicable sales tax, upon shipment of fulfilled orders, when persuasive evidence of an arrangement exists, the selling price is fixed or determinable and collection of resulting receivables is reasonably assured. Customers place Consumer product orders through the Company's websites and pay primarily using credit cards. Enterprise customers are invoiced upon fulfillment. Shipping charged to customers is recognized as revenue at the time of shipment.

For gift card sales and flash deal promotions through group buying websites, the Company recognizes revenue on a gross basis, as it is the primary obligor, when redeemed items are shipped. Revenues from sales of prepaid orders on its websites are deferred until shipment of fulfilled orders or until the prepaid period expires. The Company's share of revenue generated from its print to retail relationships, is recognized when orders are picked up by its customers at the respective retailer.

The Company provides its customers with a 100% satisfaction guarantee whereby products can be returned within a 30-day period for a reprint or refund. The Company maintains an allowance for estimated future returns based on historical data. The provision for estimated returns is included in accrued expenses.

The Company periodically provides incentive offers to its customers in exchange for setting up an account and to encourage purchases. Such offers include free products and percentage discounts on current purchases. Discounts, when accepted by customers, are treated as a reduction to the purchase price of the related transaction and are presented in net revenues. Production costs related to free products are included in cost of revenues upon redemption.

The Company's advertising revenues are derived from the sale of online advertisements on its websites. Advertising revenues are recognized as "impressions" (i.e., the number of times that an advertisement appears in pages viewed by users of the Company's websites) are delivered; as "clicks" (which are generated each time users of the Company's websites click through the advertisements to an advertiser's designated website) are provided to advertisers; or ratably over the term of the agreement with the expectation that the advertisement will be delivered ratably over the contract period.

*Restructuring Costs*

The Company records restructuring costs when expenses are incurred. The Company accrues for lease termination costs when the restructuring event takes place. The Company accrues for severance once the total severance pool has been calculated, approved and communicated, and recognizes the expense ratably over the required service period, from the communication date to the exit date. The Company also accelerates depreciation using a revised economic life of the leasehold improvement assets.

*Advertising Costs*

Advertising costs are expensed as incurred, except for direct mail advertising which is expensed when the advertising first takes place. The Company did not have any capitalized direct mail costs at December 31, 2012 and December 31, 2011. Total advertising costs are a component of sales and marketing expenses and include print advertising, internet advertising, such as display ads and keyword search terms and TV and radio advertising. These amounts totaled approximately $69,938,000, $54,112,000 and $30,651,000 during the years ended December 31, 2012, 2011 and 2010, respectively.

*Table of Contents*

# SHUTTERFLY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Stock-Based Compensation*

The Company measures stock based awards at fair value and recognizes compensation expense for all share-based payment awards made to its employees and directors, including employee stock options and restricted stock awards.

The Company estimates the fair value of stock options granted using the Black-Scholes valuation model. This model requires the Company to make estimates and assumptions including, among other things, estimates regarding the length of time an employee will retain vested stock options before exercising them, the estimated volatility of the Company's common stock price and the number of options that will be forfeited prior to vesting. The fair value is then amortized on a straight-line basis over the requisite service periods of the awards, which is generally the vesting period. Changes in these estimates and assumptions can materially affect the determination of the fair value of stock-based compensation and consequently, the related amount recognized in the Company's consolidated statements of income.

The cost of restricted stock awards and performance based restricted stock awards is determined using the fair value of the Company's common stock on the date of grant. Compensation expense is recognized for restricted stock awards on a straight-line basis over the vesting period. Compensation expense associated with performance based restricted stock awards is recognized on an accelerated attribution model, and ultimately based on whether or not satisfaction of the performance criteria is probable. If in the future, situations indicate that the performance criteria are not probable, then no further compensation cost will be recorded, and any previous costs will be reversed.

### *Income Taxes*

The Company uses the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are recognized by applying the statutory tax rates in effect in the years in which the differences between the financial reporting and tax filing bases of existing assets and liabilities are expected to reverse. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized.

The Company reports a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return. The application of income tax law is inherently complex. Laws and regulations in this area are voluminous and are often ambiguous. The Company is required to make subjective assumptions and judgments regarding its income tax exposures. Interpretations and guidance surrounding income tax laws and regulations change over time. As such, changes in the Company's subjective assumptions and judgments can materially affect amounts recognized in the consolidated balance sheets and statements of income.

The Company's policy is to recognize interest and /or penalties related to all tax positions in income tax expense. To the extent that accrued interest and penalties do not ultimately become payable, amounts accrued will be reduced and reflected as a reduction of the overall income tax provision in the period that such determination is made. No interest and penalties were accrued as of December 31, 2012 and 2011.

The Company is subject to taxation in the United States and Israel.

58

*Table of Contents*

## SHUTTERFLY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Net Income Per Share*

Basic net income per share attributed to common shares is computed by dividing the net income attributable to common shares for the period by the weighted average number of common shares outstanding during the period.

Diluted net income per share attributed to common shares is computed by dividing the net income attributable to common shares for the period by the weighted average number of common and potential common shares outstanding during the period, if the effect of each class of potential common shares is dilutive. Potential common shares include restricted stock units and incremental shares of common stock issuable upon the exercise of stock options.

| | Year ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| **Net income per share:** | *(in thousands, except per share amounts)* | | |
| **Numerator** | | | |
| Net income | $ 22,998 | $ 14,048 | $ 17,127 |
| **Denominator** | | | |
| Denominator for basic net income per share | | | |
| Weighted-average common shares outstanding | 35,826 | 32,788 | 27,025 |
| Dilutive effect of stock options and restricted awards | 1,606 | 2,219 | 2,224 |
| Denominator for diluted net income per share | 37,432 | 35,007 | 29,249 |
| **Net income per share** | | | |
| Basic | $ 0.64 | $ 0.43 | $ 0.63 |
| Diluted | $ 0.61 | $ 0.40 | $ 0.59 |

The following weighted-average outstanding stock options and restricted stock units were excluded from the computation of diluted net income per common share for the periods presented because including them would have had an anti-dilutive effect (in thousands):

| | Year ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Stock options and restricted stock units | 748 | 278 | 830 |

*Comprehensive Income*

Comprehensive income is defined as the change in equity of a business enterprise during a period from transactions and other events and circumstances from non-owner sources. Comprehensive income is composed of net income. Accordingly, the accompanying consolidated statements of income reflect all changes in comprehensive income.

59

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### Segment Reporting

The Company reports as one operating segment with the Chief Executive Officer ("CEO") being the Company's chief operating decision maker. The Company's CEO reviews financial information presented on a consolidated basis for purposes of allocating resources and evaluating financial performance. The Company has a single reporting unit and there are no segment managers who are held accountable for operations, operating results or components below the consolidated unit level.

Net revenues by Consumer and Enterprise categories were as follows:

|  | Year ended December 31, | | | | | |
|  | 2012 | | 2011 | | 2010 | |
|  | *(in thousands)* | | | | | |
| Net revenues | | | | | | |
| Consumer | $ | 613,445 | $ | 459,725 | $ | 302,599 |
| Enterprise | | 27,179 | | 13,545 | | 5,108 |
| Total net revenues | $ | 640,624 | $ | 473,270 | $ | 307,707 |

### Recent Accounting Pronouncements

In September 2011, the Financial Accounting Standards Board issued new accounting guidance intended to simplify goodwill impairment testing. Entities will be allowed to perform a qualitative assessment on goodwill impairment to determine whether a quantitative assessment is necessary. This guidance is effective for the Company's interim and annual periods beginning January 1, 2012. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

### Note 3 — Balance Sheet Components

### Intellectual Property Prepaid Royalties

Total amortization for these license agreements in 2012 and 2011 were $946,000 and $761,000, respectively. As of December 31, 2012, the Company had a balance of $3.6 million in unamortized prepaid royalties. Amortization of these licenses is estimated as follows (in thousands):

| Year Ending: | |
|---|---|
| 2013 | 1,008 |
| 2014 | 771 |
| 2015 | 498 |
| 2016 | 389 |
| 2017 | 334 |
| Thereafter | 645 |
| | $ 3,645 |

### Prepaid Expenses and Other Current Assets

|  | December 31, | | | |
|  | 2012 | | 2011 | |
|  | *(in thousands)* | | | |
| Prepaid service contracts – current portion | $ | 5,771 | $ | 4,727 |
| Deferred costs | | 3,278 | | 717 |
| Prepaid income taxes | | — | | 1,952 |
| Other prepaid expenses and current assets | | 6,219 | | 6,474 |

|  | | | |
|---|---|---|---|
| $ | 15,268 | $ | 13,870 |

60

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Property and Equipment*

| | December 31, | | |
|---|---|---|---|
| | **2012** | | **2011** |
| | *(in thousands)* | | |
| Computer and other equipment | $ | 135,181 | $ | 102,061 |
| Software | | 17,342 | | 12,579 |
| Leasehold improvements | | 11,009 | | 9,559 |
| Building construction-in-progress | | 6,372 | | — |
| Furniture and fixtures | | 4,075 | | 3,762 |
| Capitalized software and website development costs | | 49,013 | | 35,842 |
| | | 222,992 | | 163,803 |
| Less: Accumulated depreciation and amortization | | (130,325) | | (109,680) |
| Net property and equipment | $ | 92,667 | $ | 54,123 |

Building construction-in-progress value of $6.4 million represents the estimated fair market value of a building under a build-to-suit lease of which the Company is the "deemed owner" for accounting purposes only. See *"Note 5 - Commitments and Contingencies."*

Depreciation and amortization expense totaled $29,424,000, $22,316,000, and $23,429,000 for the years ended December 31, 2012, 2011 and 2010, respectively.

Total capitalized software and website development costs, net of accumulated amortization totaled $21,857,000 and $16,923,000 at December 31, 2012 and 2011, respectively. Amortization of capitalized costs totaled approximately $8,352,000, $5,371,000 and $4,207,000 for the years ended December 31, 2012, 2011 and 2010, respectively.

*Intangible Assets*

Intangible assets are comprised of the following at December 31:

| | Weighted Average Useful Life | December 31, | | |
|---|---|---|---|---|
| | | **2012** | | **2011** |
| | | *(in thousands)* | | |
| Purchased technology | 10 years | $ | 99,003 | $ | 76,843 |
| Less: accumulated amortization | | | (23,153) | | (12,771) |
| | | | 75,850 | | 64,072 |
| | | | | | |
| Customer relationships | 6 years | | 60,066 | | 35,235 |
| Less: accumulated amortization | | | (13,902) | | (4,742) |
| | | | 46,164 | | 30,493 |
| | | | | | |
| Licenses and other | 3 years | | 871 | | 871 |
| Less: accumulated amortization | | | (616) | | (420) |
| | | | 255 | | 451 |
| | | | | | |
| Total | | $ | 122,269 | $ | 95,016 |

Purchased technology is amortized over a period ranging from two to sixteen years. Customer relationships are amortized over a period ranging from two to seven years. Licenses and other is amortized over a period ranging from two to five years.

61

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Intangible asset amortization expense for the years ended December 31, 2012, 2011 and 2010 was $19,739,000, $11,375,000 and $1,849,000, respectively. Amortization of existing intangible assets is estimated to be as follows (in thousands):

| Year Ending: | | |
|---|---|---|
| 2013 | $ | 23,911 |
| 2014 | | 22,980 |
| 2015 | | 20,191 |
| 2016 | | 14,019 |
| 2017 | | 11,530 |
| Thereafter | | 29,638 |
| | $ | 122,269 |

### *Goodwill*

Changes in the carrying amount of goodwill are as follows (in thousands):

| | | |
|---|---|---|
| Balance, December 31, 2010 | $ | 11,163 |
| Acquisition of business | | 329,245 |
| Goodwill adjustments | | — |
| Balance, December 31, 2011 | | 340,408 |
| Acquisition of business | | 17,941 |
| Goodwill adjustments | | — |
| Balance, December 31, 2012 | $ | 358,349 |

The increase in goodwill for the year ended December 31, 2012 was a result of the acquisitions of Photoccino, Ltd., Penguin Digital, Inc., and ThisLife.com, Inc.

The increase in goodwill for the year ended December 31, 2011 was a result of the acquisition of Tiny Prints in April 2011.

### *Accrued Liabilities*

| | December 31, | | | |
|---|---|---|---|---|
| | **2012** | | **2011** | |
| | *(in thousands)* | | | |
| Accrued production costs | $ | 22,534 | $ | 16,939 |
| Accrued marketing expenses | | 21,371 | | 19,072 |
| Accrued income and sales tax | | 15,002 | | 11,106 |
| Accrued compensation | | 13,904 | | 5,485 |
| Accrued consulting | | 4,200 | | 2,347 |
| Accrued purchases | | 3,685 | | 871 |
| Accrued fixed assets | | 1,554 | | 633 |
| Accrued other | | 6,222 | | 2,818 |
| | $ | 88,472 | $ | 59,271 |

62

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 4 — Acquisitions**

*Purchased Intangible Assets*

**Eastman Kodak Gallery Assets**

On March 1, 2012, the Company entered into an agreement with Kodak for the proposed sale of certain assets of its Kodak Gallery online photo services business for $23.8 million through a court-supervised auction process. On April 30, 2012, the transaction was approved by the bankruptcy court and on May 2, 2012 the transaction closed. The Company paid $19.0 million at close and the remaining $4.8 million at the end of the transition period, which was during 2012. This acquisition was accounted for as an asset acquisition and as such the Company has capitalized transaction costs of approximately $0.6 million, for a total purchase price of $24.4 million. The purchase price was allocated to a single asset, customer list, which will be amortized over its estimated useful life of four years.

*Business Combinations*

**ThisLife.com, Inc.**

On December 28, 2012, the Company acquired ThisLife.com, Inc. ("ThisLife") for a total aggregate cash purchase price of $22.5 million. ThisLife provides cloud-based services for protecting, organizing, storing and sharing photos and videos which will strengthen the Company's photo storage and sharing capabilities as well as enable the creation of products across the web and mobile efficiently. The acquisition was accounted for as a non-taxable purchase transaction and, accordingly, the purchase price has been allocated to the acquired tangible assets, liabilities assumed, and identifiable intangible assets acquired based on their estimated fair values on the acquisition date. The excess of the purchase price over the aggregate fair values was recorded as goodwill. In addition, restricted stock awards were granted to certain ThisLife employees contingent upon their continued employment for a period of three years and will be recorded as stock-based compensation over the vesting period. Also, performance-based restricted stock units ("PBRSU") were granted to certain ThisLife employees contingent on achieving certain performance milestones and continued employment for a period of three years. These awards will be recorded as stock-based compensation over the vesting period.

Of the total purchase price, $14.6 million was allocated to developed technology and is being amortized over an estimated useful life of five years and $0.2 million was allocated to the active user base which will be amortized over an estimated useful life of two years. The assets and liabilities acquired totaled approximately $1.0 million and $1.2 million, respectively. The remaining excess purchase price of approximately $7.9 million was allocated to goodwill primarily representing the assembled workforce and synergies from the accelerated time to market. In addition, $4.3 million was recorded as a deferred tax liability representing the difference between the assigned values of the assets acquired and the tax basis of those assets, with the offset recorded as additional goodwill. The results of operations for the acquired business have been included in the consolidated statement of income for the period subsequent to the Company's acquisition of ThisLife. ThisLife's results of operations for periods prior to this acquisition were not material to the consolidated statement of operations and, accordingly, pro forma financial information has not been presented.

**Penguin Digital, Inc.**

On September 14, 2012, the Company acquired Penguin Digital, Inc. ("Penguin Digital") for a total aggregate cash purchase price of $7.1 million. Penguin Digital is a mobile application development company that has an iPhone application that allows users to access their photos from iPhones or their Facebook or Instagram accounts and create customized products and gifts from their mobile devices. The acquisition was accounted for as a non-taxable purchase transaction and, accordingly, the purchase price has been allocated to the acquired tangible assets, liabilities assumed, and identifiable intangible assets acquired based on their estimated fair values on the acquisition date. The excess of the purchase price over the aggregate fair values was recorded as goodwill. In addition, RSUs were granted to certain Penguin Digital employees contingent upon their continued employment for a period of three years. Also, PBRSUs were granted to certain Penguin Digital employees contingent on achieving certain performance milestones and continued employment for a period of three years. These awards will be recorded as stock-based compensation over the vesting period.

Of the total purchase price, $2.9 million was allocated to developed technology and is being amortized over an estimated useful life of three years, $0.9 million was allocated to in-process research and development, and $0.2 million was allocated to the active user base which will be amortized over an estimated useful life of two years. The assets and liabilities acquired totaled approximately $0.1 million and $0.2 million, respectively. The remaining excess purchase price of approximately $3.2 million

63

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

was allocated to goodwill primarily representing the assembled workforce and synergies from the accelerated time to market. In addition, $0.9 million was recorded as a deferred tax liability which represents the difference between the assigned values of the assets acquired and the tax basis of those assets offset by net operating loss carryforwards. The offset is recorded as additional goodwill. The results of operations for the acquired business have been included in the consolidated statement of income for the period subsequent to the acquisition. Penguin Digital's results of operations for periods prior to this acquisition were not material to the consolidated statement of income and, accordingly, pro forma financial information has not been presented.

*Photoccino Ltd.*

On May 25, 2012, the Company acquired Photoccino Ltd. ("Photoccino") for a total aggregate cash purchase price of $4.6 million. Photoccino has developed technologies for photo ranking, analysis and organization which will allow customers to more efficiently organize and select the best photos from their archives so they can quickly and easily create photo books, calendars, cards, and photo gifts. Photoccino's technology applies proprietary algorithms to analyze and evaluate the quality and content of photos, ranks them, and automatically creates photo products using the customer's best images. The acquisition was accounted for as a non-taxable purchase transaction and, accordingly, the purchase price has been allocated to the acquired tangible assets, liabilities assumed, and identifiable intangible assets acquired based on their estimated fair values on the acquisition date. The excess of the purchase price over the aggregate fair values was recorded as goodwill. In addition, restricted stock awards were granted to certain Photoccino employees contingent upon their continued employment for a period of three years and will be recorded as stock-based compensation over the vesting period.

Of the total purchase price, $3.0 million was allocated to developed technology and is being amortized over an estimated useful life of five years, $0.7 million was allocated to in-process research and development, and $80,000 was allocated to non-compete agreements with the founders which will be amortized over an estimated useful life of two years. The assets and liabilities acquired totaled approximately $0.1 million. The remaining excess purchase price of approximately $0.7 million was allocated to goodwill primarily representing the assembled workforce. In addition, $0.9 million was recorded as a deferred tax liability representing the difference between the assigned values of the assets acquired and the tax basis of those assets, with the offset recorded as additional goodwill. The results of operations for the acquired business have been included in the consolidated statement of operations for the period subsequent to the Company's acquisition of Photoccino. Photoccino's results of operations for periods prior to this acquisition were not material to the consolidated statement of operations and, accordingly, pro forma financial information has not been presented.

*Tiny Prints, Inc.*

On April 25, 2011, the Company acquired Tiny Prints, Inc. ("Tiny Prints"), a privately-held ecommerce company. Pursuant to the terms of the agreement, all of the outstanding shares of capital stock of Tiny Prints, together with vested and unvested Tiny Prints equity awards, were acquired by the Company for aggregate consideration comprised of (i) approximately $146.0 million in cash, and approximately 4.0 million shares of the Company's common stock issuable in exchange for shares of Tiny Prints capital stock and (ii) Company equity awards for approximately 1.4 million shares of common stock in exchange for vested and unvested Tiny Prints' equity awards assumed by the Company, in each case pursuant and subject to the terms of the Merger Agreement. The 5.4 million shares of Shutterfly common stock issuable pursuant to the agreement equal approximately 18.5% of the Company's outstanding common stock as of March 30, 2011.

Subsequent to the acquisition date, the Company finalized the Net Working Capital, Net Cash, and Net Debt amounts resulting in a reduction of purchase price of approximately $1.3 million. In accordance with the merger agreement, this amount will be repaid from the consideration held in escrow in the same proportion of cash and stock as was made in the initial escrow contribution. As of December 31, 2011, the cash proceeds due from escrow have been received and the stock has been deducted from shares outstanding.

*Purchase Price*

The total purchase price, after adjusting for changes in Net Working Capital, Net Cash, and Net Debt, is as follows (in thousands):

64

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | | |
|---|---|---:|
| Cash consideration | $ | 146,040 |
| Fair value of common stock issued | | 218,557 |
| Fair value of vested stock awards assumed | | 41,766 |
| **Total fair value of consideration transferred** | **$** | **406,363** |

Tiny Prints operates tinyprints.com and weddingpaperdivas.com which offer cards, invitations, and personalized stationery. With the acquisition and combined resources, the Company expects to incur significant revenue and cost synergies through the Tiny Prints brands, customer base and workforce.

*Estimated Fair Value of Stock Awards Assumed*

In connection with the acquisition, each Tiny Prints stock option that was outstanding and unexercised was assumed and converted into an option to purchase the Company's common stock based on a conversion ratio of 0.327, which was calculated as the consideration price per share of $12.44 divided by a fixed per share value of $38. The Company assumed the stock options in accordance with the terms of the applicable Tiny Prints stock option plan and the stock option agreement. Based on Tiny Prints' stock options outstanding at April 25, 2011, the Company converted options to purchase approximately 4.1 million shares of Tiny Prints common stock into options to purchase approximately 1.3 million shares of the Company's common stock. The Company also assumed and converted 196,896 unvested shares of outstanding Tiny Prints restricted stock units into 64,386 shares of the Company's restricted stock units, using the same conversion ratios stated above.

The fair value of stock options assumed was calculated using a Black-Scholes valuation model with the following assumptions: closing date market price of $54.64 per share; expected term of 4.5; risk-free interest rate of 2.1%; expected volatility of 48.1%; and no dividend yield. The fair value of restricted stock units assumed was calculated using the closing date market price of $54.64 per share for the Company's common stock. The Company included the fair value of vested stock options assumed of $41.8 million in the consideration transferred for the acquisition. The estimated fair value of unvested stock options and restricted stock units assumed by the Company over $25.8 million was not included in the consideration transferred and is being recognized as stock-based compensation expense over the weighted average remaining vesting period of approximately two years. In addition, the Company determined that $2.9 million of incremental fair value was associated with vested awards at the acquisition date, and has recognized this additional amount in its post-combination financial statements as stock-based compensation.

*Purchase Price Allocation*

Under the purchase accounting method, the total purchase price was allocated to Tiny Prints' tangible and identifiable intangible assets acquired and liabilities assumed based upon their estimated fair values as of the April 25, 2011 closing date of the acquisition. The excess purchase price over the value of the net assets acquired is recorded as goodwill.

The purchase price of Tiny Prints is allocated as follows (in thousands):

| | | Amount | Estimated Useful Life (in years) |
|---|---|---:|---:|
| Total assets acquired | $ | 19,235 | N/A |
| Total liabilities assumed | | (42,097) | N/A |
| Identifiable intangible assets: | | | |
| Trade name | | 51,100 | 15 |
| Customer base | | 33,300 | 7 |
| Developed technology | | 12,500 | 4 |
| Other | | 3,080 | 2-3 |
| Goodwill | | 329,245 | N/A |
| Total purchase price | $ | 406,363 | |

Initially, included in the total liabilities assumed was a net deferred tax liability balance of $32.2 million, primarily comprised of the difference between the assigned values of the tangible and intangible assets acquired and the tax basis of those assets. This amount is net of deferred tax assets related to vested non-qualified stock options included in the purchase price, as well as other

65

Table of Contents

## SHUTTERFLY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

deferred tax assets acquired in the transaction. Subsequent to recording the transaction, and upon filing of the Tiny Prints tax returns, the Company reduced its estimate of acquired deferred tax liabilities by $2.0 million, with an offsetting reduction in goodwill. This resulted in an adjusted net deferred tax liability balance of $30.2 million.

Amortizable intangible assets total $100.0 million and consist of trade name, customer base, developed technology, and other contractual agreements with useful lives that range from 2 to 15 years.

Goodwill of $329.2 million represents the excess of the purchase price over the fair value of the underlying net tangible and identifiable intangible assets, and represents the expected synergistic benefits of the transaction and the knowledge and experience of the workforce in place. In accordance with applicable accounting standards, goodwill will not be amortized but instead will be tested for impairment at least annually, or, more frequently if certain indicators are present. In the event that the management of the combined company determined that the value of goodwill has become impaired, the combined company will incur an accounting charge for the amount of the impairment during the fiscal quarter in which the determination is made.

Acquisition-related costs were included in general and administrative expenses in the Company's consolidated statement of operations for the year ended December 31, 2011.

The following table presents the pro forma statements of income obtained by combining the historical consolidated operations of the Company and Tiny Prints for the year ended December 31, 2011 and 2010, giving effect to the merger as if it occurred on January 1, 2011 and 2010, respectively (in thousands, except per share data):

|  | Year Ended December 31, | |
|  | 2011 | 2010 |
| --- | --- | --- |
| Pro forma net revenues | $ 499,048 | $ 395,069 |
| Pro forma net income | 11,089 | 16,266 |
| Pro forma diluted net income per share | $ 0.32 | $ 0.56 |

Included in net revenues for the year ended December 31, 2011 is $93.0 million of net revenues from sales of Tiny Prints products from the acquisition date of April 25, 2011 through December 31, 2011.

### WMSG, Inc.

On November 5, 2010, the Company acquired certain assets and liabilities of WMSG, Inc. ("WMSG") for a total aggregate purchase price of $6.0 million. This acquisition enabled the Company to provide a complete solution for variable digital print marketers and other print-on-demand opportunities. WMSG was a privately-held, digital direct marketing specialist with strong data management and marketing analytics capabilities located in Dallas, Texas. The acquisition was accounted for as a purchase transaction and accordingly, the purchase price was allocated to tangible assets acquired and identifiable intangible assets acquired based on their estimated fair values on the acquisition date. The excess of the purchase price over the aggregate fair values was recorded as goodwill.

The total aggregate purchase price of $6.0 million was comprised of $5.8 million cash consideration, net of $0.2 million cash acquired. The Company recorded the assets acquired at fair value at the date of acquisition. The adjusted purchase price was allocated to tangible assets of $0.6 million and intangible assets of $2.4 million which was comprised of $1.3 million in developed core technology, $0.9 million in customer relationships and $0.2 million in non-compete agreements. The intangible assets will be amortized over their estimated useful lives ranging from two to five years. The remaining excess purchase price of approximately $2.9 million was allocated to goodwill. The results of operations for WMSG have been included in the consolidated statement of operations for the period subsequent to the acquisition date. Acquisition-related costs were included in general and administrative expenses in the Company's consolidated statement of operations for year ended December 31, 2010.

### Note 5 — Commitments and Contingencies

#### Operating Leases

The Company leases office and production space under various non-cancelable operating leases that expire no later than May 2017. Rent expense was $4,776,000, $4,201,000 and $3,964,000, for the years ended December 31, 2012, 2011 and 2010,

66

*Table of Contents*

# SHUTTERFLY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

respectively. In 2010, the Company renewed the lease for its corporate office. The lease renewal provided for a $2.1 million tenant improvement reimbursement allowance which the Company utilized during 2011. Reimbursements under this provision were recorded as a deferred lease incentive and will reduce rent expense over the remaining lease term.

Rent expense is recorded on a straight-line basis over the lease term. When a lease provides for fixed escalations of the minimum rental payments, the difference between the straight-line rent charged to expense, and the amount payable under the lease is recognized as deferred rent.

The Company also has non-cancelable operating leases for certain production equipment with terms ranging from four to five years. As of December 31, 2012, the total outstanding obligation under all equipment operating leases was $22,578,000.

At December 31, 2012, the total future minimum payments under non-cancelable operating leases are as follows (in thousands):

|  | | Operating Leases |
|---|---|---|
| **Year Ending:** | | |
| 2013 | $ | 11,499 |
| 2014 | | 10,172 |
| 2015 | | 8,950 |
| 2016 | | 5,778 |
| 2017 | | 1,330 |
| Thereafter | | — |
| Total minimum lease payments | $ | 37,729 |

Purchase obligations consist of non-cancelable marketing and service agreements and co-location services that expire at various dates through the year 2015. As of December 31, 2012, the Company's purchase obligations totaled $22,806,000.

### *Build-to-suit Lease*

During the year ended December 31, 2012, the Company executed a lease for a new 300,000 square foot east coast production and customer service facility in Fort Mill, South Carolina. This facility will replace the Company's current east coast production facility in Charlotte, North Carolina and is expected to open during 2013. In order for the facility to meet the Company's operating specifications, both the landlord and the Company are making structural changes as part of the uplift of the building, and as a result, the Company has concluded that it is the "deemed owner" of the building (for accounting purposes only) during the construction period. Accordingly, at lease inception, the Company recorded an asset of $4.9 million, representing its estimate of the fair market value of the building, and a corresponding construction financing obligation, recorded as a component of other non-current liabilities. During 2012, the Company increased the asset and financing obligations by $1.5 million for building uplift costs incurred by the landlord. The Company will increase the asset and financing obligation as additional building uplift costs are incurred by the landlord during the construction period.

Upon completion of construction, the Company will evaluate the de-recognition of the asset and liability under the provisions of ASC 840.40 Leases - Sale-Leaseback Transactions. However, if the Company does not comply with the provisions needed for sale-leaseback accounting, the lease will be accounted for as a financing obligation and lease payments will be attributed to (1) a reduction of the principal financing obligation; (2) imputed interest expense; and (3) land lease expense (which is considered an operating lease and a component of cost of goods sold) representing an imputed cost to lease the underlying land of the facility. In addition, the underlying building asset will be depreciated over the building's estimated useful life of 30 years. And at the conclusion of the lease term, the Company would de-recognize both the net book values of the asset and financing obligation.

### *Indemnifications*

In the normal course of business, the Company enters into contracts and agreements that contain a variety of representations and warranties and provide for general indemnifications. The Company's exposure under these agreements is unknown because it involves future claims that may be made against the Company, but have not yet been made. To date, the Company has not paid any claims or been required to defend any action related to its indemnification obligations. However, the Company may record charges in the future as a result of these indemnification obligations.

*Table of Contents*

## SHUTTERFLY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Contingencies

From time to time, the Company may have certain contingent liabilities that arise in the ordinary course of its business activities. The Company accrues contingent liabilities when it is probable that future expenditures will be made and such expenditures can be reasonably estimated.

### Syndicated Credit Facility

On November 22, 2011, the Company entered into a credit agreement ("Credit Agreement") with J.P. Morgan Securities LLC, Wells Fargo Securities, LLC, Fifth Third Bank, Silicon Valley Bank, US Bank and Citibank, N.A. ("the Banks"). JPMorgan Chase Bank, N.A. acted as administrative agent in the Credit Agreement. The Credit Agreement is for 5 years and provides for a $125.0 million senior secured revolving credit facility (the "credit facility") and if requested by the Company, the Banks may increase the credit facility by $75.0 million subject to certain conditions, for a total credit facility of $200.0 million. From inception through December 31, 2012, the Company has not drawn on the credit facility.

At the Company's option, loans under the Facility will bear stated interest based on the Base Rate or Adjusted LIBO Rate, in each case plus the Applicable Rate (respectively, as defined in the Credit Agreement). The Base Rate will be, for any day, the highest of (a) 1/2 of 1% per annum above the Federal Funds Effective Rate (as defined in the Credit Agreement), (b) JPMorgan Chase Bank's prime rate and (c) the Adjusted LIBO Rate for a term of one month plus 1.00%. Eurodollar borrowings may be for one, two, three or six months (or such period that is 12 months or less, requested by Intersil and consented to by all the Lenders) and will be at an annual rate equal to the period-applicable Eurodollar Rate plus the Applicable Rate. The Applicable Rate for all revolving loans is based on a pricing grid ranging from 0.500% to 1.25% per annum for Base Rate loans and 1.50% to 2.250% for Adjusted LIBO Rate loans based on the Company's Leverage Ratio (as defined in the Credit Agreement).

Amounts repaid under the Facility may be reborrowed. The revolving loan facility matures on the fifth anniversary of its closing and is payable in full upon maturity. The Company intends to use the new Facility from time to time for general corporate purposes, working capital and potential acquisitions.

The Credit Agreement contains customary representations and warranties, affirmative and negative covenants, and events of default. Among other covenants, the Company may not permit (i) the ratio of Consolidated Total Indebtedness on any date to Consolidated EBITDA (each as defined in the Credit Agreement) for the most recent four consecutive fiscal quarters to exceed 2.75 to 1.00, and (ii) the ratio of its Consolidated EBITDA for any period of four consecutive fiscal quarters to its interest and rental expense and the amount of scheduled principal payments on long-term debt, for the same period, to be less than 2.50 to 1.00. As of December 31, 2012, the Company is in compliance with these covenants.

The Company incurred $1.1 million of Credit Facility origination costs during the twelve months ended December 31, 2011, which have been capitalized within prepaid expenses for the current portion and other assets for the non-current portion. These fees are being amortized over the 5-year term of the Credit Facility as a component of interest expense.

### Legal Matters

On January 4, 2013, Express Card Systems, LLC filed a complaint for alleged patent infringement against the Company in Express Card Systems, LLC. v. Shutterfly, Inc. et. al., Civ. No. 6:13-cv-18, in the Eastern District of Texas, Tyler Division. The complaint asserts infringement of U.S. Patents Nos., 5,748,484 and 5,552,994, which claim among other things a system for printing social expression cards in response to electronically transmitted orders. The complaint asserts that the Company directly or indirectly infringes the patents without providing any details concerning the alleged infringement, and it seeks unspecified damages. The Company believes the suit is without merit and will defend itself vigorously.

On December 10, 2010, Eastman Kodak Company ("Kodak") filed a complaint for alleged patent infringement against the Company in Eastman Kodak Company v. Shutterfly, Inc., C.A. No. 10-1079-SLR, in the U.S. District Court for the District of Delaware. The complaint asserted infringement of U.S. Patents Nos. 6,549,306; 6,600,572; 7,202,982; 6,069,712; and 6,512,570, which claimed among other things, methods for selecting photographic images using index prints, an image handling system incorporating coded instructions, and processing a roll of exposed photographic film into corresponding visual prints and distributing such prints. The complaint asserted that the Company directly or indirectly infringed the patents without providing any details concerning the alleged infringement, and it sought unspecified damages and injunctive relief. On February 5, 2013, Kodak filed a stipulation and order lifting the stay and dismissing the case with prejudice.

Table of Contents

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On January 31, 2011, the Company filed a complaint for patent infringement against Eastman Kodak Company and Kodak Imaging Network, Inc. in Shutterfly, Inc. v. Eastman Kodak Company and Kodak Imaging Network, Inc., C.A. No. 11-099-SLR, in the U.S. District Court for the District of Delaware. The complaint asserted infringement of U.S. Patents Nos. 6,583,799; 7,269,800; 6,587,596; 6,973,222; 7,474,801; 7,016,869; and 7,395,229, which claim among other things, methods for image uploading, image cropping, automatic generation of photo albums, and changing attributes of an image-based product. The complaint asserted that Kodak directly or indirectly infringed the patents, and it sought unspecified damages and injunctive relief. On February 5, 2013, the Company filed a stipulation and order lifting the stay and dismissing the case with prejudice.

In all cases, at each reporting period, the Company evaluates whether or not a potential loss amount or a potential range of loss is probable and reasonably estimable under the provisions of the authoritative guidance that addresses accounting for contingencies. In such cases, the Company accrues for the amount, or if a range, the Company accrues the low end of the range as a component of legal expense. The Company monitors developments in these legal matters that could affect the estimate the Company had previously accrued.  There are no amounts accrued which the Company believes would be material to its financial position and results of operations.

**Note 6 — Stock-Based Compensation**

*1999 Stock Plan*

In September 1999, the Company adopted the 1999 Stock Plan (the "1999 Plan"). Under the 1999 Plan, the Company issued shares of common stock and options to purchase common stock to employees, directors and consultants. Options granted under the Plan were incentive stock options or non-qualified stock options. Incentive stock options ("ISO") were granted only to Company employees, which includes officers and directors of the Company. Non-qualified stock options ("NSO") and stock purchase rights were able to be granted to employees and consultants. Options under the Plan were to be granted at prices not less than 85% of the deemed fair value of the shares on the date of the grant as determined by the Company's Board of Directors ("the Board"), provided, however, that (i) the exercise price of an ISO and NSO was not less than 100% and 85% of the deemed fair value of the shares on the date of grant, respectively, and (ii) the exercise price of an ISO and NSO granted to a 10% stockholder was not less than 110% of the deemed fair value of the shares on the date of grant. The Board determined the period over which options became exercisable. The term of the options was to be no longer than five years for ISOs for which the grantee owns greater than 10% of the voting power of all classes of stock and no longer than ten years for all other options. Options granted under the 1999 Plan generally vested over four years. The Board of Directors determined that no further grants of awards under the 1999 Plan would be made after the Company's IPO.

*2006 Equity Incentive Plan*

In June 2006, the Board adopted, and in September 2006 the Company's stockholders approved, the 2006 Equity Incentive Plan (the "2006 Plan"), and all shares of common stock available for grant under the 1999 Plan transferred to the 2006 Plan. The 2006 Plan provides for the grant of ISOs to employees (including officers and directors who are also employees) of the Company or of a parent or subsidiary of the Company, and for the grant of all other types of awards to employees, officers, directors, consultants, independent contractors and advisors of the Company or any parent or subsidiary of the Company, provided such consultants, independent contractors and advisors render bona-fide services not in connection with the offer and sale of securities in a capital-raising transaction. Other types of awards under the 2006 Plan include NSOs, restricted stock awards, stock bonus awards, restricted stock units, and performance shares.

Options issued under the 2006 Plan are generally for periods not to exceed 10 years and are issued at the fair value of the shares of common stock on the date of grant as determined by the Board. The fair value of the Company's common stock is determined by the last sale price of such stock on the NASDAQ Global Select Market. Options issued under the 2006 Plan typically vest with respect to 25% of the shares one year after the options' vesting commencement date, and the remainder ratably on a monthly basis over the following three years.

The 2006 Plan provides for automatic replenishments on January 1 of 2011, 2012, and 2013 of 3.5%, 3.3%, and 3.1%, respectively of the number of shares of the Company's common stock issued and outstanding on the December 31 immediately prior to the date of increase.

*Tiny Prints 2008 Equity Incentive Plan*

In April 2011, in connection with the acquisition of Tiny Prints, the Company converted and assumed the equity awards granted under the Tiny Prints 2008 Equity Incentive Plan (the "Tiny Prints Plan")  (*See Note 4 – Acquisitions*).  Awards granted under the

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Tiny Prints Plan include ISO, NSO, and restricted share awards, all of which generally vest with respect to 25% of the shares one year after the options' vesting commencement date, and the remainder ratably on a monthly basis over the following three years. Options under this plan will expire if not exercised within 10 years from the date of grant, and options and awards will expire if forfeited due to termination.

### Stock Option Activity

A summary of the Company's stock option activity at December 31, 2012 and changes during the period are presented in the table below (share numbers and aggregate intrinsic values in thousands):

| | Number of Options Outstanding | Weighted Average Exercise Price | Weighted Average Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balances, December 31, 2011 | 2,768 | $ 15.71 | | |
| Granted | 139 | 28.72 | | |
| Exercised | (771) | 13.24 | | |
| Forfeited, canceled or expired | (102) | 24.72 | | |
| Balances, December 31, 2012 | 2,034 | $ 17.09 | 5.5 | $ 28,854 |
| Options vested and expected to vest at December 31, 2012 | 2,001 | $ 16.85 | 5.4 | $ 28,718 |
| Options vested at December 31, 2012 | 1,677 | $ 14.63 | 4.8 | $ 26,705 |

As of December 31, 2011 and 2010, there were 2,188,000 and 2,716,000 options vested, respectively.

During the year ended December 31, 2012, the Company granted stock options to purchase an aggregate of 139,000 shares of common stock with a weighted average grant-date fair value of $12.93 per share. In fiscal years ended December 31, 2011 and 2010, the Company granted stock options to purchase an aggregate of 197,000 and 257,000 shares of common stock, respectively, with a weighted average grant-date value of $20.32 and $10.62 per share, respectively.

The total intrinsic value of options exercised during the twelve months ended December 31, 2012, 2011 and 2010 was $12,299,000, $78,641,000 and $19,721,000, respectively. Net cash proceeds from the exercise of stock options were $10,211,000 for the twelve months ended December 31, 2012.

### Valuation of Stock Options

The Company estimated the fair value of each option award on the date of grant using the Black-Scholes option-pricing model and the assumptions noted in the following table. In the years ended December 31, 2012 and 2011, the Company calculated volatility using an average of its historical and implied volatilities as it had sufficient public trading history to cover the entire expected term. In all prior years, expected volatility also included historical and implied volatility of a peer group of publicly traded entities. The expected term of options gave consideration to historical exercises, post vest cancellations and the options contractual term. The risk-free rate for the expected term of the option is based on the U.S. Treasury Constant Maturity at the time of grant. The assumptions used to value options granted during the twelve months ended December 31, 2012, 2011, and 2010, were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Dividend yield | — | — | — |
| Annual risk free rate of return | 0.8% | 1.5% | 1.9% |
| Expected volatility | 56.5% | 53.3% | 51.1% |
| Expected term (years) | 4.3 | 4.3 | 4.5 |

Employee stock-based compensation expense recognized during the years ended December 31, 2012 and 2011 was calculated based on awards ultimately expected to vest and has been reduced for estimated forfeitures. Forfeitures are estimated at the time of

grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates.

70

*Table of Contents*

## SHUTTERFLY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Restricted Stock Units*

The Company grants restricted stock units ("RSUs") to its employees under the provisions of the 2006 Equity Incentive Plan and Inducement awards to new employees upon hire in accordance with NASDAQ Listing Rule 5635(c)(4). The cost of RSUs is determined using the fair value of the Company's common stock on the date of grant. RSUs typically vest and are settled annually, based on a three or four year total vesting term. Compensation cost is amortized on a straight-line basis over the requisite service period.

*Restricted Stock Unit Activity*

A summary of the Company's restricted stock unit activity for the twelve months ended December 31, 2012, is as follows (share numbers in thousands):

|  | Number of Units Outstanding | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Awarded and unvested, December 31, 2011 | 1,969 | $ | 31.33 |
| Granted | 2,566 | | 28.55 |
| Vested | (885) | | 23.18 |
| Forfeited | (398) | | 33.40 |
| Awarded and unvested, December 31, 2012 | 3,252 | $ | 31.10 |
| Restricted stock units expected to vest, December 31, 2012 | 2,895 | | |

The chart below summarizes grant activity during the twelve months ended December 31, 2012 by equity plan (share numbers in thousands):

|  | Grants in 2012 |
|---|---|
| 2006 Equity Incentive Plan | |
| Restricted stock units (1) | 1,385 |
| Performance-based restricted stock units (2) | 445 |
| Total grants under 2006 Plan | 1,830 |
| | |
| Inducement Plans | |
| Restricted stock units (3) | 635 |
| Performance-based restricted stock units (4) | 101 |
| Total grants under Inducement Plans | 736 |
| | |
| Total awards granted in 2012 | 2,566 |

(1) Awards issued under the 2006 Equity Incentive Plan include restricted stock awards granted to new and current employees. Awards issued under this plan typically vest over a three or four year total vesting term.

(2) Includes 445,000 performance-based restricted stock units (PBRSUs) issued under the 2006 Equity Incentive Plan which are tied to the Company's 2012 financial performance and which have three year service criteria. Compensation cost associated with these PBRSUs is recognized on an accelerated attribution model and ultimately based on whether or not satisfaction of the performance criteria is probable. As of December 31, 2012, the performance criteria for the fiscal year was met and the associated stock-based compensation has been recognized.

(3) Inducement awards are issued to newly hired officers and to new employees from acquired companies. These awards typically vest annually over a three year period based on continued employment. The above includes 366,000 RSUs to certain employees of Photoccino, Penguin Digital, and ThisLife.

71

*Table of Contents*

## SHUTTERFLY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(4) Includes PBRSUs issued to certain employees in connection with the acquisitions of Penguin Digital and ThisLife, which have both performance and service vesting criteria and vest annually over a three year term contingent on achieving certain performance milestones and continued employment.

During the years ended December 31, 2012 and 2011, the fair value of awards vested were $20,507,000 and $12,419,000, respectively.

At December 31, 2012, the Company had $76,906,000 of total unrecognized stock-based compensation expense, net of estimated forfeitures, related to stock options and RSUs that will be recognized over a weighted-average period of approximately three years.

### Note 7 — Income Taxes

Income before provision for income taxes is as follows (in thousands):

|  | Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| United States | $ 40,024 | $ 15,362 | $ 25,215 |
| Foreign | 134 | — | — |
| Total | $ 40,158 | $ 15,362 | $ 25,215 |

The components of the provision for income taxes are as follows (in thousands):

|  | December 31, | | |
|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Federal: |  |  |  |
| Current | $ 14,605 | $ 5,800 | $ 5,773 |
| Deferred | (316) | (3,095) | 2,247 |
|  | 14,289 | 2,705 | 8,020 |
| State: |  |  |  |
| Current | 2,383 | 1,280 | 294 |
| Deferred | 455 | (2,671) | (226) |
|  | 2,838 | (1,391) | 68 |
| Foreign: |  |  |  |
| Current | 118 | — | — |
| Deferred | (85) | — | — |
|  | 33 | — | — |
| Total income tax expense (benefit): |  |  |  |
| Current | 17,106 | 7,080 | 6,067 |
| Deferred | 54 | (5,766) | 2,021 |
|  | $ 17,160 | $ 1,314 | $ 8,088 |

72

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company's actual tax expense differed from the statutory federal income tax rate, as follows:

|  | December 31, | | |
|  | **2012** | **2011** | **2010** |
| --- | --- | --- | --- |
| Income tax expense at statutory rate | 35.0% | 34.0 % | 34.0 % |
| State income taxes | 0.9 | (7.7) | 1.7 |
| Stock-based compensation | 1.1 | (13.5) | (0.4) |
| R&D tax credit | — | (7.2) | (2.6) |
| Acquisition costs | — | 3.0 | — |
| Valuation allowance | 5.5 | — | — |
| Other | 0.2 | — | (0.6) |
|  | 42.7% | 8.6 % | 32.1 % |

At December 31, 2012, the Company had approximately $5.5 million, $45.7 million, and $0.9 million of federal, California and other state jurisdictions net operating loss carryforwards, respectively, to reduce future taxable income. $29.2 million of the California net operating loss carryforwards is associated with windfall tax benefits that will be recorded as additional paid-in capital when realized. These carryforwards will expire beginning in the year 2028 and 2016 for federal and California purposes, respectively, and no sooner than 2031 for the portion related to other state jurisdictions, if not utilized.

Internal Revenue Code limits the use of net operating loss and tax credit carryforwards in the case of an "ownership change" of a corporation. Any ownership changes, as defined, may restrict utilization of carryforwards.

The Company also had research and development credit carryforwards of approximately $4.1 million and $5.7 million for federal and state income tax purposes, respectively, at December 31, 2012, of which $4.1 million and $2.3 million is associated with windfall tax benefits for federal and state income tax purposes, respectively, that will be recorded as additional paid-in capital when realized. The research and development credits may be carried forward over a period of 20 years for federal tax purposes, indefinitely for California tax purposes, and 15 years for Arizona purposes. The research and development tax credit will expire starting in 2027 for federal and 2025 for Arizona.

On January 2, 2013, President Barack Obama signed into law The American Taxpayer Relief Act of 2012, which reinstated the research tax credit retroactive to January 1, 2012 and extended the credit through December 31, 2013. As a result of the new legislation, the Company is expected to recognize a $1.3 million tax benefit relating to the federal research tax credit during the three months ended March 31, 2013.

The components of the net deferred tax assets as of December 31, 2012 and 2011 are as follows (in thousands):

|  | December 31, | |
|  | **2012** | **2011** |
| --- | --- | --- |
| Deferred tax assets: |  |  |
| Net operating loss carryforwards | $ 2,917 | $ 1,979 |
| Reserves and other tax benefits | 22,527 | 18,457 |
| Tax credits | 2,415 | 3,176 |
| Other | 13 | 15 |
| Deferred tax assets | 27,872 | 23,627 |
| Valuation allowance | (2,203) | — |
| Net deferred tax assets | 25,669 | 23,627 |
| Deferred tax liabilities: |  |  |
| Depreciation and amortization | (41,400) | (33,192) |
| Net deferred tax assets / (liabilities) | $ (15,731) | $ (9,565) |

Realization of deferred tax assets is dependent upon the generation of future taxable income, if any, the timing and amount of which are uncertain. In November 2012, California passed Proposition 39 mandating a single sales factor apportionment method beginning on or after January 1, 2013. As a result, the Company no longer believes that it is more likely than not that certain

73

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

California deferred tax assets will be realized as of December 31, 2012. Accordingly, during the year ended December 31, 2012, the Company has recorded a valuation allowance of $2.2 million.

As of December 31, 2012, the Company had $5.4 million of unrecognized tax benefits. A reconciliation of the beginning and ending amounts of unrecognized income tax benefits is as follows (in thousands):

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Balance of unrecognized tax benefits at January 1 | $ 4,364 | $ 2,955 | $ 2,179 |
| Additions for tax positions of prior years | 137 | — | 132 |
| Additions for tax positions related to current year | 1,009 | 1,409 | 644 |
| Reductions for tax positions of prior years | (65) | — | — |
| Balance of unrecognized tax benefits at December 31 | $ 5,445 | $ 4,364 | $ 2,955 |

If the $5.4 million of unrecognized tax benefits as of December 31, 2012 is recognized, approximately $2.8 million would decrease the effective tax rate in the period in which each of the benefits is recognized. The remaining amount would be offset by the reversal of related deferred tax assets on which a valuation allowance is placed. The Company does not expect any material changes to its unrecognized tax benefits within the next twelve months.

The Company provides for federal income taxes on the earnings of its foreign subsidiaries, as such, earnings are currently recognized as US taxable income.

As of December 31, 2012, the Company is subject to taxation in the United States and Israel. The Company is subject to examination for tax years including and after 2009 for federal, 2008 for California and other state jurisdictions, and 2011 for Israel. Certain tax years outside the normal statute of limitation remain open to audit by tax authorities due to tax attributes generated in those early years which have been carried forward and may be audited in subsequent years when utilized.

**Note 8 — Employee Benefit Plan**

In 2000, the Company established a 401(k) plan under the provisions of which eligible employees may contribute an amount up to 50% of their compensation on a pre-tax basis, subject to IRS limitations. The Company matches employees' contributions at the discretion of the Board.

In 2012 and 2011, there were no discretionary contributions.

**Note 9 — Share Repurchase Program**

On October 24, 2012, the Company's Board of Directors conditionally authorized a share repurchase program of the Company's common stock subject to the approval of the Audit Committee of the Board of Directors. On October 29, 2012, the Audit Committee approved a share repurchase program for up to $60.0 million of the Company's common stock. The share repurchase authorization, which is effective immediately, permits the Company to effect repurchases for cash from time to time through open market, privately negotiated or other transactions, including pursuant to trading plans established in accordance with Rules 10b5-1 and 10b-18 of the Securities Exchange Act of 1934, as amended, or by a combination of such methods. The repurchase program does not obligate the Company to repurchase any dollar amount or number of shares and the program may be suspended or discontinued at any time. As of December 31, 2012, the remaining authorized amount for stock repurchases under the share repurchase program was $56.2 million.

All repurchased shares of common stock have been retired. Between October 29, 2012 and December 31, 2012, the Company repurchased 137,262 shares of its outstanding common stock at an average of $27.34 per share pursuant to the share repurchase program.

74

*Table of Contents*

**SHUTTERFLY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 10 — Quarterly Financial Data (Unaudited)**

Summarized quarterly financial data for the years ended December 31, 2012 and 2011 are as follows (in thousands, except per share amounts):

| | Year Ended December 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net revenues | $ 91,291 | $ 99,020 | $ 98,536 | $ 351,777 |
| Gross profit | $ 41,238 | $ 48,310 | $ 43,407 | $ 212,812 |
| Net income (loss) | $ (10,040) | $ (9,511) | $ (10,478) | $ 53,027 |
| | | | | |
| Net income (loss) per common share: | | | | |
| Basic | $ (0.29) | $ (0.27) | $ (0.29) | $ 1.46 |
| Diluted | $ (0.29) | $ (0.27) | $ (0.29) | $ 1.40 |

| | Year Ended December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net revenues | $ 57,229 | $ 75,764 | $ 76,523 | $ 263,754 |
| Gross profit | $ 27,683 | $ 35,883 | $ 34,876 | $ 155,286 |
| Net income (loss) | $ (7,760) | $ (3,650) | $ (9,953) | $ 35,411 |
| | | | | |
| Net income (loss) per common share: | | | | |
| Basic | $ (0.27) | $ (0.11) | $ (0.29) | $ 1.02 |
| Diluted | $ (0.27) | $ (0.11) | $ (0.29) | $ 0.97 |

**Note 11 — Subsequent Event**

On February 1, 2013, the Company entered into an agreement to license 1,100 Kodak imaging patents, as well as the patents that Kodak is keeping as part of its on-going business. In addition, as part of this agreement, current patent-related ligation between Shutterfly and Kodak was dismissed. Substantially all of the license consideration will be recorded as a prepaid patent royalty amount during the three months ending March 31, 2013, which will be amortized over the aggregate average remaining life of the patent portfolio. The remaining amount represents the estimated cost to conclude the litigation and has been recorded as a portion of General and Administrative expense for the twelve months ended December 31, 2012.

75

**Schedule II**
**Valuation and Qualifying Accounts**

| | | Additions | | | |
| --- | --- | --- | --- | --- | --- |
| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
| | | *In thousands* | | | |
| **Allowance for Doubtful Accounts Receivable** | | | | | |
| Year ended December 31, 2010 | $ 23 | 168 | — | (36) | $ 155 |
| Year ended December 31, 2011 | $ 155 | 259 | — | (80) | $ 334 |
| Year ended December 31, 2012 | $ 334 | 303 | — | (406) | $ 231 |

Tax Valuation Allowance

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year ended December 31, 2010 | $ | — | | — | | — | | $ | — |
| Year ended December 31, 2011 | $ | — | | — | | — | | $ | — |
| Year ended December 31, 2012 | $ | — | 2,203 | | — | | $ | 2,203 |

76

---

## ITEM 9. *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.*

Not applicable.

## ITEM 9A. *CONTROLS AND PROCEDURES.*

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2012. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, ("Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Our management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this annual report on Form 10-K. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2012, our disclosure controls and procedures were effective at the reasonable assurance level.

### Management's Report on Internal Control over Financial Reporting

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15(d)-15(f) under the Exchange Act. The Company's internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;
- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and
- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may change over time.

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2012.

The Company reviewed the results of management's assessment with the Audit Committee of the Board of Directors. The effectiveness of the Company's internal control over financial reporting as of December 31, 2012 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

77

---

*Table of Contents*

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2012 that materially affected, or are reasonable likely to materially affect, our internal control over financial reporting.

**Limitation on Effectiveness of Controls**

Management does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent or detect all error and fraud. Any control system, no matter how well designed and operated, is based upon certain assumptions and can provide only reasonable, not absolute, assurance that its objectives will be met. Further, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the Company have been detected.

**ITEM 9B. OTHER INFORMATION**

None.

## PART III

### ITEM 10. *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.*

The information concerning our directors required by this Item is incorporated by reference to the section in our Proxy Statement entitled "Proposal No. 1 — Election of Directors."

The information concerning our executive officers required by this Item is incorporated by reference to the section in our Proxy Statement entitled "Executive Officers."

The information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 required by this Item is incorporated by reference to the section in our Proxy Statement entitled "Section 16(a) Beneficial Ownership Reporting Compliance."

We have adopted a written code of ethics for financial employees that applies to our principal executive officer, principal financial officer, principal accounting officer, controller and other employees of the finance department designated by the Company's Chief Financial Officer. This code of ethics, titled the "Code of Conduct and Ethics for Chief Executive Officer and Senior Financial Department Personnel," can be found on our website at www.shutterfly.com. We intend to make all required disclosures concerning any amendments to, or waivers from, our code of ethics on our website.

The information concerning material changes to the procedures by which stockholders may recommend nominees to the Board of Directors required by this Item, if any, is incorporated by reference to information set forth in the Proxy Statement, in the section entitled "Information Regarding the Board of Directors and its Committees."

The information concerning the audit committee of the Board of Directors and the audit committee financial experts required by this Item is incorporated by reference to information set forth in the Proxy Statement, in the section entitled "Information Regarding the Board of Directors and its Committees."

### ITEM 11. *EXECUTIVE COMPENSATION.*

The information required by this Item with respect to executive compensation, risk management and the compensation committee of the Board of Directors is incorporated by reference to information set forth in the Proxy Statement in the sections entitled "Executive Compensation," "Compensation Committee Interlocks and Insider Participation," and "Compensation Committee Report."

### ITEM 12. *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.*

The information required by this Item is incorporated by reference to information set forth in the Proxy Statement in the sections entitled "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information."

### ITEM 13. *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.*

The information concerning certain relationships and related transactions required by this Item is incorporated by reference to information set forth in the Proxy Statement in the section entitled "Certain Transactions."

The information required by this Item with respect to director independence is incorporated by reference to information set forth in the Proxy Statement in the section entitled "Independence of Board of Directors and its Committees."

### ITEM 14. *PRINCIPAL ACCOUNTING FEES AND SERVICES.*

The information concerning principal accounting fees and services required by this Item is incorporated by reference to the section in our Proxy Statement entitled "Ratification of Selection of Independent Registered Public Accounting Firm."

79

**PART IV**

**ITEM 15.** *EXHIBITS AND FINANCIAL STATEMENT SCHEDULE.*

(a) The following documents are filed as part of this annual report on Form 10-K:

1. *Financial Statements* . The consolidated financial statements of Shutterfly, Inc. are incorporated by reference to Part II, Item 8 of this annual report on Form 10-K.

2. *Financial Statement Schedule* . The Valuation and Qualifying Accounts schedule is incorporated by reference to Part II, Item 8 of this annual report.

3. *Exhibits* . We have filed, or incorporated into this report by reference, the exhibits listed on the accompanying Index to Exhibits immediately following the signature page of this Form 10-K.

80

*Table of Contents*

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SHUTTERFLY, INC.
(Registrant)

Dated: February 13, 2013          By:    /s/ Brian M. Regan
_____

                                       Brian M. Regan
                                       Senior Vice President and Chief Financial Officer
                                       (Principal Financial Officer)

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Jeffrey T. Housenbold, Brian M. Regan and Brian R. Manca, jointly and severally, his or her attorneys-in-fact, each with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Jeffrey T. Housenbold<br>Jeffrey T. Housenbold | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | February 13, 2013 |
| /s/ Brian M. Regan<br>Brian M. Regan | Senior Vice President and Chief Financial Officer<br>(Principal Financial Officer) | February 13, 2013 |
| /s/ Brian R. Manca<br>Brian R. Manca | Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) | February 13, 2013 |
| /s/ Philip A. Marineau<br>Philip A. Marineau | Chairman of the Board of Directors and Director | February 13, 2013 |
| /s/ Eric J. Keller<br>Eric J. Keller | Director | February 13, 2013 |
| /s/ Stephen J. Killeen<br>Stephen J. Killeen | Director | February 13, 2013 |
| /s/ Nancy J. Schoendorf<br>Nancy J. Schoendorf | Director | February 13, 2013 |
| /s/ Brian T. Swette<br>Brian T. Swette | Director | February 13, 2013 |

| | | |
|---|---|---|
| /s/ James N. White | Director | February 13, 2013 |
| James N. White | | |

81

*Table of Contents*

**INDEX TO EXHIBITS**

| Exhibit Number | Exhibit Description | Form | File No. | Date of First Filing | Exhibit Number | Provided Herewith |
|---|---|---|---|---|---|---|
| | | **Incorporated by Reference** | | | | |
| 2.01 | Agreement and Plan of Merger, dated as of March 21, 2011, by and among Shutterfly, Inc., Horsley Acquisition Sub I, Inc., Horsley Acquisition Sub II, LLC, Tiny Prints, Inc. and the Stockholder Representative. | 8-K | 001-33031 | March 21, 2011 | 2.01 | |
| 3.01 | Restated Certificate of Incorporation. | S-1 | 333-135426 | June 29, 2006 | 3.03 | |
| 3.02 | Restated Bylaws. | 10-Q | 001-33031 | July 31, 2012 | 3.02 | |
| 4.01 | Form of common stock certificate. | S-1/A | 333-135426 | August 18, 2006 | 4.01 | |
| 4.02 | Registration Rights Agreement, dated April 25, 2011, by and among Shutterfly, Inc. and the parties thereto. | 8-K | 001-33031 | April 25, 2011 | 4.01 | |
| 10.01 | Form of Indemnity Agreement.* | S-1 | 333-135426 | June 29, 2006 | 10.01 | |
| 10.02 | 1999 Stock Plan and forms of stock option agreement and a stock option exercise agreement.* | S-1 | 333-135426 | June 29, 2006 | 10.02 | |
| 10.03 | 2006 Equity Incentive Plan, as amended, and forms of stock option agreement, stock option exercise agreement, restricted stock agreement, restricted stock unit agreement, stock appreciation right agreement and stock bonus agreement.* | 10-K | 001-33031 | February 7, 2011 | 10.24 | |
| 10.04 | Form of Inducement Restricted Stock Unit Award Agreement.* | | | | | X |
| 10.05 | Shutterfly, Inc. 2012 Quarterly Bonus Plan.* | 10-Q | 001-33031 | May 3, 2012 | 10.1 | |
| 10.06 | Shutterfly, Inc. Executive Stock Ownership Guidelines | 10-Q | 001-33031 | May 3, 2012 | 10.2 | |
| 10.07 | Offer letter dated January 5, 2005 for Jeffrey T. Housenbold.* | S-1 | 333-135426 | June 29, 2006 | 10.08 | |
| 10.08 | Amendment to Employment Agreement dated December 8, 2008 for Jeffrey T. Housenbold.* | 10-Q | 001-33031 | May 1, 2009 | 10.02 | |
| 10.09 | Amendment Number 2 to Employment Agreement dated March 12, 2009 for Jeffrey T. Housenbold.* | 10-Q | 001-33031 | May 1, 2009 | 10.03 | |
| 10.10 | Offer Letter dated March 21, 2005 for Dan McCormick.* | 10-Q | 001-33031 | May 3, 2010 | 10.03 | |
| 10.11 | Amendment to Offer Letter dated December 26, 2008 for Dan McCormick.* | 10-Q | 001-33031 | May 3, 2010 | 10.04 | |
| 10.12 | Offer letter dated January 17, 2007 for Dwayne Black.* | 10-K | 001-33031 | March 20, 2007 | 10.15 | |
| 10.13 | Amendment to Offer Letter dated December 23, 2008 for Dwayne Black.* | 10-K | 001-33031 | February 24, 2009 | 10.2 | |
| 10.14 | Offer Letter dated December 17, 2007 for Peter Navin.* | 10-Q | 001-33031 | May 3, 2010 | 10.05 | |

| 10.15 | Amendment to Offer Letter dated December 26, 2008 for Peter Navin.* | 10-Q | 001-33031 | May 3, 2010 | 10.06 | |
| 10.16 | Offer Letter, dated July 18, 2012, by and between Shutterfly, Inc. and Brian Regan.* | 8-K | 001-33031 | July 30, 2012 | 10.01 | |

82

*Table of Contents*

| 10.17 | Offer letter dated November 27, 2007 for Mark J. Rubash.* | 10-K | 001-33031 | March 10, 2008 | 10.2 | |
| 10.18 | Amendment to Offer Letter dated December 26, 2008 for Mark J. Rubash.* | 10-K | 001-33031 | February 24, 2009 | 10.19 | |
| 10.19 | Lease Agreement between Liberty Cotton Center LLC and Shutterfly, Inc., dated August 22, 2008, as amended on October 29, 2008. | 10-Q | 001-33031 | October 31, 2008 | 10.02 | |
| 10.20 | Lease Agreement, dated March 18, 2010, by and between Shutterfly, Inc. and Westport Office Park, LLC | 10-Q | 001-33031 | May 3, 2010 | 10.02 | |
| 10.21 | Supply Agreement, dated as of April 20, 2007, by and between Shutterfly, Inc. and FUJIFILM U.S.A, Inc.** | 10-Q | 001-33031 | August 1, 2007 | 10.18 | |
| 10.22 | Amendment No. 2 to Fulfillment Agreement and Amendment No. 1 to Supply Agreement, dated as of March 29, 2010, by and between Shutterfly, Inc. and FUJIFILM North America Corporation.** | 10-Q | 001-33031 | May 3, 2010 | 10.01 | |
| 10.23 | Amendment No. 2 to Supply Agreement made as of August 23, 2012 by and between Shutterfly, Inc. and FUJIFILM North America Corporation.** | 10-Q | 001.33031 | November 6, 2012 | 10.02 | |
| 10.24 | Credit Agreement, dated as of November 22, 2011, by and among the Shutterfly, Inc., the Lenders (as defined therein) and JPMorgan Chase Bank, N.A. | 10-K | 001-33031 | February 13, 2012 | 10.25 | |
| 23.01 | Consent of Independent Registered Public Accounting Firm. | | | | | X |
| 24.01 | Power of Attorney. (See signature page of this Form 10-K) | | | | | X |
| 31.01 | Certification of Chief Executive Officer Pursuant to Securities Exchange Act Rule 13a-14(a). | | | | | X |
| 31.02 | Certification of Chief Financial Officer Pursuant to Securities Exchange Act Rule 13a-14(a). | | | | | X |
| 32.01 | Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350 and Securities Exchange Act Rule 13a-14(b).*** | | | | | X |
| 32.02 | Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350 and Securities Exchange Act Rule 13a-14(b).*** | | | | | X |
| 101 | The following financial statements from the Shutterfly Inc.'s Annual Report on Form 10-K for the year ended December 31, 2012, formatted in XBRL (Extensible Business Reporting Language): (i) Consolidated Balance Sheets, (ii) Consolidated Statements of Income, (iii) Consolidated Statements of Stockholders' Equity, (iv) Consolidated Statements of Cash Flows, and (v) Notes to | | | | | X |

Consolidated Financial Statements, tagged at
Level I through IV.

83

\*          Represents a management contract or compensatory plan.


\*\*         Confidential treatment has been granted for certain portions of this document pursuant to an application for confidential treatment sent to the Securities and Exchange Commission. Such portions are omitted from this filing and were filed separately with the Securities and Exchange Commission.


\*\*\*        This certification is not deemed "filed" for purposes of Section 18 of the Securities Exchange Act, or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934, except to the extent that Shutterfly specifically incorporates it by reference.


84

# Exhibit 516

 Meta

Back to Newsroom

Meta

# Our Response to the Decision on Facebook's EU-US Data Transfers

May 22, 2023

By Nick Clegg, President, Global Affairs & Jennifer Newstead, Chief Legal Officer

## Takeaways

- From 7 September, the transatlantic transfer of Facebook user data will be certified under the new Data Privacy Framework (DPF).

- The DPF ends long-standing uncertainty for thousands of organisations, including Meta.

- The DPF enables Meta to continue providing  our services in Europe.

*Update on September 7, 2023 at 8:00AM PT, by a Meta Company Spokesperson:*

From 7 September, Meta will rely on the new Data Privacy Framework (DPF) for the transfer of certain types of data, including Facebook user data and data relating to Meta business tools, from the EU to the US.

The DPF, and its accompanying European Commission adequacy decision announced earlier this summer, ensures the continued protection and enhanced legal safeguards for Europeans whose data is transferred between Europe and the US by thousands of organisations. It resolves a long-standing conflict of law between the EU and US, and ensures that vital digital connections and communications between businesses, families, and friends on both sides of the Atlantic can continue uninterrupted.

The introduction of the DPF concludes the years of uncertainty faced by thousands of businesses, including Meta, when transferring data between the EU and US for the provision of everyday services that are enjoyed by millions of people. Notwithstanding this positive development, our appeals against the

decisions of the Irish Data Protection Commission and European Data Protection Board continue.

*Originally published on May 22, 2023 at 02:12AM PT, by Nick Clegg, President, Global Affairs & Jennifer Newstead, Chief Legal Officer:*

The ability for data to be transferred across borders is fundamental to how the global open internet works. From finance and telecommunications to critical public services like healthcare or education, the free flow of data supports many of the services that we have come to rely on. Thousands of businesses and other organisations rely on the ability to transfer data between the EU and the US in order to operate and provide services that people use every day.

Without the ability to transfer data across borders, the internet risks being carved up into national and regional silos, restricting the global economy and leaving citizens in different countries unable to access many of the shared services we have come to rely on. That's why providing a sound legal basis for the transfer of data between the EU and the US has been a political priority on both sides of the Atlantic for many years.

In 2020, the Court of Justice of the European Union (CJEU) invalidated Privacy Shield – a key legal mechanism for the transfer of personal data from the EU to the US. This decision created considerable regulatory and legal uncertainty for thousands of organisations, including Meta.

At the time of its decision in 2020, the CJEU confirmed that an alternative legal mechanism called Standard Contractual Clauses (or SCCs) would continue to be valid subject to various legal safeguards.  As such, like thousands of other businesses, Meta used SCCs believing them to be compliant with the General Data Protection Regulation (GDPR).

Today, the Irish Data Protection Commission (DPC) has <u>set out</u> its findings into Meta's use of this common legal instrument to transfer Facebook user data between the EU and the US. Despite acknowledging we had acted in good faith and that a fine was unjustified, the DPC was overruled at the last minute by the European Data Protection Board (EDPB). We are appealing these decisions and will immediately seek a stay with the courts who can pause the implementation deadlines, given the harm that these orders would cause, including to the millions of people who use Facebook every day.

## Meta Uses the Same Legal Mechanisms as Other Organisations

Ultimately, the invalidation of Privacy Shield in 2020 was caused by a fundamental conflict of law between the US government's rules on access to data and the privacy rights of Europeans. It is a conflict that neither Meta nor any other business could resolve on its own. We are therefore disappointed to have been singled out when using the same legal mechanism as thousands of other companies looking to provide services in Europe.

The DPC initially acknowledged that Meta had continued its EU-US data transfers in good faith, and that a fine would be unnecessary and disproportionate. However, this was overruled by the EDPB, which also chose to disregard the clear progress that policymakers are making to resolve this underlying  issue. This decision is flawed, unjustified and sets a dangerous precedent for the countless other companies transferring data between the EU and US.

It also raises serious questions about a regulatory process that enables the EDPB to overrule a lead regulator in this way, disregarding the findings of its multi-year inquiry without giving the company in question a right to be heard.

## There is Already a Political Agreement to Solve the Underlying Conflict of Law

Policymakers in both the EU and the US are on a clear path to resolving this conflict with the new Data Privacy Framework (DPF). In March 2022, President Biden and Commission President Von der Leyen announced that they reached an agreement on the principles of a new framework to enable the free flow of transatlantic data. Policymakers on both sides of the Atlantic have committed to fully implementing the DPF "as quickly as possible."

Regulators, including the EDPB, have welcomed the improvements made by the DPF. We are pleased that the DPC also confirmed in its decision that there will be no suspension of the transfers or other action required of Meta, such as a requirement to delete EU data subjects' data once the underlying conflict of law has been resolved. This will mean that if the DPF comes into effect before the implementation deadlines expire, our services can continue as they do today without any disruption or impact on users.

At a time where the internet is fracturing under pressure from authoritarian regimes, like-minded democracies should work together to promote and defend the idea of the open internet. No country has done more than the US to align with European rules via their latest reforms, while transfers continue largely unchallenged to countries such as China.

Our priority is to ensure that our users, advertisers, customers and partners can continue to enjoy Facebook while keeping their data safe and secure. There is no immediate disruption to Facebook because the decision includes implementation periods that run until later this year. We intend to appeal both the decision's substance and its orders including the fine, and will seek a stay through the courts to pause the implementation deadlines.

Category: Newsroom for Europe, Middle East and Africa

   

## RELATED NEWS

Meta

### Building AI Technology for Europeans in a Transparent and Responsible Way

Update on June 14, 2024 at 7:30am PT: We're disappointed by the request from the Irish Data Protection Commission (DPC), our lead regulator, on behalf of the European DPAs, to delay training our large language models (LLMs) using public content shared by adults on Facebook and Instagram — particularly since we incorporated regulatory feedback and the European DPAs have been informed since March.

## Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

## Featured News

## Threads

What Is the Fediverse?

June 25, 2024

## Meta

Releasing New AI Research Models to Accelerate Innovation at Scale

June 18, 2024

 Meta

Follow Us

    

Virtual reality 

Smart glasses

About us

Our community ⌄

Our actions ⌄

Support ⌄

© 2024 Meta     Community Standards     Data Policy     Terms     Cookie policy     United States (English) ⌄

# Exhibit 517



# Farewell, Periscope



Periscope · Follow
2 min read · Dec 15, 2020

👏 1.4K     💬 44                    🔖➕   ▶   ⬆

Periscope Community,

Today, we're sharing that we have made the difficult decision to discontinue Periscope as a separate mobile app by March 2021.

First off, we want to be transparent about why we're making this decision, especially to those of you who are active and passionate users of Periscope

today. The truth is that the Periscope app is in an unsustainable maintenance-mode state, and has been for a while. Over the past couple of years, we've seen declining usage and know that the cost to support the app will only continue to go up over time. Leaving it in its current state isn't doing right by the current and former Periscope community or by Twitter. We still believe in the power of live video to solve impactful problems, which is why we've brought most of the core capabilities of Periscope into Twitter. We probably would have made this decision sooner if it weren't for all of the projects we reprioritized due to the events of 2020. We're sharing our decision with you now because we want to be transparent and honest about where we're at and what's next.

We're planning to remove Periscope from the app stores by March 2021, but no one will be able to create a new account in-app starting with the next release. Broadcasts that were shared to Twitter will live on as replays, and all broadcasters will be able to download an archive of their Periscope broadcasts and data before the app is removed in March 2021. You can find more info here about what will happen to your Super Hearts and broadcasts, how you can go live on Twitter going forward, and more.

Although it's time to say goodbye, the legacy of Periscope will live on far beyond the boundaries of the app itself. The capabilities and ethos of the Periscope team and infrastructure already permeate Twitter, and we're confident that live video still has the potential of seeing an even wider audience within the Twitter product.

Most importantly, we're so grateful to all of you who invested time and energy into making Periscope the place to show what's happening in your world and creating vibrant communities. We've learned so much, shared incredible experiences together, witnessed unforgettable moments in history, and seen pockets of the world we could've only imagined when we first launched Periscope. It was a genuine honor to pour our heart and soul

into building something that other people loved enough to use and build their own communities around. Thank you so much.

Much love,

Team Periscope



## Written by Periscope



242K Followers

Explore the world in real time through someone else's eyes

---

**More from Periscope**



🔵 Periscope

**Periscope Producer, a new way to broadcast live video**



🔵 Periscope in Periscope

**Explore the World**

Periscope iOS 1.1 Update

Dear Periscope Community,

Oct 13, 2016    👏 456    💬 18                                    🔖

                                                Jun 4, 2015    👏 185    💬 18                         🔖



🔵 Periscope in Periscope                         🔵 Periscope in Periscope

**Introducing Landscape**                         **Apple App Store's 2015 App of the
You asked, we delivered! In the latest version     Year**
of iOS and Android, Periscopers can now hol…       This morning we woke up to a delightful
                                                    surprise — Periscope has been named App…

Sep 10, 2015    👏 312    💬 31          🔖          Dec 9, 2015    👏 398    💬 35          🔖

---

See all from Periscope

---

## Recommended from Medium



 Alexander Nguyen in Level Up Coding

 Unbecoming

### The resume that got a software engineer a $300,000 job at Google.

1-page. Well-formatted.

### 10 Seconds That Ended My 20 Year Marriage

It's August in Northern Virginia, hot and humid. I still haven't showered from my...

Jun 1      9.4K      115

Feb 16, 2022      80K      1129

---

## Lists

 **Staff Picks**
673 stories · 1095 saves

 **Stories to Help You Level-Up at Work**
19 stories · 666 saves

 **Self-Improvement 101**
20 stories · 2196 saves

 **Productivity 101**
20 stories · 1953 saves

---





Open in app ↗

Sign up    Sign in

  Search

✎ Write

 Karolina Kozmana

 Sufyan Maan, M.Eng in ILLUMINATION

### Common side effects of not drinking

By rejecting alcohol, you reject something very human, an extra limb that we have...

### What Happens When You Start Reading Every Day

Think before you speak. Read before you think. — Fran Lebowitz

Jan 21      39K      1029

Mar 11      23K      504



 Hazel Paradise

### How I Create Passive Income With No Money

many ways to start a passive income today

Mar 27    16.8K    432



 Artturi Jalli

### I Built an App in 6 Hours that Makes $1,500/Mo

Copy my strategy!



Jan 23    19.1K    204

---

See more recommendations

# Exhibit 518

Vox needs your help to cover the 2024 election. **Support our journalism today** ›



TECHNOLOGY

# Snapchat built a livestreaming video feature — but it's for the Olympics, not for regular users

Snap is full of video, but it's never streamed live video before.

by **Kurt Wagner**

Feb 7, 2018, 3:26 PM EST

 



Xinhua/Ju Huanzong via Getty Images

Snapchat built a new feature for streaming live video inside the app — you just won't be able to use it.

That's because the feature, which is just called Live, is only for Snapchat's publishing partners at launch, according to a company spokesperson. First up: NBC, which is going to use the live video feature to show live coverage from the winter Olympics, which start next week in South Korea.

Case 1:20-cv-03590-JEB   Document 369-8   Filed 07/12/24   Page 254 of 573

Snap announced Wednesday that NBC will stream some live broadcast footage directly to Snapchat's Discover section. The footage you'll see inside Snap is the same stuff you'll see from NBC on television, but much, much shorter: Each live segment inside Snapchat will be somewhere between two and six minutes.

That means Snapchat won't be your place to watch full Olympics coverage, of course. Just snippets. But NBC is very protective of its video rights around the Olympics and doesn't usually stream them anywhere besides NBC-owned properties. Snapchat is not NBC-owned, but NBCUniversal did invest $500 million in Snap when the company went public last year. So there are incentives.

Beyond the Olympics, though, the live feature is interesting for Snap because it probably means Snapchat will stream other stuff live in the future, something it's never done before. Snap is full of video, but it has never been a place for live, appointment video.

A few other logistics about the NBC arrangement:

- The livestreams are part of a broader Olympics deal between Snap and NBC, which includes NBC sharing other Olympics highlights inside the app using other features, like Stories. That arrangement calls for a revenue split on advertising sold alongside that content, but the live feeds won't include ads.

- The live videos will be deleted from the app after they are done streaming. So if you miss the small window where NBC is live, you'll have to go watch somewhere else (like TV).

Case 1:20-cv-03590-JEB   Document 369-8   Filed 07/12/24   Page 255 of 573

The first livestream is set to air on Feb. 10.

---

*This article originally appeared on Recode.net.*

YOU'VE READ 1 ARTICLE IN THE LAST MONTH

Here at Vox, we believe in helping everyone understand our complicated world, so that we can all help to shape it. Our mission is to create clear, accessible journalism to empower understanding and action.

If you share our vision, please consider supporting our work by becoming a *Vox Member*. Your support ensures Vox a stable, independent source of funding to underpin our journalism. If you are not ready to become a Member, even small contributions are meaningful in supporting a sustainable model for journalism.

Thank you for being part of our community.

**Swati Sharma**
*Vox Editor-in-Chief*

·······MEMBERSHIP·······

| **Monthly** | **Annual** | One-time |
|---|---|---|

◉ **$5/month**          ◯ $10/month

◯ $25/month            ◯ $50/month

◯ Other

Join for $5/month

We accept credit card, Apple Pay, and Google Pay.
You can also contribute via



## More in **Technology**

**FUTURE PERFECT**

Two ways to go wrong in predicting AI



**BUSINESS & FINANCE**

Is Nvidia stock overvalued? It depends on the future of AI.



**SUPREME COURT**

The Supreme Court hands an embarrassing defeat to America's Trumpiest court



**FUTURE PERFECT**

What if quitting your terrible job would help the economy?



**MEDIA**

Julian Assange's release is still a lose-lose for press freedom



**CLIMATE**

The race to get ahead of the next tornado



## The Latest

**POLITICS**

How Democrats got here

**SUPREME COURT**

Why the Supreme Court just ruled in favor of over 300 January 6 insurrectionists

**2024 ELECTIONS**

What about Kamala?

**SUPREME COURT**

The Supreme Court just made a massive power grab it will come to regret

**POLITICS**

Case 1:20-cv-03590-JEB   Document 369-8   Filed 07/12/24   Page 257 of 573

The Democrats who could replace Biden if he steps aside

**INTERNET CULTURE**

Hawk Tuah Girl, explained by straight dudes



    

**About us** | **Our staff** | **Ethics & Guidelines** | **How we make money** | **Contact us** | **How to pitch Vox** | **Newsletters**

Privacy Notice | Terms of Use | Cookie Policy | Do Not Sell or Share My Personal Data | Licensing | Accessibility | Platform Status | Careers

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

# Exhibit 519



Menu 

APPS / REPORT / TECH

# Instagram Direct gets a huge update focused on messaging your friends / At last, you can share images from your feed to your friends

By **Ariha Setalvad**
Via **Instagram blog**

Sep 1, 2015, 1:01 PM EDT

   | **0** **Comments (0 New)**



Instagram

In December 2013, Instagram introduced Instagram Direct, which let users send private photo and video messages to each other for the first time. But while its tiny inbox icon sits at the top of the app, Direct has often felt like an island within the larger Instagram app. You couldn't share images from your feed using Direct, or respond to a photo with a photo, or start a conversation using text. But as of today,

you can do all three, as part of a massive overhaul of Direct that makes Instagram feel like a full-featured messaging app for the first time.

"Share posts, locations, and profiles right from your newsfeed"

About 85 million people use Direct each month — less than one third of Instagram's 300 million-strong user base. That's likely a result of Direct's isolation from the rest of the app. It's clear people want to share images from the feed with their friends: the company says 40 percent of all comments on Instagram posts are "@" mentions. Today, that's the best way to direct a friend's attention to a post on Instagram. The Facebook-owned service hopes Direct will begin taking the place of those mentions starting today.

"We wanted to design Direct around conversations that are very visual and very rich. It was a natural extension, honestly, for our community," says Ann Baum, a software engineer who works on Direct.

You can share more than photos in Direct now, too. Locations, hashtag pages, and profiles can all be sent as direct messages right from your Instagram feed. This makes Instagram more useful to groups — and you can add up to 15 people to a direct message. So if you see a picture of a particularly spectacular hike, by clicking the arrow button under the picture, you can share it with your local hiking group as a suggested activity. (Or just send it to your friend who thinks a 10-mile hike is a normal Sunday morning activity.)

6/29/24, 7:19 AM
Instagram Direct gets a big update focused on messaging your friends - The Verge
Case 1:20-cv-03590-JEB Document 369-8 Filed 07/12/24 Page 261 of 573



Messages within a conversation are now threaded, to make for a more traditional messaging experience. You can reply to messages using text, emoji, or a new heart icon in the bottom right corner. You can also respond with an image of your own, either by sharing one from your feed, or through the new camera you'll find inside Direct, which lets you take a picture without having to leave the conversation.

"You can reply with text, emoji, or just a heart"

The team says Direct's privacy model hasn't changed. Anyone can send you a message, but if you don't follow them, your message will be marked "pending," and

appear as a message request. The recipient can then choose either to allow or decline your message. If you decline a message, you won't see messages from that sender again; and if you need to, you can block users. For group messages, you must be friends with the creator of the group in order to take part in the conversation. If your account is private, the only people who can see your messages are the ones you are already friends with.

"Photos sent using Direct are only visible to people who could already see them"

Instagram has spent the past year developing different ideas around messaging products. Last summer, the company introduced Bolt, a one-tap, one-on-one messaging service that was similar to Taptalk and Snapchat. But Bolt is still only available in New Zealand, Singapore, and South Africa. Today's update to Direct brings some of the same private messaging that Bolt offers to a larger audience, but remains tied closely to your photo feed.

Direct has some important limitations. You can't download or save images from a conversation, and groups have a maximum of 15 people. But for maybe the first time, Direct truly feels like part of the core Instagram experience — and Instagram feels more of a messaging app than it ever has before. Facebook already has two of the world's largest messaging apps in Messenger and WhatsApp. Instagram may just have become its third.

The update for Instagram Direct will be available to iOS and Android users starting today.

> ▭  0 COMMENTS (**0 NEW**)

More from **Apps**

## Vudu's name is changing to 'Fandango at Home'

---

## Apple unbanned Epic so it can make an iOS games store in the EU

---

## Yep, Apple's breaking iPhone web apps in the EU

---

## How to make the most of Google Keep

TERMS OF USE  /  PRIVACY NOTICE  /  COOKIE POLICY  /  DO NOT SELL OR SHARE MY PERSONAL DATA  /  LICENSING FAQ
/  ACCESSIBILITY  /  PLATFORM STATUS  /  HOW WE RATE AND REVIEW PRODUCTS

CONTACT  /  TIP US  /  COMMUNITY GUIDELINES  /  ABOUT  /  ETHICS STATEMENT

THE VERGE IS A VOX MEDIA NETWORK

ADVERTISE WITH US  /  JOBS @ VOX MEDIA

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

# Exhibit 520

Blog
Back

**Product**

# Goodbye, Fleets

By
Ilya Brown
Wednesday, 14 July 2021

We built Fleets as a lower-pressure, ephemeral way for people to share their fleeting thoughts. We hoped Fleets would help more people feel comfortable joining the conversation on Twitter. But, in the time since we introduced Fleets to everyone (https://rejouer.perma.cc/replay-web-page/w/id-412ae357b02f/mp_/https://twitter.com/kayvz/status/1328685331789484034?s=20), we haven't seen an increase in the number of new people joining the conversation with Fleets like we hoped. Because of this, on August 3, Fleets will no longer be available on Twitter.

- Using our learnings from Fleets, we'll focus on creating other ways for people to join the conversation and talk about what's happening in their world. Here's some of what we learned and what's next:
- Although we built Fleets to address some of the anxieties that hold people back from Tweeting, Fleets are mostly used by people who are already Tweeting to amplify their own Tweets and talk directly with others. We'll explore more ways to address what holds people back from participating on Twitter. And for the people who already are Tweeting, we're focused on making this better for you.
- Most Fleets include media – people enjoy quickly sharing photos and videos to add to the discussion on Twitter. Soon, we'll test updates to the Tweet composer and camera to incorporate features from the Fleets composer – like the full-screen camera, text formatting options, and GIF stickers.
- The top of the timeline continues to be a good spot to highlight what's happening right now so you'll still see Spaces there when someone you follow is hosting or speaking in a live audio conversation.
- Our Fleet ads test, which concluded as planned last month, was one of our first explorations of full-screen, vertical format ads. We're taking a close look at learnings to assess how these ads perform on Twitter.
  We're evolving what Twitter is, and trying bigger, bolder things to serve the public conversation. A number of these updates, like Fleets, are speculative and won't work out. We'll be rigorous, evaluate what works, and know when to move on and focus elsewhere. If we're not evolving our approach and winding down features every once in a while – we're not taking big enough chances. We'll continue to build new ways to participate in conversations, listening to feedback and changing direction when there may be a better way to serve people using Twitter.



(https://rejouer.perma.cc/replay-web-page/w/id-412ae357b02f/mp_/https://www.twitter.com/iiyabr0wn)

Ilya Brown

# Exhibit 521



NEWS AND EVENTS

## Bringing YouTube Shorts to the U.S.

BY **TODD SHERMAN**, *PRODUCT LEAD, YOUTUBE SHORTS*

MAR 18, 2021   —   5 MINUTE READ

We're introducing our YouTube Shorts Beta to the U.S starting today, as we continue to build the experience alongside our global community.

Last September, we announced that we are building YouTube Shorts, a short-form video experience for anyone who wants to create short, catchy videos using nothing but their mobile phones. Since introducing our initial beta in India, we've already started to see creators having fun with Shorts, and the number of Indian channels using our creation tools has more than tripled since the beginning of December alone. People are also watching more and more Shorts around the globe - the YouTube Shorts player has now surpassed 6.5 billion daily views globally.

Starting today and over the next several weeks, we'll gradually expand our Shorts beta to the U.S. We plan to introduce more features as we continue to build Shorts alongside creators and artists. Here's an update on where we're headed with YouTube Shorts based on feedback from our community.



Unlocking a new playground of creativity

With our Shorts beta in India, we had foundational creation tools, like a multi-segment camera to string multiple video clips together, the ability to record with music, control speed settings, and more. And today we're adding more features, like the ability to add text to specific points in your video. You'll also be able to sample audio from other Shorts so you can remix it into your own creation.



In the coming months, we'll launch the ability to use audio from videos across YouTube - which includes billions of videos worldwide - unlocking a new playground of creativity like never before. This means you can give your own creative spin on the content you love to watch on YouTube and help find it a new audience -- whether it's reacting to your favorite jokes, trying your hand at a creator's latest recipe, or re-enacting comedic skits. Creators will be in control and will be able to opt out if they don't want their long form video remixed.



We've also worked alongside our music partners to make sure artists and creators have a large library of songs to use in their Shorts. As we launch our beta in the US, we'll have millions of songs (and growing), music catalogs from over 250 labels and publishers, including Universal Music Group's labels and publishing companies, Sony Music Entertainment and Publishing, Warner Music Group and Warner Chappell Music, Believe, Merlin, 300 Entertainment, Kobalt, Beggars, CD Baby, Empire, Peer, Reservoir, OneRPM and more. As we expand Shorts, the library and number of partners will continue to grow.

Stay tuned for more Shorts creation tools rolling out in the future as we expand to more countries.



**Delivering a seamless viewing experience across YouTube**

We know that creation is only part of the Shorts experience. We also want to help people find Shorts to enjoy and help creators get discovered. We've introduced a row on the YouTube homepage especially for Shorts, have launched a new watch experience that lets you easily swipe vertically from one video to the next, and are testing adding a Shorts tab on mobile that makes it easier for you to watch Shorts with a single tap.

We're also exploring how to deepen your connection with Shorts content, creators, and artists you're most interested in by integrating it with the YouTube you already know and love. For instance, if you hear a snippet of a song on Shorts, you can easily find the full song, watch the music video, or learn more about the artist —all on YouTube. And soon it will work both ways. Loving music from Megan Thee Stallion? Tap the create button right from the video to make your own Short with that audio, or check out how others are using it on Shorts.

As more people create and watch Shorts, we expect that our systems will get even better, improving our ability to help you discover new content, trends, and creators you'll love.



**Supporting mobile creators**

YouTube has helped an entire generation of creators turn their creativity into businesses and become the next generation media companies. Over the last three years, we've paid more than $30 billion to creators, artists, and media companies.

Shorts is a new way to watch and create on YouTube, so we're taking a fresh look at what it means to monetize Shorts and reward creators for their content. We are deeply committed to supporting the next generation of mobile creators with Shorts, and are actively working on what monetization options will look like in the future.



Parents are always asking if you're done with something 🙏😩 | Otay Known #shorts

The Shorts beta will start gradually rolling out today and will be available to everybody in the U.S. over the next several weeks. We know that it will take us time to get this right, and we're just getting started. We can't wait for you to try Shorts and help us build a first-class short-form video experience right on YouTube.

**Related Topics**

Products and Features

Explore the latest company news, creator and artist profiles, culture and trends analyses, and behind-the-scenes insights on the YouTube Official Blog.

**Our Channels**

X (Twitter)

**Connect**

About YouTube

YouTube Products

For Business

For Creators

Policy & Safety     Copyright     Brand Guidelines     Privacy     Terms

Help     English

# Exhibit 522



Log in



# Instagram Live Stories: Available Globally

🕐 January 24, 2017

    

Log in

Today we're excited to share that live video on Instagram Stories – a new way to connect with your friends and followers right now – will be rolling out to our entire global community over the next week. From real-time makeup tutorials to live DJ sets, it's been exciting to watch as the community shares new sides of their lives.

To go live, just swipe right from feed and choose Start Live Video in the camera. When you're done, your live story will disappear from the app. You may also see Top Live on Explore, connecting you to exciting live stories happening now.

To learn more about live video on Instagram Stories, check out the Instagram Help Center.

**Live video on Instagram Stories is available for everyone as part of Instagram version 10.0 and above.**

RELATED ARTICLES

# Check out more announcements about product

Log in

---

#PRODUCT   #INSTAGRAM   #ANNOUNCEMENTS

## Introducing Trending Now on Threads



---

#PRODUCT   #INSTAGRAM   #ANNOUNCEMENTS

## Instagram Announces New Messaging Improvements



---

#ANNOUNCEMENTS   #PRODUCT   #INSTAGRAM



# Introducing New Parental Controls and Teen Privacy Defaults

Log in

---

## Our Story

Leadership

Brand

Brand Kit

Working at Instagram

Politics

## Features

Reels

Stories

Messenger

Shopping

Search & Explore

## Safety

Safety Tools

Privacy Tools

Account Security

## Community

Programs

Anti-Bullying

Parents

## Threads

## Business

## Creators

## News

## Meta

## Family Center

## Help Center ↗



English (US)        Instagram from Meta        API        Privacy        Terms        Sitemap

# Exhibit 523

WWW.VOX.COM /2017/6/22/15849966/transcript-instagram-ceo-kevin-systrom-facebook-photo-video-recode-decode

# Full transcript: Instagram CEO Kevin Systrom on Recode Decode

Recode Staff : 64-81 minutes : 6/22/2017

On this episode of **Recode Decode, hosted by Kara Swisher**, Instagram's co-founder and CEO Kevin Systrom stopped by the studio to talk about how his app is thriving inside Facebook, what he thinks about innovation and copying, and why Instagram isn't as much of a cesspool as the rest of the internet.

You can read some of the highlights from the interview at that link, or listen to it in the audio player below. We've also provided a lightly edited complete transcript of their conversation.

If you like this, be sure to subscribe to **Recode Decode** on Apple Podcasts, Google Play Music, Tuneln or Stitcher.

**Kara Swisher: Hi, I'm Kara Swisher, executive editor of Recode. Today in the red chair is Kevin Systrom, the CEO of Instagram. The little app you might have heard of. He co-founded the company in 2010 with Mike Krieger. And in April 2012, they sold it to Facebook for $1 billion. In April, Instagram announced it had more than 700 million active users. I know Kevin pretty well. I've written profiles on him. I've known him since the beginning of Instagram. Welcome to Recode Decode.**

**Kevin Systrom**: Thanks for having me.

**No problem.**

Yeah.

**So it's amazing how large Instagram has gotten. So talk a little bit about that journey, because when we met, you had just sold to Facebook, I think, and you had just sort of started off on your journey there.**

Right.

**Let's review for people that don't know. We have a wider listener base about what you were thinking when you founded it. It was, as I recall, it moved from thing to thing to thing before it finally hit on what it became.**

I started this app called Bourbon. It wasn't even an app, actually. It was a website that worked ... It was optimized for the mobile phones. So the dirty secret of Instagram is that I didn't know how to make an app so I just made a website instead and I went around marketing it to VCs as like, "Hey, HTML5 is the future. Forget about apps, this works on Android and IOS." But the dirty secret was I didn't know how to make an app.

**Right.**



So it turns out that a couple people believed me, Andreessen Horowitz and Baseline Ventures. And they were like, this is great but find a co-founder to go work on this because you got to learn how to make an app. And I ran into Mike Krieger who was a classmate of mine at Stanford and he was one of the original beta users of this app called Bourbon. And the original idea was that you would check in at a place. This is like the old idea of check in — so you're at a bar, you're at a concert. You check in and you tell all your friends where you're at. So it was popular with all of a 100 people.

**So Foursquare?**

It was basically Foursquare, Gowalla, but it had a couple really interesting features. So No. 1 ...

**God, I forgot about Gowalla. Go ahead.**

Remember? Yeah. Like all the rage around check-ins. So the first feature was plans. So you could say hey, I'm planning on being at this place, this time, anyone want to join me? It was a way of socializing and gathering people together at a location in the future. So that was like a unique angle.

**It was. There was one in Japan called ImaHima, I think i told you about.**

Oh, really?

**Yeah, in 2002 I remember meeting with the founder. It was that, "I'm here having a beer."**

I'm having a beer or I'm gonna have a beer. And I thought that was pretty innovative but it wasn't innovative enough to really garner attention, because we would give this app to people and they'd be like, "Okay, first of all, it's not an app. It's a website. Learn how to make an app." And the second thing is like this plan thing is cool but like it's not cool enough to use versus Foursquare or Gowalla.

But the one feature we had that I think really set it apart was being able to post a photo. And people would go to a bar, post a photo of the beer they were drinking or whatever they were eating or they were at a park. And it was a really cool way to see what all your friends were up to.

**Sure, visual. You weren't thinking the visual internet, were you?**

No, no. At the time ... I had an iPhone 3G, like the old school one, not even the 3GS. And the camera's pretty crummy, no offense to the folks that worked on that camera but listen, it was crummy back in the day. And as we saw people posting photos on this check-in app, we started realizing hey, there's like a thing there. And Mike and I had this soul-searching moment where we sat down in this room. We had just met with someone from Andreessen Horowitz who looked at us with a blank stare when they heard we were doing a check-in app. And we were like, this isn't going to work. We need to differentiate somehow.

**Right.**

And we wrote down the things people loved about Bourbon. It was plans, it was some of the gamification stuff, and then it was the photos. And we crossed the first two off cause we were like, I don't know, plans seems niche. The gamification stuff seems ... I don't know, it's everywhere. And then the last one was photos. And we were like, you know what, there's some people working on photos on the mobile phone. There was Treehouse

at the time. I don't know if you remember that? There was Pic Please, there were a bunch of these apps that were all trying to do photos.

I looked at Mike and I was like, "Mike, I think there's something around photos because these cameras are getting better, not worse. I think there will be an inflection point where people don't carry around point-and-shoots anymore, they're just gonna carry around these phones." And I think an inflection point happened literally like two months into basically having that discussion. The iPhone 4 launched.

**Yeah, thank you, Apple.**

And that was like the first mobile camera that actually competed with the point-and-shoot. So at that moment, we pivoted and we focused solely on photos and that was basically the beginning of Instagram.

**That was the key part. You had done photography in high school though. You were a photographer, correct?**

Yeah.

**I remember talking to your photo teacher from high school.**

Yeah, I'm not sure I was a good photographer. I'm not sure I'm a good photographer now either, by the way. My employees are always like, "Your photos are okay." But listen, running a company and being a good photographer are two different skill sets. I'm not saying I'm good at either but listen, one of them's working.

**Jack Dorsey is really good at it.**

I would say that I was an okay photographer in high school. I took classes. I really loved messing around with photos, but the one thing I really loved was taking a photo and you could actually add these chemicals to the developing bath or whatever ...

**Silver.**

Yeah. Like I think it was selenium toning that I used. And my photo teacher at the time ...

**It makes it old, like olden days.**

Well that was like sepia and there's selenium and there are all these things. Anyway, you can like mix the chemicals and cross process. I was like these look really cool and I was using a square-format camera, and all of that kinda came back to me as we were working on Instagram. I think that really resonated with people initially because you took a kind of crummy camera and you made it retro on purpose.

**Right.**

And it took advantage of the crumminess rather than trying to build around it.

**Which is what you did with filters, which was the big insight I think you did before other people did.**

I would say on that, I'm not sure many people realize this, but Instagram wasn't the first company to do filters either. There was Hipstamatic, there was Camera Bag. The value is basically built on looking around at all the

different ingredients in the world and saying how can I combine this into like a new dish.

**Right.**

And I mean filters plus social plus basically a Twitter feed of photos, it became like a thing overnight. People actually initially downloaded it thinking it was a filter app. And that's why they downloaded it. They wanted to make their stuff look cool.

**They didn't realize it was a social media plan.**

They had no idea.

**Interesting.**

And what happened was they started getting likes, and before you knew it, it was like oh, there's an actual network here. And it started to take off.

**Right. So there was a back and forth then. I'm not gonna go into detail about whether Twitter would buy. You had talked to the Twitter people rather seriously. Jack Dorsey is one of your fist major users that sort of got you kind of hip.**

I worked with him at Odeo.

**You worked with him at Odeo.**

Yeah.

**And then you ended up selling to Facebook. I'm not gonna get into the details of that, but why sell? Why did you think about selling? Cause now, you sort of could be your own thing. I mean, we talked about this. I always said you sold for cheap. I just tried to make you feel bad. But ...**

Hindsight is 20/20, right?

**Yes it is. It is. But was the thinking behind it because a lot of people feel like Mark got a very valuable company for a relatively small amount of money, considering now.**

So let's rewind back to 2012. We are not a company of 700 people, we don't have 700 million people around the world.

**You don't have access to that audience, do you?**

No. Let's zoom all the way back to 2012 in a world where we're sitting around a little table right now. Every single one of our employees would have fit around this table. We were about eight or nine when the deal happened and then I think by the time we actually closed the deal, we were something like 13. But we were like eight people keeping the service alive that was growing like wild fire.

**What was the number? How many people were using it at the time?**

I want to say it was something like 20 million.

**20 million, I remember that.**

Which is a good number but you can point out a bunch of apps today that have 20 million monthly active users that are growing and they're fine but who knows if they'll be the next whatever Instagram, Facebook, you name it. So at the time, we had eight people, we were struggling to keep the site up and we were raising money. Every VC looked at us like we were crazy when we asked for a $500 million evaluation, which sounds funny now because like every company goes out and if you're like doing Airbnb for dogs, you get a 500 million ...

**500 million.**

Yeah, it's like the default term sheet.

**Sure.**

But at the time, I literally got a phone call back-channel from a VC being like, you're crazy and it's offensive that you're asking for this valuation. And I was ... I feel like we're actually doing a good thing ...

**Were your feelings hurt?**

No, in retrospect, I realize that phone call was just angling to get a better deal.

**Yeah.**

But at the time, listen, I had been running a company for a year. We were struggling to keep the setup, $500 million valuation, and then Mark came along and was like hey, how about I double that and you get to keep working on what you love and you get all the expertise of Facebook and you get to work with me, Sheryl, Schrep, etc. It sounded like a really good deal, and if you look in retrospect, I think it was a great deal. Think about all the things we've accomplished being part of Facebook. All the things we have plugged into — whether it's hiring, spam fighting, the ad system. We have thousands of salespeople who are basically selling ads for Instagram and we snapped our fingers to access them. So a lot of really great ...

**Do you actually snap your fingers?**

Yes, I snap my fingers.

**Yeah.**

Yeah. I guess my point is like ...

**No, I get it. It's like, which would have happened without the other kind of thing. If not for this, then that.**

I think we would have been successful as an independent company as well but ... I don't know.

**Well, you look at Snapchat, they're struggling because they're smaller.**

Well, I don't know if Snapchat is a good example. But think about all the amazing companies that got to 15, 20 million users and it was like the hot startup, all the headlines ...

**So many.**

You and others wrote.

**We don't write hot headlines.**

And then guess what? They're gone in a year. It could have gone either way but in retrospect, what I'm glad is I'm working with my co-founder still on the coolest company ever with some of the most amazing coaches in Mark and others.

**What's interesting is that you're still there. A lot of founders leave. It's really kind of ... I'm always like ... I call you every now and then I hear you're leaving and I think people have approached you and some things have been interesting for you.**

Interesting, I'd love to hear which ones.

**I don't know which ones.**

Maybe I don't know about the deals.

**I know you've been approached. What keeps you there? What is the things? A lot of founders leave, they absolutely do when they're a division of a bigger company, and Facebook has only gotten more enormous since you got there.**

Mike and I often have this conversation, which is like why do all these entrepreneurs leave on Day One? Peter Thiel, I think, left PayPal on Day One and then, I don't know, it was like a blazing glory of whatever on the first day. Elon I think did as well. You can name all these entrepreneurs who just left.

I was talking with an entrepreneur who will not be named. His point was like yeah, I just don't know what I'd do with you because I've never had a good relationship with my acquirer. It seems like you really do. And I was like yeah, Mike and I talk about this all day. It's like Schrep, who's the CTO.

**Mike Schroepfer, yeah.**

And then you have Mark and Sheryl. They have kept to their commitment not only to keep us independent, allow us to thrive.

**Right.**

But they've also provided resources for us to be able to do that. And why do anything else if you have your baby — which is this company, is thriving, making a bunch of money, you're launching new products that people really love that are successful. To do what? Go sit on a beach? That sounds ...

**That's interesting, because everybody does do it. You're an outlier, like a unicorn. Nobody stays in the company. They don't grow with the company, they don't remain.**

But usually they're successful, meaning the acquired company kind of floats, it goes sideways. I think ...

**Instagram has had a couple of those too.**

Yeah, but I think Instagram has done the opposite. If Instagram I think were down and we weren't able to control our destiny and a bunch of bad things were happening, I wouldn't be there. I don't think many people would want to work there.

**Right.**

But I think Mike and I are an example of investing in a company for the long term and waking up every day and being really excited about growing.

**And you know, people would want to try and understand what is the key thing they do. Do they pet you? What is the key? I was there the other day doing a podcast with Sheryl and I was like, where is Instagram? And you're over somewhere else. You have another building, right? Is that correct?**

Yeah. I mean, we're on the campus. Own slash lease like a big swath of land and we didn't on purpose go far away, it's just like that was the building that was available.

**How many people do you have now?**

It's like between 600 and 700. It's hard to nail down an exact number because some people work half their time on Instagram and then of course you have people that contribute, and finance, and sales, and a bunch of others.

**Sure.**

Effectively, if this company were like ... If we just like took all the resources that we had and spun it out, it would probably be in the thousands. But anyway, I think the thing that made it work was actually not what they did, it's what they didn't do. I see Mark practice a tremendous amount of restraint in giving us the freedom to run, but the reason why I think he gives us the freedom to run is because when we run, it typically works.

Now, if we had launched live stories, video on Instagram and all those things that cratered, I don't think we'd have that long of a runway. You earn it. You earn it over time, and that's actually what they don't do that ends up helping. It's like they're not modeling in the product necessarily. And I actually take that and I think about all the great entrepreneurs that we have at Instagram. The people running the products. And I've learned that lesson as well, if you give people a runway ...

**Not to meddle.**

Not to meddle if things are going really well. You leave it alone. And I think that's happened in a bunch of areas at Instagram.

**So what do you do day to day then?**

Podcast.

**Podcast. Conferences.**

No, so what do I do day to day?

**Yeah.**

My main job is to make sure that one, the company is pointed in the right direction, so strategy. What areas are we focusing on? Okay, we're gonna focus on live, we're gonna focus on stories, we're gonna focus on messaging, we're gonna focus on content production, whatever. What are the areas that we focus on and then making sure that we actually execute against them. Usually that means coaching the team or getting the team in place. So hiring senior people and working with those senior people to make sure that they have the resources that they need. I do spend maybe 25 percent of my time in the pixels of the product. I think that's something as a founder that I hold dear that a lot of CO's I know just abstract themselves. I think much to Instagram, sometimes our designers I get into the details. Listen ...

**That was always your interest.**

It's my interest and I guess when you founded the company, you're allowed to dabble.

**Yeah. Steve Jobs. Always dabbling in something.**

Yeah, but that's what I say is my job description. Point it in the right direction, the right people and then there's a certain percentage of dabbling.

**So let's talk about the growth a little bit. In the next little bit I want to talk a little bit about other competitors and things like that, because people sort of slag you a lot for borrowing some ideas from others. But you mentioned at the top of this, but we'll get to that later.**

**What do you attribute the growth to? I'm trying think of my own kid and I'll give you two observations, another one late. He doesn't use Facebook at all but he loves Instagram. It's fascinating. And I'm like, why don't you just use Facebook and he's like no, it's not cool. And I was like, Instagram's cool? And he's like, yeah, Instagram's cool. It's a really interesting ... He's right in your area. He does use Snapchat heavily also but he's using Instagram a lot more. And it's a really interesting ... This is just an anecdotal thing, but I've heard it again and again among younger people. Instagram seems to be something they like, and so do old people, so do all kinds of people. So can you talk about the growth? Because I think that's one of the more important things that you've managed to have everybody on it and yet not be hopelessly uncool for the people that you want to come on it.**

Thank you. We're not hopelessly uncool. I'm gonna get a t-shirt that says that and wear it around the office.

**Not hopelessly uncool.**

Like Kevin, not hopelessly uncool.

**Not that Facebook is, but I cannot get my kid to use Facebook, it's really interesting. I've told this to Mark and Sheryl before.**

There are a couple of things going on here. One is a question about young people in the U.S. When you zoom out and you say how many people are there in the world, billions. Teens or whatever in the U.S. represent a very small fraction of the overall population. It's possible to be very very big and have areas that you want to go work on. And I think that teens in the U.S. are particularly interesting to everyone in tech because they tend to

adopt products way before everyone else. If you've ever seen a teen use a phone, their fingers move at a million miles per hour and you're just like I didn't even know there was that shortcut. They just understand in a way that you and I don't. I didn't grow up with a phone in my hand; they are. And I think that it's interesting to watch what they use because I think it's a signal of where technology is going.

**Sure.**

It's always been the case. Facebook started with college kids. Instagram interestingly didn't start with youth, it actually started more with I'd say the like 20, 30 something hipster in San Francisco, self proclaimed.

**Yeah, absolutely.**

And I think spread out from there. But the growth has really come from that large population overseas. So Instagram from Day One was a universal network. Images are the one thing that you can look at, not speak the other person's language and connect with them. We had the universal "Like" button, which is like a universal sign of appreciation. You saw the photo, it doesn't matter what other language that person speaks. So now over 80 percent of our community is overseas, outside the U.S.

**Right. 80 percent?**

Over 80 percent.

**Where particularly?**

You name it, we're there. I'm sure we have ...

**I assume U.S. is your biggest market but maybe not.**

It probably is, yeah.

**No. 2, or right near there.**

We have a bunch of countries right at the top and the good news is ... I'll give you some broad categories. Brazil is very very large for us. India is growing quickly. Europe in general is very strong. We see a lot of strength in developed countries. I'd say it's the less developed countries with less developed mobile networks like older phones that don't support higher-end media where I think that's the future of where we need to go and how we need to sell our product. And a lot of our growth in the next year is gonna come from that. And that requires a shift internally, not only for us to appreciate the problems that folks have with lower-end phones and lower-end networks, connectivity issues. but it also requires us to think hard about how we have to deliver media over the wire to these phones and display it because that's Instagram.

**Right.**

We can't convert Instagram to text and then it just works. Like a big reason why WhatsApp has done so well especially in overseas markets is its focus on performance and it's mostly texts. Now they've optimized the hell outta that app. I've learned a lot from watching Jan and what they do. Performance is the key for the next chapter of growth. But you asked where growth comes from?

**They've added in photos, they've added in stickers. It's a lot more stickers than text. You don't do photos.**

I guess what I'm saying is, most of our growth is gonna come from overseas because there are a lot more people outside the U.S. than there are inside the US. That being said, the US continues to be a very interesting market for us where we have to grow, and most of our ad business is based in the U.S., like most companies.

**Right. All right, we're gonna talk about that more when we get back, especially video because I think that's a big push by Instagram in recent months.**

[ad]

**We're here with Kevin Systrom, the CEO of Instagram, who is still an employee of Facebook. I was with Jeff Weiner onstage after LinkedIn got bought by Microsoft and he refused to say he was a Microsoft employee. It was very funny. And he kept saying, "I'm the CEO of LinkedIn." I'd go, "Comma, a division of Microsoft." You feel good about being part of the bigger picture, but you do have a separate identity. It's an unusual situation where people don't necessarily know that Facebook owns Instagram or WhatsApp or things like that. It's sort of a constellation of products.**

As an entrepreneur, if you had to choose to be part of one tech company, Facebook is a pretty good one. Like it's done very very well. It's reaching mass heights of users all over the world, it has great technologies who live there, it's working on super cool leading-edge technology products. I am happy to proclaim that I'm an employee there. At the same time, running the company Instagram is a very different job and it feels very different. We have a distinct but compatible culture.

**What would you say the culture is?**

Of Instagram?

**Yeah.**

I'd say it's defined by two very distinct things. No. 1 is simplicity. I think if you walk into Instagram, it's a very very simple aesthetic. Everywhere you walk, we focus on removing complexity at every single step. I think people care deeply about simplicity. The second, I'd say, is craft. And I'm actually gonna name three things. I remembered a third thing. Craft is the second thing. We've got a Blue Bottle Coffee in the lobby. It's something Mike and I care really deeply about.

**Yeah, you have coffee investments, right?**

Yeah. And we love coffee.

**You really are the San Franciscan, aren't you?**

We ...

**You have your craft Bourbon.**

It's about craft. We care about ...

**I can't believe you don't have a handlebar mustache right now, but go ahead.**

Well, listen, I didn't have a beard when we first met so I'm getting there.

**That's true.**

And I'm kinda ... I'm not wearing plaid.

**You have to get the Lincoln beard if you really want to go the full hog.**

I am. But craft is a big part of our culture. The final one that I'd say is that we focus on solving problems. I have this problem-centric culture where you can't come into a product review and just say hey, here's a cool feature we want to build. That doesn't fly at Instagram. What does fly is, coming in and saying here's the problem we want to solve for this person. Here's how we know it's a problem. Here's the data that back that up or the antidotes.

**Give me an example.**

Sure. Let's talk about Stories. We looked at sharing on Instagram and every time we talked to someone, we would say, "Hey, so why do you share across services? It's like you share on Snapchat, you share on Facebook, you share on Twitter, you share on Instagram. Why do you share across services?" And interestingly what we found was the biggest problem they have with Instagram is feeling the pressure of sharing really amazing photos.

So you hear antidotes all the time. You might hear it from your kids: "I didn't get enough likes so I deleted the photo." "I don't know if that's good enough to put on Instagram." "I can only put one on Instagram per day cause I gotta show off this thing and then it's gonna live on my profile which is awesome because it represents me." But at the same time, it's kinda like hanging a photo in a photo gallery. And it turns out every photo you want to take, you want to hang in a photo gallery but is important to ...

**Instagram is a fancier place.**

There you go. So now our values of craft and simplicity reinforce that, but the problem is that people want to actually share a lot more but they don't want it to hang on the gallery wall. So Stories came in as a solution. The idea was not hey, there's another company that's doing Stories, let's just do that. It was, okay, we have identified a problem in the community, which is people really want to share more but the constraints of Instagram are that it has to be really good, you have to be willing to hang it on the gallery wall. And what if we allowed you to also share really informally the things that are thrown away but really valuable for a certain amount of time.

That flip side of the sharing coin was a problem that we identified along the way, seeing consumer trends. And when the team walked in, they were like, what problem we're solving is not competition. The problem we're solving is sharing and here's the data that backs that up. And that's why now that we've launched the product, now over 200 million people use Stories every day. It's clearly working and it clearly solves a problem for people, whereas coming in and pitching a cool idea — Hey, what if we did X, Y or Z because it's cool and it's a hard technical problem — that doesn't fly at Instagram because you have to be solving a problem.

**We're gonna get to Snapchat in a minute, but you were also competing with Facebook too in terms of people's attention and use because they have photos and videos and Live and things like that. What is that? Is there a tension there between that? They also are trying to get people to do precisely what you do.**

Companies are not single individuals. Companies are complex organizations with lots of different people. So I'm sure if you talk to specific people inside of Facebook whose goal is X, Y or Z, they feel like oh, I don't know, Instagram or WhatsApp or maybe even Oculus trades off against it. But that's true at any company, right? If you have a couple of reporters who are both covering similar things, they're competing, right? Like whose story goes out first? But that's okay, and I think that's relatively healthy. I think the interesting thing is sharing photos is not sharing photos across every service. People do it for reasons. On Facebook, you find a lot of hey, I want to memorialize this vacation or this wedding or this amazing thing that happened and I want to share it with my friends and family, co-workers, etc. And it's an album, it's rich, etc. I think that's great.

Instagram tends to be more about hey, is this photo crafted, composed correctly? Is the light right? Am I using the right filter? That just scratches a different itch. But they're both photos and videos.

**That's a Facebook thing.**

Yeah. I think that's totally fine. I talk a lot about this job's hypothesis. Have you ever heard about what job did you hire this thing for? The Clay Christensen thing?

**No.**

It's amazing and I use it all the time in the company, which is ... What job are you hiring this product for, and they asked people when they walked in. I think it was like at McDonald's or something. What job are you hiring that milkshake for? People looked at them crazy, like you're looking at me crazy right now. But he would explain: What problem does it solve in your life? And they figured out there were two distinct consumer groups. One was, it solves a breakfast problem. So when I'm on the way to work, I order this milkshake cause it's easy. It's like a protein shake in the morning. And then there's another segment of customers in the afternoon who basically buy it to keep their kids happy before they actually make dinner. And now whenever people come into the room to talk about products, we talk about what job are you hiring that product for? So you talk about photo sharing. You can hire different products for different jobs and it happens to be that they're all photo-sharing products.

**Very similar, right.**

Yeah. Different audiences, different creative tools, different jobs. And as soon as you look at the world through that lens, you realize why it makes sense that all these products exist. They might compete with each other on the margin but in general, they have very distinct jobs.

**So I'm gonna talk about some of your competitors. Twitter, my greatest dangers, I cannot share my Instagram. I have to double post them. If you want the best quality, you have to double post them. When is that ever gonna get fixed, or never? Is that just never happening?**

I haven't thought about that subject in a really long time.

**There's probably a lot of people who use both.**

That being said, there are ways of doing it. You can use ... there are reposing apps like ...

**They never look right.**

Oh, well.

**They used to be great. You could just post one on Instagram and it would go on Twitter looking beautiful.**

Yeah, there was basically a time where we had integrated with a bunch of their stuff and then they cut off access.

**They cut it off. They were mad at you.**

I was just like, companies are companies and they have deals and that deal fell through. I'm not against ...

**How do you look at the things they're doing? Cause they were doing Vine and other things that are similar to Facebook and you. Do you consider them a competitor or not?**

Which one, Twitter or Vine?

**Twitter. They're in the moment. I think they're more in-the-moment news kind of thing.**

Once you get to a certain size ... Okay, so actually I want to answer this a different way, which is the thing that I learned being at Facebook that I would not have considered otherwise, is the focus on time. Time is this indivisible unit, it's very hard.

**You only have a certain amount.**

You only have a certain amount of time. It is the indivisible, mutually exclusive unit of your life that you're either watching TV, you're either reading the newspaper or using a social network, right? And sure, you can shift around time on a given day, but time is the thing you're competing for. By that measure, yeah. Like Reed Hastings at Netflix, you know what he calls his biggest competitor?

**What?**

Sleep.

**Sleep.**

It's super interesting, right?

**He would say that.**

Right. But I took that from him and I was like, sleep's a competitor, maybe reading's a competitor. Yes, once you get to a certain size I guess you're competing for time and attention, and the question is, is your use case looking at photos the most compelling one?

**Right.**

But I don't know. I don't wake up every day thinking about competition and like hey, what features are they working on and what features should we be working on. I think the question is, do we have a singular mission for the company? Are we going after it? Are we solving the real problems that our community has on every given day?

**So talk about your focus on video because it's really been in Stories and the idea of what you're doing. And then I do want to get into talking about Snapchat, for you to talk about how you feel about what people say about borrowing their things. Talk about why video. What's the shift? Instagram has been a photo service. It still is largely a photo service, or is it not? Is it not?**

Depends how you define it.

**Video or photos?**

Okay. Put it differently. Every passing day, video becomes more and more of a percentage that gets shared, but definitely more and more of a percentage of how much time people spend on Instagram. So if you just look at like, okay, the 20-something minutes per day that people spend on Instagram, what percentage of that is watching video? It goes up over time. Today is probably the highest day of history and it's probably the lowest day of the future.

And that's because I think video has become more ... It wouldn't be accepted. It's more possible because you have higher data speeds. You have more unlimited plans or I guess in certain countries you have more limited plans. But people are consuming more and more video because I think the devices are getting better. People are learning to produce video better. Stories is actually largely video. So if you actually watch your stories as a part of Instagram, you're gonna see a lot of video. It's not necessarily the 16x9 beautifully produced trailer that people are watching, it's actually video, fullscreen, 9x16, vertical video on both Stories and Live. People are spending a lot of time on those and watching those.

It's just a shift in behavior. I think people are getting past the fact that a single frame represents a moment and they're realizing that you can actually consume life through video and that's going to continue to happen in the future.

**Is that a good thing? Because it's not really craft, is it? It's really not. They get messier and they get less curated.**

I think you can have craft in messiness. Look at a Jackson Pollack. You both describe that as messy and ...

**I'm not seeing a lot of Jackson Pollack videos on your service.**

Yeah, but I'm just saying there's precedence for messy, beautiful.

**Right.**

So I don't think craft is necessarily neat.

**Does it change this idea around simplicity around your service? Cause it does ... It's noisier. It's much noisier. It's a different product, really — or not. I don't know.**

So okay. Initially, I think our mission when we first started was something like "capture and share the world's photos" or something, right? And I think we changed it to "moments" when video came along. But now we talk about strengthening relationships. And if you think about strengthening relationships, you can do that through different types of media. It can be a photo, it can be a boomerang, it can be a time lapse. You can capture a moment in all sorts of different ways. It can be a live video. And we're going to adopt any format that allows you to strengthen your relationship with other people through that shared experience. So if I can see what you're doing on the weekend, you can see my bike ride. I can see my friend, the book they're reading. I'm getting closer to them through that shared experience. We're gonna have all that. It's not about photos.

**Tell me about what it is, meaning the format.**

Yeah, a baby's first steps. You want to see a photo of that, like no. Now does Boomerang work? Sure. Do I want a video? Probably. But if you're watching a live concert, you probably want live video. There's just all sorts of use cases to grow closer with others through different formats. I hate it when I read articles that name Instagram the photo-sharing app.

**Right.**

It's like the first thing I said when I got to Facebook actually, I did an all hands in front of the entire company. And I said, "Just so you know, we are not a photo-sharing app."

**Even though you just paid a billion dollars for a photo-sharing app.**

We are not a photo-sharing app. And everyone looked at me like I was crazy. I remember Mark came after and he was like, "Why did you say that? I don't get it." I explained. I think we're much more than that. We're about people knowing each other or sharing their moments in their lives. It's gonna be more than just photos in the future — of course video, but other formats too. And that tends to resonate with people once you understand it and I think our history shows that we've gone after that.

**So video is now increasing, do you ever imagine a time where photos is a very tiny part of your business?**

I'm gonna get specific here. So video I think will be a large part of what's consumed. I think photos will be a large part of what people take. I don't imagine a world where ... I could be like a foot in my mouth about this, but I don't imagine a world where videos are just the primary way people share because photos are so easy. But you can sort of define it in different ways. When you say a part of your business, it's like which one monetizes better?

**Right. Which one does monetize better?**

That's a good question. I think it depends on the service and ...

**Difficult on your service.**

No, videos actually are pretty good and advertisers see them as premium. Depends on the producer.

**Right, not inserting them in other people's feeds but in terms of doing their own thing.**

Yeah, but you look at Stories. Is story video the same as feed video? So it gets complex. Is live video the same as feed video? That's why I think we can't call these things just photos or videos, it's like it totally depends on the exact format.

**How do you differentiate between the live and the story? How do you look at it?**

Well, right now, live is a film roll. You and I can go live right now. We'll have a bunch of viewers and then the second we click done, it's gone.

**Right.**

And that actually unlocks a bunch of sharing because I feel more comfortable sharing and I'm not worried it's gonna get discovered later and I'm gonna look silly, whatever. Turns out teens really love it for that use case as well. They hang out after school with their friends on live. And that's very different from, say, editing a beautiful trailer in 16x9 to show off a new movie.

**Sure.**

Well, it's definitely a video, there are two very different experiences. I think it shows the depth of one format that it can be many things.

**Right. So let's get to Snapchat. My son also is an avid user of both things. You met him, you remember?**

Yeah.

**He says, "Tell that tall guy I'm really pissed at him because he stole Snapchat. He stole what they're doing. And I'm mad because I don't want to do that on Instagram and that's what I do on Snapchat." Fast-forward recently, he does it on Instagram. He shifted over. He still uses Snapchat quite heavily and the language he speaks is, "I'm doing snaps." He doesn't say, "I'm doing Instagrams." But he's definitely annoyed that you ... He goes, "That's not what I use Instagram for." He was sort of mad at a brand. When something becomes something else, I think someone who's an avid user gets annoyed by the shift. Talk a bit about the criticism of you, of essentially Snapchat coming up with something and you all copying it.**

Yeah. Let's take Instagram Day One. Instagram was a combination of basically Hipstamatic, Twitter, some stuff from Facebook like the "Like" button. In fact, the "Like" button came from FriendFeed. You can trace the roots of every feature anyone has in their app somewhere in the history of technology. Apple designed a cellphone. Sure, it looked different, it was fullscreen, glass screen. First one without a keyboard. But it wasn't the first cellphone, right? Tesla, super innovative, definitely not the first car. It's got wheels, it's got air conditioning, right? But you know it's powered differently so that's unique. I don't think you can find a single thing in Silicon Valley that hasn't been built on the amazing work that technologists throughout history have done.

We decided we wanted to have the slide show format, which we also called Stories and that also makes the copying narrative a little easier. But it's a slide show. It turns out people really like it and if we just copied, I don't think people would just use it because going back to the jobs being hired for, that job is being fulfilled by someone else really well. So what we had to do is say are we fulfilling an actual need that people have and are we gonna do it in a unique and useful way? I think the answer is yes because now, over 200 million people use it every single day. I think that's an awesome testament to doing it well.

But originality is an interesting concept in Silicon Valley because I think we look around and I think we focus so much on who had what idea first but ... Twitter, Facebook. The first time anyone adopts something that someone else did, I think there can be this criticism. Can you imagine LinkedIn without a news feed? Can you imagine Twitter without effectively a news feed? Ranked Feed, now Twitter's doing it, LinkedIn does it, we all do it. I think these innovations that happen and then they spread throughout technology. I know we live in a society based on capitalism but competition is good for consumers. And it would be crazy if we saw something that worked with consumers that was in our domain and we didn't decide to compete on it. I understand ...

**So filters, same thing?**

Filter is the same thing.

**What have they borrowed from you? I think that's an interesting question.**

I think Snapchat is a great company. I think they're gonna continue to do well. But when you look back, they didn't have filters initially, they adopted filters because I think Instagram had filters and I know a lot of others were trying to adopt filters as well. Facebook adopted filters and you could have said the same thing at the time. We're copying each other but I don't know, that's just the way Silicon Valley works. The question is, who executes the best? And execution is everything. We are doing our best to provide a service to users that people clearly want that scratches an itch, which is: I don't want to just share the highlights of my day, I also want to share the ongoing moments throughout the day. And it just solves it really well.

So then the question is, on a level playing field between companies, now you have stories in Facebook, you have it in My Day on Messenger, you've got in on WhatsApp, and you're gonna see it other places too. Who does it the best and who executes on creative tools, on the next-generation features, like who does it the best? And that is going to be, I think, the determination of who wins in the long run. And honestly, it's not gonna be one winner. You're gonna have many winners and you're gonna have people competing, you're gonna have different subsegments of users who are adopting a certain thing because they love it. Facebook is not the only social network in the world, it may be the largest, but I think that's okay. And that's what makes Silicon Valley work is that competition and looking around and adopting the best-of-breed things to make your service better.

**So do you ... When people use those criticisms, what do you feel like?**

It's fair for people to criticize, but just imagine the only car in the world was the Model T right now. Like someone invents the car, it's really cool. Horseless carriage they called it, right? But do you blame other companies for also building cars that have wheels and a steering wheel and AC and windows?

**It's a little closer. Some of this stuff feels a little closer to what they're doing. I know it feels like it to them. It feels ...**

It's always gonna feel that way to the first car producer. Oh, you have windows too. Oh, you have a steering wheel. Oh, you have AC. Do you have a radio? Right? The question is what unique stuff do you build on top of it. When we adopted it, we decided that one of the really annoying things about the format that it just kept going and you can pause it to look at something, you can rewind and we did all that. Like we actually implemented that.

**You're a much easier version, no question.**

My point is, if you think about the car analogy. Different cars have different functionality and different utility values depending on the features, and our job is not just to look at another car company and copy the shape of their car and all the unique characteristics but instead make it our own. Same with newsfeed between Facebook and all these others. It's one thing to have a newsfeed but you gotta make it your own over time. And I think that is our job and I think we're doing pretty well at it.

**All right. We're here with Kevin Systrom from Instagram. We are gonna talk more about innovation and how you innovate. I want to hear about some original innovation from Instagram to come.**

[ad]

**We're here with Kevin Systrom, the CEO of Instagram. We've been talking about a lot of things, about Snapchat, about Twitter, about stories, innovation, how to do things. I want to talk about innovation and where it's going, because one of the things, I do understand iteration of companies upon companies, but some people feel that maybe true innovation is harder, to be the originator of an idea. Instagram, you're right. There were lots of photo-sharing services but you were unique in terms of what you offered. Do you feel that you've lost innovation? Or how do you keep innovation at a company? And things that you truly introduced that are wow, that just come from you.**

Yeah. I don't think that we've lost that spirit internally. Again, true innovation is like looking around at the world and putting the ingredients together and figuring out how to execute on it, market it, scale it. The amount of work that goes into making these things work at scale, at 700 million users around the world, that's where the magic is every single day. Making it work in different countries, on different networks. The reason why we're seeing the growth we have ...

**Because you do it well in lots of places.**

Yeah. I'd say 90 percent of our effort on a given day is figuring out how to scale the service. Not just technically but like all the nooks and crannies of the product that need to work for people. I think one of the areas that I'm most proud about our innovation actually is around this area called well being. About six months ago, I decided that we were in a particular position with our scale and the people that worked at our company and the characteristics of them that we could actually be one of the first companies — if not the first company — online to really set a precedent about caring about our users and our community. We've always been really community focused. But you might ask, "Okay, Kevin, what does that mean?" You talk to teenagers today about their experience online and bullying is a thing. You talk to any parent, I'm sure you feel this way. Bullying is one of the biggest problems that teenagers have online.

**Twitter is a hellscape.**

Well, you can talk about anyone at any age. I totally agree. I am picking teenagers as a specific example of a population that is most vulnerable. And what I decided six months ago or so is that we are gonna have an entire group of people that literally work on making the internet a safer place. Not just Instagram, but other services as well. We're gonna build technology, processes, etc., to basically make the experience on Instagram a safer place. So comment moderation, we have machine learning, teams that basically try to figure out when somebody's getting bullied to help them. Suicides are a topic that are very current right now online, especially with Live. How do we get in front of people so that we can save those people before they harm themselves? That takes a lot of hard work and that is not what stickers or face masks are we launching, it's actually real technology that keeps people safe.

**Why do you imagine Facebook's been drawn into that? Interestingly, before it was launched, I did say to some of your executives, someone's gonna kill themselves, and they said I was negative. It was an interesting thing. What I want to get to is why don't these technologists think of this before they're starting to create their ... And then they're like, we made it, we didn't know. And I'm like, you kind of could have anticipated some of these behaviors. And it's interesting that it doesn't happen on Instagram. Maybe it's just not the platform of choice for murdering, but why is that? What do you think? Because people don't think of it that way or?**

A couple characteristics. One, the internet is a really big place.

**Sure.**

No one person can control what happens on the internet or what people choose to do or broadcast. That can mean really good things, which is ... Social media allows for democratic voice.

**There's things they can control on Facebook.**

Well, you can be an unheard person with an issue and then be heard. It gives you a platform.

**Sure.**

People with eating disorders, people with psychological issues, mental health issues, it can be a really healing place for a lot of people to connect. That's the pro side. The con side is there are a lot of people in the world and some people choose to do very bad things. That is not a new thing. That happens in the world ...

**Of course not.**

Right. It's always happened. The question is now that people have a platform to broadcast that ...

**Now, you're running the platform so it's your job. That's my feeling, is that a lot of these platforms, will act like they're agnostic. Like it's just a platform. It's just benign. I'm like, it's not benign and you have ... Same thing.**

I would never claim that. And in fact ...

**Same thing around fake news, for example.**

What I was just saying to you about well being is that I actually ... Instagram has signed up to be a leader in this space and say no, this is our responsibility as a large platform. We're never gonna get it perfect. It's a really big place. We're never gonna get it perfect but we are gonna try.

**I want to get to why technologists don't think like that. What is it? Is it a chip missing? They don't understand ... There is a real feeling that I feel that they abrogate their responsibility that they clearly have at this point. I was having an argument in Facebook, you know, about ... I was like, the New York Times has to get it right, and they do. They take it as a solemn responsibility. Why don't you have to get it right? Why are you suddenly become a platform of no ability to control it when you have every means of control or you have a lot of means. Nobody was expecting perfection from the New York Times or anybody else but not thinking about it was really ... like what happens in technology where you just make something and don't think about the consequences? I guess that's what I want to talk about, consequences.**

Well, I can't diagnose the specific individuals you're talking about because I don't know the specific cases. What I can tell you is that I feel differently. And now, do I feel personal responsible for making the world a safer place online? Yeah. Am I gonna get it perfect? No. But the intention is there. And I realize that the products we build have real impact on people. They have impact on their mental health, they have impact on their social networks in the real world, their relationships with their friends, and that at its best that can be such an amazing thing. At its worst, it's really scary and no one has the answers on Day One. Why? It's because it's absolutely unprecedented that you have companies operating at the scale that we are. Name another company that operates in the billions of people on a given day.

**I get that.**

And that's not a defense, it's simply it's unprecedented. So I think what you're seeing is we're all learning along the way.

**I know, but to me, an adult knows consequences. That's the difference between a teenager and an adult, that they do understand the impact of what they're doing. It was interesting for Mark to come from "fake news, we had nothing to do with it" to "oh, okay, maybe we should work on community, maybe we should police this stuff, maybe we should." But it was a fast journey because he got so much pressure.**

**You have an equally large platform. What do you think your responsibilities are in doing that? Now Instagram, to be fair, is one of the nicer places on the internet. You don't see a lot of ugly comments. They're shut down really quickly. It's astonishing, actually. I never have a repulsive experience on Instagram and I have it every day on every other service and increasingly on Facebook, all the time on Twitter. And at some point, it's the responsibility of the platform. What do you do ... I'm paying you a compliment, it's not a repulsive place — that shouldn't be on a t-shirt either. Why do you think that is? Is it because of the tools you use or the people that use it? Because it seems like 700 million people, you're gonna get some bad apples all over the place.**

Our rule Day One of Instagram, it actually came ... You're gonna laugh. There was this video and I could find it somewhere. The founder of LOLCats.

**I know that guy.**

Right.

**Yeah.**

Did this whole speech about community building. And he said you have to prune the trolls. And my wife ... I was watching this video to learn about community building and she likes to poke fun at me and she says are you pruning the trolls. And it became a thing in the household, but now actually at Day One of Instagram, we had this motto, which is, "Prune the trolls." And me, Mike, our first hire was a community manager. Not an engineer, not a designer.

Listen, in retrospect do I wish we had more engineers to scale the service? Sure. But the first thing we did was we made sure to prune the trolls. I was deactivating accounts. Mike was deactivating accounts. We didn't really have clear policies at the outset but it set a tone that if you're not gonna be a good player, if you're not gonna play by the rules, you're outta here. It wasn't about "oh, they copied my photo." There was some of that. It was like, if you're here to cause trouble, you don't belong. And I think that set a tone in the community.

Now, I think that scaled, but listen, at 700 million people it's not perfect. And as much as you have a great experience, a lot of people don't, but it is our job to make sure that we do everything possible to staff against great projects that innovate on keeping safe. So whether that's machine learning and using artificial intelligence to identify comments that are bullying and get rid of them immediately, identifying accounts that are bad actors before they act, figuring out how to keep people safe online is ... Two years, three years, no, no, no, 10 years down the road, I'm not gonna remember the funny stickers that we built or the face masks. The bunny's cute but put that aside. That's not our legacy, our legacy is are we keeping people safe online.

And well after all of us are gone, did Instagram leave its mark on the world by developing technologies and tools that other social networks can adopt. You asked about copying. The one thing I hope every single company copies from Instagram, my hope is our effort on keeping people safe.

**One of the things that people worry about, though, is it is not going that way. That social media has become weaponized. Look, we have a president who uses Twitter as a cudgel. That has not been proven and they cannot prove it because he doesn't cross the line. How do you change that shift? Because it looks a little bit like it's going in a very bad direction no matter how many people are trying to pull it back.**

It is hard.

**Or do you not think of that.**

No, I'm acknowledging the problem and I don't have perfect answers but I think No. 1, you model the behavior you want to see. So I think our company spends an inordinate amount of time on modeling great behavior. Whether it is the programs we do to understand the impact on mental health ...

**Anthropologists.**

We spend a ton of time on modeling great behavior that I think we want other social networks to model as well. And again, like when Elon gave up the patents to Tesla, he's like, "Please copy this because the world gets better if people do this." I feel the same way about the technology we're building around keeping people safe. The way I look at it, though, is it's our responsibility to innovate and we're not always gonna get it right. And I think it's really hard. I don't have the answers, I wish I was smarter to figure this out but we have a lot of smart people at Instagram who are working actively on it. I don't have a clear answer for you because there is no clear answer.

**Okay, that's fair. Not much longer, two more things. The business model and then what are you worried about. Let's start with the first. Right now, you're advertising the number. Do you have a number that you've released?**

Which one?

**Advertising sales.**

No, we don't release advertising sales. I think we released active advertisers recently, one million active advertisers, I think was the number. And it's grown a lot because how long it's been.

**And they're most putting up pictures or videos or whatever.**

It's all putting up photos and videos. And in fact ...

**But not inserting into other people's feeds or things like that.**

Sorry, I guess the way to think about it is ...

**I mean, they're in the feeds but they're doing their own creatives.**

Yes. Exactly. They're doing their own creatives. And we're seeing a bunch of great antidotes from advertisers about how they love the performance on the platform, they reach unique audiences. But at the scale of 700 million, if you're an advertiser and you want to reach a 32-year-old female in Alaska who really loves salmon fishing, you can find that person.

**You can find that easily.**

And that's what's unprecedented. I was just at a conference with a bunch of COs and for more traditional companies. I looked around and I said, "How many of you guys and gals feel like you're being told to do social media and you don't know what to do?" And all of them raised their hands. And then I said, "The one thing you can get from social media," and I raised my hand and I said, "Disclaimer, I work for this company and I benefit from you buying ads, but you can reach the consumers you want to reach and that's unprecedented because you buy TV, you buy print, you buy all these things and you spend a bunch of money and you're never gonna fire anyone for buying TV. When you start to realize you can reach the exact consumers you want to reach and know if they convert, that's unprecedented in the history of advertising. That's why technology companies are doing well."

**What do you see on Instagram so people will convert? What is the ... People looking at, say, a Burberry in the feed, which they can do on their own and not work with you necessarily. I just haven't seen anything that innovative in the advertising space that's not just like banner ads.**

You know, the strangest thing about advertising is the one part of technology where your goal is actually not to innovate Day One. Because if you want to sell advertising at scale, if you go to advertisers and you say we have this crazy new format, you gotta produce this crazy new thing and think about a completely differently than how you think about TV and print and all that stuff, it falls flat.

**Right.**

So actually what you want to do is figure out how do you have a very basic format that works really well and performs well on the metrics that advertisers care about and they use a shared language between things like TV, print, radio and online media. And when you do that, it actually starts working really well.

So look at what Facebook's business model was many years ago with social ads, etc., it was hard to sell that. But now that you have something really simple, that you basically measure against other comps like Google and TV, you can actually buy it really easily and it makes sense inside a buying program. I don't think our goal is to be innovative necessarily in the product offering. I think our goal is to be innovative in the value we deliver. The fact that you know that that customer then converts and then you can say you're a boss. I know I just spent, I don't know, 10 grand on this ad campaign, we got 30 grand back. It was worth it, let's do more.

**Right, but do you see innovation in that?**

Oh, for sure. We launched advertising on Stories recently, which is a different format. We do multi-product ads so you can swipe between different types of products. We just launched the save feature, which is super popular on Instagram right now, and a lot of the things people are saving are commercial posts. So you see a cool sweater from this brand, you save it.

The secret of commerce online is no one wants to convert in the moment on a $200 item. So if I see something really cool like a bike helmet I really want because I'm big into cycling, I'm not gonna convert on the spot but maybe I'll save it, maybe I'll come back to it. Maybe I'm choosing between three different models. That's the type of experience I think we can innovate on Instagram. And I think we're doing pretty well at that. It's the early innings so the game is yet to finish. So we'll see. It's really cool.

**You couldn't escape without a sports metaphor. Last question. What do you worry about? I mean, I ask a lot of people I interview here, share a mistake they made. I don't want the sort of the learning ...**

Personally or for the company?

**No, personal. I want a story about personally.**

Personally. I'm really new at my job in the grand scheme of things. Like I told you, I was at the CO conference and I meet these amazing seasoned managers, the Jack Welch's of the world, and I've been managing people, what, like four or five years now? I'm not bad at it, I don't think. We should ask the people in the room. But learning to scale as an individual in a hyper-growth mode is something that I don't think many people have to deal with because usually you take your job, you get promoted, you learn skills, you go to a seminars.

**And the bar is low in Silicon Valley, let's be honest.**

No one ever really like drops you in the deep end managing a company that now touches twice as many people than live in the United States on a monthly basis. And that's pressure, but in a good way. I love competition. I'm one of the more competitive people you'll meet. I love waking up every morning and feeling like I don't have it perfected. So running the company I think is something that I've grown a tremendous amount in the last few years and something that I look at and I know I'm not perfect at and I have a ton of growth ahead of me.

**What do you think you do wrong? Or a mistake you've made?**

Which one? At this conference ...

**It's only 40 percent of decisions are wrong, so you have to accept that.**

Yeah. Warren Buffett was onstage and people are like, "What are the big ones you missed?" And he's like, "Where do I start?"

**The internet.**

Yeah. Jeff Bezos has this line that people shouldn't be judged based on their batting average but rather their slugging percentage. That's effectively what he talks about. That's again, getting back into sports. It's not about like on average, the question is when you hit, are you hitting grand slams? And that's something that I think we've transitioned to at Instagram, which is like, okay, we can take a lot of risks and fail. Does that matter if that product fails? No, not really. What matters is we have one every couple years that's a grand slam.

**Yeah.**

And I think Stories falls into that bucket. I think we've had other ones, like the adoption of video falls into that bucket. And the question ...

**What didn't?**

Well, the initial version of Direct was terrible.

**Yeah.**

Didn't really take off. We had this weird thing where it put you and a bunch of friends into a thread. It was just silly and weird. We pivoted it to Via messaging service, that started working and that grew to be a sizable portion of the community using it on a monthly basis. And then, now adding film roll photos into that I think has accelerated that growth.

But I have had plenty of failures along the way. There was a film roll photo-sharing thing that we did called Bolt that fell flat, miserably. It was awful. Good news is that not many people remember it. We worked on advertising for a long time that was very curated. I approved ...

**I remember. That was weird.**

It was totally unsalable. There were a lot of reasons to doing it that probably don't make sense to go into right now but ...

**I think you can probably be a little fussy, that's my impression.**

Yeah. Listen, fussy is a good thing.

**Especially with your liquor, like your bourbon.**

I don't drink that much anymore.

**Yeah, I know but you had that ...**

Yeah, we did have a bourbon cart.

**I don't mind that.**

Could I be good at my job if I wasn't fussy?

**That's true.**

Now, honestly I think about this and I'm like, okay, so you can be fussy but you better be right or otherwise you're fussy and wrong all the time and those people get kicked out pretty quickly.

**Yeah.**

Hopefully my slugging percentage is on the up and up. Maybe that's the thing I worry about most. Are we keeping our slugging percentage up and taking in enough big bets?

**I can't believe I'm asking you this but it's such a cliché question, but if you weren't doing this, what would you do? Run for office? Have they asked you to do that yet? Everyone's being asked to do that.**

It's so funny, because before the whole ...

**Because if Mark's running and petting cows and Sheryl's running ...**

Listen, I would not want to compete with Mark, he's great.

**Yeah.**

And also, he stated that he's not doing it.

**I think people are dead wrong about that.**

I would not run. I once brought up the idea cause our CO Marty worked in D.C. for a long time. And I was like maybe some day I'll run for office and she looks at me and she's like, "I don't think you'd last a moment." I like my solitary time. I like thinking and reading.

**People grabbing you? No, I don't see that.**

Shaking a lot of hands, right.

**Yeah, no.**

Listen, I don't know. That's not something that's on my list. What would I be doing otherwise? I would definitely just go back to starting another company. If you told me I couldn't do Instagram tomorrow, I'd go back to starting another company. Honestly, I'm a pretty mission-driven person myself. I'd probably figure out the best way to bring people together and strengthening relationships that wasn't Instagram. What that is probably involves media, it probably involves things like virtual reality. There are a bunch of exciting new chapters in technology coming ahead. I'd love to work on that stuff. But the good news is, I have this platform, it's called Instagram and I get to do all that there.

**Virtual reality Instagram, when is that coming?**

That's a good question. We'll time it. But yeah, I'd probably be doing that. I'm an active person and I want to stay active, and building a company is one of those thrilling experiences in my life and I'm gonna keep doing it.

**That's good. I thought you would say, "Oh, I want to be an astronaut" or something.**

No. I don't think so.

**Maybe a spy.**

Listen, I'd probably bike a little bit more but listen, it's a fine balance.

**Absolutely. Anyway, thank you so much. We've been talking with a very thoughtful executive. He always has been and I think he always will be. Kevin Systrom from Instagram. Thank you for coming.**

Thanks for having me.

# Exhibit 524

Case 1:20-cv-03590-JEB   Document 369-9   Filed 07/12/24   Page 310 of 573


Oversight Board

# Q2 2023 TRANSPARENCY REPORT: BOARD'S RECOMMENDATIONS LEAD TO KEY CHANGES IN META'S CROSS-CHECK PROGRAM

October 26, 2023

Today, the Oversight Board published its **Transparency Report for Q2 2023**. Alongside an overview of the Board's activities in this quarter, this also includes data showing how recommendations from our **policy advisory opinion on Meta's Cross-Check Program** have led to substantial and positive changes, benefiting the people who use Facebook and Instagram.

## Enforcement Exemption List Reduced by More Than Half

In October 2021, coverage in the *Wall Street Journal* about Meta's cross-check program raised questions about how the company was treating its most powerful users. This included a practice described as "allowlisting" or "whitelisting," which exempted certain content from enforcement for specific policies. Meta refers to this practice as "technical corrections" and acknowledged in our policy advisory opinion that a "lack of governance over practices in the past, […] inadvertently resulted in some entities not receiving many enforcement actions."

In response to our recommendations, Meta has now established clear criteria around these practices, including who should benefit from them. This new approach has already led to an immediate decrease in the overall size of the technical corrections list by more than half (55%).

## Outstanding Backlogs Cleared for Content From Users on Meta's Cross-Check Lists

If a post from a user on Meta's cross-check lists is identified as breaking the company's rules, it remains on the platform pending further review. This means that, because of cross-check, content identified as breaking Meta's rules is left up on Facebook and Instagram when it is most viral and could cause harm. As the volume of content selected for cross-check can exceed Meta's review capacity, in the past the program has operated with a backlog, which delays decisions on such content.

Our policy advisory opinion noted that, in September 2021, the *Wall Street Journal* reported that Brazilian soccer star Neymar posted non-consensual intimate imagery of another person on his Facebook and Instagram accounts. According to reporting by *The Guardian*, the video was online for over a day, and "an internal review of the Neymar posts found that the video was viewed 56 million times on Facebook and Instagram before removal," despite representing a clear violation of Meta's content policies. According to Meta, the reason for the prolonged accessibility of this violating content was a "delay in reviewing the content due to a backlog at the time."

In our policy advisory opinion, we called on Meta not to operate cross-check at a backlog. Meta now reports that it has cleared all outstanding backlogs in its cross-check review queues dedicated to potentially violating content from entities on its lists, producing a 96% decrease in resolution time (time taken for review and any subsequent enforcement) for 90% of the jobs created in the first half of 2023, compared with the second half of 2022.

Case 1:20-cv-03590-JEB Document 369-9 Filed 07/12/24 Page 312 of 573

A smaller backlog means that Meta can review and take enforcement action against potentially violating content faster. This, in turn, helps the company reduce the risk of users being exposed to violating content while it is awaiting review.

For more details on our impact on Meta's cross-check program, please see Meta's Q2 2023 update on the Board **here**.

## The Oversight Board in Q2 2023

Our Q2 2023 Transparency Report also contains an overview of the Board's activities during this period, including the following highlights:

- We published decisions on six cases in Q2 2023. Three of these were standard decisions: Armenian Prisoners of War, Brazilian General's Speech and Cambodian Prime Minister, while a further three (Anti-Colonial Leader Amílcar Cabral, Metaphorical Statement Against the President of Peru and Dehumanizing Speech Against a Woman) were summary decisions. These examine cases in which Meta reversed its original decision on a piece of content after the Board brought it to the company's attention.
- We also published a policy advisory opinion on the Removal of COVID-19 Misinformation, including 18 recommendations. In combination with the recommendations from other case decisions published in Q2 2023, we made 30 recommendations in total during this quarter.
- We received 259 public comments to the Board ahead of the deliberations on our three standard cases and one policy advisory opinion (summary decisions do not consider public comments).
- Users submitted nearly 100,000 cases to the Board in Q2 2023, with close to 25% from Instagram users, the highest-ever proportion recorded from this platform.

## Meta Implements More Recommendations

Case 1:20-cv-03590-JEB Document 369-9 Filed 07/12/24 Page 313 of 573

To ensure that Meta delivers on its commitments, we monitor the company's progress towards implementing our recommendations, using our own, independent, data-driven approach. In our Q2 2023 Transparency Report, we note that the overall number of recommendations fully or partially implemented by Meta increased by 16 recommendations (rising from 44 in our Q1 report to 60 in our Q2 report), representing the largest-ever jump between the publication of quarterly reports.

## Community Standards in More Languages

In April 2021, our Punjabi Concern over the RSS in India decision urged Meta to translate its Community Standards into all languages widely spoken by its users. Since then, Meta has translated Facebook's rules into more than 20 additional languages (including Pashto and Somali, which Meta announced in its Q2 2023 quarterly update). This means that, since we made this recommendation, Meta has translated Facebook's rules into languages spoken by more than a billion people worldwide.

## What's Next

As part of our commitment to transparency, we will continue to publish transparency reports on a quarterly basis. These will include data about how our recommendations are changing Meta's approach to content moderation.

## Attachments

### Q2 2023 Transparency Report

Case 1:20-cv-03590-JEB Document 369-9 Filed 07/12/24 Page 314 of 573

**Table of Recommendations**

**Return to News**

# STRATEGIC PRIORITIES

---

# TRACK YOUR APPEAL

---

# SUBSCRIBE

# GET IN TOUCH

**CAREERS**

**PRESS REQUESTS**

# RESOURCES

6/29/24, 8:08 PM
Case 1:20-cv-03590-JEB Document 369-9 Filed 07/12/24 Page 315 of 573
2020 Transparency Report: Board Recommendations Lead to Key Changes in Meta's Cross-Check Program | Oversight Board

FAQS

PRIVACY NOTICE

TERMS

COOKIES

© 2024 Oversight Board. All Rights Reserved.

# Exhibit 525

 Meta

Language ⌄

Home → Policies → Facebook Community Standards

# Suicide, Self-Injury, and Eating Disorders

## Policy details

Change log ⌄

Transparency Center

### Policy Rationale

We care deeply about the safety of the people who use our apps. We regularly consult with experts in suicide, self-injury and eating disorders to help inform our policies and enforcement, and we work with organizations around the world to provide assistance to people in distress.

While we do not allow people to intentionally or unintentionally celebrate or promote suicide, self-injury or eating disorders, we do allow people to discuss these topics because we want our services to be a space where people can share their experiences, raise awareness about these issues, and seek support from one another.

We remove any content that encourages suicide, self-injury or eating disorders, including fictional content such as memes or illustrations, and any self-injury content which is graphic, regardless of context. We also remove content that mocks victims or survivors of suicide, self-injury or eating disorders, as well as real time depictions of suicide or self-injury. Content about recovery from suicide, self-injury or eating disorders that is allowed, but may contain imagery that could be upsetting (such as a healed scar) is placed behind a sensitivity screen.

When people post or search for suicide, self-injury or eating disorders related content, we will direct them to local organizations that can provide support and if our Community Operations team is concerned about immediate harm we will contact local emergency services to get them help. For more information, visit the Facebook Safety Center.

With respect to live content, experts have told us that if someone is saying they intend to attempt suicide on a livestream, we should leave the content up for as long as possible because the longer someone is talking to a camera, the more opportunity there is for a friend or family member to call emergency services.However, to minimize the risk of others being negatively impacted by viewing this content, we will stop the livestream at the point at which the threat turns into an attempt. As mentioned above, in any case, we will contact emergency services if we identify someone is at immediate risk of harming themselves.

Do not post:

Content that promotes, encourages, coordinates, or provides instructions for suicide, self-injury, or eating disorders.

- Content that depicts graphic self-injury imagery

- Content depicting a person who engaged in a suicide attempt or death by suicide
- Content that focuses on depiction of ribs, collar bones, thigh gaps, hips, concave stomach, or protruding spine or scapula when shared together with terms associated with eating disorders
- Content that contains instructions for drastic and unhealthy weight loss when shared together with terms associated with eating disorders
- Content that mocks victims or survivors of suicide, self-injury or eating disorders who are either publicly known or implied to have experienced suicide or self-injury
- Imagery depicting body modification (e.g., tattoo, piercing, scarification, self-flagellation, etc.) when shared in a suicide or self-injury context

For the following content, we include a warning screen so that people are aware the content may be sensitive. We also limit the ability to view the content to adults, ages 18 and older:

- Photos or videos depicting a person who engaged in euthanasia/assisted suicide in a medical setting.

For the following content, we include a label so that people are aware the content may be sensitive:

- Content that depicts older instances of self-harm such as healed cuts or other non-graphic self-injury imagery in a self-injury, suicide or recovery context.
- Content that depicts ribs, collar bones, thigh gaps, hips, concave stomach, or protruding spine or scapula in a recovery context.

---



We provide resources to people who post written or verbal admissions of engagement in self injury, including:

- Suicide.
- Euthanasia/assisted suicide.
- Self-harm.
- Eating disorders.
- Vague, potentially suicidal statements or references (including memes or stock imagery about sad mood or depression) in a suicide or self-injury context.

---

For the following Community Standards, we require additional information and/or context to enforce:

- We may remove suicide notes when we have confirmation of a suicide or suicide attempt. We try to identify suicide notes using several factors, including but not limited to:
  - Family or legal representative requests,
  - Reports from media, law enforcement, or other third party sources (e.g. government agencies, NGOs), or the Suicidal

Content Contact Form or Instagram Contact Form.

Read less

---

## ⌃ User experiences

See some examples of what enforcement looks like for people on Facebook, such as: what it looks like to report something you don't think should be on Facebook, to be told you've violated our Community Standards and to see a warning screen over certain content.

**Note:** We're always improving, so what you see here may be slightly outdated compared to what we currently use.

---

USER EXPERIENCE
### Reporting



---

USER EXPERIENCE
### Post-report communication



USER EXPERIENCE
## Takedown experience



USER EXPERIENCE
## Warning screens



---

## ⌃ Data

---

### ⌃ Prevalence

Percentage of times people saw violating content

PREVALENCE

## How prevalent were suicide and self-injury violations?



Views of violating content that contains suicide and self-injury are very infrequent, and we remove much of this content before people see it. As a result, many times we do not find

enough violating samples to precisely estimate prevalence.

In Q1 2024, this was true for violations of our policies on suicide and self-injury, terrorism and restricted goods and services on Facebook and Instagram. In these cases, we can estimate an upper limit of how often someone would see content that violates these policies.

In Q1 2024, the upper limit was 0.05% for violations of our policy for suicide and self-injury on Facebook. This means that out of every 10,000 views of content on Facebook, we estimate no more than 5 of those views contained content that violated the policy.

---

∧  **Content actioned**

Number of pieces of violating content we took action on

**CONTENT ACTIONED**

# How much suicide and self-injury content did we take action on?



How we calculate it  ⓘ Read about this data

---

∧ **Proactive rate**

Percentage of violating content we found before people reported it

PROACTIVE RATE

## Of the violating content we actioned for suicide and self-injury, how much did we find and action before people reported it?



■ Found and actioned by us    ◆ Reported by users

How we calculate it  ⓘ Read about this data

---

∧ **Appealed content**

Number of pieces of content people appealed after we took action on it

**APPEALED CONTENT**

# How much of the content we actioned for suicide and self-injury did people appeal?

500k

400k

300k

200k

100k

0

2020    2021    2022    2023    2024

How we calculate it ⓘ Read about this data

---

∧  **Restored content**

Number of pieces of content we restored after we originally took action on it

**RESTORED CONTENT**

# How much actioned content for suicide and self-injury was later restored?





| ■ Restored without appeal | ◆ Restored after appeal | ▬ Total |

**How we calculate it** ⓘ **Read about this data**

## Enforcement

We have the same policies around the world, for everyone on Facebook.

## Review teams

Our global team of over 15,000 reviewers work every day to keep people on Facebook safe.

**Stakeholder engagement**

Outside experts, academics, NGOs and policymakers help inform the Facebook Community Standards.

## ⌃ Get help with suicide and self-injury

Learn what you can do if you see something on Facebook that goes against our Community Standards.

**Visit our Help Center**

↗

NEXT

# Child Sexual Exploitation, Abuse and Nudity

**PREVIOUS**

# Fraud and Deception

 Meta

**POLICIES**

**ENFORCEMENT**

**SECURITY**

**FEATURES**

**GOVERNANCE**

**REPORTS**

**RESEARCH TOOLS**

Privacy Policy    Terms of Service    Cookies

# Exhibit 526

 Meta

Transparency Center

Home → How Meta enforces its policies → Taking action

# Providing context on sensitive or misleading content

**UPDATED** APR 2, 2024

One way Meta promotes a safe, authentic community is by informing people that content might be sensitive or misleading, even if it doesn't explicitly violate the Facebook Community Standards or Instagram Community Guidelines. In this instance, we'll include additional context about the content to help people decide what to read, trust or share.

## How we provide context on content

By providing people with specific and relevant context when they come across a flagged post, we can help them be more informed about what they see and read. Here are some ways we provide context on relevant pieces of content that may be sensitive or misleading:

∧ **Warning screens on sensitive content on Facebook, Instagram and Threads**
Our goal is to protect people from viewing potentially sensitive content.

**Facebook**

People value the ability to discuss important and often difficult issues online, but they also have different sensitivities to certain kinds of content. Therefore, we include a warning screen over potentially sensitive content on Facebook, such as:

- Violent or graphic imagery.

- Posts that contain descriptions of bullying or harassment, if shared to raise awareness.

- Some forms of nudity.

- Posts related to suicide or suicide attempts.



EXPERIENCE
**View a warning screen experience**

→

**Instagram**

To help people avoid coming across content they'd rather not see, we limit the visibility of certain posts that are flagged by people on Instagram for containing sensitive or graphic material. Photos and videos containing such content will appear with a warning screen to inform people about the content before they view it. This warning screen appears when viewing a post in feed or on someone's profile.

---

^ **Verified badges on Facebook, Instagram, Messenger and Threads**

Our goal is to help people feel confident about the content and accounts they interact with.

To combat impersonations and help people avoid scammers that pretend to be high-profile people, Meta provides verified badges on Pages and profiles that indicate a

verified account. This means we've confirmed the authentic presence of the public figure, celebrity or global brand that the account represents.

**How do I request a verified badge on Facebook?**



---

∧   **Notification screens on outdated articles on the Facebook app**

Our goal is to make it easier for people to identify content that's timely, reliable and most valuable to them.

To give people more context about a news article before they share it on Facebook, Meta includes a notification screen if the article is more than 90 days old. After which, we allow people to continue sharing it if they desire. This notification helps people understand how old a given news article is, and its source.

To ensure we don't slow the spread of credible information, especially in the health space, content posted by government health authorities and recognized global health organizations does not have this notification screen.

**Why am I seeing a notification screen when sharing someone else's post on Facebook?**

---

PREVIOUS

# Reducing the distribution of problematic content


Meta

POLICIES

ENFORCEMENT

SECURITY

FEATURES

GOVERNANCE

REPORTS

RESEARCH TOOLS

Privacy Policy   Terms of Service   Cookies

# Exhibit 527

 Meta

Transparency Center

Home → Policies → Facebook Community Standards

# Misinformation

## Policy details

| Change log | ⌄ |
| --- | --- |

### Policy Rationale

Misinformation is different from other types of speech addressed in our Community Standards because there is no way to articulate a comprehensive list of what is prohibited. With graphic violence or hate speech, for instance, our policies specify the speech we prohibit, and even persons who disagree with those policies can follow them. With misinformation, however, we cannot provide such a line. The world is changing constantly, and what is true one minute may not be true the next minute. People also have different levels of information about the world around them, and may believe something is true when it is not. A policy that simply prohibits "misinformation" would not provide useful notice to the people who use our services and would be unenforceable, as we don't have perfect access to information.

Instead, our policies articulate different categories of misinformation and try to provide clear guidance about how we treat that speech when we see it. For each category, our approach reflects our attempt to balance our values of expression, safety, dignity, authenticity, and privacy.

We remove misinformation where it is likely to directly contribute to the risk of imminent physical harm. We also remove content that is likely to directly contribute to interference with the functioning of political processes and certain highly deceptive manipulated media. In determining what constitutes misinformation in these categories, we partner with independent experts who possess knowledge and expertise to assess the truth of the content and whether it is likely to directly contribute to the risk of imminent harm. This includes, for instance, partnering with human rights organizations with a presence on the ground in a country to determine the truth of a rumor about civil conflict, and partnering with health organizations during the global COVID-19 pandemic.

For all other misinformation, we focus on reducing its prevalence or creating an environment that fosters a productive dialogue. We know that people often use misinformation in harmless ways, such as to exaggerate a point ("This team has the worst record in the history of the sport!") or in humor or satire ("My husband just won Husband of the Year.") They also may share their experience through stories that contain inaccuracies. In some cases, people share deeply-held personal opinions that others consider false or share information that they believe to be true but others consider incomplete or misleading.

Recognizing how common such speech is, we focus on slowing the spread of hoaxes and viral misinformation, and directing users to authoritative information. As part of that effort, we partner with third-party fact checking organizations to review and rate the accuracy of the most viral content on our platforms (see here to learn more about how our fact-checking program works). We also provide resources to increase media and digital literacy so people can decide what to read,

trust, and share themselves. We require people to disclose, using our AI-disclosure tool, whenever they post organic content with photorealistic video or realistic-sounding audio that was digitally created or altered, and we may apply penalties if they fail to do so. We may also add a label to certain digitally created or altered content that creates a particularly high risk of misleading people on a matter of public importance.

Finally, we prohibit content and behavior in other areas that often overlap with the spread of misinformation. For example, our Community Standards prohibit fake accounts, fraud, and coordinated inauthentic behavior.

As online and offline environments change and evolve, we will continue to evolve these policies. Pages, Groups, Profiles, and Instagram accounts that repeatedly share the misinformation listed below may, in addition to having their content removed, receive decreased distribution, limitations on their ability to advertise, or be removed from our platforms. Additional information on what happens when Facebook removes content can be found here.

## Misinformation we remove:

We remove the following types of misinformation:

**I. Physical Harm or Violence**

We remove misinformation or unverifiable rumors that expert partners have determined are likely to directly contribute to a risk of imminent violence or physical harm to people. We define misinformation as

content with a claim that is determined to be false by an authoritative third party. We define an unverifiable rumor as a claim whose source expert partners confirm is extremely hard or impossible to trace, for which authoritative sources are absent, where there is not enough specificity for the claim to be debunked, or where the claim is too incredulous or too irrational to be believed.

We know that sometimes misinformation that might appear benign could, in a specific context, contribute to a risk of offline harm, including threats of violence that could contribute to a heightened risk of death, serious injury, or other physical harm. We work with a global network of non-governmental organizations (NGOs), not-for-profit organizations, humanitarian organizations, and international organizations that have expertise in these local dynamics.

In countries experiencing a heightened risk of societal violence, we work proactively with local partners to understand which false claims may directly contribute to a risk of imminent physical harm. We then work to identify and remove content making those claims on our platform. For example, in consultation with local experts, we may remove out-of-context media falsely claiming to depict acts of violence, victims or perpetrators of violence, weapons, or military hardware.

## II. Harmful Health Misinformation

We consult with leading health organizations to identify health misinformation likely to directly contribute to imminent harm to public health and safety. The harmful health misinformation that we remove includes the following:

- **Misinformation about vaccines.** We remove misinformation primarily about vaccines when public health authorities conclude that the information is false and likely to directly contribute to imminent vaccine refusals. They include:

a. Vaccines cause autism (Ex: "Increased vaccinations are why so many kids have autism these days.")

b. Vaccines cause Sudden Infant Death Syndrome (Ex: "Don't you know vaccines cause SIDS?"

c. Vaccines cause the disease against which they are meant to protect, or cause the person receiving the vaccine to be more likely to get the disease (Ex: "Taking a vaccine actually makes you more likely to get the disease since there's a strain of the disease inside. Beware!")

d. Vaccines or their ingredients are deadly, toxic, poisonous, harmful, or dangerous (Ex: "Sure, you can take vaccines, if you don't mind putting poison in your body.")

e. Natural immunity is safer than vaccine-acquired immunity (Ex: "It's safest to just get the disease rather than the vaccine.")

f. It is dangerous to get several vaccines in a short period of time, even if that timing is medically recommended (Ex: "Never take more than one vaccine at the same time, that is dangerous - I don't care what your doctor tells you!")

g. Vaccines are not effective at preventing the disease against which they purport to protect. However, for the COVID-19, flu, and malaria vaccines, we do not remove claims that those vaccines are not effective in preventing someone from contracting those viruses. (Ex's: Remove – "The polio vaccine doesn't do anything to stop you from getting the disease"; Remove – "Vaccines actually don't do anything to stop you from getting diseases"; Allow – "The vaccine doesn't stop you from getting COVID-19, that's why you still need to socially distance and wear a mask when you're around others.")

h. Acquiring measles cannot cause death (requires additional information and/or context) (Ex: "Don't worry about whether you get measles, it can't be fatal.")

i. Vitamin C is as effective as vaccines in preventing diseases for which vaccines exist.

- **Misinformation about health during public health emergencies.** We remove misinformation during public health emergencies when public health authorities conclude that the information is false and likely to directly contribute to the risk of imminent physical harm, including by contributing to the risk of individuals getting or spreading a harmful disease or refusing an associated vaccine. We identify public health emergencies in partnership with global and local health authorities. This currently includes certain false claims related to COVID-19 in countries still experiencing a publicly announced state of emergency regarding the virus. **Click here for a complete set of rules regarding what misinformation we do not allow regarding COVID-19 and vaccines.**

- **Promoting or advocating for harmful miracle cures for health issues.** These include treatments where the recommended application, in a health context, is likely to directly contribute to the risk of serious injury or death, and the treatment has no legitimate health use (ex: bleach, disinfectant, black salve, caustic soda).

### III. Voter or Census Interference

In an effort to promote election and census integrity, we remove misinformation that is likely to directly contribute to a risk of interference with people's ability to participate in those processes. This includes the following:

- Misinformation about the dates, locations, times, and methods for voting, voter registration, or census participation.
- Misinformation about who can vote, qualifications for voting, whether a vote will be counted, and what information or materials must be provided in order to vote.
- Misinformation about whether a candidate is running or not.
- Misinformation about who can participate in the census and what information or materials must be provided in order to participate.

- Misinformation about government involvement in the census, including, where applicable, that an individual's census information will be shared with another (non-census) government agency.
- False or unverified claims that the U.S. Immigration and Customs Enforcement (ICE) is at a voting location.
- Explicit false claims that people will be infected by COVID-19 (or another communicable disease) if they participate in the voting process.
- False claims about current conditions at a U.S. voting location that would make it impossible to vote, as verified by an election authority.

We have additional policies intended to cover calls for violence, the promotion of illegal participation, and calls for coordinated interference in elections, which are represented in other sections of our Community Standards.

## IV. Manipulated Media

Media can be edited in a variety of ways. In many cases, these changes are benign, such as content being cropped or shortened for artistic reasons or music being added. In other cases, the manipulation is not apparent and could mislead, particularly in the case of video content. We remove this content because it can go viral quickly and experts advise that false beliefs regarding manipulated media often cannot be corrected through further discourse.

We remove videos under this policy if specific criteria are met: (1) the video has been edited or synthesized, beyond adjustments for clarity or quality, in ways that are not apparent to an average person, and would likely mislead an average person to believe a subject of the video said words that they did not say; and (2) the video is the product of artificial intelligence or machine learning, including deep learning techniques (e.g., a technical deepfake), that merges, combines,

replaces, and/or superimposes content onto a video, creating a video that appears authentic.

For the following content, we include an informative label:

**Content Digitally Created or Altered that May Mislead**

For content that does not otherwise violate the Community Standards, we may place an informative label on the face of content – or reject content submitted as an advertisement – when the content is a photorealistic image or video, or realistic sounding audio, that was digitally created or altered and creates a particularly high risk of materially deceiving the public on a matter of public importance.

Read less

^ User experiences

See some examples of what enforcement looks like for people on Facebook, such as: what it looks like to report something you don't think should be on Facebook, to be told you've violated our Community Standards and to see a warning screen over certain content.

**Note:** We're always improving, so what you see here may be slightly outdated compared to what we currently use.

USER EXPERIENCE

## Reporting

→

USER EXPERIENCE

## Post-report communication

→

USER EXPERIENCE

## Takedown experience

→

USER EXPERIENCE

## Warning screens



### Enforcement

We have the same policies around the world, for everyone on Facebook.

### Review teams

Our global team of over 15,000 reviewers work every day to keep people on Facebook safe.

### Stakeholder engagement

Outside experts, academics, NGOs and policymakers help inform the Facebook Community Standards.

## ⌃ Get help with misinformation

Learn what you can do if you see something on Facebook that goes against our Community Standards.

**Visit our Help Center**



---

**NEXT**

# Memorialization

---

**PREVIOUS**

# Inauthentic Behavior



POLICIES

ENFORCEMENT

SECURITY

FEATURES

GOVERNANCE

REPORTS

RESEARCH TOOLS

Privacy Policy    Terms of Service    Cookies

# Exhibit 528

# Google Releases Gemini, an A.I.-Driven Chatbot and Voice Assistant

As it races to compete with OpenAI's ChatGPT, Google has retired its Bard chatbot and released a more powerful app.

 **By Cade Metz**
Cade Metz has covered artificial intelligence for more than a decade.

Feb. 8, 2024

First, there were talking digital assistants like Siri, Alexa and Google Assistant. Then there were online chatbots like ChatGPT and Google Bard. Now, the two are merging.

On Thursday, Google introduced Gemini, a smartphone app that behaves like a talking digital assistant as well as a conversational chatbot. Responding to voice and text requests, it can answer questions, write poetry, generate images, draft emails, analyze personal photos and take other actions, like setting a timer or placing a phone call.

Immediately available to English speakers in more than 150 countries and territories, including the United States, Gemini replaces Bard and Google Assistant. It is underpinned by artificial intelligence technology that the company has been developing since early last year.

The new app is designed to do an array of tasks, including serving as a personal tutor, helping computer programmers with coding tasks and even preparing job hunters for interviews, Google said.

"It can help you role-play in a variety of scenarios," said Sissie Hsiao. a Google vice president in charge of the company's Google Assistant unit, during a briefing with reporters.

When ChatGPT arrived from OpenAI at the end of 2022, wowing the public with the way it answered questions, wrote term papers and generated computer code, Google found itself playing catch-up. Like other tech giants, the company had spent years developing similar technology but had not released a product as advanced as ChatGPT.

(The New York Times sued OpenAI and its partner, Microsoft, in December, claiming copyright infringement of news content related to A.I. systems.)

Google released its own chatbot, Bard, in March to middling reviews. In the weeks that followed, the company merged its two leading A.I. labs — Google Brain and DeepMind — and announced that the combined lab was developing new A.I. technology called Gemini.

Gemini is what researchers call a large language model, or L.L.M., a mathematical system that can learn skills by analyzing vast amounts of data, including books, computer programs and online chatter. By identifying patterns in all that text, an L.L.M. can learn to generate text on its own. That means it can write poetry, generate computer code and even carry on a conversation.

It is also prone to mistakes. It can get facts wrong or "hallucinate" — make stuff up.

Gemini is a "multimodal" system, meaning it can respond to both images and sounds. After analyzing a math problem that included graphs, shapes and other images, it could answer the question much the way a high school student would.

In December, Google used a limited version of this technology to upgrade Bard. Now, the company has retired the Bard name and is releasing a more powerful version of the technology through the Gemini app, which is available on Android phones and the web. A version for iPhones will arrive "in the coming weeks," Google said.

Google created a free but limited version of the Gemini app. A more powerful version — called Gemini Advanced and underpinned by a version of Google's Ultra language model — is available for a $19.99 monthly subscription. Google offers a free two-month trial.

Google has released benchmark test results claiming that Ultra outperformed OpenAI's latest technology, GPT-4, in several key areas, including generating computer code and summarizing news articles.

The Gemini app can also generate, analyze and respond to images. Users can upload a photo from their Super Bowl party, for instance, and ask the app to generate a caption.

Google also said it would offer similar technology through the Google Workspace and Google Cloud business services. This will allow customers to use the technology alongside apps like Gmail and Google Docs.

On Android phones, the new app will replace Google Assistant if users download Gemini. Like Google Assistant, it can respond to voice commands, though it also responds to text commands.

Google said it would also continue to offer and improve Google Assistant.

Last year, OpenAI released a similar version of its ChatGPT chatbot that can respond to voice commands. Most industry insiders believe that the A.I. technology that drives chatbots like ChatGPT will merge with and replace digital assistants like Apple's Siri and Amazon's Alexa.

**Cade Metz** writes about artificial intelligence, driverless cars, robotics, virtual reality and other emerging areas of technology. More about Cade Metz

---

A version of this article appears in print on , Section B, Page 8 of the New York edition with the headline: Gemini, a Merger of a Chatbot and an Assistant, Enters the Arena

# Exhibit 529

Corporate Partners & Foundations



Protector    Guardian    Ally    Supporter    In-Kind Champion    Case Resource Partners    Become a Partner

## Every child deserves a safe childhood.

The National Center for Missing & Exploited Children cultivates dynamic corporate partnerships that provide vital financial, in-kind and programmatic support to our organization. Corporate partner collaboration is critical to the mission of finding missing children, reducing child sexual exploitation and preventing future victimization.

## PROTECTOR

With significant contributions at the highest level, corporate partners at the Protector level demonstrate a generous annual commitment to NCMEC's cause through financial and in-kind support, as well as ongoing efforts to elevate the mission of keeping children safe.



Adobe partners with NCMEC to leverage computer technology to keep children safer. By donating essential software tools used in technological support and age progressions, in addition to funding important prevention education programs such as NetSmartz, Adobe has enabled NCMEC to analyze images, create educational content, and improve web content and functionality like never before.



Amazon is committed to preventing child sexual abuse material (CSAM). Amazon dedicates significant resources to combat CSAM and makes ongoing investments in new technologies and tools to enhance the capability for CSAM prevention, detection, response, and removal. In 2023, Amazon provided NCMEC millions of dollars in AWS offerings to enable the reliable operation of mission-critical infrastructure and applications that help missing and exploited children. Additionally, Amazon provides funding to the Exploited Child Division to support their hash sharing and Notice and Tracking initiatives that help remove CSAM from the internet.



As the global leader in the digital intelligence market with a passion for technology innovation and keeping communities safe, Cellebrite provides law enforcement, military and intelligence, and enterprise customers with the most complete, industry-proven range of solutions that encompass digital forensics, extraction, and analytics. Cellebrite supports NCMEC by connecting law enforcement, investigative teams, forensic examiners, and analysts with its optimal resources.



As a member of the Technology Coalition and the U.S. Financial Coalition Against Child Sexual Exploitation, Google works to fight online child sexual abuse material and help NCMEC better serve its mission through Google Grants for Adwords products and donated software, such as Google Earth Pro. These services, along with the incorporation of AMBER Alerts into its Public Alerts Platform, have greatly enhanced NCMEC's ability to efficiently help search for missing and exploited children. Additionally, Google's work to make the internet a safer place is demonstrated by its Family Safety Center, which provides resources on family safety basics and keeping data secure.



Griffeye provides digital media forensics for child sexual abuse investigations and partners with NCMEC on developing collaborative platforms to facilitate sharing of valuable information with law enforcement working on child sexual exploitation cases. This platform streamlines law enforcement's and investigators' workflows and provides increased opportunities to prioritize first-generation material and safeguard victims from ongoing abuse. Through our partnership, Griffeye will continue to bolster the CyberTipline while also integrating its platform with NCMEC's Child Victim Identification Program (CVIP).



Intel's longstanding partnership with NCMEC has provided critical leadership, vision, and support. Thanks to its significant commitment, NCMEC has benefitted from Intel's unique expertise in technology trends such as AI, security, industry influence, reputation, and resources. NCMEC is able to address online harms to children with Intel's help.



Meta works closely with NCMEC to combat online child sexual exploitation. By participating in voluntary NCMEC industry initiatives, Meta is proactive in detecting child sexual abuse material on its systems and works to prevent continued victimization. Meta remains on the cutting edge by developing tools to protect children and sharing best practices with other online companies.



Microsoft's mission highlights child online protection at its core. It develops and shares technologies such as PhotoDNA and grooming detection techniques, invests in research to help better understand the threat of child sexual abuse online, works to educate consumers about keeping kids safe online, and promotes digital civility in all online interactions.



The Oak Foundation is committed to end child sexual abuse online and offline. It supports work that accelerates action at the community, national, and global levels. Thanks to its generous support, NCMEC is launching a first-of-its-kind Global Child Sexual Exploitation Policy Platform to drive advocacy, help create consistent global policy and legislation, and ensure efforts to combat online child sexual exploitation continue to modernize globally.



Old Navy places child safety as a core value and demonstrates this through its commitment to the Code Adam program, a protocol for store associates to follow if a child should become missing when in their store. Through Code Adam, Old Navy provides customers with child safety resources and works closely with law enforcement to create safer communities. Old Navy also hosts child safety events every May in honor of raising funds and awareness for NCMEC.

Palantir

Through its partnership with NCMEC, Palantir provides its data integration software in support of NCMEC's mission to help find missing children, reduce child sexual exploitation, and prevent future victimization. Palantir's software allows NCMEC's staff to find connections between disparate data sources, helping speed up and streamline its work to save the most vulnerable victims.



Verisign is a global provider of domain name registry services and internet infrastructure. Verisign donated the use of a new software tool to NCMEC, built in-house by Verisign technologies, which improves the process of acting against domain names that lead to websites that are hosting child sexual abuse material. Verisign's contribution of this powerful tool, along with its multiyear financial commitment, is valuable in helping NCMEC achieve our mission.



Zoom is committed to combating abuse and harm on its platform. It also supports NCMEC with both in-kind and financial contributions. Additionally, Zoom has developed new processes to help identify abuse before it happens. In addition to a generous financial contribution, Zoom provides vital in-kind products and services to NCMEC. These donations enable NCMEC to deliver important trainings, meet with stakeholders in need of NCMEC's resources and connect with child protection professionals, law enforcement officials, educators, families and survivors across the globe.

## GUARDIAN

Corporate partners at the Guardian level come from a variety of industries and have a substantial impact on NCMEC's work. Through their financial support, NCMEC is able to provide vital resources in communities.



The Australian Federal Police supports NCMEC in combatting the sexual exploitation of children, with an emphasis on CyberTipline reports involving Australia. Through its work, the AFP coordinates the Australian Centre to Counter Child Exploitation (ACCE), which provides a consistent, holistic, and coordinated response to counter the online exploitation of children.

flock safety

Flock Safety, the first public safety operating system for cities, has partnered with NCMEC since 2024 as part of its commitment to eliminating crime. Flock Safety's technology is helping thousands of communities across the U.S. help keep children safe, and has been instrumental in the safe recovery and return of hundreds of missing persons.



LexisNexis Risk Solutions supports NCMEC by sponsoring various events, including the annual Heroes' and Hope Awards, the Long-Term Missing Children Summit, and the creation and management of the ADAM Program, which has assisted in the recovery of missing children since 2000.



The National Crime Agency supports NCMEC's effort to combat the sexual exploitation of children, with an emphasis on CyberTipline reports involving the United Kingdom. Through its work, the NCA coordinates the Child Exploitation and Online Protection Command (CEOP), which is tasked to work both nationally and internationally to bring online child sex offenders – including those involved in the production, distribution, and viewing of child abuse material – to the U.K. courts.



Pokémon's work with NCMEC stems from a shared belief that all children have the right to be safe at play. Pokémon has provided generous financial support to critical prevention programming and other NCMEC initiatives that help make the world a safer place for children.



Ring works to increase awareness of missing children by leveraging the power of neighborhood communities to help reunite missing children with their families. NCMEC missing child posters are featured directly on the Neighbors App by Ring to reach millions of engaged community members who can help bring more children home. Ring also donates funds to support NCMEC's mission.



Securitas promotes health and safety, champions children's causes, aids at-risk communities, and supports veterans. As NCMEC's first security industry partner, Securitas brings to life its values of integrity, vigilance, and helpfulness by mobilizing its 100,000 skilled North American officers across nearly 20,000 client sites to support the search for missing and exploited children. Securitas also leverages its 400 North American branch offices for timely distribution of NCMEC posters and alerts.

## SOLOVIEV GROUP

The Soloviev Group's seed investment is helping NCMEC launch its Global Child Sexual Exploitation Policy Platform, the first-of-its-kind platform developed to drive advocacy and help create consistent global policy and legislation to combat online child sexual exploitation.



Yubo is a global social network that connects millions of young people around the world every day. NCMEC and Yubo collaborate on leveraging technology and NCMEC's child protection information to reduce risk to young people, improve their digital awareness, and increase their online safety skills. Yubo's commitment to online safety is further exemplified by the company's ongoing efforts to remove child sexual abuse material from its platform.

## ALLY

Ally level supporters are critical to the work in finding missing children, reducing child sexual exploitation and preventing child victimization.



The AHLA Foundation is a key partner in amplifying hotel industry awareness of child protection issues, in support of its No Room for Trafficking initiative. They promote critical NCMEC resources to its members including ADAM Alerts, the NCMEC CyberTipline, and 1-800-THE-LOST. Through a generous monetary donation, the AHLA Foundation is strengthening NCMEC's fight to protect children from sex trafficking.



Airbnb is committed to providing safe experiences for hosts and guests. Through its partnership with NCMEC, Airbnb bolsters its safety and reporting protocols when there are suspected endangerments to children.



Disney has partnered with NCMEC to maintain a fun and safe online entertainment experience for children. The collaborative Teaching Digital Citizenship program arms educators, law enforcement officers, and others with the tools they need to teach internet safety to children ages five to 17. Disney's continued support allows NCMEC to further critical initiatives in child safety and prevention.



As an advocate for child safety, Lifetouch® is NCMEC's official provider of free child ID cards, the SmileSafe Kids card. Lifetouch understands that a current photo is one of the single most important resources in the recovery of a missing child. They staff a 24/7 rapid response team to provide current photos of missing children to NCMEC. This team has assisted with more than 2,400 searches, with SmileSafe Kids cards being credited in the recovery of children in 25 states.



Match works diligently to keep underage users off its platforms. Through its commitment to safety and zero tolerance of exploitation, Match helps to establish a safer online dating world.



Snap works closely with organizations like NCMEC because we know no one entity or organization can tackle these issues relating to online child sexual exploitation alone. We are honored to support NCMEC's critical work and to participate in global initiatives to combat child sexual exploitation and abuse online.

## SUPPORTER

The charitable contributions of partners at the Supporter level help provide hope to those who need it most.



DNA Labs International provides DNA testing to law enforcement agencies that may require assistance across the United States. By partnering with NCMEC, they can, when appropriate, help with cases that may require DNA technology. This support can assist victims and families in search of answers about their loved one.

DropBox builds safety practices with an emphasis on child protection.



GeoComply partners with NCMEC through sponsorship of key events and amplification of child protection legislation. Its support of NCMEC's mission underscores its dedication to protecting vulnerable online consumers and making the internet a safer place.



Grayshift supports those who fight to protect children by sponsoring NCMEC's annual Hero's Awards and critical training events for law enforcement.



Motorola Solutions supports NCMEC's professional education program that provides response training, technical assistance, and mental health resources to law enforcement personnel and others who investigate crimes against children.



Total Defense supports NCMEC in its mission to help find missing children, reduce child sexual exploitation, and prevent child victimization. It provides quarterly monetary support for NCMEC to provide important programs that assist missing and exploited children nationwide.



Vericast, formerly Valassis, has produced powerful and profound results in NCMEC's efforts to find missing children. In addition, Vericast employees hold fundraisers throughout the year to support NCMEC.

## IN-KIND CHAMPION

These partners provide access to tools, services and other resources that help further NCMEC's work to protect children.





































# CASE RESOURCE PARTNERS

These partners provide resources to survivors and families NCMEC supports and to NCMEC partners to assist on cases relating to missing and exploited children.























Become a Partner!

24-Hour Call Center: 1-800-843-5678

EN ES

| Blog | Media | Contact |
| Legal T&C | Donor Privacy | Our Impact |
| Careers | About Us | Leadership |
| Florida | New York | Texas |

Copyright © 2024 National Center for Missing & Exploited Children. All rights reserved.

This Web site is funded, in part, through a grant from the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice. Neither the U.S. Department of Justice nor any of its components operate, control, are responsible for, or necessarily endorse, this Web site (including, without limitation, its content, technical infrastructure, and policies, and any services or tools provided).

3.2.21.P

# Exhibit 530

# New Tools to Help Protect Against Sextortion and Intimate Image Abuse

about.fb.com/news/2024/04/new-tools-to-help-protect-against-sextortion-and-intimate-image-abuse/

February 6, 2024



Financial sextortion is a horrific crime. We've spent years working closely with experts, including those experienced in fighting these crimes, to understand the tactics scammers use to find and extort victims online, so we can develop effective ways to help stop them.

Today, we're sharing an overview of our latest work to tackle these crimes. This includes new tools we're testing to help protect people from sextortion and other forms of intimate image abuse, and to make it as hard as possible for scammers to find potential targets – on Meta's apps and across the internet. We're also testing new measures to support young people in recognizing and protecting themselves from sextortion scams.

These updates build on our longstanding work to help protect young people from unwanted or potentially harmful contact. We default teens into stricter message settings so they can't be messaged by anyone they're not already connected to, show Safety Notices to teens who are already in contact with potential scam accounts, and offer a dedicated option for people to report DMs that are threatening to share private images. We also supported the National Center for Missing and Exploited Children (NCMEC) in developing Take It Down, a platform that lets young people take back control of their intimate images and helps prevent them being shared online – taking power away from scammers.

## Introducing Nudity Protection in DMs

While people overwhelmingly use DMs to share what they love with their friends, family or favorite creators, sextortion scammers may also use private messages to share or ask for intimate images. To help address this, we'll soon start testing our new nudity protection feature in Instagram DMs, which blurs images detected as containing nudity and encourages people to think twice before sending nude images. This feature is designed not only to protect people from seeing unwanted nudity in their DMs, but also to protect them from scammers who may send nude images to trick people into sending their own images in return.

Nudity protection will be turned on by default for teens under 18 globally, and we'll show a notification to adults encouraging them to turn it on.

When nudity protection is turned on, people sending images containing nudity will see a message reminding them to be cautious when sending sensitive photos, and that they can unsend these photos if they've changed their mind.



Anyone who tries to forward a nude image they've received will see a message encouraging them to reconsider.



When someone receives an image containing nudity, it will be automatically blurred under a warning screen, meaning the recipient isn't confronted with a nude image and they can choose whether or not to view it. We'll also show them a message encouraging them not to feel pressure to respond, with an option to block the sender and report the chat.

When sending or receiving these images, people will be directed to safety tips, developed with guidance from experts, about the potential risks involved. These tips include reminders that people may screenshot or forward images without your knowledge, that your relationship to the person may change in the future, and that you should review profiles carefully in case they're not who they say they are. They also link to a range of resources, including Meta's Safety Center, support helplines, StopNCII.org for those over 18, and Take It Down for those under 18.

Nudity protection uses on-device machine learning to analyze whether an image sent in a DM on Instagram contains nudity. Because the images are analyzed on the device itself, nudity protection will work in end-to-end encrypted chats, where Meta won't have access to

these images – unless someone chooses to report them to us.

> *"Companies have a responsibility to ensure the protection of minors who use their platforms. Meta's proposed device-side safety measures within its encrypted environment is encouraging. We are hopeful these new measures will increase reporting by minors and curb the circulation of online child exploitation."* **–John Shehan, Senior Vice President, National Center for Missing & Exploited Children**.

> *"As an educator, parent, and researcher on adolescent online behavior, I applaud Meta's new feature that handles the exchange of personal nude content in a thoughtful, nuanced, and appropriate way. It reduces unwanted exposure to potentially traumatic images, gently introduces cognitive dissonance to those who may be open to sharing nudes, and educates people about the potential downsides involved. Each of these should help decrease the incidence of sextortion and related harms, helping to keep young people safe online."* *–***Dr. Sameer Hinduja, Co-Director of the <u>Cyberbullying Research Center</u> and Faculty Associate at the Berkman Klein Center at Harvard University.**

## Preventing Potential Scammers from Connecting with Teens

We take severe action when we become aware of people engaging in sextortion: we remove their account, take steps to prevent them from creating new ones and, where appropriate, report them to the NCMEC and law enforcement. Our expert teams also work to investigate and disrupt networks of these criminals, disable their accounts and report them to NCMEC and law enforcement – including several networks in the last year alone.

Now, we're also developing technology to help identify where accounts may *potentially* be engaging in sextortion scams, based on a range of signals that could indicate sextortion behavior. While these signals aren't necessarily evidence that an account has broken our rules, we're taking precautionary steps to help prevent these accounts from finding and interacting with teen accounts. This builds on the <u>work we already do</u> to prevent other potentially suspicious accounts from finding and interacting with teens.

One way we're doing this is by making it even harder for potential sextortion accounts to message or interact with people. Now, any message requests potential sextortion accounts try to send will go straight to the recipient's hidden requests folder, meaning they won't be notified of the message and never have to see it. For those who are already chatting to potential scam or sextortion accounts, we show <u>Safety Notices</u> encouraging them to report any threats to share their private images, and reminding them that they can say no to anything that makes them feel uncomfortable.

For teens, we're going even further. We already restrict adults from starting DM chats with teens they're not connected to, and in January we announced stricter messaging defaults for teens under 16 (under 18 in certain countries), meaning they can only be messaged by people they're already connected to – no matter how old the sender is. Now, we won't show the "Message" button on a teen's profile to potential sextortion accounts, even if they're already connected. We're also testing hiding teens from these accounts in people's follower, following and like lists, and making it harder for them to find teen accounts in Search results.

## New Resources for People Who May Have Been Approached by Scammers

We're testing new pop-up messages for people who may have interacted with an account we've removed for sextortion. The message will direct them to our expert-backed resources, including our Stop Sextortion Hub, support helplines, the option to reach out to a friend, StopNCII.org for those over 18, and Take It Down for those under 18.

We're also adding new child safety helplines from around the world into our in-app reporting flows. This means when teens report relevant issues – such as nudity, threats to share private images or sexual exploitation or solicitation – we'll direct them to local child safety helplines where available.

## Fighting Sextortion Scams Across the Internet

In November, we announced we were founding members of Lantern, a program run by the Tech Coalition that enables technology companies to share signals about accounts and behaviors that violate their child safety policies.

This industry cooperation is critical, because predators don't limit themselves to just one platform – and the same is true of sextortion scammers. These criminals target victims across the different apps they use, often moving their conversations from one app to another. That's why we've started to share more sextortion-specific signals to Lantern, to build on this important cooperation and try to stop sextortion scams not just on individual platforms, but across the whole internet.

# Exhibit 531

Case 1:20-cv-03590-JEB   Document 369-8   Filed 07/12/24   Page 396 of 573



Lower My AWS Bill

📅 04.21.2021

# S3's Durability Guarantees Aren't What You Think

**BY COREY QUINN**

S3 has insanely generous data durability guarantees. Even so, read the fine print, and you'll realize that S3 doesn't remove the need for backups.

Prev      Home ▸ Blog ▸ S3's Durability Guarantees Aren't What You Think      Next

For those unfamiliar, AWS's Simple Storage Service (or "S3") is an object store.

This is different from a file store or a block store because if you try to use it as one of those, a bunch of people will come out of the woodwork to yell at you for a variety of reasons.

Object storage is the most economical storage approach across multiple providers; the cloud collectively "took a vote" and object stores won.

Today, I want to highlight some of the guarantees AWS makes around your data.

## Availability

Availability describes the idea of "can I access the data that's stored in S3?" Except for that one time in 2017 where S3 went down in us-east-1, the availability of the service has been exceptional—far better than AWS is held to via their published SLAs for the service.

A 99.9% uptime guarantee means that the service can be down for as much as 1m26s a day, 43m49s a month, or 8h45m56s per year before they're in violation.

In practice, if S3 were down anywhere near that much on a consistent basis, the internet would have largely made other plans for where data was going to live. This is all fine and good—because it's not where I'm taking this post today.

## Durability

Durability describes the idea of "I have stored my data inside of S3; how much of that data have you lost?"

This is understandably a very different risk model than availability. "I can't reach my data" is one thing; "my data is lost and gone forever" is quite another.

Compared to the 99.9% availability guarantee, S3's durability design target numbers are the stuff of legend / absurdity: 99.999999999%. Amazon states that "if you store 10,000,000 objects with Amazon S3, you can on average expect to incur a loss of a single object once every 10,000 years."

This is well beyond the risk level of "gravity randomly stops working."

## Let's unpack that

I want to point out a few things that are worth noting.

First, this is presumably due to the number of different hard drives that the objects reside upon; I presume that it's using something similar to Reed-Solomon error correction / erasure coding.

In effect, you can imagine it as "your file is mathematically broken into 100 parts; any 70 of those parts are sufficient to reconstitute your file." Those parts are then strewn across different drives, locations, etc. The probability of those drives simultaneously failing is what gives that ridiculous durability number.

Second, AWS offers no formal SLA around data durability in S3. Okay, fine. It's clear the service works; reliable reports of S3 losing data are nonexistent. Let me save you some time if you're trying to negotiate your AWS contract to include custom SLAs: You won't get them.

Third and most relevant to what you should consider in your planning is that their durability target applies to a bunch of different S3 storage classes—including their One Zone Infrequent Access tier. This storage class saves money by only storing your data in a single availability zone, and thus wouldn't survive the destruction of that AZ.

Let's go back and restate that: Moving all of the hard drives that contain your data closer together (in some cases, into a single building) does not impact the durability metrics. From this, we can surmise that disasters aren't included in the calculation of S3's durability.

## What this means for you

In hindsight, this makes perfect sense.

The collapse of government and the takeover of an AWS region by roving gangs of bandits is orders of magnitude more likely than 0.000000001%. A bad push to the S3 control plane that doesn't get caught and eats all of your data is also more likely.

Realistically, winning the lottery while being struck by a meteorite and lightning at the same time as you're being abducted by aliens is more likely than that. All of the AWS regions can burn down eight times in a row and it's still more likely.

What this means here in reality is that using S3 doesn't remove the need for backups.

## Let me put that more bluntly

If you trust AWS's durability guarantees for important data, awesome. You should; they're good numbers.

But what are the odds of someone in your organization (accidentally or otherwise) deleting critical data from the wrong bucket or misconfiguring a lifecycle policy to do it for them?

Backing your data up elsewhere is a great idea if your business is going to have a hard time existing without it. "Another region" is a good idea; "another AWS account that nobody from the first account has access to" is a better one; and "another cloud provider entirely" is the easiest one to explain to your Risk Management people.

## And so…

I'm not suggesting that AWS is doing anything wrong by citing these numbers.

I just know that I've spoken to folks who have used the durability numbers as evidence that they don't need to worry about backing things up.

6/24/24, 10:01 AM                              Discounting Guarantees at Work too | Last Week in AWS Blog

And that frankly scares the hell out of me. So I implore you: Don't do that!

---



### by Corey Quinn

Corey is the Chief Cloud Economist at The Duckbill Group, where he specializes in helping companies improve their AWS bills by making them smaller and less horrifying. He also hosts the "Screaming in the Cloud" and "AWS Morning Brief" podcasts; and curates "Last Week in AWS," a weekly newsletter summarizing the latest in AWS news, blogs, and tools, sprinkled with snark and thoughtful analysis in roughly equal measure.

## More Posts from Corey

[Back to the Blog]

### Changing of the Guard: "AWS Appoints Matt Garman as CEO"

BY COREY QUINN

This morning's announcement that Adam Selipsky would be stepping down

### AWS's (de)Generative AI Blunder

BY COREY QUINN

AWS has been very publicly insecure about the perception that it's lagging behind in the Generative AI space for the past year. Unfortunately, rather than

### Generative AI Builds a re:Invent Scavenger Hunt

BY COREY QUINN

Let's begin with the tl;dr: At this year's re:Invent, I'm hosting a photo scavenger hunt with significant prizes for "most items found" and "most creative entry."



## Get the newsletter!

Stay up to date on the latest AWS news, opinions, and tools, all lovingly sprinkled with a bit of snark.

Email Address

Sign Me Up!

The world of cloud takes itself far too seriously. We aim to change that.

Lower my AWS bill, please!

Newsletter          About

Podcasts            Contact

Blog                Sponsorships

Merch               Disclosures

Contribute

Scalability Guarantees | The Duckbill Group



© 2024 The Duckbill Group. All Rights Reserved.   Privacy Policy   Cookie Policy

# Exhibit 532

FORBES > INNOVATION > CONSUMER TECH

# Amazon S3 Outage Has Broken A Large Chunk Of The Internet

**Ryan Whitwam** Former Contributor ⓘ 

*A lover of Android, keyboards, and other things that go beep.*

Feb 28, 2017, 04:01pm EST

Updated Feb 28, 2017, 04:11pm EST

🕐 **This article is more than 7 years old.**



Amazon Web Services, via Amazon

Amazon is best known as an online retailer that sells just about anything you can think of. However, it also runs a massive web hosting service called Amazon S3, which stands for Simple Storage Service (a part of Amazon Web Services). A huge number of websites store content and run services with Amazon S3, and Amazon is currently reporting "high error rates." That means a lot of things are broken.

When the problems started earlier today, Amazon's status dashboard wasn't even showing a problem. The company did manage to fix that after a few hours—it now says the issues

Privacy · Terms

stem from the US-EAST-1 region, which likely refers to the Amazon data center in the Ashburn, Virginia area. Services relying only upon S3 in other parts of the US and other regions around the world are not impacted.

Amazon S3 is used by more than 120,000 domains across the world. Some of the major sites and services affected by the outage include Quora, Giphy, Instagram, IMDb, American Airlines, Imgur, and Slack. In some cases entire sites are offline, but in others it's just parts of the service. For example, Slack users can't upload files to their group chats at the moment, but the chat still works. Amusingly, the outage tracking website Is It Down Right Now is down right now because of the S3 outage. A number of smart home devices that rely on S3 for parts of their functionality are also experiencing problems. So yes, your lights might not work because of a problem at Amazon's data center. What a time to be alive.

> For S3, we believe we understand root cause and are working hard at repairing. Future updates across all services will be on dashboard.
>
> — Amazon Web Services (@awscloud) February 28, 2017

Amazon is providing updates on the situation via the Amazon Web Services Twitter account. In the early afternoon, Amazon reported that its engineers had identified the root cause of the outage, but offered no further information. There have been no apparent improvements in the state of S3 an hour after that announcement. Work to fix the problem continues. Until then, maybe take a walk.

---

**Forbes Daily: Join over 1 million Forbes Daily subscribers and get our best stories, exclusive reporting and essential analysis of the day's news in your inbox every weekday.**

| Email address | Sign Up |
|---|---|

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

---

 **Ryan Whitwam**

Ryan is a writer, skeptic, lover of all things electronic, and Android fan. He writes words about all these, and hopes you'll read some of them. Ryan's... **Read More**

Editorial Standards                                                    Reprints & Permissions

ADVERTISEMENT

# Exhibit 533

July 09, 2015

# Amazon Web Services Announces AWS Device Farm

*New service makes it easy for developers to automate and scale app testing on real mobile devices to deliver higher quality apps*

SEATTLE--(BUSINESS WIRE)--Jul. 9, 2015-- Amazon Web Services, Inc. (AWS), an Amazon.com company (NASDAQ:AMZN), today announced AWS Device Farm, a new service that helps mobile app developers quickly and securely test their apps on smartphones, tablets, and other devices to improve the quality of their Android and Fire OS apps. Developers can upload their apps and run tests simultaneously on all of the most commonly used mobile devices across a continually expanding fleet that includes the latest device/OS combinations. As tests complete, developers receive timely reports that identify problems, helping them bring their apps to market faster and with better quality. There is no setup cost to get started with AWS Device Farm, and developers pay as they go. To learn more about AWS Device Farm, visit: http://aws.amazon.com/device-farm.

Today, to test mobile apps, developers most often rely on manual testing of their apps. They use emulators that try to simulate the behavior of real devices, or they rely on their own collection of local devices that only cover a small set of the overall device market. Developers also have to address variations in firmware and operating systems, maintain operation with intermittent network connectivity, integrate reliably with back-end services, and ensure compatibility with other apps running on the device. Now, AWS Device Farm gives developers access to a fleet of devices that includes all the latest hardware, operating systems, and platforms so they can instantly test their apps across a large selection of Android and Fire devices, and integrate these tests into their continuous deployment cycle. AWS Device Farm removes the complexity and expense of designing, deploying, and operating device farms and automation infrastructure so that developers can focus on delivering the best app experience to their customers. Developers simply upload their Android or Fire OS application and select from a catalog of devices. Then, developers can configure AWS Device Farm's built-in test suite to verify functionality with no scripting required, or they can choose from a range of popular, open-source test frameworks like Appium, Calabash, and Espresso.

"For mobile app developers, delivering high-quality apps across all of the different device and OS combinations is a major effort – it's time consuming, complicated, and expensive. And, as new devices continue to enter the market, developers are looking for an easier way to build and test across them," said Marco Argenti, Vice President, AWS. "AWS Device Farm gives developers a very simple and cost-effective way to test the real user

experience of their apps across multiple device types at scale. And, when used along with other AWS Mobile Services like Amazon Cognito, AWS Lambda, Amazon API Gateway, and Amazon Simple Notification Service (Amazon SNS), developers have a full platform that makes it even easier to build, deploy, test, and iterate great mobile apps."

Developers can use AWS Device Farm to test real-world customer scenarios, fine-tuning test environments with a broad set of device configurations, including language, location, app data, and app dependencies. AWS Device Farm also makes it easy for developers to focus on the most important issues by providing comprehensive, actionable reports as tests are completed. AWS Device Farm automatically identifies and groups identical errors across multiple devices, allowing developers to quickly and efficiently analyze data from potentially hundreds of tests.

"New Relic is a product-first company and AWS Device Farm removes the logistics and expense of maintaining a test lab, which has allowed our mobile engineering team to stay more focused on our product," said Patrick Lightbody, Vice President, Product Management at New Relic. "AWS Device Farm's simple UI has made deployment easier, enabling New Relic to more rapidly test across a wide variety of hardware and provide valuable results in minutes. With Device Farm, we have been able to develop New Relic Mobile into a product that can help developers build high-performance, stable mobile applications for every device."

PikPok is a New Zealand-based publisher of fun and addictive games with 100s of millions of customers playing on smartphones, tablets, and desktops, including "Into the Dead," "Turbo Racing League," and "Flick Kick Football Legends." "AWS Device Farm has been delivering great results for our games," said Tyrone McAuley, PikPok. "With AWS Device Farm, we've been able to test our games incredibly efficiently and cost effectively at scale. Device-specific issues are identified rapidly, we're testing more often, getting results faster, and our customers are seeing fewer issues. Great for both player satisfaction and the bottom line!"

Financial services companies use First Performance Global's technology platform to connect and engage with credit card users. "In the financial technology industry, quality assurance is at the forefront of our focus," said Sosh Howell, Director of Technology, First Performance Global. "Until now, it has been cumbersome to test how our mobile apps work across every possible device and platform combination. AWS Device Farm helps us streamline our testing procedures and allows us to provide our clients with stable and consistent products."

**About Amazon Web Services**

Launched in 2006, Amazon Web Services offers a robust, fully featured technology infrastructure platform in the cloud comprised of a broad set of compute, storage, database, analytics, application, and deployment services

from data center locations in the U.S., Australia, Brazil, China, Germany, Ireland, Japan, and Singapore. More than a million customers, including fast-growing startups, large enterprises, and government agencies across 190 countries, rely on AWS services to innovate quickly, lower IT costs and scale applications globally. To learn more about AWS, visit http://aws.amazon.com.

**About Amazon**

Amazon.com opened on the World Wide Web in July 1995. The company is guided by four principles: customer obsession rather than competitor focus, passion for invention, commitment to operational excellence, and long-term thinking. Customer reviews, 1-Click shopping, personalized recommendations, Prime, Fulfillment by Amazon, AWS, Kindle Direct Publishing, Kindle, Fire phone, Fire tablets, and Fire TV, and Amazon Echo are some of the products and services pioneered by Amazon.

View source version on businesswire.com: http://www.businesswire.com/news/home/20150709005949/en/

Source: Amazon Web Services, Inc.

Amazon.com, Inc.

Media Hotline, 206-266-7180

www.amazon.com/pr

# Exhibit 534

POSTED ON JULY 27, 2022 TO DEVINFRA

# Programming languages endorsed for server-side use at Meta



By Eric Garcia

  

- Supporting a programming language at Meta is a very careful and deliberate decision.
- We're sharing our internal programming language guidance that helps our engineers and developers choose the best language for their projects.
- Rust is the latest addition to Meta's list of supported server-side languages.

At Meta, we use many different programming languages for a wide variety of platforms and use cases. Supporting a new language is not a decision we make lightly. It's important that every language we adopt is the best fit for a particular use case, so we do a high level of diligence whenever we evaluate a language. Language decisions tend to stick once they're made, so we want to be deliberate from the onset to give our engineers the best tools to work with.

Today, we're sharing insights into our internal guidance on the various languages that play an important role at Meta — and specifically our server-side programming languages, to which Rust is the latest addition.

## What is a supported language at Meta?

Before we get into the individual details, here's what *supported* means (and doesn't mean) within Meta:

- If a language is *supported*, developers can count on getting a good experience with code editing, debugging, build, and deployment, as well as core libraries and interoperability. Developers can also count on that experience not going away — they won't be asked to move off a supported language. For most cases, Meta recommends choosing a supported language for new projects and services.

1/8

- Fully supporting a language is a major investment for Meta, so "long tail" languages are *community supported*. For those languages, there are far fewer guarantees, and teams adopting them will have to take on the maintenance burden. In most cases, teams should avoid using them for new applications, unless a team already has a significant investment in the language.

**Meta's primary supported server-side languages are Hack, C++, Rust, and Python**.

- For performance-sensitive back-end services, we encourage C++ and Rust. Rust is a new addition to this list. There's a rapidly increasing Rust footprint in our products and services, and we're committing to Rust long-term and welcome early adopters.
- For CLI tools, we recommend Rust. This is a new recommendation for this year.
- For business logic and relatively stateless applications, the Hack ecosystem has the highest level of automation and support at Meta and is the recommended language.
- Finally, Meta continues to heavily support our Python developers. For data science, ML applications, and Instagram, Python continues to be the language of choice, and we continue to invest in the experience with this ecosystem.
- For specific use cases, we support other languages, including Java, Erlang, Haskell, and Go. These languages are currently not widely supported outside of specific use cases.

## How did we arrive at our list of supported languages?

Let's explain why we have a supported language list and why we're generally reluctant to add languages to that list (although Rust is a new addition). The main reason is that it takes a significant engineering investment to support a programming language at Meta scale, and that cost is broadly distributed — not just borne by its users. Some examples:

- **Support for core libraries.** There are very few isolated services, and the fewer languages we have, the less burden there is on core libraries.
- **Security and privacy.** A fragmented stack raises the complexity of building important security and privacy features into our services.
- **Operational risk.** If some service encounters a critical issue, it will require immediate assistance. We've built up incredible amounts of expertise in diagnosing and resolving production issues, and our incident response relies on being able to read, understand, and debug services to help in a major incident. Avoiding fragmentation reduces operational risk.
- **Expertise.** We build and maintain a critical mass of engineers with expertise in each of these languages.
- **Developer experience.** Supported languages have teams working on improving areas like IDE support, build speed, debugging experience, and more.

Choosing a suboptimal language for a project can be costly in terms of time, efficiency, and productivity. So, it's worth putting every language we evaluate under a heavy amount of scrutiny. The examples above demonstrate just how much investment we put into supporting a language.

## Rust is the latest server-side language at Meta

Since we began our journey with Rust, the number of projects using Rust inside Meta has increased at an accelerated rate. We're excited to see Rust added to this list of server-side supported languages, giving our engineers more tools, flexibility, and support for their work. Meta is committed to provide long-term support for programming languages used by our developer, and this move signals Meta's long-term commitment and support for the Rust language ecosystem.



**◀ Prev**

[Launching Instagram Messaging on desktop](Launching Instagram Messaging on desktop)

**Next ▶**

[Five security principles for billions of messages across Meta's apps](Five security principles for billions of messages across Meta's apps)



## Read More in DevInfra

View All ▶



JUN 10, 2024

Serverless Jupyter Notebooks at Meta



MAY 22, 2024

Composable data management at Meta



MAR 18, 2024

Logarithm: A logging engine for AI training workflows and services




EPISODE 60

# Simplified Executable Deployment with Dotslash

Michael B.

Pascal H.

Andres S.

Meta Tech Podcast

∞ Meta

FEB 26, 2024

How DotSlash makes executable deployment simpler




FEB 20, 2024

Aligning Velox and Apache Arrow: Towards composable data management



FEB 12, 2024

Meta loves Python

## Related Posts



Apr 29, 2021

A brief history of Rust at Facebook



Apr 26, 2022

SQL Notebooks: Combining the power of Jupyter and SQL editors for data analytics



May 02, 2022

How the Cinder JIT's function inliner helps us optimize Instagram

## Related Positions

Software Engineer (Technical Leadership) – Privacy Tech

MENLO PARK, US

Software Engineer, Audio Applied Scientist – Remote Presence

BELLEVUE, US

Software Engineer, Audio Applied Scientist – Remote Presence

MENLO PARK, US

Software Engineer – Datacenter networking

BELLEVUE, US

Software Engineer – Datacenter networking

MENLO PARK, US

See All Jobs

## Available Positions

Software Engineer (Technical Leadership) – Privacy Tech
MENLO PARK, US
Software Engineer, Audio Applied Scientist – Remote Presence
BELLEVUE, US
Software Engineer, Audio Applied Scientist – Remote Presence
MENLO PARK, US
Software Engineer – Datacenter networking
BELLEVUE, US
Software Engineer – Datacenter networking
MENLO PARK, US

See All Jobs

## Technology at Meta



Engineering at Meta - X

Follow



AI at Meta

Read



Meta Quest Blog

Read

## Open Source

Meta believes in building community through open source technology. Explore our latest projects in Artificial Intelligence, Data Infrastructure, Development Tools, Front End, Languages, Platforms, Security, Virtual Reality, and more.



ANDROID



iOS



WEB





Meta for Developers

Read



BACKEND

HARDWARE

Learn More



Meta Bug Bounty

Learn more



RSS

Subscribe

 Meta

Engineering at Meta is a technical news resource for engineers interested in how we solve large-scale technical challenges at Meta.

Home

Company Info

Careers

© 2024 Meta

TermsPrivacyCookiesHelp

# Exhibit 535

## REFORMS TO THE MERGER REVIEW PROCESS

### Announcement by

### Deborah Platt Majoras
### Chairman, Federal Trade Commission

### February 16, 2006

The Federal Trade Commission spends substantial time and resources reviewing proposed mergers and acquisitions to determine whether their effect "may be substantially to lessen competition, or to tend to create a monopoly."[1]  Most reviewed transactions are reported to the FTC and the Department of Justice's Antitrust Division (the "agencies") pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act").[2]  Each year, more than 95% of all HSR-reported transactions are "cleared" during the initial 30-day waiting period, as the respective agency determines that the transaction is unlikely to lessen competition substantially.  For the remaining transactions, the reviewing agency issues a request for additional information (known as a "second request"), which requires the parties to provide the agencies with documents and data from their paper and electronic files.  The agencies issue second requests when additional information is needed to perform a proper analysis under the antitrust laws.

The HSR Act is an important component of U.S. antitrust merger policy.  The law provides the agencies with the time and ability to review and, when appropriate, challenge mergers prior to consummation when they are likely to be anticompetitive.  Since the HSR Act became operational in 1978, however, merging parties' burdens in responding to second requests have increased substantially, as have the burdens of

---

[1] 15 U.S.C. § 18.

[2] 15 U.S.C. § 18a.

agency staff in reviewing and analyzing the documents and information provided. Parties today advise that complying with a second request in a significant transaction routinely costs millions of dollars and requires months to respond.

While a number of factors have contributed to the greater burden, two developments in particular have combined to increase the volume of materials produced in response to second requests. First, standards for reviewing transactions have changed substantially since the passage of the HSR Act, such that today the agencies rely less on readily apparent structural indicators, such as market shares, and more on detailed and direct market analyses. Such direct market analyses are fact intensive, and can require substantial volumes of documents and quantitative data. Second, advances in technology – from the copy machine to e-mail – have resulted in companies' producing and retaining substantially more documents. This increased number of documents places burdens on firms that must respond to second requests and presents challenges to our agency staff, who must locate the relevant information in the parties' large productions.

To address the increased burden on parties and the staff, the FTC will implement new guidelines and procedures that will apply to the second request process. These guidelines and procedures will take effect for all HSR filings submitted on or after February 17, 2006. The reforms are intended to streamline the merger review process by formalizing well-defined best practices. They are designed to facilitate rapid identification of the relevant issues, preparation of more focused second requests, and use of consistent investigation timetables. The reforms also are designed to improve the FTC's merger review processes by making staff, the parties, and outside counsel more

accountable for deviations from the best practices. This document provides an overview of the reforms and explains their purpose and how the FTC will implement them.

## Background of the Merger Review Process

The antitrust merger review process is a vital component of U.S. antitrust law and economic policy. Mergers and acquisitions are important mechanisms for transferring resources to their most productive use. These transfers can increase price competition, efficiency, and innovation, to the substantial benefit of U.S. consumers. Some transactions, however, can produce or enable the exercise of substantial market power by eliminating competition between close competitors, or by enabling firms to engage in anticompetitive coordination. Such transactions reduce the overall efficiency of the U.S. economy and can cause significant harm to American consumers.

### Antitrust Merger Laws

The FTC and the Antitrust Division have authority to bring court actions to enjoin transactions that are likely to reduce competition substantially.[3] The FTC also may challenge anticompetitive mergers through administrative litigation.[4] The FTC reviews transactions in many industries that are vital to the American economy and consumers. These industries include pharmaceuticals, oil and gas, computer hardware, and many retail food products. This work, combined with the Antitrust Division's review of mergers in other critical industries, such as telecommunications, electricity, financial services, and steel, likely saves U.S. consumers hundreds of millions of dollars each year, by deterring, blocking, and modifying transactions that would have resulted in higher prices, lower levels of service, and reduced innovation.

---

[3] 15 U.S.C. §§ 25 and 53(b).

[4] 15 U.S.C. § 45(b).

In 1976, Congress increased the agencies' ability to enforce the antitrust laws with respect to mergers and acquisitions when it passed the HSR Act. The HSR Act requires parties to transactions of a specified size to notify the FTC and DOJ of their intention to consummate a merger or acquisition, and then wait until at least the expiration of an "initial waiting period" (usually 30 days) before they complete the transaction. Over the past five years, the agencies have "cleared" approximately 95% of all transactions reported under the HSR Act during the initial waiting period.[5]

The HSR Act also provides that if either agency determines during the initial waiting period that additional inquiry is necessary, the agency may issue a second request. A second request extends the waiting period for a specified time period (usually 30 days) after the parties have substantially complied with the request. While the FTC and DOJ jointly drafted a "Model Second Request," in most instances, the agencies issue second requests that are variations on the model that have been customized for particular industries.

### Second Requests

Second requests are essential to the merger review process because they enable the FTC and DOJ to determine and document with facts, rather than guesswork and speculation, whether certain transactions are likely to be anticompetitive. The agencies exercise significant restraint in issuing second requests. Between 1998 and 2005, the agencies issued second requests at an annual rate of between 2% and 4.1% of the total

---

[5] The HSR process substantially increased the accuracy and consistency of the merger review process because it enabled the agencies to review transactions before consummation, and standardized some merger review procedures. Before the passage of the HSR Act, the agencies often learned about a transaction after it had closed. Antitrust review of completed transactions proved expensive, and in some cases impractical, because the merging parties quickly combined their operations.

number of reportable transactions.  During this period, the majority of the investigations in which the FTC issued a second request resulted in a merger challenge, consent order, or modification to the transaction, suggesting that the FTC generally issues second requests only when there is a strong possibility that some aspect of a transaction would violate the antitrust laws.  From 1998 to 2005, the annual percentage of second request investigations by the FTC that resulted in some type of enforcement action ranged from 44% to 78%.

**Ratio of Enforcement Actions to Second Requests, Issued FYs 1998 to 2005**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| **Federal Trade Commission Second Requests** | 46 | 45 | 43 | 27 | 27 | 15 | 20 | 25 |
| **Number resulting in challenges, consents, restructurings, etc. [1]** | 33 | 35 | 33 | 12 | 19 | 10 | 10 | 12 |
| **% resulting in challenges, etc.** | 72% | 78% | 77% | 44% | 73%[2] | 67% | 50% | 57%[2] |

Notes:
1.  These data refer to the number of Second Requests issued in the specified fiscal year that resulted in a challenge, regardless of whether the challenge occurred in the same fiscal year.
2.  The percentages are computed with respect to the number of matters closed.  One second request issued in 2002 and four second requests issued in 2005 relate to matters that are still open.  The circumstances surrounding second request investigations that are still pending are not public information.

Despite the small number of second requests issued each year, and the relatively high percentage of second request investigations that result in some form of antitrust enforcement action, the second request process remains controversial.  The primary sources of concern are the cost and time required to comply.  The parties and the agencies often spend millions of dollars to collect, review, and analyze the responsive materials, and second request investigations can take a substantial amount of time, often ranging from six to nine months.

While responding to second requests always has involved substantial expense, in recent years complying has become even more costly and complex, primarily due to

fundamental changes in antitrust analysis and in technology. First, the FTC relies less on market shares and structural indicators and more on direct analysis of competitive effects. In the 1970s, the agencies and the courts primarily relied on structural presumptions that used market shares and concentration ratios to evaluate and ultimately challenge transactions. Transactions that resulted in a company's obtaining a high or even moderate-sized market share often were presumed unlawful, unless the parties to the transaction could produce compelling evidence that the transaction was not likely to reduce competition. Today, the agencies focus more on direct analysis of the competition in the market at issue. For mergers that raise significant competitive concerns, it is routine to attempt to assess the transactions' competitive effects with econometric models, which often can be highly fact-intensive and require large data sets and other information. For example, contemporary merger investigations often involve economic modeling of competitive bidding situations in the market at issue. There is widespread agreement within the antitrust community that the direct analysis of competitive effects has produced more reliable results than heavy reliance on structural presumptions, but an unintended collateral effect has been to increase the burden on the parties and the agencies.

Second, lower costs of storing electronic documents and the ubiquitous use of computers have substantially increased the number of electronic documents that firms produce and retain, which in turn has increased the size of many second request productions. Several years ago, the FTC received only two productions of over one million pages in its fiscal year; last fiscal year, the FTC received nine such productions. The growth in the number of electronic documents has increased the volume of

potentially relevant materials and raised substantial technical document production challenges due to the wide array of software and formats used to produce and manage electronic documents.

### Reform to the Merger Review Process

Despite these challenges, the merger review process works well for many transactions, with staff capturing sufficient information to conduct the appropriate analysis with minimal burdens. Further, some complaints about the process are misplaced and unrealistic; the FTC typically cannot analyze a merger that falls into the very limited number that require close scrutiny in the manner required by the antitrust laws with only limited information about the transaction and the relevant markets. Thus, large electronic document productions (with their attendant costs), combined with the use of complex direct analyses of competitive effects, sometimes are required to protect American consumers.

Nonetheless, reform of the merger review process is necessary to adapt to current legal standards and technology. Our job is to serve the public, and if we are not continually working to improve and to make the merger review process as effective and efficient as possible, then we are not fulfilling our mission for consumers. Waste and inefficiencies in the process are paid for by taxpayers, shareholders, and consumers – and they are one and the same.

Over the past year, a team of FTC staff, forming our Merger Process Task Force, has assessed our merger review process. The Task Force has explored many issues, including the improvement of the FTC's technology to receive and review electronic productions and changes to the FTC's internal procedures. Our first set of reforms is

directed at the second request process because of its rapidly rising costs, and because the process is the area of greatest concern.

The fundamental approach of the reforms announced today is to turn well-accepted best practices into formal components of the merger review process. A core objective is to lower the costs of merger investigations for the FTC and the parties by reducing the volume of materials that parties must produce to respond to a second request. The reforms also are designed to permit staff, in cooperation with the parties, to identify rapidly the relevant substantive issues and focus more quickly and effectively on the relevant documents and data. To mandate smaller second requests, without giving staff the ability more effectively to determine the sources of the relevant information, would not produce durable benefits. Finally, the reforms are intended to control costs by reducing the volume of electronic storage materials that parties need to preserve, eliminating the need for most multiple searches of employees' files, and reducing the size of privilege logs.

Three additional points are worth noting. First, given the highly fact-specific nature of merger analysis, views vary within the agency on how to reduce the burdens of the merger review process without sacrificing the quality of the investigation. Views among merger practitioners on this issue vary as well. The reforms are designed to improve, rather than diminish, the FTC's ability to conduct merger investigations and to challenge anticompetitive transactions, while lessening the burdens on all involved.

Second, comprehensive review of the merger review process reveals the significance of the "human" element. In our effort to identify why the process has broken down in some but not all cases, it became clear that conduct of staff or the parties that is

perceived as unreasonable or untrustworthy can significantly disrupt and prolong a merger investigation. Not surprisingly, the process works most effectively and efficiently when staff and outside counsel and their clients communicate effectively and work in a cooperative and professional manner. These reforms are intended to demonstrate the FTC's good faith intention to work hard to minimize the burdens of the merger review process. We anticipate that parties, in turn, will approach the merger review process in a spirit of cooperation.

Finally, today's rollout of reforms does not mark the conclusion of our work in this area, even as concerns second requests. We will continue to work on mechanisms and procedures that will reduce the scope of document and data requests and improve our logistical processes.

### Merger Review Process Reforms

The Bureaus of Competition and Economics will implement the following reforms to the merger review process.

1. <u>**Custodian Presumption**</u>

   **A. There will be a presumption that the FTC will not require a party to a transaction to search the files of more than 35 of its employees[6] to comply with a second request, provided that the party:**

   **(1) provides staff with the organization charts specified in the second request, or provides equivalent materials that allow staff to identify the party's employees and their positions;**

   **(2) makes at least one of its employees available to meet in person with staff to inform staff about the responsibilities of those employees of the party who have knowledge about (a) the transaction, (b) the relevant products or services, and (c) the other issues identified in the second request, and after this "Initial Meeting," continues to make its employees available on a reasonable basis, either in person or by telephone, until**

---

[6] The term "employee" includes any officer, director, employee, or agent of the party.

staff has the information that is reasonably necessary to designate a search group;

(3) provides staff, if staff requests after the Initial Meeting, with brief written descriptions of the responsibilities of a limited number of employees who have been reasonably designated by staff, within seven business days of the receipt of a request by staff;

(4) makes available to meet with staff in person at least one employee who is knowledgeable about how the party collects, maintains, and uses the types of data specified in the second request, and the databases and other software used by the party to store and analyze the data, and after this "Initial Data Meeting," continues to make its employees available on a reasonable basis, either in person or by telephone, until staff and the party agree upon the data to be produced; [7]

(5) produces the materials responsive to the second request 30 days before formally certifying substantial compliance with the second request or agrees to a mutually acceptable "rolling" production or other form of timing agreement; and

(6) agrees to propose to the court jointly with the FTC a scheduling order that contains at least a 60-day discovery period, if the FTC challenges the transaction in an adjudicative forum. [8]

**B.** Staff promptly will notify the party of the identities of the 35 or fewer employees whose files the party is required to search once the party has provided staff with the information that is reasonably necessary for staff to designate the search group.

**C.** The files of an employee in a search group shall be considered to include all hard copy and electronic files of all persons responsible for maintaining the files of the employee, including the employee's personal assistants, secretary, or persons with the same or similar responsibilities.

**D.** The restriction on the number of employees in a party's search group does not apply to requests for information contained in "corporate" or "central" files, such as central databases, budgets, contracts, and financial reports.

---

[7] Staff may agree to waive the requirements in paragraphs 1(A)(2) and 1(A)(4) that a party make its employees available in person for the Initial Meeting and the Initial Data Meeting.

[8] Staff may agree to a scheduling order with a shorter discovery schedule.

**E.  The party will not be required to produce its privilege log until it certifies that it has substantially complied with the second request.**

**F.  The Director of the Bureau of Competition may authorize a larger search group for a party when it is reasonably likely that a larger search group is necessary for the FTC to analyze a transaction's potential competitive effects.  Staff shall notify the party if staff asks the Director to authorize a larger search group, and, when reasonably feasible, shall notify the party of the identities of the employees whom staff believes should be included in the search group.  Before the Director decides whether to grant staff's request, the party will be entitled to meet or confer with the Director to present its views on why the search group should be limited to no more than 35 employees.[9]  The Director will promptly decide whether to authorize a larger search group after receiving the views of the party.  If the Director authorizes a larger search group, the party will not be required to comply with the requirements contained in paragraphs 1(A)(5)-(6) of the custodian presumption.**

The most difficult issue that the FTC confronted during its evaluation of the merger review process was whether to limit the number of the employees (often referred to as "custodians") whose files the FTC may require a party to search to comply with a second request.  The information required to conduct merger investigations varies substantially due to differences in the number of product and geographic markets, differences in how businesses are conducted and organized, and the degree of complexity of the competitive issues.  It is clear that there is no "one-size-fits-all" search group for every transaction.  At the same time, it is equally clear that the size of the search group is one of the most important determinants of the total cost of most merger investigations. The number and type of the specifications in a second request affect the cost and size of productions, but to a much smaller degree than the number of employees in the search group.  This is because many of the costs involved in searching an employee's files are fixed.

---

[9] The party may meet or confer in person or by telephone with the Director, or may present its views in writing.

The strong relationship between search group size and investigation cost warrants adopting procedures that ensure that the number of employees whom parties are required to search is not greater than necessary. Therefore, the FTC will establish a presumptive limit of 35 employees for a party's search group ("custodian presumption"). To utilize the custodian presumption, a party must provide staff with the organization charts (or equivalent materials) required by the second request and with the specified additional information and access to its employees (described above), produce the materials responsive to the second request 30 days before formally certifying substantial compliance (or enter into a mutually acceptable rolling or other form of timing agreement), and, if the FTC challenges the transaction, agree to propose to the court jointly with the FTC a scheduling order that contains at least a 60-day discovery period.

### Size of the Custodian Presumption

The FTC will implement a presumptive limit of 35 employees per party because our experience suggests that search groups of that size are likely to be sufficient for the FTC to analyze the competitive effects of most of the transactions that the FTC reviews. The presumption number does not preclude staff and the parties from negotiating smaller search groups, as has occurred in past practice. In some circumstances, smaller search groups will be appropriate. The presumption level is not intended to function as a "floor" on the number of employees in a search group.

The FTC considered but ultimately rejected establishing a range of presumptive custodian limits that are tied to the size of the transaction or the type of industry. The added costs in the complexity of such an approach likely would have outweighed the flexibility it might provide. Nor does it appear viable to limit search groups only to

certain types or categories of employees. We have reviewed "hot documents" from prior investigations to determine whether there was a reasonably clear pattern of plainly relevant documents in the files of persons holding certain positions. The review did not reveal such a pattern.

An absolute cap on the number of custodians in a search group also was rejected. As stated, there is no one-size-fits-all search group. Some investigations almost certainly will require search groups that are larger than 35 custodians per party. For example, a larger search group probably would be needed to review a merger of firms that have retail gasoline operations in many geographic markets. Similarly, a merger that implicates a large number of product markets also may require more than 35 employees per party in the search groups. To address these situations, staff may request that the Director of the Bureau of Competition authorize staff to exceed the presumptive limit. The Bureau Director may authorize a search group that exceeds 35 employees by an amount determined by the Bureau Director when it is reasonably likely that a larger search group of that amount is necessary for the FTC to analyze a transaction's competitive effects. Staff shall notify the potentially affected party if staff requests authorization to use a larger search group. The affected party will have the right to meet or confer with the Bureau Director or a Deputy Director before the Director decides whether to authorize staff to exceed the presumption level.

### **Access to the Parties' Employees**

To narrow a party's second request search group and the overall scope of a second request, staff requires accurate and complete information about the responsibilities of the party's employees and the nature of its relevant operations. When negotiating search

13

groups, staff sometimes encounters outside counsel or party representatives who lack this information, which can lengthen the time required to modify the second request and make it difficult to designate a narrow search group.

It is particularly important that staff have accurate information about a party's employees and operations when a presumptive limit applies to the number of employees in a search group.  Accordingly, the reforms provide that, for the custodian presumption to apply to a party, after the party provides staff with the required organization charts (or equivalent materials), the party must make available, to meet in person with staff, one or more of its employees who are knowledgeable about (a) the responsibilities of the party's employees likely to have relevant materials, (b) the party's relevant business operations, and (c) the relevant quantitative data.  The party must continue to make its employees available on a reasonable basis, either in person or by telephone, until staff and the party agree upon a search group, and until staff and the party agree upon the data to be produced.  In some instances, staff can narrow search groups more effectively when a party provides documents that describe the responsibilities of its employees, as a supplement to the organization charts required by the second request.  To ensure that staff has access to such materials, the reforms also condition the use of the custodian presumption on the party's providing staff, if staff so requests after the Initial Meeting, with brief written descriptions of the responsibilities of a limited number of employees who have been reasonably designated by staff, within seven (7) business days of the receipt of a request by staff.

### Timing

Staff will be required promptly to notify a party of the identities of the 35 or fewer employees whose files the party is required to search once a party has provided staff with the information that is reasonably necessary for staff to designate the search group. In addition, as discussed below, the FTC will implement a requirement that a Bureau of Competition staff lawyer with substantial merger experience participate in all negotiations over the second request. This requirement should increase the efficiency of second request negotiations. If staff asks the Bureau Director to authorize a search group that contains more than 35 employees, the Bureau Director must promptly decide whether to grant staff's request after meeting or conferring with the party (if the party requests to meet or confer).

The custodian presumption does not specify a particular number of days within which staff must designate the employees for the search group after staff meets with the party's employees, nor does the presumption set forth a specific time within which the Bureau Director must decide whether to authorize a larger search group. Such requirements could provide greater certainty in some circumstances, but in many situations they likely would create incentives for strategic behavior and generate counterproductive procedural disputes and other transaction costs that exceed their benefits.

### Thirty-Day Advance Production or Rolling Production Period

For the custodian presumption to apply to a party, the party also must agree to produce the documents and data responsive to the second request 30 days before it submits its certification of substantial compliance with the second request, or to enter into

a mutually acceptable "rolling" production or other timing agreement. (Rolling production agreements involve the production of responsive materials over an agreed-upon period of time.)

The requirement that a party produce materials responsive to the second request 30 days before certifying substantial compliance (or pursuant to a mutually acceptable rolling or other timing agreement) will create incentives for staff and the parties to agree to the types of investigation schedules that often promote faster resolution of the core issues, more accurate decisions by the agencies, and fewer litigation challenges to transactions.

The advance/rolling production requirement is not an effort to change or modify the HSR Act. Under the Act, the agencies have 30 days to decide whether to challenge a transaction after the parties to a transaction certify that they have substantially complied with the second request. It is relatively rare, however, for parties to withhold the materials responsive to the second request until they certify that they are in substantial compliance. Instead, they typically produce documents on a rolling basis. It is even rarer for parties to trigger the 30-day clock, and then require the reviewing agency to make an enforcement decision by the end of the waiting period when questions about the transaction remain. Far more common is for staff and the parties to enter into a timing agreement in which the parties agree to produce substantial amounts of materials that are responsive to the second request before they certify that they are in substantial compliance.

The parties and staff frequently enter into advance and rolling production agreements because they often enable staff to focus more effectively on what can be

16

dispositive issues – a practice that shortens the length of investigations.  In contrast, when the parties do not provide the materials responsive to the second request until they certify that they are in substantial compliance, the FTC often must simultaneously conduct a wide-ranging competitive effects analysis, negotiate a potential settlement agreement, and prepare for a possible litigation challenge to the transaction.  In rare circumstances, this dynamic produces a resolution within the 30-day time period.  Far more often, it produces inefficiencies, which in turn generate eleventh-hour requests by staff, Bureau management, the Commission, and (quite often) the parties to extend the deadline in order to reconcile the multiple tracks on which the FTC and the parties are proceeding. The FTC and the parties almost always agree to each other's extension requests.  In the FTC's experience, these last-minute extensions lengthen the total investigation more than do mutually acceptable timing agreements entered into by staff and the parties during the second request negotiations.

Accordingly, linking the custodian presumption to an advance/rolling production requirement will formalize a practice that the FTC's experience shows generally reduces the cost and length of the merger review process.  Again, however, the advance production requirement does not change the provisions of the HSR Act, or its implementing regulations.  Parties remain entitled to trigger the 30-day clock by substantially complying with the second request.

**Non-Application to Central Files**

The custodian presumption will not apply to requests for documents that are contained in "company" or "central" files.  Staff may request that parties produce these materials regardless of whether they are contained in the files of the employees in the

search groups.  This provision is not a loophole that will allow circumvention of the restrictions imposed by the custodian presumption.  Requests for information contained in corporate and central files generally will be limited to the types of documents and data that parties produce routinely in merger investigations, but which often are not found in complete form in the files of an individual employee.  Examples of these materials are central databases, contracts, licenses, responses to requests for proposals, financial reports, budgets, and company sales files.

The exclusion of materials contained in corporate or central files from the limitations imposed by the custodian presumption reflects two realities.  First, in many circumstances, there is no individual who retains a complete set of the types of materials that often are stored centrally, such as contracts and proposals.  Second, even when an individual does possess all of the required information, the time and cost needed to identify and agree upon the individual often would offset the value of any reductions in document production size that such an approach might achieve.

### Sixty-Day Pre-Trial Discovery Period

The custodian presumption and the provisions of the other reforms place limitations on the volume of information that the FTC will require parties to produce in most second request investigations.  In most instances, these limitations should not prevent the FTC from obtaining access to the relevant persons and information needed to challenge a transaction in court.  It is important, however, to make certain that if the FTC brings a litigation challenge, the FTC has the opportunity to take additional necessary discovery.

To ensure that the FTC is not prejudiced if it challenges a transaction, the reforms condition the limitations of the custodian presumption on the party's agreement to allow the FTC adequate time to take discovery of relevant information that the party did not provide during the investigation. Accordingly, for the custodian presumption to apply to a party, the party must agree that, if the FTC brings a litigation challenge to the transaction, the party will agree to propose to the court jointly with the FTC a scheduling order that contains at least a 60-day discovery period. (Staff may agree to a scheduling order with a shorter discovery schedule.)

2. **Two-Year Relevant Time Period**

   A. **There will be a presumption that the "relevant time period" for a second request will be from two years prior to the date on which the FTC issues the second request until 45 days prior to the date on which the party certifies that it has substantially complied with the second request. When the custodian presumption's 30-day advance production period applies, the presumptive relevant time period will be from two years prior to the date on which the FTC issues the second request until 45 days prior to the date on which the party produces the materials responsive to the second request. A party will be required to produce all responsive documents that it generated or obtained during the relevant time period.**

   B. **The two-year relevant time period presumption does not apply to requests for data.**

   C. **Staff may enlarge the relevant time period when it is reasonably likely that a longer relevant time period is necessary for the FTC to analyze a transaction's competitive effects.**

The length of the time period for which a party is required to search for documents (the "relevant time period") also can affect the size, cost, and length of a second request investigation. For example, in recent second requests that had a three-year relevant time period, approximately 25% of the materials produced by the parties were more than two years old. The Model Second Request currently requires that the

party produce responsive materials for a three-year relevant time period.  Experience

shows, however, that in many investigations documents generated or obtained more than

two years before the FTC issues a second request do not significantly inform the FTC's

analysis of the competitive effects of the transactions.

 The forward "cut-off" date for a second request production – the most recent date

for which a party is required to produce documents – also can have a significant impact

on the cost of a second request.  The Model Second Request requires a party to submit

responsive documents produced or obtained by the party up to 30 days before substantial

compliance for most of the specifications.  Specifications 7 and 15 (the competition and

acquisition document specifications) require a party to produce documents that it

produced or obtained up to 14 days before the party certifies substantial compliance.  The

14-day cut-off period, and even the 30-day cut-off period, can generate significant

expenses by requiring parties to conduct multiple searches of some employees' files –

known as "second sweeps."  The benefits of these relatively short cut-off periods rarely

outweigh the costs.  In many merger investigations, staff agrees to significantly longer

cut-off periods.

 The FTC's experiences indicate that it is appropriate to reduce the length of the

standard relevant time period.  The FTC will adopt a presumption that the relevant time

period for the FTC's second request will be from two years prior to the date on which the

FTC issues the second request until 45 days prior to the date on which the party certifies

that it is in substantial compliance.  When the custodian presumption's 30-day advance

production period applies, there will be a presumption that the forward cut-off date for

the relevant time period will be 45 days from the date on which the party *produces* the

materials responsive to the second request. A party will be required to produce all responsive documents that it generated or obtained during the relevant time period.[10]

Staff will retain the discretion to enlarge or shorten the relevant time period in appropriate circumstances. In some circumstances, it may be simpler or more cost-effective to make the relevant time period slightly longer than two years by starting the period on the first day of a company's quarter, or the first day of a calendar or fiscal year. Starting dates at the beginning of a quarter or a calendar or fiscal year also may be necessary to make certain that the parties produce at least two years of their strategic plans and other core business documents.

In addition, in some circumstances, it may be necessary to use a three-year or longer relevant time period. For example, a longer relevant time period may be appropriate for a transaction that involves markets with long-term contracts.

Finally, a more recent forward cut-off date for some specifications or for some custodians also may be warranted in some circumstances. For example, if potential efficiencies are a major issue in the investigation, the FTC may need a more recent cut-off date for efficiencies-related specifications because the parties are likely to generate documents reflecting anticipated efficiencies throughout the merger review process.

3.    **Empirical Data**

    A. **Staff will inform the parties about the competitive effects theories under consideration and the types of empirical analyses that may prove useful in the investigation.**

    B. **Parties are strongly encouraged to provide staff with the following: (1) a written description of how the party collects, maintains, and uses the**

---

[10] The two-year relevant time period presumption does not apply to requests for data. As explained in the next section, the period of time for which data are needed varies considerably.

types of data that are responsive to the second request; (2) a proposal to limit the data request, and data samples to support the proposal; and (3) access to the employees of the party who are knowledgeable about how the party collects, maintains, and uses the types of data specified in the second request (collectively, "Data Negotiation Information").

**C.** A party will be entitled to meet or confer with a Director or a Deputy Director from the Bureau of Competition and from the Bureau of Economics if the party believes that staff has not sufficiently limited the data requests. An employee from the party who previously was made available to staff to discuss the party's data must attend the meeting. A party's providing the Data Negotiation Information to staff will greatly assist Bureau management's ability to evaluate a claim that data requests are too broad.

During merger investigations, staff and the parties often devote significant resources to gathering and analyzing empirical data. The greater emphasis on direct analysis of competitive effects has increased the need for such information. Also adding to the cost and complexity of data analyses is that lower storage costs and improved software tools have increased the volume of potentially relevant data. Unfortunately, to date, we have found no viable one-size-fits-all limitations or presumptions that will reduce the costs of data productions in merger investigations. The number of employees searched typically is not a relevant metric. It is possible to establish a presumptive limit on the time period covered by data requests, but experience has shown that a presumption is not likely to be effective because the period of time for which data are needed varies considerably.

The most realistic approach to control the cost and complexity of data productions is to formalize practices that facilitate early and ongoing communication between staff and the parties' business personnel, combined with the exercise of sound judgment about the types and volume of data that are reasonably necessary to analyze transactions. The

22

Bureau of Economics articulated some such practices in 2002.[11]  These practices continue to be the best approach to handle data issues efficiently during the second request process.

First, staff will inform the parties of the competitive effects theories under consideration, and the types of empirical analyses that may prove useful in the investigation.

Second, the Bureaus will strongly encourage each party to provide staff with: (1) a written description of how the party maintains the responsive data; (2) a proposal to limit the data request and data samples to support the proposal; and (3) access to employees or officers of the party who are knowledgeable about how the party collects, maintains, and uses the types of data specified in the second request, and the databases and other software used by the party to store and analyze the data (collectively, "Data Negotiation Information").

If, after negotiations between staff and a party, the party believes that the data requests remain too broad, the party will be entitled to meet or confer with a Director or a Deputy Director from the Bureau of Competition and from the Bureau of Economics.  An employee from the party who previously was made available to staff to discuss the party's data must attend the meeting.  While the right to meet with Bureau management is not expressly conditioned on the party's having provided all of the Data Negotiation Information to staff, the party's having done so will greatly enhance the ability of Bureau management to evaluate the party's claim that the data requests are overly broad.

---

[11]  *See* Bureau of Economics, Federal Trade Commission, *Best Practices for Data, Economic and Financial Analyses in Antitrust Investigations* (Nov. 2002), *available at* http://www.ftc.gov/be/ftcbebp.pdf.

4.    **Preservation of Backup Tapes**

**There will be presumptions that (1) a party may elect to preserve backup tapes for only two calendar days identified by staff, and (2) the FTC will require a party to produce documents contained on backup tapes only when responsive documents are not available through other more accessible sources.  If a party's document storage system does not permit designation of backup tapes for two specific calendar days, staff will work with the party to designate a comparable set of backup tapes that the party must preserve.**

Instruction C of the Model Second Request defines "documents" to include responsive documents contained on all backup tapes and comparable storage media (collectively, "backup tapes").  Backup tapes are used for disaster recovery or archiving purposes, and generally are not configured for routine document review.  Consequently, the production of information contained on backup tapes often is particularly expensive.  Moreover, in most investigations, the production of information contained on backup tapes is not necessary because the information on the tapes is available through more easily accessible sources.  For this reason, staff often eliminates or modifies the requirement that the parties search and produce responsive materials from backup tapes.  In certain instances, however, backup tapes are the only sources of relevant information.

The FTC will establish presumptions that (1) a party may elect to preserve backup tapes for two (2) calendar days identified by staff, and (2) the FTC will require a party to produce documents contained on backup tapes only if responsive documents are not available through other more accessible sources.  In appropriate circumstances – such as when backup tapes are the only source of highly relevant information – staff may require a party to preserve and produce information that is contained on additional backup tapes.  These presumptions will reduce expenses for many parties and will preserve the FTC's ability to obtain needed information.

5.    **Partial Privilege Log**

The Model Second Request requires a party to produce a log of all responsive documents and information that the party withholds pursuant to a claim of privilege. The requirement that a party produce a log creates incentives for the party to make certain that documents withheld on privilege grounds do, in fact, satisfy the legal requirements for the applicable privilege. By enabling staff to review the appropriateness of any privilege claims, the privilege log also increases the likelihood that the party will withhold only materials that qualify for a privilege. Preparation of a complete privilege log, however, can impose substantial costs on a party that in some circumstances outweigh the benefits of the log. In particular, preparation of a complete privilege log may not always serve the public interest for second request investigations that are resolved rapidly – either because staff concludes that the transaction does not violate the antitrust laws, or because the matter is resolved quickly through a consent agreement.

To balance these costs and benefits better, the FTC will modify the instructions to the second request to allow a party to elect to produce a partial privilege log for all of the custodians in the party's search group, in conjunction with a complete privilege log for a small subset of those custodians. The FTC and its staff, however, will retain the right to require any party to produce a complete privilege log for all custodians in appropriate circumstances.

The modified instructions will contain the following provisions:

a.   In place of a Complete Privilege Log ("Complete Log") for all of the custodians in the search group, a party may elect to submit a Partial Privilege Log ("Partial Log") for all of the custodians in the search group and a Complete Log for a subset of the custodians in the search group, as specified in paragraph d.

b. A Complete Log will contain the information specified in the instructions to the Second Request, including, but not limited to, the following information, for each withheld document for a covered custodian: (1) authors; (2) addressees; (3) all recipients of the original and any copies; (4) date; and (5) a description of the document in a manner that, though not revealing the privileged information, provides sufficiently detailed information to enable staff, the FTC, or a court to assess the applicability of the privilege claimed.

c. The Partial Log will contain the following information for each withheld document for a covered custodian: (1) the name of the custodian from whom responsive documents are withheld on the basis of a claim of privilege; and (2) the total number of documents (stating the number of attachments separately) contained in each such custodian's files that are withheld under a claim of privilege.

d. Within five business days after receipt of the Partial Log, staff may identify in writing five individuals or ten percent of the total number of custodians searched, whichever is greater, for which the party will be required to produce a Complete Log in order to certify compliance with the Second Request.

e. For a party to exercise the option to produce a Partial Log, the party must provide a signed statement in which the party acknowledges that, in consideration for being permitted to submit a Partial Log:

   i. The FTC retains the right to serve a discovery request or requests regarding documents withheld on grounds of privilege in the event the FTC votes to seek relief through judicial or administrative proceedings;

   ii. The party will produce a Complete Log for all custodians in the search group no later than fifteen calendar days after such a discovery request is served, which will occur promptly after the filing of the FTC's complaint; and

   iii. The party waives its objections to such discovery, including the production of a Complete Log for all custodians in the search group, except for any objections based strictly on privilege.

f. A party must retain all privileged documents that are responsive to the Second Request until the expiration of the HSR waiting period or the completion of any litigation challenging the transaction.

g. The FTC will retain the right to require a party to produce a Complete Log for all custodians in a party's search group in appropriate circumstances.

6.   **Electronic Production and De-Duplication**

Today's rollout of reforms does not mark the conclusion of our work to improve the merger review process.  One ongoing project is aimed at improving the FTC's ability to accept and review electronic documents.  We also are working to identify more clearly to parties the various formats and technology platforms that parties can use to provide electronic documents.

While improvements to electronic production technologies and procedures will occur over time, the FTC will implement one procedure today that will give greater clarity to an important electronic production issue: the use of "de-duplication" software tools.  Some parties eliminate from their second request productions duplicate e-mails, as well as other documents that are essentially identical to documents that they do produce. These processes often are referred to as "de-duplication" and "near-de-duplication." Some parties use these techniques without first discussing the issue with staff, while others discuss the issue and then receive modifications that allow them to eliminate duplicates in some circumstances.

As the volume of electronic documents grows, the use of electronic de-duplication techniques can be effective in reducing the size and cost of document productions.  Such techniques also can significantly impair the FTC's ability to investigate a transaction. For example, if document collection and de-duplication occur before or during second request modification negotiations, important documents may reside in the files of a custodian who is not included in a party's search group.  De-duplication and near-de-duplication across entire productions also can conceal that a particular custodian received documents, which could impair staff's ability to conduct investigational hearings.

To achieve the benefits of de-duplication without impeding the FTC's ability to enforce the antitrust laws, the FTC will add the following instruction to the second request, which requires a party, during negotiations about modifications to the second request, to advise staff about the use of de-duplication and other comparable analytical tools:

> If you intend to utilize any De-duplication or Near-de-duplication software or services when collecting or reviewing information that is stored in the Company's computer systems or electronic storage media in response to this Request, or if the Company's computer systems contain or utilize such software, you must contact the attorneys for the government to determine, with the assistance of the appropriate government technical officials, whether and in what manner the Company may use such software or services when producing materials in response to this Second Request.

These requirements will provide staff with more complete information earlier in the investigation process, which in turn will give staff greater flexibility to authorize greater use of de-duplication tools.

## 7. **Additional Reforms to the Merger Review Process**

### A. **Specification 1(b)**

Specification 1(b) of the Model Second Request requires a party to provide a list of all agents and representatives of a company. The specification can be overbroad in some circumstances because it requires parties to produce a complete list of their agents and representatives, regardless of their role. Staff routinely modifies this specification to limit the request to those agents and representatives involved with the transaction and the relevant products. To eliminate the potentially unnecessary scope of this specification, the FTC will presumptively modify the request to require that parties list only their agents who are involved in the transaction and the relevant market(s).

### B.      Specification 4: Facilities

Specification 4 of the Model Second Request requires a party to provide information about each of its facilities that are or have been involved in the manufacture or sale of any relevant product.  In some circumstances, this specification can impose unnecessary requirements.  There is, however, no plausible bright-line modification to this specification.  Accordingly, the FTC will modify Specification 4 to require staff to consider reductions in the scope of this request on a case-by-case basis.

### C.      Definition of "Documents"

The definition of "documents" in the Model Second Request can include some categories of documents that do not necessarily further the FTC's analysis of whether a transaction is likely to violate the antitrust laws (in particular, tax and other types of regulatory documents that do not concern the potential competitive impact of the transaction).  The FTC will modify the instructions to its second requests to exclude these materials presumptively.

### 8.      Reforms Do Not Preclude Other Modifications to Second Requests

The foregoing reforms are not intended to preclude or discourage staff or parties from negotiating additional modifications to second requests, or entering into other forms of agreements.  As stated, no two investigations are alike, and there is a substantial human element in the merger investigation process.  To conduct a merger investigation efficiently requires staff and the parties to work on an ongoing basis to enter into agreements that identify and narrow the relevant issues and identify the information that is needed to resolve those issues.

Particularly important is that staff and the parties make use of processes that enable "quick look" investigations in appropriate circumstances. The most efficient approach to expedite some investigations is for the parties to produce quickly a limited set of core documents and information (*e.g.*, the chief strategic officer's documents, bid data), in exchange for staff's commitment to analyze the materials in a very short period (*e.g.*, three weeks) and then to advise the parties about the status of the investigation. In all situations, staff, the parties, and their counsel should work aggressively to devise mechanisms to collect the information that will allow the FTC to determine in a cost-effective manner whether a transaction violates the antitrust laws.

## 9.  **Internal Reforms**

In addition to implementing reforms that will directly reduce the scope of second requests, the Bureaus of Competition and Economics have worked on developing reforms to the Bureaus' internal processes. The Bureaus have implemented several new practices, and this work is ongoing. The FTC is, however, announcing today the implementation of a requirement that a Bureau of Competition staff lawyer with substantial experience participate in the negotiations over modifications to a second request. This requirement should ensure that the staff who negotiate the second request have sufficient authority to agree to modifications to the second request in a reasonable time period.

### Conclusion

The reforms announced today mark the completion of one stage of an ongoing process to improve the merger review process. The FTC will continue to work to streamline our procedures, and improve our technology, so that we quickly clear

transactions that do not raise anticompetitive concerns and effectively challenge

transactions that violate the antitrust laws.

# Exhibit 536

**Best Practices for Merger Investigations**
**Bureau of Competition - August 2015**

Since the Commission published the Reforms to the Merger Review Process in 2006,[1] several aspects of the merger review process have evolved. First, we learned that parties rarely invoked the Merger Process Reforms. Second, firms now rely more extensively on the "withdraw and refile" process in connection with the initial review period of Hart-Scott-Rodino filings. Firms have also become much more sophisticated in the use of electronic discovery and search techniques. These developments and others led the Bureau of Competition to review the Bureau's merger investigation practices. Our review identified practices that promote efficiency and balance the burden of merger investigations with the need for thoroughness. Based on this review, the following guidance provides best practice recommendations for improving the merger review process.

These guidelines address early voluntary submission of information, withdraws and refiles, timing agreements, negotiating Second Requests, and common presumptions.

## 1. Early Voluntary Submission of Information

Providing information to staff early is a common best practice. Parties can produce information in addition to the HSR filing during the initial waiting period or even before the filing is made. This information may resolve staff's questions about the transaction during the investigation's preliminary phase, which may obviate the need for a Second Request. Or, the early submission of key information may allow staff to tailor the Second Request and thus reduce the burden of production.

Certain key information is always helpful and staff will almost certainly request it. Preparing and gathering the following documents and information in anticipation of an HSR filing or of a voluntary access letter may expedite the merger review process.

    a. Strategic and marketing plans for the previous two years. On a case-by-case basis, staff may request these plans further back than two years in order to capture a pivotal business development or historic event. Often this is to identify natural experiments to investigate how competition works in the industry.

    b. A list of all currently manufactured, marketed, or sold products and products in development.

    c. A list of top 10 customers (and suppliers if relevant) with contact information for customers of overlapping products.

    d. A list of top competitors with contact information for competitors who provide overlapping products.

---

[1] DEBORAH PLATT MAJORAS, CHAIRMAN, FEDERAL TRADE COMMISSION, REFORMS TO THE MERGER REVIEW PROCESS (2006), *available at* https://www.ftc.gov/sites/default/files/attachments/mergers/mergerreviewprocess.pdf.

    e.   Market share information for overlapping products.

    f.   A list of the types of reports the company prepares on a regular basis.

    g.   Information you believe will assist staff in assessing the proposed merger and the markets involved.

Beyond these materials, in certain circumstances, it may be beneficial for parties to provide some additional documents in the initial waiting period, including:

    a.   An organization chart.  If your client does not have one, this may be a document you want to prepare.  An organization chart helps staff identify potential document custodians or candidates for interviews.

    b.   A data map.  Data maps can be helpful in identifying the types of data your client creates and stores and the relationships between the client's different data sets.

## 2.  Effective Use of Withdraw and Refile

At times, near the end of an initial review period, open issues may remain that could be resolved with relative ease with certain information or a bit more time.  In certain cases, merging parties give staff more time by withdraw their HSR filing and refiling.  This procedure resets the HSR timing provisions without the need to pay an additional filing fee.[2]  Historically, additional time during the initial HSR waiting period appears to reduce the likelihood that a Second Request will issue and increases the likelihood that any Second Request issued will be narrower in scope.  Of course, a withdraw and refile will not be effective in avoiding a Second Request in an investigation that requires substantial review.  For more information on the withdraw and refile process, read our blog post, *Running Time,* and a tip sheet put together by the Premerger Notification Office.

## 3.  Negotiating the Second Request

Staff will negotiate a Second Request in good faith through meaningful discussions "to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought."[3]  Second Request negotiations have proven to be important in reducing the burden for both sides while still allowing staff to obtain the necessary information to evaluate a proposed transaction.  Under the FTC Rules of Practice § 2.20, after a Second Request is issued, staff should initiate a discussion addressing the competitive issues raised by the

---

[2] *See* 16 C.F.R. § 803.12.  Written notice is required to initiate a withdraw and refile.  Withdraw and refile is available only if the proposed transaction has not changed and the refile notice is received within two business days after withdrawal.  Only the acquiring person (A-side) can withdraw and refile to restart the HSR timing.  The acquired company (B-side) is not required to update its filing.  After one withdraw/refile, another withdraw/refile would require a new filing fee (and would not have to be refiled within two days.)  Thereafter, another withdraw/refile would be available within two days without a filing fee.

[3] FTC Rules of Practice 16 C.F.R. § 2.4.

transaction and the most effective way to obtain information and documents relating to the competitive issues raised.  The most productive meetings are those in which staff clearly communicates the competitive issues raised by the transaction and the information that will be required to explore the issues.

The merging parties can contribute to these negotiations best by explaining the organizational and decision-making structure of the parties' businesses as well as where, how, and by whom relevant information is kept.  Employees or counsel familiar with company's operations, data, storage, and document retention policies should participate in the meeting.  Parties can further maximize the productivity of the meeting by providing organizational charts in advance and being prepared to discuss the duties and responsibilities of the individuals with relevant documents or information.  Understanding the location of pertinent information may allow staff to narrow document custodian lists.  Equally important in the most successful meetings is conveying to staff the structure and content of central files, corporate files, and databases.  A search of these files will be required regardless of the particular custodians excluded from further searches.  Negotiating the Second Request rarely involved a one-time event, and subsequent meetings are common.  Our review of previous investigations suggests that an early, substantive discussion on issues, custodians, data, and documents leads to less costly, more focused Second Requests, which in turn leads to faster compliance and review.

*Document Custodians*

The appropriate number of document custodians to search in an investigation varies widely by transaction and party.  Accordingly, we have not imposed an absolute limit on the number of custodians a party must search in response to a Second Request.  The Commission's 2006 Merger Process Reforms established a presumptive limit of 35 custodians if the parties met certain conditions.  Although this presumption was rarely triggered, the retrospective survey of merger investigations revealed that since the Reforms were promulgated, most merging parties who submitted responses to the Second Request searched fewer than 35 custodians.

*Modifications*

The Second Request modification process is iterative and can speed up or slow down the entire merger review.  Under most circumstances you can expect staff to respond to a request for modification within two business days.  Many times the response will be a substantive answer, but in some instances, the response may be that staff is still considering the modification, needs additional information to respond to your request, or is consulting with the Bureau of Economics.  While final modifications will always require a formal letter from staff, parties may expedite the process by emailing staff draft modification language.  Finally, modification letters will no longer require the signature of division management.

*Search Terms*

Parties increasingly use search terms to comply with a Second Request.  The company is in the best position to know the types of documents its employees generate and the terminology

3

used in its particular industry.  Staff will not agree that a particular list of search terms is sufficient for the company to certify compliance with a Second Request.

Companies may provide a list of search terms in advance of producing documents and staff may comment on the proposed search terms.  Based upon our review of previous merger investigations, we believe that disclosing the search terms to staff in advance of a document production improves the likelihood that the search will be sufficiently comprehensive.  Nevertheless, it is ultimately the company's responsibility to gather and produce the necessary documents and information to comply with the Second Request, regardless of the method the company uses to gather and review the documents and information produced.

*Quick Look*

If staff's anticompetitive theory rests upon a specific issue, or the Second Request includes multiple relevant product markets, a "quick look" on that issue or a subset of relevant products may be sufficient to resolve the anticompetitive concerns without the parties' full compliance with the Second Requests.  In a quick look, the parties agree to produce a limited set of core documents and information identified by staff.  In exchange, staff agrees to analyze the materials in a short period and then advise the parties of the outcome of the quick look.

The 2006 Merger Process Reforms contemplated formalized, written agreements between staff and the parties to narrow issues and identify information to be submitted by the parties to resolve those issues.  The internal review suggests that formal quick look agreements are rare and protracted negotiations of such agreements may distract from the substantive merger investigation.  Instead, in many cases, parties and staff together may identify key custodians and/or specifications to be prioritized in the search and production of materials responsive to the Second Request, and engage in substantive discussions about the material produced.

*Timing Agreement*

Parties should expect staff to request a timing agreement in cases that require substantial review.  Timing agreement discussions should begin as early as possible, and may be initiated by staff or the parties, who should work together to form an overall investigational plan.  The amount of time staff requires to complete their investigation often depends on the size and scope of the investigation, as well as the parties' demands.  For example, a merger investigation involving a large number of product and geographic markets may require more staff time than a case with a more limited scope.  Similarly, if parties ask staff to engage in settlement discussions, focus on peripheral markets, review and discuss white papers, or otherwise create staff resource constraints, staff likely will require additional time to complete the investigation.

We hope these guidelines will assist parties in reducing the burden of the merger review process.  Although it is most expeditious to resolve issues at the staff level when possible, if at any point in the process significant issues are not being addressed or resolved, the parties should contact Division management and/or the Bureau Director's office.

# Exhibit 537

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)

15 U.S.C.A. § 18a

§ 18a. Premerger notification and waiting period

Effective: December 21, 2000
Currentness

**(a) Filing**

Except as exempted pursuant to subsection (c), no person shall acquire, directly or indirectly, any voting securities or assets of any other person, unless both persons (or in the case of a tender offer, the acquiring person) file notification pursuant to rules under subsection (d)(1) and the waiting period described in subsection (b)(1) has expired, if--

**(1)** the acquiring person, or the person whose voting securities or assets are being acquired, is engaged in commerce or in any activity affecting commerce; and

**(2)** as a result of such acquisition, the acquiring person would hold an aggregate total amount of the voting securities and assets of the acquired person--

**(A)** in excess of $200,000,000 (as adjusted and published for each fiscal year beginning after September 30, 2004, in the same manner as provided in section 19(a)(5) of this title to reflect the percentage change in the gross national product for such fiscal year compared to the gross national product for the year ending September 30, 2003); or

**(B)(i)** in excess of $50,000,000 (as so adjusted and published) but not in excess of $200,000,000 (as so adjusted and published); and

**(ii)(I)** any voting securities or assets of a person engaged in manufacturing which has annual net sales or total assets of $10,000,000 (as so adjusted and published) or more are being acquired by any person which has total assets or annual net sales of $100,000,000 (as so adjusted and published) or more;

**(II)** any voting securities or assets of a person not engaged in manufacturing which has total assets of $10,000,000 (as so adjusted and published) or more are being acquired by any person which has total assets or annual net sales of $100,000,000 (as so adjusted and published) or more; or

**(III)** any voting securities or assets of a person with annual net sales or total assets of $100,000,000 (as so adjusted and published) or more are being acquired by any person with total assets or annual net sales of $10,000,000 (as so adjusted and published) or more.

In the case of a tender offer, the person whose voting securities are sought to be acquired by a person required to file notification under this subsection shall file notification pursuant to rules under subsection (d).

**(b) Waiting period; publication; voting securities**

**(1)** The waiting period required under subsection (a) shall--

**(A)** begin on the date of the receipt by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice (hereinafter referred to in this section as the "Assistant Attorney General") of--

**(i)** the completed notification required under subsection (a), or

**(ii)** if such notification is not completed, the notification to the extent completed and a statement of the reasons for such noncompliance,

from both persons, or, in the case of a tender offer, the acquiring person; and

**(B)** end on the thirtieth day after the date of such receipt (or in the case of a cash tender offer, the fifteenth day), or on such later date as may be set under subsection (e)(2) or (g)(2).

**(2)** The Federal Trade Commission and the Assistant Attorney General may, in individual cases, terminate the waiting period specified in paragraph (1) and allow any person to proceed with any acquisition subject to this section, and promptly shall cause to be published in the Federal Register a notice that neither intends to take any action within such period with respect to such acquisition.

**(3)** As used in this section--

**(A)** The term "voting securities" means any securities which at present or upon conversion entitle the owner or holder thereof to vote for the election of directors of the issuer or, with respect to unincorporated issuers, persons exercising similar functions.

**(B)** The amount or percentage of voting securities or assets of a person which are acquired or held by another person shall be determined by aggregating the amount or percentage of such voting securities or assets held or acquired by such other person and each affiliate thereof.

**(c) Exempt transactions**

The following classes of transactions are exempt from the requirements of this section--

**(1)** acquisitions of goods or realty transferred in the ordinary course of business;

**(2)** acquisitions of bonds, mortgages, deeds of trust, or other obligations which are not voting securities;

**(3)** acquisitions of voting securities of an issuer at least 50 per centum of the voting securities of which are owned by the acquiring person prior to such acquisition;

**(4)** transfers to or from a Federal agency or a State or political subdivision thereof;

**(5)** transactions specifically exempted from the antitrust laws by Federal statute;

**(6)** transactions specifically exempted from the antitrust laws by Federal statute if approved by a Federal agency, if copies of all information and documentary material filed with such agency are contemporaneously filed with the Federal Trade Commission and the Assistant Attorney General;

**(7)** transactions which require agency approval under section 1467a(e) of title 12, section 1828(c) of title 12, or section 1842 of Title 12, except that a portion of a transaction is not exempt under this paragraph if such portion of the transaction (A) is subject to section 1843(k) of Title 12; and (B) does not require agency approval under section 1842 of Title 12;

**(8)** transactions which require agency approval under section 1843 of title 12 or section 1464 of Title 12, if copies of all information and documentary material filed with any such agency are contemporaneously filed with the Federal Trade Commission and the Assistant Attorney General at least 30 days prior to consummation of the proposed transaction, except that a portion of a transaction is not exempt under this paragraph if such portion of the transaction (A) is subject to section 1843(k) of Title 12; and (B) does not require agency approval under section 1843 of Title 12;

**(9)** acquisitions, solely for the purpose of investment, of voting securities, if, as a result of such acquisition, the securities acquired or held do not exceed 10 per centum of the outstanding voting securities of the issuer;

**(10)** acquisitions of voting securities, if, as a result of such acquisition, the voting securities acquired do not increase, directly or indirectly, the acquiring person's per centum share of outstanding voting securities of the issuer;

**(11)** acquisitions, solely for the purpose of investment, by any bank, banking association, trust company, investment company, or insurance company, of (A) voting securities pursuant to a plan of reorganization or dissolution; or (B) assets in the ordinary course of its business; and

**(12)** such other acquisitions, transfers, or transactions, as may be exempted under subsection (d)(2)(B).

**(d) Commission rules**

The Federal Trade Commission, with the concurrence of the Assistant Attorney General and by rule in accordance with section 553 of Title 5, consistent with the purposes of this section--

**(1)** shall require that the notification required under subsection (a) be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws; and

**(2)** may--

**(A)** define the terms used in this section;

**(B)** exempt, from the requirements of this section, classes of persons, acquisitions, transfers, or transactions which are not likely to violate the antitrust laws; and

**(C)** prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section.

**(e) Additional information; waiting period extensions**

**(1)(A)** The Federal Trade Commission or the Assistant Attorney General may, prior to the expiration of the 30-day waiting period (or in the case of a cash tender offer, the 15-day waiting period) specified in subsection (b)(1) of this section, require the submission of additional information or documentary material relevant to the proposed acquisition, from a person required to file notification with respect to such acquisition under subsection (a) of this section prior to the expiration of the waiting period specified in subsection (b)(1) of this section, or from any officer, director, partner, agent, or employee of such person.

**(B)(i)** The Assistant Attorney General and the Federal Trade Commission shall each designate a senior official who does not have direct responsibility for the review of any enforcement recommendation under this section concerning the transaction at issue, to hear any petition filed by such person to determine--

**(I)** whether the request for additional information or documentary material is unreasonably cumulative, unduly burdensome, or duplicative; or

**(II)** whether the request for additional information or documentary material has been substantially complied with by the petitioning person.

**(ii)** Internal review procedures for petitions filed pursuant to clause (i) shall include reasonable deadlines for expedited review of such petitions, after reasonable negotiations with investigative staff, in order to avoid undue delay of the merger review process.

**(iii)** Not later than 90 days after December 21, 2000, the Assistant Attorney General and the Federal Trade Commission shall conduct an internal review and implement reforms of the merger review process in order to eliminate unnecessary burden, remove costly duplication, and eliminate undue delay, in order to achieve a more effective and more efficient merger review process.

**(iv)** Not later than 120 days after December 21, 2000, the Assistant Attorney General and the Federal Trade Commission shall issue or amend their respective industry guidance, regulations, operating manuals and relevant policy documents, to the extent appropriate, to implement each reform in this subparagraph.

**(v)** Not later than 180 days after December 21, 2000, the Assistant Attorney General and the Federal Trade Commission shall each report to Congress--

**(I)** which reforms each agency has adopted under this subparagraph;

**(II)** which steps each has taken to implement such internal reforms; and

**(III)** the effects of such reforms.

**(2)** The Federal Trade Commission or the Assistant Attorney General, in its or his discretion, may extend the 30-day waiting period (or in the case of a cash tender offer, the 15-day waiting period) specified in subsection (b)(1) of this section for an additional period of not more than 30 days (or in the case of a cash tender offer, 10 days) after the date on which the Federal Trade Commission or the Assistant Attorney General, as the case may be, receives from any person to whom a request is made under paragraph (1), or in the case of tender offers, the acquiring person, (A) all the information and documentary material required to be submitted pursuant to such a request, or (B) if such request is not fully complied with, the information and documentary material submitted and a statement of the reasons for such noncompliance. Such additional period may be further extended only by the United States district court, upon an application by the Federal Trade Commission or the Assistant Attorney General pursuant to subsection (g)(2).

**(f) Preliminary injunctions; hearings**

If a proceeding is instituted or an action is filed by the Federal Trade Commission, alleging that a proposed acquisition violates section 18 of this title, or section 45 of this title, or an action is filed by the United States, alleging that a proposed acquisition violates such section 18 of this title, or section 1 or 2 of this title, and the Federal Trade Commission or the Assistant Attorney General (1) files a motion for a preliminary injunction against consummation of such acquisition pendente lite, and (2) certifies the United States district court for the judicial district within which the respondent resides or carries on business, or in which the action is brought, that it or he believes that the public interest requires relief pendente lite pursuant to this subsection, then upon the filing of such motion and certification, the chief judge of such district court shall immediately notify the chief judge of the United States court of appeals for the circuit in which such district court is located, who shall designate a United States district judge to whom such action shall be assigned for all purposes.

**(g) Civil penalty; compliance; power of court**

**(1)** Any person, or any officer, director, or partner thereof, who fails to comply with any provision of this section shall be liable to the United States for a civil penalty of not more than $10,000 for each day during which such person is in violation of this section. Such penalty may be recovered in a civil action brought by the United States.

**(2)** If any person, or any officer, director, partner, agent, or employee thereof, fails substantially to comply with the notification requirement under subsection (a) or any request for the submission of additional information or documentary material under subsection (e)(1) of this section within the waiting period specified in subsection (b)(1) and as may be extended under subsection (e)(2), the United States district court--

    **(A)** may order compliance;

    **(B)** shall extend the waiting period specified in subsection (b)(1) and as may have been extended under subsection (e)(2) until there has been substantial compliance, except that, in the case of a tender offer, the court may not extend such waiting period on the basis of a failure, by the person whose stock is sought to be acquired, to comply substantially with such notification requirement or any such request; and

    **(C)** may grant such other equitable relief as the court in its discretion determines necessary or appropriate,

upon application of the Federal Trade Commission or the Assistant Attorney General.

### (h) Disclosure exemption

Any information or documentary material filed with the Assistant Attorney General or the Federal Trade Commission pursuant to this section shall be exempt from disclosure under section 552 of Title 5, and no such information or documentary material may be made public, except as may be relevant to any administrative or judicial action or proceeding. Nothing in this section is intended to prevent disclosure to either body of Congress or to any duly authorized committee or subcommittee of the Congress.

### (i) Construction with other laws

**(1)** Any action taken by the Federal Trade Commission or the Assistant Attorney General or any failure of the Federal Trade Commission or the Assistant Attorney General to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law.

**(2)** Nothing contained in this section shall limit the authority of the Assistant Attorney General or the Federal Trade Commission to secure at any time from any person documentary material, oral testimony, or other information under the Antitrust Civil Process Act, the Federal Trade Commission Act, or any other provision of law.

### (j) Omitted

### (k) Extensions of time

If the end of any period of time provided in this section falls on a Saturday, Sunday, or legal public holiday (as defined in section 6103(a) of Title 5), then such period shall be extended to the end of the next day that is not a Saturday, Sunday, or legal public holiday.

**CREDIT(S)**

(Oct. 15, 1914, c. 323, § 7A, as added Pub.L. 94-435, Title II, § 201, Sept. 30, 1976, 90 Stat. 1390; amended Pub.L. 98-620, Title IV, § 402(10)(A), Nov. 8, 1984, 98 Stat. 3358; Pub.L. 101-73, Title XII, § 1214, Aug. 9, 1989, 103 Stat. 529; Pub.L. 106-102, Title I, § 133(c), Nov. 12, 1999, 113 Stat. 1383; Pub.L. 106-553, § 1(a)(2) [Title VI, § 630(a), (c), (d)], Dec. 21, 2000, 114 Stat. 2762, 2762A-108, 2762A-110.)

Notes of Decisions (13)

15 U.S.C.A. § 18a, 15 USCA § 18a
Current through P.L. 118-62. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 538

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

FEDERAL TRADE COMMISSION,

           Plaintiff,

      v.

META PLATFORMS, INC.,

           Defendant.

Case No. 1:20-cv-03590-JEB

**PUBLIC REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

---

**MEMORANDUM IN SUPPORT OF**
**MOTION TO COMPEL PRODUCTION OF 2012 AND 2014 FTC MEMORANDA**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................................................. iii

I.     The FTC Is Withholding Critically Relevant Documents Prepared in 2012
       and 2014 About the Acquisitions of Instagram and WhatsApp ................................4

       A.     The 2012 Instagram Documents ..........................................................................4

       B.     The 2014 WhatsApp Documents .........................................................................5

       C.     Meta Seeks the Documents; the FTC Categorically Refuses To
              Produce Them ......................................................................................................6

II.    The 2012 Instagram Documents and 2014 WhatsApp Documents Are
       Critically Relevant and Should Be Produced ............................................................8

III.   The FTC Memoranda Are Not Protected by Any Applicable Privilege or
       Protection ................................................................................................................11

       A.     The Deliberative Process Privilege Does Not Shield the FTC
              Memoranda from Discovery ..............................................................................12

              1.     The Deliberative Process Privilege Does Not Apply to the
                     Instagram Memoranda .............................................................................12

              2.     The Deliberative Process Privilege Does Not Apply to
                     Factual Materials Contained in the FTC Memoranda ..............................13

              3.     The FTC Cannot Invoke the Deliberative Process Privilege
                     Because Its Decision-Making Process Is Directly at Issue .......................14

              4.     The Deliberative Process Privilege Is a Qualified Privilege
                     and Does Not Protect the FTC Memoranda .............................................15

              5.     The FTC Waived Any Claim of Privilege ................................................20

       B.     The Work Product Doctrine Does Not Shield the FTC Memoranda
              from Discovery ..................................................................................................20

              1.     The Bureau of Economics Memorandum Is Not Work
                     Product ....................................................................................................20

              2.     Meta Has a Substantial Need for the Documents .....................................22

       C.     The Attorney-Client Privilege Does Not Apply ................................................26

       D.     The Investigatory File Privilege Does Not Apply .............................................27

IV.     The FTC Waived Any Privilege by Voluntarily Providing the Memoranda
        to House Judiciary Committee Members and Staff ............................................................28

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES[*]

Page

**CASES**

*Alexander v. FBI*, 192 F.R.D. 42 (D.D.C. 2000) .......................................................20

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 21 F. Supp. 3d 60
    (D.D.C. 2014) ......................................................................................................14

*Amchem Prods., Inc. v. GAF Corp.*, 64 F.R.D. 550 (N.D. Ga. 1974) ...........................19

*Anthem, Inc. Data Breach Litig.*, *In re*, 236 F. Supp. 3d 150 (D.D.C. 2017)................27

\* *Bird v. Penn Cent. Co.*, 61 F.R.D. 43 (E.D. Pa. 1973) ........................................24, 25

*Breiterman v. U.S. Capitol Police*, 323 F.R.D. 36 (D.D.C. 2017)................................19

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980).............................................26

\* *Brock v. Weiser*, 1987 WL 12686 (N.D. Ill. June 15, 1987)........................................15

*Cal. State Foster Parent Ass'n v. Wagner*, 2008 WL 2872775
    (N.D. Cal. July 23, 2008) ...............................................................................17, 19

*Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336
    (D.D.C. 2018) ......................................................................................................12

*Chisler v. Johnston*, 796 F. Supp. 2d 632 (W.D. Pa. 2011)..........................................17

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Commerce*,
    2020 WL 4732095 (D.D.C. Aug. 14, 2020) ................................................28, 29

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)............26

*Comm. on Oversight & Gov't Reform, U.S. House of Representatives
    v. Lynch*, 156 F. Supp. 3d 101 (D.D.C. 2016) ...........................................18-19

*Doe 2 v. Esper*, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) ......................................14

*EPA v. Mink*, 410 U.S. 73 (1973) .............................................................................13-14

*Fed. Home Loan Mortg. Corp. v. Deloitte & Touche, LLP*,
    2015 WL 12766388 (S.D. Fla. Aug. 4, 2015)..................................................18

*Fed. Nat'l Mortg. Ass'n Sec., Derivative & "ERISA" Litig.*,
    2009 WL 10708594 (D.D.C. June 9, 2009)......................................................28

---

[*] Authorities principally relied upon are marked with an asterisk.

*First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312 (2000)....................................16, 29, 30

*FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142 (D.C. Cir. 2015) ..............................22

*FTC v. Facebook, Inc.*, --- F. Supp. 3d ---, 2022 WL 103308
(D.D.C. Jan. 11, 2022)..................................................................................................25

*FTC v. Lukens Steel Co.*, 444 F. Supp. 803 (D.D.C. 1977) ...........................................................8

*FTC v. Match Grp., Inc.*, No. 1:22-mc-00054-RJL, Dkt. No. 11
(D.D.C. June 8, 2022)..................................................................................................23

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) .....................................................9-10

*FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522 (E.D. Pa. 2020)........................................10

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984) ...............................................20

*Ginsburg v. InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010)........................................................11

*Gradeless v. Am. Mut. Share Ins. Corp.*, 2011 WL 221895
(S.D. Ind. Jan. 19, 2011)..............................................................................................19

*Howard v. Fowler Bros., Inc.*, 2011 WL 3438407 (W.D. Ky. Aug. 5, 2011) ..............................24

*Interstate Fire & Cas. Co. v. Roman Cath. Church of Diocese of Phoenix*,
2012 WL 12867974 (D. Ariz. Jan. 19, 2012) ..................................................................23

*Janicker ex rel. Janicker v. George Washington Univ.*, 94 F.R.D. 648
(D.D.C. 1982) .............................................................................................................20, 21

*Johnson v. Wash. Metro. Area Transit Auth.*, 1990 WL 113877
(D.D.C. July 26, 1990)..................................................................................................23

* *Jud. Watch, Inc. v. U.S. Dep't of State*, 2019 WL 2452325
(D.D.C. June 12, 2019)..................................................................................................22, 24

*Kockums Indus. Ltd. v. Salem Equip., Inc.*, 561 F. Supp. 168 (D. Or. 1983) ..............................25

*Le v. Diligence, Inc.*, 312 F.R.D. 245 (D. Mass. 2015) ...............................................................23

*Leamon v. KBR, Inc.*, 2011 WL 13340584 (S.D. Tex. Nov. 10, 2011) ........................................23

*Lundy v. Interfirst Corp.*, 105 F.R.D. 499 (D.D.C. 1985) ......................................................12, 18

*MacNamara v. City of New York*, 249 F.R.D. 70 (S.D.N.Y. 2008)............................................17

*Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., In re*, 274 F.R.D. 106
(S.D.N.Y. 2011) ..........................................................................................................18

*Miller v. Holzmann*, 2007 WL 779393 (D.D.C. Mar. 8, 2007) .................................................27

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ....................................................................14

*Murphy v. Dep't of Army*, 613 F.2d 1151 (D.C. Cir. 1979)......................................................30

*NAACP v. Bureau of Census*, 401 F. Supp. 3d 608 (D. Md. 2019) ..............................................19

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)....................................14

*Playboy Enters., Inc. v. Dep't of Just.*, 677 F.2d 931 (D.C. Cir. 1982)......................................14

*Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010) ............................14

*Rafferty v. KeyPoint Gov't Sols., Inc.*, 2018 WL 3059600
    (D. Idaho June 19, 2018).......................................................................................21

*Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827 (3d Cir. 1995)....................................12

*Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598 (D.C. Cir. 2001)............................29, 30

*Schlefer v. United States*, 702 F.2d 233 (D.C. Cir. 1983)........................................................26

*Sealed Case, In re*:

    676 F.2d 793 (D.C. Cir. 1982) .........................................................................24

    * 121 F.3d 729 (D.C. Cir. 1997) ..................................................................16, 28

*SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403 (S.D.N.Y. 2009) ...............................................8

*Sterling Drug, Inc. v. FTC*, 450 F.2d 698 (D.C. Cir. 1971)........................................................16

*Subpoena Duces Tecum Served on Off. of Comptroller of Currency, In re*,
    145 F.3d 1422 (D.C. Cir.), *on reh'g in part*, 156 F.3d 1279
    (D.C. Cir. 1998) .............................................................................................14

*Subpoenas Duces Tecum, In re*, 738 F.2d 1367 (D.C. Cir. 1984) ..........................................28, 30

*Swartwood v. Cty. of San Diego*, 2013 WL 6670545 (S.D. Cal. Dec. 18, 2013) ...................16, 17

*Tri-State Hosp. Supply Corp. v. United States*, 2005 WL 3447890
    (D.D.C. Dec. 16, 2005).............................................................................24, 25, 27

*United States v. AT&T Co.*:

    86 F.R.D. 603 (D.D.C. 1979)......................................................................24, 25

    498 F. Supp. 353 (D.D.C. 1980) ..........................................................................9

*United States v. AT&T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018),
    *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ................................................................10

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ...............................8

*United States v. Gates*, 35 F.R.D. 524 (D. Colo. 1964) ...................................................18

*United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121 (D.D.C. 2012) ..............21

*United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988) .......................................................9

*United States v. Legal Servs. for New York City*, 249 F.3d 1077 (D.C. Cir. 2001) .......11

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...............................8, 10

*United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1
    (D.D.C. 2013) ..............................................................................................................11

* *United States v. Philip Morris Inc.*, 212 F.R.D. 421 (D.D.C. 2002) .............................29

*United States v. Warren*, 42 F.3d 647 (D.C. Cir. 1994)......................................................9

*U.S. ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419 (D.D.C. 2014) ..............23

*Veiga, In re*, 746 F. Supp. 3d 27 (D.D.C. 2010) ...............................................................28

*Vitamins Antitrust Litig., In re*, 211 F.R.D. 1 (D.D.C. 2002) .........................................23

*Warren v. Bastyr Univ.*, 2013 WL 2181762 (W.D. Wash. May 17, 2013) .....................21

*Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*,
    2020 WL 527987 (M.D. Pa. Jan. 31, 2020)...............................................................19


**STATUTES AND RULES**

Clayton Act, 15 U.S.C. § 12 *et seq.* ..................................................................................10

    § 7, 15 U.S.C. § 18....................................................................................................10

    § 7A, 15 U.S.C. § 18a................................................................................................25

    § 7A(d)(1), 15 U.S.C. § 18a(d)(1) ..............................................................................4

    § 7A(e)(1)(A), 15 U.S.C. § 18a(e)(1)(A).....................................................................4

Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.* ............................................14

Freedom of Information Act, 5 U.S.C. § 552 ............................................12, 16, 22, 24, 26, 29, 30

    5 U.S.C. § 552(b) .............................................................................................29

    5 U.S.C. § 552(d) .............................................................................................29

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435,
    90 Stat. 1383 .....................................................................4, 5, 6, 9, 10, 25, 27

Sherman Act, 15 U.S.C. § 1 *et seq.*:

    § 2, 15 U.S.C. § 2 .......................................................................8, 9, 10, 11

Fed. R. Civ. P. 34 ......................................................................................................6

Fed. R. Evid. 801(d)(2) .............................................................................................9


**OTHER MATERIALS**

5 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020).....................8

Fed. Trade Comm'n, *2016 Open Government Plan* (Sept. 15, 2016),
    https://www.ftc.gov/system/files/attachments/open-government/
    final_opengov_plan2016.pdf ..........................................................................13

Ltr. from Daniel J. Matheson (FTC Counsel) to Kevin B. Huff (Meta Counsel)
    (May 12, 2022).......................................................................5, 6, 7, 28

Ltr. from Daniel J. Matheson (FTC Counsel) to Kevin B. Huff (Meta Counsel)
    4 (May 13, 2022)........................................................................................5

Ltr. from Dione J. Stearns (Assistant General Counsel, FTC) to Andreas L.
    Booher (Apr. 2, 2015).................................................................................26

Ltr. from April J. Tabor (Acting Secretary of the Commission) to Reps. Jerold
    Nadler, et al. (House Judiciary Comm.) (Oct. 29, 2019).................................29

Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the
    Comm. on the Judiciary, Investigation of Competition in Digital
    Markets:  Majority Staff Report and Recommendations, 116th Cong.
    (Oct. 2020) ..................................................................................................7

The alleged "exclusionary conduct" in this unprecedented monopolization case is two acquisitions made by Meta Platforms, Inc. ("Meta"). The Federal Trade Commission ("FTC" or "Commission") reviewed and cleared both of these acquisitions, in 2012 (Instagram) and 2014 (WhatsApp). Meta is seeking the Court's assistance because hiding what the agency found and concluded in 2012 and 2014 is unsupported as a matter of law and simply unfair. That the FTC finds it necessary to cover up its own contemporaneous findings on issues that it now seeks to litigate, a decade after the fact, speaks volumes about why its case against Meta has no merit.

The FTC has admitted that the eight documents at issue include extensive memoranda, from staff attorneys as well as from economists, recounting as of 2012 the relevant facts of competition (*i.e.*, the relevant antitrust market) and the likely effect on competition and consumers from the then-proposed acquisition of Instagram. Indeed, it cannot contend otherwise, as this is standard agency procedure. *See* Ex. B, Royall Decl. ¶ 8. The FTC similarly allowed the WhatsApp acquisition to close, but without even making a second request for information. The FTC admits that it has documents concerning this acquisition too. Both the Instagram and the WhatsApp documents are almost certain to reveal that the FTC determined that each acquisition was unlikely to lessen competition or harm consumers. The central relevance – indeed, possibly dispositive significance – of these documents cannot seriously be disputed.

There are no other sources for this critical evidence. Documents are no longer available, including at least some of the documents collected by the FTC; the memories of witnesses, including witnesses who spoke to the FTC, have undoubtedly become less clear if not entirely faded. Allowing only the FTC to have access to this contemporaneous evidence is unfair.

The FTC voluntarily furnished these pivotal documents to Members of Congress and their staff (which at the time included the current FTC chair) for use in the House Judiciary

Committee's 2019 investigation of digital markets in general and these two transactions in particular. The ensuing committee report references the FTC's voluntary production. But when Meta requested these documents, the FTC stonewalled, claiming unspecified "privilege." In meet-and-confer sessions with Meta counsel, the FTC relied only on "deliberative process." But it now asserts a grab bag of privileges, none of which is applicable and all of which were waived even if applicable.

*The "deliberative process" privilege does not immunize the 2012 and 2014 documents*. The FTC's internal rules provide that the "deliberative process" privilege should not be claimed after ten years have elapsed. As of this summer, ten years will have elapsed since the Instagram acquisition closed. The FTC itself thus recognizes that agency "candor" cannot be chilled by disclosure of these aged materials. And even if applicable, the "deliberative process" privilege cannot shield relevant facts from discovery, cannot shield the FTC's analyses and reasons for clearing the deal where Meta's equitable defenses place the agency's conduct at issue, and is in any case qualified and overcome by Meta's substantial need. That need is compelling here, given the FTC's extraordinary decision to change its view of these acquisitions, ten and eight years after the fact, and the loss of evidence resulting from its unprecedented delay.

*The "work product doctrine" does not immunize the 2012 and 2014 documents*. The "work product doctrine" is inapplicable here. The documents were in some instances prepared by economists not acting at the direction of lawyers, and all of them likely contain core facts as well as FTC admissions. In any case, this doctrine is also qualified and overcome by the substantial need for production of contemporaneous evidence that is not available from any other source.

*The "attorney-client" privilege does not immunize the 2012 and 2014 documents*. In discussions with Meta, the FTC did not rely on this privilege – and for good reason. No

attorney-client privilege can be asserted as to staff descriptions and analyses of third-party information, which is what the documents at issue contain. The attorney-client privilege simply does not apply here, and Meta is aware of no authority supporting the FTC's belated assertion of that privilege.

*No "investigatory file" privilege immunizes the 2012 and 2014 documents.* The FTC cannot shield its work behind the cloak of an "investigatory file privilege." If there were such a broad and sweeping privilege, no internal government documents would ever be subject to discovery. The FTC cannot shoehorn its critical documents into this claimed privilege, which has been applied only in limited circumstances not remotely analogous to those presented here.

*Any claim of privilege was waived when the FTC chose to voluntarily share the documents with House Judiciary Committee members and staff.* In any event, the FTC cannot assert any of these privileges because it waived them by voluntarily sharing the documents with a third party. That voluntary circulation was accompanied by no enforceable confidentiality obligation and eviscerates any claim of privilege.

The FTC's strenuous efforts to prevent its own 2012 and 2014 compilations of relevant facts and conclusions from seeing the light of day – indeed, from being reviewed by the Court as part of its consideration of this motion – are strongly indicative of the need for these documents to be produced so that this case can be litigated fairly and fully. That evidence is highly likely to show that there is *no* "Personal Social Networking Services" market, that competition in 2012 and 2014 was robust and involved many firms the agency now wants to exclude from consideration, and that the facts available at the time did *not* show that the subject transactions were likely to harm competition and consumers in any way. In short, they are likely to prove that the FTC has no case. If the Court has doubt about any of this, it should review the documents *in camera* – something the agency tellingly opposes.

## I.     The FTC Is Withholding Critically Relevant Documents Prepared in 2012 and 2014 About the Acquisitions of Instagram and WhatsApp

### A.     The 2012 Instagram Documents

On April 9, 2012, Meta announced an agreement to acquire Instagram for approximately $1 billion.  On April 16, 2012, Meta filed with the federal government a required pre-merger notification about the acquisition under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR").  The FTC was required to review, and did review, this proposed acquisition to "determine" whether it would, "if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1).

Under the FTC's standard procedures, the FTC's pre-merger office first reviewed the filing.  On May 16, 2012, the FTC issued a second request, "requir[ing] the submission of additional information or documentary material."  *Id.* § 18a(e)(1)(A).  The FTC has confirmed to Meta that, prior to issuing the second request, staff from the FTC's Bureau of Competition and staff from its Bureau of Economics each prepared a "merger screening memorandum."  The Bureau of Competition also prepared a memorandum requesting authorization to use compulsory process and a memorandum regarding the issuance of a civil investigative demand to a third party.  As a matter of standard agency procedure, these memoranda contain *facts* relating to the FTC's review as well as a request for action from the Commission and the reasons for that request.  *See* Royall Decl. ¶¶ 4-6.

The FTC then conducted an extensive investigation, requiring production of a significant volume of documents from Meta and others, and interviews of Meta witnesses (including Mark Zuckerberg and Sheryl Sandberg), Instagram witnesses (founders Kevin Systrom and Mike Krieger), as well as third parties.  The FTC interviewed or asked to interview representatives from more than two dozen third-party companies as part of its review of the Instagram transaction.  Meta and Instagram each produced approximately 10,000 documents to the FTC.

The FTC has conceded that at least some of the documents it obtained in 2012 from third parties are no longer available. *See* Ex. C, Ltr. from Daniel J. Matheson (FTC Counsel) to Kevin B. Huff (Meta Counsel) at 4 (May 13, 2022).

The FTC's Bureau of Competition and its Bureau of Economics each prepared a memorandum to the Commissioners. *See* Ex. D, Ltr. from Daniel J. Matheson (FTC Counsel) to Kevin B. Huff (Meta Counsel) at 9 (May 12, 2022) ("May 12 Matheson Ltr."). As a matter of standard practice, these memoranda set forth the facts the FTC had developed in its investigation. *See* Royall Decl. ¶ 8. Of necessity, these facts included information about the market (or markets) in which Facebook and Instagram competed, barriers to entry (if any) in those markets, and whether Facebook's acquisition of Instagram would be expected to harm competition or consumers. *See id*. The memoranda also included recommendations to the Commission on whether these facts supported a challenge to the acquisition under federal antitrust law. *See id*. The economists' memorandum likewise discussed the facts relevant to market definition and market power. *See id*. (If there is any dispute on these points, Meta urges the Court to review the memoranda *in camera* as part of its consideration of the instant motion.)

On August 22, 2012, after receipt of these memoranda, the FTC voted 5-0 to close its investigation of the Instagram transaction without challenging it or imposing conditions to closing. After the acquisition closed on September 6, 2012, Meta incorporated and enhanced Instagram as a Meta product, investing significant resources to improve and grow Instagram from a reported 27 million registered users before the acquisition to more than a billion monthly active users worldwide.

### B. The 2014 WhatsApp Documents

On February 19, 2014, Meta announced an agreement to acquire WhatsApp. On March 13, 2014, Meta filed the required HSR pre-merger notification.

Here, as with Instagram, the FTC conducted an investigation that included interviews of nonparty companies. The FTC has confirmed to Meta that the FTC created documents relating to the WhatsApp HSR review, including a document that appears to consist of notes prepared by staff from the Bureau of Competition and a note assigning responsibility for the file to the appropriate division within the FTC. *See* May 12 Matheson Ltr. at 9.

The FTC allowed the transaction to close in 2014 without a second request and without challenge or conditions. In reliance on that regulatory clearance, Meta then made WhatsApp free for all consumers, and incorporated and enhanced WhatsApp as a Meta product, investing significant resources to improve and grow WhatsApp, which now has more than two billion monthly active users worldwide.

### C. Meta Seeks the Documents; the FTC Categorically Refuses To Produce Them

On March 9, 2022, Meta requested under Federal Rule of Civil Procedure 34 that the FTC produce the documents now at issue, among others. The FTC asserted boilerplate objections to this request on April 8, 2022, claiming that the information was irrelevant, that discovery of the documents (just eight documents, as the FTC later admitted) would not be proportional to the needs of the case, and that it would be "unduly burdensome." *See* FTC's Objections and Responses to Request for Production No. 1 (reproduced pursuant to Local Civil Rule 5.2(b) and 26.2(d) as Exhibit A) (attached)). The FTC also asserted generically that the information sought is protected by privileges.

The parties met and conferred on April 19, 2022 and May 6, 2022, and exchanged follow-up correspondence on April 27, 2022, May 10, 2022, May 12, 2022, and May 13, 2022. During these communications, the FTC confirmed that it possessed documents regarding the Instagram and WhatsApp investigations. Specifically, the FTC confirmed the existence of the

following documents (among others), which will be referred to collectively as the "FTC memoranda":

> Instagram:  (1) Bureau of Competition memorandum to the Commission requesting authorization of the use of compulsory process; (2) "Merger Screening Memoranda" prepared by the Bureau of Competition to the Merger Screening Committee, later provided to the Commission as an attachment to the compulsory process memorandum; (3) "Merger Screening Memoranda" prepared by the Bureau of Economics to the Merger Screening Committee, later provided to the Commission as an attachment to the compulsory process memorandum; (4) "Bureau of Competition . . . memorandum to the Commission with respect to closing the investigation"; (5) "Bureau of Economics . . . memorandum to the Commission with respect to closing the investigation"; and (6) resolution authorizing the use of compulsory process. May 12 Matheson Ltr. at 8-10.

> WhatsApp:  (1) A document that "appears to consist of notes prepared by Bureau of Competition personnel"; and (2) a "note assigning responsibility for the file to the appropriate merger division." *Id*. at 9.

The FTC also informed Meta that it had voluntarily provided *all* of the above documents to the Antitrust Subcommittee of the House Judiciary Committee in 2019.  *Id*. at 9-10.  At the time, the Subcommittee was investigating the FTC's investigations of digital markets, including the Instagram and WhatsApp acquisitions.  The subcommittee did not issue a subpoena or other compulsory process.  *See* Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the Comm. on the Judiciary, Investigation of Competition in Digital Markets:  Majority Staff Report and Recommendations, 116th Cong. 28 (Oct. 2020).

The FTC initially resisted production of the FTC memoranda to Meta on grounds of "deliberative process privilege."  It refused to say whether it asserted other privileges.  But it now asserts three additional privileges or protections:  attorney-client, investigatory file, and attorney work product.  Ex. E, Vedova Decl. ¶¶ 17-30.

## II.    The 2012 Instagram Documents and 2014 WhatsApp Documents Are Critically Relevant and Should Be Produced

To prevail in this antitrust case, the FTC must prove (among other things) that (1) Meta possessed monopoly power in a relevant antitrust market, and (2) Meta's acquisitions of Instagram and WhatsApp harmed competition and consumers.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 50, 58 (D.C. Cir. 2001) (en banc) (per curiam).  The federal rules authorize broad discovery, particularly in antitrust cases.  *See FTC v. Lukens Steel Co.*, 444 F. Supp. 803, 805 (D.D.C. 1977).  The FTC is no more or less entitled to avoid discovery of potentially relevant evidence than any other litigant.  *See SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403, 414 (S.D.N.Y. 2009) ("Like any ordinary litigant, the Government must abide by the Federal Rules of Civil Procedure.  It is not entitled to special consideration concerning the scope of discovery, especially when it voluntarily initiates an action.").

The FTC memoranda are obviously relevant.  Prepared at a time when significant documents were available, and witness memories were fresh, they may be the *best* available evidence bearing on three of the most fundamental issues in this Section 2 case:  What are the relevant market or markets for purposes of assessing the effect on competition and consumers of the Instagram and WhatsApp acquisitions?  What other entities competed in those markets?  And what was the likelihood of harm to consumers if the acquisitions were consummated?

The relevant market or markets, and the likely effect on consumers, must be assessed *at the time of the acquisition*.  *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 989 (D.C. Cir. 1990) (issue whether acquisition was "likely to substantially lessen competition"); *see also* 5 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1205a (4th ed. 2020) (acquisition must be evaluated "on the basis of evidence of the situation existing at the time of the acquisition").

The government has never sought to prosecute a Section 2 case like this one, based on long-concluded (and cleared) acquisitions. Thus, the FTC has placed Meta in the difficult position of having to defend itself by developing facts as to the actual state of competition in 2012 and 2014. The FTC memoranda directly address these issues; most important, they are a compendium of facts from key market participants that are likely unavailable from any other source, as well as admissions from the agency as to the import of those facts. *See* Fed. R. Evid. 801(d)(2); *United States v. AT&T Co.*, 498 F. Supp. 353, 356 (D.D.C. 1980) (statements made by agency officials admissible as party admissions in antitrust case); *see also United States v. Warren*, 42 F.3d 647, 655 (D.C. Cir. 1994) (statement the government adopted was a party admission); *United States v. Kattar*, 840 F.2d 118, 131 (1st Cir. 1988) (same).

Meta has already been informed by third parties that, for obvious reasons, ten-year-old (or older) documents have not been kept. The FTC has conceded that some of the documents it collected in 2012 are no longer available. Equally obvious is the fact that witness memories are affected by the passage of time, and it is beyond argument that the witnesses who provided information to the FTC in 2012 and 2014 did so at a time when relevant issues were fresher in mind than they are now.

The facts and admissions contained in the FTC memoranda are discoverable, indeed critically relevant, for all of the following reasons:

*The memoranda necessarily contain facts and admissions regarding the actual state of competition in 2012 and 2014, and the relevant market or markets affected by the Instagram and WhatsApp transactions.* To discharge its statutory obligation, the FTC necessarily had to evaluate the state of competition – who competed with who, and on what basis? Fundamental to any HSR inquiry is, first and perhaps foremost, determination of the relevant antitrust market or markets that may be affected by the transaction. *See*, *e.g.*, *FTC v. RAG-Stiftung*, 436 F. Supp. 3d

278, 292 (D.D.C. 2020) (denying relief where "FTC's proposed market [is] overbroad and inconsistent with the commercial realities of the industry"); *see also FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 556-57 (E.D. Pa. 2020) (declining to enjoin merger where government's effort to prove relevant market improperly relied on "conclusory assertions" and "rank speculation").

It is certain that the FTC undertook this inquiry in 2012 and 2014; it is likewise highly probable that it did *not* find any facts supporting the existence of the fictive "PSNS" market that it invented for purposes of this belated claim. The underlying facts contained in the memoranda are highly relevant and, given the passage of time, are unlikely to be found in any other place. The agency's *conclusions* from these facts, its determination of what they show as to the relevant market or markets, are also powerful admissions of a party opponent.

*The memoranda necessarily contain facts and admissions regarding the likely effect on competition and consumers of the Instagram and WhatsApp transactions.* Under Section 7 of the Clayton Act, the standard of review for HSR purposes, the agency was required to find facts, and draw conclusions, as to the likely effect on competition from the acquisitions, and particularly whether consumers were likely to be harmed in a tangible, concrete way – for example, by a price increase. *See*, *e.g.*, *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 214 (D.D.C. 2018) (rejecting "speculative" evidence of likely harm and explaining that it fell "far short of persuasively showing that this merger threatens to harm competition") (cleaned up), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). For the instant Section 2 case, at least the same standard applies. *See*, *e.g.*, *Microsoft*, 253 F.3d at 58-59 (government must show conduct had "anticompetitive effect" that harmed the competitive process and consumers) (emphasis omitted).

The agency necessarily did that in 2012 when it cleared the Instagram transaction 5-0 and in 2014 when it did not even issue a second request for the WhatsApp transaction. And, because it

10

cleared the transactions, it is highly likely that it *did not* find facts supporting a claim that harm to consumers was likely from either acquisition. Both the underlying facts and the FTC's conclusions (admissions) are centrally relevant and highly probative, as well as unavailable from any other source at this late date.

*The memoranda necessarily contain facts and admissions relevant to Meta's equitable defenses*. In addition to going directly to the fundamental elements of the agency's Section 2 case, the documents are directly at issue in connection with Meta's equitable defenses. Where, as here, a government agency seeks to dismantle a unitary company, ten and eight years after reviewing and clearing the transactions that created it, after billions of dollars have been invested in reliance on that clearance, the government's memoranda detailing the facts found and conclusions drawn are squarely at issue in the defenses of laches, estoppel, and waiver. *See*, *e.g.*, *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 12-13 (D.D.C. 2013) ("Estoppel is an equitable doctrine invoked to avoid injustice by precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct."). That evidence will certainly call into question the availability of the breakup remedy that the FTC has demanded. *See*, *e.g.*, *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235-36 (8th Cir. 2010) (equities weighed "overwhelmingly" against divestiture of consummated merger "closed . . . with no opposition by the government's antitrust enforcers").

## III. The FTC Memoranda Are Not Protected by Any Applicable Privilege or Protection

It is the FTC's burden to establish that privilege applies to each of the eight documents it is withholding. *See United States v. Legal Servs. for New York City*, 249 F.3d 1077, 1081 (D.C. Cir. 2001). It has not done so.

### A. The Deliberative Process Privilege Does Not Shield the FTC Memoranda from Discovery

The "deliberative-process privilege" can apply to "advisory opinions, recommendations and deliberations" to "protect[] the decision making processes of government agencies." *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 352 (D.D.C. 2018). The FTC claims that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Vedova Decl. ¶ 20. Yet the FTC's own internal policies provide that no such privilege should be claimed after ten years – even to exempt a document from Freedom of Information Act ("FOIA") disclosure, which would release the memoranda to the general public. The Instagram investigation closed in August 2012 (*infra* Part III.A.1). The privilege, where it can be claimed, does not even apply to factual material (*infra* Part III.A.2) or agency decision-making called into question by Meta's affirmative defenses (*infra* Part III.A.3). Even where it applies, it is a "qualified" privilege to be "narrowly construed": the court may order disclosure of all such materials upon "balanc[ing] the parties' interests." *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 854 (3d Cir. 1995). Here, the balance strongly favors disclosure of this critically relevant information (*infra* Part III.A.4). As this Court has explained, the privilege "obstruct[s] the search for truth," and its "benefits are indirect and speculative," so it must be "strictly construed." *Lundy v. Interfirst Corp.*, 105 F.R.D. 499, 504 (D.D.C. 1985). Finally, it was waived (*infra* Part IV).

### 1. The Deliberative Process Privilege Does Not Apply to the Instagram Memoranda

Recognizing that shrouding agency decision-making is inconsistent with open government, the FTC has an internal policy that, even in the FOIA context, where courts have been most protective, the deliberative process privilege should not be claimed after ten years:

> In the absence of staff articulating a reasonably foreseeable harm that a disclosure could create, FOIA staff will release the document to the requester. Further, for many years, when processing FOIA requests, the FTC has worked under the presumption that most information protected by the Deliberative Process Privilege (Exemption 5) should be released if the file has been closed for more than ten years unless staff can articulate a compelling reason for withholding the information.

FTC, *2016 Open Government Plan* 11 (Sept. 15, 2016), https://www.ftc.gov/system/files/

attachments/open-government/final_opengov_plan2016.pdf. We are now ten years after the

Instagram acquisition was announced and carefully reviewed by the FTC. The agency voted 5-0

to close the investigation without enforcement action on August 22, 2012, so the file will have

been closed for ten years by the end of this summer. No "compelling" reason for withholding

has even been suggested. In these circumstances, under the agency's own construction of the

deliberative process privilege, it cannot be invoked, at least as to the documents relating to

Instagram.

Moreover, because the FTC has "for many years" operated under the presumption that

documents "should be released" after ten years, the FTC cannot credibly argue that disclosure

would chill the candid speech needed for optimum government decision-making. The staff who

created both the Instagram and the WhatsApp memoranda did so under the assumption that they

would be disclosed to the public ten years later. All of the memoranda relating to the Instagram

transaction, at minimum, must therefore be produced without redaction.

    2.    The Deliberative Process Privilege Does Not Apply to Factual Materials
          Contained in the FTC Memoranda

As a matter of standard agency practice, the Bureau of Competition and the Bureau of

Economics must describe in their memoranda the material facts that were found during the

investigation. *See* Royall Decl. ¶ 8. It is black-letter law in this Circuit that the deliberative

process privilege does not apply at all to purely factual material. *See EPA v. Mink*, 410 U.S. 73,

13

87-88 (1973); *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007). The FTC's conclusory

statement ███████████████████████████████████████

████████████, Vedova Decl. ¶ 19, does not amount to the "detailed justification"

necessary to withhold the material. *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 21 F.

Supp. 3d 60, 83 (D.D.C. 2014). At the very least, the Court should review the FTC memoranda

*in camera* and order disclosure of all the factual material. *See id.*; *Pub. Citizen, Inc. v. Off. of

Mgmt. & Budget*, 598 F.3d 865, 876 (D.C. Cir. 2010) (ordering disclosure of factual information

in OMB analysis); *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 30, 39 (D.C. Cir. 2002)

(ordering disclosure of "purely factual" "site-specific information about the location of an

endangered species" for agency decision-making under Endangered Species Act); *Playboy

Enters., Inc. v. Dep't of Just.*, 677 F.2d 931, 936 (D.C. Cir. 1982) (ordering disclosure of factual

material in DOJ Office of Professional Responsibility report).

        3.      <u>The FTC Cannot Invoke the Deliberative Process Privilege Because Its
Decision-Making Process Is Directly at Issue</u>

Even if the FTC could invoke the deliberative process privilege here (and it cannot), more

than just the facts contained in the FTC memoranda must be disclosed. The full documents,

containing all of the staff conclusions and recommendations, must also be disclosed. The D.C.

Circuit has held that the deliberative process privilege "does not enter the picture at all" when

"the government's intent" or "the nature of governmental officials' deliberations" is at issue. *In

re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424-25

(D.C. Cir.), *on reh'g in part*, 156 F.3d 1279 (D.C. Cir. 1998); *see Doe 2 v. Esper*, 2019 WL

4394842, at *6 (D.D.C. Sept. 13, 2019) (deliberative process privilege inapplicable because

extent of deference afforded to government's position was at issue).

Meta has asserted equitable defenses (laches, estoppel, and waiver) that pivot on the unfairness of the government's conduct here: clearing transactions, inducing reliance over eight-to-ten years at the cost of billions of dollars, then suddenly reemerging to challenge those acquisitions on grounds that were likely rejected as unfounded when the transactions were reviewed and cleared. These equitable defenses put squarely at issue the FTC's intent and decision-making processes in 2012 and 2014, and strip any "deliberative process" argument from the contemporaneous documents as to that intent and decision-making.

*Brock v. Weiser*, 1987 WL 12686, at *2 (N.D. Ill. June 15, 1987), is instructive. There, the Department of Labor brought an enforcement action against the defendant after having previously investigated the defendant and informed him that the agency had decided to take "no further action." *Id.* at *3. When the Department later brought a case, the defendant asserted an estoppel defense based on reliance on the agency's prior decision. *Id.* Because the defendant's estoppel defense made the agency's "decision-making process . . . an issue in th[e] case," the court concluded that the agency could not assert the deliberate process privilege and ordered it to produce documents concerning its decision-making process from its earlier investigation. *Id.* For the same reasons, the deliberative process privilege is inapplicable here.

4.    The Deliberative Process Privilege Is a Qualified Privilege and Does Not Protect the FTC Memoranda

The deliberative process privilege, even where applicable, is a *qualified* privilege that can be overcome by a showing of need. Here the need is manifest. The evidence that Meta needs to defend itself, a decade after the acquisition of Instagram and eight years after the acquisition of WhatsApp, almost certainly overlaps with much of the very same evidence the agency accumulated in the FTC memoranda. Those memoranda likely constitute a contemporaneous

record of why those acquisitions *did not* violate the antitrust laws and *could not* be challenged in court. In short, this evidence is highly likely to prove that the FTC has no case.

In making this evaluation, courts consider, *inter alia*, (a) the relevance of the evidence, (b) the availability of evidence from other sources, (c) the seriousness of the litigation, (d) the role of the government, and (e) the possibility of future timidity by government employees. *See In re Sealed Case*, 121 F.3d 729, 737-38 (D.C. Cir. 1997) (per curiam). All of these factors strongly favor disclosure of the FTC memoranda. In an unrelated context, for reasons not applicable here, some courts have protected FTC staff memoranda from disclosure when those documents have been sought under the FOIA. *See*, *e.g.*, *Sterling Drug, Inc. v. FTC*, 450 F.2d 698 (D.C. Cir. 1971). These cases are inapplicable because this case does not involve a FOIA request. Unlike in civil discovery, in FOIA litigation, a showing of need cannot overcome the deliberative process privilege. *See Sealed Case*, 121 F.3d at 737 & n.5.

*Relevance of the evidence*. As discussed above, *supra* Part II, the FTC memoranda could not be *more* relevant. The agency necessarily made findings as to the relevant market and the likely effect of the acquisitions. In addition, its actions are highly relevant to Meta's equitable defenses, as well as the availability of the FTC's requested breakup remedy. *See*, *e.g.*, *Swartwood v. Cty. of San Diego*, 2013 WL 6670545, at *6 (S.D. Cal. Dec. 18, 2013) (ordering disclosure of report from government investigation in part because it is "clearly relevant" to the case). The FTC memoranda are all the more relevant because they are contemporaneous with the events at issue in the current litigation, which was brought so long after those events as to unfairly prejudice Meta in its efforts to obtain evidence necessary for its defense. *See First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 322 (2000) (privilege did not bar disclosure where government's internal communications would help interpret contract by revealing government's intent at the time of the transaction at issue).

*Availability of evidence from other sources.*  There is no other source for the evidence available in the FTC memoranda.

*First*, as discussed above, *supra* Part II, the FTC memoranda contain the facts – from documents and witness accounts – *most relevant* to the issues before the Court.  With the passage of time, it is highly unlikely that this same evidence can be reassembled ten and eight years after the fact.  Further, to the extent testifying third parties' thoughts and opinions have changed between when the acquisitions occurred and now, the memoranda may contain critical potential impeachment material.  Certainly no other compendium of evidence centrally relevant to the Instagram and WhatsApp acquisitions exists anywhere else.  *See Swartwood*, 2013 WL 6670545, at *6 (ordering disclosure of government investigative document because such information was unavailable elsewhere); *Cal. State Foster Parent Ass'n v. Wagner*, 2008 WL 2872775, at *5 (N.D. Cal. July 23, 2008) (ordering disclosure because, "[w]hile some of the factual information contained in the analyses may be reproducible elsewhere, it is likely that the quality and persuasiveness of such evidence will be substantially inferior to that produced by the agency charged with enforcing and administering the programs at issue in this litigation").

*Second*, the FTC memoranda are the *only* source of the FTC's decision-making process, which is directly at issue in Meta's equitable defenses, as explained above, *supra* Part II.  *See Chisler v. Johnston*, 796 F. Supp. 2d 632, 641 (W.D. Pa. 2011) (ordering disclosure of internal report because "no other evidence that speaks to the [Department of Corrections'] reaction" exists); *MacNamara v. City of New York*, 249 F.R.D. 70, 82 (S.D.N.Y. 2008) (ordering disclosure of document because it contained information about government personnel and their role in challenged conduct that would be unavailable from other sources).

*Seriousness of litigation.*  This is arguably one of the most significant antitrust cases that the government has ever brought.  The government seeks for the first time ever to dismantle a

major U.S. company a decade after the company made the acquisitions that helped it grow and

serve billions of people, and a decade after the very same government agency cleared the

acquisitions. *Cf. Fed. Home Loan Mortg. Corp. v. Deloitte & Touche, LLP*, 2015 WL 12766388,

at *7 (S.D. Fla. Aug. 4, 2015) (professional malpractice claim seeking $1.3 billion in damages

sufficiently "serious" to support disclosure of documents withheld under claim of "deliberative

process" privilege).

    *Role of the government*.  Here, the FTC is a plaintiff in a civil lawsuit.  "When the

government seeks affirmative relief, it is fundamentally unfair to allow it to evade discovery of

materials that a private plaintiff would have to turn over."  *In re Methyl Tertiary Butyl Ether*

*(MTBE) Prods. Liab. Litig.*, 274 F.R.D. 106, 114 (S.D.N.Y. 2011); *see United States v. Gates*,

35 F.R.D. 524, 529 (D. Colo. 1964) (government cannot "maintain a civil action against one of

its citizens" while "at the same time refus[ing] to permit the very . . . company whose dealings

are under attack to have access to the materials which appear at this juncture to provide the . . .

material both for the government's claim . . . and for [defendant's] defense"); *Lundy*, 105 F.R.D.

at 503 (privilege carries less weight where government is party).  Moreover, the FTC's actions

in first clearing, then delaying, and then abruptly changing its position are directly at issue in

Meta's equitable defenses, so its role is uniquely important in this case.  *See supra* Part II.

    *Possibility of future government timidity*.  The agency itself has recognized that

disclosure poses no threat to government decision-making here, where disclosure comes ten

years after the fact for the Instagram memoranda.  *See supra* Part III.A.1.  This makes perfect

sense:  There is no reason to believe that disclosure of decade-old work will make the FTC staff

"timid" in the future.  Moreover, if disclosure did threaten such effect, that ship has sailed:  *there*

*has already been disclosure* to House Judiciary Committee members and staff, which belies any

claim that secrecy is required to prevent the chilling of internal deliberations.  *See Comm. on*

*Oversight & Gov't Reform, U.S. House of Representatives v. Lynch*, 156 F. Supp. 3d 101, 114

(D.D.C. 2016) (no harms from disclosure where executive previously disclosed contents of

documents); *Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 2020 WL 527987, at

*14 (M.D. Pa. Jan. 31, 2020) (no threat of government timidity where emails had previously

been "sent to numerous individuals").  The documents were created, and the decisions made, ten

and eight years ago.  This significantly reduces any concern about chilling staff candor.  *See*

*Gradeless v. Am. Mut. Share Ins. Corp.*, 2011 WL 221895, at *5 (S.D. Ind. Jan. 19, 2011) (any

harm to deliberative process is "ameliorated by the fact that the administrative decisions at issue

took place about seven years ago and have long ago been 'completed' ").  Further, the FTC has

not claimed and cannot claim that the memoranda contain particularly sensitive information,

such that disclosure might chill agency candor.  *Compare Breiterman v. U.S. Capitol Police*, 323

F.R.D. 36, 46 (D.D.C. 2017) (critiques of agency disciplinary practices highly sensitive), *with*

*NAACP v. Bureau of Census*, 401 F. Supp. 3d 608, 618 (D. Md. 2019) (economic and statistical

analyses "not so sensitive that their disclosure might diminish the candor of agency deliberations

in the future"), *and Amchem Prods., Inc. v. GAF Corp.*, 64 F.R.D. 550, 553 (N.D. Ga. 1974)

(draft Environmental Protection Agency interpretations of statute not shown to be "sensitive").

Finally, here, unlike with Congress, the documents will be subject to a protective order

that limits their use to this case, and the agency has the option of producing documents to Meta

as "Confidential" or "Highly Confidential."  *See Wagner*, 2008 WL 2872775, at *6 (ordering

disclosure where concerns over chilling of agency discussion "may be mitigated by issuing a

protective order or having the documents disclosed under seal").  Where the FTC readily

revealed these documents to Congress and staff, with no protection against public disclosure, it

cannot credibly claim that disclosure here, under the Protective Order, would inhibit agency staff

candor in the future.

To the extent the FTC attempts to rely on *FTC v. Warner Communications, Inc.*, 742 F.2d 1156 (9th Cir. 1984) (per curiam), the case is inapposite. There, the Ninth Circuit held that two memoranda from the FTC's Bureau of Economics recommending against challenging a merger were protected by the deliberative process privilege. In *Warner*, however, the FTC promptly challenged the acquisition, and similar information was available to the defendants, *id.* at 1161-62; here, the FTC cleared the deals and waited years to challenge them, causing a delay that has inhibited Meta's ability to obtain historical information with which to defend itself. Further, the FTC memoranda are central to Meta's equitable defenses, which was not the case in *Warner*.

### 5. The FTC Waived Any Claim of Privilege

Furthermore, the FTC has waived any claim of privilege by voluntarily providing all the FTC memoranda to House Judiciary Committee members and staff. *See infra* Part IV.

## B. The Work Product Doctrine Does Not Shield the FTC Memoranda from Discovery

The FTC asserts that the documents are protected work product. But, for multiple reasons, that doctrine does not shield the FTC memoranda from discovery.

### 1. The Bureau of Economics Memorandum Is Not Work Product

The Bureau of Economics memorandum evaluating the Instagram transaction is not work product at all. The FTC has not established that it was created by counsel or by someone acting at the direction of counsel. *See Janicker ex rel. Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650-51 (D.D.C. 1982). The burden of proving that the work product doctrine applies falls "on the party asserting privilege." *Alexander v. FBI*, 192 F.R.D. 42, 46 (D.D.C. 2000). To carry this burden, a party must offer more than "general and conclusory declarations" and come forward with "specific information" about the creation and use of the documents and the involvement of attorneys. *Id.* at 45-46. The FTC fails to carry this burden. While Ms. Vedova

states that  she does not provide any specific facts ██████████████████████████████████████████████████. Vedova Decl. ¶ 26; *but see id.* ¶¶ 6, 24 (conceding that ███████████████████████████████████████████████). Ms. Vedova does not claim to have been personally involved in the FTC's contemporaneous evaluation of the Instagram merger at all, and her declaration does not claim that she wrote or received any memoranda regarding that merger at the time.

The FTC's staff economists are independent from the Bureau of Competition; they conduct an independent assessment based on economics and "do not act at the direction of attorneys." Royall Decl. ¶ 5; *see also United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 134, 137 (D.D.C. 2012) (degree of counsel's involvement is "key component" that "bears directly on whether the document was prepared in anticipation of litigation"). They review the economic evidence regarding the market or markets, and the likelihood of harm to competition and consumers from the transaction under review. *See* Royall Decl. ¶¶ 5, 8. The work of the FTC's economists should therefore be produced. *See Janicker*, 94 F.R.D. at 650-51 (internal committee report not produced "at the direction of counsel"); *ISS Marine Servs.*, 905 F. Supp. 2d at 138 (investigation "was conducted by a non-attorney who never communicated with outside counsel"); *Warren v. Bastyr Univ.*, 2013 WL 2181762, at *3 (W.D. Wash. May 17, 2013) ("no indication that an attorney requested[ ] or created" the documents in question); *Rafferty v. KeyPoint Gov't Sols., Inc.*, 2018 WL 3059600, at *7 (D. Idaho June 19, 2018) (investigative report not "prepared . . . at the direction of counsel").

2.    Meta Has a Substantial Need for the Documents

To the extent the work product doctrine is applicable, Meta's need for the FTC memoranda is compelling and exceeds the showing made in other cases where courts ordered disclosure.

*There is substantial need for disclosure of the factual materials contained in the FTC memoranda*.  There is only limited protection for facts contained in documents prepared by attorneys in anticipation of litigation.  "Fact" work product is discoverable upon a showing of substantial need and unavailability through other means.  *See FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 153 (D.C. Cir. 2015).  "Substantial need" is established where materials are relevant to the case, have unique value apart from those already in movant's possession, and "special circumstances" prevent the movant from otherwise obtaining the materials.  *Id.* at 154-55.  Meta easily meets this test under the extraordinary circumstances here.

*The FTC memoranda are relevant*.  There is no question that the facts collected and memorialized by the agency in 2012 and 2014, as to the relevant market or markets and the likely effects of the two transactions, as well as the agency's reasons for acting or not acting, are centrally relevant to Meta's challenges to the government's case and its equitable affirmative defenses.  *See Jud. Watch, Inc. v. U.S. Dep't of State*, 2019 WL 2452325, at *1-3 (D.D.C. June 12, 2019) (emails with attorney opinions were discoverable fact work product because their recommendations – regarding whether Secretary Clinton could use private email to avoid FOIA obligations – amounted to "material facts" central to underlying issues in case).

*The FTC memoranda have unique value*.  The collection of contemporaneous facts, from a variety of sources including documents and witnesses, has unique value because Meta does not possess this evidence and cannot otherwise obtain this evidence – and certainly cannot do so ten and eight years after the transactions at issue.

22

*Special circumstances prevent Meta from otherwise obtaining the materials*. The passage of time alone constitutes a special circumstance that prevents Meta from obtaining this centrally relevant evidence. Meta is already aware that documents have been lost – both the FTC itself and third parties have confirmed this. It is equally likely that witnesses have significantly diminished memories a decade after the fact. *See*, *e.g.*, *FTC v. Match Grp., Inc.*, No. 1:22-mc-00054-RJL, Dkt. No. 11, at 15-16 (D.D.C. June 8, 2022) (petition by FTC to enforce Civil Investigative Demand to obtain internal documents from 2014 because "FTC must be able to weigh the credibility of witness testimony against the contemporaneous documents"); *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002) (substantial need where, *inter alia*, documents had been destroyed); *see also*, *e.g.*, *Le v. Diligence, Inc.*, 312 F.R.D. 245, 245-48 (D. Mass. 2015) ("substantial need" for photos depicting boat where injury occurred because boat underwent "structural changes" and no other depiction of its "condition . . . at the [relevant time]" existed); *Interstate Fire & Cas. Co. v. Roman Cath. Church of Diocese of Phoenix*, 2012 WL 12867974, at *1 (D. Ariz. Jan. 19, 2012) ("substantial need" where – due to passage of time – witnesses had faded memories); *Johnson v. Wash. Metro. Area Transit Auth.*, 1990 WL 113877, at *2-3 (D.D.C. July 26, 1990) (same); *Leamon v. KBR, Inc.*, 2011 WL 13340584, at *2 (S.D. Tex. Nov. 10, 2011) (same).

The government has never before sought to break up a company ten and eight years after clearing the transactions that created the unitary company. If that does not establish a compelling case for substantial need for the facts that caused the government to clear the transactions, nothing will. Indeed, it would be grossly unfair to let the FTC possess and use the contemporaneous evidence collected in 2012 and 2014 without making that evidence equally available to Meta, as courts have held in ordering disclosure. *See U.S. ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419, 425-26 (D.D.C. 2014) (substantial need where one side had

23

"substantial advantage from having access to the fruits of [a] prior criminal investigation" that provided "critical sources of evidence for *both* sides"); *Howard v. Fowler Bros., Inc.*, 2011 WL 3438407, at *2 (W.D. Ky. Aug. 5, 2011) (similarly emphasizing unfair asymmetry – defendant's ability to interview key witnesses "unavailable to Plaintiff").

*There is no protected opinion work product here.* As the Court held in *Judicial Watch*, the agency's reasons for acting or not acting are "material facts" relevant to the FTC's claims and Meta's affirmative defenses. *See Jud. Watch*, 2019 WL 2452325, at *1-3 (emails with attorney opinions discoverable as fact work product). But even if the staff conclusions and recommendations here are characterized as opinion work product, they still must be disclosed. Production of opinion work product can be compelled upon an "extraordinary showing of necessity," *In re Sealed Case*, 676 F.2d 793, 811 (D.C. Cir. 1982), such as when "evaluative opinions and observations . . . are essential to establish and substantiate [a] defendant's claim," *United States v. AT&T Co.*, 86 F.R.D. 603, 633 n.1 (D.D.C. 1979) (citing *Bird v. Penn Cent. Co.*, 61 F.R.D. 43 (E.D. Pa. 1973)), or when the opinion work product "goes to the heart of the issues in the litigation," *Tri-State Hosp. Supply Corp. v. United States*, 2005 WL 3447890, at *6 (D.D.C. Dec. 16, 2005).

Both grounds are present here. The FTC's evaluative opinions and observations are essential to substantiate Meta's equitable claims that the government has acted unfairly and inequitably in bringing this case so many years after the transactions and after conducting careful reviews that resulted in the transactions being cleared – a clearance on which Meta was entitled to rely. The FTC's decision-making is directly at issue in this case. *See supra* Part II.

*Bird v. Penn Central Co.*, 61 F.R.D. 43 (E.D. Pa. 1973) (cited with approval by *AT&T*, 86 F.R.D. at 633 n.1), is instructive. In that case, plaintiff insurance companies sought to rescind two insurance policies covering the defendants based on alleged false statements in their insurance application. The defendants asserted a laches defense on the ground that the insurers should have known about the allegedly false statements years ago and sought investigative materials compiled by the insurers' lawyers. The court ordered production of the documents, which the insurers claimed were opinion work product, because they were "essential" for the defendants to "substantiate their defense." 61 F.R.D. at 46-47; *see also Kockums Indus. Ltd. v. Salem Equip., Inc.*, 561 F. Supp. 168, 173 (D. Or. 1983) (ordering disclosure of opinion work product without which "the defendant will have no chance to prove its potentially valid counterclaims"); *Tri-State Hosp.*, 2005 WL 3447890, at *6 (ordering disclosure of opinion work product where decision to sue was at heart of malicious-prosecution case).

Any opinion work product here likewise "goes to the heart of the issues in the litigation." *Tri-State Hosp.*, 2005 WL 3447890, at *6. There is no doubt that the agency lawyers identified and assessed the relevant market or markets, and that issue is of potentially dispositive significance to this case. If the FTC fails to prove its "PSNS" market definition, the case fails. Meta believes the agency lawyers found no such market when they conducted their 2012 and 2014 investigations, and that certainly goes to the heart of this case. Equally apparent: the agency was required under HSR to determine whether the acquisitions threatened *likely* harm to competition and consumers. *See* 15 U.S.C. § 18a. The same element is present in this case, as the Court has held. *See FTC v. Facebook, Inc.*, --- F. Supp. 3d ---, 2022 WL 103308, at *12 (D.D.C. Jan. 11, 2022). Meta believes that the agency lawyers found *no* such harm in 2012 and 2014, even after careful review of relevant contemporaneous evidence. That, too, indisputably goes to the heart of the case.

This case is therefore the extraordinary case in which it would be fundamentally unfair to allow the adversary to hide its centrally relevant and potentially dispositive admissions behind a screen of work product privilege.  Any protection that arguably exists has been overcome by Meta's showing of substantial need and extraordinary necessity.

Moreover, for the reasons set forth below, *infra* Part IV, the agency waived any claim of privilege when it chose to share all of its memoranda with the House Judiciary Committee.

### C.      The Attorney-Client Privilege Does Not Apply

The FTC asserts attorney-client privilege over the memoranda, though it has not relied on the privilege in prior correspondence and did not purport to invoke the privilege in response to a FOIA request for similar staff recommendation memoranda relating to Google.  *See* Ltr. from Dione J. Stearns (Assistant General Counsel, FTC) to Andreas L. Booher (Apr. 2, 2015), https://www.ftc.gov/system/files/documents/foia_requests/150401googlememo_0.pdf.  The D.C. Circuit requires an agency that seeks to claim the privilege over a communication from counsel to an agency client to establish that the communication reveals confidential information *belonging to the agency*.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980); *Brinton v. Dep't of State*, 636 F.2d 600, 603-04 (D.C. Cir. 1980).  The FTC fails to identify any confidential information belonging to the purported agency client – the Commission – that would be revealed by the memoranda.  The FTC claims that these memoranda may ████████████████████████████  Vedova Decl. ¶ 30.  But the D.C. Circuit has held that a communication reflecting confidential information about third parties is insufficient for an agency to claim attorney-client privilege; the privileged document must reveal "private information *concerning the agency*."  *Coastal States*, 617 F.2d at 863 (emphasis added); *see Schlefer v. United States*, 702 F.2d 233, 245 (D.C. Cir. 1983) (attorney-client privilege did not apply to communication reflecting information from an agency "outsider,"

26

rather than "the Agency official who solicits the Chief Counsel's advice").  Moreover, the

agency waived any claim of privilege by voluntarily sharing all of its memoranda with the House

Judiciary Committee.  *See infra* Part IV.

### D. The Investigatory File Privilege Does Not Apply

The FTC claims "investigatory file privilege" ████████████████████████

███████████████████████████████████████████████.  Vedova Decl. ¶ 23.

But the FTC has already provided Meta with the names of the third parties it interviewed during

the 2012 and 2014 investigations, and it has agreed that it must produce any documents those

third parties provided (some of which have been lost, as it concedes).  And Ms. Vedova provides

no substance to the claim of "secret" internal procedures.  Those procedures are public under the

HSR and are even disclosed in the very declaration that the FTC has submitted.

Courts in this district recognizing this privilege have held that "the most crucial and

important factor" is "the importance of the information sought."  *Tri-State Hosp.*, 2005 WL

3447890, at *9.  This factor weighs heavily in favor of Meta for the reasons described above.

Other factors also favor Meta.  Because the FTC's 2012 and 2014 investigations are "long since

over," there is no risk that production of the memoranda will interfere with an ongoing

investigation.  *Miller v. Holzmann*, 2007 WL 779393, at *2 (D.D.C. Mar. 8, 2007); *see Tri-State

Hosp.*, 2005 WL 3447890, at *10 (no investigatory files privilege where investigation "took

place approximately ten years ago").  And any concerns as to third-party confidential

information provided to the FTC a decade ago are unfounded:  the FTC concedes that such

material must be disclosed, including the names of witnesses and documents they produced.

And confidential information, if any, is more than adequately addressed by the Protective Order.

*See In re Anthem, Inc. Data Breach Litig.*, 236 F. Supp. 3d 150, 167 (D.D.C. 2017) (no

investigatory files privilege; protective order adequately addressed government's concerns

regarding third-party confidential information).  And, once again, the FTC waived any claim of privilege by voluntarily sharing all of its memoranda with the House Judiciary Committee.  *See infra* Part IV.

## IV. The FTC Waived Any Privilege by Voluntarily Providing the Memoranda to House Judiciary Committee Members and Staff

The FTC has confirmed that it shared the FTC memoranda with Members of Congress and their staff.  *See* May 12 Matheson Ltr. at 9.  That disclosure was voluntary:  the House Judiciary Committee made only an informal request for those documents and never issued a subpoena or other form of compulsory process to the FTC; and the FTC neither sought nor obtained enforceable confidentiality protection.  *See supra* p. 7.

This disclosure waived any privilege claim.  *See*, *e.g.*, *Sealed Case*, 121 F.3d at 741-42 (White House waived deliberative process privilege as to "specific documents that it voluntarily revealed to third parties outside the White House"); *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) ("[a]ny voluntary disclosure by the holder" of attorney-client privilege "is inconsistent with the confidential relationship and thus waives the privilege"); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Commerce*, 2020 WL 4732095, at *2 (D.D.C. Aug. 14, 2020) ("*CREW*") (Commerce Department waived deliberative process privilege as to documents shared with "a third party"); *see also In re Veiga*, 746 F. Supp. 2d 27, 35 (D.D.C. 2010) ("[V]oluntary disclosure to a third party constitutes a waiver [of work product privilege] where the disclosure is made under circumstances inconsistent with the maintenance of secrecy from one's adversary."); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & "ERISA" Litig.*, 2009 WL 10708594, at *2 (D.D.C. June 9, 2009) (Federal Housing Finance Agency waived deliberative process privilege by failing to take "'reasonable steps' to protect its deliberative process privilege" and producing purportedly privileged documents).  Sharing with

legislators and their staff is not different from sharing with any other third party – it effects a waiver. *See*, *e.g.*, *United States v. Philip Morris Inc.*, 212 F.R.D. 421, 426 (D.D.C. 2002) (producing documents to Congress waived attorney-client and work product privilege); *First Heights Bank*, 46 Fed. Cl. at 319 (producing documents to Congress waived attorney-client privilege).

The FTC's failure to demand that the House Judiciary Committee issue a formal subpoena or take specific precautions to protect the confidentiality of the materials confirms the FTC waived any privilege claim. *See CREW*, 2020 WL 4732095, at *2 ("An agency must take steps to protect privileged material that is commensurate with the breadth of the privilege it seeks to claim."). The FTC's ███████████████████████████ ████████ in the documents, *see* Ex. F, Ltr. from April J. Tabor (Acting Secretary of the Commission) to Reps. Jerold Nadler, et al. (House Judiciary Comm.) (Oct. 29, 2019) – which the Committee and its staff was free to disregard – was insufficient. *See Philip Morris*, 212 F.R.D. at 424-26 ("cursory" statement in cover letter to Congress was "insufficient" to protect documents from waiver).

The FTC has denied waiving any applicable privileges based on cases decided under FOIA. FOIA establishes a process that allows members of the public to request government documents and allows the government to withhold documents if one of nine statutory exemptions applies. *See* 5 U.S.C. § 552(b). FOIA also specifies that the application of one of FOIA's statutory exemptions does not give an agency "authority to withhold information from Congress." *Id.* § 552(d). On the basis of § 552(d)'s language, the D.C. Circuit has held that an agency's ability to assert that one of FOIA's statutory exemptions applies is not affected by whether the document has been shared with Congress. *See Rockwell Int'l Corp. v. U.S. Dep't of*

*Just.*, 235 F.3d 598, 604 (D.C. Cir. 2001); *Murphy v. Dep't of Army*, 613 F.2d 1151, 1155-56 (D.C. Cir. 1979).

Meta does not seek the FTC memoranda under FOIA; the specific statutory provision protecting disclosure to Congress does not apply. Instead, Meta seeks these memoranda from a litigation adversary pursuing claims to break up the company. It relies on civil discovery obligations that apply no less to the FTC than to Meta. In that context, the rule that a voluntary disclosure to Congress waives a party's privileges in contested litigation applies. *See*, *e.g.*, *First Heights Bank*, 46 Fed. Cl. at 319 (two federal entities – the Federal Savings and Loan Insurance Corporation and the Resolution Trust Corporation – waived attorney-client privilege by producing privileged communications to Congress).

Moreover, the FOIA cases present none of the extraordinary facts that are present here. *See Rockwell*, 235 F.3d 598; *Murphy*, 613 F.2d 1151. The FTC previously cleared the deals it now challenges. When a change in leadership prompted second-guessing of those clearances, and Members of Congress sought to revisit them as well, the agency voluntarily disclosed its 2012 and 2014 compilations of facts and conclusions. The Members and their staff reviewed and then relied on these very documents in a public report specifically addressing the FTC's review of the Instagram and WhatsApp acquisitions. It would be fundamentally unfair to permit the FTC to funnel these documents to outsiders, while denying Meta the use of these same documents that are critical for its defense. *See Subpoenas Duces Tecum*, 738 F.2d at 1372 (affirming compulsion order; it would be "unfair to allow [a party] to select according to their own self-interest to which adversaries they will allow access to the materials").

**CONCLUSION**

The Court should order the FTC to produce to Meta unredacted copies of the eight FTC memoranda that have been withheld on claim of privilege.

Dated: July 5, 2022

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
Kevin B. Huff (D.C. Bar No. 462043)
L. Vivian Dong (D.C. Bar No. 1722506)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900

*Counsel for Defendant Meta Platforms, Inc.*

# Exhibit 539

An official website of the United States government  Here's how you know ⌄

English | español | Report Fraud | Get Consumer Alerts | Search the Legal Library | Submit Public Comments

**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

Enforcement ⌄   Policy ⌄   Advice and Guidance ⌄   News and Events ⌄   About the FTC ⌄   🔍

# Premerger Notification and the Merger Review Process

Home  /  Competition Guidance  /  Guide to Antitrust Laws  /  Mergers

**Guide to Antitrust Laws**

The Antitrust Laws

The Enforcers

Dealings with Competitors

Dealings in the Supply Chain

Single Firm Conduct

Price Discrimination: Robinson-Patman Violations

**Mergers**

   Competitive Effects

   Entry and Efficiencies

   Markets

   Frequently Asked Questions About Merger Consent Order Provisions

   **Premerger Notification and the Merger Review Process**

Under the Hart-Scott-Rodino (HSR) Act, parties to certain large mergers and acquisitions must file premerger notification and wait for government review. The parties may not close their deal until the waiting period outlined in the HSR Act has passed, or the government has granted early termination of the waiting period. The FTC administers the premerger notification program, and its staff members answer questions and maintain a website with helpful information about how and when to file. The FTC also provides daily updates of deals that receive early termination.

## Steps in the Merger Review Process

### Step One: Filing Notice of a Proposed Deal

Not all mergers or acquisitions require a premerger filing. Generally, the deal must first have a minimum value and the parties must be a minimum size. These filing thresholds are updated annually. In addition, some stock or asset purchases are exempt, as are purchases of some types of real property. For further help with filing requirements, see the FTC's Guides to the Premerger Notification Program. There is a filing fee for premerger filings.

For most transactions requiring a filing, both buyer and seller must file forms and provide data about the industry and their own businesses. Once the filing is complete, the parties must wait 30 days (15 days in the case of a cash tender offer or a bankruptcy) or until the agencies grant early termination of the waiting period before they can consummate the deal.

### Step Two: Clearance to One Antitrust Agency

Parties proposing a deal file with both the FTC and DOJ, but only one antitrust agency will review the proposed merger. Staff from the FTC and DOJ consult and the matter is "cleared" to one agency or the other for review (this is known as the "clearance process"). Once clearance is granted, the investigating agency can obtain non-public information from various sources, including the parties to the deal or other industry participants.

### Step Three: Waiting Period Expires or Agency Issues Second Request

After a preliminary review of the premerger filing, the agency can:

1. terminate the waiting period prior to the end of the waiting period (grant Early Termination or "ET");

2. allow the initial waiting period to expire; or

3. issue a Request for Additional Information ("Second Request") to each party, asking for more information.

If the waiting period expires or is terminated, the parties are free to close their deal. If the agency has determined that it needs more information to assess the proposed deal, it sends both parties a Second Request. This extends the waiting period and prevents the companies from completing their deal until they have "substantially complied" with the Second Request and observed a second waiting period. A Second Request typically asks for business documents and data that will inform the agency about the company's products or services, market conditions where the company does business, and the likely competitive effects of the merger. The agency may conduct interviews (either informally or by sworn testimony) of company personnel or others with knowledge about the industry.

### Step Four: Parties Substantially Comply with the Second Requests

Typically, once both companies have substantially complied with the Second Request, the agency has an additional 30 days to review the materials and take action, if necessary. (In the case of a cash tender offer or bankruptcy, the agency has 10 days to complete its review and the time begins to run as soon as the buyer has substantially complied.) The length of time for this phase of review may be extended by agreement between the parties and the government in an effort to resolve any remaining issues without litigation.

### Step Five: The Waiting Period Expires or the Agency Challenges the Deal

The potential outcomes at this stage are:

1. close the investigation and let the deal go forward unchallenged;

2. enter into a negotiated consent agreement with the companies that includes provisions that will restore competition; or

3. seek to stop the entire transaction by filing for a preliminary injunction in federal court pending an administrative trial on the merits.

Unless the agency takes some action that results in a court order stopping the merger, the parties can close their deal at the end of the waiting period. Sometimes, the parties will abandon their plans once they learn that the agency is likely to challenge the proposed merger.

In many merger investigations, the potential for competitive harm is not a result of the transaction as a whole, but rather occurs only in certain lines of business. One example would be when a buyer competes in a limited line of products with the company it seeks to buy. In this situation the parties may resolve the concerns about the merger by agreeing to sell off the particular overlapping business unit or assets of one of the merging parties, but then complete the remainder of the merger as proposed. This allows the procompetitive benefits of the merger to be realized without creating the potential for anticompetitive harm. Many merger challenges are resolved with a consent agreement between the agency and the merging parties.

Previous:                                              Up
Frequently Asked Questions About Merger
Consent Order Provisions



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

Report Fraud     Get Consumer Alerts     Search the Legal Library     Submit Public Comments

**Enforcement**
Cases and Proceedings
Premerger Notification Program
Merger Review
Anticompetitive Practices
Rulemaking
Statutes
Competition and Consumer Protection Guidance Documents
Warning Letters
Consumer Sentinel Network
Criminal Liaison Unit
FTC Refund Programs
Notices of Penalty Offenses
Competition Matters Blog

**Policy**
Advocacy and Research
Advisory Opinions
Cooperation Agreements
Federal Register Notices
Reports
Public Comments
Studies
Testimony
Policy Statements
International
Office of Technology Blog

**Advice and Guidance**
Consumer Advice
Military Consumer
Consumer.gov
Business Guidance
Competition Guidance
Bulk Publications

**News and Events**
News
Events
Features
Topics
Data and Visualizations
Contests
Stay Connected

**About the FTC**
Mission
History
Commissioners and Staff
Bureaus and Offices
Budget and Strategy
Office of Inspector General
Careers at the FTC
Contact

Privacy Policy     Policy and Notices     Accessibility     FOIA     No FEAR Act     Office of Inspector General     USA.gov

# Exhibit 540

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

META PLATFORMS, INC.,

      Defendant.

Case No. 1:20-cv-03590-JEB

**REPLY MEMORANDUM IN SUPPORT OF META PLATFORMS, INC.'S
MOTION TO COMPEL ANSWER TO INTERROGATORY NO. 10
REGARDING THE FTC'S MARKET DEFINITION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

I.     The FTC Does Not Lack Information About Its Own Construct ....................................... 2

II.    The FTC Does Not Need Discovery To Answer The Question ......................................... 5

III.   The FTC's Other Excuses Are Evasions And Non-Sequiturs ........................................... 6

     A.     The FTC's Alternative Theory Of Market Power Cannot Justify A
          Refusal To Provide Fundamental Information About The Theory
          On Which The Court Permitted The Case To Proceed .............................................. 6

     B.     Meta's Interrogatory Response Has No Bearing On The FTC's
          Response ..................................................................................................................... 8

     C.     Whether The FTC Considers Features As Potential "Barriers To
          Entry" Is Irrelevant ................................................................................................... 8

     D.     Meta Needs This Information Now To Conduct Effective
          Discovery ................................................................................................................... 9

CONCLUSION ........................................................................................................................... 10

# TABLE OF AUTHORITIES

Page

## CASES

\* *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012).......................................................4, 9

*Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011) ........................5

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins.*, 166 F. Supp. 3d 988
(N.D. Cal. 2015)..........................................................................................................4, 9

*Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 17 (D.D.C. 2009)............................................8

*FTC v. Facebook, Inc.*:

560 F. Supp. 3d 1 (D.D.C. 2021) .........................................................................7

--- F. Supp. 3d ---, 2022 WL 103308 (D.D.C. Jan. 11, 2022) .............................2

*FTC v. Shkreli*, --- F. Supp. 3d ---, 2022 WL 135026 (S.D.N.Y. Jan. 14, 2022)....................7

\* *King v. E.F. Hutton & Co.*, 117 F.R.D. 2 (D.D.C. 1987) ........................................5, 6

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) .............................................................7

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071
(C.D. Cal. 2017).............................................................................................................4

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ...............................6

\* *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) .......................................................................................4

*United States v. Anthem, Inc.*:

2016 WL 11164045 (D.D.C. Oct. 10, 2016) .....................................................10

2016 WL 11755527 (D.D.C. Sept. 30, 2016) ...................................................10

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...................................7

---

[*] Authorities principally relied upon are marked with an asterisk.

**STATUTES AND RULES**

15 U.S.C. § 2 ...........................................................................................................7, 10

Fed. R. Civ. P. 26 ..........................................................................................................9

## INTRODUCTION

The FTC avoided a second dismissal of its case by persuading the Court that it had plausibly alleged facts to support the claim that Meta had and has a monopoly share of a relevant antitrust market, the so-called "personal social networking services" market ("PSNS"). One can do many things on Facebook and Instagram, only some of which the FTC considers to be qualifying PSNS activities. That much is clear. Thus, the FTC asserts that its claim depends on the scope of competition for the provision of those specific PSNS activities, and that Meta has a monopoly share of the *PSNS* time that is spent on Facebook, Instagram, and other firms.

The threshold question in this case, therefore, is what activities are PSNS activities, and what time spent is PSNS time? Without that information, Meta cannot fairly defend against the FTC's core monopoly allegation and cannot conduct the fact discovery necessary to rebut the FTC's allegations that there is a distinct market for PSNS in which Meta has a monopoly.

PSNS is an FTC invention, used by no market participant and understood only by the FTC. What consumers can do on Meta services is public information, available to anyone who uses the services, including the FTC. The answer to Meta's interrogatory requires only the mapping of the FTC's definition (which is opaque to Meta) onto the public information. Meta cannot do that; the FTC can. Notwithstanding the FTC's extensive pre-complaint investigation, the FTC says the answer to this fundamental question must wait until an expert reveals it more than a year from now. But Meta needs to know the case it must defend, and in particular what the FTC's market and power allegations actually mean. It needs the information now, so that it can conduct fact discovery targeted at what the FTC is actually alleging. Meta should not be required to guess at what the FTC is claiming; the FTC should be ordered to tell Meta what activities count as use of PSNS under the FTC's market definition.

## ARGUMENT

The FTC offers a medley of excuses for its refusal to provide a responsive answer to Interrogatory No. 10.  None is persuasive.

### I.  The FTC Does Not Lack Information About Its Own Construct

The FTC has said, in substance, that nine activities and perhaps *some* other time spent on "surfaces" such as Facebook and Instagram "Feed" and "Stories" are within the market.  But it has not said and cannot plausibly say that *all* activities and time spent on those surfaces or the many other surfaces on Facebook and Instagram are PSNS, as they include activities such as interest-based broadcast or discovery (e.g., viewing a post by a celebrity) (Substitute Am. Compl. ¶ 174 (Sept. 8, 2021), ECF No. 82 ("Am. Compl.")), "passive" "video or audio consumption" (*id*. ¶ 175), and "content broadcasting and consumption" (*id.* ¶ 176) that the FTC specifically excluded from its three-feature qualitative definition of PSNS.  *See id.* ¶¶ 165-176; *see also FTC v. Facebook, Inc.*, --- F. Supp. 3d ---, 2022 WL 103308, at *8 (D.D.C. Jan. 11, 2022) (time spent "passively viewing a music video . . . falls outside of the market definition").  After months of delay, the FTC now claims it doesn't know whether *anything* on Facebook and Instagram beyond its nine activities meets its criteria for using a PSN service.  *See* Pl. FTC's Mem. Law Opp'n Def. Meta Platforms, Inc.'s Mot. Compel at 1 (July 14, 2022), ECF No. 157 ("Opp'n") (claiming that its list of nine activities "fully" reflects its "current understanding" of what counts as use of "[PSNS]"); *id.* at 7-9 (stating it doesn't know whether viewing content on Facebook Marketplace, Facebook Dating, or Instagram Shops or "content on your Facebook Feed that was not posted by one of your Facebook friends constitutes use of [PSNS]").  This is specious.

The FTC has claimed that Meta had and has a high percentage (greater than 70%) of all time spent on PSN services in the United States. *See* Am. Compl. ¶ 202. To make that claim, it necessarily had to determine what activities on Meta's services and the services offered by other firms constitute use of PSNS, and what time spent on the services offered by those firms is PSNS time. Vague statements from Meta executives that the "use cases that we've focused on the most over time are helping you connect . . . with your friends and family," Def. Meta Platforms, Inc.'s Mem. Supp. Mot. Compel, Ex. A at 5 (July 1, 2022), ECF No. 151-3, which the FTC says show that Facebook Blue and Instagram "facilitat[e] friends and family sharing as a distinct service" Opp'n at 10, cannot possibly provide a good faith basis for such a claim, because it is evident that "sharing" is not co-extensive with PSNS. Among other reasons, the FTC itself claims that friends and family sharing on iMessage, LinkedIn, WhatsApp, Twitter, YouTube, and TikTok is *not* PSNS. *See* Am. Compl. ¶¶ 172-176.

Additionally, the nine activities that the FTC now says qualify as PSNS cannot possibly support even the Meta-specific time-spent allegations the FTC reiterates in its opposition. *See* Opp'n at 15 (reiterating its representation that "Facebook Blue and Instagram are 'predominantly used' as [PSNS]," and that the Court can "conservative[ly]" accept that more than 50% of the time users spend on the apps is on PSNS). Even the testimony and documents cited by the FTC indicate that users spend only a small fraction of their time on activities the FTC says qualify as PSNS, and that they use the apps for many things other than those nine activities. *See*, *e.g.*, ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

Unless the FTC is prepared to admit that it had *no* actual basis for the factual allegation that allowed its case to proceed, it must come forward with *all* of the activities it has classified as PSNS in order to support that claim.

Whether or not the FTC had a good faith basis for the only allegation of monopoly power that passed muster with the Court, its other allegations prove that it not only can but *has* determined what *it* thinks is PSNS and what isn't. It has alleged that what people do on YouTube, Reddit, TikTok, Twitter, iMessage, Pinterest, LinkedIn, and Nextdoor (and with whom) is never PSNS. *See* Am. Compl. ¶¶ 172-176. What people do on Facebook and Instagram (and with whom), as well as the various features that they can use, is public information known to every user of the product, just like the features of the other applications the FTC claims to understand fully. It is simply not credible for the FTC to assert that it doesn't have enough information to say what features of Meta's applications count for purposes of assessing the FTC's relevant market. Lack of notice about the boundaries of the relevant product market is grounds for dismissal, not an excuse for refusing to answer an interrogatory calling for that information. *See Agnew v. NCAA*, 683 F.3d 328, 346 (7th Cir. 2012) (affirming dismissal based on insufficient "notice of the relevant market" where the "confines of [the alleged product] market are far too unclear"); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (affirming dismissal where court could not "determine the boundaries of the relevant product market"); *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1084 (C.D. Cal. 2017) (dismissing where definition left "unclear what products this might encompass," because such "ambiguities make Plaintiff's market definition unsustainable on its face"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins.*, 166 F. Supp. 3d 988, 997 (N.D. Cal. 2015) (dismissing because "Plaintiff must provide enough facts [about the

relevant market] to enable the opposing party to defend itself effectively"); *Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786, at *3-4 (S.D.N.Y. Apr. 14, 2011) (dismissing where allegations fell "well below the threshold to allege a relevant product market" because "the Court [was] left to speculate" whether certain products were included).

The FTC cannot withhold this information, plainly in its possession, based on professions of supposed ignorance. *See King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 5 (D.D.C. 1987) (rejecting plaintiff's attempts to delay interrogatory response, where it was "inconceivable that, after bringing the claims in this case," it could not answer the question, since "Rule 11 is designed to insure that allegations in a complaint, drafted by a member of the Bar, are supported by sufficient factual information at the time the claims are initially asserted").

## II.    The FTC Does Not Need Discovery To Answer The Question

The FTC repeatedly claims (Opp'n at 3, 5, 11, 14) that it need not respond further because it is waiting on Meta to produce "documents and data" that will help explain "how users engage with its products and the extent to which Meta's various features and activities are intertwined with its core use case of personal social networking." That is nonsense.

*First*, the FTC has identified no particular internal Meta information that it lacks, and more fundamentally, no discovery is needed for the FTC to apply its invented definition to the consumer-facing features of Meta's services and the competing services of other firms. That exercise does not require any internal documents as the FTC has had no problem doing it for applications such as Twitter, LinkedIn, Reddit, Apple's iMessage, YouTube, and TikTok – from which it does not claim to have had any meaningful discovery. PSNS activities are allegedly what *consumers* do when using certain applications – the FTC has never claimed that it is dependent on what happens behind the scenes, or whether some features are connected to other

features.  The FTC thus cannot explain why internal information is even relevant to whether activities on consumer-facing features qualify as use of PSNS or not.

*Second*, if discovery were necessary (and it isn't) the FTC already had 18 months of pre-complaint investigation, sought and reviewed more than 12 million pages of Meta documents, took testimony from 18 senior Meta executives, and conducted scores of non-party interviews. Pl. FTC's Mem. Supp. Mot. Compel Rule 26(f) Conf. at 6-7 (Apr. 22, 2021), ECF No. 63-1 (arguing FTC was in position "unlike most private litigants" due to its extensive pre-complaint discovery).  Courts routinely reject similar attempts by government plaintiffs to delay interrogatory responses as premature where they have benefited from similar pre-complaint discovery.  Def. Meta Platforms, Inc.'s Mem. Supp. Mot. Compel at 17 (July 1, 2022), ECF No. 151-1 (collecting cases).  The FTC has devoted intense focus to the issue of PSNS, what it is and what it covers.  It cannot plausibly claim to be unable now to assess public, consumer facing features and provide Meta with the basic outlines of its case.  *See King*, 117 F.R.D. at 5 ("It is no answer for plaintiffs to assert that they will need discovery or to consult with an expert[.]").

## III.  The FTC's Other Excuses Are Evasions And Non-Sequiturs

### A.  The FTC's Alternative Theory Of Market Power Cannot Justify A Refusal To Provide Fundamental Information About The Theory On Which The Court Permitted The Case To Proceed

The FTC makes the surprising (and incorrect) argument that it need not provide information about its market definition because it can proceed "without ever" defining a PSNS market.  Opp'n at 12.  The FTC suggests that it intends to meet its burden by proving monopoly power "through direct proof, which does not turn on establishing a relevant market."  *Id.*

The FTC has not abandoned its "indirect" theory of market power, which the FTC agrees requires the FTC to prove a relevant market.  (*Times Picayune*, cited by the FTC (Opp'n at 12),

assessing the "newspaper advertising market in New Orleans," does not say otherwise.)  But even under what the FTC now foreshadows as a change in direction, it must prove a relevant market.  That the FTC wants to escape its burden here should be telling evidence that it knows it cannot meet that burden.  That is the very opposite of a valid excuse for not responding to an interrogatory.  As the Court held, while the FTC may want "the Court to simply nod to the conventional wisdom that Facebook is a monopolist . . . , 'monopoly power' is a term of art under federal law with a precise economic meaning: the power to profitably raise prices or exclude competition *in a properly defined market*."  *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 20 (D.D.C. 2021) (emphasis added).  The FTC made "no real direct-proof argument" at the pleading stage, *id.* at 13, and it is the "rare" case in which direct evidence exists or can carry the day.  *Id.* at 12 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)).

If the FTC now wants to shift its theory, it still has the burden of establishing a relevant antitrust market.  In *American Express*, the plaintiffs argued that the Court "need not define the relevant market" because they "offered actual evidence of adverse effects on competition."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018).  The Supreme Court rejected that argument, explaining that the challenged conduct "[could not] be evaluated unless the Court first define[d] the relevant market."  *Id.*  That must be true:  a plaintiff cannot demonstrate a *market-wide* effect (e.g., higher prices, lower output) without first defining the market.  The cases cited by the FTC do not support its argument here.  *See Microsoft*, 253 F.3d at 51-56 (affirming finding that Microsoft had monopoly power in the market for operating systems); *FTC v. Shkreli*, --- F. Supp. 3d ---, 2022 WL 135026, at *36 (S.D.N.Y. Jan. 14, 2022) (recognizing that "[t]he analysis" in a § 2 case "relies, as a threshold matter, on the definition of the relevant market").

Meta charges no price, and it will therefore be impossible for the FTC to prove that it charges prices higher than competitive prices. To even articulate such a theory, however, the FTC would have to establish the competitive price, which itself would require a determination of the relevant market – that is, the prices offered by the other firms that competed in such a market. Meta is aware of *no case* that has ever adopted what the FTC hints at in its Opposition: a claim that "quality" (however defined), reduced or less than it otherwise might have been, can provide "direct effects" evidence of monopoly power. That theory simply makes no sense for a host of reasons. But even on its own mistaken terms, as with price there would be a need to establish a competitive benchmark, and therefore a need to prove a relevant market.

**B.      Meta's Interrogatory Response Has No Bearing On The FTC's Response**

In an apparent tit for tat, the FTC complains (Opp'n at 10) that Meta has inadequately answered one of its interrogatories. Meta has answered and has met and conferred about the request, which in substance asked for an exhaustive list of information that is publicly available. Meta will consider supplementing its response, and if the FTC remains unsatisfied it has recourse to the Court. The injection of this unripe matter into this motion is inappropriate and irrelevant. The FTC cannot justify a refusal to answer an entirely appropriate interrogatory based on dissatisfaction with a Meta answer to one of its interrogatories. *See Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 17, 24 (D.D.C. 2009) (a party is "not justified in providing insufficient [interrogatory] answers just because [the other party allegedly] did").

**C.      Whether The FTC Considers Features As Potential "Barriers To Entry" Is Irrelevant**

The FTC also justifies its non-answer (Opp'n at 11) with the non-sequitur that "even seemingly different services within Facebook Blue and Instagram (like dating or shopping) may bolster entry barriers in [PSNS] – and thus may play a part in preserving Meta's monopoly

power." The interrogatory does not ask for "barriers to entry" but rather for whether these and the other services of Facebook and Instagram are included within PSN services, such that some or all time spent on them counts towards any assessment of supposed power in the claimed relevant market. Saying something might be a barrier to entry is simply another dodge and not a justification for a refusal to answer. The FTC does not offer any authority suggesting otherwise.

**D. Meta Needs This Information Now To Conduct Effective Discovery**

The FTC does not dispute the central importance of the information sought by Interrogatory No. 10; it just wishes to defer its answer until after fact discovery, when it expects to have an expert answer it. The problem, however, is that *fact discovery* is necessary for the examination of the FTC's PSNS theory. The information that Meta will collect from non-parties will depend in significant part on the contours of the FTC's alleged market – what is in, what is out. Meta should not be required to shadow box or guess on these fundamental questions.

The FTC argues that Meta should simply conduct "industry" discovery without reference to the actual allegations it must defend against. Opp'n at 18. It has neither authority nor logic to support that proposition. In every case, discovery not only can but *must* be shaped by the particular allegations. *See*, *e.g.*, Fed. R. Civ. P. 26. Basic information about the contours of the alleged relevant antitrust market presents the clearest example of information that needs to be provided at the outset to shape the case for discovery. *See Agnew*, 683 F.3d at 346 (plaintiffs cannot "attempt[ ] to hedge [its] bets by keeping their market allegations vague" because defendant must have "sufficient notice of the relevant market" to defend itself); *Bay Area Surgical Mgmt.*, 166 F. Supp. 3d at 997 ("Plaintiff must provide enough facts [about the relevant market] to enable the opposing party to defend itself effectively.").

Meta is aware of no case in the 132-year history of the Sherman Act that has proceeded through discovery in which a plaintiff has refused to tell the defendant which portions of its own products are in the alleged market.  The cases cited by the FTC provide no support for its position.  In *United States v. Anthem, Inc.*, for example, the government was not withholding the identity of the relevant services in the market.  2016 WL 11755527, at *1 (D.D.C. Sept. 30, 2016).  The Special Master denied an interrogatory asking the government to go further by identifying "the market share of each competitor" and "the methodology and all data and documents[] that support [the] market share calculation."  *Id.*; *see also* 2016 WL 11164045, at *5 (D.D.C. Oct. 10, 2016) (denying request that government identify "presumptively unlawful" markets because that, too, depended on same market-share data).  In any case, the expert reports including this information were produced within weeks.

There was no argument there, and can be no serious argument here, that a defendant need not be provided with definitive information about the services at issue, well in advance of expert reports.  Meta is not now asking for the specific market share of each competitor in the FTC's PSNS market.  What Meta is asking for is the information that the plaintiff *had* provided in *Anthem*, and what every antitrust plaintiff has been required to provide in a Section 2 case: enough information about which of the defendant's services are in the claimed market(s), so as to permit the defendant to conduct the discovery necessary to test the claimed market(s).

## CONCLUSION

The Court should order the FTC to provide a complete answer to Interrogatory No. 10, and to state unequivocally which "surfaces" or features available to users on Meta's services provide PSNS and under what circumstances, such that Meta has fair notice as to what time spent on each of its surfaces or features counts as PSNS time spent.

Dated: July 21, 2022

/s/ *Mark C. Hansen*

Mark C. Hansen  (D.C. Bar No. 425930)
Kevin B. Huff (D.C. Bar No. 462043)
Kevin J. Miller (D.C. Bar No. 478154)
Kevin D. Horvitz (D.C. Bar No. 1521032)*
Hannah D. Carlin (D.C. Bar No. 1719743)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900

*Counsel for Defendant Meta Platforms, Inc.*

* Application for Admission to the Bar of the
 U.S. District Court for the District of
 Columbia Pending

# Exhibit 541

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION,**

Plaintiff,

v.

**META PLATFORMS, INC.**

Defendant.

Civil Action No. 1:20-cv-03590 (JEB)

## JOINT CIVIL RULE 16.3 REPORT TO THE COURT

In accordance with Federal Rule of Civil Procedure 26(f) and Civil Local Rule 16.3, Plaintiff Federal Trade Commission ("FTC") and Defendant Meta Platforms, Inc. ("Meta") have met and conferred, and hereby submit this Joint Meet and Confer Statement and proposed Scheduling and Case Management Order to the Court. *See* Ex. A (FTC Proposed Scheduling Order), Ex. B (Meta Proposed Scheduling Order).[1]

1. **Service of Complaint.** Counsel for Meta has accepted service of the Complaint and waived formal service of a summons.

2. **Initial Disclosures.** The Parties exchanged initial disclosures on February 22, 2022.

3. **Local Rules 16.3(c)(1), 16.3(c)(4), 16.3(c)(5).**

   a) Likelihood of Disposal by Dispositive Motion.

---

[1] Where the Parties are in agreement, their agreed position is as stated in the numbered paragraphs. Where they disagree, their respective positions and explanations for their positions are set forth separately in the numbered paragraphs.

***Plaintiff's Position***:  Plaintiff does not anticipate that any motions for summary judgment that might be filed will impact the scope or timing of discovery.

***Defendant's Position***:  Meta anticipates it will file a motion or motions for summary judgment and reserves its rights as to the timing of the motion or motions.

b) <u>Settlement</u>.  The Parties do not believe that settlement discussions would be useful to engage in at this time.

c) <u>ADR</u>.  The Parties have considered the possibility of using alternative dispute resolution procedures but do not believe that ADR would be useful to engage in at this time.  At a later time, the Parties will confer regarding whether mediation may be appropriate.

d) <u>Bifurcation</u>.

***Plaintiff's Position***:  The parties should proceed expeditiously to a trial that deals exclusively with liability issues.  Following the liability trial, Plaintiff anticipates a separate remedy hearing. The provisions set forth below relating to discovery shall not apply to any additional discovery to facilitate a remedy phase.  The parties should meet and confer at an appropriate time and submit to the Court, no later than five weeks prior to the final pretrial conference, proposals for an amended or separate Case Management Order governing the remedy phase.

***Defendant's Position***:  Meta submits that only fact and expert discovery on liability issues should be scheduled at this time.  Additional scheduling is premature, including scheduling relating to a subsequent remedies phase, if any is required.  Such proceedings will be unnecessary if Plaintiff fails to prove its case

as to liability.  Plaintiff's proposal that the Parties confer on a Case Management

Order for a remedies phase "no later than five weeks prior to the final pretrial

conference" for the liability phase is unnecessary, disruptive, and premature.

Only after the Court has ruled on the liability issues should any additional

proceedings be scheduled, as the Court's rulings will likely affect the scope and

timing of any such subsequent phase if one is required.  Meta is aware of no

instance, and Plaintiff has cited none, where the Court has entered a Case

Management Order relating to a separate remedies phase prior to a liability

determination.  Plaintiff has given no reason why these additional proceedings

need to be scheduled prior to a liability determination.

4.    **Discovery Conference.**  The Parties have met and conferred pursuant to Federal

Rule of Civil Procedure 26(f) and Local Rule 16.3. The Parties discussed proposals for a

Scheduling and Case Management Order, as well as proposals for an ESI Order, a 502(d) Order,

and a Protective Order.  These discussions satisfied the Parties' obligation under Federal Rule of

Civil Procedure 26(f) and Local Rule 16.3.

5.    **Case Schedule.**  The Parties' respective scheduling proposals, including for fact

discovery, are set forth below.

***<u>Plaintiff's Position</u>***:

The Federal Trade Commission seeks a prompt end to the ongoing conduct through

which Meta unlawfully maintains its monopoly power.  Accordingly, the FTC requests that the

Court set a trial date, and adopt other procedural mechanisms (described herein), to efficiently

advance discovery and expeditiously resolve the FTC's claims.  Meta – predictably – seeks

delay, and thus seeks to transform the FTC's suit into a lengthy and unnecessarily expansive campaign.[2]  This is not warranted or in the public interest.

Plaintiff's proposed schedule is appropriate in light of the "special urgency" that applies to government suits that "seek to enjoin ongoing anticompetitive conduct."  *United States v. Dentsply Int'l, Inc.*, 190 F.R.D. 140, 145 (D. Del. 1999).  Plaintiff's reasonable proposals further the public interest in promptly addressing ongoing anticompetitive conduct, and are consistent with the FTC's recent experience in complex antitrust cases seeking injunctive relief to remedy ongoing monopolization.  *See* Scheduling Order at 2, *FTC v. Surescripts*, 1:19-cv-01080-JDB, (D.D.C. Feb. 28, 2020), ECF No. 54 (providing approximately 11 months from start of discovery to close of fact discovery); Case Management Order at 2, *FTC v. Qualcomm,* 5:17-cv-00220-LHK, (N.D. Cal. Apr. 19, 2017), ECF No. 75 (providing approximately 11 months from Case Management Order to close of fact discovery, and approximately 20 months from Case Management Order to trial).  The fact that the parties in *United States v. Google* agreed to a different schedule provides no reason for delay, where the FTC believes a more rapid resolution

---

[2] Prompt resolution of the FTC's claims will speed the efficient resolution of litigation throughout the country, as Meta seeks to leverage delay in the FTC case to postpone even distantly related lawsuits that present "different theories."  *See* Seventh Joint Case Management Statement at 12-13, *Klein v. Meta Platforms, Inc.*, 3:20-cv-08570-JD (N.D. Cal. Feb. 17, 2022) ECF No. 227 (Meta seeks delayed resolution of an earlier-filed private class action despite "different theories presented in [the FTC's complaint] and private plaintiff actions").  The FTC noticed the *Klein* case as a related action because a class of consumers alleged that Meta employed a "Copy, Acquire, Kill" strategy to maintain monopoly power in a Social Network Market.  On January 14, 2022, the *Klein* court held that the consumer plaintiffs adequately alleged that Meta possessed monopoly power in the relevant market, but dismissed the consumer plaintiffs' "Copy, Acquire, Kill" claims as untimely.  The *Klein* consumer plaintiffs recently informed the district court that they will not seek to amend those claims; a class of advertisers will amend its claims that Meta maintained power in a Social Advertising Market.  *Id.* at 4.  In *Klein*, the only remaining claims that allege that Meta maintained monopoly power in a Social Network Market are based on the consumer class' claim that Meta made "false representations about its data privacy."  *See id* at 3.

4

is feasible. Indeed, Plaintiff's proposed trial schedule provides a reasonable midpoint between *Google,* Scheduling and Case Management Order at 3-7, *United States v. Google, LLC*, 1:20-cv-03010-APM (D.D.C. Dec. 21, 2020), ECF No. 85 (approximately 33 months from CMO to trial), and *Microsoft*, in which the government filed its complaint on May 18, 1998, and began trial *five months* later on October 19, 1998. *United States v. Microsoft*, 253 F.3d 34, 47 (D.C. Cir. 2001).

Plaintiff's proposed schedule is achievable in this matter, particularly if the Court adopts the efficiency-enhancing measures Plaintiff proposes below, such as interim deadlines to ensure that disputes regarding third party discovery do not delay the Court's schedule. *See, e.g.*, *FTC v. Qualcomm*, 5:17-cv-00220-LHK (N.D. Cal., Nov. 15, 2017), ECF No. 308 (setting deadlines for briefing disputes regarding third party discovery and deadlines to complete third party productions). These commonsense proposals should address Meta's speculation that the parties or/and third parties will be unable to resolve any discovery disputes in a timely fashion. Fed. R. Civ. P. 16(c)(2)(L); *see also id.* at (c)(2)(P) (the Court may take appropriate action to manage "potentially difficult or protracted actions" and facilitate "the just, speedy, and inexpensive disposition of the action").

Another measure the Court should adopt is to set a trial date in the Case Management Order, just as other courts have done in recent complex antitrust cases involving government plaintiffs. *See* Scheduling and Case Management Order at 10, *United States v. Google, LLC*, 1:20-cv-03010-APM (D.D.C. Dec. 21, 2020), ECF No. 85; Case Management Order at 2, *FTC v. Qualcomm,* 5:17-cv-00220-LHK (N.D. Cal. Apr. 19, 2017), ECF No. 75. A fixed trial date provides numerous benefits: among other benefits, a fixed trial date motivates parties and third parties to resolve any disputes expeditiously. Indeed, Meta argues that the FTC's proposed discovery schedule is unrealistic based on the fact that the court extended the discovery schedule

in *FTC v. Surescripts*, but ignores the fact that the *Surescripts* court did not set a trial date in its CMO. In *FTC v. Qualcomm*, the court set a trial date in the CMO, and trial began precisely as scheduled. Case Management Order, *FTC v. Qualcomm,* 5:17-cv-00220-LHK (N.D. Cal. Apr. 19, 2017), ECF No. 75.

Contrary to Meta's assertions, the FTC's discovery requests do not necessitate a lengthy discovery period, but rather, underscore the FTC's ability and desire to move forward with discovery expeditiously. The FTC has already served its first set of Requests for Production (on February 15, 2022) and is ready to meet and confer promptly with Meta, including with respect to a proposed scope of production. Nor does Meta's remarkable claim that it needs to burden nearly 300 third parties with discovery requests warrant a lengthy discovery period. While Meta claims it competes with virtually every other internet service or mode of communication, *see, e.g.*, Mem. in Supp. of Facebook, Inc.'s Mot. to Dismiss FTC's Compl. at 18, ECF No. 56-1, it is doubtful that discovery from such an extensive list of third parties is warranted in this matter. Further, Meta cannot be heard to object to the FTC's proposed mechanisms to efficiently handle third-party discovery on the one hand, and then use its own opposition to such mechanisms as a basis to seek a longer discovery period on the other.

Meta's request for an extended expert deposition period is likewise unwarranted and inconsistent with the FTC's recent experience. Meta suggests that the parties may have a total of twelve experts, but this is speculative, and in any event would not require three full months for expert depositions. In *FTC v. Qualcomm*, the parties prepared at least 12 expert reports, and the expert deposition period was 4 weeks, just as Plaintiff proposes here. Case Management Order, *FTC v. Qualcomm,* 5:17-cv-00220-LHK (N.D. Cal. Apr. 19, 2017), ECF No. 75.

For these reasons, Plaintiff proposes the following schedule for fact discovery, expert

discovery, and trial:

| Scheduled Event | Calculation of Date | Date |
|---|---|---|
| Defendant's Answer | | Jan. 25, 2022 |
| Fact discovery commences | | Feb. 7, 2022 |
| Deadline to amend pleadings/join additional Parties as of right | | Feb. 15, 2022 |
| Initial Disclosures | | Feb. 22, 2022 |
| FTC to substantially complete production of investigative file | | Feb. 24-28, 2022 |
| Deadline to file any motions to compel in connection with disputes with third parties regarding documents and data discovery | | July 11, 2022 |
| Deadline to complete production of third party documents and data | | Oct. 3, 2022 |
| Close of fact discovery | 53 weeks after start of fact discovery | Jan. 13, 2023 |
| Plaintiffs serve opening expert disclosures in accordance with Rule 26(a)(2)(B) | 6 weeks after fact discovery ends | Feb. 24, 2023 |
| Defendant's expert reports | 14 weeks after fact discovery ends | April 21, 2023 |
| Plaintiff's rebuttal expert report(s) | 22 weeks after fact discovery ends | June 16, 2023 |
| Close of expert discovery | 26 weeks after fact discovery ends | July 14, 2023 |
| Deadline for summary judgment or *Daubert* motions | 2 weeks after expert discovery ends | July 28, 2023 |
| Deadline for oppositions summary judgment or *Daubert* motions | 3 weeks after summary judgment or *Daubert* motion(s) | Aug. 18, 2023 |
| Deadline for replies concerning summary judgment and D*aubert* motions | 10 days after *Daubert* or summary judgment oppositions | Aug. 28, 2023 |
| Final Pretrial Conference | | Nov. 9, 2023 |
| Trial begins | | Dec. 11, 2023 |

### *Defendant's Position*:

Meta submits that the Plaintiff's schedule is unrealistic as well as unfair to Meta, and that

the following schedule is appropriate for the reasons stated below:

| Event | Calculation of Date | Date |
|---|---|---|
| Deadline to amend pleadings or add parties | | Feb. 15, 2022 |
| Parties exchange Rule 26(a)(1) initial disclosures | | Feb. 22, 2022 |
| Plaintiff to produce investigative file | | Feb. 24-28, 2022 |
| Close of fact discovery | 15 months from CMO | May 29, 2023 |
| Plaintiff's opening expert reports | 16.5 months from CMO | July 13, 2023 |
| Defendant's expert reports | 18.5 months from CMO | Sept. 12, 2023 |
| Plaintiff's rebuttal expert report(s) | 20.5 months from CMO | Nov. 14, 2023 |
| Close of expert discovery | 23.5 months from CMO | Feb. 13, 2024 |

Scheduling beyond the completion of expert discovery is contrary to the Court's practice, premature, and inefficient.  *See*, *e.g.*, Rule 16 Scheduling Conf. Tr., ECF No. 68, at 2:23-24, 3:11-12, *Grant v. Entm't Cruises*, No. 17-cv-01159-JEB (D.D.C. Aug. 8, 2018); Scheduling Order, ECF No. 30, *White v. Edgewood Mgmt. Corp.*, No. 19-cv-02508-JEB (D.D.C. May 15, 2020) (scheduling only through post-discovery status hearing despite *joint* proposal for post-discovery dispositive motion deadlines and a pretrial conference date).  There is no reason to depart from the Court's usual practice here.  The FTC's stated demand for expedition is inconsistent with its long delay in challenging mergers that occurred 10 (Instagram) and 8 (WhatsApp) years ago, its 18-month pre-filing investigation, and its request for extensions even after it filed its complaint.  The Court should set a trial date only after it has resolved summary judgment motions, which may dispose of the FTC's claims in their entirety or limit the scope of any claims that remain for trial.  Given the complex and extensive pretrial proceedings that must be completed before any trial can occur, any date set now would likely be unrealistic and illusory, and helpful to neither the Parties nor the Court.

Beyond that, the main points of disagreement between the Parties as to the case schedule are the length of fact discovery (Meta proposes 15 months, while Plaintiff proposes 10 months)

and the length of expert discovery (Meta proposes 8.5 months, while Plaintiff proposes 4.5 months).

Meta believes that its proposals are reasonable for the following reasons.

*First*, Meta is not seeking an extended schedule. On the contrary, the time period for discovery proposed in Meta's schedule is similar to what the Court has regularly set for ordinary, less complex actions. *See*, *e.g.*, Scheduling Order, ECF No. 33 (June 20, 2011) and Minute Order (June 27, 2013), *United States v. Speqtrum, Inc*, No. 10-cv-2111-JEB (D.D.C. Compl. filed Dec. 13, 2010) (just over 24.5 months between initial scheduling order and close of discovery); Scheduling Order, ECF No. 63 (June 5, 2012), Minute Order (Aug. 23, 2013), Minute Order (Dec. 12, 2013), and Minute Order (June 23, 2014), *SEC v. E-Smart Techs., Inc.*, No. 11-cv-895-JEB (D.D.C. Compl. filed May 13, 2011) (just under 16 months between initial scheduling order and close of fact discovery; 10 months between close of fact discovery and close of expert discovery). The FTC is effectively proposing that Meta should be limited to only about two thirds of the usual period for discovery, for no reason other than what its attorneys claimed was a "marching order" from superiors to make sure that the case is tried by a certain (artificial) deadline: December 2023.[3]

*Second*, this case is unusually complex and unprecedented – an obvious and undisputed point. The FTC seeks, for the first time ever, to dismantle a company based on acquisitions that it reviewed and cleared, and that Meta completely integrated, many years ago. The FTC's allegations cover more than a decade and touch nearly every aspect of Meta's business. While the supposed antitrust violation is limited to 2 acquisitions, the FTC's proposed market definition

---

[3] The FTC attorneys gave this explanation during the Parties' telephonic Rule 26(f) conference on February 7, 2022.

and monopoly power allegations involve a constellation of issues relating to everything Meta and its many competitors have done from at least 2012 until the present, as well as similarly complex issues regarding future competition in the fast-changing world of technology. *See United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) (en banc) ("Rapid technological change leads to markets in which firms compete through innovation for temporary market dominance, from which they may be displaced by the next wave of product advancements.").

Discovery will be necessary on many issues, including the nature and identity of competitors over a period of more than a decade; Meta's ability (or inability) to raise prices, restrict output, or reduce quality over that same extended period; Meta's acquisitions of Instagram and WhatsApp and their actual *effect* on competition and consumers; and the basis (or lack of basis) for the FTC's contention that consumers would have materially better products but for those acquisitions. The FTC has demonstrated by its actions that it recognizes the need for extensive discovery, both as to subject matter and timing. On February 15, the FTC served 40 requests for production (some of which contain up to 12 subparts), that span a broad range of issues and the time period from 2009 to the present (some from 2007 to the present). The FTC's new requests are significantly broader than what the agency requested during the investigation, in which document production occurred over 18 months. For example, one of the FTC's current requests calls for "all documents relating to the Company's revenues." While this and other requests are unwarranted, and will likely be contested, they underscore the Parties' joint recognition of the extraordinary breadth of necessary discovery in this case.

The FTC recognizes the case will be "potentially difficult or protracted," but suggests – without any support – that adopting numerous additional procedural requirements inconsistent with the Federal Rules of Civil Procedure will somehow expedite discovery. That is wishful

thinking, as imposing untested attempts to re-write the Federal Rules of Civil Procedure is more likely to spawn time-consuming disputes than streamline the extensive discovery that both sides agree is necessary. The FTC's citation to the *Google* case illustrates that: the agreed upon experiments there did not result in a shortened discovery period, and indeed that case has a discovery period similar to what Meta proposes here. The schedule initially set had to be extended notwithstanding the so called "efficiency-enhancing measures." Order, ECF No. 263, at 1 (Dec. 6, 2021), *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C.). Meta's individual objections to each of these untested and unnecessary procedures is discussed *infra*.

*Third*, the FTC can argue for a compressed schedule because it already had 18 months of unlimited discovery before filing this action. During its investigation, it collected more than 12 million pages of documents from Meta, and an untold number from third parties. It took testimony from 24 senior Meta employees (totaling 150 hours of testimony). *See* FTC's Mem. Supp. Mot. To Compel Rule 26(f) Conference, ECF No. 63-1, at 7 (seeking to expedite discovery planning because the FTC already possessed much of the information it needed). The FTC seeks an additional 10 months of discovery here, but objects to Meta's request that it have *half* the time the FTC would have for discovery (18 months pre-complaint plus 10 months now) under its proposal. This would be both unfair and unwarranted. The FTC has no response to this obvious disparity, and has given no good reason why Meta's discovery in this case should be confined or limited. The extraordinarily broad document requests the FTC has already served confirm that allowing only 10 months for fact discovery is entirely unrealistic even for the discovery that the FTC intends to seek from Meta. The FTC's investigation undoubtedly included expansive discovery from scores of third parties, such as market participants, commercial data providers, consumers, and others. Meta will need to review the FTC's

investigative file before it can assess the FTC's case and frame additional appropriate and necessary discovery of the FTC and the third parties who were part of its investigation as well as additional third parties, and that discovery is going to take time.

*Fourth*, a significant discovery period is necessary because of the extensive Party discovery that will be required in this case.  Meta will need to obtain and analyze not only the FTC's files relating to its 18-month investigation, but also the extensive review the FTC conducted at the time it cleared the Instagram and WhatsApp transactions in 2012 and 2014.  Meta should be allowed to seek discovery relating to the highly relevant issues of whether and how the FTC evaluated potential harm to competition and consumers in 2012 and 2014 and why it decided not to challenge those transactions.  The FTC's own assessment of these issues – admissions by an opposing party – are both discoverable and potentially of crucial significance.  Meta expects significant and time-consuming litigation with the FTC over these materials, as the agency has indicated it will resist efforts to conduct discovery into its prior decision-making and party admissions.

*Fifth*, a significant discovery period is necessary because of the breadth of third-party discovery that will be required.  These third parties may oppose and contest this discovery, as many, if not most, of the third parties will be firms that consider themselves competitors of Meta.  They may be resistant to providing commercially sensitive information to Meta or its counsel.  Indeed, according to counsel for the FTC, third parties that have been in discussions with the FTC regarding the protective order have concerns regarding the FTC's provision of the investigative files or discovery in this case to Meta.  But such discovery is crucially necessary in order for Meta to defend itself against the FTC's allegations that Facebook had and has little or *no* competition.  Discovery will expose these allegations as untrue.  Meta has already identified

286 companies that are likely to have relevant information it may use to support its defenses (and many others will surely be identified in the FTC's investigative files), most of which have made public statements that Meta is a competitor.

Further, a number of important third parties who have relevant information (for example, the parent company of TikTok) are located outside the United States; obtaining appropriate discovery from them is likely to take a significant amount of time, as the Hague Convention procedures are elaborate and lengthy. The execution of letters rogatory may take a year or more. *See* State Department, Preparation of Letters Rogatory, https://perma.cc/ZC67-GXMK (visited on Feb. 22, 2022). The FTC's own discovery requests to Meta similarly seek information about competitors outside the United States, some of which encompass services "anywhere in the world." The time and resources necessary for translation and review of foreign language documents alone would make the FTC's schedule unworkable.

Meta will need this extensive discovery to demonstrate that the FTC's alleged relevant antitrust market improperly excludes many competitive alternatives. Meta will also need discovery from these companies relating to their privacy, data protection, and advertising policies and practices, among others, to defend against the FTC's unsupportable allegations that consumers would have had better or higher-quality products in these and possibly other respects absent the challenged acquisitions of Instagram and WhatsApp. In short, third-party discovery in this case will necessarily be more extensive, time-consuming, and likely difficult, than discovery in other cases for which the Court has provided a discovery period similar to or longer than what Meta seeks here.

*Sixth*, a significant expert discovery period is necessary because this case will require extensive expert analysis and many expert depositions. *See FTC v. Facebook, Inc.*, 2022 WL

103308, at *13 (D.D.C. Jan. 11, 2022) (explaining that the agency will have to *prove* its allegations "likely with expert testimony").  Given the breadth of the issues framed by the Amended Complaint, Meta expects that it may be required to offer testimony from experts in many fields, including, but not limited to economics, entrepreneurship, digital platforms, mergers and acquisitions, regulatory review of reportable transactions, securities markets, online advertising, surveys, privacy, and computing infrastructure.  After the Parties exchange opening, rebuttal, and reply expert reports, there will undoubtedly be many expert depositions.  Meta currently estimates that the Parties may offer testimony from a dozen experts, if not more.  *See id.* at *7 (predicting a "potential 'battle of the experts'").  The FTC's suggestion that 4 weeks is sufficient to complete all expert depositions is unrealistic.  Three months for completion of all expert depositions will be necessary given the complexity and breadth of the likely expert work in this case, much of which will be data intensive.

Meta's proposal is consistent with other schedules this Court has ordered for cases involving fewer experts than are likely to be presented here.  Scheduling Order, ECF. No. 13, *Anderson v. Washington Hilton, L.L.C.*, No. 1:21-cv-01140 (D.D.C. Oct. 29, 2021) (2 months and 21 days between rebuttal expert disclosures and close of discovery for relatively straightforward tort claims); Scheduling Order, ECF No. 10, *Kelbaner v. Bernhardt*, No. 1:20-cv-02974 (D.D.C. Apr. 28, 2021) (3 months between expert disclosures and close of discovery for employment discrimination action).  And, the FTC's truncated expert deposition schedule is particularly prejudicial to Meta:  under the FTC's schedule, the FTC will have 6 weeks following Meta's submission of opposing expert reports to file a rebuttal report, and another 4 weeks after that for depositions.  This means that the FTC will have a 6-week head start to prepare for depositions of Meta's experts.  Meta, in contrast, will receive the FTC's expert reports – which

14

could be expansive and draw on considerable volumes of data and documents – for the first time

only 4 weeks before expert discovery concludes.  While the FTC will have a head start under any

scheduling proposal, Meta's proposal of 3 months for expert depositions will give Meta

sufficient time to prepare for and then depose the FTC's experts, and is necessary to balance the

FTC's head start.

     *Seventh*, there is no emergency here that could justify depriving Meta of appropriate time

for the extensive discovery that it legitimately needs to defend itself against the FTC's

allegations covering more than a decade of Meta's business activity and its attempt to break the

company into pieces.  The FTC's demands for a rushed schedule are unnecessary and

inconsistent with its own conduct.  It waited 8 years to challenge Meta's acquisition of Instagram

(2012), and 6 years to challenge Meta's acquisition of WhatsApp (2014).  It took 18 months to

conduct its investigation of Meta's conduct.  It has not sought and could not credibly seek a

preliminary injunction.  Its suggestion that a rushed period is necessary for claims relating to

long-past acquisitions would turn every case of alleged past violation into a claim of current-day

emergency.  *United States v. Dentsply International, Inc.* does not support an expedited schedule.

The court there adopted the unremarkable proposition that, for purposes of efficient resolution of

the government action seeking to enjoin an ongoing exclusive-dealing agreement, the case

should not be consolidated with a related private action.  *See* 190 F.R.D. 140, 145 (D. Del.

1999).  The FTC's compressed schedule is prejudicial to Meta but not to the agency given the

lengthy discovery period the agency has already had.

     *Finally*, Meta seeks an appropriate, not a delayed, schedule.  Meta's proposed schedule

approximates the schedules in other government antitrust cases pending in this court.  For

example, Meta's proposed schedule is very similar to the schedule that Judge Mehta set in the

Google antitrust case, where the Court provided a total of 22.5 months from the time of its case management order to the close of both fact and expert discovery: 16.5 months for fact discovery from the time of the case management order; 1 month from the close of fact discovery to opening expert reports; and 5 months from opening expert reports to the close of expert discovery. *See* Scheduling and Case Management Order, ECF No. 85, at 3-4 (Dec. 21, 2020), Order, ECF No. 263, at 1 (Dec. 6, 2021), *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C.); *see also* Scheduling Order, ECF No. 93 (Mar. 2, 2011) and Second Amended Scheduling Order, ECF No. 214, at 2 (Mar. 28, 2012), *United States v. Am. Express Co.*, No. 10-cv-04496-NGG-RER (E.D.N.Y.) (22 months between initial scheduling order and close of fact discovery; just under 6.5 months between close of fact discovery and close of expert discovery).

The schedules the Plaintiff cites are inapposite. *FTC v. Surescripts* supports *Meta's* proposed schedule, not Plaintiff's. There, the truncated schedule initially proposed (which the FTC now attempts to use as a benchmark) proved unworkable. Consequently, the FTC and the defendant jointly requested 2 extensions, which the court granted, resulting in a discovery schedule very close to what Meta proposes: 14 months for fact discovery and just under 9 months between close of fact discovery and close of expert discovery. *See* First Amended Scheduling Order, ECF No. 79, at 2 (Nov. 12, 2021), Second Amended Scheduling Order, ECF No. 79, at 2 (Apr. 13, 2021), Minute Order (Dec. 2, 2021), *FTC v. Surescripts, LLC*, No. 19-cv-01080-JDB. The schedule in *FTC v. Qualcomm*, from a different court, was based on that court's stated preference for initially scheduling all trials within 2 years of the filing of the complaint, a practice inconsistent with the practice of this Court. CMC Tr., ECF No. 79, at 20-24, No. 5:17-cv-00220-LHK (N.D. Cal. Apr. 19, 2017). In *United States v. Microsoft Corp.*, the district court ordered expedition of a government case where there was both a past history of

enforcement (a consent decree agreed to 3 years earlier) and a request for a preliminary

injunction, *United States v. Microsoft Corp.*, 253 F.3d 34, at 47 (D.C. Cir. 2001) – neither of

which is present here. The FTC has not sought a preliminary injunction nor could it plausibly

seek one.

      **6.**      **Discovery of Confidential Information.** Discovery and production of

confidential information will be governed by the Protective Order and an ESI Order entered by

the Court in this action. No deadline in this order shall override any deadline set forth in the

Protective Order or ESI Order. When sending discovery requests, notices, and subpoenas to

Nonparties, the Parties must include copies of any Protective Orders in effect at the time.

      The Parties have a dispute regarding the appropriate provisions for a Protective Order,

ESI Order, and 502(d) Order.

      ***Plaintiff's Position***: The FTC has provided to Meta a complete proposal for a protective

order that parallels the protections provided to commercially sensitive information produced by

parties and third parties in a recent complex antitrust case involving government plaintiffs. *See*

Stipulated Protective Order, *United States v. Google, LLC*, 1:20-cv-03010-APM (D.D.C., Dec.

21, 2020), ECF No. 84. The parties have met and conferred regarding their competing proposals.

The Court should instruct each party to submit, on a date convenient for the Court, a proposed

Protective Order, and a supporting Memorandum not to exceed 10 pages explaining the reasons

supporting the party's proposal. *See* Minute Order, *United States v. Google, LLC*, 1:20-cv-

03010-APM (D.D.C., Nov. 9, 2020), ECF No. 84 ("the parties are directed to submit position

statements outlining their respective positions on the disputed terms of a protective order, not to

exceed ten pages, on or before November 13, 2020. Third parties wishing to be heard on the

17

disputed terms of the protective order may also submit position statements, not to exceed seven pages, on or before November 13, 2020.").

The FTC has also provided to Meta a complete proposal for an ESI Order governing the production of documents and information in this case, and the parties have met and conferred regarding their competing proposals. The parties should continue to meet and confer and present to the Court either a joint proposal or competing proposals accompanied by a supporting Memorandum not to exceed 10 pages explaining the reasons supporting the party's proposal.

***Defendant's Position***: The FTC's proposed protective order is inconsistent with case law, inefficient, and unfair. Meta raised these concerns with the FTC and provided the FTC a proposed protective order. Meta believes the Parties should continue to meet and confer regarding their disputes. Assuming the disputes are not resolved by the February 28, 2022 scheduling conference, Meta proposes that the Court should instruct each Party to submit, on a date and in a format convenient for the Court, a proposed Protective Order, and a supporting Memorandum explaining the reasons supporting the Party's proposal.

Meta has also provided the FTC a proposed ESI and 502(d) Order and also believes the Parties should continue to meet and confer regarding their disputes on these proposals. Assuming the disputes are not resolved by the February 28, 2022 scheduling conference, the Court should instruct each Party to submit, on a date and in a format convenient for the Court, a proposed ESI and 502(d) Order and a supporting Memorandum explaining the reasons supporting the Party's proposal.

7. **Production of Investigation Materials.** Plaintiff shall begin production of its investigatory file no later than February 24, 2022, and anticipates substantially completing the production of its investigatory file no later than February 28, 2022. The FTC's investigatory file

will be produced on an outside-counsel-only basis pending entry of an appropriate protective order.

### 8. Document Requests.

**_Plaintiff's Position_**:  Plaintiff requests that the Court adopt requirements similar to those that a court in this District recently adopted to ensure the efficient completion of discovery in a complex antitrust case involving a government plaintiff.  *See* Scheduling and Case Management Order at 9, *United States v. Google, LLC*, 1:20-cv-03010-APM (D.D.C. Dec. 21, 2020), ECF No. 85.  The Court should order as follows:

The Parties must serve any objections to requests for productions of documents within **[30]** days as required by FRCP 34.  Within **[7]** calendar days of service of any objections to a request for production, the Parties must meet and confer to attempt to resolve any objections and to agree on materials to be searched.  At the time it serves its responses, the producing Party will provide an estimated date for inspection/production in accordance with Fed. R. Civ. P. 34(b)(2)(B).  To the extent that there is a dispute regarding the scope of production that impacts the estimated time period for completion of the responsive production, the Producing Party will supplement its good-faith estimate of the time period for completion of the responsive production upon resolution of such disputes. Responsive productions (subject to any objections or custodian issues that have not been resolved) shall be made on a rolling basis.

**_Defendant's Position_**:  Meta objects to Plaintiff's attempt to place restrictions on discovery that are additional to or inconsistent with the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 34 already outlines the requirements for responding to document requests, including when and how a party must respond.  *See*, *e.g.*, Fed. R. Civ. P. 34(b)(2)(A) (providing requirements for "Time to Respond"); *id.* at 34(b)(2)(B) (providing requirements or

"Responding to Each Item"). Imposing additional requirements, including a 7-day period in which the Parties must meet and confer, is unnecessary and burdensome. The FTC has not provided good cause to modify the Federal Rules of Civil Procedure. The fact that the parties agreed in *Google* that the Rules as to document requests should be modified is not a reason that the same modifications should be imposed here, where Meta objects to the modification. If the Court is inclined to consider this proposal, Meta requests an opportunity to fully brief the issue.

9.     **Interrogatories.**

*__Plaintiff's Position__*:  Plaintiff requests that the Court adopt requirements similar to those that a court in this District recently adopted to ensure the efficient completion of discovery in a complex antitrust case involving a government plaintiff. *See* Scheduling and Case Management Order at 10, *United States v. Google, LLC*, 1:20-cv-03010-APM (D.D.C. Dec. 21, 2020), ECF No. 85. The Court should order as follows:

The Parties must respond and serve any objections to interrogatories within **[30]** calendar days as required by Fed. R. Civ. P. 33. Within **[7]** calendar days of service of any objections, the parties must meet and confer to attempt to resolve any objections and to discuss whether the request may be satisfied by the production of documents or structured data. Each Party is limited to **[30]** interrogatories in total (including discrete subparts). Contention interrogatories may be answered at any time up to **[30]** days after the close of fact discovery. Each side reserves the right to ask the Court for leave to serve additional interrogatories.

*__Defendant's Position__*:  Meta agrees that each Party should be limited to **[30]** interrogatories in total (including discrete subparts), and that each Party should have the right to ask the Court for leave to serve additional interrogatories.

Meta otherwise objects to Plaintiff's attempt to place restrictions on discovery that are additional to or inconsistent with the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 33 already outlines the requirements for responding to interrogatories, including when and how a party must respond. *See*, *e.g.*, Fed. R. Civ. P. 33(b) (providing requirements for "Answers and Objections," including time to respond and objections). Imposing additional requirements, including a 7-day period in which the Parties must meet and confer, is unnecessary and burdensome. The FTC has not provided good cause to modify the Federal Rules of Civil Procedure. The fact that the parties agreed in *Google* that the Rules as to interrogatories should be modified is not a reason that the same modifications should be imposed here, where Meta objects to the modification. If the Court is inclined to consider Plaintiff's proposal, Meta requests an opportunity to fully brief the issue.

### 10. Requests for Admission.

___*Plaintiff's Position*___: Plaintiff requests that the Court adopt provisions that will maximize the efficiency of requests for admission regarding the authentication or admissibility of documents, data, or other evidence. Pre-trial requests for admission are an efficient way to resolve evidentiary disputes, and courts in this District have recently endorsed the approach the FTC requests to ensure efficiency in complex antitrust cases involving a government plaintiff. *See* Scheduling Order at 3, *FTC v. Surescripts*, 1:19-cv-01080-JDB (D.D.C. Feb. 28, 2020), ECF No. 54 ("The close of fact discovery shall not preclude requests for admission regarding the authentication and admissibility of exhibits."). The FTC's proposal to allow requests for admission regarding evidentiary issues after the close of fact discovery is a natural consequence of its proposal to crystallize disputes over authenticity at the time the parties exchange objections to trial exhibits. *See infra*, Section 17 ("Any good-faith objection to a document's authenticity

must be provided with the exchange of other objections to intended trial exhibits."). Meta's supposed concern that the FTC will serve numerous requests for admissions is simply speculative: indeed, the whole purpose of the FTC's proposal in Section 17, *infra*, is to minimize the need for requests for admissions by establishing a presumption that materials produced in discovery are authentic (***not*** admissible), absent a genuine good-faith dispute. *See id.* This process efficiently resolves any genuine disputes regarding authenticity, and avoids needless requests for admission regarding documents that will not be introduced at trial. Meta's speculation that the FTC will attempt to prove its case by introducing large numbers of documents without establishing their importance and implications is both entirely unfounded and irrelevant to the merits of the FTC's sensible proposal. Accordingly, the Court should order as follows:

Each side is limited to **[35]** requests for admission in total. Each side reserves the right to ask the Court for leave to serve additional requests for admission. Requests for admission relating solely to the authentication or admissibility of documents, data, or other evidence (which are issues that the parties must attempt to resolve initially through negotiation) do not count against these limits. The close of fact discovery shall not preclude requests for admission regarding the authentication and admissibility of exhibits.

***Defendant's Position***: Meta generally agrees with Plaintiff's proposed numerical limits for requests for admission (35 per side, with no limit on requests for admission relating solely to document authentication) but believes that all such discovery should be completed within the period set by the Court for fact discovery. Plaintiff has given no valid reason for extending the document discovery phase in this way. That other parties in other cases may have agreed to do so is no sound reason to do it here over Meta's objection.

Meta further objects to attempts by Plaintiff to use requests for admission to establish "admissibility" as that is a trial issue and should be considered at a later date. This and other FTC proposals indicate to Meta that the agency anticipates trial by flooding unexplained and selectively culled internal Meta documents into the record without testimony, where the meaning and relevance of those documents may be unclear. Indeed, during the Rule 26 conference, the FTC's counsel suggested that they would need 4,000 requests for admission dedicated just to document authenticity. Such a strategy would be both unfair and legally invalid, as this District and other courts have determined. Transcript of Evidentiary Hearing, ECF No. 182, at 10:21-25, *United States v. AT&T Inc.*, No. 17-CV-2511-RJL (D.D.C. Mar. 19, 2018) (refusing to admit emails without witness testimony); *see also FTC v. Washington Data Res.*, 856 F. Supp. 2d 1247, 1253 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013) ("bulky 'document dump' (preferred only by an unskilled or unprepared or overwhelmed lawyer) is a disfavored (and risky) practice that almost always results in grief for the lawyers or the judge or for anyone else left to swim in a great reservoir of undifferentiated and unfamiliar paper").

Witnesses should have the opportunity to explain and provide context for any statements in emails or other contemporaneous documents the Parties seek to offer in evidence. Plaintiff should conduct discovery in a manner that will produce relevant and probative evidence – and not base its case on a legally invalid "ambush by unexplained documents" that has been rejected in this and other courts. With sufficient time for fact discovery, Plaintiff will have ample opportunity to ask witnesses about whatever documents it believes are relevant and thereby avoid creating a record that cannot satisfy Federal Rule of Evidence 403 or other legal requirements.

11.    **Discovery on Nonparties.**

*__Plaintiff's Position__*:  Plaintiff requests that the Court adopt requirements similar to those

that a court in this District recently adopted to ensure the efficient completion of third party

discovery in a complex antitrust case involving a government plaintiff.  *See* Scheduling and Case

Management Order at 10, *United States, et. al. v. Google, LLC*, 1:20-cv-03010-APM, ECF No.

85 (D.D.C. Dec. 21, 2020); *see also* Order Amending Scheduling and Case Management Order,

*United States, et. al. v. Google, LLC*, 1:20-cv-03010-APM, ECF No. 126 (D.D.C. Mar. 30, 2021)

(a party must serve a document subpoena within 7 days, where a third party has received a

document subpoena from the other party).  This proposal minimizes burdens on third parties by

ensuring that both Plaintiff and Defendant promptly and simultaneously engage in discussions

with each third party regarding the scope of discovery requests, and eliminates the predictable

delay that can arise when a third party receives a Rule 45 subpoena from one party but has not

yet received a subpoena from the other party.  The Court should order as follows:

Each Party must serve upon the other Party a copy of any discovery request served

electronically on any Nonparty at the same time it is served on the Nonparty.  A requesting Party

must provide the other Party with a written record of any oral or written modifications,

extensions, or postponements to the discovery request within **[3]** business days of the

modification, extension, or postponement.  Every discovery request to a Nonparty shall include a

cover letter requesting that (a) the Nonparty stamp each document with a production number and

any applicable confidentiality designation prior to producing it; (b) the Nonparty provide both to

the requesting Party and to the other side copies of all productions at the same time; (c) the

Nonparty provide to both the requesting Party and the other side copies of all written

correspondence with any Party concerning the Nonparty's response to or compliance with any

discovery request (including any extensions, modifications, or postponements). When sending discovery requests, notices, and subpoenas to Nonparties, the Parties must include copies of any Protective Orders in effect at the time. After May 2, 2022, if a Party is in receipt of a subpoena served pursuant to Federal Rule of Civil Procedure 45 upon a Nonparty, the deadline for the receiving Party to serve any subpoena upon that Nonparty is 7 days.

*__Defendant's Position__*: Meta objects to Plaintiff's attempt to place restrictions on discovery that are additional to or inconsistent with the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 45 already outlines the requirements for serving and responding to non-party discovery, including who must be served and noticed and when and how a party must respond. *See*, *e.g.*, Fed. R. Civ. P. 45(a)(1) (providing the "Form and Contents" of subpoenas); *id.* at 45(a)(4) (requirements for "Notice to Other Parties Before Services"); *id.* at 45(d) (providing for objections and enforcement of subpoenas). Imposing additional requirements, including requiring the Parties exchange a written record of any oral or written modifications within a 3-day period, is unnecessary and burdensome. The FTC has not provided good cause to modify the Federal Rules of Civil Procedure. The fact that the parties agreed in *Google* that the Rules as to discovery on nonparties should be modified is not a reason that the same modifications should be imposed here, where Meta objects to the modification. If the Court is inclined to consider Plaintiff's proposal, Meta requests an opportunity to fully brief the issue.

12.    **Depositions.**

    a.  **Number of Depositions.**

***Plaintiff's Position*:**

Meta provides no precedent in support of its remarkable proposal to: (1) provide itself 900 hours of deposition time, but approximately 750 hours for the FTC; (2) limit the FTC to 200 hours of testimony from current and former Meta employees; and (3) restrict the questions the FTC is permitted to ask witnesses who sat for investigational hearings.  Courts in this District routinely reject requests to limit the government's litigation discovery from witnesses who previously sat for an investigational hearing during an FTC investigation.  *Compare* Joint Mot. for Case Management and Scheduling Order at 17-18, *FTC v. Draftkings, Inc.*, No. 17-cv-1195 (KBJ) (July 3, 2017), ECF No. 31 *with* Case Management and Scheduling Order at 9, *FTC v. Draftkings, Inc.*, No. 17-cv-1195 (KBJ) (D.D.C. July 10, 2017), ECF No. 46 (rejecting Defendant's proposal to limit FTC deposition time based on prior testimony in investigational hearings); s*ee also* Scheduling and Case Management Order at 11, *United States, et. al. v. Google, LLC*, 1:20-cv-03010-APM (D.D.C. Dec. 21, 2020), ECF No. 85 ("depositions previously taken in response to Civil Investigative Demands" do not count against deposition limits); Case Management Order at 10-11, *United States v. AT&T Inc.*, No. 1:17-cv-2511 (D.D.C. Dec. 21, 2017), ECF No. 54 ("Any party may further depose any person whose deposition was taken pursuant to a Civil Investigative Demand, and the fact that such person's deposition was taken pursuant to a Civil Investigative Demand may not be used as a basis for any party to object to that person's deposition."); Scheduling Order at 3, *FTC v. Surescripts*, No. 19-1080 (JDB) (D.D.C. Feb. 28, 2020), ECF No. 54 ("Depositions taken during the

Commission's pre-complaint investigation do not count toward the number of depositions allowed by this Order.").

Investigations serve a different purpose than litigation, and courts have long recognized that a government agency's pre-complaint investigation is not a substitute for, nor should it limit, post-complaint discovery. *Oklahoma Press Pub Co. v. Walling*, 327 U.S. 186, 201 (1946) (agency investigations are intended "to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's judgment, the facts thus discovered should justify doing so."); *S.E.C. v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000) (noting "there is no authority which suggests that it is appropriate to limit the SEC's right to take discovery based upon the extent of its previous investigation into the facts underlying its case" (quoting *SEC v. Saul,* 133 F.R.D. 115, 118 (N.D. Ill. 1990))); *see also United States v. GAF Corp.*, 596 F.2d 10, 14 (2d Cir. 1979) ("It is important to remember that the [Justice] Department's objective at the pre-complaint stage of the investigation is not to 'prove' its case but rather to make an informed decision on whether or not to file a complaint." (quoting H. R. REP. 94-1343 at 26, Hart-Scott-Rodino Antitrust Improvements Act of 1976)); *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) ("In the pre-complaint stage, an investigating agency is under no obligation to propound a narrowly focused theory of a possible future case."). Investigational hearings help the FTC determine whether a target has violated or is about to violate the antitrust laws. Depositions seek testimony to prove specific elements in court. Meta's proposal to restrict the FTC's deposition "areas" would unfairly and inefficiently prevent the FTC from exploring the facts to which Meta's executives might testify at trial; for example, it would prevent the FTC from eliciting testimony regarding documents that address an "area" that the FTC explored during an investigational hearing. This is inappropriate, as the

27

authorities cited above recognize that investigational hearings routinely have a different focus, or are conducted at a higher level of generality, than depositions taken once litigation has commenced.  Further, Meta's proposal would doubtless lead to disputes about whether a line of inquiry deals with a "new area," or instead with an "area" that was already covered by prior testimony.  (The parties have had no opportunity to discuss what Meta means by a "new area" because Meta presented this proposal in writing on February 22, 2022, shortly before the deadline for this filing, after previously taking the position that the FTC should be prevented entirely from deposing any Meta executive who provided testimony during the FTC's investigation.)

Given that Meta's proposal is unfair, inefficient, and unworkable, it is unsurprising that Meta provides no precedent for its adoption.  Meta cites only an out-of-Circuit case in which, in the limited context of a preliminary injunction hearing, a court denied a deposition that was limited to three topics about which the witness had previously testified.  *See* Def.'s Mot. for Protective Order at 24-25, *United States v. UPM-Kymmene Oyj*, No. 03-cv-2528 (N.D. Ill. May 9, 2003), ECF No. 42.  This case is irrelevant to the proposal Meta advances.  Even the briefing on which Meta relies acknowledges that investigational hearings in the limited context of a preliminary injunction challenge to a merger are fundamentally different from the government's pre-complaint investigations of complex monopolization cases.  *Id.* at 5 ("While the Government has asserted that investigative depositions serve different purposes than litigation depositions, that generalization – ***which certainly applies in ponderous wide-ranging investigations*** – most assuredly does not apply" in the pre-merger review process) (emphasis added).

Accordingly, the Court should order as follows:

Each side should be limited to 500 total deposition hours for fact witnesses.  The hours

limit refers to time of testimony actually taken on the record. In the event that a noticed entity designates as a 30(b)(6) witness an individual that was also noticed pursuant to Rule 30(b)(1), the noticed entity and each noticing Party shall meet and confer to determine whether it is appropriate to extend the length of the deposition beyond the limit that would otherwise apply if the individual's deposition had been noticed only pursuant to Rule 30(b)(1). There shall be no limit on the number of separate 30(b)(6) notices that can be served on a Party or a Third Party.

The following depositions do not count against the above deposition limits: (a) depositions of the Parties' designated expert witnesses; (b) sworn testimony previously taken during the FTC's pre-Complaint investigation or in any other litigation or government investigation; and (c) depositions taken for the sole purpose of establishing the authenticity or admissibility of documents, provided that such depositions may be noticed only after the Party taking the deposition has taken reasonable steps to establish authenticity or admissibility through other means, and further provided that such depositions must be designated at the time that they are noticed as being taken for the sole purpose of establishing authenticity or admissibility.

***Defendant's Position***: Each Party should be limited to 900 total deposition hours for fact witnesses, with a maximum of 200 hours for depositions of current and former Meta employees. Depositions pursuant to Federal Rule of Civil Procedure 30(b)(6) should count against the 200-hour maximum, and the total number of hours of Rule 30(b)(6) testimony of Meta should not exceed 21 hours (unless otherwise agreed by counsel or decided by Court order). Depositions of the Parties' designated expert witnesses should not count against the deposition hours allocated for fact witnesses. Sworn testimony taken by the FTC of Meta employees during its pre-complaint investigation (approximately 150 hours) should count against its 900-hour deposition limit, as the investigation covered the same issues now before this Court

and the FTC will undoubtedly seek to use that testimony in this proceeding.  The Court should limit any deposition of Meta employees to new areas not covered in prior sworn testimony. Depositions should be conducted as provided in the Federal Rules of Civil Procedure.

     *Meta's total hours proposal is reasonable and necessary.*  A significant number of depositions (900 hours per side) will be necessary so that Meta can conduct necessary third-party discovery to defend this case.  *See* Defendant's Position, No. 5.  The gap between the Meta proposal (900 hours) and the FTC proposal (500 hours) is largely illusory:  The FTC has already conducted 150 hours of questioning of Meta witnesses (not accounting for third-party testimony taken and interviews conducted during the investigation) and it seeks an unlimited number of hours for certain categories of depositions, such as "document admissibility."  On February 22, 2022, Meta notified the FTC that it will imminently serve 81 third-party subpoenas, and expects to serve many more.  Meta has already identified 286 companies that are likely to have relevant information it may use to support its defenses, most of which have identified Meta as a competitor.  The 900-hour budget will provide both sides with the scope necessary to conduct the extensive discovery that both sides have said they need.

     Nine hundred hours of deposition time therefore is amply justified in a case of this complexity and magnitude.  *See, e.g., United States v. Philip Morris, Inc.*, 449 F. Supp. 2d 1, 33 (D.D.C. 2006) ("parties each took over 1,000 hours of depositions" in a civil RICO action); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 229 (2d Cir. 2016) (noting that "[d]iscovery included more than 400 depositions" – equivalent to 2,800 hours assuming 7-hour depositions); *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 2014 WL 5392465, at *2 (S.D.N.Y. Oct. 9, 2014) ("The private plaintiffs and the government, on the one hand, and the defendants on the other *each* were permitted collectively to take up to

150 fact depositions.") (equivalent to 1,050 hours assuming 7-hour depositions); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 759472, at \*3 (N.D. Ill. Sept. 1, 1999) ("The parties took over 1000 depositions in this matter.") (equivalent to 7,000 hours assuming 7-hour depositions).

    *A 200-hour cap on depositions of Meta current and former employees is reasonable.*  A 200-hour cap on depositions of Meta's current and former employees, a 21-hour cap on 30(b)(6) depositions, and limitations on duplicating the testimony of Meta employees who already testified in the investigation are entirely reasonable.  *See*, *e.g.*, Def.'s Mot. for Protective Order, ECF No. 42, at 2 (May 9, 2003) and Opinion, *United States v. UPM-Kymmene Oyj*, No. 03-cv-25828, 2003 WL 21804221, at \*1 (N.D. Ill. May 16, 2003) (vacating deposition notice of a company's CEO because the government had already taken a day-long deposition of the CEO "[d]uring its [antitrust] investigation").  The FTC should not be permitted to repetitively burden Meta's senior employees, who are trying to manage a complex enterprise while at the same time being sought for testimony in political and judicial matters covering many of the same issues.  The FTC (with its cooperating State plaintiffs) took 2-day depositions of Meta's most senior executives.  Meta's proposed limitations on depositions of Meta witnesses will eliminate unnecessary and wasteful depositions of Meta's current and former employees.  *See Affinity Labs of Texas v. Apple, Inc.*, 2011 WL 1753982, at \*17 (N.D. Cal. May 9, 2011) (denying motion to compel deposition of Steve Jobs); *In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, 2006 WL 1328259, at \*10 (S.D.N.Y. May 16, 2006) (denying motion to compel depositions of Siemens AG executives).  In opposing Meta's proposal, the FTC states that "Meta has no basis to assert that the FTC will depose its executives only to duplicate testimony already provided."  The prior testimony was already repetitive and cumulative.  The Court should limit any deposition of

Meta employees to new areas, just as the FTC at least implicitly concedes would be appropriate here.

### b. Notice of Depositions.

*__Plaintiff's Position__*: The FTC proposes a commonsense procedure for noticing depositions, objecting to notices, and scheduling depositions, similar to those a court in this District recently adopted to ensure the efficient completion of discovery in a complex antitrust case involving a government plaintiff. *See* Scheduling and Case Management Order at 11-12, *United States, et. al. v. Google, LLC*, 1:20-cv-03010-APM, ECF No. 85 (D.D.C. Dec. 21, 2020). The Court should order as follows:

Within **[10]** calendar days of receipt of a deposition notice, the noticed Party or Nonparty must provide any objections it intends to assert in response to that deposition notice, and, if relevant, an alternative date on which witnesses will be made available for testimony. Parties and Nonparties will use their best efforts to make witnesses available for deposition at a mutually agreeable time and location and without undue delay. If a witness is a former employee of any Party or Nonparty, upon receipt of a deposition notice for the former employee, that Party or Nonparty shall, within **[10]** calendar days of the deposition notice, provide the date of departure and last known address of the former employee, state whether counsel for the Party or Nonparty can accept service of the notice, and state whether the counsel for the Party or Nonparty will be representing the witness in connection with the deposition and, if not, provide the name and contact information for the witness' counsel or state that counsel for the Party or Nonparty is unaware that the witness is represented by counsel.

If a Party serves a subpoena for the production of documents or electronically stored information on a Party or Nonparty and a subpoena commanding attendance at a deposition by a

witness employed by such Party or Nonparty, the Party serving those subpoenas must schedule the witness's deposition for a date at least **[14]** calendar days after the return date for the document subpoena.  If the return date for the document subpoena is extended: absent consent of both Plaintiff and Defendant, the deposition must be postponed to a date at least **[14]** calendar days following the date of production of substantially all documents required by the subpoena (as modified by any negotiations regarding subpoena compliance) (a) with respect to which the witness is an author, addressee, recipient, or custodian; and (b) are contained in a shared filing location or other electronic or physical repository that the witness accessed in the ordinary course of business.

For any deposition lasting longer than **[7]** hours, either Party or the witness may demand that the time remaining after the seventh hour be carried over to be completed on the next consecutive business day, or as soon as possible consistent with the convenience of the witness and the Parties.

***Defendant's Position***:  Meta objects to Plaintiff's attempt to place restrictions on discovery that are additional to or inconsistent with the Federal Rules of Civil Procedure. Federal Rules of Civil Procedure 30 and 45 already provide the appropriate requirements for serving and responding to party and non-party depositions, including who must receive notice and when and how a party or non-party must respond.  Imposing additional requirements is unnecessary and burdensome.  The FTC has not provided good cause for the additional restrictions it seeks.  If the Court is inclined to consider Plaintiff's proposal, Meta requests an opportunity to fully brief the issue.

c. **Allocation of Time During Depositions.**

*Plaintiff's Position*:

1. ***Defendant's current employees***: During the deposition of a current employee of Defendant, Plaintiff may examine the witness for up to 7 hours.

2. ***Defendant's former employees***: During the deposition of a former employee of Defendant that is noticed only by one side, the other side may question the witness for up to one hour at the conclusion of the noticing party's examination, which shall last no more than 6 hours. During the deposition of a former employee of Defendant that is noticed by both Parties, the deposition will be **[10]** hours: (a) if the witness provided sworn testimony during the FTC's pre-Complaint investigation, the time will be divided equally between the sides; (b) if the witness did not provide sworn testimony during the FTC's pre-Complaint investigation, Plaintiff may examine the witness for up to 7 hours and Defendant may examine the witness for up to 3 hours. In any deposition of a former employee of Defendant, any time allotted to one side not used by that side may not be used by the other side.

3. ***Nonparty witnesses who are not a former employee of Defendant***: (a) if the deposition is noticed by only one side, the non-noticing side may question the witness for up to one hour at the conclusion of the noticing party's examination, which shall last no more than 6 hours; (b) if the deposition is noticed by both sides, then the deposition will be **[10]** hours and will be divided equally between the sides. Any time allotted to one side not used by that side in a Nonparty deposition may not be used by the other side.

*Defendant's Position*: Meta submits that depositions should be conducted as provided in

the Federal Rules of Civil Procedure, and that Plaintiff's proposals to add limitations additional

to or inconsistent with the Federal Rules of Civil Procedure should not be imposed, except as

agreed below.

1. ***Defendant's Current and Former Employees*** (Plaintiff's Position Nos. 1 and 2,

    above):  The FTC should only be allowed to depose current or former Meta

    employees who provided sworn testimony during the FTC's pre-complaint

    investigation as to topics not previously covered in that prior testimony; and no

    deposition should exceed the 7 hours provided in the Federal Rules of Civil

    Procedure.  *See* Fed. R. Civ. P. 30(a)(2) (requiring leave to re-depose a witness who

    "has already been deposed in the case"); *id.* 30(d)(1) (requiring leave for a deposition

    longer than "1 day of 7 hours").

    For former employees, if the witness did not provide an interview or sworn testimony

    during the FTC's pre-complaint investigation:  (a) if the deposition is noticed by both

    sides, the 7 hours should be divided equally between the sides (3.5 hours each); (b) if

    the deposition is noticed by only one side, Meta and the FTC's proposals are the

    same, i.e., the noticing Party should have 6 hours for its examination, and the non-

    noticing Party should be allowed to question the witness for up to 1 hour at the

    conclusion of the noticing Party's examination.  Former employees who provided an

    interview during the FTC's pre-complaint investigation should be examined by

    Defendant for up to 7 hours and by Plaintiff for up to 3 hours.  For former employees

    who provided sworn testimony during the FTC's pre-complaint investigation, the

    FTC should be permitted to take testimony only on topics not previously covered in

    the prior testimony.  Such former employees who provided sworn testimony during

the FTC's pre-complaint investigation should be examined by Defendant for up to 7

hours and by Plaintiff for up to 3 hours.  Any change in these time allocations should

be granted only upon a particularized showing of good cause made to the Court.  In

any deposition of a former employee of Defendant, any time allotted to one side not

used by that side should not be used by the other side.

2. ***Nonparty Witnesses Who Are Not a Former Employee of Defendant***:  Meta agrees

with the FTC's proposal.

**13. Dispute Resolution.**  No discovery motions may be filed without leave of court.  In the

event a discovery dispute arises, the Parties shall make a good faith effort to resolve or narrow

the areas of disagreement.  If the Parties are unable to resolve the discovery dispute, the Parties

shall jointly call chambers at (202) 354-3300, at which time the Court will either rule on the

issue or determine the manner in which it will be handled.

**14. Inadvertent Production of Privileged Information.**  Inadvertent production of

privileged information shall be governed by the terms of a Court order under Federal Rule of

Evidence 502(d).

**15. Privilege Logs.**  The Parties agree that the following privileged or otherwise protected

communications shall not be the subject of discovery, need not be preserved, and need not be

placed on a privilege log:  email, notes, drafts, communications, memoranda, documents, or

other work product produced by or exchanged solely among and between:  (a) outside counsel[4]

for the Defendant; (b) outside counsel for Defendant and/or In-House counsel (as that term is

defined in the Protective Order in this action) employed by Defendant and counsel for Parties

---

[4] As used in this Paragraph, "counsel" includes attorneys, economists or other experts
assisting counsel, paralegals, assistants, and those acting on behalf of counsel.

with common legal interest in defending potential or current litigation against Meta; (c) In-House

Counsel (as that term is defined in the Protective Order in this action) employed by Defendant on

topics relating to potential or current litigation against Meta; (d) counsel for the Federal Trade

Commission (or persons employed by the Federal Trade Commission); (e) counsel for the

Federal Trade Commission (or persons employed by the Federal Trade Commission) and counsel

for a plaintiff with which the FTC shares a common legal interest in pursuing or exploring

litigation against Meta; (f) counsel for the Federal Trade Commission (or persons employed by

the Federal Trade Commission) and counsel employed by any executive-branch agency of the

federal government.  When responsive or non-responsive, privileged documents described in this

Paragraph are attached to responsive non-privileged documents that are produced in whole or in

part; however, the producing Party will insert a placeholder to indicate a document has been

withheld from that family.

**16. Privilege Log Timing and Format.**

_**Plaintiff's Position**_:  If a producing party redacts documents within a production or

withholds documents from a production as privileged, it shall provide a privilege log relating to

those documents within **[21]** calendar days of the production in which the documents would have

been included but for the privilege claim.  A producing Party must provide a final privilege log

no later than **[30]** calendar days prior to the close of fact discovery.  All privilege logs shall be

provided in Excel format.

_**Defendant's Position**_:  Meta submits that the Parties should provide privilege logs 90

days after completion of production for each set of requests of production, or such other agreed

upon date.  For production of discovery completed at the close of fact discovery, the Parties

should provide privilege logs by 30 days after the completion of production.  All privilege logs

should be provided in Excel format. The FTC's proposal to provide privilege logs in an
expedited basis and before fact discovery is even completed is unnecessary and burdensome.

### 17. Presumptions of Authenticity.

*Plaintiff's Position*: The FTC proposes a commonsense procedure similar to the
approach recently adopted by courts in this District in antitrust cases involving government
plaintiffs. *See* Scheduling and Case Management Order at 16, *United States v. Google, LLC*,
1:20-cv-03010-APM (D.D.C. Dec. 21, 2020), ECF No. 85; Case Management Order at 15,
*United States v. AT&T Inc.*, No. 17-CV-2511-RJL (D.D.C. Dec. 21, 2017), ECF No. 54. The
Court should order as follows:

Documents produced in response to a discovery request by Parties and Nonparties from
their own files will be presumed to be authentic within the meaning of Federal Rule of Evidence
901. Any good-faith objection to a document's authenticity must be provided with the exchange
of other objections to intended trial exhibits. If the opposing side serves a specific good-faith
written objection to the document's authenticity, the presumption of authenticity will no longer
apply to that document and the parties will promptly meet and confer to attempt to resolve any
objection.

*Defendant's Position*: Meta respectfully submits that evidentiary rulings are premature
and not the appropriate subject of the initial scheduling order. As explained above (Defendant's
Position, No. 10), this and other FTC proposals indicate to Meta that the FTC may flood the
record with documents that were not the subject of testimony from witnesses with personal
knowledge, i.e., a "document dump." This is entirely inappropriate as explained above. For
present purposes, there is no need to address matters beyond the scheduling of fact and expert
discovery, in accordance with what Meta understands to be the Court's standard practice. The

fact that the parties agreed in *Google* and *AT&T* that the Rules as to authentication should be modified is not a reason that the same modifications should be imposed here, where Meta objects to the modification.  If the Court is inclined to consider Plaintiff's proposal, however, Meta requests an opportunity to fully brief the issue.

**18. Expert Witness Disclosures** – **Materials Protected from Disclosure.**  The following information, documents, and materials are not discoverable, and need not be preserved or disclosed for purposes of complying with Federal Rule of Civil Procedure 26(a)(2), 26(b)(4), or any other rule, including testimony at deposition, hearing, or trial, unless such materials provide the only record of a fact or assumption that the expert relied on in forming the opinions to be expressed:  (a) any form of oral or written communications, correspondence, or work product shared between:  (i) the expert and any persons assisting the expert; (ii) Plaintiff's counsel and Plaintiff's experts, or between any agent or employee of Plaintiff's counsel and Plaintiff's experts; (iii) Meta's counsel and Meta's experts, or between any agent or employee of Meta's counsel and Meta's experts; (iv) testifying and non-testifying experts; (v) non-testifying experts; or (vi) testifying experts; (b) expert's notes, except for notes of interviews if the expert relied upon the notes in forming any opinions in his or her final report; (c) drafts of expert reports, affidavits, or declarations or comments, mark-ups, or edits prepared in connection with such drafts; and (d) data formulations, data runs, data analyses, surveys, studies, or any database-related operations not relied upon by the expert in forming any opinions in his or her final report.

**19. Expert Witness Disclosures** – **Materials To Be Disclosed.**  Subject to the limitations of the prior paragraph, the Parties agree that the following materials will be disclosed within **[2]** calendar days of when each expert report is served, or, for those materials to be made available upon request, within **[7]** calendar days of the request: (a) a list of all documents relied upon by

the expert in forming any opinions in his or her report, including Bates numbers of documents previously produced; (b) a list of all publications authored by the expert in the previous **[10]** years; (c) upon reasonable request, copies of all publications authored by the expert in the previous **[10]** years that are not readily available publicly; and (d) for all calculations or other quantitative analyses appearing in the report, the data set and programs underlying such calculations or quantitative analyses that were relied upon by the expert, including the programs and codes necessary to recreate the calculations or quantitative analyses from the data set.

**20. Expert Depositions.** Each expert may be deposed for **[7]** hours. The Parties may request additional time only upon a particularized showing of good cause made to the Court. Depositions of each Party's experts will be conducted only after disclosure of all expert reports and materials to be disclosed.

**21. Service of Pleadings and Discovery on Other Parties.** Service of all pleadings must be made by ECF (which will send notice to all Parties and Nonparties registered with ECF). Service of all trial subpoenas and discovery requests on a Party (including subpoenas for testimony or documents under Federal Rule of Civil Procedure 45), expert disclosures, and delivery of all correspondence in this matter must be made by email to the persons whose email is listed below. Service of trial subpoenas and discovery requests on a Nonparty (including subpoenas for testimony or documents under Federal Rule of Civil Procedure 45) may be made by email when the Nonparty or counsel for the Nonparty consents, or when service is made by email on a counsel who enters an appearance in this action on behalf of the Nonparty. Service via email will be considered equivalent to service by hand.

> For Plaintiff FTC:
> Daniel Matheson
> Owen Masters
> Michael Smith

Krisha Cerilli
Robert Zuver
Maggie DiMoscato
Sunila Steepen
Dominique Wilson
Federal Trade Commission
600 Pennsylvania Ave. N.W.
Washington D.C. 20580
Tel: 202-326-2075
dmatheson@ftc.gov
omasters@ftc.gov
msmith9@ftc.gov
kcerilli@ftc.gov
rzuver@ftc.gov
mdimoscato@ftc.gov
ssteephen@ftc.gov
dwilson1@ftc.gov


For Defendant Meta:
Mark C. Hansen
Kevin B. Huff
Kenneth M. Fetterman
Geoffrey M Klineberg
Kevin J. Miller
Aaron M. Panner
Alex A. Parkinson
Ana Nikolic Paul
Aaseesh P. Polavarapu
Kellogg, Hansen, Todd, Figel, & Frederick, P.L.L.C.
1615 M Street, N.W. Suite 400
Washington, DC 20036
Tel: 202-326-7900
mhansen@kellogghansen.com
khuff@kellogghansen.com
kfetterman@kellogghansen.com
gklineberg@kellogghansen.com
kmiller@kellogghansen.com
apanner@kellogghansen.com
aparkinson@kellogghansen.com
apaul@kellogghansen.com
apolavarapu@kellogghansen.com

Sonal N. Mehta
Wilmer Cutler Pickering Hale & Dorr LLP

2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel: 650-858-6000
sonal.mehta@wilmerhale.com

David Gringer
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel:  212-230-8800
david.gringer@wilmerhale.com

James P. Rouhandeh
Michael Scheinkman
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Tel: 212-450-4000
rouhandeh@davispolk.com
michael.scheinkman@davispolk.com

**22. Nationwide Service of Process.**  Good cause having been shown in view of the geographic dispersion of potential witnesses in this action, the Parties will be allowed nationwide service of process of discovery and trial subpoenas pursuant to Federal Rule of Civil Procedure 45 and 15 U.S.C. § 23 to issue from this Court.  The availability of nationwide service of process, however, does not make a witness who is otherwise "unavailable" for purposes of Federal Rule of Civil Procedure 32 and Federal Rule of Evidence 804 available under these rules regarding the use at trial of a deposition taken in this action.

**23. Modification of Scheduling and Case Management Order.**  Parties may not extend any deadline by stipulation; instead, Parties must seek extensions by motion.  Consent motions are generally looked upon with favor by the Court.

DATED: February 22, 2022                    Respectfully submitted,


/s/ Daniel J. Matheson
Daniel Matheson, Esq.
(D.C. Bar #502490)
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue N.W.
Washington, D.C. 20580
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*


/s/ Mark Hansen
Mark Hansen, Esq.
Kellogg, Hansen, Todd, Figel & Frederick,
P.L.L.C.
1615 M Street, N.W.
Washington, D.C. 20036
Mhansen@kellogghansen.com
(202) 326-7904

*Counsel for Meta Platforms, Inc.*

# Exhibit 542

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

        Plaintiff,

    v.

META PLATFORMS, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

## JOINT STATUS REPORT REGARDING EXPERT DISCOVERY

Pursuant to the Court's Minute Order of June 8, 2023, expert discovery closes February 20, 2024. The Parties do not have any disputes regarding expert discovery at this time.

Dated: January 31, 2024

Respectfully submitted,

*/s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria DiMoscato (D.C. Bar 489743)
Patricia Galvan
Noel Miller (D.C. Bar 1026068)

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*

*/s/ Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Kevin J. Miller (D.C. Bar No. 478154)
Kenneth M. Fetterman (D.C. Bar No. 474220)
KELLOGG, HANSEN, TODD,

1

FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

James P. Rouhandeh (NY0390)
Michael Scheinkman (NY0381)
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, New York 10017
Tel: (212) 450-4754
james.rouhandeh@davispolk.com

Sonal N. Mehta (CA SBN 222086)
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000
Sonal.Mehta@wilmerhale.com

David Z. Gringer (D.C. Bar No. 1001200)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
David.gringer@wilmerhale.com

*Counsel for Defendant Meta Platforms, Inc.*

2

# Exhibit 543

∞ Meta       Developer Products    Docs    Blog    More    Log In    🔍

←   Back to News for Developers

# Introducing Camera Effects Platform

April 18, 2017

By Ficus Kirkpatrick

 ✉ Subscribe to Developer news

   

Facebook has long been a place where people connect and communicate with one another by sharing personal stories, photos, and videos about their lives. Last month we introduced the Facebook camera to make photo and video sharing even more expressive with fun masks, frames, interactive filters, and fresh art from featured guests, but we believe that self-expression needs more than just the effects we create. So today we're making it possible for the whole world's creative community to build for the Facebook camera with the launch of **Camera Effects Platform**.

   

**The Camera Effects Platform turns smartphone cameras into the first AR platform, providing an opportunity for artists and developers to create effects for the Facebook camera.** Included with this new platform are two creative tools, Frame Studio and AR Studio, that give the Facebook community the power to create a full spectrum of camera effects, from simple frames to interactive augmented reality (AR) experiences. This platform empowers artists and developers to connect art with data to bring AR into everyday life through the Facebook camera.

**The tools in the Camera Effects Platform:**

**Frame Studio** is a web-based tool that allows anyone with a profile or Page to design frames for use on profile pictures or in the new Facebook camera. Frames that are made in Frame Studio will appear in the cameras of your friends or Page fans. It will also feature the creator's name alongside the effect in the camera as well as in the final posts in News Feed. Frames must follow Facebook's guidelines and cannot include logos or trademarks unless pre-approved by Facebook.

**AR Studio**, an augmented reality experience authoring tool, is now in closed beta for Mac. AR Studio enables artists and developers to build their own AR experiences such as animated frames, masks, and interactive effects that respond to motion, interactions during Live broadcasts, or third-party data. Approved effects made with AR Studio will be available in the new Facebook camera for use with photos, videos or Live broadcasts. AR Studio is built to enable you to code against the real world; to create experiences that are responsive to the environment around you.

AR Studio lets developers create effects that combine various computer vision algorithms, sensor data, and their own data, to create an experience that comes to life. Here are a few key features of the platform that is in closed beta today:

Search News 🔍

TOPICS   —

Artificial Intelligence   +
Augmented Reality   +
Business Tools   +
Developer Platform   +
Developer Policy   +
Developer Tools
Gaming   +
Open Source   +
Platforms   +
Programs   +
Publishing   +
Social Integrations   +
Virtual Reality   +

EVENTS   —

Startups
Meta Connect
Tech by Her
Hackathon
All Developer Events

YEAR   +

RELATED NEWS



Earlier this year we released Camera Effects Platform in closed beta, putting the the the first augmented reality platform into the hands of talented creators such as brands, publishers, artists and developers.

Augmented Reality • 2017 • Spark AR Studio

December 20, 2017



Announcing our XR Hackathon Winners

Artificial Intelligence • Augmented Reality • Programs • 2021 • Spark AR Studio

December 7, 2021

‹ **Face Tracker** is a real-time computer vision algorithm that tracks the face and allows the creator to make masks that fit and respond to facial movements without writing a line of code.

‹ **Sensor data** is used to allow developers to create effects where people can move their phone to pan around a virtual world.

‹ **Scripting APIs** allow developers to access and download data, respond to user interactions, and modify the effect in real time.

Our earliest AR Studio beta partners, Electronic Arts' *Mass Effect: Andromeda*, GIPHY, Manchester United, Nike, Real Madrid, TripIt, and Warner Bros' *Justice League*, have used AR Studio to build camera effects that can help delight and engage their communities in a new way.

**Create Effects for Facebook Live**

As a part of the AR Studio beta program, new effects are now available in Facebook Live. AR Studio enables developers to design effects that respond directly, in real time, to what's happening in Facebook Live broadcasts, such as how many people are watching and what they are saying in comments. This opens up a whole set of new possibilities for developers and makes **Facebook Live broadcasts** even more engaging by connecting creative effects to interactions between broadcasters and viewers.

See how these effects work by checking out two we're making available today in Facebook Live: **This or That** and **GIPHY Live**. Both effects are powered by AR Studio and are designed to respond in real time to what's happening in a live broadcast.

‹ **This or That** is an effect created by Facebook to show how broadcasters and viewers can interact live in new ways. Broadcasters get to pick between two options live while viewers can comment using a hashtag to pick the option they think the broadcaster will choose. The effect then surfaces the most popular hashtag!



‹ We've also partnered with GIPHY to announce **GIPHY Live**. This effect allows viewers to let broadcasters know which topics they're most interested in by commenting with hashtags during the live video. The most frequently commented hashtags will show up in a ticker across the top of the video. The broadcaster can then select one of those hashtags to cause a GIF related to that topic to pop up on screen, creating a whole new form of interaction between broadcaster and viewer.

With the launch of the Camera Effects Platform, people will see more effects in their Facebook camera that are more personal, like frames from their local sports team, advanced effects that help share their morning run stats, frames made by local artists to celebrate hometown pride, or "just for fun" frames from their creative friends.

Tags: Augmented Reality, 2017, Spark AR Studio

---



**F8 Refresh Hackathon winners announced**

Augmented Reality · Programs · 2021 · Spark AR Studio
June 2, 2021

→ More News

---

 **Meta**

**Products**
Artificial Intelligence
AR/VR

**Programs**
ThreatExchange
Support

**News**
Blog
Success Stories

Follow Us

Business Tools

Gaming

Open Source

Publishing

Social Integrations

Social Presence

Support

Developer Support

Bugs

Platform Status

Report a Platform Data Incident

Facebook for Developers

Community Group

Sitemap

Videos

Meta for Developers Page

Terms and Policies

Responsible Platform Initiatives

Platform Terms

Developer Policies

© 2024 Meta

About    Create Ad    Careers    Privacy Policy    Cookies    Terms    English (US) ▼