# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:20-cv-03590 (JEB) |
| **META PLATFORMS, INC.** | **PUBLIC RECORD VERSION** |
| Defendant. | |

**Plaintiff Federal Trade Commission's Reply Memorandum of Law in Support of Plaintiff's Cross-Motion for Partial Summary Judgment**

# TABLE OF CONTENTS

I. Meta Fails to Identify Evidence That Might Meet Its Burden to Establish Nonpretextual Procompetitive Justifications ................................................................................................. 2

   A. Meta's Insistence That Its Genuine Motivation Is Irrelevant Flouts the Supreme Court and the *Microsoft* Burden-Shifting Framework ............................................................. 3

      1. Controlling authority establishes that *Microsoft*'s "nonpretextual" requirement is a necessary and independent criterion for a Section 2 procompetitive justification ....... 3

      2. The authorities cited by the FTC focus on a monopolist's subjective motivation, contradicting Meta's proposed rule ................................................................................ 5

      3. Meta identifies no authority supporting its proposed rule ........................................... 7

      4. *Microsoft*'s "nonpretextual" requirement serves important purposes ........................ 8

   B. Meta Fails to Identify Evidence That Meta Acquired Instagram for a Genuine Reason Other Than to Eliminate a Threat ................................................................................... 9

   C. Meta Fails to Identify Evidence That Meta Acquired WhatsApp for a Genuine Reason Other Than to Eliminate a Threat ................................................................................. 14

II. Meta Fails to Identify Evidence of Merger-Specific Procompetitive Benefits ...................... 17

III. Meta Fails to Identify Evidence That Its Tenth Justification Is Legally Cognizable ............ 21

IV. The Court Must Address the FTC's Motion for Partial Summary Judgment ........................ 22

   A. The FTC Has Proffered Evidence of Monopoly Power .................................................. 22

      1. The FTC has proffered direct evidence of monopoly power ...................................... 23

      2. The FTC has proffered indirect evidence of monopoly power ................................... 25

      3. The FTC has proffered evidence of price discrimination supporting both monopoly power and the PSN services market ............................................................................. 31

   B. The FTC Has Proffered Evidence of Exclusionary Conduct ........................................... 34

V. Conclusion .............................................................................................................................. 35

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 13

*\*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................... 1, 9, 20, 22

*Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995) .......................... 25

*\*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................ 3

*FTC v. H.J. Heinz Co.*, 116 F. Supp. 2d 190 (D.D.C. 2000) ........................................ 18

*\*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ...................................... 17, 18, 19

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) .................................................. 33

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.D.C. 2008) ................................. 33

*Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, 2008 WL 73689

   (N.D. Cal. Jan. 5, 2008) ........................................................................ 22

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) ................................................. 28

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir. 1990) .......................... 3, 6

*\*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ............... passim

*In re AMR Corp.*, 625 B.R. 215 (Bankr. S.D.N.Y. 2021) ............................................. 20

*In re AMR Corp.*, No. 22-901, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) ................................ 21

*\*In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077

   (N.D. Ill. 2023) ........................................................................ 17

*In the Matter of Evanston Northwestern Healthcare Corp.*, No. 9315, 2007 WL 2286195

   (F.T.C. Aug. 6, 2007) ........................................................................ 18

*In the Matter of McWane, Inc., et al.*, No. 9351, 2014 WL 556261 (F.T.C. Jan. 30, 2014) ........... 7

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) .......................................... 7, 28

*\*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ..................... 4, 7

*New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ....... 6

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................... 20

*Novell Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ................................... 8

*Rothe Dev., Inc. v. Dep't of Def.,* 107 F. Supp. 3d 183 (D.D.C. 2015) ........................................ 26

*\*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ........................................... 17, 19

*United States v. Carilion Health Sys.*, 707 F. Supp. 840 (W.D. Va. 1989) ................................. 22

*United States v. Dentsply Int'l*, 277 F. Supp. 2d 387 (D. Del. 2003) ........................................... 7

*United States v. Dentsply Int'l*, 399 F.3d 181 (3d Cir. 2005) ........................................................ 7

*\*United States v. Google LLC*, No. 1:20-cv-03010 (APM), 2024 WL 3647498

   (D.D.C. Aug. 5, 2024) ........................................................................................................... passim

*\*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) ................................................. passim

*Washington v. Time Oil Co.*, 687 F. Supp. 529 (W.D. Wash. 1988) ........................................... 19

**Rules**

Fed. R. Civ. P. 56(c) .................................................................................................................... 13

**Treatises**

Herbert Hovenkamp, *Antitrust Law, An Analysis of Antitrust Principles and Their*

   *Application* ...................................................................................................................... 20, 21

Meta's Opposition fails to "designate specific facts showing that there is a genuine issue for trial" as to whether Meta's proffered justifications are legally cognizable.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Accordingly, the Court should narrow the issues for trial by dismissing Meta's fourth and fifth affirmative defenses, as courts readily grant summary judgment dismissing non-cognizable justifications.  *See* ECF No. 363-1 ("FTC Mem.") at 65-66.

The first nine of Meta's ten categories of justifications should be dismissed because they are legally non-cognizable for two independently sufficient reasons.

First, controlling Supreme Court and Circuit authority establish that in monopoly cases a justification is not legally cognizable unless it is "nonpretextual"—i.e., a proffered justification must represent a genuine reason for the challenged conduct.  *Infra* § I.A.  Here, the FTC has proffered extensive evidence that the genuine reason Meta acquired Instagram and WhatsApp was to eliminate threats; and Meta's Opposition fails to designate specific facts that might show that Meta undertook the acquisitions for a different genuine reason.  *Infra* §§ I.B, I.C.

Second, Meta's Opposition fails to identify evidence that its first nine justifications are merger specific.  *See* FTC Mem. at 75-76, 79-80.  Meta claims that it has made this showing because it claims that Instagram and WhatsApp produced "benefits for consumers" following the acquisitions and Meta argues that it is irrelevant that Meta itself could have produced the same benefits absent the acquisitions.  ECF No. 369 ("Meta Opp.") at 4, 62-64.  Meta's argument must be rejected because it contradicts this Court's previous instruction that "the burden would be on Meta to demonstrate that benefits it claims resulted from its acquisitions could not have been achieved absent the acquisitions."  ECF No. 281 at 7 (quotation omitted); *see infra* § II.

Meta's tenth and final category of justification should likewise be dismissed because Meta fails to identify evidence that Meta benefited competition by increasing its leverage over

two firms it claims as competitors, Meta Opp. at 64.  *Infra* § III.

Finally, Meta argues that the Court "does not need to reach" Meta's affirmative defenses because the FTC has advanced only "a theoretical claim of anticompetitive effects."  Meta Opp. at 58.  Contrary to Meta's suggestion, the FTC has proffered extensive evidence establishing its prima facie case, including evidence that Meta possesses monopoly power and evidence that Meta's acquisitions harmed the competitive process by eliminating firms that "reasonably constituted nascent threats."  FTC Mem. at 40 (quoting *United States v. Microsoft*, 253 F.3d 34, 79 (D.C. Cir. 2001)).  Further, the FTC has proffered evidence that Meta's conduct has resulted in consumer harm.  *Infra* § IV.  Accordingly, Meta bears the burden to proffer evidence that would allow a reasonable trier of fact to determine that its justifications are legally cognizable.  Meta's Opposition fails to meet this burden.

**I.      Meta Fails to Identify Evidence That Might Meet Its Burden to Establish Nonpretextual Procompetitive Justifications**

The FTC's opening Memorandum identified numerous contemporaneous documents demonstrating that the genuine reason Meta acquired Instagram and WhatsApp was to eliminate competitive threats.  *See* FTC Mem. at 71-74, 77-79.  Meta's Opposition does not meaningfully address these documents, but instead primarily argues that its "subjective motive" is irrelevant to whether its proffered justifications are legally cognizable.  Meta Opp. at 60-61.  Meta's argument contradicts precedent and has been expressly rejected.  *See infra* § I.A; *Image Tech. Servs., Inc. v. Eastman Kodak Co.* ("*ITS 2*"), 125 F.3d 1195, 1219 (9th Cir. 1997) (rejecting monopolist's argument "that its subjective motivation is irrelevant").

Meta's fallback argument suggests that Meta intended to grow the acquired applications rather than eliminate threats.  Meta Opp. at 61-62.  This argument fails, as Meta fails to identify evidence that might allow a reasonable trier of fact to conclude that any of the justifications that

Meta has advanced was a genuine reason for the acquisitions.  *Infra* §§ I.B, I.C.

### A. Meta's Insistence That Its Genuine Motivation Is Irrelevant Flouts the Supreme Court and the *Microsoft* Burden-Shifting Framework

*Microsoft* instructs that once a Section 2 plaintiff establishes its prima facie case, the burden shifts to the monopolist to advance a "nonpretextual" procompetitive justification for its conduct.  *Microsoft*, 253 F.3d at 59.  Meta proposes a rule that eliminates *Microsoft*'s "nonpretextual" requirement, arguing that the Court should find that any justification for a monopolist's conduct is legally cognizable, regardless of the monopolist's genuine purpose, unless "the claimed benefits *did not exist*."  Meta Opp. at 60 (emphasis in original).  Meta's rule is not the law (*infra* § I.A.1-3) and would undermine sound Section 2 principles (*infra* § I.A.4).

#### 1. Controlling authority establishes that *Microsoft*'s "nonpretextual" requirement is a necessary and independent criterion for a Section 2 procompetitive justification

Controlling authority establishes that *Microsoft*'s nonpretextual requirement is a necessary and independent criterion for a procompetitive justification in Section 2 cases.

