**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-03590-JEB |
| META PLATFORMS, INC., | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF
META PLATFORMS, INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................3

A.    Meta's Business ................................................................................................3

B.    Meta's Acquisitions ..........................................................................................5

C.    The FTC's Claims.............................................................................................6

LEGAL STANDARD.........................................................................................................10

ARGUMENT ....................................................................................................................10

I.    THE FTC HAS NO EVIDENCE TO SUPPORT ITS CONTRIVED "PERSONAL SOCIAL NETWORKING SERVICES" MARKET ........................................................10

II.    THE FTC HAS NO EVIDENCE OF MONOPOLY POWER ........................................21

A.    There Is No "Indirect" Evidence of Monopoly Power ...........................................22

B.    There Is No "Direct Evidence" of Monopoly Power.............................................24

III.    THE FTC HAS NO EVIDENCE OF EXCLUSIONARY CONDUCT ...........................31

A.    The FTC Has No Evidence That Meta's Acquisitions Were Exclusionary...........32

B.    The FTC's Pre-Acquisition Review Should Create a Presumption That the Acquisitions Were Not Anticompetitive...............................................................47

CONCLUSION..................................................................................................................50

# TABLE OF AUTHORITIES[*]

Page

## CASES

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................44

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406
(7th Cir. 1995)..........................................................................................................................30

\* *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)........24, 26, 35, 39

\* *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...........................................2, 11, 14, 17, 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...........................................39

*Bush v. Dist. of Columbia*, 595 F.3d 384 (D.C. Cir. 2010) ..........................................................10

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ...........................................................................36

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................10

*CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816 (D.C. Cir. 2001) .......................................30

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ......................................50

*DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332 (Fed. Cir. 2014) ........................................17

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 16404659
(N.D. Cal. Apr. 26, 2016), *aff'd*, 724 F. App'x 556 (9th Cir. 2018)................................48

*Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682 (8th Cir. 1993)....................................................35

\* *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ............................................ 14-15, 50

*FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977).......................................................43, 46

\* *FTC v. Facebook, Inc.*:

560 F. Supp. 3d 1 (D.D.C. 2021) ...................................... 1, 7, 10, 12-13, 21-23, 30-31, 47

581 F. Supp. 3d 34 (D.D.C. 2022) .......................................................1, 7, 22-23, 26, 31-33

*FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023)............................................43

\* *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ............................................. 13-14, 17

---

[*] Authorities principally relied upon are marked with an asterisk.

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) .......................................................43

*FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977) ...............................................................43

*Golan v. Pingel Enter., Inc.*, 310 F.3d 1360 (Fed. Cir. 2002) .....................................................17

*Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792 (1st Cir. 1988) ...........................13

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)..............................................................13

*IGT v. All. Gaming Corp.*, 702 F.3d 1338 (Fed. Cir. 2012)..........................................................17

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) ........................................11

*Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710 (7th Cir. 2006)..........................26

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 706 F.2d 1488 (7th Cir. 1983) .................. 38-39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................................33

*Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851 (2d Cir. 1974)......................................45

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421 (3d Cir. 2016) .............16, 30

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984)....................................................33

*NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614 (D.D.C. 1991) ....................................................34

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986)..............................................11

* *New York v. Facebook, Inc.*:

    549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom. New York v. Meta
    Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023)..................................................................31

    66 F.4th 288 (D.C. Cir. 2023)............................................................................31, 47, 49

* *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ...........................................24, 32

* *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ......................................................... 11-12, 29, 33

*Pharm. Rsch. & Mfrs. of Am. v. FTC*, 790 F.3d 198 (D.C. Cir. 2015) ...........................................49

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) ...................................................35

*Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660
    (7th Cir. 1982)......................................................................................................................39

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ..............................13

\* *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ..................................................33

\* *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210
   (D.C. Cir. 1986) .................................................................................14, 33, 39, 48

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994).............................36

*Super Premium Ice Cream Distrib. Antitrust Litig.*, *In re*, 691 F. Supp. 1262
   (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow*
   *Gourmet Ice Creams, Inc.*, 1990 WL 12148 (9th Cir. Feb. 8, 1990)
   (judgment noted at 895 F.2d 1417 (Table)) ................................................... 17-18

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) .................................................................48

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989) ........................17

*Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir. 1990) ........................................49

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945)........................................50

*United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729 (D. Md. 1976)..............................45

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ....................................50

*United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir. 1997) .........................................14

*United States v. Google LLC*, — F. Supp. 3d —, 2023 WL 4999901
   (D.D.C. Aug. 4, 2023)....................................................................................33

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) .........................................43

\* *United States v. Microsoft Corp.*, 253 F.3d 34
   (D.C. Cir. 2001) ..................................................... 3, 10, 12-13, 21-22, 24, 26, 31-33

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004)......................................13

*United States v. Paramount Pictures, Inc.*, 2020 WL 4573069
   (S.D.N.Y. Aug. 7, 2020) ..................................................................................48

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) ............................................ 45-46

\* *United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ..............................................49-50

\* *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)............31, 49

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001) ...........................35

*Whiteru v. WMATA*, 636 F. Supp. 3d 107 (D.D.C. 2022)..............................................10

iv

**STATUTES AND RULES**

Clayton Act, 15 U.S.C. § 12 *et seq.*:

    § 7, 15 U.S.C. § 18 ...........................................................................................39, 43, 48, 50

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*:

    § 13(b), 15 U.S.C. § 53(b) ...........................................................................................1, 43

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435,
90 Stat. 1383 ...........................................................................................................5-6, 49

Sherman Act, 15 U.S.C. § 1 *et seq.*:

    § 1, 15 U.S.C. § 1 ............................................................................................................33

    § 2, 15 U.S.C. § 2 ............................................................................... 1, 22, 31, 43, 47-48, 50

Fed. R. Civ. P. 56 ............................................................................................................10

**INTRODUCTION**

The FTC's belated enforcement action against Meta Platforms, Inc. ("Meta") under Section 13(b) of the FTC Act should be dismissed. The FTC claims that Meta violated Section 2 of the Sherman Act by maintaining a monopoly in a contrived "market" for the free-to-consumer use of something it calls "personal social networking services" (or "PSNS"). In its interrogatory responses, the FTC defines PSNS to include only the Facebook, Instagram, Snapchat, and MeWe applications ("apps") and states that virtually everything done on Facebook and Instagram – not just sharing with friends and family – is within the claimed market. The FTC's entire case centers on the consummation of two acquisitions in 2012 and 2014, both of which the FTC reviewed carefully and cleared. The FTC's initial complaint was dismissed for failure to state a plausible claim. *See generally FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021). Its amended complaint survived in part, based on the FTC's commitment to provide *evidence* that would support the existence of a PSNS relevant antitrust market, Meta's monopoly power in that market, and harm to competition and consumers from Meta's acquisitions of Instagram and WhatsApp. *See generally FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022). After extensive discovery, it is now apparent that the FTC cannot prove *any* of the required elements of its Section 2 claim. This first-ever attempt to revisit acquisitions reviewed and cleared by the FTC more than a decade ago itself threatens beneficial competition and is unsupported.

1.    ***The FTC Has No Evidence To Support Its Alleged Market.*** A relevant antitrust market must include the substitutes that people would use more of when faced with a price increase for Facebook or Instagram. The FTC must demonstrate – but cannot prove – that its alleged PSNS market includes all reasonable substitutes for the more than 250 activities people engage in on Facebook and Instagram. But there is no competent evidence that consumers do not substitute for these activities beyond Facebook, Instagram, Snapchat, and MeWe. The FTC

has none of the evidence required in this Circuit, neither data-based analysis of substitution nor evidence to support the qualitative factors bearing on substitution from *Brown Shoe*.  Both the quantitative evidence and proper application of the *Brown Shoe* factors contradict the FTC's candidate market.  That evidence demonstrates consumers *will* substitute beyond the artificially limited PSNS set.  Consumers use *many* other services that offer some or even most of the plethora of activities available on Meta's apps.  These include but are not limited to services offered by TikTok, YouTube, Twitter (X), LinkedIn, Apple, and many others.  The FTC relies on *ipse dixit* assertions that Meta apps are "different," which have never been found sufficient by any court.  *See infra* Part I.

**2.      *The FTC Has No Evidence To Support Its Allegation That Meta Has Monopoly Power.***  Monopoly power is the power to raise price above a competitive level, or restrict output or quality below a competitive level.  The FTC has no evidence that Meta has such power.  The FTC's attempt to prove power *indirectly* founders on its failure to establish a valid market in which Meta has a "dominant" share, as well as its failure to show that significant barriers to entry prevent other firms from offering competitive services.  Many have entered, and others – like WhatsApp, before it was acquired – could enter according to the FTC.  The *direct* evidence of monopoly power that the FTC previously said was "rarely available" is in fact unavailable here: Meta has never charged a price and has never restricted output.  Meta provides its valuable apps to billions of people – for free.  It has *increased* output and the range of services that it provides, thereby demonstrating an effective price *reduction* (greater value for consumers).  And while the FTC complains about certain aspects of the quality of Meta's apps, the FTC (and its Armada of hired expert witnesses) have not even attempted to consider overall Meta app quality, much less benchmark it against a competitive level.  No court has ever accepted anecdotal or speculative

claims, like those made here by the FTC, as proof of monopoly power.  Indeed, no court has ever relied on "quality" claims alone to prove monopoly power.  *See infra* Part II.

       3.       ***The FTC Has No Evidence To Support Its Allegation That Meta's Acquisitions of Instagram and WhatsApp Harmed Consumers***.  The FTC needs evidence to prove that Meta maintained a PSNS monopoly through conduct that was "exclusionary" or "predatory."  Exclusionary conduct is conduct that actually caused harm to competition and consumers.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001) (en banc) (per curiam).  The FTC claims that the Instagram and WhatsApp acquisitions – and only those – were the exclusionary conduct that maintained Meta's monopoly in 2012 and 2014.  But the FTC has no evidence that either challenged acquisition harmed competition and consumers.  Its expert witnesses have not even hypothesized a "but-for" world, without one or both acquisitions, in which consumers would have services that are better than the services they have now.  The FTC claims only that having more competitors may be better and speculates that good things might have happened if Instagram and WhatsApp had been left to make their way without Meta's resources and assistance.  No court has ever accepted that kind of speculation as proof.  *See infra* Part III.

**BACKGROUND**

**A.    Meta's Business**

       Meta offers users a variety of tools for communicating, sharing, and consuming content on several services, including Facebook, Instagram, Messenger, and WhatsApp.  *See* SMF ¶¶ 2-4.  In their free time, users can take part in many activities on those apps.  *See*, *e.g.*, SMF ¶¶ 7, 17 (Facebook), ¶ 65 (listing Instagram features), ¶¶ 93-112 (Messenger), ¶¶ 114-125 (WhatsApp).  These include not only sharing personal updates, photographs, videos, and other content with friends and family, but also sending one-to-one and group messages, reading, shopping, posting

3

to interest-based groups, and viewing long- and short-form videos from sources with whom the user does not have a personal relationship ("unconnected sources"), such as a business or influencer the user follows, or public accounts like the National Basketball Association or Saturday Night Live.  *See* SMF ¶¶ 20-44, 70-92, 114-125.  Today, ███████████ of what users consume on Facebook and Instagram is *not* friends-or-family content; ███████████ of time on Facebook and ████ of time on Instagram is spent engaging with content that comes from public or other unconnected sources.  *See* SMF ¶¶ 11, 56.

