**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

   Plaintiff,

   v.

META PLATFORMS, INC.,

   Defendant.

Case No. 1:20-cv-03590-JEB

**META PLATFORMS, INC.'S REPLY TO FEDERAL TRADE COMMISSION'S
RULE 7(H) STATEMENT OF GENUINE ISSUES**

# TABLE OF CONTENTS

**Page**

META INTRODUCTION ...................................................................................................1

FTC INTRODUCTION ....................................................................................................1

    A.    Many of Meta's Statements Fail to Establish the Absence of a Genuine
Dispute as to Any Fact that is Material to The Outcome of This Litigation ...............1

    B.    Meta's SMF Employs Section Titles That Inaccurately Describe Associated
Statements.....................................................................................................................2

    C.    Meta's Memorandum in Support of its Motion for Summary Judgment Mis-
States or Overstates Many of Meta's Statements .........................................................3

META REPLY INTRODUCTION ....................................................................................3

I.    COMPETITION .......................................................................................................8

    A.    Meta's Services and Meta's Business.............................................................................8

        1.    Meta's Services ....................................................................................................8

            a.    Facebook....................................................................................................11

                i.    Profile ............................................................................................ 20

                ii.    Friends........................................................................................... 20

                iii.    Photos and Videos ......................................................................... 21

                iv.    Facebook Feed .............................................................................. 21

                v.    Pages ............................................................................................. 22

                vi.    Facebook Groups .......................................................................... 22

                vii.    Facebook Live............................................................................... 23

                viii.    Facebook Marketplace .................................................................. 24

                ix.    Facebook Stories ........................................................................... 24

                x.    Facebook Watch / Facebook Video .............................................. 24

                xi.    Facebook Gaming ......................................................................... 26

                xii.    Facebook Dating ........................................................................... 26

xiii.   Facebook Reels ................................................................. 26

xiv.   Privacy ............................................................................ 27

b.   Instagram .................................................................................. 37

i.   Profile ............................................................................. 49

ii.   Follow .............................................................................. 49

iii.   Photos and Video ........................................................... 49

iv.   Instagram Feed ............................................................... 50

v.   Explore ............................................................................ 51

vi.   Instagram Direct ............................................................. 51

vii.   Instagram Stories ........................................................... 52

viii.   Instagram Live ................................................................ 52

ix.   Instagram Shop .............................................................. 53

x.   Instagram Reels .............................................................. 53

xi.   Threads ............................................................................ 54

c.   Messenger .................................................................................. 54

i.   Messaging ....................................................................... 55

ii.   Voice and Video Calls .................................................... 56

iii.   Stories ............................................................................. 57

iv.   Rooms .............................................................................. 57

v.   Community Chats ........................................................... 58

d.   WhatsApp .................................................................................. 58

i.   Messaging ....................................................................... 59

ii.   Status .............................................................................. 59

iii.   Broadcast Lists .............................................................. 59

iv.   Voice and Video Calls .................................................... 60

|   |   | v. | WhatsApp Business App ................................................................. 60 |
|   |   | vi. | Channels ...................................................................................... 61 |
|   |   | e. | Meta's Innovation ..........................................................................61 |
|   | 2. | | Meta's Business ....................................................................................72 |
|   |   | a. | Facebook and Instagram ................................................................73 |
|   |   | b. | WhatsApp .......................................................................................95 |
|   | 3. | | Meta's Infrastructure ............................................................................98 |
| B. | | | Other Services...............................................................................................113 |
|   | 1. | | Other Services Outside Alleged PSNS Market.....................................113 |
|   |   | a. | YouTube ........................................................................................113 |
|   |   |   | i. Background ...................................................................... 113 |
|   |   |   | ii. Features ............................................................................ 117 |
|   |   |   | iii. Competition Between YouTube and Facebook and Instagram......................................................................... 132 |
|   |   |   | iv. Competition Between YouTube and Facebook and Instagram for Sharing and Viewing Short-Form Video Content ............................................................................ 160 |
|   |   | b. | TikTok ...........................................................................................172 |
|   |   |   | i. Background ...................................................................... 172 |
|   |   |   | ii. Features ............................................................................ 173 |
|   |   |   | iii. Competition Between TikTok and Facebook and Instagram ..... 205 |
|   |   |   | iv. Competition Between TikTok and Facebook and Instagram for Sharing and Viewing Short-Form Video Content.................. 228 |
|   |   | c. | Twitter ...........................................................................................248 |
|   |   |   | i. Background ...................................................................... 248 |
|   |   |   | ii. Features ............................................................................ 253 |
|   |   |   | iii. Competition Between Twitter and Facebook and Instagram...... 280 |

iv. Competition Between Twitter and Facebook and Instagram for Sharing and Viewing Interest-Based Content ...................... 295

d. Pinterest ...................................................................................305

   i. Background ............................................................... 305

   ii. Features ................................................................... 306

   iii. Competition Between Pinterest and Facebook and Instagram........................................................... 311

e. Nextdoor ....................................................................................338

   i. Background ............................................................... 338

   ii. Features ................................................................... 338

   iii. Competition Between Nextdoor and Facebook and Instagram........................................................... 341

f. Reddit ........................................................................................362

   i. Background ............................................................... 362

   ii. Features ................................................................... 363

   iii. Competition Between Reddit and Facebook and Instagram....... 369

g. LinkedIn .....................................................................................380

   i. Background ............................................................... 380

   ii. Features ................................................................... 381

   iii. Competition Between LinkedIn and Facebook and Instagram........................................................... 391

h. Strava ........................................................................................401

   i. Background ............................................................... 401

   ii. Features ................................................................... 401

   iii. Competition Between Strava and Facebook and Instagram ....... 403

i. Apps That Offer Messaging Functionality ...........................................405

   i. Apple Messages (iMessage) ...................................... 406

iv

ii.   Google Messaging Apps ................................................... 412

iii.   Discord ........................................................................ 413

iv.   Competition Between Meta and Applications Offering Messaging ..................................................................... 414

v.   FTC Expert Opinions Regarding Personal Social Networking Services Activity on Messaging ............................ 450

j.   Many Other Companies Represent to the Public in Annual Reports That They Compete with Facebook or Instagram ................... 455

k.   There Is No Public Recognition of a PSNS Market Consisting of Facebook, Instagram, Snapchat, and MeWe ......................... 458

i.   Non-Parties Consistently Testified That They Were Not Familiar with the FTC's PSNS Market ........................... 458

ii.   There Is No Evidence of Industry Recognition of the FTC's PSNS Market ............................................................... 472

iii.   Terms Like "Social Network" and "Social Media" Are Regularly Used To Describe Services That Are Not in the FTC's PSNS Market ................................................... 474

2.   Other Alleged PSNS Services ................................................... 479

a.   Snapchat ............................................................................. 479

i.   Background .................................................................. 479

ii.   Features ....................................................................... 482

iii.   Snap Competition with Apps Outside the FTC's PSNS Market .......................................................................... 489

iv.   Snap Competition with Non-PSNS Apps for Activities in the FTC's PSNS Market When Done on Snapchat but Not in the FTC's Market When Done on Other Apps ..................... 497

b.   MeWe ................................................................................. 513

i.   Background .................................................................. 513

ii.   Features ....................................................................... 514

iii.   MeWe Competition with Apps Outside the FTC's PSNS Market .......................................................................... 516

C.    Meta's Experts' Empirical Substitution Data .............................................525

1.    Professor John List's "Pricing Experiment" .................................535

2.    Professor John List's "TikTok Natural Experiment".....................548

3.    Professor John List's "Switching Analysis" .................................559

4.    Professor Dennis Carlton's Outage Analysis.................................571

II.    THE FTC'S "PERSONAL SOCIAL NETWORKING SERVICES" MARKET.............578

A.    Original Definition...........................................................................580

B.    Discovery Position...........................................................................580

1.    The FTC States That Facebook, Instagram, Snapchat, and MeWe Are the Only Active Providers of PSNS .................................582

2.    The FTC States That All Features and Activities on Facebook and Instagram (Other Than Facebook Dating) Are Personal Social Networking...........................................................................583

3.    The FTC States That It Has Not Conducted a Comparison of Features and Activities Available on Alleged PSNS and Non-PSNS Applications and That "Individual Feature Substitution Is Not Relevant to the FTC's Contentions"....................................................................................589

4.    The FTC's 30(b)(6) Representative Confirms That the FTC Has Not Identified Evidence Addressing Users' Motives for Using Particular Features or Consumer Substitution Behavior ....................................599

5.    The FTC Confirms Again That Its Market Definition Does Not Rely on Evidence of Dissimilar Features, Dissimilar Motives for Using Features, or Lack of Feature-Level Substitution.............................606

C.    FTC's Experts' Positions ...................................................................609

1.    FTC Expert Professor Clifford Lampe's Opinions .........................609

2.    FTC Expert Professor C. Scott Hemphill's Opinions .....................628

a.    Professor C. Scott Hemphill's Purported Expertise .............628

b.    The Contours of the PSNS Market........................................628

c.    All Time on All Activities on Facebook and Instagram Is Time Spent Consuming Personal Networking Services .................631

d.      Professor Hemphill's Opinion That No Activities on Alleged
        Non-PSNS Apps Are Personal Social Networking Activities .............639

e.      Professor Hemphill Acknowledges Evidence of Substitution
        Between Facebook and Instagram and Non-PSNS Apps .....................642

f.      Professor Hemphill Does Not Offer Any Quantitative Evidence
        of Substitution ....................................................................................644

g.      Competition for Marginal Users ...........................................................647

h.      No Evidence of Discrimination Based on Demand for Friend and
        Family Content .....................................................................................651

i.      Share Calculations ...............................................................................654

3.      FTC Expert Michal Malkiewicz's Opinions ..................................................657

III.    META'S ACQUISITIONS ..................................................................................668

A.      Meta's Acquisition of Instagram (2012) .................................................668

1.      Instagram Pre-Acquisition ...........................................................................669

a.      Pre-Acquisition Monetization ..............................................................669

b.      Pre-Acquisition Growth........................................................................675

c.      Pre-Acquisition Features ......................................................................693

d.      Pre-Acquisition Integrity .....................................................................706

e.      Pre-Acquisition Infrastructure .............................................................730

2.      Instagram Acquisition Discussions ..............................................................758

3.      Instagram Pre-Clearance Review .................................................................762

4.      Post-Acquisition Instagram...........................................................................766

a.      Post-Acquisition Monetization .............................................................784

b.      Post-Acquisition Growth ......................................................................801

c.      Post-Acquisition Features.....................................................................822

d.      Post-Acquisition Integrity ....................................................................834

e.      Post-Acquisition Infrastructure ...........................................................858

B.    Meta's Acquisition of WhatsApp (2014) ................................................881

    1.    WhatsApp Pre-Acquisition ................................................................881

        a.    Pre-Acquisition Monetization ..............................................881

        b.    Pre-Acquisition Growth ........................................................893

        c.    Pre-Acquisition Features ......................................................908

        d.    Pre-Acquisition Privacy ........................................................934

        e.    Pre-Acquisition Infrastructure ............................................934

        f.    Pre-Acquisition Spam ..........................................................945

    2.    WhatsApp Acquisition Discussions ................................................947

    3.    WhatsApp Pre-Clearance Review ....................................................956

    4.    Post-Acquisition WhatsApp ............................................................962

        a.    Post-Acquisition Monetization ............................................967

        b.    Post-Acquisition Growth ......................................................983

        c.    Post-Acquisition Features ....................................................987

        d.    Post-Acquisition Privacy ....................................................1001

        e.    Post-Acquisition Infrastructure ..........................................1007

        f.    Post-Acquisition Spam ......................................................1038

## META INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Rule 7(h) of the

Local Rules of the United States District Court for the District of Columbia, Defendant Meta

Platforms, Inc. ("Meta") submits this statement of undisputed material facts as to which it

contends there is no genuine issue to be tried in support of its Motion for Summary Judgment.

## FTC INTRODUCTION

The FTC respectfully submits this Statement of Genuine Issues, pursuant to Local Rule

7(h), in support of its opposition to Meta's Motion for Summary Judgment (ECF No. 324).

Below, the FTC provides a response to each statement in Meta's Statement of Undisputed Facts.

*See infra* at FTC Responses to Statements 1-869. In addition, as the parties have previously

agreed, the FTC will set forth relevant material facts in a contemporaneously filed

Counterstatement of Material Facts in Opposition to Meta's Motion for Summary Judgment and

in Support of the FTC's Motion for Partial Summary Judgment. For the convenience of the

Court, the FTC's Counterstatement will begin at number 870 to avoid any numbering overlap

with Meta's Statements. The parties' goal in adopting this numbering convention is to provide,

for the Court's convenience, a sequentially numbered statement of proposed facts and disputes,

pursuant to Local Rule 7(h).

The FTC notes the following persistent Issues throughout Meta's Statement of Material

Facts.

### A.     Many of Meta's Statements Fail to Establish the Absence of a Genuine Dispute as to Any Fact that is Material to The Outcome of This Litigation

In many instances, Meta's Statements propose only that a witness (often a Meta

employee) provided certain self-serving testimony at deposition, or that a Meta-authored

document contains certain words. *See, e.g.*, Statements 145(d), 443, 656, 750.  In some

instances, the FTC's Response notes that the FTC disputes that the Statement advanced by Meta establishes the absence of a genuine dispute as to any material fact: while it might be true that the witness (or document) conveyed the statement, the statement of the witness (or document) is not material to the outcome of the litigation because, *inter alia*, the statement is contradicted by or rendered unimportant by other evidence, or the statement (even if credited and uncontradicted) would not establish any underlying fact that might impact the substantive outcome of this litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (defining a fact as "material" if it is capable of affecting the substantive outcome of the litigation "under the governing law").  In other instances the FTC has not disputed the Statement on this basis, or has not raised an objection, even though a dispute or objection may be appropriate.   Even where the FTC has neither disputed a Statement nor raised an objection to a Statement, the FTC reserves the right to later challenge the truth of any Statement provided by Meta, and treats the Statement as undisputed solely for the purposes of resolving Meta's Motion for Summary Judgment.

**B.     Meta's SMF Employs Section Titles That Inaccurately Describe Associated Statements**

There are often important discrepancies between (a) the Statements contained in the actual paragraphs in Meta's SMF and (b) the section titles Meta has supplied in connection with the Statements.  As one of many examples, Meta's Section II.B.4 is titled "The FTC's 30(b)(6) Representative Confirms That the FTC Has Not Identified Evidence Addressing Users' Motives for Using Particular Features or Consumer Substitution Behavior," but as explained in the FTC's Responses to Statements 594-598, none of Meta's purported "facts" contain any evidence that supports, or is even particularly relevant to, the title of the section.

C.     **Meta's Memorandum in Support of its Motion for Summary Judgment Mis-States or Overstates Many of Meta's Statements**

There are often important discrepancies between the Statements advanced in Meta's SMF and the characterization of those Statements in Meta's Memorandum in Support of its Motion for Summary Judgment (ECF No. 324).  Some Statements in Meta's SMF may be correct and correctly supported, but that Statement is then cited in Meta's Memorandum for a different or broader proposition that is either disputed by the FTC or is not supported by the Statement or the corresponding cites to the factual record.  The FTC's responses in its Statement of Genuine Issues address only the advanced Statements as written, and the FTC reserves the right to challenge all inconsistent statements in Meta's Memorandum.

## META REPLY INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Defendant Meta Platforms, Inc. ("Meta") submits this Reply to Plaintiff Federal Trade Commission's ("FTC") Responses to Meta's Statement of Material Facts in Support of Meta's Motion for Summary Judgment ("Meta SMF"), including the Introduction preceding the FTC's responses.

**FTC Responses**:  Where the FTC responds that a particular Meta statement is "undisputed" (with or without a "caveat" or claim that Meta's statement is "undisputed but incomplete" or "undisputed but immaterial"), no reply is necessary.  Where the FTC nonetheless responds to statements that it deems "undisputed" with extraneous or immaterial additional information, Meta will explain – if warranted, and with reference to this Introduction as necessary – why the statement remains undisputed.

To the extent that Meta does not reply to a particular FTC response, Meta's position is that no further reply is warranted for resolution of the pending motions because the response does not create a genuine dispute of material fact on its face; Meta does not concede any fact for

any purpose outside the context of the pending motions.

This approach is appropriate because the FTC has injected immaterial and argumentative positions that have no bearing on summary judgment and the pending motions into its fact responses.  For example, the following is an exemplar Meta statement and FTC response:

> <u>Meta Statement</u>:  FTC expert Clifford Lampe purports to be an expert in "the areas of Human-Computer Interactions, Social Computing, and Computer-Mediated Communication" and studied "social media, computer-mediated communication, and social networks for over 20 years."  Ex. 290 at ¶ 2 (Lampe Rep.).

> <u>FTC Response</u>:  Undisputed but incomplete.  The first sentence is undisputed but incomplete to the extent that the phrase "purported expert" suggests that Professor Lampe lacks qualifications: he is a highly qualified expert in the areas of Human-Computer Interactions, Social Computing, and Computer-Mediated Communication.  Ex. 290 ¶¶ 2-8 (Lampe Rep.).

Meta SMF ¶ 602.  The assertion in this FTC's response that Professor Lampe is "highly qualified" is immaterial and, more important, an improper response to the above fact statement.  Rather than debating Professor Lampe's qualifications in a fact statement, Meta will not reply further to the above "Undisputed" response, reserving all rights to address Professor Lampe's qualifications later, if necessary.  Meta will treat all such statements – "Undisputed but . . . " – as undisputed for the pending motions.

**Recurring Objectionable Issues**:  In addition, the FTC's response statements raise recurring objectionable issues (addressed here rather than repeatedly throughout in every instance the FTC repeats the objectionable response):

1. ***Many of the FTC's responses are improper legal argument.***  Significant portions of the FTC's responses are improper legal briefing that the Court should disregard.  *See Johnson v. District of Columbia*, 2019 WL 3767103, at *3-4 (D.D.C. Aug. 9, 2019) (explaining that a supposed fact statement should not include "[a]rguments and invocations of legal authority").

For example, in response to Meta's accurate quotation of admissions from Professor

Hemphill – the FTC's principal economic expert – the FTC responds, in part:

> Moreover, that conduct may be assessed under a consumer welfare standard does not mean that conduct is condemned as anticompetitive only upon a showing by the plaintiff that the challenged conduct has reduced consumer welfare relative to the but-for world.  *See, e.g.*, *Microsoft*, 253 F.3d 34, 79 (D.C. Cir. 2001) ("To require that [Section] 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action.").

Meta SMF ¶ 715.  Setting aside that this statement is wrong as a matter of law, it improperly

injects legal argument into a supposed "fact" response, extending the FTC's briefing and evading

this Court's order on page limits for the pending motions.

The FTC also repeatedly asserts boilerplate evidentiary objections by positing a legal

conclusion without explaining the objection, let alone citing any Federal Rule of Evidence.  *See*,

*e.g.*, Meta SMF ¶ 1 (FTC response "object[ing] that the statement is not supported by admissible

evidence" with no further explanation or citation to any Federal Rule of Evidence).  Other times,

the FTC asserts that certain expert testimony is inadmissible, again without explanation or

citation to any Rule.  *See*, *e.g.*, Meta SMF ¶ 45 (asserting in a "fact" response that "[t]he cited

material relays inadmissible hearsay and fails to constitute an expert opinion based on any

applicable analysis or relevant expertise," with no further explanation or citation to any Federal

Rule of Evidence).  Issues regarding the admissibility of evidence and particularly expert

testimony are premature.  And, even if such an objection could be proper to dispute certain

material under Federal Rule of Civil Procedure 56, the FTC's boilerplate is uniformly

undeveloped and unexplained.

These legal responses to Meta's statements fail to create a genuine dispute of material

fact and are improper.  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101

F.3d 145, 153 (D.C. Cir. 1996) (statement of nonmovant "repeatedly blending factual assertions with legal argument" was contrary to purpose of local rule); *Mack v. Strauss*, 134 F. Supp. 2d 103, 108 (D.D.C. 2001) (nonmovant's statement "is riddled with self-serving, conclusory statements"), *aff'd*, 2001 WL 1286263 (D.C. Cir. Sept. 28, 2001) (per curiam); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.2, at 513 (4th ed. 2016) ("the opposing party cannot discharge its burden" of showing a genuine dispute of fact "by alleging legal conclusions").

      **2.**     ***The FTC's responses are immaterial for multiple recurring reasons.***  The FTC's ensuing responses present recurring and boilerplate objections that are immaterial to the pending motions and that fail to create a genuine dispute of material fact.

      For example, objections that common terms are vague or undefined – which the FTC asserts without explanation – are a makeweight.  In each instance, Meta uses the words and phrases at issue according to their ordinary meaning, without giving the terms a special definition.  Failure to explain in every instance below why a term is not vague – e.g., why the FTC's repeated claim that "pre-acquisition" is "vague as to time" (it means before the acquisition), *see*, *e.g.*, Meta SMF ¶ 671 – is not an admission that the FTC is correct.  Instead, absent special clarification, terms should be read and understood as they are used ordinarily.

      Similarly, the FTC's repeated practice of stating that Meta "omitted" certain portions of a deponent's testimony or a document and then reciting lengthy and irrelevant additional material in response does not create a genuine dispute of material fact to the statement at issue. Sometimes, the additional material reinforces Meta's statement.  *See*, *e.g.*, Meta SMF ¶ 146 (regarding "ad load" as a quality metric and adding material that *confirms* the Meta statement). But in no case does it create a genuine dispute of material fact as to the Meta statement, nor is

Meta's providing accurate recitations of testimony – and not all of that testimony – misleading.

**The FTC's Introduction:**  The assertions in the FTC's Introduction to its responses do not create genuine disputes of material fact.  The FTC's Introduction raises three issues, all conclusory and none material.

*First*, the FTC recites several critiques (*see* FTC Introduction Point A) without explanation or context.  For example, the FTC makes the blanket assertion that undisputedly accurate statements – e.g., the FTC acknowledges that "it might be true that the witness (or document) conveyed the statement" – are immaterial.  That assertion is entitled to no weight.  The significance of any particular fact is a legal question; it would not have been inappropriate for Meta to explain in every fact statement why each fact is material to the outcome of the litigation.  Meta will respond, where necessary, based on the context of the statement and the FTC's particular response.

*Second*, the FTC objects (*see* FTC Introduction Point B) to some of the headers that Meta employs (albeit citing just one example).  Meta's headers are provided for organizational purposes – they are not independent statements of fact.  The statements below each header speak for themselves.  For example, the FTC faults the heading for Section II.B.4 – "The FTC's 30(b)(6) Representative Confirms That the FTC Has Not Identified Evidence Addressing Users' Motives for Using Particular Features or Consumer Substitution Behavior" – even though its 30(b)(6) representative gave the following testimony:

> Q.  In its interrogatory responses, is the FTC relying on any facts regarding whether consumers would substitute usage for the specific features on Meta's services to the specific features on the 12 non-Meta services?
>
> . . .
>
> A. . . . I'm not aware, as I sit here right now, looking at the pages you've pointed me to look at, that any of this addresses consumer substitution behavior.

Ex. 294 at 43:11-44:10 (Takashima (FTC) Dep. Tr.); *see also* Meta SMF ¶ 596 (quoting Ex. 294 (Takashima (FTC) Dep. Tr.)).

*Third*, the FTC asserts (*see* FTC Introduction Point C) that Meta overstates unspecified parts of the record in unspecified ways. The ensuing statements and Meta's briefing speak for themselves. The FTC simply asserting otherwise without providing a single example or citation to which Meta could respond is itself telling. To the extent the FTC raises any specific concern in its briefing (or in response to a particular fact statement), Meta will answer as necessary.

## I.  COMPETITION

1. The average U.S. adult smartphone consumer uses dozens of apps each month. *See* Ex. 1 at ¶ 224 (Ghose Rep.) ("Overall, the average U.S. adult smartphone consumer uses 46 different apps in a month, and more than seven 'social media' apps in particular." (footnote omitted)); *see also* Ex. 2 at ¶ 299 (Carlton Rep.) ("in June 2022 Facebook users used an average of 26 different apps per day").

**FTC Response: Disputed in part.** The FTC disputes that Statement 1 constitutes a material fact subject to proof at trial, and objects that the statement is not supported by admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2). The first sentence in Statement 1 is otherwise undisputed. The first and second parentheticals in Statement 1 are undisputed to the extent that they relay words that appear in the cited reports.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact. *See supra* Meta Introduction.

### A.  Meta's Services and Meta's Business

#### 1.  Meta's Services

2. Meta is a company that "build[s] technolog[ies] that help[] people connect and share, find communities, and grow businesses." Ex. 325 at 7 (Meta 2023 Form 10-K). Meta's

mission is to give "people the power to build community and bring the world closer together."
*Id.*

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 2 recounts words that appear in the cited document.  The first sentence is otherwise disputed in part because the excerpted language renders the statement incomplete: the subsequent sentence in the document states that Meta's "products enable people to connect and *share with friends and family* through mobile devices, personal computers, virtual reality (VR) and mixed reality (MR) headsets, and wearables." Ex. 325 at 7 (Meta 2023 Form 10K) (emphasis added).  The FTC objects to the second sentence of Statement 2 because "mission" is vague and undefined.  The second sentence is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the document contains the material quoted in the statement.  *See supra* Meta Introduction.

3.     Meta works toward that mission, in part, by offering four consumer-facing apps: Facebook, Instagram, Messenger, and WhatsApp.  Ex. 325 at 7-8 (Meta 2023 Form 10K).

**FTC Response: Undisputed.**  The FTC objects that "mission" is vague and undefined.  Otherwise undisputed.

4.     Meta refers to Facebook, Instagram, Messenger, and WhatsApp as the "Family of Apps" or "FoA."  Ex. 325 at 7-8 (Meta 2023 Form 10K).

**FTC Response: Undisputed.**

5.     Consumers do not have to pay Meta to use Facebook, Instagram, Messenger, or WhatsApp.  Ex. 279 at ¶ 73 (Hemphill Rep.); Ex. 2 at ¶ 122 (Carlton Rep.); Ex. 139 at 141:16-20 (Zuckerberg IH Tr.).  Consumers have never had to pay to use Facebook or Instagram.  *See* Ex. 3 at ¶ 40 (List Rep.).

**FTC Response: Undisputed but incomplete.**  Undisputed that Meta does not currently charge a monetary price to most users of Facebook, Instagram, Messenger, or WhatsApp, and that users do not "have to" pay a monetary price to use those services, but incomplete because (1) Meta offers users in Europe the choice to pay a monthly subscription to use Facebook and Instagram without any ads, *see* PX0552, *Facebook and Instagram to Offer Subscription for No Ads in Europe*, Meta (Oct. 30, 2023), https://about.fb.com/news/2023/10/facebook-and-instagram-to-offer-subscription-for-no-ads-in-europe/, and (2) the presence of advertisements on these products functions as a "tax" on their use.  *See* Ex. 139 at 193:13-194:9 (Zuckerberg IH Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that consumers in the United States do not have to pay Meta to use Facebook, Instagram, Messenger, or WhatsApp, and that consumers in the United States have never had to pay to use Facebook and Instagram.  *See supra* Meta Introduction.  The FTC's conclusory assertion that advertisements function as a tax does not create a genuine dispute of material fact that seeing advertisements is akin to a monetary tax.  Unlike paying a monetary tax, users can skip past advertisements rather than engaging with them.  Unlike paying a monetary tax, users derive value from engaging with advertisements they are interested in.  *See* Ex. 2 at ¶¶ 133-138 (Carlton Rep.); *see also* Ex. 4 at ¶ 49 (Tucker Rep.).  It also is undisputed that consumers have varied preferences regarding ads, as Professor Hemphill testified:  "Q. You'd agree that individuals vary in their receptivity to ads? . . .  A. Yes, I think that's – I think that's right.  In the discussion of – yes, I think that there's some evidence in the record about differences in user receptivity to ads, yes."  *See infra* Meta SMF ¶ 148 (quoting Ex. 283 at 245:7-13 (Hemphill Dep. Tr.));

Ex. 283 at 245:21-246:5 (Hemphill Dep. Tr.) ("I would expect that – the amount of disutility from ads would vary across users.").

<div align="center">a.      <strong>Facebook</strong></div>

6.      Facebook.com launched in 2004.  Ex. 139 at 21:25-22:1 (Zuckerberg IH Tr.).  In 2008, the company launched a mobile app so that users could access Facebook from their phones.  Ex. 2 at ¶ 294 (Carlton Rep.).  Meta herein refers to Facebook.com and the Facebook app together as "Facebook."

**FTC Response: Undisputed but incomplete.**  The first sentence is undisputed.  The second sentence is undisputed but incomplete because prior to the launch of the "mobile app," users could access Facebook.com from mobile phones by visiting the website from their browser.  *See* PX0290, Mark Slee, *Facebook For Your Phone*, Facebook Blog (Jan. 10, 2007), https://web.archive.org/web/20070117061124/http://blog.facebook.com/blog.php?post=2228532 130.  The third sentence is undisputed.

7.      In the 20 years since its launch, Facebook's offerings and features have evolved. *See* Ex. 1 at ¶¶ 111-117 (Ghose Rep.); Ex. 2 at ¶¶ 76-81 (Carlton Rep.); *see also infra* at ¶¶ 17-50.

**FTC Response: Undisputed.**

8.      Facebook is "a place for people to share life's moments and discuss what's happening, nurture and build relationships, discover, and connect to interests, and create economic opportunity.  They can do this through Feed, Reels, Stories, Groups, Marketplace, and more."  Ex. 325 at 7 (Meta 2023 Form 10-K).

**FTC Response: Undisputed.**

9. **Facebook Usage Data.** Facebook monthly active users in the United States increased from more than 158.9 million in 2012 to more than ▮▮▮▮▮▮ as of 2022. *See* Ex. 279 at p. 238, Ex. 42 & p. C.26, Ex. C-25 (Hemphill Rep.).

**FTC Response: Undisputed.**

10. Monthly time spent on Facebook in the United States ▮▮▮▮▮▮▮▮ from 2012 to 2022, from more than 96.5 billion minutes to more than ▮▮▮▮▮▮ minutes. *See* Ex. 279 at p. 241, Ex. 45 & p. C.27, Ex. C-26 (Hemphill Rep.).

**FTC Response: Undisputed.**

11. Meta's expert economist, Professor Dennis Carlton, calculated that, as of January 2023, "▮▮▮▮▮▮▮ of time spent on Facebook is associated with content from 'friends'" (where "'friends' indicates a sharing relationship, not necessarily a personal connection"). Ex. 2 at ¶ 69 & p. 68, tbl. 10 (Carlton Rep.). Professor Carlton calculated that, "[w]hen measured by impressions, that fraction is ▮▮▮▮▮." *Id.* at ¶ 69. In other words, "▮▮▮▮▮▮▮ of content viewed on Facebook (excluding advertising), and ▮▮▮▮▮ of time spent is *not* associated with . . . friends and family sharing." *Id.* These results are depicted in the below table:



*Id.* at p. 68, tbl. 10.

**FTC Response: Disputed.**  It is undisputed that Statement 11 relays words that appear in

Professor Carlton's report.  Statement 11 is otherwise disputed as not supported by the cited

material as required by the Local Rules and Federal Rules, and because it does not establish the

absence of a genuine factual dispute because it is contradicted by other, more reliable, evidence.

*See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h); Fed. R. Civ. P. 56(c)(1)(B).  Professor Carlton

measured content directly posted by Facebook friends, and then asserted without basis or support

that all other content is not "*associated with* . . . friends and family sharing" or "*associated with*

content from 'friends.'"  Ex. 2 at ¶ 69 (Carlton Rep.) (emphasis added).

This assertion is disputed, as Professor Carlton provides no evidence or analysis in support of his vague phrasing, and Professor Hemphill has explained that content that is not posted by a "friend" can still have a connection to friends and family sharing, which includes content that Professor Carlton claims is "not associated" with such sharing.  *See* PX9007, Hemphill Rebuttal Report at ¶ 252 ("[T]hese surfaces . . . also play a role in delivering Meta's PSN offering and the friends and family use case.  For example, since introducing Reels, Meta's strategy ███████████████████████████████████████████████████████ ████████████████████████████████.  Furthermore, even if a video was not originally posted by a friend connection, Facebook allows and encourages users to reshare unconnected video content with friends and family and broadcasts comments posted to those users' friends' feeds.  Thus, the 'minority' usage figures of Meta's experts understate the significance of the friends and family sharing use case. . .");  PX9000, Hemphill Report at ¶¶ 269-270 (collecting evidence showing that "some engagement on Facebook Reels does involve friends and family sharing, and Facebook has emphasized ████████████████████ ██████████████████████████ and collecting evidence showing that "Meta ████████████████████████████████████████████████████████ ████████████ . . . Among the other surfaces that facilitate some amount of friends and family sharing are Facebook Groups, Facebook Marketplace, Facebook Watch, and Gaming.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the vast majority of time spent on Facebook is not engaging with "friends" content, nor does it provide evidence to dispute Professor Carlton's calculation of that time spent relative to other activities and features on the Facebook service.  *See supra* Meta Introduction.  The FTC cites paragraph 252 of Professor Hemphill's rebuttal report, which observes simply that non-friends

content can be shared with friends and family; Professor Carlton's figures show how often that occurs.  Professor Carlton does not state that content not posted from a friend cannot be associated with friends-and-family sharing; he expressly identifies content – from wherever posted – that is "associated with Prof. Hemphill's friends and family sharing."  Ex. 2 at ¶ 69 (Carlton Rep.) (adding "Prof. Hemphill's," which the FTC snips, to clarify what Professor Carlton is measuring).  In other words, if – as Professor Hemphill describes in the cited hypothetical – a user views on her Feed video content that was initially uploaded to Facebook by an account she does not follow (such as a video posted by the Facebook Page of a celebrity the user does not follow) that was re-shared by one of the user's Facebook friends, the time the user spends watching that re-shared video content on her Feed is included in the ██ of time Professor Carlton calculates as "associated with Prof. Hemphill's friends and family sharing." *Id.*  Professor Hemphill offers no other calculation in the cited paragraph (nor does the FTC).

The FTC also cites paragraphs 269 and 270 of Professor Hemphill's opening report, which acknowledges that some engagement on Facebook surfaces involves friends-and-family sharing, while other engagement does not.  The fact that Facebook users can share public, unconnected, or non-friends content with friends and family does not dispute Professor Carlton's calculation of how often that occurs.

Professor Hemphill himself finds that friends-and-family sharing comprises less than half of time on Facebook Feed, *see* PX9007 at p. 85 & Ex. 9 (Hemphill Rebuttal Rep.), and he does not dispute that other Facebook features – e.g., Watch, Reels, Marketplace, and Groups and more – can be expected to have even less friends-and-family content.  Indeed, the only sources Professor Hemphill cites for the immaterial proposition that such surfaces possess some friends-and-family content demonstrate that any such friends-and-family content is a small or non-

existent portion of the content on those surfaces.  Professor Hemphill cites three sources for the proposition that Facebook Watch "facilitate[s] some amount of friends and family sharing" at paragraph 270 of his report:  One is a 2014 document created three years before Facebook Watch existed; the second is a 2019 document stating that "the Watch Tab excludes videos from Friends and Family," and (3) an excerpt of testimony from Mr. Backstrom, who testified, "I believe that watch is entirely public content . . . [and] does not generally include content from friends."  *See* PX9007 at ¶ 270 & n.506 (Hemphill Rep.) (citing FB_FTC_CID_02349518 (from 2014), PX3438 at -287 (FTC-META-012248285) (May 8, 2019), and PX6093 (Backstrom Dep. Tr.)); PX6093 at 125:7-126:14 (Backstrom Dep. Tr.).  The one source Professor Hemphill relies on for the proposition that Facebook Groups facilitate some amount of friends and family sharing is a quote from a deposition stating that Facebook Groups is "predominantly used to connect with larger groups of people who you may not necessarily know in real life."  PX9007 at ¶ 270 & n.504 (Hemphill Rep.) (quoting PX6069 at 42:19-24 (Alison Dep. Tr.)).  And the excerpts of testimony Professor Hemphill exclusively relies on to support the proposition Facebook Marketplace facilitates some amount of friends-and-family sharing do not state that any friend or family content appears on Facebook Marketplace.  *See* PX9007 at ¶ 270 n.505 (Hemphill Rep.) (citing PX6093 at 145:5-14, 175:14-24, 176:18-177:9 (Backstrom Dep. Tr.)).

12.     Professor C. Scott Hemphill, the FTC's proffered economic expert, and Professor Clifford Lampe, the FTC's proffered industry expert, did not dispute the calculations in Professor Carlton's Table 10.  *See* Ex. 280 at ¶ 244 & n.331 (Hemphill Rebuttal Rep.); Ex. 281 at 240:18-241:22 (Lampe Dep. Tr.).

**FTC Response: Disputed in part.**  Undisputed that Professor Lampe does not address the calculations that appear in Professor Carlton's Table 10.  Otherwise disputed because while

Professor Hemphill does not dispute the arithmetic appearing in Professor Carlton's Table 10, Professor Hemphill disputes the relevance of the underlying data in his rebuttal report, as well as the conclusions that Professor Carlton suggests from "partial data from one of a series of feed composition experiments."  PX9007, Hemphill Rebuttal Report at ¶ 250; *see supra* at FTC Response to Statement 11.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the vast majority of time spent on Facebook is not engaging with "friends" content, nor does it provide evidence to dispute Professor Carlton's calculation of that time spent relative to other activities and features on the Facebook service, nor does it dispute that Professor Hemphill and Professor Lampe have no other calculations of those figures.  *See supra* Meta Introduction.  The FTC cites paragraph 250 of Professor Hemphill's rebuttal report, which addresses a *different* calculation from Professor Carlton (regarding Professor Carlton's Table 8) – not this one (which is Professor Carlton's Table 10).

13.     Today, users spend more time viewing videos on Facebook than performing any other activity on Facebook.  Ex. 2 at pp. 76-77, figs. 2 & 3 (Carlton Rep.).  More than 40% of all time spent on Facebook is on Videos.  *Id.* p. 76, fig. 2.

**FTC Response: Undisputed but incomplete.**  Statement 13 omits Professor Carlton's concession that the "difference between the time and the impressions numbers is driven by the fact that a photo or text post and a video each count as one impression, but the video will consume more time."  *See* Ex. 2 at ¶ 69 (Carlton Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that today users spend more time viewing videos on Facebook (40% of all time spent) than any other activity on the service.  *See supra* Meta Introduction.  In fact, Meta announced in its First

Quarter Earnings Call for 2024 that, as of April 2024, more than 60% of time on Facebook and Instagram is spent watching video.  *See* Ex. 499 at 6 (Meta Q1 2024 Earnings Call).

14.    "New video-related features" (except Stories) have ███████████████ of their content posted by users' friends (where "'friends' indicates a sharing relationship").  Ex. 2 at ¶ 69 & p. 68, tbl. 10 (Carlton Rep.).  ███████████████████████████████ ███████████████████████████████.  *Id.* at ¶¶ 68, 69, & p. 68, tbl. 10.

**FTC Response: Disputed in part.**  The first sentence of Statement 14 is undisputed. The second sentence is disputed in part because the phrase "comes from" is vague, and it is contradicted by other evidence to the extent it suggests that all content that is not *posted by* a friend does not "come[] from" a user with whom the consumer has a reciprocal sharing relationship – for example, a user might view a video that is recommended or re-shared by a friend.  *See* PX9007, Hemphill Rebuttal Report at ¶ 252 ("[E]ven if a video was not originally posted by a friend connection, Facebook allows and encourages users to reshare unconnected video content with friends and family and broadcasts comments posted to those users' friends' feeds.  Thus, the 'minority' usage figures of Meta's experts understate the significance of the friends and family sharing use case. . .").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that ███████████████ of content that users consume on new video features (other than Stories; like Reels) comes from a user's friends.  *See supra* Meta Introduction.  As the phrase "comes from" is ordinarily understood and used, it is clear that it refers to content posted or generated by a particular source.  The FTC's reference to paragraph 252 of Professor Hemphill's rebuttal report acknowledges the undisputed possibility that a user could share this non-friends content with a friend – but that does not dispute Professor Carlton's calculation of how often that actually

happens on these surfaces.  In other words, if – as the FTC describes in its hypothetical – a user views on her Feed video content that was initially uploaded to Facebook by an account she does not follow (e.g., a video posted by the Facebook Page of a celebrity the user does not follow) that was re-shared by one of the user's Facebook friends, the time the user spends watching that re-shared video content on her Feed is already included in the ██ of time Professor Carlton calculates as "associated with Prof. Hemphill's friends and family sharing."  Ex. 2 at ¶ 69 (Carlton Rep.).

15.     Meta's expert economist, Professor John List, calculated that, as of June 2023, "[t]he Facebook services that account for the largest shares of user time include[d] ████████ ████████"; and "████████████ together represent[ed] ████ of time spent on Facebook." Ex. 3 at ¶ 33 & p. 13, tbl. II-1 (List Rep.).  These results are depicted in the below table:



*Id.* at p. 13, tbl. II-1.

**FTC Response: Undisputed.**

16.     Professors Hemphill and Lampe did not dispute the calculations in Professor List's Table II-1.

**FTC Response: Undisputed but immaterial.**

17.     **Facebook Features.**  Meta released more than 160 new features on Facebook between September 2011 and July 2023.  *See* Ex. 2 at pp. 255-262, tbl. 35 (Carlton Rep.).  For example, Meta introduced Stories in 2017 and Reels in 2021.  *See id.*  Facebook has offered or currently offers the following features, among others:

**FTC Response: Undisputed.**

### i.     Profile

18.     Profile features have been available on Facebook since it launched.  Ex. 324 at 13 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

19.     Profile is a place where users can share information about themselves (e.g., interests, photos, videos, current city, and hometown).  Ex. 324 at 13 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### ii.     Friends

20.     Users have been able to add "Friends" on Facebook since it launched.  Ex. 324 at 11 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

21.     "On Facebook, a user can submit a 'friend' request to another user.  That other user has to agree to establish a connection, at which point each user is a 'friend' of the other – a reciprocal relationship is automatically created."  Ex. 2 at ¶ 72 (Carlton Rep.).

**FTC Response: Undisputed.**

22.     Among other things, friends may see each other's activity in Feed, Stories, and Photos.  Ex. 324 at 11 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### iii.     Photos and Videos

23.     Facebook began enabling users to upload photos and videos to Facebook around October 1, 2005.  Ex. 324 at 5 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### iv.     Facebook Feed

24.     Meta launched Feed (or "News Feed") around September 5, 2006.  Ex. 324 at 5 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

25.     "When [users] open Facebook and see Feed in [their] Home tab, [users] experience a mix of 'connected content' (e.g., content from the people [they're] friends with or are following, Groups [they've] joined, and Pages [they've] liked) as well as 'recommended content' (e.g., content [Facebook] think[s] [they'll] be interested in from those [they] may want to know)."  Ex. 459 (Meta, *Our Approach to Facebook Feed Ranking*); *see also* Ex. 2 at ¶¶ 63-64 (Carlton Rep.).

**FTC Response: Disputed in part.**  The FTC objects that Statement 25 is vague as to time, and disputes Statement 25 to the extent that it purports to relate to any time period other than the time period described by the cited source material because the Statement is not supported by the cited material, *see* Fed. R. Civ. P. 56(c)(1)(A) and L.R. 7(h), and is contradicted by other evidence.  Facebook Feed launched in 2006 but Facebook Groups did not launch until October 2010, *see infra* at Statement 28; Facebook Pages launched in November 2007, *see infra*

21

at Statement 26; and when Feed launched Pages could not post content into Feed.  *See* Ex. 243,

FTC-META-003095912 at -912 ("When Facebook was launched there was no public content, it

was [a] place where college kids could connect with their friends.  When News Feed launched in

late 2006 we had pages, but they couldn't post into News Feed. . . .  Through all of this,

connecting with friends and family has remained the most stated reason that people use

Facebook.").  Otherwise undisputed.

   **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Feed contains a mix of content from public, unconnected, and friends or family sources.  *See*

*supra* Meta Introduction.  The FTC's response confirms that Meta has undertaken to innovate

and improve its Feed feature since it launched in 2006, e.g., by adding Groups.

### v.      Pages

   26.     Meta launched Pages around November 6, 2007.  Ex. 324 at 5 (Meta's Suppl.

Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

   **FTC Response: Undisputed.**

   27.     Facebook users "can like or follow a Page to get updates from business[es],

organizations and public figures.  Anyone with a Facebook account can create a Page or help

manage one, as long as they have a role on the Page."  Ex. 326 at 1 (Facebook, *Pages*,

https://perma.cc/W4ZR-BJFP).

   **FTC Response: Undisputed.**

### vi.      Facebook Groups

   28.     Meta launched Facebook Groups around October 6, 2010.  Ex. 324 at 5 (Meta's

Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

   **FTC Response: Undisputed.**

29.     "Groups are a place to connect, learn and share with people who have similar interests.  You can create or join a group for anything – stargazing, baking, parenting – with people across the globe or across the street."  Ex. 327 (Meta, *Groups*, https://perma.cc/8HD4-X8SJ?type=image).  Groups allow users to communicate about shared interests, such as Instant Pot recipes, pop stars, or comedy.  *See id.*

**FTC Response: Undisputed but incomplete.**  Statement 29 is undisputed, but incomplete: Groups also enable friends and family to connect with one another.  *See* Ex. 146 Alison Dep. Tr., at 39:24-43:14; PX0553, *Setting up your new group,* Meta, https://www.facebook.com/community/getting-started-with-groups/how-to-set-up-a-facebook-group/ ("Whether you're looking to create a community for family and friends or looking to start a community to connect with like-minded people, these tips will have your community up and running in no time.").  Otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Groups are for interest-based sharing and engagement.  The observation that friends and family can also connect on Groups does not create a genuine dispute, nor does the FTC quantify how often that actually occurs (as Professor Carlton does, *see supra* Meta SMF ¶ 11 (citing Ex. 2 at ¶ 69 (Carlton Rep.)), let alone relative to Group engagement that is interest-based.  In fact, the FTC's proffered industry expert, Professor Lampe, has conceded that, in his opinion, "the dominant use for [Facebook] groups is around interest-based communities."  *See infra* Meta SMF ¶ 607(e) (quoting Ex. 281 at 216:11-20 (Lampe Dep. Tr.)).

### vii.     Facebook Live

30.     Meta introduced Facebook Live for certain public figures around August 5, 2015.  Ex. 324 at 6 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  Meta made Facebook Live more widely available by approximately April 6, 2016.  *Id.*

**FTC Response: Undisputed.**

31.     Facebook Live is "a mobile video livestreaming service."  Ex. 1 at ¶ 50 (Ghose Rep.).

**FTC Response: Undisputed.**

### viii.     Facebook Marketplace

32.     Meta introduced Facebook Marketplace around October 3, 2016.  Ex. 324 at 6 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

33.     Facebook users "can use Marketplace to buy and sell items with people in [their] community on Facebook."  Ex. 328 at 1 (Facebook, *Marketplace*, https://perma.cc/892J-5M9G).

**FTC Response: Undisputed.**

### ix.     Facebook Stories

34.     Meta introduced Facebook Stories around March 28, 2017.  Ex. 324 at 6 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

35.     Facebook "Stories are full-screen, short-form, ephemeral" forms of content Facebook users share with their friends and followers.  Ex. 329 at 1 (Facebook, *Facebook Stories:  An Introduction for Content Creators*, https://perma.cc/F8F4-TN7K).  Stories can include text, photos, and videos.  *Id.*  "Photos play for five seconds each, and videos up to 20 seconds are supported."  *Id.*  "All content posted to Stories lasts only 24 hours."  *Id.*

**FTC Response: Undisputed.**

### x.     Facebook Watch / Facebook Video

36.     Meta introduced Facebook Watch around August 9, 2017.  Ex. 324 at 6 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  In July 2023, Meta renamed

"Facebook Watch" to "Facebook Video."  Ex. 330 at 2 (Facebook Newsroom, *Video on Facebook Keeps Getting Better*, https://perma.cc/L46D-LYHD).

**FTC Response: Undisputed.**

37.     Facebook Video is "the one-stop shop for everything video on Facebook, including Reels, long-form and Live content."  Ex. 330 at 2 (Facebook Newsroom, *Video on Facebook Keeps Getting Better*, https://perma.cc/L46D-LYHD)*.*  The Facebook Video tab enables users to "scroll vertically through a personalized feed that recommends all types of video content."  *Id.*  The tab also features a "horizontal-scroll reels section that highlight[s] recommended reels."  *Id.*

**FTC Response: Undisputed.**

38.     As of the fourth quarter of 2023, Meta had "sustained growth in Reels and video overall as daily watch time across all video types grew over 25% year-over-year in Q4, driven by ongoing rankings improvements.  In-feed recommendations of posts from accounts that you're not connected to drive incremental engagement as [Meta] increasingly personalize[s] recommendations, and we expect to deliver further improvements this year."  Ex. 331 at 7 (Meta Q4 2023 Earnings Call).

**FTC Response: Disputed in part.** The FTC disputes that the second sentence of Statement 38 constitutes a material fact subject to proof at trial, and objects that the statement is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1), 56(c)(2).  Statement 38 is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that engagement with video is increasing, driven by content from public or unconnected sources.  *See supra* Meta Introduction.

### xi.      Facebook Gaming

39.     Meta introduced a dedicated Facebook Gaming tab around March 14, 2019.

Ex. 324 at 11 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

40.     The Gaming tab contains a feed where users can play games, watch gaming

videos, and connect with gaming groups.  Ex. 324 at 11 (Meta's Suppl. Objs. & Resps. to FTC's

Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### xii.     Facebook Dating

41.     Meta launched Facebook Dating around September 5, 2019.  Ex. 324 at 6 (Meta's

Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

42.     Facebook users interested in meeting new people can create a "Dating profile,"

which they can use to "send likes and messages to people [they are] interested in."  Ex. 332 at 1

(Facebook, *Facebook Dating*, https://perma.cc/QU76-56FN).

**FTC Response: Undisputed.**

### xiii.    Facebook Reels

43.     Meta launched Facebook Reels around September 29, 2021.  Ex. 324 at 6 (Meta's

Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

44.     Facebook Reels are "short videos consisting of music, audio, AR effects, text

overlays and more" that Facebook users can "create . . . on the Facebook app on [their] mobile

device."  Ex. 333 at 1 (Meta, *Unlock Your Creativity with Reels on Facebook*,

https://perma.cc/BC5Z-CG46).  Users' Reels "are shared directly to [their] fans in [the fans']

core News Feed and to new audiences in a dedicated Reels section in News Feed that gives
people who are new to [the users] the opportunity to discover and enjoy [their] creations." *Id.*

**FTC Response: Undisputed but incomplete.**   Undisputed that Statement 44 relays
words that appear in the cited document.   However, the quoted language renders the Statement
incomplete.   The cited source subsequently states that "[w]ith Reels, you can share creations with
your friends and followers . . . [o]nce your Reel is ready to share, you can add a description and
hashtags, and tag your friends."   Ex. 333 at 2 (Meta, *Unlock Your Creativity with Reels on
Facebook*, https://perma.cc/BC5Z-CG46).

**Meta Reply:**   The FTC's response does not create a genuine dispute of material fact
regarding the definition and use of Facebook Reels.   *See supra* Meta Introduction.   The
observation that users can share Reels with "friends and followers" does not create a genuine
dispute of material fact or address how often that sharing occurs.   It does, however, confirm that
Meta has continued to invest in innovating its services, including as to the supposed friends-and-
family sharing use that the FTC alleges.

### xiv.   Privacy

45.   Meta released dozens of new privacy and user-data controls between 2012 and
2022.   *See* Ex. 1 at § IV.C.2 (Ghose Rep.) (collecting updates to Meta privacy tools and
features).   For example:

**FTC Response: Disputed.**   The FTC objects that the statement is not supported by
admissible evidence.   *See* Fed. R. Civ. P. 56(c)(2).   The cited material relays inadmissible
hearsay and fails to constitute an expert opinion based on any applicable analysis or relevant
expertise.

**Meta Reply:**   The FTC's response does not create a genuine dispute of material fact that
Meta has released dozens of new privacy and user-data controls between 2012 and 2022, as

Professor Ghose opined.  *See supra* Meta Introduction.  The FTC's conclusory assertions regarding the admissibility of Professor Ghose's opinions are unfounded and do not create a genuine dispute of material fact.  This fact statement is not an appropriate place to challenge, without support, the admissibility of Professor Ghose's opinions and this response therefore warrants no reply.  To the extent a reply is necessary, the FTC makes no effort to identify any specific hearsay statement it challenges as inadmissible, and Federal Rule of Evidence 703 would permit Professor Ghose to rely on the cited material in any event.  To the extent the FTC's response can be read to challenge Professor Ghose's testimony under Federal Rule of Evidence 702, his expertise in the digital economy and the mobile app industry – fields on which he regularly publishes, teaches, and consults – is beyond reasonable dispute, and his opinions follow from the application of that expertise to the facts of the case.  *See generally* Ex. 1 at § I (Ghose Rep.) (summarizing Professor Ghose's qualifications); *id.* at ¶¶ 29-30 (explaining his assignment and summarizing his findings "based on [his] expertise in the digital economy and mobile app industry").

46.     In 2012, Meta introduced updated Granular Data Permissions, allowing users to see information a third-party app within Facebook was seeking to access and requiring permission for third-party apps to access that information.  *See* Ex. 1 at ¶ 296 (Ghose Rep.).

**FTC Response: Disputed.**  The FTC disputes Statement 46 as not supported by the cited material and vague as to time.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  Statement 46 relies upon Professor Ghose's report, which itself cites a December 2011 TechCrunch article to support his assertion that Meta introduced granular data permissions in 2012.  *See* Ex. 1 at ¶ 296 (Ghose Rep.).  However, the cited TechCrunch article merely lists an "updated granular data permissions dialog box" as one of forty-five "privacy-related changes" Facebook was expected to enact "to

comply with the recommendations of an audit by Ireland's Office of the Data Protection

Commissioner."  PX0548 at -005, Josh Constine, *45 Privacy Changes Facebook Will Make to

Comply with Data Protection Law*, TechCrunch (Dec. 21, 2011),

https://techcrunch.com/2011/12/21/privacy-changes-audit/.  It is unclear when or whether

granular data permissions were updated based on the article Professor Ghose cites, Professor

Ghose adds no applicable analysis or expertise to the statements in the article, and thus Statement

46 is both vague as to time and not supported by the cited material.

 **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta introduced a privacy feature called Granular Data Permissions in 2012.  *See supra* Meta

Introduction.  The FTC ignores the surrounding paragraphs (and supporting footnotes) in

Professor Ghose's report.  It discusses the June 8, 2012 update to Facebook's privacy policy,

which includes the policies described in this paragraph.  *See* Ex. 1 at ¶¶ 292-297 (Ghose Rep.);

*see also* Ex. 496 at 4 (Facebook, *June 8, 2012 Data Use Policy*) (under the heading

"[c]ontrolling what information you share with applications," explaining that "[i]f [an]

application" a user chose to connect with "needs additional information" beyond the user's

"basic info," "such as your stories, photos or likes, it will have to ask you for specific

permission," and identifying the "setting" that "lets you control the applications you use" and

"see the permissions you have given th[o]se applications").  Any dispute regarding the precise

date on which Meta introduced the referenced update is not material.

 47. Between 2019 and 2020, Meta introduced the Clear History tool that allows users

to view, control, and clear data that apps and websites send to Facebook.  *See* Ex. 1 at ¶ 313

(Ghose Rep.).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the terms "control" and "clear" as vague and undefined, and to Statement 47 as vague as to time. Statement 47 is incomplete because it relies upon Professor Ghose's report, which itself cites public reporting and a Meta press release, and these sources do not support the assertion that the Clear History tool was introduced in the United States prior to January 28, 2020.  *See* Ex. 1 at ¶ 313 (Ghose Rep.).  Only the last published article from January 28, 2020 clearly states that "Facebook's Clear History tool is now available in all countries."  The three other materials that Professor Ghose cites are from August 2019 when Meta announced the feature and its gradual roll-out starting in "Ireland, South Korea, and Spain."  *See, e.g.*, PX0549, Erin Egan & David Baser, *Now You Can See and Control the Data That Apps and Websites Share with Facebook*, Meta (Aug. 20, 2019), https://about.fb.com/news/2019/08/off-facebook-activity/.  Statement 47 is further disputed in part because while Meta's press release regarding the feature does use the terms "control" and "clear," the document states that, when users opt to "clear" data, Meta would merely "remove your identifying information from the data," *id*. at -004; the FTC disputes Meta's assertion that the ability to deidentify data qualifies as the ability to "control" and "clear" data.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta introduced a privacy feature called Clear History between 2019 and 2020.  *See supra* Meta Introduction.  The terms the FTC complains are vague require no definition; the cited document (and the sources on which it relies) explains the Clear History tool and its implementation.  *See* Ex. 1 at ¶ 313 & nn.670-671 (Ghose Rep.).  The FTC's further discussion of when and where Meta implemented Clear History does not contradict this paragraph, but merely elaborates on it in immaterial detail.  It is undisputed that Meta added this privacy feature after the acquisitions at

issue.  The FTC response itself claims that one of the sources Professor Ghose cited as support "clearly states" (that is the FTC's own characterization of the source) that the feature "is now available in all countries" as of January 2020.

48.     Meta has updated its Privacy Checkup tool to educate consumers on how to manage privacy and data settings.  *See* Ex. 1 at ¶ 315 (Ghose Rep.).

**FTC Response: Undisputed.**

49.     In 2022, Meta released Privacy Center, which is a hub for users to learn about privacy and security options available on Meta's services.  *See* Ex. 1 at ¶ 317 (Ghose Rep.).

**FTC Response: Disputed.**  The FTC disputes Statement 49 as not supported by the cited material, *see* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h), and vague as to time.  The Statement relies upon Professor Ghose's report, which itself cites a Meta press release.  *See* Ex. 1 at ¶ 317 (Ghose Rep.).  That January 7, 2022, press release stated that "Privacy Center is now available to *a limited number of people using Facebook on desktop* in the US, and we plan to roll it out to more people and more of our apps in the coming months."  PX0550, Introducing Privacy Center, Meta (Jan. 7, 2022), https://about.fb.com/news/2022/01/introducing-privacy-center/ (emphasis added).  Professor Ghose cites no materials demonstrating when or whether Privacy Center was rolled out to all users and to Meta's other apps, and thus Statement 49 is both vague as to time and not supported by the cited material.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta introduced a privacy feature called Privacy Center in 2022.  *See supra* Meta Introduction. The cited source announcing Privacy Center's launch supports this paragraph; the details regarding Privacy Center's subsequent rollout that the FTC demands are unnecessary to support this paragraph, as the FTC does not dispute that the Privacy Center feature is available to U.S.

users.  Moreover, it is beyond reasonable dispute that Meta has released Privacy Center –
following the acquisitions at issue – and that it serves as a hub for users to learn about privacy
and security options available on Facebook, Instagram, and Messenger.

50.      Also in 2022, Meta announced new privacy updates for teenagers on Instagram
and Facebook, making it so that users of a certain age have more-private settings by default.  *See*
Ex. 1 at ¶ 317 (Ghose Rep.)*.*

**FTC Response: Disputed.**  The FTC disputes Statement 50 as not supported by the cited
material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The
Statement relies upon Professor Ghose's report, which itself cites a November 2022 TechCrunch
article.  *See* Ex. 1 at ¶ 317 (Ghose Rep.).  That article stated that "everyone under the age of 16,
or under 18 in certain countries, will now be defaulted into more private settings *when they join*
*Facebook*."  PX0551, Aisha Malik, *Meta Rolls Out New Privacy Updates for Teens on*
*Instagram and Facebook*, TechCrunch (Nov. 21, 2022),
https://techcrunch.com/2022/11/21/meta-rolls-out-new-privacy-updates-teens-instagram-
facebook/ (emphasis added).  That is, "users of a certain age" did not "have more-private settings
by default" if they were already registered users or falsified their age.  The FTC thus disputes
Statement 50 as not supported by the cited material or, in the alternative, objects to the term
"default" as vague and undefined.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
Meta introduced new privacy features for teenagers on Instagram and Facebook in 2022,
including making settings more-private by default.  *See supra* Meta Introduction.  The FTC's
claim that "default" is vague and undefined is without basis:  the cited source explains the
privacy updates' content, and further explains the additional measures Facebook took to

encourage existing teen users to protect their privacy (which the FTC does not mention).  *See*

PX0551 at 2 (TechCrunch, *Meta rolls out new privacy updates for teens on Instagram and*

*Facebook*) ("For teens already on the app, Facebook is going to start encouraging them to choose

more private settings in terms of who can see their friends lists, the posts they're tagged in, the

people and lists they follow, and who is allowed to comment on their public posts.  The

Facebook privacy update comes over a year after Instagram started to default young users'

accounts to private accounts at sign-up.").  The observation that this might not apply to existing

users or hypothetical users who "falsified their age" does not dispute the Meta statement.  It is

undisputed that Meta added this privacy feature after the acquisitions at issue.

51.     Professor Hemphill testified regarding privacy and data control on Meta's

services:  "Q. But you don't have an opinion that the quality of privacy or the quality of user

control over personal information declined [between June 2018 and June 2022], do you?  . . .

A. I would agree that I don't have some specific opinion that there was some specific switch that

they flipped downward and then suddenly saw this drop."  Ex. 283 at 222:1-15 (Hemphill Dep.

Tr.); *see also* Ex. 280 at p. 19, Ex. 1 (Hemphill Rebuttal Rep.).

**FTC Response: Disputed and incomplete.**  It is undisputed that Statement 51 relays

some of the words that appear in Professor Hemphill's testimony.  Statement 51 is otherwise

disputed as not supported by the cited material as required by Local Rule 7(h) and Federal Rule

of Civil Procedure 56(c)(1)(A).  Statement 51 is disputed because it is incomplete and omits

Professor Hemphill's response to the question, which in full part read: "A. I would agree that I

don't have some specific opinion that there was some specific switch that they flipped downward

and then suddenly saw this drop.  I'm not connecting the overall drop that we're seeing in each

of these different components to specific actions except to the extent that in discussing

competitive effects I talk with some specificity about the -- the concerns about privacy and, you

know, complaints about investment, for example, that ███████ had about Instagram."  Ex. 283

at 222:6-15 (Hemphill Dep. Tr.).

Immediately preceding this exchange, Professor Hemphill testified that the quality of

privacy and data control on Meta's services declined from June 2018 and June 2022: "Q. Okay.

You found that user sentiment regarding control of personal information on Meta's apps

declined, correct?  A. Yes.  I believe the top left panel of Exhibit 1, which is addressed to this

question, how much control do you have over your personal information on Meta's apps and

products, bears on this question, as does the top left panel of Exhibit 2 about Instagram user

sentiment focused on -- excuse me -- on control of personal information. . . . As I discuss in the

rebuttal report, the differences in timing across these drops is supportive of the conclusion that

these metrics are not just reflecting overall perceptions of Meta but tracking changes over time in

the quality of these different attributes of the app. . . . the point here is that we're seeing

differently timed drops across each of these specific attributes, which is confirmatory of the

topline result that we're seeing quality decline."  *Id.* at 220:2-221:22.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Professor Hemphill testified he has no opinion that the quality of privacy or user control of

personal information deteriorated on Meta's services between June 2018 and June 2022.  *See*

*supra* Meta Introduction.  The FTC's catalog of other statements Professor Hemphill made –

about *user sentiment*, not objective privacy or privacy features and tools – likewise do not create

a dispute regarding his disclaimer of any opinion that the quality of privacy or the quality of user

control over personal information declined between June 2018 and June 2022.  The testimony

about "user sentiment" regarding privacy does not create a genuine dispute of material fact –

user responses to whether they feel the Meta services have become more private does not create

a genuine dispute of material fact regarding whether the Meta services are in fact more private –

an investigation that Professor Hemphill concededly did not undertake.  Indeed, when asked

whether he investigated what changes to Meta's services might have caused user sentiment

regarding privacy to decline, Professor Hemphill acknowledged, "I don't have a particular

change in mind of, you know, decreases."  Ex. 283 at 220:2-221:22 (Hemphill Dep. Tr.).

Professor Hemphill also acknowledged:  "Q. Are you an expert in the aspect of privacy

associated with users' control of their information. . . . A. No, I'm not claiming an expertise

about the fine details of actions taken to improve or worsen control over personal information in

Meta's apps.  Q. So if someone were an expert in that and gave the opinion that actually users'

control over information substantially improved over this period, notwithstanding the change in

sentiment, you'd have no basis to say that expert was wrong, would you? . . .  A. It's certainly

something that I would take into account in evaluating the evidence."  *Id.* at 222:16-223:10.

52.     Other firms have faced litigation and administrative action related to user privacy,

e.g., the FTC has required Snapchat to establish a privacy program for the protection of user

data, fined Twitter on multiple occasions for privacy violations, and brought actions against

TikTok and Google related to user privacy.  *See* Ex. 1 at ¶¶ 287-291 (Ghose Rep.).

**FTC Response: Undisputed but immaterial.**

53.     Other firms have faced incidents of data misuse, e.g., Twitter announced in May

2018 that it discovered a "bug" that saved user passwords unprotected on an internal log; and in

August 2020, an unsecured database left users' online profiles exposed, affecting not only

Instagram but also TikTok and YouTube.  *See* Ex. 1 at ¶ 324 (Ghose Rep.).

**FTC Response: Undisputed but immaterial.**

35

54.     Professor Lampe testified about a post on Twitter concerning Cambridge Analytica in which he wrote:  "Other tech companies should thank their stars that it was Facebook in the hot seat and not them.  Facebook is only different in their scope, not in their behaviors."  Ex. 281 at 277:14-278:7 (Lampe Dep. Tr.); *see also* Ex. 334 (MetaFTC-DX-1152). He stated, "I would agree that in the specific narrow case of Cambridge Analytica there would be no difference" between Meta and other companies.  Ex. 281 at 278:15-279:1 (Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete and immaterial.**  Undisputed that Statement 54 accurately recounts some of the words appearing in the cited material.  Disputed that Professor Lampe stated that there was "no difference between Meta and other companies." Professor Lampe responded to a question asking about "behaviors":

> Q. And in the context of Cambridge Analytica, was it an accurate statement that Facebook's behaviors were not different than other tech companies?
>
> MR. SMITH: Objection.
>
> A. I would go back and readdress that with more time, but sitting here now, I would agree that in the specific narrow case of Cambridge Analytica there would be no difference.

Ex. 281 at 278:15-279:1 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe stated publicly that Meta's behaviors are not different from its peers' behaviors (as it relates to data use).  *See supra* Meta Introduction.  The FTC's claims that this paragraph is incomplete and immaterial does not create a dispute undermining its concession that Professor Lampe gave the testimony quoted in the first sentence.  The FTC does not and cannot dispute that Professor Lampe stated, "I would agree that in the specific narrow case of Cambridge Analytica there would be no difference" between Meta's behaviors and those of "other tech

companies." Ex. 281 at 278:15-279:1 (Lampe Dep. Tr.). Any dispute about whether Meta

differed from other companies in some unidentified respect unrelated to privacy "behavior" is

immaterial.

<p style="text-align:center"><b>b.      Instagram</b></p>

55.     Kevin Systrom and Mike Krieger launched Instagram in October 2010. Ex. 284

at 15:6-8 (Systrom IH Tr.).

**FTC Response: Undisputed.**

56.     **Instagram Usage Data.** Professor Carlton calculated that, as of February 2023,

"███████████ of time spent and ████████████ of impressions viewed on Instagram are from

reciprocal follows where neither account is a creator account (but one or both could be a business

account)." Ex. 2 at ¶ 73 & p.72, tbl. 12 (Carlton Rep.). In other words, "████████████████ of

content viewed on Instagram (excluding advertising) and ████████████████ of time spent is *not*

associated with . . . friends and family sharing." *Id.* These results are depicted in the below

table:



*Id.* at p. 72, tbl. 12.

**FTC Response: Disputed.**  It is undisputed that Statement 56 relays words that appear in

Professor Carlton's report.  Statement 56 is otherwise disputed as not supported by the cited

material as required by Local Rule 7(h) and Federal Rule of Civil Procedure 56(c)(1)(A), and

because it does not establish the absence of a genuine factual dispute because it is contradicted

by other, more reliable, evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Professor Carlton asserted

without basis or support that all other content is not "*associated with* . . . friends and family

sharing."  Ex. 2 at ¶ 73 & p.72, tbl. 12 (Carlton Rep.).  This assertion is disputed, as Professor

Carlton provides no evidence or analysis in support of his vague phrasing, and Professor

Hemphill has explained that content that is not posted by a "reciprocal follow" can still have a

connection to friends and family sharing, which includes content that Professor Carlton claims is

"not associated" with such sharing.  *See* PX9007, Hemphill Rebuttal Report at ¶ 252 ("these

surfaces . . . also play a role in delivering Meta's PSN offering and the friends and family use case.  For example, since introducing Reels, Meta's strategy has focused on ███████████ ████████████████████████████████████████████████████████████ ████████.  Furthermore, even if a video was not originally posted by a friend connection, Facebook allows and encourages users to reshare unconnected video content with friends and family and broadcasts comments posted to those users' friends' feeds.  Thus, the 'minority' usage figures of Meta's experts understate the significance of the friends and family sharing use case . . . ."); PX9000, Hemphill Report at ¶¶ 269-270 (collecting evidence showing that "some engagement on Facebook Reels does involve friends and family sharing, and █████████ ████████████████████████████████████████████████████" and collecting evidence showing that "████████████████████████████████ █████████████████████████████████ . . . Among the other surfaces that facilitate some amount of friends and family sharing are Facebook Groups, Facebook Marketplace, Facebook Watch, and Gaming.").

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the vast majority of time spent on Instagram is not engaging with what Professor Hemphill describes as "friends and family" content, nor does it provide evidence to dispute Professor Carlton's calculation of that time spent relative to other activities and features on the Instagram service.  *See supra* Meta Introduction.  The FTC does not dispute that Professor Carlton accurately calculated that "███████████ of time spent and █████████ of impressions viewed on Instagram are from reciprocal follows where neither account is a creator account (but one or both could be a business account)."  Ex. 2 at ¶ 73 & p.72, tbl. 12 (Carlton Rep.).  The FTC also does not dispute that "reciprocal follows where neither account is a creator account (but one

or both could be a business account") is a reasonable and over-inclusive proxy for a "friend or family" relationship for the purposes of Professor Carlton's calculations.

The FTC cites paragraph 252 of Professor Hemphill's rebuttal report, which discusses Facebook (not Instagram), and which simply observes that non-friends content can be shared with friends and family on Facebook.  As Meta explained in its reply to paragraph 11, that re-shared video content on Facebook Feed is already included in the ▮ of time Professor Carlton calculates as "associated with [Prof. Hemphill's] friends and family sharing" on Facebook.  *See supra* Meta Reply to SMF ¶ 11 (citing Ex. 2 at ¶ 69 (Carlton Rep.)).  Thus, there is no support for the FTC's conclusory assertion that "Professor Hemphill has explained that content that is not posted by a 'reciprocal follow' can still have a connection to friends and family sharing" on Instagram.  If content is shared by reciprocal follows where neither account is a creator account, the time spent viewing such content is already included in the ▮ of time spent on Instagram that Professor Carlton conservatively attributes to "Prof. Hemphill's friends and family sharing," even if the initial post was unconnected public content that was "reshare[d]" by the user's non-creator reciprocal follow.  Ex. 2 at ¶ 73 & p.72, tbl. 12 (Carlton Rep.).  Professor Hemphill offers no other calculation in the cited paragraph (nor does the FTC elsewhere).

The FTC also cites paragraphs 269 and 270 of Professor Hemphill's opening report, which again discuss Facebook rather than Instagram, presumably to suggest that some friend-and-family sharing can occur even on surfaces like Instagram Reels.  The fact that Instagram users can view content posted by friends and family on surfaces like Instagram Reels does not undermine Professor Carlton's calculation of how often that occurs.  Professor Hemphill and the FTC offer no contrary calculation of time spent on Instagram or the percentage of content from reciprocal non-creator accounts on any Instagram surface.

57.    Professors Hemphill and Lampe did not dispute the calculations in Professor Carlton's Table 12.  *See* Ex. 281 at 240:18-241:22 (Lampe Dep. Tr.).

**FTC Response: Disputed.**  The FTC objects that Statement 57 is not supported by the cited material, as required by Federal Rule 56(c)(1)(A) and Local Rule 7(h).  The cited material relates only to the deposition testimony of Professor Lampe, and does not relate to any testimony or statement from Professor Hemphill.  Statement 57 is disputed because, as explained in the FTC's response to Statement 56, Professor Hemphill explained that "the 'minority' usage figures of Meta's experts understate the significance of the friends and family sharing use case." PX9007, Hemphill Rebuttal Report at ¶ 252.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the vast majority of time spent on Instagram is not engaging with "friends" content, nor does it provide evidence to dispute Professor Carlton's calculation of that time spent relative to other activities and features on the Instagram service, nor does it dispute that Professor Hemphill and Professor Lampe have no other calculations of those figures.  *See supra* Meta Introduction.  The FTC cites paragraph 252 of Professor Hemphill's rebuttal report, which explains that, "even if a video was not originally posted by a friend connection, Facebook allows and encourages users to reshare [that] unconnected video content with friends and family."  Setting aside that this statement is about Facebook – not Instagram, which is at issue here – the conclusory assertion that a user can reshare unconnected content with friends does not address how often that occurs; Professor Carlton, by contrast, calculated such figures for Instagram (using non-creator reciprocal follows as an over-inclusive and therefore conservative proxy for "friends" on Instagram).  The conclusory assertion that Meta "encourages users" to reshare is immaterial and supported by no factual material cited in paragraph 252 of Professor Hemphill's rebuttal report.

58.     Using Instagram video features – including Reels and Live (which are entirely video) and Stories (which is a mix of video and other content) – now accounts for ██████████ time spent on Instagram.  *See* Ex. 2 at ¶ 82 & p. 79, fig. 4 (Carlton Rep.).

**FTC Response: Disputed.**  When calculating time spent in Figure 4 of his report, which is based on FTC-META-012468455, Professor Carlton aggregated data on the product level. Applying the same approach to the data Meta produced in response to Request for Production No. 115 (PX3332, FTC-META-012478767), which show monthly *time_spent_min* across all users by product and surface, the combined share of time spent from Reels, Live and Stories accounts for ██████ of total time spent in January 2023, the latest month of data available.

**Meta Reply:**  This new FTC analysis – not sponsored by any expert witness or addressed in any deposition of a Meta expert witness – does not create a genuine dispute of material fact. *See supra* Meta Introduction.  The FTC does not explain any flaw in Professor Carlton's methodology or data set; the observation that he "aggregated data on the product level" is not a critique.  The fact that the FTC used a *different* data set and calculated that time spent on Reels, Live, and Stories is ███ of all time spent is immaterial to the pending motion.  It is undisputed that a significant amount of time spent – ████████████████████████ – is consuming video features (none of which existed before the Instagram acquisition).  In fact, Meta announced in its First Quarter Earnings Call for 2024 that, as of April 2024, more than 60% of time on Facebook and Instagram is spent watching video, and that Reels alone accounts for 50% of time spent on Instagram.  *See* Ex. 499 at 4, 6 (Meta Q1 2024 Earnings Call).

59.     In February 2023, consuming Instagram Reels accounted for ██████████████ of time spent on Instagram.  *See* Ex. 2 at p. 79, fig. 4 (Carlton Rep.).

**FTC Response: Disputed.**  When calculating time spent in Figure 4 of his report, which is based on FTC-META-012468455, Professor Carlton aggregated data on the product level. Applying the same approach to the data Meta produced in response to Request for Production No. 115 (PX3332, FTC-META-012478767), which show monthly *time_spent_min* across all users by product and surface, the share of time spent on Instagram Reels accounts for █████████ of total time spent in January 2023, the latest month of data available.

**Meta Reply:**  This new FTC analysis – not sponsored by any expert witness or addressed in any deposition of a Meta expert witness – does not create a genuine dispute of material.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 58 (addressing similar response).  The FTC does not explain any flaw in Professor Carlton's methodology or data set; the observation that he "aggregated data on the product level" is not a critique.  The fact that the FTC used a *different* data set and calculated that time spent on Reels is ████ of all time spent is immaterial to the pending motion.  It is undisputed that a significant amount of time spent – █████████ of all time on Instagram – is consuming Reels (which Professor Hemphill agreed competes with TikTok).  *See infra* Meta SMF ¶ 262 (quoting Ex. 283 at 164:11-165:6 (Hemphill Dep. Tr.)).  In fact, Meta announced in its First Quarter Earnings Call for 2024 that, as of April 2024, Reels alone accounts for 50% of time spent on Instagram.  *See* Ex. 499 at 4 (Meta Q1 2024 Earnings Call).

60.   When Instagram users are consuming Instagram Reels, ██████████████ of time spent and ████ of total impressions on Reels comes from users' "reciprocal follows where neither account is a creator account (but one or both could be a business account)."  *See* Ex. 2 at ¶ 73 & p. 72, tbl. 12 (Carlton Rep.).  ███████████████████████████████

███████████████████████████████████████  *Id.* at ¶ 72 & p. 72, tbl. 12 (rows "Home – Reels"

and "Reels").

**FTC Response: Disputed in part.**  The first sentence of Statement 60 is undisputed.

The second sentence is disputed in part because the phrase "comes from" is vague, and it is

contradicted by other evidence to the extent it suggests that all content that is not *posted by* a

"reciprocal follow[]" does not "come[] from" a user with whom the consumer has a reciprocal

sharing relationship – for example, a user might view of video that is recommended or re-shared

by a friend.  *See* PX9007, Hemphill Rebuttal Report at ¶ 252 ("even if a video was not originally

posted by a friend connection, Facebook allows and encourages users to reshare unconnected

video content with friends and family and broadcasts comments posted to those users' friends'

feeds.  Thus, the 'minority' usage figures of Meta's experts understate the significance of the

friends and family sharing use case, . . .").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████  of time spent and ███ of total impressions on Reels comes from users'

"reciprocal follows where neither account is a creator account (but one or both could be a

business account)."  *See supra* Meta Introduction.  The FTC also does not contest that

"reciprocal follows where neither account is a creator account (but one or both could be a

business account)" is a reasonable and over-inclusive proxy for a "friend or family" relationship

for the purposes of Professor Carlton's calculations.  The term "comes from" is not vague and

carries its ordinary usage, i.e., ████████████████  of content a user consumes from Reels is

generated by non-creator reciprocal followers (an over-inclusive and thus conservative proxy for

"friends" on Instagram).

The FTC cites a passage from Professor Hemphill's report that discusses Facebook rather than Instagram, to posit that a user on Instagram might view a video that is re-shared by a "friend" on Instagram.  The FTC response is not specific to Instagram, but also does not dispute Professor Carlton's calculation.  Professor Carlton already attributes any re-shared public content as impressions and time spent viewing content "com[ing] from" a user with whom the consumer has a reciprocal sharing relationship.  *See* Ex. 2 at ¶ 73 & p. 72, tbl. 12 (Carlton Rep.).  *See id.* Professor Hemphill and the FTC do not offer any alternative calculations, and the FTC's response does not create a genuine dispute of material fact relating to the accuracy of Professor Carlton's findings.

61.     When Meta . Ex. 2 at ¶ 83 (Carlton Rep.).  In other words,

*Id.*

**<u>FTC Response: Disputed.</u>**  Statement 61 is disputed because it is not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h). The purported study referenced in Statement 61 and by Professor Carlton is vaguely described by Professor Carlton ( and lacks any detail or source material to evaluate the methodology and reliability of the study or its results, including, *inter alia*, no details on sampling method, duration, and . *See* Ex. 2 at ¶ 83 (Carlton Rep.).  The FTC therefore disputes that the study is reliable or sufficient to support anything informative about a material fact at issue in the litigation.

**Meta Reply:**  The FTC response does not create a genuine dispute of material fact because Meta conducted the study referenced in the ordinary course – it was not prepared for litigation – and determined it to be sufficiently reliable for those purposes.  *See supra* Meta Introduction.  The FTC offers no expert opinion or testimony critiquing that study or its methodology.  The FTC obtained the material at issue in discovery and had every opportunity to probe the reliability of the study.  It is undisputed that the █████████████████████ ████████████████████████████████████████████████; the FTC does not dispute that fact.

62.     Meta provided Instagram Feed composition data in conjunction with the corporate deposition of Blake Cutler, Meta's director of product management.  *See* Ex. 259 (PX12541).  From that data, ██████ of impressions were classified as likely related to a personal relationship.  *See* Ex. 2 at ¶ 74 & n.121, & p. 73, tbl. 13 (Carlton Rep.).  ████████████████ of content viewed on Instagram Feed (including advertising) is *not* associated with . . . friends and family sharing."  *Id.* at ¶ 74 & n.121.

**FTC Response: Disputed in part.**  The first sentence is undisputed.  The second and third sentences are disputed as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), and because they do not establish the absence of a genuine factual dispute because they are contradicted by other, more reliable, evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Professor Carlton asserted without basis or support that certain impressions were not "likely related to a personal relationship" or not "*associated with . . . friends and family sharing.*"  This assertion is disputed, as Professor Carlton provides no evidence or analysis in support of his vague phrasing, and Professor Hemphill has explained that content that is not *posted* by a "reciprocal follow" or an account described in Professor Carlton's

Exhibit 2 can still have a connection to friends and family sharing.  *See* PX9007, Hemphill

Rebuttal Report at ¶ 252 ("even if a video was not originally posted by a friend connection,

Facebook allows and encourages users to reshare unconnected video content with friends and

family and broadcasts comments posted to those users' friends' feeds.  Thus, the 'minority'

usage figures of Meta's experts understate the significance of the friends and family sharing use

case. . .").

    **Meta Reply:**  This response does not create a genuine dispute of material fact that only a

fraction – and clear minority – of content on Instagram Feed is likely related to a personal

relationship the user has with another user.  *See supra* Meta Introduction.  The response

misquotes Professor Carlton's report – which explained that most content was "*not* associated

with *Prof. Hemphill's* friends and family sharing" (emphasis added to words FTC omitted) –

which analysis and methodology Professor Carlton explained in his report, including at Table 13.

No evidence, cited material, or paragraph 252 of Professor Hemphill's rebuttal report (which

discusses Facebook, and not Instagram – which is at issue here) supports the conclusory

assertion that Professor Carlton's calculations understate the significance of the friends and

family sharing use case.  The FTC and Professor Hemphill do not offer any explanation or

evidence to suggest that a user who views a public video re-shared by a non-creator reciprocal

follower (an over-inclusive and therefore conservative proxy for "friends" on Instagram) would

not be counted in the ▮ of impressions on Feed that are shown as coming from a personal

connection and counted for the purposes of Professor Carlton's analysis as "associated with Prof.

Hemphill's friends and family sharing."  *See* Ex. 2 at ¶ 74 & n.121, & p. 73, tbl. 13 (Carlton

Rep.).  Those ▮ of impressions that are counted as "associated with Prof. Hemphill's friends

and family sharing" include both original posts from non-creator reciprocal follows and re-shares from non-creator reciprocal follows. *See id.*

63.    In February 2023, consuming content on Instagram's Explore surface accounted for ███████████ of time spent on Instagram and ██ of all impressions on Instagram. Ex. 2 at p. 72, tbl. 12 (Carlton Rep.).

**FTC Response: Undisputed but immaterial.**

64.    When Instagram users are using the Instagram Explore surface, ██████████████ of time spent and ██ of total impressions on Explore comes from users' "reciprocal follows where neither account is a creator account (but one or both could be a business account)." Ex. 2 at ¶ 73 & p. 72, tbl. 12 (Carlton Rep.).

**FTC Response: Undisputed but immaterial.**

65.    As of June 2023, "Instagram services that account for the largest shares of user time include[d] ████████████████ ; and ██████████ together represent[ed] . . . ██████ of time spent on Instagram." Ex. 3 at ¶ 33, p. 13, tbl. II-1 (List Rep.). These results are depicted in Professor List's Table II-1, at *supra* ¶ 15.

**FTC Response: Undisputed but immaterial.**

66.    Professor Hemphill did not dispute the calculations in Professor List's Table II-1, *supra* ¶ 15.

**FTC Response: Undisputed but immaterial.**

67.    **Instagram Features.**  Instagram has offered or currently offers the following features, among others:

**FTC Response: Undisputed.**

### i.       Profile

68.      Instagram Profiles are where users can find their photos, videos, and settings on Instagram.  Ex. 324 at 15 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022))*.*  On their Profiles, users can view what they have shared and see a list of the people they are following and who is following them.  *Id*.  Users can add a biography, profile picture, or website to Instagram Profiles, and they may identify by pseudonyms, instead of a real name.  *See* Ex. 281 at 310:5-8 (Lampe Dep. Tr.); Ex. 290 at ¶ 163 (Lampe Rep.).

**FTC Response: Undisputed.**

### ii.       Follow

69.      Users have been able to "Follow" other users on Instagram since Instagram launched.  *See* Ex. 284 at 49:22-50:3 (Systrom IH Tr.).  "On Instagram, connections are one-way.  Whether user A follows user B or not is independent of whether user B follows user A.  If user A follows user B, and user B follows user A, then that relationship is referred to as a 'reciprocal follow,' but there is no direct equivalent in Instagram to a 'friend' request in Facebook that will automatically set up a reciprocal relationship."  Ex. 2 at ¶ 72 (Carlton Rep.).

**FTC Response: Undisputed.**

### iii.       Photos and Video

70.      Since around the time Instagram launched, users have been able to post photos on Instagram.  *See* Ex. 279 at ¶ 116 (Hemphill Rep.).  Instagram users originally posted photos via a "Share" button. *Id.*

**FTC Response: Undisputed.**

71.      Meta added the ability for users to share videos on Instagram around June 20, 2013.  Ex. 2 at ¶ 82 & n.130 (Carlton Rep.).

**FTC Response: Undisputed.**

72.     Instagram allows users to share one or multiple photos and videos as a single post to Instagram Feeds; users can also add a caption or location and tag other accounts.  Ex. 324 at 14 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### iv.     Instagram Feed

73.     Instagram's Feed has existed since Instagram's launch.  *See* Ex. 284 at 50:11-13 (Systrom IH Tr.).  At the time of launch, Instagram's Feed enabled users to post their own photos to the Feed.  *See id*. at 51:24-52:6.

**FTC Response: Undisputed.**

74.     Instagram's Feed has evolved over time.  For example, around March 23, 2022, Meta introduced Favorites and Following, two new ways for users to choose what they see in their Feeds.  Ex. 324 at 8 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

75.     In addition to allowing users to post and interact with photos, "Instagram Feed is a place where [users] can share and connect with the people and things [they] care about.  When [users] open Instagram or refresh [their] feed, the photos and videos [Meta] think[s] [they] care about most will appear towards the top of [their] feed.  In addition to seeing content from people and hashtags [they] follow, [the users] may also see suggested accounts that are relevant to [their] interests."  Ex. 335 (Instagram, *How Instagram Feed Works*, https://perma.cc/C86D-U9ZV).

**FTC Response: Undisputed.**

### v.  Explore

76.     Instagram introduced the Explore tab around June 25, 2012.  Ex. 324 at 14

(Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  Meta introduced an

updated Explore page and improved search features around June 23, 2015.  *Id.*

**FTC Response: Undisputed.**

77.     People visit Instagram's Explore tab to discover photos, short-form videos, long-

form videos, and stories from accounts or users they do not follow.  Ex. 324 at 14 (Meta's Suppl.

Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  Users may see photos and videos that

people they follow have liked, or that have been liked by a large number of other users.  *Id.*

**FTC Response: Undisputed.**

78.     The Explore tab surfaces trends as they emerge in real time, connecting people to

events and conversations both near and around the globe from individuals, groups, or businesses.

Ex. 324 at 14 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### vi.  Instagram Direct

79.     Meta introduced Instagram Direct around December 12, 2013.  Ex. 324 at 13

(Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  Instagram Direct is the

messaging function in Instagram.  *Id.*

**FTC Response: Undisputed.**

80.     Instagram Direct enables users to exchange threaded messages and share posts

they see in Feed and Stories on a one-to-one, one-to-some, or one-to-many basis.  Ex. 324 at 13

(Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)); *see also* Ex. 336

(Instagram, *Instagram Group Chat Size Limits*) ("Most group conversations on Instagram can

include up to 250 people.")  It also allows people to send and receive text, photos, and videos, as

well as disappearing content, polls, profiles, and location pages as messages, in addition to video chatting.  Ex. 324 at 14 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

81.    Around September 30, 2020, Meta updated Instagram Direct to add features including watch together, vanish mode, selfie stickers, chat colors, custom emoji reactions, forwarding, replies, animated message effects, message controls, and enhanced reporting and blocking updates.  Ex. 324 at 14 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### vii.    Instagram Stories

82.    Meta introduced Instagram Stories around August 2, 2016.  Ex. 324 at 7 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

83.    Instagram Stories enable users "to share moments and experiences."  Ex. 337 at 2 (Instagram, *Share Your Everyday Moments*, https://perma.cc/G9UG-HWHB).  Stories posted on Instagram last for 24 hours.  *Id*. at 3.  However, users may also post Stories as Highlights to their Profiles, making them accessible to other viewers for more than 24 hours.  *Id*.

**FTC Response: Undisputed.**

### viii.    Instagram Live

84.    Meta announced Live video on Instagram Stories around November 21, 2016.  Ex. 324 at 7 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

85.     Instagram Live enables users to "start a live broadcast to connect with [their] followers in real time.  Once a live broadcast has ended, [users] can share a reply or access it in [their] Live Archive."  Ex. 338 (Instagram, *Live*).

**FTC Response: Undisputed.**

### ix.     Instagram Shop

86.     Meta introduced Instagram Shop around July 16, 2020.  Ex. 324 at 8 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

87.     Instagram Shop enables users to make purchases from Instagram accounts with shops.  *See* Ex. 324 at 8 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)); Ex. 339 (Instagram, *Shop*).

**FTC Response: Undisputed.**

### x.     Instagram Reels

88.     Meta launched Instagram Reels around August 5, 2020.  Ex. 324 at 8 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

89.     Reels allows users to "record and edit short videos" up to 90 seconds in length, and then "share" those videos, or "reels."  Ex. 340 at 1 (Instagram, *Reels*).

**FTC Response: Undisputed.**

90.     For public Instagram accounts, "[a]nyone on Instagram can see and share [the users'] reels.  People may see [the users'] reels on places like Feed, the Reels viewer, Explore and audio, effect and hashtag pages."  Ex. 341 (Instagram, *Who Can Share and See Your Reels on Instagram*).

**FTC Response: Undisputed.**

### xi.   Threads

91.    Meta announced the launch of Threads on July 5, 2023.  Ex. 342 (Meta,

*Introducing Threads:  A New Way to Share with Text*).

**FTC Response: Undisputed.**

92.    "Threads is an application for text-based updates and public conversations, where

communities come together to discuss topics of interest.  People can connect directly with their

favorite creators and others who love the same things or build a loyal following of their own to

share their ideas, opinions, and creativity with the world."  Ex. 325 at 8 (Meta 2023 Form 10K).

**FTC Response: Undisputed.**

### c.   Messenger

93.    Messenger is a "messaging application for people to connect with friends, family,

communities, and businesses across platforms and devices through text, audio and video calls."

Ex. 325 at 8 (Meta 2023 Form 10K).

**FTC Response: Undisputed.**

94.    Facebook users have been able to message one another since approximately its

launch.  *See* Ex. 139 at 141:21-142:5 (Zuckerberg IH Tr.) (stating that Facebook Messages was

available on Facebook "a few weeks after I started the original service").

**FTC Response: Undisputed.**

95.    Around August 2011, Meta launched Messenger as a standalone app.  *See* Ex. 324

at 11 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)); Ex. 139 at 141:21-

143:1-2 (Zuckerberg IH Tr.).  At the time of launch, Messenger enabled users to "send and

receive real-time messages with individual friends as well as small groups of friends, send

photos, and privately share your location."  Ex. 343 at 2 (ZDNET, *Facebook Launches Facebook*

*Messenger App for Android, iPhone*, https://perma.cc/TKN5-HP2Q).  Users can send and receive messages from either the Messenger app or the Facebook app.  *Id.* at 3.

**FTC Response: Undisputed.**

96.   **Messenger Features.**  Messenger has offered or currently offers the following features, among others:

**FTC Response: Undisputed.**

### i.        Messaging

97.   Messenger enables users to "send photos, voice messages, GIFs, stickers or AI stickers of up to 25 MB in file size in [their] Messenger chats" to other users.  Ex. 344 at 1 (Meta, *Send a Photo, Video, Sticker, or Voice Message on Messenger*, https://perma.cc/2MFA-QQPP?type=image).

**FTC Response: Undisputed.**

98.   Messenger allows users to send "Group chats," which are "conversations you have with more than one person on Messenger, such as friends and family."  Ex. 345 at 1 (Meta, *Group Chats*, https://perma.cc/AD28-MVNS?type=image).

**FTC Response: Undisputed.**

99.   Messenger encrypts messages sent via the app:  "End-to-end encryption on Messenger adds extra security and protection to [users'] messages and calls so only [the user] and whoever [the user is] talking to can see, hear or read them.  The content of [users'] messages and calls in end-to-end encrypted conversations is protected from the moment it leaves [the user's] device to the moment it reaches the receiver's device."  Ex. 346 at 1 (Messenger, *What End-to-End Encryption on Messenger Means and How It Works*, https://perma.cc/8B2J-B6A5?type=image).

**FTC Response: Undisputed.**

100.    Messenger's "Secret Conversations" with end-to-end encryption began to roll out around July 8, 2016.  Ex. 324 at 9 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### ii.    Voice and Video Calls

101.    Meta started offering audio calls on Messenger in approximately 2013 and fully rolled out one-to-one audio calls around April 2014.  Ex. 324 at 16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

102.    Meta introduced video calling in Messenger around April 27, 2015.  Ex. 324 at 16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

103.    Meta began introducing group calling globally around April 20, 2016.  Ex. 324 at 16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

104.    Meta introduced Group Video Chat around December 19, 2016.  Ex. 324 at 9 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

105.    Messenger enables voice calling and video chats with a single person or a group. Ex. 324 at 16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

106.    Messenger offers features such as animated reactions, filters, masks, effects, and the ability to take screenshots during video chats.  Ex. 324 at 16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

### iii. Stories

107.    Meta introduced Messenger Stories, then called Messenger Day, around March 9, 2017.  Ex. 324 at 16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

108.    Messenger Stories are similar to Facebook and Instagram Stories.  Ex. 324 at 16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  Users can share Stories publicly, with Facebook friends and Messenger connections, with only Facebook friends, or with a custom list of users.  *Id.* at 17.

**FTC Response: Disputed in part.**  The FTC objects that "similar to" is so vague it is not susceptible to a response, and on that basis disputes the first sentence.  The second sentence is undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Messenger Stories has features that resemble Facebook Stories and Instagram Stories.  *See supra* Meta Introduction.  The second sentence, describing Messenger Stories, is undisputed.

### iv. Rooms

109.    Meta launched Rooms around May 2020.  Ex. 324 at 9 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

110.    Rooms allows users to interact with other people via video chat.  Ex. 347 (Instagram, *Messenger Rooms*, https://perma.cc/S4E4-NCFC).  To use Rooms, users create and share links with up to 50 individuals.  *Id.* at 2.  Each link recipient – regardless of whether they are a Facebook user – can join the Room to video chat for an unlimited amount of time.  *Id.* at 3.

**FTC Response: Undisputed.**

### v.   Community Chats

111.    Meta introduced Community Chats on Messenger around September 2022.
Ex. 348 (Meta, Introducing Community Chats:  Connecting Your Community in Real Time on
Messenger and Facebook).

**FTC Response: Undisputed.**

112.    "Community Chats let people connect more deeply with communities in real time
around the topics they care about in multiple formats, including text, audio and video.  The
experience seamlessly blends Messenger and Facebook Groups to allow people to connect when,
where and how they want."  Ex. 348 at 2 (Meta, *Introducing Community Chats:  Connecting
Your Community in Real Time on Messenger and Facebook*).

**FTC Response: Undisputed.**

### d.   WhatsApp

113.    Brian Acton and Jan Koum founded WhatsApp in 2009.  *See* Ex. 163 at 182:5-16
(Acton Dep. Tr.).

**FTC Response: Undisputed.**

114.    **WhatsApp Features.**  WhatsApp has offered or currently offers the following
features, among others:

**FTC Response: Disputed in part.**  The FTC objects to the term "has offered or currently
offers" is vague as to time, and disputes Statement 114 in part as not supported by the cited
material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).
Otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact.  As
the colon at the end of the sentence indicates, the material cited in the paragraphs below supports
the statement.

### i. Messaging

115.     WhatsApp allows users to communicate with other individuals utilizing "[users']

phone's Internet connection to send messages," which allows users to "avoid SMS fees."

Ex. 349 at 1 (WhatsApp, *WhatsApp Features*, https://perma.cc/92S4-YF8F).

**FTC Response: Undisputed.**

116.     WhatsApp allows Group Chats with up to 1,024 users, in addition to enabling

users to take and send photos, videos, and voice messages, and providing features to enhance

photos and videos, such as adding emojis, as well as messaging encryption.  *See infra* Part

III.B.4(c)-(d).

**FTC Response: Undisputed.**

### ii. Status

117.     The WhatsApp app enables users to share their status.  Ex. 324 at 15 (Meta's

Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

118.     Around February 24, 2017, Meta updated WhatsApp's Status feature, allowing

people to share photos and videos with their WhatsApp friends and contacts (in addition to

simple text status).  Ex. 324 at 15-16 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2

(Sept. 9, 2022)).  Status allows users to share text, photo, video, and GIF updates that are end-to-

end encrypted and disappear after 24 hours.  *Id.* at 16.

**FTC Response: Undisputed.**

### iii. Broadcast Lists

119.     WhatsApp launched broadcast lists in approximately December 2013.  Ex. 324

at 15 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

120.     The broadcast lists feature allows users to send a message to several contacts at once.  Ex. 324 at 15 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  Broadcast lists are saved lists of message recipients to whom users can repeatedly send broadcast messages without having to select them each time.  *Id.*

**FTC Response: Undisputed.**

### iv.     Voice and Video Calls

121.     Meta launched Voice Calls on WhatsApp in approximately March 2015.  Ex. 324 at 15 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

122.     Meta announced Video Calling on WhatsApp around November 14, 2016.  Ex. 324 at 9 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).

**FTC Response: Undisputed.**

123.     "WhatsApp voice and video calls use [the user's] phone's Internet connection, instead of [their] cell plan's voice minutes, so [they] don't have to worry about expensive calling charges."  Ex. 349 at 2 (WhatsApp, *WhatsApp Features*, https://perma.cc/92S4-YF8F).

**FTC Response: Undisputed.**

### v.     WhatsApp Business App

124.     Meta launched the WhatsApp Business App around January 2018.  Ex. 324 at 9 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 2 (Sept. 9, 2022)).  The WhatsApp Business App is a standalone app that enables businesses "to communicate one-on-one with [their] customers throughout [the customer's] purchase process."  Ex. 350 at 2 (WhatsApp Business, *Built With the Small Business Owner in Mind*, https://perma.cc/GS5T-L9EV).

**FTC Response: Undisputed.**

### vi.    Channels

125.    Meta introduced WhatsApp Channels around June 2023.  Ex. 351 at 1 (WhatsApp

Blog, *Introducing WhatsApp Channels.  A Private Way to Follow What Matters*,

https://perma.cc/XBV5-3E6Q).  "Channels are a one-way broadcast tool for admins to send text,

photos, videos, stickers, and polls."  *Id.*  To help users select channels to follow, Meta announced

it was "building a searchable directory where [users] can find [their] hobbies, sports teams,

updates from local officials, and more."  *Id.*  Users "can also get to a channel from invite links

sent in chats, e-mail, or posted online."  *Id.*

**FTC Response: Undisputed.**

### e.    Meta's Innovation

126.    From 2012 through 2022, Meta spent approximately $126.25 billion on research

and development, and another $112.1 billion on "net purchases of property and equipment as

[Meta] continued to invest in servers, data centers, and network infrastructure."  Ex. 2 at ¶ 315

(Carlton Rep.) (citing Form 10-Ks).  In both 2022 and 2023 (as of September 26, 2023), Meta

had invested 29% of its total revenues into research and development – a ratio that exceeded

Alphabet, Microsoft, Amazon, and Apple.  *See id.* at p. 226, tbl. 32.  Between 2012 and 2017,

Meta's annual spending on research and development grew every year, from $1.4 billion in 2012

to $7.75 billion in 2017.  *See id.* at p. 225, tbl. 31.  Those numbers have continued to increase:

Meta spent more than $10 billion on research and development in 2018 and $13.6 billion in

2019.  *See* Ex. 352 at 55 (Facebook 2019 Form 10-K).  Meta then spent more than $18 billion on

research and development in 2020, more than $24 billion in 2021, and more than $35 billion in

2022.  *See* Ex. 353 at 69 (Meta 2022 Form 10-K).

**FTC Response: Undisputed but incomplete.**  Undisputed that the cited exhibits contain

the quoted language, and that Meta reported spending the stated amounts.  These amounts are

overstated, however, because they include massive spending on Meta's Reality Labs, Meta's VR

arm which has little or nothing to do with its core personal social network services business. *See*

PX9007, Hemphill Rebuttal Report, at ¶¶ 743, 745. Furthermore, Meta's own ordinary course

documents concede that the ███████████████████████████████████████████

███████████████████. *See* PX3177, Meta document: "R&D Spend Analysis – A

Comparison of FB vs. ██████," (Apr. 6, 2021), FTC-META-004667237 at -237-39 (comparing



).

By this more appropriate metric, and with the irrelevant Reality Labs expenditures

removed, Meta spends less than nearly all of its self-selected benchmark firms on R&D. *See*

PX9007, Hemphill Rebuttal Report, Exhibits 36, 37.

**Meta Reply:** The FTC does not create a genuine dispute of material fact that Meta

invests billions annually in research-and-development spending to improve its products, which

include, among others, Facebook, Instagram, and WhatsApp. *See supra* Meta Introduction.

Regarding spending on Reality Labs, the material the FTC cites – two paragraphs from Professor

Hemphill's rebuttal report – does not quantify that spending relative to other investments, nor

does it dispute that Meta spends billions on research-and-development annually. Regarding

PX3177, the FTC mischaracterizes the document – the report concludes, "██████████████████

████████████████████████████████████████████████████████████



.” PX3177 at -237
(FTC-META-004667237); *see also id.* at -238 (

).

127.     Professor Hemphill agreed that "innovation . . . include[s] addition of features."
Ex. 283 at 229:17-19 (Hemphill Dep. Tr.).  For example, when asked, "You would agree with
me that the addition of Stories to the Instagram and Facebook apps was a quality improvement,
correct?," Professor Hemphill testified:  "Yes.  I would – I would agree with that and indeed
emphasize the introduction of Stories by Facebook and Instagram as a product improving
competitive response to the threat posed by Snapchat."  *Id.* at 231:10-19.  Professor Hemphill
also testified that the addition of Reels was a quality improvement:  "Q. . . . And the addition of
Reels was a quality improvement, correct?  . . .  A. It's a quality improvement, I think I would
agree with that, albeit one that is less directly improving of the provision of personal social
networking services."  *Id.* at 231:20-232:4.  Professor Hemphill later added:  "Q. . . .  And just to
be clear, you agree that the addition of Reels was an innovation of Facebook and Instagram's
personal social networking services, correct?  . . .  A. It was an innovation bringing the
competition to TikTok in the way that we talked about and which I agree serves to, to some
degree, improve the personal social networking offering for all users."  *Id.* at 263:17-264:4.

**FTC Response: Disputed in part.**  Undisputed that Statement 127 recounts words that
appear in the cited document.  Statement 127 is otherwise disputed as the cited material does not
establish the absence of a genuine dispute regarding a material fact, s*ee* Fed. R. Civ. P.

56(c)(1)(B): Professor Hemphill's excerpted testimony that adding Reels represented "bringing the competition to TikTok" does not establish that Meta and TikTok compete in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  Meta omits the earlier testimony to which Professor Hemphill was referring when he said, "bringing the competition to TikTok in the way that we talked about."  Ex. 283 at 264:1-2 (Hemphill Dep. Tr.).  In that earlier testimony, Professor Hemphill testified that "chasing additional usage through Reels, bringing the competition to TikTok in the manner that we've been discussing is in a sense pursuing users and usage on the margin as I say in paragraph 362 [of the Hemphill Rebuttal Report]."  *Id.* at 165:2-6).  In paragraph 362 of his rebuttal report, Professor Hemphill states clearly that the effects of chasing such marginal usage "do[] not point to Meta being competitively constrained, but rather to the lack of competition in personal social networking services, with Meta exercising monopoly power in the manner discussed above."  PX9007, Hemphill Rebuttal Report at ¶ 362.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta adding features to its services is innovation, quality improvement, and competition with other products.  *See supra* Meta Introduction.  The additional passages that the FTC quotes from Professor Hemphill's testimony confirm Meta's point – there is competition on the "margin" for "additional usage," which Meta (and other firms) convert to advertising revenue.  Paragraph 362 of Professor Hemphill's rebuttal report restates conclusions without any citation to record material other than Professor Carlton's report.  Professor Hemphill testified, "[t]here is a sense in which competition often occurs at . . . the margin," and Meta's incentive is "to gain users and usage wherever [it] can" by "pursuing users and usage on the margin."  *See infra* Meta SMF ¶ 637 (quoting Ex. 283 at 164:11-165:6, 165:14-15, 166:18-20 (Hemphill Dep. Tr.)).  He also

explained during his deposition that there is no evidence Meta identifies and then discriminates against a distinct "friends and family" demand: "I've not seen evidence of Meta, for example, internally calculating, you know, some numerical value of inelasticity and responding with a change in ad load." *See infra* Meta SMF ¶ 640 (quoting Ex. 283 at 253:8-17 (Hemphill Dep. Tr.)). Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including watching videos, there is likewise no genuine dispute that the competition between Reels and TikTok occurs within the relevant market. *See infra* Meta SMF ¶¶ 580-584; 622 (citing Ex. 283 at 80:20-81:21 (Hemphill Dep. Tr.)) (Professor Hemphill confirming that his opinion is "100 percent" of the time a user spends on the "Reels tab" "watch[ing] a series of short videos of an otherwise unknown individual dancing" is time spent engaging in "personal social networking.")

128.    "Digital economy companies often incorporate features from other popular apps into their own as a strategy to stay competitive by engaging users and holding their attention." Ex. 1 at ¶¶ 46-53 (Ghose Rep.). For example, after Meta introduced News Feed, the Like button, and Live, several other apps introduced similar features; and after Snap introduced Stories and TikTok popularized short-form video content, other apps introduced similar features. *Id.*; *see also* Ex. 2 at ¶ 36 (Carlton Rep.) ("[C]opying of successful features is a commonplace and desirable part of competition, and is actually an indicator of the presence of competition.").

**FTC Response: Disputed in part.** Undisputed that Statement 128 relays words that appear in the cited materials. It is undisputed that some other apps have features that they call "feeds" or "stories," or that play short videos, but the FTC objects that Statement 128's assertion that "several other apps introduced similar features" is so vague that a reasonable response is not

possible, as Meta does not identify which apps have features that Meta asserts are similar, nor does it describe in what ways the features supposedly are "similar," particularly in relation to the provision of personal social network services.

Statement 128 is otherwise disputed as the cited material does not establish the absence of a genuine dispute regarding a material fact, s*ee* Fed. R. Civ. P. 56(c)(1)(B): the existence or introduction of various features that are claimed to be "similar" does not establish that any firm competes with Meta in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply**:  The FTC's response does not create a genuine dispute of material fact that online services compete through feature innovation (often releasing similar and overlapping features).  *See supra* Meta Introduction.  The term "several other apps introduced similar features" is in reference to the materials cited, which enumerates the many services that have these overlapping and similar features – which the FTC response does not dispute, e.g., Instagram introduced Reels as a response to TikTok.  The FTC's conclusory assertion that competition for time spent on similar features across services that the FTC omits from its alleged market does not bear on the existence of that market is wrong.

129.   Professor Hemphill testified regarding the quality of Meta's services:  "Q. . . . It's fair to say that you made no effort to construct any sort of quantitative quality index for Facebook and Instagram, true?  . . .  A. I don't see how that would – I don't see how that would be done as, you know, it's not something that I have done, I don't see how one would do that."  Ex. 283 at 232:16-233:2 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 129 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  Statement 129 is otherwise disputed as the cited material does not establish the absence of a genuine dispute regarding a material fact, s*ee* Fed. R. Civ. P. 56(c)(1)(B): Professor Hemphill's excerpted testimony does not establish that any firm competes with Meta in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  As Professor Hemphill testified, constructing a quantitative quality index would not be possible and, even if it were, would not serve any useful purpose in the analysis of Meta's monopoly power or the effects of its conduct on competition. *See* Ex. 283 at 232:21-233:2 (Hemphill Dep. Tr.) ("I don't see how that would be done as, you know, it's not something that I have done, I don't see how one would do that."); *id.* at 232:10-15 ("I can't think of a quantitative measurement of the improvement of Reels.  I'm not sure what that would look like or to what end that would serve either for the analysis of monopoly power or of competitive effects.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that neither Professor Hemphill nor the FTC have a means of measuring the relative quality of Meta's services, which encompass many factors.  *See supra* Meta Introduction.  The FTC's conclusory recitation that there is a "personal social networking services" market – made without reference to any record material – does not create a genuine dispute of material fact.

130.    Professor Hemphill also testified about quality-adjusted price:  "Q. . . . Now, you would agree with me that, all else equal, if quality-adjusted price declines, usage would increase, correct?  . . . A. Yes.  I think all else equal, one would expect that to be true.  Speaking at a high level of generality and we want to be careful that we're getting it right, but yes, at least – yes, I

think as a general matter that's true."  Ex. 283 at 233:3-12 (Hemphill Dep. Tr.).  He added that

"we have a robust finding in economics that as quality improves holding constant price we

would expect usage to rise, all else equal, and because we see evidence of usage falling in the

face of increases in quality-adjusted price."  *Id.* at 233:16-22.  Professor Hemphill also testified:

"Q. So you'd agree that, all else equal, if the quality of Instagram increases, the quality-adjusted

price declines and usage increases, correct?  . . .  A. Yes.  In general terms I would agree that as

quality increases, holding price constant, that we would expect usage to increase."  *Id.* at 234:7-

14; *see also id.* at 234:15-235:1 (agreeing the same as to Facebook).

**FTC Response: Disputed in part.**  Statement 130 is undisputed to the extent that it

recounts words that appear in the cited transcript but is otherwise disputed.  Statement 130 is

otherwise disputed as the cited material does not establish the absence of a genuine dispute

regarding a material fact, s*ee* Fed. R. Civ. P. 56(c)(1)(B): Professor Hemphill's excerpted

testimony does not establish that any firm competes with Meta in the provision of personal social

network services, that there is not a relevant market for personal social network services, or that

Meta is not exercising monopoly power.

The FTC also notes that this is an example of Meta's assertion in its brief diverging from

its actual proposed Statement.  In its brief, Meta cites Statement 130 for the proposition that:

"Professor Hemphill acknowledged that Meta's increase in output is evidence that quality-

adjusted prices are declining – where, as here, price is held constant (zero) and output increases,

that indicates quality is improving."  Mot. at 26.  Professor Hemphill's excerpted testimony says

no such thing, and accordingly, Meta's assertion in its brief is unsupported by the cited material

as required under Fed. R. Civ. P. 56(c)(1)(A) and Local Rule 7(h).

Meta's distortion of the cited testimony in its brief is wrongheaded in several respects. First, Professor Hemphill repeatedly indicated that only holding "all else equal" would one expect usage of a product to increase as the quality-adjusted price of the product declines (or quality improves).  But, with respect to usage of Meta's apps since 2011, "all else" has not been held equal.  Among other things, there has been a significant increase in consumer usage of online services, as adoption of smartphones has expanded.  PX9007, Hemphill Rebuttal Report at ¶¶ 44, 612-14.

Second, Meta's statement in its brief improperly inverts the standard economic relationship between price and quantity consumed.  Professor Hemphill described how, all else equal, economic principles would predict that usage of a product should increase as price declines (or as quality improves).  But the converse is *not* necessarily true: standard economic principles do not require that increased usage of a product necessarily implies that the price of the product has declined (or that its quality has improved).  Neither Meta's brief nor Statement 130 provide any support for such an assertion.  Meta's brief therefore makes a logical leap (that increased usage of Facebook and Instagram implies that their quality has improved) that is unsupported by the cited testimony or standard economic principles.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill agreed, as a matter of economics, that increasing output coupled with stable prices is a sign of increasing quality (or decreasing quality-adjusted price) – and he undertook no investigation to explain why else this might occur in the context of Meta's services.  *See supra* Meta Introduction.  The FTC's conclusory recitation that there is a "personal social networking services" market – made without reference to any record material – does not create a genuine dispute of material fact.  The FTC's claim that Meta mischaracterized Professor Hemphill's

concessions about economics and his work in this case is without support; the statements in his

deposition speak for themselves.  The FTC cites paragraphs from Professor Hemphill's rebuttal

report that do not address this phenomenon, but instead concern the early rise of Instagram as

mobile computing became popular years ago; nor do those paragraphs explain why usage is

increasing on a per user basis.  In any event, the observation that usage of online services is

increasing is question begging; absent some other explanation, that output with steady prices

indicates a decline in quality-adjusted price, as Professor Hemphill testified.  The FTC's

discussion of economic principles – that the supply-demand relationship runs in one direction,

but not the other – is confusing, self-contradictory, offered without citation to any record

materials (it is just lawyer argument), and finds no support in the admissions of the FTC's

proffered expert (Professor Hemphill).  Meta observes that the FTC's response includes claims

that are not responsive to the statement of fact recited – this is yet another example of the FTC

extending its briefing into fact statements and thus an improper expansion of the page limits the

Court ordered for briefing.

131.    Regarding the relationship between quality and output on Facebook and

Instagram, Professor Hemphill testified:  "Q. You point to nothing in your report to account for

the increase in users and usage other than a reduction in quality-adjusted price?  . . .  A. I'm not

following what you're – it's not – it's not my mission in the reports to observe an increase in

usage and then parcel out the sources of that."  Ex. 283 at 235:16-236:1 (Hemphill Dep. Tr.); *id.*

at 236:7-8 ("The relevant question is what does usage look like relative to a but-for world.").

**FTC Response: Disputed in part.**  Statement 131 is undisputed to the extent that it

recounts words that appear in the cited transcript but is otherwise disputed.  Statement 129 is

otherwise disputed as the cited material does not establish the absence of a genuine dispute

regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Professor Hemphill's excerpted testimony does not establish that any firm competes with Meta in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

As Professor Hemphill testified, "[i]t's well understood that monopolization can coincide with an increase in usage," and that usage on Facebook and Instagram has increased "*despite* Meta's monopolization of the personal social networking services market."  Ex. 283 at 236:5-20 (Hemphill Dep. Tr.) (emphasis added).  The statement also ignores Professor Hemphill's testimony and evidence cited in his report showing that the quality-adjusted price of Facebook and Instagram has gone up, not down, since 2012.  *See, e.g.*, PX9000, Hemphill Report, at ¶¶ 38, 51, 161, 761, 1141-59; ███████████████████████████████████████ ███████████████████████████████████████████████████████; Ex. 283 at 215:20-22 (Hemphill Dep. Tr.) ("The quality-adjusted price [of Facebook and Instagram] has increased equivalently given a zero price and the quality has declined.").

The statement further ignores the evidence and explanations provided in Professor Hemphill's reports that increased usage of PSN apps since 2011 is associated, among other things, with a significant increase in consumer usage of online services as adoption of smartphones has expanded.  PX9007, Hemphill Rebuttal Report at ¶¶ 44, 612-14.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill agreed, as a matter of economics, that increasing output coupled with stable prices is a sign of increasing quality (or decreasing quality-adjusted price) – and he undertook no investigation to explain why else this might occur in the context of Meta's services.  *See supra* Meta Introduction.  The FTC's conclusory recitation that there is a "personal social networking

services" market – made without reference to any record material – does not create a genuine dispute of material fact.  The observation that output *can* increase for reasons unrelated to quality where price is stable does not contradict Professor Hemphill's concession that he did not undertake an investigation to determine whether that is the case here.  The FTC cites paragraphs from Professor Hemphill's rebuttal report that do not address this phenomenon, but instead concern the early rise of Instagram as mobile computing became popular years ago; nor do those paragraphs explain why usage is increasing on a per user basis.  In any event, the observation that usage of online services is increasing is question begging; absent some other explanation, that output with steady prices indicates a decline in quality-adjusted price, as Professor Hemphill testified.  As to the FTC's conclusory assertion that quality-adjusted price has increased, the agency ignores the concession from Professor Hemphill that there is no measure of app quality in the record.  *See supra* Meta SMF ¶ 129.  Professor Hemphill testified regarding the number of advertisements that consumers see on Facebook and Instagram:  "Q. . . . You don't identify any competitive benchmark for Meta's level of ad load, correct? . . . A.  I don't know what you mean by a competitive benchmark for ad load, what that would mean or what purpose that would serve."  *See infra* ¶ 146 (quoting Ex. 283 at 242:11-18 (Hemphill Dep. Tr.)).

### 2.   Meta's Business

132.    Meta "generate[s] substantially all of [its] revenue from selling advertising placements on [the] family of apps to marketers."  Ex. 325 at 7 (Meta 2023 Form 10K). Specifically, "[m]arketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."  *Id.*  "Ads on [Meta's] platforms enable marketers to reach people across a range of marketing objectives, such as generating leads or driving awareness."  *Id.*

**<u>FTC Response: Undisputed</u>**.

### a.   Facebook and Instagram

133.    Meta generates most of its revenue by selling advertising on Facebook and Instagram.  *See* Ex. 286 at ¶ 13 (Aral Rep.); Ex. 325 at 7 (Meta 2023 Form 10-K).

**FTC Response: Undisputed but incomplete.**  The 2023 Form 10-K cited in Statement 133 (and in Statement 132) states that "we generate substantially all of our revenue from selling advertising placements on our family of apps to marketers."  *See* Ex. 325 at 7 (Meta 2023 Form 10-K).  The cited paragraph from Professor Aral's opening report does not discuss Meta's revenue.  *See* Ex. 286 at ¶ 13 (Aral Rep.).

134.    Meta sells ███ of its global ad inventory through Meta's Ads Manager.  *See* Ex. 286 at ¶ 13 n.5 (Aral Rep.).  Meta's Ads Manager is a self-service platform that "allows advertisers to choose the objectives of an advertising campaign (e.g., brand awareness or conversion), to target that campaign at a specified segment of users, and to choose the campaign's visual format and the Facebook and/or Instagram surface(s) on which the campaign will appear."  *Id.* at ¶ 13.

**FTC Response: Undisputed.**

135.    Advertisers can and typically do advertise on multiple digital ad venues.  *See* Ex. 4 at ¶ 12 (Tucker Rep.); Ex. 287 at 34:11-17 (Aral Dep. Tr.); Ex. 286 at ¶ 83 (Aral Rep.).  Advertisers' switching costs are low.  *See* Ex. 4 at ¶ 14 (Tucker Rep.); *see* Ex. 287 at 100:2-4 (Aral Dep. Tr.).

**FTC Response: Disputed in part.**

The first sentence of Statement of 135 is undisputed.  The second sentence of Statement 135 is disputed.

The FTC objects to the second sentence of Statement 135 because the terms "switching costs" and "low" are vague and undefined, and because Statement 135's second sentence is not

supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and

Local Rule 7(h), and is contradicted by other testimony.  The cited excerpt from Professor Aral's

deposition is not supportive of Statement 135's second sentence, and in fact Professor Aral's

deposition testimony, when reviewed in full, contradicted the assertion in Statement 135's

second sentence.  Professor Aral noted, expressly, that he was not "confirm[ing]" Professor

Tucker's statements, as neither he nor Professor Tucker had performed the predicate "set of

analyses" to develop an opinion on switching costs.  *See* Ex. 287 at 99:13-100:8 (Aral Dep. Tr.).

Further, Professor Aral expressly contradicted the assertion in Statement 135's second sentence.

Professor Aral stated in his deposition that he did not "agree that there are low switching costs to

moving ad spend across digital ad platforms."  Ex. 287 at 36:8-12 (Aral Dep. Tr.).  This is

because "there are a number of factors that determine the switching costs for any given

advertiser in any given moment with regard to whether it would want to switch or shift dollars or

focus," and therefore "in some cases the switching costs could be very high."  Ex. 287 at 36:8-

37:7 (Aral Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Professor Tucker and Professor Aral both agreed that advertisers can and typically do advertise

on multiple digital ad venues as quoted in the statement.  *See supra* Meta Introduction.  As

Professor Aral opined in his report, "the basic process of integrated digital marketing is to create

and deploy content in each channel, to analyze its performance by measuring ROI [return on

investment] and other KPIs [key performance indicators], and then to optimize performance

within channels (by tweaking content and allocating more money to the best performing content

and platforms) and across channels (by allocating money toward the best performing channels,

and away from the worst performing channels).  This optimization may move dollars back and

forth across channels or platforms over time, between different campaigns, or even as ROI waxes and wanes for specific platforms during a given campaign.  In other words, this is not a one-time decision, but a constant reallocation of marketing investment based on observed KPIs."  PX9003 at ¶ 83 (Aral Rep.); *see also id.* at ¶ 55 (digital advertisers use "[c]ampaign progress reports," which are "detailed reports on each campaign, reflecting all the sites involved and the results of their work, and provide real-time statistics," and "are typically reflected with a delay of only a few seconds, allowing advertisers to quickly reduce the cost of inefficient channels or platforms").

136.    Advertisers will adjust or optimize their ad spend across ad-supported digital platforms based on factors such as how well their ads are performing, the target audience, and "the engagement of the target audience on the various platforms."  Ex. 287 at 35:8-18 (Aral Dep. Tr.); *see also* Ex. 4 at ¶ 12 (Tucker Rep.).

**FTC Response: Disputed.**  The FTC objects to the terms "optimize" and "ad-supported digital platforms" as vague and undefined and to Statement 136 as (1) not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h); and (2) vague as to time and frequency.  The excerpts from Professor Aral's deposition and Professor Tucker's report do not support Statement 136, because they do not purport to define the meaning of the terms "optimize" and "ad-supported digital platforms."  Statement 136's phrasing as "[a]dvertisers *will* adjust or optimize . . ." (Statement 136, emphasis added) also gives no indication as to the time period when this activity is occurring, or how often it may be occurring.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that advertisers adjust or optimize their ad spend across ad-supported digital platforms based on factors such as how well their ads are performing, the target audience, and "the engagement of

the target audience on the various platforms."  Ex. 287 at 35:8-18 (Aral Dep. Tr.); *see also supra* Meta Introduction.  The FTC's claim that various terms are vague does not create a genuine dispute – the terms can be interpreted as ordinarily understood and used, including as Professor Aral used those terms in his report, including as quoted below in paragraph 137.

137.    "[O]ptimization may move dollars back and forth across channels or platforms over time, between different campaigns, or even as [return on investment] waxes and wanes for specific platforms during a given campaign."  Ex. 286 at ¶ 83 (Aral Rep.).  This "is not a one-time decision, but a constant reallocation of marketing investment based on observed [key performance indicators]."  *Id.*

**FTC Response: Disputed in part and incomplete.**  Statement 137 is undisputed to the extent that it recounts words that appear in Professor Aral's opening report, but it is otherwise disputed in part.  The FTC disputes that Statement 137 constitutes a material fact subject to proof at trial, and objects that Statement 137 is not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  Statement 137 is not supported by the cited evidence: Professor Aral clarified in his deposition that in the cited-to paragraph of his report, he was describing an "idealized process, not a statement of fact of what happens but an ideal that advertisers might seek to achieve.  Period."  Ex. 287 at 40:9-41:4 (Aral Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Aral's report contains the material quoted in the statement.  *See supra* Meta Introduction.

138.    In the digital-advertising ecosystem, users are not captured exclusively by any particular ad-supported venue.  *See* Ex. 287 at 45:12-47:21 (Aral Dep. Tr.); Ex. 140 at 23:15-18

(Tucker Dep. Tr.).  Rather, an advertiser can reach the same users through multiple different ad-supported venues using data the advertiser already possesses – such as consumer email addresses, phone numbers, and browsing activity – that can come from the advertiser's business, such as in-store rewards programs, or from third-party data providers, such as data management platforms.  *See* Ex. 4 at ¶ 21 & n.18 (Tucker Rep.).

**FTC Response: Disputed in part.**  It is undisputed that a particular advertiser *might* be able to reach a particular user on more than one digital advertising platform, but Statement 138 is otherwise disputed to the extent that it suggests that *all* advertisers have multiple cost-effective means to reach *all* users.  With respect to Statement 138's first sentence, the FTC (1) objects to the terms "digital-advertising ecosystem" and "captured" as vague and undefined; (2) disputes that Statement 138's first sentence constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute as to any material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(1); and (3) disputes Statement 138's first sentence as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The material cited in Statement 138's first sentence does not provide definitions of the vague terms "digital-advertising ecosystem" and "captured."

With respect to Statement 138's second sentence, it is undisputed that Statement 138's second sentence contains paraphrasing from Paragraph 21 of Professor Tucker's report.  *See* Ex. 4 at ¶ 21 (Tucker Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Tucker opined that advertisers can reach users through multiple different ad-supported venues, which the FTC's proffered monetization expert, Professor Aral, did not dispute.  *See*

*supra* Meta Introduction.  The FTC's claim that various terms are vague does not create a genuine dispute – the terms can be interpreted as ordinarily understood and used.

139.    If advertisers have relatively less success advertising to Meta's users, those advertisers will shift to alternative ad-supported venues to reach those users.  *See* Ex. 287 at 27:21-28:22 (Aral Dep. Tr.); Ex. 286 at ¶ 83 (Aral Rep.); Ex. 4 at ¶ 21 (Tucker Rep.).

**FTC Response: Disputed.**  The FTC objects to Statement 139 as (1) not supported by the cited material from Professor Aral's deposition transcript and report, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h); and (2) vague as to time.  The FTC disputes that Statement 139 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(1).  As Professor Aral clarified in his deposition, in the cited-to paragraph of his report, he was describing an "idealized process, not a statement of fact of what happens but an ideal that advertisers might seek to achieve.  Period."  Ex. 287 at 40:9-41:4 (Aral Dep. Tr.); *see also* Ex. 286 at ¶ 83 (Aral Rep.).  And in the cited-to portion of Professor Aral's deposition, Professor Aral noted that he was referring to one advertiser, Procter & Gamble, as opposed to "advertisers" more broadly.  *See* Ex. 287 at 28:16-22 (Aral Dep. Tr.) ("A second parallel process is the process of allocating money across what I wrote here as platforms.  And to the extent that within a channel there are alternative platforms to allocate money to, then one might – a Procter & Gamble, as you describe in your example, might try to do that.").

It is undisputed that Professor Tucker's report states the assertion in Statement 139 (verbatim), but Professor Tucker's statement cites no support for her assertion, and she does not purport to offer an opinion regarding the time that it might take an advertiser to "shift."  *See* Ex. 4 at ¶ 21 (Tucker Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Tucker opined that if advertisers have relatively less success advertising to Meta's users, those advertisers will shift to alternative ad-supported venues to reach those users.  *See supra* Meta Introduction.  Professor Aral did not dispute Professor Tucker's opinion, and in fact offered that same opinion in his report.  *See supra* Meta Reply to SMF ¶ 135; Meta SMF ¶ 137.

140.    Other ad-supported venues have recognized how advertisers optimize their ad spend.  For example, a director of product at Snap, Ashish Wahi, testified that "advertisers shift budgets based on performance. . . .  If they get better outcomes on one channel, versus another, they typically would shift budgets."  Ex. 95 at 15:5-8, 62:3-8 (Wahi (Snapchat) Dep. Tr.).  Amazon's director for consumer ad experience, Jean-Luc Nahon, similarly testified that "advertisers have many options" and "they move the [advertising] budget where it works for them."  Ex. 87 at 21:21-22:2, 105:1-5 (Nahon (Amazon) Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  The FTC disputes Statement 140's first sentence because it is (1) not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), because those materials do not provide support for the undefined term "advertisers optimize their ad spend"; and (2) vague as to time.

Otherwise undisputed, although the FTC objects that the third sentence's excerpt from Mr. Nahon's deposition transcript is incomplete: the question that Mr. Nahon was answering specified that he was referring to only "tail and torso advertisers."  *See* Ex. 87 at 104:17-21 (Nahon (Amazon) Dep. Tr.) ("But as you said, the tail and torso advertisers are also addressed by Facebook and Instagram.  So would you agree that Amazon's performance advertising offering targets the same segment that Facebook and Instagram do?").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Wahi and Mr. Nahon testified as quoted in the statement.  *See supra* Meta Introduction.

141.    Competition from other ad-supported venues requires Meta to provide a compelling experience for both its advertisers and users.  *See* Ex. 4 at ¶ 21 (Tucker Rep.); Ex. 140 at 90:9-18 (Tucker Dep. Tr.) ("[G]iven intensive competition in advertising, Meta has improved its product for advertisers . . . [and] Meta has worked hard to improve the quality of its ad product for users as well.").

**FTC Response: Disputed.**  The FTC (1) objects to the term "compelling experience" as vague and undefined and to Statement 141 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h); (2) disputes that Statement 141 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1), 56(c)(1)(B).

Statement 141's excerpt from Professor Tucker's deposition transcript does not establish the absence of a factual dispute because this excerpt leaves out other material testimony from Professor Tucker.  In her deposition, Professor Tucker testified that she was *not* offering the opinion that a supposed "competitive constraint" on Meta flowing from the "[c]ompetition from other ad-supported venues" was a constraint of any particular magnitude: when asked whether her report "contain[ed] an opinion or analysis measuring or quantifying the magnitude of that competitive constraint": "[i]t's not the case that I've done some kind of aggregate calibration exercise where I've marked out thresholds or anything like that."  Ex. 140 at 310:4-16 (Tucker Dep. Tr.).  Professor Tucker also admitted that, when asked whether "[t]he presence of cross-platform network effects . . . necessarily preclude[d] the possession or exercise of monopoly

power": "it's always going to be a competitive constraint," but "the question" was "how strong a competitive constraint it is."  Ex. 140 at 69:22-70:7 (Tucker Dep. Tr.).  Per Professor Tucker, an evaluation of this competitive constraint "may have different outcomes."  *See* Ex. 140 at 65:21-66:12 (Tucker Dep. Tr.).

Further, competition for advertising does not discipline an exercise of monopoly power over users of Facebook and Instagram.  *See* PX9007, Hemphill Rebuttal Report at § 2.1.2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Tucker opined in her report and testified that competition from other ad-supported venues requires Meta to provide a compelling experience for both its advertisers and its users as quoted in the statement.  *See supra* Meta Introduction.  The additional testimony from Professor Tucker that the FTC recites does not contradict that fact.  The FTC's proffered monetization expert, Professor Aral, did not rebut or dispute Professor Tucker's opinion, and in fact offered similar views in his book:  "Platforms like Facebook, Twitter, and YouTube provide connections, communication, and content to get consumers' attention" and "then sell that attention . . .  with ads. . . .  [T]he amount and quality of those platforms' ad inventory scales with the number of consumers they serve and how engaged those consumers are with the content the platforms curate," and so these attention platforms are "obsessed with . . . growth . . . and engagement[]."  Ex. 354 at 203-204 (MetaFTC-DX-1157, *The Hype Machine*).

142.    As Professor Aral articulated it, "to monetize eyeballs, you have to retain those eyeballs," and "one of the ways that you retain eyeballs . . . is to keep the content on the platform engaging."  Ex. 287 at 69:15-70:4 & errata (Aral Dep. Tr.); Ex. 354 at 81 (MetaFTC-DX-1157, *The Hype Machine*).  Otherwise, Meta could lose revenue.  *See* Ex. 4 at ¶ 29 (Tucker Rep.).  In

other words, "without [user] attention, social media platforms wither and die." Ex. 287 at 66:1-15 & errata (Aral Dep. Tr.); Ex. 354 at 202 (MetaFTC-DX-1157, *The Hype Machine*).

**FTC Response: Disputed in part.** It is undisputed that Statement 142 recounts excerpts that appear in the cited sources. The assertion in Statement 142's second sentence—that "[o]therwise, Meta could lose revenue"—is disputed in part. The FTC disputes that Statement 142's second sentence constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2). The phrasing of Statement 142's second sentence—"Meta *could* lose revenue" (emphasis added)—is inherently speculative, and the cited paragraph from Professor Tucker's does not furnish support for the statement because the paragraph refers to "a firm," generally, as opposed to Meta, specifically.

Further, the statement is disputed insofar as Meta is using it to imply that competition for advertising disciplines an exercise of monopoly power over users. That is incorrect. Competition for advertising does not discipline an exercise of monopoly power over users of Facebook and Instagram. *See* PX9007, Hemphill Rebuttal Report at § 2.1.2.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Professor Aral made the quoted statements. *See supra* Meta Introduction.

143. Meta has innovated new online advertising formats and improved others, e.g., introducing Videos into Carousel Ads, Search Ads, and others; improving the appearance of ads in Mobile News Feed; and deploying targeting and measurement tools to boost advertising relevance and effectiveness. *See* Ex. 4 at ¶¶ 17-19, 52 (Tucker Rep.); *see also id.* at ¶¶ 96-98 (discussing advertising innovations Meta introduced to Instagram).

**FTC Response: Disputed.**  The FTC objects to the terms "innovated" and "improved" as vague and undefined and to Statement 143's assertion that Meta has "innovated new online advertising formats and improved others" as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The FTC disputes that "introducing Videos into Carousel Ads, Search Ads, and others; improving the appearance of ads in Mobile News Feed; and deploying targeting and measurement tools to boost advertising relevance and effectiveness" constitutes Meta having "innovated new online advertising formats and improved others," and Meta cites no evidence to indicate that Meta *users* perceived these developments to be innovations or improvements.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta has introduced new online advertising formats and improved others.  *See supra* Meta Introduction.  The FTC cites no evidence contradicting that fact.  The FTC's claim that various terms are vague does not create a genuine dispute – the terms can be interpreted as ordinarily understood and used.

144.   Many other digital platforms generate revenue by selling advertising and compete with Meta to attract advertisers, ███████████████████  Snapchat, Pinterest, TikTok, Twitter, Google, Amazon, ██████████, and LinkedIn:

   a. **Snapchat.**  Snapchat competes with "Facebook, Google, Twitter, Pinterest, and TikTok" for a share of advertisers' "overall ad budget."  Ex. 95 at 59:8-61:7 (Wahi (Snapchat) Dep. Tr.).

   b. **Pinterest.**  Pinterest competes for advertising dollars with "Google, Amazon, Facebook, . . . YouTube, Instagram, Snapchat, and Twitter."  Ex. 45 at 164:13-165:17 (Roberts (Pinterest) Dep. Tr.).

c. **TikTok.** "[T]here's no doubt that TikTok and Facebook compete to provide advertising." Ex. 24 at 212:9-11 (Presser (TikTok) Dep. Tr.) (agreeing with quoted statement).

d. **Twitter.** Twitter "compete[s] with Meta for . . . advertising budgets." Ex. 39 at 82:14-21 (Perzyk (Twitter) Dep. Tr.).

e. **Google.** Meta's Audience Network and Google Display Network are competing advertising offerings, *see* Ex. 8 at 131:22-132:6 (D. Weinstein (Alphabet) Dep. Tr.); YouTube "compete[s] with Facebook" for advertising dollars "[d]epending on the goal of the marketer," *id.* at 35:9-14; and YouTube "[a]bsolutely" "compete[s] with Instagram for advertising dollars," *id.* at 142:3-5.

f. **Amazon.** "Meta," "Google," and "Microsoft" all compete with Amazon's advertising services, and "advertisers have a lot of choices on . . . where they can spend their money, and so it's up to them to decide where and how they can spend their money with Amazon or with a flurry of other options." Ex. 87 at 34:7-21 (Nahon (Amazon) Dep. Tr.).

g. ███████████████████████████████████████████

██████████████████████████████

h. **LinkedIn.** LinkedIn views Meta as competing for advertising dollars across "the full digital advertising market." Ex. 67 at 213:11-214:4 (Shrivastava (LinkedIn) Dep. Tr.).

**FTC Response: Disputed in part.** It is undisputed that "[m]any other digital platforms generate revenue by selling advertising." The FTC objects to the terms and phrases "many" and

"to attract advertisers" as vague and undefined, and to Statement 144's assertion that "[m]any other digital platforms . . . compete with Meta to attract advertisers, including but not limited to Snapchat, Pinterest, TikTok, Twitter, Google, Amazon, ███████, and LinkedIn" as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The FTC responds to this Statement's subparts as follows:

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that other digital platforms generate revenue by selling advertising and compete with Meta to attract advertisers, including those listed.  *See supra* Meta Introduction.  The FTC's claim that various terms are vague does not create a genuine dispute – the terms can be interpreted as ordinarily understood and used.  The FTC's response does not create a genuine dispute of material fact that witnesses from Snapchat, Pinterest, TikTok, Twitter, Google, Amazon, Tumblr, ███████, and LinkedIn testified as quoted in the statement.  The additional testimony the FTC cites from Mr. Wahi in subparagraph (a) reinforces that Snap competes for advertising budgets with apps outside the FTC's claimed PSNS market, including Twitter, Pinterest, and TikTok.  None of the additional context the FTC adds to Meta's statements in the subparts or objections to ordinary words creates a genuine dispute of material fact.

    a.  **FTC Response: Undisputed but incomplete.**  The FTC objects that Statement 144(a) is vague as to time, and objects that Meta provided incomplete excerpts from ███████ deposition testimony.  Mr. Wahi also testified that to advertisers, "search budgets" were "different" than "the social budget," *see* Ex. 95 at 60:1-20 (Wahi (Snapchat) Dep. Tr.), and excluded Google from his list of potential rivals for "the social budget."  Ex. 95 at 60:1-10 (Wahi

(Snapchat) Dep. Tr.) ("[Snap], Meta, Twitter, Pinterest, [and] TikTok . . . all compete" for "the social budget within an advertiser's overall ad budget.").

    b.  **FTC Response: Undisputed.**

    c.  **FTC Response: Undisputed.**

    d.  **FTC Response: Undisputed.**

    e.  **FTC Response: Disputed in part and incomplete.**  The FTC objects to the phrases "competing advertising offerings and "advertising dollars" as vague and undefined and to Statement 144(e) as (1) not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) and (2) vague as to time.  It is undisputed that Statement 144(e) contains accurately transcribed excerpts from ▌▌▌▌▌▌ deposition testimony, but Ms. Weinstein also testified that she was "not an expert in our Display Network business."  *See* Ex. 8 at 133:19-20 (D. Weinstein (Alphabet) Dep. Tr.).  This proviso ▌▌▌▌▌▌ means that Meta has not furnished adequate evidentiary support for its assertion in Statement 144(e) that ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ ; this specific assertion is disputed on that basis.

    f.  **FTC Response: Disputed in part and incomplete.**  The FTC objects to the phrase "flurry of other options" as vague and undefined.  It is undisputed that Statement 144(f) contains accurately transcribed excerpts from ▌▌▌▌▌▌ deposition testimony.  But Statement 144(f)'s excerpts are incomplete.  Mr. Nahon also stated that Amazon "build[s] [its] product starting from the customer, and we don't necessarily pay as much attention to competitors."  Ex. 87 at 33:4-6 (Nahon (Amazon) Dep. Tr.).  When Mr. Nahon was asked whether he could "remember any instances in which Amazon tried to attract ad spend away from Meta," Mr. Nahon demurred.  *See* Ex. 87 at 34:22-35:8 (Nahon (Amazon) Dep. Tr.).  And Mr. Nahon stated

that "[a]s far as I know, Amazon does not build products around competitors."  Ex. 87 at 35:20-21 (Nahon (Amazon) Dep. Tr.).

     g.  **FTC Response: Disputed in part.**  The FTC objects to the phrase  █████████ as vague and undefined.  It is undisputed that Statement 144(g) contains an accurately transcribed excerpt from ████████████████.  But Statement 144(g)'s excerpt is incomplete.  ██████████████████████

     h.  **FTC Response: Disputed and incomplete.**  The FTC objects to the phrases "████████████████" and "████████████████" as vague and undefined  and to Statement 144(h) as (1) not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) and (2) vague as to time.  Meta has not furnished adequate evidentiary support for Statement 144(h)'s assertion that "███████████ ██████████████████████████████"  Statement 144(h) is therefore disputed.  Meta has provided an incomplete excerpt of Mr. Shrivastava's deposition testimony.  Mr. Shrivastava testified that, though he was "not an expert on Meta" and was "an outsider" that could not "speak to [Meta's] precise intentions," "the target market for Meta [was] the full digital advertising market," which Mr. Shrivastava defined as "the overall spend across all forms of digital advertising, not breaking that into search, display, social, B2B, B2C, . . . all those subverticals."  Ex. 67 at 213:5-21 (Shrivastava (LinkedIn) Dep. Tr.).  Mr. Shrivastava's testimony placed Meta in contrast to LinkedIn, which "for the last several years [had] been focused more on business customers and business advertising."  Ex. 67 at 209:16-18

(Shrivastava (LinkedIn) Dep. Tr.).  Statement 144(h)'s assertion ███████████████

███████████████████████████ is therefore unsupported and disputed.

145.    Similarly, Meta has recognized that it competes with other venues for the sale of

advertising:

    a.   In a presentation circulated internally on February 28, 2012, titled "Revenue

recognition disclosure review," Meta described Google, Yahoo, Microsoft,

and other companies as "competitors with similar models" for its advertising

"revenue streams."  Ex. 184 at -874.002 (FB_FTC_CID_01544873).

    b.   Since 2019, Meta has maintained "Competition Time" updates for its Global

Marketing Solutions team to track advertising innovations and product

launches by competitors such as Google, Pinterest, Snapchat, Twitter, Line,

Kakao, WeChat, and others.  *See*, *e.g.*, Ex. 200 at -831-832

(FB_FTC_CID_10652831); Ex. 179 (FB_FTC_CID_00054152); Ex. 180

(FB_FTC_CID_00054153).

    c.   An internal Meta post on December 6, 2017, ███████████████

███████████████████████████████████

███████████████████████████

████████████████████████████████████

██████    Ex. 206 at -441 (FB_FTC_CID_12202441).

    d.   David Fischer, formerly Meta's chief revenue officer, wrote in a May 21,

2017 email that ████████ is "the most serious threat out there on the ads

side.  Their intent data is second-to-none and in that way they are probably an

even bigger threat ████████████ in terms of where they will steal dollars."

Ex. 197 at -645 (FB_FTC_CID_06268643); Ex. 141 at 56:2-6 (Fischer IH Tr.).

e. Meta executives testified about advertising competition from Google, Twitter, TikTok, and others. *See*, *e.g.*, Ex. 141 at 157:2-17 (Fischer IH Tr.).

**FTC Response: Disputed in part.** The FTC objects to the term "venues" as vague and undefined and to Statement 145 as (1) not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) and (2) vague as to time. Statement 145's assertion that "Meta has recognized that it competes with other venues for the sale of advertising" appears to be supported only by Statement 145's multiple subparts, at Statement 145(a) through Statement 145(e). The FTC responds to this Statement's subparts as follows:

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Meta has recognized it has multiple competitors for advertising. *See supra* Meta Introduction. The FTC's claim that various terms are vague does not create a genuine dispute – the terms can be interpreted as ordinarily understood and used. The FTC's response does not create a genuine dispute of material fact that Meta witnesses made the statements quoted in the statement.

a. **FTC Response: Undisputed but incomplete.** It is undisputed that the cited presentation lists Google, Yahoo, Microsoft, and other firms as "competitors with similar models for both of our revenue streams, Advertising and Payments." Ex. 184 at -874.002 (FB_FTC_CID_01544873). Statement 145(a)'s excerpt of the presentation, though, is incomplete. The presentation appears to be a "summary analysis" prepared by Meta's Chief Financial Officer's staff, and the presentation focused on firms' "revenue disclosures," without providing any detail on how Meta supposedly "competes with" those

firms "for the sale of advertising." *See generally* Ex. 184

(FB_FTC_CID_01544873) (describing presentation as "a summary analysis

compiled by the team," with cover email sent to "CFO-Staff" mailing list*)*.

b. **FTC Response: Disputed in part.** It is undisputed that Meta appears to have

distributed a "Competition Time" update presentation on June 26, 2019. *See*

Ex. 200 at -831-32 (FB_FTC_CID_10652831). It is disputed that Meta has

"maintained" these update presentations on a continuous basis "[s]ince 2019."

Meta has not furnished adequate evidentiary support for this assertion. The

other presentations that Statement 145(b) cites, at Ex. 179 and Ex. 180, are

undated. *See* Ex. 179 (FB_FTC_CID_00054152); Ex. 180

(FB_FTC_CID_00054153).

c. **FTC Response: Undisputed.**

d. **FTC Response: Disputed in part and incomplete.** It is undisputed that Mr.

Fischer wrote those words in the May 21, 2017 email that Statement 145(d)

cites, with the clarification that Mr. Fischer does not appear to have been

holding the title of chief revenue officer when he sent that email. *See* Ex. 141

at 56:2-4 (Fischer IH Tr.) (explaining that "[m]y title was changed at some

point – I believe it was in early 2019 – to chief revenue officer").

e. **FTC Response: Disputed in part.** The FTC objects to the term "advertising

competition" as vague and undefined and to Statement 145(e) as (1) not

supported by the cited material, as required by Federal Rule of Civil

Procedure 56(c)(1)(A) and Local Rule 7(h) and (2) vague as to time. Meta

has not furnished adequate evidentiary support to support Statement 145(e)'s

assertion that *multiple* "Meta executives" provided the referenced testimony.

*See* Ex. 141 at 157:2-17 (Fischer IH Tr.).  Statement 145(e) cites only to

testimony from Mr. Fischer.  The accuracy of Statement 145(e)'s summary of

the referenced excerpt from Mr. Fischer's deposition is undisputed.

146.     Professor C. Scott Hemphill, the FTC's proffered economic expert, testified

regarding the number of advertisements that consumers see on Facebook and Instagram:  "Q. . . .

You don't identify any competitive benchmark for Meta's level of ad load, correct? . . .  A. I

don't know what you mean by a competitive benchmark for ad load, what that would mean or

what purpose that would serve."  Ex. 283 at 242:11-18 (Hemphill Dep. Tr.).  He also testified:

"[A]d load being above competitive levels is not the way that I think about it."  *Id.* at 244:2-4.

**FTC Response: Disputed in part and incomplete and misleading.**  Statement 146 is

undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise

disputed.  Statement 146 is otherwise disputed as the cited material does not establish the

absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Professor

Hemphill's excerpted testimony does not establish (a) that any firm competes with Meta in the

provision of personal social network services, (b) that there is not a relevant market for personal

social network services, or (c) that Meta is not exercising monopoly power.

Further, Statement 146's transcript excerpts are incomplete in such as a manner as to be

misleading.  With respect to Statement 146's first transcript excerpt, Professor Hemphill also

testified that:

    [T]he ad load on ▋▋▋▋▋▋ doesn't resolve the question of
. . . monopoly power given that ▋▋▋▋▋▋▋
▋▋▋▋▋▋▋.  As I discuss in the reports, the role
of this analysis of ad load in context is to understand whether Meta's
high by any measure and sustained profits over a decade are
explained by -- in substantial part by user inelasticity, and the

analysis of ad load is informative about that.  It doesn't really come into play ▮▮▮▮▮▮ because ▮▮▮▮▮ doesn't have that precondition of high profits to provide a reason to explore that there.

Ex. 283 at 243:4-16 (Hemphill Dep. Tr.).

With respect to Statement 146's second transcript excerpt, Professor Hemphill's full answer to the question posed to him was:

> As I think it pains to discuss, the point is about quality-adjusted price being above competitive levels and ad load being a component of - - a component of that discussion.  And so *ad load* being above competitive levels is not the way that I think about it.  It's a *quality-adjusted price* being above competitive levels for which ad load is - - is one component.

Ex. 283 at 243:21-244:6 (Hemphill Dep. Tr.) (emphasis added).

**Meta Reply:**  The FTC's response and the additional material the FTC claims provides context does not create a genuine dispute of material fact regarding whether Professor Hemphill calculated a competitive level or benchmark for ad load (he did not).  *See supra* Meta Introduction.  Professor Hemphill admitted that he has no way to calculate overall or net quality, *see supra* Meta SMF ¶ 129 – and so there can be no evidence of quality-adjusted price vis-à-vis competitive levels, at all, whether measured by ad load or anything else.

147.    An analysis by Professor Dennis Carlton, Meta's expert economist, shows that Facebook's and Instagram's ad loads are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Ex. 2 at ¶ 151 (Carlton Rep.).  For example, whereas Facebook's and Instagram's ad loads are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



*See id.*

92

**FTC Response: Disputed.**  The FTC objects to the terms "consistently" and "certain periods" as vague and undefined and to Statement 147 as (1) not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), and (2) vague as to time.  Professor Carlton expressly contradicted Meta's assertion that his analysis ████████ ████████████████████████████████████████████████ those of other services, as he states, in his report's footnote 211, that "[a]d load measurement comparisons across platforms can be imperfect because, for example, a video ad and a text ad may take different amounts of time to view."  Ex. 2 at n.211 (Carlton Rep.).  Furthermore, as Professor Hemphill explains, comparisons of ad load across platforms are uninformative when they fail to control for differences across those platforms.  PX9007, Hemphill Rebuttal Report at ¶¶ 101-102.  Professor Carlton agrees that ad load can be affected by numerous factors, including, but not limited to, monopoly power.  Ex. 2 at ¶ 8 (Carlton Rep.).

**Meta Reply:**  The FTC's response and the additional material the FTC claims provides context does not create a genuine dispute of material fact that Professor Carlton compared Meta's ad loads to peer firms and that the analysis showed that Meta ████████████ ████████████████████████.  *See supra* Meta Introduction.

148.    Professor Hemphill testified regarding consumer preferences and ads:  "Q. You'd agree that individuals vary in their receptivity to ads?  . . .  A. Yes, I think that's – I think that's right.  In the discussion of – yes, I think that there's some evidence in the record about differences in user receptivity to ads, yes."  Ex. 283 at 245:7-13 (Hemphill Dep. Tr.).  He also testified:  "Q. . . . Some individuals have a greater disutility associated with seeing ads than other users; is that fair?  . . .  A. Yes, I would – I would expect that – the amount of disutility from ads would vary across users."  *Id.* at 245:21-246:5.

**FTC Response: Disputed in part and incomplete.**  Statement 148 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 148 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B): Professor Hemphill's excerpted testimony does not establish (a) that any firm competes with Meta in the provision of personal social network services, (b) that there is not a relevant market for personal social network services, or (c) that Meta is not exercising monopoly power.

The deposition testimony excerpts that Statement 148 presents are also incomplete, because they leave out the context of this discussion.  Professor Hemphill was discussing Meta's price discrimination: he noted in his deposition, directly before Statement 148's excerpts, that "[v]arying the ad load with respect to differing levels of user inelasticity is . . . a form of price discrimination."  Ex. 283 at 245:4-6 (Hemphill Dep. Tr.).  Following Statement 148's excerpts, Professor Hemphill testified that "the basic point is that in response to differential taste for friends and family sharing that individual users will cut back their usage to varying degrees and that recognizing that Meta varies the ad load to . . . those users."  Ex. 283 at 247:10-15 (Hemphill Dep. Tr.).  Professor Hemphill further testified that "what the price discrimination analysis here is doing is working through the explicit things that Meta sets out to do as observable in the record and bearing out that they do have the effect that the documents claim about differences in ad load."  Ex. 283 at 251:5-10 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response and the additional material the FTC claims provides context does not create a genuine dispute of material fact regarding whether the FTC has evidence that Meta varies ad load based on any user's "differential taste for friends and family

sharing." Ex. 283 at 247:11-12 (Hemphill Dep. Tr.).  Professor Hemphill conceded as part of

this discussion that he has no evidence that Meta targets users "with a change in ad load" based

their "demand for friends and family sharing." *Id.* at 253:10-11, 253:16-17; *see also id.* at 253:8-

17 ("Q. . . .  So it's correct to say that you don't have any claim that Meta discriminates in ad

load based directly on a user's demand for friends and family sharing? . . .  A. I don't know

whether they do or not, but I've not seen evidence of Meta, for example, internally calculating,

you know, some numerical value of inelasticity and responding with a change in ad load."); *id.* at

252:17-253:2 ("Q. . . .  I want you to suppose there are two 58-year-old male users of Facebook

and they are identical except that one has a higher demand for friends and family sharing than

the other.  Is there a way to measure that directly? . . .  A. I don't know what you have in mind or

what need there would be to – to do that.").

 Moreover, the only data in the record about the relationship between friend counts and ad

load shows ███████████████████████████████████████████████████

███████████████████. *See* Ex. 2 at ¶ 110 (Carlton Rep.); *see id.* at ¶ 114 (████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████)

(emphasis added); *see also id.* at ¶ 118 & p. 105, tbl. 23 (same result for ████████████████

███████████).



### b. WhatsApp

149. Meta does not show WhatsApp users ads on the app.  *See* Ex. 167 at 2 (Meta's

Resp. to FTC's Req. for Prod. 68(a) (Dec. 2, 2022)) ("There are no ads on WhatsApp").

**FTC Response: Undisputed.**

150.    WhatsApp currently earns revenue from both Paid Messaging (via its Business Application Programming Interface, or "API") and Click-to-WhatsApp ads.  *See* Ex. 4 at ¶¶ 112, 118 (Tucker Rep.).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that WhatsApp currently earns revenue from paid messaging.  Statement 150's assertion that WhatsApp currently earns revenue from paid messaging is incomplete: in her deposition, Susan Li—Meta's chief financial officer—described the revenue that Meta earns from paid messaging as ███████

██████  PX6185, Li (Meta) Dep. Tr., at 19:8-10, 228:3-4.

Statement 150's assertion that "WhatsApp currently earns revenue from . . . Click-to-WhatsApp" is disputed as it is misleading and incomplete.  Evidence shows that Meta's "Click-to" advertising—whether Click-to-Messenger, or Click-to-WhatsApp—are "not incremental revenue," *see* PX6130, Imam (Meta) Dep. Tr., at 116:22-23, for Meta, so the assertion that Click-to-WhatsApp "earns revenue" is misleading and incomplete.  John Hegeman—Meta's VP of monetization—explained in his deposition, Click-to-WhatsApp ads, in particular, are "ads that show up on Facebook or Instagram but . . . allow a user to click through and engage with a business on WhatsApp."  PX6084, Hegeman (Meta) Dep. Tr., at 7:15-16, 210:11-20.  "[C]lick-to-WhatsApp ads don't have a distinct place to show other than the places that normal ads could show."  PX6084, Hegeman (Meta) Dep. Tr., at 212:9-11.  Mubarak Imam explained in her deposition that Meta's "Click-to" advertising is not revenue earned by WhatsApp, but is instead "just moving money from one of Facebook's pockets to another of Facebook's pockets."  PX6130, Imam (Meta) Dep. Tr., at 117:17-18.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether or how WhatsApp earns revenue.  *See supra* Meta Introduction.  Indeed, the

FTC's response does not identify anything in paragraph 150 that it disputes.  The additional material the FTC cites as necessary for "[]complete[ness]" does not dispute that WhatsApp earns revenue through paid messaging and Click-to-WhatsApp ads.  As the evidence shows, in 2022, paid messaging on WhatsApp generated more than ▮▮▮▮▮▮ in revenue in the U.S. and more than ▮▮▮▮▮▮ worldwide, and global WhatsApp paid messaging revenue is expected to reach ▮▮▮▮▮▮.  *See infra* Meta SMF ¶¶ 828-829.  Global revenue from Click-to-WhatsApp has grown from ▮▮▮▮▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, and, as of the third quarter of 2022, Click-to-WhatsApp revenue had passed a $1.5 billion run rate and was growing more than 80% year-over-year.  *See infra* ¶ 831 (internal citations omitted).

The FTC cites no additional evidence in support of its statement – which it attributes to Ms. Imam – that "Meta's 'Click-to' advertising is not revenue earned by WhatsApp."  Ms. Imam did not say that in her deposition.  Rather, her testimony explained that since a Click-to advertisement (whether Click-to-WhatsApp or Click-to-Messenger) appears in one app (i.e., Facebook or Instagram) and clicks into another (i.e., WhatsApp or Messenger), that revenue could be apportioned to both apps, as long as no revenue is counted twice.  *See* PX6130 at 117:5-118:4 (Imam Dep Tr.) ("The Ads team had goals on, like, how much Ads revenue is going to come from a particular surface, that being in this case Facebook Blue App, and this particular type of ad because it lived in Facebook Blue, you could argue was money that ads were generating on Facebook Blue.  But because they clicked into Messenger, Messenger said we are claiming ▮▮▮▮▮▮ of those because after the click, it goes to Messenger.  And so it's not increment of new [*sic*] because it's not like ▮▮▮▮▮▮▮▮ they're bringing in.  It's just moving money from one of Facebook's pockets to another of Facebook's pockets. . . . 'Our point

instead is to figure out what portion should be attributed across the family to ensure that we are not double counting revenue as it scales.'" (quoting PX15199 (FB_FTC_CID_03296704))). None of the other evidence the FTC cites states that no revenue from Click-to-WhatsApp ads is attributable to WhatsApp.

The FTC's statements that Click-to-WhatsApp revenue is not incremental revenue are contradicted by significant other evidence, including the FTC's own proffered financial expert, Mr. Hearle, who estimated that ███████ of Click-to-WhatsApp revenue was incremental revenue. *See* PX9005 at ¶¶ 8(c), 70 & pp. 48-50, tbls. 6.1-6.3 (Hearle Rep.); *see also* PX15277 at -178 (FTC-META-012249178) (putting WhatsApp's incremental revenue at, variously, ███ and ███) (cited in FTC Counter SMF ¶ 2434(b)); PX2993 at -951 (FTC-META-011737951) (finding in June 2021 that "███ of CtWA revenue is incremental") (cited in FTC Counter SMF ¶ 2434(c)).  Although Meta does not accept those estimates as accurate, they illustrate that there is no dispute that some Click-to-WhatsApp revenue is incremental.

### 3.   Meta's Infrastructure

151.    Meta runs its services, including Facebook, Instagram, Messenger, and WhatsApp, on its proprietary technical infrastructure.  Globally, as of June 2022, Meta's infrastructure supported approximately ███████ monthly active users on Facebook, ███████ monthly active users on WhatsApp, ███████ monthly active users on Instagram, and ███████ monthly active users on Messenger.  *See* Ex. 5 at ¶¶ 41, 43 (Nieh Rep.) ("Meta is one of the world's four largest providers of what is sometimes referred to as 'hyperscale' infrastructure.").

**FTC Response: Disputed in part.**  The FTC disputes the first sentence of Statement 151 because it is not supported by any cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The first sentence is also disputed because it is contradicted by evidence that Meta's infrastructure uses a variety of open-sourced, publicly available services,

that are not "proprietary" in the ordinary meaning of the term.  *See, e.g.*, PX0556 at 9 (Meta SEC Form 10K, dated Feb. 1, 2024) ("a substantial portion of our technical infrastructure is also provided by third parties"); PX6088, Janardhan (Meta) Dep. Tr., at 159:18-160:7 (indicating that several Meta databases are based on open-source technology); PX6021, Parikh (Meta) IH Tr., at 97:15-19 (explaining that Meta also "make[s] a lot of contributions of technology to open source").  The first sentence is also disputed because Meta supplements its infrastructure by contracting with cloud providers, which is not "proprietary technical infrastructure" within the ordinary meaning of the term.  *See, e.g.*, PX10988, Meta email chain: J. Kalich to D. Mortensen and S. Janardhan, re "Approval Request: AWS ███ Cloud Deal," (Apr. 22, 2021), FTC-META-010412034, at -038 (describing the 2020 actual versus budget spend for AWS as part of ███ agreement); PX3228, Meta document: "Jay<>Thomas Briefing," (undated), FTC-META-005116860, at -860 ("FB utilizes AWS, MSFT Azure, and GCP/Drive today; however, AWS is the "primary" partner for overall spend and workload span across the enterprise with about ███ spend, which is accelerating."); PX13042, Meta document: "WhatsApp Backup Storage Bid," (undated), FTC-META-003034973, at 974 (indicating "the current distribution of Cloud spend by group" at Meta).

The second sentence is disputed to the extent that it claims that "Meta's infrastructure" is exclusive to or propriety to Meta – as noted above, this claim is contradicted by evidence that Meta utilizes cloud service providers and uses a variety of open-sourced, publicly available services.

The FTC also disputes Statement 151's assertion that "Meta is one of the world's four largest providers of what is sometimes referred to as 'hyperscale' infrastructure" because the source cited is contradicted by other evidence.  The FTC's infrastructure expert, Tim Bray,

reviewed "[t]he Nieh Report claims that Meta had almost as much capacity as AWS and Google," and concluded that the numbers in the Nieh report "contradict Meta's internal estimates."  PX9011, Bray Rebuttal Report at ¶ 89.  Mr. Bray further concluded that, "rather than relying on Meta's assessments, informed by conversations with AWS engineers, the Nieh Report cites an article in DataCentre Magazine that includes no sources or methodology, leaving no insight into the source or reliability of the figures cited."  *Id.* at ¶ 89.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Facebook, Instagram, Messenger, and WhatsApp run on Meta's proprietary technical infrastructure.  *See supra* Meta Introduction.  As the term "proprietary" is ordinarily understood and used, there is no dispute that Meta owns and operates its own technical infrastructure.  The fact that Meta's infrastructure incorporates open-source services is irrelevant and nonresponsive to the facts stated in this paragraph.  The use of open-source technology is ubiquitous in the industry, *see* PX9001 at ¶ 75 (Bray Rep.) ("The use of open-source software is crucial to the infrastructure of every organization discussed in this document."), and has no bearing on the fact that Meta has invested billions of dollars to develop and build the software and hardware that Meta's applications rely on, including investing more than ███████ on data centers in the U.S. alone.  *See* Ex. 5 at ¶¶ 40, 46-65 (Nieh Rep.) (detailing the major components of Meta's infrastructure, including Meta's data centers, content delivery network, network backbone, and hardware and software infrastructure).  Even where Meta uses open source software, it devotes extensive resources to optimizing that software to its workloads.  *See id.* at ¶ 28 ("To use open-source software effectively often entails costs to evaluate, license, install, configure, integrate, customize, operate, and support the open-source technology.  . . .  It is, in fact, common for open-source projects to be forked, which is the process of copying open-source code and

independently developing it to create separate software that may not be made public.  Companies can also combine open-source software with their own custom software to create more bespoke solutions.  For example, Jay Parikh, Meta's former Head of Infrastructure, explained that Meta will modify open-source software 'to make it work in [Meta's] environment and make it work at [Meta's] scale.'" (internal citations omitted)).

The FTC's response that "Meta supplements its infrastructure by contracting with cloud providers" is irrelevant and nonresponsive to the facts stated in this paragraph and does not create a dispute of material fact that Facebook, Instagram, Messenger, and WhatsApp run on Meta's proprietary technical infrastructure.  Meta's Family of Apps, including Facebook, Instagram, Messenger, and WhatsApp, ███████████████████████████████████ ███████████████.  *See* Ex. 157 at 226:19-23, 227:23-228:20 (Parikh Dep. Tr.) (explaining that ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████); PX6062 at 59:6-9 (Mortenson Dep. Tr.) ("████████████████████ ██████████████████████████████████████████████████ ████████████████").  ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *See* Ex. 157 at 227:16-21, 228:9-16 (Parikh Dep. Tr.) (explaining that ██████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████); PX6062 at 58:18-23 (Mortenson Dep. Tr.) (explaining that ████████████████████████████████████████████ ████████████████████████████████████████████████████

████████"); PX6088 at 124:9-19, 126:6-11 (Janardhan Dep. Tr.) (█████████████

████████████████████████████████████████████████████████████████

██).

       The FTC's response does not create a genuine dispute of material fact that Meta is one of

the largest providers of hyperscale infrastructure providers in the world.  The FTC does not cite

any evidence to support that Meta is not one of the largest providers of hyperscale infrastructure

in the world.  *See* Ex. 289 at 240:8-241:8 (Bray Dep. Tr.) (testifying he did not know who were

the largest hyperscalers in the United States).

       152.    "Infrastructure supports the functionality of the product and contributes to the

quality of its user experience.  The operation of an online product requires orchestrating the

functions of numerous different infrastructure components, a complex process that creates risk of

unintended incidents and failures."  Ex. 288 at ¶ 41 (Bray Rep.).

    **FTC Response: Undisputed.**

       153.    Meta's infrastructure consists of many different components that are shared by

Meta's apps, including:

        a.  **Data Centers.**  As of 2023, Meta operates a worldwide system of data centers

           consisting of ████████████████████████████████████

           ████████████████.  *See* Ex. 220 at -089 (FTC-META-012239089).  Meta

           has invested more than ████████ in data centers in the United States alone.

           *See* Ex. 5 at ¶ 40 (Nieh Rep.).

    **FTC Response: Disputed in part.**  As to Statement 153.a, the FTC objects to the

assertion that the metrics were applicable "as of 2023" because the statement is not supported by

the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule

7(h).  Ex. 220 at -089 (FTC-META-012239089) is undated.  Otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

the metrics listed in the statement were applicable as of 2023.  *See supra* Meta Introduction.

Contrary to the FTC's assertion otherwise, the cited exhibit is dated February 2023.  *See* Ex. 220

at -096 (FTC-META-012239089).



    b.  **Network Infrastructure.**  In addition to its data centers, Meta also operates a global content delivery network ("CDN"), which consists of ▮▮▮ points of presence ("PoPs") ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Ex. 220 at -096-097, -100 (FTC-META-012239089).  Meta's CDN "ensure[s] that ▮▮▮ of [Meta's] content is served locally and never needs to traverse the internet," which leads to "a performance benefit for [Meta's] users."  *Id.* at -100.  Meta connects its data center regions and PoPs ▮▮▮▮▮▮▮▮▮▮▮▮.  *See id.* at -096.  As of February 2023, Meta has approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and its network infrastructure "connect[s] servers in [Meta's] data centers (DCs) and PoPs to all ▮▮▮ of the entire Family of Apps."  *Id.*

**FTC Response: Disputed in part.**  The first sentence is disputed in part because it is

vague as to time.  It is undisputed that at the present time Meta operates a CDN, but at previous

periods of time Meta used a third-party CDN service provider, Akamai, until at least 2017.

PX3101, Meta presentation: "CFO Quarterly Results Presentation Quarter and Year Ended

December 31, 2016" (Jan. 12, 2017), FB_FTC_CID_10037620 at -053, -077-78.  Post-

acquisition, Instagram migrated to Akamai, not Meta's CDN (FBCDN), PX10882, Meta

message: M. Krieger to Instagram Internal, (Apr. 5, 2013), FB_FTC_CID_10683133 at -133, and

continued to use Akamai into 2017.  PX3330, Meta email chain: N. Shortway to ██████████ et

al., re: "Instagram/Zero-Rating Client-Side," (Aug. 11, 2016), FTC-META-000312347 at -347

("It seems that we will be using Akamai for blocked countries (IR, etc) indefinitely.  We will

also be using it for the near future in Brazil and other areas not well covered by FBCDN.").

WhatsApp, post-acquisition, relied on Akamai as a "fallback" if Meta's CDN was unable to

provide sufficient capacity to handle peak holiday traffic.  *See* PX3219, Meta presentation:

"Capacity Plan for Video Products" (Oct. 2015), FTC-META-008683728 at -738, -740, -748

(slides 12-13, 21).

The second sentence is disputed to the extent that it asserts that Meta's CDN provides "a

performance benefit to users" compared to other CDNs and POPs, which are widely available

services and easily obtained through third parties.  *See* PX9001, Bray Report at ¶ 57 (There are

many CDN providers: "[e]ach of the 'Public Cloud' providers has its own CDN, and there are

other independent providers, for example, Akamai, CloudFlare, StackPath, and Fastly."); *id.* at ¶

211 ("███████████████████ use CDNs, either self-built or from one or more third

parties, to deliver a reliable, low latency, user experience for their users.").  For example, ample

evidence indicates, *inter alia*, that WhatsApp could have contracted with a commercial CDN

provider and improved its network latency without Meta.  *See* PX6009, Acton (Meta/WhatsApp)

IH Tr., at 196:25-197-4 ("[A] global content delivery network is something you can get from

Akamai or Cloudflare.  You can get it from a number of different providers just as a service that

you purchase."); *id.* at 200:14-18 ("Q. Would WhatsApp also have been able to improve latency

had it not been acquired by Facebook?  A. Yeah.  We had all the technical know-how and ability to do all these things. . . .").  The FTC disputes the assertion that Meta's CDN provides "a performance benefit to users" compared to alternative CDNs because it is not supported by the material cited, and because it is contradicted by other evidence, including Professor Nieh's expert report, which concedes that Meta's CDN cost and performance was akin to Akamai. PX9022, Nieh Report at ¶ 169 ("Meta found that the 'costs and performance' of its native CDN was 'better or at least equal to that of Akamai.'").

Statement 153.b is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta operates a global content delivery network ("CDN"), which consists of ████████ points of presence ███████████████████████████████████████████████████████████ ████████████████████████████████████████████.  The fact that Meta used a third-party CDN service provider prior to fully developing its own CDN is irrelevant and nonresponsive to the facts stated in this paragraph.  Further, the FTC's statement that Meta used Akamai "until at least 2017" is misleading.  Meta began developing its own CDN several years before that, and began migrating Instagram traffic to Meta's own CDN by early 2014.  *See* Ex. 5 at ¶¶ 169-170 (Nieh Rep.).

The FTC's response that "[p]ost-acquisition, Instagram migrated to Akamai, not Meta's CDN" is irrelevant and nonresponsive to the facts stated in this paragraph.  Although Instagram initially migrated to Akamai, by early 2014 Instagram began migrating from Akamai to Meta's CDN.  *Id.*  Extensive evidence confirms that Instagram benefited from migrating from Akamai to Meta's CDN.  *See id.* at ¶¶ 169-172 (describing Instagram's decision to migrate from Akamai to Meta's CDN and the resulting benefits).  Further, the acquisition facilitated Instagram's ability to

use Akamai, which provided advantages that Instagram could not have obtained on its own. *See id.* at ¶ 124 ("[E]ven though Instagram's initial CDN migration relied on Akamai infrastructure to some extent, Instagram's ability to use this superior solution benefitted significantly from Meta's existing contract and discounts with Akamai, as well as from Meta's CDN engineers."); *id.* at ¶¶ 169-72 (describing additional benefits Instagram received from Meta's CDN).

The FTC's response also does not create a genuine dispute of material fact that Meta's CDN provides a performance benefit for Meta's users. *See supra* Meta Introduction. The cited materials support that Meta's CDN improves the performance of Meta's applications. *See* Ex. 220 at -096 (FTC-META-012239089) (explaining that Meta's Edge Network and CDN "keep[ ] content closer to users, enhancing their product experience"). The FTC's proffered infrastructure expert, Mr. Bray, acknowledges that CDNs are "essential to the successful operation of products which display media such as images and video." PX9001 at ¶ 55 (Bray Rep.).

The FTC's responses that CDNs and POPs "are widely available services and easily obtained through third parties" and that "WhatsApp could have contracted with a commercial CDN provider and improved its network latency without Meta" are irrelevant and nonresponsive to the facts stated in this paragraph. The fact that WhatsApp would have benefited by adopting any CDN, given that it was not using a CDN prior to the acquisition, does not create a genuine dispute of material fact that Meta's CDN provided WhatsApp better performance than it could have obtained using a third-party CDN. Further, evidence shows that ████████████ ████████████████████████████████████████████████████████. *See* Ex. 5 at ¶¶ 228-234 (Nieh Rep.). By using Meta's CDN, "████████████████████████████████████ ████████████████████████████████████████████████████████████



██████████ *Id.* at ¶ 229.  This ████████████████████████.  In fact, ██████
█████████████████████████████████████████████.  *Id.*
at ¶ 234.

Even if Instagram and WhatsApp could have used third-party CDNs as the FTC alleges,
it is purely speculative that Instagram and WhatsApp would have received similar or greater
benefits from those CDNs than it did from Meta's CDN and Edge network.

The additional material the FTC claims "concedes that Meta's CDN cost and
performance was akin to Akamai" does not create a genuine dispute of material fact that
Instagram received benefits from Meta's CDN that it could not have achieved absent the
acquisition.  The cited paragraph of Nieh's Report confirms that, in 2016, "Meta found that the
'costs and performance' of its native CDN was 'better or at least equal to that of Akamai,'" and
demonstrates that Meta's CDN provided additional unique benefits, including ██████████
████████████████████████████████████████████
█████████████████████████████."  *Id.* at ¶ 169.  Professor Nieh
further explained that "Instagram benefitted from having a CDN that was dedicated to Meta's
Family of Apps, and that could therefore be optimized for Instagram's needs."  *Id.* at ¶ 171.

     c.  **Hardware and Software Infrastructure.**  Meta's infrastructure organization
        operates the software and hardware infrastructure that runs inside Meta's data
        centers, including more than ████████████████.  *See* Ex. 5
        at ¶¶ 55--57 (Nieh Rep.).

**FTC Response: Undisputed.**

d. **Reliability.**  Meta has a separate engineering organization focused on the reliability of Meta's infrastructure and apps.  *See* Ex. 5 at ¶ 61 (Nieh Rep.). Meta's reliability organization works "to reduce the likelihood and impact of major outages," and "████████████████████████████████████ ████████████████████████████."  *Id.* at ¶ 61 & n.93 (quoting Ex. 258 (FTC-META-012239137)).

**FTC Response: Undisputed.**

154.    The FTC has no evidence that Meta has reduced quality below competitive levels by degrading distribution or service speed; Tim Bray, the FTC's proffered infrastructure expert, testified that he had no basis to rule out whether Meta's apps are the fastest, have the highest availability, or have the lowest variability on the planet.  *See* Ex. 289 at 41:11-18, 45:10-18, 48:13-19 (Bray Dep. Tr.).

**FTC Response: Disputed.**  The FTC (1) objects to the terms "degrading distribution" and "service speed" as vague and undefined; (2) disputes Statement 154 because it is not supported by any cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h); and (3) disputes Statement 154 because it is contradicted by significant evidence.

The cited material provides no support for the assertion that "[t]he FTC has no evidence that Meta has reduced quality below competitive levels," and neither "degrading distribution" nor "service speed" are referenced in the cited materials.  Statement 154 misrepresents the cited material to the extent that it suggests that Mr. Bray testified to a lack of "evidence."  While there are standard metrics used in the industry to measure infrastructure performance including speed, variability, and availability – *see* Ex. 289 Bray Dep. at 67:7-15, 81:11-19, 90:20-91:3; *see also*

108

PX9001, Bray Report at ¶¶ 98-106, 113, and 126; PX9011, Bray Rebuttal Report at ¶¶ 15-16, 18, 107 – Mr. Bray stated in reference to the cited testimony that the industry standard metrics necessary to render an opinion on the issue were unavailable.  *See* Ex. 289 Bray Dep. at 41:17-18 ("I can't have any opinion on that at all, not having seen any evidence related to it."); *id.* at 45:10-18 (testifying that "I really can't offer any opinion" based on "the evidence [he'd] seen."); 48:18-19 (testifying that he had "no basis to say anything on that issue").  But contrary to Statement 154, Mr. Bray provided other evidence Meta has poor quality and that Instagram and WhatsApp have encountered problems from using Meta's infrastructure.  *See id.* at 129:3-14, 130:19-131:2; *see also* PX9001, Bray Report at ¶ 130 (finding no evidence of improvement to user experience), ¶¶ 142-144 (describing outages on Meta's infrastructure), ¶¶ 145-146 (discussing cascading failures on Meta's infrastructure), ¶¶ 199-202 (discussing capacity constraints on Meta's infrastructure impacting product development), █████████████████ ████████████████████; PX9011, Bray Rebuttal Report at ¶¶ 93-100 (discussing capacity constraints  and degraded services on Meta's infrastructure), ¶¶ 101-106 (describing engineering work diverted from application development to efficiency engineering to generate capacity on Meta's infrastructure), ¶¶ 107-112 (outages on Meta's infrastructure).  *See infra* at FTC Responses to Statements 756-758, 762, 856, 860; *see also* FTC Counterstatement of Material Facts in Support of FTC's Motion for Partial Summary Judgment and in Opposition to Meta Platforms, Inc.'s Motion for Summary Judgment [hereinafter, "CMF"], at §§ V.E.2.c., V.E.3.

   **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC has no evidence that Meta has reduced quality below competitive levels by degrading distribution or service speed.  *See supra* Meta Introduction.  As the terms "distribution" and

"service speed" are ordinarily understood and used, there is no dispute that the FTC has no evidence that Meta reduced the quality of Instagram and WhatsApp by migrating them onto Meta's infrastructure. The FTC's response that "Mr. Bray provided other evidence Meta has poor quality and that Instagram and WhatsApp have encountered problems from using Meta's infrastructure" is irrelevant and nonresponsive to the fact stated in this paragraph. Mr. Bray's reports do not compare Instagram's and WhatsApp's performance on Meta's infrastructure to any competitive benchmark and the FTC does not provide any evidence to compare Instagram's and WhatsApp's quality to those of any other entity. Mr. Bray testified that he did not compare Instagram's and WhatsApp's speed, availability, variability, durability, number of outages, or user experience to any third-party apps. *See* Ex. 289 at 41:2-9, 43:15-21, 48:3-11, 52:13-18, 56:6-12, 59:15-22, 98:5-16 (Bray Dep. Tr.). Further, contrary to the FTC's assertion that "there are standard metrics used in the industry to measure infrastructure performance including speed, variability, and availability," Mr. Bray testified that his reports did not identify any industry standards for speed at the time of Instagram's acquisition, that he was "not aware of industry standards" for variability, and that "[t]here is no such industry standard" for availability "because the availability requirements for different kinds of applications are deeply different. And even within applications the availability requirements for particular operations are different. So it would not be really appropriate to try and pull out an industry standard." *Id.* at 36:18-22, 42:14-43:10, 46:9-14. Mr. Bray also testified that he did not analyze how Instagram's speed or availability compared to other apps or services at any point in time, *see id.* at 41:2-9, 43:15-21, and admitted that his reports did not discuss whether Instagram meets or exceeds an industry level for speed or availability, *see id.* at 37:3-12, 42:20-43:10. The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine

110

dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

155.    Mr. Bray testified:  "Q. You haven't offered an opinion that Instagram offers a wors[e] user experience today than it did prior to the acquisition; correct?  . . .  A. I have not offered an opinion that Instagram offers a worse user experience.  I have not offered such an opinion, that's correct."  Ex. 289 at 128:11-18 & errata (Bray Dep. Tr.).  He also testified: "Q. You haven't offered an opinion that WhatsApp offers a worse user experience today than it did prior to the acquisition; correct?  . . .  A. That is correct."  *Id.* at 130:8-12.  He also testified: "Q. And you've offered no opinion in your reports how the speed of Instagram or WhatsApp has compared to other apps or services at any other point in time; correct?  . . .  A. You know, that was outside the scope of the issues I was addressed to ask by [sic] FTC."  *Id.* at 41:2-9.

**FTC Response: Disputed in part.**  It is undisputed that Statement 155 accurately recounts words that appear in the cited materials.  The FTC disputes the first transcript reference in Statement 155 as incomplete and misleading because it omits Mr. Bray's subsequent testimony related to Instagram's performance under Meta's ownership:

> Q. And you haven't offered an opinion that Instagram offers worse functionality or performance today than it did prior to the acquisition; correct? . . . [A.] There were some cases where I noted that the capacity limitations imposed by Meta prior to the – post-acquisition did, in fact, involve Instagram delaying features and reducing their disaster recovery potential and so on.  So I certainly did identify some number of places.  Oh, and there was also the Foursquare migration, which was very, very badly reviewed.  So I do have some specific examples of places where the effects of the acquisition and migration were not positive to the user experience.

Ex. 289 at 128:20-129:14 (Bray Dep. Tr.).

Similarly, the FTC disputes the second transcript reference in Statement 155 as incomplete and misleading because it omits Mr. Bray's subsequent testimony related to WhatsApp's performance under Meta's ownership:

> Q. And you haven't offered an opinion that WhatsApp offers worse functionality or performance today that it did prior to the acquisition, correct? . . . [A.] I do believe I discussed some outage frequencies in WhatsApp post-acquisition. . . . So that would have been an instance of something getting worse after the acquisition.

Ex. 289 at 130:14-131:2 (Bray Dep. Tr.).

The FTC also disputes the last transcript reference in Statement 155 as incomplete because it omits Mr. Bray's earlier testimony that "[his] assignment was to establish whether [he] could verify an improvement, and based on the absence or either metric data or discussions in contemporaneous documents, [he] was not able to find evidence that would allow [him] to verify those claims."  Ex. 289 at 80:17-22 (Bray Dep. Tr.); *see also id.* at 81:10-19 ("I would assume that if people care about the user experience, which one assumes they would, that discussions of standard metrics would appear in contemporaneous documents and would have been available for me to verify that, yes, we did improve that millisecond latency.  And that was strikingly absent.").

In his expert reports, Mr. Bray identified several shortcomings that resulted from using Meta's infrastructure such as capacity limitations, impacts to feature development, and outages. *See* Ex. 289 at 129:3-9 (Bray Dep. Tr.); *see also* PX9001, Bray Report, at ¶ 130 (no evidence of improvement to user experience), ¶¶ 142-144 (outages on Meta's infrastructure), ¶¶ 145-146 (discussing cascading failures on Meta's infrastructure); ¶¶ 199-202 (capacity constraints impacting product development); PX9011, Bray Rebuttal Report at ¶¶ 93-100 (capacity constraints resulting in competition between Meta products for capacity and degraded services),

¶¶ 101-106 (engineering work diverted from application development to efficiency engineering to generate capacity), ¶¶ 107-112 (outages on Meta's infrastructure).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Bray has not offered the opinion that Instagram or WhatsApp have a worse user experience today than before the acquisition.  *See supra* Meta Introduction.  The FTC's response does not allege, and the supporting evidence does not show, that Instagram or WhatsApp offer a worse user experience today than prior to the acquisition, much less than Instagram or WhatsApp would have offered a superior user experience absent the acquisition.  The FTC's response also does not create a genuine dispute of material fact that Mr. Bray did not compare the speed of Instagram or WhatsApp to any other apps.  Mr. Bray's reports do not compare Instagram's and WhatsApp's performance on Meta's infrastructure to any competitive benchmark and the FTC does not provide any evidence to compare Instagram's and WhatsApp's quality to those of any other entity.  Mr. Bray similarly testified that he did not compare Instagram's and WhatsApp's availability, variability, durability, number of outages, or user experience to any third-party apps. *See* Ex. 289 at 43:15-21, 48:3-11, 52:13-18, 56:6-12, 59:15-22, 98:5-16 (Bray Dep. Tr.).

### B.    Other Services

#### 1.    Other Services Outside Alleged PSNS Market

##### a.    YouTube

###### i.    Background

156.    YouTube is a video and audio sharing platform that contains user-generated content and allows users to interact with each other, including by commenting on videos.  *See* Ex. 290 at ¶¶ 255-256 (Lampe Rep.); Ex. 8 at 23:19-24:3 (D. Weinstein (Alphabet) Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that "video and audio sharing platform" is an accurate description of YouTube, that YouTube contains user-

generated content, and that users can interact with each other on YouTube via commenting on videos.  The statement is otherwise disputed, and the FTC objects in part to Statement 156 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The FTC disputes Meta's assertion that – aside from commenting on videos – there are other means by which users may interact with each other on YouTube is not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  Paragraph 256 of the Lampe report specifically states YouTube "does allow for interactions via comments on videos," indicating comments on videos are *the* means by which users are able to interact on YouTube, rather than one of several means of interaction, as implied by Statement 156.  *See* Ex. 290 at ¶ 256 (Lampe Rep.).  ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding Meta's high-level description of YouTube.  *See supra* Meta Introduction.  The FTC's trivial objection to Meta's use of the phrase "including by" is factually incorrect:  in addition to commenting on videos, YouTube users can also interact by liking and disliking videos.  *See infra* Meta SMF ¶ 167.

157.    YouTube launched in 2005, and Google acquired YouTube in 2006 for $1.65 billion.  *See* Ex. 290 at ¶ 255 & n.665 (Lampe Rep.).

**FTC Response: Undisputed.**

158.    As of January 2023, YouTube had 2.5 billion monthly active users worldwide. *See* Ex. 290 at ¶ 255 n.665 (Lampe Rep.).  Meta's expert economist, Professor Dennis Carlton, found that, as of June 2022, Facebook and Instagram (incrementally) had ██████████ daily

active users in the United States, . *See* Ex. 2 at p. 277, tbl. 36 (Carlton Rep.). In October 2022, Facebook and Instagram (incrementally) had ▮ monthly active users in the United States, ▮. *See id.* at p. 279, tbl. 37. In October 2022, Facebook and Instagram (incrementally) had time spent ▮ ▮ hours monthly, ▮. *See id.* at p. 281, tbl. 38.

**FTC Response: Disputed in part.** The first sentence is undisputed. It is undisputed that the second, third, and fourth sentences of Statement 158 accurately recount the information presented in the cited material, but are otherwise disputed. The second, third, and fourth sentences cite to data from ▮ that, per the Carlton report table referenced, appear to ▮ ▮. Further, the second, third, and fourth sentences, citing Professor Carlton's analysis, reflect only "incremental" Instagram users rather than the total number of Facebook and Instagram users. *See* PX9007, Hemphill Rebuttal Report at ¶¶ 475-78 (explaining the flaws in Professor Carlton's "de-deduplication" methodology).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact concerning the usage statistics in Meta's statement. *See supra* Meta Introduction. With respect to Professor Carlton's use of data from ▮, Professor Hemphill never disputed the appropriateness of relying on data from ▮. In fact, Professor Hemphill relies on ▮ data in his own calculations. *See* PX9000 at ¶ 621 (Hemphill Rep.). With respect to how Professor Carlton counts the number of Facebook and Instagram monthly and daily users, Professor Carlton explained that he calculated usership of Facebook and Instagram incrementally by de-duplicating users in his report. Ex. 2 at ¶ 95 (Carlton Rep.). With respect to how Professor

Carlton counts time spent data, unlike user data, time spent data is necessarily cumulative or incremental, as a given minute is spent either on Facebook or Instagram.  *Id.*

159.    YouTube's "[m]ain source of revenue is advertising," generating "[a]bout $35 billion" in revenue annually.  Ex. 8 at 248:20-249:4 (D. Weinstein (Alphabet) Dep. Tr.).

**FTC Response: Undisputed.**  Statement 159 is undisputed with the clarification that the cited testimony regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ relates only to the time at which the testimony was given.

160.    Individuals can watch videos on YouTube without an account, but users signed into their YouTube account, which is associated with a "channel," have access to greater functionality, including the ability to subscribe to channels and engage with videos via comments.  *See* Ex. 290 at ¶ 257 (Lampe Rep.); Ex. 9 at 214:21-215:11 (Filner (Alphabet) Dep. Tr.).  For "most users," accounts on YouTube are linked to their Google accounts.  Ex. 290 at ¶ 257 (Lampe Rep.).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that individuals can watch videos on YouTube without an account, that most users' YouTube accounts are linked to their Google accounts, and that signing into an account is required to subscribe to channels and to leave a comment on a video.  Statement 160 is otherwise disputed.  The FTC objects to the phrase "engage with videos via comments" as vague, and objects in part to Statement 160 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h). ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Further, the cited testimony from Mr. Filner explains that "[a]nyone signed in [on YouTube] can comment at a video," but does not indicate that individuals without an account or not signed into an account cannot "engage" with

comments on videos by viewing the comments.  *See* Ex. 9 at 215:17-20 (Filner (Alphabet) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that individuals can watch videos on YouTube without an account, but users signed into their YouTube account, which is associated with a "channel," have access to greater functionality, including the ability to subscribe to channels and engage with videos via commenting.  *See supra* Meta Introduction.

### ii.    Features

161.    YouTube has many features that are similar to features on Facebook and Instagram.  *See*, *e.g.*, *supra* Part I.A.1(a)(x), (a)(viii) & (b)(iii), (b)(iii).

**FTC Response: Disputed.**  The FTC objects to the terms "many" and "similar" as vague as to time and vague as to their meaning, and disputes Statement 161 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The cited internal references are brief descriptions of several Meta features: Part I.A.1(a)(x) to Facebook Watch / Facebook Video; (a)(viii) to Facebook Marketplace; and (b)(iii)—which is cited twice—to Instagram Photos and Video; the cited material contains no mention of YouTube or any YouTube features.  Further, Statement 161 does not identify which YouTube features Meta asserts are "similar" to features of Facebook and Instagram.  Meta has not provided any basis for the assertion that many YouTube features are similar to features on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B); s*ee also* CMF at § II.A.5.b.1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube, Facebook, and Instagram have many similar features.  *See supra* Meta Introduction. As the terms "many" and "similar" are ordinarily understood and used, there is no dispute there

are multiple features on YouTube that resemble features on Facebook and Instagram.  As Meta

demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part

I.A.1(a)-(b), and the following paragraphs describing YouTube's features, *see infra* Meta SMF

¶¶ 162-180 – most of which the FTC does not dispute – Facebook, Instagram, and YouTube all

have:  a social graph, a feed, and user profiles.  They also have features for posting, viewing,

sharing both long and short-form videos; finding and subscribing to content – including content

from friends or family; liking and commenting on videos; and other "social" features.  *See id.*

The FTC's cross-reference to a section of its Counterstatement without explanation does not

itself create a genuine dispute of material fact.  While no reply is required, none of those

paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to

those paragraphs here.

162. **Watching and Sharing Videos.**  When users access YouTube through either the

app or its webpage, the first thing they see is YouTube's homepage, which displays "a panel that

has a number of different videos, shorts, advertising."  Ex. 10 at 49:19-50:1 (Kim (Alphabet)

Dep. Tr.).  This is called the "home feed."  Ex. 8 at 216:20-217:4 (D. Weinstein (Alphabet) Dep.

Tr.) ("So when you first show up at the YouTube app . . . it is a feed.").  The below left

screenshot is an example of how YouTube users' home feeds appear on the YouTube mobile

app.  For comparison, the below right screenshot is an example of how Facebook users' video

feeds appear on the Facebook mobile app.



**FTC Response: Undisputed but incomplete.** The first and second sentences of

Statement 162 are undisputed.  Regarding the third and fourth sentences of Statement 162, it is

undisputed that the above screenshots appear to be examples of content that could be displayed

on the home feed on the YouTube mobile app and Facebook video feed on the Facebook mobile

app with respect to the present time, subject to the caveat that Meta does not identify how the

screenshots were generated or obtained (specifically the steps taken to generate the content that

appears on each screenshot and the user's past behavior), and the FTC objects that the above

screenshots are not admissible evidence nor are they supported by admissible evidence.  *See* Fed.

R. Civ. P. 56(c)(2).

**Meta Reply:**  The FTC's response does not dispute the stated fact.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that Meta would be unable to introduce screenshots comparing relevant apps in an admissible form at trial is meritless.  *See Ali v. District of Columbia*, 810 F. Supp. 2d 78, 83-84 (D.D.C. 2011) (there is a "difference between evidence that is admissible at trial and evidence that the Court may consider at summary judgment," where a party "is not required to produce evidence in a form that would be admissible at trial, so long as her evidence is capable of being converted into admissible evidence" (internal quotation marks omitted)).

163.    The videos displayed on users' homepages are based on a variety of factors that YouTube believes will meet the needs of users, such as users' past behavior, including what videos they have previously "liked" and whether a video was posted by a creator the users subscribe to, among other factors.  *See* Ex. 10 at 54:2-9, 50:15-51:6 (Kim (Alphabet) Dep. Tr.); Ex. 8 at 25:14-26:6 (D. Weinstein (Alphabet) Dep. Tr.).

**FTC Response: Undisputed.**

164.    **Finding and Subscribing to Channels.**  Users can "subscribe" to other users' channels on YouTube.  *See* Ex. 9 at 226:19-227:8 (Filner (Alphabet) Dep. Tr.).  Users receive notifications when the channels they subscribe to post a new video.  *See id.* at 29:15-17.

**FTC Response: Disputed in part.**  The FTC disputes in part Statement 164 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The first sentence is disputed.  Per the cited deposition testimony of Mr. Filner, subscribe means "that [users] are interested in videos from a creator."  Ex. 9 at 226:19-227:8 (Filner (Alphabet) Dep. Tr.).  Mr. Filner's testimony specifically refers to subscribing to creators' channels, not subscribing to other users' channels.  *See id.*  The second sentence is disputed.  It is undisputed that ████

███████████████████████████████████████████████████.  However,

the cited testimony from Mr. Filner sets out that users "can" get notified if "their favorite

channels post new videos," or after subscribing, "choose to go further and receive notifications

and other updates . . . from creators that [they] subscribe to."  Ex. 9 at 29:15-17, 226:19-227:8

(Filner (Alphabet) Dep. Tr.).  Thus, users have the option to receive notifications from channels

they subscribe to, but █████████████████████████████████████████████

█████████  of Statement 164.

**Meta Reply:**  The FTC's response does not dispute the fact that users can subscribe to

other users' YouTube channels.  *See supra* Meta Introduction.  Channels can be named based on

a user's real name:  Mr. Filner testified that YouTube users can set up accounts using a name of

their choice, and that he did not know what proportion of users use their real name for the name

of their channel.  *See* Ex. 9 at 225:19-227:8 (Filner (Alphabet) Dep. Tr.).

165.    YouTube users can find other users based on the name of their channels.  *See*

Ex. 9 at 31:8-10 (Filner (Alphabet) Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  It is undisputed that ███████████

██████████████████████████████████.  However, the testimony cited from Mr.

Filner in Statement 165 is incomplete.  Mr. Filner was asked whether "YouTube ha[s] a tool that

allows users to find other users, such as friends or family, by typing in their name or email

address," to which he responded "[n]o, it has a feature that allows you to find people based on

the name of their channel."  Ex. 9 at 31:3-10 (Filner (Alphabet) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

users can find channels on YouTube based on the name of the user's channel, which can be

named based on the user's real name.  *See supra* Meta Introduction, Meta Reply to SMF ¶ 165.

166.    YouTube users can view videos uploaded by their friends and family members using YouTube.  *See* Ex. 9 at 28:4-7 (Filner (Alphabet) Dep. Tr.).  Users can also subscribe to channels of friends and family members.  *See* Ex. 10 at 49:2-6 (Kim (Alphabet) Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  It is undisputed that the testimony from Mr. Filner in the first sentence is accurately cited.  However, when asked "[w]hat tools [] YouTube provide[s] to allow users to share videos with a group of their friends," Mr. Filner testified that "YouTube's video features are more focused at sharing publicly," adding that he "d[id not] have an understanding that there are features focused at sharing specifically to friends. . . . YouTube provides a number of tools for video sharing like uploading a video.  Again, none of this is specific to friends."  Ex. 9 at 32:21-34:13 (Filner (Alphabet) Dep. Tr.).  The second sentence is undisputed to the extent that the testimony cited from Mr. Kim indicates users *can* subscribe to a channel on YouTube, whether or not the channel happens to be operated by a creator who is a personal friend of the user's.  However, Mr. Kim's testimony as cited in Statement 166 is misrepresented and incomplete.  Mr. Kim was asked whether "a user [could] subscribe to a friend's YouTube channels," and Mr. Kim's response indicated "[t]hey could if the channel was a creator's channel, yes, if the friend was a creator, yes."  Ex. 10 at 49:2-6 (Kim (Alphabet) Dep. Tr.).  Further, as explained in the FTC's response to Statement 165, YouTube does not have a tool which allows users to find friends and family by typing in their name or email address.  Ex. 9 at 31:3-10 (Filner (Alphabet) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube users can view videos uploaded by friends and family and subscribe to their channels.  *See supra* Meta Introduction.  As Mr. Kim also explained, any user can create a channel that others can subscribe to, Ex. 10 at 296:8-15 (Kim (Alphabet) Dep. Tr.), and as reflected in the

statement, users can subscribe to their friends' channels.  The additional testimony the FTC adds

in its response does not dispute the stated fact and is itself incomplete.  YouTube users can also

post "Private" videos, which are only viewable by other users who are granted access to view the

video, or post "Unlisted" videos, which are only viewable to other users who are provided a link

to the video.  Ex. 507 at 1-2 (YouTube Help, *Change Video Privacy Settings*,

https://perma.cc/7KKZ-A3GW?type=image).  Therefore, users can also view content from

friends and family when the video uploader shares the content with them.  For example, a parent

may post a child's recital on YouTube, and make it visible only to family members who have

been granted access to the video (Private) or provided the link to the video (Unlisted).  *See id.*;

*infra* Meta SMF ¶¶ 173, 175.  Additionally, YouTube has tools that allow users to search for

their friends and family by searching for the name of their channel.  *See supra* Meta SMF

¶¶ 164-165.  There is also no genuine dispute that YouTube users *do* watch videos posted by

their friends.  Indeed, to the extent they are relevant, the surveys the FTC relies on indicate that

YouTube is used for that purpose.  *See*, *e.g.*, PX12982 at -032 (FTC-META-006826485) (Meta

survey showing that ███████████████████████████████████████████

██████ ).

168.     **Liking and Disliking Videos.**  YouTube users can "like" or "dislike" videos

posted on YouTube by clicking on a thumbs-up or thumbs-down button.  *See* Ex. 10 at 31:10-18

(Kim (Alphabet) Dep. Tr.); Ex. 9 at 28:11-12 (Filner (Alphabet) Dep. Tr.).

>    **FTC Response: Undisputed.**

168.     **Commenting on Videos.**  If a channel has allowed it for the video, YouTube

users can leave comments on a video.  *See* Ex. 355 at 1 (YouTube Help, *Post & Interact with*

*Comments*, https://perma.cc/JJU2-4JNK).  Comments are public and any user can reply to, like, or dislike previously posted comments.  *See id.*

**FTC Response: Undisputed.**

169.    **Sharing Video Content.**  Users can share a YouTube video through YouTube's sharing button below each video.  *See* Ex. 356 at 1 (YouTube Help, *Share Videos and Channels, Computer*, https://perma.cc/YS55-6NDB).  *See id.*  Clicking that button opens a panel presenting different sharing options, including directly sharing the video on Facebook, WhatsApp, Twitter, Reddit, and LinkedIn, or through email.  *See id.*  The panel also provides a URL link to the video, which users can copy and send to someone else through other means of communication. *See id.*

**FTC Response: Undisputed.**

170.    **YouTube Shorts.**  YouTube launched Shorts in the United States in March 2021. *See* Ex. 2 at p. 50, tbl. 6 (Carlton Rep.).  "YouTube Shorts is videos currently defined as being shorter than 60 seconds and is often [in] vertical format . . . that is uploaded onto . . .YouTube Shorts surfaces."  Ex. 10 at 16:18-17:1, 39:17-22 (Kim (Alphabet) Dep. Tr.).

**FTC Response: Undisputed.**

171.    The screenshot on the below left is an example of how the Shorts surface appears on a mobile device.  For comparison, the screenshot in the middle shows Instagram Reels on a mobile device, and the screenshot on the right shows Facebook Reels on a mobile device.



**FTC Response: Undisputed but incomplete.**  It is undisputed that the screenshots in Statement 171 appear to be examples of content that could be displayed on the YouTube Shorts surface, Instagram Reels, and Facebook Reels on a mobile device with respect to the present time, subject to the caveat that Meta does not identify how the screenshots were generated or obtained (specifically the steps taken to generate the content that appears on each screenshot and the user's past behavior), and the FTC objects that the above screenshots are not admissible evidence nor are they supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).

**Meta Reply:**  The FTC's response does not dispute the stated fact.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that

Meta would be unable to introduce screenshots of the relevant apps in an admissible form at trial is meritless.  *See supra* Meta Reply to SMF ¶ 162 (addressing similar response).

172.     As of November 2022, Shorts watch time accounted for "up to ███ of mobile [watch time] on YouTube."  Ex. 11 at -770 (MetaFTC-Klein-DX-204, GOOG-META-02398770).  On Alphabet's July 25, 2023 earnings call, YouTube announced that "YouTube Shorts are now watched by over 2 billion logged-in users every month, up from 1.5 billion just one year ago."  Ex. 357 at 4 (Alphabet Q2 2023 Earnings Call).  On Alphabet's January 30, 2024 earnings call, YouTube announced that "Shorts remains a top priority" and that it "continue[s] to grow watch time across YouTube, with strong growth in Shorts and Connected TV."  Ex. 358 at 7 (Alphabet Q4 2023 Earnings Call).

**FTC Response: Undisputed.**

173.     **Posting Video Content.**  YouTube users can upload a video up to 15 minutes long.  *See* Ex. 360 (YouTube Help, *Upload Videos Longer Than 15 Minutes*).  YouTube users with a verified account can upload and publish videos (except Shorts) up to 256 GB or 12 hours, whichever is less.  *See id.*  Users can add details to their videos, including giving the video a title and a description and selecting a thumbnail image.  *See* Ex. 359 at 1 (YouTube Help, *Upload YouTube Videos, Computer*).  If users are using mobile devices, YouTube will upload the video as a Short if it is 60 seconds or less and has a square or vertical aspect ratio.  *See* Ex. 361 (YouTube Help, *Upload YouTube Videos, Android*, https://perma.cc/H6RB-AHFV).  Users can upload videos to their channel publicly or privately, which means that only they or a specific set of users can see them.  *See* Ex. 10 at 296:8-15 (Kim (Alphabet) Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  The FTC disputes in part Statement 173 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The first

four sentences are undisputed.  The fifth sentence is disputed in part and does not accurately reflect Mr. Kim's testimony: he testified that a private video means "only you can see it or you *grant access* to a very specific set of people."  Ex. 10 at 296:8-12 (Kim (Alphabet) Dep. Tr.) (emphasis added).  Thus, █████████████████████████████████████

████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding how users can upload videos to YouTube.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 166 (explaining the difference between public, private, and unlisted channels).

174.   Users uploading Shorts can edit their videos with YouTube's "Short Creations Tools," including by adding text, filters, or audio to their videos.  Ex. 363 at 1-2 (YouTube Help, *Shorts Editing Tips*, https://perma.cc/S4JP-KFWZ).  Instagram also offers "a variety of creative editing tools" for Reels, including audio and effects.  Ex. 362 at 2 (Instagram, *Introducing Instagram Reels*, https://perma.cc/B5VL-UWXW).

**FTC Response: Undisputed.**

175.   YouTube users can upload videos that they expect to be of interest to their friends and family members; for example, they can post a video of a child's recital on YouTube for friends and family to watch.  *See* Ex. 8 at 33:4-11 (D. Weinstein (Alphabet) Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  The FTC disputes in part Statement 175 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The cited testimony from Ms. Weinstein makes no mention of "users upload[ing] videos that they expect to be of interest to their friends and family members," but it is undisputed that she testified that users could, "post a video and mark it private and then e-mail it to a small group of people," Ex. 8 at 32:1-10 (Weinstein (Alphabet) Dep. Tr.), and that users "can" post a "video of a child's

recital on YouTube for friends and family, like grandparents, to watch[.]"  Ex. 8 at 33:4-11

(Weinstein (Alphabet) Dep. Tr.).  However, Ms. Weinstein also testified in the same answer that

"unless they mark it private, not just [] friends and family would be able to see the video."  Ex. 8

at 33:4-11 (Weinstein (Alphabet) Dep. Tr.).

   **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding how users can upload videos to YouTube and who many view those videos.  *See supra*

Meta Introduction; Meta Reply to SMF ¶ 166 (explaining the difference between public, private,

and unlisted channels).

   176.    In addition to uploading videos, YouTube users can record a live stream.  *See*

Ex. 10 at 41:17-18 (Kim (Alphabet) Dep. Tr.).

   **FTC Response: Disputed.**  The FTC disputes Statement 176 as not supported by the

cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  When asked if YouTube *users* can

live stream in YouTube, Mr. Kim specifically testified "YouTube users can't – YouTube

creators can live stream from YouTube."  Ex. 10 at 41:17-18 (Kim (Alphabet) Dep. Tr.).

   **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

some YouTube users can record a live stream.  *See supra* Meta Introduction.  As Mr. Kim

explained, creators are users, and "any user can become a creator with their own channel."

Ex. 10 at 43:14-44:9 (Kim (Alphabet) Dep. Tr.); *see also* Ex. 9 at 236:2-236:9 (Filner (Alphabet)

Dep. Tr.) (equating "creators" with anyone who posts a video on YouTube).

   177.    **Other "Social" Features.**  Aaron Filner, a senior director of product management

at YouTube, agreed that "there is no industry-wide definition of social networking service," but

that YouTube has "some of the functionality of a social network" and "has the ability to read and

share content, and it has a home feed, and for some users public profiles." Ex. 9 at 79:4-9, 14:11-13, 94:17-95:8 (Filner (Alphabet) Dep. Tr.).

**FTC Response: Undisputed but incomplete.** It is undisputed that Statement 177 accurately quotes statements made by Mr. Filner during his deposition. However, Mr. Filner also testified that he was "not aware of a social network service offered by Google including YouTube." Ex. 9 at 245:11-21 (Filner (Alphabet) Dep. Tr.).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact. The FTC's response admits Mr. Filner testified there is no definition of a social networking service and YouTube has functionality of a social network. *See supra* Meta Introduction.

178.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

**FTC Response: Disputed in part.** It is undisputed Statement 178 relays the words that appear in the cited documents. The FTC disputes in part Statement 178 as not supported by the cited material. *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h). The first and fourth sentences are

otherwise disputed because the assertion that YouTube is a social network is contradicted by

YouTube documents and testimony from Alphabet executives.  For example, Mr. Filner testified

that he was "not aware of a social network service offered by Google including YouTube."

Ex. 9 at 245:11-21 (Filner (Alphabet) Dep. Tr.).  Additionally, in a submission to the Australian

Competition and Consumer Commission, Google stated plainly that "YouTube does not have a

social networking purpose."  PX13494, Google document: "ACCC Digital Platforms Services

Inquiry" (Nov. 18, 2022), at -007*;* ███████████████████.  The second and

third sentences are otherwise disputed as not supported by the cited material to the extent that

they ██████████████████████ Ms. Weinstein testified that she "proofread . . .

but did not draft" weekly newsletter emails, like the kind cited in Ex. 13.  Ex. 8 at 135:17-136:1

(Weinstein (Alphabet) Dep. Tr.).  Ms. Weinstein also testified that "'social platform' is a

complicated term," and in the context of the quoted material in the second sentence, "probably

'social' was an unnecessary word."  Ex. 8 at 240:22-241:8 (Weinstein (Alphabet) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

YouTube internal documents refer to YouTube as a social platform or social network.  *See supra*

Meta Introduction.  Other parties refer to YouTube as a social network as well.  *See*, *e.g.*, *infra*

Meta SMF ¶ 413 (LinkedIn describing YouTube as a social network).  The additional materials

the FTC adds in its response do not dispute the stated fact and are themselves incomplete.  Mr.

Filner agreed that "there is no industry-wide definition of social networking service," but that

YouTube has "some of the functionality of a social network" and "has the ability to read and

share content, and it has a home feed, and for some users public profiles."  *See supra* Meta SMF

¶ 177 (quoting Ex. 9 at 79:4-9, 14:11-13, 94:17-95:8 (Filner (Alphabet) Dep. Tr.)); FTC Resp. to

Meta SMF ¶ 177 ("undisputed that Statement 177 accurately quotes statements made by

Mr. Filner during his deposition"). Google has also explained that "term 'social network,' . . . is a label that does not appear to be very important for users" because "[o]ther types of service offer similar functionalities that allow users to achieve the same objectives as social networks." Ex. 14 at -894 (MetaFTC-Klein-DX-51, GOOG-META-02536890). And PX13494 which the FTC cites is a response to an inquiry from Australia's competition authority, where YouTube advocated that it should not be included in an investigation relating to "social media platforms;" it is not an internal document created in the ordinary course of business. And the portions the FTC recites do not create a genuine dispute that YouTube's features overlap with social networks. The cited document also states, under the heading "How YouTube competes for users," that "YouTube faces competitive constraints for user attention from many sources, including social media platforms." PX13494 at -011 (ACCC Digital Platforms Services Inquiry: March 2023 Interim Report on the Provision of Social Media Services by Social Media Platforms).

179.    According to Google, it "offers a range of services," including YouTube, "that have one or more of the functionalities of a social network and therefore compete for users with social networks." Ex. 14 at -896 (MetaFTC-Klein-DX-51, GOOG-META-02536890); *see* Ex. 9 at 95:10-22 (Filner (Alphabet) Dep. Tr.) (agreeing with statement).

**FTC Response: Undisputed**. Undisputed that Statement 179 accurately relays the words that appear in the cited materials.

180.    On August 18, 2020, Mr. Zuckerberg testified that "YouTube has this basic structure which is that you have creators and you have a follow graph and people subscribe to it, which there is a network structure to it." Ex. 139 at 125:23-126:1 (Zuckerberg IH Tr.).

**FTC Response: Undisputed.**  Undisputed that Statement 180 accurately quotes the words that appear in the cited transcript.

### iii.     Competition Between YouTube and Facebook and Instagram

181.     **Meta Documents and Testimony.**  Meta documents and executives recognize YouTube as one of Facebook's and Instagram's competitors.  For example, Meta's 10-K for the fiscal year ending in December 31, 2021 stated:  "We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences, including, for example, Alphabet (Google and YouTube), Amazon, Apple, ByteDance, (TikTok), Microsoft, Snap (Snapchat), Tencent (WeChat), and Twitter."  Ex. 364 at 7-8 (Meta 2021 Form 10-K).

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague.  It is undisputed that Statement 181 accurately quotes the words that appear in the cited document.  Statement 181 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes YouTube as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction.  As the term "competitors" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that Facebook, Instagram, and YouTube

compete with one another.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including watching videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and YouTube within the relevant market.  As of April 2024, more than 60% of time on Facebook and Instagram is spent watching video, and Reels alone accounts for 50% of time spent on Instagram.  *See* Ex. 499 at 4, 6 (Meta Q1 2024 Earnings Call).  All available empirical evidence of substitution shows YouTube is a closer substitute for Facebook and Instagram than Snapchat, which the FTC asserts is a PSN app.  *See infra* Meta SMF ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage), ¶¶ 537-547 (Professor List's pricing experiment).  Whether users treat two products as substitutes – here, YouTube and Facebook or Instagram – is material to whether they are competitors in a relevant market.

182.    Mr. Zuckerberg agreed that "YouTube competes with the Facebook application to offer United States users the use case of online sharing with friends."  Ex. 142 at 37:20-39:7 (Zuckerberg Dep. Tr.).  In response to a question about "groups with which Facebook has experienced particular challenges," Mr. Zuckerberg testified:  "Video, you know, has always been a somewhat challenging area because YouTube started off so much bigger than us."  Ex. 139 at 43:8-44:23 (Zuckerberg IH Tr.).  Mr. Zuckerberg noted that "people share a lot of videos through Facebook but a lot more through YouTube."  *Id.* at 29:6-7.  Other Meta executives have explained that YouTube is a competitor.  *See infra* at ¶ 199 (collecting testimony); *infra* at ¶ 248 (Mr. Mosseri's public statement:  "[T]here's some really serious competition right now.  TikTok is huge, YouTube is even bigger.").

**FTC Response: Disputed in part and incomplete.**  The first sentence is undisputed only to the extent that the sentence accurately quotes the testimony cited.  The first sentence of Statement 182 is otherwise disputed and is contradicted by other testimony: in answering whether YouTube competes with Facebook for the use case of sharing online with friends, Mr. Zuckerberg contrasted sharing "in a feed," where "someone would share something directly, and people would interact in the feed," with "find[ing] interesting content on . . . [a] service like YouTube, and then they send that to friends."  Ex. 142 at 38:1-9 (Zuckerberg Dep. Tr.).  Mr. Zuckerberg noted that "a lot of those interactions aren't happening on the YouTube website or app itself."  Ex. 142 at 39:1-7 (Zuckerberg Dep. Tr.).  Mr. Zuckerberg also testified that "[y]ou can call that entertainment in the sense that people are . . . more watching videos than interacting with friends while they're watching the videos."  Ex. 142 at 38:19-22 (Zuckerberg Dep. Tr.).  Additionally, Mr. Zuckerberg testified that "sharing with friends" is not the "main use" of YouTube, recognizing that "a lot of people would say that YouTube is -- you find entertaining content."  Ex. 142 at 39:16-24 (Zuckerberg Dep. Tr.).

The second sentence of Statement 182 is undisputed.

The third sentence of Statement 182 is undisputed only to the extent that it accurately quotes the words that appear in the cited material.  The third sentence is otherwise disputed and is contradicted by other testimony to the extent it suggests that Mr. Zuckerberg testified that "people . . . share videos . . . through YouTube."  Mr. Zuckerberg testified that users "find interesting content on . . . [a] service like YouTube, and then they send that to friends."  Ex. 142 at 38:1-9 (Zuckerberg Dep. Tr.).  Mr. Zuckerberg noted that "a lot of those interactions aren't happening on the YouTube website or app itself."  Ex. 142 at 39:1-7 (Zuckerberg Dep. Tr.).  Additionally, Mr. Zuckerberg testified that "sharing with friends" is not the "main use" of

YouTube, recognizing that "a lot of people would say that YouTube is -- you find entertaining content." Ex.142 at 39:16-24 (Zuckerberg Dep. Tr.).  Furthermore, ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. *See* PX3335, FTC-META-012516614 ████████████████; PX3419, FTC-META-010478096 ██████████ ██████████; PX7047, GOOG-META-01594386, PX7050, GOOG-META-01594387, PX7051, GOOG-META-01594388, PX7052, GOOG-META-01594389 (data on YouTube videos uploaded); PX7048, GOOG-META-03246388 (data on YouTube MAV).

The FTC objects to the term "competitor" as used in the fourth sentence of Statement 182 as vague.  The fourth sentence is disputed, as it is not supported by the cited material and does not establish the absence of a genuine dispute: Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h); Fed. R. Civ. P. 56(c)(1)(B).  Regarding the internal citation to paragraph 199, it is undisputed that paragraph 199 identifies quotations from Meta executives referring to YouTube as a competitor exclusively in the context of YouTube Shorts and short form video.  Regarding the internal citation to paragraph 248, it is undisputed that it accurately quotes the words that appear in the document cited.  However, Mr. Mosseri's public statement was explicitly made with the context of "lean[ing] into . . . entertainment and into video."  Ex. 247 at -297-98 (FTC-META-004553295).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Zuckerberg testified that YouTube and Facebook compete for U.S. users in sharing with

friends.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).

The additional testimony the FTC adds in its response does not create a genuine dispute or

contradict Mr. Zuckerberg's testimony – Mr. Zuckerberg pointing out differences between

Facebook and YouTube is not inconsistent with Facebook and YouTube also being competitors.

The FTC also mischaracterizes Mr. Zuckerberg's testimony by claiming that he contrasted

sharing "in a feed" with "find[ing] interesting content on . . . [a] service like YouTube" and

sending that content to friends.  Ex. 142 at 38:1-9 (Zuckerberg Dep. Tr.).  Mr. Zuckerberg did

not contrast feeds with YouTube, he contrasted users interacting with each other on a feed with

users interacting with each other off-feed in messaging apps or Groups:  "I think ten years ago

most of how sharing worked, in a feed at least, was that someone would share something

directly, and people would interact in the feed.  Today the way that this works more is that

people find interesting content, *whether it's in a feed or on another internet service like

YouTube*, and then they send that to friends and interact with it more than messaging apps or

Groups."  *Id.* (emphasis added).

      The FTC's assertion that the material cited in paragraphs 199 and 248 refer to

competition for short-form video and entertainment fails to create a genuine dispute of material

fact.  Given that the FTC has defined "PSN services" to include all activities in which users

engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating),

including watching short-form video and entertainment content, *see infra* Meta SMF ¶¶ 580-584,

there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and

YouTube within the relevant market.

      183.    Meta's internal documents describe users substituting away from Facebook and

Instagram to YouTube.  For example, an internal April 2017 document titled "Core App Time

Spent Review:  Growth Slowdown Summary" stated that Facebook was "[l]osing time to

YouTube."  Ex. 235 at -291, -293 (FB_FTC_CID_05999290).  Another internal document, titled

███████████████████████████████████████████████████████████████

████████████████████████████████████████████  Ex. 273 at -.003

(FTC-META-006826485); *see also infra* at ¶ 264 (October 3, 2022 email from Adam Mosseri

regarding ████████ and ████████████████ from YouTube).

**FTC Response: Disputed.**  The FTC objects to the term "substituting away" as vague.

The first sentence of Statement 183 is disputed, as it is not supported by the cited material.  *See*

Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The material cited in the second sentence does not

indicate users were substituting their use of Facebook for YouTube.  The cited material refers to

an internal document which describes YouTube as "growing time spent share" faster than

Facebook, which is does not support the assertion that users were "substituting away from

Facebook and Instagram to YouTube."  *See* Ex. 235 at -293 (FB_FTC_CID_05999290).

The material cited in the third sentence does not support the assertion that users were

"substituting away," or that users were replacing time spent on Instagram with time spent on

YouTube or any other app included in the survey.  The cited material refers to ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████  Ex. 273

at Slide 3 (FTC-META-006826485).  The third sentence also omits that ████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████.  Ex. 273 at Slide 3 (FTC-META-006826485).  Further, ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████.

Additionally, the internal citation to paragraph 264 refers to an email from Mr. Mosseri which does not address user substitution from Facebook and Instagram to YouTube.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that users substituted usage of YouTube for usage of Facebook.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).  As the term "substituting usage" is ordinarily understood and used, the evidence demonstrates that time spent on YouTube and Facebook and Instagram are reasonably interchangeable for the same purpose.  The additional portions of the documents the FTC recites add immaterial details and do not create a genuine dispute about the fact that Meta's documents describe users substituting away from Facebook and Instagram to YouTube – indeed, the FTC does not dispute that the documents are correctly quoted.  As to Exhibit 235, the fact that YouTube is growing in time-spent share faster than Facebook is consistent with the document also stating that Facebook was "[l]osing time to YouTube." Ex. 235 at -291, -293 (FB_FTC_CID_05999290).  As to Exhibit 273, the fact that ████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.  Ex. 273 at -.004 (FTC-META-006826485).  Consistent with this, all available empirical evidence of substitution shows that YouTube is a closer substitute for Facebook and Instagram than Snapchat, which the FTC asserts is PSNS.  *See infra* Meta SMF ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage), ¶¶ 537-547 (Professor List's pricing experiment).

184.    Meta documents have recognized YouTube as one of Meta's competitors.  For example, a May 5, 2021 email to Adam Mosseri, the head of Instagram, stated that one of the items the team wanted to hear about in advance of an all hands meeting was "what is key to succeed amidst intense competition from Tiktok and YouTube?"  Ex. 267 at -117 (FTC-META-006131117); Ex. 143 at 61:13-18 (Mosseri Dep. Tr.). ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████  Ex. 269 (FTC-META-005945648). ████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████  Ex. 268 at -711-712 (FTC-META-006208711).  ████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████  Ex. 270 at -667 (FTC-META-011549667).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term "competitors" as vague.  It is undisputed that Statement 184 accurately quotes the words that appear in the cited document.  The first sentence of Statement 184 is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms compete in various aspects of firm operations does not establish that Meta and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is

not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The second sentence is

disputed because Ex. 267 at -117 (FTC-META-006131117) 

. The third sentence is disputed because

Ex. 269 (FTC-META-005945648) is focused only on competition with respect to video between

YouTube, TikTok, and Facebook Video.  The fourth sentence is disputed because the cited

material refers to competition with respect to video: Ex. 268 is a

Ex. 268 at -711

(FTC-META-006208711).  The fifth sentence is disputed because the cited material refers to

Ex. 270 at -667 (FTC-META-011549667).

 **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta recognizes YouTube as one of Facebook's and Instagram's competitors.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).  The FTC's assertion that

the documents cited refer to competition for video, short-form video, or Facebook Groups fails to

create a genuine dispute of material fact.  As of April 2024, more than 60% of time on Facebook

and Instagram is spent watching video.  *See* Ex. 499 at 6 (Meta Q1 2024 Earnings Call).  Given

that the FTC has defined "PSN services" to include all activities in which users engage on apps

that the FTC includes in the alleged PSNS market (except Facebook Dating), including watching

short- and long-form video and time engaging with content in Facebook Groups, *see infra* Meta

SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between

Facebook, Instagram, and YouTube within the relevant market.

185.    From 2014 to 2019, Meta tracked the "usage trends and strategic actions for, among others, LinkedIn, Pinterest, Twitter, YouTube, and a variety of apps offering messaging functionality," in ███████████████████████████.  Ex. 1 at ¶ 83 (Ghose Rep.). YouTube, Twitter, and Pinterest were among the apps tracked in all 65 documents between 2014 and 2019.  *See id*.  Similarly, Meta created "Industry Insights" documents between 2019 and 2023 "track[ing] usage and product releases for 'key apps' including Amazon, Android Messages, Apple Music, Discord, LinkedIn, Netflix, Pinterest, Reddit, Snapchat, Spotify, TikTok, Twitch, Twitter, WeChat, and YouTube."  *Id*.

**FTC Response: Disputed in part.**  It is undisputed Statement 185 accurately quotes the words that appear in the cited materials.  Otherwise disputed because Statement 185 is not relevant to any material fact and does not establish the absence of any genuine dispute over any material fact.  Meta tracking usage statistics of other apps does not establish that those apps are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked YouTube as a competitor.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).

186.    Materials for Meta's board of directors dated December 8, 2016 compared Facebook, Instagram, Messenger, and WhatsApp to YouTube and Snapchat and "identified YouTube as a "competing digital video service."  Ex. 237 at -117, -134 (FB_FTC_CID_10969081).  As early as July 30, 2011, Justin Osofsky – Meta's head of online sales, operations, and partnerships – emailed Sheryl Sandberg and others: "Youtube presents a

significant strategic issue for us. . . .  We've been talking about YT for a long time, but need to move faster in deciding what to do and executing."  Ex. 233 at -861 (FB_FTC_CID_04470860); Ex. 147 at 59:25-60:3 (Osofsky Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Undisputed that Statement 186 accurately recounts words that appear in the cited documents.  Statement 186 is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms compete in various aspects of firm operations does not establish that Meta and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Further, the first sentence is incomplete because the cited document solely compared Meta's apps to YouTube and Snapchat on the basis of ███████████████████  Ex. 237 at -117 (FB_FTC_CID_10969081).  Ex. 237 also identified YouTube as a "competing digital video service[]" ██████████████████████████████████████████████████████ ████████   Ex. 237 at -134 (FB_FTC_CID_10969081).

Additionally, the document described in the second sentence is an email from Mr. Osofsky responding to an email from ████████████, a former director of engineering at Meta, who described YouTube as a "public video sharing service": "[a] non-trivial amount of my fb sharing is getting/sending youtube videos.  Given our tight focus on friends and sharing with friends, is a public video sharing service a non-goal?"  *See* Ex. 233 at -863 (FB_FTC_CID_04470860).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes YouTube as one of Facebook's and Instagram's competitors.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).  The FTC's assertion that

the documents cited refer to competition for youth, digital video, and public video sharing fail to

create a genuine dispute of material fact.  As of April 2024, more than 60% of time on Facebook

and Instagram is spent watching video.  *See* Ex. 499 at 6 (Meta Q1 2024 Earnings Call).  Given

that the FTC has defined "PSN services" to include all activities in which users (of any age)

engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating),

including watching videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute

that competition occurs between Facebook, Instagram, and YouTube within the relevant market.

187.    Meta has made changes to its services ███████████████████████████ .

For example, a November 6, 2018 internal post regarding "Facebook App Monetization

Discussion and FYI" explained that ███████████████████████████████████████



███████████████████████████ Ex. 263 at -297 (FTC-META-011970297); *see supra* ¶ 15

(depicting share of time spent on Facebook Watch), ¶¶ 36-38 (describing Facebook

Watch/Video).

**FTC Response: Disputed in part.**  It is undisputed that Statement 187 accurately

recounts the words that appear in the cited document.  The FTC objects to the terms "changes"

and "in response to competition" as vague, and disputes in part Statement 187 as not supported

by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

The first sentence of Statement 187 accurately recounts the words that appear in the cited

document but is otherwise disputed, as the material cited does not establish the absence of a

genuine dispute regarding a material fact: Meta's perception that other firms compete in various

aspects of firm operations does not establish that Meta and YouTube are competitors in the

provision of personal social network services, that there is not a relevant market for personal

social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P.

56(c)(1)(B).  The second sentence is disputed because its description of █████████████████

████████████████████████  does not indicate that ████████████████████████████████

███████████████████████████████  Neither do the internal references to paragraphs 15 and

36-38 ██████████████████████████████████████████████████████████████████████████

███████████████ .

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta invested in its services to help retain users ████████████████████████ .  *See supra*

Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).

    188.    A 2020 internal Meta report discussed competition between ███████████████

█████ .  *See* Ex. 264 at -630 (FTC-META-005889624).  Under the heading "competitive

landscape," the report stated: █████████████████████████████████████████████████████

██████████████████████████████████████████████████  *Id.*  In the

first bullet under "strategy," the document outlined recommendations: ████████████████

█████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████

█████████████████████████  *Id.* at -625; *see also* Ex. 270 (FTC-META-011549667)

(June 11, 2021 document discussing how to ███████████████████████████████████████████

████████████████████████ ).

    **FTC Response: Disputed in part.**  It is undisputed Statement 188 accurately quotes the

words that appear in the cited materials.  Otherwise disputed, as the material cited does not

establish the absence of a genuine dispute regarding a material fact: Meta's perception that other

firms compete for live content does not establish that Meta and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The first, second, and third sentences are disputed in part because cited document describes competition with respect to ███████████ .  Further, under the "strategy" subheading referenced in the third sentence, the document also notes the ████████████████ ████████████████████ .  Ex. 264 at -625 (FTC-META-005889624).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes ████████████████████ .  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).  The FTC's assertion that the documents cited ████████████████████████ ██████ fails to create a genuine dispute of material fact.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including ███████████ , *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and YouTube within the relevant market.

189.   **YouTube Documents and Testimony.**  ████████████████



███████████████  Alphabet's 2021 10-K stated:  "We face formidable

competition . . . including from . . . Social networks offered by ByteDance, Meta, Snap, and

Twitter." Ex. 365 at -254 (MetaFTC-Klein-DX-50, GOOG-META-00041245). Mr. Filner

agreed with that statement. *See* Ex. 9 at 64:10-21 (Filner (Alphabet) Dep. Tr.). Mr. Filner also

agreed that "YouTube compete[s] for user time with people who use Facebook" and with "users

of Instagram." *Id.* at 87:5-13; *see also id.* at 351:12-20 ("I do believe that people can go to either

Facebook or YouTube for user attention."). Similarly, Ms. Weinstein agreed that "YouTube

compete[s] with Instagram for user time and attention." Ex. 8 at 142:6-9 (D. Weinstein

(Alphabet) Dep. Tr.).

      **FTC Response: Disputed in part and incomplete.** The FTC objects to the term

████████████ as vague and undefined. It is undisputed that Statement 189 accurately quotes the

words that appear in the cited materials.

      The first, second, fourth, fifth, and sixth sentences of Statement 189 are otherwise

disputed, as the material cited does not establish the absence of a genuine dispute regarding a

material fact: ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████

      The third sentence is otherwise disputed because it mischaracterizes the cited material.

The cited portion of Ex. 365 at -254 (MetaFTC-Klein-DX-50, GOOG-META-00041245) states

that Alphabet itself, not YouTube, "face[s] formidable competition in every aspect of [their]

business." Additionally, regarding social networks, Ex. 365 at -254 (MetaFTC-Klein-DX-50,

GOOG-META-00041245) explains that competition as "[s]ome users increasingly rely on social

networks for product or service referrals, rather than seeking information through traditional search engines," suggesting that the statements relate to competition with Google in search and commerce rather than competition with YouTube.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube recognizes Facebook and Instagram as two of its competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).  The third sentence in Meta's statement does not mischaracterize Alphabet's 2021 10-K:  Meta stated that the 2021 10-K was Alphabet's, not YouTube's.  Moreover, the cited page of the 10-K also states that Alphabet competes with "[p]roviders of digital video services, such as . . . Meta . . . ."  Ex. 365 at -254 (MetaFTC-Klein-DX-50, GOOG-META-00041245).

190.  ██████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

**FTC Response: Undisputed but immaterial.**  It is undisputed Statement 190 accurately quotes the words that appear in the cited materials.  However, the FTC objects to Statement 190 because it is not relevant to any material fact and does not establish the absence of any genuine dispute:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube recognizes Facebook and Instagram as two of its competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).

191.   █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████  Ms. Weinstein also testified that YouTube, TikTok, Instagram, Facebook, Snapchat, and Twitter compete with each other for "creators."  *Id.* at 242:11-17.

**FTC Response: Disputed in part and incomplete.**  It is undisputed Statement 191 accurately quotes the words that appear in the cited materials.  Statement 191 is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact: ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Additionally, the second sentence is incomplete because it omits that ██████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube recognizes Facebook and Instagram as two of its competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).

192.   ████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term ██████████ as vague and undefined.  It is undisputed that Statement 192 accurately quotes the words that appear in the cited materials.  The first sentence is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact: ██████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████ *See* Fed. R. Civ. P.

56(c)(1)(B).

The second sentence is otherwise disputed because ████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

The third sentence is otherwise disputed, as ██████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████

The fourth sentence is otherwise disputed, as ████████████████████

███████████████████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

YouTube recognizes Facebook and Instagram as two of its competitors.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).  The FTC's argument that

the document titled ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████  The FTC's assertion that ████████████████████████████

██████████████████████████████████  fails to create a genuine dispute

of material fact.  Given that the FTC has defined "PSN services" to include all activities in which

users engage on apps that the FTC includes in the alleged PSNS market (except Facebook

Dating), including engagement from watching video, *see infra* Meta SMF ¶¶ 580-584, there is

likewise no genuine dispute that competition occurs between Facebook, Instagram, and YouTube

within the relevant market.  As of April 2024, more than 60% of time on Facebook and

Instagram is spent watching video.  *See* Ex. 499 at 6 (Meta Q1 2024 Earnings Call).

193.

"Google operates YouTube (a video sharing platform that brings together

creators, viewers, and advertisers)," and

Ex. 14 at -896

(MetaFTC-Klein-DX-51, GOOG-META-02536890); *see also id.* at -907



**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 193

accurately quotes the words that appear in the cited materials.  Otherwise disputed, as the

material cited does not establish the absence of a genuine dispute regarding a material fact:

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube recognizes Facebook and Instagram as two of its competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 181 (addressing similar response).

194.    YouTube provides a reasonable substitute for certain engagement on Facebook and Instagram, including consumption of video on Facebook Watch/Video.  ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████    In Google's view:  "Facebook has a similar video sharing service [to YouTube] called Facebook Video.  Facebook Video has similar features to YouTube (a variety of its videos, the ability to upload long videos and comment/like videos, users who want to watch or share videos use them as substitutes.  █████████████████████

████████████."  *Id.* at -900; *see also* Ex. 9 at 104:8-105:1 (Filner (Alphabet) Dep. Tr.) (agreeing with statement); *id.* at 68:9-12 (agreeing that Meta is a competitor to YouTube as a provider of digital video services).

**FTC Response: Disputed.**  It is undisputed that Statement 194 accurately quotes the words that appear in the cited documents and testimony.

The FTC disputes the first sentence.  The FTC objects to the term "certain engagement" as so vague the first sentence is not susceptible to a reasonable response.  The FTC objects to the term "reasonable substitute" as vague and undefined.  The term "reasonable substitute" can

constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and

the cited materials do not establish reasonable interchangeability relevant to antitrust market

definition or how consumers would behave in response to a small but significant, non-transitory

increase in the price (or decrease in quality) above (or below) a competitive level of Facebook,

Instagram, YouTube, or any particular set of products or services posited as a relevant antitrust

market.

  The FTC also disputes Statement 194 as not supported by the cited material. *See* Fed. R.

Civ. P. 56(c)(1)(A); L.R. 7(h). Statement 194 cites ███████████████████████

████████████████████████ and the statement is thus not supported by the cited

material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

  While no response is required, the cited material does not establish that ███████████

████████████████████████████████████████████████████

█████████, and the cited material does not establish the absence of a genuine dispute of

material fact: ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████. *See* Fed. R. Civ. P. 56(c)(1)(B). *See, e.g.*, CMF at § II.A.5.b.1.

  **Meta Reply:** The FTC's response does not create a genuine dispute of material fact that

YouTube, Facebook, and Instagram can be and are used interchangeably, including for viewing

videos, which the FTC includes in the alleged PSNS relevant market, when on Facebook and

Instagram. *See supra* Meta Introduction. As the terms "reasonable substitute" and "certain

engagement" are ordinarily understood and used, the evidence demonstrates that certain

activities on YouTube, like viewing video, are reasonably interchangeable with similar activities

on Facebook and Instagram, like viewing videos on Facebook Watch.  *See supra* Meta

SMF ¶¶ 191-203.  Indeed, the FTC acknowledges in its response that █████████████████

████████████████████████████████████  The FTC's response does not

dispute that Google accurately represented that "users who want to watch or share videos use

them as substitutes."  Given that the FTC has defined "PSN services" to include all activities in

which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook

Dating), including viewing videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine

dispute that competition occurs between Facebook, Instagram, and YouTube within the relevant

market.  All available empirical evidence of substitution shows that YouTube is a closer a

substitute for Facebook and Instagram as Snapchat, which the FTC asserts is a PSN app.  *See*

*infra* ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage); ¶¶ 537-547 (Professor

List's pricing experiment).  Whether users treat two products as substitutes – here, YouTube and

Facebook or Instagram – is material to whether they are competitors in a relevant market.  The

FTC's cross-reference to a section of its Counterstatement without explanation does not itself

create a genuine dispute of material fact.  While no reply is required, none of those paragraphs

creates a genuine dispute of material fact, and Meta incorporates its responses to those

paragraphs here.

Moreover, Meta's statement is supported by the cited material.  Alphabet defined the

term "Facebook" in Exhibit 14 to include "all its group companies, including . . . Instagram, LLC

. . . ."  Ex. 14 at -891 (MetaFTC-Klein-DX-51, GOOG-META-02536890).  There is also

extensive evidence that YouTube provides a reasonable substitute for certain engagement on

Instagram, including consumption of video.  *See, e.g., infra* Meta SMF ¶¶ 183, 195-196, 199-203.

195.    Ms. Weinstein agreed that users can use Facebook and YouTube as substitutes "for sharing a video."  Ex. 8 at 233:11-19 (D. Weinstein (Alphabet) Dep. Tr.).  Mr. Filner agreed that "Meta is a competitor to YouTube as a provider of digital video services."  Ex. 9 at 68:9-12 (Filner (Alphabet) Dep. Tr.).  When asked, "what services will YouTube users use from Facebook that are a substitute for a Google service," Mr. Filner testified, "consum[ing] video." *Id.* at 103:6-16.

**FTC Response: Disputed in part and incomplete.**  Statement 195 is undisputed to the extent it accurately quotes words that appear in the cited materials.  The FTC objects to the term ███████ as vague, and also disputes in part Statement 195 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

The first sentence is disputed in part because the quotation is incomplete and contradicted by other testimony from the witness.  Ms. Weinstein testified that Facebook and YouTube can be used as substitutes "[f]undamentally for sharing a video, yes.  To what purpose that you're trying to accomplish with the video, I think then different parts of the -- different services would be better for different goals."  Ex. 8 at 233:11-19 (D. Weinstein (Alphabet) Dep. Tr.).  Further, when asked if YouTube Shorts and Instagram Reels were substitutes, Ms. Weinstein testified "I think there's some things that are similar, and I think there's some things that are really unique." Ex. 8 at 233:20-234:17 (D. Weinstein (Alphabet) Dep. Tr.).  Similarly, when asked if she agreed that Facebook Reels and YouTube Shorts have "substitutable features," Ms. Weinstein testified "I think there are some features that overlap, and I think there's some features that are very

distinctive certainly on YouTube. . . . I imagine Facebook has other distinctive features as well."
Ex. 8 at 234:22-235:8 (D. Weinstein (Alphabet) Dep. Tr.).

The second sentence is disputed in part, as the material cited does not establish the
absence of a genuine dispute regarding a material fact: ██████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

The third sentence is disputed because it does not accurately reflect the witness's
testimony. Mr. Filner's testified that "[i]t's possible to consume video at both YouTube and
Facebook, which I think is the primary area where I could see someone using either app" in
response to the question cited, not that consuming video on Facebook is a substitute for a Google
service. Ex. 9 at 103:6-16 (Filner (Alphabet) Dep. Tr.).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that
YouTube, Facebook, and Instagram can be and are used interchangeably, including for viewing
videos. *See supra* Meta Introduction; Meta Reply to SMF ¶ 194 (addressing similar response).
The additional testimony the FTC adds in its response does not dispute the stated fact and is
itself incomplete. Like the FTC's response above to paragraph 194, which did not dispute "users
who want to watch or share videos use [Facebook and YouTube] as substitutes," the FTC's
response here does not dispute that Ms. Weinstein testified that users can use Facebook and
YouTube as substitutes "for sharing a video." Ex. 8 at 233:11-19 (D. Weinstein (Alphabet) Dep.
Tr.). Meta's statement accurately reflects Mr. Filner's testimony, as he identified consuming

videos on both applications when responding to the question "what services will YouTube users use from Facebook that are a substitute for a Google service," after he had already testified that "Meta is a competitor to YouTube as a provider of digital video services," Ex. 9 at 68:9-12 (Filner (Alphabet) Dep. Tr.), the latter of which the FTC does not dispute.  Immediately after the cited testimony, Mr. Filner testified that he agreed with Google's representation that "Facebook has a similar video sharing service called Facebook Video.  Facebook Video has similar features to YouTube []a variety of its videos -- a variety of its videos, the ability to upload long videos and comment/like videos[], users who want to watch or share videos use them as substitutes. Facebook is competing with YouTube for users."  Ex. 9 at 104:8-105:1 (Filner (Alphabet) Dep. Tr.) (testifying about Ex. 14 (Meta-FTC-Klein-DX-51, GOOG-META-02536890)).

196.    Mr. Kim testified that Instagram TV (a "long-form video product[]" that provided "algorithmically driven recommendations" to users for content to watch) and Facebook Watch (now called Facebook Video) "very much" compete with YouTube for user time and attention. Ex. 10 at 70:20-71:10, 74:12-75:10 (Kim (Alphabet) Dep. Tr.).  He explained that Facebook Watch is a "direct offering that mimic[s] our services" and the fact that "Facebook and Instagram had actually offered exclusive deals to our creators that were on YouTube to only exclusively create content on Instagram TV or Facebook Watch . . . made it very clear that that was, you know direct competition with our services."  *Id.* at 74:12-75:10.

**FTC Response: Disputed in part.**  The FTC objects to the term ████████ as vague.  It is undisputed that Statement 196 accurately quotes the words that appears in the cited transcript. Statement 196 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact: ██████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube, Facebook, and Instagram can be and are used interchangeably, including for watching videos.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 194 (addressing similar response).  Indeed, the FTC acknowledges in its response that YouTube may compete with Meta in "certain aspects" like "creator content."  For clarity, Meta also notes that, consistent with other Google documents and testimony describing video on Meta's products as a "substitute" to YouTube for "users," *see*, *e.g.*, *supra* Meta SMF ¶¶ 194-195, Mr. Kim testified that competition for creators was further evidence that "made it very clear" that YouTube was "very much" competing with Facebook and Instagram for users.

197.    The FTC's proffered monetization expert, Professor Aral, wrote in a 2020 book titled, "The Hype Machine:  How Social Media Disrupts Our Elections, Our Economy, and Our Health – And How We Must Adapt," that "attention is . . . what powers the business models of all the major social media platforms.  It's what they compete for and sell to brands and governments attempting to create behavior change on a global scale.  Without attention, social media platforms wither and die . . . . Platforms like Facebook, Twitter, and YouTube provide connections, communication, and content to get consumers' attention."  Ex. 354 at 202-203 (MetaFTC-DX-1157, *The Hype Machine*).

**FTC Response: Undisputed but immaterial.**

iv.   **Competition Between YouTube and Facebook and Instagram for Sharing and Viewing Short-Form Video Content**

198.    YouTube provides a reasonable substitute for certain engagement on Facebook and Instagram, including viewing and sharing short-form videos.  *See infra* at ¶¶ 199-203.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute" and "certain engagement" as so vague and undefined that Statement 198 is not susceptible to a reasonable response, and disputes Statement 198 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Facebook, Instagram, YouTube, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC disputes that Meta has provided any basis for the assertion that users consider YouTube as a reasonable substitute for viewing or sharing short-form video on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with Facebook and Instagram in various aspects of firm operations (e.g., short-form video) or in a broad sense for user time and attention does not establish that Meta and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B); *see also* CMF at § II.A.5.b.1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube, Facebook, and Instagram can be and are used interchangeably, including for viewing

and sharing short-form videos.  *See supra* Meta Introduction.  As the terms "reasonable substitute" and "certain engagement" are ordinarily understood and used, the evidence demonstrates that certain activities on YouTube, like viewing short-form video content, are reasonably interchangeable with similar activities on Facebook and Instagram, like viewing short-form video content on Facebook and Instagram.  *See infra* Meta SMF ¶¶ 199-203.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including viewing and sharing short-form videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and YouTube within the relevant market.  As of April 2024, more than 60% of time on Facebook and Instagram is spent watching video, and Reels alone accounts for 50% of time spent on Instagram.  *See* Ex. 499 at 4, 6 (Meta Q1 2024 Earnings Call).  All available empirical evidence of substitution shows YouTube is a closer substitute for Facebook and Instagram than Snapchat, which the FTC asserts is a PSN app. *See infra* ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage), ¶¶ 537-547 (Professor List's pricing experiment).  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

199.  **Meta Documents.**  Meta documents and executives recognize that YouTube provides a reasonable substitute to Facebook Reels and Instagram Reels for sharing and viewing short-form video – and that they all also compete with TikTok.  For example, in August 2021, Tom Alison – the head of Facebook – instructed his team to ███████████████████

████████████████████████████████████████████ Ex. 271

at -713 (FTC-META-004015713); Ex. 146 at 18:15-20 (Alison Dep. Tr.); *see also infra* at ¶ 264

(discussing October 3, 2022 email from Mr. Mosseri regarding ███████████████████

███████████████████████████████████); Ex. 272 at -132-133 (FTC-META-

004616132) (Aug. 23, 2021 post noting that ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████).  On

March 23, 2023, Mr. Osofsky testified that Reels is a "product in the short-form video space up

against lots of competitors such as TikTok and YouTube Shorts."  Ex. 147 at 161:24-162:20

(Osofsky Dep. Tr.); *see also infra* ¶ 261 (discussing testimony from Mr. Mosseri relating to

competition between Reels and YouTube and TikTok).

   **FTC Response: Disputed.**  While it is undisputed that Statement 199 accurately quotes

the words that appear in the cited documents and transcripts, the FTC disputes Statement 199 as

not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

   The FTC disputes the first sentence of Statement 199 because the cited materials refer to

YouTube Shorts and not "YouTube" generally, and also because the terms "reasonable

substitute" and "compete" are vague and undefined.  The term "reasonable substitute" can

constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and

the cited materials neither contain that term nor suffice to establish reasonable interchangeability

relevant to antitrust market definition or how consumers would behave in response to a small but

significant, non-transitory increase in the price (or decrease in quality) above (or below) a

competitive level of YouTube (or YouTube Shorts), Facebook Reels, Instagram Reels, TikTok,

or any particular set of products or services posited as a relevant antitrust market.  While no

response is required, the FTC states that Meta has not provided any basis for the assertion that

users consider YouTube (or YouTube Shorts) as a reasonable substitute for viewing or sharing

short-form video on Facebook Reels and Instagram Reels, and the cited material does not

establish the absence of a genuine dispute of material fact: Meta's perception that other firms

compete in various aspects of firm operations (e.g., sharing and viewing short-form video) or in a

broad sense for user time and attention does not establish that YouTube (or YouTube Shorts),

Facebook Reels, Instagram Reels, and TikTok are competitors in the provision of personal social

network services, that there is not a relevant market for personal social network services, or that

Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The second and third sentences are disputed because the documents and executives cited

in Statement 199 indicate that █████████████████████████████████████████████

█████████████████████████████████████.  For example, the "Reels

Review with Mark [Zuckerberg]" presentation referenced in Exhibit 272 (Ex. 272 at -132 (FTC-

META-004616132)) describes Meta's Reels strategy, which recognizes that ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██ PX3226, Meta email chain: ███████ to K. Patel and ██████ re: "Update/addl context on Reels

MZ review," (Aug. 26, 2021), FTC-META-003699749 at -771, -794 (email attaching "Reels

Update" presentation).  In their respective depositions, Mr. Alison, Mr. Mosseri, and Mr.

Osofsky all likewise agreed that ████████████████████████████████████████████

██████████████████.  Ex. 146 at 134:20-136:4 (Alison Dep. Tr.); Ex. 143 at 159:25-162:1

(Mosseri Dep. Tr.); Ex. 147 at 153:13-157:4 (Osofsky Dep. Tr.).  *See also* CMF at

§ II.A.5.b.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta recognizes YouTube as one of Facebook's and Instagram's competitors for sharing and

viewing short-form video, which the FTC includes in the alleged PSNS market when on

Facebook and Instagram.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 198 (addressing

similar response).  The additional portions of the cited documents the FTC recites regarding

Meta's attempt to differentiate its products do not create a genuine dispute that Facebook and

Instagram are substitutable with TikTok, YouTube, and other services.  Moreover, the cited

document acknowledges that ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

PX3226 at -761 (FTC-META-003699749).  The FTC's cross-reference to a section of its

Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact,

and Meta incorporates its responses to those paragraphs here.

200.    **YouTube Documents.**  YouTube documents and testimony recognize that

Facebook and Instagram Reels provide a reasonable substitute to YouTube for sharing and

viewing short-form video – and that all three short-form video offerings also compete with

TikTok. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

**FTC Response: Disputed.**  While it is undisputed that Statement 200 accurately quotes the words that appear in the cited documents and transcripts, the FTC disputes the first sentence of Statement 200 because the cited material refers to Facebook Reels and YouTube Shorts and not Facebook and YouTube generally, and disputes Statement 200 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The FTC further disputes the first sentence of Statement 200 because the terms "reasonable substitute" and "compete" are vague and undefined.  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials neither contain that term nor suffice to establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of YouTube (or YouTube Shorts), Facebook (or Facebook Reels), Instagram Reels, TikTok, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider YouTube (or YouTube Shorts) as a reasonable substitute for viewing or sharing short-form video on Facebook (or Facebook Reels) and Instagram Reels, and the cited material does not establish the absence of a genuine dispute of material fact: Meta's perception that other firms compete in various aspects of firm operations (e.g., sharing and viewing short-form video) or in a broad sense for user time and attention does not establish that YouTube (or YouTube Shorts), Facebook (or Facebook Reels), Instagram Reels, and TikTok are competitors in the provision of

personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC further disputes Statement 200 because the cited document concerns competition for advertisers and advertising, not user-side competition. In contrast, Alphabet executive Aaron Filner testified that "YouTube and social media platforms are not substitutable with respect to users." PX6095, Filner (Alphabet) Dep. Tr., at 292:3-292:8. *See also* CMF at § II.A.5.b.1.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that YouTube recognizes Facebook and Instagram as two of YouTube's competitors for sharing and viewing short-form video, which the FTC includes the alleged PSNS relevant market when on Facebook and Instagram. *See supra* Meta Introduction; Meta Reply to SMF ¶ 198 (addressing similar response). The FTC assertion that the document Meta cited discusses advertising competition does not dispute the stated fact. Moreover, the document supports that YouTube Shorts competes with Facebook, Instagram, and TikTok's short-form video offerings. ██

███████████████████████████████████████████████████████

█████████████████ Ex. 11 at -770 (MetaFTC-Klein-DX-204, GOOG-META-02398770). Contrary to the FTC's suggestion (and consistent with the evidence discussed below in paragraphs 201-203), Mr. Filner testified that "Facebook is competing with YouTube for users," that "users who want to watch or share videos use them as substitutes," and that "Meta is a competitor to YouTube as [a] provider of digital video services." *See* Ex. 9 at 68:9-12, 104:8:9-105:1 (Filner (Alphabet) Dep. Tr.). The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs create a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

201.     In response to the question, "[w]as YouTube Shorts created to help YouTube compete better with Facebook, Instagram, and TikTok?"  Ms. Weinstein testified:



Ex. 8 at 44:6-20 (D. Weinstein (Alphabet) Dep. Tr.).  Ms. Weinstein further testified that "TikTok and Instagram were among the places it was easier to make a mobile video and share it with an audience" and that "TikTok and Instagram are certainly among the top players" in the "[short-form video] space."  *Id.* at 48:9-13, 49:8-15.  Ms. Weinstein also testified:

*Id.* at 159:5-14, 159:20-160:2.

**FTC Response: Disputed in part.**  It is undisputed Statement 201 accurately quotes words that appear in the cited transcript.  Otherwise disputed, as Statement 201 is not a material fact subject to proof at trial and the material cited does not establish the absence of a genuine dispute of material fact: Ms. Weinstein's belief that YouTube Shorts competes with Meta in certain aspects of its operations (*e.g.*, video) or in a broad sense for time or attention does not establish that Meta and YouTube are competitors in the provision of personal social network

services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Further disputed because when asked whether she agreed that YouTube Shorts and Facebook Reels were substitutes and whether she agreed that YouTube Shorts and Instagram Reels were substitutes, Ms. Weinstein did not agree, testifying that while they have similar features, they are used for distinct purposes.  Ex. 8 at 233:11-235:8, 310:14-312:16 (D. Weinstein (Alphabet) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that YouTube launched Shorts to compete with Facebook, Instagram, and TikTok for sharing and viewing short-form video.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 198 (addressing similar response).  Indeed, the FTC acknowledges in its response that YouTube may compete with Meta in "certain aspects" like "video."  The FTC mischaracterizes the additional testimony from Ms. Weinstein it adds in its response by claiming that Ms. Weinstein "did not agree" that YouTube Shorts is a substitute for Facebook and Instagram Reels.  Ms. Weinstein expressed no such disagreement.  The questioner asked Ms. Weinstein, "Do you agree that users can use Facebook and YouTube as substitutes *for sharing videos*?"  Ex. 8 at 233:11-13 (D. Weinstein (Alphabet) Dep. Tr.) (emphasis added).  To which Ms. Weinstein's full answer was, "Substitutes for sharing videos?  Fundamentally for sharing a video, yes.  To what purpose that you're trying to accomplish with the video, I think then different parts of the – different services would be better for different goals."  *Id.* at 233:14-19.  The questioner then asked, "Do you agree that YouTube Shorts and Instagram Reels are sub – substitutes for each other? . . . Do they have substitutable features?"  *Id.* at 233:20-234:3.  To which Ms. Weinstein's full answer was, "I think there's some things that are similar, and I think there's some things that are really unique.  I

know YouTube's products more than Facebook's products, but there's some things that I believe you can do that are really distinct on YouTube.  Like, if you watch a short music video – see a Short that features a music clip, you might want to see the full length music video which you would then click-through and potentially go to the music service or go to a long-form version. So it's like a slightly different experience that you might have versus Facebook's service." *Id.* at 234:4-17.  Indeed, the FTC's own questioner acknowledged to Ms. Weinstein, "You testified that Facebook and YouTube, you said they were fundamentally substitutes for sharing a video, yes." *Id.* at 312:21-313:1.  The additional testimony from Ms. Weinstein that the FTC adds also does not show that she testified YouTube Shorts, Facebook Reels, and Instagram Reels are used for distinct purposes, as the FTC claims.  Ms. Weinstein testified that YouTube would "be better" for a user sharing a video if the user "wanted to reach a large number of potential viewers," and Facebook would "be better" for the user if the user "had an established smaller group of people that [he] had preidentified . . . ." *Id.* at 312:3-16.

202.     Instagram, TikTok, and YouTube all offer users "the choice to see short-form video."  Ex. 10 at 64:4-10 (Kim (Alphabet) Dep. Tr.).  "Instagram and YouTube are competing in the short-form video space." *Id.* at 76:11-16.  Some "creators are uploading the same short-form video to TikTok, Instagram Reels, and YouTube Shorts." *Id.* at 121:2-9.

**FTC Response: Disputed in part and incomplete.**  The FTC disputes Statement 202 as not supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The FTC disputes the first sentence of Statement 202 because the cited material refers to Instagram Reels and YouTube Shorts and not Instagram and YouTube generally.

The FTC disputes the second sentence of Statement 202 because Mr. Kim was asked about competition between YouTube and Instagram for "user time and attention in the short-

form video space," and replied that the competition was for creator, rather than user, engagement.  Ex. 10 at 76:7-76:16 (Kim (Alphabet) Dep. Tr.); *see also id.* at 219:10-220:21, 222:14-15 (testifying that Instagram Reels and YouTube Shorts are competing for creators, but that there are "different reasons why users come to YouTube than Instagram").

The third sentence is undisputed with the clarification that the cited testimony relates only to the time at which the testimony was given and does not establish the absence of a genuine dispute: Mr. Kim's perception that other firms may be "competing" in certain aspects of its operations (e.g., short-form video) or in a broad sense for time or attention does not establish that Instagram, TikTok, and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram, TikTok, and YouTube all offer users the choice to see short-form video and are competing in such offerings.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 198 (addressing similar response).  The FTC mischaracterizes the additional testimony from Mr. Kim that it adds in its response.  First, Mr. Kim did not testify that "competition was for creator, rather than user, engagement," as the FTC claims.  Asked about competition for "user time and attention in the short-form video space," Mr. Kim answered, "[C]reators have choices to upload their videos, engage on those platforms.  So within the form of short-form video, I would say that, *yes, Instagram and YouTube are competing in the short-form video space*."  Ex. 10 at 76:7-16 (Kim (Alphabet) Dep. Tr.) (emphasis added).  He testified that competition for creators is one of the factors that "very much" led YouTube to conclude that it was competing with other video offerings on Instagram and Facebook for *user* engagement.  *Id.* at 74:12-75:10.  Second, the

FTC's parenthetical mischaracterizes Mr. Kim's testimony, who testified that he suspects that there may be some different reasons as to why users use YouTube Shorts and Instagram Reels, "but I don't have definitive data on that to be comprehensive." *Id.* at 222:7-17.

203.    Professor Clifford Lampe, the FTC's proffered industry expert, testified that, for the users watching Reels on Facebook or Instagram with a motivation of entertainment or passing time due to boredom, "they could also pass time or watch videos on YouTube, yes." Ex. 281 at 246:10-18 (Lampe Dep. Tr.).  Professor Lampe also testified that entertainment is "often mentioned as a motivation for using YouTube." *Id.* at 131:6-9.

**FTC Response: Disputed in part and incomplete.**  Statement 203 is undisputed to the extent that it relays words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 203 constitutes a material fact subject to proof at trial and objects that the material does not establish that absence of a genuine dispute, is contradicted by other evidence, and is misleading and incomplete.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Professor Lampe also testified that "I think there's some nuance in that in that the social graph in personal social networking services PSNS vastly changes the experience.  So I'm not comfortable saying they're completely replaceable with one another because of that social graph change . . . . the experience is different because of the PSNS underlying factor."  *See* Ex. 281 at 134:21-135:21 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe testified that users seeking entertainment or to pass time due to boredom on Reels can do so on YouTube.  *See supra* Meta Introduction.  The additional material the FTC adds in its response from Professor Lampe's testimony merely disputes that "Facebook, Instagram, TikTok, YouTube, Reddit, Twitter, and Pinterest" are "completely replaceable with

one another," which is not what Meta's statement claims.  Ex. 281 at 134:21-135:11 (Lampe

Dep. Tr.).  The statement from Professor Lampe about differences between the apps is also

entirely conclusory, as he conceded that he did not examine motivations for using specific

features of applications, *see* Ex. 281 at 248:2-12 (Lampe Dep. Tr.), and that, in his view, the

motivation for watching video on Facebook and Instagram is "largely for entertainment" and

only "occasionally" for "personal social networking."  *See infra* Meta SMF ¶ 607(a) (quoting

Ex. 281 at 238:2-239:4 (Lampe Dep. Tr.)).

<div align="center"><b>b.     TikTok</b></div>

<div align="center"><b>i.     Background</b></div>

204.     TikTok is a "software application" that provides a "platform" where users can

"create and share content."  Ex. 366 at ¶¶ 1, 4, 16 (MetaFTC-Klein-DX-761, Pappas Decl.).

**FTC Response: Undisputed.**

205.     TikTok launched in the United States in August 2018.  *See* Ex. 25 at 29:13-14

(Pappas (TikTok) Dep. Tr.).

**FTC Response: Undisputed.**

206.     Users can access TikTok on their mobile devices through the TikTok app.  *See*

Ex. 25 at 29:2-4 (Pappas (TikTok) Dep. Tr.).  Users can also access a web application version of

TikTok on their computers.  *See id.* at 29:5-8.

**FTC Response: Undisputed.**

207.     TikTok data indicate that in August 2018, the month TikTok launched, it had

approximately 14.5 million monthly active users in the United States.  *See* Ex. 26 at -.001 & cell

D24 (TIK-00000831); *see also* Ex. 25 at 32:9-22 (Pappas (TikTok) Dep. Tr.).  In December

2020, TikTok had approximately 107 million monthly active users and 57 million daily active

users in the United States.  *See* Ex. 27 at -.002 & row 65 (TIKTOK-SD-00000021).  In April

<div align="center">172</div>

2023, TikTok had approximately 179 million monthly active users and 93 million daily active users in the United States.  *See id.* at -.001 & row 37.  ████████████████████ ████████████████████████████ (compared to ██████████ on Instagram).  *See* Ex. 2 at p. 281, tbl. 38 (Carlton Rep.).

**FTC Response: Undisputed.**

### ii.    Features

208.    TikTok has many features that are similar to features on Instagram and Facebook. *See*, *e.g.*, *supra* Part I.A.1(a)(xiii) & (b)(x).

**FTC Response: Disputed.**  The FTC objects to the terms "many" and "similar" as vague as to their meaning, and disputes Statement 208 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The cited internal references are brief descriptions of several Meta features: Part I.A.1(a)(xiii) to Facebook Reels, and (b)(x) to Instagram Reels; the cited material contains no mention of TikTok or any TikTok features.  Further, Statement 208 does not identify which TikTok features Meta asserts are "similar" to features of Facebook and Instagram.  Meta has not provided any basis for the assertion that many TikTok features are similar to features on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.b.2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that TikTok, Facebook, and Instagram have many similar features.  *See supra* Meta Introduction.  As the terms "many" and "similar" are ordinarily understood and used, there is no dispute there are multiple features on TikTok that resemble features on Facebook and Instagram.  As Meta demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part I.A.1(a)-(b), and the following paragraphs describing TikTok's features, *see infra* Meta SMF

¶¶ 212-215, 217-237, 239 – most of which the FTC does not dispute –Facebook, Instagram, and TikTok all have:  a social graph; a feed; and user profiles.  They also have features for posting, viewing, and sharing short-form videos; finding and connecting other users – including friends and family; liking and commenting on videos; messaging; reviewing other users' connections; and other "social" features.  *See id.*  The FTC's cross-reference a sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those statements here.

209.    Professor Lampe opined that TikTok is a "Social Networking Site" because "it has a basic profile, a traversable network of connections [that is, a social graph], and a stream of user-generated activity to consume and with which to interact [that is, a shared social space]."  Ex. 290 at ¶¶ 46, 85, 109, 226 (Lampe Rep.).  Professor Lampe agreed that it is "definitely possible" for users to use TikTok for "personal social networking."  Ex. 281 at 334:2-11 (Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 209 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed.  The FTC disputes that the cited language in paragraphs 85 and 109 of the Lampe report appear in Ex. 290, which only includes limited portions of the Lampe report.  The FTC disputes that Statement 209 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), and objects that it is incomplete because it omits that Paragraph 226 of the Lampe report subsequently states that "TikTok is not a PSNS, as people use TikTok and its basic

network features primarily to consume content, not to engage in maintaining social relationships." Ex. 290 at ¶ 226 (Lampe Rep.).

     The FTC disputes the second sentence of Statement 209 as incomplete and misleading because Meta takes Professor Lampe's testimony out of context; his complete answer was that "I think it's possible that you could find a TikTok user as in any case that's *an exception* to the norms and motivations for this site and they're using it for personal social networking.  *From the evidence I've seen that would be an unusual case*, but that it could occur is definitely possible." Ex. 281 at 334:6-334:11 (Lampe Dep. Tr) (emphasis added).

     **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe opined that TikTok is a "Social Networking Site" and that it is possible for users to use TikTok for "personal social networking."  *See supra* Meta Introduction.  The additional material the FTC claims Meta "omit[ted]" states Professor Lampe's opinion that TikTok is not a "PSNS," but that material does not create a genuine dispute that Professor Lampe agrees that TikTok is an "SNS" (or "Social Networking Site").  Similarly, the additional "context" the FTC provides to Professor Lampe's testimony, that a user who uses TikTok for personal social networking would be an "unusual case," does not dispute that he agreed it is "definitely possible" that a user could use TikTok for personal social networking.  Professor Lampe also testified that he had no opinion on how much time users spent on any platform to fulfill a particular motivation, Ex. 281 at 139:6-17 (Lampe Dep. Tr.), and had no "opinion one way or another that in April 2020 more or less than ██████████████████████████ ████████████████████████████████████."  Ex. 281 at 363:1-364:16 (Lampe Dep. Tr.) (testifying about Ex. 222 at -.047 (FTC-META-005944143)).  Meta inadvertently omitted

paragraphs 85 and 109 from the excerpted Lampe Report in Exhibit 290.  They appear in the

FTC's exhibit PX9004.

210.     Professor C. Scott Hemphill, the FTC's proffered economic expert, testified that

TikTok "has something of a social graph" and that "one to many communications can be sent

and received over that social graph."  Ex. 283 at 46:16-47:10 (Hemphill Dep. Tr.).  He also

testified that TikTok is "a shared social space within which content delivery and interactions

occur," albeit "to a quite limited degree" compared to Facebook or Instagram.  *Id.* at 47:11-18.

**FTC Response: Disputed in part and incomplete.**  Statement 210 is undisputed to the

extent that it relays words that appear in the cited testimony but is otherwise disputed.  The FTC

disputes that Statement 210 constitutes a material fact subject to proof at trial and objects that the

material cited does not establish the absence of a genuine dispute regarding a material fact.  *See*

Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B). ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  He also explained that "if a user

wanted to turn to TikTok as a place to engage in that distinct demand for maintaining

relationships and sharing experiences with friends, family, and social acquaintances in a shared

social space, you wouldn't expect to find them there."  *Id.* at 56:2-56:7.  Furthermore, TikTok

executive Blake Chandlee testified that TikTok does not have a social graph, explaining that "we

are -- we were an interest or a content graph platform versus social platform.  So our content

doesn't rely on relationships between friends and family, it relies on our interests.  And so they're

very different in their -- in their -- their utility to users."  *See* PX6160, Chandlee (TikTok) Dep.

Tr., at 17:9-17:21.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill provided the testimony Meta quoted.  *See supra* Meta Introduction.  The additional testimony from Mr. Chandlee that the FTC adds in its response does not dispute Professor Hemphill's testimony.  In fact, Mr. Chandlee acknowledged that TikTok users are able to connect with other users and follow other users, *see* PX6160 at 58:21-59:14 (Chandlee (TikTok) Dep. Tr.), which is consistent with the FTC's definition of a social graph as "the set of connections that users make among each other within a social network," Counter SMF ¶ 1088.  As for more specific questions about how TikTok describes and maps connections between its users, ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████.  There is also no genuine dispute of material fact that TikTok has a social graph, as the FTC defines it.  ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████  *See infra* Meta SMF ¶ 241.  Moreover, Professor Hemphill conceded that he did not know whether the percentage of friends' content on Instagram Reels was higher than TikTok's For You Page.  *See infra* ¶ 216.

211.    Users watch short-form videos on Facebook Reels, Instagram Reels, and TikTok for entertainment purposes.  *See* Ex. 283 at 27:7-15 (Hemphill Dep. Tr.) ("[a] user can watch short-form videos on Reels for entertainment purposes much as they do on TikTok"); Ex. 281

at 246:2-9 (Lampe Dep. Tr.) (agreeing that "users that are watching Reels on Facebook or Instagram with a motivation of entertainment or passing time due to boredom . . . could also satisfy those same motivations by watching TikTok").  At least some of the time, users would find TikTok to be "a suitable alternative" to watching a video for entertainment purposes on Instagram Reels.  Ex. 283 at 39:12-40:2 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 211 is undisputed to the extent that it relays words in the cited testimony but is otherwise disputed.  The FTC disputes that Statement 211 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).

The first sentence is disputed to the extent that it suggests that users watch short-form videos on Instagram Reels or Facebook Reels solely for entertainment purposes, because that assertion is contradicted by other evidence.  Professor Hemphill explained that, when watching a short-form video on Instagram Reels, "the context is different and the meaning of that viewing is often different."  *See* Ex. 283 Hemphill Dep. Tr. at 27:12-15; *see also* PX9007, Hemphill Rebuttal Report at ¶ 252 ("these surfaces . . . also play a role in delivering Meta's PSN offering and the friends and family use case. For example, since introducing Reels, Meta's strategy has focused on differentiating Reels from other short form video products by leveraging its social graph to drive user adoption and engagement.  Furthermore, even if a video was not originally posted by a friend connection, Facebook allows and encourages users to reshare unconnected video content with friends and family and broadcasts comments posted to those users' friends' feeds.  Thus, the 'minority' usage figures of Meta's experts understate the significance of the friends and family sharing use case. . ."); PX9000, Hemphill Report at ¶¶ 269-270 (collecting

evidence showing that "some engagement on Facebook Reels does involve friends and family sharing, and 

" and collecting evidence showing that "

. . . Among the other surfaces that facilitate some amount of friends and family sharing are Facebook Groups, Facebook Marketplace, Facebook Watch, and Gaming.").

The first sentence is further disputed as incomplete, as Professor Lampe testified that "some types of users" could fulfill a motivation of entertainment by switching from Facebook or Instagram to TikTok.  *See* Ex. 281 Lampe Dep. Tr. at 246:8-246:9.

The second sentence is disputed as incomplete, as Professor Hemphill's excerpted testimony was that watching a video for entertainment purposes on TikTok is "not a good substitute" for watching a video for entertainment on Instagram "to the extent that context matters.  Surely some of the time a user, as I've said, not in that moment directly engaged in friends and family sharing would find TikTok a suitable alternative in that moment, but that's not a powerful constraint as I discuss in the report on Meta's ability to exercise monopoly power." Ex. 283 Hemphill Dep. Tr. at 39:17-40:2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that users watch short-form videos on Facebook Reels, Instagram Reels, and TikTok for entertainment purposes.  *See supra* Meta Introduction.  The additional citations to Professor Hemphill's testimony and expert report do not support the assertion that time a user spends on Facebook or Instagram – such as watching a Reel that the viewer never shares with anyone – is more closely associated with friends and family sharing than watching the same Reel on TikTok. Indeed, Professor Hemphill recognized that a user may spend time on the "Reels tab"

"watch[ing] a series of short videos of an otherwise unknown individual dancing," even when the content "was not posted or forwarded by anyone the user knows." *See infra* Meta SMF ¶ 622 (quoting Ex. 283 at 80:20-81:21 (Hemphill Dep. Tr.)).  And the FTC's own proffered industry expert, Professor Lampe, conceded that, in his view, the motivation for watching video on Facebook and Instagram is "largely for entertainment purposes" and only "occasionally" for "personal social networking."  *See infra* Meta SMF ¶ 607(a) (quoting Ex. 281 at 238:2-239:4 (Lampe Dep. Tr.)).

Professor Hemphill claims that the "context is different" when a user views an unconnected Reel on Facebook because Facebook allows the user to reshare that Reel with a friend or family member, but that does not meaningfully differentiate the two services because (1) there is no evidence of how frequently Facebook users reshare Reels with friends and family; and (2) users are also able to reshare TikToks with a friend or family member through TikTok's messaging service.  *See infra* Meta SMF ¶ 232.  Mr. Zuckerberg testified that "███████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████" Ex. 142 at 161:9-18 (Zuckerberg Dep. Tr.).

Finally, none of the cited material supports the assertion that user engagement with short-form video on Facebook and Instagram involves "friends and family sharing."  On the contrary, the most recent usage data in the record to consider this issue shows the opposite.  *See supra* Meta SMF ¶ 14 (Facebook video features, except Stories, have ████████ of their content posted by a user's friends), ¶ 60 (████████████ of time spent on Instagram Reels from users'

friends).  Professor Hemphill also conceded that he did not know whether the percentage of friends' content on Instagram Reels was higher than on TikTok's For You feed.  *See infra* ¶ 216.

212.  **For You.**  When users open the TikTok app, the first thing they see is the "For You" feed in the Home screen.  *See* Ex. 368 at 1 (TikTok, *For You*, https://perma.cc/NY9U-D9K6).  The below left screenshot ("For You Image") is an example of how TikTok users' For You feeds appear on the TikTok mobile app.  *See* Ex. 24 at 30:19-31:12, 190:13-16 (Presser (TikTok) Dep. Tr.); Ex. 367 at 2 (MetaFTC-Klein-DX-116, *TikTok's Response to the ACCC*). For comparison, the below right screenshot is an example of what Instagram users see when they view another user's Reel in the Instagram mobile app.



**FTC Response: Undisputed.**  The first sentence of Statement 212 is undisputed.

Regarding the second and third sentences of Statement 212, it is undisputed that the above

screenshots appear to be examples of content that could be displayed on the TikTok app and the

Instagram mobile app with respect to the present time, subject to the caveat that Meta does not

identify how the screenshots were generated or obtained (specifically the steps taken to generate

the content that appears on each screenshot and the user's past behavior), and the above

screenshots are not admissible evidence nor are they supported by admissible evidence. *See* Fed.

R. Civ. P. 56(c)(2).

**Meta Reply:**  The FTC's response does not dispute the stated fact.  The FTC's

evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that

Meta would be unable to introduce screenshots comparing relevant apps in an admissible form at

trial is meritless.  *Ali v. District of Columbia*, 810 F. Supp. 2d 78, 83-84 (D.D.C. 2011) (there is a

"difference between evidence that is admissible at trial and evidence that the Court may consider

at summary judgment," where a party "is not required to produce evidence in a form that would

be admissible at trial, so long as her evidence is capable of being converted into admissible

evidence" (internal quotation marks omitted)).

213.    The For You feed displays a "stream" of posts with video or photo content.

Ex. 367 at 2 (MetaFTC-Klein-DX-116, *TikTok's Response to the ACCC*).  Photo posts can

include multiple photos.  *See* Ex. 24 at 35:9-11 (Presser (TikTok) Dep. Tr.).  Sometimes, instead

of a video or photo post, users will see other users' livestreams.  *See id*. at 35:5-8.

**FTC Response: Disputed in part and incomplete.**  The first sentence of Statement 213

is disputed as the cited document only states that the For You feed provides users with a "stream

of videos" and makes no reference to photos.  *See* Ex. 367 at 2 (MetaFTC-Klein-DX-116,

*TikTok's Response to the ACCC*).  Otherwise undisputed.

214.    TikTok shows a variety of content to users in the For You feed, including content

from accounts users follow and users' Friends content, as well as content from news

organizations, businesses, and entertainers.  *See* Ex. 25 at 15:20-16:3 (Pappas (TikTok) Dep. Tr.)

("TikTok . . . is an entertainment platform powered by the community, meaning a majority of

content is uploaded by people, much like you and me, as well as publishers and music artists and

so on."); *id.* at 74:19-75:2 ("[P]ublishers" include "different brands or businesses that published content on TikTok.  So the examples they gave for, you know, BuzzFeed, news organizations, different types of merchants, et cetera.").

**FTC Response: Disputed.**  The FTC disputes Statement 214 because the cited material does not support the factual proposition in the first sentence, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The FTC also disputes Statement 214 because ███

███████████████████████████████████████████████████

██████████████████████████████████ .

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that TikTok shows a variety of content in the For You feed, as the cited deposition testimony stated. *See supra* Meta Introduction; *infra* Meta SMF ¶ 215 (FTC not disputing that when the user's connections on the app upload content or engage with a particular piece of content, TikTok is more likely to present that content to the users on the For You Feed); Ex. 24 at 167:8-170:4 (Presser (TikTok) Dep. Tr.) (TikTok promotes friend content to users on their For You feed). Meta inadvertently attributed the second quotation to V. Pappas's deposition transcript.  The correct citation is Ex. 28 at 74:19-75:2 (Morrison (TikTok) Dep. Tr.).

215.    When users' connections on the app upload content or engage with a particular piece of content, TikTok is more likely to present that content to the users on the For You feed. *See* Ex. 24 at 168:21-169:4 (Presser (TikTok) Dep. Tr.) ("Q. Understood.  But if the – all other factors being equal, if the poster of the content is friends with the potentially receiving user, does that fact make it more likely that TikTok will present that content to the user?  A. Yes, I – I believe so."); *id.* at 169:17-170:4 ("Q. Understand – understanding that there are many components, is the fact that a user's friend liked a particular piece of content a fact that weighs in

favor of presenting that content to a user through the For You feed? . . .  A. If the question is, is

that one of the factors that would be included in the – in the recommendation considerations,

then, yes, I believe that would be.").

**FTC Response: Undisputed.**

216.    In a January 2020 survey conducted by Meta, described in an April 2020 slide

deck, 

Ex. 222 at -.001, -.047 (FTC-META-005944143).  Professor Hemphill, testified that it

would be consistent with his opinions that

Ex. 283 at 92:16-21 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 216 is undisputed to the

extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The

FTC disputes that Statement 216 constitutes a material fact subject to proof at trial and objects

that the material cited does not establish the absence of a genuine dispute regarding a material

fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC objects that the first sentence is incomplete, as the cited document notes that friends

and family sharing is                          , and that

Ex. 222 at -007 (FTC-META-005944143).

The FTC objects that the second sentence is incomplete, as Professor Hemphill clarified

that "the app-wide analysis of each of these apps is not Reels in isolation, but the core

functionality and use of the app as a whole and likewise for TikTok.  So it doesn't depend on the

specific comparison that you have in mind."  *See* Ex. 283 at 92:21-93:4 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding the results of the cited survey.  *See supra* Meta Introduction.  Regarding Professor

Hemphill's testimony, the FTC's response does not dispute that Professor Hemphill did not

measure and therefore does not know whether there is more friends-related content on the

TikTok For You feed or on Instagram Reels.  *See also* Ex. 283 at 91:20-92:7 (Hemphill Dep. Tr.)

("Q. Do you have an opinion that users view a higher proportion of friends' content on Reels

than they do on the TikTok For You tab?  . . . A. . . . I don't recall an empirical comparison of

exactly the kind that you're talking about.").  ██████████████████████████████

████████████████████████████████████  *See supra* Meta SMF

¶¶ 207, 216, *infra* ¶¶ 220, 223-224, 239-241, 243, 261-265.  The FTC response also

misrepresents the cited document.  The document does not state that ████████████████

████████████████████████████████████.  In fact, the survey

also noted that ████████████████████████████████  Ex. 222 at -

.047 (FTC-META-005944143).  The excerpt the FTC cites states that █████████████

████████████████████████████████████  *Id*. at -.007.

However, ████████████████████.  As Meta observed two years later (and the FTC

does not dispute), ████████████████████████████████████

████████████████████████████  *See infra* Meta SMF ¶ 238 (quoting Ex. 252 at -290

(MetaFTC-DX-1183, FTC-META-003582289)).

  217. **Following & Friending.**  When TikTok users "follow a user," it means that the

"following" user "subscribe[s] [to] or . . . receive[s] updates" about "the channel of the content"

that the "followed" user is producing.  Ex. 24 at 29:19-30:6 (Presser (TikTok) Dep. Tr.).  TikTok

users "[c]an follow other users who are their real-life friends and family."  *Id*. at 136:21-137:3.

  **FTC Response: Undisputed.**

218.    As seen at the top of the For You Image, users can also view the "Following" feed via the Home screen by tapping on "Following."  The "Following" feed displays content from accounts that users "ha[ve] proactively chosen to follow."  Ex. 367 at 2 (MetaKlein-FTC-DX-116, *TikTok's Response to the ACCC*); *see also* Ex. 24 at 190:13-16 (Presser (TikTok) Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC objects that the first sentence of Statement 218 is incomplete because neither the statement nor the cited materials include an "Image" despite what Statement 218 states.  Otherwise undisputed, to the extent that the "Image" referred to is represented above in Statement 212.

**Meta Reply:**  The FTC's response does not dispute the stated fact.  Meta defined "For You Image" as the image of TikTok's For You feed in paragraph 212 above.

219.    TikTok users can also use the search functionality, seen at the top right of the For You Image, then follow other users who post content on topics that the users are interested in. *See* Ex. 24 at 139:20-140:5 (Presser (TikTok) Dep. Tr.).  When viewing a post, users can follow the user who created the post by tapping the button with the plus sign on the right side in the For You Image.  *See id.* at 48:19-49:4.

**FTC Response: Undisputed but incomplete.**  The FTC objects that the first sentence of Statement 219 is incomplete because neither the statement nor the cited materials include an "Image" despite what Statement 219 states.  Otherwise undisputed, to the extent that the "Image" referred to is represented above in Statement 212.

**Meta Reply:**  The FTC's response does not dispute the stated fact.  Meta defined "For You Image" as the image of TikTok's For You feed in paragraph 212 above.

220.    ███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

**FTC Response: Undisputed but incomplete.**  The FTC objects that the third sentence of

Statement 220 is incomplete because it incorporates the assumption that ████████████

██████████████████████████████████████

██████████████████████████████████████

████████████.

221.    TikTok users can send pre-drafted messages to their friends who do not have

TikTok via text and other messaging platforms, inviting their friends to join TikTok and follow

their account.  *See* Ex. 24 at 28:5-29:10 (Presser (TikTok) Dep. Tr.).

**FTC Response: Undisputed.**

222.    TikTok's website states that, "[t]o help you find and follow people you might

know on TikTok," TikTok may "[s]uggest accounts to you, by showing you their videos and the

Add Friends feature on your profile," and "[s]uggest your account to others on TikTok so they

can follow you."  Ex. 369 at 1 (TikTok, *Suggested Accounts*, https://perma.cc/28N6-UJQ4).

**FTC Response: Undisputed.**

223.    TikTok uses the term "Friend" to describe a connection between "users that are

mutually following each other."  Ex. 24 at 30:7-10 (Presser (TikTok) Dep. Tr.).

**FTC Response: Undisputed.**

224.    By tapping the icon labelled "Friends" near the bottom of the For You Image,

users go to the "Friends tab," where they can view the "Friends" feed and a list of their Friends.

*See* Ex. 24 at 31:13-32:1 (Presser (TikTok) Dep. Tr.).  The "Friends" feed displays content

exclusively from users' Friends.  *Id.*

**FTC Response: Disputed in part and incomplete.** The FTC objects that first sentence of Statement 224 is incomplete because neither the statement nor the cited materials include an "Image" despite what Statement 224 states. The third sentence is disputed in part because the cited testimony does not support the assertion that the "Friends" tab displays content "exclusively" from users' "Friends." Otherwise undisputed.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that the "Friends" tab features content exclusively from a user's friends. When asked what happens when a user clicks on the Friends tab, Mr. Presser testified that "[a] user will be brought to the content from those friends and the list of those friends." *See* Ex. 24 at 31:13-32:1 (Presser (TikTok) Dep. Tr.). Meta defined "For You Image" as the image of TikTok's For You feed in paragraph 212 above.

225. The "Discover" tab used to be in the Friends tab's place. *See* Ex. 24 at 32:9-13 (Presser (TikTok) Dep. Tr.). "The Discover tab highlighted key content and entertainment categories that were relevant to a given user." *Id*. at 32:15-17. TikTok replaced the Discover tab with the Friends tab in 2022. *Id.* at 32:6-13.

**FTC Response: Undisputed.**

226. **Posting Video Content.** At the center bottom of the For You Image, there is a button resembling a plus sign. Tapping that button allows users to create and post content, including videos, photos, text, or start a livestream. *See* Ex. 24 at 34:19-35:4 (Presser (TikTok) Dep. Tr.). TikTok users can also post a Story, a video up to 15 seconds long that disappears after 24 hours. *See* Ex. 370 at 1 (TikTok, *TikTok Stories: What It Is and How to Use It*, https://perma.cc/P99G-46H6).

**FTC Response: Undisputed but incomplete.**  The FTC objects that the first sentence of Statement 226 is incomplete because neither the statement nor the cited materials include an "Image" despite what Statement 226 states.  Otherwise undisputed, to the extent that the Image referred to is represented above in Statement 212.

**Meta Reply:**  The FTC's response does not dispute the stated fact.  Meta defined "For You Image" as the image of TikTok's For You feed in paragraph 212 above.

227.     Videos created on the TikTok app can be up to 60 seconds long.  Videos uploaded onto the app can be up to three minutes long.  *See* Ex. 371 at 1 (TikTok, *Camera Tools*, https://perma.cc/4AYV-JHZE).

**FTC Response: Disputed in part.**  The second sentence is disputed because users can now upload videos up to 10 minutes long, or 20 minutes long behind a paywall.  *See* PX0510, Aisha Malik, *TikTok expands max video length to 10 minutes, up from 3 minutes*, Tech Crunch (Feb. 28, 2022), https://techcrunch.com/2022/02/28/tiktok-expands-max-video-length-to-10-minutes-up-from-3-minutes/; PX0511, Mia Sato, *TikTok introduces paywalled content, with videos up to 20 minutes long*, The Verge (Mar. 7, 2023), https://www.theverge.com/2023/3/7/23628202/tiktok-paywalled-content-series-monetization-longer-videos.  Otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact, but the response does correctly clarify that TikTok now allows certain users to upload longer videos.

228.     Users can edit their videos, photos, and other content with TikTok's editing tools.  The below left screenshot shows an effect that users can apply to a video or photo using TikTok's "Effects" library.  Many similar effects are available on Instagram.  For comparison, the below right screenshot shows a similar preset effect from Instagram Reels' "Effects" library.



**FTC Response: Disputed in part and incomplete.** The first sentence is undisputed.

Regarding the second and fourth sentences of Statement 228, it is undisputed that the above

screenshots appear to be examples of content that could be displayed on the TikTok mobile app

and the Instagram mobile app with respect to the present time, subject to the caveat that Meta

does not identify how the screenshots were generated or obtained (specifically the steps taken to

generate the content that appears on each screenshot and the user's past behavior), and the above

screenshots are not admissible evidence nor are they supported by admissible evidence.

The third sentence is disputed because the term "many" is so vague that an appropriate response is not possible, and it is not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), as the proffered screenshots do not show "many" similar effects on Instagram.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that users can edit their content on both TikTok and Instagram.  *See supra* Meta Introduction.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that Meta would be unable to introduce screenshots of the relevant apps in an admissible form at trial is meritless.  *See supra* Meta Reply to SMF ¶ 212 (addressing similar response).

229.    Users can customize the audience for any post they make.  *See* Ex. 372 at 1 (TikTok, *Video Privacy*, https://perma.cc/NTM5-3JUJ).  *Id.*  If users have a public account, they can make posts visible to everyone, just Friends, or just themselves.  *Id.*  If users have private accounts, they can make the post visible to just followers, just Friends, or just themselves.  *Id.*

**FTC Response: Undisputed.**

230.    **Liking Videos.**  On the right-hand side of the For You Image, below the button to follow an account, there is a heart-shaped button.  Tapping that button allows users to "like" a given video.  *See* Ex. 24 at 49:10-49:13 (Presser (TikTok) Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC objects that the first sentence of Statement 230 is incomplete because neither the statement nor the cited materials include an "Image" despite what Statement 230 states.  Otherwise undisputed, to the extent that the Image referred to is represented above in Statement 212.

**Meta Reply:**  The FTC's response does not dispute the stated fact.  Meta defined "For You Image" as the image of TikTok's For You feed in paragraph 212 above.

231.   **Comments on Videos.**   Below the heart-shaped button is a button shaped like a comment bubble with three dots inside.   Tapping that button pulls up the comments for a given video, allowing users to read the comments other users have made and to post their own comments.   *See* Ex. 24 at 49:21-50:2 (Presser (TikTok) Dep. Tr.).   Users can tag another user in their comments, reply to a previously posted comment, and like comments.   *Id*. at 50:15-51:1. These actions prompt a notification to the tagged user or original poster.   *Id*. at 50:15-51:4.

**FTC Response: Undisputed.**   The FTC notes that the citation for the second sentence should be 50:11-51:1 of the Presser transcript to accurately support the factual statement.

232.   **Sharing Video Content.**   Below the comment button in the For You Image is an arrow-shaped button that enables users to share a video.   Users can share a video through TikTok DM – TikTok's messaging offering – or through other messaging services, including the phone's native messaging system (e.g., iMessage, SMS text message) or third-party messaging systems like Facebook Messenger or Instagram Direct.   *See* Ex. 24 at 51:20-28, 52:1-2 (Presser (TikTok) Dep. Tr.).   The below left screenshot shows some of the sharing options available on the TikTok mobile app.   For comparison, the below right screenshot shows some of the sharing options available on Instagram Reels on the Instagram mobile app.



**FTC Response: Undisputed but incomplete.**  Regarding the first, third, and fourth

sentences of Statement 232, it is undisputed that the above screenshots appear to be examples of

content that could be displayed on the home feed on the TikTok mobile app and Instagram

mobile app with respect to the present time, subject to the caveat that Meta does not identify how

the screenshots were generated or obtained (specifically the steps taken to generate the content

that appears on each screenshot and the user's past behavior), and the above screenshots are not

admissible evidence nor are they supported by admissible evidence.  The first sentence is incomplete because the proffered screenshot does not indicate that it is from the "For You" feed of the TikTok mobile app.  Otherwise undisputed.

**Meta Reply:**  The FTC's response does not dispute the stated fact.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that Meta would be unable to introduce screenshots of the relevant apps in an admissible form at trial is meritless.  *See supra* Meta Reply to SMF ¶ 212 (addressing similar response).

233.    **Pictures on TikTok Now.**  Towards the end of 2022, TikTok introduced a new feature, TikTok Now, which prompts users once a day "to take a picture of themselves and take a picture of their surroundings" and post it.  Ex. 24 at 37:20-38:19 (Presser (TikTok) Dep. Tr.).  TikTok's current head of operations, Adam Presser, testified that ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████.

**FTC Response: Undisputed but incomplete.**  The FTC objects that Statement 233 is incomplete because it fails to note that TikTok deprecated TikTok Now in 2023.  *See* PX0321, Jon Porter, *TikTok is discontinuing its BeReal clone*, The Verge (June 27, 2023), https://www.theverge.com/2023/6/27/23775125/tiktok-now-discontinued-notification-bereal-murder-clone.

234.    **User Profile.**  Each TikTok user account has a profile, which "will include typically a picture or an icon.  It will include the videos that that user has posted, and it will have other tabs that show videos that they have saved or bookmarked.  It may also provide the

numbers of users who they are following, and the number of users who are following them."
Ex. 24 at 42:15-22 (Presser (TikTok) Dep. Tr.).

**FTC Response: Undisputed.**

235.     The below left screenshot is an example of the fields TikTok users can populate on their TikTok profile.  For comparison, the below right screenshot is an example of the fields Instagram users can populate on their Instagram profile.  As with Instagram, users need not use their real name on TikTok.  *See* Ex. 373 at 1 (TikTok, *Changing Your Nickname*, https://perma.cc/2DKN-TMV4).



**FTC Response: Undisputed but incomplete.**  Regarding the first and second sentence, it is undisputed that the above screenshots appear to be examples of content that could be displayed on TikTok mobile app and Instagram mobile app with respect to the present time, subject to the caveat that Meta does not identify how the screenshots were generated or obtained (specifically the steps taken to generate the content that appears on each screenshot and the user's past behavior), and the above screenshots are not admissible evidence nor are they supported by admissible evidence.  The third sentence is undisputed.

**Meta Reply:**  The FTC's response does not dispute the stated fact.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that Meta would be unable to introduce screenshots of the relevant apps in an admissible form at trial is meritless.  *See supra* Meta Reply to SMF ¶ 212 (addressing similar response).

236.     Users can make their TikTok account either public or private.  *See* Ex. 374 at 1 (TikTok, *Choosing Between a Private or Public Account*, https://perma.cc/9PF8-QAK7).  Users with private accounts must approve who can follow them, watch their posted content, see their likes, and see their followers and following lists.  *Id.*  Anyone can follow, watch the posted content of, and see the likes, followers, and following lists of users with public accounts, though users can customize the privacy settings of individual posts.  *Id.*  Every account is searchable on TikTok.  *Id.*

**FTC Response: Undisputed.**

237.     **Messaging.**  The button to the right of the plus sign button on the bottom of the For You Image is the Inbox tab.  The Inbox is where users receive notifications.  *See* Ex. 24 at 40:15-20 (Presser (TikTok) Dep. Tr.).  Users over the age of 16 can also send messages to other users via the Inbox, a feature TikTok calls "Direct messaging" or "DM."  Ex. 375 at 1

(TikTok, *Direct Messages*, https://perma.cc/V8Y2-TB5M).  Users can control who they can

receive messages from.  *Id.*  Users can DM other TikTok users messages and TikTok videos

without leaving the app.  *Id.*

**FTC Response: Undisputed but incomplete.**  The FTC objects that the first sentence of

Statement 237 is incomplete because neither the statement nor the cited materials include an

"Image" despite what Statement 237 states.  Otherwise undisputed, to the extent that the Image

referred to is represented above in Statement 212.

**Meta Reply:**  The FTC's response does not dispute the stated fact.  Meta defined "For

You Image" as the image of TikTok's For You feed in paragraph 212 above.

238.   ███████████████████████████████████████

███████████████████████ Ex. 252 at -290 (MetaFTC-DX-1183, FTC-META-

003582289).

**FTC Response: Disputed in part.**  Statement 238 is undisputed to the extent that it

relays words that appear in the cited document.  Otherwise disputed in part, as the material cited

does not establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P.

56(c)(1)(B).  Meta's perception that other firms (such as TikTok) may be ███████████

█████████████████ in certain aspects of its operations or in a broad sense for time or

attention does not establish that Meta and TikTok are competitors in the provision of personal

social network services, that there is not a relevant market for personal social network services,

or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

█████████████████████████████████████████████.  *See*

*supra* Meta Introduction.

239.   **Other "Social" Features.**  TikTok has "social features," including "sending messages," *see supra* at ¶¶ 232, 237-238; "leaving comments on videos," *see supra* at ¶ 231; and "following creators," *see supra* at ¶¶ 217-219.  Ex. 24 at 120:6-11 (Presser (TikTok) Dep. Tr.).

**FTC Response: Disputed in part.**  Undisputed that Statement 239 accurately relays words that appear in the cited material.  Otherwise disputed in part, as Statement 239 is not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h): the deponent testified that "it depends on really how we think about what 'social features' means" and that it "could" include the features identified in Statement 239.  *See* Ex. 24 Presser (TikTok) Dep. Tr. at 120:6-120:11.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that TikTok has social features.  *See supra* Meta Introduction.  The FTC does not dispute Meta's statements above describing TikTok's features including sending messages, leaving comments on videos, and following creators.  *See supra* Meta SMF ¶¶ 217-219, 231, 232, 237-238.  The FTC in its Counterstatement characterized ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████    *See* Counter SMF ██████.

240.   TikTok encourages its users to engage in social interactions and connect with real-life friends and family members on the app.  TikTok has a dedicated "Social team" of "product managers who are engaged in working on products that relate to social experiences."  Ex. 24 at 130:19-131:7 (Presser (TikTok) Dep. Tr.).  ███████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████

██████████████████████████████████

█████████████████████████████████

██████████████████████████████████

██████████████████████████████████

█████████████████████████████████

████████████████████████████████

████████

**FTC Response: Disputed.** It is undisputed that Statement 240 recounts words that appear in the cited materials, but Statement 240 is otherwise disputed.

The first sentence is disputed, as it is not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) because none of the materials cited in Statement 240 refer to "real-life friends and family members on the app."

- In the second sentence, the cited material refers to the "Social team" working on "social experiences," which does not provide any support the statement in the first sentence regarding "real-life friends and family members on the app."

- In the third sentence, the cited material refers to "key product changes that the Social team has been working on," which does not provide any support for the statement in the first sentence regarding "real-life friends and family members on the app."

- In the fourth sentence, reference to the "Friends tab" and "Friends' videos" do not refer to real-life friends and family members: instead, as described by Meta's Statement 223,

"TikTok uses the term "Friend" to describe a connection between "users that are
mutually following each other," (citing Ex. 24 at 30:7-10 (Presser (TikTok) Dep. Tr.)."

- ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

The second, third, fourth, and fifth sentences of Statement 240 are also disputed, as the cited
material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R.
Civ. P. 56(c)(1)(B): the cited statements do not suggest that Meta and TikTok are competitors in
the provision of personal social network services, that there is not a relevant market for personal
social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
TikTok encourages its users to engage in social interactions and connect with real-life friends
and family members on the app.  *See supra* Meta Introduction.  The cited materials support that

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

241. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███ By comparison, Professor Hemphill calculated that, ███████████████

███████████████████████████████████. Ex. 279 at ¶ 287

(Hemphill Rep.). ███████████████████████████

███████████████████████████

**FTC Response: Disputed in part and incomplete.** Undisputed that Statement 241

recounts statements that appear within the cited material. Otherwise disputed in part because █

███████████████████████████████████████████

██████████ does not establish the absence of a genuine dispute regarding a material fact, *see*

Fed. R. Civ. P. 56(c)(1)(B): ████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████ .

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

the ████████████████████████████████████████████

████████████████████ .  *See supra* Meta Introduction.

242.    Professor Hemphill testified that "conceivably there are individuals" on TikTok

who "turn to TikTok for a place to engage in demand for maintaining relationships and sharing

experiences with friends, family, and social acquaintances in a shared social space."  Ex. 283

at 56:12-57:7 (Hemphill Dep. Tr.); *see also supra* at ¶ 209 (Professor Lampe testimony

regarding TikTok's social networking features).

**FTC Response: Disputed in part and incomplete.**  Statement 242 is undisputed to the

extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The

FTC disputes that Statement 242 constitutes a material fact subject to proof at trial and objects

that the material cited does not establish the absence of a genuine dispute regarding a material

facts.  *See* Fed. R. Civ. P. 56(c)(1), 56(c)(1)(B).  Statement 242 is also incomplete because it

omits Professor Hemphill's testimony that "There may – conceivably there are individuals that

are -- that are doing that.  I don't think it's -- my opinion is that it's not a place to which users

can reliably turn for that.  I can't rule out the possibility that there may be individuals here and

there that use the app in that fashion. . . . there could be some clump of users that utilize the app

in that fashion.  I haven't seen evidence of that, but it's -- it's possible."  *See* Ex. 283 at 57:1-

57:19 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill provided the testimony quoted in the statement.  *See supra* Meta Introduction.

243.  A January 2020 survey conducted by Meta, described in an April 2020 slide deck, found that ██████████████████████████████████████████████████ ████████████████████  Ex. 222 at -.047 (FTC-META-005944143).  Professor Lampe had no "opinion one way or another that in April 2020 more or less than ████████████████ ██████████████████████████████████████████."  Ex. 281 at 363:1-364:16 (Lampe Dep. Tr.) (testifying about Ex. 222 at -.047 (FTC-META-005944143)).

**FTC Response: Disputed in part and incomplete.**  Statement 243 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed.  The FTC disputes that Statement 243 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1), 56(c)(1)(B), 56(c)(2).  Statement 243 is incomplete because it omits Professor Lampe's testimony that, after reviewing the document cited in Statement 243, "[i]t is still my opinion that TikTok is not a PSNS.  The evidence I have seen shows that when we look at the motivations for why people are on TikTok that it's not for that.  That's the bulk of the evidence I've seen.  I agree this evidence is counter to that and I pay attention to it and account for it, but it's counter to the bulk of evidence I've seen on TikTok."  *See* Ex. 281 Lampe Dep. Tr. at 329:21-330:6.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the results of the cited survey or Professor Lampe's concession that he did not have a contrary view on the proportion of users on TikTok that typically use it to watch videos posted

by their friends.  *See supra* Meta Introduction.  The additional testimony the FTC includes does

not dispute the results or reach a contrary conclusion, and Professor Lampe repeatedly testified

that he is "not looking at percentage of time spent or amount of time spent" on any activities "in

forming [his] opinion."  Ex. 281 at 296:6-13, 363:1-364:16 (Lampe Dep. Tr.); *see also id.* at

140:4-7 (same).

iii.    **Competition Between TikTok and Facebook and Instagram**

244.    **Meta Documents and Testimony.**  Meta documents and executives recognize

TikTok as one of Facebook's and Instagram's competitors.  For example, Meta's executives

expressed concern about TikTok's success in a February 2020 internal messaging group of

senior Meta executives, including Mr. Zuckerberg and Meta's chief marketing officer, Alex

Schultz.  *See* Ex. 1 at ¶ 85 (Ghose Rep.).  Mr. Schultz stated, "TikTock [sic] competition really

matters . . . TikTock [sic] is the best competitor yet."  *Id.* at ¶ 85 & n.158.  At an internal "all

hands" meeting in February 2022, Mr. Zuckerberg stated, ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████        *Id.* at ¶ 86 & n.171.

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague.

It is undisputed that Statement 244 relays the words that appear in the cited document.

Statement 244 is otherwise disputed, as the cited material (the Ghose report) does not constitute

admissible evidence regarding any of the underlying statements relayed in Statement 244.  *See*

Fed. R. Civ. P. 56(c)(2).  Statement 244 is additionally disputed because it does not establish the

absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's

perception that other firms may be "competitors" in certain aspects of its operations or in a broad

sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

 **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes TikTok as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction.  As the term "competitors" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that Facebook, Instagram, and TikTok compete with one another.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including watching short-form videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and TikTok within the relevant market.  *See infra* Meta SMF ¶¶ 580-584, 622 (Professor Hemphill confirming that his opinion is "100 percent" of the time a user spends on the "Reels tab" "watch[ing] a series of short videos of an otherwise unknown individual dancing" is time spent engaging in "personal social networking" (quoting Ex. 283 at 80:20-81:21 (Hemphill Dep. Tr.))).  All available empirical evidence of substitution shows that TikTok is a closer substitute for Facebook and Instagram than Snapchat, which the FTC asserts is a PSN app.  *See id.* at ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage), ¶¶ 537-547 (Professor List's pricing experiment).  Whether users treat two products as substitutes – here, TikTok and Facebook or Instagram – is material to whether they are competitors in a relevant market.  Nor is this fact statement an appropriate place to challenge the admissibility of Professor Ghose's opinion.  Moreover, the FTC misunderstands the evidentiary standard at summary judgment, *see supra* Meta Reply to SMF ¶ 212; the suggestion that Meta would not be able to introduce

statements from its own executives at trial is meritless and Federal Rule of Evidence 703 would permit Professor Ghose to rely on the cited material in any event.

245.    Meta's executives also testified that TikTok is one of Facebook's and Instagram's biggest competitors.  On May 9, 2023, Mr. Zuckerberg testified that "TikTok is, at this point, one of [our] biggest competitors" and that, "for Facebook and Instagram especially, I would say TikTok is the biggest kind of competitor that's another app that's out there today that we face." Ex. 142 at 159:16-18, 161:22-25 (Zuckerberg Dep. Tr.).  Mr. Zuckerberg stated that "part of what [TikTok] do[es]" is "provide a service in the United States of friends sharing based on real-life identities," pointing out that "they have been very aggressive over the last few years when you open up the app of trying to get you to import your contacts, import Facebook friends, map out a graph . . . .  But we also compete with them a lot more broadly around short-form video and entertainment."  *Id.* at 159:19-160:1, 160:9-10.

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague. It is undisputed that Statement 245 relays the words that appear in the cited testimony, but Statement 245 is otherwise disputed.  The third sentence of Statement 245 is disputed because it is contradicted by other, more reliable, evidence: In its response to the European Commission's Request for Information, TikTok explained that "[w]e believe that our services . . . do not qualify as 'social networking services'" because TikTok aims to "enable users to view, create and share short form video content whereas the primary aim of 'social networking services' is to enable users to connect and network with friends and professional acquaintances."  PX13581, TikTok document: "ByteDance Response to European Commission Request for Information" (undated), TIK-00000001 at -008.  TikTok also stated that "Facebook and Instagram are used as a 'complement' in addition to our services."  *Id.* at -009.  Moreover, TikTok's Chief of Staff and

corporate representative, Adam Presser, confirmed the accuracy of these statements in his

deposition.  *See* PX6097, Presser (TikTok) Dep. Tr., at 18:11-13, 197:20-199:8, 201:13-201:20,

205:4-205:18, 206:13-207:4.

Statement 245 is otherwise disputed because the cited material does not establish the

absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's

perception that other firms may be "competitors" in certain aspects of its operations or in a broad

sense for time or attention does not establish that Meta and TikTok are competitors in the

provision of personal social network services, that there is not a relevant market for personal

social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta recognizes TikTok as one of Facebook's and Instagram's competitors, or that Mr.

Zuckerberg testified that TikTok is one of Facebook's and Instagram's "biggest competitors" and

"provide[s] a service in the United States of friends sharing based on real-life identities."  *See*

*supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).  In fact, it

cites no evidence from Meta at all.  Additionally, the cited document, ██████████████

████████████████████████████████████████████████████████

███, does not contradict Mr. Zuckerberg's testimony discussing TikTok's "aggressive" friend

sharing efforts "over the last few years."  Since the document was submitted, Meta launched

Reels on Instagram in August 2020 and TikTok launched the Friends tab.  *See* Ex. 24 at 288:17-

289:2, 292:22-293:6 (Presser (TikTok) Dep. Tr.); *infra* Meta SMF ¶ 745; FTC Resp. to Meta

SMF ¶ 271 (admitting that the document was created before August 2020).  As of April 2024,

more than 60% of time on Facebook and Instagram is spent watching video, and Reels alone

accounts for 50% of time spent on Instagram.  *See* Ex. 499 at 4, 6 (Meta Q1 2024 Earnings Call).

███████████████████████████████████████████████████

██████████████████████████████████████████ *See supra*

Meta SMF ¶ 241.

Moreover, whether TikTok defines itself as a "social networking service" – like the

FTC's proffered expert, Professor Lampe, does (*see* PX9004 at ¶¶ 46, 85, 109, 226 (Lampe

Rep.)) – does not determine whether Meta recognizes TikTok as a competitor to Facebook and

Instagram, or whether TikTok recognizes Facebook and Instagram as competitors. ██████████

██████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ The cited document only offers a high-level response

to a question from the European Commission. *See* PX13581 at -006, -010 (TIK-00000001).

While TikTok described how it "believe[d]" users use "social networking services," it qualified

its answer, explaining that "[w]e have not conducted studies on this question nor are we aware of

such studies." *Id.* at -005. ████████████████████████████

████████████████████████████████████████████████

███ Additionally, Mr. Presser did not confirm the accuracy of the cited statement relating to

whether Facebook and Instagram can be used as a complement to TikTok. He was only asked

(and only addressed) whether ByteDance's response – which included discussion of how TikTok

can be used to create and share short-form videos – "[t]aken as a whole . . . accurately

describe[s] TikTok's current product offering within the United States." Ex. 24 at 206:13-207:4

(Presser (TikTok) Dep. Tr.). Additionally, Mr. Presser did not describe two of the four apps the

FTC claims are PSNS market participants as "personal social networking services" – omitting

Snapchat and MeWe – and including QZone, which is not in the FTC's alleged PSNS market. *See id.* at 201:13-203:2.

246.    Speaking about TikTok, Mr. Mosseri testified at his March 29, 2023 deposition that "[t]hey are, in my 15 years at Meta, the most well-executing, efficient, ruthless competitor that we've ever seen."  Ex. 143 at 244:4-19 (Mosseri Dep. Tr.).  Years earlier, at a September 1, 2020 Investigative Hearing, Ms. Sandberg testified about TikTok:  "[T]hey are beating us.  You know, their growth – they had a billion users, as I understand it, faster than we ever did.  Their video usage is exploding.  They are getting teens and teens' [sic] girls, which are usually the harbingers of the future product adoption."  Ex. 144 at 210:20-25 (Sandberg IH Tr.).

**FTC Response: Disputed in part.**  It is undisputed that Statement 246 relays the words that appear in the cited testimony.  Statement 246 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that another firm may be a "competitor" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power. Statement 246 is also disputed because the testimony of Mosseri and Sandberg is contradicted by other Meta executives.  Dan Rose, for example, when asked "[i]s it correct to say that TikTok is not primarily used to communicate with friends and family," answered "[y]es, I would say that's correct."  *See* PX6065, Rose (Meta) Dep. Tr., at 271:7-12.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Mosseri and Ms. Sandberg testified that Meta recognizes TikTok as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing

similar response).  The testimony the FTC adds in its response from Mr. Rose's does not contradict their testimony and is incomplete.  Mr. Rose identified TikTok as "one of the largest competitors to Facebook," that includes "competing for time and attention, but also competing for connecting and sharing content with friends, with broader networks, with the public, and competing for people's time in how they would discover content, browse content online, and connect through that content."  PX6065 at 259:24-260:18 & errata (Rose Dep. Tr.).  TikTok need not be "primarily used to communicate with friends or family" to be one of Meta's top competitors.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including watching short-form videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and TikTok within the relevant market.

247.    Meta's reoccurring Industry Insight reports, prepared between 2019 through 2023, listed TikTok as a competitor.  *See supra* at ¶ 185.

**FTC Response: Disputed in part.**  The FTC objects to the term "competitor" as vague. It is undisputed that Statement 247 relays the words that appear in the cited material.  Statement 247 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be a "competitor" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked TikTok as a competitor.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).

248.    Meta has developed strategies and made changes to its products in response to competition from TikTok.  For example, Mr. Mosseri posted a public video on his Instagram account, @mosseri, on January 31, 2021, explaining some of these changes:  "I want to start by saying we're no longer a photo-sharing app or a square photo-sharing app.  The number one reason that people say that they use Instagram in research is to be entertained.  So people are looking to us for that.  So actually, this past week in our internal all hands, we shared, or I shared a lot about what we're trying to do to lean into that trend – into entertainment and into video.  Because let's be honest: there's some really serious competition right now.  TikTok is huge, YouTube is even bigger, and there's lots of other upstarts as well.  And so people are looking to Instagram to be entertained, there's stiff competition and there's more to do, and we have to embrace that.  And that means change.  So what you're going to see over the next couple of months really is us start to experiment more in the space of what we call recommendations, so showing you things in Feed that you may not be following yet.  We just started testing an early version of this last week."  Ex. 247 at -297-298 (FTC-META-004553295).

**FTC Response: Disputed in part.**  The FTC objects to the term "competition" as vague. It is undisputed that Statement 248 relays the words that appear in the cited document. Statement 248 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal

social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked, developed strategies, and made changes to its products in response to competition from TikTok.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).

249.   Among the changes Meta made in response to competition from TikTok is  For example, in an October 6, 2020 email, Meta's Chief Product Officer, Chris Cox, described the project of ███████████

███████████████████████████████████

█████   Ex. 255 at -022 (PX12491, FTC-META-003897021).  John Hegeman, Meta's vice president of monetization, responded regarding ████████████████████

███████████████████████████████████

███████████████████████████  *Id.*  In the lead up to this change, an April 16, 2021 slide deck addressing the "Framework of Competitive Headwinds for Facebook Family of Apps" suggested that ████████████████

███████████████████████████████████

████████████████████████  Ex. 249 at -.032 (FTC-META-006275723).

**FTC Response: Disputed in part.**  The FTC objects to the term "competition" as vague. It is undisputed that Statement 249 relays the words that appear in the cited documents. Statement 249 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that

other firms may be "competition" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked, developed strategies, and made changes to its products in response to competition from TikTok.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).

250.    Explaining how "consumer demand factor[ed] into the amount of recommended content" in feed versus content from one's friends, Meta's corporate representative and vice president of engineering, Lars Backstrom, testified that "one of the sort of clear trends in the market is that people have a desire for the content that is kind of like connected to their interests, and where they don't have to go through sort of work to find all of the content creators, and so you sort of see obviously the rise of TikTok, and to a large extent this is the YouTube model as well, and so, as part of providing people with the highest quality feed that we can, it was clear that, you know, the only way to compete really was to offer a similar sort of quality of experience."  Ex. 145 at 5:23-25, 188:11-24 (Backstrom Dep. Tr.).

**FTC Response: Disputed in part.**  It is undisputed that Statement 250 relays the words that appear in the cited documents.  Statement 250 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be "compete" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are

competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked, developed strategies, and made changes to its products in response to competition from TikTok and YouTube.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).

251.    Meta ordinary-course documents observe ███████████████████████



█████████    Ex. 146 at 191:16-192:12 (Alison Dep. Tr.); *see* Ex. 253 at PX10242-008 (PX10242, FTC-META-006751238).

**FTC Response: Disputed.**  It is undisputed that Statement 251 relays the words that appear in the cited document.  Statement 251 is otherwise disputed.  The first sentence is disputed, as it is not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) because none of the materials cited in Statement 251 discusses "██████████████████████████████████████████ ████████████."  First, the document ███████████████████████████ ██████████████████████████████████.  *See generally* Ex. 253 (PX10242, FTC-META-006751238) (█████████████████████████████████).  Second, the statements in the second sentence of Statement 251 say ████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ .

Statement 251 is further disputed because as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): ██████

████████████████████████████████████████████████████████████ with respect to the Facebook application in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that users switch among Facebook, Instagram, and TikTok and that Meta has observed such switching.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).  First, ordinary-course documents Meta cited show substitution between Instagram and TikTok specifically.  *See*, *e.g.*, *infra* Meta SMF ¶¶ 252, 256, 263-264.  Second, as the term

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ .  Third, though Exhibit 253 generally concerns ████████████████████████

████████████████████████████████████████████████ . *See* Ex. 253 at PX10242-017 (PX10242, FTC-META-006751238); Ex. 147 at 138:14-139:6 (Osofsky Dep. Tr.).  Finally, all available empirical evidence of substitution shows that TikTok is a closer substitute for Facebook and Instagram than Snapchat, which the FTC asserts is PSN

app.  *See infra* Meta SMF ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage),

¶¶ 537-547 (Professor List's pricing experiment).



252.

Ex. 254 at -525, -541 (PX10247, FTC-META-007255518).

*Id.* at -541.  Mr.

Alison prepared these parts of the presentation himself and reviewed the presentation for

accuracy.  *See* Ex. 146 at 9:18-21, 137:11-17 (Alison Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term

"competition" as vague.  It is undisputed that Statement 252 relays the words that appear in the

cited documents, and the third sentence of Statement 252 is undisputed.  Statement 252 is

otherwise disputed, as the cited material does not establish the absence of a genuine dispute

regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may

be "competition" in certain aspects of its operations or in a broad sense for time or attention does

not establish that Meta and TikTok are competitors in the provision of personal social network

services, that there is not a relevant market for personal social network services, or that Meta is

not exercising monopoly power.  Statement 252 is also incomplete because Alison testified that

████████████████████████████████████████████████ *See* Ex. 146

Alison Dep. Tr. at 77:4-78:18.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████████

████████████████.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing

similar response).  The additional testimony the FTC adds in its response from Mr. Alison

referring to ████████ fails to create a genuine dispute of material fact.  Given that the

FTC has defined "PSN services" to include all activities in which users engage on apps that the

FTC includes in the alleged PSNS market (except Facebook Dating), including watching short-

form videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that

competition occurs between Facebook, Instagram, and TikTok within the relevant market.

253.    Before Meta released Instagram Reels in 2020 and Facebook Reels in 2021, Meta

had already observed user substitution away from Facebook to TikTok.  ████████████



████████████████  *See* Ex. 239 at -162.001, -162.002 (FTC-META-

000207161); Ex. 1 at ¶ 85 (Ghose Rep.).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term "user

substitution" as vague as vague and undefined.  It is undisputed that the second sentence of

Statement 253 relays the words that appear in the cited document.

The first sentence is disputed, as it is not supported by the cited material as required by

Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) because none of the materials

cited in Statement 253 discusses "user substitution away from Facebook": Meta's claim that the

cited materials indicate a ████████████ does not support the assertion that Facebook observed "user substitution away from Facebook to TikTok."

Statement 253 is also disputed because the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that its observed "substitution" to TikTok (or other firms) by its users in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that users substituted usage of TikTok for usage of Facebook.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).  As the term "user substitution" is ordinarily understood and used, the evidence demonstrates that time spent on TikTok and Facebook are reasonably interchangeable for the same purpose.  As the document indicated, ███████████

██████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ Ex. 239 at - 162.006 (FTC-META-000207161).

254.    **TikTok Documents and Testimony.**  TikTok documents and executives recognize Facebook and Instagram as two of TikTok's competitors.  ████████████████

█████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████████

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term

███████████ as vague.  It is undisputed that Statement 254 accurately relays the words that

appear in the cited materials.  Statement 254 is otherwise disputed, as the cited material does not

establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P.

56(c)(1)(B): TikTok's perception that other firms may be "competitors" in certain aspects of its

operations or in a broad sense for time or attention does not establish that Meta and TikTok are

competitors in the provision of personal social network services, that there is not a relevant

market for personal social network services, or that Meta is not exercising monopoly power.  The

first sentence is also disputed because it does not clarify in what areas TikTok and

Facebook/Instagram purportedly compete.  The second and third sentences are incomplete

because the cited document primarily addresses Facebook and Instagram in the context of Reels.

The fourth sentence is incomplete because it fails to state that the deponent's answer was to a

question which asked about competition for users' time and attention.

Additionally, in the deposition of TikTok's Chief of Staff and corporate representative,

Adam Presser, which Meta cites in Statement 254, when asked if "TikTok view[s] itself as

competing with Facebook and Instagram as a place where users can view photos and videos,"

Mr. Presser replied "I would say that we think of ourselves and our platform as primarily an

entertainment platform that gives users the opportunity to create and share entertainment content.

Other platforms may provide users with similar types of functionalities but may be focused on

core differentiated features."  *See* Ex. 24 at 65:7-65:17 (Presser (TikTok) Dep. Tr.).  When

subsequently asked if Facebook and Instagram fit his description, Mr. Presser replied "I would say these platforms may offer all, some of the similar functions but are not necessarily used for the same reasons." *Id.* at 65:19-66:10.

Moreover, when asked if TikTok views itself "as a competitive alternative to Facebook and Instagram for messaging," Mr. Presser answered "[w]e offer messaging capabilities as a part of the service that we provide to our users in their consumption of entertainment; but, no, I don't think we view ourselves as a social network." *Id.* at 111:8-15.

Mr. Presser also testified that "it is directionally correct in that we are engaged in an entertainment platform where we share and allow users to share, create, consume content; but we are not a social networking platform.  So there are areas in which we do compete with Facebook, and there are other areas where we do not compete with Facebook." *Id.* at 211:21-212:8.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that TikTok recognizes Facebook and Instagram as two of its competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).  The second and third sentences in Meta's statement are not incomplete.  ██████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████  Second, the FTC fails to explain why TikTok's focus on Reels undermines whether TikTok perceives Facebook and Instagram as competitors.  TikTok need not consider every feature on Facebook and Instagram as equally competitively relevant to consider Facebook and Instagram as competitors.  Reels, in any event, is one of Instagram's most popular features: in February 2023, consuming Instagram Reels accounted for ███████████████  of time spent

on Instagram.  *See supra* Meta SMF ¶ 59.  As of April 24, 2024, Reels alone accounts for 50% of

time spent on Instagram.  *See* Ex. 499 at 4 (Meta Q1 2024 Earnings Call).  The additional

testimony from Mr. Presser that the FTC adds in its response supports Meta's statement that

TikTok recognizes Facebook and Instagram as competitors.  Mr. Presser characterized TikTok as

an "entertainment platform" and not primarily a "social networking platform" while also

testifying that TikTok competes with Facebook and Instagram.  Ex. 24 at 59:2-6, 211:21-212:8

(Presser (TikTok) Dep. Tr.).

255.　████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term

████████ as vague.  It is undisputed that Statement 255 relays the words that appear in the

cited testimony.  Statement 255 is otherwise disputed, as the cited material does not establish the

absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's

perception that TikTok (or another firm) "competes" in certain aspects of its operations or in a

broad sense for time or attention does not establish that Meta and TikTok are competitors in the

provision of personal social network services, that there is not a relevant market for personal

social network services, or that Meta is not exercising monopoly power.

Statement 255 is also incomplete because TikTok's Chief of Staff and corporative

representative, Adam Presser, distinguished in his deposition between the areas where TikTok

competes with Meta and the areas where it does not.  He specified that "it is directionally correct

222

in that we are engaged in an entertainment platform where we share and allow users to share, create, consume content; but we are not a social networking platform.  So there are areas in which we do compete with Facebook, and there are other areas where we do not compete with Facebook." *See* Ex. 24 at 211:21-212:8 (Presser (TikTok) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that TikTok recognizes Facebook and Instagram as two of its competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).  Contrary to the FTC's assertion, Meta's statement is not incomplete because Mr. Presser also testified that there are some areas in which TikTok does not compete with Facebook.  It is undisputed that Mr. Presser testified that ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

256.  █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

**FTC Response: Disputed in part.**  The FTC objects to the term ████████ as vague. It is undisputed that Statement 256 relays the words that appear in the cited materials.  Statement 256 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): TikTok's perception that users might more intensively use TikTok during an outage impacting all of Meta's applications does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that ███████████████████████████████████████████████.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).

257.  **Walmart Analysis of TikTok Acquisition.**  Walmart's September 2020 press release announcing its agreement to acquire a portion of TikTok's US operations described TikTok as a "social network" that "a hundred million Americans . . . love."  Ex. 376 (MetaFTC-DX-120).  Walmart's corporate representative testified that Walmart viewed TikTok as a "social network" and viewed TikTok as competing in a "market for social networks."  Ex. 37 at 107:2-9 (Yam (Walmart) Dep. Tr.).  ████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

██   Walmart "considere[d] TikTok's competitive position in a market for social networks"

during August 2020 to September 2020 "[i]n the context of the potential transaction," by

"review[ing] . . . materials that included . . . TikTok and [its] competitors."  *Id.* at 108:1-10.

**FTC Response: Disputed in part.**  The FTC objects to the term ████████ as vague.  It

is undisputed that Statement 257 relays words that appear in the cited materials.

The fourth and fifth sentences of Statement 257 are disputed, as they are not supported by

the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule

7(h) and not supported by admissible evidence: none of the materials cited support the assertion

███████████████████████████████████████████████████████████

██████████████████████████████████  The witness testified, in the portion of the cited

material cited by Meta:

> Q. I'll ask you a couple of general process questions now.  During
> this period from August 2020 to September 2020, did Walmart ever
> consider TikTok's competitive position in a market for social
> networks?
>
> MR. WALTER-WARNER: Objection. Lack of foundation. Form.
>
> THE WITNESS: Yes. In the context of the potential transaction,
> there -- there was an evaluation -- or there was a review of materials
> that included a -- TikTok and competitors.
>
> Q. Actually, before we introduce, Ms. Yam, you just mentioned
> materials. Could you just describe what materials you were referring
> to? And if you don't recall, you can tell me, and I can help jog your
> memory.
>
> A. So just -- and to clarify again, right, like my -- I -- I didn't have
> a capacity in the potential transaction, so this is just representing
> knowledge that was -- as -- in my capacity as a Walmart
> representative based on work with counsel.   And so my
> understanding is that ██████████ provided detail to -- provided detail
> related to a possible transaction related to TikTok and, in the context

of those materials, right, there might -- there was competitive a detail included.

███████████████████████████████████

Statement 257 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Walmart's perception that TikTok "competes" with Meta in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that after agreeing to acquire a portion of TikTok's operations in the United States, Walmart described TikTok as a "social network" and viewed YouTube, Instagram, and Snap as TikTok's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).

258.    Walmart's ordinary-course documents describe consumers switching from Meta's apps to TikTok. █████████████████████████████

███████████████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████  Walmart's corporate representative testified that the companies listed on this slide "compete for user engagement."  Ex. 37 at 93:3-9 (Yam (Walmart) Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term "switching" as vague.  It is undisputed that Statement 258 accurately quotes words that appear in the cited materials.  Statement 258 is otherwise disputed.

The first sentence is disputed because it is not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h): none of the cited materials relate to "switching from Meta's apps to TikTok."  The first sentence is further disputed because it is contradicted by other evidence and incomplete, as the cited document ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████.

Statement 258 is further disputed because the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Walmart's perception that Meta faces "competition" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Walmart's documents describe users switching from Facebook and Instagram to TikTok.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 244 (addressing similar response).  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including watching

short-form videos, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that

competition occurs between Facebook, Instagram, and TikTok within the relevant market.  ██

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████  All available empirical evidence of

substitution shows that TikTok is a closer substitute for Facebook and Instagram than Snapchat,

which the FTC asserts is PSN app.  *See infra* Meta SMF ¶¶ 562-566 (Professor Carlton's

analysis of October 2021 outage), ¶¶ 537-547 (Professor List's pricing experiment).

<div style="margin-left: 2em;">

iv.  **Competition Between TikTok and Facebook and
Instagram for Sharing and Viewing Short-Form
Video Content**

</div>

259.    TikTok provides a reasonable substitute for certain engagement on Facebook and

Instagram, including sharing and viewing short-form videos.  *See infra* at ¶¶ 260-270.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute" and

"certain engagement" as so vague and undefined that Statement 259 is not susceptible to a

reasonable response, and disputes Statement 259 as not supported by the cited material as

required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term

"reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d

34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability

relevant to antitrust market definition or how consumers would behave in response to a small but

significant, non-transitory increase in the price (or decrease in quality) above (or below) a

competitive level of Facebook, Instagram, TikTok, or any particular set of products or services

posited as a relevant antitrust market.  While no response is required, the FTC disputes that Meta

has provided any basis for the assertion that users consider TikTok as a reasonable substitute for

viewing or sharing short-form video on Facebook and Instagram, and the cited material does not

establish the absence of a genuine dispute of material fact: that other firms may compete with

Facebook and Instagram in various aspects of firm operations (e.g., short-form video) or in a

broad sense for user time and attention does not establish that Meta and TikTok are competitors

in the provision of personal social network services, that there is not a relevant market for

personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R.

Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.b.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

TikTok, Facebook, and Instagram can be and are used interchangeably, including for sharing and

viewing short-form videos.  *See supra* Meta Introduction.  As the terms "reasonable substitute"

and "certain engagement" are ordinarily understood and used, the evidence demonstrates that

certain activities on TikTok, like viewing short-form video content, are reasonably

interchangeable with similar activities on Facebook and Instagram, like viewing short-form

video content on Reels.  *See infra* Meta SMF ¶¶ 260-271.  Given that the FTC has defined "PSN

services" to include all activities in which users engage on apps that the FTC includes in the

alleged PSNS market (except Facebook Dating), including watching short-form videos, there is

likewise no genuine dispute that competition occurs between Facebook, Instagram, and TikTok

within the relevant market.  *See infra* Meta SMF ¶¶ 580-584, 622 (Professor Hemphill

confirming that his opinion is "100 percent" of the time a user spends on the "Reels tab"

"watch[ing] a series of short videos of an otherwise unknown individual dancing" is time spent

engaging in "personal social networking" (quoting Ex. 283 at 80:20-81:21 (Hemphill Dep. Tr.))).

As of April 2024, more than 60% of time on Facebook and Instagram is spent watching video,

and Reels alone accounts for 50% of time spent on Instagram.  *See* Ex. 499 at 4, 6 (Meta Q1

2024 Earnings Call).  All available empirical evidence of substitution shows that TikTok is a

closer substitute for Facebook and Instagram than Snapchat, which the FTC asserts is a PSN app. *See infra* Meta SMF ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage), ¶¶ 537-547 (Professor List's pricing experiment).  Whether users treat two products as substitutes – here, TikTok and Facebook or Instagram – is material to whether they are competitors in a relevant market.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

260.    Professor Hemphill testified that, if Meta lowered the quality of its Reels offerings, "there might well be some shift" in usage from Reels to TikTok.  Ex. 283 at 59:15-60:21 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 260 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 260 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

Statement 260 is also disputed because it is contradicted by other evidence: when asked about substituting consumption of a video for entertainment purposes on TikTok as opposed to Instagram Reels, Professor Hemphill explained that "[i]t's not a good substitute to the extent that context matters.  Surely some of the time a user, as I've said, not in that moment directly engaged in friends and family sharing would find TikTok a suitable alternative in that moment, but that's not a powerful constraint as I discuss in the report on Meta's ability to exercise monopoly power."  *See* Ex. 283 at 39:12-40:2 (Hemphill Dep. Tr.).  Professor Hemphill elaborated that "the

differentiated nature of what – of what Meta is providing leads me to think that there wouldn't be as much a shift, but I would acknowledge that there might well be some shift.  As I discuss in the report, you know, Meta sort of came to Reels – I'm sorry – came toward TikTok with Reels as a way of earning incremental usage.  So raising the – lowering the quality, let's say, of the Reels offering might well produce some shifting to TikTok, dampened in the ways that I described."  *Id.* at 59:20-60:21.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified that if Meta lowered the quality of its Reels offerings, some usage might shift from Reels to TikTok.  *See supra* Meta Introduction.  The additional testimony from Professor Hemphill the FTC adds in its response does not contradict the testimony Meta quoted in the statement.

261.  **Meta Documents and Testimony.**  Meta's executives testified that adding Reels to Facebook and Instagram was, in part, a competitive response to TikTok's success.  On March 23, 2023, Mr. Osofsky testified that Reels 

. Reels was our product in the short-form video space up against lots of competitors such as TikTok and YouTube Shorts and we wanted Reels to be successful."  Ex. 147 at 161:24-162:20 (Osofsky Dep. Tr.).  Mr. Mosseri testified that

Ex. 143 at 243:25-244:15 (Mosseri Dep. Tr.).

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████ *Id.* at 252:16-253:6 & errata.

**FTC Response: Disputed in part.**  The FTC objects to the term "competitive response" as vague.  It is undisputed that Statement 261 relays the words that appear in the cited testimony. Statement 261 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that TikTok merited a "competitive response" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and YouTube are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta's executives testified that adding Reels to Facebook and Instagram was, in part, a competitive response to TikTok.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar response).  As the term "competitive response" is ordinarily understood and used, the evidence demonstrates that Meta added Reels to Facebook and Instagram, in part, in response to competition from TikTok.

262.    Professor Hemphill testified that Meta added Reels to Facebook in order to "bring[] the competition to TikTok" and thereby "pursu[e] additional users and usage at the margin."  Ex. 283 at 164:11-165:6 (Hemphill Dep. Tr.) ("Q. So you would agree that addition of Reels to Facebook was an example of pursuing additional users and usage at the margin?  A. Well, sure. . . .  I would agree as a general matter that chasing additional usage through Reels,

bringing the competition to TikTok in the manner that we've been discussing is in a sense pursuing users and usage on the margin as I say in paragraph 362.").

  **FTC Response: Disputed in part and incomplete.**  Statement 262 is undisputed to the extent that it relays words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 262 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Statement 262 is also incomplete because Professor Hemphill also testified that "Meta introducing Reels . . . does not itself imply competitive constraint" and that Facebook pursuing additional usage via Reels is "neither here nor there for the hypothetical monopolist test to the extent that the hypothetical monopolist test gets to choose where to increase the quality-adjusted price from the competitive level.  So I think it's neither here nor there for the implementation of HMT and its proper application."  *See* Ex. 283 at 164:4-165:1 (Hemphill Dep. Tr.).  Professor Hemphill also added that "[t]here's certainly an effort to gain users and usage wherever Meta can and doing so is consistent with the possession of monopoly power in the relevant antitrust marketing for personal social networking services."  *Id.* at 165:14-18.

  **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified that Meta added Reels to Facebook in order to compete with TikTok.  *See supra* Meta Introduction.  The additional testimony from Professor Hemphill the FTC adds in its response does not contradict the testimony Meta quoted.  Whether Professor Hemphill believes that Meta's introduction of Reels in response to competition from TikTok is relevant to the implementation of the hypothetical monopolist test is not relevant to the original quoted testimony.  Professor Hemphill testified that he did not perform a quantitative

hypothetical monopolist test because doing so would be "infeasible to perform and would be misleading if it was performed."  *See infra* Meta SMF ¶ 633 (quoting Ex. 283 at 140:12-141:8 (Hemphill Dep. Tr.)).

263.    Meta documents and executives recognize TikTok provides a reasonable substitute for certain engagement on Facebook and Instagram, including sharing and viewing short-form videos.  For example, Mr. Alison testified that Meta's "board was very interested in how we were responding to the competitive threat from TikTok; so I do believe that Reels was something that was discussed more than once with the board that year."  Ex. 146 at 124:23-125:3 (Alison Dep. Tr.); *see also supra* at ¶ 245 (Zuckerberg testifying "Meta "compete[s] with [TikTok] a lot more broadly around short-form video and entertainment").

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute" and "certain engagement" as so vague and undefined that Statement 263 is not susceptible to a reasonable response, and disputes Statement 263 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Facebook, Instagram, TikTok, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC disputes that Meta has provided any basis for the assertion that users consider TikTok as a reasonable substitute for viewing or sharing of short-form video on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with

Facebook and Instagram in various aspects of firm operations (e.g., short-form video) or in a broad sense for user time and attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B). *See also* CMF at § II.A.5.b.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes TikTok as one of Facebook's and Instagram's competitors for sharing and viewing short-form videos, and that competition with TikTok was specifically discussed with Meta's board of directors. *See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar response).  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here



264. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████ Ex. 251 at -837 (FTC-META-012375836). ██████████████████████████████████
███████████████████████████████████████████████
█████████ *Id.* at -837-838. █████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 245 at -557, -563

(FTC-META-003585557). ████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.* at -567.

**FTC Response: Disputed in part.** It is undisputed that Statement 264 accurately quotes the words that appear in the cited material. Statement 264 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be in "competition" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Meta recognizes TikTok as one of Facebook's and Instagram's competitors for sharing and viewing short-form videos, and that ███████████████████████████████████████████████ ████████████████████████████████. *See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar response).

265.   ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████



Ex. 250 at -208

(FTC-META-010276205); *see also* Ex. 146 at 72:16-73:5 (Alison Dep. Tr.) (

).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 265 accurately quotes the words that appear in the cited materials.  The first sentence of Statement 265 is disputed in part and incomplete, to the extent that it suggests that Meta " ," , as this is contradicted by the evidence cited that Meta also .  The FTC objects to Statement 265 as the cited materials do not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms may be "competitors" in certain aspects of its operations (e.g., short-form video) or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes TikTok as one of Facebook's and Instagram's competitors for sharing and

viewing short-form videos.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar response).  The FTC's observation that Meta also ███████████████████████ ████████████████████████████████████████████ is correct, but does not create a genuine dispute of material fact.

266.    Professor Lampe testified that he "didn't look at if [TikTok's] replacing entertainment functions from other platforms," including Facebook and Instagram, or "whether the quantity of time spent on TikTok that has been rising over the last several years has come at the expense of the quantity of time spent on Facebook and Instagram," because neither issue was "necessary to make [his] opinion about TikTok."  Ex. 281 at 104:5-105:8 (Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 266 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 266 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), as Professor Lampe explained that the relevant assessments were unnecessary to reach his opinions.  Statement 266 also omits testimony from Professor Lampe, which renders the Statement incomplete.  Professor Lampe's full testimony was that he "did some analysis looking at what are the motivations that people say they use TikTok for and looked at ████████████████████ and how other people see TikTok. The evidence I point to says that people are using it for entertainment purposes. So I didn't look at if it's replacing entertainment functions from other platforms. I just looked overall at how people were using it." Ex. 281 at 104:9-16 (Lampe Dep Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe did not perform the analysis discussed.  *See supra* Meta Introduction.  The

additional testimony from Professor Lampe the FTC cites does not contradict the testimony Meta quoted.

267. 

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the terms

███████████████████████████████████ as so vague and undefined that Statement 267 is not susceptible to a reasonable response, and disputes Statement 267 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h). The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Facebook, Instagram, TikTok, or any particular set of products or services posited as a relevant antitrust market.

While no response is required, the FTC disputes Statement 267 because Meta has not provided any basis for the assertion that ███████████████████████████

██████████████████████████████████████████████████████████, as required by

Federal Rule of Civil Procedure 56(c)(1) and Local Rule 7(h), because the cited material are not

relevant to the assertion that ████████████████████████████████████████████

████████████████████████████████████████████ *See* Fed. R. Civ. P.

56(c)(1)(A); L.R. 7(h).

The FTC disputes Statement 267 for the additional reason that the cited material does not

establish the absence of a genuine dispute of material fact: that other firms may compete with

Facebook and Instagram in various aspects of firm operations (e.g., short-form video) or in a

broad sense for user time and attention does not establish that Meta and TikTok are competitors

in the provision of personal social network services, that there is not a relevant market for

personal social network services, or that Meta is not exercising monopoly power. *See* Fed. R.

Civ. P. 56(c)(1)(B). *See also* CMF at § II.A.5.b. It is undisputed that Statement 267 accurately

quotes words that appear in the cited materials, subject to the caveat that the quoted language in

the third sentence does not appear on the cited page of Ex. 34. *See* Ex. 34 at -113 (MetaFTC-

Klein-DX-1034, TIK-00345110).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████████████████████

██████████████████. *See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar

response). Indeed, the FTC acknowledges in its response that TikTok may compete with

Facebook and Instagram in "various aspects" like "short-form video." The FTC's cross-

reference to a section of its Counterstatement without explanation does not itself create a genuine

dispute of material fact. While no reply is required, none of those paragraphs creates a genuine

dispute of material fact, and Meta incorporates its responses to those paragraphs here.

Meta inadvertently cited to page -113 of Exhibit 34.  The quoted language in the third sentence appears on page -133 of Exhibit 34.  Ex. 34 at -133 (MetaFTC-Klein-DX-1034, TIK-00345110).

268.



TikTok's president of global business solutions, Blake Chandlee, testified consistently at his May 22, 2023 deposition.  *See* Ex. 36 at 68:16-21 (Chandlee Dep. Tr.) ("Q. And you consider Reels a competitive response by Facebook to TikTok?  A. I would say Reels has very similar characteristics from a visual perspective in the sense that it's – in the sense it's a feed based on video, yes.").

**FTC Response: Disputed in part.**  It is undisputed that Statement 268 accurately quotes the words that appear in the cited materials but is otherwise disputed.

The first sentence of Statement 268 is disputed because the assertion is as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule

7(h): ██████████████████████████████████████████

████████████████████████████████████████.

    The FTC further disputes Statement 268 because the cited materials do not establish the absence of a genuine dispute regarding a material fact: TikTok's perception that other firms may provide "competition for user attention and time" or offer products with "a feed based on video" does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████

███████████████████████████████████████.

*See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar response).

    269.  ██████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 269 accurately quotes the words that appear in the cited material.  However, the FTC objects that Statement 269 does not constitute a material fact subject to proof at trial, and the cited materials do not establish the absence of a genuine dispute regarding a material fact: TikTok's perception that other firms may be "competitors" in certain aspects of its operations (e.g., short-form video) or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

█████████████████████████████████████████████████████████

███████████████████████████████████████.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar response).

270.     ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████



**FTC Response: Disputed in part and incomplete and immaterial.**  Statement 270 is undisputed to the it extent it relays words that appear in the cited materials but is otherwise disputed, as Statement 270 does not constitute a material fact subject to proof at trial, and the cited materials do not establish the absence of a genuine dispute regarding a material fact: TikTok's perception that other firms may be "competitors" in certain aspects of its operations (e.g., short-form video) or in a broad sense for time or attention does not establish that Meta and TikTok are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Additionally, the fifth sentence is disputed, as

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

*See supra* Meta Introduction; Meta Reply to SMF ¶ 259 (addressing similar

response).  The additional portions of the documents the FTC adds in its response do not

contradict the portion of the document that Meta quoted.  It is undisputed that ████████

████████████████████████████████ apps the FTC includes in the alleged

PSNS market.  *See supra* Meta SMF ¶ 241.  Meta's own analysis showed that in January 2020,

████████████████████████████████████████████████

█████  *see supra* ¶ 216 (citing Ex. 222 at -.001, -.047 (FTC-META-005944143)),

271.    In its January 24, 2023 response to Meta Interrogatory Nos. 13 and 14, contending

that TikTok does not provide PSNS and that none of the enumerated activities on TikTok

constitute PSNS, the FTC cited no documents from after Meta released Reels in August 2020.

*See* Ex. 291 at 50-53, FTC's Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps.

to Meta's Second Set of Interrogs. (Jan. 24, 2023)).  Similarly, none of the documents the FTC

cited in its February 6, 2023 response to Meta Interrogatory No. 15, to purportedly show that

Meta recognizes that PSNS is distinct from TikTok, is from after Meta released Reels.  *See*

Ex. 292 at 6-8, (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Feb. 6, 2023)).

In its response to Interrogatory No. 16, on May 3, 2023, the FTC indicated again that it had not

addressed substitution between Reels on Facebook or Instagram and TikTok, stating that it had

not conducted "an analysis comparing the individual features on TikTok and those currently

available on Facebook Blue and Instagram."  *See* Ex. 297 at 31, FTC's Resp. to Meta's Interrog.

No. 16 (FTC's Objs. & Resps. to Meta's Third Set of Interrogs. (May 3, 2023)).

**FTC Response: Disputed.**  The FTC disputes the first two sentences of Statement 271 as

they do not constitute a material fact subject to proof at trial, and the cited materials do not

establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P.

56(c)(1)(B).

The first sentence is undisputed to the extent that none of the three documents cited by the FTC are from after August 2020, but it is immaterial: the FTC notes that its relevant discovery responses did not purport to identify all documents that might be relevant to the interrogatories to which Meta responded. *See, e.g.*, Ex. 292 at 6 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Feb. 6, 2023)) ("Examples of such evidence include . . .").

The second sentence is disputed for the additional reason that it is not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h). The cited portion of the document does not refer to a response "to purportedly show that Meta recognizes that PSNS is distinct from TikTok," but instead specifically about "Meta recogniz[ing] a market for personal social networking services, as distinct from other forms of online services and specialized social networks." It is undisputed that neither of the two documents concerning TikTok in that section of the document cited are from after August 2020, but it is immaterial: the FTC notes that its relevant discovery responses did not purport to identify all documents that might be relevant to the interrogatories to which Meta responded. *See, e.g.*, Ex. 292 at 6, (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Feb. 6, 2023)) ("Examples of such evidence include . . .").

The third sentence is disputed as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), which do not relate to or support the assertion that "the FTC indicated again that it had not addressed *substitution between* Reels on Facebook or Instagram and TikTok" (emphasis added). The FTC, quoting its earlier response to Interrogatory 14, did not address *substitution between* Reels on Facebook or Instagram and TikTok. *See* Ex. 297 at 31, FTC's Resp. to Meta's Interrog. No. 16 (FTC's Objs. & Resps. to Meta's Third Set of Interrogs. (May 3, 2023)). The FTC stated, in relevant part:

Meta's List implies that the above-referenced features/activities are available on TikTok and are "similar" to features/activities available on Facebook Blue and Instagram. Meta's List at 5, 11 (implying similarity with Facebook Blue), 13-16, 18 (implying similarity with Instagram). But Meta provides no evidence to suggest that these particular features/activities function, are presented, or are used similarly to any features/activities available on Facebook Blue and Instagram. Meta provides no evidence regarding how often these features/activities occur on TikTok compared to other user features/activities on TikTok, or indeed that these particular features/activities ever occur at all. For these, among other reasons, the FTC has not presently conducted such an analysis comparing the individual features available on TikTok and those currently available on Facebook Blue and Instagram.

The FTC's present understanding is that TikTok does not provide personal social networking services and the features/activities identified above are therefore not part of a personal social networking offering.



*See, e.g.*, SAC ¶ 176 (distinguishing personal social networking services from a content broadcasting and consumption service          ).

Ex. 297 at 31.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC cited no documents from after Meta released Reels in August 2020 in the cited discovery responses, which the FTC did not supplement.  *See supra* Meta Introduction.  None of the additional portions of the FTC's discovery responses that the FTC adds in its response dispute that the FTC stated that it had not conducted an analysis comparing TikTok features and activities with those offered by Facebook and Instagram.  On the contrary, in the excerpted response the FTC confirmed again that it had "not presently conducted such an analysis comparing the individual features available on TikTok and those currently available on Facebook . . . and Instagram." Ex. 297 at 31 (FTC's Objs. & Resps. to Meta's Third Set of Interrogs. (May

3, 2023)).  It similarly represented to the Court that "[i]ndividual [f]eature [s]ubstitution is [n]ot [r]elevant to the FTC's [c]ontentions."  *See infra* Meta SMF ¶ 593.

### c.   Twitter

#### i.   Background

272.    Twitter launched in 2006.  *See* Ex. 377 at 91 (Twitter 2013 Form S-1).  Twitter is "a service for friends, family, and coworkers to communicate and stay connected through the exchange of quick, frequent messages."  Ex. 40 at 67:20-68:6 (Chen (Twitter) Dep. Tr.); *see also* Ex. 378 (MetaFTC-DX-469).

**FTC Response: Disputed in part.**  The FTC does not dispute the first sentence. Otherwise disputed, as the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).  The second sentence is an accurate quotation from Exhibit 378, but when asked by Meta's counsel to describe Twitter in his own view, Mr. Chen testified that "Twitter is a platform for public conversation."  Ex. 40 at 67:10-14 (Chen (Twitter) Dep. Tr.).  When prompted with the quoted language, Mr. Chen clarified that interactions outside of direct messages on Twitter are usually public. Ex. 40 at 67:20-68:17 (Chen (Twitter) Dep. Tr.) ("So friends and family can either follow each other and stay connected *in public* through messages, or what we call tweets, on Twitter; or they can privately message -- message each other through our private messaging feature, which we call Twitter DMs, or direct messages. . . .  A tweet is a message that a user can post, *that will usually be viewable by the public*, unless that user chooses to have a private account on Twitter.") (emphases added).  The second sentence is also contradicted by the document cited in the first sentence, which describes Twitter as "a global platform for public self-expression and conversation in real time" and distinguishes Twitter from social networks like Facebook, which "allow people to share information with their friends and family and discover information based

248

on the interests of their connections." ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ *See* CMF at § II.A.5.c.1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter is "a service for friends, family, and coworkers to communicate and stay connected through the exchange of quick, frequent messages."  *See supra* Meta Introduction.  The FTC's response that some of that communication is done publicly; that Twitter has additional uses beyond those listed in Meta's statement; or that Twitter has changed how it describes itself since 2013 does not raise a genuine dispute with Meta's high-level description of Twitter.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact that Twitter has many uses, one of which is sharing with friends and family, and Meta incorporates its responses to those statements here.

273.    In July 2023, Twitter rebranded to "X."  *See* Ex. 379 (New York Times, *From Twitter to X*).

**FTC Response: Undisputed.**

274.    Users may choose to use Twitter for free, although users can also pay Twitter for a premium subscription.  *See* Ex. 39 at 294:15-296:3 (Perzyk (Twitter) Dep. Tr.).  ██████

████████████████████████████████████████████

**FTC Response: Undisputed.**

275. 

**FTC Response: Undisputed but incomplete.**  Statement 275 is incomplete because it

omits the full context for Mr. Chen's testimony includes the prior question, when Mr. Chen was

asked to explain what a quote ("We cannot be the conversation layer if users have to pay to

participate. Moreover, this would put at risk the 500 million daily tweets that are Twitter's

lifeblood.") was conveying.  Ex. 40 at 153:1-9 (Chen (Twitter) Dep. Tr.).  Mr. Chen testified in

response that:

> being the public conversation of the layer -- layer of the Internet is
> the company's mission. I mean, that was pretty widely known.
> Right? And so that was -- that's just basically our -- our mission
> statement. The -- you know, I think what we were trying to say here
> was that if you try to make every user pay just to use the platform
> and to do the basic features of tweeting and getting a message out,
> you would put at risk those 500 million daily tweets, which is all the
> content on Twitter's platform. Right? It's what differentiates it from
> any other platform, because people are putting content on there.

*Id.* at 153:10-154:1.  Mr. Chen was subsequently asked "[w]hy would charging users to pay just

to use the platform put at risk those 500 million daily tweets," which prompted the testimony

quoted in Statement 275.  *Id.* at 154:5-7.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

███████████████████████████.  *See supra* Meta Introduction.  The additional "context" the FTC provides does not create a genuine dispute about the stated fact.

276.    According to Twitter, "[p]eople come to Twitter for many reasons," including: "Sharing Content with the World.  Users leverage our platform to express themselves publicly to the world, share with their friends and family and participate in conversations by tweeting messages, photos and videos to their followers in real time."  Ex. 377 at 92, 98 (Twitter 2013 Form S-1).

**FTC Response: Disputed in part.**  It is undisputed that Statement 276 recounts words that appear in the cited material.  Otherwise disputed, as more reliable evidence establishes that users do not come to Twitter to share with friends and family.  *See, e.g.*, PX6144, Coleman (Twitter) Dep. Tr., at 163:8-14 ("I expect that people on Twitter are staying connected with others who share an interest. And on Snap, Instagram and Facebook, I assume that the bulk of who they are staying connected with is people they know in real life, like their friends and family."); PX6114, Chen (Twitter) Dep. Tr., at 67:10-19 (when asked, "[i]n your own view, what is Twitter?" Mr. Chen testified, "Twitter is a platform for public conversation."  When subsequently asked, "[w]hat . . . Twitter allow[s] users to do with the service," Mr. Chen testified that "Twitter allows users to participate in and view conversations happening in public for the areas that they are most interested in.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that there are many reasons people use Twitter, one of which is to "share with their friends and family."  *See supra* Meta Introduction.  The additional "context" the FTC provides does not create a genuine dispute about the stated fact.  Additionally, there is also extensive evidence that Twitter is in fact used to share with friends and family.  For example, a Twitter witness

251

explained "friends and family can either follow each other and stay connected in public through messages, or what we call tweets, on Twitter; or they can privately message – message each other through our private messaging feature, which we call Twitter DMs, or direct messages." *See infra* Meta SMF ¶ 306 (quoting Ex. 40 at 12:8-9, 68:8-17 (Chen (Twitter) Dep. Tr.)). ▮



And a January 2020 survey showed that ▮▮▮ *See infra* ¶ 310 (quoting Ex. 222 at -.079 (FTC-META-005944143)). The same survey found that ▮▮▮ *See* Ex. 222 at -.060 (FTC-META-005944143). The document likewise noted that ▮▮▮, *see id.*, leading Meta to conclude that ▮▮▮ *Id.*

277.     "In the three months ended December 31, 2021," Twitter reported having "38 million average mDAU ['Monetizable Daily Active Usage or Users'] in the United States and 179 million average mDAU in the rest of the world." Ex. 380 at 42 (Twitter 2021 Form 10-K).

**FTC Response: Undisputed.**

278.     Twitter generates revenue in various ways, including sales of advertising and premium subscriptions for paying consumers. *See* Ex. 380 at 54 (Twitter 2021 Form 10-K) ("We generate the substantial majority of our revenue from the sale of advertising services."); Ex. 290 at ¶ 240 & n.621 (Lampe Rep.).

**FTC Response: Undisputed.**

### ii.    Features

279.    Twitter has many features that are similar to features on Instagram and Facebook. *See*, *e.g.*, *supra* Part I.A.1(a)(v) & (b)(v).

**FTC Response: Disputed and incomplete.**  The FTC objects to the terms "many" and "similar" as vague.  The FTC disputes Statement 279 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The internal references cited in the first sentence are brief descriptions of a subset of features on Facebook and Instagram: Part I.A.1(a)(v) relates to Facebook Pages, and (b)(v) relates to Instagram Search & Explore.  The cited material contains no mention of Twitter or any Twitter features.  Further, Statement 279 does not identify which Twitter features Meta asserts are "similar" to features of Facebook and Instagram.  Meta has not provided any basis for the assertion that many Twitter features are similar to features on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter, Facebook, and Instagram have many similar features.  *See supra* Meta Introduction.  As the terms "many" and "similar" are ordinarily understood and used, there is no dispute there are multiple features on Twitter that resemble features on Facebook and Instagram.  As Meta demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part I.A.1(a)-(b), and the following paragraphs describing Twitter's features, *see infra* Meta SMF ¶¶ 280, 282-306 – most of which the FTC does not dispute – Facebook, Instagram, and Twitter all have:  a social graph; a feed; and user profiles.  They also have features for posting, viewing, and sharing text, photos, and videos; features for finding and connecting with other users – including friends or family; liking and commenting on posts; messaging; reviewing other users'

connections; and other "social" features.  *See supra.*  As just one example, Facebook Pages and Instagram Explore are similar to Twitter's features.  Facebook Pages allow for "updates from business[es], organizations and public figures."  *See supra* ¶ 27.  Instagram Explore allows people to see content "from accounts or users they do not follow" including "trends as they emerge in real time, connecting people to events and conversations both near and around the globe from individuals, groups, or businesses."  *See supra* ¶¶ 77-78.  These are use cases that the FTC recognizes are part of Twitter.  *See, e.g.*, Counter SMF ¶¶ 1221(a), 1222(d), 1225(f).

280.    Professor Lampe testified that Twitter is "an SNS," Ex. 281 at 314:13 (Lampe Dep. Tr.), or a "social networking site," Ex. 290 at ¶ 49 (Lampe Rep.).  According to Professor Lampe, Twitter is a social networking site because it contains (1) user profiles, (2) a social graph (what Professor Lampe calls a "list of connections"), and (3) a feed (what Professor Lampe calls an "activity stream").  *See id.* at ¶¶ 242-249.  Professor Lampe stated that Twitter profiles "contain a list of connections" that enables Twitter users to view who other users follow "to find other accounts the user might want to follow."  *Id.* at ¶ 246 (Lampe Rep.).

**FTC Response: Disputed in part and incomplete.**  Statement 280 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed.  The FTC disputes that Statement 280 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).  Additionally, Statement 280 omits necessary context from the cited material.

The first sentence omits the immediate subsequent testimony from Professor Lampe where he testified that he agreed that "despite that aspect of Twitter including a picture and a short bio with some discoverability features . . . Twitter [is] not a PSNS," which Professor

254

Lampe explained "is why it's so important to understand . . . motivations for use."  Ex. 281 at

314:16-315:2 (Lampe Dep. Tr.).

The second sentence omits context from Professor Lampe's about the three factors cited

for Twitter, namely that ███████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

The third sentence selectively quotes the cited paragraph, taking the quoted language out

of context: ███████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Professor Lampe opined that Twitter is a "Social Networking Site," with certain features.  *See*

*supra* Meta Introduction.  The additional "context" the FTC provides does not create a genuine

dispute about the stated fact.  The additional material the FTC claims Meta "omit[ted]" state

Professor Lampe's opinion that Twitter is not a "PSNS," but that does not dispute that Professor

Lampe testified that Twitter is an "SNS" (or "Social Networking Site").  Professor Lampe also

stated that Twitter had each of the listed features (and the FTC does not contend otherwise).  And

Professor Lampe stated that Twitter allows users to see other users' connections for the purpose

of "find[ing] other accounts the user might want to follow."  That Professor Lampe also stated

that some users might not be able to find ███████████  through this method with ███

because some Twitter users might not ████████████  Ex. 290 at ¶ 246 (Lampe. Rep.),

does not create any dispute with respect to Twitter having such a feature.  And the FTC has taken

the position that the existence of anonymous accounts is not an impediment to using an app for

friends and family sharing.  Professor Lampe notes approximately half of Instagram users are

pseudonymous.  *See* Ex. 290 at ¶ 163 n.356 (Lampe Rep.) (quoting PX6078 at 190:8-191:14

(Mosseri Dep. Tr.)).  As Mr. Mosseri – the head of Instagram – testified:  "[W]e allow people to

use pseudonyms . . . .  [I]n general, if you want to use a different name or a nickname or no name

and just a handle, we are perfectly comfortable with that. . . .  [M]aybe half of people or maybe a

little bit more will use their first and last name there."  PX6078 at 190:17-191:11 (Mosseri Dep.

Tr.).

281.    According to Professor Lampe, "it's possible that some people use Twitter to

maintain personal social networks."  Ex. 290 at ¶ 253 (Lampe Rep.).  At his deposition,

Professor Lampe was asked, "Do you agree that some people use Twitter for personal social

networking," and he answered, "I agree that that's a possible use of Twitter that people could

have, yes."  Ex. 281 at 340:4-8 (Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 281 is undisputed to the

extent that it recounts words that appear in the cited materials but is otherwise disputed.  The

FTC disputes that Statement 281 constitutes a material fact subject to proof at trial and objects

that the material cited does not establish the absence of a genuine dispute and is not supported by

admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).  Additionally, Statement 281 omits necessary context from the cited material.

The full quote cited in the first sentence, from the Lampe report, is: "[w]hile it's possible that some people use Twitter to maintain personal social networks, the lack of a rich set of personal information in profile fields, the norms of broadcast communication to a public audience, the asymmetric linking, and the pseudonymous interaction make personal network maintenance a rare exception to the common use of the platform."  Ex. 290 at ¶ 253 (Lampe Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe opined that "personal social networking" is "a possible use of Twitter."  *See supra* Meta Introduction.  The additional "context" the FTC provides does not create a genuine dispute about the statements in Professor Lampe's testimony (after he issued his reports).  Further, Professor Lampe conceded at his deposition that he had "offered no opinion quantifying how many people use Twitter for personal social networking."  Ex. 281 at 340:9-14 (Lampe Dep. Tr.).  His prior statement in his report that "personal network maintenance" is "rare" on Twitter therefore is without basis and does not create a genuine dispute.  Evidence shows that personal network maintenance is a meaningful use of Twitter.  *See supra* Meta Reply to SMF ¶ 276 (addressing similar response).

282.    Professor Hemphill stated that, on Twitter, ███████████████████████ ███████████████████  Ex. 279 at ¶ 453 (Hemphill Rep.).  He also acknowledged that Twitter "provides the option to connect with contacts in the user's address book," and "sometimes suggests connecting with the accounts of people the user already knows."  *Id*.

**FTC Response: Disputed in part and incomplete.**  Statement 282 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed.  The FTC disputes that Statement 282 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).  Additionally, Statement 282 omits necessary context from the cited material.



**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified that Twitter allows and enables users to connect with their friends and family.  *See supra* Meta Introduction.  The additional "context" the FTC provides merely contends that this is ███████████████████████████████.  Nor does Professor Hemphill's analysis of ███████████████████████████████████████████ ███████████.  He calculated the ███████████████████████████████ ████████████████████████████████████.  *See* PX9000 at -148 (Hemphill Rep.) (Exhibit 21 Notes).  This is misleading because ███████████████████████████████



By comparison, Mr. Hemphill calculated ▮▮▮▮▮ of Instagram users' followers are reciprocal.  *See* PX9000 at ¶ 389 & Ex. 21 (Hemphill Rep.).  Thus, Mr. Hemphill's analysis is consistent with ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.  The ▮▮▮▮▮ that Mr. Hemphill calculated is ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.

283.   **Post on Feed.**  When users open the Twitter app, the first thing they see is Twitter's "Home" tab, which includes a "For you" feed and a "Following" feed.  Ex. 40 at 76:9-77:6, 80:8-81:2 (Chen (Twitter) Dep. Tr.).  Users can toggle between the "Following" feed and the "For you" feed; the Following feed is a chronological feed of posts from accounts users follow, while the For you feed contains both posts from accounts users may follow and posts from accounts users do not follow that Twitter's algorithm determines users might find engaging.  *See id.* at 81:4-17.  The below left screenshot is an example of how Twitter users' feeds appear on the Twitter mobile app.  For comparison, the below right screenshot is an example of how Facebook users' feeds appear on the Facebook mobile app.

259



**FTC Response: Undisputed but incomplete.**  The first and second sentences of

Statement 283 are undisputed.  Regarding the third and fourth sentences of Statement 283, it is

undisputed that the above screenshots appear to be examples of content that could be displayed

users' feeds on the Twitter mobile app and Facebook mobile app with respect to the present time,

subject to the caveat that Meta does not identify how the screenshots were generated or obtained

(specifically the steps taken to generate the content that appears on each screenshot and the

user's past behavior), and the above screenshots are not admissible evidence nor are they

supported by admissible evidence.

**Meta Reply:**  The FTC's response does not dispute the fact in the statement.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that Meta would be unable to introduce screenshots comparing relevant apps in an admissible form at trial is meritless.  *Ali v. District of Columbia*, 810 F. Supp. 2d 78, 83-84 (D.D.C. 2011) (there is a "difference between evidence that is admissible at trial and evidence that the Court may consider at summary judgment," where a party "is not required to produce evidence in a form that would be admissible at trial, so long as her evidence is capable of being converted into admissible evidence" (internal quotation marks omitted)).

284.    **Video Posts in Feed.**  On September 29, 2022, Twitter announced that it was "rolling out two new updates to how [users] experiences videos on Twitter," including an "immersive media viewer," which "expands videos to full screen with a single click" and makes "video discovery easier," as users can "[j]ust scroll up to start browsing more engaging video content."  Ex. 381 at 1 (MetaFTC-DX-467).

**FTC Response: Undisputed.**

285.    The below left screenshot shows how Twitter's immersive media viewer appears on the Twitter mobile app.  *See* Ex. 381 at 2 (MetaFTC-DX-467).  For comparison, the screenshot in the center shows how Instagram Reels appears on the Instagram mobile app, and the screenshot on the right shows how Facebook Reels appears on the Facebook mobile app.



**FTC Response: Undisputed but incomplete.**  It is undisputed that the above screenshots appear to be examples of content that could be displayed on Twitter's immersive media viewer, Instagram Reels, and Facebook Reels on a mobile device with respect to the present time, subject to the caveat that Meta does not identify how the screenshots were generated or obtained (specifically the steps taken to generate the content that appears on each screenshot and the user's past behavior), and the above screenshots are not admissible evidence nor are they supported by admissible evidence.

**Meta Reply:**  The FTC's response does not dispute the fact in the statement.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that Meta would be unable to introduce screenshots of the relevant apps in an admissible form at trial is meritless.  *See supra* Meta Reply to SMF ¶ 283 (addressing similar response).

286.     Twitter's former vice president and head of corporate development and strategy, Jonathan Chen, was asked, "Would the types of videos shown on Twitter be similar in nature to the types of videos shown on Reels in Facebook and Instagram?," and he responded, "Yes." Ex. 40 at 57:21-58:2 (Chen (Twitter) Dep. Tr.).

**FTC Response: Undisputed.**

287.     A January 8, 2024 post on Twitter's Blog stated "X is now a video-first platform, with video being part of more than 8 in 10 user sessions, and we've seen views increase almost 30% year over year.  Plus, now more than 100 million people watch vertical video on X every day."  Ex. 382 at 1 (X Blog, *X's Vertical Video Revolution*, https://perma.cc/8WRL-2D8M). And, as of March 29, 2024, Twitter's website stated that "[v]ertical video is the fastest growing surface on X – accounting for ~20% of daily total time spent on the platform."  Ex. 383 at 1 (X Business, *Vertical Video Ads*, https://perma.cc/4PP5-9ASE).

**FTC Response: Undisputed.**

288.     **Posting Content.**  Twitter users can upload a post, which may contain text, photos, videos, and links.  *See* Ex. 40 at 69:2-13 (Chen (Twitter) Dep. Tr.).  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Posts appear on users' profiles, can be seen by users' followers, and are searchable on Twitter by default.  *See* Ex. 378 at 2-3 (MetaFTC-DX-469).

**FTC Response: Undisputed but incomplete.**  The first and second sentences of Statement 288 are undisputed.  Regarding the third sentence, it is undisputed that that Posts appear on users' profiles, are searchable on Twitter by default, and can be seen by users'

followers—but by default, users' Posts are public, allowing all users to view their Posts. ████

████

289.    **Replying to Posts.**  Twitter users can interact with other users by "replying" to others' posts and by "mentioning" them. Ex. 384 at 1, 2 (X, *About Replies and Mentions*, https://perma.cc/3Q6Q-3SMZ).  On Twitter, a "reply" is a response to another user's post.  *See id.*  A "mention" on Twitter is a post or reply that contains another user's username, preceded by the "@" symbol.  *See id.*

**FTC Response: Undisputed.**

290.    **Liking Posts.**  Twitter users can "like" posts and replies by clicking or tapping a heart-shaped icon.  *See* Ex. 40 at 83:10-16 (Chen (Twitter) Dep. Tr.).

**FTC Response: Undisputed.**

291.    **Reposting.**  Users can "repost" the posts they view on Twitter.  *See* Ex. 40 at 83:13-17 (Chen (Twitter) Dep. Tr.).  Reposts are sometimes referred to as "Retweets."  *See id.*  When users retweet another post, they share that post with their own followers.  *See id.* at 83:13-19.

**FTC Response: Undisputed.**

292.    **Following.**  Twitter users can follow other accounts on Twitter.  *See* Ex. 378 at 3 (MetaFTC-DX-469).  "Following" someone "means [users have] chosen to subscribe to their Twitter updates," so that, "every time they post a new message, it will appear on [users'] Twitter Home timeline."  *Id.*

**FTC Response: Undisputed.**

293.    Like Instagram, Twitter's follow model is asymmetric.  *See* Ex. 39 at 84:9-17 (Perzyk (Twitter) Dep. Tr.); Ex. 290 at ¶ 240 (Lampe Rep.).  In other words, one user can choose

to "follow" a second user, even if the second user does not follow the first user.  *See* Ex. 39

at 84:9-17 (Perzyk (Twitter) Dep. Tr.).

      **FTC Response: Undisputed but incomplete.**  Statement 293 is undisputed to the extent

it refers to information about Twitter.  The cited material, however, 

███████████████.  Additionally, while it is undisputed that Instagram has an asymmetric

follow model, ████████████████████████████████████████████

Twitter users have almost none."  PX9000, Hemphill Report at ¶ 452; *see also* ██████████

██████████ ("While a site with a follow model might still have ███████████████████

████████████████████████, ████████████████████

████████████████████████████.").

      **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

both Twitter and Instagram have an asymmetric follow model.  *See supra* Meta Introduction;

Meta SMF ¶ 69 (Instagram has asymmetric follow model); Meta Reply to SMF ¶ 282

(addressing Professor Hemphill's calculation of ████████████████).

    294.    To find accounts to follow, Twitter users "can search for people by name or

username," "import friends from other networks," or "invite friends via email."  Ex. 378 at 3

(MetaFTC-DX-469).

      **FTC Response: Undisputed.**

    295.    To find people to follow, Twitter users can upload their mobile devices' contact

lists to Twitter.  *See* Ex. 40 at 79:4-15 (Chen (Twitter) Dep. Tr.).  "Often the best connections on

X are with people [users] already know.  In order to help [users] make those connections, we

use . . . email address[es] and phone number[s] to make [users] account[s] discoverable to

others."  Ex. 385 at 1 (X, *About Your Email and Phone Number*, https://perma.cc/7XT2-NT26).

"If someone has [a user's] email address or phone number in their contacts, they may find [a user's] account when they upload those contacts to X.  [A user's] account may also appear as a suggestion for others to follow if [a user's] email address or phone number is included in the contacts that others have uploaded."  *Id.*

**FTC Response: Undisputed.**

296.     Mr. Chen agreed that "the phone contact importer functionality on Twitter [would] be an easy way for a new user to connect with their friends and family on Twitter." Ex. 40 at 79:16-21 (Chen (Twitter) Dep. Tr.).  Twitter users can also explore a friend's profile page to find other people they might want to follow by looking at that friend's followers and followees.  *See id.* at 71:3-7.

**FTC Response: Undisputed but incomplete.**  Statement 296 is undisputed, but omits important context that ███████████████████████████████████████████
███████████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter has traversable connection lists.  *See supra* Meta Introduction.  In the material cited by the FTC, Professor Lampe does not quantify how many Twitter user profiles make the identity of the user apparent.  Indeed, Instagram has a high fraction (approximately half) of pseudonymous accounts.  *See* PX6078 at 190:9-191:14 (Mosseri Dep. Tr.) ("[W]e allow people to use pseudonyms . . . .  [M]aybe half of people or maybe a little bit more will use their first and last name there.").

297.     **Profile.**  Every Twitter account has a profile.  *See* Ex. 40 at 69:14-20 (Chen (Twitter) Dep. Tr.).  Twitter users' profiles include the Tweets they have posted, the number of accounts following them, and the number of accounts they follow.  *See id.* at 70: 5-71:2.  If users

click on a follower or followee, then Twitter will display their identities.  *See id.*  

**FTC Response: Disputed in part and incomplete.**  The first and second sentences are undisputed.  The third sentence is disputed because,

. The fourth sentence is undisputed to the extent it accurately cites the cited material, but omits context from the latter source, the Lampe report,

.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter accounts have profiles that contain their Tweets, followers, biographical information, and pictures.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 296 (addressing pseudonymity arguments).  Professor Lampe's statement the

.

298.    Twitter users' profile information "is always public," but Twitter users "can use either [their] real name or a pseudonym."  Ex. 386 at 2 (*X Privacy Policy*, https://perma.cc/X3V9-G5MG (Sept. 29, 2023)).

**FTC Response: Undisputed.**

299.    Professor Lampe stated that Twitter's "bio field could potentially be used to give information to help the discovery process for relationship maintenance."  Ex. 290 at ¶ 244

(Lampe Rep.).  Professor Lampe testified that Twitter profiles provide more discoverability of identity than Snapchat profiles.  *See* Ex. 281 at 316:7-11 (Lampe Dep. Tr.) ("Q. . . . So as compared to Facebook, Instagram, Twitter, and TikTok, Snap profiles provide less discoverability; is that fair to say?  A. I agree that feature provides less discoverability with less information."); *id.* at 314:5-15 (agreeing that there "are aspects of Twitter that allow for discoverability of identity").

    **FTC Response: Undisputed but incomplete.**  Statement 299 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 299 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

    Further, Statement 299 omits information from both the Lampe report and Professor Lampe's testimony which render the statement incomplete.  The full quote of the language cited in the first sentence is: "[w]hile the bio field could potentially be used to give information to help the discovery process for relationship maintenance, this is not the norm."  Ex. 290 at ¶ 244 (Lampe Rep.).  Professor Lampe's report also described how █████████████████████ █████████████████████████████████████████████████████ ████.  Additionally, Professor Lampe also agreed in his testimony that "despite . . . Twitter including . . . a short bio with some discoverability features . . . Twitter [is] not a PSNS," which Professor Lampe explained "is why it's so important to understand . . . motivations for use." Ex. 281 at 314:16-315:2 (Lampe Dep. Tr.).

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter's profiles may contain biographical information and provide a greater degree of

discoverability than Snapchat (which the FTC claims is a "PSNS").  *See supra* Meta

Introduction.  The additional "context" the FTC provides does not create a genuine dispute as it

merely notes that some Twitter users may choose to remain pseudonymous but does not indicate

how many Twitter users choose to remain pseudonymous.  S*ee supra* Meta Reply to SMF ¶ 297

(addressing pseudonymity arguments).

300.  **Messaging.**  Twitter users can send private messages to each other, either

one-on-one or in a group message, in a feature called Twitter Direct Messages or "DMs."  *See*

Ex. 40 at 68:8-17, 83:21-84:4 (Chen (Twitter) Dep. Tr.).  Twitter users can send and view DMs

in Twitter's dedicated DMs tab.  *Id.* at 84:7-16.  Mr. Chen testified that friends and family can

"stay connected" by sending Twitter DMs to each other.  *Id.* at 68:8-17.

**FTC Response: Disputed in part and incomplete.**  The FTC disputes in part Statement

300 as not supported by the cited material as required by Federal Rule of Civil Procedure

56(c)(1)(A) and Local Rule 7(h).

The first and second sentences are undisputed.

The third sentence is disputed.  Mr. Chen was asked about the ways "Twitter allow[s]

friends and family to communicate and stay connected."  Ex. 40 at 68:8-9 (Chen (Twitter) Dep.

Tr.).  Mr. Chen's full response was: "[s]o friends and family can either follow each other and

stay connected in public through messages, or what we call tweets, on Twitter; or they can

privately message -- message each other through our private messaging feature, which we call

Twitter DMs, or direct messages."  *Id.* at 68:11-17.  █████████████████████████

████████████████████████████████████████████████████

████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Twitter users can share with friends and family using messaging functionality on Twitter.  *See supra* Meta Introduction.  Whether that is called "communic[ating]" or "stay[ing] connected" is immaterial.  Additionally, in a survey Meta conducted ███████

████████████████████████████████████████████████████████████████████████

████████, *see* Ex. 222 at -.060 (FTC-META-005944143), leading Meta to conclude that ████

██████████████████████████████████  *Id.*

301.   **Calling.**  Twitter has an "Audio and Video Calling" feature.  *See* Ex. 387 at 1 (X, *Audio and Video Calls*, https://perma.cc/4UW7-8XD3).  "By default [users are] able to receive calls from accounts [they] follow or have in [their] address book (if [a user has] previously given us access to [their] address book)," but "[t]o be able to call another user they must have sent [the user] a Direct Message at least once before."  *Id*.

**FTC Response: Undisputed.**

302.   **Live Videos.**  Twitter users with public accounts can "create live videos to share what's happening live."  Ex. 388 at 1 (X, *How to Create Live Videos*, https://perma.cc/G246-SG7Q).  Twitter users "can discover and watch live videos from [their] Home timeline, notifications, search, and trends" and "watch live videos and replays from anyone on X whose account isn't protected."  *Id*. at 2.

**FTC Response: Undisputed.**

303.   **Lists.**  Twitter's "Lists" feature allows users "to customize, organize and prioritize the posts [they] see in [their] timeline."  Ex. 390 at 1 (X, *How to Use X Lists*, https://perma.cc/8MQQ-NUEV).  Twitter users "can create a List of other X accounts by topic or

interest (e.g., a list of friends, coworkers, celebrities, athletes)."  Ex. 389 at 2 (X Help Center, *Glossary*, https://perma.cc/PVB7-9D5V).

      **FTC Response: Undisputed.**

    304.   **Communities.**  Twitter Communities "give people a dedicated place to connect, share, and get closer to the discussions they care about most."  Ex. 391 at 1 (X, *Communities on X*, https://perma.cc/WJP2-G7VK).  "Communities are started and managed by people on X," and users "who accept invites to join a Community become members."  *Id*.  To join a Community on Twitter, users "must have a public account."  *Id*.  Once users join a Community, users "can post into it," but "Community posts will not be sent to [the users'] followers' Home timelines."  *Id*.

      **FTC Response: Undisputed.**

    305.   "Every post, Moment, List, Space, and Community has its own URL that [users] can share with friends."  Ex. 392 at 1 (X, *Identifying Information*, https://perma.cc/U7FT-SY9X).

      **FTC Response: Undisputed.**

    306.   **Other "Social" Features.**  Twitter describes itself as "a service for friends, family, and coworkers to communicate and stay connected through the exchange of quick, frequent messages."  Ex. 378 (MetaFTC-DX-469).  On May 2, 2023, Mr. Chen was asked whether that is "an accurate description of Twitter," and he answered:  "Yes."  Ex. 40 at 67:20-68:6 (Chen (Twitter) Dep. Tr.).  Mr. Chen testified that "friends and family can either follow each other and stay connected in public through messages, or what we call tweets, on Twitter; or they can privately message – message each other through our private messaging feature, which we call Twitter DMs, or direct messages."  *Id.* at 12:8-9, 68:8-17.

**FTC Response: Disputed in part and incomplete.**  The FTC disputes in part Statement 306 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

It is undisputed the first sentence accurately quotes the words that appear in the cited document.  Otherwise disputed, as the first sentence is contradicted by more reliable evidence. "Twitter's About page . . .  emphasizes its focus on public conversation."  PX9004, Lampe Report at ¶ 241.  Twitter's focus on public conversation is further emphasized by its own public statements, the testimony of Twitter executives, and statements by Meta executives.  *See* PX9000, Hemphill Report at ¶¶ 442-447; Ex. 40 at 67:10-19 (Chen (Twitter) Dep. Tr.). Regarding the second sentence, it is undisputed that Mr. Chen answered that the quoted language was an accurate description of Twitter.  Otherwise disputed, as on the very same page of the transcript, Mr. Chen was asked "[i]n your own view, what is Twitter?" to which he answered "Twitter is a platform for public conversation."  Ex. 40 at 67:10-14 (Chen (Twitter) Dep. Tr.). The next question asked of Mr. Chen was "[w]hat . . . Twitter allow[s] users to do with the service," to which he answered "Twitter allows users to participate in and view conversations happening in public for the areas that they are most interested in."  *Id.* at 67:15-19.

Regarding the third sentence, it is undisputed that the sentence accurately cites the words that appear in the transcript.  Otherwise disputed, as the sentence omits that the question asked of Mr. Chen which prompted the testimony quoted in the third sentence was "[h]ow does Twitter allow friends and family to communicate and stay connected?"  *Id.* at 68:8-9.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter is "a service for friends, family, and coworkers to communicate and stay connected through the exchange of quick, frequent messages."  *See supra* Meta Introduction.  The FTC's

response that some of that communication is done publicly and that Twitter has additional uses beyond those listed in Meta's statement does not create a genuine dispute about the stated fact.

307.    In response to the question, "Yes or no, would the public-facing statement by Twitter on its Website that it is a service for friends, family, and coworkers to communicate and stay connected through the exchange of quick frequent messages be evidence that supports the notion Twitter is a personal social networking service?," Professor Lampe testified: "To answer very briefly, yes, in the context of all the other evidence I would collect on the same topic." Ex. 281 at 349:4-14 (Lampe Dep. Tr.).

**FTC Response: Disputed and incomplete.**  Statement 307 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 307 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

Further, Statement 307 omits key context from the testimony which renders the statement incomplete.  Professor Lampe was asked and confirmed in his testimony that "how a platform itself presents itself to the public" was one factor that informed his opinion on Twitter.  *See* Ex. 281 at 346:10-19 (Lampe Dep. Tr.).  Indeed, Professor Lampe considered and relied on public statements made by Twitter in SEC filings, its App Store description, its Help Center pages, and its About page, in forming his opinion that Twitter is not a personal social network services.  *See* Ex. 290 at ¶¶ 239-241 (Lampe Rep.); *id.* at ¶ 239 n.616-619; *id.* at ¶¶ 240-41 n.623-625.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC's proffered expert agreed that Twitter's public description of itself is evidence that

Twitter is a PSNS as the FTC defines the term.  *See supra* Meta Introduction.  In any event, in addition to Twitter's public website, Twitter's SEC filings also describe Twitter as a place to share with friends and family.  *See* PX10481 at -011 (Twitter Form S-1) ("Users leverage our platform to express themselves publicly to the world, *share with their friends and family* and participate in conversations.") (emphasis added); Ex. 378 (MetaFTC-DX-469) ("New user FAQ" on Twitter website:  "Twitter is a service for friends, family, and coworkers to communicate and stay connected . . . .").

308.  ██████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████  Mr. Chen "agree[d]" that "wanting to stay up with friends" "was a motivator for signing up for Twitter," and added:  "You know, for . . . people to know what's going on with the people they care about and the things they care about.  Right?  That's essentially what – what the Twitter platform offers."  Ex. 40 at 108:2-14 (Chen (Twitter) Dep. Tr.).  ████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████

**FTC Response: Disputed in part and incomplete.**  Statement 308 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed.  The FTC disputes that Statement 308 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Further, Statement 308 omits key context from the cited materials which renders the statement incomplete.

Regarding the first and second sentences, the same slide cited indicates that █% of respondents selected "[t]o stay up to date on current events," and █% selected "[t]o stay up to date with the latest trends," "[t]o stay up to date with celebrities' lives, and "[t]o receive breaking news," respectively, as reasons they initially created their Twitter account.  Ex. 41 at -.012 (MetaFTC-DX-471, TWTR-FB00023700).  Additionally, █% of respondents selected "I'm not interested in following celebrities," █% selected "My friends/family don't use it," and █% selected "I don't like the idea of being followed by people I don't know" when asked why they had not set up a Twitter account.  *Id.*

Regarding the third sentence, Mr. Chen's testimony is taken out of context and incomplete.  Mr. Chen testimony agreed that "wanting to stay up with friends *and current events* was a motivator for signing up for Twitter."  ████████████████████████

Regarding the fourth sentence, the same slide indicates that █% of respondents indicated Twitter was "best describe[d]" as a service for interests content or news.  Ex. 41 at -.035 (MetaFTC-DX-471, TWTR-FB00023700) (█% of users selected "[a] social network best for connecting with experts and other enthusiasts over interests," █% selected "[a] one-stop aggregator for discovering news, interesting content, and daily headlines," and █% selected "[a] news source best for receiving timely updates.").  Additionally, the context for the quotation

cited about Twitter being used for "personal use" is a question which merely contrasts "personal use" with professional or business-related use.  *See id.* at -.035.

Moreover, other portions of the materials cited are contrary to the quoted language in Statement 308.  For example, the same document indicates that "[w]hile competitors connect people to friends, Twitter is seen as better at connecting people to experts in their interests," with competitors in this case referring to Facebook, Instagram, and Snapchat.  *Id.* at -.022.  Mr. Chen testified that his understanding of that statement was that "a more primary use case of [Facebook, Instagram, and Snapchat] is to focus on, you know, content for friends; versus on Twitter, a more primary use case is on interest in experts in fields."  Ex. 40 at 205:13-206:2 (Chen (Twitter) Dep. Tr.).  Another slide in the same document reported that the top interests respondents visited Twitter for were celebrities, internet videos, and sports teams/athletes.  Ex. 41 at -.025 (MetaFTC-DX-471, TWTR-FB00023700).  Family/friends was overwhelmingly the top interest for Facebook, tied for the second top interest for Instagram, and the third top interest for Snapchat; meanwhile, family/friends did not appear in the top ten interests for Twitter.  *Id.* at -.025.  Mr. Chen testified that the finding of the top three interests for Twitter being celebrities, internet videos, and sports teams and athletes was consistent with his understanding of why users use Twitter, and that family/friends being the top reason for people to use Facebook was also consistent with his understanding of Facebook.  Ex. 40 at 210:22-211:18 (Chen (Twitter) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter's own study of its service found sharing with friends and family to be a significant use of Twitter.  *See supra* Meta Introduction.  The FTC's response that Twitter has additional uses beyond those listed in Meta's statement does not create a genuine dispute about the stated fact.

309. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

**FTC Response: Disputed and incomplete.**  Statement 309 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed.  The FTC disputes that Statement 309 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Further, Statement 309 omits key context from the cited materials which renders the statement incomplete.

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████

█████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████



**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter's own study of its service found substantial amounts of Twitter users use the app to interact with friends and family.  *See supra* Meta Introduction.  The FTC's response that Twitter has additional uses beyond those listed in Meta's statement does not create a genuine dispute about the stated fact, nor does the additional "context" the FTC provides. ███████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

310.     An April 2020 slide deck describing a January 2020 Meta survey, titled ████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 222 at -.079

(FTC-META-005944143). ███████████████████████████████

████████████████████ *Id.*

**FTC Response: Undisputed but incomplete.**  Statement 310 is undisputed to the extent that it recounts words that appear in the cited materials, but the FTC objects that Statement 310 does constitute a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Additionally, the cited slide reports that ███████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 222 at -.079 (FTC-META-005944143). ████████████████████████████████████████████████████████████████████████████████████████████████ *Id.*

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter's own study of its service found sharing with friends and family to be a significant use of Twitter.  *See supra* Meta Introduction.  The FTC's response that Twitter has additional uses beyond those listed in Meta's statement does not create a genuine dispute about the stated fact.

### iii.   Competition Between Twitter and Facebook and Instagram

311.   **Meta Documents and Testimony.**  Meta documents and executives recognize Twitter as one of Facebook's and Instagram's competitors.  For example, in its annual report for the fiscal year ended December 31, 2021, Meta states:  "We face significant competition in every aspect of our business, including, but not limited to, companies that facilitate the ability of users to share, communicate, and discover content and information online or enable marketers to reach their existing or prospective audiences, including, for example, . . . Twitter."  Ex. 364 at 7-8 (Meta 2021 Form 10-K).  Meta also identified Twitter in other annual reports.  *See, e.g.*, Ex. 352 at 7 (Facebook 2019 Form 10-K) ("We also compete with . . . [c]ompanies that offer products

across broad platforms that replicate capabilities we provide.  For example, among other areas, we compete with . . . Twitter in social media.").

   **FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague. It is undisputed that Statement 311 accurately quotes the words that appear in the cited documents.  Statement 311 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

   **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Twitter as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction.  As the term "competitors" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that Facebook, Instagram, and Twitter compete with one another.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including sharing and viewing interest-based content, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and Twitter within the relevant market.  All available empirical evidence of substitution shows that Twitter is as close a substitute for Facebook and Instagram as Snapchat, which the FTC asserts is a PSN app.  *See infra* ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage).  Whether users treat two products as substitutes – here, Twitter and Facebook or Instagram – is material to whether they are competitors in a relevant market.

312.    Each of Meta's monthly Industry Update reports, prepared from 2014 through 2023, listed Twitter as a competitor.  *See supra* at ¶ 185.  Meta's recurring Industry Insight reports, prepared from 2019 through 2023, routinely listed Twitter as a competitor.  *See id.*

**FTC Response: Disputed in part.**  The FTC objects to the term "competitor" as vague. It is undisputed that Statement 311 relays the words that appear in the cited material.  Statement 311 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be a "competitor" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked Twitter as a competitor.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).

313.    Meta internal documents ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and identify Twitter as a competitor.  For example, on October 21, 2019, a Director of Product Strategy for Facebook and Instagram, ▇▇▇▇▇, published a post titled "Market Landscape: Creation & Sharing [August + September, 2019]," which states that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 238 at -400 (FB_FTC_CID_11916400) (brackets in original).  The post also states, under the heading "Major comp updates," that ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* at -404, -407.



**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term "competitor" as vague.  It is undisputed that Statement 313 relays the words that appear in the cited material.  Statement 313 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be a "competitor" in certain aspects of its operations (e.g., interest topics) or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

The third sentence is further disputed in part as incomplete because the document explains that ████████████████████████████████████████████████████ ████████████████████████████████  Ex. 238 at -407 (FB_FTC_CID_11916400).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta monitored and identified Twitter as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).

314.    In March 2015, Instagram's then-Director of Product Marketing, ██████, in an email thread titled "competitor overview," discussed an upcoming meeting on "how we size up vs. our competitors" and circulated a graphic titled "Instagram vs. Competition – INTERNAL ONLY."  Ex. 241 at -825, 827, -828.001 (FTC-META-002479825).  That graphic, excerpted below, compares Instagram to Facebook, Twitter, Pinterest, YouTube, and Snap across various metrics including "audience" and "mobile time spent."  *Id.*



**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 314 relays the words that appear in the cited material.  Statement 314 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be a "competitor" in certain aspects of its operations (e.g., advertising) or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

Statement 314 is further disputed in part as incomplete because rather than analyzing competition for users, the graphic compares the apps' offerings to advertisers, including advertising products, pricing, buying mechanisms, business value propositions, types of advertisers, and core features for marketers.  The section of the graphic which mentions users

recognizes that the consumer value proposition for Facebook is to "connect with your friends and the world around you."  Ex. 241 at -828.001 (FTC-META-002479825).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Twitter as one of Facebook's and Instagram's competitors – including for advertising.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).

315.    In 2013, Mr. Zuckerberg wrote an internal email titled "Public Content vs. Twitter," stating:  "My sense is we're just continuing to lose ground to Twitter. . . . I'm very worried that we're actually falling further behind."  Ex. 262 at -357 (FB_FTC_CID_05935257).  Mr. Zuckerberg also stated that "we can grow at a much faster rate there by taking market share from Twitter and others."  *Id.*  Mr. Zuckerberg testified that, around the time of the Instagram acquisition, "Twitter was certainly a – an important competitor for us and still is to this day."  Ex. 139 at 328:6-10 (Zuckerberg IH Tr.).  On March 9, 2023, Dan Rose, Meta's former vice president of partnerships, who worked at the company from 2006 to February 2019, was asked, "During the time you were at Facebook, did you consider Twitter a competitor?," and he answered, "Yes," because "[t]hey were a social product that was competing with us for time and attention.  When users thought about where to share content, Twitter was an alternative to Facebook for sharing content.  When users thought about where to go consume content, Twitter was an alternative to Facebook for consuming content.  Our products continued over many years to converge and, to this day, I think still do converge on a lot of different features and use cases."  Ex. 148 at 18:13-15, 22:19-23, 256:4-20 & errata (Rose Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 315 relays the words that appear in the cited materials.  Statement 315 is otherwise disputed, as the

cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may be a "competitor" in certain aspects of its operations (e.g., public content) or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

The first, second, and third sentences of Statement 315 are further disputed in part as incomplete because Mr. Zuckerberg's email demonstrates his recognition that competition between Facebook and Twitter exists in a distinct "public content" market. *See* Ex. 262 at -357-58 (FB_FTC_CID_05935257) ("I think the market for composing content and publishing it broadly is at the end of its current s-curve in growth. That means that instead of doubling in the next year, we can maybe hope for a 10-20% increase in the size of the total market of posting content. However, the market for sharing public content is not one we currently own, so we can grow at a much faster rate there by taking market share from Twitter and others, even if the total market doesn't expand by that much. Said another way, all of the things we're doing to increase the type of production we have in the system today (read: sharing with friends) likely only have the opportunity to add up to a 10-20% increase if we do really well. But we probably have the opportunity to double the amount of public content shared in our system or grow it even faster if we do well there.").

The fourth sentence of Statement 315 is further disputed in part as incomplete because Mr. Rose's testimony also demonstrates his recognition in differentiation between Twitter and Facebook based on type of content. *See* Ex. 148 at 224:1-234:2 (Rose Dep. Tr.) (testifying that from 2013 until today, Twitter's model of a "town hall" or "public square" makes the primary

place for conversations about public, interest-based content such as TV shows, whereas these conversations do not primarily occur on Facebook, which is more of a "living room" or "water cooler" where users interact with people that they're likely to know in the real world, replacing the "conversations that used to take place in the living room where families sat around in the living room").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Twitter as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).  The FTC's claim that there is no competition for sharing with friends and family because the document discusses "public content" both misreads the document and does not dispute the stated fact.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market, including viewing and sharing interest-based content, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and Twitter within the relevant market.  Additionally, the FTC provides no evidence that sharing with friends and family cannot be done publicly.  Indeed, Mr. Zuckerberg remarks in the email:  "I also see more content published on Twitter by my friends and folks I know in the valley."  Ex. 262 at -257 (FB_FTC_CID_05935257).  And he notes the fluidity in public versus non-public sharing:  "[A] large network based on public sharing can easily expand and take market share from us in types of content that have historically been shared non-publicly on Facebook."  *Id.* at -258.  The FTC's attempt to make the same distinction about "public sharing" with respect to Mr. Rose's testimony is equally out of context.  Mr. Rose testified he "consider[ed] Twitter a competitor" because "[t]hey were a social product that was competing with us for time and attention.  When users thought about where to share content,

Twitter was an alternative to Facebook for sharing content.  When users thought about where to go consume content, Twitter was an alternative to Facebook for consuming content.  Our products continued over many years to converge and to this day, I think still do converge on a lot of different features and use cases."  Ex. 148 at 256:4-20 & errata (Rose Dep. Tr.).

316.   **Twitter Documents and Testimony.**  Twitter documents and executives recognize Facebook and Instagram as two of Twitter's competitors.  For example, Twitter's annual report for the fiscal year ended December 31, 2021 stated, "[w]e compete with the following companies for people's attention and for advertisers' budgets," and then listed "Meta (including Facebook, Instagram and WhatsApp), Alphabet (including Google and YouTube), Microsoft (including LinkedIn), Snapchat, TikTok, Pinterest, and Yahoo," among other companies.  Ex. 380 at 8 (Twitter 2021 Form 10-K).  Twitter's annual report for the fiscal year ended December 31, 2014 stated:  "We compete with the following companies: Companies that offer products that enable everyone to create and share ideas and other information.  These offerings include, for example, Facebook and Google, as well as largely regional social media and messaging companies that have strong positions in particular countries."  Ex. 393 at 7 (Twitter 2014 Form 10-K).  And Twitter's annual report for the fiscal year ended December 31, 2013 stated, "We compete against many companies to attract and engage users, . . . such as Facebook (including Instagram), Google, LinkedIn, Yahoo! And Microsoft."  Ex. 394 at 9 (Twitter 2013 Form 10-K).  Twitter stated in the same annual report that the "industry is evolving rapidly and is becoming increasingly competitive."  *Id.*

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term "competitors" as vague.  It is undisputed that Statement 316 accurately quotes the words that appear in the cited documents.  Statement 316 is otherwise disputed, as the cited material does

not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P.

56(c)(1)(B): Twitter's perception that other firms may be "competitors" in certain aspects of its

operations or in a broad sense for time or attention does not establish that Meta and Twitter are

competitors in the provision of personal social network services, that there is not a relevant

market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Twitter recognizes Facebook and Instagram as two of Twitter's competitors.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).

317.

**[REDACTED]**

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term **[REDACTED]** as vague.  It is undisputed that Statement 317 accurately quotes the words that appear in the cited documents.  Statement 317 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): **[REDACTED]**

**[REDACTED]**

The first sentence of Statement 317 is further disputed as incomplete because before the quoted language, the presentation reads: **[REDACTED]**

**[REDACTED]**.

The second sentence of Statement 317 is further disputed as incomplete because in

another portion ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████ .

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Twitter recognizes Facebook and Instagram as two of Twitter's competitors.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).  The FTC claims that

competition between Twitter and Facebook or Instagram may not involve sharing with friends

and family, but that ignores the FTC's definition of PSNS, *see infra* Meta Reply to SMF ¶¶ 580-

584, and the cited document states otherwise. ████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████

318.    Mr. Chen testified that ███████████████████████████████████

██████████████████████████████████████ .  *See* Ex. 40 at 23:10-24:14

(Chen (Twitter) Dep. Tr.).  When asked, "[w]hat did Twitter compete with this set of companies

over," Mr. Chen answered, "user time share."  *Id.* at 24:21-25:3.  He also testified that Facebook

and Twitter "competed over" "user time share."  *Id.* at 23:4-8.  Mr. Chen also testified that, as of

November 2013, he believed Twitter's "most significant competitor . . . was probably Facebook

or Reddit or Snapchat."  *Id.* at 20:4-7.

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term

████████████ as vague.  It is undisputed that Statement 318 quotes the words that appear in the

cited testimony.  Statement 318 is otherwise disputed, as the cited material does not establish the

absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ .

　　　Statement 318 is further disputed as incomplete because Mr. Chen recognized that

although the above listed companies were the "primary scaled companies or platforms in the

consumer social space" which competed for "user time share," Mr. Chen used the term "personal

social network" to refer to a narrower segment of platforms within the consumer social space

based on "where each platform [wa]s focused."  Ex. 40 at 27:12-28:1 (Chen (Twitter) Dep. Tr.).

According to Mr. Chen, in November 2013, Twitter and Facebook did not offer the same service,

as "Twitter was more of a public conversation. And Facebook, while you could do things in

public, it was -- it was more focused around friends and family at the time."  *Id.* at 22:8-23:3.

Throughout his time at Twitter, Mr. Chen's understanding was that the primary reason for users

to use Facebook was to connect with friends and family.  *Id.* at 212:19-213:8.

　　　**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Twitter recognizes Facebook and Instagram as two of Twitter's competitors.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).  The FTC's response does

not create a genuine dispute of material fact that Mr. Chen testified that Instagram and Facebook

have been among Twitter's "most significant competitors," including in 2022 and 2013.  Ex. 40

at 12:10-13, 20:4-7, 23:10-24:14 (Chen (Twitter) Dep. Tr.).  The FTC's response that Instagram, Facebook, and Twitter differentiated their apps to a degree and were not exactly the same does not dispute the stated fact and is itself not complete.  Mr. Chen confirmed that Instagram and Facebook were among Twitter's "most significant competitors" despite any such differentiation. *See id.* at 23:4-8, 25:9-15 ("Q.  Did each of the set of companies differentiate their services from one another?  A.  Yes.  Q.  And despite that differentiation in services, they still competed for user time share, right?  A. Yes.").  Mr. Chen also testified that while he thought of the term "personal social network" to refer to a segment "a little more narrow than consumer social," he did not recall seeing the term in any presentations describing Twitter's competitive landscape, and did not identify Facebook, Instagram, Snapchat, or MeWe as "personal social networks."  *Id.* at 27:12-28:5.  The additional testimony the FTC adds in its response regarding 2013 does not dispute the stated fact, as Facebook, Instagram, and Twitter have evolved since 2013.  *See supra* Meta Reply to SMF ¶ 279 (discussing current overlapping features).  And the additional material the FTC adds in its response does not support the assertion that the primary reason users use Facebook (or Instagram) is to connect with friends and family.  On the contrary, the most recent usage data in the record shows the opposite:  Professor Carlton calculated that as of January 2023, at most ▮▮▮▮▮ of time spent on Facebook is associated with viewing content from friends and, as of February 2023, only ▮▮▮▮▮ of time spent on Instagram is viewing content from a user's non-creator reciprocal follows (a conservative proxy for "friends").  *See supra* Meta SMF ¶¶ 11, 56.

319.    Twitter's vice president of sales enhancement, Timothy Perzyk, identified Facebook as Twitter's most significant competitor for user time and attention in the 2011 to 2014 time period.  *See* Ex. 39 at 16:21-17:1, 138:7-12, 139:15-18 (Perzyk (Twitter) Dep. Tr.) ("Who

was Twitter's most significant competitor for user time and attention in the 2014 time

period? . . .   A. Facebook, the app[ ].").   When asked to identify "Twitter's most significant

competitor from 2020 to today," ██████████████████████████████   *Id.* at 139:15-18.

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term

██████████  as vague.  It is undisputed that Statement 319 accurately quotes the words that

appear in the cited testimony.  Statement 319 is otherwise disputed, as the cited material does not

establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P.

56(c)(1)(B): ██████████████████████████████████████



██ .

The first sentence of Statement 319 is further disputed as incomplete because Mr. Perzyk

clarified that Facebook was Twitter's most major competitor because there was a "scarcity" of

competitors to Twitter at that time.  *See* PX6139, Perzyk (Twitter) Dep. Tr., 138:14-139:9.  The

second sentence of Statement 319 is further disputed as incomplete because Mr. Perzyk clarified

that his answer was limited to the shared use cases between Twitter and Instagram, including

"[t]he asymmetric follow model, the preponderance or grouping of prominent celebrities using

the service, and going back to the use cases, on staying informed or entertained, I think

Instagram also meets some of those use cases."  *Id.* at 140:3-7.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Twitter recognizes Facebook and Instagram as two of Twitter's competitors.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 311 (addressing similar response).  The FTC's response does

not create a genuine dispute of material fact that Mr. Perzyk testified that ███████████

█████████████████████████████████████████████ at different time periods.  Ex. 39 at

18:3-11, 138:7-12, 139:15-18 (Perzyk (Twitter) Dep. Tr.).  █████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████

> ### iv.   Competition Between Twitter and Facebook and Instagram for Sharing and Viewing Interest-Based Content

320.    Twitter provides a reasonable substitute for certain engagement on Facebook and

Instagram, including sharing and viewing interest-based content.  *See infra* at ¶¶ 321-326.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute" and

"certain engagement" as so vague and undefined that Statement 320 is not susceptible to a

reasonable response, and disputes Statement 320 as not supported by the cited material as

required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term

"reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d

34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability

relevant to antitrust market definition or how consumers would behave in response to a small but

significant, non-transitory increase in the price (or decrease in quality) above (or below) a

competitive level of Facebook, Instagram, Twitter, or any particular set of products or services

posited as a relevant antitrust market.  While no response is required, the FTC disputes that Meta

has provided any basis for the assertion that users consider Twitter as a reasonable substitute for

sharing and viewing interest-based content on Facebook and Instagram, and the cited material

does not establish the absence of a genuine dispute of material fact: that other firms may compete

with Facebook and Instagram in various aspects of firm operations (e.g., interest-based content)

or in a broad sense for user time and attention does not establish that Meta and Twitter are

competitors in the provision of personal social network services, that there is not a relevant

market for personal social network services, or that Meta is not exercising monopoly power.  *See*

Fed. R. Civ. P. 56(c)(1)(B); *see also, e.g.*, CMF at § II.A.5.c.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Twitter, Facebook, and Instagram can be and are used interchangeably, including for sharing and

viewing interest-based content.  *See supra* Meta Introduction.  As the terms "reasonable

substitute" and "certain engagement" are ordinarily understood and used, the evidence

demonstrates that certain activities on Twitter, like sharing and viewing interest-based content,

are reasonably interchangeable with similar activities on Facebook and Instagram, like viewing

Facebook Pages or the Instagram Explore Tab.  *See infra* Meta SMF ¶¶ 321-326.  Given that the

FTC has defined "PSN services" to include all activities in which users engage on apps that the

FTC includes in the alleged PSNS market (except Facebook Dating), including sharing and

viewing interest-based content, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine

dispute that competition occurs between Facebook, Instagram, and Twitter within the relevant

market.  All available empirical evidence of substitution shows that Twitter is as close a

substitute for Facebook and Instagram as Snapchat, which the FTC asserts is a PSN app.  *See*

*infra* ¶¶ 562-566 (Professor Carlton's analysis of October 2021 outage).  Whether users treat two

products as substitutes – here, YouTube and Facebook or Instagram – is material to whether they

are competitors in a relevant market.  The FTC's cross-reference to a section of its

Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact,

and Meta incorporates its responses to those paragraphs here.

321.   **Meta Documents and Testimony.**  Meta documents and executives recognize Twitter provides a reasonable substitute for certain engagement on Facebook and Instagram, including sharing and viewing interest-based content.  For example, a Meta document titled "Facebook App – 2020 H1/H2 Review," dated June 24, 2020, highlighted "Top Priorities" for 2020 discusses Facebook's ███████████████████████████████.  Ex. 256 at -011 (FTC-META-011024966).  Under the header, ███████████████████████ ████████████████ the document stated ████████████████████████████ ███████████████████████████████████████████████████████ ██████████████.  *Id.*

**FTC Response: Disputed.**  While it is undisputed that Statement 321 accurately quotes the words that appear in the cited document, the FTC disputes Statement 321 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The FTC disputes the first sentence of Statement 321 because the cited materials refer only to Facebook and not Instagram, and also because the terms "reasonable substitute" and "certain engagement" are vague and undefined.  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials neither contain that term nor suffice to establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Twitter, Facebook, Instagram, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider Twitter as a reasonable substitute

for sharing and viewing interest-based content on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of material fact: Meta's perception that other firms compete in various aspects of firm operations (e.g., sharing and viewing interest-based content) or in a broad sense for user time and attention does not establish that Twitter, Facebook, and Instagram are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The second sentence of Statement of 321 is further disputed because despite Meta's claim that Twitter is a "reasonable substitute," the document demonstrates that ██████████ ████████████████████████████████████████████.  Ex. 256 at -011 (FTC-META-011024966) (bold in original).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Twitter as one of Facebook's and Instagram's competitors for sharing and viewing interest-based content.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 320 (addressing similar response).  The cited material shows Facebook had been "████████ ████████" for "████████" ████████████████████████████████████████ ████████████████████████████████████████████ ████████.

322.     Another 2020 email thread discussed a project to "██████████████ ████████████████████████," including "████████████████████████████████ ████████████████████████████."  Ex. 260 at -113 (FTC-META-002690113).

**FTC Response: Disputed in part and incomplete.** It is undisputed that Statement 322 relays the words that appear in the cited materials. Statement 322 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Meta's perception that other firms may compete in certain aspects of its operations (e.g., community) or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Meta recognizes Twitter as one of Facebook's and Instagram's competitors for sharing and viewing interest-based content. *See supra* Meta Introduction; Meta Reply to SMF ¶ 320 (addressing similar response).

323.    On July 29, 2020, Fidji Simo, then the head of Facebook, was asked "who are Facebook Blue's competitors for seeing content from public figures," and she testified in response, "Twitter is a big one." Ex. 149 at 46:13-19, 230:17-21 (Simo IH Tr.). When asked "who are Facebook's competitors for [resharing content]," Ms. Simo testified that "Twitter is the main one." *Id*. at 231:19-25.

**FTC Response: Disputed in part and incomplete.** It is undisputed that Statement 323 quotes the words that appear in the cited testimony. Statement 323 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Ms. Simo's perception that other firms may compete in certain aspects of Meta's operations (e.g., public content from public figures) or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of

personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Twitter as one of Facebook's and Instagram's competitors for sharing and viewing interest-based content.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 320 (addressing similar response).

324.    **Twitter Documents and Testimony.**  Twitter documents and executives recognize Facebook and Instagram provide a reasonable substitute for certain engagement on Twitter, including sharing and viewing interest-based content.  When asked "███████████ ████████████████████████████████████" Mr. Perzyk testified that Instagram and Twitter "share some use cases," including an "asymmetric follow model, the preponderance or grouping of prominent celebrities using the service, and . . . staying informed or entertained." Ex. 39 at 16:21-17:1, 139:20-140:7 (Perzyk (Twitter) Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  While it is undisputed that Statement 324 accurately quotes the words that appear in the cited transcript, the FTC disputes Statement 324 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The FTC disputes the first sentence of Statement 324 because ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████.  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and ████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████



. While no response is required, the FTC states that Meta has not provided any basis for the assertion that ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Twitter is a reasonable substitute with Instagram and Facebook for sharing and viewing interest-based content.  In that portion of Mr. Perzyk's testimony, he stated specifically that ████████████████████████████████████████████

████████████████████████  Ex. 39 at 138:2-140:7 (Perzyk (Twitter) Dep. Tr.).

325.    Keith Coleman, Twitter's vice president of products, testified that Facebook, Instagram, and Snap have "some overlapping use cases with Twitter."  Ex. 44 at 16:15-16, 117:11-118:8 (Coleman (Twitter) Dep. Tr.).  Mr. Coleman also testified that "there is probably the most overlap with Instagram where there are . . . certain interests where . . . Instagram is a great way to follow those interests, interests that particularly benefit from visuals."  *Id.* at 120:21-121:5.  He further testified that Instagram has "evolved to be increasingly a place

where you can see interests and you can follow interests," and "has definitely expanded over time to be a place where you can follow interests." *Id.* at 121:13-122:5.  When asked whether "Facebook and YouTube were competitors to some degree with Twitter for the use case of staying up to date on news," he answered, "I think that's a fair statement." *Id.* at 544:7-14.

**FTC Response: Disputed and incomplete.**  It is undisputed that Statement 325 quotes the words that appear in the cited testimony.  Statement 325 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ .

The first, second, and third sentences of Statement 325 are further disputed because they mischaracterize Mr. Coleman's testimony and omit the context.  In the cited passage, Mr. Coleman testified that Twitter serves a different main purpose than Facebook and Instagram, and that even though Facebook, Instagram, Snap, and Twitter "often get grouped together because they're these like big social media companies . . . the reality if people use them for different reasons."  Ex. 44 at 120:2-121:11 (Coleman (Twitter) Dep. Tr.).  Specifically, Mr. Coleman testified that:

> Facebook, Instagram and Snap, they're all used . . . primarily to see what friends and family are doing. Twitter is mainly used to see what's happening in the world and what people think about it.  There is -- of these, I would say there is probably the most overlap with Instagram where there are -- there are cases -- like there are certain interests where -- where -- like Instagram is a great way to follow those interests, interests that particularly benefit from visuals. But generally speaking, the super strength of those products is seeing

> what your friends are doing, what your family's doing.   And the
> strength of Twitter is seeing what's going on in the world.  So that's
> how [Twitter] talked about them.

*Id.* at 120:14-121:11.  Even if  "[Instagram has] evolved to be increasingly a place where you can

see interests and you can follow interests . . . what locks people there the most is this ability to

see what your friends and family are doing."  *Id.* at 121:16-22.

The fourth sentence of Statement 325 is also disputed because Mr. Coleman's testimony

is mischaracterized and removed from its context.  Mr. Coleman testified that though "there's

some overlap in the [news] use case . . . [he has] not thought of [Facebook and YouTube] as key

competitors in that -- in staying up to date with news.  *Id.* at 543:14-19.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Twitter recognizes Twitter as competing with Facebook and Instagram for sharing and viewing

interest-based content.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 320 (addressing

similar response).  The FTC's response does not create a genuine dispute of material that Mr.

Coleman testified that Facebook, Instagram, and Twitter have overlapping use cases.  He

repeatedly affirmed that testimony, including testifying that, besides Twitter, Instagram is "best

in serving" the use case of "keeping consumers up to date with influencer[s] and experts."

Ex. 44 at 555:1-8 (K. Coleman (Twitter) Dep. Tr.); *see also*, *e.g.*, *id.* at 544:8-14 (Facebook and

Twitter compete on the "use case of staying up to date on news"); *id.* at 545:14-546:7 (same for

"current events"); *id.* at 546:22-547:15 (same for "pop culture"); *id.* at 548:5-549:2 (Facebook

and Instagram and Twitter compete on the "use case of staying up to date with celebrities"); *id.*

at 550:6-551:1 (testifying "staying up to date with celebrities and pop culture" were "significant"

and "common" uses of both Instagram and Twitter); *id.* at 554:7-16 (similar).

The additional "context" the FTC provides regarding Mr. Coleman's testimony about the

degree to which Facebook, Instagram, and Twitter served other use cases does not create a

genuine dispute about the stated fact.  Mr. Coleman also testified that "shar[ing] with their friends and family" is a "value proposition" of Twitter.  *Id.* at 40:9-41:2; *see id.* at 116:18-117:6 (answering "what features on Twitter would help users stay up to date with their friends" with "You could use the features – like you could post Tweets and read Tweets and reply.  And those could be – like if you were following all – if you were following a group of friends, you would see whatever they were saying or talking about.  And that use case certainly does exist on the product. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ ("There's obviously like – there are some people who follow their friends on Twitter . . . .").

    326.    Twitter's ordinary-course documents contain assessments that Facebook and Instagram are used for consuming content relating to personal interests and hobbies, along with other applications like TikTok and Snapchat. ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

**FTC Response: Disputed in part and incomplete.** It is undisputed that Statement 326 quotes words that appear in the cited document. Statement 326 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): ████████████████████████████

████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Twitter recognizes Twitter as one of Facebook's and Instagram's competitors for sharing and viewing interest-based content. *See supra* Meta Introduction; Meta Reply to SMF ¶ 320 (addressing similar response). The FTC notes the report includes users from other countries, but the FTC provides no reason to believe the results are not representative for the United States.

### d.    Pinterest

#### i.    Background

327.    Pinterest was founded in 2009. *See* Ex. 395 at Ex. 10.7 (Pinterest Form S1 (Mar. 22, 2019)).

**FTC Response: Disputed.** The FTC disputes Statement 327 because it is contradicted by other evidence and not supported by the cited material, as required by Federal Rule of Civil

Procedure 56(c)(1)(A) and Local Rule 7(h).  Other evidence indicates Pinterest was

founded/launched in March 2010, but was in development during 2009.  *See, e.g.*, PX0512-001

at -002, Jessica Bursztynsky & Jennifer Elias, *Pinterest CEO Ben Silberman is stepping down

and the stock is up*, CNBC (June 28, 2022), https://www.cnbc.com/2022/06/28/pinterest-shares-

pop-on-report-ceo-ben-silbermann-is-stepping-down.html (describing the company as being

founded in 2010).  The cited source refers to a stock plan enacted in 2009, not evidence that

Pinterest was founded in 2009.

**Meta Reply:**  The difference between the date Pinterest began developing a product

versus the date Pinterest was founded or launched is immaterial.  *See supra* Meta Introduction.

328.    Pinterest is available to users for free, and advertising is Pinterest's only source of

revenue.  *See* Ex. 45 at 331:8-10 (Roberts (Pinterest) Dep. Tr.).

**FTC Response: Undisputed.**

329.    Pinterest's latest annual report stated that it has 498 million monthly active users

worldwide.  *See* Ex. 396 at 8 (Pinterest 2023 10-K).

**FTC Response: Undisputed.**

## ii.    Features

330.    Pinterest has many features that are similar to features on Instagram and

Facebook.  *See*, *e.g.*, *supra* Part I.A.1(a)-(b).  "Pinterest may check boxes that could classify it as

[a social networking site]."  Ex. 290 at ¶ 212 (Lampe Rep.).

**FTC Response: Disputed.**  The FTC objects to the terms "many" and "similar" as

vague.  The FTC disputes Statement 330 as not supported by the cited material, as required by

Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The internal references cited in the first sentence are brief descriptions of features on

Facebook and Instagram: Part I.A.1(a) to Facebook features, and (b) to Instagram features.  The

cited material contains no mention of Pinterest or any Pinterest features.  Further, Statement 330 does not identify which Pinterest features Meta asserts are "similar" to features of Facebook and Instagram.  Meta has not provided any basis for the assertion that many Pinterest features are similar to features on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Regarding the second sentence, it is undisputed that it recounts words that appear in the cited source.  Otherwise disputed, as Meta's quotation omits the quote's context and thus renders it incomplete.  The full quote is: "[w]hile Pinterest may check boxes that could classify it as an SNS, these affordances are sparse, and more importantly, not leveraged for a robust networking environment."  Ex. 290 at ¶ 212 (Lampe Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Pinterest, Facebook, and Instagram have many similar features.  *See supra* Meta Introduction. As the terms "many" and "similar" are ordinarily understood and used, there is no dispute there are multiple features on Pinterest that resemble features on Facebook and Instagram.  As Meta demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part I.A.1(a)-(b), and the following paragraphs describing Pinterest's features, *see infra* Meta SMF ¶ 331-341 – most of which the FTC does not dispute – Facebook, Instagram, and Pinterest all have:  a social graph, a feed, and user profiles.  They also have features for posting, viewing, and sharing text, photos, and long and short-form videos; finding and subscribing to content – including content from friends or family; groups for sharing interests; commerce; search; notifications; messaging functionality; and reviewing other users' connections.  The additional material the FTC claims Meta "omit[ted]" from Professor Lampe's testimony does not dispute that Professor Lampe testified that Pinterest could be classified as a social networking site.

331.     Pinterest has a feed, personal profiles, short-form videos, long-form videos, groups for sharing interests, commerce, photo and video sharing, search functionality, and notifications.  *See* Ex. 1 at Ex. E (Ghose Rep.).

**FTC Response: Disputed in part.**  Statement 331 is undisputed to the extent that it accurately cites the information contained in the cited material, with the caveat that the Ghose report indicates Pinterest has "Interests/Groups," not specifically that Pinterest has "groups for sharing interests."  Ex. 1 at Ex. E (Ghose Rep.).  Otherwise disputed, as the FTC objects that the cited material does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Pinterest has the features Meta identified, including groups that allow users to share interests. *See supra* Meta Introduction.

332.     When users sign up for Pinterest, they can create a profile, which allows users to post a picture of themselves and share details about themselves with other users, including a biography.  *See* Ex. 397 at 1-2 (Pinterest, *Edit Your Profile*, https://perma.cc/UJ3M-PLRK).

**FTC Response: Undisputed.**

333.     To find accounts to follow, users can import their mobile contacts to Pinterest, *see* Ex. 45 at 27:14-18 (Roberts (Pinterest) Dep. Tr.), and can search for their friends or other accounts to follow, *see id.* at 33:14-21.

**FTC Response: Undisputed but incomplete.**  It is undisputed that Statement 333 accurately states the testimony from the cited material, but Statement 333 omits testimony from Ms. Roberts, Pinterest's corporate representative who "leads[] product for [Pinterest's] growth team, which renders the testimony incomplete.  Ms. Roberts testified that using Pinterest's search

functionality to search for other users is "not a very common action on Pinterest," ███

████████████████████████████████████ Ex. 45 at 16:20-22, 32:18-33:21 (Roberts

(Pinterest) Dep. Tr.).

     **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

users can search Pinterest for their friends to find accounts to follow.  *See supra* Meta

Introduction.  The additional "context" the FTC provides that ███████████████████

does not dispute that the functionality exists and that people use it.  The features to identify

friends on Pinterest are more robust than applications the FTC identifies as PSNS.  Unlike

Snapchat – which the FTC asserts provides PSNS – Pinterest's social graph is traversable.  *See*

*infra* Meta SMF ¶ 334; Ex. 281 at 320:3-5 (Lampe Dep. Tr.) ("Q. And would you agree that

Snapchat does not have public displays of connections? A. It does not").

     334.  The graph of individuals' connections on Pinterest is traversable, meaning, users

can see what accounts another user follows and what accounts follow them.  *See* Ex. 45 at 34:12-

35:4 (Roberts (Pinterest) Dep.).

     **FTC Response: Undisputed.**

     335.  Unless users choose to set their profile as private, users can view profiles of

accounts they do not follow, including friends' profiles.  *See* Ex. 398 at 1 (Pinterest, *Make Your*

*Profile Private or Public*, https://perma.cc/2Z8J-SSMK).

     **FTC Response: Undisputed but incomplete.**  The FTC objects in part to Statement 335

as not supported by the cited material, as required by Federal Rule of Civil Procedure

56(c)(1)(A) and Local Rule 7(h).  The cited source offers support for the proposition that users

may set their Pinterest profiles as private or public but offers no support for the proposition that

non-private profiles are viewable by users who do not follow those accounts, nor that those accounts include friends' profiles.  Statement 335 is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that users can view "public" profiles of accounts they do not follow, which can include a user's friends.  *See supra* Meta Introduction.

336.     "When users open the Pinterest mobile application or navigate to www.pinterest.com, they are by default in their Home Feed."  Ex. 396 at 8 (Pinterest 2023 Form 10-K).  The Home Feed contains "Pins" in a "scrolling format."  *Id.*

**FTC Response: Undisputed.**

337.     Pins are "images" and "videos" that can be uploaded from a computer or mobile device.  Images found online can also be Pins.  Ex. 399 at 1 (Pinterest, *Guide to Creating Pins*, https://perma.cc/WM5H-VPZ9).

**FTC Response: Undisputed.**

338.     The Home Feed contains Pins that are recommended to users, in addition to Pins that "are related to users or creators [that the users] follow."  Ex. 45 at 29:10-22 (Roberts (Pinterest) Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  It is undisputed that Statement 338 accurately quotes the words that appear in the cited source.  However, Statement 338 omits testimony from Ms. Roberts which renders the testimony incomplete.  Ms. Roberts' full testimony was that "[t]here could be some pins in the home feed that are related to users or creators that you follow, but it's not a – not a very large portion of what a user would see in their home feed."  Ex. 45 at 29:10-16 (Roberts (Pinterest) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the content on Pinterest's Home Feed.  That the connected content may be not be a "very large portion" does not mean that it is not a "portion" or even a "large portion" of content the on the Home Feed.

339.    Pinterest users can leave comments on any public Pin, as well as their friends' Pins.  *See* Ex. 45 at 37:5-11 (Roberts (Pinterest) Dep. Tr.).

**FTC Response: Undisputed.**

340.    Pinterest users can create and manage group boards, which allow multiple users to save Pins to the same board.  *See* Ex. 45 at 37:12-22 (Roberts (Pinterest) Dep. Tr.).  When asked if the "primary purpose" of group boards is to "collaborate with your friends and family over ideas and plans," Ms. Roberts testified, "I think that's fair."  *Id.* at 39:22-40:4.

**FTC Response: Undisputed.**

341.    Pinterest also has a messaging feature that allows users to send direct messages to other users on Pinterest.  *See* Ex. 45 at 40:6-8 (Roberts (Pinterest) Dep. Tr.).

**FTC Response: Undisputed.**

### iii.    Competition Between Pinterest and Facebook and Instagram

342.    Pinterest provides a reasonable substitute for certain engagement on Facebook and Instagram, including sharing and viewing interest-based and inspirational content.  *See infra* at ¶¶ 343-358.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute" and "certain engagement" as so vague and undefined that Statement 342 is not susceptible to a reasonable response, and disputes Statement 342 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term

"reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Facebook, Instagram, Pinterest, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider Pinterest as a reasonable substitute for sharing and viewing interest-based and inspirational content on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with Facebook and Instagram in various aspects of firm operations (e.g., interest-based and inspirational content) or in a broad sense for user time and attention does not establish that Meta and Pinterest are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.c.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Pinterest, Facebook, and Instagram can be and are used interchangeably, including for sharing and viewing interest-based and inspirational content.  *See supra* Meta Introduction.  As the terms "reasonable substitute" and "certain engagement" are ordinarily understood and used, the evidence demonstrates that certain activities on Pinterest, like sharing and viewing interest-based and inspirational content, are reasonably interchangeable with similar activities on Facebook and Instagram, including sharing and viewing interest-based and inspirational content.  *See infra* Meta SMF ¶¶ 343-358.  Given that the FTC has defined "PSN services" to include all activities

in which users engage on apps that the FTC includes in the alleged PSNS market (except

Facebook Dating), including sharing and viewing interest-based and inspirational content, *see*

*infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs

between Facebook, Instagram, and Pinterest within the relevant market. The FTC's cross-

reference to a section of its Counterstatement without explanation does not itself create a genuine

dispute of material fact. While no reply is required, none of those paragraphs creates a genuine

dispute of material fact, and Meta incorporates its responses to those paragraphs here.

343. **Meta Documents and Testimony.** Meta documents and executives recognize

Pinterest as of one Facebook's and Instagram's competitors. For example, Meta tracked

Pinterest in all 65 of Meta's monthly Industry Update reports, prepared from 2014 through 2026.

*See supra* at ¶ 185. Meta's reoccurring Industry Insight reports, prepared between 2019 through

2023, also listed Pinterest as a competitor. *See id.* Mr. Rose, Meta's former vice president of

partnerships who worked at Meta from 2006 to 2019, testified that he considered Pinterest to be

a competitor during his time at Meta. *See* Ex. 148 at 258:20-260:24 (Rose Dep. Tr.).

**FTC Response: Disputed in part.** The FTC objects to the term "competitors" as vague.

It is undisputed that Statement 343 accurately quotes the words that appear in the cited materials.

Statement 343 is otherwise disputed, as the cited materials do not establish the absence of a

genuine dispute regarding a material fact: Meta's perception that other firms may be

"competitors" in certain aspects of its operations or in a broad sense for time or attention does

not establish that Meta and Pinterest are competitors in the provision of personal social

networking services, that there is not a relevant market for personal social networking services,

or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked Pinterest as a competitor.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).  As the term "competitors" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that Facebook, Instagram, and Pinterest compete with one another.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including sharing and viewing interest-based and inspirational content, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and Pinterest within the relevant market.

344.    Meta internal documents monitor Pinterest feature developments and identify Pinterst as a competitor.  A "Market Overview" summary circulated at Meta in 2019 discussed new products and competitive actions by Amazon Music, Discord, Google Photos, Pinterest, Reddit, Snapchat, Spotify, TikTok, Twitch, Twitter, and YouTube, among others.  *See* Ex. 238 at -400-410 (FB_FTC_CID_11916400).  An April 2021 internal "FB US Long Term Themes" document identified trends in "Engagement / Competition" for a variety of apps, including Clubhouse, Discord, Pinterest, Reddit, Telegram, TikTok, Twitch, Twitter, and YouTube. Ex. 249 at -.011, -.034-36 (FTC-META-006275723).  A December 2021 "Video Product Strategy" document evaluated time spent on Pinterest, Snapchat, TikTok, Twitter, and YouTube. Ex. 274 at -594 (FTC-META-003042584).

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague. It is undisputed that Statement 344 accurately quotes the words that appear in the cited materials. Statement 344 is otherwise disputed, as the cited materials do not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms may be

"competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and Pinterest are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Additionally, with respect to the third sentence, while the sentence accurately describes the document cited, Pinterest is not even included in the document's "Video competitive landscape" chart.  *See* Ex. 274 at -588 (FTC-META-003042584).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta monitors Pinterest feature developments, identifies Pinterest as a competitor, and assesses new products and competitive actions in relation to Pinterest.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).

345. 

Ex. 257 at -785 (FTC-META-006846785).

**FTC Response: Disputed in part.**  It is undisputed that Statement 345 accurately quotes the words that appear in the cited document.  Statement 345 is otherwise disputed in part, as the material cited does not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and Pinterest are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R.

Civ. P. 56(c)(1)(B).  ██████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████  Ex. 257 at -785 (FTC-META-006846785).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Pinterest as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).  The additional portions of Exhibit 257 the FTC adds in its response do not create a genuine dispute that among other things, Meta recognizes Facebook, Instagram, and Pinterest as ██████████████████████

██████████, which the FTC defines as PSNS on Facebook and Instagram.

346.    Meta has made changes to its services to compete with Pinterest.  For example, in a November 2021 email from ██████████ to Mr. Mosseri, with the subject line, "Instagram Weekly Update – 11/1/2021," ██████████ wrote, ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████  Ex. 242 at -842 (FTC-META-002998840).  A March 18, 2022 internal email among Instagram employees notes: "We've launched visual search camera(!) . . . ██████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████  Ex. 244 at -912 (FTC-META-003238909).

**FTC Response: Disputed in part and incomplete.**  Statement 346 is undisputed to the extent it accurately quotes the words that appear in the cited materials.  The FTC objects to the phrase "changes to its services" as vague and undefined, and disputes in part Statement 346 as

not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The first sentence is further disputed, as Statement 346 does not identify more than one "change" made by Meta to its services.

The second sentence is disputed, as the second sentence and accompanying cited document do not identify a change Meta made to its services: the document merely states that

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████. Ex. 242 at -842 (FTC-META-002998840).

The third sentence is undisputed, but incomplete because the feature described in the third sentence relates to ███████ and not personal social networking services.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta has made changes to its services to compete with Pinterest.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).  As the term "changes to its service" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that Facebook and Instagram have launched new features or updated existing features to better compete with Pinterest.  The additional portions of the documents the FTC adds to its response do not create a genuine dispute that among other things, Meta recognizes Facebook, Instagram, and Pinterest as competitors for ███████, which the FTC defines as PSNS on Facebook and Instagram, and introduced features to better compete with Pinterest.

347.  **Pinterest Documents and Testimony.**  Pinterest documents and executives recognize Facebook and Instagram as two of Pinterest's competitors.  According to Pinterest's 2023 annual report, Pinterest "compete[s] to attract, engage and retain users and their time and

attention." Ex. 396 at 10 (Pinterest 2023 Form 10-K). Companies Pinterest competes with included "Amazon, Meta (including Facebook and Instagram), Google (including YouTube), Snap, TikTok and X (formerly known as Twitter), that offer users engaging content and commerce opportunities through similar technology or products to ours." *Id.* at 10. Pinterest's head of user growth, Julia Cochran Roberts, testified that the companies identified in its annual report, including Facebook, Instagram, YouTube, Snap, and TikTok, ███████████████████ ██████████████████ Ex. 45 at 16:20-22, 55:4-20 (Roberts (Pinterest) Dep. Tr.). Ms. Roberts testified that it was accurate in 2014 that "Instagram consistently shows up on [Pinterest's] radar as a competitor that contends on marketshare, timeshare & mindshare or a generally less Pinterest familiar market" and agreed that is "generally consistent with [her] personal understanding and experience at Pinterest." *Id.* at 89:8-89:21.

**FTC Response: Disputed in part.** The FTC objects to the term ██████████ as vague. It is undisputed that Statement 347 accurately quotes the words that appear in the cited materials. Statement 347 is otherwise disputed, as the cited materials do not establish the absence of a genuine dispute regarding a material fact: ████████████████████ ███████████████████████████████████████ ███████████████████████████████ ████████████████████████████████████████ ████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Pinterest recognizes Pinterest as one of Facebook's and Instagram's competitors, that Facebook and Instagram are among Pinterest's "████████████████████" and that "Instagram consistently shows up on [Pinterest's] radar as a competitor that contends on marketshare,

timeshare & mindshare." *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).

348.    A document dated June 29, 2017 and titled "Pinterest Competitive Assessment" identifies Instagram and Facebook in a list of "Horizontal competitors" along with Amazon, Google, and YouTube.  Ex. 46 at -660 (MetaFTC-Klein-DX-14, PIN - FTC - 0000001660). Pinterest's corporate representative testified that it was Pinterest's understanding that those companies were "horizontal competitors" at that time.  Ex. 45 at 75:3-76:12 (Roberts (Pinterest) Dep. Tr.).  The same document states that ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ *Id.* at -675.

**FTC Response: Undisputed but incomplete.**  It is undisputed that Statement 348 accurately quotes the words that appear in the cited document.  However, the FTC otherwise disputes Statement 348 as the material cited does not establish the absence of a genuine dispute regarding a material fact: ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████ .  *See* Fed. R. Civ. P. 56(c)(1)(B).

The first sentence is undisputed to the extent it accurately describes the document cited, but incomplete because it omits that Facebook and Instagram were classified as "Entertainment

(Traditional/Social Interaction)," while Pinterest was separately classified as "Discovery."
Ex. 46 at -662 (MetaFTC-Klein-DX-14, PIN - FTC - 0000001660).

The second sentence is undisputed to the extent it accurately describes the testimony cited, but incomplete because the testimony was about the document cited in the first sentence, PX6082 at 75:3-76:12, and omits that Facebook and Instagram were classified as "Entertainment (Traditional/Social Interaction)," while Pinterest was separately classified as "Discovery." Ex. 46 at -662 (MetaFTC-Klein-DX-14, PIN - FTC - 0000001660).

The third sentence is undisputed to the extent it accurately quotes the words that appear in the cited document, but incomplete because it omits the context that Pinterest's "core turf" was "IG . . . mov[ing] into Discovery" and seeing Instagram's "traffic increase . . . to commerce sites." Ex. 46 at -663 (MetaFTC-Klein-DX-14, PIN - FTC - 0000001660). The same document further describes how Pinterest "[o]wn[ing] visual discovery with intent to action . . . "[d]ifferentiates [Pinterest] from IG." Ex. 46 at -665 (MetaFTC-Klein-DX-14, PIN - FTC - 0000001660). The fourth sentence is undisputed.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Pinterest recognizes Facebook and Instagram as Pinterest's competitors, that Pinterest observed that ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████. *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response). The additional portions of the documents the FTC recites do not create a genuine dispute that among other things, Pinterest recognizes competition from apps regardless of how it "classifie[s]" them and Pinterest recognizes Instagram as a competitor for user engagement, including with respect to visual discovery and commerce. ███████████

███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████ *See* Ex. 45 at 457:3-458:19 (Roberts (Pinterest) Dep. Tr.).

349.    ██████████████████████████████████████

██████████████████████████ *See* Ex. 47 at -141 (PIN - FTC - 0000005141). ██

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████ *See*, *e.g.*, Ex. 48 (PIN -

FTC - 0000005220) (Q3 2018); Ex. 57 (PIN – FTC – 0000005114) (Q1 2020); Ex. 49 (PIN -

FTC - 0000005270) (Q3 2020).

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 349

accurately quotes the words that appear in the cited document.  However, the FTC objects to

Statement 349 as the material cited does not establish the absence of a genuine dispute:

█████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

*See* Fed. R. Civ. P. 56(c)(1)(B).

350.    Pinterest has observed users ████████████████████████

████████████████ .  *See* Ex. 45 at 86:15-87:18 (Roberts (Pinterest) Dep. Tr.) ("Q . . .

█████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████ .").

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the terms

██████████████████████████ as so vague and undefined that Statement 350 is not susceptible

to a reasonable response, and disputes Statement 350 as not supported by the cited material as

required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  It is undisputed

that Statement 350 accurately quotes the words that appear in the cited material.  Otherwise

disputed, as the cited material ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████ .  While no response is required, the FTC states that Meta

has not provided any basis for the assertion that ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████ .  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.c.

Further, Julia Roberts, Pinterest's corporate representative, did not testify that users

"were substituting between Pinterest and competitors, including Instagram."  Ms. Roberts'

testimony concerned user research which discussed users' "not seeking inspiration anymore" on

Pinterest and using TikTok instead of Pinterest to fill a "user need around escape and escaping." Ex. 45 at 84:1-85:5 (Roberts (Pinterest) Dep. Tr.).  Ms. Roberts testified that "one of the . . . hypotheses" a particular cohort of users had declined in Pinterest usage was increasing use of other platforms, which does not indicate users were substituting between Pinterest and other platforms.  *See* Ex. 45 at 82:18-83:18 (Roberts (Pinterest) Dep. Tr.).  Ms. Roberts also testified that Pinterest did not "have a way to quantify where users were going if they're not on Pinterest" and did not "have any sense of what percentage of [the decline in cohort users] went to TikTok and Instagram instead."  Ex. 45 at 86:4-14, 87:20-88:4 (Roberts (Pinterest) Dep. Tr.).

  **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that ███████████████████████████████████████████████████████████████████. *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).  As the terms "substituting" and "competitors" are ordinarily understood and used, the evidence demonstrates that certain activities on Pinterest, like sharing and viewing interest-based and inspirational content, are reasonably interchangeable with similar activities on Facebook and Instagram, including sharing and viewing interest-based and inspirational content.  *See supra* Meta SMF ¶¶ 343-350, *infra* ¶¶ 351-358.  The additional portions of the documents the FTC recites do not create a genuine dispute that among other things, Pinterest has observed ████ ███████████████████████████████████████████.  The additional testimony from Ms. Roberts' that the FTC adds in its response does not dispute that Ms. Roberts concluded that ████████████████████████████████████████████████████.  *See* Ex. 45 at 86:15-87:18 (Roberts (Pinterest) Dep. Tr.).  This is further corroborated by ████████ ████████████████████████████████████████████████, discussed in paragraphs 351-354 below.  Finally, the

FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

351.    Pinterest found that . On June 22, 2021, a Pinterest employee, Yining Malloch, emailed other employees regarding "█████████████████████," Ex. 51 at -534 (MetaFTC-Klein-DX-254, PIN - FTC - 0000023533), with a link to a document titled ██████████████ ████████████████████████████." Ex. 52 (PIN - FTC - 0000085734); *see also* Ex. 50 at 60:6-62:21 (Coleman (Pinterest) Dep. Tr.).  Under the heading "████████████ ████████" in the executive summary, the document states: "███████████████████ ████████████████████████████████████████████ Ex. 52 at -737 (PIN - FTC - 0000085734).  Another slide in the document included the heading ████████████████████████████████████████████ ████████████████████████████.



*Id.* at -760.

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the terms

█████████████████████████████  in the first sentence as so vague and undefined that

Statement 351 is not susceptible to a reasonable response, and disputes Statement 351 as not

supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and

Local Rule 7(h).  It is undisputed that Statement 351 accurately quotes the words that appear in

the cited material.  Otherwise disputed, as the cited material does not ████████████

█████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████.  While no response is required, the

FTC states that Meta has not provided any basis for the assertion that ████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF

at § II.A.5.c.

The second sentence is undisputed.

The third sentence is undisputed to the extent it accurately quotes the words that appear

in the cited document.  Otherwise disputed, as the third sentence omits information from the

document which renders it incomplete.  ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████

The fourth sentence is undisputed to the extent it accurately quotes the words that appear

in the cited document.  Otherwise disputed, as ████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that ████████████████████████████████████████████.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).  As the terms "switching" and "competing platforms" are ordinarily understood and used, the evidence demonstrates that Pinterest competes with Facebook and Instagram and that ████████████ ████████████████████████████████████████.  The FTC's response that "████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████" does not create a genuine dispute of material fact.  The cited document clearly analyzes "████████████████████████████ ████████████████████████████████████████████████ █████████████████████████.  Ex. 52 at -735, -737 (PIN - FTC - 0000085734).  And the additional portions of the documents the FTC recites do not create a genuine dispute that ████████████████████████████████████████.  Finally, the FTC's cross-reference to a section of its counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

352.  The document also analyzed █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ *see* Ex. 52 at -763-766 (PIN - FTC - 0000085734), and explained that ████████████████████████████



██████████████████████████ *id.* at -762.  The next four slides include charts showing

the ███████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████. *See id.* at -763-766.

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 352

accurately quotes the words that appear in the cited document.  However, the FTC objects to

Statement 352 as the material cited does not establish the absence of a genuine dispute:

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:** The FTC's response does not dispute Pinterest's ███████████████████

██████████████████████████████████.

353.    Other Pinterest documents discuss the impact of competition with companies

including Instagram and TikTok.  *See, e.g.*, Ex. 53 at -288 (MetaFTC-Klein-DX-251, PIN - FTC

- 0000023288) (May 21, 2021 email with the subject line "Hypotheses," written by Scott

Coleman, Pinterest's then head of growth and international product, stating ████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████); Ex. 54 at -

196-198 (MetaFTC-Klein-DX-252, PIN - FTC - 0000024196) (June 2, 2021 email copying chief

executive officer, Ben Silberman, among others, which explained employees were looking into

the possibility that people are "████████████████████████████████████████████████

███████████████████████████████████████████████"). Scott Coleman testified that

Pinterest observed a "███████████████████████" Ex. 50 at 49:7-50:19 (Coleman (Pinterest)

Dep. Tr.).

**FTC Response: Disputed in part and incomplete.** The FTC objects to the term

█████████████ as vague. It is undisputed that Statement 347 accurately quotes the words that

appear in the cited materials. Statement 347 is otherwise disputed, as the cited materials do not

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

Further, regarding the first sentence's citation to Ex. 54, the ellipses inserted render the

quotation incomplete. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████

The second sentence is disputed as it misrepresents the relevant testimony. 

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Pinterest recognizes Instagram as a competitor. *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response). The additional portions of the documents the FTC recites do not create a genuine dispute that among other things, ████████████████████ ███████████████████████. Meta's citation to Exhibit 54 does not mischaracterize the document. The additional material the FTC cites does not contradict the conclusion of the document, namely, that Pinterest "got initial data back on ██████████ █████████████████████" and found that "[b]oth seem to be happening." Ex. 54 at -196-198 (MetaFTC-Klein-DX-252, PIN - FTC - 0000024196). The FTC's response that "[t]he document also does not indicate specifically whether portion (a) and/or (b) of the hypothesis 'seem[ed] to be happening,' instead remaining vague as to which portion it was referring to," is not plausible. The document's use of the word "both" makes it clear that both of the hypotheses "seem[ed] to be happening." *Id.* The second sentence in Meta's statement does

not misrepresent Mr. Coleman's testimony.  Mr. Coleman confirmed that it was his

understanding that ██████████████████████████.  *See* Ex. 50 at 53:11-20 (S.

Coleman (Pinterest) Dep. Tr.).

354.   ██████████████████████████████

████████████████████████████

██████████████████████████████

██████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████

██████████████████████████████

████████████████████████

████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████



**FTC Response: Disputed.**  The FTC objects to the terms ████████ ████████ as so vague and undefined that Statement 354 is not susceptible to a reasonable response, and disputes Statement 354 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  It is undisputed that Statement 354 accurately quotes the words that appear in the cited material.  Otherwise disputed, as the cited material does not establish ████████████████████

████████.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that ████████████████████

████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.c.



**Meta Reply**:  The FTC's response does not create a genuine dispute of material fact that

██████████████████████████████████████████████████

███████████████████████████████████████. *See supra*

Meta Introduction; Meta Reply to SMF ████ (addressing similar response).  The additional

portions of the documents the FTC recites do not create a genuine dispute regarding ████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Finally, the FTC's cross-reference to a section of its Counterstatement without explanation does

not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

355.    Ms. Roberts testified that Pinterest can be successful in its competition against Facebook, Amazon, Google, and YouTube in areas where there is competitive overlap.  *See* Ex. 45 at 75:13-77:22 (Roberts (Pinterest) Dep. Tr.).  Pinterest's representative testified about that competitive overlap further:  "Q. . . . [W]hen [Pinterest] thinks about competition, [is it] only focused on apps that do everything that Pinterest does and that a user could replace Pinterest with entirely, or is looking at apps that overlap with certain things that Pinterest offers?  A. I'd say both apps.  There's some sort of look-like Pinterest clones that have popped up over the years but it's probably more common that apps overlap with sort of a specific portion of like features or user needs."  *Id.* at 154:11-155:1.  When asked, "And both those examples are relevant to the competitive analysis that Pinterest conducts in the ordinary course?," Pinterest's representative testified, "Yes."  *Id.* at 155:3-6.

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 355 accurately quotes the words that appear in the cited document.  However, the FTC objects to Statement 355 as the material cited does not establish the absence of a genuine dispute:

██████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

*See* Fed. R. Civ. P. 56(c)(1)(B).

356.   ***Competition for Inspiration Sources.***   Pinterest documents and testimony recognize that Pinterest provides a reasonable substitute for certain engagement on Facebook and Instagram, including as an inspiration source. ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████   Ex. 56 at -841 (MetaFTC-Klein-DX-256, PIN - FTC - 0000021840).  Ms. Roberts agreed that Pinterest is a competitive alternative for users choosing Instagram as inspiration source.  *See* Ex. 45 at 454:20-455:10 (Roberts (Pinterest) Dep. Tr.) ("Q. And would Pinterest be a competitive alternative for those users? . . . [A.] For which users?  Q. Ones that would be choosing Instagram as an inspiration source?  A. Sort of inspiration for broad interests, yeah.  Q. It would be a competitive alternative? . . .  [A.] We compete for that, yes.").

**FTC Response: Disputed.**  The FTC objects to the ████████████████████████████ ████████████████   as so vague and undefined that Statement 356 is not susceptible to a reasonable response, and disputes Statement 356 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that ████████████████████████████

████████████████████████████████████████████████████████████



.

*See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.c.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Pinterest, Facebook, and Instagram can be and are used interchangeably as an inspiration source, that Pinterest documents concluded that Instagram is "definitely a direct competitor in the inspiration space," and that Ms. Roberts testified that Pinterest is a competitive alternative for users choosing Instagram as an inspiration source.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 342 (addressing similar response).  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

357.   ***Competition for Lifestyle and Other Uses.***  Professor Lampe opined that



Professor Lampe also testified that Instagram "could also have a core use of 'lifestyle.'"  Ex. 281 at 198:9-22 (Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 357 is undisputed to the extent that it recounts words that appear in the cited report but is otherwise disputed.  The FTC

disputes that Statement 357 constitutes a material fact subject to proof at trial, and disputes

Statement 357 as incomplete.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The first sentence of Statement 357 is disputed in part and incomplete because it omits

the full quote contained in Professor Lampe's report and takes Professor Lampe's use of the term

██████████ out of context.  Specifically, Professor Lampe's report stated that ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████

The second sentence is disputed in part and incomplete because it omits Professor

Lampe's testimony, that "I was speaking specifically to a core use [for Instagram] of personal

networking, but I do qualify in one of my reports that it could also have a core use of lifestyle."

Ex. 281 at 198:17-22 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding Professor Lampe's opinions comparing Pinterest and Instagram.  *See supra* Meta

Introduction.  The additional material the FTC claims Meta "omit[ted]" does not dispute that

Professor Lampe opined that Instagram and Pinterest are ██████████████████ and that

usage of Instagram ███████████████████.  Similarly, Professor Lampe's opinion that

Instagram has a core use of personal networking does not dispute that he testified Instagram

could also have a core use of lifestyle.  Professor Lampe further agreed that "lifestyle" is a "big

use of Instagram."  Ex. 281 at 199:1-14 (Lampe Dep. Tr.).

358. 

**FTC Response: Undisputed but immaterial.** It is undisputed that Statement 358 accurately quotes the words that appear in the cited document. However, the FTC objects to the term ▮▮▮▮▮ as vague and undefined, and objects to Statement 358 as the material cited does not establish the absence of a genuine dispute: ▮▮▮▮▮

▮▮▮▮▮. *See* Fed. R. Civ. P. 56(c)(1)(B).

    **e.**    **Nextdoor**

        **i.**    **Background**

359. Nextdoor launched in the United States in 2011. Ex. 58 at 143:20-22, 329:12-14 (Hsu (Nextdoor) Dep. Tr.).

**FTC Response: Undisputed.**

        **ii.**    **Features**

360. Nextdoor has many features that are similar to features on Facebook and Instagram. *See*, *e.g.*, *supra* Part I.A.1(a)(vi), (viii) & (b)(v), (ix).

**FTC Response: Disputed.**  The FTC objects to the terms "many" and "similar" as vague as to time and vague as to their meaning, and disputes Statement 360 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h). The cited internal references are brief descriptions of several Meta features: Part I.A.1(a)(vi) to Facebook Groups; (a)(viii) to Facebook Marketplace; (b)(v) to Instagram Explore; and (b)(ix) to Instagram Shop; the cited material contains no mention of Nextdoor or any Nextdoor features. Further, Statement 360 does not identify which Nextdoor features Meta asserts are "similar" to features of Facebook and Instagram.  Meta has not provided any basis for the assertion that many Nextdoor features are similar to features on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B). *See also* CMF at § II.A.5.a.2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Nextdoor, Facebook, and Instagram have many similar features.  *See supra* Meta Introduction. As the terms "many" and "similar" are ordinarily understood and used, there is no dispute there are multiple features on Nextdoor that resemble features on Facebook and Instagram.  As Meta demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part I.A.1(a)-(b), and the following paragraphs describing Nextdoor's features, *see*, *e.g.*, *infra* Meta SMF ¶¶ 361-363, 375, 378-379 – many of which the FTC does not dispute – Facebook, Instagram, and Nextdoor all have:  a social graph; a feed; and user profiles.  They also have features for posting, viewing, and sharing text, photos, and videos; finding and connecting with others – including friends or family; liking and commenting on posts; messaging; ███████████ ███████████████████████.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those statements here.

361.    Nextdoor users have profiles with information about themselves, and they can post and view content from other users who live nearby, which populates users' feeds, along with algorithmically selected content.  *See* Ex. 1 at ¶ 205 (Ghose Rep.).

**FTC Response: Disputed in part.**  Statement 361 is undisputed to the extent that it recounts words that appear in the cited report but is disputed in part because the underlying material cited does not support the assertion.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  Ghose provides no support for the assertion regarding "algorithmically selected content."

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Nextdoor users have profiles and that content is tailored to users.  *See supra* Meta Introduction. The FTC's own Counterstatement agrees with ███████████████████████.  *See* Counter SMF ¶ 1161(a) (███████████████████), ¶ 1160(b) (███████████████████████ ███████████████████████████████████████); ¶ 1160(f) (███████████████████████████████████████████████████ ███████████████████████████████ (citation omitted)).

362.    Nextdoor users can share photos with others on the site, join groups, and shop in an online marketplace, among other activities.  *See* Ex. 1 at ¶¶ 205-206 (Ghose Rep.).

**FTC Response: Undisputed.**

363.    ███████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████

**FTC Response: Undisputed.**

### iii. Competition Between Nextdoor and Facebook and Instagram

364.    Nextdoor provides a reasonable substitute for certain engagement on Facebook, including communicating with neighbors in a geographic community, participating in interest-based groups, and buying and selling products.  *See infra* at ¶¶ 365-379.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute" and "certain engagement" as so vague and undefined that Statement 364 is not susceptible to a reasonable response, and disputes Statement 364 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials are not sufficient to establish reasonable interchangeability or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) of Facebook, Nextdoor, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider Nextdoor as a reasonable substitute for communicating with neighbors in a geographic community, participating in interest-based groups, or buying and selling products on Facebook, and the cited material does not establish the absence of a genuine dispute of material fact: that Nextdoor may compete with Facebook in various aspects of firm operations or in a broad sense for user time and attention does not establish that Meta and Nextdoor are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at §§ II.A.5.a, II.A.5.c.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Nextdoor and Facebook can be and are used interchangeably, including (among other things) for communicating with neighbors in a geographic community, participating in interest-based groups, and buying and selling products.  *See supra* Meta Introduction.  As the terms "reasonable substitute" and "certain engagement" are ordinarily understood and used, the evidence demonstrates that certain activities on Nextdoor, like communicating with neighbors in a geographic community, participating in interest-based groups, and buying and selling products, are reasonably interchangeable with similar activities on Facebook, like viewing content in Facebook groups or buying and selling on Marketplace.  *See infra* Meta SMF ¶¶ 365-368.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), "[v]iewing or posting content in a Group focused on a geographic community, such as a neighborhood or city," or buying and selling items on Facebook Marketplace, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook and Nextdoor within the relevant market.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs create a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

365.  **Meta Documents.**  Meta documents and testimony recognize Nextdoor as one of Facebook's competitors.  For example, Ms. Simo testified that "another key competitor in the community space is Nextdoor, which is focused on local communities."  Ex. 149 at 210:20-211:6 (Simo IH Tr.).  When asked "why," she explained "Because they're clearly a platform where you

can create communities, in this case based on your location, and Facebook groups definitely keep

chasing that space of wanting to connect people within their neighborhood."  *Id.* at 210:23-211:6.

    **FTC Response: Disputed in part and incomplete.**  The FTC objects to the term

"competitors" as vague and undefined.  It is undisputed that Statement 365 accurately quotes the

testimony that appears in the cited transcript.  The first sentence of Statement 365 is otherwise

disputed, as the cited material does not establish the absence of a genuine dispute: Meta's

perception that other firms may be "competitors" in certain aspects of its operations (e.g., local

communities) or in a broad sense for time or attention does not establish that Facebook and

Nextdoor are competitors in the provision of personal social networking services, that there is

not a relevant market for personal social networking services, or that Meta is not exercising

monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

    The FTC further disputes the second and third sentence of Statement 365 because they

are incomplete and ignore the context regarding this testimony.  Specifically, Ms. Simo testified

that "post[ing] a photograph or a status update" with friends is "very different" from joining a

"community or group," which is a "different use case."  Ex. 149 at 209:17-22 (Simo IH Tr.).

Ms. Simo further clarified that even within various categories of communities (local

neighborhood, interests, etc.) Facebook Groups faces different competitors.  *Id.* at 211:21-213:4.

But according to Ms. Simo, competition on local communities from Nextdoor is "different from

friends and family . . . Friends and family, like, we don't call that community, we call that

friends and family . . . even though, in normal language, you can probably say, like, your friends

and family are your community."  *Id.*

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta recognizes Nextdoor as one of Facebook's competitors.  *See supra* Meta Introduction;

Meta Reply to SMF ¶ 364 (addressing similar response).  As the term "competitors" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that Facebook and Nextdoor compete with one another.  The FTC does not dispute that Ms. Simo testified that Facebook views Nextdoor as a "key competitor in the community space" – and concedes in its response that ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ The additional portions of Ms. Simo's testimony the FTC recites regarding differences among product features does not create a genuine dispute that Nextdoor and Facebook are competitors. And the additional testimony from Ms. Simo acknowledges that friends and family are part of one's "community."

366.    A September 26, 2016 internal email among Meta employees circulated an analysis titled "Competitive Update 3: Community-Centric Competitors," which described Nextdoor as a "main competitor" and compared Nextdoor features to Facebook features, including features on Facebook Groups.  Ex. 232 at -634-637 (FB_FTC_CID_03548634).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 366 accurately quotes the words that appear in the cited document.  Statement 366 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute: Meta's perception that other firms may compete in certain aspects of its operations (e.g., neighborhoods) or in a broad sense for time or attention does not establish that Meta and Nextdoor are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC further disputes Statement 366 because it is incomplete and omits the full context of the quotation.  The full sentence Meta cites reads: "First, we will take a deeper look at Nextdoor, a main competitor *in the neighborhoods market*. Then, we will look at a few other community-centric competitors and see how they size up next to Groups (generally, and city communities specifically)."  Ex. 232 at -634 (FB_FTC_CID_03548634 ) (emphasis added). Thus, this document shows that Meta employees identified a distinct neighborhoods market, whose competitors consisted of Facebook Groups, Nextdoor, Reddit, MeetUp, and Craigslist.  *Id.* at -634-640.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Nextdoor as a competitor and compared Nextdoor's features to Facebook features.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar response). The additional portions of the document the FTC recites do not contradict the statement; indeed, the FTC's response concedes that the quotations of the documents are accurate.  The FTC fails to explain what it means by "distinct neighborhoods market."  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including "posting content in a Group focused on a geographic community, such as a neighborhood or city," *infra* Meta SMF ¶ 583, and its response admits that the document describes at least "Nextdoor, Reddit, MeetUp, and Craigslist" as Meta's "competitors" in this regard.  Accordingly, there is likewise no genuine dispute that competition occurs between Facebook and Nextdoor, among other apps, within the relevant market.

367.    A June 2019 email among employees, with the subject line "Marketing Insights HPM: May 2019," ███████████████████████████████████



███████████████████████████ Ex. 248 at -174 (FTC-META-005208173).  The

document explained that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*Id.*  A document titled "Research Insights," from 2019, with the subject ███████████

█████████████████████████████████████████████████████████

███████████████████████████████████. Ex. 236 at -702

(FB_FTC_CID_10401702).  The document states that ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.*

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 367

quotes the words that appear in the cited documents. Statement 367 is otherwise disputed, as the

cited material does not establish the absence of a genuine dispute: Meta's perception that other

firms may compete in certain aspects of its operations (e.g., community) or in a broad sense for

time or attention does not establish that Meta and Nextdoor are competitors in the provision of

personal social networking services, that there is not a relevant market for personal social

networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P.

56(c)(1)(B).

The FTC further disputes the first and second sentences of Statement 367 because the

cited document refers specifically to ██████████████████████████████████████████

████████████████████████████████████████ Ex. 248 at -174 (FTC-

META-005208173).

The third and fourth sentences are further disputed because the cited document describes ▇



Ex. 236 at -702 (FB_FTC_CID_10401702).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Nextdoor as a competitor.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar responses).  The additional portions of the documents the FTC recites do not create a genuine dispute that the documents describe Nextdoor as Facebook's competitor; indeed, the FTC's response concedes that the quotations of the documents are accurate.  As to Exhibit 248, the additional quoted portions do not contradict Meta's statement, and nothing in the document supports the facially implausible suggestion that the document ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  As to Exhibit 236, the additional quoted portions do not contradict Meta's statement that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

368.    In a document titled "Mobile-Shopping in USA: Insights and Recommendations," dated February 28, 2019, a Meta employee analyzed competition with Nextdoor for "mobile-shopping." Ex. 234 at -744 (FB_FTC_CID_05003739).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 368 quotes the words that appear in the cited document.  Statement 368 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute: Meta's perception that other firms may compete in certain aspects of its operations (e.g., e-Commerce) or in a broad sense for

time or attention does not establish that Meta and Nextdoor are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

Statement 368 is further disputed because the cited document appears to have been prepared by a person interviewing for Meta, not a Meta employee. Ex. 234 at -739 (FB_FTC_CID_05003739) (email from a recruiter to Keval Patel, writing "[t]hank you for taking the time to interview ███████████ tomorrow. Please find attached his presentation."). The cited document only analyzes the "e-Commerce in USA" market and indicates that Facebook Marketplace competes with Letgo, OfferUp, eBay, and Nextdoor for "[customer-to-customer] listings (goods, cars, rental homes)." *Id.* at -742-44.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Meta competes with Nextdoor for buying and selling items. *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar responses). While Meta inadvertently misattributed the authorship of the document, that does not create a genuine dispute that Nextdoor competes with Facebook Marketplace. The document, drafted by an eBay employee, analyzes competition between Meta, Nextdoor, and eBay, among others. *See* Ex. 234 at -743 (FB_FTC_CID_05003739). Indeed, the FTC concedes that ████████████████████ ███████████████████████████████████████████████ *See infra* FTC Resp. to Meta SMF ¶ 369. And other Meta documents analyze competition with Nextdoor's shopping offerings. *See*, *e.g.*, Ex. 232 at -636 (FB_FTC_CID_03548634) (analyzing Nextdoor's free and classified items offerings). The additional portions of the document the FTC recites do not

contradict the statement; indeed, the FTC's response concedes that the quotations of the documents are accurate.

369.  █████████████████████████████████████

████████████████████████████████ Nextdoor "most directly

compete[s]" with "Meta (including through Facebook and Instagram)" "to attract, engage, and

retain users."  Ex. 400 at 9 (Nextdoor 2023 Form 10-K). █████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

**FTC Response: Disputed and incomplete.**  The FTC objects to the term ████████████

as vague and undefined, and disputes in part Statement 369 as not supported by the cited

material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The first sentence of Statement 369 is disputed, as the cited material does not establish

the absence of a genuine dispute: ███████████████████████

█████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████.  *See* Fed. R.

Civ. P. 56(c)(1)(B).

The second sentence is disputed because it misquotes the cited document, which instead

reads: "[Nextdoor] most directly compete[s] with social media companies that offer local

products to advertisers and users, including large companies such as Meta (including through

Facebook and Instagram), Alphabet (including through Google), and other companies that provide home services, classifieds, real estate, recommendations, and search engines. We compete with these companies to attract, engage, and retain users and to attract and retain advertisers." Ex. 400 at 9 (Nextdoor 2023 Form 10-K).  Meta mischaracterizes the document to refer solely to Meta and only with respect to users. ███████████████████

███████████████████████████████

███████████████████████████████

██████████████████████

███████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

█████████████████████████████

█████████████████████████████

███████████████████████████

█████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████

████████████████████████████

███████████████████████████████

███████



**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that ███████████████████████████████. *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar response). As the term "competitors" is ordinarily understood and used, ████████████████████████ ██████████████████████████████. The additional portions of the documents the FTC recites do not create a genuine dispute that ██ ███████████████████████████████. As to Exhibit 400, Meta does not "misquote" Nextdoor's 10-K – which states that Nextdoor "most directly compete[s] with social media companies" "including" "Meta (including through Facebook and Instagram)." And the additional and immaterial portions of ████████████ ██████████████████████. *See also infra* Meta Reply to SMF ¶ 370 (addressing the FTC's incorrect assertion that ████████████████████ ████████████).

370. ██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████████████████████████████████████

████████

**FTC Response: Disputed in part.**  It is undisputed that Statement 370 quotes the

testimony that appears in the cited transcript.  The first sentence of Statement 370 is otherwise

disputed, as the cited material does not establish the absence of a genuine dispute: ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The second sentence is otherwise disputed because ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 364 (addressing similar response).  The additional portions

of ██████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████



371.

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 371 accurately quotes the words that appear in the cited document and transcript.  Statement 371 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute:

.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The FTC otherwise disputes the second sentence of Statement 371 as not supported by the cited material:

.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar response).

372. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 372 accurately quotes the words that appear in the cited documents and transcript.  Statement 372 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute:

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

███████████████████████████████████████████

███████████████████████████████████. *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar response).

373. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 373 accurately quotes the words that appear in the cited documents and transcript.  Statement 373 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute:

. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

. *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar response).  The additional portions of the document the FTC recites do not contradict the statement; indeed, the FTC concedes that the quotations and

substance of the excerpts of the documents are accurate.  Meta correctly identified the beginning

Bates page for the exhibit.  To the extent the FTC's response is meant to suggest an unrelated

proposition that ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

374.  █████████████████████████████

████████████████████████████████

██████████████████████

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 374 accurately quotes the words that appear in the cited transcript.  Statement 374 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute: ██████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████ .  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that in ████████████████████████████████████████████████

██████████████████ .  *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar response).

375.  ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 375 accurately quotes the words that appear in the cited transcript.  Statement 375 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute of material fact:



.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar response).

376.    Professor Lampe testified that "at a high level that you can fulfill that information – that motivation to seek information about a geographic community on both [Facebook and Nextdoor]," notwithstanding the "differences between those platforms and how that rolls out." Ex. 281 at 261:4-261:15 (Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 376 is undisputed to the extent that it relays words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 376 constitutes a material fact subject to proof at trial and objects that the material does not establish that absence of a genuine dispute, is contradicted by other evidence, and is misleading and incomplete.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).  Professor Lampe was testifying specifically about Nextdoor and Facebook Groups, not Facebook generally.  *See* Ex. 281 at 260:14-261:15 (Lampe Dep. Tr.).  Professor Lampe also testified that Nextdoor lacks

the broader context and implementation of a personal social network services app, ███████
████████████████████████████████. *Id.*

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
Professor Lampe testified that at a high level "you can fulfill" the "motivation to seek
information about a geographic community on both" Facebook Groups and Nextdoor.  *See supra*
Meta Introduction.  The FTC's qualification that Professor Lampe was discussing Facebook
Groups is immaterial, as the FTC contends that Facebook Groups is part of Meta's PSN offering.
*See* Meta Reply to SMF ¶ 364 (addressing similar response).  The FTC's citation of additional
testimony from Professor Lampe does not create a dispute of material fact regarding Meta's
statement.

377.   ████████████████████████████████████
████████████████████████████████████
███████████████████████████████
████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
█████████████

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 377
accurately quotes the words that appear in the cited transcript.  Statement 377 is otherwise
disputed, as the cited material does not establish the absence of a genuine dispute: ██████
████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████████. *See supra* Meta

Introduction; Meta Reply to SMF ¶ 364 (addressing similar response).

   378.   ████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

**FTC response: Disputed in part and incomplete.**  It is undisputed that Statement 378

accurately quotes the words that appear in the cited transcript.  Statement 378 is otherwise

disputed, as the cited material does not establish the absence of a genuine dispute regarding a

material fact: █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

   Statement 378 is further disputed because it is incomplete and contradicted by other

testimony. ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

██████████████████████████████████████████████████

████████████████████████████.  *See supra* Meta Introduction; Meta Reply to SMF

¶ 364 (addressing similar response).  The additional portions of ████████ testimony the FTC

recites – about unrelated topics more than one hundred pages removed from the cited testimony

– do not contradict the statement; indeed, the FTC's response concedes that the quotations of the

testimony are accurate.

379.   ████████████████████████████████████

█████████████████████████████████████████████████

████

**FTC response: Disputed in part and incomplete.**  It is undisputed that Statement 379

accurately quotes the words that appear in the cited transcript.  Statement 379 is otherwise

disputed, as the cited material does not establish the absence of a genuine dispute: ████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

███████████████████████████████████████████████████████████

██████████ .  *See supra* Meta Introduction; Meta Reply to SMF ¶ 364 (addressing similar

response).

### f.    Reddit

#### i.    Background

380.    Reddit was founded in 2005 as a "community where users could post links from

across the internet and go to find something new."  Ex. 63 at -002 (MetaFTC-Klein-DX-319,

REDDIT_20cv3590-DDC_00000001).  As of March 2022, Reddit had more than 500 million

"visitors around the world."  *Id.*

**FTC Response: Undisputed.**

381.    Reddit is accessible as a website and as an app on users' mobile devices.  *See*

Ex. 64 at 18:17-19 (Raymond (Reddit) Dep. Tr.).

**FTC Response: Undisputed.**

382.    Individuals can browse Reddit without an account, but users with accounts have

access to greater functionality, including the ability to create posts, interact with other users, and

interact with posts.  *See* Ex. 64 at 19:15-20:2, 22:15-27:19 (Raymond (Reddit) Dep. Tr.).  To

create such an account, users must provide an email address.  *See id*. at 22:15-20.  When setting

up an account profile, Reddit provides the option for users to link their Facebook, Instagram, or

Twitter account (among others).  *See id*. at 20:22-22:9.

**FTC Response: Disputed in part.**  The FTC disputes in part Statement 382 as not

supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and

Local Rule 7(h), and in part contradicted by other testimony.

The first and third sentences are undisputed.

The second sentence is disputed, as it is contradicted by Ms. Raymond's testimony that users need to provide "[v]ery little[,] [a]lmost nothing" to Reddit in order to make an account, and that users "can have a user ID without even giving [their] email address."  Ex. 64 at 20:3-7 (Raymond (Reddit) Dep. Tr.).

### ii.     Features

383.     Reddit has many features that are similar to features on Instagram and Facebook. *See*, *e.g.*, *supra* ¶¶ Part I.A.1(a)(vi) & (b)(v).

**FTC Response: Disputed.**  The FTC objects to the terms "many" and "similar" as vague.  The FTC disputes Statement 383 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The internal references cited are brief descriptions of features on Facebook and Instagram: Part I.A.1(a)(vi) to Facebook Groups, and (b)(v) to Instagram Search and Explore. The cited material contains no mention of Reddit or any Reddit features.  Further, Statement 383 does not identify which Reddit features Meta asserts are "similar" to features of Facebook and Instagram.  Meta has not provided any basis for the assertion that many Reddit features are similar to features on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Reddit, Facebook, and Instagram have many similar features.  *See supra* Meta Introduction.  As the terms "many" and "similar" are ordinarily understood and used, there is no dispute there are multiple features on Reddit that resemble features on Facebook and Instagram.  As Meta demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part I.A.1, and the following paragraphs describing Reddit's features, *see infra* Meta SMF ¶¶ 384-389 – most of which the FTC does not dispute – both Facebook and Instagram as well as Reddit have

features for posting, viewing, and sharing text, photos, and videos; feeds that serve content

tailored to the individual user; finding and subscribing to content – including content from

friends and family; the ability to identify content related to ones interests; liking and commenting

on posts; messaging; and other "social" features. *See infra* Meta SMF ¶¶ 384-389; Ex. 64 at

31:21-32:6 (Raymond (Reddit) Dep. Tr.) (describing following features).

384.   Reddit's user interface is primarily organized by three feeds:  Home, Popular, and

News. *See* Ex. 1 at ¶ 190 (Ghose Rep.).

**FTC Response: Undisputed.**

385.   Like Facebook and Instagram, Reddit's feeds are populated by photos, videos,

and other content shared by other users. *See* Ex. 1 at ¶ 190 (Ghose Rep.); Ex. 64 at 25:20-26:21

(Raymond (Reddit) Dep. Tr.).  In 2023, Reddit added a "Watch" feed focused on short-form

video that is comparable to Instagram Reels or TikTok.  Ex. 1 at ¶ 190 (Ghose Rep.).

**FTC Response: Disputed in part.**  The FTC objects that the material cited does not

establish the absence of a genuine dispute, *see* Fed. R. Civ. P. 56(c)(1)(B), and is not supported

by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule

7(h).

Regarding the first sentence, it is undisputed that Ms. Raymond testified that users can

share "[t]ext, photos, videos," and links to other platforms or websites on Reddit.  However, the

proposition that the population of Reddit's feeds is "[l]ike Facebook and Instagram" is disputed,

as it is not supported by the cited material, as required by Federal Rule of Civil Procedure

56(c)(1)(A) and Local Rule 7(h), nor by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).  The

only source for that portion of the sentence is Professor Ghose's report, which is not supported

by any underlying evidence and is not admissible evidence as it does not purport to provide an

expert opinion that the population of Reddit's feeds is "[l]ike Facebook and Instagram."

Regarding the second sentence, it is undisputed that Reddit added a "Watch" feature in 2023.

However, the proposition that Reddit's "Watch" feature is comparable to Instagram Reels or

TikTok is disputed, as it is not supported by the cited material, as required by Federal Rule of

Civil Procedure 56(c)(1)(A) and Local Rule 7(h), nor by admissible evidence.  *See* Fed. R. Civ.

P. 56(c)(2).  The only source for that portion of the sentence is Professor Ghose's report, which

is not supported by any underlying evidence and is not admissible evidence as it does not purport

to provide an expert opinion that Reddit's "Watch" feature is comparable to Instagram Reels or

TikTok.

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Facebook, Instagram, and Reddit feeds are populated by photos, videos, and other content shared

by other users, nor a genuine dispute of material fact that Reddit's Watch feed is comparable to

TikTok and Instagram Reels.  *See supra* Meta Introduction; Meta SMF ¶¶ 23, 25, 75  (Facebook

and Instagram feeds populated by photos, videos, and other content shared by other users).  The

FTC's claim that these statements are unsupported by Professor Ghose's opinion is baseless.

The cited materials support the fact that Reddit, like Facebook and Instagram, has feeds

populated by multimedia content, and that Reddit's Watch feed is comparable to Instagram Reels

and TikTok.  The FTC's statement that Professor Ghose's opinion is "not supported by any

underlying evidence" ignores the fact that paragraph 190 of Professor Ghose's report references

documents as well as Professor Ghose's Exhibit E, which directly compares the features of

Facebook and Instagram with Reddit (and others).  And the FTC's claim that Professor Ghose

"does not purport to provide an expert opinion" on several points appearing nearly verbatim in his expert report is incorrect and unsupported.

386.    Reddit is organized by communities, referred to as "subreddits," based on specific interests where users post content.  *See* Ex. 63 at -002 (MetaFTC-Klein-DX-319, REDDIT_20cv3590-DDC_00000001).  As of March 2022, there were more than 100,000 active subreddits.  *See id.*

**FTC Response: Undisputed.**

387.    For example, there are subreddits dedicated to various interest-based content, e.g., users interested in gardening could join "r/gardening," while users interested in political discussion might join "r/politics."  *See* Ex. 63 at -004-005 (MetaFTC-Klein-DX-319, REDDIT_20cv3590-DDC_00000001).  For people interested in keeping up with popular culture, there are subreddits for icons, such as r/TaylorSwift, and popular television shows, such as "r/westworld" and "r/thebachelor."  *See id.*  There are also communities built around, for example, types of media (such as "r/videos" or "r/memes"), specific geographic locations (such as "r/NewOrleans" or "r/nyc"), and commerce (such as "r/gameswap" or "r/Watchexchange"), among others.  *See id.*

**FTC Response: Undisputed and incomplete.**  Statement 387 is undisputed, subject to the caveat that "r/TaylorSwift" does not appear in the document cited.

388.    Subreddits are similar to Facebook Groups, an interest- and community-based feature of the Facebook app.  *See* Ex. 1 at ¶ 193 (Ghose Rep.).  The below left screenshot is an example of the "Instant Pot" subreddit on Reddit's mobile app.  For comparison, the below right screenshot is an example of the "Slow Cooker/Instant Pot Recipes" Facebook Group on Facebook's mobile app.



**FTC Response: Disputed in part.**  The FTC objects to the term "similar" as vague and undefined.

The first sentence of Statement 388 is disputed because it is not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), nor by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).  The only source for that portion of the sentence is Professor Ghose's report, which is not supported by any underlying evidence and is not admissible evidence as it does not purport to provide an expert opinion that "Subreddits are similar to Facebook Groups."

Regarding the second sentence, it is undisputed that the above screenshots appear to be examples of content that could be displayed in a subreddit on the Reddit mobile app and a Facebook Group on the Facebook mobile app with respect to the present time, subject to the caveat that Meta does not identify how the screenshots were generated or obtained (specifically the steps taken to generate the content that appears on each screenshot and the user's past behavior), and the above screenshots are not admissible evidence, nor are they supported by admissible evidence. *See* Fed. R. Civ. P. 56(c)(2).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that subreddits are similar to Facebook Groups. *See supra* Meta Introduction.  As the term "similar" is ordinarily understood and used, there is no dispute subreddits and Facebook Groups – both interest-based community fora – are similar.  The FTC's claim that the statement is unsupported by Professor Ghose's opinion is baseless.  The cited materials support the fact that Reddit and Facebook Groups are both interest-based communities.  The FTC's inexplicable statement that Professor Ghose's opinion is "not supported by any underlying evidence" ignores the fact that paragraph 193 of Professor Ghose's report ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████.  The FTC's claim that Professor Ghose "does not purport to provide an expert opinion" on this point, despite it appearing nearly verbatim in his expert report, is incorrect and unsupported.

The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that Meta would be unable to introduce screenshots comparing relevant apps in an admissible form at trial is meritless.  *Ali v. District of Columbia*, 810 F. Supp. 2d 78, 83-84 (D.D.C. 2011) (There is a "difference between evidence that is admissible at trial and evidence

that the Court may consider at summary judgment," where a party "is not required to produce evidence in a form that would be admissible at trial, so long as her evidence is capable of being converted into admissible evidence." (internal quotation marks omitted)).

389.    A 2021 Reddit presentation to investors compared Reddit and Facebook, describing both as having "[v]olume, breadth, and depth of communities [that] allows people to find anything they're looking for."  Ex. 65 at -068 (MetaFTC-DX-657, MetaFTC-Klein-DX-320, REDDIT_20cv3590-DDC_00000035).

**FTC Response: Undisputed but incomplete.**  It is undisputed that Statement 389 accurately recounts the words that appear in the cited document.  However, Statement 389 omits that the document compared Reddit to a number of other services besides Facebook; that of the nine factors listed in the comparison chart, Reddit and Facebook only shared a single factor—the one mentioned in Statement 389; and that the title of the slide cited is "Reddit is Built from a Different Premise." ████████████████████████████████████

████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Reddit compared its features to Facebook and identified communities as an area of overlap.  *See supra* Meta Introduction.

### iii.    Competition Between Reddit and Facebook and Instagram

390.    Reddit provides a reasonable substitute for certain engagement on Facebook and Instagram, including sharing and viewing interest-based content and viewing various forms of entertaining content.  *See infra* at ¶¶ 391-398.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute" and "certain engagement" as so vague and undefined that Statement 390 is not susceptible to a

reasonable response, and disputes Statement 390 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Facebook, Instagram, Reddit, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider Reddit as a reasonable substitute for sharing and viewing interest-based content and viewing various forms of entertaining content on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with Facebook and Instagram in various aspects of firm operations (e.g., interest-based and entertaining content) or in a broad sense for user time and attention does not establish that Meta and Reddit are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at §§ II.A.5.b-c.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Reddit, Facebook, and Instagram can be and are used interchangeably, including for sharing and viewing interest-based content.  *See supra* Meta Introduction.  As the terms "reasonable substitute" and "certain engagement" are ordinarily understood and used, the evidence demonstrates that certain activities on Reddit, like sharing and viewing interest-based content, are reasonably interchangeable with similar activities on Facebook and Instagram, such as

viewing Facebook Pages or Groups or the Instagram Explore Tab.  *See infra* Meta SMF ¶¶ 391-398.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including sharing and viewing interest-based content, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and Reddit within the relevant market.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

391.    Professors Lampe and Hemphill described Facebook Groups and Reddit as being used for similar purposes.  When discussing Facebook Groups in his report, Professor Hemphill quotes testimony from Mr. Alison, explaining that Facebook Groups is "'sometimes . . . use[d] to connect with groups of friends, but it's predominantly used to connect with larger groups of people who you may not necessarily know in real life.'" Ex. 279 at ¶ 270 n.504 (Hemphill Rep.) (quoting Ex. 146 at 42:19-24 (Alison Dep. Tr.)).  Professor Lampe testified that "the dominant use for [Facebook] groups is around interest-based communities."  Ex. 281 at 216:11-20 (Lampe Dep. Tr.) (responding affirmatively to the question whether "it would be unlikely that personal social networking is the motivation basis for using Facebook groups").  Professor Lampe testified "that both Reddit and Facebook groups offer interest-based communities."  *Id.* at 217:4-10.

**FTC Response: Disputed in part and incomplete.**  The FTC objects to "similar" as used in the first sentence as vague and undefined.  Statement 391 is undisputed to the extent it recounts words that appear in the cited material but is otherwise disputed.  The FTC disputes that

Statement 391 constitutes a material fact subject to proof at trial, *see* Fed. R. Civ. P. 56 (c)(1), and disputes Statement 391 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The first sentence is disputed and is contradicted by other available evidence.  *See, e.g.*, PX9000, Hemphill Report at ¶¶ 471-485 (" ███████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ . . . . Reddit lacks key functionality that would be needed to satisfy user demand for friends and family sharing"); PX9004, Lampe Report at ¶¶ 213-223 (" █████████████████████████ ██████████████████████████ ").

The second sentence is undisputed to the extent it accurately quotes the words that appear in the cited document, but is otherwise disputed.  The cited quotation is the only purported support Meta provides from Professor Hemphill, and the footnote cited, as well as the underlying evidence, does not concern or mention Reddit.

The third and fourth sentences are undisputed to the extent they accurately quote the words that appear in the cited transcript, but are otherwise disputed because they are contradicted by Professor Lampe's testimony, when asked about whether "the dominant use for [Facebook] groups would overlap with the use for Reddit," that Facebook Groups and Reddit "are very different sites."  Ex. 281 at 216:21-217:3 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Reddit and Facebook Groups are used for similar purposes.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 390 (addressing similar response).  As the term "similar" is ordinarily understood and used, there is no dispute that Professors Hemphill and Lampe have described

Reddit and Facebook Groups as resembling each other.  As to the first sentence, the material

cited by the FTC does not, in fact, contradict the statement provided – given that both Professor's

Hemphill and Lampe conceded that ███████████████████████████████████

███████, the FTC's citation to portions of Professor Hemphill and Professor Lampe's reports that

claim that ███████████████████████████████ are inapposite.  As to the final

sentence, the FTC again fails to raise a genuine dispute of material fact, except insofar as it

intends to argue that its own expert, Professor Lampe, was unable to provide a consistent answer

as to the similarities between Reddit and Facebook Groups.  Professor Lampe's attempt to

minimize his concession that "both Reddit and Facebook groups offer interest-based

communities" by claiming in a conclusory fashion that Facebook Groups and Reddit "are very

different sites," does not create a genuine dispute of material fact.

392.     **Meta Documents.**  Meta documents recognize Reddit as one of Facebook's

competitors.  For example, a 2019 "Market Overview" summary discussed new products and

competitive actions by Reddit, among others.  *See* Ex. 238 at -410 (FB_FTC_CID_11916400).

An April 2021 document titled "FB US Long Term Themes" identified trends in "Engagement /

Competition" for numerous apps, including Reddit, Telegram, TikTok, Twitch, Twitter, and

YouTube.  Ex. 249 at -723.011, -723.034-036 (FTC-META-006275723).

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague

and undefined.  It is undisputed that Statement 392 accurately quotes the words that appear in the

cited materials.  Statement 392 is otherwise disputed, as the cited materials do not establish the

absence of a genuine dispute regarding a material fact: Meta's perception that other firms may be

"competitors" in certain aspects of its operations or in a broad sense for time or attention does

not establish that Meta and Reddit are competitors in the provision of personal social networking

services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Reddit as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 390 (addressing similar response).

393.    Meta's reoccurring Industry Insights reports, prepared between 2019 and 2023, routinely listed Reddit as a competitor.  *See supra* at ¶ 185.

**FTC Response: Undisputed but incomplete.**  The FTC objects to the terms "competitors" and "routinely" as vague and undefined.  It is undisputed that Statement 393 accurately describes the words that appear in the cited materials.  Statement 393 is otherwise disputed, as the cited materials do not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and Reddit are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta tracked Reddit as a competitor.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 390 (addressing similar response).  As the term "routinely" is ordinarily understood and used, it is clear that Meta regularly listed Reddit as a competitor.  *See supra* Meta SMF ¶ 185 (Reddit appeared in Meta's "Industry Insights" between 2019 and 2024).

394.    Meta documents and executives also recognize that Reddit provides a reasonable substitute for certain engagement on Facebook, including sharing and viewing interest-based

content.  For example, Mr. Alison testified that Reddit and YouTube, among others, are two of Facebook's competitors that focus on interest-based sharing.  *See* Ex. 146 at 53:9-53:15 (Alison Dep. Tr.).

**FTC Response: Disputed and incomplete.**  The FTC objects to the terms "reasonable substitute" and "certain engagement" as so vague and undefined that Statement 394 is not susceptible to a reasonable response, and disputes Statement 394 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The first sentence is disputed because the term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Facebook, Instagram, Reddit, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider Reddit as a reasonable substitute for sharing and viewing interest-based content on Facebook and Instagram, and the cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with Facebook and Instagram in various aspects of firm operations (e.g., interest-based content) or in a broad sense for user time and attention does not establish that Meta and Reddit are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.c.

The second sentence is disputed and not supported by the testimony cited from Mr. Alison, which says nothing about substitution between Facebook and Reddit. Specifically, Mr. Allison's testimony cited was that ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 146 at 53:9-15 (Alison Dep. Tr.).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Meta recognizes Reddit as one of Facebook's and Instagram's competitors. *See supra* Meta Introduction; Meta Reply to SMF ¶ 390 (addressing similar response). The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

395.   A 2019 document titled "Research Insights," with the subject ████████████ ████████████████████████████████████ shows ████████████████████████ ████████████████████████████████. Ex. 236 at -702 (FB_FTC_CID_10401702). The first sentence of the "Findings" states that ████████████████████████████ ████████████████████████████████████████████ *Id.* ████████████████████████ ████████████████████████████████████████████ *Id.*

**FTC Response: Undisputed but immaterial.** It is undisputed that Statement 395 accurately quotes the words that appear in the cited document. However, the FTC objects to Statement 395 as the material cited does not establish the absence of a genuine dispute: Meta's

376

perception that other firms may be "███████████████" in certain aspects of its operations or in a broad sense of competing for time or attention does not establish that Meta and Reddit are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

396.    A June 24, 2020 document titled "Facebook App – 2020 H1/H2 Review" stated as part of the "2020 roadmap" that Facebook would



Ex. 256 at -009, -010 (FTC-META-011024966).  The document noted that ████████ ████████████████████████████████████████████ ██████████████████████  *Id.*; *see also supra* at ¶ 367 (discussing competition between ████████████████████████, among other apps).

**FTC Response: Disputed in part.**  It is undisputed that Statement 396 accurately quotes the words that appear in the cited document.  However, the FTC objects to Statement 396 as the material cited does not establish the absence of a genuine dispute: Meta's perception that other firms may "compete" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and Reddit are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Reddit as one of Facebook's and Instagram's competitors, and that it has made changes in its products to better compete against Reddit.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 390 (addressing similar response).

397.    **Reddit Documents and Testimony.**  Reddit documents and executives recognize Facebook as one of Reddit's competitors.  For example, Reddit's Form S-1 filing with the SEC states:  "We are competing for people's time and global advertising spend.  As such, we face significant competition across many areas of our business.  People may choose to spend their time using other products when looking to fulfill the needs Reddit provides, such as being entertained, seeking information, diving into current events, exploring passions and hobbies, or peer-to-peer commerce."  Ex. 63 at -033 (MetaFTC-Klein-DX-319, REDDIT_20cv3590-DDC_00000001).  The Form S-1 also states:  "Advertisers can also reach consumers via many other digital advertising platforms and channels," and Reddit "compete[s] directly with all other major advertising platforms as well as publishers including: Google, Meta, Snapchat, TikTok, Pinterest, and Twitter."  *Id.*  Winter Raymond, a director and assistant general counsel at Reddit, agreed that "Reddit competes with Facebook, YouTube, Snap, TikTok, Roblox, Twitch, and Instagram for entertainment."  Ex. 64 at 13:16-19, 64:22-65:3 (Raymond (Reddit) Dep. Tr.).  Ms. Raymond also testified that Reddit faces competition for users with "anywhere a user would want to spend their time online."  *Id.* at 61:19-62:10.

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 397 accurately quotes the words that appear in the cited material.  However, the FTC objects to Statement 397 as the material cited does not establish the absence of a genuine dispute: ███

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Reddit recognizes Facebook and Instagram as two of Reddit's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 390 (addressing similar response).

398.    Reddit documents and executives recognize that Facebook provides a reasonable substitute for certain engagement on Reddit, including for sharing and viewing interest-based content and viewing various forms of entertaining content.  Ms. Raymond stated that "Reddit competes with a number of competitors, including Facebook Groups, Discord, Twitter, and Pinterest for user time spent on passions and hobbies," and that "Reddit competes for user time and attention on peer-to-peer commerce with Facebook Marketplace, Nextdoor, Craigslist, Poshmark, Etsy, and eBay."  Ex. 64 at 67:7-16, 68:10-18 (Raymond (Reddit) Dep. Tr.); *see also* Ex. 63 at -033 (MetaFTC-Klein-DX-319, REDDIT_20cv3590-DDC_00000001 (similar)).

**FTC Response: Disputed and incomplete.**  The FTC objects to the terms  as so vague and undefined that Statement 398 is not susceptible to a reasonable response, and disputes Statement 398 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish

. While no response is required, the FTC states that Meta has not provided any basis for the assertion that



*See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at §§ II.A.5.b-c.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Reddit recognizes Facebook and Instagram as two of Reddit's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 390 (addressing similar response).  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

### g.     LinkedIn

### i.     Background

399.    LinkedIn was founded in 2003 and, today, is a wholly owned subsidiary of Microsoft Corporation.  *See* Ex. 68 at -066 (MetaFTC-Klein-DX-214, LI_METALIT_00000065).

**FTC Response: Undisputed.**

400.    LinkedIn describes its "core business" as a "widely used social networking service and related talent and marketing solutions."  Ex. 68 at -066 (MetaFTC-Klein-DX-214, LI_METALIT_00000065).

**FTC Response: Undisputed but incomplete.**  The cited document further describes LinkedIn's core business as follows: "LinkedIn's social networking services focus on

professionals and promoting professional connections." ███████████████████

███████████████████

**Meta Reply:**  The FTC's response does not dispute the stated fact.  *See supra* Meta

Introduction.  The additional material the FTC includes in its response is inaccurate.  LinkedIn

did not use "core business" in the sentence the FTC recites.

### ii.      Features

401.     LinkedIn has many features that are similar to features on Instagram and

Facebook.  Professor Hemphill opined that "LinkedIn has a social graph that in certain respects

resembles Facebook's social graph.  Like Facebook's process for adding friends, LinkedIn

allows a user to send 'connection requests' to other users, who can choose to accept or decline

the request."  Ex. 279 at ¶ 401 (Hemphill Rep.).  Professor Lampe was asked if he "ha[d] any

basis to dispute that especially since the pandemic there has been an increase in personal content

being shared on LinkedIn."  Ex. 281 at 336:19-22 (Lampe Dep. Tr.).  He responded:  "I don't

think in my opinion I say that there's never been any personal content shared on LinkedIn."  *Id.*

at 337:1-6.  Professor Lampe testified that he "ha[d] no basis to dispute" that "since the

pandemic sharing with friends and family has been an increasing use case with LinkedIn."  *Id.*

at 338:6-12.

**FTC Response: Disputed and incomplete.**  The FTC objects to the terms "many" and

"similar" as vague and undefined, and disputes the first sentence of Statement 401 as not

supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and

Local Rule 7(h).

The FTC further disputes the second, third, fourth, and fifth sentences of Statement 401

because although they relay words that appear in the cited documents and transcripts, the FTC

otherwise disputes that they constitute a material fact subject to proof at trial and states that the

material does not establish the absence of a genuine dispute regarding a material fact, and is misleading and incomplete.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).

The second sentence of Statement 401 is disputed because Professor Hemphill distinguishes LinkedIn's social graph in the very next paragraph of his report, citing evidence that LinkedIn's social graph "does not provide an internal representation of a user's real-world friends and family relationships. Instead, it provides a representation of a user's professional relationships—often referred to as a 'professional graph.'  LinkedIn has many users who are also on Facebook, but the connection 'edges' made between users are different. LinkedIn's edges are typically drawn between colleagues and coworkers rather than friends and family."  PX9000, Hemphill Report at ¶ 402 (citing Jeff Weiner, *The Future of LinkedIn and the Economic Graph*, LinkedIn (Dec. 10, 2012), https://www.linkedin.com/pulse/20121210053039-22330283-the-future-of-linkedin-and-the-economic-graph; LinkedIn, *Data for Impact*, https://economicgraph.linkedin.com/data-for-impact# ("Our data goes as far as LinkedIn. It's the world's most complete professional graph . . . ."); PX2245, Meta document: "Possible Ends States for the Family of Apps" (Feb. 28, 2019), FB_FTC_CID_02068454, at -456 ("Facebook, Linkedin, and Nextdoor coexist in the US with similar userbases but orthogonal graphs: Facebook connects friends and family, Linkedin connects coworkers, Nextdoor connects neighbors."); PX3227, Meta document: "End States Project Log" (June 20, 2018), FB_FTC_CID_12303387, at -393 ("Even when two apps both have high reach, connections can cluster differently (orthogonal clusters). E.g., in one app you can be connected to your friends, in another app you can be connected to your family. (There are many apps which have largely overlapping users, but cluster in different ways: Nextdoor, linkedin, pinterest, reddit).")); *see*

*also* PX9000, Hemphill Report at ¶ 403 ("The defining professional character of LinkedIn's social graph is well known and well-advertised by LinkedIn.").

The third, fourth, and fifth sentences of Statement 401 are disputed as incomplete in that they omit part of the exchange with Professor Lampe, who testified that although he did not specifically examine the question of whether the pandemic had any effects on Linkedin's norms, "LinkedIn [primarily] signals itself and the motivations for use are for professional networking." Ex. 281 at 336:19-22 (Lampe Dep. Tr.).  Professor Lampe further testified that based on the research he conducted and the evidence he has reviewed, personal social networking "would be a rare use case and almost impossible for [users] to use [LinkedIn] in personal social networking . . . since the -- even if there are friends and family within your LinkedIn network, that doesn't necessarily speak to your entire social graph like we're talking about with other PSNS." *Id.* at 338:13-339:3.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that LinkedIn, Facebook, and Instagram have many similar features.  *See* supra Meta Introduction. As the terms "many" and "similar" are ordinarily understood and used, there is no dispute that there are multiple features on LinkedIn that resemble features on Instagram and Facebook.  As Meta demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part I.A.1(a)-(b), and the following paragraphs describing LinkedIn's features, *see infra* Meta SMF ¶¶ 212-215, 217-237, 239 – most of which the FTC does not dispute – Facebook, Instagram, and LinkedIn all have:  a social graph; a feed; and user profiles.  They also have features for posting, viewing, and sharing text, photos, and videos; finding and connecting with other users – including friends or family; liking and commenting on posts; messaging; reviewing other users' connections; and other "social" features.  *See infra* Meta SMF ¶¶ 402-407.

The FTC's response that Professor Hemphill opined that LinkedIn's social graph is "different" does not raise a genuine dispute with the asserted fact that LinkedIn has a social graph. Professor Hemphill opined that LinkedIn users can connect with other users using a process similar to Facebook's, which is consistent with the FTC's definition of a social graph as "the set of connections that users make among each other within a social network." Counter SMF ¶ 1088. And the FTC's own Counterstatement concedes that "users can connect with friends and family on LinkedIn." Counter SMF ¶ 1137. Mr. Pattabiraman, a senior director of product at LinkedIn, testified that LinkedIn allows users to connect with users in their mobile address book, and that "by offering [this feature], you are able to form connections with people you know, including your friends, your family, and your coworkers." *See infra* Meta SMF ¶ 405 (quoting Ex. 69 at 69:20-70:16 (Pattabiraman (LinkedIn) Dep. Tr.)). The FTC's response also fails to create a genuine dispute of material fact that Professor Lampe did not dispute that friends and family sharing on LinkedIn increased since the pandemic; indeed, the FTC's response adds that Professor Lampe "testified that . . . he did not specifically examine" that question.

Mr. Pattabiraman also testified that the line between personal and professional is so blurred on LinkedIn that, ██████████████████████████████████████████

██████████████████████████████████████████████████████████

Ex. 69 at 270:6-272:6 (Pattabiraman (LinkedIn) Dep. Tr.). As examples of personal sharing that is frequent on LinkedIn, Mr. Pattabiraman testified: "[it] can be anything from you overcoming a big challenge in your life. It could be you running a marathon. . . . Sometimes there is also your viewpoints, your personal viewpoints on topics that are important to society. Could be politics, religion. Could be anything that is important to you as an individual that you would also like your friends, families, and coworkers to know." *See infra* Meta SMF ¶ 406 (quoting Ex. 69 at

77:19-78:1, 78:3-22 (Pattabiraman (LinkedIn) Dep. Tr.)).  Mr. Pattabiraman also testified, "On

LinkedIn, we have professionals that connect with their friends.  They could -- could be because

they are sharing content on what's happening in the professional world. . . .  It could be because

they need to message each other and stay in touch.  These are all use cases that I'm aware of

where we see friends and family connect on LinkedIn."  Ex. 69 at 32:16-33:3 (Pattabiraman

(LinkedIn) Dep. Tr.).

     402.   ██████████████████████████████████████ *See* Ex. 1

at ¶ 181 (Ghose Rep.).  LinkedIn, like Facebook, offers reciprocal connections between users,

lets users post a profile photo of users that must reflect the likeness of the users, and allows users

to view other users' connections.  *See id.* at ¶ 181 & nn.426-431.

     **FTC Response: Disputed in part.**  Statement 402 is undisputed with respect to features

on LinkedIn.  Otherwise disputed with respect to Facebook because Statement 402 is not

supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and

Local Rule 7(h) with respect to ████████████████████████████████████████

██████████████████████████████████.

     403.   ████████████████████████████████████████████

████████████████████████████ *See* Ex. 1 at ¶ 181 & n.427 (Ghose Rep.).

Kumaresh Pattabiraman, a senior director of product at LinkedIn, testified:  "LinkedIn serves

content from people you know and are connected to, and so in order to power a feed, you need to

know who the user's connections are and how the user follows in order to serve the right content

that adds value to the user."  Ex. 69 at 61:1-6 (Pattabiraman (LinkedIn) Dep. Tr.).

     **FTC Response: Disputed in part.**  It is undisputed that ████████████████████

███████████████, but the first sentence of Statement 403 is disputed in part because the cited

material does not support the assertion that ████████████████████████████████

████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

The second sentence of Statement 403 is undisputed subject to the clarification that Mr.

Pattabiraman's testimony is misquoted.  Instead, he testified that, "you need to know who the

user's connections are and *who* the user follows . . ." ████████████████████████████

████████████████████

404.    "LinkedIn has a social graph that models the relationship between the people on

it.  So you can connect with a friend, a family member, a coworker, in the same way you do it on

– on Facebook or many other social platforms that people interact with so far."  Ex. 69 at 59:18-

60:5 (Pattabiraman (LinkedIn) Dep. Tr.); *see also id.* at 68:3-14 ("One of the key jobs to be done

for LinkedIn is to help you stay connected with people you know and some of your strongest

connections," "like if your . . . close buddy or if a cousin is looking for a job," "the user . . .

would get to know about it because LinkedIn knows that this person matters to you.").

**FTC Response: Undisputed but incomplete.**  Statement 404 is undisputed to the extent

that it accurately recounts words that appear in the cited transcript but is otherwise disputed

because the testimony cited is incomplete.  In the cited testimony, Mr. Pattabiraman testified that

"[o]ne of the key jobs to be done for LinkedIn is to help you stay connected with people you

know and some of your strongest connections, if they have a certain need on the platform, like if

your -- if your -- your close buddy or if a cousin is looking for a job and they post on LinkedIn

that they are looking for a job, or if they share an article about something that's happening in

their -- in their workplace, that gives the user -- would get to know about it because LinkedIn

knows that this person matters to you."  Ex. 69 at 68:3-14 (Pattabiraman (LinkedIn) Dep. Tr.).

Mr. Pattabiraman testified that LinkedIn connected users with these connections in service of its

mission to connect people to economic opportunities: "LinkedIn is in the space of connecting professionals and, more broadly, people that are pursuing economic opportunity.  Now, professionals that are in the space of work use LinkedIn to connect with economic opportunity, but to think more broadly about people that need to find economic opportunity, it includes friends, families.  It includes people that help each other in pursuit of such opportunities." *Id.* at 32:4-13.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that LinkedIn's "social graph" allows users to "connect with a friend, a family member, a coworker, in the same way you do it on . . . Facebook."  *See supra* Meta Introduction.  The stated fact, as the additional testimony the FTC's recites to "[]complete" the statement does not dispute Mr. Pattabiraman testified as quoted or the meaning of that testimony.  That users also use LinkedIn to pursue economic opportunity does not create a genuine dispute regarding this statement of fact.

405.    LinkedIn allows users to connect with people in their mobile address book who also have a LinkedIn account; as Mr. Pattabiraman testified, "by offering the ability to import [the mobile address book], you are able to form connections with people you know, including your friends, your family, and your coworkers."  Ex. 69 at 69:20-70:16 (Pattabiraman (LinkedIn) Dep. Tr.).  Mr. Pattabiraman added that this feature "connect[s] members with people they know so they can stay connected."  *Id.*

**FTC Response: Disputed in part and incomplete.**  Statement 405 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the testimony cited is incomplete and misleadingly omits the part of Mr. Pattabiraman's testimony where he explains why LinkedIn offers the mobile contacts sync functionality: "[w]hy

does LinkedIn do it? In order to connect members with people they know so they can stay connected and help each other out in the pursuit of economic opportunity." ████████

████████████████████████

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact LinkedIn allows users to form connections with people they know by importing their mobile address book.  *See supra* Meta Introduction.  Indeed, the FTC's response does not create a genuine dispute about the stated fact, as the additional testimony the FTC's recites to "[]complete" the statement does not dispute Mr. Pattabiraman testified as quoted or the import of that testimony.  That users also use LinkedIn to pursue economic opportunity does not create a genuine dispute regarding this statement of fact.

    406.    Mr. Pattabiraman testified that "we have always seen friends and family to be a part of your experience in LinkedIn."  Ex. 69 at 77:19- 78:1 (Pattabiraman (LinkedIn) Dep. Tr.).  He also testified that LinkedIn has "see[n] an increase in personal content being shared" that "has only increased with the . . . pandemic."  *Id.*  When asked "[w]hat kinds of personal content" he "observ[ed] increas[ing] on LinkedIn," he replied:  "I can give . . . examples.  You sharing a personal update about – can be anything from you overcoming a big challenge in your life.  It could be you running a marathon. . . .  Sometimes there is also your viewpoints, your personal viewpoints on topics that are important to society.  Could be politics, religion.  Could be anything that is important to you as an individual that you would also like your friends, families, and coworkers to know."  *Id.* at 78:3-22.

    **FTC Response: Disputed in part and incomplete.**  Statement 406 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the testimony cited is incomplete and omits the part of Mr. Pattabiraman's testimony where he

explains that this testimony was based solely on his own personal experience.  *See* Ex. 69 at 77:7-9 (Pattabiraman (LinkedIn) Dep. Tr.) ("I'm sharing this based off of my -- my observations, so this is just to the best of my knowledge.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that friends and family are part of the experience on LinkedIn.  *See supra* Meta Introduction.  Indeed, the FTC's response does not create a genuine dispute about the stated fact, as the additional testimony the FTC's recites to "[]complete" the statement does not dispute that Mr. Pattabiraman, a LinkedIn employee for over a decade, testified as quoted or the import of that testimony.

Meta notes that the first sentence in the statement contains a typo, it should read:  Mr. Pattabiraman testified that "we have always seen friends and family to be a part of your experience on LinkedIn."  Ex. 69 at 77:19- 78:1 (Pattabiraman (LinkedIn) Dep. Tr.).

407.    Meta expert Professor Anindya Ghose described one study as finding that: "Millennials use LinkedIn just as they would any other social media website like Facebook or Instagram," that "Millennials use LinkedIn to form meaningful connections by keeping their networks fresh and active," and that "[u]sing LinkedIn for personal identity and social needs seems to be some of the most significant gratifications among Millennial users."  Ex. 1 at ¶ 185 & n.435 (Ghose Rep.).

**FTC Response: Disputed and incomplete.**  Statement 407 is undisputed to the extent that it accurately recounts words that appear in Ghose's expert report but is otherwise disputed because the underlying material cited does not support the assertion and the assertion is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A); 56(c)(2); L.R. 7(h).

The FTC disputes Statement 407 because Professor Ghose grossly mischaracterizes the cited study and omits its authors' actual findings on Millennials' motivations, uses, and gratifications for using LinkedIn.  *See* PX0513, Stephanie Smith & Brandi Watkins, *Millennials' Uses and Gratifications on LinkedIn: Implications for Recruitment and Retention*, 60 Int'l Journal of Bus. Commc'n 560 (2023).  On motivations, the authors found that "[i]nformation seeking was the most important reason cited for using LinkedIn . . . includ[ing] looking for information on jobs and internships and opportunities to apply for jobs and internships. Additionally . . . Millennial LinkedIn users like to use the site to share information about jobs and internships with others. Thus, we can conclude that actual information about jobs and internships drive much of the Millennial interest in using LinkedIn."  *Id.* at 569-570.  The authors also found that "Millennial users see LinkedIn as a tool for not only seeking information related to job and internship opportunities but as a way to present themselves professionally."  *Id.* at 571.  On uses for LinkedIn, the authors found that "LinkedIn provides Millennial users with a space to [professionally] brand themselves and to increase their [professional] networking capabilities." *Id.* at 572.  And finally, on gratifications, the authors found that Millennials saw LinkedIn as "a valuable resource for job and internship information . . . interacting and meeting with potential employers and adding to contacts to their professional networks. . . .  This supports previous findings in this analysis that point to LinkedIn as being part of Millennials professional self-branding efforts."  *Id.* at 575.

　　Thus, contrary to Professor Ghose's mischaracterization, this recent study affirmed Professor Lampe's conclusions with respect to LinkedIn: "a primary motive and use of LinkedIn among Millennials is to develop their professional network."  *Id.* at 580.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Ghose opined that "Millennials use LinkedIn just as they would any other social media website like Facebook or Instagram."  *See supra* Meta Introduction.  The additional portions of the study the FTC recites do not create a genuine dispute about the stated fact.  Professor Ghose's account of the study's findings is amply supported.  The study states: "this study indicates that Millennials use LinkedIn just as they would any other social media website like Facebook or Instagram.," and that "despite the unique characteristics of the site, Millennials use LinkedIn for professional development, entertainment, and/or networking."  PX0513 at 579 (Stephanie Smith & Brandi Watkins, *Millennials' Uses and Gratifications on LinkedIn: Implications for Recruitment and Retention*).  This statement does not claim that Millennials do not use LinkedIn for professional purposes; the FTC's assertions about that topic do not create a genuine dispute regarding this statement of fact.

### iii.   Competition Between LinkedIn and Facebook and Instagram

408.    LinkedIn provides a reasonable substitute for certain engagement on Facebook and Instagram, including for sharing and connecting with others.  *See infra* at ¶¶ 409-414.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute," "certain engagement," and "sharing and connecting with others" as so vague and undefined that Statement 408 is not susceptible to a reasonable response, and disputes Statement 408 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials are not sufficient to establish reasonable interchangeability or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) of Facebook,

Instagram, LinkedIn, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider LinkedIn as a reasonable substitute for "sharing and connecting with others," and the cited material does not establish the absence of a genuine dispute of material fact: that LinkedIn may compete with Facebook in various aspects of firm operations or in a broad sense for user time and attention does not establish that Meta and LinkedIn are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.a.1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that LinkedIn, Facebook, and Instagram can be and are used interchangeably, including for sharing and connecting with others.  *See supra* Meta Introduction.  As the terms "reasonable substitute" and "certain engagement" are ordinarily understood and used, the evidence demonstrates that certain activities on LinkedIn, like connecting with friends, posting about a new job and sending messages congratulating someone on a professional achievement, are reasonably interchangeable with similar activities on Facebook and Instagram.  *See infra* Meta SMF ¶¶ 409-414.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including viewing and sharing professional content, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and LinkedIn within the relevant market.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those

paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

409.    **Meta Documents and Testimony.**  Meta documents and executives recognize LinkedIn as one of Facebook's and Instagram's competitors.  Ms. Simo testified that LinkedIn was one of Facebook's competitors.  *See* Ex. 150 at 218:23-219:3 (Simo Dep. Tr.) ("Q. . . . [C]an you tell us who some of Facebook's competitors were? . . .  [A.] There were many ranging from iMessage, Snapchat, Twitter, LinkedIn, TikTok, YouTube, many of them."); *see also id.* at 221:14-222:4 & errata ("[Y]our work colleagues are fundamentally social connections and they're your community and, therefore, we were tracking LinkedIn closely.").

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague and undefined, and disputes in part Statement 409 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).
It is undisputed that Statement 409 quotes the testimony that appears in the cited transcript and errata.  The first sentence of Statement 409 is disputed in part because the cited materials only refer to Facebook, not Instagram.  The first and second sentences of Statement 409 are otherwise disputed, as the cited material does not establish the absence of a genuine dispute: Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Facebook and LinkedIn are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes LinkedIn as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 408 (addressing similar response).

410.    Meta's monthly Industry Update reports, prepared from 2014 through 2026, listed LinkedIn as a competitor in 64 of 65 such documents between 2014 and 2019.  Meta's reoccurring Industry Insight reports, prepared between 2019 through 2023, also listed LinkedIn as a competitor.  *See supra* at ¶ 185.

**FTC Response: Disputed in part.**  The FTC objects to the term "competitor" as vague. It is undisputed that Statement 410 relays the words that appear in the cited material.  Statement 410 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms may be a "competitor" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and Twitter are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The FTC further disputes the first sentence of Statement 410 because there is no basis for the assertion that Meta prepared these reports in the future "through 2026."

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes LinkedIn as one of Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 408 (addressing similar response).

411.    Other Meta documents recognize competition between Facebook and LinkedIn. *See*, *e.g.*, Ex. 275 at -758 (FB_FTC_CID_03551685) (2014 "Utility Three-Year Plan" slide deck listing "Google" and "LinkedIn" as "Key Competitors" for "[b]ein[g] the best place for finding,

learning about, connecting and contacting someone"); Ex. 260 at -113 (FTC-META-002690113)

(email describing project to █████████████████████████████████████

including ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████); Ex. 261 at -639 to -643 (FB_FTC_CID_00054637) (July 2019 Slide Deck

entitled ████████████████████████████████████████████████

████████ seeking to ████████████████████████████████████

████████████████████████████████████████████████████

████████).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term

"competition" as vague and undefined.  It is undisputed that Statement 411 accurately recounts

words that appear in the cited documents.  Statement 411 is otherwise disputed, as the material

cited does not establish the absence of a genuine dispute regarding a material fact: Meta's

perception that other firms compete in various aspects of firm operations (e.g., community) does

not establish that Meta and LinkedIn are competitors in the provision of personal social network

services, that there is not a relevant market for personal social network services, or that Meta is

not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The first and second parentheticals within the second sentence of Statement 411 are also

disputed because the cited materials refer to the comparison between LinkedIn and Facebook

Groups, not Facebook as a whole.  The third parenthetical within the second sentence of

Statement 411 is further disputed as incomplete because the cited slide deck states that ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████ Ex. 261 at -638, -643 (FB_FTC_CID_00054637).  The slide deck

finds that ███████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████. *Id.* at -643, -644.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta recognizes LinkedIn is one of Facebook's competitors.  *See supra* Meta Introduction; Meta

Reply to SMF ¶ 408 (addressing similar response).  The FTC's assertion that the documents

cited refer to Facebook Groups fails to create a genuine dispute of material fact; the FTC has

defined "PSN services" to include all activities in which users engage on apps that the FTC

includes in the alleged PSNS market (except Facebook Dating), including time spent engaging

with content in Facebook Groups.  *See infra* Meta SMF ¶¶ 580-584.

412.  **LinkedIn Documents and Testimony.**  LinkedIn's documents and executives

recognize Facebook and Instagram as two of LinkedIn's competitors.  For example, a 2012

PowerPoint stated, "Mobile engagement is a large opportunity for LinkedIn; time can be used to

benchmark with competitors" and provided mobile engagement statistics from third-party apps

including Facebook and Twitter.  Ex. 70 at -845.001 (LI_FTC_0004845).  A February 2016

presentation regarding video sharing on LinkedIn concluded, "Video is the next step in our

sharing ecosystem.  Video is a strong driver of engagement among our competitors" and that

"Facebook sees 100M hours of daily video watch time."  Ex. 71 at -862

(LI_METALIT_00009860).  A 2016 slide deck, entitled "Feed Engagement: Threaded

Comments, Likes on Comments, And Top Comments," included a slide with the subject line

"Benchmarking – Competitor Overview"; that slide compared various features of LinkedIn, Facebook, Twitter, and Reddit.  Ex. 72 at -307 (LI_FTC_0006295).  A 2019 internal LinkedIn report ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  Ex. 73 at -622 (LI_METALIT_00003618).  A 2020 internal report noted that

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  Ex. 74 at -408 (LI_METALIT_00002406).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the term ████████████ as vague and undefined, and disputes in part Statement 412 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  It is undisputed that Statement 412 quotes the words that appear in the cited materials.  Statement 412 is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact: ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████  ████████████  .  *See* Fed. R. Civ. P. 56(c)(1)(B).

████████████████████████████████████

████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

The third sentence of Statement 412 is disputed as incomplete because the presentation refers to a potential project to allow influencers to post short videos to LinkedIn, but Meta cites no evidence on whether the project was ever implemented successfully. ████████████

████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███

The sixth sentence of Statement 412 is disputed as incomplete because it omits the context of the document, which analyzed the effects of the COVID-19 pandemic on LinkedIn's business strategy. ███████████████████████████████████

█████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that LinkedIn recognizes Facebook as one of LinkedIn's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 408 (addressing similar response).  The additional "context" the FTC provides adds immaterial details – that one document is just about Facebook; that LinkedIn competes with additional apps Meta's statement did not identify; that a document discusses a feature that might not have launched; that the document also points out ways Facebook and LinkedIn are different; or that LinkedIn competes with Facebook for advertising – and does not create a genuine dispute about the fact that LinkedIn's documents identify Facebook as one of LinkedIn's competitors.

413.    In a May 2020 response to a European Commission request for information, which asked LinkedIn to distinguish between "professional social networks" and "a relevant network market which put forward interpersonal contacts," LinkedIn ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Ex. 75 at -771-772 (MetaFTC-Klein-DX-125, LI_METALIT_00001748).  LinkedIn stated that

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████  *Id.* at -772.

**FTC Response: Disputed in part.**  The FTC disputes in part Statement 413 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  Contrary to Meta's assertion that ███████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.  It is undisputed that Statement 413 quotes the words that appear in the cited materials.  Statement 413 is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact: ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that LinkedIn does not recognize a distinction between "professional social networks" and "personal social networks" and that LinkedIn identified apps outside the FTC's alleged market as social networking services.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 408 (addressing similar response).

414.  ████████████████████████████████  Mr. Pattabiraman testified that people use "████████████████████████ to know what are the best job opportunities out here, doing a job search, and finding an economic opportunity."  Ex. 69 at 51:20-52:2 (Pattabiraman (LinkedIn) Dep. Tr.).

**FTC Response: Disputed in part.**  It is undisputed that Statement 414 accurately quotes the testimony that appear in the cited transcript.  Statement 414 is otherwise disputed, as the

material cited does not establish the absence of a genuine dispute regarding a material fact:



. *See*

Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

[BLACK REDACTION BAR] . *See supra* Meta Introduction; Meta Reply to SMF

¶ 408 (addressing similar response).

> ### h.     Strava

> #### i.     Background

415.     Strava describes itself as an application that "makes fitness tracking social" by "hous[ing] your entire active journey in one spot" and allowing users to "share it with friends." Ex. 401 (MetaFTC-DX-15).

**FTC Response: Undisputed.**

416.     Strava was founded in 2009 and had over 100 million users by 2023.  *See* Ex. 76 at 17:2-6 (Ortega (Strava) Dep. Tr.).

**FTC Response: Undisputed.**

> #### ii.     Features

417.     Strava has many features that are similar to features on Instagram and Facebook. *See*, *e.g.*, *supra* Part I.A.1(a)(iii) & (b)(iii).  Strava's vice president of connected partnerships, Mateo Ortega, testified that Strava has an "activity feed," so "if you follow people, you'll see the activities that they do.  And then you can give kudos.  Comments are a form of motivation on those."  Ex. 76 at 11:9-11, 24:1-5 (Ortega (Strava) Dep. Tr.).  Users can also tag one another in

an activity post and upload photos, and videos, and freeform text posts.  *See* Ex. 76 at 25:13-22;

41:20-42:13 (Ortega (Strava) Dep. Tr.).

    **FTC Response: Disputed.**  The FTC objects to the terms ████████████████ as vague

and undefined, and disputes the first sentence of Statement 417 as not supported by the cited

material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The

cited internal references are brief descriptions of several Meta features: Part I.A.1(a)(iii) to

Facebook Photos and Videos; and (b)(iii) to Instagram Photos and Video; but Statement 417

does not provide any basis for the assertion that ██████████████████████████████

████████████████, and the cited material does not establish the absence of a genuine

dispute of a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.a.3.

    The FTC further disputes the third sentence of Statement 417 because ███████



    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Strava, Facebook, and Instagram have many similar features.  *See supra* Meta Introduction.  As

the terms "many" and "similar" are ordinarily understood and used, there is no dispute there are

multiple features on Strava that resemble features on Facebook and Instagram.  As Meta

demonstrated in the paragraphs describing Facebook's and Instagram's features, *see supra* Part

I.A.1, and the paragraph above describing Strava's features – none of which the FTC disputes –

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████     The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those statements here.

### iii.   Competition Between Strava and Facebook and Instagram

418.   ██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████████

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague and undefined.  It is undisputed that Statement 418 quotes the words that appear in the cited material.  Statement 418 is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact: ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that ██████████████████████████████████████. *See supra* Meta

Introduction.  As the term "competitors" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that ████████████████████████████ ████████████████████.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including posting fitness related content on a user's feed or in a group of fitness enthusiasts, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that ████████████████████████████████████████████████████.

419.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

**FTC Response: Disputed in part.**  It is undisputed that Statement 419 accurately quotes the testimony that appears in the cited transcript.  Statement 419 is otherwise disputed, as the material cited does not establish the absence of a genuine dispute regarding a material fact:

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 418 (addressing similar response).

### i.  Apps That Offer Messaging Functionality

420.    Users can communicate on Instagram and Facebook through multiple means,

including, among other things, posts that are shared on Feed or Stories and messages to

individuals or groups of individuals through Instagram Direct or Facebook Chat/Messages.  *See*

*supra* Part I.A.1(b)(vi) & (c)(i).

**FTC Response: Undisputed.**

421.    In addition to applications such as TikTok, Twitter, Pinterest, Snapchat, and

MeWe that offer messaging – *see supra* at ¶¶ 237-238, 300, 341; *see infra* at ¶¶ 492, 523 –

Apple, Google, and Discord offer applications with messaging functionality in the United States.

*See infra* at ¶¶ 423-437.

**FTC Response: Undisputed.**

422.    Applications with messaging functionality have many features that are similar to

features on Instagram and Facebook.  *See supra* Part I.A.1(b)(vi) & (c)(i).

**FTC Response: Disputed.**  The FTC objects the terms "many" and "similar" as so vague

that the FTC cannot formulate a reasonable response, and objects that Statement 422 is not

supported by the cited material as required by Federal R. Civ. P. 56(c)(1)(A) and Local Rule

7(h).  The internal references cited in Statement 422 describe only Meta's services, and do not

purport to cite material relevant to non-Meta "[a]pplications with messaging functionality."

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that applications with messaging functionality have many features that are similar to features on Facebook and Instagram.  *See supra* Meta Introduction.  As the terms "many" and "similar" are ordinarily understood and used, there is no dispute that there are multiple features on applications with messaging functionality that resemble features on Facebook and Instagram.  As Meta demonstrated in the paragraphs describing Facebook's, Instagram's, and WhatsApp's features, *see supra* Part I.A.1(b)(vi) & (c)-(d), and the following paragraphs describing the features of Apple Messages, Google messaging apps, and Discord, *see infra* Part I.B.1(i)-(iii) – most of which the FTC does not dispute – Facebook, Instagram, and applications with messaging functionality, such as WhatsApp, Apple Messaging, and Google messaging apps, all have:  a social graph, shared social space, and other "social features."  They also have features that allow users to connect with people they know, including by sending and viewing text, photos, and videos; voice messages; embellishing messages with GIFs, stickers, and likes; and engaging in broadcast or group conversations.  *See supra* Meta SMF ¶¶ 79-81, 96-112, 116, 120, 125, *infra* ¶¶ 423-432, 435-437.

### i.      Apple Messages (iMessage)

423.    Apple's Messages app allows users to "communicate with people that they know by sending and receiving text messages and other types of content, like photos and videos." Ex. 82 at 21:8-20 (Shah (Apple) Dep. Tr.).

**FTC Response: Undisputed.**

424.    The Messages app is part of Apple's iOS, iPadOS, and MacOS operating systems available for use on an iPhone, iPad, or Mac computer.  *See* Ex. 82 at 22:5-16 (Shah (Apple) Dep. Tr.).  It comes preloaded on each of those devices.  *See id.* at 27:13-20.  As of January 27, 2021, there were over 1 billion active iPhones.  *See id.* at 29:5-32:7. ██████████████



In 2021, Messages (or iMessage) had ▮▮▮▮▮ monthly active users in the United States, compared to Google Messages with ▮▮▮▮▮ as of that time. *See* Ex. 2 at ¶ 304 (Carlton Rep.).

**FTC Response: Disputed in part and incomplete.** The first three sentences are undisputed. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The fifth sentence is undisputed.

**Meta Reply:** The FTC correctly notes that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The statement is otherwise undisputed.

425.    iMessage is an underlying service supported by the Messages app that enables users to send text messages. *See* Ex. 82 at 14:14-19, 21:21-22:4 (Shah (Apple) Dep. Tr.). iMessage was launched in 2011, and offers a way for users to "send text messages in the Messages app." *Id.* at 22:2-4, 182:22-183:3. "The Messages app is part of iOS, iPadOS and MacOS, and so users are able to launch and use Messages when they use" iPhones, iPads or Apple computers running MacOS. *See id.* at 22:5-8.

**FTC Response: Undisputed.**

426.    Messages users can send text messages to other users, as well as "photos, videos, attachments, documents, [and] links," including, for example, links to music. Ex. 82 at 65:6-14

(Shah (Apple) Dep. Tr.).  Messages users can communicate with up to 32 other people in a single conversation.  *See id.* at 26:2-27:4.

**FTC Response: Undisputed.**

427.    Since 2016, Apple's Messages app has enabled users to embellish messages with stickers, as well as confetti and other effects.  *See* Ex. 1 at ¶ 178 n.418 (Ghose Rep.).  As part of the same update, Messages enabled users to "tapback[ ]," a feature through which users could respond directly to a message with an icon.  *Id.*  Specifically, users can apply a "tapback[ ]" consisting of an icon like a heart, a question mark, two exclamation points, a thumbs up, or a thumbs down to a message or piece of media previously sent as part of a conversation.  Ex. 82 at 114:11-115:9 (Shah (Apple) Dep. Tr.).

**FTC Response: Undisputed.**

428.    The below left screenshot is an example of an iMessage conversation, including a heart icon.  For comparison, the below right screenshot is an example of a conversation on Instagram Direct, including a heart icon.



**FTC Response: Undisputed.**  It is undisputed that the first and second sentences refer to screenshots that appear to be examples of content that could be displayed in the Messages app and the Instagram app on a mobile device, subject to the caveat that Meta does not identify how the screenshots were generated or obtained (specifically the steps taken to generate the content that appears on each screenshot) and the above screenshots are not admissible evidence nor are they supported by admissible evidence.

**Meta Reply:**  The FTC's response does not dispute the fact in the statement.  The FTC's evidentiary "caveat" misstates the summary judgment standard, and the FTC's suggestion that

Meta would be unable to introduce screenshots comparing relevant apps in an admissible form at trial is meritless. *Ali v. District of Columbia*, 810 F. Supp. 2d 78, 83-84 (D.D.C. 2011) (there is a "difference between evidence that is admissible at trial and evidence that the Court may consider at summary judgment," where a party "is not required to produce evidence in a form that would be admissible at trial, so long as her evidence is capable of being converted into admissible evidence" (internal quotation marks omitted)).

429.    When a participant in an iMessage conversation shares multiple photos at once, Messages enables the users to swipe through those photos to review in the Messages app (rather than downloading them to another app); users can also scroll through all of the photos that have been shared in a given conversation by accessing the conversation's information panel (rather than going to another app). *See* Ex. 82 at 117:9-118:22 (Shah (Apple) Dep. Tr.).

**FTC Response: Undisputed.**

430.    Users can use the Messages app to communicate with friends and family. *See* Ex. 82 at 41:12-17 (Shah (Apple) Dep. Tr.). A draft Apple press release from 2020 described Messages as "central to communicating with friends and family." Ex. 78 at -662 (MetaFTC-Klein-DX-154, APL-FTCMETA_00006662). Ronak Shah, the director of product marketing for internet technologies and user privacy at Apple, testified that the "core use case" of Messages was "to allow users to communicate with the people that are in their life that they know, in small, you know – relatively small groups of up to 32 people by exchanging text messages, photos, videos, and links to articles and other types of content." Ex. 82 at 13:22-14:2, 175:8-16 (Shah (Apple) Dep. Tr.).

**FTC Response: Undisputed.**

431.     Professor Hemphill testified that iMessage's "network of connections" includes "nodes and connections and these are people that you know in the real world," and he "suppose[s] it could be a social graph of a kind."  Ex. 283 at 97:22-98:15 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 431 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 431 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).  Professor Hemphill subsequently testified that "relying on phone numbers and phone lists and so forth poses a challenge for thinking about messaging generally as personal – as being akin to personal social networking . . . ."  Ex. 283 at 98:9-13 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill recognized that iMessage's "network of connections . . . could be a social graph of a kind."  *See supra* Meta Introduction.  The additional testimony the FTC recites from Professor Hemphill does not contradict the testimony quoted in the statement.

432.     When asked if posts in a group on iMessage "appear in a shared social space," Professor Hemphill testified, "I don't know. . . .  [T]here are aspects I think of a shared social space there."  Ex. 283 at 98:16-99:3 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 432 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed.  The FTC disputes that Statement 432 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).  Meta also takes Professor Hemphill's

testimony out of context, rendering the statement incomplete.  Professor Hemphill testified in the same answer that "it's hardly automatic. You've had to do all this work to build your cozy little group . . ."  Ex. 283 at 98:16-99:3 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill recognized that there are "aspects" of group iMessages that are "a shared social space."  *See supra* Meta Introduction.  The additional testimony the FTC recites from Professor Hemphill does not contradict the testimony quoted in the statement.

### ii.    Google Messaging Apps

433.    Google has offered several messaging apps, including formerly Google Hangouts and now Google Messages.  *See* Ex. 19 at 31:21-32:3 (Leske (Alphabet) Dep. Tr.) (Google Hangouts); Ex. 20 at 18:3-8, 121:10-17 (Slattery (Alphabet) Dep. Tr.) (Google Messages).

**FTC Response: Undisputed.**

434.    Google has offered Google Messages in the United States since 2014, and today is pre-installed on many Android phones.  *See* Ex. 20 at 33:10-13, 110:19-111:2 (Slattery (Alphabet) Dep. Tr.).

**FTC Response: Undisputed.**

435.    Google Hangouts and Google Messages enable users to send text messages to other users, as well as photos, videos, and links.  *See* Ex. 20 at 18:6-8 (Slattery (Alphabet) Dep. Tr.); Ex. 19 at 30:14-31:17, 204:16-205:6 (Leske Dep. Tr.).

**FTC Response: Undisputed.**

436.    Non-enterprise users of Google Hangouts could initially message groups of up to 50 users, but Google expanded the limit to 150 users.  *See* Ex. 19 at 32:4-19, 55:21-56:6 (Leske (Alphabet) Dep. Tr.).

**FTC Response: Undisputed.**

### iii.    Discord

437.    Discord is a communication app that allows users to converse with one another over text or voice.  *See* Ex. 83 at 22:1-6 (Tang (Discord) Dep. Tr.).  Users can post text messages, upload photos and videos, and connect to a voice or video call in real time.  *See id.* at 24:1-13, 24:19-25:8.  Discord also allows users to send one-to-one and group messages.  *See id.* at 26:4-6.  Discord provides users a "friends list," which shows contacts with whom users can communicate.  *See id.* at 26:12-28:3.

**FTC Response: Undisputed but incomplete.**  The FTC objects to the fourth sentence of Statement 437 because ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████   Otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Discord is a communication platform that allows text, photo, video, and voice communications in both one-to-one and group setting.  As the term "contacts with whom users can communicate" is ordinarily understood and used, there is no dispute that a Discord user can initiate communications with one or more other Discord users on Discord's platform.  The additional testimony the FTC recites from Ms. Tang does not create a dispute of material fact, and is also incomplete because Ms. Tang also testified that users "can request to be added or to connect with [other users] in order to message them."  Ex. 83 at 27:3-7 (Tang (Discord) Dep. Tr.).

iv.   **Competition Between Meta and Applications Offering Messaging**

438.   Messaging apps are a reasonable substitute for certain engagement on Facebook and Instagram, including for sharing and communicating with friends and family.  *See infra* at ¶¶ 439-456.

**FTC Response: Disputed.**  The FTC objects to the terms "reasonable substitute," "certain engagement," and "sharing and communicating with friends and family" as so vague and undefined that Statement 438 is not susceptible to a reasonable response, and disputes Statement 438 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials are not sufficient to establish reasonable interchangeability or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) of Facebook, Instagram, or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider "[m]essaging apps" as a reasonable substitute for "sharing and communicating with friends and family," and the cited material does not establish the absence of a genuine dispute of material fact: that "[m]essaging apps" may compete with Meta in various aspects of firm operations or in a broad sense for user time and attention does not establish that Meta and "[m]essaging apps" are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.5.d.  The FTC provides further detail in its Responses to Statements 439-456.

**<u>Meta Reply</u>:**  The FTC's response does not create a genuine dispute of material fact that messaging apps can be and are used interchangeably with Facebook and Instagram, including for sharing with friends and family.  *See supra* Meta Introduction.  As the terms "reasonable substitute" and "certain engagement" are ordinarily understood and used, the evidence demonstrates that certain activities on ███████████████████████████████████, are reasonably interchangeable with similar activities on Facebook and Instagram, including messaging with friends and family.  *See infra* Meta SMF ¶¶ 439-456.  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including sending messages on Facebook and Facebook Chat and Instagram Direct, *see infra* ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and messaging apps within the relevant market.  Mobile messaging exists on Instagram Direct, Facebook Chat, Messenger, WhatsApp, Snapchat, TikTok, Twitter, LinkedIn, ████, Pinterest, iMessage, Discord, among other apps.  *See supra* ¶¶ 79, 93, 115, 237, 300, 341, 420, 423, ███, 437, *supra* ¶ 492; Ex. 69 at 149:11-16 (Pattabiraman (LinkedIn) Dep. Tr.); ██████████████████████████ ████████████████.  It is also undisputed that one-to-one and one-to-few communications account for significant uses of alleged PSN applications.  *See*, *e.g.*, *infra* Meta SMF ¶ 440 (Mr. Mosseri testifying that Instagram is "more of a messaging app than a broadcast-sharing app at this point" (quoting Ex. 143 at 206:2-4 (Mosseri Dep. Tr.))), ¶¶ 492-493 (undisputed that ████████ of the time spent on Snapchat is on the "Chat" feature, which allows users to send one-to-one or group messages (citing Ex. 98 at -010 (MetaFTC-Klein-DX-390, SNAP – FTC – No. 191-0134 – 0000116009) and quoting Ex. 96 at 112:20-113:14 (Andreou (Snap) Dep. Tr.))), ████ (FTC proffered expert, Professor Lampe, opining that ████████████████████████████████

███████████████████████████████████████████████

██████ (quoting Ex. 290 at ¶ 182 (Lampe Rep.))).

All available empirical evidence of substitution shows that non-PSN apps are closer substitutes for Facebook and Instagram than Snapchat, which the FTC asserts is a PSN app.  *See infra* Meta SMF ¶¶ 562-566 (citing Ex. 2 at ¶ 29 & p. 34, tbl. 1 (Carlton Rep.)).  This is consistent with documents and testimony from Meta and other apps, and testimony from the FTC's proffered experts.  *See infra* ¶¶ 439-447 (Meta documents and testimony), ¶¶ 448-456 (non-party documents and testimony), ¶¶ 457-460 (FTC expert testimony).  For example, Professor Hemphill acknowledged that messaging on iMessage provides a way to share with a "network of connections" using a "social graph" in a "shared social space."  *See infra* ¶¶ 431-432 (quoting Ex. 283 at 97:22-98:15, 98:16-99:3 (Hemphill Dep. Tr.)).  The additional testimony the FTC recites from Professor Hemphill, stating that he does not believe messaging should be in the PSNS market, does not dispute that there is substitution between Facebook and Instagram and messaging apps.  When asked if "messaging applications are also a substitute communication channel for communicating with close friends," Professor Lampe testified, "[m]essaging along with other apps can be used for maintaining relationships with close friends, yes."  *See infra* ¶ 459 (quoting Ex. 281 at 57:17-58:7 (Lampe Dep. Tr.)); *see also* ███████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████ .

The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those

paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

439.    **Meta Documents and Testimony.**  Meta documents and executives recognize messaging apps as Facebook's and Instagram's competitors.  For example, in August 2020, Mr. Zuckerberg testified that ███████████████████████████████████████ ██████████████████████████████████  Ex. 139 at 133:10-134:14 (Zuckerberg IH Tr.).  At his May 9, 2023 deposition, Mr. Zuckerberg testified that "a lot of, you know, what [the FTC is] calling friends sharing has actually shifted to messaging apps, you know, like the ones that we build but also iMessage and Snapchat and things like that is because people want the ability to share with different groups of people."  Ex. 142 at 18:3-9 (Zuckerberg Dep. Tr.).  Mr. Zuckerberg also noted that, "I think iMessage and text messaging are big competitors" to Facebook.  *Id.* at 37:13-14.

**FTC Response: Disputed in part.**  The FTC objects to the term "competitors" as vague. It is undisputed that the second, third, and fourth sentences of Statement 439 accurately relay the words that appear in the cited materials.

The first, second, and fourth sentences of Statement 439 are otherwise disputed as the material cited does not establish the absence of a genuine dispute regarding any material fact: Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and messaging apps are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. As Professor Hemphill has explained, an increase in usage of time spent on messaging apps, including iMessage, is not inconsistent with the existence of a relevant antitrust market for

personal social networking services.  *See, e.g.*, Ex. 283 at 110:2-14 (Hemphill Dep. Tr.) ("Q. Is it your opinion that Meta considers iMessage to be a competitor of its – of Facebook and Instagram? . . . A. Well, I recall Apple's strong view that iMessage is not doing that. I would agree at a very high level of generality that lots of things are competitive constraints, not in a way relevant to market definition for reasons that are set out in the report. So, you know, it wouldn't surprise me for Facebook or now Meta to regard lots of things as competitors at that general level including messaging.").

The third sentence of Statement 439 is otherwise disputed because other, more reliable, evidence contradicts the assertion that "friends sharing has actually shifted to messaging apps." As Professor Hemphill explained, ██████████████████████████████████████ ████████████████████████████████████████████.  *See* PX9007, Hemphill Rebuttal Report Exs. 7, 8, and ¶ 243 (████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████).  Professor Hemphill testified as follows:

> Q. Meta executives have recognized a shift from Feed-based sharing to sharing via messaging, correct?
>
> ***
>
> Well, I don't know what we mean by – by shift. ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████ . . . . So based on the graph that you showed me, I don't know in what sense we mean shift. If we mean shift as a -- as a percentage, I guess possibly, right. It could be true that Feed and Stories together could be unchanged or a bit up and messages grows even bigger. And so mechanically as a fraction that would increase. That would be a shift in a percentage basis of a kind, but not a shift that would significantly challenge my opinion that personal social networking services are a relevant antitrust market.

Ex. 283 at 135:5-136:6 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes iMessage and messaging apps as Facebook's and Instagram's competitors or that Mr. Zuckerberg testified that friend sharing has shifted to messaging apps.  *See supra* Meta Introduction.  As the term "competitors" is ordinarily understood and used, including in Meta testimony and ordinary-course documents, it is clear that Facebook, Instagram, and messaging apps compete with one another.  The testimony the FTC recites from Professor Hemphill regarding competition does not create a dispute of material fact, as Professor Hemphill conceded that "that to communicate with real world friends or real world family under particular circumstances messaging is an alternative to which they might turn."  Ex. 283 at 109:20-110:1 (Hemphill Dep. Tr.).  Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including sending messages on Facebook and Facebook Chat and Instagram Direct, *see infra* Meta SMF ¶¶ 580-584, there is likewise no genuine dispute that competition occurs between Facebook, Instagram, and messaging apps within the relevant market.  Mobile messaging exists on Instagram Direct, Facebook Chat, Messenger, WhatsApp, Snapchat, TikTok, Twitter, LinkedIn, ████, Pinterest, iMessage, Discord, among other apps.  *See supra* ¶¶ 79, 93, 115, 237, 300, 341, 420, 423, ██, 437, *infra* ¶ 492; Ex. 69 at 149:11-16 (Pattabiraman (LinkedIn) Dep. Tr.); ████████████████████████████.  It is

also undisputed that one-to-one and one-to-few communications account for significant uses of alleged PSN applications.  *See*, *e.g.*, *infra* Meta SMF ¶ 440 (Mr. Mosseri testifying that Instagram is "more of a messaging app than a broadcast-sharing app at this point" (quoting Ex. 143 at 206:2-4 (Mosseri Dep. Tr.))), ¶¶ 492-493 (undisputed that ██████ of the time spent on Snapchat is on the "Chat" feature, which allows users to send one-to-one or group messages (citing Ex. 98 at -010 (MetaFTC-Klein-DX-390, SNAP – FTC – No. 191-0134 – 0000116009) and quoting Ex. 96 at 112:20-113:14 (Andreou (Snap) Dep. Tr.))), ████ (FTC proffered expert, Professor Lampe, opining that ███████████████████████████ ██████████████████████████████████████ (quoting Ex. 290 at ¶ 182 (Lampe Rep.))).

All available empirical evidence of substitution shows that non-PSN apps are closer substitutes for Facebook and Instagram than Snapchat, which the FTC asserts is a PSN app.  *See infra* Meta SMF ¶¶ 562-566 (citing Ex. 2 at ¶ 29 & p. 34, tbl. 1 (Carlton Rep.)).  This is consistent with documents and testimony from Meta and other apps, and testimony from the FTC's proffered experts.  *See supra* ¶ 439, *infra* ¶¶ 440-447 (Meta documents and testimony), ¶¶ 448-456 (non-party documents and testimony), ¶¶ 457-460 (FTC expert testimony).  For example, Professor Hemphill acknowledged that messaging on iMessage provides a way to share with a "network of connections" using a "social graph" in a "shared social space."  *See infra* at ¶¶ 431-432 (quoting Ex. 283 at 97:22-98:15, 98:16-99:3 (Hemphill Dep. Tr.)).  When asked if "messaging applications are also a substitute communication channel for communicating with close friends," Professor Lampe testified, "[m]essaging along with other apps can be used for maintaining relationships with close friends, yes."  *See infra* ¶ 459 (quoting Ex. 281 at 57:17-58:7 (Lampe Dep. Tr.)); *see also* ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ .

The portions of Professor Hemphill's rebuttal report and the testimony from Professor Hemphill that the FTC recites do not create a dispute of material fact. Although Professor Hemphill found that ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ . *See supra* Meta SMF ¶ 9 (undisputed that Facebook's U.S. monthly active users count increased by approximately ██ ██ between 2012 and 2022), *infra* ¶¶ 658 & 724 (undisputed that Instagram's U.S. monthly active users count increased by approximately ██████ between 2012 and 2022); PX9007, Hemphill Rebuttal Rep. at ¶ 243 & p. 83, Exs. 7, 8 (not controlling for number of users). It is therefore undisputed that sharing with friends and family using messaging apps has increased, ████████████████████████████████████████████████████████████

███████████████████████████████ .

440.    Other Meta executives testified about the shift from broadcast sharing to messaging. Mr. Mosseri testified: ██████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ Ex. 143 at 145:3-23 (Mosseri Dep. Tr.).  Mr. Mosseri further testified

that Instagram is "more of a messaging app than a broadcast-sharing app at this point."  *Id.*

at 206:2-4.  Mr. Mosseri also testified that ████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ *Id.* at 203:15-18.

**FTC Response: Disputed in part.**  Undisputed only to the extent that Statement 440

accurately quotes the words that appear in the cited materials.  Otherwise disputed, as the

material cited does not establish the absence of a genuine dispute regarding a material fact, *see*

Fed. R. Civ. P. 56(c)(1)(B), and as not supported by the cited material as required by Federal

Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The first sentence and second sentences are disputed because other, more reliable,

evidence contradicts the assertion that there has been a "shift from broadcast sharing to

messaging."  As Professor Hemphill explained, ██████████████████████████████████

██████████████████████████████████████████████████.  *See*

PX9007, Hemphill Rebuttal Report Exs. 7, 8, and ¶ 243 (████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████).  Professor Hemphill testified as follows:

Q. Meta executives have recognized a shift from Feed-based sharing to sharing via messaging, correct?

***

Well, I don't know what we mean by – by shift. █████████
██████████████████████████████████████████
██████████████████████████ . . . . So based on the graph that you showed me, I don't know in what sense we mean shift. If we mean shift as a -- as a percentage, I guess possibly, right. It could be true that Feed and Stories together could be unchanged or a bit up and messages grows even bigger. And so mechanically as a fraction that would increase. That would be a shift in a percentage basis of a kind, but not a shift that would significantly challenge my opinion that personal social networking services are a relevant antitrust market.

Ex. 283 at 135:5-136:6 (Hemphill Dep. Tr.).

Professor Lampe also explained that:

I agree that private sharing has increased, but broadcast sharing is still pretty healthy.  So it's hard for me to make an assessment of how much of that is a replacement, which I think is what you're asking, versus that both of those activities have increased.  There's still both public sharing and private sharing on Facebook.

*See* Ex. 281 at 88:19-89:4 (Lampe Dep. Tr.); CMF at § II.A.5.d(3).

The FTC objects that the third and fourth sentences do not support any assertion regarding "a shift from broadcast sharing to messaging," as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes iMessage and messaging apps as Facebook's and Instagram's competitors or that Mr. Mosseri testified that █████████████████████████████████
████████████████████.  *See supra* Meta's Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).  The testimony the FTC recites from Professor Hemphill does not create a genuine dispute regarding competition or the shift from broadcast sharing to messaging,

as stated above in Meta's reply to paragraph 439.  Testimony the FTC recites from Professor

Lampe that he was unable to make an assessment of the shift does not create a genuine dispute

regarding ███████████████████████████████████████████████████████████

███████████████, and also for the reasons stated above in Meta's reply to paragraph 439.

Finally, the FTC suggestion that the third and fourth sentences quoting Mr. Mosseri's testimony

do not support the statement is baseless.  Mr. Mosseri's testimony about Instagram being "more

of a messaging app than a broadcast-sharing app at this point" reflects his opinion that

Instagram's use has shifted from the latter to the former over time.  His testimony about ██████

██████████████████████████████████████████████████████████████████

███████████████████████████. The FTC's cross-reference to a section of its

Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact,

and Meta incorporates its responses to those paragraphs here.

    441.    Mr. Alison testified, ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████ Ex. 146 at 69:22-70:11 (Alison Dep.

Tr.).  Ms. Simo, Mr. Alison's predecessor as the head of Facebook, testified that "one of the

trends that we've seen and that iMessage exemplifies is this idea that people more and more like

to share privately and not with all of their friends, but just with a couple of their friends, which is

something that we've certainly – a trend that we've certainly perceived and – and that has impacted our roadmap."  Ex. 149 at 227:2-8 (Simo IH Tr.).

**FTC Response: Disputed in part.**  Undisputed only to the extent that Statement 441 accurately quotes the words that appear in the cited materials.  Otherwise disputed, as the material cited does not establish the absence of a genuine dispute: Meta's perception that other firms compete in various aspects of firm operations does not establish that Meta and messaging apps are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Mr. Alison's testimony is also contradicted by the testimony of TikTok executive and corporate representative Adam Presser, who, when asked if TikTok views itself "as a competitive alternative to Facebook and Instagram for messaging," answered "[w]e offer messaging capabilities as a part of the service that we provide to our users in their consumption of entertainment; but, no, I don't think we view ourselves as a social network."  *See* Ex. 24 at 111:8-15 (Presser (TikTok) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes iMessage and messaging apps as Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).  The testimony the FTC recites from █████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████.  As Meta has observed, ██████████████████████████████████████████ ████████████████████████████ Ex. 252 at -290 (MetaFTC-DX-1183, FTC-META-003582289).  █████████████████████████████████████████



*See supra* Meta SMF ¶¶ 79-81 (Instagram), ¶¶ 97-100 (Facebook).

442.   Documents from Meta reflect the shift from broadcast sharing to messaging and confirm competition between Facebook and Instagram and applications that offer messaging functionality.  For example, ████████████████████████████████████████

Ex. 243 at -913 (FTC-META-003095912).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the use of the term "competition" as vague and undefined.  It is undisputed that the second sentence of Statement 442 accurately relays the words that appear in the cited document.  The FTC disputes the first sentence Statement 442 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The first sentence is disputed because ████████████████████ does not "reflect [a] shift from broadcast sharing to messaging" or "confirm competition between" any applications, and the material cited does not establish the absence of a genuine dispute: Meta's perception that other firms compete in various

426

aspects of firm operations is not relevant to any material fact and does not establish that Meta

and messaging apps are competitors in the provision of personal social networking services.

As Professor Hemphill explained, ████████████████████████████████████████

████████████████████████████████████████████. *See* PX9007,

Hemphill Rebuttal Report Exs. 7, 8, and ¶ 243 (████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████).  Professor Hemphill testified as follows:

> Q. Meta executives have recognized a shift from Feed-based sharing to sharing via messaging, correct?
>
> ***
>
> Well, I don't know what we mean by – by shift. ████████████████
> ████████████████████████████████████████
> ████████████████ . . . . So based on the graph that you showed
> me, I don't know in what sense we mean shift. If we mean shift as a
> -- as a percentage, I guess possibly, right. It could be true that Feed
> and Stories together could be unchanged or a bit up and messages
> grows even bigger. And so mechanically as a fraction that would
> increase. That would be a shift in a percentage basis of a kind, but
> not a shift that would significantly challenge my opinion that
> personal social networking services are a relevant antitrust market.

Ex. 283 at 135:5-136:6 (Hemphill Dep. Tr.).

Professor Lampe also explained that "I agree that private sharing has increased, but broadcast

sharing is still pretty healthy.  So it's hard for me to make an assessment of how much of that is a

replacement, which I think is what you're asking, versus that both of those activities have increased.  There's still both public sharing and private sharing on Facebook."  *See* Ex. 281 at 88:19-89:4 (Lampe Dep. Tr.).  *See also* CMF at § II.A.5.d(3).

Further, the quoted language renders the statement incomplete.  Mr. Mosseri explains that



Ex. 243 at -912 (FTC-META-003095912) (emphasis added).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes a shift from broadcast sharing to private sharing via messaging platforms and that messaging apps compete with Facebook and Instagram.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).  The additional testimony the FTC recites from Mr. Mosseri does not create a genuine dispute that users are shifting to private sharing via messaging platforms, where users can share with friends and family.  And actual usage data shows that ██████████████████████████████████████████████████████████████ ████████████████████████████████████████. *See supra* Meta SMF ¶¶ 11-12, 56-57.  As Mr. Mosseri also testified, ████████████████████████████████████████████████.  Ex. 143 at 150:2-11 (Mosseri Dep. Tr.).  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

443.     In 2016, Mr. Schultz, then Meta's vice president of analytics, wrote in an email discussing data on Snapchat's effect on Meta engagement and how it may compare with messaging apps' effect:  "A key thing to note that stands out to me is that in the world of messaging when we were freaking out on that although messaging was clearly creating new forms and new volumes of sharing we also saw REAL PAIN in Facebook's core business (esp. in DE and ES at first).  When whatsapp was down we saw huge surges in revenue, content sharing, feedback and message sends AND in the countries where a big messaging competitor happened facebook growth stagnated and engagement shrank. . . .  We have simply not seen the same in Norway with snapchat so my inclination is that this MATTERS A LOT but is more incremental than messaging was (very important to include iMessage in the thinking btw – we see iMessage as bigger than facebook, whatsapp, messenger or snapchat on iOS in the US)."  Ex. 231 at -550 (FB_FTC_CID_02425546).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 443 accurately relays the words that appear in the cited document.  Statement 443 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute: Meta's perception that other firms may be "competitor[s]" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and messaging apps are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes that messaging apps compete with Facebook and Instagram not just for sharing

content, but that ███████████████████████████████████. *See supra*

Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).

> 444.   A July 2019 Meta strategy document stated that ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Ex. 246 at -814-815 (FTC-

META-003670810).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 444

accurately relays the words that appear in the cited document.  Statement 444 is otherwise

disputed, as the cited material does not establish the absence of a genuine dispute: the phrase

████████████████ is so vague and undefined that Statement 444 is not susceptible to a

reasonable response, and Meta's perception that Instagram was ██████████████████

████████ in certain aspects of its operations or in a broad sense for time or attention does not

establish that Meta and messaging apps are competitors in the provision of personal social

networking services, that there is not a relevant market for personal social networking services,

or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta recognizes that messaging apps compete with Instagram, ████████████████. *See*

*supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).  As the term

████████████████ is ordinarily understood and used, including in the context of the document

in question, it is clear that ████████████████████████████████████████████████

████████████████.

445. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████ Ex. 222 at

-.002, -.009 (FTC-META-005944143). ███████████████████

███████████████████████████████████ *Id.*  At his

deposition, Professor Hemphill acknowledged that he ███████████████

████████████████████████████ Ex. 283 at 117:7-15

(Hemphill Dep. Tr.).  Professor Hemphill relied on ████████████████ *See*

Ex. 279 at ¶ 284 n.573 (Hemphill Rep.).

**FTC Response: Disputed in part.**  It is undisputed that Statement 445 accurately relays

the words that appear in the cited material.  Statement 445 is otherwise disputed.

The first and second sentences are disputed because they do not establish the absence of a

genuine dispute and are not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B),

56(c)(2).

The third sentence is disputed because it mis-states the witness's testimony, which did

not relate to ████████████████████████ and instead related to his

testimony that "███████████████████████████████████"

-- Professor Hemphill testified:

> A. My recollection is that there is evidence suggesting that ██████
> ████████████████████ ███████
>
> Q. And do you have an opinion about ████████████████
> ██████████ ?

MS. CERILLI: Objection to form.

A. I believe that there's evidence that ███████████████████████████
███████████████████████████████████████████████████████████
███████

Ex. 283 at 117:3-15 (Hemphill Dep. Tr.).

The final sentence is undisputed to the extent that Professor Hemphill relied on the cited material as evidence for the statement that "Another Meta presentation from 2020 reported that ████████████████████████████████████████████████████████████████████" but otherwise disputed to the extent that the final sentence asserts that Professor Hemphill relied on the cited material to support an assertion regarding mobile messaging or the growth of a "private sharing" use case.  Professor Hemphill testified that iMessage use among close connections was "consistent with my opinions that iMessage is incapable of the kind of social graph or shared social space that would be needed for a full PSN offering."  Ex. 283 at 117:16-118:2 (Hemphill Dep. Tr.).  This distinction is reinforced by Professor Hemphill in his report where he explained "evidence demonstrates that people use these mobile messaging applications for different reasons than they use personal social networking applications. Messaging apps are used for one-to-one or one-to-few private messaging, which differs from the use case of personal social networking apps: friends and family sharing through the formation of social network connections and broadcast sharing, and interaction with those connections in a shared social space."  PX9000, Hemphill Report at ¶ 574.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that a Meta survey regarding the ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar

response).  The FTC's claim that the quoted language "mis-states" Professor Hemphill's

testimony is incorrect because his testimony that ████████████████████████████

████████████████████████ does relate to a ███████████████████████████████

██████████████████████████████████████████████████████████████████████████.

And there is no dispute that ███████████████████████ of all time on Snap is spent

"viewing or spending time on Chat."  *See infra* Meta SMF ¶ 493.  The FTC's "dispute" with the

final sentence is not genuine or material because Meta stated only that Professor Hemphill relied

on the document.

446.    Similarly, a September 2020 discussion among Instagram executives stated ████



████████████████████████████████████ Ex. 240 at -082 (FTC-META-002474082).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 446

accurately relays the words that appear in the cited document. Statement 446 is otherwise

disputed.

The FTC objects to the word "[s]imilarly" because it provides no context that might

allow the FTC to understand Meta's assertion regarding what the quoted language in Statement

446 is asserted to be "similar[]" to, and the FTC is therefore unable to formulate a reasonable

response to Statement 446.  While no response is required, the FTC disputes Statement 446 as

the cited material does not establish the absence of a genuine dispute: Meta's perception that

other firms may be in "competition" in certain aspects of its operations or in a broad sense for

time or attention does not establish that Meta and messaging apps are competitors in the

provision of personal social networking services, that there is not a relevant market for personal

social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta ███████████████████████████████████████████████████████████████████

███████████.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).  The "similarly" is a reference to the statement in the prior paragraph.

447.    On Meta's January 2021 earnings call, Mr. Zuckerberg stated "we increasingly see Apple as one of our biggest competitors.  iMessage is a key linchpin of their ecosystem.  It comes pre-installed on every iPhone and they've preferenced it with private APIs and permissions, which is why iMessage is the most used messaging service in the US."  Ex. 402 at 3 (Facebook, Inc. Q4 2020 Earnings Call).  Mr. Zuckerberg reiterated this point during Meta's October 2021 earnings call, stating that "over the last decade . . . competition [for Meta's services] has also gotten more intense, especially with Apple's iMessage growing in popularity."  Ex. 403 at 3 (Facebook, Inc. Q3 2021 Earnings Call).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that Statement 447 accurately relays the words that appear in the cited document.  Statement 447 is otherwise disputed, as the cited material does not establish the absence of a genuine dispute regarding a material fact: Meta's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not establish that Meta and messaging apps are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta recognizes Apple – including its iMessage product – as one of its biggest competitors.  *See supra* Meta Introduction; Meta SMF ¶¶ 339-440 (including Meta replies).

448.   **Nonparty Documents and Testimony.** 

**FTC Response: Disputed.**  The FTC objects to the use of the term ▇▇▇▇▇ in Statement 448 as vague and undefined.  Statement 448 is otherwise disputed.

First, Statement 448 is disputed because it is not supported by any cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

Second, Statement 448 is disputed because an increase in usage of messaging does not a "shift from broadcast sharing to messaging," and the material cited does not establish the absence of a genuine dispute: Meta's perception that other firms compete in various aspects of firm operations is not relevant to any material fact and does not establish that Meta and messaging apps are competitors in the provision of personal social networking services.  As Professor Hemphill explained, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *See* PX9007, Hemphill Rebuttal Report Exs. 7, 8, and ¶ 243 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

████████████████████████████████████████████████████████

████████████████████████ ).

Professor Lampe also explained that "I agree that private sharing has increased, but broadcast sharing is still pretty healthy. So it's hard for me to make an assessment of how much of that is a replacement, which I think is what you're asking, versus that both of those activities have increased. There's still both public sharing and private sharing on Facebook." *See* Ex. 281 at 88:19-89:4 (Lampe Dep. Tr.). *See also* CMF at § II.A.5.d(3).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████████████████

████████████████████████████████. *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response). The evidence supporting this statement is in the paragraphs below. *See infra* Meta SMF ████████ (documents and testimony from ████, Google, Apple, ████████████ ). The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

449.  ***Twitter.***  Twitter documents and executives recognize messaging apps as Facebook's and Instagram's competitors. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the use of the term ██████████ as vague and undefined.  The first sentence of Statement 449 is disputed because it is not supported by any cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) – the material cited in connection with the second sentence does not relate to or reference that ███████████████████████████████████ ████████████████████████

The first sentence is further disputed because the suggestion that the second sentence suggests that Twitter recognizes "messaging apps" as "competitors" to all services identified in the second sentence is contradicted by Mr. Chen's testimony contrasting private messaging with Twitter's primary use case of "any time there's a conversation happening in public, you know, Twitter is the place to be for -- for that conversation." ███████████████████████ ██

Statement 449 is disputed, as it does not establish the absence of a genuine dispute: ██ ███████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██ .  *See* Fed. R. Civ. P. 56(c)(1)(B).

It is undisputed that the second sentence of Statement 449 accurately relays the words that appear in the cited material.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Twitter recognizes messaging apps as Facebook's and Instagram's competitors and observed a

shift from broadcast sharing to messaging. *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response). The additional portions of Mr. Chen's testimony about the existence of public sharing on Twitter (50 pages after the testimony Meta cited) does not contradict Mr. Chen's testimony that Twitter reported that users were taking content from social platforms to messaging apps.

      450. ***Google.*** Google documents and executives recognize messaging apps as Facebook's and Instagram's competitors. ████████████████████

████████████████████████

██████████████████████████

██████████████████████████

███████████████████████████

██████████████████████████

██████████████████████

███████████████████████

███████████████████████████

██████████████████████

███████████████████████████

████████████████

      **FTC Response: Disputed in part and incomplete.** The FTC objects to the use of the term "competitors" as vague and undefined.

      The first sentence of Statement 450 is disputed because it is not supported by any cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) – the material cited in Statement 450 does not relate to or reference that ████████████████

████████████████████████████████████████████████ The first

sentence is further disputed because it is contradicted by other, more reliable, testimony from a

Google executive, who distinguished between Google Hangouts (a former messaging app) and

Google+ (a former personal social network) as each having a different "fundamental value

proposition for an end user." ███████████████████████████████

Statement 450 is disputed, as it does not establish the absence of a genuine dispute: ███

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███. *See* Fed. R. Civ. P. 56(c)(1)(B).

It is undisputed that the second, third, fourth, and fifth sentences of Statement 450

accurately relay some of the content of the cited materials.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Google recognizes messaging apps as Facebook's and Instagram's competitors and observed a

shift from broadcast sharing to messaging.  *See supra* Meta Introduction; Meta Reply to SMF

¶ 439 (addressing similar response).  The FTC is incorrect that the paragraph does not support

the proposition: ████████████████████████████

█████████████████████████████████.  Mr. Leske's

testimony discussing Google+ from over a decade ago does not contradict ███████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████ and

observed a shift from broadcast sharing to messaging.  *See infra* Meta SMF ¶ 451.

451.    Matthew Leske, a product lead at Google who has worked on various Alphabet

messaging products, testified that the company monitored developments from Instagram.  *See*

Ex. 19 at 202:11-15 (Leske (Alphabet) Dep. Tr.).  He testified that Instagram and Snapchat,

among others, would come up "in most discussions we would have about messaging."  *Id.*

at 227:20-228:4.  In April 2016, Google employees circulated internally news stories indicating

that "'original broadcast sharing' was down 21% year over year" on Facebook with a "factor in

the decline [being] that some sharing activity shifted to messaging, and to competitors."  Ex. 22

at -140-141 (GOOG-META-00962140).

**FTC Response: Disputed in part and incomplete.**  It is undisputed that the second and

third sentences of Statement 451 accurately relay words that appear in the cited materials.

Statement 451 is otherwise disputed as the cited material does not establish the absence of a

genuine dispute: the assertion that Google "monitored developments from Instagram," or would

discuss Instagram and Snapchat in "discussions we would have about messaging," or "circulated

internally news stories" does not establish that Meta and messaging apps (or Meta and Google)

are competitors in the provision of personal social networking services, that there is not a

relevant market for personal social networking services, or that Meta is not exercising monopoly

power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC further disputes Statement 451 because it is contradicted by Mr. Leske's

subsequent testimony, where he testified that "I don't feel like the – those first -- the Facebook,

Instagram, LinkedIn, and Twitter were necessarily apps we actively were trying to seek users

from other than Facebook Messenger, but to some degree users choose to spend their time in a

given day in a particular place.  So to the degree you're attracting use when a user can choose to spend ten minutes in App A or App B, you would hope that they would spend it in – Google would hope that they spend that time in Google apps obviously."  Ex. 19 at 273:22-274:12 (Leske (Alphabet) Dep. Tr.).

The third sentence is further disputed because the statements cited therein are not admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Google recognized that its various messaging applications considered alleged PSN applications including Snapchat and Instagram as competitors, that it monitors them in the ordinary course of business, that they would come up in most conversations that the company had about messaging, and that Google observed a shift from broadcast sharing to messaging.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response), ¶ 450 (addressing Google documents).  ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████  Mr. Leske explained that, during his time working on Hangouts, to the extent someone was going to send a message the company wanted the user to do so using "Hangouts as compared to Instagram."  *Id.* at 274:14-18.  Mr. Leske also explained that Instagram offers the "core use case for messaging."  *Id.* at 258:14-16.

452.  ***Apple.***  Apple documents recognize messaging apps as Facebook's and Instagram's competitors.  █████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████ Ex. 81 at -307 (MetaFTC-Klein-

DX-157, APL-FTCMETA_00005274).  A 2016 strategy document titled ████████████

prepared by Apple identified as one of the ████████████████████████████████████

██████████████████████████████████████████ Ex. 79 at -078 (APL-

FTCMETA_00016037).  And a 2021 email between Apple employees discussing ████████

████████████████████████████████████ described the ████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the use of the

term ████████████ as vague and undefined.  It is undisputed that the second, third, and fourth

sentences of Statement 452 accurately relay words that appear in the cited documents.

Otherwise disputed.

The first sentence of Statement 452 is disputed because it is not supported by any cited

material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) – the

material cited in Statement 452 does not relate to or reference that ████████████████████████

██████████████████████████████████████████ Statement 452 is otherwise

disputed, as it does not establish the absence of a genuine dispute: ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████.

*See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Apple recognizes messaging apps as Facebook's and Instagram's competitors.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).

453.

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the use of the

term " ███████████ " as vague and undefined.  It is undisputed that the second, third, and fourth

sentences of Statement 453 accurately relay words that appear in the cited testimony.

The first sentence of Statement 453 is disputed because it is not supported by any cited material

as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h) – the material

cited in Statement 453 does not relate to or reference that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

Statement 453 is otherwise disputed as the cited material does not establish the absence of a

genuine dispute: ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

████████████████████████████████████████████████████.  *See supra*

Meta's Introduction; Meta Reply to SMF ¶ 439 (addressing similar response).  The additional

portions of ▮▮▮▮▮ testimony the FTC recites do not create a genuine dispute that, among other things, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮; *infra* Meta SMF ¶¶ 580-584 (FTC classifying all features on PSN apps as in the relevant market). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In any event, these are important features on apps the FTC classifies as PSNS. *See*, *e.g.*, Meta SMF ¶ 440 (Mr. Mosseri testifying that Instagram is "more of a messaging app than a broadcast-sharing app at this point." (quoting Ex. 143 at 206:2-4 (Mosseri Dep. Tr.))), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮. Contrary to the FTC's characterization, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

454.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

**FTC Response: Disputed in part and incomplete.**  It is undisputed that the first and second sentences of Statement 454 accurately relay words that appear in the cited testimony. Statement 454 is otherwise disputed as the cited material does not establish the absence of a genuine dispute: ████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████ . *See* Fed. R. Civ. P. 56(c)(1)(B).

Statement 454 is also incomplete because the deponent contrasted Discord with personal social networking apps by explaining that "my understanding was that it was not common for people who were using Discord on a interest-led type of community to know the other person or go by the other person's real name." ███████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that ██████████████████████████████████████████████████

██████ . *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar response), ██████████████████████████████████████ . The additional portions of ██████████ testimony

the FTC recites do not create a genuine dispute that among other things, ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████  The FTC is also incorrect that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████

455.   ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████

**FTC Response: Disputed in part and incomplete.**  It is undisputed that the second, third, and fourth sentences of Statement 455 accurately relay words that appear in the cited evidence.  Statement 455 is otherwise disputed as the cited material does not establish the absence of a genuine dispute: ████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Statement 455 is also incomplete because Discord's corporate representative distinguished Discord from Facebook, explaining that "for the time that I was there, I would say that Facebook as a platform overall and Discord were quite different in that Facebook -- I did not consider Facebook as a place where people were sharing the same interests necessarily. It was very much surrounding a person's personal network, like their known friends or family, and it is about that person's life and that person's perspective, as opposed to collectively we are all there talking about this hobby, passion, interest of ours.  There are probably some element[s] of that, but I do not consider that to be the majority of what Facebook was about." ████████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

██████████████████████████████████████████████████████████

████████████████████████████████████████.  *See supra* Meta

Introduction; Meta Reply to SMF ¶ 439 (addressing similar response), ████████████████████

██████████. The additional portions of ████████ testimony the FTC cites indicating that

████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████.

456.   **Verizon.**  Verizon documents recognize messaging apps as Facebook's and

Instagram's competitors.  Verizon's communications portfolio consists of several products

including a messenger app called Verizon Messages.  *See* ███████████████████

█████████████.  Verizon's ██████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the use of the

term ████████████ as vague and undefined.  It is undisputed that the third and fourth sentences

of Statement 456 accurately relay words that appear in the cited testimony.  Statement 456 is

otherwise disputed as the cited material does not establish the absence of a genuine dispute

regarding a material fact: ███████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████.  *See* Fed. R. Civ. P.

56(c)(1)(B).  Statement 456 is also contradicted by the deponent's testimony that 

*See* Ex. 88 at 70:8-71:7, 96:8-9 ( ).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Verizon

. *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar

response).

### v.   FTC Expert Opinions Regarding Personal Social Networking Services Activity on Messaging

457.    When asked if "an individual wants to share content with friends and family, will

they consider the functionality of both public and private sharing as possible ways of sharing?"

Professor Hemphill testified, "If they are seeking to satisfy the particularized demand for

personal social networking I'd say no, but speaking at a very high level of generality, I would

agree that to communicate with real world friends or real world family under particular

circumstances messaging is an alternative to which they might turn."  Ex. 283 at 109:12-110:1

(Hemphill Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 457 is undisputed to the extent that it

relays words that appear in the cited transcript but is otherwise disputed.  Statement 457 is

otherwise disputed as the cited material does not establish the absence of a genuine dispute

regarding a material fact: Professor Hemphill's excerpted testimony that "under particular

circumstances" messaging provides a way for people to communicate does not establish that

Meta and "messaging" (or any messaging application) competes in the provision of personal

social networking services, that there is not a relevant market for personal social networking

services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Professor Hemphill subsequently testified that "at a very high level of generality that lots of things are competitive constraints, not in a way relevant to market definition for reasons that are set out in the report.  So, you know, it wouldn't surprise me for Facebook or now Meta to regard lots of things as competitors at that general level including messaging."  *See* Ex. 283 at 110:7-14 (Hemphill Dep. Tr.).  Professor Hemphill also explained that "messaging, among other things, is not a close enough substitute for satisfying the demand for personal social networking services to warrant inclusion in the market . . . messaging lacks a social graph or a shared social space."  *See id.* at 100:12-19 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill agreed that private messaging applications can provide an alternative platform to Facebook and Instagram through which users can communicate with their real world friends and family.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar arguments, including the same testimony from Professor Hemphill).

458.    In one of his published articles, Professor Lampe states that "Facebook is unlikely to be a critical communication for close friends because these stronger ties typically use multiple, redundant channels to communicate, as suggested by media multiplexity."  Ex. 404 at 5 (MetaFTC-DX-1136).  Professor Lampe agreed in his deposition with the accuracy of that statement, and that "amongst others, messaging apps" would be a communication channel that would be used for communicating with close friends.  Ex. 281 at 52:20-53:19 (Lampe Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 458 is undisputed to the extent that it relays words that appear in the cited document but is otherwise disputed.  The FTC disputes that Statement 458 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R.

Civ. P. 56(c)(1)(B); 56(c)(1): Professor Lampe's excerpted testimony that messaging provides a way for people to communicate does not establish that Meta and "messaging apps" (or any messaging application) compete in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  Professor Lampe clarified during his deposition that the term "critical" as used in the article "by which at the time we meant that it would become the *only* way that close friends would communicate."  Ex. 281 at 53:10-13 (Lampe Dep. Tr.) (emphasis added).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe wrote in an article – prior to this litigation – and affirmed in this deposition that messaging apps are a reasonable substitute to Facebook for communicating with close friends. *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar arguments).

459.    When asked if "messaging applications are also a substitute communication channel for communicating with close friends," Professor Lampe testified, "[m]essaging along with other apps can be used for maintaining relationships with close friends, yes."  Ex. 281 at 57:17-58:7 (Lampe Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 459 is undisputed to the extent that it relays words that appear in the cited testimony but is otherwise disputed.  The FTC disputes that Statement 459 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B); 56(c)(1): Professor Lampe's excerpted testimony that "messaging along with other apps can be used for maintain relationships" does not establish that Meta and "messaging along with other apps" compete in the provision of personal social networking services, that

there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe testified that "[m]essaging along with other apps can be used for maintaining relationships" with close friends.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar arguments).

460.    When users send a message to one reciprocal connection on Instagram, Professor Lampe testified that users would "*not* be . . . personal social networking as we've previously defined it."  Ex. 281 at 266:9-267:5 (Lampe Dep. Tr.).  Similarly, Professor Lampe testified that when users send a message on Snapchat to another user, that use is not personal social networking.  *See id.* at 293:22-294:6 ("Q. Okay.  One thing you can do with Snapchat is messaging, right?  A. That's correct, as I understand it.  Q. You would agree that messaging use of the app is not personal social networking, right? . . .  A. I would agree, yes.").

**FTC Response: Disputed and incomplete.**  Statement 460 is undisputed to the extent that it relays words that appear in the cited testimony but is otherwise disputed.  The FTC disputes that Statement 460 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B); 56(c)(1): Professor Lampe's excerpted testimony does not establish that Meta and any messaging application compete in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.

The first sentence of Statement 460 is disputed and incomplete because it omits that Professor Lampe's testimony: (1) related solely to the use of the Instagram Direct function on

Instagram, and not to other ways that a user might "send a message to one reciprocal connection," and (2) was limited to what was meant by "personal social networking" in his response, which related solely to how the term is personal social networking is defined "in the longer term" relevant to "the larger PSNS function." Professor Lampe testified regarding use of the messaging function on Instagram as follows:

> Q. All right. And would the activity of sending or viewing messages to one other Facebook friend be personal social networking?
>
> A. Not as we define it in the longer term. So it's relationship maintenance behavior, but it's not personal social networking where we're talking about mass personal broadcast to a broad network.
>
> Q. And let's talk about a group of two to five. Is sending or viewing messages within a group of two to five Facebook friends personal social networking?
>
> MR. SMITH: Objection.
>
> A. Facebook Messenger for me behaves like the messaging services I address in my rebuttal report where since it doesn't have that mass personal effect or bridge multiple parts of a diverse
>
> network that that doesn't then create the personal social networking. Relationship maintenance behavior certainly, but not the larger PSNS function.
>
> Q. And with respect to Instagram Direct, do you understand that to be a service similar to Facebook Messenger?
>
> A. As I understand it, yes.
>
> Q. All right. And would sending messages to one other reciprocal connection on Instagram Direct be personal social networking?
>
> MR. SMITH: Objection.
>
> A. I would have the same basic takeaway as I do for Facebook Messenger, that without that mass personal effect that you get through the specific PSNS features it would not be a personal social networking as we've previously defined it.

Ex. 281 at 265:7-266:17 (Lampe Dep. Tr.).

The second sentence is incomplete because it omits that Professor Lampe's response was again limited to "personal social networking as we defined it earlier." *Id.* at 294:16-295:8 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe testified that messaging on Instagram Direct and Snapchat would not be personal social networking.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 439 (addressing similar arguments).  The FTC's response does not create a genuine dispute of material fact that Professor Lampe (one of the FTC's proffered experts), has offered opinions that conflict with the FTC's market definition and that of Professor Hemphill (another of the FTC's proffered experts) – that is, the FTC has taken the position that messaging on Facebook, Instagram, and Snapchat is personal social networking, while Professor Lampe says that such messaging on those apps is not.  Professor Lampe's response makes this clear.  He testified that use of Instagram Direct – regardless of the number of recipients – "would not be personal social networking as we've previously defined it."  Ex. 281 at 266:5-267:5 (Lampe Dep. Tr.).  He testified the same for Snapchat.  *See id.* 293:22-294:6.

### j.     Many Other Companies Represent to the Public in Annual Reports That They Compete with Facebook or Instagram

461.    At least 184 companies stated that they competed with Meta, Facebook, or Instagram in at least 2012, 2014, or 2021.  Ex. 1 at ¶¶ 74-76 & Ex. C (Ghose Rep.) (compiling list of annual reports).

**FTC Response: Disputed in part.**  Statement 461 is undisputed to the extent that it recounts words that appear in Professor Ghose's report but is otherwise disputed in part.  The FTC disputes that Statement 461 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute of material fact.  *See*

Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).  Professor Ghose cites the 10-K filings of various companies, but the cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with Facebook and Instagram in various aspects of firm operations (e.g., short-form video) or in a broad sense for user time and attention does not establish that any of those firms are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Professor Ghose does not meaningfully consider why these firms mention Meta or how their products may differ from those offered by Meta, or whether they satisfy the same user motivations as Facebook and Instagram with respect to relationship maintenance.  Nor does he point to any evidence in any of these 10-Ks he purported to analyze that any companies beyond those identified by the FTC are personal social network services platforms.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that at least 184 companies stated that they competed with Meta, Facebook, or Instagram in at least 2012, 2014, or 2021.  *See supra* Meta Introduction.

462.    Professor Ghose explained that he compiled the list of 184 companies after examining the Form 10-K "for every U.S. public company in each of three years, 2012, 2014, and 2021, that included the words 'Facebook,' 'Meta,' 'Meta Platforms,' or 'Instagram' within 100 words of the keyword 'compet\*'."  Ex. 1 at ¶¶ 74-76 & Ex. C (Ghose Rep.).  There "were 184 companies that stated they compete with Meta, Facebook, or Instagram in at least one of 2012, 2014, and 2021."  *Id.* at ¶ 75.  Professor Ghose explained that, "[t]his exhibit likely understates the degree of competition because I did not mark cases where a company states, for

instance, that it faces competition with 'social networking companies' or 'news aggregators,' but did not mention Meta or its apps specifically." *Id*. at ¶ 76.

**FTC Response: Disputed in part.**  Statement 462 is undisputed to the extent that it recounts words that appear in Professor Ghose's report but is otherwise disputed in part.  The FTC disputes that Statement 462 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B); 56(c)(2).  The cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with Facebook and Instagram in various aspects of firm operations (e.g., short-form video) or in a broad sense for user time and attention does not establish that any of those firms are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Professor Ghose does not meaningfully consider why these firms mention Meta or how their products may differ from those offered by Meta, or whether they satisfy the same user motivations as Facebook and Instagram with respect to relationship maintenance.  Nor does he point to any evidence in any of these 10-Ks he purported to analyze that any companies beyond those identified by the FTC are personal social network services platforms.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding how Professor Ghose identified the 184 companies that stated that they competed with Meta, Facebook, or Instagram in at least 2012, 2014, or 2021.  *See supra* Meta Introduction.

      **k.**     **There Is No Public Recognition of a PSNS Market Consisting of Facebook, Instagram, Snapchat, and MeWe**

      **i.**     **Non-Parties Consistently Testified That They Were Not Familiar with the FTC's PSNS Market**

463.    **YouTube and Google Hangouts.**  Mr. Filner was asked whether, "other than counsel, have you ever heard the term 'personal social networking service' ever used"; he testified that "it's possible, but I don't recall it.  I don't think I have."  Ex. 9 at 14:6-10, 204:4-18 (Filner (Alphabet) Dep. Tr.).  Thomas Kim, a director of product management, creator monetization, at YouTube, also testified that he "can't recall" the "specific term" "personal social networking services" being used in the ordinary course of business at YouTube and Google.  Ex. 10 at 16:18-17:1, 217:4-10 (Kim (Alphabet) Dep. Tr.).  Mr. Kim also testified that he did not know what the term "personal social networking services" means.  *Id.* at 217:12-13.

**FTC Response: Disputed in part.**  Statement 463 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed because the material cited does not establish the absence of a genuine dispute) and is contradicted by other, more relevant and reliable evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  In addition, the cited material is contradicted by documents from Alphabet that recognize a distinction between social networking services focused on personal uses and those focused on personal uses, including Google's response to the EC regarding Google+.  ████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Google witnesses did not recall the term "personal social networking service" being used in the ordinary course of business.  *See supra* Meta Introduction.  The Google document the FTC cites does not create a genuine dispute that Google does not recognize the FTC's alleged PSNS market consisting only of Facebook, Instagram, Snap, and MeWe.  In fact, the document undermines the existence of the FTC's alleged PSNS market.  ███████████████████

█████████████████████████████████████████

████████████████   Ex. 14 at -900 (GOOG-META-02536890).  ████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████   "Google is not aware of clear-cut segmentations within social networks based on use case or user case."  *Id.* And, as described in paragraph 464, Google wrote that it was "not aware of any definition" of a "social network service."  *Id.* at -894.

464.   ██████████████████████████████████████

██████████   Google wrote, "[t]here is no single industry definition of a social network service and Google is not aware of any definition that could be robustly applied in a binary way. . . . The term 'social network' . . . is a label that does not appear to be very important for users." Ex. 14 at -894 (MetaFTC-Klein-DX-51, GOOG-META-02536890).  Ms. Weinstein agreed with those statements, *see* Ex. 8 at 227:10-228:14 (D. Weinstein (Alphabet) Dep. Tr.), because she

"do[es]n't think users would choose where to spend their time based on whether or not something had a label, social network or a TV network or whatever.  I think they find wherever entertainment or value is provided and go there," *id.* at 228:15-20.  Mr. Filner agreed "that there is no industry-wide definition of social networking service."  Ex. 9 at 79:4-9 (Filner (Alphabet) Dep. Tr.).  As did Matthew Leske.  Ex. 19 at 27:16-29:5, 267:3-268:4 (Leske (Alphabet) Dep. Tr.).

> **FTC Response: Disputed in part.**  Statement 464 is undisputed to the extent that it recounts words that appear in the cited materials but is otherwise disputed in part because the material cited does not establish the absence of a genuine dispute, *see* Fed. R. Civ. P. 56(c)(1)(B), and is contradicted by other, more relevant and reliable evidence.  The fact that
>
> ██████████████████████████████████████████
> ████████████████████████████████████
> ███████████████████████████████████████████
> ███████████████████████████████████████.
>
> *See* Fed. R. Civ. P. 56(c)(1)(B).

> **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Google documents and testimony do not recognize an industry definition of social network service and the label is not important.  *See supra* Meta Introduction.

465.   **Apple.**  On April 27, 2023, Mr. Shah was asked whether "personal social networking service" is a term he uses in the "ordinary course" of his work at Apple.  He replied, "no."  Ex. 82 at 272:21-273:5 (Shah (Apple) Dep. Tr.).

> **FTC Response: Disputed in part.**  Statement 465 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed in part because the

material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P.

56(c)(1)(B).  The fact that 

.  *See* Fed. R. Civ. P.

56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Apple's witness testified that "personal social networking service" was not a term used in the

ordinary course of work at Apple.  *See supra* Meta Introduction.

466.    **Reddit.**  On May 2, 2023, Ms. Raymond was asked "Reddit does not have an

internal working definition of the term personal social networking services either, does it"; she

replied "we do not."  Ex. 64 at 345:14-17 (Raymond (Reddit) Dep. Tr.).  Ms. Raymond also

agreed that personal social networking services was not "a term that Reddit uses in its regular

course of business."  *Id.* at 345:14-20.  Reddit similarly stated, in response to a request for

information from the European Commission, that it "does not have a definition of social

networking service, nor is it aware of a commonly accepted definition."  Ex. 66 at -003

(PX13216, Reddit-FTC-00000001).

**FTC Response: Disputed in part.**  Statement 466 is undisputed to the extent that it

recounts words that appear in the cited documents but is otherwise disputed because the material

cited does not establish the absence of a genuine dispute and is contradicted by more reliable

evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that

█████████████████████████████████████████████████████████████

████ .  *See* Fed. R. Civ. P. 56(c)(1)(B).

The first and second sentences of Statement 466 are also disputed because the cited

material is contradicted by Ms. Raymond's testimony that the definition of social networking

services is "services that enable construction of public or semipublic profile with personal

information.  Such profiles allow users to connect with other users through a network facilitated

by a service."  ███████████████████████████████  The third sentence is also

disputed because in the same submission to the European Commission, Reddit states that it is

"not a social networking service" and that "[u]ser-to-user relationships are not the focus of

Reddit."  ████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Reddit's witness did not recall the term "personal social networking service" being used in the

ordinary course of business.  *See supra* Meta Introduction.  The additional cited testimony and

document in the FTC's response do not create a genuine dispute that Reddit does not recognize

the FTC's alleged PSNS market consisting only of Facebook, Instagram, Snap, and MeWe.

Further, Ms. Raymond did not offer a definition of a "social network" during her deposition.

Instead, she merely read from a Reddit filing with the European Commission in which Reddit

stated:  "Most scholarship defines social networking as services that enable construction of

public or semipublic profile with personal information."  Ex. 64 at 241:4-12 (Raymond (Reddit)

Dep. Tr.) ("A. I can read what we said. . . .  We stated: Most scholarship . . . .") (quoting Reddit-

FTC-00000042).  That is consistent with Reddit's statement in other regulatory filings that it

"does not have a definition of social networking service, nor is it aware of a commonly accepted

definition."  Ex. 66 at -003 (PX13216, Reddit-FTC-00000001).

467.     **Vimeo.**  On May 9, 2023, Mark Kornfilt, formerly the president of Vimeo, testified that Vimeo does not use the term "personal social networking service" in the ordinary course of its business.  Ex. 89 at 10:21-11:6, 35:15-19 (Kornfilt (Vimeo) Dep. Tr.).  When asked if Vimeo recognizes "personal social networking service" as a term of art that is used by other companies in Vimeo's industry, Mr. Kornfilt testified, "No."  *Id.* at 35:21-36:3.

**FTC Response: Disputed in part.**  Statement 467 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that █████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ .  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Vimeo's witness testified that Vimeo does not use or recognize as a term of art in the industry "personal social networking services."  *See supra* Meta Introduction.

468.     **Pixlr.**  On April 20, 2023, the founder and chief executive officer of Pixlr, Ola Sevandersson, testified that 123RF (Pixlr's parent company) does not use the term "personal social networking services" in the ordinary course of its business.  Ex. 90 at 20:12-21:13, 91:1-4 (Sevandersson (Pixlr) Dep. Tr.).  When asked whether Pixlr "recognize[s] a distinct market that includes only Snap, Facebook, and Instagram," Mr. Sevandersson said "no," and explained that "we never lump those three together when we make a business decision."  *Id.* at 93:4-13.

**FTC Response: Disputed in part.**  Statement 468 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The second sentence of Statement 468 is also disputed because it is irrelevant whether Pixlr – which does not offer a personal social networking services – does not consider "only Snap, Facebook, and Instagram" when making business decisions, and the statement is contradicted by other testimony offered by the witness that Pixlr did in fact recognize a market of Facebook and Instagram.  █████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Pixlr's witness testified that the term "personal social networking service" was not used in the ordinary course of business at Pixlr and that Pixlr does not recognize the FTC's alleged PSNS market consisting only of Facebook, Instagram, Snap, and MeWe.  *See supra* Meta Introduction.

469.  **Socialcam.**  On May 2, 2023, Socialcam's co-founder and former chief executive officer, Michael Seibel, was asked whether, "outside of your knowledge of the term 'personal social networking services' as it's used in this lawsuit, have you encountered the term?"  He replied, "I don't think so.  But I – I don't remember."  Ex. 91 at 27:9-17, 135:22-136:5 (Seibel (Socialcam) Dep. Tr.).  When asked, "[i]n your career, have you ever viewed Facebook, Instagram and Snap as the only participants in a distinct competitive market," Mr. Seibel testified, "[o]nly, no."  *Id.* at 136:15-20.

**FTC Response: Disputed in part.**  Statement 469 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that . *See* Fed. R. Civ. P. 56(c)(1)(B).  The second sentence of Statement 469 is also disputed because

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Socialcam's witness testified that "personal social networking service" was not a term encountered prior to the litigation and that Socialcam does not recognize the FTC's alleged PSNS market consisting only of Facebook, Instagram, Snap, and MeWe.  *See supra* Meta Introduction.

470.    **Discord.**  On May 4, 2023, Ms. Tang was asked whether she "use[d] the term 'personal social networking service' in the ordinary course of business at Discord"; she replied, "no, it was not part of day-to-day language used in my role."  Ex. 83 at 16:12-21, 117:19-118:5 (Tang (Discord) Dep. Tr.).

**FTC Response: Disputed in part.**  Statement 470 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that

███████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Discord's witness testified that the term "personal social networking service" was not used in the ordinary course of business at Discord.  *See supra* Meta Introduction.

471.  ██████████████████  Quora's chief financial officer, Courtland Showerman,

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████

**FTC Response: Disputed in part.**  Statement 471 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████



. *See* Fed. R. Civ. P.

56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

██████████████████████████████████████████████████████████████

████████████████████████.  *See supra* Meta Introduction.

472.  **Foursquare.**  On March 16, 2023, Foursquare co-founder Dennis Crowley was

asked whether specific companies were "personal social network[s]"; Mr. Crowley explained,

"I'm not even sure I know what a personal social network is, though.  I don't think we ever got a

definition out of it."  Ex. 93 at 18:19-19:16, 280:12-17 (Crowley (Foursquare) Dep. Tr.).

**FTC Response: Disputed.**  Statement 472 is undisputed to the extent that it recounts

words that appear in the cited transcript but is otherwise disputed because the material cited does

not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  In this

quotation, Mr. Crowley was referring to how counsel for Meta never defined the term "personal

social network" for him, and accordingly, he was unable to name which companies were a

"personal social network."

> Q. Okay. So given that you never understood the meaning of [PSN],
> would you be able to identify any players in that space?
>
> A. If you gave me the name of a company, I'm sure I'd know who
> the company is.
>
> Q. But you wouldn't know whether it fit into this personal social
> networking space?

A. I bet if you gave me three companies, it would jostle my memory about what the PSN space was about . . .

Q. Would any of the companies on this slide be personal social network as you understand it?

A. . . . I don't think we ever got a definition out of it.

Ex. 93 at 151:11-20; 280:12-17 (Crowley (Foursquare) Dep. Tr.).

Nonetheless, when asked "[h]ave you heard the phrase 'personal social networking services' before?" Mr. Crowley testified "Yes." ███████████████████████████

███████████████████████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Foursquare's witness was unable to define what is a "personal social networking service" or identify any apps in the alleged PSNS market.  *See supra* Meta Introduction.  The additional testimony the FTC cites does not show that Mr. Crowley was familiar with the term "personal social networking services."  On the contrary, when the FTC asked Mr. Crowley how he would describe a personal social networking service, Mr. Crowley replied "I don't know," explaining that he "just never understood the meaning of it."  Ex. 93 at 151:6-10 (Crowley (Foursquare) Dep. Tr.).

473.    **Viddy.**  On May 22, 2023, Viddy's co-founder, JJ Aguhob, was asked whether he was familiar with the term "social networking services"; he replied, "Personal social networking. I understand the description.  I've never heard it described that way.  To me they're – it's usually described as social media."  Ex. 94 at 18:19-19:16, 137:14-20 (Aguhob (Viddy) Dep. Tr.). When asked for examples of companies he considered to be "social media companies," Mr. Aguhob identified Twitter, among others.  *Id.* at 137:21-138:9.

**FTC Response: Disputed in part.**  Statement 473 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed because the material

cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The

fact that ███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

> **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Viddy's witness testified that he had not heard the term "personal social networking service"

defined the way the FTC does.  *See supra* Meta Introduction.

> 474.  **Snapchat.**  On May 3, 2023, Jacob Andreou, Snapchat's then senior vice

president of growth, testified that if the term "personal social networking services" had been

used, in his experience, "the context in which it would ever have been talked about, you know,

rarely, again, if at all, is really to talk about social media services broadly.  And for us, social

media encompasses everything from one end of the spectrum of communication with friends all

the way to the other end of the spectrum, which is more broadcast and entertainment."  Ex. 96

at 17:7-8, 148:3-21 (Andreou (Snap) Dep. Tr.).  When asked about the statement in Snap's 2022

Annual Report that "[w]e compete broadly with the social media offerings of Alphabet, Apple,

ByteDance, Meta, Pinterest, and Twitter," Ex. 406 at 20 (Snap 2022 Form 10-K), Mr. Andreou

testified, "Snap does compete with other social media offerings, where I'll define 'social media

offerings' as being everything from the spectrum of like pure social to almost like pure media in

some sense, with things in the middle being more overlapping.  And I think that that's why this

competitive set is as broad as it is here."  Ex. 96 at 68:20-69:14 (Andreou (Snap) Dep. Tr.

(discussing Snap 2022 Form 10-K)).

**FTC Response: Disputed.**  Statement 474 is disputed because the first sentence does not accurately present the question asked to the witness or the witness's response.  Mr. Andreou was not asked about a hypothetical situation ("if the term . . .  had been used"), the questions posed to him were about the meaning he ascribed to the term when he actually used the term:

> Q.  Outside the context of this litigation, do you use the term "personal social networking services"?
>
> A. Very rarely.
>
> Q. And what do you understand that term to mean?
>
> * * *
>
> Q. Prior to Snap's involvement in this lawsuit, *how would you have used* the term "personal social networking services"?
>
> A. It seems to mean broadly like social media products that are used for personal reasons and personal purposes.

████████████████████████████████████████████████

The remainder of Statement 474 accurately recounts words that appear in the cited material, but is disputed because the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The fact that ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).  Further, the deponent was able to give a definition of what personal social networking services was: "social media products that are used for personal reasons and personal purposes." ██████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Snap's witness testified that a "personal social networking service" referred, if anything, to

social media services broadly.  *See supra* Meta Introduction.  The additional testimony the FTC

cites does not show that Mr. Andreou defined the term "personal social networking services,"

much less recognized the FTC's alleged PSNS market consisting only of Facebook, Instagram,

Snap, and MeWe.  Rather, when asked "how would you have used the term 'personal social

networking services'" before Snap's involvement in the ligation, Mr. Andreou replied:  "*It seems*

to mean *broadly* like social media products that are used for personal reasons and personal

purposes," adding that the term "would ever have been talked about, you know, rarely, again, if

at all, is really to talk about *social media services broadly*."  Ex. 96 at 148:3-11 (Andreou (Snap)

Dep. Tr.) (emphases added).

475.    **MeWe.**  On April 27, 2023, Mark Weinstein – MeWe founder and former chief

executive officer – testified that he does not recognize a PSNS market consisting of Facebook,

Instagram, Snapchat, and MeWe.  When asked to "name every personal social network you can

think of," he responded "MeWe, Facebook, Snapchat, WeChat."  Ex. 126 at 109:6-8 (M.

Weinstein (MeWe) Dep. Tr.).  In contrast, "Instagram is not a personal social network that would

allow [users] to connect [their] family and friends in any meaningful way except, you know, for

broadcasting purposes. . . where [users] can narrow the scope of who [they]'re broadcasting to,

but it's very much an entertainment broadcast schematic."  *Id.* at 310:8-310:18.  MeWe's

ordinary-course documents do not recognize competition only from Facebook, Instagram, and

Snapchat, and instead describe multiple apps outside the FTC's PSNS market as rivals.  *See infra*

at ¶¶ 526-532.

    **FTC Response: Disputed in part.**  Statement 475 is undisputed to the extent that it

recounts words that appear in the cited transcript but is otherwise disputed because the material

cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R.

Civ. P. 56(c)(1)(B), and because it is in part contradicted by other, more reliable, evidence.  The

first three sentences are disputed in part because 

. *See* CMF at §§ II.a.3.c, III.B.  The fourth sentence is

disputed because it fails to establish the absence of a dispute regarding any fact that is material:

.

*See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

MeWe does not recognize a PSNS market consisting of Facebook, Instagram, Snapchat, and

MeWe.  *See supra* Meta Introduction.  The FTC's cross-reference to multiple sections in its

Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact,

and Meta incorporates its responses to those paragraphs here.

### ii.     There Is No Evidence of Industry Recognition of the FTC's PSNS Market

476.     No contemporaneous ordinary-course document from any party or non-party

produced in this case describes Facebook, Instagram, Snapchat, and MeWe all as "personal

social networking services."

**FTC Response: Disputed in part.**  Statement 476 is undisputed to the extent that the

FTC is not aware of a document that both (i) uses the precise phrase "personal social networking

services" and also (ii) identifies – on the face of the document – all four of the identified

services; the Statement is otherwise disputed because the material cited does not establish the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). The fact that various documents may have (i) employed terms other than the precise term "personal social networking services" in connection with the four identified services, or (ii) used the term "personal social networking services" but failed to identify one of the four services identified in Statement 476, does not establish that any other firms are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that no contemporaneous ordinary-course document from any party or non-party produced in this case describes Facebook, Instagram, Snapchat, and MeWe all as "personal social networking services."

477. No document produced or testimony provided in this case states or otherwise recognizes that there is a distinct market – by any name – that consists exclusively of Facebook, Instagram, Snapchat, and MeWe.

**FTC Response: Disputed.** Statement 477 is disputed because the material cited does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), and is contradicted by copious documents produced and testimony provided in this case that "otherwise recognizes" that there is a distinct market within the United States that – at the present time – includes Facebook, Instagram, Snapchat, and MeWe. *See, e.g.*, PX8006,

█████████████████████████████████ ("To my knowledge, only MeWe and Snapchat remain as "personal social networking" competitors to Facebook; the others have

gone out of business or been acquired."); ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ *See generally* CMF at § II.A.

 **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

no document produced or testimony provided in this case recognizes a market consisting only of

Facebook, Instagram, Snapchat, and MeWe.  *See supra* Meta Introduction.  The documents the

FTC cites do not create a genuine dispute of material fact regarding the lack of recognition of the

FTC's alleged PSNS market.  On the contrary, the cited documents confirm no such market

exists.  Mr. Weinstein – MeWe founder and former chief executive officer – testified that

"Instagram is not a personal social network."  Ex. 126 at 310:6-18 (M. Weinstein (MeWe) Dep.

Tr.). ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

And contemporaneous evidence indicates that Mr. Morin perceived Path's closest competitors as

applications that offer messaging.  *See* Ex. 500 at 1 (TechCrunch, *Path's Competitors Aren't*

*Facebook and Twitter, They're Email and SMS Says Dave Morin*, https://perma.cc/LJR7-

4HAN?type=standard) (Mr. Morin stating, "Our competition isn't anyone else in the social

networking world, it's SMS and email.").  The FTC's cross-reference to a section of its

Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact,

and Meta incorporates its responses to those paragraphs here.

   **iii.** **Terms Like "Social Network" and "Social Media" Are Regularly Used To Describe Services That Are Not in the FTC's PSNS Market**

 478. No document produced or testimony provided in this case states or otherwise

recognizes a commonly understood definition of "social network" or "social media."

**FTC Response: Disputed.**  The FTC objects that Statement 478 is not supported by any cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), and the phrase "commonly understood definition" in Statement 478 is so vague that no adequate response to this Statement can be formulated.  While no response is required, the FTC disputes Statement 478 because it is contradicted by testimony and documents that indicate that the terms "social network" and "social media" are both understood by and regularly used by industry participants.  *See, e.g.,* ██████████████████████████ ("Snap does compete with other social media offerings, where I'll define 'social media offerings' as being everything from the spectrum of like pure social to almost like pure media in some sense, with things in the middle being more overlapping."); ██████████████████████████
██████ .

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that there is no document produced or testimony provided in this case that states or recognizes a common definition of "social network" or "social media."  *See supra* Meta Introduction.  The excerpted testimony cited by the FTC does not create a genuine dispute of material fact regarding the lack of any recognition of the terms "social network" or "social media."  Indeed, Mr. Andreou's description of "social media" as "everything" from "pure social to almost like pure media" provides further evidence of the point.

479.    Industry participants, public sources, and record evidence in this case often describe many companies that the FTC excludes from its market definition as social networks or social media providers.  *See* Ex. 1 at ¶¶ 35-100 (Ghose Rep.).

**FTC Response: Disputed in part.**  The FTC disputes that Statement 479 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the

absence of a genuine dispute regarding any material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B);

56(c)(1).  While it may be true that firms that do not offer personal social networking services

are described as "social networks or social media providers," this does not establish that any

other firms are competitors in the provision of personal social networking services, that there is

not a relevant market for personal social networking services, or that Meta is not exercising

monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

multiple sources define many companies that the FTC excludes from the PSNS market as social

networks or social media providers.  *See supra* Meta Introduction.

480.     The FTC refers to companies it excluded from its market definition as "social

media and video streaming" services.  In December 2020, the FTC sent orders to file a special

report to Amazon, TikTok (ByteDance), Discord, Facebook, Reddit, Snap, Twitter, WhatsApp,

and YouTube.  Ex. 294 at 305:5-306:8 (Takashima (FTC) Dep. Tr.).  Each notice defined "social

media and video streaming" services as "any product or service that allows users to create and

share content with other users (whether a private or group interaction) through an application or

website on any device."  Ex. 407 at 27 (MetaFTC-DX-1001).  On May 22, 2023, the FTC's

30(b)(6) designee testified that these notices "reflect[] a determination by the agency that each of

those companies provides a social media and video streaming service as that term is used and

defined specifically in the 6(b) order."  Ex. 294 at 312:7-313:4 (Takashima (FTC) Dep. Tr.); *see

also id.* at 325:21-326:20 ("[F]or the purposes of the FTC's own use of its social media . . .

Reddit falls under that umbrella.").

**FTC Response: Disputed in part.**  Undisputed that Statement 480 recounts words that

appear in the cited materials, but Statement 480 is otherwise disputed because it does not

constitute a material fact subject to proof at trial and the material cited does not establish the absence of a genuine dispute regarding any material fact. *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B). The fact that the FTC provided a definition of "social media and video streaming" for the purpose of issuing subpoenas does not establish that any other firms are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that the FTC defined both companies that included in the PSNS market and companies it excluded from the PSNS market as "social media and video streaming" services. *See supra* Meta Introduction.

481. Professor Lampe opined that TikTok is a "social network site." Ex. 281 at 325:21-326:3 (Lampe Dep. Tr.) ("Q. . . . I want to talk about TikTok for a second. You agree that TikTok has all of the elements of a social networking site; is that fair? A. In my – both reports I do describe TikTok as a social networking site."). He also testified that applications like Twitter and LinkedIn are social network sites or could be characterized as social networks. *Id.* at 317:20-21 ("As with Twitter, we define LinkedIn – I define LinkedIn as an SNS.").

**FTC Response: Disputed in part.** Statement 481 is undisputed to the extent that it recounts words that appear in the cited transcript but is otherwise disputed in part. The FTC disputes that Statement 481 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding any material fact, as it does not establish that any other firms are competitors in the provision of personal social

networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC's proffered expert opined TikTok is a social network site.  *See supra* Meta Introduction.

482.    *See*, *e.g.*, *supra* at ▮▮▮▮▮▮▮▮▮▮▮▮▮, ¶¶ 257-258 (Walmart testimony and documents), ¶¶ 308-309, 316-317, 326 (Twitter documents), ▮▮▮ ▮▮▮▮▮▮▮▮ ¶ 400 (LinkedIn document)▮▮▮▮▮▮▮▮▮▮▮▮; *infra* at ¶¶ 526, 528-529 (MeWe testimony and document); *see also supra* at ¶ 197 (book by FTC expert).

**FTC Response: Disputed in part.**  The FTC disputes that Statement 482 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding any material fact.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).  While it may be true that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this does not establish that any other firms are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Statement 482 is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that multiple documents define services that the FTC excludes from the PSNS market as social networks or social media.  *See supra* Meta Introduction.

### 2.    Other Alleged PSNS Services

#### a.    Snapchat

##### i.    Background

483.    Snapchat, offered by the company Snap Inc., first became available to download in 2011.  *See* Ex. 406 at 21-22 (Snap 2022 Form 10-K); Ex. 279 at ¶ 137 (Hemphill Rep.).

**FTC Response: Undisputed.**

484.    Since launch, Snapchat has allowed users to send and receive other disappearing photos and videos, called "Snaps."  *See* Ex. 96 at 155:9-16, 156:12-15 (Andreou (Snap) Dep. Tr.).  Users can "add friends, and then . . . send them photos. . . .  [E]ach Snap" appears in a recipient's "inbox," and the recipient "would be able to press and hold" the Snap "to view" it, "keep[ing a] finger on the screen."  *Id.* at 155:17-156:4.  When users "release [thei]r finger[s], the Snap would disappear.  And . . . if anyone were to screenshot that Snap, it would notify the person who sent it that the Snap was screenshotted."  *Id.* at 156:4-8.

**FTC Response: Disputed in part.**  Statement 484 is undisputed to the extent it accurately quotes the words that appear in the cited transcript.  The FTC disputes in part Statement 484 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

Regarding the first sentence, the FTC objects to the term ███ as vague and undefined.  It is undisputed that ████████████████████████████ ██████████████.  The first sentence is otherwise disputed, as the cited testimony indicates that Snapchat "launched" videos "shortly after launch[ing the full app]."  Ex. 96 at 155:17-156:15 (Andreou (Snap) Dep. Tr.).  Accordingly, users have not been able to send disappearing videos on Snapchat since its launch.

The second sentence is undisputed to the extent that Snapchat users can add friends, send them photos, and view the photos by pressing and holding the screen.  The second sentence is otherwise disputed, as the cited testimony did not indicate that "'Each Snap' appears in a recipient's 'Inbox,'" but rather that "each Snap . . . would be represented as a cell, kind of like in your inbox, almost like a digital version of a mailbox or something."  *Id.* at 155:20-156:2.

The third sentence is undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding how a user sends and receives Snaps on Snapchat features.  *See supra* Meta Introduction.

485.    In 2013, Snap added a feature called Stories.  *See* Ex. 279 at ¶ 139 (Hemphill Rep.); Ex. 1 at ¶ 51 (Ghose Rep.); Ex. 96 at 198:6-9 (Andreou (Snap) Dep. Tr.).  Stories are collections of Snaps (either photos or videos) that play in the order in which they were taken.  *See* Ex. 406 at 6 (Snap 2022 Form 10-K); Ex. 96 at 196:20-197:18 (Andreou (Snap) Dep. Tr.).  Stories are ephemeral and available for 24 hours after being posted.  *See* Ex. 1 at ¶ 51 (Ghose Rep.); Ex. 96 at 196:20-197:2 (Andreou (Snap) Dep. Tr.).  All of a user's friends can view Stories in a broadcast format.  *See* Ex. 279 at ¶ 139 (Hemphill Rep.).  Users can also view Stories posted by users with whom they do not have a bidirectional friend connection, such as a "celebrity or public figure."  Ex. 96 at 30:12-16 (Andreou (Snap) Dep. Tr.) ("[I]f you think of a celebrity or public figure, if someone is adding them, obviously they're not going to add everyone back, but those people will still be able to see their stories.").

**FTC Response: Disputed in part.**  The FTC disputes in part Statement 485.

The first, second, third, and fourth sentences are undisputed.

The fifth sentence is undisputed to the extent it accurately quotes the words that appear in the cited transcript, but is otherwise disputed.  Users can only view Stories posted by users with whom they do not have a bidirectional friend connection only if the other user has set their privacy settings to allow any Snapchat user to view their story, or if they have chosen to have a public profile.  *See* PX0514, *How can I change who can see My Story on Snapchat?*, SNAPCHAT: SNAPCHAT SUPPORT, https://help.snapchat.com/hc/en-us/articles/7012279488532-How-can-I-change-who-can-see-My-Story-on-Snapchat; PX0515, *Where did my 'Everyone' privacy setting option for My Story go?*, Snapchat: Snapchat Support, https://help.snapchat.com/hc/en-us/articles/14697065507092-Where-did-my-Everyone-privacy-setting-option-for-My-Story-go. The default privacy setting for users "is that only [users'] Friends . . . can view [their] Story." PX0514, *How can I change who can see My Story on Snapchat?*, Snapchat: Snapchat Support, https://help.snapchat.com/hc/en-us/articles/7012279488532-How-can-I-change-who-can-see-My-Story-on-Snapchat.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding Snapchat's Stories features.  *See supra* Meta Introduction.

486.   The FTC claims that Snap started providing PSNS in October 2013.  *See* Ex. 295 at 5, FTC's Suppl. Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Nov. 4, 2022)).

**FTC Response: Disputed.**  The FTC disputes Statement 486 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h). In the cited material, the FTC specifically stated that Snapchat "appears to have offered PSNS *at least as early* as October 2013."  Ex. 295 at 5, FTC's Suppl. Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Nov. 4, 2022)) (emphasis added).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact.  *See supra* Meta Introduction; *see also* Counter SMF ¶ 1045 ("Since the launch of Stories, Snapchat has had a core use of friends and family sharing and functionality to facilitate and foster that use.").

487.    Snap "generate[s] substantially all of [its] revenue from advertising."  Ex. 406 at 3, 15 (Snap 2022 Form 10-K).  Snap reported that in 2022, 2021, and 2020, "advertising revenue accounted for approximately 99%, 99%, and 99% of total revenue, respectively."  *Id.* at 15.

**FTC Response: Undisputed.**

### ii.    Features

488.    Snap has many features that are similar to features on services the FTC excludes from the proposed PSNS market.

**FTC Response: Disputed.**  The FTC objects to the terms "many," "similar," and "services the FTC excludes from the proposed PSNS market" as vague and undefined.  The FTC disputes Statement 488 because it is not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The FTC also disputes that Statement 488 constitutes a material fact subject to proof at trial, and objects that the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Snapchat has many features similar to the apps the FTC excludes from the PSNS market, including messaging features.  As the terms "many" and "similar" are ordinarily understood and used, there is no dispute there are multiple features on Snapchat that resemble features on apps the FTC excludes from the PSNS market.  For example, the FTC agrees that it is undisputed that Snapchat users (like YouTube users) can watch "longer-form video content that typically spans 3

to 5 minutes," *see infra* Meta SMF ¶ 495 (and the FTC's "undisputed" response); and that

Snapchat users (like TikTok users or YouTube users) can watch short-form video on Snapchat's

Spotlight feature, *see infra* ¶ 496 (and the FTC's "undisputed" response), which has been

acknowledged as Snapchat's "competitive response to TikTok," *infra* ¶ 497 (and the FTC's

"undisputed" response).  And the FTC does not dispute that Snapchat (like iMessage) offers text

messaging features, *see infra* ¶ 492 (and the FTC's "undisputed" response), that Snap's head of

user engagement testified that Snapchat competes with iMessage, *see infra* ¶ 499 (and the FTC's

"undisputed" response), and that Snap's internal documents have stated that "our . . . biggest

competitors" include "iMessage," *infra* ¶ 507 (and the FTC's response – which agrees that the

document makes this quoted statement).

489.    **Friending.**  Snapchat has a "hybrid friending model."  Ex. 96 at 30:3-11

(Andreou (Snap) Dep. Tr.).  Users become "friend[s]" if they follow one another in a

"bidirectional" manner.  *See id.*; *see also* Ex. 97 at 26:2-11 (Levenson (Snap) Dep. Tr.).  Friends

can message, send Snaps, and view one another's Stories.  *See* Ex. 96 at 30:3-11, 155:18-156:8

(Andreou (Snap) Dep. Tr.).  In addition to bidirectional friend connections, Snapchat users can

also follow other users who do not follow them back – and can see the Stories that those users

post.  *See* Ex. 97 at 26:12-15 (Levenson (Snap) Dep. Tr.); Ex. 96 at 30:12-31:1, 38:19-39:1

(Andreou (Snap) Dep. Tr.).  As a default setting, users may only send Snaps or messages to

bidirectional friends – but users have the ability to change the settings and receive Snaps from

users with whom they are not friends.  *See* Ex. 96 at 157:15-159:13 (Andreou (Snap) Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  The FTC disputes in part Statement

486 as not supported by the cited material as required by Federal Rule of Civil Procedure

56(c)(1)(A) and Local Rule 7(h).

The first sentence of Statement 486 is undisputed.

The second sentence of Statement 486 is undisputed to the extent the quoted words appear in the cited material.  It is also undisputed that ███████████████████████████.

However, the cited materials do not support the proposition that ███████████████.  The terminology used to describe the action of friending on Snapchat is to "add" other users or "send a friend request." ████████████████████████████████████

████████████

The third sentence of Statement 486 is undisputed.

The fourth sentence of Statement 486 is disputed.  Snapchat users can subscribe to other users in addition to bidirectional friend connections, but users can only view Stories posted by users with whom they do not have a bidirectional friend connection only if the other user has set their privacy settings to allow any Snapchat user to view their story, or if they have chosen to have a public profile.  *See* PX0514, *How can I change who can see My Story on Snapchat?*, SNAPCHAT: SNAPCHAT SUPPORT, https://help.snapchat.com/hc/en-us/articles/7012279488532-How-can-I-change-who-can-see-My-Story-on-Snapchat; PX0515, *Where did my 'Everyone' privacy setting option for My Story go?*, SNAPCHAT: SNAPCHAT SUPPORT, https://help.snapchat.com/hc/en-us/articles/14697065507092-Where-did-my-Everyone-privacy-setting-option-for-My-Story-go.  The default privacy setting for users "is that only [users'] Friends . . . can view [their] Story."  PX0514, *How can I change who can see My Story on Snapchat?*, SNAPCHAT: SNAPCHAT SUPPORT, https://help.snapchat.com/hc/en-us/articles/7012279488532-How-can-I-change-who-can-see-My-Story-on-Snapchat.  Users may also "subscribe" to "public account[s]" on Snapchat, which can include public figures,

businesses, influencers or creators, and smaller public accounts.  ███████████████

███████████

The fifth sentence is undisputed, but omits testimony that renders the sentence incomplete.  Mr. Andreou testified that users who choose to change the setting to allow people they are not friends with on Snapchat to message them is "quite rare" and "does not represent the majority of our community," nor does Snapchat "encourage it or ask that people do it."  ███████

██████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding Snapchat's hybrid friending model.  *See supra* Meta Introduction.

490.  **Five Tabs.**  Today, the Snapchat app is comprised of five tabs, which appear at the bottom of the app's interface:  "Map, Chat, Camera, Stories, and Spotlight."  Ex. 96 at 166:2-18, 168:7-18 (Andreou (Snap) Dep. Tr.).  An image of each of the five tabs is below.  *See* Ex. 408 at 1 (Snapchat, *Snapchat 101*, https://perma.cc/5MFJ-G7FX).



**FTC Response: Undisputed.**

491.   **Map.**  Snapchat's "Map" feature – contained in its left-most tab – is a "map where people can see a subset of their friends, as well as find places . . . that are popular with their friends."  Ex. 96 at 33:4-7 (Andreou (Snap) Dep. Tr.).  The feature shows locations and events where users post Snaps or Stories.  *See id.* at 33:11-15.

   **FTC Response: Undisputed.**

492.   **Chat.**  Snapchat's "Chat" feature – the second-to-left tab – allows one-to-one and group messaging with up to 100 people.  *See* Ex. 96 at 34:17-35:6 (Andreou (Snap) Dep. Tr.).  When users send a Snap to other users, the Snap creates a notification in the "Chat" tab.  *See id.* at 207:20-208:5.  The Chat feature also allows users to send each other text-based messages.  *See id.* at 162:8-12, 315:10-17.

   **FTC Response: Undisputed.**

493.   A March 2022 document prepared for the Snap board of directors contained a chart showing "View Time by Function," which showed that, between August 2021 and February 2022, Chat comprised ███████████ of "Total View Time" on Snapchat.  Ex. 98 at -010 (MetaFTC-Klein-DX-390, SNAP – FTC – No. 191-0134 – 0000116009).  Snap's corporate representative testified that ██████████████████████ of all time on Snap is spent "viewing or spending time on Chat."  Ex. 96 at 112:20-113:14 (Andreou (Snap) Dep. Tr.).

   **FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 493 accurately quotes the words that appear in the cited materials.  The FTC objects to Statement 493 as not relevant to any material fact and does not establish the absence of any genuine dispute over any material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not dispute the stated fact that ███████ ██████████ of all time on Snapchat is spent messaging – an activity that is also conducted on apps the FTC excludes from the PSNS market.  *See supra* Meta Introduction.

494.    **Camera.**  Snapchat's "Camera" tab – the third tab, in the center – allows users to take photos or videos, which they can then use to send Snaps, post to Stories, or use as part of short-form video content on Spotlight.  *See* Ex. 96 at 167:9-15, 169:19-170:7 (Andreou (Snap) Dep. Tr.).  Snap users can also use the Camera tab to "interact with augmented reality," *id.* at 169:14-16, including by adding filters, *see id.* at 169:16; Ex. 409 at 5-6 (Snap 2020 Form 10-K).

**FTC Responses Undisputed.**

495.    **Stories and Discover.**  Snapchat's fourth tab is the "Stories" and "Discover" tab.  *See* Ex. 96 at 38:6-13 (Andreou (Snap) Dep. Tr.).  When users tap on this tab, they see three types of Stories content:  At the top of the screen, users see "Friends Stories" – i.e., Stories posted by users with whom they have a reciprocal following relationship.  *See id*. at 38:14-18.  Beneath Friends Stories, users can see Stories posted by users they follow but who do not follow them back under the heading "Following."  *See id.* at 38:19-39:1.  These can include Stories posted by a "public figure," a "smaller public account," "influencers or creators," aspiring influencers –"someone who's just trying to start posting and making it big" – publishers "like Daily Mail," or businesses.  *Id.* at 39:2-19; *see also* Ex. 411 (Social Champ, *What is Snapchat*, https://perma.cc/2LMT-8BSZ).  Additionally, users can follow "shows" – longer-form video content that typically spans 3 to 5 minutes.  *See* Ex. 410 (Business Insider, *How to Get a Snap Show to Make Money as an Influencer*).  Finally, at the bottom of the interface, users can see "Discover" content, which Snap recommends to users through an algorithm.  *See* Ex. 96

at 42:13-22 (Andreou (Snap) Dep. Tr.).  Discover content includes Stories content posted by

public accounts.  *See id.* at 39:1-40:8 (Snapchat has "the ability to kind of recommend stories

from really any kind of entity that is public that you may not necessarily follow already or may

not have subscribed to.").

**FTC Response: Undisputed.**

496.   **Spotlight.**  Snapchat's fifth and right-most tab is Spotlight, which Snap launched

around November 2020.  *See* Ex. 412 (Snapchat Newsroom, *Introducing Spotlight on Snapchat*).

Spotlight contains short-form video content that Snapchat recommends to users through an

algorithm.  *See* Ex. 96 at 48:7-10, 44:8-45:9 (Andreou (Snap) Dep. Tr.).  Spotlight content is

"99-plus percent" created by "people who you don't have a friend connection with."  *Id.*

at 256:20-257:5, 48:13-49:1.

**FTC Response: Undisputed.**

497.   Multiple news outlets have described Spotlight as Snap's competitive response to

TikTok.  *See* Ex. 414 (Business Insider, *Snapchat Is Launching a TikTok-Like Tab Called*

*Spotlight*) ("Snapchat is gunning for TikTok with a new app feature called Spotlight, a curated,

scrollable feed of short videos generated by users."); Ex. 416 (TechCrunch, *Snapchat Launches a*

*TikTok-Like Feed Called Spotlight*) (describing Spotlight as "Snapchat's biggest attempt at

taking on TikTok to date"); Ex. 415 at 1 (The Verge, *Snapchat Officially Launches In-App*

*TikTok Competitor Called Spotlight*, https://perma.cc/W3QQ-6JQ9) ("Imagine, basically,

TikTok but in Snapchat."); Ex. 413 (Wall Street Journal, *Snap Counters TikTok with Spotlight*

*Video-Sharing Feature*) ("Snap . . . is launching a video-sharing feature to rival TikTok.").

Professor Hemphill has described Spotlight as a competitive response to TikTok.  *See* Ex. 279

at ¶ 1189 (Hemphill Rep.) ("Snap ha[s] responded to TikTok by offering programs to share revenue with short-form video content creators on . . . Snapchat Spotlight.").

**FTC Response: Disputed in part.**  It is undisputed Statement 497 accurately quotes the words that appear in the cited materials.  The FTC objects to Statement 497 as not relevant to any material fact and does not establish the absence of any genuine dispute over any material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC further disputes that the first sentence of Statement 497 constitutes a material fact subject to proof at trial.  *See* Fed. R. Civ. P. 56(c)(1).

Regarding the second sentence, it is undisputed that the quoted words are accurately cited from the cited source.  It is otherwise disputed, as the FTC disputes that the second sentence constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B); 56(c)(2).  Further, the second sentence inaccurately frames the words written by Professor Hemphill.  The paragraph cited from Professor Hemphill's report described Snapchat's program for sharing revenue with short-form video content creators on Snapchat Spotlight as a competitive response to TikTok's program for sharing ad revenues, TikTok Pulse, specifically.  *See* PX9000, Hemphill Report at ¶ 1189.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that multiple news outlets have described Spotlight as Snap's competitive response to TikTok.  *See supra* Meta Introduction.

### iii.      Snap Competition with Apps Outside the FTC's PSNS Market

498.     Snap's documents and executives do not recognize competition from only Facebook, Instagram, and MeWe, but instead describe multiple apps outside the FTC's claimed

PSNS market as competitors.  Snap's competitors include (among others) YouTube, TikTok, Pinterest, Twitter, Instagram, Facebook, and Apple.  *See* Ex. 418 at 20 (Snap 2023 Form 10-K); Ex. 406 at 20 (Snap 2022 Form 10-K); Ex. 417 at 19 (Snap 2021 Form 10-K); Ex. 409 at 18 (Snap 2020 Form 10-K).

      **FTC Response: Disputed in part.**  The FTC objects to the term ███████████ as vague. The FTC does not dispute that Statement 498 accurately recounts information that appears in the cited material, but the FTC otherwise disputes Statement 498 as the material cited does not establish the absence of a genuine dispute regarding a material fact: ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

      **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Snap recognizes apps outside the FTC's PSNS market as competitors to Snapchat, including YouTube, TikTok, Pinterest, Twitter, and Apple.  *See supra* Meta Introduction.  As the term "competitors" is ordinarily understood and used, including in Snap testimony and ordinary-course documents, it is clear that Snapchat competes with apps outside the FTC's PSNS market. Given that the FTC has defined "PSN services" to include all activities in which users engage on apps that the FTC includes in the alleged PSNS market (except Facebook Dating), *see infra* Meta SMF ¶¶ 580-584, 589-590, there is likewise no genuine dispute that competition occurs between Snapchat and these other apps within the relevant market.

499.    Snap's senior director of growth, David Levenson, testified that Snap competes for time spent with TikTok, YouTube, Facebook, Instagram, WhatsApp, iMessage, Twitter, Pinterest, BeReal, and Discord.  *See* Ex. 97 at 15:7-9, 28:11-13 (Levenson (Snap) Dep. Tr.) ("Q. [D]oes Snap compete with TikTok for overall time spent on the app?  A. Yes."); *id.* at 28:14-16 (same for YouTube); *id.* at 28:17-19 (same for Facebook); *id.* at 28:20-22 (same for Instagram); *id.* at 29:1-3 (same for WhatsApp); *id.* at 29:4-6 (same for iMessage); *id.* at 29:7-9 (same for Twitter); *id.* at 29:10-12 (same for Pinterest); *id.* at 29:13-15 (same for BeReal); *id.* at 29:16-18 (same for Discord).  Mr. Levenson also testified that "[a]ny application that takes your eyeballs off of Snapchat competes with overall time spent with Snapchat."  *Id.* at 29:22-30:2.

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 499 accurately recounts the words that appear in the cited material.  However, the FTC objects to Statement 499 as the material cited does not establish the absence of a genuine dispute regarding a material fact: █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

500.    Snap "routinely track[ed]" time spent on TikTok, Twitter, YouTube, Netflix, and other applications.  *See* Ex. 97 at 176:9-12 (Levenson (Snap) Dep. Tr.) ("Snap did routinely track the time spent on TikTok, Twitter, YouTube, Netflix, Instagram, and other applications[;] correct?  A. That's correct.").  For example, Snap's ordinary-course documents tracking trends in time-spent metrics typically included a slide titled "Competitor Trends" that included "the apps

that [Snap] most compete[s] with for time spent." *Id.* at 176:16-177:6 (Levenson (Snap) Dep.

Tr.).  These slides included companies other than Instagram, Facebook, and MeWe, including

TikTok, YouTube, Twitter, Facebook Messenger, and WhatsApp.  *See*, *e.g.*, Ex. 99 at -216

(MetaFTC-Klein-DX-727, SNAP – FTC – No. 191-0134 – 0000137196) ("Competitor Trends

(US)" slide listing Facebook, FB Messenger, Netflix, TikTok, YouTube, and others); Ex. 100 at -

029 (SNAP – FTC – No. 191-0134 – 0000029012) ("Competitor Trends (Global) – Indexed"

slide listing Facebook, Snapchat, Twitter, FB Messenger, Instagram, WhatsApp, and TikTok);

Ex. 101 at -302-304 (SNAP – FTC – No. 191-0134 – 0000112275) (similar); Ex. 102 at -113

(MetaFTC-Klein-DX-389, SNAP – FTC – No. 191-0134 – 0000137081) (similar).

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 500

accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 500 as the material cited does not establish the absence of a genuine dispute regarding

a material fact: ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ .  *See* Fed. R. Civ. P. 56(c)(1)(B).

501.    Other Snap ordinary-course documents do not recognize competition from

Facebook, Instagram, and MeWe only.  For example, talking points prepared for Evan Spiegel –

Snap's chief executive officer – before a September 8, 2022 Economist interview stated:

"Besides [its] product, which is definitely compelling, ByteDance is a really tough

competitor . . . .  [W]hile we are used to competing with really big companies – Facebook,

Twitter, and YouTube were huge and household names when Bobby and I launched Snapchat –

TikTok presents a unique type of competitive challenge . . . ." Ex. 103 at -465 (SNAP – FTC – No. 191-0134 – 0000121462).

**FTC Response: Disputed in part.** It is undisputed that Statement 501 accurately quotes the words that appear in the cited material. However, the FTC otherwise disputes Statement 501 as the material cited does not establish the absence of a genuine dispute regarding a material fact:



. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Snap recognizes apps outside the FTC's PSNS market as competitors to Snapchat, including Twitter, YouTube, and TikTok. *See supra* Meta Introduction; Meta Reply to SMF ¶ 498 (addressing similar response).

502.    Snap's ordinary-course documents describe





**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 502 accurately quotes the words that appear in the cited material.  However, the FTC objects to Statement 502 as the material cited does not establish the absence of a genuine dispute regarding a material fact: ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

503.   ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 503 accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 503 as the material cited does not establish the absence of a genuine dispute regarding

a material fact: ███████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████ . *See* Fed. R. Civ. P. 56(c)(1)(B).

504. ███████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████

█████████████████████████████

█████████████████████████████████

█████████████████████████████████

████████████████████████████

████████████████████████████████

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 504

accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 504 as the material cited does not establish the absence of a genuine dispute regarding

a material fact: ███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

505.    Snap's ordinary-course documents also describe Twitter as a competitor.  *See* Ex. 112 at -753 (SNAP – FTC – No. 191-0134 – 0000086736) ("Right now, we're thinking about competition very broadly – basically as anyone who competes for time and attention on mobile devices.  In that regard, I would say that Facebook and Twitter are two of our main competitors."); Ex. 113 at -991 (SNAP – FTC – No. 191-0134 – 0000113985) (stating, under "Competition," that "[w]e have seen continued growth in comparison to our peers since the start of 2020, trailing only TikTok . . . although App Annie also has us trailing Instagram and Twitter").

**FTC Undisputed but immaterial.**  It is undisputed that Statement 505 accurately quotes the words that appear in the cited material.  However, the FTC objects to Statement 505 as the material cited does not establish the absence of a genuine dispute regarding a material fact:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

iv.     **Snap Competition with Non-PSNS Apps for Activities in the FTC's PSNS Market When Done on Snapchat but Not in the FTC's Market When Done on Other Apps**

506.    There are reasonable substitutes for Snapchat – with respect to messaging as well as sharing and viewing videos – outside the FTC's alleged PSNS market.  *See infra* at ¶¶ 507-520.

**FTC Response: Disputed.**  The FTC objects to the term "reasonable substitutes" as so vague and undefined that Statement 506 is not susceptible to a reasonable response, objects that Statement 506 fails to identify what "substitutes . . . outside the FTC's alleged PSNS market" are being referred to, and disputes Statement 506 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The term "reasonable substitute" can constitute a term of art, *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001), and the cited materials do not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price (or decrease in quality) above (or below) a competitive level of Snapchat or any particular set of products or services posited as a relevant antitrust market.  While no response is required, the FTC states that Meta has not provided any basis for the assertion that users consider other, unnamed services as reasonable substitutes for messaging as well as sharing and viewing videos on Snapchat, and the cited material does not establish the absence of a genuine dispute of material fact: that other firms may compete with Snapchat in various aspects of firm operations (e.g., messaging, videos) or in a broad sense for user time and attention does not establish that Snapchat and other firms are competitors in the provision of personal social networking services, that there is not a relevant market for personal

social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P.

56(c)(1)(B).  *See also* CMF at § II.A.3.e.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Snapchat and other apps outside of the FTC's PSNS market can be and are used interchangeably,

including for messaging as well as sharing and viewing videos.  *See supra* Meta Introduction.

As the term "reasonable substitute" is ordinarily understood and used, the evidence demonstrates

that certain activities on Snapchat, like messaging and viewing short-form video content, are

reasonably interchangeable with similar activities on non-PSN apps.  *See infra* Meta SMF

¶¶ 507-509 (Snapchat's Chat feature competes with Facebook Messenger, WhatsApp, iMessage,

and SMS), ¶¶ 510-511 (Snapchat's Spotlight feature competes with TikTok and YouTube

Shorts), ¶¶ 512-520 (Snapchat's Stories feature competes with TikTok, YouTube, and others).

Given that the FTC has defined "PSN services" to include all activities in which users engage on

apps that the FTC includes in the alleged PSNS market (except Facebook Dating), including

watching short-form videos and messaging, *see infra* Meta SMF ¶¶ 580-584, 589-590, there is

likewise no genuine dispute that competition occurs between Snapchat and apps like YouTube,

TikTok, and iMessage within the relevant market.  The FTC's cross-reference to Section II.A.3.e

in its Counterstatement without explanation does not itself create a genuine dispute of material

fact.  While no reply is required to, none of those paragraphs creates a genuine dispute of

material fact, and Meta incorporates its responses to those paragraphs here.

507.    **Chat.**  Documents and testimony from Snap confirm Snapchat's Chat feature

competes with services including iMessage and WhatsApp.  Snapchat's "Chat" feature

"competes with" (among others) Facebook Messenger, WhatsApp, iMessage, and SMS.  Ex. 96

at 86:11-12, 24:20-25:6 (Andreou (Snap) Dep. Tr.); *see also* Ex. 114 at -.001 (MetaFTC-Klein-

DX-394, SNAP – FTC – No. 191-0134 – 0000115662) 

**FTC Response: Disputed in part.**  The FTC objects to the term "competes" as used in the first sentence as vague and undefined.  It is undisputed that Statement 507 accurately quotes the words that appear in the cited material.  However, the FTC otherwise disputes Statement 507 as the material cited does not establish the absence of a genuine dispute regarding a material fact:

.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Snapchat recognizes that other apps outside of the FTC's PSNS market – such as iMessage, WhatsApp, Messenger, and SMS – can be and are used interchangeably with Snapchat.  *See* *supra* Meta Introduction; Meta Reply to SMF ¶ 506 (addressing similar response).

508.    Professor Lampe, the FTC's proffered industry expert, opined that

Ex. 290 at ¶ 182 (Lampe Rep.).

**FTC Response: Disputed and incomplete.**  Statement 508 is undisputed to the extent that it recounts words that appear in the cited material.  Otherwise disputed, as the FTC disputes

that Statement 508 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).  Further, the quoted language is taken out of context, thus rendering the quote incomplete.  The full sentence cited from Professor Lampe's opinion is that ███████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████ Ex. 290 at ¶ 182 (Lampe Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe opined that ████████████████████████████████████████ ███████████████████████████████████████ *See supra* Meta Introduction.  The additional portion of Professor Lampe's report that the FTC recites does not contradict the stated fact.

509.    In January 2023, the FTC's Supplemental Response to Meta's Interrogatories 13 and 14 – stated that it "continues to examine the extent to which users view and experience Snapchat as a mobile messaging application, as opposed to or in addition to as a personal social networking service" – highlighted an excerpt in a Meta document from 2014, "listing Snapchat as a 'Top 10 SMS-Replacement App[ ]' "; an excerpt in a Meta document from 2018 stating "Messaging has very high adoption on Snapchat"; an excerpt from a Raymond James report on Snap describing Snap as "more of a chat application or messaging company"; and a 2016 Business Insider article titled "Teens Say They're Texting for Snapchat Because It's More Casual."  Ex. 291 at 6, 29-30, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

**FTC Response: Disputed and immaterial.**  Statement 509 is undisputed to the extent that it recounts words that appear in the cited material.  Otherwise disputed, as the FTC disputes that Statement 509 constitutes a material fact subject to proof at trial, and disputes that Statement 509 is supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(2).  Further, the FTC disputes Statement 509 as the material cited does not establish the absence of a genuine dispute regarding a material fact: Meta or others' perception that other firms may be "competitors" in certain aspects of its operations (e.g., messaging) or in a broad sense for time or attention does not establish that Snap and other firms are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC's interrogatory response stated that it "continues to examine the extent to which users view and experience Snapchat as a mobile messaging application, as opposed to or in addition to as a personal social networking service" and highlighted a number of excerpts describing Snapchat as a messaging app.  *See supra* Meta Introduction.  The FTC subsequently confirmed its position that all time spent on Snapchat is allegedly PSNS time.  Ex. 461, FTC's Resp. to Meta's Interrog. No. 23 (FTC's Suppl. Objs. & Resps. to Meta's Third Set of Interrogs. (June 7, 2023)).

510.    **Spotlight.**  Documents and testimony from Snap confirm Snapchat's Spotlight feature competes with sharing and viewing short-form video content, including TikTok and YouTube Shorts.  *See* Ex. 96 at 25:10-13 (Andreou (Snap) Dep. Tr.) (describing Spotlight's "competitive set" as including "Shorts by YouTube, Reels by Facebook, [and,] TikTok obviously, as well").  Talking points for Snap's chief executive officer called TikTok, Spotlight,

Reels, and YouTube "substitutes."  Ex. 115 at -826 (SNAP – FTC – No. 191-0134 –

0000120823) ("[I]f – for whatever reason – young people in the US and potentially elsewhere

were to lose access to TikTok it might be frustrating to them, but pretty quickly they would find

a more than credible substitute be it Spotlight, Reels, YouTube[,] or some combination of those

or others.  There is nothing fundamentally unique about those products.").

      **FTC Response: Undisputed but immaterial and incomplete.**  The FTC objects to the

term "competes" as used in the first sentence as vague and undefined.  It is undisputed that

Statement 510 accurately quotes the words that appear in the cited material.  However, the FTC

objects to Statement 510 as the material cited does not establish the absence of a genuine dispute

regarding a material fact: ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████. *See* Fed. R. Civ. P.

56(c)(1)(B).

      Additionally, the first sentence of Statement 510 fails to include the full context of Mr.

Andreou's testimony, which indicated that when Snap evaluates its "competitive set" for its

"version of social media" (referring to Stories), Snap looks at competition with Facebook and

Instagram. ███████████████████████████████

      **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Mr. Andreou testified as quoted in the statement and the documents cited contain the language

quoted in the statement. *See supra* Meta Introduction.

511.    Snap has a policy of ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████. Ex. 116 at -784-785

(SNAP – FTC – No. 191-0134 – 0000050784).  In an October 2022 email thread, Snap

employees discussed whether █████████████████████████████

██████████. *See* Ex. 108 at -875 (SNAP – FTC – No. 191-0134 – 0000050874).  One

executive, █████████████████████████████████████████

██████████   *Id.*  Jacob Andreou, Snapchat's former senior vice president of growth, wrote:

█████████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████   *Id.* at -874.

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 511

accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 511 as the material cited does not establish the absence of a genuine dispute:  ████

██████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████.  *See* Fed. R. Civ. P.

56(c)(1)(B).

512.    **Friends Stories.**  Documents and testimony from Snap confirm that both friends

Stories and non-friends Stories posted on Snapchat's Stories feature compete with video content

on TikTok and YouTube, in addition to other apps.  For example, Snap's internal business

documents have stated that TikTok ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████. *See* Ex. 117

at -685 (SNAP – FTC – No. 191-0134 – 0000114666).

**FTC Response: Disputed and misleading.**  It is undisputed that the second sentence of

Statement 512 accurately quotes some of the words that appear in the cited material.  Statement

512 is otherwise disputed, because Meta's selective quotations render Statement 512 misleading

and Statement 512 is disputed as not supported by the cited material as required by Federal Rule

of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).

The cited material does not support the statement in the first sentence that ███████████

████████████████████████████████████████████████

███████████████████████████████.  Nor does the cited material

support the statement in the second sentence that "████████████████████████

█████████████████████████████.  Instead, the cited material indicates ██████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

Statement 512 is also disputed because the material cited does not establish the absence of a genuine dispute regarding a material fact: ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Snap recognizes that both friends Stories and non-friends Stories posted on Snapchat's Stories feature compete with video content on TikTok and YouTube, in addition to other apps.  *See supra* Meta Introduction.  The additional portions of the document the FTC recites do not create a genuine dispute.  Indeed, its response *concedes* that the cited document "plainly references" "TikTok" and describes "Snap's perception that TikTok . . . compete[s] with Snapchat for time and attention."  *See*, *e.g.*, *infra* Meta SMF ¶ 518 (and the FTC's "undisputed" response) ████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████.  The FTC also does not create a genuine dispute of material fact that Snapchat competes with apps beyond just TikTok.  *See*, *e.g.*, *supra* ¶ 499 (and the FTC's "undisputed" response) (testimony from Snap's senior director of growth that Snapchat competes for time spent with TikTok, YouTube, iMessage, Twitter, Pinterest, and others).

513.  ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 513

accurately relays content that appears in the cited material.  However, the FTC objects to

Statement 513 as the material cited does not establish the absence of a genuine dispute: ▮

▮.

*See* Fed. R. Civ. P. 56(c)(1)(B). ▮

514. ██████████████████████████████

██████████████████████████████

514. ████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

████

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 514 accurately quotes the words that appear in the cited material.  However, the FTC objects to Statement 514 as the material cited does not establish the absence of a genuine dispute: ████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).

515. ██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 515

accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 515 as the material cited does not establish the absence of a genuine dispute: ████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████.

*See* Fed. R. Civ. P. 56(c)(1)(B).

516.    In September 2022, Business Insider reported that Snap had launched an initiative

called "Project Sunshine."  *See* Ex. 119 at -904 (MetaFTC-Klein-DX-730, SNAP – FTC – No.

191-0134 – 0000050903).  Mr. Levenson testified that "Project Sunshine was an effort that

several teams at the company undertook to improve our friend Stories experience to grow

engagement with friend stories."  Ex. 97 at 103:10-13 (Levenson (Snap) Dep. Tr.).  Snap

launched Project Sunshine in response to declines in Friend Story engagement.  *See id.*

at 103:14-19 ("Q. Do you know what precipitated the creation of Project Sunshine?  A. We've

seen continued declines in friend story engagement . . . for a few years.  So we wanted to kick off

this project.").  Business Insider's article described Project Sunshine as "figur[ing] out how to

get views and engagement of [Snap's] core Story product back to peak levels in the face of

changing user habits and the increased popularity of TikTok."  Ex. 119 at -904 (MetaFTC-Klein-

DX-730, SNAP – FTC – No. 191-0134 – 0000050903); *see also id.* ("With the rise of TikTok, Snap has seen overall engagement and posting of Stories dragged down, the people said.").  The article also stated that "[b]roader trends, along with the rise of TikTok, are said to have dragged down usage of Snap." *Id.*  When asked about Project Sunshine and this article, Mr. Levenson agreed that ███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████

 **FTC Response: Disputed in part.**  It is undisputed that Statement 516 accurately quotes the words that appear in the cited material.  The FTC otherwise disputes Statement 516 as the material cited does not establish the absence of a genuine dispute regarding a material fact:

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████.

*See* Fed. R. Civ. P. 56(c)(1)(B).  Additionally, the FTC disputes in part that Statement 516 constitutes a material fact subject to proof at trial and objects that the material cited—███████████

████████████████████████—is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1), 56(c)(2).

 **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Snap launched its "Project Sunshine" initiative in response to declining engagement on Stories,

to which TikTok contributed.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 506

(addressing similar response).

517.  

Ex. 122 at -730 (SNAP – FTC – No. 191-0134 – 0000114688)

; *see also supra* at ¶ 502

(discussing teen users opting to go to TikTok as

).

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 517

accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 517 as the material cited does not establish the absence of a genuine dispute:

.  *See* Fed. R. Civ. P. 56(c)(1)(B).

518.  A February 2022 document prepared for Snap's board of directors – stated that

Snapchat "pair[s] a product (Spotlight) that drives spontaneous engagement and creator

discovery with a subscription surface . . . (Stories)," but that "[n]evertheless, we have seen the

impact of competition on engagement and on our ad business over the past two years and expect

those dynamics to persist."  Ex. 121 at -293 (MetaFTC-Klein-DX-721, SNAP – FTC – No. 191-

0134 – 0000128293).  Mr. Levenson testified that these sentences referred to "creator content on Spotlight and Stories," Ex. 97 at 34:5-9 (Levenson (Snap) Dep. Tr.), and that the reference to the "impact of competition on engagement" referred to the "impact of" "Tiktok's growth, Reels' growth, and Shorts' growth, among other short form video platforms" which "impacted our engagement on Snapchat with creator content," *id.* at 34:20-36:4; *see also id.* at 35:7-10 ███

███

███

███

███

███  Ex. 121 at -294 (MetaFTC-Klein-DX-721, SNAP – FTC – No. 191-0134 – 0000128293).

Mr. Levenson testified that referred to engagement on Snapchat, including on Stories. *See* Ex. 97 at 40:16-20 (Levenson (Snap) Dep. Tr.) ███

███

███

███

███

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 518 accurately quotes the words that appear in the cited material.  However, the FTC objects to Statement 518 as the material cited does not establish the absence of a genuine dispute: ███

███

███

███



. *See* Fed. R. Civ. P. 56(c)(1)(B).

519.

**FTC Response: Undisputed but immaterial.**  It is undisputed that Statement 519 accurately quotes the words that appear in the cited material.  However, the FTC objects to Statement 519 as the material cited does not establish the absence of a genuine dispute:

. *See* Fed. R. Civ. P. 56(c)(1)(B).

520. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

**FTC Response: Undisputed but immaterial and incomplete.**  It is undisputed that

Statement 520 accurately quotes the words that appear in the cited material.  However, the FTC

objects to Statement 520 as the material cited does not establish the absence of a genuine dispute:

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Further, Statement 520

omits information from the document that renders it incomplete.  ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

       **b.**    **MeWe**

       **i.**    **Background**

521.     The FTC claims that MeWe is a "personal social networking service."  Ex. 295

at 3, FTC's Suppl. Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First

Set of Interrogs. (Nov. 4, 2022)).

**FTC Response: Undisputed.**

522.     MeWe "launched for iOS and Android in October 2014" and "sought to

differentiate itself from Facebook by providing a privacy-focused service that does not serve ads

or track user activities."  Ex. 279 at ¶ 148 (Hemphill Rep.).  "MeWe instead offers users a

'freemium' model, wherein users can choose between using a no-cost version of the site that provides users with basic social networking functions or subscribing to MeWe and accessing additional features, including data storage." *Id.*

**FTC Response: Undisputed.**

### ii.       Features

523.   MeWe has many features that are similar to features on apps excluded from the FTC's PSNS market.  MeWe allows users to, among other things, "post text and images on their timelines, share other member[s'] content, send disappearing messages, join and create groups, and to take part in private or group chats."  Ex. 419 at 3 (webwise, *Explained:  What is MeWe*).

**FTC Response: Disputed in part.**  The FTC objects to the terms "many," "similar," and "apps excluded from the FTC's proposed PSNS market" as vague and undefined.  The second sentence is undisputed.

Otherwise disputed, as the FTC disputes that Statement 523 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B); 56(c)(2).  The FTC further disputes Statement 523 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  Statement 523 does not identify how any specified features are similar to features of other apps, nor identify any other apps at all.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that MeWe has many features similar to apps that the FTC excludes from the PSNS market, e.g., messaging features.  As the terms "many" and "similar" are ordinarily understood and used, there is no dispute that MeWe has multiple or several features that are like those on "apps excluded from the FTC's proposed PSNS market" (not itself a vague phrase, e.g., TikTok,

YouTube, iMessage, Twitter, and others).  The cited material supports the claim that MeWe has

many such features – e.g., messaging, passive video consumption – that are present on apps the

FTC excludes from the PSNS market as explained in the FTC's own pleadings, this submission,

the Court's decisions on Meta's motions to dismiss, and ample additional case material.

524.    As shown in the screenshot below, MeWe allows users to customize their profile

with a profile photo and background photo, as well as background information such as their

location and job.  Ex. 419 at 2 (webwise, *Explained:  What is MeWe*).



**FTC Response: Undisputed.**

525.    On September 28, 2018, Mark Weinstein – MeWe founder and former chief

executive officer – wrote in an email that, among other features, MeWe has "tens of thousands"

of "groups," as well as "1:1 chats and group chats," "MeWe Pages," and "an upcoming tweak to

our member profiles that give MeWe members a cool Twitter-like experience."  Ex. 125 at -695

(MetaFTC-Klein-DX-301, MEWE034695).  Mr. Weinstein testified:  "Q. Are MeWe groups

limited to personal family and friends groups?  A. No, as I just explained, you can start a group, you know, of a topic of your choosing."  Ex. 126 at 26:2-5 (M. Weinstein (MeWe) Dep. Tr.).

**FTC Response: Undisputed.**

### iii.    MeWe Competition with Apps Outside the FTC's PSNS Market

526.    MeWe's ordinary-course documents and testimony do not recognize a PSNS market consisting of Facebook, Instagram, Snapchat, and MeWe.  For example, Mr. Weinstein testified:  "Q. Can you please name every personal social network you can think of?  A. MeWe, Facebook, Snapchat, WeChat."  Ex. 126 at 109:6-8 (M. Weinstein (MeWe) Dep. Tr.).  In contrast, "Instagram is not a personal social network that would allow [users] to connect [their] family and friends in any meaningful way except, you know, for broadcasting purposes.  So, again, if Instagram was a personal social network by itself as a standalone, you know, then Facebook would own its competitor.  There's nothing competitive about it.  Instagram is a broadcast network where [users] can narrow the scope of who [they]'re broadcasting to, but it's very much an entertainment broadcast schematic."  *Id.* at 310:8-310:18.  In response to the question "You owned and operated a personal social network for almost a decade, is it possible to use a personal social network without ever connecting with family and friends?," Mr. Weinstein answered:  "It's possible to."  *Id.* at 108:21-109:4.

**FTC Response: Disputed in part.**  It is undisputed that Statement 526 accurately recounts the contents of the cited material.  Otherwise disputed, as the material cited does not establish the absence of a genuine dispute of material fact, and ███████████████████████

██████████████████████████████████████████████

████████████████████████████████.  *See* Fed. R. Civ. P. 56(c)(1)(B).  *See also* CMF at § II.A.3.c, III.B.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that MeWe *itself* does not recognize a four-firm PSNS market comprised of Facebook, Instagram, MeWe, and Snapchat – a proposition the FTC response does not contest.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those sections creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

527.    Mr. Weinstein also testified: "Snapchat did not launch as a personal social network.  Snapchat launched as a one-trick pony with disappearing content that attracted its teen market, which it still has a dominant foothold in.  And then it expanded."  Ex. 126 at 132:12-18 (M. Weinstein (MeWe) Dep. Tr.).  He later testified about Snapchat:  "Q. Why as CEO of one personal social network were you not focused on Snapchat, another personal social network? . . . [A.] Snap has a market segment that's teens.  It's very clear, even as they expanded . . . their market segment is teens, they're strong there, they've always been strong there.  And we were focused on real personal social networking, not just direct one-to-one teen social networking, not just on one dominant feature and then they launched more features and became a full-fledged personal social network."  *Id.* at 174:22-175:15 & errata.

**FTC Response: Undisputed.**

528.    ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████



**FTC Response: Disputed in part.**  It is undisputed that Statement 528 accurately

portrays ████████████████████████████████████████████████████.

The second sentence is undisputed.  Statement 528 is otherwise disputed.

The first and third sentences are disputed because they are not supported by the cited

material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  The

cited material does not support the assertion that the document "describe[s] multiple apps outside

the FTC's PSNS market as competitors," nor does it support the assertion that "listed MeWe and

Snapchat, Facebook, Instagram, and TikTok as 'a few examples' of 'Social Media.'"  Instead,

the cited material indicates that Ex. 127 at -909 identified "Social Media *Features.*"  *Id.*

(emphasis added).

The first and third sentences of Statement 528 are also disputed because the material cited does not establish the absence of a genuine dispute regarding a material fact: ███████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████

█████████████████████████████

███████████████████████████████. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

███████████████████████████████

████████████████████████████

███. The cited materials support that showing, including because ██████████████

███████████████████████████████

█████████████████████████████

█████████████████████████████

███████████████████████████████

█████████████████████████████

███████████████████████████████

██████████████████████

529.  █████████████████████████

████████████████████████████████

██████████████████

███████████████████████████████████████████████████████

**FTC Response: Undisputed and immaterial.**  It is undisputed that Statement 529

accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 529 as the material cited does not establish the absence of a genuine dispute regarding

a material fact: ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████. *See* Fed. R. Civ. P. 56(c)(1)(B).

 **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

███████████████████████████████████████████████



530.

**FTC Response: Undisputed and immaterial.**  It is undisputed that Statement 530

accurately quotes the words that appear in the cited material.  However, the FTC objects to

Statement 530 as the material cited does not establish the absence of a genuine dispute regarding a material fact: MeWe's perception that other firms may be "competitors" in certain aspects of its operations or in a broad sense for time or attention does not suggest that those firms compete in the market for personal social networking services, or that MeWe and Meta are not competitors in the provision of personal social networking services, or that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that MeWe recognizes competition from an array of firms – including TikTok, Twitter, Reddit, and WhatsApp – outside the FTC's four-firm PSNS market.  These materials support the claim that MeWe itself does not recognize a so-called "personal social networking services" market – a term that does not arise in any of MeWe's ordinary-course business documents, let alone limited to just Facebook, Instagram, Snapchat, and MeWe for the provision of a subset of unspecified features.

531.  ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████



**FTC Response: Undisputed.**

532.



**FTC Response: Undisputed and immaterial.**  It is undisputed that Statement 532 accurately quotes the words that appear in the cited material.  However, the FTC objects to Statement 532 as the material cited does not establish the absence of a genuine dispute: MeWe's perception that other firms may be "comparable" in some sense (e.g., ability to monetize users and generate revenue) or that those firms are "social media companies" does not establish that MeWe and other firms are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that MeWe recognizes competition from an array of firms outside the FTC's four-firm PSNS market. These materials support the claim that MeWe itself does not recognize a so-called "personal

social networking services" market – a term that does not arise in any of MeWe's ordinary-course business documents, let alone limited to just Facebook, Instagram, Snapchat, and MeWe for the provision of a subset of unspecified features.

### C.   Meta's Experts' Empirical Substitution Data

533.   Meta's expert economists Professor John List and Professor Dennis Carlton conducted various empirical analyses to test the FTC's proposed market definition.  *See generally* Ex. 3 (List Rep.); Ex. 2 (Carlton Rep.).

**FTC Response: Disputed in part.**  The FTC disputes that Statement 533 constitutes a material fact subject to proof at trial, *see* Fed. R. Civ. P. 56(c)(1), and disputes that the various empirical analyses are appropriately designed to "test the FTC's proposed market definition," given the fatal flaws in the design of the analyses.  *See* PX9007, Hemphill Rebuttal Report at ¶¶ 365-474.  Undisputed that Professors List and Carlton purported to conduct empirical analyses.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professors John List and Dennis Carlton conducted empirical analyses to test the FTC's proposed market definition.  *See supra* Meta Introduction.  The FTC's claim that the design of these analyses contain "fatal flaws" is addressed in Meta's reply to paragraph 534 below where the FTC describes these alleged flaws, and Meta incorporates its responses to those claims here.

534.   Professor List undertook three empirical analyses to evaluate the FTC's alleged "Personal Social Networking Services" (or "PSNS") market definition.  He described these as: (1) a "Pricing Experiment" – a large-scale experiment that evaluates patterns of diversion from Facebook and Instagram to other apps and activities in response to financial incentives to reduce engagement on Facebook and Instagram, *see infra* at ¶¶ 537-547; (2) a "TikTok Natural Experiment" – an analysis of the impact of India's June 2020 TikTok ban on engagement on

Facebook and Instagram, which provides a natural experiment for evaluating substitution between TikTok and Facebook and Instagram, *see infra* at ¶¶ 548-553; and (3) a "Switching Analysis" – an observational switching analysis of the relationship between changes in the use of Facebook or Instagram and changes in the use of other apps, *see infra* at ¶¶ 554-561.

**FTC Response: Disputed in part.**  Statement 534 is undisputed to the extent that it accurately recounts words that appear in Professor List's expert report.  Otherwise disputed.

The first sentence of Statement 534 is disputed insofar as it describes Professor List's analysis as evaluating "market definition," given the fatal flaws in the design of the analyses. *See* PX9007, Hemphill Rebuttal Report at ¶¶ 365-474.  The second sentence is disputed insofar as it describes Professor List's "Pricing Experiment" as analyzing "patterns of diversion" from Facebook and Instagram to other apps and activities.  To study "patterns of diversion," one must analyze consumer behavior in response to a change in the price or quality of a particular good or service.  While Professor List's Pricing Experiment provided an economic incentive for two small experimental groups of users to reduce their consumption of Facebook and Instagram, one cannot reasonably infer diversion patterns from this experiment, for reasons detailed in Professor Hemphill's rebuttal report.  *See id.* at ¶¶ 415-19.

First, unlike typical Facebook and Instagram users, participants in Professor List's Pricing Experiment participated with the knowledge that the experiment was finite, potentially suppressing diversion to other personal social network services that would occur as a result of a genuine, non-transitory change in price or quality.  *See id.* at ¶ 420 ("The price increase that Prof. List's experiment induces on the treatment group, however, is known by the experiment participants to last for just four weeks.  Thus, the way that they respond to the incentives provided by the experiment will be driven by short term accommodations rather than what their

actual response would be to a small non-transitory increase in the quality-adjusted price."). Second, Facebook and Instagram are social networks and exhibit network effects.  *See* Ex. 3 (List Rep.) ¶ 205 (describing Facebook as an incumbent service characterized by network effects).  In other words, the value that one user derives from Facebook or Instagram is largely a function of other users' engagement on the platform. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See, e.g.*, PX15508, Meta email chain: ███ to C. Cox et al. re: ████████████ (Dec. 8, 2017), FB_FTC_CID_05179576, at -576 ████████████████████████████████████████████████████████████████████████████████████████; *see also* Ex. 3 (List Rep.) App'x P-8 n.10 (citing the same document for Meta's estimate of network effects). Because Professor List's Pricing Experiment only changed product quality for a very small subset of users, the experiment failed to capture the change in user behavior that would result from a genuine change in price or quality on the applications.  This fatal flaw makes the Pricing Experiment inapt to evaluate "patterns of diversion."

The first sentence of Statement 534 is also disputed insofar as it describes Professor List's "TikTok Natural Experiment" as "evaluating substitution between TikTok and Facebook and Instagram."  As Professor Hemphill details in his rebuttal report, the TikTok Natural Experiment captures changes in behavior in India following a complete ban of TikTok *and more than 300 other applications* in 2020.  *See* PX9007, Hemphill Rebuttal Report at ¶¶ 447-53; *see also* PX0565, Reuters, "India Adds 54 More Chinese Apps to Ban List; Sea Says It Complies with Laws" (Feb. 15, 2022), https://www.reuters.com/world/india/sea-owned-game-free-fire-unavailable-india-after-ban-chinese-apps-2022-02-15/.  Professor List does not—and cannot—

distinguish between changes in engagement on Facebook or Instagram that occurred as a result of TikTok being banned, the ban of other applications, or other changes in user behavior.  As a result, the TikTok Natural Experiment is not sufficient to draw conclusions about substitution between TikTok and Facebook or Instagram.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor List conducted three empirical analyses to evaluate the FTC's alleged PSNS market definition.  *See supra* Meta Introduction.

The FTC's claim that the participants in Professor List's pricing experiment had knowledge that the experiment was finite and may have acted differently than they would have in response to a non-transitory change in price ignores the fact that Professor List found that participants' behavior stabilized after a week, which provided a surrogate for long-run behavior. *See* PX6178 at 70:3-7 (List Dep. Tr.) ("My experiment is four weeks, but what I observe after a week is a lot of stability.  So I view that as a good surrogate.  So I do view that as non-transitory."), 73:19-74:18, 97:20-98:4 ("I consider my experiment a long-term one.  It's a long-term one because I can get a surrogate and then I know the long-run elasticity.  So let's be clear about what an experimentalist calls 'long term.'  So if I said 'long term' here, that that would be at least four weeks, that's right.").

The FTC's claim that Professor List's pricing experiment is inapt to evaluate patterns of diversion because it fails to consider network effects wrongly assumes that potential network effects affect the results of the pricing experiment.  The cited portions of Professor Hemphill's report do not support such a claim or provide evidence of the existence or magnitude of network effects for alleged PSNS apps or non-PSNS apps.  Professor List explained the theory that any differences in relative switching rates among users may be a result of network effects is directly

contradicted by the evidence from the pricing experiment that people divert as much attention

away from Feed and Stories as other parts of the Facebook service when they are paid not to use

Facebook.  *See id.* at 156:21-158:15.  In general, network effects are less relevant where, as here,

apps are easy to download (and adopt) and multi-homing among apps is already extensive.  Ex. 2

at ¶¶ 194, 297-300 (Carlton Rep.).

The FTC's claim that " 

" ignores that Professor List's

pricing experiment analyzes individual diversion patterns, not group diversion patterns, which is

consistent with the approach that Meta often uses in its experiments.  *See* Ex. 3, App'x I (List

Rep.) (discussing five ordinary-course Meta experiments, including

); *id.* at p. I-8 ("I understand that a random sample of Facebook or Instagram users was

randomly assigned to treatment or control groups in each experiment and that new Meta users

continue to be assigned to these experiments over time.").

The FTC's claim that Professor List's TikTok Natural Experiment cannot be used to

draw conclusions about substitution between TikTok and Facebook or Instagram because it does

not distinguish between changes in engagement on Facebook or Instagram that occurred as a

result of TikTok being banned, the ban of other applications, or other changes in user behavior,

ignores several key aspects of the experiment.  India initially banned 58 apps on the same day as

TikTok, and among these 58 other banned Chinese apps TikTok accounted for            of

usage.  PX6178 at 188:3-11 (List Dep. Tr.).  India banned 118 additional apps less than three

months later, and TikTok accounted for approximately            of usage of the 176 total

banned apps.  *Id.* at 198:7-17.  Professor List found that it was unnecessary to consider the

effects of diversion from any other apps for the purposes of his analysis given TikTok's ▮▮

▮▮▮ share among all banned apps during the initial ban.  *See id.* at 198:18-202:1.

535.    Professor List concluded that "[e]ach of these empirical approaches establishes that Facebook and Instagram face competition from a wide variety of apps and that observed substitution patterns are inconsistent with the FTC's and Prof. Hemphill's claim that PSNS is a relevant economic market for evaluating the competitive impact of Meta's acquisitions of Instagram and WhatsApp."  Ex. 3 at ¶ 38 (List Rep.).

**FTC Response: Disputed in part.**  Statement 535 is undisputed to the extent that it accurately recounts words that appear in Professor List's expert report.  Otherwise disputed.  The first sentence of Statement 535 is disputed insofar as it claims that each of Professor List's empirical approaches establishes that Facebook and Instagram face competition from a wide variety of apps.  The TikTok Natural Experiment tests the extent to which users increase their time spent of non-banned applications after the Indian government banned more than 200 apps (including TikTok).  This experiment does not demonstrate that Facebook and Instagram "face competition from a wide variety of apps."  At most, it demonstrates that people increase their consumption of a wide variety of applications when *TikTok* is banned.  Similarly, Professor List's Switching Analysis does not reach the question of what applications are competitive substitutes for Facebook or Instagram.  It merely reports some users' changes in application usage over time.  Those changes in usage need not result from competition between the applications.  In other words, the Switching Analysis cannot demonstrate the extent to which changes in the price or quality of one application lead to changes in usage of another.

The first sentence of Statement 535 is also disputed insofar as it claims that "observed substitution patterns are inconsistent with the FTC's and Prof. Hemphill's claim that PSNS is a

relevant economic market." By Professor List's own admission, the TikTok Natural Experiment and the Switching Analysis do not measure substitution from Facebook or Instagram to other applications. *See* PX6178, List (Meta) Dep. Tr., at 180:8-182:21 (testifying that the TikTok Natural Experiment measures substitution from TikTok to Facebook and Instagram and that economic theory does not predict that there is exact symmetry); *see also id.* at 23:8-25:22 (agreeing that the Switching Analysis "can't identify why an individual shifted time between apps" and, as a result, that it is "not clear that those shifts occurred due to price or quality changes in another app"). And as noted in the FTC's response to Statement 534, one cannot rely on the Pricing Experiment to reach reliable conclusions about "patterns of diversion" or substitution patterns among Facebook and Instagram users given the limitations of the experiment.

The statement is also disputed insofar as it assumes that Professor List's findings are inconsistent with the existence of a market for personal social network services. By his own admission, Professor List did not perform a hypothetical monopolist test to evaluate whether personal social network services is a relevant market. *See* PX6178, List (Meta) Dep. Tr., at 65:15-19 ("Q: None of your other analyses implement the HMT in and of themselves; correct? A: That's correct."). His conclusions also presume that experimental evidence that users substitute to non-personal social network services firms at a higher rate than other personal social network services firms under certain conditions is sufficient to undermine the existence of a personal social network services market. Those conclusions are unwarranted and contrary to the principles of market definition established by the merger guidelines. *See* PX9007, Hemphill Rebuttal Report at ¶ 17 (explaining that the algorithmic approach to market definition "wrongly assigns a low share (and clean bill of health) even where monopoly power had been established

through direct evidence" and "include[s] remote substitutes whenever a small firm making the same product is included in the market").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that each of Professor List's three empirical analyses show that Facebook and Instagram face competition from a wide variety of apps, or that the observed substitution patterns from these experiments undermine the FTC's alleged PSNS market definition.  *See supra* Meta Introduction.

The FTC's claim that Professor List's TikTok experiment "at most" shows that people use a wide variety of other apps when TikTok is banned mischaracterizes the experiment and its economic significance.  It is the FTC's burden to define a relevant market, but Professor Hemphill admitted that he performed no quantitative analysis of substitution.  *See* Ex. 283 at 142:16-144:4 (Hemphill Dep. Tr.) (acknowledging that no analysis of "quantitative evidence of substitution in response to any change in quality" was performed); Ex. 2 at ¶¶ 15-16 (Carlton Rep.) ("Prof. Hemphill's analysis is devoid of using substitution as his basis for market definition.").  Professor List's analysis of the India TikTok ban shows that the FTC's alleged candidate market consisting of only four "PSNS apps" is inconsistent with the empirical evidence in this case, which shows that Facebook and Instagram users substituted more time to apps outside the alleged PSNS market (including TikTok, YouTube, Twitter and others) than to apps within the alleged market (Snapchat or MeWe).  *See* Ex. 3 at ¶¶ 21, 122, 137-139 (List Rep.).

The FTC's claim that Professor List's Switching Analysis merely reports some users' changes in application usage over time likewise mischaracterizes the experiment and its economic significance.  Professor List's switching analysis shows that the FTC's alleged

candidate market consisting of all PSN apps is inconsistent with the empirical evidence in this case, which shows that Facebook and Instagram users substituted more time to apps outside the alleged PSN market (including TikTok, YouTube, Twitter and others) than to apps within the alleged market (Snapchat or MeWe). *See id.* at ¶¶ 21, 122, 142, 160-163; PX6178 at 25:13-22 (List Dep. Tr.) (switching analysis "informative about the relevant substitutes").

The FTC's claim that Professor List's results do not undermine the alleged PSNS market because Professor List did not perform an HMT and applies an "algorithmic approach" also mischaracterize Professor List's experiments and their economic significance.  Although Professor List's analyses do not execute a quantitative implementation of the HMT, they are highly reliable and informative for assessing the relevant market and Meta's monopoly power. *See*, *e.g.*, Ex. 2 at ¶¶ 20-44 (Carlton Rep.); Ex. 3 at ¶¶ 13-22 (List Rep.); PX6179 at 162:16-169:4 (Carlton Dep. Tr.); PX6178 at 25:1-27:17, 59:2-18, 76:13-77:2, 77:14-78:10, 84:12-86:2, 114:22-120:17, 180:8-181:6, 187:6-195:9 (List Dep. Tr.).  These analyses demonstrate that, because of the relative magnitude of switching, if Snapchat and MeWe are within the relevant market, then TikTok and YouTube (and others) should be included in the relevant market as well.  *See* Ex. 2 at ¶¶ 20-44 (Carlton Rep.); Ex. 3 at ¶¶ 13-22 (List Rep.).

536.    Professor Carlton analyzed documents and data regarding a Meta service outage in October 2021.  *See infra* at ¶¶ 562-566.  He "found that when users diverted time away from Facebook and Instagram during the outage, that time went primarily to TikTok, YouTube, and messaging, more so than to Snapchat."  Ex. 2 at ¶ 25 (Carlton Rep.).

**FTC Response: Disputed in part.**  The FTC disputes Statement 536 insofar as it implies that Professor Carlton's outage analysis found that "time went primarily" to any application; instead, he found that time primarily went to no other app, as ███ of the time was a "reduction

in time spent using the phone." Ex. 2 at ¶ 29 (Carlton Rep.).  Apps with larger increases in

minutes than ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████. *Id.*

at Table 1.

The FTC also disputes Statement 536 as failing to establish the absence of a genuine

dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(B).  As explained in Professor Hemphill's

rebuttal report, Professor Carlton's outage analysis is unreliable and uninformative of market

definition in this matter given its numerous flaws.  PX9007, Hemphill Rebuttal Report at §

2.2.3.1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Professor Carlton's outage analysis found that when users diverted time away from Facebook

and Instagram during the October 2021 outage, that time went primarily to apps outside the

alleged PSNS market (TikTok, YouTube, and messaging) instead of to apps within the alleged

market (Snapchat).  *See supra* Meta Introduction.

The FTC's claim that during the outage "time went primarily" to "no other app" but

instead was a "reduction in time spent using the phone" mischaracterizes the evidence, which

shows that approximately ████████████ of all diverted time went to other apps besides Facebook

and Instagram.  Off-device time is not analogous to use of a single app, but instead comprises a

limitless number of other activities.  *See* Ex. 3, App'x E at pp. E-26-E-27 & tbl. E-10 (List Rep.).

It is unknown whether any off-device activity has higher diversion than the apps in the analysis,

and therefore no such comparisons are possible.  The FTC's claim that Professor Carlton's

outage analysis contains "numerous flaws" is addressed below in Meta's reply to paragraphs

562-566 where the FTC describes these alleged flaws, and Meta incorporates its responses to those claims here.

### 1.    Professor John List's "Pricing Experiment"

537.    Meta's economic expert, Professor John List, designed and implemented a multi-week field experiment involving approximately 6,000 participants (the "Pricing Experiment") that generated data he used to estimate the extent of economic substitution between Facebook, Instagram, other online services, and off-device activities.  *See* Ex. 3 at ¶¶ 17, 39 & App'x F at F-18 (List Rep.).

**FTC Response: Disputed in part.**  The FTC disputes that Statement 537 constitutes a material fact subject to proof at trial, *see* Fed. R. Civ. P. 56(c)(1), and disputes that Professor List's analysis is appropriately designed to "estimate the extent of economic substitution between Facebook, Instagram, other online services, and off-device activities" given the fatal flaws in the design of the analyses.  *See* PX9007, Hemphill Rebuttal Report at ¶¶ 365-474.  The FTC disputes Statement 537 insofar as it claims that the Pricing Experiment "generated data he used to estimate the extent of economic substitution between Facebook, Instagram, other online services, and off-device activities."  As explained in the FTC's response to Statement 534, the flaws inherent in the design of the Pricing Experiment render it inapt to measure economic substitution as it would occur in response to a genuine increase in price or change in quality on Facebook or Instagram.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor List's Pricing Experiment generated data from 6,000 participants regarding economic substitution between Facebook, Instagram, other online services, and off-device activities.  The FTC cites only its response to paragraph 534 above, and Meta incorporates its reply to that response here.  *See supra* Meta Introduction.

538.     In the Pricing Experiment, "[d]evice monitors were installed on participants'
mobile devices to measure baseline engagement on various apps and changes in engagement on
apps during the treatment period."  Ex. 3 at ¶ 52 (List Rep.).

**FTC Response: Disputed in part.**  Statement 538 is undisputed to the extent that it
accurately recounts words that appear in Professor List's expert report.  Otherwise disputed.
Statement 538 is incomplete because "baseline engagement" is vague, undefined, and
ambiguous.  Professor List's study of "engagement" was limited to a measurement of time spent,
whereas Meta and other industry participants study engagement in many other ways.  *See* Ex. 3
at ¶ 52 (List Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
the Pricing Experiment used device monitors installed on participants' mobile devices to
measure baseline engagement on various apps and changes in engagement on those apps during
the treatment period.  *See supra* Meta Introduction.  Professor List makes clear that "baseline
engagement" means, with respect to each app, the user's "engagement in the four weeks prior to
the start of the experiment."  Ex. 3 at ¶ 73 (List Rep.).  Although Professor List's pricing
experiment evaluated time spent, and no other engagement metrics, he reported results both on
how users' time spent changed during the experiment, where that time went when it was not on
Facebook and Instagram, and where that time came from among the various surfaces of
Facebook and Instagram.  *See* PX6178 at 76:13-77:2 (List Dep. Tr.).

539.     To overcome the problems of analyzing substitution among zero-price goods, the
Pricing Experiment presented users with economic incentives to reduce the amount of time they
spend on Facebook or Instagram.  *See* Ex. 3 at ¶¶ 6, 16, 39 (List Rep.).  This is equivalent to
introducing a positive price to use Facebook or Instagram.  *See id.* at ¶ 16.  Professor List

observed how users reallocate their time to other apps and activities in response to economic incentives.  *See id.*

    **FTC Response: Disputed in part.**  Statement 539 is undisputed to the extent that it accurately recounts words that appear in Professor List's expert report.  Otherwise disputed.

    The FTC disputes Statement 539 on the grounds that the Pricing Experiment does not "overcome the problems of analyzing substitution among zero-price goods."  As noted in the FTC's response to Statement 534, the Pricing Experiment fails to accurately replicate the conditions in which a genuine change in price or quality would occur.  Specifically, the fact that participants knew about the short, finite nature of experiment, combined with the fact that the experiment failed to appropriately take network effects into consideration, means that the experiment cannot predict user behavior in response to a price increase or change in quality.  Because the experiment fails to account for these conditions, it does not "overcome the problems" associated with analyzing substitution among zero-price goods.

    The FTC further disputes Statement 539 on the grounds that the experimental conditions in Professor List's Pricing Experiment are not "equivalent to introducing a positive price to use Facebook or Instagram," and that Professor List provides no support for that proposition.  For the reasons provided in the preceding paragraph and the FTC's response to Statement 534, the FTC disputes the claim that an observer can rely on the Pricing Experiment to predict user behavior in response to a genuine change in price or quality.

    The FTC further disputes Statement 539 to the extent that it claims that the Pricing Experiment "observed how users reallocate their time to other apps and activities in response to economic incentives."  Professor List observed how users reallocate their time to other apps and activities in response to the introduction of *one* artificial economic incentive: a payment to spend

less time on Facebook or Instagram.  The results of the Pricing Experiment cannot be used to
"observe how users reallocate their time to other apps and activities" in response to other
economic incentives, or in response to economic incentives generally.  As explained in the
FTC's response to Statement 534, the limitations of the Pricing Experiment make it an inapt tool
to predict user behavior in response to a genuine change in price or quality.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
the Pricing Experiment overcomes the problems of analyzing substitution among zero-price
goods by effectively introducing a positive price to use Facebook or Instagram and analyzing
how users reallocate their time to other apps and activities in response to this effective price
increase.  *See supra* Meta Introduction.

The FTC's claims that participants in the pricing experiment knew that it was finite in
duration, that the experiment failed to account for network effects, and that the experiment
predicts user behavior in response to a change in price, are misplaced for the reasons discussed in
Meta's reply to the FTC's response to paragraph 534 above, which Meta incorporates here.  With
respect to the FTC's claim that Professor List provides no support for the self-evident
proposition that paying users to decrease their time on Facebook and Instagram is economically
equivalent to introducing a positive price to use these services, Professor List explained that
many aspects of his experiment have been validated through other similar academic studies that
look at how exogenous changes in quality or price affect users and usage.  PX6178 at 84:12-
86:11 (List Dep. Tr.); Ex. 3 at ¶¶ 49-50 (List Rep.).  The FTC's claim that the results of the
Pricing Experiment cannot be used to observe how users react in response to unspecified
economic incentives other than price is immaterial; the FTC itself has claimed to rely on
"quality-adjusted price" of the apps in its analysis of market power and competitive effects.

538

PX9000 at ¶¶ 36-39 (Hemphill Rep.) (opining that "[a]d load is an important component of quality-adjusted price").

540.    The experiment divided the treatment group into Facebook and Instagram groups: (1) the Facebook experiment paid users to reduce their usage of Facebook and measured diversion from Facebook; and (2) the Instagram experiment paid Instagram users to reduce their usage of Instagram and measured diversion from Instagram.  *See* Ex. 3 at ¶¶ 73-81 (List Rep.).

**FTC Response: Disputed in part.**  The FTC disputes that the experiments "measured diversion," for the reasons articulated in its response to Statement 534.  Statement 540 is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact and does not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 534.

541.    To establish a causal (and not simply correlational) relationship between the economic incentives and changes in engagement, the Pricing Experiment also included "control groups" of Facebook and Instagram users who did not face a price for reducing their use of Facebook or Instagram.  *See* Ex. 3 at ¶¶ 16, 55-58 (List Rep.).

**FTC Response: Disputed in part.**  The FTC disputes that the Pricing Experiment established a causal relationship between economic incentives and changes in engagement.  Professor List's conclusion that the changes in behavior observed in the experiment might establish changes in user behavior in response to a genuine price increase or quality change in the real world is unsupported and flawed.  As noted in the FTC's response to Statement 534, Professor List's Pricing Experiment fails to replicate the conditions of a genuine change in economic incentives in a way that would allow an observer to form conclusions about how users

would behave if Meta were to raise the prices or change the quality of either Facebook or Instagram.  Statement 541 is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the Pricing Experiment used control groups of Facebook and Instagram users to establish a causal relationship between the economic incentives and changes in engagement.  *See supra* Meta Introduction.  The FTC's claims regarding the methodology of the experiment cites only its response to paragraph 534 above, and Meta incorporates its reply to that response here.

542.    By comparing changes in the behavior of participants in the treatment and control groups between the baseline and treatment periods, Professor List obtained causal estimates of the impact of financial incentives on (1) engagement on Facebook or Instagram; and (2) economic substitution between Facebook or Instagram and other apps and activities.  *See* Ex. 3 at ¶ 55 (List Rep.).

**FTC Response: Disputed in part.**  As detailed in its responses to Statements 541 and 534, the FTC disputes that the results of Professor List's Pricing Experiment form a basis to evaluate how users would change their behavior in response to a genuine change in price or quality on Facebook or Instagram.  Therefore, the FTC disputes Statement 542 insofar as it suggests that the Pricing Experiment reflects how a genuine change in application price or quality would affect engagement or economic substitution.

As noted in its response to Statement 538, the FTC disputes that the experiments purport to measure impact on user "engagement" insofar as "engagement" refers to anything beyond the amount of time that people spend on various applications.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor List's experiment compared changes in the behavior of participants in treatment and

control groups to obtain causal estimates of the impact of financial incentives on engagement on Facebook or Instagram and the substitution between Facebook or Instagram and other apps. *See supra* Meta Introduction. The FTC cites only its responses to paragraphs 534, 538, and 541 above, and Meta incorporates its replies to those responses here.

543.    "The Pricing Experiment provides direct estimates of diversion from Facebook or Instagram to other apps and off-device activities. The results for both the Facebook and Instagram experiments establish that PSNS account for only a modest fraction of diversion. . . . TikTok and YouTube, combined, account for a larger share of diversion than do PSNS apps. These results contradict the FTC's and Prof. Hemphill's market definition." Ex. 3 at ¶ 94 (List Rep.); *see also id.* at ¶ 21 ("[T]he results of the Pricing Experiment establish that when users reduce engagement on Facebook or Instagram in response to financial incentives, they divert their time not primarily to other PSNS apps (as defined by the FTC and Prof. Hemphill), but to a wide range of other apps and activities.").

**FTC Response: Disputed in part.** As noted in its response to Statement 534, the FTC disputes that the Pricing Experiment is sufficient to measure "patterns of diversion" as the experiment design was fatally flawed and fails to measure any "diversion" that might occur in response to a genuine price increase or change in application quality. Accordingly, the results of the Pricing Experiment do not provide basis to conclude that "TikTok and YouTube, combined, account for a larger share of diversion than do PSNS apps" and "contradict the FTC's and Professor Hemphill's market definition." Furthermore, as noted in its response to Statement 535, the FTC disputes that the results of the Pricing Experiment are inconsistent with the existence of a market for personal social network services, and disputes that they contradict the FTC's or Professor Hemphill's market definition. *See* PX9007, Hemphill Rebuttal Report at ¶ 213

(indicating that the results of the Pricing Experiment are consistent with the FTC's market definition because "[w]hen faced with a price increase, users have little reason to switch to another PSN app unless and until their friends and family also switch. Thus, relatively high short run diversion to apps like TikTok and YouTube—particularly in response to a brief triggering event like an outage or pricing experiment—is neither informative nor inconsistent with my opinions.").

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that the Pricing Experiment provides direct estimates of diversion from Facebook or Instagram to other apps and off-device activities, which show that so-called PSNS apps account for only a modest fraction of diversion, contrary to the FTC's and Prof. Hemphill's market definition. *See supra* Meta Introduction. The FTC cites only its responses to paragraphs 534 and 535 above, and Meta incorporates its replies to those responses here.

544.    The results of the Facebook experiment were as follows: "[P]SNS apps account for only 6% of time diverted from Facebook – 5% of time is diverted to Instagram and about 1% to Snapchat. [T]ikTok [5%] and YouTube [8%] together account for 13% of time diverted from Facebook. [B]rowsers account for 10% of time diverted from Facebook, and Games account for 14%. [R]oughly 39% of time is diverted from Facebook to off-device activities." Ex. 3 at ¶ 114 (List Rep.).

**FTC Response: Disputed in part.** Statement 544 is undisputed to the extent that it accurately recounts words that appear in the cited material. Otherwise disputed for the same reasons articulated in the FTC's response to Statement 534. Professor List's Pricing Experiment is inapt to evaluate "patterns of diversion" as they would occur in response to a genuine change in application price or quality on Facebook.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact and does not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 534.

545.    The results of the Instagram experiment were as follows:  "[P]SNS apps account for only 16% of time diverted from Instagram – 13% to Facebook and 2% to Snapchat.  [13% diversion to Facebook and 2% diversion to Snapchat do not add up to 16% due to rounding.] [T]ikTok and YouTube together account for 29% of time diverted from Instagram – 19% to YouTube (which is greater than diversion to Facebook) and 10% to TikTok.  [B]rowsers account for 18% of time diverted from Instagram, and Games account for 3%."  Ex. 3 at ¶ 117 & n.61 (List Rep.).

**FTC Response: Disputed in part.**  Statement 545 is undisputed to the extent that it accurately recounts words that appear in the cited material.  Otherwise disputed for the same reasons articulated in the FTC's response to Statement 534.  Professor List's Pricing Experiment is inapt to evaluate "patterns of diversion" as they would occur in response to a genuine change in application price or quality on Instagram.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact and does not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 534.

546.    Professor List summarized "the diversion rates from the Facebook and Instagram experiments graphically" in the below figures.  Ex. 3 at ¶ 118 (List Rep.).  "The graphs summarize in ascending order the diversion rates for each app and category, with the PSNS apps denoted in orange."  *Id.*



*Id.* at p. 47, fig. II-5 (List Rep.).



*Id.* at p. 48, fig. II-6 (List Rep.).

**FTC Response: Disputed in part.**  Statement 546 is undisputed to the extent that it accurately recounts words that appear in the cited material.  Otherwise disputed for the same reasons articulated in the FTC's response to Statement 534.  Professor List's Pricing Experiment is inapt to evaluate "patterns of diversion" as they would occur in response to a genuine change in application price or quality.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact and does not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 534.

547.    Professor List concluded that "the results of the Pricing Experiment contradict the FTC's and Prof. Hemphill's PSNS market definitions."  Ex. 3 at ¶ 120 (List Rep.).  That is

because "[t]he results of the Pricing Experiment establish that when users reduce engagement on Facebook or Instagram in response to financial incentives, they divert their time not primarily to other PSNS apps (as defined by the FTC and Prof. Hemphill), but to a wide range of other apps and activities."  *Id.* at ¶ 21.

**FTC Response: Disputed in part.**  Statement 547 is undisputed to the extent that it accurately reflects the words contained within Professor List's expert report.  Otherwise disputed.  The FTC disputes that the results of the Pricing Experiment contradict the FTC's and Professor Hemphill's market definition for the same reasons as articulated in response to Statements 534.  The conditions of the Pricing Experiment, including its finite nature and the fact that it does not accurately reflect network effects, make it inapt to draw conclusions about how user behavior would change in response to a genuine price increase.  Therefore, the results of the Pricing Experiment provide a poor basis to conclude that personal social network services is not a relevant market or that "when users reduce engagement on Facebook or Instagram in response to financial incentives, they divert their time not primarily to other PSNS apps . . . but to a wide range of other apps and activities."  Ex. 3 at ¶ 21 (List Rep.).

Furthermore, as explained in response to Statement 534, the results of the Pricing Experiment are not inconsistent with the existence of a market for personal social network services.  The fact that the largest category of users diverted their time to off-device activities is consistent with a market for personal social network services.  In response to an incentive to use Facebook and Instagram less, the Pricing Experiment participants most frequently opted to decrease mobile device use altogether rather than switch to another application.  As explained in Professor Hemphill's rebuttal report, this finding is consistent with the conclusion that personal social network services is a relevant market.  *See* PX9007, Hemphill Rebuttal Report at ¶ 213

(indicating that the results of the Pricing Experiment are consistent with the FTC's market

definition because "[w]hen faced with a price increase, users have little reason to switch to

another PSN app unless and until their friends and family also switch. Thus, relatively high short

run diversion to apps like TikTok and YouTube—particularly in response to a brief triggering

event like an outage or pricing experiment—is neither informative nor inconsistent with my

opinions.").

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that

the results of Professor List's Pricing Experiment contradict the FTC's and Prof. Hemphill's

PSNS market definitions. *See supra* Meta Introduction.

The FTC's claims that participants in the pricing experiment knew that it was finite in

duration, that the experiment failed to account for network effects, and that the experiment

predicts user behavior in response to a change in price, are misplaced for the reasons discussed in

the Meta's reply to the FTC's response to paragraph 534 above, which Meta incorporates here.

The FTC's claim that the largest category of users diverted their time to off-device

activities mischaracterizes the results of the experiment and its economic significance. Off-

device time is not analogous to use of a single app, but instead comprises a limitless number of

other activities. *See* Ex. 3, App'x at pp. E-26-E-27 & tbl. E-10 (List Rep.). It is unknown

whether any off-device activity has higher diversion than the apps in the analysis, and therefore

no such comparisons are possible.

Paragraph 213 of Professor Hemphill's rebuttal report does not support the FTC's

criticism that Professor List's pricing experiment fails to account for network effects. Contrary

to what Professor Hemphill assumes, users in the Facebook arm of the pricing experiment did

switch to Instagram. *Id.* at ¶¶ 112-115. Professor List further explained that the theory that any

differences in relative switching rates among users in the Facebook arm may be a result of network effects is directly contradicted by the evidence from the pricing experiment that people divert as much attention away from Feed and Stories as from other parts of the Facebook service when they are paid not to use Facebook.  PX6178 at 156:21-158:15 (List Dep. Tr.).  In general, network effects are less relevant where, as here, apps are easy to download (and adopt) and multi-homing among apps is already extensive.  Ex. 2 at ¶¶ 194, 297-300 (Carlton Rep.).

<h3 style="text-align:center">2.    Professor John List's "TikTok Natural Experiment"</h3>

548.    In 2020, the Indian government banned TikTok and 58 other Chinese apps.  *See* Ex. 3 at ¶ 125 (List Rep.).  At the time, TikTok had more than 200 million users in India and accounted for ▮▮ of the engagement in India on the banned apps prior to the ban, based on ▮▮ ▮▮▮▮▮▮▮▮▮.  *See id.*

**FTC Response: Disputed.**  Statement 548 is disputed on the basis that it does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), because evidence that the numerous applications banned in India might compete in a broad sense for time or attention does not establish that Meta and the provider of any of those applications are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes the claim that "[i]n 2020, the Indian government banned TikTok and 58 other Chinese apps."  While it is true that the Indian government initially banned 59 apps in June 2020, the Indian government banned additional applications later in 2020.  *See* PX6178, List (Meta) Dep. Tr., at 197:10-198:3 ("Q. You referenced an additional ban that India enacted in September it [sic] 2020; right?  [A.] [T]hat's correct. . . . And I have the September 1st ban, 200 apps, PUBG.").



Meta's own internal estimates indicated that ███████ ████████████████████████████████████████ PX10689 at -017, Meta presentation, ██████████████████████ (Sept. 9, 2020), FTC-META-006258823.

As noted in its response to Statement 538, the FTC disputes that the experiments purport to measure impact on user "engagement" insofar as "engagement" refers to anything beyond the amount of time that people spend on various applications.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that in 2020 the Indian government banned TikTok and 58 other Chinese apps, and that at that time TikTok had more than 200 million users in India and accounted for ███ of the engagement in India on the banned apps prior to the ban.  *See supra* Meta Introduction.  Professor List acknowledged that the Indian government banned additional applications later in 2020 and explained that he focused on the initial ban because it included TikTok, and that data from the period of the initial app ban supports his conclusions.  *See* PX6178 at 199:18-200:14 (List Dep. Tr.).  The FTC's dispute regarding TikTok's share of engagement in India is immaterial.  The internal Meta estimates that the FTC cites ████████████████████████████ ███████████████████████████.  Meta also incorporates here its reply to the FTC's response to paragraph 538 above.

549.    Meta's expert economist, Professor John List, conducted a statistical analysis to determine whether and how much the ban affected engagement on Facebook and Instagram.  *See* Ex. 3 at ¶ 132 (List Rep.).  He compared changes in actual engagement on Facebook and Instagram in India after the ban with estimates of but-for changes in engagement based on Facebook and Instagram engagement in other countries that most closely approximated engagement in India prior to the ban.  *See id.* at ¶¶ 122, 132.

**FTC Response: Disputed in part.**  The FTC disputes Statement 549 on the basis that the countries comprising "Synthetic India" in Professor List's TikTok Natural Experiment do not "most closely approximate engagement in India prior to the ban" or form a basis to determine "how much the ban affected engagement on Facebook and Instagram."  As explained in Professor Hemphill's rebuttal report, "Instagram tested Reels in India very shortly after the ban, while it only did so in two of the countries in Prof. List's control group."  *See* PX9007, Hemphill Rebuttal Report at ¶ 457.  The fact that TikTok launched in India earlier than other countries in the control group likely led to a differential increase in the time spent on Instagram in India, even absent the TikTok ban.  Furthermore, Professor List's synthetic control group does not accurately reflect the unique ways in which India was affected by Covid and government lockdown policies.  *See* PX9007, Hemphill Rebuttal Report at ¶ 458.

Statement 549 is also disputed on the basis that it does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), because evidence that the numerous applications banned in India might compete in a broad sense for time or attention does not establish that Meta and the provider of any of those applications are competitors in the provision of personal social network services, that there is not a relevant market for personal

social network services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

As noted in its response to Statement 538, the FTC disputes that the experiments purport to measure impact on user "engagement" insofar as "engagement" refers to anything beyond the amount of time that people spend on various applications.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor List's TikTok experiment compared changes in actual engagement on Facebook and Instagram in India after the ban with estimates of but-for changes in engagement in other countries that most closely approximated engagement in India prior to the ban ("Synthetic India").  *See supra* Meta Introduction.

The FTC's claim that the countries comprising Synthetic India do not provide a valid control group because Instagram tested Reels in India shortly after the ban, but only tested Reels in two of the countries in the control group does not create a genuine dispute of material fact because Reels was rolled out in India only one month earlier compared to the control group, and only on Instagram not Facebook, and Professor List's results "show significant diversion from TikTok to Facebook even before Facebook launched Reels."  Ex. 3 at ¶ 21 (List Rep.).  The FTC's response also ignores the fact that, regardless of when Meta introduced Reels in India and Synthetic India countries, ███████████████████████████████████████ ███████████████████████████████████.  *See id.* at ¶¶ 135-138.  The FTC cites no support for its claim that the fact Reels launched in India earlier than other countries in the control group likely led to a differential in the time spent on Instagram in India, which in any case is contradicted by Professor List's results.  *See id.*  Professor List's use of Synthetic India also enabled the changes in time spent on Facebook and Instagram as a result of the India ban to

be distinguished from the effects of COVID in India.  *See* PX6178 at 190:19-191:2, 200:17-21 (List Dep. Tr.); Ex. 3 at ¶ 132 (List Rep.).  Furthermore, as Professor List demonstrated, Meta accelerated the rollout of Reels in India precisely because of the TikTok ban, which is further evidence that Instagram and TikTok compete.  *See* Ex. 3 at ¶¶ 126-129 (List Rep.); *see also id.* at

███████████████████████████████████████████████████████

███████████████████████████████████████.  Meta also incorporates here its reply to the FTC's response to paragraph 538 above.

550.    Professor List found that actual engagement on both Facebook and Instagram increased following the ban relative to levels that would have been expected but for the ban.  *See* Ex. 3 at ¶ 122 (List Rep.).  The effects he found were large and statistically significant.  *See id.* at ¶¶ 122, 137.

**FTC Response: Disputed in part.**  The FTC disputes Statement 550 on the basis that it does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), because evidence that the numerous applications banned in India might compete in a broad sense for time or attention does not establish that Meta and the provider of any of those applications are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.  As noted in its response to Statement 538, the FTC disputes that the experiments purport to measure impact on user "engagement" insofar as "engagement" refers to anything beyond the amount of time that people spend on various applications.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact and does not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶¶ 534, 538.

551.    "India's TikTok ban had an immediate and sizeable long-term effect on engagement on both Facebook and Instagram in India.  The effects grew over time, which is consistent with the rising importance of TikTok and short-form video content over the same period."  Ex. 3 at ¶ 137 (List Rep.).

**FTC Response: Disputed in part.**  This statement is undisputed to the extent that it accurately reflects Professor List's findings as contained within his expert report.  Otherwise disputed.  The FTC disputes the first sentence because, among other reasons, the FTC disputes Professor List's characterization of the event as the "TikTok Ban," as cited in this statement.  As explained in the FTC's response to Statement 548, the Indian government banned 58 additional applications in June 2020, and has since banned more than 200 apps.  Professor List does not claim to—and cannot—isolate the effects of the ban of TikTok versus the effects related to the ban of other applications during the same period.  *See* PX6178, List (Meta) Dep. Tr., at 195:10-200:21 (acknowledging that the ban of TikTok does not account for the total effect observed in the experiment).  Therefore, the FTC disputes Professor List's findings to the extent that they seek to show the effect of the ban of TikTok on the amount of time that users spend on Facebook or Instagram.

The FTC disputes the second sentence because, among other reasons, Professor List also does not provide any support for the statement regarding the "rising importance of TikTok," within India or elsewhere; the FTC disputes the assertion that TikTok was "rising" in importance in India, as by Professor List's own admission the app was banned in India in 2020.

The FTC also disputes Statement 551 on the basis that it does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), because evidence that the numerous applications banned in India might compete in a broad sense for time or

attention does not establish that Meta and the provider of any of those applications are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1)(B).  As noted in its response to Statement 538, the FTC disputes that the experiments purport to measure impact on user "engagement" insofar as "engagement" refers to anything beyond the amount of time that people spend on various applications.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that India's TikTok ban increased engagement on Facebook and Instagram, that these effects grew over time, and that this is consistent with the rising importance of short-form video content over this same period.  *See supra* Meta Introduction.  With respect to the FTC's claim regarding Professor List's use of phrase "TikTok Ban," Meta incorporates here its reply to paragraph 548 above.

With respect to Professor List's claim regarding the "rising importance of TikTok," Professor List cited data showing that "time spent on TikTok outside of India █████████ ██████ minutes per day in June 2020 to ████████ minutes per day in June 2021."  Ex. 3 at ¶ 137 & n.87 (List Rep.).  At the time of the ban, India was TikTok's biggest foreign market.  *See id.* at ¶ 125 n.65 (List Rep.) (citing BBC (2020) "India bans TikTok, WeChat and dozens more Chinese apps," https://www.bbc.com/news/technology-53225720).

The FTC's other claims cite no evidence, do not create a genuine dispute of material fact, and do not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶¶ 534, 538.

552.    Professor List summarized results from his statistical analysis in the below Figures.  *See* Ex. 3 at ¶ 135 (List Rep.).  "These results . . . demonstrate that engagement on Facebook and Instagram in India increased rapidly following the ban."  *Id.*



*Id.* at p. 57, fig. II-9 (List Rep.).



*Id.* at p. 58, fig. II-10 (List Rep.).

**FTC Response: Disputed in part.**  This statement is undisputed to the extent that it accurately reflects Professor List's findings as contained within his expert report.  As noted in its response to Statement 538, the FTC disputes that the experiments purport to measure impact on user "engagement" insofar as "engagement" refers to anything beyond the amount of time that people spend on various applications.

The FTC disputes Professor List's characterization of the event as the "TikTok Ban," as cited in this statement.  As explained in the FTC's response to Statement 548, the Indian government banned 58 additional applications in June 2020, and has since banned more than 200 apps.  Professor List does not claim to—and cannot—isolate the effects of the ban of TikTok

versus the effects related to the ban of other applications during the same period.  *See* PX6178, List (Meta) Dep. Tr., at 195:10-200:21 (acknowledging that the ban of TikTok does not account for the total effect observed in the experiment).  Therefore, the FTC disputes Professor List's findings to the extent that they seek to show the effect of the ban of TikTok on the amount of time that users spend on Facebook or Instagram.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the figures summarize the results of Professor List's statistical analysis and demonstrate that engagement on Facebook and Instagram in India increased rapidly following the ban.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 538.  With respect to the FTC's claim regarding Professor List's use of phrase "TikTok Ban," Meta incorporates here its reply to paragraph 548 above.

553.     Professor List concluded that his results "[we]re inconsistent with the FTC's claim that Facebook and Instagram participate in a market that excludes TikTok" and "provid[ed] further empirical support that Facebook and Instagram are substitutes for TikTok." Ex. 3 at ¶¶ 137-138 (List Rep.).

**FTC Response: Disputed in part.**  This statement is undisputed to the extent that it accurately reflects the words contained within Professor List's expert report.  The FTC disputes that the results of Professor List's analysis are "inconsistent with the FTC's claim that Facebook and Instagram participate in a market that excludes TikTok."  First, as noted in the FTC's responses to Statement 534, Professor List's analysis is insufficient to evaluate substitution between TikTok and Facebook or Instagram.  As noted in the FTC's response to Statement 548, India banned many applications—including applications that may offer personal social network services—in June 2020, and Professor List's experiment cannot isolate the effects of the TikTok

ban from effects related to the banning of other applications or other changes in time spent in India unrelated to the ban.  Therefore, as Professor Hemphill notes in his rebuttal report, Professor List's analysis is inapt to assess substitution between TikTok and Facebook or Instagram.  *See* PX9007, Hemphill Rebuttal Report at ¶¶ 453-55.

Furthermore, even if Professor List's experiment showed that people increased the time that they spend on Facebook and Instagram following the ban of TikTok, that finding is not inconsistent with the FTC's "claim that Facebook and Instagram participate in a market that excludes TikTok."  The FTC disputes Statement 553 on the basis that it does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), because evidence that the numerous applications banned in India might compete in a broad sense for time or attention does not establish that Meta and the provider of any of those applications are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor List's results provide further empirical support that Facebook and Instagram are substitutes for TikTok and are inconsistent with the FTC's claim that Facebook and Instagram participate in a market that excludes TikTok.  *See supra* Meta Introduction.  With respect to the FTC's claim that the experiment cannot isolate the effects of the TikTok ban from effects related to the banning of other applications, Meta incorporates here its reply to paragraph 534 above. The FTC provides no support or explanation for its claim that "even if Professor List's experiment showed that people increased the time that they spend on Facebook and Instagram following the ban of TikTok, that finding is not inconsistent with the FTC's 'claim that Facebook and Instagram participate in a market that excludes TikTok.'"  Professor List's analysis of the

India TikTok ban shows that the FTC's alleged candidate market is inconsistent with the empirical evidence in this case, which shows that Facebook and Instagram users substituted more time to apps outside the alleged PSNS market (including TikTok, YouTube, Twitter, and others) than to apps within the alleged market (Snapchat and MeWe). *See* Ex. 3 at ¶¶ 21, 122, 137-139 (List Rep.); *see also id.* at ¶ 123 ("Facebook, Instagram, TikTok, and many other apps offer similar services in India and the United States. If Facebook and Instagram are substitutes for TikTok in India, then Facebook and Instagram are likely to be substitutes for TikTok in the United States as well."); PX6178 at 191:21-192:2 (List Dep. Tr.) (Professor List's analysis of the India ban "suggests that when people no longer use TikTok, they move to Facebook and Instagram, and that's the definition of being a substitute."). The FTC's other claims cite no evidence, do not create a genuine dispute of material fact, and do not warrant further reply. *See supra* Meta Introduction; Meta Reply to SMF ¶¶ 534, 538.

### 3.     Professor John List's "Switching Analysis"

554.     Meta's expert economist, Professor John List, analyzed data Meta collected in the ordinary course to evaluate how Meta users trade off time spent on Facebook, Instagram, and other apps. *See* Ex. 3 at ¶ 140 (List Rep.). Professor List explained that "[t]his analysis identifies which apps and activities gain time when users reduce time spent on Facebook or Instagram, and vice versa." *Id.*

**FTC Response: Disputed in part.** The FTC disputes Statement 554 to the extent that it characterizes Professor List's Switching Analysis as evaluating how Meta users "trade off" time spent between applications. Professor List's Switching Analysis tracks how the share of users' time spent on applications varies over time but does not analyze how users trade engagement on one application with engagement on another application. For example, consider a scenario in which time spent on both Facebook and TikTok increases, but the user increases her time spent

on TikTok more than she increases her time spent on Facebook, and the user's time on all other apps remains the same.  That user has not "traded off" time spent on Facebook for time spent on TikTok—she has *increased* her time spent on Facebook—but Professor List's Switching Analysis reports this event as a "trade off" because the share of total device time attributable to Facebook has declined and the share of total device time attributable to TikTok has increased. *See, e.g.*, Ex. 3 at ¶ 150-51 (List Rep.).

Statement 554 is undisputed to the extent that it accurately reflects the words contained within Professor List's expert report.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor List's switching analysis reviewed data that Meta collected in the ordinary course to evaluate how Meta users trade-off time spent on Facebook, Instagram, and other apps.  *See supra* Meta Introduction.  The FTC's claim that Professor List's analysis does not necessarily show users trading-off time on one app for time on another app is not supported by any evidence – it cites none here – and ignores the methods used in the analysis.  Professor List's assumption that users keep total time spent on their mobile devices constant is a well-established analytical approach.  *See* Ex. 3 at ¶ 150 (List Rep.) ("To isolate substitution from the confounding effect of changes in total device time, the switching analysis focuses on shares of total device time spent on each app or activity.").  Applying this multi-step approach, Professor List's switching analysis "yields estimates of the share of the reduction (or increase) in time on Facebook or Instagram that is gained (or lost) by other apps and categories.  By construction, the decrease (or increase) in the share of time on Facebook or Instagram is fully offset by increases (or decreases) in the share of time spent on other apps."  *Id.* at ¶ 151.

555.   Professor List analyzed ███████████████████████████████

███████████████████████████████. *See* Ex. 3 at ¶ 147

(List Rep.). ████████████████████████████████████████

████████████████████████████████ *See id.* ███████████████

████████████████████████████████ *See id.* █████████████

█████████████████████████████████████████████████████

██████████████████ *See id.*

**FTC Response: Disputed in part and incomplete.**  The FTC disputes this statement

insofar as it creates the impression that Professor List analyzed data █████████████

███████████████████████████████.  Professor List's report

indicates that ███████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████ Ex. 3 at ¶ 147 n.93 (List Rep).

Otherwise, the FTC does not dispute that this statement contains an accurate description

of Professor List's Switching Analysis methodology.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding the participants ███████████████ that was used in Professor List's switching

analysis.  *See supra* Meta Introduction.  ███████████████████████████

███████████████████████████████, that is immaterial because Professor

List was not analyzing switching patterns over that entire time period.  Rather, for each of the

█████████████████████████████████████████████████████

██████.  Ex. 3 at ¶ 147 (List Rep.).

556.    For each user, Professor List compared the share of time spent online by app in the first six weeks to the share of time spent on each app in the final six weeks. Ex. 3 at ¶ 149 (List Rep.).  He "estimate[d] a system of regressions that evaluate the relationship" between "changes in the share of a participant's time spent on Facebook or Instagram and changes in the share of time spent on other apps or app categories."  *Id.* at ¶¶ 149-150.

**FTC Response: Disputed.**  The FTC disputes Statement 556 on the basis that it does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), because even if a user spends more time on another application (for example, if the user begins to intensively play a popular game within the Gaming category), and the participant's *share* of time spent on other applications goes down as a result of spending more time per day using his or her phone, that evidence provides no relevant information regarding a relationship between the user's Facebook usage and the usage of any other application or category of applications.  Further, the fact that users split their time across multiple applications does not establish that Meta and the provider of any of those applications are competitors in the provision of personal social network services, that there is not a relevant market for personal social network services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding Professor List's use of a regression analysis to compare changes in participants' time spent on Facebook or Instagram to changes in the share of time spent on other apps or app categories.  *See supra* Meta Introduction.  The FTC cites no evidence or support for its claim that Professor List's analysis fails to show a relationship between a user's increase or decrease of Facebook or Instagram usage and the usage of other applications or categories of applications.  Professor List explained that "it is a fundamental economic principle that people shift time from

apps that they value less highly to apps that they value more highly.  Over time, changes in engagement on a given app can reflect changes in users' tastes and/or changes in the quality of services provided on a given app.  However, in identifying empirical regularities in switching patterns, the analysis identifies the apps that Facebook or Instagram users most frequently see as the next best use of their time.  Thus, an analysis of switching behavior provides additional empirical evidence to evaluate the FTC's proposed market definition."  Ex. 3 at ¶ 141 (List Rep.); *id.* at ¶ 142 ("If the FTC's market definition is correct, I would expect to see substantial switching between the three apps included in the PSNS market (Facebook, Instagram, and Snapchat) relative to apps outside the proposed relevant market.  Contrary to this expectation, my switching analysis establishes that switching between PSNS apps accounts for a small share of overall switching activity, with substantially more attention attributable to non-PSNS apps such as TikTok, YouTube, and the gaming category.  These results are consistent with the results of the Pricing Experiment, providing convergent validity wherein the results of different methodologies support the same conclusion: Facebook and Instagram face competition from a wide variety of apps.").

557.    Professor List found that "users who change their time spent on Facebook distribute that time across a variety of apps, with little time moving to or from the other PSNS apps."  Ex. 3 at ¶ 156 (List Rep.).



*Id.* at ¶ 154.

**FTC Response: Disputed in part and incomplete.**  The FTC does not dispute that Statement 557 relays words that appear in the cited material.  The FTC disputes the first sentence

of Statement 557 insofar as the statement mischaracterizes Professor List's Switching Analysis as analyzing "users who change their time spent on Facebook."  As noted in the FTC's response to Statement 554, the Switching Analysis evaluates changes in the *share* of time spent.  The Switching Analysis may report that a user whose Facebook usage stays exactly the same or increases over the relevant period has "switched" if the time that user spends on other apps is relatively higher.  For the same reason, the FTC disputes the statement in the first sentence that Professor List found anything about "time moving" between any sets of apps: Professor List did not measure whether any "time" was "moving," he measured shares of time spent.

The second sentence of Statement 557 is disputed for a similar reason: because Professor List did not even assess any "change in time on Facebook," but only a change in share of time spent, it is incorrect that his analysis shows anything at all about any apps or categories of apps that might "account" for a "change in time on Facebook."  The third sentence is likewise disputed for the same reason: Professor List's analysis does not capture whether any "time moved to or from Facebook," and does not capture whether any apps or categories of apps had any "effect."

Furthermore, Statement 557 is incomplete insofar as it fails to include that Professor List's analysis attributed ███████████████████████████████████████████ ████████████████████████████████████████. Ex. 3 at p. 66, tbl. II-13 (List Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor List's switching analysis found that users who change their time spent on Facebook distribute that time across a variety of apps, with little time moving to or from the other supposed PSNS apps.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 554.  The FTC's claim regarding Professor List's analysis of shares of time spent is misplaced for the reasons described

in Meta's reply to paragraph 556 above, which Meta incorporates here.  The FTC's completeness

objection fails to assert, much less demonstrate, the import of not referencing the "Other"

category, which is a catch-all for a wide variety of apps and therefore not comparable to either

individual apps or defined categories like Games and Entertainment.

558.    Professor List summarized the results of the Facebook Switching Analysis

"graphically, sorted from left to right by the share of time captured by each app or category," in

the below figure.  Ex. 3 at ¶ 156 (List Rep.).  "The two PSNS apps are shaded in orange, while

non-PSNS apps and activities are shaded blue."  *Id.*  Professor List explained:  "This figure

further demonstrates that users who change their time spent on Facebook distribute that time

across a variety of apps, with little time moving to or from the other PSNS apps."  *Id.*



*Id.* at p. 67, fig. II-13 (List Rep.).

**FTC Response: Disputed in part.**  The FTC does not dispute that Professor List performed the analysis described in Statement 558.  The FTC disputes Statement 558 insofar as the statement mischaracterizes Professor List's Switching Analysis as analyzing "users who change their time spent on Facebook."  As noted in the FTC's response to Statement 554, the Switching Analysis evaluates changes in the *share* of time spent.  The Switching Analysis may report that a user whose Facebook usage stays exactly the same or increases over the relevant

period has "switched" if the time that user spends on other apps increases—e.g., they begin to play a particular game more intensively.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the figure summarizes the results of Professor List's Switching Analysis and shows that users who change their time spent on Facebook distribute that time across a variety of apps, with little time moving to or from the other PSNS apps.  *See supra* Meta Introduction.  The FTC's claim regarding how the Switching Analysis tracked changes in the share of time spent is addressed in Meta's reply to paragraph 554 above, which Meta incorporates here.

559.   Professor List found that



Ex. 3 at ¶¶ 157-158 (List Rep.).

**FTC Response: Disputed in part and incomplete.**  The FTC does not dispute that Professor List performed the analysis described in Statement 559.  The FTC disputes the first sentence of Statement 559 because the statement mischaracterizes Professor List's Switching Analysis as analyzing the "change in time on Instagram."  As noted in the FTC's response to Statement 554, the Switching Analysis evaluates changes in the *share* of time spent.  The Switching Analysis may report that a user whose Instagram usage stays exactly the same or increases over the relevant period has "switched" if the time that user spends on other apps is relatively higher.  The second sentence is disputed for the same reason: Professor List's analysis did not measure whether any "time moved to or from Instagram," it assessed only changes in the

share of time spent; likewise, Professor List's analysis did not establish that any apps or app categories had any "effects" on "time moved to or from Instagram."

Furthermore, Statement 559 is incomplete insofar as it does not include Professor List's figures for the ███████████████████████████████████████████████

███████████████████████████████████████████████████. Ex. 3, p. 68, tbl. II-14 (List Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact with respect to the findings of Professor List's Switching Analysis with respect to Instagram.  *See supra* Meta Introduction.  The FTC's claim regarding how the Switching Analysis tracked changes in the share of time spent is addressed in Meta's reply to paragraph 554 above, which Meta incorporates here.  The FTC's completeness objection fails to assert, much less demonstrate, the import of not referencing the "Other" category, which is a catch-all for a wide variety of apps and therefore not comparable either to individual apps or defined categories like Games and Entertainment.  The same is true for the "Browser" category, which is not analogous to use of a single app, but instead provides a user access to a limitless number of other websites and services.  Ex. 2 at ¶ 29 (Carlton Rep.).

560.   Professor List summarized the results of the Instagram Switching Analysis graphically in the below figure.  *See* Ex. 3 at ¶ 159 (List Rep.).  The two PSNS apps are shaded in orange, while non-PSNS apps and activities are shaded blue.  Professor List explained that this figure "demonstrates that users who change their time spent on Instagram distribute that time across a variety of apps, with little time moving to or from the other PSNS apps."  *Id.*



*Id.* at p. 69, fig. II-14 (List Rep.).

**FTC Response: Disputed in part.** The FTC does not dispute that Professor List performed the analysis described in Statement 560. The FTC disputes Statement 560 insofar as the statement mischaracterizes Professor List's Switching Analysis as analyzing users' "change in time spent on Instagram." As noted in response to Statement 554, the Switching Analysis evaluates changes in the *share* of time spent. The Switching Analysis may report that a user whose Instagram usage stays exactly the same or increases over the relevant period has "switched" if the time that user spends on other apps is relatively higher.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the figure summarizes the results of Professor List's Switching Analysis and shows that users who change their time spent on Instagram distribute that time across a variety of apps, with little time moving to or from the other PSNS apps.  *See supra* Meta Introduction.  The FTC's claim regarding how the Switching Analysis tracked changes in the share of time spent is addressed in Meta's reply to paragraph 554 above, which Meta incorporates here.

561.   Professor List concluded that "the results of the Switching Analysis of ███████████████████████████████████ indicate[d] that changes in time on Facebook and Instagram are associated with changes in a wide array of apps and that PSNS account for a small share of that time."  Ex. 3 at ¶ 160 (List Rep.).

**FTC Response: Disputed in part.**  The FTC disputes Statement 561 because the statement mischaracterizes Professor List's Switching Analysis as analyzing "changes in time on Facebook and Instagram."  As noted in the FTC's response to Statement 554, the Switching Analysis evaluates changes in the *share* of time spent, it does not measure any "changes in time on Facebook and Instagram," and thus it provides no basis for the conclusion articulated in Statement 561.  The Switching Analysis may report that a user whose Facebook or Instagram usage stays exactly the same or increases over the relevant period has "switched" if the time that user spends on other apps is relatively higher.

The FTC does not dispute that Professor List's report includes the language contained within Statement 561.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact and does not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 554.

### 4.       Professor Dennis Carlton's Outage Analysis

562.    Meta's expert economist, Professor Dennis Carlton, "analyzed substitution patterns in response to the largest outage in Meta's history."  Ex. 2 at ¶ 25 (Carlton Rep.).  "On October 4, 2021, from roughly 8:40 AM PST to roughly 3 PM PST, all of Meta's apps (including Facebook, Instagram, and WhatsApp) were subject to a global outage."  *Id.* at ¶ 26.  Professor Carlton "use[d] data from this incident to ask how much time did users substitute to other apps and to which apps did they substitute the most?"  *Id.*

**FTC Response: Disputed in part and incomplete.**  Statement 562 is undisputed to the extent that it accurately recounts words that appear in Professor Carlton's expert report but is otherwise disputed.

The first and third sentences of Statement 562 are disputed because Statement 562 does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2): Professor Carlton claims to analyze "substitution," but his outage analysis does not establish reasonable interchangeability relevant to antitrust market definition or explain how consumers would behave in response to a small but significant, non-transitory increase in the price above, or decrease in quality below, a competitive level of Facebook, Instagram, or any particular set of products or services posited as a relevant antitrust market.  *See* PX9007, Hemphill Rebuttal Report at § 2.2.3.1.

Statement 562 is also disputed because the underlying material cited does not support the assertion.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  The first sentence is thus disputed in part because Professor Carlton provides no support for the assertion that the outage was the largest in Meta's history.  *See* Ex. 2 at ¶ 25 (Carlton Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Carlton conducted an analysis of an outage of Meta's services on October 4, 2021, to

determine what apps users substituted to when Meta's apps were unavailable.  *See supra* Meta

Introduction.  The FTC's claim – that Professor Carlton's outage analysis "does not establish

reasonable interchangeability relevant to antitrust market definition or explain how consumers

would behave in response to a small but significant, non-transitory increase in the price above, or

decrease in quality below, a competitive level of Facebook, Instagram, or any particular set of

products or services posited as a relevant antitrust market" – does not create a genuine dispute of

material fact because it misapprehends Professor Carlton's analysis and its economic

significance.  It is the FTC's burden to define a relevant market, but Professor Hemphill admitted

that he performed no quantitative analysis of substitution.  *See* Ex. 283 at 142:16-144:4

(Hemphill Dep. Tr.) (acknowledging that no analysis of "quantitative evidence of substitution in

response to any change in quality" was performed); Ex. 2 at ¶¶ 15-16 (Carlton Rep.) ("Prof.

Hemphill's analysis is devoid of using substitution as his basis for market definition.").

Professor Carlton's outage analysis shows that the FTC's alleged candidate market is

inconsistent with the empirical evidence in this case, which shows that Facebook and Instagram

users substituted more time to apps outside the alleged "PSNS" market (including TikTok,

YouTube, Twitter, and others) than to apps within the alleged market (Snapchat and MeWe).

*See* Ex. 2 at ¶¶ 20-44 (Carlton Rep.); PX6179 at 179:14-21 (Carlton Dep. Tr.).  It further

demonstrates that, because of the relative magnitude of switching, if Snapchat and MeWe are

within the relevant market, then TikTok and YouTube should be included in the relevant market

as well.  *See* Ex. 2 at ¶¶ 20-44 (Carlton Rep.); PX6179 at 179:14-21 (Carlton Dep. Tr.).  The

outage analysis thus provides relevant evidence of substitution that undermines the FTC's market

definition.  Ex. 2 at ¶ 30 (Carlton Rep.) ("If, as Prof. Hemphill claims, Snapchat is in his relevant

market, then apps with greater substitution from Facebook and Instagram than Snapchat should

also be in his market.  These data from the Meta outage indicate that TikTok, YouTube, built-in messaging apps, and Twitter should also be in Prof. Hemphill's relevant market.") (internal citations omitted).

563.    Professor Carlton also 

. Ex. 2 at ¶¶ 27, 29 (Carlton Rep.).

*Id.* at ¶ 29.

**FTC Response: Disputed in part.**  Statement 563 is undisputed to the extent that it accurately recounts words that appear in Professor Carlton's expert report.  The first sentence of Statement 563 is otherwise disputed because it does not establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Professor Carlton claims to analyze "substitution patterns," but his outage analysis does not establish reasonable interchangeability relevant to antitrust market definition or explain how consumers would behave in response to a small but significant, non-transitory increase in the price above, or decrease in quality below, a competitive level of Facebook, Instagram, or any particular set of products or services posited as a relevant antitrust market.  *See* PX9007, Hemphill Rebuttal Report at § 2.2.3.1.  The second sentence is disputed in part because Professor Carlton's analysis was limited to examining the difference in time spent rather than how usage may (or may not) have changed on those apps.  Ex. 2 at ¶ 29 (Carlton Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Carlton analyzed substitution patterns from Facebook to other apps during the outage

██████████████████████████████████████████████████████

████████████████████████████████████████. *See supra* Meta

Introduction.  The FTC's claims that this analysis does not attempt to apply tools used in

"antitrust market definition" is misplaced for the reasons described in Meta's reply to paragraph

562 above, which Meta incorporates here.

564.     Professor Carlton found that "[r]oughly ████████ of the Meta time loss was

diverted to non-Meta apps, with the remaining ████████ of time being a reduction in time spent

using the phone."  Ex. 2 at ¶ 29 (Carlton Rep.).  In particular, ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ also experienced larger increases in minutes ████████████ *Id.*

**FTC Response: Disputed in part and incomplete.**  Statement 564 is undisputed to the

extent that it accurately recounts words that appear in Professor Carlton's expert report.  The

second sentence of Statement 564 is disputed in part as incomplete because Professor Carlton

also found that ████████████████ experienced a larger increase in minutes than ████████.

Ex. 2 at ¶ 29 (Carlton Rep.).  Otherwise disputed because Professor Carlton does not consider

how the prior usage of the apps affects his results.  *See* PX9007, Hemphill Rebuttal Report at §

2.2.3.1.1-2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding the results of Professor Carlton's outage analysis.  *See supra* Meta Introduction.  The

FTC's claim that ████████████████ experienced a larger increase in minutes than ████████

is true but immaterial; the FTC fails to explain or demonstrate the relevance of this fact.  The

FTC's claim that Professor Carlton did not consider how the prior usage of the apps affects his

results is misplaced.  Professor Carlton compared usage during the outage to a baseline usage

from ███████████████.  Ex. 2 at ¶ 29 (Carlton Rep.).

      With respect to the FTC's claim that Professor Carlton did not consider how the prior

usage of apps affects his results, Professor Hemphill's rebuttal report does not support that

assertion.  Professor Hemphill manipulates the data in Professor Carlton's analysis by arbitrarily

defining an active user of Snapchat as one who used the service at least five minutes per day in

the week prior to the outage.  He also fails to apply his limitation to users of other apps, which

creates an apples-to-oranges comparison between "active" users of Snapchat and users of all

other apps.

      565.    Professor Carlton summarized the results from his analysis in the Table below.

*See* Ex. 2 at ¶ 29 (Carlton Rep.).  ███████████████████████



██████████████ *Id.* at ¶ 32.  ██████████████████████

███████████████████████████

██████████████████████████████ *Id.*

at ¶ 33; *id.* at p. 37, tbl. 2.



*Id.* at p. 34, tbl. 1 (Carlton Rep.).

**FTC Response: Disputed in part and incomplete.**  Statement 565 is undisputed to the extent that it accurately relays words and a table that appear in Professor Carlton's expert report. Otherwise disputed because Professor Carlton does not consider how the prior usage of the apps affects his results.  *See* PX9007, Hemphill Rebuttal Report at § 2.2.3.1.1-2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact and does not warrant further reply.  *See supra* Meta Introduction; Meta Reply to SMF ¶¶ 534, 564.

566.    Professor Carlton concluded:  "If, as Prof. Hemphill claims, Snapchat is in his relevant market, then apps with greater substitution from Facebook and Instagram than Snapchat should also be in his market.  These data from the Meta outage indicate that TikTok, YouTube, built-in messaging apps, and Twitter should also be in Prof. Hemphill's relevant market."  Ex. 2 at ¶ 30 (Carlton Rep.).

**FTC Response: Disputed in part and incomplete.**  Statement 566 is undisputed to the extent that it accurately recounts words that appear in Professor Carlton's expert report. Otherwise disputed that Statement 566 constitutes a material fact subject to proof at trial.  *See* Fed. R. Civ. P. 56(c)(1).  The FTC further disputes Professor Carlton's conclusions because they rely on two unsupported economic assumptions: first, that the relevant antitrust market should be defined in strict adherence to his derived order of diversion; and second, that this order of diversion was not affected by his study of an outage which represented an infinite, transitory price increase at the monopolized level.  *See* PX6179, Carlton (Meta) Dep. Tr., at 135:2-136:10; *id.* at 174:5-176:10; *see also* PX9000, Hemphill Report at § 2.2.1.  Statement 566 is thus disputed because, as explained *supra*, Statement 566 does not establish the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Professor Carlton claims to analyze "substitution," but his outage analysis does not establish reasonable interchangeability relevant to antitrust market definition or how consumers would behave in response to a small but significant, non-transitory increase in the price above, or decrease in quality below, a competitive level of Facebook, Instagram, or any particular set of products or services posited as a relevant antitrust market.  *See* PX9007, Hemphill Rebuttal Report at § 2.2.3.1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that if, as the FTC and Professor Hemphill claim, Snapchat is in the relevant market, then apps with

greater substitution from Facebook and Instagram than Snapchat should also be in that market. *See supra* Meta Introduction. The FTC's response mischaracterizes Professor Carlton's opinions. Professor Carlton does not attempt to define a relevant market, and nowhere provides the opinion that if a market is defined to include Firms A, B and C, the market must include all firms that receive greater diversion than exists between those firms. The FTC has the burden to define a relevant antitrust market. The FTC's approach to doing so ignores diversion among apps. It is the FTC's burden to define a relevant market, but Professor Hemphill did not perform a quantitative HMT and instead admitted that he performed no quantitative analysis of substitution. *See* Ex. 283 at 140:12-141:8 (Hemphill Dep. Tr.) (testifying that no quantitative HMT was performed because that "particular kind of analysis was infeasible to perform and would be misleading if it was performed"); *see also id.* at 142:16-144:4 (acknowledging that no analysis of "quantitative evidence of substitution in response to any change in quality" was performed); Ex. 2 at ¶¶ 15-16 (Carlton Rep.) ("Prof. Hemphill's analysis is devoid of using substitution as his basis for market definition."). Professor Hemphill claims that MeWe is in the relevant market despite minimal diversion from Facebook or Instagram to MeWe. Professor Carlton explained: "If you think [MeWe is] an important competitive constraint, that is you, I mean Professor Hemphill, I think this is an important competitive constraint and says anyone who is like MeWe in terms of its influence, constraining influence on Facebook should be in the market, well, I do think it would lead to tons of firms in the market, but I don't think that's reasonable." PX6179 at 166:9-16 (Carlton Dep. Tr.); *id.* at 116:2-4 ("If you exclude from the market the closest substitutes, I'm not sure what the purpose of defining a market is.").

## II.   THE FTC'S "PERSONAL SOCIAL NETWORKING SERVICES" MARKET

567.   The FTC has alleged that Meta is a monopolist in the provision of "personal social networking" services ("PSN services" or "PSNS"), which are "online services that enable

and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space."  Compl. ¶¶ 52, 64 (Dec. 9, 2020), ECF No. 3; *see also infra* Part II.A.

**FTC Response: Undisputed.**  Statement 567 is undisputed with the caveat that the FTC has alleged Meta possesses monopoly power in the relevant market for personal social networking services in the United States.

568.    The FTC has alleged that the current participants in the PSNS market are Facebook, Instagram, Snapchat, and MeWe.  *See* Ex. 295 at 5-6, FTC's Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Nov. 4, 2022)).  The FTC identified five additional providers as formerly offering PSNS in the United States:  Google+ (July 2011 – April 2019), Path (January 1, 2011 – October 2018), Friendster (January 1, 2011 – May 2011), Myspace (prior to January 1, 2011), and Orkut (January 1, 2011 – September 2014). *Id.*; *see also infra* Part II.B.1.

**FTC Response: Undisputed.**   Statement 568 is undisputed with the caveat that the FTC's response to Meta's Interrogatory No. 3 identified "providers [that] have offered or currently offer PSNS in the United States within the relevant time period."  Ex. 295 at 3, FTC's Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Nov. 4, 2022)).

569.    Meta asked the FTC to categorize 250+ activities on Facebook and Instagram as either PSNS or non-PSNS.  *See* Ex. 420 (MetaFTC-DX-996, Meta's List of Features or Activities for Classification by the FTC (Aug. 22, 2022)); *see also infra* Part II.B.2.  In response, the FTC decided that "all of the features/activities identified by Meta for Facebook and Instagram are part of Meta's personal social networking offering, except Facebook Dating."

Ex. 405 at 2 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)); *see also infra* Part II.B.2.

**FTC Response: Undisputed.**

A.      **Original Definition**

570.      On December 9, 2020, the FTC filed a complaint alleging that Meta has been a monopolist in the provision of "personal social networking" services since at least 2011.  Compl. at ¶ 64 (Dec. 9, 2020), ECF No. 3.  The FTC alleged that PSN services are "online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space." *Id.* at ¶ 52.

**FTC Response: Undisputed.**

571.      The FTC defined PSNS as having "[t]hree key elements."  Compl. at ¶ 52 (Dec. 9, 2020), ECF No. 3.  "First, [they] are built on a social graph that maps the connections between users and their friends, family, and other personal connections." *Id.* at ¶ 53.  "Second, [they] include features that many users regularly employ to interact with personal connections and share their personal experiences in a shared [virtual] social space, including in a one-to-many 'broadcast' format." *Id.* at ¶ 54.  And "[t]hird, [they] include features that allow users to find and connect with other users, to make it easier for each user to build and expand their set of personal connections.  The social graph also supports this feature by informing [the users] which [new] connections" might be available based on their existing networks. *Id.* at ¶ 55; *see also* Am. Compl. ¶¶ 167-169 (Sept. 8, 2021), ECF No. 81 (same).

**FTC Response: Undisputed.**

B.      **Discovery Position**

572.      In its first set of interrogatories, Meta asked the FTC to clarify its alleged market definition:  "For each feature or activity available to users on Facebook, Instagram, WhatsApp,

or Facebook Messenger, specify whether the feature or activity is or is not within the definition of 'personal social networking.'" Ex. 296 at 2, Meta's Interrog. No. 10 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (June 14, 2022)) (quoting Am. Compl. at ¶ 164 (Sept. 8, 2021), ECF No. 82).

**FTC Response: Undisputed.**

573.    On June 14, 2022, the FTC served its supplemental responses. *See* Ex. 296 at 4 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (June 14, 2022)). The FTC identified several examples of activities that it decided would qualify as "use of personal social networking services," such as viewing friends' profiles on Facebook or Instagram. *Id.* at 7, 9.

**FTC Response: Disputed in part and incomplete.** The FTC disputes that the cited material supports the assertion that the FTC's response to Meta's interrogatory endeavored to provide "examples of activities that it decided would qualify as 'use of personal social networking services.'"

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact regarding the FTC's June 14, 2022 discovery responses, which provided examples of activities it deemed "use of personal social networking services." *See supra* Meta Introduction.

574.    On August 1, 2022, the Court granted Meta's motion to compel a more detailed response to its Interrogatory No. 10. *See* Order at 2 (Aug. 1, 2022), ECF No. 165. The Court directed the FTC to categorize features or activities on Facebook, Instagram, WhatsApp, or Facebook Messenger (which Meta would enumerate) "as included or excluded from the definition of 'personal social networking.'" *Id.* The Court also ordered that, "[i]f, at any point in the future, the FTC takes a different position on any such feature or activity, the FTC shall so supplement its response." *Id.*

**FTC Response: Undisputed.**

      1.    **The FTC States That Facebook, Instagram, Snapchat, and MeWe Are the Only Active Providers of PSNS**

575.    In its November 4, 2022 response to Meta's Interrogatory No. 3, the FTC identified Facebook, Instagram, Snapchat, and MeWe as the only providers currently offering personal social networking services in the United States. *See* Ex. 295 at 5-6, FTC's Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Nov. 4, 2022)).

**FTC Response: Undisputed.**

576.    The FTC stated that Facebook and Instagram offered PSNS as early as January 1, 2011 and continue to offer PSNS today; Snapchat offered PSNS at least as early as October 2013 and continues to offer PSNS today; and MeWe offered PSNS at least as early as March 2016 and continues to offer PSNS today. *See* Ex. 295 at 5-6, FTC's Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Nov. 4, 2022)).

**FTC Response: Undisputed.**

577.    The FTC identified five additional providers as formerly offering PSNS in the United States: Google+ (July 2011 – April 2019), Path (January 1, 2011 – October 2018), Friendster (January 1, 2011 – May 2011), Myspace (prior to January 1, 2011), and Orkut (January 1, 2011–September 2014). *See* Ex. 295 at 5-6, FTC's Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Nov. 4, 2022)).

**FTC Response: Undisputed.**

2.     **The FTC States That All Features and Activities on Facebook and Instagram (Other Than Facebook Dating) Are Personal Social Networking**

578.    On August 22, 2022, Meta provided the FTC with a list of 322 features or activities on Meta's services.  *See* Ex. 420 (MetaFTC-DX-996, Meta's List of Features or Activities for Classification by the FTC (Aug. 22, 2022)).  Of those, 123 are on Facebook and 146 are on Instagram.  *See id.* at 3-21.

**FTC Response: Undisputed.**

579.    On September 12, 2022, the FTC responded that "all of the features/activities identified by Meta for Facebook and Instagram are part of Meta's personal social networking offering, except Facebook Dating."  Ex. 405 at 2 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)).

**FTC Response: Undisputed but incomplete.**  Statement 579 is undisputed to the extent that it recounts words that appear in the cited discovery response, but the FTC objects to Statement 579 as incomplete because it omits relevant portions of the FTC's discovery response.  *See* CMF at § I.A.2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the FTC's September 12, 2022 discovery responses.  To the extent the FTC attempts to incorporate a section of its Counterstatement, Meta incorporates its responses to those paragraphs in that here.

580.    The FTC's September 12, 2022 response stated that *every* listed activity on Facebook on Instagram (save activities occurring on Facebook Dating) is included in "personal social networking."  Ex. 405 at 5-37 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)).

**FTC Response: Undisputed but incomplete.**  Statement 580 is undisputed to the extent that it recounts words that appear in the cited discovery response, but the FTC objects to Statement 580 as incomplete because it omits relevant portions of the FTC's discovery response.  *See* CMF at § I.A.2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the FTC's September 12, 2022 discovery responses.  *See supra* Meta Introduction.  To the extent the FTC attempts to incorporate a section of its Counterstatement, Meta incorporates its responses to those paragraphs in that here.

581.    These listed activities included, among other things:  viewing Reels, even those posted by public accounts with no connection to the user; sending one-to-one messages on Instagram Direct; watching videos posted by a public account with no connection to the user; viewing or posting interest-based content in Facebook Groups; and viewing or posting content for sale on Marketplace.  *See* Ex. 405 at 5-37 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)).

**FTC Response: Disputed in part.**  The FTC disputes the characterizations in Statement 581.  The phrases "public account," "no connection," "one-to-one messages," and "interest-based content" do not appear in the features in Exhibit 405.  *See* Ex. 405 at 5-37 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC considers all time spent on Facebook and Instagram (other than Facebook Dating) to be "PSNS" time spent, even if it does not involve friends-and-family sharing but instead – as stated above – involves viewing Reels from public accounts with no connection to the user, messaging, consuming interest-based content in Groups, or shopping on Marketplace.  *See supra* Meta

Introduction; *infra* Meta SMF ¶ 622 (Professor Hemphill confirming that "100 percent" of the time a user spends on the "Reels tab" "watch[ing] a series of short videos of an otherwise unknown individual dancing" is time spent engaging in "personal social networking," even when the content "was not posted or forwarded by anyone the user knows" (quoting Ex. 283 at 80:20-81:21 (Hemphill Dep. Tr.))).  Nor does the FTC's response dispute that these descriptions are accurate characterizations of some of the enumerated activities users can and do engage in on Facebook and Instagram.  *See*, *e.g.*, Ex. 405 at 5 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)) (Facebook List Nos. 1 and 4) ("Viewing publicly accessible video(s)" on Facebook Watch and watching videos "posted by a Page or person User does not follow"); *id.* at 18 (Instagram List No. 16) ("Viewing Reel(s) posted by an account that User does not follow, and that does not follow User."); *id.* at 6 (Facebook List No. 20) ("Viewing or posting content in a Group User joined based on the User's interests, such as the 'Slow Cooker/Instant Pot Recipes' Group."); *id.* at 35 (Instagram List Nos. 128 and 130) ("Sending or viewing message(s) to or from an account User follows that does not follow User" and "Sending or viewing message(s)sent to a group of 2-5 other users."); *id.* at 5 (Facebook List Nos. 6-8) (relating to Facebook Marketplace).  *See also supra* Meta Introduction.

582.    Examples of how the FTC classified features/activities on Facebook Watch, Facebook Reels, Instagram Reels, and IGTV are below, excerpted from the FTC's response.  *See* Ex. 405 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)).

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 1 | Watch | Viewing publicly accessible video(s) on the "For You," "Live," "Music," "Gaming," "Following," "Saved," or "Shows" Tabs posted by a Page User follows. | Yes |
| **Facebook** | 5 | Watch | Viewing advertisement(s). | Yes |
| **Facebook** | 12 | Reels | Viewing Reel(s) posted by an account that is not a Facebook Friend of User or a person or Page User follows. | Yes |
| **Facebook** | 65 | Feed | Viewing linked content (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Yes |
| **Instagram** | 16 | Reels | Viewing Reel(s) posted by an account that User does not follow, and that does not follow User. | Yes |
| **Instagram** | 59 | IGTV | Watching video(s) on IGTV. | Yes |

**FTC Response: Undisputed.**

583.    Examples of how the FTC classified features/activities on Facebook Groups,

Facebook Marketplace, Facebook Messaging / Chat, and Instagram Direct are below:

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 6 | Marketplace | Viewing content of any form (such as Items for Sale) that was not posted by one of User's Facebook Friends. | Yes |
| **Facebook** | 20 | Groups | Viewing or posting content in a Group User joined based on the User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Yes |
| **Facebook** | 29 | Groups | Viewing or posting content in a Group focused on a geographic community, such as a neighborhood or city. | Yes |
| **Facebook** | 91 | Messaging/ Chat | Sending or viewing message(s) sent to one other Facebook Friend. | Yes |
| **Instagram** | 128 | Instagram Direct | Sending or viewing message(s)to or from an account User follows that does not follow User. | Yes |
| **Instagram** | 130 | Instagram Direct | Sending or viewing message(s)sent to a group of 2-5 other users. | Yes |

**FTC Response: Undisputed.**

584.    Examples of how the FTC classified features/activities on Facebook and

Instagram Stories and Feed are below:

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 37 | Stories | Viewing Story(ies) [sic] posted by a Public Figure or other Personal Account User follows that is not Facebook Friends with User. | Yes |
| **Facebook** | 43 | Feed | Posting to all of User's Facebook Friends encouraging them to attend an industry-networking event hosted by User's employer. | Yes |
| **Facebook** | 79 | Feed | Viewing Recommended user-generated non-video content that does not originate from User's Facebook Friends, or people or Pages User follows or subscribes to or Groups User has joined. | Yes |
| **Instagram** | 37 | Stories | Viewing Story(ies) [sic] posted by a celebrity or influencer that User follows that does not follow User. | Yes |
| **Instagram** | 80 | Feed | Viewing Original photo(s) posted by a celebrity or influencer that User follows but does not follow User. | Yes |
| **Instagram** | 102 | Feed | Viewing Original video(s) posted by an account that User does not follow, and that does not follow User. | Yes |

**FTC Response: Undisputed.**

585.    The FTC also stated that all listed activities on WhatsApp and Facebook

Messenger were not included within the definition of "personal social networking," except

posting and viewing Stories on Facebook Messenger.  *See* Ex. 405 at 3-4, 37-43 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)).

**FTC Response: Undisputed but incomplete.**  Statement 585 is undisputed to the extent that it recounts words that appear in the cited discovery response, but the FTC objects to Statement 585 as incomplete because it omits relevant portions of the FTC's discovery response.  *See* CMF at § I.A.2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the FTC's September 12, 2022 discovery responses.  *See supra* Meta Introduction.  To the extent the FTC attempts to incorporate a section of its Counterstatement, Meta incorporates its responses to those paragraphs in here.

### 3. The FTC States That It Has Not Conducted a Comparison of Features and Activities Available on Alleged PSNS and Non-PSNS Applications and That "Individual Feature Substitution Is Not Relevant to the FTC's Contentions"

586.   Meta served two Interrogatories (Nos. 13 and 14) asking the FTC to state "whether use of that feature or activity or similar feature or activity counts as time spent using a 'personal social networking service' when the feature or activity is used or performed on" other applications identified in the Amended Complaint (Strava, LinkedIn, iMessage, Twitter, Reddit, Pinterest, YouTube, Spotify, Nextdoor, Netflix, Hulu, TikTok, Snapchat, Google+, MeWe, Path, Friendster, Myspace, or Orkut), "and explain why or why not."  Ex. 421 at 7-8, Meta's Interrog. Nos. 13-14 (Meta's Second Set of Interrogs. the FTC (Oct. 17, 2022)).

**FTC Response: Undisputed.**

587.   The parties agreed Meta would provide the FTC a list of 100 features or activities on specific non-Meta apps that the FTC could treat as similar to the features and activities that the FTC classified as PSNS when they occur on Facebook or Instagram.  *See* Jt. Status Rep. at 8-

13, 13-18 (Dec. 15, 2022), ECF No. 227; *see also id.* at 8 (FTC stating that it has "agreed to identify relevant facts" in its response).

**FTC Response: Undisputed.**  Statement 587 is undisputed with the caveat that the Court has already held the interrogatory, as originally propounded, did not ask the FTC to provide "all relevant facts."  *See* Order Denying Mot. to Compel (Mar. 29, 2023), ECF No. 264 at 4 ("Meta does not contest that Plaintiff answered directly and categorically the 'yes or no' aspects of both Interrogatories. It nonetheless moves to compel further responses because, it argues, the FTC has not provided the 'relevant facts' Meta sought that would support Plaintiff's positions and categorizations. . . .  The Court disagrees.  Had Meta wanted all relevant facts about what makes the use of one platform/feature pair a PSNS usage while another is not, it could have asked for those. That is a familiar interrogatory formulation, but it does not appear in either Interrogatory here.").  Statement 587 is otherwise undisputed.

588.   Meta provided the FTC with a list of features or activities on December 20, 2022, with pairs of features for the FTC to address in response to Interrogatory Nos. 13 and 14.  *See* Ex. 422 (Meta's List of Features or Activities for Explanation by the FTC (Dec. 20, 2022), ECF No. 237-4).  For example, the list asked the FTC to explain, with relevant facts, why "[v]iewing Reel(s) [on Instagram] posted by a celebrity" qualifies as using PSNS, when "[v]iewing videos posted on TikTok by a celebrity" does not.  *Id.* at 13 (activity No. 60).

**FTC Response: Disputed in part.**  The first sentence is undisputed.  The second sentence is disputed in part, to the extent that it suggests that the FTC was obligated to provide *all* relevant facts.  The Court has already held the interrogatory, as originally propounded, did not ask the FTC to provide "all relevant facts."  *See* Order Denying Mot. to Compel (Mar. 29, 2023), ECF No. 264 at 3 ("Meta does not contest that Plaintiff answered directly and categorically the

'yes or no' aspects of both Interrogatories.  It nonetheless moves to compel further responses because, it argues, the FTC has not provided the 'relevant facts' Meta sought that would support Plaintiff's positions and categorizations. . . .  The Court disagrees. Had Meta wanted all relevant facts about what makes the use of one platform/feature pair a PSNS usage while another is not, it could have asked for those. That is a familiar interrogatory formulation, but it does not appear in either Interrogatory here.").  Statement 588 is otherwise undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta provided the FTC with a list of features or activities on December 20, 2022, with pairs of features for the FTC to address in response to Interrogatory Nos. 13 and 14, including by providing relevant facts supporting its classifications.  *See supra* Meta Introduction.

589.    On January 24, 2023, the FTC provided its supplemental responses.  *See* Ex. 291 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).  The FTC stated that it has "not presently conducted such a feature-by-feature analysis comparing the individual features available on these nineteen third-party applications and those available on Facebook Blue, Instagram, and Facebook Messenger." *Id.* at 13.  Yet, it stated that its present understanding is that all "features/activities identified by Meta for Friendster, Google+, MeWe, Myspace, Orkut, Path, and Snapchat qualify as part of each application's respective personal social networking offering," that "Hulu, iMessage, LinkedIn, Netflix, Nextdoor, Pinterest, Reddit, Spotify, Strava, TikTok, Twitter, and YouTube do not offer personal social networking services," and that, "[a]s such, all features/activities identified by Meta on these applications do not qualify as being part of personal social networking services." *Id.* at 12-13.

**FTC Response: Undisputed.**

590.    For example, the FTC elaborated that "[v]iewing video(s) on Snapchat Spotlight posted by an account that User does not subscribe to" and "[s]ending message(s) to one other Snapchat Friend" count as use of personal social networking services.  Ex. 291 at 27, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

**FTC Response: Disputed and misleading.**  The FTC disputes that Statement 590 is not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), and objects that Statement 590 misleadingly mischaracterizes the cited material.

The material quoted in Statement 590 does not represent "the FTC elaborat[ing]," those are statements provided by Meta.  The FTC simply responded "Yes" to statements provided by Meta.  *See* Ex. 291 at 27, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).  Further, the FTC also stated:

> Meta's List implies that the above-referenced features/activities are available on Snapchat and are "similar" to features/activities available on Facebook Blue and Instagram. Meta's List at 5, 7, 12 (implying similarity with Facebook Blue), 14-15, 18 (implying similarity with Instagram). But Meta provides no evidence to suggest that these particular features/activities function, are presented, or are used similarly to any features/activities available on Facebook Blue and Instagram. Meta provides no evidence regarding how often these features/activities occur on Snapchat compared to other user features/activities on Snapchat, or indeed that these particular features/activities ever occur at all. For these, among other reasons, the FTC has not presently conducted such an analysis comparing the individual features available on Snapchat and those available on Facebook Blue and Instagram.

> Even so, the FTC's present impression is that Snapchat provides personal social networking services and the features/activities identified above are likely part of Snapchat's personal social networking offering. The FTC's classification is driven in large part by the likely connection between the features/activities and users' ability to share and experience each of the various features and activities with their social networks of friends, family, and personal connections in a shared social space.

Ex. 291 at 28-29, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. &
Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
the FTC's discovery response contained the material quoted in the statement.  *See supra* Meta
Introduction.

591.    In contrast, the FTC stated that the following do *not* count as use of personal
social networking services, among other activities:

    a.  **iMessage.**  "Sending message(s) to one other friend or family member on
iMessage" or "sending message(s) to a group of 21-30 other users on
iMessage."  Ex. 291 at 32, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14
(FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24,
2023)).

    b.  **LinkedIn.**  "Posting Original photo(s) about a highly personal milestone
(such as a health event) on LinkedIn" or "Sending message(s) on LinkedIn to
a friend or family member to wish him a happy birthday."  Ex. 291 at 35,
FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. &
Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

    c.  **Nextdoor.**  "Viewing items for sale posted by one of User's Nextdoor
Connections on the 'For Sale and Free' Tab" or "Viewing comments to
Original post(s) by a User's Nextdoor Connection."  Ex. 291 at 39, FTC's
Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to
Meta's Second Set of Interrogs. (Jan. 24, 2023)).

d.   **Pinterest.**  "Viewing Original photo(s) on Pinterest posted by User's family member" or "Viewing recommended Idea Pins on Pinterest's Watch Tab that do not originate from people or Boards User follows."  Ex. 291 at 41, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

e.   **Reddit.**  "Posting [or viewing] content in a Community on Reddit User joined based on the User's interests, such as the 'Instant Pot' Community."  Ex. 291 at 44, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

f.   **Strava.**  "Posting Original content on Strava, encouraging User's personal friends that reside in close physical proximity to one another to attend a local social event."  Ex. 291 at 48, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

g.   **TikTok.**  "Viewing video(s) on TikTok posted by User's TikTok Friend," "Viewing video(s) on TikTok posted by an account that is not a TikTok Friend of User," "Posting TikTok video(s) to an audience limited exclusively to User's TikTok Friends," "Viewing videos posted on TikTok by a celebrity User follows that does not follow User," "Viewing video(s) on TikTok posted by an account that User does not follow, and that does not follow User," "Viewing TikTok Story(ies) [sic] posted by User's personal friend or family member," or "Sending message(s) containing content posted by an account User does not follow on TikTok."  Ex. 291 at 50-52, FTC's Suppl. Resp. to

Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

h. **Twitter.** "Viewing Original photo(s) on Twitter posted by User's friend or family member," "Viewing live video(s) on Twitter posted by User's friend or family member," "Viewing content on User's Home timeline on Twitter posted by an account that User follows that does not follow User," or "Viewing content (e.g. a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) linked in a Tweet by an individual who User follows and who also follows User on Twitter." Ex. 291 at 54-55, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

i. **YouTube.** "Viewing Original video(s) posted by a User's friend or family member on YouTube showing their child's first steps," "Viewing YouTube Shorts posted by a celebrity User subscribes to who does not subscribe to User," "Commenting on YouTube Shorts posted by an account User subscribes to," "Viewing Suggested video content that does not originate from accounts User subscribes to on YouTube," "Viewing content on YouTube posted by account that User subscribes to that does not subscribe to User," or "Watching live-stream gaming videos on YouTube Live." Ex. 291 at 58-59, FTC's Suppl. Resp. to Meta's Interrog. Nos. 13-14 (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)).

**FTC Response: Undisputed.**

592.     In February 2023, Meta moved to compel a further response to Interrogatory Nos. 13 and 14, arguing, among other things, that the FTC failed to address or provide a factual basis for its position that the pairs of PSNS and non-PSNS features were not reasonable substitutes. *See* Meta's Mem. in Support of Mot. To Compel Answers to Interrogs. Nos. 13 & 14 (Feb. 24, 2023), ECF No. 244-1.

**FTC Response: Undisputed.**  For additional context, the Court denied this Motion to Compel because "[h]ad Meta wanted all relevant facts about what makes the use of one platform/feature pair a PSNS usage while another is not, it could have asked for those."  Order Denying Mot. to Compel, ECF 264 at 3.

593.     In its opposition brief, the FTC explained that "[i]ndividual [f]eature [s]ubstitution is [n]ot [r]elevant to the FTC's [c]ontentions."  FTC's Mem. in Opp. to Mot. To Compel Answers to Interrogs. Nos. 13 &14, at 11 (Mar. 7, 2023), ECF No. 250-1.  The FTC stated that it "has not, for example, . . . assessed . . . whether YouTube is a reasonable substitute for Facebook Watch" for the consumption of online videos.  *Id.* at 14-15.  After the Court denied Meta's motion to compel, Meta served another contention Interrogatory (No. 16), seeking again the factual basis for the FTC's position that use of each Listed Feature on Facebook, Instagram, or Messenger is a PSNS usage while use of the corresponding Listed Feature on the other products or services is not a PSNS usage.  *See* Ex. 297 at 8, FTC's Resp. to Meta's Interrog. No. 16 (FTC's Objs. & Resps. to Meta's Third Set of Interrogs. (May 3, 2023)).  The FTC provided a response to Interrogatory No. 16 on May 3, 2023.  *See id.*  The FTC stated that it had not conducted "an analysis comparing the individual features" on the non-PSNS applications and the alleged PSNS applications.  *See*, *e.g.*, *id.* at 11.  The FTC later stated that its response was "full and complete."  Ex. 423 at 2-3 (Hr'g Tr. (May 15, 2023), ECF No. 297).

**FTC Response: Disputed in part and incomplete.**  The first sentence is undisputed, but

is incomplete, as it omits that the FTC further explained:

> The FTC alleges a relevant market for PSNS, i.e., an integrated friends and family social networking service. *See* Memorandum Opinion II ("Mem. Op. II") at 10-13, ECF No. 90. As such, the important question is which other products offer reasonable substitutes for the PSNS applications that Meta offers: if users wanted to leave Facebook and Instagram, to what other applications would they turn to maintain a network of friends and family, connecting and sharing with them in a communal space? As the FTC has explained (for example): not YouTube, Reddit, or LinkedIn. Ex. A at 41-42 (LinkedIn), 50-51 (Reddit), 64-67 (YouTube). . . . Meta instead attempts to focus on individual features/activities available on Facebook or Instagram, and insists that the important question is the existence or non-existence of "reasonable substitutability" between those features and other non-PSNS applications. . . . In effect, Meta is asking whether there may exist distinct relevant markets for community groups—or video consumption or e-commerce—in which Meta and Reddit, or Meta and YouTube, or Meta and an e-commerce application, may compete. But this is neither a relevant question, nor what Meta's interrogatories request.

FTC's Mem. in Opp. to Mot. To Compel Answers to Interrogs. Nos. 13 & 14, at 11-12 (Mar. 7,

2023), ECF No. 250.

The second sentence is disputed.  Contrary to the statement in the second sentence, the

FTC did not make any statement about YouTube or Facebook Watch regarding "the

consumption of online videos."  The FTC stated:

> This case is about Meta's monopoly power over PSNS, and its maintenance of that power by anticompetitive means. Accordingly, the FTC has not analyzed whether individual features/activities *are reasonable substitutes in other markets apart from PSNS*. The FTC has not, for example, assessed whether Facebook Watch also competes *in a market for online video consumption* with firms like YouTube, nor has it assessed whether YouTube is a reasonable substitute for Facebook Watch *in such a market*.

*Id.* at 14-15 (emphasis added).

The third and fourth sentences are undisputed.

The fifth sentence is disputed and incomplete because the quoted portion is a quotation from the FTC's response to Interrogatory 14, not the FTC's Response to Interrogatory 16.  The FTC provided its Response to Interrogatory 16, including the factual bases supporting its Response, in fuller detail than described in Statement 593.  *See* Ex. 297 at 8-23, FTC's Resp. to Meta's Interrog. No. 16 (FTC's Objs. & Resps. to Meta's Third Set of Interrogs. (May 3, 2023)).  For example, the FTC provided numerous Meta and third-party documents and testimony in support of its position that "YouTube does not provide personal social networking services and the features/activities identified above [by Meta] are therefore not part of a personal social networking offering."  FTC's Mem. in Opp. to Mot. To Compel Answers to Interrogs. Nos. 13 &14, at 66 (Mar. 7, 2023), ECF No. 250-1.

The sixth sentence is undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC explained that "[i]ndividual [f]eature [s]ubstitution is [n]ot [r]elevant to the FTC's [c]ontentions" and that its stated position (which it did not supplement) is that it has not conducted "an analysis comparing the individual features" on allegedly non-PSNS applications to the features on the alleged PSNS applications or assessed substitutability of those features. *See supra* Meta Introduction.

As to the second sentence, the FTC's undisputed position is that all time spent on Facebook and Instagram (except for Facebook Dating) is time spent "personal social networking," including consumption of video, even if the user is watching the video for entertainment purposes.  *See supra* Meta SMF ¶¶ 579, 582; *infra* ¶ 622.  Thus, the FTC's concession that the "FTC has not, for example, assessed whether Facebook Watch also competes in a market for online video consumption with firms like YouTube, nor has it assessed whether

YouTube is a reasonable substitute for Facebook Watch in such a market" (as quoted above) does not create a genuine dispute of material fact that the FTC has not assessed whether YouTube is a reasonable substitute for Facebook Watch for the consumption of online videos.

As to the fifth sentence, the FTC's response does not create a genuine dispute of material fact that the FTC's position through the close of discovery has been that it has not conducted "an analysis comparing the individual features" on the allegedly non-PSNS applications to features on the alleged PSNS applications.  The FTC's response to Meta's Interrogatory No. 16 expressly incorporated that position from its previous response to Interrogatory No. 14.  *See* Ex. 297 at 11, FTC's Resp. to Meta's Interrog. No. 16 (FTC's Objs. & Resps. to Meta's Third Set of Interrogs. (May 3, 2023)) ("As the FTC has previously explained in its Responses and Objections to Meta's Interrogatory No. 14 . . . the FTC has not presently conducted such an analysis comparing the individual features available on [alleged non-PSNS application] and those currently available on [alleged PSNS application].").  The FTC did not supplement either response or claim to have conducted such an analysis in its Response to Interrogatory No. 16.  And in a Rule 30(b)(6) deposition conducted on the last day of fact discovery, the FTC's 30(b)(6) representative confirmed the FTC's position.  *See infra* Meta SMF ¶ 595.  Further, in its responses to written 30(b)(6) deposition questions, the FTC did not purport to have conducted any such analysis.  *See infra* ¶ 601.

### 4.  The FTC's 30(b)(6) Representative Confirms That the FTC Has Not Identified Evidence Addressing Users' Motives for Using Particular Features or Consumer Substitution Behavior

594.    On April 3, 2023, Meta served on the FTC a Rule 30(b)(6) deposition notice.  *See* Ex. 424 (Meta's Notice of 30(b)(6) Dep. of FTC (Apr. 3, 2023)).  Topic 6 required testimony from the FTC on "[t]he facts supporting [the FTC's] Response to Meta's List of Features or Activities (Sept. 12, 2022) and [the FTC's] responses to Meta's Interrogatory Nos. 13, 14, and

16." *Id.* at Topic 6.  The FTC agreed to produce a witness for all noticed Topics.  *See* Ex. 168 at 1 (Jt. Status Rep., Ex. D (May 31, 2023), ECF No. 302-25)).

      **FTC Response: Undisputed.**

    595.    In the 30(b)(6) deposition of the FTC conducted on the last day of fact discovery, Edward Takashima, the FTC's 30(b)(6) representative, testified that the "FTC has not presently conducted a feature-by-feature analysis comparing the individual features available on these 19 third-party applications and those available on Facebook Blue, Instagram, and Facebook Messenger."  Ex. 294 at 38:7-12 (Takashima (FTC) Dep. Tr.).

      **FTC Response: Disputed**.  Mr. Takashima did not testify that, as of the date of the 30(b)(6) deposition**,** the FTC had "not presently conducted a feature-by-feature analysis."  To the contrary, Mr. Takashima clarified that (1) he was prepared to address the actual 30(b)(6) deposition topic, which was limited to facts that supported the FTC's previous written responses to certain interrogatories; (2) the scope of the 30(b)(6) topics did not encompass any analysis or information that was not set forth in or used to support the text of the relevant interrogatory responses; and (3) that he was unable to provide information outside the scope of the noticed topics without violating various privileges.  *See* Ex. 294 at 36:11-38:22 (Takashima (FTC) Dep. Tr.).  The relevant interrogatories did not seek "all relevant facts," as the Court determined in denying Meta's motion to compel.  *See* Order Denying Mot. to Compel (Mar. 29, 2023), ECF No. 264 at 3 ("[Meta] moves to compel further responses because, it argues, the FTC has not provided the 'relevant facts' Meta sought that would support Plaintiff's positions and categorizations. . . . The Court disagrees. Had Meta wanted all relevant facts about what makes the use of one platform/feature pair a PSNS usage while another is not, it could have asked for

those. That is a familiar interrogatory formulation, but it does not appear in either Interrogatory here.").

In the portion of the deposition transcript quoted in Statement 595, Mr. Takashima was reading from the text of the interrogatory responses themselves, he was not providing testimony regarding the existence or non-existence of a feature-by-feature analysis as of the date of the deposition.  Mr. Takashima testified as follows:

> Q. So sitting here today, you cannot identify any facts that the FTC is relying on regarding a feature-by-feature analysis comparing on the one hand the features on Meta's applications, and the – and on the other hand the 12 non-Meta applications we've been discussing?
>
> \*\*\*
>
> THE WITNESS: I just want to be clear. I'm prepared to speak to -- let me pull up the -- the actual deposition topic.  I'm prepared to speak to the facts supporting the FTC's responses to Meta's list of features or activities dated September 12th,  2022, and the FTC's responses to interrogatories Numbers 13, 14, and 16. To the extent you're asking me to do -- I think testify to or speculate as to what the FTC -- or make a judgment, I guess, is a better word – about what the FTC is relying on aside from what is set forth in the interrogatory responses, and the facts supporting those responses, I don't think I can do that without getting into work product issues.
>
> Q. The interrogatories ask for this feature-by-feature comparison.  And I'm asking you today whether you can identify any facts that the FTC is relying on regarding a feature-by-feature analysis comparing on the one hand the features on Meta's application, and on the other hand the 12 non-Meta applications we've been discussing.  If you can identify, I'm going to ask you to identify them. If not, the answer is no.
>
> MS. MUSSER: Objection. Just misstates the interrogatory response, as well as the scope of the interrogatory as modified by negotiations.
>
> THE WITNESS: Again, I think my answer is the same, which is that the FTC's response states here that "the FTC has not presently conducted a feature-by-feature analysis comparing the individual features available on these 19 third-party applications and those available on Facebook Blue, Instagram, and Facebook Messenger." I'm here prepared to testify as to the facts supporting the FTC's

> interrogatory responses to 13, 14, and 16, including the -- the
> documents cited in the interrogatory responses.  I think what you're
> asking for me -- asking me for is beyond that, or requires an analysis
> interpreting those documents. And I don't think I can do that without
> getting into privileged territory.

Ex. 294 at 36:11-38:22 (Takashima (FTC) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

the FTC's 30(b)(6) representative testified as quoted in the statement, or that the FTC's position

through the close of discovery has been that it has not "conducted a feature-by-feature analysis"

comparing the features on alleged PSNS applications to the features on allegedly non-PSNS

applications.  *See supra* Meta Introduction.  The FTC's response does not assert that the FTC has

conducted such analysis.  The FTC's characterization of its 30(b)(6) representative's purported

clarification is immaterial.

The FTC's purported clarifications are also incorrect.  Among other things, Meta called

for all facts supporting the FTC's position.  After the Court denied Meta's motion to compel

relating to Interrogatory Nos. 13-14, Meta served Interrogatory No. 16, which stated:  "With

reference to Your Response to Meta's List of Features or Activities (Sept. 12, 2022) and Your

Supplemental Objections and Responses to Meta's Interrogatory No. 14 (Jan. 24, 2023), identify

all relevant facts supporting Your contention that use of each Listed Feature on Facebook,

Instagram, or Messenger is a PSNS usage while use of the corresponding Listed Feature on the

other products or services is not a PSNS usage."  Ex. 297 at 8, Meta's Interrog. No. 16 (FTC's

Objs. & Resps. to Meta's Third Set of Interrogs. (May 3, 2023).  Topic 6 of Meta's deposition

notice called for "[t]he facts supporting Your response to Meta's List of Feature or Activities

(Sept. 12, 2022) and Your responses to Meta's Interrogatory Nos. 13, 14, and 16,"  Ex. 424 at 7

(Meta's Notice of 30(b)(6) Dep. of FTC (Apr. 3, 2023)), and the instructions specified that

"[u]nless otherwise specified, the timeframe of these deposition topics is from January 1, 2011 to

the present." *Id.* at 3.  The FTC agreed to produce a witness for all noticed Topics and did not

seek a protective order limiting the scope of the deposition.  *See supra* Meta SMF ¶ 594.

596.    When asked, "[i]n its interrogatory responses, is the FTC relying on any facts

regarding whether consumers consider the specific features on Meta's services to be similar to

the specific features on the . . . non-Meta services," the FTC's representative testified, "I don't

see anything in this response that addresses, I think, the issue you're raising, which is what

consumers may believe."  Ex. 294 at 42:1-43:9 (Takashima (FTC) Dep. Tr.).  When asked if the

FTC's responses "rely[ ] on any facts regarding whether consumers would substitute usage for

the specific features on Meta's services to the specific features on the . . . non-Meta services,"

the FTC representative testified, "I'm not aware, as I sit here right now, . . . that any of this

addresses consumer substitution behavior."  *Id.* at 43:11-44:10.

**FTC Response: Undisputed but incomplete.**  As explained in the FTC's response to

Statement 595, the witness's testimony was limited to the text of the FTC's responses to the

relevant interrogatories and the facts that supported the text of the FTC's responses.  *See supra* at

FTC Response to Statement 595.

**Meta Reply:**  As explained above in Meta's reply to statement 595, the FTC's response

does not create a genuine dispute of material fact.  *See supra* Meta Introduction.

597.    Counsel for Meta asked similar questions with respect to specific features.  For

example, the FTC representative was asked if there are "any facts underlying the FTC's

interrogatory response regarding whether consumers consider viewing short-form video on

TikTok as a substitute for viewing short-form video on Facebook Reels or Instagram Reels," and

the FTC's representative testified, "I don't see a portion of the response to – to Rog 14 that

addresses – I think the terms you used were 'consumer substitution' and 'Reels' in particular; I

don't see those addressed specifically in pages 50 to – and 53 for TikTok."  Ex. 294 at 128:13-

129:13 (Takashima (FTC) Dep. Tr.).  The FTC's representative also separately testified, "I don't

see anything, as I sit here right now, looking, in the TikTok specific response to Rogs 14 or 16,

that specifically address, I think competition or Reels." *Id.* at 132:11-17.

> **FTC Response: Undisputed but incomplete.**  As explained in the FTC's response to
>
> Statement 595, the witness's testimony was limited to the text of the FTC's responses to the
>
> relevant interrogatories and the facts that supported the text of the FTC's responses.  *See supra* at
>
> FTC Response to Statement 595.

> **Meta Reply:**  As explained above in Meta's reply to statement 595, the FTC's response
>
> does not create a genuine dispute of material fact.  *See supra* Meta Introduction.

598.    When the FTC's representative was asked if he could provide a specific factual

basis for the FTC's contention "that viewing a [R]eel posted by an account that user does not

follow, and that does not follow user, [is included in a] personal social personal social

networking service," the FTC's representative testified, "I have not performed that analysis, with

respect to precisely viewing Reels posted by an account that a user does not follow and that does

not follow user for Instagram Reels."  Ex. 294 at 238:12-240:19 (Takashima (FTC) Dep. Tr.).

> **FTC Response: Disputed.**  Statement 598 does not accurately state the question posed to
>
> the witness, and does not accurately state the witness's answer.  The witness was not asked, "if
>
> he could provide a specific factual basis," instead the witness was asked whether the witness
>
> could identify "facts *in the FTC's interrogatory responses*."  Ex. 294 at 240:5-241:7 (Takashima
>
> (FTC) Dep. Tr) (emphasis added).  As explained in the FTC's response to Statement 595, the
>
> witness's testimony was limited to the text of the FTC's responses to the relevant interrogatories
>
> and the facts that supported the text of the FTC's responses, and his answer was limited by the

privilege instruction provided by counsel.  *See supra* at FTC Response to Statement 595.  Mr.

Takashima testified as follows:

> Q. Are you aware of any facts in the FTC's interrogatory responses concerning the reasons why consumers would watch a reel posted by an account that user does not follow and that does not follow user?
>
> MS. MUSSER: Objection. Outside the scope. Also objection, to the extent it calls for work product. The witness may answer, to the extent he can do so without implicating work product.
>
> THE WITNESS: Again, as I sit here today, I -- I have not performed that analysis, with respect to precisely viewing Reels posted by an account that a user does not follow and that does not follow user for Instagram Reels.  In order to do that, I would need to go through the -- the various documents that I've been referring to, including those set out or listed in the FTC's response to Interrogatory 16. I would need a considerable amount of time, I think, to do that, to review them with this question in mind. And I think answering that would entail forming a legal judgment, which would implicate work product issues.

Ex. 294 at 240:5-241:7 (Takashima (FTC) Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

the FTC's 30(b)(6) representative could not provide a specific factual basis for the FTC's

position that "viewing a [R]eel posted by an account that user does not follow, and that does not

follow user, [is included in a] personal social personal social networking service."  *See supra*

Meta Introduction.  As reflected in the deposition testimony cited in Meta's statement, the FTC's

30(b)(6) representative was asked for the FTC's factual basis relating to Reels without using the

words "in the FTC's interrogatory responses" and the representative testified that he could not

identify any specific facts.  *See* Ex. 294 at 238:12-240:19 (Takashima (FTC) Dep. Tr.).  The

FTC's response that the testimony was limited to the "facts that supported the text of the FTC's

responses" does not create a genuine dispute that the FTC's 30(b)(6) representative did not

provide any facts supporting the statement in the FTC's interrogatory response (which the FTC

did not supplement).

> ### 5.      The FTC Confirms Again That Its Market Definition Does Not Rely on Evidence of Dissimilar Features, Dissimilar Motives for Using Features, or Lack of Feature-Level Substitution

599.    After the deposition, Meta moved to compel the FTC to provide written responses

to five specific questions relevant to the 30(b)(6) deposition:

1. Does the FTC's classification of each specified feature and activity on Facebook and Instagram as personal social networking (except Facebook Dating) rely on any facts regarding the reasons why consumers use those features and activities (for example, to communicate with friends and family or not)? And if so, explain those factual contentions and provide the factual support on which the FTC relies.

2. Do the FTC's classifications of each specified feature and activity on Facebook and Instagram as personal social networking (except Facebook Dating) rely on any facts regarding how consumers actually use those features and activities (for example, to communicate with friends and family or not)? And if so, explain those factual contentions and provide the factual support on which the FTC relies.

3. Does the FTC's different market classifications of specified pairs of features and activities on-and-off Meta's platform (like watching short-form video on Instagram and TikTok) rely on any facts regarding the (dis)similarity of the user experience for those pairs of features and activities? And if so, explain those factual contentions and provide the factual support on which the FTC relies.

4. Does the FTC's different market classifications of specified pairs of features and activities on-and-off Meta's platform (like watching short-form video on Instagram and TikTok) rely on any facts regarding the circumstances under which consumers have switched (or would be willing to switch) between those pairs of features and activities). And if so, explain those factual contentions and provide the factual support on which the FTC relies.

5. Does the FTC's different market classifications of specified pairs of features and activities on-and-off Meta's platform (like watching short-form video on Instagram and TikTok) rely on any facts regarding whether there are impediments to consumers switching between those pairs of features and activities? And if so, explain those factual contentions and provide the factual support on which the FTC relies.

Jt. Status Rep. at 2 (May 31, 2023), ECF No. 302-1.

**<u>FTC Response: Undisputed.</u>**

600.     The FTC opposed Meta's request for written responses to 30(b)(6) questions.  *See*

Jt. Status Rep. at 15 (May 31, 2023), ECF No. 302-1.  In that opposition, the FTC stated that

"[n]one of the FTC's interrogatory responses address 'switching' behavior or 'reasons why

consumers use' a particular application or whether applications can 'effectively compete' for

certain use cases."  *Id.*

**FTC Response: Undisputed.**

601.     The Court in part granted Meta's request for written 30(b)(6) responses.  The

Court directed the FTC to provide a written response to Questions 4 and 5.  *See* Order at 1-2

(June 7, 2023), ECF No. 304.  As to questions 1-3, the Court ruled that the FTC need not provide

further responses.  *See id.* at 1.  The Court held that those three questions ask about

"'contentions' that the FTC does not make and thus need not have 'factual support.'"  *Id.*  On

July 6, 2023, the FTC provided written responses to Questions 4 and 5 of Meta's Requests for

Written Responses.  *See* Ex. 298 (FTC's Written Suppl. Resps. to Questions 4-5 of Meta's Req.

for Written Resps. (July 6, 2023)).  In its responses, the FTC reiterated its position that the "FTC

does not believe it is necessary to rely on facts regarding the circumstances under which

consumers have switched (or would be willing to switch) between alleged pairs of features and

activities)" and that the "FTC does not believe it is necessary to rely on facts regarding whether

there are impediments to consumers switching between those pairs of features and activities."

*Id.* at 5, 12.

**FTC Response: Undisputed but incomplete.**  Statement 601 accurately recounts some

of the words that appear in the cited source material, but it is incomplete and misleading to the

extent that the final sentence suggests that the FTC did not provide evidence or facts regarding

"the circumstances under which consumers have switched (or would be willing to switch)

between alleged pairs of features and activities)" or "impediments to consumers switching

between those pairs of features and activities."  In the cited material, the FTC identified copious

evidence on both points, and stated:

> The FTC does not believe it is necessary to rely on facts regarding
> the circumstances under which consumers have switched (or would
> be willing to switch) between alleged pairs of features and
> activities). Nonetheless, the FTC notes that the FTC's responses to
> Meta's interrogatories 3, 10-16, and 23 provide explanations and
> evidence relevant to the circumstances under which consumers have
> switched (or would be willing to switch) between Facebook and
> Instagram and other applications because they explain which firms
> provide personal social networking services and which firms
> provide other online services that are not reasonable substitutes and
> cite evidence supporting these conclusions. Additionally, the FTC
> notes the following evidence . . .

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

> The FTC does not believe it is necessary to rely on facts regarding
> whether there are impediments to consumers switching between
> those pairs of features and activities. Nonetheless, the FTC notes
> that the FTC's responses to Meta's interrogatories 3, 10-16, and 23
> provide explanations and evidence relevant to impediments to
> consumers switching between Facebook and Instagram and other
> applications because they explain which firms provide personal
> social networking services and which firms provide other online
> services that are not reasonable substitutes and cite evidence
> supporting these conclusions. Additionally, the FTC notes the
> following evidence . . .

Ex. 298 at 5-10, 12-17 (FTC's Written Suppl. Resps. to Questions 4-5 of Meta's Req. for Written

Resps. (July 6, 2023) (citing additional evidence)).

**Meta Reply:**  Because the FTC does not dispute the stated fact, no response is required.

*See supra* Meta Introduction.  The additional material the FTC cites in response to Meta's

undisputed fact does not create any genuine dispute of material fact that the FTC did not cite any

evidence or offer any explanation in response to the question it was directed to address relating

to switching between specific pairs of features and activities.  *See* Ex. 298 (FTC's Suppl. Resp.

to Questions 4-5 of Meta's Req. for Written Resps. Following Meta's 30(b)(6) Dep. of FTC (July 6, 2023)) (not stating, for example, that the different classification between specified pairs of features like watching short-form video from unconnected sources on Instagram or TikTok relied on circumstances under which consumers have switched or would be willing to switch between those alleged activities, or whether there would be impediments to do so).  As evidenced by the excerpt the FTC includes in its response, the FTC never purported to assess whether users would be willing to switch between specific features on alleged PSNS apps and non-PSNS apps (such as unconnected video on Reels and TikTok), and it repeatedly disclaimed conducting any such inquiry through the conclusion of discovery.

### C.    FTC's Experts' Positions

#### 1.    FTC Expert Professor Clifford Lampe's Opinions

602.    FTC expert Clifford Lampe purports to be an expert in "the areas of Human-Computer Interactions, Social Computing, and Computer-Mediated Communication" and studied "social media, computer-mediated communication, and social networks for over 20 years." Ex. 290 at ¶ 2 (Lampe Rep.).

**FTC Response: Undisputed but incomplete.**  The first sentence is undisputed but incomplete to the extent that the phrase "purported expert" suggests that Professor Lampe lacks qualifications: he is a highly qualified expert in the areas of Human-Computer Interactions, Social Computing, and Computer-Mediated Communication.  Ex. 290 ¶¶ 2-8 (Lampe Rep.).

603.    Professor Lampe opined "that there are distinct platforms whose design, motivations, and norms enable masspersonal, low cost maintenance of broad personal relationship networks that are comprised of real life connections," Ex. 290 at ¶ 13 (Lampe Rep.), which he calls "personal social networking," Ex. 281 at 163:20-164:7 (Lampe Dep. Tr.).  He "call[s] this collection of providers Personal Social Network Sites (PSNS)" and states that

includes Facebook, Instagram, Snapchat, and MeWe.  Ex. 290 at ¶¶ 13-15 (Lampe Rep.);
Ex. 282 at ¶ 78 (Lampe Rebuttal Rep.) (classifying MeWe as a PSNS).

**FTC Response: Undisputed.**

604.    According to Professor Lampe, uses of Facebook and Instagram are "extremely
heterogeneous."  Ex. 281 at 165:12-166:4 (Lampe Dep. Tr.) (agreeing that "[f]or some value of
use I believe that's true" with respect to "use of Facebook [being] extremely heterogeneous"); *id.*
at 169:6-170:2 (same); *id.* at 255:10-256:1 (Instagram); *see also* Ex. 425 at 2323 (MetaFTC-DX-
1151, *Computers in Human Behavior*) ("Given the heterogeneous nature of these sites, and the
diversity of users of these sites, it is likely that different users come to Facebook for different
reasons and that these reasons may be associated with different types of use, such as connecting
with strangers or interacting only with close friends.").

**FTC Response: Disputed in part and incomplete.**  Undisputed that Statement 604
relays some of the words in the cited material.  The FTC disputes that Statement 604 constitutes
a material fact subject to proof at trial and objects that the material cited does not establish the
absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P.
56(c)(1)(B), 56(c)(1).  Statement 604 is disputed in part and incomplete because it omits
Professor Lampe's clarification that by "use," he was including "different ways that people
engage in relationship maintenance behaviors."  Professor Lampe testified as follows:

> Q. . . . was it an accurate statement in 2011 that "use of Facebook is
> extremely heterogeneous"?
>
> ***
>
> A. For some value of use I believe that's true, yes, but the important
> thing to really consider there is what we mean by "use" in this case.
>
> ***

> when we talk about even personal networking, there are lots of different ways of doing that. So how people -- use can include, for instance, different ways that people engage in relationship maintenance behaviors . . . . it's hard for me to tell what type of use I was talking about here, but I would say that "use" can be heterogeneous and there are different types of uses of Facebook.

Ex. 281 at 165:15-166:21 (Lampe Dep. Tr.); *see also id.* at 169:10-12 ("I think there are a lot of uses of Facebook, but I find that the core use remains remarkably consistent.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe has stated that the uses of Facebook and Instagram are "extremely heterogeneous."  *See supra* Meta Introduction.  When Professor Lampe referred to different "uses," he was not referring to "different ways that people engage in relationship maintenance behaviors," as the FTC asserts.  The FTC's second set of asterisks omits the following testimony: "Q.  Do you agree that Facebook had many uses apart from personal social networking in June 2011? . . .  A.  I agree that it had other uses other than personal social networking in 2011." Ex. 281 at 165:22-166:4 (Lampe Dep. Tr.).  And immediately after the testimony that the FTC puts in its response, Professor Lampe testified:  "Q.  And not only different types of performing personal social networking, but would you agree that as of 2011 there were many different uses wholly separate from personal social networking of Facebook? . . .  A.  Yeah.  As I say in my original report, Facebook has offered other types of uses than personal social networking.  Q. Since 2011 Facebook has only continued to add new features; is that correct?  A.  I would amend that a little bit to say that features have come and gone since Facebook started."  *Id.* at 166:22-167:13; *see also infra* Meta SMF ¶ 607 (discussing other uses of Facebook and Instagram that Professor Lampe testified were not, in his opinion, personal social networking).

605.    Professor Lampe testified that both Facebook and Instagram offer "other types of uses than personal social networking."  Ex. 281 at 166:22-167:8 (Lampe Dep. Tr.); *id.* at 252:1-8

(agreeing that "some portion of users are there on the Instagram feed for reasons wholly apart from personal social networking"); *id.* at 218:18-219:3 ("[T]hat is common for broad platforms like Facebook and Instagram to have multiple motivations and uses that they meet."); *id.* at 255:10-256:1 ("[I]t's not my opinion that all time on [Facebook and Instagram] is motivated by personal social networking[.  T]here are other motivations that bring people to these platforms as well . . . .").

**FTC Response: Disputed in part and incomplete.**  Undisputed that Statement 605 relays words that appear in the cited material.  Statement 605 is otherwise disputed as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Professor Lampe's excerpted testimony that Facebook and Instagram offer "other types of uses than personal social networking" does not establish that firms that do not offer personal social networking services are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  Statement 605 is further disputed as incomplete because it omits Professor Lampe's clarification that despite other uses, Facebook's core use of personal social networking "remains remarkably consistent" and "Facebook is a personal social networking site and that uses of that site are then related to personal social networking.  So it's not watching the comedy video that makes Facebook a PSNS.  It's that Facebook's a PSNS where you can watch a comedy video."  Ex. 281 at 169:12, 253:1-17 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe admitted that, in his view, Facebook and Instagram have features and uses that are not personal social networking.  *See supra* Meta Introduction.  The FTC's additional "clarification" does not contradict that fact.  Furthermore, Professor Lampe did not offer the

opinion that personal social networking is the only "core use" of Facebook.  He testified an app

may have "multiple core uses."  Ex. 281 at 127:2-7 (Lampe Dep Tr.); *see*, *e.g.*, *infra* Meta SMF

¶¶ 608, 612(d).  He testified:  "I don't have an opinion on" whether Facebook has "other core

uses in addition to personal social networking. . . .  I identified the core use of personal social

networking and wasn't looking for other types of core uses in that assessment."  Ex. 281 at

169:13-170:21 (Lampe Dep. Tr.); *see id.* at 125:22-126:14, 147:4-8.  Further, Professor Lampe

does not define the term "core use" and concedes he may consider something to be a "core use"

even if that use accounts for less than 10 percent of the time on an app.  *Id.* at 284:12-19

(testifying he has "not used the term 'core use' before in my published research"), 289:5-16

(stating that "core use" is a "synthesis" of multiple qualitative and malleable factors regarding

determination of core use), 289:17-290:2 (refusing to identify any "level" for factors to

distinguish "a mere use from a core use"), 296:6-299:3 (stating that "amount of time spent" does

not matter to his analysis), 301:8-302:5 (stating it would depend on the "context" to assess

whether a use that only 20% of users of an app use is a "core use").

606.    According to Professor Lampe, the motivations met by Facebook and Instagram

include relaxing entertainment, *see* Ex. 281 at 125:4-9 (Lampe Dep. Tr.); relieving boredom, *see*

*id.* at 132:8-10; and social connection, *see id.* at 181:8-12.  Motivations for using Facebook,

according to Professor Lampe, also include "expressive information sharing," "escapism," "cool

and new trend," "companionship," "professional advancement," and "habitual pass time."  *Id.*

at 219:16-220:3.

**FTC Response: Disputed in part and incomplete.**  Undisputed that Statement 606

relays words that appear in the cited material.  Statement 606 is otherwise disputed as the cited

material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R.

Civ. P. 56(c)(1)(B): Professor Lampe's excerpted testimony that Facebook and Instagram may meet motivations other than friends and family sharing does not establish that firms that do not offer personal social networking services are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  Statement 606 is also disputed as incomplete because it omits Professor Lampe's clarification that despite other motivations, Facebook's core use of personal social networking "remains remarkably consistent" and "Facebook is a personal social networking site and that uses of that site are then related to personal social networking.  So it's not watching the comedy video that makes Facebook a PSNS.  It's that Facebook's a PSNS where you can watch a comedy video," Ex. 281 at 169:12, 253:1-17 (Lampe Dep. Tr.), and "you could have a core use and people may differ on norms and motivations framework on that core use, but that the core use itself remains remarkably consistent.  Not universally shared but remarkably consistent."  Ex. 281 at 146:10-147:3 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe testified Facebook and Instagram have features and uses that are not personal social networking.  The FTC's additional "clarification" does not contradict that fact.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 605 (addressing similar response).

607.   Professor Lampe testified the following are uses of Facebook and Instagram:

    a.   **Watching Videos and Reels.**  Professor Lampe testified that watching video on Facebook and Instagram being "largely for entertainment purposes" is "consistent" with his view.  Ex. 281 at 238:2-239:4 (Lampe Dep. Tr.) ("I believe that the findings I've seen lead me to believe that video is largely for entertainment purposes.  Occasionally it's used for personal social

networking, but largely for entertainment."); *see also id.* at 245:8-246:1 (agreeing that "entertainment" and "passing time due to boredom" are motivations for watching Reels).

b. **Viewing Content from Celebrities, Influencers, and Public Figures.**
Professor Lampe testified it is "definitely possible" that users "watching stories from celebrities and influencers" on Facebook and Instagram are "not motivated by personal social networking."  Ex. 281 at 255:10-256:1 (Lampe Dep. Tr.); *see also id.* at 256:2-9 (same including "public figure[s]").

c. **Viewing Linked Content.**  Professor Lampe testified that it is "potentially very likely" that an individual is "motivated by something other than personal social networking" when viewing content on their Facebook Feed "in a linked post such as a New York Times article or a 20-minute comedy routine from a famous comedian that was posted on YouTube."  Ex. 281 at 253:18-255:3 (Lampe Dep. Tr.).

d. **Using Instagram Direct.**  Professor Lampe testified that "sending messages to one other reciprocal connection on Instagram Direct . . . would not be . . . personal social networking."  Ex. 281 at 266:9-267:5 (Lampe Dep. Tr.); *see also id.* at 265:7-13.

e. **Using Facebook Groups.**  Professor Lampe testified that "the dominant use for [Facebook] groups is around interest-based communities."  Ex. 281 at 216:11-20 (Lampe Dep. Tr.) (responding affirmatively to question whether "it would be unlikely that personal social networking is the motivating basis for using Facebook groups").

f. **Using Facebook Marketplace.**  Professor Lampe testified that "it's quite likely that" viewing items for sale on Facebook Marketplace not posted by friends is "not personal social networking, that there's another motivation being fulfilled."  Ex. 281 at 264:15-265:2 (Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Undisputed that Statement 607 relays words that appear in the cited material.  Statement 607 is otherwise disputed as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Professor Lampe's excerpted testimony that Facebook and Instagram may meet motivations other than friends and family sharing does not establish that firms that do not offer personal social networking services are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  Statement 607 is also disputed in part and incomplete because it omits Professor Lampe's clarification that "you have to understand motivation to understand specific feature use within a platform and that most platforms are actually bundles of features that meet multiple motivations."  Ex. 281 at 230:7-11 (Lampe Dep. Tr.).

Professor Lampe also explained that "I think if you want to understand kind of low-level or really ground-level uses and practices it's important to understand the features, but I do think there's a higher level of motivations where you don't necessarily have to consider individual features."  Ex. 281 at 232:2-15 (Lampe Dep. Tr.).

Professor Lampe further elaborated that "to understand any feature—I think that could include individual features like this—you need to understand motivations and norms along with the design of the feature."  Ex. 281 at 233:19-234:10 (Lampe Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Professor Lampe admitted that use of the aforementioned features of Facebook and Instagram are, in his view, predominately not personal social networking or motivated by personal social networking.  *See supra* Meta Introduction.  The FTC's "clarification" does not contradict the asserted facts from Professor Lampe's cited testimony.

608.    Professor Lampe opined that Instagram has a "core use" of consuming interest-based or "lifestyle" content.  Ex. 281 at 126:15-127:7 (Lampe Dep. Tr.) ("[L]ifestyle type of content . . . could be another core use of Instagram."); *see also id.* at 199:1-7 ("lifestyle" use is "people asymmetrically following brands or celebrities to learn more about the content or things that they're interested in"); *id.* at 199:8-14 ("follow[ing] brands, celebrities, or other topics that [consumers are] interested in" is "a big use of Instagram").

**FTC Response: Disputed.**  Statement 608 is disputed because Professor Lampe said that "lifestyle" content "could be" another core use of Instagram; he did not say that Instagram does have a "core use" of "lifestyle" content.  Statement 606 is also disputed as the cited material does not establish the absence of a genuine dispute regarding a material fact, *see* Fed. R. Civ. P. 56(c)(1)(B): Professor Lampe's excerpted testimony that Facebook and Instagram may meet motivations other than friends and family sharing does not establish that firms that do not offer personal social networking services are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe identified interest-based or "lifestyle" content as a "core use" and a "big use" of Instagram.  *See supra* Meta Introduction.  Professor Lampe testified:

"Q.  Do you have a view on whether Facebook and Instagram have other core uses?

A.  I think with Instagram especially as it's evolved over time there's been, as I mention in my rebuttal report, a lot of lifestyle type of content that could be another core use of Instagram, which doesn't invalidate the core use of relationship maintenance, but I think with Instagram especially that could be another core use."

Ex. 281 at 126:15-127:1.  Later in his deposition he reaffirmed that "lifestyle" content was a

"core use" of Instagram:

Q.  What do you mean by Instagram having a core use of lifestyle?

. . .

A.  The use I'm talking about more specifically are people asymmetrically following brands or celebrities to learn more about the content or things that they're interested in.

Q.  It's your understanding that it's a significant use of Instagram to follow brands, celebrities, or other topics that they're interested in?

. . .

A.  That's what I – yes, I said in my report that I think that's a big use of Instagram.

*Id.* at 198:9-199:14.

609.    Professor Lampe offered no opinion regarding the amount of time spent on the

different uses of Facebook and Instagram.  *See* Ex. 281 at 139:17-140:7 (Lampe Dep. Tr.) ("I

have not studied time spent on these platforms for [different] motivations."); *id.* at 209:11-210:3

("Q. Do you offer any opinion in this case that more than half of the time spent on Instagram is

motivated by personal social networking as opposed to other motivations such as seeking

entertainment or lifestyle issues or relieving boredom?  A. No. . . ."); *id.* at 210:4-14 (similar for

Instagram); *id.* at 252:9-17 (Professor Lampe "did not try to answer those questions" about "the

specific proportions of people that are there on the Instagram service due to personal social

networking, due to lifestyle interests, due to relaxing entertainment, due to passing the time due

to boredom, or due to any other number of motivations why they could be [on] Instagram"); *id.*
at 178:3-179:3 (similar for Facebook).  Professor Lampe does not dispute Professor Dennis
Carlton's analysis that ██████████ of time spent on Facebook and Instagram,
respectively, is consumption of content posted by users' friends or family.  *See id.* at 240:2-
241:22.

>     **FTC Response: Disputed in part.**  The first sentence is disputed as not supported by the
cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), to
the extent that it suggests that each "motivation" Professor Lampe discuss aligns with only one
"use" of a personal social networking services, as Professor Lampe used the term: Professor
Lampe testified that "use can include, for instance, different ways that people engage in
relationship maintenance behaviors."  Ex. 281 at 165:15-166:21 (Lampe Dep. Tr.); *see also id.* at
169:10-12 ("I think there are a lot of uses of Facebook, but I find that the core use remains
remarkably consistent.").

>     The second sentence is undisputed, as Professor Lampe did not address in his reports the
referenced calculations.

>     **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
Professor Lampe did not offer an opinion regarding the amount of time spent on the different
uses of Facebook and Instagram.  *See supra* Meta Introduction.

>     610.    According to Professor Lampe, the use that makes PSNS distinct from other apps
is "weak tie masspersonal relationship maintenance."  Ex. 281 at 30:14-31:2 & errata (Lampe
Dep. Tr.) (agreeing that "the primary thing that defines PSNS as separate from other types of
social networking sites or messaging applications is that PSNS enable, have a motivation of, and
have a norm of weak tie masspersonal relationship maintenance behaviors"); *see also id.*

at 41:18-42:17; *id.* at 60:8-16 ("weak tie maintenance . . . was the important difference" for

Facebook, even though "communicating with close friends" was a more common use); *id.*

at 66:6-12 ("Q. And what makes PSNS unique in your view is the ability to – the ability, norm,

and motivation to communicate with weak ties that you do not regularly engage with; is that

correct? . . . A. I think it's that that distinguishes them from other platforms."); Ex. 290 at ¶ 24

(Lampe Rep.) ("Personal Social Network Sites also serve a distinct purpose than interpersonal

sites (*e.g.* messaging) and mass media (*e.g.* Netflix), neither of which enable maintenance of

weak ties at scale through networked interactions.").

**FTC Response: Disputed in part and incomplete.** Undisputed that Statement 610

relays words that appear in the cited material. Otherwise disputed, as it misrepresents the

witness's testimony and opinions, and is contradicted by evidence.

The first sentence is disputed because it misrepresents the witness's testimony. Professor

Lampe did not state that the "the *use* that makes PSNS distinct from *other apps* is 'weak tie

masspersonal relationship maintenance.'" Professor Lampe's opening report and rebuttal report

explained that his opinions are based on his examination of the combination of relevant services'

designs and norms, and the motivations of users; thus, neither his opinions nor his testimony

relate exclusively to any particular "use." *See* Ex. 290 at ¶¶ 13-14 (Lampe Rep.). Moreover, the

question he was asked at his deposition did not relate to a particular "use," nor did it relate to

"other apps"—instead he was asked about the "thing" that distinguishes personal social

networking services from "other types of social networking sites or messaging applications."

Professor Lampe testified as follows:

> Q. . . . Would it be fair to say the primary thing that defines PSNS
> as separate from other types of social networking sites or messaging
> applications is that PSNS both enable and have a norm of weak tie
> mass personal relationship maintenance behaviors?

\*\*\*

I would include the word "motivations" in that as well, that users are motivated to maintain their networks through those tools is the amendment I would make to what you just said.

Q. All right. And just so we have a clear answer, is it fair to say that the primary thing that defines PSNS as separate from other types of social networking sites or messaging applications is that PSNS enable, have a motivation of, and have a norm of weak tie mass personal relationship maintenance behaviors?

\*\*\*

A. Yeah. The major point I try to make in my report is that it's the combination of those factors that create the distinction.

Ex. 281 at 29:20-31:2 (Lampe Dep. Tr.).

Moreover, Statement 610 is incomplete because it omits Professor Lampe's clarification that, with respect to the distinction between personal social networking services and messaging services, "the key feature of PSNS is that it includes close friends and the weak network *at the same time*. That's the important thing is the including of both, but that doesn't then make it so that close friends and family are not there." Ex. 281 at 71:13-72:5 (Lampe Dep. Tr.) (emphasis added). The FTC also disputes Statement 610 as not supported by the cited material as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), to the extent it suggests that "weak tie masspersonal relationship maintenance" aligns with only one "use" of a personal social networking service, as Professor Lampe used the term: Professor Lampe testified that "use can include, for instance, different ways that people engage in relationship maintenance behaviors." Ex. 281 at 165:15-166:21 (Lampe Dep. Tr.); *see also id.* at 169:10-12 ("I think there are a lot of uses of Facebook, but I find that the core use remains remarkably consistent.").

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Professor Lampe's opinion is that PSNS are "unique" because they enable communication with

"weak ties." *See supra* Meta Introduction.  Professor Lampe gave that testimony on multiple

occasions, including specifically:

> Q.  And what makes PSNS unique in your view is the ability to –
> the ability, norm, and motivation to communicate with the weak ties
> that you do not regularly engage with; is that correct?
>
> . . .
>
> A.  I think it's that that distinguishes them from other platforms.

Ex. 281 at 66:6-12 (Lampe Dep. Tr.).  That testimony follows from his concession that

"messaging applications [are] commonly used for the purpose of maintaining personal

relationships and sharing experiences with friends [and] family."  *Id.* at 41:3-42:8; *see also id.*

at 52:20-53:19 (agreeing that Facebook is "unlikely to be a critical communication channel for

close friends because these stronger ties typically use multiple redundant channels to

communicate," including messaging applications); *id.* at 57:21-58:5 ("Messaging along with

other apps can be used for maintaining relationships with close friends, yes.").  Thus, the only

"unique" aspect of PSNS – according to Professor Lampe – is communicating with weak ties,

meaning those individuals with whom one does not regularly engage.  None of the additional

material cited by the FTC is to the contrary.

611.    Professor Lampe defined "weak ties" as the "broad set of people that you

communicate with less frequently" than close friends or family; "weak ties" include people such

as "work colleagues, members of your church, old friends you've lost touch with, and casual

acquaintances."  Ex. 281 at 21:10-22 (Lampe Dep. Tr.).

**FTC Response: Undisputed.**

612.    Professor Lampe opined that other applications can satisfy the following uses of

Facebook and Instagram:

a.  **Sharing with Close Friends and Family (Not Weak Ties).**  Professor Lampe agreed that "messaging applications [are] commonly used for the purpose of maintaining personal relationships and sharing experiences with friends, family, and other personal connections at least with respect to close friends and family."  Ex. 281 at 41:3-42:8 (Lampe Dep. Tr.); *see also id.* at 52:20-53:19 (agreeing that Facebook is "unlikely to be a critical communication channel for close friends because these stronger ties typically use multiple redundant channels to communicate," including messaging applications); *id.* at 57:21:58:5 ("Messaging along with other apps can be used for maintaining relationships with close friends, yes.").  Messaging applications, according to Professor Lampe, include iMessage, Google's messaging applications, and SMS texting.  *See id.* at 23:5-10.

b.  **Watching Video.**  Professor Lampe testified that consumers "watching [R]eels on Facebook or Instagram with a motivation of entertainment or passing time due to boredom" could "satisfy those same motivations" on TikTok and YouTube.  Ex. 281 at 246:2-18 (Lampe Dep. Tr.); *see also* Ex. 290 at ¶¶ 22-23 (Lampe Rep.) (opining that primary motivation of TikTok and YouTube use is watching video).

c.  **Relieving Boredom.**  Professor Lampe testified that consumers with "a desire to simply relieve boredom, not maintain relationships," can satisfy that with "either Facebook, Instagram, TikTok, YouTube, Reddit, Twitter, or Pinterest."  Ex. 281 at 137:11-21 (Lampe Dep. Tr.).

d. **Sharing or Viewing Interest-Based Content.**  Professor Lampe opined that

Pinterest "users are motivated to share content in the form of images, largely

around lifestyle topics."  Ex. 290 at ¶ 21 (Lampe Rep.).  He testified that that

there could also be a "lifestyle" "core use" of Instagram.  Ex. 281 at 198:9-22

(Lampe Dep. Tr.).  Professor Lampe testified "that both Reddit and Facebook

groups offer interest-based communities," Ex. 281 at 217:2-10 (Lampe Dep.

Tr.), and that "at a high level that you can fulfill" the "motivation" of

"learn[ing] information about their geographic community" on both Facebook

and Nextdoor, *id.* at 261:4-15.  Professor Lampe also categorizes use of

Twitter as "primarily motivated by the sharing and discovery of information,"

Ex. 290 at ¶ 19 (Lampe Rep.), and he has found "expressive information

sharing" also to be a motivation for using Facebook, Ex. 281 at 219:16-220:8

(Lampe Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Undisputed that Statement 612

relays words that appear in the cited material.  The FTC disputes that Statement 612 constitutes a

material fact subject to proof at trial and objects that the material cited does not establish the

absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P.

56(c)(1)(B), 56(c)(1).  Statement 612 is disputed in part and incomplete because it omits

Professor Lampe's clarification that "It's about their motivations for why they're using the

platform."  Ex. 281 at 42:18-43:13 (Lampe Dep. Tr.).  Also, when asked about motivations for

using Facebook Reels, Professor Lampe explained that "[m]y opinion is not related to the

motivation for why they're watching reels.  It's why they're on Facebook in the first place."  *Id.*

at 171:16-172:2.  Additionally, Professor Lampe explained that Facebook users "can still have

other things they want to do like be entertained or relieve boredom on Facebook, but it's that motivation to do personal social networking that brings them to Facebook."  *Id*. at 196:18-197:4; *see also id*. at 248:10-19 ("[w]hen I'm looking at motivations to use Facebook I'm not looking at a feature level.  I'm looking at the broad reason why you're on a platform . . . . My opinion is more at a higher level looking at why people are on Facebook or Instagram in the first place.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe admitted use of the listed features (like watching video) is, in his opinion, likely not motivated by personal social networking, and further, that Facebook and Instagram users could satisfy the same motivations to use those features on other apps like TikTok.  *See supra* Meta Introduction.  None of the additional "clarification[s]" added by the FTC even addresses this point.  The FTC also does not explain how the purported distinction between a motivation to spend time on a specific feature rather than a motivation to be "on Facebook or Instagram in the first place" makes any difference to the asserted fact.  Professor Lampe also offered no opinion on what it means to be on the platform "in the first place" and similarly offered no opinion on the percentage of people motivated to be on the platform "in the first place."  Ex. 281 at 250:8-21 (Lampe Dep. Tr.) ("Q. And one thing you mentioned in the prior answer is you kind of looked at the reason why people are on the platform specifically . . . What percentage of Instagram users are there due to the motivation of personal social networking? A. . . . I didn't form an opinion related to any percentage or time spent.").  In any event, Professor Lampe's research addresses this point, and he reached the conclusion that it would be a mistake to focus on motivations for "general use" (as the FTC does) to the exclusion of motivations for using specific features:  "[M]otivations which significantly predict general use of Facebook paint an incomplete picture of motivations for using the site and obscure our ability to

gain insight into user motivations of use." Ex. 281 at 233:5-234:10 (Lampe Dep. Tr.); *id*. at 234:20-235:6 ("Q. . . . To get a complete understanding of why people are using a social media platform you think it's important to know at a general level why people are using the service overall and also to understand why people are using specific features; is that fair? . . . A. I think that's correct, yes.").

613.    Professor Lampe was aware of no evidence that Meta "identif[ies] specific people using Facebook and Instagram for the purpose of maintaining relationships with weak ties and tries to extract more value from them by charging them a fee or showing them more ads." Ex. 281 at 47:20-48:13 (Lampe Dep. Tr.).  He also offered no opinion that "Meta is even able to identify the specific people using Facebook and Instagram for the purpose of maintaining relationships with weak ties as opposed to other reasons like maintaining relationships with close friends and family." *Id.* at 49:3-15.  Professor Lampe testified, "I don't feel qualified to determine whether two corporations are actually competitors or not within any kind of economic situation." Ex. 281 at 160:8-17 (Lampe Dep. Tr.).  When asked, "did you in forming your opinions in this matter attempt to determine whether any specific mobile app was in economic competition with another mobile app in this case," Professor Lampe testified:  "I did not.  My expertise isn't in economic analysis." *Id.* at 163:4-10.

**FTC Response: Undisputed.**

614.    Professor Lampe testified that he does not have any opinion regarding the *Brown Shoe* factors.  *See* Ex. 281 at 273:5-8 (Lampe Dep. Tr.) ("[Q]. Do you have any opinion regarding the Brown Shoe factors?  . . .  A. I do not, no.  I – no.").  Professor Lampe stated in his rebuttal report, "I understand that the '*Brown Shoe* factors' Prof. Ghose utilizes in his report are a legal framework, and I note that they are not a framework that I am aware of being utilized in the

academic study of computer mediated technologies.  As I discuss below, a more appropriate way to ascertain whether personal relationship maintenance is a core purpose of a social network service from an academic perspective is by analyzing site design, motivations, and norms." Ex. 282 at ¶ 3 (Lampe Rebuttal Rep.).  Professor Lampe further opined in his rebuttal report that the *Brown Shoe* factors of "distinct price, distinct customers, sensitivity to price changes, and specialized vendors" are "not informative for my assessment of whether PSNS are a distinct type of platform.  Academic research in my field on computer-mediated communication systems does not distinguish different types of platforms based on these factors."  *Id.* at ¶ 210.

**FTC Response: Disputed in part and incomplete.**  Undisputed that Statement 614 relays words that appear in the cited material.  The FTC disputes that Statement 614 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B); 56(c)(2).  Further, Statement 614 is incomplete as it fails to mention relevant aspects of Professor Lampe's analyses.  Statement 614 omits that Professor Lampe's opening report offered analysis that is directly informative of the "industry or public recognition" and "peculiar characteristics and uses" *Brown Shoe* factors.  CMF at ¶ 905; PX9004, Lampe Report at ¶¶ 128-272.  And Statement 614 also omits that in his rebuttal report, Professor Lampe addressed Professor Ghose's arguments with respect to the *Brown Shoe* factors.  CMF at ¶ 906; PX9010, Lampe Rebuttal Report at ¶¶ 18-20, 89, 210.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Lampe disclaimed any opinion about the *Brown Shoe* factors in his testimony.  *See supra* Meta Introduction.

### 2.   FTC Expert Professor C. Scott Hemphill's Opinions

#### a.   Professor C. Scott Hemphill's Purported Expertise

615.    Professor Hemphill is a law professor at New York University, and his "research focuses on the law and economics of competition and innovation."  Ex. 279 at ¶ 1 (Hemphill Rep.).  The FTC intends to proffer his opinions in this matter in his "capacity as an economist." *Id.* at ¶ 5.

**FTC Response: Undisputed but incomplete.**  Statement 615 is undisputed to the extent that it relays words that appear in the cited report and indicates that Professor Hemphill is a professor at New York University.  The FTC objects that Statement 615 does not establish the absence of a genuine dispute regarding a material fact, and objects that Statement 615 is incomplete.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Statement 615 is incomplete because it fails to indicate that Professor Hemphill holds a Ph.D. in economics from Stanford University and a M.Sc. in economics from the London School of Economics.  *See* Ex. 279 at ¶ 1 (Hemphill Rep.). Furthermore, the first sentence of Statement 615 fails to note that Professor Hemphill's "academic research has focused, in substantial part, on the economics of competition and innovation," Ex. 279 at ¶ 2 (Hemphill Rep.), and the second sentence of Statement 615 fails to note that Professor Hemphill also submitted a rebuttal report in this matter in his "capacity as an economist."  PX9007, Hemphill Rebuttal Report at ¶ 2.

#### b.   The Contours of the PSNS Market

616.    Professor Hemphill testified that, in his view, "the underlying market definition is based on functionality and use" and that "PSN services provide a means for communicating with friends and family, [and] other social acquaintances," within "a shared social space."  Ex. 283 at 20:6-15 (Hemphill Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  Statement 616 is undisputed to the extent that it relays words that appear in the cited transcript.  The FTC objects that Statement 616 is incomplete because it omits Professor Hemphill's clarification of what he meant by "communicate."  After explaining that "PSN services provide a means for communicating with friends and family, [and] other social acquaintances," Professor Hemphill testified that "[b]y 'communicate' here I mean to maintain relationships, share experiences with those kinds of individuals within a shared social space and that the elements that you're describing are the functionality by which that's achieved."  Ex. 283 at 20:6-15 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement.  *See supra* Meta Introduction.

617.    After being asked about the FTC's allegation in its Amended Complaint that personal social networking services "include features that allow users to find and connect with other users to make it easier for each user to build and expand their set of personal connections," Professor Hemphill testified that "[t]he possession or absence" of that "connectivity tool[ ]" is "not essential" to his "analysis of functionality."  Ex. 283 at 21:15-22:15 (Hemphill Dep. Tr.).

**FTC Response: Disputed.**  The FTC disputes that Statement 617 because it misstates the question asked and the answer given, is contradicted by other evidence, and is misleading and incomplete.  *See* Fed. R. Civ. P. 56(c)(1)(B).  This statement is misleading and incomplete because it suggests that the cited portion of Professor Hemphill's answer responded to the question cited.  In fact, Professor Hemphill's testimony cited in Statement 617 was a response to a different question:

> Q. Okay.  And are you familiar with the fact that the amended complaint states that personal social networking services include features that allow users to find and connect with other users to make

it easier for each user to build and expand their set of personal connections?

MS. CERILLI: Objection to form.

A. Yes, I'm aware and discuss in my report connectivity tools as a part of the functionality that PSN apps provide.

Q. Is it your opinion that that functionality is a necessary feature of a PSNS app?

MS. CERILLI: Objection to form.

A. So my analysis is an analysis of both functionality and use and within the analysis of functionality, you know, these connectivity tools play a role as I discussed in the initial report. The possession or absence in a given context is not essential. The overall analysis is – is broader.

Ex. 283 at 21:19-22:15 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified the presence or absence of connectivity tools – as described in the FTC's complaint – is "not essential" to whether a service qualifies as a "PSNS" according to him.  *See supra* Meta Introduction.  It is obvious from the testimony excerpts the FTC provides that the second question referring to "that functionality" is in reference to the connectivity tools referenced in the first question and Professor Hemphill's response to that question, in which he refers to "connectivity tools as a part of the functionality that PSN apps provide."  Ex. 283 at 21:19-22:15 (Hemphill Dep. Tr.).

618.    Professor Hemphill opined that "[t]he largest participants in this market are Facebook, Instagram, and Snapchat."  Ex. 279 at ¶ 24 (Hemphill Rep.).  He opined that MeWe is a participant in the market for personal networking as well.  *See id.* at ¶ 148.  He also opined that it would be conservative to include "BeReal" as a "market participant" in "assessing Meta's

market significance." *Id.* at ¶ 327.  According to Professor Hemphill, defunct providers of PSN services include "Friendster, Myspace, Orkut, Path, and Google+." *See id.* at ¶ 330.

**FTC Response: Undisputed.**  Statement 618 is undisputed, subject to the caveat that the FTC notes that Paragraph 148 in Professor Hemphill's report, which Meta cited to support the second sentence in this statement, does not indicate that MeWe is a participant in the market for personal social networking services.

619.    Professor Hemphill opines that "PSN apps based in other countries appear to have a minimal presence among users in the United States," including KakaoStory, which is owned by Kakao.  Ex. 279 at ¶¶ 328, 970 (Hemphill Rep.).

**FTC Response: Undisputed.**

c.    **All Time on All Activities on Facebook and Instagram Is Time Spent Consuming Personal Networking Services**

620.    Professor Hemphill testified that he agrees with the FTC's September 12, 2022 Response to Meta's List of Features or Activities that "[a]ll of the features, activities identified by Meta for Facebook and Instagram are part of Meta's personal social networking offering except Facebook dating," with the caveat that he does not "have a particular view about Facebook Dating."  Ex. 283 at 72:1-13 (Hemphill Dep. Tr.); *see also* Ex. 405 at 2 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)).

**FTC Response: Undisputed.**  The FTC notes for purposes of clarity that the language quoted in the first part of the statement ("[a]ll of the features, activities identified by Meta for Facebook and Instagram are part of Meta's personal social networking offering except Facebook dating") is an excerpt from the FTC's September 12, 2022 Response to Meta's List of Features or Activities that was referenced in the examiner's question, not a quotation from Professor Hemphill's testimony.

621.     Professor Hemphill testified that "[m]y opinion is that everything that's happening on the app is the provision of personal social networking services."  Ex. 283 at 80:14-81:21 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  Statement 621 is undisputed to the extent that it relays words that appear in the cited transcript but is otherwise disputed.  The FTC disputes Statement 621 as incomplete.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).  The FTC objects to Statement 621 as incomplete because it does not specify the "app" referred to: the line of questioning was specific to Reels.  *See* Ex. 283 at 80:20-81:2 (Hemphill Dep. Tr.).  Although he testified that Facebook, for example, provides an "integrated PSN services offering," *see, e.g.*, Ex. 283 at 27:21-28:1 (Hemphill Dep. Tr.), Professor Hemphill also testified that Facebook Dating was not necessarily the provision of personal social networking services.  *See* Ex. 283 at 72:1-13 (Hemphill Dep. Tr.) (agreeing with the FTC's discovery response that excluded Facebook Dating from the activities included in Meta's personal social networking offerings and noting that he did not "have a particular view about Facebook Dating"); *see also* Ex. 283 at 73:16-74:16 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement.  *See supra* Meta Introduction.

622.     For example, Professor Hemphill confirmed that his opinion is "100 percent" of the time a user spends on the "Reels tab" "watch[ing] a series of short videos of an otherwise unknown individual dancing" is time spent engaging in "personal social networking," even when the content "was not posted or forwarded by anyone the user knows."  Ex. 283 at 80:20-81:21 (Hemphill Dep. Tr.) ("Q. You agree that 100 percent of the time spent engaged in that activity is personal social networking, correct?  . . .  A. Yeah.  My opinion is that everything that's

happening on the app is the provision of personal social networking services for the reasons that we've already talked about, and that's true even as the specific moments the user is not, you know, directly engaged with friends and family in that moment.").

**FTC Response: Undisputed but incomplete.**  Statement 622 is undisputed to the extent that it relays words that appear in the cited transcript, but it is incomplete in describing Professor Hemphill's testimony.  The exchange with Professor Hemphill was as follows:

> Q. And I want you to suppose that in the Reels tab a Facebook user watches a series of short videos of an otherwise unknown individual dancing, content that was not posted or forwarded by anyone the user knows. Can you suppose that with me . . . . You agree that 100 percent of the time spent engaged in that activity is personal social networking, correct?
>
> ***
>
> Yeah.  My opinion is that everything that's happening on the app is the *provision of* personal social networking services for the reasons that we've already talked about, and that's true even as the specific moments the user is not, you know, directly engaged with friends and family in that moment."

Ex. 283 at 80:20-81:21 (Hemphill Dep. Tr.) (emphasis added).

Furthermore, in his reports, Professor Hemphill explained in detail his opinion regarding time spent in PSN apps on additional features and uses that do not always entail direct interaction with friends and family as well as their relevance for the measurement of market shares. PX9000, Hemphill Report at ¶¶ 265-72 ("Additional features and uses"), 644-59 ("Market shares measured at the sub-app level"); PX9007, Hemphill Rebuttal Report at § 2.2.2.4  ("Presence of other activities on Facebook and Instagram does not refute the PSN market or diminish Meta's monopoly power").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified 100% of time spent on Reels is time spent engaged in "personal

social networking" – not just time spent on a personal social networking service – even if that time is spent engaging with non-friends-and-family content.  *See supra* Meta Introduction.  The FTC does not explain what additional or different context the above block quotes provide.  The FTC's recitation of conclusory assertions from Professor Hemphill's reports – including as to ultimate legal conclusions like the presence of "monopoly power" (an element of the FTC's claim) – does not create a dispute as to the fact that the FTC and Professor Hemphill have taken the position that all time spent on Reels is "personal social networking."

623.    Professor Hemphill similarly agreed that "watching short-form videos on Reels for entertainment purposes [is] personal social networking," Ex. 283 at 27:16-28:3 (Hemphill Dep. Tr.); *see also id.* at 28:12-19, and that "viewing of unconnected content on Reels" "contribute[s] to the overall satisfaction" of the demand for friends and family sharing, *id.* at 35:20-36:9.

**FTC Response: Undisputed but incomplete.**  Statement 623 is undisputed to the extent that it relays words that appear in the cited transcript, but it is incomplete in describing Professor Hemphill's testimony.  The exchanges with Professor Hemphill were as follows:

> Q. Okay.   So is watching short-form videos on Reels for entertainment purposes personal social networking?
>
> MS. CERILLI: Objection to form.
>
> A. I would say yes. Yes. It's part of the personal social networking service that Facebook provides as part of its integrated PSN services offering. And so yes, although in the moment, you know, the user may or may not be directly engaged with friends and family.
>
> Q. . . . You stated that watching videos on Reels is personal social networking services, correct?
>
> MS. CERILLI: Objection to form.
>
> A. It's -- it's consumption of the PSN services offering that Facebook provides, yes.

Ex. 283 at 27:16-28:11 (Hemphill Dep. Tr.).  Professor Hemphill's testimony continued:

> Q. . . . Is the viewing of unconnected content on Reels, does that satisfy a demand for friends and family sharing?
>
> MS. CERILLI: Objection to form.
>
> A. I mean, it's part of this overall integrated service provided by the app which is satisfying a demand for personal social networking services, that is a demand for friends and family sharing. It is contributing to the overall satisfaction of that demand, though, you know, in a given moment the user may not be directly engaged with friends and family.

Ex. 283 at 35:20-36:9 (Hemphill Dep. Tr.).

Furthermore, in his reports, Professor Hemphill explained in detail his opinion regarding time spent in PSN apps on additional features and uses that do not always entail direct interaction with friends and family as well as their relevance for the measurement of market shares. PX9000, Hemphill Report at ¶¶ 265-72 ("Additional features and uses"), 644-59 ("Market shares measured at the sub-app level"); PX9007, Hemphill Rebuttal Report at § 2.2.2.4 ("Presence of other activities on Facebook and Instagram does not refute the PSN market or diminish Meta's monopoly power").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified time spent on Reels watching videos for entertainment purposes is time spent engaged in "personal social networking" – not just time spent on a personal social networking service – even if that time is spent engaged with non-friends-and-family content.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 622 (addressing similar response).  The FTC does not explain what additional or different context the above block quotes provide.  The FTC's recitation of conclusory assertions from Professor Hemphill's reports – including as to ultimate legal conclusions like the presence of "monopoly power" (an element of the FTC's claim) – does

not create a dispute as to the fact that the FTC and Professor Hemphill have taken the position that all time spent on Reels is "personal social networking."

624.    Professor Hemphill agreed that, when a user watches two minutes of the Tonight Show on the Watch tab of Facebook, that use is included within "the personal social networking service provision" even "though in the moment the exact thing that they're doing at that moment may not have a direct engagement with friends and family sharing."  Ex. 283 at 76:7-22 (Hemphill Dep. Tr.).  He also agreed that such a user is "satisfying [a] demand for personal social networking services" even if the "user . . . never shares [that] video with any part of their social graph," as "[t]hey're still partaking of the integrated PSN service offering."  *Id.* at 78:7-18; *see also id.* at 79:16-80:7.

**FTC Response: Undisputed but incomplete.**  Statement 624 is undisputed to the extent that it relays words that appear in the cited transcript, but it is incomplete in describing Professor Hemphill's testimony.  The exchanges with Professor Hemphill were as follows:

> Q. Okay.  And I want you to suppose that a Facebook user opens the app, navigates to what is now called the video tab, and watches a two-minute video clip from The Tonight Show. . . . You agree that that two minutes of use is personal social networking, correct?
>
> ***
>
> A. Well, I would agree that Facebook is providing this integrated personal social networking service and that they are using that service, though in the moment the exact thing that they're doing at that moment may not have a direct engagement with friends and family sharing.
>
> Q. . . . Is it your position that that two minutes of use is included within personal social networking?
>
>  MS. CERILLI: Objection to form, foundation, and incomplete hypothetical.
>
> A. Yes, it is part of the personal social networking service provision, albeit with this caveat that I think is fair to acknowledge.

Ex. 283 at 75:14-76:22 (Hemphill Dep. Tr.) (emphasis added).

> Q. For a user that never shares video with any part of their social graph, is the viewing of video satisfying demand -- the viewing of video that I've described satisfying demand for personal social networking services?
>
> ***
>
> Well, I think their time on the app is doing so, albeit with the acknowledgement that in a particular moment they may not be directly engaged with -- with friends and family.  They're still partaking of the integrated PSN service offering.

Ex. 283 at 78:7-18 (Hemphill Dep. Tr.).

Furthermore, in his reports, Professor Hemphill explained in detail his opinion regarding time spent in PSN apps on additional features and uses that do not always entail direct interaction with friends and family as well as their relevance for the measurement of market shares. PX9000, Hemphill Report at ¶¶ 265-72 ("Additional features and uses"), 644-59 ("Market shares measured at the sub-app level"); PX9007, Hemphill Rebuttal Report at § 2.2.2.4 ("Presence of other activities on Facebook and Instagram does not refute the PSN market or diminish Meta's monopoly power").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified time spent watching public videos from unconnected sources is time spent engaged in "personal social networking" – not just time spent on a personal social networking service – even if that time is spent engaged with non-friends-and-family content.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 622 (addressing similar response).  The FTC does not explain what additional or different context the above block quotes provide.  The FTC's recitation of conclusory assertions from Professor Hemphill's reports – including as to ultimate legal conclusions like the presence of "monopoly power" (an element of the FTC's claim) – does not create a dispute as to the fact that the FTC and Professor Hemphill have taken the position

that all time spent viewing unconnected content on the Watch tab of Facebook is "personal social networking."

625.   Professor Hemphill confirmed his view that Instagram "is providing PSN services" when a user sends a message to a group of 11-20 other users on Instagram Direct. Ex. 283 at 82:6-16 (Hemphill Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  Statement 625 is incomplete because it omits a portion of the relevant question.  In the cited portion of testimony, Professor Hemphill testified, with respect to Instagram Direct:

> Q. Okay. And is it your opinion that *sending, reviewing messages sent* to a group of 11 -- between 11 and 20 other users is personal social networking?
>
> ***
>
> A.  I would say that in Instagram Direct being part of this integrated personal social networking offering of Instagram is providing PSN services through Instagram Direct as well as the other parts of the app.

Ex. 283 at 82:6-16 (Hemphill Dep. Tr.) (emphasis added).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement.  *See supra* Meta Introduction.

626.   Professor Hemphill testified about users that have different preferences and engage in different activities on Facebook and Instagram: "Q. . . . Let's talk about a user who spends very little time on Feed, very little time in Stories, loves Reels, spends a lot of time on Reels.  Another user, same amount of time on the app, lot of time in Feed, lot of time in Stories, very little time in Reels.  As I understand it, both of those users are consuming the same amount of personal social networking services, correct? . . .  A. Yes.  I think the underlying activities are in both cases as to each element in the pair consuming personal social networking services and,

as I have discussed, differing parts of the app or differing users in differing contexts maybe to varying degrees satisfying their demand for personal social networking services through their activities." Ex. 283 at 191:10-192:5 (Hemphill Dep. Tr.).

> **FTC Response: Undisputed.**

> ### d. Professor Hemphill's Opinion That No Activities on Alleged Non-PSNS Apps Are Personal Social Networking Activities

627.    In his deposition, Professor Hemphill testified that no time spent on alleged non-PSNS applications qualifies as PSNS.  For example, Professor Hemphill testified that "conceivably there are individuals" on TikTok who "turn to TikTok as a place to engage in that distinct demand for maintaining relationships and sharing experiences with friends, family, and social acquaintances in a shared social space[.]" Ex. 283 at 56:2-7, 56:22-57:7 (Hemphill Dep. Tr.).  Yet, when asked, "[i]s it your opinion that the activity of posting that short video to TikTok where it will be viewed by friends on TikTok is in a different market from the activity of posting it to Instagram where it will be viewed by followers on Instagram," Professor Hemphill testified that was his opinion, because "one is not engaged in the consumption of personal social networking services on the TikTok side." *Id.* at 52:19-53:21.

> **FTC Response: Disputed in part and incomplete.**  Statement 627 is undisputed to the extent that it relays words that appear in the cited transcript but is otherwise disputed and incomplete.

> The first sentence is undisputed.

> The second sentence in Statement 627 is disputed to the extent it suggests that quoted excerpts of the examiner's questions represented Professor Hemphill's testimony.  Professor Hemphill testified as follows:

> > A . . . if a user wanted to turn to TikTok as a place to engage in that distinct   demand   for   maintaining   relationships   and   sharing

> experiences with friends, family, and social acquaintances in a
> shared social space, *you wouldn't expect to find them there*. So part
> of the equation is the absence of their presence . . . .
>
> Q.  Is it your testimony that there are no individuals who turn to
> TikTok for a place to engage in demand for maintaining
> relationships and sharing experiences with friends, family, and
> social acquaintances in a shared social space?
>
> . . .
>
> A. No. I wouldn't put it quite that way. There may be -- conceivably
> there are individuals that are -- that are doing that. I don't think it's
> -- my opinion is that it's not a place to which users can reliably turn
> for that. I can't rule out the possibility that there may be individuals
> here and there that use the app in that fashion.

Ex. 283 at 56:2-57:7 (Hemphill Dep. Tr.) (emphasis added).

The third sentence is disputed as misleading because it suggests that the cited material

represents Professor Hemphill's testimony comparing TikTok to Instagram.  In fact, Professor

Hemphill asked several clarifying questions about the examiner's hypothetical and ultimately

responded to that hypothetical with the understanding that the "example involves TikTok on the

one hand and *Instagram Stories* on the other."  Ex. 283 at 52:19-53:21 (Hemphill Dep. Tr.)

(emphasis added).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Professor Hemphill testified 100% of time spent watching short-form video on TikTok is not

PSNS even if that time spent is maintaining relationships and sharing experiences with friends,

family, and social acquaintances in a shared social space.  *See supra* Meta Introduction.  The

FTC does not explain what additional or different context the above block quotes provide.

Professor Hemphill also addressed the question specifically with regard to Instagram Feed.  *See*

Ex. 283 at 55:1-6 (Hemphill Dep. Tr.).  The additional testimony the FTC references (without

providing the testimony in full) does not create a dispute as to the fact that Professor Hemphill

and the FTC have taken the position that no time spent on alleged non-PSNS applications qualifies as PSNS even if the time is spent sharing with friends and family in a shared social space.

628.    Professor Hemphill opined in his opening report that "[a] user can watch short-form videos on Reels for entertainment purposes, much as they do on TikTok or YouTube." Ex. 279 at ¶ 269 (Hemphill Rep.); *see also* Ex. 283 at 27:4-6 (Hemphill Dep. Tr.) ("I would agree that as a user spends time on [Facebook or Instagram] it's feasible to watch a video for entertainment purposes."). Professor Hemphill testified that "a user that is on the Facebook app watching a video is – is receiving personal social networking services and that context in which it's doing so differentiates the watching of the video from – from watching the same – let's say the exact same content on TikTok." *Id.* at 38:19-39:2.

**FTC Response: Undisputed but immaterial.** Statement 628 is undisputed to the extent that it relays words that appear in the cited report and transcript, but the fact that a user can watch short-form videos for entertainment purposes on Reels, TikTok, or YouTube does not establish that TikTok and YouTube are competitors in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. As Professor Hemphill explained in his opening report, "existence of additional features and uses [on PSN apps] does have potential relevance, not for the identification of market participants, but for the measurement of market shares." Ex. 279 at ¶ 268 (Hemphill Rep.).

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Professor Hemphill offered the quoted opinion and testified as quoted in the statement. *See supra* Meta Introduction.

629.     When shown the FTC's proffered industry expert, Professor Clifford Lampe's, testimony agreeing that some people use Twitter for personal social networking, Professor Hemphill testified, "I don't agree that Twitter has core functionality and use for personal social networking that would qualify it as a PSN app.  And so I don't think Twitter is engaged in personal social networking."  Ex. 283 at 82:18-84:8 (Hemphill Dep. Tr.).

**FTC Response: Disputed.**  Statement 629 is disputed because it is misstates the testimony that was shown to Professor Hemphill, and is misleading.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).  Professor Hemphill was not shown testimony from Professor Lampe "agreeing that some people" do, in fact, use Twitter for personal social networking; instead, Professor Hemphill was shown testimony from Professor Lampe that it's "possible" that "people could" use Twitter for personal social networking.  *See* Ex. 283 at 83:17-22 (Hemphill Dep. Tr.) ("Q. And he said 'I agree that's a possible use of Twitter that people could have, yes'; do you see that?  A. Yes. I don't have the context in which he's saying this just from looking at this sentence, but I see the sentence, yes.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement.  *See supra* Meta Introduction.

### e.     Professor Hemphill Acknowledges Evidence of Substitution Between Facebook and Instagram and Non-PSNS Apps

630.     Professor Hemphill testified regarding substitution:  "[T]he right way to think about this is . . . does a single organization that controls all the producers in the candidate market have the capability of monopolizing the market, that is of raising the quality-adjusted price above the competitive level. . . .  And substitution is important in – it's central in understanding that question."  Ex. 283 at 139:2-140:11 (Hemphill Dep. Tr.).

**FTC Response: Undisputed.**  Statement 630 is undisputed, subject to the caveat that the FTC notes that the relevant portion of Professor Hemphill's testimony that Meta presumably intended to cite in support of this paragraph begins at line 140:2 in Professor Hemphill's transcript, not line 139:2.

631.    Professor Hemphill was asked if, "[i]n reaching your opinions in this matter do you know whether TikTok is taking time spent share from Facebook and Instagram."  Ex. 283 at 130:10-12 (Hemphill Dep. Tr.).  He testified in response: ██████████████████

████████████████████████████████████████████████████

██████████████  *Id.* at 130:14-18.

**FTC Response: Undisputed but incomplete and immaterial.**  Statement 631 is incomplete because it omits the remainder of Professor Hemphill's answer, in which he testified, "[t]hat evidence is perfectly consistent with my opinions for reasons that I've tried to make clear."  Ex. 283 at 130:14-18 (Hemphill Dep. Tr.).  Furthermore, Statement 631 does not establish that TikTok is a competitor with Meta in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement.  *See supra* Meta Introduction.

632.    When asked, "[s]o what I'm asking you is[,] is TikTok capturing time spent from Facebook and Instagram," Professor Hemphill testified:  "██████████████████

████████████████████████████████████████████████████

██████████████████████████████, which is perfectly

consistent with the nature of competition here as I've tried to make clear." Ex. 283 at 132:8-17 (Hemphill Dep. Tr.).

**FTC Response: Undisputed but immaterial.** Statement 632 does not establish that TikTok is a competitor with Meta in the provision of personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement. *See supra* Meta Introduction.

### f.   Professor Hemphill Does Not Offer Any Quantitative Evidence of Substitution

633.    Professor Hemphill testified that he did not perform a hypothetical monopolist test because "a particular kind of analysis was infeasible to perform and would be misleading if it was performed." Ex. 283 at 140:12-141:8 (Hemphill Dep. Tr.).

**FTC Response: Disputed in part and misleading and incomplete.** Statement 633 is undisputed to the extent that it relays words that appear in the cited transcript but is otherwise disputed. Statement 633 is misleading and incomplete because Professor Hemphill did, in fact, perform a hypothetical monopolist test, and the results of that test supported his conclusion that there is relevant market for personal social networking services. *See* PX9007, Hemphill Rebuttal Report at ¶¶ 174-177, 181-182, 184-187; PX9000, Hemphill Report at ¶¶ 189-190, 193, 195. Professor Hemphill never testified that he did not perform a hypothetical monopolist test. In fact, when asked whether he had "data to perform a quantitative hypothetical monopolist test in this matter," Ex. 283 at 140:12-15 (Hemphill Dep. Tr.), Professor Hemphill testified, "I think I had data that allowed some quantitative analysis, that is an input into the hypothetical monopolist test, including the comparison of apps and the way in which they're used . . . . So to that extent I

would disagree that I lacked the data.  I had the data that I used."  Ex. 283 at 140:17-141:4

(Hemphill Dep. Tr.).  He also testified that in a monopolized market, "we want to understand

whether a hypothetical monopolist raising the quality-adjusted price from the competitive level

can do so profitably, and that question is informed by both qualitative and, where available,

quantitative sources."  Ex. 283 at 141:18-142:10 (Hemphill Dep. Tr.).  This testimony is

consistent with Professor Hemphill's opinions regarding his implementation of the hypothetical

monopolist test in his reports.  *See, e.g.*, PX9007, Hemphill Rebuttal Report at ¶¶ 174-228;

PX9000, Hemphill Report at ¶¶ 170-197.  Professor Hemphill summarized his implementation of

the horizontal monopolist test as follows: "I began with the candidate market of personal social

networking providers (a conservative choice, compared to the alternative of a market containing

Meta alone) . . . . Relying on a variety of evidence, I concluded that this collection of products

satisfies the HMT: it is a market capable of being monopolized, inasmuch as outsider firms

cannot effectively discipline the exercise of market power."  PX9007, Hemphill Rebuttal Report

at ¶ 187.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Professor Hemphill did not perform a hypothetical monopolist test.  *See supra* Meta

Introduction.  The foregoing materials the FTC cites are Professor Hemphill's assertions that his

review of qualitative materials – e.g., documents – led him to conclude that he had performed

"the HMT," without actually conducting a hypothetical monopolist test using any quantitative

data or econometrics.  The deposition testimony that Meta cited confirms that Professor

Hemphill did not perform a hypothetical monopolist test, e.g., he did not simulate whether a

hypothetical monopolist of all services in the alleged PSNS market could profitably increase

prices by 5% (or a small but significant amount) for a nontransitory period without losing

consumers to such a degree (crossing a critical loss threshold) that the price increase would be unprofitable (nor did he perform an analogous test using quality as a substitute for price).

634.    When asked, "[i]f I wanted to look in your reports for the best quantitative evidence of substitution, what would I look at," Professor Hemphill testified:  "Well, the quantitative evidence that bears on substitutability is the quantitative evidence that we talked about, which includes differences among apps, which includes the direct evidence of the exercise of monopoly power, which bears on this question of implementation of the hypothetical monopolist test.  I'm not offering an analysis of substitution in response to an infinite price rise at the monopolized level . . . because such – such analysis is misleading rather than informative." Ex. 283 at 142:16-143:11 (Hemphill Dep. Tr.).

**FTC Response: Undisputed.**

635.    When asked, "if I wanted to find quantitative evidence of substitution in response to any change in quality in your report, where would I look," Professor Hemphill testified, among other things, "I have not done an analysis of that kind."  Ex. 283 at 143:12-144:4 (Hemphill Dep. Tr.).

**FTC Response: Disputed and incomplete.**  Statement 635 is disputed as misleading and incomplete because Professor Hemphill's full answer indicated that he did not offer quantitative evidence of substitution "*of the particular kind that Meta's experts purport to be providing* . . . because it would be inappropriate to do so."  Ex. 283 at 143:12-144:4 (Hemphill Dep. Tr.) (emphasis added) ("Q. Right.  But just so I'm clear, if I wanted to find quantitative evidence of substitution in response to any change in quality in your report, where would I look?  . . . .  A. So of the particular kind that Meta's experts purport to be providing, which is I think of the kind that you're talking about, I have not done an analysis of that kind because I think it would be

646

inappropriate. So, for example, you know, Meta's breakdown for six hours, which was an infinite price increase, that's a kind of quantitative analysis, maybe the kind that you have in mind. I didn't do that because it would be inappropriate to do so.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill did not provide any quantitative evidence of substitution in response to any change in quality.  *See supra* Meta Introduction.  Professor Hemphill's assertion that it would be "inappropriate" to do empirical analysis lacks any support or explanation and does not create any genuine dispute of material fact.  The empirical work Meta's experts conducted is explained in detail above (*see supra* Meta SMF Part I.C.1-4).

### g.    Competition for Marginal Users

636.    Professor Hemphill testified, regarding a hypothetical monopolist increasing prices, "that small price increases focus our attention to the change in decision-making by marginal customers as opposed to also taking in the changes by inframarginal customers."  Ex. 283 at 159:14-18 (Hemphill Dep. Tr.).  He also testified:  "Q. And that's because what's relevant to a hypothetical monopolist choosing whether to implement a small but significant price change is the impact on marginal customers, correct?  . . .  A. I would – I would put it differently.  I would say it's because we want to understand whether a hypothetical monopolist can profitably impose a small price increase."  *Id.* at 159:19-160:5.  Professor Hemphill further testified:  "We're interested in whether small price changes are chosen by a profit-maximizing monopolist and the changes that we anticipate and are focused on are the changes of marginal customers as opposed to the inframarginal customers as well."  *Id.* at 162:10-15.

**FTC Response: Undisputed.**

637.     Professor Hemphill agreed that "[t]here is a sense in which competition often occurs at . . . the margin," Ex. 283 at 166:18-20 (Hemphill Dep. Tr.), that "[t]here's certainly an effort to gain users and usage wherever Meta can[,]" *id.* at 165:14-15, and that Meta adding Reels is an example of "pursuing users and usage on the margin," *id.* at 164:11-165:6.

**FTC Response: Undisputed but incomplete and immaterial.**  Statement 637 is undisputed to the extent that it relays words that appear in the cited transcript but is incomplete because it omits that while Professor Hemphill's testimony that although "[t]here's a sense in which [the addition of Reels to Facebook is] pursuing user -- usage at the margin.  That's neither here nor there for the hypothetical monopolist test . . . . I think it's neither here nor there for the implementation of HMT and its proper application."  Ex. 283 at 164:15-165:1 (Hemphill Dep. Tr.).  In addition, while Professor Hemphill testified that "[t]here's certainly an effort to gain users and usage wherever Meta can[,]" *id.* at 165:14-15, he explained that "doing so is consistent with the possession of monopoly power in the relevant antitrust market[] for personal social networking services."  *Id.* at 165:15-18.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement.  *See supra* Meta Introduction.

638.     Professor Hemphill testified that he "would agree that economic theory posits a tendency toward" consumers equalizing the marginal utility of the last minute spent on YouTube, TikTok, and Reels.  Ex. 283 at 168:9-21 (Hemphill Dep. Tr.).

**FTC Response: Disputed.**  Statement 638 is disputed as unsupported by the cited material as required by as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), because it mischaracterizes Professor Hemphill's testimony: nothing in the examiner's question or Professor Hemphill's answer referenced Reels.  In response to a question about

whether he agreed that "for a user the marginal utility of the last minute spend on TikTok is equal to the marginal utility of the last minute spent on YouTube," Ex. 283 at 168:9-12 (Hemphill Dep. Tr.), Professor Hemphill testified: "I would agree that economic theory posits a tendency toward that." *Id.* at 168:17-18.  Professor Hemphill further testified: "Whether or not it actually achieves it I don't have a view really.  I would doubt that it perfectly does, but there is a tendency." *Id.* at 168:19-21.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified economic theory posits a tendency toward consumers equalizing the marginal utility of the last minute spent on multiple services – including those above.  *See supra* Meta Introduction.  The additional material the FTC claims provides context does not create a dispute that the discussion was about Reels, TikTok, and YouTube, but instead obscures that clarity: "Q.  Right.  So would you agree that for a user the marginal utility of the last minute spent on TikTok is equal to the marginal utility of the last minute spent on YouTube? . . .  A. I mean, I don't think we all work like sort of clockwork.  Economic objects, whether that is being precisely achieved by individuals I think is subject to some doubt.  I would agree that economic theory posits a tendency toward that.  Whether or not it actually achieves it I don't have a view really.  I would doubt that it perfectly does, but there is the tendency.  Q.  Okay.  And the *same tendency would apply to the marginal utility of the last minute spent on, say, Reels? . . .  A. Yes.*"  Ex. 283 at 168:9-169:9 (Hemphill Dep. Tr.) (emphases added).  Also: "Q.  Right.  And just to finish my set of questions, the marginal utility of that last minute spent on *TikTok*, the marginal utility of the last minute spent on *YouTube*, the marginal utility of the last minute spent on *Reels*, the marginal utility of the last minute spent on *Feed*, we can agree that economic theory says there's a tendency for the user to equilibrate those, correct? . . .  A. I would agree that there's a

tendency toward equilibration which is consistent with the possession of monopoly power by a particular, you know, pair of apps in this case or by the existence of a relevant market for personal social networking services." *Id.* at 169:10-170:2 (emphases added).

639.     Regarding the makeup of marginal content that users might reduce on Facebook Feed in response to a decrease in quality, Professor Hemphill testified that "they would be reducing their consumption of feed content overall" because "they are seeing a consolidated feed." Ex. 283 at 195:4-196:16 (Hemphill Dep. Tr.).  Professor Hemphill agreed that users are likely to reduce marginal minutes that "would be coming from stuff relatively bottom feeding which are less effective in satisfying friends and family sharing." *Id.* at 199:12-19.  He testified that "might be true in general across users," as he thinks the evidence he relies on "is general" across users. *Id.* at 199:22-200:7.

**FTC Response: Disputed in part.**  Undisputed that Statement 639 contains excerpts from Professor Hemphill's testimony but Statement 639 is disputed in part as incomplete because it does not include relevant testimony from Professor Hemphill.  In response to the question "And you take the position that when a user reduces usage in response, for example, to an increase in ad load that they are likely to reduce their consumption of content that is less tightly connected to friends and family sharing than other types of content?" Professor Hemphill testified: "To the extent that this point in [paragraph 442 of his rebuttal report] relying on the depositions is – is accurate, I think it would follow that the incremental minutes would be coming from stuff relatively bottom feeding which are less effective in satisfying friends and family sharing.  I think that seems – I think that that follows from the supposition that these deposition excerpts are correct." Ex. 283 at 199:5-19 (Hemphill Dep. Tr.).  The third sentence in this statement is also incomplete because it does not include relevant testimony from Professor

Hemphill indicating that he was unsure if his previous answer would apply to all users.  *See* Ex. 283 at 199:22-200:7 (Hemphill Dep. Tr.) ("I don't know whether it's true for all users. I think it might be true in general across users. . . . I don't know based on these deposition excerpts if that's true always across all users or has been true over all time").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill agreed time spent that consumers might reduce on Feed in response to a decrease in quality on Facebook or Instagram would include content that is generally not friends-and-family content, or that a user Feed is consolidated content and not only friends-and-family content.  *See supra* Meta Introduction.  The additional deposition excerpts that the FTC cites do not dispute those admissions, nor does the FTC explain what necessary context or clarification the additional testimony provides.

### h.    No Evidence of Discrimination Based on Demand for Friend and Family Content

640.    When asked, "[s]o it's correct to say that you don't have any claim that Meta discriminates in ad load based directly on a user's demand for friends and family sharing," Professor Hemphill testified, "I've not seen evidence of Meta, for example, internally calculating, you know, some numerical value of inelasticity and responding with a change in ad load."  Ex. 283 at 253:8-17 (Hemphill Dep. Tr.).

**FTC Response: Disputed.**  Statement 640 is disputed because it is contradicted by Professor Hemphill's testimony, misleading and incomplete. *See* Fed. R. Civ. P. 52(c)(2). Professor Hemphill testified:

> Q. Okay.  So it's correct to say that you don't have any claim that Meta discriminates in ad load based directly on a user's demand for friends and family sharing?
>
> MS. CERILLI: Objection to form.

> A. I don't know whether they do or not, but I've not seen evidence of Meta, for example, internally calculating, you know, some numerical value of inelasticity and responding with a change in ad load. You know, what I've seen that comes closest is this last measure of price discrimination, the individuals with low sensitivity to ads which, you know, incorporates that [i.e., a user's demand for friends and family sharing] but may not be incorporating **only** that, you know, specific attribute. It's a little unclear would say what exactly is happening when they price discriminate with respect to low sensitivity to ads.

Ex. 283 at 253:8-254:3 (Hemphill Dep. Tr.) (emphasis added).

Thus, Professor Hemphill testified that he has seen evidence of "price discrimination" against "individuals with low sensitivity to ads," which "incorporates" a user's demand for friends and family sharing "but may not be incorporating only that . . . specific attribute." *Id.* Furthermore, Statement 640 is misleading and contradicted by Professor Hemphill's opinions that Meta has price discriminated in ad load based on users' demand for friends and family sharing. *See, e.g.*, PX9007, Hemphill Rebuttal Report at ¶ 107 ("First, evidence shows that Meta has price discriminated against users who more intensely use Facebook and Instagram for friends and family sharing, in the form of differential ad load."), ¶ 339 ("price discrimination . . . insulates Meta from competition for users with inelastic demand for friends and family sharing"), ¶ 351 ("As the foregoing shows, Meta is in fact targeting users with a strong taste for friends and family sharing. Meta subjects such users with inelastic demand for friends and family sharing to higher ad load and lower efforts to improve quality and innovation related to friends and family sharing.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill has seen no evidence that Meta "price discriminates" against demand for friends-and-family sharing by showing more ads to users fulfilling that demand by sharing with friends and family or engaging with friends and family on Meta's services relative to other

activities on Meta's services.  *See supra* Meta Introduction.  The additional material the FTC

adds in its response does not undermine that conclusion or create a genuine dispute of material

fact – it confirms the point.  The FTC's observation that Meta "price discriminates" against users

with "low sensitivity to ads" means that Meta shows more ads to users that have a low sensitivity

to them, i.e., that engage with advertising and click on advertisements (a proxy for receptivity to

and enjoyment of advertising), instead of scrolling past ads (Meta shows these users who simply

scroll past ads relatively fewer ads).  The FTC's citations to Professor Hemphill's rebuttal report

do not undermine his deposition testimony, but instead confirm that those statements in his

rebuttal report – pre-dating his deposition (when he made the above-quoted admissions) – do not

in fact concern price discrimination as to friends-and-family sharing.  Paragraph 107 refers to

Professor Hemphill's finding that Meta shows ██████████████████████████

████ ; there is no evidence or material cited to support the claim that ████████ engage in more

friends-and-family sharing than ██████████ .  When asked about that at his deposition,

Professor Hemphill testified:  "Q. So do you – am I to understand that there's price

discrimination ████████████████████████████ , or is that not price

discrimination? . . .  A. I've not seen record evidence that they're engaged in price discrimination

along these dimensions in exactly that way.  The evidence that I've seen with respect to ████

████████████████████████████ as I discuss with some detail in both – both reports.  It's

conceivable that they're engaged in forms of price discrimination that I have not been able to

uncover, though I haven't seen evidence of – of that."  Ex. 283 at 254:22-255:14 (Hemphill Dep.

Tr.).  Professor Hemphill admitted that he had not attempted to measure demand for friends-and-

family sharing:  "Q. Okay.  Let's try to take it a step at a time.  You could measure directly a

user's demand for friends and family sharing, yes or no? . . .  A. I don't know what you have in

mind about directly measuring the demand for friends and family sharing.  So at this level of generality I'm not sure whether I could or not."  *Id.* at 251:11-18.  Paragraph 339 of Professor Hemphill's rebuttal report cites no record materials or evidence, let alone anything showing any price discrimination against friends-and-family sharing demand.  The conclusory paragraphs the FTC cites do not create a genuine dispute of material fact.  Professor Hemphill has no evidence and is aware of no evidence that Meta price discriminates against users satisfying a friends-and-family sharing demand by showing them more ads than users engaging in other activities on Meta's services.

641.   When asked, "with respect to privacy and privacy settings, you don't argue that privacy settings are different for individual users," Professor Hemphill testified:  "No.  No.  I mean, I think it's conceivable that – no.  As I understand it, privacy – the privacy protection that is an attribute of quality for Facebook and for Instagram, that that is app wide."  Ex. 283 at 173:9-17 (Hemphill Dep. Tr.).

**FTC Response: Undisputed.**

642.   With respect to Reels and Stories, Professor Hemphill agreed that they were made available on an app-wide basis for all users.  *See* Ex. 283 at 173:18-174:13 (Hemphill Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  Statement 642 is incomplete because Professor Hemphill noted that Reels and Stories might not have been made available on an app-wide basis immediately because there might have been a "difference in rollout."  *See* Ex. 283 at 173:18-174:13 (Hemphill Dep. Tr.).

### i.      Share Calculations

643.   Meta's expert economist, Professor Dennis Carlton, calculated Meta's share of time spent including Twitter, TikTok, and YouTube as █████ using Professor Hemphill's time-spent data for June 2022, as follows:



Ex. 2 at p. 90, tbl. 14 (Carlton Rep.).

**FTC Response: Disputed in part.**  Statement 643 is undisputed to the extent that it

relays a screenshot of a table that appeared in the cited report but is otherwise disputed.  The

FTC otherwise disputes Statement 643 because it fails to establish the absence of a genuine

dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Using data from June 2022,

Professor Carlton calculated Meta's MAU shares amongst firms that included (1) the participants

in Professor Hemphill's market for personal social networking services; plus (2) YouTube,

TikTok, and Twitter, based on his substitution analysis.  *See* Ex. 2 at ¶¶ 96-97 (Carlton Rep.).

As Professor Hemphill explained, however, Professor Carlton's substitution analysis based on

his outage study is flawed for several reasons.  *See* PX9007, Hemphill Rebuttal Report at ¶¶ 371-

414.  Professor Carlton's calculations are thus irrelevant to the existence of a personal social

networking services market, Meta's share of the personal social networking services market, and

Meta's exercise of monopoly power in that market, because YouTube, TikTok, and Twitter do

not participate in the market for personal social networking services.  *See also* CMF at

§§ II.A.5.b, II.A.5.c.1.

> **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta's share is below ▮▮▮ when YouTube, TikTok, and Twitter are included based on the

substitution and diversion analyses that Professor Carlton and Professor List performed.  *See*

*supra* Meta Introduction.  This is true whether measured by U.S. monthly active users (as in

Table 14 from Professor Carlton's report) or time spent on the services:



Ex. 2 at p. 91, tbl. 16 (Carlton Rep.).  The FTC's citation to multiple entire sections of its

Counterstatement without explanation or context is improper and requires no further reply.  The

FTC's cross-reference to multiple sections of its Counterstatement without explanation does not

itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

644.     Professor Hemphill testified regarding market shares:  "Q. You do not contest in your reports that if YouTube and TikTok are included in the market Meta's market shares do not provide a basis for an inference of monopoly power, correct? . . . I'd have to see what the shares look like.  The shares if those two are included would certainly go down and I'd have to look to see what I made of that under those circumstances."  Ex. 283 at 266:13-21 (Hemphill Dep. Tr.).  He also testified about that share calculation:  "Well, if the share was lower, to the extent that we pay attention to market shares as I discuss we do, the indirect evidence arising from market definition would be altered in the expected way because the shares were lower."  *Id.* at 267:6-12.

**FTC Response: Undisputed but incomplete.**  Statement 644 is undisputed to the extent that it relays words that appear in the cited transcript, but the FTC objects that Statement 644 is incomplete because in addition to the testimony cited in the second sentence regarding market share calculations, Professor Hemphill testified, "The direct evidence of monopoly power would be – would be unaffected."  Ex. 283 at 267:6-12 (Hemphill Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified as quoted in the statement.  *See supra* Meta Introduction.

### 3.     FTC Expert Michal Malkiewicz's Opinions

645.     The FTC retained Michal Malkiewicz as a purported expert to conduct an online survey "to assess consumers' usage of and attitudes toward Meta's products and other internet services."  Ex. 299 at ¶ 25 (Malkiewicz Rep.).  Mr. Malkiewicz's survey "ask[ed] respondents" to choose from a list of eleven reasons "the[ir] most important reason for using each internet service that they had identified using in the past 12 months."  *Id.* at ¶ 55.

**FTC Response: Undisputed but incomplete.**  The first sentence is undisputed but incomplete to the extent that the phrase "purported expert" suggests that Mr. Malkiewicz lacks qualifications: he is a highly qualified and experienced expert in survey research methods. Ex. 299 at ¶ 1-7 & Schedule 1 (Malkiewicz Rep.).  The second sentence is undisputed but incomplete because one of the eleven answer options cited in the second sentence was an "Other" option, which gave respondents the ability to write in their own answer.  Ex. 299 at ¶ 55 (Malkiewicz Rep.).

646.    Mr. Malkiewicz's survey found that more than 63% of respondents who reported using Instagram did not select "[t]o keep up with [their] friends' and family's lives in one place" as their "most important reason[ ]" for using Instagram.  Ex. 299 at p. 36, tbl. 6 (Malkiewicz Rep.).  Those respondents instead selected "[t]o enjoy entertainment content," "[t]o follow or interact with public figures," "[t]o obtain and/or share news and information about [their] interests," "[t]o communicate privately with [their] contacts," and other options as their "most important" reasons for using Instagram.  *Id.*

**FTC Response: Undisputed but immaterial and incomplete.**  Statement 646 is undisputed to the extent it accurately reports words that appear in the cited material.  Statement 646 is incomplete because it omits that "[t]o keep up with my friends' and family's lives in one place" was selected by respondents more than any other answer option as their "most important reason" for using Instagram.  Ex. 299 at ¶ 74 & Table 6 (Malkiewicz Rep.).  The FTC objects that Statement 646 does not establish the absence of a genuine dispute regarding any material fact: the fact that some survey respondents selected answers other than "[t]o keep up with my friends' and family's lives in one place" does not suggest that Instagram does not provide personal social networking services, that there is not a relevant market for personal social

networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P.
56(c)(1)(B).

      **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that,
despite the FTC's claim that Instagram has a "core use" of "friends and family sharing," the
majority of respondents to the Malkiewicz survey did not select friends-and-family sharing as the
"most important reason" for using Instagram.  *See supra* Meta Introduction.

      647.    In his report, Mr. Malkiewicz cited a 2021 Meta survey ███████████
that, according to him, "aimed to clarify the role of friends and family and interests on Instagram
usage."  Ex. 299 at ¶ 127 (Malkiewicz Rep.).  When that survey asked respondents whether they



. Ex. 266 at -175 (MetaFTC-DX-1116, FTC-META-
012193165).  After noting ████████████████████████████
██████, *id.* at -179, the survey report observed that ████████████████████
████████████████████████████████████████████
█████████████ *see id.* at -180.  The survey report shows that change graphically:



**FTC Response: Disputed in part and incomplete.** Statement 647 is undisputed to the extent it accurately reports words that appear in the cited material but is otherwise disputed. The FTC disputes that Statement 647 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute regarding a material fact: Meta's observations regarding ████████████████████████████ ████████████████████████████████████████ does not suggest that Meta does not provide personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power. *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).

The FTC disputes the statement "████████████████████████" as unsupported by the underlying graphic to which the statement relates: the figures do not indicate that ████ ████████████████████████, instead the graphic indicates the

███████████████████████████████████████████████████

█████████████████████

The second, third, and fourth sentences are disputed and are incomplete, as Meta fails to report that the information cited from the left chart, *see* Ex. 266 at -175, -179, -180 (MetaFTC-DX-1116, FTC-META-012193165), ████████████████████████████

████████████ *See* Ex. 266 at -182 (MetaFTC-DX-1116, FTC-META-012193165).  Other pages within Ex. 266 ██████████████████████████████████

██████████. *See* Ex. 266 at -180 (the right chart), -182 (MetaFTC-DX-1116, FTC-META-012193165) ("US impressions per DAU YoY").  Understanding the results █████████ is important given that "███████████████████████████████████

█████████████████████." Ex. 266 at -169, 182 (MetaFTC-DX-1116, FTC-META-012193165).

The first sentence is undisputed.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, despite the FTC's claim that Instagram has a "core use" of "friends and family sharing," ████

████████ respondents to a survey the FTC's proffered expert relied upon ████████████████

████████████████████████. *See supra* Meta Introduction.  According to the survey report, █████████████████████████

████████████████████████. *See* Ex. 266 at -182 (MetaFTC-DX-1116, FTC-META-012193165).  The FTC provides no explanation how comparing ██████████████████████ meaningfully changes the conclusions.

648.    The same survey report found that ███████████████████

██████████████████████████████ Ex. 266 at -181

(MetaFTC-DX-1116, FTC-META-012193165).  The graph below shows that respondents

█████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.*



**FTC Response: Disputed in part and incomplete.**  Statement 648 is undisputed to the

extent it accurately reports words that appear in the cited material but is otherwise disputed.  The

FTC disputes in part Statement 648 as not supported by the cited material as required by Federal

Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), and disputes Statement 648 because

the material cited does not establish the absence of a genuine dispute regarding a material fact:

Meta's observation that some users reported ████████████████████████████████

█████████████ does not suggest that Meta does not provide personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes the proposition claimed in the second sentence, that respondents "███████████████████████████," because it is not supported by the cited material. The chart displayed in the image above shows ████████████████████████ ████████████████.  *See* Ex. 266 at -181 (MetaFTC-DX-1116, FTC-META-012193165). Neither the chart nor the information contained on the cited page indicates whether respondents ███████████████████████████████████ █████████████.  The results displayed instead indicate that respondents ███████████ ███████████████████████████████████ ███████████████████████ at the time the survey was conducted.  *See* Ex. 266 at -182 (MetaFTC-DX-1116, FTC-META-012193165).  Respondents █████████████ ███████████████████████████████████ █████████████████████████.  *See* Ex. 266 at -182 (MetaFTC-DX-1116, FTC-META-012193165).

The FTC also notes that, like the preceding Statement 647, Statement 648 does not report that the information cited from pages -175, -179, and -180 (the left chart) of Ex. 266 ████████ ███████████████████████████████ *See* Ex. 266 at -182 (MetaFTC-DX-1116, FTC-META-012193165).  Other pages within Ex. 266 ██████████████████ ███████████████████████████.  *See* Ex. 266 at -180 (the right chart), -182 (MetaFTC-DX-1116, FTC-META-012193165).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, despite the FTC's claim that Instagram has a "core use" of "friends and family sharing," nearly ███ of respondents to a survey the FTC's proffered expert relied upon whose ████████████████

█████████████████████████████████

█████████████████████████████████. Ex. 266 at -181 (MetaFTC-DX-1116, FTC-META-012193165) (emphasis in original); *id.* at -182 (reporting that ███████████

███████████████████████); *see also supra* Meta Introduction.  The survey report also shows that ███████████████████

████████████████████████████████

█████████████ *Id.* at -178, -179; *see also id.* at -179 ("████████████

█████████████████████████████

██████████") (emphasis in original).

649.    Mr. Malkiewicz's survey ██████ found that nearly 66% of respondents who reported using Snapchat did not report "[t]o keep up with my friends' and family's lives in one place" as their "most important reason[ ]" for using Snapchat.  Ex. 299 at p. 38, tbl. 7 (Malkiewicz Rep.).  Those respondents instead chose "[t]o communicate privately with my contacts" and "[t]o enjoy entertainment content," among other options, as their "most important" reasons for using Snapchat.  *Id.*  Mr. Malkiewicz confirmed that the difference between the two most commonly selected "most important" reasons for using Snapchat – "[t]o communicate privately with my contacts" and "[t]o keep up with my friends' and family's lives in one place" –

"is not statistically significant at the 99% confidence level."  Ex. 300 at ¶ 133 (Malkiewicz Rebuttal Rep.).

**FTC Response: Undisputed but immaterial and incomplete.**  Statement 649 is undisputed to the extent it accurately reports words that appear in the cited material.  The FTC objects that Statement 649 does not establish the absence of a genuine dispute regarding a material fact: the fact that some users reported "most important" reasons for using Snapchat other than "[t]o keep up with my friends' and family's lives in one place" does not suggest that Snapchat does not provide personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC objects to the first sentence of Statement 649 as incomplete, because it omits that "[t]o keep up with my friends' and family's lives in one place" was selected by respondents more than any other answer option as their "most important reason" for using Snapchat.  *See* Ex. 299 at ¶ 76 & Table 7 (Malkiewicz Rep.).

Additionally, the second sentence omits that while the difference between the percentage of Snapchat respondents who selected "[t]o keep up with my friends' and family's lives in once place" and "[t]o communicate privately with my contacts" was not statistically significant at the 99% confidence level, the difference between the percentage of Snapchat respondents who selected "[t]o keep up with my friends' and family's lives in once place" and the third-most commonly selected answer ("[t]o enjoy entertainment content") was statistically significant at the 99% confidence level.  *See* Ex. 300 at ¶ 133 (Malkiewicz Rebuttal Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, despite the FTC's claim that Snapchat has a "core use" of "friends and family sharing," the

majority of respondents to the Malkiewicz survey did not select friends-and-family sharing as the "most important reason" for using Snapchat.  *See supra* Meta Introduction.

650.    Mr. Malkiewicz also reported that 26.1% of respondents who reported using Instagram, nearly 17% of respondents who reported using Twitter, 27.2% of respondents who reported using Pinterest, and 27.4% of respondents who reported using Reddit selected "[t]o enjoy entertainment content" as their most important reason for using those apps.  Ex. 299 at pp. 36, 48, 50, 52, tbls. 6, 12-14 (Malkiewicz Rep.).

**FTC Response: Undisputed but immaterial.**  Statement 650 is undisputed to the extent it accurately reports words that appear in the cited material.  The FTC objects that Statement 650 does not establish the absence of a genuine dispute regarding a material fact: the fact that some users of various services reported that their "most important" reason apps was "[t]o enjoy entertainment content" does not suggest that Instagram does not provide personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, despite the FTC's claim that Instagram has a "core use" of "friends and family sharing," a similar percentage of respondents to the Malkiewicz survey selected entertainment as their most important reason for using Instagram and other apps outside the FTC's alleged market.  *See supra* Meta Introduction.

651.    At least a quarter of respondents who reported using WhatsApp, Facebook Messenger, or text messaging – which Mr. Malkiewicz defined to include iMessage and Android Messaging – identified "[t]o keep up with my friends' and family's lives" as their "most

important" reason for using those services.  Ex. 299 at ¶¶ 53, 91 & pp. 56-59, tbls. 16-18 (Malkiewicz Rep.).

**FTC Response: Undisputed but immaterial and incomplete.**  Statement 651 is undisputed to the extent it accurately reports words that appear in the cited material.  The FTC objects that Statement 651 is incomplete because it omits that for all three of WhatsApp, Facebook Messenger, and Text Messaging/iMessage/Android Messaging, a majority of respondents answering for each service selected "[t]o communicate privately with my contacts" as their most important reason for using the service.  Ex. 299 at ¶¶ 89-91 & Tables 16-18 (Malkiewicz Rep.).  The FTC objects that Statement 651 does not constitute a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute: the fact that some users of WhatsApp, Facebook Messenger, and "text messaging" reported that their "most important" reasons for using the app was to "[t]o keep up with my friends' and family's lives in one place" does not suggest that Meta does not provide personal social networking services, that there is not a relevant market for personal social networking services, or that Meta is not exercising monopoly power.  *See* Fed. R. Civ. P. 56(c)(1); 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, despite the FTC's exclusion of messaging apps from the claimed relevant market, a quarter of respondents to the Malkiewicz survey selected friends-and-family sharing as their most important reason for using messaging apps.  *See supra* Meta Introduction.

652.    Mr. Malkiewicz reported that he "never set out to measure economic substitution" with his survey, Ex. 300 at ¶ 99 (Malkiewicz Rebuttal Rep.), testifying that measuring "economic substitution . . . was not part of [his] assignment," Ex. 301 at 73:3-10 (Malkiewicz

Dep. Tr.).  And Mr. Malkiewicz confirmed that he did "not calculate the amount of time spent

for each use" by respondents, *id.* at 85:10-20, or "review any datasets" showing how users

actually spend their time on Meta's or other apps, *id.* at 93:16-19.

**FTC Response: Undisputed.**

III.     **META'S ACQUISITIONS**

A.     **Meta's Acquisition of Instagram (2012)**

653.     Meta served a contention Interrogatory (No. 17) seeking the factual basis for the

FTC's position that Meta is engaged in an ongoing violation of Section 2 of the Sherman Act.

Ex. 297 at 54-56, FTC's Resp. to Meta Interrog. No. 17 (FTC's Objs. & Resps. to Meta's Third

Set of Interrogs. (May 3, 2023)).  The FTC responded that "Meta's course of conduct of holding

Instagram and WhatsApp is ongoing," and that "publicly available documents" establish that

Meta "continues to operate Instagram and WhatsApp" – identifying no other conduct.  *Id.*

**FTC Response: Disputed.**  Statement 653 misstates Meta's Interrogatory No. 17, and

the FTC's response.  Meta's Interrogatory No. 17 did not "seek the factual basis for the FTC's

position that Meta is engaged in an ongoing violation of Section 2 of the Sherman Act."  Rather,

that Interrogatory asked the FTC to identify all relevant facts on which the FTC based – at the

time it drafted the Complaint – a specific allegation in ¶ 233 of the Amended Complaint.

Ex. 297 at 54, FTC's Resp. to Meta Interrog. No. 17 (FTC's Objs. & Resps. to Meta's Third Set

of Interrogs. (May 3, 2023)) ("Identify all relevant facts supporting Your allegation, in Paragraph

233 of the Amended Complaint and in briefing to the Court on Motion to Dismiss, that Meta is

engaged in an ongoing violation of Section 2 of the Sherman Act.").  The FTC's response to

Interrogatory No. 17 did not purport to provide the evidence developed during discovery that

supports "the FTC's position," as Statement 653 suggests.  Instead, the FTC's response objected

to the Interrogatory, and stated

> [i]t is not a meaningful exercise, and is disproportionate to the needs of the case, for the FTC to list out for Meta each document or each fact within the discovery record or publicly available sources that demonstrate that Meta continues to hold, integrate, own, and operate Instagram and WhatsApp . . . to the extent that Meta is requesting the FTC to explain further its briefing in the motion to dismiss or why the alleged facts constitute an ongoing violation of Section 2, Meta is equally well positioned to apply the facts that the FTC has already identified to the law.  For the reasons stated above, the FTC directs Meta to its own public filings and documents in response to this Interrogatory.

*Id.* at 54-56.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that in response to Interrogatory No. 17 – which sought "all relevant facts" supporting the specific paragraph in the FTC's amended complaint alleging an "ongoing violation of Section 2 of the Sherman Act" – the FTC identified no conduct other than Meta's continued operation of Instagram and WhatsApp to show that Meta is engaged in an ongoing Section 2 violation.  *See supra* Meta Introduction.

### 1. Instagram Pre-Acquisition

#### a. Pre-Acquisition Monetization

654.    Kevin Systrom – one of the Instagram co-founders, *see* Ex. 284 at 15:9-10 (Systrom IH Tr.) – testified that, before the Meta acquisition, Instagram had essentially "no revenues" and agreed that Instagram "hadn't begun the process of developing an advertising strategy."  Ex. 151 at 213:24-214:10, 215:1-4 (Systrom Dep. Tr.).  He also testified: "Q. . . . [A]t the time of the Facebook acquisition, Instagram did not have a plan for exactly how it was going to monetize, correct? . . .  [A.] That's correct."  *Id.* at 325:8-13.

**FTC Response: Disputed in part.**  The FTC does not dispute that Mr. Systrom is one of the co-founders of Instagram, or that the quoted language appears in the cited transcript, but otherwise disputes Statement 653 as described herein.

The FTC disputes the first sentence of Statement 654 that Instagram had "no revenues," although the FTC does not dispute that Instagram had limited revenues prior to the closing of its acquisition by Meta in September 2012. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

The FTC further disputes the second sentence of Statement 654 as incomplete and misleading because ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact regarding Instagram's pre-acquisition revenue or plans to monetize through advertising. *See supra* Meta Introduction.  The FTC does not cite any evidence showing whether Instagram had any revenue before the acquisition (and if so how much).  The additional testimony from Mr. Systrom that the FTC claims is necessary for completeness in fact reinforces that Instagram had no concrete plan to monetize through advertising before the acquisition:  "[W]e hadn't hired

a team.  We didn't – we hadn't done anything other than pitch ideas on advertising."  Ex. 151 at

214:22-24 (Systrom Dep. Tr.).  Additional evidence confirms that Instagram had no advertising

business before the acquisition and no concrete plan to build one.  *See*, *e.g.*, Meta SMF ¶¶ 654-

655; *see also* Ex. 284 at 95:4-6 (Systrom IH Tr.) ("[W]e had no immediate [monetization] plans.

We didn't have an effort on it.  We didn't have engineers.  We had zero – zero built around

that."); Ex. 479 at -650 (FB_FTC_CID_08707650) (Mr. Systrom wrote to a potential advertising

partner in July 2011, "At this time we're not looking to add advertising inside the platform, but

I'll make sure to reach out if that becomes a priority."); *see also* Meta Resp. to Counter SMF

¶ 2109.

655.  ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████

**FTC Response: Disputed in part.**  The FTC objects to the term "pre-acquisition" as

vague as to time and unsupported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R.

7(h).

The FTC does not dispute that ████████ is a partner at ██████████, that ██████

██████ invested in Instagram prior to Instagram's acquisition by Meta, or that the quoted

language appears in the cited transcript, but otherwise disputes Statement 655 as described

herein.

The FTC disputes Statement 655 as incomplete and misleading.  Prior to being acquired

by Meta, Instagram raised the capital ██████████ references in his testimony (via a $50 million

Series B funding) round and planned to use the funding to build its team and infrastructure.  See

PX6146, Krieger (Meta/Instagram) Dep. Tr., at 20:19-21:20 ("Q. And do you recall how much

Instagram raised as part of that Series B?  A. I believe the total was $50 million.  Q. So you

raised $50 million in early 2012.  What did you plan to do with that $50 million?  A. Primarily,

scale up the team – we were already fairly popular at that time and our engineer team was quite

small – and scale up the infrastructure . . . ."). ████████████████████████

███████████████████████████████████████████

█████████████████████████

     Further, Statement 655 omits that, ██████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that,

prior to the acquisition, Instagram needed capital.  *See supra* Meta Introduction.  Indeed, the

FTC does not dispute any of the facts stated in this paragraph.  The FTC suggests that, once

Instagram had raised capital in its series B round, it no longer needed capital, but it cites no

evidence to support that claim.  The additional material the FTC cites for completeness regarding how Instagram planned to monetize is irrelevant and nonresponsive to the fact stated in this paragraph.  Mr. Krieger's testimony makes no reference to monetization.  Evidence confirms that Instagram had no advertising business before the acquisition and no concrete plan to build one, as stated above in Meta's reply to paragraph 654.

656.    In March 2012, Amy Cole – who then handled Instagram's business operations, Ex. 152 at 23:21-24:6 (Cole Dep. Tr.) – wrote in an email to a business inquiring about a "media partnership opportunity" that Instagram was "still a very small company (only 11 people), so [it did not] have the capacity to take on partnerships at this time," and was not "promot[ing] specific brands/events/contests on [its] platform."  Ex. 323 at -847-848 (PX10556, FTC-META-000018842).

**FTC Response: Disputed in part.**  The FTC objects to the description of Ms. Cole's role as having "handled Instagram's business operations" as vague.

The FTC does not dispute that the quoted language appears in the cited document, but otherwise disputes Statement 656 as described herein.

The FTC disputes Statement 656 as incomplete because it ignores other statements in the same email chain in which Ms. Cole offered "to talk through other ways for Instagram to be involved" and "to talk through any of [Instagram's] policies around partnerships or about ideas for how to use Instagram for photo submission/display (if you do choose to integrate Instagram)."  Ex. 323 at -847 (PX10556, FTC-META-000018842); *see also id.* at -847 (explaining that "[w]e also use our blog to tell interesting user stories and keep them updated about community-related events, so we may be able to work something in to [sic] a larger blog post.").  Ms. Cole also provided a four-page document demonstrating "best practices or

examples" from previous "campaigns and competitions," *id.* at -847, listing "Recent Event Examples" and "Recent Campaign Examples," as well as: "Primary Ways to Use Your Instagram Account," "Tips For Managing Your Instagram Account," "Useful Links," "Website/Live Display Examples," and "Account Examples." *Id.* at -843-846.

The FTC also disputes Statement 656 as the cited material does not show the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). Ample evidence indicates, *inter alia*, that Instagram was well-positioned to build an advertising business without being acquired by Meta, that advertisers were interested in Instagram, and that Meta did not deliver any benefits to Instagram related to advertising for which Meta's acquisition was necessary. *See* CMF at §§ V.C.1, 3-4; *see also supra* at FTC Response to Statement 655.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact regarding Instagram's ability, prior to the acquisition, to take on partnerships or promote specific brands, events, or contests. *See supra* Meta Introduction. The FTC does not dispute that in March 2012, Ms. Cole turned down a media partnership opportunity because Instagram lacked capacity. The FTC cites additional correspondence between Ms. Cole and the inquiring company, none of which shows that Instagram was able to take on the opportunity it declined. *See* Ex. 323 at -843-847 (PX10556, FTC-META-000018842). The FTC cites no other evidence that Instagram was in a position to take on partnerships or promote specific brands, events, or contests prior to the acquisition.

The FTC's further response that "Instagram was well-positioned to build an advertising business without being acquired by Meta" is irrelevant and nonresponsive to the fact stated in this paragraph. Meta's reply to paragraph 654 above, and Meta's response to paragraph 2109 of the FTC's Counterstatement, which Meta incorporates here, state extensive evidence showing

that Instagram had no advertising business before the acquisition and no concrete plan to build one.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

### b. Pre-Acquisition Growth

657.    Just before the acquisition, Instagram had 13 employees.  *See* Ex. 284 at 99:20-21 (Systrom IH Tr.).  Mike Krieger – the other Instagram co-founder, *see* Ex. 302 at 12:6-21 (Krieger IH Tr.) – testified that "we had more work than we had the capacity to do" and "our recruiting efforts thus far had been – had yielded great people but at a slow pace."  Ex. 153 at 305:16-19 (Krieger Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the terms "just before the acquisition" and "we" as vague, and to Statement 657 as vague as to time.

The FTC does not dispute the first sentence of Statement 657, although notes that "just before the acquisition" is vague as to time and for completeness notes that Instagram ███████ ███████████████████ between the time Meta agreed to acquire Instagram (April 9, 2012) (*see* PX0295, *Facebook to Acquire Instagram*, Meta (Apr. 9, 2012), https://investor.fb.com/investor-news/press-release-details/2012/Facebook-to-Acquire-Instagram/default.aspx) and the closing of the acquisition (August 31, 2012) (*see* PX15544, Meta Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (Meta admitting that Facebook's acquisition of Instagram closed on August 31, 2012). ██████████████████████████████

██████████████████████████████████████████████

██████████

For the second sentence, the FTC does not dispute that Mr. Krieger is a co-founder of Instagram or that the quoted testimony appears in Mr. Krieger's investigational hearing and deposition testimony, but otherwise disputes Statement 657 as vague, incomplete, and as not showing the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram had 13 employees before Meta announced it had agreed to buy it. *See supra* Meta Introduction.

658.    As of March 2012, Instagram had approximately 3.9 million U.S. monthly active users. *See* Ex. 279 at p. 238, Ex. 42 (Hemphill Rep.).  Instagram users in the United States spent 391 million minutes on the service in March 2012. *See id.* at p. 241, Ex. 45.

**FTC Response: Undisputed.**

659.    Cross-posting from Instagram to Facebook was "a significant form of distribution and exposure for Instagram content" before the acquisition.  Ex. 280 at ¶ 158 (Hemphill Rebuttal Rep.).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute Statement 659, but notes that it is incomplete.  Professor Hemphill additionally explained, ███████████████

███████████████████████████, that Instagram had other resources for distribution

and growth outside of cross-posting with Facebook.  *See* PX9007, Hemphill Rebuttal Report at

§§ 3.3.3.2-3.3.3.3; PX9000, Hemphill Report at §§ 4.1.2, 4.1.4.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Professor Hemphill provided the opinion quoted in the statement.  *See supra* Meta Introduction.

660.    Mr. Systrom testified that Instagram "focused heavily on rebroadcasting onto

other platforms," "which allowed us to get more attention."  Ex. 284 at 144:13-15 (Systrom IH

Tr.).  He also testified:  "Q. . . . Before Facebook's acquisition, Instagram obtained a significant

amount of distribution through Facebook; is that fair?  A.  I would say that's true."  Ex. 151

at 221:23-222:1 (Systrom Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute Statement 660,

but notes that it is incomplete.

The FTC does not dispute that the first sentence of Statement 660 contains quoted

excerpts from Mr. Systrom's testimony.  However, the first sentence of Statement 660 is

incomplete because ███████████████████████████████

█████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

██████████████████████████████████ le

[REDACTED]

[REDACTED]

The FTC does not dispute that the second sentence of Statement 660 accurately quotes the cited deposition testimony, but notes further that it is incomplete [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

**Meta Reply**:  The FTC's response does not create a genuine dispute of material fact that, prior to the acquisition, Instagram focused heavily on rebroadcasting onto other platforms and obtained a significant amount of distribution through Facebook, as the FTC's own proffered expert has opined.  *See supra* Meta SMF ¶ 659, *infra* ¶¶ 661-669 (collecting testimony).  The fact that Mr. Systrom identified other causes of Instagram's growth and believed that Instagram was not dependent on Facebook alone for growth does not contradict these facts.  *See supra* Meta Introduction.  Just prior to the testimony quoted by the FTC, when Mr. Systrom was asked "would Instagram have experienced similar growth" in 2012-2014 "if Facebook had not acquired it," he answered that, if "Facebook had deemed us as a competitor, had we not been part of that, it likely would have been much harder for us to do some of the things that made it easy to grow by distributing content on Facebook."  Ex. 284 at 244:5-245:4 (Systrom IH Tr.).  And the FTC has conceded that it has no evidence regarding how Instagram's growth would have compared in a "but-for" world.  *See infra* Meta SMF ¶ 738.

661.   

**FTC Response: Disputed in part.**  The FTC objects to the term "pre-acquisition" in Statement 661 as vague as to time and inconsistent with ▮▮▮▮▮▮ actual testimony.

The FTC does not dispute that the quoted language appears in the cited transcript, that Instagram enabled users to share posts on other services, including Facebook and Twitter, or that these posts benefitted these other services in the form of more engagement.  The FTC otherwise disputes Statement 661 as described herein.

The FTC disputes the characterization that the cited language covers the entire pre-acquisition period because the term "pre-acquisition" in Statement 661 is vague as to time and inconsistent with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that prior to being acquired by Meta, Instagram was able to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See supra* Meta Introduction.  As the term "pre-

acquisition" is ordinarily understood and used, it is clear that paragraph 661 refers to the time period prior to Meta's acquisition of Instagram.  The additional testimony from ███████ does not create a genuine dispute of material fact, because it is undisputed that Instagram continued to rely on Facebook for growth up until and after the acquisition.  *See* Meta Reply to SMF ¶ 660 (addressing similar response).

662.    For example, Mr. Systrom testified that Instagram grew using Facebook's Find Friends API, or Application Programming Interface.  *See* Ex. 151 at 225:9-25 (Systrom Dep. Tr.); Ex. 284 at 117:18-20 (Systrom IH Tr.) (testifying that, "if I was a Facebook user, I could find all of my friends on Facebook who currently used Instagram").  He also testified that "likely one of the top ways" Instagram gained new users at the time was discovery on Facebook, which was "certainly a big driver of growth," along with distribution on Twitter.  Ex. 151 at 227:2-14 (Systrom Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC objects to "at the time" and "discovery on Facebook" as vague, and to Statement 662 as incomplete.

The FTC does not dispute that the quoted language appears in Mr. Systrom's cited transcripts.  However, the language in Statement 662 is incomplete.  ███████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram grew using access to Facebook's Find Friends Application Programming Interface (or "API").  *See supra* Meta Introduction; *see also* Meta Reply to SMF ¶ 660 (addressing similar response).

663.    Mr. Systrom testified that, for Instagram pre-acquisition, distribution on platforms like Facebook was "essential" and that Instagram "would not have grown nearly as quickly" otherwise.  Ex. 284 at 120:8-121:3 (Systrom IH Tr.).  He wrote in an October 21, 2012, email, "the traffic we get from [Facebook] links in feed are pretty high quality" and "are, after all what got us to where we are today."  Ex. 223 at -832 (MetaFTC-DX-685, FB_FTC_CID_06209832). He testified about the email:  "The awareness that you get from being on third parties – call it advertising.  Call it awareness – is enormously helpful for driving downloads and new user sign ups."  Ex. 151 at 233:12-16 (Systrom Dep. Tr.); *see also id.* at 236:18-24 (stating that "Facebook was one of the main drivers of distribution in terms of awareness, and were that to go away because [Facebook] found us either too competitive or unfriendly or just didn't like us, that would cause us to have issues with growth").

**FTC Response: Disputed in part and incomplete.**  The FTC objects to Statement 663 as incomplete.

The FTC does not dispute that the quoted language appears in the cited materials.  But the FTC disputes Statement 663 because ████████████████████████████████████████



**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that distribution on platforms like Facebook was essential for Instagram's pre-acquisition growth, and that traffic Facebook drove to Instagram got Instagram to where it was in October 2012. *See supra* Meta Introduction; *see also* Meta Reply to SMF ¶ 660 (addressing similar response). None of the additional testimony the FTC cites – which relates to Instagram's post-acquisition

growth, or Mr. Systrom's speculation about what might have happened absent the acquisition –
contradicts or even addresses that fact.

664.     Mr. Krieger testified:  "Q. . . . [I]nitially what was Instagram's plan for acquiring
users when it launched?  A. We thought the best way would be for people to take the photos that
they shared out to other platforms, like Twitter and Facebook, which were, you know, in our
launch set, and, therefore, generate interest in how those photos were created through linking
back to Instagram.  And that would be – what we call the flywheel of what the user acquisition
pipeline would be."  Ex. 302 at 98:14-99:4 (Krieger IH Tr.).

**FTC Response: Undisputed.**

665.     Mr. Krieger testified that, before the acquisition, "both Facebook and Twitter was
a significant source of our growth."  Ex. 153 at 205:24-206:12 (Krieger Dep. Tr.).  He also
testified:  "Q. And Facebook didn't – or Meta didn't have to adopt the Open Graph protocol to
allow cross-posting by Instagram, correct? . . .  [A.] It was a product offering that they made,
presumably, for their own strategic reasons.  Q. . . . So you would agree that that was something
they could have taken away, correct? . . .  [A.] Yes.  And, in fact, they later deprecated it maybe
a year or two after acquisition."  *Id.* at 206:13-25.

**FTC Response: Disputed in part.**  The FTC objects to Statement 665 as vague,
including that the terms "Open Graph protocol," "that that was something," and "deprecated it"
are vague.

The FTC does not that dispute that the quoted testimony appears in Mr. Krieger's
deposition transcript.  However, the FTC disputes Statement 665 because ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

█████████████████████████████████████████   For example, the umbrella

concept of Facebook's "Open Graph" is not limited to cross-posting of content between

Facebook and third-party applications, and ███████████████████████████████

████████████████████████████████████████   only changes in 2014-15

to the functionality of the Find Friends API—which was not "taken away" but merely

modified—and not to cross-posting or other aspects of Open Graph.  *See* PX2596, Meta

messages: E. O'Neil to ████, (Nov. 18, 2013), FB_FTC_CID_00605149 at -149; *see also*

PX2740 at -020-28, Meta presentation: "Facebook Platform for non-engineers" (Sept. 1, 2011),

FB_FTC_CID_06690042 (showing examples of Open Graph functionality).

The FTC further disputes Statement 665 as unsupported by the cited material, as required

by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), and as failing to show the

absence of genuine dispute of material fact, Fed. R. Civ. P. 56(c)(1)(B), to the extent Meta is

asserting through this statement that Meta removed the ability of third-party applications to

cross-post on Facebook.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Facebook and Twitter were a significant source of Instagram's pre-acquisition growth, and that

Meta could have taken away Instagram's ability to allow users to cross-post to Facebook.  *See*

*supra* Meta Introduction; *see also* Meta Reply to SMF ¶ 660 (addressing similar response).

None of the evidence the FTC cites contradicts those facts.  The questions and answers cited in

the paragraph are not vague; the testimony, read using common understanding of the words and

phrases therein, speaks for itself.

666.   Mr. Systrom testified:  "Q. . . . Did Instagram use Facebook's Open Graph to

share photos to Facebook?  A. I believe so, yes.  Q. And was this preacquisition?  A. I believe so,

yes.  Q. So what was Facebook's Open Graph?  A. The portion that we used allowed us to mechanically call specific parts of their API to perform user actions on behalf of the user.  So if I were a Facebook user and I used Instagram and I wanted to post my Instagram photo over to Facebook, I could do that, and we used – Open Graph was the API we used behind the scenes to automate that action on behalf of the user.  Q. Okay.  And was Instagram able to acquire users through – through the Open Graph?  A. Open Graph itself did not acquire users; however, posting photos to Facebook certainly advertised the Instagram platform on Facebook.  Its – its sole purpose is to – you know, its primary purpose was to distribute the photo on Facebook.  But the secondary effect was that people were seeing more about Instagram on Facebook in their feeds because there was also a link, along with a photo, to come back to the Instagram site to learn more about what Instagram was.  The second way Open Graph supported – if I was a Facebook user, I could find all my friends on Facebook who currently used Instagram, and that was part of the Open Graph API as well."  Ex. 284 at 116:14-117:21 (Systrom IH Tr.).

**FTC Response: Undisputed.**

667.     Regarding distribution on Facebook, Mr. Systrom testified that, if "Facebook [were] to decide to cut off those links, you would be in a situation where you had to find your growth elsewhere on other platforms," which "would certainly cut off a significant portion of growth, and you would have to figure out other ways of doing it."  Ex. 151 at 233:17-25 (Systrom Dep. Tr.).  He also testified that, "had [Instagram] been independent," Meta "likely would not have let us simply just post free-form links onto the site and have attribution to Instagram."  Ex. 284 at 241:11-14 (Systrom IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the phrases "distribution on Facebook," "those links," and "post free-form links" in Statement 667 as vague.

The FTC disputes the first sentence of Statement 667 as incomplete and misleading

because ███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

The FTC does not dispute that the second sentence of Statement 667 quotes from Mr.

Systrom's investigational hearing testimony.  Likewise, however, the excerpt is incomplete, as it

removes context. ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████

The FTC further disputes Statement 667 as unsupported by the cited material, as required

by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h), to the extent the statement

is asserting ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████ .

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that if Meta had cut off Instagram's links to Facebook before the acquisition, it would have cut off a significant portion of Instagram's growth; and had Instagram remained independent, Meta likely would not have let it simply just post free-form links onto Facebook with attribution to Instagram.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 660 (addressing similar response).  The additional testimony the FTC cites regarding Mr. Systrom's beliefs about Instagram *after* the acquisition – once Meta had grown Instagram – does not contradict those facts, but is instead merely speculation.  The questions and answers cited in the paragraph are not vague; the testimony, read using common understanding of the words and phrases therein, speaks for itself.

668.    Mr. Systrom also testified:  "Q. Okay.  Before Facebook bought Instagram, do you remember being concerned that you didn't want to upset Facebook? . . .  [A.] Just in general?  Q. . . . Yeah.  A. Yes?  Yeah, of course.  Q. Why?  A. A multibillion-dollar company against a start-up with very little venture capital funding and at the time probably five or six employees with little or no experience running a start-up – in general, I would say you should be cautious when dealing with large corporations.  On top of that, like you've mentioned a couple times, Facebook was one of the main growth drivers.  And were we to somehow sever[] that relationship, those growth drivers could have been compromised as they were with, you know, Twitter eventually along the way."  Ex. 151 at 232:12-233:7 (Systrom Dep. Tr.).  He testified: "Q. You believed that if Facebook had never bought Instagram, Facebook likely would have stopped helping Instagram with distribution. . . .  [A.] I don't remember exactly what I thought at the time.  But sitting here today, yeah, I would agree with that."  *Id.* at 234:1-7.

**FTC Response: Undisputed but vague and incomplete.**  The FTC objects to the phrase "stopped helping Instagram with distribution" in Statement 668 as vague.

The FTC does not dispute that Statement 668 reflects excerpts from Mr. Systrom's deposition transcript.  However, Statement 668 is incomplete because Mr. Systrom also testified in his Investigational Hearing that Instagram was ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████  Ex. 284 at 245:5-11 (Systrom IH Tr.).  Mr. Systrom's testimony is therefore not consistent with the implication that Instagram was dependent on Meta for growth.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Systrom testified that Facebook was one of Instagram's "main growth drivers" and that, if Facebook had not bought Instagram, it likely would have stopped helping Instagram with distribution.  *See supra* Meta Introduction; *see also* Meta Reply to SMF ¶ 660 (addressing similar response).  The additional testimony the FTC cites regarding Mr. Systrom's beliefs about Instagram *after* the acquisition – once Meta had grown Instagram – does not contradict those facts, but is instead merely speculation.

669.    Mr. Systrom further testified about Facebook distribution:  "Q. I know you mentioned Instagram using Facebook as distribution.  Were there other things that Instagram stood to lose if you, quote/unquote, poked Facebook?  A. So I think – I think our relationship with Twitter and how that progressed is a good example of – of what might have and/or would have happened with Facebook.  It became clear to Twitter that – that we would be less partners with them once we were part of Facebook because I think of their previous relationship with

Facebook, less about their judgment about how we felt about them.  And they decided to remove certain functionality – or the ability for us to use certain parts of their API that helped our – our community connect with their friends. . . .  Were the world different and Instagram remained – remained independent or part of some other company . . . I think the same thing would have happened, but Facebook would have been the actor in that case.  They would not have allowed us to use those API endpoints.  And the reason why I think that is because they have done that to other companies.  So it's not – I'm not guessing here.  I'm – I'm extrapolating based on previous behavior, and that would have made it relatively hard for people to find their friends."  Ex. 284 at 166:11-167:22 (Systrom IH Tr.).

     **FTC Response: Disputed in part.**  The FTC objects to ████████████████████ ████████████████████████████ in Statement 669 as vague.

     The FTC does not dispute that Statement 669 quotes excerpts of Mr. Systrom's Investigational Hearing testimony.  However, the FTC disputes Statement 669 because the excerpted testimony is incomplete as the ellipses substitute for further details on Twitter's actions and Systrom's statement ████████████████████████████████ as well as Systrom's reference to potential alternative acquirers, ████████████████ ███████  Ex. 284 at 167:8-9; 167:13. (Systrom IH Tr.).

     The FTC further disputes statement 669 as incomplete because it removes context that immediately followed the excerpted testimony.  Mr. Systrom continued his testimony: "███

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ .” Ex. 284 at 167:19-168:9 (Systrom IH Tr.).

The FTC further disputes Statement 669 as unsupported by the cited material, as required by Fed. R. Civ. P. 56(c)(1)(A) and Local Rule 7(h), and as failing to show the absence of a genuine dispute of material fact, Fed. R. Civ. P. 56(c)(1)(B), to the extent Meta is asserting through this statement that Meta removed the ability of third-party applications to cross-post on Facebook.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Systrom testified that if Instagram has not been acquired by Facebook, then Facebook would have cut off Instagram's access to Facebook's distribution tools.  *See supra* Meta Introduction; Meta Reply to SMF ¶ 660 (addressing similar response).  The additional testimony the FTC cites does not contradict that testimony.  Mr. Systrom's observation that Snapchat has "grown to a very large size," while contrary to elements of the FTC's claim, does not address how Instagram would have fared without the Meta acquisition.  The questions and answers cited in the paragraph are not vague; the testimony, read using common understanding of the words and phrases therein, speaks for itself.

670.    Professor Steven Kaplan, one of Meta's experts, described a quantitative study, which he co-authored, of venture-capital investment in startups that found "about half of VC holdings end up being worthless, or with very low value," while "[r]oughly 60% of investments lose money."  Ex. 6 at ¶¶ 76-78 (Kaplan Rep.).  Professor Kaplan also examined every startup company in the United States that received venture capital funding between 2008 and 2014 in which its Series B round valued the company at between $250 million and $5 billion

(Instagram's 2012 Series B funding valued it at $500 million).  *See id.* at ¶¶ 82-88.  Of these 82

companies, excluding Instagram and WhatsApp, only two (Uber and Airbnb) have achieved a

market capitalization of more than $50 billion.  *See id.* at ¶¶ 82-88, Ex. B, Ex. C-1, Ex. C-2, &

Ex. C-3.  No company has come close to the ███████ market value that Professor Kaplan

estimated Instagram is worth today ████████████████████████████████████

█████████████████████.  *See id.* at ¶ 87 & n.107.

**FTC Response: Disputed in part**.  The FTC objects to "worthless, or with very low

value," and "lose money" as vague.

The FTC does not dispute that Statement 670 accurately restates Professor Kaplan's

description of his quantitative study, but notes that Statement 670 is incomplete.  As Professor

Rim explains in his rebuttal report, ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

PX9014, Rim Rebuttal Report at ¶ 46.

The FTC otherwise disputes Statement 670 as not establishing the absence of a genuine

dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence demonstrates that,

absent Meta's acquisition of Instagram, Instagram would have continued to operate as a

meaningful competitor to Meta.  *See* CMF at §§ III.B.1-3, III.D.1.  As Professor Rim explained,

Instagram "showed extraordinary promise, as evidenced by [its] outstanding growth and top-

notch stickiness."  PX9014, Rim Rebuttal Report at ¶ 63; *see also* PX6182, Rim (FTC) Dep. Tr.,

at 71:13-19 ("I opined that, you know, maximum 6 percent of chance that it will fail, but I as an

expert think that actually that is even high and that I believe it is very likely that Instagram and WhatsApp would have been very successful if they were not acquired by Meta.").

Notably, Professor Kaplan made clear in his deposition testimony that he was not opining that Instagram or WhatsApp would have failed but for the acquisition.  PX6183, Kaplan (Meta) Dep. Tr., at 80:13-21 ("Q. You're not opining in your report that Instagram would have failed absent its acquisition by Meta; are you?  A. I am not.  Q. And you're not opining in your report that WhatsApp would have failed absent its acquisition by Meta; are you?  A. I am not opining that either one would have failed.  I did opine they might have failed.").  Likewise, Professor Kaplan did not opine that Instagram or WhatsApp was "more likely to fail than not absent the acquisition."  PX6183, Kaplan (Meta) Dep. Tr., at 182:17-20 ("Q. You don't opine in your report that Instagram and WhatsApp were more likely to fail than not absent the acquisition by Meta; correct?  A. I do not.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding Professor Kaplan's finding that, of every startup company in the United States that received venture capital funding between 2008 and 2014 in which its Series B round funding valued the company at between $250 million and $5 billion (Instagram's 2012 Series B funding valued it at $500 million) – 82 companies total, excluding Instagram and WhatsApp – only two (Uber and Airbnb) have achieved a market capitalization of more than $50 billion; and that no company has come close to the ████████ market value that Professor Kaplan estimated Instagram is worth today ████████████████████████████████████ ████████████████████.  The FTC cites no evidence contradicting those facts, but rather points to its expert's opinion that Instagram was not likely to have failed if it had not been acquired by Meta.  That is immaterial and nonresponsive.  *See supra* Meta Introduction.  As the

FTC admits, Professor Kaplan did not offer any opinion that Instagram was more likely to fail than not absent the acquisition – the relevant question (in response to which the FTC has no evidence) is whether Instagram would be better than it is today without the acquisition.  In addition, the FTC's own proffered expert, Professor Rim, testified that it was possible an independent Instagram would have failed.  *See* PX6182 at 71:13-19 (Rim (FTC) Dep. Tr.). Mr. Systrom likewise testified that, absent the acquisition, it is possible that Instagram would have failed.  *See* PX6133 at 251:9-16 (Systrom Dep. Tr.) ("Do you believe that prior to the time Facebook bought Instagram, it could have gone either way?  Meaning it could have succeeded, or it could have failed?  A.  I do believe, yeah.  Q.  And why do you believe that?  A.  It's very hard to know, in alternate universes, what would have happened.").  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

### c.  Pre-Acquisition Features

671.    Mr. Systrom testified that pre-acquisition Instagram was "focused" on "sharing photos."  Ex. 284 at 82:21-22 (Systrom IH Tr.).  He also testified, "we were pretty clear we were focused on photos at the time" and not "general social network ambitions."  *Id.* at 149:25-150:6. Mr. Systrom testified:  "Q. . . . Were users able to share photos within the Instagram app? . . . Share their own photos, like post their own photos to the feed?  A. Yeah, I mean, that's the only thing we supported."  *Id.* at 51:24-52:6.

**<ins>FTC Response: Disputed in part, and incomplete and misleading.</ins>**

The FTC objects to the term "pre-acquisition" as vague as to time and unsupported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

The FTC does not dispute that Statement 671 recounts words that appear in the cited document, but the FTC disputes that Statement 671 shows the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes Statement 671 as incomplete and misleading.  The cited portion mischaracterizes Mr. Systrom's testimony and omits portions of his testimony that would reveal the mischaracterization.  This first sentence is disputed in part because Meta selectively quotes the testimony to give the false impression that Mr. Systrom testified that Instagram was ██████████ exclusively on photo sharing.  The quoted testimony was given in response to the question: "why there was such a focus on *mobile* for Instagram."  Ex. 284 at 82:3-4 (Systrom IH Tr.) (emphasis added).  Mr. Systrom responded:



*Id.* at 82:7-22.  Mr. Systrom's testimony describes Instagram's strategy for entering the market for personal social network services; it does not state that photo-sharing was Instagram's exclusive use and focus.

The second sentence is disputed in part because Mr. Systrom did not testify that Instagram was not focused on "████████████████████."  Rather, in the quoted portion of his testimony, he was asked to describe his interactions with Mr. Zuckerberg regarding

██████████████████████ and whether he *expressed to Mr. Zuckerberg* ██████████

█████████████████████████████" *Id.* at 149:21-24.  Systrom responded:



*Id.* at 149:25-150:6.  The quoted portion of Mr. Systrom's testimony is about how he expressed

his ambitions for Instagram to Mr. Zuckerberg, a competitor and potential acquirer, during the

specific acquisition talks; it is not about whether Instagram actually was a personal social

network, or about its plans to continue to grow and add social networking features.

On that latter point, Mr. Systrom's testimony is clear: he testified that Instagram ██████

████████████████████████████████ *Id.* at 68:11-23.  And Mr.

Systrom ultimately told Mr. Zuckerberg about Instagram's plans to expand beyond being a

photo-centric social network:

> Really it just comes down to wanting complete independence to
> pave our own path.  This in particular means not limiting the scope
> of Instagram to just photos - but to explore other mediums as well
> which support the original vision of Burbn being to improve the way
> we communicate and share in the real world.

PX3190, Meta email chain: K. Systrom to M. Zuckerberg, "(no subject)," (Mar. 20, 2012),

FB_FTC_CID_01552674, at -674.

The third sentence is disputed because Meta's selective quotation of Mr. Systrom's

statement, "████████████████████," is misleading.  Mr. Systrom was asked about

Instagram's features and functionalities at the time of Instagram's launch.  He discussed the ██

████████████████████████████.  *See* Ex. 284, Systrom (Meta/Instagram)

IH Tr., at 51:4-52:14.  His latter discussion ████████ is particularly relevant to make clear that

Instagram had personal social networking functionality from the beginning:



Ex. 284 at 52:7-14 (Systrom IH Tr.).  Mr. Systrom also testified that ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  PX6133, Systrom (Meta/Instagram) Dep. Tr., at

13:21-14:12; *see also* Ex. 284 at 73:21-74:3 (Systrom IH Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that,

prior to the acquisition, Instagram was focused on photo sharing and did not have general social

network ambitions.  *See supra* Meta Introduction.  As the term "pre-acquisition" is ordinarily

understood and used, it is clear that paragraph 671 refers to the time period prior to Meta's

acquisition of Instagram.

The additional testimony the FTC cites in its response regarding the first sentence of

paragraph 671 confirms that Instagram was focused on photo sharing.  In it, Mr. Systrom

testified that Instagram "focused specifically on the most differentiated feature, which was

sharing photos."  Ex. 284 at 82:21-22 (Systrom IH Tr.); *see also id.* at 51:24-52:6 (Mr. Systrom

testified:  "Q. Were users able to share photos within the Instagram app?  A.  I don't understand

the question. Sorry.  Share -- you mean share photos that they found or?  Q.  Share their own

photos, like post their own photos to the feed?  A.  Yeah, I mean, that's the only thing we

supported.").

The FTC disputes the second sentence of paragraph 671, suggesting that Mr. Systrom's

conversations with Mr. Zuckerberg may not have reflected his actual ambitions for Instagram

because Mr. Zuckerberg was, at the time (according to the FTC) "a competitor and potential

acquirer." But as Mr. Systrom testified, Instagram "w[as] not trying to downplay our ambitions overall" and was "pretty clear we were focused on photos at the time." *Id.* at 149:25-150:6.

672.    Mr. Krieger testified:  "Q. Can you describe what the features on Instagram were when it first launched?  A. The primary feature was posting photos.  You could either take a photo with a camera inside the application or upload something from your – your library or gallery.  You could filter those photos.  I think we had – I'm going to guess – 16 filters that were available that each had a sort of different color treatment on your photos.  You could add a caption to the photo before you posted and add an optional geotag and location.  You could share that photo to your Instagram followers, but you can also choose to cross-post it to – I think @launchfacebook [and] Twitter. . . .  On the consumer side of the photos, you could view the photos.  You could follow people, view the photos they posted.  Like, you know, perform a like action on the photos, comment on the photos, view the comments and likes on your own photos." Ex. 302 at 37:1-38:1 (Krieger IH Tr.).

**FTC Response: Undisputed.**

673.    Mr. Krieger also testified:  "Q. . . . [W]ho were people sharing with on Instagram? Who were they connected to? A. I think the first – so one feature we had is you could import your contacts from Facebook or your phone or your followers, I guess the people you followed on Twitter.  And I would characterize the initial sort of social graph as a combining of those two. So some friends.  They could be friends who had joined.  But also, you know, especially people who [were] Twitter users at the time had built this network of people that they might not have known in real life but were – sort of shared some interest where – whether it was graphic design or software engineering or something else.  And sort of Instagram brought those both together. So your friends plus people who shared interests." Ex. 302 at 42:14-43:7 (Krieger IH Tr.).

**FTC Response: Undisputed.**

674.    Pre-acquisition Instagram user accounts were public by default.  *See* Ex. 302 at 43:25-45:2 (Krieger IH Tr.).  The "popular" or "explore" tab on Instagram pre-acquisition showed photos that were popular on Instagram, not based on who an individual user followed or that user's interests.  *See id.* at 38:1-4; *see also* Ex. 153 at 212:10-19 (Krieger Dep. Tr.); Ex. 284 at 70:21-71:19 (Systrom IH Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that newly created Instagram accounts were public by default prior to the acquisition.  However, the FTC notes that Mr. Krieger also stated that users had the option to set their accounts as private from launch; that private accounts tended to be personal accounts; and that the percentage of private accounts started growing over time.  Ex. 302 at 44:8-45:23 (Krieger IH Tr.).

The FTC does not dispute Meta's description of the "popular" or "explorer" tab as it existed at launch.  However, the FTC notes that Meta omits testimony stating that that this tab was intended to "bootstrap" the user experience while both new users and Instagram itself built out their social graphs.  Mr. Systrom explained that the "explorer" tab—which has at various times been referred to as the "popular," "discover," and "explore" tab, but was called "explorer" at launch—was designed to give new users at launch "███████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████." Ex. 284 at 70:21-71:15 (Systrom IH Tr.).  Mr. Krieger explained: "████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████" Ex. 153 at 212:14-19 (Krieger Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that prior to the acquisition, Instagram accounts were public by default, and the "popular" or "explore" tab showed photos that were popular on Instagram.  *See supra* Meta Introduction.

675.   On March 20, 2012, Mr. Systrom wrote to Mark Zuckerberg, Meta's chief executive officer, stating:  "Most of the photos on Instagram are not social photos, but instead tend towards photos of the world around us.  Our graphs are significantly different as well.  For one, we have an asymmetric visual interest graph – one which I'm sure differs from most peoples' [Facebook] graphs."  Ex. 181 at -883 (FB_FTC_CID_01527881).

**FTC Response: Disputed in part.**  The FTC does not dispute that Statement 675 recounts words that appear in the cited document, but otherwise disputes Statement 675 as incomplete.  The FTC notes that Meta selectively quotes a short portion of the lengthy March 20, 2012 exchange between Systrom and Zuckerberg.  In the same exchange, Systrom wrote "[w]e both have a passion for social products," and that Instagram "want[ed] complete independence to pave our own path[,]" which "in particular means not limiting the scope of Instagram to just photos – but to explore other mediums as well which support the original vision of Burbn being to improve the way we communicate and share in the real world."  Ex. 181 at -883 (FB_FTC_CID_01527881).  That is, Mr. Systrom expressed in the same message his intention for Instagram to further develop as a personal social networking app.  The quoted statement should be understood both in this context and in the broader context of the acquisition discussions, including that Meta would enter "destroy mode" if discussions were not handled carefully—a sentiment Mr. Systrom expressed elsewhere in his testimony.  Ex. 151, Systrom (Meta/Instagram) Dep. Tr., at 236:25-237:12; *see also* Ex. 284, Systrom (Meta/Instagram) IH Tr., at 165:12-166:10 (discussing Instagram's "███████████████████████").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, prior to the acquisition, most of the photos on Instagram were not social photos, and that Instagram had an asymmetric visual interest graph, which differed from Facebook's user graph. *See supra* Meta Introduction.  The additional language from the document and testimony the FTC quotes about what Instagram might have done in the future does not contradict these facts.

676.    Also in 2012, the United Kingdom Office of Fair Trading or "OFT" wrote of Instagram and Facebook: "While Facebook is predominantly used by off-line friends using their real identities to connect online and share experiences (including photos), Instagram is predominantly used to share artful images by individuals often using pseudonyms.  The information posted on Facebook is generally shared amongst friends only.  By contrast, on Instagram the default position is that photos are available to all other users of the service." Ex. 426 at ¶ 22 (OFT, *Anticipated Acquisition by Facebook Inc. of Instagram Inc.*).

**FTC Response: Disputed in part and incomplete.**  The FTC does not dispute that Statement 676 recounts words that appear in the cited document, but the FTC disputes that Statement 676 constitutes a material fact subject to proof at trial and objects that the statement is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1), 56(c)(2).  The FTC further disputes Statement 676 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The OFT report constitutes, and is based on, inadmissible hearsay.  *See* Ex. 426 at ¶ 22 (OFT, *Anticipated Acquisition by Facebook Inc. of Instagram Inc.*) (the sentence preceding the material quoted in Statement 676, stating that "[t]he merger parties and third parties told the OFT that the functionality of Instagram's social network and Facebook's social network are significantly different").

As to the first sentence, the FTC does not dispute that "Facebook is predominantly used by off-line friends to connect online and share experiences (including photos)."  However, the FTC disputes that "Instagram is predominantly used to share artful images by individuals often using pseudonyms," because this is disputed by other evidence establishing that friends and family sharing was the predominant use of Instagram.  *See, e.g.,* Ex. 284, Systrom (Meta/Instagram) IH Tr., at 73:21-74:3 ("█████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████"); Ex. 181, Meta messages: M. Zuckerberg (Meta) to K. Systrom (Meta/Instagram), (Mar. 20, 2012), FB_FTC_01527881, at -881 ("many people follow all of their friends" on Instagram).

For completeness, the FTC notes that the OFT's successor agency commissioned a follow-up report in 2019 that acknowledged significant shortcomings in the OFT's 2012 analysis and conclusions, including that the OFT might have "underestimated Instagram's potential to grow into a significant competitive force in the supply of social networking services."  PX0498 at v, II.32, LEAR, *Ex-post Assessment of Merger Control Decisions in Digital Markets: Final Report*, (May 9, 2019), https://www.learlab.com/wp-content/uploads/2019/06/CMA_past_digital_mergers_GOV.UK_version-1.pdf [hereinafter "Lear Report"]; *see also* PX9007, Hemphill Rebuttal Report, at ¶ 519 (citing same and noting brief three-month duration of investigation and short ten-page decision).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, in 2012, the United Kingdom Office of Fair Trading ("OFT") found that Instagram was then predominantly used to share artful images "by individuals often using pseudonyms."

Mr. Systrom's testimony does not change those findings. *See supra* Meta Introduction. That finding can be presented in an admissible form, including, but not limited to, under Federal Rules of Evidence 703 and 803. The FTC's conclusory assertion otherwise – without citing to, let alone explaining the application of, any Federal Rule of Evidence – is insufficient to dispute the fact.

The additional material the FTC claims is necessary "for completeness" does not create a dispute regarding the OFT's conclusions in 2012, because a retrospective analysis by a third-party contractor (Lear) does not change those 2012 conclusions. Furthermore, the FTC overstates this contractor's conclusions as "acknowledg[ing] significant shortcomings" in the original analysis. The contractor stated that the OFT "*might* have also underestimated Instagram's potential to grow" – which is purely speculative – not that it did so. PX0498 at v (Lear Report) (emphasis added).

677. Mr. Systrom testified: "I don't know of many people who signed up and started using Instagram who said, wow, this replaces my behavior of posting photos on Facebook, because the photos you post on Facebook are so different in nature and character than the photos you post on Instagram. That does not mean the companies don't compete at some point in the future or in some nature, but I think people use them for different things." Ex. 284 at 164:1-9 (Systrom IH Tr.).

**Disputed in part and incomplete.** The FTC does not dispute that the cited transcript contains the words quoted in Statement 677, but the FTC disputes Statement 677 as incomplete and because the cited material does not show the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B).

Statement 677 omits Mr. Systrom's testimony that ██████████████████

████████████████████████████████████████████████████████

████." Ex. 284 at 165:2-4 (Systrom IH Tr.).  Furthermore, the FTC notes that Meta's selective

quotation omits the context of Mr. Systrom's response, which was limited to a discussion of the

specific use of posting photos and reflected on Facebook's limited mobile presence at the time.

Mr. Systrom testified:





Ex. 284 at 161:3-20, 163:4-164:9 (Systrom IH Tr.).

Further, ample evidence indicates that friends-and-family photo sharing was (and is) a core use case for both Facebook and Instagram. *See, e.g.*, PX2822, Meta email chain: M. Zuckerberg to D. Ebersman, "(no subject)," (Feb. 28, 2012), FB_FTC_CID_03694681, at -681-682 (expressing interest in buying Instagram to, among other things, "neutralize a potential competitor"); PX6029, Zuckerberg (Meta) IH Tr., at 272:23-273:8 (testifying that "neutralize a potential competitor" meant "to take companies that were competing with us for specific use cases and turn them into our bets, right, so basically turning them from being a competitor to our [] bet in that space[.]"); PX1202, Meta messages: M. Zuckerberg to ▮▮▮▮, (Apr. 5, 2012) FB_FTC_CID_06290875, at -875-876 ("I think they're [Instagram] pretty threatening to us . . . . I mean, it depends on how big they'd get. . . . But photos is one of a few core use cases for us.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, for most users, posting photos on Instagram did not replace the behavior of posting photos on Facebook, because the photos posted on Facebook were so different in nature and character than the photos users posted on Instagram at the time.  Mr. Systrom's speculation that Facebook and Instagram would "have come up against each other in certain areas" in the future does not contradict that fact.  Ex. 284 at 165:2-4 (Systrom IH Tr.).  The additional materials the FTC cites do not create a genuine dispute of material fact that, prior to the acquisition, posting photos on Instagram was different from posting photos on Facebook (or other uses of Facebook).  The cited

materials do not discuss "friends-and-family photo sharing" or "core use case" (whatever those phrases mean) or users' actual use of Instagram compared to Facebook.

678.    Professor C. Scott Hemphill, the FTC's proffered expert economist, stated that, when Instagram launched, it "was an iOS-only application with an intentionally narrow feature set" that focused on photo sharing.  Ex. 279 at ¶ 115 (Hemphill Rep.).

**FTC Response: Disputed in part.**  The FTC does not dispute that the cited report contains the words quoted in Statement 678, but disputes Statement 678 as selectively quoting only part of paragraph 115 of Professor Hemphill's opening report, creating the misleading impression that Instagram was somehow "narrow[er]" in its functionality than a full-fledged social network.  In fact, Professor Hemphill describes Instagram as a full-fledged social network with a focus on photos.  Paragraph 115 reads, in full, as follows:

> When it launched, Instagram was an iOS-only application with an intentionally narrow feature set that focused on taking, sharing, and engaging with photos with friends and family.  Instagram users could take or upload photos, apply one of several preset "filters" to photos, and add descriptions to photos. . . . Instagram's social graph was built around "unidirectional" connections, such that a user could "follow" other users.  After posting a photo on Instagram, it would appear in followers' feeds, where users could engage with the photo by "liking" or commenting on the photo.  Likes and comments would appear underneath the photo in other users' feeds.

Ex. 279 at ¶ 115 (Hemphill Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that it's proffered expert, Professor Hemphill, opined that, when Instagram launched, it "was an iOS-only application with an intentionally narrow feature set" that focused on photo sharing.  Ex. 279 at ¶ 115 (Hemphill Rep.).  The additional portion of Professor Hemphill's report that the FTC quotes does not contradict that fact, nor does it anywhere state, as the FTC claims, that

"Instagram [w]as a full-fledged social network with a focus on photos." *See supra* Meta Introduction.

### d.        Pre-Acquisition Integrity

679.      On August 1, 2012, Dan Toffey – then, a member of the Instagram team responsible for content moderation, *see* Ex. 154 at 18:20-19:22 (Toffey Dep. Tr.) – wrote in an email: "I think we've reached a critical point with SPAM.  It is no longer possible to tell which accounts are spam simply from the User Flag page.  We are being hit with what looks like 5 to 7 different types of spam, each with their own characteristics. . . .  It is now basically necessary to open every profile page to see whether they are legitimate [or] spammers, which increases the amount of time necessary to review by 3 or 4 times."  Ex. 224 at -533-534 (PX10020, FB_FTC_CID_12203533).

**FTC Response: Disputed in part.**  The FTC objects to the term "critical point" as vague, and objects to Statement 679 because the cited material does not establish the absence of a genuine dispute as to any material fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material or that Dan Toffey was a member of the Instagram team responsible for content moderation, but otherwise disputes Statement 679 as described herein.

The FTC disputes Statement 679 as incomplete and misleading because subsequent communications show that Mr. Toffey's concerns about spam were effectively addressed the same day (on August 1, 2012).  In an email dated the next day, August 2, 2012, Mr. Toffey acknowledged that Instagram's efforts to address spam *the prior day* were successful: "On the whole, Spam filters enacted yesterday [are] paying HUGE dividends."  PX3061, Meta email

chain: D. Toffey to M. Krieger, et al. re "Spam report: Thursday morning," (Aug. 2, 2012), FB_FTC_CID_09340377, at -377; *see also* Ex. 154 at 133:2-134:10 (Toffey Dep. Tr.) (stating that "[i]t appears that the prevalence of spam [on Instagram] on August 2nd [2012] was less than what we saw on August 1st [2012].").

Additionally, Mr. Toffey testified that the purpose of the spam report contained in his August 1, 2012 email was to "showcase for Mike [Krieger] the different techniques that spammers were using with the intent of him [Mr. Krieger] being able to develop techniques for reducing the prevalence of that content." Ex. 154 at 121:1-19 (Toffey Dep. Tr.).

The FTC further disputes Statement 679's assertion that Instagram reached a critical point with spam because testimony from Instagram's co-founders shows that spam was not slowing down Instagram's growth or crippling its operations prior to the Meta acquisition. PX6146, Krieger (Meta/Instagram) Dep. Tr., at 135:15-17 ("███████████ ██████████████████████████████████████████████"); PX6133, Systrom (Meta/Instagram) Dep. Tr., at 166:4-11 ("██████████████ ████████████████████████████████████████ ████████████████").

In addition, the FTC's integrity expert, Damon McCoy, evaluated Meta's integrity claims and supporting evidence related to Instagram and concluded that "the record does not indicate that Instagram was facing a critical or exceptional level of spam pre-acquisition." PX9002, McCoy Report at ¶ 146.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that, in August 2012, Dan Toffey thought that Instagram had reached a critical point with spam, including because Instagram had to address different varieties of spam and the time it took for

Meta's community team to review flagged profiles had increased by 3 to 4 times. *See supra* Meta Introduction. As the phrase "critical point" is ordinarily understood and used, there is no dispute that Mr. Toffey believed that, in August 2012, Instagram's spam-fighting system was being overwhelmed by the spam appearing on Instagram. *See* Ex. 154 at 115:21-116:13 (Toffey Dep. Tr.) (testifying that his belief that Instagram had reached a critical point was "based on the fact or the perception that [Instagram's] ability to identify and remove spam content and spam accounts was being overwhelmed by the different varieties of spam that were appearing on Instagram" in August 2012, and that he "remember[s] spam being an acute issue, especially in that period").

The additional material that the FTC claims is necessary for completeness does not dispute that Mr. Toffey wrote in an August 2012 email that Instagram had reached a critical point with spam. In fact, Mr. Krieger responded to the thread email the FTC identifies, stating "I'm sure they'll be back . . . cat & mouse 4 eva." PX10025 at -408 (FTC-META-003313408) (ellipses in original); *see also* Ex. 302 at 232:4-233:2 (Krieger IH Tr.) (testifying that, before the acquisition, Instagram relied on "pretty rudimentary defenses" to combat spam that were "quite easy" for a "dedicated-enough spammer . . . to circumvent"). The cited paragraph in Professor McCoy's report does not cite any evidence post-dating July 2012, and therefore it cannot (and does not) create a genuine dispute of material fact as to Mr. Toffey's understanding about the amount of spam on Instagram as of August 2012. *See* PX9002 at ¶ 146 (McCoy Rep.).

680.    Mr. Toffey testified that bad actors "were rapidly adjusting their techniques" to target Instagram with different types of spam. Ex. 154 at 117:4-9, 120:12-122:8 (Toffey Dep. Tr.). He also testified that he could recall "seeing spam content overrun [Instagram's] Explore tab" pre-acquisition. *Id*. at 117:13-16. Mr. Toffey further testified that users' reports of

objectionable content on Instagram had grown almost tenfold by early 2012. *See id.* at 97:4-6

("the number of flagged photos grew eight to ten X").

**FTC Response: Disputed in part.**  The FTC objects to the term "techniques" as vague,

to "early 2012" and Statement 680 as vague as to time.  The FTC further objects to Statement

680 because the cited material does not establish the absence of a genuine dispute as to any

material fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B),

56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but

otherwise disputes Statement 680 as described herein.

The FTC disputes the first and second sentence of Statement 680 as incomplete because it

omits testimony immediately prior to the quoted material that clarifies that Mr. Toffey's

testimony was based on a "general sense" and not on specific recollections of what Instagram

was seeing at the time.  Ex. 154 at 116:19-117:3 (Toffey Dep. Tr.) ("Q. Well, is it true that aside

from this e-mail you don't remember anything that contributed to your recollection that spam

was an acute issue close to this August [2012] timeframe? . . .  [A]: I'd say that I don't have clear

and specific recollections of what we were seeing at that time and how we were processing and

conducting our work at that time, just based on how long ago it was. . . .").

The FTC further disputes the second sentence of Statement 680 because it omits

testimony from Mr. Toffey explaining that his experience seeing spam content on the Explore

tab was not something he encountered in his work reviewing spam for Instagram. *Id.* at 118:17-

119:4 ("Q. So you refer to the experience of seeing spam content on the Explore page.  Are you

referring to your personal experience? . . .  [A.] I'm referring to spam that I encountered in

utilizing my personal Instagram account. . . .  [Q.] That would not be spam that you encountered as part of your work reviewing spam flags, correct? . . .  [A.] Correct.").

The FTC disputes the third sentence in Statement 680 as incomplete and misleading because it omits Mr. Toffey's testimony regarding Instagram's use of a third-party content moderator firm to manage objectionable content.  *Id.* at 96:4 ("After a period of time I recall that we contracted with a third party to remove, or review and remove problematic content from our platform.").

In addition, the FTC's integrity expert, Damon McCoy, evaluated Meta's integrity claims and supporting evidence related to Instagram, and concluded that "the record does not indicate that Instagram was facing a critical or exceptional level of spam pre-acquisition."  PX9002, McCoy Report at ¶ 146; *see also id.* at ¶ 17 ("In fact, Instagram was capably managing integrity, having deployed increasingly sophisticated tools and techniques in response to integrity issues, and had ample funding and engineering talent available to follow the path of the many other online platforms that have successfully grown their integrity programs.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Toffey testified that, before the acquisition closed, spammers were rapidly adjusting their techniques to target Instagram, that Instagram's Explore page which was overrun with spam, and that users' reports of potential policy violations had grown nearly ten-fold by early 2012.  *See supra* Meta Introduction.  The FTC does not cite any evidence contradicting the fact that Mr. Toffey provided this testimony.  As the term "techniques" is ordinarily understood and used, there is no dispute that spammers were rapidly adjusting the approaches they used to target Instagram with different variations of spam.  As the term "early 2012" is ordinary understood and used, there is no dispute that that users' reports of policy-violating content on Instagram had

grown almost ten-fold in the first few months of the year 2012. *See* Ex. 154 at 96:18-97:6

(Toffey Dep. Tr.) (testifying that "the number of flagged photos grew eight to ten X or so before

that outsourcing [of content moderation to CrowdFlower] was completed"); Ex. 7 at ¶ 140

(Subrahmanian Rep.) (citing materials establishing that Instagram outsourced content moderation

to CrowdFlower in May 2012).

The additional testimony from Mr. Toffey regarding his recollections that the FTC claims

is necessary for completeness does not create a dispute that Mr. Toffey testified that, before the

acquisition closed, spammers were rapidly adjusting their techniques to target Instagram and that

Instagram's Explore page was overrun with spam. Indeed, Mr. Toffey testified that he

"remember[s] the sense of feeling a bit overwhelmed in [Instagram's] capacity to tackle [spam],"

and that recollection, in turn, was "primarily based" on his "experience of seeing spam content

overrun [Instagram's] Explore tab; the experience of getting, you know, crappy-looking

comments left on [his] photos and just the general sort of accrued impression of the day-to-day

experience of tackling this work." Ex. 154 at 116:19-117:19 (Toffey Dep. Tr.).

The additional testimony from Mr. Toffey regarding his personal experience that the FTC

claims Meta "omit[ted]" does not create a dispute that Mr. Toffey testified that he experienced

seeing Instagram's Explore tab overrun with spam. If anything, that testimony reinforces the

statement in paragraph 680 because, before the acquisition closed, Instagram determined what

spam to block primarily through its employees' "own use" of the app. Ex. 153 at 136:10-17

(Krieger Dep. Tr.) ("Q. . . . if users were – were not able to report spam preacquisition, how did

you know which spam to block? A. Primarily, I think, through our own use. We, at the time,

had a popular page, the second tab in the app. And that was a target often of spam because they

were the most high-visibility photos on the platform.").

The additional testimony regarding Instagram outsourcing manual review of flagged content to CrowdFlower that the FTC claims Meta "omit[ted]" does not create a dispute that Mr. Toffey testified that users' reports of potential policy violations had grown nearly ten-fold by early 2012.  Indeed, that decision corroborates the growing amount of policy-violating content on Instagram.  *See* Ex. 154 at 95:25-96:7 (Toffey Dep. Tr.) ("[Instagram] had a growing community at that time and we had a small team and so it was quite a challenge to stay on top of removing that [policy-violating] content from [Instagram].  After a period of time I recall that we contracted with a third party to remove, or review and remove problematic content from our platform.").  The third-party provider, CrowdFlower, "primarily reviewed objectionable content" – "nudity, for example, or violence."  Ex. 153 at 136:1-5 (Krieger Dep. Tr.).  Instagram's community team remained responsible for circulating spam reports and taking action on individual comments and individual accounts through August 2012.  *See* Ex. 154 at 158:13-159:11 (Toffey Dep. Tr.); *see also* Ex. 224 (PX10020, FB_FTC_CID_12203533).

Paragraph 146 of Professor McCoy's report does not cite any evidence post-dating July 2012, and therefore it cannot and does not create a genuine dispute of material fact regarding the amount of spam on Instagram before the acquisition closed, and particularly between July 2012 and August 31, 2012.  *See* PX9002 at ¶ 146 (McCoy Rep.); *see also id.* at ¶ 133 (Professor McCoy acknowledging that "spam attacks are constantly evolving").  Paragraph 17 of Professor McCoy's report does not cite any evidence and therefore does not create a genuine dispute of material fact.

681.    Nick Shortway – an engineer at Instagram pre-acquisition, *see* Ex. 156 at 9:4-21 (Shortway Dep. Tr.) – testified:  "At the time when I started, spam was so bad on the platform, deactivating really bad accounts and all of that type of activity that it was incredibly difficult for

even users to operate." *Id*. at 22:18-21 & errata.  Patrick Bozeman – formerly the director of

engineering at Instagram, *see* Ex. 155 at 18:8-11 (Bozeman Dep. Tr.) – testified "[t]here was a lot

of bad stuff going on preacquisition," including "a lot of inauthentic activity and spam," which

could have "crushed" Instagram.  *Id*. at 137:4-7.

    **FTC Response: Disputed in part.**  The FTC objects to the term "pre-acquisition" and

"at the time when I started" as vague as to time, to the terms "difficult for users to operate," "bad

stuff," and "crushed" as vague.  The FTC further objects to Statement 681 because the cited

material does not establish the absence of a genuine dispute as to any material fact and is not

supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

    The FTC does not dispute that the quoted language appears in the cited material, but

otherwise disputes Statement 681 as described herein.

    The FTC disputes Statement 681 because Mr. Shortway was not an engineer at Instagram

"pre-acquisition."  Mr. Shortway testified that his "first day on the job" as an infrastructure

engineer for Instagram was around September 6, 2012, Ex. 156 at 9:14-10:3, 13:21-23 (Shortway

Dep. Tr.), which is after Meta acquired Instagram (on August 31, 2012).  *See* PX15544, Meta

Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (Meta admitting

that Facebook's acquisition of Instagram closed on August 31, 2012).  Mr. Shortway further

testified that he did not have "direct responsibility" for identifying and preventing objectionable

content on Instagram and that "as [Instagram] started growing the engineering team, [he]

continued to stay more on the infrastructure side and [Instagram] started building up people who

had more experience with catching bad content and spam."  Ex. 156 at 28:24-29:9 (Shortway

Dep. Tr.).

The FTC further disputes Statement 681 because other evidence shows that spam was not impacting Instagram's growth or operations, and that spam would not have "crushed" Instagram. Testimony from Instagram's co-founders shows that spam was not slowing down Instagram's growth or crippling its operations prior to the Meta acquisition.  PX6146, Krieger (Meta/Instagram) Dep. Tr., at 135:15-17 ("█████████████████████████████████ ████████████████████████████████████."); PX6146, Systrom (Meta/Instagram) Dep. Tr., at 166:4-8 ("████████████████████████████████████ ███████████████████████████████████████████.").

Other evidence indicates that Instagram was effectively managing spam pre-acquisition. In June 2012, Kevin Systrom turned down an offer to use Impermium's spam mitigation services, explaining that Instagram was "actually tackling the spam thing pretty well these days." PX15223, Meta email chain: K. Systrom to ██████ re: "Impermium <-> Instagram Intro?" (June 30, 2012), FB_FTC_CID_12185539, at -539.  In an email dated January 2013, a Meta engineer – described as "Facebook's best spam fighter," PX3225, Meta message: R. Branson to ████████ and A. Cole, (Nov. 12, 2012), FB_FTC_CID_11759461, at -461 – wrote: "[t]he number of accounts caught at signup time by Instagram's old ol' IPSpamCalculator is an order of magnitude larger than those caught by other policies.  This is good and speaks to the fact that IG's system works." PX10887, Meta email chain: ██████████ to ████████, et al. re "[tasks] #2016790: Begin IG fake account registration classification in earnest [sinstagram]," (Jan. 11, 2013), FB_FTC_CID_02627996, at -996.

In addition, the FTC's integrity expert, Damon McCoy, evaluated Meta's integrity claims and supporting evidence regarding Instagram, and concluded that "the record does not indicate that Instagram was facing a critical or exceptional level of spam pre-acquisition."  PX9002,

McCoy Report at ¶ 146; *see also id.* at ¶ 17 ("In fact, Instagram was capably managing integrity, having deployed increasingly sophisticated tools and techniques in response to integrity issues, and had ample funding and engineering talent available to follow the path of the many other online platforms that have successfully grown their integrity programs.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Shortway testified, that when he started at Instagram, spam was so bad that it made it incredibly difficult for users to operate the app, and that Mr. Bozeman testified that "[t]here was a lot of bad stuff going on preacquisition," including "a lot of inauthentic activity and spam," which could have "crushed" Instagram.  *See supra* Meta Introduction.

As the terms "at the time when I started" and "difficult for users to operate" are ordinarily understood and used, there is no dispute that, when Mr. Shortway began his employment at Instagram on or around September 6, 2012, he believed spam made using Instagram incredibly challenging for users.  *See* Ex. 156 at 9:4-7, 10:4-6, 13:16-23 (Shortway Dep. Tr.) (testifying that he was hired and reported to Mr. Krieger in August 2012, and that his first day on the job was around September 6, 2012).

The additional testimony from Mr. Shortway that the FTC cites fails to create a dispute of material fact regarding Mr. Shortway's testimony that, when he started at Instagram, spam was so bad it was incredibly difficult for users to operate the app.  His start date – six days after the acquisition closed – is immaterial because Instagram was still using its pre-acquisition integrity systems at that time.  *See* Ex. 302 at 234:20-235:3 (Krieger IH Tr.) (Instagram integrated with Meta's antispam system in "October or November of 2012"); *infra* Meta SMF ¶ 748 (discussing Instagram's integration with Meta's spam-fighting system in November 2012).  Mr. Shortway not having "direct responsibility" for Instagram's integrity is likewise immaterial because he had

"edited some of the code" that Instagram used to detect and remove policy-violating content before Instagram integrated with Meta's integrity systems, was involved in addressing incidents involving policy-violating content, and "hear[d] a lot of bad press" regarding the impact of spam on Instagram users' experiences when he started at the company.  Ex. 156 at 22:6-22, 23:18-24:20, 28:24-29:9 (Shortway Dep. Tr.).  Thus, he has a foundation to offer the testimony in paragraph 681.

The additional materials cited by the FTC do not create a dispute of material fact regarding Mr. Shortway's and Mr. Bozeman's testimony in paragraph 681.  Mr. Krieger testified that, before the acquisition closed, Instagram relied on "pretty rudimentary defenses" to combat spam, which were "quite easy" for a "dedicated-enough spammer . . . to circumvent."  Ex. 302 at 232:4-233:2 (Krieger IH Tr.).  He also testified that he did not recall Instagram having any authentication mechanisms to address fake accounts before the acquisition closed, and that "none of the [pre-acquisition Instagram] team had any expertise in site integrity or spam."  Ex. 153 at 142:13-143:4 (Krieger Dep. Tr.).  Mr. Systrom's testimony and a single statement he made to an investor from Greylock in June 2012 do not create a genuine dispute of material fact as to the amount of spam and policy-violating content on Instagram, particularly between July 2012 and when the acquisition closed.  *See* PX15223 at -539 (FB_FTC_CID_12185539); *see also* Ex. 284 at 278:12-15 (Systrom IH Tr.) (testifying that, before the acquisition, Mr. Krieger was "most involved" in Instagram's efforts to combat bots and spam); Ex. 154 at 105:19-21 (Toffey Dep. Tr.) ("Q. Do you know if Kevin Systrom had any responsibilities related to spam in 2012? A. None that I recall."); PX9002 at ¶ 133 (McCoy Rep.) (explaining that spam-fighting is an "iterative" process because "spam attacks are constantly evolving").  Nor does the January 2013 email cited by the FTC create a dispute, because it is focused solely on "fake account

registration," and the evidence shows that Instagram ultimately deleted and replaced Instagram's legacy spam-fighting code, including the IPSpamCalculator, with "more scalable solutions using [Meta's] Sentry & Sigma" tools.  *See* Ex. 7 at ¶ 128 & n.335 (Subrahmanian Rep.) (quoting FB_FTC_CID_12206936 at -936, in which Mr. Krieger wrote:  "Props to ▇▇▇▇ for deleting a ton of legacy Instagram spam-fighting code, all of which has been replaced by more scalable solutions using Sentry & Sigma."); Ex. 470 at -950 (FTC-META-007081950) (November 2013 post discussing ▇▇▇▇▇▇▇ work to retire IPSpamCalculator).

The cited paragraphs of Professor McCoy's report do not create a genuine dispute of material fact regarding the amount of spam on Instagram before the acquisition closed, and particularly between July 2012 and August 31, 2012, including for the reasons stated above in Meta's reply to paragraph 680.

682.    Mr. Krieger in an October 16, 2015, Meta document, titled "The evolution of spam fighting at Instagram," states that, before the acquisition, Instagram had an "ad-hoc method of creating one-off policies to fight spam" that "simply wouldn't scale."  Ex. 214 at -836 (FTC-META-005087836).  The document also states that Instagram's "spam-fighting code was messy," and its response time to address spam "was incredibly slow," including because updating "spam policies necessitated a full rollout of [Instagram's] site."  *Id.*

**FTC Response: Disputed in part.**  The FTC objects to the terms "policies," "messy," and "incredibly slow," as vague, to the term "before the acquisition" as vague as to time, and to Statement 682 because the cited material does not establish the absence of a genuine dispute as to any material fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 682 as described herein.

The FTC disputes Statement 682 because other evidence shows that Instagram was effectively addressing spam before the Meta acquisition and would have been able to scale its approach to combating spam without Meta.  Instagram co-founder Kevin Systrom testified that prior to the acquisition, Instagram had developed several ██████████████████████████ ████████████████████████████████████████████ PX6027, Systrom (Meta/Instagram) IH Tr., at 278:12-20.  Systrom also testified that prior to the acquisition ████████████████████████████████████ ████ PX6133, Systrom (Meta/Instagram) Dep. Tr., at 164:24-165:19; *see also id*. at 169:25-170:7 ("████████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████").  In June 2012, Kevin Systrom stated that Instagram was "actually tackling the spam thing pretty well these days."  PX15223, Meta email chain: K. Systrom to █████ re: "Impermium <-> Instagram Intro?" (June 30, 2012), FB_FTC_CID_12185539, at -539.  In an email dated January 2013, a Meta engineer – described as "Facebook's best spam fighter," PX3225, Meta message: R. Branson to █████ and A. Cole, (Nov. 12, 2012), FB_FTC_CID_11759461, at -461 – wrote: "[t]he number of accounts caught at signup time by Instagram's old ol' IPSpamCalculator is an order of magnitude larger than those caught by other policies.  This is good and speaks to the fact that IG's system works."  PX10887, Meta email chain: █████████ to █████, et al. re "[tasks] #2016790: Begin IG fake account registration classification in earnest [sinstagram]," (Jan. 11, 2013), FB_FTC_CID_02627996, at -996.

In addition, the FTC's integrity expert, Damon McCoy, evaluated Meta's integrity claims and supporting evidence regarding Instagram, and concluded: "[Instagram's] levels of pre-acquisition spam were not exceptional, and it had already deployed increasingly sophisticated tools and techniques of its own, including certain techniques that Meta claims credit for deploying via its systems. That Instagram could have continued to deploy spam-fighting capabilities, without intervention by Meta, is additionally supported by the fact that numerous other online platforms successfully manage spam at scale every day, both at the time of the acquisition and today." PX9002, McCoy Report at ¶ 144.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that, before the acquisition closed, Instagram relied on an "ad-hoc method of creating one-off policies to fight spam," which "simply wouldn't scale"; its "spam-fighting code was messy"; and its response time to address spam "was incredibly slow," including because updating "spam policies necessitated a full rollout of [Instagram's] site." As the terms "policies," "messy," "incredibly slow," and "before the acquisition" are ordinarily understood and used, there is no dispute that the ad-hoc approach to spam-fighting that Instagram used prior to August 31, 2012 (i.e., when the acquisition closed) was not scalable, Instagram's spam-fighting code was "strewn throughout [its] codebase with little consistency," and updating Instagram's spam-fighting filters was a time-consuming process that required a full rollout of Instagram's site. Ex. 214 at -836 (FTC-META-005087836).

The additional materials cited by the FTC also do not create a dispute of material fact regarding pre-acquisition Instagram's approach to fighting spam, including for the reasons stated above in Meta's reply to paragraph 681. In addition, Mr. Systrom testified that his "cofounder, Mike [Krieger], was the person most involved" in Instagram's pre-acquisition efforts to combat

spam.  Ex. 284 at 278:12-15 (Systrom IH Tr.).  According to Mr. Krieger – who also authored

portions of Ex. 214 (FTC-META-005087836) – Instagram used "pretty rudimentary defenses" to

combat spam, which were "quite easy" for a "dedicated-enough spammer . . . to circumvent,"

before the acquisition closed.  Ex. 302 at 232:4-233:2 (Krieger IH Tr.).  He also testified that he

did not recall Instagram having any authentication mechanisms to address fake accounts before

the acquisition closed, and that "none of the [pre-acquisition Instagram] team had any expertise

in site integrity or spam."  Ex. 153 at 142:13-143:4 (Krieger Dep. Tr.).

        Paragraph 144 of Professor McCoy's report does not cite any evidence and therefore does

not create a genuine dispute of material fact.  *See* PX9002 at ¶ 144 (McCoy Rep.).

        683.    Mr. Krieger testified that pre-acquisition Instagram had "rudimentary defenses" to

address these issues.  Ex. 302 at 232:4-10 (Krieger IH Tr.); *see also* Ex. 153 at 253:7-12 (Krieger

Dep. Tr.).  According to Mr. Krieger, no one on the Instagram "team had any expertise in site

integrity or spam."  Ex. 153 at 143:3-4 (Krieger Dep. Tr.).  Mr. Shortway testified that it was

"incredibly difficult" for pre-acquisition Instagram to detect spam or other objectionable content,

and it was not "really good at either of them."  Ex. 156 at 23:18-24:7 (Shortway Dep. Tr.).  He

also testified, regarding objectionable content, that Instagram's approach was "somewhat

shoddy" and lacked "a real professional solution."  *Id.* at 23:12-15.  Mr. Shortway further

testified that Instagram relied on "hacked-together solutions that [it was] struggling to make

work."  *Id.* at 22:10-12.

        **FTC Response: Disputed in part.**  The FTC objects to the term "pre-acquisition" as

vague as to time, to the terms "these issues," "rudimentary," "expertise," "difficult," "shoddy,"

"a real professional solution," "hacked-together solutions," and "struggling" as vague.  The FTC

further objects to Statement 683 because the cited material does not establish the absence of a

genuine dispute as to any material fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 683 as described herein.

The FTC disputes the first sentence of Statement 683 as incomplete and misleading because it is vague as to time, and the evidence indicates that spam only started to appear on Instagram in the months before the Meta acquisition.  *See* Ex. 302 at 232:4-10 (Krieger IH Tr.), (" ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ "); *id.* at 233:10-16 ("█████████

███████████████████████████████████████████████████████

█████████████████████████████ ").

The FTC also disputes that the term "these issues" in the first sentence of Statement 683 as vague and incomplete because it omits the context for Mr. Krieger's reference to "████████████

████████ " which was in a response to a question about spam pre-acquisition.  *See id.* at 232:4-10.

The FTC disputes the second sentence of Statement 683 as misleading and incomplete because evidence indicates that Kevin Systrom had developed expertise in fighting spam before the Meta acquisition.  In a message dated February 2, 2012, Mr. Systrom wrote: "From someone smart who has worked on this stuff: [[How should Instagram defend itself against spam?]] [sic] I worked on spam fighting from late 2007 to late 2009."  PX2867, Meta email chain: K. Systrom to dev listserv re: "Spam Fighting," (Feb. 2, 2012), FB_FTC_CID_02983512, at -512.  Mr. Krieger also testified that Instagram planned to ██████████████████████████████████████████

 . Ex. 153 at

20:22-21:20 (Krieger Dep. Tr.).  The second sentence in Statement 683 also omits testimony

from Mr. Krieger indicating "████████████████████████████████████

████████."  *Id.* at 146:19-24; *see also id.,* at 20:22-21:3 ("██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████").

The FTC disputes that Mr. Shortway's testimony in Statement 683 because he was not an

engineer at Instagram "pre-acquisition."  Mr. Shortway testified that his "first day on the job" as

an infrastructure engineer for Instagram was around September 6, 2012, Ex. 156 at 9:14-10:3,

13:21-23 (Shortway Dep. Tr.), which is after Meta acquired Instagram (on August 31, 2012).

PX15544, Meta Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09

(Meta admitting that Facebook's acquisition of Instagram closed on August 31, 2012).  Mr.

Shortway further testified that he did not have "direct responsibility" for identifying and

preventing objectionable content on Instagram and that "as [Instagram] started growing the

engineering team, [he] continued to stay more on the infrastructure side and [Instagram] started

building up people who had more experience with catching bad content and spam."  Ex. 156

at 28:24-29:9 (Shortway Dep. Tr.).

The FTC further disputes Mr. Shortway's testimony because other evidence indicates that

Instagram was effectively addressing spam and objectionable content before the Meta

acquisition.  Kevin Systrom testified that prior to the acquisition, Instagram had developed

several "████████████████████████████████████

████████████████"  PX6027, Systrom (Meta/Instagram) IH Tr., at 278:12-20.  In

June 2012, Kevin Systrom stated that Instagram was "actually tackling the spam thing pretty well these days." PX15223, Meta email chain: K. Systrom to ███ re: "Impermium <-> Instagram Intro?" (June 30, 2012), FB_FTC_CID_12185539, at -539.  In an email dated January 2013, a Meta engineer – described as "Facebook's best spam fighter," PX3225, Meta message: R. Branson to ███ and A. Cole, (Nov. 12, 2012), (FB_FTC_CID_11759461), at -461 – wrote: "[t]he number of accounts caught at signup time by Instagram's old ol' IPSpamCalculator is an order of magnitude larger than those caught by other policies.  This is good and speaks to the fact that IG's system works."  PX10887, Meta email chain: ███ to ███, et al. re: "[tasks] #2016790: Begin IG fake account registration classification in earnest [sinstagram]," (Jan. 11, 2013), FB_FTC_CID_02627996, at -996.  Instagram was using other tools before the Meta acquisition such as blocklists and rate limiters, Ex. 153 at 134:1-135:6 (Krieger Dep. Tr.), that other online platforms – including Twitter (PX6144, Coleman (Twitter) Dep. Tr., at 283:9-21; 287:1-288:17), Pinterest, (PX6108, Coleman (Pinterest) Dep. Tr., at 204:17-207:2), and Meta (PX9020, Subrahmanian Report at ¶ 38) – were using to address spam and objectionable content.

In addition, the FTC's integrity expert, Damon McCoy, evaluated Meta's integrity claims and supporting evidence regarding Instagram, and concluded that prior to the acquisition "Instagram was capably managing integrity, having deployed increasingly sophisticated tools and techniques in response to integrity issues, and had ample funding and engineering talent available to follow the path of the many other online platforms that have successfully grown their integrity programs."  PX9002, McCoy Report at ¶ 17.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Krieger testified that, before the acquisition closed, Instagram had rudimentary defenses to

address spam, and no one on the Instagram team had expertise in site integrity or spam-fighting.

The FTC's response likewise does not create a genuine dispute of material fact that

Mr. Shortway testified it was incredibly difficult for pre-acquisition Instagram to detect spam

and policy-violating content; Instagram was not good at detecting spam or policy-violating

content; and Instagram struggled to make its pre-acquisition systems work against policy-

violating content, including because they were hacked-together, somewhat shoddy, and not a

professional solution.

As the term "pre-acquisition" is ordinarily understood and used, there is no dispute that

Mr. Krieger's and Mr. Shortway's testimony pertains to the integrity systems Instagram

deployed prior to August 31, 2012 (i.e., when the acquisition closed).  As the term "rudimentary"

is ordinarily understood and used, there is no dispute that Mr. Krieger testified that the defenses

Instagram used to combat spam before the acquisition closed were unsophisticated.  As the term

"expertise" is ordinarily understood and used, there is no dispute that Mr. Krieger testified that

no one on the pre-acquisition Instagram team had specialized knowledge or skill in site integrity

or spam-fighting.  The FTC's confusion about the term "expertise" is belied by its affirmative

use of the term in its response to paragraph 683 (i.e., "Kevin Systrom had developed expertise in

fighting spam").  As the terms "difficult" and "struggling" are ordinarily understood and used,

there is no dispute that Mr. Shortway testified that it was incredibly challenging for pre-

acquisition Instagram to detect and remove policy-violating content.  The FTC asked

Mr. Shortway what he meant by "hacked-together solutions," and he explained that "they were

somewhat shoddy and trying to just pull some things together without a real professional

solution."  Ex. 156 at 23:6-15 (Shortway Dep. Tr.).  The FTC disputes the first sentence because

it claims the term "these issues" is vague, but the immediately preceding paragraph (¶ 682) –

which "these issues" refers to – pertains to Instagram's preacquisition approach to spam fighting. *Compare supra* Meta SMF ¶ 682, *with* Ex. 302 at 232:4-10 (Krieger IH Tr.) ("Q. . . . Was Instagram having issues with spam preacquisition?  A.  We were.  Starting in maybe May of 2012 is when spam started appearing more on Instagram.  And we had built – I'd characterize it as pretty rudimentary defenses, you know, that year.").

The FTC claims that additional testimony from Mr. Krieger regarding when spam appeared on Instagram is necessary for completeness, but the FTC mischaracterizes that testimony, and, in any event, it does not create a dispute regarding the rudimentary spam-fighting defenses that Instagram used before the acquisition closed.  Mr. Krieger testified that "low-grade spam" appeared on Instagram "within the first year" of its existence – not, as the FTC incorrectly claims, "in the months before the Meta acquisition" – and Instagram experienced "a notable uptick in spam in [May] 2012" when it encountered "coordinated" or "professionalized attempts" by spammers.  Ex. 153 at 130:22-131:10, 132:18-23 (Krieger Dep. Tr.); *see supra* Meta SMF ¶ 55 (undisputed that Instagram launched in October 2010); Counter SMF ¶ 2194(b) (undisputed that Instagram experienced low-grade spam in the first year after its launch).

For the second sentence, the additional testimony the FTC claims is necessary for completeness does not create a dispute that Mr. Krieger testified that, before the acquisition, no one on the Instagram team had expertise in site integrity or spam.  The FTC claims that evidence indicates that Mr. Systrom had developed expertise in spam-fighting before the acquisition, but there is no indication that Mr. Systrom was referring to himself in the cited document, and context suggests he was not.  *See, e.g.*, PX2867 at -512 (FB_FTC_CID_02983512) ("There are three sub-projects that *you* want to do . . . .  Here are some of the different kinds of jobs that *you* will want to schedule . . . ." (emphases added)).  In any event, the evidence shows that

Mr. Systrom played a limited (if any) role in combatting spam on Instagram before the acquisition.  *See* Ex. 284 at 278:12-15 (Systrom IH Tr.) (testifying that Mr. Krieger was "the person most involved" in Instagram's pre-acquisition efforts to combat spam); *see also* Ex. 154 at 105:19-21 (Toffey Dep. Tr.) ("Q. Do you know if Kevin Systrom had any responsibilities related to spam in 2012?  A. None that I recall.").

For the third, fourth, and fifth sentences, the additional materials that the FTC cites do not create a dispute of material fact regarding Mr. Shortway's description of the systems Instagram used prior to the acquisition to combat spam and policy-violating content, including for the reasons stated above in Meta's reply to paragraph 681.  In addition, the fact that Instagram used blocklists and rate limiters before the acquisition closed does not contradict or undermine Mr. Shortway's testimony.  *See*, *e.g.*, Ex. 214 at -836 (FTC-META-005087836) (stating that Instagram's pre-integration "spam-fighting code was messy," including because "rate limits were often strewn throughout the codebase with little consistency," which "made it immensely hard to comprehend 1) the variety of policies that were running at any one time and 2) how these policies interacted with one another").

Paragraph 17 of Professor McCoy's report does not cite any evidence and therefore does not create a genuine dispute of material fact as to any sentence in paragraph 683.

684.    Jay Parikh – former head of infrastructure at Meta, Ex. 157 at 25:22-24 (Parikh Dep. Tr.) – testified: "[Instagram was] struggling to manage the spam, so basically the safety of the users on Instagram at the time, and they were struggling to keep up with the different types of and the magnitude or the complexity of the attacks that spammers and phishers were targeting Instagram for.  And their systems weren't designed or built for scaling to handle this rapidly

escalating set of attacks, and I guess they were a target, and that was one of the first things they asked us for our help on after the acquisition closed."  Ex. 158 at 110:7-22 (Parikh IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the terms "struggling," "magnitude," "complexity," and "rapidly" as vague, and to Statement 684 as vague as to time. The FTC further objects to Statement 684 because the cited material does not establish the absence of a genuine dispute as to any material fact and is not supported by admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 684 as described herein.

The FTC disputes Statement 684 as incomplete and misleading because other evidence indicates that spam only started to appear on Instagram in the months before the Meta acquisition.  *See* PX6015, Krieger (Meta/Instagram) IH Tr., at 232:4-10 ("█████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████ ██████████ ").

Moreover, Mr. Parikh was not an Instagram employee or responsible for integrity issues at Instagram prior to the acquisition, *see* Ex. 157 at 28:3-17; 29:3-23; 34:13-15; 120:11-15, (Parikh Dep. Tr.), and other evidence indicates that Instagram was effectively addressing spam before the Meta acquisition.  Instagram co-founder Kevin Systrom testified that prior to the acquisition, Instagram had developed several "████████████████████████████ █████████████████████████████████████████████████████ "  PX6027, Systrom

(Meta/Instagram) IH Tr., at 278:12-20.  In June 2012, Kevin Systrom stated that Instagram was "actually tackling the spam thing pretty well these days."  PX15223, Meta email chain: K. Systrom to ▮▮▮ re: "Impermium <-> Instagram Intro?" (June 30, 2012), FB_FTC_CID_12185539, at -539.  In an email dated January 2013, a Meta engineer – described as "Facebook's best spam fighter," PX3225, Meta message: R. Branson to ▮▮▮ and A. Cole, (Nov. 12, 2012), FB_FTC_CID_11759461, at -461 – wrote: "[t]he number of accounts caught at signup time by Instagram's old ol' IPSpamCalculator is an order of magnitude larger than those caught by other policies.  This is good and speaks to the fact that IG's system works." PX10887, Meta email chain: ▮▮▮ to ▮▮▮, et al. re: "[tasks] #2016790: Begin IG fake account registration classification in earnest [sinstagram]," (Jan. 11, 2013), FB_FTC_CID_02627996, at -996.

The FTC also disputes Statement 684 because other evidence shows that Instagram would have been able to scale its approach to combating spam without Meta.  *See* PX6146, Krieger (Meta/Instagram) Dep. Tr., at 20:22-21:3 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮").

In addition, the FTC's integrity expert, Damon McCoy, evaluated Meta's integrity claims and supporting evidence regarding Instagram, and concluded: "[Instagram's] levels of pre-acquisition spam were not exceptional, and it had already deployed increasingly sophisticated tools and techniques of its own, including certain techniques that Meta claims credit for deploying via its systems.  That Instagram could have continued to deploy spam-fighting capabilities, without intervention by Meta, is additionally supported by the fact that numerous

other online platforms successfully manage spam at scale every day, both at the time of the acquisition and today."  PX9002, McCoy Report at ¶ 144.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Parikh testified that, before the acquisition, Instagram struggled to manage and keep up with the different types, magnitude, and complexity of spam attacks on its platform, and the systems Instagram relied upon at the time were not built to scale or handle the rapidly escalating spam attacks that Instagram encountered.  As the terms "struggling," "magnitude," "complexity," and "rapidly" are ordinarily understood and used, there is no dispute that Mr. Parikh believed that pre-acquisition Instagram experienced challenges and difficulty in attempting to manage the different types, significant amount, and sophisticated nature of the spam on its platform and that those attacks were escalating quickly.  The FTC's claim that the statement is "vague as to time" does not create a dispute because this statement falls under the "Pre-Acquisition Integrity" heading, and Mr. Parikh's testimony indicates that Instagram's struggles occurred before Instagram's integration with Meta's spam-fighting system.  *See* Ex. 158 at 110:11-112:11 (Parikh IH Tr.).  The additional testimony from Mr. Krieger regarding when spam appeared on Instagram, which the FTC claims is necessary for completeness, in fact reinforces Mr. Parikh's belief that, before the acquisition closed, Instagram faced rapidly escalating and complex spam attacks, including for the reasons stated above in Meta's reply to paragraph 683.

The FTC's claim that Mr. Parikh was not an Instagram employee or responsible for integrity issues at Instagram prior to the acquisition does not create a genuine dispute of material fact because Mr. Parikh testified that, after the acquisition closed, he met with Instagram's engineers and leadership team to discuss the challenges they faced, including "that they were

struggling to manage the spam." Ex. 158 at 109:10-110:22 (Parikh IH Tr.); *see supra* Meta SMF ¶¶ 679-681 (discussing pre-acquisition levels of spam on Instagram).

Paragraph 144 of Professor McCoy's report does not cite any evidence and therefore does not create a genuine dispute of material fact. *See* PX9002 at ¶ 144 (McCoy Rep.).

### e.     Pre-Acquisition Infrastructure

685.   Before the Meta acquisition, Instagram operated on Amazon Web Services ("AWS"). *See* Ex. 153 at 43:12-44:11 (Krieger Dep. Tr.). Mr. Shortway testified regarding Instagram's infrastructure that "our packet rates became unmanageable and slow, and we couldn't provide the performance to our users." Ex. 156 at 114:17-24 (Shortway Dep. Tr.). He also testified this required "a very large hack" in which AWS would troubleshoot the infrastructure with Instagram on a nightly basis. *Id.* at 114:25-115:10.

**FTC Response: Disputed in part and incomplete.** The FTC objects to the second and third sentences in Statement 685 as vague as to time, and to the terms "unmanageable," "slow," "performance," and "very large hack" as vague.

The FTC does not dispute that Instagram operated on AWS's infrastructure before the Meta acquisition, or that the quoted language appears in the cited material, but otherwise disputes Statement 685 as described herein.

The FTC disputes Statement 685 as misleading in referencing "before the acquisition," because Instagram used AWS before *and after* the Meta acquisition. *See* Ex. 153 at 78:4-9 (Krieger Dep. Tr.) ("█████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████").

The FTC disputes the second and third sentences in Statement 685 as vague as to time and because Mr. Shortway was not an engineer at Instagram "pre-acquisition." Mr. Shortway

testified that his "first day on the job" as an infrastructure engineer for Instagram was around September 6, 2012, Ex. 156 at 9:14-10:3, 13:21-23 (Shortway Dep. Tr.), which is after Meta acquired Instagram (on August 31, 2012).  *See* PX15544, Meta Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (Meta admitting that Facebook's acquisition of Instagram closed on August 31, 2012).

    The FTC further disputes the second sentence's assertion that Instagram "couldn't provide the performance to [its] users" on AWS because it is contradicted by other evidence.  Instagram co-founder Kevin Systrom testified that that AWS "███████████████

███" and was meeting Instagram's infrastructure needs:



        PX6027, Systrom (Meta/Instagram) IH Tr., at 229:25-230:19.

    Mr. Systrom also testified that Instagram was well-positioned to continue growing and meeting its infrastructure needs without Meta.  *Id.* at 235:20-23 ("███████████████████

███████████████████████████████████████████████████████

███████████████"); PX6133, Systrom (Meta/Instagram) Dep. Tr., at 16:16-18 ("████████

███████████████████████████████████████████████████████").

    Additionally, the FTC disputes the last sentence in Statement 685 as vague and misleading because other evidence shows that "hacks" are common engineering solutions to

technical issues.  *See, e.g.*, PX9011, Bray Rebuttal Report at ¶ 166 ("Speaking as a seasoned software engineer, I can testify that every production system I have ever dealt with is well-populated with 'hacks'").

Finally, the FTC further disputes Statement 685 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence, *inter alia*, shows Instagram was well-positioned to continue growing successfully on AWS without the Meta acquisition.  In fact, Instagram grew rapidly on AWS prior to its acquisition by Meta.  *See* PX10023, Meta email chain: S. Sweeney to Instagram distribution list re: "Happy 100 million users," (Aug. 29, 2012), FTC-META-003148243, at -243 ("Good morning Instagram, Congratulations on crossing 100,000,000 registered users!  Would you believe that one year ago we had less than 10 million users.  To give even more perspective on how incredible growth has been, in less than five months we have had over 30 million Android users sign up.").

And Instagram continued to grow on AWS after the Meta acquisition.  *See, e.g.*, Ex. 153 at 93:15-23 (Krieger Dep. Tr.) ("█████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram was experiencing technical challenges on AWS, including slow packet rates.  *See supra* Meta Introduction.  As the terms "unmanageable," "slow," "performance," and "very large hack" are ordinarily understood and used, there is no dispute that the material cited in the paragraph discusses Instagram's technical challenges on AWS.  The fact that Instagram

continued using AWS for a period after the acquisition has no bearing on the fact that Instagram was experiencing technical issues on AWS prior to migrating to Meta's infrastructure.  The FTC does not dispute that Mr. Shortway's testimony pertains to the infrastructure Instagram had in place on AWS prior to Instagram's migration to Meta's infrastructure.

The additional material that the FTC claims "contradict[s]" Mr. Shortway's testimony does not create a genuine dispute of material fact that Instagram was experiencing technical challenges on AWS.  Mr. Shortway's testimony discusses the "noisy neighbor" problem.  *See* Ex. 156 at 114:17-24 (Shortway Dep. Tr.); Ex. 5 at ¶ 25 (Nieh Rep.) (explaining the noisy neighbor problem).  Mr. Systrom testified that one of the benefits of migrating to Meta's infrastructure was that Instagram could avoid the noisy neighbor problem on AWS's servers. *See* Ex. 151 at 356:24-358:22 (Systrom Dep. Tr.).  Further, other evidence confirms that Instagram experienced numerous technical challenges and scaling issues on AWS.  *See infra* Meta SMF ¶¶ 686-694; Ex. 5 at ¶¶ 97-115 (Nieh Rep.).

The FTC's further response that "Instagram was well-positioned to continue growing successfully on AWS without the Meta acquisition" is nonresponsive to the fact stated in this paragraph and does not create a dispute of material fact.  To the extent the FTC's response suggests that absent the acquisition, Instagram would have scaled as quickly, efficiently, or effectively as it did as part of Meta, that is purely speculative and unsupported by any competent evidence.  Conversely, extensive evidence confirms that Instagram was experiencing numerous technical challenges and scaling issues prior to the acquisition, *see infra* Meta SMF ¶¶ 686-694; Ex. 5 at ¶ 97-115 (Nieh Rep.), and that Instagram received enormous benefits because of the acquisition that enabled Instagram to scale quickly, efficiently, and effectively.  *See infra* Meta SMF ¶¶ 755-762; Ex. 5 at ¶ 94 (Nieh Rep.) ("Instagram received enormous benefits from Meta

and its infrastructure, which enabled Instagram to scale more quickly, efficiently, and effectively

than it could have using other alternatives."); *id.* at ¶¶ 94-215 (Nieh Rep.) (describing those

benefits).

686.    Regarding the pre-acquisition Instagram infrastructure, Mr. Systrom testified:

"[W]e were spending 95 percent of our waking hours making sure that the service was running."

Ex. 151 at 216:9-11 (Systrom Dep. Tr.).  Mr. Systrom also testified: "I would say every week or

so we had a – an instance where we had to figure out how to keep the servers running."  *Id.*

at 215:24-216:1.

**FTC Response: Disputed in part.**  The FTC objects to the term "pre-acquisition" as

vague as to time.

The FTC does not dispute that the quoted language appears in the cited transcript, but

otherwise disputes Statement 686 as described herein.

The FTC disputes Statement 686 as the cited material does not show the absence of a

genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence,

*inter alia*, shows Instagram was well-positioned to continue growing successfully on AWS

without the Meta acquisition and, in fact, that Instagram continued to grow on AWS after the

Meta acquisition.  *See, e.g.*, PX6027, Systrom (Meta/Instagram) IH Tr., at 235:20-23 ("███████

███████████████████████████████████████████████████████

███████████████████████"); PX6146, Krieger (Meta/Instagram) Dep. Tr., at 93:15-

23 ("████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████").

The FTC further disputes Statement 686 as incomplete.  Mr. Systrom's full response shows that Instagram was successfully maintaining service to users:



Ex. 151 at 215:19-216:15 (Systrom Dep. Tr.).

Mr. Systrom also testified during his investigational hearing that, prior to the Meta acquisition, Instagram "had figured out [its] model of engagement, and we were scaling":



PX6027, Systrom (Meta/Instagram) IH Tr., at 107:23-108:7; *see also id.* at 109: 14-17

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram was spending a significant portion of its time ensuring its infrastructure was functioning.  *See supra* Meta Introduction.  As the term "pre-acquisition" is ordinarily understood and used, there is no dispute that Mr. Systrom's testimony pertains to the infrastructure Instagram had in place on AWS prior to Meta's acquisition of Instagram and before Instagram migrated to Meta's infrastructure.

The FTC's response that "Instagram was well-positioned to continue growing successfully on AWS without the Meta acquisition and, in fact, that Instagram continued to grow on AWS after the Meta acquisition" is nonresponsive to the facts stated in this paragraph and does not create a dispute of material fact for the reasons stated above in Meta's reply to paragraph 685.

The additional testimony that the FTC cites fails to create a dispute of material fact regarding Mr. Systrom's testimony that Instagram was spending a significant portion of its time ensuring its infrastructure was functioning.  In the first quote referenced by the FTC, Mr. Systrom testified that "by far the majority of our time was spent on" trying to keep Instagram's servers running and that "we were spending all of our time keeping the service running."  Ex. 151 at 215:19-216:15 (Systrom Dep. Tr.).  In the second quote, Mr. Systrom testified that Instagram "needed to hire a lot more people and run more quickly," which corroborates that Instagram did not have sufficient capabilities to reduce the amount of time it was spending on Instagram's infrastructure.  *See* PX6027 at 107:23-108:7 (Systrom IH Tr.).

687.    Mr. Systrom testified:  "Q. Okay.  Do you remember saying that 'Instagram's infrastructure was duct-taped along the way'?  A. Yes.  Q. Okay.  What did you mean by that?  A. We were growing so quickly that in order to keep up with the growth, we made a lot of quality of code tradeoffs where we would be okay with things not being perfect just to stay up with the constant demand."  Ex. 151 at 219:1-10 (Systrom Dep. Tr.); *see also* Ex. 153 at 222:19-223:24 (Krieger Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the Statement 687 as vague as to time.

The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 687 as described herein.

The FTC disputes Statement 687 as vague as to time, materially incomplete, and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Other testimony by Mr. Systrom indicates that Instagram had figured out how to continue scaling on AWS to support its explosive user growth before it was acquired by Meta:



PX6027, Systrom (Meta/Instagram) IH Tr., at 107:25-108:7; *see also id.* at 109:14-17 ██████; ██████████████████████████████████████); *id.* at 229:25-230:19 ████████████████████████████ *id.* at 235:20-23 ██████████████████████████████████████ ████████████████████).

Instagram's ability to deliver an excellent user experience is also evidenced by the fact that it was experiencing rapid growth on AWS prior to the acquisition by Meta, and that it was able to continue growing on AWS even after the acquisition.  *See* PX10023, Meta email chain: S. Sweeney to Instagram distribution list re: "Happy 100 million users," (Aug. 29, 2012), FTC-META-003148243, at -243 ("Good morning Instagram, Congratulations on crossing 100,000,000 registered users!  Would you believe that one year ago we had less than 10 million users.  To give even more perspective on how incredible growth has been, in less than five months we have had over 30 million Android users sign up."); *see also* Ex. 153 at 93:15-23 (Krieger Dep. Tr.) ("████████████████████████████████████████ ████████████████████████████").

Moreover, evidence indicates that Instagram was rapidly evolving from launch in October 2010, Ex. 153 at 71:5-6 (Krieger Dep. Tr.), to the acquisition by Meta in August 2012.  *See* PX15544, Meta Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (Meta admitting that Facebook's acquisition of Instagram closed on August 31, 2012).  For example, a presentation by Mr. Krieger shows Instagram rapidly evolving its infrastructure to accommodate its growth: "year 1: everything is on fire," "year 2: house in order," and "year 3: . . . distributed systems."  PX10881, Meta presentation: "Instagration" (2014), FB_FTC_CID_02613735 at -758, -764, -783.  Mr. Krieger expands on year three, describing Instagram as having "scaled to 150 million monthlies and beyond" and "very stable" before its migration to Meta's infrastructure.  *Id.* at -787-88; *see generally* PX9001, Bray Report at § III.C.; PX9011, Bray Rebuttal Report at § IV.B. (describing the process of moving to distributed systems to accommodate increased user demand).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram made many quality-of-code tradeoffs to stay up with demand.  *See supra* Meta Introduction.  The additional testimony the FTC cites does not create a genuine dispute as to that fact, nor does the FTC's claim that Instagram "rapidly evolv[ed] its infrastructure."  *See supra* Meta's Reply to SMF ¶ 685 (addressing similar response).

688.    Mr. Krieger testified that Instagram was "under water from an engineering perspective" and it was "very hard to scale [Instagram] with just the small team we had." Ex. 153 at 269:20-270:8 (Krieger Dep. Tr.); Ex. 302 at 159:15-17 (Krieger IH Tr.).  He also testified that Instagram was not able to "break out of that cycle of being in the primarily firefighting mode."  Ex. 153 at 269:2-11 (Krieger Dep. Tr.); *see also* Ex. 156 at 10:15-23 (Shortway Dep. Tr.) (testifying that Instagram was "in firefighting mode" when he joined the

company in August 2012).  Mr. Krieger stated in a publicly available interview that "every weekend [Instagram] survived was an accomplishment."  Ex. 427 at 8:55-9:05 (InfoQ, *How a Small Team Scales Instagram*, https://perma.cc/P2AZ-RTVL).

**FTC Response: Disputed in part.**  With the exception of the citation to Mr. Shortway's deposition testimony, the FTC objects to Statement 688 as vague as to time.

The FTC disputes Statement 688 as incomplete and misleading because other evidence indicates that Instagram was successfully scaling with the team that it had prior to its acquisition by Meta.  *See* PX10023, Meta email chain: S. Sweeney to Instagram distribution list re: "Happy 100 million users," (Aug. 29, 2012), FTC-META-003148243, at -243 ("Good morning Instagram, Congratulations on crossing 100,000,000 registered users!  Would you believe that one year ago we had less than 10 million users.  To give even more perspective on how incredible growth has been, in less than five months we have had over 30 million Android users sign up."); PX6027, Systrom (Meta/Instagram) IH Tr., at 235:20-23 ("██████████████████ ██████████████████████████████████████████████████ ██████████████████); *id.* at 229:25-230:17 ("█████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████").

Other evidence also shows that Instagram could have grown its infrastructure team without Meta.  In fact, Instagram was actively hiring engineers at the time of the acquisition, and Instagram's founders also testified they could have hired additional employees without joining Meta.  *See* Ex. 153 at 20:9-14 (Krieger Dep. Tr.) ("████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████"); *id.* at 20:22-21:3 ("██████████████

739



"); *id.* at 21:18-20 ("

"); PX6027, Systrom (Meta/Instagram) IH Tr., at 232:25-233:19 ("

").

The FTC also disputes the second sentence in Statement 688 as incomplete because Mr. Krieger did not testify that Instagram would have been unable to scale:



Ex. 153 at 269:2-11 (Krieger Dep. Tr.).

The FTC further disputes the reference to Mr. Shortway's testimony in Statement 688 because he did not join Instagram in August 2012 and was not an engineer at Instagram prior to the acquisition by Meta.  Mr. Shortway testified that his "first day on the job" as an infrastructure engineer for Instagram was around September 6, 2012, Ex. 156 at 13:21-23 (Shortway Dep. Tr.),

which is after Meta acquired Instagram (on August 31, 2012).  PX15544, Meta Obj. & Resp. to

FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (Meta admitting that Facebook's

acquisition of Instagram closed on August 31, 2012).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Instagram was underwater from an engineering perspective, that it was very hard to scale

Instagram with its small team, and that Instagram was not able to break out of being primarily in

firefighting mode.  *See supra* Meta Introduction.  The FTC's response that "Instagram was

successfully scaling with the team that it had prior to its acquisition by Meta" is nonresponsive to

the facts stated in the paragraph and does not create a dispute of material fact for the reasons

stated above in Meta's reply to paragraph 685.

The FTC's response that "Instagram could have grown its infrastructure team without

Meta" is irrelevant and nonresponsive to the fact stated in this paragraph.  It is undisputed that

Instagram could have hired additional employees without joining Meta.  That has no bearing on

the fact that Instagram lacked sufficient engineers prior to the acquisition, and it is purely

speculative whether Instagram would have been able to hire all the employees it needed,

particularly engineers, in a timely fashion.  *See* Ex. 5 at ¶ 99 (Nieh Rep.) ("According to

Mr. Krieger, Instagram also was 'underwater' from an engineering resources perspective, and it

'is very hard to scale it with just the small team we had.'  Mr. Krieger referred to this condition

as the 'recruiting cycle of death,' which he explains 'as a negative feedback cycle where you're

not able to keep pace — you're not able to scale the team.  And because you're not able to scale

the team, your existing work keeps getting harder.'" (internal citations omitted)).

689.    Mr. Shortway testified that pre-acquisition Instagram's engineers "were

essentially on call 24/7" and "spent just countless days" fixing infrastructure problems.  Ex. 156

at 72:9-16 (Shortway Dep. Tr.).  He also testified that they would "always carry our laptop and a MiFi with us at all times" to fix problems, such that engineers were fixing Instagram from "almost a Dr. Seuss book of places."  *Id.* at 72:9-25 & errata.

**FTC Response: Disputed in part.**  The FTC objects to the term "pre-acquisition" as vague as to time and to "infrastructure problems" and "problems" as vague.

The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 689 as described herein.

The FTC disputes Statement 689 because Mr. Shortway was not an engineer at Instagram "pre-acquisition."  Mr. Shortway testified that his "first day on the job" as an infrastructure engineer for Instagram was around September 6, 2012, Ex. 156 at 13:21-23 (Shortway Dep. Tr.), which is after Meta acquired Instagram (on August 31, 2012).  *See* PX15544, Meta Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (Meta admitting that Facebook's acquisition of Instagram closed on August 31, 2012).

The FTC disputes Statement 689 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Other evidence shows Instagram was not having material infrastructure problems pre-acquisition and was well-positioned to continue scaling on AWS without Meta.  *See* PX6027, Systrom (Meta/Instagram) IH Tr., at 109:14-17 (



); *id.* at 235:20-23 (

); *id.* at 107:23-108:7 (



); *see also* PX6146, Krieger (Meta/Instagram) Dep. Tr., at 93:15-23 (May 16, 2023) (

).

The FTC further disputes (to the extent implied by Statement 689) that Instagram was experiencing out-of-the ordinary or insurmountable infrastructure challenges prior to the acquisition. *See* PX3191, Meta document: "untitled," (Sept. 29, 2011), FTC-META-003361267, at -270 ("Startups are a twenty-four-hour endeavor[.]"); PX3336, Instagram email chain: K. Systrom to ▮▮▮▮ re: "Forbes Interview," (June 26, 2012), FTC-META-003352513 at -514 ("[I]f you're thinking of a startup as a place to clock-in hours, it's probably not the right place for you. If it's woven into the fabric of your life, you know it's more about the mission than it is about a paycheck or stock."). Other evidence shows that Meta itself has an extensive process for "incident response," including 24/7 support for any "technical indent that requires human intervention to resolve": "Engineers who write production code are expected to support that code in production and this responsibility is shared through an on-call rotation with regular shifts. At any time, at least one person should be 'on call' for every system in production." PX10087, Meta document: "DevInfra Deep Dive," (undated), FTC-META-012239137, at -161.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Instagram's engineers were spending a significant amount of time fixing infrastructure problems. *See supra* Meta Introduction. There is no dispute that Mr. Shortway's testimony pertains to

Instagram on AWS before Instagram migrated to Meta's infrastructure.  *See* Ex. 156 at 70:7-72:25 (Shortway Dep. Tr.) (addressing Instagram's infrastructure on AWS).

The FTC's response that "Instagram was not having material infrastructure problems pre-acquisition and was well-positioned to continue scaling on AWS without Meta" is nonresponsive to the facts stated in this paragraph and does not create a dispute of material fact for the reasons stated above in Meta's reply to paragraph 685.

690.    Mr. Systrom stated in a 2012 interview:  "I missed birthdays, dinners, weekends with family visiting.  Honestly there wasn't much of a choice – either we worked on Instagram or it came crumbling down and it wouldn't work.  For a while it was a race against the clock, and only recently have we figured out [how] to keep it from being a constant firefight."  Ex. 213 at -513 (FTC-META-003352513).  He said in another interview:  "Weekends didn't exist.  Mike [Krieger] and I set up an alarm on our phones if the servers were overloaded and went down, and that went off every four or five hours.  Then as we grew, it went off every hour, or every 15 minutes.  To this day, I have a Pavlovian response to that alarm:  simultaneous nausea and anxiety."  Ex. 428 at 3 (MetaFTC-DX-684).

**FTC Response: Disputed in part.**

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 690 as described herein.

The FTC disputes the first interview reference in Statement 690 as vague and incomplete because it omits the next statement in Mr. Systrom's response, in which he explains how to "keep it from being a constant firefight": "For a while it was a race against the clock, and only recently have we figured out to keep it from being a constant firefight.  Part of this is hiring people who can help with these challenges more easily, and part of it is simply us getting better

at growing more quickly. . . ."  Ex. 213 at -513-14 (FTC-META-003352513).  The FTC disputes

the second interview reference in Statement 690 as incomplete and misleading because it omits

Mr. Systrom's next statement that "it was also a sign of growth, which is a great problem to

have."  Ex. 428 at 3 (MetaFTC-DX-684).  Additionally, Mr. Systrom testified that he "█████

████████████████████████████████████████" in the interview and "█████████████████

████████████████████████████████████████." PX6133, Systrom

(Meta/Instagram) Dep. Tr., at 217:5-218:16.

        The FTC further disputes Statement 690 as the cited material does not show the absence

of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence

indicates, *inter alia*, that Instagram was not having material infrastructure problems pre-

acquisition and was well-positioned to grow without the acquisition by Meta.  For example, in

the first interview cited in Statement 690, Mr. Systrom's response to a prior question indicates

that Instagram was successfully navigating challenges:

> 1. What inspired you to create Instagram and what were your biggest
> challenges in the beginning? . . . The biggest obstacles when we
> started were primarily around scaling.  We had no idea that our little
> side project that we named Instagram would turn into one of the
> fastest growing apps in history.  I remember distinctly the first day
> launching and crumbling under the demand.  We could barely keep
> our servers up under all the load, but eventually we figured it all out
> – and frankly building at scale is something that has become part of
> our DNA.

> Ex. 213 at -513 (FTC-META-003352513).

        Similarly, the second interview reference in Statement 690 omits Mr. Systrom's

subsequent statements indicating that Instagram's success was the result of hard work:

> When you're small, it's very hard to succeed without giving your
> entire life to this thing.  The technology moves so fast and the
> context – your competition – changes so quickly that the one
> advantage you have as a small company is speed.  You can pack
> three to four working days into one day and gain an advantage.

Ex. 428 at 3 (MetaFTC-DX-684).

Finally, FTC disputes (to the extent implied by Statement 690) that working long hours was out-of-the ordinary or suggestive of problems.  *See* PX3191, Meta document: "untitled," (Sept. 29, 2011), FTC-META-003361267, at -270 ("Startups are a twenty-four-hour endeavor[.]"); PX10087, Meta document: "DevInfra Deep Dive," (undated), FTC-META-012239137, at -161 ("Engineers who write production code are expected to support that code in production and this responsibility is shared through an on-call rotation with regular shifts.  At any time, at least one person should be 'on call' for every system in production.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the facts stated by Mr. Systrom.  *See supra* Meta Introduction.  The additional material the FTC claims Meta "omit[ted]" does not create a dispute regarding the fact that Mr. Systrom and Mr. Krieger had to work constantly to prevent Instagram's infrastructure from failing.

The FTC's further response that "Instagram was not having material infrastructure problems pre-acquisition and was well-positioned to grow without the acquisition by Meta" is nonresponsive to the facts stated in this paragraph and does not create a dispute of material fact for the reasons stated above in Meta's reply to paragraph 685.

The FTC's further response that "working long hours [is not] out-of-the-ordinary or suggestive of problems" does not create a genuine dispute of material fact regarding Mr. Systrom's statement.  Mr. Systrom's statement is clear that he and Mr. Krieger worked excessive hours specifically to prevent Instagram from "crumbling down."  Ex. 213 at -513 (FTC-META-003352513).

691.    On March 30, 2011, Mr. Systrom wrote an email to AWS, stating that Instagram's "main database box lives on the largest memory instance you guys offer . . . and about every week or so it spontaneously decides to hard restart thus throwing our service into a fit."  Ex. 207

at -872 (FB_FTC_CID_12209872).  He wrote in the same email that this is "really hard to recover from" and "this one issue makes it really hard for us to have a reliable experience for our users." *Id.*

   **FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 691 as described herein.

   The FTC disputes Statement 691 as incomplete and misleading because in the same email Mr. Systrom states, "We've been pretty happy with amazon's stuff."  Ex. 207 at -872 (FB_FTC_CID_12209872).  Other evidence shows AWS working with Instagram to resolve the issue.  *See* PX3194 Meta email chain: ████ to K. Systrom et al., re: "AWS EC2/EMR discussion – Instagram," (Apr. 4, 2011), FTC-META-003357836, at -836 (showing agenda for meeting between Instagram as including "Data store boxes having performance issues" and "Best practices on how to plan for scaling and redundancy on data store and DB instances"); *see also* ███████████████ ("In my experience . . . AWS provides support for any customers that leverage AWS and want support as a service, of course").

   The FTC further disputes Statement 691 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence shows, *inter alia*, that Instagram was not having material infrastructure problems pre-acquisition and was well-positioned to continue growing successfully on AWS without the Meta acquisition—and in fact, that Instagram continued to grow on AWS after the Meta acquisition.  *See, e.g.*, PX6027, Systrom (Meta/Instagram) IH Tr., at 235:20-23 ("████ ███████████████████████████████████████████ ████████████████"); PX6146, Krieger (Meta/Instagram) Dep. Tr., at 93:15-23 (May 16, 2023) ("████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ ”).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram was experiencing an issue with AWS's memory instances and that Mr. Systrom wrote that the issue "makes it really hard for us to have a reliable experience for our users."  *See supra* Meta Introduction.  Indeed, the FTC's response does not dispute that Instagram experienced this issue on AWS or that the issue negatively impacted Instagram's user experience.  The FTC's response that "[o]ther evidence shows AWS working with Instagram to resolve the issue" merely confirms that Instagram was experiencing the issue on AWS.  The FTC's further response that "Instagram was not having material infrastructure problems pre-acquisition" and that "Instagram continued to grow on AWS after the Meta acquisition" is nonresponsive to the facts stated in this paragraph and does not create a dispute of material fact for the reasons stated above in Meta's reply to paragraph 685.

692.    Instagram sustained multiple outages before the acquisition, e.g., in June 2012 and in early September 2012.  Ex. 5 at ¶¶ 101 n.204 (Nieh Rep.); *see also* Ex. 212 at -324 (FTC-META-003313324) (September 5, 2012, email in which Mr. Krieger reports "another" outage, "the second time we've had a network outage w/ Amazon in 2 days").

**FTC Response: Disputed.**  The FTC objects to Statement 692 as vague as to time, to the term "outages" as vague.

The FTC disputes the first sentence in Statement 692 as unsupported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  Statement 692 cites to a footnote in the Nieh report, which in turn cites to other material.  However, Professor Nieh himself does not

characterize footnote 204 as supporting a claim that "Instagram sustained multiple outages before the acquisition."  Professor Nieh instead uses that footnote to support a vague statement that "Instagram also experienced issues on AWS that affected Instagram's performance and its ability to improve its service and scale further."  Ex. 5 at ¶ 101 n.204 (Nieh Rep.).

Further, the materials cited in footnote 204 do not establish the existence of multiple outages on Instagram prior to the acquisition.  For example, one of the documents cited in footnote 204 is dated June 2012, and Professor Nieh's report describes the document as evidence that Instagram experienced latency between its servers under a heavy bandwidth load, not that it resulted in an outage: "Mr. Krieger noting 'one weird experience where latency between [instances] was very high under heavy bandwidth load' to AWS."  Ex. 5 at ¶ 101 n.204 (Nieh Rep.); PX3229, Meta email chain: M. Krieger to ▮▮▮▮ re: "ElastiCache q," (June 5, 2012), FB_FTC_CID_12203352, at -352.

The FTC also disputes Statement 692 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Evidence does not indicate that Instagram's performance related to outages is better under Meta's ownership.  For instance, evidence indicates that Meta's own infrastructure has suffered numerous outages.  *See* PX9001, Bray Report, Appendix B (providing a sample of outages in Meta's infrastructure from 2014 onwards).  Additionally, Mr. Krieger testified that Instagram was not motivated to migrate to Meta's infrastructure to reduce outages and improve reliability as one would expect if Instagram was unreliable.  *See* PX6015, Krieger (Meta/Instagram) IH Tr., at 277:23-24 ("▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").  The FTC's infrastructure expert, Tim Bray, reviewed the record and concluded, "that the claim of superior or improved reliability from Meta's infrastructure to be unsupported and that the

evidence suggests that Meta's infrastructure was more vulnerable, not more resilient, to reliability issues."  PX9011, Bray Rebuttal Report, at ¶ 112; *see also* PX9001, Bray Report, at ¶ 142 ("[E]vidence of Instagram's rapid and sustained growth runs counter to Meta's claim that issues on AWS were having an impact on Instagram's growth."); PX6015, Krieger (Meta/Instagram) IH Tr., at 151:2-11 (describing a single outage as a " █████████████ " and as a " █████████ ").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram sustained multiple outages before the acquisition.  *See supra* Meta Introduction. Contrary to the FTC's objection, this fact is directly supported by the cited material, including that Instagram sustained an outage prior to the acquisition when a storm took out the one and only AWS data center region that Instagram was using, making Instagram unavailable to all of its users.  *See* Ex. 5 at ¶ 194 (Nieh Rep.).

The FTC's further response that "[e]vidence does not indicate that Instagram's performance related to outages is better under Meta's ownership" is nonresponsive to the fact stated in the paragraph and does not create a genuine dispute of material fact.  Mr. Bray admitted that he did not analyze whether Instagram meets or exceeds an industry standard of outages.  *See* Ex. 289 at 56:6-12 (Bray Dep. Tr.) (stating "that was not within the scope of the questions which I was asked").  Mr. Bray further stated that he was not aware of evidence comparing Instagram's outages before and after the acquisition.  *See id.* at 61:20-62:3.  Evidence confirms that migrating to Meta's infrastructure improved Instagram's reliability.  *See*, *e.g.*, Ex. 5 at ¶ 212 (Nieh Rep.) ("[T]he reliability of Instagram benefitted greatly overall from migrating to Meta's infrastructure.  Instagram also obtained access to Meta's large and talented pool of reliability engineers that have helped Instagram maintain high reliability over the past decade."); *see also*

Ex. 153 at 277:18-278:10 (Krieger Dep. Tr.) (testifying that adopting Meta's infrastructure services improved Instagram's stability and reliability).  The FTC's response does not allege, and the cited materials do not show, that Meta or Instagram experienced more outages than any other hyperscale infrastructure provider, much less that Instagram would have faced fewer outages absent the acquisition than it did since migrating to Meta's infrastructure.

693.    Mr. Parikh testified:  "Instagram only ran out of one AWS data center at the time and they didn't have . . . an easy way to expand.  So that if that AWS data center had a bad day, if it went down or something happened to it, the Instagram service would be down for all of the users."  Ex. 158 at 114:12-17 (Parikh IH Tr.).  Mr. Krieger testified that AWS "was quite slow relative to our needs in terms of being able to read user data sort of in real time."  Ex. 153 at 225:22-226:3 (Krieger Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to Statement 693 as vague as to time.

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 693 as described herein.

The FTC disputes the first sentence in Statement 693 as contradicted by other evidence.  Mr. Parikh was not an employee of Instagram prior to the acquisition, and acknowledged in later testimony that he lacked foundation for the testimony quoted in Statement 693 when he testified that he could not recall AWS configurations in 2012 or whether Instagram would have "taken advantage of the multiple availability zones through AWS."  PX6061, Parikh (Meta) Dep. Tr., at 293:10-14.

Other evidence indicates that, at the time of the acquisition, Instagram was operating out of a single AWS Region (Northern Virginia), which is comprised of multiple Availability Zones

(AZs), each of which contains one or more data centers.  *See* PX9001, Bray Report, at ¶ 160 & n.219, 165;  ("As I mentioned earlier, an availability zone is not just a data center."); ("Availability Zones are distinct locations that are engineered to be insulated from failures in other Availability Zones and provide inexpensive, low latency network connectivity to other Availability Zones in the same Region.").  Instagram operated out of multiple AZs in 2012, not a single data center.  *See* Ex. 153 at 56:3-4 (Krieger Dep. Tr.) (".").

Further, the FTC disputes that Instagram did not have "an easy way to expand" because Instagram was able to leverage available in multiple AZs.  *See, e.g.*, Ex. 153 at 48:5-7 (Krieger Dep. Tr.) ("").

The FTC also disputes the first sentence in Statement 693 as incomplete to the extent it implies that by migrating to Meta's data centers that Instagram automatically began operating from multiple regions.  In fact, "Instagram was not multi-regional in Meta's infrastructure until 2015, three years after it was acquired [and a year after it began using Meta's data centers]."  PX9011, Bray Rebuttal Report, at ¶ 235.

The FTC's infrastructure expert, Tim Bray, also notes that, "[t]he Nieh Report implies that the use of Meta's infrastructure obviated the need for Instagram to update its systems to work in a multiregion configuration, but as I describe in my Initial Report, Instagram had to take the same steps to become multi-region within Meta as it would have on AWS."  *Id.* at ¶ 235.  At all relevant times, AWS had multiple, geographically-distributed regions (each containing

multiple availability zones) available which Instagram would have been able to take advantage of. *See* PX9001, Bray Report, at ¶¶ 160-61.

The FTC also disputes the second sentence of Statement 693 because it misrepresents Mr. Krieger's testimony. Mr. Krieger's statement read in full states: "████████████████████ ████████████████████████████████████████████████████████ ████████████████████████" Ex. 153 at 225:22-226:3 (Krieger Dep. Tr.). Mr. Krieger was referring to one AWS service, Elastic Block storage circa 2010, not the state of all of the AWS' services or Elastic Block storage offered to Instagram at the time of the acquisition. The second sentence of Statement 693 is also incomplete because it omits the next line of testimony where, when asked specifically about AWS in 2012, Mr. Krieger testified that ████████████████████████████████████████████████████████ ████████████████████████████ *Id.* at 226:4-21.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Instagram ran out of a single AWS data center region such that, if the region went down, then Instagram's service would be unavailable, or that AWS was slow relative to Instagram's needs to read user data. *See supra* Meta Introduction. The additional material that the FTC states "contradict[s]" Mr. Parikh's testimony is nonresponsive to the facts stated in the paragraph. Other evidence confirms, and the FTC does not dispute, that Instagram ran out of a single AWS data center region prior to the acquisition, that Instagram was not configured to operate across multiple regions, and that running out of a single data center region made Instagram susceptible to outages in that region. *See* Ex. 5 at ¶ 194 (Nieh Rep.) ("Prior to the acquisition, Instagram operated in a single data center region on AWS (Northern Virginia), thus rendering the service vulnerable to a disaster affecting that region. In June 2012, an outage on AWS in the Eastern

U.S. took down Instagram for at least 20 hours because it was operating in only a single data center in that region.  Although AWS offered some multi-region capabilities pre-acquisition, an app must be configured to operate across multiple regions in order to take advantage of such offerings, and Instagram was not so configured." (internal citations omitted)).

The additional material the FTC cites concerning the first sentence of the paragraph does not create a dispute that Instagram ran out of a single AWS data center region prior to the acquisition and that running out of a single data center region made Instagram susceptible to outages in that region.  It is undisputed that Instagram theoretically may have been able to modify its technical architecture to operate out of multiple geographically distributed data centers absent the acquisition, but that fact is irrelevant and nonresponsive to the facts stated in this paragraph.  It is purely speculative whether Instagram could have implemented a multi-data center architecture absent the acquisition, how long it would have taken, and what it would have cost.  Extensive evidence shows that, in fact, Instagram was able to operate out of multiple data centers more quickly and efficiently because of its ability to rely on Meta's infrastructure.  *See* Ex. 5 ¶¶ 194-195 (Nieh Rep.) (explaining that Meta "had demonstrated strengths in running very large-scale apps across multiple data center regions, and used those capabilities to help Instagram scale its infrastructure geographically across multiple data centers").

The FTC's response that Meta "misrepresents Mr. Krieger's testimony" does not create a genuine dispute that Mr. Krieger testified that AWS was slow relative to Instagram's needs to read user data.  As the FTC acknowledges, Mr. Krieger's testimony relates to AWS's Elastic Block Storage ("EBS"), which Instagram used for database storage.  The FTC does not dispute that prior to August 2012, AWS's EBS had insufficient performance to meet Instagram's needs.  *See* Ex. 5 at ¶ 106 (Nieh Rep.) ("Prior to August 2012, AWS's Elastic Block Storage (EBS) for

use with EC2 offered a maximum of 400 IOPS.  Mr. Krieger explained, '[i]f you've ever tried to run a database with any kind of load with 400 IOPS available to you, you know you're going to be in for a bad time as soon as you're under any kind of traffic.'  Mr. Krieger described this as Instagram's 'first bottleneck' and said it was 'pretty brutal.'" (internal citations omitted)).  Evidence confirms that EBS's technical limitations caused Instagram to rearchitect its infrastructure prematurely and that, even after AWS introduced new products, Instagram faced capacity constraints with respect to the new AWS products that Instagram sought to use in place of EBS.  *See id.* at ¶¶ 106-109.

694.    Mr. Systrom testified:  "I wish I had more time to spend on the product at that time, but . . . Mike [Krieger] and I were spending most of our time keeping the servers running."  Ex. 151 at 219:20-23 (Systrom Dep. Tr.).  Mr. Systrom agreed they "[l]ikely" had to "prioritize building infrastructure readiness and strength over feature development."  *Id.* at 220:7-10.

**FTC Response: Disputed in part.**  The FTC objects to Statement 694 as vague as to time.

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 694 as described herein.

The FTC disputes Statement 694 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence shows, *inter alia*, that Instagram was well-positioned to develop features without being acquired by Meta.  Prior to the acquisition, Instagram launched its Android application in April of 2012.  PX9001, Bray Report, at ¶ 119.  Further, Mr. Systrom testified that Instagram could have added a variety of specific features, including video and messaging, without Meta:

███████████████████████████



PX6027, Systrom (Meta/Instagram) IH Tr., at 248:7-20; *see also id.* at 249:20-250:4 ("███████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████").

Other evidence also shows that Instagram had to fight for resources within Meta to

develop some of its features: "████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████" *Id.* at 250:13-251:14.

Additionally, Mr. Systrom also testified that, prior to the Meta acquisition, Instagram

"had figured out [its] model of engagement, and we were scaling":



*Id.* at 107:23-108:7; *see also id.* at 109:14-17 (████████████████████████

████████████████████████; *see also* PX6146, Krieger

(Meta/Instagram) Dep. Tr., at 16:18-22 ("████████████████████

██████████████████████████████████ ).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that prior to the acquisition Mr. Systrom and Mr. Krieger were spending most of their time keeping Instagram's servers running and that Instagram had to prioritize infrastructure over feature development.  *See supra* Meta Introduction.  The FTC's responses "that Instagram was well-positioned to develop features without being acquired by Meta" and "that Instagram had to fight for resources within Meta to develop some of its features" are irrelevant and nonresponsive to the facts stated in this paragraph.  To the extent the FTC's responses suggest that Instagram would have been able to add features as successfully as it did as part of Meta, that is purely speculative and does not create a genuine dispute of material fact.  Evidence confirms that the acquisition enabled Instagram to develop and launch new features more quickly and efficiently than it could have absent the acquisition.  *See* Ex. 5 at ¶ 196 (Nieh Rep.) ("The vast majority of Instagram's new feature development has occurred while Instagram has been integrated with Meta, relying on Meta's infrastructure and other extensive resources that are dedicated to Meta's Family of Apps.  Instagram was able to rely on Meta's talent pool and hiring expertise for its product teams; offload the infrastructure-related issues related to developing and launching new features to Meta's Infrastructure Organization; and use Meta's developer tools, logging and data analytics, continuous deployment systems, and AI systems.  Meta's infrastructure, engineering resources, and technical capabilities helped Instagram develop and launch new features and functionality more rapidly and efficiently at massive scale." (internal citations omitted)).

The additional testimony from Mr. Systrom that the FTC cites fails to create a dispute of material fact regarding Mr. Systrom's testimony that prior to the acquisition he and Mr. Krieger were spending most of their time keeping Instagram's servers running and that Instagram had to

prioritize infrastructure over feature development.  The cited testimony that Instagram "needed to hire a lot more people and run more quickly" corroborates that Instagram did not have sufficient capabilities to prioritize feature development prior to the acquisition.  *See* PX6027 at 107:23-108:7.

### 2.    Instagram Acquisition Discussions

695.    On February 12, 2012, Mr. Zuckerberg sent a message to Matthew Cohler at Benchmark Capital – an Instagram investor, *see* Ex. 134 at 27:12-28:2, 40:12-20 (Cohler (Benchmark Capital) Dep. Tr.) – stating that Meta acquiring Instagram could "make sense since photos by themselves aren't a great business," noting that Facebook users posting Instagram content to Facebook "drives a lot of activity."  Ex. 228 at -940-941 (PX1135, FB_FTC_CID_01543939).

**FTC Response: Undisputed but incomplete.**  Undisputed that the exhibit includes the quoted language, but in the same message Mr. Zuckerberg also admits: "I think their camera is really good and increasingly I'm seeing people use it to post to FB, which I think is bad for us." Ex. 228 at -940 (PX1135, FB_FTC_CID_01543939).

696.    On February 13, 2012, ███████ messaged Instagram co-founder Kevin Systrom about a possible acquisition.  *See* Ex. 230 at -020 (PX2759, FB_FTC_CID_08721020). Mr. Systrom responded to ask whether Mr. Zuckerberg would "go into destroy mode if I say no." *Id.*  Mr. Systrom testified that "destroy mode" referred to the possibility that Meta might "cut off" Instagram from distribution on Facebook, among other actions.  Ex. 151 at 236:25-237:12 (Systrom Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The exhibit includes the quoted language, but Statement 696 does not completely describe Mr. Systrom's testimony.  Mr. Systrom testified that "destroy mode" was a term used by ███████ to describe *a range of actions* that Meta

might take.  Ex. 151 at 237:4-17 (Systrom Dep. Tr.).  As to distribution, Mr. Systrom noted in

his testimony that " 

" *Id.* at 238:2-14.  Mr. Systrom also testified that " ███████ " refers to the fact

that "███████████████████████████████████████████████████████████████████

███████████████████████████████," as exemplified by Meta's reaction to Google+: "███████

██████████████████████████████████████████████████████████

███████████████████████████████████████" *Id.* at 22:5-

24.  Systrom confirmed in his testimony that " ████████ " in Ex. 230 referred to Meta putting

that kind of focus on Instagram—in other words, that Facebook would compete *harder* if

Instagram existed as an independent rival.  *Id.* at 22:25-23:2.

697.    On March 12, 2012, Mr. Zuckerberg emailed Mr. Systrom to express interest in

"making an offer to acquire Instagram," requesting that Mr. Systrom "send along" a "deck"

about Instagram for the two to "start discussing the offer."  Ex. 182 at -967

(FB_FTC_CID_01543967).  Mr. Systrom emailed Mr. Zuckerberg a presentation about

Instagram the next day.  *See* Ex. 205 at -562 (FB_FTC_CID_12185562).

**FTC Response: Undisputed.**  Undisputed that the exhibits contain the quoted language.

For completeness, the FTC notes that in Exhibit 182, Mr. Zuckerberg expressed interest "in

making an offer to acquire Instagram along the lines we discussed last week," and asked him to

send a copy of Instagram's "VC deck."  Ex. 182 at -967 (FB_FTC_CID_01543967).  The "VC

deck" refers to the presentation that Instagram made to venture capital investors in its Series B

fundraising round, in which Instagram raised approximately $50 million at a valuation of $500

million.  *See* Ex. 205 at -562 (FB_FTC_CID_12185562); CMF at § III.B.1.c.  Then, when

sending the deck to Mr. Zuckerberg on March 13, 2012, Mr. Systrom noted: "I've attached the

slides that we showed investors recently (we've obviously grown since this deck)."  Ex. 205 at -

562 (FB_FTC_CID_12185562).

698.    On March 14, 2012, Mr. Zuckerberg emailed Mr. Systrom about "Instagram

joining Facebook," stating that he was "really excited about what [Meta] can do to grow

Instagram as an independent brand and product."  Ex. 181 at -885 (FB_FTC_CID_01527881).

Mr. Zuckerberg added that Instagram could "do some amazing things" with the "infrastructure

[Meta] built . . . around storing and serving photos, querying them, etc."  *Id.* (referencing "the

value of using all of the infrastructure that we've built up rather than having to build everything

from scratch").

**FTC Response: Disputed in part.**  Undisputed that the exhibit contains the quoted

language but otherwise disputed as the cited material does not show the absence of a genuine

dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*,

that Meta acquired Instagram to eliminate a competitive threat, that Meta did not acquire

Instagram to bring improvements to Instagram, and that Meta did not deliver benefits to

Instagram for which Meta's acquisition was necessary.  *See* CMF at §§ III.B, III.D.1, V.A-E.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Mr. Zuckerberg emailed Mr. Systrom to convey how an acquisition would benefit Instagram.

*See supra* Meta Introduction.  The FTC's cross-reference to multiple sections of its

Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact,

and Meta incorporates its responses to those paragraphs here.

699.    On April 3, 2012, Mr. Zuckerberg emailed ███████, referring to the idea of Meta acquiring Instagram for $500 million with the Instagram founders having "complete freedom to keep running Instagram."  Ex. 196 at -535 (FB_FTC_CID_06251535).

**FTC Response: Disputed in part.**  Undisputed that the exhibit contains the quoted language, but disputed Meta or Mr. Zuckerberg provided Instagram with "complete freedom" to run Instagram.  Ample evidence indicates that Meta in fact forced Instagram's founders on many occasions to take actions against their will that were detrimental to Instagram.  *See, e.g.,* CMF at §§ IV.B, IV.C, V.A.3, V.B.3, V.D.6.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Zuckerberg emailed ███████ to discuss a potential acquisition of Instagram.  *See supra* Meta Introduction.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

700.    On April 5, 2012, Mr. Systrom and Mr. Zuckerberg emailed about the possibility of an acquisition, with Mr. Systrom stating that $2 billion was Instagram's "yes absolutely number" for an acquisition, but that Instagram would discuss "less."  Ex. 183 at -981 (FB_FTC_CID_01543981); Ex. 151 at 241:14-242:3 (Systrom Dep. Tr.).

**FTC Response: Undisputed.**  For completeness, Mr. Systrom's message to Mr. Zuckerberg was as follows: "We should have the discussion – 2 was my yes absolutely number.  Less is just something to think through together is that ok?"  Ex. 183 at -981 (FB_FTC_CID_01543981).

701.    On April 8, 2012, Mr. Zuckerberg and Mr. Systrom agreed that Meta would acquire Instagram at a purchase price of $1 billion.  *See* Ex. 284 at 178:20-179:13 (Systrom IH Tr.).

**FTC Response: Undisputed.**

### 3.    Instagram Pre-Clearance Review

702.    On April 16, 2012, Meta submitted to the FTC a Hart-Scott-Rodino Act Premerger Notification Form for the Instagram transaction.  *See* Ex. 304 (Facebook Hart-Scott-Rodino Act Submission, FTC-PROD-00012904).  The submission includes a production of documents, e.g., a message in which Mr. Zuckerberg wrote:  "One business questions [sic] I've been thinking about recently is how much we should be willing to pay to acquire mobile app companies like Instagram and Path that are building networks that are competitive with our own."  Ex. 303 at -821 (Attachment 4I-9, FTC-PROD-00013821); *see also* Am. Compl. ¶¶ 89-91 (Sept. 8, 2021), ECF No. 82 (quoting this document from Meta's production in 2012).

**FTC Response: Undisputed.**

703.    Meta and Instagram produced additional documents to the FTC as part of the Hart-Scott-Rodino Act Submission and in response to subsequent FTC requests for information. *See*, *e.g.*, Ex. 304 (FTC-PROD-00012904); Ex. 305 (FTC-PROD-00013396).

**FTC Response: Undisputed.**

704.    On May 16, 2012, the FTC issued a request for "additional information and documentary materials" concerning the proposed transaction (i.e., a "Second Request").  *See* Ex. 306 at 1 (FTC, Second Request Letter, FTC-PROD-00013736).

**FTC Response: Undisputed.**

705.    In response to the Second Request, Meta produced more than 9,000 documents – collected from several custodians, including Mr. Zuckerberg – and Instagram produced more

than 10,000 documents.  *See* Hansen Decl. ¶ 8; *see also*, *e.g.*, Ex. 307 at -921 (FTC-PROD-00012921) (concerning Meta's production); Ex. 293 at -038 (FTC-PROD-00016037) (concerning Instagram's production).

**FTC Response: Undisputed.**

706.    During its investigation, the FTC interviewed Meta executives, including Meta's chief executive officer, as well as 49 individuals ███████████████.  *See* Ex. 309 at 9-10 (FTC's Suppl. Objs. & Resps. To Meta's First Set of Interrogs. (Oct. 7, 2022)).  ███

███████████████████████████████████████, Twitter produced documents █

███████████████████████████████████████.  *See* Ex. 308 at -426 (FTC-PROD-00013425).



**FTC Response: Disputed in part.**  The first sentence of this Statement is undisputed. The second sentence of this Statement is disputed because Meta asserts that "████████████ ███████████████████," when in fact only *one* nonparty – Twitter – produced documents to the FTC.  *See* FTC's Opp. To Meta's Mot. To Compel, Matheson Decl. ¶ 10 (July 19, 2022), ECF No. 160 ("Related to the FTC's 2012 investigation of Facebook's acquisition of Instagram, the FTC received a document production from only one third party.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC's investigation included interviews of Meta executives ███████████████ and that Twitter produced documents.  *See supra* Meta Introduction.

707.    On August 22, 2012, the FTC notified Meta and Instagram: "The Commission has been conducting an investigation to determine whether the proposed acquisition of Instagram, Inc. by Facebook, Inc. may violate Section 7 of the Clayton Act or Section 5 of the Federal Trade Commission Act."  Ex. 429 (FTC, Closing Letter).  The correspondence continued: "Upon

further review of this matter, it now appears that no further action is warranted by the Commission at this time.  Accordingly, the investigation has been closed." *Id.*

**FTC Response: Undisputed but incomplete.**  It is undisputed that on August 22, 2012, the FTC sent letters to Tom Barnett, counsel for Facebook, and Patricia Zeigler, counsel for Instagram.  The quoted language is accurate but incomplete because it omits the last two sentences of the letters: "[t]his action is not to be construed as a determination that a violation may not have occurred, just as the pendency of an investigation should not be construed as a determination that a violation has occurred.  The Commission reserves the right to take such further action as the public interest may require."  Ex. 429 (FTC, Closing Letter).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that on August 22, 2012, the FTC closed its investigation of the Instagram acquisition after finding no further action was warranted.  *See supra* Meta Introduction.

708.    In response to Meta's First Set of Requests for Admission, "the FTC admits that its investigation of Facebook, Inc.'s proposed acquisition of Instagram was 'competent.'" Ex. 430 at 3, FTC's Resp. to Meta's Req. for Admis. No. 1 (FTC's Objs. & Resps. To Meta's First Set of Reqs. for Admis. (May 4, 2023)).

**FTC Response: Undisputed but incomplete.**  Undisputed that in response to Meta's First Set of Requests for Admission, the FTC admitted that its investigation of Facebook, Inc.'s proposed acquisition of Instagram was "competent," subject to the FTC's objection that the term "competent" is vague.  While the selected language is quoted accurately, it is incomplete because Meta's Request for Admission sought the FTC to "[a]dmit that, in 2012, the FTC conducted a competent and thorough investigation of Facebook, Inc.'s proposed acquisition of Instagram." The FTC's response stated that "the FTC denies that its investigation of Facebook, Inc.'s

proposed acquisition of Instagram was 'thorough.'"  Ex. 430 at 3-4, FTC's Resp. to Meta's Req.

for Admis. No. 1 (FTC's Objs. & Resps. To Meta's First Set of Reqs. for Admis. (May 4, 2023)).

**Meta Reply:**  The FTC's response – denying that it conducted a "thorough" investigation

– does not create a genuine dispute of material fact that the FTC admitted its investigation of

Facebook Inc.'s acquisition of Instagram was competent.  *See supra* Meta Introduction.

709.    On August 22, 2012, the United Kingdom Office of Fair Trading or OFT closed

its investigation of the proposed Instagram acquisition, writing: "In the social networking space,

the OFT has no reason to believe that Instagram would be uniquely placed to compete against

Facebook, either as a potential social network or as a provider of advertising space."  Ex. 426

at ¶ 44 (OFT, *Anticipated Acquisition by Facebook Inc. of Instagram Inc.*).

**FTC Response: Undisputed but incomplete.**  It is undisputed that the language quoted

from ¶ 44 of the OFT's decision is accurate, but Meta's Statement 709 is incomplete because a

retrospective commissioned by the OFT's successor, the Competition and Markets Authority,

found that the OFT's 2012 decision contained "a number of gaps in the way the Authorities have

assessed the Facebook/Instagram merger," including the failure to properly measure and

acknowledge that "at the time of the merger Instagram was generating significant user

engagement" and that available evidence contradicted the OFT's claim that Instagram was not

particularly well-placed to compete with Facebook "in the supply of social network services."

PX0498, Lear Report, at ¶ II.81, II.32.  The retrospective corrected the OFT's earlier work

stating, "[g]iven the evidence that was available to them, the Authorities might have also

underestimated Instagram's potential to grow into a significant competitive force in the supply of

social networking services." *Id.* at v.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the OFT closed its investigation of the proposed Instagram acquisition in August 2012 after concluding that Instagram was not "uniquely placed to compete against Facebook."  Ex. 426 at ¶ 44 (OFT, *Anticipated Acquisition by Facebook Inc. of Instagram Inc.*).  The additional material that the FTC claims makes Meta's statement "incomplete" does not create a material dispute regarding the OFT's conclusions in 2012, because a retrospective analysis by a third-party contractor (Lear) does not change those 2012 conclusions.  Furthermore, the FTC overstates this contractor's conclusions by stating that it "corrected the OFT's earlier work," because the contractor stated that OFT "*might* have also underestimated Instagram's potential to grow" – which is purely speculative – not that it did so.  PX0498 at v (Lear Report) (emphasis added).

### 4.    Post-Acquisition Instagram

710.    Since the Instagram acquisition closed on September 6, 2012, *see* Ex. 6 at ¶ 8 & n.7 (Kaplan Rep.), Meta has invested more than a billion dollars in Instagram.  *See* Ex. 169 at 12 (Meta's Suppl. Objs. & Resps. To FTC's Interrog. No. 6 (Sept. 22, 2022)).  In 2022, alone, Meta spent more than $35 billion on research and development across its business.  Ex. 353 at 69 (Meta 2022 Form-10K).

**FTC Response: Disputed in part.**  The FTC disputes the first clause of the first sentence of Statement 710 because the Kaplan report's citation concerning the Instagram acquisition closing date is incorrect; the Instagram acquisition closed on August 31, 2012, not September 6, 2012.  PX15544, Meta Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (admitting that "Facebook's acquisition of Instagram closed on August 31, 2012").

The FTC cannot verify and therefore disputes the second clause of the first sentence of Statement 710 because the interrogatory response cited therein does not provide any support for

the assertion that "Meta has invested more than a billion dollars in Instagram."  *See* Fed. R. Civ.

P. 56(c)(1)(A); L.R. 7(h).  In reference to Instagram's "2,500 full time employees," Meta's

interrogatory response asserted vaguely and without evidence that "[t]he expansion of the

Instagram team represents billions of dollars of investment in developing, expanding,

monetizing, and otherwise improving the product . . . ."  Ex. 169 at 12 (Meta's Suppl. Objs. &

Resps. To FTC's Interrog. No. 6 (Sept. 22, 2022))

The FTC does not dispute that the second sentence of Statement 710 comports with the

investment figures provided in Meta's 2022 annual filing, but this figure does not indicate what,

if any, of this overall number was spent on Instagram or WhatsApp as opposed to Facebook,

advertising, Reality Labs, or any of Meta's other products.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Meta has invested more than a billion dollars in Instagram following the acquisition or that Meta

spends tens of billions of dollars annually on research and development.  *See supra* Meta

Introduction.  The FTC had the opportunity to test Meta's interrogatory response in discovery,

and it admittedly has no basis to dispute the fact asserted with sworn verification.  Meta does not

dispute that the closing date for the Instagram acquisition was August 31, 2012.

711.    An academic study prepared in 2023 independent of any litigation determined that

Instagram generates between $62,514,362,880 and $78,142,953,600 in annual consumer surplus,

while Facebook generates between $128,190,562,200 and $156,677,353,800 in annual consumer

surplus.  *See* Ex. 2 at ¶ 229 & tbl. 28 (Carlton Rep.).  The study "used incentivized choice

experiments involving 39,717 users in 13 countries to estimate consumer welfare," as well as

"surveys to estimate the relative value of other apps to Facebook."  *Id*. at ¶ 347.  The study found

that a U.S. consumer's "willingness-to-accept" value – i.e., what the median consumer in the

experiment would accept to stop using the service – was "roughly $30 per month" for Instagram and "around $50 per month" for Facebook.  *Id*.

**FTC Response: Disputed.**  The FTC disputes the consumer surplus estimates generated by Professor Carlton using the Brynjolfsson academic study—and reported in Statement 711— for at least five reasons.

First, the FTC disputes the characterization of Statement 711 indicating that an academic study "determined" that Instagram and Facebook "generate[]" the consumer surplus figures reflected in Statement 711.  Those figures do not appear in the academic study cited by Professor Carlton.  Rather, Professor Carlton himself generated the consumer surplus estimates reflected in Statement 711 by ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████.  As Professor Carlton noted: ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████  *See* Ex. 2 at ¶ 229 (Carlton Rep.) (emphasis added).

Second, the underlying study is inadmissible hearsay not capable of being rendered in an admissible form at trial.  *See* Fed. R. Civ. P. 56(c)(2).  In Statement 711, Meta cites a portion of Professor Carlton's rebuttal report that generates consumer surplus estimates using "willingness-to-accept" values of an underlying study, which is itself inadmissible.  *See* Ex. 2 at ¶ 229 & tbl. 28 (Carlton Rep.) (citing PX0499, Erik Brynjolfsson et al., *The Digital Welfare of Nations: New Measures of Welfare Gains and Inequality*, NBER (Sept. 2023), http://www.nber.org/papers/w31670).  Statement 711 represents an attempt to inject shadow

expert analysis without providing any of the underlying data or evidence, which was collected by Meta employees and therefore available to Meta.

Third, the FTC disputes the statement that the study was "prepared . . . independent of any litigation."  Meta has not established the purpose for which this study was created or that the cited study was not prepared for litigation.  Five of the study's eight authors are or were Meta employees when the research was conducted, and the research appears to have been conducted after the FTC filed this case.  *See* PX0499 at 001, Erik Brynjolfsson et al., *The Digital Welfare of Nations: New Measures of Welfare Gains and Inequality*, NBER (Sept. 2023), http://www.nber.org/papers/w31670 ("A.L., D.K., H.G., and D.D. are employees of Meta Platforms and hold a financial interest in Meta. N.W. was an employee of Meta while this research was conducted . . . ."); *see also id*. at -026, App'x Fig. 3 (noting that offer "ends 4/7/22 at 11:59pm PST").

Fourth, the study relies on an unreliable methodology not suited to measuring consumer surplus.  As explained by Professor Hemphill, the "willingness to accept" methodology may overstate consumer surplus for a number of reasons well recognized in the economic literature. *See* PX9007, Hemphill Rebuttal Report at ¶ 807.  Multiple studies that Professor Carlton relied upon to produce his estimates of consumer surplus explicitly recognized how the methodology may be particularly inapt in the context of personal social networking services.  *See id*. at ¶ 807 n.1293 (quoting H. Allcott, et al., *The Welfare Effects of Social Media*, 110 AM. ECON. REV. 629 (2020) ("[I]f users do not understand the ways in which social media could be addictive or make them unhappy, these standard approaches could overstate consumer surplus gains.")); *see also id.* at ¶ 807 ("Furthermore, the majority of the studies Prof. Carlton cites fail to account for how

network effects affect consumer valuations, yet as one study Prof. Carlton did not cite notes, valuations are lower if a user's friends and family are removed as well.").

Finally, the FTC disputes Statement 711 as the cited material does not show the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). As Professor Hemphill explained, Professor Carlton's consumer surplus estimates are "beside the point," as "the presence of consumer surplus does not indicate a lack of market power or anticompetitive conduct resulting in significant consumer harm." PX9007, Hemphill Rebuttal Report at ¶ 804.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Instagram and Facebook both generate tens or hundreds of billions of dollars in annual consumer surplus, as reflected in Professor Carlton's rebuttal report. *See supra* Meta Introduction. Professor Hemphill had the opportunity to rebut Professor Carlton's opinions and the FTC had the opportunity to probe them in discovery, and none of the FTC's "five reasons" for disputing Meta's evidentiary showing has merit.

*First*, the cited materials support Professor Carlton's calculations based on the independent academic study he cites; the FTC does not dispute any aspect of his calculations.

*Second*, Professor Carlton's reliance on independent academic studies is admissible under Federal Rule of Evidence 703. The assertion that this evidence is inadmissible because the data underlying the independent academic study upon which Professor Carlton relies were themselves available to Meta is a non-sequitur under Federal Rule of Evidence 703. Meta observes that the FTC's proffered experts rely on academic studies in forming their opinions.

*Third*, the FTC's assertion that some of the authors of the independent academic study were or are Meta employees does not establish that the study was conducted for this litigation, and the FTC has no basis for asserting otherwise.

*Fourth*, other than Professor Hemphill's assertion, the FTC cites no material or economic literature contesting the use of willingness-to-accept and willingness-to-pay figures to estimate consumer surplus.  *See* Ex. 2 at ¶ 229 (Carlton Rep.).  Professor Carlton expressly provides high and low ranges of estimated surplus, using both willingness-to-accept and willingness-to-pay data.  Professor Hemphill opined that "one study" claims "valuations are lower if a user's friends and family are removed as well."  PX9007 at ¶ 807 (Hemphill Rebuttal Rep.).  That assumes a hypothetical not at issue – the studies that Professor Carlton cites ask how much users would be willing to pay or accept in exchange for using Meta's free services as those study participants use them in their real lives.  *See* Ex. 2 at ¶ 229 (Carlton Rep.); *see also id.* at App'x E, ¶¶ 346-351 (discussing each study).  The FTC has presented no evidence or other material doubting whether the participants in these studies are representative of Meta's user population (which spends a vast majority of time on the service not sharing with friends and family).  *See supra* Meta SMF ¶¶ 11-12, 56-60.  Further disputed because Professor Hemphill does not claim that Meta would have generated less than hundreds of billions of dollars' worth of consumer surplus following the acquisitions if a modification were made to the studies that asked users to assume they have no friends or family on Meta's services (as the single paper he cites suggests).

*Fifth*, the assertion that the presence of consumer surplus is "beside the point" is incorrect because consumer surplus is relevant to assessing the consumer welfare effects of the challenged transactions, which Professor Hemphill conceded is relevant to evaluating whether conduct is anticompetitive:  "Q. . . . Now, turning to the question of anticompetitive effects, you agree that the proper standard for judging effects here is consumer welfare, correct? . . . A. Yes.  I would broadly agree that consumer welfare compared to the but-for world in which the acquisitions did not take place, you know, as – it's an important caveat as experienced by users of personal social

networking services is the right way to think about competitive effects." *See infra* Meta SMF ¶ 715 (quoting Ex. 283 at 267:14-268:2 (Hemphill Dep. Tr.)).  Professor Hemphill continued: "Q. . . . If consumer welfare is higher in the actual world than it would have been in the but-for world, then you would agree that the conduct in question is not anticompetitive, correct? . . .  A. I would – I would agree that if consumer welfare for personal social networking users is higher in the actual world than in the but-for world, that, you know, that would be adverse to a conclusion about competitive effects." *Id.* (quoting Ex. 283 at 268:21-269:19 (Hemphill Dep. Tr.)).  Finally, as Professor Carlton explained in concluding his analysis of these surplus figures:  "The precise numbers are irrelevant for purposes of this analysis: the point is simply that Meta's apps clearly generate enormous value for hundreds of millions of users in the U.S. and billions of users worldwide."  Ex. 2 at ¶ 229 (Carlton Rep.).

712.     Another academic study prepared in 2019 independent of any litigation determined that, following the Instagram acquisition, Facebook generates between $113,947,166,400 and $190,861,503,720 in annual consumer surplus.  *See* Ex. 2 at ¶ 229 & tbl. 28 (Carlton Rep.).  The study, which involved 1,769 users at a U.S. university, found that Facebook had a median value of $40 per week.  *Id.* at ¶ 350.

**FTC Response: Disputed.**  The FTC disputes the consumer surplus estimates generated by Professor Carlton using the Mosquera academic study—and reported in Statement 712—for at least four reasons.

First, the FTC disputes the characterization of Statement 712 indicating that an academic study "determined" that Facebook "generates" the consumer surplus figures reflected in Statement 712.  Those figures do not appear in the academic study cited by Professor Carlton. Rather, Professor Carlton himself generated the consumer surplus estimates reflected in



Statement 712 by ████████████████████████████████

████████████████████████████████████████████

████████ .  As Professor Carlton noted: ████████████████████████████

████████████████████████████████████████████

████████████████████████████ *See* Ex. 2 at ¶ 229 (Carlton Rep.) (emphasis

added).

Second, the study is inadmissible hearsay incapable of being rendered in admissible

form at trial.  *See* Fed. R. Civ. P. 56(c)(2).  Meta cites a portion of Professor Carlton's rebuttal

report that generates consumer surplus estimates using findings about the short-term value of

Facebook from an underlying study, the substance of which is itself inadmissible.  *See* Ex. 2

at ¶ 229 & tbl. 28 (Carlton Rep.) (citing Robert Mosquera, et al., *The Economic Effects of*

*Facebook*, 23 Experimental Econ. 575 (2020), https://doi.org/10.1007/s10683-019-09625-y).

Professor Carlton's "opinion," on which Meta relies, simply took the willingness-to-accept value

found by Mosquera et al. and ████████████████████████████ .

Third, the study relies on an unreliable methodology for the reasons outlined in the FTC's

Response to Statement 711.

Finally, the FTC disputes Statement 712 as the cited material does not show the absence

of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  As Professor

Hemphill explained, Professor Carlton's consumer surplus estimates are "beside the point," as

"the presence of consumer surplus does not indicate a lack of market power or anticompetitive

conduct resulting in significant consumer harm."  PX9007, Hemphill Rebuttal Report at ¶ 804.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Facebook generates tens or hundreds of billions of dollars in annual consumer surplus, as

Professor Carlton calculated.  *See supra* Meta Introduction.  Professor Hemphill had the opportunity to rebut Professor Carlton's opinions and the FTC had the opportunity to probe them in discovery, and none of the FTC's "four reasons" for disputing Meta's evidentiary showing has merit.

*First*, the cited materials support Professor Carlton's calculations based on the independent academic study he cites; the FTC does not dispute any aspect of his calculations.

*Second*, Professor Carlton's reliance on independent academic studies is admissible under Federal Rule of Evidence 703.  Meta observes that the FTC's proffered experts rely on academic studies in forming their opinions.

*Third*, the FTC's assertion of an unexplained "unreliable methodology" is without support; other than Professor Hemphill's assertion, the FTC cites no record material or economic literature contesting the use of willingness-to-accept and willingness-to-pay figures to estimate consumer surplus.  *See* Ex. 2 at ¶ 229 (Carlton Rep.).  Professor Carlton expressly provides high and low ranges of estimated surplus, using both willingness-to-accept and willingness-to-pay data.  Professor Hemphill opined that "one study" claims "valuations are lower if a user's friends and family are removed as well."  PX9007 at ¶ 807 (Hemphill Rebuttal Rep.).  That assumes a hypothetical not at issue – the studies that Professor Carlton cites ask how much users would be willing to pay or accept in exchange for using Meta's free services as those study participants use them in their real lives.  *See* Ex. 2 at ¶ 229 (Carlton Rep.); *see also id.* at App'x E, ¶¶ 346-351 (discussing each study).  The FTC has presented no evidence or other material doubting whether the participants in these studies are representative of Meta's user population (which spends a vast majority of time on the service not sharing with friends and family).  *See supra* Meta SMF ¶¶ 11-12, 56-60.  Further disputed because Professor Hemphill does not claim that Meta would have

generated less than hundreds of billions of dollars' worth of consumer surplus following the acquisitions if a modification were made to the studies that asked users to assume they have no friends or family on Meta's services (as the single paper he cites suggests).

*Fourth*, the assertion that the presence of consumer surplus is "beside the point" is incorrect because consumer surplus is relevant to assessing the consumer welfare effects of the challenged transactions, which Professor Hemphill conceded is relevant to evaluating whether conduct is anticompetitive:  "Q. . . . Now, turning to the question of anticompetitive effects, you agree that the proper standard for judging effects here is consumer welfare, correct? . . . A. Yes. I would broadly agree that consumer welfare compared to the but-for world in which the acquisitions did not take place, you know, as – it's an important caveat as experienced by users of personal social networking services is the right way to think about competitive effects." *See supra* Meta SMF ¶ 715 (quoting Ex. 283 at 267:14-268:2 (Hemphill Dep. Tr.)).  Professor Hemphill continued:  "Q. . . . If consumer welfare is higher in the actual world than it would have been in the but-for world, then you would agree that the conduct in question is not anticompetitive, correct? . . .  A. I would – I would agree that if consumer welfare for personal social networking users is higher in the actual world than in the but-for world, that, you know, that would be adverse to a conclusion about competitive effects." *Id.* (quoting Ex. 283 at 268:21-269:19 (Hemphill Dep. Tr.)).  Finally, as Professor Carlton explained in concluding his analysis of these surplus figures:  "The precise numbers are irrelevant for purposes of this analysis: the point is simply that Meta's apps clearly generate enormous value for hundreds of millions of users in the U.S. and billions of users worldwide."  Ex. 2 at ¶ 229 (Carlton Rep.).

713.    Another academic study prepared in 2020 independent of any litigation determined that, following the Instagram acquisition, Facebook generates between

$244,986,407,760 and $578,281,869,480 in annual consumer surplus.  *See* Ex. 2 at ¶ 229 &

tbl. 28 (Carlton Rep.).  The study, which "used an incentivized experiment" involving 2,743

users who were paid to deactivate Facebook, found a mean willingness-to-accept value of $180

per month.  *Id.* at ¶ 349.

      **FTC Response: Disputed.**  The FTC disputes the consumer surplus estimates generated

by Professor Carlton using the Allcott academic study—and reported in Statement 713—for at

least five reasons.

      First, the FTC disputes the characterization of Statement 713 indicating that an academic

study "determined" that Facebook "generates" the consumer surplus figures reflected in

Statement 713.  Those figures do not appear in the academic study cited by Professor Carlton.

Rather, Professor Carlton himself generated the consumer surplus estimates reflected in

Statement 713 by ████████████████████████████████████████████

████████████████████████████████████████████████████

████████ .  As Professor Carlton noted: ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████   *See* Ex. 2 at ¶ 229 (Carlton Rep.) (emphasis

added).

      Second, the underlying study is inadmissible hearsay not capable of being rendered in

admissible form at trial.  *See* Fed. R. Civ. P. 56(c)(2).  Meta cites a portion of Professor Carlton's

rebuttal report that generates consumer surplus estimates using findings about the short-term

value of Facebook from an underlying study, the substance of which is itself inadmissible.  *See*

Ex. 2 at ¶ 229 & tbl. 28 (Carlton Rep.) (citing Hunt Allcott, et al., *The Welfare Effects of*

*SocialMedia*, 110 AM. ECON. REV. 629 (2020),

https://www.aeaweb.org/articles?id=10.1257/aer.20190658).

Third, Meta has not established the purpose for which the Allcott study was prepared and that it was not prepared for any litigation reason. The study was informed by discussions with and recommendations by Facebook employees who, according to internal communications, recommended the study not mention their involvement to "avoid a PR story about our involvement on this." PX3195, Meta email chain: ▇▇ to ▇▇▇, et al. re: "Facebook deactivation experiment draft," (Jan. 10, 2019), FTC-META-010153015, at -017.

Fourth, the study relies on an unreliable methodology for the reasons discussed in the FTC's Response to Statement 711.

Finally, the FTC disputes Statement 713 as the cited material does not show the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). As Professor Hemphill explained, Professor Carlton's consumer surplus estimates are "beside the point," as "the presence of consumer surplus does not indicate a lack of market power or anticompetitive conduct resulting in significant consumer harm." PX9007, Hemphill Rebuttal Report at ¶ 804.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Instagram and Facebook both generate tens or hundreds of billions of dollars in annual consumer surplus, as reflected in Professor Carlton's rebuttal report. *See supra* Meta Introduction. Professor Hemphill had the opportunity to rebut Professor Carlton's opinions and the FTC had the opportunity to probe them in discovery, and none of the FTC's "five reasons" for disputing Meta's evidentiary showing has merit.

*First*, the cited materials support Professor Carlton's calculations based on the independent academic study he cites; the FTC does not dispute any aspect of his calculations.

*Second*, Professor Carlton's reliance on independent academic studies is admissible under Federal Rule of Evidence 703.  Meta observes that the FTC's proffered experts rely on academic studies in forming their opinions.

*Third*, the FTC's assertion that some of the authors of the independent academic study had undescribed discussions with Meta employees does not establish that the study was conducted for this litigation, and the FTC has no basis for asserting otherwise.  Indeed, the FTC's cited email about this issue predates the FTC's original complaint in this case by almost two years.

*Fourth*, other than Professor Hemphill's assertion, the FTC cites no record material or economic literature contesting the use of willingness-to-accept and willingness-to-pay figures to estimate consumer surplus.  *See* Ex. 2 at ¶ 229 (Carlton Rep.).  Professor Carlton expressly provides high and low ranges of estimated surplus, using both willingness-to-accept and willingness-to-pay data.  Professor Hemphill opined that "one study" claims "valuations are lower if a user's friends and family are removed as well."  PX9007 at ¶ 807 (Hemphill Rebuttal Rep.).  That assumes a hypothetical not at issue – the studies that Professor Carlton cites ask how much users would be willing to pay or accept in exchange for using Meta's free services as those study participants use them in their real lives.  *See* Ex. 2 at ¶ 229 (Carlton Rep.); *see also id.* at App'x E, ¶¶ 346-351 (discussing each study).  The FTC has presented no evidence or other material doubting whether the participants in these studies are representative of Meta's user population (which spends a vast majority of time on the service not sharing with friends and family).  *See supra* Meta SMF ¶¶ 11-12, 56-60.  Further disputed because Professor Hemphill does not claim that Meta would have generated less than hundreds of billions of dollars' worth of consumer surplus following the acquisitions if a modification were made to the studies that asked

users to assume they have no friends or family on Meta's services (as the single paper he cites suggests).

*Fifth*, the assertion that the presence of consumer surplus is "beside the point" is incorrect because consumer surplus is relevant to assessing the consumer welfare effects of the challenged transactions, which Professor Hemphill conceded is relevant to evaluating whether conduct is anticompetitive:  "Q. . . . Now, turning to the question of anticompetitive effects, you agree that the proper standard for judging effects here is consumer welfare, correct? . . . A. Yes.  I would broadly agree that consumer welfare compared to the but-for world in which the acquisitions did not take place, you know, as – it's an important caveat as experienced by users of personal social networking services is the right way to think about competitive effects."  *See supra* Meta SMF ¶ 715 (quoting Ex. 283 at 267:14-268:2 (Hemphill Dep. Tr.)).  Professor Hemphill continued: "Q. . . . If consumer welfare is higher in the actual world than it would have been in the but-for world, then you would agree that the conduct in question is not anticompetitive, correct? . . .  A. I would – I would agree that if consumer welfare for personal social networking users is higher in the actual world than in the but-for world, that, you know, that would be adverse to a conclusion about competitive effects."  *Id.* quoting Ex. 283 at 268:21-269:19 (Hemphill Dep. Tr.)).  Finally, as Professor Carlton explained in concluding his analysis of these surplus figures:  "The precise numbers are irrelevant for purposes of this analysis: the point is simply that Meta's apps clearly generate enormous value for hundreds of millions of users in the U.S. and billions of users worldwide."  Ex. 2 at ¶ 229 (Carlton Rep.).

714.    Professor Jihoon Rim – one of the FTC's proffered experts – declined to name any app or acquisition when asked, "Defining 'consumer benefit' however you like, can you

name a start-up acquisition in the United States that has generated more consumer benefit than the Instagram acquisition?"  Ex. 310 at 120:18-121:4 (Rim Dep. Tr.).

**FTC Response: Disputed.**  The FTC objects that Statement 714 does not articulate a material fact subject to proof at trial.  *See* Fed. R. Civ. P. 56(c)(1).

The FTC disputes Statement 714 as it mischaracterizes Professor Rim's testimony, given that Professor Rim repeatedly responded to the proffered questions by asking for clarification and stating he did not understand the terminology being used.  Asking for clarification in response to vague and ambiguous questions, which lacked foundation, does not create an implication that the witness answered in the negative.

Prior to the cited testimony, counsel for Meta asked Professor Rim whether he could "name a start-up acquisition in the United States that generated more consumer welfare than the Instagram acquisition?  [objection]" to which Professor Rim responded: "I am not familiar with the terminology 'consumer welfare.' So I think it's a little bit difficult to answer that."  Ex. 310 at 116:7-14 (Rim Dep. Tr.).  Counsel then asked Professor Rim twice whether he was "familiar with the term 'consumer welfare'", and whether he had "an understanding of what the term 'consumer welfare' means."  *Id.* at 117:2-120-10.  In each case, Professor Rim testified he is not familiar with the term "consumer welfare," and counsel provided no explanation of the term.  *Id.* at 117:2-120-10.

Counsel then asked a near identical version of his initially ambiguous question: "Can you name a start-up acquisition in the United States that has generated more consumer benefit than the Instagram acquisition?" to which Professor Rim responded: "Again, I think – I think you should define 'consumer benefit.'  I mean, I'm not sure what you mean by 'consumer benefit.'"  *Id.* at 120:12-17.  Meta ultimately responded by abandoning the question after Professor Rim

repeated that he would need clarification as to the definition of "consumer benefit" to answer. *Id.* at 121:2-5 ("A. I think I answered this, but without knowing the definition of 'consumer benefit' it's difficult for me to answer that question. Q. Okay. . . .").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC's proffered expert on startup acquisitions declined to name any app or acquisition that generated more consumer benefit – the quotation in Meta's statement is not about "consumer welfare" – than the Instagram acquisition.  *See supra* Meta Introduction.  As the quoted material makes clear, Professor Rim was invited to answer the question using any definition of "consumer benefit" (a clear term) he would prefer.

715.    Professor C. Scott Hemphill – the FTC's proffered expert economist – testified: "Q. . . . Now, turning to the question of anticompetitive effects, you agree that the proper standard for judging effects here is consumer welfare, correct? . . .  A. Yes.  I would broadly agree that consumer welfare compared to the but-for world in which the acquisitions did not take place, you know, as – it's an important caveat as experienced by users of personal social networking services is the right way to think about competitive effects."  Ex. 283 at 267:14-268:2 (Hemphill Dep. Tr.).  He also testified:  "Q. . . . If consumer welfare is higher in the actual world than it would have been in the but-for world, then you would agree that the conduct in question is not anticompetitive, correct? . . .  A. I would – I would agree that if consumer welfare for personal social networking users is higher in the actual world than in the but-for world, that, you know, that would be adverse to a conclusion about competitive effects.  Q. And that would be true irrespective of the number of competitors, correct? . . .  A. I would agree that numerosity of competitors, though highly relevant to a prediction about consumer welfare, is not the end of the analysis."  *Id.* at 268:21-269:19.  Professor Hemphill also testified:  "The relevant question is

what does usage look like relative to a but-for world." *Id.* at 236:7-8; *see also id.* at 229:21-230:1 (recognizing that "the relevant question here is the actual world that we live in compared to the but-for world").

    **FTC Response: Disputed in part and incomplete.**  The FTC objects that Statement 715 does not articulate a material fact subject to proof at trial.  *See* Fed. R. Civ. P. 56(c)(1).

    Statement 715 is undisputed only to the extent that it accurately quotes the transcription of Professor Hemphill's testimony.  Statement 715 is otherwise disputed as the testimony excerpts are incomplete, misleading, and do not establish the absence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(B).

    First, Professor Hemphill, as an economic expert, was asked about the theoretical relevance of measuring consumer welfare to assess the effects of conduct—ostensibly, according to antitrust economics.  *See* Ex. 283 at 268:3-7 (Hemphill Dep. Tr.) ("Q. So you'd agree that if as a result of some conduct market-wide output is higher in the actual world than it would have been in the but-for world, that conduct should not be condemned as anticompetitive, correct?").  Professor Hemphill's qualified answers were not opinions on legal standards, which are both beyond the purview of an expert witness generally and beyond the scope of his expert testimony.  Moreover, that conduct may be assessed under a consumer welfare standard does not mean that conduct is condemned as anticompetitive only upon a showing by the plaintiff that the challenged conduct has reduced consumer welfare relative to the but-for world.  *See, e.g.*, *Microsoft*, 253 F.3d 34, 79 (D.C. Cir. 2001) ("To require that [Section] 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action.").

Second, the third sentence's first quotation of Professor Hemphill's testimony is incomplete.  Professor Hemphill was not opining as to the "relevant question" for the whole of an inquiry into anticompetitive effects, but was responsive to a specific question regarding increased usage of personal social network apps:

> Q. You point to nothing in your report to account for the increase in users and usage other than a reduction in quality-adjusted price?
>
> Ms. Cerilli: Objection to form.
>
> A. I'm not following what you're – it's not – it's not my mission in the reports to observe an increase in usage and then parcel out the sources of that.  My mission, my assignment is to understand the monopoly power that Meta wields and has wielded and the competitive effects of the transaction and part of that is to present evidence about quality-adjusted price.  It's well understood that monopolization can coincide with an increase in usage.  The relevant question is what does usage look like relative to a but-for world.

Ex. 283 at 235:16-236:8 (Hemphill Dep. Tr.).

Professor Hemphill's response was narrowly focused on assessing increased usage of personal social network apps—an assessment which is itself only one factor in a broader inquiry into the effects of conduct on consumer welfare.  *See, e.g.*, PX9007, Hemphill Rebuttal Report at ¶ 611 (explaining that expanded output alone does not necessarily equate to increased consumer welfare).

Similarly, the third sentence's second quotation of Professor Hemphill's testimony is incomplete.  Professor Hemphill was not opining as to the "relevant question" for the whole of an inquiry into anticompetitive effects but was responding to a specific line of questions regarding changes in product quality, including "feature innovation."  Ex. 283 at 229:19-230:3 (Hemphill Dep. Tr.) ("I think feature innovation is a – is a relevant piece of the puzzle and, again, recognizing that the relevant question here is the actual world that we live in compared to

the but-for world in which we might expect to see and observe different innovation, that is we observe the lack."); *see also* PX9007, Hemphill Rebuttal Report at ¶¶ 730-33 (describing reduced innovation stemming from Meta's monopoly power and anticompetitive conduct).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill "agree[d] that if consumer welfare for personal social networking users is higher in the actual world than in the but-for world, that, you know, that would be adverse to a conclusion about competitive effects," and that "[t]he relevant question is what does usage look like relative to a but-for world."  *See supra* Meta Introduction.  The additional testimony from Professor Hemphill that the FTC claims is necessary for completeness does not contradict the cited testimony or create a genuine dispute of material fact.  The FTC's injection of legal argument – concerning the impact of Professor Hemphill's admissions – is both improper for a fact statement and incorrect as a matter of law (the FTC is confusing a discussion about "causation" as though it is about effects), as Meta explains in its briefing.  The Court should disregard this argument about legal standards on a core element of the FTC's monopolization claim – exclusionary conduct – as an improper supplement to the FTC's briefing.  Regarding innovation, it is undisputed that Professor Hemphill also admitted that Meta had improved its services by innovating new features.  *See supra* Meta SMF ¶ 127.  Regarding the possibility that output could increase even in an already-monopolized market for various unstated reasons, Professor Hemphill admitted that he did not consider why output was increasing on Meta's services.  *See supra* ¶ 131.

### a.    Post-Acquisition Monetization

716.    Meta introduced advertising on Instagram in November 2013.  *See* Ex. 4 at ¶ 87 & n.173 (Tucker Rep.); Ex. 286 at ¶ 14 (Aral Rep.).  Since then, Meta has released new advertising

tools and formats on Instagram, such as new layout options and photo sizes in August 2015.  *See* Ex. 4 at ¶ 93 (Tucker Rep.).

**FTC Response: Disputed in part.**  The FTC objects to the term "new advertising tools and formats" as vague, and to the second sentence in Statement 716 as vague as to time.  The FTC further objects to Statement 716 because the material cited does not establish the absence of a genuine dispute as to any material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes the first sentence in Statement 716 because it is inconsistent with Mr. Systrom's testimony that Instagram had some advertising prior to the Meta acquisition: "█████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████"  PX6133, Systrom (Meta/Instagram) Dep. Tr., 170:16-21.

The FTC disputes the second sentence in Statement 716 as vague and unsupported because the cited material does not show the release of new advertising tools and formats on Instagram other than a release in August 2015, and for the August 2015 release, the article cited in Professor Tucker's report does not explain the "new layout options and photo sizes" beyond vague references to "new layout options in addition to its signature square for pictures and videos" and "portrait and landscape formats."  *See* Ex. 4 at ¶ 93 & n.185 (Tucker Rep.); PX0501, Yasmeen Abutaleb, *Facebook's Instagram Adds New Photo Sizes To Keep Users, Attract Ads,* Reuters (Aug. 27, 2015), https://www.reuters.com/article/facebook-instagram-layout/facebooksinstagram-adds-new-photo-sizes-to-keep-users-attract-ads-idUSL1N1121OP20150827.

Other evidence indicates that Meta did not provide Instagram with any unique advertising tools or formats. Patrick Bozeman – who was Instagram's Director of Engineering during the launch and scaling of Instagram's advertising business, *see* PX6035, Bozeman (Meta) Dep. Tr., at 18:8-19:14– testified that "[i]n broad strokes," Instagram's advertising technology was made up of "all standard components," and that "there are ads business[es] with similar functionalities to Instagram's current ads offerings," "assuming we are talking about targeting and pacing and things along those lines." *Id.* at 73:13-15, 100:14-20. And in Meta's Relevant Markets Tutorial Submission, filed on February 17, 2023, in the *Klein, et al. v. Meta Platforms* litigation in the Northern District of California, Meta stated that "[a]d formats, targeting, and advertiser tools like analytics or content-creation tools are part of the value proposition for Meta and its many competitors," and that "virtually every ad format available through Meta can be found elsewhere." PX0300, Klein Market Tutorial (Meta), at -010, -012.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact regarding the new advertising tools and formats Meta released on Instagram. Paragraph 716 clearly states that Meta's release of new layout options and photo sizes in August 2015 is an example of the new advertising tools and formats Meta released on Instagram. There is significant additional evidence, including in paragraphs 717-719 immediately following this one, of other new advertising tools and formats that Meta released on Instagram. *See also* Ex. 4 ¶¶ 93-98 (Tucker Rep.). The observation that Instagram had "affiliate links" pre-acquisition that were not advertising "in earnest" does not create a genuine dispute of material fact that Meta launched advertising on Instagram in 2013, after the acquisition.

The FTC's further response that "Meta did not provide Instagram with any unique advertising tools or formats" is irrelevant and nonresponsive to the fact stated in this paragraph.

As stated in Meta's response to paragraph 2141 of the FTC's Counterstatement, Meta does not dispute that some of the advertising formats and features Meta introduced to Instagram are used by other digital advertising businesses and may have been available to an independent Instagram. But whether Instagram could have adopted the same advertising formats and features as successfully absent the acquisition – compared to what Instagram was in fact able to adopt because of the acquisition and Meta – is purely speculative.  The evidence shows that Meta's expertise and practical experience were critical to the successful launch of Instagram's advertising technology.  *See infra* Meta SMF ¶¶ 717-721 (describing how Meta's expertise and practical experience helped grow Instagram's advertising technology more quickly and efficiently); Ex. 4 at ¶¶ 88-102 (Tucker Rep.) (same); Meta Resps. to Counter SMF ¶¶ 2103-2109.

717.     In September 2015, Meta enabled Facebook's marketing partners to advertise on Instagram using Facebook tools.  *See* Ex. 4 at ¶ 89 & n.179 (Tucker Rep.).  On September 21, 2018, Ime Archibong – then Meta's vice president of product partnerships, *see* Ex. 159 at 32:6-21 (Archibong IH Tr.) – wrote in an email:  "Instagram pivoted to use the FB ads stack rather than building a separate product – this decision enabled rapid growth of IG's monetization efforts."  Ex. 191 at -548 (FB_FTC_CID_03360548).

**FTC Response: Disputed in part.**  The FTC objects to the terms "Facebook's marketing partners," "Facebook tools," "ads stack," and "product" in Statement 717 as vague.  The FTC further objects to the second sentence in Statement 717 as vague as to the time of Instagram's "pivot[] to use the FB ads stack."

The FTC does not dispute that the quoted language in the second sentence in Statement 717 appears in the cited document, but the FTC otherwise disputes Statement 717 as described herein.

The FTC disputes the first sentence in Statement 717 because the cited materials fail, as required by Fed. R. Civ. P. 56(c)(1)(B) and Local Rule 7(h), to support the assertion that "Meta enabled Facebook's marketing *partners* to advertise . . . ."  Paragraph 89 of the cited document refers to a September 30, 2015 Meta blog post whereby Meta announced that it had "opened the API access to Instagram Ads to *all Facebook Marketing Developers*," *see* Ex. 4 at ¶ 89 (Tucker Rep.) (emphasis added), whereas footnote 179 of the cited document, which is a news post from February 2015, refers to Meta's "*Facebook Marketing Partner program*."  *See id.* at ¶ 89 & n.179 (Tucker Rep.) (emphasis added).  The cited material fails to support the assertion that "Facebook Marketing Developers" refers to Facebook's marketing *partners*.

The FTC disputes the second sentence of Statement 717 because the subject of the email – "Fyi, what was sent to me" – indicates that Mr. Archibong did not write the cited document, and because the title of the material in the body of the email indicates it was prepared for him (not written by him): "Business Platform Strategy – 9/13 update copy *for* Ime [Archibong]." Ex. 191 at -548 (FB_FTC_CID_03360548) (emphasis added).

The FTC further disputes Statement 717 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that Instagram was well-positioned to build an advertising business without being acquired by Meta, and that Meta did not deliver any benefits to Instagram related to advertising for which Meta's acquisition was necessary.  *See* PX6027, Systrom (Meta/Instagram) IH Tr., at 200:10-12 ("███████████████████████████████████

██████████████ ”); PX9003, Aral Report at ¶¶ 11(a), 98(d), 263, 268 (Meta's claims of delivering greater success or speed to Instagram's monetization are unsupported and contradicted by other evidence); CMF at §§ V.C.1-4.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Meta created advertising opportunities for Instagram using Facebook tools, including Facebook Marketing Partners.  The September 30, 2015 Meta blog post cited in this paragraph clearly states:  "Today we have opened the API access to Instagram Ads to all Facebook Marketing Developers, for all advertisers, in all countries.  Using the same Facebook Marketing APIs that you are familiar with already, you can now create ads for 400 million active monthly Instagram users."  Ex. 4 at ¶ 89, n.176 (Tucker Rep.).  The FTC quibbles over the word "Developers," but in the other material cited in paragraph 89 of Professor Tucker's report, in August 2015, an Instagram representative said:  "The Instagram Ads API will help us make ads more relevant to the community, serve more diverse business objectives, and make buying on the platform easier for advertisers.  We started working with a group of Facebook Marketing Partners a few weeks ago and they've brought great experience and technological savvy onto the platform.  We'll continue to build upon the Instagram Ads API in the coming weeks and months."  *Id.* at n.177.  A brand executive added, "Now, Instagram is bringing on experienced Facebook Marketing Partners to help brands use the same advanced Facebook targeting tools to create and deliver relevance-driven ad campaigns that increase ROI [return on investment] by reaching the right audience, at the right place and time. . . .  This is one of the most anticipated moments in the evolution of advertising, and we expect the platform's offering will continue to expand rapidly."  *Id.*

The FTC's further response "that Instagram was well-positioned to build an advertising business without being acquired by Meta, and that Meta did not deliver any benefits to Instagram related to advertising for which Meta's acquisition was necessary" is irrelevant and nonresponsive to the fact stated in this paragraph.  It is also unsupported by the record.  *See*, *e.g.*, *supra* Meta SMF ¶¶ 716717, *infra* ¶¶ 718-721; Meta Resps. to Counter SMF ¶¶ 2103-2109, 2141-2152.

The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

718.   In September 2015, Meta launched direct-response advertising on Instagram.  *See* Ex. 4 at ¶ 93 & n.186 (Tucker Rep.).

**FTC Response: Disputed in part.**  The FTC does not dispute that direct-response advertising launched on Instagram in 2015.  The FTC further disputes (to the extent implied by Statement 718) that Meta was necessary for or the reason why Instagram launched direct-response advertising.  Instagram's CEO Kevin Systrom testified that Instagram was always planning on offering direct response advertising.  PX6133, Systrom (Meta/Instagram) Dep. Tr., at 177:19-178:4 ("███████████████████████████████████████████████████ ███████████████████████████████████████████████████").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether or when Meta launched direct-response advertising on Instagram.  Nothing in the FTC's response disputes that Meta launched direct-response advertising on Instagram in 2015.  The FTC's further response regarding whether Meta was necessary to Instagram

launching direct-response advertising is irrelevant and nonresponsive to the fact stated in this paragraph.  Whether Instagram would have launched direct response advertising as successfully as it was in fact able to roll it out because of the acquisition is purely speculative.  *See* Ex. 4 at ¶ 93 (Tucker Rep.) (describing benefits to Instagram of the direct response advertising it launched post-acquisition); *supra* Meta SMF ¶¶ 716-718, *infra* ¶¶ 719-721 (describing Instagram's post-acquisition monetization).

719.    In September 2015, Meta also made the Facebook self-service advertising tool available to advertisers on Instagram.  *See* Ex. 2 at ¶ 257 & n.374 (Carlton Rep.).  Following this launch, self-serve advertisements came to comprise ███████ of Instagram advertising revenue. *See id.* at p. 190, fig. 18 (Carlton Rep.).  This can be represented graphically:



*Id.*

**FTC Response: Disputed in part.**  The FTC objects to Statement 719 as vague and ambiguous, including for failing to disclose or identify the unit of measure for the revenue figures of the y-axis.

The FTC does not dispute that Meta made a Facebook self-service advertising tool available to advertisers on Instagram in 2015 or that self-service ads comprise ███ of Instagram advertising revenue, but the FTC otherwise disputes Statement 719 as described herein.

The FTC disputes Figure 18 to Statement 719 as vague and ambiguous, for not clearly labeling the "Y-axis" reflecting revenue totals.  Figure 18 in Professor Carlton's report, which purports to show "Total Revenue" from "Instagram U.S. Advertising," with the Y-axis indicating the number of "Billions."  But Figure 18 is unclear because it does not indicate the unit of currency that it is reporting (i.e., dollars versus cents), creating an incomplete and incorrect impression of Instagram's advertising revenues.  Professor Carlton's Figure 18 appears to be reporting advertising revenue in cents, rather than dollars.  Professor Hemphill's Rebuttal Report provides revenue totals for Instagram in dollars.  *See* PX9007, Hemphill Rebuttal Report, Ex. 6.

The FTC additionally disputes Statement 719 as not showing the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that Instagram was well-positioned to launch an advertising business, including self-service advertising, without being acquired by Meta, and that Meta did not deliver any benefits to Instagram related to advertising for which Meta's acquisition was necessary.  For instance, Patrick Bozeman – who was Instagram's Director of Engineering during the launch and scaling of Instagram's advertising business, *see* PX6035, Bozeman (Meta) Dep. Tr., at 18:8-19:14 – testified that "[i]n broad strokes," Instagram's advertising technology was made up of "all

standard components," and that "there are ads business[es] with similar functionalities to Instagram's current ads offerings," "assuming we are talking about targeting and pacing and things along those lines." *Id.* at 73:13-15, 100:14-20.  Additionally, in Meta's Relevant Markets Tutorial Submission, filed on February 17, 2023 in the *Klein, et al. v. Meta Platforms* litigation in the Northern District of California, Meta stated that "[m]any of Meta's competitors, such as Google, Amazon, Apple, TikTok, Hulu, Pinterest, and Twitter, also offer self-service ad-buying tools."  PX0300, Klein Market Tutorial (Meta), at -010.  *See also* CMF at §§ V.C.3-4; PX9003, Aral Report at ¶¶ 154-155, 158, 211.

> **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Meta made the Facebook self-service advertising tool available to advertisers on Instagram in September 2015, or whether self-serve advertisements came to comprise ▮ ▮ of Instagram advertising revenue.  Nothing in the FTC's response disputes those facts. The FTC's further response regarding whether Meta was necessary to Instagram launching an advertising business, including self-service advertising, is irrelevant and nonresponsive to the facts stated in this paragraph.  Whether Instagram would have launched self-service advertising as successfully as it was in fact able to launch it because of the acquisition is purely speculative. *See* Ex. 4 at ¶¶ 92, 98, 130-133 (Tucker Rep.) (describing benefits to Instagram of the self-service advertising system it launched post-acquisition); *supra* Meta SMF ¶¶ 716-719, *infra* 720-721 (describing Instagram's post-acquisition monetization).  Regarding the definition of the "y-axis" in the above image, the image speaks for itself (including in defining the y-axis) and this is irrelevant to the proportion of revenue attributable to self-service advertisements.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs

creates a genuine dispute of material fact, and Meta incorporates its responses to those

paragraphs here.

720.    On January 9, 2017, Instagram co-founder Kevin Systrom wrote in an email:

"Our financial success was, in large part, an outcome of Facebook's extraordinary ad ecosystem.

Our turnaround in content production was in large part due to the adoption of an existing format.

Our increase in time spent was largely derived from an existing playbook of feed ranking

developed at [Facebook]."  Ex. 188 at -304 (FB_FTC_CID_02985304).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to the terms "ad

ecosystem," "content production," "format," and "existing playbook of feed ranking" as vague.

The FTC does not dispute that the quoted language appears in the cited material, but

otherwise disputes Statement 720 as described herein.

The FTC disputes the first sentence in Statement 720 as incomplete because Mr. Systrom

testified in this matter that Instagram did not need Meta's advertising tools and technologies to

develop a successful advertising business.  *See* PX6027, Systrom (Meta/Instagram) IH Tr., at

200:10-12 (Systrom IH Tr.) ("Q: And could you have successfully monetized Instagram without

Facebook?  A: Absolutely."); *see also* PX9003, Aral Report at ¶¶ 123-31.  Other evidence

similarly indicates that Meta did not provide Instagram with any unique advertising technologies.

For instance, Patrick Bozeman – who was Instagram's Director of Engineering during the launch

and scaling of Instagram's advertising business, *see* PX6035, Bozeman (Meta) Dep. Tr., at 18:8-

19:14 – testified that "[i]n broad strokes," Instagram's advertising technology was made up of

"all standard components," and that "there are ads business[es] with similar functionalities to

Instagram's current ads offerings," "assuming we are talking about targeting and pacing and

things along those lines."  *Id.* at 73:13-15, 100:14-20 (Bozeman (Meta) Dep. Tr.).

The FTC disputes the second and third sentences in Statement 720 as so vague as to its meaning that a substantive response is not possible, and further to the entirety of Statement 720 as not showing the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that Meta did not deliver any unique advertising features or formats to Instagram, and that Instagram was well-positioned to build an advertising business without being acquired by Meta.  For instance, in Meta's Relevant Markets Tutorial Submission, filed on February 17, 2023 in the *Klein, et al. v. Meta Platforms* litigation in the Northern District of California, Meta stated that "[a]d formats, targeting, and advertiser tools like analytics or content-creation tools are part of the value proposition for Meta and its many competitors," and that "virtually every ad format available through Meta can be found elsewhere."  PX0300, Klein Market Tutorial (Meta), at -010, -012; *see also* PX9003, Aral Report at ¶ 158 ("The advertising formats and features that Meta claims it introduced—such as native advertising, direct response advertising, self-service advertising, cross-posting compatibility, and measurement tools—are standard components of a digital advertising business, and, as such, they would have been available to an independent Instagram.  And Instagram was well positioned to make these basic advertising formats and features available for advertisers.").

Other evidence additionally indicates that Instagram co-founders Kevin Systrom and Mike Krieger had been contemplating showing ads in Instagram's feed prior to the Meta acquisition.  *See* PX6027, Systrom (Meta/Instagram) IH Tr., at 95:13-15 ("the monetization plan was always advertising, and it was always showing ads in feed"); PX6015, Krieger (Meta/Instagram) IH Tr., at 71:21-22 ("There's a path forward that would involve advertising and feed.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding Kevin Systrom's statement that Instagram's actual financial success as a result of the acquisition was, in large part, an outcome of Facebook's extraordinary ad ecosystem, or the ways in which he described how Meta's extraordinary ad ecosystem benefited Instagram.  The FTC does not dispute any of those facts.  The FTC points to Mr. Systrom's testimony that he believed Instagram could have monetized successfully if it had not been acquired by Meta.  Whether Instagram could have monetized as successfully absent the acquisition as Instagram was in fact able to monetize because of the acquisition is purely speculative.  *See supra* Meta SMF ¶¶ 716-720, *infra* ¶ 721 (describing Instagram's post-acquisition monetization).

The FTC's further response that "Meta did not provide Instagram with any unique advertising technologies" or "advertising features or formats" is irrelevant and nonresponsive to the fact stated in this paragraph.  As stated in Meta's response to paragraph 2141 of the FTC's Counterstatement, Meta does not dispute that some of the advertising technologies, formats, and features Meta introduced to Instagram are used by other digital advertising businesses and may have been available to an independent Instagram.  But whether Instagram could have adopted the same advertising technologies, formats, and features as successfully absent the acquisition – compared to what Instagram was in fact able to adopt because of the acquisition and Meta – is purely speculative.  The evidence shows that Meta's expertise and practical experience were critical to the successful launch of Instagram's advertising technology, formats, and features. *See*, *e.g.*, *supra* Meta SMF ¶¶ 716-720, *infra* ¶ 721; Ex. 4 at ¶¶ 88-102 (Tucker Rep.); Meta Resps. to Counter SMF ¶¶ 2103-2109.

721.    Instagram generated advertising revenues of ███████████████████ ████████████████████████████████████████████████████████. *See*

Ex. 279 at p. 25, Ex. 7 (Hemphill Rep.).  Some publicly reported estimates of Instagram's

standalone valuation as of 2018 were between $80 billion and $100 billion.  *See* Ex. 2 at ¶ 260 &

n.377 (Carlton Rep.).  Meta expert Professor Steven Kaplan estimated Instagram is worth close

to ███████ today ████████████████████████████████████████████████████████

███████ .  *See supra* at ¶ 670.

**FTC Response: Disputed in part.**  The FTC does not dispute the first sentence of

Statement 721, or that the dollar figures in the second and third sentences of Statement 721

appear in the cited materials, but otherwise disputes Statement 721 as described herein.

The FTC disputes the last sentence of Statement 721 because Professor Kaplan is not a valuation

expert and did not make or provide an expert opinion or estimate of Instagram's valuation.  The

FTC additionally disputes that Statement 721 shows the absence of a genuine dispute regarding a

material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

the statement accurately describes the FTC's and Meta's experts' calculations.  *See supra* Meta

Introduction.  The FTC's conclusory assertions regarding Professor Kaplan's opinions are

unfounded and do not create a genuine dispute of material fact.  As stated, Professor Kaplan

estimated Instagram is worth close to ███████ today.

722.    Professor Sinan Aral – the FTC's proffered monetization expert, Ex. 286 at ¶ 1

(Aral Rep.) – opined on "Meta's claimed monetization benefits related to acquiring Instagram

and WhatsApp" and "whether Meta's acquisitions of Instagram or WhatsApp were necessary to

achieve the claimed benefits."  *Id.* at ¶ 8.  He testified:  "Q. So it's your opinion that [Instagram]

could have monetized more successfully, but not that it would have monetized more

successfully? . . .  A. I don't state a particular opinion in either report about whether it could have

or would have monetized more successfully."  Ex. 287 at 167:1-7 (Aral Dep. Tr.).  Professor

Aral also testified:  "I was not tasked with answering the question that you asked, which is, could

Instagram have been better without the acquisition of Meta.  And so I didn't offer an opinion on

that specifically."  *Id.* at 180:18-22 & errata.

**FTC Response: Disputed in part.**  The FTC objects to Statement 722 as incomplete

because the first sentence omits that Professor Aral also opined on "whether, and if so, to what

extent, the claimed benefits were actually achieved."  *See* Ex. 286 at ¶ 8 (Aral Rep.).  The FTC

further objects to Statement 722 because the cited material does not establish the absence of a

genuine dispute as to any material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC does not dispute that Professor Aral opined on the matters identified in the first

sentence of Statement 722, or that the quoted language appears in the cited material, but

otherwise disputes Statement 722 as described herein.

The FTC disputes Statement 722's description of Professor Aral's testimony and

opinions as incomplete and misleading.  Professor Aral's assignments were to assess the

monetization claims advanced by Meta, not to offer an opinion regarding all aspects of

"monetization."  *See* Ex. 286 at ¶ 8 (Aral Rep.) ("The FTC asked me to evaluate Meta's claimed

monetization benefits related to acquiring Instagram and WhatsApp, and to assess (1) whether

Meta's acquisitions of Instagram or WhatsApp were necessary to achieve the claimed benefits,

and (2) whether, and if so, to what extent, the claimed benefits were actually achieved.");

PX9008, Aral Rebuttal Report at ¶ 4 ("The focus of this Rebuttal Report is certain monetization

benefit claims, as well as claims related to advertising targeting and the utility of advertising,

made by Meta's experts in their expert reports.").  Professor Aral thoroughly assessed those

claims and opined, with robust supporting evidence, that Meta's acquisition of Instagram and

WhatsApp were not necessary to achieve Meta's claimed monetization benefits.  *See* Ex. 286 at ¶ 11(b) (Aral Rep.) ("I . . . conclude that Meta's acquisitions of Instagram or WhatsApp were not necessary to achieve the claimed monetization-related benefits that Meta lists for each acquisition."); *see generally id.* at § IV ("Analysis of Meta's Monetization Benefit Claims Regarding its Acquisition of Instagram"), § V ("Analysis of Meta's Monetization Benefit Claims Regarding its Acquisition of WhatsApp"); PX9008, Aral Rebuttal Report at ¶ 15(b) ("I . . . conclude that Meta's acquisitions of Instagram or WhatsApp were not necessary to achieve the claimed monetization-related benefits that Meta lists for each acquisition."); *see generally id.* at § IV ("Analysis of Meta's Monetization Benefit Claims Regarding its Acquisition of Instagram"), § V ("Analysis of Meta's Monetization Benefit Claims Regarding its Acquisition of WhatsApp").

The FTC further disputes the first transcript reference in Statement 722 as incomplete and misleading because it omits the rest of Professor Aral's answer to the question, clarifying that he believed it was possible that Instagram could have monetized more successfully without Meta and that Instagram and WhatsApp would likely have achieved the claimed monetization without Meta:

> I don't state a particular opinion in either report about whether [Instagram] could have or would have monetized more successfully. But I'm evaluating in response to your question that Meta introduced a number of difficulties and challenges to monetization that certainly makes that possible.  In my report and rebuttal report, the opinion that I come to in conducting my analysis is that Instagram [and] WhatsApp could have and likely would have achieved the claimed monetization benefits absent the acquisitions.

Ex. 287 at 167:5-16 (Aral Dep. Tr.).

The FTC disputes the second transcript reference in Statement 722 as incomplete and misleading because it omits the question and answer immediately preceding the cited material

and it also omits the question to Professor Aral that prompts his response.  Together, this testimony indicates that Professor Aral determined that Meta introduced severe deficiencies to Instagram's efforts to create an advertising business from which he concluded it was possible that Instagram might have monetized more successfully without Meta.

> Q. And even if that were true, where in your report does it say that ad technology on Instagram could have been better if it had not been acquired by Meta?
>
> A. Well, the -- the opinion and argument is that the acquisition brought deficiencies which hamper advertising efforts to Instagram. So the implication is that the absence of those deficiencies are potentially or lead to the possibility that things might have been better without them.
>
> Q. So you're describing an implication from the opinion that you've offered, you are not describing an express opinion that you state in your report?
>
> ***
>
> A. Well, I should qualify that by saying that I had a particular assignment, which was to evaluate the monetization benefit claims made by Meta.  And in doing so, I also pointed out that Meta brought to Instagram a number of deficiencies [with respect to advertising technology].  And so I was not tasked with answering the question that you asked, which is, could Instagram have been better without the acquisition of Meta.  And so I didn't offer an opinion on that specifically.  But I did offer opinions that indicate that Meta introduced a significant number of severe deficiencies to Instagram's attempts and efforts to generate an advertising business.

*Id.* at 179:17-181:5 & errata.  *See also id.* at 135:2-4 (Aral Dep. Tr.) ("What I've stated is that the claimed [monetization] benefits could have and likely would have been achieved absent the acquisitions.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether its proffered expert, Professor Aral, offered the opinion that Instagram could have or would have monetized more successfully or been better if it had not been acquired by

Meta.  As the quoted testimony in paragraph 722 and in the FTC's response to paragraph 722

shows, Professor Aral clearly admitted that he did not offer those opinions.  And the FTC does

not cite anything in either of Professor Aral's reports or his testimony that states those opinions.

Professor Aral's other opinions regarding "monetization claims advanced by Meta" are irrelevant

and nonresponsive to the fact stated in this paragraph.  They are also unsupported, as stated in

Meta's responses to paragraphs 2103, 2104(b), 2106, and 2112 in the FTC's Counterstatement.

### b.      Post-Acquisition Growth

723.    Following the Instagram acquisition, Meta provided Instagram with several

resources for growing and increasing user engagement on Instagram, e.g.:

    a.  As of November 2012, Meta used app-install ads (called "Neko ads") on

       Facebook to promote Instagram.  Ex. 210 at -793-796 (FTC-META-

       002733793); *see also* Ex. 201 at -.001, -.002 (FB_FTC_CID_11435712) (row

       7, "Instagram leverages Neko as a channel to drive Installs and/or App

       Opens").

    b.  As of 2014, Meta also used Network Ego ads on Facebook to promote

       Instagram.  *See* Ex. 217 at -752 (FTC-META-011737752).  Javier Olivan –

       Meta's chief operating officer – testified that █████████████████

       ████████████████████████████████████████████

       ████████████████████████████████████████

       Ex. 160 at 63:8-10, 148:14-149:5 (Olivan Dep. Tr.).

    c.  In 2015, Meta launched an Instagram Bookmark on the Facebook mobile app.

       *See* Ex. 193 at -267 (FB_FTC_CID_05304266); Ex. 161 at 257:8-20 (Schultz

       IH Tr.).  On May 15, 2015, Alex Schultz – then Meta's vice president of

analytics and currently Meta's chief marketing officer, *see* Ex. 162 at 10:10-16 (Schultz Dep. Tr.) – wrote in an email:  "Instagram growth continues to accelerate due to a bunch of huge wins over the past couple weeks, driven by bookmarks (+200K), Neko fix/refresh (+30K) and NetEgo update (+7.5K)." Ex. 185 at -558 (FB_FTC_CID_02387556).  Mr. Krieger testified:  "as we integrated more deeply with Facebook, a lot of the collaborations happened between our growth team and Facebook's growth team, you know, the bookmark as an example, and a few of these other things.  Those would, of course, not have been available to us had we remained independent."  Ex. 302 at 177:9-15 (Krieger IH Tr.).

d.   In 2016, Meta completed its rollout of web registrations for Instagram, which enabled new users to "sign up for Instagram from 802onetizin.com."  Ex. 208 at -280 (FTC-META-000111278).  On March 28, 2016, Mr. Systrom wrote in an email that "we are expected to generate roughly 200K/day from web registration which should be a big win for overall growth."  Ex. 218 at -264 (FTC-META-011883264).

e.   Also as of 2016, Meta implemented notifications on Facebook to alert Instagram users of new followers on Instagram.  *See* Ex. 216 at 464-465 (FTC-META-008614464) ("Top wins" for "Growth" include "FB jewel notif to churned IG users with new follows").  Meta also used notifications on Facebook to invite Facebook users to join Instagram and to notify Instagram users of unseen activity and follower activity on Instagram.  *See* Ex. 201 at -.001, -.004, -.005 (FB_FTC_CID_11435712).

f.  Meta allowed Instagram to use the Facebook Open Graph to allow users to find their friends on Instagram.  *See* Ex. 151 at 115:3-14, 132:16-18 (Systrom Dep. Tr.).

g.  Meta also allowed cross-posting of Instagram content on Facebook.  *See* Ex. 201 at -.001, -.002, -.004, -.005 (FB_FTC_CID_11435712) (row 13, "Pivot Chaining" initiative shows a "user who clicked like-comment-share button or clicked the photo itself" on Facebook "an eligible IG photo in FB news feed").

**FTC Response: Disputed in part.**  The FTC does not dispute elements of Statement 723, as specified below, but otherwise disputes Statement 723 as described herein.

The FTC disputes Statement 723 because the cited material does not establish the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that since acquiring Instagram, Meta has taken steps to hamper Instagram's growth and that Meta's acquisition of Instagram was not necessary for Instagram to grow.  *See, e.g.*, CMF at § V.A, █████████████████████████████████ █████████████████████████; PX9007, Hemphill Rebuttal Report §§ 3.3.3.2-.3; PX9000, Hemphill Report §§ 4.1.2, 4.1.4.

For example, before being acquired by Meta, Instagram allowed users to cross-post content from Instagram to several applications, including Facebook.  *See* Ex. 151 at 222:9-23 (Systrom Dep. Tr.) (noting Instagram also allowed users to post Instagram content to "Foursquare, Posterous, Twitter . . . and likely a couple others").  But years after the acquisition, Meta restricted cross-posts from Instagram to Facebook by removing attribution links.  As Exhibit 201 (cited in 723(a), (e), (f), and (g)) shows, by approximately mid-2018, links to content

posted from Instagram on Facebook appear to have been "turned off."  Ex. 201 at -.001, -.003

(FB_FTC_CID_11435712) (rows 10-11, noting both "text link[s]," – i.e., "IG content that is

cross-posted to Facebook includes Deeplink(s) in the FB story header that sends people to the IG

app (if installed) or app store (if not installed)" – and "photo link[s]" had been "turned off" in

September 2017).  This means that while content posted from Instagram to Facebook might

appear on Facebook, it would lack an attribution link to Instagram.  *See, e.g.*, PX1594, Meta

email chain: M. Zuckerberg to A. Schultz, et al. re: "IG links in FB," (July 15, 2018),

FB_FTC_CID_05935412, at -414.  Meta removed these attributions in part to slow growth on

Instagram and help growth on Facebook, a result that contradicts the claim in Statement

723.  *See id.* at -412-413.

      Evidence also indicates that the particular integrations or resources specified in statement

723 did not require Meta acquiring Instagram, and could have been made available without the

acquisition, as they were for other third parties.  For example, Exhibit 210 demonstrates that

third parties can purchase "Neko" ads from Meta that include social context like "63 friends use

this" application.  *See* Ex. 210 at -795 (FTC-META-002733793) (showing ad for "Fab"

indicating "63 friends use this").  As a part of Meta, Instagram purchased ads on terms no

different from other third parties.  *See, e.g.*, PX6047, Cole (Meta/Instagram) Dep. Tr., at 158:13-

159:5 (noting that Instagram used the same ad-buying tools and process as third parties).

      Similarly, as early as September 2013—two years before the launch of the Instagram

Bookmark in 2015—third-party developers could pay to "start showing Neko ads as Sponsored

Bookmarks" on Facebook.  PX12486, Meta email: M. Vernal to ███, et al., re: "Platform

HPM" (Sept. 24, 2013), FB_FTC_CID_06009425, at -425; *see also* PX6065, Rose (Meta) Dep.

Tr., at 210:20-212:5 ("we allowed developers to reach our users . . . [with] a bookmark inside of

Facebook . . . And at some point, I believe we experimented with having a way for developers to buy advertising inventory in that area of the website.").  Likewise, reengagement notifications are also used outside of Meta.  *See, e.g.*, PX6035, Bozeman (Meta) Dep. Tr., at 141:10-142:13 (agreeing that many apps send notifications).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, following the Instagram acquisition, Meta provided Instagram with resources for growing and increasing user engagement.  Meta's decision six years after the acquisition to eliminate attribution links does not create a material dispute that the acquisition benefited Instagram's growth efforts and provided Instagram with resources to increase user engagement.  *See supra* Meta Introduction; *see also infra* Meta SMF ¶¶ 724-728, 735-737 (describing evidence of how Instagram used Meta's infrastructure, knowledge, and resources to improve its growth).  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

The FTC also responds to Statements 723(a)-(g) separately below:

    a.  **FTC Response: Disputed in part.**  The FTC objects to "as of November 2012," as vague as to time.  The FTC does not dispute that Exhibit 210 appears to demonstrate that Instagram used some of its advertising budget to run at least one ad campaign on Facebook in 2012.  *See* Ex. 210 at -796 (FTC-META-002733793) ("Here's our account number . . . Still trying to nail down a budget . . . ."); *id.* at -794 ("[i]f cost becomes an issue, I would take budget out of US and DE"); *id.* at -793 ("you're running the same ads as the fab

screenshot.").  The FTC, however, otherwise disputes Statement 723(a) as not

supported by the cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A), L.R.

7(h).  Exhibit 201 appears to report results of "holdout" testing conducted in

2018 but does not demonstrate that Instagram continuously paid for Neko ads

from 2012 to present as implied in Statement 723(a).  *See* Ex. 201 at -.001-

.003 (FB_FTC_CID_11435712) (row 7).  Additionally, the data included in

the underlying spreadsheet report "little success thus far" for the "impact" of

Neko ads, which does not establish that Neko ads had any established

impact.  *Id.* at -.013-.015 (cell G8).

**Meta Reply:**  The FTC's response does not create a genuine dispute of

material fact that, as of November 2012, Meta used app-install ads (called

"Neko ads") on Facebook to promote Instagram.  As the phrase "as of

November 2012" is ordinarily understood and used, there is no dispute that, in

November 2012, Meta was using Neko Ads to promote Instagram.

b. **FTC Response: Disputed in part.**  The FTC objects to the quoted testimony

as incomplete and objects to "[a]s of 2014" as vague as to time.  The FTC

does not dispute that Instagram may have used "Netego" units on Facebook to

promote Instagram until approximately 2018, but evidence indicates that Meta

removed Instagram's access to "Netego ads" in 2018.  *See, e.g.*, PX2352,

Meta email chain: N. Gleit to ███ and J. Olivan re: "Follow-up from

Meeting Today/Next Steps," (June 30, 2018) FB_FTC_CID_03904781, at -

781-782 ("we will be turning off the following FB-> IG promotion areas: . . .

Netego Ads"); *see also* Ex. 160 at 141:12-149:5 (Olivan Dep. Tr.)

(introducing PX2352 and discussing Net Ego ads).

**Meta Reply:**  The FTC's response does not create a genuine dispute of

material fact; as the phrase "as of 2014" is ordinarily understood and used,

there is no dispute that, in 2014, Meta was using Network Ego ads on

Facebook to promote Instagram.  The FTC says that Instagram may have

ceased using these ads in 2018; whether Meta deprecated Network Ego does

not create a material dispute that, after the acquisition, Meta used Network

Ego ads to promote Instagram.

c.  **FTC Response: Disputed in part.**  The FTC does not dispute that Instagram

Bookmark launched in 2015 or that Statement 723(c) accurately quotes words

appearing in the cited documents, but disputes Statement 723(c) as not

establishing the absence of a genuine dispute of material fact.  *See* Fed. R.

Civ. P. 56(c)(1)(B).  As noted above, the FTC disputes that bookmarks could

not or would not have been available to Instagram without the acquisition.  As

early as September 2013—two years before the launch of the Instagram

Bookmark in 2015—third-party developers could pay to "start showing Neko

ads as Sponsored Bookmarks" on Facebook.  PX12486, Meta email: M.

Vernal to ███ re: "Platform HPM," (Sept. 24, 2013),

FB_FTC_CID_06009425, at -425; *see also* PX6065, Rose (Meta) Dep. Tr., at

210:20-212:5.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta launched an Instagram Bookmark on the Facebook mobile app in 2015.

d.  **FTC Response: Undisputed.**

e.  **FTC Response: Disputed in part.**  The FTC objects to "as of 2016" as vague as to time.  The FTC does not dispute the first sentence of Statement 723(e).  However, the FTC disputes the second sentence because evidence indicates Meta removed or limited access to these notifications in 2018.  *See* Ex. 160 at 133:25-135:16 (Olivan Dep. Tr.) (indicating Mr. Zuckerberg requested "jewel notifications for Instagram" should be "deprecate[d] immediately").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact; as the phrase "as of 2016" is ordinarily understood and used, there is no dispute that, by 2016, Meta implemented notifications on Facebook to alert Instagram users of new followers on Instagram.  The FTC says that Instagram may have removed or limited access to these notifications in 2018, but that statement does not create a genuine dispute of material fact that, after the acquisition, Meta implemented notifications on Facebook to alert Instagram users of new followers on Instagram, which benefited Instagram's growth.

f.  **FTC Response: Undisputed but incomplete and vague.**  The FTC objects to Statement 723(f) as vague as to time.  The FTC does not dispute that when asked about the umbrella concept of "Open Graph," Mr. Systrom testified

regarding "Open Graph."  The FTC notes, however, that the term "Open

Graph" is vague because it refers to group of several different APIs (available

to third parties) and the cited material does not establish that Instagram used

all or even most of these APIs.

**Meta Reply:**  The FTC's response does not create a genuine dispute of

material fact; as the term "Open Graph" is understood in this context,

including as used in depositions in this matter, Meta allowed Instagram to use

the Facebook Open Graph to allow users to find their friends on Instagram.

g.  **FTC Response: Disputed in part.**  The FTC objects to "allowed cross-

posting" as vague and to Statement 723(g) as vague as to time.  The FTC does

not dispute that Instagram users, like the users of many applications, had the

ability to post content from Instagram to Facebook both before and after the

acquisition.  The FTC otherwise disputes Statement 723(g) as not supported

by the cited material and because Statement 723(g) does not demonstrate the

absence of any genuine dispute of material fact.  *See* Fed. R. Civ. P.

56(c)(1)(A), 56(c)(1)B); L.R. 7(h).  Exhibit 201 appears to report the results of

several holdout experiments in 2018 only but does not establish that Instagram

has always cross-posted to Facebook on consistent terms for the entire

relevant time period.  *See* Ex. 201 at -.001-.003

(FB_FTC_CID_11435712).  As noted above, Exhibit 201 supports the

conclusion that Meta removed attribution links for Instagram content posted to

Facebook.  *See id.* at -.001-.003 (rows 10-11); *see also* PX1594, Meta email

chain: M. Zuckerberg to A. Schultz, et al. re: "IG links in FB," (July 16,

2018), FB_FTC_CID_05935412, at -412-414.  In parenthetical, Statement 723(g) also refers to "Pivot Chaining," but Exhibit 201 does not establish how widely, where, or how often this function was actually deployed.  *See* Ex. 201 at -.006 (FB_FTC_CID_11435712) (cell J13).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta allowed cross-posting of Instagram content on Facebook.  The evidence confirms Meta allowed Instagram content to be posed to Facebook.  Mr. Systrom testified:  Instagram "relied on Facebook for . . . a fair amount of distribution.  Were that to go away or in some way become more difficult to use, it would make it just harder.  It's not impossible, but harder."  Ex. 284 at 165:24-166:3 (Systrom IH Tr.).

724.    Instagram averaged more than 110.7 million U.S. monthly active users in the fourth quarter of 2016, and ███████████████ U.S. monthly active users in the first half of 2022.  *See* Ex. 279 at p. C.26, Ex. C-25 (Hemphill Rep.).  U.S. time spent on Instagram averaged ████████████████████ per month in the first half of 2022.  *See id.* at p. C.27, Ex. C-26.

**FTC Response: Undisputed.**

725.    Facebook averaged more than 158.9 million U.S. monthly active users in March 2012, and ███████████████ U.S. monthly active users in the first half of 2022.  *See* Ex. 279 at p. 238, Ex. 42, & p. C.26, Ex. C-25 (Hemphill Rep.).  U.S. time spent on Facebook was more than 96.5 billion minutes in March 2012, and averaged ███████████████ ████████ per month in the first half of 2022.  *See id.* at p. 241, Ex. 45, & p. C.27, Ex. C-26.

**FTC Response: Undisputed.**

726.     Mr. Krieger testified that Instagram worked "with the Facebook growth team," and "[t]he decisions that they made in collaboration with us had positive effects on our growth." Ex. 153 at 343:25-344:24 (Krieger Dep. Tr.).  He also testified:  "By being able to build out our growth team, we were able to staff projects to experiment with whether certain changes in the product might help with growth, whether they were . . . machine-learning changes" or "changes to the sign-up experience, or changes to our push notifications and how those were used for reengagement.  So having a larger team meant we could take more swings at . . . lifting growth." *Id.* at 348:10-19.

**FTC Response: Disputed in part.**  The FTC objects to "positive effects on our growth" as vague.

The FTC does not dispute that the excerpted phrases appear as part of Mr. Krieger's deposition testimony, but otherwise disputes Statement 726 as not showing the absence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that Meta took action after the acquisition to hamper Instagram's growth for the benefit of Facebook and that Instagram did not need to be acquired by Meta to continue growing.  *See, e.g.*, CMF at § V.A; ████████████████████████████████████████████████████████ ; PX9007, Hemphill Rebuttal Report at §§ 3.3.3.2-.3; PX9000, Hemphill Report at §§ 4.1.2, 4.1.4.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Krieger testified that Instagram worked "with the Facebook growth team," and "[t]he decisions that they made in collaboration with us had positive effects on our growth."  Ex. 153 at 343:25-344:24 (Krieger Dep. Tr.); *see also* Meta Introduction.  As the phrase "positive effects on our growth" is ordinarily understood and used, Mr. Krieger testified that Instagram's work

with Meta's growth team improved Instagram's growth.  Although the FTC alleges (without

support but instead vague citation to scores of unexplained paragraphs of expert reports and an

entire section of the Counterstatement) that Meta took action after the acquisition to hamper

Instagram's growth, the evidence shows that Instagram used Meta's infrastructure, knowledge,

and resources to improve its growth efforts.  *See supra* Meta SMF ¶¶ 724-727, *infra* ¶¶ 728, 735-

737 (describing evidence of how Meta supported Instagram's growth).  The FTC's cross-

reference to a section of its Counterstatement without explanation does not itself create a genuine

dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine

dispute of material fact, and Meta incorporates its responses to those paragraphs here.

727.    Mr. Systrom testified:  "Q. . . . Do you believe that prior to the time Facebook

bought Instagram, it could have gone either way?  Meaning it could have succeeded, or it could

have failed?  A. I do believe, yeah.  Q. And why do you believe that?  A. It's very hard to know,

in alternate universes, what would have happened.  Q. Okay.  Would you agree that being part of

Facebook allowed Instagram to skip several years of development?  A. I do, yes."  Ex. 151

at 251:9-21 (Systrom Dep. Tr.).

**FTC Response: Disputed in part and incomplete.**  The FTC objects to Statement 727's

terms and phrases "it could have gone either way," "it could have succeeded," "it could have

failed," "skip several years of development," "succeeded," "failed," and "skip" as vague and

ambiguous.

The FTC does not dispute that cited material contains the quoted testimony, but otherwise

disputes Statement 727 as materially incomplete and as not establishing the absence of a genuine

dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Mr. Systrom additionally

testified that following Instagram's Series B funding round, he was "very optimistic" "about

Instagram's future prospects as an independent company," and he believed that "Instagram was well positioned to keep growing as it had been growing," with Instagram managing obstacles to growth "as any company would."  Ex. 151 at 16:1-24 (Systrom Dep. Tr.).  He also testified that Instagram was not dependent on Meta for growth.  PX6027, Systrom (Meta/Instagram) IH Tr., at 245:5-11 ("Q. . . . But Instagram wasn't dependent on Facebook for growth?  A. Not at all.  In fact, years later, when they took much of that away, while Instagram growth stuttered, I think, for a short amount of time, it continued to grow and, today, is much larger than it was when I left.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Systrom testified that Instagram could have failed had it remained independent.  *See supra* Meta Introduction.  As the terms "it could have gone either way," "it could have succeeded," "it could have failed," "skip several years of development," "succeeded," "failed," and "skip" are ordinarily understood and used, there is no dispute that it is possible that an independent Instagram would have failed.  The additional material the FTC cites for completeness does not create a dispute that Mr. Systrom said it was possible an independent Instagram would have failed.  The FTC's proffered expert, Professor Rim, likewise testified that it was possible an independent Instagram would have failed.  *See* PX6182 at 71:13-19 (Rim (FTC) Dep. Tr.).

728.    Professor Rim testified:  "Q. Okay.  Can you identify a start-up acquisition in the United States of a mobile app that resulted in more user growth than the Instagram acquisition? . . .  A. So I don't have a specific company right now in my mind, and I do not know how many number of users have grown even for Instagram."  Ex. 310 at 130:20-131:9 (Rim Dep. Tr.).

**FTC Response: Disputed.**  The FTC disputes that Statement 728 constitutes a material fact subject to proof at trial and disputes Statement 728 as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1), 56(c)(1)(B).

Statement 728's recitation of a transcript exchange in which Meta asked Professor Rim a question outside the scope of his expert engagement does not articulate a material fact subject to proof at trial.  Professor Rim made clear in the cited lines of his deposition transcript that he was not assigned to analyze the quoted question and therefore did not have an opinion on it.  Ex. 310 at 131:5-9 (Rim Dep. Tr.) ("So I would have to, you know, look into the data and see what are, you know, the companies that have enabled a lot of user growth, and then I can compare and opine on that."); *see also id*. at 131:2 ("Mr. Widnell: Objection, form, scope.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Rim, the FTC's proffered startup acquisition expert, could not identify a startup acquisition of a mobile app in the United States that resulted in more user growth than the Instagram acquisition.  *See supra* Meta Introduction.

729.    Other firms that the FTC labels "personal social networking services" entered and grew following the Instagram acquisition, e.g.:

> a.  **MeWe.**  The FTC contends that MeWe offered a "personal social networking" app since at least 2016.  Ex. 295 at 8, FTC's Suppl. Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. To Meta's First Set of Interrogs. (Nov. 4, 2022)); *see also* Ex. 279 at ¶ 148 (Hemphill Rep.). ███████████ ██████████████████████████████████████ *See* Ex. 279 at p. C.26, Ex. C-25 (Hemphill Rep.).

b. **Snapchat.** The FTC contends that Snapchat became a "personal social networking service" in October 2013. Ex. 295 at 7, FTC's Suppl. Resp. to Meta's Interrog. No. 3 (FTC's Suppl. Objs. & Resps. To Meta's First Set of Interrogs. (Nov. 4, 2022)). ████████████████████████████████

████████████████████████████████████████

████████████████████████ *See* Ex. 279 at p. C.26, Ex. C-25 (Hemphill Rep.). ███████████████████████████████████

████████████████████████████████████████

████████████ *See id.* at p. C.27, Ex. C-26.

**FTC Response: Undisputed.** The FTC responds to this Statement's subparts as follows:

a. **FTC Response: Undisputed.**

b. **FTC Response: Undisputed.**

730. Professor Hemphill calculated shares of U.S. "personal social networking services" based on six "PSN Services" with U.S. users in March 2012. Ex. 279 at p. 238, Ex. 42, & p. 241, Ex. 45 (Hemphill Rep.) (listing Facebook, Instagram, Myspace, Google+, Orkut, and Path). Professor Hemphill calculated shares of U.S. "personal social networking services" based on seven "PSN Services" with U.S. users in the first half of 2022, as well as an "Other" category comprised of a further five "PSN Services." *Id.* at p. C.25, Ex. C-24 (listing Facebook, Instagram, Snapchat, MeWe, BeReal, Myspace, LINE, and an "other" category that includes LiveJournal, Qzon, Renren, Vkontakte, and Weibo).

**FTC Response: Undisputed.**

731. Professor Hemphill found that the aggregate number of U.S. monthly active users on all "personal social networks" grew from approximately 218 million in 2012 before the

Instagram acquisition to ███████████ in 2022. *Compare* Ex. 279 at p. 238, Ex. 42 (Hemphill Rep.), *with id.* at p. C.26, Ex. C-25. He also found that the aggregate number of U.S. monthly active users on "personal social networks" that Meta does not own grew from approximately 55 million in 2012 before the Instagram acquisition to ██████████ by 2022. *Compare id.* at p. 238, Ex. 42, *with id.* at p. C.26, Ex. C-25.

**FTC Response: Undisputed.**

732.    Professor Hemphill determined that the aggregate U.S. time spent on "personal social networks" grew from approximately 97 billion monthly minutes in 2012 before the Instagram acquisition to ██████████████ minutes by 2022. *Compare* Ex. 279 at p. 241, Ex. 45 (Hemphill Rep.), *with id.* at p. C.27, Ex. C-26. He also found that the aggregate U.S. time spent on "personal social networks" that Meta does not own grew from approximately 500 million monthly minutes in March 2012 before the Instagram acquisition ██████████████ ████████████████ by 2022. *Compare id.* at p. 241, Ex. 45, *with id.* at p. C.27, Ex. C-26.

**FTC Response: Undisputed but incomplete.**  The FTC notes that the figures cited in Statement 732 are specifically for March 2012 and the first half of 2022. *See* Ex. 279 at p. 241, Ex. 45 (Hemphill Rep.); Ex. 279 at p. C.27, Ex. C-26 (Hemphill Rep.).

733.    Professor Rim testified: "Q. Okay. You have not simulated how personal social networking consumers would have fared but for the Instagram acquisition, have you? A. . . . That was not the scope of my report." Ex. 310 at 121:6-19 (Rim Dep. Tr.). Professor Rim also testified: "Q. . . . Do you know one way or the other whether there's any evidence in the record simulating how personal social networking consumers would have been in the counterfactual without Meta acquiring Instagram? . . . A. . . . I do not know if there is any kind of evidence what you're mentioning." *Id.* at 122:16-123:10. He further testified: "Q. Which paragraph

number in your report offers the opinion that Instagram would have grown to be bigger than it is today had Meta not acquired it? . . . A. I have not predicted the number of users of Instagram in the counterfactual world that was not acquired by Meta." *Id.* at 113:13-21.

**FTC Response: Disputed.** The FTC disputes Statement 733 as not constituting a material fact subject to proof at trial and as not establishing the absence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(1), 56(c)(1)(B). Statement 728's recitation of a transcript exchange in which Meta asked Professor Rim questions outside the scope of his expert engagement is incomplete, misleading, and does not articulate a material fact subject to proof at trial.

Regarding the question quoted in the first sentence, Professor Rim responded:

> If I understood your question correctly, you're asking me if I have done any study what the users would have fared if they were – if those companies were not, you know, acquired by Meta; is that your question? That was not the scope of my report. Again, I am clearly saying that – so my task was rebutting the Kaplan and [Carlton reports] . . . . My task was not calculating what's – you know, how this is affecting the consumers.

Ex. 310 at 121:9-19 (Rim Dep. Tr.).

Regarding the question quoted in the second sentence, Professor Rim responded:

> So let me explain it this way. My task was clear. So I worked with my team. If I thought something was important, for example, let's take a look at other technology companies and see how extraordinary Instagram and WhatsApp were, then I would request relevant data to my team and they send it to me, I review it, we discuss it, and we write a report. So to my – I mean, I do not know if there is any kind of evidence what you're mentioning. That is not the way how I wrote the report.

*Id.* at 122:22-123:10.

Finally, the third sentence excludes the conclusion to Professor Rim's quoted response to the question posed: "I have not predicted the number of users of Instagram in the counterfactual world that was not acquired by Meta.  That is not my opinion in this report."  *Id.* at 113:18-21.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Rim, the FTC's proffered startup acquisition expert, did not simulate how personal social networking consumers would have fared but for the Instagram acquisition as part of attempting to rebut Professors Carlton and Kaplan; did not know one way or the other whether there is any evidence in the record simulating how personal social networking consumers would have been in the counterfactual world without Meta acquiring Instagram; and did not offer the opinion that Instagram would have grown to be bigger than it is today had Meta not acquired it. *See supra* Meta Introduction.

734.    Professor Hemphill testified:  "Q. . . . You nowhere give the opinion in your reports that in the but-for world market-wide output in the market for PSNS would have been higher than in the actual world, correct? . . .  A. . . . No, I can't, as I sit here, think of a specific place where I offer the view that out – output would be even higher in the but-for world, no. . . . I'm not offering a bottomline view that it would have been even higher."  Ex. 283 at 281:10-282:4 (Hemphill Dep. Tr.).

**FTC Response: Disputed.**  The FTC disputes Statement 734 as materially incomplete and misleading and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Statement 734 is incomplete and misleading for at least three reasons.

First, as he indicated in his deposition, Professor Hemphill provided extensive analysis, reasoning, and evidence in his reports concerning how Meta's monopoly power and exclusionary

conduct in acquiring Instagram and WhatsApp reduced output relative to the but-for world. *See e.g.*, Ex. 283 at 281:15-17 (Hemphill Dep. Tr.) ("I mean, I provide reasons to expect a weakening of output relative to the but-for world in terms of consumer surplus, in terms of quality."); *id*. at 273:7-12 (noting that Meta's "incentives are not aligned with maximization of usage," since increased ad load boosts revenues but undermines usage); *id*. at 273:16-274:2 (noting that, even if ad load were held constant, "there's also an incentive to . . . cut back on investments in innovation"); *see also* PX9007, Hemphill Rebuttal Report at ¶¶ 350-52, 355-362, 729-739 (detailing Meta's reduced investment in friends and family sharing, and its harmful impact on user engagement and sentiment, and explaining how this reflects a monopolist's restriction of output and exercise of monopoly power); *id*. at 601-606, 609-10 (detailing how Meta's acquisition of Instagram directly eliminated competitive pressures between the two firms, and explaining how this harms market-wide output and consumer welfare); *id*. at § 3.3.3.2 (detailing how the main drivers of Instagram's growth are independent of Meta's actions); *id*. at § 3.3.3.3 (detailing how Meta's actions have impeded Instagram usage). In his rebuttal report, Professor Hemphill stated that "Prof. Carlton does not establish an output expansion and overlooks significant ways in which Instagram and overall output has been hampered." *Id*. at ¶ 798.

Second, Professor Hemphill explained in both his deposition and his reports that a focus on higher output is incomplete, and does not equate with higher consumer welfare. In his deposition, Professor Hemphill noted that "output is not a complete account," but rather "a partial analysis," and "[y]ou can have output without necessarily having consumer welfare coming along with it." Ex. 283 at 268:10-13, 282:1-2 (Hemphill Dep. Tr.). Put another way, Professor Hemphill stated that "you could have output without high consumer surplus associated

with that output." *Id.* at 268:16-17; *see also* PX9007, Hemphill Rebuttal Report at ¶¶ 611 ("Less innovation tends to suppress usage and to have effects not captured in usage statistics, by reducing consumer surplus for each unit of output."); *id.* at ¶ 805 (detailing the shortcomings of Professor Carlton's consumer surplus estimates); *id.* at ¶¶ 348-352 (detailing how Meta targets inelastic users for a higher quality-adjusted price).

Finally, Professor Hemphill explained how extensive evidence—including Meta's increased ad load, reduced investments in friends and family sharing, declining user sentiment across multiple dimensions of product quality, and prioritization of profits over addressing declining user sentiment—indicates that consumers are worse off and the acquisitions "were not procompetitive overall." *Id.* at ¶ 826; *see also id.* at ¶¶ 350-52, 355-362, 729-739.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Hemphill testified that he did not offer the opinion that, in the but-for world, market-wide output in the (alleged) market for personal social networking services would have been higher than in the actual world.  None of the additional material the FTC cites creates a genuine dispute that Professor Hemphill offered the quoted testimony.  As just one example, the FTC cites Professor Hemphill's testimony that he "provide[d] reasons to expect a weakening of output relative to the but-for world in terms of consumer surplus."  The fact that Professor Hemphill "provided reasons to expect a weakening of output" does not create a genuine dispute of material fact that he admitted that he did not offer the opinion that, in the but-for world, market-wide output would have been higher.

735.    Professor Hemphill opined that, in 2018, "Meta took a number of actions, including the elimination of Instagram promotions on the Facebook app and Instagram's budget for internal ads.  These measures were expected to slow Instagram's growth."  Ex. 279

at ¶¶ 1084-1085 (Hemphill Rep.).  He found that, in 2018, there were more than ███████ U.S.

monthly active users on Instagram, and more than ███████ U.S. monthly active users on

Facebook.  *See id.* at p. C.26, Ex. C-25.

**FTC Response: Undisputed.**

736.    On June 29, 2018, Mr. Olivan – who was then Meta's vice president of central

products, *see* Ex. 160 at 60:17-24 (Olivan Dep. Tr.) – wrote in an email to the Instagram

founders and others:  "Hey guys, Quick recap of what we spoke today / next steps on each of the

areas we discussed:  Given engagement issues on FB, we stop using FB real state to drive non-

FB engagement.  As a result, will be turning off the following FB-> IG promotion areas:  Entry

Points[,] Notifications[,] Netego Ads[.]  Cross-Sharing[:]  We discussed removing content

attribution across all apps in the family.  This mostly impacts IG content shared on feeds, but

would also apply to FB content on IG."  Ex. 229 at -781 (PX2352, FB_FTC_CID_03904781).

**FTC Response: Undisputed.**

737.    The number of U.S. monthly active users on Instagram grew from more than ████

████ in 2017 to more than ████████ in 2018, more than ████████ in 2019, more than ████

████ in 2020, and more than ████████ in 2021 (ultimately reaching more than ████████

by June 2022).  *See* Ex. 279 at p. C.26, Ex. C-25 (Hemphill Rep.).

**FTC Response: Undisputed.**

738.    Meta propounded the following Request for Admission on the FTC:  "Admit that

if Meta had terminated Instagram's access to the Find Friends API in 2012 instead of acquiring

Instagram, Instagram's growth would have 'slowed significantly' (*see* Am. Compl. ¶ 155)."

Ex. 430 at 5, FTC's Resp. to Meta's Req. for Admis. No. 4 (FTC's Objs. & Resps. To Meta's

First Set of Reqs. for Admis. (May 4, 2023)).  In response, the FTC denied this Request for

Admission, also stating:  "The FTC further objects because the FTC has not assessed a hypothetical situation in which Meta terminated Instagram's access to the Find Friends API in 2012 instead of acquiring Instagram."  *Id.*

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that Statement 738 accurately quotes words from both Meta's Request for Admission and the FTC's response, but the Statement's recitation is incomplete.  The Statement excludes the FTC's primary objection to Meta's Request for Admission, which was that Meta failed to define the phrase "slowed significantly."  *See* Ex. 430 at 5, FTC's Resp. to Meta's Req. for Admis. No. 4 (FTC's Objs. & Resps. To Meta's First Set of Reqs. for Admis. (May 4, 2023)).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that "the FTC has not assessed a hypothetical situation in which Meta terminated Instagram's access to the Find Friends API in 2012 instead of acquiring Instagram."  *See supra* Meta Introduction. The additional material the FTC cites for completeness does not contradict the statement.  The assertion that Meta did not define the phrase "slowed significantly" is unserious – as the quotation marks indicate, that is a quote from the cited paragraph of the FTC's amended complaint.

### c.    Post-Acquisition Features

739.    Between May 2013 and March 2021, Meta publicly announced the release of more than 30 new features and services on Instagram.  *See* Ex. 170 at 16-18, 45, Meta's Suppl. Resp. to FTC's Suppl. Interrog. No. 10 (Meta's Suppl. Objs. & Resps. To FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)); *see also* Ex. 2 at p. 253, tbl. 33 (Carlton Rep.).

**FTC Response: Disputed.**  The FTC disputes Statement 739 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h). In its supplemental response to the FTC's Interrogatory Number 10, Meta listed 31 "new features

and services, *and improvements to features and services*." Ex. 170 at 16-18 (Meta's Suppl. Objs. & Resps. To FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)) (emphasis added).  Professor Carlton's report reproduced this list of 31 items—referring to them as "New Instagram Features"—in Table 33 of his Appendix C.  Ex. 2 at p. 253, tbl. 33 (Carlton Rep.).

Neither Professor Carlton nor Statement 739 here included the caveat indicated in Meta's response to the FTC's interrogatory: the 31-item list includes a number of items listed as "improvements to features and services" rather than new features and services—e.g., a tool to "[s]hare videos from camera roll," "new photo-editing tools," and "new photo filters."  Ex. 170 at 16-18 (Meta's Suppl. Objs. & Resps. To FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)).  The FTC therefore disputes that the cited material supports the assertion that Meta has "publicly announced the release of more than 30 new features and services on Instagram."

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, between May 2013 and March 2021, Meta publicly announced the release of more than 30 new features and services on Instagram.  The FTC's taking issue with "new" versus "improved" does not contradict this fact.  *See supra* Meta Introduction.  The FTC does not dispute that an improvement to a feature can itself be a new service, i.e., a new way to use the pre-existing feature.

740.    Around June 2013, Meta released Video on Instagram, allowing users to create, post, and edit videos on Instagram.  *See* Ex. 2 at ¶ 82 & n.130 (Carlton Rep.).  Mr. Krieger wrote an internal Meta post the same day stating: "There is no way this project would have gone as well as it had without the support from Infra."  Ex. 219 at -298 (FTC-META-012220298).  As of March 2018, Instagram users in the United States were posting ███████████ videos per

month.  *See* Ex. 171 at 7 & Ex. 3(a)-03 (Facebook, Inc. Resp. to FTC Civil Investigative

Demand Spec. 1(a) & 3(a) (Jan. 17, 2020)).

**FTC Response: Undisputed but incomplete.**  The FTC objects to "this project" and

"support from Infra" as vague.

The FTC does not dispute that Statement 740 recounts statements made in the cited

materials, but notes that Statement 740 is vague and incomplete.  Among other things, Video on

Instagram was launched on AWS infrastructure.  *See* PX6047, Cole (Meta/Instagram) Dep. Tr.,

at 132:25-133:13); PX6015, Krieger (Meta/Instagram) IH Tr., at 187:14-22.  Meta did not

provide "technical resources," only an "engineer who helped us build videos [and] had

previously worked on Facebook videos."  *See* PX6015, Krieger (Meta/Instagram) IH Tr., at

187:23-188:4.  Additionally, evidence indicates that Meta under-resourced Instagram's efforts to

develop and improve its video features.  *See, e.g.*, PX3160, Meta message: M. Levine to K.

Systrom, (Sept. 15, 2017), FB_FTC_CID_03124377, at -378 ("I think the video allocation is one

of the best examples we have of undermining IG as core and investment area.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that,

around June 2013, Meta released Video on Instagram, allowing users to create, post, and edit

videos on Instagram.  As the FTC's response admits, Meta provided engineering support for that

effort.  The quoted testimony that, at one point in time, that support included one engineer does

not address Meta's ongoing and substantial support of Instagram's video features (the FTC does

not make the claim that all of those video features run today with the support of a single person).

And one employee's email regarding the amount of video support Instagram was receiving from

Meta in 2017, four years later, does not contradict this fact.  *See supra* Meta Introduction.

741.     Around December 2013, Meta released Instagram Direct, allowing users to send and receive text, photo, and video messages with other Instagram users. *See* Ex. 431 (Instagram, *Introducing Instagram Direct Message*, https://perma.cc/G25M-EUAH).  In September 2015, Instagram announced publicly that Instagram Direct had more than 85 million monthly users. *See* Ex. 432 (Instagram Blog, *Introducing Improvements to Instagram Direct*).  Instagram users sent approximately ███ Instagram Direct messages in 2016, which grew to approximately ███ Instagram Direct messages in 2018. *See* Ex. 171 at 7 & Ex. 3(a)-03 (Facebook, Inc. Resp. to FTC Civil Investigative Demand Spec. 1(a) & 3(a) (Jan. 17, 2020)).  Meta has subsequently updated the Instagram Direct feature, e.g., adding the ability to send content from a user's Feed via Direct Message and displaying Direct Messages in threads in September 2015. *See*, *e.g.*, Ex. 432 (Instagram Blog, *Introducing Improvements to Instagram Direct*).  Around July 2018, Meta added video chatting to Instagram Direct, and by October 2018, Instagram users could host video calls with up to six participants over Instagram Direct. *See* Ex. 2 at p. 253, tbl. 33 (Carlton Rep.).  As of October 2019, Instagram users in the United States were sending more than ███ Instagram Direct messages per month. *See* Ex. 171 at 7 & Ex. 3(a)-03 (Facebook, Inc. Resp. to FTC Civil Investigative Demand Spec. 1(a) & 3(a) (Jan. 17, 2020)).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that Statement 741 recounts statements made in the cited materials, but notes that Statement 741 is incomplete. Among other things, Instagram Direct was launched on AWS infrastructure.  PX6015, Krieger (Meta/Instagram) IH Tr., at 188:21-189-1 ("Q. Okay. And was Instagram still entirely on AWS when you launched the direct-messaging feature? A. Yes, we were. I think we had started the process of integrating with Facebook, but we were still using Amazon at the time.").  Additionally, evidence indicates that Instagram was not able to use Meta's direct messaging

infrastructure.  The Instagram team had to "write much of the messaging code from scratch," because the Meta messaging infrastructure was "specifically built for Facebook," not Instagram. PX6027, Systrom (Meta/Instagram) IH Tr., at 249:20-250:1.

742.    Around March 2016, Meta announced that it would replace chronological Feed on Instagram with an algorithmic ranked Feed "based on the likelihood [the user will] be interested in the content, [the user's] relationship with the person posting and the timeliness of the post." Ex. 433 (Instagram Blog, *See Posts You Care about First in Your Feed*); *see also* Ex. 151 at 267:18-22 (Systrom Dep. Tr.).  Mr. Krieger testified:  "Ranked feed was primarily helpful in contributing to an increase in time spent on Instagram."  Ex. 153 at 383:16-384:2 (Krieger Dep. Tr.).  Mr. Systrom testified that ranked Feed "was successful in increasing engagement on Instagram."  Ex. 151 at 369:10-13 (Systrom Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that Statement 742 recounts statements made in the cited materials, but notes that the deposition testimony from Mr. Systrom cited to support the first sentence of Statement 742 is irrelevant and appears to be an inaccurate pincite.  *See* Ex. 151 at 267:18-22 (Systrom Dep. Tr.) ("Q. He came from Facebook?  A. That's right.  Q. And over the years, many engineers came from Facebook over to Instagram?  A. That's correct.").  The FTC further notes that Meta has characterized the 2016 feed changes to Instagram as intended to prioritize friends and family content.  *See* PX15558 at 8, Meta's Supp. Objs. & Resps. to FTC's Interrog. No. 6 (Sept. 22, 2022) ("Among the many relevant efforts were Meta's introduction of algorithmic feed ranking, which uses machine learning to order content based on what users find most relevant, and thus promised to prioritize friend content over interest-based content; the launch of Instagram Stories, a form of ephemeral sharing that increased content production; and changes to connection strategy that prioritized

recommendations to follow friends and family over celebrities to encourage reciprocal connection and sharing.").

Additionally, evidence indicates that Instagram developed its own ranked feed algorithm from scratch using its own systems because Meta's ranked feed algorithm was tailored to Facebook. PX6027, Systrom (Instagram/Meta) IH Tr., at 60:19-61:11 ("We were not able to reuse the Facebook algorithm. So we had to develop our own with our own system and everything, effectively, from scratch.")

743.    Around August 2016, Meta released Stories on Instagram. *See* Ex. 435 at 1 (Instagram Blog, *Introducing Instagram Stories*, https://perma.cc/P4WV-K3FT). Stories allows Instagram users to post and share disappearing photo, text, and video content. *See id.* Meta released Stories on Instagram before releasing it on Facebook. *Cf.* Ex. 434 at 5 (Meta, *More Ways To Share with the Facebook Camera*, https://perma.cc/76CG-7DDF) (announcing the release of Stories on Facebook in March 2017). Meta has continued to update Stories on Instagram, e.g., adding a feature for users to curate a list of Instagram users who can view new Stories in November 2018. *See* Ex. 437 (Instagram, *Curate Instagram Stories for Close Friends Only*). Instagram announced that Stories had more than 100 million daily users within three months of its launch. *See* Ex. 436 (MetaFTC-DX-923, Instagram, *Engineering the Instagram Stories Team*). As of December 2017, Stories had more than 250 million worldwide monthly active users. *See* Ex. 438 (MetaFTC-DX-922). As of October 2019, Instagram users in the United States were posting more than ███████ Stories per month. *See* Ex. 171 at 7 & Ex. 3(a)-03 (Facebook, Inc. Resp. to FTC Civil Investigative Demand Spec. 1(a) & 3(a) (Jan. 17, 2020)). And as of February 2023, ███████ of all time spent on Instagram was spent on Stories. *See* Ex. 2 at p. 72, tbl. 12 (Carlton Rep.); *see also id.* at p. 79, fig. 4.

**FTC Response: Undisputed.**

744.    Around November 2016, Meta added a feature to Stories on Instagram called Instagram Live, which allows users to stream live video that other Instagram users can watch and react to (including with comments) in real time.  *See* Ex. 441 at 1-2 (TechCrunch, *Instagram Launches Disappearing Live Video and Messages*, https://perma.cc/8ZH7-UZQ5).  Meta has continued to update Instagram Live, e.g., adding the ability to save live videos after a broadcast in March 2017.  *See* Ex. 440 (Instagram, *New:  Save Your Live Video to Your Phone*).  Around October 2017, Meta added the ability to create and host an Instagram Live video stream with another user.  *See* Ex. 442 (Instagram, *Go Live on Instagram with a Friend*).  And around March 2021, Meta added Live Rooms to Instagram Live, allowing for group live streaming.  *See* Ex. 439 (Instagram, *Doubling Up on Instagram Live with Live Rooms*).

**FTC Response: Undisputed.**

745.    Around August 2020, Meta released Reels on Instagram, allowing users to create, post, edit, and view short-form videos on Instagram.  *See* Ex. 362 at 1 (Instagram, *Introducing Instagram Reels*, https://perma.cc/B5VL-UWXW).  Meta released Reels on Instagram before releasing Reels on Facebook.  *Cf.* Ex. 443 at 1 (Meta, *Launching Reels on Facebook in the US*, https://perma.cc/Y5DU-G4MG) (announcing the release of Reels on Facebook in September 2021).  When Meta launched Reels, Meta also added a custom vertical feed to the Instagram Explore tab to enable users to discover and watch Reels on Instagram.  *See* Ex. 362 at 3 (Instagram, *Introducing Instagram Reels*, https://perma.cc/B5VL-UWXW).  As of June 2023, more than ▮ of all time spent on Instagram was using Reels.  *See* Ex. 3 at p. 13, tbl. II-1 (List Rep.).  In 2023, a Meta study found that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████.  *See* Ex. 2 at ¶ 83 (Carlton Rep.).

Professor Hemphill testified:  "Q. . . . And just to be clear, you agree that the addition of Reels

was an innovation of Facebook and Instagram's personal social networking services, correct? . . .

A. It was an innovation bringing the competition to TikTok in the way that we talked about and

which I agree serves to, to some degree, improve the personal social networking offering for all

users."  Ex. 283 at 263:17-264:4 (Hemphill Dep. Tr.).

 **FTC Response: Disputed in part.**  The FTC does not dispute the first, second, and third

sentences of Statement 745, and does not dispute that the final sentence of Statement 745

contains accurate excerpts from Professor Hemphill's deposition transcript.

 The FTC disputes the fourth and fifth sentences of Statement 745 as not supported by the

cited material, not supported by admissible evidence, and as not establishing the absence of a

genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), 56(c)(1)(B); L.R.

7(h).  The fourth sentence relies on data from Meta that was not produced during fact

discovery—in particular, covering time periods after the date that Meta produced usage data to

the FTC.  Additionally, the purported "Meta study" referenced in Statement 745 and by

Professor Carlton is vaguely described by Professor Carlton ("█████████████████████

████████████████████████████")  and lacks any detail or source

material to evaluate the methodology and reliability of the study or its results, including, *inter*

*alia*, no details on sampling method, duration, and ████████████████████████

██████████████████████.  *See* Ex. 2 at ¶ 83 (Carlton Rep.).  The FTC

therefore disputes that the study is reliable or provides anything informative about a material fact

at issue in the litigation.  Finally, as detailed elsewhere, consumer time spent on Reels is

consistent with the FTC's relevant market and Meta's exercise of monopoly power. *See* PX9007, Hemphill Rebuttal Report at ¶¶ 234-254, 353-364.

      **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that around August 2020, Meta released Reels on Instagram, allowing users to create, post, edit, and view short-form videos on Instagram; that Meta released Reels on Instagram before releasing Reels on Facebook; and that when Meta launched Reels, Meta also added a custom vertical feed to the Instagram Explore tab to enable users to discover and watch Reels on Instagram.  The FTC does not dispute those facts.  The FTC's response also does not create a genuine dispute of material fact that, as of June 2023, more than ███ of all time spent on Instagram was using Reels.  The FTC does not cite any evidence disputing that fact; it merely questions the source of the data.  But the data supporting that fact was produced during expert discovery in the backup materials to Professor List's report.  *See* Ex. 3 at p. 13, tbl. II-1 & App'x B at p. B-11 (List Rep.). These data could not have been produced during fact discovery because they are data Professor List used to contextualize user time spent in the period corresponding to his pricing experiment, which concluded after the close of fact discovery.  The FTC had the opportunity to, but did not, question Professor List about these data at his deposition.

      The FTC's response also does not create a genuine dispute of material fact that, in 2023, a Meta study found that ████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████.  *See* Ex. 2 at ¶ 83 (Carlton Rep.).  Again, the FTC does not cite any evidence disputing that fact; it merely questions the methodology of the study cited and discussed in Professor Carlton's report.  *See id.* at ¶ 83 & n.132.  Meta produced data showing the study's results – including usage data for the control and treatment groups in the

study for a variety of surfaces – during fact discovery (at FTC-META-012468443).  *See* Ex. 2 at

¶ 83 n.132 (Carlton Rep.); *see also* Ex. 509 (May 18, 2023 Production Cover Letter)).  The FTC

had the opportunity to, but did not, question Professor Carlton about these data at his deposition.

746.    As of February 2023, ▬▬▬▬▬▬ of all U.S. time spent on Instagram was

using features – including Reels, Stories, and Instagram Live – that Meta introduced to Instagram

following the acquisition (and that did not exist when Meta acquired Instagram).  *See* Ex. 2

at p. 79, fig. 4 (Carlton Rep.).  The share of U.S. time spent by feature on Instagram as of

February 2023 can be represented graphically:



Ex. 2 at p. 79, fig. 4 (Carlton Rep.).

**FTC Response: Disputed.**  Statement 746 is disputed as incomplete and as not

establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes Statement 746 and Figure 4 as inconsistent with other data produced by Meta to the FTC.  Statement 746 cites to Figure 4 of Professor Carlton's report; Figure 4 itself cites a Meta production of ████████████████████████  *See* PX3331, Meta data production: Meta's Resp. to FTC's Req. for Prod.. No. 86 (May 18, 2023), FTC-META-012468455.

But Meta produced other data in response to the FTC's RFP No. 115 that show monthly ████████████ across all users by Instagram surface.  *See* PX3332, Meta data production: Meta's Resp. to FTC's Req. for Prod. No. 115 (May 17, 2023), FTC-META-012478767 (Instagram time spent data).  These data align with total "time spent" data that Meta produced in response to the FTC's RFP No. 42 (*see* PX3333, Meta data production: Meta's Resp. to FTC's Req. for Prod. No. 42(a) (Feb. 28, 2023), FTC-META-012004982 (Instagram time spent data)), whereas PX3331, Meta data production: Meta's Resp. to FTC's Req. for Prod. No. 86 (May 18, 2023), FTC-META-012468455 (used by Professor Carlton in Figure 4) does not.  *Compare* PX3333, Meta data production: FTC-META-012004982 *with* PX3332, Meta data production: FTC-META-012478767; *compare* PX3333, Meta data production: FTC-META-012004982 *with* PX3331, Meta data production: FTC-META-012468455.

When calculating time spent in his Figure 4, Professor Carlton aggregates based on particular Instagram surfaces.  When the same approach is applied to the data that Meta produced in response to the FTC's RFP No. 115, the combined share of time spent from Reels, Live, and Stories accounts for ███ of total time spent in January 2023 (the latest month available in this data set) as opposed to the share that Professor Carlton reports (and that Meta relies upon in Statement 746): ████

**Meta Reply:**  This new FTC analysis – not sponsored by any expert witness or addressed in any deposition of a Meta expert witness – does not create a genuine dispute of material fact. *See supra* Meta Introduction.  The FTC does not explain any flaw in Professor Carlton's methodology or data set; the observation that he "aggregates based on particular Instagram surfaces" is not a critique.  The fact that the FTC used a different data set and calculated time spent on Reels, Live, and Stories is ███ of all time spent is immaterial to the pending motions.  It is undisputed that a significant amount of time spent – ███████████████ ███ – is consuming video features (none of which existed before the Instagram acquisition).

747.    Mr. Systrom testified: "You know, the more features that we launched, whether it was videos or eventually, like I said, Stories or Chat in the form of Instagram direct, those types of features always increased engagement over time.  The things that increased engagement the most, by far, was the algorithmic feed that came many, many years later."  Ex. 284 at 138:24-139:5 (Systrom IH Tr.).  Mr. Systrom also testified:  "Q. . . . Did Facebook pay for Instagram to develop new features? . . .  [A.] Of course.  Q. . . . And did that drive user growth?  A. Of course."  Ex. 151 at 304:12-18 (Systrom Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC does not dispute that Statement 747 recounts words that appear in the cited transcript, but disputes Statement 747 as incomplete.  The cited portion distorts the context of Mr. Systrom's testimony and omits related portions of his testimony.

Mr. Systrom was asked "how much users were on Instagram and whether [engagement] was increasing or staying the same" from launch to the acquisition.  Ex. 284 at 138:5-13 (Systrom IH Tr.).  Mr. Systrom responded that the Android launch increased engagement for iOS users due to increased network effects and then went on to offer the quoted testimony regarding

features.  *Id*. at 138:18-139:8.  As a whole, these were Mr. Systrom's general recollections concerning the causes of increased engagement over the years and should be understood in that context.

The FTC additionally notes that the cited portion of the deposition testimony is stripped of immediate context in which Mr. Systrom made clear that Instagram would have funded and developed new features independent of Meta.  *See* Ex. 151 at 303:15-22 (Systrom Dep. Tr.) ("The question is . . . what would have happened had Facebook not been there? These are all very specific elements that Facebook controls. That if Facebook were not there, it wouldn't have happened. We would have hired employees. We would have built a growth team. We would have done lots of these things.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta paid for Instagram to develop new features, which drove user growth and increased engagement.  The FTC's speculation about what Instagram might have done absent the acquisition does not contradict these facts about what actually happened because of the acquisition.  *See supra* Meta Introduction.

### d.   Post-Acquisition Integrity

748.   On November 29, 2012, after the acquisition had closed, Mr. Krieger emailed that "███████████████████████████████████ Sentry," one of Meta's anti-spam systems.  Ex. 189 at -173 (FB_FTC_CID_03265173) (stating that "Comment spam has gotten much better on Instagram").  He testified that integrating Instagram into Meta's integrity systems "was one of the first sort of orders of business" following the acquisition.  Ex. 153 at 154:5-9 (Krieger Dep. Tr.).  Mr. Krieger also testified that this happened "[a]lmost instantly" once the acquisition had closed.  Ex. 302 at 234:20-22 (Krieger IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the term "integrating Instagram into Meta's integrity systems" as vague, and objects to the second and third sentences in Statement 748 as vague as to time.  The FTC further objects to Statement 748 because the cited material does not establish the absence of a genuine dispute as to any material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 748 as described herein.

The FTC disputes the first quote in Statement 748 as incomplete because it omits language in the cited document showing that integrity issues remained unresolved as of November 29, 2012.  Under the heading "[l]owlights," Mr. Krieger wrote: "[p]hoto spam [on Instagram] is still a large issue (███ is starting to tackle that now)."  Ex. 189 at -173 (FB_FTC_CID_03265173).  The FTC disputes the second quote in Statement 748 – "Comment spam has gotten much better on Instagram" – as undermined by another statement in the document indicating that Instagram was unable to measure quantitatively the effectiveness of connecting to Meta's spam systems: "[Instagram] lack[s] metrics around how successful [the integrity] initiatives are being beyond qualitative measurements."  *Id.*

The FTC disputes the third sentence in Statement 748 because Instagram did not integrate into Meta's integrity systems right when the acquisition closed.  Testimony by other knowledgeable witnesses show that Instagram was not immediately integrated into all of Meta's integrity systems.  Gregg Stefancik – the engineering manager of Meta's site integrity team, PX6042, Stefancik (Meta) Dep. Tr., at 18:2-11 – testified that Instagram could not immediately plug into Meta's integrity tools following the Meta acquisition:

> Q. So Instagram had a different backend structure, and that meant
> that some of Facebook's integrity tools could not be immediately

and automatically used by Instagram? . . . [A.] That's correct.  They
-- because they were on a different backend, it was not -- you know,
it wasn't plug and play.

*Id.* at 65:22-66:4.

Similarly, Miguel Velazquez – who helped manage the integration of Instagram's user

support and operations into Meta's existing user operations teams, PX6033, Velazquez (Meta)

Dep. Tr., at 14:12-20 – testified that:

> there were [integrity] tools that we weren't like fully plugged into
> on the Facebook side yet that, just because they required, you know,
> engineering investment to, to plug into them.  And that was sort of
> like preventing us from being like as sophisticated with sort of
> proactive content moderation on the Instagram side as we were on
> the Facebook side.

*Id.* at 155:19-156:12.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that,

by November 29, 2012, ████████████████████████████████████

███████ Sentry (one of Meta's anti-spam tools) and that integrating Instagram with Meta's

integrity systems was one of the first orders of business for Instagram after the acquisition

closed.  As the phrase "integrating Instagram in Meta's integrity systems" is ordinarily

understood and used, there is no dispute that one of the first priorities for Instagram after the

acquisition closed was to connect to Meta's integrity systems, particularly Meta's spam-fighting

system.  *See* Ex. 153 at 253:22-254:13 (Krieger Dep. Tr.) (testifying that "[t]he plan was, were

the acquisition to close, that [Instagram] would integrate with [Meta's] spam-fighting system"

and "one thing we had raised in our conversations [with Meta before the acquisition closed] was

how site integrity and spam was high on the list for integration that we wanted to do").

For the first quote, the additional evidence the FTC claims Meta "omits" does not create a

dispute of material fact.  In fact, that evidence reinforces the benefits that Instagram received

after the acquisition because ██████, a Meta engineer, was starting to tackle photo spam on

Instagram, *see* Ex. 189 at -173 (FB_FTC_CID_03265173); Ex. 7 at ¶ 131 & n.350

(Subrahmanian Rep.) (citing evidence that ██████ was a Meta engineer in 2012), and

approximately one week later, Meta deployed PhotoDNA on Instagram to combat photo spam,

*see* PX3428 at -359 (FB_FTC_CID_06210359) (December 7, 2012 message thread, in which

Mr. Krieger wrote that Instagram was "deploying PhotoDNA tomorrow/Monday" to "help

identify repeated spam photos"); Ex. 153 at 147:17-148:2 (Krieger Dep. Tr.) (testifying that he

"hadn't even heard of [PhotoDNA] before the acquisition," and Instagram's "road map did not

include [PhotoDNA] prior to the acquisition").

     For the second quote, the material cited by the FTC reinforces that qualitative metrics

corroborated that comment spam had gotten much better on Instagram after it started using

Meta's spam-fighting system, Sentry.  *See also* Ex. 480 at -351 (FB_FTC_CID_12203351)

(November 26, 2012 email in which Mr. Krieger wrote that spam had "gotten a ton better [on

Instagram] – we had ██████ basically full-time on Instagram the last week and a half and

he set up a ton of rules in Sigma/Sentry to really good results."); *see also* PX3225 at -461

(FB_FTC_CID_11759461) ("██████ from the SI [Site Integrity] team is now spending

about 80% of his time working on Instagram spam issues now!  He is basically Facebook's best

spam fighter, so we're super psyched to have ██ on our side.").  The fact that Instagram

lacked metrics to quantify the benefits it reaped from Meta's spam-fighting systems in

November 2012 does not undermine Mr. Krieger's statement that comment spam had gotten

much better on Instagram, particularly because Instagram "had basically no data science

capabilities" and "didn't have great tracking internally about what the prevalence of spam was to

begin with" before the acquisition closed.  Ex. 153 at 73:20-25, 135:7-11 (Krieger Dep. Tr.).

For the third sentence, the additional testimony cited by the FTC does not contradict or undermine the fact that Instagram integrated with Meta's spam-fighting systems by November 2012. *See also* Ex. 153 at 257:1-17 (Krieger Dep. Tr.) ("Q. . . . following the acquisition, when you first became part of Meta, within the first few months, you decided to do your first integration with Facebook's infrastructure for spam-fighting, correct?  A.  Correct. . . . [Q.]  And that was almost instantly after you got to Meta, correct? . . . A. I'm trying to remember the timeline for it, but it was certainly within the first two months, for example."); *see also* Ex. 302 at 234:20-235:3 (Krieger IH Tr.) (testifying that Instagram integrated with Meta's antispam system in "October or November of 2012").

749.    Mr. Krieger testified:  "Q. . . . How did the actions that Instagram undertook on its own compare to the antispam program that Facebook had?  A. They were radically more sophisticated on the Facebook side.  So their systems used better pattern recognition, machine learning, clustering of behaviors so that if, you know, a bunch of suspicious-looking things all came from the same place, that probably means that place is – or, you know, that machine is compromised, like, just a whole host of improved technology."  Ex. 302 at 233:17-234:2 (Krieger IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to Statement 749 as vague as to time and because the cited material does not establish the absence of a genuine dispute as to any material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 749 as described herein.

The FTC disputes Statement 749 as incomplete and misleading.  Immediately before the quoted language, Mike Krieger testified that spam was not an issue on Instagram prior to April

2012: "Q. Okay.  Were you thinking about spam prevention before the acquisition?  A. It hadn't been an issue before, like, before April, we had been, I guess, fortunate in that it hadn't really been an issue.  So given the rest of our priorities, it hadn't risen to our -- to our sort of priority list."  Ex. 302 at 233:10-16 (Krieger IH Tr.).

Mr. Krieger further testified that Instagram would have continued improving its spam-fighting tools if Instagram had not been acquired by Meta.  *See id.* at 234:3-6 (Krieger IH Tr.) ("Q. So could Instagram have developed a better antispam program without the help of Facebook? A. Yes . . ."); *id.* at 234:16-19 ("Q. And would you have built out Instagram's antispam tools if Facebook had not acquired Instagram?  A. Yes."); *id.* 237:4-9 ("Q. So you think Instagram would have been able to deal with problematic content without Facebook's help?  A. Yes. We would have built that capability out.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Krieger testified that, compared to Instagram's pre-acquisition spam-fighting systems, the antispam systems Meta had were radically more sophisticated, including because Meta used better pattern recognition, machine learning, clustering of behaviors, and just a whole host of improved technology.  *See supra* Meta Introduction.  The statement is not vague as to time because the quoted testimony and surrounding context establish that Mr. Krieger was comparing the spam-fighting systems that Instagram developed before the acquisition in 2012 with the spam-fighting systems that Meta used at that time.  *See* Ex. 302 at 232:4-234:2 (Krieger IH Tr.).

The additional testimony from Mr. Krieger regarding spam on Instagram becoming more of an issue in April 2012 does not create a dispute regarding how Instagram's pre-acquisition spam-fighting systems compared to Meta's systems.  Indeed, Mr. Krieger testified that, after spam became more of an issue on Instagram "in maybe May of 2012," Instagram built "pretty

839

rudimentary defenses" that were "quite easy" for "a dedicated-enough spammer . . . to circumvent." *Id.* at 232:4-233:2.

750.    Mr. Shortway – an engineer at Instagram pre-acquisition – testified that "detecting spam and objectionable content is one of . . . the hardest problems in all of computing," and "it takes years and years of expertise and hard engineering work to be able to develop something even remotely successful at . . . actually blocking this content and classifying this content, a lot of machine learning that no one in the [pre-acquisition Instagram] team had experience in and Meta had a team . . . that was very skilled in this and had years of experience behind them." Ex. 156 at 26:3-17 (Shortway Dep. Tr.).

**FTC Response: Disputed.**  The FTC objects to Statement 750 because the cited material does not establish the absence of a genuine dispute as to any material fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 750 as described herein.

The FTC disputes Statement 750 because Mr. Shortway was not an engineer at Instagram "pre-acquisition."  Mr. Shortway testified that his "first day on the job" as an infrastructure engineer for Instagram was around September 6, 2012, Ex. 156 at 9:14-10:3, 13:21-23 (Shortway Dep. Tr.), which is after Meta acquired Instagram (on August 31, 2012).  PX15544, Meta Obj. & Resp. to FTC Request for Admission No. 18 (May 5, 2023), at 008-09 (Meta admitting that Facebook's acquisition of Instagram closed on August 31, 2012).  Mr. Shortway further testified that he did not have "direct responsibility" for identifying and preventing objectionable content on Instagram and that "as [Instagram] started growing the engineering team, [he] continued to

stay more on the infrastructure side and [Instagram] started building up people who had more

experience with catching bad content and spam."  Ex. 156 at 28:24-29:9 (Shortway Dep. Tr.).

The FTC further disputes Statement 750 because other evidence shows that Instagram

was effectively addressing spam and objectionable content before the Meta acquisition.  Kevin

Systrom testified that prior to the acquisition, Instagram had developed several "unique

techniques . . . to fight bots and spam, including one I think that still exist[ed in 2020] that works

fairly well . . . ."  PX6027, Systrom (Meta/Instagram) IH Tr., at 278:12-20.  Indeed, in June

2012, Kevin Systrom turned down an offer to use Impermium's spam mitigation services,

explaining that Instagram was "actually tackling the spam thing pretty well these

days."  PX15223, Meta email chain: K. Systrom to ███ re: "Impermium <-> Instagram

Intro?" (June 30, 2012), FB_FTC_CID_12185539, at -539.  In an email dated January 2013, a

Meta engineer – described as "Facebook's best spam fighter," PX3225, Meta message: R.

Branson to ███ and A. Cole (Nov. 12, 2012), FB_FTC_CID_11759461, at -461 – wrote:

"[t]he number of accounts caught at signup time by Instagram's old ol' IPSpamCalculator is an

order of magnitude larger than those caught by other policies.  This is good and speaks to the fact

that IG's system works."  PX10887, Meta email chain: ███ to ███, et al. re: "[tasks]

#2016790: Begin IG fake account registration classification in earnest [sinstagram] (Jan. 11,

2013), FB_FTC_CID_02627996, at -996.

In addition, the FTC's integrity expert, Damon McCoy, reviewed Meta's integrity claims

and supporting evidence regarding Instagram, and concluded that prior to the acquisition

"Instagram was capably managing integrity, having deployed increasingly sophisticated tools

and techniques in response to integrity issues, and had ample funding and engineering talent

available to follow the path of the many other online platforms that have successfully grown their integrity programs."  PX9002, McCoy Report at ¶ 17.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Shortway testified that detecting spam and policy-violating content is one of the hardest problems in computing; it takes years of expertise, hard engineering work, and a lot of machine learning to develop a system that is remotely successful at blocking spam and policy-violating content; the pre-acquisition Instagram team lacked experience in machine learning and building successful systems to detect and block spam and policy-violating content; and, when the Instagram acquisition closed, Meta's team was very skilled in developing systems to address spam and policy-violating content, and had years of experience behind them.  *See supra* Meta Introduction.

None of the additional material cited by the FTC creates a dispute of material fact regarding Mr. Shortway's testimony in paragraph 750.  Mr. Shortway's start date – six days after the acquisition closed – is immaterial because Instagram was still using its pre-acquisition integrity systems at that time.  *See* Ex. 302 at 234:20-235:3 (Krieger IH Tr.) (Instagram integrated with Meta's antispam system in "October or November of 2012"); *see supra* Meta SMF ¶ 748 (discussing Instagram's integration with Meta's spam-fighting system in November 2012).  Mr. Shortway had "edited some of the code" that Instagram used to detect and remove policy-violating content before Instagram integrated with Meta's integrity systems, and was involved in addressing incidents involving policy-violating content, and thus he has a foundation to offer the testimony in paragraph 750.  Ex. 156 at 23:18-24:20, 28:24-29:9 (Shortway Dep. Tr.).

Mr. Systrom's testimony regarding the development of spam-fighting techniques does not establish that anyone on the Instagram team had experience with machine-learning techniques to block spam or otherwise contradict Mr. Shortway's testimony in paragraph 750. *See* Ex. 302 at 232:4-233:2 (Krieger IH Tr.) (testifying that, before the acquisition, Instagram relied on "pretty rudimentary defenses" to combat spam that were "quite easy to circumvent" for a "dedicated-enough spammer"); Ex. 153 at 142:13-143:4 (Krieger Dep. Tr.) ("none of the [pre-acquisition Instagram] team had any expertise in site integrity or spam.").  The single statement that Mr. Systrom made to an investor from Greylock in June 2012 declining Impermium's service does not create a genuine dispute of material fact as to the difficulty associated with detecting spam and policy-violating content, whether anyone on the Instagram team had experience with machine learning or developing successful systems to detect and block spam and policy-violating content, or the skill and experience of Meta's integrity team at the time Meta acquired Instagram.  *See* PX15223 at -539 (FB_FTC_CID_12185539).  Nor does the January 2013 email cited by the FTC create a dispute, because it is focused solely on "fake account registration," and the evidence shows that Instagram ultimately deleted and replaced Instagram's legacy spam-fighting code, including the IPSpamCalculator, with "more scalable solutions using [Meta's] Sentry & Sigma" tools.  *See* Ex. 7 at ¶ 128 & n.335 (Subrahmanian Rep.) (quoting FB_FTC_CID_12206936 at -936, in which Mr. Krieger wrote:  "Props to ▆▆▆ for deleting a ton of legacy Instagram spam-fighting code, all of which has been replaced by more scalable solutions using Sentry & Sigma."); Ex. 470 at -950 (FTC-META-007081950) (November 2013 post discussing ▆▆▆▆▆ work to retire IPSpamCalculator).

Paragraph 17 of Professor McCoy's report does not cite any evidence and therefore does not create a genuine dispute of material fact.

751.     Ms. Cole, who handled Instagram's business operations before the acquisition,

testified:  "Q. Did Meta also assist Instagram with controlling spam or undesirable

content? . . .  A. Yes.  When we joined – before we joined Meta, the – it was initially one of the

responsibilities of the community team.  We had two people when I joined the team, and then

four by the time we joined Meta, who were responsible for reviewing the content that was

reported, essentially, on the platform.  Before we joined Meta it had gotten to a scale that they

needed to outsource some support in managing that volume of content that needed to be

reviewed.  And after joining Meta we were able to move over to Meta's systems and

infrastructure for integrity, which helped from a cost and a scaling perspective."  Ex. 152

at 198:23-199:15 & errata (Cole Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to "helped from a cost and a scaling

perspective" as vague, and "[b]efore we joined Meta" and "after joining Meta" as vague as to

time.  The FTC further objects to Statement 751 because the cited material does not establish the

absence of a genuine dispute as to any material fact and is not supported by admissible

evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but

otherwise disputes Statement 751 as described herein.

The FTC disputes the penultimate sentences in Statement 751 as incomplete because

other evidence shows that Instagram had started to scale its approach to content moderation prior

to the Meta acquisition and could have continued doing so.  Mike Krieger testified that Instagram

used CrowdFlower, a third party content moderator, PX6146, Krieger (Meta/Instagram) Dep.

Tr., at 135:22-136:5, prior to the acquisition by Meta to "process[] the [flagged] content in a

more scalable way . . . ."  *Id.* at 143:9-16.  Mr. Krieger further testified that if Instagram had not

been acquired by Meta, it would have "look[ed] at different vendors beyond CrowdFlower, including probably some of the other vendors that Facebook used as its sort of moderation force . . . ."  *Id.* at 265:23-266:13.

The FTC disputes the final sentence in Statement 751 as vague as to time.  Ms. Cole testified that "it was quite a long process to be able to [transition over to Meta infrastructure]." Ex. 152 at 132:18-21 (Cole Dep. Tr.) ("At some point after joining Meta we did transition over to Meta infrastructure, but it was quite a long process to be able to do so.").  The FTC also disputes Statement 751 because Ms. Cole testified that she did not have any responsibilities for integrity or infrastructure on Instagram prior to the Meta acquisition.  *Id.* at 76:15-17 ("Q. Were you responsible for integrity, things like controlling spam and pornography?  A. No."); *id.* at 71:6-19.  Ms. Cole also did not have any responsibilities for integrity on Instagram post-acquisition. *See id.* at 135:5-136:10.  The FTC further disputes that the evidence in the record indicates that Meta has delivered cost savings to Instagram.  PX9005, Hearle Report at ¶ 122 ("[A]fter reviewing Meta's claims and documentation regarding infrastructure cost savings related to the acquisition of Instagram, I conclude that Meta has not substantiated its claimed infrastructure cost savings related to the acquisition of Instagram, and I am unable to verify that Meta lowered overall infrastructure costs for Instagram."); *see also* PX9009, Hearle Rebuttal Report at ¶ 15 ("[M]y opinion that Meta has not provided adequate substantiation to verify its infrastructure cost-savings claims for Instagram remains unchanged.").

In addition, the FTC's integrity expert, Damon McCoy, evaluated Meta's integrity claims and supporting evidence regarding Instagram, concluded, *inter alia*, that "[he] cannot verify that Meta delivered improved integrity to Instagram because Meta does not have key data that would

allow evaluation of the effects of its tools and systems on Instagram's integrity performance."
PX9002, McCoy Report at ¶ 17(b).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram employee Amy Cole testified that, as a result of Meta's acquisition of Instagram, Instagram was able to utilize Meta's systems and infrastructure for integrity to achieve cost and efficiency gains.  *See supra* Meta Introduction.  As the terms "helped from a cost and a scaling perspective," "[b]efore we joined Meta," and "after joining Meta" are ordinarily understood and used, there is no dispute that Ms. Cole is discussing cost and efficiency improvements to Instagram's content moderation efforts following Instagram's acquisition by Meta.  The testimony cited by the FTC regarding the "long process" of transition concerns Instagram's migration from Amazon Web Services' servers used for content, not the Instagram infrastructure related to integrity, which was the subject of the cited testimony from Ms. Cole.  *See* Ex. 152 at 132:14-24, 132:25-133:13 (Cole Dep. Tr.) (discussing the migration of AWS infrastructure used for content such as video); *supra* Meta SMF ¶ 748 (discussing Instagram's integration with Meta's spam-fighting systems in November 2012); Ex. 7 at ¶ 145 (Subrahmanian Rep.) (citing evidence that, in August 2013, Instagram ended its contract with CrowdFlower and started to use Meta's moderation teams).

The additional material the FTC claims is necessary for completeness does not create a dispute regarding Ms. Cole's testimony.  The material comes not from other portions of Ms. Cole's testimony, but rather the testimony of a different witness, Mr. Krieger.  Moreover, the fact that Mr. Krieger testified that Instagram had begun to use CrowdFlower for content moderation prior to its acquisition by Meta is not inconsistent with Ms. Cole's testimony that Instagram was facing increased issues related to content moderation and that Meta's systems and

infrastructure for integrity allowed Instagram to deal with those issues in a more cost-effective and scalable fashion.  Indeed, Mr. Krieger testified that Instagram encountered "several issues" with CrowdFlower, including "inconsistent responses."  Ex. 302 at 236:12-22 (Krieger IH Tr.) (testifying that Instagram's collaboration with CrowdFlower was "not ideal" and "a solution that would have needed additional iterations").

Nor does Ms. Cole's testimony that she did not have any direct responsibility for integrity or infrastructure cast doubt on the cited testimony by Ms. Cole regarding the integrity benefits Meta provided following the acquisition.  Ms. Cole was hired in 2011 as Instagram's sixth employee and was responsible for business operations, including tracking user growth and infrastructure spending.  *See* Ex. 152 at 23:21-23 (Cole Dep. Tr.) (hired 2011), 65:16-25 (sixth Instagram employee), 66:12-16 (responsible for business operations), 71:9-14 (responsibilities included tracking user growth and infrastructure spending).  Given her responsibilities, Ms. Cole had the foundation and knowledge to address the integrity benefits Meta provided to Instagram. Likewise, the testimony of Mr. Hearle, the FTC's proffered expert, related to "'infrastructures services' [Instagram] needed to run its operations from Amazon Web Services [for] . . . data storage, data transfers, and cloud computing" and is not relevant to the systems and infrastructure for integrity that is the subject of Ms. Cole's testimony.  *See* PX9005 at ¶ 97 (Hearle Rep.); PX9009 at ¶ 15 (Hearle Rebuttal Rep.) (opining about infrastructure costs "compared to AWS").

Finally, paragraph 17(b) of Professor McCoy's report does not cite any evidence and therefore does not create a genuine dispute of material fact.  In addition, paragraph 17(b) of Professor McCoy's report does not address the testimony of Ms. Cole cited in paragraph 751.

752.    Since the acquisition, Meta has launched several tools, systems, and AI models on Instagram to benefit its integrity, including:

a.      Meta's spam-fighting systems, which include:

    i.     Sentry, a web service that interacts with the Instagram server for spam fighting purposes.  *See* Ex. 214 at -836 (FTC-META-005087836);

    ii.    Sigma, a rule engine that can run anti-abuse rules on large quantities of data to proactively block malicious actions.  *See* Ex. 444 (Engineering at Meta, *Fighting Spam with Haskell*, https://perma.cc/A3T6-XKNJ);

   iii.    Orb, a logging mechanism that enables investigations into recent data that has been sent to Sentry.  *See* Ex. 190 at -868 (FB_FTC_CID_03285861);

   iv.    Blackhole, a tool that automatically blocks URLs and domains associated with malicious actions, such as spam.  *See* Ex. 190 at -869 (FB_FTC_CID_03285861); and

    v.    Karma, █████████████████████████████████ ████████████.  *See* Ex. 214 at -836 (FTC-META-005087836).

b.      Check-pointing techniques, which identify and remove inauthentic accounts and can help to catch login activity from a location not typically associated with the user.  *See* Ex. 153 at 260:8-261:15 (Krieger Dep. Tr.).

c.      Meta's Media Match Service, ███████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████ ████████████ Ex. 211 at -890 (FTC-META-005479889).

d.    Deep Entity Classification or "DEC", a machine-learning framework "that detects abusive accounts in [online social networks]" by extracting features "of accounts by aggregating properties and behavioral features from their direct and indirect neighbors in the social graph."  Ex. 445 (Xu, et al., *Deep Entity Classification:  Abusive Account Detection for Online Social Networks*); Ex. 215 at -349 (FTC-META-005437348).

**FTC Response: Disputed in part.**

The FTC objects to Statement 752, and the term "since the acquisition," as vague as to time, and objects to the term "benefit [Instagram's] integrity" as vague.  The FTC further objects to Statement 752 because the cited material does not establish the absence of a genuine dispute as to any material fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that Meta has used the tools, systems, and AI models identified in Statement 752 for integrity on Instagram after the acquisition, but otherwise disputes Statement 752 as described herein.

The FTC disputes that the cited material in Statement 752 shows a benefit to integrity on Instagram.  The citations for the subparts in Statement 752 describe the intended function of the tools, systems, and AI models, but do not show that the level of spam or objectionable content on Instagram reduced as a result.  Further, the FTC's integrity expert, Professor Damon McCoy, evaluated Meta's integrity claims and supporting evidence regarding Instagram, and found that "[he] cannot verify that Meta delivered improved integrity to Instagram because Meta does not have key data that would allow evaluation of the effects of its tools and systems on Instagram's integrity performance."  PX9002, McCoy Report at ¶ 17(b).

The FTC disputes subpart (b) of Statement 752 because other evidence shows Instagram users who were using Facebook Connect to log into their Instagram accounts were benefiting from Meta's Checkpoint tools *prior* to its acquisition by Meta.  Arturo Bejar – a Meta engineer who had previously managed site integrity on Facebook before working on Instagram's integrity team, PX6052, Bejar (Meta) Dep. Tr., at 16:9-18, 22:19-23:5, 25:4-26:2 – testified that "people who use[d] Facebook Connect benefitted from all of [Meta's] integrity systems directly" and that Facebook Connect allowed third parties to "take advantage of all of the countermeasures that [Meta had] against fake accounts."  PX6052, Bejar (Meta) Dep. Tr., at 49:1-22; *see also* PX10744, Meta email chain: █████ to A. Bejar, et al. re: "Spam consultation with snapchat?" (Feb. 12, 2014), FB_FTC_CID_06495964, at -964 ("Facebook Connect, login with Google, login with Microsoft Passport/Live will all give [] some measure of protection against fakes and phishing.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta provided the proprietary technologies listed above in subparagraphs (a)-(d) to Instagram, creating an integrity benefit for Instagram.  *See supra* Meta Introduction.  As the terms "since the acquisition," and "benefit [Instagram's] integrity" are ordinarily understood and used, there is no dispute that Instagram's use of the listed tools after its acquisition by Meta improved Instagram's integrity systems.

The fact that Professor McCoy testified that he could not verify Meta's claimed integrity benefits using particular data does not create a genuine dispute of material fact that Meta provided Instagram with the tools listed in paragraph 752 or that those tools benefited Instagram in its ability to tackle integrity issues.  The quoted testimony from Mr. Bejar that the FTC cites concerns only checkpointing tools, and not the other tools identified in subparagraphs 752(a),

752(c), and 752(d).  And even with regard to checkpoint tools, Mr. Bejar's testimony that

Facebook Connect provided some benefit to Instagram before the acquisition does not create a

genuine dispute of material fact regarding the panoply of benefits provided by the integrity tools

and systems Meta provided to Instagram after the acquisition.  Indeed, pre-acquisition Instagram

was protected by Meta's fake account countermeasures only if an Instagram user logged in to

Instagram using their Facebook credentials via Facebook Connect.  Instagram users were not

required to log in to Instagram using Facebook Connect before the acquisition closed, meaning

that Instagram benefited from Meta's account verification tools only to the extent a user chose to

log in to Instagram using their Facebook credentials.  *See* PX6052 at 49:13-17 (Bejar Dep. Tr.);

*see also id.* at 245:15-23 (Bejar testifying that "[t]here were [sic] no direct API access to [D]elta"

for third parties outside Facebook Connect).  In addition, Meta's integrity expert, Professor

Subrahmanian, confirmed that these tools resulted in tangible benefits to Instagram's integrity

efforts.  *See* Ex. 7 at ¶¶ 32-42 (Subrahmanian Rep.) (describing the benefits of Meta's spam-

fighting tools and citing independent studies and first-hand accounts of Meta's success in

combatting spam), ¶¶ 124-135 (describing the benefits of Sigma and other anti-spam tools and

the improvements experienced by Instagram as a result of their deployment), ¶¶ 40-41 & n.81

(describing DEC and citing statistics on improvements Meta achieved).

753.    Mr. Systrom testified:  "Q. . . . When Instagram joined Facebook, was Instagram

able to scale its response to problematic content by relying on Facebook's site integrity

team? . . .  [A.] I believe so, yes."  Ex. 151 at 362:17-22 (Systrom Dep. Tr.).  He also

testified:  "Q. If Instagram had not been part of Facebook, it wouldn't have been able to use

Facebook's site integrity team, correct? . . .  [A.] Correct."  *Id.* at 363:2-6.  Mr. Systrom further

testified:  "Q. . . . And if Instagram had remained independent, it wouldn't have been able to plug

into Facebook's spam fighting systems, correct? . . .  A. Not Facebook's, no." *Id.* at 366:11-16.

**FTC Response: Disputed in part.**  The FTC objects to "use Facebook's site integrity team" and "plug into Facebook's spam fighting systems" as vague.  The FTC further objects to Statement 753 because the cited material does not establish the absence of a genuine dispute as to any material fact and is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 753 as described herein.

The FTC disputes the first sentence in Statement 753 as incomplete because it omits testimony from Mr. Systrom explaining that Instagram did not need Meta to scale its response to problematic content:

> Q. Did Facebook do anything to help Instagram with problematic content post-acquisition?
>
> A. . . . it wasn't like someone showed up and solved our issues in a major way, right? . . .
>
> Q. Would Instagram have been able to scale its response to problematic content without Facebook's help had it stayed independent?
>
> A. Yeah.  Absolutely.

PX6027, Systrom (Meta/Instagram) IH Tr., at 277:11-25.

Moreover, other evidence shows that Instagram had started to scale its approach to content moderation prior to the Meta acquisition and could have continued doing so.  Mike Krieger testified that Instagram used CrowdFlower, a third party content moderator, PX6146, Krieger (Meta/Instagram) Dep. Tr., at 135:22-136:5, prior to the acquisition by Meta to "process[] the [flagged] content in a more scalable way . . . ." *Id.* at 143:9-16.  Mr. Krieger

further testified that if Instagram had not been acquired by Meta, it would have "look[ed] at different vendors beyond CrowdFlower, including probably some of the other vendors that Facebook used as its sort of moderation force . . . ."  *Id.* at 265:23-266:13.

The FTC disputes the second and third references in Statement 753 because other evidence shows that Instagram would have had access to Meta's site integrity team and spam fighting systems without the acquisition.  *See* PX9020, Subrahmanian Report at ¶ 32 ("Meta has open sourced some of these [integrity] technologies, and it regularly shares its integrity insights with other online platforms and industry professionals through various conferences and events."); PX0509 at -002, Antigone Davis & Guy Rosen, *Open-Sourcing Photo- and Video-Matching Technology to Make the Internet Safer,* Meta Newsroom, Aug. 1, 2019, https://about.fb.com/news/2019/08/open-source-photo-video-matching/ (announcing that Meta would be "sharing some of the tech we use to fight abuse on our platform . . . ."); PX6052, Bejar (Meta) Dep. Tr., at 49:1-22 ("people who use[d] Facebook Connect benefitted from all of [Meta's] integrity systems directly"); PX10744, Meta email chain: ███ to A. Bejar re: "Spam consultation with snapchat?" (Feb. 12, 2014), FB_FTC_CID_06495964, at -964 ("We sometimes do 1-hour calls with platform partner companies to give them advice on spam fighting techniques").  In fact, prior to its acquisition by Meta, Instagram was engaged in discussions with Meta about strategies for fighting spam.  PX3224, Meta email chain: K. Systrom to R. Branson and M. Krieger re: "Reschedule SPAM meeting," (May 24, 2012), FTC-META-003352631, at -631.

The FTC also disputes the third sentence because former Meta employees indicated that Instagram even after acquisition could not simply "plug into" Meta's integrity system without significant tooling and customization.  PX6042, Stefancik (Meta) Dep. Tr., at 65:22-66:4

("because they were on a different backend, it was not -- you know, it wasn't plug and play"); PX6033, Velazquez (Meta) Dep. Tr., at 155:19-156:12 ("there were tools that we weren't like fully plugged into on the Facebook side yet that, just because they required, you know, engineering investment to, to plug into them.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Systrom testified that Meta's acquisition of Instagram allowed it to rely on Meta's Site Integrity team to scale its response to policy-violating content, and that Instagram would not have been able to use resources from Meta's Site Integrity team or plug into Meta's spam-fighting systems had the acquisition not occurred.  *See supra* Meta Introduction.  As the terms "use Facebook's site integrity team" and "plug into Facebook's spam fighting systems" are ordinarily understood and used, there is no dispute that Mr. Systrom testified that engineers on Meta's Site Integrity team worked on integrity-related issues on Instagram after the acquisition closed, and that Instagram was able to use Meta's tools to fight spam, such as Sentry and Sigma. *See, e.g.,* PX3225 at -461 (FB_FTC_CID_11759461) (November 2012 post stating, " ███ ███ from the SI [Site Integrity] team is now spending about 80% of his time working on Instagram spam issues now!  He is basically Facebook's best spam fighter, so we're super psyched to have ███ on our side."); *supra* Meta SMF ¶ 748 (discussing Instagram's use of Sentry in November 2012).

The FTC's proffered integrity expert, Professor McCoy testified that, other than Instagram, only YouTube (which was acquired by Google) had been able to grow its user base while also managing integrity issues at scale.  Ex. 313 at 113:17-114:5 (McCoy Dep. Tr.).  The evidence shows that Instagram benefited from the work of Meta's Site Integrity engineers and use of Meta's spam-fighting systems.  *See, e.g.*, Ex. 480 at -351 (FB_FTC_CID_12203351)

(November 26, 2012 email in which Mr. Krieger wrote that spam had "gotten a ton better [on Instagram] – we had ███████ basically full-time on Instagram the last week and a half and he set up a ton of rules in Sigma/Sentry to really good results").  And Meta's integrity expert, Professor Subrahmanian, confirmed that the tools provided by Meta to Instagram after the acquisition resulted in tangible benefits to Instagram's integrity efforts.  *See* Ex. 7 at ¶¶ 38-42 (Subrahmanian Rep.) (describing the benefits of Meta's spam-fighting tools and citing independent studies and first-hand accounts of Meta's success in combatting spam), ¶¶ 124-135 (describing the benefits of Sigma and spam systems and the improvements experienced by Instagram as a result of their deployment), ¶¶ 40-41 & n.81 (describing DEC and citing statistics on improvements Meta achieved).

The cited testimony that Meta's tools required some customization and engineering does not create a genuine dispute of material fact.  The FTC cites no evidence that Facebook did not provide the engineering and customization necessary to integrate Meta's tools into Instagram's systems.  The record shows Meta did in fact provide engineering support to customize Meta's tools for the benefit of Instagram's integrity systems.  *See*, *e.g.*, Ex. 153 at 159:7-160:6 (Krieger Dep. Tr.) (describing work completed by ███████ and ███████ – both Site Integrity engineers at the time – to customize Meta's spam-fighting tools for Instagram); *see also* Ex. 7 at ¶ 125 (Subrahmanian Rep.) ("integration with Meta's anti-spam systems happened 'almost instantly' after the acquisition"); *id.* at ¶ 127 ("within a year of the acquisition, Facebook engineers helped Instagram build a phishing detection system that leveraged and reused components of Meta's Delta tool").

754.    Professor Damon McCoy – the FTC's proffered integrity expert – opined regarding "Meta's claimed integrity-related benefits related to acquiring Instagram and

WhatsApp." Ex. 312 at ¶ 13 (McCoy Rep.). He testified: "Q. . . . Is it your conclusion that it is at least possible that Instagram's integrity today is superior to what Instagram's integrity would have been had it remained independent? . . . A. If you pose a hypothetical of that saying is something possible, then it's possible that I fall through this floor because of our understanding of quantum mechanics within there. So yes, I would say that it's possible." Ex. 313 at 176:1-11 (McCoy Dep. Tr.). Professor McCoy also testified: "Q. Sitting here today, you don't know what systems an . . . independent Instagram would be using to combat integrity, correct? A. That's correct. I don't know what specific systems they would have built. Q. And you don't know how many average monthly users an independent Instagram would have today, correct? A. That is correct. . . . Q. And you don't have any opinion as to how many . . . integrity engineers an independent Instagram would employ today, correct? A. That's correct." *Id.* at 192:22-193:16.

**FTC Response: Disputed.** The FTC objects to Statement 754 as incomplete and misleading. The FTC further objects to Statement 754 because the cited material does not establish the absence of a genuine dispute as to any material fact and is not supported by admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 754 as described herein.

The FTC disputes the first transcript reference in Statement 754 as incomplete and misleading because it omits testimony by Professor McCoy clearly stating his conclusion that Instagram's integrity was likely inferior as a result of its acquisition by Meta: "Q. . . . So I understand that, what you're saying is Instagram's integrity is likely inferior to what it would be had it not been purchased by Meta, correct? A. Yes, that's my opinion." Ex. 313 at 187:1-5 (McCoy Dep. Tr.). Professor McCoy expands on his conclusion in his opening expert report,

explaining that several policy choices that Meta has instituted on Instagram have "impaired Instagram's integrity performance."  Ex. 312 at ¶¶ 81, 82 (McCoy Rep.).

The FTC disputes the second transcript reference in Statement 754 as incomplete and misleading because it ignores Professor McCoy's testimony clarifying his conclusion: "Q. . . . You don't have any opinion, do you, on what Instagram's integrity policies would be like today absent its acquisition by Meta, correct?  A. I don't believe that that correctly states things." Ex. 313 at 194:9-13 (McCoy Dep. Tr.).  Professor McCoy explains in his expert report that prior to the acquisition "Instagram was capably managing integrity, having deployed increasingly sophisticated tools and techniques in response to integrity issues, and had ample funding and engineering talent available to follow the path of the many other online platforms that have successfully grown their integrity programs."  Ex. 312 at ¶ 17 (McCoy Rep.); *see also id.* (concluding that "Meta's acquisition of Instagram was not necessary for Instagram to successfully attack integrity issues at scale, or to achieve any of the other specific integrity benefits Meta claims, because the tools and methods that Meta provided were not exceptional in the industry . . . .").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor McCoy testified that he did not know what integrity systems Instagram, in a but-for world without the acquisition, would use today, or the number of engineers Instagram would devote to integrity in that but-for world.  *See supra* Meta Introduction; *see also* PX9013 at ¶ 32 (McCoy Rebuttal Rep.) ("The farther we move away from 2012, the more difficult it is to assess what kind of integrity problems Instagram would have had and what kind of resources and solutions it would have been able to deploy independent of Meta.").  Professor McCoy further

testified that he was unaware what resources and funding Instagram had available to it at the time of the acquisition.  *See* Ex. 313 at 143:2-9 (McCoy Dep. Tr.).

### e.    Post-Acquisition Infrastructure

755.    In June 2014, Instagram publicly announced that, in April 2013, it had started migrating its computing infrastructure from AWS to Meta's data centers.  *See* Ex. 446 at 1 (Medium, *Migrating From AWS to FB*, https://perma.cc/HBX3-TUBR).  Mr. Systrom testified: "Q. And after the Facebook acquisition, Instagram ultimately switched over to Facebook's infrastructure?  A. Correct."  Ex. 151 at 353:13-16 (Systrom Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the second sentence in Statement 755 as vague as to the time of Instagram's purported switch to Facebook's infrastructure after the acquisition.

The FTC does not dispute that Instagram eventually migrated its compute infrastructure from AWS's infrastructure to Meta's data centers after the Meta acquisition, or that the quoted language appears in the cited material, but otherwise disputes Statement 755 as described herein.

The FTC disputes the assertion in the first sentence in Statement 755 – that Instagram started migrating its compute infrastructure to Meta's data centers in April 2013 – because it is contradicted by other evidence indicating that Instagram was still using AWS's compute infrastructure in November 2013 and Instagram did not start using multiple Meta data centers until 2015.  Meta's infrastructure expert, Professor Jason Nieh, acknowledges in his report that "Instagram first had to migrate to Amazon's Virtual Private Cloud (VPC), and from there to Meta's data centers" and that "Meta and Instagram completed the migration of Instagram's computing workloads from AWS EC2 to [Amazon's] VPC in November 2013."  PX9022, Nieh Report at ¶¶ 153-54; *see also* PX3413, Meta email chain: K. Systrom to M. Schroepfer and M. Krieger re: "Instagram HPM," (Nov. 20, 2013), FB_FTC_CID_02635094, at -094 ("We have

finished the migration from EC2 to VPC!"); *id.* at -094-95 ("With our servers in [Amazon] VPC, we can now communicate directly to FB data centers . . . .").

While Instagram appears to have been operating from a Meta data center in 2014, *see* PX3414, Meta message board post: N. Shortway post to Insta Internal (Apr. 25, 2014), FTC-META-012220197, at -197 ("▮▮▮▮▮▮ and I just cut over the majority of all traffic from AWS into FB."), other evidence shows that Instagram did not migrate to a multi-data center architecture until 2015, *see* PX3415, Meta document: "Instagration part 2: Multi-regional data centers" (Oct. 15, 2015), FTC-META-008622362, at -362 ; PX6147, Krieger (Meta/Instagram) Dep. Tr., at 423:24-424:6 ("Q. . . . It took Instagram several years to migrate into multiple Meta data centers, right? . . . [A.] . . . If you start the clock from when we first did Instagration, then I would characterize that as a couple of years.").

The FTC disputes the second sentence in Statement 755 as vague as to the time of Instagram's "switch[] over to Facebook's infrastructure" and misleading because Instagram did not adopt all of Meta's infrastructure when it migrated to Meta's data center in 2014, or even when it migrated to a multi-data center architecture in 2015.  Ample evidence shows that Instagram did not adopt various pieces of Meta's software infrastructure for years after the Meta acquisition.  *See generally* PX9001, Bray Report at ¶¶ 120-21 (describing phases of Instagram's migration to Meta infrastructure between 2013 and 2021).

For example, David Mortenson – former Vice President of Engineering at Meta – testified that Instagram was still migrating some infrastructure services in 2020 and 2021.  *See* PX6062, Mortenson (Meta) Dep. Tr., at 17:15-16, 148:20-149:2 (▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

██████████████████████████████████████████████████

██████████████████████); *see also id.* at 68:24-69:1 ("Q. What about Cassandra?  Is that an

open-source database?  A. Yes."); PX9001, Bray Report at ¶ 235 ("Instagram's adoption of

ZippyDB appears to have been part of a decision to retire Cassandra around 2019.").  Other

evidence shows that in some cases Instagram built its own technologies rather than rely on

Meta's technologies.  *See, e.g.*, PX9011, Bray Rebuttal Report at ¶ 341 ("The Nieh Report does

not assert that Instagram benefited from any Meta technology to develop its ranked feed, nor

does it deny that Instagram built is own unique ranked feed…."); PX6062, Mortenson (Meta)

Dep. Tr., at 232:25-233:4 ("Q. Okay.  So that's what this email is reflecting here that, at this

point in time, Facebook and Instagram were using different exploratory efforts relating to

machine learning training?  A. I believe that's accurate, yes.").

      The FTC further disputes (to the extent implied by Statement 755) that Instagram was

able to simply "switch over" to Meta's infrastructure.  Other evidence indicates that Meta had to

customize or improve existing infrastructure to accommodate Instagram's workload.  *See, e.g.*,

PX9001, Bray Report at ¶ 221 ("At the time of the acquisition, Everstore did not appear to match

S3's performance or reliability.  Evidence indicates that Meta needed to make engineering

investments in Everstore to achieve parity with S3 for Instagram's use cases."); PX3416, Meta

messages: ████████ to Everstore (Feb. 18, 2018), FB_FTC_CID_07715859, at 860 ("The

IG team is seeing unacceptably high latency on writes, and this [is] affecting user interactions.

We need to debug this in order for Instagram to be able to use Everstore for its video storage.

Right now, the claim is that the application is seeing 3 to 4 seconds of latency whereas [AWS]

S3 sees sub second latencies . . . ."); PX9011, Bray Rebuttal Report at ¶ 278 ("The migration

process necessitated building a separate version of TAO called 'InstaTAO.'  Meta's former

Infrastructure VP David Mortenson explained that building InstaTAO allowed engineers to make changes 'to support the functionality that Instagram needed' before moving 'them over to use the regular version of TAO.'") (citing PX6062, Mortenson (Meta) Dep. Tr., at 123:6-22).

Additionally, the FTC disputes Statement 755 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The FTC's infrastructure expert, Tim Bray, examined the record, including evidence proffered by Meta's infrastructure expert, and concluded that Instagram obtained benefits from migrating to Amazon VPC in 2013, but that such benefits were not attributable to Meta's infrastructure.  PX9011, Bray Rebuttal Report at ¶ 227 ("[T]he majority of the latency improvement [in the graph showing Instagram's move from Amazon Classic to Amazon VPC to Meta's data center] is attributable to Instagram's migration to Amazon VPC in late 2013."); *see also* PX11060, Meta email: ████ to J. Parikh re: "Instagration All Hands Shout Out Data," (Apr. 29, 2014), FTC-META-003102521, at -521 (indicating that "[g]raph below shows Amazon Classic to Amazon VPC to FB transition").  Additionally, Meta's own expert recognizes that Instagram would have achieved the benefits of migrating to Amazon's VPC absent the acquisition by Meta. In his expert report, Professor Nieh concedes that "[a]lthough the migration to VPC was challenging, Instagram would have needed to perform this migration even if it stayed on AWS in order to migrate to a new version EC2."  PX9022, Nieh Report at ¶ 153; *see also* PX6055, Shortway (Meta) Dep. Tr., at 116:16-18 (explaining that Instagram decided that "regardless of whether or not we . . . were going to migrate to [Meta], we needed to migrate into Virtual Private Cloud").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram started migrating its compute infrastructure from AWS to Meta's data centers in April

2013 or that Instagram ultimately migrated fully onto Meta's infrastructure.  *See supra* Meta

Introduction.  Contrary to the FTC's assertion, the fact that Instagram did not complete its

migration in April 2013 does not "contradict[ ]" the fact that Instagram started its migration in

April 2013.  Similarly, the fact that Instagram continued to adopt more of Meta's infrastructure

services after Instagram migrated from AWS to Meta's data centers does not create a genuine

dispute of material fact that Instagram migrated fully from AWS to Meta's data centers.

The FTC's further response that "Meta had to customize or improve existing

infrastructure to accommodate Instagram's workload" is irrelevant and nonresponsive to the

facts stated in this paragraph.  It is common for companies to develop new solutions to facilitate

migration.  *See, e.g.*, Ex. 5 at ¶ 153 (Nieh Rep.) (describing how Instagram had to "develop

custom software and processes" to migrate between AWS's EC2 to AWS's VPC); *id.* at ¶ 317

(discussing how ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ ).

The FTC's further response that "Instagram obtained benefits from migrating to Amazon

VPC in 2013" is irrelevant and nonresponsive to the facts stated in this paragraph.  The fact that

Instagram's latency improved when it migrated from Amazon Classic to Amazon VPC has no

bearing on the fact that Instagram received additional latency reduction as a result of migrating

from VPC to Meta's infrastructure.  *See* Ex. 5 at ¶¶ 155-158 (Nieh Rep.).

756.    Tim Bray, the FTC's proffered infrastructure expert, opined that "[u]sers'

perceptions of how quickly an online product responds to requests is an important component of

the quality of their experience," and that the delay between a user request and an online

product's response is commonly referred to as latency.  Ex. 288 at ¶ 98 (Bray Rep.).  Mr. Krieger

testified that Instagram saw a "significant latency reduction post-Instagration," a term referring

to Instagram's migration to Meta's data servers.  Ex. 153 at 76:24-77:5, 287:3-20 (Krieger Dep.

Tr.).  He prepared a presentation in 2014 stating that there was a "75% latency reduction in our

core 'hot path' in rendering feeds" after the integration.  Ex. 226 at -917 (PX10881,

FB_FTC_CID_02613734).

**FTC Response: Disputed.**  The FTC objects to the terms "significant latency reduction"

and "core 'hot path' in rendering feeds" as vague, and to the terms "significant latency reduction

post-Instagration" and "75% latency reduction . . . after the integration" as vague, including

vague as to the time.

The FTC does not dispute the first sentence in Statement 756, or that the quoted language

appears in the cited material, but otherwise disputes Statement 756 as described herein.

The FTC disputes the accuracy of the reference to the cited testimony: Mr. Krieger

testified that "Instagration" was an "internal nickname for the project to move from AWS to

Facebook's data centers," not "Meta's data *servers*."  Ex. 153 at 77: 3-5 (Krieger Dep. Tr.).  The

FTC also disputes Statement 756's assertion that "Instagration" refers to Instagram's migration

to Meta's data servers because other evidence shows that the term is not used consistently by

Meta employees.  *See, e.g.*, PX9001, Bray Report at ¶ 120 ("Instagram's infrastructure was

migrated onto Meta's infrastructure piecemeal, in a process stretching between 2013 and 2021.

At various times, Meta has referred to some of the phases of this project as 'Instagration,' a

portmanteau of Instagram and migration.").

Additionally, the FTC disputes Statement 756's assertion that Instagram experienced a

significant reduction in latency following the migration to Meta's data centers, because, as

discussed in the FTC's response to Statement 755, Instagram did not adopt a multi-data center

architecture until 2015, *see* PX3415, Meta document: "Instagration part 2: Multi-regional data centers" (Oct. 15, 2015), FTC-META-008622362 at -362, which is after the 2014 presentation cited in the last sentence in Statement 756.  *See* Ex. 226 at -917 (PX10881, FB_FTC_CID_02613734).  That presentation is what is being discussed in the portion of Mr. Krieger's testimony cited in the second sentence in Statement 756.  *See* Ex. 153 at 286:25-287:24 (Krieger Dep. Tr.).

The FTC further disputes that Instagram experienced a "significant latency reduction post-Instagration" or that "there was a '75% latency reduction in [Instagram's] core "hot path" in rendering feeds' after the integration."  These assertions in Statement 756 are contradicted by other evidence showing that the majority of the latency reduction Instagram experienced in late 2013 and early 2014 was attributable to Instagram's migration to an updated version of AWS's compute infrastructure, *not the migration to a Meta data center*, which did not occur until April 25, 2014.  *See* PX9022, Nieh Report at ¶ 157, Fig. 2 (showing average latency for Instagram data fetching in 2013 and 2014).



Meta's infrastructure expert, Professor Jason Nieh, acknowledged in his report that "Amazon later developed VPC 'as a companion product to the existing EC2 offering, though it quickly became considered to be EC2 2.0, as it remedied many of the commonly accepted EC2 downfalls.'"  PX9022, Nieh Report at ¶ 153, n.363 (quoting PX0611, Nick Shortway, *Migrating from AWS to AWS*, Instagram Engineering (Oct. 23, 2014), https://instagram-engineering.com/migrating-from-aws-to-aws-f4b16a65e13c).  The FTC's infrastructure expert, Tim Bray, examined the record, including evidence proffered by Professor Nieh to show the benefits of Instagram's migration to Meta's compute infrastructure, and concluded that "[t]he majority of this benefit would have been achieved absent Meta's infrastructure."  PX9011, Bray Rebuttal Report at ¶ 228.

Additionally, the FTC disputes that Statement 756 shows the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The source data that Professor Nieh relies upon to graph Instagram data fetching demonstrates that ████████████ ██████████████████████████████████████████████████ ████████████████████████████████████.  *See* PX8011, Declaration of Alexander Gaynor (FTC) (May 22, 2024), at Fig. A.



*See also* PX10089, Meta data: ███████████████████████████████████

FTC-META-012478685.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram's latency improved as a result of migrating from AWS to Meta's infrastructure.  *See supra* Meta Introduction.  The FTC does not dispute that Instagram migrated from AWS to Meta's infrastructure in 2014 and that the cited presentation refers to benefits resulting from that migration.  The FTC's claim that Mr. Krieger did not use the phrase "Instagration" to refer to Instagram's migration from AWS to Meta's infrastructure is belied by the FTC's own citation, in the preceding sentence, to Mr. Krieger's definition of the phrase "Instagration," which he defined as an "internal nickname for the project to move from AWS to Facebook's data centers." Ex. 153 at 77: 3-5 (Krieger Dep. Tr.).  As the terms "significant latency reduction," "core hot path in rendering feeds," "significant latency reduction post-Instagration," and "75% latency reduction . . . after the integration" are used within the cited material, there is no dispute that the cited material discusses latency improvements that Instagram received as a result of migrating from AWS to Meta's infrastructure.

866

The FTC's further response that "other evidence showing that the majority of the latency reduction Instagram experienced in late 2013 and early 2014 was attributable to Instagram's migration to an updated version of AWS's compute infrastructure, *not the migration to a Meta data center*, which did not occur until April 25, 2014" is irrelevant and nonresponsive to the facts stated in this paragraph.  The fact that Instagram's latency improved when it migrated from Amazon Classic to Amazon VPC has no bearing on the fact that Instagram received additional latency reduction as a result of migrating from VPC to Meta's infrastructure.  *See* Ex. 5 at ¶¶ 155-158 (Nieh Rep.).

The FTC's further response that "" is irrelevant and nonresponsive to the facts stated in this paragraph.  The FTC cites no evidence to support its claim that

. *See* Ex. 2 at ¶ 250 (Carlton Rep.) (explaining that

).  It is unsurprising that

. *See* Ex. 5 at ¶¶ 155-158 (Nieh Rep.).

Meta further objects that the Declaration of Alex Gaynor, disclosed by the FTC for the first time as an exhibit to its summary judgment papers, is improper expert testimony that was not timely disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2).  The contents of his Declaration are accordingly not evidence that can be presented in a form admissible at trial

pursuant to Federal Rule of Civil Procedure 56(c)(2) and, therefore, cannot be relied on at summary judgment.

757.     Following the transition to Meta's infrastructure, the average time taken to fetch data for Instagram's Feed fell from approximately 40 milliseconds (before the transition) to approximately 20 milliseconds (after the transition). *See* Ex. 2 at p. 181, fig. 14 (Carlton Rep.). This can be shown graphically:



*Id.* at p. 181, fig. 14.

**FTC Response: Disputed.**  The FTC objects to "[f]ollowing the transition to Meta's infrastructure" as vague.

868

The FTC does not dispute that Statement 757 accurately recounts Professor Carlton's description of Figure 14 as described in his expert report, but otherwise disputes Statement 757 as described herein.

The FTC disputes the term "fetch data" in Statement 757 as vague and incomplete because it fails to identify which of the many operations associated with rendering Instagram feed visible to users is included in the assertion.  *See* PX9001, Bray Report at ¶ 109 ("The latency experienced by an end-user requesting and getting a feed is related to the sum of the latencies of all the steps in that story: each system that a request interacts with, and every database that gets queried, takes time.  Analysis of latency is made more complex in that some of the processes can happen in parallel with others (for example, if two databases need to be consulted, those checks may be performed in parallel, which means the time elapsed is the slower of the two, not the sum of the two).").

The FTC further disputes Statement 757 as incomplete and misleading because it selectively omits data showing that ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████, *see* PX10089, Meta data: ███████████████████ ████████████ FTC-META-012478685, whereas Statement 757 only displays average data for the period from ███████████████████████.  The source data that Professor Carlton relies upon to graph Instagram data fetching shows that ██████████████████████ ████████████████████████████████████████████ ████████████████████████████.  *See* PX8011, Declaration of

Alexander Gaynor (FTC) (May 22, 2024), at Fig. A; *see also* PX10089, Meta data: ███████
████████████████████████████████ FTC-META-012478685.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
Instagram's latency improved as a result of migrating from AWS to Meta's infrastructure.  *See*
*supra* Meta Introduction.  The data Professor Carlton relied on was collected by Meta and
produced to the FTC at Bates number FTC-META-012478685 in response to the FTC's request
for data Meta's experts relied upon (Request for Production No. 86), which Meta explained to
the FTC in Meta's production cover letter.  *See* Ex. 509 (May 18, 2023 Production Cover Letter).
The FTC never asked for more information about these data during fact discovery.  In expert
discovery, Professor Nieh testified about the data:  "███████████████████████████
████████████████████████████████████████████████
██████████████."  PX6181 at 121:19-22 (Nieh Dep. Tr.).  Other evidence confirms
that Instagram received performance benefits from migrating to Meta's infrastructure.  *See* Ex. 5
at ¶ 155 (Nieh Rep.) ("Extensive evidence confirms that Instagram received performance and
reliability benefits from migrating to Meta's infrastructure."); *id.* at ¶¶ 155-158 (describing and
discussing that evidence).

The additional material the FTC claims Meta "omit[ted]" is irrelevant and nonresponsive
to the facts stated in this paragraph and does not create a dispute that Instagram's latency
improved as a result of migrating from AWS to Meta's infrastructure.  The FTC cites no
evidence to support its claim that the ██████████████████████████████
██████████████████████████████████████████████
██████████████.  *See* Ex. 2 at ¶ 250 (Carlton Rep.) (explaining that ██████████████
██████████████████████████████████████████████



). It is unsurprising that

. *See* Ex. 5 at ¶¶ 155-158 (Nieh Rep.).

Meta further objects that the Declaration of Alex Gaynor, disclosed by the FTC for the

first time as an exhibit to its summary judgment papers, is improper expert testimony that was

not timely disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2).  The contents of his

Declaration are accordingly not evidence that can be presented in a form admissible at trial

pursuant to Federal Rule of Civil Procedure 56(c)(2) and, therefore, cannot be relied on at

summary judgment.

758.    In 2014, an internal Meta email reported that the "benchmark for [Instagram] data

fetching went from a very noisy ~100ms in Amazon Classic down to a very consistent 20ms in

[Meta's infrastructure]."  Ex. 227 at -521 (PX11060, FTC-META-003102521).

**FTC Response: Disputed.**  The FTC objects to the terms "benchmark," "data fetching,"

and "very noisy" as vague.

The FTC does not dispute that the quoted language appears in the cited material, but

otherwise disputes Statement 758 as described herein.

The FTC disputes Statement 758 as incomplete and misleading because it omits the next

sentence in the cited document clearly indicating that the decrease in latency – from 100ms to

20ms – was not solely attributable to Instagram's migration to Meta's infrastructure: "Graph

below shows Amazon Classic *to Amazon VPC* to FB transition."  Ex. 227 at -521 (PX11060,

FTC-META-003102521) (emphasis added); *see also* PX9011, Bray Rebuttal Report at ¶ 227

("The graph shows an initial state with a latency that the email describes as 'noisy,' with a mean

value somewhat below 80ms (not the 100ms claimed in the email); then there is a dramatic drop in November 2013 to a mean value somewhere around 35ms, and finally another in April 2014 to a mean value around 20ms.  While the data underlying this graph is not available to me, it suggests that the majority of the latency improvement is attributable to Instagram's migration to Amazon VPC in late 2013.").  The FTC further notes that Statement 758 is inconsistent with Statement 757, which asserts that "average time taken to fetch data for Instagram's Feed fell from approximately 40 milliseconds (before the transition) to approximately 20 milliseconds (after the transition)."

Additionally, the FTC disputes that Statement 758 shows the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Other evidence shows that ███████████████████████████████████████████████████████████.  *See* PX8011, Declaration of Alexander Gaynor (FTC) (May 22, 2024), at Fig. A; *see also* PX10089, Meta data: █████████████████████████████████████ FTC-META-012478685.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Instagram's latency improved as a result of migrating from AWS to Meta's infrastructure.  *See supra* Meta Introduction.  As the terms "benchmark," "data fetching," and "very noisy" are ordinarily understood and used, there is no dispute that the cited material discusses latency improvements that Instagram received as a result of migrating to Meta's infrastructure.

The additional material the FTC claims Meta "omit[ted]" does not create a dispute that Instagram's latency improved as a result of migrating from AWS to Meta's infrastructure.  The fact that a portion of the latency reduction discussed in the document cited in the paragraph is attributable to Meta's migration from Amazon Classic to Amazon VPC has no bearing on the

fact that Instagram received additional latency reduction as a result of migrating from VPC to

Meta's infrastructure.  *See* Ex. 5 at ¶¶ 155-158 (Nieh Rep.).

The FTC's further response that "[o]ther evidence shows that 

is irrelevant and nonresponsive to

the facts stated in this paragraph.  The FTC cites no evidence to support its claim that

.  *See* Ex. 2 at ¶ 250

(Carlton Rep.) (explaining that

.  It is unsurprising that

.  *See* Ex. 5 at

¶¶ 155-158 (Nieh Rep.).

Meta further objects that the Declaration of Alex Gaynor, disclosed by the FTC for the

first time as an exhibit to its summary judgment papers, is improper expert testimony that was

not timely disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2).  The contents of his

Declaration are accordingly not evidence that can be presented in a form admissible at trial

pursuant to Federal Rule of Civil Procedure 56(c)(2) and, therefore, cannot be relied on at

summary judgment.

759.    Instagram also migrated to Meta's access caching layer (called TAO), *see* Ex. 5

at ¶¶ 177-178 (Nieh Rep.), which stores data to and recalls data from Meta's social graph.  *See*

Ex. 172 at 4-5, Meta's Resp. to Topic 5, Question 1 (Meta's Resp. to Topic 5 of FTC's Rule

30(b)(6) Notice Concerning Data Topics (Jan. 27, 2023)).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that Instagram migrated to TAO after the Meta acquisition, but notes that Instagram migrated to TAO several years after the acquisition.  PX6055, Shortway (Meta) Dep. Tr., at 186:22-24 ("Q. When did . . . Instagram start using TAO?  A. I'm almost positive sometime in 2016."); *see also* PX9011, Bray Rebuttal Report at ¶ 275 n.640.

760.    During the migration to this Meta system, Instagram wrote user "likes" to both Meta's infrastructure and Instagram's pre-acquisition legacy system (which used Postgres), the latter of which had a higher failure rate than Meta's system.  *See* Ex. 2 at ¶ 251 & fig. 15 (Carlton Rep.).  This can be shown graphically:



*Id.* at p. 182, fig. 15.

**FTC Response: Disputed.**

The FTC does not dispute that Statement 760 accurately recounts Professor Carlton's

description of Figure 15 as described in his expert report, but otherwise disputes Statement 760

as described herein.

The FTC disputes Statement 760 as the cited material does not show the absence of a

genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The FTC's

infrastructure expert, Tim Bray, reviewed Professor Carlton's infrastructure-related claims,

including Figure 15 in his report and the Meta document that underlies Figure 15, PX10089,

Meta data: ███████████████████████████████████ FTC-META-

012478686, and concluded that he "disagree[s] that this limited data shows that migrating to

TAO would have improved Instagram's user experience or reliability."  PX9011, Bray Rebuttal

Report at ¶ 268.  Mr. Bray explained that: "In [his] experience, this sort of failure is not

uncommon in systems like this which do a very high volume of database updates," but that

"[t]his situation is typically handled by a 'backoff and retry' algorithm, where the software

making the request pauses briefly then tries again, multiple times if necessary."  *Id.* at ¶ 269.

Therefore, "[i]f Instagram had not already implemented such logic in its systems, it would have

been able to improve reliability by doing so independent of its acquisition by Meta."  *Id.* at ¶

270.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Instagram's pre-acquisition legacy system had a higher failure rate when writing likes than

Meta's system.  *See supra* Meta Introduction.  Indeed, the FTC does not dispute any of the facts

stated in this paragraph.  The additional material the FTC cites is irrelevant and nonresponsive to

the facts stated in this paragraph.  Other evidence confirms that Instagram benefited from adopting TAO.  *See* Ex. 5 at ¶¶ 177-182 (Nieh Rep.) (describing the benefits Instagram received as a result of adopting TAO); PX9001 at ¶ 228 (Bray Rep.) (acknowledging that "[t]he benefits to developers here [as a result of Instagram adopting TAO] seem real, and it is plausible that they might have accelerated the development of certain Instagram features").  The FTC's assertion that Instagram could have achieved the same benefits absent the acquisition is purely speculative.

761.    Mr. Krieger testified regarding the Instagram migration onto Meta's infrastructure:  "Q. Now, did Instagram's stability increase as – as a product of the migration?  A. Not immediately, but we were able to adopt services that Facebook had over time that did increase the stability.  The one quick example would be search.  So we had switched from using Solr.  At the time, we had moved on to another search system.  But then we were able to move on to Facebook's search infrastructure.  And that increased reliability really significantly."  Ex. 302 at 231:15-24 (Krieger IH Tr.).

**FTC Response: Disputed in Part.**  The FTC objects to the terms "stability" and "really significantly" as vague, and to the terms "the migration," "adopt services," and "not immediately" as vague as to time.

The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 761 as described herein.

The FTC disputes Statement 761 as incomplete because it omits Mr. Krieger's response to the next question, showing that Instagram was capable of improving the stability of its search function without Meta.  *See* Ex. 302 at 231:25-232:3 (Krieger IH Tr.) ("Q. Could Instagram have developed its own search system to increase stability without Facebook?  A. Yes.").

The FTC disputes Statement 761 as the cited material does not show the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). Evidence shows that Instagram struggled to obtain support for its search feature from Meta. *See, e.g.*, PX3417, Meta email chain: ███ to ███ et al. re: "Instagram Search, reliability and ownership," (May 11, 2015), FTC-META-001243317, at -318 (explaining that an Instagram employee "has mentioned a few times he doesn't feel the Instagram team is getting the support they expected from us on Infra support [for Search] recently"); PX3418, Meta email chain: ███ to ███ et al. re: "IG and search collaboration in H2," (June 1, 2015), FB_FTC_CID_02636017, at -019 ("We have a very small PE team at Instagram and they are already swamped with work for our regular deployment (our stack is completely independent from Facebook). Adding Search work to their list of responsibilities is not something they are prepared for and I'm wondering if it's even a logical thing to do."); PX3418, Meta email chain: ███ to ███ et al. re: "IG and search collaboration in H2," (June 1, 2015), FB_FTC_CID_02636017, at -018 ("We can help with training, but in the long/mid term we cannot support Instagram, as the rest of our search specific goals would be at risk.").

Additionally, the FTC's infrastructure expert reviewed the evidence related to Instagram's adoption of Meta's search software, and concluded that: "Given this evidence of the significant cost in people and time for Instagram to adopt Unicorn [Meta's search software], it is reasonable to conclude that it would have been equally or even more productive to enhance [Instagram's] existing infrastructure or pursue another alternative." PX9011, Bray Rebuttal Report at ¶ 255.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Instagram's stability and reliability improved as a result of adopting Meta's infrastructure

services.  *See supra* Meta Introduction.  Indeed, the FTC does not dispute that adopting Meta's infrastructure services improved Instagram's stability and reliability, instead addressing only a single infrastructure service (Meta's search infrastructure) that Mr. Krieger discussed as "one quick example."  Even as to that one example, the additional testimony from Mr. Krieger that the FTC claims is necessary for completeness is not responsive to the facts in the statement.  It is purely speculative whether Instagram could have achieved the same benefits from developing its own search infrastructure that it did from adopting Meta's search infrastructure.  *See* Ex. 153 at 392:5-22 (Krieger Dep. Tr.).

The FTC's further response that Instagram "struggled to obtain support for its search feature from Meta" is irrelevant and nonresponsive to the facts stated in this paragraph.  The cited evidence discusses the process of migrating Instagram to Meta's search infrastructure and does not bear on whether, once completed, the migration benefited Instagram.  Other evidence confirms that Instagram benefited from adopting Meta's search infrastructure.  *See* Ex. 5 at ¶¶ 165-168 (Nieh Rep.).

762.    Mr. Bray testified:  "Q. But you haven't offered an opinion that at a holistic level the performance or functionality of Instagram is worse today than it was prior to the acquisition; correct? . . .  [A.] I think you will struggle to find holistic opinions in my report.  There's a large number of claims, and the technology and benefit requirements are highly specific to them."  Ex. 289 at 129:16-130:3 (Bray Dep. Tr.).  He also testified:  "Q. You don't provide an opinion that Meta's infrastructure lacks a specific functionality or capability that would benefit Instagram or WhatsApp and that one of the leading three cloud providers offers; do you? . . .  [A.] So, first of all, that was outside the scope of the questions I was asked to address, which are whether the claimed benefits were verifiable and whether attractive alternatives were available for each of the

claimed benefits.  I can't say.  There are big reports.  I do not recall calling out any specific

shortfalls on the Meta front." *Id.* at 286:3-17.  Mr. Bray also testified:  "Q. . . . Nothing in your

report discusses whether Instagram meets or exceeds an industry standard for speed; correct? . . .

[A.] The discussion I included that specifically mentions industry – Instagram's speed is a

citation from Meta management, but it is not co[u]ched in the form of an industry standard." *Id.*

at 37:2-12.

      **FTC Response: Disputed.**  The FTC does not dispute that the quoted language appears

in the cited material, but otherwise disputes Statement 762 as described herein.

      The FTC disputes the first and second transcript reference in Statement 762 as

incomplete and misleading because it omits Mr. Bray's testimony to a prior question related to

Instagram's performance under Meta's ownership:

> Q. And you haven't offered an opinion that Instagram offers worse
> functionality or performance today than it did prior to the
> acquisition; correct? … [A.] There were some cases where I noted
> that the capacity limitations imposed by Meta prior to the – post-
> acquisition did, in fact, involve Instagram delaying features and
> reducing their disaster recovery potential and so on.  So I certainly
> did identify some number of places.  Oh, and there was also the
> Foursquare migration, which was very, very badly reviewed.  So I
> do have some specific examples of places where the effects of the
> acquisition and migration were not positive to the user experience.

Ex. 289 at 128:20-129:14 (Bray Dep. Tr.).

      Similarly, the FTC disputes the second transcript reference in Statement 762 as

incomplete and misleading because it omits Mr. Bray's subsequent testimony related to

WhatsApp's performance under Meta's ownership: "Q. And you haven't offered an opinion that

WhatsApp offers worse functionality or performance today that it did prior to the acquisition;

correct?" … [A.] I do believe I discussed some outage frequencies in WhatsApp post-

acquisition. . . . So that would have been an instance of something going worse after

acquisition." Ex. 289 at 130:14-131:2 (Bray Dep. Tr.). Further, Mr. Bray describes evidence in his report indicating that Meta's own infrastructure has suffered numerous outages affecting Instagram and WhatsApp. *See* PX9001, Bray Report, App'x B (providing a sample of outages in Meta's infrastructure from 2014 onwards). Additionally, Mr. Bray concluded "that the claim of superior or improved reliability from Meta's infrastructure [was] unsupported and that the evidence suggests that Meta's infrastructure was more vulnerable, not more resilient, to reliability issues." PX9011, Bray Rebuttal Report at ¶ 112; *see also* PX9001, Bray Report at ¶ 142 ("[E]vidence of Instagram's rapid and sustained growth runs counter to Meta's claim that issues on AWS were having an impact on Instagram's growth.").

The FTC also disputes the last transcript reference in Statement 762 as incomplete because it omits Mr. Bray's testimony explaining that "[his] assignment was to establish whether [he] could verify an improvement, and based on the absence of either metric data or discussions in contemporaneous documents, [he] was not able to find evidence that would allow [him] to verify those claims." Ex. 289 at 80:17-22 (Bray Dep. Tr.); *see also id.* at 81:13-19 ("I would assume that if people care about the user experience, which one assumes they would, that discussions of standard metrics would appear in contemporaneous documents and would have been available for me to verify that, yes, we did improve that millisecond latency. And that was strikingly absent.").

Additionally, the FTC disputes that Statement 762 shows the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). Mr. Bray reviewed Meta's infrastructure-related claims and the record, including Meta's expert reports, and concluded that "there remains a marked absence of any form of evidence that Instagram's or WhatsApp's transition to Meta infrastructure improved either product's reliability or user experience," *see*

PX9011, Bray Rebuttal Report at ¶ 20, and "[t]he Nieh Report fails to change my opinion that the benefits to users of Instagram and WhatsApp due to Meta's infrastructure and expertise, to the extent they exist, would have been achievable through other means . . . ." *Id.* at ¶ 14(b).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Bray testified that he did not offer a holistic opinion that the performance or functionality of Instagram is worse today than prior to the acquisition; that he did not offer an opinion that Meta's infrastructure lacks functionality that would benefit Instagram or WhatsApp and that such functionality is offered by public cloud services; and that he did not offer an opinion regarding whether Instagram meets or exceeds an industry standard for speed.  *See supra* Meta Introduction.  The additional material the FTC claims Meta "omit[ted]" is irrelevant and nonresponsive to the facts stated in this paragraph.  Mr. Bray's reports do not compare Instagram's and WhatsApp's performance on Meta's infrastructure to any competitive benchmark.  Mr. Bray testified that he did not compare Instagram's and WhatsApp's speed, availability, variability, durability, number of outages, or user experience to any third-party apps. *See* Ex. 289 at 41:2-9, 43:15-21, 48:3-11, 52:13-18, 56:6-12, 59:15-22, 98:5-16 (Bray Dep. Tr.).

## B.    Meta's Acquisition of WhatsApp (2014)

### 1.    WhatsApp Pre-Acquisition

#### a.    Pre-Acquisition Monetization

763.    Before the Meta acquisition, WhatsApp charged U.S. consumers a one-time download fee of $1.00 to use the WhatsApp app on the iOS mobile operating system.  *See* Ex. 314 at 218:17-25, 220:12-14 (Acton IH Tr.); *see also id.* at 221:15-17 (testifying that the fee was imposed on U.S. users).  For users on the Android mobile operating system, WhatsApp was free to download and use for one year, with a $0.99 annual subscription fee thereafter.  *See id.* at 219:1-10.

**FTC Response: Disputed.**  The FTC objects to the term "[b]efore the Meta acquisition" as vague.

The FTC does not dispute that WhatsApp charged some users prior to the Meta acquisition, but otherwise disputes Statement 763 as described herein.

The FTC disputes Statement 763's first sentence as incomplete because WhatsApp removed the one-time download fee for iOS users in July 2013, several months prior to the time that Meta made a "concrete" offer to acquire WhatsApp, and more than a year before the acquisition closed in October 2014.  *See* PX0555, Katie Collins, *WhatsApp on iPhone Now Charges Small Annual Subscription Fee*, Wired (July 17, 2013), https://www.wired.com/story/whatsapp-on-ios-now-free/ ("WhatsApp is now free to download on the iPhone, with the messaging app moving to the same annual subscription model that its Android app currently uses."); Ex. 314 at 220:16-23 (Acton IH Tr.) (clarifying that "[w]hat happened is, we turned on Payment for Android, and because we had such a substantial number of Android users, the revenue from Android essentially meant that we could make iPhone completely free, and so we did.  We had the plan of putting the 99-cent payment into iPhone, but eventually that plan was canceled."); PX13948, Meta message: M. Zuckerberg to A. Zoufonoun (Oct. 26, 2013), FB_FTC_CID_08706608, at -003 (in October 2013, prior to a meeting with Mr. Koum, Mr. Zuckerberg asked a colleague if he should "propose something concrete to Jan tonight[,]").

The FTC further disputes Statement 763's second sentence as incomplete because all "users on the Android mobile operating system" were not subject to the annual subscription fee referenced therein.  WhatsApp's subscription fee was inconsistently applied and not collected from all Android users.  Ex. 314 at 221:15-17 (Acton IH Tr.) ("Q. In what countries did you

enforce [the Android subscription fee] in?  A. U.S., U.K., Canada, Germany, France, Italy, Spain.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Acton testified as quoted in the statement.  *See supra* Meta Introduction.  The article the FTC cites regarding iOS confirms – in the portion that the FTC quotes above – that WhatsApp charged iOS users (adopting "the same annual subscription model that its Android app currently uses").  The claim that WhatsApp's fee "was inconsistently applied" elides that Mr. Acton testified – in the portion that the FTC quotes above – that WhatsApp enforced the fee in the United States (the alleged geographic market).

764.     Regarding the WhatsApp subscription fee, Brian Acton – one of WhatsApp's co-founders, *see* Ex. 314 at 17:22-25 (Acton IH Tr.) – testified:  "Q. If Facebook had not owned WhatsApp, could WhatsApp have ended the subscription fee?  A. No.  Q. And why not?  A. We had operating costs that we had to cover."  *Id.* at 222:15-20; *see also id.* at 87:12-15 ("Our general operating thesis was free for the first year, some paid amount per year, a dollar per year, we'll say.  That was sort of our long-term goal to get to.").

**FTC Response: Disputed in part.**  The FTC does not dispute that Mr. Acton was one of WhatsApp's co-founders, or that the quoted language appears in the cited document, but otherwise disputes Statement 764 as described herein.

The FTC disputes that WhatsApp could not have ended the subscription fee without being acquired by Meta and disputes Statement 764 as not showing the absence of a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  As noted above, *see* FTC Response to Statement 763, WhatsApp did not even consistently apply the subscription fee prior to its acquisition, underscoring that Meta's acquisition was not necessary for it to be removed.  Mr.

Acton's testimony also indicates that WhatsApp needed a viable monetization strategy because it had operating costs to cover (as all companies do), which supports and confirms that, without being acquired by Meta, WhatsApp was a significant threat to pivot into personal social networking, which may have entailed a monetization approach other than a subscription fee. *See, e.g.*, PX9000, Hemphill Report at ¶¶ 1003-07 (describing WhatsApp monetization, including that "monetizing through advertising PSN services was an attractive opportunity in light of difficulties with advertising within a mobile messaging service itself"); PX9007, Hemphill Rebuttal Report at ¶¶ 720-22 (noting that "it is entirely plausible that WhatsApp in the but-for world would have ended the subscription fee, before or concurrently with pivoting," and that "WhatsApp's PSN offering would (eventually) likely be monetized through ads"); PX9014, Rim Rebuttal Report at § V.A.1 ("Absent the acquisition by Meta, WhatsApp was likely to monetize going forward."); *see also* PX9014, Rim Rebuttal Report at § V.B (noting that "a likely evolution path for WhatsApp would have involved expansion into adjacent uses"). Further, Meta's removal of WhatsApp's subscription fee is a sign of Meta's anticompetitive conduct and the anticompetitive effects of Meta's acquisition of WhatsApp. *See* PX9000, Hemphill Report at ¶¶ 1113-22; PX9007, Hemphill Rebuttal Report at ¶¶ 721-22.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact regarding whether WhatsApp intended to end its subscription fee before being acquired by Meta. As the testimony quoted in paragraph 764 shows, Mr. Acton, one of WhatsApp's co-founders, provided sworn testimony that WhatsApp could not have ended its subscription fee if it had not been acquired by Meta. *See* Ex. 314 at 222:15-20 (Acton IH Tr.). The only evidence the FTC cites in attempting to rebut Mr. Acton's assessment of his own company's ability to end its subscription fee is the FTC's proffered experts' speculation.

The rest of the FTC's response is nonresponsive, unsupported, and irrelevant to the fact stated in paragraph 764.  *First*, the FTC does not explain why WhatsApp's inconsistent application of its subscription fee prior to the acquisition (enforcing it *in the United States*) "underscore[s] that Meta's acquisition was not necessary for it to be removed."  *Second*, the FTC claims that Mr. Acton's testimony shows that, but for the acquisition, WhatsApp – needing funds for operating costs as Mr. Acton testified – would have pivoted away from over-the-top messaging to what the FTC calls "PSNS," which in turn "may have entailed" monetizing in some other way than the subscription fee that Mr. Acton testified WhatsApp would not have ended. The FTC cites no actual evidence that WhatsApp had any intention of or plans to add features and monetize in this way.  And the FTC ignores significant evidence that WhatsApp had no intention of pivoting into social networking or monetizing through advertising.  *See*, *e.g.*, *infra* Meta SMF ¶¶ 787-788, 790.  *Third*, the FTC's claim that "Meta's removal of WhatsApp's subscription fee is a sign of Meta's anticompetitive conduct and the anticompetitive effects of Meta's acquisition of WhatsApp" has nothing to do with whether WhatsApp intended to end its subscription fee if it had not been acquired by Meta.  This also is an improper legal conclusion that does not require further response.  To the extent a response is necessary, the evidence shows that Meta made WhatsApp free so that it could grow faster – a price decrease that benefited consumers.  *See infra* ¶ 825.

765.  ██████████████████████ – an investor in WhatsApp, *see* Ex. 314 at 79:8-80:6 (Acton IH Tr.) – ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**FTC Response: Disputed in part.**  The FTC does not dispute that ████████████ was an investor in WhatsApp, or that the quoted language appears in the cited document, but otherwise disputes Statement 765 as described herein.

The FTC disputes Statement 765 because it is contradicted by other evidence that WhatsApp's subscription fee model was not extended to iPhone users.  Mr. Acton testified that WhatsApp made its app "completely free" for iPhone users.  Ex. 314 at 220:16-23 (Acton IH Tr.) ("A. What happened is, we turned on Payment for Android, and because we had such a substantial number of Android users, the revenue from Android essentially meant that we could make iPhone completely free, and so we did. We had the plan of putting the 99-cent payment into iPhone, but eventually that plan was canceled.").

The FTC further disputes the assertion in Statement 765 that a "99 cent annual subscription [would be] kicking in after the first year on Android" as incomplete because all "users on the Android mobile operating system" were not subject to the annual subscription fee referenced therein.  WhatsApp's subscription fee was inconsistently applied and not collected from all Android users.  Ex. 314 at 221:15-17 (Acton IH Tr.) ("Q.  In what countries did you enforce [the Android subscription fee] in?  A.  U.S., U.K., Canada, Germany, France, Italy, Spain.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the document contains the material quoted in the statement.  *See supra* Meta Introduction.

766.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**FTC Response: Disputed in part.**  The FTC does not dispute the first sentence, or that quoted language appears in the cited materials, but otherwise disputes Section 766 as described herein.

The FTC disputes the second sentence in Statement 766 because other evidence indicates that WhatsApp's subscription fee model was never extended to iPhone users.  Mr. Acton testified that WhatsApp made the iPhone app "completely free" and did not charge either a download fee or a subscription fee to iPhone users.  Ex. 314 at 220:16-23 (Acton IH Tr.) ("A. What happened is, we turned on Payment for Android, and because we had such a substantial number of Android users, the revenue from Android essentially meant that we could make iPhone completely free, and so we did. We had the plan of putting the 99-cent payment into iPhone, but eventually that plan was canceled.").

The FTC further disputes the second sentence in Statement 766 as incomplete because all "users on the Android mobile operating system" were not subject to the annual subscription fee referenced therein.  WhatsApp's subscription fee was inconsistently applied and not collected from all Android users.  Ex. 314 at 221:15-17 (Acton IH Tr.) ("Q.  In what countries did you enforce [the Android subscription fee] in?  A.  U.S., U.K., Canada, Germany, France, Italy, Spain.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the document contains the material quoted in the statement.  *See supra* Meta Introduction.

767.   ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited materials, but otherwise disputes Statement 767 as the cited material does not show the absence of a genuine issue of material fact. ████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding how WhatsApp would have monetized if it had not been acquired by Meta or whether WhatsApp would have "pivot[ed] into personal social networking."  The documents and testimony quoted in paragraph 767 show █████████████████████████████████████

████████████████████████████████.  Nothing in these documents or testimony shows that WhatsApp was likely to "pivot into 'personal social networking'" to monetize, and the FTC cites no evidence that WhatsApp had any intention of or plans to do so.

The FTC ignores significant evidence that WhatsApp had no intention of "pivot[ing] into 'personal social networking'" as a monetization strategy.  *See*, *e.g.*, *infra* Meta SMF ¶¶ 787-788, 790.  Finally, the FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those

paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

768.    On January 29, 2014, the co-head of global technology investment banking at Morgan Stanley – which WhatsApp subsequently engaged as a consultant for a potential Meta acquisition, *see* Ex. 314 at 166:20-167:11 (Acton IH Tr.); Ex. 132 at 8:13-9:6, 15:9-16:21 (Grimes (Morgan Stanley) Dep. Tr.) – emailed to an employee at Sequoia Capital a presentation titled "WhatsApp Overview."  *See* Ex. 133 at -557-558 (PX10227, MS_FTCMETA-00001557). The presentation includes a slide called "Mobile Messaging Competitive Landscape," which identifies thirteen different services and lists WhatsApp as the only one with "Subscription" as the "Revenue Model."  *Id.* at -561.  The presentation includes another slide called "Revenue Streams Introduced by Potential Acquirers," which states:



Ex. 133 at -613 (PX10227, MS_FTCMETA-00001557).

**FTC Response: Undisputed.**

769.    Mr. Acton testified regarding pre-acquisition monetization for WhatsApp:  "Q. And you certainly had no plans to replace your subscription model with an ad-supported model, correct?  A. Absolutely not.  Q. There was never on the map?  A. Never."  Ex. 163 at 227:7-12 (Acton Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the term "pre-acquisition" as vague as to time.  The FTC does not dispute that the quoted language appears in the cited materials, but otherwise disputes Statement 769 as the cited material does not show the absence of a genuine issue of material fact.  Other evidence shows the need for WhatsApp to adopt a viable approach to monetizing its product, with one approach being to pivot into an ad-supported

offering of personal social networking.  *See* PX9014, Rim Rebuttal Report at § V.A.1 ("Absent the acquisition by Meta, WhatsApp was likely to monetize going forward"); *see also id.* at § V.B (noting that "a likely evolution path for WhatsApp would have involved expansion into adjacent uses"); CMF at § III.C.2.a.4.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether WhatsApp would have monetized through advertising if it had not been acquired by Meta.  As the testimony quoted in paragraph 769 shows, Mr. Acton (one of WhatsApp's co-founders) provided sworn testimony that WhatsApp had no plans to pivot from its subscription fee to an ad-supported model.  *See* Ex. 163 at 227:7-12 (Acton Dep. Tr.).

The FTC cites no evidence that WhatsApp had any intention of or plans to monetize through advertising.  The FTC purports to support its response with opinions it quotes from the rebuttal report of its proffered expert, Professor Rim.  But the language the FTC quotes from Professor Rim's rebuttal report comes from headings in the report that cite no evidence.  *See* PX9014 at §§ V.A.1, V.B (section headings).  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

770.  ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

Ex. 315 at ¶¶ 103-104 (Rim Rebuttal Rep.).

**FTC Response: Undisputed.**  The FTC does not dispute Statement 770, but notes that this supports and confirms that, without being acquired by Meta, WhatsApp was a significant

threat to pivot into personal social networking, as such a pivot provided a viable monetization approach. *See, e.g.*, PX9014, Rim Rebuttal Report at § V.A.1 ("Absent the acquisition by Meta, WhatsApp was likely to monetize going forward"); *see also id.* at § V.B (noting that "a likely evolution path for WhatsApp would have involved expansion into adjacent uses"); CMF at § III.C.2.a.4.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding how WhatsApp would have monetized if it had not been acquired by Meta or whether WhatsApp would have "pivot[ed] into personal social networking" to monetize, for the reasons stated above in Meta's replies to paragraphs 767 and 769.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

771.    Jan Koum – WhatsApp's other co-founder, *see* Ex. 285 at 19:4-23 (Koum IH Tr.) – testified regarding WhatsApp's monetization plans before the acquisition:  "[W]e didn't have a clear monetization strategy ourselves that was foolproof and we could depend on long-term." Ex. 285 at 157:11-13 (Koum IH Tr.).  WhatsApp lost $138 million in 2013, the year before it was acquired by Meta.  *See* Ex. 4 at ¶ 105 (Tucker Rep.).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute Statement 771, but notes that this supports and confirms that, without being acquired by Meta, WhatsApp was a significant threat to pivot into personal social networking, as such a pivot provided a viable monetization approach.  *See, e.g.*, PX9014, Rim Rebuttal Report at § V.A.1 ("Absent the acquisition by Meta, WhatsApp was likely to monetize going forward"); *see also id.* at § V.B

(noting that "a likely evolution path for WhatsApp would have involved expansion into adjacent

uses").

The FTC also notes that Statement 771 is incomplete in failing to note the ████████

losses Meta has incurred operating WhatsApp since the acquisition: ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *See*

PX9005, Hearle Report at Table 6.1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding how WhatsApp would have monetized if it had not been acquired by Meta or whether

WhatsApp would have "pivot[ed] into personal social networking" to monetize, for the reasons

stated above in Meta's replies to paragraphs 767 and 769.  The FTC's further response regarding

WhatsApp's post-acquisition revenue is irrelevant and nonresponsive to the fact stated in this

paragraph, which is about "WhatsApp's monetization plans *before* the acquisition." (emphasis

added).

### b.    Pre-Acquisition Growth

772.   ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

**FTC Response: Undisputed.**

773.   ██████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████

**FTC Response: Undisputed.**

774.    As of September 2013, Meta's internal data estimated that about 7% of U.S. iPhone owners had installed WhatsApp.  *See* Ex. 192 at -921.003-921.004 (FB_FTC_CID_03802920).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that Statement 774 accurately recounts the figure reported in the cited document.  For completeness, Meta's internal data also includes estimates of percentages of U.S. iPhone users installing other applications, which indicates that WhatsApp's figure is among the highest for OTT mobile messaging apps, with others reported as: Facebook Messenger (11%), Kik (6%), Viber (5%), LINE (2%), WeChat (2%), and KakaoTalk (1%).  Ex. 192 at -921.003-921.004 (FB_FTC_CID_03802920).  The document also reports figures for Snapchat (19%), an ephemeral photo messaging app that pivoted into providing personal social networking services, *see* PX9000, Hemphill Report at ¶¶ 290, 294, and Skype (14%), an app primarily used for video calling, PX15411, Skype presentation: "Skype Competitive Review" (Dec. 16, 2013), MS-LIT_0000006746, at -748 ("Skype has strong share in video communications"); PX6153, Carrasco (Microsoft) Dep. Tr., at 35:19-36:10 ("Skype is definitely a leader [in] video calling for consumer, on desktop in particular . . . I wouldn't qualify it as [a] leader in any other capacity."

775.    On November 15, 2013, a WhatsApp employee emailed Mr. Acton and Mr. Koum an October 16, 2013 presentation called "WhatsApp: Growth & Competition Update."  Ex. 221 at -912-913 (MetaFTC-DX-404, FB_FTC_CID_02584912).  That presentation includes a slide titled "Daily growth rate varies dramatically as a percentage of smartphone users" showing that the daily growth rate for WhatsApp was 0.009% in the United States.  *Id.* at -929.

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that the October 16, 2013, presentation is accurately quoted to include the slide with the daily growth rate number for WhatsApp in the United States.  However, the FTC notes for context that the figure is reporting only daily growth rate, and the highest daily growth rate on the slide for any country is only 0.173% (Brazil).  Ex. 221 at -929 (MetaFTC-DX-404, FB_FTC_CID_02584912).  It is also vague regarding what period of time the daily growth rate was being measured in that slide.  Other evidence, including documents selectively quoted by Meta in Statements 777 and 778, indicate that WhatsApp had a monthly growth rate over █ and an annual growth rate of over █ in the United States in 2014.  *See* PX7065, █ email chain: █ to █ █, re: "whatsapp," (Jan. 28. 2014), █ (█ growth rate in the U.S. as of January 2014); PX10279, █ email chain: █ to █, re: "final message presentation," (Feb. 12, 2014), █ (█ MAU growth in the U.S. over the last month and █ MAU growth in the U.S. over the last year as of February 2014).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding WhatsApp's growth rate or penetration in the United States.  The assertion about its annual growth rate confirms how little penetration WhatsApp had in the U.S. market at the time (the denominator was low).

776.    The co-head of global technology investment banking at Morgan Stanley – a WhatsApp consultant – emailed an employee at Sequoia Capital a presentation titled "WhatsApp Overview."  *See* Ex. 133 at -557-558 (PX10227, MS_FTCMETA-00001557).  The presentation includes a slide called "Monthly Active User Breakdown by Country," which states that "2013E WhatsApp User Penetration by Country" as "% Penetration of Smartphone Users" is 9% for the

United States.  *Id.* at -608 (listing penetration rates for several countries, including 99% in Spain, 94% in Mexico, 90% in Brazil, 65% in India, and 49% in the United Kingdom).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that the language in Statement 776 appears in the cited document.  However, the FTC notes that another slide in that presentation titled "2012 Annual Message Volume Higher than All Operators in China and US" shows a chart that illustrates WhatsApp's 2012 messaging volume to be higher than all operators in the US and China.  Ex. 133 at -567 (PX10227, MS_FTCMETA-00001557).  Additionally, in the slide titled "WhatsApp is the Only Global Messenger Today," a circle contains a chart for "U.S.," which shows that WhatsApp is second only to (and close behind) Facebook Messenger, with a large gap after that: Facebook Messenger at 12%, WhatsApp at 9%, and Line, WeChat, and Kakao Talk each at 1%.  *Id.* at -572.  ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮  Jim Goetz, who was also a member of WhatsApp's Board.  PX 6045, Goetz (Sequoia Capital) Dep. Tr., at 13:19-22 ("Q. And while at Sequoia, did you manage Sequoia's investments in WhatsApp?  A. I was the board member and sponsor for the WhatsApp investment.").

777.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  – an investor in WhatsApp, *see* Ex. 314 at 96:13-97:1 (Acton IH Tr.) – ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████

██████████████████████

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that the language in Statement 777 appears in the cited document.  However, the FTC notes that the email summary also contains a table describing "Country by country analysis and comparison to FB," which lists WhatsApp's growth as ██████ for the United States.  Ex. 137 at -583 (MetaFTC-DX-679, DST0001582).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding WhatsApp's growth rate or penetration in the United States.  The assertion about its annual growth rate confirms how little penetration WhatsApp had in the U.S. market at the time (the denominator was low).

778.   

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that the language in Statement 778 appears in the cited document.  However, the FTC notes that the presentation also contains a slide titled "User Growth in Current Top ██ Markets," which lists ████ monthly active user (MAU) growth in the United States over the last month and ████

MAU growth over the last year.  Ex. 138 at -033 (PX10279, ███████).  In comparison, the same slide lists 1 month MAU growth at ███ for the Top █ markets and ███ globally and 1 year MAU growth at ████ for the Top █ markets and ████ globally.  The FTC also notes that the presentation contains a slide titled "MAU Projections for Key Markets," which projects WhatsApp to have ██████ MAUs in the United States by the end of 2015.  Ex. 138 at -036 (PX10279, DST0000016).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding WhatsApp's growth rate or penetration in the United States.  The assertion about its annual growth rate confirms how little penetration WhatsApp had in the U.S. market at the time (the denominator was low).

779.    Mr. Acton testified:  "Q. And is it true that the United States has never been a core market of WhatsApp?  . . .  A. In my time from 2009 to 2014 – to 2017, the United States was – was never a core market from a user and growth perspective."  Ex. 163 at 204:18-24 (Acton Dep. Tr.).  He also testified that WhatsApp was "so small and we had such limited penetration in the U.S. market that we – we ourselves, were not competitive."  *Id.* at 203:18-21; *see also* Ex. 314 at 99:13-16 (Acton IH Tr.) ("Q. So thinking about the U.S. in particular, what did growth in the U.S. of WhatsApp look like during that time period?  A. Growth in the United States was slow.").

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language in Statement 779 appears in the cited document, but otherwise disputes Statement 779 as incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The excerpt of Mr. Acton's testimony is incomplete as Mr. Acton also testified that WhatsApp would continue to grow in the United States: "We felt that we would grow in every country of the world, including the United States, knowing that every country would have a different growth rate and a different adoption rate in each country."  Ex. 163 at 272:1-5 (Acton Dep. Tr.); *see also id.* at 271:12-18 ("Q. . . .  So speaking, then, still about the acquisition time period, in the time leading up to the acquisition, in what direction was WhatsApp's user base trending in the United States?  Was it trending up or trending down?  A. At the time of the acquisition, I think it was slowly trending up.").  Additionally, as detailed above, and elsewhere, other evidence, including Meta's own internal documents, indicate that WhatsApp was one of the leading mobile messaging applications in the United States prior the acquisition.  *See FTC Responses to Statements 774, 776;* CMF at §§ III.C.2.a.1-2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Acton testified the United States was never WhatsApp's core market before the acquisition, that WhatsApp's penetration in the United States was limited and its growth was slow, and that WhatsApp was not competitive in the United States.  *See supra* Meta Introduction.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

780.    Regarding usage in the United States, Mr. Acton testified:  "Q. In February 2014 time frame, why did people in the United States use WhatsApp?  A. I'd say at that time we were getting more anecdotal evidence that they were using it to talk to friends and family that were overseas and abroad.  I wouldn't say that we had a ton of day-to-day – if anything, the U.S.

market was a hard market for us because people were using adjacent messaging products.  They were using iMessage.  They were using Facebook Messenger.  And so our growth in the U.S. was quite slow."  Ex. 314 at 147:7-17 (Acton IH Tr.).  He also testified that "it was fairly common that people had unlimited SMS" and WhatsApp "would frequently get feedback from people in the United States . . . like, 'Why would I bother?  I get unlimited texting.' "  Ex. 163 at 198:6-24 (Acton Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language in Statement 780 appears in the cited document, but otherwise disputes Statement 780 as incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The excerpt of Mr. Acton's testimony is incomplete, as Mr. Acton also testified that WhatsApp would continue to grow in the United States "[b]ecause we had a rock solid product that was delightful to its users, and eventually people would come to realize that and use it."  Ex. 163 at 272:6-12 (Acton Dep. Tr.).

Evidence also indicates that usage of WhatsApp internationally contributed to increased growth in the United States.  WhatsApp's Director for Growth and Business Development Mubarik Imam testified that in the United States there was an "opportunity for [WhatsApp] to grow based on product-market fit with immigrant where [WhatsApp saw] reverse network effects."  PX15191, Meta email chain: M. Imam to C. Daniels et al. re: "WA in iOS countries," (June 26, 2018), FB_FTC_CID_02496775, at -775.  Ms. Imam explained that by "reverse network effects" she meant that when consumers in the United States would first use WhatsApp to chat with family and friends abroad and then find other users in the United States who had similarly downloaded WhatsApp to chat with family and friends abroad.  *See* PX6130, Imam

(Meta) Dep. Tr., at 104:25-106:4.  These users would then see that "WhatsApp is a better experience."  *See id.* at 105:25-106:1; *see also* PX6076, Olivan (Meta) Dep. Tr. at 216:3-216:11 ("Q. And you mentioned . . . WhatsApp has also grown in the United States since 2012; is that right?  A. Yeah, but mostly because of people like me who have friends outside of the United States, live in the United States, and because it's used on every other – many other countries in the world and, again, people have friends in different places.").

Additionally, as detailed elsewhere, other evidence, including Meta's own internal documents, indicate that WhatsApp was one of the leading mobile messaging applications in the United States prior to the acquisition.  *See* FTC Responses to Statements 774, 776; CMF at §§ III.C.2.a.1-2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that WhatsApp's pre-acquisition growth in the United States was slow.  *See supra* Meta Introduction. The testimony from Mr. Acton that WhatsApp would continue to grow because it was a good product and the testimony from Mr. Imam that WhatsApp grew in the United States mostly because of users who had friends outside of the United Sates does not undermine Mr. Acton's testimony that growth in the United States was "quite slow."  Ex. 314 at 147:16-17 (Acton IH Tr.).  Theorizing about how WhatsApp might have grown more does not create a genuine dispute about its actual and empirical growth.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

781.    Mr. Acton also testified:  "Q. You did not take any actions specifically to target growth in the United States before you were acquired?  A. No."  Ex. 163 at 213:8-11 (Acton

Dep. Tr.).  Mr. Acton testified:  "Q. So could WhatsApp have taken actions to target growth in the U.S.?  A. I suppose you can always take money, flush it down the toilet, and market with television and radio ads.  I wouldn't do it."  *Id.* at 146:2-6.

**FTC Response: Disputed in part.**  The FTC objects to "take any actions specifically to target growth" and "actions to target growth" in Statement 781 as vague.

The FTC does not dispute that the quoted language in Statement 781 appears in the cited transcript, but otherwise disputes Statement 781 as vague, incomplete, and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Mr. Acton also testified that WhatsApp would grow in the United States without taking any actions to specifically to target growth.  He stated:

> Q. Preacquisition, did you have any intention that WhatsApp would continue to grow in the United States?  A. Intention versus expectation.  I think we felt that we would grow in every country of the world, including the United States, knowing that every country would have a different growth rate and a different adoption rate in each country.  Q. Why did you believe that WhatsApp would continue to grow in the United States preacquisition? . . . [A.] Because we had a rock solid product that was delightful to its users, and eventually people would come to realize that and use it.

Ex. 163 at 271:22-272:12 (Acton Dep. Tr.).

Statement 781 is also incomplete because there is no evidence that television or radio ads were part of WhatsApp's significant growth and penetration in any market.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that WhatsApp did not take any actions specifically to target growth in the United States before it

was acquired, or that Mr. Acton likened doing so to flushing money down the toilet.  Speculation

about what WhatsApp might have done absent the acquisition does not contradict facts about

what actually happened because of the acquisition.  *See supra* Meta Introduction.

782.    Mr. Acton testified that, in the United States prior to the acquisition, there were "a

number of alternative systems of communication that were realtime, instant messaging based."

Ex. 163 at 204:11-17 (Acton Dep. Tr.).  These included:

    a.  **Apple's iMessage.**  *See* Ex. 314 at 147:13-16 (Acton IH Tr.); Ex. 2 at ¶ 289

       (Carlton Rep.).  ████████████████████████████████

       ████████████  *See* Ex. 2 at ¶ 289 (Carlton Rep.) (stating ████████

       ████████████).  Professor C. Scott Hemphill, the FTC's proffered

       economic expert, used data showing that, ████████████████

       ████████████████████████████████████████

       ████████████.  *See id.* at ¶ 304 (referencing Professor Hemphill's backup data).

       ████████████████████████████████████████

       ████  *See id.* at p. 279, tbl. 37.

    b.  **Google Hangouts.**  ████████████████████████████

    c.  **Facebook Messenger.**  *See* Ex. 163 at 204:1-4 (Acton Dep. Tr.); Ex. 314

       at 147:13-16 (Acton IH Tr.).

    d.  **Kik Messenger.**  *See* Ex. 192 at -.003-.004 (FB_FTC_CID_03802920)

       (Meta's internal data estimating that approximately 6% of U.S. iPhone owners

       had installed Kik as of September 2013).

    e.  **Viber.**  *See* Ex. 192 at -.003-.004 (FB_FTC_CID_03802920) (Meta's internal

       data estimating that approximately 5% of U.S. iPhone owners had installed

Viber as of September 2013); Ex. 163 at 206:5-6 (Acton Dep. Tr.) ("Viber and

WeChat were also then – available then, as well.").

f. **WeChat.**  *See* Ex. 192 at -.003-.004 (FB_FTC_CID_03802920) (Meta's

internal data estimating that approximately 2% of U.S. iPhone owners had

installed WeChat as of September 2013); Ex. 163 at 206:5-6 (Acton Dep. Tr.)

("Viber and WeChat were also then – available then, as well.").

g. **Blackberry Messenger.**  *See* Ex. 163 at 204:5-10 (Acton Dep. Tr.).

h. **Telegram.**  *See* Ex. 314 at 143:21-144:3 (Acton IH Tr.).

**FTC Response: Disputed in part and misleading.**  The FTC does not dispute that the

quoted language in Statement 782 appears in the cited materials, but the FTC disputes that Mr.

Acton named all the applications included in subparts (a)-(h) when discussing "a number of

alternative systems of communication that were realtime, instant messaging based."  Mr. Acton

only mentioned iMessage, Facebook Messenger, and BlackBerry Messenger by name.  *See*

Ex. 163 at 203:25-204:17 (Acton Dep. Tr.).

This fact also has multiple subparts at ¶ 782(a) through ¶ 782(h).  The FTC responds to

this Fact's subparts as follows:

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

there were multiple alternative systems of communication in the United States that were realtime

and instant-messaging based prior to the acquisition.  *See supra* Meta Introduction.  The specific

apps listed in paragraph 782's subparagraphs are supported by the material cited in the

subparagraph for each app.

a. **(iMessage and Google Messages) FTC Response: Disputed in part.**  The

FTC does not dispute that iMessage is a "realtime, instant messaging based"

communications system.  The FTC disputes the first sentence in this subpart

as unsupported by cited material.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R.

7(h).  Meta cites to Professor Carlton's report, which provides no citations for

the statement for either iMessage or Google Messages.  The FTC does not

dispute the figures reported from Professor Hemphill's reports in the second

and third sentences of the subpart.

**Meta Reply:**  The FTC's response does not create a genuine dispute of

material fact that iMessage is a "realtime, instant messaging based"

communication system.  The FTC's other supposed disputes are immaterial.

b.  **(Google Hangouts) FTC Response: Disputed in part.**  The FTC disputes

this subpart as not supported by cited material.  *See* Fed. R. Civ. P.

56(c)(1)(A); L.R. 7(h).  The citation provided is only to the launch date of

Google Hangouts and does not support the fact that Google Hangouts is a

"realtime, instant messaging based" communications system.  Mr. Leske, the

Infrastructure Product Lead for Google Talk, Google Hangouts Video, and

Google Hangouts Chat at Google from 2010 to 2014, Ex. 19 at 26:21-27:2

(Leske Dep. Tr.), testified that Hangouts "was launched as a multiway video

product." *Id.* at 29:14-19.  Mr. Leske clarified that Hangouts is "the video

product" and Hangouts Chat is "the chat functionality in Hangouts."  *Id.* at

30:10-13.

**Meta Reply:**  The FTC's response does not create a genuine dispute of

material fact that Google Hangouts included a "realtime, instant messaging

based" functionality (whether branded as Google Hangouts Video or Google Hangouts Chat.  The FTC's other supposed disputes are immaterial.

  c. **(Facebook Messenger) FTC Response: Undisputed.**

  d. **(Kik Messenger) FTC Response: Undisputed.**

  e. **(Viber) FTC Response: Undisputed.**

  f. **(WeChat) FTC Response: Undisputed.**

  g. **(BlackBerry Messenger) FTC Response: Undisputed.**

  h. **(Telegram) FTC Response: Undisputed.**

783. Professor Jihoon Rim – one of the FTC's proffered experts and formerly the chief executive officer of Kakao, *see* Ex. 315 at ¶ 17 (Rim Rebuttal Rep.) – opined that "adding a social networking offering to a mobile messaging application" is "an example of a natural evolution of a messenger company which seeks to monetize by adding features that are better suited to recognize advertising revenue." *Id.* at ¶ 129.  In 2010, Kakao launched an app called KakaoTalk in 2010, *see* Ex. 447 at 3 (MetaFTC-DX-1174), which Professor Rim identified as a "messenger application," Ex. 315 at ¶ 14 (Rim Rebuttal Rep.).  In 2012, Kakao launched a separate app called KakaoStory, *see* Ex. 447 at 3 (MetaFTC-DX-1174), which Professor Rim identified as "a friends and family-focused social networking service," Ex. 315 at ¶ 14 (Rim Rebuttal Rep.).  In 2015, Kakao purchased Path, *see* Ex. 447 at 3 (MetaFTC-DX-1174), which Professor Rim identified as a personal social networking service, *see* Ex. 310 at 260:6-15 (Rim Dep. Tr.).

 **FTC Response: Undisputed.**  The FTC notes that the specific quote from Professor Rim's report is that KakaoTalk is a "mobile messenger application."  Ex. 315 at ¶ 14 (Rim Rebuttal Rep.)

784.     Regarding the Kakao acquisition of Path, Professor Rim testified: "So my understanding of acquisition of Path was that Kakao wanted to enter the Indonesia market and Path – I did not know the numbers, but Path at that time was quite popular in Indonesia.  That is my understanding why Kakao acquired Path."  Ex. 310 at 261:6-11 (Rim Dep. Tr.).  He further testified:  "Q. Why couldn't Kakao just introduce KakaoStory into Indonesia and compete that way?  . . .  A. There could be many reasons that I can just think right now beginning with, first, my understanding is that in Indonesia Facebook and Instagram were both popular.  So from Kakao to become a latecomer and launch a social network, it's not an easy game."  *Id.* at 261:12-21.  Professor Rim also testified:  "[I]f we had a very strong position in Indonesia as a messenger, for example, we could have launched our own personal social network in Indonesia, but, again, as I said, . . . KakaoTalk as a messenger didn't really have a presence in Indonesia.  So if you want to do something in Indonesia, especially when it comes to a social network, I guess at that time the executives, the CEO, the board thought that acquiring Path, which was quite popular in Indonesia, would have been a good decision."  *Id.* at 262:1-14.

**FTC Response: Disputed.**  The FTC does not dispute that the language quoted in Statement 784 appears in the cited deposition transcript, but the FTC disputes that Statement 784 constitutes a material fact subject to proof at trial and objects that the material cited does not establish the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC further disputes Statement 784 as containing incomplete excerpted testimony to questions that assumed facts and were not articulated by Professor Rim.  The FTC objected to the form of the questions posed.  *See, e.g.*, Ex. 310 at 261:12-14 (Rim Dep. Tr.).  For instance, in the second question, Meta's counsel assumed facts not established by Professor Rim or other evidence as Professor Rim never stated that Kakao could *not* "introduce KakaoStory into

Indonesia and compete that way."  Professor Rim's answer focused on explaining his understanding of why Kakao purchased Path *instead* of competing by introducing KakaoStory, not on answering a question about whether Kakao *could* have competed by introducing KakaoStory.  Professor Rim was also not CEO of Kakao at the time Kakao acquired Path and was explicit that he had to "guess" as to the potential reasons for the acquisition.  Ex. 310 at 260:21-261:2, 262:1-14 (Rim Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Rim testified as quoted in the statement.  *See supra* Meta Introduction.

### c.      Pre-Acquisition Features

785.    Before the Meta acquisition, WhatsApp offered messaging as an SMS alternative.  *See* Ex. 314 at 31:3-32:3 (Acton IH Tr.); *see also id.* at 50:4-22 (stating that between 2009 and early 2014, WhatsApp offered messaging for "[p]hoto, audio, video sending, privacy blocking," as well as "[g]roup chat" and "smaller features" like "backup and restore"), 76:21-25 ("Q. So during your conversations with the investors, how did you describe WhatsApp as a product?  A. As an alternative to SMS using the data network.").

**FTC Response: Undisputed.**

786.    WhatsApp had "the goal of keeping the app simple to use and elegant and not all burdened with all these complexities with these additional features."  Ex. 285 at 70:6-11 (Koum IH Tr.).  "Prior to the acquisition, [WhatsApp] was primarily a messaging product, as [it] had not yet added voice and video features."  Ex. 163 at 179:23-25 (Acton Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC objects to "all these complexities" and "these additional features" as vague.

The FTC does not dispute that the quoted language in Statement 786 appears in the cited document, but notes that Statement 786 is materially incomplete.  Mr. Koum did not testify that

the addition of any features, or voice and video calling, would represent unnecessary

complexities.  Rather, Mr. Koum testified:

> Q. Did adding that ability to send voice messages increase the
> complexity of WhatsApp beyond just a simple text-messaging
> application?
>
> A. I wouldn't say it increased the complexity of the app because
> the way we designed it, as the way we would design most of our
> features, was always with the goal of keeping the app simple to use
> and elegant and not all burdened with all these complexities with
> these additional features.  So I – it definitely brought in an extra
> feature, and every time you add a feature to a product it makes it
> slightly more complicated to use.  But I believe the way we built it
> and implemented it, that it did not make it more complex or more
> difficult to use.
>
> Q. And was that your – I guess is that true from the other features
> as well, you were implementing them in a way that kept the app
> more simple to use even though they added some additional
> ability?
>
> A. In my opinion, yes. . . .

Ex. 285 at 70:3-23 (Koum IH Tr.).

Statement 786 is also incomplete because it omits testimony from Mr. Acton's deposition

clarifying that while WhatsApp had not yet added voice and video calling, the company had

already implemented other features related to voice and video content, and voice messaging was

in active development prior to the acquisition.  In full, Mr. Acton testified: "Prior to the

acquisition, [WhatsApp] was primarily a messaging product, as we had not yet added voice and

video features.  So we predominantly offered direct messaging, group messaging, and broadcast

messaging of text, media, contacts, locations, audio, and video content."  Ex. 163 at 179:23-

180:3 (Acton Dep. Tr.).  Mr. Acton also testified that WhatsApp had a plan to offer voice and

video features at the time of its acquisition, and that such features "were a work in progress.

Voice was almost ready to launch prior to the acquisition."  Ex. 163 at 230:5-12 (Acton Dep. Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that one WhatsApp co-founder testified that, pre-acquisition, WhatsApp was a simple messaging app, while the other co-founder testified that WhatsApp had a "goal" *not* to incorporate "these additional features."  The materials the FTC cites – about unfulfilled plans to launch features (e.g., "a work in progress") – does not contradict or dispute this testimony.

787.    Mr. Acton testified:  "Q. The FTC has, in its lawsuit against Meta, made the allegation that if WhatsApp had not been acquired by Meta, then Facebook, it would have pivoted to become a Facebook direct competitor, something more like Facebook.  Do you agree? A. No. . . .  Q. Is there any doubt in your mind about that?  A. No.  Q. Would WhatsApp have continued on the trajectory it had been on if you had stayed managing it?  . . .  A. Yes."  Ex. 163 at 232:23-234:13 (Acton Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to "continued on the trajectory" and "stayed managing" in Statement 787 as vague.

The FTC does not dispute that the quoted language in Statement 787 appears in the cited transcript.  The FTC otherwise disputes Statement 787 as materially incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Ample evidence indicates, *inter alia*, that WhatsApp was likely to pivot into social networking had it not been acquired by Meta.  CMF at §§ III.C.2.a-b.  As Meta's own experts have concluded, WhatsApp's messaging-only focus with a subscription model "was not sustainable because it did not successfully generate sufficient revenue."  *See* PX9015, Tucker

Report at ¶ 105; *see also* PX9023, Kaplan Report at ¶ 151 ("WhatsApp had not yet reached the point of generating significant revenue.").

The quoted excerpt from Mr. Acton is vague and incomplete.  For example, it does not address WhatsApp's imperative of finding a "sustainable" monetization approach, which required an adjustment to its existing pre-acquisition "trajectory" of a messaging subscription model.  Other evidence indicates that Mr. Acton was not aware that WhatsApp was not profitable at the time Meta acquired WhatsApp.  *Compare* Ex. 163, at 156:9-16 (Acton Dep. Tr.) ("Q. Do you remember whether WhatsApp ever created a proper financial model after this?  A. I doubt it.  We never did this borrow thing.  Q. And did you ever need to create a proper financial model for anything else prior to being acquired by Facebook?  A. No. We were profitable.");  *with* PX11685 at 004, (Exhibit 99.1 to Facebook, Inc. SEC Form 8-K/A, dated Oct. 28, 2014) (WhatsApp's financial statements for 2013 reflected total revenues of $10.2 million and a net loss of $138.1 million.).



Similarly, as the FTC's rebuttal expert, Professor Rim, explains in his report, startups go through a natural evolution from focusing on growth to expanding and monetizing.  *See* PX9014, Rim Rebuttal Report at ¶¶100-02.  Professor Rim also testified to this point:

> So a founder, usually at the early stage of a company they have their vision, they create a product, and then they see the product

growing, but they face the reality because at the end of the day you have to pay for infrastructure, you have to pay your employees, and you look at, you know, your financials and you see that on an annual basis you're losing $130 million, which is a large number. It's got to be like 10 million per month. Then you have to – usually a founder – you know, that is what I was explaining previously, that, you know, a founder grows, learns, faces the facts, that's my understanding of a founder.

PX6182 Rim (FTC) Dep. Tr., at 184:10-185:11

Additionally, evidence indicates that offering advertising through a personal social network service (either within the WhatsApp messaging app or as a spinoff app like KakaoStory) was the most likely way WhatsApp could successfully monetize, ███████████████ ███████████████. CMF at § III.C.2.a.4. Relatedly, Mr. Acton was not the only decisionmaker that would determine WhatsApp's path absent an acquisition by Meta. *See, e.g.,* PX6182, Rim (FTC) Dep. Tr., at 185:8-11 ("[A] founder is an important figure in a company, but that doesn't mean that a founder has the total control of a company. That's a different story."). Sequoia Capital had a seat on WhatsApp's Board. *See* ███████████████ ███████████████. Absent Meta's acquisition of WhatsApp, investors would have a say in WhatsApp's decision-making (including through additional Board seats) as WhatsApp sought additional funding, and there were likewise many alternative acquisition suitors. *See, e.g.*, PX3145, Meta email chain: ███████ to J. Koum re: "Rumor," (Apr. 7, 2013), FTC-META-009045607, at -607 ("Clear to us that you could get tencent, facebook and google into a bidding war (with microsoft and yahoo trailing).").

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Mr. Acton testified he had no doubt in his mind that if WhatsApp had not been acquired by Meta, it would not have pivoted. None of the material cited in the FTC's response contradicts or even addresses that fact. *See supra* Meta Introduction. The FTC's cross-reference to multiple

sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.  The FTC's citation to a generic statement from a proffered expert that perhaps investors could have accumulated additional board seats in unexplained ways – or that WhatsApp not only would have "pivoted" but actually made a new app (like Kakao in South Korea) – is speculation, not evidence relevant to actual effects of the acquisition.  Mr. Acton's asserted knowledge base of the WhatsApp financials is not a reason that WhatsApp would or would not have so pivoted; the above materials provide no support for that inference.

788.    Mr. Acton also testified, "Facebook Blue had a bevy of features that we were never going to implement."  Ex. 314 at 138:25-139:1 (Acton IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to Statement 788 as vague.

The FTC does not dispute that the quoted language in Statement 788 appears in the cited transcript.  The FTC otherwise disputes Statement 788 as materially incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Statement 788 is incomplete because it omits clarifications about this statement that Mr. Acton made during his deposition:



[REDACTED]

PX6086, Acton (Meta/WhatsApp) Dep. Tr., at 231:4-16.

Mr. Acton also testified: "[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]."  PX6086, Acton (Meta/WhatsApp) Dep.

Tr., at 232:11-17.

The FTC additionally disputes Statement 788 as materially incomplete and as not

establishing the absence of a genuine dispute of material fact, for the reasons articulated in

response to Statement 787.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The quoted excerpt from Mr. Acton

is vague and incomplete.  Ample evidence indicates, *inter alia*, that WhatsApp was likely to

pivot into social networking had it not been acquired by Meta.  *See* FTC Response to Statement

787; CMF at §§ III.C.2.a-b.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Mr. Acton testified Facebook had a bevy of features that WhatsApp was never going to

implement.  None of the material cited in the FTC's response contradicts or even addresses that

fact.  *See supra* Meta Introduction.  The FTC's cross-reference to multiple sections of its

Counterstatement without explanation does not itself create a genuine dispute of material fact.

While no reply is required, none of those paragraphs creates a genuine dispute of material fact,

and Meta incorporates its responses to those paragraphs here.

789.    Regarding the possibility of adding a feature similar to "People You May Know"

from the Facebook app to WhatsApp, Mr. Acton testified:  "We also felt that it was an inferior

product experience to suggest – to suggest people that are outside your established social

network.  Q. Why did you feel that it was an inferior product experience to suggest people that

were outside a user's established social network?  A. Because we felt that the telephone number

address book was sufficient at making that establishment.  We had never felt a need to go beyond

the telephone address book at that time."  Ex. 163 at 50:5-14 (Acton Dep. Tr.); *see also* Ex. 314

at 111:1-9 (Acton IH Tr.) ("Q. Did WhatsApp use the Facebook's Find My Friends feature?  A.

No.  Q. And why not?  A. We didn't think it was an appropriate thing to do for our product.  Q.

And why wasn't it appropriate?  A. Facebook is ID-based and WhatsApp is telephone-number

based.  Apples and oranges.").

    **FTC Response: Disputed in part.**  The FTC objects to Statement 789 as vague.

    The FTC does not dispute that the quoted language in Statement 789 appears in the cited

transcript.  The FTC otherwise disputes Statement 789 as materially incomplete and as not

establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

    Statement 789 is incomplete as it omits relevant portions of Mr. Acton's deposition

transcript and the first sentence mischaracterizes the question Mr. Acton responded to during the

deposition.  Mr. Acton was not testifying about "the possibility of adding a feature similar to

'People You May Know' from the Facebook app," as Meta vaguely asserts in Statement 789, but

rather was specifically testifying as to why WhatsApp did not offer such a feature in 2014:

        Q.  Are  you  familiar  with  Facebook's  People  You  May  Know
        Feature?

        A. Yes.

        Q. Did WhatsApp have a – offer a similar feature –

        A. No.

        Q. . . . in 2014?

        A. No.

Q. Why not?

A. We didn't think it was suited for our product.

Q. Why wasn't it – why didn't you think that it was suited for your product?

A. I think it's largely viewed as a growth vehicle, and we were not having any problems growing our user base.

Ex. 163 at 49:14-50:4 (Acton Dep. Tr.).

The FTC additionally disputes Statement 789 as not establishing the absence of a genuine dispute of material fact, and disputes that this vague and incomplete excerpt establishes that WhatsApp would not have added a feature like Facebook's People You May Know feature had it not been acquired by Meta (including through an adjacent personal social network app along with its messaging app).

PX6041, Endres (Meta) Dep. Tr., at 166:18-167:6).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that WhatsApp did not intend pre-acquisition to implement a feature similar to "People You May Know."  *See supra* Meta Introduction.

790.     Before the Meta acquisition, Mr. Acton gave Mr. Koum a handwritten note stating, "No Ads! No Games! No Gimmicks!"  Ex. 448 (MetaFTC-DX-420).  Mr. Acton testified that those declarations were "important guiding principles for us in terms of how we thought

about what we were building and what we would choose to do and what we would choose not to do.  And we didn't want to have any ads in our product.  We didn't want to put games into our product.  We really focused a lot on building utility, and we didn't even want to have gimmicks." Ex. 163 at 177:5-6, 177:25-178:7 (Acton Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to Statement 790 as vague.

The FTC does not dispute that the quoted language in Statement 790 appears in the cited document, but otherwise disputes Statement 790 as materially incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC particularly disputes Statement 790 as not establishing the absence of a genuine dispute of material fact regarding whether WhatsApp would have added features or pursued personal social network services had it not been acquired by Meta.  In this regard, the quoted excerpts from Mr. Acton are vague and incomplete.  As detailed elsewhere, ample evidence indicates, *inter alia*, that WhatsApp was likely to pivot into social networking had it not been acquired by Meta.  *See supra* at FTC Response to Statement 787; CMF at §§ III.C.2.a-b, III.D.2.



Morgan Stanley, an investment bank, also created its own model to value WhatsApp.

Morgan Stanley incorporated a ████████████████████████████████████.  In all the

scenarios where Morgan Stanley valued WhatsApp as a multiple of EBITDA without

incorporating ████████████, WhatsApp's revenue was less than ████████.  PX10228,

Morgan Stanley email: M. Grimes to J. Goetz re: "Files" (Feb. 3, 2014), MS_FTCMETA-

00001673, at -674-80 (attaching Morgan Stanley's models where WhatsApp was acquired and

looking at different acquisition models based on ███████████████████████████████

██████████████████████████████████████████████████████████████

███████ ).  In all the scenarios where Morgan Stanley valued WhatsApp as a multiple of EBITDA

and incorporated ████████████, WhatsApp's value was greater than ████████. *Id.*

(looking at models where ██████████████████).  Thus, WhatsApp was ██████████████

█████████████████████████████.  CMF at § III.C.2.a.4.

As Professor Rim detailed: "The evidence shows then that several knowledgeable

players—████████████████████—anticipated that WhatsApp would at some point

attain ████████████████████████████████████████,

suggesting that a WhatsApp not acquired by Meta would have developed a social networking

offering similar to Facebook."  PX9014, Rim Rebuttal Report at ¶ 118.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Mr. Acton gave Mr. Koum a handwritten note stating, "No Ads!  No Games!  No Gimmicks!"

and that Mr. Acton testified those declarations were important guiding principles for WhatsApp

regarding the product they were building, which the founders did not want to have any ads.

None of the material cited in the FTC's response contradicts or even addresses that fact.  *See*

*supra* Meta Introduction.  Rather, the FTC speculates about how WhatsApp might have

monetized, but cites no actual evidence that WhatsApp had any intention of or plans to add

features and monetize in the way the FTC theorizes.  And the FTC ignores significant evidence,

including Mr. Acton's testimony quoted in this paragraph, showing that WhatsApp had no

intention of pivoting into social networking or monetizing through advertising.  *See*, *e.g.*, *supra*

Meta SMF ¶¶ 786-788; *infra* ¶¶ 791-794; *see also* ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████. The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

791. ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

**FTC Response: Undisputed but incomplete.** The FTC does not dispute that the quoted language in Statement 791 appears in the cited document. ██████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

792.     On April 24, 2013, Mr. Koum emailed Mr. Acton:  "i also will never understand why a more cluttered product with ads and less privacy and more gimmicky stuff appeals more in Asia.  The product i want to build and to be proud of is simple and utilitarian and clean." Ex. 186 at -309-10 (FB_FTC_CID_02588309).  Mr. Acton responded, "As both Line and Kakao continue to branch out with games and media, they are going to kill the fundamental experience," which "gives us an opportunity to keep people focused on what really matters:  the conversation," and "our focus may be our biggest strategic advantage."  *Id.* at -309.

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language in Statement 792 appears in the cited document, but the FTC otherwise disputes Statement 792 as materially incomplete and as not establishing the absence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(1)(B).

FTC disputes that the quoted language establishes the absence of a genuine dispute of material fact regarding the extent to which WhatsApp might have emulated LINE's and Kakao's strategies of branching out into offering personal social networking services.  As detailed above and elsewhere, ample evidence indicates that this was WhatsApp's likely path had it not been acquired by Meta.  *See supra* at FTC Response to Statement 787; CMF at §§ III.C.2.a-b, III.D.2.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████  In

addition, when identifying companies with comparable earning potential to WhatsApp in its

February 17, 2014 presentation to the Board, Meta explicitly compared WhatsApp's potential

ARPU (average revenue per user) to LINE's current ARPU to justify the transaction.  CMF at

§ III.C.2.a.4.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

Mr. Koum and Mr. Acton agreed they did not want WhatsApp to have ads, and that they saw

keeping the focus on messaging as a strategic advantage.  *See supra* Meta Introduction; *see also*

*supra* Meta Reply to SMF ¶ 790 (addressing similar response).  The FTC's cross-reference to

multiple sections of its Counterstatement without explanation does not itself create a genuine

dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine

dispute of material fact, and Meta incorporates its responses to those paragraphs here.

793.    On May 20, 2013, a Spanish-language newspaper called El País published an

article online (in English) quoting Mr. Koum as stating:  "We want messaging to be as simple

and easy as possible.  We don't want our application to be a social network or a gaming network,

but a messaging network. . . . . We want to be purely about messaging."  Ex. 449 at 5 (MetaFTC-

DX-423).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language

in Statement 793 appears in the cited document, but the FTC otherwise disputes Statement 793

as materially incomplete and as not establishing the absence of a genuine dispute of material fact.

*See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC in particular disputes that the quoted excerpt establishes the absence of a genuine dispute of material fact regarding whether WhatsApp would have incorporated personal social network services into its offerings (within the messaging app or as a spinoff app like KakaoStory) had it not been acquired by Meta. As detailed elsewhere, ample evidence indicates, *inter alia*, that WhatsApp was likely to pivot into personal social networking had it not been acquired by Meta, as it would have needed to do so in order to successfully monetize. *See supra* at FTC Response to Statement 787; CMF at §§ III.C.2.a-b.

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Mr. Koum did not want WhatsApp to be a social network or a gaming network, but a messaging-only service that was as simple as possible. *See supra* Meta Introduction; *supra* Meta Reply to SMF ¶ 790 (addressing similar response). The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

794. 

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language
in Statement 794 appears in the cited document, but otherwise disputes Statement 794 as
materially incomplete.  ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

████████

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
the document contains the material quoted in the statement.  *See supra* Meta Introduction.

795.    Meta propounded the following Interrogatory No. 19 on the FTC:  "Identify all
relevant facts supporting Your allegation that WhatsApp in 2014, prior to the acquisition by
Meta, was likely to provide PSNS in the United States.  *See, e.g.*, Am. Compl. ¶ 127."  Ex. 297
at 60, FTC's Resp. to Meta's Interrog. No. 19 (FTC's Objs. & Resps. To Meta's Third Set of
Interrogs. (May 3, 2023)).  The FTC's response does not identify any document internal to
WhatsApp that contemplates, discusses, or addresses a plan for adding personal social
networking to WhatsApp before the acquisition.  *See id.*

**FTC Response: Undisputed but incomplete and misleading.**  The FTC does not
dispute that Meta propounded the above Interrogatory No. 19 on the FTC.  However, the FTC

raised many objections to this interrogatory, including that the interrogatory "misstates the allegation in Paragraph 127 of the Amended Complaint, which does not allege that 'WhatsApp *in 2014*, prior to the acquisition by Meta, was likely to provide PSNS in the United States.'" Ex. 297, FTC's Resp. to Meta's Interrog. No. 19 (FTC's Objs. & Resps. to Meta's Third Set of Interrogs. (May 3, 2023)) at 61.  As stated in the FTC's response: "The FTC has not alleged that WhatsApp was necessarily 'likely to' begin providing PSNS in the United States in 2014.  The FTC alleges that WhatsApp was a competitive threat to Meta because WhatsApp, either on its own or as a result of an acquisition by or partnership with another entity would have had the ability and incentive to enter the U.S. personal social networking market." *Id.* at 61.

The FTC also objected on the grounds that Interrogatory No. 19 sought "information and evidence subject to ongoing factual discovery" and "information and evidence which may be the subject of expert discovery." *Id.* at 60.  The FTC's response to this interrogatory represented a response "to the best of its present ability after a reasonably diligent inquiry" while discovery was still ongoing.  *Id.* at 61.

To support its allegation that WhatsApp was a competitive threat to pivot into personal social networking services, the FTC provided testimonial and documentary evidence in its response to Interrogatory No. 19, ███████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████. *See id.* at 61-63.

Ample additional evidence now bolsters that assessment.  *See* CMF at § III.C.2.a.  For instance, Professor Rim, in addition to founding a venture capitalist firm specializing in technology start-ups, is also a former CEO of Kakao.  PX6182, Rim (FTC) Dep. Tr., at 9:13-21,

10:3-5.  He explained in his deposition that product evolution can be decided either internally or at the board level:

> Q. Okay.  Do you agree that in considering what an app might do and how it might evolve it is important to consider its own internal planning?
>
> [A.] Internal document did you say?
>
> Q. Internal planning is what I said.
>
> A. Internal planning. I mean, I think it depends because some of the product evolution could be decided internally, some of them could have been decided on the board level. If it's the board level it's not exactly internally. So there are various cases I think.

*Id.* at 185:12-186:1

    **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC's response to Meta's Interrogatory No. 19 does not identify any document internal to WhatsApp that contemplates, discusses, or addresses a plan for adding personal social networking to WhatsApp before the acquisition.  *See supra* Meta Introduction.  After the fact testimony and material from an investor does not dispute that fact – these are not contemporaneous (pre-acquisition) documents internal to WhatsApp.  Further, the FTC ignores significant evidence showing that WhatsApp had no intention of pivoting into social networking. *See*, *e.g.*, *supra* Meta SMF ¶¶ 786-788, 790-794.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact. While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

    796.    Meta propounded the following Interrogatory No. 21 on the FTC:  "Identify all relevant facts supporting Your allegation that, if Meta had not acquired WhatsApp, consumers would have products or services that are better tha[n] those available today.  *See* Am. Compl.

¶¶ 220-222." Ex. 311 at 35, FTC's Suppl. Resp. to Meta's Interrog. No. 21 (FTC's Suppl. Objs. & Resps. To Meta's Third Set of Interrogs. (May 31, 2023)).  The FTC's supplemental response does not identify any document internal to WhatsApp that contemplates, discusses, or addresses a plan for adding personal social networking to WhatsApp before the acquisition.  *See id.*

**FTC Response: Disputed in part.**  The FTC objects to "internal to WhatsApp" and "plan" as vague.

The FTC does not dispute that Meta propounded Interrogatory No. 21 on the FTC, but otherwise disputes Statement 796 as materially incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC raised many objections to this interrogatory, including that the interrogatory "misstates the FTC's complaint."  Ex. 311, FTC's Suppl. Resp. to Meta's Interrog. No. 21 (FTC's Suppl. Objs. & Resps. to Meta's Third Set of Interrogs. (May 31, 2023)) at 35. Regarding the paragraphs of the Amended Complaint cited in Interrogatory No. 21, the FTC's response stated:

> These paragraphs outline, *inter alia*, that Meta has monopoly power in personal social networking services (paragraph 222); that Meta acquiring WhatsApp (part of "[t]he conduct described above" in paragraph 220) harmed and suppressed competition in personal social networking services; that Meta's monopoly power harms consumers (paragraphs 221-222); and that Meta's suppression of competition has protected its monopoly power and deprived consumers of the benefits of competition, which impacts a variety of factors that harm consumers, including product quality, consumer choice, and innovation (paragraphs 221-222).  Meta's interrogatory is therefore not directed at any specific allegation contained in paragraphs 221-222 of the FTC's complaint, and the FTC therefore cannot practically reply.

*Id.* at 36.

The FTC also objected to Interrogatory No. 21 because it sought "information and evidence subject to ongoing factual discovery" and "information and evidence which may be the

927

subject of expert discovery." *Id.* at 35.  The FTC additionally stated that "an analysis of how Meta's monopoly power harms consumers, and the impact of Meta's anticompetitive conduct, is the proper province of expert reports and will be provided in the upcoming expert reports under the schedule provided in the Joint Scheduling Report." *Id.* at 36-37.

The FTC disputes that there is no evidence "internal to WhatsApp" that contemplates, addresses, or discusses a pivot by WhatsApp into personal social networking.



Additionally, ample other evidence indicates that WhatsApp was a threat to pivot into personal social networking.  *See* CMF at § III.C.2.a.

**<u>Meta Reply:</u>**  The FTC's response does not create a genuine dispute of material fact that its response to Meta's Interrogatory No. 21 did not identify any document internal to WhatsApp that contemplates, discusses, or addresses a plan for adding personal social networking to WhatsApp before the acquisition.  *See supra* Meta Introduction.  A document from an external investor does not change that fact.  Further, the FTC ignores significant evidence showing that WhatsApp had no intention of pivoting into social networking.  *See, e.g., supra* Meta SMF ¶¶ 786-788, 790-794.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

797.    According to Professor Rim, "several market players predicted that[,] in order to monetize[,] WhatsApp would develop adjacent features, which typically included a social network component." Ex. 315 at ¶¶ 111-118 (Rim Rebuttal Rep.).  But Professor Rim could not identify any evidence indicating that Apple, Google, Kakao, Path, Pinterest, MeWe, Reddit, Snapchat, or Twitter thought, before the WhatsApp acquisition, that WhatsApp was a potential entrant into personal social networking.  *See* Ex. 310 at 234:19-239:21 (Rim Dep. Tr.).  Nor could Professor Rim identify any document cited in his report from any "personal social networking" company stating that it perceived WhatsApp as the only potential entrant into personal social networking.  *See id.* at 234:4-17.

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language in Statement 797 appears in Professor Rim's rebuttal report and deposition transcript, but disputes Statement 797 as an incomplete and misleading reflection of Professor Rim's statements and testimony.

Professor Rim offered a rebuttal report disagreeing "with Professors Kaplan and Carlton that WhatsApp, absent its acquisition by Meta, was unlikely to develop an offering including a social networking offering similar to Facebook."  Exhibit 315 at ¶ 35 (Rim Rebuttal Rep.).  To support this opinion, Professor Rim pointed to evidence "that several knowledgeable players— ██████████████████████████—anticipated that WhatsApp would at some point attain revenue comparable to companies with an advertising-focused monetization model, suggesting that a WhatsApp not acquired by Meta would have developed a social networking offering similar to Facebook."  Exhibit 315 at ¶ 118 (Rim Rebuttal Rep.). ████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████

Further, the language "any evidence" in sentence two of Statement 797 misstates Professor Rim's testimony.  Professor Rim was repeatedly asked to identify any document *cited in his report*, not generally identify any evidence.  *See* Ex. 310 at 234:19—235:1, 235:7-11, 235:17-20, 236:19-237:1, 237:10-14, 237:22-238:4, 238:11-15, 238:21-239:3, 239:11-15 (Rim Dep. Tr.).  Professor Rim emphasized in his testimony that it was unnecessary for him to review documents by all technology companies to form his opinion on how a successful mobile messenger would monetize.  *See, e.g.*, Ex. 310 at 236:3-5 (Rim Dep. Tr.) ("Reviewing documents for third parties, internal documents of third parties, I didn't think that it was necessary to form my opinion."), 237:3-8 ("I do not think that reviewing whether Twitter had the perception or how Twitter felt of WhatsApp was relevant to this task that I was given . . . I requested the data that I thought was relevant, and I used the evidence to write this report."), 237:17-21 ("I didn't think it was necessary for me to review all the technology companies' documents to form an opinion on how a mobile messenger – a successful mobile messenger would monetize.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Professor Rim could not identify any evidence indicating that Apple, Google, Kakao, Path, Pinterest, MeWe, Reddit, Snapchat, or Twitter thought, before the WhatsApp acquisition, that WhatsApp was a potential entrant into personal social networking, or any document cited in his report from any "personal social networking" company stating that it perceived WhatsApp as the only potential entrant into personal social networking.  *See supra* Meta Introduction.  That Professor Rim pointed to ████████████████████████████ about WhatsApp's

potential future revenue does not change that fact.  Professor Rim and the FTC ignore evidence

that WhatsApp had no intention of pivoting to social networking, *see supra* Meta SMF ¶¶ 786-

794, and that █████████████ had no role in making business decisions at WhatsApp, *see*

Ex. 285 at 91:17-92:5 (Koum IH Tr.).  The distinction that the FTC draws between material that

Professor Rim cited in his report and any evidence in the record – the suggestion being that

perhaps Professor Rim is aware of such evidence in the record but decided not to cite it in his

report or mention it at his deposition – is immaterial and unfounded.

798.    Professor Rim relied upon ███████████████████████████████

████████████████████████████████.  *See* Ex. 315 at ¶ 108 n.152 (Rim

Rebuttal Rep.); *see also* Ex. 310 at 240:12-241:1 (Rim Dep. Tr.).  As Professor Rim

acknowledged – *see* Ex. 310 at 241:8-242:9 (Rim Dep. Tr.) – that Microsoft presentation

contains a slide called "Market Fragmentation" that states "Beyond Apple, Google and

Facebook, a secondary tier of competitors exists who should be considered as a threat,"

identifying several dozen apps:



Ex. 135 at -754 (PX15411,                       ).  The Microsoft presentation includes another

slide called "Tier 2 Competition x Geography," which states:  "WhatsApp has arguably the

largest geographic spread in terms of users.  The US appears to be one of the few countries

where WhatsApp has struggled to gain a foothold."  *Id.* at -757.  The Microsoft presentation

includes a further slide called "How are competitors monetizing free?," which states:  "Providers

are evolving IM apps from simple message services to rich, full-featured platforms to increase

engagement, develop reach and monetise.  Whilst this trend[ ] started initially with apps

developed in Asia, increasingly more competitors (with the notable exception of WhatsApp) are

developing platform upon messaging strategies."  *Id.* at -777.

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language in Statement 798 appears in the cited excerpts, but otherwise disputes Statement 798 as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Statement 798 is incomplete because it omits the context in which Professor Rim cited this Microsoft presentation in his report: that is, to assess the monetization strategies of messenger companies other than WhatsApp.  Professor Rim cited this presentation in a section titled "Monetizing strategies of other messenger companies," to present evidence "show[ing] that a likely evolution path for WhatsApp would have involved expansion into adjacent uses, e.g., a social networking offering similar to Facebook."  Ex. 315 at § V(B)(1) (Rim Rebuttal Rep.).  In that context, Professor Rim cites to the slide titled "How are competitors monetizing free?" and quotes the subheader "Competition are using high engagement to drive complementary monetization models" in addition to the quote stated by Meta above.  *See* Ex. 315 at ¶ 108 n.152 (Rim Rebuttal Rep.); Ex. 135 at -777 (PX15411, MS-LIT_0000006746).

The FTC further disputes Statement 798 as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that WhatsApp was a significant threat to pivot into personal social network services and that there were not many other such threats.  CMF at §§ III.C.2.a, III.C.2.c.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the document contains the material quoted in the statement or that Professor Rim testified as quoted in the statement.  *See supra* Meta Introduction.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

799.     Professor Hemphill testified:  "Q. And you've not offered an opinion as to when WhatsApp would have become a PSN in the but-for world, correct?  . . .  A. That's – that's – that's correct."  Ex. 283 at 283:8-12 (Hemphill Dep. Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that the quoted language in Statement 799 appears in the cited document.  However, the FTC notes that Statement 799 is incomplete as it omits the remainder of Professor Hemphill's response.  Professor Hemphill's full response to the question was: "A. That's – that's – that's correct.  I think I'm offering the opinion that in 2014 at the time of the acquisition that it was a significant threat to do so, but I'm not offering an opinion about the exact timing in which such a threat would have been actualized."  Ex. 283 at 283:12-17 (Hemphill Dep. Tr.).

### d.     Pre-Acquisition Privacy

800.     Mr. Acton testified regarding privacy features on WhatsApp before the Meta acquisition:  "Q. What privacy features were added prior to the acquisition by Facebook?  A. Most importantly and notably was the privacy blocking, so that if someone was annoying you[,] you could stop receiving messages from them.  I think prior to the acquisition we also had this idea of your last-seen timestamp and we had privacy on that.  There was Read Receipts, and we had privacy on Read Receipts, that you could turn them off."  Ex. 314 at 59:20-60:7 (Acton IH Tr.); *see also id.* at 63:3-6 (testifying that WhatsApp added "transport encryption" in late 2011 or early 2012).

**FTC Response: Undisputed.**

### e.     Pre-Acquisition Infrastructure

801.     Before the Meta acquisition, WhatsApp distributed content over a physical infrastructure that it leased from a company called SoftLayer.  *See* Ex. 163 at 103:18-104:7 (Acton Dep. Tr.); Ex. 314 at 183:5-8 (Acton IH Tr.) ("So we were getting machines, leasing

them, on a 30-day basis, changing machine architecture, experimenting and optimizing the

machine architecture in SoftLayer."); *see also* Ex. 285 at 184:12-17 (Koum IH Tr.) (similar).

WhatsApp did not use a content delivery network prior to the acquisition. *See* Ex. 164 at 44:17-

20, 48:10-11, 48:15-22 (Gupta Dep. Tr.).

    **FTC Response: Disputed in part.**

    The FTC does not dispute that, before the Meta acquisition, WhatsApp was using

SoftLayer and was not using a content delivery network.  The FTC also does not dispute that the

quoted language appears in the cited transcript.  The FTC otherwise disputes Statement 801 as

described herein.

    The FTC disputes the "before the acquisition" characterization of the first sentence of

Statement 801 as misleading because WhatsApp used SoftLayer before *and after* the Meta

acquisition.  *See* PX6021, Parikh (Meta) IH Tr. at 209:5-9 ("By the end of 2018, the WhatsApp

team had transitioned off of SoftLayer and was running in Facebook infrastructure.  And in 2018

that's when the core application logic moved off of SoftLayer into Facebook infrastructure.").

    The FTC also disputes the second sentence in Statement 801 as the cited material does

not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P.

56(c)(1)(B).  Ample evidence indicates, *inter alia*, that WhatsApp could have contracted with a

commercial CDN provider without Meta.  *See* Ex. 163 at 196:25-197:4 (Acton Dep. Tr.) ("[A]

global content delivery network is something you can get from Akamai or Cloudflare.  You can

get it from a number of different providers just as a service that you purchase."); *id.* at 200:14-18

("Q. Would WhatsApp also have been able to improve latency had it not been acquired by

Facebook?  A. Yeah.  We had all the technical know-how and ability to do all these things . . .

."); *see also* PX9001, Bray Report at ¶ 393 ("Unlike Instagram, WhatsApp was not using a CDN

service prior to being acquired by Meta.  However, in my experience, since a high proportion of WhatsApp traffic is individual-to-individual, it has less need for the service a CDN provides, i.e., caching popular widely-shared objects (usually images and video) around the world to facilitate their access by millions of users.  A CDn's benefits are greatest when there are highly popular pieces of content (e.g., a popular celebrity sharing an image); however, when content will be viewed by only a single other user, a CDN offers limited benefits.  The fact that WhatsApp scaled to hundreds of millions of users without the benefit of any CDN illustrates this point.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether, prior to the acquisition, WhatsApp distributed content over a physical infrastructure that it leased from SoftLayer, or whether it did so without using a content delivery network ("CDN").  *See supra* Meta Introduction.  On the contrary, the FTC's own Counterstatement establishes both points.  *See* Counter SMF ¶ 2456 (WhatsApp's use of SoftLayer); *id.* at ¶ 2502 (WhatsApp's lack of a CDN).  Evidence that WhatsApp continued to use SoftLayer for some purposes after the acquisition does not create a dispute undermining the FTC's concessions that the facts stated in this paragraph are true and that the quoted language appears in the cited material.  The same is true of the FTC's claim that WhatsApp could have relied on a third-party CDN provider (contrary to the evidence, which shows the enormous benefits WhatsApp enjoyed as a result of its use of Meta's CDN, *see* Ex. 5 at ¶¶ 228-234 (Nieh Rep.)).  The FTC's claim that WhatsApp could have relied on a third-party CDN is also speculative.  Moreover, it erroneously conflates the CDN service available from third parties with Meta's proprietary CDN.  By using Meta's CDN, ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████

████████████████  *Id.* at ¶ 229.  This ████████████████████████████.  In

fact, ████████████████████████████████████████████████████████

███████.  *Id.* at ¶ 234.

802.    Nitin Gupta – head of engineering at WhatsApp, *see* Ex. 164 at 12:20-22 (Gupta

Dep. Tr.) – testified:  "The infrastructure that [WhatsApp] had in SoftLayer was highly fragile.

And the performance wasn't that great."  *Id.* at 41:3-5.  He further testified that WhatsApp "just

had one region in East Coast, and we had a cold data center in Dallas, which we had never tested

before.  What that means is if that region got hit in eastern U.S. and we are in Washington, we

would be down for days and weeks together without any ability to bring ourselves back up

again."  *Id.* at 42:1-8.

**FTC Response: Disputed in part.**  The FTC objects to the terms "highly fragile" and

"performance" as vague and to Statement 802 as vague as to time.

The FTC does not dispute that Nitin Gupta was the head of engineering at WhatsApp

starting in October 2016, or that the quoted language appears in the cited transcript, but

otherwise disputes Statement 802 as described herein.

The FTC disputes Statement 802 as the cited material does not show the absence of a

genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence

indicates, *inter alia*, that WhatsApp's SoftLayer infrastructure was not fragile and was able to

support WhatsApp's growth to over ████████ monthly active users.  *See* PX6068, Acton

(WhatsApp/Meta) Dep. Tr., at 107:20-108:8 ("Q. Was it your belief that WhatsApp could have

continued operating on SoftLayer servers as WhatsApp continued to grow? . . . A. I think it's a

given that WhatsApp could have continued to own and operate its service, yes . . . . [Q.] Would

WhatsApp have been able to continue to own and operate its service with SoftLayer? . . . [A.]

With SoftLayer specifically, I – yes.  You know, there's always the desire to do cost

optimization and explore other hosting providers, so I can't guarantee that we would have stayed

on SoftLayer forever; but we could have continued in 2014, easily to continue on SoftLayer."));

Ex. 164 at 69:6-10 (Gupta Dep. Tr.) ("Q. So is it fair to say that WhatsApp was using SoftLayer

infrastructure to serve ██████████████████████████████████████

██████████████████████?  A. That seems to be correct, yes.").

     Other evidence also indicates that WhatsApp had superior performance on SoftLayer as

compared to Facebook Messenger on Meta's infrastructure.  *See* PX3201, Meta email chain: S.

Lessin to M. Vernal re: "████████," (May 8, 2013), FB_FTC_CID_04109587, at -590 ("As you

know, there's a huge gap in perceived performance of our Messenger app compared to Whatsapp

[sic] and other competitors."); PX2477, Meta email chain: M. Schroepfer to R. Endres re: "Send

Latency," (May 8, 2013), FB_FTC_CID_02941561, at -563 ("I know you've probably done this

recently but Peter and I just did a side by side test of WhatsApp, Viber, and Messenger Master

(most recent build) and the difference is stark.  WhatsApp and Viber are both near instant (from

push send to received on peters phone).  We take seconds."); PX11028, Meta email chain: J.

Parikh to J. Olivan re: "[e FYI (Engineering Announcement)] uploaded latency goals.jpg," (Sept.

16, 2013), FB_FTC_CID_04329544, at -544 ("GOAL: Improve reliability and latency of our

messaging solution so that it's competitive with WhatsApp.").

     **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding whether Mr. Gupta gave the quoted testimony.  The FTC's assertion that certain terms

Mr. Gupta used are vague – terms the FTC was free to ask Mr. Gupta to clarify during his

deposition – does not create a dispute undermining its concession that the quoted language

appears in the cited material.  Moreover, the FTC's response does not create a genuine dispute of

material fact regarding the fragility and performance of WhatsApp's SoftLayer infrastructure.

Mr. Acton's quoted testimony that WhatsApp could have continued to own and operate its

service on SoftLayer in 2014 does not refute the fragility of WhatsApp's infrastructure at that

time; indeed, within days after the acquisition was announced (on February 22, 2014), Mr. Acton

wrote that WhatsApp "went down" for approximately four hours "because of a softlayer router."

Ex. 195 at -775 (FB_FTC_CID_06072775).  Further, Mr. Acton left the company before

WhatsApp migrated to Meta's data center infrastructure.  *See* PX6086 at 117:22-23 (Acton Dep.

Tr.).  Evidence shows that reliability benefits, such as the desire to adopt a multi-region

architecture, were among the key reasons WhatsApp migrated to Meta's data center

infrastructure.  *See* Ex. 5 at ¶¶ 222, 242-244 (Nieh Rep.) (discussing contemporaneous internal

documents and sworn testimony).

In the quoted excerpt of Mr. Gupta's testimony, he was discussing the state of WhatsApp

in May 2017.  *See* Ex. 164 at 68:14-15 (Gupta Dep. Tr.).  By that point, WhatsApp already had

been using key components of Meta's infrastructure, including Meta's CDN and media storage

service, for years.  *See* Ex. 5 at ¶¶ 228-239 (Nieh Rep.); *see also infra* Meta SMF ¶¶ 863-864

(discussing Mr. Acton's testimony crediting Meta's CDN and Everstore with providing benefits

"straightaway in 2014, 2015").  Further, the FTC's claim that WhatsApp performed better than

Facebook Messenger is irrelevant to whether WhatsApp's infrastructure was fragile and, in any

event, relies on email snippets that at most describe limited and ambiguous comparisons of

WhatsApp and Messenger that do not support the FTC's broad claims.  None of this material

undermines Mr. Gupta's testimony regarding the fragility and performance of WhatsApp's

SoftLayer infrastructure.  On the contrary, that testimony is corroborated by ample ordinary-

course evidence.  *See* Ex. 5 at ¶¶ 249-256 (Nieh Rep.).

803.    "WhatsApp did experience outages in its early days."  Ex. 288 at ¶ 382 (Bray

Rep.).  According to Mr. Acton, "by 2013 I think we were averaging one or two outages per

year.  Even after we got acquired, we had one to – one – you know, half to one outage per year.

So were on a steady decline of managing our outages."  Ex. 314 at 187:20-24 (Acton IH Tr.).

Mr. Koum testified:  "Q. How frequently did WhatsApp have outages between 2009 and 2014?

A. . . . I would say on average we would have an outage every month, but, remember, some of

them were small and some of them were also outages that only affected a certain aspect of the

service."  Ex. 285 at 184:24-185:11 (Koum IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to Statement 803 because the term

"outages" is vague.

The FTC does not dispute that the quoted language appears in the cited material, but

otherwise disputes Statement 803 as described herein.

The FTC disputes the first sentence in Statement 803 as incomplete and misleading

because it omits Mr. Bray's full statement describing WhatsApp as "operating at a high level of

reliability" before it was acquired by Meta:



PX9001, Bray Report at ¶ 382 (emphasis added).

The FTC disputes the second and third sentences of Statement 803 as materially

incomplete.  Other evidence indicates that outages on WhatsApp in the year before the Meta

acquisition were a "small amount of downtime":

> Q. . . . In the context of uptime of the WhatsApp application for
> users, what does reliability mean to you?

A.  How many minutes or seconds per year you're up versus how many you're down.  So reliability, a lot of times I would talk about six nines of reliabilities which would be 99.9999 percent uptime in a given year, which a lot of times would -- I think roughly estimates about 15 minutes of downtime for a given uptime of six nines.

Q.  And is downtime sometimes referred to as an outage?

A.  It's always referred to as an outage.

Q. . . . Prior to being acquired by Facebook, how would you describe WhatsApp's reliability?

A. I would say that WhatsApp's reliability was good and, you know, sort of better over time.  I would say we probably achieved on the order of -- in -- in – let's say in 2013, which was a full year, we probably had five nines of reliability, not six nines of reliability; and our goals were always to achieve six nines of reliability.  But what is five nines of reliability?  It's probably an average of a couple hours in a -- in a given year.  It's not -- it's measured – it's measured in sort of hours per year.  So it's a pretty small number of -- small amount of downtime."

PX6068, Acton (WhatsApp/Meta) Dep. Tr., at 111:9-112:10.  Additionally, WhatsApp co-founder Jan Koum also testified that WhatsApp did not move to Meta's infrastructure to reduce outages: "Q. Did you need to move on to Facebook to reduce the frequency of WhatsApp's outages?  A. No.  I don't think that had to do with -- one didn't have anything to do with the other."  PX6010, Koum (WhatsApp/Meta) IH Tr., at 188:8-11.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Mr. Bray, Mr. Acton, and Mr. Koum gave the quoted testimony, or whether WhatsApp experienced outages before the acquisition.  The FTC's claims that "outages" is vague; that WhatsApp was improving in that regard prior to the acquisition, that its "downtime" was "small," and that WhatsApp did not move to Meta's infrastructure to reduce outages – all of which mischaracterize the evidence of the limitations of WhatsApp's pre-acquisition infrastructure, *see* Ex. 5 at ¶¶ 220-223 (Nieh Rep.) – do not create a dispute undermining its

concession that the quoted language appears in the cited material.  Whether or not Mr. Koum believed WhatsApp did not move to Meta's infrastructure to reduce outages, the evidence shows that the acquisition did in fact reduce outages and WhatsApp's vulnerability to them.  *See id.* at ¶¶ 249-256 (discussing evidence of the performance and reliability benefits WhatsApp derived from Meta's infrastructure).

804.    For example, on November 4, 2012, Mr. Koum emailed that WhatsApp was experiencing "[a]bysmal private network performance" that "caus[ed] lots of grief and outages." Ex. 202 at -447 (FB_FTC_CID_11760445).  On February 22, 2014, Mr. Acton emailed that WhatsApp "went down" for approximately four hours "because of a softlayer router."  Ex. 195 at -775 (FB_FTC_CID_06072775).  On August 19, 2014, another WhatsApp employee emailed SoftLayer:  "Every one of these crashes is . . . causing media messages to be substantially delayed in sending to our users; at this point there have been enough incidents that we are likely talking about millions of messages that have been delayed or our users have been forced to use bytes from their data plan to re-upload these to a different server."  Ex. 203 at -450 (FB_FTC_CID_11760449).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited documents, but otherwise disputes Statement 804 as described herein.

The FTC disputes Statement 804 because the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that WhatsApp was delivering a reliable experience prior to the acquisition. "███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  ” PX9001, Bray Report at ¶ 382 (emphasis added).

Similarly, evidence indicates that WhatsApp had superior performance on SoftLayer as compared to Facebook Messenger on Meta's infrastructure. *See* PX3201, Meta email chain: S. Lessin to M. Vernal re: "████████," (May 8, 2013), FB_FTC_CID_04109587, at -590 ("As you know, there's a huge gap in perceived performance of our Messenger app compared to Whatsapp [sic] and other competitors."); PX2477, Meta email chain: M. Schroepfer to R. Endres re: "Send Latency," (May 8, 2013), FB_FTC_CID_02941561, at -563 ("I know you've probably done this recently but Peter and I just did a side by side test of WhatsApp, Viber, and Messenger Master (most recent build) and the difference is stark.  WhatsApp and Viber are both near instant (from push send to received on peters phone).  We take seconds."); PX11028, Meta email chain: J. Parikh to J. Olivan re: "[e FYI (Engineering Announcement)] uploaded latency goals.jpg," (Sept. 16, 2013), FB_FTC_CID_04329544, at -544 ("GOAL: Improve reliability and latency of our messaging solution so that it's competitive with WhatsApp.").

The FTC further disputes the first sentence of Statement 804 as incomplete because it omits the response from SoftLayer offering to trouble-shoot the network issue: "At this stage it would be very beneficial for us to have a call with you and our network engineers to go over your infrastructure in greater detail to see if we can determine what is causing the issues you are seeing."  Ex. 202 at -446 (FB_FTC_CID_11760445); *see also* PX6068, Acton (WhatsApp/Meta) Dep. Tr., at 106:25-107:2 ("Q. Did WhatsApp continue to use SoftLayer for networking after the acquisition?  A. Yes.").  Testimony by Mr. Koum also indicates that WhatsApp did not move to Meta's infrastructure to reduce outages: "Q. Did you need to move on to Facebook to reduce the

frequency of WhatsApp's outages?  A. No.  I don't think that had to do with -- one didn't have anything to do with the other."  PX6010, Koum (WhatsApp/Meta) IH Tr., at 188:8-11.

Other evidence also indicates that WhatsApp experienced only one significant outage in the two years prior to the February 2014 email cited in the second sentence.  *See* PX3208, Meta email: J. Koum to ███████ re: "Useless," (Feb. 27, 2014), FB_FTC_CID_11760456, at -458 ("we had one major outage in the last two years").

Finally, for context regarding the reference to "millions of messages" in the last sentence, WhatsApp was handling tens of billions of messages per day in 2014.  *See* PX13794, Meta email: A. Bosworth to ███████ re: "WhatsApp," (Feb. 19, 2014), FB_FTC_CID_03831593, at -593 (describing WhatsApp as having "built a leading and rapidly growing real-time mobile messaging service, with . . . [m]essaging volume approaching the entire global telecom SMS volume"); PX12127, Meta email chain: J. Olivan to A. Zoufonoun re: "WhatsApp/FB sends," (Aug. 28, 2013), FB_FTC_CID_06085872, at -872 ("Trust me - this keeps me awake every night.  We are definitely not playing in the same field as whatsapp does (as evidenced by the fact that we only have 200M messenger to messenger daily sends as opposed to their 12B daily sends by now).").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, pre-acquisition, WhatsApp repeatedly attributed outages to the technical limitations of its pre-acquisition infrastructure.  The FTC's additional claims regarding WhatsApp's pre-acquisition infrastructure – all of which mischaracterize the evidence of its limitations and the enormous benefits Meta's infrastructure provided to WhatsApp, *see* Ex. 5 at ¶¶ 220-269 (Nieh Rep.) – do not undermine its concession that the quoted language appears in the cited documents.

The FTC's claim that WhatsApp performed better than Facebook Messenger is both irrelevant to whether WhatsApp's infrastructure was fragile and, in any event, relies on email snippets that at most describe limited and ambiguous comparisons of WhatsApp and Messenger that do not support the FTC's broad claims. The evidence shows that WhatsApp's performance improved on Meta's infrastructure. *See id.* at ¶¶ 249-256 (discussing evidence of performance and reliability benefits WhatsApp derived from Meta's infrastructure).

The offer from SoftLayer to have a call with WhatsApp confirms that WhatsApp had been experiencing trouble on SoftLayer. It does not provide evidence that SoftLayer would have been able to solve those issues as WhatsApp grew, particularly as it had failed to do so pre-acquisition. Whether or not Mr. Koum believed WhatsApp did not move to Meta's infrastructure to reduce outages, the evidence shows that the acquisition did in fact reduce outages and WhatsApp's vulnerability to them. *See id.* The fact that WhatsApp was handling billions of messages does not dispute the fact that pre-acquisition WhatsApp had service-quality and performance issues with respect to millions of messages.

### f.      Pre-Acquisition Spam

805.    Mr. Acton testified regarding spam on WhatsApp before the Meta acquisition: "Q. To what extent was WhatsApp's spam system helping to reduce spam on WhatsApp prior to its acquisition by Facebook? A. I would say to a limited extent. Q. Why was it limited? A. The system was fairly immature and naively built." Ex. 163 at 119:7-13 (Acton Dep. Tr.). Mr. Acton also testified that "at the time of the acquisition, [WhatsApp] did not have the expertise in-house and would have had to hire people . . . to help us [build a second-generation system to fight spam]." *Id.* at 120:4-6.

**FTC Response: Disputed in part.** The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 805 as described herein.

The FTC disputes the first reference to Mr. Acton's testimony as incomplete and misleading because it omits testimony indicating that WhatsApp had "built a system to deal with spam" prior to the acquisition.  Immediately before the testimony cited in the first part of Statement 805, Mr. Acton testified: "Q: Prior to Facebook's acquisition of WhatsApp, had WhatsApp built a system to deal with spam on its application?  A: Yes.  Q: Was WhatsApp making improvements to that system prior to being acquired by Facebook?  A: Yes."  Ex. 163 at 118:21-119:2 (Acton Dep. Tr.); *see also* PX6009, Acton (Meta/WhatsApp) IH Tr., at 236:3-6; 236:21-237:3.

The second reference to Mr. Acton's testimony in Statement 805 is also incomplete and misleading because it omits the question to Mr. Acton as well as his response that WhatsApp "would have built" its own second-generation system to fight spam and "had the knowledge, expertise, and contact network of people to hire to build it":

> Q. Would WhatsApp have built its own second-generation system to fight spam?
>
> ***
>
> THE WITNESS: We – we certainly had the knowledge, expertise, and contact network of people to hire to build it. I would say that at the time of the acquisition, we did not have the expertise in-house and would have had to hire people in – to help us do so. Yeah. We would have built it, but we wouldn't – we would have had to . . . hire people to help us build it."

Ex. 163 at 119:22-120:10 (Acton Dep. Tr.); *see also* PX9013, McCoy Rebuttal Report at ¶ 6 (concluding that "[Meta's integrity expert] Professor Subrahmanian has failed to establish that Meta's acquisition led to integrity benefits for WhatsApp beyond what WhatsApp could have achieved without the acquisition").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Acton testified that, prior to its acquisition by Meta, WhatsApp's ability to deal with spam

was limited and that its anti-spam systems were "fairly immature" and "naively built."  Nothing

in the additional testimony the FTC cites – that Mr. Action testified that WhatsApp had built a

system to address spam that they were working to improve and that WhatsApp would have built

a second-generation system *if* it would have hired additional engineers – is inconsistent with Mr.

Acton's general observation about WhatsApp's anti-spam abilities prior to the acquisition, as

quoted above in Meta's statement.

### 2.    WhatsApp Acquisition Discussions

806.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**FTC Response: Undisputed.**

807.    WhatsApp co-founder Brian Acton testified regarding potential acquisitions in

2014, "we were not seeking acquisitions and we were not soliciting acquisitions."  Ex. 314

at 160:7-10 (Acton IH Tr.).  He also testified:  "Q. In 2014, were you and Mr. Koum looking to

be acquired?  A. No.  Q. What was your plan: to be acquired, go public, or continue to run

WhatsApp yourself as independent?  . . .  A. Continue to run as independent."  Ex. 163

at 234:11-20 (Acton Dep. Tr.).  Jan Koum, WhatsApp's other co-founder, testified:  "We were

not interested in selling the company all the way up until February of 2014."  Ex. 285 at 145:7-

12 (Koum IH Tr.).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that the quoted language appears in the cited transcripts, but notes that Mr. Koum also testified regarding accepting Facebook's offer that "[w]e could [continue to build out and grow the company].  We were planning to do that.  I just think that it's one thing when you have no choice but to go do it and it's different when you have a choice between accepting an offer versus going and doing it yourself."  Ex. 285 at 159:1-7 (Koum IH Tr.).

808.    The FTC's proffered economic expert, Professor C. Scott Hemphill, opined that "███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████."  Ex. 279 at ¶¶ 1018, 1021 (Hemphill Rep.).  Regarding the possibility of a Google acquisition, Mr. Koum testified:  "Q. Did you receive any offers from Google to acquire WhatsApp?  A. . . . [I]f you're asking me if we had any offers from Google around February of 2014, the answer is no."  Ex. 285 at 159:8-22 (Koum IH Tr.).  About "one meeting" Mr. Koum and Mr. Acton had "with Larry Page and Sundar [Pichai]" in early 2014, Mr. Koum testified that he "got a sense that [Mr. Page] was not very familiar with our product and didn't really understand how WhatsApp worked or why it was popular and I don't think he understood the scale at which we were operating.  So it was just a very awkward meeting because I got a sense that they were – they were interested [in us], but I don't think they understood themselves why they were interested . . . ."  *Id.* At 160:1-22.

**FTC Response: Disputed in part.**  The FTC does not dispute the first sentence of Statement 808, or that the quoted language from Mr. Koum appears in the cited transcript, but otherwise disputes Statement 808 as materially incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes Statement 808 as incompletely excerpting Mr. Koum's testimony and as omitting testimony from Mr. Acton indicating that Google had made offers to acquire WhatsApp.  Mr. Koum's full response to the excerpted question above indicated only that WhatsApp did not have "any written or confirmed numbers" from Google around February 2014: "[I]f you're asking me if we had any offers from Google around February of 2014, the answer is no, *we did not have any written or confirmed numbers from Google*."  Ex. 285 at 159:19-22 (Koum IH Tr.) (emphasis added).

Additionally, regarding the 2014 meeting with Larry Page and Sundar Pichai, Mr. Koum also testified that "we had a relationship with Sundar, which was a great working relationship." *Id.* at 160:10-12.  On whether Google "would be interested in further conversations," Mr. Koum testified: "Perhaps.  We didn't part on any bad terms or – I'm sure if we went to them, came back and said, look, would you be interested in making an offer, maybe they would make an offer." *Id.* at 160:24-161:4.

Further, Mr. Acton, WhatsApp's other cofounder, testified that Google had pursued WhatsApp for an acquisition and made acquisition offers, including in 2014:

> Q. . . . Did WhatsApp ever receive an acquisition offer from Google?
>
> A. Yes.
>
> Q. And how many times – how many offers?
>
> A. One formal.
>
> Q. And was there an informal discussion about an acquisition as well?
>
> A. Yes.
>
> Q. So when was the formal offer?
>
> A. I think it was 2011.
>
> ***

Q. . . . When was the informal offer – or informal discussions about an acquisition with Google?

A. . . . The informal ones were the week – same week of 2014."

PX6009, Acton (Meta/WhatsApp) IH Tr., at 176:10-19, 179:18-180:1.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Koum testified as quoted in the statement.  *See supra* Meta Introduction.  The additional material that the FTC cites is merely speculation about a potential or hypothetical offer materializing at some point in the future, not a statement of fact.

809.    Mr. Acton testified:  "Q. If WhatsApp were acquired by Google, would you have been able to dictate the development of the WhatsApp product after the acquisition? . . .  A. If the acquisition had been performed, we would have stipulated a similar control model that we had with Facebook."  Ex. 163 at 275:5-12 (Acton Dep. Tr.).  An internal presentation for Google's leadership team, dated February 3, 2014, in a slide on WhatsApp, highlighted, under the heading "Recent News & Concerns," that WhatsApp "is very open about its intent to remain independent" and that the WhatsApp founders are "explicit about their dislike of ads-supported business models."  Ex. 23 at -016 (MetaFTC-DX-1085, GOOG-META-00047007).

**FTC Response: Undisputed but incomplete.**  The FTC does not dispute that the quoted language appears in the cited materials, but notes that the excerpts are incomplete.  The Google presentation also includes a slide titled "WhatsApp: potential path to revenue" that includes bullets under the subheading "Monetization Options" that state "Advertising (they could change their mind once they have 1B+ users)" and "Richer Social Networking features: . . . Could purposely evolve WhatsApp into a much richer social network experience."  Ex. 23 at -030 (MetaFTC-DX-1085, GOOG-META-00047007).

810.    Regarding the possibility of a Tencent acquisition, Mr. Acton testified:  "Q. Did Tencent ever offer to acquire WhatsApp?  A. Fake news.  No."  Ex. 314 at 181:18-19 (Acton IH Tr.).  Mr. Koum testified:  "Q. Did Tencent ever make an offer or show interest in acquiring WhatsApp?  A. Not – I think it's hard for me to gauge somebody's interest, but they never made an offer."  Ex. 285 at 161:18-21 (Koum IH Tr.); *see also* Ex. 314 at 121:23-122:4 (Acton IH Tr.) ("Tencent actually tried to engage with us a number of different ways, partnerships and investments, but we were never very receptive.  So they went their own direction and built WeChat, and, you know, it had basic features of messaging and communications based on the telephone number and address book.").  Regarding the possibility of a Microsoft acquisition, Mr. Acton testified:  "Q. Did Microsoft ever offer to acquire WhatsApp.  A. No."  Ex. 314 at 181:24-182:1 (Acton IH Tr.).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited transcripts, but otherwise disputes Statement 810 as materially incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Evidence indicates that Microsoft and Tencent were interested in acquiring WhatsApp.  On January 22, 2013, ███████████████████████████████████ sent an email to Mr. Koum, which was a "whatsapp confidential summary for [his] partners" that noted: "Overtures from Facebook, Google, *TenCent*, *Microsoft* and others continue."  PX1363, ████████████ email chain: ████████ to J. Koum re: "whatsapp confidential summary for my partners. let me know if you have comments/suggestions/changes," (Jan. 22, 2013), FB_FTC_CID_02572469, at -469 (emphasis added).  ████████████████████████████ ████████████████████████████████████████████████████████



PX3196, ▮▮▮▮ email chain: ▮▮ to J. Koum re: "▮▮▮▮ LPs & Tencent missive," (Aug. 16, 3013), FB_FTC_CID_02582691, at -691.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Acton testified that Tencent and Microsoft never offered to acquire WhatsApp.  The additional material the FTC cites does not create a dispute that Mr. Koum and Mr. Acton testified that they did not receive acquisition offers from Tencent or Microsoft, and did not view those parties as seriously interested in acquiring WhatsApp.  The additional materials the FTC cites reporting purported "[o]vertures" and "interest[s]" – veiled or otherwise – do not create a genuine dispute regarding the fact that those alleged suitors never came forward with real offers.

811.    Regarding the possibility of any acquisition in 2014, Mr. Koum testified, "[T]o me nobody really kind of stepped up to the plate until Facebook came out and said here is an offer and let's talk about the terms if you guys are interested."  Ex. 285 at 163:2-7 (Koum IH Tr.).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited transcripts, but otherwise disputes Statement 811 as materially incomplete

and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Statement 811 omits context indicating that "offer" in Mr. Koum's testimony referred only to having a formal written offer or handshake agreement and contemplated less formal engagement from Google.  Specifically, for the testimony excerpted in Statement 811, Mr. Koum was responding to a question that asked: "Did anyone *besides Facebook or Google* express interest in pursuing discussions with WhatsApp that you thought might lead to an offer?" Ex. 285 at 162:4-6 (Koum IH Tr.) (emphasis added).  Mr. Koum had also specified right before that "[a]n offer to me is something that it's a number you handshake on or you have something written on a piece of paper."  *Id.* at 161:25-162:2.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Koum testified as quoted in the statement.  *See supra* Meta Introduction.

812.   On February 15, 2014, Sheryl Sandberg – then Meta's chief operating officer – emailed Meta's board of directors:  "Earlier tonight, WhatsApp agreed in principle to be acquired by Facebook, at a price of $16 billion, with an additional $3 billion in RSU-based retention packages."  Ex. 175 at -450 (FB_FTC_CID_00003450).

**FTC Response: Undisputed.**

813.   On February 17, 2014, Meta's board of directors met to discuss the proposed WhatsApp acquisition.  *See* Ex. 178 at -385 (FB_FTC_CID_00049384).  Minutes from that board meeting describe Meta's rationales for the transaction, including that the proposed transaction would "mak[e] it more difficult for operating system providers to exclude [Meta's] mobile applications from their mobile operating system platforms."  *Id.* At -386; *see also* Ex. 174 at -298 (FB_FTC_CID_00002297) (stating the same rationale); Ex. 276 at -596.005 (PX10858,

FB_FTC_CID_10650595) (noting "[t]he mobile ecosystem is characterized by extremely high concentration by Android [Google] and iOS [Apple]").  A slide deck presented to Meta's board of directors regarding the transaction also identifies as a rationale for the transaction that WhatsApp could "help Facebook grow by exposing Facebook to people who are not yet part of" Facebook.  Ex. 276 at -596.005 (PX10858, FB_FTC_CID_10650595).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited documents, but otherwise disputes Statement 813 as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

With respect to the second sentence of Statement 813, the FTC disputes that this sentence reflects a meaningful or motivating rationale for Meta's acquisition of WhatsApp. Meta has not offered any evidence that operating system providers were contemplating excluding Meta's mobile applications from their mobile operating system platforms.  Nor is the FTC aware of any plans by Meta for how the WhatsApp acquisition would help to achieve this objective or any efforts by Meta to achieve this objective post-acquisition.

With respect to the third sentence of Statement 813, the FTC disputes that this sentence reflects a meaningful or motivating rationale for Meta's acquisition of WhatsApp.  The FTC is not aware of any plans by Meta or how the WhatsApp acquisition would help to achieve this objective.  Mr. Acton also testified:

> Q. During negotiations, did you cover how WhatsApp would benefit Facebook Blue?
>
> A. No.
>
> Q. Did you cover how WhatsApp would benefit Facebook Messenger?
>
> A. No.
>
> Q. Did you cover how WhatsApp would benefit Instagram?

A. No.

PX6009, Acton (Meta/WhatsApp) IH Tr., at 170:18-171:1.

Further, ample evidence indicates, *inter alia*, that Meta pursued its acquisition of WhatsApp out of concern that WhatsApp was a competitive threat to pivot into personal social networking services. *See* CMF at § III.C.2.b.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that minutes from the board meeting where the WhatsApp transaction was presented for approval (as well as other supporting documents) identify several rationales for the acquisition, including to help protect Meta's apps from being de-platformed. *See supra* Meta Introduction.  The document containing the minutes speaks for itself, and the FTC does not offer any rebuttal of that fact.  The FTC's assertion that it is unaware of other evidence supporting the rationales stated in the board minutes ignores the numerous contemporaneous documents cited in the statement itself.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

814.    On February 19, 2014, Meta announced publicly:  "Facebook will acquire WhatsApp for approximately $16 billion, consisting of $4 billion in cash, plus 184 million shares or approximately $12 billion worth of our stock.  In addition, we will grant 46 million RSUs worth approximately $3 billion to the WhatsApp employees, including their founders, that will vest over four years subsequent to closing."  Ex. 194 at -892 (FB_FTC_CID_05809887).

**FTC Response: Undisputed.**

### 3.    WhatsApp Pre-Clearance Review

815.    On March 13, 2014, Meta submitted to the Federal Trade Commission and Department of Justice a Hart-Scott-Rodino Act Premerger Notification Form for the WhatsApp transaction.  *See* Ex. 173 (FB_FTC_CID_00002091).  Before that, the FTC had sent both Meta and WhatsApp requests for voluntary productions of documents relating to the publicly announced transaction.  *See* Ex. 316 (FTC-PROD-00016226) (requesting materials from Meta); Ex. 317 (FTC-PROD-00016227) (requesting materials from WhatsApp).  The FTC also conducted pre-submission interviews.  *See* Ex. 318 (FTC-PROD-00016381).

**FTC Response: Disputed in part.**  The first and second sentences of Statement 815 are undisputed.  Facebook filed its HSR form on March 13, 2014.  Nine days prior to that, on March 4, 2014, an FTC attorney sent an informal voluntary document request to Facebook's counsel, Tom Barnett, seeking seven categories of documents, and sent an informal voluntary document request to WhatsApp's counsel, Hanno Kaiser, seeking eight categories of documents.

The third sentence of Statement 815 is disputed because it is not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h). Statement 815 cites to Ex. 318 (FTC-PROD-00016381) in support of its assertion that the FTC conducted pre-submission interviews.  Exhibit 318 is an email exchange between an FTC attorney and Facebook counsel, Tom Barnett, discussing an upcoming interview of two Facebook executives, Javier Olivan and Raymond Endres, which was scheduled to take place on March 10, 2014.  But the last email in this exchange is from one FTC attorney to her FTC colleagues on March 10, 2014, stating: "I am in the office, but need to leave by 2:15." Accordingly, the cited material does not indicate whether the call that was scheduled on March 10, 2014, actually took place.

**Meta Reply:**  The FTC's response does not create a genuine dispute as to the fact that

Meta submitted the required pre-merger notifications and the FTC sent Meta document requests.

*See supra* Meta Introduction.  Whether the interviews took place on March 10, 2014 or another

date is immaterial.

816.    Between March 13, 2014 and April 3, 2014, Meta and WhatsApp produced to the

FTC more than 1,000 pages of documents and data, including emails collected from the custodial

files of Mark Zuckerberg (Meta's chief executive officer), Sheryl Sandberg (then Meta's chief

operating officer), Javier Olivan (then Meta's vice president of growth and analytics; currently

its chief operating officer), Amin Zoufonoun (then Meta's director of corporate development),

and others.  *See* Ex. 173 (FB_FTC_CID_00002091); Ex. 176 (FB_FTC_CID_00003790);

Ex. 319 (FTC-PROD-00015377) (WhatsApp document production); Ex. 320 (FTC-PROD-

00015458) (WhatsApp data production); Ex. 321 at -230 (FTC-PROD-00016230) (providing

WhatsApp "ordinary course of business documents relating to (i) discussions with actual or

potential investors, (ii) any potential acquisition of WhatsApp, (iii) any potential acquisition by

WhatsApp, and (iv) communications between WhatsApp's founders and Mark Zuckerberg").

**FTC Response: Undisputed but incomplete.**  It is undisputed that between March 13, 2014 and

April 3, 2014, Meta and WhatsApp produced to the FTC more than 1,000 pages of documents

and data, including emails collected from the custodial files of Mark Zuckerberg (Meta's chief

executive officer), Sheryl Sandberg (then Meta's chief operating officer), Javier Olivan (then

Meta's vice president of growth and analytics; currently its chief operating officer), Amin

Zoufonoun (then Meta's director of corporate development), and others, but Statement 816 is

incomplete because it omits that a number of 4(c) documents were withheld by Facebook on the

basis of privilege.  Specifically, Facebook's Hart-Scott-Rodino premerger notification filing

includes a privilege log listing 25 documents that were withheld in their entirety for privilege—more documents than were submitted with the filing itself.  Ex. 173 (FB_FTC_CID_00002091 at -100-06).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta produced documents and data to the FTC.  *See supra* Meta Introduction.

817.    During its review of the WhatsApp transaction, the FTC interviewed 16 individuals from 9 nonparty companies.  *See* Ex. 309 at 10, Appx. A (FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. (Oct. 7, 2022)).  The FTC also collected documents from some nonparty companies; for example, ████████████████████████████ ██████████, *see* Ex. 2 at ¶ 279 (Carlton Rep.) ████████████████████████████ ████████████████████████████████████████████████ ████████████████  Ex. 322 at -373.002 (FTC-PROD-00015372).

**FTC Response: Disputed in part.**  Sentence 1 of Statement 817 is undisputed.  Sentence 2 of Statement 817 is disputed for two reasons.  First, the FTC disputes the second sentence of Statement 817 as not supported by the cited material, as required by Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  Sentence 2 of Statement 817 states that the FTC collected documents from "some nonparty companies," and cites to Ex. 322 in support.  Exhibit 322 is an email from Microsoft in-house counsel, Randy Long, to an FTC attorney, dated March 31, 2014, attaching a document requested by the FTC attorney.  Exhibit 322 does not include or refer to any other document productions from any other nonparty companies.  Accordingly, Ex. 322 does not support the assertion in sentence 2 of Statement 817 that the FTC collected documents from "some" nonparty companies.

Second, sentence 2 of Statement 817 makes an incorrect and misleading characterization about a document produced by Microsoft Corporation to the FTC during the review of the WhatsApp transaction.  Sentence 2 states, in pertinent part, that Microsoft Corporation "submitted a presentation stating about WhatsApp that the United States is 'not deeply penetrated – unlimited texting plans from telcos are one key factor.'"  The presentation in question was entitled "OTT Adoption.pptx" and discussed the "scale and rate of adoption for mobile Over-the-Top apps" and depicted the "[u]ser penetration of messaging apps" including KakaoTalk, Kik Messenger, LINE, WeChat, and WhatsApp.  Ex. 322 at -373.001-373.002 (FTC-PROD-00015372).  While the document contains the language quoted in sentence 2 of Statement 817, Statement 817's characterization that the presentation stated "about WhatsApp" in particular that the United States is "not deeply penetrated – unlimited texting plans from telcos are one key factor" is incorrect and misleading.  The presentation stated, in connection with a chart below depicting the user penetration rates of five separate messaging apps (KakaoTalk, Kik Messenger, LINE, WeChat, and WhatsApp) by country, "US, Canada, Australia, and France are not deeply penetrated – unlimited texting plans from telcos are one key factor."  Ex. 322 at -373.002 (FTC-PROD-00015372).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that the FTC sought and collected materials and information from nonparties or that the material produced by one of the nonparties contains the quoted language.  *See supra* Meta Introduction.

818.    On April 10, 2014, it was publicly reported that the FTC had closed its investigation; the FTC did not issue a "Second Request" for the proposed transaction upon the expiration of the mandatory 30-day waiting period.  *See* Ex. 2 at ¶ 207 (Carlton Rep.).

**FTC Response: Undisputed.**

819.     The FTC's public description of "Premerger Notification and the Merger Review Process" states:  "If the waiting period expires or is terminated, the parties are free to close their deal."  Ex. 450 at 2 (FTC, *Premerger Notification and the Merger Review Process*).

**FTC Response: Undisputed.**

820.     In response to Meta's First Set of Requests for Admission, "the FTC admits that its investigation of Facebook, Inc.'s proposed acquisition of WhatsApp was 'competent.'" Ex. 430 at 4, FTC's Resp. to Meta's Req. for Admis. No. 2 (FTC's Objs. & Resps. to Meta's First Set of Reqs. for Admis. (May 4, 2023)).

**FTC Response: Undisputed but incomplete.**  It is undisputed that in response to Meta's First Set of Requests for Admission, the FTC admitted that its investigation of Facebook, Inc.'s proposed acquisition of WhatsApp was "competent," subject to the FTC's objection that the term "competent" is vague.  While the selected excerpt is quoted accurately, it is incomplete because Meta's Request for Admission sought the FTC to "[a]dmit that, in 2014, the FTC conducted a competent and thorough investigation of Facebook, Inc.'s proposed acquisition of WhatsApp." The FTC's response stated that "the FTC denies that its investigation of Facebook, Inc.'s proposed acquisition of WhatsApp was 'thorough.'"  Ex. 430 at 4, FTC's Resp. to Meta's Req. for Admis. No. 2 (FTC's Objs. & Resps. to Meta's First Set of Reqs. for Admis. (May 4, 2023)).

**Meta Reply:**  The FTC's response – denying that it conducted a "thorough" investigation – does not create a genuine dispute of material fact that the FTC admitted its investigation of the WhatsApp acquisition was competent.  *See supra* Meta Introduction.

821.     The European Commission continued to investigate the proposed transaction after April 2014; on October 3, 2014, it published an Article 6(1)(b) Non-Opposition, concluding that

"the European Commission has decided not to oppose the Transaction," Ex. 451 at ¶ 191

(MetaFTC-DX-1082), and stating:

>  a.  "If consumer communications apps were included in the potential market for
>
>  social networking services, the number of alternative providers would expand
>
>  substantially.  In particular, it would encompass such market players as
>
>  WhatsApp, LINE, WeChat, iMessage, Skype, Snapchat, Viber, and Hangouts.
>
>  The market would also potentially include other non-consumer
>
>  communications services providers which enable interaction and exchange of
>
>  content between users, such as YouTube."  Ex. 451 at ¶ 150 (MetaFTC-DX-
>
>  1082).
>
>  b.  "Consequently, if the potential market for social networking services includes
>
>  consumer communications apps such as WhatsApp, there are a significant
>
>  number of alternative service providers, which are used by consumers
>
>  interchangeably."  Ex. 451 at ¶ 152 (MetaFTC-DX-1082).
>
>  c.  "During the market investigation, several third parties argued that (i) absent
>
>  the Transaction WhatsApp would become a provider of social networking
>
>  services in competition with Facebook. . . .  As regards the first claim
>
>  concerning potential competition, the Commission collected and assessed
>
>  relevant evidence. . . .  No indication was found of WhatsApp's plans to
>
>  become a social network which would compete with Facebook absent the
>
>  merger.  Indeed, the focus of WhatsApp has traditionally been on offering a
>
>  light and simple communications service on smartphones only."  Ex. 451
>
>  at ¶¶ 144-145 (MetaFTC-DX-1082).

**FTC Response: Undisputed but incomplete.**  The FTC objects that Statement 821 does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  It is undisputed that the cited European Commission decision contains the words quoted in Statement 821.  However, the excerpt is incomplete because it fails to note the truncated nature of the European Commission's inquiry: The European Commission received notice of the transaction on August 29, 2014, and issued its decision not to oppose the transaction thirty-five days later on October 3, 2014.  *See* Ex. 451 at ¶¶ 1, 191 (MetaFTC-DX-1082).

822.    On October 6, 2014, Meta completed its acquisition of WhatsApp.  *See* Ex. 452 (Facebook, Inc. Form 8-K (Oct. 6, 2014)).

**FTC Response: Undisputed.**

### 4.    Post-Acquisition WhatsApp

823.    Since the acquisition, Meta has invested more than a billion dollars in WhatsApp.  *See* Ex. 169 at 13-14 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 6 (Sept. 22, 2022)); *see also* Ex. 170 at 21-25, Meta's Resp. to FTC's Interrog. No. 10 (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)).  In 2022 alone, Meta spent more than $35 billion on research and development across its business.  Ex. 353 at 71 (Meta 2022 Form 10K).

**FTC Response: Disputed in part.**  The FTC cannot verify and therefore disputes the first sentence of Statement 823 because the cited interrogatory response does not provide any support for the claim that "Meta has invested more than a billion dollars in WhatsApp."  *See* Fed. R. Civ. P. 56(c)(1)(A) and Local Rule 7(h).  Meta's interrogatory response asserted vaguely and without evidence that Meta invested money "in developing, expanding, monetizing, and otherwise improving the product."  Ex. 169 at 13 (Meta's Suppl. Objs. & Resps. to FTC's Interrog. No. 6 (Sept. 22, 2022)).

The FTC does not dispute that the second sentence of Statement 823 comports with the investment figures provided in Meta's 2022 annual filing, but this figure does not indicate what, if any, of this overall number was spent on Instagram or WhatsApp as opposed to Facebook, advertising, Reality Labs, or any of Meta's other products. *See, e.g.*, Ex. 353 at 71 (Meta 2022 Form 10K) (stating that this expense included "$1.31 billion impairment charges to leases and leasehold improvements.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta has invested more than a billion dollars in WhatsApp following the acquisition. *See supra* Meta Introduction.  The FTC had the opportunity to test Meta's interrogatory response in discovery and it admittedly has no basis to dispute the fact asserted with sworn verification.  The FTC's assertion that it now cannot verify the response does not dispute the stated fact.

824.    An academic study prepared in 2023 independent of any litigation determined that WhatsApp generates between $25,605,661,848 and $31,514,660,736 in annual consumer surplus.  *See* Ex. 2 at ¶ 229 & tbl. 28 (Carlton Rep.).  The study "used incentivized choice experiments involving 39,717 users in 13 countries to estimate consumer welfare," as well as "surveys to estimate the relative value of other apps to Facebook." *Id*. at ¶ 347.  The study found that the median consumer's "willingness-to-accept" value for WhatsApp was "roughly $30 per month." *Id*.

**FTC Response: Disputed.**  The FTC disputes the consumer surplus estimates generated by Professor Carlton using the Brynjolfsson academic study—and reported in Statement 824—for at least five reasons.

First, the FTC disputes the characterization of Statement 824 indicating that an academic study "determined" that WhatsApp "generates" the consumer surplus figures reflected in

Statement 824.  Those figures do not appear in the academic study cited by Professor Carlton.

Rather, Professor Carlton himself generated the consumer surplus estimates reflected in

Statement 824 by ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████.  As Professor Carlton noted: ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████  *See* Ex. 2 at ¶ 229 (Carlton Rep.) (emphasis

added).

Second, the underlying study is inadmissible hearsay not capable of being rendered in an

admissible form at trial.  *See* Fed. R. Civ. P. 56(c)(2).  In Statement 824, Meta cites a portion of

Professor Carlton's rebuttal report that generates consumer surplus estimates using "willingness-

to-accept" values of an underlying study, which is itself inadmissible.  *See* Ex. 2 at ¶ 229 &

tbl. 28 (Carlton Rep.) (citing PX0499, Erik Brynjolfsson et al., *The Digital Welfare of Nations:

New Measures of Welfare Gains and Inequality*, NBER (Sept. 2023),

http://www.nber.org/papers/w31670).

Third, the FTC disputes the statement that the study was "prepared . . . independent of

any litigation."  Meta has not established the purpose for which this study was created or that the

cited study was not prepared for litigation.  Five of the study's eight authors are or were Meta

employees when the research was conducted, and the research appears to have been conducted

after the FTC filed this case in December 2020.  *See* PX0499 at 1, Erik Brynjolfsson et al., *The

Digital Welfare of Nations: New Measures of Welfare Gains and Inequality*, NBER (Sept. 2023),

http://www.nber.org/papers/w31670 ("A.L., D.K., H.G., and D.D. are employees of Meta

Platforms and hold a financial interest in Meta.  N.W. was an employee of Meta while this

research was conducted . . . ."); *see also id*. at 24, App'x Fig. 3 (noting that offer "ends 4/7/22 at 11:59pm PST").

Fourth, the study relies on an unreliable methodology as described in the FTC's Response to Statement 711.

Finally, the FTC disputes Statement 824 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  As Professor Hemphill explained, Professor Carlton's consumer surplus estimates are "beside the point," as "the presence of consumer surplus does not indicate a lack of market power or anticompetitive conduct resulting in significant consumer harm."  PX9007, Hemphill Rebuttal Report at ¶ 804.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that WhatsApp generates tens of billions of dollars in annual consumer surplus, as reflected in Professor Carlton's rebuttal report.  *See supra* Meta Introduction.  Professor Hemphill had the opportunity to rebut Professor Carlton's opinions and the FTC had the opportunity to probe them in discovery, and none of the FTC's "five reasons" for disputing Meta's evidentiary showing has merit.

*First*, the cited materials support Professor Carlton's calculations based on the independent academic study he cites; the FTC does not dispute any aspect of his calculations.

*Second*, Professor Carlton's reliance on independent academic studies is admissible under Federal Rule of Evidence 703.  Meta observes that the FTC's proffered experts rely on academic studies in forming their opinions.

*Third*, the FTC's assertion that some of the authors of the independent academic study were or are Meta employees does not establish that the study was conducted for this litigation, and the FTC has no basis for asserting otherwise.

*Fourth*, the FTC cites no record material or economic literature contesting the use of willingness-to-accept and willingness-to-pay figures to estimate consumer surplus. *See* Ex. 2 at ¶ 229 (Carlton Rep.). Professor Carlton expressly provides high and low ranges of estimated surplus, using both willingness-to-accept and willingness-to-pay data.

*Fifth*, the assertion that the presence of consumer surplus is "beside the point" is incorrect because consumer surplus is relevant to assessing the consumer welfare effects of the challenged transactions, which Professor Hemphill conceded is relevant to evaluating whether conduct is anticompetitive: "Q. . . . Now, turning to the question of anticompetitive effects, you agree that the proper standard for judging effects here is consumer welfare, correct? . . . A. Yes. I would broadly agree that consumer welfare compared to the but-for world in which the acquisitions did not take place, you know, as – it's an important caveat as experienced by users of personal social networking services is the right way to think about competitive effects." *See supra* Meta SMF ¶ 715 (quoting Ex. 283 at 267:14-268:2 (Hemphill Dep. Tr.)). Professor Hemphill continued: "Q. . . . If consumer welfare is higher in the actual world than it would have been in the but-for world, then you would agree that the conduct in question is not anticompetitive, correct? . . . A. I would – I would agree that if consumer welfare for personal social networking users is higher in the actual world than in the but-for world, that, you know, that would be adverse to a conclusion about competitive effects." *Id.* (quoting Ex. 283 at 268:21-269:19 (Hemphill Dep. Tr.)). Finally, as Professor Carlton explained in concluding his analysis of these surplus figures: "The precise numbers are irrelevant for purposes of this analysis: the point is simply that Meta's apps clearly generate enormous value for hundreds of millions of users in the U.S. and billions of users worldwide." Ex. 2 at ¶ 229 (Carlton Rep.).

### a.     Post-Acquisition Monetization

825.     After acquiring WhatsApp, Meta eliminated the WhatsApp subscription fee.  *See* Ex. 285 at 166:5-16 (Koum IH Tr.).  WhatsApp co-founder Brian Acton testified: "Q. And why did WhatsApp end the annual subscription fee?  A. Mark Zuckerberg wanted it.  Q. Did he say why he wanted to end the subscription fee?  A. I think the product could grow faster if it was free effectively, so we took it out."  Ex. 314 at 222:5-11 (Acton IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the terms "[a]fter acquiring WhatsApp," "grow faster," and "free effectively" as vague.

The FTC does not dispute that Meta eliminated WhatsApp's subscription fee, or that the quoted language appears in the cited document, but otherwise disputes Statement 825 as described herein.

The FTC disputes Statement 825's second sentence as incomplete and misleading because it ignores Mr. Acton's testimony immediately after the cited exchange: "Q. Did WhatsApp grow faster as a result of eliminating the subscription fee?  A. Not to my knowledge."  Ex. 314 at 222:12-14 (Acton IH Tr.).  The FTC further disputes Statement 825's second sentence as vague because the testimony does not indicate whether it was Mr. Zuckerberg or Mr. Acton that "[thought] the product could grow faster if it was free effectively."

The FTC further disputes Statement 825 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that Meta's acquisition of WhatsApp was not necessary for the removal of the subscription fee, and that Meta's removal of the subscription fee was part of the anticompetitive conduct and effect of the acquisition.  *See supra* at FTC Responses to Statements 763 & 764.

**Meta Reply:**  The FTC's response does not create a genuine dispute as to the fact that Meta eliminated WhatsApp's subscription fee, which benefited consumers.  As to the FTC's other responses, Meta incorporates its above reply to paragraph 764.  The FTC does not cite any evidence that WhatsApp was going to eliminate its fees without the Meta acquisition – it has (at most) only speculation.

826.    WhatsApp remains free to use at zero price ($0.00) in any amount without display advertising.  *See* Ex. 279 at ¶ 49 (Hemphill Rep.) (stating that "Meta has offered the WhatsApp service for free, without advertising"); *see also id.* at ¶ 1103 (same), ¶ 1113 (same); Ex. 314 at 231:11-14 (Acton IH Tr.) ("Q. So I think you might have answered this, but did Facebook implement any of these ads on WhatsApp while you were still at Facebook?  A. No.").

**FTC Response: Disputed in part.**  The FTC objects to the terms "in any amount" and "display advertising" as vague.

The FTC does not dispute that WhatsApp is currently offered at a monetary price of $0.00, or that the quoted language appears in the cited documents, but otherwise disputes Statement 826 as described herein.

The FTC disputes Statement 826's citations to Professor Hemphill's report is incomplete and does not show the absence of a genuine dispute as to a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The cited paragraphs of Professor Hemphill's report also state that Meta's "willingness to absorb ███████ monetary losses ███████ likely has the effect of discouraging entry into messaging, thereby deterring entry by other firms otherwise inclined to pivot into personal social networking."  *See* Ex. 279 at ¶ 49 (Hemphill Rep.); *see also id.* at ¶ 1103 (same); *id.* at ¶ 1113 ("By offering the service for free and without any advertising or other significant form of monetization, WhatsApp makes it more difficult for competing messaging services to

operate profitably and to develop the scale needed to pivot to PSN services.  In this way, Meta has increased barriers to entry in PSN services by blocking the most likely entry path.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Meta offers WhatsApp for free without advertising, which the FTC does not dispute.  The additional materials the FTC cites as necessary for completeness have nothing to do with whether Meta offers WhatsApp for free without showing display advertising, which is the fact stated in this paragraph.  The additional materials are also contradicted by the record, which shows that numerous services with over-the-top messaging have emerged following the WhatsApp acquisition.  *See infra* Meta SMF ¶ 837 (discussing Discord, Signal, Microsoft Teams), ¶ 836 (discussing iMessage, which had grown to ███████ monthly active users in the United States by 2021).

827.    Meta "monetize[s] WhatsApp in two ways" – both developed by Meta after the WhatsApp acquisition – "(i) Paid Messaging and (ii) Click-to-WhatsApp ads."  Ex. 265 at -300 (FTC-META-012554300).

**FTC Response: Disputed in part and incomplete.**  The FTC does not dispute that Meta monetizes WhatsApp through paid messaging, or that the quoted language appears within the cited document, but otherwise disputes Statement 827 as described herein.

The FTC disputes Statement 827 as not showing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  In its response to FTC information requests in this matter, Meta ████████████████████████████████████████████████████ ██████████████████.  *See* PX9005, Hearle Report at ¶ 62-64 (explaining ██████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████

███████ ); *see also* PX3337, Meta data production: Meta's Resp. to FTC's Req. for Prod. No.

68(b), (Feb. 28, 2023), FTC-META-012005015; PX15556 at -002, Ltr. from L. Smith (Meta

Counsel) to FTC re: "data responsive to the FTC's Second Set of RFPs," (Dec. 2, 2022) ("There

are no ads on WhatsApp and therefore no data for WhatsApp is included here.").  Meta's internal

documents suggest as little as ████ and at most ████ of Click-to-WhatsApp revenue is

"incremental" to Meta's consolidated revenues and attributable to WhatsApp.  PX9005, Hearle

Report at ¶ 61; *see also* PX15275, Meta message board post: ███████ post to Click to

WhatsApp – FYI (Mar. 12, 2019), FTC-META-011627747, at -747 (incrementality of Click to

WhatsApp revenue estimated to be █████████ depending on the approach); *see also*

PX15277, Meta document: "CtWA Incrementality – June 2021," (June 24, 2021), FTC-META-

012249178, at -178 ("Incrementality defines the net new revenue FB makes because of the

existence of CtWA[.]  Historic calculations put this at ████ of CtWA revenue but a revised

calculation shows this is now ████"); PX2993, Meta message board post: ████████ post to

Click to WhatsApp – x-Fam Working Group (Nov. 29, 2021), FTC-META-011737951, at -951

(about ████ of CtWA revenue is incremental compared to Messaging Ad revenue across CtWA).

The FTC further disputes Statement 827 as vague and incomplete as to the timing of

these two efforts at monetization.  These two efforts at monetization were launched years after

Meta's acquisition of WhatsApp.  Click-to-WhatsApp advertisements were launched on

December 13, 2017, more than four years after Meta's acquisition of WhatsApp.  *See* PX3200,

Meta email chain: ███████ to D. Fischer, et al. re: "Facebook ads that click-to-WhatsApp

launches tomorrow (Dec 13)," (Dec. 12, 2017), FB_FTC_CID_03858999, at -999.  WhatsApp's

paid messaging service launched in 2018, five years after Meta's acquisition of WhatsApp.  *See*

PX0505, *Growing Our Tools for Business*, WhatsApp Blog (Aug. 1, 2018),

https://blog.whatsapp.com/growing-our-tools-for-business.

The FTC further disputes (to the extent implied by Statement 827) that Meta's support was necessary for WhatsApp to develop paid messaging or to partner with other apps to launch Click-to-WhatsApp advertising.  Evidence shows that other apps have developed paid messaging; for example, an internal Meta presentation from January 2020 observed that Meta was "not the only player investing in this [business messaging] space."  PX10060, Meta document: "Business Messaging Review Presentation" (Jan. 30, 2020), FTC-META-001402152, at -170.  Concerning Click-to-WhatsApp advertising, Professor Aral opined in his report that "the record suggests that WhatsApp would have been capable of launching such a feature—even on Instagram and Facebook—as an independent company."  Ex. 286, Aral Report at ¶ 290; *see also* CMF at § V.H.5.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the two primary ways Meta monetizes WhatsApp:  paid messaging and Click-to-WhatsApp ads.  The FTC does not dispute that Meta monetizes WhatsApp via paid messaging – only that it monetizes WhatsApp via Click-to-WhatsApp ads.  The materials the FTC cites do not create a genuine dispute that Meta monetizes WhatsApp via Click-to-WhatsApp ads.

As Meta's documents explain, Click-to-WhatsApp generates revenue: ███████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████



PX15269 at -367 (FB_FTC_CID_02127365).

In addition, the FTC is incorrect that Meta did not produce Click-to-WhatsApp revenue data.  Meta produced ████████████████████████████████████████ ████████████████████████, in response to the FTC's Fourth Set of Interrogatories, Interrogatory No. 14, at Bates number FTC-META-012309813.  *See* Ex. 469 at 3 (May 5, 2023 Production Cover Letter. As Professor Tucker observed based on those data and Meta's documents, by the third quarter of 2022, the annual revenue run rate of Click-to-WhatsApp ads had surpassed $1.5 billion with 80% year-over-year growth ████████████████████████ ████████, with quarterly revenues of ██████████████████████ growing to ████ ████████████████████. *See* Ex. 4 at ¶ 118 & n.246 & p. D-5 (Tucker Rep.) (citing ██████████████████ data produced at FTC-META-012309813 and a Meta earnings call transcript).

The FTC's contention that Click-to-WhatsApp revenue is between ████ and ████ "incremental" to Meta's consolidated revenues belies the FTC's claim that Meta has not monetized WhatsApp through Click-to-WhatsApp ads.  Even accepting the FTC's ██████████ range – which Meta does not, *see* Meta Resps. to Counter SMF ¶¶ 2435-2437 – shows that Meta has monetized WhatsApp through Click-to-WhatsApp ads.

The FTC's response regarding *when* Meta launched paid messaging and Click-to-WhatsApp is irrelevant and nonresponsive to the fact stated in this paragraph.  Likewise, the FTC's response that "Meta's support was [not] necessary for WhatsApp to develop paid messaging or to partner with other apps to launch Click-to-WhatsApp advertising" has nothing to

do with how Meta has actually monetized WhatsApp.  It is also not supported by the record.  The

only claimed evidence that Professor Aral provides in support of his otherwise unsupported

statement that WhatsApp would have been able to launch Click-to-WhatsApp as an independent

company is a single email showing that, ████████████████████████████████████

████████████████████████████████████.  *See* Ex. 286 at ¶ 290 &

n.475 (Aral Rep.).  The five paragraphs the FTC cites from Section V.H.5 of its

Counterstatement make the same unsupported statements the FTC repeats here and do not

contain any evidence showing WhatsApp would have been able to launch Click-to-WhatsApp in

a but-for world without the acquisition; Meta incorporates its responses to those paragraphs here.

*See* Meta Resps. to Counter SMF ¶¶ 2447-2451.  Against the FTC's unsupported speculation is

extensive evidence that Meta in fact supported WhatsApp's successful monetization.  *See supra*

Meta SMF ¶¶ 825-827, *infra* ¶¶ 828-832; *see also* Ex. 287 at 139:20-140:2 (Aral Dep. Tr.)

(FTC's proffered monetization expert testifying:  "Q. Can you name any stand-alone messaging

app that has monetized more successfully than WhatsApp? . . . A. I don't know.").

 The FTC's cross-reference to a section of its Counterstatement without explanation does

not itself create a genuine dispute of material fact.  While no reply is required, none of those

paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to

those paragraphs here.

 828. Paid Messaging, which operates via the WhatsApp Business API, is a way for

businesses to "communicat[e] with customers at scale through programmatic access."  Ex. 4

at ¶ 109 & n.225 (Tucker Rep.).  Businesses may, for example, "initiate conversations related to

marketing, utility, and authentication, as well as to respond to customers' service

requests."  Ex. 4 at ¶ 109 (Tucker Rep.) (summarizing Paid Messaging functionalities).  These

services "generated over ███████ in revenue worldwide in 2022, with ██████████ generated from non-U.S. regions."  Ex. 4 at ¶ 112 (Tucker Rep.) (summarizing revenue data).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited document, or that paid messaging on WhatsApp is a way for certain businesses to communicate with customers, but otherwise disputes Statement 828 as described herein.

The FTC disputes Statement 828's first sentence as incomplete.  Evidence indicates that on WhatsApp, paid messaging is only available for "medium and large businesses," not "businesses" generally.  *See* Ex. 4 at n.225 (Tucker Rep.) (citing *WhatsApp Business – Products*, WhatsApp, https://business.whatsapp.com/#productsproducts) ("WhatsApp Business Platform[:] For medium to large businesses communicating with customers at scale through programmatic access.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding how WhatsApp's Business API functions.  *See supra* Meta Introduction.

829.    A long-range plan that Meta prepared for its board of directors in 2023 states: ██████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
██████████████████████████████ Ex. 265 at -300-301, -306 (FTC-META-012554300).

**FTC Response: Disputed in part.**  The FTC objects to the term "long-range plan" as vague as to time.

The FTC does not dispute that the quoted language appears in the cited document, but disputes Statement 829 as described herein.

The FTC disputes Statement 829's framing of the cited document as a "prepared for its board of directors" because it is unsupported by the cited document. *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

The FTC further disputes Statement 829 as incomplete because the alleged projected revenue of ██████████ for Paid Messaging is speculative and lacking in underlying support, as reflected in testimony from Meta's expert, Catherine Tucker:



> Q. And also in paragraph 112, you credit Meta's projections that revenues through the WhatsApp business API will grow from ██ ██ in 2022, to ██████████; is that right?
>
> . . .
>
> A. Yes. I don't know if I credit it, but I certainly report it. This document -- I don't know what you mean by "credit." I just repeat what the document says.
>
> Q. You're not vouching for that growth projection, correct?
>
> A. I mean, I think that's a big question.  I don't think – it's very hard for anyone to vouch for any projection, because the point is it's a projection, it's your best guess about what's going to happen.  But my memory of that document is that it did seem based on analysis rather than just being fanciful or something like that.
>
> Q. You didn't analyze whether those growth predictions are sound, correct?
>
> A. I mean, again, when you analyze a projection, you can't vouch that the projection is going to be true.  It's a projection.  All you can analyze is does it seem to be based on sound math, sound understanding of the business model, and my recollection at least is that it was.
>
> Q. And as your footnote notes, that level of growth from ██ ██ in 2022, to ██████████, would require a consistent year over year growth of ██████ per year between 2022 and ██, correct?

██████████████████

PX6169, Tucker (Meta) Dep. Tr., at 263:9-264:19.

The FTC further disputes Statement 829 as incomplete and misleading because it ignores the ██████ monetary losses that WhatsApp has incurred since being acquired by Meta.  *See* PX9005, Hearle Report, Table 6.1, Table 6.3 (explaining WhatsApp lost ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ ); *id.* at ¶ 67 (explaining that WhatsApp's losses in Tables 6.1 through 6.3 ████████████████████████████████████ ); *see also* PX9003, Aral Report at ¶¶ 281-285 (noting that WhatsApp ████████████████████████████ ████████ the average revenue per user (ARPU) that WhatsApp generated through a simple subscription model prior to the acquisition).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding Meta's long-range projections for WhatsApp's paid messaging revenue as stated in paragraph 829.  The FTC does not identify any evidence that contradicts the revenue projections in paragraph 829 or provide any legitimate reason to question the projections.  The only evidence the FTC cites in support of its purported dispute is testimony from Meta's expert, Professor Tucker, but that testimony on its face supports the projections.  Professor Tucker testified that she believed the projections were "based on analysis" and "based on sound math, sound understanding of the business model."  PX6169 at 264:3-13 (Tucker Dep. Tr.).  Her testimony also related only to the projected revenue of ████████████████ for paid messaging, and not any of the other metrics stated in paragraph 829 or Exhibit 265.  *See id.* at 263:9-264:13.

The FTC also objects that "long-range plan" is vague as to time, but the document itself states in numerous places, on every page, that the projections are through ██ . *See* Ex. 265 at -300, -301, -302, -303, -304, -305, -306 (FTC-META-012554300).

The FTC's further response that paragraph 829 is "incomplete and misleading" because it ignores what the FTC claims are WhatsApp's "████████ monetary losses" since the acquisition is irrelevant and nonresponsive to the facts stated in paragraph 829, which regard Meta's *future* revenue projections.  The FTC's loss calculations for WhatsApp that it repeats again in response to paragraph 829 are also fundamentally flawed, as stated above in Meta's reply to paragraph 827, and Meta's responses to paragraphs 2435-2437 in the FTC's Counterstatement.  WhatsApp has begun earning significant revenue.  *See infra* Meta SMF ¶ 831 ("Global revenue from Click-to-WhatsApp has grown from ████████████████████████████ to ████████████████ ████████████████ ," and "[a]s of 2022, Click-to-WhatsApp had 'passed a $1.5 billion run rate' and was 'growing more than 80% year-over-year.'"), ¶ 828 (in 2022 paid messaging generated more than ████████ in revenue in the U.S. and more than ████████ worldwide).

830.    "Click-to-WhatsApp ads are ads on Facebook News Feed, Stories, and Marketplace or Instagram News Feed, Stories, and Explore that have a 'Send Message' button the user can click on that takes them to WhatsApp to start a conversation with the advertiser."  Ex. 4 at ¶ 114 (Tucker Rep.); *see also* Ex. 314 at 227:12-19 (Acton IH Tr.) ("[S]o the ad may have some had call out, like 'Click here to get more info.'  And then, you know, you would click on the – click somewhere or tap on your phone and it would launch WhatsApp.  It would go straight to a conversation with the business and then you could ask the business something.  You could say 'Can I have more info?' and the person would respond.").

**FTC Response: Undisputed.**

831.    Global revenue from Click-to-WhatsApp has grown from ████████████

████████████ to ████████████████████████████████. *See* Ex. 4 at ¶ 118 (Tucker

Rep.) (summarizing Meta revenue data).  As of 2022, Click-to-WhatsApp had "passed a

$1.5 billion run rate" and was "growing more than 80% year-over-year."  Ex. 453 at 3 (Meta Q3

2022 Earnings Call Tr.).

**FTC Response: Disputed in part.**  The FTC objects to the term "[a]s of 2022" as vague

as to time.

The FTC does not dispute Statement 831's first sentence, or that the quoted language

appears in the cited documents, but disputes Statement 831 as described herein.

The FTC disputes (to the extent implied by Statement 831) that Meta's support was

necessary for WhatsApp to achieve the revenue figures that Statement 831 lists.  Without being

acquired by Meta, WhatsApp was a significant threat to pivot into personal social networking,

with advertising as an accompanying business model.  *See, e.g.*, PX9000, Hemphill Report at ¶¶

1003-1007 (describing WhatsApp monetization, including that "monetizing through advertising

PSN services was an attractive opportunity in light of difficulties with advertising within a

mobile messaging service itself"); PX9007, Hemphill Rebuttal Report at ¶¶ 720-722 (noting that

"it is entirely plausible that WhatsApp in the but-for world would have ended the subscription

fee, before or concurrently with pivoting," and that "WhatsApp's PSN offering would

(eventually) likely be monetized through ads"); PX9014, Rim Rebuttal Report at ¶¶ 103-106

("Absent the acquisition by Meta, WhatsApp was likely to monetize going forward"); *see also*

PX9014, Rim Rebuttal Report at ¶¶ 107-110 (noting that "a likely evolution path for WhatsApp

would have involved expansion into adjacent uses").  Meta itself has stated that there are "a

multitude of players that . . . have a strong digital advertising offering."  PX3009, Meta

document: "Facebook Ireland Limited's Response to the Competition and Markets Authority's Request for Information of 18 July 2019," (Sept. 13, 2019), FB_FTC_CID_00050114, at -262.  And revenue to the degree noted in Statement 831 is not unique to Meta: Amazon, ████████, Pinterest, Snap, Twitter, and YouTube all generate billions of dollars of advertising revenue.  *See* CMF at § V.C.3.d; *see also generally* CMF at § V.C.

Furthermore, while the FTC does not dispute that the cited materials contain the Click-to-WhatsApp revenue numbers reported here, the FTC notes that, in its response to FTC information requests in this matter, Meta ████████████████████████████████ ████████████████████████████████.  *See* PX9005, Hearle Report at ¶¶ 62-64 (explaining ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████); *see also* PX3337, Meta data production: Meta's Resp. to FTC's Req. for Prod. No. 68(b), (Feb. 28, 2023), FTC-META-012005015; PX15556 at -002, Ltr. from L. Smith (Meta Counsel) to FTC re: "data responsive to the FTC's Second Set of RFPs," (Dec. 2, 2022) ("There are no ads on WhatsApp and therefore no data for WhatsApp is included here.").  Meta's internal documents suggest as little as ████ and at most ████ of Click-to-WhatsApp revenue is "incremental" to Meta's consolidated revenues and attributable to WhatsApp.  PX9005, Hearle Report at ¶ 61; *see also*  PX15275, Meta message board post: █ ████████ post to Click to WhatsApp – FYI (Mar. 12, 2019), FTC-META-011627747, at -747 (incrementality of Click to WhatsApp revenue estimated to be ██████████ depending on the approach); *see also* PX15277, Meta document: "CtWA Incrementality – June 2021," (June 24, 2021), FTC-META-012249178, at -178 ("Incrementality defines the net new revenue FB makes because of the existence of CtWA[.]  Historic calculations put this at ████ of CtWA

revenue but a revised calculation shows this is now ███"); PX2993, Meta message board post:

████████ post to Click to WhatsApp – x-Fam Working Group (Nov. 29, 2021), FTC-META-011737951, at -951 (about ███ of CtWA revenue is incremental compared to Messaging Ad revenue across CtWA).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding the global revenue that Click-to-WhatsApp has generated.  Indeed, the FTC's response does not identify anything in paragraph 831 that it disputes.  The FTC's responses that "Meta's support was [not] necessary for WhatsApp to achieve the revenue figures that Statement 831 lists," that "WhatsApp was a significant threat to pivot into personal social networking," and its recitation of the same Click-to-WhatsApp incremental revenue figures that it repeats throughout its responses, are all irrelevant and nonresponsive to the facts stated in paragraph 831.  These responses do not create a dispute regarding the global revenue that Click-to-WhatsApp has generated.  They are also unsupported, as stated below.

*First*, the FTC's response that "Meta's support was [not] necessary for WhatsApp to achieve the revenue figures that Statement 831 lists" appears to be based solely on the fact that other ad-supported platforms including Amazon, LinkedIn, Pinterest, Snap, Twitter, and YouTube – none of which is a standalone messaging app – "generate billions of dollars of advertising revenue" and that other apps have strong digital advertising offerings.  The FTC makes no effort to quantify that revenue, compare it to WhatsApp's revenue, or explain how this has anything to do with Click-to-WhatsApp's global revenue.  The FTC's cross-reference to multiple sections of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

*Second*, the FTC's response that WhatsApp "was a significant threat to pivot into personal social networking, with advertising as an accompanying business model" is entirely unsupported (and unrelated to Click-to-WhatsApp's global revenue).

*Third*, the FTC's recitation of what it claims is Click-to-WhatsApp's incremental revenue is not supported, as stated above in Meta's reply to paragraph 150 and in Meta's responses to paragraphs 2435-2437 of the FTC's Counterstatement.

832.    The FTC's proffered monetization expert, Professor Sinan Aral, testified:  "Q. Can you name any stand-alone messaging app that has monetized more successfully than WhatsApp? . . .  A. I don't know."  Ex. 287 at 139:20-140:2 (Aral Dep. Tr.); *see also id.* at 315:2-6 ("Q. Do you know how successful any of those other [business messaging] products have been compared to WhatsApp's? . . .  A. I don't recall, sitting here today."); Ex. 286 at ¶¶ 280, 289-291 (Aral Rep.) (not identifying any stand-alone messaging app that has monetized as or more successfully than WhatsApp).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 832 as described herein.

The FTC disputes Statement 832's description of Professor Aral's testimony and opinions as incomplete and misleading.  Professor Aral's assignments were to assess the monetization claims advanced by Meta, not to offer an opinion regarding all aspects of "monetization."  *See* Ex. 286 at ¶ 8 (Aral Rep.) ("The FTC asked me to evaluate Meta's claimed monetization benefits related to acquiring Instagram and WhatsApp, and to assess (1) whether Meta's acquisitions of Instagram of WhatsApp were necessary to achieve the claimed benefits, and (2) whether, and if so, to what extent, the claimed benefits were actually achieved."); PX9008, Aral Rebuttal Report at ¶ 4 ("The focus of this Rebuttal Report is certain monetization

benefit claims, as well as claims related to advertising targeting and the utility of advertising, made by Meta's experts in their expert reports.").  Professor Aral thoroughly assessed those claims and opined, with robust supporting evidence, that Meta's acquisition of Instagram and WhatsApp were not necessary to achieve Meta's claimed monetization benefits.  *See* Ex. 286, Aral Report at ¶ 11(b) (concluding that "Meta's acquisitions of Instagram or WhatsApp were not necessary to achieve the claimed monetization-related benefits that Meta lists for each acquisition"); PX9008, Aral Rebuttal Rep. at ¶ 15(b) (same).

The FTC further disputes the first transcript reference in Statement 832 as incomplete and misleading because it omits Professor Aral's answers to the two questions immediately preceding the cited material.  Professor Aral's answers to the two preceding questions state his opinions that "Meta's attempt to monetize WhatsApp was largely unsuccessful," Ex. 287 at 138:9-10 (Aral Dep. Tr.) and that "it's reasonable to believe that [the monetization] claimed benefits likely would have been achieved by WhatsApp absent the acquisition."  Ex. 287 at 138:22-139:4.

The FTC further disputes the second transcript reference in Statement 832 as incomplete and misleading because it omits Professor Aral's answers to the two questions immediately preceding the cited materials.  Professor Aral's answers to the two preceding questions state his opinions concerning whether Meta's acquisition of WhatsApp was necessary for WhatsApp to achieve the claimed benefit of business messaging.  Professor Aral noted that "[t]he relevant analysis to determine whether Meta brought unique capabilities to WhatsApp is to seek to find out whether or not there are other similar capabilities being developed and invested heavily in -- in the marketplace, which seems to be the case."  *Id.* at 314:17-315:1.  Professor Aral also explained that in his report, he "noted that several other players were investing heavily in the

space, were leading innovations in the space, were offering specific elements of such a business line, including integrated payments, and reengagement capabilities; and that these other services were all similar to the WhatsApp [B]usiness API." *Id.* at 313:21-314:6.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether its proffered monetization expert, Professor Aral, was able to name any standalone messaging app that has monetized more successfully than WhatsApp.  The FTC points to extensive additional testimony by Professor Aral that the FTC claims is necessary for completeness, but none of that testimony shows Professor Aral identifying any standalone messaging app that has monetized more successfully than WhatsApp.  Nor does the FTC point to anything in either of Professor Aral's reports identifying any standalone messaging app that has monetized more successfully than WhatsApp.  The FTC's other responses describing Professor Aral's assignment and other opinions are irrelevant and nonresponsive to the fact stated in paragraph 832, which is that Professor Aral could not name any standalone messaging app that has monetized more successfully than WhatsApp.  Meta has addressed why Professor Aral's WhatsApp opinions are unsupported and speculative in its reply to paragraph 827 above, and in its responses to paragraphs 2427, 2428, 2444, 2448, and 2451 in the FTC's Counterstatement; Meta incorporates those replies and responses here.

### b.   Post-Acquisition Growth

833.   In June 2022, WhatsApp had ▮▮▮▮▮ U.S. monthly active users.  *See* Ex. 2 at ¶ 228 & tbl. 27 (Carlton Rep.) (citing Professor Hemphill's data reporting that those ▮▮

▮▮▮▮ U.S. monthly active users spent ▮▮▮▮▮▮▮▮▮▮▮▮ – on

the service in June 2022).

**FTC Response: Undisputed.**

834.     As of June 2022, WhatsApp had approximately ███████ global monthly active users, and approximately ████████ U.S. monthly active users.  *See* Ex. 2 at ¶ 214 (Carlton Rep.).

**FTC Response: Undisputed.**

835.     Global time spent on WhatsApp increased from approximately ████████ ████████ per month in May 2018 to approximately ████████████████████ in June 2022; U.S. time spent on WhatsApp increased from approximately ████████████ per month in May 2018 to approximately ███████████ per month in June 2022.  *See* Ex. 170 at 64-65, Meta's Resp. to FTC's Interrog. No. 10(b)(ii) (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)).

**FTC Response: Undisputed.**

836.     Other messaging services grew following the WhatsApp acquisition, e.g., iMessage had grown to more than ███████ U.S. monthly active users by 2021.  *See* Ex. 2 at ¶ 304 (Carlton Rep.) (citing Professor Hemphill's backup data).

**FTC Response: Disputed in part.**  The FTC does not dispute that the cited data shows iMessage with ██████ U.S. monthly active users by 2021, but otherwise disputes Statement 836 as unsupported by the cited material, as the cited material does not show iMessage's usage for any other year, nor does it show that other "messaging services" grew in the post-acquisition period to support the Statement 836's assertion that "mobile messaging services" (plural) have grown.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, since iMessage launched in 2011, it grew to ███████ U.S. monthly active users by 2021.  *See supra* Meta Introduction; Meta SMF ¶ 425.

837.    New services with over-the-top messaging – i.e., services "using internet technology as your underlying backbone" "instead of using traditional telephone technology," Ex. 279 at ¶ 943 (Hemphill Rep.); *see also* Ex. 314 at 32:8-22 (Acton IH Tr.) (describing an "over-the-top messaging product") – emerged following the WhatsApp acquisition, including:

    a.  **Discord (May 2015).**  The "About" page of Discord's website reports: "Discord is a voice, video and text communication service used by over a hundred million people to hang out and talk with their friends and communities."  Ex. 454 at 1 (*About Discord*, https://perma.cc/XW3T-4H7Q).

    b.  **Signal Messenger (November 2015).**  Mr. Acton – who went on to found the Signal Technology Foundation, which operates Signal Messenger, *see* Ex. 163 at 28:22-29:9 (Acton Dep. Tr.) – testified:  "Signal Messenger is a communications app that provides texting, media transfer, voice and video calling, group – group chat; many features that popular messengers, " including "WeChat, LINE, KakaoTalk, Telegram, [and] WhatsApp" – "have." *Id*. at 29:10-18.

    c.  **Microsoft Teams (March 2017).**  Amit Fulay, Microsoft's vice president of product for Teams, Teams Consumer, and GroupMe, testified that the consumer-facing version of Microsoft Teams, launched in May 2021, "is a communications and collaboration product," that supports "text messaging, both one-on-one and group chats," "audio calling," and "video calling, both one-on-one and group video calling," among other features.  Ex. 136 at 9:17-20, 22:16-17, 26:10-21, 28:9-10 (Fulay (Microsoft) Dep. Tr.)

**FTC Response: Disputed in part.**  The FTC does not dispute that the language quoted in the first sentence of Statement 837 appear in the cited material, but disputes that Statement 837 shows the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes that all applications with chat functionalities are equivalent to over-the-top messaging applications like WhatsApp and Facebook Messenger.  For instance, Microsoft Teams' core use case is as an enterprise communications system.  *See* PX0516, Claire Sission, *Five ways Microsoft Teams has transformed Microsoft*, Microsoft Teams Blog, (Apr. 30, 2024), https://www.microsoft.com/insidetrack/blog/five-ways-microsoft-teams-has-transformed-microsoft/ ("It's no secret that companies that remained productive during the COVID era used the latest technology to continue working effectively and efficiently. Microsoft Teams has been a large factor in this.  Companies like Accenture, Toyota, Kohler, Lumen, Ernst & Young, and Pfizer are just a few of the companies that use Microsoft Teams to keep their global enterprises running successfully."); PX15335, Microsoft document: "Product 365 Pre-Read: Teams for Life (Consumer)" (Oct. 2021), MS-LIT_0000006304, at -306 ("38% of the [monthly active users] are in [Teams Consumer] who join meetings for work ([Teams for Work]).").  Similarly, Discord's primary use case is for people to communicate while gaming. ███████████████████ ███████████████  Further, other evidence indicates that, *inter alia*, "no OTT mobile messenger has been able to achieve scale comparable to WhatsApp" in the United State or globally, consistent with Meta operating WhatsApp as a moat.  *See* Ex. 279 at ¶¶ 1117-22 (Hemphill Rep.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that following the WhatsApp acquisition, new services with over-the-top messaging emerged.  *See*

*supra* Meta Introduction.  The FTC's assertion that one of those services has a different "core use case" (whatever that means) does not dispute that fact.

Statement 837 also has multiple subparts at ¶ 837(a) through ¶ 837(c), and the FTC responds to this Fact's subparts as follows:

    a.  **(Discord) FTC Response: Undisputed.**

    b.  **(Signal Messenger) FTC Response: Undisputed.**

    c.  **(Microsoft Teams) FTC Response: Disputed in part.**  The FTC does not dispute that the language quoted in Statement 837(c) appears in the cited transcript, but the FTC disputes the March 2017 date listed, for which no citation is provided.  *See* Fed. R. Civ. P. 56(c)(1)(A); L.R. 7(h).  Mr. Fulay testified that Teams Consumer was launched May 2021 and Teams for Work was launched in 2016.  Ex. 136 at 28:9-13 (Fulay (Microsoft) Dep. Tr.).

        **Meta Reply:**  The FTC's response does not create a genuine dispute of material fact.  Whether Teams for Work launched in 2016, 2017, or 2021 is immaterial – all these dates are after the WhatsApp acquisition.

838.    Other services with over-the-top messaging released new features following the WhatsApp acquisition, e.g., in November 2022, Signal Messenger released Signal Stories, which allows users to create and share images, videos, and texts that automatically disappear after 24 hours.  *See* Ex. 2 at p. 42, tbl. 3 (Carlton Rep.).

    **FTC Response: Undisputed.**

        **c.    Post-Acquisition Features**

839.    Neeraj Arora – WhatsApp's former chief business officer, *see* Ex. 165 at 16:21-17:1 (Arora Tr.) – testified that WhatsApp's "speed of execution went up" after being acquired by Meta because "[a]s a startup you have to be very careful about how much you spend and how

fast you spend, and being a part of [Facebook] made it easier for us to have more resources cheaply, cheaper than what we could do . . . ourselves and faster as well. . . .  We had more engineers to work on things that we wanted to work on . . . ."  *Id.* at 162:2-23.

    **FTC Response: Disputed in part and incomplete.**  The FTC objects to Statement 839 as vague, including vague as to time.

    The FTC does not dispute that the quoted language in Statement 839 appears in the cited document, or that Mr. Arora was WhatsApp's former chief business officer, but otherwise disputes Statement 839 as described herein.

    The FTC disputes Statement 839 as incomplete, as Mr. Arora was answering questions about statements that he made in a video clip of an interview played during his deposition, but that video clip is no longer available at the URL that Meta noted in the deposition.  *See* Ex. 165 at 160:1-5 (Arora Tr.) (Meta's counsel reading into the record the video clip's URL and then stating, "I'm just going to let this play, and I'll ask you the questions afterwards," with the video clip thereafter playing).  Accordingly, the FTC cannot assess the context or details of the statements that Mr. Arora purportedly made during this interview.

    The FTC also disputes Statement 839 as vague and as not showing the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Mr. Arora was not responsible for product or engineering at WhatsApp.  *See* Ex. 165 at 49:9-12 (Arora Tr.) ("My responsibility was to help the founders [of WhatsApp] with everything that was not to do with product or engineering, and most of that used to cover business functions or operations.").  Additionally, ample evidence indicates, *inter alia*, that Meta's efforts to integrate WhatsApp were often limited or delayed, and that Meta did not deliver benefits to WhatsApp for which Meta's acquisition was necessary.  *See* CMF at § V.I.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Arora testified that WhatsApp's speed of execution went up after the acquisition, including because WhatsApp had more and cheaper resources than it would have had on its own.  *See supra* Meta Introduction.  The statements quoted in paragraph 839 are not from Mr. Arora's video interview; they are from his deposition.  In any event, the video interview Mr. Arora was addressing in his deposition testimony is readily available online using the information Meta's counsel provided on the record.  *See* Ex. 165 at 158:18-22 (Arora Dep. Tr.) (Meta's counsel identified the name of the podcast on which Mr. Arora appeared – "Insights," as well as the date of his appearance – "July 2020"); *see also* YOURSTORY, [Podcast] *Neeraj Arora on What He Learned from His WhatsApp Journey* (July 12, 2020), https://yourstory.com/2020/07/podcast-whatsapp-facebook-neeraj-arora.  The FTC's cross-reference to a section of its Counterstatement without explanation does not itself create a genuine dispute of material fact.  While no reply is required, none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

840.    Between January 2015 and February 2023, Meta released more than a dozen new WhatsApp features.  *See* Ex. 170 at 23-24, Meta's Resp. to FTC's Interrog. No. 10 (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)).  For example:

> a.  In January 2015, Meta released "WhatsApp Web," allowing users the ability to use WhatsApp on mobile web browsers.  *See* Ex. 2 at p. 254, tbl. 34 (Carlton Rep.).

> b.  In May 2016, Meta released a WhatsApp desktop app, allowing users the ability to use WhatsApp on computers.  *See* Ex. 2 at p. 254, tbl. 34 (Carlton Rep.).

    c.   In November 2022, Meta announced a suite of new features supporting

        "Communities on WhatsApp," including in-chat "polls," "32-person video

        calls," and support for groups with "up to 1024 users and . . . end-to-end

        encryption."  Ex. 277 at -056, -059 (FTC-META-012355056).

    d.   In December 2022, Meta introduced new improvements to video and audio

        calling on WhatsApp, including the ability to share call links, to call up to 32

        people at once, and to message or mute other call participants.  *See* Ex. 455

        (WhatsApp Blog, *Improved Calling on WhatsApp*).

*See also* Ex. 170 (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31,

2023)).

    **FTC Response: Disputed.**  The FTC disputes Statement 840 because Meta has not

furnished evidentiary support for several assertions within Statement 840, as required by Federal

Rule of Civil Procedure 56(c)(1)(A) and Local Rule 7(h).  For instance, aspects of the source

material cited in Statement 840 are vague as to the specific features and functionality of these

purported developments, and thus cannot be verified with the cited material.  *See, e.g.*, Ex. 277

at -056 (FTC-META-012355056) (only mentioning "polls and 32-person video calls" as new

features discussed by media coverage).

    The FTC also disputes Statement 840 as not establishing the absence of a genuine dispute

of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that

WhatsApp was capable of adding features without Meta, as they were already doing prior to the

acquisition.  *See, e.g.*, PX9001, Bray Report at ¶ 424 ("███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ "); PX9011, Bray

Rebuttal Report at Section IX.C. (entitled "The Nieh Report Vastly Overstates the Extent to

Which Meta's Infrastructure Helped WhatsApp Develop, Launch, and Scale New Features More

Quickly.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

between January 2015 and February 2023, Meta released more than a dozen new WhatsApp

features, including those listed in paragraph 840.  The FTC does not identify any evidence

disputing that fact, which is supported by Meta's sworn interrogatory response and which would

be subject to testimonial proof at trial.  *See supra* Meta Introduction.  In the single document the

FTC disputes as not providing sufficient evidentiary support for two such feature launches –

Meta's announcement in November 2022 that WhatsApp would begin supporting groups with

"up to 1024 users and . . . end-to-end encryption," Ex. 277 at -056, -059 (FTC-META-

012355056) – the document shows more than a half dozen articles reporting on that

announcement, *see*, *e.g.*, *id.* at -058-061, -067.  The FTC's citation to an entire section of Mr.

Bray's expert report without explanation (other than reciting the conclusory section heading)

does not itself create a genuine dispute of material fact.

841.    In March and April 2015, Meta released free voice calling on WhatsApp for

Android and iOS users, respectively.  *See* Ex. 5 at ¶ 262 (Nieh Rep.).

**FTC Response: Undisputed.**

842.    Before that (and before Meta closed the WhatsApp acquisition), in June 2014, Mr.

Acton wrote in an email that he "found [his] experience" with a test version of WhatsApp voice

calling to be "tremendously disappointing."  Ex. 187 at -602 (FB_FTC_CID_02595602).

**FTC Response: Disputed in part.**

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 842 as described herein.

The FTC disputes Statement 842 as incomplete and as not establishing the absence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). Evidence indicates that WhatsApp was in the process of building voice and video calling features when it was acquired by Meta, and was capable of completing and launching it successfully without Meta. *See* PX3205, WhatsApp email chain: ███████ to J. Koum re: "Audio calls on platforms," (Oct. 2, 2013), FB_FTC_CID_09331051, at -051 ("We have basic audio calls that now work between various platforms that we want to support for v1."); PX6068, Acton (Meta/WhatsApp) Dep. Tr., at 117:10-16 ("we had written the software to do [voice calling] in SoftLayer infrastructure, but we were able to eventually just launch it on Facebook infrastructure."); PX6009, Acton (Meta/WhatsApp) IH Tr., at 211:10-19 ("Q. And would WhatsApp have added this [voice calling] feature had it not been – had it not been acquired by Facebook? A. Oh, absolutely. We had already built it. I mean, we were building it. Q. Would it have taken longer . . . to build it? A. No.").

**Meta Reply:** The FTC's response does not create a genuine dispute of material fact that Mr. Acton found his experience with a pre-acquisition test version of WhatsApp voice calling to be tremendously disappointing. The FTC identifies no evidence disputing that fact. *See supra* Meta Introduction. Mr. Acton also testified that Meta's "network infrastructure that enabled us to roll out our voice and video calling were two areas of improvement for WhatsApp that were . . . quick wins" for WhatsApp from the Meta acquisition. *See infra* Meta SMF ¶ 844 (quoting Ex. 163 at 249:6-9 (Acton Dep. Tr.)).

843.    On October 10, 2014, a Meta employee wrote in an email that WhatsApp co-founder Jan Koum "asked for help on VoIP [voice calling], and we will provide that."  Ex. 177 at -126 (FB_FTC_CID_00021125).

**FTC Response: Disputed in part.**

The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 843 as described herein.

The FTC disputes Statement 843 as incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that WhatsApp was more than capable of building voice and video calling features without Meta because they were already doing it prior to the acquisition.  *See* PX6009, Acton (Meta/WhatsApp) IH Tr., at 211:10-19 ("Q. And would WhatsApp have added this [voice calling] feature had it not been – had it not been acquired by Facebook?  A. Oh, absolutely.  We had already built it.  I mean, we were building it.  Q. Would it have taken longer . . . to build it?  A. No."); *see also* PX6068, Acton (Meta/WhatsApp) Dep. Tr., at 117:10-16 ("we had written the software to do [voice calling] in SoftLayer infrastructure, but we were able to eventually just launch it on Facebook infrastructure."); PX3205, WhatsApp email chain: ██████ to J. Koum re: "Audio calls on platforms," (Oct. 2, 2013), FB_FTC_CID_09331051, at -051 ("We have basic audio calls that now work between various platforms that we want to support for v1.").

Additionally, the FTC's infrastructure expert, Tim Bray, concluded that "the existence of other voice and video calling products demonstrates that knowledge of how to build this functionality" existed outside of Meta.  PX9011, Bray Rebuttal Report at ¶ 393; *see also* PX9022, Nieh Report at ¶ 260 (acknowledging that "other companies (such as Line, KakaoTalk, and Skype) had already introduced" voice calling by 2015).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Koum asked Meta for help with voice calling and Meta responded that it would provide assistance.  The FTC's quotes of Mr. Acton stating that WhatsApp was planning to launch voice calling anyway, as well as its assertion that the existence of voice calling on other products shows that the knowledge of how to build it existed outside Meta, do not contradict that fact.  *See supra* Meta Introduction.  Moreover, the evidence shows that WhatsApp struggled with launching voice calling before the acquisition, *see* Ex. 5 at ¶ 260 (Nieh Rep.), and that Meta's infrastructure was a critical resource to WhatsApp in launching voice calling.  *See infra* Meta SMF ¶¶ 844-845.

844.    Mr. Acton testified, "[Meta's] network infrastructure that enabled us to roll out our voice and video calling were two areas of improvement for WhatsApp that were the quick wins that I had talked about."  Ex. 163 at 249:6-9 (Acton Dep. Tr.).  On October 26, 2015, the publication Wired published an article attributing to Mr. Acton the statement that the "biggest change" to WhatsApp's infrastructure to support voice calling "was the addition of voice relay infrastructure.  The nice part of that is that we were able to build and deploy this inside of Facebook's global network and, as such, did not have to make significant changes to our own core infrastructure."  Ex. 278 at -242 ((FB_FTC_CID_11464238)).  Mr. Acton confirmed in his deposition that this statement was true.  *See* Ex. 163 at 254:11-22 (Acton Dep. Tr.).

**FTC Response: Disputed in part.**  The FTC objects to "areas of improvement" and "this statement" in Statement 844 as vague.

The FTC does not dispute that the quoted language appears in the cited materials, but otherwise disputes Statement 844 as described herein.

The FTC disputes the first sentence of Statement 844 as incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Other evidence, including from Mr. Acton, indicates that Meta's network infrastructure did not enable WhatsApp to roll out voice and video calling, as WhatsApp had the capabilities to do that without Meta.  *See* PX6009, Acton (Meta/WhatsApp) IH Tr., at 211:10-19 ("Q. And would WhatsApp have added this [voice calling] feature had it not been – had it not been acquired by Facebook?  A. Oh, absolutely.  We had already built it.  I mean, we were building it.  Q. Would it have taken longer . . . to build it?  A. No."); *see also* PX6068, Acton (Meta/WhatsApp) Dep. Tr., at 117:10-16 ("we had written the software to do [voice calling] in SoftLayer infrastructure, but we were able to eventually just launch it on Facebook infrastructure."); PX3205, WhatsApp email chain: ████████ to J. Koum re: "Audio calls on platforms," (Oct. 2, 2013), FB_FTC_CID_09331051, at -051 ("We have basic audio calls that now work between various platforms that we want to support for v1.").

The FTC disputes the third sentence in Statement 844 as similarly incomplete.  Other evidence, including from Mr. Acton, indicates that WhatsApp could have contracted with a commercial network provider without Meta.  *See* PX6009, Acton (Meta/WhatsApp) IH Tr., at 196:25-197:4 ("[A] global content delivery network is something you can get from Akamai or Cloudflare.  You can get it from a number of different providers just as a service that you purchase.").  Additionally, the FTC disputes that WhatsApp was only using "Facebook's global network" because, in 2015, WhatsApp also relied on Akamai, a third-party CDN provider that Meta had contracted with to support expected workload surges.  *See* PX3219, Meta presentation: "Capacity Plan for Video Products" (Oct. 2015), FTC-META-008683728, at -738, -740, -748.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta's infrastructure enabled WhatsApp to rollout voice and video calling, and that Mr. Acton viewed the rollout of those features as quick wins that improved WhatsApp.  The FTC's speculation about what WhatsApp might have done absent the acquisition does not contradict these facts about what actually happened because of the acquisition.  *See supra* Meta Introduction.

845.    On December 15, 2015, Jay Parikh – then head of infrastructure at Meta, *see* Ex. 157 at 17:23-18:1, 25:22-24 (Parikh Dep. Tr.) – wrote in an email to Ms. Sandberg – then Meta's chief operating officer – that WhatsApp "would have taken much longer to [launch] VOIP without being able to use our infrastructure."  Ex. 204 at -135 (FB_FTC_CID_11761135).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language appears in the cited material, but otherwise disputes Statement 845 as described herein.

The FTC disputes Statement 845 because it is contradicted by other evidence.  WhatsApp co-founder Brian Acton testified that it would not have taken WhatsApp longer to add voice calling if it had not been acquired by Meta.  *See* PX6009, Acton (Meta/WhatsApp) IH Tr., at 211:10-19 ("Q. And would WhatsApp have added this [voice calling] feature had it not been – had it not been acquired by Facebook?  A. Oh, absolutely.  We had already built it.  I mean, we were building it.  Q. Would it have taken longer . . . to build it?  A. No.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Parikh, the head of infrastructure at Meta, believed that WhatsApp would have taken much longer to launch voice calling without being able to use Meta's infrastructure.  The FTC's speculation about what WhatsApp might have done absent the acquisition does not contradict this fact about what actually happened because of the acquisition.  *See supra* Meta Introduction.

846.     After launching WhatsApp voice calling, in November 2016, Meta also released free video calling on WhatsApp.  *See* Ex. 2 at ¶ 279 & n.414 (Carlton Rep.).

**FTC Response: Undisputed.**

847.     In February 2017, Meta released WhatsApp Status, a feature allowing users to share content overlaid with drawings, emojis, and captions that disappears after 24 hours.  *See* Ex. 2 at p. 42, tbl. 3 (Carlton Rep.); *see also* Ex. 163 at 245:3-23 (Acton Dep. Tr.) (testifying that Mr. Zuckerberg encouraged WhatsApp to adopt the Status feature but that he "hesitated" to do so; ultimately, the feature was "positive in engagement" and a "positive addition[] to the product").

**FTC Response: Disputed in part.**  The FTC does not dispute that Meta released the WhatsApp Status feature in 2017, but disputes the excerpted quote from Mr. Acton's testimony as incomplete.  Mr. Acton's full response was: "Q. Okay.  And did you resist adding some of these features, at least initially? . . . [A.] Are you referring to the two features [Status on WhatsApp and Stories on Signal] in question?  [Q.] Yes, sir.  A. I – I wouldn't say we strongly resisted.  I think we – it's probably more accurately stated as we hesitated."  Ex. 163 at 254:3-12 (Acton Dep. Tr.).  Mr. Acton further testified that WhatsApp would have "eventually implemented the Status feature."  *Id.* at 275:21-276:2.

The FTC further disputes the last transcript reference in Statement 847 as vague and incomplete.  WhatsApp co-founder Jan Koum did not recall whether WhatsApp was tracking the impact of user engagement from the introduction of WhatsApp Status: "Q. Did WhatsApp benefit from redesigning the status feature?  A. Benefit how?  Q. In terms of tracking users or retaining users or increasing engagement, things of that nature.  A. I don't know if our user numbers would specific correlate to this feature.  I don't know if we had that analytics.  The

feature was definitely used and continues to be used, but I think it's hard for me to say how much of that usage is directly related to people signing up for the product or wanting to continue to use the product."  PX6010, Koum (Meta/WhatsApp) IH Tr., at 175:5-17.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, in February 2017, Meta released WhatsApp Status, which allows users to share content overlaid with drawings, emojis, and captions that disappears after 24 hours.  The FTC's speculation about what WhatsApp might have done absent the acquisition does not contradict this fact about what actually happened because of the acquisition.  *See supra* Meta Introduction.

848.    Meta has subsequently updated WhatsApp Status, releasing new features in February 2023, including voice status and additional ways to react to another user's Status post. *See* Ex. 2 at p. 254, tbl. 34 (Carlton Rep.).  On July 25, 2018, Ms. Sandberg stated on an earnings call that 450 million global WhatsApp users had shared content using WhatsApp Status.  *See* Ex. 199 at -389 (FB_FTC_CID_10433307).

**FTC Response: Undisputed.**

849.    Mr. Acton testified:  "Q. Did anyone at Facebook play a role in the feature development at WhatsApp?  A. Mark Zuckerberg.  Q. And can you describe his role in feature development at WhatsApp?  A. He asked for some specific things and we had a hard time saying no.  So we did them.  Q. And what specific things did he ask for?  A. Well, at one point he asked us to improve our camera features.  There was a big push on cameras, they called it, or lockdown on camera.  He very much wanted us to build a timeline story feature which became our Status – or an iteration of our Status feature."  Ex. 314 at 207:7-21 (Acton IH Tr.); *see also id.* at 209:8-12 ("Q. Did WhatsApp benefit from the improved camera features?  A. Probably, yes.  Q. And how do you think it benefited?  A. I think it improved engagement.").

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language in Statement 849 appears in the cited material, but otherwise disputes Statement 849 as described herein.

The FTC disputes the last transcript reference in Statement 849 as incomplete because it omits Mr. Acton's subsequent testimony describing the limited impact on user engagement from the addition of WhatsApp's camera features: "I never felt that it was like a feature that would knock the ball out of the park.  I think it was just an incremental improvement and I still think that to this day."  Ex. 314 at 209:16-19 (Acton IH Tr.).  Mr. Acton also testified that, "[a]s to the magnitude of the impact [of the camera features and the Status features], I think that is to be understood better with the data."  PX6068, Acton (Meta/WhatsApp) Dep. Tr., at 245:20-21.

The FTC also disputes Statement 849 as not establishing the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The FTC's infrastructure expert, Tim Bray, reviewed the camera features added to WhatsApp and concluded that "none of these features is sophisticated, particularly at the time they were introduced, and could straightforwardly have been implemented by WhatsApp without any assistance from Meta."  PX9011, Bray Rebuttal Report at ¶ 397.  Mr. Bray further concluded that "[m]any of these features were provided by other products during this time."  *Id.* at ¶ 397 & n.924.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that WhatsApp launched improved camera features upon Mr. Zuckerberg's initiative and that Mr. Acton thought the improved camera features improved engagement.  The FTC's speculation about what WhatsApp might have done absent the acquisition does not contradict this fact about what actually happened because of the acquisition.  *See supra* Meta Introduction.  When asked "[w]ould WhatsApp have added this [improved camera] feature eventually had it not been

acquired by [Meta]," Mr. Acton stated that "[i]t was not in my knowledge or ambition to do so." Ex. 314 at 209:2-7 (Acton IH Tr.).

850.    Mr. Koum testified:  "Q. After Facebook acquired WhatsApp, did WhatsApp introduce any features specifically because Facebook asked you to?  A. I think in terms of user-visible features, there were probably some.  I think the one that comes to mind is the redevelopment of the status functionality to make it more like Snapchat Stories."  Ex. 285 at 173:3-9 (Koum IH Tr.).

**FTC Response: Disputed in part.**  The FTC does not dispute that the quoted language in Statement 850 appears in the cited transcript, but otherwise disputes Statement 850 as described herein.

The FTC disputes Statement 850 as incomplete and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Mr. Koum further testified that "we also knew that we had to do something with an old Status 1.0 functionality in our app." Ex. 285 at 174:2-4 (Koum IH Tr.).  Statement 850 also omits Mr. Koum's answer to the prior question, indicating that WhatsApp could have added additional features without the Meta acquisition:  "Q. Are there any user features that you can think of that WhatsApp would not have had the ability to develop if Facebook had not acquired WhatsApp?  A. I can't think of any.  I think if we wanted to have built something, we would go and build it."  Ex. 285 at 172:22-173:2 (Koum IH Tr.).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that WhatsApp launched user-visible features, including Status, because of Meta.  The FTC's speculation about what WhatsApp might have done absent the acquisition does not contradict these facts about what actually happened because of the acquisition.  *See supra* Meta

Introduction; *supra* Meta SMF ¶¶ 839-849 (addressing features WhatsApp launched after the acquisition).

### d.  Post-Acquisition Privacy

851.  Following the acquisition, Meta released several new privacy features on WhatsApp.  *See* Ex. 170 at 24, Meta's Resp. to FTC's Interrog. No. 10 (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)).

**FTC Response: Disputed.**  The FTC objects to Statement 851 as vague, and disputes Statement 851 as not supported by the cited material and as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(1)(B).

The interrogatory responses cited in Statement 851 do not state that "Meta released several new privacy features on WhatsApp," but instead list a string of features launched or "improve[d]" on WhatsApp after the date the acquisition closed, while stating generally that "[s]ince it became part of Meta, the user experience of WhatsApp has improved through the introduction of numerous new features and services, and improvements to features and services." *See* Ex. 170 at 23-24, Meta's Resp. to FTC's Interrog. No. 10 (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)).  As described below, however, the interrogatory's list of features includes items that were already in development or partially deployed by WhatsApp even prior to Meta's acquisition.  *See* FTC Response to Statement 852.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Meta released several new privacy features on WhatsApp after the acquisition.  *See supra* Meta Introduction; *infra* Meta Reply to SMF ¶ 852 (addressing similar response).

852.  For example, in April 2016, Meta released full end-to-end encryption for every WhatsApp message, call, photo, video, file, and voice message.  *See* Ex. 2 at p. 254, tbl. 34

(Carlton Rep.).  "Encryption was also either nonexistent or substantially weaker in SMS, which opened the door for user privacy to be compromised."  Ex. 279 at ¶ 949 (Hemphill Rep.).

**FTC Response: Disputed in part.**  The FTC does not dispute that WhatsApp widely released end-to-end encryption in 2016, after WhatsApp was acquired by Meta, but disputes that Meta directed WhatsApp's release of end-to-end encryption and disputes Statement 852 as not establishing the absence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Evidence indicates that WhatsApp's development and deployment of end-to-end encryption began before its acquisition by Meta.  WhatsApp began implementing end-to-end encryption in 2013, prior to the acquisition.  PX6009, Acton (Meta/WhatsApp) IH Tr., at 51:9-18; *id.* at 68:22-69:12; *see also* PX0503, Moxie Marlinspike, *Open Whisper Systems partners with WhatsApp to provide end-to-end encryption*, Signal (Nov. 18, 2014), https://signal.org/blog/whatsapp/ ("The most recent WhatsApp Android client release includes support for the TextSecure encryption protocol, and billions of encrypted messages are being exchanged daily.").

WhatsApp contracted with Signal and its lead engineer Moxie Marlinspike to consult on adding end-to-end encryption to WhatsApp, who began work before the Meta's acquisition of WhatsApp closed in October 2014.  PX6086, Acton (Meta/WhatsApp) Dep. Tr., at 62:15-63:3; *see also* PX3199, Meta email chain: J. Koum (Meta/WhatsApp) to ███████ (Alphabet) re: "meeting today," (Apr. 5, 2014), FB_FTC_CID_03113817 at -318 ("btw, confidentially: ███ from Open WhisperSystems is starting to work with us on E2E this monday - i can't  tell you how excited i am to get this done and rolled out to half a billion users"); PX3209, Meta document: "Security FYI" (Nov. 23, 2014), FB_FTC_CID_12242591 at -591 ("WhatsApp Encryption — A surprise blog post from Whisper Systems on Tuesday announced that they have

been working with WhatsApp for the past half year to build their TextSecure protocol for end-to-end encryption directly into WhatsApp.  The encryption currently works on the most recent WhatsApp Android client release.").

Further, Mr. Acton testified that Meta did not provide resources to WhatsApp needed to add end-to-end encryption, nor did Meta assist WhatsApp in rolling out the feature.  PX6009, Acton (Meta/WhatsApp) IH. Tr., at 211:20-212:4 ("Q: I know we talked about end-to-end encryption as well. Do you remember when that was launched post acquisition? A: 2016. Q: Did Facebook provide WhatsApp the resources it needed to add this feature? A: No. Q: Would it have taken WhatsApp longer to add this feature had it not been acquired by Facebook? A: No."); PX6086, Acton (Meta/WhatsApp) Dep. Tr., at 268:12-20 ("Q: On end-to-end encryption, you testified that that didn't get rolled out until I think 2016; is that right? A. Correct. Q. Did Facebook help you get that product rolled out? A. No. Q. You did that all on your own? A. Yes."); *see also* PX, Koum (Meta/WhatsApp) IH Tr., at 172:18-21.

Meta employee Arturo Bejar, who previously led integrity efforts at Facebook and worked on Instagram's integrity team, also testified that Meta did not have "the expertise" to do the engineering needed for end-to-end encryption:

> Q. Did Facebook have any integrity tools calibrated to work with end-to-end encryption? A. I think 'calibration' is not quite the right term here. In order to work with end-to-end encryption, you had to do a meaningful amount of engineering work in order to be able to adapt things. Q. But Facebook had the expertise to do it at the time of the WhatsApp acquisition? A. No.  I wouldn't say we had the expertise to do it.

PX6052, Bejar (Meta) Dep. Tr., at 56:10-21.

The second sentence of Statement 852 also does not create a genuine dispute of material fact because WhatsApp did not use SMS—before or after the acquisition—and therefore the strength of SMS encryption has no bearing on WhatsApp's ability to provide encryption at any

point.  *See* PX6010, Koum (Meta/WhatsApp) IH Tr., at 49:23-25 ("I consider mobile messengers

to be the ones that are running on the application layer and are using TCP/IP networking to

communicate."); *id.* at 56:22-25 ("So then as a cross-platform TCP/IP mobile messenger,

WhatsApp combined those advantages of SMS while also addressing the shortcomings of SMS?

A. That's what we tried to do, yes.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that

in April 2016, Meta released full end-to-end encryption for every WhatsApp message, call,

photo, video, file, and voice message.  *See supra* Meta Introduction.  The FTC does not dispute

that fact.  It is likewise undisputed that, although WhatsApp started work on end-to-end

encryption before the acquisition, it did not complete it until after the acquisition.  *See* Ex. 314 at

51:15-18 (Acton IH Tr.); *see also* Counter SMF ¶ 2407(a).  WhatsApp's speed of execution

increased after the acquisition, when Meta contributed to the development of end-to-end

encryption on WhatsApp.  *See supra* Meta SMF ¶ 839 (testimony from Mr. Arora – WhatsApp's

former chief business officer – that WhatsApp's "speed of execution went up" after being

acquired by Meta (quoting Ex. 165 at 162:2-23 (Arora Dep. Tr.))); Ex. 5 at ¶ 267 & n.688 (Nieh

Rep.).  Mr. Acton testified that WhatsApp launched end-to-end encryption before iMessage and

Skype, *see* Ex. 163 at 63:9-17 (Acton Dep. Tr.), which put WhatsApp in a "leadership position

. . . in terms of protecting communication privacy, which helped both retention engagement and

monthly actives," Ex. 314 at 212:9-14 (Acton IH Tr.).

853.    Mr. Acton testified: "Q. So did OTT messaging apps also provide benefits with

regards to encryption that SMS couldn't offer?  A. Absolutely, yes."  Ex. 314 at 41:19-22 (Acton

IH Tr.).  Mr. Acton also testified regarding the release of full end-to-end encryption: "It was a

huge marketing win for us to be a population of a billion users having end-to-end encrypted

conversations.  So we established a leadership position, I believe, in terms of protecting

communication privacy, which helped both retention engagement and monthly actives." *Id.*

at 212:5-14.

> **FTC Response: Undisputed.**

854.    Other post-acquisition privacy features that Meta released for WhatsApp include:

   a.   In February 2019, Meta released face and fingerprint identification protection

   for WhatsApp on the iOS mobile operating system.  *See* Ex. 2 at p. 254,

   tbl. 34 (Carlton Rep.).

   b.   In April 2019, Meta released new privacy settings for WhatsApp groups,

   including a new invitation system for users to decide who can add them to

   WhatsApp groups.  *See* Ex. 2 at p. 254, tbl. 34 (Carlton Rep.).

   c.   In March 2021, Meta released private and secure one-to-one voice and video

   calling for the WhatsApp Desktop app.  *See* Ex. 2 at p. 254, tbl. 34 (Carlton

   Rep.).

   d.   In August 2021, Meta released ephemeral messaging on WhatsApp, allowing

   users to send photos and videos that disappear once the recipient has viewed

   the content.  *See* Ex. 2 at p. 254, tbl. 34 (Carlton Rep.).

   e.   In August 2022, Meta released new privacy features including an option to

   prevent users from taking screenshots of "View Once" photos or videos

   shared on WhatsApp.  *See* Ex. 456 at 2 (WhatsApp Blog, *New Features for

   More Privacy, More Protection, More Control*, https://perma.cc/Z62R-CLZ9).

   f.   In April 2023, Meta released new security features including verification tools

   to protect users from mobile device malware, to verify a user's identity when

her account is moved to a new device, and to automatically verify that the user
has a secure connection.  *See* Ex. 457 at 1, 2 (WhatsApp Blog, *New Security
Features:  Account Protect, Device Verification, Automatic Security Codes*,
https://perma.cc/T4PA-T5WK).

g.  In May 2023, Meta released a WhatsApp feature called "Chat Lock," which
allows users to require a password or fingerprint to access selected WhatsApp
conversations.  *See* Ex. 458 (WhatsApp Blog, *Chat Lock:  Making Your Most
Intimate Conversations Even More Private*).

*See* Ex. 170 (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023));
*see also* Ex. 2 at p. 254, tbl. 34 (Carlton Rep.).

**FTC Response: Disputed in part.**  The FTC does not dispute that the cited materials
(including Meta's own interrogatory response and expert report) state that Meta released the
specified features on WhatsApp (although without underlying evidence that the FTC can
evaluate), but the FTC disputes Statement 854 as not establishing the absence of a genuine
dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).

Ample evidence indicates, *inter alia*, that WhatsApp was well-positioned to add features
without being acquired by Meta, and that Meta did not deliver any features to WhatsApp for
which Meta's acquisition was necessary.  *See* CMF at § V.G.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that
Meta released multiple privacy features for WhatsApp after the acquisition.  *See supra* Meta
Introduction.  The FTC's cross-reference to a section of its Counterstatement without
explanation does not itself create a genuine dispute of material fact.  While no reply is required,

none of those paragraphs creates a genuine dispute of material fact, and Meta incorporates its responses to those paragraphs here.

### e.      Post-Acquisition Infrastructure

855.    Following the acquisition, WhatsApp began migrating onto Meta's infrastructure. *See* Ex. 225 at PX10101-003 (PX10101, FB_FTC_CID_10150357); Ex. 158 at 209:5-9 (Parikh IH Tr.) ("By the end of 2018, the WhatsApp team had transitioned off of SoftLayer and was running in Facebook infrastructure.").

**FTC Response: Disputed in part.**   The FTC objects to the term "following the acquisition" as vague as to time.

The FTC does not dispute that the quoted language appears in the cited material, or that WhatsApp had transitioned off SoftLayer to run on Meta's infrastructure, but otherwise disputes Statement 855 as described herein.

The FTC disputes Statement 855 as vague and misleading because the cited material shows that WhatsApp did not *begin* migrating its core computing infrastructure onto Meta's infrastructure until three years after the acquisition, in 2017.  *See* Ex. 225 at PX10101-003, PX10101-008 (PX10101, FB_FTC_CID_10150358) (May 2017 slide deck describing WhatsApp migration to Meta's infrastructure as "4 months in – overall project is tracking 2 weeks behind").

The FTC further disputes Statement 855 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that WhatsApp was not able to fully migrate to Meta's infrastructure because of WhatsApp's unique architecture.  PX10105, Meta presentation: "All Hands" (Dec. 3, 2018), FB_FTC_CID_09188953, at -021 ("2018: Change of Plan[:] Plan B: use ZippyDB & ForgETS . . . After discussions with TAO team decide that it's too big of a leap for WhatsApp"); PX10106, Meta email chain: N. Gupta to J. Parikh, R. Endres, et al. re: "interop thoughts," (July

24, 2019), FB_FTC_CID_02366761 at -762-63 (████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████); *see also* PX9001, Bray Report at ¶ 37 ("Further, WhatsApp had a technical architecture

that was less mainstream and very different from Meta's, and, as a result, many of Meta's in-

house technologies were less applicable to WhatsApp's architecture.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding whether, following the acquisition, WhatsApp began migrating onto Meta's

infrastructure.  The FTC's observations that this paragraph does not state a complete timeline of

that migration, that WhatsApp chose to migrate to Meta's infrastructure in stages and over

several years, and that the enormous benefits that WhatsApp received from its migration to

Meta's infrastructure did not require it to use all of Meta's infrastructure technologies – all

claims that mischaracterize the evidence regarding WhatsApp's migration and its benefits, *see*

Ex. 5 at ¶¶ 224-269 (Nieh Rep.) – do not create a dispute undermining its concession that the

quoted language appears in the cited material.

The FTC is incorrect that WhatsApp was not able to fully migrate to Meta's

infrastructure because of WhatsApp's unique architecture; the evidence it cites does not support

that claim.  Evidence shows that Meta did not migrate WhatsApp to TAO because WhatsApp

and Meta found that WhatsApp's workload was better suited for a different Meta service

(ZippyDB).  *See id.* at ¶ 247.  The evidence shows WhatsApp operates entirely on Meta's

infrastructure.  *See* PX6021 at 209:1-9 (Parikh IH Tr.) ("By the end of 2018, the WhatsApp team

had transitioned off of SoftLayer and was running in Facebook infrastructure.  And in 2018

that's when the core application logic moved off of SoftLayer into Facebook infrastructure.").

856.    Regarding the decision to migrate, Mr. Acton testified that WhatsApp migrated

onto Meta's infrastructure "predominantly for cost and operability reasons."  Ex. 163 at 118:13-

18 (Acton Dep. Tr.).  Mr. Acton also was quoted as stating publicly, after the acquisition, that

Meta "has made significant investments in infrastructure that as a small company we were never

able to make."  Ex. 6 at ¶ 154 (Kaplan Rep.).

**FTC Response: Disputed in part.**  The FTC objects to the terms "cost," "operability,"

and "significant investments" in Statement 856 as vague.

The FTC does not dispute that the quoted language appears in the cited material, but

otherwise disputes Statement 856 as described herein.

The FTC disputes the first sentence in Statement 856 because other evidence shows that

WhatsApp did not migrate onto Meta's infrastructure for "cost" reasons.  Meta prepared a set of

answers to "Top Questions" regarding its acquisition of WhatsApp in 2014, including a question

related to costs: "Do you see any cost savings from switching WhatsApp over to Facebook's IT

platform?  No."  PX2518, Meta document: "WhatsApp Q&A Prep" (Feb. 19, 2014),

FB_FTC_CID_08896347, at 350.

The FTC further disputes (to the extent implied by the first sentence in Statement 801)

that WhatsApp achieved costs by migrating to Meta's infrastructure.  The FTC's financial

expert, Kevin Hearle, evaluated Meta's claims and supporting evidence that "its acquisition of

WhatsApp generated procompetitive cost savings because WhatsApp shares and runs on Meta's

technical infrastructure," and concluded he was "unable to verify any cost savings related to

WhatsApp."  PX9005, Hearle Report at ¶¶ 123-125; PX9009, Hearle Rebuttal Report at ¶ 16

("As a result, Prof. Nieh's claims do not alter my previous conclusion that I am unable to verify any infrastructure-related cost savings related to WhatsApp."); *see also* PX9011, Bray Rebuttal Report at ¶ 14 ("The Nieh Report fails to support its assertions that the acquisitions produced infrastructure-related cost savings with evidence that accounts for the relevant technology costs.").

Additionally, the FTC disputes the first sentence in Statement 856 as incomplete because it omits clarifying testimony as to the meaning of Mr. Acton's reference to "operability." Immediately preceding the quoted language, Mr. Acton testified that WhatsApp did *not* migrate onto Meta's infrastructure to improve reliability: "Q. Did WhatsApp migrate to Facebook's infrastructure in order to improve the reliability of WhatsApp's infrastructure?  A. No."  Ex. 163 at 118:13-16 (Acton Dep. Tr.).  In prior testimony, Mr. Acton explained that WhatsApp migrated onto Meta's infrastructure to ensure that Meta could continue to operate WhatsApp after the departure of knowledgeable WhatsApp engineers, including Mr. Acton.  *See* Ex. 314, Acton (Meta/WhatsApp) IH Tr., at 192:9-193:4 ("I knew it was important for the long-term operations of WhatsApp that it be hosted inside Facebook infrastructure so that Facebook could properly own and operate the service after I was gone."); *id* at 193:5-17 ("And so I wanted to make sure that before everyone disappeared after they got all of their payouts that Facebook was in a position to own and operate it with their own employees and their own technologies and their own staff."); *see also* Ex. 285, Koum (Meta/WhatsApp) IH Tr., at 187:3-21 ("And so me and Brian knew that within four years of the deal closing most of those engineers -- most of the people who knew how to operate this infrastructure would be gone.  So long-term we either had to put everything that we do into Facebook because they would be operating the infrastructure

for many decades to come or we keep using SoftLayer and they would have to train how to run

SoftLayer and keep using it.").

The FTC also disputes Statement 856 as the cited material does not show the absence of a

genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence

indicates, *inter alia*, that WhatsApp was well-positioned to continue growing without being

acquired by Meta, and that Meta did not deliver any benefits to WhatsApp related to

infrastructure for which Meta's acquisition was necessary.  *See* Ex. 163 at 200:6-13 (Acton Dep.

Tr.) ("Q. If WhatsApp had not been acquired by Facebook, would WhatsApp have been able to

meet its continued needs for scaling its infrastructure?  A. Oh, absolutely, yes.  I am a hundred

percent confident in that.  Q. And would WhatsApp have been able to continue improving its

reliability?  A. Yes."); Ex. 285, Koum (Meta/WhatsApp) IH Tr., at 188:12-15 ("Q. Did you need

to move onto Facebook infrastructure to continue improving the WhatsApp product?  A. I don't

think so . . . ."); PX6039, Gupta (Meta) Dep. Tr., at 69:6-10 ("Q. So is it fair to say that

WhatsApp was using SoftLayer infrastructure to serve ███████████████████████

████████████████████████████████████?  A. That seems to be correct,

yes."); *see also* PX9001, Bray Report at ¶ 36 ("After reviewing the evidence related to

WhatsApp, I have also concluded Meta has not supported its claims that its infrastructure or

expertise helped improve WhatsApp's user experience, or that the claimed improvements could

not have been achieved by WhatsApp independently.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding whether Mr. Acton gave the quoted testimony and made the quoted public statement.

The FTC's assertion that certain terms in those statements are vague – terms the FTC was free to

ask Mr. Acton to clarify during his deposition – does not create a dispute undermining its

concession that the quoted language appears in the cited material.  The FTC also fails to show a genuine dispute of material fact regarding the cost benefits that WhatsApp anticipated and realized, of which there is ample evidence.  *See* Ex. 5 at ¶ 224 & n.562 (Nieh Rep.); *see also id.* at ¶¶ 226, 237, 240, 246, 250, 268-269.  Mr. Hearle's claimed inability to verify the correctness of this evidence is irrelevant to its content and veracity.  The FTC's assertions that WhatsApp might have succeeded to the same, or even a greater, degree without relying on Meta's infrastructure are speculative.  Evidence shows that "WhatsApp received enormous benefits from Meta and its infrastructure that enabled [it] to scale more quickly, efficiently, and effectively than [it] could have using other alternatives."  *Id.* at ¶ 219 (Nieh Rep.); *id.* at ¶¶ 220-269 (setting forth those benefits).

857.   Mr. Koum testified that one of the reasons WhatsApp migrated onto Meta's infrastructure was "the cost reason," because Meta "has millions of servers and because [Meta] has [its] own data centers and because [Meta] operates on such a global scale, [its] cost would be different from what we were paying to SoftLayer."  Ex. 285 at 187:3-188:7 (Koum IH Tr.); *see also id.* at 188:3-7 ("[F]rom a financial point it makes sense to take our infrastructure and move it inside of [Meta] because it would be a lot cheaper and we don't have to pay the bill to SoftLayer every month, which at some point got to be very expensive.").

**FTC Response: Disputed in part.**  The FTC objects to "the cost reason" in Statement 857 as vague.

The FTC does not dispute that Meta owned and operated some of its own data centers in 2014, or that the quoted language appears in the cited material, but otherwise disputes Statement 857 as described herein.

The FTC disputes Statement 857 as vague and incomplete because other evidence shows that WhatsApp did not migrate onto Meta's infrastructure for "cost" reasons and that SoftLayer was able to provide WhatsApp with needed server capacity. PX2518, Meta document: "WhatsApp Q&A Prep" (Feb. 19, 2014), FB_FTC_CID_08896347, at -005 ("Do you see any cost savings from switching WhatsApp over to Facebook's IT platform? No."); PX6086, Acton (Meta/WhatsApp) Dep. Tr., at 107:6-15 ("Q. Speaking about the servers that WhatsApp leased from SoftLayer, would there have been a limit on the number of additional SoftLayer servers that WhatsApp could have leased prior to its acquisition by Facebook? A. Not any extraordinary limits. The limits would be dictated by SoftLayer's availability at that time, but they were fairly proactive in buying new servers in anticipation of growth and capacity needs for their business.").

The FTC further disputes Statement 857 because the cited material does not show the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B). The FTC's financial expert, Kevin Hearle, evaluated Meta's claims and supporting evidence that "its acquisition of WhatsApp generated procompetitive cost savings because WhatsApp shares and runs on Meta's technical infrastructure," and concluded he was "unable to verify any cost savings related to WhatsApp." PX9005, Hearle Report at ¶¶ 123-125; PX9009, Hearle Rebuttal Report at ¶ 16 ("As a result, Prof. Nieh's claims do not alter my previous conclusion that I am unable to verify any infrastructure-related cost savings related to WhatsApp."); *see also* PX9011, Bray Rebuttal Report at ¶ 14 ("The Nieh Report fails to support its assertions that the acquisitions produced infrastructure-related cost savings with evidence that accounts for the relevant technology costs.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Mr. Koum gave the quoted testimony.  The FTC's assertion that a term in that testimony is vague – a term the FTC was free to ask Mr. Koum to clarify during his deposition – does not create a dispute undermining its concession that the quoted language appears in the cited material.  The FTC also fails to show a genuine dispute of material fact regarding the cost benefits that WhatsApp anticipated and realized, of which there is ample evidence.  *See* Ex. 5 at ¶ 224 & n.562 (Nieh Rep.); *see also id.* at ¶¶ 226, 237, 240, 246, 250, 268-269.  Mr. Hearle's claimed inability to verify the correctness of this evidence is irrelevant to its content and veracity.

858.    In May 2017, following the migration of WhatsApp onto Meta's content delivery network, a WhatsApp employee emailed a presentation, which states, "30% improvements due to CDN," and reports that median download time on Meta's content delivery network ("P50") was 34% faster compared to SoftLayer, while median upload time was 32% faster.  Ex. 225 at PX10101-005 (PX10101, FB_FTC_CID_10150357).

**FTC Response: Undisputed but incomplete.**

The FTC does not dispute that content delivery networks ("CDNs") can improve latency, but otherwise disputes Statement 858 as described herein.

The FTC disputes Statement 858 because the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that WhatsApp could have obtained the benefits of a CDN without the Meta acquisition.  WhatsApp co-founder Brian Acton testified that "a global content delivery network is something that you can get from Akamai or Cloudflare.  You can get it from a number of different providers just as a service that you purchase."  PX6009, Acton (Meta/WhatsApp) IH

Tr., at 196:25-197:4; *id.* at 200:14-18 ("Q. Would WhatsApp also have been able to improve

latency had it not been acquired by Facebook?  A. Yeah.  We had all the technical know-how

and ability to do all these things."); *see also* PX9011, Bray Rebuttal Report at ¶ 366 ("[T]he Nieh

Report documents what one would expect: WhatsApp had not been using a CDN, and when it

adopted one, media download performance improved.  However, the fact that the CDN it

adopted was Meta's does not show that Meta's CDN was the only one capable of providing these

benefits.").

    **Meta Reply:**  The FTC's attempt to show that this statement is incomplete does not

create a genuine dispute of material fact as to the facts asserted in the statement.  The FTC's

response also does not create a genuine dispute of material fact regarding the benefits that

WhatsApp received from using Meta's content delivery network ("CDN").  Evidence shows that

those benefits were enormous.  *See* Ex. 5 at ¶¶ 228-234 (Nieh Rep.).  The FTC's claim that

WhatsApp could have relied on a third-party CDN is speculative.  Moreover, it erroneously

conflates the CDN service available from third parties with Meta's proprietary CDN.  By using

Meta's CDN, "███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████.'"  *Id.* at ¶ 229.  This ████

███████████████████████████.  In fact, ███████████████████████

███████████████████████████.  *Id.* at ¶ 234.  In 2018, WhatsApp

prepared a presentation called "WhatsApp Migration:  the journey," which states:  "We are in a

better position," listing the following benefits from the migration:  "[1] Multi-region[; 2]

Automation to reduce operational cost[; 3] Direct access to all FB services[; 4] Trained tons of

people in our code base, troubleshooting and operation[; 5] Improved message delivery time

thanks to FB point of presence[; 6] More in common with FB stack, easier to recruit."  Ex. 198 at -256.027 (FB_FTC_CID_07025255).

859.    In 2018, WhatsApp prepared a presentation called "WhatsApp Migration:  the journey," which states:  "We are in a better position," listing the following benefits from the migration:  "[1] Multi-region[; 2] Automation to reduce operational cost[; 3] Direct access to all FB services[; 4] Trained tons of people in our code base, troubleshooting and operation[; 5] Improved message delivery time thanks to FB point of presence[; 6] More in common with FB stack, easier to recruit."  Ex. 198 at -256.027 (FB_FTC_CID_07025255).

**FTC Response: Disputed in part.**

The FTC objects to the terms "WhatsApp prepared," "automation," "operational cost," and "all FB services" as vague.

The FTC does not dispute that the quoted language appears in the cited materials, but otherwise disputes Statement 859 as described herein.

The FTC disputes Statement 859 because the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The cited document describes purported benefits to Meta—having acquired WhatsApp and as a result having two sets of infrastructure—from a complex migration process of moving WhatsApp to Meta's infrastructure in 2018.  *See* Ex. 198 at -256.023-.027 (FB_FTC_CID_07025255).  The document does not show operational or cost benefits as compared with WhatsApp operating independently or acquired by another firm.  *See* PX9011, Bray Rebuttal Report at ¶ 23 (describing generally how combined firms have an incentive to reduce redundancy, but that this does not constitute a benefit relative to an independent firm).

The migration process was not undertaken until 2018, *see* Ex. 198 at -256.023-.025 (FB_FTC_CID_07025255), which was several years after Meta's acquisition of WhatsApp in February 2014—and the time and costs associated with it would not have needed to be undertaken by WhatsApp without Meta's acquisition.  *See* PX2994, Meta presentation: "KPMG Economic and Valuation" (Oct. 6, 2014), FTC-META-005177379, at -384 ("The transaction closed on October 6, 2014"); PX3211, Meta email chain: ███ to Infra Leads, J. Parikh re: "[Infra Leads] WhatsApp Integration into FB Infra," (Mar. 14, 2017), FTC-META-003107037 at -037 ("In 2017, WhatsApp will be integrated into FB infra and the work has already started since last month. . . . It is a really complicated project and the scope is very wide which touches many areas of the FB infra from networking, traffic management, production engineering, capacity, data center operations, security, core systems, and integration with many of existing FB infra tiers/services (e.g. caching, storage, monitoring, etc).").

The FTC further disputes Statement 859 because other evidence indicates that WhatsApp could have migrated to a multi-region architecture without Meta.  *See generally* PX9001, Bray Report at ¶¶ 158-164 (describing how use of a multi-region architecture is a well-known technique, and that multiple data-center regions are offered by all major cloud providers).

The FTC also disputes Statement 859's reference to "reduction in operational cost" as vague and unsupported.  The FTC's financial expert, Kevin Hearle, evaluated Meta's claims and supporting evidence that "its acquisition of WhatsApp generated procompetitive cost savings because WhatsApp shares and runs on Meta's technical infrastructure," and concluded he was "unable to verify any cost savings related to WhatsApp."  PX9005, Hearle Report at ¶¶ 123-125; PX9009, Hearle Rebuttal Report at ¶ 16.

The FTC disputes Statement 859's assertion of "[d]irect access to all FB services" because other evidence shows that, while WhatsApp may have had access to Meta's infrastructure services, it was not able to fully migrate to them because of WhatsApp's unique architecture.  *See, e.g.*, PX10105 at -024, Meta presentation: "All Hands" (Dec. 3, 2018), FB_FTC_CID_09188953 ("2018: Change of Plan[:] Plan B: use ZippyDB & ForgETS . . . After discussions with TAO team decide that it's too big of a leap for WhatsApp"); *see also* PX9001, Bray Report at ¶ 37 ("Further, WhatsApp had a technical architecture that was less mainstream and very different from Meta's, and, as a result, many of Meta's in-house technologies were less applicable to WhatsApp's architecture").

The FTC also disputes that "[t]rain[ing] tons of people in [WhatsApp's] code base" is a benefit of Meta's acquisition of WhatsApp because other evidence shows WhatsApp's co-founders believed that the training of Meta's engineers was necessary for continued operation of WhatsApp under Meta's ownership.  *See* PX6009, Acton (Meta/WhatsApp) IH Tr., at 192:9-193:4 ("I knew it was important for the long-term operations of WhatsApp that it be hosted inside Facebook infrastructure so that Facebook could properly own and operate the service after I was gone."); PX6010, Koum (Meta/WhatsApp) IH Tr., at 187:3-21.

Finally, ample evidence indicates, *inter alia*, that WhatsApp continued to grow successfully on non-Meta infrastructure prior to the migration and that Meta did not provide WhatsApp with infrastructure benefits that could not have been achieved without the Meta acquisition.  *See* PX6086, Acton (Meta/WhatsApp) Dep. Tr., at 106:25-107:5 ("Q. Did WhatsApp continue to use SoftLayer for networking after the acquisition?  A. Yes.  Q. And you said that it continued to do so even when you left Facebook [in 2017]; is that right?  A. Yes."); PX6009, Acton (Meta/WhatsApp) IH Tr. 200:6-13 ("Q. If WhatsApp had not been acquired by

Facebook, would WhatsApp have been able to meet its continued needs for scaling its infrastructure?  A. Oh, absolutely, yes.  I am a hundred percent confident in that."); PX6039, Gupta (Meta) Dep. Tr., at 69:6-10 ("Q. So is it fair to say that WhatsApp was using SoftLayer infrastructure to serve ███████████████████████████████████████████

███████████████████████? A. That seems to be correct, yes."); PX9001, Bray Report at ¶ 374 ("It took more than four years for WhatsApp to complete its migration from SoftLayer to Meta's infrastructure, all while growing considerably on SoftLayer in this time.").

The FTC's infrastructure expert, Tim Bray, reviewed Meta's infrastructure-related claims and supporting evidence, and concluded that "the infrastructure, techniques, and capabilities Meta provided to WhatsApp were straightforwardly available elsewhere."  *Id.* at ¶ 387 ("In my opinion, WhatsApp could have straightforwardly achieved a geographically distributed infrastructure by late 2018 without any access to 'Meta infrastructure, just as many other companies have done.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding this paragraph's account of the cited presentation.  The FTC's assertions that the quoted statements are incorrect or incomplete do not create a dispute undermining its concession that the quoted language appears in the cited presentation.

The FTC's response also fails to create a genuine dispute of material fact regarding the benefits WhatsApp received from its migration to Meta's infrastructure, of which there is ample evidence.  *See* Ex. 5 at ¶¶ 224-268 (Nieh Rep.).  Particularly with regard to WhatsApp's migration to Meta's data center infrastructure (the subject of this paragraph), evidence shows that Meta left WhatsApp free to decide when to migrate to Meta's data center infrastructure; that when WhatsApp decided to do so in 2017, the adoption of Meta's multi-region architecture was

a significant anticipated benefit to WhatsApp; and that since that migration was substantially completed in 2018, WhatsApp has realized significant benefits. *See id.* at ¶¶ 240-242, 250-251.

The FTC's assertions that WhatsApp might have succeeded to the same, or a greater, degree without relying on Meta's infrastructure are speculative. Evidence shows that "WhatsApp received enormous benefits from Meta and its infrastructure that enabled [it] to scale more quickly, efficiently, and effectively than [it] could have using other alternatives." *Id.* at ¶ 219; *see also*, *e.g.*, *id.* at ¶¶ 220-269 (explaining those benefits).

860.    In May 2021, Nitin Gupta – head of engineering at WhatsApp – wrote an email listing the following "multiple wins" from migrating WhatsApp onto Meta's infrastructure: "1. Messaging has become more performant & reliable. Before Fb infra, we had 1 active region and 1 cold region. We never did a DR [disaster recovery] exercise. Now we are in ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This has allowed for better load balancing across regions leading to lower messaging latency, higher reliability especially being able to handle NYE spikes. 2. FB CDN has reduced our user perceived media upload/download latencies by ▮▮▮ besides improving reliability. . . . 3. WhatsApp Status (aka Stories) has scaled seamlessly by relying on FB infra especially CDNs. . . . 4. We have built numerous features/capabilities faster and better by relying solely on FB infra," including "VoIP," "integrity systems, various business features such as SMB catalog, Shops, discovery (Click-To-WA-Ads), API access, [and] payments." Ex. 209 at -938-939 (FTC-META-002530938).

**FTC Response: Disputed in part.**

The FTC does not dispute that the quoted language appears in the cited materials, but otherwise disputes Statement 860 as described herein.

The FTC disputes Statement 860 because the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  FTC's infrastructure expert, Tim Bray, evaluated the complete record related to Meta's claims and supporting evidence of purported benefits associated with WhatsApp's infrastructure, and found that the record did not show that Meta delivered infrastructure benefits to WhatsApp for which the acquisition was necessary.  PX9001, Bray Report at ¶ 36-40; PX9011, Bray Rebuttal Report at ¶ 14.

For example, Mr. Bray analyzed the "handful of New Year's Eve events from 2015 to 2018" that Meta's infrastructure expert, Professor Jason Nieh, offered as evidence that Meta's infrastructure improved the reliability and durability of WhatsApp, and concluded that "WhatsApp did not require access to Meta's infrastructure to continue to scale and improve." *Id.* at ¶ 351.  With respect to the purported benefits of Meta's CDN, WhatsApp co-founder Brian Acton testified that "a global content delivery network is something that you can get from Akamai or Cloudflare.  You can get it from a number of different providers just as a service that you purchase."  PX6009, Acton (Meta/WhatsApp) IH Tr., at 196:25-197:4; *id.* at 200:11-20 ("Q. Would WhatsApp also have been able to improve latency had it not been acquired by Facebook? A. Yeah.  We had all the technical know-how and ability to do all these things.").

Additionally, ample evidence indicates, *inter alia*, that WhatsApp had been delivering a high level of performance and reliability prior to its acquisition and without Meta's infrastructure.  *See* PX3201, Meta email chain: S. Lessin to M. Vernal re: "██████," (May 8, 2013), FB_FTC_CID_04109587, at 590 ("As you know, there's a huge gap in perceived performance of our Messenger app compared to WhatsApp and other competitors."); PX2477, Meta email chain: M. Schroepfer to R. Endres, et al. re: "Send Latency," (May 8, 2013),

FB_FTC_CID_02941561, at -563 ("I know you've probably done this recently but Peter and I

just did a side by side test of WhatsApp, Viber, and Messenger Master (most recent build) and

the difference is stark.  WhatsApp and Viber are both near instant (from push send to received on

peters phone).  We take seconds."); PX11028, Meta email chain: J. Parikh to J. Olivan re: "[e

FYI (Engineering Announcements)] Upload latency goals.jpg," (Sept. 16, 2013),

FB_FTC_CID_04329544, at -544 (Email from J. Parikh, Meta, to J. Olivan, Meta, Sept. 16,

2013) ("GOAL: Improve reliability and latency of our messaging solution so that it's

competitive with WhatsApp.").

      Further, other evidence indicates that WhatsApp has experienced performance and

reliability challenges on Meta's infrastructure.  For example, WhatsApp experienced reliability

problems on Meta's media storage, Everstore, and problems using Meta's TAO service.

PX11022, Meta email chain: J. Koum to J. Parikh re: "Everstore issues," (June 9, 2015),

FB_FTC_CID_02581139, at -139 ("Hey man, sorry to be the bearer of bad news, but looks like

our initial experience with everstore is not going well."); *id.* (███████████ telling Koum that

Everstore was "Not even close" to "6 9's" of reliability.);  PX13047, Meta email chain: ███████

to J. Parikh, et al. re: "[WhatsApp FB Infra] Here's the weekly update on Everstore. . ." (July 7,

2015), FTC-META-004712798, at -100 ("Facebook's users are used to retrying everything

because we're not that reliable.  WhatsApp's users expect that once a video is uploaded, their

servers have accepted it and there won't be any reason to re-upload it.  ██████ said that

[WhatsApp's] current reliability is around 99.99% for their own server and uploading to

everstore isn't even 99%.  Remember this is 99% over 40Gbps private circuits between

SoftLayer and Facebook.  [WhatsApp] are 99.99% over crappy 3g connections."); PX10105,

Meta presentation: "All Hands" (Dec. 3, 2018), FB_FTC_CID_09188953, at -021 ("2018:

Change of Plan[:] Plan B: use ZippyDB & ForgETS . . . After discussions with TAO team decide

that it's too big of a leap for WhatsApp"); PX10106, Meta email chain: N. Gupta to J. Parikh, R.

Endres, et al. re: "interop thoughts," (July 24, 2019), FB_FTC_CID_02366761, at -002-003 ("



").

    WhatsApp co-founder Brian Acton also testified that Meta's infrastructure was "higher

complexity and less fault tolerant," and therefore Meta and WhatsApp had a "mismatch between

[WhatsApp's] expectations of reliability and redundancy compared to [Meta's], and it was good

because we forced them to work harder at being more reliable."  PX6009, Acton

(Meta/WhatsApp) IH Tr., at 193:21-194:4; *see also* PX3485 at -018, Meta presentation:

"WhatsApp Migration: the journey" (undated), FB_FTC_CID_07025256 (migrating to Meta's

infrastructure required "analyz[ing] and design[ing] better message reliability service").

    The FTC addresses Meta's claims regarding voice and video calling it its response to

Statement 861.  With respect to Statement 860's assertion that WhatsApp "built numerous

features/capabilities faster and better by relying solely on FB infra," the FTC's infrastructure

expert, Mr. Bray, analyzed Meta's related claims and supporting evidence, and concluded that,

"[b]ecause Meta does not identify any connection to Meta's infrastructure in relation to the

introduction of the features in its list, I cannot assess whether Meta's infrastructure contributed to

any benefits it claims resulted from those features."  *See* PX9001, Bray Report at ¶ 452.  After

reviewing Professor Nieh's expert report, Mr. Bray re-affirmed his conclusions: "I am unable to

verify any benefits to WhatsApp from Meta's infrastructure or engineering expertise or that Meta's resources were required to launch any of these WhatsApp features."  PX9011, Bray Rebuttal at ¶ 401.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding this paragraph's account of the cited document.  The FTC's efforts to show that the quoted statements are incorrect or incomplete do not create a dispute undermining its concession that the quoted language appears in the cited document.

The FTC's response also fails to create a genuine dispute of material fact regarding the benefits WhatsApp received from its migration to Meta's infrastructure, of which there is ample evidence.  *See* Ex. 5 at ¶¶ 224-268 (Nieh Rep.).  The FTC's assertions regarding WhatsApp's pre-acquisition infrastructure ignore evidence of its limitations.  *See id.* at ¶¶ 222-223 (describing the deficiencies of WhatsApp's pre-acquisition infrastructure).

The FTC's assertions that WhatsApp might have succeeded to the same, or a greater, degree without relying on Meta's infrastructure are speculative.  Evidence shows that "WhatsApp received enormous benefits from Meta and its infrastructure that enabled [it] to scale more quickly, efficiently, and effectively than [it] could have using other alternatives."  *Id.* at ¶ 219; *see also*, *e.g.*, *id.* at ¶¶ 220-269 (setting forth those benefits).  The FTC's claims that WhatsApp could have obtained the benefits of a content delivery network ("CDN") from a third-party are both speculative and ignore the unique benefits of Meta's CDN.  By using Meta's CDN, "███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████  *Id.* at ¶ 229.  This ██████

██████████████████████████████████. In fact, ███████████████████████████████

████████████████████████████████████. *Id.* at ¶ 234.

861.    In May 2021, Will Cathcart – the head of WhatsApp, *see* Ex. 166 at 16:5-6 &

errata (Cathcart Dep. Tr.) – wrote in an email: "The launches of voice calling and video calling

were made possible by the FB network infrastructure and would have been much harder /

impossible to do without it.  We now serve ████████████." Ex. 209 at -939 (FTC-META-

002530938).  Mr. Cathcart added that WhatsApp "██████████████████ . . . in about a

week in March 2020.  We wouldn't have been able to stay up and reliable through the

unprecedented surges in usage at the start of the pandemic if it weren't for the scale and

nimbleness of FB Infra." *Id.*

**FTC Response: Disputed in part.**

The FTC does not dispute that the quoted language appears in the cited materials, but

otherwise disputes Statement 861 as described herein.

The FTC disputes Statement 861 because Mr. Cathcart did not have responsibilities for

WhatsApp prior to becoming the head of WhatsApp in 2019.  Ex. 166, at 16:16-18:15 (Cathcart

Dep. Tr.) ("Q. Prior to assuming your current role [as head of WhatsApp], you were vice

president of the Facebook app; right?  A. That is correct.").

The FTC further disputes Statement 861 because the cited material does not show the

absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample

evidence indicates, *inter alia*, that WhatsApp did not need to be acquired by Meta to develop

voice and video calling.  Indeed, WhatsApp co-founder Brian Acton testified that WhatsApp

would have "absolutely" added a voice calling feature if it had not been acquired by Meta and

that it was already building it prior to the acquisition.  PX6009, Acton (Meta/WhatsApp) IH Tr.,

at 211:10-19 (" 

"); *see also* Ex. 163,

Acton (Meta/WhatsApp) Dep. Tr., at 117:10-16 ("

"); PX3205, Meta email chain: ███████ to J. Koum, et al. re: "WhatsApp voip

dev," FB_FTC_CID_09331051 at 051 ("We have basic audio calls that now work between

various platforms that we want to support for v1.").

Additionally, the FTC's infrastructure expert, Tim Bray, concluded that "the existence of

other voice and video calling products demonstrates that knowledge of how to build this

functionality" existed outside of Meta.  PX9011, Bray Rebuttal Report at ¶ 393; *see also*

PX9022, Nieh Report at ¶ 260 (acknowledging that "other companies (such as Line, KakaoTalk,

and Skype) had already introduced" voice calling by 2015).

The FTC also disputes (to the extent implied by the second sentence in Statement 861)

that WhatsApp could not have secured server capacity without being acquired by Meta.  *See*

PX6086, Acton (Meta/WhatsApp) Dep. Tr., at 107:6-15 ("Q. Speaking about the servers that

WhatsApp leased from SoftLayer, would there have been a limit on the number of additional

SoftLayer servers that WhatsApp could have leased prior to its acquisition by Facebook?  A. Not

any extraordinary limits.  The limits would be dictated by SoftLayer's availability at that time,

but they were fairly proactive in buying new servers in anticipation of growth and capacity needs

for their business.").

In fact, WhatsApp grew to ███████████████ while on SoftLayer.  PX6039, Gupta

(Meta) Dep. Tr., at 69:6-10 ("Q. So is it fair to say that WhatsApp was using SoftLayer

infrastructure to serve ██████████████████████████████████████

█████████████████?  A. That seems to be correct, yes."); *see also* PX6009, Acton

(Meta/WhatsApp) IH Tr., at 200:6-13 ("Q. If WhatsApp had not been acquired by Facebook,

would WhatsApp have been able to meet its continued needs for scaling its infrastructure?  A.

Oh, absolutely, yes.  I am a hundred percent confident in that."); *id.* at 185:12-24 ("Q. And was

the engineering focused on making sure the hardware configurations were set up for handling

scaling and growth on WhatsApp?  A. Certainly, yes.  Our general principle of provisioning [on

SoftLayer] was to double capacity.").

The FTC further disputes the last sentence in Statement 861 because other evidence

indicates that Meta was not reliable during the pandemic including in 2020.  *See* PX9001, Bray

Report at ¶ 144; *id.*, Appendix B (showing disruptions affecting WhatsApp's users, during the

pandemic); *see generally* PX9011, Bray Rebuttal Report at ¶¶ 87-112 ("addres[sing] claims from

Meta that it was uniquely capable of providing infrastructure capacity to Instagram and

WhatsApp, and also of operating that infrastructure with better reliability than the acquired

companies could achieve").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact

regarding this paragraph's account of the cited document.  The FTC's efforts to show that the

quoted statements are incorrect or incomplete do not create a dispute undermining its concession

that the quoted language appears in the cited document.

The FTC's response also fails to create a genuine dispute of material fact regarding the

benefits WhatsApp received from its migration to Meta's infrastructure.  The FTC's assertions

regarding WhatsApp's ability to add voice and video calling absent Meta's infrastructure are

speculative; evidence shows that Meta's infrastructure supplied critical benefits to WhatsApp as it implemented those features. *See* Ex. 5 at ¶¶ 228-234 (Nieh Rep.); *see also* Meta SMF ¶ 844.

The FTC's claims regarding WhatsApp's likely growth trajectory are likewise speculative; as Mr. Acton recognized, at the time of the acquisition, the questions of "the value of the network that [WhatsApp] had built," whether WhatsApp was "going to get bigger," and WhatsApp's "value per user" are all reduced to "speculation." Ex. 314 at 162:4-22 (Acton IH Tr.); *see also* Ex. 5 at ¶ 218 (Nieh Rep.) ("It is impossible to know whether WhatsApp could have achieved [its] extraordinary [post-acquisition] growth on its own.").

The FTC's speculation also is immaterial, because evidence shows that "WhatsApp received enormous benefits from Meta and its infrastructure that enabled [it] to scale more quickly, efficiently, and effectively than [it] could have using other alternatives." Ex. 5 at ¶ 219; *see also*, *e.g.*, *id.* at ¶¶ 220-269 (setting forth those benefits).

862.    Mr. Acton testified regarding the Meta infrastructure: "Q. So why was WhatsApp moving to Facebook's internal infrastructure?  A. There were two immediate wins that I can talk about.  One was the global content delivery network that Facebook had built. . . .  SoftLayer didn't really have one.  And so there was a clear win that if we set up our voice and video relay servers in the global network, we could reduce latency in establishing voice and video communications and improve the quality.  So that was a big win for us, that, you know – that was a case of, like, Facebook had already done the investment and we had not yet done it.  If we had done it with SoftLayer, we would have had a global network, but it probably would have existed in, say, 10 parts of the world instead of the 100 parts of the world that Facebook had.  So that's one aspect, is the global delivery network." Ex. 314 at 190:7-25 (Acton IH Tr.).

**FTC Response: Disputed in part.**

The FTC does not dispute that, before the Meta acquisition, WhatsApp was not using a content delivery network and that, after the acquisition, WhatsApp adopted Meta's content delivery network.  The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 862 as described herein.

The FTC disputes Statement 862 as incomplete and because the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  The FTC disputes that WhatsApp was only using "the global content delivery network that Facebook had built" because, in 2015, WhatsApp also relied on Akamai, a third-party CDN provider that Meta had contracted with to support expected workload surges.  *See* PX3219 at -013-14, -022, Meta presentation: "Capacity Plan for Video Products" (Oct. 2015), FTC-META-008683728.  The FTC further disputes that WhatsApp would have had to use SoftLayer as its CDN provider had it not been acquired by Meta.  Other evidence, including from Mr. Acton, indicates that WhatsApp could have contracted with a commercial CDN provider and improved its network latency without Meta.  *See* Ex. 314 at 196:25-197-4 (Acton IH Tr.) ("[A] global content delivery network is something you can get from Akamai or Cloudflare.  You can get it from a number of different providers just as a service that you purchase."); *id.* at 200:14-20 ("Q. Would WhatsApp also have been able to improve latency had it not been acquired by Facebook?  A. Yeah.  We had all the technical know-how and ability to do all these things.").

Further, with respect to voice and video calling, other evidence also indicates that WhatsApp was already building voice and video calling capabilities prior to the acquisition.  *See id.* at 211:11-19 ("Q. And would WhatsApp have added this [voice calling] feature had it not been – had it not been acquired by Facebook?  A. Oh, absolutely.  We had already built it.  I mean, we were building it.  Q. Would it have taken longer . . . to build it?  A. No."); *see also*

PX6086, Acton (Meta/WhatsApp) Dep. Tr., at 117:10-16 ("we had written the software to do
[voice calling] in SoftLayer infrastructure, but we were able to eventually just launch it on
Facebook infrastructure."); PX3205, Meta/WhatsApp email chain: ████ to J. Koum re:
"Audio calls on platforms," (Oct. 2, 2013), FB_FTC_CID_09331051, at -051 ("We have basic
audio calls that now work between various platforms that we want to support for v1.").

 The FTC's infrastructure expert, Tim Bray, also found that the magnitude of any
potential improvement from the use of Meta's CDN "would have been limited, particularly
within the United States," because of the large number of public-cloud data centers in the United
States, but also that "the absence of details such as comparative latency metrics prevents [him]
from verifying the magnitude of any potential benefit." *See* PX9011, Bray Rebuttal Report at ¶
394; *id.* at ¶¶ 391-392 (noting only about "40% or less" of WhatsApp calls globally would likely
have been impacted by the use of Meta's CDN).

 **Meta Reply:** The FTC's response does not create a genuine dispute of material fact
regarding whether Mr. Acton gave the quoted testimony. The FTC's efforts to show that the
quoted statements are incorrect or incomplete do not create a dispute undermining its concession
that the quoted language appears in the cited testimony.

 The FTC's response also does not create a genuine dispute of material fact regarding the
benefits that WhatsApp received from using Meta's CDN. Evidence shows that those benefits
were enormous. *See* Ex. 5 at ¶¶ 228-234 (Nieh Rep.). The FTC's account of Meta's relationship
with Akamai omits a key fact: the evidence it cites merely describes a contingency plan to
"[f]all back to Akamai if needed" in a particular region, not to rely on Akamai in general for
WhatsApp's CDN needs. PX3219 at -748 (FTC-META-008683726). The FTC's assertions
regarding WhatsApp's ability to add voice and video calling absent Meta's infrastructure are

speculative; evidence corroborates Mr. Acton's testimony regarding the crucial role Meta's CDN

played in supporting WhatsApp's implementation of those features. *See* Ex. 5 at ¶¶ 228-

234 (Nieh Rep.); *see also* Meta SMF ¶ 844.

The FTC's claim that WhatsApp could have received the same benefits while relying on

a third-party CDN is speculative. Moreover, it erroneously conflates the CDN service available

from third parties with Meta's proprietary CDN. By using Meta's CDN, "███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████" Ex. 5 at ¶ 229 (Nieh Rep.). This ███████████████

████████████████████████████████. In fact, ████████████████████████████████████

████████████████████████. *Id.* at ¶ 234.

863.     He added that a "second" benefit was that WhatsApp "moved all the media into

Everstore, which was [Meta's] large-scale media storage system, and that improved media

delivery for us. And it also outsourced the operations of the media storage. And that was really

the benefit for us. Because we were small, we didn't have the operational staff to deal with – to

deal with what was happening. So those were the two media benefits to adopting Facebook

infrastructure. Quick wins. We did those straightaway in 2014, 2015." Ex. 314 at 191:1-25

(Acton IH Tr.).

**FTC Response: Disputed in part.**

The FTC does not dispute that the quoted language appears in the cited transcript, but

otherwise disputes Statement 863 as described herein.

The FTC disputes Statement 863 as incomplete and because the cited material does not

show the absence of a genuine dispute regarding a material fact. *See* Fed. R. Civ. P. 56(c)(1)(B).

The FTC disputes that WhatsApp "moved all the media into Everstore" "straightaway, in 2014, 2015" and that WhatsApp's adoption of Meta's infrastructure resulted in "[q]uick wins." A Meta document dated January 5, 2016 shows that WhatsApp had completed 99% of video storage migration to Everstore, but had only begun the process for photo storage migration. PX3212, Meta message board post: ███████ post to WhatsApp <> FB Infra (Jan. 7 2016), FTC-META-004676264 at -264 (showing "+ 99% of videos served and 14% of images were served from everstore"). WhatsApp was still migrating photo storage to Meta's infrastructure in 2017, more than 3 years after Meta acquired WhatsApp in February 2014. PX3211, Meta message board post: ████ post to Infra Leads (Mar. 14, 2017), FTC-META-003107037 at -037 ("WhatsApp's video components/storage are on FB infra already. And the immediate next step is to move the photos/audio components to FB."); PX10861, Meta email chain: ████ to M. Zuckerberg, et al. re: "WhatsApp is signed," (Feb. 19, 2014), FB_FTC_CID_01497813, at -813 (WhatsApp deal signed in February 2014).

Other evidence also indicates that WhatsApp had to slow down the migration of videos to Everstore because it was unreliable and that Everstore did not "improve[] media delivery for [WhatsApp]." *See* PX3204, Meta email: ██████ to K. Anand re: "Everstore info," (July 6, 2015), FB_FTC_CID_09104022, at -022 ("WhatsApp — 20% of videos coming to Everstore. They won't fully onboard until Facebook infra meets their 99.999 reliability requirement (their goal is 6 9s!)."); PX11022, Meta email chain: J. Koum to J. Parikh re: "Everstore issues," (June 9, 2015),  FB_FTC_CID_02581139, at 139 (Email from J. Koum, Meta/WhatsApp, to J. Parikh, Meta, June 9, 2015) ("Hey man, sorry to be the bearer of bad news, but looks like our initial experience with everstore is not going well."); *id.* (████████ telling Koum that Everstore was "Not even close" to "6 9's" of reliability.); PX13047, Meta email chain: █████ to J. Parikh,

et al. re: "[WhatsApp FB Infra] Here's the weekly update on Everstore. . ." (July 7, 2015), FTC-META-004712798, at -100 ("Facebook's users are used to retrying everything because we're not that reliable.  WhatsApp's users expect that once a video is uploaded, their servers have accepted it and there won't be any reason to re-upload it.  ▮▮▮▮ said that [WhatsApp's] current reliability is around 99.99% for their own server and uploading to everstore isn't even 99%.  Remember this is 99% over 40Gbps private circuits between SoftLayer and Facebook.  [WhatsApp] are 99.99% over crappy 3g connections.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Mr. Acton gave the quoted testimony.  The FTC's efforts to show that the quoted statements are incorrect or incomplete do not create a dispute undermining its concession that the quoted language appears in the cited testimony.  The FTC's response also does not create a genuine dispute of material fact regarding the benefits that WhatsApp received from using Everstore.  Extensive evidence shows that WhatsApp benefited from its reliance on Everstore.  *See* Ex. 5 at ¶¶ 235-239 (Nieh Rep.).  The FTC's claim that WhatsApp could have received these same benefits absent the acquisition is speculative.

864.    Mr. Acton also testified regarding migrating WhatsApp onto the Meta infrastructure:  "Q. Did EverStore help you deliver media efficiently and globally?  A. Yes. . . . But more importantly, EverStore was scaleably and cost effectively [sic]."  Ex. 163 at 250:7-12 (Acton Dep. Tr.); *see also id.* at 249:4-9 ("I think earlier today you heard me mention EverStore as a technological step forward for us, and the Face – Facebook network infrastructure that enabled us to roll out our voice and video calling were two areas of improvement for WhatsApp that were the quick wins that I had talked about.").

**FTC Response: Disputed in part.**  The FTC objects to Statement 864 as vague as to time and to the terms "efficiently," "scaleably," and "cost effectively" as vague.

The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputed Statement 864 as described herein.

The FTC disputes Statement 864 because the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Other evidence indicates that Everstore did not help WhatsApp "deliver media efficiently and globally."  *See* PX3204, Meta email: ▇▇▇▇ to K. Anand re: "Everstore info," (July 6, 2015), FB_FTC_CID_09104022, at -022 ("WhatsApp — 20% of videos coming to Everstore.  They won't fully onboard until Facebook infra meets their 99.999 reliability requirement (their goal is 6 9s!)."); PX11022, Meta email chain: J. Koum to J. Parikh re: "Everstore issues," (June 9, 2015), FB_FTC_CID_02581139, at -139 ("Hey man, sorry to be the bearer of bad news, but looks like our initial experience with everstore is not going well."); *id.* (▇▇▇▇▇ telling Koum that Everstore was "Not even close" to "6 9's" of reliability.);  PX13047, Meta email chain: ▇▇▇ to J. Parikh, et al. re: "[WhatsApp FB Infra] Here's the weekly update on Everstore. . ." (July 7, 2015), FTC-META-004712798, at -100 ("▇▇▇ said that [WhatsApp's] current reliability is around 99.99% for their own server and uploading to everstore isn't even 99%.").

Other evidence also shows that WhatsApp could have continued to scale successfully without Meta.  *See* PX6009, Acton (Meta/WhatsApp) IH Tr., at 200:6-13 ("Q. If WhatsApp had not been acquired by Facebook, would WhatsApp have been able to meet its continued needs for scaling its infrastructure?  A. Oh, absolutely, yes.  I am a hundred percent confident in that.").  Further, the FTC disputes that Evertore was "cost effective[]."; *see also* PX9011, Bray Rebuttal

Report at ¶ 14 ("The Nieh Report fails to support its assertions that the acquisitions produced infrastructure-related cost savings with evidence that accounts for the relevant technology costs.").

Further, other evidence indicates that WhatsApp was already building voice and video calling capabilities prior to the acquisition.  *See* Ex. 314 at 211:11-19, Acton (Meta/WhatsApp) IH Tr., ("Q. And would WhatsApp have added this [voice calling] feature had it not been – had it not been acquired by Facebook?  A. Oh, absolutely.  We had already built it.  I mean, we were building it.  Q. Would it have taken longer . . . to build it?  A. No."); *see also* Ex. 163 at 117:10-16 (Acton Dep. Tr.) ("we had written the software to do [voice calling] in SoftLayer infrastructure, but we were able to eventually just launch it on Facebook infrastructure."); PX3205, Meta/WhatsApp email chain: ███████ to J. Koum re: "Audio calls on platforms," (Oct. 2, 2013), FB_FTC_CID_09331051, at -051 ("We have basic audio calls that now work between various platforms that we want to support for v1.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Mr. Acton gave the quoted testimony.  The FTC's efforts to show that the quoted statements are incorrect or incomplete do not create a dispute undermining its concession that the quoted language appears in the cited testimony.  The FTC's response also does not create a genuine dispute of material fact regarding the benefits that WhatsApp received from using Everstore.  Extensive evidence shows that WhatsApp benefited from its reliance on Everstore. *See* Ex. 5 at ¶¶ 235-239 (Nieh Rep.).  The FTC's claim that WhatsApp could have received these same benefits absent the acquisition is speculative.

865.    Regarding moving WhatsApp's media to Meta's content delivery network (CDN), Mr. Acton testified:  "Q. [D]id the moving to the content delivery network reduce latency for

WhatsApp?  A. Yes."  Ex. 163 at 250:2-4 Acton Dep. Tr.).  He also testified that, "[t]he CDN, as

you mentioned, lowers latency, which improves the deliverability of the objects, so there's –

there's a user experience improvement, yes.  Q. And that would improve the quality?  A. Yes."

*Id*. at 250:17-23.

**FTC Response: Disputed in part.**

The FTC objects to Statement 865 as vague as to time.

The FTC does not dispute that, before the Meta acquisition, WhatsApp was not using a

content delivery network and that, after the acquisition, WhatsApp began using Meta's content

delivery network.  The FTC also does not dispute that the quoted language appears in the cited

transcript.  The FTC otherwise disputes Statement 865 as described herein.

The FTC disputes Statement 865 as the cited material does not show the absence of a

genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence

indicates, *inter alia*, that WhatsApp could have contracted with a commercial CDN provider and

improved its network latency without Meta.  *See* PX6086, Acton (Meta/WhatsApp) Dep. Tr., at

196:25-197-4 ("[A] global content delivery network is something you can get from Akamai or

Cloudflare.  You can get it from a number of different providers just as a service that you

purchase."); *id.* at 200:14-20 ("Q. Would WhatsApp also have been able to improve latency had

it not been acquired by Facebook?  A. Yeah.  We had all the technical know-how and ability to

do all these things."); *see also* PX9001, Bray Report at ¶ 393 ("Unlike Instagram, WhatsApp was

not using a CDN service prior to being acquired by Meta.  However, in my experience, since a

high proportion of WhatsApp traffic is individual-to-individual, it has less need for the service a

CDN provides, i.e., caching popular widely-shared objects (usually images and video) around the

world to facilitate their access by millions of users.  A CDN's benefits are greatest when there

are highly popular pieces of content (e.g., a popular celebrity sharing an image); however, when content will be viewed by only a single other user, a CDN offers limited benefits.  The fact that WhatsApp scaled to hundreds of millions of users without the benefit of any CDN illustrates this point.").

The FTC's infrastructure expert, Tim Bray, also found that the magnitude of any potential improvement from the use of Meta's CDN "would have been limited, particularly within the United States," because of the large number of public-cloud data-centers in the United States, but also that "the absence of details such as comparative latency metrics prevents [him] from verifying the magnitude of any potential benefit."  *See* PX9011, Bray Rebuttal Report at ¶ 394; *id.* at ¶¶ 391-392 (noting only about 40% or less of WhatsApp calls globally would likely have been impacted by the use of Meta's CDN).

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact regarding whether Mr. Acton gave the quoted testimony.  The FTC's efforts to show that the quoted statements are incorrect or incomplete do not create a dispute undermining its concession that the quoted language appears in the cited testimony.  The FTC's response also does not create a genuine dispute of material fact regarding the benefits that WhatsApp received from using Meta's CDN.  Evidence shows that those benefits were enormous.  *See* Ex. 5 at ¶¶ 228-234 (Nieh Rep.).  The FTC's claim that WhatsApp could have received the same benefits while relying on a third-party CDN is speculative.  Moreover, it erroneously conflates the CDN service available from third parties with Meta's proprietary CDN.  By using Meta's CDN, "█████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ *Id.* at ¶ 229.  This ██████████████

████████████   .  In fact, ████████████████████████████████████

███████████████████████   .  *Id.* at ¶ 234.

### f.      Post-Acquisition Spam

866.      Regarding "spam" on WhatsApp, Mr. Acton testified it was a "reasonably sized" problem prior to the acquisition.  Ex. 314 at 235:15-25 (Acton IH Tr.); *see also id.* at 236:1-2 (calling spam on WhatsApp a "low-to-medium-sized problem" before the Meta acquisition).

**FTC Response: Disputed.**  The FTC disputes Statement 866 because Mr. Acton did not testify that spam on WhatsApp was a reasonably sized problem prior to the acquisition.  Mr. Acton testified that "[spam] was reasonably sized" before asking for clarification as to the time in question.  When the question was clarified to ask about "in 2014, prior to the acquisition," Mr. Acton testified that "it was a low-to-medium-sized problem."  Ex. 314 at 235:22-236:2 (Acton IH Tr.) ("Q. And how big of a problem was spam?  A. It was reasonably sized.  At what time?  Q. Let's – so in 2014, prior to the acquisition.  A.  I would say it was a low-to-medium-sized problem.").

The FTC further disputes Statement 866 because it omits testimony by Mr. Acton stating that spam on WhatsApp was not an urgent problem prior to and immediately after the acquisition: "[spam] wasn't a problem that we had to drop everything and adopt [Facebook's spam technology] on day one."  *Id.* at 237:17-25 (Q. So why didn't you start using -- why didn't you WhatsApp start using Facebook's spam technology immediately after the acquisition?  A. Because, as I mentioned, it was a low-to-medium problem.  It wasn't such an urgent and -- you know, it wasn't a problem that we had to drop everything and adopt on day one.  We were able to do it opportunistically as this person came on and opportunistically as he was available.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Acton testified that WhatsApp was experiencing a reasonably sized problem with spam prior to its acquisition by Meta.  *See supra* Meta Introduction.

867.    Mr. Acton also testified: "Q. And when WhatsApp joined Facebook, did Facebook change the way that WhatsApp was dealing with spam?  A. Facebook, yes.  Q. And how did it do that?  A. Facebook had a system for fighting spam.  Q. And did Facebook's system improve the way that WhatsApp dealt with spam?  A. Yes.  Q. And how did it improve the issue of dealing with spam?  A. There [are] generally two measurables:  precision and recall.  And we saw the precision improve and we saw the recall improve."  Ex. 314 at 236:7-20 (Acton IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to Statement 867 because it is vague as to the extent of the claimed improvement from using Meta's spam system and is vague as to time.

The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 867 as described herein.

The FTC disputes that Meta changed the way that WhatsApp was dealing with spam "when WhatsApp joined Facebook."  Ex. 314 at 236:7-20 (Acton IH Tr.)  Other evidence indicates that WhatsApp did not start using Meta's spam technology until late 2015 or early 2016, and therefore any such improvements could not have taken place "when WhatsApp joined Facebook": Mr. Acton testified that WhatsApp did not start using Meta's spam technology until sometime in late 2015 or early 2016, which is consistent with an internal Meta document indicating that WhatsApp had not started using Meta's spam technology as late as May 2015.  *See id.* at 237:4-10:3 ("Q. And when did WhatsApp begin utilizing Facebook's system to fight spam?  A. I want to say like late 2015, early 2016, but I wouldn't – I wouldn't know for sure.

Yeah.  Q. But it wasn't immediately after the acquisition?  A. Correct."); PX10747, Meta email

chain: ███████ to ████████, et al. re: "WhatsApp may be interested in more collaboration . . ."

(May 1, 2015), FB_FTC_CID_06507621, at -623 ("If they [WhatsApp] are mainly hit by fake

accounts, the first things to do would be to build the Sentry integration . . . .").

The FTC further disputes Statement 867 as the cited material does not show the absence

of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence

indicates, *inter alia*, that Meta's spam system did not improve the way WhatsApp dealt with

spam, and more specifically that WhatsApp could have improved the precision and recall of its

spam tools without Meta.  *See* Ex. 314 at 236:21-237:3 (Acton IH Tr.) ("Q. Could WhatsApp

have improved its precision in the system that you had built prior to the acquisition to fight

spam?  A. Yes.  Q. Could WhatsApp have improved its recall in the system that you used to fight

spam prior to the acquisition? A. Yeah."); PX12115, Meta email chain: G. Rosen to J. Parikh, et

al. re: "Integrity & tools growth," (Apr. 27, 2018), FB_FTC_CID_03893562 at -563 ("We are

under-invested in integrity, and need to catch up everywhere."); PX10747, Meta email chain: ██

██████ to A. Bejar, et al. re: "WhatsApp may be interested in more collaboration . . ." (May 5,

2015), FB_FTC_CID_06507621 at -621 ("WhatsApp is attacked by skilled and persistent

spammers that have already gone through several rounds of iterations.  Spam-fighting is a burden

to WhatsApp engineers, it's not their speciality [sic] and they want to focus on building their

product instead. 5 of them are working part-time on this. They don't have the right systems nor

tools."); *see also* PX9002, McCoy Report at ¶ 262 ("Moreover, there is evidence that Meta may

have harmed WhatsApp's integrity efforts by not dedicating resources to building out

WhatsApp's integrity systems.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Acton testified that WhatsApp's use of Meta's spam-fighting systems improved the way that WhatsApp dealt with spam, particularly its precision and recall.  *See supra* Meta Introduction. As the terms "improve" and "when WhatsApp joined Facebook" are ordinarily understood and used, there is no dispute that Mr. Action was describing the spam-fighting benefits WhatsApp obtained as a result of its acquisition by Meta in the period after the acquisition closed.

None of the additional materials cited by the FTC creates a dispute regarding Mr. Acton's testimony in paragraph 867, including for the reasons stated below in Meta's reply to paragraph 868.  In addition, when the FTC asked Mr. Bejar about PX10747, Mr. Bejar testified that the document is "very consistent with the fact that [Meta's Site Integrity team was] very responsive" when it became aware of integrity-related challenges on WhatsApp.  PX6052 at 63:1-65:15 (Bejar Dep. Tr.).

868.    Mr. Koum testified:  "Q. Did the way you dealt with spam change after Facebook acquired WhatsApp?  A. Yes.  Q. How so?  A. I think they had slightly sophisticated systems for fighting spam because they had been doing it longer than we had and on a much larger scale. And I think some of our engineers who were working on spam were able to tap into their systems to figure out – to better help us figure out what is spam and what is not spam."  Ex. 285 at 189:24-190:9 (Koum IH Tr.).

**FTC Response: Disputed in part.**  The FTC objects to Statement 868 because it is vague as to the extent of any claimed benefits from Meta's spam systems, vague as to time, and incomplete.

The FTC does not dispute that the quoted language appears in the cited transcript, but otherwise disputes Statement 868 as described herein.  The FTC disputes that Statement 868

establishes that Meta's spam systems or engineers improved spam on WhatsApp after the acquisition, or the extent of any such improvements, because the cited testimony is vague, unexplained, and unsupported.  Further, immediately following the testimony cited in Statement 868, Mr. Acton testified that he did not know how much Meta improved WhatsApp's ability to deal with spam.  Ex. 285 at 190:10-12 (Koum IH Tr.) ("Q: Do you know how much [Meta's spam systems] improved WhatsApp's ability to deal with spam issues?  A: I don't have a number[.]").

Statement 868 is also incomplete because it omits testimony by Mr. Koum indicating that WhatsApp could have improved its ability to deal with spam without Meta.  Mr. Koum testified:

> Q. If Facebook had not acquired WhatsApp, could you have continued to improve your ability to deal with spam issues?
>
> A. Yes.  Q. How would you have done so?  A. We would hire people to go build a team that specializes in spam abuse and spam detection and give them enough resources and server capacity to go build what would be needed to solve that problem, just like we solved any problem that came up until 2014, by hiring smart people and giving them resources to solve the problem.

*Id.* at 190:13-24 (Koum IH Tr.).

Statement 868 is additionally vague as to time because it does not specify when, after the acquisition, WhatsApp changed the way it dealt with spam, and other evidence indicates that WhatsApp did not start using Meta's spam technology until late 2015 or early 2016.  *See* PX6009, Acton (Meta/WhatsApp) IH Tr., at 237:4-10 ("Q. And when did WhatsApp begin utilizing Facebook's system to fight spam?  A. I want to say like late 2015, early 2016, but I wouldn't – I wouldn't know for sure.  Yeah.  Q. But it wasn't immediately after the acquisition?  A. Correct."); PX10747 Meta email chain: ███████ to ███████ et al. re: "WhatsApp may be interested in more collaboration . . ." (May 1, 2015), FB_FTC_CID_06507621, at -623 ("If they

[WhatsApp] are mainly hit by fake accounts, the first things to do would be to build the Sentry integration . . . .").

The FTC further disputes Statement 867 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that Meta's integrity systems and engineers did not help WhatsApp fight spam in the years after the acquisition, and that Meta did not deliver benefits to WhatsApp related to spam for which Meta's acquisition was necessary.  *See, e.g.*, PX12115, Meta email chain: G. Rosen to J. Parikh, et al. re: "Integrity & tools growth," (Apr. 27, 2018), FB_FTC_CID_03893562, at -563 ("We are under-invested in integrity, and need to catch up everywhere."); PX9013, McCoy Rebuttal Report at ¶¶ 393, 394.

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that Mr. Koum testified that Meta changed WhatsApp's abilities to fight spam by providing more sophisticated systems, which helped WhatsApp better deal with spam.  *See supra* Meta Introduction.  The cited testimony is not vague as to the benefits Meta provided WhatsApp, as Mr. Koum clearly identifies two specific benefits:  the sophistication of Meta's spam-fighting systems and Meta's greater experience with fighting spam at scale.  Nor is Mr. Koum's testimony vague as to the relevant time period, as his testimony expressly refers to the period "after Facebook acquired WhatsApp."  The 2018 email cited by the FTC does not create a dispute regarding Mr. Koum's testimony in paragraph 868, including because it does not contradict Mr. Koum's testimony and because other evidence shows that, in 2018, Meta "more than doubled the number of people who work[ed] on safety and security [as compared to 2017] to more than 30,000," and that "integrity became the number one area of growth in 2017 and 2018," as Meta "hired across all functions – engineering and product, operations, policy"

because integrity "is a team effort."  PX10940 at -007, -013 (FTC-META-006840603).  Guy

Rosen also testified that, when he became Meta's vice president of integrity in February 2017,

Meta "had smaller teams" working on integrity, "as did the whole industry" because integrity

"wasn't really a focus area for technology companies."  PX6058 at 15:21-16:3, 30:11-22 (Rosen

Dep. Tr.).

869.    An internal retrospective from 2018 discussing WhatsApp's migration to Meta's

infrastructure observed that, in "2014," "WhatsApp didn't have" a "[s]pam fighting

infrastructure," but that by 2016, WhatsApp was leveraging Meta's "Sentry" system "for spam

fighting."  Ex. 198 at -256.002, -256.003 (FB_FTC_CID_07025255).  Sentry is a Meta-

developed integrity tool ███████████████████████████████████████████

███████████████████████████████████████████████████ Ex. 7 at ¶¶ 38, 126

(Subrahmanian Rep.).

**FTC Response: Disputed in part.**  The FTC objects to the term "spam fighting

infrastructure" in Statement 869 as vague.

The FTC does not dispute that the quoted language appears in the cited document, but

otherwise disputes Statement 869 as described herein.

The FTC disputes the first sentence as incomplete and misleading because WhatsApp had

the ability to fight spam prior to the acquisition by Meta.  Mr. Acton testified that, prior to the

acquisition, "[WhatsApp] built a system to [deal with spam].  It was based on heuristics and

analysis of [] data."  PX6009, Acton (Meta/WhatsApp) IH Tr., at 236:3-6.  Jan Koum testified

that WhatsApp had "a number of mechanisms in place to catch potential spammers and abusers."

PX6010, Koum (Meta/WhatsApp) IH Tr., at 189:1-23.

The FTC further disputes Statement 869 as the cited material does not show the absence of a genuine dispute regarding a material fact.  *See* Fed. R. Civ. P. 56(c)(1)(B).  Ample evidence indicates, *inter alia*, that Meta did not leverage its integrity systems effectively for WhatsApp. *See, e.g.*, PX12115, Meta email chain: G. Rosen to J. Parikh, et al. re: "Integrity & tools growth," (Apr. 27, 2018), FB_FTC_CID_03893562, at -563 ("We are under-invested in integrity, and need to catch up everywhere."); PX3069, Meta document: "Integrity 2017-H2/2018-H1 Review" (Jan. 5, 2018), FTC-META-003740267, at -279 ("While concentrating on supporting new business products, work on classic spam detection decreased.  There was a corresponding increase in spam reports against accounts later banned, from ~30k / day to ~95k / day.").

**Meta Reply:**  The FTC's response does not create a genuine dispute of material fact that, by 2016, WhatsApp leveraged Meta's Sentry system to fight spam, which was an improvement as compared to 2014 when WhatsApp lacked a spam-fighting infrastructure.  *See supra* Meta Introduction; Meta SMF ¶ 805 (describing WhatsApp's lack of spam-fighting infrastructure or expertise before the acquisition).  The testimony from Mr. Acton and Mr. Koum regarding WhatsApp's systems and methods for dealing with spam that the FTC cites in response is not inconsistent with the fact that WhatsApp lacked a spam-fighting infrastructure in 2014.  And the additional materials from 2018 that the FTC cites do not create a dispute, including for the reasons stated above in Meta's reply to paragraph 868.

Dated: July 12, 2024

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*