# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION,**

                Plaintiff,

      v.

**META PLATFORMS, INC.**

                Defendant.

Civil Action No. 1:20-cv-03590 (JEB)

**PUBLIC RECORD VERSION**

**LESSER REDACTED VERSION**

**Plaintiff Federal Trade Commission's Updated Memorandum of Law in Opposition to Defendant Meta Platforms, Inc.'s Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment**

## TABLE OF CONTENTS

**LEGAL STANDARD** ...................................................................................................... 3

**ARGUMENT** ..................................................................................................................... 3

I.   Meta Has Monopoly Power Over PSN Services in the United States ............................... 3

   A.   PSN Services Are a Distinct Product Offering with Distinct Consumer Demand ....... 3

      1.   Evidence Shows a Distinct Consumer Demand for Friends and Family Sharing, Which Is a Core Use Case of Facebook and Instagram .................... 4

      2.   PSN Apps Serve the Distinct Demand for Friends and Family Sharing .......... 5

      3.   PSN Apps Can Constitute a Distinct Market and Also Offer Functions Less Directly Related to Sharing with Friends and Family ....................................... 6

   B.   PSN Services in the United States Constitutes a Relevant Antitrust Market .............. 8

      1.   Meta's Brief Misstates Foundational Principles of Market Definition............. 8

      2.   The *Brown Shoe* Practical Indicia Delineate a Relevant Market for PSN Services ........................................................................................................ 11

         (a)   PSN apps have a "peculiar use" of friends and family sharing ..... 12

         (b)   PSN apps have "peculiar characteristics"...................................... 13

         (c)   Industry and public recognition of distinct demand for friends and family sharing and PSN apps ........................................................ 14

         (d)   Remaining *Brown Shoe* factors .................................................... 16

      3.   Other Apps Are Not Reasonable Substitutes for PSN Services ..................... 18

      4.   A Hypothetical Monopolist of PSN Services Would Profitably Impose a Quality-Adjusted Price Increase Above a Competitive Level ....................... 21

      5.   Meta's Experts' Analyses Are Irredeemably Flawed .................................... 23

      6.   Professor Hemphill and Professor Lampe's Opinions Do Not Conflict......... 29

   C.   Meta's Dominant Market Share and Significant Entry Barriers for PSN Services .... 30

   D.   Direct Evidence Indicates Meta's Monopoly Power over PSN Services .................. 33

II.   Meta's Acquisitions of Instagram and WhatsApp Constitute Exclusionary Conduct that Harmed Competition and Consumers ................................................................................. 38

   A.   Instagram and WhatsApp Represented Significant Competitive Threats to Meta in PSN Services.......................................................................................................... 40

      1.   Instagram Was a Direct PSN Rival that Posed a Significant Threat to Meta's PSN Services Monopoly ................................................................................ 40

      2.   WhatsApp Was a Potential PSN Rival that Posed a Significant Threat to Meta's PSN Services Monopoly Power.......................................................... 42

B. Meta's Acquisitions of Instagram and WhatsApp Contributed to the Maintenance of Meta's PSN Monopoly ............................................................................... 48

C. While Not Required, Ample Evidence Indicates that Meta's Conduct Harms Consumers ................................................................................................ 55

    1. Meta Misstates the Legal Standard Applicable to its Conduct ...................... 55

    2. Meta's Continued Maintenance of Its Monopoly Harms Consumers ........... 59

D. Meta's Request for a "Presumption" of Legality is Legally and Factually Baseless . 60

III. The Court Should Grant Partial Summary Judgment and Dismiss Meta's Claimed Procompetitive Justifications ............................................................................ 64

A. The Legal Standards Applicable to the FTC's Cross-Motion and Meta's Procompetitive Benefit Justifications ................................................................. 65

    1. The Legal Standard for Motions for Partial Summary Judgment .................. 65

    2. The Legal Standard for Procompetitive Justifications .................................... 66

B. Meta's Asserted Procompetitive Justifications in this Litigation ............................... 68

C. Undisputed Facts Show that Meta's Procompetitive Benefit Claims Are Not Cognizable ............................................................................................ 69

    1. All of Meta's Instagram Justifications Are Pretextual and Could Have Been Achieved Absent the Acquisition ................................................ 71

        (a) Meta's Instagram Justifications Are Pretextual ............................ 71

        (b) Meta's Instagram Justifications Were Achievable Without the Acquisition 75

    2. Meta's First Three WhatsApp Justifications Are Pretextual and Could Have Been Achieved Absent the Acquisitions ........................................ 77

        (a) Meta's First Three WhatsApp Justifications Are Pretextual ......... 77

        (b) Meta's First Three Justifications for the WhatsApp Acquisition Were Achievable Without the Acquisition ....................................... 79

    3. Meta's Final WhatsApp Justification is Unrelated to Improving Competition ............................................................................................ 80

CONCLUSION .................................................................................................... 80

## TABLE OF AUTHORITIES

**Cases**

*Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194 (3d Cir. 1994) ...................................37

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946) ....................................................34, 35, 55

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................................3, 65

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ...........................................33, 38

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)........................................................8, 15, 16

*\*Citizen Pub. Co. v. United States*, 394 U.S. 131 (1969) ............................................................52, 53

*Clarett v. National Football League*, 306 F. Supp. 2d 379 (S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004) .......................................................................................68, 70

*Colo. Interstate Gas Co. v. Nat'l Gas Pipeline Co. of Am.*, 885 F.2d 683 (10th Cir. 1989) .........33

*Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F. Supp. 780 (S.D. Tex. 1971), *aff'd*, 476 F.2d 989 (5th Cir. 1973)...............................................................................................................57

*Dr. Pepper/Seven-Up Cos., Inc. v. FTC*, 991 F.2d 859 (D.C. Cir. 1993) .......................................52

*\*Eastman Kodak Co. v. Image Tech. Servs, Inc.*, 504 U.S. 451 (1992) ........................9, 10, 12, 67

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016).......................61

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) .......................................9, 22, 24, 26

*Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitrust Litig.)*, 739 F.3d 262 (6th Cir. 2014) .............................................................................................................................................23

*FTC v. Advoc. Health Care*, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017)...................................26

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021)..............................................9, 10, 33, 39

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022).........................................30, 31, 39, 40

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ......................................................... passim

*FTC v. IQVIA Holdings Inc.*, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) .....................12, 14, 15, 29

*FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023) ............................................11

iii

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ........................................15

*FTC v. Polypore*, 686 F. 3d 1208 (11th Cir. 2012)...........................................................................58

*FTC v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986) ................................................................4

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016)................................................................16

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997)..................................................12, 15, 21

*FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2020) ........................................................56

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023) ...........................................35, 37, 65

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ........................................................... passim

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ........................................ passim

*Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C. Cir. 1977) ........................................................49

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) .........................................................................3

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ................ passim

*In re Carbon Black Antitrust Litig.*, 2005 WL 2323184 (D. Mass. Sept. 8, 2005) .......................61

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ...........................61

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126 (N.D. Cal. 2014) ...............................................................................................................................................66

*In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077 (N.D. Ill. 2023) .........................................................................................................................................65, 71

*Insight Equity v. Transitions Optical, Inc.*, 252 F. Supp. 3d 382 (D. Del. 2017)...............10, 24, 27

*Jackson v. Att'y Gen. U.S.*, 456 F. Supp. 3d 62 (D.D.C. 2020)....................................................65

*Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010 (10th Cir. 1998) .....................................71

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ................................................................ passim

*Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762 (9th Cir. 2001) ...................12

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ........................................................... passim

iv

*Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285 (D.C. Cir. 1989), *aff'd*, 493 U.S. 38 (1989) ............................................................................................................................52

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ..............................................................74

*Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350 (1970) .........................................................19

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008).....................................................................58

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ...........................................35

*Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327 (2d Cir. 2024).....................11, 21

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ..................62

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021) ..................................61, 63

*Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 1983-2 Trade Cas. (CCH) P65,522 (D. Neb.), *modified on other grounds and aff'd per curiam*, 713 F.2d 428 (8th Cir. 1983) .................. passim

*Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987) .............................57

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006)....................................................................................61

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953) .................................................10

*Town of Concord, Mass. v. Bos. Edison Co.*, 915 F.2d 17 (1st Cir. 1990) ....................................62

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992) .........33

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017).......................................................26

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) .............................................. passim

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ...........................31

*United States v. Bertelsmann SE & Co. KgaA*, 646 F. Supp. 3d 1 (D.D.C. 2022).......................15

*United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729 (D. Md. 1976)...............................32

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974).......................................................18, 19

*United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387 (D. Del. 2003)....................................74

*\*United States v. Dentsply*, 399 F.3d 181 (3d Cir. 2005).................................................... passim

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962) ..................................................53

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .......................3, 24, 36, 38

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973)....................................58

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974) .....................................52

*United States v. Google LLC*, 2023 WL 4999901 (D.D.C. Aug. 4, 2023)....................58

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ......................................... passim

*United States v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011) ..............................8, 9, 11, 18, 26

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)........................... passim

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (1999) .................................. passim

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000)...........................51

*United States v. Paramount Pictures, Inc.*, 2020 WL 4573069 (S.D.N.Y. Aug. 7, 2020).............61

*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ....................................68

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004) ...............62

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)  ..............................67, 75, 77, 79

**Statutes**

15 U.S.C. § 18a(e)......................................................................................................61

15 U.S.C. § 18a(i)(1)..................................................................................................60

**Other Authorities & Materials**

Complaint, *FTC v. Cardinal Health, Inc.*, No. 15-cv-3031 (S.D.N.Y. Apr. 20, 2015) .................63

*Grinnell Corp. v. U.S.*, Appellant Br., 1966 WL 100458 (Feb. 18, 1966) ....................63

H.R. REP. 94-1373, at 1, 5, 1976 U.S.C.C.A.N. 2637, 2637.......................................63

U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010)...........................22

U.S. Dep't of Justice & FTC, Merger Guidelines (2023)...........................21, 22, 23, 24

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................3, 65

**Treatises**

Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2022) ............................................ passim

P. Areeda & L. Kaplow, Antitrust Analysis (4th ed. 1988) ...........................................9

Posner, Antitrust Law: An Economic Perspective (1976)............................................24

Richard Posner, *Antitrust Law* (2d ed. 2001).......................................................11, 24

Meta seeks to avoid a trial, insisting that no reasonable factfinder could return a liability

verdict.  In doing so, Meta asks the Court to ignore voluminous evidence, much of it from Meta

itself, showing: (1) Facebook has always served a demand for friends and family sharing and has

"always put friends and family at the core of the experience"; (2) Instagram "immediately"

offered users a social graph to "share their daily lives" "primarily with their friends and family"

and thus created a "parallel network"; (3) Instagram grew rapidly into a "mega-network"

comprising 30+ million users when the acquisition was announced and 100+ million when it

closed; (4) Meta knew the growth of Instagram's parallel network meant "some people might

just share on Instagram now" and stop sharing on Facebook; (5) Instagram, mere days prior to

the acquisition, turbocharged its growth by launching on Android phones and also received $50

million in funding to "build an army" of engineers; and (6) Meta acquired Instagram to

"neutralize" a threat.  *See* FTC Rule 7(h) Counterstatement (hereinafter "CS") ¶¶ 1112(c),

1595(b)-(c), 1635(d), 1652(a)-(b), 1616, 1635(c), 2019(e), 1613, 1622, 1694.

Shifting focus to WhatsApp—just as Meta did immediately after eliminating the threat of

Instagram—Meta asks the Court to ignore evidence that: (1) WhatsApp offered a mobile

messaging service far superior to Meta's Facebook Messenger; (2) leading apps in Asia had used

mobile messaging "as a springboard to build more general mobile social networks" and were

threatening Facebook in various countries in that region; (3) WhatsApp likewise had "the

opportunity to build out a social platform either as a standalone company or via acquisition by an

existing social player," and was well positioned to do so in the United States; (4) Meta

executives were "all terrified" of this result; (5) other established firms were interested in

acquiring WhatsApp, including one with a goal to "grow it into a mobile social network" and

another that Meta feared would be able to ███████████████████████████████ after

acquiring WhatsApp; and (6) Mark Zuckerberg resolved to "use M&A to build a competitive moat," and Meta did so by vastly overpaying to acquire WhatsApp and then sacrificing huge sums each year for the past decade in order to maintain its "moat." *See* CS ¶¶ 1737(b), 1799(a), 1801, 1794(a), 1740-77, 1802(e), 1813, 1819, 1885, 1837-46, 1783, 909(a)-(b), 1889.

And Meta asks the Court to ignore the FTC's well-qualified experts from multiple disciplines establishing that: (1) personal social networking services ("PSNS" or "PSN services") represent a distinct market; (2) Meta exercises monopoly power within the PSN services market; and (3) Meta cannot show that its acquisitions were necessary to improve the acquired firms' growth, infrastructure, advertising, or integrity outcomes—and indeed, the acquisitions harmed consumers by increasing quality-adjusted price (including by harming integrity) and undermining the acquired firms' innovation and growth. *Infra* §§ I, II.C.2, III.

Finally, Meta asks the Court to ignore extensive evidence of post-acquisition harm and degradations in multiple dimensions of product quality, while Meta reaps enormous profits. *Infra* §§ I.D, II.C.2. Meta's legally baseless request for a "presumption" cannot blind the Court to such evidence: this evidence of harm was not available during the FTC's initial investigation of the Instagram transaction—narrowly limited in scope at Meta's request—or the WhatsApp transaction, just like information Meta had in its files and did not provide. *Infra* § II.D.

Meta would have the Court ignore all the foregoing and credit its own experts' analyses—which are irredeemably flawed, *infra* § I.B.5—and other unimportant evidence. But disputes about the weight given evidence are resolved in trials. Meta cannot avoid a trial in light of extensive evidence indicating that Meta exercises monopoly power and that its acquisitions harm the competitive process. *Infra* §§ I-II. The FTC respectfully asks the Court to deny Meta's motion for summary judgment, and also to grant the FTC's cross-motion for partial summary

judgment and dismiss Meta's asserted procompetitive justifications.  *See infra* § III.

**LEGAL STANDARD**

The FTC's Section 2 cause of action has two elements—monopoly power and exclusionary conduct.  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001).  Summary judgment is appropriate on either element only if the movant shows no reasonable factfinder could return a verdict for the non-movant because there is no genuine dispute over a "material" fact, drawing all reasonable inferences in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citation omitted) (defining "material" fact); Fed. R. Civ. P. 56.

**ARGUMENT**

**I.      Meta Has Monopoly Power Over PSN Services in the United States**

Monopoly power entails "the power to control prices or exclude competition."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  Monopoly power can be established either through direct evidence that a firm can profitably raise price or exclude competition, or through indirect evidence of "a firm's possession of a dominant share of a relevant market that is protected by entry barriers."  *Microsoft*, 253 F.3d at 51.  Here, extensive evidence provides both direct and indirect proof of Meta's monopoly power.

**A.  PSN Services Are a Distinct Product Offering with Distinct Consumer Demand**

The relevant market for assessing Meta's conduct is the provision of PSN services in the United States.  SAC ¶ 165.  PSN services serve a distinct type of consumer demand for connecting and maintaining relationships with friends, family, and other personal connections online in a shared social space (for brevity, "friends and family sharing").  CS § II.A.2.  The

3

competitors in this market are the apps ("PSN apps")[1] that provide PSNS.  CS § II.A.3.

          1.   <u>Evidence Shows a Distinct Consumer Demand for Friends and Family</u>
                 <u>Sharing, Which Is a Core Use Case of Facebook and Instagram</u>

Meta and other online service providers recognize that while multiple online apps are available, consumers "hire" different apps to serve different "jobs" and different "use cases."  CS § II.A.1.  They also recognize a distinct consumer demand for the use case of friends and family sharing.  CS § II.A.2; *see also FTC v. PPG Indus., Inc*., 798 F.2d 1500, 1504 (D.C. Cir. 1986) (affirming lower court's definition of relevant market where it was "based on both buyers' and sellers' perceptions of the relevant market").

Facebook and Instagram serve this demand.  CS §§ II.A.3.b-c; II.A.4.a.1-2.  Throughout its existence, Facebook's "foundational use case" has been "connecting with friends and family and sharing moments of your life with them"; and in Mr. Zuckerberg's words "we've always put friends and family at the core of the experience."  CS ¶¶ 1016(c), 1112(c); *see* CS § II.A.4.a.1.  Likewise, Instagram at its launch and since has had a core use case of connecting with friends and family.  CS § II.A.4.a.2.  Neither Meta nor its experts dispute that friends and family sharing has been, and remains, a core use of Facebook and Instagram.  CS ¶¶ 1057, 1059, 1060-61, 1324.

Other firms also recognize that a demand exists for this use case.  Friendster and Myspace were early examples.  CS § II.A.3.a.  Likewise, Alphabet launched Google+ (now defunct) to serve the "core use case[]" of "connecting users with their friends and family," despite already operating YouTube, which hosts user-generated content but has a distinctly different design and purpose focused on serving demand for consumption of entertaining video.  CS ¶¶ 1018(a), 1175-1180; *see* CS §§ II.A.3.d.1, II.A.5.b.1.  Similarly, Path (now defunct) ███████████████████████████████████████████████ by creating "an intimate space for

---

[1] "PSN apps" refers to both websites and mobile applications.  *See* PX9000 ¶ 202.

sharing with [c]lose [f]riends."  CS ¶¶ 1018(b), 1043(b); *see* CS § II.A.3.d.2.

To be sure, there are ways other than a PSN app to communicate with friends and family, such as email, phone, or text messaging.  But the personal social networking experience provides a distinct value proposition, reducing the transaction costs of maintaining personal connections with a broad network of people by allowing consumers to maintain relationships and share with groups of friends in a communal setting.  CS ¶ 1015(a).

Indeed, the very fact that Meta maintains distinct messaging apps (Facebook Messenger and WhatsApp) while also operating Facebook and Instagram, underscores its recognition that social networking and mobile messaging entail distinct value propositions, as Meta has explicitly represented to a foreign antitrust enforcer.  CS ¶¶ 1015(b-c) ("[A] social networking service is not a substitute for a consumer communications service."); *see also* CS §§ III.C.2.a-b, V.F.2.

Copious evidence therefore belies Meta's claim that the concept of PSN services is "contrived," entailing "something" that Meta has never heard of.  ECF No. 324-1 ("Mot.") at 1. In truth, Meta and others recognize the concept of a social networking service centered on friends and family as serving a distinct demand.  CS ¶¶ 1012-18.

2.  <u>PSN Apps Serve the Distinct Demand for Friends and Family Sharing</u>

Evidence establishes that specialized PSN apps developed to serve the distinct demand for friends and family sharing.  Stated differently, PSN apps have core use and functionality for friends and family sharing, while non-PSN apps do not.  CS §§ II.A.4.a, b; II.A.5.

Current PSN apps, in addition to Facebook and Instagram, include Snapchat and MeWe, as well as PSN apps, such as WeChat and KakaoStory, that operate primarily outside the United States; defunct PSN apps include Friendster, Myspace, Path, and Google+.  CS § II.A.3.  Meta's brief largely disregards these defunct or foreign providers, in an effort to claim that PSN services are "a gerrymandered market," Mot. at 11, but that claim disregards conclusive evidence that the

distinctive PSN offerings provided by the above-identified PSN apps are recognized by Meta itself and by others.  *See generally* CS §§ II.A.3, II.A.4.c.2; CS ¶¶ 1018, 1729-31.

