# PX2373

**Public Record Version**

MINUTES OF A SPECIAL MEETING
OF THE BOARD OF DIRECTORS OF
FACEBOOK, INC.

| | |
|---|---|
| **DATE:** | April 8, 2012 |
| **TIME:** | 3:00 p.m., Pacific Time |
| **PLACE:** | Via Teleconference |
| **DIRECTORS PRESENT:** | Erskine Bowles |
| | James Breyer |
| | Donald E. Graham |
| | Reed Hastings |
| | Peter Thiel |
| | Mark Zuckerberg |
| **DIRECTORS ABSENT:** | Marc Andreessen |
| **OTHERS PRESENT:** | David Ebersman |
| | ██████████ █████ (█████████ |
| | Sheryl Sandberg |
| | ████████████ |
| | Amin Zoufonoun |

1.  **Call to Order.**

The meeting was called to order with all participants in attendance.  It was noted that a quorum of the Board of Directors (the "***Board***") was present, and that the meeting, having been duly noticed and convened, was ready to proceed with its business.  All participants indicated that they could hear and be heard clearly.  ████████ acted as Secretary of the meeting.

2.  **Acquisition of Instagram, Inc.**

Mr. Zuckerberg reviewed the proposed acquisition of Instagram, Inc. Mr. Zuckerberg highlighted the importance of photos to sharing and engagement in social media, and noted the success that Instagram had achieved in generating growth and engagement in its user base

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

through its mobile photo-sharing applications. Mr. Zuckerberg described the Company's plans to maintain Instagram as a standalone service and to continue the service's links to third-party platforms such as Flicker, Foursquare, Tumblr and Twitter. He also described the Company's plans to separately incorporate Instagram's know-how into Facebook mobile and other products in order to improve the user experience with photos and to help drive user engagement. Mr. Zuckerberg also discussed the proposed acquisition purchase price of approximately 23 million shares of Class A common stock and $300 million in cash.  Questions were asked by members of the Board, including queries about the purchase price, the Instagram team and alternatives to this transaction that had been explored.  Mr. Zuckerberg addressed these questions and, with respect to purchase price, noted that he believed, following consultation with Company management, that in light of valuations of other private companies in the Internet space, the valuation of Facebook and the anticipated value the combination of the two companies would bring to users and to Facebook, that the purchase price was prudent and would be a wise investment by the Company.  Discussion ensued.

███████████ then described the terms of the proposed merger agreement, including transaction structure, consideration, equity awards to be granted to continuing employees, indemnification and conditions to closing.  ███████ also noted the fact that a venture capital fund affiliated with Mr. Andreessen was an investor in Instagram, and that Mr. Andreessen had accordingly recused himself from consideration of the proposed acquisition.  ███████ then described the due diligence process and noted that no significant issues relating to Instagram had been discovered therein. Following such presentation, upon motion upon a motion duly made, seconded and unanimously carried, the following resolutions were adopted:

> WHEREAS, the Company desires to acquire Instagram, Inc., a Delaware corporation ("*Instagram*"), by entering into an Agreement and Plan of Merger substantially in the form attached hereto as Exhibit A (the "*Merger Agreement*"; capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Merger Agreement) by and among the Company, Iris Acquisition Sub, Inc., a Delaware corporation and wholly owned subsidiary of the Company ("*Sub I*"), Iris Acquisition Sub I, LLC, a Delaware limited liability company and wholly owned subsidiary of the Company ("*Sub II*"), Instagram and the Stockholders' Agent, pursuant to which (i) Sub I will merge with and into Instagram in a statutory reverse-triangular merger (the "*First Merger*"), with Instagram to survive the First Merger, and (ii) immediately following the

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

effectiveness of the First Merger, Instagram will merge with and into Sub II in a statutory forward triangular merger (the "*Second Merger*" and collectively or in seriatim with the First Merger, as appropriate, the "*Merger*"), with Sub II to survive the Second Merger.

WHEREAS, the Company and Instagram intend, by executing the Merger Agreement, to adopt a plan of reorganization for Instagram within the meaning of Section 354(a)(1) of the Internal Revenue Code of 1986, as amended (the "*Code*"), and to cause the Merger to qualify as a "reorganization" under the provisions of Section 368(a) of the Code.

WHEREAS, in accordance with the terms of the Merger Agreement, at the closing of the Merger (the "*Closing*"), the Company will pay, in exchange for all of the issued and outstanding shares of Instagram capital stock, consideration consisting of (i) 22,999,412 shares of the Company's Class A Common Stock (the "*Closing Stock Consideration*") and (ii) an amount of cash equal to Three Hundred Million Dollars ($300,000,000) (the "*Closing Cash Consideration*" and together with the Closing Cash Consideration, the "*Total Merger Consideration*").

WHEREAS, a number of shares equal to 10% of the Closing Stock Consideration and an amount of cash equal to 10% of the Closing Cash Consideration will be deposited with U.S. Bank N.A., as escrow agent (the "*Bank*") in two separate escrow accounts (such deposited amounts, together with any distributions that may be made thereon, to constitute two separate escrow funds, and together, the "*Escrow Funds*") and the Escrow Funds shall be available to satisfy indemnification obligations of the Converting Holders (as defined in the Merger Agreement) in connection with the Merger as more fully described in the Merger Agreement.

WHEREAS, in accordance with the terms of the Merger Agreement, each outstanding option (whether vested or unvested) of Instagram will be terminated and cancelled without consideration and will not be assumed or substituted by the Company.

WHEREAS, in accordance with the terms of the Merger Agreement, management will recommend that the Company issue up to 4,276,453 restricted stock units under the Company's 2005 Stock Plan or 2012 Equity Incentive Plan (the "*Company RSUs*") in connection with the Merger to certain employees of Instagram who will continue their employment with the Company following the Closing, which Company RSUs will be recommended for grant by the Compensation Committee of the Board at its next regularly scheduled meeting following the Closing.

WHEREAS, it is hereby disclosed and made known to the Board that Andreessen Horowitz Fund I, LP, an affiliate of Mr. Andreessen, owns approximately eight percent (8%) of Instagram's outstanding equity, will be entitled to receive a corresponding portion of the Total Merger Consideration and, as a result of such interests, Mr. Andreessen is (or may be deemed to be) an interested party in the

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

Merger and the Merger is (or may be deemed to be) a related party transaction (as such, an "*Related Party Transaction*").

WHEREAS, the Board has discussed with the Company's management the advisability, merits and risks of the Company acquiring Instagram.

WHEREAS, the Company's management and legal and financial advisors have substantially summarized for the Board the principal terms of the Merger and the Merger Agreement and have further described the course of negotiations regarding the key terms of the Merger Agreement.

WHEREAS, the Company's management and legal and financial advisors have presented to the Board the principal results of the Company's due diligence investigation conducted with respect to the Merger.

NOW, THEREFORE, BE IT RESOLVED, that the Merger is advisable and fair to, and in the best interests of, the Company and its stockholders and the Merger Agreement (including all exhibits and schedules thereto), as such documents were described to the Board, are hereby adopted and approved, together with such changes thereto as the officer or officers of the Company executing the same may approve, such approval to be evidenced conclusively by his/her or their execution thereof.

RESOLVED FURTHER, that the officers of the Company hereby are, and each of them hereby is, authorized and directed to execute and deliver the Merger Agreement (including all exhibits and schedules thereto to be executed by the Company) on behalf of and in the name of the Company, and to attest the same, together with such changes thereto as the officer or officers of the Company executing the same may approve, such approval to be evidenced conclusively by his/her or their execution thereof.

RESOLVED FURTHER, that the Merger, as a Related Party Transaction, is fair to the Company and hereby approved in all respects;

RESOLVED FURTHER, that the shares constituting the Closing Stock Consideration issued pursuant to the Merger shall be issued pursuant to the exemption from registration under Section 4(2) of, and/or Regulation D promulgated under, the Securities Act of 1933, as amended, and available exemptions from the registration or qualification requirements of any other applicable state "blue sky" securities laws.

RESOLVED FURTHER, that the officers of the Company, and each of them with full authority to act without the others, are hereby authorized to execute and cause the proper notices and other forms (including consents to service of process) as may be required or advisable to be filed with any applicable securities law regulatory authorities.

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

RESOLVED FURTHER, that the officers of the Company, and each of them with full authority to act without the others, are hereby authorized to execute and deliver on behalf of the Company the filings and notifications as may be required to be made by the Company in connection with the Merger under the Hart–Scott–Rodino Antitrust Improvements Act of 1976.

RESOLVED FURTHER, that the officers of the Company hereby are, and each of them hereby is, authorized for and on behalf of and in the name of the Company, to take any and all actions and execute such documents as they may deem necessary or advisable in order to consummate the proposed Merger as contemplated by the Merger Agreement, including without limitation obtaining consents from any third parties and filing of appropriate documents with any governmental offices or agencies.

Acquisition Subsidiaries

RESOLVED, that all prior actions by the officers of the Company in connection with the formation of Sub I and Sub II are hereby approved, adopted and ratified.

RESOLVED FURTHER, that the officers of the Company, and each of them with full authority to act without the others, are authorized to purchase, on behalf of the Company, 1,000 shares of the authorized Common Stock, par value $0.001 per share of Sub I, constituting all of the authorized capital stock of Sub I, in exchange for the aggregate purchase price of $1.00.

RESOLVED FURTHER, that the officers of the Company, and each of them with full authority to act without the others, are authorized to make a contribution, on behalf of the Company, of up to $100.00 to the capital of the Sub II in exchange for all of its membership interests or units.

RESOLVED FURTHER, that the officers of the Company, and each of them with authority to act without the others, are authorized to execute and deliver all documents and take such additional actions as may be necessary or advisable to organize Sub I and Sub II.

Omnibus Resolutions

RESOLVED FURTHER, that any actions taken by the Company's officers prior to the date of these resolutions in connection with the matters approved by these resolutions are hereby ratified and approved.

RESOLVED FURTHER, that the Board hereby authorizes the officers of the Company, each of them with authority to act without the others in the name of the Company and on its behalf, to take or cause to be taken any and all such additional action or actions as, in the judgment of the officer taking or causing such action or actions, may appear desirable or appropriate to carry out the purposes of the foregoing resolutions.

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

3.     **Adjournment.**

There being no further business to come before the Board, upon motion duly made, seconded and unanimously carried, the meeting was adjourned.



Secretary of the Meeting

APPROVED:

Mark Zuckerberg
Chairman of the Meeting

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

## Exhibit A

**Merger Agreement**

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497153

EXECUTION COPY

# AGREEMENT AND PLAN OF MERGER

by and among

**FACEBOOK, INC.**
a Delaware corporation,

**IRIS ACQUISITION SUB, INC.**
a Delaware corporation,

**IRIS ACQUISITION SUB I, LLC**
a Delaware limited liability company,

**INSTAGRAM, INC.**
a Delaware corporation,

and

█████████ as Stockholders' Agent

Dated as of April 8, 2012

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

### AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "*Agreement*") is made and entered into as of April 8, 2012 (the "*Agreement Date*"), by and among Facebook, Inc., a Delaware corporation ("*Acquirer*"), Iris Acquisition Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Acquirer ("*Merger Sub I*"), Iris Acquisition Sub I, LLC, a Delaware limited liability company and a wholly owned subsidiary of Acquirer ("*Merger Sub II*" and together with Merger Sub I, the "*Merger Subs*") Instagram, Inc., a Delaware corporation (the "*Company*"), and ▮▮▮▮▮▮▮▮, as stockholders' agent (the "*Stockholders' Agent*"). Certain other capitalized terms used in this Agreement are defined in Exhibit A.

### RECITALS

A.   The respective Boards of Directors and Board of Managers of each of Acquirer, Merger Subs and the Company have approved this Agreement, and deem it advisable, fair and in the best interests of their respective stockholders that Acquirer acquire the Company through the statutory merger of Sub I with and into the Company, pursuant to which the Company would become a wholly owned subsidiary of Acquirer (the "*First Merger*"), and, as part of the same overall transaction, the surviving entity of the First Merger would merge with and into Sub II (the "*Second Merger*" and collectively or in seriatim with the First Merger, as appropriate, the "*Merger*") upon the terms and conditions set forth herein and, in furtherance thereof, have approved the First Merger, this Agreement and the transactions contemplated hereby.

B.   It is intended that the First Merger and the Second Merger are integrated steps in the transaction contemplated by this Agreement and will together qualify as a tax-free reorganization within the meaning of Section 368(a) of the Code.

C.   Concurrently with the execution of this Agreement, and as a condition and inducement to Acquirer's and Merger Subs' willingness to enter into this Agreement, Kevin Systrom and Mike Krieger (each, a "*Key Employee*") have each entered into (1) employment offer letters, together with a confidential information and assignment agreement (the "*Key Employee Offer Letters*"), (2) non-competition agreements in substantially the form of attached Exhibit B (the "*Non-Competition Agreements*"), and (3) vesting agreements in substantially the form of attached Exhibit C (the "*Vesting Agreements*").

D.   As soon as reasonably practical following the execution and delivery of this Agreement, and as a condition and inducement to Acquirer's and Merger Subs' willingness to enter into this Agreement, the Converting Holders identified on Exhibit D hereto are entering into investment representation letters with Acquirer (the "*Investor Rep Letter*").

E.   As soon as reasonably practical following the execution and delivery of this Agreement, it is intended that the Company obtain and deliver to Acquirer a true, correct and complete copy of a written consent of stockholders evidencing the approval of this Agreement in the form attached hereto as Exhibit E (the "*Company Stockholder Approval*"), signed by holders of outstanding Company Capital Stock representing at least 75% of all outstanding shares of Company Capital Stock and at least 75% of the voting power of all outstanding shares of Company Capital Stock (the "*Requisite Stockholder Approval*").

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497155

PX2373-009

NOW, THEREFORE, in consideration of the representations, warranties, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
### THE MERGER

1.1     The Merger.

(a)     The Merger. At the Effective Time (as such term is defined in Section 1.1(d)), on the terms and subject to the conditions set forth in this Agreement, the Certificate of Merger in substantially the form attached hereto as Exhibit F (the "*Certificate of Merger*") and the applicable provisions of Delaware Law, Merger Sub I shall merge with and into the Company, the separate corporate existence of Merger Sub I shall cease and the Company shall continue as the surviving corporation and shall become a wholly owned subsidiary of Acquirer. The Company, as the surviving corporation after the First Merger, is hereinafter sometimes referred to as the "*First Step Surviving Corporation*." At the Second Effective Time, on the terms and subject to the conditions set forth in this Agreement, the Certificate of Merger in substantially the form attached hereto as Exhibit G (the "*Second Certificate of Merger*") and the applicable provisions of Delaware Law, the First Step Surviving Corporation shall merge with and into Merger Sub II, the separate corporate existence of the First Step Surviving Corporation shall cease and Merger Sub II shall continue as the surviving entity (the surviving entity after the Second Merger, or its successor, is sometimes referred to herein as the "*Final Surviving Entity*"). The parties to this Agreement agree to treat the First Merger and the Second Merger as integrated steps in the transaction contemplated by this Agreement and for any and all federal and state income tax reporting purposes shall report the transaction as a single "reorganization" within the meaning of Section 368(a)(1)(A) of the Code. The parties to this Agreement hereby adopt this Agreement as a "plan of reorganization" within the meaning of Treasury Regulations Section 1.368-2(g).

(b)     Effects of the Merger. The Merger shall have the effects set forth in this Agreement and in the applicable provisions of Delaware Law.

(c)     Closing. The consummation of the First Merger (the "*Closing*") shall take place at the offices of Fenwick & West LLP, Silicon Valley Center, 801 California Street, Mountain View, California, or at such other location as the parties hereto agree at 10:00 a.m. local time on a date to be mutually agreed upon by the Acquirer and the Company, which date shall be no later than the third Business Day after all of the conditions set forth in ARTICLE 6 of this Agreement have been satisfied or waived (other than those conditions which, by their terms, are intended to be satisfied at the Closing), or at such other time and place as the Acquirer and the Company shall mutually agree. The date on which the Closing occurs is sometimes referred to in this Agreement as the "*Closing Date*."

(d)     Effective Time and Second Effective Time. At the Closing, after the satisfaction or waiver of each of the conditions set forth in ARTICLE 6, Merger Sub I and the Company shall cause the Certificate of Merger to be filed with the Secretary of State of the State of Delaware, in accordance with the relevant provisions of Delaware Law (the time of acceptance by the Secretary of State of the State of Delaware of such filing or such later time as may be agreed to by Acquirer and the Company and set forth in the Certificate of Merger being referred to herein as the "*Effective Time*"). Promptly following the Effective Time, but in no event later than three (3) Business Days thereafter, the Company and Merger Sub II shall cause the Second Certificate of Merger to be filed with the Secretary of State of the State of Delaware, in accordance with the relevant provisions of Delaware Law (the time of acceptance by the Secretary of State of the State of Delaware of such filing being referred to herein as the "*Second Effective Time*").

2

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(e)   Certificate of Incorporation and Bylaws; Directors and Officers.   Unless otherwise determined by Acquirer and the Company prior to the Effective Time:

(i)   At the Effective Time, (i) the Certificate of Incorporation of the First Step Surviving Corporation shall be amended in its entirety to read as set forth in the Certificate of Merger, until thereafter amended as provided by Delaware Law, and (ii) the Bylaws of Merger Sub I shall become the Bylaws of the First Step Surviving Corporation, until thereafter amended as provided by Delaware Law, the Certificate of Incorporation of the First Step Surviving Corporation and such Bylaws.

(ii)   At the Second Effective Time, (ii) the Certificate of Formation of Sub II, as in effect immediately prior to the Second Effective Time, shall be amended in its entirety to read as set forth in the Second Certificate of Merger, until thereafter amended as provided by Delaware Law, and (ii) the Limited Liability Company Agreement of Merger Sub II, as in effect immediately prior to the Second Effective Time, shall become the Limited Liability Company Agreement of the Final Surviving Entity, until thereafter amended as provided by Delaware Law, the Certificate of Formation of Merger Sub II and such Limited Liability Company Agreement.

(iii)   At the Effective Time, (i) the members of the Board of Directors of Merger Sub I immediately prior to the Effective Time shall be appointed as the members of the Board of Directors of the First Step Surviving Corporation immediately after the Effective Time until their respective successors are duly elected or appointed and qualified, and (ii) the officers of Merger Sub I immediately prior to the Effective Time shall be appointed as the officers of the First Step Surviving Corporation immediately after the Effective Time until their respective successors are duly appointed.

(iv)   At the Second Effective Time, (i) the Managers of Merger Sub II immediately prior to the Second Effective Time shall be the Managers of the Final Surviving Entity immediately after the Second Effective Time until their respective successors are duly appointed, and (ii) the officers of Merger Sub II immediately prior to the Second Effective Time shall be the officers of the Final Surviving Entity immediately after the Second Effective Time until their respective successors are duly admitted.

1.2   Closing Deliveries.

(a)   Acquirer Deliveries.   Acquirer shall deliver to the Company, at or prior to the Closing, a certificate, dated as of the Closing Date, executed on behalf of Acquirer by a duly authorized officer of Acquirer to the effect that each of the conditions set forth in clause (a) of Section 6.2 have been satisfied.

(b)   Company Deliveries.   The Company shall deliver to Acquirer, at or prior to the Closing,

(i)   a certificate, dated as of the Closing Date and executed on behalf of the Company by its Chief Executive Officer, to the effect that each of the conditions set forth in clause (a) of Section 6.3 has been satisfied;

(ii)   a certificate, dated as of the Closing Date and executed on behalf of the Company by its Secretary, certifying the Company's (A) certificate of incorporation (the "*Certificate of Incorporation*"), (B) bylaws (the "*Bylaws*"), (C) board resolutions approving the Merger and adopting this Agreement, (D) stockholder resolutions approving the Merger and adopting this Agreement, and (E) other matters in Acquirer's reasonable discretion;

3

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497157

PX2373-011

(iii)    a written opinion from the Company's legal counsel, covering the matters set forth on Exhibit H, dated as of the Closing Date and addressed to Acquirer;

(iv)    the Company Stockholder Approval executed by each Company Stockholder;

(v)    the Stockholder Agreement executed by each Company Stockholder;

(vi)    a Non-Competition Agreement executed by each of the Key Employees;

(vii)    the Escrow Agreement in substantially the form of attached Exhibit I (the "**Escrow Agreement**") executed by the Stockholders' Agent;

(viii)    the Key Employee Offer Letters;

(ix)    a Vesting Agreement executed by each Key Employee and each other employee who holds stock of the Company that provides for the vesting of such employee's Total Stock Merger Consideration;

(x)    evidence satisfactory to Acquirer of the resignation of each of the directors and each of the officers of the Company in office immediately prior to the Closing as directors and/or officers of the Company effective no later than immediately prior to the Effective Time;

(xi)    correct and complete copies of all election statements under Section 83(b) of the Code that are in the Company's possession or subject to its control with respect to any unvested securities or other property issued by the Company, any Subsidiary or any ERISA Affiliate to any of their respective employees, non-employee directors, consultants and other service providers;

(xii)    a certificate from the Secretary of State of the States of Delaware and California and each other State or other jurisdiction in which the Company is qualified to do business as a foreign corporation dated within three days prior to the Closing Date certifying that the Company is in good standing and that all applicable Taxes and fees of the Company or such Subsidiary through and including the Closing Date have been paid;

(xiii)    evidence satisfactory to Acquirer of the termination or waiver of any rights of first refusal, rights to any liquidation preference, redemption rights, and rights of notice of the Merger of any Company Stockholder, effective as of and contingent upon the Closing;

(xiv)    the Spreadsheet (as such term is defined in Section 5.8) completed to include all of the information specified in Section 5.8 in a form acceptable to Acquirer and a certificate executed by the Chief Executive Officer of the Company, dated as of the Closing Date, certifying that such Spreadsheet is true, correct and complete;

(xv)    FIRPTA documentation consisting of (A) a notice to the Internal Revenue Service, in accordance with the requirements of Treasury Regulation Section 1.897-2(h)(2), in substantially the form attached hereto as Exhibit J, dated as of the Closing Date and executed by the Company, together with written authorization for Acquirer to deliver such notice form to the Internal Revenue Service on behalf of the Company after the Closing, and (B) a FIRPTA Notification Letter, in substantially the form attached hereto as Exhibit K, dated as of the Closing Date and executed by the Company;

4

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497158

(xvi)    the Certificate of Merger and the Second Certificate of Merger, executed by the Company;

(xvii)   an Amendment, Waiver and Consent, in substantially the form of the attached Exhibit L (the "*Option Waiver*"), executed by each Company Optionholder and individuals set forth on Schedule 2.2(a) of the Company Disclosure Letter;

(xviii)  executed confirmatory assignments of Intellectual Property from any of the Company's current and former employees and independent contractors and consultants that have not executed such agreements in each case in a form that is reasonably acceptable to Acquirer;

(xix)    a parachute payment waiver, in substantially the form attached hereto as Exhibit M (the "*Parachute Payment Waiver*"), executed by each Person required to execute such a waiver pursuant to Section 5.14 hereof; and

(xx)     either (1) written consents executed by such number of eligible Company Stockholders as is required by the terms of Section 280G(b)(5)(B) of the Code so as to render the parachute payment provisions of Section 280G of the Code inapplicable to any and all accelerated vesting payments, benefits, options and/or stock provided pursuant to agreements, Contracts or arrangements that might otherwise result, separately or in the aggregate, in the payment of any amount and/or the provision of any benefit that would not be deductible by reason of Section 280G of the Code, with such stockholder approval or non-approval to be obtained in a manner which satisfies all applicable requirements of Section 280G(b)(5)(B) of the Code and the Treasury Regulations thereunder, including Q&A-7 of Section 1.280G-1 of such Treasury Regulations or (2) in the absence of such stockholder approval, none of those payments or benefits shall be paid or payable or provided, pursuant to the Parachute Payment Waivers delivered to Acquirer pursuant to Section 1.2(b)(xix) above.

