**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

        **v.**

**META PLATFORMS, INC.,**

    **Defendant.**

</td><td>

**Civil Action No. 20-3590 (JEB)**

</td></tr>
</table>

## MEMORANDUM OPINION

How times have changed. Not so long ago, a company called Facebook so dominated the provision of personal social-networking services that a movie charting its rise was entitled simply "The Social Network." Fifteen years later — and four years into the Federal Trade Commission's antitrust suit against it — that company (now called Meta) argues that the market with which it was once nearly synonymous does not even exist. Gazing across an online landscape teeming with companies catering to every conceivable interest, Meta sees a bloody battle for users' time and attention in which its products face withering competition. After over two years of discovery, it now moves for summary judgment on the FTC's claims that it violated Section 2 of the Sherman Act through its acquisitions of Instagram and WhatsApp. The FTC opposes that Motion and has itself cross-filed for partial summary judgment on certain of Meta's affirmative defenses. Both parties have buttressed their filings with a voluminous evidentiary record, mere summaries of which span thousands of pages.

Although the field of the parties' combat has shrunk somewhat over time, the FTC's story has remained "essentially unchanged." FTC v. Facebook, Inc. (Facebook II), 581 F. Supp. 3d 34, 40 (D.D.C. 2022). Armed now with experts and evidence, Plaintiff continues to argue that a relevant antitrust market exists for personal social-networking (PSN) services and that, since at least 2012, Meta has enjoyed monopoly power in that market. The Commission further contends that Defendant unlawfully maintained that monopoly by acquiring two actual or nascent competitors, Instagram and WhatsApp, that posed a threat to its dominance at the time. Meta retorts that PSN services do not constitute a relevant antitrust market over which the company exercises any degree of monopoly power and that no other direct effects of monopoly power have been shown. Even if it did possess such power, Meta denies that its Instagram and WhatsApp acquisitions were anticompetitive, especially considering the significant investments it has since made to improve and grow both applications.

In the end, while the parties' legal jousting is both impressive and comprehensive, it leaves no clear victor. This case must go to trial. Under the forgiving summary-judgment standard, the FTC has put forward evidence sufficient for a reasonable factfinder to rule in its favor. Prevailing here, however, does not obscure the fact that the Commission faces hard questions about whether its claims can hold up in the crucible of trial. Indeed, its positions at times strain this country's creaking antitrust precedents to their limits. All the same, except for Count II, which the Court previously found lacking but could not dismiss, and one of Meta's defenses, for which Defendant has not proffered sufficient evidence to survive summary judgment, the Court will deny Meta's Motion for Summary Judgment and the FTC's Cross-Motion for Partial Summary Judgment.

**Table of Contents**

I.   Background ........................................................................................................... 4

  A.   Factual Background ........................................................................................ 4

    1.   *Facebook* ................................................................................................ 4

    2.   *The Acquisitions* ................................................................................... 6

      a.   Instagram ........................................................................................... 6

      b.   WhatsApp ........................................................................................... 8

    3.   *Other Applications* ............................................................................. 10

  B.   Procedural History ....................................................................................... 12

II.  Legal Standard .................................................................................................. 14

III. Analysis ............................................................................................................ 16

  A.   Monopoly Power ........................................................................................... 17

    1.   *Market Definition* ............................................................................... 18

      a.   <u>Brown Shoe</u> Factors ........................................................................... 22

      b.   Expert Testimony ............................................................................. 39

    2.   *Market Share* ...................................................................................... 43

    3.   *Barriers to Entry* ............................................................................... 47

  B.   Anticompetitive Conduct ............................................................................. 52

    1.   *Legal Framework* ................................................................................ 53

      a.   Anticompetitive Effects .................................................................. 53

      b.   Nascent Threats ............................................................................... 62

    2.   *Acquisitions* ........................................................................................ 65

      a.   Instagram ......................................................................................... 65

      b.   WhatsApp ......................................................................................... 72

    3.   *Procompetitive Justifications* ............................................................ 76

      a.   Legal Framework ............................................................................. 77

      b.   Application ....................................................................................... 83

IV.  Conclusion ........................................................................................................ 92

I.     **Background**

As many of the relevant facts remain contested, the Court will address them later when examining the parties' contentions.  Here, it provides an overview of the undisputed facts and the history of the litigation to this point.

A.     Factual Background

1.     *Facebook*

Although those sufficiently interested to be reading this Opinion are likely familiar with Meta's history, it is worth a brief retelling.  Mark Zuckerberg founded Facebook in 2004 as "The Facebook," a "social-networking service initially limited to college students."  FTC v. Facebook, Inc. (Facebook I), 560 F. Supp. 3d 1, 6 (D.D.C. 2021).  The parties continue to vigorously dispute the precise definition and boundaries of PSN services, but, at a minimum, they are online platforms that enable "users to virtually connect with others in their network and to digitally share their views and experiences by posting about them in a shared, virtual social space."  Id. at 5–6.  While Facebook may have been early to the game, it was not the first: other PSN companies include now-defunct Friendster and Myspace, both of which launched in 2002.  Id. at 5.  By 2009, however, Facebook had "surpassed Myspace to become the most widely used online social networking service in the United States."  ECF No. 363-2 (FTC's Statement of Material Facts), ¶ 1560.

As originally conceived, Facebook consisted of a few simple features: a "Profile," where users could share information about themselves, coupled with the ability to add other Profiles as "Friends" — "reciprocal relationship[s]" that grant users access to information and updates about each other.  See ECF No. 325-2 (Meta's Statement of Material Facts), ¶¶ 18–22.  Within a few years of its founding, Facebook enabled users to upload photos and videos to their Profiles,

followed shortly thereafter by the creation of the "Feed" (formerly the "News Feed"), which presented a mix of content from people's Friends.  Id., ¶¶ 23–25.  Other features (also known as "surfaces") have since rolled in: "Pages" (2007), which permits users to follow businesses, organizations, and public figures to get updates; "Groups" (2010), which allows users to form a subcommunity for any reason or none at all; "Live" (2015), which is Facebook's mobile video livestreaming service; "Marketplace" (2016), where users can buy and sell items with people in their community; "Stories" (2017), which permits users to share "full-screen, short-form, ephemeral forms of content" with their Friends and followers; "Gaming" (2019), where users can play games, watch gaming videos, and connect with gaming Groups; "Dating" (2019), which facilitates romantic connections; and "Reels" (2021), which displays short-form videos.  Id., ¶¶ 26–44 (internal quotation marks omitted).  In addition, while Facebook users have been able to message one another almost since its launch, id., ¶ 94, in 2011 Facebook launched "Messenger" as a stand-alone application.  Id., ¶ 95.  Currently, Messenger enables users to, among other things, send individual messages, start group chats, conduct voice and video calls, and post Stories.  Id., ¶¶ 96–112.

　　　　Facebook managed fantastic growth during its first two decades of existence.  By the end of 2009, it boasted 112 million monthly active users in the United States and Canada, a number that expanded to 158.9 million U.S. monthly active users by early 2012 and ████████ such users by the first half of 2022.  See FTC SMF, ¶ 1561; Meta SMF, ¶ 725.  And it charged those users nothing to use the service.  See Meta SMF, ¶ 5.  That remains true today across all four applications that constitute the "family" of Meta's products: Facebook, Messenger, Instagram, and WhatsApp.  Id., ¶¶ 4–5.  Instead, Meta generates revenue primarily through advertising on Instagram and Facebook.  Id., ¶¶ 132–33.  Through its "Ads Manager," Meta lets advertisers

customize their campaigns to target specific segments of users on various surfaces, with options to increase or decrease spending based on feedback about how the advertisements are performing with the target audience.  Id., ¶¶ 134, 136.  In 2021 alone, Meta earned $114.9 billion in advertising revenue.  See FTC SMF, ¶ 1439(c).

Since its founding, Zuckerberg has remained at the helm.  He is its CEO and the Chairman of its Board of Directors, and he controls a majority of the company's voting shares. Id., ¶ 1562.  He has testified that he cannot "think of any examples" of when the Board ever overruled a decision that he had made.  See ECF No. 356-1 (Pl. Docs. Vol. 58) at ECF p. 839 (FTC Investigational Hearing of Mark Zuckerberg at 24:11–24).

    2. *The Acquisitions*

Facebook did not merely invent new features and collect new users, however.  As is by now clear, it also grew by acquisition.  Indeed, the company changed its name to Meta in 2021 to unite its various "apps and technologies under one new company brand."  Introducing Meta: A Social Technology Company, Meta (Oct. 28, 2021), https://perma.cc/5MPH-7WU5.  The Court will refer to "Meta" when discussing the company formerly known as "Facebook," and to "Facebook" when discussing the specific PSN platform discussed above, which is also called "Facebook Blue"—"what its millions of users think of when they think of 'Facebook.'" Facebook I, 560 F. Supp. 3d at 6.  Two acquisitions are at the center of this lawsuit: those of Instagram and WhatsApp.

    a. Instagram

Founded in 2010 by Kevin Systrom and Mike Krieger, see Meta SMF, ¶ 55, Instagram was a photo-editing and -sharing service with similar features to Facebook.  For instance, users could likewise set up a "Profile" with some of their personal information, connect with other

users via a one-way "Follow," and browse content posted by accounts they follow on Instagram's "Feed." Id., ¶¶ 67–69, 73. Initially, users were limited to sharing photos that they had either taken with an in-app camera or uploaded from their own photo library. Id., ¶¶ 70, 672. Currently, however, users can share both photos and videos as posts to the Feed or as "Stories," id., ¶¶ 71–72, 82–83, post short-form videos or "Reels," id., ¶¶ 89–90, message other users directly via Instagram "Direct," id., ¶¶ 79–80, broadcast a video live to their followers through Instagram "Live," id., ¶ 85, shop online via Instagram "Shop," id., ¶ 87, and post text-based content to the public on Instagram "Threads." Id., ¶ 92.

Prior to its acquisition by Meta in 2012, Instagram had just over a dozen employees and approximately 3.9 million U.S. monthly active users. Id., ¶¶ 657–58; see also FTC SMF, ¶ 1608 (35 million total users). Its chief differentiator was its focus on mobile rather than desktop use. The technological "shift" from desktop to mobile created a "brief moment and opening . . . for [a company] like Instagram to create a mobile-optimized experience." Pl. Docs. Vol. 58 at ECF p. 551 (FTC Investigational Hearing of Kevin Systrom at 82:9–17). That mobile orientation drove Instagram's decision to focus on photo sharing, taking advantage of the increasingly high-quality cameras found on consumers' smartphones. See id. at 44:20–24 ("[W]ith the camera in your pocket in the form of a cell phone[,] . . . the primary way we would communicate would be with photos, and possibly videos some day . . . ."); FTC SMF, ¶ 1567 (describing launch of iPhone 4, which featured significantly improved camera). The company leveraged its mobile-first orientation by permitting users to "rebroadcast" their posts onto the other platforms, thus ██████████████████████████████████████████. See Meta SMF, ¶¶ 660–61.

In February and March of 2012, Zuckerberg began communicating to Systrom his interest in acquiring Instagram. Id., ¶¶ 696–97. The parties dispute Meta's motivations for the

acquisition.  Meta points to evidence that it sought to "grow Instagram as an independent brand and product," id., ¶ 698 (quoting email from Zuckerberg to Systrom), while the FTC insists that Meta "acquired Instagram to eliminate a competitive threat," ECF No. 328-2 (FTC Resp. to Meta SMF) at 564, particularly in light of the challenges Meta faced in transitioning the desktop version of Facebook to the mobile environment.  See FTC SMF, ¶¶ 1569–74, 1576–86.  On April 8, 2012, Zuckerberg and Systrom agreed that Meta would acquire Instagram for $1 billion.  See Meta SMF, ¶ 701.

Just over a week later, Meta submitted to the FTC a Hart-Scott-Rodino (HSR) Act Premerger Notification Form for the transaction.  Id., ¶ 702; see 15 U.S.C. § 18a.  The FTC's review of the transaction took over four months and involved a "rare" request for additional information and documents.  See Facebook I, 560 F. Supp. 3d at 7; Meta SMF, ¶ 704.  Eventually, however, the FTC cleared the acquisition to proceed.  See Meta SMF, ¶ 707.  In the first half of 2022, Instagram had more than ██████████ U.S. monthly active users.  Id., ¶ 724.

b.     WhatsApp

In September 2009, Brian Acton and Jan Koum launched WhatsApp as an "over-the-top" (OTT) mobile-messaging service.  See FTC SMF, ¶¶ 1732, 1765.  OTT services use the internet, rather than traditional telephone infrastructure, to enable users to communicate with one another.  Id., ¶ 1714.  As a cross-platform application, WhatsApp could be downloaded and used on different types of devices.  Id., ¶ 1733.  Android users of WhatsApp paid a yearly subscription fee of $0.99, while iPhone users could use the application for free after paying — at least for a time — a one-time download fee of $1.00.  See Meta SMF, ¶ 763; see also FTC Resp. to Meta SMF, ¶ 763 (pointing out that WhatsApp removed download fee in July 2013).

Users quickly flocked to the service: by March 2011, the company had 17 million registered users, 11 million monthly active users, and 7.5 million daily active users, and it was registering 100,000 new users each day.  See FTC SMF, ¶ 1735(a).  By April 2013, those numbers had grown to 320 million registered users, 160 million daily active users, and 800,000 new registrations per day.  Id., ¶ 1735(h)–(i).  Most of those users lived outside the United States.  See ECF No. 370-3 (Meta Reply to FTC SMF), ¶ 1735 (citing only 6.9 million U.S. monthly active users by April 2013); see also ECF No. 361-1 (Pl. Docs. Vol. 57) at ECF p. 614 (FTC Investigative Hearing of Brian Acton at 147:13–15) (calling U.S. market a "hard market" because "people were using adjacent messaging products"); Meta SMF, ¶ 776 (9% penetration of smartphone users in United States, compared to 99% in Spain, 94% in Mexico, 90% in Brazil, 65% in India, and 49% in United Kingdom).  Nonetheless, by some estimations, in September 2013 WhatsApp was second only to Facebook Messenger in OTT cross-platform mobile-messaging services in the United States.  See FTC Resp. to Meta SMF, ¶¶ 774, 776.

Meta soon began making acquisition overtures.  See FTC SMF, ¶ 1831.  As before, the parties dispute its purpose in pursuing WhatsApp.  Defendant points to various rationales, including that the acquisition would make it more difficult to exclude Meta's applications from mobile-operating-system platforms and would also help Facebook to grow through exposure to potential new users.  See Meta SMF, ¶ 813.  The FTC observes that Facebook Messenger struggled to compete with WhatsApp, see FTC SMF, ¶¶ 1727–28, and that Meta feared WhatsApp's pivot into PSN services.  Id., ¶¶ 1799.  In any event, on February 19, 2014, Meta announced that it would pay approximately $19 billion to purchase WhatsApp.  See Meta SMF, ¶ 814 ($16 billion purchase price, plus $3 billion paid to WhatsApp employees, including founders).

On March 13, Meta submitted to the FTC and DOJ an HSR Premerger Notification Form for the acquisition.  See id., ¶ 815.  Just under a month later, it was publicly reported that the FTC had closed its investigation, permitting the merger to proceed.  Id., ¶ 818.  Meta believes it highly relevant that the FTC previously approved both purchases but now reverses field to challenge them as anticompetitive.

### 3.    *Other Applications*

Although Meta, Facebook, Instagram, and WhatsApp are the main characters in this drama, other online platforms and applications play supporting roles.  Two such platforms that the FTC contends compete directly with Facebook and Instagram in the relevant market are Snapchat and MeWe.  Snapchat first became available to download in 2011 and permits users to send and receive disappearing photos and videos to their friends, called "Snaps."  Meta SMF, ¶¶ 483–84.  As of 2013, users can also post collections of Snaps as "Stories," which are transmitted in a broadcast format to their friends.  Id., ¶ 485.  Snaps and Stories are shared only between bidirectional friends as a default.  Id., ¶ 489.  Users can, however, set their privacy settings to allow any Snapchat user to view their stories, or they can choose to have a public profile.  See FTC Resp. to Meta SMF, ¶ 485.  In addition to sending photos and videos, friends can also "Chat" with one another via direct messages, see Meta SMF, ¶ 492, as well as browse short-form videos posted primarily by non-friends on "Spotlight."  Id., ¶ 496.  Snapchat generates revenue through advertising.  Id., ¶ 144(a).

MeWe, which launched for mobile use in October 2014, is a PSN service that seeks to provide a "privacy-focused" service that does not rely on advertising or tracking user activities.  Id., ¶ 522.  Instead, users choose between a free, basic version of the site or a paid subscription that unlocks additional features, such as data storage.  Id.  Users create a profile with personal

information and can post text and images on their timelines, share other users' content, send messages, join and create groups, and participate in group chats. Id., ¶¶ 523–24.

Outside of the FTC's proposed market are other platforms with which Meta claims to compete. Launched in 2005, YouTube — acquired by Google (now Alphabet, Inc.) in 2006 — permits users to watch and share videos either through a mobile application or on its webpage. See Meta SMF, ¶¶ 156–57, 160, 162. ███████████████████████████

████████. See ECF No. 346-1 (Pl. Docs. Vol. 65) at ECF p. 2,758 (Deposition of Thomas Kim at 347:7–8, 14–17). Another service, X — which launched in 2006 as "Twitter" and adopted its new name in July 2023 — permits users to upload posts containing text, images, videos, or links to their followers or to the public at large on a "Feed," where they can be "liked," reposted, or replied to. See Meta SMF, ¶¶ 272–73, 283, 288–91. Users can choose to allow only their followers to view their posts, and they can use either their real name or a pseudonym. Id., ¶ 298; see also FTC Resp. to Meta SMF, ¶ 288 (posts are public "by default"). Finally, and relatively new to the scene, TikTok was launched in the United States in 2018 primarily as a platform for users to share short-form video or photo content, also presented in various "feeds." See Meta SMF, ¶¶ 204–05, 211–213, 218. Account holders can create content and interact with others' content by liking the videos or commenting on them, id., ¶¶ 230–31, become "Friends" with another user if they mutually follow one another, id., ¶ 223, and send in-app messages to other users via the "Inbox." Id., ¶ 237. Accounts can be either public or private; anyone can follow and watch the content of users with public accounts. Id., ¶ 236. Like virtually all other digital platforms, YouTube, X, and TikTok largely offer their services to users for free and generate revenue through advertising. Id., ¶¶ 144(c)–(d), 159, 274, 278, 288.

The Court also takes judicial notice of the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, 138 Stat. 895, 955–60 (2024), which requires TikTok to be divested from its Chinese parent company, ByteDance, or else face an effective ban within the United States.  See Earle v. District of Columbia, 707 F.3d 299, 308 n.10 (D.C. Cir. 2012) (noting that courts "may take judicial notice of statutes").  The constitutionality of that statute is currently before this Circuit.  See TikTok, Inc. v. Garland, No. 24-1113 (D.C. Cir. 2024) (oral argument heard Sept. 16, 2024).

