**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>        Defendant. | Case No. 1:20-cv-03590-JEB |

**<u>META PLATFORMS, INC.'S PRETRIAL MOTIONS *IN LIMINE*</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

I.    MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT IN
      SUPPORT OF NEW AND UNDISCLOSED MARKET DEFINITION .............................2

      A.    Background ..................................................................................................4

            1.    The FTC's Candidate "Personal Social Networking" Market ...........................4

            2.    The FTC's Expert Witnesses Retreat from the FTC's Committed "All-
                  In" Market ...........................................................................................8

      B.    Argument ...................................................................................................10

II.   MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL PREVIOUSLY
      DISMISSED OR ABANDONED CLAIMS AND ALLEGATIONS ...............................18

      A.    Legal Standard ............................................................................................18

      B.    Argument ...................................................................................................19

III.  MOTION *IN LIMINE* TO PRECLUDE TESTIMONY AND ARGUMENT
      REGARDING META'S HART-SCOTT-RODINO PRODUCTIONS.............................21

      A.    Background ..................................................................................................21

            1.    Premerger Reviews:  Instagram (2012) and WhatsApp (2014) ......................21

            2.    The FTC's Proposed Joint Stipulations of Fact .............................................22

      B.    Argument ...................................................................................................23

IV.   MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT
      REGARDING INFLAMMATORY MATTERS ...............................................................26

      A.    Background ..................................................................................................26

      B.    Legal Standard ............................................................................................29

      C.    Argument ...................................................................................................30

            1.    The Court Should Exclude Inflammatory Complaints About Third-
                  Party Users That Misuse Meta's Apps.............................................................30

            2.    The Court Should Prevent a Mini-Trial About Mental Health and
                  Social Media ........................................................................................32

V.     MOTION *IN LIMINE* TO EXCLUDE FOREIGN REGULATORY FILINGS ..................34

       A.    Background ..................................................................................................34

       B.    Argument .....................................................................................................35

VI.    MOTION *IN LIMINE* TO PRECLUDE PROFESSOR RIM'S SPECULATION
       ABOUT HOW WHATSAPP MIGHT HAVE DEVELOPED BUT FOR THE
       ACQUISITION ........................................................................................................38

       A.    Background ..................................................................................................38

       B.    Legal Standard ............................................................................................39

       C.    Argument .....................................................................................................39

VII.   MOTION *IN LIMINE* TO PRECLUDE PROFESSOR HEMPHILL'S MISUSE OF
       CONSUMER SURVEYS TO DERIVE "MARKET SHARES" ........................................43

       A.    Background ..................................................................................................43

       B.    Legal Standard ............................................................................................44

       C.    Argument .....................................................................................................45

# TABLE OF AUTHORITIES[*]

**Page**

**CASES**

*A.T.O. Golden Constr. Corp. v. Allied World Ins. Co.*, 2018 WL 5886663
(S.D. Fla. Nov. 9, 2018)................................................................................................25

*Apple Inc. v. Samsung Elecs. Co.*, 2018 WL 1586276 (N.D. Cal. Apr. 2, 2018) .........................48

*Arias v. DynCorp*, 928 F. Supp. 2d 10 (D.D.C. 2013)....................................................................39

*Arsanjani v. United States*, 2023 WL 3231101 (D.D.C. May 3, 2023),
*aff'd*, 2024 WL 718726 (D.C. Cir. Feb. 20, 2024)..........................................................41

*Brooks v. Chrysler Corp.*, 786 F.2d 1191 (D.C. Cir. 1986)...........................................................29

*Brown v. Perez*, 835 F.3d 1223 (10th Cir. 2016)...........................................................................35

*Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024)............................................................................32

*Coles v. Perry*, 217 F.R.D. 1 (D.D.C. 2003).................................................................................33

*Cont'l Trend Res., Inc. v. OXY USA Inc.*, 44 F.3d 1465 (10th Cir. 1995),
*judgment vacated*, 517 U.S. 1216 (1996) .........................................................................13

*Corrigan v. Glover*, 254 F. Supp. 3d 184 (D.D.C. 2017).............................................................29

*CPR Assocs., Inc. v. Southeastern Pa. Chapter of Am. Heart Ass'n, Pa. Affiliate Inc.*,
1991 WL 53674 (E.D. Pa. Apr. 5, 1991), *aff'd sub nom. CPR Assocs., Inc. v.
Walls*, 947 F.2d 934 (3d Cir. 1991) ...................................................................................12

* *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ......................................................45

*Deselms v. Occidental Petrol. Corp.*, 2024 WL 4103602 (D. Wyo. July 29, 2024) ...................12

*Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Oklahoma Bd. of Regents*,
2023 WL 3898736 (E.D. Okla. June 8, 2023)....................................................................19

*Doe 2 v. Esper*, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) .......................................................24

*EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig., In re*,
2021 WL 6072512 (D. Kan. Dec. 23, 2021).....................................................................37

*ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383 (S.D.N.Y. 1999) ........................37

---

[*] Authorities upon which we chiefly rely are designated with an asterisk (*).

*Estes Park Taffy Co. v. Original Taffy Shop, Inc.*, 2017 WL 2472149
(D. Colo. June 8, 2017) .................................................................................................45

* *FTC v. Facebook, Inc.*:

    560 F. Supp. 3d 1 (D.D.C. 2021) .........................................................................2, 4

    581 F. Supp. 3d 34 (D.D.C. 2022) .............................................................2, 4, 26

* *FTC v. Meta Platforms, Inc.*:

    2022 WL 4078930 (D.D.C. Sept. 6, 2022) ...........................................................23

    2024 WL 4772423 (D.D.C. Nov. 13, 2024) ....................................2, 12, 17, 19, 20

* *FTC v. Staples, Inc.*:

    970 F. Supp. 1066 (D.D.C. 1997) .........................................................................16

    190 F. Supp. 3d 100 (D.D.C. 2016) ......................................................................16

* *FTC v. Whole Foods Mkt., Inc.*:

    No. 1:07-cv-01021-PLF (D.D.C. July 12, 2007), ECF No. 105 .......................14

    548 F.3d 1028 (D.C. Cir. 2008) ..........................................................3, 13, 14, 15

*Gillis v. Murphy-Brown, LLC*, 2018 WL 5834689 (E.D.N.C. Nov. 6, 2018) ...............19

*Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958 (D.C. Cir. 2016)........................40

*Grzadzinksi v. Garland*, No. 1:20-cv-01411-JEB (D.D.C.):

    ECF No. 57 (Jan. 31, 2023) ...................................................................................18

    2023 WL 1815719 (Feb. 8, 2023) .........................................................................18

*Holmes-Martin v. Sibelius*, 2011 WL 13244746 (D.D.C. Mar. 3, 2011) ......................18

*Huthnance v. Dist. of Columbia*, 255 F.R.D. 297 (D.D.C. 2008)..................................11

*Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274 (Fed. Cir. 2023)....................24

*Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 636 F. Supp. 3d 73 (D.D.C. 2022)..................36

*Leyba v. Renger*, 874 F. Supp. 1229 (D.N.M. 1994) ....................................................12

*Mahmud v. Kaufmann*, 607 F. Supp. 2d 541 (S.D.N.Y.), *aff'd*, 358 F. App'x 229
(2d Cir. 2009)................................................................................................. 12-13

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 2010 WL 2607241
(N.D. Ill. June 23, 2010) ................................................................. 41-42

*Marceline v. Delgado*, 2012 WL 517301 (D. Conn. Feb. 16, 2012) ............................................ 25

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002) ............................ 16

*Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568 (N.D. Miss. 2004),
*aff'd in part and remanded*, 459 F.3d 1328 (Fed. Cir. 2006) ............................ 16

*Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489
(Fed. Cir. 2019) ................................................................................ 47

*Parsi v. Daioleslam*, 852 F. Supp. 2d 82 (D.D.C. 2012) ................................................ 42

*Pub. Citizen v. U.S. Dep't of Agric.*, 2022 WL 3139003 (D.D.C. Aug. 5, 2022) ..................... 35

*Radware, Ltd. v. F5 Networks, Inc.*, 147 F. Supp. 3d 974 (N.D. Cal. 2015) ........................... 48

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) ..................... 16

*Ricketts v. City of Hartford*, 74 F.3d 1397 (2d Cir. 1996) .............................................. 32

\* *Rodriguez v. Wash. Metro. Area Transit Auth.*, 2021 WL 7286936
(D.D.C. Dec. 7, 2021) .................................................................. 18, 29

*Rosden v. Leuthold*, 274 F.2d 747 (D.C. Cir. 1960) ..................................................... 12

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 72 F. Supp. 3d 131
(D.D.C. 2014) ................................................................................ 36

*Salem v. United States Lines Co.*, 370 U.S. 31 (1962) .................................................. 39

*Smith v. Rosebud Farmstand*, 2015 WL 14070901 (N.D. Ill. Nov. 24, 2015) ......................... 25

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010) ...................................... 45

*Thomas v. Duvall*, 2021 WL 5233319 (M.D. Pa. Nov. 10, 2021) ..................................... 29

*Thorp v. Dist. of Columbia*, 327 F. Supp. 3d 186 (D.D.C. 2018),
*aff'd*, 788 F. App'x 8 (D.C. Cir. 2019) ............................................................ 12

*United States v. AT & T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018),
*aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ............................................................ 47

*United States v. Google*, No. 1:20-cv-03010-APM (D.D.C. Sept. 4, 2023),
ECF No. 683 ................................................................................ 19

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ............................... 47

*United States v. Ham*, 998 F.2d 1247 (4th Cir. 1993) ...................................................30

*United States v. Lewis*, 693 F.2d 189 (D.C. Cir. 1982) .................................................29

*United States v. Libby*, 461 F. Supp. 2d 3 (D.D.C. 2006)..............................................42

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .............................23, 32

*United States v. Moore*, 589 F. Supp. 3d 87 (D.D.C. 2022) ..........................................32

*United States v. Philip Morris USA, Inc.*, 219 F.R.D. 198 (D.D.C. 2004) ....................11

*United States v. Schuette*, 2023 WL 163490 (N.D. Cal. Jan. 11, 2023) ........................31

*United States Smelting Co. v. Parry*, 166 F. 407 (8th Cir. 1909) ..................................39

*Western Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052
    (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) ........................................13

*White v. United States*, 148 F.3d 787 (7th Cir. 1998).....................................................32

*Wing Enters., Inc. v. Tricam Indus., Inc.*, 829 F. App'x 508 (Fed. Cir. 2020) ..............45

*Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272 (Fed. Cir. 2012) ..................11

**STATUTES AND RULES**

Clayton Act, 15 U.S.C. § 12 *et seq.* ...............................................................................13

    § 7, 15 U.S.C. § 18.................................................................................................13

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435,
    90 Stat. 1383 ....................................................................................1, 21, 22, 23, 25

    15 U.S.C. § 18a(d)(1)............................................................................................23

Fed. R. Evid.:

    Rule 402 .................................................................................................................29

    Rule 403 .................................................................................................................29

    Rule 602 .................................................................................................................34

    Rule 702 .......................................................................................................38, 39, 44

    Rule 801 .................................................................................................................35

**OTHER MATERIALS**

Shari Seidman Diamond, "Reference Guide on Survey Research,"
    *in* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 359
    (3d ed. 2011) ...............................................................................................45, 46

Jt. Mem. of Points & Authorities of Whole Foods Market, Inc., and Wild Oats
    Markets, Inc., *FTC v. Whole Foods Mkt., Inc.*, No. 1:07-cv-01021-PLF
    (D.D.C. July 27, 2007), ECF No. 141.............................................................14

National Ctr. for Missing & Exploited Children, *Corporate Partners & Foundations*,
    https://www.missingkids.org/supportus/our-corporate-partners......................28

Meta Platforms, Inc. ("Meta") submits these motions for an Order directing the Federal Trade Commission ("FTC") not to mention, discuss, imply, argue, or allude to the following – unless Meta opens the door – whether in the FTC's opening, examination of witnesses (on direct or cross), expert opinion, interposing or arguing objections, closing, or otherwise:

- *First*, any expert testimony or argument that is inconsistent with the FTC's contention – set forth in an interrogatory response compelled by the Court that the FTC never amended – that the "personal social networking" market is an "all-in" market that includes everything users do on Facebook and Instagram except for Facebook Dating.

