# Exhibit A

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Federal Trade Commission | ) |
| *Plaintiff* | ) |
| v. | ) |
| Meta Platforms, Inc. | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.    1:20-cv-03590-JEB

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:     TikTok Inc. c/o Craig M. Reiser, Esq.
        Axinn, Veltrop & Harkrider LLP, 114 West 47th Street, New York, NY 10036

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: | Remote Deposition or alternatively at: Federal Trade Commission 10990 Wilshire Blvd.,Suite 400, Los Angeles, CA 90024 | Date and Time: 04/20/2023 9:00 am |
|---|---|---|

The deposition will be recorded by this method:     stenographic means

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     04/10/2023

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Maggie DiMoscato |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Plaintiff
Federal Trade Commission
                                                        , who issues or requests this subpoena, are:
Maggie DiMoscato, 400 7th St. SW, Washington, DC 20024, mdimoscato@ftc.gov, (202) 326-2315

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

PX13604-001

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:20-cv-03590-JEB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 1:20-cv-03590-JEB

**NOTICE OF DEPOSITION**

Pursuant to Federal Rule of Civil Procedure 30(b)(6), notice is hereby given that Plaintiff Federal

Trade Commission will conduct a deposition of TikTok Inc., at the following date, time, and

location:

| Date: April 20, 2023<br>Time: 9:00 am PT | Location: By remote means or alternatively at:<br>Federal Trade Commission |
|---|---|

The deposition will be recorded by stenographic means. Pursuant to Federal Rule of Civil

Procedure 30(b)(6), TikTok Inc. is required to designate one or more officers, directors, managing

agents, employees or other persons to testify on its behalf on the subjects set forth in Attachment

A. The deposition will continue day to day until completed.

Dated: April 10, 2023

Respectfully submitted,

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria Dimoscato (D.C. Bar 489743)
Michael Smith (D.C. Bar 996738)
Albert Teng (D.C. Bar 1021115)
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Abby L. Dennis (D.C. Bar 994476)

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

PX13604-005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2023, I caused true and correct copies of the foregoing Notice of Deposition to be served via electronic mail on counsel listed below:

TikTok Inc.
c/o Craig M. Reiser, Esq.
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036
creiser@axinn.com


*/s/ Maggie DiMoscato*
Maggie DiMoscato
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2315

*Attorney for Plaintiff*
*Federal Trade Commission*

PX13604-006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**FEDERAL TRADE COMMISSION**,

Plaintiff,

v.

**META PLATFORMS, INC.**,

Defendant.

Civil Action No. 1:20-cv-03590 (JEB)

---

**ATTACHMENT A TO PLAINTIFF'S SUBPOENA TO TESTIFY AT A DEPOSITION
ISSUED TO TIKTOK INC.**

1. For the Company's Relevant Product(s):

    a.  the features, functionalities, and use cases;

    b.  business model(s), including actual and contemplated efforts to generate revenue and pricing;

    c.  time period during which the Company provided or sold the Relevant Product(s);

    d.  how many users use the Relevant Product and the demographics of those users; and

    e.  performance, including the level of user engagement, and the technical performance of the Relevant Product(s), including any technical challenges (e.g., crashes, bugs, latency).

2. Competition in the provision or sale of the Company's Relevant Product(s), including, but not limited to, the competitive position of the Company and competition relating to quality (e.g., advertising load, privacy, and data protection), user engagement, service, and features.

3. Whether the Company provides or sells Personal Social Networking Services, as defined in the Federal Trade Commission's amended complaint in this litigation; actual or attempted entry or expansion in the provision or sale of Personal Social Networking Services; and barriers to entry or expansion in the provision or sale of Personal Social Networking Services.

1

4. The effect of advertising on users of the Company's Relevant Product(s), including, but not limited to:

    a. how the amount (including advertising load), quality, or relevance of advertising displayed to users affects user activity, engagement, or growth; and

    b. the level of advertising load of any Relevant Product provided or sold by the Company.

5. The Company's actions and strategies to block, remove, or otherwise mitigate Objectionable Content on any of its Relevant Products, as well as the effectiveness of such actions and strategies.

6. The Computing Architecture that the Company uses to operate the Relevant Product(s), including the Company's rationale for, costs of, and efforts to reduce the cost of using its Computing Architecture.

7. The Company's provision of Digital Advertising Services, including the features, functionalities, and performance of the Company's Digital Advertising Services, and the time period during which the Company provided each such service.

8. Competition in the provision or sale of Digital Advertising Services, including, but not limited to, the competitive position of the Company and competition relating to advertising quality or performance (e.g., advertiser return on investment, conversion rate, lead quality, and click-through rate), and barriers to entry or expansion into the provision or sale of Digital Advertising Services.

9. How the Company operates its Digital Advertising Services, including the methods or means by which the Company developed the services, how the Company sells and serves advertisements, the sources of data used to target or track advertisements, the Computing Architecture that the Company uses to provide the services, and how the Company handles any other major component of running the Company's advertising business.

10. The Company's communications with Meta relating to this litigation.

11. All topics listed in the Deposition Topics enumerated in the Subpoena to Testify at a Deposition in a Civil Action issued by Defendant in this litigation to the Company on or about February 6, 2023.

12. 

2



PX13604-009

## INSTRUCTIONS

A.  Any subject set forth in the disjunctive shall also be read as if it is propounded in the conjunctive, and vice versa.  Any request propounded in the masculine gender shall also be read as if propounded in the feminine and neuter gender, and vice versa.  Any subject set forth in the singular shall also be read as if propounded in the plural, and vice versa. Any subject set forth in the present tense shall also be read as if propounded in the past tense, and vice versa.

B.  If you object to any subject in whole or in part on the basis of privilege, set forth the subject matter that will be withheld and the nature of the privilege claimed.

C.  If you refuse to provide a designation based in whole or in part on the grounds of burdensomeness, describe in detail the burden imposed and the effort that would be required to provide information responsive to the request.

D.  Unless otherwise specified, the timeframe of these deposition topics is from January 1, 2010 to the present.

4

PX13604-010

# DEFINITIONS

For purposes of this Subpoena, the following definitions apply:

A. The terms "and" and "or" have both conjunctive and disjunctive meanings.

B. "Company" means TikTok Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial or total ownership or control between the Company and any other Person.

C. "Computing Architecture" means the hardware and software components used by the Company to meet its information technology needs, and can include on-premises data centers; leased data centers; co-located data centers; services offered by Amazon Web Services, Google Cloud Platform, Microsoft Azure; content delivery networks; servers (physical and virtual); networking; applications; and database software.

D. "Digital Advertising Services" means the provision or sale of any type of online advertising, including search advertising, display advertising, social advertising, or any other form of advertising displayed online through an app or website.

E. "Mobile Messaging" means messaging via short-message-service or multimedia-message-service protocols, and messaging via internet-based, over-the-top apps.

F. "Person" includes the Company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

G. "Personal Social Networking Services" or "PSNS" means online services that enable and are used by people to maintain personal relationships and share experiences (e.g., personal updates, interests, photos, news, videos) with friends, family, and other personal connections in a shared social space (e.g., in a one-to-many broadcast feed).

H. "Other Online Services" means online services, other than PSNS, that enable the sharing or consumption of content, and includes Mobile Messaging services, specialized social networking services, interest-based networking services, and content consumption services.

I. "Relevant Product" means (1) PSNS and (2) Other Online Services. For the avoidance of doubt, "Relevant Product" includes, but is not limited to, services offered to users by Facebook Blue, Facebook Messenger, Instagram, WhatsApp, Friendster, Google+, LinkedIn, MeWe, Myspace, Nextdoor, Orkut, Path, Pinterest, Reddit, Snapchat, Strava, TikTok, Twitter, and YouTube.

J. The terms "subsidiary," "affiliate," and "joint venture" refer to any person in which there is partial (25% or more) or total ownership or control between a person and any other person.

