# Exhibit 1

**Filed Under Seal**

# Exhibit 2

**Filed Under Seal**

# Exhibit 3

**Filed Under Seal**

# Exhibit 4

```
 1                  UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   THE UNITED STATES OF AMERICA,      Civil Action
                                        No. 21-02886
 4              Plaintiff(s),

 5         vs.

 6   BERTELSMANN SE & CO. KGAA,         Washington, D.C.
     et al,                             August 17, 2022
 7                                      9:30 a.m.
                Defendant(s).           Morning Session
 8   -----------------------------------------------------------

 9                  TRANSCRIPT OF BENCH TRIAL
               BEFORE THE HONORABLE FLORENCE Y. PAN
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   FOR THE PLAINTIFF:       John R. Read, Esquire
                              Ihan Kim, Esquire
13                            Melvin A. Schwarz, I, Esquire
                              Ethan Stevenson, Esquire
14                            United States Department of Justice
                              Antitrust Division
15                            450 Fifth Street, Northwest
                              Washington, D.C. 20530
16

17   FOR THE DEFENDANTS       Daniel M. Petrocelli, Esquire
     BERTELSMANN and          M. Randall Oppenheimer, Esquire
18   PENGUIN RANDOM HOUSE:    Megan Smith, Esquire
                              O'Melveny & Myers, LLP
19                            1999 Avenue of the Stars
                              Eighth Floor
20                            Los Angeles, California 90067

21

22

23

24

25
```

```
 1              THE COURT:  I understand that.  Thank you.

 2              MR. FRACKMAN:  Thank you.

 3              THE COURT:  Anything else from you, Mr. Schwarz?

 4              MR. SCHWARZ:  No, Your Honor.  Just for the record I

 5    would like to say that the Peabody Energy case, which he cited,

 6    there was an expert in that case, and the court still rejected

 7    most of the efficiencies in any event.

 8              And I think the law is clear from the D.C. Circuit in

 9    Anthem on the fact that these cannot be vague, speculative, or

10    otherwise cannot be verified by reasonable means.  That's at

11    359.  And I don't think this is reasonable at all.

12              THE COURT:  Okay.  Thank you.

13              The Court has heard the evidence on this issue and the

14    arguments of the parties and is prepared to rule.

15              Dr. Snyder is an expert witness for the defendants who

16    is offered to testify on merger-related efficiencies.  His

17    expert opinion relies on a projection of synergies produced in

18    November of 2020 by Manuel Sansigre, a senior vice president at

19    Penguin Random House who's in charge of mergers and

20    acquisitions.

21              Mr. Sansigre produced his synergy projections to help

22    Random House evaluate whether it should acquire Simon &

23    Schuster.

24              Dr. Snyder's expert report offers three primary

25    conclusions about Mr. Sansigre's projections.
```

1          First, that the projected synergies are the type that

2   economists would recognize given the features of the publishing

3   industry.

4          Second, that the projected synergies are

5   merger-specific efficiencies.

6          Third, that the projected synergies would benefit

7   authors through higher income and consumers through greater

8   availability of books.

9          Significantly, however, Dr. Snyder concedes that he

10  did not, quote, independently verify specific dollar amounts,

11  unquote, and did not, quote, independently derive estimates,

12  unquote, of Mr. Sansigre's projected synergies.  Thus, the

13  parties agree and stipulate that Dr. Snyder did not verify the

14  projections from the November 2020 model that form the basis of

15  his expert opinion on efficiencies.

16         The government filed a motion in limine to exclude

17  Dr. Snyder's testimony on efficiencies under Federal Rule of

18  Evidence 702.  The government argued, among other things, that

19  Dr. Snyder's reliance on unverified projections rendered his

20  efficiencies testimony inadmissible under Rule 702, the

21  horizontal merger guidelines, and cases applying the horizontal

22  merger guidelines.

23         The Court essentially deferred ruling on the motion to

24  preclude the expert testimony on efficiencies determining that

25  it should hear the evidence about Mr. Sansigre's projections

 1  before deciding whether the alleged efficiencies are verifiable

 2  and verified as required by the horizontal merger guidelines

 3  and persuasive case law.

 4        The Court decided to hear the evidence during the

 5  trial given that this is a bench trial but instructed the

 6  parties to arrange the presentation of evidence so that the

 7  verifiability of Mr. Sansigre's projected synergies could be

 8  considered and argued and the Court could then rule on the

 9  government's motion before hearing the totality of Dr. Snyder's

10  expert testimony on efficiencies.

11        The Court determined that it would be more efficient

12  to proceed in this fashion because if defendants were unable to

13  meet their burden to show that the efficiencies were

14  substantiated, verifiable, and verified under the horizontal

15  merger guidelines, then it would be unnecessary to consider any

16  of the other aspects of the efficiencies evidence.

17        The Court has now heard the evidence on the projected

18  efficiencies and arguments from the parties, and it will grant

19  the motion to preclude the efficiencies evidence because the

20  efficiencies projected by Penguin Random House are not

21  substantiated and verified.

22        Although many of the projections may be verifiable,

23  some are not verifiable.  Moreover, the efficiencies have not,

24  in fact, been independently verified by anyone, and they,

25  therefore, are not cognizable under the horizontal merger

1  guidelines and are not reliable under Rule 702.

2        Finally, the Court concludes that the efficiencies

3  projections in the November 2020 model are unreliable because

4  they are out of date and include 2021 projections that have

5  been proved to be inaccurate.

6        The applicable legal standards are as follows:

7        Federal Rule of Evidence 702 concerning testimony by

8  expert witnesses provides, quote, a witness who is qualified as

9  an expert by knowledge, skill, experience, training, or

10  education may testify in the form of an opinion or otherwise

11  if, A, the expert's scientific, technical, or other specialized

12  knowledge will help the trier of fact to understand the

13  evidence or to determine a fact in issue; B, the testimony is

14  based on sufficient facts or data; C, the testimony is the

15  product of reliable principles and methods; and D, the expert

16  has reliably applied the principles and methods to the facts of

17  the case, unquote.

18        Rule 702 incorporates the Supreme Court's guidance in

19  Daubert versus Merrell Dow Pharmaceuticals, Inc. which called

20  upon trial judges to serve a gatekeeping role in ensuring that

21  an expert's testimony both rests on a reliable foundation and

22  is relevant to the task at hand.

23        Also in Kumho Tire Company, Limited versus Carmichael,

24  the Supreme Court clarified that the gatekeeper role extends to

25  all expert testimony.

1          And this is confirmed by Rule 702's advisory committee

2     note to the 2000 amendment.

3          The party seeking to introduce expert testimony must

4     demonstrate its admissibility by a preponderance of the

5     evidence.  Courts take a flexible approach to deciding Rule 702

6     motions and have broad discretion in determining whether to

7     admit or exclude expert testimony.

8          Horizontal merger guideline section 10.

9          The horizontal merger guidelines outline the analysis

10    and enforcement practices of the Department of Justice and the

11    Federal Trade Commission with respect to horizontal mergers

12    under the federal antitrust laws including section 7 of the

13    Clayton Act.  See horizontal merger guideline section 1.

14         Federal courts frequently use the guidelines to

15    develop legal standards in antitrust litigation.  See, for

16    example, FTC versus H.J. Heinz Company, 246 F.3d 708.  That's a

17    D.C. Circuit case from 2001.

18         Section 10 of the horizontal merger guidelines

19    discusses efficiencies.  The guidelines observe that

20    efficiencies are difficult to verify and quantify in part

21    because much of the information relating to efficiencies is

22    uniquely in the possession of the merging firms.  Moreover,

23    efficiencies projected reasonably and in good faith by the

24    merging firms may not be realized.

25         Therefore, the merger guidelines say, it is incumbent

```
 1   upon the merging firms to substantiate efficiency claims so
 2   that the agencies can verify by reasonable means the likelihood
 3   and magnitude of each asserted efficiency.
 4           Courts interpret this requirement of substantiation
 5   and verification to encompass, quote, how and when each
 6   efficiency would be achieved and any costs of doing so, how
 7   each efficiency would enhance the merged firm's ability and
 8   incentive to compete, and why each would be merger specific,
 9   end quote.  That's from United States versus H&R Block, 833
10   F.Supp.2d 36 at 89.  That's a D.D.C. case from 2011, and it is
11   quoting the horizontal merger guidelines section 10.
12           Under the guidelines, projected efficiencies are
13   generally less credible when generated outside the usual
14   business planning process, and they are more credible when
15   substantiated by analogous past experience.
16           Ultimately, efficiencies must be cognizable to be
17   considered under the guidelines.  Quote, cognizable
18   efficiencies are merger-specific efficiencies that have been
19   verified and do not arise from anticompetitive reductions in
20   output or service.
21           A cognizable efficiency claim must represent a type of
22   cost saving that could not be achieved without the merger, and
23   the estimate of the predicted saving must be reasonably
24   verifiable by an independent party.  And that's quoting the
25   horizontal merger guidelines and also, I believe, H&R Block.
```

1          Case law provides that the Court must undertake a

2     rigorous analysis of the kinds of efficiencies being urged by

3     the parties in order to ensure that those efficiencies

4     represent more than mere speculation and promises about

5     post-merger waiver.  That's H&R Block at 89.

6          So, thus, in sum, the foregoing legal standards and

7     precedents place the burden on defendants to establish that the

8     projected efficiency relied upon by Dr. Snyder are

9     substantiated, that they are reasonably verifiable by an

10    independent party, and that they are, in fact, verified.

11         Where efficiencies are not independently verifiable

12    and verified, no court in this jurisdiction has ever given any

13    weight to such efficiencies evidence.  See H&R Block, 833

14    F.Supp.2d 36, D.D.C. 2011; United States versus Aetna, 240

15    F.Supp.3d, D.D.C. 2017; FTC versus Sysco Corporation, 113

16    F.Supp.3d, 1, D.D.C. 2015; FTC versus Wilhelmsen Holding, ASA,

17    341 F.Supp.3d 27, D.D.C. 2018; FTC versus Staples, 970 F.Supp

18    1066, D.D.C. 1997.

19         This is because it is the parties' interest to be

20    aggressive and optimistic in the projection of efficiencies to

21    justify their own merger.  Because courts are not

22    well-positioned to verify such projections, independent

23    verification is critical in order to allow a court to determine

24    whether such projections are reliable.

25         Without verification, the efficiencies analysis could

1    swallow the analytical framework required by the Clayton Act.

2    See H&R Block at 91.

3            The Court's findings and conclusions are as follows:

4            Number one, many of the projected efficiencies in the

5    November 2020 model may be verifiable, but at least some are

6    not verifiable.

7            According to the testimony of Mr. Sansigre, he and his

8    team worked very hard to derive the efficiencies model.  They

9    began in March 2020 by including detailed data about Penguin

10   Random House.  When data became available from Simon & Schuster

11   in September 2020, he added that data to the model.  When

12   additional data became available in October 2020, he included

13   that data as well.  The data and assumptions in the model were

14   closely checked by executives in the Bertelsmann M&A group and

15   the ZI risk management group including Markus Dohle and Nihar

16   Malaviya.

17           Mr. Sansigre estimates that the model was revised a

18   hundred times before it became final.  All of Mr. Sansigre's

19   judgments and assumptions were based on his broad experience in

20   M&A and in particular in M&A in the publishing industry.

21           And the Court has no doubt that Mr. Sansigre is very

22   competent, an expert in these matters.

