**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

FEDERAL TRADE COMMISSION,

        Plaintiff,

    v.

META PLATFORMS, INC.,

        Defendant.

---

Case No. 1:20-cv-03590-JEB

**META PLATFORMS, INC.'S OPPOSITION TO FEDERAL TRADE COMMISSION'S
MOTION *IN LIMINE* TO EXCLUDE
<u>TESTIMONY OF JASON NIEH REGARDING "COST SAVINGS"</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................................ ii

BACKGROUND ............................................................................................................................3

ARGUMENT ..................................................................................................................................5

I.    PROFESSOR NIEH'S OPINIONS ARE SUPPORTED BY SUFFICIENT
      FACTS AND DATA ..............................................................................................................5

II.   PROFESSOR NIEH'S OPINIONS ARE BASED ON A RELIABLE
      METHODOLOGY .................................................................................................................9

III.  PROFESSOR NIEH IS QUALIFIED TO RENDER OPINIONS
      REGARDING COST PERFORMANCE OF META'S
      INFRASTRUCTURE .............................................................................................................11

CONCLUSION.............................................................................................................................12

# TABLE OF AUTHORITIES[*]

Page

CASES

*FTC v. Meta Platforms, Inc.*, 2024 WL 4772423 (D.D.C. Nov. 13, 2024) ...................................2

*Garcia v. GGI Glass Distrib. Corp.*, 2024 WL 4253161 (D.D.C. Sept. 19, 2024) .......................7

*Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958 (D.C. Cir. 2016)..........................7

*Gordon v. New England Cent. R.R., Inc.*, 2019 WL 4024726 (D. Vt. Aug. 27, 2019) .................................................................................................................................12

* *Heller v. Dist. of Columbia*, 952 F. Supp. 2d 133 (D.D.C. 2013) ....................................9

*Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*, 2024 WL 4534156 (D.D.C. July 16, 2024).........................................................................12

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) .................................8

* *Paige Int'l, Inc. v. XL Specialty Ins. Co.*, 2016 WL 3024008 (D.D.C. May 25, 2016) ..............................................................................................10

*Parsi v. Daioleslam*, 852 F. Supp. 2d 82 (D.D.C. 2012) ..............................................................9

* *Robinson v. Dist. of Columbia*, 75 F. Supp. 3d 190 (D.D.C. 2014).......................................7

*SEC v. Ripple Labs, Inc.*, 2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023)........................................8

*SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450 (S.D.N.Y. 2023) ....................................11

*United States v. Ausby*, 436 F. Supp. 3d 134 (D.D.C. 2019) ................................................. 11-12

*United States v. DynCorp Int'l LLC*, 715 F. Supp. 3d 45 (D.D.C. 2024)................................7, 12

* *Wash. Metro. Area Transit Auth. v. Aon Risk Servs., Inc. of Md.*, 2013 WL 12341666 (D.D.C. Feb. 22, 2013) ....................................................................12

*Zerega Ave. Realty Corp. v. Hanover Ins. Co.*, 2006 WL 1343643 (S.D.N.Y. May 17, 2006)..............................................................................................9

---

[*] Authorities principally relied upon are marked with an asterisk (*).

OTHER MATERIALS

John L. Hennessy & David A. Patterson, *Computer Architecture:  A Quantitative
    Approach* (Todd Green et al. eds., 5th ed. 2012)................................................................4

Professor Jason Nieh of Columbia University has taught and published for decades in the field of computer science, specializing in some of the key technologies used in the computing infrastructure that supports the applications at issue in this case. Professor Nieh will testify about how the "hyperscale" infrastructure that Meta custom built to support its family of apps has provided Instagram and WhatsApp with a range of benefits, including enabling them to scale more quickly, efficiently, and effectively than would have been possible absent the acquisitions. Professor Nieh will also explain how Meta's infrastructure has improved performance and reliability, and supported innovation for its family of apps. The FTC does not seek to exclude any of this testimony.

