# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:20-cv-03590 (JEB) |
| | **PUBLIC VERSION** |
| **META PLATFORMS, INC.** | |
| Defendant. | |

**Plaintiff Federal Trade Commission's Opposition to Defendant Meta Platforms, Inc.'s Pretrial Motions *In Limine***

# TABLE OF CONTENTS

I. THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT IN SUPPORT OF MARKET DEFINITION .................. 2

   A. FACTUAL BACKGROUND ................................................................................ 2

      1. The FTC's Complaint ................................................................................ 3

      2. Fact Discovery ........................................................................................... 3

      3. Expert Discovery ...................................................................................... 5

      4. Summary Judgment .................................................................................. 7

   B. ARGUMENT ................................................................................................... 8

      1. Meta's "Motion *in Limine*" fails the basic requirements of articulating the legal basis for and objects of exclusion ........................................................ 8

      2. The FTC's evidence and arguments are consistent with the FTC's Interrogatory 10 response, highly probative, and not prejudicial .................. 11

         (a) There is no legal basis to exclude evidence and arguments that non-PSN apps should be excluded from the relevant market. ............. 11

         (b) There is no legal basis to exclude evidence or argument confirming the robustness of market share calculations. .................................. 13

         (c) There is no legal basis to exclude evidence and arguments that Meta price discriminates against users with more inelastic demand. ........................................................................................ 18

         (d) There is no legal basis to exclude evidence or argument that *Whole Foods* supports the FTC's relevant market. .................................. 19

      3. Meta's remaining arguments are baseless..................................................... 20

   C. CONCLUSION................................................................................................ 21

II. THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL PREVIOUSLY DISMISSED OR ABANDONED CLAIMS AND ALLEGATIONS .................................................................................................. 22

   A. LEGAL STANDARD....................................................................................... 22

   B. ARGUMENT ................................................................................................... 23

III. THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY AND ARGUMENT REGARDING META'S HSR PRODUCTIONS AND INSTEAD PRECLUDE ALL EVIDENCE AND ARGUMENT REGARDING THE FTC'S PRIOR HSR REVIEWS .................................................... 28

   A. The Court Should Exclude HSR Evidence Under Rule 402 as Irrelevant................. 29

   B. The Court Should Exclude HSR Evidence Under Rule 403 Because it Would Invite a Mini-trial and Risks Confusing the Issues ................................................. 31

C.  The Court Should Not Pre-emptively Tie the FTC's Hands at Trial and Permit the FTC to Put Meta's HSR Evidence in Proper Context.................................................. 32

IV. THE COURT SHOULD DENY DEFENDANT'S META'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING INFLAMMATORY MATTERS ........................................................................................................... 34

A.  ARGUMENT ................................................................................................ 34

1.  The evidence Meta seeks to exclude is relevant to rebut Meta's alleged procompetitive justifications and as evidence of degraded quality, consumer harm, and monopoly power .......................................................................... 35

2.  The probative value of the FTC's integrity evidence is not substantially outweighed by unfair prejudice nor is it a waste of trial time ........................ 41

B.  CONCLUSION.............................................................................................. 44

V. THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FOREIGN REGULATORY FILINGS.............................................................................. 45

A.  Even if Not Admitted for the Truth of the Matters Asserted, the Foreign Regulatory Filings Contain Statements that Reflect "Industry and Public Recognition" Under the *Brown Shoe* Factors ............................................................................................ 45

B.  The Foreign Regulatory Filings Are Subject to the Residual Hearsay Exception...... 47

C.  Lack of a Sponsoring Witness Is Not a Basis to Exclude These Documents ............. 50

D.  Meta's Complaint That It Would Need to Respond to the Foreign Regulatory Filings Only Underscores the Relevance of the Documents.................................................. 50

VI. THE COURT SHOULD DENY DEFENDANT'S MOTION TO EXCLUDE PROFESSOR RIM'S OPINION 2 ...................................................................................... 52

A.  BACKGROUND ........................................................................................... 52

B.  ARGUMENT ................................................................................................ 53

1.  Contrary to Meta's assertions, where an expert offers an opinion based on experience, the expert need not use a "scientific" methodology. .................. 53

2.  Professor Rim's uniquely relevant experience qualifies him to provide reliable expert testimony on, among other things, WhatsApp's likely evolution path absent acquisition by Meta................................................................. 55

3.  Professor Rim applied his deep experience and industry standard methodology to the facts of this case in order to proffer his Opinion 2. ............................ 57

4.  Even if Meta's unsubstantiated attacks on Professor Rim were valid, they would go towards weight, not admissibility. ................................................. 60

C.  CONCLUSION.............................................................................................. 62

VII. THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE PROFESSOR HEMPHILL'S USE OF CONSUMER SURVEYS TO DERIVE "MARKET SHARES" ...................................................................................... 63

A.  BACKGROUND ........................................................................................... 63

B. LEGAL STANDARD ................................................................................................ 65

C. ARGUMENT ......................................................................................................... 66

    1. Prof. Hemphill's Proration Analysis is relevant and useful to the trier of fact, as called for under Federal Rule of Evidence 702 ......................................... 66

    2. Prof. Hemphill conducted the Proration Analysis using reliable methods ..... 67

    3. Conducting a sensitivity analysis, as Prof. Hemphill did, is a standard economic methodology endorsed in other cases and economic literature. ...... 68

    4. Surveys are reasonable and reliable inputs into Prof. Hemphill's Proration Analysis ........................................................................................................ 69

    5. Meta misrepresents the FTC's survey expert when criticizing Prof. Hemphill's use of the Malkiewicz survey. ....................................................................... 72

    6. Meta's critiques of the Proration Analysis reflect substantive disagreement and, at most, go to weight of the evidence and not admissibility. .................. 73

D. CONCLUSION ....................................................................................................... 75

# TABLE OF AUTHORITIES

## Cases

*Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) ............................................................ 65

*Arsanjani v. United States*, 2023 WL 3231101 (D.D.C. May 3, 2023),
    *aff'd*, No. 23-5109, 2024 WL 718726 (D.C. Cir. Feb. 20, 2024) ........................................... 60

*Artis v. Santos*, 95 F.4th 518 (7th Cir. 2024) ................................................................................ 55

*Barnes v. Dist. of Columbia*, 924 F. Supp. 2d 74 (D.D.C. 2013) .................................... 10, 14, 18

*Bazarian Int'l Fin. Assocs. v. Desarrollos Aerohotelco*,
    315 F. Supp. 3d 101 (D.D.C. 2018) ...................................................................... 54, 56, 58, 74

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ................................................ 18

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................................... 18, 46

*Brown v. Perez*, 835 F.3d 1223 (10th Cir. 2016) ......................................................................... 48

*Carroll v. Trump,* 124 F.4th 140 (2d Cir. 2024) ........................................................................... 43

*Coles v. Perry*, 217 F.R.D. 1 (D.D.C. 2003) ............................................................................... 43

*CPR Assocs., Inc. v. Se. Pa. Chapter of Am. Heart Ass'n, Pa. Affiliate Inc.*,
    1991 WL 53674 (E.D. Pa. Apr. 5, 1991) ................................................................................ 9

*Daniels v. District of Columbia*, 15 F. Supp. 3d 62 (D.D.C. 2014)............................................... 34

*Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993) ..................................................... 65

*DL v. District of Columbia*, 109 F. Supp. 3d 12 (D.D.C. 2015) ................................................... 66

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................ 38

*ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383 (S.D.N.Y. 1999)............... 51

*Fernandors v. District of Columbia*, 2006 WL 449300 (D.D.C. Feb. 23, 2006) ......................... 33

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) ................................................ *passim*

*FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062 (D.N.J. Aug. 4, 2021),
    *aff'd*, 30 F.4th 160 (3d Cir. 2022)......................................................................................... 68

*FTC v. Kroger*, 2024 WL 5053016 (D. Or. Dec. 10, 2024) ........................................................ 68

*FTC v. Meta Platforms, Inc.*, 2022 WL 4078930 (D.D.C. Sept. 6, 2022).................................... 32

*FTC v. Meta Platforms, Inc.*, 2024 WL 4772423 (D.D.C. Nov. 13, 2024) ........................... *passim*

*FTC v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986) .......................................................... 70

*FTC v. Qualcomm Inc.*, 2018 WL 5848999 (N.D. Cal. Nov. 6, 2018)......................................... 49

*FTC v. Tapestry, Inc.*, 2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024)..................................... 46, 70

*FTC v. Whole Foods Mkt.*, 548 F.3d 1028 (D.C. Cir. 2008) ................................................. 19, 20

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)............................... 17

*Graco Inc. v. PMC Glob., Inc.*, 2012 WL 762448 (D.N.J. Mar. 6, 2012) ..................................... 69

*Groobert v. President & Dirs. of Georgetown Coll.*,
219 F. Supp. 2d 1 (D.D.C. 2002) ....................................................................... 53, 54, 62, 65

*Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517 (5th Cir. 1981)..................................... 35

*Heller v. D.C.*, 952 F. Supp. 2d 133 (D.D.C. 2013),
*aff'd in relevant part Heller v. D.C.*, 801 F.3d 264 (D.C. Cir. 2015) ............................. *passim*

*Holmes-Martin v. Sibelius*, 2011 WL 13244746 (D.D.C. Mar. 3, 2011) .................................... 22

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ........................ 37

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Prac. and Antitrust Litig.*,
2021 WL 6072512 (D. Kan. Dec. 23, 2021)........................................................................ 50, 51

*In re GLUMETZA Antitrust Litig.*, 2021 WL 3773621 (N.D. Cal. Aug. 25, 2021)..................... 61

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
2022 WL 1814440 (N.D. Cal. June 2, 2022) .............................................................................. 61

*Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 636 F. Supp. 3d 73 (D.D.C. 2022).................. 48

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)............................................ 54, 62, 65

*Leyba v. Renger*, 874 F. Supp. 1229 (D.N.M. 1994) ................................................................... 9

*Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002)...................................................................... 22

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ................................................... 22

*Parallel Networks Licensing, LLC v. Microsoft Corp.*,
2017 WL 11557655 (D. Del. Feb. 22, 2017)............................................................................. 75

*Parallel Networks Licensing, LLC v. Microsoft Corp.*,
777 F. App'x 489 (Fed. Cir. 2019) ........................................................................................... 74

*Pinkett v. Dr. Leonard's Healthcare Corp.*, 2021 WL 1634565 (D.D.C. Apr. 27, 2021)............ 31

*Polaris PowerLED Tech., LLC v. Samsung Elecs. America, Inc.*,
386 F. Supp. 3d 760 (E.D. Tex. 2019) ...................................................................................... 47

*Public Citizen v. U.S. Dep't of Agric.*, 2022 WL 3139003 (D.D.C. Aug. 5, 2022)..................... 48

*Ricketts v. City of Hartford*, 74 F.3d 1397 (2d Cir. 1996) .......................................................... 39

*Rodriguez v. Wash. Metro. Area Transit Auth.*,
2021 WL 7286936 (D.D.C. Dec. 7, 2021)................................................................................. 22

*Rosden v. Leuthold*, 274 F.2d 747 (D.C. Cir. 1960) .................................................................... 9

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*,
72 F. Supp. 3d 131 (D.D.C. 2014)............................................................................................ 49

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999)........................................................ 74

*SEC v. Johnson*, 525 F. Supp. 2d 70 (D.D.C. 2007)................................................................... 61

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
    749 F. Supp. 2d 542 (E.D. Ky. 2010) ................................................................ 30

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021) ........................... 30

*Tek Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 2017 WL 952955 (N.D. Cal. Mar. 12, 2017) ........ 50

*Thorp v. Dist. of Columbia*, 319 F. Supp. 3d 1 (D.D.C. 2018) ...................................... 10

*Thorp v. Dist. of Columbia*, 327 F. Supp. 3d 186 (D.D.C. 2018) ................................... 9

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
    608 F.3d 871 (D.C. Cir. 2010) ...................................................................... 65

*United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984) ................................... 31

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ........................ 17, 70

*United States v. AT&T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018) ................................... 74

*United States v. Baez*, 2024 WL 4880011 (D.D.C. Nov. 25, 2024) .................................. 34

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ............... 17, 70

*United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) ............... 68

*United States v. Bray*, 2024 WL 3723942 (D.D.C. Aug. 8, 2024) .................................. 35

*United States v. Calloway*, 2023 WL 3743890 (D.C. Cir. June 1, 2023) .......................... 31

*United States v. Crawford*, 2024 WL 1908799 (D.D.C. May 1, 2024) ..................... 10, 14, 19

*United States v. Fitzsimons*, 605 F. Supp. 3d 92 (D.D.C. 2022) .................................. 35

*United States v. Google*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) ................................ 38

*United States v. Griffith*, 2023 WL 2043223 (D.D.C. Feb. 23, 2023) ............................. 35

*United States v. H&R Block*, 831 F. Supp. 2d 27 (D.D.C. 2011) .................................. 74

*United States v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011) .................................. 74

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ......................................... 54

*United States v. Macandrew*, 2022 WL 17961247 (D.D.C. Dec 27, 2022) ........................ 41

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ............................ 36, 68

*United States v. Mitchell*, 49 F.3d 769 (D.C. Cir. 1995) ........................................ 43

*United States v. Moore*, 589 F. Supp. 3d 87 (D.D.C. 2022) ...................................... 39

*United States v. Olaitan*, 2023 WL 4993525 (D.D.C. Aug. 4, 2023) .............................. 31

*United States v. Philip Morris USA, Inc.*, 219 F.R.D. 198 (D.D.C. 2004) ......................... 9

*United States v. Raymond*, 2023 WL 6588546 (D.D.C. Oct. 10, 2023) ........................... 61

*United States v. Rhine*, 2023 WL 2072450 (D.D.C. Feb. 17, 2023) ........................... 35, 43

*United States v. Saguil*, 600 F. App'x 945 (5th Cir. 2015) ...................................... 47

*United States v. Schuette,* 2023 WL 163490 (N.D. Cal. Jan. 11, 2023) ...................................... 39

*White v. United States*, 148 F.3d 787 (7th Cir. 1998) .................................................................. 39

*Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272 (Fed. Cir. 2012) ................................ 9

*Yuen v. U.S. Stock Transfer Co.*, 966 F. Supp. 944 (C.D. Cal. 1997).......................................... 49

**Statutes**

Clayton Act ............................................................................................................................. 29, 38

Hart-Scott-Rodino Act ........................................................................................................... 28, 30

Sherman Act.............................................................................................................. 28, 29, 31, 33

**Other Authorities**

*Council Regulation (EC) No 1/2003*, European Union (Dec. 16, 2002),
    https://eur-lex.europa.eu/eli/reg/2003/1/oj/eng........................................................................ 48

*Criminal Code Act 1995*, Federal Register of Legislation,
    https://www.legislation.gov.au/C2004A04868/latest/text........................................................ 48

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law:
    An Analysis of Antitrust Principles and Their Application ¶ 701h........................................... 35

**Rules**

Federal Rule of Civil Procedure 26 ............................................................................................. 61

Federal Rule of Civil Procedure 33 ............................................................................................... 8

Federal Rule of Civil Procedure 37 ......................................................................................... 8, 11

Federal Rule of Evidence 401 ............................................................................................... *passim*

Federal Rule of Evidence 402 ....................................................................................... 29, 30, 34

Federal Rule of Evidence 403 ............................................................................................... *passim*

Federal Rule of Evidence 404 ..................................................................................................... 51

Federal Rule of Evidence 702 ............................................................................................... *passim*

Federal Rule of Evidence 807 ............................................................................................... 47, 48

Local Civil Rule 7(a) ................................................................................................................... 10

Plaintiff Federal Trade Commission ("FTC") respectfully requests that the Court deny all of Defendant Meta Platforms, Inc.'s ("Meta") pretrial motions *in limine*. Meta's motions fail in large part because each either misunderstands (whether genuine or feigned) the arguments that the FTC intends to advance, and/or it seeks to prevent the FTC from responding to issues that Meta has injected into the proceedings. For example, the first two motions fail because, among other reasons, Meta incorrectly insists that the FTC intends to offer a "new or undisclosed market definition" and advance "previously dismissed or abandoned claims." *See infra* §§ I, II. Neither of these assertions are true. Meta's third and fourth motions, in addition to containing misunderstandings of the FTC's position, also try to prevent the FTC from responding to subjects Meta has put at issue in this proceeding. For example, Meta's third motion relates to evidence regarding the sufficiency of the FTC's Hart-Scott-Rodino reviews. The FTC has no intent to inject any such evidence into the trial, yet Meta seeks to prevent the FTC from rebutting any evidence Meta may raise on this issue. *See infra* § III. Likewise, Meta's fourth motion seeks to prevent the FTC from responding to Meta's alleged procompetitive justifications that it has improved Instagram's and WhatsApp's integrity efforts. *See infra* § IV. Meta's remaining motions contain similar defects. For the reasons described below, Meta's motions should all be denied.

