# Meta MIL #7, Exhibit A

**Filed Under Seal**

# Meta MIL #7, Exhibit B

## Filed Under Seal

# Meta MIL #7, Exhibit C

## Filed Under Seal

# Meta MIL #7, Exhibit D

**Filed Under Seal**

# Meta MIL #7, Exhibit E

Let's Take the Con Out of Econometrics

Author(s): Edward E. Leamer

Source: *The American Economic Review*, Mar., 1983, Vol. 73, No. 1 (Mar., 1983), pp. 31–43

Published by: American Economic Association

Stable URL: https://www.jstor.org/stable/1803924

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



is collaborating with JSTOR to digitize, preserve and extend access to *The American Economic Review*

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

# Let's Take the Con out of Econometrics

## By Edward E. Leamer*

Econometricians would like to project the image of agricultural experimenters who divide a farm into a set of smaller plots of land and who select randomly the level of fertilizer to be used on each plot. If some plots are assigned a certain amount of fertilizer while others are assigned none, then the difference between the mean yield of the fertilized plots and the mean yield of the unfertilized plots is a measure of the effect of fertilizer on agricultural yields. The econometrician's humble job is only to determine if that difference is large enough to suggest a real effect of fertilizer, or is so small that it is more likely due to random variation.

This image of the applied econometrician's art is grossly misleading. I would like to suggest a more accurate one. The applied econometrician is like a farmer who notices that the yield is somewhat higher under trees where birds roost, and he uses this as evidence that bird droppings increase yields. However, when he presents this finding at the annual meeting of the American Ecological Association, another farmer in the audience objects that he used the same data but came up with the conclusion that moderate amounts of shade increase yields. A bright chap in the back of the room then observes that these two hypotheses are indistinguishable, given the available data. He mentions the phrase "identification problem," which, though no one knows quite what it means, is said with such authority that it is totally convincing. The meeting reconvenes in the halls and in the bars, with heated discussion whether this is the kind of work that merits promotion from Associate to Full Farmer; the Luminists strongly opposed to promotion and the Aviophiles equally strong in favor.

*Professor of economics, University of California-Los Angeles. This paper was a public lecture presented at the University of Toronto, January 1982. I acknowledge partial support by NSF grant SOC78-09479.

One should not jump to the conclusion that there is necessarily a substantive difference between drawing inferences from experimental as opposed to nonexperimental data. The images I have drawn are deliberately prejudicial. First, we had the experimental scientist with hair neatly combed, wide eyes peering out of horn-rimmed glasses, a white coat, and an electronic calculator for generating the random assignment of fertilizer treatment to plots of land. This seems to contrast sharply with the nonexperimental farmer with overalls, unkempt hair, and bird droppings on his boots. Another image, drawn by Orcutt, is even more damaging: "Doing econometrics is like trying to learn the laws of electricity by playing the radio." However, we need not now submit to the tyranny of images, as many of us have in the past.

### I. Is Randomization Essential?

What is the real difference between these two settings? Randomization seems to be the answer. In the experimental setting, the fertilizer treatment is "randomly" assigned to plots of land, whereas in the other case nature did the assignment. Now it is the tyranny of words that we must resist. "Random" does not mean adequately mixed in *every* sample. It only means that on the average, the fertilizer treatments are adequately mixed. Randomization implies that the least squares estimator is "unbiased," but that definitely does not mean that for each sample the estimate is correct. Sometimes the estimate is too high, sometimes too low. I am reminded of the lawyer who remarked that "when I was a young man I lost many cases that I should have won, but when I grew older I won many that I should have lost, so on the average justice was done."

In particular, it is possible for the randomized assignment to lead to exactly the same allocation as the nonrandom assignment,

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB    Document 419-8    Filed 03/12/25    Page 8 of 46

namely, with treated plots of land all being under trees and with nontreated plots of land all being away from trees. I submit that, if this is the outcome of the randomization, then the randomized experiment and the nonrandomized experiment are exactly the same. Many econometricians would insist that there is a difference, because the randomized experiment generates "unbiased" estimates. But all this means is that, if this particular experiment yields a gross overestimate, some other experiment yields a gross underestimate.

Randomization thus does not assure that each and every experiment is "adequately mixed," but randomization does make "adequate mixing" probable. In order to make clear what I believe to be the true value of randomization, let me refer to the model

$$(1) \qquad Y_i = \alpha + \beta F_i + \gamma L_i + U_i,$$

where $Y_i$ is the yield of plot $i$; $F_i$ is the fertilizer assigned to plot $i$; $L_i$ is the light falling on plot $i$; $U_i$ is the unspecified influence on the yield of plot $i$, and where $\beta$, the fertilizer effect, is the object of the inferential exercise. We may suppose to begin the argument that the light level is expensive to measure and that it is decided to base an estimate of $\beta$ initially only on measurement of $Y_i$ and $F_i$. We may assume also that the natural experiment produces values for $F_i$, $L_i$, and $U_i$ with expected values $E(U_i|F_i) = 0$ and $E(L_i|F_i) = r_0 + r_1 F_i$. In the more familiar parlance, it is assumed that the fertilizer level and the residual effects are uncorrelated, but the fertilizer level and the light level are possibly correlated. As every beginning econometrics student knows, if you omit from a model a variable which is correlated with included variables, bad things happen. These bad things are revealed to the econometrician by computing the conditional mean of $Y$ given $F$ but not $L$:

$$(2) \quad E(Y|F) = \alpha + \beta F + \gamma E(L|F)$$

$$= \alpha + \beta F + \gamma (r_0 + r_1 F)$$

$$\equiv (\alpha + \alpha^*) + (\beta + \beta^*) F,$$

where $\alpha^* = \gamma r_0$ and $\beta^* = \gamma r_1$. The linear regression of $Y$ on $F$ provides estimates of the parameters of the conditional distribution of $Y$ given $F$, and in this case the regression coefficients are estimates not of $\alpha$ and $\beta$, but rather of $\alpha + \alpha^*$ and $\beta + \beta^*$. The parameters $\alpha^*$ and $\beta^*$ measure the bias in the least squares estimates. This bias could be due to left-out variables, or to measurement errors in $F$, or to simultaneity.

When observing a nonexperiment, the bias parameters $\alpha^*$ and $\beta^*$ can be thought to be small, but they cannot sensibly be treated as exact zeroes. The notion that the bias parameters are small can be captured by the assumption that $\alpha^*$ and $\beta^*$ are drawn from a normal distribution with zero means and covariance matrix $M$. The model can then be written as $Y = \alpha + \beta F + \varepsilon$, where $\varepsilon$ is the sum of three random variables: $U + \alpha^* + \beta^* F$. Because the error term $\varepsilon$ is not spherical, the proper way to estimate $\alpha$ and $\beta$ is generalized least squares. My 1974 article demonstrates that if $(a, b)$ represent the least squares estimates of $(\alpha, \beta)$, then the generalized least squares estimates $(\hat{\alpha}, \hat{\beta})$ are also equal to $(a, b)$:

$$(3) \qquad \begin{pmatrix} \hat{\alpha} \\ \hat{\beta} \end{pmatrix} = \begin{pmatrix} a \\ b \end{pmatrix},$$

and if $S$ represents the sample covariance matrix for the least squares estimates, then the sample covariance matrix for $(\hat{\alpha}, \hat{\beta})$ is

$$(4) \qquad Var(\hat{\alpha}, \hat{\beta}) = S + M,$$

where $M$ is the covariance matrix of $(\alpha^*, \beta^*)$.

The meaning of equation (3) is that unless one knows the direction of the bias, the possibility of bias does not call for any adjustment to the estimates. The possibility of bias does require an adjustment to the covariance matrix (4). The uncertainty is composed of two parts: the usual sampling uncertainty $S$ plus the misspecification uncertainty $M$. As sample size grows, the sampling uncertainty $S$ ever decreases, but the misspecification uncertainty $M$ remains ever constant. The misspecification matrix $M$ that we must add to the least squares variance

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB    Document 419-8    Filed 03/12/25    Page 9 of 46

matrix is just the (prior) variance of the bias coefficients $(\alpha^*, \beta^*)$. If this variance matrix is small, the least squares bias is likely to be small. If $M$ is large, it is correspondingly probable that $(\alpha^*, \beta^*)$ is large.

It would be a remarkable bootstrap if we could determine the extent of the misspecification from the data. The data in fact contain no information about the size of the bias, a point which is revealed by studying the likelihood function. The misspecification matrix $M$ is therefore a pure prior concept. One must decide independent of the data how good the nonexperiment is.

The formal difference between a randomized experiment and a natural experiment is measured by the matrix $M$. If the treatment is randomized, the bias parameters $(\alpha^*, \beta^*)$ are exactly zero, or, equivalently, the matrix $M$ is a zero matrix. If $M$ is zero, the least squares estimates are consistent. If $M$ is not zero, as in the natural experiment, there remains a fixed amount of specification uncertainty, independent of sample size.

There is therefore a sharp difference between inference from randomized experiments and inference from natural experiments. This seems to draw a sharp distinction between economics where randomized experiments are rare and "science" where experiments are routinely done. But the fact of the matter is that no one has ever designed an experiment that is free of bias, and no one can. As it turns out, the technician who was assigning fertilizer levels to plots of land, took his calculator into the fields, and when he was out in the sun, the calculator got heated up and generated large "random" numbers, which the technician took to mean no fertilizer; and when he stood under the shade of the trees, his cool calculator produced small numbers, and these plots received fertilizer.

You may object that this story is rather fanciful, but I need only make you think it is possible, to force you to set $M \neq 0$. Or if you think a computer can really produce random numbers (calculated by a mathematical formula and therefore perfectly predictable!), I will bring up mismeasurement of the fertilizer level, or human error in carrying out the computer instructions. Thus, the attempt to

randomize and the attempt to measure accurately ensures that $M$ is small, but not zero, and the difference between scientific experiments and natural experiments is difference in degree, but not in kind. Admittedly however, the misspecification uncertainty in many experimental settings may be so small that it is well approximated by zero. This can very rarely be said in nonexperimental settings.

Examples may be ultimately convincing. There is a great deal of empirical knowledge in the science of astronomy, yet there are no experiments. Medical knowledge is another good example. I was struck by a headline in the January 5, 1982 *New York Times*: "Life Saving Benefits of Low-Cholesterol Diet Affirmed in *Rigorous* Study." The article describes a randomized experiment with a control group and a treated group. "Rigorous" is therefore interpreted as "randomized." As a matter of fact, there was a great deal of evidence suggesting a link between heart disease and diet before any experiments were performed on humans. There were cross-cultural comparisons and there were animal studies. Actually, the only reason for performing the randomized experiment was that someone believed there was pretty clear non-experimental evidence to begin with. The nonexperimental evidence was, of course, inconclusive, which in my language means that the misspecification uncertainty $M$ remained uncomfortably large. The fact that the Japanese have both less incidence of heart disease and also diets lower in cholesterol compared to Americans is not convincing evidence, because there are so many other factors that remain unaccounted for. The fact that pigs on a high cholesterol diet develop occluded arteries is also not convincing, because the similarity in physiology in pigs and humans can be questioned.

When the sampling uncertainty $S$ gets small compared to the misspecification uncertainty $M$, it is time to look for other forms of evidence, experiments or nonexperiments. Suppose I am interested in measuring the width of a coin, and I provide rulers to a room of volunteers. After each volunteer has reported a measurement, I compute the mean and standard deviation, and I conclude that

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB    Document 419-8    Filed 03/12/25    Page 10 of 46

the coin has width 1.325 millimeters with a standard error of .013. Since this amount of uncertainty is not to my liking, I propose to find three other rooms full of volunteers, thereby multiplying the sample size by four, and dividing the standard error in half. That is a silly way to get a more accurate measurement, because I have already reached the point where the sampling uncertainty $S$ is very small compared with the misspecification uncertainty $M$. If I want to increase the true accuracy of my estimate, it is time for me to consider using a micrometer. So too in the case of diet and heart disease. Medical researchers had more or less exhausted the vein of nonexperimental evidence, and it became time to switch to the more expensive but richer vein of experimental evidence.

In economics, too, we are switching to experimental evidence. There are the laboratory experiments of Charles Plott and Vernon Smith (1978) and Smith (1980), and there are the field experiments such as the Seattle/Denver income maintenance experiment. Another way to limit the misspecification error $M$ is to gather different kinds of nonexperiments. Formally speaking, we will say that experiment 1 is qualitatively different from experiment 2 if the bias parameters $(\alpha_1^*, \beta_1^*)$ are distributed independently of the bias parameters $(\alpha_2^*, \beta_2^*)$. In that event, simple averaging of the data from the two experiments yields average bias parameters $(\alpha_1^* + \alpha_2^*, \ \beta_1^* + \beta_2^*)/2$ with misspecification variance matrix $M/2$, half as large as the (common) individual variances. Milton Friedman's study of the permanent income hypothesis is the best example of this that I know. Other examples are hard to come by. I believe we need to put much more effort into identifying qualitatively different and convincing kinds of evidence.

Parenthetically, I note that traditional econometric theory, which does not admit experimental bias, as a consequence also admits no "hard core" propositions. Demand curves can be shown to be positively sloped. Utility can be shown not to be maximized. Econometric evidence of a positively sloped demand curve would, as a matter of fact, be routinely explained in terms of simultaneity bias. If utility seems not to have been maxi-

mized, it is only that the econometrician has misspecified the utility function. The misspecification matrix $M$ thus forms Imre Lakatos' "protective belt" which protects certain hard core propositions from falsification.

