# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

       Plaintiff,

       v.

META PLATFORMS, INC.,

       Defendant.

Case No. 1:20-cv-03590-JEB

## META PLATFORMS, INC.'S REPLY SUPPORTING ITS
## PRETRIAL MOTIONS *IN LIMINE*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... ii

I.    REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE
      EVIDENCE OR ARGUMENT IN SUPPORT OF NEW AND UNDISCLOSED
      MARKET DEFINITION .........................................................................1

      A.    The Court Has Ample Authority To Hold The FTC To Its Interrogatory
            Response.................................................................................3

      B.    The Court Should Exclude Evidence And Argument Inconsistent With The
            FTC's Avowed "All-In" Market............................................................5

II.   REPLY SUPPORTING META'S MOTION *IN LIMINE* TO EXCLUDE FROM
      TRIAL PREVIOUSLY DISMISSED OR ABANDONED CLAIMS AND
      ALLEGATIONS ...............................................................................10

III.  REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE
      TESTIMONY AND ARGUMENT REGARDING META'S HART-SCOTT-
      RODINO PRODUCTIONS ......................................................................14

IV.   REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE
      EVIDENCE OR ARGUMENT REGARDING INFLAMMATORY MATTERS.............17

V.    REPLY SUPPORTING META'S MOTION *IN LIMINE* TO EXCLUDE
      FOREIGN REGULATORY FILINGS ..........................................................22

VI.   REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE
      PROFESSOR RIM'S SPECULATION ABOUT HOW WHATSAPP MIGHT
      HAVE DEVELOPED BUT FOR THE ACQUISITION ......................................28

VII.  REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE
      PROFESSOR HEMPHILL'S MISUSE OF CONSUMER SURVEYS TO DERIVE
      "MARKET SHARES" ..........................................................................32

# TABLE OF AUTHORITIES*

**Page**

## CASES

* *Arsanjani v. United States*, 2023 WL 3231101 (D.D.C. May 3, 2023),
    *aff'd*, 2024 WL 718726 (D.C. Cir. Feb. 20, 2024) ...................................................29, 30

*Bair v. Callahan*, 664 F.3d 1225 (8th Cir. 2012) .......................................................................14

*Barry v. Trs. of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside Loc.
    Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91
    (D.D.C. 2006) ......................................................................................................................26

*Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*,
    315 F. Supp. 3d 101 (D.D.C. 2018) ....................................................................................38

*Brooks v. Chrysler Corp.*, 786 F.2d 1191 (D.C. Cir. 1986) ........................................................22

*Brown v. Perez*, 835 F.3d 1223 (10th Cir. 2016) ........................................................................25

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..............................................................26

*DCFS USA, LLC v. Dist. of Columbia*, 803 F. Supp. 2d 29 (D.D.C. 2011) ..................................4

*Doe 2 v. Esper*, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) .....................................................16

*English v. Dist. of Columbia*, 651 F.3d 1 (D.C. Cir. 2011) ........................................................12

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) ...........................................................6

*FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062
    (D.N.J. Aug. 4, 2021) ....................................................................................................35, 36

*FTC v. Kroger Co.*, 2024 WL 5053016 (D. Or. Dec. 10, 2024) ............................................35, 36

*FTC v. Meta Platforms, Inc.*, 2024 WL 4772423 (D.D.C. Nov. 13, 2024) ................2, 5, 8, 19, 36

*FTC v. Qualcomm Inc.*, 2018 WL 5848999 (N.D. Cal. Nov. 6, 2018), *vacated*,
    969 F.3d 974 (9th Cir. 2020) ...............................................................................................25

*FTC v. Tapestry, Inc.*, 2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024) ............................27, 36, 37, 38

* *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ...............................................9

*Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490 (7th Cir. 1998) ................................................11

*Gillis v. Murphy-Brown, LLC*, 2018 WL 5834689 (E.D.N.C. Nov. 6, 2018) ..............................13

---

* Authorities upon which Meta chiefly relies are designated with an asterisk (*).

*Graco Inc. v. PMC Glob., Inc.*, 2012 WL 762448 (D.N.J. Mar. 6, 2012) .....................................36

*Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1
    (D.D.C. 2002) ........................................................................................................................28

*Heller v. Dist. of Columbia*, 952 F. Supp. 2d 133 (D.D.C. 2013) ...........................................29

\* *Holmes-Martin v. Sibelius*, 2011 WL 13244746 (D.D.C. Mar. 3, 2011) .................................13

*Huthnance v. Dist. of Columbia*, 255 F.R.D. 297 (D.D.C. 2008) ..............................................1

*Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274 (Fed. Cir. 2023) ...................................17

*Jankins v. TDC Mgmt. Corp.*, 21 F.3d 436 (D.C. Cir. 1994) ......................................................12

\* *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012) .......................................9, 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................30, 32

*Mazloum v. D.C. Metro. Police Dep't*, 517 F. Supp. 2d 74 (D.D.C. 2007) ...............................11

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ....................................................................18, 19

*Polaris PowerLED Techs., LLC v. Samsung Elecs. Am., Inc.*, 386 F. Supp. 3d 760
    (E.D. Tex. 2019) ....................................................................................................................25

*Pub. Citizen v. U.S. Dep't of Agric.*, 2022 WL 3139003 (D.D.C. Aug. 5, 2022) .......................25

*Rodriguez v. Wash. Metro. Area Transit Auth.*, 2021 WL 7286936
    (D.D.C. Dec. 7, 2021) ...........................................................................................................13

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999) ......................................................38

*Scott v. Dyno Nobel, Inc.*, 2022 WL 1122718 (E.D. Mo. Apr. 14, 2022) ...................................12

*SEC v. Jasper*, 678 F.3d 1116 (9th Cir. 2012) ..........................................................................26

*SEC v. Johnson*, 525 F. Supp. 2d 70 (D.D.C. 2007) ..................................................................31

*United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) .....................35

*United States v. Crawford*, 2024 WL 1908799 (D.D.C. May 1, 2024) .........................................2

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ...........................................................29

*United States v. Libby*, 475 F. Supp. 2d 73 (D.D.C. 2007) ........................................................26

*United States v. Long*, 328 F.3d 655 (D.C. Cir. 2003) ..............................................................12

*United States v. Mason*, 951 F.3d 567 (D.C. Cir. 2020) ............................................................23

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .......................................11, 12, 35

*United States v. Raymond*, 2023 WL 6588546 (D.D.C. Oct. 10, 2023) .......................................31

*United States v. Saguil*, 600 F. App'x 945 (5th Cir. 2015)..........................................................25

*United States v. Schuette*, 2023 WL 163490 (N.D. Cal. Jan. 11, 2023) .....................................22

*White v. United States*, 148 F.3d 787 (7th Cir. 1998)..................................................................22

*Youssef v. Lynch*, 2016 WL 2771803 (D.D.C. May 12, 2016) .....................................................14

*Yuen v. U.S. Stock Transfer Co.*, 966 F. Supp. 944 (C.D. Cal. 1997)..........................................25

## STATUTES AND RULES

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435,
    90 Stat. 1383 ...........................................................................................14, 15, 16, 17

Lanham Act, 15 U.S.C. § 1051 *et seq.* ........................................................................................38

18 U.S.C. § 1001(a) .....................................................................................................................25

Fed. R. Civ. P. 37(c) ......................................................................................................................3

Fed. R. Evid.:

    Rule 402 ...........................................................................................................................15

    Rule 403 ................................................................................................................11, 12, 14

    Rule 404(b) .......................................................................................................................10

    Rule 702 .......................................................................................................28, 30, 32, 38

    Rule 802 ...........................................................................................................................22

    Rule 803(6) .......................................................................................................................27

    Rule 807 ...............................................................................................................23, 25, 26

I.    **REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT IN SUPPORT OF NEW AND UNDISCLOSED MARKET DEFINITION**

The FTC never disputes that, to the extent it seeks to introduce evidence or argument supporting a market definition that contradicts its response to Meta's Interrogatory No. 10 – in particular its insistence and commitment that all activities on Facebook and Instagram (other than Facebook Dating, which the FTC carved out) constitute "personal social networking" – such evidence and argument should be excluded. That result follows from the principle, clearly articulated in Meta's opening brief and never contested by the FTC, that a party is "bound" by its interrogatory responses. *See* Def. Meta's Mot. *in Limine* To Preclude Evidence or Argument in Support of New and Undisclosed Market Definition at 11 (Feb. 21, 2025), ECF No. 404 ("Meta Mot.") (citing *Huthnance v. Dist. of Columbia*, 255 F.R.D. 297, 300 (D.D.C. 2008)). The FTC's purported confusion regarding the legal basis for Meta's motion is belied by its insistence that it can distinguish Meta's cases on the basis that "the FTC has not changed and is not changing its Interrogatory 10 response." Pl. Federal Trade Commission's Opp. to Meta Mot. at 8 (Mar. 7, 2025), ECF No. 412 ("FTC Opp.").

That remains to be seen – and, if the FTC is so sure, then it should be no problem for this Court to issue an order stating that the FTC cannot introduce argument or evidence contrary to its interrogatory response.