In *Kodak*, the Supreme Court held that a proffered justification cannot defeat a plaintiff's prima facie case if that justification is "pretextual."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.* ("*Kodak*"), 504 U.S. 451, 484 (1992).  There, the Supreme Court reviewed the Ninth Circuit's holding that a monopolist's motion for summary judgment was foreclosed by "triable issues of fact as to whether [the monopolist's] . . . proffered reasons are genuine rather than pretextual."  *Image Tech. Serv., Inc. v. Eastman Kodak Co.* ("*ITS 1*"), 903 F.2d 612, 620 (9th Cir. 1990).  The Supreme Court affirmed based on "evidence from which a reasonable trier of fact could conclude that [the monopolist's proffered] reason is pretextual."  *Kodak*, 504 U.S. at 484 (quoting *ITS 1*, 903 F.2d at 618).  Under *Kodak*, pretext is therefore an independent basis on which to dismiss a proffered justification.  *See ITS 1*, 903 F.2d at 618-19 (proffered reasons must be "genuine **and** sufficient," and fail if "pretextual **or** insufficient") (emphases added).

3

Applying *Kodak*, the Ninth Circuit has confirmed that a justification is not legally cognizable if the court determines "**either** that the justification does not legitimately promote competition **or** that the justification is pretextual." *ITS 2*, 125 F.3d at 1212 (emphases added). Indeed, *ITS 2* approved jury instructions stating that only *after* determining that a proffered business reason has a real procompetitive effect (e.g., "reducing costs"), the jury "should then consider whether each such reason is pretextual-in other words, not a genuine reason for Kodak's conduct." *Id.* at 1220 n.12.

For this reason, the *Microsoft* Court of Appeals instructed that a defendant may advance a "procompetitive justification," *Microsoft*, 253 F.3d at 59 (citing *Kodak*), only if the justification is "nonpretextual," *id.* Meta's proposed rule would read the word "nonpretextual" out of the *Microsoft* decision, but Meta provides no authority that suggests it would be appropriate for this Court to ignore the plain language of the Court of Appeals. Moreover, ignoring the Court's plain language would render the second step of the *Microsoft* framework superfluous: as a matter of logic, if a claimed benefit does not exist it necessarily cannot "outweigh[]" any anticompetitive effect. *See id.* at 58-59. Thus, no purpose would be served by requiring the justification to be "nonpretextual." *Id.* at 58. Meta's position cannot be squared with the *Microsoft* framework.

Meta's position likewise has been rejected by the Second Circuit, which has expressly held that under the *Microsoft* framework it is unnecessary to consider the sufficiency of a justification unless it is nonpretextual. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) ("Because we have determined that Defendants' procompetitive justifications are pretextual, we need not weigh them against the anticompetitive harms.").

In short, "nonpretextual" is an independent criterion: a monopolist's proffered justification is legally cognizable only if it represents "a genuine reason for [the monopolist's]

4

conduct." *ITS 2*, 125 F.3d at 1220 n.12 (quoting jury instructions); *id.* at 1219 (a monopolist

cannot "rely upon a pretextual business justification to mask anticompetitive conduct").

    2.  <u>The authorities cited by the FTC focus on a monopolist's subjective motivation,</u>
<u>contradicting Meta's proposed rule</u>

Meta strenuously but inaccurately insists that in "every case" cited by the FTC,

justifications were held pretextual because they "were *not real*, i.e., the claimed benefits *did not*

*exist*." Meta Opp. at 60-61 (italics in original). Meta is incorrect: for example, as discussed

above the plain language of *Kodak* and *Microsoft* focuses on a monopolist's subjective motive by

foreclosing justifications that represent a "pretext," i.e., "a pretended reason for doing something

that is used to hide the real reason." *See Pretext*, Cambridge Dictionary,

https://dictionary.cambridge.org/us/dictionary/english/pretext (last visited Aug. 8, 2024).

Meta's Opposition also fails to distinguish *ITS 2* and *Actavis*, and it simply ignores

*Dentsply* and *McWane*. *See* FTC Mem. at 74 (citing these authorities). These cases confirm that

courts focus on monopolists' subjective motivations; if that inquiry reveals pretext, the court is

not required to consider a justification's sufficiency.

For *ITS 2*, Meta is inaccurate when it suggests that *ITS 2* involved a defendant "declining

to license" products. Meta Opp. at 61. In fact, the plaintiffs challenged Kodak's refusal to sell

parts to independent services operators (ISOs), which was coupled with efforts to dissuade others

from selling parts to ISOs. *See ITS 2*, 125 F.3d at 1200-01, 1216 n.9. Meta is also incorrect

when it suggests that the only justification at issue related to intellectual property ("IP"), Meta

Opp. at 61. In fact, Kodak advanced an IP justification and also a "quality control justification."

*ITS 2*, 135 F.3d at 1213. The Ninth Circuit rejected both as pretextual. *Id.* at 1213-14, 1219-20.

Meta's Opposition focuses only on Kodak's IP justification, i.e., "Kodak's contention

that its refusal to sell its parts to ISOs was based on its reluctance to sell its patented or

copyrighted parts." *Id.* at 1219; *see* Meta Opp. at 61.  The Ninth Circuit held that the IP

justification was pretextual, expressly rejecting Kodak's argument "that its subjective motivation

is irrelevant." *ITS 2*, 125 F.3d at 1219-20.  The Ninth Circuit reviewed the district court's refusal

to instruct the jury that Kodak's IP rights could justify Kodak's conduct, based on the district

court's conclusion that "Kodak was not actually motivated by protecting its intellectual property

rights." *Id.* at 1218-20.  The Ninth Circuit held that the district court erred by removing this

question from the jury, but that the error was harmless because "it is more probable than not that

the jury would have found Kodak's presumptively valid business justification rebutted on the

grounds of pretext." *Id.*  The *ITS 2* rule is therefore plain: where challenged conduct is not

"actually motivated" by a proffered justification, the justification is not legally cognizable.

The *ITS 2* court likewise rejected Kodak's proffered "quality control justification" as

pretextual based on evidence of Kodak's genuine subjective motive.  *Id.* at 1213-14.  For

example, the fact that Kodak adopted the challenged policy "only after" an ISO successfully won

a major contract provided evidence that Kodak's genuine motive was to hobble its rivals rather

than ensure quality.  *Id.*; *see also ITS 1*, 903 F.2d at 618-19.  Thus, the *ITS 2* court rejected

Kodak's quality control justification based on evidence that parallels the FTC's compelling

evidence here that Meta's acquisitions of both Instagram and WhatsApp were motivated by

Meta's fear that their success might erode Meta's monopoly power.  *See infra* §§ I.B, I.C.

*Actavis* likewise contradicts Meta's suggestion that a monopolist's subjective motivation

is irrelevant.  There, the district court rejected all of "Defendants' and Defendants' experts [*sic*]

rationalizations" as pretextual because the defendant failed to provide evidence that the

"rationalizations" represented a genuine motivation for its conduct.  *New York v. Actavis, PLC*,

2014 WL 7015198, at *40-41 (S.D.N.Y. Dec. 11, 2014) ("There is no indication that these

6

ancillary benefits were the basis for Defendants' [conduct].").  The Second Circuit affirmed: like the district court, it focused on evidence that the defendant's subjective motive was to "put up barriers or obstacles" to competition.  *Actavis PLC*, 787 F.3d at 658.  And, as already noted, the Second Circuit expressly held that it was not required to address the sufficiency of the proffered justifications once it determined that the justifications were pretextual.  *See id.*

*Dentsply* applied the same approach, holding that "Dentsply cannot prove that [the challenged policy] is pro-competitive" because the articulated goals were "merely pretextual" given its "pre-litigation rationale."  *United States v. Dentsply Int'l*, 277 F. Supp. 2d 387, 453 (D. Del. 2003), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005); *see also* 399 F.3d at 196-97 (affirming holding "that Dentsply's alleged justification was pretextual").  Likewise, in *McWane*, the Federal Trade Commission focused on "contemporaneous planning documents" and held that "contemporaneous evidence belies McWane's contention that its [challenged] policies were motivated by" a proffered procompetitive justification.  *In the Matter of McWane, Inc., et al.*, No. 9351, 2014 WL 556261, at *31 (F.T.C. Jan. 30, 2014).  The Eleventh Circuit upheld the finding that the justification was "merely pretextual," citing evidence that McWane's true motivation was "preventing [a rival] from becoming an effective competitor."  *McWane, Inc. v. FTC*, 783 F.3d 814, 841-42 (11th Cir. 2015) ("McWane's damning internal documents seem to be powerful evidence that its procompetitive justifications are 'merely pretextual.'").

In sum, the FTC's authorities confirm that courts focus on a monopolist's subjective motivations when determining whether proffered justifications are legally cognizable, and contradict Meta's assertion that its genuine subjective motive is irrelevant.

3.  <u>Meta identifies no authority supporting its proposed rule</u>

Meta cites only two cases in its effort to sidestep the rule that only nonpretextual business justifications are legally cognizable, neither of which support its position.  *See* Meta Opp. at 60.