Meta offers its apps free of charge and in unlimited quantities.  *See* SMF ¶ 5.  Meta's Facebook app has been free since its inception in 2004 and has remained free since Meta supposedly became a monopolist in 2011.  *See* SMF ¶ 5.  Meta also provides Instagram for free. *See* SMF ¶ 5.  And Meta cut the price of WhatsApp to zero after acquiring it.  *See* SMF ¶ 825. Meta generates substantially all of its revenues from selling advertising placements on Facebook and Instagram, *see* SMF ¶ 132, which compete with many other digital advertisers for those sales, *see*, *e.g.*, SMF ¶ 144.  To the extent consumers spend more time on Meta's apps, Meta has the opportunity to sell more advertising.  *See* SMF ¶ 142.  Meta accordingly has an incentive not only to attract users, but also to keep them engaged and spending time with positive user experiences on Meta's services – rather than others – to increase advertising revenues and profits.  *See* SMF ¶ 141.

To enhance the experience of users – all of whom consume content and some of whom also post content – Meta has invested billions of dollars into one of the largest content-distribution infrastructures on Earth.  *See* SMF ¶¶ 126, 151.  Meta's infrastructure ensures that users can reliably access Meta's platforms with limited delay or interruption, even as content becomes increasingly bandwidth intensive.  *See* SMF ¶ 152.  In addition, as consumer

preferences change and competitors evolve, Meta invests tens of billions of dollars into research and development so that it can offer scores of new features and innovations that will attract new users and keep existing users engaged.  *See*, *e.g.*, SMF ¶¶ 126-127, 710, 823.

**B.    Meta's Acquisitions**

Meta acquired Instagram in 2012.  *See* SMF ¶ 701.  Before the acquisition was announced, Instagram had 13 employees, approximately 3.9 million U.S. monthly active users, and a third-party infrastructure that suffered multiple outages.  *See* SMF ¶¶ 657-658 (growth), ¶¶ 679-680, 683-690 (integrity and infrastructure).  Meta agreed to buy Instagram for $1 billion. *See* SMF ¶ 701.  Meta submitted the acquisition for pre-clearance merger review under the Hart-Scott-Rodino Act.  *See* SMF ¶ 702.  After issuing a second request, the FTC received thousands of documents – from both Instagram and Meta, including emails in which Meta executives discuss Instagram as one of several emerging and potentially competitive mobile apps, and which the FTC quotes in its amended complaint – in addition to interviewing dozens of nonparties.  *See* SMF ¶¶ 702-706.  The FTC also conducted interviews of Meta executives, including the CEO, and had access to the Instagram founders.  *See* SMF ¶ 706.  Ultimately, the FTC decided against challenging the acquisition.  *See* SMF ¶¶ 707-708.  Meta has since invested billions of dollars in developing Instagram, placing it on Meta's infrastructure, growing it to ████████████████████████████, and releasing dozens of new features.  *See* SMF ¶ 710 (investment), ¶ 724 (growth), ¶¶ 739-747 (features), ¶¶ 755-762 (infrastructure); *see also id.* ¶ 126 (research and development).

Meta acquired WhatsApp in 2014.  *See* SMF ¶¶ 814, 822.  Around the time of the acquisition, WhatsApp had approximately ████████ global users.  *See* SMF ¶ 778.  But its U.S. presence was small; ████████████████████ stated the app had approximately ██ penetration and ████████ U.S. monthly active users.  *See* SMF ¶ 778.

WhatsApp had no plan to attempt growth in the United States and no plan to offer advertising or otherwise obtain revenues aside from its consumer subscription fees (which it planned to expand). *See* SMF ¶¶ 764-765, 767-771 (monetization), ¶¶ 772-781 (U.S. growth). Meta agreed to buy WhatsApp for $16 billion (plus $3 billion for employee retention). *See* SMF ¶ 814. Meta submitted the acquisition for pre-clearance merger review under the Hart-Scott-Rodino Act. *See* SMF ¶ 815. The FTC received documents and interviewed nonparties as part of its initial investigation. *See* SMF ¶¶ 816-817. The FTC then decided against issuing a second request. *See* SMF ¶¶ 818-819. Meta has since invested billions of dollars into WhatsApp, placing it on Meta's infrastructure, growing it to ████████████████████████████ – with ██ ████████████████ – and releasing more than a dozen new features. *See* SMF ¶ 823 (investment), ¶¶ 833-835 (growth), ¶¶ 840-841, 846-848, 851-854 (features), ¶¶ 855-865 (infrastructure); *see also id.* ¶ 126. Meta did that while cutting the price of WhatsApp to zero and never showing display advertisements. *See* SMF ¶¶ 825-826. It earns revenues from WhatsApp by selling applications to businesses. *See* SMF ¶¶ 827-831; *see also id.* ¶ 832.

## C.     The FTC's Claims

The FTC claims that Meta unlawfully maintained a monopoly of an alleged PSNS market, which is comprised of only Facebook, Instagram, Snapchat, and MeWe. *See* SMF ¶¶ 575-576 (citing FTC interrogatory response limiting market to four active firms). The FTC confirmed, in a Court-ordered interrogatory response, that everything a user does on Facebook and Instagram (other than Dating) is time spent within the claimed PSNS market. *See* SMF ¶¶ 578-581. This includes the more than 250 activities (268 total between Facebook and Instagram) that Meta submitted in its interrogatory to the FTC – not just sharing with friends and family but also reading, passively watching videos, shopping, messaging, gaming, and engaging with other entertainment. *See* SMF ¶¶ 578, 582-584.

6

The FTC's interrogatory response is at odds with what the Court previously characterized as the ordinary understanding of the FTC's market-definition allegations.  *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 19 (D.D.C. 2021) ("some of the features offered by a Facebook or Instagram or Path are not, seemingly, part of those firms' PSN-services offerings as defined by the FTC," e.g., "time a user spends engaging with specific interest-based Facebook pages or groups"); *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 48-49 (D.D.C. 2022) ("time spent on Facebook Blue and Instagram includes interacting with friends, family, and other personal contacts" as well as "engaging in activity – such as passively viewing a music video – that falls outside of the market definition").

The FTC likewise represented in another interrogatory response that the very same things done on Facebook and Instagram do *not* count as PSNS time spent when done on any other app or service (aside from Snapchat and MeWe).  *See* SMF ¶¶ 589-591.  For example:

- **Short-Form Video:**  Facebook and Instagram "Reels" display short-form videos, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ comes from friends or reciprocal followers but which are instead generated by third parties with no connection to the user.  *See* SMF ¶¶ 11-14, 43-44, 60, 88-90.  As of June 2023, Reels accounted for ▮▮▮▮▮▮▮▮▮▮ time spent on Facebook and ▮▮▮▮▮▮▮▮▮▮ time spent on Instagram.  *See* SMF ¶ 15; *see also id.* ¶ 59.  The appearance and content of Reels videos are virtually identical to short-form videos that users can and do view on TikTok and YouTube Shorts (often identical down to the watermark).  *See* SMF ¶¶ 170-172, 211-212.  The FTC contends that 100% of the time spent on Reels is PSNS, including watching Reels posted by celebrities, creators, and public accounts with no connection to the viewer.  *See* SMF ¶ 582.  The FTC further contends that 100% of the time spent viewing identical short-form videos on TikTok and

YouTube Shorts – whether or not posted by people the user actually knows – is *not* PSNS. *See* SMF ¶ 591; *see also id.* ¶¶ 627-628.

- ***Small-Group Messaging***:  Facebook and Instagram users can send and receive text, photo, and video messages on a one-to-one, one-to-some, or one-to-many basis (e.g., group chats).  *See* SMF ¶¶ 79-80, 93-95.  Small-group messaging is a growing use of Instagram in particular.  *See* SMF ¶¶ 727-728.  Messages sent on Instagram and Facebook are similar in appearance and operation to messages sent on other services such as Apple's iMessage.  *See* SMF ¶¶ 440, 442-445, 741.  The FTC represented that identical messages, to identical recipients, are PSNS when sent on Facebook and Instagram, but not PSNS when sent on Apple's iMessage and other services.  *See* SMF ¶¶ 589-591.  The FTC further represented that sending a message within the Facebook app is PSNS, while sending the exact same message (to the same recipient) on Facebook's Messenger app – which users can access through an in-app link on the Facebook app – is not PSNS.  *Compare* SMF ¶ 583, *with id.* ¶ 585.

- ***Viewing Video Content***:  Users on Facebook and Instagram can view videos of various lengths, including videos that are longer than those offered on Reels – e.g., a comedy sketch, fashion show, sporting event, political speech, or movie.  *See*, *e.g.*, SMF ¶¶ 30-31, 36-38, 84-85.  More time is now spent viewing short and longer videos on Facebook than on ███████████████, and ████████████ that video time is spent watching content posted by unconnected sources.  *See* SMF ¶¶ 11-14.  Consumers can (and do) watch identical videos on a variety of services, including YouTube and others.  *See*, *e.g.*, SMF ¶¶ 162-163; *see also id.* ¶¶ 284-287.  The FTC confirmed that using Facebook or Instagram to watch a video posted by an unconnected source constitutes PSNS.  *See* SMF

8

¶¶ 582-584.  But the FTC further contends that watching that identical video on YouTube and other services is not in the proposed PSNS market.  *See* SMF ¶ 591.

- ***Consuming Interest-Based Content***:  Users on Facebook and Instagram can engage with a variety of features to view, post, share, and consume interest-based content – including from public or other unconnected sources.  *See* SMF ¶¶ 26-29, 77.  According to one of the FTC's expert witnesses, keeping up with popular culture and related interests is a "core" use case for Instagram.  *See* SMF ¶¶ 357, 608.  That common use case is also served by, among others, Twitter, Pinterest, and Reddit, as well as YouTube and TikTok.  *See, e.g.*, SMF ¶¶ 283-285 (Twitter), ¶¶ 330-341 (Pinterest), ¶¶ 386-388 (Reddit).  The FTC has asserted that using Facebook or Instagram to consume interest-based content that has nothing to do with friends or family constitutes PSNS.  *See* SMF ¶¶ 581-584.  But the FTC also contends that consuming such content on other services like Twitter or Pinterest or Reddit is not in the proposed PSNS market.  *See* SMF ¶¶ 589-591.

- ***Shopping on Marketplace***:  Facebook users can shop via a service called Marketplace within the Facebook app.  *See* SMF ¶¶ 32-33.  Marketplace transactions include users buying from other users they do not know, in addition to transacting with commercial businesses and online storefronts.  *See* SMF ¶¶ 32-33; *see also id.* ¶¶ 86-87.  The FTC has asserted that viewing goods on Marketplace from a vendor the user does not know constitutes PSNS (as does all transacting on Marketplace).  *See* SMF ¶¶ 581-583.  The FTC also contends that using all other online storefronts to view goods from a vendor the user does or does not know is *not* in its proposed PSNS market.  *See* SMF ¶ 591.

There are dozens of such examples; all told, the FTC considers 250+ activities on Facebook and Instagram to be PSNS – everything but Dating – while the same activities on different services (other than Snapchat and MeWe) are *not* PSNS.  *Compare* SMF ¶¶ 581-584, *with id.* ¶¶ 589-591.

The FTC does not contend that Meta has engaged in any anticompetitive conduct since acquiring Instagram and WhatsApp.  The FTC confirmed in discovery that it challenges only the acquisitions – and Meta's continued possession of unspecified assets obtained from Instagram and WhatsApp many years ago – and no other conduct.  *See* SMF ¶ 653.

## LEGAL STANDARD

Under Federal Rule 56, once the movant has made a showing to "demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the burden shifts to the nonmovant "to produce admissible evidence establishing a genuine issue of material fact," *Bush v. Dist. of Columbia*, 595 F.3d 384, 386 (D.C. Cir. 2010).  "A fact is 'material' if it is capable of affecting the substantive outcome of the litigation.  A dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Whiteru v. WMATA*, 636 F. Supp. 3d 107, 111 (D.D.C. 2022) (citations omitted).