Indeed, Meta and others recognize that PSN apps are distinct from other apps that do not have a core use of friends and family sharing, such as: private messaging apps, entertainment apps, interest-based apps, and social networks dedicated to professional or other specialized connections.  *See infra* § I.B.2.c; *see* CS § II.A.5.  For example, Meta distinguished TikTok from its own services, because TikTok is "not hired for sharing with friends and family," CS ¶ 1010(c), and TikTok itself acknowledges the same distinction: it recognizes "significant differences" in how people use and perceive Facebook and TikTok, with people using "Facebook to connect and network with friends and acquaintances," while using TikTok "as an entertainment platform."  CS ¶ 1197(e).  Indeed, TikTok expressly characterizes Facebook, Instagram, and WeChat as "[p]ersonal social networking services," and recognizes that TikTok is not a "social networking service[]."  CS ¶¶ 1018(c), 1199.  Likewise, Snapchat considers itself an app that provides a friends-and-family social networking experience, and recognizes that, "[u]nlike Snapchat, TikTok is not a place for deep connection with friends or emotional engagement[.]"  CS ¶ 1201(a); *see also* CS § II.A.5.b.2.

       3.   <u>PSN Apps Can Constitute a Distinct Market and Also Offer Functions Less Directly Related to Sharing with Friends and Family</u>

PSN apps are not necessarily filled exclusively with content from friends and family.  *See* SAC ¶ 168 (PSN services provide a "shared social space" regularly employed by people to share with friends and family, which  may also contain publisher-created content and advertising).  A PSN app may include this "non-friend content" by design as part of the friends and family sharing experience: Facebook, Instagram, and Snap include this "non-friend content" and functionality that does not involve direct interaction with friends and family, such as watching a

short-form video not posted by a friend, CS § II.A.7.a; CS ¶ 1063, and that integration allows people to share and discuss such content within the app with their network of friends and family. CS ¶¶ 1310-15.

Contrary to Meta's assertions, Mot. at 4, 7-10, 19-20, the FTC does not ignore these activities, which do not undermine a relevant market for PSN services or Meta's monopoly power. First, Meta's incorporation of various activities into its PSN offerings on Facebook and Instagram does not undermine the PSN services market and does *not* mean that apps that do not provide friends and family sharing should be included in the market. *See* Mot. at 7-9, 19-20. This would be a significant error of law, because such apps are not reasonable substitutes for consumers seeking to satisfy their demand for friends and family sharing. *See infra* § I.B.3.

Second, in assessing Meta's market share, Professor Hemphill explained why it is appropriate to include activities on PSN apps that may not involve direct interaction with friends and family: both Facebook and Instagram incorporate such activities into the friends and family sharing experience. CS ¶ 1309. Moreover, Professor Hemphill demonstrated that these shares reliably indicate Meta's dominance by alternately calculating market shares to focus more narrowly on the parts of PSN apps that are most directly related to broadcast sharing with friends and family. *Infra* § I.C; *see* CS ¶¶ 1402-04.

Finally, Meta appears to suggest that an increasing ratio of content in Facebook and Instagram that does not involve direct sharing with friends and family implies that friends and family sharing is not important anymore. Mot. at 4. This is not so. CS § II.A.7.b. At the outset, the FTC disputes Meta's stingy classifications of whether content is related to friends and family sharing; as noted, seemingly "non-friend content" can play a part in friends and family sharing when it appears within a PSN app. FTC's Rule 7(h) Statement of Genuine Issues ("FTC SGI")

¶¶ 11-12, 14, 56-57, 60; CS ¶ 1310.  But even accepting Meta's overly restrictive classifications, Meta and its experts stress only *proportions* of time spent or content, for the last two years.  Mot. at 4; CS ¶¶ 1317-19.  Obviously, putting additional "non-friend content" into an app necessarily reduces proportions of pre-existing "friend" content, but this does not mean the original content is declining or becoming less important.  CS ¶¶ 1317-19.  In fact, demand for friends and family sharing has been large and important throughout the relevant period and remains so today.  CS ¶ 1316.

## B.  PSN Services in the United States Constitutes a Relevant Antitrust Market

Monopoly power can be inferred by a firm's possession of a dominant share in a relevant market protected by entry barriers.  *See Microsoft*, 253 F.3d at 51.  As discussed here, ample evidence indicates that PSN services in the United States are a relevant antitrust market.

### 1.  Meta's Brief Misstates Foundational Principles of Market Definition

At the outset, it is important to correct several misstatements of foundational market definition principles that pervade Meta's motion.[2]

**First, Meta ignores that market definition focuses on the purpose for which consumers demand a product.**  A relevant product market is "a term of art in antitrust analysis" that identifies a set of products over which a firm could profitably exercise monopoly power. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 50-51 (D.D.C. 2011).  The "outer boundaries" of a relevant product market "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Courts focus on whether products are "reasonably interchangeable by consumers for the same purpose."  *See Microsoft*, 253 F.3d at 52

---

[2] As Meta does not contest that the United States is a relevant geographic market, the FTC focuses on Meta's arguments regarding the PSN services product market.

(citation omitted); *FTC v. Facebook, Inc*. 560 F. Supp. 3d 1, 13 (D.D.C. 2021) ("*Facebook I*") (quoting *Microsoft*, 253 F.3d at 52).  In other words, "courts look at whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other."  *Id.* (quoting *H&R Block*, 833 F. Supp. 2d at 51).

Meta's brief ignores the basic principle that market definition focuses on the *purpose* for which products are used, even omitting *Microsoft*'s "for the same purpose" language when purporting to cite its articulation of the market definition inquiry.  *See* Mot. at 12; *Microsoft*, 253 F.3d at 52.  This omission is telling and fatal.  As detailed below, unrebutted and overwhelming evidence indicates that other online services—those that are not PSN apps—are not used or suited for the purpose of friends and family sharing.  *Infra* § I.B.3.

**Second, Meta ignores the *Cellophane* fallacy.**  Defining a relevant market requires special care in Section 2 cases, as they involve firms that are already alleged to have monopoly power.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 n. 7 (9th Cir. 2023).  It is a significant error—known as the *Cellophane* fallacy—to observe "substitution" away from a monopolist's already-elevated prices and conclude that additional products or firms belong in the relevant market, or that the firm does not possess monopoly power.  *See Eastman Kodak Co. v. Image Tech. Servs, Inc.*, 504 U.S. 451, 471 (1992) ("[T]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power.") (emphasis in original) (quoting P. Areeda & L. Kaplow, *Antitrust Analysis* ¶ 340(b) (4th ed. 1988)).

In this matter, both the FTC's expert and Meta's own expert have explained this fallacy, CS ¶ 1298, yet Meta invites the Court to fall prey to it by wrongly claiming that market definition focuses on substitution in response to "price increases" above Meta's current quality-

adjusted price for Facebook and Instagram.  *See* Mot. at 1 ("A relevant antitrust market must include the substitutes that people would use more of when faced with a price increase for Facebook and Instagram."); *id.* at 14 (suggesting that the HMT examines free-floating "price increases," rather than an increase above a competitive level).  This assertion, incorrect as a matter of economics, also flouts the Supreme Court.  *See Kodak*, 504 U.S. at 470-71.

        **Third, Meta incorrectly insists that consumers can never substitute to products outside a relevant market.**  According to Meta, the relevant market must include all "services to which consumers would shift time in response to a price increase."  Mot. at 14.  This is clearly incorrect: the question is not whether consumers would shift time away from PSN apps at all, but "to what extent" they would consume non-PSN apps for the same purposes.  *Facebook I*, 560 F. Supp. 3d at 14 (citation omitted).  Indeed, Meta's own economic expert does not dispute that a set of products can represent a relevant market "even if customers would substitute significantly to products outside that group in response to a price increase."  CS ¶ 950.

        Meta's insistence on including all apps to which any time would shift in the event of a price increase is not the law even outside of the Section 2 context.  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015) ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."); *cf. Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) ("For every product, substitutes exist.  But a relevant market cannot meaningfully encompass that infinite range.").  And it would plainly produce errors in the Section 2 context, as the *Cellophane* fallacy teaches that one should *expect* switching to out-of-market products if a monopolist increases its already-elevated prices.  *See Insight Equity v. Transitions Optical, Inc.*, 252 F. Supp. 3d 382, 389-390 (D. Del. 2017) (where a monopolist already charges "a

supracompetitive price," in the event of a further increase "consumers will substitute to products they would not substitute to at a competitive price" because "at a high enough price, even poor substitutes look good to the consumer.") (quoting Richard Posner, *Antitrust Law* (2d ed. 2001)).

Meta's three errors combine to subvert the market definition inquiry.  Here, applying correct market definition principles, the evidence establishes that PSN services represent a relevant product market.

> ### 2.   The *Brown Shoe* Practical Indicia Delineate a Relevant Market for PSN Services

Courts consider market definition "under established legal frameworks such as the 'hypothetical monopolist' test or the *Brown Shoe* factors."  *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024); *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 912 (N.D. Cal. 2023) ("[C]ourts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT.").

The *Brown Shoe* factors serve as "evidentiary proxies" for assessing whether products outside a relevant market are "reasonably interchangeable" with those inside of the market.  *See H&R Block*, 833 F. Supp. 2d at 51, 54.  Meta oddly suggests that the FTC does not contend that PSN services satisfy the *Brown Shoe* practical indicia.  Mot. at 17.  This is odd to say, given that the FTC opposed Meta's motion to dismiss by citing *Brown Shoe* and explaining how its allegations indicated that PSN services had distinct characteristics and uses.  ECF 59 at 18-19.  It is also incorrect: the FTC has not yet submitted its trial findings and conclusions, but it expects to proffer evidence at trial showing that practical indicia indicate PSN services are a relevant market, as previewed here.  Meta is likewise incorrect to suggest that the FTC's experts did not support the *Brown Shoe* factors.  Mot. at 17.  Two of the FTC's experts—Professor Hemphill and Professor Lampe—provided analysis (drawing on their respective areas of expertise) that is

directly informative regarding the *Brown Shoe* factors, and addressed and rebutted the discussion of the *Brown Shoe* factors provided by Professor Ghose, Meta's expert.  CS ¶ 893-94, 905-06.

Indeed, as explained below, Meta fails to demonstrate the absence of a genuine dispute on any of the factors, although each factor need not be satisfied to establish a relevant market. *See FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997); *FTC v. IQVIA Holdings Inc.*, 2024 WL 81232, at *13 (S.D.N.Y. Jan. 8, 2024).  Accordingly, summary judgment in Meta's favor is inappropriate.  *See Eastman Kodak*, 504 U.S. at 482 (reversing grant of summary judgment and noting market definition could only be determined "after a factual inquiry"); *Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766–68 (9th Cir. 2001) (reversing grant of summary judgment where *Brown Shoe* factors alone raised an issue of fact).

(a) <u>PSN apps have a "peculiar use" of friends and family sharing</u>

Extensive evidence indicates that PSN apps have a distinctive core use of friends and family sharing, *see* CS § II.A.4.a, and that Meta and other firms recognize that different apps address different "use cases."  *Supra* § I.A.1; CS § II.A.1; *see also* CS ¶ 1324.  Evidence also shows that the apps outside of the relevant market (e.g., YouTube, TikTok) lack a core use of friends and family sharing.  CS § II.A.5.  Meta identifies no evidence indicating that non-PSN apps have such a core use, and its experts have provided none.  CS § II.A.5.e.  Thus unrebutted evidence is plainly sufficient to delineate a "peculiar use" within the meaning of *Brown Shoe* that directly speaks to the "purpose" for which PSN apps can be used, in contrast to other types of apps.  *See FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039-40 (D.C. Cir. 2008); *Sysco*, 113 F. Supp. 3d at 27-28; *Staples*, 970 F. Supp. at 1078-79; *cf. Microsoft*, 253 F.3d at 52.

Meta cites no evidence supporting its sweeping assertion that consumers do "the exact same things" on apps outside the relevant market that consumers do on Facebook or Instagram, Mot. at 19, nor that purportedly similar activities are "identical" on non-PSN apps, compared to

Facebook and Instagram.  *See* Mot. at 7-9, 22.  Meta proffers only isolated unsourced screen shots of content on various apps.  *See* FTC SGI ¶¶ 162, 171, 212, 228, 232, 235, 283, 285, 388, 428.  Moreover, Meta's claim ignores evidence that activities such as watching an entertaining video on Facebook or Instagram are differentiated from activities on non-PSN apps because Facebook and Instagram integrate the activities with friends and family sharing.  CS § II.A.7.a.

(b) <u>PSN apps have "peculiar characteristics"</u>

PSN apps have "peculiar characteristics" that facilitate and foster friends and family sharing.  CS § II.A.4.b.  In particular, PSN apps have (or had when operating), a social graph built with friend and family connections, CS § II.A.4.b.1, tools to foster building network connections with friends and family, CS § II.A.4.b.2, and a shared social space for sharing personal information and content with friends and family, CS § II.A.4.b.3.

Moreover, PSN apps share common design elements and norms including an emphasis on real-life identities, so that users are motivated to use PSN apps for relationship maintenance because they perceive them to be useful in meeting that goal.  *See* CS ¶¶ 898(a-c), 905(b), 1082-86.  The norms of PSN apps and users' motivations to use them are important characteristics that distinguish PSN apps from non-PSN apps: due in part to strong network effects, if an app is not *perceived* by a large number of users as possessing a core purpose of personal sharing, it becomes less useful for that purpose.  *See* CS ¶¶ 1125-27.  Nor do non-PSN apps share the common design elements, norms, and user motivations that typify PSN apps.  *See* CS ¶¶ 898(e), 1131 (LinkedIn), 1149 (Nextdoor), 1174 (YouTube), 1196 (TikTok), 1220 (Twitter), 1237 (Reddit), 1256 (Pinterest), 1277 (mobile messengers).

Meta therefore errs in asserting that the FTC's experts concede that non-PSN apps have "the very features that the FTC claims are characteristic of PSNS apps."  Mot. at 19.  The FTC does not allege that *any* social graph is characteristic of PSN apps, but rather that PSN apps have

a particular type of social graph built around friends and family connections.  CS § II.A.4.b.1; SAC ¶ 167.  A social graph centered on professional connections (e.g., LinkedIn's) differs dramatically from the social graph that characterizes a PSN app.  CS ¶ 1139; *see also* CS ¶ 1295(e).  Indeed, Meta itself describes LinkedIn's social graph as "orthogonal" to Facebook's.  CS ¶ 1139(c).  Similarly, Meta argues that TikTok and Twitter "allow" for sharing in a "shared social space."  Mot. at 19.  But the existence of any shared space is not a distinguishing characteristic of PSN apps; instead, it is a shared space regularly employed for sharing with friends and family.  CS § II.A.4.b.3; SAC ¶ 168.  Here, both ordinary-course evidence and data show that TikTok and Twitter are not designed and used for friends and family content, and this "characteristic" thus differs from PSN apps.  CS ¶¶ 1205-16, 1226-1232.

At bottom, Meta identifies purportedly "similar" features at a superficial level of generality that fails to suggest that non-PSN apps are capable of serving the demand that PSN apps serve.  CS ¶¶ 904, 1295-96.  To say that LinkedIn is "similar" to Facebook on account of having—generically, a "feed" and a "social graph"—is akin to saying that broadline distributors and specialty distributors both have warehouses and trucks, and thus are "similar," while ignoring the distinguishing characteristics of their warehouses and trucks.  *See Sysco*, 113 F. Supp. at 28-29; CS ¶ 1295(e).  Such superficialities do not refute a relevant market.  *See Sysco*, 113 F. Supp. at 28-29; *see also IQVIA*, 2024 WL 81232, at *13-20 (advertising in the market had "distinct characteristics and offer[ed] something meaningfully different," unlike other online advertising that provided some of the same features).

### (c) Industry and public recognition of distinct demand for friends and family sharing and PSN apps

As previewed above, Meta and others recognize both a distinct consumer demand for friends and family sharing and that PSN apps serve that demand, in contrast to other applications

that lack a core use case of friends-and-family sharing.  *Supra* §§ I.A.1, I.A.2; CS § II.A.4.c.

Meta disregards the foregoing compelling evidence of industry and public recognition, pointing instead to evidence suggesting that broader markets may exist for "social media" apps or "time and attention" or that non-PSNS offerings compete with Meta in other spheres (e.g., to satisfy demand for entertaining video).  Mot. at 18-19.  In doing so, Meta fails to understand that the *Brown Shoe* factors provide persuasive evidence supporting a narrower "submarket," even though there may be a broader market for "attention" or "social media."  *See Staples*, 970 F. Supp. at 1075.  Stated differently, Meta disregards that a firm can operate in multiple and concentric relevant markets.  *See United States v. Bertelsmann SE & Co. KgaA*, 646 F. Supp. 3d 1, 27-28 (D.D.C. 2022).  Defining a relevant market is "not an end unto itself," but rather a means to analyze the competitive concern raised in a plaintiff's cause of action (*id.* at 24): here, whether Meta—which indisputably operates an app (Facebook) that serves a core use of friends and family sharing—has monopoly power with respect to that service.  SAC ¶ 232.

"[T]he FTC does not have to *disprove* Defendants' theory of [a broader] product market. It has to show only that [its proposed] market satisfies the criteria for a relevant product market." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 895 (E.D. Mo. 2020) (emphasis in original) (citing *Brown Shoe*, 370 U.S. at 325); *see also IQVIA*, 2024 WL 81232, at *24  ("the existence of a larger market within which two products compete does not necessarily mean that they are reasonably interchangeable substitutes for one another").  Whether, hypothetically, a market for "all attention" or for consumption of entertaining video might also constitute relevant markets in which Facebook competes with firms such YouTube, is a question for a different case involving a different (hypothetical) competitive problem.  *See Bertelsmann*, 646 F. Supp. 3d at 27-28 ("The Court is unswayed by the defendants' tactic of enumerating other markets or submarkets in

which competition would not be harmed by the merger….[E]ven if alternative submarkets exist…, or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable."); *see also infra* I.B.3.

Meta also seems to demand that the FTC produce a magic-bullet document applying "the PSNS rubric" to all four of Facebook, Instagram, Snapchat, and MeWe.  Mot. at 18.  This misses the mark because the *Brown Shoe* inquiry does not hinge on the use of particular jargon to describe a market; it focuses instead on whether a product offering or a set of firms represents "a separate economic entity."  *See Brown Shoe*, 370 U.S. at 325; *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 119 (D.D.C. 2016) (industry recognition of "large B-to-B customers as a separate economic entity").  In any event, industry participants have expressly referred to "personal social networking," to Facebook as a "personal social network," and to Facebook and Instagram as "personal social networking services."  CS ¶¶ 1108, 1111; *see also* CS ¶ 1108(n).

Here, extensive evidence indicates that PSN apps represent a separate economic entity because they have a core use and functionality for friends and family sharing, and compete with one another to satisfy the demand for that use case.  CS §§ II.A.2, II.A.4.a.1-4.

(d) Remaining *Brown Shoe* factors

Attempting to sidestep "[t]he remaining *Brown Shoe* factors," Mot. at 20, Meta provides no serious argument and fails to show the absence of a dispute on any of them.[3]

**Sensitivity to price changes, distinct customers, and distinct prices.**  Contrary to Meta's claims that there "is *no* evidence" regarding consumers' sensitivity to price changes, Mot. at 20 (emphasis in original), there is copious evidence on this point, and it strongly supports the

---

[3] It is unnecessary to address "specialized vendors" given the other indicia, and Meta fails to meaningfully address it.  *See* Mot. at 20 (citing Meta's SMF ¶ 614, which contains no information about specialized vendors).

PSN services market.  Evidence shows that Meta's customers are insensitive to changes in the quality-adjusted price, such as increased ad loads or significant degradations of the perceived quality of Meta's offerings, including the Cambridge Analytica scandal.  CS § II.C.4.  Indeed, Meta did not significantly lose users following the latter scandal, indicating that it is not constrained from exercising monopoly power by the range of widely used non-PSN apps that it claims, but instead competes within "a separate economic entity"—i.e., a market for PSN services in which it holds tremendous power.  CS § II.C.4.a.1.