1.3    Effect on Capital Stock and Options.

(a)    Treatment of Company Capital Stock and Options.  On the terms and subject to the conditions set forth in this Agreement, and without any action on the part of any Company Stockholder and/or Company Optionholder:

(i)    Company Common Stock.  At the Effective Time, each share of Company Common Stock (which shall include shares of Company Common Stock issued upon conversion of (A) the shares of Senior Preferred Stock pursuant to Section 4(b)(i) of the Certificate of Incorporation and (B) the shares of Company BN Preferred Stock pursuant to Section C(4)(a)(i) of the Certificate of Incorporation) issued and outstanding immediately prior to the Effective Time (other than Dissenting Shares and shares owned by the Company) shall be automatically converted into, subject to and in accordance with Section 1.4, (A) a number of shares of Acquirer Common Stock equal to the Stock Closing Amount Per Share, (B) an amount of cash (without interest) equal to the Cash Closing Amount Per Share, and (C) the right to receive upon release from the Escrow Funds (as defined in Section 8.1) and subject to Article 8, (1) a number of shares of Acquirer Common Stock equal to the Stock Escrow Amount Per Share, and (2) an amount of cash equal to the Cash Escrow Amount Per Share.  The number of shares of Acquirer Common Stock each Company Stockholder is entitled to receive pursuant to this Section 1.3(a)(i) for the shares of Company Common Stock held by such Company Stockholder shall be rounded down to the nearest whole share and computed after aggregating all shares of Company Common Stock represented by a particular stock certificate held by such Company Stockholder.  The amount of cash each Company Stockholder is entitled to receive pursuant to this Section 1.3(a)(i) for the shares of Company Common Stock held by such Company Stockholder shall be rounded to the nearest cent after aggregating cash amounts for all shares of Company Common Stock held by such Company Stockholder.

5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

Acquirer, the Company and the Final Surviving Entity intend that the cash and shares of Acquirer Common Stock payable pursuant to this Section 1.3(a)(i) to the holders of Company Common Stock (but only with respect to their Company Common Shares which was fully vested upon receipt or for which they have filed timely and valid elections under Section 83(b) of the Code) will be treated as received in exchange for the applicable holder's Company Common Stock, and agree to report for income Tax purposes such payments as consideration for such holder's Company Common Shares and not as compensation for services. Pursuant to Revenue Ruling 2007-49, the holders of Company Common Stock that receive Acquirer Common Stock in the Merger that are subject to vesting arrangements will make a timely and valid election under Section 83(b) of the Code with respect to such Acquirer Common Stock, in which case, Acquirer, the Company and the Final Surviving Entity agree that no compensation will occur when such Acquirer Common Stock vests.

(ii)     Company Options.    At the Effective Time, each Company Option (whether vested or unvested) that is issued and outstanding immediately prior to the Effective Time shall be terminated and cancelled without consideration and shall not be assumed or substituted by Acquirer.

(iii)     Capital Stock of Merger Sub I.    Each share of capital stock of Merger Sub I that is issued and outstanding immediately prior to the Effective Time will, by virtue of the First Merger and without further action on the part of the sole stockholder of Merger Sub I, be converted into and become one share of common stock of the First Step Surviving Corporation (and the shares of the First Step Surviving Corporation into which the shares of Merger Sub I capital stock are so converted shall be the only shares of the First Step Surviving Corporation's capital stock that are issued and outstanding immediately after the Effective Time). Each certificate evidencing ownership of shares of Merger Sub I capital stock will evidence ownership of such shares of common stock of the First Step Surviving Corporation.

(b)     Treatment of Shares and Membership Interests in Second Merger.    At the Second Effective Time, each share of common stock of the First Step Surviving Corporation that is issued and outstanding immediately prior to the Second Effective Time shall be cancelled and extinguished without any conversion thereof. At the Second Effective Time, each membership interest of Merger Sub II that is issued and outstanding immediately prior to the Second Effective Time will constitute one membership interest of the Final Surviving Entity. Such membership interests shall be the only membership interests of the Final Surviving Entity that are issued and outstanding immediately after the Second Effective Time.

(c)     Treatment of Company Capital Stock Owned by the Company.    At the Effective Time, all shares of Company Capital Stock that are owned by the Company immediately prior to the Effective Time shall be canceled and extinguished without any conversion thereof.

(d)     Adjustments.    In the event of any stock split, reverse stock split, stock dividend (including any dividend or distribution of securities convertible into capital stock), reorganization, reclassification, combination, recapitalization or other like change with respect to the Company Capital Stock or Acquirer Common Stock occurring after the date hereof and prior to the Effective Time, all references in this Agreement to specified numbers of shares of any class or series affected thereby, and all calculations provided for that are based upon numbers of shares of any class or series (or trading prices therefor) affected thereby, shall be equitably adjusted to the extent necessary to provide the parties the same economic effect as contemplated by this Agreement prior to such stock split, reverse stock split, stock dividend, reorganization, reclassification, combination, recapitalization or other like change.

(e)     Appraisal Rights.    Notwithstanding anything contained herein to the contrary, any Dissenting Shares shall not be converted into the right to receive the applicable Total Merger

6

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497160

Consideration, but shall instead be converted into the right to receive such consideration as may be determined to be due with respect to any such Dissenting Shares pursuant to Delaware Law or California Law. Each holder of Dissenting Shares who, pursuant to the provisions of Delaware Law or California Law, becomes entitled to payment thereunder for such shares shall receive payment therefor in accordance with Delaware Law or California Law (but only after the value therefor shall have been agreed upon or finally determined pursuant to such provisions). If, after the Effective Time, any Dissenting Shares shall lose their status as Dissenting Shares, then any such shares shall immediately be converted into the right to receive the applicable Total Merger Consideration in respect of such shares as if such shares never had been Dissenting Shares, and Acquirer shall issue and deliver to the holder thereof, at (or as promptly as reasonably practicable after) the applicable time or times specified in Section 1.4(a), following the satisfaction of the applicable conditions set forth in Section 1.4(a), the applicable Total Merger Consideration as if such shares never had been Dissenting Shares. The Company shall give Acquirer (i) prompt notice of any demands for appraisal or purchase received by the Company, withdrawals of such demands, and any other instruments served pursuant to Delaware Law or California Law and received by the Company and (ii) the right to direct all negotiations and proceedings with respect to demands for appraisal or purchase under Delaware Law or California Law. The Company shall not, except with the prior written consent of Acquirer, or as otherwise required under Delaware Law or California Law, voluntarily make any payment or offer to make any payment with respect to, or settle or offer to settle, any claim or demand in respect of any Dissenting Shares. The payout of consideration under this Agreement to the Converting Holders (other than to holders of Dissenting Shares who shall be treated as provided in this Section 1.3(d) and under Delaware Law or California Law) shall not be affected by the exercise or potential exercise of appraisal rights or dissenters' rights under Delaware Law or California Law by any other stockholder of the Company.

(f)     Rights Not Transferable. The rights of the Company Securityholders under this Agreement as of immediately prior to the Effective Time are personal to each such Company Securityholder and shall not be transferable for any reason otherwise than by operation of law, will or the laws of descent and distribution. Any attempted transfer of such right by any holder thereof (otherwise than as permitted by the immediately preceding sentence) shall be null and void.

(g)     Fractional Shares. No fractional shares of Acquirer Common Stock will be issued in connection with the Merger, but in lieu thereof each holder of shares of Company Common Stock who would otherwise be entitled to a fraction of a share of Acquirer Common Stock (after aggregating for each particular stock certificate representing Company Common Stock all fractional shares of Acquirer Common Stock to be received by such holder) shall receive from Acquirer an amount of cash (rounded to the nearest whole cent) equal to the product of (i) such fraction and (ii) the Fair Market Value of Acquirer Common Stock.

1.4     Surrender of Certificates.

(a)     Exchange Procedures.

(i)     As soon as reasonably practicable (but not more than three (3) Business Days) after the Closing Date, Acquirer shall mail to every holder of record of Company Capital Stock that was issued and outstanding immediately prior to the Effective Time and that has not previously delivered its certificates or instruments, which immediately prior to the Effective Time represented issued and outstanding Company Capital Stock (together, the "***Converting Instruments***"), with a properly completed and duly executed letter of transmittal in customary form (the "***Letter of Transmittal***") together with instructions for use of the Letter of Transmittal in effecting the surrender of the Converting Instruments into the right to receive the applicable Total Merger Consideration. The Letter of Transmittal shall

7

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

specify that delivery of the Converting Instruments shall be effected, and risk of loss and title to the Converting Instruments shall pass, only upon receipt thereof by the Acquirer, together with a properly completed and duly executed Letter of Transmittal, duly executed on behalf of each Person effecting the surrender of such the Converting Instruments, and shall be in such form and have such other provisions as Acquirer may reasonably specify, including that the Converting Holders agree to be bound by the provisions of Section 1.5 and ARTICLE 8 and agree to release the Company, the First Step Surviving Corporation and the Final Surviving Entity from any claims, rights, liabilities and causes of action whatsoever based upon, relating to or arising out of the Converting Instruments.

(ii)     As soon as reasonably practicable after the Closing, Acquirer shall cause to be deposited with U.S. Bank N.A. or other bank or trust company as Acquirer may choose in its discretion (the "*Paying Agent*") (i) the shares of Acquirer Common Stock and cash issuable pursuant to Section 1.3(a), less the Total Escrow Shares and Total Escrow Cash to be deposited into the Escrow Funds in connection herewith pursuant to the provisions of Section 8.1 and (ii) cash in an amount sufficient to permit payment of cash in lieu of any related fractional shares pursuant to Section 1.3(g).

(iii)     As soon as reasonably practicable after the date of delivery to the Acquirer of a Converting Instrument, together with a properly completed and duly executed Letter of Transmittal and any other documentation required thereby, (A) the holder of record of such Converting Instrument shall be entitled to receive that number of shares of Acquirer Common Stock and cash that such holder has the right to receive pursuant to Section 1.3(a) in respect of such Converting Instrument, less such Converting Holder's Pro Rata Share of the Total Escrow Shares (the "*Shares*") and Pro Rata Share of the Total Escrow Cash, and (B) such Converting Instrument shall be canceled.

(iv)     Any certificates evidencing the Shares (if the Shares are certificated) shall bear the following legends (along with any other legends that may be required under applicable state and federal corporate and securities laws):

(1)     THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER STATE SECURITIES LAWS AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS.

(2)     THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

(3)     THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER CONTAINED IN THE BYLAWS OF THE COMPANY, INCLUDING SECTION 8.17 THEREIN (MARKET STAND-OFF RESTRICTION).

(4)     Any legend required to be placed thereon by the California Commissioner of Corporations.

8

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

It is Acquirer's current policy to not issue stock certificates representing shares of its capital stock, and all new issuances of capital stock are reflected on Acquirer's books and records in book entry only, with appropriate notations reflecting the applicable legends.

(v)     At the Effective Time and upon receipt of written confirmation of the effectiveness of the Merger from the Secretary of State of the State of Delaware, Acquirer will instruct the Paying Agent to pay by check or wire transfer of same-day funds the applicable Total Merger Consideration, pursuant to Section 1.3 and subject to the terms of this Agreement, to each Converting Holder, less such Converting Holder's Pro Rata Share of the Total Escrow Shares and Total Escrow Cash, other than to those holders of Dissenting Shares not entitled to payment, as promptly as practicable following the submission of a the Converting Instrument to the Paying Agent and a duly executed Letter of Transmittal by such holder of record.  If any Converting Instrument shall have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the Person claiming such document to be lost, stolen, or destroyed and, if required by Acquirer or the Paying Agent, the payment of any reasonable fees, and the execution of an indemnity agreement as Acquirer or the Paying Agent may reasonably direct, the Paying Agent will issue in exchange for such lost, stolen, or destroyed document, the applicable Merger Consideration to which the holder is entitled under Section 1.3.

(vi)     Notwithstanding the other provisions of this Article 1, Acquirer shall withhold from each Converting Holder's portion of the applicable Total Merger Consideration issuable pursuant to Section 1.3(a) such Converting Holder's Pro Rata Share of the Total Escrow Shares and Total Escrow Cash and deposit the Total Escrow Shares and Total Escrow Cash with the Escrow Agent pursuant to Section 8.1.  The Total Escrow Shares contributed to the Stock Escrow Fund shall, to the maximum extent possible, consist of vested shares of Acquirer Common Stock and any unvested shares of Acquirer Common Stock placed in escrow shall vest before any non-escrowed unvested shares of Acquirer Common Stock.  The Total Escrow Shares and Total Escrow Cash shall constitute security for the indemnification obligations of such Converting Holders pursuant to ARTICLE 8, and shall be held in and distributed in accordance with the provisions of the Escrow Agreement.  The adoption of this Agreement and the approval of the Merger by the Company Stockholders shall constitute approval of the Total Escrow Shares and Total Escrow Cash and the appointment of the Stockholders' Agent.

(b)     No Liability.  Notwithstanding anything to the contrary in this Section 1.4, none of the First Step Surviving Corporation, the Final Surviving Entity or any party hereto shall be liable to any Person for any amount properly paid to a public official pursuant to any applicable abandoned property, escheat or similar law.

(c)     Unclaimed Consideration.  Each holder of a Converting Instrument who has not theretofore complied with the exchange procedures set forth in and contemplated by Section 1.4(a) shall look only to the First Step Surviving Corporation, following the Effective Time, or the Final Surviving Entity, following the Second Effective Time (subject to abandoned property, escheat and similar laws) for its claim, only as a general unsecured creditor thereof, to a Merger Consideration issuable pursuant to Section 1.3(a).  Notwithstanding anything to the contrary contained herein, if any Converting Instrument has not been surrendered prior to the earlier of the first anniversary of the Effective Time or such date on which the merger consideration contemplated by Section 1.3 in respect of such Converting Instrument would otherwise escheat to or become the property of any Governmental Entity, any amounts payable in respect of such Converting Instrument shall, to the extent permitted by applicable law, become the property of Acquirer, free and clear of all claims or interests of any Person previously entitled thereto.

(d)     Unless the Company Stockholder makes an express designation to the contrary in its Letter of Transmittal provided in accordance with Section 1.4(a), for purposes of this Agreement and

9

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497163

in accordance with Treasury Regulation Section 1.358-2(a)(2)(ii), the Cash Closing Amount Per Share and the Cash Escrow Amount Per Share that the Company Stockholder is entitled to receive pursuant to Section 1.3(a)(i) shall be treated as received for its Company Capital Stock exchanged in the Merger in the following order of priority: (i) first, to the Company Capital Stock held by such Company Stockholder for more than one year before the Merger within the meaning of Section 1223 of the Code, if any, first to such Company Capital Stock with the highest federal income tax basis and then in descending tax basis order until such cash portion for such Company Stockholder has been fully allocated, and (ii) any remaining amount to all other of such Company Stockholder's Company Capital Stock, first to such Company Capital Stock with the highest federal income tax basis and then in descending tax basis order until such cash portion for such Company Stockholder has been fully allocated. For the avoidance of doubt, the designation of the order in which a Company Stockholder receives its allocable cash portion of the Total Merger Consideration shall not change the timing or amount of the Total Merger Consideration that any Company Stockholder is entitled to receive under this Agreement.

1.5     No Further Ownership Rights in the Company Capital Stock.  The Total Merger Consideration paid or payable following the surrender for exchange of shares of the Converting Instruments in accordance with the terms hereof shall be paid or payable in full satisfaction of all rights pertaining to such shares of Company Capital Stock, and there shall be no further registration of transfers on the records of the First Step Surviving Corporation of shares of Company Capital Stock that were issued and outstanding immediately prior to the Effective Time.  If, after the Effective Time, any Converting Instrument is presented to the First Step Surviving Corporation for any reason, such Converting Instrument shall be canceled and exchanged as provided in this ARTICLE 1.

1.6     Tax Consequences.  The Company and Acquirer intend, by executing this Agreement, to adopt a plan of reorganization within the meaning of Section 354(a)(1) of the Code, and to cause the Merger to qualify as a "reorganization" under the provisions of Section 368(a) of the Code.  Acquirer makes no representations or warranties to the Company or to any Company Securityholder regarding the Tax treatment of the Merger, or any of the Tax consequences to the Company or any Company Securityholder of this Agreement, the Merger or any of the other transactions or agreements contemplated hereby.  The Company acknowledges that the Company and the Company Securityholders are relying solely on their own Tax advisors in connection with this Agreement, the Merger and the other transactions and agreements contemplated hereby.

1.7     Certain Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be paid by the party on whom such Taxes are imposed, and each such party shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

1.8     Withholding Rights.  Acquirer and the First Step Surviving Corporation shall be entitled to deduct and withhold from the Total Merger Consideration, and from any other payments otherwise required pursuant to this Agreement, to any Key Employee, any other employee of the Company who becomes an employee or consultant of the First Step Surviving Corporation or Acquirer, any holder of any shares of Company Capital Stock, any Company Options, or any Converting Instruments such amounts in cash or shares as Acquirer or the First Step Surviving Corporation is required to deduct and withhold with respect to any such deliveries and payments under the Code or any provision of state, local, provincial or foreign Tax law.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to such holders in respect of which such deduction and withholding was made.

10

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

1.9     Taking of Necessary Action; Further Action.  If, at any time after the Effective Time, any further action is necessary or desirable to carry out the purposes of this Agreement and to vest the First Step Surviving Corporation after the Effective Time or the Final Surviving Entity following the Second Effective Time with full right, title and interest in, to and under, and/or possession of, all assets, property, rights, privileges, powers and franchises of the Company, the officers and directors of the First Step Surviving Corporation or the officers and managers of the Final Surviving Entity, as applicable, are fully authorized, in the name and on behalf of the Company or otherwise, to take all lawful action necessary or desirable to accomplish such purpose or acts, so long as such action is not inconsistent with this Agreement.

## ARTICLE 2

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Subject to the disclosures set forth in the disclosure letter of the Company delivered to Acquirer concurrently with the parties' execution of this Agreement (the "***Company Disclosure Letter***") (each of which disclosures, in order to be effective, shall clearly indicate the Section and, if applicable, the Subsection of this ARTICLE 2 to which it relates (unless and only to the extent the relevance to other representations and warranties is reasonably apparent from the actual text of the disclosures), and each of which disclosures shall also be deemed to be representations and warranties made by the Company to Acquirer under this ARTICLE 2), the Company represents and warrants to Acquirer, as of the date hereof and as of the Closing Date, as follows:

2.1     Organization, Standing, Power and Subsidiaries.

(a)     The Company is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. The Company has the corporate power to own, operate and lease its properties and to conduct its Business and is duly qualified to do business and is in good standing in each jurisdiction where the failure to be so qualified or in good standing, individually or in the aggregate with any such other failures, would reasonably be expected to have a Material Adverse Effect on the Company. The Company has and, since its inception has had, no Subsidiaries or any equity or ownership interest, whether direct or indirect, in, or any loans to, any corporation, partnership, limited liability company, joint venture or other business entity.

(b)     Schedule 2.1(b) of the Company Disclosure Letter sets forth a true, correct and complete list of: (i) the names of the members of the board of directors (or similar body) of the Company (the "***Board of Directors***"); (ii) the names of the members of each committee of the Board of Directors (or similar body); and (iii) the names and titles of the officers of the Company.

2.2     Capital Structure.

(a)     The authorized capital stock of the Company consists solely of (i) 30,000,000 shares of Company Class A Common Stock, (ii) 30,000,000 shares of Company Class B Common Stock, and (iii) 24,560,775 shares of Company Preferred Stock, 777,887 of which are designated as Company BN Preferred Stock, 3,462,602 of which are designated as Company Series Seed Preferred Stock, 5,228,842 of which are designated Company Series A Preferred Stock, 3,200,000 of which are designated Company Series B Preferred Stock, 3,462,602 are designated Company Series Seed-1 Preferred Stock, 5,228,842 are designated Company Series A-1 Preferred Stock, and 3,200,000 are designated Company Series B-1 Preferred Stock.  A total of 9,926,156 shares of Company Class A Common Stock, no shares of Company Class B Common Stock, 520,346 shares of Company BN Preferred Stock, 3,462,602 shares of Company Series Seed Preferred Stock, 5,228,842 shares of Company Series A Preferred Stock, 3,193,516 Company Series B Preferred Stock, no shares of Company Series Seed-1 Preferred Stock, no

11

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

shares of Company Series A-1 Preferred Stock, and no shares of Company Series B-1 Preferred Stock, are issued and outstanding as of the Agreement Date. The Company holds no treasury shares. As of the Agreement Date, there are no other issued and outstanding shares of capital stock or other securities of the Company and no outstanding commitments or Contracts to issue any shares of capital stock or other securities of the Company other than pursuant to the exercise of outstanding Company Options under the Company Option Plans. Schedule 2.2(a) of the Company Disclosure Letter accurately sets forth, as of the Agreement Date, the name of each Person that is the registered owner of any shares of Company Common Stock and Company Preferred Stock and the number of such shares so owned by such Person, and the number of shares of Company Common Stock that would be owned by such Person assuming conversion of all shares of Company Preferred Stock so owned by such Person giving effect to all anti-dilution and similar adjustments. The number of such shares set forth as being so owned by such Person constitutes the entire interest of such person in the issued and outstanding capital stock or voting securities of the Company. All issued and outstanding shares of Company Capital Stock are duly authorized, validly issued, fully paid and non-assessable and are free of any Encumbrances, preemptive rights, rights of first refusal or "put" or "call" rights created by statute, the Certificate of Incorporation or Bylaws or any Contract to which the Company is a party or by which the Company is bound. The Company has never declared or paid any dividends on any shares of Company Capital Stock. There is no liability for dividends accrued and unpaid by the Company. The Company is not under any obligation to register under the Securities Act any shares of Company Capital Stock or any other securities of the Company, whether currently outstanding or that may subsequently be issued. Each share of Company Preferred Stock is convertible into shares of Company Common Stock on a one-for-one basis. All of the Company Preferred Stock will convert into shares of Common Stock immediately prior to the Closing. All issued and outstanding shares of Company Capital Stock, and all Company Options and Company Warrants were issued in compliance with all applicable Legal Requirements and all requirements set forth in applicable Contracts.

       (b)     As of the Agreement Date, the Company has reserved (i) 2,923,606 shares of Company Class B Common Stock for issuance to employees, non-employee directors and consultants pursuant to the Company 2012 Stock Plan, of which no shares are subject to outstanding and unexercised Company Options, and 2,923,606 shares remain available for issuance thereunder and (ii) 499,127 shares of Company Common Stock for issuance to employees, non-employee directors and consultants pursuant to the Company 2010 Stock Plan, of which 499,127 shares are subject to outstanding and unexercised Company Options, and no shares remain available for issuance thereunder. Schedule 2.2(b) of the Company Disclosure Letter sets forth, as of the Agreement Date, a true, correct and complete list of all holders of outstanding Company Options, whether or not granted under the Company Option Plans, including the number of shares of Company Common Stock subject to each Company Option, the date of grant, the vesting schedule (and the terms of any acceleration thereof), the exercise price per share, the intended Tax status of such option under Section 422 of the Code, the term of each Company Option and the plan from which such Company Option was granted. Correct and complete copies of each Company Option Plan, all agreements and instruments relating to or issued under each Company Option Plan (including executed copies of all Contracts relating to each Company Option and the shares of Company Capital Stock purchased under such option) have been provided to Acquirer's counsel, and such plans and Contracts have not been amended, modified or supplemented since being provided to Acquirer's counsel, and there are no agreements, understandings or commitments to amend, modify or supplement such plans or Contracts in any case from those provided to Acquirer's counsel. The terms of the Company Option Plans permit the substitution of Company Options to purchase Company Common Stock as provided in this Agreement, without the consent or approval of the holders of such securities, the Company Stockholders, or otherwise and without any acceleration of the exercise schedule or vesting provisions in effect for those Company Options. No benefits under any of such Company Option Plans will accelerate

12

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497166

in connection with the Merger. No other outstanding Company Options, whether under the Company Option Plans or otherwise, will be accelerated in connection with the Merger.

(c)     Other than as set forth on Schedules 2.2(a) and 2.2(b) of the Company Disclosure Letter, as of the Agreement Date, no Person has any right to acquire any shares of Company Capital Stock or any Company Options, or other rights to purchase shares of Company Capital Stock or other securities of the Company, from the Company or any Company Securityholder.