B.    Procedural History

The FTC filed this action on December 9, 2020, alleging one count of monopoly maintenance under Section 2 of the Sherman Act.  See ECF No. 3 (Redacted Compl.), ¶¶ 169–74.  In particular, Plaintiff alleged that Meta had abused its dominant position in the market for PSN services by (a) acquiring Instagram and WhatsApp, which it viewed as potential threats to its monopoly, and (b) adopting and enforcing several anticompetitive policies that blocked rivals from interconnecting their product with Facebook (the "interoperability allegations").  Id., ¶¶ 23–26, 71–73.  The Commission brought suit under Section 13(b) of the FTC Act, which authorizes it to seek an injunction against an entity that "is violating" or "is about to violate" the antitrust laws, including Section 2.  See 15 U.S.C. § 53(b).  It asked for an injunction to prevent such conduct in the future as well as an order mandating, among other relief, divestiture of Instagram and WhatsApp.  See Redacted Compl. at 51.

As the Court has noted in previous Opinions, although the suit was initially assigned to Judge Christopher R. Cooper of this district, he subsequently re-assigned it to this Court, which was handling an earlier-filed and related State case against Meta.  See Facebook I, 560 F. Supp. 3d at 11; see also Minute Order of Jan. 12, 2021.  Facebook moved to dismiss both cases.  The

Court granted dismissal of the States' entire case, finding that the acquisition-based allegations were barred by laches and that the interoperability allegations both failed to state a claim and came too late to permit equitable relief. See New York v. Facebook, Inc., 549 F. Supp. 3d 6, 24, 34, 49 (D.D.C. 2021), aff'd sub nom. New York v. Meta Platforms, Inc., 66 F.4th 288 (D.C. Cir. 2023). As for the FTC's suit, the Court held that the Commission had not adequately alleged that Meta possessed monopoly power in the relevant market, resting instead on a "naked allegation" that the company had a dominant position. Facebook I, 560 F. Supp. 3d at 4. Acknowledging that such defect "could conceivably be overcome" by an Amended Complaint, however, the Court dismissed only the Complaint, not the entire case, "leaving the agency the chance to replead if it believes it can successfully remedy the infirmities described" in the Court's Opinion. Id. at 4, 11. The Court noted, however, that it remained unconvinced that the interoperability allegations could be a basis for injunctive relief. Id. at 20, 28, 30.

Eager for a rematch, the FTC accepted the Court's invitation. In August 2021, the agency filed an Amended Complaint once more alleging unlawful monopoly maintenance under Section 2 of the Sherman Act and bringing suit under Section 13(b) of the FTC Act. See ECF No. 76 (Amended Complaint filed under seal); ECF No. 82 (Redacted Am. Compl.), ¶¶ 230–43. This new-and-improved Complaint, however, now contained two counts: Count I encompassed only the acquisition-based allegations, while Count II incorporated those allegations while appending the interoperability allegations. See Redacted Am. Compl., ¶¶ 232, 238. As before, the FTC sought an injunction against any such conduct in the future and divestiture of the Instagram and WhatsApp acquisitions. Id. at 79.

As the reader has by now no doubt surmised, Plaintiff's second effort fared better than its first. This time around, the Court found that the Commission had plausibly alleged the elements

of monopoly power — that is, it had plausibly alleged the existence of a relevant antitrust market of PSN services, that Meta possessed a dominant market share of that market, and that significant barriers to entry made its share durable.  See Facebook II, 581 F. Supp. 3d at 43–52. As for its allegations of anticompetitive conduct, the FTC batted .500.  While the Court found its Count I (acquisition-related) allegations sufficient to survive the motion to dismiss, it remained unimpressed with its Count II allegations regarding interoperability.  Id. at 53–59.  Because Count II also encompassed the agency's acquisition allegations, however — and a court evaluating a Rule 12(b)(6) motion to dismiss cannot "parse" the viable from the unviable in the same claim — the Court did not dismiss the count.  Id. at 59–60.  Rather, it indicated that the interoperability arguments could be "sliced out at summary judgment," id. at 60, and it barred discovery on such policies.  Id. at 61.

After over two years of discovery on the remaining allegations, Meta has now moved for summary judgment.  See ECF No. 325-1 (Meta MSJ).  The FTC opposes that Motion and has filed a Cross-Motion for Partial Summary Judgment on Meta's asserted procompetitive justifications for the acquisitions.  See ECF No. 363-1 (Updated FTC Opp. and Cross MSJ). Those Motions are now ripe.

## II.    Legal Standard

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  Fam. Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).  If the court determines that one party is not entitled to summary judgment, it "changes tack on the cross motion and gives the unsuccessful movant 'all of the favorable factual inferences that it has

just given to the movant's opponent.'" Nucap Indus., Inc. v. Robert Bosch LLC, 273 F. Supp. 3d 986, 998 (N.D. Ill. 2017) (quoting Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund, 778 F.3d 593, 603 (7th Cir. 2015)). It is nonetheless still possible for a court to deny summary judgment to both sides.

Summary judgment is appropriate "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Airlie Foundation v. IRS, 283 F. Supp. 2d 58, 61 (D.D.C. 2003); see also Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); CEI Wash. Bureau, Inc. v. DOJ, 469 F.3d 126, 129 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Liberty Lobby, 477 U.S. at 248; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. Liberty Lobby, 477 U.S. at 248; see Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). The court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). To defeat summary judgment, however, an opposition must

consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant is required to provide evidence that would permit a reasonable factfinder to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249–50 (citations omitted).

## III.    Analysis

A violation of Section 2 of the Sherman Act via monopoly maintenance "has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful . . . maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident.'" United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)). As before, Meta seeks summary judgment against the FTC on both of those prerequisites. Specifically, it argues that the Commission has not created a genuine dispute of material fact over whether Meta possesses monopoly power in a properly defined market, see Meta MSJ at 10–31, or has engaged in any exclusionary conduct by acquiring Instagram and WhatsApp. See id. at 31–47. The agency's burden on the latter should be particularly heavy, Defendant argues, given its initial preclearance of both mergers during the HSR process. See id. at 47–50. Plaintiff opposes Meta on all fronts and fires its own volley in return, arguing that not only should the Court find that the agency survives Defendant's Motion, but it should also hold that Meta cannot raise any of its procompetitive justifications as

affirmative defenses to the charge of anticompetitive conduct.  See FTC Opp. at 64–80.  The

Court will address each of these issues in turn.

> A.    Monopoly Power

Start with the critical threshold inquiry: whether the FTC has put forth enough evidence

to convince a reasonable factfinder that Meta has a monopoly in the relevant market.

Traditionally, monopoly power has been understood as "the power to control prices" while

"exclud[ing] competition."  Microsoft, 253 F.3d at 51 (quoting United States v. E.I. du Pont de

Nemours & Co., 351 U.S. 377, 391 (1956)); see IIB Philip E. Areeda & Herbert Hovenkamp,

Antitrust Law, ¶ 501, at 117 (5th ed. 2021).  More specifically, a firm is considered a monopolist

if it can maintain prices above the competitive level.  See Microsoft, 253 F.3d at 51.  When

plaintiffs can therefore provide "direct proof" of supracompetitive prices that remain protected

from erosion through competition, "the existence of monopoly power is clear."  Id.  Such proof,

however, is "only rarely available."  Id.  More typically, courts infer the existence of a monopoly

through three pieces of "circumstantial evidence": the existence of (1) a relevant antitrust market,

in which the defendant holds (2) a dominant market share, protected by (3) barriers to the entry

of rivals.  Id.; see also S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 980, 1000–01

(D.C. Cir. 1984).  The first two prerequisites measure a firm's market power, while the latter

recognizes that market power becomes monopoly power "only if it is durable."  Lenox

MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1124 (10th Cir. 2014).

The FTC argues that it has provided evidence sufficient to support a finding of monopoly

power through either the direct or indirect methods.  See FTC Opp. at 3.  As before, however, the

agency "devotes far more attention to the indirect-proof argument."  Facebook II, 581 F. Supp.

3d at 44.  Because the Court concludes that the FTC has proffered sufficient evidence to get to

17

trial on that approach, it need not address whether the Commission's direct evidence also suffices. See id. (taking similar approach at motion-to-dismiss stage). The Court thus separately examines the three prerequisites for monopoly power under the indirect approach.

1.    *Market Definition*

While in some antitrust cases, the definition of the relevant market is often the simplest of the issues (*e.g.*, bicycles or kitchen appliances), that is not the case here. Instead, defining the denominator of the market-power question — *viz.*, the boundaries of the market Meta is claimed to dominate — is no walk in the park. See Facebook I, 560 F. Supp. 3d at 14. The definition of a relevant antitrust market is "basically a fact question dependent upon the special characteristics of the industry involved." Twin City Sportservice, Inc. v Charles O. Finley & Co., 676 F.2d 1291, 1299 (9th Cir. 1982). It includes "two components: the product market and the geographic market." Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp., 947 F. Supp. 2d 88, 102 (D.D.C. 2013). A relevant geographic market is the geographic arena "where sellers compete for a group of buyers." IIB Areeda & Hovenkamp, ¶ 550a, at 351; see FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 119 (D.D.C. 2004). Here, the parties agree that the relevant geographic market is the United States. See FTC Opp. at 8 n.2.

The heart of the dispute — indeed, the question on which this case may ultimately turn at trial — is whether the FTC has adequately defined a relevant product market. Such a market "is a term of art in antitrust analysis," United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 50 (D.D.C. 2011), and includes "all products reasonably interchangeable by consumers for the same purposes." Microsoft, 253 F.3d at 52 (internal quotation marks and citation omitted). Whether products are "reasonably interchangeable" with one another depends on two factors: functional interchangeability — *i.e.*, "whether buyers view similar products as substitutes," FTC v. Sysco

18

Corp., 113 F. Supp. 3d 1, 25 (D.D.C. 2015) — and cross-elasticity of demand — *i.e.*, whether a slight increase in the price of one product causes a considerable number of customers to switch to a different product. See Arch Coal, 329 F. Supp. 2d at 120. Although cross-elasticity of demand typically turns on prices, it also depends on other intangible factors, such as whether "the switch can be accomplished without the consumer incurring undue expense or inconvenience." Sysco, 113 F. Supp. 3d at 26. "In other words, courts look at whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other." H & R Block, 833 F. Supp. 2d at 51 (internal quotation marks and citation omitted).

This question of the relevant product market is pivotal, at least when proving monopoly power via the indirect method. The FTC continues to argue that the market here comprises PSN services in the United States, which it defines as online services that possess the "core functionality" of "maintaining relationships and sharing with friends and family in a shared space." FTC SMF, ¶¶ 1007–08; compare Redacted Am. Compl., ¶¶ 165–80. Meta rejoins that no such product market exists. See Meta MSJ at 10–21; ECF No. 370-1 (Meta Reply) at 4–28. To make out its case at this juncture, the Commission must put forth evidence of such a market sufficient to support a verdict against Meta at trial.

That evidence typically comes in one — or both — of two forms. The first, largely qualitative, examines "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Because these Brown Shoe factors are simply "evidentiary proxies for direct proof" of substitutability and cross-

elasticity of demand, see Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 218–19 (D.C. Cir. 1986), "submarkets can exist even if only some of these factors are present." FTC v. Staples, Inc., 970 F. Supp. 1066, 1075 (D.D.C. 1997).  The second, usually quantitative approach involves examining expert testimony in the field of economics.  See Sysco, 113 F. Supp. 3d at 33.  Such testimony very often includes a "hypothetical monopolist test" (HMT), which "asks whether a hypothetical profit-maximizing firm . . . that was the only present and future seller of a group of products . . . likely would undertake at least a small but significant non-transitory increase in price ('SSNIP') or other worsening of terms ('SSNIPT') for at least one product in the group."  DOJ & FTC Merger Guidelines § 4.3.A (2023) ("2023 Merger Guidelines"); see FTC v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1038 (D.C. Cir. 2008) (Brown, J.) (writing for court, although other judge in majority concurred only in judgment) (describing this test); H & R Block, 833 F. Supp. 2d at 51–52 (also describing test).  As both types of evidence are in play, the Court will examine each in turn.

Before doing so, however, it pauses to emphasize a few principles that will guide its evaluation of the record.  First, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."  Staples, 970 F. Supp. at 1075; see Whole Foods, 548 F.3d at 1040 (Brown, J.) (similar).  Rather, "[w]ithin a general product market, 'well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1121 (9th Cir. 2018) (quoting Brown Shoe, 370 U.S. at 325). That means, as relevant here, that competition between Meta and other social-media firms for users' time and attention does not necessarily make them part of the same relevant product market.  See Sysco, 113 F. Supp. 3d at 26.

Second, and related, "market definition is guided by the 'narrowest market' principle." Id. In other words, "[a] relevant market cannot meaningfully encompass [an] infinite range [of products]. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." Times–Picayune Publ'g Co. v. United States, 345 U.S. 594, 612 n.31 (1953). The relevant product market is "the most narrowly-defined product or group of products sold by the merging firms" that is supported by the pertinent evidence. Arch Coal, 329 F. Supp. 2d at 120 (emphasis added).

Finally, the determination of the relevant product market must ultimately "take into account the economic and commercial realities" of the social-media landscape. FTC v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 46 (D.D.C. 1998); see also Grinnell, 384 U.S. at 572 (product market should "reflect[] commercial realities"). Most importantly here, the proposed PSN-services market — and, for that matter, most of the broader market of social-media services — is characterized by the absence of prices on the user side. See Facebook II, 581 F. Supp. 3d at 55. Recall that Meta and many of its competitors do not charge for use, preferring instead to capture advertising revenues. That makes this case an awkward fit with many of this nation's antitrust precedents, which have confronted anticompetitive practices mostly in markets subject to more traditional price and output effects. While that unusual aspect of this suit does not relieve Plaintiff of its burden to put forth evidence sufficient to support a relevant product market at trial, it does call for greater flexibility in evaluating that evidence, particularly at the summary-judgment stage. See, e.g., United States v. Google LLC, --- F. Supp. 3d ----, Nos. 20-3010 & 20-3715, 2024 WL 3647498, at *68–69 (D.D.C. Aug. 5, 2024) (acknowledging similar market features and adjusting analysis accordingly).

With those principles in mind, the Court will now assess the evidence in the light most favorable to the FTC. The take-home message is this: although Plaintiff may have a tall task awaiting it at trial, it has provided enough evidence of a relevant product market comprising PSN services to preclude judgment against it as a matter of law. The Court starts with the <u>Brown Shoe</u> factors — which, though "old school antitrust law," nonetheless "bind the court." <u>Id.</u> at *67 (cleaned up).

        a.     <u>Brown Shoe</u> Factors

Consistent with how other courts have deployed the <u>Brown Shoe</u> factors, <u>see, e.g.,</u> <u>FTC v. IVQVIA Holdings Inc.</u>, 710 F. Supp. 3d 329, 355 (S.D.N.Y. 2024), the Court will analyze them with respect to the reasonably interchangeable substitutes proposed by Meta — *i.e.*, the full universe of social-media platforms and applications. <u>See</u> Meta MSJ at 10–11. The factors, again, are: (i) the product's peculiar characteristics and uses, (ii) industry or public recognition of the submarket as a separate economic entity, (iii) unique production facilities, (iv) distinct customers, distinct prices, and sensitivity to price changes, and (v) specialized vendors. <u>See</u> <u>Brown Shoe</u>, 370 U.S. at 325. As neither of the parties addresses the last, <u>see</u> FTC Opp. at 16 n.3, the Court will also skip it.

        i.     *Peculiar Characteristics and Uses*

The Court begins with the "peculiar characteristics and uses" supposedly unique to products in Plaintiff's proposed market. As for characteristics, the FTC focuses on three: (1) a "social graph" focused on friends-and-family sharing, coupled with (2) tools to foster building network connections with those friends and family, in (3) a shared social space. <u>See</u> <u>id.</u> at 13–14.

Starting with the first, the Commission has provided evidence that Facebook, Instagram, Snapchat, MeWe, and other now-defunct products in its proposed market differentiate themselves by constructing a social graph focused on friends and family sharing.  A social graph, according to the agency, "is the set of connections that users make among each other within a social network."  FTC SMF, ¶ 1088.  So stated, it is a feature that is apparently common to many social-media products, as Meta is quick to point out.  See Meta MSJ at 19; Meta Reply at 24–25; see also, e.g., FTC SMF, ¶ 1089; Meta SMF, ¶¶ 209–10 (TikTok), 280 (X), 401 (LinkedIn).  But the Commission's evidence — which includes depositions of executives at many of these firms and statements in internal documents — suggests that PSN services like Facebook and Instagram distinguish themselves by social graphs specifically "built around friends and family connections."  FTC Opp. at 14; see FTC SMF, ¶ 1090.  That is, while many online platforms create networks of various connections, only some of them create a network focused on personal relationships, as opposed to professional connections (LinkedIn), see FTC SMF, ¶ 1139, or various other interests (YouTube, TikTok, X).  See id., ¶¶ 1182, 1208, 1228.  Meta's products are self-avowedly of the former type.  See, e.g., id., ¶¶ 1090(a)(i), (b)(ii) (internal document describing both Facebook and Instagram as products offering "one-to-many sharing bounded by a friend graph"); cf. id., ¶ 1139(c) (different internal document describing LinkedIn's social graph as "orthogonal" to Facebook's because it focused on "coworkers" instead of "friends and family").  Indeed, an internal Meta presentation referred to █████████████████████████████ ██████████████████████  Id., ¶ 1090(a)(iii).  A strange term to use if the feature is, as Meta claims, no different from what is on offer at every other social-media company.  See Meta MSJ at 19.

The salience of these differences is widely recognized, including by other companies. Pinterest (a social-media company that permits users to "pin" various "interests" to their "boards," see Meta SMF, ¶¶ 330–40), has submitted in public filings that "social networks can be distinguished based on use cases and target user base," with "'[p]ersonal' versus 'professional'" being "one axis of differentiation." FTC SMF, ¶ 1108(i). Adam Presser — the head of operations for TikTok, one of the largest competitors that Meta seeks to include in any relevant product market — testified that such a social graph was a "core differentiated feature" of services like Instagram and Facebook, in distinction to TikTok. Id., ¶ 1090(b)(iii); see also id., ¶ 1089(b) (TikTok executive explaining that TikTok's graph is a "content graph" that "relies on our interests" as opposed to "relationships between friends and family"); id., ¶ 1208 (other TikTok executives testifying similarly). ██████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████. Id., ¶ 1090(a)(v). So, too, executives at YouTube repeatedly testified that their service does not use, and did not plan to leverage, a social graph built on friends-and-family connections. Id., ¶ 1182.

The FTC has also submitted evidence that PSN services deploy certain other design tools or norms designed to leverage their friends-and-family-focused social graphs. For instance, they suggest new "friends" or "follows" based on friends in common and address-book information. See id., ¶¶ 1092–96. They also emphasize the use of real identities, which facilitates the core purpose of enabling users to connect with their actual friends and family. See id., ¶¶ 1092(b), 1094(b). Other services that Defendant claims as competitors, conversely, do not have such a norm or, indeed, have the opposite norm: one of anonymity or pseudonymity. See, e.g., ¶¶ 1108(k) (Reddit wants users to be able to share personal information "while maintaining their

24

privacy" and does not require users to share their real identity); ██ (███████████

███████████████████████████); 1231 (pseudonymity common on X).  Such evidence

tends to support the FTC's contention that PSN services distinguish themselves through a suite

of characteristics — some, admittedly, rather subtle — that are peculiar to platforms seeking to

enable friends-and-family sharing.