- *Second*, argument or evidence about or in support of claims or allegations this Court has already dismissed or that the FTC has abandoned.

- *Third*, argument or eliciting testimony concerning the FTC's unsubstantiated assertion that Meta's document submissions under the Hart-Scott-Rodino Act were incomplete in 2012 (for Instagram) or 2014 (for WhatsApp).

- *Fourth*, highly inflammatory material relating to the FTC's legally irrelevant assertions about user mental health and how some users might misuse Meta's services.

- *Fifth*, hearsay out-of-court statements – and lawyer-crafted advocacy – that Meta's rivals submitted to foreign competition regulators.

- *Sixth*, FTC expert Professor Rim's speculation as to how WhatsApp could have developed (or not) – "absent its acquisition by Meta" – because it is based on nothing more than highlighting documents from the record.

- *Seventh*, the proffered opinion of Professor Hemphill – the FTC's principal expert witness – that a consumer survey, including the one conducted by Michal Malkiewicz (whom the FTC proffers as a survey expert), can be used to determine Meta's supposed market share.

## I.    MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT IN SUPPORT OF NEW AND UNDISCLOSED MARKET DEFINITION

The FTC was ordered during discovery to answer a Meta interrogatory and commit to the boundaries of its claimed relevant product market, because it was apparent that not *all* time spent on Meta's services was included in the relevant competition for what the FTC called "personal social networking" or "PSN."  *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 48 (D.D.C. 2022) ("While Defendant is correct that data capturing time spent on platforms providing PSN services includes more than time spent just using such services, that imperfection is not fatal at this stage."); *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 19 (D.D.C. 2021) (similar); *see also FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, at *15-16 (D.D.C. Nov. 13, 2024) (same).

In response to Meta's interrogatory, the FTC chose *not* to specify that only certain activities were PSN but rather to claim that *everything* on the Facebook and Instagram apps (except Facebook Dating) is *included* in "personal social networking" and thus part of the relevant product market in this case.  Whether the FTC made that choice because it could not determine market shares based on small slices of the time spent on the Meta apps or because its case would not support a plausible claim for dramatic relief (breakup) if limited to a small subset of what people do on those apps, makes no difference.  It chose not to rely only on "sharing" with friends and family for good reason – the "friends-and-family sharing" that the FTC puts at the center of its case, which is only *part* of the Feed and Stories features on the apps, now makes up a small and declining share of the time users spend on both Facebook and Instagram (less than █████ on Facebook and less than █████ on Instagram).  Friends-and-family sharing has migrated to messaging services like iMessage and others.

But the FTC made its choice, and the case proceeded on the unequivocal "all-in" market claimed in the FTC's answer.  The only disclosed theory in the case was that Meta can raise

price and restrict output (relative to competitive levels) on *everything* users do on Facebook and Instagram – it's all "personal social networking" – and not just on some unspecified sliver of use. Discovery was conducted on that "all-in" theory; Meta obtained testimony from scores of nonparties to debunk the claim that Meta faces no competition for all the things that people do on the Facebook and Instagram apps. Meta is competitively constrained by many other services, among them TikTok, YouTube, and iMessage; it cannot raise the "price" (or reduce the quality) on its apps without losing usage to these substitutes. The FTC is free to try proving otherwise, but Meta is confident that it will not be able to do so.

It now seems that, after the end of fact discovery, the FTC wants to walk back its commitment to proving the "all-in" relevant market. It has at least hinted at a different market theory – the relevant arena of competition (i.e., antitrust market) is the provision of "core" sharing with "friends and family" as it is done on the Feed (where most time is not friend sharing) and Stories (consuming friend content on this service is approximately ■ of total time spent on Facebook) features. Such sharing is only part of the time spent even on those features. The FTC's new theory is that Meta is a monopolist because it can raise price, restrict output, or reduce quality (all relative to a competitive benchmark) for only the people who engage in that activity. The claimed support for this new theory is the D.C. Circuit's decision in *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) (Brown, J.), in which the court blocked a merger based on lack of effective competition for some, but not all, products sold in organic-specialty grocery stores. Whatever the merits of that theory, it is inconsistent with what the FTC disclosed and committed to proving in this case during discovery. It would be improper and unfair to allow the FTC to inject it into the trial at this point.

A.      Background

1.      The FTC's Candidate "Personal Social Networking" Market

The FTC's allegations caused the Court to state – repeatedly – that some of the time spent on Facebook and Instagram must not be "personal social networking."  For example, in granting Meta's motion to dismiss the initial Complaint, the Court reasoned:  "To the extent that, say, Instagram users spend their time on the site or app watching a comedy routine posted by the official page of a famous comedian, are they spending time on a PSN service?  If not, as the Complaint suggests is the case, then time spent 'on Facebook' or 'on Instagram' bears an uncertain relationship to the actual metric that would be relevant:  time spent using their PSN services in particular."  *Facebook*, 560 F. Supp. 3d at 19 (citation omitted); *see id.* (calling this an "uncertainty left open by the Complaint as to exactly which features of Facebook, Instagram, *et al.* do and do not constitute part of their PSN services").  And in denying Meta's motion to dismiss the Amended Complaint, the Court stated it would not – at that stage – fault the FTC for failing to allege "precisely what percentage of users' time spent on Facebook Blue and Instagram includes interacting with friends, family, and other personal contacts, as opposed to engaging in activity – such as passively viewing a music video – that falls outside of the market definition."  *Facebook*, 581 F. Supp. 3d at 49; *see id.* (noting such data "may not exist").

Against that background of FTC unclarity, Meta issued an interrogatory requiring the FTC to state which activities on Meta's apps are included within "personal social networking" and which are not.  *See* Ex. 1 at 10, Meta's Interrog. No. 10 (Meta's First Set of Interrogs. to FTC (Mar. 30, 2022)) (citing Am. Compl. ¶ 164, ECF No. 82).  After considerable back-and-forth, the Court ordered Meta to "submit to the FTC a list of each feature or activity available to users on Facebook, Instagram, WhatsApp, or Facebook Messenger that Meta wishes the FTC to categorize as included or excluded from the definition of 'personal social networking,'" and

ordered the FTC to "inform Meta whether each such feature or activity is or is not *within*" the

FTC's alleged relevant market.  Order at 2 (Aug. 1, 2022), ECF No. 165 (emphasis added).  The

Court also ordered the FTC to supplement its responses if its position changed:  "If, at any point

in the future, the FTC takes a different position on any such feature or activity, the FTC shall so

supplement its response."  *Id.*

Meta provided the FTC with a list of 322 features and activities available on Facebook

and Instagram.  *See* Ex. 2 (MetaFTC-DX-996, Meta's List of Features or Activities for

Classification by the FTC (Aug. 22, 2022)) (calling for the FTC to identify which of these is

"included" within "personal social networking").  The FTC responded that "*all of the*

*features/activities* identified by Meta for Facebook and Instagram are part of Meta's personal

social networking offering, except Facebook Dating."  Ex. 3 at 2 (MetaFTC-DX-997, FTC's

Resp. to Meta's List of Features or Activities (Sept. 12, 2022)) (emphasis added).  For example:

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 1 | Watch | Viewing publicly accessible video(s) on the "For You," "Live," "Music," "Gaming," "Following," "Saved," or "Shows" Tabs posted by a Page User follows. | Yes |
| Facebook | 5 | Watch | Viewing advertisement(s). | Yes |
| Facebook | 12 | Reels | Viewing Reel(s) posted by an account that is not a Facebook Friend of User or a person or Page User follows. | Yes |
| Facebook | 65 | Feed | Viewing linked content (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Yes |
| Instagram | 16 | Reels | Viewing Reel(s) posted by an account that User does not follow, and that does not follow User. | Yes |
| Instagram | 59 | IGTV | Watching video(s) on IGTV. | Yes |

*See* Meta Rule 7(H) Statement in Support of Summary Judgment ¶ 582 (Apr. 5, 2024), ECF No. 326 ("Meta SMF"). These listed activities included, among many other things, viewing the short-form videos called "Reels" – including those posted by public accounts with no connection to the user – sending one-to-one messages on Instagram Direct, watching long videos posted by a public account with no connection to the user, viewing or posting interest-based content in Facebook Groups, and viewing or posting items for sale on Marketplace.

The FTC's response was that all these activities are *within* the claimed relevant market; all of it is "included" in "personal social networking." *See generally* Ex. 3. Accordingly, the firms that provide online services that offer some or all of those activities are competitors in the

relevant market. That is, Meta cannot raise the price of Facebook or Instagram above a competitive level without losing usage to services like TikTok, YouTube, and iMessage – which provide the same or very similar services as those swept within the "all-in" market where everything (except Dating) is "personal social networking" (Reels videos vs. TikTok videos, to cite just one example). The FTC never supplemented its response to this interrogatory, and, per Court order, the FTC therefore is committed to its market theory that every minute on the Facebook and Instagram apps (except Facebook Dating minutes) is part of the relevant competition for "personal social networking." Every competitor for any of those minutes (not just some of them) must be accounted for in any assessment of market share.

As the Court observed, the FTC's answers to Meta's interrogatories "directly" and "categorically" state which activities count as use of "personal social networking" and which do not. Order at 3 (Mar. 29, 2023), ECF No. 264. Accordingly, Meta subsequently – in preparation for trial – served on the FTC the following proposed stipulated facts, which track word-for-word the FTC's interrogatory answer as to the factual basis for its claims regarding the relevant market:

- "Personal social networking," as defined by the FTC, includes all of the features/activities on Facebook and Instagram that Meta identified in its August 22, 2022 list of features/activities, other than Facebook Dating. *See* Ex. 3.

- The FTC classifies viewing Reels posted by an account that a User does not follow, and that does not follow that User, on Instagram Reels as included in the definition of "personal social networking." *See id.*; *see also* Meta SMF ¶ 582 (undisputed by FTC).

- The FTC classifies viewing videos on Facebook Watch that were not posted by a User's Facebook friend as included in the definition of "personal social networking." *See* Ex. 3; *see also* Meta SMF ¶ 583 (undisputed by FTC).