5

K.   The term "this litigation" means the federal court proceeding (*Federal Trade Commission, et al., v. Meta Platforms, Inc.*, Civil Action No. 20-cv-03590-JEB) filed in the District Court for the District of Columbia.

Please call Maggie DiMoscato at (202) 326-2315 with any questions relating to the scope or meaning of this subpoena.

PX13604-012

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of April, 2023, I served the foregoing on the following entity via electronic mail:

TikTok Inc.
c/o Craig Reiser
114 West 47th Street,
New York, NY 10036

Dated:  April 10, 2023                     /s/ Maggie DiMoscato
                                            Attorney

7

PX13604-013

# Exhibit B

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Federal Trade Commission | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:20-cv-03590-JEB |
| Meta Platforms, Inc. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:          Pinterest, Inc. c/o Peter Mucchetti, Esq.
          Clifford Chance LLP, 2001 K Street NW, Washington, D.C 20006
*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Remote Deposition | Date and Time: |
|---|---|
| Federal Trade Commission 90 7th Street, Suite 14-300, San Francisco, CA 94103 | 04/14/2023 9:00 am |

The deposition will be recorded by this method: ___stenographic means___

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  ___02/07/2023___

          *CLERK OF COURT*

                              OR

          _____          ___/s/ Mitchell London___
          *Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  ___Plaintiff___
Federal Trade Commission                              , who issues or requests this subpoena, are:
Mitchell London, 400 7th St. NW, Washington, DC 20024, glondon@ftc.gov, (202) 326-2451

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

PX12626-001

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:20-cv-03590-JEB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

PX12626-002

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 1:20-cv-03590-JEB

## <u>NOTICE OF DEPOSITION</u>

Pursuant to Federal Rule of Civil Procedure 30(b)(6), notice is hereby given that Plaintiff Federal

Trade Commission will conduct a deposition of Pinterest, Inc., at the following date, time, and

location:

| Date: April 14, 2023<br>Time: 9:00 am PT | Location: By remote means or alternatively at:<br>Federal Trade Commission<br>90 7th Street, Suite 14-300, San Francisco, CA<br>94103 |
|---|---|

The deposition will be recorded by stenographic means. Pursuant to Federal Rule of Civil

Procedure 30(b)(6), Pinterest, Inc. is required to designate one or more officers, directors,

managing agents, employees or other persons to testify on its behalf on the subjects set forth in

Attachment A. The deposition will continue day to day until completed.

Dated: February 7, 2023

Respectfully submitted,

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria Dimoscato (D.C. Bar 489743)
Michael Smith (D.C. Bar 996738)
Albert Teng (D.C. Bar 1021115)
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Abby L. Dennis (D.C. Bar 994476)

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

2

PX12626-005

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2023, I caused true and correct copies of the foregoing Notice of Deposition to be served via electronic mail on counsel listed below:

Pinterest, Inc.
c/o Peter Mucchetti, Esq.
Clifford Chance LLP
2001 K Street, NW
Washington, D.C 20006
peter.mucchetti@cliffordchance.com

*/s/ Mitchell London*
Mitchell London
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2451

*Attorney for Plaintiff*
*Federal Trade Commission*

PX12626-006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | |
| Plaintiff, | |
| v. | Civil Action No. 1:20-cv-03590 (JEB) |
| **META PLATFORMS, INC.**, | |
| Defendant. | |

**ATTACHMENT A TO PLAINTIFF'S SUBPOENA TO TESTIFY AT A DEPOSITION
ISSUED TO PINTEREST INC.**

**REQUESTS**

1. All Topics for Examination enumerated in Schedule A of the Subpoena to Testify at a Deposition in a Civil Action issued by the Defendant to the Company on or about January 25, 2022.

2. For the Company's Relevant Product(s):

    a. the features, functionalities, and use cases;

    b. business model(s), including actual and contemplated efforts to generate revenue and pricing;

    c. time period during which the Company provided or sold the Relevant Product(s);

    d. how many users use the Relevant Product and the demographics of those users; and

    e. performance, including the level of user engagement, and the technical performance of the Relevant Product(s), including any technical challenges (e.g., crashes, bugs, latency).

3. Competition in the provision or sale of the Company's Relevant Product(s), including, but not limited to, the competitive position of the Company and competition relating to quality (e.g., advertising load, privacy, and data protection), user engagement, service, and features.

1

4. Whether the Company provides or sells Personal Social Networking Services, as defined in the Federal Trade Commission's amended complaint in this litigation; actual or attempted entry or expansion in the provision or sale of Personal Social Networking Services; and barriers to entry or expansion in the provision or sale of Personal Social Networking Services. This topic includes, but is not limited to, characterizations of Pinterest's relevant products included in the following Documents:



5. The effect of advertising on users of the Company's Relevant Product(s), including, but not limited to:

   a. how the amount (including advertising load), quality, or relevance of advertising displayed to users affects user activity, engagement, or growth; and

   b. the level of advertising load of any Relevant Product provided or sold by the Company.

6. The Company's actions and strategies to block, remove, or otherwise mitigate Objectionable Content on any of its Relevant Products, as well as the effectiveness of such actions and strategies.

7. The Computing Architecture that the Company uses to operate the Relevant Product(s), including the Company's rationale for, costs of, and efforts to reduce the cost of using its Computing Architecture.

8. The Company's provision of Digital Advertising Services, including the features, functionalities, and performance of the Company's Digital Advertising Services, and the time period during which the Company provided each such service.

9. Competition in the provision or sale of Digital Advertising Services, including, but not limited to, the competitive position of the Company and competition relating to advertising quality or performance (e.g., advertiser return on investment, conversion rate, lead quality, and click-through rate), and barriers to entry or expansion into the provision or sale of Digital Advertising Services.

10. How the Company operates its Digital Advertising Services, including the methods or means by which the Company developed the services, how the Company sells and serves advertisements, the sources of data used to target or track advertisements, the Computing Architecture that the Company uses to provide the services, and how the Company handles any other major component of running the Company's advertising business.

2

PX12626-008

11. The Company's communications with Meta relating to this litigation.

PX12626-009

## INSTRUCTIONS

A. Any subject set forth in the disjunctive shall also be read as if it is propounded in the conjunctive, and vice versa.  Any request propounded in the masculine gender shall also be read as if propounded in the feminine and neuter gender, and vice versa.  Any subject set forth in the singular shall also be read as if propounded in the plural, and vice versa. Any subject set forth in the present tense shall also be read as if propounded in the past tense, and vice versa.

B. If you object to any subject in whole or in part on the basis of privilege, set forth the subject matter that will be withheld and the nature of the privilege claimed.

C. If you refuse to provide a designation based in whole or in part on the grounds of burdensomeness, describe in detail the burden imposed and the effort that would be required to provide information responsive to the request.

D. Unless otherwise specified, the timeframe of these deposition topics is from January 1, 2010 to the present.

4

PX12626-010

## DEFINITIONS

For purposes of this Subpoena, the following definitions apply:

A. The terms "and" and "or" have both conjunctive and disjunctive meanings.

B. "Company" means Pinterest Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial or total ownership or control between the Company and any other Person.

C. "Computing Architecture" means the hardware and software components used by the Company to meet its information technology needs, and can include on-premises data centers; leased data centers; co-located data centers; services offered by Amazon Web Services, Google Cloud Platform, Microsoft Azure; content delivery networks; servers (physical and virtual); networking; applications; and database software.

D. "Digital Advertising Services" means the provision or sale of any type of online advertising, including search advertising, display advertising, social advertising, or any other form of advertising displayed online through an app or website.

E. "Mobile Messaging" means messaging via short-message-service or multimedia-message-service protocols, and messaging via internet-based, over-the-top apps.

F. "Person" includes the Company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

G. "Personal Social Networking Services" or "PSNS" means online services that enable and are used by people to maintain personal relationships and share experiences (e.g., personal updates, interests, photos, news, videos) with friends, family, and other personal connections in a shared social space (e.g., in a one-to-many broadcast feed).