23           Mr. Sansigre uses the term synergies and efficiencies

24   interchangeably.  His model identified four categories of

25   synergies; real estate, operating expenses, variable costs, and

```
 1   revenue.
 2        The real estate efficiencies were largely based on
 3   expected consolidation of Simon & Schuster's New York
 4   headquarters with Penguin Random House's New York headquarters.
 5   Mr. Sansigre consulted with managers within Penguin Random
 6   House and determined that the personnel of Simon & Schuster
 7   could be accommodated in Penguin Random House's New York office
 8   space.  He then examined Simon & Schuster's lease and consulted
 9   with real estate experts who advised him that he could sublet
10   Simon & Schuster's office space for 50 percent of the rental
11   payments owed under the lease.  He also examined other real
12   estate holdings and estimated some additional savings from
13   allowing other leases to expire.  Based on those calculations,
14   he projected approximately $10 million in savings per year,
15   almost all of which are from consolidating the New York office
16   space.
17        The operating expense synergies reflect efficiencies
18   in headcount and non-headcount expenses, essentially personnel
19   costs.
20        Mr. Sansigre's November 2020 model projected
21   $           in annual operating expense synergies in 2025.
22        You know, I didn't think of this before, parties, but
23   I do have numbers in this.  Is it okay for me to be reading
24   this publicly?
25        MR. FRACKMAN:  As the Court knows, we actually made
```

```
 1   quite an effort to keep the numbers confidential.  And I think
 2   both Simon & Schuster and Penguin Random House believe they are
 3   confidential.  They affect personnel issues and subsequent
 4   events.
 5            THE COURT:  I am going to black out the numbers then,
 6   and we will issue a blacked out -- I will just black out the
 7   numbers and then read on the record.  Thank you.  I'm sorry
 8   about that.
 9            Okay.  So Mr. Sansigre's November 2020 model projected
10   a certain amount in annual operating expense synergies in 2025.
11   Mr. Sansigre began by predicting a percentage decrease in
12   operating expenses.  And this figure was based on prior
13   operating expense synergies in 26 prior acquisitions including
14   the 2013 Penguin Random House merger which had operating
15   expense synergies of a certain percentage as well as
16   consultation with Penguin Random House executives like
17   Mr. Malaviya and Mr. Dohle.
18            Then Mr. Sansigre looked at the data examining costs
19   department by department to identify where operating expense
20   synergies actually might be achieved.
21            In some departments such as sales, IT, and
22   administration, Mr. Sansigre looked at specific employee roles
23   and third party contracts to determine which kinds of positions
24   or contacts might be redundant to estimate headcount and
25   non-headcount savings.
```

```
 1              In some other departments such as fulfillment,

 2    Mr. Sansigre used his judgment to project a percentage of

 3    savings based on considerations like Penguin Random House's

 4    ability to scale its distribution to meet a portion of Simon &

 5    Schuster's distribution demand.

 6              After reviewing the department-by-department data,

 7    Mr. Sansigre compared the cumulative projected synergies of

 8    that analysis with the expected percentage of synergies that he

 9    had used based on prior transactions and management judgment,

10    and the two projected synergies number matched.

11              Mr.  Sansigre's November 2020 model projected a

12    certain amount of annual variable cost synergies in 2025.  As

13    part of the variable costs, Mr. Sansigre considered return

14    rates.  He found that Penguin Random House had lower return

15    rates than Simon & Schuster by certain percentage points

16    between 2017 and 2021.  He reviewed records of improved rates

17    from the 2013 merger from Penguin and Random House, the

18    acquisition of smaller publishers like Little Tiger, and

19    experiences of Penguin Random House's third party distribution

20    clients.  He also consulted Simon & Schuster and Penguin Random

21    House management.

22              Based on those considerations, Mr. Sansigre used his

23    judgment to predict a certain percentage of improvement in

24    Simon & Schuster's post-merger return rate by 2025.  Penguin

25    Random House's investments in a supply chain were a significant
```

1    factor in those projections.

2           Mr. Sansigre's November 2020 model projected a certain

3    amount of annual revenue synergies in 2025.  The most

4    significant projected revenue synergies came from gross

5    physical sales and audio.  After accounting for certain rising

6    costs, most significantly royalties and advance write-offs, he

7    came up with a particular number that was a projected increase

8    in sales.  And the sales projections are based on

9    Mr. Sansigre's judgment and experience.

10          Penguin Random House's large sales force was a

11   significant factor in Mr. Sansigre's gross physical sales

12   projections.  He believed this large sales force would get

13   Simon & Schuster books into more stores and, thus, increase

14   sales, namely in independent books stores, specialty stores,

15   and international retailers.

16          Simon & Schuster relies on its top customers for a

17   greater proportion of its sales than Penguin Random House does.

18   Mr. Sansigre interpreted this to mean that Penguin Random House

19   could improve Simon & Schuster's sales among it's non-top

20   customers.

21          Considering past acquisitions, Mr. Sansigre noted that

22   Penguin Random House doubled the sales of Little Tiger's

23   imprints within two years after acquiring the smaller

24   publisher.

25          Notably, however, Mr. Sansigre's sales projections do

```
1   not align with the historical data from the 2013 merger of
2   Penguin and Random House which is more similar in scale to the
3   proposed merger of Penguin Random House and Simon & Schuster.
4         After the 2013 merger, sales declined.  Mr. Sansigre
5   discounts the sales results of the 2013 merger because of
6   changed market conditions including the decline of commercial
7   fiction around 2013 in which Penguin was heavily invested at
8   the time.
9         In audio Mr. Sansigre predicted that Penguin Random
10  House's significant investments in in-house audio production
11  would let it improve Simon & Schuster's audio revenue because
12  Simon & Schuster relied on third parties for much of its audio
13  revenue.
14        Mr. Sansigre used his judgment to predict that Simon &
15  Schuster would have a certain percentage increase in audio
16  revenue post merger through essentially growing with the market
17  and benefiting from Penguin Random House's in-house
18  capabilities.
19        Mr. Sansigre discounted Simon & Schuster's
20  management's relatively high predictions for a Simon & Schuster
21  standalone future audio revenue because he wanted to
22  independently analyze the value of the merger.
23        So in sum, Mr. Sansigre's projected synergies are
24  based on educated management judgments mostly based on past
25  experience and applied to whatever detailed data about the
```

 1 | businesses of Penguin Random House and Simon & Schuster that
 2 | was available to him.
 3 |       Many of the projections about cost savings are
 4 | arguably verifiable because theoretically an independent party
 5 | could look at all the underlying data about the costs of each
 6 | entity that Mr. Sansigre compiled and inputted into his
 7 | spreadsheets.  They could get detailed explanations about the
 8 | assumptions that Mr. Sansigre made in coming up with his
 9 | percentage estimates of savings, and they could determine
10 | whether those assumptions were reasonable and based on past
11 | experience.  Relying on past experience is favored by the
12 | horizontal merger guidelines.
13 |       Some of the projections, however, most notably the
14 | revenue projections, are not verifiable and are not based on
15 | past experience.
16 |       The November 2020 model projects sales synergies after
17 | the merger even though past experience does not support any
18 | sales synergies because after Penguin and Random House merged
19 | in 2013, they experienced a decrease in sales.
20 |       There were other merger experiences of Penguin Random
21 | House that supported the idea of sales synergies, but
22 | Mr. Sansigre picked and chose among the different precedents
23 | and he justified his sales projections not relying on Penguin
24 | and Random House merger based on his evaluation of changed
25 | marketing conditions.

1          Therefore, the actual percentages that Mr. Sansigre

2     chose to apply to revenues as synergies are not verifiable.

3          Indeed, the defendants have conceded that revenue

4     synergies are the least easy to predict, and one of

5     Mr. Sansigre's own emails in the record acknowledges that the

6     sales efficiencies are difficult to predict.

7          Ultimately, however, the projected sales synergies are

8     derived from Mr. Sansigre's personal judgment, and they are not

9     consistent with the most prominent past experience and, thus,

10    the projected sales synergies in particular are not verifiable.

11         Number two, none of the efficiencies are independently

12    verified.

13         The parties agree and stipulate that, regardless of

14    whether the model was verifiable, it was not, in fact, verified

15    by anyone outside of Penguin Random House.  Thus, there was no

16    independent verification as the horizontal merger guidelines

17    and prior case law contemplate.

18         Defendants argue that the Court may verify the

19    projections by hearing how they were derived and satisfying

20    itself that Mr. Sansigre put in a lot of work and made

21    reasonable assumptions, but the Court strongly disagrees that

22    this is what is contemplated by horizontal merger guidelines

23    and the case law.

24         The Court is not in a position to fact-check what

25    Mr. Sansigre says that he did or to determine whether his

1    assumptions were reasonable.  Notably, none of the cases that

2    have considered this issue support the notion that the Court

3    should provide the independent verification necessary to

4    support efficiencies evidence proffered by defendants.

5         Defendants have said that there's no case that says an

6    expert is necessary.  And I think that's true.  Nobody has said

7    that explicitly.  But the defendants have the burden to

8    establish that these efficiencies were independently verified,

9    and they assume a risk in litigation in arguing to a court that

10   a court should do that work that in many precedents was

11   performed by experts with much more knowledge about the

12   industry and expertise in dealing with financial models and

13   assumptions than a court could reasonably be expected to have.

14        This Court notes that in the Sysco case, that court

15   found that the expert had not verified whether efficiencies

16   predicted by a consulting company were merger specific and for

17   that reason among others declined to consider the efficiencies

18   evidence.  That court did not attempt to verify the merger

19   specificity on its own.  And this Court is not aware of any

20   other precedent where a court has undertaken the kind of

21   rigorous verification that is necessary in order to rely on

22   efficiencies in an antitrust case.

23        Number three, subsequent updates of the November 2020

24   model undermine its reliability.

25        After the November 2020 model was created,

1    Mr. Sansigre continued to update and refine the model.  Most

2    notably, new iterations of the model were created in June 2021

3    and January 2022.  The new iterations have some drastically

4    different projections with respect to efficiencies.  The Court

5    focuses on the January 2022 model because defendants contend

6    that the June 2021 model was about a special circumstance, a

7    possible large infusion of cash to the business.

8         Looking at the January 2022 model, that model predicts

9    an increase in gross physical sales of ▇▇▇▇▇▇▇▇▇▇▇ as

10   compared to ▇▇▇▇▇▇▇ in the November 2022 model.

11        The January 2022 model predicts -- I'm sorry, I should

12   not have said those numbers.

13        The January '22 model predicts a certain number in

14   fulfilling savings as compared to a much larger number

15   predicted in November 2020, and savings on administration in

16   the 2022 model is far larger as compared to the number in the

17   November 2020 model.  And I understand that that includes

18   editorial and art, but the additions of those lines does not

19   account for the magnitude of the change.

20        Furthermore, certain projections of the November 2020

21   model were proved inaccurate by the actual performance of

22   Simon & Schuster in 2021.

23        While the November 2020 model made certain predictions

24   of synergies for a merged company based on inputs regarding

25   Simon & Schuster's expected performance as a standalone

1    company, the actual standalone performance of Simon & Schuster

2    exceeded the predictions.

3            This indicates that the November 2020 model is both

4    out of date because it does not include actual updated

5    performance numbers and also that the November 2020 model

6    relied on proveably wrong projections and predictions.

7            Mr. Sansigre testified that the November 2020 model is

8    still the most reliable because it reflects pre-pandemic market

9    conditions.  It appears to be his judgment that the future will

10   look more like the pre-pandemic world than the present world.

11           The Court rejects that testimony because Mr. Sansigre

12   cannot possibly know what the post-pandemic world will be like

13   and whether the book industry will revert to pre-pandemic

14   levels of sales and costs.  Even with the benefit of industry

15   expertise, it is clear to this Court that we are in uncharted

16   waters.

17           Thus, the Court concludes that the November 2020 model

18   is unreliable because its inputs are not updated and its

19   projections are proveably inconsistent with actual numbers for

20   Simon & Schuster in 2021.  The Court finds that Mr. Sansigre's

21   justifications for continuing to use the November 2020 model

22   are unpersuasive.