Instead, the FTC focuses solely on Professor Nieh's opinion that Meta's infrastructure offers better "cost performance" than public cloud services and other alternatives. Although the FTC suggests that "cost performance" is an accounting concept, it is not. Rather, evaluation of cost performance requires a determination of both relative infrastructure cost and computing performance and is primarily the domain of computer scientists and engineers – like Professor Nieh. Indeed, Professor Nieh's opinions about cost performance respond not to any FTC economist or financial expert but to the opinions of Mr. Tim Bray – whose expertise is in "the business and technology of software," Ex. 1 ¶ 1 (Bray Rep.). And Mr. Bray purports to address Professor Nieh's cost performance opinions in rebuttal, relying on the same type of evidence and methods that Professor Nieh employed. *See* Ex. 2 ¶¶ 59, 135-137 (Bray Rebuttal Rep.). As a distinguished computer scientist who has advised startups concerning the very technology choices at issue here, Professor Nieh has the right expertise to offer the opinions he rendered.

The FTC's claim that Professor Nieh's opinion is not based on adequate facts or data is similarly unfounded. Professor Nieh evaluated Meta's custom infrastructure and compared it to alternatives available from third parties and explains, in detail, why Meta's approach offers

significant cost performance advantages.  For example, Professor Nieh will explain that Meta

differs from the three hyperscale public cloud services in the United States – Amazon Web

Services, Google Cloud Platform, and Microsoft Azure – because Meta's infrastructure is

devoted entirely to its own apps, enabling Meta to customize its infrastructure to optimize the

performance, reliability, innovation, and efficiency of Meta's apps and to meet their unique

requirements.  Relying on internal Meta technical documents, academic publications, ordinary-

course cost studies, and ███████████, Professor Nieh explains how Meta's customized

infrastructure has saved billions of dollars, while also providing superior performance.

Evaluating such materials – including Meta's internal evaluations – requires technical expertise;

it is no simple document-reading exercise.

    Professor Nieh also clearly explained the methodology he used in reaching his

opinions.  In concluding that "Instagram and WhatsApp have received enormous benefits from

Meta's infrastructure, engineering resources, and technical capabilities," Ex. 3 ¶ 11 (Nieh Rep.),

Professor Nieh describes the specific ways in which Meta customized the key components of its

infrastructure – data centers, hardware, software, and broadband networks – to gain cost savings

over available alternatives.  Professor Nieh did not – and did not need to – offer a specific

quantification of cost savings to determine that the benefits were large.

    Professor Nieh's testimony will therefore assist the Court in assessing whether Meta's

acquisitions "increased output," "improved service [and] quality," and "spurred greater

innovation" than would likely have occurred otherwise.  *See FTC v. Meta Platforms, Inc.*, 2024

WL 4772423, at *35 (D.D.C. Nov. 13, 2024).  The Court should therefore deny the FTC's

motion *in limine* to exclude Professor Nieh's "cost-savings opinions."

## BACKGROUND

Professor Nieh received his Ph.D. in electrical engineering from Stanford and is a tenured Professor of Computer Science at Columbia University, where he also is the co-Director of the Software Systems Laboratory. *See* Ex. 3 ¶¶ 1-2. He has published "over one hundred peer-reviewed scholarly articles and research papers on computer systems"; has researched topics central to this case (such as virtualization, a foundational technology for public cloud services); and has received many professional awards and honors. *Id.* ¶¶ 3-4, 6. He has also advised multiple startups regarding some of the key technologies at issue here. *See id.* ¶ 5.

Meta retained Professor Nieh to provide an "opinion about whether the integration of Instagram and WhatsApp with Meta's infrastructure provided benefits to Instagram, WhatsApp, and Meta," and also to respond to the opinions of the FTC's proffered expert, Tim Bray. *Id.* ¶ 8. Based on his review of extensive evidence – including internal documents, data, and depositions from Meta and ███████; academic publications regarding Meta's and others' infrastructure; interviews with key Meta personnel; and extensive public sources – Professor Nieh concludes: "Instagram and WhatsApp have received enormous benefits from Meta's infrastructure, engineering resources, and technical capabilities. These benefits helped improve the performance of Instagram and WhatsApp, including the user experience they provide, more quickly, efficiently, and effectively than Instagram and WhatsApp would have been able to achieve on their own." *Id.* ¶ 11. The FTC does not seek to exclude these opinions.