I.    **THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT IN SUPPORT OF MARKET DEFINITION**

Meta's motion *in limine* seeks to exclude "evidence or argument" of a purportedly "new and undisclosed market definition." Meta's Pretrial Mot. *in Lim.* ("Mot.") at 2, ECF No. 404. A foundational problem with Meta's motion, however, is that the FTC is not advancing a new or undisclosed relevant market. And all the evidence and arguments that Meta appears to object to are both consistent with the FTC's prior market definition discussions, and either directly supports that relevant market or are relevant to some other element of the FTC's proof, like market shares. Meta may dispute their import, but that is not a legitimate basis for exclusion. And indeed, the Court's summary judgment decision relied on just such evidence and argument in finding that there were triable issues. *See FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, at *17-18, *19, *39, *56 (D.D.C. Nov. 13, 2024).

Meta's motion is also foundationally flawed in that it fails to articulate the actual legal basis for the purported exclusion—i.e., what rule of evidence or civil procedure warrants exclusion of the FTC's evidence and arguments. While this necessarily hampers the FTC's ability to respond, as detailed below, the FTC's evidence and arguments present no prejudice or unfair surprise to Meta, and moreover are highly probative. As such, there is no basis for exclusion under any rule or authority known to the FTC or cited in Meta's motion, and Meta's motion should be denied.

A.    **FACTUAL BACKGROUND**

Because Meta leaves out and mischaracterizes many facts in its motion, the FTC sets forth the following to correct and clarify the record.

      1.  The FTC's Complaint

From the outset, the FTC has defined its proposed relevant market as "personal social networking services," or "PSN services," which "consist of online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space."  Complaint ¶ 52 (Dec. 9, 2020) ("Compl."), ECF No. 3; Substitute Am. Compl. ¶ 166 (Sept. 8, 2021) ("SAC"), ECF No. 81; *see also* Compl. ¶¶ 53-55, ECF No. 3 (identifying key distinguishing characteristics of PSN services); SAC ¶¶ 167-169, ECF No. 81 (same).  The FTC further identified apps that provide PSN services and explained that other types of online services are not reasonable substitutes.  SAC ¶¶ 169, 171-177, 184-189, ECF No. 81.  And the FTC alleged that Meta's market shares, as measured using multiple metrics, indicated that Meta possessed monopoly power in the relevant market, even if one did not count all time spent on Facebook and Instagram.  *Id.* ¶¶ 190-202.

      2.  Fact Discovery

During fact discovery, Meta propounded multiple interrogatories relating to the FTC's market definition, which the FTC responded to with detailed explanations and evidence citations. *See, e.g.*, Ex. A (FTC's Objs. & Suppl. Resps. to Meta's First Set of Interrogs. (June 14, 2022)) (Interrogatory 10); Ex. B (FTC's Objs. & Resp. to Meta's List of Features or Activities (Sept. 12, 2022)) (Interrogatory 10); Ex. C (FTC's Suppl. Objs. & Resps. to Meta's Second Set of Interrogs. (Jan. 24, 2023)) (Interrogatories 13 and 14).

Meta propounded Interrogatory 10 on March 30, 2022, requesting "[f]or each feature or activity available to users on Facebook, Instagram, WhatsApp, or Facebook Messenger, specify whether the feature or activity is or is not within the definition of 'personal social networking.'" Ex. D (Meta's First Set of Interrogs. to the FTC at 10 (March 30, 2022)) (Interrogatory 10).  The FTC timely responded on April 29, 2022, and then supplemented its responses on June 14, 2022.

Ex. E, FTC's Objs. & Resps. to Meta's First Set of Interrogs. at 24 (April 29, 2022); Ex. A at 2.

The FTC's response identified evidence showing Facebook and Instagram provide "'friends and

family' sharing" as a "core use case."  Ex. A at 6-11.

Unsatisfied, Meta moved to compel further responses to Interrogatory 10.  After the

Court set forth a process for the FTC to supplement its response, the FTC did so on September

12, 2022.  Order at 2 (Aug. 1, 2022), ECF No. 165; Ex. B.  The FTC's Sep. 12, 2022 response

incorporated the FTC's prior responses to Interrogatory 10, provided the required "yes/no"

classifications for each of the 322 "features or activities" identified by Meta, and provided a

narrative explanation for those classifications.  The FTC explained:

> The FTC's classifications are driven in large part by the connection between
> the feature/activity and users' ability to share and experience each of the various
> features and activities with their social networks of friends, family, and personal
> connections in a shared social space—all built and maintained within the Facebook
> and Instagram applications—using Facebook's and Instagram's integrated and
> personalized social experiences. . . .  The FTC classifies Facebook Dating
> [differently] because evidence suggests that Meta affirmatively cordons off Dating
> . . . .  The FTC's classifications [for Meta apps] have no implication for . . . any
> specific feature or activity offered by a different product . . . .

Ex. B at 2-4.

The FTC also reiterated the unchanged nature of the proposed market in response to other

interrogatories, which Meta ignores.  For example, on October 17, 2022, Meta propounded

Interrogatories 13 and 14, seeking similar classifications for non-Meta apps.  Ex. F (Meta's

Second Set of Interrogs. to FTC at 7-8 (Oct. 17, 2022)) (Interrogatories 13 and 14).  The FTC

substantively responded, again emphasizing that its classifications were based in large part on

whether the apps had the core functionality and use for sharing with friends and family identified

in the FTC's Complaint.  Ex. C at 5-6.  The FTC explained that "it is not necessary to perform a

highly granular and burdensome, feature/activity-by-feature/activity analysis," *id.* at 9, 14,

because non-PSN apps have user experiences dedicated to other uses, rather than "maintaining a

network of friends, family, and personal connections and sharing experiences with them in a shared social space," *see id.* at 37-67.

Meta moved to compel further responses to Interrogatories 13 and 14 on February 25, 2023, making arguments very similar to those it now puts before the Court again. Meta's Mem. in Supp. of Mot. to Compel (Feb. 25, 2023), ECF No. 244-2. The Court denied the motion, rejecting Meta's argument that the FTC's interrogatory responses "differ materially from the relevant market alleged in the Amended Complaint": "The FTC's Interrogatory answers do not appear to the Court to deviate from this definitional element of the FTC's case. While Meta may well not agree with this definition or the relevant market, that is a merits dispute, not a discovery-based one." Order at 4 (Mar. 29, 2023), ECF No. 264.

Throughout fact discovery, Meta sought evidence to establish competition with Meta along multiple dimensions, including for sharing with friends and family and other activities that Meta maintains take place on Facebook and Instagram. *E.g.,* ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ *see generally* Rule 7(h) Statement in Support of Meta's Mot. For Summ. J. § I.B (July 12, 2024), ECF No. 369-1.

3. <u>Expert Discovery</u>

In July 2023, the FTC disclosed its initial expert reports. The FTC's economic expert Professor Hemphill concluded—consistent with the FTC's complaint and discovery responses—that a relevant market exists for PSN services in the United States, where the most prominent participants are Facebook, Instagram, and Snapchat. *E.g.*, Ex. I (PX9000) ¶¶ 24, 26, 189-197; *see also* Ex. J (PX9007) ¶¶ 15, 229-230.

Prof. Hemphill further explained, again consistent with the FTC's complaint and discovery responses, that the presence of features and activities on PSN apps that are less directly tied to friends and family sharing does not carry the further implication that the market for PSN services should be expanded to include non-PSN apps. Ex. I ¶¶ 265-271. That is because non-PSN apps are not reasonable substitutes for satisfying demand for friends and family sharing. *Id.* ¶¶ 371-395, 533-555. Rather, Prof. Hemphill explained, these other activities instead raise a question of whether Meta's competitive significance in the provision of PSN services may be overstated, relative to other PSN apps, if these additional features and activities are treated as equal contributors to the provision of PSN services when calculating market shares. *Id.* ¶¶ 644-649. To evaluate that potential issue, Prof. Hemphill used multiple metrics and analytical tools (as discussed in further detail in Section II.B.), and found Meta to have a dominant share no matter how different metrics were cut. *Id.* ¶¶ 650-659.

Prof. Hemphill also proffered other analyses supporting his conclusion that Meta had monopoly power with respect to PSN services, including evidence that consumer demand for Facebook and Instagram is relatively inelastic and that Meta engaged in price discrimination to raise quality-adjusted price higher for more inelastic users. *Id.* ¶¶ 727-760.

FTC computer-mediated communications expert Professor Lampe also offered opinions relevant to the FTC's proposed market, including that "there are distinct platforms whose design, motivations, and norms enable masspersonal, low cost maintenance of broad personal relationship networks that are comprised of real life connections," which he refers to as "Personal Social Network Sites." Ex. K (PX9004) ¶ 13; *see also* Ex. L (PX9010) ¶ 1.

On October 3, 2023, Meta submitted expert reports responding to the opinions of Profs. Hemphill and Lampe. The reports of Meta's experts demonstrate they understood the FTC's

position and those of its experts and attempted to offer a response.  *E.g.,* ████████

████████████████████████████████████████████

████████████████████████████████████████

██████    Profs. Hemphill and Lampe in turn submitted rebuttal reports to Meta's experts on

December 5, 2023.

On February 20, 2024, Meta deposed Prof. Hemphill on his initial and rebuttal reports.

Meta repeatedly probed Prof. Hemphill's opinions with questions related to each of the topics

now discussed in its motion—including ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████    Meta also deposed Prof. Lampe, and he offered testimony consistent with

and supportive of the FTC's relevant market.  *See* FTC's Cross-Mot. for Partial Summ. J. ("FTC

Opening Brief") at 29-30 (May 24, 2024), ECF No. 363-1.

4.  Summary Judgment

In the spring and summer of 2024, the parties briefed summary judgment, which included

thorough arguments about market definition, the apps in the relevant market, Meta's market

share, and other issues that Meta raises again in its motion *in limine*.  *See* Meta's Mot. for Summ.

J. ("Meta Opening Brief") at 10-23 (Apr. 5, 2024), ECF No. 325-1; FTC Opening Brief at 3-34,

ECF No. 363-1; Meta's Reply in Supp. of Mot. for Summ. J. ("Meta Reply Brief") at 4-31 (July

12, 2024), ECF No. 370-1; FTC's Reply in Supp. of Cross-Mot. for Partial Summ. J. ("FTC

Reply Brief") at 25-34 (Aug. 9, 2024), ECF No. 372-1.  On November 13, 2024, the Court

denied Meta's summary judgment motion on the possession of monopoly power in the relevant

market comprising PSN services in the United States.  Order at 1 (Nov. 13, 2024), ECF No. 383;

*Meta Platforms*, 2024 WL 4772423, at *19.

### B.  ARGUMENT

1.  <u>Meta's "Motion *in Limine*" fails the basic requirements of articulating the legal basis for and objects of exclusion.</u>

Meta's motion fails the most basic requirements of a motion *in limine*—to articulate what

the legal basis for purported exclusion is and what, exactly, the motion aims to exclude.  The

motion notably lacks a "legal standard" section, and one searches in vain through Meta's brief

for a clear articulation of what evidentiary or procedural rule the FTC is purported to have

violated, or that forms the basis for excluding any part of the FTC's trial record.

In places, Meta seems to suggest that the FTC is attempting to "walk back" its

Interrogatory 10 response, and that this should be forbidden because the FTC did not supplement

that response.  Mot. at 3, 5, 11.  But Meta never directly invokes Federal Rules of Civil

Procedure ("FRCP") 33, dealing with interrogatories, or FRCP 37, which governs requests for

sanctions for purported failure to make discovery disclosures.  Thus, it is not clear that Rule 37,

or a purported failure to supplement, is the basis for Meta's motion.

Meta does cite a few cases involving interrogatory supplements and potential exclusion

under FRCP 37, *see e.g.*, Mot. at 11, making FRCP 37 the FTC's best guess as to the claimed

legal basis for exclusion.  However, the FTC has not changed and is not changing its

Interrogatory 10 response, and the FTC's arguments and evidence (during expert discovery, at

summary judgment, and forthcoming at trial) are consistent with that response.  Thus, Meta's

cases are inapposite. *See, e.g.*, *United States v. Philip Morris USA, Inc.*, 219 F.R.D. 198, 201 (D.D.C. 2004) (excluding racketeering acts identified for the first time at summary judgment that were not disclosed in response to interrogatory requesting all racketeering acts); *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280-83 (Fed. Cir. 2012) (excluding reliance on certain drawings where failure to respond to part of interrogatory denied meaningful opportunity to challenge that reliance).

Meta elsewhere references the FTC's evidence being "prejudicial," Mot. at 10-11, perhaps suggesting certain evidence should be excluded under Federal Rule of Evidence ("FRE") 403, which permits exclusion of evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"  But Meta's brief makes no reference to Rule 403.  Thus, it is not clear that Rule 403 (or another rule of evidence) is the basis for exclusion.

Meta's remaining cases are both factually distinguishable and procedurally inapt.  Several cases indicate that a plaintiff should not change its market definition at summary judgment or trial without having amended its pleading.  Mot. at 12-13; *see, e.g.*, *CPR Assocs., Inc. v. Se. Pa. Chapter of Am. Heart Ass'n, Pa. Affiliate Inc.*, 1991 WL 53674, at *26-27 (E.D. Pa. Apr. 5, 1991) (considering whether the plaintiff could change its market definition at trial); *Leyba v. Renger*, 874 F. Supp. 1229, 1238 (D.N.M. 1994) (considering whether plaintiff could change its market definition at summary judgment).  But these cases do not track to a motion *in limine*, and in any event, are not applicable because the FTC is not changing its market definition from the one in its pleadings.  Still other cases cited by Meta simply have no bearing on any of the issues it appears to raise.  *See, e.g.*, *Rosden v. Leuthold*, 274 F.2d 747, 750 (D.C. Cir. 1960) (finding trial court erred when it did not allow a party to amend pleading to correct mathematical error); *Thorp v. Dist. of Columbia*, 327 F. Supp. 3d 186, 194 (D.D.C. 2018) (denying motion for

reconsideration of summary judgment in part because defendant did not raise argument in summary judgment briefing that it tried to raise on reconsideration).

Meta's motion also has a second basic deficiency in that it fails to specify what evidence and arguments it is seeking to bar. On the face of its motion, Meta seems to argue only that FTC should not be allowed to change its market definition. Meta styles its motion as one to "preclude evidence or argument in support of new and undisclosed market definition," Mot. at 2, and accuses FTC of "hint[ing] at a different market theory," *id.* at 3, and "shift[ing] its market definition after fact discovery," *id.* at 11. As detailed elsewhere, this supposed change in market definition—hinted or otherwise—is imaginary. Thus, based on Meta's own phrasing, its motion appears moot.

In sum, while styled as a motion *in limine*, Meta's motion fails at the threshold because it does not articulate the legal basis for the requested exclusion or provide clear notice of the objects of exclusion. *See Thorp v. Dist. of Columbia*, 319 F. Supp. 3d 1, 20 (D.D.C. 2018) (Local Civil Rule 7(a) requires "a statement of the specific points of law and authority that support the motion," which is intended "to ensure that the nonmovant and the courts are provided notice of what is sought and the legal basis for the motion"). Further, "[m]otions *in limine* are a means for arguing why 'evidence should or should not, for evidentiary reasons, be introduced at trial.'" *United States v. Crawford*, 2024 WL 1908799, at *1 (D.D.C. May 1, 2024). They are not vehicles for debating the evidence or "resolv[ing] factual disputes." *Barnes v. Dist. of Columbia*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013). At bottom, Meta's motion is intent on disputing the FTC's unchanged evidence and arguments regarding market definition, as Meta has throughout the case. *See infra* Section 2. But Meta's rehashing of its ongoing market definition disputes in the guise of a motion *in limine* is not a basis for exclusion.

10

2. <u>The FTC's evidence and arguments are consistent with the FTC's Interrogatory 10 response, highly probative, and not prejudicial.</u>

As detailed above, Meta's brief fails to give the FTC the basic notice expected of a motion *in limine*. While this necessarily hampers the FTC's ability to respond, the FTC will address the evidence and arguments that appear to be the greatest objects of Meta's complaints. In particular, as best the FTC can tell, Meta's motion is potentially seeking to exclude evidence and arguments that the FTC has put forth throughout this case, including:

- Evidence or argument that non-PSN apps should be excluded from the FTC's relevant market and/or market share calculations, because of Meta's position that certain activities on those apps can also be performed on Facebook and Instagram. Mot. at 10-12.

- Evidence or argument confirming the robustness of market share calculations in the FTC's relevant market. *E.g.*, *id.* at 10-11, 16.

- Evidence or argument that Meta can price discriminate against users with more inelastic demand. *E.g.*, *id.* at 17.

- Legal argument invoking *Whole Foods* as supporting the FTC's relevant market definition. *E.g.*, *id.* at 13-15.