## II. Is Control Essential?

The experimental scientist who notices that the fertilizer treatment is correlated with the light level can correct his experimental design. He can control the light level, or he can allocate the fertilizer treatment in such a way that the fertilizer level and the light level are not perfectly correlated.

The nonexperimental scientist by definition cannot control the levels of extraneous influences such as light. But he can control for the variable light level by including light in the estimating equation. Provided nature does not select values for light and values for fertilizer levels that are perfectly correlated, the effect of fertilizer on yields can be estimated with a multiple regression. The collinearity in naturally selected treatment variables may mean that the data evidence is weak, but it does not invalidate in any way the usual least squares estimates. Here, again, there is no essential difference between experimental and nonexperimental inference.

## III. Are the Degrees of Freedom Inadequate with Nonexperimental Data?

As a substitute for experimental control, the nonexperimental researcher is obligated to include in the regression equation all variables that might have an important effect. The NBER data banks contain time-series data on 2,000 macroeconomic variables. A model explaining gross national product in terms of all these variables would face a severe degrees-of-freedom deficit since the number of annual observations is less than thirty. Though the number of observations of any phenomenon is clearly limited, the number of explanatory variables is logically unlimited. If a polynomial could have a degree as high as $k$, it would usually be admitted that the degree could be $k + 1$ as well. A theory that allows $k$ lagged explanatory vari-

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB    Document 419-8    Filed 03/12/25    Page 11 of 46



FIGURE 1. HYPOTHETICAL DATA AND
THREE ESTIMATED QUADRATIC FUNCTIONS



FIGURE 2. HYPOTHETICAL DATA AND
ESTIMATED QUADRATIC FUNCTION

ables would ordinarily allow $k + 1$. If the level of money might affect $GNP$, then why not the number of presidential sneezes, or the size of the polar ice cap?

The number of explanatory variables is unlimited in a nonexperimental setting, but it is also unlimited in an experimental setting. Consider again the fertilizer example in which the farmer randomly decides either to apply $F_1$ pounds of fertilizer per acre or zero pounds, and obtains the data illustrated in Figure 1. These data admit the inference that fertilizer level $F_1$ produces higher yields than no fertilizer. But the farmer is interested in selecting the fertilizer level that maximizes profits. If it is hypothesized that yield is a linear function of the fertilizer intensity $Y = \alpha + \beta F + U$, then profits are

$$Profits = pA(\alpha + \beta F + U) - p_F AF,$$

where $A$ is total acreage, $p$ is the product price, and $p_F$ is the price per pound of fertilizer. This profit function is linear in $F$ with slope $A(\beta p - p_F)$. The farmer maximizes profits therefore by using no fertilizer if the price of fertilizer is high, $\beta p < p_F$, and using an unlimited amount of fertilizer if the price is low, $\beta p > p_F$. It is to be expected that you will find this answer unacceptable for one of

several reasons:

1) When the farmer tries to buy an unlimited amount of fertilizer, he will drive up its price, and the problem should be reformulated to make $p_F$ a function of $F$.

2) Uncertainty in the fertilizer effect $\beta$ causes uncertainty in profits, *Variance* ( *profits* ) $= p^2 A^2 F^2 Var(\beta)$, and risk aversion will limit the level of fertilizer applied.

3) The yield function is nonlinear.

Economic theorists doubtless find reasons 1) and 2) compelling, but I suspect that the real reason farmers don't use huge amounts of fertilizer is that the marginal increase in the yield eventually decreases. Plants don't grow in fertilizer alone.

So let us suppose that yield is a quadratic function of fertilizer intensity, $Y = \alpha + \beta_1 F + \beta_2 F^2 + U$, and suppose we have only the data illustrated in Figure 1. Unfortunately, there are an infinite number of quadratic functions all of which fit the data equally well, three of which are drawn. If there were no other information available, we could conclude only that the yield is higher at $F_1$ than at zero. Formally speaking, there is an identification problem, which can be solved by altering the experimental design. The yield must be observed at a third point, as in Figure 2, where I have drawn the least squares estimated quadratic function and have indicated the fertilizer intensity $F_m$ that maximizes the yield. I expect that most people would question whether these data admit the

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB    Document 419-8    Filed 03/12/25    Page 12 of 46



FIGURE 3. HYPOTHETICAL DATA AND
THREE ESTIMATED FUNCTIONS

inference that the yield is maximized at $F_m$. Actually, after inspection of this figure, I don't think anything can be inferred except that the yield at $F_2$ is higher than at $F_1$, which in turn is higher than at zero. Thus I don't believe the function is quadratic. If it is allowed to be a cubic then again there is an identification problem.

This kind of logic can be extended indefinitely. One can always find a set of observations that will make the inferences implied by a polynomial of degree $p$ seem silly. This is true regardless of the degree $p$. Thus no model with a finite number of parameters is actually believed, whether the data are experimental or nonexperimental.

### IV. Do We Need Prior Information?

A model with an infinite number of parameters will allow inference from a finite data set only if there is some prior information that effectively constrains the ranges of the parameters. Figure 3 depicts another hypothetical sequence of observations and three estimated relationships between yield and fertilizer. I believe the solid line $A$ is a better representation of the relationship than either of the other two. The piecewise linear form $B$ fits the data better, but I think this peculiar meandering function is highly unlikely on an a priori basis. Though $B$ and $C$ fit the data equally well, I believe that $B$ is much more

likely than $C$. What I am revealing is the a priori opinion that the function is likely to be smooth and single peaked.

What should now be clear is that data alone cannot reveal the relationship between yield and fertilizer intensity. Data can reveal the yield at sampled values of fertilizer intensities, but in order to interpolate between these sampled values, we must resort to subjective prior information.

Economists have inherited from the physical sciences the myth that scientific inference is objective, and free of personal prejudice. This is utter nonsense. All knowledge is human belief; more accurately, human opinion. What often happens in the physical sciences is that there is a high degree of conformity of opinion. When this occurs, the opinion held by most is asserted to be an objective fact, and those who doubt it are labelled "nuts." But history is replete with examples of opinions losing majority status, with once-objective "truths" shrinking into the dark corners of social intercourse. To give a trivial example, coming now from California I am unsure whether fat ties or thin ties are aesthetically more pleasing.

The false idol of objectivity has done great damage to economic science. Theoretical econometricians have interpreted scientific objectivity to mean that an economist must identify exactly the variables in the model, the functional form, and the distribution of the errors. Given these assumptions, and given a data set, the econometric method produces an objective inference from a data set, unencumbered by the subjective opinions of the researcher.

This advice could be treated as ludicrous, except that it fills all the econometric textbooks. Fortunately, it is ignored by applied econometricians. The econometric art as it is practiced at the computer terminal involves fitting many, perhaps thousands, of statistical models. One or several that the researcher finds pleasing are selected for reporting purposes. This searching for a model is often well intentioned, but there can be no doubt that such a specification search invalidates the traditional theories of inference. The concepts of unbiasedness, consistency, efficiency, maximum-likelihood estimation,

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

in fact, all the concepts of traditional theory, utterly lose their meaning by the time an applied researcher pulls from the bramble of computer output the one thorn of a model he likes best, the one he chooses to portray as a rose. The consuming public is hardly fooled by this chicanery. The econometrician's shabby art is humorously and disparagingly labelled "data mining," "fishing," "grubbing," "number crunching." A joke evokes the Inquisition: "If you torture the data long enough, Nature will confess" (Coase). Another suggests methodological fickleness: "Econometricians, like artists, tend to fall in love with their models" (wag unknown). Or how about: "There are two things you are better off not watching in the making: sausages and econometric estimates."

This is a sad and decidedly unscientific state of affairs we find ourselves in. Hardly anyone takes data analyses seriously. Or perhaps more accurately, hardly anyone takes anyone else's data analyses seriously. Like elaborately plumed birds who have long since lost the ability to procreate but not the desire, we preen and strut and display our *t*-values.

If we want to make progress, the first step we must take is to discard the counterproductive goal of objective inference. The dictionary defines an inference as a logical conclusion based on a set of facts. The "facts" used for statistical inference about $\theta$ are first the data, symbolized by $x$, second a conditional probability density, known as a sampling distribution, $f(x|\theta)$, and, third, explicitly for a Bayesian and implicitly for "all others," a marginal or prior probability density function $f(\theta)$. Because both the sampling distribution and the prior distribution are actually *opinions* and not *facts*, a statistical inference is and must forever remain an *opinion*.

What is a fact? A fact is merely an opinion held by all, or at least held by a set of people you regard to be a close approximation to all.[1] For some that set includes only one

person. I myself have the opinion that Andrew Jackson was the sixteenth president of the United States. If many of my friends agree, I may take it to be a fact. Actually, I am most likely to regard it to be a fact if the authors of one or more books say it is so.

The difference between a fact and an opinion for purposes of decision making and inference is that when I use opinions, I get uncomfortable. I am not too uncomfortable with the opinion that error terms are normally distributed because most econometricians make use of that assumption. This observation has deluded me into thinking that the opinion that error terms are normal may be a fact, when I know deep inside that normal distributions are actually used only for convenience. In contrast, I am *quite* uncomfortable using a prior distribution, mostly I suspect because hardly anyone uses them. If convenient prior distributions were used as often as convenient sampling distributions, I suspect that I could be as easily deluded into thinking that prior distributions are facts as I have been into thinking that sampling distributions are facts.

To emphasize this hierarchy of statements, I display them in order: truths; facts; opinions; conventions. Note that I have added to the top of the order, the category truths. This will appeal to those of you who feel compelled to believe in such things. At the bottom are conventions. In practice, it may be difficult to distinguish a fact from a convention, but when facts are clearly unavailable, we must strongly resist the deceit or delusion that conventions can represent.

What troubles me about using opinions is their whimsical nature. Some mornings when I arise, I have the opinion that Raisin Bran is better than eggs. By the time I get to the kitchen, I may well decide on eggs, or oatmeal. I usually do recall that the sixteenth president distinguished himself. Sometimes I think he was Jackson; often I think he was Lincoln.

A data analysis is similar. Sometimes I take the error terms to be correlated, sometimes uncorrelated; sometimes normal and sometimes nonnormal; sometimes I include observations from the decade of the fifties, sometimes I exclude them; sometimes the

---

[1] This notion of "truth by consensus" is espoused by Thomas Kuhn (1962) and Michael Polanyi (1964). Oscar Wilde agrees by dissent: "A truth ceases to be true when more than one person believes it."

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB    Document 419-8    Filed 03/12/25    Page 14 of 46

equation is linear and sometimes nonlinear; sometimes I control for variable $z$, sometimes I don't. Does it depend on what I had for breakfast?

As I see it, the fundamental problem facing econometrics is how adequately to control the whimsical character of inference, how sensibly to base inferences on opinions when facts are unavailable. At least a partial solution to this problem has already been formed by practicing econometricians. A common reporting style is to record the inferences implied by alternative sets of opinions. It is not unusual to find tables that show how an inference changes as variables are added to or deleted from the equation. This kind of sensitivity analysis reports special features of the mapping from the space of assumptions to the space of inferences. The defect of this style is that the coverage of assumptions is infinitesimal, in fact a zero volume set in the space of assumptions. What is needed instead is a more complete, but still economical way to report the mapping of assumptions into inferences. What I propose to do is to develop a correspondence between regions in the assumption space and regions in the inference space. I will report that all assumptions in a certain set lead to essentially the same inference. Or I will report that there are assumptions within the set under consideration that lead to radically different inferences. In the latter case, I will suspend inference and decision, or I will work harder to narrow the set of assumptions.

Thus what I am asserting is that the choice of a particular sampling distribution, or a particular prior distribution, is inherently whimsical. But statements such as "The sampling distribution is symmetric and unimodal" and "My prior is located at the origin" are not necessarily whimsical, and in certain circumstances do not make me uncomfortable.

To put this somewhat differently, an inference is not believable if it is fragile, if it can be reversed by minor changes in assumptions. As consumers of research, we correctly reserve judgment on an inference until it stands up to a study of fragility, usually by other researchers advocating opposite opinions. It is, however, much more efficient for

individual researchers to perform their own sensitivity analyses, and we ought to be demanding much more complete and more honest reporting of the fragility of claimed inferences.

The job of a researcher is then to report economically and informatively the mapping from assumptions into inferences. In a slogan, "The mapping is the message." The mapping does not depend on opinions (assumptions), but reporting the mapping economically and informatively does. A researcher has to decide which assumptions or which sets of alternative assumptions are worth reporting. A researcher is therefore forced either to anticipate the opinions of his consuming public, or to recommend his own opinions. It is actually a good idea to do both, and a serious defect of current practice is that it concentrates excessively on convincing one's self and, as a consequence, fails to convince the general professional audience.