The reason the FTC resists such a simple solution is that, in its interrogatory response, it stated that viewing a short-form video from a source that the viewer does not know on Facebook or Instagram Reels constitutes personal social networking. *See* Meta Mot. Ex. 3 at 5-6, 16-20 (MetaFTC-DX-997, FTC's Resp. to Meta's List of Features or Activities (Sept. 12, 2022)). Accordingly, to the extent that viewing a short-form video from a source the viewer does not know on TikTok is a reasonable substitute for Reels and thus imposes a competitive constraint

on Reels, TikTok competes with Facebook and Instagram *in the market for personal social networking*. This is just one example among dozens. The FTC did not have to commit to the position that Reels, Groups, Marketplace, and other features untethered from friends-and-family sharing are in the market – it excluded Dating from the relevant market because of its characteristics and the way it is used. *See id.* at 3. But having committed to that position – which it reaffirms in its opposition – the FTC cannot seek to prove that the competition between TikTok and Reels takes place outside the relevant market. To prevail, it *must* prove that TikTok does not effectively compete with Reels.

The FTC insists that it does not seek to deviate from its interrogatory response, but it also insists that it should be free to introduce evidence that relevant competition is limited to "activities . . . closely associated with friends and family sharing." FTC Opp. at 16. Such double-talk is no response to Meta's motion; it is instead an illustration of the problem. The FTC suggests that it has been attempting to "have-it-both-ways" from the start, *FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, at *20 (D.D.C. Nov. 13, 2024), and that it should be permitted to continue on the same path. But the time has come – finally – to decide what "evidence should or should not . . . be introduced at trial." *United States v. Crawford*, 2024 WL 1908799, at *1 (D.D.C. May 1, 2024). Make no mistake, if the FTC is permitted to pivot from its "all-in" market position to an alternative based on purportedly "core" friends-and-family-sharing features only, Meta will show that case to be factually baseless. But to permit the FTC to disavow its carefully considered position – on which Meta has relied for two and a half years throughout fact and expert discovery – would be unfair and prejudicial.

Meta has a *right* to know the FTC's contention regarding the market definition in this case. Enough of the FTC dancing around the issue.

2

Meta's motion therefore squarely poses the question:  may the FTC now concede that TikTok competitively constrains Reels while simultaneously maintaining that TikTok does *not* competitively constrain Meta's apps in the market for personal social networking, even though the FTC's interrogatory response maintains that all Reels are *in the market for personal social networking* even without any relationship to friend sharing?  If the FTC is held to its interrogatory response – and, of course, it should be – it cannot maintain these contradictory positions.  The Court should accordingly grant the motion.

## A.    The Court Has Ample Authority To Hold The FTC To Its Interrogatory Response

The FTC does not contest the basic principle that a party is bound by its interrogatory responses.  Here there is something more – the express terms of this Court's order.  The FTC resisted disclosing its market definition contentions for months; when the Court ordered it to do so, the Court made explicit that if the FTC intended to "*take[ ] a different position* on any . . . feature or activity" it would be required to "supplement its response," which the FTC did not do.  Order at 2 (Aug. 1, 2022), ECF No. 165 (emphasis added).  Meta need not show prejudice to enforce the express terms of this Court's order.

Even if this were an ordinary case of failure to supplement under Federal Rule of Civil Procedure 37(c), the prejudice from allowing the FTC to depart from the positions disclosed in its interrogatory response would be substantial.  The FTC does not and cannot dispute that Meta's litigation choices have been based on the FTC's interrogatory response; Meta should not be forced to defend its case without clarity about the FTC's market definition – clarity that Interrogatory No. 10 was designed to provide.  Indeed, as Meta has explained, its discovery plan was predicated upon the FTC's committed "all-in" market definition.  *See* Meta Mot. at 10-13.  Had Meta understood that the FTC's position on market definition was subject to change (and outright contradiction of its interrogatory response), it could have asked different questions in

depositions or pursued additional nonparty discovery.  *See DCFS USA, LLC v. Dist. of Columbia*, 803 F. Supp. 2d 29, 37 (D.D.C. 2011) (late disclosure of information is prejudicial when it "rob[s]" the opposing party of the opportunity to "sensibly plan").

The FTC claims that Meta, in responding to the FTC's experts and at summary judgment, understood that the FTC had departed from its "all-in" market definition and addressed the FTC's arguments in support of a narrower friends-and-family-sharing market.  *See* FTC Opp. at 6-8.  But Meta made clear that the FTC's alternative position was not consistent with its interrogatory response.  As Professor Carlton noted in his response to Professor Hemphill:

> Prof. Hemphill appears to define two ***inconsistent*** versions of [the "personal social networking services"] market.  On the one hand, Prof. Hemphill claims that although it is the "core functionality" of friends and family sharing that distinguishes the apps in this market, the entirety of the usage of the app is in the market, as the FTC has repeatedly said . . . .  On the other hand, Prof. Hemphill appears to also be claiming, without explicitly saying so, that there is a separate relevant product market limited to a minority of use of the Facebook and Instagram apps (friends and family sharing only)[.]

Ex. 1 ¶ 11 (Carlton Rep.) (emphasis added); *see also* Meta Reply in Support of Mot. for Summary Judgment at 1 (July 12, 2024), ECF No. 369 (noting that the FTC's interrogatory response "necessarily sweeps in 'passive' consumption of video and other entertainment, and time spent using features that also are available on apps like TikTok, YouTube, and Twitter, and web browsers, and on messaging products like Apple iMessage").  Meta explained that the FTC's "attempts to sidestep [the] problem" by positing a more limited market were unsupported by evidence, *id.*, but Meta never departed from the position that the FTC's interrogatory response did not allow it to defend any more limited market definition.

From the start, this Court has repeatedly recognized the ambiguity of the FTC's market definition.  *See* Meta Mot. at 4.  The Court's summary judgment decision likewise recognizes that the FTC's legal arguments seek to have it both ways – including by arguing that the relevant

market is limited to a "core use case of friends-and-family sharing." *Meta Platforms*, 2024 WL 4772423, at *20. But the FTC expressly disavowed such a limited "core use" market in its interrogatory response, and this Court made clear in a binding order – upon which Meta relied – that the FTC would be held to that disavowal. The time has come to put an end to the FTC's shell game.

**B.    The Court Should Exclude Evidence And Argument Inconsistent With The FTC's Avowed "All-In" Market**

The FTC can no more show that the evidence and argument Meta seeks to exclude are consistent with its "all-in" market definition than it can show that this Court is without legal authority to exclude such evidence. The FTC insists – repeatedly – that it stands by its interrogatory response and maintains its contention that what it calls "non-PSN" apps are outside its proposed market. But the question is not whether the FTC asserts that TikTok, YouTube, iMessage, and the rest are outside the relevant market – that, of course, is its legal position – but whether the FTC is free to support that assertion by introducing evidence and argument that the market is limited to friends-and-family-sharing features, which it is not.

**1.    *Exclusion of Non-PSN Apps.*** The FTC sets up a strawman when it claims (at 11-12) that Meta is attempting "to bar the FTC from arguing that TikTok is excluded from the relevant market." Rather, Meta seeks to preclude the FTC from arguing (for example) that TikTok is outside the market because competition between TikTok and Reels does not constitute competition for personal social networking services. The FTC's interrogatory response commits the FTC to the position that such competition is in the relevant market, because use of Reels (with no connection to friends or family) is personal social networking according to the FTC.

To be sure, the FTC is free to introduce evidence – if it has any (Meta is aware of none) – that short-form videos on TikTok do not compete with Reels, notwithstanding that they are, in

the FTC's word, effectively "identical."  FTC Opp. at 12.  The FTC asserts (*id.*) that, because TikTok "lack[s] the distinctive functionality and use necessary to satisfy demand for PSN services," it can be excluded from the market.  But viewing short-form videos from unconnected sources on Reels *is* "personal social networking" under the FTC's definition.  The FTC is therefore bound to prove, in keeping with its interrogatory response and this Court's order, that TikTok is incapable of "satisfy[ing] [the] demand" for short-form videos that the Reels feature on Facebook and Instagram seeks to satisfy.  The FTC's well-justified fear that it cannot prove any such thing is no reason to allow it to violate this Court's order.

  **2.** ***Market Share Calculations.*** Professor Hemphill's alternative market share calculations – which the FTC effectively admits (at 15) are based on the premise that "activities on Facebook and Instagram [that] are less directly tied to interacting with friends and family" are outside the market – must be excluded because they are inconsistent with the FTC's contention that *all* activities on Facebook and Instagram, irrespective of whether they involve friends-and-family sharing, constitute personal social networking (other than Dating).

  The FTC's half-hearted assertion (at 16) that these calculations are "entirely consistent with the FTC's relevant market allegations" is trickery:  in support of this assertion, the FTC refers *not* to the FTC's September 12, 2022 "all-in" response (*see* FTC Opp. MIL #1 Ex. B) but to an earlier June response (*see* FTC Opp. MIL #1 Ex. A) – the very ambiguity of which led this Court to order the FTC to respond to Meta's feature-by-feature interrogatory.  *See* Order (Aug. 1, 2022), ECF No. 165.  It is also true that the FTC had, at one time, indicated that some time spent on Facebook and Instagram might be excluded from the market, *see* FTC Opp. at 16; that is why this Court, in allowing the Amended Complaint to proceed, stated its understanding that time spent "passively viewing a music video . . . falls outside of the market definition," *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 49 (D.D.C. 2022).  But the FTC's later interrogatory

response repudiated that position, insisting and *committing* that all activities – including passively viewing a music video – are personal social networking.  *See* Meta Mot. Ex. 3 at 2, 5.