First, Meta cites an inapposite statement from *Novell Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013), which did not address the question of whether a monopolist's subjective motive should be disregarded when the monopolist attempts to advance a justification.  In *Novell*, the question was whether evidence supported the plaintiff's prima facie case.  *Id.* at 1074-78.  Applying standards specific to unilateral refusals to deal, the *Novell* court held that the plaintiff could not establish its prima facie case absent evidence of the monopolist's "willingness to sacrifice short-term profits," *id.* at 1076, 1078, and determined that an "email" failed to provide such evidence, *id.* at 1077-78; *see* Meta Opp. at 60.  Neither the language cited by Meta, nor any other aspect of *Novell*, is relevant to the issue of whether a justification is legally cognizable if it is not a genuine motivation for a monopolist's conduct.

Second, Meta offers a snippet from *Microsoft*, which Meta suggests indicates that inquiry into a monopolist's intent is relevant only to illuminate "the likely effect of the monopolist's conduct."  Meta Opp. at 60.  Meta misunderstands the import of the language, which indicates that intent is not a necessary element for establishing liability under Section 2.  *See United States v. Google LLC*, No. 20-CV-3010 (APM), 2024 WL 3647498, at *134 (D.D.C. Aug. 5, 2024) ("*U.S. v. Google*") (under *Microsoft,* "intent is not an element of a Section 2 violation").  Moreover, *Microsoft*'s observation that intent can illuminate the likely effect a monopolist's conduct does not erase—and indeed is consistent with—the "nonpretextual" requirement imposed by the *Microsoft* "burden-shifting inquiry."  *Id.* at *65; *see also infra* § I.A.4.

4.  *Microsoft*'s "nonpretextual" requirement serves important purposes

Meta trivializes *Microsoft*'s nonpretextual requirement when it suggests that by applying it here, the Court would punish Meta for acting with "bad intent."  Meta Opp. at 61.  That is not the purpose served by the nonpretextual requirement, as the *Microsoft* Court instructed that the requirement must be applied, while also recognizing that Section 2 liability does not solely turn

on motive, but instead on whether a monopolist's conduct "tends to destroy competition itself."
*Microsoft*, 253 F.3d at 58.  Intent to harm a competitor (which a rival may consider "bad" intent)
does not establish a violation if "the competitive *process*" is not harmed.  *Id.* (italics in original)
(Sherman Act is not directed against "conduct which is competitive," and even a malicious act
does not necessarily violate the antitrust laws).  However, *Microsoft* also instructs that where a
monopolist has engaged in conduct that does not represent competition on the merits, evidence
of intent can help a court "understand the likely effect of the monopolist's conduct."  *Id.* at 59.

*Microsoft* further recognizes that the details of the but-for world are inherently hard to
reconstruct.  *See id.* at 79.  The nonpretextual requirement serves a useful screening function that
assists the Court's efforts, by preventing Meta from advancing post-hoc justifications for its
acquisitions, such as developments that post-dated its acquisitions but were not a genuine motive
for its conduct.  While Meta may wish to justify its conduct based on claimed "benefits" that
were not the genuine motive for its conduct, that option is foreclosed by *Microsoft*, as the same
(or greater) results may have materialized in the but-for world, and Meta must "suffer the
uncertain consequences of its own undesirable conduct."  *Id.*; *U.S. v. Google* at *104 (citing
*Microsoft*).

**B.  Meta Fails to Identify Evidence That Meta Acquired Instagram for a Genuine
Reason Other Than to Eliminate a Threat**

The FTC's opening Memorandum identified numerous candid and contemporaneous
communications among Meta executives that plainly provide admissible evidence that the
genuine reason Meta acquired Instagram was to eliminate a competitive threat.  Meta bears the
burden to designate specific facts that might support a finding that the genuine reason Meta
acquired Instagram was to accomplish a different goal.  *See Celotex*, 477 U.S. at 324.  Meta's
Opposition fails to do so, as it barely attempts to dispute the FTC's evidence, and identifies only

two bits of contemporaneous evidence, neither of which could support a finding in its favor.

Meta's first bit of contemporaneous evidence is the assertion that Mr. Zuckerberg wrote "Meta would acquire Instagram and then 'incorporate' it into Meta's 'products.'"  Meta Opp. at 61 (citing CS ¶ 1694).  This fails for two reasons.  First, Meta does not claim the acquisition improved its pre-existing products—indeed, Meta expressly disclaims that improvements in its pre-existing products are a justification.  Meta Opp. at 63.  Nor did Meta's relevant interrogatory responses identify any justification based on supposed benefits to any Meta products other than Instagram and WhatsApp.  *See* CS ¶¶ 2575, 2607; PX10092 at -015-019, -022-026.

Second, Meta misstates the relevant document.  Contrary to Meta's assertion, Mr. Zuckerberg did not suggest in PX2822 that Meta would "acquire Instagram and then 'incorporate' it into Meta's 'products.'"  Meta Opp. at 61.  Instead, he wrote that Meta would "incorporate [Instagram's] *innovations* into our core products . . . rather than actually combining the products."  CS ¶ 1694; PX2822 at -002 (emphasis added).  This is a material distinction—as Mr. Zuckerberg has admitted, Meta's genuine motive for acquiring Instagram did not include "directly integrating their products" because "in reality we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway."  CS ¶ 1694; PX2822 at -002.  Thus, the very evidence on which Meta relies (1) fails to identify any improvement that Meta intended to make to Instagram and (2) states that Meta's genuine reason for the acquisition was not to "incorporate it [Instagram] into Meta's products."  Meta Opp. at 61.

The sole other piece of contemporaneous evidence Meta cites in relation to Instagram is equally unavailing.  *See* Meta Opp. at 61 (citing SMF ¶ 698).  The cited document is an email exchange in which Mr. Zuckerberg expressed that he was "really excited about the acquisition" and Mr. Systrom replied that "[Mike Krieger] and I feel that we'd like to stay independent for the

10

time being." Ex. 181, FB_FTC_CID_01527881 at -883-85.  Mr. Zuckerberg's lone reference to "infrastructure," made in an attempt to convince Mr. Systrom to agree to sell, does not evince Meta's subjective intent—at best, it shows a Meta sales pitch to a reluctant acquisition target.

Even drawing reasonable inferences in Meta's favor, Meta's two bits of contemporaneous evidence could not support a determination that Meta's genuine motive for the acquisition was to grow Instagram, particularly considering the mountain of evidence demonstrating that Meta acquired Instagram to neutralize a competitor.  *See, e.g.*, CS ¶¶ 1632, 1647-52, 1687-1702, 1706-09.  Indeed, Meta does not contradict or even meaningfully address the FTC's evidence that the latter was Meta's genuine motivation.  For example, Meta's Opposition does not address Mr. Zuckerberg's contemporaneous admission to his colleagues that the reason to consider "paying a lot of money" to acquire Instagram had nothing to do with improving Instagram's product: instead, he candidly admitted that "I'm worried we're so far behind that we don't even understand how far behind we are and that this is going to be a huge amount of work . . . I worry that it will take us too long to catch up, if we even will."  CS ¶ 1690.  The next day, Mr. Zuckerberg initiated discussions with Instagram. CS ¶¶ 1691-92.  Meta's response to the FTC's Counterstatement does not dispute this evidence, instead reiterating the untenable legal argument that Meta's genuine motive is irrelevant.  *See* Meta Resp. CS ¶¶ 1690-92, 1689.

Meta likewise does not meaningfully dispute numerous other facts establishing that removing a competitive threat was the genuine reason Meta acquired Instagram, including:

- Facebook found itself "very vulnerable" during the shift to mobile.  CS ¶¶ 1563-64, 1573. This was in part due to Meta's choice, described by Mr. Zuckerberg as the "biggest mistake that we made as a company," to write the Facebook app in the HTML5 programming language, producing "poor user experiences for many iPhone users."  CS ¶¶ 1590-92.

11

- By January 2012, Mr. Zuckerberg described photo sharing on Facebook's mobile app as looking like it was "built in the stone age" when compared "to Instagram and Path."  CS ¶ 1580; *see also* CS ¶¶ 1582, 1603(b) (Meta admits that by 2012, "[i]n contrast to Facebook's mobile apps, Instagram . . . from the outset [was] praised as exemplifying the speed, reliability, and simplicity necessary to succeed in the mobile environment").

- Meta tried "to compete with them [Instagram] on building a – the Facebook Camera app."  CS ¶ 1674(g) (quoting Mr. Zuckerberg.  In June 2011, Mr. Zuckerberg told the Facebook Camera team that they needed "to get our act together quickly on this since Instagram is growing so fast," and that "[t]able stakes for beating them are a standalone mobile app."  CS ¶ 1679(a). In September 2011, he emphasized that the app needed to "ship soon . . . [i]n the time it has taken us to get ou[r] act together on this Instagram has become a large and viable competitor to us on mobile photos."  CS ¶ 1679(c).

- On February 27, 2012, Mr. Zuckerberg wrote to Meta's CFO that the reason to acquire rivals such as Instagram "that are building networks that are competitive with our own" is that "the networks are established . . . and if they grow to a large scale they could be very disruptive to us."  CS ¶ 1693.  The next day, Mr. Zuckerberg wrote that the purpose was to "neutralize a potential competitor" and not to "integrate their products with ours in order to improve our service" because "we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway."  CS ¶ 1694.

- On April 3, 2012, Mr. Zuckerberg informed Meta's CTO that "[Instagram's] growth rate is crazy . . . If we launch soon, we can hopefully get to comparable scale to what they have now relatively quickly.  If we take a lot longer then . . . they may be totally unreachable."  CS ¶ 1697; *see also* CS ¶ 1698 (the same day, Mr. Zuckerberg contacted an Instagram board member).

12

- On April 5, 2012, Mr. Zuckerberg justified pursuing an acquisition because "Instagram can hurt us meaningfully without becoming a huge business."  CS ¶¶ 1701, 2054.1(a).