## ARGUMENT

## I.    THE FTC HAS NO EVIDENCE TO SUPPORT ITS CONTRIVED "PERSONAL SOCIAL NETWORKING SERVICES" MARKET

It is the FTC's burden to come forward with evidence that proves the existence of the relevant antitrust market that Meta allegedly monopolized.  *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 13 (D.D.C. 2021); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam).  This Court should grant summary judgment because the FTC cannot carry that burden.  It has no evidence to support a relevant antitrust market of PSNS in the United States, consisting of only Facebook, Instagram, Snapchat, and MeWe – but not

TikTok, YouTube, iMessage, Twitter, LinkedIn, or any other competitor.  This claimed market has no basis in "commercial realities."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 543-44 (2018).  It is instead a textbook example of a gerrymandered market that exaggerates Meta's position.  *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) ("No party can expect to gerrymander its way to an antitrust victory without due regard for market realities."); *see also Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429-30 (D.C. Cir. 1986) (affirming directed verdict where market is "arbitrarily circumscribed" so that it "exaggerates [defendant's] position").

Most fundamentally, the FTC cannot prove that it has included all reasonable substitute services in its market definition.  The FTC has the burden of proving that its candidate market includes all the services to which consumers would switch (by using more) in response to increases in price.  *See infra* Point 1.  Those are *substitutes* that prevent Meta from charging a price above competitive levels, or reducing output or quality below competitive levels.  The FTC has none of the quantitative or qualitative evidence of substitution recognized as authoritative in this Circuit.  *See infra* Point 2.  The quantitative and qualitative evidence actually points in the opposite direction – there *is* substitution to many services the FTC excludes from its claimed market.  The FTC's expert witnesses *say* that PSNS is a relevant market but have no evidence of substitution to support it.  They cannot explain – much less support with evidence – why consumers might not, for example, tap TikTok to watch a short-form video when Facebook's similar (or even identical) videos do not satisfy; or communicate with friends and family on iMessage when they are displeased by messaging on Instagram; or view videos on YouTube when Meta's apps seem less attractive; or shop on Nextdoor when Marketplace does not offer what they are looking to buy.

If there were any doubt that the FTC's market definition is dictated by litigation tactics rather than the evidence, it is confirmed by the conflicting opinions of the FTC's expert witnesses (its main economic expert, Professor Hemphill, is a law professor; the other, Professor Lampe, is a claimed industry expert). They disagree on the definition of the PSNS market. Professor Hemphill accepts the FTC's interrogatory response and says everything one does on Facebook and Instagram counts as PSNS (other than Dating), while those exact same things done on other services do *not*. *See* SMF ¶¶ 620-626; *see also id.* ¶¶ 579-580. Professor Lampe, however, says that what distinguishes so-called PSNS apps from non-PSNS apps is a tiny sliver of use: sharing with "weak tie" connections; not family, not close friends, not the entire world, but rather some amorphous collection of intermediate people connected in some unidentified way. *See* SMF ¶¶ 610-611; *see also id.* ¶¶ 603-608. And unlike Professor Hemphill and the FTC, Professor Lampe says that much of what users do on Facebook and Instagram – like messaging – does not count as PSNS because it is different from this "weak tie" sharing that allegedly distinguishes Meta's apps. *See* SMF ¶ 607. Where the FTC's own expert witnesses cannot even agree on the relevant arena of competition (the market) or who the competitors are and for what, it is a blaring alarm that the alleged market has no support in commercial realities.

1.    ***The FTC must present evidence that consumers do not substitute between so-called "PSNS" and other services.*** The FTC must prove that its candidate market includes all reasonable substitutes. This is black-letter law: the proponent of a market definition must prove – with *evidence*, not unsupported theory – that the claimed market constitutes "the area of effective competition." *Am. Express*, 585 U.S. at 543-44. This means that *all* acceptable substitutes must be included. *See Microsoft*, 253 F.3d at 52 (relevant market must include "*all* products reasonably interchangeable by consumers") (emphasis added); *Facebook*, 560 F. Supp.

3d at 13-14 ("[a]t bottom, products that are sufficiently interchangeable compete with each other in the relevant legal sense," citing *Microsoft*); *see also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (similar).  Remarkably, the FTC *testified* at a Rule 30(b)(6) deposition that, while it takes the position that all activities on Facebook and Instagram are PSNS (save Dating) and that the same activities on other services are *not* PSNS, it had identified *no* evidence regarding substitution to support those distinctions.  *See* SMF ¶¶ 595-598.

It is simply not enough to claim that there are functional differences between services; the question is whether consumers consider them acceptable substitutes notwithstanding such differences.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (market defined by willingness of consumers to substitute even if "there may be some degree of preference for the one [product] over the other"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1159 (N.D. Cal. 2004) (rejecting a candidate market that lacked any "quantitative metric" to "determine the distinction" between what is in and out, and holding that "[m]ore is required" than "the mere notion that there is 'something different' about the merging products and all others"); *see also Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 798 (1st Cir. 1988) (Breyer, J.) (explaining that differentiated products can be substitutes).

The relevant substitution need not be complete replacement; consumers need not drop Facebook or Instagram completely for substitute services.  "Demand substitution" occurs at the margins, such that a shift in time spent from Meta's apps to other services can make it unprofitable for Meta to raise prices above competitive levels.  *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) ("[d]emand substitution polices the outer boundaries of a product market," because "demand substitution . . . illuminates whether customers can switch to one product and constrain anticompetitive pricing in another"); *see also* SMF ¶ 142 (explaining

that advertising revenues are tied to consumer engagement or time spent on the service).

Accordingly, the services to which consumers would shift time in response to a price increase must be included in the market.  *See RAG-Stiftung*, 436 F. Supp. 3d at 292 ("[p]roduct markets are almost always defined by demand substitution," which "describes customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service"); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004) ("The general question is whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other."); *see also United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997) ("the question is whether a hypothetical monopolist could *profitably* raise price" without losing enough customers "to make the price increase unprofitable").

       2.       ***The FTC has neither quantitative nor qualitative evidence that users substitute Facebook and Instagram usage with only other so-called "PSNS".***  Courts in this Circuit have uniformly required proof – not mere theory or speculation – that a candidate market includes all reasonable substitutes, in one of two forms.  *See RAG-Stiftung*, 436 F. Supp. 3d at 293 ("Courts use two approaches to help define a relevant product market.").  *First*, an economist can use quantitative tests to demonstrate whether and how the defined market includes all reasonable substitutes.  *See Arch Coal*, 329 F. Supp. 2d at 120-21.  *Second*, a plaintiff can conduct an analysis of the qualitative factors the Supreme Court identified in *Brown Shoe*, again to demonstrate that the proposed market includes all acceptable substitutes.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (explaining that the *Brown Shoe* factors are "evidentiary proxies for direct proof of substitutability").  The FTC cannot make the required showing for *either* standard.

      **a.**        **No Quantitative Evidence of Substitution Supports the Alleged PSNS**

**Market:**  The FTC's expert witnesses admitted that no quantitative evidence regarding

substitution in the proposed market supports their opinions.  Professor Hemphill, the main FTC

expert witness on market definition, conceded that he did not perform and had no data to perform

a "hypothetical monopolist test" – a recognized test intended to determine whether a single firm

controlling the proposed market could profitably impose a small but significant non-transitory

increase in price – or any other quantitative test.  *See* SMF ¶¶ 633-635.  And no other FTC expert

witness performed that or any other quantitative analysis of substitution.  *See* SMF ¶¶ 609, 613,

652.  The FTC's survey expert – who disclaimed opining on substitution – actually found that

consumers *do* use Facebook, Instagram, and other services the FTC excludes from the claimed

market to do some of the same things.  *See* SMF ¶¶ 645-652.  Thus, the record lacks *any* attempt

by the FTC to support its claimed market with objective, data-based analysis of substitution.

      Meta expert witnesses *did* perform such analyses.  They analyzed data from past service

outages and conducted extensive field experiments involving thousands of consumers.  *See* SMF

Part I.C (Empirical Substitution).  The data from these experiments establish that consumers

freely substitute in response to economic stimuli analogous to price increases – and they do so

with a mere smartphone swipe and tap.  *See* SMF ¶¶ 544-546 (Pricing Experiment), ¶ 552

(TikTok Ban), ¶¶ 557-560 (Switching Analysis), ¶¶ 564-565 (Outage Analysis).  The evidence

strongly supports the conclusion that TikTok, YouTube, and several other apps are acceptable

substitutes for Facebook and Instagram – but the FTC must exile them from the "market" to

claim a "dominant" share for Meta.  *See Arch Coal*, 329 F. Supp. 2d at 120 ("If a slight decrease

in the price of product A causes a considerable number of customers of product B to switch to A,

that would indicate that a cross-elasticity of demand exists between A and B and that they

15

compete in the same product market."); *see also Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 437 (3d Cir. 2016) (similar).

The FTC's insistence that Snapchat *is* in the market (*see* SMF ¶ 575) provides a commonsense way to test the FTC's candidate market:  to the extent an app is a closer substitute for Facebook and Instagram than is Snapchat, the app that is a closer substitute cannot be excluded from the market.  There is ample empirical evidence that several apps, including TikTok and YouTube, are closer substitutes:

- Professor List performed a multi-week "pricing" experiment in which he compensated thousands of Facebook and Instagram users to reduce their time spent on the apps; using device monitors, he determined diversion rates – i.e., the share of time diverted to other apps and activities.  *See* SMF ¶¶ 537-543.  He found that, for Facebook, more time was diverted to YouTube (8%) and TikTok (5%) than was diverted to Snapchat (1%).  *See* SMF ¶¶ 544, 546.  For Instagram, 19% of user time was diverted to YouTube and 10% to TikTok; just 2% was diverted to Snapchat.  *See* SMF ¶¶ 545-546.

- Professor Carlton studied changes in usage for various apps during a several-hours-long outage of all of Meta's apps in October 2021.  *See* SMF ¶¶ 562-563.  ██████████

  ████████████████████████████████████████████████████

  ████████████████████████████████████████████████████

  ██████████████████████████████████████████████

  ████████████████████████████████████████████████████

  ██████████████████████████.  *See* SMF ¶¶ 564-565.

The empirical studies in the record demonstrate that other services – including YouTube and TikTok – are closer substitutes for Facebook and Instagram than is Snapchat.  *See also*, *e.g.*,

16

SMF Part I.C.2 (TikTok Ban), Part I.C.3 (Switching Analysis).  The FTC can make no contrary claim based on any data-based evidence, and that lack of quantitative evidence should result in summary judgment.  *See DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1344 (Fed. Cir. 2014) (affirming summary judgment where plaintiff's evidence "fails to answer the pertinent economic question of whether a sufficient number of customers would switch to a competing technology if faced with a small but significant price increase"); *see also Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1369 (Fed. Cir. 2002) (affirming summary judgment, rejecting "conclusory allegations" about market definition made "without further supporting evidence").

b.    ***Brown Shoe* Indicia of Substitution Are Not Even Claimed in Support of PSNS:**  Although data-based analysis is the gold standard, courts in this Circuit have also evaluated substitution using the qualitative factors identified by the Supreme Court in *Brown Shoe*.  *See RAG-Stiftung*, 436 F. Supp. 3d at 293.  But the FTC and its eight expert witnesses have not even sought to justify the PSNS construct with evidence bearing on these factors, *see* SMF ¶ 614 – and for good reason:  none of the *Brown Shoe* factors supports the claimed PSNS market.  *See IGT v. All. Gaming Corp.*, 702 F.3d 1338, 1347 (Fed. Cir. 2012) (affirming summary judgment where neither public nor industry perception supported claimed market); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989) (affirming summary judgment, stating that evidence different stores are "perceived as distinguishable . . . form[s] an inadequate basis for concluding that home centers and other retailers lack the ability to attract substantial amounts of business away from each other").  Merely claiming that products are "different" is insufficient as a matter of law.  *See In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) ("Courts have repeatedly rejected efforts to define markets by . . . product quality variances."), *aff'd sub nom. Haagen-Dazs Co. v.*

17

*Double Rainbow Gourmet Ice Creams, Inc.*, 1990 WL 12148 (9th Cir. Feb. 8, 1990) (judgment noted at 895 F.2d 1417 (Table)).