Relatedly, Meta's ordinary-course surveys and the FTC's survey expert provide evidence of distinct customers that cite friends and family sharing as central to their use of Meta's PSN apps (unlike non-PSN apps), and data confirms that an overwhelming majority of Facebook and Instagram users utilize the aspects of both apps (Feed and Stories) most directly related to friends and family sharing.  CS §§ II.A.4.a.6, II.A.7.b.  Moreover, Meta discriminates in its quality-adjusted price by imposing higher prices on certain users.  *Infra* § I.D; CS § II.C.4.b.  This is evidence of "distinct prices" and "distinct customers" that confirms PSN services as a relevant market.  *See Whole Foods*, 548 F.3d at 1039-40 (price discrimination represented evidence of "distinct prices" and "distinct customers").

**Unique production facilities.**  Meta incongruously claims that there are "*no* unique production facilities," Mot. at 20 (emphasis in original), yet it simultaneously and inconsistently claims "proprietary" infrastructure that delivered procompetitive benefits to Instagram and WhatsApp.  *See* Mot. at 4, 5, 6, 36.  On its face, Meta's motion therefore creates a factual dispute about unique production facilities.  Moreover, while evidence contradicts Meta's claims of procompetitive benefits related to infrastructure, CS §§ V.E, V.I, VII.A.1, VII.A.6, VII.B.1, VII.B.3, other evidence indicates that PSN apps have unique production facilities, including a

network of other users producing and sharing friends and family content.  CS § II.A.4.d.

### 3.   Other Apps Are Not Reasonable Substitutes for PSN Services

The evidence discussed above answers Meta's demand for "evidence of substitution,"

Mot. at 11, 12-14, because the *Brown Shoe* practical indicia are "evidentiary proxies for proof of

substitutability and cross-elasticities of supply and demand."  *H&R Block*, 833 F. Supp. 2d at 51.

That is, the extensive evidence detailed above of the distinctions between PSN apps and non-

PSN apps, and of the distinct demand for friends and family sharing, indicates that other online

services and the apps that provide them are not "reasonably interchangeable by consumers for

the same purposes" as PSN services.  *Microsoft*, 253 F.3d at 52.

Meta persistently suggests that the presence of activities on Facebook and Instagram that

do not directly involve sharing with friends and family negates the PSN market or requires

inclusion of non-PSN apps in the market.  Mot. at 7-10, 19-20.  As addressed above and revisited

here, this is wrong for several reasons.  *Supra* §§ I.A.3 & I.B.2.c.

First, as already noted, Meta never actually provides evidence that any such features or

activities are "identical," *supra*, and the evidence indicates that Meta has differentiated its

functionality from non-PSN apps by incorporating offerings such as short-form video within the

friends-and-family social networking experiences of Facebook and Instagram.  CS § I.A.7.a.  But

even if it were true that such features were identical that would be no more probative of market

definition than the unremarkable fact that consumers shop at different stores that may sell some

identical items.  *Whole Foods*, 548 F.3d at 1040 ("[t]he fact that a customer might buy a stick of

gum at a supermarket or at a convenience store does not mean there is no definable groceries

market"); *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 662, 664 (1974) ("savings banks"

properly excluded from "commercial banks" relevant market despite "fierce" competition

between them for "identical or essentially fungible services" because for some customers

18

"commercial banks . . . offer a 'cluster of products and services' that their savings bank counterparts do not") (internal citation omitted).

Indeed, when firms within the relevant market provide an integrated offering that affords "access to certain products or services that would otherwise be unavailable to" customers with a demand for the relevant product, providers of individual components of the integrated offering are not reasonable substitutes. *Whole Foods*, 548 F.3d at 1039 (quoting *Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360 (1970)); *see also Conn. Nat'l Bank*, 418 U.S. at 662, 664; *Sysco*, 113 F. Supp. 3d at 27-29 (specialty distributors not substitutes for broadline services).

Here, non-PSN apps do not offer a core use and functionality that serves the demand for friends and family sharing.  CS ¶ 1125.  That means they are not reasonable substitutes for PSN services, and do not belong in a relevant market for PSN services, even though they may compete with Meta to serve the demand for, e.g., consuming entertaining video.  *See* Mot. at 18. For the same reason, evidence that "YouTube believes it competes with Meta apps for video viewing," Mot. at 18, does not constitute evidence that YouTube competes with Meta to satisfy demand for friends and family sharing.  *See Whole Foods*, 548 F.3d at 1040 (evidence that specialty supermarkets and other stores "are direct competitors in some submarkets . . . is not the end of the inquiry") (alterations in original) (quoting *Conn. Nat'l Bank*, 418 U.S. at 664 n. 3).

In sum, non-PSN apps cannot satisfy consumers' demand for friends and family sharing and do not check Meta's ability to exercise power over Facebook and Instagram users seeking to satisfy this demand, even if non-PSN apps may compete for the attention of users seeking to satisfy other demands, such as consuming news or entertaining videos.  CS § II.A.7.c.  Evidence shows that Facebook and Instagram users exhibit a strong demand for friends and family sharing, CS § II.A.7.b, and evidence also indicates that Meta has been able to let quality decline on

Facebook and Instagram and still reap high profits, CS § II.C.5, underscoring that non-PSN apps do not discipline Meta's exercise of monopoly power.  CS ¶¶ 1333-34.

Second, evidence that Meta price discriminates on the friends and family sharing use case confirms the relevant market for PSN services (and Meta's exercise of monopoly power).  Meta price discriminates through several mechanisms.  CS §§ II.A.7.c.2, II.C.4.  For example, Meta is able to vary ad load on Facebook ████████, often inflicting higher ad load on ████ ████ users—who tend to have a greater demand for friends and family sharing—compared to ████████████.  CS ¶ 1525.  Similarly, user ████████████████████████— who are more likely to use Facebook for friends and family sharing—tend to receive higher ad load than those users ████████████████.  CS ¶ 1528.  Additionally, Meta recognizes that it has underinvested in the friends and family sharing use case on Facebook and Instagram, which means that it has effectively reduced quality (and raised quality-adjusted price) to users that value that use case.  CS § II.C.3.c.

Stated differently, Meta charges a higher quality-adjusted price to users with relatively inelastic demand for friends and family sharing, CS § II.C.4.b.2, regardless of the competition it faces for more elastic users—according to Meta, elastic users might include people who do not demand friends and family sharing and instead use Facebook and Instagram for activities that they can find on (e.g.) TikTok or YouTube.  *See, e.g.*, *Whole Foods*, 548 F.3d at 1038 ("[C]ustomers may be captive to the sole supplier, which can then, by means of price discrimination, extract monopoly profits from them while competing for the business of marginal customers.").  Key pieces of the foregoing price discrimination evidence are unrebutted, CS § I.C.1.e, which is sufficient to sustain the relevant market at trial and forecloses summary judgment in Meta's favor.  *See Whole Foods*, 548 F.3d at 1038-39 (core customers with demand

for the relevant product that were vulnerable to price discrimination confirmed the existence of a

relevant market); *Staples* 970 F. Supp. 1066, 1078-79 (same); *Sysco*, 113 F. Supp. 3d at 38-39

(discussing targeted customer concept).

Finally, no authority supports Meta's suggestion that the Court should analyze separately

"all reasonable substitutes" for each of the "250 activities" Meta claims are available on

Facebook and Instagram.  Mot. at 1.  Facebook and Instagram are integrated service offerings,

CS § II.A.7.a, and Meta cites no evidence indicating that consumers view Facebook and

Instagram as atomized collections of discrete activities, which Meta suggests is the appropriate

way to view the apps.  *See* Mot. at 1, 6.  When such integrated products/services are at issue,

relevant antitrust markets are routinely defined without separately analyzing each component of

the service.  *See Whole Foods*, 548 F.3d at 1036-1041 (defining a relevant market for specialized

supermarkets without separately analyzing every food item sold in supermarkets); *Sysco*, 113 F.

Supp. 3d at 24-50 (defining a relevant market for broadline distribution without separately

analyzing individual items sold by broadline distributors); *Staples*, 970 F. Supp. 1066, 1078

(same, defining office supply superstore market).

    4. <u>A Hypothetical Monopolist of PSN Services Would Profitably Impose a<br>Quality-Adjusted Price Increase Above a Competitive Level</u>

Application of the HMT provides an alternate means of identifying a relevant market and

further evidence that PSN services are a properly defined relevant market.  *See Regeneron*

*Pharms.*, 96 F.4th at 341; *see id.* n. 8.  As detailed below in § I.B.5, the HMT asks whether a

single firm controlling a set of products can profitably raise quality-adjusted price above a

competitive level.  U.S. Dep't of Justice & FTC, Merger Guidelines § 4.3.A (2023) ("2023

Guidelines").  Contrary to Meta's assertion, Mot. at 15, the HMT does not require a quantitative

implementation.  *See, e.g., McWane, Inc. v. FTC*, 783 F.3d 814, 829-30 (11th Cir. 2015)

(crediting testimony of economic expert that applied an HMT using qualitative evidence and noting that courts "routinely rely on qualitative economic evidence to define relevant markets") (citation omitted).  Indeed, the FTC-DOJ Merger Guidelines, on which courts rely as persuasive authority, expressly contemplate evaluating the HMT using qualitative evidence, as Meta's expert concedes.  CS § I.C.1.c, ¶¶ 1299-1300; *see also* 2023 Guidelines § 4.3.C.; U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines § 4.1.3 (2010) ("2010 Guidelines").

Reliance on qualitative evidence is particularly appropriate in Section 2 cases, because empirical studies of price increases above a monopolist's current prices fall prey to the *Cellophane* fallacy.  *See supra* § I.B.1; CS ¶ 1298; *see also* CS ¶¶ 953-54; *Epic Games*, 67 F.4th at 975 n. 7.

Here, Professor Hemphill examined a wide range of evidence—including empirical analysis regarding how apps are used, consumer surveys, ordinary course documents, and testimonial evidence—that illuminates the purpose for which consumers use various apps, and the extent to which non-PSN apps are reasonable substitutes for consumer seeking to satisfy demand for friends and family sharing.  CS §§ II.A.4.a.6-8, II.A.5.  And he described how this evidence shows that a hypothetical monopolist controlling all PSN services (and thereby all PSN apps) would profitably raise quality-adjusted price above a competitive level.  CS § II.A.6.  Professor Hemphill's market definition analysis is additionally bolstered by the extensive direct evidence that Meta exercises significant market power over users, *see infra* § I.D, and by the evidence that Meta's control of Instagram allowed it to increase quality-adjusted prices on Facebook and Instagram by (among other things) raising ad loads.  *See infra* § II.C.2; CS §§ I.C.1.d, II.C.3.a; *see also* 2010 Guidelines § 4 ("[E]vidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise

significantly can itself establish that those products form a relevant market."). And while a quantitative execution of the HMT is not required, *see McWane*, 783 F. 3d at 829-30, Professor Hemphill additionally explained how the "de-merger" model offered by one of Meta's experts (Professor List) demonstrated that a firm controlling both Facebook and Instagram would profitably raise ad load on users (one component of quality-adjusted price), compared to Instagram operating independently. CS ¶¶ 1304, 1953.

In sum, Professor Hemphill's analysis matches or exceeds showings that courts have found sufficient to impose liability after trial, and thus summary judgment forestalling a trial is plainly inappropriate. *See McWane*, 783 F.3d at 829; *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (1999) (hereinafter, "*Microsoft Findings*") at ¶¶ 19-29 (finding relevant market with reference to only qualitative evidence); Testimony of Franklin M. Fisher (DOJ Economic Expert), *United States v. Microsoft*, *available at*: https://www.justice.gov/atr/testimony-franklin-m-fisher-united-states-v-microsoft-corporation#9 (offering opinion on relevant market and monopoly power relying on qualitative evidence).

### 5.   Meta's Experts' Analyses Are Irredeemably Flawed

Meta stresses four analyses conducted by its experts: an analysis of an "outage" by Professor Carlton, and three data analyses by Professor List. Mot. at 15-16. These analyses are irredeemably flawed and uninformative regarding market definition or Meta's monopoly power.

**First, Meta's experts did not properly implement the basic elements of the HMT.** The HMT asks whether "a hypothetical profit-maximizing firm" controlling all products within the candidate market would find it profitable to impose a "*small* but significant *non-transitory* increase in price ('SSNIP') or other worsening of terms ('SSNIPT') for at least one product in the [candidate market]," with "small' typically understood as a 5% increase. 2023 Guidelines § 4.3.A (emphasis added); *Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitrust Litig.)*, 739

F.3d 262, 277-78 (6th Cir. 2014); *Sysco*, 113 F. Supp. 3d at 33-34 (articulating and relying on the hypothetical monopolist test).

In the Section 2 context, the baseline for implementing the "price increase" of a SSNIP test is competitive prices—not the defendant's existing prices.  2023 Guidelines § 4.3.B n.83; CS § I.C.1.b, ¶¶ 1297(c), 1351.  For this reason, even if certain basic requirements can be met, a SSNIP test—which looks at price increases—is of limited value in monopolization cases: because they "involve markets in which a defendant has substantial market power or monopoly power (and has *already* exercised that power to charge a supracompetitive price), a SSNIP analysis in such cases 'must not be used uncritically, and alternative indicia of market power should be explored.'"  *Epic Games*, 67 F.4th at 975 n. 7 (emphasis in original) (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 539 (4th ed. 2022) (hereinafter "*Antitrust Law*")).

Here, Meta's purported quantitative analyses are of no value at all, because Meta's experts ignored the preconditions required to properly implement the HMT.  CS §§ II.A.8.a-b.  Professor Carlton analyzed an "outage": this is not a "small" price increase because an outage is equivalent to an infinite price increase; moreover the outage was transitory rather than non-transitory (it lasted only a few hours).  CS ¶ 1344.  These failings fatally undermine the insight the HMT is intended to provide regarding products that are "reasonably interchangeable by consumers for the same purpose."  *See Microsoft*, 253 F.3d at 52 (quoting *du Pont*, 351 U.S. at 395).  An enormous (even infinite) price increase fails to illuminate which products might be *reasonably* interchangeable with Meta's PSN offerings.  *Insight Equity*, 252 F. Supp. 3d at 390 ("[A]t a high enough price, even poor substitutes look good to the consumer.") (quoting Richard Posner, *Antitrust Law* (2d ed. 2001).

Likewise fatal is a failure to measure non-transitory price increases, particularly given the

strong network effects present here: it takes time for consumers using PSN apps to build a network of friends and family on the app. *See* CS ¶¶ 1344-45, 1350. When a user's preferred PSN app is unavailable for a few hours (or even weeks), a PSN user cannot practically satisfy their demand for friends and family sharing by switching to a different app on which they have not built a network—and even if another PSN app is available, the user cannot immediately build the requisite network of connections on the app. *See* CS ¶¶ 1345(b)-(d), 1350. Any "switching" then observed to non-PSN apps does not hold an inference that consumers are finding reasonable outlets for their demand for friends and family sharing, but rather that they are finding other things to do while they wait to resume access to PSN services. *See* CS ¶ 1350. Indeed, in Professor Carlton's outage study, nearly ███████ of the Meta time lost was caused by people not using their phone at all, underscoring that many people found no online service a suitable way to spend their time when Facebook and Instagram were unavailable. CS ¶ 1350(e); *see also* CS §§ II.A.8.c-d (discussing other flaws in Professor Carlton's analysis).

Professor List's "pricing" experiment fails to furnish evidence relevant to implementing the HMT for the same reasons Professor Carlton's did: it was transitory (study participants knew it ended in a few weeks) and not "small" (20% price increase). CS ¶ 1345. Professor List's analysis of an episode in which India banned TikTok and 58 other applications likewise did not involve a "small" price increase (instead, an infinite price increase), and is flawed for other reasons. CS ¶ 1346. Finally, Professor List's analysis of a "switching study" involved no pricing change or worsening of terms, CS ¶ 1347, and thus fails to provide any basis for implementing the HMT. It is also uninformative because while Meta claims the study showed how users "trade off time spent," it in fact observed only changes in *shares* of time spent. Thus if a subject's use of Facebook did not change but the consumer more intensively used a gaming

25

app, Meta labels it a "trade off" even though usage of Facebook was unchanged. *See* CS ¶ 1347(c); FTC SGI ¶¶ 554-61.

**Second, even if Meta's experts had followed the basic prerequisites of the SSNIP test, their results would still be uninformative due to the *Cellophane* fallacy.** Professor Carlton's study and Professor List's pricing experiment fail for the additional reason that they apply (large) price increases to Meta's current prices for Facebook and Instagram, rather than to prices set at a competitive level. CS ¶ 1351. This improperly falls prey to the *Cellophane* fallacy. *See infra* § II.A.1; *Epic Games*, 67 F.4th at 975 n. 7.

**Third, Meta's purportedly "commonsense" market definition approach lacks a basis in law or economics.** Meta commits yet another error by asserting (notably without any supporting citation) that no apps can "be excluded from the market," if Professor Carlton's and Professor List's flawed empirical studies indicate they received a greater transitory time-spent increase than Snapchat. Mot. at 16. This argument fails both due to the lack of legal support and because courts have rejected various defendants' efforts to insist on a "technical approach" of defining participants in a relevant market based on a rigid order of supposed diversion. *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 37–41 (D.D.C. 2017) (rejecting a "technical approach" to market definition that requires ranking and ordering based on diversion levels); *FTC v. Advoc. Health Care*, 2017 WL 1022015, at *4 (N.D. Ill. Mar. 16, 2017) (diversion ratios insufficient to establish that alternatives should be included in relevant market in light of other evidence); *H&R Block*, 833 F. Supp. 2d at 64-71 (rejecting defendants' complaint that the plaintiff had not included alternatives that were "closer substitutes" based on a diversion measure). This is plainly true here as well, given ordinary-course evidence indicating that non-PSN apps are not attractive options for consumers for friends and family sharing, and given that

26

Meta's supposed evidence of diversion is based on a faulty methodology rather than a proper implementation of a SSNIP test.

Respected economists likewise disavow this "algorithmic" approach to market definition; the 2023 Merger Guidelines nowhere suggest it is appropriate; and the 2010 Merger Guidelines mentioned but did not require the approach. *See* CS ¶¶ 1357-58.  And in any event, Professor Carlton failed to even implement his own flawed order-of-diversion approach in suggesting the apps that he claims might be "closer substitutes" to Facebook and Instagram than Snapchat.  CS ¶ 1367.

Meta's empirical studies are also fatally flawed ways to assess order of diversion, even assuming one wanted to follow an "algorithmic" approach.  At bottom, given their failure to follow basic elements of a proper "SSNIP" test, Meta's empirical studies are biased towards creating greater "diversion" to non-PSN apps and therefore do not show that non-PSN apps are "closer substitutes" to Facebook and Instagram than PSN apps, in any sense intended by a proper implementation of the HMT.  CS § II.A.8.c.2.  As already noted, given network effects and switching costs, "transitory" price increases are an especially unsuitable way to assess substitution for friends and family sharing, and that means that Meta's transitory stimuli would produce more switching to non-PSN apps than a properly run SSNIP.  CS § II.A.8.  Likewise, the cross-elasticity of demand between two products can change as the price of one product increases.  CS ¶ 1351(c).  This means that at Meta's already-elevated quality-adjusted prices, a price increase will cause greater diversion to "out-of-market" non-PSN apps than would be the case if Meta priced Facebook and Instagram at a competitive level.  CS ¶ 1363; *Insight Equity*, 252 F. Supp. 3d 382, 390 ("At the inflated supracompetitive price, consumers will substitute to products they would not substitute to at a competitive price."); CS ¶ 1351(c).  Large price

increases likewise alter substitution.  *See* CS ¶¶ 1344(a), 1346(a), 1349, 1363.