(d)     No bonds, debentures, notes or other indebtedness of the Company (i) granting its holder the right to vote on any matters on which any Company Securityholder may vote (or which is convertible into, or exchangeable for, securities having such right) or (ii) the value of which is any way based upon or derived from capital or voting stock of the Company, is issued or outstanding as of the Agreement Date (collectively, "***Company Voting Debt***").

(e)     Except for the Company Options described in Schedule 2.2(b) of the Company Disclosure Letter, there are no options, warrants, calls, rights or Contracts of any character to which the Company is a party or by which it is bound obligating the Company to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any shares of any Company Capital Stock, Company Options, or other rights to purchase shares of Company Capital Stock or other securities of the Company, or any Company Voting Debt, or obligating the Company to grant, extend, accelerate the vesting and/or repurchase rights of, change the price of, or otherwise amend or enter into any such Company Option, call, right or Contract. There are no Contracts relating to voting, purchase, sale or transfer of any Company Capital Stock (i) between or among the Company and any Company Securityholder, other than written contracts granting the Company the right to purchase unvested shares upon termination of employment or service, and (ii) to the knowledge of the Company, between or among any of the Company Securityholders. Neither the Company Option Plans nor any Contract of any character to which the Company and/or any Subsidiary is a party to or by which the Company is bound relating to any Company Options requires or otherwise provides for any accelerated vesting of any Company Options in connection with the Merger or any other transaction contemplated by this Agreement or upon termination of employment or service with the Company or with Acquirer or any Subsidiary, or any other event, whether before, upon or following the Merger or otherwise.

(f)     The Spreadsheet will accurately set forth, as of the Closing, the name of each Person that is the registered owner of any shares of Company Capital Stock and/or Company Options and the number and kind of such shares so owned, or subject to Company Options so owned, by such Person. The number of such shares set forth as being so owned, or subject to Company Options so owned, by such Person will constitute the entire interest of such person in the issued and outstanding capital stock, voting securities or other securities of the Company. As of the Closing, no other Person not disclosed in the Spreadsheet will have a right to acquire any shares of Company Capital Stock and/or Company Options from the Company. In addition, the shares of Company Capital Stock and/or Company Options disclosed in the Spreadsheet will be, as of the Closing, free and clear of any Encumbrances created by the Certificate of Incorporation or Bylaws or any Contract to which the Company is a party or by which it is bound.

2.3     Authority; Noncontravention.

(a)     Subject to approval of the Merger and adoption of this Agreement pursuant to the Company Stockholder Approval, the Company has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company. This Agreement has been duly

13

26246/00600/DOCS/2269228.5

executed and delivered by the Company and constitutes the valid and binding obligation of the Company enforceable against the Company in accordance with its terms subject only to the effect, if any, of (i) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies. The Board of Directors, by resolutions duly adopted (and not thereafter modified or rescinded) by the unanimous vote of the Board of Directors, has approved and adopted this Agreement and approved the Merger and the other transactions contemplated hereby, determined that this Agreement and the terms and conditions of the Merger and this Agreement are advisable and in the best interests of the Company and the Company Stockholders, and directed that the adoption of this Agreement be submitted to the Company Stockholders for consideration and unanimously recommended that all of the Company Stockholders adopt this Agreement. The affirmative votes of (i) the holders of a majority of the outstanding shares of Company Common Stock and Company Preferred Stock (voting together as a single voting class on an as-converted to Company Common Stock basis), (ii) the holders of a majority of the outstanding shares of Company Common Stock (voting as a separate voting class), and (iii) the holders of at least sixty percent (60%) of the outstanding shares of Senior Preferred Stock (voting as a separate voting class) are the only votes of the holders of the Company Capital Stock necessary to adopt this Agreement and approve the Merger.

(b)     The execution and delivery of this Agreement by the Company does not, and the consummation of the transactions contemplated hereby will not, (i) result in the creation of any Encumbrance on any of the material properties or assets of the Company or any of the shares of Company Capital Stock or (ii) conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or require any consent, approval or waiver from any Person pursuant to, (A) any provision of the Certificate of Incorporation or Bylaws or other equivalent organizational or governing documents of the Company, in each case as amended to date, (B) any Contract of the Company or any Contract applicable to any of its material properties or assets, or (C) any Legal Requirements applicable to the Company or any of its material properties or assets.

(c)     No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person is required by or with respect to the Company in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) the filing of the Certificate of Merger and Second Certificate of Merger, as provided in Section 1.1(d), (ii) such filings and notifications as may be required to be made by the Company in connection with the Merger under the HSR Act and the expiration or early termination of applicable waiting periods under the HSR Act, and (iii) such other consents, authorizations, filings, approvals, notices and registrations which, if not obtained or made, would not be material to the Company's ability to consummate the Merger or to perform its obligations under this Agreement and would not prevent, materially alter or delay any of the transactions contemplated by this Agreement.

(d)     No "fair price", "moratorium", "control share acquisition" or other similar antitakeover statute or regulation enacted under state or federal laws in the United States (with the exception of Section 203 of the DGCL) ("**_Takeover Statutes_**") is applicable to the Merger or the other transactions contemplated hereby. The action of the Board of Directors of the Company in approving this Agreement and the transactions contemplated hereby and thereby is sufficient to render inapplicable to this Agreement and the transactions contemplated hereby and thereby the restrictions on "business combinations" (as defined in Section 203 of the DGCL) as set forth in Section 203 of the DGCL. Complete and correct copies of the resolutions referred to above have been delivered to Acquirer on or prior to the Agreement Date.

14

26246/00600/DOCS/2269228.5

2.4    Financial Statements.

(a)    The Company has delivered to Acquirer its unaudited consolidated financial statements for each fiscal year subsequent to the Company's inception date and its unaudited consolidated financial statements for the 2-month period ended February 29, 2012 (including, in each case, balance sheets, statements of operations and statements of cash flows) (collectively, the "*Financial Statements*"), which are included as Schedule 2.4(a) of the Company Disclosure Letter. The Financial Statements (i) are derived from and in accordance with the books and records of the Company, (ii) complied as to form in all material respects with applicable accounting requirements with respect thereto as of their respective dates, (iii) were prepared in accordance with GAAP, except for the absence of footnotes, applied on a consistent basis throughout the periods involved, and (iv) fairly and accurately present the consolidated financial condition of the Company at the dates therein indicated and the consolidated results of operations and cash flows of the Company for the periods therein specified.

(b)    The Company has no Liabilities of any nature other than (i) those set forth or adequately provided for in the Balance Sheet included in the Financial Statements as of February 29, 2012 (the "*Company Balance Sheet*"), (ii) those incurred in the conduct of the Company's business since February 29, 2012 (the "*Company Balance Sheet Date*") in the ordinary course, consistent with past practice, which are of the type that ordinarily recur and, individually or in the aggregate, are not material in nature or amount and do not result from any breach of Contract, warranty, infringement, tort or violation of law, and (iii) those incurred by the Company in connection with the execution of this Agreement. Except for Liabilities reflected in the Financial Statements, the Company has no off balance sheet Liability of any nature to, or any financial interest in, any third party or entities, the purpose or effect of which is to defer, postpone, reduce or otherwise avoid or adjust the recording of expenses incurred by the Company. Without limiting the generality of the foregoing, the Company has never guaranteed any debt or other obligation of any other Person.

(c)    Schedule 2.4(c) of the Company Disclosure Letter accurately lists all indebtedness of Company for money borrowed ("*Company Debt*"), including, for each item of Company Debt, the agreement governing the Company Debt and the interest rate, maturity date and any assets or properties securing such Company Debt. All Company Debt may be prepaid at the Closing without penalty under the terms of the Contracts governing such Company Debt.

(d)    Schedule 2.4(d) of the Company Disclosure Letter sets forth the names and locations of all banks and other financial institutions at which the Company maintains accounts and the names of all persons authorized to make withdrawals therefrom.

2.5    Litigation. There is no private or governmental action, claim, proceeding, suit, hearing, litigation, audit or investigation (whether civil, criminal, administrative, judicial or investigative), or any appeal therefrom pending before any Governmental Entity (a "*Legal Proceeding*"), or, to the knowledge of the Company, threatened against the Company or any of its assets or properties or any of its directors, officers or employees (in their capacities as such or relating to their employment, services or relationship with the Company), nor, to the knowledge of the Company, is there any reasonable basis for any such Legal Proceeding. There is no Order outstanding against the Company, any of its assets or properties, or, to the knowledge of the Company, any of its directors, officers or employees (in their capacities as such or relating to their employment, services or relationship with the Company). The Company does not have any Legal Proceeding pending against any other Person. To the knowledge of the Company, there is no current basis for any indemnity claim under Section 5.16.

2.6    Restrictions on Business Activities. There is no Contract or Order binding upon the Company that restricts or prohibits, purports to restrict or prohibit, has or would reasonably be expected

15

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

to have, whether before or after consummation of the Merger, the effect of prohibiting, restricting or impairing any current or presently proposed business practice of the Company, any acquisition of property by the Company or the conduct or operation of Business or limiting the freedom of the Company to engage in the Business or any line of business, to sell, license or otherwise distribute services or products in any market or geographic area, or to compete with any Person, including any grants by the Company of exclusive rights or exclusive licenses. Other than the Material Contracts or as set forth on Schedule 2.6 of the Company Disclosure Letter, there are no Contracts or permits to which the Company is a party that relate to or affect the assets or properties of the Company.

2.7    Compliance with Laws; Governmental Permits.

(a)    The Company has complied in all material respects with, is not in material violation of, and has not received any notices of violation with respect to, any Legal Requirement.

(b)    The Company has obtained each material federal, state, county, local or foreign governmental consent, license, permit, grant, or other authorization of a Governmental Entity (i) pursuant to which the Company currently operates or holds any interest in any of its assets or properties or (ii) that is required for the operation of the Company's business or the holding of any such interest (all of the foregoing consents, licenses, permits, grants, and other authorizations, collectively, the "*Company Authorizations*"), and all of the Company Authorizations are in full force and effect. The Company has not received any notice or other communication from any Governmental Entity regarding (i) any actual or possible violation of any Company Authorization or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Company Authorization. The Company has materially complied with all of the terms of the Company Authorizations and none of the Company Authorizations will be terminated or impaired, or will become terminable, in whole or in part, as a result of the consummation of the transactions contemplated by this Agreement.

2.8    Title to, Condition and Sufficiency of Assets.

(a)    The Company has good title to, or valid leasehold interest in all of its properties, and interests in properties and assets, real and personal, reflected on the Company Balance Sheet or acquired after the Company Balance Sheet Date (except properties and assets, or interests in properties and assets, sold or otherwise disposed of since the Company Balance Sheet Date in the ordinary course of business consistent with past practice), or, with respect to leased properties and assets, valid leasehold interests in such properties and assets which afford the Company valid leasehold possession of the properties and assets that are the subject of such leases, in each case, free and clear of all Encumbrances, except Permitted Encumbrances. Schedule 2.8(a) of the Company Disclosure Letter identifies each parcel of real property leased by the Company. The Company has heretofore provided to Acquirer's counsel true, correct and complete copies of all leases, subleases and other agreements under which the Company uses or occupies or has the right to use or occupy, now or in the future, any real property or facility, including all modifications, amendments and supplements thereto. The Company does not currently own any real property.

(b)    The assets and properties owned by the Company (i) constitute all of the assets and properties that are necessary for the Company to conduct, operate and continue the Business and to sell and otherwise enjoy full rights to exploitation of its assets, properties and all products and services that are provided in connection with its assets and properties, and (ii) constitute all of the assets and properties that are used in the Business, without (A) the need for Acquirer to acquire or license any other asset, property or Intellectual Property, or (B) the breach or violation of any Contract.

2.9    Intellectual Property.

16

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(a)     As used in this Agreement, the following terms have the meanings indicated below:

(i)     "*Company Intellectual Property*" means any and all Company Owned Intellectual Property and any and all Third Party Intellectual Property that is licensed to the Company.

(ii)     "*Company Intellectual Property Agreements*" means any Contract governing any Company Intellectual Property to which the Company is a party or bound by, except for Contracts for Third Party Intellectual Property that is generally, commercially available software and (i) is not material to the Company; (ii) has not been modified or customized for the Company; and (iii) is licensed for an annual fee under $1,000.

(iii)     "*Company Owned Intellectual Property*" means any and all Intellectual Property that is owned by the Company.

(iv)     "*Company Products*" means all products or services produced, marketed, licensed, sold, publicly distributed or publicly performed by or on behalf of the Company.

(v)     "*Company Registered Intellectual Property*" means the United States, international and foreign: (A) patents and patent applications (including provisional applications); (B) registered trademarks, applications to register trademarks, intent-to-use applications, or other registrations or applications related to trademarks; (C) registered Internet domain names; and (D) registered copyrights and applications for copyright registration; in each of (A)-(D) registered or filed in the name of, the Company.

(vi)     "*Company Source Code*" means, collectively, any software source code or database specifications or designs, or any material proprietary information or algorithm contained in or relating to any software source code or database specifications or designs, of any Company Owned Intellectual Property or Company Products.

(vii)     "*Intellectual Property*" means (A) Intellectual Property Rights; and (B) Proprietary Information and Technology.

(viii)     "*Intellectual Property Rights*" means any and all of the following and all rights in, arising out of, or associated therewith, throughout the world: Patents, common law and statutory rights associated with trade secrets, confidential and proprietary information, and know-how, industrial designs and any registrations and applications therefor, trade names, logos, trade dress, trademarks and service marks, trademark and service mark registrations, trademark and service mark applications, and any and all goodwill associated with and symbolized by the foregoing items, Internet domain name applications and registrations, Internet and World Wide Web URLs or addresses, copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto, mask works, mask work registrations and applications therefor, and any equivalent or similar rights in semiconductor masks, layouts, architectures or topology, moral and economic rights of authors and inventors, however denominated, and any similar or equivalent rights to any of the foregoing.

(ix)     "*Open Source Materials*" means software or other material that is distributed as "free software," "open source software" or under similar licensing or distribution terms (including but not limited to the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL) the Sun Industry Standards License (SISL) and the Apache License).

17

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(x)     "*Patents*" means patents, utility models, and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof, and equivalent or similar rights in inventions and discoveries anywhere in the world, including invention disclosures.

(xi)    "*Personal Data*" means a natural person's name, street address, telephone number, e-mail address, photograph, social security number, driver's license number, passport number, or any other piece of information that allows the identification of a natural person.

(xii)   "*Proprietary Information and Technology*" means any and all of the following: works of authorship, computer programs, source code and executable code, whether embodied in software, firmware or otherwise, assemblers, applets, compilers, user interfaces, application programming interfaces, protocols, architectures, documentation, annotations, comments, designs, files, records, schematics, test methodologies, test vectors, emulation and simulation tools and reports, hardware development tools, models, tooling, prototypes, breadboards and other devices, data, data structures, databases, data compilations and collections, inventions (whether or not patentable), invention disclosures, discoveries, improvements, technology, proprietary and confidential ideas and information, know-how and information maintained as trade secrets, tools, concepts, techniques, methods, processes, formulae, patterns, algorithms and specifications, customer lists and supplier lists and any and all instantiations or embodiments of the foregoing or any Intellectual Property Rights in any form and embodied in any media.

(xiii)  "*Third Party Intellectual Property*" means any and all Intellectual Property owned by a third party.

(b)     Status. The Company has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on the Business, free and clear of any Encumbrances other than Permitted Encumbrances, and without any conflict with or infringement upon the rights of others. The Company Intellectual Property collectively constitute all of the intangible assets, intangible properties, rights and Intellectual Property necessary for Acquirer's conduct of, or that are used in or held for use for, the Business without: (i) the need for Acquirer to acquire or license any other intangible asset, intangible property or Intellectual Property Right, and (ii) the breach or violation of any Contract. The Company has not transferred ownership of, or agreed to transfer ownership of, or granted any exclusive licenses to, or agreed to grant any exclusive licenses to any Intellectual Property to any third party. No third party has any ownership right, title, interest, claim in or lien on any of the Company Owned Intellectual Property.

(c)     Company Registered Intellectual Property.   Schedule 2.9(c) of the Company Disclosure Letter lists all Company Registered Intellectual Property, and the jurisdictions in which it has been issued or registered or in which any application for such issuance and registration has been filed, or in which any other filing or recordation has been made; and all actions that are required to be taken by the Company within 120 days of the Agreement Date with respect to such Intellectual Property Rights in order to avoid prejudice to, impairment or abandonment of such Intellectual Property Rights. Each item of Company Registered Intellectual Property is valid and subsisting (or in the case of applications, applied for), all registration, maintenance and renewal fees currently due in connection with such Company Registered Intellectual Property have been paid and all documents, recordations and certificates in connection with such Company Registered Intellectual Property currently required to be filed have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of prosecuting, maintaining and perfecting such Company Registered Intellectual Property and recording Company's ownership interests therein.

18

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(d)  No Government Assistance. At no time during the conception of or reduction to practice of any of the Company Owned Intellectual Property was any developer, inventor or other contributor to such Company Owned Intellectual Property operating under any grants from any Governmental Entity or agency or private source, performing research sponsored by any Governmental Entity or agency or private source or subject to any employment agreement or invention assignment or nondisclosure agreement or other obligation with any third party that would reasonably be expected to adversely affect the Company's rights in such Company Owned Intellectual Property.

(e)  Founders. All rights in, to and under all Intellectual Property created by the Company's founders for or on behalf or in contemplation of the Company (i) prior to the inception of the Company or (ii) prior to their commencement of employment with the Company have been duly and validly assigned to the Company, and the Company has no reason to believe that any such Person is unwilling to provide the Company or Acquirer with such cooperation as may reasonably be required to complete and prosecute all appropriate U.S. and foreign patent and copyright filings related thereto.

(f)  Invention Assignment and Confidentiality Agreement. The Company has secured from all consultants, advisors, employees and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for the Company (each an "*Author*"), unencumbered and unrestricted exclusive ownership of, all of the Authors' Intellectual Property in such contribution and has obtained the waiver of all non-assignable rights. No Author has retained any rights, licenses, claims or interest whatsoever with respect to any Intellectual Property developed by the Author for the Company. Without limiting the foregoing, the Company has obtained written and enforceable proprietary information and invention disclosure and Intellectual Property assignments from all current and former Authors. The Company has provided to Acquirer copies of all such forms currently and historically used by the Company.

(g)  No Violation. No current or former employee, consultant, advisor or independent contractor of the Company: (i) to the knowledge of the Company is in violation of any term or covenant of any Contract relating to employment, invention disclosure, invention assignment, non-disclosure or non-competition or any other Contract with any other party by virtue of such employee's, consultant's, advisor's or independent contractor's being employed by, or performing services for, the Company or using trade secrets or proprietary information of others without permission; or (ii) has developed any technology, software or other copyrightable, patentable or otherwise proprietary work for the Company that is subject to any agreement under which such employee, consultant, advisor or independent contractor has assigned or otherwise granted to any third party any rights (including Intellectual Property Rights) in or to such technology, software or other copyrightable, patentable or otherwise proprietary work. Neither the execution nor delivery of this Agreement will conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any Contract of the type described in clause (i) of the foregoing sentence.

(h)  Confidential Information. The Company has taken commercially reasonable steps to protect and preserve the confidentiality of all confidential or non-public information of the Company (including, without limitation, trade secrets) or provided by any third party to the Company ("*Confidential Information*"). All current and former employees and contractors of the Company and any third party having access to Confidential Information have executed and delivered to the Company a written legally binding agreement regarding the protection of such Confidential Information. The Company has implemented and maintains a reasonable security plan consistent with industry practices of companies offering similar services. To the knowledge of the Company, the Company has not experienced any breach of security or otherwise unauthorized access by third parties to the Confidential Information, including Personal Data in the Company's possession, custody or control.

19

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497173

PX2373-027

(i)     Non-Infringement. To the knowledge of the Company, there is no unauthorized use, unauthorized disclosure, infringement or misappropriation of any Company Owned Intellectual Property by any third party. The Company has not brought any action, suit or proceeding for infringement or misappropriation of any Intellectual Property. The Company is not infringing, misappropriating or violating and has not infringed, misappropriated or violated the Intellectual Property of any third party. The Company has not been sued in any action, suit or proceeding or received any written communications (including any third party reports by users) alleging that the Company has infringed, misappropriated, or violated or, by conducting its business as presently proposed, would infringe, misappropriate, or violate any Intellectual Property of any other Person or entity. No Company Owned Intellectual Property or Company Product is subject to any Legal Proceeding, Order, judgment, settlement agreement, stipulation or right that restricts in any manner the use, transfer, or licensing thereof by the Company, or which may affect the validity, use or enforceability of any such Company Owned Intellectual Property.

(j)     Digital Millennium Copyright Act. Except as provided in Schedule 2.9(j) of the Company Disclosure Letter, the Company operates and has operated its Business in such a manner as to take reasonable advantage, if and when applicable, of the safe harbors provided by Section 512 of the Digital Millennium Copyright Act ("*DMCA*"), including by informing users of its products and services of such policy, designating an agent for notice of infringement claims, registering such agent with the United States Copyright Office, and taking appropriate action expeditiously upon receiving notice of possible infringement in accordance with the "notice and take-down" procedures of the DMCA.

(k)     Licenses; Agreements. The Company has not granted any options, licenses or agreements of any kind relating to any Company Owned Intellectual Property outside of normal nonexclusive end use terms of service entered into by users of the Company Products in the ordinary course (copies of which have been provided to Acquirer's counsel), nor is the Company bound by or a party to any option, license or agreement of any kind with respect to any of the Company Owned Intellectual Property. The Company is not obligated to pay any royalties or other payments to third parties with respect to the marketing, sale, distribution, manufacture, license or use of any Company Products or Company Owned Intellectual Property or any other property or rights. Neither the execution nor delivery of this Agreement will conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant, or instrument under which any of such employees is now obligated.

(l)     Other Intellectual Property Agreements. With respect to the Company Intellectual Property Agreements:

(i)     The Company is not (and will not be as a result of the execution and delivery or effectiveness of this Agreement or the performance of the Company's obligations under this Agreement), in breach of any Company Intellectual Property Agreement and the consummation of the transactions contemplated by this Agreement will not result in the modification, cancellation, termination, suspension of, or acceleration of any payments, rights, obligations, or remedies with respect to any material Company Intellectual Property Agreements, or give any non-Company party to any Company Intellectual Property Agreement the right to do any of the foregoing;

(ii)     Following the Closing, the Company (as a wholly owned subsidiary of Acquirer) will be permitted to exercise all of the Company's rights under the Company Intellectual Property Agreements to the same extent the Company would have been able to had the transactions contemplated by this Agreement not occurred and without the payment of any additional amounts or

20

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497174

consideration other than ongoing fees, royalties or payments which the Company would otherwise be required to pay;

(iii)     To the knowledge of the Company, there are no disputes regarding the scope of any Company Intellectual Property Agreements, or performance under any Company Intellectual Property Agreements including with respect to any payments to be made or received by the Company thereunder;

(iv)     No Company Intellectual Property Agreement requires the Company to include any Third Party Intellectual Property in any Company Product or obtain any Person's approval of any Company Product at any stage of development, licensing, distribution or sale of that Company Product;

(v)     None of the Company Intellectual Property Agreements grants any third party exclusive rights to or under any Company Owned Intellectual Property;

(vi)     None of the Company Intellectual Property Agreements grants any third party the right to sublicense any Company Owned Intellectual Property;

(vii)     Except as provided in Schedule 2.9(l)(vii) of the Company Disclosure Letter, the Company has obtained valid, written, perpetual, non-terminable (other than for cause) licenses (sufficient for the conduct of the Business) to all Third Party Intellectual Property that is incorporated into, integrated or bundled by the Company with any of the Company Products; and

(viii)     No third party that has licensed Intellectual Property Rights to the Company has ownership or license rights to improvements or derivative works made by the Company in the Third Party Intellectual Property that has been licensed to the Company.