Consistent with the above, Plaintiff has also presented evidence that friends-and-family

sharing is a "peculiar . . . use[]" of PSN services.  Brown Shoe, 370 U.S. at 325.  The FTC's

expert Clifford Lampe — a professor at the University of Michigan School of Information, an

acknowledged expert in human-computer interactions and previously a close advisor to Meta

— submitted a report summarizing academic research on computer-mediated communications

systems.  See ECF No. 331-6 (Pl. Docs. Vol. 74) at ECF pp. 155–56 (Report of Clifford Lampe),

¶¶ 1–7.  He concluded that "only a subset of computer-mediated technologies" — which he

termed "Personal Social Network Sites" — "combine design with user motivations and norms

centered in efficient personal relationship maintenance across an individual's social network,

including their strong and weak ties." Id., ¶¶ 9, 13.  That conclusion followed from his analysis

of "three main factors": the "technical features" of a social-networking site, the "motivation" of

the people using the site, and the "norms of use for that platform that people have evolved over

time." Id., ¶ 79.  PSN services, according to Lampe, are "platforms whose design, motivations,

and norms enable masspersonal, low cost maintenance of broad personal relationship networks

that are comprised of real life connections." Id.; see also id., ¶¶ 81–99 (outlining specific design

features, such as emphasis on real IDs).  On the basis of that complex interaction among design,

motivations, and norms, Lampe concluded that Facebook, Instagram, and Snap were examples of

PSN services, but X, TikTok, YouTube, and LinkedIn were not.  Id., ¶¶ 14–23; see also FTC

SMF, ¶¶ 895–901 (summarizing findings).

Meta itself appears to recognize the power of such norms in differentiating its products as

suited for friends-and-family sharing.  Take just a few examples.  During his investigational

hearing before the FTC, Zuckerberg repeatedly acknowledged that "the use cases that [Meta has]

focused on the most over time are around helping you connect with . . . your friends and family,"

as opposed to "primarily being around interests."  Zuckerberg Hr. at 184:12–15.  He also

testified that "the culture of the apps and which features get emphasized can lead to . . . different

use cases," and that "Facebook has always kind of emphasized this semi-private community

space," somewhere between the "fully public" YouTube and the "one-on-one, private network."

Id. at 181:23–25, 183:14–18.  Indeed, the former head of the Facebook application stated in an

email that, although both Facebook and YouTube offer video products, they "serve nearly

disjoint use cases."  FTC SMF, ¶ 1010(h).  The company's internal documents have also noted

that some applications' norm of anonymity make them a bad fit for friends-and-family sharing,

see id., ¶ 1082(c), while other emails acknowledge that Instagram and TikTok are "hired" by

users for "very different jobs," as the latter product "is not hired for sharing with friends and

family."  Id., ¶ 1010(c).

Other actors also acknowledge that friends-and-family sharing is a peculiar use of PSN

services.  See, e.g., id., ¶ 1084(h) (███████████████████████████████████████

████████████████████████████████████████).  ████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████          Pl. Docs. Vol. 65 at ECF p. 876 (Deposition of Keith Coleman, Vol. 2, at 434:9–

21) (also describing that as Facebook's "core job").  Such use cases, he explained, delimit a

company's competition: X therefore "didn't talk a lot about competing for attention because you

can't do much with that . . . . I mean, there's so many things that grab your attention. . . . [W]hen

I think of like what competition is useful to me in developing the product, . . . it's competition or

alternatives that <u>serve the same purpose</u>."  Pl. Docs. Vol. 65 at ECF pp. 469–70 (Deposition of

Keith Coleman, Vol. 1, at 88:15–89:5) (emphasis added).  An internal ███████ presentation

similarly noted that the "professional purpose of [LinkedIn] creates norms and expectation[s]

about the responsibilities and conduct of both LinkedIn and its members."  FTC SMF,

¶ 1082(d)(ii); <u>see also</u> <u>id.</u>, ¶ 1084(i) (███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████).  ███████████████

████████████████████████████████████████

███████████████████████████.  <u>See</u> <u>id.</u>, ¶ 1154(b)–(c).  ██████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████.  <u>Id.</u>, ¶ 1154(e).

       Finally, Plaintiff has also submitted data that, while far from a slam dunk, nonetheless

support this use-case differentiation.  For instance, Meta records a metric that it calls

"meaningful social interactions" (MSI) to "capture the concept of active engagement with friend

and family (and group) content" on Facebook.  <u>Id.</u>, ¶ 1081(a).  From 2017–2020, MSI activity

data saw "significant peaks . . . in time periods that tightly coincide with seven holidays

"ordinarily associated with spending time with friends and family."  <u>Id.</u>, ¶ 1081(b).  ████████████

████████████████████████████████████████.  <u>Id.</u>, ¶ 1081(d).

These data suggest that, consistent with the FTC's thesis, these platforms serve separate core uses and see differential demand based on changing patterns of user needs.

ii.       *Industry or Public Recognition*

The Commission has also put forward evidence of industry and public recognition of a distinct market of PSN services typified by the characteristics and uses outlined above. Such evidence "matters" for distinguishing product markets "because we assume that economic actors usually have accurate perceptions of economic realities." Rothery Storage, 792 F.2d at 218 n.4.

In particular here, statements both from industry executives and in ordinary-course documents tend to show that market participants understand their products to serve a distinct demand for friends-and-family sharing. See Sysco, 113 F. Supp. 3d at 27–28, 30 (relying on executives' statements to help determine relevant product market); H & R Block, 833 F. Supp. 2d at 52 ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents."). For instance, Plaintiff points to repeated statements by Meta executives — including Zuckerberg — that fostering connections with friends and family remains the primary use or focus for Facebook, see FTC SMF, ¶ 1320, and that they understand Instagram to target the same core use, see id., ¶ 1321, even as both services expanded to other use cases. Zuckerberg even went so far as to say that, despite the "explo[sion]" of public content on Facebook in recent years, Meta would still seek to "put friends and family at the core of the experience." Id., ¶ 1320(c). Likewise, Sheryl Sandberg, Meta's former COO, testified before the FTC that staying connected with friends and family is "a core part" of Facebook and "the majority of what people do" on the platform. See Pl. Docs. Vol. 58 at ECF p. 110 (FTC Investigational Hearing of Sheryl Sandberg at 44:10–14). And Adam Mosseri, the head of Instagram within Meta, agreed that "connect[ing] with . . . friends

and family" is a "core use case" of Instagram, that it is one of the "distinct jobs" that the
application is "hired for," and that Instagram is "uniquely good" at integrating it with another of
the platform's primary uses (to "entertain").  See ECF No. 355-1 (Pl. Docs. Vol. 61) at ECF
pp. 456–57 (Deposition of Adam Mosseri at 129:23–131:12).

     Such statements align with the companies' internal assessments.  Internal presentations
and emails at Meta refer to Facebook's and Instagram's ████████████████████████████
████████.  See FTC SMF, ¶¶ 1057, 1061; see also ECF No. 331-8 (Pl. Docs. Vol. 76) at ECF
pp. 9–11 (Expert Rebuttal Report of Clifford Lampe, ¶¶ 24–25) (collecting statements).  For
example, early brand-positioning documents placed Facebook "closest" to MySpace (which
Meta viewed as "offer[ing] users a community where they can share . . . with a growing network
of mutual friends") and further from Google and YouTube.  See FTC SMF, ¶ 1070.  A more
recent Meta analysis similarly concluded: ████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████  Id., ¶ 1323(b).

     Internal presentations at Snapchat similarly convey its understanding that its value
proposition is "being the place to connect to close groups of friends," while its "Stories" product
was used to build "relationship value" (as opposed to "entertainment value").  Id., ¶ 1065; see
also Lampe Rebuttal Report, ¶ 26 (collecting statements about other platforms).  Likewise,
TikTok's former Director of UX Research testified that during his time at TikTok he
"constantly" saw in various surveys and forms of user research that "Instagram and
Facebook . . . would be apps that people would primarily use to connect with people that they
already know, in some way or another, versus TikTok [which] was a little bit more random than

that." ECF No. 343-1 (Pl. Docs. Vol. 66) at ECF p. 1,360–61 (Deposition of Eric Morrison at 192:14–193:9).

Evidence also shows that public expectations match these internal assessments. Extensive user surveys conducted by Meta itself march to the same tune: users see Facebook, Instagram, and Snapchat as the best applications for keeping up with family and friends and sharing content with those groups. See FTC SMF, ¶ 1075. For instance, user research conducted by Meta in 2017 on Facebook, X, Instagram, Snapchat, WhatsApp, and YouTube found that Facebook "was seen as the best app to keep up with family/friends who are far away," and Instagram "was seen as the best app for seeing interesting photos/videos shared by friends." Id., ¶ 1075(a). A 2018 survey conducted by Meta also concluded that "Facebook's core value proposition is robustly anchored in 'keeping up with friends and family,'" id., ¶ 1075(d), while a different survey conducted the same year found that ███████████████████████████ ███████████████████████ Id., ¶ 1075(c). Meta's survey results from 2019 through 2022 are of a piece. See, e.g., Pl. Docs. Vol. 74 at ECF pp. 483–90 (Expert Report of Michal Malkiewicz, ¶¶ 121–37) (summarizing results from numerous Meta surveys between 2019 to 2022). TikTok's research and surveys likewise showed that staying connected to friends and family was the reason individuals used Facebook, Instagram, and Snapchat. See FTC SMF, ¶ 1075(f)–(g).

Plaintiff has, in addition, submitted the expert report of Michal Malkiewicz, who conducted a consumer web survey of 3,228 respondents showing that users selected "to keep up with [their] friends' and family's lives in one place" more than any other reason for using Facebook, Instagram, Snapchat, and MeWe, yet did not commonly select that reason for other services like X, LinkedIn, TikTok, and YouTube. See Malkiewicz Report, ¶¶ 11, 33. For

instance, 60.1% of respondents indicated that they used Facebook for that purpose. Id., ¶ 66. While the numbers are not quite as impressive for Instagram, Snapchat, and MeWe — where 36.7%, 34.1%, and 22.9%, respectively, said they turned to those platforms to keep up with friends and family — that reason was still selected more than any other. Id., ¶¶ 66, 78. Meanwhile, only 4.5% of respondents picked friends-and-family sharing as their primary reason for using TikTok, 2.8% for YouTube, 4.6% for LinkedIn, and 5.5% for X. Id., ¶ 67. Such numbers shore up Plaintiff's contention that a publicly recognized focus on friends-and-family sharing differentiates products in its proposed market from others that Meta seeks to include.

iii.    *Unique Production Facilities*

It is somewhat unclear what, if any, "unique production facilities" are relevant to Plaintiff's case. As our Circuit has explained, courts look to this factor as a proxy for "the ability of other producers to shift resources" to make the product in the proposed market, should prices rise or output be restricted. Rothery Storage, 792 F.2d at 218 n.4. There is little evidence, however, that TikTok, YouTube, or other such platforms lack the technical know-how to offer PSN services. Rather, the FTC argues that such services require "the presence of a network of users producing friends and family content to share with their connections," FTC SMF, ¶ 1119, and that recreating that network from scratch is difficult without significant time and expense. See id., ¶¶ 1120–21. So conceived, this factor overlaps substantially with Plaintiff's argument for high entry barriers, so the Court will address it more fully then.

iv.    *Distinct Customers and Prices, Sensitivity to Price Changes*

Finally, the Commission has presented evidence that Meta can price discriminate within its PSN-services market. See Whole Foods, 548 F.3d at 1038–39 (explaining that monopolies can extract monopoly profits from "captive" consumers through price discrimination); IIB

Areeda & Hovenkamp, ¶ 517a, at 155, 157 (same).   Here, the available evidence of such

discrimination is not straightforward, as users access Meta's products free of charge.  Even with

zero-price products, however, a monopolist can increase the "quality-adjusted price" by

degrading the quality of the product while keeping prices constant (at zero).  See FTC SMF,

¶ 1435; Google, 2024 WL 3647498, at *126.  The FTC argues that consumers of Meta's

products generally "pay" by watching advertisements and providing their personal

information.  See id., ¶ 1437.  An increase in the quality-adjusted price of Meta's products thus

might be shown through an increased "ad load" — or "the percentage of advertisements served

to users as a fraction of total items shown" — a decrease in privacy, or other indications of

declining quality.  Id., ¶¶ 1440–42; see also id., ¶¶ 1478–83 (likening ad load to "tax" on user

experience and drag on user engagement).  Meta could raise the quality-adjusted price,

moreover, only for "core" users whose demand is relatively inelastic, which signals that they

have few other substitutes.  See Whole Foods, 548 F.3d at 1037–38.

The Commission contends that users who come to Meta's products for friends-and-

family sharing ("core users") do, in fact, face higher quality-adjusted prices.  It points to two key

pieces of evidence.  First, multiple internal Meta surveys showed that ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████.  See id., ¶ 1503 (collating results from various user surveys).  For instance, a 2020

internal analysis of ████████████████████████████████████████████████████

████████████████████████████████████████████.  Id., ¶ 1503(b).  Another, more recent survey

found that ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████. Id., ¶ 1503(h).  And things appear to have ████████████.  See, e.g., id.,

¶¶ 1500 (██████████████████████████████████████), 1502

(Meta executives fretting over underinvestment in friends-and-family sharing over time).  Such

evidence suggests Meta has raised the quality-adjusted price for users who come to it for friends-

and-family sharing.

        Second, and more directly, there is evidence both that Meta raises the ad load for users

whose demand is more inelastic, and that such users overlap with those who tend to use Meta's

products for friends-and-family sharing.  To start, Defendant openly admits that it adjusts ad load

based on a user's perceived sensitivity to advertisements.  See id., ¶ 1529.  That alone suggests

that at least some users may have an inelastic demand for Meta's products, in that increases in

the "price" (ad load) do not translate into a measurable drop-off in demand.  Cf. IIB Areeda &

Hovenkamp, ¶ 517a, at 155 (noting that "'persistent' and systematic price discrimination" over

"two (or more) groups of customers with different demands" can indicate market power in a

relevant product market).  Plaintiff points out, moreover, that those adjustments have

recognizable patterns: Meta shows fewer ads ████████████████████████

████████████████████████████████████████████████████████

███████████████████████.  See FTC SMF, ¶¶ 1525 (evidence of ████████

ad-load variations); 1528 (evidence of ad-load variation based on ████████████████

███████████████████████).  Why?  Meta's own analyses indicate that ████████

█████████████ users of Instagram and Facebook are more likely to use the applications for

friends-and-family sharing than ██████████████████████.  See id., ¶ 1530;

ECF No. 331-7 (Pl. Docs. Vol. 75) at ECF pp. 38–39 (Expert Rebuttal Report of Scott

Hemphill), ¶ 108.  Increasing the quality-adjusted price for these users therefore does not

comparably reduce their demand for the service. Collectively, such evidence tends to support a finding that Meta identifies users who come to its products for friends-and-family sharing and exercises monopoly power over such users by raising the quality-adjusted price of accessing its services.

*v.*    *Meta's Counterarguments*

Meta, of course, does not accept this evidence lying down. Its arguments, however, tend to show — rather than refute — that genuine disputes of material fact continue to exist over the relevant product market. They thus do not demonstrate that Meta is entitled to judgment as a matter of law.

Defendant's most consistent attack reduces to the same core claim: it competes against many companies, not just those the FTC identifies as part of the PSN-services market. See, e.g., Meta MSJ at 10–14; Meta Reply at 4–6. This claim really consists of two different and repeated assertions: first, that Meta competes against numerous other online offerings in a market for users' "time and attention," see, e.g., Meta SMF, ¶¶ 187, 189, 196–97; Meta MSJ at 18–19, and second, that the FTC has not shown that there is a narrower product market. See, e.g., Meta Reply at 1–2, 4–7.

The first of these assertions is true but beside the point. The FTC readily admits that Meta has incorporated some features (like Reels) to "bring [it] into more direct competition with non-PSN apps such as (e.g.) YouTube and TikTok." FTC SMF, ¶ 1325. And, no doubt, copious evidence demonstrates both that the company views itself as competing against many other companies for users' time and attention, and that users seek out Meta's products for far more than just friends-and-family sharing. See Meta Reply at 6. As the Commission points out, however, it is beyond cavil that companies "can operate in multiple and concentric relevant

34

markets."  FTC Opp. at 15; see, e.g., Sysco, 113 F. Supp. 3d at 26 ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.") (quoting Staples, 970 F. Supp. at 1075); FTC v. IQVIA Holdings, Inc., 710 F. Supp. 3d 329, 368 (S.D.N.Y. 2024) (same); United States v. Bertelsmann Se & Co. KGaA, 646 F. Supp. 3d 1, 28 (D.D.C. 2022) (same).  The narrowest-market principle, moreover, requires laser-like focus here on "the most narrowly defined product or group of products" that is supported by the evidence.  Arch Coal, 329 F. Supp. 2d at 120.  Meta's extensive evidence of head-to-head competition outside the PSN-services market therefore does nothing to show that its proposed "time and attention" market is the only relevant antitrust market.  Indeed, if the Court were to credit Defendant's preferred market, it sees no obvious limiting principle: when it comes to so broad a market as "time and attention," Meta competes not just with YouTube, TikTok, and X, but also with watching a movie at a friend's house, reading a book at the library, and playing online poker.  Antitrust law does not require consideration of such an "infinite range" of possible substitutes.  Times-Picayune, 345 U.S. at 612 n.31.

Meta's second assertion comes nearer to the mark.  Although Plaintiff need not disprove the existence of some broader market for time and attention, it still must prove the existence of a relevant product market composed of PSN services.  See FTC Opp. at 15.  To put the issue another way: the FTC must show that PSN services are not merely different products, but that they compose a separate product market, which means that they cannot readily be substituted for other products outside the proposed market.  See Microsoft, 253 F.3d at 52.  On this point, Meta argues that the Commission has boxed itself into a corner by claiming that virtually all time spent on PSN apps counts for the purposes of computing Meta's market share, while the same time

spent on other applications doing similar activities does not.  See Meta Reply at 4–5.  According

to Meta, that position "sweeps in" all sorts of activities that occur on Meta's platforms that have

ready substitutes elsewhere, such as passively watching a video or shopping for furniture.  Id. at

1.  The Court will have more to say about this issue when discussing Meta's market share, but it

addresses its relevance to the product market here.

    The FTC first defends its market definition by disputing Meta's premise.  Because a

sports clip watched on Facebook is "integrated" within a social graph focused on friends-and-

family sharing, the agency argues, it is a fundamentally different experience from watching that

same clip on YouTube or TikTok.  See FTC Opp. at 18.  Some evidence bears out Plaintiff's

claim.  See FTC SMF, ¶¶ 1309–14.  For instance, Meta's executives appear to view unconnected

content as a complement to Meta's core offering, creating a feedback loop in which content

discovery drives engagement with friends and family, which in turn drives more content

discovery.  See, e.g., id., ¶ 1310.  Intuitively, however, the argument faces an uphill climb,

especially when much of the same content is available on multiple applications outside the

FTC's proposed market.