- The FTC classifies viewing content of any form (such as Items for Sale) that was not posted by one of a User's Facebook friends on Facebook Marketplace as included in the definition of "personal social networking." *See* Ex. 3; *see also* Meta SMF ¶ 583 (undisputed by FTC).

- The FTC classifies sending or viewing messages sent to a group of 2-5 other users on Instagram Direct as included in the definition of "personal social networking."  *See* Ex. 3; *see also* Meta SMF ¶ 583 (undisputed by FTC).

But the FTC has refused to agree to any of the above stipulations and thus to limit itself at trial to the market it committed to prove.  That is likely because, in discovery, Meta developed overwhelming evidence of the vigorous competition across the spectrum of features within the claimed "all-in" market.  The FTC also hinted at plans to pursue a narrower market or "submarket" consisting only of the time spent on "core" friends-and-family sharing.  *See* FTC Br. in Opp'n to Meta's Mot. for Summary Judgment at 4 (June 4, 2024), ECF No. 364 ("Evidence shows a distinct consumer demand for friends and family sharing, which is a core use case of Facebook and Instagram") (capitalization modified).

## 2.    The FTC's Expert Witnesses Retreat from the FTC's Committed "All-In" Market

The reason why Meta demanded that the FTC define clearly what it considered to be within the relevant market is obvious:  Meta was entitled to know exactly what the FTC was claiming so that Meta could obtain relevant evidence in discovery to contest the FTC's claim.  *See* Order at 1 (Aug. 1, 2022), ECF No. 165 (explaining that, "given that [the FTC's] investigation has long since commenced," Meta "seem[ed] reasonable in asking the FTC to define the relevant market").  Based on the FTC's commitment to the "all-in" market, Meta conducted discovery to establish the vigorous competition that the Meta apps face across all use cases that the FTC defined as "included" within "personal social networking."  Meta obtained evidence from 139 nonparties and took testimony from 65 nonparty witnesses, all to establish that there is intense competition for time spent online engaging in the activities included in the FTC's "personal social networking" market definition.  For example, Meta obtained evidence to prove that the very same short-form videos available on the Meta apps (the "Reels" feature) are

also available to consumers on TikTok and YouTube, and the very same sofa can be viewed and purchased on Facebook Marketplace as well as on eBay or Nextdoor.

After fact discovery closed, facing this evidence from the nonparties, the FTC offered only hints in the reports of its expert witnesses that it might seek to prove a different and narrower market. Although he affirmed his support for the "all-in" market to which the FTC had committed, Professor C. Scott Hemphill of NYU Law School, the FTC's principal economist, implied that there may be a narrower market limited to broadcast sharing with friends and family on the Feed and Stories features within the Facebook and Instagram apps. He then purported to evaluate the availability of substitutes and supposed presence of monopoly power in *that* alternative submarket. He attempted to dismiss the relevance of competition for time spent on *non*-friends-and-family sharing activities. *See* Ex. 4 ¶ 33 (PX09000, Hemphill Rep.) (stating "any app that adequately serves user demand for PSN services is properly included, regardless of whether the app also performs *additional* functions that satisfy other uses"). He went on to estimate market shares limited to time spent only on what he believed to be sharing features (Feed and Stories; even though *most* time on Feed is not friend sharing and friend sharing with Stories is approximately ▮ of total time spent on Facebook). He offered the opinion that Meta "discriminates" against those users with higher demand for friends-and-family sharing activity by showing them more ads. That is, they are "charged" a higher price-equivalent, with ad load as a proxy for price.

Another of the FTC's expert witnesses, Professor Clifford Lampe, also hinted at a different and narrower market – similar but not identical to the submarket Professor Hemphill posited. Rejecting the FTC's "all-in" theory, he testified that *not* everything served by the Meta apps falls within the claimed market (and not all friends-and-family sharing is included either).

According to Professor Lampe: "Facebook has offered other types of uses than personal social networking." Ex. 5 at 167:6-8 (Lampe Dep. Tr.). For example, and contrary to the FTC's assertion that video watching is within the market, Professor Lampe disclaimed the relevance of video competition, stating this is "largely for entertainment purposes." *Id.* at 238:2-15. He landed on a relevant market limited to "weak tie mass personal relationship maintenance," *id.* at 30:14-31:2, which he says is *not* connecting with close friends or family but instead with "work colleagues, members of your church, old friends you've lost touch with, and casual acquaintances," *id.* at 21:9-22.

**B.    Argument**

1.    ***The FTC cannot present argument or expert opinion inconsistent with its "all-in" market definition by now claiming a "friends-and-family" market.*** The FTC has committed to an "all-in" market definition. Accordingly, evidence that TikTok competes with Instagram Reels is not merely evidence that TikTok and Instagram Reels compete in *some* market but that they compete *in the market for "personal social networking"* as the FTC chose to define it. Reels *is* "personal social networking," just as much as sharing friend content, according to the FTC's interrogatory response. The FTC is free to present evidence that competition from TikTok does not effectively constrain Instagram in its provision of Reels (if it has any; Meta is aware of none). But it is not free to discount competition for time spent on the many use cases the FTC included within "personal social networking" by segregating friends-and-family sharing into a newly claimed relevant market limited to Feed and Stories, or portions of activities on Feed and Stories.

2.    ***Any such change in the FTC's candidate market would run afoul of the Court's order and prejudice Meta's defense.*** Any assertion by the FTC or its experts that the claimed relevant market is limited to a subset of activities on Facebook and Instagram – friends-and-

10

family sharing – would be directly inconsistent with the FTC's interrogatory responses, its duty to supplement those responses, and the Court's explicit order requiring timely supplementation on this issue specifically.  *See* Order at 2 (Aug. 1, 2022), ECF No. 165 ("If, at any point in the future, the FTC takes a different position on any such feature or activity, the FTC shall so supplement its response.").  The positions to which the FTC committed in discovery defined the nature of the FTC's case, and it is far too late for it to change horses.  It is beyond dispute that a "plaintiff is bound by the answers given in [its] responses to defendants' interrogatories." *Huthnance v. Dist. of Columbia*, 255 F.R.D. 297, 300 (D.D.C. 2008); *see also United States v. Philip Morris USA, Inc.*, 219 F.R.D. 198, 201 (D.D.C. 2004) (failure to supplement interrogatory response "undermines the comprehensive efforts of the Court to ensure an orderly march to trial"); *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280-82 (Fed. Cir. 2012) (excluding evidence, stating "as theories mature . . . responses to interrogatories, and particularly contention interrogatories, [must] be corrected or supplemented to reflect those changes").

It also would prejudice Meta if the FTC were allowed to shift its market definition after fact discovery, after equivocal expert testimony (e.g., Professor Hemphill embracing the "all-in" market but also hinting at a narrower market), and now on the eve of trial.  Meta litigated the FTC's "all-in" market.  That litigation – and the strategies and tactics Meta employed as part of it – unfolded over approximately two and a half years.  It conducted extensive nonparty discovery based on the FTC's "all-in" market, eliciting concessions from competitors (e.g., TikTok and YouTube and iMessage and dozens more) about how they view competition within the market boundaries to which the FTC committed.  The FTC cannot shift to a narrower friends-and-family market to avoid evidence that Meta faces competition from TikTok and YouTube and iMessage

and others for activities and time spent that the *FTC itself* included in "personal social networking."  *See* Ex. 3.

The purpose of pretrial practice is "to define the claims and defenses of the parties," thereby "lessening the opportunities for surprise and thereby expediting the trial."  *Rosden v. Leuthold*, 274 F.2d 747, 750 (D.C. Cir. 1960).  Parties are *not* "permitted to keep certain evidence and argument under wraps for trial without penalty."  *Thorp v. Dist. of Columbia*, 327 F. Supp. 3d 186, 194 (D.D.C. 2018), *aff'd*, 788 F. App'x 8 (D.C. Cir. 2019) (per curiam).  Those considerations are particularly acute here, as perhaps no issue is as important in an antitrust case like this one as the definition of the candidate relevant market the FTC must prove.  *See Meta Platforms*, 2024 WL 4772423, at *9 ("The heart of the dispute – indeed, the question on which this case may ultimately turn at trial – is whether the FTC has adequately defined a relevant product market.").

Courts regularly refuse to allow plaintiffs to change market definition this late in a case, even when they file an appropriate motion or submit appropriate supplementation – which the FTC has not done here.  *See, e.g., Deselms v. Occidental Petrol. Corp.*, 2024 WL 4103602, at *3 (D. Wyo. July 29, 2024) (granting defendant's motion *in limine* to preclude evidence or argument in support of a new market definition, because "it is necessary to limit the scope of possible theories, in the name of fairness and judicial efficiency," at trial); *CPR Assocs., Inc. v. Southeastern Pa. Chapter of Am. Heart Ass'n, Pa. Affiliate Inc.*, 1991 WL 53674, at *26-27 (E.D. Pa. Apr. 5, 1991) (stating that the court did not err at trial when it "limit[ed] the relevant markets to that stated in the complaint"), *aff'd sub nom. CPR Assocs., Inc. v. Walls*, 947 F.2d 934 (3d Cir. 1991) (table); *Leyba v. Renger*, 874 F. Supp. 1229, 1236-38 (D.N.M. 1994) (refusing to allow plaintiff to recharacterize and narrow the relevant market at summary judgment); *Mahmud*

*v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y.) (similar), *aff'd*, 358 F. App'x 229 (2d Cir. 2009); *see also Cont'l Trend Res., Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (affirming district court's refusal to permit plaintiffs to narrow market definition at summary judgment), *judgment vacated on other grounds*, 517 U.S. 1216 (1996); *Western Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1059-60 (N.D. Cal. 1998) (characterizing as improper, and rejecting, plaintiff's shifting market definitions), *aff'd*, 190 F.3d 974 (9th Cir. 1999).

Meta focused not only its fact discovery – including extensive nonparty discovery – but also its expert discovery and trial strategy on the "all-in" market the FTC defined.  For example, in preparing expert discovery, Meta conducted extensive experiments, sought relevant testimony, and crafted its detailed analyses to combat the FTC's stated position to which it committed under Court order in the interrogatory response.  The FTC did not start to hint at its shift away from that commitment during fact discovery, but it instead waited to serve its voluminous expert reports (and even there the positions were vague and undeveloped).  It would be patently unfair to allow the FTC to change the fundamental nature of this case now.