H. "Other Online Services" means online services, other than PSNS, that enable the sharing or consumption of content, and includes Mobile Messaging services, specialized social networking services, interest-based networking services, and content consumption services.

I. "Price" or "pricing," includes price, gross price, net price, average price, unit price, effective price, dead net price, rebate, package price, bundled price, discount, credit, charge or chargeback, allowance, debit, or any other payment or receipt of anything of value incurred in whole or in part as a result of the sale or provision of the applicable product.

J. "Relevant Product" means (1) PSNS and (2) Other Online Services. For the avoidance of doubt, "Relevant Product" includes, but is not limited to, services offered to users by Facebook Blue, Facebook Messenger, Instagram, WhatsApp, Friendster, Google+,

PX12626-011

LinkedIn, MeWe, Myspace, Nextdoor, Orkut, Path, Pinterest, Reddit, Snapchat, Strava, TikTok, Twitter, and YouTube.

K.  The terms "subsidiary," "affiliate," and "joint venture" refer to any person in which there is partial (25% or more) or total ownership or control between a person and any other person.

L.  The term "this litigation" means the federal court proceeding (*Federal Trade Commission, et al., v. Meta Platforms, Inc.*, Civil Action No. 20-cv-03590-JEB) filed in the District Court for the District of Columbia.

Please call Mitchell London at (202) 326-2415 with any questions relating to the scope or meaning of this subpoena.

6

PX12626-012

# Exhibit C

**Filed Under Seal**

# Exhibit D

**Filed Under Seal**

# Exhibit E

**Filed Under Seal**

# Exhibit F

**Filed Under Seal**

# Exhibit G

**Filed Under Seal**

# Exhibit H

**Filed Under Seal**

# Exhibit I

**Filed Under Seal**

# Exhibit J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED,<br><br>Defendant. | Case No. 17-CV-00220-LHK<br><br>**ORDER DENYING MOTION TO QUASH TRIAL SUBPOENA**<br><br>Re: Dkt. No. 1041 |

Before the Court is a motion to quash the trial subpoena served on Christopher Johnson ("Johnson"). ECF No. 1041 ("Mot."). The Court DENIES the motion.

## I. BACKGROUND

On January 26, 2018, Qualcomm served a Rule 30(b)(6) subpoena on Bain & Co. ("Bain"). Mot., Ex. 3. Bain provided management consulting services to third party Intel Co. ("Intel"). Mot. at 2. The subpoena sought information related to Bain's understanding and analysis of Intel's competition with Qualcomm. Mot. at 2. On February 23, 2018, Bain moved to quash the rule 30(b)(6) subpoena arguing, *inter alia*, that it imposed a substantial burden on Bain and that it improperly sought expert testimony from Bain. ECF No. 588. After a hearing, Magistrate Judge Cousins granted the motion in part, allowing the Rule 30(b)(6) deposition, but narrowing the

Case No. 17-CV-00220-LHK
ORDER DENYING MOTION TO QUASH TRIAL SUBPOENA

United States District Court
Northern District of California

scope of topics to be addressed and limiting the duration of the deposition to three hours. ECF No. 597. On March 28, 2018, Johnson testified as Bain's 30(b)(6) representative.

On December 4, 2018, Qualcomm served a trial subpoena on Johnson. Mot., Ex. 4. On December 21, 2018, Bain and Johnson filed the motion to quash the subpoena. ECF No. 1041. On December 31, 2018, Qualcomm filed its opposition. ECF No. 1060. On January 2, 2019, Bain filed its reply. ECF No. 1069.

## II.     DISCUSSION

### A. Hearsay

Bain contends that Johnson's testimony would be inadmissible hearsay. However, Bain acknowledges that Johnson "worked on projects for Bain's client Intel . . . from 2010 until mid-2011, and again beginning 2015." Mot. at 5. Bain cites no authority for its argument that "his knowledge would be inevitably comingled with his extensive Rule 30(b)(6) preparation." Mot. at 7. Accordingly, the Court finds that Johnson has personal knowledge as to testimony regarding his own work at Bain. This is a sufficient reason to reject Bain's argument that any testimony would be impermissible hearsay.

Moreover, one of the key cases relied upon by Bain is *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416 (5th Cir. 2006). However, *Brazos River Auth.* holds that "if a rule 30(b)(6) witness is made available at trial, he should be allowed to testify as to matters within corporate knowledge to which he testified in deposition." *Id.* at 435. Similarly, the Court agrees that Johnson should be allowed to testify as to the matters to which he testified in his Rule 30(b)(6) deposition.

Accordingly, the Court concludes that Johnson's alleged lack of personal knowledge does not preclude Johnson from testifying to matters within Bain's corporate knowledge to which Johnson has already testified, including Bain's analysis of Intel's competition with Qualcomm and Bain's analysis of the relevant research output of Intel and Qualcomm. The Court finds that this testimony is relevant to the Court's analysis of whether Qualcomm's conduct had an anticompetitive effect by suppressing research activities of its competitors. However, this does not eliminate the restrictions of the hearsay rule. As explained by some of the cases upon which Bain

Case No. 17-CV-00220-LHK
ORDER DENYING MOTION TO QUASH TRIAL SUBPOENA

United States District Court
Northern District of California

relies, Johnson may not testify to any material that constitutes hearsay not falling within one of the authorized exceptions. *See Brazos River Auth.*, 469 F.3d at 435. Moreover, any appropriate objections may be asserted at trial.

### B. Lay Testimony

Bain contends that Johnson's testimony would be inadmissible as lay testimony and that Qualcomm seeks to improperly obtain unretained expert testimony. As this Court previously explained in its opinion rejecting a similar argument as to whether Qualcomm's own employees could testify regarding the contributions of Qualcomm's technologies to cellular standards and communications, Fed. R. Evid. 701 permits lay witness testimony that is founded in knowledge gained from the witness's employment in the business at issue. ECF No. 973 at 3. In that Order, the Court concluded that "so long as Qualcomm's witnesses base their testimony on their personal experiences as percipient witnesses, they are permitted to testify as lay witnesses regarding Qualcomm's contributions to standards and technologies." *Id.* Similarly, here the Court concludes that Johnson may give lay testimony on topics including the ability and incentive of Qualcomm and its competitors to invest in technology, provided that such testimony is based on his experience gained during his employment.

## III. CONCLUSION

For the foregoing reasons, the Court rejects Bain's challenges to the admissibility of Johnson's testimony and finds that Johnson's testimony would be relevant. Accordingly, the Court DENIES Bain's motion to quash.

**IT IS SO ORDERED.**


Dated: January 8, 2019

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

# Exhibit K

# PUBLIC APPENDIX—
# SEALED MATERIAL IN SEPARATE SUPPLEMENT

ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024

No. 24-1113 (and consolidated cases)

IN THE

United States Court of Appeals
for the District of Columbia Circuit

———————

TIKTOK INC. and BYTEDANCE LTD.