23           The Court, thus, finds that the November 2020

24   efficiencies model contains some projected efficiencies that

25   are not verifiable and that, in any event, none of the

```
 1   efficiencies have been verified as required by the horizontal

 2   merger guidelines and persuasive case law.

 3           Moreover, the model is unreliable because it is not

 4   updated and makes proveably inaccurate projections.  As a

 5   result, Dr. Snyder's expert report based on the November 2020

 6   model is not based on sufficient facts and data under Rule 702

 7   and must be excluded.

 8           Five precedents in this jurisdiction unanimously

 9   support this conclusion.  Those precedents are H&R Block,

10   Wilhelmsen, Staples, Aetna, and Sysco.

11           In United States versus H&R Block, the court rejected

12   efficiencies evidence where the projected efficiencies, quote,

13   were largely premised on defendant's managers' experiential

14   judgment about likely costs rather than a detailed analysis of

15   historical data.

16           The court noted that, while reliance on the estimation

17   and judgment of experienced executives about costs may be

18   perfectly sensible as a business matter, the lack of a

19   verifiable method of factual analysis resulting in the cost

20   estimates renders them not cognizable by the court.

21           If this were not so, then the efficiencies defense

22   might well swallow the whole of section 7 of the Clayton Act

23   because management would be able to present large efficiencies

24   based on its own judgment and the court would be hard pressed

25   to find otherwise.
```

1          In this case, many of the efficiencies projections are

2     also premised on management expectations and judgment.

3          In FTC versus Wilhelmsen Holding ASA, the court

4     rejected efficiencies evidence where the projected efficiencies

5     were based on, quote, a series of significant assumptions,

6     percentage reductions in cost, percentage increases in

7     productivity, or assumed cost product equivalencies that were

8     doing all the work in calculation of the estimates.

9          There the critical issue was that because the bases

10    for the assumptions the expert identified and their role in the

11    efficiencies analysis were unclear, the reasonableness of the

12    assumptions along with the ultimate determinations could not be

13    verified with any degree of rigor.

14         Significantly, the court in that case noted that,

15    quote, references to the merging parties' past practices,

16    managerial expertise, and incentives or internal verification

17    processes, unquote, could not, quote, serve to substantiate any

18    efficiencies, unquote, because a court cannot substitute

19    defendants' assessments and projections for independent

20    verification.

21         So here, while Penguin Random House's internal process

22    was rigorous, that internal process cannot substitute for

23    independent verification.

24         In FTC versus Staples, the court rejected efficiencies

25    evidence where, quote, the defendants' projected base case

1    savings of $5 billion were in large part unverified or at least

2    the defendants failed to produce the necessary documentation

3    for verification, unquote.

4         Here the efficiencies also are unverified.  And

5    although the defendants will say that they produced the

6    documentation for verification, as the Court has already

7    stated, the Court does not have the capability, the time, or

8    resources to perform the verification.

9         In United States versus Aetna, the court rejected

10   efficiencies evidence where the defendants' experts failed to

11   review the underlying provider contracts after the merging

12   parties approached -- after the merging parties projected

13   efficiencies based on the contracts, and that was criticized.

14        Instead, the expert noted simply that a third party

15   consultant had taken a large haircut to the total savings

16   estimated and without much analysis concluded that the savings

17   were verifiable.

18        The court deemed that insufficient.  The court said,

19   without a more robust analysis which the companies have not

20   provided, the court cannot conclude that these network

21   efficiencies are verifiable and likely to be passed on to

22   consumers.

23        Here, like in that case, Dr. Snyder also failed to

24   look closely at the underlying data and did not do any robust

25   analysis to verify the efficiencies.

1        Finally, in FTC versus Sysco, the court rejected

2  efficiencies evidence where defendants' expert relied on

3  synergy projections made by McKinsey, the consulting firm which

4  was hired by Sysco to determine the prospective value of

5  acquiring U.S. Foods.

6        The court there did not question the rigor and scale

7  of the analysis conducted by McKinsey but noted that the expert

8  had not verified that the synergies were merger specific.

9        The court stated that it was not clear what

10  independent analysis the expert did to reduce McKinsey's

11  projected savings to merger-specific savings.

12        The court also noted that in one example, the expert

13  relied exclusively on documents created by either McKinsey or

14  defendants.  He performed no independent analysis to verify

15  those numbers.

16        Again, similarly in this case, Dr. Snyder did not

17  perform any independent analysis to verify the numbers.  And in

18  that case, the court did not undertake to do the verification

19  itself.

20        As a result, the Court will exclude Dr. Snyder's

21  testimony on efficiencies.  No independent party could

22  reasonably verify the magnitude of at least some of the

23  asserted efficiencies in Mr. Sansigre's projected model,

24  especially the sales synergies, and Dr. Snyder made no attempt

25  to provide a quantitative verification of the synergies.

 1  Because Dr. Snyder's testimony was not based on sufficient

 2  facts and data, that testimony cannot help the trier of fact to

 3  determine a fact at issue and, therefore, is not admissible

 4  under Rule 702.

 5       Although the Court's reasoning is firmly grounded in

 6  precedents applying the horizontal merger guidelines, it bears

 7  mentioning that the Court's analysis under Rule 702 is also

 8  consistent with the application of that rule in other contexts.

 9  It is well established that expert testimony may be excluded

10  under Rule 702 where the expert relies uncritically on

11  information provided to them by the party or parties for whom

12  they are working.

13       In the Title VII case, Campbell versus National

14  Railroad Passenger Corporation, the court excluded the

15  testimony of plaintiffs' expert who relied on a summary of

16  testimony prepared by plaintiffs' counsel to form his opinions

17  without independently reviewing or verifying that testimony.

18  That case is at 311 F.Supp.3d 281 from 299 to 300.  That's

19  D.D.C. 2018.

20       The court reasoned, quote, such blind reliance on

21  facts provided by plaintiff's counsel combined with his failure

22  to review other sources of information renders his expert

23  report unreliable, unquote.  That's at 300.

24       See also McReynolds versus Sodexho Marriott Services,

25  Inc., 349 F.Supp.2d 30 at 38, D.D.C. 2004, allowing in a

1    Title VII case testimony of plaintiffs' expert who relied on

2    data prepared by the opposing party instead of by the same

3    party who retained the expert.

4          And see also United States ex rel Morsell versus

5    NortonLifeLock, Inc.  That's 568 F.Supp.3d 248 at 276, D.D.C.

6    2021, where expert and false claims case explicitly disclaimed

7    verification of assumptions, the expert was allowed to opine

8    only conditionally assuming the government succeeds in proving

9    the assumptions upon which the opinions rely.

10         All of these cases support the proposition that an

11   expert's opinion may be excluded as unreliable when the opinion

12   blindly rests on evidence provided by the party that retains

13   the expert.  A party may not cloak unexamined assumptions in

14   the authority of expert analysis.  See Ask Chemicals, LP versus

15   Computer Packages, Inc, 593 F.Appx. 506, 510, Sixth Circuit,

16   2014.

17         For all the foregoing reasons, the Court grants the

18   government's motion to exclude the defendants' efficiencies

19   evidence.

20         Does any party want any additional findings or

21   conclusions for the record?

22         MR. SCHWARZ:  No, Your Honor.

23         MR. FRACKMAN:  I think that covers it, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         So we were in the midst of Dr. Snyder's testimony.

# Exhibit 5

**Filed Under Seal**

# Exhibit 6

**Filed Under Seal**

# Exhibit 7

**Filed Under Seal**

# Exhibit 8

AWS News Blog

# The New Cloud TCO Comparison Calculator for Web Applications

by Jeff Barr | on 31 OCT 2012 | in Launch, News | Permalink | ↱ Share

I have been having discussions related to the Total Cost of Ownership (TCO) of running workloads in the cloud as it compares to running them on premises. One consistent conclusion is that weighing the financial considerations of owning and operating a data center or co-located facility versus employing a cloud infrastructure or a cloud service requires detailed and careful analysis. The TCO is often the financial metric that is used to estimate and compare direct and indirect costs of a product or a service. It typically includes the actual costs of procurement, management, maintenance and decommissioning of hardware resources over their useful life (which is typically a 3 or 5 year period). Given the plethora of different hardware configurations available today, it sometimes becomes difficult to know the actual costs and come up with an accurate TCO model that represents the true cost of running your application.

Im also hearing from customers that it can be challenging for them to do the right apples-to-apples comparisons between on premises infrastructure and an infrastructure that is offered as a service. In practice, it is not as simple as just measuring potential hardware expense alongside utility pricing for compute and storage resources (read our TCO Whitepaper). We have noticed that customers struggle to compare the two models especially when they are trying to compare the TCO of a web application scenario that includes compute, storage, network access, load balancing and all the complements of the architecture.

I am very happy to announce the new TCO Calculator for Web Applications. This tool should help anyone with even a base level of familiarity with infrastructure to generate a fact based apples to apples TCO comparison for on premises and AWS infrastructure. The tool is simple to use and allows you to adjust your assumptions based on your current data center setup. In three easy steps, it provides both a summary and a comprehensive detailed report, with an FAQ that explains assumptions and methods used.



In order to provide an objective analysis, the tool uses a combination of data points from analyst research, and analysis of data from hundreds of customers by both AWS and AWS partners. The calculator also provides user-

adjusted variables in order to ensure further objectivity. The calculator was commissioned to be built by 2nd Watch, an AWS Advanced Partner who leveraged their own wealth of customer data points and experience in operating both data center and AWS infrastructure.

### Real Example

Let's take a look at an example to help us understand how this works. Lets assume that you wanted to refresh hardware and had to renew a contract with your existing co-lo facility and were evaluating whether AWS cloud will be more cost effective or not in a long run

Lets say that following is your existing or planned on premises infrastructure specification:

- **Web Servers**: 4 Production, 6 Dev and QA. 1 CPU, 6 Core, 2.6 Ghz, 4 GB RAM, 400 GB HD, Linux Ubuntu, 10% maintenance, 11% discount

- **Database Servers**: 2 Production, 2 Dev and QA. 2 CPU, 4 Core, 1.6 Ghz, 16 GB RAM, 1.0 TB database, MySQL on Linux, 10% maintenance, 11% Discount

- **Storage**: 4 TB SAN, no NAS, long term storage, or archive, 10% Maintenance Costs, 10% Discount

- **Network**: Fully redundant firewalls, switches and load balancers, 50 Mbps Internet with 2 telecommunications providers – secondary independent 5MB backup provider

- **Environment**: Cage (shared with other company equipment) Tier 1 Co lo Facility, Dual Utility Providers, 1.5 Racks, 10% hardware/software maintenance, 3 year amortization

- **Administrative Overhead**: 15% Administrative Overhead

- **Growth Rate**: 30% annually

- **Usage Pattern:** Spiky Predictable. Like most web apps, a predictable and cyclical usage pattern.

The beauty of this tool is that you will be able to input exactly this configuration and adjust your assumptions. Whether you use it by just answering seven simple questions, or you spend more time with it to model more detailed scenarios, it can save you lots of effort while providing comprehensive comparisons.

Most importantly, it will help alleviate most common mistakes that we see when customers develop TCO comparison models such as not including the 3 Year Reserved Instances in a 3 Year cost comparison analysis or not including Heavy Utilization RIs for your baseline Always-on workloads or underestimating the personnel costs and ignoring the applications usage patterns.

This web based calculator is currently in beta and is currently optimized for the Web Application use case, although it can be used to model other infrastructure setups. As always, we are looking for feedback, suggestions and comments and hope to roll out more use cases and improve it over time.