Instead, the FTC seeks to prevent Professor Nieh from testifying "that moving Instagram and WhatsApp to Meta's infrastructure allegedly provided them *cost* benefits." Pl. Federal Trade Commission's Mot. *in Limine* To Exclude Testimony of Jason Nieh Regarding Alleged Cost Savings at 1 (Feb. 25, 2025), ECF No. 408 ("FTC Mot.") (emphasis added). As the FTC concedes, Professor Nieh does not "calculate any specific cost savings from the acquisitions,"

3

but instead opines that Meta's infrastructure is "'able to provide performance and cost benefits to its own apps that far exceed what these apps, including Instagram and WhatsApp, could obtain from public cloud services or other alternatives.'" *Id.* (quoting Ex. 3 ¶ 12). In analyzing these benefits, Professor Nieh does not merely compare the dollar costs of different alternatives. He instead recognizes the significant technological and other differences between such alternatives, and therefore grounds his analysis in the well-known *engineering* concept of "cost performance" – which he explains as "the cost required to achieve a desired performance level." Ex. 3 ¶ 75 (citing John L. Hennessy & David A. Patterson, *Computer Architecture: A Quantitative Approach* 27 (Todd Green et al. eds., 5th ed. 2012)).

Professor Nieh begins his analysis by demonstrating how Meta has been able to optimize its infrastructure for Meta's computing workloads, which has enabled Meta to reduce costs and to realize other significant benefits, such as improved performance and reliability, undisputed by the FTC's motion. *See id.* ¶¶ 67-71. Professor Nieh then compares the customized infrastructure that Meta provides to public cloud services, including how they compare in terms of cost performance. *See id.* ¶¶ 72, 75-87. Among other things, Professor Nieh describes how ████ ██████, public industry sources, and Meta's own internal analysis all show the cost performance benefits of using Meta's own infrastructure compared to public cloud services and other alternatives. *See id.* He also explains how Instagram and WhatsApp specifically benefited from the superior cost performance of Meta's infrastructure. *See id.* ¶¶ 208-211 (Instagram), 268-269 (WhatsApp).

In forming his opinions, Professor Nieh also responds to the claims of the FTC's expert, Mr. Bray, with respect to cost performance. *See id.* ¶¶ 80-86. As Mr. Bray acknowledged in his deposition, "there are sections in my rebuttal report and in my initial report where I discuss cost performance both generally and in the context of specific claims." Ex. 4 at 33:8-11 (Bray Dep.

Tr.).  When asked "which alternatives do you think you performed a head-to-head comparison with Meta's infrastructure in terms of cost performance," Mr. Bray responded:  "I think, once again, overwhelmingly with respect to the public cloud."  *Id.* at 33:12-17.

**ARGUMENT**

## I.  PROFESSOR NIEH'S OPINIONS ARE SUPPORTED BY SUFFICIENT FACTS AND DATA

Professor Nieh describes how each of the key components of Meta's infrastructure – data centers, hardware inside those data centers, software that runs on that hardware, and networking that connects everything together – has been customized to optimize cost performance.  *See* Ex. 3 ¶¶ 47-49, 52, 55 (data centers); *id.* ¶¶ 56, 68, 71 (hardware); *id.* ¶¶ 57, 69-71 (software); *id.* ¶¶ 52-54 (networking).  With respect to each aspect, Professor Nieh supplies quantitative and qualitative evidence of the benefits of Meta's approach.

The FTC nevertheless claims (at 4) that Professor Nieh's opinions fall short because he failed to provide evidence regarding "(1) how much it costs or has cost Meta to operate Instagram or WhatsApp on its infrastructure or (2) how much it cost Meta to transition the acquired apps from their pre-acquisition infrastructure to Meta's."  But Professor Nieh did not seek to provide a comprehensive estimate of all of the costs that Meta has saved by operating Instagram and WhatsApp on its infrastructure.  He instead describes several specific ways in which Meta's technical choices in building its infrastructure have enabled it to optimize for providing superior performance at a relatively low cost compared to alternatives.

In the case of data centers, for example, Professor Nieh explains that, "[r]ather than 'offering a variety of high-memory or high-CPU machine types,' Meta has moved its 'fleet toward ███████████████████████████████████████,'" which has resulted in "'an ██ percent savings in power and a ██ percent savings in total cost of ownership.'"  Ex. 3

5

¶ 68 (citations omitted).  Professor Nieh explains that "Meta was able to implement these architectural changes because, 'unlike a public cloud that needs to support diverse customer requirements, [Meta] only need[s] to optimize for [its] internal workloads.'" *Id.* (citation omitted; last alteration added).