As described below, each of these four categories is consistent with the FTC's Interrogatory 10 response, highly probative of issues in dispute at trial, appropriately disclosed, and not prejudicial to Meta, including because Meta has not been denied a meaningful opportunity to challenge the FTC's evidence and arguments. As such, there is no basis to exclude these materials under any cases cited by Meta, FRCP 37, FRE 403, or any other evidentiary or procedural rule.

      (a) There is no legal basis to exclude evidence and arguments that non-PSN apps should be excluded from the relevant market.

Meta appears to argue that the FTC's response to Interrogatory 10 somehow bars the FTC from arguing that non-PSN apps should be excluded from the relevant market. Mot. at 7, 10. Specifically, Meta's motion suggests it wants the Court to bar the FTC from arguing that TikTok

is excluded from the relevant market and/or market share calculations based on time spent, because of Meta's position that TikTok competes for time spent with Instagram Reels. *Id.* But Meta's argument here underscores that its motion is predicated on its disagreement with the FTC's consistent market definition position, including the FTC's response to Interrogatory 10—not on any prejudicial evidence or insufficient notice by the FTC.

Indeed, the FTC has been clear and consistent from the outset that non-PSN apps are properly excluded from the relevant market—even if they have one or more features/activities that are arguably similar, or even identical, to a feature/activity available on Facebook or Instagram—because they lack the distinctive functionality and use necessary to satisfy demand for PSN services. *See, e.g.*, SAC ¶¶ 171-177, ECF No. 81; Ex. C (classifying each feature/activity on non-PSN apps as "not part of a personal social networking offering"); Ex. C at 9 (explaining that "it is not necessary to perform a highly granular and burdensome, feature/activity-by-feature/activity analysis . . . in order to define a relevant market and show monopoly power").

The FTC's prior briefing on these issues reaffirmed the FTC's position that non-PSN apps should be excluded from the market for PSN services: "[t]o be in the relevant market, an application must . . . provide online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space. . . . If an online application does not provide such services, then it is out of the market because such applications are not regarded by users as a close substitute for PSNS services." FTC Mem. of Law in Opp'n to Meta's Mot. to Compel at 19-20 (Mar. 7, 2023), ECF No. 250. The parties also debated this issue at summary judgment, and the Court found that "competition between Meta and other social-media firms for users' time and attention does not

necessarily make them part of the same relevant product market," and ultimately agreed that summary judgment was not appropriate on the FTC's relevant market.  *Meta Platforms*, 2024 WL 4772423, at *9, *15-16.

Moreover, Meta has not shown that it has suffered any prejudice, both because the FTC has not changed the relevant market or deviated from its interrogatory responses and because Meta identifies nothing it would have done differently in fact or expert discovery if the FTC had responded any differently in its Interrogatory 10 response.  To the contrary, Meta's brief only vaguely gestures at the idea that it would have done something different in fact or expert discovery.  Mot. at 13.  This does not establish prejudice.  Additionally, as Meta itself touts, *see id.* at 8 (claiming "overwhelming evidence"), Meta took extensive discovery from third parties seeking to turn over every stone for evidence of competition with Facebook and Instagram, including with respect to sharing with friends and family and other activities.  *Supra* Section A.2.  And Meta's experts in turn argued that Meta faces competition for any and all activities on Facebook and Instagram, including sharing with friends and family.  *Supra* Section A.3.

Meta's apparent attempt to bar the FTC from arguing non-PSN apps are properly excluded from the relevant market should therefore be denied.

> (b) There is no legal basis to exclude evidence or argument confirming the robustness of market share calculations.

Another flavor of argument in Meta's motion is the suggestion that certain market share calculations that the FTC and its expert have offered contradict the FTC's relevant market and/or its response to Interrogatory 10.  Mot. at 10-11, 16.  In particular, Meta suggests it wants the Court to bar the FTC from presenting any market share calculations that represent less than all of time spent on Facebook and Instagram.  *Id.*  Under Meta's conception, any piece of evidence or argument that does not in isolation refer to all time spent on Facebook and Instagram is somehow

inconsistent with the FTC's Interrogatory 10 response and accordingly must be stricken.  *Id.*; *see also id. at* 2-3.  That is false, and again reflects Meta simply disputing the import of evidence, which is not the function of a motion *in limine*.  *Crawford*, 2024 WL 1908799, at *1; *Barnes*, 924 F. Supp. 2d at 78.

Regardless, as detailed below, the FTC's proffered market share calculations directly support the FTC's relevant market, as articulated in the FTC's complaint and Interrogatory 10 response, and thus are highly probative—as this Court found in denying Meta's motion for summary judgment.  *Meta Platforms*, 2024 WL 4772423, at *19-20.  As above, Meta likewise has not, and cannot, articulate any prejudice.  Accordingly, this flavor of Meta's motion to exclude should also be denied.

At the outset, Meta's Interrogatory 10 did not ask the FTC to explain the factual basis or evidence supporting its relevant market or Interrogatory 10 response—much less did it ask the FTC to detail the manner in which the FTC would calculate market shares.  *See* Ex. A at 2; *cf.* Order at 3, ECF No. 264 (noting with respect to Meta's analogous interrogatories for third-party apps: "The Court disagrees.  Had Meta wanted all relevant facts about what makes the use of one platform/feature pair a PSNS usage while another is not, it could have asked for those.").

The FTC in turn timely disclosed its opening and rebuttal reports, containing expert market share analysis, pursuant to the Court's expert discovery schedule.  In particular, the FTC's economic expert, Prof. Hemphill, disclosed market definition and market share opinions—each consistent with the FTC's complaint and discovery responses.  Specifically, Prof. Hemphill concluded that there is a relevant antitrust market for PSN services in the United States, and that Meta has a dominant share in that relevant market as measured through multiple ordinary course performance metrics, including daily active users ("DAU"), monthly active users

("MAU"), time spent, and broadcast posts. Ex. I ¶¶ 621-643. These calculations show that Meta's market share has exceeded 62% at all points between 2011 and 2022, regardless of the metric used. *Id.* ¶ 612.

Given that some activities on Facebook and Instagram are less directly tied to interacting with friends and family, Prof. Hemphill also measured market shares focusing on the portions of Facebook, Instagram, and Snapchat most closely associated with sharing with friends and family. *Id.* ¶¶ 268, 644, 650-59. As Prof. Hemphill explained, he did these robustness checks focused on Feed and Stories not because he was proffering a different relevant market—e.g., one comprising only a fraction of Facebook, Instagram, and other PSN apps—but to address the possibility that, by counting "at par" the features less directly tied to friends and family sharing, the relative competitive significance of Facebook and Instagram (compared to other PSN apps) might be overstated. *Id.* ¶ 268 ("The existence of additional features and uses does have potential relevance, not for the identification of market participants, but for the measurement of market shares. The integration of diverse activities within a single app in the PSN market raises the question of whether all activity counts equally, for purposes of evaluating an app's competitive significance as a PSN provider. . . . In [a later section calculating market shares], I employ a variety of measures of and inclusion criteria for PSN output to ensure a robust assessment of PSN market shares and thus the competitive significance of Meta and other market participants."); *see also id.* ¶ 644. This analysis provided further confirmation of Meta's dominant share. *Id.* ¶¶ 650-59.

Nor did Meta lack sufficient notice and opportunity to respond to Prof. Hemphill's analysis. Prof. Hemphill's opening report disclosed his analysis, and Meta's experts took the opportunity to respond, with ██████████████████████████████████████████

███████████████████████████████████████████████

█████████████  Prof. Hemphill also offered a market share sensitivity analysis in his rebuttal

report.  *See* Section VII.  But this analysis was a response to Meta's experts, *id.*, and Meta

notably does not (and cannot) contend that the analysis was outside the scope of proper rebuttal.

Prof. Hemphill's market share analysis is also entirely consistent with the FTC's relevant

market allegations and Interrogatory 10 response.  As explained, he did not offer them in support

of a different relevant market.  For instance, Prof. Hemphill's robustness check focused on Feed

and Stories is entirely consistent with the FTC's Interrogatory 10 response, which identified

these activities as closely associated with friends and family sharing.  Ex. A at 7-8 ("Ordinary

Course evidence indicates that Meta positions Feed, Stories, and Timeline . . . for use of personal

networking services.  For example, ████████████████████████████████████

██████████████████████████████████████████████

Likewise, the FTC's amended complaint stated that the FTC believed Meta's dominant

market share with respect to PSN services could be observed through multiple share metrics,

including DAUs, MAUs, and time spent, and expressly contemplated a proration of time spent as

a robustness check.  SAC ¶¶ 198-202, ECF No. 81.  Similarly, in briefing related to Meta's

motion to compel further responses to Interrogatories 13 and 14, the FTC explained:

> To the extent that there is any concern that counting all time spent on Facebook and Instagram overstates their significance as personal social networking providers, the FTC expects at trial (as it did in its complaint) to provide multiple market share metrics (not only time spent) establishing Meta's dominant share of PSNS. As to time spent, the FTC anticipates its expert(s) will consider whether imperfections in the data likely affect the bottom-line conclusion that Meta's share of PSNS is indicative of monopoly power or whether, ***as to a metric based on time spent, any type of adjustment is warranted***.

FTC Mem. of Law in Opp'n to Meta's Mot. to Compel at 20, ECF No. 250 (emphasis added).

Thus, it was completely predictable that one of the ways "the FTC's lead expert . . . calculated

Meta's market share [was] . . . 'based on the parts of PSN apps that are most directly related to broadcast sharing with friends and family.'" *Meta Platforms*, 2024 WL 4772423, at *20 (internal citations omitted).

Finally, the proffering of multiple market share estimates, including sensitivities and robustness checks, is a well-established practice. *See, e.g.*, Ex. P (PX15347) § 4.4.B ("How market shares are calculated may further depend on the characteristics of a particular market, and on the availability of data. Moreover, multiple metrics may be informative in any particular case."); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 61 (D.D.C. 2018) (recognizing expert's calculation of multiple market share calculations and "increased sensitivity to market reality as a strength of [the expert's] analysis, not a flaw"); *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *32-37 (N.D. Cal. Jan. 8, 2014) (crediting expert's "robustness checks" on his market share calculations which showed "consistent results" and "revealed the same basic market structure," even though the data available was "imperfect"); *see also United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 207 (D.D.C. 2017) ("[P]laintiffs 'need not present market shares . . . with the precision of a NASA scientist. The "closest available approximation" often will do.'") (internal citations omitted). Meta's cases involving a party attempting to use shares in a wholly separate market to impute shares in the relevant market in turn are inapposite. *See* Mot. at 16-17.

Meta's motion seems intent on relitigating a dispute from summary judgment about the FTC's market share estimates. The Court rejected Meta's arguments as a basis for summary judgment. *Meta Platforms*, 2024 WL 4772423, at *20 ("Meta raises issues with these friends-and-family-focused market-share measurements, . . . [r]esolving those disputes . . . is inappropriate at the summary-judgment stage, especially without any evidence that <u>better</u>

methods of market-share measurement exist.").  They are equally inappropriate as the basis of a

motion *in limine*.  *See Barnes*, 924 F. Supp. 2d at 78.

> (c) There is no legal basis to exclude evidence and arguments that Meta
> price discriminates against users with more inelastic demand.

Meta appears to seek to exclude evidence that Meta can price discriminate against users

with more inelastic demand, while incongruously asserting that "Professor Hemphill has no

evidence of such discrimination."  Mot. at 17.  Meta's brief relatedly falsely claims that the FTC

is offering a "new theory" that Meta can exercise monopoly power or raise quality-adjusted price

"for only the people who engage" in Meta's narrow construction of what relates to friends-and-

family sharing on Facebook and Instagram.  Mot. at 3.

Meta is wrong.  The FTC has proffered evidence of Meta's broad exercise of monopoly

power, as reflected in quality declining on Facebook and Instagram across multiple dimensions,

while Meta reaps sustained high profits.  FTC Opening Brief at 19-20, 33-34, ECF No. 363-1.

Further, evidence that Meta price discriminates is consistent with the FTC's proposed market and

interrogatory responses, and indeed squarely supports the FTC's relevant market while also

serving as direct evidence of monopoly power.  As discussed at summary judgment, Meta's price

discrimination is relevant to Meta's possession of monopoly power in at least two ways.  First,

price discrimination is relevant to delineating the FTC's product market using the *Brown Shoe*

practical indicia.  FTC Opening Brief at 17, 20-21, ECF No. 363-1; *Meta Platforms*, 2024 WL

4772423, at *9, 14.  Second, price discrimination can serve as direct evidence of monopoly

power, which does not rely on market definition.  FTC Opening Brief at 33-34, ECF No. 363-1

(citing *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007)); *Meta

Platforms*, 2024 WL 4772423, at *8, 16; *see also* Ex. I ¶¶ 727-731.

Meta likewise has not suffered any prejudice.  Prof. Hemphill's opinions related to the

FTC's price discrimination evidence are consistent with the FTC's interrogatory responses and

were timely disclosed in the FTC's expert reports, Ex. I ¶¶ 727-760; Ex. J ¶¶ 104-121,

████████████████████████████████████████████████████████

████████████████████████

Meta's attempt to prevent the FTC from using evidence or argument related to price

discrimination should therefore be denied.

> (d) There is no legal basis to exclude evidence or argument that *Whole*
> *Foods* supports the FTC's relevant market.

Meta appears to seek to exclude legal argument invoking *Whole Foods* as supporting the

FTC's relevant market definition.  Mot. at 13-16.  This is an unusual ask in a motion *in limine*,

which are traditionally used to argue why evidence should be excluded for evidentiary reasons.

*See Crawford*, 2024 WL 1908799, at *1.  Meta's *Whole Foods* arguments also lack substantive

merit.  First, Meta continues to wrongly assert that *Whole Foods* sustained a market limited only

to a subset of customers or in-store products.  *See* Mot. at 14.  To the contrary, as previously

explained, FTC evidence paralleling evidence from *Whole Foods*—including evidence centered

on Feed and Stories—confirms the FTC's relevant market and is not a "retreat," Mot. at 8, or

evidence proffered in support of some different relevant market, FTC Reply Brief at 33-34, ECF

No. 372-1.

Relatedly, Meta is wrong that *Whole Foods* implies that "the FTC committed to prove

that Meta's Cheerios do *not* compete with TikTok's Cheerios."  Mot. at 15.  *Whole Foods* stands

for the opposite, as the FTC previously explained.  FTC Opening Brief at 18, ECF No. 363-1

(quoting *Whole Foods* that "the fact that a customer might buy a stick of gum at a supermarket or

at a convenience store does not mean there is no defensible groceries market") (alterations omitted).

Second, the FTC has repeatedly cited *Whole Foods* in its market definition disputes with Meta, underscoring that there is no unfair surprise. *Id.*; *see also* FTC Mem. of Law in Opp'n to Meta's Mot. to Compel at 12-13, ECF No. 250. Likewise, the FTC has repeatedly rejected Meta's argument that discussions of competition in this case must occur at the individual activity level. *See* FTC Mem. of Law in Opp'n to Meta's Mot. to Compel at 13 (July 14, 2022), ECF No. 157 ("the focus on piecemeal activities overlooks the integrated service being offered"); Ex. B at 2 (stating that "[t]he FTC's classifications are driven in large part by the connection between the feature/activity and users' ability to share and experience each of the various features and activities" with their network of personal connections); FTC Mem. of Law in Opp'n to Meta's Mot. to Compel at 1, ECF No. 250 ("The FTC further alleges that . . . PSNS reflect integrated services centered on friends and family, and not, as Meta suggests, a balkanized set of individual activities and features.").

### 3. Meta's remaining arguments are baseless.

Meta's motion makes two other arguments in passing that likewise do not support its motion to exclude. First, the background section of Meta's brief suggests that FTC expert Prof. Lampe "hinted at a different and narrower market" limited to weak connections and excluding close friends and family. Mot. at 9-10 (piecing together separate fragments of testimony from Prof. Lampe). This is a mischaracterizing of Prof. Lampe, as previously explained. FTC Opening Brief at 29-30, ECF No. 363-1.

Meta's motion also mentions stipulations Meta proposed, Mot. at 7-8, suggesting the parties' inability to reach agreement implied the FTC planned to pursue a different market at trial. The FTC has no such plans, as detailed above. Rather, as the FTC explained to Meta,

20

"[w]here [the FTC] did not agree to a proposed stipulation, the proposed statements were not positing facts, but instead were characterizing a party's position on a legal issue, or otherwise characterizing or decontextualizing material evidence or discovery responses, among other issues."  Ex. Q (T. Mattes email to J. Hartman).

## C.  CONCLUSION

For the foregoing reasons, Meta's motion should be denied.

II.     **THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL PREVIOUSLY DISMISSED OR ABANDONED CLAIMS AND ALLEGATIONS**

Meta moves to exclude the FTC from raising evidence or argument about any other actual or attempted acquisitions other than its acquisitions of Instagram and WhatsApp, arguing that this evidence solely relates to claims that the Court dismissed or the FTC abandoned.  But evidence of Meta's pattern of acquisitions (and attempted acquisitions) of current or potential competitors is probative of its course of conduct; namely, that when faced with competitive threats it did not compete, but rather tried to buy.  The Court should deny Meta's motion accordingly.