The whimsical character of econometric inference has been partially controlled in the past by an incomplete sensitivity analysis. It has also been controlled by the use of conventions. The normal distribution is now so common that there is nothing at all whimsical in its use. In some areas of study, the list of variables is partially conventional, often based on whatever list the first researcher happened to select. Even conventional prior distributions have been proposed and are used with nonnegligible frequency. I am referring to Robert Shiller's (1973) smoothness prior for distributed lag analysis and to Arthur Hoerl and Robert Kennard's (1970) ridge regression prior. It used to aggravate me that these methods seem to find public favor whereas overt and complete Bayesian methods such as my own proposals (1972) for distributed lag priors are generally ignored. However, there is a very good reason for this: the attempt to form a prior distribution from scratch involves an untold number of partly arbitrary decisions. The public is rightfully resistant to the whimsical inferences which result, but at the same time is receptive to the use of priors in ways that control the whimsy. Though the use of conventions does control the whimsy, it can do so at the cost of relevance. Inferences based

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

on Hoerl and Kennard's conventional "ridge regression" prior are usually irrelevant, because it is rarely sensible to take the prior to be spherical and located at the origin, and because a closer approximation to prior belief can be suspected to lead to substantially different inferences. In contrast, the conventional assumption of normality at least uses a distribution which usually cannot be ruled out altogether. Still, we may properly demand a demonstration that the inferences are insensitive to this distributional assumption.

### A. *The Horizon Problem: Sherlock Holmes Inference*

Conventions are not to be ruled out altogether, however. One can go mad trying to report completely the mapping from assumptions into inferences since the space of assumptions is infinite dimensional. A formal statistical analysis therefore has to be done within the limits of a reasonable horizon. An informed convention can usefully limit this horizon. If it turned out that sensible neighborhoods of distributions around the normal distribution 99 times out of 100 produced the same inference, then we could all agree that there are other more important things to worry about, and we may properly adopt the convention of normality. The consistency of least squares estimates under wide sets of assumptions is used improperly as support for this convention, since the inferences from a given finite sample may nonetheless be quite sensitive to the normality assumption.[2]

The truly sharp distinction between inference from experimental and inference from nonexperimental data is that experimental inference sensibly admits a conventional horizon in a critical dimension, namely the choice of explanatory variables. If fertilizer is randomly assigned to plots of land, it is conventional to restrict attention to the relationship between yield and fertilizer, and

to proceed as if the model were perfectly specified, which in my notation means that the misspecification matrix $M$ is the zero matrix. There is only a small risk that when you present your findings, someone will object that fertilizer and light level are correlated, and there is an even smaller risk that the conventional zero value for $M$ will lead to inappropriate inferences. In contrast, it would be foolhardy to adopt such a limited horizon with nonexperimental data. But if you decide to include light level in your horizon, then why not rainfall; and if rainfall, then why not temperature; and if temperature, then why not soil depth, and if soil depth, then why not the soil grade; ad infinitum. Though this list is never ending, it can be made so long that a nonexperimental researcher can feel as comfortable as an experimental researcher that the risk of having his findings upset by an extension of the horizon is very low. The exact point where the list is terminated must be whimsical, but the inferences can be expected not to be sensitive to the termination point if the horizon is wide enough.

Still, the horizon within which we all do our statistical analyses has to be ultimately troublesome, since there is no formal way to know what inferential monsters lurk beyond our immediate field of vision. "Diagnostic" tests with explicit alternative hypotheses such as the Durbin-Watson test for first-order autocorrelation do not truly ask if the horizon should be extended, since first-order autocorrelation is explicitly identified and clearly in our field of vision. Diagnostic tests such as goodness-of-fit tests, without explicit alternative hypotheses, are useless since, if the sample size is large enough, any maintained hypothesis will be rejected (for example, no observed distribution is exactly normal). Such tests therefore degenerate into elaborate rituals for measuring the effective sample size.

The only way I know to ask the question whether the horizon is wide enough is to study the anomalies of the data. In the words of the physiologist, C. Bernard:

> A great surgeon performs operations for stones by a single method; later he

---

[2] In particular, least squares estimates are completely sensitive to the independence assumption, since by choice of sample covariance matrix a generalized least squares estimate can be made to assume any value whatsoever (see my 1981 paper).

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

makes a statistical summary of deaths and recoveries, and he concludes from these statistics that the mortality law for this operation is two out of five. Well, I say that this ratio means literally nothing scientifically, and gives no certainty in performing the next operation. What really should be done, instead of gathering facts empirically, is to study them more accurately, each in its special determinism...by statistics, we get a conjecture of greater or less probability about a given case, but never any certainty, never any absolute determinism...only basing itself on experimental determinism can medicine become a true science.

[1927, pp. 137–38]

A study of the anomalies of the data is what I have called "Sherlock Holmes" inference, since Holmes turns statistical inference on its head: "It is a capital mistake to theorize before you have all the evidence. It biases the judgements." Statistical theory counsels us to begin with an elicitation of opinions about the sampling process and its parameters; the theory, in other words. After that, data may be studied in a purely mechanical way. Holmes warns that this biases the judgements, meaning that a theory constructed before seeing the facts can be disastrously inappropriate and psychologically difficult to discard. But if theories are constructed after having studied the data, it is difficult to establish by how much, if at all, the data favor the data-instigated hypothesis. For example, suppose I think that a certain coefficient ought to be positive, and my reaction to the anomalous result of a negative estimate is to find another variable to include in the equation so that the estimate is positive. Have I found evidence that the coefficient is positive? It would seem that we should require evidence that is more convincing than the traditional standard. I have proposed a method for discounting such evidence (1974). Initially, when you regress yield on fertilizer as in equation (2), you are required to assess a prior distribution for the experimental bias parameter $\beta^*$; that is, you must select the misspecification matrix $M$. Then, when the least squares estimate of $\beta$

turns out to be negative, and you decide to include in the equation the light level as well as the fertilizer level, you are obligated to form a prior for the light coefficient $\gamma$ consistent with the prior for $\beta^*$, given that $\beta^* = \gamma r_1$, where $r_1$ is the regression coefficient of light on fertilizer.[3]

This method for discounting the output of exploratory data analysis requires a discipline that is lacking even in its author. It is consequently important that we reduce the risk of Holmesian discoveries by extending the horizon reasonably far. The degree of a polynomial or the order of a distributed lag need not be data instigated, since the horizon is easily extended to include high degrees and high orders. It is similarly wise to ask yourself before examining the data what you would do if the estimate of your favorite coefficient had the wrong sign. If that makes you think of a specific left-out variable, it is better to include it from the beginning.

Though it is wise to select a wide horizon to reduce the risk of Holmesian discoveries, it is mistaken then to analyze a data set as if the horizon were wide enough. Within the limits of a horizon, no revolutionary inference can be made, since all possible inferences are predicted in advance (admittedly, some with low probabilities). Within the horizon, inference and decision can be turned over completely to a computer. But the great human revolutionary discoveries are made when the horizon is extended for reasons that cannot be predicted in advance and cannot be computerized. If you wish to make such discoveries, you will have to poke at the horizon, and poke again.

### V. An Example

This rhetoric is understandably tiring. Methodology, like sex, is better demonstrated than discussed, though often better anticipated than experienced. Accordingly, let me give you an example of what all this

---

[3]In a randomized experiment with $r_1 = 0$, the constraint $\beta^* = \gamma r_1$ is irrelevant, and you are free to play these exploratory games without penalty. This is a very critical difference between randomized experiments and nonrandomized nonexperiments.

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB     Document 419-8     Filed 03/12/25     Page 17 of 46

ranting and raving is about. I trust you will find it even better in the experience than in the anticipation. A problem of considerable policy importance is whether or not to have capital punishment. If capital punishment had no deterrent value, most of us would prefer not to impose such an irreversible punishment, though, for a significant minority, the pure joy of vengeance is reason enough. The deterrent value of capital punishment is, of course, an empirical issue. The unresolved debate over its effectiveness began when evolution was judging the survival value of the vengeance gene. Nature was unable to make a decisive judgment. Possibly econometricians can.

In Table 1, you will find a list of variables that are hypothesized to influence the murder rate.[4] The data to be examined are state-by-state murder rates in 1950. The variables are divided into three sets. There are four deterrent variables that characterize the criminal justice system, or in economic parlance, the expected out-of-pocket cost of crime. There are four economic variables that measure the opportunity cost of crime. And there are four social/environmental variables that possibly condition the taste for crime. This leaves unmeasured only the expected rewards for criminal behavior, though these are possibly related to the economic and social variables and are otherwise assumed not to vary from state to state.

A simple regression of the murder rate on all these variables leads to the conclusion that each additional execution deters thirteen murders, with a standard error of seven. That seems like such a healthy rate of return, we might want just to randomly draft executees from the population at large. This proposal would be unlikely to withstand the scrutiny of any macroeconomists who are skilled at finding rational expectations equilibria.

The issue I would like to address instead is whether this conclusion is fragile or not. Does it hold up if the list of variables in the model is changed? Individuals with different experiences and different training will find

[4] This material is taken from a study by a student of mine, Walter McManus (1982).

TABLE 1—VARIABLES USED IN THE ANALYSIS

a. Dependent Variable
   $M$ = Murder rate per 100,000, FBI estimate.
b. Independent Deterrent Variables
   $PC$ = (Conditional) Probability of conviction for murder given commission. Defined by $PC = C/Q$, where $C$ = convictions for murder, $Q = M \cdot NS$, $NS$ = state population. This is to correct for the fact that $M$ is an estimate based on a sample from each state.
   $PX$ = (Conditional) Probability of execution given conviction (average number of executions 1946–50 divided by $C$).
   $T$ = Median time served in months for murder by prisoners released in 1951.
   $XPOS$ = A dummy equal to 1 if $PX > 0$.
c. Independent Economic Variables
   $W$ = Median income of families in 1949.
   $X$ = Percent of families in 1949 with less than one-half $W$.
   $U$ = Unemployment rate.
   $LF$ = Labor force participation rate.
d. Independent Social and Environmental Variables
   $NW$ = Percent nonwhite.
   $AGE$ = Percent 15–24 years old.
   $URB$ = Percent urban.
   $MALE$ = Percent male.
   $FAMHO$ = Percent of families that are husband and wife both present families.
   $SOUTH$ = A dummy equal to 1 for southern states (Alabama, Arkansas, Delaware, Florida, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia).
e. Weighting Variable
   $SQRTNF$ = Square root of the population of the FBI-reporting region. Note that weighting is done by multiplying variables by $SQRTNF$.
f. Level of Observation
   Observations are for 44 states, 35 executing and 9 nonexecuting. The executing states are: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia.
   The nonexecuting states are: Idaho, Maine, Minnesota, Montana, New Hampshire, Rhode Island, Utah, Wisconsin, Wyoming.

different subsets of the variables to be candidates for omission from the equation. Five different lists of doubtful variables are reported in Table 2. A right winger expects

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

TABLE 2—ALTERNATIVE PRIOR SPECIFICATIONS

| Prior | PC | PX | T | XPOS | W | X | U | LF | NW | AGE | URB | MALE | FAMHO | SOUTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Right Winger | I | I | I | * | D | D | D | D | D | D | D | D | D | D |
| Rational Maximizer | I | I | I | * | I | I | I | I | D | D | D | D | D | D |
| Eye-for-an-Eye | I | I | D | * | D | D | D | D | D | D | D | D | D | D |
| Bleeding Heart | D | D | D | * | I | I | I | I | D | D | D | D | D | D |
| Crime of Passion | D | D | D | * | I | I | I | I | I | I | I | I | I | I |

*Notes:* 1) *I* indicates variables considered important by a researcher with the respective prior. Thus, every model considered by the researcher will include these variables. *D* indicates variables considered doubtful by the researcher. * indicates *XPOS*, the dummy equal to 1 for executing states. Each prior was pooled with the data two ways: one with *XPOS* treated as important, and one with it as doubtful.

2) With five basic priors and *XPOS* treated as doubtful or important by each, we get ten alternative prior specifications.

the punishment variables to have an effect, but treats all other variables as doubtful. He wants to know whether the data still favor the large deterrent effect, if he omits some of these doubtful variables. The rational maximizer takes the variables that measure the expected economic return of crime as important, but treats the taste variables as doubtful. The eye-for-an-eye prior treats all variables as doubtful except the probability of execution. An individual with the bleeding heart prior sees murder as the result of economic impoverishment. Finally, if murder is thought to be a crime of passion then the punishment variables are doubtful.

In Table 3, I have listed the extreme estimates that could be found by each of these groups of researchers. The right-winger minimum of $-22.56$ means that a regression of the murder rate data on the three punishment variables and a suitably selected linear combination of the other variables yields an estimate of the deterrent effect equal to 22.56 lives per execution. It is possible also to find an estimate of $-.86$. Anything between these two extremes can be similarly obtained; but no estimate outside this interval can be generated no matter how the doubtful variables are manipulated (linearly). Thus the right winger can report that the inference from this data set that executions deter murders is not fragile. The rational maximizer similarly finds that conclusion insensitive to choice of model, but the other three priors allow execution actually to encourage murder, possibly by a brutalizing effect on society.

TABLE 3—EXTREME ESTIMATES OF THE EFFECT OF EXECUTIONS ON MURDERS

| Prior | Minimum Estimate | Maximum Estimate |
|---|---|---|
| Right Winger | $-22.56$ | $-.86$ |
| Rational Maximizer | $-15.91$ | $-10.24$ |
| Eye-for-an-Eye | $-28.66$ | $1.91$ |
| Bleeding Heart | $-25.59$ | $12.37$ |
| Crime of Passion | $-17.32$ | $4.10$ |

*Note:* Least squares is $-13.22$ with a standard error of 7.2.