The FTC suggests (at 17) that any market share calculation, whatever the relationship to the asserted *relevant* market, can be useful as a "robustness check[ ]."  But the mere ability to assemble data for a numerator and a denominator hardly means that the resulting fraction will be meaningful.  And neither Professor Hemphill nor the FTC has explained how his submarket share calculations have any relevance to the "all-in" market that the FTC is stuck with under the interrogatory response.  This is especially prejudicial because it is undisputed that the non-friends features and activities the FTC included in its "all-in" market but now seeks to abandon constitute a substantial majority of time spent on Facebook and Instagram.  Accordingly, those calculations are irrelevant and inadmissible.  *See* Meta Mot. at 16 (citing cases).

**3.    *Price Discrimination.*** The FTC tries to dodge this issue by suggesting (at 18) that its argument is limited to the claim that Meta can "price discriminate against users with more inelastic demand," asserting that this provides "direct evidence of monopoly power."  But this is not the issue:  as the FTC's principal economist conceded, "all ad-supported venues regardless of market power do the same thing."  Ex. 2 at 240:8-12 (Hemphill Dep. Tr.); *see also* Ex. 3 ¶ 85 (Hemphill Rebuttal Rep.) ("[F]irms that lack monopoly power can and do . . . price discriminate.").  Professor Hemphill made a *different* claim:  Meta "has price discriminated against users who more intensely use Facebook and Instagram for friends and family sharing."  *Id.* ¶ 107.

The FTC offers no justification for evidence of discrimination against users with a preference for friends-and-family sharing because such evidence seeks to limit the relevant market to a particular use case that is narrower than or contrary to the "all-in" market to which it also committed.  The FTC's opaque reference to a *Brown Shoe* "submarket" is unavailing – to the extent the FTC is referring to this Court's discussion of price discrimination in its summary

judgment opinion, the Court there was considering a "have-it-both-ways" market that the FTC should not be permitted to pursue now that we are at trial.  *See Meta Platforms*, 2024 WL 4772423, at *20 ("That said, Plaintiff's have-it-both-ways market definition rears its head here, as the Court previously indicated.  The above statistics would seem to capture <u>all</u> time spent on Meta's products – *i.e.*, not just time spent on its asserted core use case of friends-and-family sharing, but also any time spent watching highlight reels of the Red Sox game on Instagram or buying an antique table from a stranger on Facebook Marketplace.").

Meta has a right to know the FTC's position and test at trial the market to which it committed, even if – and especially because – it contradicts market realities and common sense:

| Summary Judgment Reference | Meta Interrogatory Feature / Activity | Question Posed to the FTC | The FTC's Response |
|---|---|---|---|
| **"[T]ime spent watching highlight reels of the Red Sox game on Instagram . . ."** | Instagram Feed: "Viewing Original video(s) posted by an account for a business, non-profit, or other organization that User follows that does not follow User." Meta Mot. Ex. 3 at 31. | "Included in 'personal social networking'?" Meta Mot. Ex. 3 at 31. | "Yes" Meta Mot. Ex. 3 at 31. |
| **"[O]r buying an antique table from a stranger on Facebook Marketplace."** | Marketplace: "Viewing content of any form (such as Items for Sale) that was not posted by one of User's Facebook Friends." Meta Mot. Ex. 3 at 5. | "Included in 'personal social networking'?" Meta Mot. Ex. 3 at 5. | "Yes" Meta Mot. Ex. 3 at 5. |

4.    **Whole Foods *Does Not Support the FTC*.**  The FTC's effort to maintain a friends-and-family-sharing submarket despite its response to Interrogatory No. 10 is not justified

by the recognition of price discrimination against a specific consumer demand as grounds for blocking a merger of "premium, natural, and organic supermarkets" in *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008), for the reasons Meta set forth in its motion. *See* Meta Mot. at 13-15.

The FTC hardly engages with these arguments, instead claiming that Meta is somehow seeking "to exclude *legal* argument invoking *Whole Foods*." FTC Opp. at 19 (emphasis added). The FTC apparently misses the point. In *Whole Foods*, the FTC never claimed that all groceries sold at PNOS were premium, natural, or organic *products*. On the contrary, it prevailed on appeal by relying on the distinction between non-perishables – as to which conventional supermarkets provided price-constraining competition – and organic perishables, which were overpriced unless another PNOS was in the same geographic market. *See* Meta Mot. at 14-16.

Here, by contrast, the FTC has committed to the position that all features of Facebook and Instagram are personal social networking; it cannot take the position – which the FTC took in *Whole Foods* – that competition for those features fails to protect consumers of personal social networking. The FTC might try to argue that, so long as it can proffer evidence that Facebook and Instagram offer some features "closely associated with friends and family sharing" for which other apps are not good substitutes (itself untrue), the analogy to *Whole Foods* holds. *See* FTC Opp. at 16, 19. But any attempt to focus on a limited set of features – to the exclusion of others that are in the market – cannot demonstrate how competition in the market *as defined by the FTC* has been purportedly harmed by the challenged transactions.

In this regard, the FTC's attempt to say (contrary to the actual evidence) that the quality of some feature of Facebook or Instagram is lower as a result of the acquisition commits the same error that doomed the class certification motion of the private plaintiffs in *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16 (D.D.C. 2012). Those plaintiffs – a class of

individuals who shopped at Whole Foods after it was allowed to merge with Wild Oats in Los Angeles County – attempted to establish antitrust injury simply by pointing to certain products that were allegedly more expensive after the merger. This Court rejected that evidence because those users did not purchase only those price-elevated products, and they had no evidence that they paid more, on net, for *all* the products they purchased at Whole Foods. *See id.* at 24-25. By the same token, the FTC cannot prove that Meta's acquisitions had anticompetitive effects by asserting that the quality of friends-and-family-sharing features is lower, without accounting for the quality of all the features of Meta's apps.

The FTC's assertion that only friends-and-family-sharing features are relevant to assessing effects is contrary to its interrogatory response and should be barred.

## II.   REPLY SUPPORTING META'S MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL PREVIOUSLY DISMISSED OR ABANDONED CLAIMS AND ALLEGATIONS

The FTC does not claim that any Meta acquisition (other than Instagram and WhatsApp) was anticompetitive, and it does not claim that any such acquisition – or contemplated acquisition – is relevant to the competitive *effects* of the Instagram and WhatsApp transactions, which is dispositive of whether either acquisition was "exclusionary." Instead, the FTC argues (at 25) that evidence as to other actual or contemplated acquisitions is relevant because it sheds light on the "practices" that somehow informed Meta's *intent* in acquiring Instagram and WhatsApp. But this "similar act" gambit falls far short of Federal Rule of Evidence 404(b)'s requirements. What motivated Meta to acquire or consider acquiring different companies, at different times, for varied reasons specific to those firms and contexts, cannot possibly establish Meta's reasons for acquiring Instagram or WhatsApp. Even if evidence as to these unrelated other transactions or contemplated transactions could pass Rule 404(b)'s test, and be somehow minimally relevant to the acquisitions at issue in this case, the FTC *does not even claim* the

probative value of this attenuated evidence outweighs the obvious and unfair prejudice to Meta or the confusion and waste of time from injecting mini-trials on unchallenged transactions into the case. The basis for exclusion under Rule 403 is therefore conceded.

1.      Evidence of Meta's unchallenged acquisition activity is irrelevant to Meta's intent in acquiring Instagram and WhatsApp, which is itself relevant *only* to the extent it is predictive of probable effects. Here, those effects are *known*, such that intent has no role to play. *See United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (en banc) (per curiam) ("Evidence of the intent behind the conduct of a monopolist is relevant *only* to the extent it helps us understand the likely effect of the monopolist's conduct.") (emphasis added).

Often described as the "Mark of Zorro" exception to the prohibition on use of claimed similar-act evidence to prove that a defendant acted in accordance with a pattern of conduct, the limitation on use of such evidence is well-established in this Circuit. "Evidence of a similar act must meet a threshold level of similarity in order to be admissible to prove intent. . . . Otherwise, the evidence would lack probative value of intent, and instead would be more in the nature of propensity evidence." *Mazloum v. D.C. Metro. Police Dep't*, 517 F. Supp. 2d 74, 81 (D.D.C. 2007) (citing *Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490, 494 (7th Cir. 1998) ("The other act must be similar enough and close enough in time to be relevant to the matter at issue[.]")).

The FTC has not articulated how other lawful transactions and non-transactions (Snapchat, Kakao, Twitter, and Beluga) – spanning different years, geographies, companies, and even product markets on the FTC's telling – are "similar enough" to Meta's completed acquisitions of Instagram and WhatsApp. The fact that Meta acquired or sought to acquire other firms proves nothing. Absent proof that the other transactions or contemplated transactions were similar, which the FTC does not offer, the FTC cannot meet its burden to show that Meta's acquisitions of Instagram and WhatsApp aligned with a "default approach to rival firms" (FTC

Opp. at 23).  *See*, *e.g.*, *Jankins v. TDC Mgmt. Corp.*, 21 F.3d 436, 440 (D.C. Cir. 1994) (excluding testimony about events "so different . . . and so remote in time that it was not properly offered to show . . . 'intent' "); *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003) (recognizing that similarity is necessary for evidence to be "probative of intent rather than mere propensity").

Even if this Court were to find that the FTC has shown the requisite similarity between these other acquisitions and the challenged acquisitions (it has not), these unchallenged acquisitions would still be irrelevant.  They are offered solely as evidence of generalized intent.  But as noted above, and as instructed by the D.C. Circuit in *Microsoft*, even Meta's intent specifically regarding Instagram and WhatsApp has no role to play where the effects of those acquisitions are known.  Even less relevant is supposed intent evidence regarding *other* transactions, which cannot possibly inform the Court as to the likely effects of the only acquisitions at issue here.