- On April 8, 2012, Mr. Zuckerberg presented the deal to Meta's Board.  CS ¶ 1704.  The minutes of this presentation do not indicate discussion of any benefits Meta now claims the acquisitions conferred.  *See* CS ¶ 1704(b); Meta Opp. at 62-63.  Indeed, the only benefit listed in the minutes is to "incorporate Instagram's know-how into Facebook mobile and other products," CS ¶ 1704(b).  As explained above, this is not a justification Meta asserts.  *See* Meta Opp. at 63.

The foregoing contemporaneous evidence indicates that the genuine reason Meta acquired Instagram was to neutralize a competitive threat.  As discussed above, Meta's Opposition fails to identify contemporaneous evidence suggesting an alternative motive that might represent a procompetitive justification, and Meta's post-acquisition evidence is equally unavailing.  Meta's Opposition identifies only a single generic post-acquisition comment made by Mr. Zuckerberg to Meta employees, and generic testimony offered more than 10 years after the fact by Messrs. Zuckerberg and Schroepfer.  *See* Meta Opp. at 61-62 (citing Meta Resp. CS ¶¶ 1694, 1706(g)).  Even taken at face value, these post-acquisition snippets do not suggest that Meta can meet its burden to establish that its genuine motivation for acquiring Instagram was to grow the product, rather than to eliminate a threat.

Meta has had every opportunity to identify evidence that Meta's executives discussed or considered improvements to Instagram as a genuine reason that Meta pursued the acquisition— e.g., it could have provided relevant "affidavits or declarations," Fed. R. Civ. P. 56(c).  Meta has failed to do so, and thus based "on the evidence presented," the record is "so one-sided" that no reasonable jury could conclude that Meta's genuine motive for the acquisition was anything other than eliminating a threat.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

(1986).  Meta's pretextual justifications for the Instagram acquisition should be dismissed.

### C. Meta Fails to Identify Evidence That Meta Acquired WhatsApp for a Genuine Reason Other Than to Eliminate a Threat

Contemporaneous evidence shows that Meta acquired WhatsApp because it feared that a mobile messaging service would pivot into PSN services, and WhatsApp was well positioned to make this pivot.  FTC Mem. at 42-48.  For example, Meta does not dispute that:

- In October 2012, Meta executives described messaging competitors as "the biggest threat to our product that I've ever seen . . . its bigger than G+, and we're terrified," CS ¶ 1802(e)(i), and highlighted the need to "talk about the competitive threat from WhatsApp, KakaoTalk, Line, etc.  This might be the biggest threat we've ever faced as a company."  CS ¶ 1807(d).

- In February 2013, Mr. Zuckerberg told Meta's board of directors that "mobile messaging is the next biggest consumer risk and opportunity . . . the biggest competitive vector for us is for some company to build out a messaging app for communicating with small groups of people, and then transform[] that into a broader social network," and that he wanted Meta to "use M&A to build a competitive moat around us on mobile and ads."  CS ¶¶ 1802(g), 1802(h).

- In April 2013, Mr. Zuckerberg reached out to WhatsApp's founder: "If you are thinking of having WhatsApp join another company, we'd of course love to talk at this price range and are almost certainly a much better fit than Google."  CS ¶ 1831(e).

- Throughout 2013, Mr. Zuckerberg specifically identified WhatsApp as a threat.  In March, he told his messaging team leads, "[b]eing the best messaging service is the biggest opportunity and mitigation to the biggest threat we face today," citing Google, LINE, and "rumors of WhatsApp expanding into more services."  CS ¶ 1807(f).  In August, he explained that his "point about WhatsApp's direction is that if they build substantive features beyond just making SMS free, that could be enough for them to tip markets like the US."  CS ¶ 1807(i).

- Meta understood that rivals including Google were interested in acquiring WhatsApp, CS ¶¶ 1811, 1812, and this possibility concerned Meta's executives, CS ¶¶ 1832(b), (c)—indeed, Mr. Zuckerberg offered to acquire WhatsApp only two days after Meta learned of upcoming high-level talks between WhatsApp and Google, CS ¶¶ 1832(b), (e).

In response to this undisputed evidence, Meta identifies no evidence of an alternative motive that might create a triable issue of material fact. Meta's Opposition points to just one document, touting a Board presentation's vague reference to growing WhatsApp using Meta's "distribution, infrastructure, etc." Meta Opp. at 62. This presentation does not constitute evidence of an alternative motive for acquiring WhatsApp because the same document establishes Meta's intent to maintain WhatsApp's "brand and operations relatively unchanged," thus maintaining the status quo. PX1266-002. Indeed, Meta's desire to maintain or grow WhatsApp "relatively unchanged" *confirms* Meta's lack of a genuine business rationale because there is no dispute that Meta spent billions to acquire WhatsApp and has ███████████ operating WhatsApp since the acquisition, notwithstanding Meta's quibbles with how many billions it spent ████████. *See* CS ¶ 1835 (Meta admits it spent $19 billion, $3 billion of which was in restricted stock units); CS ¶ 2435 (███████████████████████████ ████████). ███████████████████ disprove any nonpretextual business rationale, given that Meta did not have plans to change WhatsApp or to make the acquisition profitable. CS ¶ 1842(f) (noting Meta did not plan to "focus on monetization for years," and approved the "[m]eaningful P&L impact" without "a revenue model proven to work at scale"); *see also* CS ¶ 1842.

Meta hints at a legitimate business rationale by insisting that its Board conducted a "valuation" of WhatsApp, although it cites only a document created *after* Meta already agreed to the purchase price. *See* CS ¶¶ 1833, 1839. Meta claims that the document shows its Board

"discussed" monetization and "compar[ed]" WhatsApp's potential monetization with a wish-list of other firms. CS ¶ 1842. But Meta elsewhere argues that these same monetization examples "show[] nothing." CS ¶ 1797. Even accepting that the Board presentation constituted a meaningful valuation analysis, it cannot give rise to an inference that Meta had a nonpretextual business rationale for the acquisition. The supposed valuation theorizes that WhatsApp would monetize like LINE—i.e., it assumes that WhatsApp would monetize like a PSN app. CS ¶ 1797(c). Meta's own evidence permits only two inferences: either (1) Meta dramatically overpaid for WhatsApp, or (2) Meta planned to pivot WhatsApp into PSN services. CS ¶ 1797. But evidence indicates that Meta had no intention to pivot WhatsApp, *see* PX1266-002 (Meta intended to operate WhatsApp "relatively unchanged"), Meta Opp. at 53 (insisting pivot was impractical), making the only logical conclusion that Meta overpaid to eliminate a threat.

Finally, Meta's Opposition fails to identify a triable issue of fact regarding its genuine motive simply by observing that Mr. Zuckerberg told Meta's Board that he wanted to create a "competitive moat" roughly a year prior to the WhatsApp acquisition. *See* Meta Opp. at 62. Mr. Zuckerberg identified his desire to create a "competitive moat" in February 2013, while he was "working on" acquiring WhatsApp at least as early as 2012. *See* CS ¶¶ 1831(d), (h) (stating in October 2013, "I've been working on this for almost two years now"). Further, Meta specifically identified WhatsApp as a threat in March 2013, made an overture to WhatsApp in April 2013, and focused on WhatsApp throughout 2013. *See* CS ¶¶ 1807(f)-(i), 1831.

Meta's post-hoc explanations for spending $19 billion to acquire WhatsApp do not add up, and the contemporaneous evidence confirms that Meta overpaid for WhatsApp because its genuine motive was to neutralize a competitive threat and operate WhatsApp as a competitive moat. Meta's pretextual justifications for the WhatsApp acquisition should be dismissed.

II.     **Meta Fails to Identify Evidence of Merger-Specific Procompetitive Benefits**

This Court has already determined that Meta bears the burden to demonstrate that its claimed benefits "could not have been achieved absent the acquisitions." ECF No. 281 at 7 (quotations omitted). In other words, Meta must show that each proffered benefit is merger specific. *See* FTC Mem. at 67. Controlling authority establishes that a benefit is merger specific only if it "cannot be achieved by either company alone." *United States v. Anthem, Inc.*, 855 F.3d 345, 356 (D.C. Cir. 2017) (quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 722 (D.C. Cir. 2001)). Meta ignores this principle, asserting that if Meta identifies a benefit to Instagram or WhatsApp, it need not identify evidence that Meta was unable to achieve an equivalent benefit on its own.[1] Meta Opp. at 63. Meta is incorrect and fails to distinguish controlling authority.

First, Meta emphasizes that the acquisitions have already happened, *see id.* at 43, 48, and seeks *ipse dixit* credit for all growth or development in the apps that have occurred since, *id.* at 37, 59. Meta's position, however, is based on its incorrect and untenable suggestion that the merger-specificity requirement applies only to "prospective" acquisitions. *See id.* at 63. But that Meta's conduct is being evaluated retrospectively is unremarkable: nearly all Section 2 monopoly maintenance cases have that posture, and the law still requires that the monopolist demonstrate that its claimed benefits "could not have been achieved" absent its conduct. ECF No. 281 at 7 (citing authorities). And this principle applies no less strongly in Section 2 cases involving acquisitions than in cases involving other forms of conduct. This is made clear by *In re NorthShore*, which applied the merger-specificity requirement to a consummated merger that was challenged under Section 2 of the Sherman Act, as well as Section 7 of the Clayton Act. *In*

---

[1]     In the limited context of this motion, the FTC is not challenging Meta's assertion that it has identified benefits to Instagram and WhatsApp, but this will be a disputed issue at trial if Meta's justifications are not dismissed. *See* FTC Mem. at 70.