      **i.**    ***No Industry Recognition for PSNS as a Four-App Market***:  Millions of pages of ordinary-course business documents and the testimony of scores of nonparty industry witnesses turned up *no* recognition of a market characterized by the "PSNS" rubric limited to the four active services the FTC identifies.  *See*, *e.g.*, SMF ¶¶ 463-477.  Nor did extensive discovery reveal any industry recognition that competition for all of the things done on Facebook and Instagram – everything except Dating, per the FTC's market definition – does *not* include obvious competitors for at least many if not most of those things on services like YouTube, TikTok, Twitter, LinkedIn, and others.  On the contrary, there is widespread recognition that competition includes these competitors.  *See*, *e.g.*, SMF ¶¶ 181-203 (YouTube), ¶¶ 244-270 (TikTok), ¶¶ 311-326 (Twitter), ¶¶ 409-414 (LinkedIn).  The FTC is *not* claiming a market limited to a particular type of friends-and-family sharing; it is claiming that the market includes virtually everything done on Facebook and Instagram and therefore virtually everything a person can do online, such as watching videos, shopping, reading news, following celebrities, gaming, messaging, and many other activities.  *See* SMF ¶¶ 581-584.  Ordinary-course business documents from both Meta and nonparties confirm broad competition, e.g.:  YouTube believes it competes with Meta apps for video viewing, *see* SMF ¶¶ 189-196, 200-202; ███████████ ████████████████████████████████████████████████; Apple believes it competes with Meta apps for messaging, *see* SMF ¶ 452; Twitter believes it competes with Meta for consuming updates, *see* SMF ¶¶ 324-326, 449; and Reddit believes it competes with Meta for interest groups, *see* SMF ¶¶ 397-398.  The widely used terms "social media" and "social network" routinely include *many* services that the FTC must exclude in its effort to call Meta

apps "dominant."  *See* SMF ¶¶ 479-482.  ████████████████████  (and

scores of companies claimed in securities disclosures) that they compete with Meta apps for user

time and attention.  *See* SMF ¶¶ 461-462; *see also*, *e.g.*, ████████████████.

      **ii.**      *No Peculiar Characteristics for the Four Claimed PSNS Apps*:  The FTC's

witnesses Professors Hemphill and Lampe conceded – consistent with overwhelming industry

recognition – that multiple apps the FTC excludes from its invented market share the very

features the FTC claims are characteristic of PSNS apps.  *See* SMF ¶¶ 203, 209, 211, 612.  For

example, services such as TikTok and Twitter allow for consuming short-form videos, following

the news, and sharing with friends and family in a shared social space.  *See* SMF ¶¶ 627-629.

Professor Hemphill conceded that TikTok has the characteristics that supposedly define PSNS,

i.e., "a social graph" that can include friends and family; "one-to-many ('broadcast')

communications"; and a "shared social space within which content delivery and interaction

occurs."  *See* SMF ¶¶ 210, 627.  Professor Lampe conceded that consumers can use Twitter for

"personal social networking."  *See* SMF ¶¶ 280-281.  There is no characteristic peculiar to

Facebook, Instagram, Snapchat, and MeWe, and none of the witnesses – including the FTC

expert witnesses – claims otherwise.  *Compare* SMF ¶¶ 498-505 (Snapchat acknowledging

broader competition), *with id.* ¶ 526 (MeWe claiming Instagram is out of the market).

      **iii.**      *No Distinctive Uses for the Four PSNS Apps*:  The FTC's expert witnesses

conceded that virtually everything consumers do on Facebook or Instagram can be done (and is

done) on other services outside the supposed PSNS market.  For example, Professor Lampe

testified that consumers can do and actually do the exact same things on other services, e.g.,

viewing public videos on YouTube, watching short-form videos from celebrities on TikTok,

viewing interest-based content on Pinterest and Reddit, and sending individual or group

messages on iMessage, among other alternatives.  *See* SMF ¶ 612.  While the FTC will argue variously that Meta apps have a "core" use case of sharing with friends and family – and a "social graph" that enables that sharing (Professor Hemphill), or a limited group consisting of people connecting with others to whom they are not close (Professor Lampe) – sharing of all types, however sliced, is done on many other services, including iMessage, TikTok, and others that have social graphs of user connections.  *See*, *e.g.*, SMF ¶¶ 645-652 (FTC survey).  Professor Lampe agrees that *most* of the activities done on Facebook and Instagram are not distinctive.  *See* SMF ¶¶ 609-612.  The many uses to which Meta apps can be put are widely shared with other services the FTC excludes from its candidate market.

   **iv.**   ***No Unique Production Facilities, Distinct Customers, Distinct Prices, Sensitivity to Price Changes, Specialized Vendors***:  The remaining *Brown Shoe* factors provide no support for a PSNS market definition.  The FTC's expert witnesses have not attempted to analyze any of these factors because there are *no* unique production facilities (apps are produced by writing code), distinct customers (consumers use an average of 46 different mobile apps in a month, *see* SMF ¶ 1), or distinct prices (ad-supported apps are typically free), and there is *no* evidence about any particular sensitivity to price changes or specialized vendors.  *See* SMF ¶ 614.  These factors, like the others discussed above, all weigh *against* the claimed market here.

*     *     *

   The FTC's theories – unsupported by evidence – cannot create a genuine dispute of material fact for trial.  It is telling that the FTC's expert witnesses did not conduct data-based analysis of substitution and studiously avoided *Brown Shoe* analysis.  There is simply *no* evidence that consumers do not substitute services beyond the four-firm PSNS set for at least *some* of the many things consumers do on the Meta apps.  The Court observed, in ruling on

20

Meta's motion to dismiss, that "at least some of the features offered by a Facebook or Instagram or Path are not, seemingly, part of those firms' PSN-services offerings as defined by the FTC." *Facebook*, 560 F. Supp. 3d at 19.  But the FTC nevertheless doubled down on its unlikely argument that everything anyone does on Facebook and Instagram (except Dating) is within the relevant market.  *See* SMF ¶¶ 578-581.  The FTC now faces the consequence of that decision:  it has the burden of proving that consumers have no acceptable substitutes for *any* of those 250+ activities other than the two firms it acknowledges as Meta competitors.  After more than a year of pre-complaint investigation and two years of extensive litigation discovery, the FTC has only *hypotheses* to support its necessary claim that the included PSNS firms are the only relevant competitors for marginal usage of all the different activities that the FTC has included as PSNS activities.  That is insufficient.

## II.      THE FTC HAS NO EVIDENCE OF MONOPOLY POWER

Monopoly power is the power to profitably charge a price above competitive levels, restrict output below competitive levels, or degrade quality below competitive levels.  *See Facebook*, 560 F. Supp. 3d at 12; *see also Microsoft*, 253 F.3d at 51.

Asserting that "direct" proof of power is "rarely available," the FTC proceeded on an "indirect" theory, claiming it is entitled to a rebuttable presumption of power because Meta allegedly has a "dominant" share (60% or more) of a properly defined relevant antitrust market, protected by significant barriers to entry.  But there is no evidence to support – and much evidence to contradict – the FTC's alleged PSNS market.  *See supra* Part I.  Its market share numbers are accordingly meaningless.  And actual competitive entry from Snapchat, as well as the FTC's own allegations that firms like WhatsApp could enter the claimed market, refute its "barriers to entry" story as well.  *See infra* Part II.A.

With its indirect theory in tatters, the FTC will likely pivot to a claim that direct evidence now is available and proves Meta's power. But the direct evidence fails to support, and indeed is inconsistent with, the FTC's claims. Meta has never charged consumers any price, much less a supra-competitive price. Meta has *increased* output dramatically, which the FTC's expert witness admits is consistent with a *reduction* in "quality-adjusted price." And while Meta is not aware of any court that has ever relied solely on claims of reduced "quality" as proof of monopoly power, the FTC and its expert witnesses have not even claimed that Meta's apps are below a competitive level of quality, much less come up with evidence capable of supporting such a determination. *See infra* Part II.B.

**A.      There Is No "Indirect" Evidence of Monopoly Power**

**1.      *The FTC's "market share" figures are meaningless.*** The FTC's failure to establish a properly defined relevant market precludes any inference of monopoly power through indirect evidence as a matter of law. *See Facebook*, 560 F. Supp. 3d at 12. For the reasons set forth above (*see supra* Part I), the FTC has no evidence to support the necessary first predicate for its Section 2 case, i.e., the claimed "PSNS" relevant market. Absent such evidence, any attempt to prove monopoly power by market share is impossible. *See Microsoft*, 253 F.3d at 51 (requiring evidence of share in a "relevant market").

Because the FTC alleges that all time spent on all Facebook and Instagram activities (save Dating) is PSNS, *see* SMF ¶¶ 578-584, there is no evidence to support the exclusion of time spent on admittedly identical features across a spectrum of apps – and it simply defies common sense as well, *see* SMF ¶¶ 605-608 (the FTC's expert witness contradicting the FTC's litigation position). That is fatal because when time spent on these features on other apps is included – e.g., watching short-form videos on TikTok – there is simply no way for the FTC to even come close to a 60% share of time spent for Meta. *See FTC v. Facebook, Inc.*, 581 F. Supp.

3d 34, 47-48 (D.D.C. 2022) (citing cases on the required share).  For example, it is undisputed

that including time spent on just TikTok, Twitter, and YouTube – all of which offer features that

are closer substitutes for Meta than Snapchat, *see supra* Part I – puts Meta's share of time spent

at ██████████ today.  *See* SMF ¶¶ 643-644.

## 2. *The evidence and the FTC's own claims disprove the existence of significant barriers to entry.*

The FTC also has the burden of proving that Meta's market position is

protected by significant barriers to entry.  *See Facebook*, 560 F. Supp. 3d at 12-13.  But the

record over the last decade or more reflects successful entry.  *See* SMF ¶ 729.  For example,

TikTok rose from ████████████████████████████████████

████████████████████████████.  *See* SMF ¶¶ 205, 207.

Short-form video has become one of the most significant use cases for Facebook, Instagram,

████████████████.  *See* SMF ¶¶ 15, 61, 65, 170-172, 207, 745-746.  And by just June 2022,

U.S. consumers were spending ████████████████████████████

████████████████.  *See* SMF ¶ 207.  Other competitors have emerged as well.  *See*,

*e.g.*, SMF ¶ 729(a) (MeWe), ¶ 837 (messengers).  For example, according to the FTC, Snapchat

entered as a PSNS in 2013 (after the Instagram acquisition).  *See* SMF ¶ 486.  By 2022, it had

████████████████████████████████████████████

████████████████.  *See* SMF ¶ 729(b).  Another new entrant, BeReal (which

Professor Hemphill includes when calculating supposed PSNS shares) launched in 2020.  *See*

SMF ¶¶ 618, 730.