In any event, Meta overlooks insights from the studies that support and confirm the market for PSN services.  CS § II.A.8.d.  That large portions of users in Professor Carlton's study and Professor List's experiment switched to no other online service—they stopped using their phones entirely—confirms the lack of reasonable substitutes for Meta's PSN services.  CS ¶ 1350(e).  Further, in Professor Carlton's outage study, for people who had both a Facebook or Instagram account and a Snapchat account, Snapchat *is* the app receiving the largest increase in usage when Meta's apps were unavailable.  CS ¶ 1370(c).  Thus, in Meta's order-of-diversion terms, Snapchat *is* the "closest substitute" to Facebook and Instagram in Professor Carlton's study for those that had a friends-and-family network built on a non-Meta PSN app—which are the only people who would have the ability, in such a short event, to find an alternative to Meta for satisfying demand for friends and family sharing.  CS ¶ 1370(c); *see also* CS ¶ 1345(d) (similar insights for Professor List's experiment).

**Finally, the analysis of Meta's experts ultimately leads nowhere.**  Notably, neither Professor Carlton nor Professor List purport to offer opinions based on an application of the HMT, and neither opines that a hypothetical monopolist controlling all PSN apps (or even just Facebook or Facebook and Instagram) would be unable to profitably raise quality-adjusted price above a competitive level.  CS § II.A.8(e).  This omission means both that Professor Hemphill's HMT opinion is unrebutted and that Meta's purported analyses of "substitution" are pointless. The HMT does not turn on *any* substitution, but only substitution that is effective in preventing a single supplier of a relevant product from profitably raising price above a competitive level.  *See* CS ¶ 950 ("[T]he hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group in

response to a price increase."); *see also IQVIA Holdings Inc.*, 2024 WL 81232, at *25.

Having piled error upon error, the analyses offered by Meta's experts are unreliable and uninformative of market definition or monopoly power in this case, and provide no basis for summary judgment in Meta's favor.  CS § II.A.8; *see also* CS ¶ 940.

      6.  <u>Professor Hemphill and Professor Lampe's Opinions Do Not Conflict</u>

Meta tries to brush aside the copious evidence establishing a relevant market by fabricating a conflict between the FTC's experts, suggesting that Professors Hemphill and Lampe disagree on which activities "count as PSNS."  Mot. at 12.  No such conflict exists. Professor Hemphill identified current PSN apps to which consumers turn to satisfy their demand for friends and family sharing.  CS ¶ 1393.  Prof. Lampe identified the same PSN apps, based on his examination of many different services' designs and norms, and the motivations of users.  CS ¶ 898.  Both experts agree that the identification of a PSN app is unaffected by the fact that (i) consumers can also engage in other activities on a PSN app that are less directly related to that purpose, and (ii) that non-PSN apps offer some of those activities.  CS ¶¶ 890, 901, 906(b).

Professor Hemphill, unlike Professor Lampe, was tasked with identifying appropriate metrics for market shares.  He explained why it is appropriate to include the full range of Facebook and Instagram activities when calculating shares, *see infra* § I.C, and Professor Lampe explained that his conclusions are entirely consistent: "Facebook is a personal social networking site and . . . uses of that site are then related to personal social networking."  FTC SGI ¶ 605. Meta is thus incorrect to suggest that Professor Lampe offered any inconsistent views on either which apps are PSN apps, or what activities should "count as" as usage of a PSN services for market share purposes—*see* Mot. at 12—indeed, as Professor Lampe is not an economist, he offered no views at all on how to calculate market shares.  FTC SGI ¶ 613.

Meta likewise errs when it suggests that Professor Lampe distinguished PSN apps from

non-PSN apps solely because they facilitate sharing with "weak tie" connections. *See* Mot. at 12. In Professor Lampe's cited testimony, he was asked to distinguish PSN apps from "other types of social networking sites or messaging applications." FTC SGI ¶ 610. PSN apps provide benefits with respect to strong and weak ties, CS ¶ 903(a), and are distinguished from those other types of applications because, among other reasons, PSN apps provide functionality designed to facilitate maintaining relationships with strong and weak ties (e.g., unlike mobile messengers PSN apps "facilitate connection discovery" through, e.g., a traversable social graph) and PSN apps' designs, norms, and user motivations center on relationship maintenance as opposed to, e.g., connecting around shared interests. *See* CS ¶¶ 899, 1125-27.

### C. Meta's Dominant Market Share and Significant Entry Barriers for PSN Services

Meta's market share well exceeds the 60% threshold "that courts ordinarily find sufficient to establish monopoly power." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 47-48 (D.D.C. 2022) ("*Facebook II*"). Professor Hemphill analyzed data, both from market participants and commercial data providers, on important metrics: time spent; Monthly Active Users ("MAU"); Daily Active Users ("DAU"); and original posting activity. CS § II.B.1.a. Employing conservative assumptions, he showed that Meta's market share has exceeded ▮% from 2011 through 2022. CS ¶¶ 1396-97, 1400. Meta's more recent shares are higher: using market participants' data, in 2022, ▮% of time spent, ▮% of MAUs, and ▮% of DAUs; from January-June 2022 ▮% of posts produced. CS ¶ 1401.

Taken together, these metrics provide compelling evidence of Meta's competitive significance within the U.S. PSN services market, as they indicate not only how many consumers turn to Meta's applications (DAU, MAU) but also how intensively consumers use them (time spent), and how intensively they use them to engage in friends and family sharing in a broadcast format (number of posts per user). *See* CS ¶ 1400. Professor Hemphill explained why it is

30

appropriate to calculate shares to include all activities on Facebook and Instagram, because both apps incorporate such activities into the friends and family sharing experience, explicitly leveraging friends-and-family social graphs to provide those activities in an integrated fashion. CS ¶ 1400, § II.A.7.a.

Meta does not suggest any alternative metrics, and these are plainly sufficient to indicate Meta's market share. *Facebook II*, 581 F. Supp. 3d at 48 ("The closest available approximation often will do.") (internal quotation omitted); *Cf. United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *32 (N.D. Cal. Jan. 8, 2014) (even if available data is "imperfect," "that does not mean that one should ignore the existing data or the market realities."). Indeed, Meta's own expert concedes that, taking as true that Prof. Hemphill correctly identified market participants, his calculations accurately indicate Meta's share. CS ¶¶ 1406-08. Further, to ensure that these metrics did not overstate Meta's dominance over friends-and-family sharing, Professor Hemphill demonstrated that Meta's share is dominant when focusing only on "the parts of PSN apps that are most directly related to broadcast sharing with friends and family." CS ¶¶ 1402-04.

Meta does not contest Professor Hemphill's calculations, but instead argues that other non-PSN apps must be included within the relevant market because they have certain features that Meta also offers, such as short form video. Mot. at 22-23. As already explained, this is incorrect. *Supra* § I.B.3. Moreover, Professor Hemphill demonstrated that Meta would possess a dominant share of friends and family sharing activity even if incidental friends and family usage of non-PSNS applications were erroneously used to calculate market shares. CS ¶ 1405.

Meta's dominant market share is protected by significant entry barriers including powerful network effects, as well as switching costs that lock users into Meta's applications. CS § II.B.2.a. *See Facebook II*, 581 F. Supp. 3d at 51 ("[T]here can be little doubt that network

effects and switching costs are commonly recognized types of barriers to entry").  Professor Hemphill's analysis of these barriers was based on, and is confirmed by, copious ordinary course evidence that Meta recognizes that its "network effects provide a [real] competitive moat," and acknowledges its goal to "make switching costs very high for users."  CS ¶¶ 1414(b), 1419(b). The high initial costs of developing a PSN app and building a friends-and-family network represents another barrier, which has been reinforced because industry participants recognize that Meta's acquisitions of Instagram and WhatsApp cemented Meta's dominance, and as a result initial funding for new PSN services has dried up.  CS ¶¶ 1422-24.

Meta ignores this evidence, and instead trumpets the growth of TikTok, which does not offer PSN services.  Mot. at 23.  According to Meta, the growth of an application with "features to compete with some" features offered by Facebook and Instagram, Mot at 23, necessarily indicates low barriers to entry and expansion in PSNS.  This is incorrect: for example, ███████



███  . *See* CS ¶¶ 1180(c), 1193, 1426(b).  Indeed, ███████████ confirms the difficulty of PSN services entry, ████████████████████████████. CS ¶¶ 1215-16.

Similarly, the existence of entry barriers is not disproven, but is instead confirmed, by the experiences of the few PSN apps that have launched in recent years.  *See* Mot. at 23 (identifying MeWe and BeReal).  BeReal and MeWe both have negligible shares because "entry barriers prevent these new apps from gaining competitively significant market shares."  CS ¶ 1425(c-e). Where entry has occurred but has not "significantly deconcentrated the market" "[t]he number of new entrants [] does not belie the substantial entry barriers characteristic of the [relevant] market."  *United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 751 (D. Md. 1976); *Meta*

*Platforms*, 654 F. Supp. 2d at 925 (quoting *Black & Decker*).  Here, concentration has only

increased, as Google+ exited the market in 2019 and Snap has failed to expand beyond its niche

and erode Meta's dominant share.  *See* PX9000, Hemphill Report Exs. 40, 43, 46-47.

Finally, Meta asserts that because WhatsApp posed a nascent threat to Meta, other firms

must pose similar threats today and Meta therefore lacks monopoly power.  Mot. at 23-24.  But

as in *Microsoft*, the existence of a significant nascent threat outside a relevant market

(WhatsApp) does not undermine an entry barrier finding.  *See Facebook I*, 560 F. Supp. 3d at 15-

16 (citing *Microsoft*, 253 F.3d at 54).  Meta's comparison is also factually inapposite: Meta cites

no evidence that any application is now well-positioned to enter PSNS, whereas in 2014

WhatsApp was well positioned to do so.  *See infra* § II.A.2.  Moreover, entry barriers are higher

today than in 2014 due in part to Meta's acquisition of WhatsApp.  *See* CS ¶¶ 1424-25, 1885-91.

### D.  Direct Evidence Indicates Meta's Monopoly Power over PSN Services

Multiple sources of direct evidence indicate that Meta has "the power to control prices"

and "exclude competition," *Grinnell*, 384 U.S. at 571, which both confirms the indirect evidence

and provides an independent demonstration of Meta's monopoly power.  CS § II.C; *see*

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007).

**Sustained high profits**.  Meta earns extraordinarily high economic profits and has

sustained them for many years, plainly indicating monopoly power.  CS § II.C.2.a; *Town Sound*

*& Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 481 n.17 (3d Cir. 1992) ("[C]ourts

can also infer market power from direct evidence of sustained supranormal profits rather than

indirectly from evidence of market shares[.]"); *Colo. Interstate Gas Co. v. Nat'l Gas Pipeline*

*Co. of Am.,* 885 F.2d 683, 695 (10th Cir. 1989) ("One measure of the degree of market power is

the persistence of a firm's ability to profitably charge monopoly prices.").  Meta's economic

expert did not dispute Meta's sustained high economic profits, which meets his textbook's

definition of monopoly power.  CS §§ I.C.1.a, II.C.2.a.

**Declining product quality**.  Meta has profitably increased the quality-adjusted price of Facebook and Instagram for consumers.  CS § II.C.3.  Despite recognizing that ad load is a tax on user engagement and users dislike ads, Meta has significantly increased ad load on Facebook and Instagram since the acquisitions.  CS § II.C.3.a.  Evidence also indicates declining quality for both apps—i.e., an increase in quality-adjusted price—across multiple other product quality dimensions, including access to friends-and-family content, privacy, integrity, reliability, and overall satisfaction.  CS §§ II.C.3, IV.C.  Unsurprisingly, user sentiment has declined, but Meta has failed to make improvements, instead favoring higher profit.  CS § II.C.3.c.  This constitutes direct evidence of monopoly power over PSNS.  *United States v. Dentsply*, 399 F.3d 181, 191 (3d Cir. 2005) (price increases and high profits were evidence of monopoly power); *McWane*, 783 F.3d at 832 (same).

**Price discrimination targeting inelastic demand and other signs of inelastic demand**. As noted above, Meta engages in price discrimination by exploiting differences in users' elasticities of demand for Meta's PSN services to set a higher quality-adjusted price for more inelastic users.  *Supra* § II.A.3; CS § II.C.4.b.  Other evidence indicates Meta's ability to exploit inelastic user demand, which likewise directly demonstrates consumers' lack of alternatives and is direct evidence of Meta's monopoly power.  *Supra* §§ II.A.3, I.B.2.d; CS § II.C.4; *see Whole Foods*, 548 F.3d at 1038 (price discrimination against inelastic customers is a vehicle to "extract monopoly profits").

**Power to exclude**.  Meta and its experts concede Meta's monopoly power by openly flaunting the claim that Meta could have crushed Instagram, or another threatening rival, by sacrificing beneficial engagement such as cross-posting between Instagram and Facebook, which

consumers value.  *See* Mot. at 40; CS § II.C.6.  The ability to crush a rival at will is plainly

evidence of monopoly power.  *See FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 47 (D.D.C.

2023) (quoting *Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 811 (1946)) ("[T]he Supreme Court has

noted that 'the material consideration in determining whether a monopoly exists is not that prices

are raised and that competition actually is excluded but that power exists to raise prices or to

exclude competition when it is desired to do so.'"); *Dentsply*, 399 F.3d at 189-90 (ability to

exclude rivals and lack of effective entry provided evidence of monopoly power).

　　The foregoing direct evidence forecloses summary judgment in Meta's favor.  *Re/Max*

*Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (summary judgment dismissing

Section 2 claim reversed due to evidence of "actual control over prices or actual exclusion of

competitors").  Meta's legally baseless arguments to the contrary ignore the record evidence.

　　*First*, Meta's argument that "substantially all of its profits come from sales of

advertising," Mot. at 30, is specious because Meta earns the vast majority of its revenue and

profits because consumers use its PSN apps—Facebook and Instagram.  CS ¶¶ 1437-39; *see also*

CS ¶¶ 1472-73 (Meta loses vast sums ███████████ on its "Metaverse" efforts).  Thus,

Meta's high profits are materially attributable to power over users of PSN services, and Meta

identifies no evidence that it possesses market power over advertisers on its PSN apps—indeed,

Meta's experts expressly disavow that Meta has such power.  CS ¶¶ 946, 1470.  By disclaiming

any ability to exercise market power over advertisers, Meta confirms that Meta's high profits are

materially attributable to consumers of its PSN apps.  *See* CS ¶¶ 1467-70.  Further, extensive

evidence—much of it undisputed—indicates that Meta's high profits are associated with its

ability to exploit inelastic *consumer* demand, as opposed to any power that Meta may possess

over advertisers.  *See supra* § II.A.3; CS §§ II.C.2.b, II.C.5.  This evidence likewise refutes

Meta's suggestion that its high profits may be a result of "superior efficiency" rather than an exploitation of inelastic consumer demand, an assertion that is in any event unsourced and unsupported by any evidence.  Mot. at 30.

**Second**, Meta's insistence that the FTC define a specific "competitive level" for prices or quality finds no support in controlling law and ignores the import of the record evidence.  Mot. at 24-26.  Cases finding supra-competitive pricing did not define a specific "competitive" price, but rather observed pricing that was insulated from competitive constraints and/or paired with high profits.  *See Dentsply*, 399 F.3d at 187 (price increases plus high profits, indicating a firm "sets prices with little concern for its competitors"); *McWane*, 783 F.3d at 832 (price increases unbothered by presence of a small rival and with high profits); *see also Microsoft*, 253 F.3d at 58 (setting price "without considering rivals' prices" is "something a firm without a monopoly would have been unable to do").  Here, there are both high profits and lack of competitive constraints.  CS §§ II.C.2 (high profits), II.C.3-5, IV.B-C (price increases and inelastic demand).

Indeed, ignoring Meta's high profits repeats the error of the *Cellophane* fallacy case by failing to recognize that high profits indicate that a defendant's prices (and price increases) are above "competitive levels."  *See* CS ¶ 1298 (describing error of majority opinion in *du Pont*); *du Pont*, 351 U.S. at 422 (1956) (C.J. Warren, dissenting) (finding defendant's price increases and "great profits" "leave no room for doubt that it had power to control the price of cellophane").  Further, having neutralized Instagram as a competitive constraint, Meta proceeded to increase quality-adjusted prices on Facebook and Instagram, including by ramping up ad load on Instagram, which directly indicates pricing above a competitive level—i.e., that Meta is pricing at an anticompetitive level it could not have achieved without removing Instagram as a competitive constraint.  CS §§ III.D.1, IV.B.

36

This evidence robustly answers Meta's request for direct evidence, but to the extent that Meta still insists on comparisons, *see* Mot. at 27-29, that evidence also abounds and is adverse to Meta.  CS ¶ 1498 (Meta's internal user sentiment score benchmarking Meta against other tech brands is declining); CS ¶¶ 1992-94 (Meta scores worse than other online services on privacy); CS ¶ 1998 (highest privacy penalty in FTC history); CS § II.C.2.a (extraordinary profits along multiple comparators).

*Finally*, Meta's remaining arguments are equally unavailing.  Meta half-heartedly suggests that it cannot be exercising market power because it offers its apps for "free."  Mot. at 25.  But the fact that a firm can exercise market power despite charging a monetary price of zero is non-controversial, and even Meta's economic expert declined to argue Meta's point.  CS ¶¶ 1433-37.  In the same vein, Meta also suggests that (i) an app's growth in usage, *ipse dixit*, indicates that the quality-adjusted price for the app is declining, and that (ii) growth in the size of the PSN services market over the last decade means it has not restricted output and thus does not have monopoly power.  Mot. at 2, 26-27, 30.  This first assertion is unsourced (having mischaracterized testimony of the FTC's economic expert, *see* Mot. at 30) and wrong as a matter of economics.  FTC SGI ¶ 130.

The second point is unavailing because while reduced total market output over time can be an indicator of monopoly power, it is not required.  *Surescripts*, 665 F. Supp. 3d at 47 ("Courts have held that the existence of so-called 'calling cards' of a competitive market, such as falling prices and increased output, do not by themselves negate the existence of monopoly power as a matter of law.").  This point is basic but important: monopoly power routinely coexists with other factors that are driving increased demand, causing total market output to increase even as a firm exercises monopoly power.  CS ¶¶ 1542-56; *see Allen-Myland, Inc. v.*

*Int'l Bus. Mach. Corp.*, 33 F.3d 194, 21011 (3d Cir. 1994) (observing that if proof of declining total output were required "a great many defendants with market power, such as Alcoa in the 1920s and perhaps even the former AT&T telephone monopoly, could be insulated from antitrust attack."); *See Microsoft Findings*, 84 F. Supp. 2d 9 at ¶ 23 (increasing PC shipments would be consistent with exercise of monopoly power); *Microsoft*, DOJ Trial Exs. 2082-83, *available at* https://www.justice.gov/sites/default/files/atr/legacy/2006/03/03/2082.pdf, https://www.justice.gov/sites/default/files/atr/legacy/2006/03/03/2083.pdf (PC shipments increased substantially over the relevant period); *du Pont*, 351 U.S. at 422 (C.J. Warren, dissenting) (noting "cellophane enjoyed phenomenal growth" during period du Pont now understood to be exercising monopoly power).

Here there is ample explanation for why usage of PSN services has increased over the last decade: the explosion in consumer use of smartphones has significantly expanded use of online services generally. CS ¶ 1542(c). The cases speak of "restricted output," *see Broadcom*, 501 F.3d at 307, and do not (as the foregoing underscores) demand proof of a declining market size. Here, there is direct evidence Meta's monopoly power has suppressed output for PSN services: Meta's underinvestment in friends and family sharing and other degradations of product quality have caused rising user dissatisfaction on Facebook and Instagram and suppressed user engagement. These are hallmarks of monopoly power. CS §§ II.C.5, II.C.7.

## II.    Meta's Acquisitions of Instagram and WhatsApp Constitute Exclusionary Conduct that Harmed Competition and Consumers

Section 2 condemns monopoly power maintained through "exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (quoting *Grinnell*, 384 U.S. at 571). That is what the extensive evidentiary record shows here.