(m)     Neither this Agreement nor the transactions contemplated by this Agreement, or the assignment to Acquirer and/or the Company by operation of law or otherwise of any Contracts to which the Company is a party, will result in: (i) Acquirer or any of its Affiliates granting to any third party any right to or with respect to any Intellectual Property Rights owned by, or licensed to Acquirer or any of its Affiliates, (ii) Acquirer or any of its Affiliates, being bound by or subject to, any exclusivity obligations, non-compete or other restriction on the operation or scope of their respective businesses, or (iii) Acquirer or the Company being obligated to pay any royalties or other material amounts to any third party in excess of those payable by any of them, respectively, in the absence of this Agreement or the transactions contemplated hereby.

(n)     Source Code.  The Company has not disclosed, delivered or licensed to any Person or agreed or obligated itself to disclose, deliver or license to any Person, or permitted the disclosure or delivery to any escrow agent or other Person of, any Company Source Code, other than disclosures to employees and consultants involved in the development of Company Products.  No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, result in the disclosure, delivery or license by the Company of any Company Source Code, other than disclosures to employees and consultants involved in the development of Company Products.  Without limiting the foregoing, neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will result in a release from escrow or other delivery to a third party of any Company Source Code.

(o)     Open Source Software.  Section 2.9(o) of the Company Disclosure Letter identifies all Open Source Materials used in any Company Products or in the conduct of the Business,

21

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497175

PX2373-029

describes the manner in which such Open Source Materials were used (such description shall include whether (and, if so, how) the Open Source Materials were used, modified and/or distributed by the Company) and identifies the licenses under which such Open Source Materials were used. The Company is in compliance with the terms and conditions of all licenses for the Open Source Materials. The Company has not (i) incorporated Open Source Materials into, or combined Open Source Materials with, the Company Owned Intellectual Property or Company Products; (ii) distributed Open Source Materials in conjunction with any Company Owned Intellectual Property or Company Products; or (iii) used Open Source Materials, in such a way that, with respect to (i), (ii), or (iii), creates, or purports to create obligations for the Company with respect to any Company Owned Intellectual Property or grant, or purport to grant, to any third party, any rights or immunities under any Company Owned Intellectual Property (including using any Open Source Materials that require, as a condition of use, modification and/or distribution of such Open Source Materials that other software incorporated into, derived from or distributed with such Open Source Materials be (A) disclosed or distributed in source code form, (B) be licensed for the purpose of making derivative works, or (C) be redistributable at no charge).

(p)     Privacy.  Except as provided in Section 2.9(p) of the Company Disclosure Letter, the Company has complied with all applicable laws, regulations and its internal privacy policies relating to the use, collection, storage, disclosure and transfer of any Personal Data collected by the Company or by third parties having authorized access to the records of the Company. The execution, delivery and performance of this Agreement, will comply with all applicable laws and regulations relating to privacy and with the Company's privacy policies.  Except as provided in Section 2.9(p) of the Company Disclosure Letter, the Company has not received any complaint regarding the Company's collection, use or disclosure of Personal Data.

(q)     Personal Data.  Section 2.9(q) of the Company Disclosure Letter identifies and describes each distinct electronic or other database containing (in whole or in part) Personal Data maintained by or for the Company at any time ("*Company Databases*"), the types of Personal Data in each such database, the means by which the Personal Data was collected, and the security policies that have been adopted and maintained with respect to each such database. No breach or violation of any such security policy by the Company has occurred or, to the knowledge of the Company, is threatened, and to the knowledge of the Company, there has been no unauthorized or illegal use of or access to any of the data or information in any of the Company Databases.

2.10    Taxes.

(a)     The Company has properly completed and timely filed all Tax Returns required to be filed by it prior to the Closing Date, has timely paid all Taxes required to be paid by it for which payment is due (whether or not shown on any Tax Return), and has no liability for Taxes in excess of the amount so paid. There is no claim for Taxes being asserted against the Company that has resulted in an Encumbrance against any of the assets or properties of the Company. All Taxes required to be withheld or paid by the Company in connection with amounts paid or owing to any employee of the Company have been duly and timely withheld or paid, and any such withheld Taxes have been either duly and timely paid to the proper Tax Authority or properly set aside in accounts for such purpose and will be duly and timely paid to the proper Tax Authority.  There are no liens on or against any of the assets or properties of the Company.

(b)     The Company has delivered or made available to Acquirer correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the Company.

22

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(c)     The Company Balance Sheet reflects all Liabilities for unpaid Taxes of the Company and/or any Subsidiary for periods (or portions of periods) through the Company Balance Sheet Date. Neither the Company nor any Subsidiary has any Liability for unpaid Taxes accruing after the Company Balance Sheet Date except for Taxes arising in the ordinary course of business subsequent to the Company Balance Sheet Date.

(d)     There is (i) no audit or pending audit of, or Tax controversy associated with, any Tax Return of the Company or any Subsidiary being conducted by a Tax Authority, (ii) no extension of any statute of limitations on the assessment of any Taxes granted by the Company or any Subsidiary currently in effect, and (iii) no agreement to any extension of time for filing any Tax Return which has not been filed. No claim has ever been made in writing by any Governmental Entity in a jurisdiction where the Company or any Subsidiary does not file Tax Returns that the Company or any Subsidiary is or may be subject to taxation by that jurisdiction.

(e)     Neither the Company nor any Subsidiary has been or will be required to include any adjustment in Taxable income for any Tax period (or portion thereof) pursuant to Section 481 or 263A of the Code or any comparable provision under state, local or foreign Tax laws as a result of transactions, events or accounting methods employed prior to the Merger.

(f)     Neither the Company nor any Subsidiary is a party to or bound by any Tax sharing, Tax indemnity, or Tax allocation agreement nor does the Company or any Subsidiary have any Liability or potential Liability to another party under any such agreement.

(g)     Each of the Company and each Subsidiary has disclosed on its Tax Returns any Tax reporting position taken in any Tax Return which could result in the imposition of penalties under Section 6662 of the Code or any comparable provisions of state, local or foreign law.

(h)     Neither the Company nor any Subsidiary has consummated or participated in, and none of them are currently participating in any transaction which was or is a "Tax shelter" transaction as defined in Sections 6662 or 6111 of the Code or the Treasury Regulations promulgated thereunder. Neither the Company nor any Subsidiary has participated in, nor are any of them currently participating in, a "Listed Transaction" or a "Reportable Transaction" within the meaning of Section 6707A(c) of the Code or Treasury Regulation Section 1.6011-4(b), or any transaction requiring disclosure under a corresponding or similar provision of state, local, or foreign law.

(i)     Neither the Company nor any Subsidiary or any predecessor of the Company or any Subsidiary has ever been a member of a consolidated, combined, unitary or aggregate group of which the Company or any predecessor of the Company was not the ultimate parent corporation.

(j)     Neither the Company nor any Subsidiary has any Liability for the Taxes of any Person (other than the Company or any Subsidiary) under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) as a transferee or successor, by Contract or otherwise.

(k)     Neither the Company nor any Subsidiary will be required to include any item of income in, or exclude any item of deduction from, Taxable income for any Taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a Taxable period ending on or prior to the Closing Date; (ii) "closing agreement" described in Section 7121 of the Code (or any corresponding or similar provision of state, local, or foreign Tax law) executed prior to the Closing Date; (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local, or

23

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497177

PX2373-031

foreign Tax law) with respect to a transaction occurring prior to the Closing Date; (iv) installment sale or open transaction disposition made on or prior to the Closing Date; or (v) prepaid amount received on or prior to the Closing Date.

(l)  Neither the Company nor any Subsidiary has incurred a dual consolidated loss within the meaning of Section 1503 of the Code.

(m)  Each of the Company and each Subsidiary has in its possession official foreign government receipts for any Taxes paid by it to any foreign Tax Authorities for which receipts have been provided.

(n)  Neither the Company nor any Subsidiary is or has ever been a "United States real property holding corporation" within the meaning of Section 897 of the Code, and the Company and each Subsidiary has filed with the Internal Revenue Service all statements, if any, which are required under Section 1.897-2(h) of the Treasury Regulations.

(o)  Neither the Company nor any Subsidiary has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for Tax-free treatment under Section 355 of the Code (i) in the two (2) years prior to the date of this Agreement or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the Merger.

(p)  The Company has delivered or made available to Acquirer copies of all election statements under Section 83(b) of the Code provided to the Company by any of its employees, non-employee directors, consultants or other service providers with respect to any Company Common Stock that was initially subject to a vesting arrangement or to other property issued by the Company to any such individual.

(q)  Schedule 2.10(q) to the Company Disclosure Letter lists all "nonqualified deferred compensation plans" (within the meaning of Section 409A of the Code) to which the Company is a party. Each such nonqualified deferred compensation plan to which the Company is a party complies with the requirements of paragraphs (2), (3) and (4) of Section 409A(a) by its terms and has been operated in accordance with such requirements. No event has occurred that would be treated by Section 409A(b) as a transfer of property for purposes of Section 83 of the Code.

(r)  The Company has a historic business within the meaning of Section 1.368-1(d) of the Treasury Regulations.

(s)  Except as disclosed on Schedule 2.10(s) to the Company Disclosure Letter, there is no agreement, plan, arrangement or other Contract covering any current or former employee or other service provider of the Company or any Subsidiary or ERISA Affiliate (as defined below) to which the Company and/or any Subsidiary is a party or by which the Company and/or any Subsidiary is bound that, considered individually or considered collectively with any other such agreements, plans, arrangements or other Contracts, will, or would reasonably be expected to, as a result of the transactions contemplated hereby (whether alone or upon the occurrence of any additional or subsequent events), give rise directly or indirectly to the payment of any amount that would reasonably be expected to be characterized as a "parachute payment" within the meaning of Section 280G of the Code (or any corresponding or similar provision of state, local or foreign Tax law). Schedule 2.10(s) of the Company Disclosure Letter lists each Person (whether U.S. or foreign) who the Company reasonably believes is, with respect to the Company and/or any Subsidiary, a "disqualified individual" (within the meaning of Section 280G of the Code and the regulations promulgated thereunder), as determined as of the Agreement Date. No stock of

24

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

the Company or any Company Securityholder is readily tradeable on an established securities market or otherwise (within the meaning of Section 280G and the regulations promulgated thereunder), such that the Company is ineligible to seek shareholder approval in a manner that complies with Section 280G(b)(5) of the Code.

    2.11    Employee Benefit Plans and Employee Matters.

        (a)    Schedule 2.11(a) of the Company Disclosure Letter lists, with respect to the Company and any trade or business (whether or not incorporated) which is treated as a single employer with the Company (an "*ERISA Affiliate*") within the meaning of Section 414(b), (c), (m) or (o) of the Code, (i) all "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), (ii) each outstanding loan extended by the Company to any Company employee (other than routine advances for business expenses made in the ordinary course of business), (iii) other than the Company Option Plan, all stock option, stock purchase, phantom stock, stock appreciation right, supplemental retirement, severance, sabbatical, medical, dental, vision care, disability, employee relocation, cafeteria benefit (Section 125 of the Code), dependent care (Section 129 of the Code), life insurance or accident insurance plans, programs or arrangements, (iv) all bonus, pension, profit sharing, savings, severance, retirement, deferred compensation or cash incentive plans, programs or arrangements, (v) all other fringe or employee benefit plans, programs or arrangements, and (vi) all employment or executive compensation or severance agreements, written or otherwise, as to which, in the case of any of clauses (i) through (vi), any unsatisfied obligations of the Company remain for the benefit of, or relating to, any present or former employee, consultant or non-employee director of the Company (all of the foregoing described in clauses (i) through (vi), collectively, the "*Company Employee Plans*").

        (b)    The Company has furnished or made available to Acquirer's counsel a true and complete copy of each of the Company Employee Plans and related plan documents. The Company does not sponsor or maintain any self-funded Company Employee Plan, including, without limitation, any plan to which a stop-loss policy applies.

        (c)    None of the Company Employee Plans promises or provides retiree medical or other retiree welfare benefits to any person other than as required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*") or similar state law and the Company has complied with the requirements of COBRA. To the Company's knowledge, there has been no "prohibited transaction" (within the meaning of Section 406 of ERISA and Section 4975 of the Code and not exempt under Section 408 of ERISA and regulatory guidance thereunder) with respect to any Company Employee Plan. Each Company Employee Plan has been administered in accordance with its terms and in compliance with the requirements prescribed by any and all statutes, rules and regulations (including ERISA and the Code), and the Company and each ERISA Affiliate has performed all obligations required to be performed by it under, is not in default under or in violation of, and has no knowledge of any default or violation by any other party to, any of the Company Employee Plans. No Company Employee Plan is covered by, and neither the Company nor ERISA Affiliate has incurred or reasonably expects to incur any Liability under Title IV of ERISA or Section 412 of the Code. Each Company Employee Plan can be amended, terminated or otherwise discontinued after the Effective Time in accordance with its terms, without Liability to Acquirer (other than ordinary administrative expenses typically incurred in a termination event). No suit, administrative proceeding, action, litigation or claim has been brought, or to the knowledge of the Company, is threatened, against or with respect to any such Company Employee Plan, including any audit or inquiry by the Internal Revenue Service or United States Department of Labor.

25

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(d)     Neither the Company nor current or former ERISA Affiliate currently maintains, sponsors, participates in or contributes to, or has ever maintained, established, sponsored, participated in, or contributed to, any pension plan (within the meaning of Section 3(2) of ERISA) which is subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code.

(e)     Neither the Company nor ERISA Affiliate is a party to, or has made any contribution to or otherwise incurred any obligation under, any "multiemployer plan" as such term is defined in Section 3(37) of ERISA or any "multiple employer plan" as such term is defined in Section 413(c) of the Code.

(f)     No Company Employee Plan is sponsored, maintained or contributed to under the law or applicable custom or rule of the any jurisdiction outside of the United States.

(g)     The Company is in compliance in all material respects with all currently applicable Legal Requirements respecting employment, discrimination in employment, terms and conditions of employment, worker classification (including the proper classification of workers as independent contractors and consultants), wages, hours and occupational safety and health and employment practices, including the Immigration Reform and Control Act, and is not engaged in any unfair labor practice. The Company is not liable for any arrears of wages, compensation, Taxes, penalties or other sums for failure to comply with any of the foregoing. As of the Effective Time, the Company will have paid in full to all employees, independent contractors and consultants all wages, salaries, commissions, bonuses, benefits and other compensation earned as of, or prior to the Closing, and due to or on behalf of such employees, independent contractors and consultants of the Company. The Company is not liable for any payment to any trust or other fund or to any Governmental Entity, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistently with past practice).

(h)     Except as set forth in Schedule 2.11(h) of the Company Disclosure Letter, neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement or any termination of employment or service in connection therewith or subsequent thereto or any other event in connection therewith will, individually or together or with the occurrence of some other event, (whether contingent or otherwise), (i) result in any material payment or benefit (including severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due or payable, or required to be provided, to any current or former employee, director, independent contractor or consultant, (ii) materially increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any current or former employee, director, independent contractor or consultant, (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation except as required under Section 411(d)(3) of the Code, (iv) increase the amount of compensation due to any Person, or (v) result in the forgiveness in whole or in part of any outstanding loans made by the Company to any Person.

2.12     Interested Party Transactions. None of the officers and directors of the Company and, to the knowledge of the Company, none of the employees or stockholders of the Company, nor any immediate family member of an officer, director, employee or stockholder of the Company, has any direct or indirect ownership, participation, royalty or other interest in, or is an officer, director, employee of or consultant or contractor for any firm, partnership, entity or corporation that competes with, or does business with, or has any contractual arrangement with, the Company (except with respect to any interest in less than 5% of the stock of any corporation whose stock is publicly traded). None of said officers or directors, or to the Company's Knowledge, employees or stockholders (who are not also officers,

26

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497180

PX2373-034

directors or employees) or any member of their immediate families, is a party to, or to the knowledge of the Company, otherwise directly or indirectly interested in, any Contract to which the Company is a party or by which the Company or any of its assets or properties may be bound or affected, except for normal compensation or welfare benefits provided for services as an officer, director or employee thereof. To the knowledge of the Company, none of said officers, directors, employees, stockholders or immediate family members has any interest in any property, real or personal, tangible or intangible (including any Intellectual Property) that is used in, or that relates to, the business of the Company, except for the rights of stockholders under applicable Legal Requirements.

2.13     Insurance.  The Company maintains the policies of insurance and bonds set forth in Schedule 2.13 of the Company Disclosure Letter, including all legally required workers' compensation insurance and errors and omissions, casualty, fire and general liability insurance.  The Company has provided to Acquirer's counsel correct and complete copies of all such policies of insurance and bonds issued at the request or for the benefit of the Company.  There is no claim pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds.  All premiums due and payable under all such policies and bonds have been timely paid and the Company is otherwise in compliance with the terms of such policies and bonds.  All such policies and bonds remain in full force and effect, and the Company has no knowledge of any threatened termination of, or material premium increase with respect to, any of such policies.

2.14     Books and Records.  The Company has provided to Acquirer or its counsel correct and complete copies of each document that has been requested by Acquirer or its counsel in connection with their legal and accounting review of the Company (other than any such document that does not exist or is not in the Company's possession or subject to its control).  Without limiting the foregoing, the Company has provided to Acquirer or its counsel complete and correct copies of (a) all documents identified on the Company Disclosure Letter, (b) the Certificate of Incorporation and Bylaws or equivalent organizational or governing documents of the Company, each as currently in effect, (c) the minute books containing records of all proceedings, consents, actions and meetings of the Board of Directors, committees of the Board of Directors and stockholders of the Company, (d) the stock ledger, journal and other records reflecting all stock issuances and transfers and all stock option and warrant grants and agreements of the Company, and (e) all permits, orders and consents issued by any regulatory agency with respect to the Company, or any securities of the Company, and all applications for such permits, orders and consents.  The minute books of the Company provided to Acquirer contain a complete and accurate summary of all meetings of directors and stockholders or actions by written consent since the time of incorporation of the Company through the date of this Agreement.  The books, records and accounts of the Company (i) are true, correct and complete in all material respects, (ii) have been maintained in accordance with reasonable business practices on a basis consistent with prior years, (iii) are stated in reasonable detail and accurately and fairly reflect all of the transactions and dispositions of the assets and properties of the Company, and (iv) accurately and fairly reflect the basis for the Financial Statements.

2.15     Material Contracts.

(a)     Schedules 2.15(a)(i) through (xx) of the Company Disclosure Letter set forth a list of each of the following Contracts to which the Company is a party ("*Material Contracts*"):

(i)     other than Company Employee Plans, any Contract providing for payments by or to the Company in the period since the Company's inception in an aggregate amount of $100,000 or more;

(ii)     any dealer, distributor or similar agreement, or any Contract providing for the grant of rights to reproduce, license, market or sell its products or services to any other Person or

27

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

relating to the advertising or promotion of the business of the Company or pursuant to which any third parties advertise on any websites operated by the Company;

(iii)     (1) any joint venture Contract, (2) any Contract that involves a sharing of revenues, profits, cash flows, expenses or losses with other Persons  or (3) any Contract that involves the payment of royalties to any other Person;

(iv)     any Contract for or relating to the employment or service of any director, officer, employee or consultant or any other type of Contract with any of its officers, employees or consultants, as the case may be, except in either case, at-will employment or consulting agreements entered into in the ordinary course of business and which do not provide for severance, notice, acceleration of benefits or any additional Liability to the Company upon a termination of employment, other than as required by any Legal Requirements;

(v)     any agreement pursuant to which any other party is granted exclusive rights or "most favored party" rights of any type or scope with respect to any of the Company Products or Company Intellectual Property, or containing any non-competition covenants or other restrictions relating to the Company Products or Company Intellectual Property; or limits the freedom of the Company to engage or participate, or compete with any other Person, in any line of business, market or geographic area with respect to the Company Products or Company Intellectual Property, or to make use of any Company Intellectual Property Rights;

(vi)     other than "shrink wrap" and similar generally available commercial end-user licenses to software that have an individual acquisition cost of $2,000 or less, all licenses, sublicenses and other Contracts to which the Company is a party and pursuant to which the Company acquired or is authorized to use any Third Party Intellectual Property Rights used in the development, marketing or licensing of the Company Products;

(vii)     any license, sublicense or other Contract to which the Company is a party and pursuant to which any Person is authorized to use any Intellectual Property Rights;

(viii)     any license, sublicense or other Contract pursuant to which Company has agreed to any restriction on the right of Company to use or enforce any Company Owned Intellectual Property Rights or pursuant to which Company agrees to encumber, transfer or sell rights in or with respect to any Company Owned Intellectual Property Rights;

(ix)     any Contracts relating to the membership of, or participation by, the Company in, or the affiliation of the Company with, any industry standards group or association;

(x)     any Contract providing for the development of any of the any software, technology or Intellectual Property Rights, independently or jointly, either by or for Company (other than employee invention assignment agreements and consulting agreements with Authors on Company's standard form of agreement, copies of which have been provided to Acquirer's counsel);

(xi)     any confidentiality, secrecy or non-disclosure Contract other than any such Contract entered into by the Company in the ordinary course of business consistent with past practice;

(xii)     any Contract to license or authorize any third party to manufacture or reproduce any of the Company Products or Company Intellectual Property;

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497182

PX2373-036

(xiii)   any agreement containing any support, maintenance or service obligation or cost on the part of Company;

(xiv)   any settlement agreement;

(xv)   any Contract pursuant to which rights of any third party are triggered or become exercisable, or under which any other consequence, result or effect arises, in connection with or as a result of the execution of this Agreement or the consummation of the Merger or other transactions contemplated hereunder, either alone or in combination with any other event;

(xvi)   any Company Product warranty;

(xvii)   any Contract or plan (including any stock option, merger and/or stock bonus plan) relating to the sale, issuance, grant, exercise, award, purchase, repurchase or redemption of any shares of Company Capital Stock or any other securities of the Company or any options, warrants, convertible notes or other rights to purchase or otherwise acquire any such shares of stock, other securities or options, warrants or other rights therefor, except for the repurchase rights disclosed on Schedule 2.2(a) of the Company Disclosure Letter;

(xviii)   any Contract with any labor union or any collective bargaining agreement or similar contract with its employees;

(xix)   any Contract of guarantee, support, indemnification (other than pursuant to its standard customer agreements), assumption or endorsement of, or any similar commitment with respect to, the Liabilities or indebtedness of any other Person; and

(xx)   any Contract with any Governmental Entity, any Company Authorization, or any Contract with a government prime contractor, or higher-tier government subcontractor, including any indefinite delivery/indefinite quantity contract, firm-fixed-price contract, schedule contract, blanket purchase agreement, or task or delivery order (each a "*Government Contract*").

(b)   All Material Contracts are in written form. The Company has performed all of the obligations required to be performed by it and is entitled to all benefits under, and is not alleged to be in default in respect of, any Material Contract. Each of the Material Contracts is in full force and effect, subject only to the effect, if any, of applicable bankruptcy and other similar laws affecting the rights of creditors generally and rules of law governing specific performance, injunctive relief and other equitable remedies. There exists no default or event of default or event, occurrence, condition or act, with respect to the Company or to the Company's knowledge, with respect to any other contracting party, which, with the giving of notice, the lapse of time or the happening of any other event or condition, would reasonably be expected to (i) become a default or event of default under any Material Contract or (ii) give any third party (A) the right to declare a default or exercise any remedy under any Material Contract, (B) the right to a rebate, chargeback, refund, credit, penalty or change in delivery schedule under any Material Contract, (C) the right to accelerate the maturity or performance of any obligation of the Company under any Material Contract, or (D) the right to cancel, terminate or modify any Material Contract. The Company has not received any notice or other communication regarding any actual or possible violation or breach of, default under, or intention to cancel or modify any Material Contract. The Company has no Liability for renegotiation of Government Contracts. Correct and complete copies of all Material Contracts have been provided or made available to Acquirer prior to the Agreement Date

2.16   Environmental, Health and Safety Matters.

29

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497183

(a)      The Company is in compliance with all Environmental, Health and Safety Requirements in connection with the ownership, use, maintenance or operation of its business or assets or properties. There are no pending, or to the knowledge of the Company, any threatened allegations by any Person that the properties or assets of the Company are not, or that its business has not been conducted, in compliance with all Environmental, Health and Safety Requirements. The Company has not retained or assumed any Liability of any other Person under any Environmental, Health and Safety Requirements. To the knowledge of the Company, there are no past or present facts, circumstances or conditions that would reasonably be expected to give rise to any Liability of the Company with respect to Environmental, Health and Safety Requirements.