    Perhaps sensing the difficulties of that path, the Commission tries another sortie: even

accepting that a Reel on Instagram, like a rose by another name, would smell as sweet as a

TikTok video, Plaintiff argues that Meta's monopoly power stems from its dominance over a

"core" service that it offers alongside many other services — namely, friends-and-family

sharing.  See FTC Opp. at 18–19.  For this point, the Commission relies on Whole Foods, where

the D.C. Circuit held that Whole Foods competed in a relevant product market for premium,

natural, and organic supermarkets (PNOS), even though it also competed in a broader market of

conventional supermarkets.  See 548 F.3d at 1038–40 (Brown, J.); see also id. at 1043–49 (Tatel,

J., concurring in the judgment).  Recognizing that "cross-shopping [with conventional supermarkets] is entirely consistent with the existence of a core group of PNOS customers," Judge Brown wrote for the court that a "core group of particularly dedicated, distinct customers, paying distinct prices, may constitute a recognizable submarket, whether they are dedicated because they need a complete cluster of products, because their particular circumstances dictate that a product is the only realistic choice, or because they find a particular product uniquely attractive." Id. at 1039–40 (cleaned up); cf. United States v. Conn. Nat'l Bank, 418 U.S. 656, 662, 664 (1974) (despite "fierce" competition between savings banks and commercial banks for "identical or essentially fungible services," former can be excluded from relevant product market because they do not offer same "cluster of services").  Because Plaintiff has proffered evidence that only PSN applications offer "a core use and functionality that serves the demand for" friends-and-family sharing, the Court agrees that it has met its burden to show that other applications are not reasonable substitutes, notwithstanding the presence of "non-PSN" activity on PSN applications.  See FTC Opp. at 19.  And, given the record evidence the Court has just summarized, a reasonable factfinder could determine that Meta has such a "core use" of friends-and-family sharing and exploits a customer base seeking out that use.

Meta's response to this maneuver is to argue that Whole Foods can be invoked only where there is evidence of price discrimination against that core group of customers, which Plaintiff has failed to proffer.  See Meta Reply at 7–15.  The Court is not convinced.  While it is certainly true that evidence of distinct prices is highly probative for delineating product markets — and that evidence of price discrimination against inelastic consumers can be direct evidence of monopoly power, see FTC SMF, ¶ 1531(a) — it is not legally required.  See Whole Foods, 548 F.3d at 359 (Tatel, J., concurring in the judgment) ("Brown Shoe lists 'distinct prices' as

only one of a non-exhaustive list of seven 'practical indicia' that may be examined to determine whether a separate market exists.").  Even were this market a typical one, Meta's position is essentially that of then-Judge Kavanaugh's dissenting opinion in Whole Foods.  See id. at 367 (Kavanaugh, J., dissenting) (lack of price discrimination "all-but-dispositive"); id. at 371 (calling Brown Shoe a "1960s-era relic").  Whatever the merits of that view, it is not the law of this Circuit, nor have courts uniformly required such evidence.  See, e.g., Google, 2024 WL 3647498, at *68–74 (finding relevant product market without looking to prices); United States v. Bazaarvoice, 2014 WL 203966, at *22–26 (N.D. Cal. 2014) (same).  Exalting price discrimination as a legal requirement is, moreover, particularly inappropriate in a zero-price market.  See Google, 2024 WL 3647498 at *68 (declining to "consider factors related to pricing" because "general search is a free product").

Besides, the FTC has submitted evidence of price discrimination, as detailed above, in the form of increased ad load and a degraded user experience for those who access Meta's products for friends-and-family sharing.  To be sure, "the pricing evidence here is unquestionably less compelling than the pricing evidence in some other cases," Whole Foods, 548 F.3d at 360 (Tatel, J., concurring in the judgment), and Meta raises serious doubts about its ultimate persuasiveness, see Meta Reply at 11–15 (attacking Plaintiff's price-discrimination evidence) — particularly in light of other evidence that this so-called "core" use case "represents a small and declining share of time spent on Facebook and Instagram."  Id. at 6.  But those are factual disputes.  They are not reasons to conclude, at this stage, that Meta is entitled to judgment as a matter of law.

Finally, Meta raises various objections to the other Brown Shoe factors, mostly by minimizing differences between products or offering competing evidence.  See, e.g., Meta Reply at 23–28; Meta Reply to FTC SMF, ¶¶ 1207–1208 (features of social graph are not "relevant to

substitution").  Whether the distinctions the FTC observes are akin to those between, for instance, broadline and specialty food distributors, cf. Sysco, 113 F. Supp. at 27–37 (finding a relevant product market), or are ultimately immaterial to the question of substitutability is, again, a factual dispute that must be resolved at trial.  The FTC has done enough to make it that far.

        b.     Expert Testimony

As the above is sufficient to preclude summary judgment on the existence of a relevant product market, the Court will only briefly address the additional expert testimony to explain why it does not alter that conclusion.

To start, as the FTC's lead expert admits, a traditional hypothetical monopolist test is not readily available in this case.  See ECF No. 331-5 (Pl. Docs. Vol. 73) at ECF p. 76 (Expert Report of Scott Hemphill, ¶ 179).  Recall that the HMT typically requires asking whether a "hypothetical monopolist" with control over all products in the proposed market could "profitably raise prices on those products."  Sysco, 113 F. Supp. 3d at 33.  The purpose of imposing that "SSNIPT" is to identify potentially substitutable goods: if consumers can substitute goods outside the proposed market, the price increase would not be profitable, and thus those other goods must be included in the market.  See id.  As already noted, however, a zero-price market does not readily lend itself to price-based analyses.  Any HMT would thus require evaluation largely of non-price data, such as "quality, service, capacity investment, choice of product variety or features, or innovative effort."  2023 Merger Guidelines, § 4.3.B.  And while a qualitative HMT is hardly "oxymoronic," as Meta claims, see Meta Reply at 17, it lacks the empirical clarity of the traditional test.

The central claim in this case, moreover, is that Meta already exercises monopoly power over the relevant product market.  It therefore makes little sense to ask if a "hypothetical"

monopolist would impose a SSNIPT.  Rather, the key question is whether Defendant can already do so.  See IIB Areeda & Hovenkamp, ¶ 539a2, at 343 ("In contrast [to the typical merger case], in a monopolization the given assumption is that a firm already has monopoly power . . . . The relevant question is . . . typically whether it already has the power to charge supracompetitive prices.") (emphasis added).  Indeed, to measure substitution in response to price increases imposed on an already monopolized market engages in a fallacy so common it has its own name: the Cellophane fallacy.  See United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377 (1956) (origin of fallacy); FTC Opp. at 9–10 (explaining it).  In short, when a monopoly already exists, any worsening of terms is apt to induce customers to substitute to products that are not, in a competitive market, true substitutes.  See Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 975 n.7 (9th Cir. 2023).  Including those products in the market based on that substitution therefore risks delineating an erroneously broad product market.  See IIB Areeda & Hovenkamp ¶ 516h, at 153–54.

        The upshot of all this is that conducting an HMT in this case is likely to overlap substantially with the type of analysis that Brown Shoe already requires — viz., a largely qualitative examination of whether any adequate substitutes exist outside the proposed product market that have prevented Meta from imposing a "worsening of terms" (SSNIPT) on customers of its products.  The FTC's halfhearted attempt to repackage Hemphill's analysis as a thoroughgoing HMT implicitly acknowledges this reality.  See FTC Opp. at 21–23.  It is therefore incorrect to claim, as Meta does, that a lack of any traditional quantitative evidence of substitution is "fatal" to Plaintiff's case.  See Meta Reply at 18.  On the contrary, "[t]here is no legal requirement that a plaintiff supply quantitative proof to define a relevant market," Google,

2024 WL3647498, at *68; see also McWane, Inc. v. FTC, 783 F.3d 814, 829–30 (11th Cir. 2015)
(same), especially when alleging the monopolization of a zero-price market.

      Undeterred, however, Meta offers four studies from its two lead experts purporting to be
the only quantitative evidence in the record, and it argues that their conclusions require granting
summary judgment in its favor.  Not only is a motion for summary judgment not the appropriate
place to weigh competing expert testimony, see Robinson v. Pezzat, 818 F.3d 1, 3–4 (D.C. Cir.
2016), but the Court also highlights a few reasons why, viewing the evidence in the light most
favorable to the FTC, these studies do not compel a contrary result.

      First, two of the studies are of questionable relevance.  One measured user behavior in
India in response to a complete ban of all Chinese-owned applications, including TikTok and
WeChat, and found an uptick in usage of Facebook and Instagram.  See ECF No. 331-9 (Pl.
Docs. Vol. 77) at ECF p. 483 (Expert Report of John A. List, ¶¶ 19, 21).  Setting aside that the
study examines data from an entirely separate geographic market and that the ban applied to
applications like WeChat that Plaintiff believes are substitutes for Meta's products abroad, Meta
also confuses the cross-elasticity of demand of its own products with that of TikTok, in effect
attempting an inverse HMT.  See Hemphill Rebuttal Report, ¶¶ 448–49.  As one of Meta's lead
experts explains in his own academic writing, however, cross-elasticities of demand between
products are not necessarily symmetrical.  See id., ¶ 449 (citing Dennis W. Carlton & Jeffrey M.
Perloff, Modern Industrial Organization 648 (2004)).  Data showing substitution from TikTok to
Meta do not, therefore, support the inference that similar substitution occurs from Meta to
TikTok.  The second study, meanwhile, shows that a reduction in the share of time spent on
Facebook or Instagram correlates with an increase in the share of time spent on TikTok,
YouTube, and other non-PSN applications.  See List Report, ¶¶ 147–63.  But the study does not

even purport to show that users were substituting one service for another; rather, the changes in proportional time spent could reflect any number of non-market factors, including increased usage of one application while holding constant usage of Meta's apps.  See Hemphill Rebuttal Report, ¶ 471.

Second, as the FTC points out, three of the studies involved exorbitant "price" increases imposed on the existing market — e.g., a 6-hour outage of all Meta's apps in October 2021, see Pl. Docs. Vol. 77 at ECF p. 815 (Expert Report of Dennis Carlton, ¶¶ 25–26); a significant (+20%) payment for participants to reduce time spent on Meta products, see List Report, ¶¶ 52, 74, 76; FTC SMF, ¶ 1345(a); and a ban on a purported competitor in India.  See List Report, ¶ 19.  An HMT typically requires, however, a price increase of no more than 5%, see 2023 Merger Guidelines, § 4.3.B, because severe price increases can induce substitution outside the relevant product market.  Cf. Insight Equity v. Transitions Optical, Inc., 252 F. Supp. 3d 382, 390 (D. Del. 2017) ("[A]t a high enough price, even poor substitutes look good to the consumer.").  By imposing steep (and, in some cases, transitory) price increases on a market that Plaintiff argues is already monopolized, these studies both fail to implement any recognized "quantitative" test and also risk falling prey to the aforementioned Cellophane fallacy.  See FTC Opp. 24–26.

Finally, even putting aside any methodological reservations that a reasonable factfinder might have, the results themselves do not necessarily dance to Meta's tune.  To take just one example, Meta makes much of the fact that in both the "outage" study and the "pricing" experiment, users diverted more of their non-Meta time to applications outside the proposed PSN market than they did to Snapchat, which Plaintiff includes in the market.  See, e.g., Meta Reply at 17–18.  To hear Meta's side of the evidentiary story, that means that if Snapchat is in the

market, all the other apps must be as well.  Id.  As the FTC notes, however, in both cases a large

plurality of users switched to "off-device time" — suggesting that, even when Meta's apps

become "pricey," many users have no real substitutes for them.  See FTC SMF, ¶ 1369.  Indeed,

in the pricing experiment, nearly two-thirds of users switched from Facebook to nothing at all

(39%), playing games (14%), or using their browser (10%), and a nearly equal proportion

switched from Instagram to nothing at all (29%), using their browser (18%), or Facebook (13%)

— hardly airtight evidence of widespread substitution away from Meta's products to non-PSN

applications like TikTok and YouTube.  See List Report at 47–48, figs. II-5 & II-6.  So, too, in

the "switching" study, a reduction in the share of time spent on Facebook was correlated with

greater increases in shares of time spent on ████████████, ████████████, and

████████████████ than on ████████████, ████████████, or even — puzzlingly —

████████████.  See List Report at 67, fig. II-13.  To interpret this evidence the way Meta

urges would require accepting the improbable contention that ████████ are a closer substitute for

Facebook than Instagram is merely because more people "switched" to it.

Ultimately, the weighing of this evidence is a task for trial, where Meta's experts may yet

win the day.  But viewing the evidence in the light most favorable to the FTC — as it must at this

juncture — the Court finds that Meta's experts have not done enough to entitle it to judgment as

a matter of law on the relevant product market.

2.    *Market Share*

After ferociously contesting Plaintiff's market definition, Meta offers little more than a

whimper against the Commission's market-share calculations.  To show monopoly power, the

FTC must put forward evidence that Meta holds a dominant share of the market for PSN

services.  See Microsoft, 253 F.3d at 51.  Here, Defendant's market share was calculated in

reliance on three sources: (1) first-party data provided in discovery by market participants; (2) data provided in discovery by Comscore and data.ai, which are data-analytics companies Meta relies on, and Onava, which is Meta's former in-house data source for third-party app-usage data; and (3) data the FTC licensed from Comscore outside the discovery process. See FTC SMF, ¶ 1398. Those sources, in turn, permitted the calculation of several metrics relevant to market share, including daily active users (DAUs), monthly active users (MAUs), and time spent on app. See id., ¶ 1400; Facebook II, 581 F. Supp. 3d at 47 (explaining why these metrics "are appropriate indicators" of market share).

Whichever way the data is sliced — and even accounting for a purported double-counting issue that one of Meta's experts identified, see Carlton Report, ¶ 96 & pp. 90–91, tbls. 14–16 — the story is the same: Meta's share of the relevant market has exceeded (at times greatly) the level typically associated with monopoly power. See FTC SMF, ¶¶ 1400–01; Facebook II, 581 F. Supp. 3d at 47–48 (discussing threshold as 60% market share). According to the FTC, between 2011 and 2022, Meta had a market share ranging between 62% and 100% in the PSN-services market. See FTC SMF, ¶ 1397. The most recent numbers, which are the most relevant for this claim, are ███████████: in 2022, market participants' data show that Meta gobbled up ████ of time spent on PSN services, ████ of MAUs, and ████ of DAUs. See FTC SMF, ¶ 1401. Those numbers, even if approximations, more than meet Plaintiff's burden to provide evidence of Meta's dominance in the relevant product market.

Defendant does not dispute these numbers, instead resuscitating its market-definition complaint: the FTC's calculations are "meaningless" because the market excludes applications like X, YouTube, and TikTok. See Meta MSJ at 22–23; Meta Reply to FTC SMF, ¶ 1396. That response essentially concedes that the market-share question will rise or fall in tandem with the

definition of the relevant product market.  Indeed, Meta's lead economic expert agreed that, assuming that the Commission's market definition was correct (which, of course, he disputed), its estimates of market share were likely accurate.  See ECF No. 342-1 (Pl. Docs. Vol. 67) at ECF p. 1,005 (Deposition of Dennis Carlton at 258:6–11).

That said, Plaintiff's have-it-both-ways market definition rears its head here, as the Court previously indicated.  The above statistics would seem to capture all time spent on Meta's products — i.e., not just time spent on its asserted core use case of friends-and-family sharing, but also any time spent watching highlight reels of the Red Sox game on Instagram or buying an antique table from a stranger on Facebook Marketplace.  Perhaps anticipating this issue, the FTC's lead expert also calculated Meta's market share both "based on the parts of PSN apps that are most directly related to broadcast sharing with friends and family" (i.e., Facebook Feed, Facebook Stories, Instagram Feed, Instagram Stories, and Snapchat Stories) and by prorating the original market share based on various surveys capturing why users turn to PSN and non-PSN applications.  See FTC SMF, ¶¶ 1402–05.  The result was ███████████, even when excluding time spent watching videos on Facebook Feed as well as "certain Meta users who spent little time" on Feed or Stories.  Id., ¶¶ 1404–05.  More specifically, under the "broadcast sharing" approach, Meta had a market share of ███ of time spent (excluding time spent watching videos on Facebook Feed), ███ of MAUs, and ███ of DAUs.  Id., ¶ 1404.  Under the proration approach, Meta's minimum prorated market share for DAUs, MAUs, or time spent based on any of the survey data is 69.3%.  Id., ¶ 1405.

Meta raises issues with these friends-and-family-focused market-share measurements, such as that the broadcast approach incorrectly assumes that most of what happens on Feed and Stories is related to friends-and-family sharing while the proration approach relies on surveys

that did not measure actual usage data. See Meta Reply to FTC SMF, ¶¶ 1402–05. Resolving those disputes, however, is inappropriate at the summary-judgment stage, especially without any evidence that better methods of market-share measurement exist. See United States v. Anthem, Inc., 236 F. Supp. 3d 171, 207 (D.D.C. 2017) ("[P]laintiffs need not present market shares . . . with the precision of a NASA scientist. The closest available approximation often will do.") (internal quotation marks omitted). The FTC has put forward enough evidence that a reasonable factfinder could conclude, based on either the all-things-considered measure or the more targeted one, that Meta dominates the relevant product market. At this juncture, that meets Plaintiff's burden.

The bigger question for the Commission, however, is which route it will take at trial. Significant unresolved questions remain over the ultimate viability of the agency's apparent position that all time spent on PSN applications relates to PSN services (even passive consumption of a video or buying a table from a stranger), while none of the time spent on applications like YouTube, TikTok, or X does so (even sharing a TikTok with a friend in-app). This counterintuitive assertion poses more difficulties, admittedly, for metrics like "time spent on the application" than it does for counting MAUs or DAUs; if the millions of people who open their Facebook or Instagram applications every day do so in part because those applications meet a specific need for friends-and-family sharing, it is plausible that all those users should "count" as part of Meta's MAUs or DAUs, even if some (or even most) of their time spent on Meta's products does not strictly relate to such sharing. And it is true that, as the Court noted in its previous Opinion, market shares must be calculated with the best available metrics — even if they are approximations — which can be considered "holistically." Facebook II, 581 F. Supp. 3d at 48–49. The FTC, however, has not fully clarified the relationship of its metrics to its

ultimate theory of the market, preferring instead to cover all its bases. While that approach suffices to get to trial, more precision will be expected at the main event.

3.    *Barriers to Entry*

What remains is the final ingredient of proving monopoly power by indirect evidence: entry barriers. See Microsoft, 253 F.3d at 51. As the Court explained above, market power matters only if it is "durable," Lenox MacLaren Surgical Corp, 762 F.3d at 1124, which can be achieved if the market has high barriers to the entry of new firms. "For antitrust purposes, a barrier to entry is best defined as any factor that permits firms already in the market to earn returns above the competitive level while deterring outsiders from entering." IIB Areeda & Hovenkamp, ¶ 420a, at 77; see also Microsoft, 253 F.3d at 51 ("'Entry barriers' are factors . . . that prevent new rivals from timely responding to an increase in price above the competitive level."). Here, the FTC argues that three such barriers exist: network effects, switching costs, and capital costs. See FTC SMF, ¶ 1409. The Court will discuss Plaintiff's evidence for each in turn, before addressing Meta's counterarguments.