**3.** ***The FTC's tactics here gain no support from* Whole Foods.**  *Whole Foods* provides no support for a last-minute switch in market definition on the eve of trial.  The case sets out a legal theory that was available to the FTC when it answered Meta's interrogatory, but the FTC *chose* not to pursue that legal theory.  In *Whole Foods*, the FTC sought an expedited proceeding to obtain a preliminary injunction that would block a proposed merger of organic grocery stores under Section 7 of the Clayton Act.  *See* 548 F.3d at 1032.  The district court refused to block the merger, but the D.C. Circuit reversed based on evidence that Whole Foods

could price some (but not all) products above competitive levels where it faced no competition from other "premium, natural, and organic supermarkets" (or "PNOS").  *See id.*

The FTC prevailed in *Whole Foods* because Whole Foods charged a premium for the distinctive products that it offered; only other "premium, natural, and organic supermarkets" or "PNOS" stores effectively constrained Whole Foods' pricing of *those* products.  *See id.* at 1040 (presence of competing PNOS had a "substantial" effect on "margins for perishables" but not dry "groceries"); *id.* (noting that Whole Foods checked pricing on "dry grocery items" but not "perishables").  Judge Brown's opinion thus makes clear that *not* all products sold in premium, natural, and organic *supermarkets* are premium, natural, or organic *products* – Cheerios are Cheerios, whether sold at Whole Foods or Safeway.  Further, the merging parties in that case asked the FTC in an interrogatory to explain only the distinguishing characteristics of grocery stories that supply "premium, natural, and organic" groceries (unlike here where Meta's interrogatory asked the FTC to identify not suppliers but *products* that are in the market).  *Cf.* Jt. Mem. of Points & Authorities of Whole Foods Market, Inc., and Wild Oats Markets, Inc. at 18, *FTC v. Whole Foods Mkt., Inc.*, No. 1:07-cv-01021-PLF (D.D.C. July 27, 2007), ECF No. 141; Mem. Op. & Order at 3, *FTC v. Whole Foods Mkt., Inc.*, No. 1:07-cv-01021-PLF (D.D.C. July 12, 2007), ECF No. 105.

The FTC disclaimed the analogous position here.  Unlike in *Whole Foods*, where the Court's holding rested on the recognition that not all "PNOS" products are "premium, natural, and organic" groceries – the basis of the submarket in that case – the FTC here took the opposite approach.  It *chose* to commit to the position that a video clip on Instagram Reels (Cheerios at Whole Foods) is *not* in the same market as the same video clip on TikTok (Cheerios at Safeway) – and, if it fails to prove that, its market must fail.  If this *Whole Foods* approach was the FTC's

theory here, it was obligated to spell it out when the Court ordered the FTC to respond to Meta's interrogatory. That is, the FTC should have answered the interrogatory by stating that the relevant market was limited to "core" or "friends-and-family sharing" because that – like the organic products in *Whole Foods* – faced no effective competition (according to the FTC). Instead, it represented, clearly, that everything on Facebook and Instagram other than Facebook Dating was indistinguishably part of the relevant product market for "personal social networking."

Put in the terms of *Whole Foods*, the FTC committed to prove that Meta's Cheerios do *not* compete with TikTok's Cheerios, because Meta's Cheerios are part of a "personal social networking" market and TikTok's Cheerios are not. If the FTC can prove this, then let it. But the FTC should not be allowed to escape the box into which it has put itself. Make no mistake – the FTC's new "friends-and-family" market theory is no better than the FTC's committed "all-in" theory. Meta is aware of no evidence that would support any claim that Meta can exploit users engaged in the shrinking scope of friends-and-family sharing. On the contrary, there is ample evidence that competition for other use cases and competition from other "sharing" apps (including iMessage, TikTok, YouTube, and others) constrains Meta as to friends-and-family sharing just as rivals constrain Meta across all use cases. What Meta does submit, respectfully, is that the FTC should not be allowed to play three-card monte with this critically important issue at trial. It should be held to its committed position that the parties fully explored in discovery and prepared to litigate at trial.

The FTC was free to define a different market – indeed, it excluded Facebook Dating from "personal social networking" and could have excluded other features from its market by, for example, responding that watching a Reel from a public source is not "personal social

15

networking." *Cf. FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997) (excluding "capital goods such as computers, fax machines, and other business machines or office furniture" from market for "consumable office supplies [sold] through office superstores"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 123, 127 (D.D.C. 2016) (excluding "ink, toner, and other adjacent BOSS items" from market for "distribution of consumable office supplies to large B-to-B customers"). But the FTC chose to respond to Meta's interrogatory by including all of that time spent in "personal social networking." And having included all features of Facebook and Instagram in the market (except Facebook Dating), the FTC is stuck with defending *that* market – not a different "friends-and-family" market that was not fully explored in discovery.

4.      ***The Court should resolve this issue now, in the interests of fairness and trial efficiency.*** The purpose of pretrial proceedings is to give the parties clarity as to the claims that must be addressed at trial. The FTC should not be permitted to introduce evidence – like Professor Hemphill's "sub-app" market shares or supposed "pro-rated" measures of market shares for friends-and-family sharing. "[A] defendant's market share in a market other than the alleged relevant market is irrelevant," and expert testimony advancing such shares should be excluded. *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1215 (11th Cir. 2002); *see also Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 582 (N.D. Miss. 2004) (excluding expert opinions on "product markets other than those pleaded"), *aff'd in part and remanded*, 459 F.3d 1328 (Fed. Cir. 2006); *cf. Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (affirming order granting motion to dismiss where plaintiff sought to "infer" power in the alleged market from "statistics indicating" that defendant was "an important player" in a different market).

Nor should Professor Hemphill be permitted to support his argument by asserting that Meta "discriminates" against only *some* users of the Facebook and Instagram apps. Leaving aside that Professor Hemphill has no evidence of such discrimination, this claim is irrelevant to the FTC's asserted market definition. To prove the market it has claimed in this case, the FTC will have to prove that users of *all* features included within the relevant market are subject to Meta's monopoly power, i.e., Meta exploits them with supracompetitive prices, output restrictions, or quality levels *below the competitive level. See Meta Platforms*, 2024 WL 4772423, at *8. Any imagined discrimination against a particular use case in support of a submarket simply has no relevance to the market the FTC defined and then committed to under Court order (without any supplement), which acknowledges no such distinctions among the apps' features; it's all "personal social networking" according to the FTC.

II.    **MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL PREVIOUSLY DISMISSED OR ABANDONED CLAIMS AND ALLEGATIONS**

The Court observed, in ruling on Meta's motion to dismiss, that the FTC does not allege that any of Meta's acquisitions or attempted acquisitions – other than the acquisitions of Instagram and WhatsApp – were anticompetitive.  This case was allowed to proceed to trial as to those two acquisitions only.  The FTC has agreed it will not relitigate dismissed claims and allegations about Meta's former Platform policies – agreeing it will not argue or elicit testimony (whether from witnesses, in reference to documents, or in expert opinion) that those policies were or are anticompetitive in design or application, singly or collectively.  But the FTC has refused to take Meta's unchallenged acquisition activity off the table.  Evidence or argument about the supposed anticompetitive nature of other acquisitions or potential acquisitions should be precluded.

A.    **Legal Standard**

Courts regularly exclude argument and evidence regarding dismissed or abandoned claims; they are irrelevant, and their introduction would be a waste of time and resources.  *See, e.g.*, *Rodriguez v. Wash. Metro. Area Transit Auth.*, 2021 WL 7286936, at *1 (D.D.C. Dec. 7, 2021) (Boasberg, J.) (granting motion *in limine* regarding dismissed claims, recognizing that, "[a]s to the rejected counts, many courts have agreed that plaintiffs are barred from raising rejected counts at trial"); Order at 1, *Grzadzinksi v. Garland*, No. 1:20-cv-01411-JEB (D.D.C. Jan. 31, 2023), ECF No. 57 (granting motion *in limine* regarding dismissed claims, noting "there is little controversy there"); *Grzadzinksi v. Garland*, 2023 WL 1815719, at *4 (D.D.C. Feb. 8, 2023) (granting motion *in limine* regarding dismissed claims); *Holmes-Martin v. Sibelius*, 2011 WL 13244746, at *2 (D.D.C. Mar. 3, 2011) (granting motion *in limine* because "the plaintiff has not shown how the evidence pertaining to the dismissed claims is relevant to this case"); *see also*

*Gillis v. Murphy-Brown, LLC*, 2018 WL 5834689, at *1 (E.D.N.C. Nov. 6, 2018) (granting

motion *in limine* because "evidence of dismissed and abandoned claims . . . is not relevant").

    **B.**    **Argument**

    It would be irrelevant and prejudicial for the FTC to introduce evidence or argument as to

the supposedly anticompetitive nature of Meta's acquisitions or potential acquisitions that were

not the subject of discovery in this case. *See* Order at 1, *United States v. Google*, No. 1:20-cv-

03010-APM (D.D.C. Sept. 4, 2023), ECF No. 683 (granting in part Google's motion *in limine*

because "the evidence is not clearly relevant to Plaintiffs' trial claims"); *see also Dixon v.*

*Oklahoma ex rel. Reg'l Univ. Sys. of Oklahoma Bd. of Regents*, 2023 WL 3898736, at *2 (E.D.

Okla. June 8, 2023) (granting motion *in limine* to exclude dismissed claims because such

evidence "lacks probative value, will . . . waste time, and risk unfair prejudice"). The FTC's

preliminary exhibit list is peppered with documents concerning acquisitions other than Instagram

and WhatsApp, including some that Meta considered but did not make (e.g., Snapchat). *See*,

*e.g.*, Ex. 6 (PX02023, FB_FTC_CID_07697415) (chart providing a history of Meta's prior

mergers and acquisitions, including Onavo, tbh, Octazen, Glancee, and EyeGroove); Ex. 7

(PX15158, FTC-META-010713270) (email from Mr. Zuckerberg discussing potential

acquisition of Snapchat); Ex. 8 (PX15159, FB_FTC_CID_08609440) (similar); Ex. 9 (PX15160,

FB_FTC_CID_08609556) (similar); Ex. 10 █████████████████████████

(similar).

    In allowing the FTC to proceed to discovery on its Amended Complaint, the Court stated

that, "while the Amended Complaint references Facebook's acquisitions of companies other than

Instagram and WhatsApp, the agency concedes that it does not allege that those acquisitions each

standing alone violated the antitrust laws." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 53

(D.D.C. 2022) (cleaned up). "The Court therefore focuses on the allegations with regard to the

acquisitions of Instagram and WhatsApp." *Id.* Discovery was accordingly confined to those two acquisitions.

After representing to the Court that other acquisitions and potential acquisitions were not alleged to be anticompetitive, and after declining to pursue any claim otherwise in discovery, the FTC should not be allowed, in fairness, to inject those issues into the case now. The FTC has no expert witness who has opined that these acquisitions or potential acquisitions, separately or collectively, were exclusionary. Accordingly, and for the reasons set forth in the above-cited authorities, any evidence or argument as to acquisitions or potential acquisitions other than Instagram and WhatsApp should be excluded as having "no conceivable bearing on the case." *Id.* at 61.