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,

*Respondent.*

———————

*caption continued on inside cover*

———————

On Petitions for Review of Constitutionality of
the Protecting Americans from Foreign Adversary Controlled
Applications Act

———————

## APPENDIX TO BRIEF OF PETITIONERS
## TIKTOK INC. AND BYTEDANCE LTD.
### Volume I of III (Pages 1–260)

———————

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*
*(continued on inside cover)*

Alexander A. Berengaut
  *Counsel of Record*
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com

PX0689-001

BRIAN FIREBAUGH et al.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

———————

BASED Politics Inc.,

*Petitioner*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

John E. Hall
Anders Linderot
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

# TABLE OF CONTENTS

## Volume I

H.R. Comm. on Energy & Com., *Protecting Americans from Foreign Adversary Controlled Applications Act*, H.R. Rep. No. 118-417 (2024) .................................................................... 1

*Legislation to Protect American Data and National Security from Foreign Adversaries: Hearing Before the Comm. on Energy & Com.*, 118th Cong. (2024) (excerpts) ...................................................... 19

170 Cong. Rec. H1164 (daily ed. Mar. 13, 2024).................................... 39

170 Cong. Rec. S2629 (daily ed. Apr. 8, 2024) (excerpts) ...................... 48

170 Cong. Rec. H2561 (daily ed. Apr. 20, 2024) (excerpts) ................... 71

170 Cong. Rec. S2943 (daily ed. Apr. 23, 2024) (excerpts) .................... 98

Declaration of Alexander A. Berengaut............................................... 148

    Ex. A: Document Entitled "Threat Posed by TikTok (Department of Justice - March 6, 2024)".................................. 155

    Ex. B: Draft National Security Agreement (Aug. 23, 2022) (redacted version; full version filed under seal) .......................... 157

## Volume II

Declaration of Alexander A. Berengaut (continued)

    Ex. C: Governance Presentation to CFIUS (Sept. 17, 2021) ........... 261

    Ex. D: Protected Data Presentation to CFIUS (Oct. 13, 2021) (redacted version; full version filed under seal) .......................... 277

    Ex. E: Content Moderation Presentation to CFIUS (Nov. 29, 2021) ............................................................................... 306

    Ex. F: Source Code Presentation to CFIUS (Nov. 30, 2021) (redacted version; full version filed under seal) .......................... 339

PX0689-003

Ex. G: Content Assurance Process Summary (Apr. 26, 2022) ......... 357

Ex. H: Letter from D. Fagan and M. Leiter to Hon. W. Adeyamo
(Dec. 28, 2022) ................................................................ 359

Ex. I: Letter from E. Andersen to Hon. W. Adeyamo and Hon.
L. Monaco (Feb. 25, 2023) ........................................... 363

Ex. J: Email Exchange Between D. Fagan and M. Leiter and B.
Reissaus (Mar. 2023) .................................................... 366

Ex. K: Email from D. Fagan and M. Leiter to B. Reissaus (Apr.
27, 2023) ...................................................................... 372

Ex. L: NSA Updates Presentation to CFIUS (May 23, 2023) .......... 374

Ex. M: NSA Updates Presentation to CFIUS (Sept. 8, 2023) .......... 385

Ex. N: Letter from D. Fagan and M. Leiter to D. Newman (Apr.
1, 2024) (redacted version; full version filed under seal) ............ 412

## Volume III

Declaration of Alexander A. Berengaut (continued)

Ex. O: Nicholas Kaufman et al., U.S.-China Econ. & Sec. Rev.
Comm'n, Shein, Temu, and Chinese e-Commerce: Data
Risks, Sourcing Violations, and Trade Loopholes (Apr. 14,
2023) ............................................................................ 530

Ex. P: Statements by Members of Congress .................................... 540

Transcript of Interview with Rep. Mike Gallagher, Fox
News (Nov. 16, 2023) ........................................... 541

House Comm. on the Chinese Communist Party, Press
Release, Gallagher, Bipartisan Coalition Introduce
Legislation to Protect Americans from Foreign
Adversary Controlled Applications, Including TikTok
(Mar. 5, 2024) .................................................... 544

PX0689-004

Transcript of Interview with Reps. Mike Gallagher and
    Krishnamoorthi, CNN (Mar. 7, 2024) .................................. 548

Sen. Tom Cotton (@SenTomCotton), X, https://x.com/
    SenTomCotton/status/1766875766111732082,
    https://perma.cc/UY6H-4ZCY (Mar. 10, 2024) .................. 553

Transcript of Interview with Rep. Raja Krishnamoorthi,
    Meet the Press (Mar. 12, 2024) ........................................... 554

Sapna Maheshawri et al., *House Passes Bill to Force
    TikTok Sale from Chinese Owner or Ban the App*, N.Y.
    Times (Mar. 13, 2024) .......................................................... 558

Transcript of Interview with Sen. Mark Warner, Fox
    News (Mar. 14, 2024) (excerpts) ......................................... 565

Transcript of Interview with Rep. Mike Gallagher, Fox
    News (Mar. 16, 2024) ........................................................... 572

Jane Coaston, *What the TikTok Bill Is Really About,
    According to a Leading Republican*, N.Y. Times
    (Apr. 1, 2024) ....................................................................... 577

Sapna Maheshwari et al., *'Thunder Run': Behind
    Lawmakers' Secretive Push to Pass the TikTok Bill*,
    N.Y. Times (Apr. 24, 2024) .................................................. 584

Transcript of Keynote Conversation Between Secretary of
    State Anthony Blinken and Sen. Mitt Romney, McCain
    Institute (May 3, 2024) (excerpts) ...................................... 593

Prem Thakker et al., *In No Labels Call, Josh Gottheimer,
    Mike Lawler, and University Trustees Agree: FBI
    Should Investigate Campus Protests*, The Intercept
    (May 4, 2024) (excerpts) ...................................................... 597

Transcript of Interview with Rep. Elise Stefanik, Maria
    Bartiromo (May 5, 2024) (excerpts) .................................... 599

PX0689-005

Sen. John Fetterman (@SenFettermanPA), X,
https://x.com/SenFettermanPA/status/
1787891840022139280, https://perma.cc/2BW9-Z78H
(May 7, 2024) ................................................................ 609

Ex. Q: Paul Mozur et al., *TikTok Deal Is Complicated by New
Rules From China Over Tech Exports*, N.Y. Times
(Aug. 29, 2020) ............................................................ 610

Ex. R: Xinhua News Agency, *Planned TikTok Deal Entails
China's Approval Under Revised Catalogue: Expert*,
XinhuaNet (Aug. 30, 2020) ........................................... 614

Ex. S: Letter from Sen. Charles E. Schumer (Apr. 5, 2024) ........... 617

Ex. T: Rachel Dobkin, *Mike Johnson's Letter Sparks New Flood
of Republican Backlash*, Newsweek (Apr. 17, 2024) ................. 620

Ex. U:  Regulation (EU) 2022/2065 of the European Parliament
and of the Council of 19 October 2022 on a Single Market
For Digital Services and amending Directive 2000/31/EC
(Digital Services Act) (excerpts) .................................... 625

European Commission, *DSA: Very Large Online Platforms
and Search Engines*, https://digital-strategy. ec.
europa. eu/en/policies/dsa-vlops, https://perma.cc/49D9-
F2UZ (last accessed June 17, 2024) .................................. 626

Digital Services Act, 2022 O.J. (L 277) (excerpts) ................. 632

Declaration of Randal S. Milch .......................................... 643

Ex. 1: Summary of Divestitures Reviewed ............................... 688

Appx. A: Curriculum Vitae ............................................... 705

Appx. B: Examples of Verizon's Divestitures of Highly
Integrated Assets ...................................................... 711

Declaration of Christopher P. Simkins ................................... 719

Appx. 1: Curriculum Vitae ............................................... 758

iv

Declaration of Steven Weber..................................................... 760

    Appx. 1: Curriculum Vitae............................................... 790

Declaration of Adam Presser ................................................ 799

PX0689-007

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

TIKTOK INC.

    and

BYTEDANCE LTD.,

           *Petitioners*,

    v.

MERRICK B. GARLAND, in his
official capacity as Attorney General
of the United States,

           *Respondent*.
_____

No. 24-1113

## DECLARATION OF ADAM PRESSER

1.    I am TikTok's Head of Operations and Trust & Safety, a role I have served in since March 2024, and I am employed by Petitioner TikTok Inc. Between June 2023 and March 2024, I was TikTok's Head of Operations, and before that, from April 2022 to June 2023, I was Vice President and TikTok Chief of Staff. As Head of Operations and Trust & Safety, my responsibilities include cultivating, maintaining and protecting TikTok's global content ecosystem. The teams I lead manage

**APP-799**

PX0689-008

our content operations and distribution all over the world, as well as our efforts to identify and remove harmful content on the platform globally. As a senior executive, I have also become broadly familiar with our operations and policies across a range of areas, including TikTok's data privacy and security policies, engineering operations, and our engagement with stakeholders and regulators in the United States and abroad.