Driving costs down for our customers is part of the DNA of Amazon and therefore also part of the DNA of AWS. Were seeing how customers from startups with hyper growth to large organizations with stable workloads are able to leverage our low prices, usage based billing, tiered pricing, and variety of purchasing options to continuously lower

their cost of acquiring and operating applications. You can find more information, more whitepapers, tools and specific case studies on our Economics Center at http://aws.amazon.com/economics

Jinesh;

# Exhibit 9

# Total Cost of Ownership (TCO) Calculator

**Estimate the cost savings you can realize by migrating your workloads to Azure**

 Bulk Upload        My saved reports        Sign In

## Servers

Enter the details of your on-premises server infrastructure. After adding a workload, select the workload type and enter the remaining details.

 Add server workload

## Databases

Enter the details of your on-premises database infrastructure. After adding a database, enter the details of your on-premises database infrastructure in the Source section. In the Destination section, select the Azure service you would like to use.

 Add database

Chat with Sales

## Storage

Enter the details of your on-premises storage infrastructure. After adding storage, select the storage type and enter the remaining details.

 Add storage

---

## Networking

Enter the amount of network bandwidth you currently consume in your on-premises environment.

Outbound bandwidth ⓘ

| 1 |
|---|

| GB | ⌄ |
|---|---|

(1 - 2000000)

Destination Region

| East Asia | ⌄ |
|---|---|

# Exhibit 10

JOHN L. **HENNESSY**        DAVID A. **PATTERSON**

# COMPUTER
# ARCHITECTURE

*A Quantitative Approach*

FIFTH EDITION



# Computer Architecture
## A Quantitative Approach

*Fifth Edition*

## John L. Hennessy
*Stanford University*

## David A. Patterson
*University of California, Berkeley*

**With Contributions by**

**Krste Asanović**
*University of California, Berkeley*

**Jason D. Bakos**
*University of South Carolina*

**Robert P. Colwell**
*R&E Colwell & Assoc. Inc.*

**Thomas M. Conte**
*North Carolina State University*

**José Duato**
*Universitat Politècnica de València and Simula*

**Diana Franklin**
*University of California, Santa Barbara*

**David Goldberg**
*The Scripps Research Institute*

**Norman P. Jouppi**
*HP Labs*

**Sheng Li**
*HP Labs*

**Naveen Muralimanohar**
*HP Labs*

**Gregory D. Peterson**
*University of Tennessee*

**Timothy M. Pinkston**
*University of Southern California*

**Parthasarathy Ranganathan**
*HP Labs*

**David A. Wood**
*University of Wisconsin–Madison*

**Amr Zaky**
*University of Santa Clara*



ELSEVIER

Amsterdam • Boston • Heidelberg • London
New York • Oxford • Paris • San Diego
San Francisco • Singapore • Sydney • Tokyo



**Acquiring Editor: Todd Green**
**Development Editor: Nate McFadden**
**Project Manager: Paul Gottehrer**
**Designer: Joanne Blank**

*Morgan Kaufmann* is an imprint of Elsevier
225 Wyman Street, Waltham, MA 02451, USA

© 2012 Elsevier, Inc. All rights reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the publisher. Details on how to seek permission, further information about the Publisher's permissions policies and our arrangements with organizations such as the Copyright Clearance Center and the Copyright Licensing Agency, can be found at our website: *www.elsevier.com/permissions*.

This book and the individual contributions contained in it are protected under copyright by the Publisher (other than as may be noted herein).

**Notices**
Knowledge and best practice in this field are constantly changing. As new research and experience broaden our understanding, changes in research methods or professional practices, may become necessary. Practitioners and researchers must always rely on their own experience and knowledge in evaluating and using any information or methods described herein. In using such information or methods they should be mindful of their own safety and the safety of others, including parties for whom they have a professional responsibility.

To the fullest extent of the law, neither the Publisher nor the authors, contributors, or editors, assume any liability for any injury and/or damage to persons or property as a matter of products liability, negligence or otherwise, or from any use or operation of any methods, products, instructions, or ideas contained in the material herein.

**Library of Congress Cataloging-in-Publication Data**
Application submitted

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library.

ISBN: 978-0-12-383872-8

For information on all MK publications
visit our website at *www.mkp.com*

Printed in the United States of America
11 12 13 14 15 10 9 8 7 6 5 4 3 2 1

*Typeset by*: diacriTech, Chennai, India

Working together to grow
libraries in developing countries

www.elsevier.com | www.bookaid.org | www.sabre.org

ELSEVIER BOOK AID International Sabre Foundation

1.6    **Trends in Cost**

Although costs tend to be less important in some computer designs—specifically supercomputers—cost-sensitive designs are of growing significance. Indeed, in the past 30 years, the use of technology improvements to lower cost, as well as increase performance, has been a major theme in the computer industry.

Textbooks often ignore the cost half of cost-performance because costs change, thereby dating books, and because the issues are subtle and differ across industry segments. Yet, an understanding of cost and its factors is essential for computer architects to make intelligent decisions about whether or not a new feature should be included in designs where cost is an issue. (Imagine architects designing skyscrapers without any information on costs of steel beams and concrete!)

This section discusses the major factors that influence the cost of a computer and how these factors are changing over time.

**The Impact of Time, Volume, and Commoditization**

The cost of a manufactured computer component decreases over time even without major improvements in the basic implementation technology. The underlying principle that drives costs down is the *learning curve*—manufacturing costs decrease over time. The learning curve itself is best measured by change in *yield*—the percentage of manufactured devices that survives the testing procedure. Whether it is a chip, a board, or a system, designs that have twice the yield will have half the cost.

Understanding how the learning curve improves yield is critical to projecting costs over a product's life. One example is that the price per megabyte of DRAM has dropped over the long term. Since DRAMs tend to be priced in close relationship to cost—with the exception of periods when there is a shortage or an oversupply—price and cost of DRAM track closely.

Microprocessor prices also drop over time, but, because they are less standardized than DRAMs, the relationship between price and cost is more complex. In a period of significant competition, price tends to track cost closely, although microprocessor vendors probably rarely sell at a loss.

Volume is a second key factor in determining cost. Increasing volumes affect cost in several ways. First, they decrease the time needed to get down the learning curve, which is partly proportional to the number of systems (or chips) manufactured. Second, volume decreases cost, since it increases purchasing and manufacturing efficiency. As a rule of thumb, some designers have estimated that cost decreases about 10% for each doubling of volume. Moreover, volume decreases the amount of development cost that must be amortized by each computer, thus allowing cost and selling price to be closer.

*Commodities* are products that are sold by multiple vendors in large volumes and are essentially identical. Virtually all the products sold on the shelves of grocery stores are commodities, as are standard DRAMs, Flash memory, disks,

monitors, and keyboards. In the past 25 years, much of the personal computer industry has become a commodity business focused on building desktop and laptop computers running Microsoft Windows.

Because many vendors ship virtually identical products, the market is highly competitive. Of course, this competition decreases the gap between cost and selling price, but it also decreases cost. Reductions occur because a commodity market has both volume and a clear product definition, which allows multiple suppliers to compete in building components for the commodity product. As a result, the overall product cost is lower because of the competition among the suppliers of the components and the volume efficiencies the suppliers can achieve. This rivalry has led to the low end of the computer business being able to achieve better price-performance than other sectors and yielded greater growth at the low end, although with very limited profits (as is typical in any commodity business).

## Cost of an Integrated Circuit

Why would a computer architecture book have a section on integrated circuit costs? In an increasingly competitive computer marketplace where standard parts—disks, Flash memory, DRAMs, and so on—are becoming a significant portion of any system's cost, integrated circuit costs are becoming a greater portion of the cost that varies between computers, especially in the high-volume, cost-sensitive portion of the market. Indeed, with personal mobile devices' increasing reliance of whole *systems on a chip* (SOC), the cost of the integrated circuits is much of the cost of the PMD. Thus, computer designers must understand the costs of chips to understand the costs of current computers.

Although the costs of integrated circuits have dropped exponentially, the basic process of silicon manufacture is unchanged: A *wafer* is still tested and chopped into *dies* that are packaged (see Figures 1.13, 1.14, and 1.15). Thus, the cost of a packaged integrated circuit is

$$\text{Cost of integrated circuit} = \frac{\text{Cost of die} + \text{Cost of testing die} + \text{Cost of packaging and final test}}{\text{Final test yield}}$$

In this section, we focus on the cost of dies, summarizing the key issues in testing and packaging at the end.

Learning how to predict the number of good chips per wafer requires first learning how many dies fit on a wafer and then learning how to predict the percentage of those that will work. From there it is simple to predict cost:

$$\text{Cost of die} = \frac{\text{Cost of wafer}}{\text{Dies per wafer} \times \text{Die yield}}$$

The most interesting feature of this first term of the chip cost equation is its sensitivity to die size, shown below.



**Figure 1.13  Photograph of an Intel Core i7 microprocessor die, which is evaluated in Chapters 2 through 5.** The dimensions are 18.9 mm by 13.6 mm (257 mm$^2$) in a 45 nm process. (Courtesy Intel.)



**Figure 1.14  Floorplan of Core i7 die in Figure 1.13 on left with close-up of floorplan of second core on right.**

**30** ▪ Chapter One *Fundamentals of Quantitative Design and Analysis*



**Figure 1.15** This 300 mm wafer contains 280 full Sandy Bridge dies, each 20.7 by 10.5 mm in a 32 nm process. (Sandy Bridge is Intel's successor to Nehalem used in the Core i7.) At 216 mm², the formula for dies per wafer estimates 282. (Courtesy Intel.)

The number of dies per wafer is approximately the area of the wafer divided by the area of the die. It can be more accurately estimated by

$$\text{Dies per wafer} = \frac{\pi \times (\text{Wafer diameter}/2)^2}{\text{Die area}} - \frac{\pi \times \text{Wafer diameter}}{\sqrt{2} \times \text{Die area}}$$

The first term is the ratio of wafer area ($\pi r^2$) to die area. The second compensates for the "square peg in a round hole" problem—rectangular dies near the periphery of round wafers. Dividing the circumference ($\pi d$) by the diagonal of a square die is approximately the number of dies along the edge.

**Example**   Find the number of dies per 300 mm (30 cm) wafer for a die that is 1.5 cm on a side and for a die that is 1.0 cm on a side.

**Answer**   When die area is 2.25 cm$^2$:

$$\text{Dies per wafer} = \frac{\pi \times (30/2)^2}{2.25} - \frac{\pi \times 30}{\sqrt{2 \times 2.25}} = \frac{706.9}{2.25} - \frac{94.2}{2.12} = 270$$

Since the area of the larger die is 2.25 times bigger, there are roughly 2.25 as many smaller dies per wafer:

$$\text{Dies per wafer} = \frac{\pi \times (30/2)^2}{1.00} - \frac{\pi \times 30}{\sqrt{2 \times 1.00}} = \frac{706.9}{1.00} - \frac{94.2}{1.41} = 640$$

However, this formula only gives the maximum number of dies per wafer. The critical question is: What is the fraction of good dies on a wafer, or the *die yield*? A simple model of integrated circuit yield, which assumes that defects are randomly distributed over the wafer and that yield is inversely proportional to the complexity of the fabrication process, leads to the following:

$$\text{Die yield} = \text{Wafer yield} \times 1/(1 + \text{Defects per unit area} \times \text{Die area})^N$$

This Bose–Einstein formula is an empirical model developed by looking at the yield of many manufacturing lines [Sydow 2006]. *Wafer yield* accounts for wafers that are completely bad and so need not be tested. For simplicity, we'll just assume the wafer yield is 100%. Defects per unit area is a measure of the random manufacturing defects that occur. In 2010, the value was typically 0.1 to 0.3 defects per square inch, or 0.016 to 0.057 defects per square centimeter, for a 40 nm process, as it depends on the maturity of the process (recall the learning curve, mentioned earlier). Finally, $N$ is a parameter called the process-complexity factor, a measure of manufacturing difficulty. For 40 nm processes in 2010, $N$ ranged from 11.5 to 15.5.