Another example involves a technology known as "containerization," which Meta (together with Google) pioneered.  *See* Ex. 4 at 146:4-147:8 (crediting Google and Meta for "the great leap forward" in containerization); Ex. 3 ¶ 37.  Professor Nieh explains how Meta's particular implementation of containerization – using ████████████████████████████████ ███████████████████████████████ – offers both performance and cost benefits compared to what was available on the public cloud.  *See* Ex. 3 ¶¶ 35-38, 158.

In addition to discussing numerous ways in which Meta's bespoke architecture was optimized for cost performance, Professor Nieh also discusses a range of sources that compare the costs of Meta's infrastructure – or the cost of operating one's own infrastructure generally – to the costs of using public cloud services.  This includes not just Meta's own internal analyses, but also statements and documents from ████████████████████████████████.  *See id.* ¶ 79.  Professor Nieh also describes an analysis by the venture capital firm Andreessen Horowitz that explained how, when analyzing the costs of using a public cloud service, it is critical to take account of the scale of the app as well as other technical factors.  *See id.* ¶ 82. Professor Nieh also responds to Mr. Bray's claims that ███████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████.  *See id.* ¶¶ 86, 310-322.

Ignoring all of this, the FTC claims (at 7) that Professor Nieh's opinion should be excluded because he "did nothing to verify the information in these Meta-provided sources, and the Court

should not condone his attempt to simply restate Meta's internal information under the guise of expert opinion." But that is hardly what Professor Nieh is doing: rather, he is applying his considerable expertise to evaluate technical documents that are far beyond the ken of a lay factfinder. For example, one of the studies includes an extensive spreadsheet comparing Meta's infrastructure to products on the public cloud, including their hardware type, their total cost of ownership, how much bandwidth they consume, what technical assumptions are made to compare these solutions, and other technical details. *See* Ex. 3 ¶ 78 n.137 (citing Ex. 5 (FTC-META-012488837 (Feb. 2023))).

These studies were prepared by skilled engineers, and technical expertise is required to evaluate and interpret them. The cases cited by the FTC (at 6-7) – which involve limited non-technical materials that required no expert interpretation – are inapposite. *Cf. Garcia v. GGI Glass Distrib. Corp.*, 2024 WL 4253161, at *1, *3 (D.D.C. Sept. 19, 2024) (disqualifying testimony of "an expert in the field of workplace safety" about a putative "'industry wide standard' for unloading glass" that rested on a "single data point" – "an online article that the editor of a trade-association magazine published over nine years ago"); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016) (excluding expert testimony based upon a selection of out-of-court statements comprehensible to a layperson); *United States v. DynCorp Int'l LLC*, 715 F. Supp. 3d 45, 64 (D.D.C. 2024) (excluding expert testimony based upon plain-language employee communications).

The FTC does not and cannot dispute that Meta's internal studies are the type of materials on which an expert can appropriately rely – and any question about Professor Nieh's reliance on them is a matter of cross-examination, not exclusion. *See Robinson v. Dist. of Columbia*, 75 F. Supp. 3d 190, 200 (D.D.C. 2014) (purportedly insufficient facts or data "are subjects Plaintiff can address through cross-examination"). Moreover, Professor Nieh's opinion is based on much

more than Meta's internal cost studies. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 214 (S.D.N.Y. 2020) (crediting defendants' expert's testimony based upon both defendants' ordinary-course documents and external studies).

The FTC (at 4-5) offers "background" that purports to show that Meta's discovery responses did not provide the FTC with adequate information regarding the cost savings Meta was claiming. The FTC's complaints are without merit, but they are in any event beside the point. Professor Nieh has provided more than sufficient facts and data – including showing how numerous Meta infrastructure components offer greater cost efficiency and performance than other alternatives – to establish that he should be permitted to testify about the cost performance benefits of Meta's customized infrastructure. *See SEC v. Ripple Labs, Inc.*, 2023 WL 5670711, at *18 (S.D.N.Y. Mar. 6, 2023) ("[T]he testimony of a party's expert must be evaluated within the context of that party's own theory of the case. . . . Where, as here, 'the legal or factual sustainability of a party's theory has not yet been decided,' that Defendants' theory of the case 'may be legally or factually deficient is not justification for concluding that, in the context of [their] theory, the expert's testimony is unreliable or unhelpful.'") (citations omitted; last alteration in original).