### A.  LEGAL STANDARD

While plaintiffs are generally "barred from raising rejected counts at trial," *Rodriguez v. Wash. Metro. Area Transit Auth.*, 2021 WL 7286936, at *1 (D.D.C. Dec. 7, 2021), "[t]he mere fact that a claim has been dismissed does not automatically render all evidence pertaining to that claim irrelevant and inadmissible."  *Holmes-Martin v. Sibelius*, 2011 WL 13244746, at *1 (D.D.C. Mar. 3, 2011) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). "Rather, the admissibility of evidence pertaining to extinguished claims is governed by the same principles that govern the admissibility of evidence, such as relevance, unfair prejudice and confusion to the jury."  *Id.* ("'[B]ackground evidence of prior acts of discrimination, though not independently actionable, would be admissible if relevant and not unfairly prejudicial under Federal Rules of Evidence 401 and 403." (citing *Lyons v. England*, 307 F.3d 1092, 1110 (9th Cir. 2002)).  Courts thus do not automatically exclude any evidence pertaining to dismissed claims, but rather evaluate the relevance and potential prejudicial effects of any evidence that a party seeks to exclude under the Federal Rules of Evidence.

## B. ARGUMENT

The FTC has no intention to litigate or revisit claims that it has left behind or that the
Court dismissed. Instead, the FTC seeks to introduce evidence of Meta's past acquisitions to
provide factual context for Meta's anticompetitive course of conduct as alleged in its Amended
Complaint—as acknowledged in this Court's prior Opinion Denying Meta's Motion to Dismiss.
*See* SAC ¶¶ 9, 11, 78, ECF No. 81. The Court wrote:

> . . . while the Amended Complaint references Facebook's acquisitions of companies
> other than Instagram and WhatsApp, the agency concedes that it does not allege
> that those acquisitions "each standing alone[ ] violated the antitrust laws. **Instead,
> the allegations provide factual context for Facebook's anticompetitive course
> of conduct.**" Redacted FTC Opp. at 21 (emphasis omitted).

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 53 (D.D.C. 2022) (emphasis added).

In other words, as the FTC previously explained and the Court acknowledged, evidence
referencing Meta's other attempted or successful acquisitions is probative of Meta's default
approach to rival firms: buy if you can, compete if you can't. *See*

For example, the FTC intends to introduce evidence that Meta attempted to acquire
Snapchat

This is significant and probative because the offer was made

a feature which Meta recognized

██████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

When Meta could not buy its way out of eventually competing with Snapchat, it instead

innovated to add ████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████

    Meta's attempted acquisition of Snap is just one example.  Meta also explored purchasing

███████ and attempted to purchase ██████ ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

    And just as in the case of Snap, Meta competed with ██████ when Meta was unable to

acquire it. ████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████    Meta likewise eventually competed with ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

Documents relating to Meta's attempted or contemplated acquisitions, such as its attempts to acquire Snap, ██████████████, are relevant under FRE 401 because they provide meaningful context for the anticompetitive practices that informed Meta's decisions to acquire Instagram and WhatsApp. They are also probative of the world that would exist but for Meta's acquisitions of Instagram and WhatsApp by demonstrating that Meta actually competes with services when it cannot acquire them. Meta cannot explain why these documents are irrelevant beyond its unsupported and incorrect argument that they relate only to abandoned or dismissed claims.

And to the extent Meta seeks to prohibit documents that even reference other acquisitions as categorically irrelevant, *see e.g.*, Mot. at 20, that overbroad exclusion should likewise be rejected. For example, Meta's acquisition in 2011 of Beluga, a then-new mobile messaging app, is referenced in an FTC exhibit and provides context for Meta's later acquisition of WhatsApp. *See* ████████████████████████████████; ██████████████████████████

████████████████████████████████████████████████████

████████████████████. The FTC should be permitted to reference Meta's other consummated or

attempted acquisitions to the extent relevant, and Meta can raise relevance objections at trial if they so choose.

Additionally, all but one of the documents that Meta cites in its motion *in limine* are clearly relevant to Meta's acquisitions of Instagram and WhatsApp. For instance, Meta's Exhibit 9—a log of messages between Mark Zuckerberg and Sheryl Sandberg on October 26, 2013— chiefly concerns negotiations between Mr. Zuckerberg and "the WhatsApp founder" regarding "our offer" of "$3b for the company plus $1b in retention packages for them." Mot. Ex. 9 at 2. Ms. Sandberg notes that "What's app [sic] is better" and Mr. Zuckerberg responds that it "is a longer term project . . . . I've been working on this for almost two years now." *Id.* at 3. Meta's contemplated acquisition of Snapchat is mentioned precisely once near the end of the document, *id.*; this exhibit, focused largely on the context of Meta's eventual acquisition of WhatsApp, thus hardly qualifies as a document with "no conceivable bearing on the case" as Meta describes. So too with Meta's Exhibits 6 and 10. *See, e.g.,* ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████. Accordingly, even if documents relating solely to Meta's acquisitions of companies other than Instagram and WhatsApp *were* irrelevant and therefore inadmissible—which they are not—the documents that Meta seeks to exclude are relevant for other reasons.

Evidence regarding Meta's attempted acquisitions—such as of Snap and ███—and completed acquisitions—such as Beluga—is plainly probative and thus admissible for multiple purposes. Contrary to Meta's unsupported claim, this evidence does not stem from any allegations that have been abandoned or dismissed. Meta's cherry-picked examples are neither

reflective of the FTC's preliminary exhibit list nor particularly supportive of Meta's own argument.  Meta has not shared how many documents it seeks to exclude with this motion, but from the FTC's count, Meta's motion would impact a small percentage of the FTC's exhibits. For these reasons, the Court should reject Meta's all-encompassing request to exclude "any evidence or argument as to acquisitions or potential acquisitions other than Instagram and WhatsApp."  Further, the Court should reject any attempt by Meta in its Reply to narrow its requested relief to any particular attempted or completed acquisitions, as Meta did not advance any transaction-specific arguments in its opening brief.  To the extent Meta genuinely wants to object to any testimony or document concerning other acquisitions on relevance grounds, it can do so during or after trial rather than in its overly-broad motion to exclude all evidence pertaining to other acquisitions.  For these reasons the Court should deny Meta's motion *in limine*.

**III.    THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY AND ARGUMENT REGARDING META'S HSR PRODUCTIONS AND INSTEAD PRECLUDE ALL EVIDENCE AND ARGUMENT REGARDING THE FTC'S PRIOR HSR REVIEWS**

Meta's next motion *in limine* concerns the FTC's pre-merger reviews of Meta's acquisitions of Instagram and WhatsApp under the Hart-Scott-Rodino Act ("HSR Reviews"). Meta apparently intends to argue for a third time that the FTC's prior HSR Reviews render its acquisitions legal under Section 2 of the Sherman Act, and Meta seeks through this motion to limit the FTC's ability to counter that argument.

To be clear, it is Meta who intends to raise the HSR Reviews at trial, not the FTC. The FTC has no intention of raising the HSR Reviews in its affirmative case, while Meta purports that it "will call" a still-unnamed witness from the FTC to testify about the Instagram acquisition, the WhatsApp acquisition, and "the FTC's clearance of those acquisitions."  Ex. A (Meta's Second Amended Witness List) at -011.  Meta also asked the FTC to agree to twelve proposed joint stipulations about the HSR Reviews that included details such as (1) how many documents Meta, Instagram, and WhatsApp produced during the HSR Reviews; (2) ███████████ ███████████████████████; and (3) that the FTC stated the HSR Reviews were "competent."  Ex. B (FTC's Response to Meta's First Set of Proposed Joint Stipulations of Fact) ¶¶ 1-4.  And while Meta's motion argues the FTC's proposed joint stipulations show that the agency intends to offer evidence and argument regarding the sufficiency or extent of the HSR Reviews ("HSR Evidence"), Mot. at 21, Meta is incorrect.  The FTC's proposed joint stipulations regarding HSR Evidence relate exclusively to rebuttal facts that the FTC served only after it learned that Meta would be re-upping the HSR Reviews at trial.  *See, e.g.*, Ex. C (FTC's Second Set of Proposed Joint Stipulations) ¶ 67 (proposing that Meta stipulate that it produced documents in this litigation that it did not produce during the HSR Reviews).

The Court should not indulge Meta's renewed attempt to inject the HSR Reviews into this case because it has already ruled they are not relevant—twice. *Facebook*, 581 F. Supp. 3d at 57 (finding "it would be improper to draw a merits conclusion about the legality of the mergers on the basis of [the HSR Reviews]"); *Meta Platforms,* 2024 WL 4772423, at *29 (same). Also, allowing Meta to raise the HSR Reviews again would invite a trial-within-a-trial about their sufficiency, wasting time that should be spent on the focus of this case. Consequently, pursuant to FRE 402 and 403, the Court should preclude any and all HSR Evidence, full stop.

Even if the Court permits Meta to offer some HSR Evidence, it should not allow Meta's side of the story to go unchallenged. Rather, insofar as Meta opens the door, the Court should deny Meta's motion *in limine* and grant the FTC permission to properly contextualize the HSR Reviews with unprivileged facts. At a minimum, the Court should not rule on this motion until it has the chance to evaluate the HSR Evidence in the full light of trial.

### A. The Court Should Exclude HSR Evidence Under FRE 402 as Irrelevant.

Meta's motion is premised on its claim that "the FTC seeks to argue to the Court" the HSR Reviews "were flawed because the agency did not have all the documents that it obtained through its recent investigation and discovery in this case." Mot. at 21. Not so. The FTC has no plan to offer HSR Evidence during its case-in-chief and has maintained at all times during this case that the HSR Reviews are irrelevant. Rather, it is Meta that has repeatedly brandished the HSR Reviews as a sword. The Court has already twice rejected Meta's attempt to wield the HSR Reviews in this way and it should disarm Meta for a third time, this time permanently.

The first time the Court addressed Meta's HSR Reviews defense was its ruling denying Meta's Motion to Dismiss the FTC's Amended Complaint. There, Meta argued that "the FTC 'unconditionally cleared both acquisitions under Section 7 of the Clayton Act, which Congress enacted to address incipient threats to competition that Section 2 <u>would not</u> condemn.'"

*Facebook*, 581 F. Supp. 3d at 56 (quoting Meta's Mot. to Dismiss at 21 (emphasis in original)).

The Court declined to dismiss the Amended Complaint on that basis, finding the "HSR reviews

at the time of the acquisitions do not bear significantly on the issue now before the Court"

because, among other things, "[t]he HSR Act does not require the FTC to reach a formal

determination as to whether the acquisition under review violates the antitrust laws" and contains

"explicit language making clear that the FTC can bring post-review challenges." *Id.* at 57.

The second time Meta swung the HSR Reviews sword was in its Motion for Summary

Judgment, when it "re-upped its argument that a presumption of legality should be extended to

its acquisitions because the FTC previously cleared them to go forward during the Hart-Scott-

Rodino process." *Meta Platforms*, 2024 WL 4772423, at *29.  The Court observed it had

"previously rejected this argument," and held that "the Commission's decision to revisit the

mergers it previously declined to block is entitled to full consideration on the merits." *Id.*

Meta now tries for a third bite at the apple.  The Court should reject Meta's gambit yet

again—this time for good—by entirely excluding HSR Evidence under FRE 402, which provides

that "[i]rrelevant evidence is not admissible."  As this Court has already recognized, *Facebook*,

581 F. Supp. 3d at 57, an antitrust enforcement agency's "decision not to pursue [a pre-merger

challenge] isn't probative as to the merger's legality because many factors may motivate such a

decision, including the [agency's] limited resources." *Steves & Sons, Inc. v. JELD-WEN, Inc.*,

988 F.3d 690, 714 (4th Cir. 2021) (affirming exclusion of Department of Justice's decision not to

pursue pre-merger investigation); *see also Static Control Components, Inc. v. Lexmark Int'l, Inc.*,

749 F. Supp. 2d 542, 556 (E.D. Ky. 2010) (affirming order barring defendant from using "the

FTC's decision not to take action as a sword because inaction on the part of the government

cannot be used to prove innocence").  Here, the Court has repeatedly ruled that it will not "draw

a merits conclusion about the legality of the mergers on the basis of [the HSR Reviews]." *Meta Platforms*, 2024 WL 4772423, at *29 (quoting *Facebook*, 581 F. Supp. 3d at 57). It should therefore exclude HSR Evidence as irrelevant. *See, e.g.*, *Pinkett v. Dr. Leonard's Healthcare Corp.*, 2021 WL 1634565, at *1-2 (D.D.C. Apr. 27, 2021) (excluding party's cost of medical care as irrelevant to dispute over severity of her injuries).

     **B. The Court Should Exclude HSR Evidence Under FRE 403 Because it Would Invite a Mini-trial and Risks Confusing the Issues.**

     Even if some HSR Evidence is probative (and none of it is), the Court should still exclude all of it under FRE 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "To reduce the risk of undue delay or wasted time, the Court can limit the admission of evidence . . . if doing so becomes appropriate to prevent [a] 'trial within a trial.'" *United States v. Olaitan*, 2023 WL 4993525, at *7 (D.D.C. Aug. 4, 2023); *see also United States v. Calloway*, 2023 WL 3743890, at *5 (D.C. Cir. June 1, 2023) (affirming exclusion of evidence on a collateral issue to avoid "wasting time" with a "trial within a trial"); *United States v. Aboumoussallem*, 726 F.2d 906, 912 (2d Cir. 1984) (affirming exclusion of testimony when it would trigger "a 'trial within a trial'").

     Here, allowing Meta to contend at trial that the HSR Reviews bear on the legality of its acquisitions under Section 2 would force the FTC to respond in kind, thereby inviting a mini-trial over the HSR Reviews' sufficiency and rigor and distracting from the focus of this case. The pre-trial back-and-forth on the proposed joint stipulations, *see supra* at 28, highlights the danger of a trial-within-a-trial if Meta is permitted to offer HSR Evidence at trial.

31

### C. The Court Should Not Pre-emptively Tie the FTC's Hands at Trial and Permit the FTC to Put Meta's HSR Evidence in Proper Context.

Meta's motion asks the Court to preclude the FTC from asserting that "Meta did not provide the FTC with the documents it sought" during the HSR Reviews or that the HSR Reviews "w[ere] flawed for lack of such documents."  Mot. at 21.  Meta speculates that the FTC will argue it "withheld documents or materials" during the HSR Reviews or even that Meta spoliated evidence.  Mot at 25.  As noted above, the FTC has no plans to raise the HSR Reviews in its case-in-chief.  Meta's fears are unfounded and cannot sustain its premature motion here.

Further, if Meta is permitted to offer HSR Evidence regarding the sufficiency and rigor of the HSR Reviews, the Court should not pre-emptively preclude the FTC from introducing non-privileged facts about Meta's document productions during the HSR Reviews.  The FTC's proposed stipulated facts related to the HSR Reviews are instructive.  They contain basic facts about the reviews and this litigation—which, notably, Meta largely conceded at summary judgment.  Ex. C ¶¶ 55-71.  For instance, they proffer that Meta produced additional documents during the FTC's pre-complaint investigation and discovery in this action than in the prior HSR Reviews, and establish the (short) timelines of each review.  *Id.* ¶¶ 55-71.

Moreover, these facts, and the arguments the FTC may make from them, do not implicate the FTC's internal privileged materials.  To be clear, under no circumstances will the FTC offer any "documents and memoranda [that agency] staff generated while reviewing both the Instagram and WhatsApp acquisitions," which the Court previously ruled are protected under the deliberative-process privilege.  *FTC v. Meta Platforms, Inc.*, 2022 WL 4078930, at *2, *5 (D.D.C. Sept. 6, 2022).  Because the FTC thus will not be using privileged information as a sword, the cases Meta cites regarding the sword/shield doctrine are inapt.  *See* Mot. at 24-25.

Rather, to the extent the HSR Reviews remain a topic at all in this litigation, the FTC has argued and will continue to argue that the prior reviews did not legally or factually immunize Meta's acquisitions—as the FTC explicitly told Meta at the time. Ex. D (PX3483) at -001 (forwarding closing letter from FTC); *Facebook*, 581 F. Supp. 3d at 57 (quoting closing letter). In that context, the FTC should be permitted to proffer basic facts and provide complete factual context, such as that the record in this case is much larger than in those prior reviews, and fully supports a finding of Section 2 liability in this action. Meta's request to exclude such non-privileged information is baseless, especially when Meta is the one persistently injecting the prior reviews into this litigation.

If the Court has any reservations, the Court should delay a ruling—denying Meta's motion and waiting until trial so that it may view the dispute in the context of the trial. *See Fernandors v. District of Columbia*, 2006 WL 449300, at *4 (D.D.C. Feb. 23, 2006) (reserving "final ruling on admissibility" until the court sees "the fuller context provided by trial").