I come away from a study of Table 3 with the feeling that any inference from these data about the deterrent effect of capital punishment is too fragile to be believed. It is possible credibly to narrow the set of assumptions, but I do not think that a credibly large set of alternative assumptions will lead to a sharp set of estimates. In another paper (1982), I found a narrower set of priors still leads to inconclusive inferences. And I have ignored the important simultaneity issue (the death penalty may have been imposed in crime ridden states to deter murder) which is often a source of great inferential fragility.

## VI. Conclusions

After three decades of churning out estimates, the econometrics club finds itself under critical scrutiny and faces incredulity as never before. Fischer Black writes of "The Trouble with Econometric Models." David

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

Case 1:20-cv-03590-JEB    Document 419-8    Filed 03/12/25    Page 19 of 46

Hendry queries "Econometrics: Alchemy or Science?" John W. Pratt and Robert Schlaifer question our understanding of "The Nature and Discovery of Structure." And Christopher Sims suggests blending "Macroeconomics and Reality."

It is apparent that I too am troubled by the fumes which leak from our computing centers. I believe serious attention to two words would sweeten the atmosphere of econometric discourse. These are whimsy and fragility. In order to draw inferences from data as described by econometric texts, it is necessary to make whimsical assumptions. The professional audience consequently and properly withholds belief until an inference is shown to be adequately insensitive to the choice of assumptions. The haphazard way we individually and collectively study the fragility of inferences leaves most of us unconvinced that any inference is believable. If we are to make effective use of our scarce data resource, it is therefore important that we study fragility in a much more systematic way. If it turns out that almost all inferences from economic data are fragile, I suppose we shall have to revert to our old methods lest we lose our customers in government, business, and on the boardwalk at Atlantic City.

## REFERENCES

**Bernard, C.,** *An Introduction to the Study of Experimental Method*, New York: Mac-Millan, 1927.

**Black, Fischer,** "The Trouble with Econometric Models," *Financial Analysts Journal*, March/April 1982, *35*, 3–11.

**Friedman, Milton,** *A Theory of the Consumption Function*, Princeton: Princeton University Press, 1957.

**Hendry, David,** "Econometrics—Alchemy or Science?," *Economica*, November 1980, *47*, 387–406.

**Hoerl, Arthur E. and Kennard, Robert W.,** "Ridge Regression: Biased Estimation for Nonorthogonal Problems," *Technometrics*, February 1970, *12*, 55–67.

**Kuhn, Thomas S.,** *The Structure of Scientific Revolutions*, Chicago: University of Chicago Press, 1962.

**Lakatos, Imre,** "Falsification and the Methodology of Scientific Research Programmes," in his and A. Musgrave, eds., *Criticism and the Growth of Knowledge*, Cambridge: Cambridge University Press, 1969.

**Leamer, Edward E.,** "A Class of Prior Distributions and Distributed Lag Analysis," *Econometrica*, November 1972, *40*, 1059–81.

_____, "False Models and Post-data Model Construction," *Journal American Statistical Association*, March 1974, *69*, 122–31.

_____, *Specification Searches*: *Ad Hoc Inference with Non-experimental Data*, New York: Wiley, 1978.

_____, "Techniques for Estimation with Incomplete Assumptions," *IEEE Conference on Decision and Control*, San Diego, December 1981.

_____, "Sets of Posterior Means with Bounded Variance Priors," *Econometrica*, May 1982, *50*, 725–36.

**McManus, Walter,** "Bayesian Estimation of the Deterrent Effect of Capital Punishment," mimeo., University of California-Los Angeles, 1981.

**Plott, Charles R. and Smith, Vernon L.,** "An Experimental Examination of Two Exchange Institutions," *Review of Economic Studies*, February 1978, *45*, 133–53.

**Polanyi, Michael,** *Personal Knowledge*, New York: Harper and Row, 1964.

**Pratt, John W. and Schlaifer, Robert,** "On the Nature and Discovery of Structure," mimeo., 1979.

**Shiller, Robert,** "A Distributed Lag Estimator Derived From Smoothness Priors," *Econometrica*, July 1973, *41*, 775–88.

**Sims, C. A.,** "Macroeconomics and Reality," *Econometrica*, January 1980, *48*, 1–48.

_____, "Scientific Standards in Econometric Modeling," mimeo., 1982.

**Smith, Vernon L.,** "Relevance of Laboratory Experiments to Testing Resource Allocation Theory," in J. Kmenta and J. Ramsey, eds., *Evaluation of Econometric Models*, New York: Academic Press, 1980, 345–77.

This content downloaded from
136.226.18.188 on Wed, 05 Mar 2025 18:38:13 UTC
All use subject to https://about.jstor.org/terms

# Meta MIL #7, Exhibit F

© 2004 American Bar Association. All rights reserved. Reprinted from *Antitrust* magazine, Summer 2004, a publication of the ABA Section of Antitrust Law.

# A *Daubert* Discipline for Merger Simulation

BY GREGORY J. WERDEN, LUKE M. FROEB, AND DAVID T. SCHEFFMAN

LITTLE ATTENTION WAS PAID TO the unilateral effects of mergers prior to the release of the 1992 Horizontal Merger Guidelines.[1] But "merger simulation"—the formal use of structural, game-theoretic models to make quantitative predictions of unilateral competitive effects—quickly came into vogue after their release. The idea is simple: With suitable models indicating what actions market participants take under particular circumstances, it is straightforward to predict the likely outcome, or "equilibrium," of their interaction, and it is similarly straightforward to compute the likely effects of a merger on the equilibrium, provided that the same, well-specified model of competitor interaction applies before and after the merger. Thus, merger simulation takes a standard model of oligopoly appropriate for the industry, calibrates it to match critical features of the industry (e.g., prices and market shares), and uses it to compute the post-merger equilibrium internalizing competition between the merging firms.[2]

If merger simulation had a well-established and consistent high degree of accuracy in predicting the effects of actual mergers, its reliability would be a settled question. Because that is not the case,[3] the reliability of any particular application of merger simulation should be gauged by examining the modeling process, which is at least as much art as science. To make the myriad choices required, the modeler draws on prior beliefs as well the available data, so any predictions from a model derive from a complex combination of beliefs, qualitative evidence, and data. Particularly because merger simulation may be used in an adversarial setting, it is important to examine the process of combining these inputs. Thus, we propose that every modeling choice in a merger simulation apt to matter significantly be accompanied either by some sort of justification or by a sensitivity analysis indicating its impact.

We first explain how our proposal for assessing the reliability of merger simulation borrows principles from the

Gregory Werden is Senior Economic Counsel, Antitrust Division, U.S. Department of Justice. Luke Froeb is Director, Bureau of Economics, Federal Trade Commission. David Scheffman is a Director of LECG and adjunct professor at the Owen School of Management, Vanderbilt University and formerly was Director of the FTC Bureau of Economics. The views expressed herein are not purported to be those of the U.S. Department of Justice, the Federal Trade Commission, or any of its Commissioners. John Geweke and Tim Muris provided helpful comments.

Federal Rules of Evidence and then detail several modeling choices that matter—showing how some might be supported by evidence, and how others should be subject to sensitivity analysis. This discussion draws on lessons learned from a decade of applying the merger simulation methodology, the main one being that it is a serious mistake to use the methodology to predict the future without first making sure that it explains the past.

## A *Daubert* Discipline for Merger Simulation

**Daubert *and Progeny.*** In *Daubert* the Supreme Court required trial judges to ensure that only "scientifically valid" testimony is exposed to the jury.[4] In *Kumho Tire* the Court explained the purpose of "*Daubert*'s gatekeeping requirement" "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field,"[5] and it made clear that the gatekeeping requirement applies to all expert testimony, including economic testimony in merger cases.[6]

In *Daubert*, the Court also held that expert testimony is admissible only if "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," i.e., only if there is a good "fit" between the testimony and the pertinent inquiry.[7] In *Joiner*, the Court again stressed this "fit" requirement in cautioning that a court should not "admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[8]

Failure to fit the facts has been the principal basis for excluding economic expert testimony in antitrust cases. The leading example is *Concord Boat*, in which the court held that "a theory that might meet certain *Daubert* factors . . . should not be admitted if it does not apply to the facts of the case."[9] After the "thorough analysis of the expert's economic model" required by *Daubert*, the court found the model wanting in several respects.[10] In several other antitrust cases, testimony premised on empirical economic models was excluded because the courts determined that those models departed from the facts of the case in critical ways.[11]

**A Daubert *Discipline.*** The *Daubert* line of cases addresses the admissibility of expert testimony at trial. Although very few merger cases ever go to trial, merger analysis in general, and merger simulation in particular, nevertheless should exhibit "intellectual rigor," and "the *ipse dixit* of the expert"

is never acceptable. To impose the sort of discipline that would be imposed at trial, every modeling choice in a merger simulation apt to matter significantly should be accompanied either by some sort of justification or by a sensitivity analysis indicating its impact.

For most modeling choices, the justification should be that they "fit" the industry under review, i.e., that there is consistency between the factual setting of the industry and a structural model that can be employed in a simulation. Evaluating fit draws on the full array of qualitative evidence developed in the case. Evaluating fit also draws on particular quantitative features of the industry, which may be directly measured, as with price-cost margins, or estimated econometrically, as with demand elasticities. If there is a general rule for evaluating fit, it is that a model of the competitive process fits the industry if it explains the past at a fairly high level of generality. For example, it is wholly unnecessary for a model to explain week-to-week price movements, but essential that it explain the average level of prices over a year.

Of course, *Daubert* does not demand a perfect fit between the model and the facts. Structural economic models are abstractions that can never perfectly describe the real world. Moreover, a perfect fit between the model and the facts is not even a goal to which a modeler should aspire. If structural models become too complex, through elaborate attempts to fit every detail of an industry, the models are apt to lose their value in merger analysis; they likely impose unreasonable informational demands and may yield no clear predictions. What is required is that a standard model of oligopoly interaction explain past outcomes of the competitive process reasonably well. Hence, a model may fit an industry quite well enough even if it does not reflect notable features of the industry.[12] Anyone performing a merger simulation ultimately should be convinced, and prepared to persuade others, that the oligopoly model employed explains the past well enough to provide useful predictions of the future.[13]

For a few modeling choices, an ample justification can be found in an axiom of economics, e.g., that firms maximize profits (in some sense). And for a few modeling choices, no justification is likely to be available because neither economic theory nor observation of the industry indicates which choice to make. For example, neither provides a sound basis for choosing a particular functional form for consumer demand. Such choices should be subjected to a sensitivity analysis—analyzing the implications of alternative choices—to make clear the range of uncertainty that surrounds the predictions of the model and whether the particular choice is apt to skew predictions in a particular direction. Price increase predictions may prove insensitive to some choices, but they are quite sensitive to others.[14]

Price-increase predictions always are subject to modeling error, stemming from assumptions that are never exactly right and may be terribly wrong, and from sampling error in the statistical estimation of model parameters.[15] Merger simulation predictions are *at best* reasonable, but rough, estimates

of the likely effects of mergers. These two sources of error imply, for example, that price increase predictions close to zero cannot meaningfully be distinguished from zero.[16]

## Basic Issues in Simulating Branded Consumer Products Mergers

Merger simulation has most often been applied to mergers involving branded consumer products, using the Bertrand oligopoly model. That model assumes competitors interact just once, each maximizing its short-run profit, with price as the sole dimension of competition.[17] Bertrand equilibrium is reached when all competitors are happy with their prices, given rivals' prices.[18] Whether the Bertrand model is appropriate in any particular case may depend on many considerations, three of which are of general application.

First, the role of non-price competition should be evaluated. Aspects of marketing strategy may interact in important ways with the choice of price or be affected by the merger in ways that would cause the price-increase predictions to be a seriously misleading description of the merger's effects. Second, responses in the recent past to any significant cost changes, new product introductions, or other "shocks" should be evaluated, asking how well the Bertrand model would have predicted them. Finally, the observed price-cost margins for the merging products and close substitutes should be compared to the margins predicted by the Bertrand model.[19]

The first step in a merger simulation is model "calibration"—choosing parameter values to make the model fit certain features of the industry.[20] In simulating a branded consumer products merger using the Bertrand model, calibration involves prices, shares, and elasticities of demand. A set of prices and shares is chosen to represent the equilibrium "but for" the proposed merger, i.e., the prices and shares that are expected to prevail in the near future absent the merger.[21] The best evidence of the "but for" equilibrium normally is the equilibrium prevailing when the merger is proposed, so the usual practice is to take the "but for" equilibrium to be the average prices and shares over a recent period, commonly the most recent one-year period for which data are available. In particular cases, however, it may be appropriate to adjust historic data to reflect reasonably foreseeable changes in prices or shares absent the merger.

Demand elasticities often are estimated econometrically using high frequency scanner data or survey data. Estimation, especially using scanner data, raises a host of potentially difficult econometric issues[22] and ultimately may not bear significant fruit. When reliable estimation is infeasible, the demand elasticities can be approximated from indications of preferences or switching patterns derived from surveys, marketing studies, and other documentary evidence. Alternatively, because the demand elasticities must have a particular relationship to price-cost margins in a Bertrand equilibrium, they can be approximated from observed margins.