And while the FTC laments (at 25-26) that some documents reference both an at-issue acquisition – Instagram or WhatsApp – and an acquisition not at issue, that is hardly an insurmountable burden.  Instead, the Court can order the FTC not to elicit testimony (unless Meta opens the door) about acquisitions referenced in those documents that are not at issue in the case.  *See*, *e.g.*, *English v. Dist. of Columbia*, 651 F.3d 1, 8 (D.C. Cir. 2011) (affirming district court's motion *in limine* ruling, which "invit[ed] appellant to seek to use portions of the [excluded report] if the door was opened") (cleaned up); *Scott v. Dyno Nobel, Inc.*, 2022 WL 1122718, at *2 (E.D. Mo. Apr. 14, 2022) (granting motion *in limine* in part with redactions to only the objectionable hearsay portions of the exhibit).

**2.**      Remarkably, the FTC does not address a single Rule 403 factor and leaves Meta's showing that this material would invite unfair prejudice and delay unrebutted.

*First*, it would be unfairly prejudicial to turn this case into serial mini-trials over transactions (and contemplated transactions) that the FTC did not challenge, has not claimed as unlawful, and were therefore not the subject of discovery. The FTC did not allege that Meta has a "default approach to rival firms" such that all its M&A activity is anticompetitive. It cannot inject that claim into the case now without causing Meta severe prejudice. For example, the acquisition of Beluga was procompetitive; but Meta has not prepared to try a Beluga case. Meta should not have to defend a case that the FTC did not even plead. Indeed, the FTC abandoned any claims regarding other transactions – before trying to introduce that claim in opposition to Meta's motion.

Meta relied on the FTC's abandonment of any claim regarding these other acquisitions in focusing fact and expert discovery on Instagram and WhatsApp. Meta did not, for example, ask its expert witness to address any of these acquisitions and did not designate fact witnesses who could address them either. The claims regarding transactions other than Instagram and WhatsApp are abandoned claims, and the Court has routinely granted motions excluding such evidence in analogous contexts. *See, e.g.*, *Rodriguez v. Wash. Metro. Area Transit Auth.*, 2021 WL 7286936, at *1 (D.D.C. Dec. 7, 2021) (granting motion *in limine* regarding dismissed claims, recognizing that, "[a]s to the rejected counts, many courts have agreed that plaintiffs are barred from raising rejected counts at trial"); *see also*, *e.g.*, *Gillis v. Murphy-Brown, LLC*, 2018 WL 5834689, at *1 (E.D.N.C. Nov. 6, 2018) (granting motion *in limine* excluding evidence about "dismissed and abandoned claims").

*Second*, turning this case into serial mini-trials on other transactions will inevitably delay proceedings and waste limited trial time. Each such transaction or contemplated or rumored transaction has specific facts that would have to be presented and contested. *See Holmes-Martin v. Sibelius*, 2011 WL 13244746, at *2 (D.D.C. Mar. 3, 2011) (granting motion *in limine*

13

considering the risk of "a 'mini-trial' on ancillary issues"); *Youssef v. Lynch*, 2016 WL 2771803, at *2 (D.D.C. May 12, 2016) (excluding evidence under Rule 403 as "the Court shall not permit a mini-trial on this issue"); *Bair v. Callahan*, 664 F.3d 1225, 1230 (8th Cir. 2012) (affirming exclusion of evidence as "fair and reasonable" in light of "the district court['s] expressed . . . concern with 'mini trials'"); Meta Mot. at 19 (collecting cases).

*    *    *

Meta argued in its opening brief (at 19) that this motion puts Rule 403 at issue, including because it would be "prejudicial for the FTC to introduce evidence or argument as to the supposedly anticompetitive nature of Meta's acquisitions or potential acquisitions." Where, as here, there is no showing that could possibly meet the controlling standard for relevance, and where the FTC has effectively conceded that it cannot prevail under the Rule 403 test – by not even attempting to claim that the probative value of the evidence outweighs the obvious prejudice, delay, and waste of time – the Court should grant the motion and exclude evidence of other transactions from this case.

## III. REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY AND ARGUMENT REGARDING META'S HART-SCOTT-RODINO PRODUCTIONS

Rather than focus on Meta's motion, the FTC pursues a motion *in limine* of its own, seeking to preclude Meta from raising Hart-Scott-Rodino ("HSR")-related evidence. But the FTC's motion is untimely and, in any event, misrepresents Meta's intentions, which are only to establish that the HSR clearances occurred after the FTC followed its standard procedures (including, in the case of Instagram, a second request). As for the issue properly presented in Meta's motion, the FTC's opposition provides no answer to the fundamental point that, were the FTC permitted to introduce evidence or argument suggesting that Meta failed to comply with its obligations under the HSR process, that would allow the FTC to use a claim of privilege as both

14

sword and shield.  The FTC's only reason for introducing such evidence is to take the sting out of the fact that the FTC approved both acquisitions by suggesting that the FTC's investigations were compromised – not just that certain documents were not produced but that *those documents mattered to the FTC's deliberations*.  (If they didn't, who cares?)  Meta sought discovery precisely to ensure that it would have the evidence necessary to show the FTC could claim no such thing; the FTC successfully claimed privilege.  Having done so, the FTC is foreclosed from impugning Meta's compliance with its obligations at the time.

1.      Improperly stretching its opposition brief into an affirmative motion *in limine*, the FTC first asks this Court to exclude evidence of the HSR clearances as irrelevant under Federal Rule of Evidence 402.  But the FTC is too late.  This Court's scheduling order of December 20, 2024, ECF No. 390, at 2, explains that "all motions in limine and other pretrial motions" were due on February 21, 2025.  Nor can the FTC plausibly claim that these arguments in its opposition are anything other than an affirmative motion *in limine* – it asks the Court to "preclude any and all HSR Evidence, full stop."  FTC Opp. at 29.  That is the function of a motion *in limine*; simply denying Meta's motion would not have that effect.

Even if the Court considers the FTC's requested relief, it should be denied.  At trial, Meta intends to put into evidence three relevant facts about the HSR reviews:  that they occurred, that Meta provided information in response to the FTC's requests, and that the FTC cleared the transactions.  These facts are undisputed.  *See* Meta Rule 7(H) Statement in Support of Summary Judgment ¶¶ 702, 815 (Apr. 5, 2024), ECF No. 326 (Meta submitted HSR Premerger Notification Forms for each transaction); *id.* ¶¶ 703, 816 (Meta submitted the FTC's requested documents); *id.* ¶¶ 707, 818 (the FTC opted not to challenge either merger).  The FTC makes much (at 28) of Meta's listing "a still-unnamed witness from the FTC" as a possible trial witness to testify about "the FTC's clearance."  But Meta included those witnesses in anticipation of the FTC's making

the very kind of claims of non-compliance that are the subject of this motion; if this motion is granted, Meta does not intend to call those witnesses. (Meta would leave those witnesses on its "may-call" list only to address the risk that the FTC could somehow open the door to this issue.)

Meta's intended use of the HSR clearances does not justify the FTC's supposed concerns over "a mini-trial over the HSR Reviews' sufficiency and rigor." FTC Opp. at 31. The facts of the FTC's review are undisputed; it is the FTC that seeks the opportunity to launch an unjustified mini-trial to undermine the validity of its own review.

2.      The FTC has no answer to the basic point that any evidence it seeks to introduce about Meta's production of documents during HSR review could be relevant *only* if the documents in question *mattered* to the FTC's review. Suppose the FTC finds a document among the millions that Meta produced that was not produced in the HSR process. Such hypothetical non-production would matter *only* if it would have influenced the FTC's deliberations. Yet the FTC *cannot* assert that any such documents were relevant to its deliberations because it successfully blocked Meta's effort to obtain discovery about that process by claiming privilege.

The FTC claims (at 33) that it intends only "to proffer basic facts and provide complete factual context." Hogwash. The reason the FTC seeks to introduce the evidence in question is to suggest (baselessly) that the process was incomplete or flawed – the only relevance of those facts is to invite the inference that Meta somehow failed to participate in these investigations in good faith and that, as a result, the FTC was thrown off track. That is precisely what the FTC may not do. *See Doe 2 v. Esper*, 2019 WL 4394842, at *6 (D.D.C. Sept. 13, 2019).

Moreover, the FTC misrepresents the type of "basic facts" it intends to offer. For example, it never denies that it intends to try to make something of the fact that Meta explained the reasons that "Quick Look" review of the Instagram transaction would be appropriate (without addressing whether such efforts had any effect on the FTC's decision-making). *See* Meta Mot.

Ex. 11 ¶ 57 (FTC's Second Set of Proposed Joint Stipulations of Fact (Feb. 17, 2025)). Nor is it appropriate for the FTC to introduce documents with the "context" that they were not produced in the appropriate HSR investigation. *See id.* ¶¶ 68, 69.

Courts rightly "preclud[e] [a party] from presenting evidence at trial on a topic for which it did not provide discovery." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1294 (Fed. Cir. 2023). Based on that principle, the Court should grant Meta's motion.