*re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1083, 1102-03 (N.D. Ill. 2023) (granting summary judgment dismissing justification where defendant "failed to produce evidence from which a reasonable jury could conclude that . . . improvements in quality were *caused* by the merger"); *see also In the Matter of Evanston Nw. Healthcare Corp.*, No. 9315, 2007 WL 2286195, at *71 (F.T.C. Aug. 6, 2007) (benefits must be merger specific even where the acquired firm "actually made the claimed improvements").

Second, Meta suggests incorrectly that *Heinz* and *Anthem* considered only improvements "to the acquirer," and not the "acquired" firm. Meta Opp. at 63. In *Heinz*, the parties proposed moving production of Beech-Nut's (acquired firm) baby food to Heinz's (acquiring firm) more efficient plant to "reduce the cost of processing the volume . . . produced by Beech-Nut by some 43 percent." *FTC v. H.J. Heinz Co.*, 116 F. Supp. 2d 190, 199 (D.D.C. 2000), *rev'd*, 246 F.3d 708 (D.C. Cir. 2001). The parties also claimed Heinz's more efficient distribution network would "cut substantial costs that result from Beech-Nut's current distribution network." *Id.*

*Heinz* thus involved substantial claimed improvements to the acquired firm. Nonetheless, the Court of Appeals held that the proffered improvements were not merger specific because "the district court never explained why Heinz [(the acquiring firm)] could not achieve the kind of efficiencies urged without merger." *Heinz*, 246 F.3d 708, 722. The Court of Appeals focused on whether, absent merger, Heinz was capable of making "its product equivalent to the Beech-Nut product" and thus producing food equivalent in quality to Beech-Nut's at the same cost as the merger would allow Beech-Nut's food to be made. *Id. Heinz* thus contradicts Meta's insistence that a justification is merger specific if the acquired firm's product benefits from a merger in a way that the acquired firm could not have achieved on its own. Instead, *Heinz* establishes that a benefit to the acquired firm is non-cognizable if the acquiring firm could have achieved an

"equivalent" benefit absent the merger.  *Id.*

Likewise, in *Anthem*, the defendants argued that the acquired firm's customers would benefit "over the long haul" from the acquiring firm's lower rates combined with the acquired firm's superior features, but the Court of Appeals rejected this proposed efficiency as not merger specific because the acquiring firm failed to show that it could not develop such a product on its own, absent the merger.  *Anthem*, 855 F.3d 345, 357-59.

Thus, under *Heinz* and *Anthem*, Meta cannot show that its justifications are merger specific absent evidence that Meta was unable to develop on its own a product "equivalent" to the post-acquisition offerings of the acquired firms.  *Heinz*, 246 F.3d 708, 722; *see also Anthem*, 855 F.3d at 357 (acquiring firm failed to offer evidence "that it cannot develop better customer-facing programs").  Here, Meta concedes that it has identified no evidence that Meta itself was unable to achieve claimed benefits absent the acquisitions, and indeed disclaims any obligation or intent to identify such evidence at trial.  *See* Meta Opp. at 62-64.  In doing so, Meta concedes that it has identified no evidence supporting a necessary element of its affirmative defense, and its first nine justifications should therefore be dismissed.  *See Washington v. Time Oil Co.*, 687 F. Supp. 529, 531 (W.D. Wash. 1988) (where a non-movant identifies no evidence creating a triable issue of fact on any element of an affirmative defense, summary judgment is required).

Instead of providing evidence that Meta was unable to achieve asserted benefits absent the acquisitions, Meta relies on two flawed legal arguments that should be rejected by the Court.

1.  Meta suggests that the FTC's demand for evidence that Meta was unable to achieve justifications absent the acquisition is "speculative."  Meta Opp. at 63.  This gets the burden backwards, as Meta bears the burden to demonstrate merger-specificity.  ECF No. 281 at 7 (Meta bears the burden at trial); *see also Anthem*, 855 F.3d at 356 (benefits must be "shown to be

merger-specific"). Thus Meta, not the FTC, bears the burden to "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted).

Indeed, the lone authority cited by Meta illustrates the type of evidentiary showing Meta has failed to make. *See* Meta Opp. at 63 (citing *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020)). In *Deutsche Telekom*, the court cited evidence of "significant practical difficulties" facing each firm as a stand-alone entity that suggested *neither* of the merging parties could have accomplished the proffered procompetitive justification absent the acquisition. 439 F. Supp. 3d at 210-12. Here, Meta's Opposition cites no such evidence. Indeed, Meta does not dispute that resources Meta supposedly used to improve Instagram and WhatsApp were available to Meta's applications. *See, e.g.*, CS ¶¶ 2578 (undisputed), 2579, 2583, 2591(b), 2597(a)-(b), 2598, 2600(c) (Instagram); CS ¶¶ 2609, 2617-18 (WhatsApp). And Meta identifies no evidence of difficulties that might have prevented Meta from using these resources to improve Meta's own applications rather than to grow Instagram or WhatsApp.

2. Meta fares no better when it suggests that because Meta supposedly made resources available to the acquired firms, the acquisitions were "vertical" in nature. Meta Opp. at 59. This is incorrect because virtually any horizontal acquisition can involve an acquiring firm that possesses certain assets that might be used to benefit the acquired firm's products—as discussed above, this was the case in *Heinz*. This common circumstance does not render Meta's acquisitions "vertical." *See* Herbert Hovenkamp, *Antitrust Law, An Analysis of Antitrust Principles and Their Application* ¶¶ 912a, 912c ("*Antitrust Law*"). Meta's acquisition of Instagram was not a vertical acquisition, as Meta and Instagram competed directly to offer PSN services. And Meta's acquisition of WhatsApp was likewise not a vertical acquisition— acquisitions of potential entrants are not vertical in nature. *See In re AMR Corp.*, 625 B.R. 215,

244 n.22 (Bankr. S.D.N.Y. 2021), *aff'd*, No. 22-901, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) (distinguishing horizontal "mergers or acquisitions involving actual or potential competitors" from "vertical mergers"); *Antitrust Law* ¶ 1000a (defining a "vertical merger" as one "between a firm selling a particular product or service and a firm that buys that product or service"). Moreover, a monopolist's acquisition of nascent rivals does not benefit from a presumption of efficiencies—to the contrary, "provable merger-specific efficiencies from [a monopolist's] acquisition of a nascent firm should be quite unusual; in most circumstances the dominant firm could readily duplicate anything that the nascent firm has to offer." *Antitrust Law* ¶ 912c.

In sum, Meta has abdicated its responsibility to identify evidence that, absent acquisition, it was unable to achieve benefits equivalent to those it attributes to the acquisitions. Accordingly, its first nine procompetitive justifications should be dismissed.

## III.   Meta Fails to Identify Evidence That Its Tenth Justification Is Legally Cognizable

Meta's tenth justification for the WhatsApp acquisition, which Meta labels "the de-platforming efficiency," Meta Opp. at 64, is neither legally cognizable nor supported by evidence. Meta cites no authority suggesting that increasing a monopolist's bargaining leverage over trading partners can represent a legally cognizable procompetitive justification, and the FTC is aware of none. The infirmity of such a justification is plain: any monopolist might justify the exclusion of rivals on the same rationale—e.g., Standard Oil could claim that acquiring or otherwise excluding potential rivals enabled it to gain leverage over suppliers, shippers, or even customers. It is untenable to claim that an increase in bargaining leverage might "legitimately promote competition," *ITS 2*, 125 F.3d at 1212, when, as here, the monopolist is claiming leverage over firms it asserts are actual or potential competitors. *See* Meta Opp. at 64 (calling Apple and Google Meta's "fiercest competitors"). Treating increased leverage over actual or potential rivals as a cognizable procompetitive justification would turn Section 2 on its head.

Unsurprisingly, Meta's argument finds no support in Meta's sole cited authority, *United States v. Carilion Health Sys.*, 707 F. Supp. 840 (W.D. Va. 1989). *Carilion* addressed, under Section 1 rather than Section 2, a merger of nonprofit hospitals that faced substantial competition. *Id.* at 841, 844. The case involved no increase in bargaining leverage over trading partners or rivals, and the passage quoted (in part) by Meta establishes only that the parties merged "in order to strengthen, rather than reduce, *competition*." *Id.* at 849 (emphasis added). Meta fails to identify even a scintilla of evidence that the acquisition of WhatsApp helped "strengthen . . . competition," or indeed had any impact on negotiations with Apple or Google.

For these reasons, even if Meta's "de-platforming efficiency" was a genuine reason for the acquisition of WhatsApp, it should be dismissed.

## IV.   The Court Must Address the FTC's Motion for Partial Summary Judgment

Meta argues that the Court "need not reach" Meta's affirmative defenses, insisting that there are no factual disputes because the FTC has "no evidence" sufficient to support its prima facie case. Meta Opp. at 58. But that assertion is untenable in light of Meta's addition of more than 1,900 pages to the parties' competing factual statements—which underscores the existence of numerous material factual disputes, as Meta spends hundreds of pages arguing with the FTC's evidence. *See* FTC Reply CS at 6-7. Such arguments cannot disguise the reality that the FTC has designated specific facts supporting each element of its prima facie case, shifting to Meta the burden to identify evidence supporting its affirmative defenses. *Celotex*, 477 U.S. at 324; *U.S. v. Google* at *65 (*Microsoft* mandates a "burden-shifting inquiry").