New and existing apps can and do develop features to compete with some or all of the

250+ features offered by Facebook and Instagram.  *See* SMF ¶ 128; *see also*, *e.g.*, ¶ 184 (Twitter

adding groups features), ¶¶ 240-243 (TikTok adding friends features).  The FTC itself says that

PSNS entry is not only possible but likely.  Acknowledging that WhatsApp was *not* a participant in its claimed PSNS market in 2014, the FTC alleged it was not only possible but *likely* that a firm with almost no U.S. presence (approximately ███ penetration ███████████████ ████████████████ ), no intention of attempting to attract more U.S. consumers, and an avowed aversion to becoming anything like Facebook, was going to pivot successfully to become a close substitute for Facebook before Meta acquired it.  *See* SMF ¶¶ 778-781 (U.S. growth), ¶¶ 785-793 (feature pivot); *see also* Am. Compl. ¶¶ 118-120 (ECF No. 81).  And if it was possible for WhatsApp to pivot, then it was certainly possible for bigger, better-financed, and U.S.-centered messaging services like Apple's iMessage to pivot as well.  *See* SMF ¶ 424; *see also id.* ¶¶ 782, 837 (other services).

**B.      There Is No "Direct Evidence" of Monopoly Power**

The FTC itself sought to downplay any basis for a theory of "direct evidence" of Meta monopoly power, because that would require proof that is "rarely available."  FTC Opp. to Meta Mot. To Dismiss Orig. Compl. at 8 (ECF No. 59) (quoting *Microsoft*, 253 F.3d at 51).  The FTC was correct – there is no evidence that Meta has raised price, restricted output, or reduced quality below a competitive level.  None.  The evidence developed in discovery indicates the *opposite* of what the FTC is required to show.

**1.      *Meta does not charge supra-competitive prices.***  Direct evidence of monopoly power requires proof that a firm "can profitably raise prices substantially above the *competitive level*."  *Microsoft*, 253 F.3d at 51 (emphasis added); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) (rejecting antitrust claim where "the price and output data do not support a reasonable inference" that defendant "elevated prices above a competitive level"); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013) (Gorsuch, J.) ("To prevail on a section 2 claim, a plaintiff generally must show the defendant

possessed sufficient market power to raise prices substantially above a competitive level without losing so much business that the gambit becomes unprofitable."). As has been clear from the outset of this case, Meta does not charge and has *never* charged consumers *any* price, both before and after it allegedly acquired a monopoly. Facebook, Instagram, and WhatsApp are free to consumers. *See* SMF ¶ 5. WhatsApp did charge consumers before it was acquired, but Meta eliminated those fees. *Compare* SMF ¶ 763, *with id.* ¶¶ 825-826. Meta cannot charge a price higher than a competitive level when it charges no price at all.

> **2.     *Meta does not restrict output below competitive levels.*** A second possible indicator of monopoly power – the ability to restrict output and thereby raise prices – also points in the opposite direction. It is undisputed that Meta has never restricted output at any point, much less below the competitive level. *See* SMF ¶ 734. On the contrary, Meta has dramatically *expanded* output since 2012. *See* SMF ¶¶ 658, 724-725. Meta apps are available to all U.S. consumers in unlimited amounts. And it is undisputed that:

- Facebook monthly active users in the United States increased from 158 million in 2012 to ███████████████████████ ; and monthly time spent on Facebook ███████████ ███████████████ , from 96 billion to ██████████████ . *See* SMF ¶ 725.

- Instagram monthly active users in the United States increased from 3.9 million in 2012 to more than 110 million by 2016, which then ████████████████████████ ; and its monthly U.S. time spent grew from 391 million minutes in March 2012 to ██████████ ██████████████ . *Compare* SMF ¶ 658, *with id.* ¶ 724.

- WhatsApp grew from approximately ██████████ U.S. monthly active users in 2014 ██ ██████████████ ; globally, WhatsApp grew from ████████████████████████ ██████████████████ . *Compare* SMF ¶ 776, *with id.* ¶¶ 833-834.

It also is undisputed that *overall* "PSNS" output has exploded by orders of magnitude since 2012, including for non-Meta firms.  *See* SMF ¶¶ 729-732.

       **3.**      ***Meta does not and cannot degrade quality below competitive levels.***  Without evidence of supra-competitive price or restricted output, the FTC is reduced to arguing that the "quality" of Meta's apps – in some unquantified sense – is not what it should be, and that this somehow proves Meta has monopoly power.  This argument has never formed the basis for *any* judicial finding of monopoly power, as far as Meta is aware.  But, in any event, the FTC and its expert witnesses have not even attempted to define a competitive level of quality, such that the overall quality of Meta's apps could be compared to the competitive level.  *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006) (requiring empirical analysis to establish a benchmark for quality).  Absent evidence that Meta maintained quality below a competitive level, the claims about quality are unavailing, just as claims about raised prices are unavailing in the absence of proof that such prices exceed a competitive level.  *See Microsoft*, 253 F.3d at 51; *see also Brooke Grp.*, 509 U.S. at 233.  The FTC's expert witness admitted that such a benchmark does not exist, and accordingly the FTC made no effort to develop evidence of quality below a competitive level.  *See* SMF ¶ 129.  Quality therefore cannot be used here as "direct evidence" of monopoly power.

      The FTC in its amended complaint identified the supposedly deficient characteristics of the Meta apps.  *See Facebook*, 581 F. Supp. 3d at 55 (listing the issues and requiring the FTC to come forward with proof).  But overall Meta app quality has *increased*, as the FTC's expert witness effectively conceded.  Professor Hemphill acknowledged that Meta's increase in output is evidence that quality-adjusted prices are *declining* – where, as here, price is held constant (zero) and output increases, that indicates quality is improving.  *See* SMF ¶ 130.  He has no other

explanation for that output increase (much less evidence to back it up).  *See* SMF ¶ 131.  The

necessary consequence of the evidence is that consumers are receiving more value from Meta's

free services – they are better – rather than receiving less as a result of the exercise of monopoly

power.  This is evidence directly contrary to the FTC's claim that Meta has monopoly power.

Granular complaints about one aspect of an app simply cannot support a claim of overall

quality degradation below a competitive level.  But, in any event, the FTC has no evidence to

show that the quality of any particular aspect of Facebook or Instagram was reduced below a

competitive level – or reduced at all.

        **a.**       **Service Speed:**  There is no evidence that Meta has reduced quality below

competitive levels by degrading distribution or service speed.  While the FTC suggested in its

amended complaint that Meta had reduced the quality of its apps in terms of speed and

distribution, it failed to produce any evidence to support that claim, which is baseless in any

case.  Meta has indisputably *improved* speed and distribution for its apps.  *See* SMF ¶¶ 151-153

(generally), ¶¶ 755-761 (Instagram), ¶¶ 855-865 (WhatsApp).  And there is no evidence that it

has ever fallen below a competitive level of speed or distribution quality in any respect.  *See*

SMF ¶¶ 154-155.

        **b.**       **Innovation:**  There is no evidence that Meta has reduced innovation – an

amorphous concept the FTC wrongly equates to price – let alone stifled innovation below a

competitive level.  The FTC's expert witness on this issue conceded that he did not even attempt

to demonstrate that Meta's continuous innovation was below a competitive standard.  *See* SMF

¶ 129.  Meta has spent billions of dollars improving Facebook and Instagram.  *See* SMF ¶ 126.

Such spending hardly indicates an effort to reduce quality.  The dramatic increase in output for

both Facebook and Instagram is itself evidence that Meta has improved quality through this

innovation.  *See* SMF ¶¶ 130-131.  And there have been *many* innovations – new features introduced on Facebook, Instagram, and WhatsApp – that the FTC's expert witness conceded are quality improvements.  *See* SMF ¶ 127.  Meta has added more than 100 new features to Facebook since 2012, *see* SMF ¶ 17, in addition to releasing dozens of new features on Instagram over that period, *see* SMF ¶ 739.  This includes the most popular features on Instagram measured by usage.  *See* SMF ¶¶ 740-746; *see also id.* ¶ 65.  WhatsApp has likewise improved, with enhanced audio and video calling, and new features such as sharing of photos and videos with groups that can include more than 1,000 users.  *See* SMF ¶¶ 116, 840-841, 846.

        **c.**        **Privacy and Data Protection:**  There is no evidence that Meta has reduced quality below competitive levels by degrading "privacy" or "data protection."  Indeed, the FTC's argument about privacy is so amorphous that it is difficult to discern what such a standard would even look like (aside from any legal requirements, which the FTC and its witnesses do not even attempt to evaluate).  As the FTC's expert witness admitted, the quality of Meta's privacy has not fallen over time, *see* SMF ¶ 51, let alone fallen below some competitive level.  In any case, Meta provides many tools for consumers to control data experiences, including new features Meta introduced after the challenged acquisitions.  *See* SMF ¶¶ 45-50, 851-853.  Meta has continually improved these user controls.  *See*, *e.g.*, SMF ¶¶ 47-50, 854.  The issues surrounding online privacy are industry-wide, as many firms grapple with how best to serve customers.  *See* SMF ¶¶ 52-54.  The FTC points to incidents in which consumer data were accessed improperly by bad actors, but these incidents – which as a matter of common sense can occur for almost any digital platform and any company – prove nothing about monopoly power.  Other firms have also experienced data misuses.  *See* SMF ¶¶ 52-54.

     **d.**    **Advertising:**  Finally, the FTC places principal reliance on the amount of advertising Meta displays to consumers who use its apps ("ad load").  But the FTC has not even attempted to determine what the "competitive" ad load is or ever was.  *See* SMF ¶ 146; *see also id.* ¶ 147.  It thus cannot claim that Meta "charges" a supra-competitive ad load to anyone, and that lack of evidence is fatal to any claim based on supposed ad-load increases.  Consumers in any event have highly varied and subjective reactions to ads.  *See* SMF ¶ 148.  And whatever users may say about liking ads, the fact is that users respond to and make purchases based on ads – that is why advertisers purchase digital advertising on Meta apps and many other platforms. *See* SMF ¶¶ 135-142.  Viewing ads is not a charge or a price, any more than viewing other content served on the apps – which consumers may or may not like – is a charge or a price. Consumers can simply ignore or move past ads they don't wish to see.

*    *    *

     The FTC's critique of Meta on quality grounds falls far short of any direct evidence that Meta exercises monopoly power.  The FTC's witnesses have not even attempted to assess *overall* quality or demonstrate a competitive level for overall quality – and without that benchmark it is impossible to claim that the services have declined below a competitive level. No court has ever found these kinds of criticisms to be valid evidence of monopoly power, much less relied on them in making a finding of such power.  The only evidence that might support such a finding – objective and empirical evidence permitting a comparison with an objective competitive benchmark – is entirely absent from the record.  *See Am. Express*, 585 U.S. at 548 (rejecting argument about power not supported by any "reliable measure" of the "transaction price").  If the FTC's argument had force, then every firm that weathered a recall, overcame a

29

problem, or experienced some other significant challenge without massive loss of customers would necessarily be a monopolist.  That obviously is not the case.

4. ***Meta's profits are not "direct evidence" of monopoly power.***  Finally, the FTC points to Meta's profitability and suggests that "high" profits alone – without reference to a competitive standard – can be sufficient evidence of monopoly power.  That is incorrect; no court has so held.  Courts have instead warned that high profits alone prove nothing because firms that face substantial competition can earn high profits for many reasons, including greater output and superior efficiency.  *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995); *accord CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816, 823 n.13 (D.C. Cir. 2001) (stating "*Blue Cross* holds that high prices or high profits alone do not necessarily evidence monopoly power"); *see also Mylan Pharms.*, 838 F.3d at 435 (affirming summary judgment where expert opinion on profits contained no "quantitative analysis" showing defendant "markedly restricted output").