Meta acquired Instagram and WhatsApp rather than responding to them by competing on the merits, eliminating them as competitive constraints and depriving consumers of the benefits that flow from competition.  As the Court has recognized, it is "well established" that a monopolist that maintains its power through the acquisition of an actual or potential rival does not engage in "competition on the merits." *Facebook I*, 560 F. Supp. 3d at 31-32; *Facebook II*, 581 F. Supp. 3d at 53 ("no shortage of authorities" establish that such acquisitions represent "a clear § 2 offense") (internal citation omitted).  Here, the evidence establishes that Instagram and WhatsApp were actual or potential rivals to Meta for PSN services, *infra* § II.A, and Meta's acquisitions—not competition on the merits—accomplished their "exclusion," by eliminating them as independent actors.  *See Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 1983-2 Trade Cas. (CCH) P65,522 (D. Neb.), *modified on other grounds and aff'd per curiam*, 713 F.2d 428 (8th Cir. 1983) ("the acquisition of potential competitors . . . could be termed exclusionary, because it removes one source of competition and helps erect a greater barrier to entry by further cementing the monopolist's market position . . ."); *see also Antitrust Law* ¶ 701b (the acquired firm "can properly be said to be 'excluded.'").

The record also leaves no doubt that Meta's conduct harmed the competitive process.  A monopolist harms the competitive process when it engages in "conduct that is reasonably capable of making a significant contribution" to maintaining its monopoly power, and "the exclusion of nascent threats" through means other than competition on the merits represents such conduct.  *Microsoft*, 253 F.3d at 79.  Here, the FTC has far stronger evidence than was available in *Microsoft*: Meta harmed the competitive process and protected its monopoly power by eliminating completely—not just interfering with—the competition that Instagram and WhatsApp "might otherwise" have presented.  *See id*; *Sun Newspapers*, 713 F.2d at 429.

The only remaining question is whether Instagram and WhatsApp "reasonably constituted nascent threats at the time [Meta] engaged in the anticompetitive conduct at issue," enabling them to contribute significantly to the maintenance of Meta's monopoly power. *Id.* Copious evidence here shows that the answer is "yes." *Infra* § II.A.

Meta attempts to invent novel presumptions and requirements, which boil down to a claim that the FTC must precisely recreate the world but-for the challenged acquisitions. All of Meta's arguments flout both Supreme Court and Circuit court precedent, and thus fail. *Infra* § III.C.1. Accordingly, the Court should deny Meta's motion for summary judgment and reject its attempt to avoid a trial.

## A. Instagram and WhatsApp Represented Significant Competitive Threats to Meta in PSN Services

Meta's Motion calls the threat posed to Meta by Instagram a fairy tale and is even more dismissive of the threat posed by WhatsApp. Mot. at 41. Yet, during the shift to mobile, Meta's apex executives and other well-informed industry participants held a different view. As described below, Meta executives' contemporaneous documents and other reliable evidence establish that Instagram and WhatsApp were serious competitive threats—Instagram as an actual PSN competitor and WhatsApp as a potential PSN rival—to Meta's dominance in PSN services. As such, Meta's acquisition of Instagram and WhatsApp are "properly classified as anticompetitive" under Section 2. *See Facebook II*, 581 F. Supp. 3d at 53 (quoting *Antitrust Law* ¶ 701a).

1.  <u>Instagram Was a Direct PSN Rival that Posed a Significant Threat to Meta's PSN Services Monopoly</u>

Meta's acquisition of Instagram targeted a participant in the relevant market: a rival "social network" relied on by users to share life events and "share their daily lives . . . with friends and family," that had emerged as "the clear leader in user experience and photo sharing."

CS ¶¶ 1595, 1644; *see* CS §§ III.B.1-2.  Meta suggests that Instagram threatened Meta only within a limited sphere of mobile photo-sharing rather than PSN services, Mot. at 37, but the evidence belies that claim.  This includes evidence indicating that: prior to the acquisition, Instagram served demand for friends and family sharing and had the requisite functionality to serve that demand (CS §§ II.A.3.c, II.A.4.a.2, II.A.4.b, III.B.1); Meta recognized Instagram as such (CS § III.B.2.b); Instagram had "escape velocity" and was achieving outstanding growth, even rivaling Facebook in some engagement metrics on mobile (CS §§ III.B.1.b, III.B.2.b, III.B.5); and Meta recognized Instagram as a significant threat as a PSN rival, and was already reacting to Instagram's competitive pressure (CS §§ III.B.2, III.B.4).

This evidence is no fairy tale.  Indeed, while Meta suggests that Instagram would have needed to grow or evolve in order to "rise to competitive significance," Mot. at 41, in truth Instagram had already achieved that before being purchased by Meta.  Less than four months after Instagram launched Mr. Zuckerberg noted the app was "growing quickly," and instructed another top executive to "track this closely."  CS ¶ 1670.  In response, Meta's "photos team" "focused almost exclusively on a new mobile photo app as we gawk at Instagram's simple photo-sharing app taking off," and over the coming months Mr. Zuckerberg and other executives repeatedly lambasted relevant employees for slow progress on the project, citing Instagram as the primary motivation.  CS § III.4.d, ¶¶ 1671, 1679(b) ("[W]hy is mobile photos app development moving so slowly?  We still are getting our ass kicked by Instagram."); CS ¶ 1679(c) ("So when is the app going to ship?" "If you're asking whether it's important to ship soon, then the answer is definitely yes.  In the time it has taken us to get ou[r] act together on this Instagram has become a large and viable competitor to us on mobile photos, which will increasingly be the future of photos.").

Moreover, the projected "new mobile photo app"—Facebook Camera—represented Meta's effort to compete with Instagram by offering a more attractive mobile PSN service.  CS § III.B.4.  Facebook Camera provided a mobile app interface for Facebook, in which users would log in with their Facebook accounts, and could take photos, add filters, post photos to their friend network on Facebook, and view photos their friends had posted on Facebook.  CS §§ III.B.4.c, III.B.4.e.  Notably, as a direct result of acquiring Instagram, Meta sidelined and then abandoned its Facebook Camera efforts, redirecting resources elsewhere.  CS § III.D.1.A.

Meta's direct competitive response to Instagram's innovation and growth thus provides clear evidence that, at the time, Instagram had achieved "competitive significance."  Notably, the threat posed by Instagram was far more direct and immediate than the threats at issue in *Microsoft*.  *See infra* § III.B.  There, the excluded threats did not participate in the relevant market for operating systems, and the district court expressly found "insufficient evidence" that "Navigator and Java already would have ignited genuine competition in the [relevant] market." *Microsoft Findings*, 84 F. Supp. 2d 9 at ¶ 411.  The *Microsoft* court nonetheless imposed liability based on the potential that Navigator and Java might in the future "ignite[] genuine competition" in the relevant market.  *Id.*  Here, evidence indicates that Instagram had already ignited competition in the PSN services market.

2. <u>WhatsApp Was a Potential PSN Rival that Posed a Significant Threat to Meta's PSN Services Monopoly Power</u>

Meta's acquisition of WhatsApp similarly constitutes exclusionary conduct under Section 2 because, prior to the acquisition, WhatsApp was a significant potential PSN rival.  Contrary to Meta's assertion, Mot. at 43, a monopolist's acquisition that frustrates potential entry is a Section 2 violation.  *See Grinnell*, 384 U.S. at 576 (finding one of Grinnell's acquisitions exclusionary under Section 2 even though Grinnell did not yet compete in that service line, because the

acquisition "eliminated [the] alternative" of Grinnell's entry and "eliminated any possibility of an outbreak of competition"); *Sun Newspapers*, 1983 WL 1853 at \*14, 23 (preliminary injunction on grounds that monopolist's acquisitions of a small existing competitor and a potential entrant violated Section 2); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e., predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.").

WhatsApp, like Instagram, constituted a more direct threat to Meta's PSN services monopoly power than Java and Navigator posed to Microsoft's monopoly power.  Meta and other industry participants were well aware that WhatsApp was well-positioned to pivot into PSN services from mobile messaging, and that it was better positioned to offer PSN services in the United States than other apps such as WeChat, LINE, and Kakao.  CS §§ III.C.2.b, III.D.2.a. Unlike Netscape and Java, WhatsApp did not require the assistance of other firms to accomplish this pivot, although acquisition by another firm offering PSN services, such as Google █ █ was a realistic and well-recognized possibility—and one which Meta feared.  CS ¶¶ 1811-19, 1884.  Meta's acquisition of WhatsApp was thus anticompetitive, as a monopolist's "acquisition of any firm that has the economic capabilities for entry and is a more-than-fanciful possible entrant is presumably anticompetitive unless the acquired firm is no different in these respects from many other firms."  *Antitrust Law* ¶ 701d.

Extensive evidence shows that these conditions are plainly satisfied.  Initially, Meta responded to the threat posed by WhatsApp and other OTT mobile messaging apps by launching Facebook Messenger, and investing heavily in it in an effort to establish a competitive moat and

hinder entry into PSN services via mobile messaging.  CS ¶¶ 1718-22.  When Meta's efforts to compete on the merits proved insufficient to address the threat that a mobile messenger would pivot to offer PSN services, it acquired its potential rival WhatsApp, thereby insulating itself from competitive entry.  CS §§ III.C.1.b, III.C.3.  Since that time, Meta has also ███████ ████████████████████████ to maintain the competitive moat protecting its PSN services monopoly.  CS ¶¶ 1888, 2435-37.  Meta thus accomplished the anticompetitive "reinforcement of the monopolist's position via the assets acquired."  *Antitrust Law* ¶ 701d.

As with Instagram, contemporaneous documents clearly show that Meta's executives were aware of, and frightened by, the threat posed by WhatsApp, and moreover, that this threat related to PSN services.  The evidence indicates, among other things, that:

- During the shift to mobile, "OTT" mobile messaging apps emerged that had more advanced functionality than SMS messaging (CS §§ III.C.1.a, III.C.2.b.1);

- Meta identified an OTT mobile messaging app pivoting into social networking as a significant threat to Meta's core use, and Meta knew that three messaging apps in Asia (WeChat, Kakao, and LINE) had made that pivot (CS § III.C.1.c);

- WhatsApp was (as Meta recognized) the leading global OTT mobile messaging app, and superior to Meta's own mobile messaging effort, Facebook Messenger, in both performance and usage (CS § III.C.2.b.3);

- Meta and others considered WhatsApp well-positioned to make the mobile messenger-to-PSN services pivot, either on its own or through acquisition ██████ ████████████████████ (CS §§ III.C.2.b.3-4);

- Meta completed a hurried effort to purchase WhatsApp in February 2014 that coincided with WhatsApp acquisition interest by Google (CS ¶¶ 1814, 1832-34,

1837); and

- Meta paid billions of dollars above any contemporaneous valuation to purchase WhatsApp and has subsequently ████████████ operating WhatsApp, underscoring the lack of a genuine business rationale for the acquisition other than preventing WhatsApp from entering competition with Facebook and maintaining a competitive moat (CS ¶ 1838).

Meta claims the FTC is "imagin[ing]" WhatsApp pivoting into PSN services, but evidence of the pivot comes from Meta's own files and other industry participants.  In early 2013, Mr. Zuckerberg recognized messaging as "the biggest threat we face today," (CS ¶¶ 1807(f), 1887(c)) and informed Meta's board (*see* CS ¶ 1802(g)) of the same reality he had already acknowledged to others: WeChat, LINE, and Kakao were "trying to build social networks and replace us."  CS ¶ 1806(e).  And while WhatsApp had not yet used messaging "as a springboard to build [a] more general mobile social network[]" (CS ¶¶ 1799(a), 1807(b), 2569(c)), Meta was plainly concerned WhatsApp might do so (CS § III.C.2.b) and no evidence suggests that WhatsApp was not capable of building—as others had—"additional other sharing features to become much broader networks than even just messaging."  CS ¶ 1799(b).  To the contrary, ████████████████████████████████████████ ████████████████████████████████████████████ CS ¶ 1794(a).  ██████████████████.  CS ¶¶ 1813, 1815.

Meta attempts to downplay the pivot threat posed by WhatsApp by suggesting it would require reversing purported WhatsApp decisions "not to pursue growth in the U.S." and to "change its product strategy" related to adding features or advertising.  Mot. at 43-44.  But this mischaracterizes or ignores material portions of the record.  WhatsApp had not made a "decision

45

not to pursue growth" in the United States, Mot. at 43, CS ¶ 1756, FTC SGI ¶ 781, and WhatsApp was positioned to continue to grow in the United States.  CS §§ V.F.1, III.C.2.a.1-2; FTC SGI ¶¶ 774, 776, and 781.  In Meta's own estimation, leadership among OTT apps in the United States was still "up for grabs" (CS ¶ 1753) and Mr. Zuckerberg recognized that if WhatsApp were to "build substantive features beyond just making SMS free, that could be enough for them to tip markets like the US."  CS ¶ 1807(i); *see also* CS § III.C.3.

WhatsApp was better positioned than WeChat, LINE, or Kakao to "tip" the United States market because, among other reasons, WhatsApp had a global focus and greater market penetration in the United States.  CS ¶¶ 1739, 1750.  In 2012—just before Snapchat added Stories and competed directly with Meta in PSN services—WhatsApp trailed only Facebook Messenger in iPhone installations in the United States among OTT cross-platform messaging apps.  CS ¶ 1750(c).  And WhatsApp was more threatening to Meta than iMessage because it was widely used on both Android devices and iPhones, ██████████████████████████

██████████████████████████.  *See* CS ¶¶ 1821-23.

Further, as Meta was aware, WhatsApp had multiple credible alternative suitors ████

████████████████████████████.  CS §§ III.C.2.b.4, III.D.2.a.  For example, Google expressed interest in acquiring WhatsApp and made at least one concrete offer, with renewed overtures in February 2014, and its internal documents reflect a deal rationale that included "[o]btain an extremely viral product . . . potentially grow it into a mobile social network."  CS ¶¶ 1812-14.  ████████████████████████████

████████ (CS ¶¶ 1816-20) ████████████████████████████

████████████████████████████████████████

████████  CS ¶ 1819; *see also* CS ¶ 1820.

Meta ignores all the foregoing evidence and focuses solely on WhatsApp's founders' testimony regarding WhatsApp's trajectory if Meta had not acquired it. Mot. at 46. As an initial matter, this testimony fails to establish the absence of a genuine dispute as to whether WhatsApp "reasonably constituted [a] nascent threat[,]" *Microsoft*, 253 F.3d at 79, in light of significant evidence suggesting that WhatsApp was capable of pivoting and possessed every economic incentive to do so. CS § III.C.2.b.4. Absent Meta's ownership, WhatsApp was ███████████ ███████████████████████████████████████████████ CS ¶¶ 1784-86, ███████████████ ██████████████████████████████████████. CS ¶¶ 1787-88; *see also* FTC SGI ¶¶ 787, 790. Indeed, Meta's own experts and the FTC's experts agree that WhatsApp needed to monetize more effectively to operate a sustainable business and earn a return for its investors. CS ¶¶ 1789-91. Evidence indicates that ████████████████████████████████████████████ ██████████████████████████████████████████████. CS ¶¶ 1792-98.

For similar reasons, even if the WhatsApp founders sincerely believe—speaking after Meta's acquisition—that they would not on their own have caused WhatsApp to pivot into PSN services, this does not establish that a pivot was unlikely. Sustainable monetization is ultimately not optional. *See* CS ¶¶ 1784, 1884. Further, even if WhatsApp's founders would not have made the choice on their own, the decision was not theirs alone—particularly as WhatsApp would need additional funding to cover operating costs moving forward. FTC SGI ¶¶ 787, 790.

███████████████████████████████████████████████ ████████████████████████████████ (CS ¶ 1794) ████████████ ██████████████████████████████████████████████ ██████████████████████████████████ (CS ¶¶ 1787-89)—██████████

███████████████████████████████████████████████████. CS ¶¶ 1792-93.

WhatsApp's founders had also demonstrated, by virtue of selling to Meta, that they were

willing to sell and thereby relinquish control, and no evidence suggests they ████████████

would have sold *only* to Meta.  CS § III.C.2.b.4; CS ¶ 1884.  Meta's suggestion to the contrary

(Mot. at 46) is both unsupported by the record, and tainted by its own anticompetitive conduct:

the exorbitant premium paid by Meta boxed out other acquirers, and its willingness to ████████

████████ by running WhatsApp without meaningful monetization (unlike the imperative that

would exist in the but-for world), underscores both Meta's lack of a serious business rationale for

the acquisition other than foreclosing competition and its subsequent anticompetitive use of

WhatsApp as a moat to prevent other entry.  CS § III.D.2.b.

In short, prior to WhatsApp's acquisition, well-informed market participants including

Meta's own executives thought that it was entirely plausible that WhatsApp would achieve

success in the United States and pivot into PSN services, either on its own or as the result of an

acquisition.  Such evidence shows that WhatsApp was a "more than fanciful" entrant into the

U.S. PSN services market and was not "no different in these respects from many other firms."

*Antitrust Law* ¶ 701d.  It also unquestionably establishes a genuine dispute regarding

WhatsApp's "hypothetical technological development in a world absent" Meta's acquisition, and

forecloses summary judgment in favor of Meta: indeed, even following a trial on the merits,

Meta must "suffer the uncertain consequences of its own undesirable conduct."  *Microsoft*, 253

F.3d at 79 (citation omitted).

### B.  Meta's Acquisitions of Instagram and WhatsApp Contributed to the Maintenance of Meta's PSN Monopoly

Meta's Motion advances several erroneous arguments that share a common flawed

theme: that no reasonable fact-finder could infer a causal connection between the relevant

acquisitions and harm to "competition and consumers."  Mot. at 31.  For example, Meta incorrectly argues that the FTC must provide evidence that "it would be better to have additional competitors" or evidence that Instagram "would have transformed competition" in the relevant market, Mot. at 38, 41; and Meta incorrectly suggests that the FTC must show that WhatsApp would "become a colossal success" after pivoting into PSN services in the United States.  Mot. at 41, 43.  This section demonstrates that Meta's arguments fail because they ignore record evidence and controlling Circuit authority; the next section addresses Meta's erroneous demands for evidence of increased prices or reduced output.  *Infra* § II.C.

At the outset, Meta's arguments defy settled principles that a monopolist's exclusion of actual or potential competitors through conduct that is not merits competition itself harms the competitive process.  *See LePage's*, 324 F.3d at 159 (successful exclusion "is not only injurious to the potential competitor but also to competition in general").  As detailed above, ample evidence indicates that Instagram and WhatsApp were actual and potential PSN rivals, and Meta's acquisitions extinguished their ability to compete with Facebook.  *Supra* § II.A.

Meta further presses for particularized evidence that Instagram and WhatsApp would have become large or "transformation[al]" PSN rivals absent Meta's acquisitions.  But this is not the law, and plaintiffs are not required to demonstrate that an excluded rival would have achieved any particular share of the relevant market.  *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 991 (D.C. Cir. 1977) ("To hold otherwise could effectively mean that a defendant is entitled to remain free of competition unless the plaintiff can prove, not only that [the excluded firm] would be a viable competitor, but also that [it] and defendant both would survive."); *see also Antitrust Law* ¶ 701c ("[A monopolist's] acquisition [of even a small competitor] should be prevented even if we assume that the small firm would probably continue to play only a very minor role or,

indeed, be shut down.  To find a §2 monopoly is necessarily to declare the preciousness of any

viable rival."); *id.* ¶ 651g ("[N]o government seriously concerned about the evil of monopoly

would condition its intervention solely on a clear and genuine chain of causation from

exclusionary act to the presence of monopoly."); *see* CS ¶ 2054.1 (Instagram could benefit

competition and consumers even if it were smaller in the but-for world than today).