(b)      The Company has made available to Acquirer a copy of all studies, audits, assessments or investigations containing material information concerning compliance with, or liability or obligations under, Environmental, Health and Safety Requirements affecting the Company that are in the possession or control of the Company, each of which is identified in Schedule 2.16 of the Company Disclosure Letter.

2.17      Export Control Laws      The Company has conducted its export transactions in accordance with all applicable U.S. export and reexport controls, including the United States Export Administration Act and Regulations, Foreign Assets Control Regulations, International Traffic in Arms Regulations and other controls administered by the U.S. Department of Commerce and/or the Department of State and all other applicable import/export controls in other countries in which the Company conducts business (except for failure to be in compliance which individually or in the aggregate are not material to the Company taken as a whole). Without limiting the foregoing:

(a)      The Company has obtained all export and import licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations and filings with any Governmental Entity required for (x) the export, import and reexport of products, services, software and technologies and (y) releases of technologies and software to foreign nationals located in the United States and abroad ("*Export Approvals*"), except for such failures to obtain that would not be material to the Company taken as a whole;

(b)      the Company is in compliance in all material respects with the terms of all applicable Export Approvals;

(c)      there are no pending or, to the knowledge of the Company, threatened claims against the Company with respect to such Export Approvals;

(d)      to the knowledge of the Company, there are no actions, conditions or circumstances pertaining to the Company's export transactions that may give rise to any future claims; and

(e)      no Export Approvals for the transfer of export licenses to Acquirer or the Final Surviving Entity are required, or such Export Approvals can be obtained expeditiously without material cost.

2.18      Transaction Fees.      No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or its Affiliates.  Set forth in Schedule 2.18 to the Company Disclosure Letter is the Company's good faith estimate of all Transaction Expenses (including Transaction Expenses reasonably anticipated to be incurred in the future).

30

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497184

PX2373-038

2.19     Foreign Corrupt Practices. Neither the Company, nor any of its officers, directors, employees, shareholders, agents or representatives, nor any Person acting for or on behalf of the Company, has directly or indirectly (a) made or attempted to make or promised any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of what form, whether in money, property, or services (i) to obtain favorable treatment for business or Contracts secured, (ii) to pay for favorable treatment for business or Contracts secured, (iii) to obtain special concessions or for special concessions already obtained, or (iv) in violation of any requirement of applicable law (including the Foreign Corrupt Practices Act), or (b) established or maintained any fund or asset that has not been recorded in the books and records of the Company. The Company has established proper internal controls and procedures to provide for compliance with the Foreign Corrupt Practices Act and has made available to Acquirer all such documentation.

2.20     Representations Complete. None of the representations or warranties made by the Company herein or in any exhibit or schedule hereto, including the Company Disclosure Letter, or in any certificate furnished by the Company pursuant to this Agreement, when all such documents are read together in their entirety, contains any untrue statement of a material fact, or omits to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading.

2.21     Information Statement. None of the information supplied by the Company for inclusion in the Information Statement (as defined below in Section 5.1(b)) will contain, as of the date of the Information Statement, any untrue statement of a material fact, or will omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

## ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF ACQUIRER AND MERGER SUBS

Acquirer represents and warrants to the Company as follows:

3.1     Organization and Standing. Each of Acquirer and the Merger Subs is a corporation or a limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Neither Acquirer nor any of the Merger Subs is in violation of any of the provisions of its articles or certificate of incorporation or certificate of formation, as applicable, or bylaws, operating agreement or equivalent organizational or governing documents.

3.2     Authority; Noncontravention.

(a)     Each of Acquirer and the Merger Subs has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Acquirer and the Merger Subs. This Agreement has been duly executed and delivered by each of Acquirer and the Merger Subs and constitutes the valid and binding obligation of Acquirer and the Merger Subs enforceable against Acquirer and the Merger Subs, respectively, in accordance with its terms, subject only to the effect, if any, of (i) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

(b)     The execution and delivery of this Agreement by Acquirer and the Merger Subs do not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right

31

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497185

of termination, cancellation or acceleration of any obligation or loss of a benefit under, or require any consent, approval or waiver from any Person pursuant to, (i) any provision of the articles or certificate of incorporation, as applicable, or bylaws or other equivalent organizational or governing documents of Acquirer and the Merger Subs, in each case as amended to date, or (ii) any applicable Legal Requirement, except where such conflict, violation, default, termination, cancellation or acceleration, individually or in the aggregate, would not be material to Acquirer's or the Merger Subs' ability to consummate the Merger or to perform their respective obligations under this Agreement.

(c) Except as required by applicable federal and state securities laws in connection with the issuance of the Shares and such filings and notifications as may be required to be made by Acquirer in connection with the Merger under the HSR Act and the expiration or early termination of applicable waiting periods under the HSR Act, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person is required by or with respect to Acquirer or the Merger Subs in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby and thereby that would reasonably be expected to adversely affect the ability of Acquirer or the Merger Subs to consummate the Merger or any of the other transactions contemplated hereby.

3.3     Capital Structure.  The capitalization information provided to the Company as of the Agreement Date as set forth on Exhibit N is true and correct.

3.4     Litigation.  There are no actions, suits, arbitrations, mediations, proceedings or claims pending or, to the knowledge of Acquirer, threatened against Acquirer or the Merger Subs that seek to restrain or enjoin the consummation of the Merger or the other transactions contemplated hereby.

3.5     Issuance of Shares.  The shares of Acquirer Common Stock comprising the Merger Consideration, when issued by Parent in accordance with the terms of this Agreement, assuming the accuracy of the representations and warranties of Company and the Company Securityholders contained in this Agreement or in the Investor Rep Letter, will be duly issued, fully paid and nonassessable.

3.6     No Prior Merger Sub Operations.  The Merger Subs were formed solely for the purpose of effecting the Merger and has not engaged in any business activities or conducted any operations other than in connection with the transactions contemplated hereby.

3.7     Fair Market Value of Acquirer's Class B Common Stock.  Acquirer's Board of Directors (or a committee thereof) has most recently determined that, as of January 31, 2012, the fair market value of Acquirer's Class B Common Stock was $30.89 per share.

## ARTICLE 4
### CONDUCT PRIOR TO THE EFFECTIVE TIME

4.1     Conduct of Business of the Company.  During the period from the Agreement Date and continuing until the earlier of the termination of this Agreement and the Effective Time:

(a) the Company shall conduct its business solely in the usual, regular and ordinary course in substantially the same manner as heretofore conducted (except to the extent expressly provided otherwise in this Agreement or as consented to in writing by Acquirer) and in compliance with all applicable Legal Requirements;

(b) the Company shall (A) pay and perform all of its debts and other obligations (including Taxes) when due, (B) use commercially reasonable efforts consistent with past practice and

32

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497186

policies to collect accounts receivable when due and not extend credit outside of the ordinary course of business consistent with past practices, (C) use commercially reasonable efforts to sell Company products consistent with past practices as to license, service and maintenance terms, incentive programs, and revenue recognition and (D) use its commercially reasonable efforts consistent with past practice and policies to preserve intact its present business organizations, keep available the services of its present officers and key employees and preserve its relationships with customers, suppliers, distributors, licensors, licensees, and others having business dealings with it, to the end that its goodwill and ongoing businesses shall be unimpaired at the Closing;

(c)   the Company shall promptly notify Acquirer of any change, occurrence or event not in the ordinary course of its Business or any Subsidiary's business, or of any change, occurrence or event which, individually or in the aggregate with any other changes, occurrences and events, would reasonably be expected to be materially adverse to the Company taken together or cause any of the conditions to closing set forth in ARTICLE 6 not to be satisfied.

4.2   Restrictions on Conduct of Business of the Company. Without limiting the generality or effect of the provisions of Section 4.1, except as set forth on Schedule 4.2, during the period from the Agreement Date and continuing until the earlier of the termination of this Agreement and the Effective Time, the Company shall not, and shall cause each Subsidiary not to, do, cause or permit any of the following (except to the extent expressly provided otherwise in this Agreement or as consented to in writing by Acquirer):

(a)   Charter Documents. Cause or permit any amendments the Certificate of Incorporation or Bylaws or equivalent organizational or governing documents;

(b)   Dividends; Changes in Capital Stock. Declare or pay any dividends on or make any other distributions (whether in cash, stock or property) in respect of any of its capital stock (except as set forth on Schedule 4.2(b) of the Company Disclosure Letter), or split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock, or repurchase or otherwise acquire, directly or indirectly, any shares of its capital stock except from former employees, non-employee directors and consultants in accordance with agreements providing for the repurchase of shares in connection with any termination of service;

(c)   Material Contracts. Enter into any Contract that would constitute a Material Contract, other material Contract or a Contract requiring a novation or consent in connection with the Merger, or violate, terminate, amend, or otherwise modify (including by entering into a new Contract with such party or otherwise) or waive any of the terms of any of its Material Contracts; *provided, however*, that this provision shall not require the Company to seek or obtain Acquirer's consent in order to set or change the prices at which the Company sells products or provides services to current customers, in the ordinary course of business;

(d)   Issuance of Securities. Issue, deliver or sell or authorize or propose the issuance, delivery or sale of, or purchase or propose the purchase of, any Company Voting Debt or any shares of Company Capital Stock or securities convertible into, or subscriptions, rights, warrants or options to acquire, or other Contracts of any character obligating it to issue any such shares or other convertible securities, other than: (i) the issuance of shares of Company Capital Stock pursuant to the exercise of Company Options that are outstanding as of the Agreement Date; (ii) the issuance of Company Common Stock upon conversion of Company Preferred Stock outstanding on the Agreement Date, and (iii) the repurchase of any shares of Company Capital Stock from former employees, non-employee directors and

33

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

consultants in accordance with Contracts providing for the repurchase of shares in connection with any termination of service;

(e) Employees; Consultants; Independent Contractors. (i) Hire any additional officers or other employees, or any consultants or independent contractors, (ii) terminate the employment, change the title, office or position, or materially reduce the responsibilities of any management, supervisory or other key personnel of the Company, (iii) enter into, amend or extend the term of any employment or consulting agreement with any officer, employee, consultant or independent contractor, or (iv) enter into any Contract with a labor union or collective bargaining agreement (unless required by applicable Legal Requirements);

(f) Loans and Investments. Make any loans or advances (other than routine expense advances to employees of the Company consistent with past practice) to, or any investments in or capital contributions to, any Person, or forgive or discharge in whole or in part any outstanding loans or advances, or prepay any indebtedness for borrowed money;

(g) Intellectual Property. Transfer or license from any Person any rights to any Intellectual Property, or transfer or license to any Person any rights to any Company Intellectual Property (other than sales and nonexclusive licenses of Company Products in the ordinary course of business consistent with its past practice), or transfer or provide a copy of any Company Source Code to any Person (including any current or former employee or consultant of the Company or any contractor or commercial partner of the Company) (other than providing access to Company Source Code to current employees and consultants of the Company involved in the development of the Company Products on a need to know basis, consistent with past practices);

(h) Patents. Take any action regarding a patent, patent application or other Intellectual Property right, other than filing continuations for existing patent applications or completing or renewing registrations of existing patents, domain names, trademarks or service marks in the ordinary course of business;

(i) Dispositions. Sell, lease, license or otherwise dispose of any of its properties or assets, other than sales and nonexclusive licenses of Company Products in the ordinary course of business consistent with its past practice, or enter into any Contract with respect to the foregoing;

(j) Indebtedness. Incur any indebtedness for borrowed money or guarantee any such indebtedness;

(k) Payment of Obligations. Pay, discharge or satisfy (i) any Liability to any Person who is an officer, director or stockholder of the Company (other than compensation due for services as an officer or director) or (ii) any claim or Liability arising otherwise than in the ordinary course of business, other than the payment, discharge or satisfaction of Liabilities reflected or reserved against in the Financial Statements and Transaction Expenses, or defer payment of any accounts payable other than in the ordinary course of business consistent with past practice, or give any discount, accommodation or other concession other than in the ordinary course of business consistent with past practice, in order to accelerate or induce the collection of any receivable;

(l) Capital Expenditures. Make any capital expenditures, capital additions or capital improvements in excess of $100,000 individually or $250,000 in the aggregate;

(m) Insurance. Materially change the amount of any insurance coverage;

34

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(n)     Termination or Waiver.  Cancel, release or waive any claims or rights held by the Company;

(o)     Employee Benefit Plans; Pay Increases.  (i) Adopt or amend any employee or compensation benefit plan, including any stock issuance or stock option plan, or amend any compensation, benefit, entitlement, grant or award provided or made under any such plan, except in each case as required under ERISA, applicable Legal Requirements or as necessary to maintain the qualified status of such plan under the Code, (ii) materially amend any deferred compensation plan within the meaning of Section 409A of the Code and Internal Revenue Service Notice 2005-1 except to the extent necessary to meet the requirements of such Section or Notice, (iii) pay any special bonus or special remuneration to any employee or non-employee director or consultant or (iv) increase the salaries, wage rates or fees of its employees or consultants (other than as disclosed to Acquirer and are set forth on Schedule 4.2(o) of the Company Disclosure Letter);

(p)     Severance Arrangements.  Grant or pay, or enter into any Contract providing for the granting of any severance, retention or termination pay, or the acceleration of vesting or other benefits, to any Person (other than payments or acceleration which have been disclosed to Acquirer and are set forth on Schedule 4.2(p) of the Company Disclosure Letter);

(q)     Lawsuits; Settlements.  (i) Commence a lawsuit other than (A) for the routine collection of bills, (B) in such cases where the Company in good faith determines that failure to commence suit would result in the material impairment of a valuable aspect of its business (provided that it consults with Acquirer prior to the filing of such a suit), or (C) for a breach of this Agreement or (ii) settle or agree to settle any pending or threatened lawsuit or other dispute;

(r)     Acquisitions.  Acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the Business, or enter into any Contract with respect to a joint venture, strategic alliance or partnership;

(s)     Taxes.  Make or change any election in respect of Taxes, adopt or change any accounting method in respect of Taxes, file any federal, state, or foreign income Tax Return or any other material Tax Return without the consent of the Acquirer prior to filing, file any amendment to a federal, state, or foreign income Tax Return or any other material Tax Return, enter into any Tax sharing or similar agreement or closing agreement, settle any claim or assessment in respect of Taxes, or consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes, or enter into intercompany transactions giving rise to deferred gain or loss of any kind, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax, if such election, adoption or other action would have the effect of increasing the Tax liability of Acquirer or its Affiliates for any period ending after the Closing Date or decreasing any Tax attribute of the Company existing on the Closing Date;

(t)     Accounting.  Change accounting methods or practices (including any change in depreciation or amortization policies) or revalue any of its assets (including writing down the value of inventory or writing off notes or accounts receivable otherwise than in the ordinary course of business), except in each case as required by changes in GAAP as concurred with its independent accountants and after notice to Acquirer;

(u)     Real Property.  Enter into any agreement for the purchase, sale or lease of any real property;

35

26246/00600/DOCS/2269228.5

(v)     Encumbrances.  Place or allow the creation of any Encumbrance (other than a Permitted Encumbrance) on any of its properties;

(w)     Interested Party Transactions.  Enter into any Contract in which any officer, director, employee, agent or stockholder of the Company (or any member of their immediate families) has an interest under circumstances that, if entered immediately prior to the Agreement Date, would require that such Contract be listed on Schedule 2.12 of the Company Disclosure Letter; and

(x)     Other.  Take or agree in writing or otherwise to take, any of the actions described in clauses (a) through (w) in this Section 4.2 or prevent the Company from performing or cause the Company not to perform one or more covenants required hereunder to be performed by the Company (such that the condition set forth in the second sentence of Section 6.3(a) would not be satisfied).

## ARTICLE 5
### ADDITIONAL AGREEMENTS

5.1     Stockholder Approval and Board Recommendation

(a)     The Company shall take all action necessary in accordance with this Agreement, Delaware Law, the Certificate of Incorporation and Bylaws to secure the Company Stockholder Approval. The Company's obligation to secure the Company Stockholder Approval in accordance with this Section 5.1 shall not be limited to or otherwise affected by the commencement, disclosure, announcement or submission to Company of any Acquisition Proposal, including a Superior Proposal, or in the event that the Company Board withholds, withdraws, amends or modifies its recommendation to the Company Stockholders in favor of the Company Stockholder Approval. The Company shall exercise commercially reasonable efforts to obtain an executed Company Stockholder Approval from each Company Stockholder. Promptly upon receipt of the Requisite Stockholder Approval, the Company shall deliver copies thereof to Acquirer.

(b)     (i) The Board of Directors shall unanimously recommend that the Company Stockholders vote in favor of the approval of the Merger and adoption of this Agreement pursuant to the Company Stockholder Approval; (ii) any information statement or other disclosure document distributed to the Company Stockholders in connection with this transaction shall include a statement to the effect that the Board of Directors has unanimously recommended that the Company Stockholders vote in favor of the approval of the Merger  and adoption of this Agreement pursuant to the Company Stockholder Approval (such document, the "***Information Statement***"); and (iii) neither the Board of Directors nor any committee thereof shall withhold, withdraw, amend or modify, or propose or resolve to withhold, withdraw, amend or modify in a manner adverse to Acquirer, the unanimous recommendation of the Board of Directors that the Company Stockholders vote in favor of the approval of the Merger and adoption of this Agreement.

5.2     No Solicitation.

(a)     From and after the date of this Agreement until the earlier of the Closing or termination of this Agreement pursuant to ARTICLE 7, the Company will not, nor will it authorize or permit any of its officers, directors, affiliates, stockholders or employees or any investment banker, attorney or other advisor or representative retained by it (all of the foregoing collectively being the "***Company Representatives***") to, directly or indirectly, (i) solicit, initiate, seek, entertain, knowingly encourage, facilitate, support or induce the making, submission or announcement of any inquiry, expression of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal (as hereinafter defined), (ii) enter into, participate in, maintain or continue any

36

26246/00600/DOCS/2269228.5

FB_FTC_CID_01497190

PX2373-044

communications (except solely to provide written notice as to the existence of these provisions) or negotiations regarding, or deliver or make available to any Person any non-public information with respect to, or take any other action regarding, any inquiry, expression of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal, (iii) agree to, accept, approve, endorse or recommend (or publicly propose or announce any intention or desire to agree to, accept, approve, endorse or recommend) any Acquisition Proposal, (iv) enter into any letter of intent or any other Contract contemplating or otherwise relating to any Acquisition Proposal, (v) submit any Acquisition Proposal to the vote of any securityholders of the Company or (vi) enter into any other transaction or series of transactions not in the ordinary course of the Company's business, the consummation of which could reasonably be expected to impede, interfere with, prevent or materially delay the Merger. The Company will immediately cease and cause to be terminated any and all existing activities, discussions or negotiations with any Persons conducted prior to or on the date of this Agreement with respect to any Acquisition Proposal. If any Company Representative, whether in his or her capacity as such or in any other capacity, takes any action that the Company is obligated pursuant to this Section 5.2 not to authorize or permit such Company Representative to take, then the Company shall be deemed for all purposes of this Agreement to have breached this Section 5.2.

"*Acquisition Proposal*" shall mean, with respect to the Company, any agreement, offer, proposal or bona fide indication of interest (other than this Agreement or any other offer, proposal or indication of interest by Acquirer), or any public announcement of intention to enter into any such agreement or of (or intention to make) any offer, proposal or bona fide indication of interest, relating to, or involving: (A) any acquisition or purchase from the Company, or from the stockholders of the Company, by any Person or Group (as hereinafter defined) of more than a 10% interest in the total outstanding voting securities of Company or any tender offer or exchange offer that if consummated would result in any Person or Group beneficially owning 10% or more of the total outstanding voting securities of the Company or any merger, consolidation, business combination or similar transaction involving the Company; (B) any sale, lease, mortgage, pledge, exchange, transfer, license (other than in the ordinary course of business), acquisition, or disposition of more than 10% of the assets of the Company in any single transaction or series of related transactions; (C) any liquidation, dissolution, recapitalization or other significant corporate reorganization of the Company, or any extraordinary dividend, whether of cash or other property; or (D) any other transaction outside of the ordinary course of the Company's business the consummation of which would reasonably be expected to materially impede, interfere with, prevent or delay the Merger.

"*Group*" shall have the definition ascribed to such term under Section 13(d) of the Exchange Act, the rules and regulations thereunder and related case law.

(b)     The Company shall immediately (but in any event, within 24 hours) notify Acquirer orally and in writing after receipt by the Company and/or any Subsidiary (or, to the knowledge of the Company, by any of the Company Representatives), of (i) any Acquisition Proposal, (ii) any inquiry, expression of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal, (iii) any other notice that any Person is considering making an Acquisition Proposal, or (iv) any request for nonpublic information relating to the Company or any Subsidiary or for access to any of the properties, books or records of the Company or any Subsidiary by any Person or Persons other than Acquirer. Such notice shall describe (1) the material terms and conditions of such Acquisition Proposal, inquiry, expression of interest, proposal, offer, notice or request, and (2) the identity of the Person or Group making any such Acquisition Proposal, inquiry, expression of interest, proposal, offer, notice or request. The Company shall keep Acquirer fully informed of the status and details of, and any modification to, any such inquiry, expression of interest, proposal or offer and any correspondence or communications related thereto and shall provide to Acquirer a true, correct and

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497191

PX2373-045

complete copy of such inquiry, expression of interest, proposal or offer and any amendments, correspondence and communications related thereto, if it is in writing, or a reasonable written summary thereof, if it is not in writing. The Company shall provide Acquirer with 48 hours prior notice (or such lesser prior notice as is provided to the members of the Board of Directors) of any meeting of the Board of Directors at which the Board of Directors is reasonably expected to discuss any Acquisition Proposal.

        5.3    Confidentiality; Public Disclosure.

        (a)    The parties hereto acknowledge that Acquirer and the Company have previously executed a non-disclosure agreement dated April 6, 2012 (the "*Confidentiality Agreement*") which shall continue in full force and effect in accordance with its terms. Each party hereto agrees that, it and its representatives shall hold the terms of the Merger in strict confidence. At no time shall any party disclose any of the terms of the Merger (including, but not limited to, the economic terms) or any non-public information about a party hereto (collectively, the "*Confidential Information*") to any other party without the prior written consent of the party about which such non-public information relates. Notwithstanding the foregoing, a party hereto shall be permitted to disclose any and all terms to its financial, tax, and legal advisors (each of whom is subject to a similar obligation of confidentiality), and to any Governmental Entity or administrative agency to the extent necessary or advisable in compliance with applicable Legal Requirement and the rules of the Nasdaq Global Select Market.

        (b)    The Company shall not issue any press release or other public communications relating to the terms of this Agreement or the transactions contemplated hereby or use Acquirer's name or refer to Acquirer directly or indirectly in connection with Acquirer's relationship with the Company in any media interview, advertisement, news release, press release or professional or trade publication, or in any print media, whether or not in response to an inquiry, without the prior written approval of Acquirer, unless required by law (in which event a satisfactory opinion of counsel to that effect shall be first delivered to Acquirer prior to any such disclosure) and except as reasonably necessary for the Company to obtain the consents and approvals of Company Stockholders and other third parties contemplated by this Agreement. Notwithstanding anything herein or in the Confidentiality Agreement, Acquirer and the Company shall mutually agree on the content of the press release or other public communications announcing the Merger and thereafter Acquirer may make such other public communications regarding this Agreement or the transactions contemplated hereby as Acquirer may determine is reasonably appropriate.

        5.4    Reasonable Efforts; Regulatory Approvals.

        (a)    Each of the parties hereto agrees to use its commercially reasonable efforts, and to cooperate with each other party hereto, to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, appropriate or desirable to consummate and make effective, in the most expeditious manner practicable, the Merger and the other transactions contemplated hereby, including the satisfaction of the respective conditions set forth in ARTICLE 6, and including to execute and deliver such other instruments and do and perform such other acts and things as may be necessary or reasonably desirable for effecting completely the consummation of the Merger and the other transactions contemplated hereby.