"For purposes of analyzing barriers to entry, a network effect is a feature that makes a network more valuable as the number of users increases." IIB Areeda & Hovenkamp, ¶ 421h, at 95. In the world of PSN services, the theory is relatively simple: because users come to products like Meta's to connect with a network of their friends, acquaintances, and family members, they have no real reason to join unless enough of their social world is already on the platform. See Facebook II, 581 F. Supp. 3d at 50. That means incumbents with large and established networks have a significant advantage over those who would seek to build out their own network.

Unsurprisingly, Plaintiff has mustered ample evidence that industry participants — including Meta itself — understand their advantages in precisely such terms. A document

prepared for potential investors in 2012, for instance, described Facebook's network as a "real competitive moat," one that was, at the time, holding at bay a now-defunct rival: Google+. See FTC SMF, ¶ 1414(b)–(c). Zuckerberg's own statements, moreover, are saturated with the recognition that network effects protected Facebook from competition. See, e.g., id., ¶ 1416 (noting in 2008 email that "the answer to your question of why it is better to buy than compete is network effects"). Other executives within Meta agree, see, e.g., id., ¶ 1416(c)–(d), as do those at Meta's competitors both within and outside of the PSN-services market. See, e.g., id., ¶ 1417 (collecting statements from Google, Snap, X, Pinterest, MeWe, and others). Even one of Meta's lead expert witnesses has previously written in one of his books that, "as a network scales, the benefits to its members get bigger and bigger and bigger — often to the point of what is known as 'lock-in,' which means members are almost shackled to using these platforms." Id., ¶ 1414(e) (quoting John A. List, The Voltage Effect 104 (2022)). Such widespread acknowledgment of this entry barrier, including by industry participants, is highly probative evidence of its existence. See Rothery Storage, 792 F.2d at 218 n.4.

The flip side of network effects are switching costs: the difficulty of leaving one PSN for another after users "invest in their social graphs and accumulate a history of photos, posts, and other content that they contribute over time." FTC SMF, ¶ 1419. Or, to use words from one 2012 Meta document: "[Y]our Timeline on Facebook is more than a conversation. It's the complete story of your life on a single page . . . ." Id., ¶ 1419(a). Here, too, record evidence reveals extensive recognition of such costs amongst industry participants, including Meta itself. One former Meta executive, for example, wrote to Zuckerberg that the incorporation of photos "is perhaps one of the most important ways we can make switching costs very high for users" because it "will be very tough for a user to switch if they can't take those photos and associated

data/comments with them." <u>Id.</u>, ¶ 1419(b).  Another former executive wrote that investors in

Meta liked that social-media products in general were "sticky" because "after you have invested

hours and hours in your friend graph or interest graph or follower graph, you are less likely to

leave for a new or different service that offers similar functionality." <u>Id.</u>, ¶ 1419(c).  Indeed,

Meta has apparently even coined its own term for these switching costs: the "ratchet effect." <u>Id.</u>,

¶ 1420(c) ("[O]nce you get a user on your app[,] it's hard to lose them.").  According to Meta's

own analysis of the ratchet effect, it means that investing early in a market "can confer a

permanent advantage." <u>Id.</u>, ¶ 1420(d).

       The evaluations of those outside Meta are no different.  To take just one example, a 2020

Snapchat document recognized that "[t]he burden of reestablishing friend connections on a new

service means high switching cost[s] for new users and locks them into existing services.

Facebook's social graph creates strong lock-in, as users become dependent on the service to

reach their family and friends." <u>Id.</u>, ¶ 1419(f); <u>see also</u> <u>id.</u>, ¶ 1421 (collecting similar statements

from third parties).  The Court can put it little better than Meta itself: in this market, the

"competitive moats are deep." <u>Id.</u>, ¶ 1420 (quoting 2012 document prepared for Meta's IPO

roadshow).

       Finally, the FTC has put forth evidence that, in part because of these entry barriers exist,

a third one appears: "high capital costs." <u>Id.</u>, ¶ 1422.  New PSN entrants require capital to build

new applications and then to operate and scale their products without adequate offsetting

revenue.  <u>See</u> <u>id.</u>, ¶¶ 1422–23.  But depositions and declarations in the record show a decreasing

willingness to invest in such companies.  In the words of one witness, ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████ ECF No. 357-1 (Pl. Docs. Vol. 59) at ECF

pp. 930–31 ████████████████████████████. Another witness, ████████████

████████████████████████████████████, stated: ████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████ ECF No. 331-4 (Declaration of

██████████), ¶ 17.  And the founder of MeWe, a Meta competitor in the PSN-services market,

explained that "Facebook's dominance made it virtually impossible for MeWe to raise money

from venture capitalists in Silicon Valley."  ECF No. 331-2 (Declaration of Mark Weinstein),

¶ 9.

In the face of this evidence, Meta offers only feeble resistance.  Some of its efforts are

purely rhetorical.  It swats away Plaintiff's evidence of network effects and switching costs as

mere "buzzwords" without meaningfully contesting that such dynamics typify the PSN-services

market or the broader social-media market generally.  See Meta Reply at 30–31; Meta Reply to

FTC SMF, ¶¶ 1403–21.  It also asserts, without apparent support, that there is "no evidence that

money is no longer available for investment in promising companies," Meta Reply at 30, leaving

largely undisputed Plaintiff's evidence, from actual market participants, that capital costs remain

high and funding scarce.  More substantively, Meta points to historical market entries as

evidence that the barriers are low.  It claims, for instance, that the entry of Snapchat and the

growth of TikTok disprove the Commission's thesis, and it points out that companies outside the

PSN-services market can pivot to compete with Meta within the market by developing new

features.  See Meta MSJ at 23–24; Meta Reply at 31.  But Snapchat entered the market almost a

decade ago, and TikTok is not in the FTC's proposed product market.  The existence of some

successes, moreover, does not refute the existence of high entry barriers.  See Microsoft, 253

F.3d at 55 ("That some developers write applications for other operating systems is not at all inconsistent with the finding that the applications barrier to entry discourages many from writing for these less popular platforms."). Barriers to entry "deter[]" the entry of rivals, see IIB Areeda & Hovenkamp, ¶ 420a, at 77 — they do not banish competition altogether. And Plaintiff rightly points out that many companies have attempted to pivot into the PSN-services market, only to find the barriers too high. See FTC Opp. at 32.

On balance, then, the Court finds that the FTC has produced enough evidence of entry barriers that a reasonable factfinder could find in its favor at trial.

* * *

Establishing the existence of a monopoly is no easy sail, and the FTC has chosen to navigate into gusty winds. In addition to the complexities of a platform market that offers its products to end users at no cost while charging for advertising, time and technological change pose serious challenges to the market analysis here. For instance, one of the platforms Meta claims as its chief rival may be banned entirely in the United States by the time this case goes to trial. See TikTok, Inc., No. 24-1113. The Facebook and Instagram of 2024, moreover, are different — in some cases dramatically so — from what they were when these acquisitions took place, offering users content, commerce, and connection far beyond what was available in 2012 or 2014. The challenge for the Commission will be to show that the "personal social networking" service that it highlights as Meta's core use case is distinct enough from the many other social-media products vying for consumers' online attention that it still constitutes its own relevant antitrust market. While the jury (so to speak) is still out on that question, Plaintiff has earned the chance to make its case.

51

B.    Anticompetitive Conduct

Merely possessing monopoly power, however, does not violate Section 2.  See Microsoft,
253 F.3d at 51, 58.  It is only when a monopolist engages in anticompetitive conduct that the
Sherman Act is properly invoked.  See Verizon Commc'ns Inc v. Law Offs. of Curtis V. Trinko,
540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly
power will not be found unlawful unless it is accompanied by an element of anticompetitive
conduct.").  Plaintiff's Complaint lists two counts.  Count I alleges that Meta engaged in such
conduct by acquiring Instagram and WhatsApp.  Count II alleges that those acquisitions, together
with Meta's interoperability policies, constitute a separate course of anticompetitive conduct.  In
its prior Opinion, the Court held that the Count II interoperability allegations failed to state a
claim for injunctive relief because they concerned long-past conduct.  See Facebook II, 581 F.3d
at 58–59.  Because those allegations were packaged with the acquisition-related ones, however,
and the Court lacked the authority to dismiss only part of a claim, it held that the interoperability
portion of Count II could be "sliced out at summary judgment."  Id. at 60.  It now does so.  That
leaves on the table only the acquisitions.

In evaluating these, the Court is guided by the Circuit's holding in Microsoft.  It there
held that "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form
of vigorous competition, can be difficult to discern: the means of illicit exclusion, like the means
of legitimate competition, are myriad.  The challenge . . . lies in stating a general rule for
distinguishing between exclusionary acts, which reduce social welfare, and competitive acts,
which increase it."  253 F.3d at 58.  To aid in that task, the Microsoft court articulated several
principles that "emerge" from "a century of case law on monopolization under § 2."  Id.  "First,
to be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'  That

is, it must harm the competitive <u>process</u> and thereby harm consumers." <u>Id.</u> "Second, the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." <u>Id.</u> at 58–59 (citations omitted). "Third, if a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." <u>Id.</u> at 59. And "[f]ourth, if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." <u>Id.</u>

While agreeing on the applicability of the first two principles, the parties fiercely dispute what counts here as an "anticompetitive effect." After examining this complex issue and setting forth the proper legal framework, the Court then analyzes the two acquisitions. It next considers the procompetitive justifications that principles three and four raise.

        1.    *Legal Framework*

        a.    Anticompetitive Effects

The parties' disagreement over the FTC's burden to show an anticompetitive effect merits an extended discussion. Meta argues that Plaintiff can make its *prima facie* case only by offering evidence of reduced <u>consumer welfare</u> — primarily in the form of higher prices, lower output, "or (maybe) reduced overall quality by some objective measure" — compared to the but-for world in which the acquisitions never took place. <u>See</u> Meta Reply at 37–47; Meta MSJ at 32–36. Because prices are zero, output has expanded, and Meta's products have improved, Defendant asserts, the FTC cannot prove anticompetitive effects. <u>See</u> Meta Reply at 47–55. The Commission, meanwhile, contends that a monopolist's acquisition of an actual or nascent rival is itself an anticompetitive action, regardless of any price or output evidence. In other words, the

exclusion or acquisition of "nascent threats" suffices to make out a *prima facie* Section 2 case. See FTC Opp. at 55–60. Since both Instagram and WhatsApp qualified as such rivals to Meta when they were acquired, Plaintiff argues, its burden has been met. See id. at 40–55.

While the law is far from pellucid on this issue, the Court is persuaded that the FTC has the better of the argument. In particular, Meta conflates the need to demonstrate "anticompetitive effects" with the need to demonstrate an impact on consumer welfare via measurable (and, in this case, counterfactual) price or output changes. To be sure, the Supreme Court has held that "reduced output, increased prices, or decreased quality in the relevant market" should be considered "[d]irect evidence of anticompetitive effects." Ohio v. American Express Co., 585 U.S. 529, 542 (2018). But price- or output-related evidence of competitive harm is downstream from the anticompetitive effect itself. As Microsoft teaches, an anticompetitive effect is anything that "has a substantial effect in protecting [a firm's] market power, and does so through a means other than competition on the merits." 253 F.3d at 62. Or consider the Supreme Court's articulation of proscribed Section 2 conduct: "[T]he willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell, 384 U.S. at 570–71.

Both formulations teach the same lesson: while conduct with anticompetitive effects indeed harms "the competitive process and thereby harms consumers," Microsoft, 253 F.3d at 58 (emphases altered), the Section 2 requirement to demonstrate anticompetitive effects is not a requirement to separately show consumer harm. Rather, plaintiffs must show that the action in question maintained a monopoly other than through "competition on the merits" and thus presumably harmed consumers. Indeed, while Meta repeatedly mischaracterizes Plaintiff's

position as an attempt to evade its burden to demonstrate anticompetitive effects, see Meta Reply at 38–42 ("The FTC misstates the law — it must prove anticompetitive effects."), the FTC never disavows that burden; it argues only that it can show anticompetitive effects without pointing to specific price or output changes.  See FTC Opp. at 55.

The caselaw bears out this important distinction.  Microsoft is the key case, and each party seeks refuge in it.  See FTC Opp. at 55–56; Meta Reply at 40–42.  There, the D.C. Circuit sitting *en banc* confronted the charge that Microsoft had unlawfully maintained a monopoly in the market for "Intelcompatible PC operating systems" by implementing "anticompetitive terms in its licensing and software developer agreements."  Microsoft, 253 F.3d at 45, 47.  In identifying the anticompetitive effects of Microsoft's actions, the court repeatedly (and unanimously) focused on whether the actions foreclosed competition on the merits, not whether they led to price or output changes.  Microsoft had, for example, implemented license restrictions that prevented original equipment manufacturers from encouraging the use of Netscape Navigator — a rival browser to Microsoft's Internet Explorer — thus protecting Microsoft's monopoly in the operating-systems market from the threat that such "middleware" might present if it reached a critical mass of users.  Id. at 60–61.  Evaluating this conduct, the court wrote: "Because this prohibition has a substantial effect in protecting Microsoft's market power, and does so through a means other than competition on the merits, it is anticompetitive."  Id. at 62.  Microsoft also took steps to "technologically bind[]" Internet Explorer to the Windows operating system, thereby deterring installation or use of other browsers.  Id. at 64–65.  Again, the court was clear about the harm: Microsoft's conduct was "anticompetitive" because it had "the effect of significantly reducing usage of rivals' products and hence protecting its own operating system monopoly" "through something other than competition on the merits."  Id. at 65.  So, too, for

Microsoft's exclusive-dealing arrangements with most internet-access providers, which foreclosed to its rivals "a substantial percentage of the available opportunities for browser distribution." Id. at 70. Because those deals had a "significant effect in preserving" Microsoft's monopoly, they "demonstrated harm to competition." Id. at 71.

Critically, Microsoft's anticompetitive conduct was aimed at what the court called "nascent threats" — middleware products that did not yet compete with Microsoft in the operating-system market but posed the threat of doing so. Id. at 53–54, 79. The court went on to articulate a "rather edentulous test" for determining that Microsoft's exclusionary conduct contributed to its continued monopoly: causation could be inferred "from the fact that a defendant has engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power." Id. at 79 (cleaned up). Thus, the court wrote, the analysis came down to two key questions: first, "whether as a general matter the exclusion of nascent threats is the type of conduct that is reasonably capable of contributing significantly to a defendant's continued monopoly power," and second, "whether [the middleware products] reasonably constituted nascent threats at the time Microsoft engaged in the anticompetitive conduct at issue." Id. As to the first question, the court had no doubt that such conduct was proscribed. Id. On the second, it found the record supported that the middleware products "showed potential as . . . threats." Id.

Meta strains to read into Microsoft a focus on price or output effects, see Meta Reply at 40–42, but it comes up empty. Again and again, Microsoft holds that anticompetitive conduct by a monopolist is simply conduct that maintains or expands its monopoly other than through competition on the merits. The "exclusion" of competitors, the court held, qualifies as such conduct. This Court sees no reason why a monopolist's acquisition of its competitors should be

any different.  See III Philip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 701b, at 228

(5th ed. 2022) ("The monopolist's acquisition of a rival must be treated . . . clearly as

anticompetitive to the extent that it eliminates competition that might have otherwise dissipated

the monopolist's power.  As such, it is a classic strategy of monopoly maintenance.").  To hold

otherwise would imply that, had Microsoft simply acquired Netscape Navigator rather than

sought to exclude it from the market, Section 2 would have remained dormant.  Meta provides no

authority — nor is the Court aware of any — that would support such a conclusion.

Indeed, it is hard to imagine an action that better fits the definition of conduct with

anticompetitive effects than a monopolist's buying out its rivals.  It has been long established, for

instance, that a horizontal merger between two competitors that "produces a firm controlling an

undue percentage share of the relevant market" is presumptively anticompetitive.  United States

v. Phila. Nat'l Bank, 374 U.S. 321, 363 (1963); see also Polyplore Int'l, Inc. v. FTC, 686 F.3d

1208, 1215–16 (11th Cir. 2012) (merger between two firms to create a duopoly is subject to

Philadelphia National presumption of anticompetitive effects); III Areeda & Hovenkamp, ¶ 701a,

at 226 ("Historically and today, merging viable competitors to create a monopoly is a clear § 2

offense . . . .").  Extending that logic, horizontal acquisitions must also presumptively qualify as

anticompetitive when one of the merging firms is already a monopolist, as is the case in any

monopoly-maintenance suit.  See III Areeda & Hovenkamp, ¶ 701a, at 226 ("[A] monopolist's

acquisition of the productive assets or stock of an actual or likely potential competitor is properly

classified as anticompetitive, for it tends to augment or reinforce the monopoly by means other

than competition on the merits.").

This view also finds support in binding precedent.  In Grinnell, for instance, the Supreme

Court held that a dominant conglomerate violated Section 2 by engaging in multiple

anticompetitive practices, which included restrictive agreements, various pricing practices, and acquisitions of competitors.  See 384 U.S. at 576.  While Meta is correct that the Court considered evidence of increased prices as one type of anticompetitive conduct, the opinion described each of the challenged practices — including the acquisitions— as "unlawful and exclusionary" in their own right.  Id. (noting that restrictive agreements "were one" anticompetitive device, pricing practices "were another," and acquisitions "were still another"); see BRFHH Shreveport, LLC v. Willis Knighton Medical Center, 176 F. Supp. 3d 606, 619–20 (W.D. La. 2016) (endorsing this reading); see also Behrend v. Comcast Corp., 2012 WL 1231794, at *20 (E.D. Pa. Apr. 12, 2012) (permitting plaintiffs to "rely upon the [acquisitions] themselves and evidence of [defendant's] resultant increase in market share as proof" of Section 2 offense).

Under Microsoft, moreover, the presumption of illegality described above would appear to apply to acquisitions of nascent as well as actual competitors.  "Indeed, one of the most effective ways for a dominant firm to maintain its monopoly position is to acquire incipient rivals as they appear on the horizon."  Herbert Hovenkamp, Federal Antitrust Policy, § 7.2, at 314 (4th ed. 2011).  "[W]hen the dominant firm in the market" merges with a nascent rival, the merger "tends to maintain a monopoly by cutting off an avenue of future competition before it has had a chance to develop.  As a result, condemnation under § 2 is appropriate."  IV Philip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 912b, at 92 (4th ed. 2016).

Meta's rejoinder to these principles is not persuasive.  It leans heavily on Rambus Inc v. FTC, 522 F.3d 456 (D.C. Cir. 2008), and Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993), to contend that the FTC must show price or output effects, but neither case provides such support.  In Rambus, a developer had misrepresented the scope of its

patent interests to a standard-setting body while that body was formulating the standards for technologies covered by those interests, enabling the developer to monopolize certain markets. See 522 F.3d at 460–62. Had the defendant fully disclosed its interests, the organization might have either excluded its technology from the standards or demanded assurances of reasonable license fees — but the FTC explicitly did not find that either outcome was more likely. See id. at 462–63. In light of that uncertainty, our Circuit determined, it was possible that the only "effect" of defendant's conduct was higher prices than would have otherwise obtained absent the deception. See id. at 464. The court thus held that anticompetitive effects had not been shown because "an otherwise lawful monopolist's use of deception simply to obtain higher prices normally has no particular tendency to exclude rivals and thus to diminish competition." Id. at 464–65. That conclusion bolsters, rather than undermines, Plaintiff's contention that the exclusion of rivals (e.g., via acquisition) is itself anticompetitive conduct. Indeed, Rambus confirms that the analysis must focus the "effect on competitive structure" rather than on "rais[ed] prices" alone. Id. at 466.