III.    **MOTION *IN LIMINE* TO PRECLUDE TESTIMONY AND ARGUMENT REGARDING META'S HART-SCOTT-RODINO PRODUCTIONS**

The FTC has no answer for the stark fact that it investigated and cleared both of the acquisitions it now challenges, 11 and 13 years later. The FTC successfully resisted discovery into its investigations. Now the FTC seeks to argue to the Court, after hiding its processes from Meta in discovery, that those processes were flawed because the agency did not have all the documents that it obtained through its recent investigation and discovery in this case. Specifically, the FTC included in its "Proposed Joint Stipulations of Fact" the assertion (at ¶ 67) that, "[i]n the FTC's pre-complaint investigation and in this litigation, Meta produced documents that it did not produce during the FTC's HSR investigations of the Instagram and WhatsApp acquisitions" – and the FTC is on track to make that argument at trial. Ex. 11 (FTC's Second Set of Proposed Joint Stipulations of Fact (Feb. 17, 2025)). This Court should prohibit the FTC from now introducing evidence or making arguments that Meta did not provide the FTC with the documents it sought, or that its analysis of the acquisitions was flawed for lack of such documents. No witness has testified that Meta failed to produce documents that the FTC sought; no witness has testified that the FTC's analyses were flawed or hampered in any way. And Meta was prevented from getting the facts that would show that the FTC had all the relevant information and made the correct decisions in 2012 and 2014, respectively.

A.    **Background**

1.    **Premerger Reviews:  Instagram (2012) and WhatsApp (2014)**

On April 16, 2012, Meta submitted to the FTC a Hart-Scott-Rodino Act ("HSR") Premerger Notification Form for the Instagram transaction. That disclosure included multiple internal documents, including messages from Mr. Zuckerberg that the FTC cites in its Amended Complaint. *See* Ex. 12 at -821 (Attachment 4(c)-9, FTC-PROD-00013821); *see also* Am.

21

Compl. ¶¶ 89-91, ECF No. 82 (quoting this document from Meta's production in 2012).  After that, the FTC issued requests for information, and Meta (and Instagram) made document productions in response.  The FTC then issued a "Second Request" for even more "additional information and documentary materials," and in response Meta produced more than 9,000 additional documents (Instagram produced an additional 10,000).  The FTC also interviewed several Meta executives – including Mr. Zuckerberg – as well as 49 individuals from ███ ████████████ (some of which produced written materials to the FTC).  The FTC never suggested contemporaneously that Meta (or Instagram) failed to comply or cooperate with any part of the HSR review.

On March 13, 2014, Meta submitted to the FTC an HSR Premerger Notification Form for the WhatsApp transaction.  Meta's submission followed its voluntary compliance – including document productions – with the FTC's pre-announcement requests for information and witness interviews.  Over the ensuing weeks, Meta and WhatsApp produced more than 1,000 pages of documents and data to the FTC, including emails from Mr. Zuckerberg and other Meta executives (e.g., Ms. Sandberg and Mr. Olivan).  The FTC conducted an HSR review that involved, among other things, interviewing 16 individuals from ████████████ (some of which produced written materials to the FTC).  The FTC declined to initiate a "Second Request" based on its pre-merger review.  The FTC never suggested that Meta (or WhatsApp) failed to comply or cooperate with any part of the HSR review.

### 2. The FTC's Proposed Joint Stipulations of Fact

The FTC's second set of proposed joint stipulations of fact contains innuendo that somehow Meta did not produce enough documents during the agency's HSR reviews based on parameters to which the FTC agreed.  For example, the FTC suggests (at ¶ 57) that Meta pushed for "a 'Quick Look' review that did not require Meta to certify compliance with the full scope of

the specifications in the Additional Requests." Ex. 11. The FTC goes further (at ¶ 67), accusing Meta of failing to produce documents: "In the FTC's pre-complaint investigation and in this litigation, Meta produced documents that it did not produce during the FTC's HSR investigations of the Instagram and WhatsApp acquisitions." *Id.* Indeed, the FTC points out (at ¶¶ 68, 69) specific documents "that were produced . . . in this litigation, but not in" the HSR reviews. *Id.* Among these are four documents that the FTC has included on its exhibit list: Ex. 13 (PX01127, FB_FTC_CID_06214279), Ex. 14 (PX01180, FB_FTC_CID_02945837), Ex. 15 (PX03370, FTC-META-002493383), and Ex. 16 (PX10446, FTC-META-004296288). The FTC omits, among other things, that Meta sought the FTC's approval for the parameters of its submissions and cooperated with the agency-directed HSR review, including as to search terms, proposed custodians, and more. *See*, *e.g.*, Ex. 17 at -184 (PX05009, FTC-PROD-00016183); Ex. 18 at -185 (PX05010, FTC-PROD-00016185). That is because the HSR Act grants the FTC authority to require submissions "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission . . . to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1).

### B.    Argument

The FTC should not be permitted to offer argument – or attempt to elicit testimony – that Meta did not cooperate fully with the FTC's review of the Instagram acquisition in 2012 or the WhatsApp acquisition in 2014 (including by making the argument that Meta, not the reviewing agency, was somehow leading the process), for two reasons:

*First*, the Court should not allow the FTC to now use its HSR review process as a sword after successfully raising a shield to prevent Meta from taking discovery into that process to assess *why* the FTC decided that both acquisitions could proceed without challenge under the

D.C. Circuit's decision in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam), and the many other cases on the books in 2012 and 2014. *See generally FTC v. Meta Platforms, Inc.*, 2022 WL 4078930 (D.D.C. Sept. 6, 2022). The FTC, having successfully invoked the deliberative-process privilege, cannot now use the issue of its investigation and its thoroughness (or lack thereof) "as a sword and as a shield." *Doe 2 v. Esper*, 2019 WL 4394842, at *6 (D.D.C. Sept. 13, 2019); *see also id.* at *7. Courts "preclud[e] [a party] from presenting evidence at trial on a topic for which it did not provide discovery." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1294 (Fed. Cir. 2023).

Indeed, the FTC is now contradicting its own brief opposing Meta's motion to compel. In opposing Meta's motion, the agency argued that D.C. Circuit case law permitting a party to overcome the deliberative-process privilege applies where "the government itself put its subjective motivation at issue when it argued that a policy . . . was a product of *reasoned* . . . judgment." FTC Opp'n Br. at 11 (July 19, 2022), ECF No. 160 (cleaned up; emphasis added). The FTC is trying to do just that; by arguing that the manner in which it conducted the investigations (e.g., agreeing to certain custodians and search terms in 2012 and 2014) compromised the propriety and accuracy of its own decision-making, the FTC is putting its subjective motivation at issue. Worse, the FTC's opposition brief to Meta's motion to compel repeatedly downplayed the importance of the 2012 and 2014 investigations, "which were based on a min[u]scule fraction of the evidence at the FTC's disposal now." *Id.* at 25. This is a classic sword-shield maneuver; the FTC resisted discovery into the adequacy of its 2012 and 2014 investigations based on the information available to it then, and it now is putting at issue the adequacy of its 2012 and 2014 investigations based on the information available to it then.

*Second*, the assertion that Meta should have produced additional documents is not only baseless but highly prejudicial – the FTC cannot ignore the attention this trial will receive from the public, even as it is tried from the bench, and the inflammatory nature of this speculation. The FTC has provided no evidence that Meta withheld documents or materials the FTC sought or failed to meet its obligations under the HSR rules. Instead, the agency is shirking its responsibility and congressionally endowed authority to control its own review and investigation. In an analogous context, courts regularly grant motions *in limine* to exclude an "assertion of spoliation" that is "unsupported by the record," because the "absence of probative value is out-weighted by [the] prejudice." *Marceline v. Delgado*, 2012 WL 517301, at *1 (D. Conn. Feb. 16, 2012); *see also Smith v. Rosebud Farmstand*, 2015 WL 14070901, at *10 (N.D. Ill. Nov. 24, 2015) ("any argument or inference that Defendants purposefully destroyed relevant evidence would be highly prejudicial"); *A.T.O. Golden Constr. Corp. v. Allied World Ins. Co.*, 2018 WL 5886663, at *5 (S.D. Fla. Nov. 9, 2018) (similar).

There is no evidence that Meta did anything misleading or that it was anything other than a good-faith participant in the FTC's reviews in 2012 and 2014. Nor is there any evidence that the FTC's analyses at the time were flawed or incomplete in any respect. The FTC resisted inquiry into those analyses, no FTC witness was made available for deposition on the analyses, and the FTC litigation lawyers have not even argued that the FTC's considered decisions in 2012 and 2014 were erroneous. The fact of the FTC's discharge of its statutory obligation to investigate, and its decisions to take no action, are the only record evidence that can be considered in this case. The FTC, having thrown a veil over the underlying process, cannot now come to this Court seeking to undermine it as inadequate or flawed.

## IV.    MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING INFLAMMATORY MATTERS

The Court should preclude the FTC from making argument, offering exhibits, or attempting to elicit testimony from fact or expert witnesses concerning highly inflammatory matters that are legally irrelevant to the FTC's antitrust case.  Specifically, this motion seeks exclusion of material about (1) how some third-party users post objectionable content on Facebook, Instagram, and WhatsApp, in violation of Meta's policies and terms of use, and (2) social media's relation to mental health.  The FTC's preliminary exhibit list suggests that the FTC wants to use this trial as a platform to scourge Meta and social media generally.

Any airing of these irrelevant – but inflammatory and prejudicial – grievances would waste valuable trial time and distract from the issues to be decided here.  Meta would be forced to respond to the FTC's materials, which are replete with invalid, inflammatory accusations and do not relate to any antitrust issues.  The FTC has no evidence, none, that these matters have any relation to the acquisitions of Instagram or WhatsApp (the only conduct at issue here), or that Meta's app quality fell below some competitive level.  Trial time is limited; the Court should require the parties to focus on the antitrust issues and prevent the FTC from derailing this trial with a sideshow.

### A.    Background

The conduct still at issue in this antitrust case "deals with only the acquisitions" of Instagram and WhatsApp.  *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 59 (D.D.C. 2022).  Thus, to succeed on the merits, the FTC must show "the acquisitions" – not any other action by Meta – "affected market conditions and competition" in a way that allowed Meta to maintain a monopoly.  *Id.* at 56.  Meta moved for summary judgment on grounds including the lack of evidence that Meta has a monopoly in any market.  Meta pointed out that there is no evidence

that Meta raised prices above the competitive level, restricted output, or reduced quality below the competitive level. *See* Meta Mem. in Support of Mot. for Summary Judgment at 21-31 (Apr. 5, 2024), ECF No. 325-01. As part of that argument, Meta observed that the FTC's allegations that Meta reduced the "quality" of its apps are unsupported by any evidence that Meta reduced "quality" below a competitive benchmark (e.g., there is no evidence that Meta has a "supra-competitive" amount of data collection or offers users privacy below competitive levels). *See* Am. Compl. ¶ 222, ECF No. 82.

The FTC did not contest that point. Instead, it flooded its summary judgment papers with claims, largely based on public press accounts, regarding child exploitation, nudity, how third parties use Meta's platforms to connect with one another in violation of Meta's policies and terms of use, and purported connections between social media platforms and mental health. Included in the FTC's grievances were unsupported and prejudicial accusations regarding █████ ████████████████████████████ – which it later retracted. Specifically, the FTC's initial Memorandum of Law in Opposition to Meta's Motion for Summary Judgment and in Support of the FTC's Cross-Motion for Partial Summary Judgment stated that ████████████ ████████████████████████████████ ECF No. 328-01 at 60 (May 24, 2024). And the FTC's initial Counterstatement of Material Facts stated that █████████ ████████████████████████████ ECF No. 328-03, ¶ 2258 (May 24, 2024). Meta promptly asked the FTC to retract these "false and inflammatory statement[s]." Ex. 19 (████████████████████████████). And the FTC agreed – itself telling evidence of the FTC's willingness to overreach with irrelevant and defamatory accusations.