2.    I am a U.S. citizen born and raised in Los Angeles, California. I have a B.A. and M.A. from Yale University, a J.D. from Harvard Law School, and an MBA from Harvard Business School. Before I joined TikTok, I worked for Warner Bros. Entertainment and then WarnerMedia, most recently as Executive Vice President, International and Head of WarnerMedia China, Australia and New Zealand, and Head of WarnerMedia International Home Entertainment Licensing. I have extensive experience working in multinational business operations in a variety of structures, including with joint ventures, licensing partners, and, as with TikTok, globally integrated businesses.

2

**APP-800**

3.     The purpose of this declaration is to provide an overview of the TikTok platform, including how we protect U.S. users' data and guard against foreign government influence. I also explain why the U.S. TikTok platform cannot realistically be severed from the rest of the global platform in one year, as I understand would be required to avoid a ban of TikTok under the "Protecting Americans from Foreign Adversary Controlled Applications Act."

## I.     Background on Petitioners TikTok Inc. and ByteDance Ltd.

4.     Like many global businesses, TikTok operates through multiple corporate entities. In the United States, the TikTok platform is provided by TikTok Inc., a California-incorporated company that has its principal place of business in Culver City, California and offices in New York, San Jose, Chicago, and Miami, among other locations. TikTok Inc. has thousands of employees in the United States. References in my declaration to "TikTok Inc." are to this specific corporate entity; references to "TikTok" are to the online platform.

5.     TikTok Inc.'s ultimate parent company is ByteDance Ltd., a Cayman Islands-incorporated equity holding company that has multiple operating subsidiaries, including in China. References in my

**APP-801**

PX0689-010

declaration to "ByteDance Ltd." are to this specific corporate entity, whereas more general references to "ByteDance" are to the corporate group, including its operating subsidiaries. ByteDance was founded in 2012 by two Chinese engineers. Today, approximately 58 percent of ByteDance Ltd. is owned by global institutional investors, including General Atlantic and Susquehanna International Group; 21 percent is owned by its global employee workforce; and 21 percent is owned by one of its founders, Zhang Yiming (a Chinese national who lives in Singapore).

6.    In addition to TikTok Inc., which provides the TikTok platform in the United States, other subsidiaries of ByteDance Ltd. provide several other applications, services, and online platforms in the United States, including for content sharing, video and music editing (such as the popular video-editing app CapCut), e-commerce, gaming, and enterprise productivity.

## II.    The TikTok Platform

7.    TikTok is an online platform that enables users to create, share, and view videos. TikTok's mission is "to inspire creativity and

PX0689-011

bring joy,"[1] and we seek to bring this mission to life through the products we build, the content we cultivate and recommend, and the rules we publish and enforce to keep harmful content away from our users.

8.    TikTok is designed to provide a creative and entertaining forum for our users to express themselves and make connections with other content creators and viewers. TikTok users primarily engage with the platform by creating and sharing videos or by watching and interacting with videos posted by others. In addition to sharing and commenting on videos, users can connect with one another in a variety of other ways, including "tagging" other users in the comments, using the app's "duet" and "stitch" tools to create new content that incorporates and responds to content created by others, using the "TikTok LIVE" feature to communicate live with others on the platform, and sending direct messages to one another. The TikTok platform is offered in more than 170 countries, but it is not offered in mainland China.

---

[1] Our Mission, TikTok, https://www.tiktok.com/about?lang_en (last visited June 17, 2024).

PX0689-012

9.     TikTok is a globally integrated platform, meaning that content posted in one country is generally available to users in any of the 170+ countries in which TikTok is available. There is an enormous array of international content available to U.S. users on the platform, some of which is extremely popular. Just to take a few examples, there is content about global sporting events like the Olympic Games (@olympics has 8.3 million followers), international sports teams (@realmadrid has 45.5 million followers), and international music such as K-pop (one of the most popular groups, BTS, has 65.3 million followers) and Tomorrowland, an annual music festival in Ibiza, Spain (@tomorrowland has 5.7 million followers).

10.     TikTok was first launched globally in May 2017 in over 150 countries, including the United States. After ByteDance Ltd. acquired another short-form video platform, musical.ly, and moved its user base to TikTok, TikTok was re-launched in the United States in August 2018.

11.     Since then, TikTok has grown to become one of the most widely used online platforms in the world. TikTok has more than 170 million monthly users in the United States and more than 1 billion

6
**APP-804**

users worldwide. With so many U.S. users, the volume of content created and viewed in the United States is correspondingly immense. In 2023, TikTok users in the United States uploaded more than 5.5 billion videos, which were viewed more than 13 trillion times here and abroad; half of those video views came from users outside the United States. In the same year, TikTok users in the United States viewed content from outside the United States more than 2.7 trillion times, which accounted for more than a quarter of all video views in the United States. U.S. content is also disproportionately popular abroad; for example, last year, even in several of TikTok's non-U.S. English-speaking markets, content from the United States comprised more than a third of all video views.

12.    TikTok's initial growth was spurred by its appeal to those who value the blend of light entertainment and humor our platform provides. Today, TikTok also has become a forum for all types of speech, including about politics, sports, family, religion, and users' jobs and hobbies.[2] Many content creators use our platform to express their

---

[2] TikTok does not, however, permit paid political advertising on the platform. *See* TikTok Business Help Center, Ad Policy Handbook: North

PX0689-014

opinions, share their stories, support their preferred political candidates, and speak out on today's many pressing issues, all to a global audience of more than one billion monthly users.

13.    TikTok Inc. itself maintains an active account on TikTok, operated by a U.S.-based team, which has more than 80 million followers globally. TikTok Inc. uses the TikTok platform to create and share its own content about issues and current events, including, for example, its support for small businesses, Earth Day, and literacy and education. The company also interacts with users by promoting public-interest content on TikTok, such as our "EduTok" campaign, which encourages users to create and share educational and motivational content on a variety of themes. The company has also launched other campaigns to promote public interest content. TikTok users also have the ability to use special filters, special effects, and stickers available on the platform to enhance their content and express their views on issues of public interest.

---

America (last updated June 2024), https://ads.tiktok.com/help/article/ad-policy-handbook-north-america.

14. Although there are other platforms that allow users to post and share content, TikTok differs from these platforms in important respects. For example, unlike other platforms, TikTok does not host written posts (except insofar as a user posts a video or picture showing written text), and it is not as focused on users' interactions with existing friends, family, or co-workers, like some other platforms are.

15. Instead, the TikTok experience is centered on discovering video content primarily through the app's For You feed, which opens a collection of videos curated by TikTok's proprietary recommendation engine based on an individual user's interests and how the user interacts with content they watch. With the For You feed, TikTok's focus is on facilitating users' discovery and exploration of new content and new communities that might be of interest to them. The For You feed provides individual, regular TikTok users a unique ability to discover new content and, for those who choose to post their own content, to reach a new and broader audience. The For You feed (and its recommendation engine) is central to the TikTok experience and one of the defining features of the TikTok platform that made it successful.

PX0689-016

16.    Although the For You feed is the most popular way users use TikTok, users can explore content on TikTok in a variety of other ways. For example, users can use the search function to find content about particular topics they are interested in. Videos in search results are sorted according to a combination of factors, including relevance to a user's search query and other users' level of engagement with the video. Relevance is determined based on things like video captions, video text, and "hashtags," all of which can only be added by the users themselves upon uploading the videos.

17.    On TikTok and other online platforms, hashtags function as content aggregators, which means that a user can locate other content with that hashtag by searching for the hashtag or clicking on the hashtag in a comment or video caption. Hashtags help users to find content that appeals to their particular hobbies, athletic pursuits, or identities and to connect with others, including through #booktok (33.8 million posts), #baseball (4.3 million posts), #blacktiktok (4.7 million posts), and #fitness (37.8 million posts). Many creators also use the platform to post product reviews, business reviews, and travel

PX0689-017

information and reviews. For example, #travel has 46.1 million posts on TikTok.