**Example**   Find the die yield for dies that are 1.5 cm on a side and 1.0 cm on a side, assuming a defect density of 0.031 per cm$^2$ and $N$ is 13.5.

**Answer**   The total die areas are 2.25 cm$^2$ and 1.00 cm$^2$. For the larger die, the yield is

$$\text{Die yield} = 1/(1 + 0.031 \times 2.25)^{13.5} = 0.40$$

For the smaller die, the yield is

$$\text{Die yield} = 1/(1 + 0.031 \times 1.00)^{13.5} = 0.66$$

That is, less than half of all the large dies are good but two-thirds of the small dies are good.

The bottom line is the number of good dies per wafer, which comes from multiplying dies per wafer by die yield to incorporate the effects of defects. The examples above predict about 109 good 2.25 $cm^2$ dies from the 300 mm wafer and 424 good 1.00 $cm^2$ dies. Many microprocessors fall between these two sizes. Low-end embedded 32-bit processors are sometimes as small as 0.10 $cm^2$, and processors used for embedded control (in printers, microwaves, and so on) are often less than 0.04 $cm^2$.

Given the tremendous price pressures on commodity products such as DRAM and SRAM, designers have included redundancy as a way to raise yield. For a number of years, DRAMs have regularly included some redundant memory cells, so that a certain number of flaws can be accommodated. Designers have used similar techniques in both standard SRAMs and in large SRAM arrays used for caches within microprocessors. Obviously, the presence of redundant entries can be used to boost the yield significantly.

Processing of a 300 mm (12-inch) diameter wafer in a leading-edge technology cost between $5000 and $6000 in 2010. Assuming a processed wafer cost of $5500, the cost of the 1.00 $cm^2$ die would be around $13, but the cost per die of the 2.25 $cm^2$ die would be about $51, or almost four times the cost for a die that is a little over twice as large.

What should a computer designer remember about chip costs? The manufacturing process dictates the wafer cost, wafer yield, and defects per unit area, so the sole control of the designer is die area. In practice, because the number of defects per unit area is small, the number of good dies per wafer, and hence the cost per die, grows roughly as the square of the die area. The computer designer affects die size, and hence cost, both by what functions are included on or excluded from the die and by the number of I/O pins.

Before we have a part that is ready for use in a computer, the die must be tested (to separate the good dies from the bad), packaged, and tested again after packaging. These steps all add significant costs.

The above analysis has focused on the variable costs of producing a functional die, which is appropriate for high-volume integrated circuits. There is, however, one very important part of the fixed costs that can significantly affect the cost of an integrated circuit for low volumes (less than 1 million parts), namely, the cost of a mask set. Each step in the integrated circuit process requires a separate mask. Thus, for modern high-density fabrication processes with four to six metal layers, mask costs exceed $1M. Obviously, this large fixed cost affects the cost of prototyping and debugging runs and, for small-volume production, can be a significant part of the production cost. Since mask costs are likely to continue to increase, designers may incorporate reconfigurable logic to enhance the flexibility of a part or choose to use gate arrays (which have fewer custom mask levels) and thus reduce the cost implications of masks.

## Cost versus Price

With the commoditization of computers, the margin between the cost to manufacture a product and the price the product sells for has been shrinking. Those

margins pay for a company's research and development (R&D), marketing, sales, manufacturing equipment maintenance, building rental, cost of financing, pretax profits, and taxes. Many engineers are surprised to find that most companies spend only 4% (in the commodity PC business) to 12% (in the high-end server business) of their income on R&D, which includes all engineering.

### Cost of Manufacturing versus Cost of Operation

For the first four editions of this book, cost meant the cost to build a computer and price meant price to purchase a computer. With the advent of warehouse-scale computers, which contain tens of thousands of servers, the cost to operate the computers is significant in addition to the cost of purchase.

As Chapter 6 shows, the amortized purchase price of servers and networks is just over 60% of the monthly cost to operate a warehouse-scale computer, assuming a short lifetime of the IT equipment of 3 to 4 years. About 30% of the monthly operational costs are for power use and the amortized infrastructure to distribute power and to cool the IT equipment, despite this infrastructure being amortized over 10 years. Thus, to lower operational costs in a warehouse-scale computer, computer architects need to use energy efficiently.

## 1.7    Dependability

Historically, integrated circuits were one of the most reliable components of a computer. Although their pins may be vulnerable, and faults may occur over communication channels, the error rate inside the chip was very low. That conventional wisdom is changing as we head to feature sizes of 32 nm and smaller, as both transient faults and permanent faults will become more commonplace, so architects must design systems to cope with these challenges. This section gives a quick overview of the issues in dependability, leaving the official definition of the terms and approaches to Section D.3 in Appendix D.

Computers are designed and constructed at different layers of abstraction. We can descend recursively down through a computer seeing components enlarge themselves to full subsystems until we run into individual transistors. Although some faults are widespread, like the loss of power, many can be limited to a single component in a module. Thus, utter failure of a module at one level may be considered merely a component error in a higher-level module. This distinction is helpful in trying to find ways to build dependable computers.

One difficult question is deciding when a system is operating properly. This philosophical point became concrete with the popularity of Internet services. Infrastructure providers started offering *service level agreements* (SLAs) or *service level objectives* (SLOs) to guarantee that their networking or power service would be dependable. For example, they would pay the customer a penalty if they did not meet an agreement more than some hours per month. Thus, an SLA could be used to decide whether the system was up or down.

cost of the infrastructure investment, it is easy to convince cloud computing *users* to give up idle instances since they are paying for them whether or not they are doing anything useful. Similarly, charging by use encourages programmers to use computation, communication, and storage efficiently, which can be difficult to encourage without an understandable pricing scheme. The explicit pricing also makes it possible for researchers to evaluate innovations in cost-performance instead of just performance, since costs are now easily measured and believable. Finally, cloud computing means that researchers can evaluate their ideas at the scale of thousands of computers, which in the past only large companies could afford.

We believe that WSCs are changing the goals and principles of server design, just as the needs of mobile clients are changing the goals and principles of microprocessor design. Both are revolutionizing the software industry, as well. Performance per dollar and performance per joule drive both mobile client hardware and the WSC hardware, and parallelism is the key to delivering on those sets of goals.

Architects will play a vital role in both halves of this exciting future world. We look forward to seeing—and to using—what will come.



## 6.10 Historical Perspectives and References

Section L.8 (available online) covers the development of clusters that were the foundation of WSC and of utility computing. (Readers interested in learning more should start with Barroso and Hölzle [2009] and the blog postings and talks of James Hamilton at *http://perspectives.mvdirona.com*.)

## Case Studies and Exercises by Parthasarathy Ranganathan

### Case Study 1: Total Cost of Ownership Influencing Warehouse-Scale Computer Design Decisions

*Concepts illustrated by this case study*

■ Total Cost of Ownership (TCO)

■ Influence of Server Cost and Power on the Entire WSC

■ Benefits and Drawbacks of Low-Power Servers

Total cost of ownership is an important metric for measuring the effectiveness of a warehouse-scale computer (WSC). TCO includes both the CAPEX and OPEX described in Section 6.4 and reflects the ownership cost of the entire datacenter to achieve a certain level of performance. In considering different servers, networks, and storage architectures, TCO is often the important comparison metric

used by datacenter owners to decide which options are best; however, TCO is a multidimensional computation that takes into account many different factors. The goal of this case study is to take a detailed look into WSCs, how different architectures influence TCO, and how TCO drives operator decisions. This case study will use the numbers from Figure 6.13 and Section 6.4, and assumes that the described WSC achieves the operator's target level of performance. TCO is often used to compare different server options that have multiple dimensions. The exercises in this case study examine how such comparisons are made in the context of WSCs and the complexity involved in making the decisions.

6.1  [5/5/10] <6.2, 6.4> In this chapter, data-level parallelism has been discussed as a way for WSCs to achieve high performance on large problems. Conceivably, even greater performance can be obtained by using high-end servers; however, higher performance servers often come with a nonlinear price increase.

    a. [5] <6.4> Assuming servers that are 10% faster at the same utilization, but 20% more expensive, what is the CAPEX for the WSC?

    b. [5] <6.4> If those servers also use 15% more power, what is the OPEX?

    c. [10] <6.2, 6.4> Given the speed improvement and power increase, what must the cost of the new servers be to be comparable to the original cluster? (*Hint:* Based on this TCO model, you may have to change the critical load of the facility.)

6.2  [5/10] <6.4, 6.8> To achieve a lower OPEX, one appealing alternative is to use low-power versions of servers to reduce the total electricity required to run the servers; however, similar to high-end servers, low-power versions of high-end components also have nonlinear trade-offs.

    a. [5] <6.4, 6.8> If low-power server options offered 15% lower power at the same performance but are 20% more expensive, are they a good trade-off?

    b. [10] <6.4, 6.8> At what cost do the servers become comparable to the original cluster? What if the price of electricity doubles?

6.3  [5/10/15] <6.4, 6.6> Servers that have different operating modes offer opportunities for dynamically running different configurations in the cluster to match workload usage. Use the data in Figure 6.23 for the power/performance modes for a given low-power server.

    a. [5] <6.4, 6.6> If a server operator decided to save power costs by running all servers at medium performance, how many servers would be needed to achieve the same level of performance?

| Mode | Performance | Power |
|------|-------------|-------|
| High | 100% | 100% |
| Medium | 75% | 60% |
| Low | 59% | 38% |

**Figure 6.23** Power–performance modes for low-power servers.

b. [10] <6.4, 6.6> What are the CAPEX and OPEX of such a configuration?

c. [15] <6.4, 6.6> If there was an alternative to purchase a server that is 20% cheaper but slower and uses less power, find the performance–power curve that provides a TCO comparable to the baseline server.

6.4 [Discussion] <6.4> Discuss the trade-offs and benefits of the two options in Exercise 6.3, assuming a constant workload being run on the servers.

6.5 [Discussion] <6.2, 6.4> Unlike high-performance computing (HPC) clusters, WSCs often experience significant workload fluctuation throughout the day. Discuss the trade-offs and benefits of the two options in Exercise 6.3, this time assuming a workload that varies.

6.6 [Discussion] <6.4, 6.7> The TCO model presented so far abstracts away a significant amount of lower level details. Discuss the impact of these abstractions to the overall accuracy of the TCO model. When are these abstractions safe to make? In what cases would greater detail provide significantly different answers?

## Case Study 2: Resource Allocation in WSCs and TCO

*Concepts illustrated by this case study*

■ Server and Power Provisioning within a WSC

■ Time-Variance of Workloads

■ Effects of Variance on TCO

Some of the key challenges to deploying efficient WSCs are provisioning resources properly and utilizing them to their fullest. This problem is complex due to the size of WSCs as well as the potential variance of the workloads being run. The exercises in this case study show how different uses of resources can affect TCO.

6.7 [5/5/10] <6.4> One of the challenges in provisioning a WSC is determining the proper power load, given the facility size. As described in the chapter, nameplate power is often a peak value that is rarely encountered.

a. [5] <6.4> Estimate how the per-server TCO changes if the nameplate server power is 200 watts and the cost is $3000.

b. [5] <6.4> Also consider a higher power, but cheaper option whose power is 300 watts and costs $2000.

c. [10] <6.4> How does the per-server TCO change if the actual average power usage of the servers is only 70% of the nameplate power?