The FTC's demand that Professor Nieh compare historical and current costs of operating Instagram and WhatsApp makes no sense in this context. From the time of the acquisitions in 2012 and 2014, and continuing until the present day, both Instagram and WhatsApp have grown tremendously and changed radically. Instagram's and WhatsApp's pre-acquisition costs cannot reliably be compared to current costs, or to any other benchmark, with the type of precision the FTC baselessly claims is required here. Nor are the current costs of operating Instagram and WhatsApp relevant: given that all of Meta's apps share a common infrastructure, it is sufficient

for Meta to show – as Professor Nieh has done – that the technology choices Meta has made for its entire family of apps provide cost performance benefits compared to alternatives.

## II.    PROFESSOR NIEH'S OPINIONS ARE BASED ON A RELIABLE METHODOLOGY

Professor Nieh applied his specialized expertise to technical evidence in the record – which, as ample authority makes clear, constitutes an appropriate and reliable methodology. *See*, *e.g.*, *Heller v. Dist. of Columbia*, 952 F. Supp. 2d 133, 141 (D.D.C. 2013) ("Each of the experts here uses the same methodology, one that has been approved by courts in a variety of cases involving experts whose experience forms the basis of their opinions.  In each case, the expert 'observed the relevant evidence' and 'applied their specialized knowledge' to the case at hand.  . . .  Indeed, this methodology has been deemed reliable for a variety of types of experience-based experts[.]") (citations omitted); *Zerega Ave. Realty Corp. v. Hanover Ins. Co.*, 2006 WL 1343643, at *4 (S.D.N.Y. May 17, 2006) (denying motion to exclude engineer's causation testimony for lack of methodology and explaining that "[d]rawing upon one's educational background and practical experience is a reliable methodology through which to develop opinions and reach conclusions about scientific, technical, or other areas of specialized knowledge").  Professor Nieh's extensive technical analysis that considered reams of highly technical evidence is worlds removed from cases where an expert simply "'read[ ]' a source 'standing alone.'"  FTC Mot. at 10 (quoting *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 89 (D.D.C. 2012)).

The FTC argues (at 8) that "rather than employ analytical methods and tools commonly employed by online services to assess costs – such as analyzing total-cost-of-ownership (TCO), rent-versus-buy, or allocating costs by average number of users – Nieh's report contains *no identifiable methodology at all*."  But the FTC supplies no authority to support the suggestion

that application of such a methodology was required to support Professor Nieh's opinion, and

none exists.  The FTC's claim that Professor Nieh failed to apply a reliable methodology is

particularly misguided given that the FTC's own expert used the same approach as Professor

Nieh, *before* Professor Nieh submitted his opinions.  As Mr. Bray testified, the way he assessed

and compared cost performance of Meta and other alternatives was "to delve into the claims and

find out what the benefits were," then "to investigate whether there were alternatives available to

the acquired companies, which would have, in [his] informed opinion, allowed them to achieve

similar benefits, and then write in the report what [he] found as a result of that investigation."

Ex. 4 at 23:22-24:11.  If the FTC believes that Mr. Bray's methodology is sufficiently reliable to

pass evidentiary muster, then the same should hold true for Professor Nieh.

Moreover, Professor Nieh relied on the very type of total cost of ownership or rent-

versus-buy analyses of infrastructure costs that the FTC claims is appropriate:  Meta itself

performed such analyses, discussed at length in documents Professor Nieh described in his report

– including documents Mr. Bray addressed on rebuttal.  *See* Ex. 3 ¶ 78 (discussing Meta internal

analyses showing "significant cost performance advantages compared to [Amazon Web Services

('AWS')] and public cloud alternatives"); *cf.* Ex. 2 ¶ 135 ("The Nieh Report also cites a Meta

study comparing its servers to AWS's and concluding that Meta's deliver anywhere from ▮▮▮▮

times better cost performance.").  Professor Nieh cites these studies and finds that they buttress

his conclusions.  If the FTC disagrees with the conclusions in these studies, then that is a

question of weight; the appropriate way to address those concerns is cross-examination, not

through excluding Professor Nieh's opinion.  *See Paige Int'l, Inc. v. XL Specialty Ins. Co.*, 2016

WL 3024008, at *7 (D.D.C. May 25, 2016) (discussing plaintiff's complaints concerning

methods that defendants' expert applied to reach specific conclusions and stating that these

complaints "implicate[ ] the precise facts in dispute between the parties that are central to this

lawsuit" and that "[r]esolving those questions here would simply be jumping the gun"); *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 467 (S.D.N.Y. 2023) ("While cast as an argument about methodology, defendants' gripes appear to be mere disagreements with [the expert's] categorizations and conclusion.").