IV.  **THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING INFLAMMATORY MATTERS**

In an attempt to justify its anticompetitive acquisitions of Instagram and WhatsApp, Meta has claimed that its "tools and expertise helped Instagram attack its integrity problems at scale." Ex. A (PX10092) at -013.  In response, the FTC intends to introduce evidence rebutting those claims by showing that Meta underinvested in Instagram's integrity efforts—or systems used to detect and remove activity or content that violates user policies—for years after the acquisition and, relatedly, that both Facebook and Instagram continually suffered from integrity issues post-acquisition.  Despite this, Meta now seeks to exclude evidence showing "how some third-party users post objectionable content" and concerning "social media's relation to mental health," arguing that this evidence is "inflammatory," "prejudicial," and a "waste [of] valuable trial time." Mot. at 26.  But Meta introduced integrity issues into the proceeding by claiming that it delivered integrity benefits to Instagram and WhatsApp.  It should not now be allowed to exclude facts rebutting these contentions simply because they do not like what these facts show.

Accordingly, the FTC respectfully asks this Court to deny Meta's motion *in limine*.

A.  **ARGUMENT**

Courts evaluate the admissibility of evidence on a trial motion *in limine* according to the framework established by Rules 401, 402, and 403 of the Federal Rules of Evidence.  *United States v. Baez*, 2024 WL 4880011, at *1-2 (D.D.C. Nov. 25, 2024).  Courts must first "assess whether the evidence is relevant."  *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 66 (D.D.C. 2014).  "Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Federal Rule of Evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." However, this balancing test "'has a highly limited application, if any at all' in a bench trial." *United States v. Bray*, 2024 WL 3723942, at *2 (D.D.C. Aug. 8, 2024) (quoting *United States v. Fitzsimons*, 605 F. Supp. 3d 92, 100 n.6 (D.D.C. 2022)).  Indeed, judges in this district have joined sister circuits in explaining that because prejudice objections "'have no logical application in bench trials . . . excluding relevant evidence on the basis of unfair prejudice [in a bench trial] is a useless procedure.'"  *United States v. Griffith*, 2023 WL 2043223, at *2 (D.D.C. Feb. 23, 2023) (quoting *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) and "joining at least one other judge of this jurisdiction").

    1.   The evidence Meta seeks to exclude is relevant to rebut Meta's alleged procompetitive justifications and as evidence of degraded quality, consumer harm, and monopoly power.

Relevance under FRE 401 is a low bar, merely requiring that evidence have "any tendency" to make a fact of consequence more or less probable.  *United States v. Rhine*, 2023 WL 2072450, at *3 (D.D.C. Feb. 17, 2023) (quoting Fed. R. Evid. 401).  Here, the evidence Meta seeks to exclude clears that bar in two ways: first, by rebutting Meta's own affirmative defenses, and second, by illustrating Meta's monopoly power and the harmful consequences of that power.

A party asserting procompetitive justifications—here, Meta—bears the burden of proving them through an "overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 701h.  Meta must establish at least three elements for each of its alleged

justifications.  First, the purported "justifications must be a form of 'competition on the merits[,]'" which "typically requires showing that the union will result in 'greater efficiency' . . . or, more directly, increased consumer welfare."  *Meta Platforms*, 2024 WL 4772423, at *79 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)).  Second, "such justifications cannot be pretextual."  *Id.* at 80.  Third, "Meta must show that the procompetitive benefits could not have been achieved without the acquisitions in question"; in short, "if the claimed benefits could have been achieved without the anticompetitive conduct, then they cannot rescue that conduct."  *Id.* at 80-81.

When asked to identify the procompetitive justifications for its acquisitions of Instagram and WhatsApp, Meta claimed in part that "Meta's tools and expertise helped Instagram attack its integrity problems at scale."  Ex. A at -013.  Specifically, Meta alleged that it helped Instagram improve its ability to reduce spam, fake and abusive accounts, and reduce presence of objectionable content on its platforms.  *Id.* at -018.  To date, Meta has not withdrawn these claims and, if anything, has doubled down on them.  Indeed, Meta has recently listed V.S. Subrahmanian as an expert witness who will testify regarding Meta's purported integrity claims. Ex. B (Meta's Second Amended Witness List) at -020.  When put to the test at trial, however, Meta will be unable to carry its burden to show that these—like its other alleged justifications— are non-pretextual, merger-specific, and narrowly tailored.  *Meta Platforms*, 2024 WL 4772423, at *80-81.  To the contrary, the FTC will introduce evidence showing that Meta systemically underinvested in Instagram and, unsurprisingly, Instagram continually struggled to combat objectionable content on the platform.

For example, the FTC intends to introduce PX3605 as evidence on this topic at trial.  This analysis—which was created for and relied upon by high-level Meta executives—explains that



Ex. C (PX3605) at -007; *see also id.* at -006-07

Content relating to bullying provides an illustrative example:

*Id.* at -008

Further, evidence will show that bullying issues on Instagram continued for years even after                                                      In 2018, Meta observed that                                                      Ex. D (PX15316) at -005; Ex. E (PX3070) at -009.  Indeed,

Ex. F (PX10759) at -002.

This evidence of Meta's failure to invest in Instagram's integrity systems for many years following the acquisition is probative of Meta's affirmative defenses because it shows that improving integrity outcomes was "not a genuine reason for" its acquisition of Instagram.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 n.12 (9th Cir. 1997) (quoting jury instructions).  The evidence therefore directly rebuts Meta's contention that integrity improvement was a non-pretextual justification for the merger.  *Id.* at 1219 (stating that the antitrust laws do not "allow[] a monopolist to rely upon a pretextual business justification to

mask anticompetitive conduct") (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 484 (1992)).

Additionally, evidence of quality issues relating to integrity—such as ███████████ ████████████████████████████████████████████████████████████████████ ████████████ Ex. G (PX10159) at -006; *see also* Ex. H (PX10160) at -009; Ex. I (PX3609) at -003—is probative for two separate reasons.  First, the efficacy of Meta's post-acquisition integrity investments is probative as to whether Meta's stated justifications were actually realized—which, of course, is a necessary predicate to showing that these benefits were merger specific.  *Meta Platforms*, 2024 WL 4772423, at *80-81 (explaining that the requirement that any justification be the "least restrictive" mirrors the "Clayton Act's requirement that efficiencies be merger specific").  Second, evidence of Meta's integrity failings is also probative of quality issues on Facebook and Instagram, which is direct evidence of Meta's monopoly power and evidence of harm to consumers.  FTC Opening Brief at 34, ECF No. 363-1 ("Evidence also indicates declining quality for both apps—i.e., an increase in quality-adjusted price—across multiple other product quality dimensions, including access to friends-and-family content, privacy, integrity, reliability, and overall satisfaction."), 60 (stating that "Meta has underinvested in integrity on Instagram and adopted integrity policies that harm users"); *see also United States v. Google*, 2024 WL 3647498, at *75 (D.D.C. Aug. 5, 2024) ("Just as the power to raise price 'when it is desired to do so' is proof of monopoly power . . . so too is the ability to degrade product quality without concern of losing consumers."); *id.* at *128 (analyzing how anticompetitive conduct had "allowed Google to degrade the quality of its text advertisements"); *Meta Platforms*, 2024 WL 4772423, at *70-71 (analyzing evidence of quality degradation of

"evidence of specific harm to consumers").  As such, this evidence is clearly "of consequence in determining the action."  Fed. R. Evid. 401.

This evidence's probative value distinguishes the cases Meta cites, which exclude evidence given its limited probative impact.  For example, in *United States v. Schuette*, the court was concerned, in part, that the evidence was "only marginally probative."  2023 WL 163490, at *3 (N.D. Cal. Jan. 11, 2023).  Other cases cited by Meta are likewise distinguishable.  *See United States v. Moore*, 589 F. Supp. 3d 87, 92 (D.D.C. 2022) ("[I]t is far from clear that [the excluded] evidence . . . is at all probative given the facts of this case."); *Ricketts v. City of Hartford*, 74 F.3d 1397, 1414 (2d Cir. 1996), *as amended on reh'g in part* (Feb. 14, 1996) (use of excluded evidence to show intent was "irrelevant to the primary question" of the case); *White v. United States*, 148 F.3d 787, 792 (7th Cir. 1998) (excluded evidence was "collateral because it had no direct bearing on" case's legal issues).

Notably, Meta does not argue that exposure to objectionable content—whether spam, nudity, or violent content—has no impact on the quality of a user's experience.  Rather, Meta appears to argue that evidence of objectionable content is irrelevant because it involves only a "small percentage" of "third party users" and because the FTC has not argued that Meta's efforts fall below some sort of "competitive benchmark."  Mot. at 30-31.  Each of those arguments fail.

Meta's argument, that evidence of whether "some bad actors" have evaded detection is irrelevant to its procompetitive justifications, is pure sophistry.  *Id*.  In the first instance, Meta relies on a misstatement of the law.  It argues that "[t]he relevant question for trial is whether Meta's demonstrable quality improvements were inevitable such that they would have happened without the two acquisitions at issue."  *Id*. at 31.  Not so.  As this Court previously held, any procompetitive justification must be a form of competition on the merits, non-pretextual, and

could not have been achieved without the acquisitions in question. *Meta Platforms*, 2024 WL 4772423, at *79-81. For example, to show that Instagram's use of PhotoDNA to reduce objectionable content is a legally cognizable procompetitive justification, Meta must first show that PhotoDNA—which is a free and widely used software tool developed by Microsoft that allows companies to detect child exploitation material—actually was successful in reducing such material on Instagram. Ex. L ███████ at -007. As such, an inquiry into Meta's success in reducing child exploitation material is relevant as to whether this purported benefit actually occurred. *Meta Platforms*, 2024 WL 4772423, at *77-78 ("For one, [procompetitive benefits are] not prospective; Meta can point to actual consumer benefits that it contends have flowed from the acquisition.").

Next, Meta must show that Instagram's use of PhotoDNA could not have been achieved by an independent Instagram. As such, the FTC intends to introduce evidence showing that Instagram could have acquired and deployed PhotoDNA as a standalone company, just as other non-Meta platforms did. So too with Meta's allegations regarding its content moderation team. The FTC will present evidence that Meta ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████

Putting those two examples aside, even under Meta's erroneous characterization of the law, it concedes that quality improvements must be "demonstrable." Mot. at 31. Nonetheless, Meta argues that because "bad actors are inevitable," individual incidents of objectionable content are also inevitable and, accordingly, irrelevant. *Id.* But while individual incidents of

objectionable content may not be dispositive of platform quality, they can be a symptom of larger structural or programmatic integrity issues that degrade the quality of the platform.

Meta cannot exclude such probative evidence by concocting a requirement that the FTC, at trial, needs to link evidence of degradation of Meta's apps' quality, or evidence rebutting Meta's procompetitive justifications, to a "competitive benchmark" or "competitive level." *See* Mot. at 27, 30. The Court has already determined that "evidence of specific harms to consumers" does not need such links in order to be viable. *See Meta Platforms*, 2024 WL 4772423, at *70-71. In denying Meta's motion for summary judgment, the Court held that the "enormous[]" growth in Instagram's ad load, Meta's ability "to adjust ad loads on both Instagram and Facebook to make up for revenue shortfalls," "Meta's explicit policy of not prioritizing Instagram's growth so as not to cannibalize too much from Facebook," and Meta's shuttering of Facebook Camera were all "evidence of specific harms of consumers." *Id.* at *70-71. And none of these harms operate by reference to "a competitive benchmark" or even to other firms more generally. *See id.* The Court should likewise reject the artificial requirement that Meta has tried to conjure up here.

        2.   The probative value of the FTC's integrity evidence is not substantially outweighed by unfair prejudice nor is it a waste of trial time.

Meta also goes on to argue that, even if evidence of objectionable content is relevant, it should nonetheless be excluded under FRE 403 because it would be "inflammatory," a "waste" of trial time and would create a "mini-trial about mental health and social media." Mot. at 26, 32. While Rule 403 "has a highly limited application, if any at all in a bench trial," even a full application of Rule 403 fails to support Meta's position. *United States v. Macandrew*, 2022 WL 17961247, at *3 (D.D.C. Dec 27, 2022) (internal quotations omitted).

In the first instance, Meta's protestations regarding the evidence's "inflammatory" nature mischaracterizes both the parties' engagement around these issues as well as the evidence sought to be excluded.  Meta appears to argue that the FTC has somehow agreed that evidence relating to certain integrity issues was unduly prejudicial.  Mot. at 27.  Not so.  The FTC's initial Counterstatement of Material Facts included evidence that shows that Meta ███████████ ████████████████████████████████████████████████████████████  Mot. at 27.  After filing, Meta asked the FTC to retract these statements.  The FTC stood by them.  *See* Ex. K (Email from D. Matheson to H. Weaver).  However, to avoid an unnecessary dispute, the FTC agreed to modify its language to the following: "Moreover, recent studies indicate that Meta's automated systems and hashtags have promoted material sexualizing children on Instagram."  FTC Updated Counterstatement of Material Fact ¶ 2258 (June 4, 2024), ECF No. 363-2.  The FTC's agreement to address Meta's concern and avoid a dispute by changing the wording of a brief to replace a ███████████████████████████████████ with the language "material sexualizing children" does not represent any sort of admission that all (or any) categories of objectionable content are unduly prejudicial.  Rather, it shows why Meta's requests for pre-trial exclusion are overbroad.  The FTC has continued to engage with Meta regarding both side's objections to the other's exhibit list.  To the extent that Meta raises similar issues as part of this engagement, the FTC will, of course, continue to meet and confer in good faith to attempt to resolve any specific concerns, as it has done in the past.  To the extent that Meta raises specific issues about an exhibit, it should seek to resolve those narrowly through the process for engagement laid out by this Court, rather than seek to exclude an overly broad set of evidence based on vague (and unsupported) concerns.

Meta's other FRE 403 arguments regarding objectionable content appear to rest on concerns that this evidence is generally inflammatory, ergo, Meta will be forced to waste trial time responding to it.  Mot. at 31-32.  But FRE 403 "does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone."  *Rhine*, 2023 WL 2072450, at *7 (internal citations omitted).  It was Meta's choice to put many of these claims at issue by either asserting them as affirmative defenses, by refusing to agree to a factual stipulation, or by otherwise contesting them.  Having put them at issue, it cannot now seek to exclude evidence necessary to rebut them under Rule 403.  *See United States v. Mitchell*, 49 F.3d 769, 776 (D.C. Cir. 1995) (refusing to exclude evidence to rebut an issue of intent that the defendant raised).  And this posture distinguishes certain Meta authorities.  *See Carroll v. Trump*, 124 F.4th 140, 176 (2d Cir. 2024) (observing that "both parties had had ample time to develop [the evidence at question] as an issue [during discovery], yet both had failed to do so"); *Coles v. Perry*, 217 F.R.D. 1, 10 (D.D.C. 2003) (excluded testimony related to claim that "[would] not go forward," and "ha[d] nothing to do" with claim at issue in case).

Finally, Meta argues that introducing evidence regarding "any purported connection between mental health and social media" will create an inappropriate "trial within a trial."  Mot. at 32.  The FTC, however, does not intend to introduce evidence related to the connection between social media and users' mental health generally.  Rather, the FTC will remain focused on objectionable content as defined and tracked within Meta's own documents.  For example, the FTC intends to introduce evidence regarding "bullying" not as part of a "mini trial" on the connection between bullying and mental health and/or social media, but rather because Meta defines objectionable content to include bullying, ███████████, and because Meta assesses its integrity success (or lack thereof) in part by evaluating ████████████████████

43

███████████████████████. *See supra* Section A.1.  Having defined objectionable content broadly, Meta cannot now claim that it would be *unfairly* prejudiced by the FTC's evidence rebutting the same.

### B.  CONCLUSION

For the reasons stated above, the FTC respectfully requests that this Court deny Meta's motion *in limine* to exclude so-called inflammatory evidence.

**V.    THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FOREIGN REGULATORY FILINGS**

Meta's Motion *in Limine* regarding Foreign Regulatory Filings should be denied.  The documents at issue consist of filings made by ███████ TikTok, Google, and ██████ to foreign regulators, including the European Commission ("EC") and the Australian Competition and Consumer Commission ("ACCC"), in response to Requests for Information ("RFIs") from those regulators.  Meta's motion should be denied because, even if the Court finds that these submissions to foreign regulators do not meet a hearsay exception, the FTC still seeks to admit them not for the truth of matters asserted therein, but to demonstrate "industry and public recognition" of the FTC's PSN services market, which is relevant under *Brown Shoe* and its progeny.  Further, these submissions are subject to the residual hearsay exception.

Notably, Meta itself seeks to admit a foreign regulatory filing, thereby acknowledging the admissibility of these types of submissions.  *See* Ex. A (Excerpt of Meta's Am. Preliminary Ex. List (Feb. 17, 2025)) (identifying DX0082, ████████████████████████████ ███████████████).  Meta also seeks to preadmit similar domestic regulatory documents, such as its own SEC filings, and asserts that they do not require witness testimony for context.  *See* Ex. B (email chain from L. Smith, Meta, to N. Miller et al., FTC (Feb. 26, 2025)) (proposing to pre-admit SEC filings and earnings call transcripts).