The predicted price effects of the merger are the differences between the simulated post-merger prices and the

prices used in the calibration. It would be meaningless to compare the simulated post-merger prices to any set of pre-merger prices other than those used to calibrate the model, because the difference between the two would only partially be attributable to the effects of the merger. In *Concord Boat* the court of appeals rejected a damage estimate the court found to have been based on such a faulty comparison. The damage model in that case attributed to the challenged conduct all sales made by the defendant in excess of half of total market sales. That attribution was inappropriate because the defendant made three-quarters of market sales before undertaking the challenged conduct.[23] A properly calibrated model might have attributed to the challenged conduct only sales by the defendant in excess of three-quarters of total market sales.

Simulating post-merger prices requires values for the marginal costs for all products in the simulation, which generally are inferred from the calibrated model. The pre-merger marginal costs are assumed to be those making the observed prices and shares a Bertrand equilibrium, given the estimated elasticities. In computing the post-merger equilibrium, it generally is necessary to assume that marginal costs are invariant to output, although it is simple to incorporate any likely effects of merger synergies on the marginal costs of the merging products.

It is important to compare the inferred marginal costs with whatever evidence is available on actual marginal costs.[24] If it appears that the inferred marginal cost for any merging product differs substantially from the likely true value, the Bertrand model does not explain pre-merger pricing and therefore cannot reliably predict post-merger prices.[25] Cost data for non-merging products typically are not available, but even without access to cost data, it may be apparent that the inferred marginal costs for one or more non-merging products are implausible. For example, a negative marginal cost clearly is implausible. The inference of a negative marginal cost despite a plausible value for a product's demand elasticity indicates that the Bertrand model does not explain that product's pricing; indeed, such a product is being priced *much more* aggressively in the real world than the Bertrand model predicts. It also can be useful to compare inferred marginal costs across products, checking in particular for implausibly large inter-product differences in marginal costs.

A virtue of formal structural modeling, such as merger simulation, is that it forces assumptions to be made explicit, which facilitates the examination of the differing implications of alternative assumptions. Structural modeling can be particularly useful for identifying what really matters, why it matters, and how much it matters. A decade of merger simulation also has lead to a greater appreciation of the complexity and variety of competitive processes, and clearer understanding that differing modeling assumptions can amplify or attenuate merger price increases, and even make them disappear altogether. Making assumptions explicit also can help keep structural modeling firmly grounded in fact, by facilitating a comparison between features of the model and the real world. Experience with merger simulation has taught that it can usefully complement a fact-intensive analysis of consumers, competitors, and the institutional setting of an industry, but it cannot substitute for such an analysis. An assessment of the facts is required to determine which of many combinations of evidence and assumptions (about demand and competitor interaction) are reasonable.

## Three Important Modeling Choices

Simulating a merger involving branded consumer products involves many choices, and the price increase predictions can be highly sensitive to some of them. The remainder of this article explores several important examples.

***Demand Elasticities.*** Demand elasticities are critical determinants of the price increase predictions from the simulation of a merger among sellers of branded consumer products that compete strictly on the basis of price. In the Sprint-WorldCom merger investigation,[26] several economists estimated firm-level demand elasticities for residential long-distance service, in which the merger would have combined the second and third largest carriers.[27] Unfortunately, it can be difficult to get precise estimates of demand elasticities, and demand estimation for residential long-distance service presented major problems.[28] Particularly when there are such problems, it is important to explore the sensitivity of the price increase predictions to the choice of values for the relevant demand elasticities.

To illustrate the sort of sensitivity analysis that might be used, we consider a simple model, based on a restrictive—potentially unrealistic—assumption about the nature of substitution among competing brands. This assumption is that customers lost by one carrier as it increased price would switch to other carriers in proportion to their relative market shares.[29] Hence, a carrier with a share of 20 percent would gain twice as many customers as a carrier with a share of 10 percent. This restrictive assumption makes it possible to calibrate the model with just prices, shares, and two demand elasticities—the aggregate elasticity of demand for residential long-distance service and the elasticity of demand faced by any one individual carrier.[30]

Figure 1 presents a contour plot of the predicted increase in residential long-distance prices averaged over all carriers, assuming Bertrand competition among them.[31] This plot reflects values of residential long-distance demand elasticity between −1.5 and −0.5 and values of WorldCom's demand elasticity between −4 and −1.25. This range of aggregate elasticities brackets estimates in the academic literature, while the range of WorldCom elasticities is consistent with many estimates we have seen for branded consumer products. The contours represent combinations of the two elasticities yielding market-wide average price increases of 0.4, 0.6, 0.8, 1.0, and 1.2 percent. Thus, the highest contour represents an average price increase three times that of the lowest contour.[32]

Presenting merger simulation results this way makes it clear how, and by how much, the choice of values of the rel-

A R T I C L E S   A N D   F E A T U R E S



Figure 1. Market-Wide Average Price Increases Predicted from the Sprint-WorldCom Merger



Figure 2. Four Demand Curves Plotted Between the Competitive and Monopoly Prices

evant demand elasticities affects the predicted price effects of a merger. Some sort of sensitivity analysis always should be performed, but the details may depend on the basis for the elasticity values employed (e.g., whether econometrics was used) and the nature of the uncertainty about the elasticities. Without some kind of sensitivity analysis relating to the values for the demand elasticities, it would be very difficult for enforcement agencies or courts to get a clear picture of what the data and modeling really are saying about possible price increases.

***Demand Curvature.*** While demand elasticities commonly are determined in some fashion from the available data, how the elasticities change with changes in prices is not. Rather, that is determined by the *assumed* functional form for demand.[33] Every functional form conventionally used in merger simulation has inherent "curvature" properties relating to the effect of a change in the price of a given product on the own and cross elasticities of demand for the merging products and close substitutes. Four functional forms have been used significantly in merger simulation—AIDS, isoelastic, linear, and logit demand. The former two yield substantially higher price increase predictions than the latter two whenever the predicted price increases are substantial.[34] Indeed, the former two can easily yield predicted price increases several times those of the latter two.

We illustrate the importance of the choice of a functional form for demand in Figure 2, in which the four commonly used demand curves are plotted between the monopoly and competitive prices. All four demand curves share a common competitive price and quantity at the lower right (i.e., the point at which price equals the assumed marginal cost), and all have the same elasticity (specifically, −2) at that

point. If only a very narrow range of prices near the competitive level were observed, all four of these demand curves would be consistent with the observed data.

We can imagine that the pre-merger industry was roughly at the competitive equilibrium, and if the proposed merger were significantly anticompetitive, it would necessarily move the equilibrium significantly. In the limiting case of merger to monopoly, the post-merger equilibrium could be one of the four equilibria at the left endpoints of the curves in Figure 2. But these four demand curves have quite different monopoly equilibria. The highest monopoly price is associated with the isoelastic demand curve, which exhibits the same demand elasticity at every point along the curve.[35] The linear, logit, and AIDS demand curves all become more elastic as price increases, and because consumers become more sensitive to price changes as prices increase, the merged firm would raise price less with those demand curves than with isoelastic demand. The linear demand curve yields the lowest monopoly price because the elasticity of demand rises faster with linear demand than with logit or AIDS demand.

There are essentially two ways to respond to the inherent uncertainty about demand curvature. One is to choose a demand form that is conservative. For example, a plaintiff attempting to block a merger could choose linear or logit demands, both of which yield relatively small price increase predictions. In an enforcement agency's deliberations on whether to challenge a merger, the same conservative approach is appropriate. A defendant could choose isoelastic or AIDS demand, which yield relatively large price increase predictions.

The other way to respond to the inherent uncertainty about demand curvature is to undertake an analysis somewhat different than merger simulation, which is not sensitive to demand curvature. Instead of asking by how much a merger would raise price in the absence of synergies affecting marginal costs, one can ask by how much would merger synergies have to reduce marginal costs to prevent any price increases at all. These latter amounts are referred to as compensating marginal cost reductions (CMCRs). CMCRs do not depend on demand curvature for the simple reason that the post-merger, post-synergy equilibrium, with the CMCRs, is precisely the same as the pre-merger, pre-synergy equilibrium. Using the Bertrand model, it is reasonably straightforward to compute the CMCRs for a merger of branded consumer products, given a set of prices, shares, and elasticities used to calibrate a merger simulation.[36]

***The Retail Sector.*** A retail sector typically separates the merging manufacturers from the consumers, and, when that is the case, simulating a merger involving manufacturers of branded consumer products requires a modeling choice about the retail sector. Most published merger simulations have just ignored the retail sector, effectively choosing to model the industry as if manufacturers sold directly to consumers.[37] This choice can be justified only in two scenarios. One is that of a "transparent" retail sector in the sense that the retail and manufacturing sectors are effectively merged together by manufacturers' use of contractual devices to extract all of the retailers' profits.[38] The other is that of retailers following a simple rule of thumb and applying a constant percentage mark-up to the prices they pay to manufacturers. In this latter scenario, the demand elasticities are exactly the same at the retail and wholesale levels, and it is trivial to translate between the two.[39]

In all other scenarios, ignoring the retail sector is apt to render merger simulation predictions significantly misleading. Regrettably, a totally realistic analysis of competing manufacturers selling through competing retailers is extraordinarily complex and well beyond the current state of the economic literature. The analysis of relatively simple models, however, has indicated that the retail sector can amplify, attenuate, eliminate, or simply pass through upstream price increases from merger.[40]

If individual retailers face no competition and charge prices that fully exploit their monopolies at the retail level, a manufacturing merger could have no effect on retail prices. The manufacturers and retailers both would want to make the "profit pie" as big as possible by setting optimal retail prices, which would be unaffected by the merger. Hence, retail prices likely would remain the same after a manufacturing merger. How manufacturers and retailers divide the pie would be determined by their relative bargaining power, which likely would be altered by a merger. The absence of an effect on retail prices may not mean that the merger of two manufacturers escapes condemnation under Section 7,[41] but ignoring the retail sector would be highly problematic. The

effect of the merger would be very different because of the retail sector; indeed, the merger could affect only fixed fees, while leaving wholesale prices, as such, unchanged.

Things are quite different if manufacturers and retailers both exercise market power at their respective levels of distribution, and if the terms under which manufacturers sell to retailers involve a single wholesale price and no fixed fees. Manufacturers then price above their marginal costs to a degree determined by the competition among them, and retailers mark up the wholesale prices to a degree determined by competition in retailing, thus presenting the "double markup" or "double marginalization" problem. Both the manufacturer and the retailer raise price significantly above their marginal cost in the attempt to capture a larger slice of the "profit pie," but that shrinks the size of the pie. Equilibrium retail prices are higher than those maximizing joint retailer and manufacturer profit.

No general model has been analyzed in which the manufacturing and retail sectors behave in this manner, but in a model with a single retailer and several manufacturers, it has been shown that the price effects of merger can be attenuated or amplified relative to those with a transparent retail sector that simply passes along upstream price increases. Whether price effects are attenuated or amplified is determined largely by the curvature of demand. The effects have much in common with the price effects of marginal cost changes, and the analysis of the pass through of cost changes demonstrates the central role of demand curvature. Particularly sensitive to assumptions about demand curvature are the price increases by the non-merging firms producing reasonably close substitutes for the merging products.[42]

In a 1995 analysis of a merger of leading bakers of white pan bread, the Justice Department's expert (one of this article's authors) concluded that retailers priced by applying a constant percentage markup to the wholesale price. In the light of this conclusion, it was straightforward to account for the retail sector in simulating the merger.[43] In other cases, it may be possible to gain some insight into the manufacturer-retailer relationship by examining the manufacturers' price-cost margins. For example, those margins are predicted to be zero or negative in two models that have been analyzed, and either prediction may be refuted easily.[44] A close examination of retailer behavior and manufacturer-retailer dealings can be vital for accurate prediction of the effects of a branded consumer products merger.

## Conclusion

The basic economic theory underlying unilateral effects from horizontal mergers is deceptively simple: Before the merger, each seller of competing branded consumer products selects the price that maximizes its profits. A merger of two such competitors necessarily alters the profit calculus by changing product ownership. Increasing the quantity sold for one merging product takes sales away from one or more products the merger brings into common ownership. The merging

firms had ignored this effect, but the merged firm fully accounts for it, responding to this change in incentives by raising prices. Non-merging firms respond with price increases of their own.

Behind this simple story is a complex game-theoretic model replete with assumptions about how consumers, retailers, and manufacturers behave, and especially about how competing manufacturers interact with each other and with retailers.[45] By specifying a particular model, it is possible to make quantitative predictions of the price effects of branded products mergers. It is important to assess the reliability of these predictions, yet there is scarce empirical evidence on their accuracy in predicting the actual price effects of mergers. Thus, to assess reliability, we propose standards derived from *Daubert* and the Federal Rules of Evidence.

Any model used to predict the effects of a merger must fit the facts of the industry in the sense that the model explains past market outcomes reasonably well. Many critical modeling choices can be justified or rejected by evidence gathered in the normal course of a merger investigation. The modeling exercise indicates kinds of evidence useful to gather and how to interpret it, while the evidence indicates whether any given model is appropriate. When the evidence cannot justify or reject an important choice, a sensitivity analysis should be done. A range of estimates should be reported that reflect the uncertainty in the model's predictions. ▪

---

[1] U.S. Dep't of Justice and Federal Trade Commission, Horizontal Merger Guidelines (1992, rev'd 1997), *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,104.