## IV.  REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING INFLAMMATORY MATTERS

The FTC's opposition confirms that, absent intervention by the Court, the FTC will use this antitrust trial as an excuse to dwell on instances where third parties have posted objectionable content on Facebook, Instagram, and WhatsApp, in violation of Meta's policies and terms of use. The FTC unflinchingly describes (at 42) its plans to introduce piles of exhibits about the worst conduct by bad actors over more than a decade – including ███████████ ██████████████████. Unable to deny that this will result in a sideshow, the FTC repeatedly (at 1, 34-38, 40, 43-44) argues that Meta put these unsavory matters at issue. But Meta's contention that it helped accelerate Instagram's development by giving Instagram access to specific systems that address objectionable content shortly after the acquisition in no way justifies the FTC's attempt to flood the record with evidence of conduct by bad actors that occurred a decade later. This inflammatory evidence serves no purpose other than to unfairly prejudice Meta and waste time; objectionable content will exist on any platform with user-generated content, and Facebook and Instagram have never claimed to be exceptions.

1.      The FTC contends (at 34-38, 40, 43-44) that it should have free rein to present evidence about objectionable content on Facebook and Instagram over more than a decade because Meta put "objectionable content" at issue as part of its "affirmative defenses."

Specifically, the FTC points to Meta's response to an interrogatory asking Meta to describe any benefits it provided to Instagram. Meta's response explained that Meta delivered specific "tools and expertise" to Instagram that helped it "attack its integrity problems at scale" after the acquisition. *See* Meta Mot. Ex. 26 at 18 (Meta's Suppl. Objs. & Resps. to FTC's Interrogs. Nos. 10 & 12 (May 31, 2023)). For example, Meta gave Instagram access to "numerous systems and services that enabled Instagram to reduce spam while scaling, including Sentry, Sigma, Blackhole, Orb, Karma, Tally, and TPS (now SRT)," access to the "PhotoDNA system" for identifying and addressing objectionable content, and access to "its moderation and review teams." *Id*.

Setting aside that the FTC incorrectly states the legal standard for proving a procompetitive justification, the FTC misunderstands the evidence Meta intends to introduce at trial. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018) ("If the defendant [puts forward a procompetitive rationale], then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."). Meta will show that, almost immediately after the acquisition in 2012, Meta provided Instagram with specific tools used for fighting spam and objectionable content that helped Instagram to address these challenges more quickly than it would have otherwise. Instagram did not use any of these tools before the acquisition, and Meta quickly made them available thereafter.

Meta has not claimed, and cannot claim, that any such tools are perfect or that they catch all bad actors among the billions of people worldwide who use Meta's services. But Meta has provided tools and resources, facts that cannot plausibly be denied. Meta's evidence that it provided tools to Instagram in no way justifies the FTC's mud throwing or diverting this case into mini-trials on the way that Meta addressed specific incidents of objectionable content from 2012 to 2025. Anecdotal, isolated, and episodic incidents of service misuse – something experienced on all services, which the FTC does not deny – are probative of nothing, particularly

because the FTC does not claim, with any data, that such incidents are more prevalent on Meta's apps than on any other service.

There is no connection between the evidence the FTC wants to introduce about how Meta responded to ███████████████████████, *see* Meta Mot. Ex. 21 (PX03613, FB_FTC_CID_09814202), and whether Meta saved Instagram time by providing it quick access to PhotoDNA after the acquisition. *See Am. Express*, 585 U.S. at 541-42; *FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, at *40 (D.D.C. Nov. 13, 2024) (collecting cases acknowledging that efficiencies are merger-specific and cognizable when they are achieved faster via merger). Meta grew Instagram from less than 4 million U.S. users to nearly ██████ today, all of whom use this service for free. That dramatic expansion in output is an undeniable merger-specific efficiency made possible by all the tools and other resources that Meta gave Instagram shortly after the acquisition, including tools for fighting spam and other objectionable content. Claiming that Instagram has not been perfect does nothing to change that. It is simply irrelevant that ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████. *See* Meta Mot. Ex. 23 (PX12204, FTC-META-003071375). These instances do not dispute, logically or legally, the benefits provided by Meta that helped Instagram grow to its current level.

Nearly all of the proposed exhibits cited in the FTC's opposition, and dozens of other exhibits on its list, concern events that took place years after the Instagram acquisition and do not bear on whether the specific tools Meta provided accelerated Instagram's ability to address the challenges with spam and objectionable content it was facing around 2012. *See* FTC Opp. MIL #4 Ex. C (PX3605 (2018)), Ex. D (PX15316 (2019)), Ex. E (PX3070 (2019)), Ex. F (PX10759 (2021)), Ex. I (PX3609 (2018)); *see also*, *e.g.*, Meta Mot. Ex. 20 (PX00717, Full Committee Hearing on Big Tech and the Online Child Sexual Exploitation Crisis (Jan. 31, 2024)). Even the

19

FTC's own expert opined that much-later events are *not* probative of what would have happened to Instagram if it had not been acquired by Meta in 2012.  *See* Ex. 4 ¶ 32 (PX09013, McCoy Rebuttal Rep.) ("The farther we move away from 2012, the more difficult it is to assess what kind of integrity problems Instagram would have had and what kind of resources and solutions it would have been able to deploy independent of Meta.").

     **2.**      The FTC argues (at 36) that Meta has indicated that it plans to put objectionable content at issue by listing Professor V.S. Subrahmanian on its witness list.  But Professor Subrahmanian's primary assignment was to respond to the FTC's expert, Professor Damon McCoy, who was proffered before Meta disclosed Professor Subrahmanian's responsive report.  Professor McCoy, among other things, makes irrelevant, but serious, allegations about CSAM based on nothing more than 2023 articles he did not write and events he admits "I have not studied."  Ex. 5 ¶¶ 21, 248 (PX09002, McCoy Rep.).  If the FTC is permitted to introduce this inflammatory testimony, Meta will be forced to rebut it.  But, if the Court grants Meta's motion, Meta may be able to substantially narrow Professor Subrahmanian's testimony or withdraw him from Meta's witness list entirely.

     **3.**      The FTC argues in the alternative (at 38) that Meta's failure to keep Facebook and Instagram free of objectionable content is relevant to the "quality" of those apps.  But none of the evidence the FTC wants to introduce is probative of any legally relevant metric of "quality."  The FTC failed to develop any metric of overall app quality or even a quantifiable way of measuring the "quality" of an app's integrity efforts.  The FTC's expert, Professor McCoy, admits he did no quantitative analysis and cannot show that the amount of objectionable content on Facebook or Instagram has increased over time or is higher than on other apps.  *See*, *e.g*., Ex. 5 ¶ 16 (McCoy admitting he did no "data" analysis and instead "turned to qualitative evidence"); *id*. ¶ 254 (similar); Ex. 6 at 74:11-14 (McCoy Dep. Tr.) ("I did the qualitative analysis of the documents

. . . and I rendered my opinions based on my analysis of those qualitative documents."); Meta Mot. Ex. 25 at 180:4-8 (McCoy Dep. Tr.) ("I don't recall identifying any industry standard [with regard to integrity]."). Professor McCoy does not even dispute that Meta's integrity efforts are consistent with industry best practices. Meta Mot. Ex. 24 ¶ 61 (McCoy Rebuttal Rep.). Absent evidence that Meta reduced overall quality below a demonstrable, objective, and competitive level, these attacks on quality – and, in particular, anecdotal and isolated instances of a user's violation of Meta's rules – prove nothing relevant.

The FTC's point reduces to the truism that Facebook and Instagram, like every other platform with user-generated content, are challenged by objectionable content and can never perfectly "solve" that problem – no matter the resources they devote to it. None of the evidence the FTC seeks to introduce is necessary for the FTC to make that unremarkable point – it is as undisputed as it is irrelevant. Despite having approximately 40,000 individuals working on safety and security today, and investing more than $20 billion towards those efforts since 2016, Meta acknowledges that it will not fully "solve" the problem of objectionable content in the foreseeable future. *See* Meta Mot. at 28. And the FTC's expert, Professor McCoy, concedes it is not possible to do so. *See* Ex. 5 ¶ 28 (McCoy Rep.) ("[I]ntegrity . . . is not something that you ever solve."); *id*. ¶ 251 ("[I]ntegrity problems are not fully 'solvable.' ").

4.      Because the FTC concedes (at 43) that any argument or evidence related to social media and mental health is irrelevant, the Court should grant Meta's motion as to mental health (even if it does not grant Meta's motion in full). Meta's motion is not mooted by the FTC's representation that it does not intend to raise this topic "generally" at trial; in the same breath, the FTC admits that it will raise this topic as part of its argument that "bullying" sometimes occurs on Facebook and Instagram (itself an objectionable topic), and Professor McCoy gratuitously

raised this topic in his reports.  *See* FTC Opp. at 43; Ex. 4 ¶¶ 51-52 (McCoy Rebuttal Rep.).  The point of a motion *in limine* is to erect a prohibitionary bar that the FTC cannot cross.

5.      The FTC appears to acknowledge (at 43) that all of "this evidence is generally inflammatory."  In fact, the FTC goes so far as to imply (*id.*) that this inflammatory material is necessary to inject some excitement into its trial presentation and prevent it from being a dull "monotone."  Spicing up the trial, by injecting lurid and irrelevant material, is unworthy of a government agency.  The FTC also does not deny (*id.*) that a broad debate over objectionable content on Facebook and Instagram will "waste trial time," or explain why it needs dozens of exhibits (more than 60) to show objectionable content exists on these apps.