### A.  The FTC Has Proffered Evidence of Monopoly Power

The FTC has proffered extensive evidence demonstrating the monopoly power element of its prima facie case. Meta disputes this evidence but where, as here, there are genuine disputes of material fact regarding monopoly power, summary judgment is inappropriate. *See,*

*e.g.*, *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, 2008 WL 73689, at *9 (N.D. Cal. Jan. 5, 2008) (denying summary judgment on monopoly power).

      1.  <u>The FTC has proffered direct evidence of monopoly power</u>

The FTC has identified undisputed evidence indicating that Meta has earned extraordinarily high economic profits for a long time, which is textbook evidence of monopoly power.  FTC Mem. at 33, 35-36; CS ¶¶ 1452-55 (high profits); CS ¶¶ 1450-51 (textbook definitions); *see U.S. v. Google* at *75 (direct evidence included "Google's immense revenues and large profit margins").

Moreover, evidence indicates that these profits are derived in material part from Meta's significant market power over users of Facebook and Instagram.  FTC Mem. at 35-36; CS ¶¶ 1439, 1468-71.  This includes evidence that users' demand for Facebook and Instagram is relatively inelastic—that is, consumers do not meaningfully switch away from Meta's services even when Meta reduces product quality.  *See* CS ¶¶ 1475, 1506 (evidence of increased quality-adjusted prices); 1492-1494 (increases in ad load, with declining user sentiment); 1495-1500 (declining user sentiment on other quality dimensions); 1501-1503 (underinvestment in friends and family sharing, triggering a decline in user sentiment); 1507, 1511-15 (inelastic response to Cambridge Analytica scandal); 1517 (other shocks have inelastic responses); 1518 (third-party survey indicating inelastic demand); 1350(e), 1519 (Meta's empirical studies indicate plurality of usage did not move to any other online service).

The foregoing evidence indicates that Meta has increased quality-adjusted prices and faces inelastic demand.  For instance, Meta does not dispute that it has significantly increased ad load, Meta Resp. CS ¶¶ 1492(a)-(c), while its own executives and ordinary course records indicate that users consider ad load a "tax," CS ¶¶ 1478, 1480-82, and its own surveys show user

sentiment about the level of ad load on Facebook and Instagram declining.  CS ¶¶ 1492(d)-(g).

This evidence creates a reasonable inference that Meta's ad load increases reflect increases in

quality-adjusted price.  CS ¶¶ 1493-94.  Likewise, evidence shows that the Cambridge Analytica

scandal negatively impacted consumer sentiment, without significantly decreasing Facebook's

usage.  CS ¶¶ 1511-13.  Drawing reasonable inferences in the FTC's favor, the Cambridge

Analytica scandal shows inelastic consumer demand.  *See* CS ¶¶ 1512-14.  Meta concedes the

underlying evidence, but untenably argues that the Court should draw a contrary inference in

Meta's favor—i.e., that consumers' "muted response" to the scandal means that consumers did

not perceive it as a quality degradation.  *See* Meta Opp. at 28; Meta Resp. CS ¶ 1507.

 Even if it stood alone, the foregoing evidence of durable profits and inelastic demand is

sufficient to establish the monopoly power element of the FTC's prima facie case.[2]  *See* FTC

Mem. at 33, 36-37 (discussing, *inter alia*, *du Pont*, *Microsoft*, *Dentsply*, *McWane*); CS ¶¶ 1450-

51 (positive economic profits get competed away in competitive markets); CS ¶¶ 1534-37

(discussing combined import of Meta's high profits and increases in quality-adjusted price).

Indeed, Meta concedes that such "[i]nelastic demand for a firm's product is evidence that

consumers lack close substitutes and that the firm has market power."  *See* Meta Resp. CS ¶

1505.  Meta argues with the FTC's evidence, *see, e.g.*, Meta Resp. CS ¶¶ 1467-69, 1534-37, but

such disputes are resolved at trial, not summary judgment.

 Meta's two legal arguments in response to the FTC's evidence are likewise insufficient to

demonstrate the absence of a triable issue of fact.  First, Meta complains that the FTC cites

authority that "involved price increases" and not quality reductions, Meta Opp. at 34, but this

---

[2] Contrary to Meta's claim, Meta Opp. at 4, the FTC does not agree with Meta that the first
element of its prima facie case requires definition of a relevant market.  *See* FTC Mem. at 33.

ignores that antitrust law and economics have long treated reductions in quality as comparable to price increases, with both representing forms of market power.  *See* ECF 59 at 11-12 (citing cases); *see also U.S. v. Google* at *75 ("the ability to degrade product quality without concern of losing consumers" provides "proof of monopoly power"); Meta Opp. at 5 (claiming the outage Professor Carlton analyzed is "a significant price increase (or the equivalent)").

Second, Meta demands "total" quality measures.  Meta Opp. at 32.  This demand is unsupported by any authority, and conflicts with cases that have highlighted dimensions of product quality without demanding the sort of overall quality metric that Meta demands.  *See, e.g.*, *U.S. v. Google* at *128 (discussing "small changes" in quality that nonetheless indicated monopoly power); *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1159, 1170 (W.D. Ark. 1995) (discussing quality dimensions like "number of photos and stories" and "extent of coverage" as quality harms without an overall quality measure).  Here, the FTC's evidence of declines in important dimensions of quality creates a triable issue of fact regarding overall quality and monopoly power.  *See, e.g.*, CS ¶¶ 1492-94, 1924-25, 1960 (ad load); 1501-03 (friends and family sharing); 1511, 1995-2001 (privacy violations); 1499(c), 1500, 1971, 1973, 1992-94 (user frustrations with data tracking); 2235, 2257-59, 2266, 2268-69, 2272 (integrity lapses).  Moreover, the FTC has proffered evidence of declines in overall consumer satisfaction with Facebook and Instagram, *see, e.g.*, CS ¶¶ 1496-98, 1499(d), 1500, which indicates—drawing inferences in the FTC's favor—declining overall quality.

2.   The FTC has proffered indirect evidence of monopoly power

The direct evidence of monopoly power is confirmed by indirect evidence of monopoly power—that is, by Meta's monopoly share in a well-defined antitrust market with entry barriers. FTC Mem. at 3-33.  Professor Hemphill calculated Meta's market share based on multiple metrics that all show Meta's dominant share.  FTC Mem. at 30; CS ¶¶ 1396-97, 1400, 1402-04;

*see also* CS ¶¶ 1406-08 (if relevant market is correct, Meta's expert does not dispute the market

share estimates); 1405 (calculations with incidental friend-related activity on non-PSN apps).

Meta does not dispute Professor Hemphill's market share calculations, but instead

disputes the existence of a relevant market for PSN services.  Meta Opp. at 4-28.  But Meta's

arguments fail to suggest the FTC has no evidence supporting its prima facie case.  The FTC has

designated specific facts supporting the relevant market for PSN services through both *Brown*

*Shoe* factors and the hypothetical monopolist test ("HMT"), which are each independently

sufficient to prove a relevant market.  FTC Mem. at 11-18, 21-23; *see U.S. v. Google* at *67, 71

("*Brown Shoe* factors warrant recognition of a general search services market").

The FTC has proffered evidence that "peculiar characteristics and uses" and other *Brown*

*Shoe* "practical indicia" distinguish PSN apps from non-PSN apps, demonstrating that they are

not reasonable substitutes.  FTC Mem. at 11-18 (discussing, *inter alia*, industry and public

recognition, insensitivity to price changes, distinct customers and prices).  In particular, PSN

apps provide a friends-and-family social networking experience ("friends and family sharing"),

while non-PSN apps do not.  FTC Mem. at 3-8, 18-21; CS § II.A.5.

Additionally, the FTC offered economic expert opinion and analysis applying the HMT

to identify a relevant market that includes only PSN apps.  *See* CS ¶ 1302 (HMT opinion).  Meta

notably concedes that its experts did not offer a contrary HMT opinion.  *See* Meta Resp. CS ¶¶

1372 ("Undisputed that Meta's experts do not opine that a candidate market consisting of only

four alleged PSN apps in the United States fails to satisfy the HMT."), 1372(a).  Meta also has

not argued that Professor Hemphill's opinions are inadmissible, which means they are part of the

evidentiary record at summary judgment.  *Cf. Rothe Dev., Inc. v. Dep't of Def.,* 107 F. Supp. 3d

183, 195 (D.D.C. 2015) (expert testimony forms part of the summary judgment evidence unless

it is deemed inadmissible beforehand).

Moreover, the *Brown Shoe* practical indicia and Professor Hemphill's opinions are supported by copious evidence.  That evidence includes data indicating that friends and family sharing remains a large and important part of Facebook and Instagram (*e.g.*, CS ¶¶ 1322(a)-(c)), and surveys indicating consumers use the apps for friends and family sharing (*e.g.*, CS ¶¶ 1075-77, 1320(f)(i)).  It further includes Meta executives' statements that friends and family sharing remains an important and core part of Facebook (*e.g.*, CS ¶¶ 1027(h), 1056, 1222(c), 1294, 1320(a), (d)) and Instagram (*e.g.*, CS ¶¶ 1017(b), 1060, 1321(a)-(b)); Meta ordinary-course records indicating the same, for Facebook (*e.g.*, CS ¶¶ 1016(c), (e), 1057(e), 1320(f), 1322(a)-(c)) and Instagram (*e.g.*, CS ¶¶ 1017(a), 1322(b), 1323(b)); and evidence from third parties indicating the same, for both Facebook (*e.g.*, CS ¶¶ 1033(c)-(e), 1058(b),(g)) and Instagram (*e.g.*, CS ¶¶ 1033(c)-(f), 1115(b)).  Further, it includes evidence that non-friend content on Facebook and Instagram has been a source of user frustration (*e.g.*, CS ¶¶ 1323(d), 1503(a)-(i)), and that friend content and connections are key drivers of user engagement, retention, and sentiment (*e.g.*, CS ¶¶ 1323(b)-(d), 1553(a)-(i), 1554(a)-(c)), underscoring the importance users place on friends and family sharing.