In any event, Meta earns profits from digital advertising, where it has innovated and benefited from an advertising sea change, with online platforms consistently providing vigorous competition and taking advertising sales away from traditional media such as television, radio, magazines, and newspapers.  *See* SMF ¶¶ 133, 141, 143, 145, 716–721.  Meta's notable innovation and resulting success in *that business* cannot be transformed into evidence supporting supra-competitive profits in an entirely different claimed market.  *See Facebook*, 560 F. Supp. 3d at 19 ("The overall revenues earned by PSN services cannot be the right metric for measuring market share here, as those revenues are all earned in a separate market – *viz.*, the market for advertising.").  Meta does not make any profit in the claimed "PSNS" use market; substantially all of its profits come from sales of advertising, *see* SMF ¶ 133, which the FTC asserts is (and

the Court has recognized as) a separate market.  And the FTC has made no claim of

monopolization in that market.  *Cf.* SMF ¶¶ 144-145 (discussing advertising competition).  Meta

is aware of no court holding that profits in a *different* market are proof of power in the alleged

market, nor would any such finding make any sense.

## III.    THE FTC HAS NO EVIDENCE OF EXCLUSIONARY CONDUCT

The FTC's claim also fails for a third reason:  it cannot prove that Meta maintained

monopoly power from 2012 onward by means of anticompetitive conduct, i.e., "exclusionary" or

"predatory" conduct.  *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540

U.S. 398, 408 (2004) (maintaining monopoly not unlawful; only monopoly maintained by

anticompetitive conduct violates Section 2); *Microsoft*, 253 F.3d at 50 (same).

The FTC initially challenged Meta's past platform policies and a handful of acquisitions,

but this Court held that the platform conduct was not anticompetitive as a matter of law, and the

D.C. Circuit affirmed that determination in related litigation.  *See Facebook*, 560 F. Supp. 3d

at 21; *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom. New York v.

Meta Platforms, Inc.*, 66 F.4th 288, 304-06 (D.C. Cir. 2023).  The platform conduct can now "be

sliced out at summary judgment."  *Facebook*, 581 F. Supp. 3d at 60.

All that remains in dispute are two acquisitions that the FTC reviewed and allowed to

proceed more than a decade ago.  Under settled Section 2 standards, the FTC has no evidence

that the acquisition of either Instagram in 2012 or WhatsApp in 2014 harmed competition and

consumers.  *See infra* Part III.A.  And it has no basis for trying to undo these carefully reviewed

acquisitions a decade or more after the fact; the FTC's clearance of these transactions should

create a presumption that the transactions were *not* anticompetitive, which the FTC has no

evidence to rebut.  *See infra* Part III.B.

A.     **The FTC Has No Evidence That Meta's Acquisitions Were Exclusionary**

The FTC's claim fails because there is no evidence that either acquisition "harm[ed] the competitive process and thereby *harm[ed] consumers*" – this Circuit's settled standard for conduct "to be condemned as exclusionary."  *Microsoft*, 253 F.3d at 58-59 (emphasis added; emphasis in original omitted).  In ten years or more since the acquisitions, Instagram and WhatsApp have generated extraordinary consumer-welfare benefits through greatly expanded output of free services, substantial service improvements, and continuous feature innovation. *See* SMF Part III.A.4 (Instagram), III.B.4 (WhatsApp).  The FTC's expert witnesses do not dispute those facts.  *See* SMF ¶¶ 733-734; *see also id.* ¶¶ 722, 754, 762.  And, critically, the FTC does not present any evidence that in the "but-for world" – where the transactions did not happen – consumer welfare would be even greater than in the real world, where Meta has generated hundreds of billions of dollars of consumer surplus.  *See* SMF ¶¶ 711-713, 824.

1.     ***The FTC must prove that consumers would have been better off if Meta had not acquired Instagram and WhatsApp.***  While the FTC would like to make this case about the Meta CEO's alleged state of mind, this element of the monopolization claim does not turn on what Meta or its CEO might have thought or intended.  It turns instead on the actual effect of the challenged conduct.  *See Microsoft*, 253 F.3d at 58-59 (antitrust inquiry turns on "the effect of [the alleged] conduct, not upon the intent behind it," and "the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect") (citations omitted); *see also Novell*, 731 F.3d at 1078 (expressions of intent to "'hurt' or 'destroy'" rivals are expected in a competitive marketplace).

This Court has identified the "key question":  whether Meta "engaged in such anticompetitive conduct by acquiring actual or potential competitors, harming the competitive process, and thereby *harming consumers*."  *Facebook*, 581 F. Supp. 3d at 53 (emphasis added);

*see also Microsoft*, 253 F.3d at 58-59 (requiring evidence of consumer harm); *see also United States v. Google LLC*, — F. Supp. 3d —, 2023 WL 4999901, at *9-10 (D.D.C. Aug. 4, 2023) (Mehta, J.) (same).  "Under this framework, the plaintiff has the initial burden to prove that the challenged [conduct] has a substantial anticompetitive effect that *harms consumers* in the relevant market."  *Am. Express*, 585 U.S. at 541 (emphasis added) (discussing analogous inquiry under Section 1); *see also Rothery Storage*, 792 F.2d at 218 ("the purpose of the antitrust laws" is "the promotion of consumer welfare").  And because the Sherman Act is a "consumer welfare prescription," *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 106-08 (1984), the consumer harm the FTC must prove is typically prices above or output below competitive levels (not simply higher prices or lower output), *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (conduct is "harmful to competition" where it has "the effect of either raising market price or limiting output"); *see also supra* pp. 24-25.

The Instagram and WhatsApp acquisitions resulted in extraordinary consumer benefits. *See infra* Part III.A.2(a) & (b).  To prove that consumers were harmed, the FTC must have facts demonstrating that, without these acquisitions, consumers would have done *even better* than they demonstrably have done.  *See Facebook*, 581 F. Supp. 3d at 56 ("Facebook insists that there is no way to know how the market for PSN services would have developed but for its acquisitions," which "reinforces the notion that the FTC down the road will have to prove its allegations about how the acquisitions affected market conditions and competition"); *see also Rambus Inc. v. FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008) (overturning FTC finding of exclusionary conduct because there was no evidence that there would have been greater consumer welfare – more output or lower prices – in the "but for world" in which the challenged conduct did not occur).

Consistent with that legal burden, Professor Hemphill agreed that as a matter of economics "the relevant question here is the actual world that we live in compared to the but-for world." *See* SMF ¶ 715 (testifying that "[t]he relevant question is what does usage look like relative to a but-for world" and stating that "I would broadly agree that consumer welfare compared to the but-for world in which the acquisitions did not take place . . . is the right way to think about competitive effects"). The parties therefore agree that the dispositive question is whether the FTC has *evidence* that consumer welfare would be greater in the but-for world (without the acquisitions) than in the real world. *See NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614, 642 (D.D.C. 1991) (rejecting antitrust claim asserting anticompetitive conduct where "plaintiffs did not offer concrete evidence as to how the price of these rights is inflated beyond what it would be" but for the challenged conduct). The answer to that question: no, and the FTC's expert witnesses do not even argue the point.

**2.** ***The FTC has no <u>evidence</u> that consumers would have been better off.*** The FTC has no evidence as to what better services consumers would have today without the Instagram and WhatsApp acquisitions. Rather than proffering evidence, after years of extensive pre-complaint investigation and broad post-complaint discovery – including close analysis of Meta's production of more than 5.6 million documents totaling more than 27 million pages and 1.25 terabytes of structured data; document productions from 139 nonparties totaling more than 5.8 million pages; more than 60 depositions of current and former Meta employees totaling more than 500 hours, plus 30 hours of Meta corporate depositions, and more than 60 nonparty depositions; and 15 reports from the FTC's proffered expert witnesses, *see* Hansen Decl. ¶¶ 4-7 – the FTC can only speculate as to how Instagram and WhatsApp might have grown or what they might have provided to consumers without the acquisitions. But speculation is not enough. *See*

34

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (affirming summary judgment for lack of anticompetitive effects, stating that "expert testimony rooted in hypothetical assumptions cannot substitute for actual market data"); *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 684, 688-89 & n.6 (8th Cir. 1993) (affirming summary judgment, rejecting the notion that "the presence of expert testimony by two economists suffices to survive summary judgment," and stating that this is "only true if the experts' testimony would allow a finding of actual detrimental effects to competition").

The Supreme Court has confirmed that speculation about anticompetitive effects – which is all the FTC offers here – is insufficient as a matter of law.  In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), the Court upheld summary judgment for the defendant after itself reviewing "the sufficiency of the evidence" and concluding "that the anticompetitive scheme [the plaintiff] alleged, when judged against the realities of the market, does not provide an adequate basis for a finding of liability." *Id.* at 230.  Relevant here, the evidence showed "output expanded" in the real world following the alleged anticompetitive conduct. *Id.* at 233.  The plaintiff's response was to *speculate* that output was "restricted in the sense that it expanded at a slower rate than it would have absent [the defendant's] intervention." *Id.*  The Supreme Court rejected that speculation, stating:  "One could speculate, for example, that the rate of segment growth would have tripled, instead of doubled, without [the defendant's] alleged predation.  But there is no concrete evidence of this." *Id.* at 234.

Here, none of the FTC's expert witnesses offered even speculation – much less evidence-based opinions – that consumers would have been better off compared to the real world had Meta not bought Instagram and WhatsApp.  As in *Brooke Group*, the lack of *evidence* is fatal, as a matter of law. *See Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085-86 (11th Cir. 2016)

(affirming summary judgment under analogous rule of reason, stating that "[e]xpert testimony" about "the likely effect of removing a competitor cannot take the place of presenting specific and concrete facts," and requiring "some empirical evidence of actual effects"); *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 776-77 (1999) (requiring the FTC to prove "anticompetitive effects" as to output, rather than "shift[ing] a burden" to the defendant "to adduce hard evidence of the procompetitive nature of its policy"); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects is not enough.").

      **a.**     **<u>Instagram</u>:**  The FTC and its expert witnesses have hypothesized that, had Meta not acquired Instagram in 2012, consumers *might* have services today with, for example, fewer ads or more privacy.  But they have no evidence to connect those hypothesized benefits to the acquisition.  They do not even speculate that output would be greater, prices lower, or overall quality superior.  At this stage of the case, to avoid summary judgment, the FTC must come forward with competent evidence of what supposedly greater benefits consumers would actually have in the but-for world compared to the real-world benchmark.  It has none.

      **i.**     ***The Real-World Consumer Benefits from the Instagram Acquisition*:**  Starting with the real-world benchmark, consumers received significant benefits from the Instagram acquisition.  Meta has spent more than a decade investing billions in expanding and improving Instagram.  *See* SMF ¶ 710.  Meta also improved service quality by placing Instagram on Meta's world-class distribution infrastructure, *see* SMF ¶¶ 755-762, while making many other product improvements and innovations, *see* SMF ¶¶ 739-747.  And output has exploded.  *See* SMF ¶¶ 724-725, 729-732.  The consumer-welfare results have been nothing less than spectacular:

- *Price*: Meta has always provided Instagram – a valuable service – to consumers *for free*. Instagram users have always paid that same price (zero) while receiving access to more features at faster speeds. *See* SMF ¶¶ 739-747 (features), ¶¶ 755-762 (infrastructure).