Indeed, in *Microsoft*, the Court of Appeals clearly instructed that a Section 2 plaintiff is

not required "to reconstruct the hypothetical marketplace absent a defendant's anticompetitive

conduct" and that "[w]e may infer causation when exclusionary conduct" is aimed at "nascent

threats." *Microsoft*, 253 F.3d at 79.  Accordingly, the Court held that "the question in this case is

not whether Java or Navigator would actually have developed into viable platform substitutes"

but rather whether "exclusion of nascent threats is the type of conduct that is reasonably capable

of contributing significantly to" the defendant's continued monopoly power and whether Java

and Navigator "reasonably constituted nascent threats at the time" of Microsoft's conduct.  *Id.*

In turn, the Court of Appeals held that Java and Navigator constituted nascent threats to

Microsoft, relying on the district court's factual findings that they "showed potential as

middleware platform threats."  *Id.* at 79 (citing *Microsoft Findings*, 84 F. Supp. 2d 9 ¶¶ 68-77).

Notably, the district court found that Netscape and Java had only "the *potential* to weaken the

applications barrier to entry" protecting Microsoft's monopoly, *Microsoft Findings*, 84 F. Supp.

2d 9 ¶ 68 (emphasis added), and Microsoft's monopoly power could not be dissipated until the

conclusion of a multi-step process requiring innovation from numerous separate actors: (i) Java

would need to improve "to such an extent that"; (ii) many (unidentified and not yet extant) other

developers would be motivated to create "many full-featured, end-user-oriented applications";

(iii) and thus "open[] the way" for still *other* (unidentified and not yet extant) developers to

invent "non-Microsoft operating systems" that might eventually "emerge as acceptable substitutes for Windows." *Id.* ¶¶ 74, 77.

The district court expressly found that the end result of this multi-actor, multi-stage, and hypothetical process was uncertain, and that plaintiffs had failed to establish that the process would have actually "ignited genuine competition." *Id.* ¶ 77 ("[T]hese middleware technologies have a long way to go before they might imperil the applications barrier to entry."); *id.* ¶ 411 ("There is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the [relevant] market."); *see also United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 44 (D.D.C. 2000) (*rev'd in part on other grounds*) ("[T]he evidence does not prove that they would have succeeded absent Microsoft's actions[.]").

Here, the evidence is much stronger, and readily establishes that Instagram and WhatsApp were PSN competitive threats, and that their exclusion contributed to Meta's maintenance of monopoly power. CS § III. Indeed, both Instagram and WhatsApp posed a dramatically more imminent and direct threat to Meta's PSNS monopoly than Java and Navigator posed to Microsoft's monopoly power. As noted already, evidence indicates that Instagram was already triggering a direct competitive response from Meta, and that Meta recognized that Instagram threatened to shift engagement from Facebook to Instagram's "parallel network." CS ¶ § III.B.2. And WhatsApp was the leading global OTT messaging app, had an imperative to find a sustainable monetization path, and Meta, ███████████ and others ████████████████ had identified a PSN pivot as an attractive path. CS § III.C.2. Further, extensive evidence shows that Meta's executives were deeply concerned by Instagram's rapid growth (CS § III.B.2) and were "all terrified" by the threat of a mobile messaging pivot and specifically lost sleep over the threat posed by WhatsApp. CS § III.C.2.b.1. The Court of

Appeals relied on similar evidence in *Microsoft*. *Microsoft*, 324 F.3d at 79 (citing *Microsoft Findings*, 84 F. Supp. 2d 9 ¶¶ 68-77); *see Microsoft Findings*, 84 F.Supp.2d 9 ¶¶ 72, 75, 77 (evidence that Microsoft executives were "deeply concerned," deeply worried," and perceived "reason to dread the increasing use of Navigator").

Meta attempts to disparage the acquired firms' prospects in the but-for world, suggesting they could find themselves in a "graveyard" of "promising startups." Mot. at 41. This assertion contradicts the record evidence, and is irrelevant as a matter of law because Metas fails to either argue or establish that it can meet the requirements of the failing company doctrine. The Supreme Court has expressly held that the "failing company doctrine" applies to Section 2 claims involving acquisitions, and that "[t]he burden of proving that the conditions of the failing company doctrine have been satisfied is on those who seek refuge under it." *Citizen Pub. Co. v. United States*, 394 U.S. 131, 136, 138-39 (1969).

The Supreme Court has further "narrowly confined the scope of the doctrine." *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1288 (D.C. Cir. 1989), *aff'd*, 493 U.S. 38 (1989) (citation omitted). Meta does not even argue that it can establish any of the three requirements of the doctrine, which are: (1) the allegedly failing firm must face "the grave probability of a business failure," *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 507 (1974) (citation omitted); *see also Dr. Pepper/Seven-Up Cos., Inc. v. FTC*, 991 F.2d 859, 864 (D.C. Cir. 1993) (firm must be "in imminent danger of failure"); (2) the prospects of successful reorganization under the bankruptcy laws must be "dim or nonexistent," *Citizen Pub. Co.*, 394 U.S. at 138; and (3) that Meta was "the only available purchaser." *Id; see also Sun Newspapers*, 1983 WL 1853 at *18 ("[D]efendants point out that the…papers were a losing operation prior to the acquisition…and have since been returned to financial health. Nearly any monopolist could

make a similar argument[.]").

Meta plainly cannot establish any of these requirements, as both firms were growing rapidly, faced no danger of bankruptcy, and other acquirers were viable candidates. CS §§ III.B.1(e), III.C.2(b)(4). Moreover, the failing company doctrine conclusively rebuts Meta's assertion that the prospect that "a different buyer might have emerged" cannot form the basis for condemning an acquisition. *See* Mot. at 46-47. It is Meta's burden, not the FTC's, to show that no different buyer might have emerged. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Indeed, while *Microsoft* underscores that the FTC does not need to establish that Instagram and WhatsApp would have in fact have succeeded against Facebook as PSN competitors in the but-for world, there is ample evidence indicating that is the case. Meta has admitted that pre-acquisition Instagram had exceptionally attractive features and "from the outset [was] praised as exemplifying the speed, reliability, and simplicity necessary to succeed in the mobile environment." CS ¶ 1603(b). Instagram grew like wildfire in its 18 months of existence, despite being available only to iPhone users, and its growth exploded when it launched on Android devices just days before Meta acquired it. CS § III.B.1.b. Mr. Zuckerberg himself at the time believed that Instagram was a "mega-network" and was "on the path to win" had Meta not acquired it, with "very talented product leaders" at the helm. CS ¶¶ 1635(e), 1645. Other similar evidence abounds. *See* CS §§ III.B.1-2, III.B.5.

Relatedly, Meta fails to support, and evidence flatly contradicts, its suggestion that Instagram had "no plan to make money" and experienced significant "service outages and spam attacks." Mot. at 40. Mr. Systrom testified that Instagram's "monetization plan was always advertising" (CS ¶ 2109) and evidence indicates both that Instagram was not experiencing

critical integrity or infrastructure challenges pre-acquisition and that Meta's ownership was not necessary for Instagram to continue to grow and manage monetization, integrity, and infrastructure.  CS §§ V.C-V.E.

Similarly, WhatsApp was thriving and well-financed.  CS §§ V.F-V.J.  And as already discussed, Meta believed it to be plausible that WhatsApp could pivot either on its own or in cooperation with an acquirer, and other evidence indicates this was a viable and likely path.  CS ¶ III.C.2.b.  Further, like Instagram, WhatsApp had no material growth, integrity, or infrastructure problems prior to its acquisition, and did not need to be acquired by Meta to succeed on any of those fronts  CS §§ V.F-V.J.

Further, Meta overlooks evidence that the acquisitions served to bolster barriers to entry into PSN services—an independent way the acquisitions protected Meta's monopoly beyond the harm from removing both firms ability to compete with Meta directly.  CS §§ III.D.1.c, III.D.2.b; *see Microsoft*, 324 F.3d at 55 (Microsoft's conduct helped prevent erosion of "applications barrier to entry").

Finally, Meta suggests that in the but-for world it might have tried to stunt Instagram's growth by eliminating "growth drivers," flaunting that Meta could have gone into "destroy mode" had Instagram not accepted Meta's acquisition offer.  *See* Mot. at 40.  Meta's argument here is problematic in several respects.  To start, Instagram's founder testified that he understood that, but for the acquisition, Meta would have competed hard against Instagram (CS ¶ 1629) but he did not believe Instagram's survival or success depended on Meta (CS ¶ 2021).  That Meta's acquisition of Instagram interrupted the reality that Meta would compete hard against Instagram in the but-for world is *a competitive harm* of the acquisition, not a benefit, as Meta perversely suggests.

Further, evidence indicates that consumers valued some of the mechanisms that Meta suggests it might have cut off in the but-for world, such as the ability to cross-post between Facebook and Instagram.  Mot. at 40 (citing Meta's SMF 655-69); CS ¶¶ 2029, 2035.  While Meta might not have a legal obligation to interoperate with actual or potential rivals, Meta's suggestion that it would harm consumers in the but-for world is not a procompetitive benefit of the acquisition.  *See Microsoft*, 253 F.3d at 59 (describing a procompetitive benefit as entailing "greater efficiency or enhanced consumer appeal").  Moreover, Meta's confident assertion that it could have materially hampered a rival by refusing to cooperate with it serves only to emphasize that it possessed the power to "exclude competition"—i.e., monopoly power.  *See supra* § I.D.

## C.  While Not Required, Ample Evidence Indicates that Meta's Conduct Harms Consumers

Meta erroneously asserts that the FTC must present evidence "consumer welfare would be even greater" absent the transactions, and "prices above or output below competitive levels." Mot. at 32, 33, 43.  This is unavailing both because it lacks any basis in law, and also because ample evidence shows that Meta's conduct has harmed consumers, including by allowing Meta to increase the quality-adjusted price of Facebook and Instagram.

### 1.  Meta Misstates the Legal Standard Applicable to its Conduct

Meta cites no authority suggesting that once a Section 2 plaintiff shows that a dominant firm excluded nascent threats through exclusionary conduct, the plaintiff must further show a change in price or output, or other specific change in consumer benefits.  Consumer harm flows inherently from a monopolist's maintenance of its position through conduct that is not merits competition.  *See Microsoft*, 253 F.3d at 58 (exclusionary conduct is conduct that has an "anticompetitive effect," meaning it "harm[s] the competitive *process* and **thereby** harm[s] consumers") (italics in original, bolded emphasis added).

Indeed, a fundamental premise of Section 2 is that the anticompetitive acquisition or maintenance of monopoly power *is itself* harmful to consumers. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810-11 (1946). *See also Antitrust Law* ¶ 651e1 (emphasis added):

> Monopoly harms consumers . . . [M]onopolizing conduct harms consumers by creating monopoly, increasing its amount, or extending its duration. Thus an expectation of consumer harm must always be at the logical end of any determination that a particular act "monopolizes" and thus satisfies §2's conduct requirement. **But this is not the same thing as showing that consumer harm has in fact resulted from the challenged practice.**

Thus, when a Section 2 plaintiff shows that a monopolist maintained its monopoly via conduct that is not competition on the merits, the plaintiff has satisfied its burden of showing exclusionary conduct. *See Microsoft*, 253 F.3d at 65, 67 (DOJ's showing of harm to competition—through excluding competitive threats without merits competition—established anticompetitive conduct); *Dentsply*, 399 F.3d at 191-96 (anticompetitive effect of monopolist's conduct was blocking growth of smaller rivals); *LePage's*, 324 F.3d at 158-63 (anticompetitive effect of monopolist's conduct was foreclosing ability of rival to compete, "which harmed competition itself").

An additional requirement that the plaintiff demonstrate precisely how the exclusionary conduct impacted prices or output is particularly inappropriate in a monopoly maintenance case, in which the very nature of the claim is that the monopolist has *prevented* competition from emerging, thereby forestalling an improvement in market outcomes. *See McWane*, 783 F.3d at 839 (monopolist's conduct constituted unlawful monopoly maintenance where it "stunted the growth" of a rival, and plaintiff did not need to show the challenged program was "responsible for [the observed] price behavior"); *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 103 (D.D.C. 2020) ("[T]he central question is whether . . . [the defendant] 'harmed competition, not just a competitor,' by blocking entrants into the market.") (citations omitted).

56

Section 2 cases involving acquisitions confirm this principle.  The Court in *Grinnell* held defendant's acquisitions unlawful where they "eliminated any possibility of an outbreak of competition that might have occurred . . . ."  *Grinnell*, 384 U.S. at 576.  The *Grinnell* Court did not require an additional showing of consumer harm: it did not mention output effects at all, and discussed price effects only to note that the defendant had to lower prices when it faced competition, whereas it could raise them where it possessed monopoly power.  *See Grinnell*, 384 U.S. 563 at 570;  *see also Credit Bureau Reports, Inc. v. Retail Credit Co,* 358 F. Supp. 780, 791 (S.D. Tex. 1971), *aff'd*, 476 F.2d 989 (5th Cir. 1973) (holding acquisitions violated Section 2 without examining prices or output); *Sun Newspapers, Inc.*, 1983 WL 1853 at *23 (preliminary injunction where monopolist newspaper's acquisitions of a small existing competitor and a potential entrant violated Section 2); *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1271 (E.D. Pa. 1987) (preliminary injunction where monopolist baker's acquisitions of competitors violated Section 2).  This parallels the evidence here that Meta invested more heavily in its PSN offerings in the limited instances it faced PSN competition, and reduced its investments and increased the quality-adjusted prices of its PSN offerings when competition was eliminated.  *Supra* § I.D; *infra* § II.C.2.

Meta cites no case in which a monopolization claim failed because the plaintiffs established anticompetitive conduct but did not prove output effects or consumer harm, and none of Meta's cited cases states or even implies that Section 2 plaintiffs have such a burden.  Many of Meta's supporting cases involve Section 1 of the Sherman Act or the Robinson-Patman Act, which, unlike Section 2, do not require a showing of monopoly power and the illicit creation or maintenance of such power.  *See* Mot. at 32-36.

The cases Meta cites that do analyze Section 2 standards confirm that a Section 2 plaintiff

must prove harm to *competition*, which is established here.  In *Google* and *Rambus*, for example, the plaintiffs failed to establish that the challenged conduct actually harmed competition.  *See United States v. Google LLC*, 2023 WL 4999901, at *21-25, 27 (D.D.C. Aug. 4, 2023) (granting summary judgment as to certain conduct for which plaintiffs identified no evidence showing that it harmed competition); *Rambus Inc. v. FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008) (no evidence showed that defendant's behavior actually affected the standard-setting body's decision-making).  In the others, none of which involved elimination of a competitive threat by acquisition, plaintiffs failed to establish some other element of a monopolization claim.  *See* Mot at 34-36 (citing *Flegel* (failure to produce evidence of monopoly power); *Roy B. Taylor Sales,* (same); *Novell* (failure to satisfy elements of refusal-to-deal claim); *Virgin Atl. Airways* (failure to establish elements of predatory pricing and monopoly leveraging claims); *Matsushita* (insufficient evidence to support "implausible" claim of a predatory pricing conspiracy)).

Finally, Meta asserts that no "court has ever held that a firm violated Section 2" by acquiring a potential competitor, incongruously citing cases brought under Section 7 of the Clayton Act.  Mot. at 43.  As demonstrated above, Meta is wrong.  *Supra* § II.A.2 (discussing *Grinnell* and *Sun Newspapers*).  Further, Meta provides no Section 7 analysis and fails to show the absence of a triable issue even if Section 7 applied.  *See, e.g., FTC v. Polypore*, 686 F. 3d 1208, 1215-16 (11th Cir. 2012) (acquisition that foreclosed entry and "ensured a continuation of the high concentration" violated Section 7); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531 (1973).  At any rate, this is a Section 2 case, and Meta's Section 7 cases are inapposite.  *See Antitrust Law* ¶ 701a (discussing "special case of mergers as unlawful monopolistic acts").  Section 2 reaches anticompetitive acts by monopolists to exclude nascent threats (including acquisitions), even when entry or disruption by those threats is not imminent or certain.  *See*

*supra; Microsoft*, 324 F.3d at 79; *Grinnell Corp.*, 384 U.S. at 576; *Antitrust Law* ¶ 701d.

        2.  <u>Meta's Continued Maintenance of Its Monopoly Harms Consumers</u>  Although the FTC is not required to make a showing of consumer harm, the record contains abundant evidence that consumers were harmed by the acquisitions.  CS § IV.  Indeed, consumers lost access to Facebook Camera as a direct result of its acquisition of Instagram, and lost the benefits flowing from Instagram trying to appeal to users to "use Instagram instead" of Facebook.  CS § III.D.1.  Instagram's ad load has also increased significantly at Meta's direction, in a manner directly tied to Meta's control: Instagram's co-founder opposed two episodes of material increases but his objections were overruled.  CS § IV.B.2.  Meta has also increased Facebook's ad load significantly since the acquisitions, aided by its ability to raise ad load on Instagram in parallel.  CS §§ II.C.3.a, IV.B, IV.C.2.  Meta also removed growth engineers from Instagram, hampering Instagram's ability to grow, and chronically deprived Instagram of resources to innovate and improve features.  CS § IV.B.3.

        More fundamentally, the acquisitions contributed to the maintenance of Meta's monopoly power, insulating it against pressure to innovate and improve product quality, including but not limited to ad load.  Meta's principal economic expert confirms the uncontroversial point that competition is better for consumers than a monopolized market, CS ¶¶ 983, 1901, and the evidence shows Meta worked harder to improve its PSN offerings during the rare episodes when it faced a competitive threat: e.g., Google+ and Snapchat Stories.  CS §§ IV.A.1-2.

        Outside of these short episodes, Meta recognizes that it has underinvested in the friends and family use case on Facebook and Instagram, causing user dissatisfaction.  CS § II.C.3.c.  Meta's power has also allowed it to deprioritize privacy, and to collect more data than its users would prefer, contributing to declining user sentiment regarding privacy and to major privacy breaches and scandals such as Cambridge Analytica.  *See* CS §§ II.C.3.b, II.C.4.a, IV.C.4.

Likewise, Meta has underinvested in integrity on Instagram and adopted integrity policies that harm users.  For example, evidence indicates that: Meta is ineffective in its efforts to remove objectionable content including material sexualizing children, and reportedly Instagram's algorithm has even recommended such material to certain users, CS § V.D.5.e.1, 2; and Meta imposed a policy of delaying removal of content posted by high-profile accounts, resulting in widespread exposure to harmful content (including but not limited to "revenge porn"), *see* CS § V.D.6.a.

Meta's internal records also show rising user dissatisfaction with multiple other aspects of product quality, including ad load, reliability, and overall satisfaction.  But freed of competitive constraints from PSN rivals, Meta has consistently declined to take steps to address known points of user dissatisfaction, recognizing that doing so would hurt profits.  CS §§ II.C.5, IV.B-C.  In sum, extensive evidence plainly indicates that, lacking meaningful PSN services competition, Meta has harmed consumers by degrading product quality.  *See* CS §§ IV.B-C.

### D.  Meta's Request for a "Presumption" of Legality is Legally and Factually Baseless

Meta argues that it is entitled to "a presumption" due to the Hart-Scott-Rodino Act ("HSR") review process is both legally and factually baseless.  Mot. at 47.  Indeed, Meta's argument is expressly foreclosed by the statutory text.  Congress explicitly provided that the FTC's decision not to challenge an acquisition after HSR review has no impact on its ability to bring a challenge in the future.  15 U.S.C. § 18a(i)(1) (stating that the FTC's failure to act "shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law").

Meta's arguments for inventing a presumption are unfounded.  Meta suggests, incorrectly, that HSR reviews necessarily entail a clean bill of health under Section 2.  Mot. at

48.  First, HSR reviews do not suggest a clean bill of health even under Section 7, as Meta was

expressly told at the time of the Instagram acquisition.  CS ¶¶ 2558.  Any contrary inference

would be deeply problematic given that the FTC and DOJ have significant resource constraints

and limited time and information during the HSR process.  *See* 15 U.S.C. § 18a(e).  Consistent

with this, courts have refused to provide defendants with any beneficial inference stemming from

even lengthy merger and non-merger antitrust investigations.  *See, e.g., Steves & Sons, Inc. v.