        (b)    As promptly as practicable (and in any event within six (6) Business Days) after the Agreement Date, Acquirer and the Company shall execute and file, or join in the execution and filing of, any application, notification (including any notification or provision of information, if any, that may be required under the HSR Act or applicable foreign antitrust laws) or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Entity, whether foreign, federal, state, local or municipal, which may be reasonably required in connection with the

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497192

PX2373-046

consummation of the Merger and the other transactions contemplated by this Agreement. Acquirer and the Company shall use commercially reasonable efforts to obtain, and to cooperate with each other to promptly obtain, all such authorizations, approvals and consents and shall pay any associated filing fees with respect to such authorizations, approvals and consents. Each party shall promptly inform the other party of any material communication between such party and any Governmental Entity regarding any of the transactions contemplated hereby. If Acquirer or any affiliate of Acquirer on the one hand, or the Company or any affiliate of the Company on the other hand, receives any formal or informal request for supplemental information or documentary material from any Governmental Entity with respect to the transactions contemplated hereby, then such party in receipt of such information or material shall make, or cause to be made, as soon as reasonably practicable, a response in compliance with such request. Acquirer and the Company shall direct, in their respective sole discretion, the making of such response, but shall consider in good faith the views of the other.

(c)     Notwithstanding anything in this Agreement to the contrary, if any administrative or judicial action or proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as violative of any federal, state or foreign statutes, rules, regulations, orders or decrees that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade, it is expressly understood and agreed that: (i) Acquirer shall not have any obligation to litigate or contest any Legal Proceeding or Order, whether temporary, preliminary or permanent; and (ii) Acquirer shall be under no obligation to make proposals, execute or carry out agreements or submit to orders providing for (1) the sale, transfer, license or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets, categories of assets, operations or categories of operations of Acquirer or any of its affiliates or the Company, (2) the discontinuation of any product or service of Acquirer or any of its affiliates or the Company, (3) the licensing or provision of any technology, software or other Intellectual Property of Acquirer or any of its affiliates or the Company to any Person, (4) the imposition of any limitation or regulation on the ability of Acquirer or any of its affiliates to freely conduct their business or own their respective assets, or (5) the holding separate of the shares of Company Capital Stock or any limitation or regulation on the ability of Acquirer or any of its affiliates to exercise full rights of ownership of the shares of Company Capital Stock (any of the foregoing, an "*Antitrust Restraint*").

5.5     Third Party Consents; Notices.

(a)     The Company shall use all reasonable efforts to obtain prior to the Closing, and deliver to Acquirer at or prior to the Closing, all consents, waivers and approvals under each Contract listed or described on Schedule 2.3(b)(ii)(B) of the Company Disclosure Letter (and any Contract entered into after the Agreement Date that would have been required to be listed or described on Schedule 2.3(b)(ii)(B) of the Company Disclosure Letter if entered into prior to the Agreement Date).

(b)     The Company shall give all notices and other information required to be given to the employees of the Company, any collective bargaining unit representing any group of employees of the Company, and any applicable government authority under the WARN Act, the National Labor Relations Act, as amended, the Code, COBRA and other applicable Legal Requirements in connection with the transactions contemplated by this Agreement.

5.6     Litigation. The Company will (i) notify Acquirer in writing promptly after learning of any Legal Proceeding initiated by or against it, or known by the Company to be threatened against the Company, or any of its directors, officers, employees or stockholders in their capacity as such (a "*New Litigation Claim*"), (ii) notify Acquirer of ongoing material developments in any New Litigation Claim

39

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497193

PX2373-047

and (iii) consult in good faith with Acquirer regarding the conduct of the defense of any New Litigation Claim.

5.7    Access to Information.

(a)    During the period commencing on the Agreement Date and continuing until the earlier of the termination of this Agreement and the Closing, (i) the Company shall afford Acquirer and its accountants, counsel and other representatives, reasonable access during business hours to (A) all of the Company's properties, books, Contracts and records and (B) all other information concerning the business, properties and personnel of the Company as Acquirer may reasonably request.

(b)    No information or knowledge obtained by Acquirer during the pendency of the transactions contemplated by this Agreement in any investigation pursuant to this Section 5.7 shall affect or be deemed to modify any representation, warranty, covenant, condition or obligation under this Agreement.

5.8    Spreadsheet. The Company shall prepare and deliver to Acquirer, at or prior to the Closing, a spreadsheet (the "*Spreadsheet*") in a form reasonably acceptable to Acquirer, which spreadsheet shall be dated as of the Closing Date and shall set forth all of the following information (in addition to the other required data and information specified therein), as of the Closing Date and immediately prior to the Effective Time: (a) the names of all the Company Stockholders and Company Optionholders and their respective addresses and where available, taxpayer identification numbers; (b) the number and kind of shares of Company Capital Stock held by, or subject to the Company Options held by, such Persons and, in the case of outstanding shares, the respective certificate numbers; (c) the number of shares of Company Capital Stock subject to and the exercise price per share in effect for each Company Option; (d) the vesting status and schedule with respect to Company Options and unvested Company Capital Stock and terms of the Company's rights to repurchase such unvested Company Capital Stock (including the repurchase price payable per share under each share of unvested Company Capital Stock); (e) the intended Tax status of each Company Option under Section 422 of the Code; (f) the calculation of the Total Escrow Shares, Total Escrow Cash, Company Shares Outstanding, Stock Closing Amount Per Share, Cash Closing Amount Per Share, Stock Escrow Amount Per Share, Cash Escrow Amount Per Share, Total Cash Merger Consideration, Total Stock Merger Consideration, and Total Merger Consideration; (g) the total amount of Taxes to be withheld from the Merger Consideration that each Company Securityholder immediately prior to the Effective Time is entitled to receive pursuant to Section 1.3 and (h) the Pro Rata Share of each Converting Holder and the interest of each Converting Holder in the Total Escrow Shares and Total Escrow Cash.

5.9    Expenses. Whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby (including Transaction Expenses) shall be paid by the party incurring such expense.

5.10    Employees.

(a)    With respect to any employee of the Company who receives an offer of employment from Acquirer or the Company, the Company shall assist Acquirer with its efforts to enter into an offer letter and confidential information and assignment agreement with such employee prior to the Closing Date. Notwithstanding any of the foregoing, with the exception of the Key Employee, neither Acquirer nor the Merger Subs (including the First Step Surviving Corporation and Final Surviving Entity) shall have any obligation to make an offer of employment to any employee of the Company. With respect to matters described in this Section 5.10, the Company will consult with Acquirer (and will consider in good faith the advice of Acquirer) prior to sending any notices or other communication

40

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497194

materials to its employees. At such time designated by Acquirer, the Company shall terminate the employment of each of those Company employees who (i) have not received an offer of continued employment with the Company or Acquirer prior to the Closing Date and (ii) have declined an offer of continued employment with the Company or Acquirer prior to the Closing Date (the "***Designated Employees***"), and the Company shall use commercially reasonable efforts to require such Designated Employees to execute a general waiver and release of claims, in a form approved by Acquirer, as a condition to the receipt of any severance paid by the Company, if any.

(b)     The Company shall ensure that, there shall be no outstanding securities, commitments or agreements of the Company immediately prior to the Effective Time that purport to obligate the Company to issue any shares of Company Capital Stock or Company Options under any circumstances other than as required to allow the conversion of the Company Preferred Stock into Company Common Stock.

(c)     The Company shall use its commercially reasonable efforts to cause the delivery to Acquirer at or prior to the Closing of a true and complete copy of each election statement under Section 83(b) of the Code filed by each Person who acquired unvested shares of Company Capital Stock (where applicable) after the Agreement Date (or prior to the Agreement Date to the extent not previously provided by the Company), together with evidence of timely filing of such election statement with the appropriate Internal Revenue Service Center.

5.11    Acquirer RSUs. Following the Closing Date, the Continuing Employees will be awarded an aggregate of 4,276,453 Acquirer RSUs (the "***Employee RSUs***") in the allocations set forth on Exhibit O hereto. The Employee RSUs will be subject to all of the terms and conditions set forth in the Plan (which shall not be inconsistent with the terms of the Key Employee Offer Letters) and in Acquirer's restricted stock unit agreement to be entered into between each Key Employee and Acquirer.

5.12    Certain Closing Certificates and Documents. The Company shall prepare and deliver to Acquirer, a draft of the Spreadsheet not later than two (2) Business Days prior to the Closing Date. Without limiting the generality or effect of the foregoing or the provisions of Section 5.7, Company shall provide to Acquirer, promptly after Acquirer's request, copies of the documents or instruments evidencing the amounts set forth on any such draft or final certificate.

5.13    Tax Matters.

(a)     Acquirer, the Company Securityholders and the Company shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information reasonably relevant to any such audit, litigation, or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Acquirer, the Company Securityholders and the Company agree to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until expiration of the statute of limitations of the respective taxable periods, and to abide by all record retention agreements entered into with any Tax Authority.

(b)     Acquirer, the Company and the Final Surviving Entity will each use its commercially reasonable efforts to cause the Merger to be treated as a reorganization within the meaning of Section 368(a) of the Code. Neither Acquirer nor the Company shall take any action prior to the Closing, and Acquirer shall use its commercially reasonable efforts not to take any action or fail to take any action (and shall use its commercially reasonable efforts to prevent the Final Surviving Entity from

41

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497195

PX2373-049

taking any action or failing to take any action) following the Closing, that would cause the Merger to fail to qualify as a reorganization within the meaning of Section 368(a) of the Code. Merger Sub II is a wholly owned entity of Acquirer and no election has been made to treat Merger Sub II as a corporation for federal income tax purposes, and no such election will be made with respect to Merger Sub II or the Final Surviving Entity if such election would cause the Merger to fail to qualify as a reorganization within the meaning of Section 368(a) of the Code.

(c)     Unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code, each of Acquirer and the Company shall report and treat the Merger as a reorganization within the meaning of Section 368 of the Code and shall file all Tax Returns consistent with that treatment.

(d)     The Company shall cause each Company Securityholder to further agree, upon request, to use their reasonable best efforts to obtain any certificate or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

5.14     280G Stockholder Approval. Promptly following the execution of this Agreement, the Company shall submit to the Company Stockholders for approval (in a manner reasonably satisfactory to Acquirer), by such number of holders of Company Stockholders as is required by the terms of Section 280G(b)(5)(B) of the Code, any payments and/or benefits that may separately or in the aggregate, constitute "parachute payments" pursuant to Section 280G of the Code ("*Section 280G Payments*") (which determination shall be made by the Company and shall be subject to review and approval by Acquirer, such approval not to be unreasonably withheld, conditioned or delayed), such that such payments and benefits shall not be deemed to be Section 280G Payments, and prior to the Closing, the Company shall deliver to Acquirer notification and documentation reasonably satisfactory to Acquirer that (a) a vote of the holders of Company Capital Stock was solicited in conformance with Section 280G and the regulations promulgated thereunder and the requisite stockholder approval was obtained with respect to any payments and/or benefits that were subject to the stockholder vote (the "*280G Stockholder Approval*"), or (b) that the 280G Stockholder Approval was not obtained and as a consequence, that such payments and/or benefits shall not be made or provided to the extent they would cause any amounts to constitute Section 280G Payments, pursuant to the waivers of those payments and/or benefits which were executed by the affected individuals prior to the vote of the holders of Company Capital Stock pursuant to this Section 5.14.

5.15     Director and Officer Indemnification.

(a)     If the Merger is consummated, then until the sixth anniversary of the Effective Time, Acquirer will cause the Final Surviving Entity to fulfill and honor in all respects the obligations of the Company to its present and former directors and officers determined as of immediately prior to the Effective Time (the "*Company Indemnified Parties*") pursuant to indemnification agreements with the Company in effect on the Agreement Date and pursuant to the Company's Certificate of Incorporation or bylaws, in each case, in effect on the Agreement Date (the "*Company Indemnification Provisions*"), with respect to claims arising out of acts or omissions occurring at or prior to the Effective Time which are asserted after the Effective Time. However, the foregoing covenants under this Section 5.15(a) shall not apply to (i) any claim or matter that relates to a willful or intentional breach of a representation, warranty or covenant made by the Company in connection with this Agreement or the transactions contemplated hereby or (ii) any claim based on a claim for indemnification made by an Indemnified Person pursuant to Article 8. In the event of breach of the representation set forth in the last sentence of Section 2.5, this Section 5.15(a) shall be terminated with respect to any claim not disclosed in Schedule 2.5 of the

42

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC                                                    FB_FTC_CID_01497196

PX2373-050

Company Disclosure Letter. For the avoidance of doubt, and notwithstanding any provision to the contrary contained in the Company Indemnification Provisions, no Company Indemnified Party shall be entitled to coverage under any Acquirer director and officer insurance policy or errors and omission policy unless such Company Indemnified Party is separately eligible for coverage under such policy pursuant to Acquirer's policies and procedures and the terms of such insurance policy.

(b)     The aggregate liability of Acquirer under Section 5.15(a) to all Company Indemnified Parties shall in no event exceed the greater of the Tail Insurance Coverage (as defined below) or the amount of stockholders' equity shown on the Company's balance sheet as of the Closing Date. Prior to the Effective Time, the Company may purchase tail insurance coverage (the "*Tail Insurance Coverage*") for the Company Indemnified Parties in a form reasonably acceptable to the Company and Acquirer, which shall provide such directors and officers with coverage for six years following the Effective Time in an amount not less than the existing coverage and that shall have other terms not materially less favorable to the insured persons than the directors' and officers' liability insurance coverage presently maintained by the Company, provided that the cost of such Insurance Coverage is included as a Transaction Expense. Acquirer shall cause the Surviving Corporation to maintain the Tail Insurance Coverage in full force and effect and continue to honor the obligations thereunder.

(c)     This Section 5.15(i) shall survive the consummation of the Merger, (ii) is intended to benefit each Company Indemnified Party and their respective heirs, (iii) is in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have against Acquirer or the Final Surviving Entity first arising after the Closing Date by contract or otherwise, (iv) shall be binding on all successors and assigns of Acquirer and the Final Surviving Entity and shall be enforceable by the Company Indemnified Parties, and (v) shall not be terminated or modified in such a manner as to adversely affect the rights of any Company Indemnified Party under this Section 5.15 without the written consent of such affected Company Indemnified Party.

5.16     Transaction Expenses. On or prior to the Closing, the Company shall pay and discharge in full all Transaction Expenses.

5.17     Privacy Policy. The Company will implement an amended version of its privacy policy, effective date prior to the Closing, containing terms reasonably acceptable to Acquirer, including without limitation an express right to transfer Personal Data to Acquirer in connection with the Merger.

5.18     Software Remediation. The Company shall use commercially reasonable efforts to complete the software remediation efforts set forth in Schedule 5.18 of the Company Disclosure Letter.

## ARTICLE 6
### CONDITIONS TO THE MERGER

6.1     Conditions to Obligations of Each Party to Effect the Merger. The respective obligations of each party hereto to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of each of the following conditions:

(a)     Company Stockholder Approval. The Merger shall have been duly and validly approved and this Agreement shall have been duly and validly adopted, as required by Delaware Law, and the Certificate of Incorporation and Bylaws, each as in effect on the date of such approval and adoption, by the requisite written consent of the Company Stockholders.

(b)     Illegality. There shall not be issued, enacted or adopted by any Governmental Entity any statute, regulation, enactment, Order or Legal Proceeding (whether temporary, preliminary or

43

26246/00600/DOCS/2269228.5

permanent) by any Governmental Entity that prohibits or renders illegal or imposes limitations on the Merger or any other transaction contemplated by this Agreement.

(c)     Governmental Approvals.  Acquirer, the Merger Subs and the Company shall have timely obtained from each Governmental Entity all approvals, waivers and consents, if any, necessary for consummation of, or in connection with, the Merger and the other transactions contemplated hereby.  All applicable waiting periods under the HSR Act or applicable foreign antitrust laws shall have expired or early termination of such waiting periods shall have been granted by both the Federal Trade Commission and the United States Department of Justice (or, with respect to foreign antitrust laws, the applicable foreign Governmental Entity).

6.2     Additional Conditions to Obligations of the Company.  The obligations of the Company to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of each of the following conditions (it being understood that each such condition is solely for the benefit of the Company and may be waived by the Company in writing in its sole discretion without notice or Liability to any Person):

(a)     Representations, Warranties and Covenants.  The representations and warranties of Acquirer in this Agreement shall be true and correct (except for such representations and warranties that are qualified by their terms by a reference to materiality or Material Adverse Effect, which representations and warranties as so qualified shall be true and correct in all respects) on and as of the date hereof and on and as of the Closing Date as though such representations and warranties were made on and as of such date, except where the failure of any such representation or warranty to be so true and correct would not have a Material Adverse Effect on Acquirer (except for representations and warranties which address matters only as to a specified date, which representations and warranties shall be true and correct with respect to such specified date where the failure of any such representation or warranty to be so true and correct would not have a Material Adverse Effect on Acquirer).  Acquirer shall have performed and complied in all material respects with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it at or prior to the Closing.

(b)     Receipt of Closing Deliveries.  The Company shall have received each of the agreements, instruments and other documents set forth in Section 1.2(a).

6.3     Additional Conditions to the Obligations of Acquirer.  The obligations of Acquirer to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of each of the following conditions (it being understood that each such condition is solely for the benefit of Acquirer and may be waived by Acquirer in writing in its sole discretion without notice or Liability to any Person):

(a)     Representations, Warranties and Covenants.   (i) The representations and warranties of the Company in this Agreement (other than the representations and warranties set forth in subsection (ii) of this Section 6.3(a)) shall be true and correct (except for such representations and warranties that are qualified by their terms by a reference to materiality or Material Adverse Effect, which representations and warranties shall be true and correct in all respects) on and as of the date hereof and on and as of the Closing Date as though such representations and warranties were made on and as of such date, except where the failure of any such representation or warranty to be so true and correct would not have a Material Adverse Effect on the Company (except for representations and warranties which address matters only as to a specified date, which representations and warranties shall be true and correct with respect to such specified date where the failure of any such representation or warranty to be so true and correct would not have a Material Adverse Effect on the Company) and (ii) the representations and warranties of the Company contained in Section 2.2 (Capital Structure), Section 2.3 (Authority;

44

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

Noncontravention) and Section 2.18 (Transaction Fees) shall be true and correct in all material respects as of the Agreement Date and as of the Closing Date as though made on and as of such date. The Company shall have performed and complied in all material respects with all covenants, obligations and conditions of this Agreement required to be performed and complied with by the Company at or prior to the Closing.

(b)     Receipt of Closing Deliveries. Acquirer shall have received each of the agreements, instruments and other documents set forth in Section 1.2(b); *provided, however,* that such receipt shall not be deemed to be an agreement by Acquirer that the amounts set forth on the Spreadsheet or any of the other agreements, instruments or documents set forth in Section 1.2(b) is accurate and shall not diminish Acquirer's remedies hereunder if any of the foregoing documents is not accurate.

(c)     Injunctions or Restraints on Conduct of Business. There shall not be issued, enacted or adopted, or threatened in writing by any Governmental Entity, any Antitrust Restraint, or any statute, regulation, enactment, Order or Legal Proceeding (whether temporary, preliminary or permanent) that prohibits or renders illegal or imposes limitations on: (a) the Merger or any other transaction contemplated by this Agreement; or (b) Acquirer's right (or the right of any subsidiary of Acquirer) to conduct the Business on or after consummation of the Merger.

(d)     No Material Adverse Effect. There shall not have occurred a Material Adverse Effect with respect to the Company.

(e)     No Outstanding Securities. There shall be no outstanding securities, warrants, options, commitments or agreements of the Company immediately prior to the Effective Time that purport to obligate the Company to issue any shares of Company Capital Stock, Company Options, or any other securities under any circumstances. All of the Company Preferred Stock shall have converted into shares of Common Stock.

(f)     Key Employees. Each Key Employee shall have signed a Key Employee Offer Letter, a Vesting Agreement and a Non-Competition Agreement, each of which shall continue to be in full force and effect and no action shall have been taken by any such individual to rescind any of such agreements.

(g)     Vesting Agreement. Each Key Employee and each employee who holds stock of the Company shall have signed a Vesting Agreement, each of which shall continue to be in full force and effect and no action shall have been taken by any such individual to rescind any of such agreements.

(h)     Company Stockholder Approval. The Company Stockholder Approval shall have been duly and validly obtained, as required by Delaware Law and California Law and the Certificate of Incorporation and Bylaws, in each case as in effect on the date of such approval and, in addition, this Agreement and the Merger shall have been duly and validly approved by holders of outstanding Company Capital Stock representing at least 90% of all outstanding shares of Company Capital Stock and at least 90% of the voting power of all outstanding shares of Company Capital Stock.

(i)     Section 280G Payments. The Company shall have delivered to Acquirer the notification and evidence required by Section 5.14.

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497199

PX2373-053

## ARTICLE 7
### TERMINATION, AMENDMENT AND WAIVER

7.1    Termination.  At any time prior to the Closing, this Agreement may be terminated and the Merger abandoned by authorized action taken by the terminating party, whether before or after the Company Stockholder Approval:

(a)    by mutual written consent duly authorized by Acquirer and the Board of Directors of the Company;

(b)    by either Acquirer or the Company, if the Closing shall not have occurred within ninety (90) days following the Agreement Date or such other date that Acquirer and the Company may agree upon in writing (the "***Termination Date***"); and *provided, further*, that the right to terminate this Agreement under this clause (b) of Section 7.1 shall not be available to any party whose breach of any covenant or agreement hereunder will have been the principal cause of, or will have directly resulted in, the failure of the Closing to occur on or before the Termination Date;

(c)    by either Acquirer or the Company, if any permanent injunction or other order of a Governmental Entity of competent authority preventing the consummation of the Merger shall have become final and nonappealable;

(d)    by Acquirer, if (i) the Company shall have breached any representation, warranty, covenant or agreement contained herein and such breach shall not have been cured within ten (10) Business Days after receipt by the Company of written notice of such breach and if not cured within the timeframe above and at or prior to the Closing, such breach would result in the failure of any of the conditions set forth in Section 6.1 or Section 6.3 to be satisfied, (ii) there shall have been a Material Adverse Effect with respect to the Company, (iii) the Company shall have breached Section 5.1 or Section 5.2, or (iv) the Requisite Stockholder Approval is not obtained within twenty-four (24) hours following the execution of this Agreement by the parties hereto; or

(e)    by the Company, if Acquirer shall have breached any representation, warranty, covenant or agreement contained herein and such breach shall not have been cured within ten (10) Business Days after receipt by Acquirer of written notice of such breach and if not cured within the timeframe above and at or prior to the Closing, such breach would result in the failure of any of the conditions set forth in Section 6.1 or Section 6.2 to be satisfied.

7.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 7.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of Acquirer, Sub, the Company or their respective officers, directors, stockholders or affiliates; *provided, however*, that (a) the provisions of this Section 7.2 (Effect of Termination), ARTICLE 9 (General Provisions) and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement and (b) nothing herein shall relieve any party hereto from liability in connection with any breach of such party's representations, warranties or covenants contained herein.

7.3    Amendment.  Subject to the provisions of applicable Legal Requirements, the parties hereto may amend this Agreement by authorized action at any time pursuant to an instrument in writing signed on behalf of each of the parties hereto (provided that after such approval, no amendment shall be made which by law requires further approval by such stockholders without such further stockholder approval).  To the extent permitted by applicable Legal Requirements, Acquirer and the Stockholders' Agent may cause this Agreement to be amended at any time after the Closing by execution of an instrument in writing signed on behalf of Acquirer and the Stockholders' Agent.

46

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

7.4     Extension; Waiver.  At any time at or prior to the Closing, any party hereto may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  At any time after the Closing, the Stockholders' Agent and Acquirer may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or other acts of the other, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions for the benefit of such Person contained herein.  Any agreement on the part of a party hereto or the Stockholders' Agent to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  Without limiting the generality or effect of the preceding sentence, no delay in exercising any right under this Agreement shall constitute a waiver of such right, and no waiver of any breach or default shall be deemed a waiver of any other breach or default of the same or any other provision in this Agreement.