Brooke Group (like Rambus) did not even concern a monopolist's acquisition of a competitor. There, the Supreme Court evaluated an alleged predatory-pricing scheme in the domestic cigarette industry. See 509 U.S. at 212. It held only that, because the "linchpin" of the allegation was that the defendant could raise prices along with other oligopolists — but there was no evidence of raised prices or reduced output — anticompetitive effects had not been shown. Id. at 232–33. Nothing in the opinion supports Meta's contention that evidence of reduced output or increased prices is required in the entirely separate context of a monopolist's acquisition of actual or nascent rivals.

Meta's other citations serve only to underscore its misunderstanding of this crucial context. Asserting that "acquisitions are not *per se* unlawful," Meta Reply at 42, Defendant cites two cases in which the acquiring firm was not a monopoly — either because it was a minor player before the acquisitions and likely did not achieve monopoly power via the mergers, see Eastman v. Quest Diagnostics, 724 F. App'x 556, 559 (9th Cir. 2018) (affirming dismissal where largest acquisition required divestiture of assets, thus creating "a significant [new] competitor," and other acquisitions were "relatively insubstantial"), or because there were no entry barriers, and the firm's dominant market share post-acquisition thus quickly eroded. See United States v. Syufy Enters., 903 F.2d 659, 664–65 (9th Cir. 1990). It is no doubt true that "the elimination of rivalry by the joinder of rivals . . . is not, per se, an unlawful restraint of trade," Rothery Storage, 792 F.2d at 223, but that is not this case.

At issue here is emphatically <u>not</u> the merger of rivals in a competitive industry, but the acquisition of a nascent competitor by the dominant firm in a market protected by entry barriers. Cf. McWane, 783 F.3d at 836 ("[C]ompetitors and competition are linked, particularly in the right market settings . . . ."); Spirit Airlines, Inc v. Nw. Airlines, Inc., 431 F.3d 917, 951 (6th Cir. 2005) ("[I]n a concentrated market with very high barriers to entry, competition will not exist without competitors."). When a monopolist acquires a rival, even a nascent one, a rebuttable presumption therefore arises that the merger is anticompetitive. See IV Areeda & Hovenkamp, ¶ 912a, at 92 (acquisition by dominant firm of nascent rival "eliminates an important route by which competition could have increased in the immediate future" and "thus bears a very strong presumption of illegality that should rarely be defeated").

To be clear, price and output effects remain highly probative evidence of anticompetitive effects, especially where the same actions could plausibly be categorized as either vigorous

competition or illicit exclusion.  And Plaintiff is free to present evidence of consumer harm, as it

has done here, that it believes is confirmation that the acquisitions were anticompetitive.  See

FTC Opp. at 59–60.  But the fact that anticompetitive conduct typically goes hand in glove with

price increases or reductions in output does not mean that, as a matter of law, such obvious

effects on consumer welfare must be demonstrated for a plaintiff to make out a *prima facie*

Section 2 case in circumstances such as those presented here.  In so holding, the Court remains

especially mindful that typical price and output effects may not obtain in this market.  See, e.g.,

Google, 2024 WL 3647498, at *80 ("[R]educed output is an ill-fitting indicia of monopoly

power in a market like search" because the "cost of responding to one additional query is near

zero.  In such a market, a dominant firm has no incentive to restrict output to earn monopoly

profits."); Microsoft, 253 F.3d at 79 (finding that middleware could become competitive threats

while relying on admission that "[m]arginal costs are essentially zero" and "[t]here are no

constraints on output" in relevant market).

Following Microsoft, then, the Court holds that, as a general matter, the acquisition of

actual competitors or nascent threats by a monopoly is "the type of conduct that is reasonably

capable of contributing significantly to a defendant's continued monopoly power."  253 F.3d at

79.  This is so because such action tends to maintain monopoly by means other than competition

on the merits.  The key question in this case thus becomes whether Instagram and WhatsApp

"reasonably constituted nascent threats" (or actual competitors) "at the time" Meta acquired

them.  Id.  If so, then the Commission has made out a *prima facie* case of monopolization, see

Google, 2024 WL 3647498, at *114 ("The loss of nascent competitors is a clear anticompetitive

effect."), and the burden shifts to Meta to show that the acquisitions nonetheless have sufficient

procompetitive justifications.  Defendant's arguments concerning low prices, increased output,

and increased innovation are thus properly viewed, if anything, as procompetitive <u>rebuttals</u> to Plaintiff's *prima facie* case, rather than as evidence that the acquisitions themselves had no anticompetitive effects. The Court stresses, moreover, that <u>Microsoft</u>'s toothless causation standard applies only to the question of liability. If Plaintiff achieves a favorable verdict at trial, it must meet a stricter standard to merit a structural remedy like divestiture. See <u>Microsoft</u>, 253 F.3d at 80.

> b.    Nascent Threats

So formulated, this standard places pressure on what it means to "reasonably constitute[] a nascent threat." <u>Id.</u> at 79. Neither party has thoroughly briefed this question. For its part, Meta at times makes use of precedent from a parallel but different context: that of the potential-competition doctrine, which is typically employed in cases brought under Section 7 of the Clayton Act when an acquisition eliminates the possibility that one firm would have entered a new market and created procompetitive effects. See, e.g., Meta Reply at 53 (citing <u>United States v. Marine Bancorporation, Inc.</u>, 418 U.S. 602, 639 (1974)). Although the viability of the doctrine is a subject of considerable debate, most courts that accept it appear to hold that it requires at least something like a "reasonable probability" that the competitor would have entered the target market and matured into a competitive force. See <u>FTC v. Meta Platforms, Inc.</u>, 654 F. Supp. 3d 892, 926–27 (N.D. Cal. 2023) (discussing cases). Our Circuit, however, has not endorsed or applied the potential-competition doctrine even in the Section 7 context, and its strict standard is in significant tension with <u>Microsoft</u> itself, which never adverted to it.

The doctrine has, moreover, mostly arisen to evaluate the competitive harm that arises when the <u>acquiring</u> firm chooses to merge with an existing market participant rather than to compete in a concentrated market itself. See, e.g., <u>Marine Bancorporation</u>, 418 U.S. at 605;

United States v. Phillips Petrol. Co., 367 F. Supp. 1226, 1228–29 (C.D. Cal. 1973), aff'd sub

nom. Tidewater Oil Co. v. United States, 418 U.S. 906 (1974); Meta, 654 F. Supp. 3d at 908; cf.

FTC v. Steris Corp., 133 F. Supp. 3d 962, 966 (N.D. Ohio 2015) (applying theory to acquisition

of potential entrant rather than established participant).  That is a materially different

circumstance from a monopolist's acquisition of a nascent threat that may develop into a future

competitor.  Cf. III Areeda & Hovenkamp, ¶ 701d, at 233 (while potential-competition doctrine

is "rightfully criticized for involving courts in undue speculation about likely consequences,"

"anticompetitive concerns are much less speculative" when "one of the merging firms is a

monopolist and the other is a potential entrant into the same market in which the monopolist has

power").  Here, moreover, Meta has not explicitly pushed the adoption of such a standard, and

the Court is not inclined to adopt it *sua sponte* as appropriate for a Section 2 case.

That leaves the Court with little other guidance.  Microsoft observed only that, in the

context of that case, the excluded competitors "showed potential as . . . threats," relying in part

on the estimation of Microsoft itself.  See 253 F.3d at 79 (noting concession by counsel for

Microsoft).  That formulation appears simply to reword the court's "reasonably constituted

nascent threats" standard.  Professors Areeda and Hovenkamp have advocated applying the

potential-competition doctrine to such circumstances while considerably lowering the bar and

would thus label as presumptively anticompetitive a monopolist's "acquisition of any firm that

has the economic capabilities for entry and is a more-than-fanciful possible entrant."  III Areeda

& Hovenkamp, ¶ 701d, at 235.  Neither party to this case has provided an alternative.

Bound by Microsoft, the Court will implement its laconic standard as best it can.  At a

minimum, if the acquiring firm itself — a rational economic actor in possession of relevant

information about the market's competitive dynamics, see III Areeda & Hovenkamp, ¶ 701d, at

233 ("The single-firm monopolist is in a position to make unilateral decisions about the risk and impact of new entry . . . .") — reasonably viewed the acquisition as a nascent competitor, that is likely to be highly probative evidence that the acquired firm constituted such a threat. This approach aligns with the accepted rule that evidence of anticompetitive intent "is relevant only to the extent it helps us to understand the likely effect of the monopolist's conduct." Microsoft, 253 F.3d at 59; see Chi. Bd. of Trade v. United States, 246 U.S. 231, 238 (1918) ("[K]nowledge of intent may help the court to interpret facts and to predict consequences."). A monopolist's fearful acquisition of a nascent competitor tends to show that the "likely effect" of the acquisition is to eliminate a threat to its dominance, and *ipso facto* that the acquired firm "reasonably constituted" such a threat.

    That said, objective evidence of the acquired firm's capability or willingness to develop into such a threat — where available — will also be probative. Threats can be overstated, especially by firms protective of their dominance. Evidence that the acquired firm could not reasonably have matured into a real competitor must cut heavily against a monopolist's subjective expectation that it would. Conversely, evidence that the acquired firm had the capability and willingness to enter the monopolist's market may suffice to show it was a nascent threat, even in the absence of strong evidence that the monopolist so viewed its acquisition target. Cf. Mercantile Tex. Corp. v. Bd. of Govs. of Fed. Rsrv. Sys., 638 F.2d 1255, 1270 (5th Cir. Unit A 1981) (absence of subjective intent not fatal to potential-competition claim if objective evidence supports reasonable probability of procompetitive entry). In the sections that follow, the Court will thus focus on Meta's own assessment of Instagram and WhatsApp, coupled with any other objective evidence of the target firms' capabilities or willingness to

compete in Defendant's market, to form a realistic understanding of the competitive threat they posed.

Before doing so, however, one last piece of housekeeping is in order. Meta has re-upped its argument that a presumption of legality should be extended to its acquisitions because the FTC previously cleared them to go forward during the Hart-Scott-Rodino process. See Meta MSJ at 47–50; Meta Reply at 55–58. The Court previously rejected this argument, see Facebook II, 581 F. Supp. 3d at 57, and it sees no reason to revisit that issue. As it previously explained, the closing of the HSR process is explicitly "not to be construed as a determination that a violation may not have occurred," and "it would be improper to draw a merits conclusion about the legality of the mergers on the basis of" such decisions. Id. (internal quotation marks omitted). While unusual, the Commission's decision to revisit mergers it previously declined to block is entitled to full consideration on the merits.

<blockquote>2.    <em>Acquisitions</em></blockquote>

The Court will now assess whether Plaintiff's evidence could convince a reasonable factfinder that Instagram and WhatsApp either were actual competitors with Meta or "reasonably constituted nascent threats" to Meta's monopoly at the time of their acquisitions. Microsoft, 253 F.3d at 79. It finds that the FTC has met its burden on this front, as it has proffered evidence that Instagram arguably qualified as an actual competitor and that WhatsApp constituted a nascent threat.

<blockquote>a.    Instagram</blockquote>

The FTC's story of the Instagram acquisition begins with what it calls the "shift to mobile": a period beginning in 2010 with the launch of the iPhone 4 where the competitive dynamics of social media shifted. See FTC Opp. at 40; FTC SMF, ¶¶ 1565–68. Designed for

desktop computers, Facebook had "enormous disadvantages" in adapting to the new environment compared to "mobile first" start-ups.  See FTC SMF, ¶¶ 1569–70.  According to the FTC, moreover, Facebook's transition to mobile was not going well: users complained of the mobile application's poor quality, lack of speed, and propensity to crash, even as, by 2012, most of its users were accessing Facebook on their mobile devices.  See id., ¶¶ 1576–79.  The application's photo features were a particular pain point.  In 2012, for instance, Zuckerberg wrote that "when you look at Instagram and Path and then go back to our Newsfeed, it looks like ours was built in the stone age."  Id., ¶ 1580 (cleaned up).  A few months later, he admitted that Facebook was "behind" Instagram in developing a compelling mobile experience.  Id., ¶ 1584.

Meanwhile, Instagram was pitching itself to investors as a "mobile-first network focused on photos."  Systrom Hr. at 100:4–9.  Launched in 2010, it "was designed specifically to take advantage of the shift to mobile."  FTC SMF, ¶ 1603.  In contrast to Facebook's mobile application, Instagram's was "praised as exemplifying the speed, reliability, and simplicity necessary to succeed in the mobile environment."  Id., ¶ 1603(b) (quoting Meta white paper); see id., ¶¶ 1606(a), 1617 (noting positive user reviews and high engagement in 2011 and 2012).  It accordingly grew quickly: from 25,000 registered users on its first day to 35 million users by the time Meta agreed to acquire the company.  Id., ¶ 1608.  By 2012, it was growing faster than the Facebook application's mobile photo-sharing capability.  Id., ¶ 1612.  Evidence in the record suggests, moreover, that Instagram was eyeing expansions beyond photo sharing, including video features and direct messaging.  Id., ¶ 1618.

This growth posed competitive problems for Meta.  At the time, Instagram's founders, Kevin Systrom and Mike Krieger, viewed their start-up as either already or imminently in competition with Defendant.  Systrom has testified that Instagram was "clearly competitive"

with Meta, see Systrom Hr. at 140:10–11, and that it would be "inevitable" that Zuckerberg would "think that we were in conflict" if Instagram remained independent.  See ECF No. 349-1 (Pl. Docs. Vol. 64) at ECF p. 475 (Deposition of Kevin Systrom at 37:6–8).  Krieger similarly testified that Instagram's "continued growth posed a challenge" to Meta because, "for people who used Instagram heavily," it was "a primary way in which they kept up with their friends and family potentially, and that is also a use case that Facebook has."  Pl. Docs. Vol. 57 at ECF p. 951 (FTC Investigational Hearing of Michael Krieger at 95:14–20).

Meta, meanwhile, fretted over the challenge posed by Instagram.  Zuckerberg noted in 2011 that Instagram was "kick[ing] ass," and he worried that "they could easily add pieces of their service that copy what we're doing now," which could pose "a real issue for [Meta]."  FTC SMF, ¶ 1632(a).  "[F]rom a defense perspective," a Meta engineer also told Zuckerberg, Instagram was a "compelling" acquisition "because of the potential for someone like Apple to use them as a foothold."  Id., ¶ 1632(c).  By February 2012, Zuckerberg described Meta as "very behind" Instagram, and the prospect of having to catch up was "really scary" — so Meta "might want to consider paying a lot of money" to acquire it.  Id., ¶ 1646(b).  Four months later, his worries only intensified.  He noted that Instagram could "hurt [Meta] meaningfully" by shifting "a core use case[]" away from Meta, and that "it's kind of going to be tough to dislodge" Instagram.  Id., ¶¶ 1649–50.

These worries were not helped by the fact that Facebook's own photo-sharing forays were not seeing comparable success.  A few months after Instagram launched, a Meta executive informed Zuckerberg that the Facebook photos team was "now focused almost exclusively on a new mobile photo app as we gawk at Instagram's simple photo-sharing app taking off."  Id., ¶ 1671.  Meta began to develop a standalone product — initially known as "Snap," then

"Facebook Camera" — to compete with Instagram, given initial difficulties with integrating photo-sharing on the Facebook Blue application.  Id., ¶¶ 1674–75; see Zuckerberg Hr. at 253:25–254:1.  But progress was slow, and Instagram was growing quickly.  See FTC SMF, ¶ 1679(b) (Meta executive asking colleagues, "[W]hy is mobile photos app development moving so slowly?  We still are getting our ass kicked by Instagram.").  In April 2012, Zuckerberg urged his team "to crank and get [Facebook Camera] out," or otherwise Instagram "may really be unreachable."  Id., ¶ 1674(f).

Small surprise, then, that the case for acquiring Instagram focused heavily on neutralizing a competitive threat.  By February 2012, Zuckerberg was suggesting to colleagues that Meta "should consider buying Instagram, even if it costs ~$500m" because "they seem to have two things that we don't: a really good camera and a photo-centric sharing network."  Id., ¶ 1690.  On camera features, he worried that it would take Meta "a huge amount of work" and "too long to catch up [to Instagram], if we even will," and the company would thus "be very behind in both functionality and brand on how one of the core use cases of Facebook will evolve in the mobile world, which is really scary and why we might want to consider paying a lot of money for this." Id.  Discussing the potential acquisition with his CFO, Zuckerberg wrote that Instagram and another potential acquisition target — Path — were "nascent but the networks are established, the brands are already meaningful[,] and if they grow to a large scale they could be very disruptive to us."  Id., ¶ 1693.  He then wrote that his purpose in acquiring Instagram and potentially other startups would be a combination of "neutraliz[ing] a potential competitor" and "integrat[ing] their products with ours in order to improve" Meta's service.  Id., ¶ 1694.

He then explained his reasoning at length:

The basic plan would be to buy these companies and leave their products running while over time incorporating the social dynamics they've invented into our core products.

One thing that may make [neutralizing a potential competitor] more reasonable here is that there are network effects around social products and a finite number of different social mechanics to invent. Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different. . . .

[Integrating their products to improve Meta] is also a factor but in reality we already know these companies' social dynamics and will integrate them over the next 12–24 months anyway.  The integration plan involves building their mechanics into our products rather than directly integrating their products if that makes sense. . . .

[O]ne way of looking at this is that what we're really buying is time. Even if some new competitors spring[] up, buying Instagram, Path, Foursquare, etc[.] now will give us a year or more to integrate their dynamics before anyone can get close to their scale again.  Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.

Id.

In light of these justifications, Zuckerberg and his team were willing to pay a pretty penny to buy Instagram.  By April 2012, he was expressing the view that Instagram could be worth the "really expensive — probably ~$1 billion" cost because it was "pretty threatening" and could "hurt [Meta] meaningfully."  Id., ¶ 1701.  Sure enough, Meta paid $1 billion to acquire the company.  Id., ¶ 1710.  That amount was double Instagram's recent Series B valuation, id., and, according to Instagram's founders, an "unprecedented" amount of money.  See Krieger Hr. at 158:9–13; Systrom Hr. at 199:17–25.  After the acquisition, Zuckerberg nonetheless explained to Meta employees that the buyout "was a no brainer" because Instagram had grown into a "mega-network" that was "on the path to win" had Meta not acquired it.  Id., ¶ 1635(e).  Another Meta executive explained that the "high level rationale" for the acquisition was that Instagram "had

escape velocity in terms of user traction (growth, engagement) and had/would become a 'core'
social, mobile service in a strategically important area for us (photo sharing) and in a different
but important way (follower graph)." Id., ¶ 1708(b).

Evidence put forward by the FTC also suggests that Instagram was uniquely positioned to
pose this competitive threat to Meta.  Other competitors at the time — namely, Path, PicPlz, and
Treehouse — failed to reach a comparable level of success.  Path, ███████████████████
████████████████████, grew slowly, reaching only 2 million users (to Instagram's 30
million) by April 2012, even though it was ████████████████. Id., ¶ 1663.  It limped
along until 2018, when it was eventually shuttered.  Id.  Internal documents suggest that Meta
accordingly took a more dismissive attitude toward it.  Id., ¶ 1664.  And PicPlz and Treehouse
faded even faster.  Id., ¶¶ 1665–66.