Now, with its preliminary exhibit list, the FTC is trying again.  Nearly 10% of the documents the FTC seeks to admit are related to "integrity" issues.  And these documents – many of which are out-of-court news reports or third-party "studies" without any sponsoring witness – discuss topics far afield from the antitrust issues in this case.  For example, the FTC apparently wants to introduce at trial a four-hour recording of a congressional hearing during which a Senator stated, "Meta's Instagram helped connect and promote a network of pedophiles. Snapchat's disappearing messages have been co-opted by criminals who financially extort young victims.  TikTok has become a 'platform of choice' for predators to access, engage, and groom children for abuse and the prevalence of CSAM on X has grown as the company has gutted its trust and safety workforce."  Ex. 20 (PX00717, Full Committee Hearing on Big Tech and the Online Child Sexual Exploitation Crisis (Jan. 31, 2024)).  The FTC also included documents regarding ████████████████████████████████ (Ex. 21 (PX03613, FB_FTC_CID_09814202)); ███████████████████ (Ex. 22 (PX10928, FB_FTC_CID_05090799)); and ██████████████ (Ex. 23 (PX12204, FTC-META-003071375)).

The intent to embarrass Meta in this public forum is unmistakable, irrelevant to this case, unfair, and prejudicial.  Meta has approximately 40,000 individuals working on safety and security, and it has invested more than $20 billion towards those efforts since 2016.  Indeed, the National Center for Missing & Exploited Children ("NCMEC") states that Meta "is proactive in detecting child sexual abuse material on its systems" and "remains on the cutting edge by developing tools to protect children and sharing best practices with other online companies."  NCMEC, *Corporate Partners & Foundations*, https://www.missingkids.org/supportus/our-corporate-partners (last visited Feb. 20, 2025).  Furthermore, the FTC's integrity expert,

Dr. Damon McCoy, does not dispute that Meta's integrity efforts comport with industry *best practices*. *See* Ex. 24 ¶ 61 (PX09013, McCoy Rebuttal Rep.) ("With respect to Professor Subrahmanian's claim that Meta 'conforms to industry best practices with regards to integrity,' as Professor Subrahmanian himself notes, I never claimed otherwise.") (footnote omitted).

### B.    Legal Standard

Evidence is admissible if it is relevant, i.e., it must make "the existence of any fact more or less probable than it would be without the evidence." *United States v. Lewis*, 693 F.2d 189, 193 (D.C. Cir. 1982) (cleaned up). "The burden is on the introducing party to establish relevancy as well as admissibility." *Corrigan v. Glover*, 254 F. Supp. 3d 184, 191 (D.D.C. 2017) (citation omitted; cleaned up). "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Courts may also exclude evidence if its probative value is substantially outweighed by "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Courts regularly exclude inflammatory evidence and arguments that have limited or no bearing on the claims or defenses of a party. *See, e.g.*, *Brooks v. Chrysler Corp.*, 786 F.2d 1191, 1198 (D.C. Cir. 1986) (documents containing "highly inflammatory remarks about [corporate defendant]" were unfairly prejudicial). This includes argument that would unnecessarily "require a trial within a trial" and invite substantial delay. *Rodriguez v. Wash. Metro. Area Transit Auth.*, 2021 WL 7286936, at *1 (D.D.C. Dec. 7, 2021) (Boasberg, J.); *see also Thomas v. Duvall*, 2021 WL 5233319, at *3 n.35 (M.D. Pa. Nov. 10, 2021) ("Rule 403 concerns related to wasting time . . . remain applicable in a bench trial.").

C.      **Argument**

1.      **The Court Should Exclude Inflammatory Complaints About Third-Party Users That Misuse Meta's Apps**

This Court should preclude evidence, testimony, questioning, and argument about how a relatively small number of third-party users (out of literally billions who use Facebook, Instagram, and WhatsApp) have tried in the past to violate Meta's policies and terms of use to post objectionable content.  Such evidence is legally irrelevant, highly prejudicial, and threatens to consume trial time for no legitimate purpose.  The mud that the FTC intends to sling at Meta – ranging from congressional hearings regarding child exploitation and CSAM to ███████ ██████████████████████████ – dredges up inflammatory topics in a trial that has nothing to do with those issues.  *See*, *e.g.*, *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) (recognizing that "no evidence could be more inflammatory or more prejudicial than allegations of child molestation").

The evidence is legally irrelevant to any issue in this antitrust case.  Facebook, Instagram, and WhatsApp have billions of users.  A very small percentage attempt to abuse those services to post objectionable content in violation of Meta's policies and terms of use.  A still smaller percentage evade Meta's attempts to prevent or remove such content.  And the FTC has never argued that Meta's efforts to prevent such abuses fall below some competitive benchmark – on the contrary, its expert on "integrity" issues disclaimed any such opinion.  *See* Ex. 25 at 180:4-8 (McCoy Dep. Tr.) (after being asked, "are you aware of any industry standard with regard to integrity," Dr. McCoy replied, "I don't recall identifying any industry standard").

Nor did Meta open the door to these issues.  Among the procompetitive benefits of its acquisitions of Instagram and WhatsApp, Meta identified five integrity-related improvements related to spam reduction, fake accounts, a third-party tool called PhotoDNA, and Meta's content

moderation and review teams.  *See* Ex. 26 at 11-13, Meta's Resp. to FTC's Interrog. No. 10

(Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)).  These

investments (and others) are designed to make it harder for bad actors to abuse Meta's services

and concededly represent quality improvements.  But no one has claimed that the systems are

perfect.  The relevant question for trial is whether Meta's demonstrable quality improvements

were inevitable such that they would have happened without the two acquisitions at issue.

Whether it is possible for some bad actors to evade Meta's policies and terms of use and share

prohibited content on Facebook, Instagram, or WhatsApp has no bearing on whether Meta

succeeded in improving Instagram and WhatsApp.  Indeed, the FTC's own "integrity" expert –

Dr. McCoy – acknowledged that bad actors are inevitable:  "[T]he essential dynamic of integrity

work is ongoing:  it is not something that you ever solve."  Ex. 27 at 11-12 (PX09002, McCoy

Rep.).

Even if individual incidents had tangential relevance to Meta's claims of procompetitive

benefits – and they do not – the prejudice Meta would suffer from the unfair public amplification

of these inflammatory incidents and the delay these mini-trials would invite substantially

outweigh any probative value.  Meta will be forced either to allow individual accusations to go

unrebutted or to devote scarce trial time to addressing the incidents, explaining mitigating facts,

and placing the incidents in their appropriate context.

If the accusations are not rebutted, Meta will suffer prejudice – if not in its defense before

this Court, then in the court of public opinion in this highly public case.  *Cf. United States v.*

*Schuette*, 2023 WL 163490, at *3 (N.D. Cal. Jan. 11, 2023) (excluding analogous material about

child exploitation "given its inflammatory nature").  If Meta engages with each of these

incidents, it will trigger a host of "trial[s] within [the] trial" that will "take up significant time in

what will already be a lengthy and involved trial." *United States v. Moore*, 589 F. Supp. 3d 87, 93 (D.D.C. 2022) (Boasberg, J.). Courts regularly exclude such arguments and evidence. *See*, *e.g.*, *Carroll v. Trump*, 124 F.4th 140, 176-77 (2d Cir. 2024) (per curiam) (finding no abuse of discretion in excluding evidence that would create "a trial within a trial" that would result in "unfair prejudice" and "wasting time"); *White v. United States*, 148 F.3d 787, 792 (7th Cir. 1998) (finding no abuse of discretion in exclusion of eight trial witnesses whose testimony "had the clear potential to develop into a trial within a trial"); *Ricketts v. City of Hartford*, 74 F.3d 1397, 1414 (2d Cir. 1996) (finding no abuse of discretion "in determining that a trial within a trial . . . would have been more confusing than helpfully probative").

### 2. The Court Should Prevent a Mini-Trial About Mental Health and Social Media

The Court also should exclude evidence about any purported connection between mental health and social media. That issue has nothing to do with this antitrust trial. The FTC has never claimed that user mental health would be better if Meta had never acquired Instagram or WhatsApp. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam). Meta has never put mental health at issue. Indeed, the FTC's integrity expert disclaimed any knowledge of a connection between social media and users' mental health. *See* Ex. 25 at 51:5-9 (after he was asked, "Have you done any work that you think could establish a causal link between use of on-line services and user harm," Dr. McCoy replied, "No, I don't believe any of the work establishes that causal link").

Yet the FTC's preliminary exhibit list indicates it plans to put at issue "bullying" on Facebook and Instagram, material related to social media generally and mental health, stories about "███████████████████████████████████████████" and complaints about ███████████████████████████████." Ex. 28 (PX10759, FTC-META-003754814). Without the

Court's intervention, the FTC will pollute the record with accusations that are highly prejudicial, designed to be inflammatory, and utterly unrelated to any of the actual issues in this case.  Any such argument will create "a substantial risk that much time will have to be expended in the exploration of [those] claim[s]" and "the risk of a trial within a trial" (e.g., the science concerning mental health and social media).  *Coles v. Perry*, 217 F.R.D. 1, 10 (D.D.C. 2003).

## V.    MOTION *IN LIMINE* TO EXCLUDE FOREIGN REGULATORY FILINGS

The Court should exclude from trial – and prohibit the FTC from using in examinations (whether through its experts or by eliciting testimony, including on cross) – lawyer-drafted submissions that Meta's *competitors* (e.g., Google, TikTok, and ██████) have made to foreign regulators (e.g., the European Commission and the Australian Competition and Consumer Commission). These voluminous submissions, several of which are included on the FTC's preliminary exhibit list, are inadmissible out-of-court hearsay statements. Moreover, ██████ ████████████████████████████████████████████████████████████, and therefore no witness can discuss or explain them (and show any relevance) at trial. *See* Fed. R. Evid. 602. These submissions ████████████████████████████████████████████████████; they were drafted by lawyers lobbying foreign regulators to take action against their client's competitor, Meta, and/or refrain from taking actions that might be unfavorable to their client, all in markets *other than* the United States.

### A.    Background

The FTC's preliminary exhibit list includes advocacy pieces submitted by Meta's rivals, including submissions made to foreign regulators to encourage them to initiate action against Meta in those foreign jurisdictions under foreign law (demonstrably different from U.S. law in multiple respects). *See* Ex. 29 (PX00546, TikTok's Response to the Australian Competition and Consumer Commission (Sept. 29, 2022)); Ex. 30 (PX13494, Google's Response to the Australian Competition and Consumer Commission (Nov. 18, 2022)); Ex. 31 ████████████ ████████████████, Ex. 32 ████████████████████, Ex. 33 ████████████ ████████████, and Ex. 34 ████████████████████████████ ████████████; Ex. 35 ████████████████████ and Ex. 36 ████████████ ████████████████████████████████████████; Ex. 37

 and Ex. 38 ███████ ██████████████████████████████; and Ex. 39 ██████████████, Ex. 40 ███████████████, and Ex. 41 ████████████████████████████ ██████████████. ████████████████████████████ ██████████████████████████████. *See*, *e.g.*, Ex. 42 █ ████████████████████████████ ██████████████████████; Ex. 43 ███████████ ████████████████████████████ ████████████████████████ ████████.