18.    Because a significant percentage of videos posted on TikTok do not have any hashtags at all, hashtags will rarely capture all of the content associated with a specific topic. For that reason, the platform's search function is based on a number of inputs, not just hashtags. For example, while #taylorswift is associated with 13.2 million posts on TikTok, a search for the term "Taylor Swift" would generate many more posts. For the same reason, it is not possible to compare the prevalence of different kinds of content on TikTok, or make comparisons to other platforms, by looking only at hashtag numbers. Through our Research Tools, qualifying researchers in the U.S. and Europe can apply to study public data about TikTok content and accounts.

19.    Users can also view a feed consisting only of content posted by those creators they have decided to "follow." That allows users to curate their own viewing experience, rather than only relying on TikTok to do so.

20.    Creators come to TikTok because of the platform's unique attributes. In my experience, creators join TikTok because of its ability

PX0689-018

to facilitate discovery through organic reach—that is, the number of people who see a post through unpaid distribution. TikTok's organic reach allows creators to reach large numbers of users—beyond their current universe of followers—without any paid promotion. Moreover, TikTok's recommendation system facilitates users' access to content created by a wide range of individuals, meaning that it is not unusual for videos created by regular people to "go viral" and receive thousands, if not millions, of views. Many platforms offer creators a forum to reach new audiences. But TikTok is unique in its ability to generate reach for regular people. For example, nine of the top ten TikTok accounts with the most followers were regular people before they joined the platform and started posting, and the tenth account is TikTok's own account. By comparison, for several of our competitors, the most-followed accounts belong to people who are independently famous, like athletes, actors, and musicians.

## III.    The Content Available on the TikTok Platform

21.    We always strive to show our users content that serves our mission to "inspire creativity and bring joy" in a safe environment. In service of that goal, we use three main editorial processes to determine

what content is shown to users: content moderation, content recommendation, and video promotion and filtering.

### A. Content Moderation

22.     The first process that determines the content available to users is content moderation. As noted above, I oversee the TikTok Trust & Safety team, which is responsible for content moderation globally. This year, we anticipate spending more than $2 billion on Trust & Safety globally, and the TikTok Trust & Safety team I oversee includes more than 40,000 employees and contractors worldwide.

23.     Consistent with our guiding principle to enable free expression while preventing harm, the goal of content moderation is to create a welcoming and safe experience for our users. The content moderation process applies to all content available on the platform, whether viewed on the For You feed or discovered via searching.

24.     Our approach to content moderation is built on the foundation of our Community Guidelines, a publicly available collection of rules and standards that apply to all TikTok users and content.[3] The

---

[3] *Community Guidelines*, TikTok (last updated April 17, 2024), https://www.tiktok.com/community-guidelines?lang=en.

**APP-811**

PX0689-020

team that writes the Community Guidelines reports to me, and I ultimately approve the Community Guidelines before they are published on the platform and our website. The Community Guidelines were created and are continually refined in consultation with third-party experts, including our U.S. Content Advisory Council. The Content Advisory Council brings together groups of American independent experts who help us develop forward-looking policies and processes to help create a safe platform for everyone. They work with us to inform and strengthen our policies, product features, and safety processes.

25.    The Community Guidelines include rules for what is allowed on TikTok, as well as standards for what content is eligible for recommendation to users in the For You feed. Among other things, the Community Guidelines prohibit nudity; promotion of or incitement to violence; promotion of criminal activities that may harm people, animals, or property; hate speech, hateful ideology, and hateful behaviors; promotion of violent or hateful political organizations; animal abuse; and harassment and bullying. Of course, on a platform as large as ours, it is natural for people to have different opinions, and we

welcome that, but we do not allow influence operations, where networks of accounts work together to mislead people or our systems and try to strategically influence public discussion. The Community Guidelines also outline our policies for dealing with misinformation. And we also have a publicly disclosed policy regarding State-Affiliated Media.

26.    We proactively enforce our Community Guidelines through a mix of technology-based and human moderation. Every video uploaded to TikTok goes through automated moderation before it appears on the platform so that content flagged as potentially violative can be automatically removed or escalated for human review by trained moderators. More than 75% of all videos removed for violating the Community Guidelines are never viewed by a single user. We also encourage users to take advantage of various tools provided through the app or on the website to report content that they believe violates the Community Guidelines. If we identify violative content—on our own or through our users—we remove such content from the platform. The team responsible for enforcing the Community Guidelines globally also reports to me. This team is governed by strict company-wide policies intended to ensure that content is moderated in accordance with our

PX0689-022

Community Guidelines, and we enforce these policies with measures to track and audit moderation decisions.

27.    In total, over 176 million videos were removed from TikTok in the period of October through December 2023 for violating the Community Guidelines. We publicly disclose these and other statistics regarding our enforcement of the Community Guidelines in our quarterly Community Guidelines Enforcement reports, which are posted on our website.[4] We also publish a report with information about covert influence operations we disrupt, including how they were detected, how many accounts we removed, how many followers the accounts had, and a description of the operations, including where it was operating from and the country that was targeted.[5] In addition to our transparency reports, as I mentioned above, through our Research Tools, qualifying researchers in the U.S. and Europe can apply to study public data about TikTok content and accounts, which provides additional transparency into the activity on our platform.

---

[4] *Community Guidelines Enforcement Report*, TikTok (published Mar. 19, 2024), https://www.tiktok.com/transparency/en/community-guidelines-enforcement/.
[5] *Covert Influence Operations Report*, TikTok, https://www.tiktok.com/transparency/en/covert-influence-operations/.

PX0689-023

28.    Even if content does not violate our Community Guidelines, we take steps as part of our content moderation processes to limit access to content that may not be suitable for certain users. For example, even though it may not violate the Guidelines, content depicting consumption of excessive amounts of alcohol by adults is not eligible for recommendation in the For You feed. Additionally, videos that some users may find to be distressing but that involve a subject of important public interest, are instead covered by "opt-in viewing screens" when flagged. These opt-in screens warn the user that the video may contain sensitive material and give the user the option to either view the content or skip to the next video.[6] Such videos are also ineligible for recommendation on users' For You feeds.[7]

B.  <u>Content Recommendation</u>

29.    The second process we use to determine what content to show to users is content recommendation. Content recommendation is

---

[6] Cormac Keenan, Refreshing Our Policies to Support Community Well-Being, TikTok (Dec. 15, 2020), https://newsroom.tiktok.com/en-us/refreshing-our-policies-to-support-community-well-being; Tara Wadhwa, New Resources to Support Our Community's Well-Being, TikTok (Sept. 14, 2021), https://newsroom.tiktok.com/en-us/new-resources-to-support-well-being.

[7] Keenan, supra n.6; Wadhwa, supra n.6.

PX0689-024

implemented by TikTok's recommendation engine, a sorting and ranking mechanism that uses statistical modeling to select videos for a user's For You feed.

30.     The recommendation system analyzes various signals from the user and other users, such as their likes, comments, and what they watch. The recommendation engine identifies a pool of candidate videos for a user, then scores and ranks those videos using machine-learning models that seek to determine which video would be most interesting to the user. As I described above, certain content is not eligible for recommendation in the For You feed and this content is not part of the candidate pool. To evaluate whether a user would find a particular video interesting, these models assign different weights to a variety of factors, including user engagement or activity information (such as video playtime, likes, shares, accounts followed, comments, content created), account or device information (such as language preference, country setting, device type), and video information (such as captions, sounds, hashtags). The system may adjust the weight assigned to a particular parameter if it "learns" that it is more or less important than

other factors in determining whether users are, or a particular user is, likely to engage with a given video.

31.     In essence, the recommendation engine functions as a large matching system, matching users with content they are predicted to like based on their viewing habits.