6.8 [15/10] <6.2, 6.4> One assumption in the TCO model is that the critical load of the facility is fixed, and the amount of servers fits that critical load. In reality, due to the variations of server power based on load, the critical power used by a facility can vary at any given time. Operators must initially provision the datacenter

based on its critical power resources and an estimate of how much power is used by the datacenter components.

   a. [15] <6.2, 6.4> Extend the TCO model to initially provision a WSC based on a server with a nameplate power of 300 watts, but also calculate the actual monthly critical power used and TCO assuming the server averages 40% utilization and 225 watts. How much capacity is left unused?

   b. [10] <6.2, 6.4> Repeat this exercise with a 500-watt server that averages 20% utilization and 300 watts.

6.9  [10] <6.4, 6.5> WSCs are often used in an interactive manner with end users, as mentioned in Section 6.5. This interactive usage often leads to time-of-day fluctuations, with peaks correlating to specific time periods. For example, for Netflix rentals, there is a peak during the evening periods of 8 to 10 p.m.; the entirety of these time-of-day effects is significant. Compare the per-server TCO of a datacenter with a capacity to match the utilization at 4 a.m. compared to 9 p.m.

6.10  [Discussion/15] <6.4, 6.5> Discuss some options to better utilize the excess servers during the off-peak hours or options to save costs. Given the interactive nature of WSCs, what are some of the challenges to aggressively reducing power usage?

6.11  [Discussion/25] <6.4, 6.6> Propose one possible way to improve TCO by focusing on reducing server power. What are the challenges to evaluating your proposal? Estimate the TCO improvements based on your proposal. What are advantages and drawbacks?

### Exercises

6.12  [10/10/10] <6.1> One of the important enablers of WSC is ample request-level parallelism, in contrast to instruction or thread-level parallelism. This question explores the implication of different types of parallelism on computer architecture and system design.

   a. [10] <6.1> Discuss scenarios where improving the instruction- or thread-level parallelism would provide greater benefits than achievable through request-level parallelism.

   b. [10] <6.1> What are the software design implications of increasing request-level parallelism?

   c. [10] <6.1> What are potential drawbacks of increasing request-level parallelism?

6.13  [Discussion/15/15] <6.2> When a cloud computing service provider receives jobs consisting of multiple Virtual Machines (VMs) (e.g., a MapReduce job), many scheduling options exist. The VMs can be scheduled in a round-robin manner to spread across all available processors and servers or they can be consolidated to use as few processors as possible. Using these scheduling options, if a job with 24 VMs was submitted and 30 processors were available in the cloud (each able to run up to 3 VMs), round-robin would use 24 processors,

while consolidated scheduling would use 8 processors. The scheduler can also find available processor cores at different scopes: socket, server, rack, and an array of racks.

a. [Discussion] <6.2> Assuming that the submitted jobs are all compute-heavy workloads, possibly with different memory bandwidth requirements, what are the pros and cons of round-robin versus consolidated scheduling in terms of power and cooling costs, performance, and reliability?

b. [15] <6.2> Assuming that the submitted jobs are all I/O-heavy workloads, what are the pros and cons of round-robin versus consolidated scheduling, at different scopes?

c. [15] <6.2> Assuming that the submitted jobs are network-heavy workloads, what are the pros and cons of round-robin versus consolidated scheduling, at different scopes?

6.14 [15/15/10/10] <6.2, 6.3> MapReduce enables large amounts of parallelism by having data-independent tasks run on multiple nodes, often using commodity hardware; however, there are limits to the level of parallelism. For example, for redundancy, MapReduce will write data blocks to multiple nodes, consuming disk and potentially network bandwidth. Assume a total dataset size of 300 GB, a network bandwidth of 1 Gb/sec, a 10 sec/GB map rate, and a 20 sec/GB reduce rate. Also assume that 30% of the data must be read from remote nodes, and each output file is written to two other nodes for redundancy. Use Figure 6.6 for all other parameters.

a. [15] <6.2, 6.3> Assume that all nodes are in the same rack. What is the expected runtime with 5 nodes? 10 nodes? 100 nodes? 1000 nodes? Discuss the bottlenecks at each node size.

b. [15] <6.2, 6.3> Assume that there are 40 nodes per rack and that any remote read/write has an equal chance of going to any node. What is the expected runtime at 100 nodes? 1000 nodes?

c. [10] <6.2, 6.3> An important consideration is minimizing data movement as much as possible. Given the significant slowdown of going from local to rack to array accesses, software must be strongly optimized to maximize locality. Assume that there are 40 nodes per rack, and 1000 nodes are used in the MapReduce job. What is the runtime if remote accesses are within the same rack 20% of the time? 50% of the time? 80% of the time?

d. [10] <6.2, 6.3> Given the simple MapReduce program in Section 6.2, discuss some possible optimizations to maximize the locality of the workload.

6.15 [20/20/10/20/20/20] <6.2> WSC programmers often use data replication to overcome failures in the software. Hadoop HDFS, for example, employs three-way replication (one local copy, one remote copy in the rack, and one remote copy in a separate rack), but it's worth examining when such replication is needed.

a. [20] <6.2> A Hadoop World 2010 attendee survey showed that over half of the Hadoop clusters had 10 nodes or less, with dataset sizes of 10 TB or less.

Using the failure frequency data in Figure 6.1, what kind of availability does a 10-node Hadoop cluster have with one-, two-, and three-way replications?

b.  [20] <6.2> Assuming the failure data in Figure 6.1 and a 1000-node Hadoop cluster, what kind of availability does it have with one-, two-, and three-way replications?

c.  [10] <6.2> The relative overhead of replication varies with the amount of data written per local compute hour. Calculate the amount of extra I/O traffic and network traffic (within and across rack) for a 1000-node Hadoop job that sorts 1 PB of data, where the intermediate results for data shuffling are written to the HDFS.

d.  [20] <6.2> Using Figure 6.6, calculate the time overhead for two- and three-way replications. Using the failure rates shown in Figure 6.1, compare the expected execution times for no replication versus two- and three-way replications.

e.  [20] <6.2> Now consider a database system applying replication on logs, assuming each transaction on average accesses the hard disk once and generates 1 KB of log data. Calculate the time overhead for two- and three-way replications. What if the transaction is executed in-memory and takes 10 μs?

f.  [20] <6.2> Now consider a database system with ACID consistency that requires two network round-trips for two-phase commitment. What is the time overhead for maintaining consistency as well as replications?

6.16  [15/15/20/15/] <6.1, 6.2, 6.8> Although request-level parallelism allows many machines to work on a single problem in parallel, thereby achieving greater overall performance, one of the challenges is avoiding dividing the problem too finely. If we look at this problem in the context of service level agreements (SLAs), using smaller problem sizes through greater partitioning can require increased effort to achieve the target SLA. Assume an SLA of 95% of queries respond at 0.5 sec or faster, and a parallel architecture similar to MapReduce that can launch multiple redundant jobs to achieve the same result. For the following questions, assume the query–response time curve shown in Figure 6.24. The curve shows the latency of response, based on the number of queries per second, for a baseline server as well as a "small" server that uses a slower processor model.

a.  [15] <6.1, 6.2, 6.8> How many servers are required to achieve that SLA, assuming that the WSC receives 30,000 queries per second, and the query–response time curve shown in Figure 6.24? How many "small" servers are required to achieve that SLA, given this response-time probability curve? Looking only at server costs, how much cheaper must the "wimpy" servers be than the normal servers to achieve a cost advantage for the target SLA?

b.  [15] <6.1, 6.2, 6.8> Often "small" servers are also less reliable due to cheaper components. Using the numbers from Figure 6.1, assume that the number of events due to flaky machines and bad memories increases by 30%. How many "small" servers are required now? How much cheaper must those servers be than the standard servers?

**482** ■ Chapter Six *Warehouse-Scale Computers to Exploit Request-Level and Data-Level Parallelism*



**Figure 6.24** Query–response time curve.

c. [20] <6.1, 6.2, 6.8> Now assume a batch processing environment. The "small" servers provide 30% of the overall performance of the regular servers. Still assuming the reliability numbers from Exercise 6.15 part (b), how many "wimpy" nodes are required to provide the same expected throughput of a 2400-node array of standard servers, assuming perfect linear scaling of performance to node size and an average task length of 10 minutes per node? What if the scaling is 85%? 60%?

d. [15] <6.1, 6.2, 6.8> Often the scaling is not a linear function, but instead a logarithmic function. A natural response may be instead to purchase larger nodes that have more computational power per node to minimize the array size. Discuss some of the trade-offs with this architecture.

6.17 [10/10/15] <6.3, 6.8> One trend in high-end servers is toward the inclusion of nonvolatile Flash memory in the memory hierarchy, either through solid-state disks (SSDs) or PCI Express-attached cards. Typical SSDs have a bandwidth of 250 MB/sec and latency of 75 μs, whereas PCIe cards have a bandwidth of 600 MB/sec and latency of 35 μs.

a. [10] Take Figure 6.7 and include these points in the local server hierarchy. Assuming that identical performance scaling factors as DRAM are accessed at different hierarchy levels, how do these Flash memory devices compare when accessed across the rack? Across the array?

b. [10] Discuss some software-based optimizations that can utilize the new level of the memory hierarchy.

c. [25] Repeat part (a), instead assuming that each node has a 32 GB PCIe card that is able to cache 50% of all disk accesses.

d. [15] As discussed in "Fallacies and Pitfalls" (Section 6.8), replacing all disks with SSDs is not necessarily a cost-effective strategy. Consider a WSC operator that uses it to provide cloud services. Discuss some scenarios where using SSDs or other Flash memory would make sense.

6.18  [20/20/Discussion] <6.3> *Memory Hierarchy*: Caching is heavily used in some
WSC designs to reduce latency, and there are multiple caching options to satisfy
varying access patterns and requirements.

   a.  [20] Let's consider the design options for streaming rich media from the Web
   (e.g., Netflix). First we need to estimate the number of movies, number of
   encode formats per movie, and concurrent viewing users. In 2010, Netflix
   had 12,000 titles for online streaming, each title having at least four encode
   formats (at 500, 1000, 1600, and 2200 kbps). Let's assume that there are
   100,000 concurrent viewers for the entire site, and an average movie is one
   hour long. Estimate the total storage capacity, I/O and network bandwidths,
   and video-streaming-related computation requirements.

   b.  [20] What are the access patterns and reference locality characteristics per
   user, per movie, and across all movies? (*Hint*: Random versus sequential,
   good versus poor temporal and spatial locality, relatively small versus large
   working set size.)

   c.  [Discussion] What movie storage options exist by using DRAM, SSD, and
   hard drives? Compare them in performance and TCO.

6.19  [10/20/20/Discussion/Discussion] <6.3> Consider a social networking Web site
with 100 million active users posting updates about themselves (in text and pic-
tures) as well as browsing and interacting with updates in their social networks.
To provide low latency, Facebook and many other Web sites use memcached as a
caching layer before the backend storage/database tiers.

   a.  [10] Estimate the data generation and request rates per user and across the
   entire site.

   b.  [20] For the social networking Web site discussed here, how much DRAM is
   needed to host its working set? Using servers each having 96 GB DRAM,
   estimate how many local versus remote memory accesses are needed to gen-
   erate a user's home page?

   c.  [20] Now consider two candidate memcached server designs, one using con-
   ventional Xeon processors and the other using smaller cores, such as Atom
   processors. Given that memcached requires large physical memory but has
   low CPU utilization, what are the pros and cons of these two designs?

   d.  [Discussion] Today's tight coupling between memory modules and proces-
   sors often requires an increase in CPU socket count in order to provide large
   memory support. List other designs to provide large physical memory with-
   out proportionally increasing the number of sockets in a server. Compare
   them based on performance, power, costs, and reliability.

   e.  [Discussion] The same user's information can be stored in both the mem-
   cached and storage servers, and such servers can be physically hosted in dif-
   ferent ways. Discuss the pros and cons of the following server layout in the
   WSC: (1) memcached collocated on the same storage server, (2) memcached
   and storage server on separate nodes in the same rack, or (3) memcached
   servers on the same racks and storage servers collocated on separate racks.