## III.    PROFESSOR NIEH IS QUALIFIED TO RENDER OPINIONS REGARDING COST PERFORMANCE OF META'S INFRASTRUCTURE

The FTC's claim that Professor Nieh lacks the expertise to analyze and compare the cost performance of Meta's infrastructure to other alternatives also has no merit.  Like the FTC's other arguments, these claims ignore the technological expertise required to perform a cost performance analysis that compares dissimilar technologies and instead criticizes Professor Nieh (at 11) for not having "prior experience performing quantitative cost-savings calculations or analyses."  As explained, Professor Nieh is not making cost-savings calculations.  He is comparing technologies, including their cost performance, just as the FTC's own expert has done.

The FTC points to an exchange in Professor Nieh's deposition where he was asked "whether he had ever 'compared the dollar cost of two different systems in [his] work before the Meta litigation.'"  FTC Mot. at 11 (brackets in original).  He responded:  "Cost performance is something that I've certainly looked at in my work.  Cost per dollar is something that I vaguely recall probably having looked at some point in time.  But I don't recall exactly when I may have looked at that."  This testimony proves the opposite of what the FTC claims.  It confirms that, although Professor Nieh does not perform "cost per dollar" analyses (the realm of accountants), he has done cost performance calculations (the realm of technologists).  Professor Nieh's background perfectly matches the subject matter of his testimony.  None of the cases the FTC cites (at 11) holds remotely to the contrary.  *Cf. United States v. Ausby*, 436 F. Supp. 3d 134,

162-63 (D.D.C. 2019) (excluding in a criminal trial purported fingerprinting expert who admitted that his primary qualifying experience was as an FBI "Fingerprint Clerk" in the 1960s); *Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*, 2024 WL 4534156, at \*4 (D.D.C. July 16, 2024) (barring an economist from venturing beyond damages testimony into testifying about "the reasonableness of attorney's fees"); *DynCorp*, 715 F. Supp. 3d at 64 (excluding part of a damages expert's testimony that was based on reading plain language in ordinary-course documents that required no "particular expertise to adequately consider").

In all events, the FTC's claims at most go to weight, rather than admissibility. *See Gordon v. New England Cent. R.R., Inc.*, 2019 WL 4024726, at \*4 (D. Vt. Aug. 27, 2019) ("To the extent [an expert] has limited experience in estimating costs for mixed-use buildings and his primary expertise is in environmental engineering, those challenges go to the weight of his testimony as opposed to its admissibility."); *see also Wash. Metro. Area Transit Auth. v. Aon Risk Servs., Inc. of Md.*, 2013 WL 12341666, at \*5 (D.D.C. Feb. 22, 2013) (rejecting argument the "crux of" which was the claim that the expert, "while very experienced in certain . . . fields, is not sufficiently knowledgeable in the specialized areas at issue here"). The FTC is free to examine Professor Nieh about the precise contours of his prior experience evaluating cost performance, whether in his academic work or his experience in private sector computer engineering. *See* Ex. 3, App. A at 2. But the FTC's arguments that Professor Nieh does not have the expertise to discuss the relative cost performance of different technological alternatives are without merit.

## CONCLUSION

The Court should deny the FTC's motion.

Dated: March 7, 2025                    Respectfully submitted,

                                        */s/ Mark C. Hansen*
                                        Mark C. Hansen (D.C. Bar No. 425930)
                                        Aaron M. Panner (D.C. Bar No. 453608)
                                        Geoffrey M. Klineberg (D.C. Bar No. 444503)
                                        Kevin D. Horvitz (D.C. Bar No. 1521032)
                                        Diego Negrón-Reichard (D.C. Bar No. 90020200)*
                                        KELLOGG, HANSEN, TODD,
                                          FIGEL & FREDERICK, P.L.L.C.
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Tel: (202) 326-7900
                                        mhansen@kellogghansen.com

                                        *Counsel for Defendant Meta Platforms, Inc.*

                                        *\* Application for admission to the Bar of the U.S.
                                        District Court for the District of Columbia pending*

13