**A.  Even if Not Admitted for the Truth of the Matters Asserted, the Foreign Regulatory Filings Contain Statements that Reflect "Industry and Public Recognition" Under the *Brown Shoe* Factors.**

Even if the statements contained in the foreign regulatory filings were not admitted for the truth of the matters asserted (which they should be), they are still admissible as probative evidence of "industry or public recognition" of the PSN services market, one of the *Brown Shoe* factors germane to defining a relevant market.  *See Brown Shoe Co. v. United States*, 370 U.S.

294, 325 (1962). These statements therefore demonstrate industry recognition of the relevant market regardless of whether the statements are true and thus are admissible. *Cf. FTC v. Tapestry, Inc.*, 2024 WL 4647809, at \*20 (S.D.N.Y. Nov. 1, 2024) (relying on SEC filings and investor calls in finding that "industry or public recognition" *Brown Shoe* factor supported the relevant market).

Here, the regulatory filings contain informative statements by industry participants regarding the PSN services market and competition in that market. For example:



- **Google** stated to the ACCC that "It is our understanding that users go to social media platforms to connect to other end-users, usually within an identified social circle (e.g., friends, relatives, colleagues, classmates or communities)." Mot. Ex. 30 (PX13494) at -006 (Response to "ACCC Digital Platforms Services Inquiry" (Nov. 18, 2022)).

Stated differently, even if the Court does not admit (for example) the ███████ statement for the truth that ███████████████████████████████████████ Mot. Ex. 31 at -376, the fact that ███████ stated this belief and position is "industry and public recognition" evidence.

46

Accordingly, even if the Court finds that the submissions are not subject to a hearsay exception, the FTC seeks to offer them, and they should be admitted, as evidence of industry and public recognition related to the FTC's relevant market.

**B.  The Foreign Regulatory Filings Are Subject to the Residual Hearsay Exception.**

Contrary to Meta's claim, the foreign regulatory filings are subject to a hearsay exception and should also be admitted for their truth.  The regulatory filings should be admitted under the residual hearsay exception for documents because they are "supported by sufficient guarantees of trustworthiness."  *See* Fed. R. Evid. 807(a)(1).  Courts have found that the circumstantial guarantees of trustworthiness exist in documents compelled by governmental organizations with penalties for providing false submissions.  *See Polaris PowerLED Tech., LLC v. Samsung Elecs. America, Inc.*, 386 F. Supp. 3d 760, 763 (E.D. Tex. 2019) (admitting aircraft maintenance log where the log was required to be maintained and failure to comply would result in a civil penalty assessed by a governmental organization); *United States v. Saguil*, 600 F. App'x 945, 947 (5th Cir. 2015) (manufacturer's inscriptions have equivalent guarantees of trustworthiness under the residual exception because they are required by law and false designations give rise to civil liability).

In this case, the filings at issue were made in response to formal RFIs issued by foreign regulatory agencies with the power to compel responses and penalize false submissions.  *See, e.g.*, Mot. Ex. 40 ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

For example, the EC has authority to impose fines under Article 23(1)(a)-(b) of Regulation 1/2003 if a company provides incorrect or misleading information in response to a Request for

Information (RFI).  *See Council Regulation (EC) No 1/2003*, European Union (Dec. 16, 2002), https://eur-lex.europa.eu/eli/reg/2003/1/oj/eng.  Similarly, the ACCC's Criminal Code Section 137.1 makes it a criminal offence to knowingly provide to the ACCC information that is false or misleading, or omit any matter or thing without which the information is misleading.  *See Criminal Code Act 1995*, Federal Register of Legislation, https://www.legislation.gov.au/ C2004A04868/latest/text.  As a result, the statements are sufficiently trustworthy to be admitted under FRE 807.  The filings themselves are also the most probative evidence on these third-party statements to foreign regulators.  *See* Fed. R. Evid. 807(a)(2).  Absent the foreign regulatory filings as exhibits, any testimony offered by witnesses regarding the statements contained in the filings would be piecemeal and incomplete.  *See* FTC Mot. *in Limine* to Admit Select Test. of Adam Presser and Julia Roberts (Feb. 21, 2025), ECF No. 407.

Because these foreign filings have inherent indicia of trustworthiness, the cases cited by Meta are distinguishable.  Meta cites two cases addressing voluntary letters written in support of Freedom of Information Act (FOIA) exemptions.  *See Public Citizen v. U.S. Dep't of Agric.*, 2022 WL 3139003, at *2-3 (D.D.C. Aug. 5, 2022) (on summary judgment, "it is a different matter to rely on [hearsay] from private third-parties to justify an agencies withholding" of FOIA documents); *Brown v. Perez*, 835 F.3d 1223, 1232-33 (10th Cir. 2016) (on summary judgment, agency did not establish that letter would be admissible).  In this case, however, the truthful responses to the RFIs were mandated by foreign regulators with the respondents subject to penalties for providing false information.

Meta also cites two inapposite cases in which courts held that documents were insufficiently reliable: in one instance because the documents were investigator-prepared interview notes containing double hearsay, *see Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*,

48

636 F. Supp. 3d 73, 94 (D.D.C. 2022), and in the other because the document was alleged to be forged, *see Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 72 F. Supp. 3d 131, 145 (D.D.C. 2014). These cases have no bearing on the filings at issue here, which are formal, non-forged responses to RFIs by foreign regulators.

Meta offers no evidence to support its position that these filings are untrustworthy because the companies have an "axe to grind" against Meta. *First*, the companies at issue dutifully complied with formal requests from foreign regulatory agencies to address concerns *by the regulators* regarding Meta's conduct. *See, e.g.*, Mot. Ex. 41 ███████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

Contrary to Meta's suggestion, these documents were not submitted *sua sponte* by the responding companies, and Meta identifies no evidence that they are unreliable. Indeed, because regulatory filings have indicia of reliability, courts regularly take judicial notice of them. *See, e.g.*, *FTC v. Qualcomm Inc.*, 2018 WL 5848999, at *6 (N.D. Cal. Nov. 6, 2018) (taking judicial notice of filings with government regulatory bodies like the Korean Fair Trade Commission); *Yuen v. U.S. Stock Transfer Co.*, 966 F. Supp. 944, 945 n.1 (C.D. Cal. 1997) (taking judicial notice of filings before a foreign court). *Second*, Meta's argument goes to the weight, rather than the admissibility of these documents. Individuals from all of the submitting third parties will be witnesses at trial, and there are ordinary-course documents from these companies on the exhibit lists of both parties. The Court is well positioned to determine the weight of these foreign regulatory filings, especially in light of other evidence that will be presented.

### C.  Lack of a Sponsoring Witness Is Not a Basis to Exclude These Documents.

Meta complains, without citation, that the FTC has not identified a sponsoring witness for many of these documents.  However, there is no freestanding sponsoring witness requirement in the Federal Rules of Evidence.  *Tek Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 2017 WL 952955, at *1 (N.D. Cal. Mar. 12, 2017).  And this Court has already stated that "I don't think I am going to need or require sponsoring witnesses . . . ."  Tr. of Status Conference at 8:19-20 (Dec. 9, 2024), ECF No. 388.

### D.  Meta's Complaint That It Would Need to Respond to the Foreign Regulatory Filings Only Underscores the Relevance of the Documents.

Meta asserts that admitting the regulatory submissions would waste time and cause delay because doing so would require Meta to demonstrate why the submissions are irrelevant.  In the same breath, Meta identifies statements in the regulatory responses that purport to contradict the FTC's arguments.  Meta cannot have it both ways.  Even if the regulatory responses contradict the FTC's arguments, then they are still relevant.  Indeed, the regulatory responses are replete with relevant information.  *See supra* Section A.

Meta also argues that alleged irrelevancies and inconsistencies in the regulatory filings— of which it provides no examples—would cause a "sideshow."  Meta is wrong.  In support of its argument, Meta relies on two cases that are fatally dissimilar to the present facts, *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383 (S.D.N.Y. 1999), and *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Prac. and Antitrust Litig.*, 2021 WL 6072512 (D. Kan. Dec. 23, 2021).  In *ESPN*, the court excluded evidence about an incident one party sought to use to demonstrate the parties' course of dealing when several witnesses had offered contradictory testimony.  76 F. Supp. 2d at 404-07.  Here, the regulatory statements do not conflict with each other and are each authored by a single entity, in contrast to the statements of

50

numerous witnesses in *ESPN*.  As a result, *ESPN* is inapposite.

In *re EpiPen* is similarly distinguishable.  There, the court excluded evidence of a prior bad act offered under FRE 404(b), relying on cases that excluded FRE 404(b) evidence because admitting such evidence would lead to mini trials.  *In re EpiPen*, 2021 WL 6072512, at *4.  In the present case, the FTC is not seeking to offer the regulatory responses as proof of prior bad acts under FRE 404(b).  Therefore, *In re EpiPen* does not support excluding the evidence at issue.

For these reasons, Meta's Motion *in Limine* regarding Foreign Regulatory Filings should be denied.

## VI.    THE COURT SHOULD DENY DEFENDANT'S MOTION TO EXCLUDE PROFESSOR RIM'S OPINION 2

After proffering two academics to assert that WhatsApp would not have provided personal social networking ("PSN") services in the but-for world, Meta offers the curious argument that Professor Rim may not respond to Meta's experts because his opinion is not based on a methodology supported by textbooks or peer-reviewed studies.  Meta is wrong on both the law and the facts.  Professor Rim's opinions are based on his own unique and significant real-world experience that bears precisely on issues central to the case, which is a perfectly valid use of expert testimony under the Federal Rules.  Meta's motion to exclude his Opinion 2[1] should be denied.

### A.  BACKGROUND

Meta seeks to exclude Professor Rim's second expert opinion, which responds to arguments by Meta's experts Professors Kaplan and Carlton that WhatsApp would not have provided PSN services in the but-for world.  *See* Mot. at 38.

In his expert report, Professor Kaplan— ███████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████
████████████████████████████

---

[1] Professor Rim offers two opinions in his expert report.  Meta moves to exclude only the second of Professor Rim's two opinions ("Opinion 2").  *See* Mot. at 38.

███████████████████████████████████████████████████████

█████████████████████

In his expert report, Professor Carlton—███████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

Professor Rim responds to these arguments by Professors Kaplan and Carlton in Opinion 2 of his expert report.  Professor Rim explains that, based on his extensive experience applied to his review of the evidence in this case, "the Kaplan Report mischaracterizes the likely evolution path which WhatsApp would have taken but for its acquisition by Meta" and that he "disagree[s] with Professors Kaplan and Carlton that WhatsApp, absent its acquisition by Meta, was unlikely to develop a social networking offering similar to Facebook."  *See* Ex. C at Section V.

## B.  ARGUMENT

1. <u>Contrary to Meta's assertions, where an expert offers an opinion based on experience, the expert need not use a "scientific" methodology.</u>

Meta complains that Professor Rim "does not cite a single textbook, peer-reviewed study, or authority" in support of his Opinion 2.  Mot. at 38; *see also id.* at 40.  But FRE 702 "expressly contemplates that an expert may be qualified on the basis of *experience*."  Fed. R. Evid. 702 (Comm. Notes) (emphasis added).  Courts in this District and elsewhere have repeatedly found that "personal experience can be a reliable and valid basis for expert testimony."  *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6-7 (D.D.C. 2002) (expert testimony regarding earning potential of budding photographer was reliable and admissible when expert's

opinion was based on expert's own experience as a photographer and owner of a production company, and not on particular expertise in "evaluating the careers of other photographers" or results of scientific or academic study); *see also, e.g.*, *Heller v. D.C.*, 952 F. Supp. 2d 133, 141-42 (D.D.C. 2013) (admitting expert testimony by law enforcement officials whose specialized knowledge was gained from field experience with gun trafficking and gun violence) (citation omitted); *United States v. Hankey*, 203 F.3d 1160, 1169-70 (9th Cir. 2000) (upholding admission of expert testimony from law enforcement officer regarding defendants' gang affiliation and likely resultant actions, when such opinions were based on the expert's "street intelligence" cultivated through professional training and communications with gang).

Where an expert's opinion stems from their qualifications and experience, those qualifications and experience "alone can constitute a basis of reliable principles and methods." *Bazarian Int'l Fin. Assocs. v. Desarrollos Aerohotelco*, 315 F. Supp. 3d 101, 110-11 (D.D.C. 2018) (collecting cases); *see also, e.g.*, *Heller*, 952 F. Supp. 2d at 141 (finding methodology of "observ[ing] the relevant evidence" and "apply[ing] their specialized knowledge to the case at hand" to be reliable and noting that such methodology "has been approved by courts in a variety of cases involving experts whose experience forms the basis of their opinions") (citation omitted).

Not surprisingly, the law also does not demand that experts utilize a scientific methodology or peer-reviewed articles, even in cases dealing with scientific experts. *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999) ("It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist."); *Groobert*, 219 F. Supp. 2d at 11 ("The court cannot penalize the plaintiff for the lack

of scientific or academic studies and published reports . . . because if it did, no plaintiff could ever present their own tests or recover damages relating to this industry."); *Artis v. Santos*, 95 F.4th 518, 526 (7th Cir. 2024) ("But by now it is no secret that an expert need not wear a lab coat nor cite peer-reviewed studies to reliably lend his expertise to the trier of fact—experience is an equally valuable teacher.").

In other words, the law does not require the type of formulaic citation to textbooks, peer-reviewed studies, or other third-party authorities that Meta demands. Mot. at 38. Where, as here, Professor Rim has applied his uniquely relevant experience to the facts at hand, that experience is sufficient.

2. <u>Professor Rim's uniquely relevant experience qualifies him to provide reliable expert testimony on, among other things, WhatsApp's likely evolution path absent acquisition by Meta.</u>

Professor Rim has uniquely relevant experience that qualifies him to proffer an opinion on WhatsApp's likely evolution path absent acquisition by Meta. He was a successful venture capitalist and technology CEO, and now teaches on those topics at NYU Stern Business School and around the world. *See* Ex. C ¶¶ 1-21.

As detailed in Professor Rim's report, he was the youngest person ever promoted to Principal at Softbank Ventures Asia, the venture capital arm of the Softbank Corporation (a multinational conglomerate that plays a prominent role in the global tech industry). *See id.* ¶ 6. In that role, he routinely identified, conducted due diligence on, and successfully invested in early and growth stage technology companies. He also attended board meetings of these companies as a Board Observer or Board Director, actively engaging in discussions on key management issues when he did so. *See id.* ¶ 8. Professor Rim then founded and led a venture capital firm that ran the best-performing fund in South Korean history (turning approximately $11 million in investment into roughly $1 billion) and was ranked in the top ten in CB Insights'

global Corporate Venture Capital rankings in 2017. *See id.* ¶¶ 10-11, 16. Professor Rim's venture capital firm analyzed and invested in numerous technology companies, focusing specifically on startup companies at the pre-revenue and pre-product stages. *See id.* ¶ 10. In this capacity, Professor Rim advised companies through changes in business strategy, including helping one technology company change its monetization strategy and grow to a staggering 25,000 times increase in valuation compared to when he invested. *See id.* ¶ 12.

Professor Rim next became the CEO and Board Director of Kakao Corporation ("Kakao"), one of the largest publicly traded technology companies in Korea. *See id.* ¶¶ 14, 17. Kakao owns and operates both the mobile messenger KakaoTalk and personal social networking service KakaoStory, among other product lines. *See id.* ¶ 14. Professor Rim has specific expertise in mobile messengers and PSN services: the realities of what it is like to run them, monetize them, and the business decisions associated with such management. *See, e.g.*, Ex. E (PX6182) at 11:13-12:5, 34:17-36:2, 38:7-12, 39:9-40:12. He also has specific expertise in technology company acquisitions and the discussions that occur at the Board of Directors level for such acquisitions. *See id.* at 36:21-37:12.

Professor Rim received many awards for his leadership of Kakao. *See* Ex. C ¶¶ 18-20. He continued to serve as Executive Advisor to Kakao for several years following his successful tenure as CEO. *See id.* ¶ 21. Following this illustrious career as a businessperson, he now is a professor, teaching technology and entrepreneurship classes at the NYU Stern School of Business and other programs around the world. *See id.* ¶¶ 1-5.

In short, Professor Rim's experience confers exactly the sort of expertise that courts routinely find qualifies an expert to opine on related topics. *See, e.g.*, *Heller*, 952 F. Supp. 2d at 141-42; *Bazarian*, 315 F. Supp. 3d at 110-11.