[2] On simulating the unilateral effects of mergers in branded consumer products industries, which is the most common application, see ABA ANTITRUST SECTION, ECONOMETRICS IN ANTITRUST ch. 11 (John D. Harkrider & Daniel L. Rubinfeld eds, forthcoming 2004) [hereinafter ECONOMETRICS]; Gregory J. Werden & Luke M. Froeb, *Simulation as an Alternative to Structural Merger Policy in Differentiated Products Industries*, in THE ECONOMICS OF THE ANTITRUST PROCESS 65 (Malcolm B. Coate & Andrew N. Kleit eds., 1996); Gregory J. Werden, *Simulating Unilateral Competitive Effects from Differentiated Products Mergers*, ANTITRUST, Spring 1997, at 27; Gregory J. Werden, *Simulating the Effects of Mergers in Differentiated Products Industries: A Practical Alternative to Structural Merger Policy*, 5 GEO. MASON L. REV. 363 (1997). For illustrative applications to actual mergers, see Jerry A. Hausman & Gregory K. Leonard, *Economic Analysis of Differentiated Products Mergers Using Real World Data*, 5 GEO. MASON L. REV. 321 (1997); Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry*, 31 RAND J. ECON. 395, 416 (2000); Gregory J. Werden, *Expert Report in* United States v. Interstate Bakeries Corp. and Continental Baking Co., 7 INT'L J. ECON. BUS. 139 (2000).

[3] Because it is difficult to generate reliable estimates of the actual price and output effects of mergers in most industries, there is scarce evidence on the accuracy of every method for predicting the competitive effects of mergers. As for merger simulation in particular, one study found merger simulation *under-predicted* the actual price effects of airline mergers. Craig Peters, Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry (U.S. Dep't of Justice, Antitrust Division, Economic Analysis Group Discussion Paper 03-1, Jan. 2003). But we find merger simulation ill-suited to the airline industry because pricing is not well explained by any oligopoly model that can be used in merger simulation. We also have doubts about the estimated "actual" price effects of the mergers in this study. Another study found simulation predicted reasonably well the effects of a merger in the ready-to-eat breakfast cereal industry. Nevo, *supra* note 2. That

conclusion, however, was not based on a detailed and reliable study of the actual effects of the merger.

[4] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993).

[5] Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 152 (1999).

[6] *Id.* at 141 ("[T]he trial judge's general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").

[7] *Daubert*, 509 U.S. at 591.

[8] General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

[9] Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000).

[10] *Id.* at 1055–57.

[11] In *American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), a highly respected econometrician's empirical model was excluded for purposes of proving damage causation because the model contained "too many assumptions and simplifications that are not supported by real-world evidence." In *Johnson Electric North America, Inc. v. Mabuchi Motor America Corp.*, 103 F. Supp. 2d 268, 280–87 (S.D.N.Y. 2000), the empirical analysis of another noted econometrician was excluded because it did "not 'fit' the facts of [the] case because it fail[ed] to take into account" key industry facts. In *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1039–41 (8th Cir. 1999), an empirical damage estimate was excluded because it inferred "causation without considering all independent variables that could affect the conclusion." Also of interest is *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760–61 (8th Cir. 2003), in which the plaintiffs' expert testimony, although "thorough, sophisticated, and often well-grounded in the relevant scientific literature," was excluded because of "excessive speculation" and a "disconnect" between the expert's analysis and the plaintiffs' "theory of liability."

[12] Information about the world is never perfect, and different sources of information often are inconsistent. The merging firms and other interested parties have incentives to slant the truth in ways that suit their interests and to avoid disclosing potentially enlightening information. Moreover, uninterested parties may not be forthcoming. Consequently, a merger investigation or trial cannot be expected to determine all facts with complete clarity and precision, and merger simulation should not be held to a higher standard of proof than is applied to other analysis. It simply may not be possible to fit *all* the "apparent facts" together in any sensible way.

[13] Different observers also perceive the facts differently or take different views of which facts are critical. If so, more than one approach may satisfy the demands of *Daubert*, leaving it to the trier of fact or the enforcement agency to determine which, if either, to credit. That determination is most fruitfully made if the competing analyses are accompanied by explicit statements of key assumptions and their justifications.

[14] Sensitivity analysis is not required for any modeling choice that is well justified by its fit with the facts. When the fit with the facts may be in dispute, however, it is useful to undertake a sensitivity analysis in addition to justifying a choice. For some modeling choices—for example, the oligopoly model used—no useful sensitivity analysis may be possible; therefore, such choices require solid justifications.

[15] If model parameters are not derived from econometrics, there may be no sampling error, although sampling error still may be associated with the measurement of prices and shares. Moreover, key economic constructs, such as marginal cost, are necessarily measured with error, so measurement error may replace sampling error when demand elasticities are inferred from the observed relationships between prices and costs rather than estimated econometrically.

[16] In addition, if the predicted price increases absent any synergies are close to zero, modest marginal-cost reductions from merger synergies would cause the merging firms to *decrease* prices, and the merger might have other offsetting consumer benefits, such as speeding the introduction of new products.

[17] The model is named for Joseph Louis François Bertrand, who posited it in *Review of "Théorie Mathématique de la Richesse Sociale*," and "*Recherches sur les Principes Mathématiques de la Théorie des Richesses*," 67 JOURNAL DES SAVANTS 499 (1883). A modern translation appears in COURNOT OLIGOPOLY 73 (Andrew F. Daughety ed., 1988). For an introductory presentation of the model, *see* DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 166–72 (3d ed. 2000). For more technical treatments, see Carl Shapiro, *Theories of Oligopoly Behavior*, in 1 HANDBOOK OF

Industrial Organization 329, 343–48 (Richard Schmalensee & Robert D. Willig eds., 1989); Xavier Vives, Oligopoly Pricing: Old Ideas and New Tools ch. 5 (1999).

[18] A Bertrand equilibrium is a Nash non-cooperative equilibrium. The concept was introduced by mathematician John F. Nash, Jr., and it earned him a share of the 1994 Nobel Memorial Prize in Economics.

[19] The price-cost margin is price minus short-run marginal cost, all divided by price. The authors of this article do not agree on exactly what the comparison between actual and predicted margins shows or how important it is, but several aspects of this comparison are detailed below.

[20] Calibrating models to observable data distinguishes the principal policy use of structural models from principal academic use of these models. In addition, much academic research is content with determining the signs of the various effects, while in policy applications, the magnitudes of the effects tend to be critical. In merger enforcement, it is plainly insufficient to determine that a merger will raise price by some—possibly trivial—amount. Typically, modeling assumptions make that a forgone conclusion, and the critical issue is whether the merger likely would raise prices substantially.

[21] By construction, the properly calibrated simulation model normally perfectly "predicts" the set of prices and shares to which the model is calibrated. In some cases, however, a perfect fit may be impossible, and the calibration entails determining the parameters making the model fit the data best.

[22] See generally Econometrics, supra note 2, App. V; Daniel Hosken et al., Demand System Estimation and Its Application to Horizontal Merger Analysis (FTC Bureau of Economics, Working Paper 246, Apr. 2002), available at http://www.ftc.gov/be/workpapers/wp246.pdf.

[23] Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000). "The model also failed to account for market events that both sides agreed were not related to any anticompetitive conduct . . . ." Id.

[24] Available accounting data on the variable costs associated with the production of branded consumer products commonly make it possible to produce reasonable estimates of the relevant short-run marginal costs. However, there may be significant conceptual issues in some cases that make it difficult to estimate marginal costs. For example, significant opportunity costs may be associated with the use of scarce factors of production that have alternative profitable uses.

[25] For an illustration in which a testifying expert (one of the authors of this article) found the Bertrand model to explain pre-merger pricing very well, see Werden, Expert Report, supra note 2.

[26] United States v. WorldCom, Inc., No. 1:00CV01526 (D.D.C. filed June 27, 2000). The parties announced the termination of their merger agreement on July 13, 2000.

[27] For a discussion of demand estimation in the case, see Econometrics, supra note 2, App. IA.

[28] The available price data masked complexity and variation of the actual terms of the calling plans among which consumers selected. The price data also reflected a mix of current and legacy prices, as well as a variety of current offerings, and the observed average prices obscured characteristics on which consumers based their choices among carriers. In addition, consumers appeared to exhibit considerable inertia in responding to new calling plans, and many likely were ill-informed.

[29] The logit model of demand is built on this assumption. On that model and merger simulation using it, see Gregory J. Werden, Luke M. Froeb & Timothy J. Tardiff, The Use of the Logit Model in Applied Industrial Organization, 3 Int'l J. Econ. Bus. 83 (1996); Gregory J. Werden & Luke M. Froeb, The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy, 10 J.L. Econ. & Org. 407 (1994).

[30] We use the prices and shares reported in Econometrics, supra note 2, App. IA, table 2.

[31] The same sort of analysis could be used as an initial screening device, i.e., a quick method for determining whether a merger plausibly might produce significant anticompetitive effects. Merger simulation of the sort described here is well-suited to such a use because little data is required for model calibration. See Gregory Werden & Luke Froeb, Calibrated Economic Models Add Focus, Accuracy, and Persuasiveness to Merger Analysis, in The Pros and Cons of Merger Control 63 (Swedish Competition Authority 2002). We believe such screening is a productive use of merger simulation, and because the predictions are not given significant weight, the reliability standards advocated here do not apply.

[32] The price increases for the merged firm are substantially greater than the market-wide average price increase, and the former price increases could be much greater than shown here if consumers perceived WorldCom and Sprint as offering particularly close substitutes.

[33] The available data in any particular case almost certainly contain too much noise and too little price variation for an empirical determination of functional form.

[34] See Philip Crooke, Luke Froeb, Steven Tschantz & Gregory J. Werden, The Effects of Assumed Demand Form on Simulated Postmerger Equilibria, 15 Rev. Indus. Org. 205 (1999).

[35] Both axes of the graph have been translated somewhat to make the relevant ranges of the demand curves appear larger. Marginal cost was assumed to be 4, making the competitive price 4 as well. The highest of the monopoly prices, with isoelastic demand, is 8, and the lowest of the monopoly prices, with linear demand, is 6.

[36] See Gregory J. Werden, A Robust Test for Consumer Welfare Enhancing Mergers Among Sellers of Differentiated Products, 44 J. Indus. Econ. 409 (1996). Thus, CMCRs can be used as a critical benchmark for assessing the efficiency claims of the merging parties. See Luke M. Froeb, Steven Tschantz & Gregory J. Werden, Pass Through Rates and the Price Effects of Mergers, Int'l J. Indus. Org. (forthcoming 2004). Although no assumption about demand curvature is required to compute CMCRs, such an assumption has to be made if the demand elasticities used to compute the CMCRs are estimated econometrically, and such estimates are sensitive to the assumption made. See Halbert White, Using Least Squares to Approximate Unknown Regression Functions, 21 Int'l Econ. Rev. 149 (1980).

[37] See, e.g., Nevo, supra note 2; Hausman & Leonard, supra note 2; Atanu Saha & Peter Simon, Predicting the Price Effects of Mergers with Polynomial Logit Demand, 7 Int'l J. Econ. Bus. 149 (2000).

[38] See Luke Froeb, Steven Tschantz & Gregory J. Werden, Vertical Restraints and the Effects of Upstream Horizontal Mergers (unpublished paper Apr. 2, 2002).

[39] Although the retail and manufacturing level demand elasticities are the same, the prices are different, and that must be accounted for.

[40] See Froeb, Tschantz & Werden, supra note 38; Daniel P. O'Brien & Greg Shaffer, Bargaining, Bundling, and Clout: The Portfolio Effects of Horizontal Mergers (FTC Bureau of Economics, Working Paper 266, Dec. 2003), available at http://www.ftc.gov/be/workpapers/wp266.pdf.

[41] In FTC v. H.J. Heinz Co., 246 F.3d 708, 719 (D.C. Cir. 2001), an "impact at the consumer level" was not required to condemn the merger of two baby food manufacturers. The court held that "the antitrust laws assume that a retailer faced with an increase in the cost of one of its inventory items 'will try so far as competition allows to pass that cost on to its customers.'" Id. (quoting In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 605 (7th Cir. 1997)). It is not entirely clear, however, that Section 7 protects the retailers in this particular scenario from having to share some of their monopoly profits with manufacturers.

[42] See Froeb, Tschantz & Werden, supra note 38.

[43] See Werden, Expert Report, supra note 2.

[44] See Froeb, Tschantz & Werden, supra note 38 (the models are described in the two paragraphs following note 40, supra). There have been several empirical analyses of the retailer-manufacturer relationship. See K. Sudhir, Structural Analysis of Manufacturer Pricing in the Presence of a Strategic Retailer, 20 Marketing Sci. 244 (2001); Sofia Berto Villas-Boas, Vertical Contracts Between Manufacturers and Retailers: An Empirical Analysis (unpublished paper May 2003), available at http://ist-socrates.berkeley.edu/~villas/vertical.pdf.