Accordingly, even if this evidence had some probative value (it does not), the value of this evidence would be outweighed by the unfair prejudice to Meta and the risk that these issues will waste time and distract from the core issues in the case.  *See*, *e.g.*, *Brooks v. Chrysler Corp.*, 786 F.2d 1191, 1198-99 (D.C. Cir. 1986) (documents containing "highly inflammatory remarks about [corporate defendant]" were unfairly prejudicial); *White v. United States*, 148 F.3d 787, 792 (7th Cir. 1998) (finding no abuse of discretion in exclusion of eight trial witnesses whose testimony "had the clear potential to develop into a trial within a trial"); *United States v. Schuette*, 2023 WL 163490, at *3 (N.D. Cal. Jan. 11, 2023) (excluding analogous material about child exploitation "given its inflammatory nature"); *see also supra* pp. 10-14.

## V.   REPLY SUPPORTING META'S MOTION *IN LIMINE* TO EXCLUDE FOREIGN REGULATORY FILINGS

The FTC admits (at 45-51) it plans to rely on Meta's competitors' lawyer-drafted foreign regulatory submissions to support its proposed "personal social networking" market definition; it further concedes that these submissions are hearsay under Federal Rule of Evidence 802.  The FTC also does not contest (at 50) that ███████████████████████████████████

███████████████████████.  It instead plans to lob them into the record without any context, so that it can extract and deploy soundbites.

No rule of evidence permits this tactic.  The submissions do not fit within Rule 807's narrow "residual exception" to the hearsay rule intended for documents that are "very important and very reliable."  *United States v. Mason*, 951 F.3d 567, 574 (D.C. Cir. 2020).  On the contrary, the foreign submissions are advocacy pieces designed to pursue the particular interests of the companies submitting them (in markets outside the United States to boot).  Nor can the FTC support the assertion that it is offering these documents for a purpose other than their truth – if the statements are not true, they have no relevance to market definition.  Admitting these documents would be particularly inappropriate because the FTC can (and in some cases will) call witnesses from the submitting parties – ███████, TikTok, Google, and ██████ – to testify at trial about the actual facts of competition.

1.    Contrary to the FTC's argument (at 47-48), the Rule 807 "residual exception" does not apply to the FTC's foreign regulatory submissions.  For that exception to apply, the proponent of an exhibit must show that it is (1) "supported by sufficient guarantees of trustworthiness" and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807.  The D.C. Circuit has underscored the narrowness of this exception, repeatedly explaining that courts must "apply this extremely narrow exception sparingly, only in the most exceptional circumstances, and only if the out-of-court statement is both *very important and very reliable*."  *Mason*, 951 F.3d at 574 (cleaned up; emphasis added).  The FTC cannot carry that heavy burden.

a.    As Meta explained in its motion (at 36), these regulatory submissions are the opposite of "very reliable."  Witnesses from ███████, TikTok, Google, and ██████ confirmed that lawyers drafted these submissions, and it is plain from the face of the documents that these

submissions were crafted to advance the interests of their clients – in some instances, attempting to deflect attention from their clients by calling a regulator's attention to Meta's apps and distancing themselves from those apps. *See, e.g.*, Meta Mot. Ex. 30 at 2 (PX13494, Google's Response to the Australian Competition and Consumer Commission (Nov. 18, 2022)) (Google submission asserting that "YouTube should not be a focus of the Inquiry" but that Facebook, Instagram, Twitter, TikTok, and Snapchat should); *see also, e.g.*, Ex. 7 at -221 ███████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ███████ .

These submissions frequently contradict both (a) internal documents that businesspeople at ███████ , TikTok, Google, and ███████ wrote in the ordinary course observing that their apps in fact compete with Meta's apps, and (b) sworn testimony that witnesses from ███████ , TikTok, Google, and ███████ gave during depositions. *Compare, e.g.*, Meta Mot. Ex. 40 at -367 ████████████████████████████████████████████████████████████ ███████████████████████████████████████████ *with* Ex. 8 at -658 ████████████████████████████████████████████████████████████ █████████████████████████ ; Ex. 9 at 56:12-17 (Presser (TikTok) Dep. Tr.) (testifying "███████ ████████████████████████████████ "); Ex. 10 at 45:9-16, 53:4-7 (Pappas (TikTok) Dep. Tr.) (testifying ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ").

The FTC claims (at 47-48) that these submissions are reliable because foreign regulators have the power to "penalize false submissions." But that is insufficient, particularly because the FTC intends to rely on the narrative and advocacy portions of these submissions, rather than any hard facts (e.g., data on time spent, features offered, or other objectively verifiable information).

Advocates advancing opinions about arguable matters – such as whether an application meets a definition of "social media" or "social network" proffered by a regulator at a particular time and place – are not deterred from putting "spin" on facts by fear of penalties, which the FTC does not claim have ever been levied, much less levied in analogous circumstances. As Meta demonstrated in its motion, submissions to regulators are regularly excluded notwithstanding statutory penalties for false statements. *See*, *e.g.*, *Pub. Citizen v. U.S. Dep't of Agric.*, 2022 WL 3139003, at *2-3 (D.D.C. Aug. 5, 2022) (excluding letter from third party's outside counsel to USDA as hearsay, even though 18 U.S.C. § 1001(a) provided for penalties, including imprisonment for any "materially false, fictitious, or fraudulent statement or representation"); *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (excluding letter from third party to Office of Workers Compensation as hearsay, even though 18 U.S.C. § 1001(a) applied).

The cases the FTC cites (at 47, 49) are inapposite. Two address documentation with no resemblance to submissions to foreign regulators: *Polaris PowerLED Technologies, LLC v. Samsung Electronics America, Inc.*, 386 F. Supp. 3d 760, 763 (E.D. Tex. 2019), concerned an aircraft maintenance log, and *United States v. Saguil*, 600 F. App'x 945, 947 (5th Cir. 2015) (per curiam), concerned an inscription on a camera that said "Made in Japan." And in both *Yuen v. U.S. Stock Transfer Co.*, 966 F. Supp. 944, 945 n.1 (C.D. Cal. 1997), and *FTC v. Qualcomm Inc.*, 2018 WL 5848999, at *5-6 (N.D. Cal. Nov. 6, 2018), *vacated*, 969 F.3d 974 (9th Cir. 2020), a party's request that the court take judicial notice of documents was unopposed. These authorities provide no support for the skewed hearsay advocacy that the FTC wants to offer in this case.

**b.** The foreign regulatory submissions are not "more probative" – they are *far less probative* – than ordinary-course documents and testimony from witnesses present at trial. Executives from ████, TikTok, Google, ████, and other competitors will provide probative evidence about the competition those companies face, including from Meta's services. Rule 807

accordingly cannot be invoked.  The FTC does not even attempt to make the *required* showing.  Instead, the FTC misstates (at 48) the standard and claims it is enough that these submissions are "the most probative evidence on these third-party statements to foreign regulators."  What attorneys working for third parties told foreign regulators is itself *irrelevant* to the inquiry under Rule 807.

The relevant question is whether these submissions are "the most probative evidence" of which apps and services compete for the marginal minutes of U.S. consumers and, therefore, the parameters of the market in which Meta's apps compete.  The answer is "no."  The FTC does not even argue otherwise.  Courts regularly reject requests to admit hearsay documents under Rule 807 where, as here, the proponent fails to establish that there is a strong need for the evidence because it is "the best evidence to prove the [proponent's] point and there is no other evidence available."  *United States v. Libby*, 475 F. Supp. 2d 73, 79 (D.D.C. 2007) (excluding document as hearsay); *see also*, *e.g.*, *Barry v. Trs. of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside Loc. Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 104 (D.D.C. 2006) (similar).

**c.**    The FTC resorts to tit-for-tat argument in suggesting (at 45) that Meta's exhibit list includes SEC filings and one foreign regulatory filing.  The admissibility of Meta's trial exhibits is, of course, a distinct question.  The SEC 10-K and 10-Q filings from competitors in the United States are admissible as business records, *see*, *e.g.*, *SEC v. Jasper*, 678 F.3d 1116, 1122-23 (9th Cir. 2012) ("virtually all 10-Ks" are admissible as business records), and establish recognition by industry participants that the relevant competition includes many competitors the FTC is desperate to fence out of its invented product market, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  The other exhibit the FTC references, ███████████, will not be offered in evidence if the Court grants this motion – it was listed only as a protective

counterweight to the FTC's multiple lawyer-drafted submissions to foreign authorities regarding foreign markets – which are irrelevant to this case in any event.

**2.** Finally, there is no credible basis for calling lawyer advocacy with foreign regulators – seeking advantage over competitors by claiming that they are not competitors or stating that they can be categorized in the way the regulator wants them to be categorized – "industry recognition" irrespective of its truth. *See* FTC Opp. at 45-46. The only case the FTC cites (at 46), *FTC v. Tapestry, Inc.*, 2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024), is inapposite for two reasons. *First*, the court there considered SEC filings, admissible as business records under Rule 803(6). *Second*, the court admitted the filings in a preliminary injunction hearing where "hearsay evidence may be considered." *Id.* at *6. The regulatory submissions here are special purpose foreign-advocacy documents more akin to FTC pleadings than actual evidence of industry recognition made in the ordinary course by market participants in the United States, and no authority supports their admission in this case.

*     *     *

If the FTC is permitted to introduce arguments made by lawyers in foreign regulatory proceedings, the result will be mini-trials over the context of the proceedings, the incentives of the submitting competitors to distance themselves from Meta, inconsistencies in the submissions, and the irrelevance of assertions made solely with regard to markets other than the U.S. market. This frolic will consume valuable chess-clock time to no useful effect. There will be ample and far more reliable evidence in the testimony, public statements, and internal documents of businesspeople at ███████, TikTok, Google, ███████, and other competitors about competition in the United States. This evidence – the real evidence of competition from the competitors themselves – is flatly contradictory to the foreign lawyer argument the FTC wants to rely upon. The FTC's remarkable denial (at 50) that the foreign regulatory submissions contradict that

evidence or each other only underscores that these submissions will result in a protracted sideshow to no probative benefit if they are admitted.