The FTC's evidence further indicates that non-PSN apps do not provide a friends-and-family social networking experience—as shown by extensive testimony (*e.g.*, CS ¶¶ 1018(f), 1033(e), 1058(a), 1075(g), 1082(b), 1151(b), 1175(c), ▮▮), ordinary course documents (*e.g.*, CS ¶¶ 1057(e), 1075(c), 1082(a), 1082(c), 1090(a)(iv), 1151(d), 1258(e)), and data analyses (*e.g.*, CS ¶¶ 1078-81, ▮▮, 1184(a), ▮▮▮▮▮▮).  This includes detailed evidence as to LinkedIn (CS ¶¶ ▮▮▮ 1085(c), 1129-46; Nextdoor (CS ¶¶ ▮▮▮ 1085(c), 1147-64); YouTube (CS ¶¶ 1085(c), 1172-93, 1426(a)▮▮); TikTok (CS ¶¶ ▮▮▮ 1085(c), 1194-1216,

███████); Twitter (CS ¶¶ 1085(c), 1218-34); Reddit (CS ¶¶ 1085(c), 1235-53); Pinterest (CS ¶¶ 1085(c), 1254-73), and others (*e.g.*, CS ¶¶ 1165-69 (Strava)).  And it includes evidence demonstrating how mobile messaging apps are materially different from PSN apps, and not reasonable substitutes, *see* CS ¶¶ 1274-94, as Meta recognizes.  CS ¶¶ 1278, 1281(a)-(b), (e)-(f).

Meta attempts to set aside the foregoing evidence based on the untenable argument that plaintiffs must present a narrow class of data or econometric illustration to define a market. Meta Opp. at 10, 18, 20-22.  Meta's position is incorrect.  FTC Mem. at 11, 21-23; *see also U.S. v. Google* at *68 ("There is no legal requirement that a plaintiff supply quantitative proof to define a relevant market.") (citing *McWane*, 783 F.3d at 829-30), *71 (defining market based on "the relevant *Brown Shoe* factors"); *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1050 (5th Cir. 2023) (plaintiff not "required to mathematically demonstrate cross-elasticity of demand").

Nor can Meta erase the foregoing evidence, including expert testimony, by asking the Court to accept Meta's version of contested factual points.  For example, Meta insists that friends and family sharing represents a minor share of what consumers do on Facebook and Instagram. *See* Meta Opp. at 6, 23, 27, 29 (citing SMF ¶¶ 11-16, 56-57).  But Meta's assertion is contradicted by copious evidence and therefore disputed.  *See supra* at 27; *see also* FTC Mem. at 7-8.  Moreover, even crediting Meta's assertion that only a portion of Facebook and Instagram involve friends and family sharing, Professor Hemphill showed Meta has a dominant share even counting only portions of the apps most directly tied to friends and family sharing.  CS ¶¶ 1402-04; *see also* FTC Mem. at 7, 31.

Likewise, Meta's Opposition relies on a disputed and unsupported assertion that Facebook and Instagram are siloed collections of 250 different "use cases," with most or nearly all having little relationship to friends and family sharing.  Meta Opp. at 5 (citing SMF ¶¶ 578,

581-84); *see also id.* (asserting with no supporting citation that the majority "do *not* involve sharing with friends and family") (emphasis in original); *see also id.* at 27 (suggesting only "one" of the 250 "uses" involves friends and family).  The cited paragraphs in Meta's statement of facts do not even make this assertion, and moreover rely on a list of "features or activities" that Meta itself sent to the FTC, which is not record evidence.  *See* SMF ¶¶ 578, 581-84.

Additionally, Meta is incorrect when it argues the FTC lacks evidence that "something about the experience of consuming non-friends content . . . is different on Facebook" and Instagram.  Meta Opp. at 16; *see also id.* at 26.  To the contrary, the FTC's evidence shows that Facebook and Instagram are differentiated from non-PSN apps because they are integrated services in which even "non-friend content" is intertwined with the friends and family sharing experience, making even purportedly "similar" activities different.  FTC Mem. at 6-8; CS § II.A.7.a; *see also* CS ¶¶ 1316-24.  This evidence includes Meta's own assessment that functionality like video on Facebook and Instagram differs from consuming video on entertainment platforms like YouTube and TikTok.  CS ¶¶ 1311-12; *see also* CS ¶ 1314 (messaging on Facebook and Instagram differs from messaging on mobile messaging apps).  And contrary to Meta's claim, this is not a "throwaway" new idea, Meta Opp. at 16, as the Court has already observed.  *See* ECF No. 264 at 3-4 (noting FTC's position that Facebook is "differentiate[d]" from other online platforms in that users can share with a "social graph" of friends and family within the app); *see also* CS ¶ 877 (FTC interrogatory response discussing Meta's integrated PSN service offering).

At bottom, Meta asserts that non-PSN apps are not meaningfully different from PSN apps.  *See, e.g.*, Meta Opp. at 24-27.  But in arguing the evidence about this for hundreds of pages, Meta merely confirms the existence of material factual disputes.  *See, e.g.*, CS ¶¶ 1125-

1296; Meta Resp. CS ¶¶ 1125-1296.  Moreover, to the extent that Meta's Opposition (unlike its

opening brief) now suggests that non-PSN apps serve demand for sharing with friends, that

assertion is plainly a disputed material issue.  *Compare* Meta Opp. at 29 (claiming non-PSN apps

compete "for some part of the time spent on friend content"), *with* ECF 325-1 (Meta Opening

Brief) at 8-9, 18-20 (non-PSN apps are used for unconnected video and interest-based content).

Indeed, Meta's assertions relating to friend content and non-PSN apps generally refer to

some claimed isolated ability to communicate with friends, not friends and family sharing.  *See,*

*e.g.*, Meta Resp. CS ¶¶ ███████████ .  But these assertions only establish a factual dispute, as

the FTC's evidence shows that the mere ability to communicate with friends is not the same as a

friends-and-family social networking experience.  *See* FTC Mem. at 4-5; *supra* at 27-29

(discussing PSN services versus mobile messaging); CS ¶¶ 1082-86, 1119-21, 1125-27, 1413,

█████ ; *see also* CS ¶¶ 1175-76 (YouTube disclaiming that it has a "social networking

purpose"; "all" reasons "users typically visit YouTube" "centre [sic] on their consumption of

video entertainment, information or knowledge"); CS ¶¶ 1018(c), 1197(e), 1199 (TikTok

disclaiming that it is a "social networking service[]" and observing "significant differences" in

how people use Facebook and TikTok); CS ¶¶ 1221(a), (b), (e) (Twitter's corporate

representative contrasting Twitter with services where users' primary use case was "to see what

friends and family were doing" and testifying that "the clear singular theme that draws people to

Twitter" is "to see what's happening in the world and what people are saying about it").

Meta also cannot erase factual disputes by claiming that the FTC or its experts have

conceded something when they have not.  *See, e.g.*, Meta Opp. at 16 (asserting the FTC and its

expert "agreed that non-PSN apps provide *effective competition* for this and other non-sharing

use cases" (emphasis added), even though that proposition is not asserted in any of the cited

SMF paragraphs, SMF ¶¶ 578, 581-84); *id.* at 25 (citing SMF ¶¶ 431-32, 457-59, 612(a) and asserting FTC experts conceded that messaging apps have the social graph and shared social space characteristics of PSN apps).  Plainly, Meta's invented "concessions" do not indicate that the FTC lacks evidence supporting its prima facie case.  *See* CS ¶¶ 1325-39 (discussing how non-PSN apps do not competitively constrain Meta); FTC Resp. SMF ¶ 457 (describing how messaging apps lack PSN attributes); CS ¶¶ 899-900, 1276-77 (describing the same).  Likewise, Meta cannot erase a dispute of material fact by arguing that its flawed empirical studies should be given primacy over other evidence, *see* Meta Opp. at 16-18, particularly as the FTC has proffered expert and ordinary course evidence indicating why these studies are unreliable and uninformative.  FTC Mem. at 23-28; CS ¶¶ 1340-76; FTC Resp. SMF ¶¶ 537-47.

    3.   <u>The FTC has proffered evidence of price discrimination supporting both monopoly power and the PSN services market</u>

The FTC has proffered evidence indicating that Meta engages in price discrimination against users of Facebook and Instagram in the form of reduced investment in friends and family sharing and a higher ad load to more inelastic users.  CS ¶¶ 1501-03, 1532-33 (reduced investment); CS ¶¶ 1523-31 (higher ad load).  This provides direct evidence of monopoly power and supports the FTC's relevant market showing.  FTC Mem. at 16-17, 20-21, 34.

For example, Professor Hemphill demonstrated that Meta shows more ads to user groups that, according to Meta's own internal records, tend to have a more intense demand for friends and family sharing.  FTC Mem. at 20; CS ¶ 1525 (████████); CS ¶ 1528 (██████████████); CS ¶ 1530 (showing both groups exhibit more intense demand).  Meta's ordinary course documents also confirm that it sets higher ad load for ████ Facebook users compared to ████ ██████████████.  CS ¶ 1525(b)(vii)-(ix).