- *Output*: Meta has grown Instagram from a service with 13 employees and 3.9 million U.S. monthly active users before the acquisition announcement in 2012 to one with ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as of 2022 at an enterprise value of approximately $100 billion. *Compare* SMF ¶¶ 657-658, *with id.* ¶ 724; *see also id.* ¶ 721 (enterprise value). And it is undisputed that *overall* marketwide output increased during that time, including among non-Meta services specifically. *See* SMF ¶¶ 724-725 (Meta services), ¶¶ 729-732 (non-Meta services).

- *Innovation*: It is undisputed that Meta has launched dozens of new features on Instagram, including popular features like Stories and Reels, *see* SMF ¶¶ 739-747, which Meta launched on Instagram before launching comparable features on Facebook, *see* SMF ¶ 743 (Stories), ¶ 745 (Reels). This transformed Instagram from an app with one feature (photo sharing) into a feature-rich service providing many ways to consume and share content. *Compare* SMF ¶¶ 671-672, 678, *with id.* ¶¶ 739-747.

According to several academic studies, Meta has provided *hundreds of billions* of dollars in consumer surplus to Instagram users since 2012. *See* SMF ¶¶ 711-713 (providing annual surplus figures). More consumers have gotten (for free) a valuable service; the difference between zero and the price those hundreds of millions of consumers would be willing to pay is consumer surplus. The FTC has no contrary surplus figures to offer. The FTC's expert witness on the subject of Instagram's prospects pre-acquisition (Professor Rim) could not identify any other

instance of an acquired U.S. mobile app startup that has generated output growth or consumer benefits of this magnitude.  *See* SMF ¶¶ 714, 728.

      **ii.**     ***The FTC Has No Evidence of Even Greater Consumer Surplus in the But-For World*:**  In contrast to the real-world benchmark, there is no *evidence* supporting the FTC's speculation that consumer welfare might have been even greater without the Instagram acquisition*.*  Indeed, the FTC *admitted* in written discovery that it "has not assessed a hypothetical situation" comparing the real world of Meta "acquiring Instagram" to a but-for world in which Instagram remained independent without access to Facebook's platform for distribution and promotion.  *See* SMF ¶ 738.  And every FTC expert witness on this point disavowed any opinion that Instagram would have grown more or been better for consumers without the acquisition (compared to the real world).  For example, Professor Hemphill testified: "No, I can't, as I sit here, think of a specific place where I offer the view that out – output would be even higher in the but-for world, no. . . .  I'm not offering a bottom-line view that it would have been even higher."  *See* SMF ¶ 734.  Professor Rim – who addresses Instagram's prospects as an independent company pre-acquisition – could not identify even one piece of evidence that suggests consumers would have fared better had Meta not acquired Instagram.  *See* SMF ¶ 733.  Other FTC expert witnesses made similar admissions.  *See* SMF ¶¶ 722, 754, 762.

      The FTC can only posit that Instagram would have been an additional PSNS and that it would be better to have additional competitors.  But no court has ever held that consumers are harmed by a mere reduction in the number of competitors, much less that this itself is enough to condemn an acquisition, let alone condemn an acquisition that has indisputably increased consumer welfare.  *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 706 F.2d 1488, 1497 (7th Cir. 1983) ("The policy of competition is designed for the ultimate benefit of consumers

. . . , and a consumer has no interest in the preservation of a fixed number of competitors greater than the number required to assure his being able to buy at the competitive price."); *Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663 (7th Cir. 1982) ("[T]here is a sense in which eliminating even a single competitor reduces competition.  But it is not the sense that is relevant in deciding whether the antitrust laws have been violated."); *see also Rothery Storage*, 792 F.2d at 223 ("From the inception of antitrust policy, the Supreme Court has recognized that the elimination of rivalry by the joinder of rivals into a larger economic unit is not, per se, an unlawful restraint of trade.").

As the Supreme Court warned when discussing antitrust injury:  "Every merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons.  But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977) (holding acquisitions did not violate lower Section 7 standard).  Indeed, Professor Hemphill testified that the "numerosity of competitors" is not itself "the end of analysis" and what matters is "consumer welfare compared to the but-for world in which the acquisitions did not take place."  *See* SMF ¶ 715.  It can *always* be speculated that an acquired company would have soared on its own, just as the plaintiff in *Brooke Group* speculated that output would have grown even more.  But that is insufficient; there must be evidence that consumers would have achieved greater benefits in the but-for world without the acquisition.

The FTC's but-for-world *speculation* that consumers might have something better ignores inconvenient facts.  It is undisputed that before the acquisition Instagram was a startup with just 13 employees that had limited features, no plan to make money, and a third-party

infrastructure that suffered repeated service outages and spam attacks.  *See* SMF ¶¶ 654-656

(monetization), ¶ 657 (growth), ¶¶ 671-672 (features), ¶¶ 679-684 (spam), ¶¶ 685-694

(infrastructure).  Critically, Instagram depended on *Facebook* for growth – both to distribute

content and to attract users.  *See* SMF ¶¶ 659-664.  The Instagram founders testified that if Meta

had ended that support – which it had every right to do, as the founders recognized – Instagram's

growth would have been significantly limited.  *See* SMF ¶¶ 665-669.  One of the founders

referred in a contemporaneous email to that as a likely consequence of spurning Facebook's offer

(he called it "destroy mode").  *See* SMF ¶ 696.  They also offered consistent testimony in this

litigation, *see* SMF ¶¶ 665-669, e.g.:  "Facebook was one of the main growth drivers.  And were

we to somehow sever[ ] that relationship, those growth drivers could have been compromised."

*See* SMF ¶ 668; *see id.* ¶ 667 (stating that this but-for scenario "would certainly cut off a

significant portion of our growth").

  Professor Hemphill made Meta's point here.  Instagram grew when Meta provided vital

promotional and operational support via "growth bridges" – that is, multiple affirmative efforts

to encourage *Facebook* users to increase usage of Instagram after Meta acquired it.  *See* SMF

¶¶ 723, 726.  Professor Hemphill claims that ████████████████████████████████████

███████████████████████ in 2018.  *See* SMF ¶¶ 735-736.  Even if he is right about that – *but

see* SMF ¶ 737 (ongoing growth) – then it shows only that Instagram grew so dramatically,

before and after the acquisition, because Meta provided vital assistance.  Meta would have had

no good reason to continue to provide that assistance to an independent Instagram after 2012.

*See* SMF ¶¶ 665-669.  The idea that Meta's growth bridges were *still* vital to Instagram by 2018,

when it was orders of magnitude larger than in 2012, confirms the importance of Meta's support.

Asserting that Instagram could have grown as well without that vitally important Meta support is

conjecture contrary to fact.  It is another level of speculation altogether to argue, as the FTC must, that Instagram's growth as a separate company would have resulted not only in continued viability, but also materially better services for consumers.

*      *      *

The Jack-and-the-Beanstalk story the FTC wishes to tell about Instagram's inevitable rise to competitive significance is not only speculation, it also ignores the formidable obstacles that Instagram faced; not just the need for Meta's assistance, but also the need to develop an advertising capability, build sustainable infrastructure, and attract highly sought after talent. Regardless of whether all these obstacles could *possibly* have been surmounted, the graveyard is full of promising startups that were unable to surmount them.  Indeed, the odds are virtually nil for startups to achieve success of the level that Instagram actually achieved.  *See* SMF ¶ 670 (empirical study of startup success), ¶ 727 (founder testimony).  There was no certainty that any of the formidable obstacles facing Instagram *would* have been surmounted, let alone all of them. Moreover, there is no competent evidence that Instagram not only would have survived but indeed would have transformed competition in a way that produced materially greater benefits for consumers.  The bottom line is that the FTC has speculation but no *evidence* to carry its burden of proving that the acquisition of Instagram actually harmed competition and consumers.

**b.**    __WhatsApp__:  Even more fictive is the FTC's speculation that WhatsApp would have changed its business, focused on the U.S. market, produced a service it had no experience with or interest in offering, and consequently become a colossal success in the United States. That narrative makes Jack-and-the-Beanstalk sound like a documentary.  The FTC needs *evidence* that consumers would have materially better "PSNS" services today if Meta had not acquired WhatsApp.  It has none.

41

       **i.**      ***The Real-World Consumer Benefits from the WhatsApp Acquisition*:**

WhatsApp in 2014 was a messaging service ▬▬▬▬ outside the United States. *See* SMF ¶ 778.

It charged U.S. customers a fee and was managed by founders who had a dogmatic insistence on

*not* making the app into something more like Facebook. *See* SMF ¶¶ 785-793 (discussing

limited features). It did not have end-to-end encryption or several other security features, and it

did not feature voice or video calling. *See* SMF ¶¶ 841, 846, 851-852. WhatsApp had relatively

few U.S. customers – approximately ▬▬ penetration in the United States as of 2014 before the

acquisition. *See* SMF ¶ 778. It had no intention of expanding its U.S. presence, according to its

founder, because U.S. consumers generally had unlimited SMS service as part of their mobile

plans and therefore were unwilling to pay for another messaging service. *See* SMF ¶¶ 779-781.

WhatsApp also had no plan to reduce prices for consumers; it had the opposite expectation. *See*

SMF ¶¶ 763-766 (discussing anticipated expansion of subscription fees pre-acquisition).

      After the acquisition, Meta made WhatsApp free. *See* SMF ¶¶ 825-826. Since that time,

tens of millions of U.S. consumers (and billions globally) have enjoyed this valuable service at

zero cost. Output increased from ▬▬▬▬ U.S. users in 2014 ▬▬▬▬▬▬▬▬, and from

▬▬▬▬ global monthly active users ▬▬▬▬▬ over the same time frame. *Compare*

SMF ¶ 778, *with id.* ¶¶ 833-835. And quality improved as well: Meta added more than a dozen

features to WhatsApp, *see* SMF ¶¶ 840-841, 846-848 – including end-to-end encryption, which

makes messaging more private, *see* SMF ¶¶ 851-854 – and it significantly improved service

quality, *see* SMF ¶¶ 858-865. Meta has provided more than a hundred billion dollars in

consumer surplus to WhatsApp users since 2014. *See* SMF ¶ 824 (providing annual surplus

figures). Those are real-world consumer benefits the FTC cannot credibly deny. Indeed, it does

not make any serious attempt to deny them.

      **ii.**     ***The FTC Has Only Speculation About the "But-For World"*:**  The FTC speculates that WhatsApp would have become a powerful PSNS rival but for the acquisition.  No court has ever held that a firm violated Section 2 by acquiring another firm that *might* enter into a different market and become a competitor.  *Cf. FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977) (denying Section 13(b) claim under lower Section 7 standard); *FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977) (same); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) (same); *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023) (same); *see also United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 639 (1974) (regarding the validity of actual potential competition as a theory, "we do not reach it").

      Here, the FTC has to pile speculation on top of speculation even to articulate a theory as to how WhatsApp, left on its own, would have produced consumer-welfare benefits greater than those consumers enjoy today:

- *First*, WhatsApp would have had to reverse its decision to charge consumers – which it had no intention of doing.  *See* SMF ¶ 764.

- *Second*, WhatsApp would have had to reverse its decision not to pursue growth in the U.S. market – which it had no intention of doing.  *See* SMF ¶ 781.

- *Third*, WhatsApp would have had to change its product strategy, to copy the features of Facebook and Instagram rather than provide a simple, unadorned messaging product – which it had no intention of doing.  *See* SMF ¶¶ 786-793.

- *Fourth*, WhatsApp would have had to recant its deep aversion to advertising, in order to support its operations, if not to make a profit for its owners – which it had no intention of doing.  *See* SMF ¶¶ 767-770.

Even if WhatsApp had attempted to do all those things, there is no evidence – only speculation – that it would have survived as a Facebook clone in the United States, much less that it would have experienced substantial growth and produced greater benefits for consumers in that uncharted territory. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007) (holding that speculation about entry is insufficient to maintain antitrust claim, and noting that firms "do not expand without limit and none of them enters every market that an outside observer might regard as profitable").