JELD-WEN, Inc.*, 988 F.3d 690, 701-702, 714 (4th Cir. 2021) (DOJ's "decision not to pursue

[acquisition after two separate investigations] isn't probative as to the merger's legality . . ."); *In

re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002) (DOJ's inaction

did not indicate absence of a price-fixing conspiracy); *In re Carbon Black Antitrust Litig.*, 2005

WL 2323184, at *1 (D. Mass. Sept. 8, 2005).

        Meta cites no contrary authority, and its cases are mischaracterized and inapposite.  Mot.

at 48.  *Texaco Inc. v. Dagher* is irrelevant, as the Court did not assess whether the relevant

transaction violated the antitrust laws; the Court merely presumed it was lawful for purposes of

assessing the plaintiffs' challenge to the way the joint venture set its prices.  547 U.S. 1, 6 n.1

(2006).  Nor does *Texaco* suggest that FTC *inaction* should be given any weight, as the relevant

"federal and state regulators," Mot. at 48, imposed a consent decree.  *Id.* at 4.  Likewise, in

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016), the FTC did

not "clear[]" the acquisition, but required a divestiture to remedy competitive concerns.  2016

WL 1640465, at *9.  And *United States v. Paramount Pictures, Inc.*, merely recites that the HSR

Act provides the agencies the "opportunity to evaluate" transactions.  2020 WL 4573069, at *7

(S.D.N.Y. Aug. 7, 2020).

        Meta's suggestion that HSR reviews involving Clayton Act Section 7 should create a

presumption in Section 2 cases is also unsupported.  Mot. at 48.  Indeed, it cuts against, not in

favor of, Meta's argument, as it would be extraordinary to treat review under one statute as

creating a presumption of legality under another.  Further, Meta misquotes *Rothery Storage* as

indicating that Section 7 sets "a lower bar" than Section 2; in fact the language Meta selectively

quotes was about Section 1.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d

210, 220 (D.C. Cir. 1986)  (Section 7's aim to reach *incipiency* differs from "rule-of-reason

analysis under section 1 of the Sherman Act").  Section 2 has its own elements that are distinct

from Section 7 (and Section 1).  *See* ECF 59 at 28-30, (Apr. 7, 2021).

      Meta is likewise incorrect that permitting post-acquisition challenges to an HSR

reportable acquisition would "provide little incremental benefit to consumers" due to the

"regulatory regime" provided by the HSR Act.  Mot. at 48-49.  First, *Trinko* did not suggest that

a regulatory regime precludes enforcement of any antitrust laws, only that it did not create a *new*

antitrust duty for firms to provide access to rivals.  *Verizon Commc'ns Inc. v. Law Offices of

Curtis V. Trinko LLP,* 540 U.S. 398, 412-15 (2004).  So too for *Town of Concord, Mass. v. Bos.

Edison Co.,* 915 F.2d 17, 22 (1st Cir. 1990) (prices set by regulation did not constitute an illegal

price squeeze while noting "we *are not* saying [] that the antitrust laws do not apply in this

regulatory context") (emphasis in original).  It would be perverse to construe the HSR Act—a

statute designed to enhance enforcement of the antitrust laws—to *preclude* enforcement of those

laws.  Second, Meta misses the import of inappropriately analogizing the HSR Act to a

regulatory regime.  *Trinko* and *Boston Edison* involved on *ongoing* regulatory oversight by

pertinent government agencies.  *Trinko*, 540 U.S. at 402, 406, 412-14 (describing "detailed

regulatory scheme" involving oversight by the FCC); *Boston Edison*, 915 F.2d at 18, 25-28

(detailing "fully regulated industry" with comprehensive government involvement).  If the HSR

Act imposed a comparable regulatory regime (it does not), the FTC and DOJ are the pertinent regulators providing ongoing oversight, and subsequent legal intervention by either agency is both appropriate and necessary.

Finally, Meta incorrectly suggests that this case is "unfair" and "unprecedented."  Mot. at 47, 49-50.  Meta's suggestion that a government challenge to consummated acquisitions is unprecedented is simply wrong: in *Grinnell*, the defendant had notified the DOJ about the acquisitions and would not proceed unless DOJ "clear[ed]" them; DOJ investigated and notified Grinnell that it "did not presently intend to take action"; and the Supreme Court did not hesitate to hold that the acquisitions violated Section 2.  *See Grinnell*, 384 U.S. at 576; Brief for Grinnell Corp., 1966 WL 100458 at *15-16 (Feb. 18, 1966).  The same is true after passage of the HSR Act.  *See, e.g., Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (Section 7 violation despite two prior government investigations); Complaint, *FTC v. Cardinal Health, Inc.*, No. 15-cv-3031 (S.D.N.Y. Apr. 20, 2015), *available at* https://www.ftc.gov/system/files/documents/cases/150420cardinalcmpt.pdf (Section 2 claim challenging, *inter alia*, two consummated acquisitions more than 10 years after HSR Act notifications).

Meta's suggestion of "unfair[ness]" is also off base in several respects.  Contrary to Meta's suggestion, the HSR Act does not confer a "reliance" interest on merging parties.  Mot. at 47, 49.  As already noted, the statute expressly contemplates post-HSR legal action, and the legislative history confirms the purpose of the act was to enhance antitrust enforcement, not hinder it in any way.  *See* H.R. REP. 94-1373, at 1, 5, 1976 U.S.C.C.A.N. 2637, 2637 (describing congressional intent to "strengthen the enforcement of Section 7" and explaining that the Act "in no way alters the substantive legal standard of Section 7").  Meta has also not been harmed: it

has reaped billions in wrongfully maintained monopoly profits since the acquisitions closed.

Meta asserts that "there is no allegation that Meta obstructed, withheld information, or was anything other than fully cooperative."  Mot. at 47.  The FTC has not revisited its prior reviews, nor Meta's compliance efforts, because they are legally irrelevant as discussed above. But there should be no misunderstanding: *at Meta's request* the FTC undertook only a limited review of the Instagram acquisition; the Instagram review in 2012 involved only unsworn interviews and a few thousand documents; and the WhatsApp review in 2014 was even more abridged.  CS §§ VI.A, VI.B.  By contrast, the FTC now has available vastly more evidence, including pre-acquisition documents Meta did not provide in 2012 and 2014.  CS § VI.C.

Moreover, there is now extensive post-acquisition evidence demonstrating the anticompetitive nature of the acquisitions, Meta's monopoly power and enduring entry barriers, and consumer harms.  CS § VI.C.3.  Challenging Meta's conduct therefore does not "chill" procompetitive behavior, Mot. at 49-50, but rather directly vindicates the antitrust laws.  In addition, Meta's assertion that the FTC's post-consummation challenge is unusual simply reinforces the reality that the FTC and DOJ do not unpredictably or arbitrarily pursue consummated acquisitions, and undermines the notion this Court needs to create a novel presumption to avoid the risk of "chilling" procompetitive conduct by "other firms."  Mot. at 49.

The world Meta proposes is antithetical to the text, structure, and purpose of the Sherman and HSR Acts.  It is one in which, if enforcers fail to take action, for any reason, to block in advance an acquisition (or set of acquisitions) that maintains monopoly power, the ill-gotten power is locked in forever and consumers must suffer.  Fortunately, that is not the law.

## III.   The Court Should Grant Partial Summary Judgment and Dismiss Meta's Claimed Procompetitive Justifications

In light of the substantial evidence that Meta's acquisitions of Instagram and WhatsApp

were anticompetitive, to attempt to overcome liability, Meta must proffer proof of (i) extraordinary, (ii) non-pretextual benefits that enhance competition for PSN services, for which (iii) its acquisitions of Instagram and WhatsApp were necessary.  *Infra* § III.A.

Meta's motion does not even argue that undisputed facts establish any of these requirements.  Accordingly, Meta cannot be awarded summary judgment on the basis of any claimed procompetitive benefit because Meta cannot plausibly assert that the evidence eliminates a genuine dispute as to whether the anticompetitive effects of its acquisitions are outweighed by legally cognizable procompetitive justification.  *See Microsoft*, 253 F.3d 34, 58-59 (describing burden-shifting framework).

Moreover, as described below, undisputed evidence indicates that Meta's procompetitive benefit claims—articulated in its interrogatory responses in response to the Court's order—are legally deficient.  In particular, undisputed evidence indicates that Meta's claims are all pretextual, were achievable without Meta acquiring Instagram and WhatsApp, or are not related to enhancing competition.  Accordingly, the FTC moves for partial summary judgment dismissing Meta's Fourth and Fifth Affirmative Defenses.

### A.  The Legal Standards Applicable to the FTC's Cross-Motion and Meta's Procompetitive Benefit Justifications

#### 1.  The Legal Standard for Motions for Partial Summary Judgment

Partial summary judgment is proper when there is no genuine dispute of material fact that would allow a reasonable factfinder to find in favor of the nonmoving party.  Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248; *Surescripts*, 665 F. Supp. 3d at 43-44.

Partial summary judgment "can serve a useful brush-clearing function even if it does not obviate the need for trial."  *Jackson v. Att'y Gen. U.S.*, 456 F. Supp. 3d 62, 66-67 (D.D.C. 2020) (citation omitted).  In antitrust cases, courts do not hesitate to grant partial summary judgment

dismissing non-cognizable procompetitive justifications, even where factual disputes remain regarding the plaintiff's prima facie case. *See In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1102 (N.D. Ill. 2023) (granting partial summary judgment dismissing defendants' non-merger-specific procompetitive justification in consummated acquisition challenge under Section 2 and Section 7); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.* ("*NCAA*"), 37 F. Supp. 3d 1126, 1151-52, 1155 (N.D. Cal. 2014) (granting partial summary judgment dismissing a non-cognizable justification).

### 2.  The Legal Standard for Procompetitive Justifications

It is doubtful that a monopolist's acquisition of an actual or potential competitor can ever be justified by purported procompetitive justifications. Such an act is "not a form of competition on the merits," and thus does not fall within *Microsoft*'s contemplation that a Section 2 defendant can respond to a plaintiff's prima facie case by asserting "a procompetitive justification—[that is] a non-pretextual claim that its conduct is indeed a form of competition on the merits." *Microsoft*, 253 F.3d at 59; *Sun Newspapers*, 1983 WL 1853 at *14 ("[W]hen the conduct is not an innovation, [but an acquisition] it is more properly viewed as an unlawful act of a monopolist: there is a suppression of competition without any corresponding benefits.").

Indeed, in *Grinnell*, the Supreme Court observed in a Section 2 case involving acquisitions that a rebuttal stage is obsolete where a court determines "monopoly power was consciously acquired." *Grinnell*, 384 U.S. at 576 n.7 ("[W]e have no reason to reach the further position of the District Court that once monopoly power is shown to exist, the burden is on the defendants to show that their dominance is due to skill, acumen, and the like."). Regardless, the issue need not be resolved in this motion because undisputed evidence shows that Meta's procompetitive justification claims do not meet legal prerequisites for procompetitive justifications in a Section 2 case. *Cf. United States v. Anthem, Inc.*, 855 F.3d 345, 355 (D.C. Cir.

2017) (declining to resolve viability of an efficiencies defense under Section 7 because other legal requirements not met).

First, Section 2 requires a defendant advancing a procompetitive justification to, among other things, demonstrate that its purported benefit claim is not "pretextual." *Microsoft*, 253 F.3d at 59. A justification is pretextual if was "not a genuine reason for [Meta's] conduct." *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1220 n.12 (9th Cir. 1997) (quoting jury instructions); *id.* at 1219 (citing Kodak, 504 U.S. at 484) (The antitrust laws do not "allow[] a monopolist to rely upon a pretextual business justification to mask anticompetitive conduct."); *see also LePage's* 324 F.3d at 164 ("The defendant bears the burden of 'persuading the [factfinder] that its conduct was justified by [a] normal business purpose.'") (citation omitted).

Second, as this Court has already determined, "the burden [is] on Meta to demonstrate that benefits it claims resulted from its acquisitions 'could not have been achieved absent the acquisitions.'" ECF No. 281 at 7 (quoting *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 478 (7th Cir. 2020) (requiring defendant to demonstrate that disputed conduct "was the result of, or necessary to achieve, much greater procompetitive benefits")). This aligns with the requirement of this Circuit that in the Section 7 context claimed benefits must be "shown to be merger-specific, meaning that it 'cannot be achieved by either company alone.'" *Anthem*, 855 F.3d at 356 (quoting *FTC v. H.J. Heinz* Co., 246 F.3d 708, 722 (D.C. Cir. 2001)).

Third, Meta may only present procompetitive benefits, that is benefits that *enhance competition*. *Image Tech. Servs.*, 125 F.3d at 1212 (a monopolist's proposed justification must "legitimately promote competition."); *cf. Anthem,* 855 F.3d at 354 (procompetitive benefits must "enhance rather than hinder competition"). Further, any claimed benefits must enhance competition in the relevant market harmed by Meta's anticompetitive conduct—here, personal

social networking services in the United States.  Competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see also Clarett v. National Football League*, 306 F. Supp. 2d 379, 408-409 (S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004) (a defendant "may not justify the anticompetitive effects of a policy by arguing that it has procompetitive effects *in a different market.*").

Finally, magnitude matters as well.  As the Court of Appeals has recognized in the Section 7 context, "high market concentration" requires "proof of extraordinary efficiencies." *Heinz*, 246 F.3d at 720 ("[e]fficiencies almost never justify a merger to monopoly or near-monopoly levels"); *see also* ECF No. 281 at 6 (internal citation omitted) ("[A]n efficiency defense cannot be allowed in monopoly cases [involving an acquisition] in the absence of an overwhelming demonstration that substantial efficiencies are involved . . . .").

### B.  Meta's Asserted Procompetitive Justifications in this Litigation

Meta has asserted, through its Fourth and Fifth affirmative defenses, that "there were procompetitive justifications" for the Instagram and WhatsApp acquisitions.  *See* ECF No. 281 (Order) at 1-2*;* ECF No. 94 (Answer) at 38.  Accordingly, the FTC served interrogatories asking Meta to "[i]dentify and describe each procompetitive justification."  PX10092 at -010-11; *see also* ECF No. 281 at 1-2.  Following a motion to compel, ECF No. 266, the Court ordered Meta to supplement certain of its responses.  *See* ECF No. 281.

On May 31, 2023, after the close of fact discovery, Meta asserted ten categories of justifications—six related to Instagram, four related to WhatsApp—broken into approximately 120 discrete claimed benefits.  *See* PX10092 at -014-26.  Each of Meta's Instagram categories identifies resources or expertise Meta claims it brought to Instagram, related to items like

features, growth, monetization, integrity, and infrastructure.  CS §§ VII.A.1-6.  In identifying

Meta resources brought to Instagram, Meta's claims necessarily involve capabilities available to

Meta's applications—including Facebook and Facebook Camera—absent Meta's acquisition of

Instagram.  *Id*.  None of Meta's Instagram justifications identify improvements to Facebook

Camera or Facebook Blue that resulted from the acquisition.  CS ¶ 2606.

Similarly, each of Meta's WhatsApp categories identifies resources or expertise Meta

claims it brought to WhatsApp, which again necessarily involve resources available to Meta's

own applications.  *See* CS ¶¶ 2607, 2609-2610, 2614, 2617.  None of Meta's WhatsApp

justifications identifies improvements to Facebook Messenger or any other Meta service that

resulted from the acquisition.  *See generally* CS ¶ 2607.

### C.  Undisputed Facts Show that Meta's Procompetitive Benefit Claims Are Not Cognizable

Undisputed facts show that Meta's ten proffered procompetitive justifications fail as a

matter of law because they are either pretextual, achievable without the acquisitions, or do not on

their face even tangentially relate to enhancing competition for PSN services.  Specifically,

undisputed facts indicate that all six of Meta's Instagram justifications are pretextual and could

have been achieved without Meta's acquisition, *infra* § III.C.1, and for WhatsApp, that Meta's

first three justifications are pretextual and could have been achieved without Meta's acquisition,

and the last (tenth overall) justification does not involve enhancing competition.  *Infra* § III.C.2-

3.

To be clear, Meta's purported "procompetitive justifications" are legally deficient for

additional reasons, including because they are neither "extraordinary" nor supported by

"overwhelming" proof.  *Supra* III.A.2.  The discussion below focuses only on certain threshold

elements (e.g., pretext) that are amenable to resolution based on undisputed facts.  But the FTC

would expect to contest all elements at a trial.

Indeed, granting the FTC's motion will substantially increase efficiency by averting the pointless presentation of evidence for legally non-cognizable justifications, which would otherwise likely consume significant time at trial.  Meta claims ten categories of justifications, and approximately 120 individual benefits within these ten categories.  CS §§ VII.A.1-6, VII.B.1-4; *see also* PX10092 at -014-26.  Even if Meta presents evidence on only a subset of its claimed benefits, the trial time consumed is likely to be substantial: Meta's interrogatory responses cite hundreds of documents (without any explanation of their relevance), at least some of which it would presumably introduce at trial.  *See* PX10092 at -028-77.  Moreover, several of Meta's expert reports reference procompetitive benefits, and two are devoted exclusively to the topic.  CS ¶ 1005.

If Meta were to present such evidence, the FTC would likely request trial time in rebuttal, because Meta's claimed justifications not only fail at the threshold for the reasons identified below, they are also contradicted by significant evidence appropriate for presentation at trial.  For example, evidence indicates that Meta's acquisition did not actually improve Instagram's integrity outcomes, and that Instagram and WhatsApp did not need access to Meta's infrastructure to continue growing.  *See* CS ¶¶ 2017, 2183, 2277, 2391, 2452; *see also* CS § V.  If Meta presents integrity or infrastructure claims at trial, the FTC would likely need to request time to present a rebuttal case involving witnesses who otherwise would not need to testify, including non-party witnesses and the FTC's expert witnesses who analyzed Meta's procompetitive benefit claims and supporting evidence.  *See, e.g.*, CS §§ I.B.3, I.B.4.b, I.B.4.d.

Fortunately, Meta's evidence and the FTC's rebuttal is unnecessary and irrelevant because Meta's claims are not legally cognizable.  *See, e.g.*, *Clarett*, 306 F. Supp. 2d at 409

(dismissing the defendant's proffered justifications as non-cognizable and granting summary judgment for plaintiff where defendant "failed to offer *any* legitimate procompetitive justifications" obviating the need for trial or fact finding); *see also Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1021-24 (10th Cir. 1998) (holding that defendant's proffered procompetitive justifications were non-cognizable and upholding grant of summary judgment for plaintiff).  Accordingly, the Court should narrow the issues for trial by eliminating non-cognizable justifications, just as other courts have done.  *In re NorthShore*, 657 F. Supp. 3d at 1102; *NCAA*, 37 F. Supp. 3d at 1155 (defendant could not rely at trial on legally non-cognizable claimed procompetitive benefits).

1. Al̲l̲ ̲o̲f̲ ̲M̲e̲t̲a̲'̲s̲ ̲I̲n̲s̲t̲a̲g̲r̲a̲m̲ ̲J̲u̲s̲t̲i̲f̲i̲c̲a̲t̲i̲o̲n̲s̲ ̲A̲r̲e̲ ̲P̲r̲e̲t̲e̲x̲t̲u̲a̲l̲ ̲a̲n̲d̲ ̲C̲o̲u̲l̲d̲ ̲H̲a̲v̲e̲ ̲B̲e̲e̲n̲ A̲c̲h̲i̲e̲v̲e̲d̲ ̲A̲b̲s̲e̲n̲t̲ ̲t̲h̲e̲ ̲A̲c̲q̲u̲i̲s̲i̲t̲i̲o̲n̲

Meta's Instagram procompetitive justification claims should be dismissed because the record evidence plainly establishes that the genuine reason Meta acquired Instagram was to eliminate a competitive threat.  As such, Meta's asserted justifications for the Instagram acquisition in this litigation are pretextual, and not "a genuine reason for [Meta's] conduct." *Image Tech Servs.*, 125 F.3d at 1220 n.12 (quoting jury instructions).  Meta's Instagram justifications also fail because each involve Meta's own resources and Meta could have improved or invested in its own comparable applications and thus achieved the asserted benefits without eliminating Instagram and WhatsApp as competitors.  *See Heinz*, 246 F.3d at 721-22.