## ARTICLE 8
ESCROW FUND AND INDEMNIFICATION

8.1     Escrow Funds.

(a)     At the Effective Time, Acquirer will withhold from the Total Merger Consideration issuable to the Company Stockholders the Total Escrow Shares and the Total Escrow Cash and such amounts shall be deposited with U.S. Bank N.A. (or another institution selected by Acquirer and reasonably satisfactory to the Company) as escrow agent (the "*Escrow Agent*") (such deposited amounts, together with any distributions that may be made thereon, to constitute two separate escrow funds, the "*Stock Escrow Fund*" and "*Cash Escrow Fund*," respectively and together, the "*Escrow Funds*") and to be governed by the provisions set forth in the Escrow Agreement.  The Escrow Funds shall be available to compensate Acquirer (on behalf of itself or any other Indemnified Person (as such term is defined in Section 8.2 below)) for Indemnifiable Damages (as such term is defined in Section 8.2 below) pursuant to the indemnification obligations of the Converting Holders.  Acquirer shall retain the Escrow Funds until 11:59 p.m. California time on the date that is thirty (30) days after the date that is twelve (12) months after the Effective Time (the "*Escrow Release Date*").  Except to the extent there is a cancellation of shares of Acquirer Common Stock held in the Stock Escrow Fund in connection with Indemnifiable Damages, shares of Acquirer Common Stock held in the Stock Escrow Fund shall be treated by the Acquirer as held in escrow for the benefit of the Company Stockholders as issued and outstanding stock of Acquirer, and the Company Stockholders shall be shown as the record holders of the Total Escrow Shares and entitled to exercise voting rights and to receive dividends (other than stock dividends merely evidencing a stock split, recapitalization or similar transaction) with respect to such shares in accordance with their respective Pro Rata Shares.  The parties hereto agree that, for tax reporting purposes, all interest and other income receive from investment of the Cash Escrow Fund shall be reported as having been earned by Acquirer.  In no event will the interest and other income attributable to the Cash Escrow Fund that is added to the Cash Escrow Fund exceed in the aggregate 12% of the initial amount of the Cash Escrow Fund, and any interest and other income received on the Cash Escrow Fund in excess thereof will be disbursed to Acquirer.  A portion of the payments from the Cash Escrow Fund will be treated as imputed interest to the extent required under the Code and the regulations promulgated thereunder.  No portion (nor all) of the Escrow Funds, nor any beneficial interest therein, may be pledged, subjected to any Encumbrance, sold, assigned or transferred, by any Converting Holder, or be taken or reached by any legal or equitable process in satisfaction of any debt or other Liability of any Converting Holder, in each case prior to the disbursement of the Escrow Funds to any Converting Holder in accordance with Section

47

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

8.1(b) below, except that each Converting Holder shall be entitled to assign such Converting Holder's rights to the Escrow Funds by will, by the laws of intestacy or by other operation of law.

(b)    Subject to Section 8.1(c) below, within five (5) Business Days following the Escrow Release Date, Acquirer (or its agent) will disburse to each Converting Holder such Converting Holder's Pro Rata Share of the Escrow Funds, less (i) that portion of the Escrow Funds previously paid to Acquirer in satisfaction of claims for indemnification in accordance with this ARTICLE 8 and (ii) that portion of the Escrow Funds that is determined, in the reasonable judgment of Acquirer, to be necessary to satisfy all unsatisfied or disputed claims for indemnification specified in any Claim Certificate (as defined in Section 8.5 below) delivered to the Stockholders' Agent prior to the Escrow Release Date in accordance with this ARTICLE 8. Any portion of the Escrow Funds held following the Escrow Release Date with respect to pending but unresolved claims for indemnification that is not awarded to Acquirer upon the resolution of such claims shall be disbursed to the Converting Holders within five (5) Business Days following resolution of such claims and in accordance with each such Converting Holder's Pro Rata Share.

8.2    Indemnification. Subject to the limitations set forth in this ARTICLE 8, the Converting Holders shall severally and not jointly indemnify and hold harmless Acquirer and its officers, directors, agents and employees, and each person, if any, who controls or may control Acquirer within the meaning of the Securities Act (each of the foregoing being referred to individually as an "*Indemnified Person*" and collectively as "*Indemnified Persons*") from and against any and all losses, Liabilities, damages, fees, lost profits, Taxes, reductions in value, interest, costs and expenses, including costs of investigation and defense and reasonable fees and expenses of lawyers, experts and other professionals, directly or indirectly, whether or not due to a third-party claim (collectively, "*Indemnifiable Damages*"), arising out of, resulting from or in connection with (i) any failure of any representation or warranty made by the Company in this Agreement or the Company Disclosure Letter (including any exhibit or schedule to the Company Disclosure Letter) to be true and correct as of the Agreement Date and as of the Closing Date as though such representation or warranty were made as of the Closing Date (except in the case of representations and warranties which by their terms speak only as of a specific date or dates, which representations and warranties shall be true and correct as of such date), (ii) any failure of any certification, representation or warranty made by the Company in any certificate (other than the Spreadsheet) delivered to Acquirer pursuant to any provision of this Agreement to be true and correct as of the date such certificate is delivered to Acquirer, (iii) any breach of or default in connection with any of the covenants or agreements made by the Company in this Agreement or any other agreements contemplated by this Agreement or the Merger, (iv) any inaccuracies in the Spreadsheet, (v) any payments paid with respect to Dissenting Shares and approved by the Stockholders' Agent (such approval to not be unreasonably withheld) to the extent that such payments, in the aggregate, exceed the value of the amounts that otherwise would have been payable pursuant to Section 1.3(a) upon the exchange of such Dissenting Shares, and any interest, costs, expenses and fees incurred by any Indemnified Person in connection with the exercise of any dissenters' rights, and (vi) any unpaid Transaction Expenses. Materiality standards or qualifications, and qualifications by reference to the defined term "Material Adverse Effect" in any representation, warranty or covenant shall only be taken into account in determining whether a breach of or default in connection with such representation, warranty or covenant (or failure of any representation or warranty to be true and correct) exists, and shall not be taken into account in determining the amount of any Indemnifiable Damages with respect to such breach, default or failure to be true and correct. The Converting Holders shall not have any right of contribution, indemnification or right of advancement from the Final Surviving Entity or Acquirer with respect to any Indemnifiable Damages claimed by an Indemnified Person.

8.3    Indemnifiable Damage Threshold; Other Limitations.

48

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(a)      Notwithstanding anything contained herein to the contrary, no Indemnified Person may make a claim against the Escrow Funds in respect of any claim for Indemnifiable Damages arising out of, resulting from or in connection with Section 8.2(i) (other than any failure of any of the Special Representations to be true and correct as aforesaid) unless and until a Claim Certificate describing Indemnifiable Damages in an aggregate amount greater than Five Million Dollars ($5,000,000) (the "*Aggregate Threshold*") has been delivered, in which case the Indemnified Person may make claims for indemnification and may receive cash or shares of Acquirer Common Stock from the Escrow Funds for all Indemnifiable Damages (including the amount of the Aggregate Threshold). The Aggregate Threshold shall not apply to any other Indemnifiable Damages.

(b)      If the Merger is consummated, recovery from the Escrow Funds shall constitute the sole and exclusive remedy for the indemnity obligations under this Agreement for the matters listed in Section 8.2(i), except (i) in the case of fraud, willful breach or intentional misrepresentation by any Person, and (ii) any failure of any of the representations and warranties contained in Section 2.2 (Capital Structure), Section 2.3 (Authority; Noncontravention), or Section 2.18 (Transaction Fees) (collectively, the "*Special Representations*") to be true and correct as aforesaid.  In the case of (A) the matters listed in Section 8.2(ii) to (vi), (B) any failure of any of the Special Representations to be true and correct as aforesaid or (C) fraud, willful breach or intentional misrepresentation by or on behalf of the Company, after Indemnified Persons have exhausted or made claims upon all amounts of cash and/or a number of shares of Acquirer Common Stock in the Escrow Funds (after taking into account all other claims for indemnification from the Escrow Funds made by Indemnified Persons), each Converting Holder shall be liable for such Person's Pro Rata Share of the amount of any Indemnifiable Damages resulting therefrom; *provided, however*, that such liability shall be limited to such Person's Pro Rata Share of the aggregate value of the Total Merger Consideration (with the value of the Total Stock Merger Consideration based on the Fair Market Value).  There shall be no maximum liability applicable to a Converting Holder in the case of (1) fraud, willful breach or intentional misrepresentation by such Converting Holder or (2) fraud, willful breach or intentional misrepresentation by or on behalf of the Company in which such Converting Holder participated or had actual knowledge.

8.4      Period for Claims Against the Escrow Funds.  Except as set forth below and in the case of claims alleging fraud, willful breach or intentional misrepresentation by any Person, the period during which claims for Indemnifiable Damages may be made (the "*Claims Period*") against the Escrow Funds for Indemnifiable Damages arising from or in connection with the matters listed in Section 8.2(i) (other than with respect to any of the Special Representations) shall commence at the Closing and terminate on the date that is twelve (12) months following the Closing Date (the "*Escrow Period*").  The Claims Period for Indemnifiable Damages arising out of, resulting from or in connection with all other claims, including (i) fraud, willful breach or intentional misrepresentation by any Person, and (ii) any failure of any of the Special Representations to be true and correct, shall commence at the Closing and terminate upon the expiration of the applicable statute of limitations.  Notwithstanding anything contained herein to the contrary, such portion of the Cash Escrow Fund and/or Stock Escrow Fund at the conclusion of the Escrow Period as in the reasonable judgment of Acquirer may be necessary to satisfy any unresolved or unsatisfied claims for Indemnifiable Damages specified in any Claim Certificate delivered to the Stockholder's Agent prior to the expiration of the Escrow Period shall remain in such Cash Escrow Fund and/or Stock Escrow Fund until such claims for Indemnifiable Damages have been resolved or satisfied.  The availability of the Escrow Funds to indemnify the Indemnified Persons will be determined without regard to any right to indemnification that any Converting Holder may have in his or her capacity as an officer, director, employee, or agent of the Company and no such Converting Holder will be entitled to any indemnification from the Company, the First Step Surviving Corporation or the Final Surviving Entity for amounts paid for indemnification under this ARTICLE 8.

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497203

PX2373-057

8.5    Claims.

(a)    On or before the last day of the applicable Claims Period, Acquirer may deliver to the Stockholders' Agent a certificate signed by any officer of Acquirer (an "*Claim Certificate*"):

(i)    stating that an Indemnified Person has incurred, paid, reserved or accrued, or in good faith believes that it may incur, pay, reserve or accrue, Indemnifiable Damages (or that with respect to any Tax matters, that any Tax Authority may raise such matter in audit of Acquirer or its subsidiaries, which could give rise to Indemnifiable Damages);

(ii)    stating the amount of such Indemnifiable Damages (which, in the case of Indemnifiable Damages not yet incurred, paid, reserved or accrued, may be the maximum amount believed by Acquirer in good faith to be incurred, paid, reserved, accrued or demanded by a third party); and

(iii)    specifying in reasonable detail (based upon the information then possessed by Acquirer) the individual items of such Indemnifiable Damages included in the amount so stated and the nature of the claim to which such Indemnifiable Damages are related.

No delay in providing such Claim Certificate within the applicable Claims Period shall affect an Indemnified Person's rights hereunder, unless (and then only to the extent that) the Stockholders' Agent or the Converting Holders are materially prejudiced thereby.

8.6    Resolution of Objections to Claims.

(a)    If the Stockholders' Agent does not contest, by written notice to Acquirer, any claim or claims by Acquirer made in any Claim Certificate within the 30-day period following receipt of the Claim Certificate, then Acquirer shall reclaim an amount of cash and/or Acquirer Common Stock from the Cash Escrow Fund or Stock Escrow Fund, as applicable, having a total value equal to the amount of any Indemnifiable Damages corresponding to such claim or claims as set forth in such Claim Certificate; *provided, that,* the per share value of any shares of Acquirer Common Stock used to satisfy any Claims under this ARTICLE 8 shall be the Fair Market Value of Acquirer Common Stock.

(b)    If the Stockholders' Agent objects in writing to any claim or claims by Acquirer made in any Claim Certificate within such 30-day period, Acquirer and the Stockholders' Agent shall attempt in good faith for 60 days after Acquirer's receipt of such written objection to resolve such objection. If Acquirer and the Stockholders' Agent shall so agree, a joint written instruction setting forth such agreement shall be prepared and signed by both parties. Acquirer shall be entitled to conclusively rely on any such joint written instruction and the Escrow Agent shall distribute cash from the Cash Escrow Fund and such number of the Total Escrow Shares from the Stock Escrow Fund in accordance with the terms of such joint written instruction.

(c)    If no such agreement can be reached during the 60-day period for good faith negotiation, but in any event upon the expiration of such 60-day period, either Acquirer or the Stockholders' Agent may bring an arbitration in accordance with the terms of Section 9.9 to resolve the matter. The decision of the arbitrator as to the validity and amount of any claim in such Claim Certificate shall be nonappealable, binding and conclusive upon the parties to this Agreement and Acquirer shall be entitled to act in accordance with such decision and the Escrow Agent shall be entitled to act in accordance with such decision and the Escrow Agent shall distribute cash from the Cash Escrow Fund and such number of the Total Escrow Shares from the Stock Escrow Fund in accordance therewith.

50

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

(d)     Judgment upon any award rendered by the trial court may be entered in any court having jurisdiction. For purposes of this Section 8.6(d), in any suit hereunder in which any claim or the amount thereof stated in the Claim Certificate is at issue, Acquirer shall be deemed to be the non-prevailing party unless the trial court awards Acquirer more than one-half of the amount in dispute, in which case the Converting Holders shall be deemed to be the non-prevailing party. The non-prevailing party to a suit shall pay its own expenses and the expenses and the fees and expenses of the prevailing party, including attorneys' fees and costs, reasonably incurred in connection with such suit.

8.7     Stockholders' Agent.

(a)     At the Closing,                     shall be constituted and appointed as the Stockholders' Agent. For purposes of this Agreement, the term "**Stockholders' Agent**" shall mean the agent for and on behalf of the Converting Holders to: (i) execute, as Stockholders' Agent, this Agreement and any agreement or instrument entered into or delivered in connection with the transactions contemplated hereby; (ii) give and receive notices, instructions, and communications permitted or required under this Agreement, or any other agreement, document or instrument entered into or executed in connection herewith, for and on behalf of any Converting Holder, to or from Acquirer (on behalf of itself or any other Indemnified Person) relating to this Agreement or any of the transactions and other matters contemplated hereby or thereby (except to the extent that this Agreement expressly contemplates that any such notice or communication shall be given or received by each Converting Holder individually); (ii) review, negotiate and agree to and authorize Acquirer to reclaim an amount of cash and/or shares of Acquirer Common Stock from the Cash Escrow Fund or Stock Escrow Fund, as applicable, in satisfaction of claims asserted by Acquirer (on behalf of itself or any other Indemnified Person, including by not objecting to such claims) pursuant to this ARTICLE 8; (iii) object to such claims pursuant to Section 8.6; (iv) consent or agree to, negotiate, enter into, or, if applicable, contest, prosecute or defend, settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to, such claims, resolve any such claims, take any actions in connection with the resolution of any dispute relating hereto or to the transactions contemplated hereby by arbitration, settlement or otherwise, and take or forego any or all actions permitted or required of any Converting Holder or necessary in the judgment of the Stockholders' Agent for the accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement; (v) consult with legal counsel, independent public accountants and other experts selected by it, solely at the cost and expense of the Converting Holders; (vi) consent or agree to any amendment to this Agreement or to waive any terms and conditions of this Agreement providing rights or benefits to the Converting Holders (other than with respect to the issuance of the Total Merger Consideration less the Total Escrow Shares and Total Escrow Cash) in accordance with the terms hereof and in the manner provided herein; and (vii) take all actions necessary or appropriate in the judgment of the Stockholders' Agent for the accomplishment of the foregoing, in each case without having to seek or obtain the consent of any Person under any circumstance. Acquirer, the Merger Subs and their respective Affiliates (including without limitation, after the Effective Time, the First Step Surviving Corporation or after the Second Effective Time, the Final Surviving Entity) shall be entitled to rely on the appointment of                     as the Stockholders' Agent and treat such Stockholders' Agent as the duly appointed attorney-in-fact of each Converting Holder and has having the duties, power and authority provided for in this Section 8.7. The Converting Holders shall be bound by all actions taken and documents executed by the Stockholders' Agent in connection with this ARTICLE 8, and Acquirer and other Indemnified Persons shall be entitled to rely exclusively on any action or decision of the Stockholders' Agent. The Person serving as the Stockholders' Agent may be replaced from time to time by the holders of a majority in interest of the aggregate value of the cash and shares of Acquirer Common Stock held in the Escrow Funds upon not less than 30 days' prior written notice to Acquirer. No bond shall be required of the Stockholders' Agent.

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497205

PX2373-059

(b)      The Stockholders' Agent shall not be liable to any former holder of Company Capital Stock for any act done or omitted hereunder as the Stockholders' Agent while acting in good faith (and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith) and without gross negligence or willful misconduct. The Stockholders' Agent shall serve as the Stockholders' Agent without compensation; provided, that the Converting Holders shall severally indemnify the Stockholders' Agent and hold him harmless against any loss, liability or expense incurred without gross negligence, willful misconduct or bad faith on the part of the Stockholders' Agent and arising out of or in connection with the acceptance or administration of his duties hereunder, including all reasonable out-of-pocket costs and expenses and legal fees and other legal costs reasonably incurred by the Stockholders' Agent. If not paid directly to the Stockholders' Agent by the Converting Holders, such losses, liabilities or expenses may be recovered by the Stockholders' Agent from the Escrow Funds otherwise distributable to the Converting Holders (and not distributed or distributable to an Indemnified Person or subject to a pending indemnification claim of an Indemnified Person) after the expiration of the Escrow Period pursuant to the terms hereof, at the time of distribution, and such recovery will be made from the Converting Holders according to their respective Pro Rata Shares.

(c)      Any notice or communication given or received by, and any decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of, the Stockholders' Agent that is within the scope of the Stockholders' Agent's authority under Section 8.7(a) shall constitute a notice or communication to or by, or a decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of all the Converting Holders and shall be final, binding and conclusive upon each such Converting Holder; and each Indemnified Person shall be entitled to rely exclusively upon any such notice, communication, decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction as being a notice or communication to or by, or a decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of, each and every such Converting Holder. Acquirer, the Merger Subs, the First Step Surviving Corporation, the Final Surviving Entity and the Indemnified Persons are hereby relieved from any Liability to any Person for any acts done by them in accordance with such notice, communication, decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of the Stockholders' Agent.

8.8      Third-Party Claims. In the event Acquirer becomes aware of a third-party claim which Acquirer in good faith believes may result in a claim against the Escrow Funds by or on behalf of an Indemnified Person, Acquirer shall have the right in its sole discretion to conduct the defense of and to settle or resolve any such claim (and the costs and expenses incurred by Acquirer in connection with such defense, settlement or resolution (including reasonable attorneys' fees, other professionals' and experts' fees and court or arbitration costs) shall be included in the Indemnifiable Damages for which Acquirer may seek indemnification pursuant to a claim made hereunder). The Stockholders' Agent shall have the right to receive copies of all pleadings, notices and communications with respect to the third-party claim to the extent that receipt of such documents does not affect any privilege relating to any Indemnified Person and shall be entitled, at its expense, to participate in, but not to determine or conduct, any defense of the third-party claim or settlement negotiations with respect to the third-party claim. However, except with the consent of the Stockholders' Agent, which consent shall be deemed to have been given unless the Stockholders' Agent shall have objected within thirty (30) days after a written request for such consent by Acquirer, no settlement or resolution by Acquirer of any claim that gives rise to a claim against the Escrow Funds by or on behalf of an Indemnified Person shall be determinative of the existence of or amount of Indemnifiable Damages relating to such matter. In the event that the Stockholders' Agent has consented to any such settlement or resolution, neither the Stockholders' Agent nor any Converting Holder shall have any power or authority to object under

52

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497206

Section 8.6 or any other provision of this ARTICLE 8 to the amount of any claim by or on behalf of any Indemnified Person against the Escrow Funds for indemnity with respect to such settlement or resolution.

8.9     Treatment of Indemnification Payments.   The Converting Holders, the Stockholders' Agent and Acquirer agree to treat (and cause their Affiliates to treat) any payment received pursuant to this ARTICLE 8 as adjustments to the Total Merger Consideration for all Tax purposes, to the maximum extent permitted by Legal Requirements.

## ARTICLE 9
### GENERAL PROVISIONS

9.1     Survival of Representations and Warranties and Covenants.   If the Merger is consummated, the representations and warranties of the Company contained in this Agreement, the Company Disclosure Letter (including any exhibit or schedule to the Company Disclosure Letter), and the other certificates contemplated hereby shall survive the Closing and remain in full force and effect, regardless of any investigation or disclosure made by or on behalf of any of the parties to this Agreement, until the date that is twelve (12) months following the Closing Date; *provided, however*, that the Special Representations and the representations and warranties of the Company contained in any certificate delivered to Acquirer regarding the same subject matter as those covered by the Special Representations pursuant to any provision of this Agreement, will remain operative and in full force and effect, regardless of any investigation or disclosure made by or on behalf of any of the parties to this Agreement, until the expiration of the applicable statute of limitations (if later than the expiration of twelve (12) months following the Closing Date) for claims against the Converting Holders which seek recovery of Indemnifiable Damages arising out of an inaccuracy or breach of such representations or warranties; *provided further*, no right to indemnification pursuant to ARTICLE 8 in respect of any claim that is set forth in an Claim Certificate delivered to the Stockholders' Agent prior to the expiration of the Escrow Period shall be affected by the expiration of such representations and warranties; and *provided, further*, that such expiration shall not affect the rights of any Indemnified Person under ARTICLE 8 or otherwise to seek recovery of Indemnifiable Damages arising out of any fraud, willful breach or intentional misrepresentation by the Company until the expiration of the applicable statute of limitations. If the Merger is consummated, the representations and warranties of Acquirer contained in this Agreement and the other certificates contemplated hereby shall expire and be of no further force or effect as of the Closing; provided, however, that the representations and warranties of Acquirer contained in Sections 3.5 (Issuance of Shares) and 3.7 (Fair Market Value of Acquirer's Class B Common Stock) will remain operative and in full force and effect, regardless of any investigation or disclosure made by or on behalf of any of the parties to this Agreement, until the date that is 12 months after the Closing Date; provided, further, that the representations and warranties of Acquirer contained in Sections 3.1 (Capital Structure), 3.2 (Authority; Noncontravention) and 3.3 (Organization and Standing) of this Agreement will remain operative and in full force and effect, regardless of any investigation or disclosure made by or on behalf of any of the parties to this Agreement, until the expiration of the applicable statute of limitations, if any. If the Merger is consummated, all covenants of the parties shall expire and be of no further force or effect as of the Closing, except to the extent such covenants provide that they are to be performed after the Closing; *provided, however*, that no right to indemnification pursuant to ARTICLE 8 in respect of any claim based upon any breach of a covenant shall be affected by the expiration of such covenant.