This evidence is sufficient to convince a reasonable factfinder that Instagram was already
a competitive threat to Meta at the time of its acquisition; that few other firms posed a
comparable threat; and that Meta's acquisition of Instagram while it enjoyed monopoly power
was thus presumptively anticompetitive.  Cf. Microsoft, 253 F.3d at 79.  Were there doubt,
however, Plaintiff has also provided evidence of specific harms to consumers.  Most relevantly,
Instagram's ad load has grown enormously over time: by 2022, ad load on Instagram Feed was
████████ what it was in 2015, while the increase on Instagram stories was ████████ the 2015
level.  See FTC SMF, ¶ 1924.  That includes a ████████████ over just one year, from 2017–18,
over the objections of Systrom himself.  Id., ¶¶ 1930, 1932.  In addition, Meta has been able to
adjust ad loads on both Instagram and Facebook to make up for revenue shortfalls on one of the
products.  See id., ¶¶ 1926–27, 1955.  Because displeased users would simply switch between

the products, "Meta knew it would recapture ad revenues" lost on one platform from the switching. Id., ¶ 1955.

The FTC has collected other evidence, moreover, of consumer harm, including Meta's explicit policy of not prioritizing Instagram's growth so as not to cannibalize too much from Facebook, id., ¶¶ 1942, 1957; declining user sentiment on privacy, ████████████████████ ██████████████, id., ¶¶ 1992–94; and Meta's ███████████████████████████ ████████, even as some other platforms have done so. See id., ¶¶ 2011–16. Finally, Plaintiff points out that Defendant decided to discontinue Facebook Camera — its competitive response to Instagram — as a standalone application shortly after the acquisition. See FTC Opp. at 42; FTC SMF, ¶ 1852 (Zuckerberg pushing to "scale back or cancel" Facebook Camera "since we're acquiring Instagram").

Meta argues that the above evidence overstates Instagram's competitive threat and underappreciates the procompetitive benefits that flowed from the merger. At the time of the acquisition, Defendant points out, "Instagram was a startup with just 13 employees that had limited features, no plan to make money, and a third-party infrastructure that suffered repeated service outages and spam attacks." Meta MSJ at 39–40. It is thus mere "conjecture" that Instagram would have even survived, much less thrived, had Meta not bought it. See id. at 41. After the acquisition, according to Meta, it poured billions into developing and growing Instagram, adding "dozens of new features" and providing "hundreds of billions of dollars of consumer surplus" since 2012. Id. at 36–37. Indeed, Meta argues, Instagram could not have achieved such success and growth without Meta's expertise. See Meta Reply at 50.

Defendant's arguments, however, mostly demonstrate the existence of factual disputes over whether Instagram was a competitive threat (or very likely to become one) at the time of the

acquisition.  Plaintiff has put forward ample evidence that it was, and that evidence carries its

burden at this stage in the proceedings.  Defendant is also wrong to suggest that Plaintiff must

prove that Instagram would have avoided the "graveyard . . . of promising startups" in order to

make its case.  See Meta MSJ at 41.  On the contrary, Microsoft held that, where it can be shown

that a monopolist squashed an actual or nascent competitor, "the defendant is made to suffer the

uncertain consequences of its own undesirable conduct."  253 F.3d at 79 (internal quotation

marks omitted).  Meta's evidence of consumer surplus and the procompetitive benefits of the

merger are, moreover, best understood as rebuttals to the Commission's prima facie case — i.e.,

as evidence that the elimination of a monopolist's competitor did not actually result in reduced

consumer welfare, as expected.  The Court will thus consider that evidence when assessing

Plaintiff's Cross-Motion for Partial Summary Judgment.

> b.    WhatsApp

Unlike Instagram, WhatsApp was not Meta's actual competitor when acquired.  Instead,

the FTC's theory is that WhatsApp was a nascent competitor: a messaging application with the

potential to expand into the PSN market.  See FTC Opp. at 42–44.  Although Plaintiff's evidence

on this front is less extensive than it is for Instagram, it also creates a triable issue of fact over

whether the WhatsApp acquisition was anticompetitive.

The switch to mobile again provides the starting point for this tale.  As part of that

transformation, OTT mobile-messaging applications — which relied on the internet to send

messages — became newly available.  See FTC SMF, ¶¶ 1714–17.  One such application was

Meta's own Facebook Messenger; another was WhatsApp.  As previously recounted, WhatsApp

grew quickly, especially overseas.  See supra Section I.A.2.b; see also FTC SMF, ¶¶ 1734–36

(documenting growth).  Meta executives assessed at the time that WhatsApp was outperforming

Facebook Messenger along multiple dimensions, including its ability to notify users that they had received a message.  See FTC SMF, ¶ 1723; see also id., ¶ 1724 (Messenger under-performing relative to LINE, KakaoTalk, and WeChat).  As a result, more users relied on WhatsApp than on Messenger to send messages.  Id., ¶ 1726.

The real danger, however, was not WhatsApp's dominance of OTT mobile messaging.  It was the possibility that it might pivot into providing PSN services.  As Plaintiff notes, other OTT mobile-messaging services had made such a pivot in Asia by 2012, mostly to grand success.  See id., ¶¶ 1729–31.  Meta executives, noting WhatsApp's growth as a messaging service, see id., ¶¶ 1736–37, began tracking such pivots.  See, e.g., id., ¶¶ 1799–1800.  Leadership was openly nervous: one internal presentation called mobile messengers "one of the most significant competitive threats [Meta] face[s]" because they were "increasingly moving into core social-networking product areas," posing "a direct threat to [Meta's] primary products."  Id., ¶ 1802(c)(i).  In February 2013, Zuckerberg told Meta's board of directors that he wanted to "use M&A to build a competitive moat around [Meta] on mobile and ads."  Id., ¶ 1802(g)–(h).  He explained that "the biggest competitive vector for [Meta] is for some company to build out a messaging app for communicating with small groups of people, and then transform[] that into a broader social network."  Id., ¶ 1802(g).  A month later, he wrote of "rumors of WhatsApp" doing just that.  Id., ¶ 1807(f).  A different Meta executive said in an email that this possibility kept him "awake every night."  Id., ¶ 1802(j).

Record evidence suggests that these fears had some basis in reality.  WhatsApp may have been capable of the pivot: the FTC's expert witness opined that it showed "extraordinary promise as indicated by industry metrics for scale, growth, and engagement."  Pl. Docs. Vol. 76 at ECF p. 720 (Expert Rebuttal Report of Jihoon Rim, ¶ 32).  Sequoia Capital, a prominent venture firm

that took a seat on WhatsApp's board as part of its growth-round investment, <u>see</u> FTC SMF, ¶ 1763, provided comprehensive assistance to WhatsApp, from hiring, to acquisitions, to money management and more.  <u>See id.</u>, ¶¶ 1767–75.  Such evidence supports the thesis that WhatsApp could have pulled off an expansion into new markets.  In addition to the capability to pivot, moreover, WhatsApp had a reason to do so: it needed a viable monetization approach.  While it was operating on a paid subscription model for some users (and a single download fee for others), ███████████████████████.  <u>See id.</u>, ¶¶ 1778–82; <u>see also id.</u>, ¶ 1785 (██████ ███████████████████████).  Advertising typically provides such a path, but it was a poor match for a messaging service because it detracted from the user experience significantly.  <u>See, e.g.</u>, <u>id.</u>, ¶¶ 1792–93.  ███████████████████████ ███.  <u>See id.</u>, ¶ 1794(a) ███████████████████████ ███████████████████████████████████████████ ████████████████.

        Meta also appeared to worry that another company could snap up WhatsApp and develop it into a PSN service.  By April 2012, Zuckerberg was under the impression that WhatsApp had turned down a sizable offer from Google and stated that he was willing to pay $1 billion "if [Meta] could get them."  <u>Id.</u>, ¶ 1811(a).  Meta leadership speculated that Google would be interested in trying again, especially after the failure of its own PSN service, Google+.  <u>See id.</u>, ¶ 1811(c)–(e).  That outcome, all agreed, would be a major issue for Meta.  <u>See id.</u>, ¶ 1811(f)–(g).  And, as it turns out, Google <u>had</u> been trying to buy WhatsApp — since at least 2010, to the tune of up to ████████, <u>id.</u>, ¶ 1812 — potentially to develop it (according to one Google presentation) "into a mobile social network."  <u>Id.</u>, ¶ 1813.  Meta was also aware that other

suitors, such as WeChat's owner Tencent, were pursuing a WhatsApp acquisition.  Id., ¶¶ 1817–
20.

So, Meta acted.  Spurred on by renewed interested from Google, Meta leadership began
more explicit overtures to WhatsApp's Jan Koum in early February 2014.  Id., ¶ 1832.  By
February 17, Meta's board of directors had met to approve the acquisition, at a total cost of $19
billion.  Id., ¶ 1835.  Two days later, the acquisition was announced at that price.  Id., ¶ 1837.
Plaintiff's evidence suggests that most valuations of WhatsApp prior to that date, either explicit
or implied, reached at most $12.5 billion.  See id., ¶ 1838.  It also suggests that Meta did not
conduct such a valuation itself.  See id., ¶¶ 1839, 1842.  Indeed, using a post-hoc valuation
conducted by accounting firm KPMG at Meta's behest in 2015, the FTC asserts that Meta
incurred "a $10.9 billion or 135% transaction premium for its acquisition of WhatsApp."  Id.,
¶¶ 1843–44.

Defendant amusingly contends that the FTC's narrative "makes Jack-and-the-Beanstalk
sound like a documentary."  Meta MSJ at 41.  It points in rebuttal to several pieces of evidence
that WhatsApp did not constitute the threat to Meta that the Commission claims, including
statements from WhatsApp's founders that it had no intention of pursuing growth in the U.S.
market, pivoting into providing PSN services, or pursuing monetization via advertising, to which
it had a "deep aversion."  Id. at 43–44; see also Meta SMF, ¶¶ 786–95 (outlining relevant
evidence).  Defendant also observes that several other messaging products could have been well
positioned to make the pivot, putting pressure on the FTC's theory that the acquisition of
WhatsApp materially reduced competitive pressure on Meta.  See Meta MSJ at 45.  As for the
story about Google's interest in acquiring WhatsApp to build it into a PSN service?  A "chain of
speculation," id. at 46, built on "spectral possibilities."  Meta Reply at 53.

Whatever the persuasiveness of Meta's arguments on this front, however — and they are surely stronger than its maneuvers regarding the Instagram acquisition — they merely raise the existence of deep factual disputes requiring the weighing of various pieces of evidence. At this stage, a reasonable factfinder could conclude, based on the evidence Plaintiff has presented, that WhatsApp constituted a nascent threat to Meta at the time of its acquisition, and that the merger was therefore anticompetitive. The evidence certainly provides reason to think that Meta feared WhatsApp's potential as a nascent PSN service and that WhatsApp was capable of making such a pivot, as many of its rivals had done outside the United States. That evidence is sufficient to preclude summary judgment.

* * *

In <u>Microsoft</u>, our Circuit prohibited monopolists from "squash[ing] nascent, albeit unproven, competitors at will — particularly in industries marked by rapid technological advance and frequent paradigm shifts." 253 F.3d at 79. Today, the Court holds that a trier of fact could reasonably conclude that Meta did just that when it acquired Instagram and WhatsApp and eliminated them as actual or nascent competitive threats. Abundant evidentiary disputes of course remain, just as they do for whether Meta possesses monopoly power in the first place. But those disputes, whatever their ultimate resolution, hold open the courthouse doors for now.

### 3.    *Procompetitive Justifications*

What remains to be decided is the FTC's Cross-Motion for Partial Summary Judgment on certain of Defendant's affirmative defenses. Having survived Meta's barrage against its own case, Plaintiff fires back that there is no further dispute of material fact as to whether Meta's procompetitive justifications for the acquisitions outweigh their anticompetitive effects. It thus asks the Court to bar Defendant from raising these defenses at trial. <u>See</u> FTC Opp. at 64–80;

ECF No. 372-1 (FTC Reply) at 1–22.  Here, however, the (brown) shoe is on the other foot.  In evaluating much of the same record evidence as above, the Court changes tack and gives Meta all of the favorable factual inferences that it has just given to the FTC.  It first discusses the applicable legal principles for evaluating such justifications.  It then applies that framework to Meta's asserted justifications and finds that each but the last survives to trial.

> a.    Legal Framework

Unfortunately for the reader, who has already traversed hill and dale, more tricky terrain must be navigated before we are home.  The central issue is this: for many decades, mergers in this nation have been challenged mostly under Section 7 of the Clayton Act, which permits enforcement agencies to block any merger where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce." 15 U.S.C. § 18.  In that forward-looking context, the law has treated claims of procompetitive merger efficiencies with some hostility, especially when monopoly looms.  See FTC v. H.J. Heinz Co., 246 F.3d 708, 720 (D.C. Cir. 2001) (merger in highly concentrated market requires "proof of extraordinary efficiencies" to rebut prima facie case of illegality); Anthem, 855 F.3d at 353–54 (expressing doubt over the legal viability of an efficiencies defense but rejecting that proposed efficiencies would save merger in any event); see also IV Areeda & Hovenkamp, ¶ 912c, at 92 ("[P]rovable merger-specific efficiencies from the acquisition of a nascent firm should be quite unusual; in most circumstances the dominant firm could readily duplicate anything that the nascent firm has to offer.").

Plaintiff, however, brings this suit under Section 2 of the Sherman Act, challenging a long-consummated merger.  That context is distinct from the aforementioned "typical" merger challenge in at least two relevant respects.  For one, it is not prospective; Meta can point to actual

consumer benefits that it contends have flowed from the acquisition.  Merger law's traditional concern with speculative efficiencies therefore has less purchase here.  See 2023 Merger Guidelines, § 3.3; Anthem, 855 F.3d at 355 (distinguishing between "possible" efficiencies and "verifiable" efficiencies).

Second, courts' treatments of procompetitive justifications under the Sherman Act's rule-of-reason framework are notably more forgiving than their evaluations of merger efficiencies under the Clayton Act.  Cf. Rothery Storage, 792 F.2d at 220 (describing Section 7 as "much more stringent" than rule-of-reason analysis).  In Microsoft, for instance, this Circuit adopted a rule-of-reason approach to evaluating Section 2 claims, holding that a defendant may rebut a plaintiff's prima facie case simply by asserting "a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."  253 F.3d at 59.  The court's subsequent treatment of Microsoft's scattered procompetitive justifications was far more lenient than the exacting scrutiny typically applied to mergers.  See, e.g., id. at 63, 67 (accepting two justifications without real balancing against anticompetitive effects).  That approach is consistent with other Section 2 cases where courts have not condemned actions otherwise injurious to competition when defendants can show a "legitimate business purpose."  Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 804 (8th Cir. 1987); see Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1295–96 (11th Cir. 2004) (preventing "free-riding" is legitimate business purpose in refusal-to-deal case); cf. Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 483–85 (1992) (cataloguing potential procompetitive justifications and identifying triable issues of fact as to each).

The relevant question, then, is which governs here: the Clayton Act's stricter, merger-specific framework; the Sherman Act's laxer, rule-of-reason approach; or some other standard. As a preliminary matter, the Court is skeptical that a <u>dramatically</u> different standard should apply depending on the statutory hook for challenging a merger.  In addition to the obvious inequities such a path would introduce, it would also exalt "formalistic distinctions" over "actual market realities." <u>Eastman Kodak</u>, 504 U.S. at 466.  The Court is nonetheless mindful that the Clayton Act was originally envisioned to be more plaintiff friendly than the Sherman Act, <u>see</u> <u>Brown Shoe</u>, 370 U.S. at 328–29, and, having made its bed with the latter statute, the FTC must lie in it.

Recent cases evaluating mergers under the Sherman Act, however, are few and inconsistent.  <u>See</u> Hovenkamp, <u>Federal Antitrust Policy</u>, § 7.2, at 315 (describing Sherman Act treatment of mergers as "all but superfluous" because of Clayton Act); <u>compare, e.g.</u>, <u>Grinnell</u>, 384 U.S. at 576 n.7 (declining even to reach question of procompetitive justifications because "the record clearly shows that this monopoly power was consciously acquired"), <u>with</u> <u>In re Northshore University HealthSystem Antitrust Litig.</u>, 657 F. Supp. 3d 1077, 1102 (N.D. Ill. 2023) (evaluating, but rejecting, procompetitive justification for hospital merger challenged under Section 2 and Section 7).  Despite this paucity, the Court gleans from the applicable caselaw a few core principles that should govern here.

First, Meta's procompetitive justifications must be a form of "competition on the merits." <u>Microsoft</u>, 253 F.3d at 59; <u>see also</u> <u>id.</u> at 67 (defendants must show that their conduct "serves a purpose other than protecting" their "monopoly").  In a merger, that typically requires showing that the union will result in "greater efficiency," <u>id.</u> at 59, or, more directly, increased consumer welfare.  <u>See</u> <u>LePage's</u>, 324 F.3d at 163 ("In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare.") (quoting <u>Data Gen. Corp. v.</u>

Grumman Sys. Support Corp., 36 F.3d 1147, 1183 (1st Cir. 1994)).  For instance, a merger might

have a procompetitive justification if it increased output, decreased prices, improved service or

quality, spurred greater innovation, or the like.  See McWane, 783 F.3d at 841; Viamedia, Inc. v.

Comcast Corp., 951 F.3d 429, 478 (7th Cir. 2020); III Areeda & Hovenkamp, ¶ 651d, at 130.

       Second, as the Commission correctly argues, such justifications cannot be pretextual.

See Microsoft, 253 F.3d at 59 (requiring a "nonpretextual" claim); Eastman Kodak, 504 U.S. at

484 (court not required to credit procompetitive justifications that are "pretextual"); Image

Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1212 (9th Cir. 1997) ("A plaintiff

may rebut an asserted business justification by demonstrating . . . that the justification is

pretextual.").  Meta retorts that it would "upend established law" to invalidate proven consumer

benefits because of a monopolist's "impure" motives.  See Meta Reply at 60.  It is Meta's

position, however, that ignores the consistent teaching of Section 2 cases that manufactured

justifications cannot be credited.  See McWane, 783 F.3d at 841–42 (noting that defendant's

"damning internal documents" were "powerful evidence that its procompetitive justifications are

merely pretextual") (internal quotation marks omitted); New York ex rel. Schneiderman v.

Actavis PLC, 787 F.3d 638, 658 (2d Cir. 2015) ("Because we have determined that Defendants'

procompetitive justifications are pretextual, we need not weigh them against the anticompetitive

harms.").  Such a rule also makes good sense.  Were it otherwise, monopolists engaging in

exclusionary conduct could evade liability by advancing post-hoc justifications based on their

later actions or events outside their control.

       Third, Meta must show that the procompetitive benefits could not have been achieved

without the acquisitions in question.  This requirement follows from cases holding that Sherman

Act defendants must choose the "least restrictive" means available to achieve an asserted

procompetitive justification, see Kreuzer v. American Academy of Periodontology, 735 F.2d 1479, 1495 (D.C. Cir. 1984); LePage's, 324 F.3d at 167; XI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1913a, at 395–96 (4th ed. 2018), but it also mirrors the Clayton Act's requirement that efficiencies be merger specific.  See Anthem, 855 F.3d at 356; Heinz, 246 F.3d at 722 (defendant must show that efficiencies from merger "cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor").  The principle in both is essentially the same: if the claimed benefits could have been achieved without the anticompetitive conduct, then they cannot rescue that conduct.