**B.      Argument**

The Court should exclude these lawyer-crafted advocacy pieces submitted by Meta competitors to foreign regulators.

**1.      *The regulatory filings are inadmissible hearsay.*** The regulatory filings are pure hearsay – out-of-court statements that the FTC intends, apparently, to offer for the truth of the matters asserted. *See* Fed. R. Evid. 801. There are no indicia that any of these filings were prepared in the ordinary course or for any reason other than to lobby foreign regulators to, among other things, take action against Meta under particular foreign laws. Courts regularly exclude hearsay like this in analogous circumstances. *See*, *e.g.*, *Pub. Citizen v. U.S. Dep't of Agric.*, 2022 WL 3139003, at *2-3 (D.D.C. Aug. 5, 2022) (excluding third-party letter submitted to nonparty state agency as inadmissible hearsay); *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (excluding third-party letter to Office of Workers Compensation as hearsay).

2.    ***Competitors with an axe to grind drafted these advocacy statements about enforcement in foreign jurisdictions.***  The obvious bias of the lawyers for Meta's competitors makes these hearsay statements all the more unreliable.  Courts regularly exclude such hearsay in these circumstances.  *See Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 636 F. Supp. 3d 73, 94 (D.D.C. 2022) (excluding documents that "were prepared with a particular client and goal in mind, which raises similar concerns about their trustworthiness"); *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 72 F. Supp. 3d 131, 145 (D.D.C. 2014) (considering circumstances "indicat[ing] a lack of trustworthiness" when excluding document as hearsay).  Competitor-lawyer advocacy against Meta abroad, not subject to meaningful cross-examination, has no place in this trial.

3.    ***Introducing regulatory submissions will waste time and cause delay.***  If the FTC is permitted to cherry-pick soundbites from these voluminous and irrelevant submissions, Meta will be forced to spend time demonstrating why the hearsay statements have no bearing on the issues in this U.S. antitrust case.  Meta will also have to take time pointing to the many statements in these filings that contradict the FTC's arguments.

For example:

- ***TikTok***'s lawyers told foreign regulators that "in relation to social networking . . . it is possible for new entrants to establish themselves relatively quickly and to effectively compete based on the quality and innovation of their product and service offerings, as the recent growth of TikTok has shown."  Ex. 29 at 3, 4.

- ***Google*** told foreign regulators that YouTube "competes vigorously for user attention with . . . Facebook," Ex. 30 at 10, ███████████████████████████████ ███████████████████████████ Ex. 35 ██ .

- ███████████████████████████████████████ ███████████████████████████████████ Ex. 33 ███████████████████████████████████████ ██████████████████████████ .

And so forth.  The many irrelevancies and inconsistencies in the foreign regulatory submissions could themselves be the subject of a long trial, to no useful purpose.  This Court should exclude these submissions to avoid such a sideshow.  *See*, *e.g.*, *ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383, 407 (S.D.N.Y. 1999) ("The probative value of such an exercise is vastly outweighed by the confusion and delay that would inevitably result from conducting a trial within a trial."); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 6072512, at *4 (D. Kan. Dec. 23, 2021) (collecting cases excluding evidence to avoid "collateral mini trials").

VI.    **MOTION *IN LIMINE* TO PRECLUDE PROFESSOR RIM'S SPECULATION ABOUT HOW WHATSAPP MIGHT HAVE DEVELOPED BUT FOR THE ACQUISITION**

The Court should exclude Professor Rim's speculative opinion that he "disagree[s] with Professors Kaplan and Carlton that WhatsApp, absent its acquisition by Meta, was unlikely to develop a social networking offering similar to Facebook" because it is nothing more than argument based on documents and relies on no standard or expertise, much less an accepted methodology used by experts in the relevant field.  This runs afoul of Federal Rule of Evidence 702.  The Court can read admissible documents and make its own determination of their import without coaching from Professor Rim, who adds nothing to this issue as a human highlighter.

A.    **Background**

The FTC did not disclose Professor Rim as an expert witness in support of its case in chief.  It instead disclosed him for rebuttal of opinions that Professor Kaplan offers:

- Opinion 1:  Contrary to the implications in the Kaplan Report, there is no reason to believe that Instagram and WhatsApp were likely to fail at the time of the acquisition.

- Opinion 2:  The Kaplan Report mischaracterizes the likely evolution path which WhatsApp would have taken but for its acquisition by Meta and I disagree with Professors Kaplan and Carlton that WhatsApp, absent its acquisition by Meta, was unlikely to develop a social networking offering similar to Facebook.

Ex. 44 at 10, 37 (PX09014, Rim Rebuttal Rep.) (capitalization modified).

Professor Rim did not disclose any methodology to describe how he reached his rebuttal opinion about WhatsApp.  He does not cite a single textbook, peer-reviewed study, or authority on that issue.  He just offers his own view of case documents he has read.  *See* Ex. 45 at 109:19-110:6 (Rim Dep. Tr.) ("Q. Can you cite to me the footnote or paragraph number in which you refer to any peer-reviewed studies that use the factors you've been discussing in determining whether or not a start-up is likely to be successful? . . . A. I do not think I cited a peer-reviewed paper when I was discussing these three metrics that I mentioned before because as a practitioner

and tech CEO this is my job.").  Professor Rim simply amplifies documents produced by parties

and nonparties in this case – e.g., deposition transcripts from ███████████████████████

███████████████ and documents that ███████████████████████████████ – from

which he highlights excerpts.  In short, he acts as an advocate rather than as an expert providing

additional evidence for the Court to consider.

### B.    Legal Standard

Federal Rule of Evidence 702 permits expert opinion testimony where its proponent

demonstrates, among other requirements, that "it is more likely than not" that the expert's

knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue,"

the testimony is based on "sufficient facts or data," and "the testimony is the product of reliable

principles and methods."  Fed. R. Evid. 702.  Expert testimony should be excluded where the

fact finder is " 'as capable of comprehending the primary facts and of drawing correct

conclusions from them as are witnesses possessed of special or peculiar training.' "  *Salem v.*

*United States Lines Co.*, 370 U.S. 31, 35 (1962) (quoting *United States Smelting Co. v. Parry*,

166 F. 407, 415 (8th Cir. 1909)).

### C.    Argument

Professor Rim's opinion about how WhatsApp might have evolved without Meta is

speculation untethered from any reliable methodology.  Indeed, he discloses none.  The Court

should exclude this testimony for two reasons:

*First*, no methodology *at all* – let alone any scientifically reliable one – underlies

Professor Rim's selective highlighting of documents and deposition testimony.  The absence of

*any* reliable methodology is fatal.  *See, e.g.*, *Arias v. DynCorp*, 928 F. Supp. 2d 10, 23-24

(D.D.C. 2013).  Professor Rim's basis for his opinion about how WhatsApp might have evolved

is that "the evidence shows that a likely evolution path for WhatsApp would have involved

expansion into adjacent uses, e.g., a social networking offering similar to Facebook,"

Ex. 44 at 42, relying *exclusively* on (1) testimony and documents from ████████

████████, *see id.* ¶¶ 107-108; (2) a document from ████████████████████, *see id.*

¶ 109; (3) ████████ documents and related deposition testimony from ████████████

████████, *see id.* ¶¶ 112-118; and (4) "Meta's internal WhatsApp acquisition

documents" comparing WhatsApp to other apps and services that monetized by showing

advertisements, *see id.* ¶¶ 119-125.  That's it.  There is no methodology to that work of simply

excerpting documents and deposition testimony.  For example, Professor Rim conducts no

scientific study of messaging services to determine their propensity – if any – to "pivot" into

broader "personal social networking."  It is just his unscientific *ipse dixit*.

    *Second*, the FTC appears to be proffering this method-less opinion so that Professor Rim

can dump documents into the record without a sponsoring witness.  It has not provided any

witness on its "will call" or even "may call" list who could sponsor many of the documents on

which he bases his opinion.  The FTC could call the relevant witnesses and permit them to testify

about what the documents actually signify.  But the FTC has apparently chosen not to do so –

perhaps because their testimony would not support the conclusions Professor Rim seeks to tease

out of the text.  But the Court does not need Professor Rim to read documents.  The Court is

certainly "competent to consider and weigh the evidence" and "draw the necessary conclusions

therefrom."  *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir.

2016).  The Court can also hear from the witnesses who actually were in command at WhatsApp

during the relevant time period.  It will not need Professor Rim to guess at what they

"presumably knew" or expected.

The FTC's response to all of this will likely be that Professor Rim has relevant industry experience – he was formerly the CEO of Kakao (a South Korean technology conglomerate that competes against Meta's services) and a venture capitalist himself. *See*, *e.g.*, Ex. 44 ¶¶ 6-8, 10, 17. That falls short for two reasons: *First*, "[c]ourts in this district have held that such cursory references to experience, without more, cannot satisfy Rule 702's reliability requirement." *Arsanjani v. United States*, 2023 WL 3231101, at *7 (D.D.C. May 3, 2023) (collecting cases), *aff'd*, 2024 WL 718726 (D.C. Cir. Feb. 20, 2024). Accordingly, "where, as here, the connection drawn by the expert between his experience and conclusions is not just tenuous but never elucidated at all, it would be abdicating the Court's gatekeeping function to find the testimony reliable based only on the expert's perfunctory assurances of his own qualifications and experience." *Id.* *Second*, Professor Rim does not discuss *at all* the experience of Kakao, the technology conglomerate he oversaw and that the FTC will point to as relevant experience here, for one obvious reason: Kakao itself *did not* "pivot" its messaging app (KakaoTalk) into a "social networking service" but instead launched a new and different app (KakaoStory) that Professor Rim claims was its social-network offering. *See* Ex. 45 at 251:4-14; *see also id.* at 10:3-11:2, 292:17-293:15.

Professor Rim's speculation on speculation – what *another* app or venture capitalist might do based on what different founders might subjectively be considering – goes far beyond the ambit of any legitimate expert testimony. His experience as an executive or venture capitalist hardly qualifies him to speculate about what the *owners* of a particular company were likely to do. In so opining, moreover, he simply ignores the contradictory testimony of WhatsApp founder Brian Acton, who testified that WhatsApp was *not* going to do what Professor Rim speculates. That centrally relevant testimony was available to, and simply not considered by, Professor Rim. *See* Ex. 46 at 232:23-234:13 (Acton Dep. Tr.); *Makor Issues & Rts., Ltd. v.*

*Tellabs, Inc.*, 2010 WL 2607241, at *5 (N.D. Ill. June 23, 2010) (excluding expert report related to defendant's financial forecasts in part because expert "did not read any testimony about how [defendant] prepared its forecast" and "did not even read the deposition transcript" of the head of defendant's forecasting division).  An expert witness who ignores the case facts cannot be allowed to testify because his opinions do not fit the relevant facts.  *See*, *e.g.*, *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 89 (D.D.C. 2012) (facts and data relied upon by expert were "patently insufficient" where expert "read only an apparently haphazard selection of defendant's sources"); *see also United States v. Libby*, 461 F. Supp. 2d 3, 6-7 (D.D.C. 2006) (discussing standard for "fit" requirement).  The Court should therefore exclude Professor Rim's testimony.