32.     The source code for TikTok's recommendation engine was originally developed by ByteDance engineers based in China and is continually developed by the TikTok Global Engineering Team. The recommendation engine is customized for TikTok's various global markets, including in the United States, and that customization is subject to special vetting in the United States. In addition to those protections, which I describe below, as with other source code, we have technical measures in place intended to ensure that only employees with appropriate access controls are able to update the recommendation engine, and those updates are also auditable.

C.  Video Promotion and Filtering

33.     Video promotion and filtering is the third process determining what content is shown to users, and is similarly intended to ensure that users have a positive experience with content they enjoy.

PX0689-026

We may promote specific content (e.g., highlights from the Super Bowl, or videos from a Beyoncé concert) in line with company content policies, including to support the inclusion of diverse and high-quality content on the platform.

34.    Our internal policies strictly limit which employees can request promotion of content. Each request to promote a video is manually reviewed and either approved or rejected based on an assessment of whether it follows the platform's content policies, including to support content diversity and quality (for example, being engaging and meaningful and focusing on timely/relevant content) and business objectives. Each video that is promoted is reviewed at least once by a human reviewer, and these teams are regionalized, so all videos promoted in the U.S. are reviewed by a U.S.-based reviewer. Our global security teams also audit promotion requests to ensure that they are consistent with our policies. Promotion currently impacts less than 1% of video views in the United States.

35.    Just as we promote certain specific content to improve the user experience, we also apply a set of rules to filter out and disperse certain content, i.e., not show one video after another about the same

PX0689-027

subject, in users' For You feeds. The objective of filtering content is to make the platform safer and more enjoyable for our users and to support commercial and product goals such as prioritizing content from the same country, avoiding duplication, and ensuring appropriate video length. For example, we filter out from users' For You feed content that is predicted to be low quality (e.g., extremely short videos). We also disperse content to try to ensure sufficient diversity of content in a user's For You feed.

36.    We also attempt to identify and disperse content that, viewed sparingly, is not harmful, but viewed repeatedly could be problematic, such as content about exercise, dieting, or mental health. These videos may be eligible for the For You feed, but, to protect our community, we work to interrupt repetitive patterns to ensure they are not viewed too often.

## IV.    TikTok's Efforts to Safeguard U.S. User Data and the Integrity of the Platform Against Foreign Government Influence.

37.    TikTok has undertaken unprecedented efforts to safeguard U.S. user data and protect the integrity of the platform against foreign government influence.

PX0689-028

38.    Like other platforms, TikTok collects certain information from users in accordance with its Privacy Policy and Terms of Service, to which users must agree as a condition of signing up for the app.[8] Pursuant to the Privacy Policy, TikTok collects users' usernames, dates of birth, and, depending on how they sign up for the app, a user's phone number or email address.[9] Notably, however, there are also several categories of data that we do not collect. Unlike other platforms, for example, TikTok does not require its users to provide certain types of personal identifying information, such as the user's real name, employment information, or familial relationships or relationship status. The current version of the TikTok app also does not collect GPS information from U.S. users.

39.    Starting in 2019, the U.S. government expressed concerns that the Chinese government could obtain access to user data TikTok collects from U.S. users, or compel ByteDance to manipulate the TikTok

---

[8] *Privacy Policy*, TikTok (last updated March 28, 2024), https://www.tiktok.com/legal/page/us/privacy-policy/en; *see also Terms of Service*, TikTok (last updated November 2023), https://www.tiktok.com/legal/page/us/terms-of-service/en.
[9] *Privacy Policy*, TikTok (last updated March 28, 2024), https://www.tiktok.com/legal/page/us/privacy-policy/en.

platform to promote the Chinese government's agenda in the United States. We disagree that these concerns are well-founded, but made a voluntary decision to engage for several years with the Committee on Foreign Investment in the United States on how to address those concerns. Following extensive engagement and the incorporation of significant U.S. government feedback, that process culminated in a 90-page draft National Security Agreement, the latest draft of which we provided to the government on August 23, 2022.

40.    The full range of commitments is described in the draft National Security Agreement, but in summary it contains several layers of protections that would enable the U.S. government to validate the security of U.S. user data and confirm that the platform is free from improper influence by any foreign government. To our knowledge, no other online platform provides these kinds of protections, which even include a "shut-down option" that would give the government the authority to suspend TikTok in the United States if we violate certain obligations under the agreement. These protections are in addition to our existing policy, technical, and transparency safeguards

PX0689-030

implemented on a global basis to safeguard TikTok user data and protect the integrity of the platform against foreign interference.

41.    Although the draft National Security Agreement was never signed, we have voluntarily begun implementing many measures that do not require the U.S. government's cooperation. We have invested more than $2 billion on that effort—sometimes referred to as "Project Texas." Among the steps we have taken as part of this initiative are the following:

42.    <u>Independent Governance</u>. We have created a special purpose subsidiary of TikTok Inc. called TikTok U.S. Data Security Inc. ("TikTok USDS") to control access to protected U.S. user data (as defined in our draft National Security Agreement) and monitor the security of the platform. The TikTok USDS team is currently led by Interim General Manager Andy Bonillo and Interim Security Officer Will Farrell, both of whom are U.S. citizens with significant experience working with the U.S. government on national security and cybersecurity matters. All TikTok USDS employees, of which there are now over 2,000, report to Mr. Bonillo and Mr. Farrell. TikTok USDS

PX0689-031

employees work in offices that are physically separate from that of other TikTok or ByteDance personnel.[10]

43.    <u>Data Protection and Access Controls</u>. We have partnered with Oracle Corporation on the migration of the U.S. platform and protected U.S. user data to Oracle's cloud environment. Every U.S. user now interacts with a version of TikTok that is run in the Oracle environment, and we have taken steps to store protected U.S. user data there. Access to the Oracle environment is limited to only TikTok USDS personnel, unless authorization is given by TikTok USDS pursuant to limited exceptions, such as for legal and compliance purposes.

44.    <u>Software Assurance</u>. TikTok USDS and Oracle review updates to the U.S. TikTok app developed by employees outside TikTok USDS, and all software updates are deployed, i.e., implemented on the U.S. TikTok platform, by TikTok USDS personnel. TikTok USDS also reviews changes to the platform code base, and Oracle has full access to

---

[10] The draft National Security Agreement requires TikTok USDS to be governed by an independent board with Security Directors whose appointment would be subject to the U.S. government's approval and would exclude ByteDance and its subsidiaries and affiliates from any oversight of TikTok USDS. TikTok USDS has provided nominees for these directors to the U.S. government, but the government has not yet approved them.

**APP-823**

PX0689-032

review the entire source code, including any updates, in dedicated transparency centers located in Columbia, Maryland; Denver, Colorado; the United Kingdom; and Australia.

45.    <u>Content Assurance</u>. TikTok's U.S. recommendation engine is stored in the Oracle cloud. TikTok USDS now deploys the recommendation engine in the United States, and as noted above, Oracle has full access to review the entire TikTok platform source code, which includes the algorithm for the recommendation engine. TikTok USDS also reviews and approves content promotion requests to help ensure that content promotion on the U.S. TikTok platform is conducted consistently with our policies and is free of foreign-government interference.

## V.    The Prohibitions in the Act Will Lead to TikTok Being Inoperable in the United States.

46.    As I understand it, the Act contains two types of prohibitions. First, it prohibits "services to distribute, maintain, or update" the TikTok platform in the United States "by means of a marketplace (including an online mobile application store)." Second, it prohibits "internet hosting services to enable the distribution, maintenance, or updating of" the TikTok platform. Together, these

PX0689-033

prohibitions would render the TikTok platform inoperable in the United States.

47.    With respect to the first prohibition, removing the app from U.S. app stores will halt the influx of any new U.S. users, immediately foreclosing millions of Americans who have not yet downloaded the app from joining TikTok.