6.20 [5/5/10/10/Discussion/Discussion] <6.3, 6.6> *Datacenter Networking*: Map-Reduce and WSC are a powerful combination to tackle large-scale data processing; for example, Google in 2008 sorted one petabyte (1 PB) of records in a little more than 6 hours using 4000 servers and 48,000 hard drives.

    a. [5] Derive disk bandwidth from Figure 6.1 and associated text. How many seconds does it take to read the data into main memory and write the sorted results back?

    b. [5] Assuming each server has two 1 Gb/sec Ethernet network interface cards (NICs) and the WSC switch infrastructure is oversubscribed by a factor of 4, how many seconds does it take to shuffle the entire dataset across 4000 servers?

    c. [10] Assuming network transfer is the performance bottleneck for petabyte sort, can you estimate what oversubscription ratio Google has in their datacenter?

    d. [10] Now let's examine the benefits of having 10 Gb/sec Ethernet without oversubscription—for example, using a 48-port 10 Gb/sec Ethernet (as used by the 2010 Indy sort benchmark winner TritonSort). How long does it take to shuffle the 1 PB of data?

    e. [Discussion] Compare the two approaches here: (1) the massively scale-out approach with high network oversubscription ratio, and (2) a relatively small-scale system with a high-bandwidth network. What are their potential bottlenecks? What are their advantages and disadvantages, in terms of scalability and TCO?

    f. [Discussion] Sort and many important scientific computing workloads are communication heavy, while many other workloads are not. List three example workloads that do not benefit from high-speed networking. What EC2 instances would you recommend to use for these two classes of workloads?

6.21 [10/25/Discussion] <6.4, 6.6> Because of the massive scale of WSCs, it is very important to properly allocate network resources based on the workloads that are expected to be run. Different allocations can have significant impacts on both the performance and total cost of ownership.

    a. [10] Using the numbers in the spreadsheet detailed in Figure 6.13, what is the oversubscription ratio at each access-layer switch? What is the impact on TCO if the oversubscription ratio is cut in half? What if it is doubled?

    b. [25] Reducing the oversubscription ratio can potentially improve the performance if a workload is network-limited. Assume a MapReduce job that uses 120 servers and reads 5 TB of data. Assume the same ratio of read/intermediate/output data as in Figure 6.2, Sep-09, and use Figure 6.6 to define the bandwidths of the memory hierarchy. For data reading, assume that 50% of data is read from remote disks; of that, 80% is read from within the rack and 20% is read from within the array. For intermediate data and output data, assume that 30% of the data uses remote disks; of that, 90% is within the rack and 10% is within the array. What is the overall performance improvement

when reducing the oversubscription ratio by half? What is the performance if it is doubled? Calculate the TCO in each case.

c. [Discussion] We are seeing the trend to more cores per system. We are also seeing the increasing adoption of optical communication (with potentially higher bandwidth and improved energy efficiency). How do you think these and other emerging technology trends will affect the design of future WSCs?

6.22  [5/15/15/20/25] <6.5> *Realizing the Capability of Amazon Web Services*: Imagine you are the site operation and infrastructure manager of an Alexa.com top site and are considering using Amazon Web Services (AWS). What factors do you need to consider in determining whether to migrate to AWS, what services and instance types to use and how much cost could you save? You can use Alexa and site traffic information (e.g., Wikipedia provides page view stats) to estimate the amount of traffic received by a top site, or you can take concrete examples from the Web, such as the following example from DrupalCon San Francisco 2010: *http://2bits.com/sites/2bits.com/files/drupal-single-server-2.8-million-page-views-a-day.pdf*. The slides describe an Alexa #3400 site that receives 2.8 million page views per day, using a single server. The server has two quad-core Xeon 2.5 GHz processors with 8 GB DRAM and three 15 K RPM SAS hard drives in a RAID1 configuration, and it costs about $400 per month. The site uses caching heavily, and the CPU utilization ranges from 50% to 250% (roughly 0.5 to 2.5 cores busy).

a. [5] Looking at the available EC2 instances (*http://aws.amazon.com/ec2/instance-types/*), what instance types match or exceed the current server configuration?

b. [15] Looking at the EC2 pricing information (*http://aws.amazon.com/ec2/pricing/*), select the most cost-efficient EC2 instances (combinations allowed) to host the site on AWS. What's the monthly cost for EC2?

c. [15] Now add the costs for IP address and network traffic to the equation, and suppose the site transfers 100 GB/day in and out on the Internet. What's the monthly cost for the site now?

d. [20] AWS also offers the Micro Instance for free for 1 year to new customers and 15 GB bandwidth each for traffic going in and out across AWS. Based on your estimation of peak and average traffic from your department Web server, can you host it for free on AWS?

e. [25] A much larger site, Netflix.com, has also migrated their streaming and encoding infrastructure to AWS. Based on their service characteristics, what AWS services could be used by Netflix and for what purposes?

6.23  [Discussion/Discussion/20/20/Discussion] <6.4> Figure 6.12 shows the impact of user perceived response time on revenue, and motivates the need to achieve high-throughput while maintaining low latency.

a. [Discussion] Taking Web search as an example, what are the possible ways of reducing query latency?

b. [Discussion] What monitoring statistics can you collect to help understand where time is spent? How do you plan to implement such a monitoring tool?

c. [20] Assuming that the number of disk accesses per query follows a normal distribution, with an average of 2 and standard deviation of 3, what kind of disk access latency is needed to satisfy a latency SLA of 0.1 sec for 95% of the queries?

d. [20] In-memory caching can reduce the frequencies of long-latency events (e.g., accessing hard drives). Assuming a steady-state hit rate of 40%, hit latency of 0.05 sec, and miss latency of 0.2 sec, does caching help meet a latency SLA of 0.1 sec for 95% of the queries?

e. [Discussion] When can cached content become stale or even inconsistent? How can this happen? How can you detect and invalidate such content?

6.24 [15/15/20] <6.4> The efficiency of typical power supply units (PSUs) varies as the load changes; for example, PSU efficiency can be about 80% at 40% load (e.g., output 40 watts from a 100-watt PSU), 75% when the load is between 20% and 40%, and 65% when the load is below 20%.

a. [15] Assume a power-proportional server whose actual power is proportional to CPU utilization, with a utilization curve as shown in Figure 6.3. What is the average PSU efficiency?

b. [15] Suppose the server employs 2*N* redundancy for PSUs (i.e., doubles the number of PSUs) to ensure stable power when one PSU fails. What is the average PSU efficiency?

c. [20] Blade server vendors use a shared pool of PSUs not only to provide redundancy but also to dynamically match the number of PSUs to the server's actual power consumption. The HP c7000 enclosure uses up to six PSUs for a total of 16 servers. In this case, what is the average PSU efficiency for the enclosure of server with the same utilization curve?

6.25 [5/Discussion/10/15/Discussion/Discussion/Discussion] <6.4> *Power stranding* is a term used to refer to power capacity that is provisioned but not used in a datacenter. Consider the data presented in Figure 6.25 [Fan, Weber, and Barroso 2007] for different groups of machines. (Note that what this paper calls a "cluster" is what we have referred to as an "array" in this chapter.)

a. [5] What is the stranded power at (1) the rack level, (2) the power distribution unit level, and (3) the array (cluster) level? What are the trends with oversubscription of power capacity at larger groups of machines?

b. [Discussion] What do you think causes the differences between power stranding at different groups of machines?

c. [10] Consider an array-level collection of machines where the total machines never use more than 72% of the aggregate power (this is sometimes also referred to as the ratio between the peak-of-sum and sum-of-peaks usage). Using the cost model in the case study, compute the cost savings from comparing a datacenter provisioned for peak capacity and one provisioned for actual use.



**Figure 6.25** Cumulative distribution function (CDF) of a real datacenter.

d. [15] Assume that the datacenter designer chose to include additional servers at the array level to take advantage of the stranded power. Using the example configuration and assumptions in part (a), compute how many more servers can now be included in the warehouse-scale computer for the same total power provisioning.

e. [Discussion] What is needed to make the optimization of part (d) work in a real-world deployment? (*Hint*: Think about what needs to happen to cap power in the rare case when all the servers in the array are used at peak power.)

f. [Discussion] Two kinds of policies can be envisioned to manage power caps [Ranganathan et al. 2006]: (1) preemptive policies where power budgets are predetermined ("don't assume you can use more power; ask before you do!") or (2) reactive policies where power budgets are throttled in the event of a power budget violation ("use as much power as needed until told you can't!"). Discuss the trade-offs between these approaches and when you would use each type.

g. [Discussion] What happens to the total stranded power if systems become more energy proportional (assume workloads similar to that of Figure 6.4)?

6.26 [5/20/Discussion] <6.4, 6.7> Section 6.7 discussed the use of per-server battery sources in the Google design. Let us examine the consequences of this design.

a. [5] Assume that the use of a battery as a mini-server-level UPS is 99.99% efficient and eliminates the need for a facility-wide UPS that is only 92% efficient. Assume that substation switching is 99.7% efficient and that the efficiency for the PDU, step-down stages, and other electrical breakers are 98%, 98%, and 99%, respectively. Calculate the overall power infrastructure efficiency improvements from using a per-server battery backup.

b. [20] Assume that the UPS is 10% of the cost of the IT equipment. Using the rest of the assumptions from the cost model in the case study, what is the break-even point for the costs of the battery (as a fraction of the cost of a single server) at which the total cost of ownership for a battery-based solution is better than that for a facility-wide UPS?

c. [Discussion] What are the other trade-offs between these two approaches? In particular, how do you think the manageability and failure model will change across these two different designs?

6.27 [5/5/Discussion] <6.4> For this exercise, consider a simplified equation for the total operational power of a WSC as follows: Total operational power = (1 + Cooling inefficiency multiplier) * IT equipment power.

a. [5] Assume an 8 MW datacenter at 80% power usage, electricity costs of \$0.10 per kilowatt-hour, and a cooling-inefficiency multiplier of 0.8. Compare the cost savings from (1) an optimization that improves cooling efficiency by 20%, and (2) an optimization that improves the energy efficiency of the IT equipment by 20%.

b. [5] What is the percentage improvement in IT equipment energy efficiency needed to match the cost savings from a 20% improvement in cooling efficiency?

c. [Discussion/10] What conclusions can you draw about the relative importance of optimizations that focus on server energy efficiency and cooling energy efficiency?

6.28 [5/5/Discussion] <6.4> As discussed in this chapter, the cooling equipment in WSCs can themselves consume a lot of energy. Cooling costs can be lowered by proactively managing temperature. Temperature-aware workload placement is one optimization that has been proposed to manage temperature to reduce cooling costs. The idea is to identify the cooling profile of a given room and map the hotter systems to the cooler spots, so that at the WSC level the requirements for overall cooling are reduced.

a. [5] The coefficient of performance (COP) of a CRAC unit is defined as the ratio of heat removed (Q) to the amount of work necessary (W) to remove that heat. The COP of a CRAC unit increases with the temperature of the air the CRAC unit pushes into the plenum. If air returns to the CRAC unit at 20 degrees Celsius and we remove 10KW of heat with a COP of 1.9, how much energy do we expend in the CRAC unit? If cooling the same volume of air, but now returning at 25 degrees Celsius, takes a COP of 3.1, how much energy do we expend in the CRAC unit now?

b. [5] Assume a workload distribution algorithm is able to match the hot workloads well with the cool spots to allow the computer room air-conditioning (CRAC) unit to be run at higher temperature to improve cooling efficiencies like in the exercise above. What is the power savings between the two cases described above?

c. [Discussion] Given the scale of WSC systems, power management can be a complex, multifaceted problem. Optimizations to improve energy efficiency

can be implemented in hardware and in software, at the system level, and at the cluster level for the IT equipment or the cooling equipment, etc. It is important to consider these interactions when designing an overall energy-efficiency solution for the WSC. Consider a consolidation algorithm that looks at server utilization and consolidates different workload classes on the same server to increase server utilization (this can potentially have the server operating at higher energy efficiency if the system is not energy proportional). How would this optimization interact with a concurrent algorithm that tried to use different power states (see ACPI, Advanced Configuration Power Interface, for some examples)? What other examples can you think of where multiple optimizations can potentially conflict with one another in a WSC? How would you solve this problem?