Meta's argument that Professor Rim lacks sufficient expertise in mobile messengers launching PSN offerings—simply because KakaoStory (Kakao's PSN service) is a separate application from KakaoTalk (Kakao's mobile messaging application)—carries no weight.  *See* Mot. at 41.  Meta itself repeatedly recognized that each of the major Asian mobile messaging applications had used its success in messaging "as a springboard to build more general social networks."  Ex. F (PX1116) at -001 (Zuckerberg message string discussing Kakao, LINE, and WeChat); *see also, e.g.*, Ex. G (PX10271) at -001 (Zuckerberg email describing the "big risk" of a "company . . . build[ing] out a messaging app for communicating with small groups of people, and then transforming that into a broader social network," and noting that Kakao, LINE, and WeChat were "running this exact strategy and it's working reasonably well");

Professor Rim likewise explained there were "variations in the rollout" of LINE, Kakao, and WeChat's social networking offerings.  *See* Ex. C ¶ 109.  But none of these differences changes the underlying point—successful mobile messaging applications were able to use their success in messaging to launch PSN services, whether in a standalone app like KakaoStory or a separate tab in the same app like WeChat Moments or LINE Timeline.  WhatsApp could have done the same.

       3.   <u>Professor Rim applied his deep experience and industry standard methodology to the facts of this case in order to proffer his Opinion 2.</u>

Meta is also wrong that Professor Rim failed to apply a methodology in reaching his Opinion 2.  As detailed above, an expert's observation of relevant evidence and application of specialized knowledge to the case at hand is a reliable methodology.  *See, e.g.*, *Heller*, 952 F.

Supp. 2d at 141; *Bazarian*, 315 F. Supp. 3d at 112-13.  Professor Rim's report applies just such a methodology.  Professor Rim lays out his rebuttal to Professors Kaplan and Carlton in a step-by-step manner that both provides insights into the practical realities of the industry and offers context for understanding the import of relevant record evidence, which only someone of Professor Rim's knowledge and experience would be capable of providing.

Drawing upon his venture capital experience, Professor Rim explains why it is wrong for Professors Kaplan and Carlton to imply that WhatsApp would never monetize.  Professor Rim notes that "the pre-monetization stage of a startup is by necessity time limited," "[t]he VC backer cannot continue to inject cash forever," and "[a]t some point, the business will need to expand and monetize."  Ex. C ¶¶ 100-102.  Professor Rim applies his expertise to his review of the record evidence, noting that testimony and documents from WhatsApp's venture capital backers likewise support the conclusion that WhatsApp's runway was not infinite.  *See id.* ¶¶ 103-106. Professor Rim further uses his venture capital experience to explain the importance of statements made in ███████████████████ that indicate plans for monetizing the app above and beyond WhatsApp's subscription model: "Based on my experience as a venture capitalist, if █ ████████████ indicates that the founders are deliberating on monetization, it signifies that ██████████████████ was engaging in discussions with the founders and that it is highly likely the company will pursue monetization in the near future.  As a VC, you wouldn't present speculative information ████████████████, which ultimately decides on ██ ███████" *Id.* ¶ 106 ███████████████████████████████████ ████████████████████

Professor Rim likewise utilizes his industry expertise in responding to assertions by Professors Kaplan and Carlton that WhatsApp would not pivot into PSN services.  Among other

things, Professor Rim notes that █████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████    Ex. C ¶ 108.  Professor Rim further explains based

on his experience that "[a] service limited to mobile messaging generally is less suited to an

advertising-focused monetization model than is a social networking offering similar to

Facebook: this was true in the 2013-2014 time period, and it remains true today."  *See id.* ¶ 111.

As with the other elements of his Opinion 2, Professor Rim applies his industry expertise

to evaluation of specific record evidence.  He analyzes numerous contemporaneous documents

by relevant venture capital firms and investment banks that each "anticipated that WhatsApp

would attain revenue comparable to companies with an advertising-focused monetization model"

and notes that such documents "suggest[] that a WhatsApp not acquired by Meta would have

developed a social networking offering similar to Facebook."  *See id.*  In reaching that

conclusion, Professor Rim applies his understanding of what those documents mean in the

venture capital and startup contexts.  For example, ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████    Professor Rim explains that

"industry standard monetization" refers to "Meta's advertising-focused monetization model in its

Facebook product, as well as the monetization strategies of WeChat, LINE, and Kakao,

described above."  *See id.* ¶ 113.  Professor Rim makes similar points regarding ██████

█████████████████████████████████████

Professor Rim also draws on his expertise as a CEO with experience engaging in

acquisitions to explain the importance of "comparables" in Meta's presentation to its Board on

the WhatsApp acquisition. ███████████████████████████████████

███████████████████████████ Professor Rim notes, among other things,

that in his experience, "the choice of 'comparables' in the context of acquisition decisions is of

the utmost importance" because "a Board of Directors being presented with such a list will

perceive it as a benchmark." *See id.* ¶¶ 120-121.  In choosing to present the Meta Board with

█████████████████████, it is reasonable to conclude that Meta likewise saw the

potential for WhatsApp to launch a PSN services offering.

Contrary to Meta's accusations, Mot. at 41, Professor Rim did exactly what the Federal

Rules of Evidence and the *Arsanjani* Court required—he explained how his "experience [led] to

the conclusion reached, why that experience [was] a sufficient basis for the opinion, and how

that experience [was] reliably applied to the facts." *See Arsanjani v. United States*, 2023 WL

3231101, at *6 (D.D.C. May 3, 2023), *aff'd*, No. 23-5109, 2024 WL 718726 (D.C. Cir. Feb. 20,

2024).

4.  <u>Even if Meta's unsubstantiated attacks on Professor Rim were valid, they
    would go towards weight, not admissibility.</u>

Meta argues that this Court should exclude Professor Rim's detailed analysis because

Professor Rim purportedly ignored testimony by Mr. Acton that he did not intend to "pivot"

WhatsApp in favor of relying on financial and venture capital documents.  *See* Mot. at 39-40, 41-

42.  Professor Rim did consider such testimony; he simply found it incomplete and not

dispositive in light of the countervailing evidence in the record and his experience working with

startups and their founders.  *See, e.g.*, Ex. E at 183:11-185:11 (describing his review of Mr.

Acton's investigational hearing testimony, his analysis of Professor Kaplan's reliance on Mr.

Acton's testimony, and the reasons why he did not find Mr. Acton's testimony determinative as

to WhatsApp's likely monetization path); *id.* at 177:5-180:5, 184:10-185:11 (noting that based

on his experience, founders "can be reluctant on monetization" to start, but eventually have to "face[] the facts" of needing to monetize).

Even if Meta's claims were valid, they would still not be grounds for exclusion of Professor Rim's Opinion 2—they would at most go to weight, not admissibility.  *See, e.g.*, *Heller*, 952 F. Supp. 2d at 140-42, *aff'd in relevant part Heller v. D.C.*, 801 F.3d 264, 272 (D.C. Cir. 2015); *United States v. Raymond*, 2023 WL 6588546, at *5 (D.D.C. Oct. 10, 2023) (allowing testimony by an expert who used his experience to analyze sufficient sources because "whether that expert should or could have used additional sources go[es] to weight, not admissibility") (quotations omitted); *SEC v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007) ("Failing to review all relevant evidence is not a ground for excluding [the expert's] testimony; rather, it provides subject matter for cross-examination.").

Meta's "human highlighter" jab fails for the same reasons.  *See* Mot. at 38.  As detailed above, Professor Rim does far more than point the Court to important evidence.  In any event, Meta's arguments about the relevance of Mr. Acton's testimony bely its real complaint—it believes Professor Rim is highlighting the wrong evidence.  Courts have rejected such claims. *See, e.g.*, *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440, at *13 n.22 (N.D. Cal. June 2, 2022) ("The ODDs likewise move to exclude expert testimony where plaintiffs' experts' allegedly act as 'human highlighters,' but then criticize the experts for their failure to address or review evidence the ODDs believe is relevant . . . . The ODDs['] motion on those grounds is DENIED[.]"); *In re GLUMETZA Antitrust Litig.*, 2021 WL 3773621, at *20 (N.D. Cal. Aug. 25, 2021) (rejecting defendants' motion to exclude expert testimony on such grounds and noting that "it is common, indeed required, under Rule 26(a)(2), for an expert to summarize the facts and data considered in their report").

Finally, Meta asserts that Professor Rim's Opinion 2 is an effort to reference documents that will not be sponsored by witnesses at trial. Mot. at 40. Meta cites no legal basis for excluding Professor Rim's testimony on these grounds, and the "liberal," "flexible" standard for expert witness testimony under Rule 702 does not countenance doing so. *See Groobert*, 219 F. Supp. 2d at 7 (quotations omitted) (citing *Kumho Tire Co.*, 526 U.S. at 149). Moreover, sponsoring witnesses are not required for trial exhibits. *See supra* Section V.C. Regardless, the assertion is premature. Final witness lists have yet to be exchanged and no witnesses have testified.

### C. CONCLUSION

Professor Rim's Opinion 2 is both relevant and reliable. That Meta does not like what it says is not grounds for exclusion. The Court should deny Meta's motion.

**VII.      THE COURT SHOULD DENY DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE PROFESSOR HEMPHILL'S USE OF CONSUMER SURVEYS TO DERIVE "MARKET SHARES"**

Meta's motion to exclude certain analysis of the FTC's economic expert, Professor Scott Hemphill, is based on an incorrect reading of his analysis and the relevant legal and economic principles. Specifically, Meta's motion moves to exclude analysis from Prof. Hemphill's rebuttal report in which he calculated prorated shares based on information from user surveys. Mot. at 43-44 (challenging Ex. A (PX9007), ¶¶ 480-481). Meta's motion should be rejected because this analysis is relevant and based on reliable methods. In particular, Prof. Hemphill's analysis demonstrates the robustness of his conclusions about Meta's dominant market share in response to assertions ▮▮▮▮▮▮▮▮▮▮ that some friend and family sharing occurs on apps outside the relevant antitrust market he identified in his opening report. In other words, Meta has monopoly power "[w]hichever way the data is sliced." *Meta Platforms*, 2024 WL 4772423, at *44.

Moreover, Prof. Hemphill's methods are reliable because he follows standard procedures for conducting market share sensitivity analysis using the best available data. The underlying surveys provide relevant information about how consumers use various apps, including for sharing with friends and family. Meta also does not contest the reliability of the surveys (one of which came from its own files), and instead only mischaracterizes the FTC's survey expert Michal Malkiewicz regarding the potential insights and use of his survey results. At most, Meta's criticisms go to the weight of Prof. Hemphill's opinions, rather than their admissibility.

**A.  BACKGROUND**

As part of his assignment in this matter, Prof. Hemphill concluded that there is a relevant antitrust market for PSN services in the United States, consisting of those apps that have core functionality and use for personal social networking ("PSN apps"). *E.g.*, Ex. B (PX9000)

¶¶ 189, 608; Ex. A ¶¶ 229-230, 480.  Prof. Hemphill further concluded that Meta has maintained a persistently dominant share in that market, as measured by multiple metrics that Meta uses to track performance in the ordinary course, including DAU, MAU, time spent, and broadcast posts.  Ex. B ¶¶ 617-659.

Prof. Hemphill's opinion regarding Meta's dominant market shares is based, in part, on his conclusion that non-PSN apps—including TikTok, Twitter, YouTube, and messaging services—are not reasonable substitutes and should not be included in the relevant market because they lack the requisite core functionality and use for friends and family sharing.  Ex. A ¶¶ 230, 479-80.

Meta and its experts dispute these opinions by Prof. Hemphill.  For instance, ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  And another Meta expert, ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████

In response, Prof. Hemphill explained how the evidence, as well as ████████████ ████████████████  does not support including non-PSN apps in the relevant market.  Ex. A ¶¶ 284-307.  His response included explaining that incidental friend-related activity does not make such apps reasonable substitutes for PSN services.  *Id.*  While not agreeing that incidental friend-related activity on non-PSN apps requires those apps' inclusion in the relevant market, Prof. Hemphill nonetheless went a step further and conducted a sensitivity analysis of his market share estimates to confirm that such incidental activity does not alter his conclusions regarding Meta's dominant market shares ("Proration Analysis").  *Id.* ¶¶ 480-81.  For this exercise, Prof.

Hemphill calculated prorated shares—for DAU, MAU, and time spent—using the results of four

user surveys, based on reported use of each app for friends and family-related activities. *Id.*

¶ 480. The four user surveys used by Prof. Hemphill in this exercise consisted of an internal

Meta survey, a survey conducted by the FTC's survey expert Mr. Malkiewicz, and two third-

party surveys. *See id.* ¶ 481 (explaining that Prof. Hemphill "multipl[ied] DAU, MAU, and time

spent by the share of users who report using the UGC app for PSN purposes").

Prof. Hemphill's analysis demonstrated that his conclusions are robust to the (contested)

assertion that there is friends and family activity on non-PSN apps that should be included in

market share calculations. Meta's minimum share across all measures and all surveys is 69.3%.

*Id.* Thus, Prof. Hemphill stated in his rebuttal report that "[e]ven if one were to credit reporting

of incidental friend-related usage on these non-PSN apps in the Malkiewicz survey or other

surveys as competitively significant, a proration of my shares based on the reported uses that

relate to friends and family sharing still shows Meta with a dominant share." *Id.* ¶ 480.

## B. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires

courts to "'ensure that any and all scientific testimony . . . is not only relevant, but

reliable.'" *Kumho Tire Co.*, 526 U.S. at 147 (quoting *Daubert v. Merrell Dow Pharms.*, Inc., 509

U.S. 579, 589 (1993)). The standard is a "liberal and 'flexible' one," *Groobert*, 219 F. Supp. 2d

at 7 (citing *Kumho Tire*, 526 U.S. at 149), and the court has "broad discretion in determining

whether to admit or exclude expert testimony." *United States ex rel. Miller v. Bill Harbert Int'l

Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010) (internal quotations and citation omitted).

In considering a Rule 702 motion, a court takes on a "limited gatekeep[ing] role" directed

at excluding expert testimony that is based upon "subjective belief" or "unsupported

speculation." *Ambrosini v. Labarraque*, 101 F.3d 129, 134-35 (D.C. Cir. 1996). Courts do not

"pass on the merits of the expert's scientific conclusions . . . and must refrain from evaluating the credibility of opposing experts and the persuasiveness of competing studies." *Heller*, 952 F. Supp. 2d at 140 (cleaned up). The "gatekeeping requirement is substantially relaxed when the judge will serve as factfinder in a trial." *DL v. District of Columbia*, 109 F. Supp. 3d 12, 28 (D.D.C. 2015).

### C. ARGUMENT

Meta's motion seeks to exclude Prof. Hemphill's Proration Analysis under FRE 702. Mot. at 44, 46 (moving to strike paragraphs 480-81 of Prof. Hemphill's Rebuttal Report). Meta does not argue that Prof. Hemphill lacks expertise (Fed. R. Evid. 702(a)), that his opinion is not based on sufficient facts or data (Fed. R. Evid. 702(b)), or that he did not apply his methodology reliably to the facts of this case (Fed. R. Evid. 702(d)). Meta likewise does not advance critiques of Mr. Malkiewicz's survey methodology or report, or attack any of the other surveys used in the Proration Analysis as methodologically flawed.

Instead, Meta's motion contends that Prof. Hemphill's Proration Analysis has a purportedly "unreliable methodology," although Meta never explicitly states that his opinion fails to satisfy FRE 702(c). As explained below, Meta's motion fails, because Professor Hemphill's Proration Analysis is relevant and useful to the trier of fact, and it involves reliable methods used by economists to assess market power. At bottom, Meta's complaints about the analysis, at most, go to the weight of the evidence and are not a basis for exclusion.

1.  Prof. Hemphill's Proration Analysis is relevant and useful to the trier of fact, as called for under Federal Rule of Evidence 702.

As an initial matter, FRE 702 permits expert testimony that, among other things, "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Prof. Hemphill's prorated estimates will help the Court understand evidence related to

Meta's persistent monopoly power.  Indeed, these estimates directly respond to arguments from ███████████ that Prof. Hemphill failed to properly account for the competitive significance of certain non-PSN apps in calculating Meta's market share, which is indirect evidence of its monopoly power.  Ex. A ¶¶ 475, 479-80.  These estimates also proportionally reduce Facebook's and Instagram's usage figures for reported survey responses that are not directly related to friend activity.  *Id.*  As such, they also address the assertion from Meta and ██████ that Facebook and Instagram are, in their view, largely not used for friends and family sharing.  *See* Meta Reply Brief at 6, ECF No. 370-1; Ex. C ¶¶ 69, 73.  The results, as detailed above, are that Meta has a persistently dominant share on every measure.  Ex. A ¶ 481.

In sum, Prof. Hemphill's prorated estimates are obviously relevant to issues put in play by Meta and its experts and will aid the Court regarding areas of interest.  *See, e.g.*, *Meta Platforms*, 2024 WL 4772423, at *46 (referencing whether no time spent on non-PSN apps should count in market share estimates); *id.*, at *38 (referencing Meta's assertion that friends-and-family sharing purportedly makes up only a small fraction of usage on Facebook and Instagram).