[45] This article concentrates on branded consumer products, because merger simulation has most often been used with such products. There are, however, other possible applications of merger simulation, and they may raise additional important issues. For an example of a different application involving quite different issues, see Luke Froeb, Steven Tschantz & Philip Crooke, Bertrand Competition with Capacity Constraints: Mergers Among Parking Lots, 113 J. Econometrics 49 (2003). With parking lots, as with airlines and hotels, a large fraction of total cost is incurred in creating capacity, which in the short term is fixed, and its costs are sunk. A competitor's short-term problem is to maximize the revenue, net of variable costs, that can be generated using its fixed capacity. The optimal strategy for parking lots is likely to be to set the highest price that fills up the lots. This likely remains the optimal strategy after a merger, so a merger of directly competing parking lots may have no short-term effect on prices.

# Meta MIL #7, Exhibit G

# LESSONS FROM *AT&T/TIME WARNER*





## BY DENNIS W. CARLTON, MARK A. ISRAEL & ALLAN L. SHAMPINE[1]

  

1 David McDaniel Keller Professor of Economics, Booth School of Business, University of Chicago and Senior Managing Director, Compass Lexecon, email: dcarlton@compasslexecon.com; Senior Managing Director, Compass Lexecon, email: misrael@compasslexecon.com; Executive Vice President, Compass Lexecon, email: ashampine@compasslexecon.com. The views expressed here are our own.

# CPI ANTITRUST CHRONICLE
## JULY 2019

**CPI Talks…**
*…with Bruce Hoffman*



**Lessons from *AT&T/Time Warner***
*By Dennis W. Carlton, Mark A. Israel*
*& Allan L. Shampine*



**Modernizing the Vertical Merger Guidelines**
*By Steven C. Salop*



***AT&T/Time Warner* and Antitrust Policy**
**Toward Vertical Mergers**
*By Gregory S. Crawford, Robin S. Lee,*
*Michael D. Whinston & Ali Yurukoglu*



**Can Vertical Merger Analysis be Salvaged**
**After the *AT&T/Time-Warner* Merger**
**Decision?**
*By Malcolm B. Coate*



**The Law Deficit in Merger Cases**
*By Thomas C. Arthur*



Visit www.competitionpolicyinternational.com for
access to these articles and more!

CPI Antitrust Chronicle July 2019

www.competitionpolicyinternational.com
Competition Policy International, Inc. 2019© Copying, reprinting, or distributing
this article is forbidden by anyone other than the publisher or author.

# I. INTRODUCTION

The *AT&T/Time* Warner merger trial represented the U.S. Department of Justice's ("DOJ") first vertical merger challenge in decades, and the parties' arguments and courts' findings are being closely scrutinized.[2] The authors were retained by AT&T and Time Warner, initially to provide economic analyses of the antitrust issues raised by the merger to the Antitrust Division of the Department of Justice, and ultimately to assist with and testify in the litigation brought by the DOJ to block the deal.[3] In our opinion, there are three key lessons from the litigation for future antitrust practice: (1) history matters; (2) be careful of predictive vertical models; and (3) efficiencies matter. We provide some high-level thoughts on each in this article.

# II. HISTORY MATTERS

The first key lesson from the *AT&T/Time Warner* trial is that history matters. While there are always differences between transactions, that does not make every transaction *sui generis*. Rather, as in so many fields of study, experiences from the past are often our best guide to predicting the future; outcomes of previous mergers, analyzed through the lens of economic theory and quantitative methods, provide critical evidence in predicting the effects of proposed mergers. Indeed, the Horizontal Merger Guidelines stress the importance of analyzing past mergers and associated natural experiments as part of merger review.[4]

In the *AT&T/Time Warner* litigation, there were several prior vertical integration and disintegration events available to help assess whether it was true, as the DOJ claimed, that vertical integration would harm compe-

---

2 On June 12, 2018, following almost two years of regulatory proceedings and a six-week trial, Judge Richard J. Leon ruled in favor of AT&T and Time Warner, permitting the planned merger to proceed without conditions. On February 26, 2019, the U.S. Court of Appeals rejected the Department of Justice's appeal of the US District Court's opinion allowing the merger of AT&T and Time Warner to proceed without conditions. The Department of Justice announced soon thereafter that it would not seek additional review of this decision. Memorandum Opinion, Judge Leon, *United States of America v. AT&T Inc., DirecTV Group Holdings, LLC, and Time Warner Inc.*, 1:17-cv-02511-RJL, June 12, 2018 ("Judge Leon Opinion"). Opinion by Judge Rogers, *United States of America, Appellant v. AT&T, Inc., et al., Appellees*, 1:17-cv-02511, USCA Case 18-5214, February 26, 2019 ("Appellate Opinion"). Diane Bartz & David Shepardson, "U.S. Justice Department will not appeal AT&T, Time Warner merger after court loss," Reuters Business news, February 26, 2019, https://www.reuters.com/article/us-timewarner-m-a-at-t/us-justice-department-will-not-appeal-att-time-warner-merger-after-court-loss-idUSKCN1QF1XB.

3 Dr. Carlton testified at trial on behalf of AT&T and his testimony was cited repeatedly by both Judge Leon and Judge Rogers. Dr. Israel was the primary economic expert during the almost two-year investigation by the Department of Justice leading up to the trial. Dr. Shampine was the overall chief of staff for the Compass Lexecon engagement.

4 U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, August 19, 2010, § 2.1.2. To be clear, the relevant goal in a retrospective is not whether prices changed — in the video industry, prices have been going up for decades whether firms merged or not. Rather, the goal is to isolate the effect of the merger.

tition.[5] We paid particular attention to the vertical merger between Comcast and NBCU, which had many of the same features as the *AT&T/Time Warner* transaction. Our econometric study of that transaction showed that the harmful effects that the DOJ claimed should have happened were not there.[6] The courts relied heavily on that evidence.[7]

In addition, recent marketplace events illustrated the importance of efficiencies generated by vertically integrated firms in the video industry. In particular, the growth of vertically integrated firms with innovative ways of creating, marketing, and monetizing content has been perhaps the single most important development in the industry over the past several years. For example, Netflix is vertically integrated, as both a content creator and a distributor. And its success rests heavily on its use of data on who is watching its shows and what they are watching to facilitate the creation and marketing of popular content. Prior to the merger, AT&T had such data but was not creating content, and Time Warner was creating content but did not have such data. Hence, the Netflix experience demonstrated that AT&T and Time Warner had complementary assets (direct relationships with and information about consumers at AT&T, and content at Time Warner) that were being underutilized pre-merger, largely because AT&T and Time Warner had trouble figuring out how to coordinate pre-merger and did not do so optimally. The merger was driven in part by the desire to adopt the structure that firms like Netflix have demonstrated is successful in making use of data to improve content creation. Again, the courts recognized the importance of this evidence.[8]

## III. BE WARY OF PREDICTIVE VERTICAL MODELS

The second key lesson from the *AT&T/Time Warner* litigation is that predictive models of vertical industrial structure based on Nash-in-Nash bargaining models can be complicated and fragile, in the sense that changes in some theoretical assumptions can matter a lot and the predictions of some models can change substantially given reasonable changes to input parameter estimates, even if one accepts the core economic premises and logic of the model being used. As a result, such models, if feasible, should be tested to see whether they would have predicted the outcomes of historical events, such as past mergers, before relying on them.

In the testimony in the *AT&T/Time Warner* litigation, we highlighted three particular flaws in the government's model, which the court credited. First, core economic assumptions made in the model were inconsistent with the facts of the case. Second, the predictions of the model were not robust — reasonable changes in the empirical inputs of the model (e.g. margins) flipped the sign of the prediction from net harm to net benefit. Third, the predictions of the model were contradicted by actual historical experience.

---

5 While parts of the record are not public, redacted copies of the trial transcripts are publicly available. The direct testimony of the government's economic expert Dr. Shapiro was on April 11th, 2018 and Dr. Carlton's was on April 12th, 2018. See also the DOJ website with redacted copies of court filings and DOJ expert reports. https://www.justice.gov/atr/case/us-v-att-inc-directv-group-holdings-llc-and-time-warner-inc.

6 The DOJ referenced a non-public FCC analysis that claimed to find some price increases as a result of the DIRECTV/Fox integration. The full details of that analysis are not publicly available (and were not available to the parties in the litigation), but the general methodology was described by the FCC based on SNL Kagan data and a limited time period. Those data have since been updated by SNL Kagan. We studied the event using SNL Kagan's updated data for the same time period and found no evidence of a price increase. Our analysis was not disputed by the DOJ.

7 See, e.g. Judge Leon Opinion, §III.B.4 — "Real-World Evidence Indicating That Prior Vertical Integration of Programmers and Distributors Has Not Affected Affiliate Fee Negotiations Undermines the Government's Increased-Leverage Theory of Harm," and §III.B.4.a — "Professor Carlton's Econometric Analyses of Prior Vertical Transactions Found No Statistically Significant Effects on Content Pricing"; and Appellate Opinion, p. 21 ("The district court's statements identified by the government, then, do not indicate that the district court misunderstood or misapplied the Nash bargaining theory but rather, upon considering whether in the context of a dynamic market where a similar merger had not resulted in a 'statistically significant increase in content costs,' the district court concluded that the theory inaccurately predicted the post-merger increase in content costs during affiliate negotiations.")

8 The Comcast/NBCU analysis just discussed was thus conservative in light of subsequent entry that increased competition and increasingly important efficiencies from vertical integration. Judge Leon Opinion, pp. 2-3 ("Watching vertically integrated, data-informed entities thrive as television subscriptions and advertising revenues declined, AT&T and Time Warner concluded that each had a problem that the other could solve: Time Warner could provide AT&T with the ability to experiment with and develop innovative video content and advertising offerings for AT&T's many video and wireless customers, and AT&T could afford Time Warner access to customer relationships and valuable data about its programming.").

www.competitionpolicyinternational.com
Competition Policy International, Inc. 2019© Copying, reprinting, or distributing
this article is forbidden by anyone other than the publisher or author.

With respect to the core economic assumptions, the government used a vertical model that had two stages. The first (upstream) stage modeled the determination of input (i.e. content) prices using a Nash bargaining (Nash-in-Nash) model. The second (downstream) stage modeled the determination of prices to final consumers (i.e. viewers of content) — making use of the input prices to each firm established in the prior stage — using a horizontal merger simulation model. The overall model made a number of strong assumptions. We focus on one particular assumption here.[9]

In the government's Nash bargaining model in the upstream market the ultimate terms of the bargain depend on the outcome that would occur if there were no agreement. For example, the terms of the agreement pre-merger between Time Warner and Comcast would depend on what Time Warner and Comcast would do — and thus what their respective profits would be — if those parties failed to reach an agreement and there was a blackout of Time Warner on Comcast. In order to predict the effects of the merger, one asks how, post-merger, the no-agreement points change and thus how the outcome of the bargaining process is predicted to change. Hence, in such models, getting the no-agreement point right is critical for accurate predictions of merger effects. But in this case, the government's expert economist got this critical point wrong: The expert ignored that AT&T had agreed not to black out any Time Warner content in its negotiations with rivals such as Comcast, and instead had agreed to continue to supply Time Warner content at either a mutually agreed upon price or at a price that a neutral arbitrator could set. As such, contrary to the government's expert's assumption, the no-agreement point was definitely not a permanent blackout. The courts agreed with our criticism that this error by itself invalidated the government's model.[10]

Regarding the model's lack of robustness with respect to reasonable changes in inputs, in this case, the entire exercise depended on accounting for the desirable effects from efficiencies and the undesirable effects from raising rivals' costs to determine the net effect of the merger on prices. And the net effect was predicted to be quite small even under the government's expert's parameter estimates, meaning that small changes in the parameter estimates not only changed the magnitude of the predicted price effect, but actually flipped the sign of the effect, changing a predicted net harm into a predicted net benefit.

More precisely, the government's model, like most vertical models, automatically generated an efficiency effect (the elimination of double marginalization), which causes the merging party, in this case DIRECTV, to lower its prices to final consumers. This efficiency effect increases competition and causes DIRECTV's rivals such as Comcast to lower their prices in response. But the model also predicted another effect in which the merging party, DIRECTV, has an incentive to raise the prices of Time Warner content for rivals such as Comcast, causing the rivals to raise their prices to final consumers, thereby enabling the merging party (i.e. DIRECTV) to raise its prices to final consumers. Because of these offsetting effects, the predictions of the government's model, and often of vertical models generally, on the welfare of all consumers depended heavily on the estimates used for, among other things, profit margins and the intensity of competition for final consumers.

In assessing the merger's ultimate effect on prices, the analyst needs to confirm that the results are not sensitive to reasonable choices for the underlying model inputs — even if one assumes that all the model's underlying assumptions on how bargaining occurs are correct. In the *AT&T/Time Warner* litigation, we were able to show that the small harmful effects that the government's expert predicted became procompetitive effects when one used more reasonable and up-to-date data. The court concluded that in light of that sensitivity, the government had failed to meet its burden of proof.[11]

---

9 Many other assumptions were also clearly inconsistent with the facts of the industry. For example, the model assumed that each negotiation between a content provider and a distributor is completely independent of every other negotiation. Given the common usage of most favored nations clauses in licenses, that assumption is clearly incorrect. However, there is currently no generally accepted way to incorporate interdependent negotiations into Nash-in-Nash models like the one the government's expert used. Similarly, the government's expert's model did not account for the many long-term contracts in place.