## VI.    REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE PROFESSOR RIM'S SPECULATION ABOUT HOW WHATSAPP MIGHT HAVE DEVELOPED BUT FOR THE ACQUISITION

The FTC does not dispute that Professor Rim's "methodology" was to read and quote a few selected documents in which people *outside* WhatsApp speculated about how WhatsApp might develop circa 2014. It argues that is acceptable under the rubric of "industry expert" or "experience" opinion. The FTC pushes that beyond its boundaries. Experience might be relevant when it enables an expert to apply industry-standard methodologies or approaches to a question. But nowhere does Professor Rim opine or claim that industry participants would assess the likelihood of WhatsApp pivoting by reading documents containing uninformed speculation from *other* industry participants. If the hearsay documents are admissible (which is doubtful), then the Court can consider them without someone interpreting them for the Court. That is not permissible expert witness testimony.

1.    *First*, the FTC argues (at 53-55) that Rule 702 says "an expert may be qualified on the basis of *experience*." That says nothing about methodology. *See* Fed. R. Evid. 702 (requiring, separately, both qualifications and a reliable methodology). So the FTC turns to a smattering of inapposite cases:

a.    In *Groobert v. President & Directors of Georgetown College*, 219 F. Supp. 2d 1 (D.D.C. 2002), the court held that experience satisfied the qualification and reliability prongs of Rule 702. But, as to methodology, the court expressly found the industry expert "uses the same methodology as other stock photography 'experts' in the field." *Id.* at 9. Here, by contrast, the FTC cannot even articulate what constitutes Professor

Rim's methodology.  Reading documents?  It's unclear.  And there is no argument that is what other "experts" in the field would do.

**b.**   In *Heller v. District of Columbia*, 952 F. Supp. 2d 133 (D.D.C. 2013), the court allowed former law enforcement officials who investigated gun trafficking to explain, e.g., the "best means" for regulating firearms.  *Id.* at 142.  In contrast, there is no explanation of Professor Rim's method or how it relates to his experience – he does not claim to have invested in a messenger or "pivoted" a messenger.  He, instead, invokes general "venture capital" experience and his time running the foreign company Kakao, which had already built its apps by the time he arrived.  Nothing in his claimed experience qualifies him to give untethered speculation about what WhatsApp could or would have done.

**c.**   Likewise, in *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000), the court upheld the admissibility of expert testimony deciphering gang signs, rules, and activities as reliable where the former officer had spent years undercover with pertinent gangs.  Professor Rim, on the other hand, has no relevant experience with U.S. messaging services and wasn't even familiar with WhatsApp or what it offered consumers after Meta acquired it.  *See* Ex. 11 at 17:15-21 (Rim Dep. Tr.) ("Q. Do you consider WhatsApp today to be a personal social network?  A. I have to take a look at, you know, the features because it has evolved, right.  So I think WhatsApp was, you know, a messenger initially.  The reason I'm saying that is because they're adding a few features and I would like to look into it.").

Experience *can* support opinion testimony, *cf.* FTC Opp. at 60, but only when it satisfies the standards articulated in the *Arsanjani* decision (which the FTC does not dispute), i.e., there must be a specific articulation that matches the experience claimed with the evaluation performed.

*See Arsanjani v. United States*, 2023 WL 3231101, at \*6-7 (D.D.C. May 3, 2023), *aff'd*, 2024 WL 718726 (D.C. Cir. Feb. 20, 2024).  For example, an undercover officer who lived with gangs could properly explain and decipher gang activity.  But permitting Professor Rim to opine on how WhatsApp might have changed its business model when he does not claim to have ever performed such an evaluation, invested in a messenger, or "pivoted" a messenger himself – or even to have worked with a U.S. app of any kind – would stretch "industry experts" beyond what *Kumho* recognizes and Rule 702 permits.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

   2.    ***Second***, the FTC says (at 55-56) that Professor Rim has relevant experience because he is "a successful venture capitalist and technology CEO" (albeit outside the United States), has identified and invested in "early and growth stage technology companies" (albeit none claimed as similar to WhatsApp), and made a lot of money at a young age (as if being rich is an all-purpose qualifier for speculation).  These parts of his resume simply do not qualify him to give admissible testimony about what the founders of a specific messaging company (not based in Korea) were going to do – *contrary to*, *and without even considering*, the deposition testimony of the founder and controlling shareholder Brian Acton.  This is just nothing like the undercover cop who lived with a gang or rival gang and could explain gang operations or signs or lingo accordingly.

   At most, Professor Rim is simply parroting the speculation of a WhatsApp investor – ███████ – whose witnesses will testify in the FTC's case and can explain their speculation, which should carry no weight anyway.  Professor Rim's gloss on that speculation adds nothing of value that the Court cannot otherwise surmise for itself.  His purported ability to divine the likely conversations between investors and the founders, as well as what the founders were going to do as a result, is a perfect example of impermissible overreach.  He opines, for instance:

"█████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████." FTC Opp. at 58. In addition to being speculation, this opinion – on what the founders were going to do, refuted by the sworn testimony of a founder – is a platitude divorced from any valid methodology.

3.    *Third*, the FTC argues (at 60-61) that gaps in the materials Professor Rim considered go to weight, not admissibility. Not so, as failure to confront the case evidence is grounds for exclusion, *see* Meta Mot. at 41-42 (collecting cases), *especially* for industry experts where the gambit is to suggest through an "expert" that unconsidered and unfavorable testimony from fact witnesses is irrelevant. Professor Rim never addressed the sworn deposition testimony of Mr. Acton – a WhatsApp founder – yet his opinion "pivots" on his claim to know what the WhatsApp founders were going to do. This is complete failure to address central evidence, not failure to exhaust *all* sources of possibly relevant evidence, which is what the FTC's citations address. *Cf. United States v. Raymond*, 2023 WL 6588546, at *5 (D.D.C. Oct. 10, 2023) ("Where sufficient sources are available to an expert medical witness to opine on the cause of a particular ailment, whether that expert should or could have used additional sources goes to weight, not admissibility.") (citation omitted; cleaned up); *SEC v. Johnson*, 525 F. Supp. 2d 70, 75-76 (D.D.C. 2007) (expert need not "review *all relevant* information") (emphasis added).

\*    \*    \*

The FTC never claims that Professor Rim has invested in a messenger, reviewed other ████████████████████████████ as part of studying or evaluating a potential pivot, pivoted a messenger, or studied a messenger pivot in any academic or professional setting. It does not assert he brings any methodology to bear other than reading documents in the record authored by

witnesses coming to trial.  It does not claim that an industry expert trying to determine whether

an app would pivot would do so by reading ████████████████████████, or anything

of the sort.  And nowhere does the FTC claim that his insights are necessary to explain some

otherwise inexplicable – or even vaguely uncertain – fact to the fact finder.  Claimed industry

experts relying on work experience must satisfy Rule 702.  Incanting general industry

background is not a license to speculate, contrary to the actual witnesses whose conduct is being

projected.  Professor Rim's offer to interpret hearsay documents should be declined, and he

should be excluded.  *See Kumho Tire*, 526 U.S. at 157-58 (upholding exclusion).

## VII.    REPLY SUPPORTING META'S MOTION *IN LIMINE* TO PRECLUDE PROFESSOR HEMPHILL'S MISUSE OF CONSUMER SURVEYS TO DERIVE "MARKET SHARES"

"Survey evidence" – here, polling a group of people for their views on the "most

important reasons" for using a service – has literally no bearing on a proper or reliable analysis

of market shares in a properly defined relevant antitrust market.  What some people might *say* in

response to leading questions may be different from, or simply not indicative of, what they *do*.

As the FTC's witness Professor Lampe explained:  "[S]pending time with my mother is an

important thing to do, but I don't spend as much time doing that as I might do something else."

Meta Mot. Ex. 5 at 73:15-74:8 (Lampe Dep. Tr.).  Put simply, 50% of people surveyed saying

that the "most important reason" for using Facebook is sharing with friends does not mean that

people spend 50% of their mobile online time sharing with friends on Facebook or even that

Facebook is where 50% of friend sharing takes place.  That is an obvious non sequitur.

What matters here is what people do – how much they use the various services at issue in

this case.  The parties have therefore calculated shares based on time spent, because the time

spent is directly correlated with the ability to serve ads, which itself is correlated with the

revenue earned by the free-to-user services.  The answers given in the surveys for "most

important reasons" are irrelevant to the objective and indisputable evidence of how and where people spend their mobile online time. The FTC's assertions that "sensitivity analysis" is standard (at 67), that market shares can be imprecise (at 68), and that surveys can be reliable (at 69-71) – could all be valid but are nonetheless beside the point here. These are generalities that do nothing to address the reasons why surveys cannot be used to calculate market share. The opposition offers no methodological defense for what the FTC's witness seeks to do here based on survey evidence. Tallying the number of consumers who report that "friends-and-family" sharing is "the most important reason" they use an app simply does not prove the number of people who *use* the app or the amount of time they spend on it.

Neither Professor Hemphill (who relies on the survey) nor Professor Malkiewicz (who conducted the survey) explains how that survey evidence can support the conclusions Professor Hemphill seeks to draw from it. And that is more than sufficient reason to exclude his opinions on this issue from the case.