The evidence that Meta price discriminates based on user characteristics that Meta knows

to be associated with more inelastic demand for friends and family sharing supports the existence

of monopoly power.  CS ¶ 1531(a) (Meta's expert conceded that if "Facebook charges a different

'price' to those who rely more on friends and family sharing than those who rely on it less," that

would be evidence that "Facebook is insulated from competition").  And that conclusion is

confirmed by ordinary course evidence that Meta shows more ads to users it observes to have

more inelastic demand for Facebook and Instagram.  *See, e.g.*, CS ¶¶ 1479, 1480(f), 1488,

1490(a)-(b), 1491(a), 1524(d), 1529(d) (████████████████████████████████

██████████████████████████); CS ¶ 1528(b) (showing ███████████████

██████████████████████████████████████).

    Meta's Opposition disputes the FTC's evidence and suggests that Meta varies ad load

based solely on ████████████████.  Meta Opp. at 11 (citing CS ¶ 1524).  But this

assertion is not supported by Meta's cited reference, and even crediting Meta's unsupported

assertion, it at best highlights a disputed factual issue.  Similarly, Meta simply identifies a battle

of the experts—not suitable to summary judgment resolution—when it asks the Court to discount

Professor Hemphill's testimony and credit instead a regression result of Professor Carlton

regarding the relationship between ad load and ████████████.  Meta Opp. at 13-14 (citing

CS ¶¶ 1528(b)(i)-(ii)).  The FTC disputes the reliability of Professor Carlton's regression, which

was incorrectly specified and therefore does not accurately report the relationship between ad

load and ████████████.  PX9007, Hemphill Rebuttal Report, ¶ 119.

    More broadly, Meta responds to the FTC's evidence by declaring that the FTC did not

produce what Meta deems "evidence of *relevant* price discrimination," Meta Opp. at 32

(emphasis added) (citing CS ¶ 1504), appearing to demand evidence of Meta using some kind of

precisely specified "friends-and-family inelasticity" score to vary ad load, *see id.* at 12 (citing CS

¶¶ 1504, 1506), or some other type of specific ad load variation, *id.* at 13-14 (focusing on ad load and ███████████████ ).  But Meta's insistence that price discrimination must manifest only in a narrowly specified way is unsupported in the record and sound economic principles, and merely underscores another dispute: Professor Carlton offered no reason that price discrimination needs to manifest in any one specific way, and the FTC disputes that it does.  *See* PX9007, Hemphill Rebuttal Report, ¶¶ 104-06, 110-18.

Nor do any of the cases cited by Meta indicate such a legal requirement: none involved the type of perfect or precise customer "identification" evidence Meta demands.  *See* Meta Opp. at 1, 7-11.  And as detailed above, evidence shows Meta is successfully raising quality-adjusted price to particular sets of users, which answers Meta's underlying demand for evidence that Meta can successfully "identify" customers for targeted price increases.  *See id*.

Likewise unsupported is Meta's suggestion that price discrimination evidence is only relevant if the market is limited to a particular subset of customers.  *See id*. at 7.  *Whole Foods* and *Staples* defined markets that included all customers of the relevant product.  *See id*. at 8-9 (discussing *Whole Foods* and *Staples*); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075-77 (D.D.C. 1997) (defining relevant market for consumables sold at office supply superstores).  For instance, in *Whole Foods*, prices varied for product categories—specialty organic perishables versus nonperishable dry goods—and the market was not limited to a subset of customers.  Meta Opp. at 8; *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037, 1039-40 (D.D.C. 2008).  Meta emphasizes that most of Whole Foods's sales were from the specialty organic perishables category, Meta Opp. at 8-9, but that does not contradict the FTC's evidence; indeed, it parallels the evidence in this case that Meta earns ██████████████ its revenues and profits through ad load imposed on users in ████████████ on Facebook and Instagram, which are the two

surfaces within both apps most closely tied to friends and family sharing.  CS ¶ 1471; *see also* CS ¶¶ 1322(b), 1403; PX9007, Hemphill Rebuttal Report, ¶ 109.  Thus, the FTC has proffered the type of evidence that even Meta concedes was relevant from other cases.

**B.  The FTC Has Proffered Evidence of Exclusionary Conduct**

The FTC has provided evidence indicating that Instagram and WhatsApp were both significant competitive threats to Meta's PSN services monopoly and were well-positioned to compete in the but-for world, and that acquisitions eliminated those threats.  *See, e.g.*, CS ¶¶ 1569-74, 1595-1617 (Instagram was a fast-growing PSN service that was strong where Meta was weak: mobile and photos); CS ¶¶ 1619-26 (Instagram had ample VC funding and access to industry expertise); CS ¶¶ 1732-77 (WhatsApp was a threat to pivot into PSNS); CS ¶¶ 1687-1713, 1831-46 (acquisitions eliminated Instagram and WhatsApp as threats).

This constitutes evidence of exclusionary conduct that produced an anticompetitive effect by "harm[ing] the competitive *process* and thereby harm[ing] consumers."  *U.S. v. Google* at *103 (italics in original, quoting *Microsoft*, 253 F.3d at 58); *id.* at *114 ("The loss of nascent competitors is a clear anticompetitive effect."); *see also* FTC Mem. at 38-48, 55-60.

Meta responds with legal arguments about what the FTC should be required to show about the but-for world.  *See, e.g.*, Meta Opp. at 39-40.  Meta's legal arguments are wrong.  *See* FTC Mem. at 52-55.  For example, Meta inaccurately asserts that evidence of "reduced output" is required to satisfy the exclusionary conduct element of a prima facie case, Meta Opp. at 40-42, claiming that *Microsoft* involved a finding of "reduced output," *id.* at 41.  In truth, the Court of Appeals made no such finding, and no such finding is required for Section 2 liability.  *See U.S. v. Google* at *122 (noting the *Microsoft* court imposed liability despite output "[growing] rapidly" during Microsoft's anticompetitive conduct, and holding "[i]ncreased output similarly does not inoculate Google against liability"); *see also* FTC Mem. at 37-38 (same in other Section 2 cases).

34

Meta's interpretation of *Microsoft* is nonetheless revealing.  Meta appears to be inferring reduced output and consumer harm—relative to a but-for world without Microsoft's conduct—from the Court of Appeal's finding that Microsoft had "protect[ed] [its] monopoly from [] competition" and hampered the growth of threats "in a manner not attributable" to superior acumen or merits competition.  *See Microsoft*, 253 F.3d at 61-62, 77; Meta Opp. at 41.  That is just what the FTC has shown, and the same inference applies.  Moreover, given that overall output was in fact expanding in *Microsoft*, *see U.S. v. Google* at *122, this further confirms that a monopolist must do more than claim that all growth and development is a procompetitive benefit attributable to its conduct, as Meta attempts to do.  *Supra* § III.  In any event, the FTC has proffered evidence of declining user sentiment and suppressed user engagement, indicating that Meta is reducing output.  FTC Mem. at 34, 37; *see, e.g.*, CS ¶¶ 1495-1500, 1503, 1937.

Finally, even granting Meta's premise that the FTC must show not just that it excluded rivals through conduct that was not merits competition, but also that this conduct "*actually* harmed consumers," Meta Opp. at 38 (italics in original), the FTC has proffered evidence of such harm.  This includes significant increases in ad load, diminished investment, and disturbing privacy and integrity violations.  FTC Mem. at 55-64; CS ¶¶ 1919-37, 1938-43 (harms from loss of competitive pressure from Instagram); 1948-61 (increased ad load); 1495-1500 (service quality); 1962-65 (underinvestment in friends and family sharing); 1966-2001 (privacy); 2002-08 (integrity, including abuse and objectionable content).  The parties clearly have a material factual dispute over the substantial evidence of quality reductions and consumer harm.  *See supra* §§ IV.A.1; Meta Opp. at 36, 45, 47-49 (quoting purported concessions about quality and output that are actually disputed); FTC Resp. SMF ¶¶ 51, 129-31, 734; CS ¶¶ 1893, 1898-1901.

## V.  Conclusion

The Court should grant the FTC's motion for partial summary judgment.

Dated:    August 9, 2024                              Respectfully submitted,

*/s/ Daniel Matheson*

Daniel J. Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Patricia Galvan
Maria Dimoscato (D.C. Bar 489743)
Robert Zuver (D.C. Bar 987216)
Peter Taylor
Nathan Brenner
David Brunfeld (D.C. Bar 1672059)
Ario Fazli (D.C. Bar 1035087)
Erin Frake (D.C. Bar 1023064)
Melissa Ihnat (D.C. Bar 498266)
Alicia Loh (D.C. Bar 1738388)
Mitchell London (D.C. Bar 1029408)
Justin Lorber (D.C. Bar 90005184)
Owen Masters (D.C. Bar 242139)
Thomas Mattes
Noel Miller (D.C. Bar 1026068)
Njeri Mugure
Danica Noble (D.C. Bar 439474)
Stephen Pearson (D.C. Bar 1765192)
Benjamin Rashkovich (D.C. Bar 5972724)
Michael Smith (D.C. Bar 996738)
Jennifer Tarr
Oren Vitenson (D.C. Bar 90005750)
Nicholas Widnell (D.C. Bar 439474)

Federal Trade Commission
Bureau of Competition
400 7th Street, SW
Washington, DC 20024
Tel.: (202) 326-2075
Email: dmatheson@ftc.gov

*Counsel for Plaintiff Federal Trade*
*Commission*