All the necessary steps in the FTC's imagined transformation of WhatsApp are contrary to the evidence. WhatsApp's founders gave unequivocal testimony that WhatsApp was not going to become like Facebook or Instagram. *See, e.g.*, SMF ¶ 788 ("Facebook Blue had a bevy of features that we were never going to implement."). For example, co-founder Brian Acton, whose Signal message app now competes with Meta, testified: "Q. The FTC has, in its lawsuit against Meta, made the allegation that if WhatsApp had not been acquired by Meta, then Facebook, it would have pivoted to become a Facebook direct competitor, something more like Facebook. Do you agree? A. No. Q. Is there any doubt in your mind about that? A. No. Q. Would WhatsApp have continued on the trajectory it had been on if you had stayed managing it? A. Yes." *See* SMF ¶ 787.

In addition, the contemporaneous documentary record is consistent with this unequivocal testimony. *See* SMF ¶¶ 790-794. For example, ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████ *See* SMF ¶ 791.
Another of WhatsApp's co-founders, Jan Koum, said publicly, before the Meta acquisition: "We don't want our application to be a social network." *See* SMF ¶ 793. In response to a contention

interrogatory that sought all facts supporting the theory that WhatsApp would have pivoted to become more like Facebook or Instagram but for the acquisition, the FTC did not cite a *single* document from within WhatsApp that indicated any pre-acquisition plan contemplating such a pivot.  *See* SMF ¶ 795.

Moreover, to the extent the FTC is willing to speculate that an international messaging app like WhatsApp could pivot to a different business and succeed in the United States as a Facebook or Instagram clone, it has no evidence – or even common sense – to support its necessary contention that no other messaging service could follow suit.  *See United States v. Siemens Corp.*, 621 F.2d 499, 509 (2d Cir. 1980) (requiring "evidence that the actual or perceived potential entrant is one of but a few likely entrants"); *Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 865 (2d Cir. 1974) (Friendly, J.) (rejecting claim where other "major participants in other markets" could be potential entrants); *United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 743 n.23 (D. Md. 1976) (requiring acquired firm to "be part of a small group, since if a large group of potential entrants exists, the loss of one will be insignificant").  That group of other potential entrants includes the U.S. messaging leader iMessage, plus Google messaging and several other messaging services active both before and after the WhatsApp acquisition.  *See* SMF ¶¶ 782, 798, 836-838; *see also* SMF Part I.B.1(i) (discussing messengers).

The FTC has only theories to explain why it believes WhatsApp alone, and not the many other prominent U.S. messaging services, could successfully transform into a Facebook or an Instagram.  Such unsupported theories carry no weight at this stage of the case.  The FTC needs evidence and has none.  One of the FTC's expert witnesses testified that it would have been unlikely for a firm like WhatsApp to successfully pivot to the United States on its own.  Professor Rim – formerly CEO of Kakao, which started as a messaging service and which the

FTC includes as a PSNS (outside the United States) – testified that his experience with Kakao was that an app with a user network primarily in a foreign market (like WhatsApp) cannot easily pivot into another geography without an acquisition.  *See* SMF ¶¶ 783-784.  ██████████████████ ██████████████████████████████████████████████████████████████, *see* SMF ¶¶ 770-771, making dramatic transformation even less likely.  *See Atl. Richfield*, 549 F.2d at 295 ("financial resources" a consideration in evaluating likelihood of entry).

Ultimately, in the face of all the contrary evidence, the FTC fashions a theory even more speculative than its magic-beans hypothesis for an independent WhatsApp:  *Google* would have bought and transformed WhatsApp.  *See* SMF ¶ 808.  But there is no evidence that Google had a concrete plan to acquire WhatsApp.  *See* SMF ¶¶ 808-809, 811.  There also is no evidence that Google would have been successful in acquiring WhatsApp if it had wanted to do so.  *See* SMF ¶ 807.  There also is no evidence as to what Google would have done with WhatsApp if it had acquired it.  Nor is there evidence that if Google had acquired WhatsApp, it would have been successful had it sought to make WhatsApp more like Facebook and Instagram; Google already owned another messenger (*see* SMF ¶¶ 433-435) and Google+, which the FTC derides as a PSNS failure.  *See* SMF ¶ 568.

The chain of speculation also ignores testimony from the WhatsApp founders that WhatsApp was not considering other possible acquirers *and* would have required any hypothetical acquirer to agree *not* to make dramatic changes to the WhatsApp messaging service. *See* SMF ¶¶ 807, 809.  Speculation about Google and what it might have done had it acquired WhatsApp is untethered to facts and of no help to the FTC.  *Cf. Siemens*, 621 F.2d at 508 ("Since the Government offered no evidence of a . . . purchase that was available and attractive to Siemens, any such theory must be rejected for lack of proof.").  Meta is aware of no court that

has ever blocked – let alone unwound – an acquisition on the ground that a different buyer might have emerged and would be preferred by the regulator.

### B. The FTC's Pre-Acquisition Review Should Create a Presumption That the Acquisitions Were Not Anticompetitive

At this stage of the case, it would be inappropriate and unfair to ignore the undisputed fact that the FTC conducted a required review of these two acquisitions before they were closed and decided not to challenge them. The FTC cannot pretend its prior reviews should play no role in evaluating whether the acquisitions were anticompetitive under Section 2. Instead, there should be a presumption that the transactions were not anticompetitive. *See Facebook*, 560 F. Supp. 3d at 32 (belated merger review might warrant "adjustment in certain burdens of proof or the remedy"). Meta duly followed regulatory requirements and presented its proposed acquisitions to the FTC, which contemporaneously investigated both. *See* SMF ¶¶ 702-708 (Instagram), ¶¶ 815-817, 820 (WhatsApp). There is no allegation that Meta obstructed, withheld information, or was anything other than fully cooperative. Meta proceeded with both transactions only after the FTC advised that it did not intend to challenge either as anticompetitive. *See* SMF ¶ 707 (Instagram), ¶¶ 818-819, 822 (WhatsApp). Meta thus acted in reliance on the FTC's regulatory decisions. *Cf. Meta Platforms*, 66 F.4th at 300-01 (discussing Meta's reliance interests in closing the acquisitions).

The FTC has never even *attempted* to litigate a Section 2 challenge under remotely similar circumstances. And no court has ever condemned the type of conduct here – submitting a proposed acquisition for review, and then acquiring, developing, and growing the asset following that review – as exclusionary conduct. Completing an acquisition following review by the responsible U.S. antitrust regulator should be presumptively lawful – not exclusionary – for at least three reasons:

*First*, the FTC reviewed both acquisitions under Section 7 of the Clayton Act, which sets a lower bar for challenge than Section 2:  Section 7 prohibits acquisitions that are considered likely to harm competition and consumers, while Section 2 requires proof of *actual* harm to competition and consumers.  *Cf. Rothery Storage*, 792 F.2d at 220 (explaining that Section 7 "applies *a much more stringent test*" for proposed transactions – and a lower bar for plaintiffs – because Section 7 is "aimed at halting incipient monopolies and trade restraints outside the scope of the Sherman Act") (emphasis added; citation omitted).  The FTC necessarily decided in 2012 and 2014 that there was insufficient evidence to proceed against either transaction, even under this more enforcement-friendly standard.  That is powerful evidence here and has to count for something, much as the FTC throughout this case has claimed that its prior action (or inaction) is irrelevant.  The FTC is wrong about that.  *See Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) (merger clearance "weigh[ed] against the conclusion" that the acquisition could be "plausibly characterized as an unreasonable restriction on competition"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.1 (2006) ("presum[ing]" that a joint venture was "lawful," including because it was "approved by federal and state regulators"); *United States v. Paramount Pictures, Inc.*, 2020 WL 4573069, at *6-7 (S.D.N.Y. Aug. 7, 2020) (pre-clearance review provides "antitrust agencies with notice and opportunity to evaluate the competitive effects of the transaction," which can indicate "a low likelihood of potential future violation").  Belatedly revisiting the FTC's determinations, when the evidence is stale – or has disappeared – increases the risk of error or, worse, risks re-characterizing acquisitions that were *not* anticompetitive as antitrust violations.

*Second*, permitting retrospective condemnation of an acquisition after it has been reviewed and allowed to proceed pursuant to a regulatory regime would provide little

48

incremental benefit to consumers, while inviting false condemnation of pro-competitive mergers – an outcome antitrust law proscribes. *See Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, J.) ("An antitrust rule that seeks to promote competition but nonetheless interferes with regulatory controls could undercut the very objectives the antitrust laws are designed to serve.").  The Supreme Court has cautioned that the existence of a regulatory regime – such as the Hart-Scott-Rodino Act pre-clearance review process here – makes it "less plausible that the antitrust laws contemplate such additional scrutiny." *Trinko*, 540 U.S. at 412.  Additional "antitrust intervention" risks "[m]istaken inferences and the resulting false condemnations" that could "chill the very conduct the antitrust laws are designed to protect." *Id.* at 414; *see also United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) ("For competitors in a free market to fear buying each other out lest they be hit with the expense and misery of an antitrust enforcement action amounts to a burden only slightly less palpable than a direct governmental prohibition against such a purchase.").

  *Third*, it would be unfair to Meta, chilling to other firms, and harmful to beneficial competition in the form of post-acquisition investments and integration to allow the FTC a do-over many years after the fact.  The merger pre-clearance process is designed to resolve challenges *before* the parties make irreversible decisions about acquisitions and large investments in acquired assets.  *See Pharm. Rsch. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 199 (D.C. Cir. 2015).  Parties necessarily rely on that regime.  *See Meta Platforms*, 66 F.4th at 300-01 ("Mergers normally lead to progressive integration of the assets and operations of the merged firms, and to investment and other business decisions that are contingent on the new situation.").  If a regulator can make a springing hindsight claim at any time – without evidence of fresh anticompetitive conduct – then the inhibiting effect on pro-competitive mergers and investment

in newly acquired assets is obvious.  That is directly contrary to the goals of antitrust.  *See Syufy*, 903 F.2d at 673 ("[I]n a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources.").

There may be circumstances that justify exceptions to the presumption.  But none is present here.  The FTC has never claimed that Meta engaged in any improper conduct in the course of the agency's reviews.  *Cf. Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 420 n.2 (5th Cir. 2008) (challenging acquisition that parties closed during ongoing agency review).  Nor is this a case where an acquisition enabled distinct anticompetitive conduct years after a transaction.  *Cf. United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 603-05 (1957) (condemning anticompetitive use of previously acquired General Motors stock to steer supply contracts, where conduct occurred at the time of challenge, not at the time stock was acquired).

The FTC claims only that the acquisitions were anticompetitive at the time – in 2012 and 2014 – and that Meta continues to hold assets from the acquired firms.  *See* SMF ¶ 653 (citing FTC interrogatory response).  There is nothing here to balance against a Section 2 presumption that reflects the evidentiary value of contemporaneous regulatory review and the risks of ignoring it.  *See Arch Coal*, 329 F. Supp. 2d at 132 (stating, in Section 7 case, that "[t]he novel approach taken by the FTC in this case makes its burden to establish anticompetitive effects in the post-merger [product] market more difficult").  The FTC's decisions to let these acquisitions proceed should be respected; Meta should not be turned upon after relying on the agency.  *See United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").

## CONCLUSION

For the foregoing reasons, the Court should grant the motion, award Meta summary judgment as to all claims, and dismiss the FTC's lawsuit.

Dated:  April 5, 2024

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Lillian V. Smith (D.C. Bar No. 252516)
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*