(a) M̲e̲t̲a̲'̲s̲ ̲I̲n̲s̲t̲a̲g̲r̲a̲m̲ ̲J̲u̲s̲t̲i̲f̲i̲c̲a̲t̲i̲o̲n̲s̲ ̲A̲r̲e̲ ̲P̲r̲e̲t̲e̲x̲t̲u̲a̲l̲

Extensive record evidence indicates that Meta acquired Instagram to eliminate Instagram as a competitive threat.  *See supra* § II.A; CS §§ III.A-B.  Meta was struggling to adapt to the "shift to mobile," CS §§ III.A.1-3, with the Facebook mobile app performing poorly and requiring a code rewrite.  CS § III.A.4.  At this point of vulnerability, Instagram emerged as a

threatening mobile-first PSN app with advanced and attractive photo-sharing capabilities.  CS §
III.B.1.  Instagram grew explosively, CS ¶¶ 1607-16, and rapidly emerged as "the clear leader in
user experience and photo sharing."  CS ¶¶ 1644, 2056(a); *id.* § III.B.2.

 Spurred by its fear of Instagram, Meta initially attempted to improve Facebook's own
photo sharing functionality and to develop a "new mobile app"—Facebook Camera, a mobile
interface for Facebook intended to have better photo sharing functionality.  *See supra* § II.A.1.
Yet Meta's efforts to improve its own mobile applications stalled throughout 2011 and early 2012,
CS §§ III.A.3, III.B.4, with Meta senior executives recognizing "we are still getting our ass
kicked by Instagram," and getting "cranky" about the "lack of progress" "mainly motivated by a
desire to slow down Instagram's growth."  CS ¶ 1679.

 Confronted with its inability to quickly develop attractive mobile features, Meta decided it
would be easier to buy Instagram than to compete with it.  CS § III.B.5.  In February 2012, Mr.
Zuckerberg proposed acquiring Instagram, and candidly explained the reason: "I'm worried we're
so far behind that we don't even understand how far behind we are and that this is going to be a
huge amount of work . . . I worry that it will take us too long to catch up, if we even will."  CS ¶
1690.  Mr. Zuckerberg told other executives that in light of Instagram's lead over Facebook, "we
might want to consider paying a lot of money" to acquire Instagram, CS ¶ 1690, and the next day
he contacted an Instagram board member to begin discussions.  CS ¶¶ 1691-92.

 Mr. Zuckerberg's motivations leading up to the Instagram acquisition are clear: in
February 2012, Mr. Zuckerberg explained that the rationale for buying companies such as
Instagram that were "building networks that are competitive with our own" was to "neutralize a
potential competitor," CS ¶ 1693-94, and that the true goal of acquisition was *not* to
"incorporate[e] the social dynamics they've invented into our core products," as Meta could

72

achieve that independently: "in reality we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway." CS ¶ 1694. In March 2012, he again warned colleagues that Instagram was trying to a build "parallel network" that would allow users (including friends and family) to interact on Instagram's network rather than on Facebook's. CS ¶¶ 1635, 1696. When Instagram was a smaller network, sharing took place both on Facebook's network and on Instagram's, but Mr. Zuckerberg recognized the threat: "as Instagram grew, the balance could shift. I think we were starting to see: Hey, well, some people might just share on Instagram now." CS ¶ 1635.

On April 9, 2012, Meta announced that it acquired Instagram for $1 billion—double the valuation Instagram had achieved days before and "unprecedented" for a business of this kind. CS ¶¶ 1705, 1710. Mr. Zuckerberg and Chief Operating Officer Sheryl Sandberg had previously agreed that this was "way too much," CS ¶ 1700, but Mr. Zuckerberg justified the "really expensive" price because absent the acquisition "Instagram could hurt us meaningfully" and was "pretty threatening to us." CS ¶ 1701. Extensive other undisputed facts demonstrate the same: that Meta's "genuine reason" for the acquisition was removing a competitive threat. *See, e.g.*, CS ¶ 1706.a (Mr. Zuckerberg privately agreeing that "Instagram was our threat"); CS ¶ 1706.c (other Meta executives justified purchase price based on "defensive value" of preventing "any competitors from gaining this traction.").

Indeed, there is no evidence that Meta assessed any potential procompetitive benefits prior to or during Mr. Zuckerberg's hurried negotiations with Mr. Systrom, and the minutes of Mr. Zuckerberg's April 8, 2012 presentation to Meta's Board of Directors fail to mention the justifications now advanced by Meta. *See* CS ¶ 1704. And following the acquisition's announcement, Meta decided not to "waste any time" planning for a migration of Instagram to

73

Meta's infrastructure, CS ¶ 2309.c, and Mr. Zuckerberg confirmed in September 2012, even after

the acquisition closed, that Meta had "no agenda in terms of making [Instagram] go onto

[Meta's] infrastructure."  CS ¶ 2310(b).

Further, after the acquisition closed, Meta underinvested in and then eliminated Facebook

Camera, which was designed to be compete with Instagram and improve upon the photo-sharing

features of the Facebook mobile application.  CS ¶¶ 1848, 1851, 1853-55, 1859-860.  And Meta

managed Instagram with a prime focus on protecting Facebook, not promoting overall growth.

*See* CS ¶ 1864 (Meta leadership "would not accept any decrease in the usage of Facebook Blue"

even if that decrease came with an increase on Instagram).

This evidence confirms that the genuine reason for Meta's conduct was to forestall

competition from Instagram and not to achieve the post hoc "procompetitive justifications"

advanced by Meta in this litigation.  As such, Meta's procompetitive benefit justifications for the

Instagram acquisition are pretextual and thus not cognizable, as numerous courts have held on

similar or even less robust records.  *See New York v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir.

2015) (justifications pretextual based on "evidence showing that Defendants were, in the words

of Defendants' own CEO, 'trying to . . . put up barriers or obstacles' to generic competition");

*Image Tech. Servs.*, 125 F.3d at 1219 ("[E]vidence regarding the state of mind of [the

monopolist's] employees may show pretext, when such evidence suggests that the proffered

business justification played no part in the decision to act."); *McWane*, 783 F.3d at 841

(defendant's procompetitive justifications belied by "internal documents" that discussed the

exclusionary conduct "in terms of . . . preventing [the target] from becoming an effective

competitor"); *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 453 (D. Del. 2003)

(rejecting defendant's proffered justifications where the defendant's "pre-litigation rationale for

74

[the relevant conduct] was expressly to exclude competitors"); *see Dentsply*, 399 F.3d 181 at 197

(affirming district court's pretext finding, reversing on other grounds).

(b) <u>Meta's Instagram Justifications Were Achievable Without the<br>Acquisition</u>

Meta's Instagram justifications exclusively identify resources that originated from Meta

(not Instagram), and assert that these resources or expertise supported the Instagram application

after it came under Meta's control.  *See* CS § VII.A.  Undisputed evidence indicates that Meta's

acquisition of Instagram was not "necessary to achieve" these claimed benefits, however, and

they are accordingly not cognizable.  *See Viamedia*, 951 F.3d at 478.

Meta's acquisition of Instagram was not necessary to achieve the claimed benefits

because there is no dispute that: (1) at the time it acquired Instagram, Meta offered Facebook

Camera, a mobile app with social and photo-sharing features similar to Instagram's offering, and

that Meta also offered nearly the same social and photo-sharing features on Facebook's mobile

application, CS § III.B.4; and (2) the resources or expertise that Meta now claims as a benefit

originated with Meta (not Instagram) and could have been used to support Facebook Camera

and/or Facebook Blue.  CS ¶¶ 2579, 2582, 2584, 2587, 2591, 2596-98, 2600.

The Court of Appeals' evaluation of the merger specificity of claimed acquisition

benefits in *Anthem* and *Heinz* is instructive.  In *Heinz*, the defendants argued that the acquisition

would provide Heinz with access to Beech-Nut's better recipes and reduce overall costs by

moving Beech-Nut's production to a more efficient and underutilized plant owned by *Heinz*.

*Heinz*, 246 F.3d at 721-22.  The district court credited this argument, but the Court of Appeals

reversed because Heinz failed to show it was unable to improve its own products and produce

them at the same plant (and thus at the same cost) as the merged entity, and thus "achieve the

efficiencies of merger without eliminating . . . a competitor."  *Id.*  Accordingly, the district court

75

erred by failing to consider whether the proposed efficiencies could "be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor." *Heinz*, 246 F.3d at 722.

In *Anthem*, the defendants argued that Anthem had spent "probably a decade" unsuccessfully attempting to replicate Cigna's "integrated wellness" approach, and therefore needed to purchase Cigna to include this approach in a new product that could combine Cigna's superior quality with Anthem's lower provider rates. *Anthem*, 855 F.3d at 357-58. The Court of Appeals held that this purported efficiency was not merger-specific where defendants failed to show that, absent the merger, Anthem "cannot develop better customer-facing programs," and failed to provide "evidence that Anthem would be unable to develop a Cigna-like product without merging." *Anthem*, 855 F.3d at 357, 365.

Meta's Instagram justifications suffer the same deficiencies. If it had not acquired Instagram, Meta could have used its resources to continue to develop its non-Instagram products, including Facebook and Facebook Camera. Instead, "since we're acquiring Instagram," Meta decided to "scale back" and ultimately cancel Facebook Camera. CS ¶¶ 1852, 1859. Indeed, there is no dispute that absent the acquisition Meta would have continued to develop its own non-Instagram products, as Mr. Zuckerberg testified that Meta would have done so; instead, he concluded following the acquisition "that we should just put all of our investment behind Instagram." CS ¶¶ 1860-62 (Mr. Zuckerberg testified that if Meta had not acquired Instagram, "we would have [] continued working on the camera app," and that prior to the acquisition Meta "had a good shot of [] innovating faster than – than Instagram.")

Thus, "the merger's asserted benefits could be achieved without the concomitant loss of a competitor," *see Heinz*, 246 F.3d at 722, and the resulting elimination of any benefits that would

have resulted if Meta had faced ongoing competition from Instagram.  *See* CS §§ III.D.1, IV.B.

### 2. Meta's First Three WhatsApp Justifications Are Pretextual and Could Have Been Achieved Absent the Acquisitions

Summary judgment is warranted on Meta's first three WhatsApp justifications for the

same reason:  undisputed facts indicate that they were not "the genuine reason" for the

acquisition and that they could have been achieved without the acquisitions.  *See Image Tech.*

*Servs.*, 125 F.3d at 1220 n.12 (quoting jury instructions); *Viamedia*, 951 F.3d at 478.

#### (a) Meta's First Three WhatsApp Justifications Are Pretextual

As with Instagram, abundant record evidence indicates that Meta's goal in acquiring

WhatsApp was to eliminate a competitive threat, not to achieve the justifications Meta now

asserts in this litigation.  *See supra* § II.A.2.

Contemporaneous documents establish the rationale of removing a competitive threat and

confirm that Meta's "proffered business justification[s] played no part in the decision to act."

*Image Tech. Servs.*, 125 F.3d at 1219.  Unanswerable evidence of Meta's "genuine reason" for

the acquisition, *id.* at 1220 n.12, is provided by the contemporaneous statements of Mr.

Zuckerberg, who is Meta's "ultimate decision-maker," and who personally negotiated and

oversaw the acquisition.  CS ¶¶ 1562, 1832(e), 1833.  Mr. Zuckerberg explained the threat posed

by OTT messaging apps, the specific threat that WhatsApp could add features and "start winning

in the US," and Meta's desire to "use M&A to build a competitive moat" in mobile.  CS

¶¶ 1802(h), 1807(g).  Numerous Meta executives confirmed the gravity of the WhatsApp threat

(and the "sleepless nights" it caused (CS ¶¶ 1807(h); 2547(c)) repeatedly emphasizing Facebook

Messenger's inferiority to WhatsApp and the likelihood that another major tech company such as

Google ███████ could acquire WhatsApp and compete with Facebook in PSN services if Meta

did not act first.  CS ¶¶ 1723-28, 1737, 1811, 1818.  Indeed, Meta's dash to acquire WhatsApp in

February 2014—over a rushed two weeks—coincided with outreach to WhatsApp from Google, an alternative acquirer.  CS ¶¶ 1814, 1832.

Further, contemporaneous records are devoid of planning for the "justifications" Meta now advances.  For example, Meta now claims that "monetization" benefits justify its acquisition of WhatsApp (CS ¶¶ 2607, 2615) but at the time of the acquisition, Meta's board of directors was informed that despite the "[m]eaningful P&L impact" of the deal, Meta had no plans for monetization and did not even plan to "focus on monetization for years" despite the lack of "a revenue model proven to work at scale."  CS ¶ 1842(f).  Likewise, Meta now claims that its acquisition was justified because it anticipated that Meta's infrastructure would contribute to "improved reliability and engagement" on WhatsApp.  CS ¶ 2608.  But WhatsApp co-founder Brian Acton testified that no one from Meta requested information about WhatsApp's infrastructure during the acquisition negotiations, CS ¶ 2456(d), and contemporaneous documents indicate Meta anticipated no cost savings from moving WhatsApp to Meta infrastructure.  CS ¶ 2507.

Meta's lack of a legitimate business justification for acquiring WhatsApp is confirmed by the enormous premium it paid, and by Meta's massive financial losses over the ensuing years, which make sense only because preventing WhatsApp's entry protected Meta's monopoly profits.  Meta's $19 billion acquisition price vastly exceeded a post-closing valuation ███████ ████████████████████████████████████ and all contemporaneous pre-acquisition valuations.  CS ¶¶ 1838, 1843-44.  Mr. Zuckerberg confirmed that, even a decade later, Meta was "███████████████████████" the purchase price it paid for WhatsApp.  CS ¶ 2438(a). And even leaving aside the enormous acquisition price, Meta has ████████████████████ on WhatsApp since its acquisition, an average of ███████████████████.  CS ¶¶ 2435-37.

Taken together, this evidence establishes unequivocally that the real reason that Meta sacrificed $19 billion (plus ██████████████ for the next decade), was to squelch a threat, not to achieve the first three of Meta's post hoc categories of justifications. *See* CS ¶¶ 1844-45, 1881-84, 2435-37. Accordingly, its first three justifications are entirely pretextual and not cognizable. *Image Tech. Servs.*, 125 F.3d at 1220 n.12 (quoting jury instructions).

> (b)  Meta's First Three Justifications for the WhatsApp Acquisition Were Achievable Without the Acquisition

Meta's first three supposed justifications for the WhatsApp acquisition are additionally deficient because, like the Instagram justifications, Meta could have achieved them by using its resources to improve its own products—specifically Facebook Messenger. *See Anthem*, 855 F.3d at 358, 365; *Viamedia*, 951 F.3d at 478; *Heinz*, 246 F.3d at 722; CS ¶¶ 2610, 2614, 2618.

The shift to mobile fueled the growth of over-the-top ("OTT") mobile messaging applications, including WhatsApp. CS § III.C.1.a. In an effort to compete in that space, CS ¶¶ 1718-21, Meta launched "Facebook Messenger," a standalone messaging app in August 2012. CS ¶ 1722. Meta had the option to respond to the competitive threat posed by WhatsApp through Facebook Messenger (*see* CS ¶ 17547), but instead, as already detailed, it acted to squelch the threat through acquisition. *Supra* § I.A.2

Meta now claims purported "benefits" of bringing its resources to WhatsApp related to infrastructure, features, monetization, and various general and administrative functions. CS ¶ 2607. Indeed, Meta's first three WhatsApp justifications relate entirely to the use of Meta resources to support WhatsApp. *See* CS ¶ 2607. But there can be no dispute that Meta's resources were available to Facebook Messenger, and that Facebook Messenger and WhatsApp were competing messaging products, as Meta's contemporaneous documents establish. CS ¶¶ 2609-10, 2614, 2617; *id*. § III.C.2.b. Here again, then, as in *Anthem* and *Heinz*, Meta's

purported benefit claims were achievable without the acquisition: Meta could have supported or improved Facebook Messenger with the same resources it argues were used to support WhatsApp, "without the concomitant loss of a competitor." *Heinz*, 246 F.3d at 722; *see Anthem*, 855 F.3d at 358, 365.  Moreover, the evidence that Facebook Messenger lagged WhatsApp as a messaging product (CS §§ III.C.2.a, III.C.2.b.1-2) cuts against, not in favor, of Meta's benefit claims.  *Anthem*, 855 F.3d at 358 ("To the extent Anthem has failed to devote the resources needed to improve its product, it is in no position to claim that consumers will benefit from it swallowing up Cigna's superior product.").

### 3.   Meta's Final WhatsApp Justification is Unrelated to Improving Competition

Meta's tenth and final justification has numerous deficiencies, but it can most simply be dismissed as not even attempting to articulate a procompetitive benefit at all, much less with respect to the U.S. market for PSN services.  Meta's final WhatsApp claim asserts a justification of improving Meta's "strategic positioning against Apple and Google."  CS ¶ 2619.  This proposed justification is not legally cognizable because it is not procompetitive: a monopolist's effort to improve its "strategic positioning" to maintain its monopoly cannot "enhance rather than hinder competition."  *See Anthem*, 855 F.3d at 354.  While Meta may desire to improve its strategic positioning against other firms, "[m]aintaining a monopoly is not the type of valid business reason that will excuse exclusionary conduct."  *LePage's*, 324 F.3d at 164; *see also Microsoft*, 253 F.3d at, 67 (conduct not justified where "Microsoft failed to meet its burden of showing that its conduct serves a purpose other than protecting its operating system monopoly").

## CONCLUSION

For the reasons set forth above, the Court should deny Meta's motion for summary judgment and grant the FTC's motion for partial summary judgment.

Dated:    May 24, 2024                    Respectfully submitted,

                                          */s/ Daniel Matheson*
                                          Daniel J. Matheson (D.C. Bar 502490)
                                          Krisha Cerilli (D.C. Bar 983281)
                                          Patricia Galvan
                                          Maria Dimoscato (D.C. Bar 489743)
                                          Robert Zuver (D.C. Bar 987216)
                                          Peter Taylor
                                          David Brunfeld (D.C. Bar 1672059)
                                          Ario Fazli (D.C. Bar 1035087)
                                          Erin Frake (D.C. Bar 1023064)
                                          Melissa Ihnat (D.C. Bar 498266)
                                          Alicia Loh (D.C. Bar 1738388)
                                          Mitchell London (D.C. Bar 1029408)
                                          Justin Lorber (D.C. Bar 90005184)
                                          Owen Masters (D.C. Bar 242139)
                                          Thomas Mattes
                                          Noel Miller (D.C. Bar 1026068)
                                          Njeri Mugure
                                          Danica Noble (D.C. Bar 439474)
                                          Stephen Pearson (D.C. Bar 1765192)
                                          Benjamin Rashkovich
                                          Michael Smith (D.C. Bar 996738)
                                          Jennifer Tarr
                                          Oren Vitenson (D.C. Bar 90005750)
                                          Nicholas Widnell (D.C. Bar 439474)

                                          Federal Trade Commission
                                          Bureau of Competition
                                          400 7th Street, SW
                                          Washington, DC 20024
                                          Tel.: (202) 326-2075
                                          Email: dmatheson@ftc.gov

                                          *Counsel for Plaintiff Federal Trade*
                                          *Commission*