9.2     Notices.   All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497207

PX2373-061

certified mail (return receipt requested) or sent via facsimile (with confirmation of receipt) to the parties hereto at the following address (or at such other address for a party as shall be specified by like notice):

(i)    if to Acquirer or the Merger Subs, to:

Facebook Inc.
1601 Willow Road
Menlo Park, CA 94025
Attention: ▮▮▮▮▮▮▮▮▮▮▮▮
Vice President, General Counsel and Secretary
Facsimile No.: ▮▮▮▮▮
Telephone No.: ▮▮▮▮▮

with a copy (which shall not constitute notice) to:

Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Attention: ▮▮▮▮▮▮▮▮▮▮
Facsimile No.: ▮▮▮▮▮▮
Telephone No.: ▮▮▮▮▮

(ii)    if to the Company, to:

Instagram, Inc.
181 South Park Avenue
San Francisco, CA 94107
Attention: Kevin Systrom, President
Telephone No.: ▮▮▮▮▮

with a copy (which shall not constitute notice) to:

Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
Attention: ▮▮▮▮▮▮
Facsimile No.: ▮▮▮▮▮
Telephone No.: ▮▮▮▮▮

(iii)    If to the Stockholders' Agent, to:

▮▮▮▮▮▮
Benchmark Capital
2480 Sand Hill Road, Suite 200
Menlo Park, CA 94025
Facsimile No.: ▮▮▮▮▮▮▮
Telephone No.: ▮▮▮▮▮

with a copy (which shall not constitute notice) to:

54

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
Attention: ▮▮▮▮▮▮
Facsimile No.: ▮▮▮▮▮▮
Telephone No.: ▮▮▮▮▮▮

9.3    Interpretation.  When a reference is made in this Agreement to Articles, Sections or Exhibits, such reference shall be to an Article or Section of, or an Exhibit to this Agreement unless otherwise indicated.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."  The phrases "provided to," "furnished to," and phrases of similar import when used herein, unless the context otherwise requires, shall mean that a true, correct and complete paper copy of the information or material referred to has been provided to the party to whom such information or material is to be provided.  Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; and (iii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement.

9.4    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto; it being understood that all parties hereto need not sign the same counterpart.

9.5    Entire Agreement; Nonassignability; Parties in Interest.  This Agreement and the documents and instruments and other agreements specifically referred to herein or delivered pursuant hereto, including all the exhibits attached hereto, the Schedules, including the Company Disclosure Letter, (a) constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof, except for the Confidentiality Agreement, which shall continue in full force and effect, and shall survive any termination of this Agreement, in accordance with its terms, (b) are not intended to confer, and shall not be construed as conferring, upon any Person other than the parties hereto any rights or remedies hereunder (except that Section 5.15 is intended to benefit the Company Indemnified Parties and ARTICLE 8 is intended to benefit Indemnified Persons) and (c) shall not be assigned by operation of law or otherwise except as otherwise specifically provided herein.

9.6    Assignment.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise by any of the parties hereto without the prior written consent of the other parties hereto, and any such assignment without such prior written consent shall be null and void, except that Acquirer may assign this Agreement to any direct or indirect wholly owned subsidiary of Acquirer without the prior consent of the Company; *provided, however*, that Acquirer shall remain liable for all of its obligations under this Agreement.  Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

9.7    Severability.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable,

55

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

the remainder of this Agreement shall continue in full force and effect and shall be interpreted so as reasonably necessary to effect the intent of the parties hereto. The parties hereto shall use all reasonable efforts to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.8    Remedies Cumulative. Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party hereto shall be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party hereto of any one remedy shall not preclude the exercise of any other remedy and nothing in this Agreement shall be deemed a waiver by any party of any right to specific performance or injunctive relief. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they are entitled at law or in equity, and the parties hereby waive the requirement of any posting of a bond in connection with the remedies described herein.

9.9    Arbitration; Submission to Jurisdiction; Consent to Service of Process.

(a)    EXCEPT FOR CLAIMS REGARDING EITHER PARTY'S INTELLECTUAL PROPERTY RIGHTS AND CONFIDENTIAL INFORMATION, TO WHICH THIS SECTION WILL NOT APPLY, IN THE EVENT THAT A RESOLUTION IS NOT REACHED AMONG THE PARTIES WITHIN SIXTY (60) DAYS AFTER WRITTEN NOTICE OF A DISPUTE, THE DISPUTE SHALL BE FINALLY SETTLED BY BINDING ARBITRATION IN SAN FRANCISCO, CALIFORNIA. SUCH ARBITRATION SHALL BE CONDUCTED IN ENGLISH IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION BY ONE (1) ARBITRATOR APPOINTED IN ACCORDANCE WITH SUCH RULES. THE ARBITRATOR SHALL ALLOW SUCH DISCOVERY AS IS APPROPRIATE TO THE PURPOSES OF ARBITRATION IN ACCOMPLISHING A FAIR, SPEEDY, AND COST-EFFECTIVE RESOLUTION OF THE DISPUTE. THE ARBITRATOR SHALL REFERENCE THE FEDERAL RULES OF CIVIL PROCEDURE THEN IN EFFECT IN SETTING THE SCOPE AND TIMING OF DISCOVERY. THE AWARD OF ARBITRATION SHALL BE FINAL AND BINDING UPON BOTH PARTIES. THE ARBITRATOR WILL AWARD TO THE PREVAILING PARTY ALL COSTS, FEES AND EXPENSES RELATED TO THE ARBITRATION, INCLUDING REASONABLE FEES AND EXPENSES OF ATTORNEYS, ACCOUNTANTS AND OTHER PROFESSIONALS INCURRED BY THE PREVAILING PARTY, AND JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.

(b)    Subject to the foregoing, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the courts of the State of California and the Federal courts of the United States of America located in the State of California, the place where this Agreement was entered and is to be performed, in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, and in respect of the transactions contemplated hereby and thereby, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or thereof, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such a California State or Federal court. The parties hereby consent to and grant any such court jurisdiction over the person of such parties and over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the

56

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

manner provided in Section 9.2 or in such other manner as may be permitted by applicable Legal Requirements, shall be valid and sufficient service thereof. With respect to any particular action, suit or proceeding, venue shall lie solely in the County of Santa Clara, California. A party may apply either to a court of competent jurisdiction or to an arbitrator, if one has been appointed, for prejudgment remedies and emergency relief pending final determination of a claim pursuant to this Section 9.9. The appointment of an arbitrator does not preclude a party from seeking prejudgment remedies and emergency relief from a court of competent jurisdiction.

9.10    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to such state's principles of conflicts of law.

9.11    Rules of Construction. The parties hereto have been represented by counsel during the negotiation, preparation and execution of this Agreement and, therefore, hereby waive, with respect to this Agreement, each Schedule and each Exhibit attached hereto, the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[SIGNATURE PAGE NEXT]

57

26246/00600-DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

IN WITNESS WHEREOF, Acquirer, the Merger Subs, the Company and the Stockholders' Agent have caused this Agreement and Plan of Merger to be executed and delivered by their respective officers thereunto duly authorized (or with respect to the Stockholders' Agent, personally), all as of the date first written above.

FACEBOOK, INC.

By:_____

Name:_____

Title:_____

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

IN WITNESS WHEREOF, Acquirer, the Merger Subs, the Company and the Stockholders' Agent have caused this Agreement and Plan of Merger to be executed and delivered by their respective officers thereunto duly authorized (or with respect to the Stockholders' Agent, personally), all as of the date first written above.

IRIS ACQUISITION SUB, INC.

By:_____
Name:_____
Title:_____

2

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497213

PX2373-067

IN WITNESS WHEREOF, Acquirer, the Merger Subs, the Company and the Stockholders' Agent have caused this Agreement and Plan of Merger to be executed and delivered by their respective officers thereunto duly authorized (or with respect to the Stockholders' Agent, personally), all as of the date first written above.

IRIS ACQUISITION SUB I, LLC


By:_____
Name:_____
Title:_____

3

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497214

PX2373-068

IN WITNESS WHEREOF, Acquirer, the Merger Subs, the Company and the Stockholders' Agent have caused this Agreement and Plan of Merger to be executed and delivered by their respective officers thereunto duly authorized (or with respect to the Stockholders' Agent, personally), all as of the date first written above.

INSTAGRAM, INC.

By:_____

Name:_____

Title:_____

4

26246/00600/DOCS/2269228.5

FB_FTC_CID_01497215

PX2373-069

IN WITNESS WHEREOF, Acquirer, the Merger Subs, the Company and the Stockholders' Agent have caused this Agreement and Plan of Merger to be executed and delivered by their respective officers thereunto duly authorized (or with respect to the Stockholders' Agent, personally), all as of the date first written above.

STOCKHOLDERS' AGENT

███████████   _____

5

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497216

PX2373-070

## EXHIBIT A

### Definitions

As used in this Agreement, the following terms shall have the meanings indicated below.  Unless indicated otherwise, all mathematical calculations contemplated hereby shall be rounded to the tenth decimal place.

"*Acquirer Common Stock*" means the Class A Common Stock, par value $0.000006 per share, of Acquirer.

"*Acquirer Options*" means options to purchase shares of Acquirer Common Stock.

"*Acquirer RSUs*" means restricted stock units granted under Acquirer's 2005 Stock Plan or any successor plan (the "*Plan*").

"*Affiliate*" has the meaning set forth in Rule 144 promulgated under the Securities Act.

"*Business*" means the business of the Company as currently conducted by the Company.

"*Business Day*" means a day (A) other than Saturday or Sunday and (B) on which commercial banks are open for business in San Francisco, California.

"*California Law*" means the General Corporation Law of the State of California.

"*Cash Closing Amount Per Share*" means the quotient obtained by dividing (i) the difference between (A) the Total Cash Merger Consideration minus (B) the Total Escrow Cash, by (ii) the Company Shares Outstanding.

"*Cash Escrow Amount Per Share*" means the quotient obtained by dividing (i) the Total Escrow Cash by (ii) the Company Shares Outstanding.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended.

"*Company BN Preferred Stock*" means the BN Preferred Stock of the Company, par value $0.00001 per share.

"*Company Capital Stock*" means the capital stock of the Company.

"*Company Class A Common Stock*" means the Class A common stock of the Company, par value $0.00001 per share.

"*Company Class B Common Stock*" means the Class B common stock of the Company, par value $0.00001 per share.

"*Company Common Stock*" means the Company Class A and Company Class B Common Stock.

"*Company Option Plan*" means, collectively, each stock option plan, program or arrangement of the Company, including without limitation, the Company's 2010 Stock Plan and 2012 Stock Plan, as amended.

6

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

"*Company Optionholders*" means the holders of Company Options.

"*Company Options*" means options to purchase shares of Company Capital Stock.

"*Company Preferred Stock*" means the Company BN Preferred Stock, the Company Series Seed Preferred Stock, the Company Series Seed-1 Preferred Stock, the Company Series A Preferred Stock, the Company Series B Preferred Stock, the Company Series A-1 Preferred Stock, and the Company Series B-1 Preferred Stock.

"*Company Securityholders*" means the Company Stockholders and Company Optionholders, collectively.

"*Company Series A Preferred Stock*" means the Series A Preferred Stock of the Company par value $0.00001 per share.

"*Company Series A-1 Preferred Stock*" means the Series A-1 Preferred Stock of the Company par value $0.00001 per share.

"*Company Series B Preferred Stock*" means the Series B Preferred Stock of the Company par value $0.00001 per share.

"*Company Series B-1 Preferred Stock*" means the Series B-1 Preferred Stock of the Company par value $0.00001 per share.

"*Company Series Seed Preferred Stock*" means the Series Seed Preferred Stock of the Company par value $0.00001 per share.

"*Company Series Seed-1 Preferred Stock*" means the Series Seed-1 Preferred Stock of the Company par value $0.00001 per share.

"*Company Shares Outstanding*" means the sum, without duplication, of the aggregate number of shares of Company Common Stock that are issued and outstanding immediately prior to the Effective Time (including the shares of Company Common Stock issuable upon the conversion of Company Preferred Stock immediately prior to the Effective Time). For the avoidance of doubt, Company Shares Outstanding shall not include shares of Company Common Stock issuable upon the exercise of Company Options, or other direct or indirect rights to acquire shares of Company Common Stock that are issued and outstanding immediately prior to the Effective Time.

"*Company Stockholders*" means the holders of shares of outstanding Company Capital Stock immediately prior to the Effective Time.

"*Company Warrants*" means warrants to purchase shares of Company Capital Stock.

"*Contract*" means any written or oral legally binding contract, agreement, instrument, commitment or undertaking of any nature (including leases, licenses, mortgages, notes, guarantees, sublicenses, subcontracts, letters of intent and purchase orders) as of the Agreement Date or as may hereafter be in effect.

"*Converting Holders*" means Company Stockholders (other than those Company Stockholders all of whose shares of Company Capital Stock constitute Dissenting Shares).

7

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497218

PX2373-072

"*Delaware Law*" means the General Corporation Law of the State of Delaware.

"*Dissenting Shares*" shall mean any shares of Company Capital Stock that are issued and outstanding immediately prior to the Effective Time and in respect of which appraisal or dissenters' rights shall have been perfected in accordance with Delaware Law or California Law in connection with the Merger.

"*Encumbrance*" means, with respect to any asset, any mortgage, deed of trust, lien, pledge, charge, security interest, title retention device, conditional sale or other security arrangement, collateral assignment, claim, charge, adverse claim of title, ownership or right to use, restriction or other encumbrance of any kind in respect of such asset (including any restriction on (i) the voting of any security or the transfer of any security or other asset, (ii) the receipt of any income derived from any asset, (iii) the use of any asset, and (iv) the possession, exercise or transfer of any other attribute of ownership of any asset).

"*Environmental, Health and Safety Requirements*" means all Orders and Legal Requirements concerning or relating to worker/occupational health and safety, or pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control, or other action or failure to act involving cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, or radiation, each as amended and as now in effect.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fair Market Value*" means (A) if Acquirer Common Stock is publicly traded, the average of the closing sales price of such securities as quoted on the NASDAQ Stock Market for the twenty (20) consecutive trading days ending with the trading day that is one (1) trading day immediately preceding the date the Fair Market Value of such securities is required to be determined hereunder or (B) if Acquirer Common Stock is not publicly traded, the fair market value per share of Acquirer Common Stock on the date of the satisfaction of the Indemnifiable Damages as determined (or most recently determined) in good-faith by Parent's board of directors (or the compensation committee thereof).

"*GAAP*" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, that are applicable to the circumstances of the date of determination, consistently applied.

"*Governmental Entity*" means any supranational, national, state, municipal, local or foreign government, any court, tribunal, arbitrator, administrative agency, commission or other governmental official, authority or instrumentality, in each case whether domestic or foreign, any stock exchange or similar self-regulatory organization or any quasi-governmental or private body exercising any regulatory, Taxing or other governmental or quasi-governmental authority (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497219

PX2373-073

"*Indemnified Person*," or "*Indemnified Persons*" has the meaning set forth in Section 8.2 hereto.

"*knowledge*" means, with respect to any fact, circumstance, event or other matter in question, the knowledge of such fact, circumstance, event or other matter after reasonable inquiry of (A) an individual, if used in reference to an individual or (B) with respect to any Person that is not an individual, the executive officers of such Person; *provided* that any executive officer will be deemed to have knowledge of a particular fact, circumstance, event or other matter if (1) such fact, circumstance, event or other matter is reflected in one or more documents (whether written or electronic, including electronic mails sent to or by such individual) in, or that have been in, the possession of such executive officer, including his or her personal files, (2) such fact, circumstance, event or other matter is reflected in one or more documents (whether written or electronic) contained in books and records of such officer's employer that would reasonably be expected to be reviewed by an individual with the duties and responsibilities of such executive officer, or (3) such knowledge could be obtained after such executive officers have reasonably consulted with his or her direct subordinates at such Person.

"*Legal Requirements*" means any federal, state, foreign, local, municipal or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity and any Orders applicable to the Company or any Subsidiary or to any of their respective assets, properties or businesses.

"*Liabilities*" means all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, asserted or unasserted, known or unknown, including those arising under any law, action or governmental order and those arising under any Contract, regardless of whether such debt, liability or obligation would be required to be disclosed on a balance sheet prepared in accordance with GAAP.

"*made available*" means, with respect to the Company, the furnishing of materials in electronic format to Acquirer's legal counsel no later than one (1) day prior to the Agreement Date.

"*Material Adverse Effect*" with respect to any entity means any change, event, violation, inaccuracy, circumstance or effect (each, an "*Effect*") that, individually or taken together with all other Effects, and regardless of whether or not such Effect constitutes a breach of the representations or warranties made by such entity in this Agreement, is, or would reasonably likely to, (i) be or become materially adverse in relation to the condition (financial or otherwise), properties, assets, liabilities, business, capitalization, operations or results of operations of such entity and its subsidiaries, taken as a whole, except to the extent that any such Effect directly results from: (A) changes in general economic conditions (provided that such changes do not affect such entity disproportionately as compared to other similarly situated participants in the industry in which such entity operates); (B) changes in applicable Legal Requirements or GAAP; (C) acts of terrorism or war (provided such changes do not affect such entity disproportionately as compared to similarly situated participants in the industry in which the Company operates; or (D) the announcement or pendency of the Merger.

"*Order*" means any order, writ, injunction, judgment, decision, ruling, decree, award, determination or stipulation issued, promulgated or entered by, or any settlement or other agreement under the jurisdiction of, any court, arbitrator, mediator or other Governmental Entity or tribunal.

"*Permitted Encumbrances*" means: (A) statutory liens for Taxes that are not yet due and payable or liens for Taxes being contested in good faith by any appropriate proceedings for which adequate reserves have been established; (B) statutory liens to secure obligations to landlords, lessors or

9

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

renters under leases or rental agreements; (C) deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance or similar programs mandated by applicable law; (D) statutory liens in favor of carriers, warehousemen, mechanics and materialmen, to secure claims for labor, materials or supplies and other like liens; (E) liens in favor of customs and revenue authorities arising as a matter of Legal Requirements to secure payments of customs duties in connection with the importation of goods, and (F) non-exclusive object code licenses of software by the Company or a Subsidiary in the ordinary course of its business consistent with past practice on its standard unmodified form of customer agreement (a copy of which has been provided to Acquirer's counsel).

"***Person***" means any natural person, company, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, trust, estate, proprietorship, joint venture, business organization or Governmental Entity.

"***Pro Rata Share***" means, with respect to a Converting Holder, the aggregate amount of shares of Acquirer Common Stock and cash such Converting Holder is entitled to receive pursuant to Section 1.3(a) with respect to its Company Capital Stock (other than Dissenting Shares) relative to the aggregate amount of shares of Acquirer Common Stock and cash all Converting Holders are entitled to receive pursuant to Section 1.3(a) with respect to their Company Capital Stock (other than Dissenting Shares).

"***SEC***" means the Securities and Exchange Commission.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Senior Preferred Stock***" means collectively, the Company Series Seed Preferred Stock, the Company Series A Preferred Stock, the Company Series B Preferred Stock, the Company Series Seed-1 Preferred Stock, the Company Series A-1 Preferred Stock and the Company Series B-1 Preferred Stock.

"***Stock Closing Amount Per Share***" means the quotient obtained by dividing (i) the difference between (A) the Total Stock Merger Consideration minus (B) the Total Escrow Shares, by (ii) the Company Shares Outstanding.

"***Stock Escrow Amount Per Share***" means the quotient obtained by dividing (i) the Total Escrow Shares by (ii) the Company Shares Outstanding.

"***Subsidiary***" means any corporation, partnership, limited liability company or other Person of which the Company, either alone or together with one or more Subsidiaries or by one or more other Subsidiaries (i) directly or indirectly owns or purports to own, beneficially or of record securities or other interests representing more than 50% of the outstanding equity, voting power, or financial interests of such Person, or (ii) is entitled, by Contract or otherwise, to elect, appoint or designate directors constituting a majority of the members of such Person's board of directors or other governing body.

"***Tax***" (and, with correlative meaning, "***Taxes***" and "***Taxable***") means (i) any net income, alternative or add-on minimum tax, gross income, estimated, gross receipts, sales, use, ad valorem, value added, transfer, franchise, fringe benefit, capital stock, profits, license, registration, withholding, payroll, social security (or equivalent), employment, unemployment, disability, excise, severance, stamp, occupation, premium, property (real, tangible or intangible), environmental or windfall profit tax, custom duty or other tax of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount (whether disputed or not) imposed by any Governmental Entity responsible for the

10

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497221

imposition of any such tax (domestic or foreign) (each, a "*Tax Authority*"), (ii) any Liability for the payment of any amounts of the type described in clause (i) of this sentence as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group for any Taxable period, and (iii) any Liability for the payment of any amounts of the type described in clause (i) or (ii) of this sentence as a result of being a transferee of or successor to any Person or as a result of any express or implied obligation to assume such Taxes or to indemnify any other Person.

"*Tax Return*" means any return, statement, report or form (including estimated Tax returns and reports, withholding Tax returns and reports, any schedule or attachment, and information returns and reports) filed or required to be filed with respect to Taxes.

"*Total Cash Merger Consideration*" means an aggregate amount of cash equal to Three Hundred Million Dollars ($300,000,000).

"*Total Escrow Cash*" means an amount equal to ten percent (10%) of the Total Cash Merger Consideration.

"*Total Escrow Shares*" means an amount equal to ten percent (10%) of the Total Stock Merger Consideration.

"*Total Merger Consideration*" means the sum of the Total Cash Merger Consideration and Total Stock Merger Consideration.

"*Total Stock Merger Consideration*" means Twenty Two Million Nine Hundred Ninety-Nine Thousand Four Hundred Twelve (22,999,412) shares of Acquirer Common Stock.

"*Transaction Expenses*" means all third party fees, costs, expenses, payments, and expenditures incurred by the Company in connection with the Merger and this Agreement and the transactions contemplated hereby whether or not billed or accrued (including any fees, costs expenses, payments, and expenditures of legal counsel and accountants, the maximum amount of fees costs, expenses, payments, and expenditures payable to financial advisors, investment bankers and brokers of the Company notwithstanding any contingencies for earnouts, escrows, etc., and any such fees, costs, expenses, payments, and expenditures incurred by Company Securityholders paid for or to be paid for by the Company).

Other capitalized terms defined elsewhere in this Agreement and not defined in this Exhibit A shall have the meanings assigned to such terms in this Agreement.

11

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497222

PX2373-076

## EXHIBIT B

**Form of Non-Competition Agreement**

12

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497223

PX2373-077

**EXHIBIT C**

**Form of Vesting Agreement**

13

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497224

PX2373-078

## EXHIBIT D

**Form of Investor Representation Letter**

14

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497225

PX2373-079

## EXHIBIT E

**Form of Company Stockholder Approval**

15

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497226

PX2373-080

## EXHIBIT F

**Form of Certificate of Merger**

16

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01697127

PX2373-081

**EXHIBIT G**

**Form of Second Certificate of Merger**

17

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497228

PX2373-082

## EXHIBIT H

**Form of Orrick Legal Opinion**

18

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497229

PX2373-083

## EXHIBIT I

**Form of Escrow Agreement**

19

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497230

PX2373-084

## EXHIBIT J

**Form of FIRPTA Notice**

20

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497231

PX2373-085

**EXHIBIT K**

**Form of FIRPTA Notification Letter**

21

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497232

PX2373-086

## EXHIBIT L

**Form of Option Waiver**

22

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497233

PX2373-087

## EXHIBIT M

**Form of Parachute Payment Waiver**

23

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497234

PX2373-088

## EXHIBIT N

### Acquirer Capitalization

**Acquirer capital stock outstanding as of December 31, 2011**

| | |
|---|---|
| Class A Common Stock | 117,097,143 |
| Class B Common Stock | 1,758,902,309 |
| Mark Zuckerberg Class B Options | 120,000,000 |
| Class B Options | 138,539,434 |
| Class B RSUs | 378,772,184 |

**Acquirer capital stock granted/issued between January 1, 2012 and March 26, 2012**

| | |
|---|---|
| Class B RSUs granted | 1,947,208 |
| Class A Shares issued | 302,250 |
| Class B Shares issued | 210 |

Since the filing of Acquirer's Amendment No. 3 to Form S-1 (File No. 333-179287), Acquirer has not issued any additional shares of its capital stock, other than pursuant to exercises of employee options in the ordinary course.

24

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497235

PX2373-089

## EXHIBIT O

### RSU Allocations

Aggregate RSU allocation (net of 26,353 share reduction for $1,100,000 sign on bonus pool):  4,250,100

Kevin Systrom: ███████
Mike Krieger: ████
Shane Sweeney: ████
Non-founder continuing employees: ██████

25

26246/00600/DOCS/2269228.5

CONFIDENTIAL TREATMENT REQUESTED BY FACEBOOK, INC

FB_FTC_CID_01497236

PX2373-090