The FTC asserts — and Meta does not appear to contest — that the burden of meeting this narrow-tailoring requirement is on Defendant.  See FTC Opp. at 67.  The D.C. Circuit has adopted that view for Section 1 rule-of-reason cases, see Kreuzer, 735 F.2d at 1495, and generally for mergers under Section 7.  See Anthem, 855 F.3d at 356 (burden on defendant to show merger-specific efficiencies).  Because the point is uncontested, the Court will accordingly assume that the burden is Defendant's to bear.  But see American Express, 585 U.S. at 542 (holding, in context of Section 1 case, that "[i]f the defendant [shows a procompetitive rationale], then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means"); XI Areeda & Hovenkamp, ¶ 1914c, at 409 & nn.25–26 (collecting cases split on this question).

Finally, procompetitive benefits in one market may only rarely rebut a showing of anticompetitive effects in a different market.  Plaintiff proposes a blanket prohibition on considering out-of-market effects, relying on United States v. Topco Assocs., Inc., 405 U.S. 596 (1972).  See FTC Opp. at 68.  Topco, however, did not involve different antitrust markets and

thus could not have held that market specificity is required under the Sherman Act. <u>See</u> 405 U.S. at 601–02 (referring only to different "marketing territor[ies]" within single national market); <u>but cf.</u> <u>Phila. Nat'l Bank</u>, 374 U.S. at 370 (construing Section 7 of Clayton Act to require market specificity). The Supreme Court has, moreover — and without apparent explanation — considered out-of-market procompetitive justifications in at least one other Sherman Act case. <u>See, e.g.</u>, <u>NCAA v. Bd. of Regents of Univ. of Oklahoma</u>, 468 U.S. 85, 117 (1984) (acknowledging legitimacy of "fostering competition among amateur athletic teams" to "enhance public interest in intercollegiate athletics" in case concerning anticompetitive conduct in market for <u>televised</u> intercollegiate football games).

The weight of authority nonetheless appears to be broadly against recognizing out-of-market procompetitive justifications without very good justification. <u>See</u> <u>Sullivan v. Nat'l Football League</u>, 34 F.3d 1091, 1112 (1st Cir. 1994) (while courts should "generally give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices," it nonetheless "seems improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market"); IVA Philip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u>, ¶ 972, at 57 (4th ed. 2016) ("As a general proposition, antitrust rejects" that "possible injuries to competition in one market are offset by efficiency benefits in a different market."); David Crane, <u>Balancing Effects Across Markets</u>, 80 Antitrust L.J. 397, 397 (2015) ("[T]he principle is best operationalized as a presumption against balancing effects across market lines that can be rebutted based on compelling evidence in particular cases."). Professors Areeda and Hovenkamp, for instance, suggest that out-of-market benefits should be cognizable only when "the threatened market is significantly smaller than the benefitted market." IVA

Areeda & Hovenkamp, ¶ 972c, at 60.  Others suggest that the burden should be on the defendant

to show that out-of-market procompetitive effects should register in the balance.  See Crane, 80

Antitrust L.J. at 411.

Out of an abundance of caution, and because the parties have not briefed this unsettled

question, the Court will permit Meta to present evidence of procompetitive effects outside the

PSN-services market, subject to a strong showing that such effects are relevant in this case.  In

doing so, the Court acknowledges that many mergers with nascent competitors may present

market-specificity issues because, by definition, a nascent competitor will often operate in a

different market from its acquirer.  Here, that affects the viability of Meta's WhatsApp-related

affirmative defenses, as the messaging application was not — and still is not — a part of the

FTC's proposed product market.  Under the Commission's bright-line rule, the Court seemingly

would be prohibited from balancing any consumer benefits (e.g., lower prices) that materialized

in the OTT mobile-messaging market because of the acquisition against the anticompetitive

effect of cutting off a nascent competitor in the separate PSN-services market.  The Commission,

however, has not asked the Court to categorically bar consideration of such effects on this basis.

See FTC Opp. at 79–80; FTC Reply at 17–22.  The Court therefore will not do so at this

juncture.  Meta will nonetheless have to demonstrate at trial why any of its WhatsApp-related

affirmative defenses should be cognizable.

> b.    Application

Meta asserts ten categories of procompetitive justifications: six related to how it

improved Instagram, three related to how it improved WhatsApp, and one related to how

WhatsApp strengthened Meta's strategic position against Apple and Google.  See ECF No.

331-10 (Pl. Docs. Vol. 78) at ECF pp. 163–164 (Meta Resp. to Interrogatory Nos. 10 & 12 at 12–

13).  The categories encompass, by the FTC's count, approximately 120 discrete benefits, see FTC Opp. at 68 — including, to take just a few examples, improving Instagram's reliability by bringing to bear Meta's "world-class data centers," Meta Resp. to Interrogs. at 14; integrating Instagram more fully with Facebook and thus accelerating the acquisition's growth, see id. at 19; and making WhatsApp free for all users.  See id. at 25.

The Commission retorts that none of these categories is a legally cognizable procompetitive justification.  On Plaintiff's telling, the evidence supports only one story: Meta acquired both Instagram and WhatsApp solely to eliminate a competitive threat, and any improvements it made to those applications it could equally have made to its own products, Facebook Camera and Messenger.  The first nine categories are thus, the FTC claims, both pretextual and non-merger specific.  See FTC Opp. at 71–80; FTC Reply at 2–21.  It also argues that the final procompetitive justification must go the same way because a monopolist is not entitled to improve its strategic positioning against other firms via anticompetitive conduct.  See FTC Opp. at 80; FTC Reply at 21–22.  The Court addresses these arguments *seriatim*.

i.    <em>Pretext</em>

As Meta points out, issues of motivation or intent — which require fact-intensive inquiries to resolve — are "peculiarly not susceptible to resolution by summary judgment." Meta Reply at 62 (quoting Miller v. Saxbe, 403 F. Supp. 1314, 1316 (D.D.C. 1975)); see also Tech 7 Systems v. Vacation Acquisition, LLC, 594 F. Supp. 2d 76, 85 (D.D.C. 2009) ("It is well-established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment.") (internal quotation marks omitted).  Plaintiff therefore faces an uphill climb in seeking judgment as a matter of law that virtually all of Meta's procompetitive

84

justifications were mere pretext.  Such an outcome would be justified only if no credible evidence suggested otherwise.

But that is not the case here.  To be sure, the evidence that Meta sought to neutralize competitive threats is weighty, as recounted previously.  See supra Section III.B.2.  Other evidence, however, points the other way.  Start with Instagram.  Defendant has proffered evidence that the company was struggling with scaling its operations to match its growth. Integrity issues were, on Meta's telling, rampant, which threatened to derail Instagram's rise. See Meta SMF, ¶¶ 679–84.  Running on Amazon Web Services, the platform was "under water from an engineering perspective," Pl. Docs. Vol. 65 at ECF p. 1,310 (Deposition of Mike Krieger at 269:20–21), such that the founders felt that they had to devote themselves 24/7 to managing infrastructure problems or else Instagram would come "crumbling down."  Meta SMF, ¶ 690.  Complete outages were not uncommon.  See id., ¶ 692.  What Meta therefore had to offer in any potential acquisition was the scale and expertise to address such challenges while incorporating into its product offering a platform that was, from the consumer's perspective, highly successful.  See Meta Reply at 59.

Record evidence supports that these opportunities motivated the merger with Instagram, at least in part.  In Zuckerberg's February 2012 email to his CFO, quoted at length above, he acknowledges that part of the purpose in seeking to acquire Instagram was to "integrate" it with Meta's products "in order to improve [Meta's] service."  FTC SMF, ¶ 1694.  That integration involved "building [Instagram's] mechanics into [Meta's] products rather than directly integrating" them, see id. — i.e., permitting Instagram to run on its own while learning from its success to improve Facebook and other Meta products.  True, Zuckerberg's email also indicated that one of the deal's rationales was to "neutralize a potential competitor."  Id.  But the FTC

omits that Zuckerberg later followed up on that email exchange seemingly to disavow that

motivation and re-emphasize his integration point:

> I didn't mean to imply that we would be buying them to prevent
> them from competing in any way.  Buying them would give us the
> people and time to incorporate their innovations into our core
> products, which is how we'd do the integration rather than actually
> combining the products.  I'm mostly excited about what the
> companies could do together if we worked to build what they've
> invented into more people's experiences.

Meta Reply to FTC SMF, ¶ 1694; see also Zuckerberg Hr. at 255:25–256:4 (testifying that Meta

wanted "to acquire something we thought would be useful and put our weight behind growing

them and making them better than we thought that they could be independently").

      That internal justification matched Zuckerberg's external sales pitch.  At around the same

time as his conversation with his CFO, he emailed an Instagram investor to broach a merger,

arguing that it could "make sense since photos by themselves aren't a great business."  Meta

SMF, ¶ 695.  In his later communications with Systrom, Zuckerberg wrote that he was "really

excited about what [Meta] can do to grow Instagram as an independent brand and product,"

specifically mentioning the "infrastructure [Meta] built . . . around storing and serving photos,

querying them, etc." and emphasizing "the value of using all of the infrastructure that we've built

up rather than having to build everything from scratch."  Id., ¶ 698.  These statements are

credible evidence, sufficient to convince a reasonable trier of fact, that Meta's proffered

procompetitive justifications were more than mere pretext for its desire to crush competition.

      Plaintiff quibbles with this evidence, arguing that it neither matches up with the

justifications Meta has already provided (which focus on benefits it provided to Instagram, not

vice versa) nor outweighs the heaps of evidence pointing in the other direction.  See FTC Reply

at 10–13.  Whether the latter holds true, however, requires a weighing of evidence reserved

exclusively for trial.  See Liberty Lobby, 477 U.S. at 255.  As to the former, Meta expressly

stated that the list of procompetitive benefits it has thus far provided is incomplete and non-

exhaustive.  See Meta Resp. to Interrogs. at 12.  It would be inappropriate at this stage of the

litigation to discount evidence of a procompetitive motivation for the merger simply because it

fits awkwardly with Meta's response to an interrogatory — especially when some of that same

evidence does support Meta's current justifications.  See, e.g., Meta SMF, ¶¶ 695, 698;

Zuckerberg Hr. at 255:25–256:4.

 As for WhatsApp, Meta likewise contends that the FTC's story does not hold up, and that

claims of pretext are therefore unfounded.  Substantial record evidence — including testimony

from WhatsApp's founders — disputes the notion that the messaging application was at all

interested in pivoting into the PSN-services market.  See Meta SMF, ¶¶ 785–94 (collecting

evidence).  Indeed, Acton testified that there was no doubt in his mind that WhatsApp would not

have made such a pivot and instead would have "continued on the trajectory it had been on"

absent the acquisition.  See Pl. Docs. Vol. 61 at ECF pp. 1,973–74 (Deposition of Brian Acton at

232:23–233:13).  According to Koum, that was in part because of WhatsApp's goal of staying

"simple to use and elegant and not all burdened with all these complexities with these additional

features," Pl. Docs. Vol. 57 at ECF p. 736 (FTC Investigational Hearing of Jan Koum at 70:9–

11), unlike WhatsApp's competitors in Asia that had pivoted into other markets.  See Meta SMF,

¶ 792.  At the same time, however, WhatsApp struggled with fragile infrastructure and the lack

of a clear path to monetization.  See id., ¶¶ 767, 770–71, 802.

 Importantly for present purposes, Meta appears to have been aware of all of the above

when formulating the case for the acquisition.  Notes from Zuckerberg's July 2012 meeting with

Koum reveal that he knew that WhatsApp, for instance, "[l]ook[ed] down on features in Asian

clones" and "[w]ant[ed] to stay focused on messages" while remaining "small with no managers." Meta Reply to FTC SMF, ¶ 1831(c). Documents from Meta's board meeting to discuss the acquisition also describe multiple rationales for the transaction, including that it could "help Facebook grow by exposing Facebook to people who are not yet part of" it and "help [WhatsApp] grow by using [Meta's] distribution, infrastructure, etc." Meta Reply to FTC SMF, ¶ 1836; Meta SMF, ¶ 813. Finally, in answer to the FTC's accusation that Defendant overpaid for the acquisition without conducting a valuation — thus negating any business case for it — Meta points to evidence that the board <u>did</u> conduct such a valuation and that it showed that "the price Meta paid was <u>less</u> than other companies paid in peer transactions on a per-user basis." Meta Reply at 54; <u>see</u> Meta Reply to FTC SMF, ¶ 1838.

In total, this evidence is sufficient to support a finding at trial that Meta's procompetitive justifications for the acquisition of WhatsApp were not entirely pretextual. Plaintiff's response, as before, is to poke holes in this evidence and point to other documents telling a different story. <u>See</u> FTC Opp at 78–79; FTC Reply at 14–16. These arguments, however valid, only underscore the persistence of factual disputes about whether Meta's genuine motivation was to "squelch a threat." FTC Opp. at 79. In light of the general injunction against resolving such fact-intensive inquiries of motive or intent at summary judgment, the Court is not persuaded that the Commission is entitled to judgment as a matter of law on the evidence so far presented.

ii.    <i>Merger Specificity</i>

Falling back to its second line of attack, the FTC argues that, regardless, these pretextual justifications miss the mark for the additional reason that they are not merger specific. The core of its argument is that any purported consumer-welfare gains from Meta's investments in Instagram and WhatsApp could have been achieved if Defendant had instead invested in

88

Facebook Camera and Messenger, so the acquisitions could not have been necessary to realize those benefits.  See FTC Opp. at 75–77, 79–80; FTC Reply at 17–21.  To make this argument, Plaintiff leans heavily on this Circuit's decisions in Heinz and Anthem, contending that they require Meta to produce evidence that it "was unable to develop on its own a product 'equivalent' to the post-acquisition offerings of the acquired firms."  FTC Reply at 19; see Heinz, 246 F.3d 708; Anthem, 855 F.3d 345.  According to the Commission, Defendant has conceded that it cannot make this showing.  See FTC Reply at 19.

Meta does dispute, however, that it could have grown Messenger or Camera into comparable products.  It points out that Camera was not designed to house "the dozens of non-camera features [that] Meta introduced to Instagram like direct messaging, video, Reels, Stories, Shop, and more," and that Messenger was linked to Facebook's social graph and thus was not seen — especially abroad — as a texting replacement the way WhatsApp was.  See Meta Reply at 63–64.  These arguments illustrate a fundamental dynamic of digital applications that Plaintiff elsewhere harnesses to its advantage: differences in norms and usage, coupled with network effects, can differentiate products and cement early advantages.  Record evidence from the FTC itself suggests that Camera's substantial underperformance relative to Instagram in 2012 could not have been remedied merely by throwing more resources at it, especially in light of Instagram's early lead in mobile photo-sharing and Meta's stumbles in adjusting to a mobile-first environment.  See, e.g., FTC SMF, ¶¶ 1668, 1671–76.  The Court is likewise aware of no evidence or testimony that the significant differences between Messenger and WhatsApp — which stem from the applications' different purposes, contact infrastructure, and geographic reach — could have been bridged by adequate "investment" from Meta.  Cf. id., ¶ 1724

(cataloging differing consumer perceptions of the applications).  Indeed, Meta continues to operate both WhatsApp and Messenger as separate applications today.

This case is thus not readily comparable to those on which the FTC relies, both of which involved Section 7 challenges.  In Heinz, for instance, this Circuit held that the district court erred by not considering whether the acquiring firm could have obtained better baby-food recipes (a motivation for the merger) by instead investing more money in developing its own recipes. See 246 F.3d at 722.  Anthem, meanwhile, concerned a claim that a health-insurance company could realize merger-specific efficiencies by combining its low rates with another company's superior customer-facing programs.  See 855 F.3d at 415.  Our Circuit upheld the district court's finding that the defendant could have improved its own programs instead by changing its marketing strategy or allocating more resources to them.  See id. at 415–16.  Here, however, there is some evidence that Meta could not have replicated either Instagram or WhatsApp in any reasonable period merely by investing more heavily its own products.  Any consumer-welfare benefits from the acquisitions (which the FTC plans nonetheless to contest at trial, see FTC Reply at 17 n.1) could thus be seen as merger specific.  Cf. Anthem, 855 F.3d at 416 (acknowledging that achieving efficiencies faster via merger may be cognizable benefit); New York v. Deutsche Telekom AG, 439 F. Supp. 3d 179, 211 (S.D.N.Y. 2020) (holding that efficiencies were merger-specific when they occurred on quicker timeframe than they would have otherwise).  At the very least, a reasonable factfinder could find, on the current record, that there were no "practical and more than merely theoretical" alternatives to combining the unique product features of Instagram and WhatsApp with the infrastructure and resources of Meta. Anthem, 855 F.3d at 357.

iii.        *De-platforming Justification*

That leaves Defendant's tenth procompetitive justification: that it acquired WhatsApp as part of a broader strategy to expand its application portfolio in order to prevent Apple or Google from "de-platforming" Meta's applications from their mobile operating systems.  See Meta Reply at 64.  Unlike Meta's other justifications, however, it is not at all clear to the Court that this one "serves a purpose other than protecting" Meta's "monopoly."  Microsoft, 253 F.3d at 67. As the FTC notes, Defendant appears to be claiming that increasing its "bargaining leverage" over Apple or Google could justify an anticompetitive acquisition.  See FTC Reply at 21.  The Court is aware of no authority for such a proposition, which would be theoretically available to any monopolist that sought to entrench its position via anticompetitive acquisitions.  Indeed, if Apple and Google were some of Meta's "fiercest competitors," as Defendant claims, see Meta Reply at 64, then the threat of "de-platforming" its products may have been a legitimate form of competition; and if it were anticompetitive (which Meta does not even argue), Meta's proper recourse would have been a lawsuit — not anticompetitive conduct of its own.  Cf. Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc., 810 F.2d 869, 877 n.8 (9th Cir. 1987) ("[I]ntentional anticompetitive behavior . . . cannot be justified on the basis of a benign ultimate objective . . . .").

Even assuming that this rationale is procompetitive, a deeper issue is that Meta has provided no evidence that acquiring WhatsApp was the least restrictive means of obtaining that benefit.  See Kreuzer, 735 F.2d at 1495.  Very little in the record discusses the de-platforming issue, much less demonstrates its likelihood, illustrates what actions Meta otherwise took to avert it, or explains why the WhatsApp acquisition advanced that goal.  Cf. Meta SMF, ¶ 813 (collecting evidence merely restating de-platforming rationale); Zuckerberg Hr. at 268:23–

269:19 (emphasizing only that Meta's fear of de-platforming partly motivated acquisition). Nor has Meta even tried to claim that the acquisition was the only way to prevent de-platforming. Even under the lenient standard at summary judgment, too little has been produced to support Meta's final procompetitive justification. The Court will accordingly grant Plaintiff's Cross-Motion as to that defense.

## IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part both Meta's Motion for Summary Judgment and the FTC's Cross-Motion for Partial Summary Judgment. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  November 13, 2024