**VII.    MOTION *IN LIMINE* TO PRECLUDE PROFESSOR HEMPHILL'S MISUSE OF CONSUMER SURVEYS TO DERIVE "MARKET SHARES"**

The Court should exclude the proffered opinion of Professor Hemphill – the FTC's principal economist – that consumer surveys, including the one conducted by Michal Malkiewicz (whom the FTC proffers as a survey expert), can be used to determine Meta's supposed market share.  Professor Hemphill's use of Mr. Malkiewicz's survey (and others) is contrary to fundamental principles of survey use in litigation and expressly *disclaimed* by Mr. Malkiewicz himself.  This contortion of these surveys (without any reliable methodology) will therefore provide no help to the Court and should be excluded as junk science.

**A.    Background**

Mr. Malkiewicz conducted a survey to examine "consumers' usage of and attitudes towards Meta's services and other online services."  Ex. 47 ¶ 8 (PX09006, Malkiewicz Rep.).  Respondents were provided a limited list of services and were then asked, among other questions, "the most important reason" for using each service.  *See id.* at Sched. 3.2.  Respondents were further given a limited list of "most important reasons" from which to choose.  Among such reasons was one that focused on sharing with "friends and family":  "To keep up with my friends' and family's lives in one place (e.g., seeing life updates from friends or family, sharing life updates, etc.)."  *See id.*  Mr. Malkiewicz reported that respondents selected this reason for Facebook, Instagram, Snapchat, and MeWe "more than any other reason."  *See id.* ¶ 11.  His survey results also show that respondents selected this same reason for more than a dozen other apps, including TikTok, YouTube, and iMessage.

Professor Hemphill, in his final report, used this data to defend a portion of his market power opinion:  "Even if one were to credit reporting of incidental friend-related usage on these non-PSN apps in the Malkiewicz survey or other surveys as competitively significant, a proration

of my shares based on the reported uses that relate to friends and family sharing still shows Meta with a dominant share."  Ex. 48 ¶ 480 (PX09007, Hemphill Rebuttal Rep.).  "For this exercise, I multiply [daily active users ('DAU'), monthly active users ('MAU')], and time spent by the share of users who report using the [user-generated content] app for PSN purposes (e.g., 'To keep up with my friends' and family's lives in one place (e.g., seeing life updates from friends or family, sharing life updates, etc.)')."  *Id.* ¶ 481.  Professor Hemphill performed the same analysis using "other surveys which report results for a sufficient number of these apps" that Meta or nonparties produced in discovery.  *Id.*

Professor Hemphill purported to show his work in a series of exhibits – *see id.* at App'x Exs. 14-17 – that claim to measure "PSN Services Market Shares Including Incidental Friend-Related Activity on Non-PSN Apps."  It appears that he assumed if 5.5% of survey respondents gave "keep up with my friends' and family's lives" as the "most important" reason for using Twitter, then 5.5% of Twitter's actual MAUs, DAUs, and time spent must be for friends-and-family sharing.  He did this for 11 different apps and then recomputed market shares for MAUs, DAUs, and time spent on the assumption that he had measured "incidental" friends-and-family time spent on these non-Meta apps (and that measuring friends-and-family sharing is even the proper market, discussed *supra* in Meta's first motion *in limine*).  Professor Hemphill then repeated this exercise with three other surveys, which similarly asked, respectively, about the "main reason for using" an app, *id.* at App'x Ex. 15, the "primary reason for using" an app, *id.* at App'x Ex. 16, and for "a purpose for using" an app, *id.* at App'x Ex. 17.

## B.    Legal Standard

Federal Rule of Evidence 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue."  This requires both that the testimony's methodology be reliable and that the testimony adequately "fit" the factual issue for which it is

proffered.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *see also Wing Enters., Inc. v. Tricam Indus., Inc.*, 829 F. App'x 508, 515-16 (Fed. Cir. 2020).  For expert surveys, a "report describing the results of a survey should include a statement describing the purpose or purposes of the survey," and "the content and execution of a survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court."  Shari Seidman Diamond, "Reference Guide on Survey Research," *in* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 359, 373 (3d ed. 2011) ("Diamond"); *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-31 & n.102 (S.D.N.Y. 2010) (describing "Diamond on Survey Research" as providing the "criteria" a court should use to "assess the validity and reliability of a survey" in the context of a *Daubert* motion); *Estes Park Taffy Co. v. Original Taffy Shop, Inc.*, 2017 WL 2472149, at *1 n.2 (D. Colo. June 8, 2017) (similar).

### C.    Argument

Professor Hemphill's reliance on Mr. Malkiewicz's survey (and three others) to calculate market shares is unreliable and should be excluded.  It will provide no utility to the Court in assessing market shares.  No science or accepted methodology supports the assertion that 40% of consumers selecting friends-and-family sharing as the *most important* use of an app – not what they spend the most time doing – somehow means that 40% of the time spent on the app should "count" for PSNS market share.  Mr. Malkiewicz himself rejected this application of his survey results:

- He testified, "this is the first time I'm seeing the table" – in which Professor Hemphill used the Malkiewicz survey to "calculate" shares – and that it looked like "adjusting the results of my survey by the various – what I understand to be actually time spent metrics."  Ex. 49 at 82:21-83:6 (Malkiewicz Dep. Tr.).

- And he added about how Professor Hemphill had used it:  "If you're asking about was it my initial intent, that's – I do not recall that being part of my assignment.  So I wouldn't likely have thought about it explicitly."  *Id.* at 83:22-84:8.

Accordingly, *Mr. Malkiewicz* was surprised when shown how Professor Hemphill had used the Malkiewicz survey. *See also* Ex. 5 at 73:15-74:8 (another FTC expert explaining that "spending time with my mother is an important thing to do, but I don't spend as much time doing that as I might do something else").

That itself betrays an unreliable methodology that warrants excluding this use of the survey. *See* Diamond at 373 ("The report describing the results of a survey should include a statement describing the purpose or purposes of the survey. One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy (e.g., to estimate damages in an antitrust suit or to assess consumer confusion in a trademark case)."); *see also* Ex. 47 ¶ 7 (stating that he consulted Professor Diamond for "this engagement," describing her as "an empirical researcher on the use of science by courts" and author of the *Reference Guide on Survey Research* in the *Reference Manual on Scientific Evidence*, which "assists judges in managing cases involving complex scientific and technical evidence").

Mr. Malkiewicz agreed that his "survey didn't actually determine the amount of time spent keeping up with friends and family on any Internet service," in "the context of actual usage." Ex. 49 at 84:10-14. Further, Mr. Malkiewicz reported that he "never set out to measure economic substitution" with his survey, Ex. 50 ¶ 99 (PX09012, Malkiewicz Rebuttal Rep.), testifying that measuring "economic substitution . . . was not part of [his] assignment," Ex. 49 at 73:3-10. He also confirmed that he did "not calculate the amount of time spent for each use" by respondents, *id*. at 85:10-20, or "review any datasets" showing how users actually spend their time on Meta's or other apps, *id*. at 93:16-19.

Professor Hemphill's use of the other three surveys for the same exercise fares no better. Two of those surveys asked respondents what the "main" or "primary" reason was for using

various apps, and Professor Hemphill again simply multiplied DAU, MAU, and time spent by the percentage of survey respondents who selected "[c]onnecting with family and close friends" or "to stay connected to friends and family" to derive market shares. *See* Ex. 48 at App'x Exs. 15-16. As with the Malkiewicz survey, no science or accepted methodology supports the assertion that the percentage of consumers selecting friends-and-family sharing as the main reason for using an app is somehow the same as that same percentage of time spent on that app counting toward market share. The other survey Professor Hemphill uses for this purpose is even less related to market shares here: Professor Hemphill multiplied DAU, MAU, and time spent by the percentage of respondents who selected "[t]o keep contact with friends and family" as "*a* purpose for using a given app." *Id.* at App'x Ex. 17 (emphasis added).

Courts routinely exclude opinions that misuse surveys. *See*, *e.g.*, *United States v. AT & T Inc.*, 310 F. Supp. 3d 161, 233 (D.D.C. 2018) (rejecting opinion that attempted to correlate survey responses to specific loss rates), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 70 (D.D.C. 2011) (rejecting proffered survey evidence because broad question about satisfaction with product "does not come much closer to identifying diversion ratios"). For example, in *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489 (Fed. Cir. 2019), the Federal Circuit affirmed exclusion of a "customer-use" survey in a patent-infringement case – proffered as "evidence that Microsoft customers use Windows Server to directly infringe the claims" – because "the survey results do not provide enough information to determine whether any respondent performed each step of the claimed methods." *Id.* at 492-93.

Here, the surveys that Professor Hemphill uses to "prorate" market shares provide no information (and ask for none) about how much time consumers spend performing any use case

on the apps and services at issue.  *See*, *e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 2018 WL 1586276, at *22 (N.D. Cal. Apr. 2, 2018) (rejecting expert's attempt to correlate survey regarding customers' reasons for choosing a phone with profits from particular phone features, including because "the percent of consumers that chooses any given feature as the most important factor in their purchasing decision could vary widely based on the number of features surveyed"); *see also Radware, Ltd. v. F5 Networks, Inc.*, 147 F. Supp. 3d 974, 1015 (N.D. Cal. 2015) ("A survey showing that 12% of people found a feature important is not, standing alone, proof that the feature drove those individuals' purchases.").  Nothing in Professor Hemphill's report explains his basis for applying the results of consumer surveys as he did.  He cites no scientific literature, peer-reviewed work, or industry examples to support deploying a consumer survey about what use of an app is most important to determine market share measured by time spent, daily users, monthly users, or anything else.

*      *      *

For the foregoing reasons, the Court should not permit Professor Hemphill to use the Malkiewicz survey – or other surveys that Meta or nonparties produced in discovery – to "prorate" market shares by purporting to measure friends-and-family usage.

Dated: February 21, 2025                    Respectfully submitted,

                                            */s/ Mark C. Hansen*
                                            Mark C. Hansen (D.C. Bar No. 425930)
                                            Aaron M. Panner (D.C. Bar No. 453608)
                                            Geoffrey M. Klineberg (D.C. Bar No. 444503)
                                            Leslie V. Pope (D.C. Bar No. 1014920)
                                            Geoffrey J.H. Block (D.C. Bar No. 90011578)
                                            Zachary M. Meskell (D.C. Bar No. 1782162)*
                                            Diego Negrón-Reichard (D.C. Bar No. 90020200)*
                                            KELLOGG, HANSEN, TODD,
                                              FIGEL & FREDERICK, P.L.L.C.
                                            1615 M Street, N.W., Suite 400
                                            Washington, D.C. 20036
                                            Tel: (202) 326-7900
                                            mhansen@kellogghansen.com

                                            *Counsel for Defendant Meta Platforms, Inc.*

                                            * Application for admission to the Bar of the U.S.
                                            District Court for the District of Columbia pending.