48.    Even those users and creators who choose to stay on the platform would be affected by the removal of the TikTok app from app stores. We also regularly update the software for the TikTok app, and consumers receive those updates via app store downloads. This prohibition would accordingly prevent users from downloading updates to the app, including security fixes. The inability to download updates would eventually render the app incompatible with the TikTok platform and therefore inoperable.

49.    The second prohibition, on the provision of internet hosting services, would likewise prevent us and our commercial partners from providing the services that enable the TikTok platform to function, effectively shutting down TikTok in the United States. For example, internet service providers may stop routing traffic to TikTok.com; data

centers may not renew contracts because it would be unclear if they would be allowed to host TikTok code, content, or data; and content delivery networks ("CDNs") that are spread throughout the country may also be covered. The termination of these services would cripple the platform in the United States and make it totally unusable.

50.    Even a temporary implementation of these prohibitions would cause significant and irreversible harms to our business and our brand. Users and content creators tend to develop lasting brand loyalty when it comes to social media and online entertainment platforms, and if we lose these users and content creators to our competitors, even on a temporary basis, some are not likely to return, even if the prohibitions are later lifted. Accordingly, even if the prohibitions of the Act are later lifted, we would not be able to make up for lost ground, because people who would have downloaded TikTok will have already turned to other competing platforms.

51.    The prohibitions also would dramatically undercut the commercial goodwill associated with TikTok and impede our ability to form and maintain commercial partnerships. By destroying the vibrant TikTok community in the U.S., the prohibitions will deal a heavy blow

to our reputation and attractiveness as a commercial partner. This collapse of goodwill will harm our revenues from existing partnerships and prevent us from realizing revenue from future opportunities, as prospective partners forge relationships with our competitors instead. If we are perceived to be an unreliable partner in the marketplace, advertisers will build partnerships with other platforms.

52.    Being banned from the United States will also devastate our U.S. workforce, permanently harming our ability to recruit and retain talent. TikTok is a technology company, and we compete fiercely for the software engineers and other talent we rely upon to run our business. These candidates often have multiple offers from other companies. Since the Act was signed into law, our competitors have been aggressively trying to recruit our talent. As the prohibitions come into effect, these problems with recruitment and retention will be greatly magnified, given that the business these employees support would be banned in the United States.

## VI.    Severing the U.S. TikTok Platform from ByteDance and the Global TikTok Platform.

53.    I understand that the only way to avoid those prohibitions is if the U.S. TikTok platform is sold, leaving no subsequent operational

relationship with the rest of the global TikTok platform or the ByteDance affiliate employees that currently support it.

54.    As discussed above, TikTok in the United States is an integrated part of the global TikTok platform. The global TikTok business is led by a leadership team based in Singapore and the United States. Many of the teams that support the global TikTok platform, including engineering, operations, Trust & Safety, and advertising sales, are spread across several different corporate entities and countries.

55.    Because the platform and the content is global, the teams working on the platform, and the tools they use, necessarily must be, as well. For example, as I mentioned above, we do not allow animal abuse on the platform, and we use software tools to identify content depicting animal abuse. It is important that the tools used to automatically detect animal abuse are effective and consistent. We have accordingly developed and refined those tools at the global level, drawing on resources from multiple functions in different countries.

56.    As another example, several members of my senior leadership team are based outside the United States, including in

London, Dublin, and Singapore, and they are responsible for a wide range of global functions on our Operations and Trust & Safety teams, including managing all content moderators globally, overseeing global publisher relationships, working with law enforcement authorities around the world to prevent crimes on the platform, and managing copyright takedown requests.

57.    The global TikTok platform also relies on the support of employees of other ByteDance subsidiaries for some functions, including the development of portions of the computer code that runs the TikTok platform. These integrated relationships are consistent with our commitments under Project Texas, pursuant to which TikTok USDS and Oracle vet updates to the U.S. platform developed by engineers outside TikTok USDS. In other words, Project Texas contemplates that source code supporting the TikTok platform, including the recommendation engine, will continue to be developed and maintained by ByteDance subsidiary employees, including in the United States and in China, and that any such source code is reviewed and vetted by TikTok USDS and Oracle.

PX0689-038

58.    Given these integrated relationships, there are several reasons why a severance of the U.S. TikTok platform from the rest of the globally integrated TikTok platform and business is not feasible.

59.    First, as I have mentioned, TikTok is a globally integrated online platform where content created in one place is generally available everywhere else. The same is true of TikTok's competitors in the United States, like YouTube, Instagram, and Snapchat. For example, as mentioned above, in 2023, half of views of videos posted in the United States came from users outside the United States, and non-U.S. content accounted for more than a quarter of all video views in the United States.

60.    Divesting the U.S. TikTok business in a way that precludes any further operational relationship with the rest of TikTok outside the United States would prevent international content from being seamlessly available in the U.S. market and vice versa. I understand that, to avoid a ban, the Act requires divestment of the U.S. TikTok application, without any ongoing operational relationship with non-U.S. TikTok or ByteDance entities, including any agreement to share user data. In the absence of an operational relationship, including an

32

agreement to share content and data with the entities that operate the global platform, the U.S. TikTok platform would become an "island" where Americans would have an experience isolated from the rest of the global platform. U.S. users on a U.S.-only version of TikTok would be unable to access the content posted by any non-U.S. TikTok users, and U.S. creators would be unable to reach that audience abroad.

61.    Such a U.S.-only version of TikTok would be unable to compete with rival, global platforms. The rich pool of global content on the TikTok platform helps generate more users and more traffic, which in turn attracts more (and more popular) creators, which in turn attracts more user traffic, restarting the cycle. Our ability to attract advertisers and drive revenue depends on user engagement. A platform of exclusively American users will be significantly less attractive to global advertisers and creators than a rival platform operating on a global scale, leading to the reverse of the cycle I described above.

62.    The operational costs associated with running an online platform for user-generated content, including the extensive Trust & Safety and content assurance operations I have described above, could not be sustained by a purely U.S.-only platform. For example, I

PX0689-040

mentioned above that we will spend over $2 billion on Trust & Safety this year. A U.S.-only platform would likely incur many of the same expenses, including on technology tools and third-party safety experts, because those costs are largely independent of the number of users on the platform and instead are mainly fixed costs associated with continually refining and maintaining a complicated set of technological and human systems and processes for a large platform hosting user-generated content. But while the costs for a U.S.-only platform would be on the same scale as they are currently, the base of revenue to support them would be considerably smaller.

63.    Second, setting aside these commercial dynamics, divesting the U.S. TikTok platform in the manner and on the timeline required by the Act would not be technologically feasible because it would require the U.S. platform to be severed from the ByteDance engineers responsible for maintaining and updating its code base.

64.    The code base supporting the TikTok platform includes billions of lines of code that have been developed over multiple years by a team of thousands of global engineers, including in China. To complete a divestiture required by the Act, *none* of those thousands of

34

**APP-832**

ByteDance employees would be permitted to continue to support TikTok in the United States. Under those circumstances, there is no question that it would take at least several years for an entirely new set of engineers to gain sufficient familiarity with the source code to perform the ongoing, necessary maintenance and development activities for the platform. Even then, such a newly-created team of engineers would need access to custom-made ByteDance software tools, which the Act prohibits.

65.    As I mentioned above, during my time at WarnerMedia and most recently at TikTok, I have worked to implement a variety of corporate relationships and reorganizations, including licensing agreements, joint ventures, mergers, and spin-offs. The divestiture contemplated by the Act is fundamentally different—a sale within one year without any possibility of follow-on cooperation. Such a transaction for a platform of TikTok's size and scope is infeasible along the timeline dictated by the Act.

PX0689-042

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury

that the foregoing is true and correct to the best of my knowledge.

Executed this day June 17, 2024.

_____
Adam Presser

**APP-834**

PX0689-043

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 20, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

June 20, 2024

/s/ Alexander A. Berengaut
Alexander A. Berengaut
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-600
aberengaut@cov.com

*Counsel for Petitioners TikTok Inc. and ByteDance Ltd.*

PX0689-044