6.29    [5/10/15/20] <6.2> Energy proportionality (sometimes also referred to as energy scale-down) is the attribute of the system to consume no power when idle, but more importantly gradually consume more power in proportion to the activity level and work done. In this exercise, we will examine the sensitivity of energy consumption to different energy proportionality models. In the exercises below, unless otherwise mentioned, use the data in Figure 6.4 as the default.

   a.    [5] A simple way to reason about energy proportionality is to assume linearity between activity and power usage. Using just the peak power and idle power data from Figure 6.4 and a linear interpolation, plot the energy-efficiency trends across varying activities. (Energy efficiency is expressed as performance per watt.) What happens if idle power (at 0% activity) is half of what is assumed in Figure 6.4? What happens if idle power is zero?

   b.    [10] Plot the energy-efficiency trends across varying activities, but use the data from column 3 of Figure 6.4 for power variation. Plot the energy efficiency assuming that the idle power (alone) is half of what is assumed in Figure 6.4. Compare these plots with the linear model in the previous exercise. What conclusions can you draw about the consequences of focusing purely on idle power alone?

   c.    [15] Assume the system utilization mix in column 7 of Figure 6.4. For simplicity, assume a discrete distribution across 1000 servers, with 109 servers at 0% utilization, 80 servers at 10% utilizations, etc. Compute the total performance and total energy for this workload mix using the assumptions in part (a) and part (b).

   d.    [20] One could potentially design a system that has a sublinear power versus load relationship in the region of load levels between 0% and 50%. This would have an energy-efficiency curve that peaks at lower utilizations (at the expense of higher utilizations). Create a new version of column 3 from Figure 6.4 that shows such an energy-efficiency curve. Assume the system utilization mix in column 7 of Figure 6.4. For simplicity, assume a discrete distribution across 1000 servers, with 109 servers at 0% utilization, 80 servers at 10% utilizations, etc. Compute the total performance and total energy for this workload mix.

| Activity (%)      | 0   | 10  | 20  | 30  | 40  | 50  | 60  | 70  | 80  | 90  | 100 |
|-------------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Power, case A (W) | 181 | 308 | 351 | 382 | 416 | 451 | 490 | 533 | 576 | 617 | 662 |
| Power, case B (W) | 250 | 275 | 325 | 340 | 395 | 405 | 415 | 425 | 440 | 445 | 450 |

**Figure 6.26** Power distribution for two servers.

| Activity (%)              | 0   | 10 | 20  | 30  | 40  | 50  | 60 | 70  | 80 | 90 | 100 |
|---------------------------|-----|----|-----|-----|-----|-----|----|-----|----|----|-----|
| No. servers, case A and B | 109 | 80 | 153 | 246 | 191 | 115 | 51 | 21  | 15 | 12 | 8   |
| No. servers, case C       | 504 | 6  | 8   | 11  | 26  | 57  | 95 | 123 | 76 | 40 | 54  |

**Figure 6.27** Utilization distributions across cluster, without and with consolidation.

6.30   [15/20/20] <6.2, 6.6> This exercise illustrates the interactions of energy proportionality models with optimizations such as server consolidation and energy-efficient server designs. Consider the scenarios shown in Figure 6.26 and Figure 6.27.

   a.  [15] Consider two servers with the power distributions shown in Figure 6.26: case A (the server considered in Figure 6.4) and case B (a less energy-proportional but more energy-efficient server than case A). Assume the system utilization mix in column 7 of Figure 6.4. For simplicity, assume a discrete distribution across 1000 servers, with 109 servers at 0% utilization, 80 servers at 10% utilizations, etc., as shown in row 1 of Figure 6.27. Assume performance variation based on column 2 of Figure 6.4. Compare the total performance and total energy for this workload mix for the two server types.

   b.  [20] Consider a cluster of 1000 servers with data similar to the data shown in Figure 6.4 (and summarized in the first rows of Figures 6.26 and 6.27). What are the total performance and total energy for the workload mix with these assumptions? Now assume that we were able to consolidate the workloads to model the distribution shown in case C (second row of Figure 6.27). What are the total performance and total energy now? How does the total energy compare with a system that has a linear energy-proportional model with idle power of zero watts and peak power of 662 watts?

   c.  [20] Repeat part (b), but with the power model of server B, and compare with the results of part (a).

6.31   [10/Discussion] <6.2, 6.4, 6.6> *System-Level Energy Proportionality Trends*: Consider the following breakdowns of the power consumption of a server:

   CPU, 50%; memory, 23%; disks, 11%; networking/other, 16%
   CPU, 33%; memory, 30%; disks, 10%; networking/other, 27%

   a.  [10] Assume a dynamic power range of $3.0\times$ for the CPU (i.e., the power consumption of the CPU at idle is one-third that of its power consumption at

| **Tier 1** | Single path for power and cooling distributions, without redundant components | 99.0% |
|---|---|---|
| **Tier 2** | $(N + 1)$ redundancy = two power and cooling distribution paths | 99.7% |
| **Tier 3** | $(N + 2)$ redundancy = three power and cooling distribution paths for uptime even during maintenance | 99.98% |
| **Tier 4** | Two active power and cooling distribution paths, with redundant components in each path, to tolerate any single equipment failure without impacting the load | 99.995% |

**Figure 6.28  Overview of data center tier classifications.** (Adapted from Pitt Turner IV et al. [2008].)

peak). Assume that the dynamic range of the memory systems, disks, and the networking/other categories above are respectively 2.0×, 1.3×, and 1.2×. What is the overall dynamic range for the total system for the two cases?

b.  [Discussion/10] What can you learn from the results of part (a)? How would we achieve better energy proportionality at the system level? (*Hint*: Energy proportionality at a system level cannot be achieved through CPU optimizations alone, but instead requires improvement across all components.)

6.32  [30] <6.4> Pitt Turner IV et al. [2008] presented a good overview of datacenter tier classifications. Tier classifications define site infrastructure performance. For simplicity, consider the key differences as shown in Figure 6.25 (adapted from Pitt Turner IV et al. [2008]). Using the TCO model in the case study, compare the cost implications of the different tiers shown.

6.33  [Discussion] <6.4> Based on the observations in Figure 6.13, what can you say qualitatively about the trade-offs between revenue loss from downtime and costs incurred for uptime?

6.34  [15/Discussion] <6.4> Some recent studies have defined a metric called TPUE, which stands for "true PUE" or "total PUE." TPUE is defined as PUE * SPUE. PUE, the power utilization effectiveness, is defined in Section 6.4 as the ratio of the total facility power over the total IT equipment power. SPUE, or server PUE, is a new metric analogous to PUE, but instead applied to computing equipment, and is defined as the ratio of total server input power to its useful power, where useful power is defined as the power consumed by the electronic components directly involved in the computation: motherboard, disks, CPUs, DRAM, I/O cards, and so on. In other words, the SPUE metric captures inefficiencies associated with the power supplies, voltage regulators, and fans housed on a server.

a.  [15] <6.4> Consider a design that uses a higher supply temperature for the CRAC units. The efficiency of the CRAC unit is approximately a quadratic function of the temperature, and this design therefore improves the overall PUE, let's assume by 7%. (Assume baseline PUE of 1.7.) However, the higher temperature at the server level triggers the on-board fan controller to

operate the fan at much higher speeds. The fan power is a cubic function of speed, and the increased fan speed leads to a degradation of SPUE. Assume a fan power model:

$$\text{Fan power} = 284 * ns * ns * ns - 75 * ns * ns,$$

where *ns* is the normalized fan speed = fan speed in rpm/18,000

and a baseline server power of 350 W. Compute the SPUE if the fan speed increases from (1) 10,000 rpm to 12,500 rpm and (2) 10,000 rpm to 18,000 rpm. Compare the PUE and TPUE in both these cases. (For simplicity, ignore the inefficiencies with power delivery in the SPUE model.)

b. [Discussion] Part (a) illustrates that, while PUE is an excellent metric to capture the overhead of the facility, it does not capture the inefficiencies within the IT equipment itself. Can you identify another design where TPUE is potentially lower than PUE? (*Hint*: See Exercise 6.26.)

6.35 [Discussion/30/Discussion] <6.2> Two recently released benchmarks provide a good starting point for energy-efficiency accounting in servers—the SPECpower_ssj2008 benchmark (available at *http://www.spec.org/power_ ssj2008/*) and the JouleSort metric (available at *http://sortbenchmark.org/*).

a. [Discussion] <6.2> Look up the descriptions of the two benchmarks. How are they similar? How are they different? What would you do to improve these benchmarks to better address the goal of improving WSC energy efficiency?

b. [30] <6.2> JouleSort measures the total system energy to perform an out-of-core sort and attempts to derive a metric that enables the comparison of systems ranging from embedded devices to supercomputers. Look up the description of the JouleSort metric at *http://sortbenchmark.org*. Download a publicly available version of the sort algorithm and run it on different classes of machines—a laptop, a PC, a mobile phone, etc.—or with different configurations. What can you learn from the JouleSort ratings for different setups?

c. [Discussion] <6.2> Consider the system with the best JouleSort rating from your experiments above. How would you improve the energy efficiency? For example, try rewriting the sort code to improve the JouleSort rating.

6.36 [10/10/15] <6.1, 6.2> Figure 6.1 is a listing of outages in an array of servers. When dealing with the large scale of WSCs, it is important to balance cluster design and software architectures to achieve the required uptime without incurring significant costs. This question explores the implications of achieving availability through hardware only.

a. [10] <6.1, 6.2> Assuming that an operator wishes to achieve 95% availability through server hardware improvements alone, how many events of each type would have to be reduced? For now, assume that individual server crashes are completely handled through redundant machines.

b. [10] <6.1, 6.2> How does the answer to part (a) change if the individual server crashes are handled by redundancy 50% of the time? 20% of the time? None of the time?

   c. [15] <6.1, 6.2> Discuss the importance of software redundancy to achieving a high level of availability. If a WSC operator considered buying machines that were cheaper, but 10% less reliable, what implications would that have on the software architecture? What are the challenges associated with software redundancy?

6.37   [15] <6.1, 6.8> Look up the current prices of standard DDR3 DRAM versus DDR3 DRAM that has error-correcting code (ECC). What is the increase in price per bit for achieving the higher reliability that ECC provides? Using the DRAM prices alone, and the data provided in Section 6.8, what is the uptime per dollar of a WSC with non-ECC versus ECC DRAM?

6.38   [5/Discussion] <6.1> *WSC Reliability and Manageability Concerns*:

   a. [5] Consider a cluster of servers costing $2000 each. Assuming an annual failure rate of 5%, an average of an hour of service time per repair, and replacement parts requiring 10% of the system cost per failure, what is the annual maintenance cost per server? Assume an hourly rate of $100 per hour for a service technician.

   b. [Discussion] Comment on the differences between this manageability model versus that in a traditional enterprise datacenter with a large number of small or medium-sized applications each running on its own dedicated hardware infrastructure.

# Exhibit 11

**Filed Under Seal**

# Exhibit 12

**Filed Under Seal**

# Exhibit 13

**Filed Under Seal**

# Exhibit 14

**Filed Under Seal**

# Exhibit 15

**Filed Under Seal**