## 2.  Prof. Hemphill conducted the Proration Analysis using reliable methods.

Meta asserts that Prof. Hemphill's use of surveys to calculate prorated shares is unreliable.  That claim is unfounded.  In fact, Prof. Hemphill used the surveys in question as a sensitivity analysis, which is a standard and reasonable methodology for economists to check the robustness of their conclusions.  *See* Ex. E (Edward E. Leamer, *Let's Take the Con Out of Econometrics*) at 31.  Moreover, courts have credited economists' reliance on surveys to inform their antitrust analysis in other cases, even when the surveys were not generated for the purpose of a particular economic analysis.  And, the surveys Prof. Hemphill relied on this matter, which speak to how consumers use various apps, are reasonable and reliable inputs into his prorated

estimates.  Finally, with respect to the FTC expert's survey in particular, Meta mischaracterized

Mr. Malkiewicz's testimony in suggesting that Prof. Hemphill's use of the survey was not

reasonable.

### 3. Conducting a sensitivity analysis, as Prof. Hemphill did, is a standard economic methodology endorsed in other cases and economic literature.

Prof. Hemphill relied on a standard and reasonable economic methodology when

performing a sensitivity analysis to demonstrate the robustness of his market share estimates.  As

described above, in response to critiques from Meta's experts, Prof. Hemphill demonstrated that

his conclusions about Meta's dominant share are robust to the (contest) claim that market shares

should account for purported friends-and-family sharing on non-PSN apps.  Ex. A ¶¶ 480-81.

His calculation of these prorated shares is consistent with a line of cases where courts consider

multiple approximations of market shares, including those that account for out-of-market

participants.  *See, e.g.*, *Microsoft Corp.*, 253 F.3d at 54 (affirming in relevant part that "Windows

accounts for a greater than 95% share . . . even if Mac OS were included, Microsoft's share

would exceed 80%"); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 37

(D.D.C. 2022) (citing expert's calculation of multiple market concentration figures in discussing

market power); *FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *20 & n.25

(D.N.J. Aug. 4, 2021), *aff'd*, 30 F.4th 160 (3d Cir. 2022) (same); *FTC v. Kroger*, 2024 WL

5053016, at *12, *26-27 (D. Or. Dec. 10, 2024) (crediting sensitivities the FTC's economic

expert calculated for both geographic market definition and for analysis of possible closure of

divestiture stores).

It is also standard practice, and well-supported in the economic literature, for economists

to conduct sensitivity analyses to demonstrate that their conclusions would not change even if

assumptions or inputs were altered.  *See* Ex. E at 43 ("The professional audience consequently

and properly withholds belief until an inference is shown to be adequately insensitive to the choice of assumptions."); Ex. F (Gregory J. Werden, Luke M. Froeb & David T. Scheffman, *A Daubert Discipline for Merger Simulation*) at 90 n.14 ("When the fit with the facts may be in dispute, however, it is useful to undertake a sensitivity analysis in addition to justifying a choice.").  Indeed, Meta's own economist, Prof. Carlton, has written the same.  *See* Ex. G (Dennis W. Carlton, Mark A. Israel & Allan L. Shampine, *Lessons from AT&T/Time Warner*) at 5 ("[M]odels should be carefully evaluated in light of industry history and tested for robustness to reasonable alternative theoretical assumptions and input values based on the facts of the case.").

Thus, Prof. Hemphill's use of a sensitivity analysis to test his market shares is a standard and reasonable economic methodology.

### 4. Surveys are reasonable and reliable inputs into Prof. Hemphill's Proration Analysis.

Meta's contention that Prof. Hemphill's reliance on surveys make his prorated estimates unreliable is wrong on both the law and the facts.  First, Prof. Hemphill's use of surveys is consistent with cases indicating that economists and courts regularly rely on ordinary course and expert surveys to inform their antitrust analysis.  *See, e.g.*, *Graco Inc. v. PMC Glob., Inc.*, 2012 WL 762448, at *10 (D.N.J. Mar. 6, 2012) (using survey to calculate market share).  In the recent *FTC v. Tapestry, Inc.* matter, for example, the FTC's economic expert relied upon four ordinary course surveys in conducting market definition analysis, even though the survey questions did not directly ask a relevant market question of what brands consumers would choose in response to a price increase or other worsening of terms.  2024 WL 4647809, at *26-28, *33.

Second, Meta is incorrect that the prorated estimates are unreliable because the specific surveys used did not ask the exact questions that Prof. Hemphill used for market share

measures—e.g., "are you a daily active user for personal social networking?" or "how much time did you spend on personal social networking?"  *See* Mot. at 46-47.  *Tapestry* underscores that this is not necessary for a survey to still provide relevant information for economic analysis. 2024 WL 4647809, at *26-27.  And as this Court and other courts have recognized, economic experts in antitrust cases routinely use the best available evidence to answer questions relevant to their antitrust analysis, including the estimation of market shares, even when that evidence only provides an approximate answer.  *Meta Platforms*, 2024 WL 4772423, at *46 (quoting *Anthem, Inc.*, 236 F. Supp. 3d at 207 ("[P]laintiffs need not present market shares . . . with the precision of a NASA scientist.  The closest available approximation often will do.") (internal citation omitted)); *Bazaarvoice, Inc.*, 2014 WL 203966, at *32 (even if available data is "imperfect . . . that does not mean that one should ignore the existing data or the market realities.").

Other courts have likewise credited the best available evidence for expert use, even if it did not directly answer the relevant antitrust question.  *See, e.g.*, *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1505 (D.C. Cir. 1986) (crediting market shares for a separate market as a "proxy" for the relevant market because market shares for the relevant market were unavailable); *Anthem, Inc.*, 236 F. Supp. 3d at 217, 220 (crediting estimated diversions based on bidding data even though the data did not include information about price responses).

Here, survey data is among the best available evidence for Prof. Hemphill's prorated estimates.  As the Court has already recognized, market share metrics can be informed by information on how consumers use the apps: "if the millions of people who open their Facebook or Instagram applications every day do so in part because those applications meet a specific need for friends-and-family sharing, it is plausible that all those users should 'count' as part of Meta's MAUs or DAUs, even if some (or even most) of their *time spent* on Meta's products does not

strictly relate to such sharing." *Meta Platforms*, 2024 WL 4772423, at \*46 (emphasis in original). Each of the surveys Prof. Hemphill relies on provides answers on consumer needs or uses directly: the surveys ask users about why they use various PSN and non-PSN apps, including users' main, primary, or most important reasons (or purposes) for using the services. Ex. A at Apps. A-14, A-15, A-16, A-17. The data from the surveys—and Prof. Hemphill's use of the data to estimate prorated shares—therefore fall well within the Court's accepted rubric for estimating market shares. Prof. Hemphill uses ordinary course and expert surveys that report information pertinent to his prorated estimates; accordingly, the surveys "provide relevant data on the issue before the court." Mot. at 45 (citing Ex. H (Shari Seidman Diamond, "Reference Guide on Survey Research") at 373).

Moreover, Meta's motion does not argue that any of the four surveys—one of which is Meta's own ordinary course survey—relied on by Prof. Hemphill in prorating his estimates are unreliable or flawed in their execution. To the contrary, Meta filed no similar motion *in limine* regarding the Malkiewicz survey or any of Mr. Malkiewicz's opinions.

Meta instead focuses its criticism on the supposed disconnect between the surveys and measurements of time spent, since the surveys ask about *why* respondents use particular apps, as opposed to the specific duration of their use. Mot. at 46. Whatever the validity of this critique, it is far less apt to the proration of MAU and DAU. *See Meta Platforms*, 2024 WL 4772423, at \*46. Moreover, consumers' use cases for PSN and non-PSN apps are generally related to intensity of use as well, making proration of time spent using the survey responses a reasonable approach. *See, e.g.*, ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

Prof. Hemphill's prorated estimates all lead to the same inescapable conclusion: that Meta has a dominant share of the market for PSN services in the United States.  Notably, this result holds for each of the four different surveys, conducted at different times between 2019 and 2023 and by different entities.  Ex. A ¶ 481.  As such, "[w]hichever way the data is sliced . . . the story is the same: Meta's share of the relevant market has exceeded (at times greatly) the level typically associated with monopoly power."  *Meta Platforms*, 2024 WL 4772423, at *44.

    5.  <u>Meta misrepresents the FTC's survey expert when criticizing Prof. Hemphill's use of the Malkiewicz survey.</u>

As referenced above, Meta rightly does not criticize Mr. Malkiewicz's survey methodology in its motion.  But Meta nonetheless attacks Prof. Hemphill's use of the Malkiewicz survey by claiming that Mr. Malkiewicz "expressly *disclaimed*" the use of his survey in Prof. Hemphill's Proration Analysis.  Mot. at 43 (emphasis in original).  That is flatly false.  On the contrary, when presented with Prof. Hemphill's prorated estimates during his deposition, Mr. Malkiewicz testified that "in the context that Professor Hemphill appears to have used [the survey results] . . . that would be a *correct* use of the data that my survey produced."  Ex. K (PX6171) at 83:17-84:4 (emphasis added); *see also id.* at 83:11-16 (Mr. Malkiewicz "d[id] not see any issues with that particular calculation" of "comparing my survey, the outcome of using my survey . . . with some of the other surveys that Professor Hemphill also had access to.").

Meta's claim that Mr. Malkiewicz "was surprised when shown how Prof. Hemphill had used the Malkiewicz survey," Mot. at 46, is similarly misleading.  In his testimony, Mr. Malkiewicz explained he was "generally aware that Professor Hemphill has used data from the

results of my survey as one data point for . . . one type of analysis that he's conducted in rebuttal to certain critiques of his initial report," and that Prof. Hemphill did so "in combination" with other usage data.  Ex. K at 80:16-81:7.  Meta also confusingly raises testimony from Mr. Malkiewicz that he was not assigned to measure economic substitution.  Mot. at 46.  That does not refute or undermine the relevant information that Prof. Hemphill gleaned from the surveys regarding how consumers use particular apps, as discussed above.  *Supra* Section C.1-4.

Finally, Meta appears to criticize Prof. Hemphill's methodology as unreliable because Mr. Malkiewicz's survey—again just one of four surveys used in Prof. Hemphill's prorated estimates—does not include a "statement describing the purpose or purposes of the survey" as measuring consumer usage.  Mot. at 46 (quoting Ex. H at 373).  This is also not accurate, as Mr. Malkiewicz's opening expert report contains such a statement: "I conducted a scientifically designed study in the form of a consumer web survey to understand users' *usage of* and attitudes toward [internet services]."  Ex. L (PX9006) ¶ 11 (emphasis added).  Further, a close examination of the language Meta cites reveals it pertains to ensuring a survey's relevance to the legal controversy at issue—not reliability—and Meta does not contend the Malkiewicz survey itself is not relevant.  *See* Ex. H at 373.  Mr. Malkiewicz likewise stated his "opinion is that Professor Hemphill correctly understands both the purpose and results of my survey."  Ex. M (PX9012) ¶ 98.  Thus, even under Meta's standard, Prof. Hemphill's use of Mr. Malkiewicz's survey is reliable.

6.  <u>Meta's critiques of the Proration Analysis reflect substantive disagreement and, at most, go to weight of the evidence and not admissibility.</u>

Meta's critiques of Prof. Hemphill's Proration Analysis, at most, go to the weight given to Prof. Hemphill's opinions, rather than their admissibility.  *See Heller*, 952 F. Supp. 2d at 142 (collecting cases).  Indeed, because Meta attacks one of the assumptions that underlies Prof.

Hemphill's Proration Analysis—that ordinary course and expert surveys are a reasonable input into prorated market shares—Meta's motion fails under the relevant law. *Bazarian*, 315 F. Supp. 3d at 113 ("[E]ven if [an expert] made factual errors or incorrect assumptions, these go only to the weight, not admissibility, of [the expert's] testimony") (citing cases); Ex. N (Hr'g Tr., *FTC v. Tapestry, Inc.*) at 64 ("Whether an input into [economic expert's] analysis; namely, the particular survey questions chosen are flawed will be assessed by this Court in deciding the weight to afford this opinion.  Therefore, the Court will not exclude it . . . .").  Likewise, "errors in [survey] methodology thus properly go only to the weight of the evidence." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999).

Meta further cites a few inapposite cases, none of which support its motion.  First, Meta cites *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 233 (D.D.C. 2018) and *United States v. H&R Block*, 833 F. Supp. 2d 36, 70 (D.D.C. 2011) for the proposition that courts "routinely exclude" expert opinions that misuse surveys.  Mot. 47.  But neither citation is to a *Daubert* opinion; instead, both courts considered what *weight* to assign surveys after the benefit of trial.  Indeed, *H&R Block* expressly underscores that Meta's complaints do not support exclusion.  There, the court denied the plaintiff's earlier motion *in limine* seeking to exclude portions of defendants' expert opinion relying on a survey, holding that "[w]hile the plaintiff has identified cogent concerns about the wording and the methodology of the survey, the Court finds that these concerns go to the weight, not the admissibility, of the evidence, especially in this bench hearing where there is no concern about jury confusion or prejudice." *United States v. H&R Block*, 831 F. Supp. 2d 27, 32-33 (D.D.C. 2011).

Meta goes on to cite three non-binding cases that do not deal in antitrust law and that have no application to the instant case.  Mot. at 47-48.  For instance, Meta cites *Parallel*

*Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 492-93 (Fed. Cir. 2019), a non-antitrust case in which the Federal Circuit affirmed a lower court's exclusion of a survey based on *relevance*. *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 2017 WL 11557655, at *3 (D. Del. Feb. 22, 2017) ("While it is true that a survey need not *prove* infringement, to be admissible, the survey must, at the very least, be *relevant*.") (emphasis in original). Both of the remaining out-of-district cases raised by Meta likewise fault experts for relying solely on individual surveys for jury cases. *See* Mot. at 48.

By contrast, Meta makes no argument that the surveys at issue here are irrelevant to Prof. Hemphill's opinions or the issues in this case—nor could they, given the Proration Analysis's relevance described above. Nor can Meta argue that any one survey is the basis for Professor Hemphill's analysis.

### D.  CONCLUSION

For the foregoing reasons, Prof. Hemphill's estimates of prorated shares are reliable and relevant. Meta's motion should be denied.

Dated:    March 7, 2025                    Respectfully submitted,

                                          */s/ Daniel Matheson*
                                          Daniel J. Matheson (D.C. Bar 502490)
                                          Krisha Cerilli (D.C. Bar 983281)
                                          Patricia Galvan
                                          Nathan Brenner
                                          Barrett Anderson
                                          Emily Bolles
                                          David Brunfeld (D.C. Bar 1672059)
                                          Maria Dimoscato (D.C. Bar 489743)
                                          Karen Goff
                                          Alicia Loh (D.C. Bar 1738388)
                                          Justin Lorber (D.C. Bar 90005184)
                                          Owen Masters (D.C. Bar 242139)
                                          Njeri Mugure
                                          Susan Musser
                                          Stephen Pearson (D.C. Bar 966738)
                                          Benjamin Rashkovich
                                          Michael Smith (D.C. Bar 996738)
                                          Ethan Stevenson
                                          Jennifer Tarr
                                          Peter Taylor
                                          Albert Teng
                                          Oren Vitenson (D.C. Bar 90005750)
                                          Brendon Walsh
                                          Nicholas Widnell (D.C. Bar 439474)

                                          Federal Trade Commission
                                          Bureau of Competition
                                          600 Pennsylvania Avenue, N.W.
                                          Washington, DC 20580
                                          Telephone: (202) 326-2075
                                          Email: dmatheson@ftc.gov

                                          *Attorneys for Plaintiff*
                                          *Federal Trade Commission*

76

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of March 2025, I served the sealed document on the following counsel via electronic mail:

Mark C. Hansen
Kevin B. Huff
Kenneth M. Fetterman
Geoffrey M. Klineberg
Kevin J. Miller
Aaron M. Panner
Alex A. Parkinson
Ana Nikolic Paul
Aaseesh P. Polavarapu
Kellogg, Hansen, Todd, Figel, & Frederick, P.L.L.C.
1615 M Street, N.W. Suite 400
Washington, DC 20036
Tel: 202-326-7900
mhansen@kellogghansen.com
khuff@kellogghansen.com
kfetterman@kellogghansen.com
gklineberg@kellogghansen.com
kmiller@kellogghansen.com
apanner@kellogghansen.com
aparkinson@kellogghansen.com
apaul@kellogghansen.com
apolavarapu@kellogghansen.com

Sonal N. Mehta
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel: 650-858-6000
sonal.mehta@wilmerhale.com

David Gringer
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-230-8800
david.gringer@wilmerhale.com

James P. Rouhandeh
Michael Scheinkman
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Tel: 212-450-4000
rouhandeh@davispolk.com
michael.scheinkman@davisolk.com

Respectfully submitted,

*/s/ Daniel Matheson*

Daniel Matheson, Esq. (D.C. Bar #502490)
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*