10 See, e.g. Appellate Opinion, p. 23 ("The post-merger arbitration agreements would prevent the blackout of Turner Broadcasting content while arbitration is pending. ... Consequently, the government's challenges to the district court's treatment of its economic theories becomes largely irrelevant, at least during the seven-year period [of the arbitration commitment].").

11 See, e.g. Judge Leon Opinion, §III.C.2 — The Evidence Is Insufficient to Support the Inputs and Assumptions Incorporated into Professor Shapiro's Bargaining Model, and p. 149 ("Accordingly, neither Professor Shapiro's model, nor his testimony based on it, provides me with an adequate basis to conclude that the challenged merger will lead to *any* raised costs on the part of distributors *or* consumers – much less consumer harms that outweigh the conceded $350 million in annual cost saving to AT&T's customers.").

www.competitionpolicyinternational.com
Competition Policy International, Inc. 2019© Copying, reprinting, or distributing this article is forbidden by anyone other than the publisher or author.

4

Finally, given that the government's vertical model depended on a number of strong assumptions and its predictions were not robust to reasonable changes in the underlying parameter estimates, a fact finder might understandably be skeptical of the model unless it can be shown to have some track record of making accurate predictions in the industry. Similar models to the government's predicted higher prices (net harm) in prior cases, and the government did not dispute that its model would have done so as well, but we demonstrated that such higher prices did not, in fact, occur.[12] Thus, the government model's predictions were contradicted by prior experience in the industry, and the courts noted that fact.[13]

## IV. EFFICIENCIES MATTER

The third key lesson, which may have a profound effect on antitrust litigation going forward, is that efficiencies (e.g. cost savings generated by the merger) matter. It may seem obvious that efficiencies should matter, but government agencies and courts may dismiss efficiencies as not "cognizable" for various reasons, and some economists have questioned the role efficiencies should play in a merger analysis.[14] In the *AT&T/Time Warner* litigation, as we noted, efficiencies were (appropriately) inherent to the government's model, and the government's expert's approach was focused on determining the net effect on prices. The courts did not take issue with the government's basic approach, and Judge Leon noted specifically that while the government had failed to meet its burden of proof in establishing there were *any* likely harms, all parties agreed that there would be efficiencies that would benefit consumers.[15] The fact that the courts credited efficiencies as credible, cognizable and relevant to the analysis of net harm is likely to be very important for the analysis of future mergers.

While the *AT&T/Time Warner* litigation concerned a vertical transaction, the principle of crediting efficiencies as central to merger analysis is not, or at least should not be, limited to vertical mergers. The elimination of double marginalization efficiencies that all parties agreed existed and were relevant were effectively cost savings that offset price increases. And all parties agreed that one should weigh the efficiencies' effects against any incentive to raise prices in order to evaluate the net effect on consumers.[16] There is no economic or logical reason why this approach should be unique to vertical transactions. To the contrary, as a matter of economics, the same logic applies to horizontal mergers.

In conclusion, analysis of vertical mergers can be complicated and difficult. In any merger inquiry, the examination of past mergers can be useful in identifying the important economic forces at work in the industry. Existing models of vertical mergers are still being developed. These models should be carefully evaluated in light of industry history and tested for robustness to reasonable alternative theoretical assumptions and input values based on the facts of the case. Furthermore, analyses should not be limited just to potential harms. Efficiencies are also important and should be accounted for in merger analyses, whether vertical or horizontal.

---

12 Notice that this is a different test than asking whether past vertical integration has been harmful. It is a direct test of the specific model. However, it is not always practical to implement such tests. For example, available data may not be sufficient to determine with any precision whether a predicted effect actually occurred or not. In particular, if a practice has always been in place, it will likely be difficult to empirically quantify its effects since there would be no contrasting example of pricing in the absence of that practice.

13 See, e.g. Appellate Opinion, p. 21 ("The district court's statements identified by the government, then, do not indicate that the district court misunderstood or misapplied the Nash bargaining theory but rather, upon considering whether in the context of a dynamic market where a similar merger had not resulted in a 'statistically significant increase in content costs,' the district court concluded that the theory inaccurately predicted the post-merger increase in content costs during affiliate negotiations.").

14 The Horizontal Merger Guidelines, for example, argue that "Efficiencies are difficult to verify and quantify." U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, August 19, 2010, § 10. See also Jonathan Baker, Nancy Rose, Steven Salop & Fiona Scott Morton, "Five Principles for Vertical Merger Enforcement Policy," Georgetown University Law Center, 2019, available at https://scholarship.law.georgetown.edu/facpub/2148, noting that there is a wide range of views on the treatment of vertical mergers and efficiencies and arguing that not only should there be no presumption of efficiencies from vertical mergers but there should be no "safe harbor" unless both firms compete in unconcentrated markets.

15 Judge Leon Opinion, p. 149 ("Accordingly, neither Professor Shapiro's model, nor his testimony based on it, provides me with an adequate basis to conclude that the challenged merger will lead to *any* raised costs on the part of distributors *or* consumers – much less consumer harms that outweigh the conceded $350 million in annual cost savings to AT&T's customers."). Appellate Opinion, p. 29 ("The district court found, and the government agreed, that the merger would result in cost savings as a result of EDM.").

16 The government did claim that the District Court erred in misunderstanding Nash bargaining and claiming that firms did not maximize profits. However, as described above, the government's claims of error were irrelevant to the main flaws in the government's case and, as the appellate court found, those claims of error were themselves incorrect.

www.competitionpolicyinternational.com
Competition Policy International, Inc. 2019© Copying, reprinting, or distributing
this article is forbidden by anyone other than the publisher or author.



# CPI Subscriptions

CPI reaches more than 20,000 readers in over 150 countries every day. Our online library houses over 23,000 papers, articles and interviews.

Visit competitionpolicyinternational.com today to see our available plans and join CPI's global community of antitrust experts.



# Meta MIL #7, Exhibit H

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

# Reference Guide on Survey Research

SHARI SEIDMAN DIAMOND

*Shari Seidman Diamond, J.D., Ph.D., is the Howard J. Trienens Professor of Law and Professor of Psychology, Northwestern University, and a Research Professor, American Bar Foundation, Chicago, Illinois.*

CONTENTS

I.  Introduction, 361
    A.  Use of Surveys in Court, 363
    B.  Surveys Used to Help Assess Expert Acceptance in the Wake of *Daubert*, 367
    C.  Surveys Used to Help Assess Community Standards: *Atkins v. Virginia*, 369
    D.  A Comparison of Survey Evidence and Individual Testimony, 372
II. Purpose and Design of the Survey, 373
    A.  Was the Survey Designed to Address Relevant Questions? 373
    B.  Was Participation in the Design, Administration, and Interpretation of the Survey Appropriately Controlled to Ensure the Objectivity of the Survey? 374
    C.  Are the Experts Who Designed, Conducted, or Analyzed the Survey Appropriately Skilled and Experienced? 375
    D.  Are the Experts Who Will Testify About Surveys Conducted by Others Appropriately Skilled and Experienced? 375
III. Population Definition and Sampling, 376
    A.  Was an Appropriate Universe or Population Identified? 376
    B.  Did the Sampling Frame Approximate the Population? 377
    C.  Does the Sample Approximate the Relevant Characteristics of the Population? 380
    D.  What Is the Evidence That Nonresponse Did Not Bias the Results of the Survey? 383
    E.  What Procedures Were Used to Reduce the Likelihood of a Biased Sample? 385
    F.  What Precautions Were Taken to Ensure That Only Qualified Respondents Were Included in the Survey? 386

*Reference Guide on Survey Research*

# II. Purpose and Design of the Survey

## A. Was the Survey Designed to Address Relevant Questions?

The report describing the results of a survey should include a statement describing the purpose or purposes of the survey. One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy (e.g., to estimate damages in an antitrust suit or to assess consumer confusion in a trademark case). Surveys not conducted specifically in preparation for, or in response to, litigation may provide important information,[62] but they frequently ask irrelevant questions[63] or select inappropriate samples of respondents for study.[64] Nonetheless, surveys do not always achieve their stated goals. Thus, the content and execution of a survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court.[65] Moreover, if a survey was not designed for purposes of litigation, one source of bias is less likely: The party presenting the survey is less likely to have designed and constructed the survey to provide evidence supporting its side of the issue in controversy.

---

62. *See, e.g.,* Wright v. Jeep Corp., 547 F. Supp. 871, 874 (E.D. Mich. 1982). Indeed, as courts increasingly have been faced with scientific issues, parties have requested in a number of recent cases that the courts compel production of research data and testimony by unretained experts. The circumstances under which an unretained expert can be compelled to testify or to disclose research data and opinions, as well as the extent of disclosure that can be required when the research conducted by the expert has a bearing on the issues in the case, are the subject of considerable current debate. *See, e.g.,* Joe S. Cecil, *Judicially Compelled Disclosure of Research Data,* 1 Cts. Health Sci. & L. 434 (1991); Richard L. Marcus, *Discovery Along the Litigation/Science Interface,* 57 Brook. L. Rev. 381, 393–428 (1991); *see also Court-Ordered Disclosure of Academic Research: A Clash of Values of Science and Law,* Law & Contemp. Probs., Summer 1996, at 1.

63. *See* Loctite Corp. v. National Starch & Chem. Corp., 516 F. Supp. 190, 206 (S.D.N.Y. 1981) (marketing surveys conducted before litigation were designed to test for brand awareness, while the "single issue at hand . . . [was] whether consumers understood the term 'Super Glue' to designate glue from a single source").

64. In *Craig v. Boren,* 429 U.S. 190 (1976), the state unsuccessfully attempted to use its annual roadside survey of the blood alcohol level, drinking habits, and preferences of drivers to justify prohibiting the sale of 3.2% beer to males under the age of 21 and to females under the age of 18. The data were biased because it was likely that the male would be driving if both the male and female occupants of the car had been drinking. As pointed out in 2 Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy: Tort Law, Evidence, and Health 527 (1988), the roadside survey would have provided more relevant data if all occupants of the cars had been included in the survey (and if the type and amount of alcohol most recently consumed had been requested so that the consumption of 3.2% beer could have been isolated).

65. *See* Merisant Co. v. McNeil Nutritionals, LLC, 242 F.R.D. 315 (E.D. Pa. 2007).

# Meta MIL #7, Exhibit I

**Filed Under Seal**

# Meta MIL #7, Exhibit J

### Filed Under Seal

# Meta MIL #7, Exhibit K

**Filed Under Seal**

# Meta MIL #7, Exhibit L

**Filed Under Seal**

# Meta MIL #7, Exhibit M

**Filed Under Seal**

# Meta MIL #7, Exhibit N

O962FTC1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     FEDERAL TRADE COMMISSION,
 3
                    Plaintiff,              New York, N.Y.
 4
              v.                            24 Civ. 3109 (JLR)
 5
     TAPESTRY, INC.,  and CAPRI
 6   HOLDINGS LIMITED,
 7                   Defendants.
     ------------------------------x        Remote Hearing
 8
                                            September 6, 2024
 9                                          10:05 a.m.
10   Before:
11                   HON. JENNIFER L. ROCHON,
12                                          District Judge
13
14                        APPEARANCES
15   FEDERAL TRADE COMMISSION
          Attorneys for Plaintiff
16   BY:  ABBY L. DENNIS
          FRANCES ANNE JOHNSON
17        ANDREW LOWDON
          VICTORIA SIMS
18
19   LATHAM & WATKINS, LLP
          Attorneys for Defendant Tapestry, Inc.
20   BY:  DAVID JOHNSON
          ALFRED PFEIFFER
21        LAWRENCE BUTERMAN
          JENNIFER GIORDANO
22
23   WACHTELL LIPTON ROSEN & KATZ
          Attorneys for Defendant Capri Holdings Limited
24   BY:  ELAINE GOLIN
          ADAM GOODMAN
25        BRITTANY FISH
```

O96Qftc2

1   reliable and recognized in the fields of economics.  *See, e.g.,*

2   *United States v. Anthem,* 236 F.Supp.3d 171, 217, 220 (D.D.C.

3   2017).  And the parenthetical reads (crediting diversion ratio

4   analysis of government's expert which utilized internal company

5   data of past bidding activity).

6          With respect to whether an input into his analysis;

7   namely, the particular survey questions chosen are flawed will

8   be assessed by this Court in deciding the weight to afford this

9   opinion.  Therefore, the Court will not exclude it at this

10  point and will evaluate it in due course, just as was done in

11  *H&R Block.*

12         With respect to am Jeff Gennette and Karen Giberson,

13  the Court next analyzes plaintiff's motion to exclude the

14  testimony of those individuals at Docket Nos. 171 and 176.

15  Mr. Gennette is the former chief executive officer and chairman

16  of Macy's, Inc., one of the largest retailers of handbags and

17  has had more than 40 years of experience at Macy's, which

18  includes Bloomingdale's in various roles.  Docket No. 281 at

19  2-3.  Ms. Giberson has more than 30 years of experience in the

20  handbag industry and is presently the president and CEO of the

21  Accessories Council and Editor-in-Chief of a magazine

22  publication dedicated to fashion accessories. Dkt. 283 at 1.

23         Plaintiff argues that the Court should exclude the

24  opinions and testimony of both Mr. Gennette and Ms. Giberson

25  because they offer opinions that are not based on reliable