1.    ***First***, the FTC argues (at 66-67) that this survey "proration" is "relevant and useful." Even if the survey proration were relevant, and it is not, that does nothing to bolster or explain the methodological reliability of this approach. The Diamond survey guide and cases applying it explain that using a survey for an unintended purpose is a question of methodology and reliability, not weight. *See* Meta Mot. at 45; *see also* Meta Mot. Ex. 47 ¶ 7 (PX09006, Malkiewicz Rep.) (hailing the Diamond guide as it "assists judges in managing cases involving complex scientific and technical evidence"). The issue is not whether the survey was done properly; it is whether Professor Hemphill can use the survey results for a purpose the survey designer did not intend, here as supposed evidence supporting a conclusion that fails as a matter of basic logic. He cannot. All that the FTC's claim about relevance confirms is that the FTC

will – if permitted – retreat to a narrow "friends-and-family-sharing" market out of the wreckage

of the all-in market to which it committed in its interrogatory response. *See supra* pp. 1-10.

    **2.**    ***Second***, the FTC claims (at 67, 68-69) that the survey proration is a typical

"sensitivity analysis." It is no such thing. No materials the FTC cites suggest otherwise. The

materials the FTC cites instead refer to pressure testing the accuracy of a model – not using an

entirely different data source (here, the surveys) to concoct an entirely different model (here,

a "market share" analysis of a narrower "friends and family submarket" via survey proration).

For example, the passage the FTC attributes (at 69) to Professor Carlton explains in full:

> In conclusion, analysis of vertical mergers can be complicated and difficult. In
> any merger inquiry, the examination of past mergers can be useful in identifying
> the important economic forces at work in the industry. Existing models of
> vertical mergers are still being developed. These models should be carefully
> evaluated in light of industry history and tested for robustness to reasonable
> alternative theoretical assumptions and input values based on the facts of the case.
> Furthermore, analyses should not be limited just to potential harms. Efficiencies
> are also important and should be accounted for in merger analyses, whether
> vertical or horizontal.

FTC Opp. MIL #7 Ex. G at 5. In other words, fact finders should evaluate the assumptions

underlying a model. That has nothing to do with Professor Hemphill's creation of an entirely

different model to predict usage and, from that, market share. But the survey data here *cannot*

predict usage. It is entirely subjective and purports to show *reasons* for usage. It does not test or

confirm the robustness or reliability of *direct* measures of time spent or MAUs or DAUs (i.e.,

how he otherwise measures market shares). That is objective and verifiable data; it requires no

"sensitivity analysis" with results of a survey that did not even ask about usage – how often or

how much. Saying that 30% of the time spent on Instagram must be "friend sharing" time

because 30% of survey respondents gave that as the "most important" reason for using the app is

nonsense. And nonsense aside, this does not test the robustness of the objectively determined

measure of market share – time spent. Nor is it relevant to MAU or DAU, which are themselves

inapt measures of share, because the user who spends 1 minute a month on the app counts as much as the user who spends many hours in any calculation of relative MAU or DAU statistics.

> **3.**    *Third*, the FTC argues (at 68, 70) that market shares need not be precise – asserting that *Microsoft*, *Bertelsmann*, *Hackensack*, and *Kroger* support its cause.  Those cases do nothing to support the use of inapt survey evidence to predict market share.  The issue is not precision of calculation but whether this approach makes any sense as a matter of survey science (how to use a consumer survey per the Diamond guide) or econometrics.  The FTC's opposition is *silent* on that issue.  Confirming that the issue is *not* the precision of calculation, Professor Hemphill reports his calculations with extreme, albeit false, precision:  Professor Hemphill figures that 36.7% of Instagram users saying the "most important" reason for using Instagram is friend sharing means that Instagram has ███████ daily active users employing, and ███████ hours spent on, that particular feature of the service.  *See* Meta Mot. Ex. 48, App'x A at 14 (PX09007, Hemphill Rebuttal Rep.).  That makes no sense.  But that veneer of precision masks junk-science methodology.  The cases the FTC cites (at 68) provide no support.  While "courts consider multiple approximations of market shares," they do not permit unexplained and logically invalid approximations, e.g.:

- The passage cited from *Microsoft* discusses *unchallenged* findings of market share based on software sales.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 54 (D.C. Cir. 2001) (en banc) (per curiam).  It could not be less relevant to this motion.

- The passage cited from *Bertelsmann* observes only that the government's expert calculated shares several ways.  *See United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 37 (D.D.C. 2022).  That says nothing about *this* way of supposedly calculating shares at issue.

- The footnote cited from *Hackensack* likewise notes that the government's expert calculated shares two ways. *See FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *20 n.25 (D.N.J. Aug. 4, 2021). It did not address a challenge to the methodology of either.

- And the material cited from *Kroger* is the same – the expert in that case measured shares of a "broader market" as a "conservative backstop" using store-level sales. *See FTC v. Kroger Co.*, 2024 WL 5053016, at *12 (D. Or. Dec. 10, 2024). There was no question about whether using that data for that purpose was junk science.

The FTC even suggests (at 63) that this Court blessed measuring shares "[w]hichever way the data is sliced." But there the Court was commenting on the *objective* measures that were presented on motion for summary judgment – time spent, DAUs, and MAUs – holding that there were issues of fact sufficient to survive summary judgment regardless of which such measure was chosen. *See FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, at *19 (D.D.C. Nov. 13, 2024). The Court was not asked to consider, and did not consider, using survey responses to infer time spent on friends sharing, let alone in the context of admissible trial evidence.

    4.       ***Fourth***, the FTC observes (at 69-70) that economists and courts in some antitrust cases sometimes use surveys for various reasons. So stipulated. Meta does not move to exclude Professor Malkiewicz. The question – as the Diamond survey guide explains – is whether Professor Hemphill is using the survey in a methodologically reliable fashion. The FTC cites (at 69) *Graco*, but that was not a consumer survey about tastes or preferences used to infer something about actual usage or consumption figures. Instead, it appears the defendant had an internal "survey" that itself tallied "market share" based on sales among competitors. *See Graco Inc. v. PMC Glob., Inc.*, 2012 WL 762448, at *10 (D.N.J. Mar. 6, 2012). And the FTC places great weight on *Tapestry*, where – as the court explained – a survey was used to determine how

many consumers would switch products in response to a price increase, which was then used to infer whether such a price increase would be profitable. *See FTC v. Tapestry, Inc.*, 2024 WL 4647809, at *27-28 (S.D.N.Y. Nov. 1, 2024). That hardly supports using a survey regarding "most important reasons" to calculate shares of actual usage.

5.    *Fifth*, the FTC argues (at 72) that Professor Malkiewicz thought the proration approach was "correct." Here's the full question and answer:

> Q. Were your survey results intended to be used to calculate market shares?
>
> A. Well, in the context that Professor Hemphill appears to have used it, again, with the caveat that this is the first time I'm seeing this specific analysis, that would be a correct use of the data that my survey produced. If you're asking about was it my initial intent, that's – I do not recall that being part of my assignment. So I wouldn't likely have thought about it explicitly.

FTC Opp. MIL #7 Ex. K at 83:19-84:8. That speaks for itself. And, whatever he said after the fact, the key point is that he did not (and could not) claim that the survey was conducted for that purpose. The FTC does not cite a single case, article, treatise, or even passage from its expert reports about using survey responses regarding the "most important reasons" for using a service to infer market shares that can be determined based on objective data as to what consumers actually do. Here, there *is* ample and unchallenged data on usage, including data on the time people spend consuming friend content on Facebook and Instagram. Professor Hemphill resorts to his mismatch because that actual hard data establishes that *very little* Facebook and Instagram time is spent on the friend-sharing activity he seeks to claim as the market in which consumers can be exploited for lack of alternatives. For the reasons explained *supra* (at 1-10), this retreat to a different market is improper. But, in any event, the misuse of survey data should prevent his effort to support that market.

6.    *Finally*, the FTC says (at 73-75) this is all about weight. But it does not cite a single case disputing that using a survey for an unintended purpose – and one that makes no

sense here – is a question of methodology.  *See* Meta Mot. at 46-48 (citing the Diamond survey guide and collecting cases).  The cases it cites say nothing contrary.  It starts with *Bazarian International Financial Associates, LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101 (D.D.C. 2018), and *Tapestry*, which explain that nitpicking figures or data does not go to methodology – not the problem here.  And the FTC also invokes *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999), which declined to exclude surveys about actual confusion or secondary meaning in a Lanham Act case as inadmissible hearsay based on challenges to the survey questions – again, not the issue here.

*        *        *

Meta is not arguing – here, at least – that Professor Hemphill's analysis requires exclusion under Rule 702 because it is too imprecise or that surveys generally are unacceptable for all uses in all instances.  But using the percentage of consumers who say that "the most important" use of a service is X or Y or Z to calculate actual shares of MAUs, DAUs, or time spent – actual metrics for usage – is junk science.  Professor Malkiewicz found that 5.5% of his survey respondents listed friends-and-family sharing as "the most important" reason to use Twitter while 2.8% of respondents said the same for YouTube, and from that Professor Hemphill surmises that Twitter has ▮▮ of time spent in market for friends-and-family sharing while YouTube has ▮▮ – none of that makes any sense.  And no case, article, treatise, or even explanation in either expert report claims otherwise.

Dated: March 14, 2025                   Respectfully submitted,

*/s/ Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
Zachary M. Meskell (D.C. Bar No. 1782162)*
Diego Negrón-Reichard (D.C. Bar No. 90020200)*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*

* Application for admission to the Bar of the U.S.
District Court for the District of Columbia pending.