# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA,<br><br>*Plaintiffs*,<br><br>v.<br><br>VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC; and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC,<br><br>*Defendants*. | Case No. 20-cv-00706 (DLC)<br><br>ECF Case |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE 30(b)(6) TESTIMONY NOT BASED ON PERSONAL KNOWLEDGE

## I. Introduction

Plaintiffs have moved to exclude as hearsay certain deposition testimony that they suggest was proffered by third-party Federal Rule of Civil Procedure 30(b)(6) designees who lacked personal knowledge regarding the subject matter of the testimony. This evidence establishes the following points:

- Mylan N.V. ("Mylan") was able to develop a comprehensive understanding of the market opportunity for generic Daraprim in 2015, but invested next to nothing in the project before ultimately placing it on hold. Mylan sourced pyrimethamine active pharmaceutical ingredient ("API") from ████████████████████████, and subsequently turned down multiple offers from ████████ for additional quantities. Mylan had at least five opportunities to purchase Daraprim samples for bioequivalence testing, but declined them all.

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████.

- ████████████████████████████████████████████████████████████.

- Following the 2015 price increase of Daraprim, compounding pharmacies, including Imprimis Pharmaceuticals ("Imprimis") and Avella Specialty Pharmacy ("Avella"), began offering compounded pyrimethamine as an alternative to Daraprim. Imprimis and Avella sourced pyrimethamine API for use in their compounded products without difficulty, including from suppliers such as LGM Pharma ("LGM"), which imported significant volumes of pyrimethamine API from ████████ and other manufacturers.

It is unsurprising that Plaintiffs want this evidence excluded. It—along with other evidence—establishes that (1) Defendants' challenged conduct did not delay generic competition and (2) Plaintiffs' proposed relevant product market of "FDA-approved pyrimethamine products" is improperly defined because it excludes substitutable products, including compounded pyrimethamine. But Plaintiffs have not met their burden to show that any of this evidence should be excluded.

## II.     Legal Standard

"A court will exclude evidence on a motion *in limine* only if it is 'clearly inadmissible on all potential grounds.'" *Romanelli v. Long Island R.R. Co.*, 898 F. Supp. 2d 626, 629 (S.D.N.Y. 2012) (citation omitted). "The movant in a motion *in limine* seeking to exclude evidence 'has the burden of establishing that the evidence is not admissible for any purpose.'" *Wilder v. World of Boxing LLC*, 220 F. Supp. 3d 473, 478 (S.D.N.Y. 2016) (citation omitted).

As Plaintiffs' cited authority describes, Rule 30(b)(6) testimony may be excluded as hearsay only where two criteria are satisfied:  First, the witness must lack personal knowledge regarding the subject matter of the testimony; second, there must be no additional record evidence to support the challenged statements.  *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 214-16 & n.5 (S.D.N.Y. 2007).  In other words, statements that would otherwise constitute hearsay are admissible if the Rule 30(b)(6) deponent testifies as to his or her personal knowledge, or the testimony is supported by additional record evidence or testimony.  *Id.*[1]

## III.     Plaintiffs' Motion Is Procedurally Improper

Plaintiffs ask the Court to exclude all of the testimony highlighted in Appendix A to their Motion, along with "any other third-party testimony not based on personal knowledge" that they do not identify.  *See* Pls.' Mem. of Law at 2 & n.1.  This kitchen-sink approach is improper because it would require the Court to make blanket determinations as to admissibility without the sort of careful, statement-by-statement analysis that is required.  For example, in *Century*

---

[1] Plaintiffs confusingly seek to draw a distinction between party and third-party 30(b)(6) designees.  *See, e.g.*, Pls.' Mem. of Law at 3 ("Third-party deposition testimony is inadmissible if it is not based on personal knowledge.").  Plaintiffs' cited authority, however, does not support such a distinction.  For example, Plaintiffs misidentify the witness in *L-3 Communications Corp. v. OSI Systems, Inc.* as a "non-party 30(b)(6) deponent" when, in reality, that witness was the plaintiffs' 30(b)(6) designee.  *See* No. 02-cv-9144, 2006 WL 988143, at *2 (S.D.N.Y. Apr. 13, 2006).  Similarly, the witness at issue in *Century Pacific* was the plaintiff's 30(b)(6) deponent.  *See* 528 F. Supp. 2d at 220.  In any event, the distinction is immaterial because, as Plaintiffs' cited authority makes clear, Rule 30(b)(6) testimony of *any* entity should not be excluded if the witness has personal knowledge or if other record evidence supports the testimony.

*Pacific*, the defendants sought to exclude two specific statements from a Rule 30(b)(6) deposition. *See* 528 F. Supp. 2d at 215-16. Judge Karas carefully assessed each statement to determine, first, whether the deponent had adequate personal knowledge of the underlying events and, second, whether there was separate record evidence that would support admissibility. *Id*. at 216.

Here, in contrast, Plaintiffs seek to exclude *forty-five* separate portions of testimony— some of which are so lengthy that they span multiple transcript pages—*plus* additional testimony that they do not even identify. Plaintiffs have proffered their objections and they are free to press them at trial. But Plaintiffs offer no basis on which to preemptively exclude broad swaths of testimony without an opportunity for the parties to argue, or the Court to assess, their respective admissibility. *See Viada v. Osaka Health Spa, Inc.*, No. 04-cv-2744, 2005 WL 3435111, at *1 (S.D.N.Y. Dec. 12, 2005) (unless challenged evidence is "clearly inadmissible on all potential grounds," motions *in limine* should be denied and "evidentiary rulings should be deferred until trial" so that they may be "resolved in proper context (citation omitted)).

## IV. The Challenged Testimony Is Admissible In Any Event

Plaintiffs have failed to carry their burden to show that the challenged testimony is subject to exclusion as hearsay. As reflected in the table below, that testimony is either (1) not hearsay at all, (2) within the witness's personal knowledge, and/or (3) supported by additional record evidence:

| Designation | Grounds for Admissibility |
|---|---|
| 36:2-8 & 36:20-25 | ● ███████████████████████ |
| 45:19-46:4 | ● ███████████████████████ |
| **Michael Hatch (Mylan)** | |
| 100:15-101:9 | ● No basis to believe Mr. Hatch lacks personal knowledge about Mylan's market forecast because (1) he recognized the document at issue, *see* 100:25-101:9, and (2) he testified that the North American Portfolio Team regularly provides information of this sort to him, *see* 65:20-66:2.<br>● The underlying forecast spreadsheet, DX 94, independently reflects Mylan's market forecast and supports Mr. Hatch's testimony.<br>● Mylan's forecasts and Mr. Hatch's testimony regarding those forecasts are not offered for their truth (i.e., their accuracy). They are offered to show that Mylan was able to, and did, assess the market opportunity for generic Daraprim. |
| 106:16-21 & 107:21-108:2 | ● The questions specifically asked Mr. Hatch to testify based on his personal knowledge. *See* 106:18-19 ("[D]o you know what the basis for those assumptions was?"); 107:21-23 ("Do you know whether the assumptions of the downward trend in sales volume were changed or updated at any point?"). |
| 118:15-120:7 | ● Here, too, the questions specifically asked Mr. Hatch to answer based on his personal knowledge. *See, e.g.,* 119:7-10 ("Do you know if the R&D department ever took any specific steps to develop Daraprim after the project was approved in November of 2015?"). |
| 121:4-123:21 | ● No basis to believe Mr. Hatch lacks personal knowledge as the document in question was emailed to him. *See* DX 95.<br>● Testimony is confirmed by the underlying document, showing Mylan invested $0 in 2016 and just over $2,000 in 2017. *See* DX 95. |
| 135:10-137:18 | ● Again, the questions asked Mr. Hatch to answer based on his personal knowledge. *See, e.g.,* 135:10-11 ("Do you know whether pyrimethamine is a difficult molecule to manufacture?"); 135:23 ("Do you know ballpark [how many different APIs Mylan manufactures]?"); 136:19-21 ("[Y]ou're not aware of any instance in which ███ had said that it would not provide pyrimethamine API to Mylan?"). |
| 143:8-13 & 145:19-148:22 150:17-152:16 | ● Mr. Hatch's testimony is directly supported by the underlying document, DX 99, an email showing Mylan declining offers from ███ ███ agent to purchase additional pyrimethamine API and informing ███ agent that the project had been placed "on hold."<br>● Mr. Hatch's testimony is separately supported by the testimony of another Mylan employee, Paula Raese, who was a recipient of the same email and was asked questions about it at her deposition. *See, e.g.,* Raese Tr. 108:17-23 ("Q: What does it mean that the Daraprim project has been placed on hold? A: So in order for him to send that e-mail to say the project had been placed on hold, we would have received notification that we were de-prioritizing our efforts by way of putting the product on hold."). |

| Designation | Grounds for Admissibility |
|---|---|
| 152:25-153:6 & 153:14-154:8 | • Again, the questions specifically asked Mr. Hatch to answer based on his personal knowledge. *See, e.g.*, 152:24-153:2 ("[A]re you aware of any further efforts by Mylan to obtain additional pyrimethamine API after November 2017?"); 153:23-25 ("Are you aware of any API supplier that refused a request from Mylan to supply pyrimethamine API?"). |
| 157:10-158:21 | • The questions sought Mr. Hatch's personal knowledge. *See* 157:15-17 ("Can you look at . . . the first-page e-mail and tell me if you understand what this document is."); 158:2 ("What do you understand that to mean?"). |
| 159:17-161:13 & 161:24-162:13 | • The document, and Mr. Hatch's testimony, are not offered for their truth (i.e., that Bionical supplied Daraprim samples), but rather they are offered to show that Mylan received the offer.<br>• Mr. Hatch's testimony that Mylan received an offer for Daraprim samples from Bionical is directly supported by the underlying document, an email quote from Bionical to Mylan. *See* DX 101. |
| 167:13-169:6 | • The document, and Mr. Hatch's testimony, are not offered for their truth (i.e., that Durbin supplied Daraprim samples), but rather they are offered to show that Mylan received the offer.<br>• Mr. Hatch's testimony that Mylan received an offer for Daraprim samples from Durbin is directly supported by the underlying document, a price quote from Durbin to Mylan. *See* DX 102. |
| 171:13-172:18 | • No basis to believe Mr. Hatch lacks personal knowledge as he testified regarding the significance of the notation that the Daraprim project was "not funded in 2017 budget." *See* 172:11-18.<br>• Testimony is confirmed by the underlying document, showing Mylan denoted the generic Daraprim project as having "Low Internal Priority." *See* DX 103. |
| 175:18-23 & 176:13-20 | • The question sought Mr. Hatch's personal knowledge. *See* 176:13-14 ("So do you recognize what this presentation is?"). After Mr. Hatch indicated that he recognized a notation on the document, he was asked one specific follow-up question. *See* 176:18 ("And what does that [notation] indicate?"). |
| 180:3-183:3 | • No basis to believe Mr. Hatch lacks personal knowledge because (1) the document in question was emailed to him, *see* DX 106, and (2) he testified that he recognized the document as a list of projects that had been removed from the 2017 work plan, *see* 181:3.<br>• Testimony is confirmed by the underlying document, showing Mylan abandoned its generic Daraprim project. *See* DX 106. |
| 184:7-185:20 | • The document, and Mr. Hatch's testimony, are not offered for their truth (i.e., that Premium Health Services supplied Daraprim samples), but rather they are offered to show that Mylan received the offer.<br>• Mr. Hatch's testimony that Mylan received an offer for Daraprim samples from Premium Health Services is directly supported by the underlying document, a price quote from Premium Health Services to Mylan. *See* DX 107. |
| 185:25-189:17 & 189:24-192:4 | • No basis to believe Mr. Hatch lacks personal knowledge because (1) the document in question was emailed to him, *see* DX 108, and (2) the questions sought his personal knowledge, *see, e.g.*, 190:5-6 ("Do you know what the basis was for that cost estimate?").<br>• Testimony is confirmed by the underlying document, showing Mylan deemed generic Daraprim as having "Low ROI." *See* DX 108. |
| 195:22-196:3 | • The question sought Mr. Hatch's personal knowledge. *See* 195:22-24 ("Do you know of any specific steps that Mylan took to advance the Daraprim project after the project was put on hold?"). |
| 196:13-198:7 | • The document, and Mr. Hatch's testimony, are not offered for their truth (i.e., that Globyz Pharma supplied Daraprim samples), but rather they are offered to show that Mylan received the offer. |

| Designation | Grounds for Admissibility |
|---|---|
| | • Mr. Hatch's testimony that Mylan received an offer for Daraprim samples from Globyz Pharma is directly supported by the underlying document, an email quote from Globyz Pharma to Mylan. *See* DX 110. |
| 198:10-201:21 | • The document, and Mr. Hatch's testimony, are not offered for their truth (i.e., that Spring Bio Solution supplied Daraprim samples), but rather they are offered to show that Mylan received the offer. |
| | • Mr. Hatch's testimony that Mylan received an offer for Daraprim samples from Spring Bio Solution is directly supported by the underlying document, an email quote from Spring Bio Solution to Mylan. *See* DX 111. |
| 202:3-204:5 | • No basis to believe Mr. Hatch lacks personal knowledge because (1) the document in question was emailed to him, *see* DX 112, and (2) Mr. Hatch testified that he recognized the document, *see* 202:25-203:6 ("Q: So do you recognize this . . . as an e-mail forwarding a draft of the 2019 and Beyond WP file? . . . A. [T]his appears to reference the 2019 work plan."). |
| | • Testimony is confirmed by the underlying document, showing Mylan decided to "kill" the generic Daraprim project. *See* DX 112. |
| 212:4-23 & 213:12-215:4 | • The questions exclusively sought Mr. Hatch's personal knowledge. *See, e.g.,* 212:4-6 ("[A]re you aware of any instance in which Mylan tried and failed to obtain pyrimethamine API?"); 212:17-19 ("Do you have any basis to believe that Mylan ever placed an order for Daraprim RLD and was unable to obtain it?"); 214:14-16 ("So did you believe that sales were in fact higher or lower than the IMS numbers were showing?"). |
| **Hamilton Lenox (LGM)** | |
| 34:7-13 | • The question sought Mr. Lenox's personal knowledge. *See* 34:8-11 ("[D]o you understand Mr. Schurder as indicating to the recipient of this email that LGM needed 250 kilograms of pyrimethamine as soon as possible?"). |
| | • Testimony that LGM needed 250 kilograms of pyrimethamine is confirmed by the underlying document reflecting LGM's request for that volume of pyrimethamine. *See* DX 272. |
| 35:11-14 | • Testimony that there was demand for pyrimethamine API is confirmed by the underlying document stating that LGM's "requirement has become urgent as our clients are lined up waiting for [pyrimethamine]." *See* DX 272. |
| 46:24-48:2 | • The question sought Mr. Lenox's personal knowledge. *See* 47:22-24 ("Do you have any understanding as to the cause of the disruption of ▮▮▮▮ supply of pyrimethamine in 2018?"). |
| | • The fact of ▮▮▮▮ manufacturing problem is confirmed by the underlying document. *See* DX 277. |
| 49:2-3 & 50:7-11 & 50:16-51:7 | • The questions sought Mr. Lenox's personal knowledge. *See, e.g.,* 50:7-9 ("So is it your understanding here that Mr. Lustman is looking for a quote for a purchase of 300 to 500 kilograms of pyrimethamine from Anuh?"). |
| | • The fact that LGM sourced pyrimethamine API from Anuh is confirmed by the underlying document. *See* DX 279. |
| **Amanda Lopez (Durbin)** | |
| 48:5-9 | • As to all testimony, Ms. Lopez confirmed that she had reviewed the 30(b)(6) topics and was the "person at Durbin most knowledgeable with respect to the topics." *See* 13:24-14:2. |
| | • The question exclusively sought Ms. Lopez's personal knowledge. *See* 48:5-7 ("[B]ased on this email, is it your understanding that Durbin could have sold Daraprim to Mylan, if Mylan wanted to purchase it?"). |
| | • Testimony that Durbin could have sold Daraprim to Mylan is confirmed by the underlying document reflecting the offer. *See* DX 254. |

| Designation | Grounds for Admissibility |
|---|---|
| 52:14-18 | • ███████████████████████████████████████ |
| 59:1-4 | • ███████████████████████████████████████ |
| 59:21-25 | • ███████████████████████████████████████ <br> • |
| 76:18-21 | • ███████████████████████████████████████ |
| 139:2-6 | • Plaintiffs omit the preceding question, which makes clear that it sought Ms. Lopez's personal knowledge. *See* 138:22-25 ("[W]hen we talk about those types of restrictions . . . , in your experience, how common are those restrictions in place for specialty drugs?"). |
| ***Dennis Saadeh (Imprimis)*** | |
| 53:20-55:8 & 55:17-55:24 | • As to all testimony, Mr. Saadeh confirmed that he had reviewed the 30(b)(6) topics, that he was "the person at [Imprimis] most knowledgeable with respect to the topics," and that no one else at Imprimis had "more knowledge than [him] concerning any of the topics." *See* 90:23-91:11. <br> • As an initial matter, Plaintiffs appear to have included this testimony in error, as ***Plaintiffs—not Defendants***—elicited this testimony. <br> • There is no basis to believe Mr. Saadeh lacks personal knowledge because he recognized the document. *See* 54:2-6 ("Q: What is this document? A: It looks to be an inventory report of all pyrimethamine raw material checked in to inventory at our New Jersey facility."). <br> • The fact of Imprimis's purchases of pyrimethamine is confirmed by the underlying document. *See* GX 3556. |
| 118:2-119:22 | • The document, and Mr. Saadeh's testimony, are not offered for their truth (i.e., that Imprimis's market forecast was accurate), but rather they are offered to show that Imprimis believed its compounded product competed with, and could take market share from, Daraprim. <br> • The testimony is directly supported by the underlying document reflecting Imprimis's market share estimates. *See* DX 132. |
| ***Eric Sredzinski (Avella)*** | |
| 67:16-68:9 | • As to all testimony, Mr. Sredzinski confirmed that no one else at Avella was "more knowledgeable than [him] concerning any of the topics listed" in Avella's 30(b)(6) notice. *See* 56:6-10. <br> • Line of questioning sought Mr. Sredzinski's personal knowledge. *See, e.g.,* 68:5-8 ("Sitting here today, are you aware of any instances in which Avella requested pyrimethamine API from ████ and in which ████ declined that request?"). |
| 68:17-72:10 | • Avella's purchases of pyrimethamine are confirmed by the underlying document showing order dates and quantities. *See* DX 214. |
| 89:7-13 | • The question exclusively sought Mr. Sredzinski's personal knowledge. *See* 89:7-10 ("And do you have any understanding of why the acquisition cost in Row 2 is higher than the acquisition cost of any of the other rows listed below?"). |

Unable to make the requisite showing needed to exclude this testimony, Plaintiffs instead seek to mischaracterize the deposition record. First, Plaintiffs accuse Defendants of improperly instructing Rule 30(b)(6) witnesses that "the entirety of their questioning was based on the witness's 30(b)(6) preparation." *See* Pls.' Mem. of Law at 2. That is false. Although Defendants issued Rule 30(b)(6) notices and deposed witnesses in their capacity as corporate representatives, Defendants never once instructed a witness to testify based solely on the witness's Rule 30(b)(6) preparation.[2] Second, Plaintiffs assert that "Defendants made no further effort to assess whether the witness's answers were based on personal knowledge or on corporate information learned as a 30(b)(6) designee." *Id.* That, too, is false. For one thing, as the chart above makes clear, Defendants painstakingly focused their questions on each witness's personal knowledge. Furthermore, even if one were to assume, counterfactually, that the challenged testimony was based solely on 30(b)(6) preparation—and not on the witness's personal knowledge—Plaintiffs' cited authority makes clear that that evidence would *still* be admissible if—as is almost universally the case here—there is "additional evidence" in the record "to support the statements." *See Century Pac.*, 528 F. Supp. 2d at 215 n.5.

## V.     Conclusion

For the reasons above, Defendants respectfully request that the Court deny Plaintiffs' Motion *In Limine* to Preclude 30(b)(6) Testimony Not Based on Personal Knowledge.

---

[2] Plaintiffs' citations to the Hatch and Lenox depositions make this clear. *See* Pls. Mem. of Law at 2. Mr. Hatch and Mr. Lenox were instructed that they were being questioned in their capacity as corporate representatives, but—contrary to Plaintiffs' misleading assertion—they were never advised that their questioning (or their answers) should be or would be based solely on their Rule 30(b)(6) preparation.

Dated: October 27, 2021

/s/ Kenneth R. David
Kenneth R. David
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1893
kdavid@kasowitz.com

*Counsel to Defendant Kevin Mulleady*

/s/ Christopher H. Casey
Christopher H. Casey (*pro hac vice*)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1155
chcasey@duanemorris.com

*Counsel to Defendant Martin Shkreli*

Respectfully submitted,

/s/ Steven A. Reed
Steven A. Reed (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
Fax: (215) 963-5001
steven.reed@morganlewis.com

Stacey Anne Mahoney
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Fax: (212) 309-6001
stacey.mahoney@morganlewis.com

*Counsel to Defendants Vyera*
*Pharmaceuticals, LLC and Phoenixus AG*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 27, 2021 a copy of the foregoing Defendants' Opposition to Plaintiffs' Motion *In Limine* to Preclude 30(b)(6) Testimony Not Based on Personal Knowledge was served upon all counsel of record in this matter by email.

*/s/ Noah J. Kaufman*

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION;
STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF ILLINOIS;
STATE OF NORTH CAROLINA; STATE
OF OHIO; COMMONWEALTH OF
PENNSYLVANIA; and
COMMONWEALTH OF VIRGINIA,

        Plaintiffs,

        v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former director
of Phoenixus AG and a former executive of
Vyera Pharmaceuticals, LLC; and KEVIN
MULLEADY, individually, as an owner and
director of Phoenixus AG and a former
executive of Vyera Pharmaceuticals, LLC,

        Defendants.

Case No. 20-cv-00706 (DLC)

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION *IN LIMINE* TO PRECLUDE 30(b)(6) TESTIMONY NOT BASED ON PERSONAL KNOWLEDGE

Plaintiffs submit this motion *in limine* to preclude the admission of deposition testimony from third-party Rule 30(b)(6) witnesses that is not based on personal knowledge. In these depositions, Defendants often instructed the witness to testify in their role as a prepared 30(b)(6) corporate representative. Defendants then failed to lay a foundation showing that any testimony they elicited was based on the witness's personal knowledge as opposed to their preparation as a corporate representative. Indeed, Defendants often persisted in their questioning even when deponents stated that they were unfamiliar with the subject or document at issue. Defendants now

1

seek to designate and admit this 30(b)(6) testimony even though it is not based on the witnesses' personal knowledge as required by Federal Rule of Evidence 602. This is improper. Defendants had ample opportunity to develop third-party deposition testimony based on personal knowledge and failed to do so. They should not be allowed to skirt the Rules of Evidence to cover this deficiency.

Plaintiffs respectfully request that the Court (1) preclude the admission of the 30(b)(6) deposition testimony not based on personal knowledge from the corporate designees from Avella, Harrow, Mylan, Durbin, LGM, and Pisgah highlighted in Appendix A; (2) preclude the admission of any other third-party testimony not based on personal knowledge into evidence at trial;[1] and (3) prohibit Defendants from referring to this excluded evidence at trial.

## FACTUAL AND PROCEDURAL BACKGROUND

During discovery Defendants served numerous Rule 30(b)(6) deposition notices and subpoenas to third-party entities. Defendants commenced many of these depositions by instructing the witness that the entirety of their questioning was based on the witness's 30(b)(6) preparation. *See, e.g.*, Hatch Dep. 86:10-16, 204:22-205:5, 210:11-20 ("You can assume that the [] entirety of my questioning will be as a 30(b)(6) designee."); Lenox Dep. 8:12-22 ("Do you understand that you're here today to testify as a corporate representative of LGM?").[2]

Defendants made no further effort to assess whether the witness's answers were based on personal knowledge or on corporate information learned as a 30(b)(6) designee. This is despite the fact that several of the designees indicated that, in preparing for the deposition, they reviewed

---

[1] In addition to the six depositions enumerated in Appendix A, Plaintiffs also broadly objected to Defendants' designations of 30(b)(6) deposition testimony from Donovan Quill (Optime), Lucas Schulz (University of Wisconsin), Vande Waa (University of South Alabama), Wessels (Caremark). *See* Proposed Joint Pretrial Order, Attachment C-2 (Defendants' Affirmative Deposition Designations).

[2] *See also* Bailey Dep. 8:21-23; Lopez Dep. 11:19-14:2.

corporate documents with other employees or counsel. *See, e.g.*, Hatch Dep. 77:4-9; Sredzinski Dep. 57:5-10; Saadeh Dep. 91:14-92:6; Lenox Dep. 8:20-9:8.[3] Nor did Defendants use these 30(b)(6) depositions to identify additional witnesses who could testify from personal knowledge, despite using a third of the 140 deposition hours allotted to them in discovery. Defendants now seek to designate and admit testimony from several of these third-party 30(b)(6) depositions.

Plaintiffs also questioned the witnesses at these depositions, but regularly took care to establish that testimony was based on personal knowledge. In many depositions, Plaintiffs' counsel instructed the witness that they should testify from personal knowledge unless the question specified otherwise. *See, e.g.*, Saadeh Dep. 10:2-8 ("I will be asking you questions based on your personal knowledge . . ."); Sredzinski Dep. 8:24-9:6 ("For the first part of the deposition, I intend to ask you questions on your personal capacity based on your personal knowledge."); Hatch Dep. 205:8-16. More generally, Plaintiffs consistently laid a foundation for the witness's knowledge, often by using documents or communications the witness personally wrote or by confirming their knowledge on a particular subject. *See, e.g.*, Hatch Dep. 64:12-66:24; Sredzinski Dep. 29:3-30:11.

## ARGUMENT

**I.  Third-party deposition testimony is inadmissible if it is not based on personal knowledge**

The Federal Rules of Civil Procedure state that deposition testimony may only be admitted if it "would be admissible under the Federal Rules of Evidence if the deponent were present and testifying." Fed. R. Civ. P. 32(a)(1)(B).[4] It is a cardinal rule of admissibility that a fact witness must have personal knowledge of the subjects upon which they testify. Fed. R. Evid. 602 ("A witness

---

[3] *See also* Lopez Dep. 16:9-12; Bailey Dep. 9:5-13.

[4] "Deposition testimony is normally inadmissible hearsay, but Fed. R. Civ. P. 32(a) creates an exception to the hearsay rules." *L-3 Commc'ns Corp. v. OSI Sys., Inc.,* No. 02 CIV. 9144 (PAC), 2006 WL 988143, at *9 (S.D.N.Y. Apr. 13, 2006) (internal quotation marks omitted).

may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . .”). Rule 30(b)(6) testimony often does not meet this standard.

Rule 30(b)(6) “permits a party to name as a deponent a public corporation” that must then “‘designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf.’” *L-3 Commc'ns Corp. v. OSI Sys., Inc.,* No. 02 CIV. 9144 (PAC), 2006 WL 988143, at *2 n.4 (S.D.N.Y. Apr. 13, 2006) (quoting Fed. R. Civ. P. 30(b)(6)). “A Rule 30(b)(6) designee is not simply testifying about matters within his or her personal knowledge, but rather is speaking for the corporation about matters to which the corporation has reasonable access.” *Oy v. Verizon Servs. Corp.*, No. 12-cv-715, 2013 WL 5675516, at *2 (D. Del. Oct. 15, 2013) (internal quotation marks omitted). The deponent “must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources.” *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997). Parties use 30(b)(6) depositions as a discovery mechanism to “identify individuals within an organization with personal knowledge regarding certain subjects” who can then be deposed. *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, No. 2:16-cv-135-JNP-PMW, 2019 WL 3500896, at *13 n.7 (D. Utah Aug. 1, 2019); *see also* Fed. R. Civ. P. 30(b)(6) advisory committee's note to 1970 amendment.

Although Rule 30(b)(6) witnesses can testify at a deposition as a corporate representative, when it comes to trial, litigants “may only offer testimony from [a non-party 30(b)(6) deponent] as a fact witness based on [their] personal knowledge . . . .” *L-3 Commc'ns,* 2006 WL 988143 at *2.[5] Information that a 30(b)(6) witness learned through their preparation is hearsay, and “[n]umerous

---

[5] Federal Rule of Civil Procedure 32 specifies that a 30(b)(6) deposition *of a party* “may be used by an adverse party for any purpose,” but it does not make this provision for non-parties. *See L-3 Commc'ns*, 2006 WL 988143 at *2.

courts have rejected hearsay evidence by a corporate deponent when there is no additional evidence to support the statements." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 n.5 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009); *see also Deutsche Shell Tanker Gesellschaft mbH v. Placid Refining Co.*, 993 F.2d 466, 473 n.29 (5th Cir. 1993) (corporate representative may not repeat "rank hearsay"); *HealthBanc*, 2019 WL 3500896 at *13 n.7 ("There is no indication in the text of Rule 30(b)(6) that the drafters of this rule intended to give organizations the special advantage of designating a witness that would be free to disregard the personal knowledge limitation on testimony.").

Defendants have failed to establish that their designated third-party testimony is based on the witness's personal knowledge. Defendants subpoenaed witnesses as corporate representatives rather than individuals, instructed them to testify only in their capacity as corporate representatives, and made no attempt to assess whether they had personal knowledge of the topics covered. Defendants often persisted in their questioning even when the witness was clear that they had no personal knowledge on a subject. *See*, *e.g.*, Lenox Dep. 45:21-48:7 (witness questioned about decision he did "not have any direct personal knowledge of" as it was made before he was employed at the company); Hatch Dep. 135:10-137:18 (witness questioned about API sourcing and manufacturing after stating he was not involved in those areas); Saadeh Dep. 116:21-119:2 (witness asked to interpret email as a 30(b)(6) corporate representative who had not personally received the email). And Defendants did not use these 30(b)(6) depositions to identify and depose other individuals who did have personal knowledge.

Defendants should not be allowed to circumvent the rules of evidence by relying on extensive third-party deposition designations not based on personal knowledge. For the foregoing reasons, the FTC respectfully requests that the Court preclude the admission of the 30(b)(6) testimony not based on personal knowledge specified in Appendix A; preclude the admission of any

other third-party testimony not based on personal knowledge into evidence at trial; and (3) prohibit

Defendants from referring to this excluded evidence at trial.

Dated: October 20, 2021

Respectfully Submitted,

/s/ Markus H. Meier
Markus H. Meier
Bradley S. Albert
Armine Black
Daniel W. Butrymowicz
Leah P. Hubinger
Lauren Peay
Neal J. Perlman
J. Maren Schmidt
James H. Weingarten
Amanda Triplett
Matthew Weprin

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3748
MMEIER@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

/s/ Elinor R. Hoffmann
Elinor R. Hoffmann
Chief, Antitrust Bureau
Bryan Bloom
Jeremy R. Kasha
Amy McFarlane
Saami Zain

Office of the New York Attorney General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8269
elinor.hoffmann@ag.ny.gov

*Counsel for Plaintiff State of New York*

/s/ Michael D. Battaglia
Michael D. Battaglia
Deputy Attorney General

Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3769
michael.battaglia@doj.ca.gov

*Counsel for Plaintiff State of California*

/s/ Richard S. Schultz
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau

Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
Tel: (872) 272-0996
Richard.Schultz@ilag.gov

*Counsel for Plaintiff State of Illinois*

/s/ Jessica V. Sutton
Jessica V. Sutton
Special Deputy Attorney General

North Carolina Department of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Tel: (919) 716-0998
jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

/s/ Beth A. Finnerty
Beth A. Finnerty
Assistant Chief, Antitrust Section

Office of the Attorney General of Ohio
30 E. Broad Street, 26th Floor
Columbus, OH 43215
Tel: (614) 466-4328
Beth.Finnerty@OhioAGO.gov

*Counsel for Plaintiff State of Ohio*

/s/ Joseph S. Betsko
Joseph S. Betsko
Senior Deputy Attorney General

Pennsylvania Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120
jbetsko@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

/s/ Tyler T. Henry
Tyler T. Henry
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219
thenry@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

# Appendix A

*FTC et al. v. Vyera Pharmaceuticals, LLC et al.*, No. 1:20cv706 (S.D.N.Y.)

### Dani Bailey (Pisgah Labs) Deposition dated Feb. 17, 2021

| Defendants' Affirmative Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Appendix A Page Reference |
|---|---|---|---|
| 35:4 -36:14 | 36:2-8 | | 2 |
| 36:20 -37:3 | 36:20-25 | | 2 |
| 44:19 -48:9 | 45:19-46:4 | | 3 |

### Michael Hatch (Mylan) Deposition dated Jan. 14, 2021

| Defendants' Affirmative Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Appendix A Page Reference |
|---|---|---|---|
| 100:15 -101:9 | 100:15 -101:9 | 101:10-102:6, 102:8-16, 102:25-103:15, 105:20-22, 105:24-106:5, 106:7-15, 106:22-107:7, 107:9-20 | 6 |
| 106:16 -106:21 | 106:16 -106:21 | | |
| 107:21 -108:2 | 107:21 -108:2 | | |
| 118:15 -120:7 | 118:15 -120:7 | | 9 |
| 121:4 -123:21 | 121:4 -123:21 | | 9 |
| 134:19 -137:18 | 135:10-137:18 | | 11 |
| 143:8 -143:13 | 143:8 -143:13 | | 12 |
| 145:19 -148:22 | 145:19 -148:22 | | 12 |
| 150:17 -152:16 | 150:17 -152:16 | | 14 |
| 152:25 -153:6 | 152:25 -153:6 | | 14 |
| 153:14 -154:8 | 153:14 -154:8 | | 14 |
| 157:10 -158:21 | 157:10 -158:21 | | 15 |
| 159:17 -162:13 | 159:17-161:13, 161:24-162:13 | | 16 |
| 163:23 -169:6 | 167:13-169:6 | | 17 |
| 171:13 -172:18 | 171:13 -172:18 | | 19 |

HIGHLY CONFIDENTIAL

*FTC et al. v. Vyera Pharmaceuticals, LLC et al.*, No. 1:20cv706 (S.D.N.Y.)

| Defendants' Affirmative Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Appendix A Page Reference |
|---|---|---|---|
| 175:18 -175:23 | 175:18 -175:23 | | 20 |
| 176:13 -176:20 | 176:13 -176:20 | | 20 |
| 180:3 -183:3 | 180:3 -183:3 | | 21 |
| 184:7 -185:20 | 184:7 -185:20 | | 22 |
| 185:25 -192:4 | 185:25-189:17, 189:24-192:4 | | 22 |
| 195:22 -196:10 | 195:22-196:3 | | 25 |
| 196:13 -198:7 | 196:13 -198:7 | | 25 |
| 198:10 -201:21 | 198:10 -201:21 | | 26 |
| 202:3 -204:5 | 202:3 -204:5 | | 27 |
| 211:19 -215:4 | 212:4-23, 213:12-215:4 | | 28 |

### Hamilton Lenox (LGM Pharma) Deposition dated Feb. 24, 2021

| | | | |
|---|---|---|---|
| 33:21 -34:13 | 34:7-13 | | 31 |
| 35:11 -35:14 | 35:11 -35:14 | | 32 |
| 45:21 -48:2 | 46:24-48:2 | | 33 |
| 49:2 -49:3 | 49:2 -49:3 | | 34 |
| 49:9 -51:7 | 50:7-11, 50:16-51:7 | | 34 |

### Amanda Lopez (Durbin USA) Deposition dated Feb. 23, 2021

| | | | |
|---|---|---|---|
| 47:9 -48:9 | 48:5-9 | | 37 |
| 52:10 -52:18 | 52:14-18 | | 38 |
| 59:1 -59:4 | 59:1-4 | | 39 |
| 59:21 -60:4 | 59:21-25 | | 39 |

HIGHLY CONFIDENTIAL

*FTC et al. v. Vyera Pharmaceuticals, LLC et al. , No. 1:20cv706 (S.D.N.Y.)*

| Defendants' Affirmative Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Appendix A Page Reference |
|---|---|---|---|
| 75:8 -76:21 | 76:18-21 | | 40 |
| 137:21 -139:6 | 139:2-6 | | 41 |

**Dennis Saadeh (Harrow Health) Deposition dated Feb. 10, 2021**

| | | | |
|---|---|---|---|
| 53:20 -55:8 | 53:20 -55:8 | | 44 |
| 55:17 -55:24 | 55:17 -55:24 | | 45 |
| 116:23 -119:22 | 118:2- 119:22 | | 46 |

**Eric Sredzinski (Avella Specialty Pharmacy) Deposition dated Feb. 16, 2021**

| | | | |
|---|---|---|---|
| 67:11 -68:9 | 67:16-68:9 | | 49 |
| 68:17 -72:10 | 68:17 -72:10 | | 49 |
| 88:14 -91:20 | 89:7-13 | | 51 |

HIGHLY CONFIDENTIAL

```
 1

 2              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 3                  CASE NO. 1:20-CV-00706-DLC

 4    FEDERAL TRADE COMMISSION; STATE    )
      OF NEW YORK; STATE OF              )
 5    CALIFORNIA; STATE OF ILLINOIS;     )
      STATE OF NORTH CAROLINA; STATE     )
 6    OF OHIO; COMMONWEALTH OF           )
      PENNSYLVANIA; and COMMONWEALTH     )
 7    OF VIRGINIA,                       )
                                         )
 8                      Plaintiffs,      )
                                         )
 9          vs.                          )
                                         )
10    VYERA PHARMACEUTICALS, LLC;        )
      PHOENIXUS AG; MARTIN SHKRELI,      )
11    individually, as an owner and      )
      former officer of Vyera            )
12    Pharmaceuticals, LLC and           )
      Phoenixus AG (formerly known as    )
13    Turing Pharmaceuticals, LLC and    )
      Turing Pharmaceuticals AG); and    )
14    KEVIN MULLEADY, individually, as   )
      an owner and director of           )
15    Phoenixus AG and a former          )
      executive of Vyera                 )
16    Pharmaceuticals, LLC,              )
                                         )
17                      Defendants.      )
      _____)
18

19                    CONDUCTED REMOTELY

20          CONFIDENTIAL - ATTORNEYS' EYES ONLY

21    VIDEOTAPED RULE 30(B)(6) DEPOSITION OF PISGAH
                LABORATORIES BY DANI BAILEY
22
                Wednesday, February 17, 2021
23

24    Reported by:
      KAREN K. KIDWELL, RMR, CRR, CRC
25    JOB NO. 189736
```



1                   Dani Bailey

22     Q.   So how long did that process take, to
23  source that raw material?
24         MR. PERLMAN: Objection. Form.
25     A.   Between four to six months for both raw

1                   Dani Bailey
2  materials.  I believe they had to be manufactured
3  before we were able to source them.
4     Q.   So if work -- work on the project began, I
5  believe you said, in April or May of 2018; is that
6  right?
7     A.   No.  I said we received the tech package
8  in April or May.
9     Q.   When -- when did work actually begin in
10  the manufacturing process for pyrimethamine?
11         MS. STEIN:  Objection to form.
12     A.   Could you be more specific?
13     Q.   Let me put it -- let me ask it this way,
14  then:  After receiving the technology transfer packet
15  from -- from [redacted] what was the next step in Pisgah's
16  process for manufacturing pyrimethamine?
17     A.   The next step in Pisgah's process for
18  manufacturing was to review all of the technology and
19  begin the transfer in R&D and quality control.
20     Q.   And did Pisgah begin sourcing the raw
21  materials it needed at that point?
22     A.   Yes.
23     Q.   When did that -- when did that step begin?
24     A.   I believe around December of 2018, we
25  began some of the preliminary activities.

1                   Dani Bailey
2     Q.   So between April or May of 2018 and --
3  when the technology transfer packet was
4  transferred -- and December of 2018, was any work
5  done by Pisgah to -- to begin the process of
6  manufacturing pyrimethamine?
7     A.   No.  We chose to work on a different
8  product first.
9     Q.   Was that a decision that -- that you made,
10  as site manager?
11     A.   I was not site manager at the time.
12     Q.   You became site manager in August of 2018;
13  is that right?
14     A.   Yes.
15     Q.   So, before you had been made -- when you
16  became site manager in August of 2018 to delay work
17  on pyrimethamine until December?
18     A.   I'm sorry.  I missed the first portion of
19  your question.
20     Q.   It was probably an unnecessarily confusing
21  question.  My -- my question was, at the time you
22  became site manager, in August of 2018, had Pisgah
23  already made a decision to delay work on
24  pyrimethamine until December of that year?
25     A.   Yes.

1                   Dani Bailey
2     Q.   And do you know who made that decision?
3     A.   I believe Dr. King made that decision.
4         MR. PERLMAN:  Will, can I just -- I'm
5  sorry.  I'm sorry to interject.  But could
6  whoever has the volume on their computers on,
7  turn off the volume on their computer?  I keep
8  hearing the Outlook alerts in the middle of the
9  question, and it makes it hard to hear.  I don't
10  know if that's true for the stenographer as
11  well.
12        Wendy, you don't have to mute your
13  whole -- you don't -- I think you can just turn
14  off the volume on your computer, so that way you
15  can object, if that's coming from you.  Sorry
16  about the --
17        MS. STEIN:  No, but then I can't hear you.
18  I can't hear you with the volume down.  That's
19  the problem.
20        MR. PERLMAN:  Oh, I see.  Okay.
21        MS. STEIN:  It's all connected.  I'll mute
22  myself, and unless I have to --
23        THE WITNESS:  I'm sorry.  Some of it's
24  coming from my computer, and I cannot get it to
25  turn off.

Page 42

Dani Bailey

```
1    guess.
2         Q.  I don't want you to guess.  But are
3    they -- do you have a sense of whether they -- the
4    cost in raw materials was significantly more than the
5    raw materials cost that Pisgah incurs for other
6    molecules that it manufactures?
7              MS. STEIN:  I just want to object, that
8         the witness has said that she's not sure of the
9         cost.  Perhaps you could show her a document.
10        We did produce many documents reflecting the
11        cost of different materials.  I'm just
12        cautioning the witness not to speculate.
13             MR. PERLMAN:  Objection to form.
14        A.  Should I answer now?
15        Q.  If you understand the question.
16        A.  Yes.  For the commercially available raw
17   materials, the cost would not be any different
18   regardless of the API we were manufacturing.
19        Q.  So were there -- were there specific raw
20   materials, including the two you mentioned earlier,
21   that -- that were particularly expensive?
22        A.  ███████████ is somewhat expensive in
23   comparison to the others.  And the specific quality
24   of ████████ the specific ███████████ is more
```

Page 43

Dani Bailey

```
1    expensive than typical ████████.
2         Q.  Any other raw materials that stand out as
3    being particularly expensive?
4         A.  Well, generally speaking, they're all
5    expensive, but no.
6         Q.  When did Pisgah first learn of a company
7    called ████████?
8         A.  I don't recall the exact date.  ██ had
9    already worked on a project with ████████ so that
10   predates pyrimethamine.
11        Q.  Do you know what -- just so I have the
12   sense of whether that was -- was that before or after
13   the acquisition, that ██ worked on the other project
14   for ████████?
15        A.  After.
16        Q.  Did -- when was the first time that you
17   learned that ████████ was a potential customer for
18   pyrimethamine manufactured by ████████?
19        A.  I don't recall the exact timeline that I
20   may have learned that.
21
```

Page 44

Dani Bailey

```
10        Q.  When you say ███ were asked to provide
11   material to ████████ what specifically were ███
12   asked to provide?
13        A.  Hello?
14        Q.  Yeah, I'm sorry.  Was I frozen?
15             VIDEOGRAPHER:  It appears like the
16        witness -- can you hear us?
17        A.  I can hear you.  I can hear you.  I could
18   not hear Mr. Cravens' question.
19        Q.  The question was, when you said ████ was
20   asked to transfer materials to or provide materials
21   to ████████ what materials are you referring to?
22        A.  Pyrimethamine.
23        Q.  Oh.  And that was -- that was before
24   Pisgah began work on developing the manufacturing
25   process in December of 2018?
```

Page 45

Dani Bailey

```
2         A.  Yes.
3         Q.  Was ████████ involved in any way in the
4    technology transfer regarding pyrimethamine?
5         A.  No.
6         Q.  Did ████████ provide any technical
7    information to Pisgah regarding pyrimethamine
8    manufacture?
9         A.  No.
10        Q.  Did ████████ provide any equipment to
11   Pisgah for the manufacture of pyrimethamine?
12        A.  No.
13        Q.  Did ████████ provide any raw materials to
14   Pisgah for the manufacture of pyrimethamine?
15        A.  No.
16        Q.  Did ████████ provide any support for the
17   preparation of the DMF update?
18        A.  No.
19        Q.  Did ████████ fund -- directly fund any
20   portion of the costs Pisgah incurred to begin
21   manufacturing pyrimethamine?
22        A.  No.
```

Page 46

Dani Bailey

5     Q.   You said the first batch of pyrimethamine
6 was manufactured sometime in April to May 2019 time
7 frame?
8     A.   Yes.
9     Q.   How many batches, total, has Pisgah
10 manufactured of pyrimethamine?
11     A.   Four and a half.
12     Q.   So did -- did each of those -- well, we'll
13 start with the four. We'll get to the half later.
14 Were those first four batches, were they all produced
15 in the same production campaign?
16     A.   Yes.
17          MR. PERLMAN: Objection. Form.
18     Q.   When I use the term "production campaign,"
19 do you know what I'm referring to?
20     A.   Yes.
21     Q.   So what does that -- what does that term
22 mean to you?
23     A.   To me, a campaign is -- is multiple
24 batches, in sequence, of the same product.
25     Q.   So -- and does that production -- that

Page 47

Dani Bailey

1     same production campaign, did that also include that
2 half-batch you mentioned?
3
4     A.   Yes.
5     Q.   So what -- what is the explanation for
6 the -- the half-batch that was produced? How did
7 that come about?
8     A.   We had an equipment failure and were not
9 able to complete the batch.
10     Q.   Do you know which -- where that fell in
11 the sequence of -- so essentially there were -- three
12 were five different batches that were initiated
13 during that one production campaign; is that right?
14     A.   Yes.
15     Q.   Do you know which of those five batches it
16 was that -- that was interrupted halfway through?
17     A.   The first batch.
18     Q.   How long did -- oh, first, is that the
19 only production campaign that Pisgah has -- has had
20 for pyrimethamine?
21     A.   Yes.
22     Q.   And how long, approximately, did that
23 production campaign take?
24     A.   I believe we finished the campaign in
25 June 2019.

Page 48

Dani Bailey

1
2     Q.   So approximately two months?
3     A.   No, I believe we started around the first
4 of April. Then we had the equipment failure. That
5 piece of equipment had to be repaired, so it caused
6 some delays.
7     Q.   So if it was sometime in June, it was --
8 it was maybe somewhere between eight and ten weeks?
9     A.   Probably closer to ten to twelve weeks.
10     Q.   Okay. How -- how long are Pisgah's
11 typical production campaigns?
12          MR. PERLMAN: Objection. Form.
13     Q.   If there is --
14     A.   That would -- that would depend on the --
15 the manufacturing process. A campaign could go from
16 three weeks to three months, depending on the
17 manufacturing process.
18     Q.   Does -- does Pisgah have the capacity to
19 have multiple production campaigns ongoing at a time?
20     A.   Capacity, yes. Staffing, no.
21     Q.   So Pisgah, at least during -- during the
22 time that it's been manufacturing pyrimethamine,
23 Pisgah only has the capacity to -- to run one
24 production campaign at a time?
25     A.   Yes.

Page 49

Dani Bailey

1
2     I'm sorry. Could -- could we have a quick
3 break?
4     Q.   Oh, sure, sure. Absolutely. Yeah.
5          MR. CRAVENS: Can we go off the record?
6          VIDEOGRAPHER: We're going off the record
7     at 10:14 a.m.
8          (A recess transpired from 10:14 a.m. until
9     10:27 a.m.)
10          VIDEOGRAPHER: We are back on the record
11     at 10:27 a.m.
12 BY MR. CRAVENS:
13     Q.   Ms. Bailey, before the break we were
14 talking about the production campaign for
15 pyrimethamine in April, May, and beginning of June of
16 2019. Has -- has Pisgah run any additional
17 production campaigns for pyrimethamine since that
18 first one?
19     A.   No.
20     Q.   Does Pisgah have plans for -- for any
21 additional production campaigns for pyrimethamine at
22 the moment?
23     A.   No.
24     Q.   You mentioned that -- I think you said it
25 was -- it was sometime before December of 2018 you

```
 1                    M. Hatch

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   Case No. 1:20-cv-00706-DLC
     ----------------------------------x
 4   FEDERAL TRADE COMMISSION;
     STATE OF NEW YORK; STATE OF
 5   CALIFORNIA; STATE OF ILLINOIS;
     STATE OF NORTH CAROLINA;
 6   STATE OF OHIO; COMMONWEALTH
     OF PENNSYLVANIA; and
 7   COMMONWEALTH OF VIRGINIA,
                      Plaintiffs,
 8
                 vs.
 9
     VYERA PHARMACEUTICALS, LLC;
10   PHOENIXUS AG; MARTIN SHKRELI,
     Individually, as an owner and
11   former officer of Vyera Pharmaceuticals, LLC
     and Phonixus AG (formerly known as
12   Turing Pharmaceuticals AG); and
     KEVIN MULLEADY, individually, as an owner
13   and director of Phoenixus AG and a former
     Executive of Vyera Phamaceuticals, LLC,
14                   Defendants.
     ----------------------------------x
15

16        REMOTE DEPOSITION OF MICHAEL HATCH

17                January 14, 2021

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 188166
```

M. Hatch

2    Q.    Because what?

3    A.    I did not create the forecast.

4    Q.    Who did create the forecast?

5    A.    The portfolio team.  The US -- I'm

6    sorry, the US portfolio team, North American

7    portfolio team.

8    Q.    Do you know which specific individuals

9    were responsible for creating that forecast?

10   A.    I don't know who specifically would

11   have created the forecast at that time, no.

12   Q.    Who -- who were the members of the

13   portfolio team at that time in 2015?

14        MR. PERLMAN:  Objection.  Vague.

15   A.    Jason Harper would have been probably

16   the -- the head of the group at that time.

17   Q.    Last name was Harper?

18   A.    Harper, H-A-R-P-E-R.

19   Q.    So I know I asked you this generally,

20   but now turning specifically to Daraprim, in

21   assessing the opportunity for Daraprim in 2015,

22   to your knowledge, did Mylan do any research

23   into the incidence, annual incidence of

24   toxoplasmosis in the US?

25   A.    I wouldn't -- I do not know.

M. Hatch

2    Q.    Did -- did Mylan do any re- --

3        Who would know?

4    A.    I -- I don't know because, again, it's

5    not something that we would normally do, so I

6    don't even know who would do it.

7    Q.    Okay.  And to your knowledge, did

8    Mylan look at any data concerning the drugs

9    prescribed to treat toxoplasmosis in the United

10   States?

11   A.    Again, I don't know if they did or did

12   not, but again, it's not common practice for us

13   to do that.

14   Q.    And to your knowledge, did Mylan do

15   any research into the typical course of

16   treatment for toxoplasmosis using Daraprim?

17   A.    Again, the indication is typically

18   irrelevant to the analysis that we're doing.  So

19   I'm not aware of us doing that.

20   Q.    Did Mylan have any reason to believe

21   that annual sales -- and by "annual sales," I

22   mean actual numbers of tablets sold -- the

23   annual sales of Daraprim would decline

24   significantly after the fall of 2015?

25        MR. PERLMAN:  Objection.  Speculation.

M. Hatch

2    Foundation.

3    A.    I don't recall seeing any documents

4    that talk about the -- the trend of the -- of

5    the doses, so I -- I don't recollect.

6        MR. CRAVENS:  Can -- Frank, can we

7    share what's Tab 2.  I'm not sure what

8    exhibit number it is in the ShareFile.  It's

9    a document beginning Bates 00157.

10       MR. DeSIMONE:  It should be appearing

11   momentarily.

12       MR. CRAVENS:  What's the exhibit

13   number?

14       MR. DeSIMONE:  Exhibit 94.

15       (Vyera Exhibit 94, a document bearing

16   Bates Nos. MYL-DARAPRIM_0000157 through 164,

17   marked for identification, as of this date.)

18       THE WITNESS:  I see it.

19   BY MR. CRAVENS:

20   Q.    Let me know when you've had a chance

21   to download it and take a brief look at it.

22   A.    Okay.

23       Okay.  I've got it open and have had a

24   chance to quickly hook at it.

25   Q.    Okay.  So can you tell know what

M. Hatch

2    the -- what the spreadsheet is, which is the

3    first page of Exhibit 94?

4    A.    It appears to be a tool that provides

5    a -- a forecast range.

6    Q.    Is this a document that -- that the

7    portfolio group put together?

8    A.    This should have been generated by the

9    North American portfolio team.

10   Q.    Turn to the box in the upper left-hand

11   corner that has -- says -- the first -- the

12   first line says "12 Months Ending July '15

13   Market."

14       Do you see that?

15   A.    I do.

16   Q.    What -- what are those numbers based

17   on?

18   A.    I can't tell you what specifically

19   these numbers are based on, but historically,

20   this would be where we would identify the IMS

21   market and the IMS market trend.

22   Q.    And do you see that, from July 2012 to

23   July 2015, the numbers in this projection show a

24   downward trend in the total size of the market?

25   A.    I do see the downward trend of the

6

M. Hatch

1   numbers here.
2       Q.   What is your understanding or what was
3   Mylan's understanding at the time of the cause
4   for the decline in sales reflected in that
5   table?
6           MR. PERLMAN:  Objection.  Foundation.
7       A.   I don't know what would -- what would
8   have been the assessment on the downward trend.
9       Q.   And did Mylan project that that
10  downward trend would continue?
11      A.   It appears on the calculations that it
12  assumed a continued downward trend.
13      Q.   Do you know the basis for that
14  assumption?
15      A.   I do not.
16      Q.   Is that -- would declining sales
17  typically be a factor that Mylan would consider
18  in deciding whether to pursue an ANDA for a
19  generic product?
20      A.   Are you referring specifically to
21  declining volume?
22      Q.   Yes.
23      A.   It would be one of many factors.
24      Q.   You see at the bottom of that box, it

M. Hatch

1   says "Total Estimated Doses, 558,000"?
2       A.   I do.
3       Q.   So does -- does that represent Mylan's
4   projection of what the total sales volume would
5   be -- total dose sales volume would be three
6   years after this projection was made?
7       A.   I'm not sure if that represents the --
8   where they believed the market will be or if --
9   if that represents Mylan's estimated share.  I
10  couldn't tell you for sure.
11      Q.   Who would be able to provide that
12  information?
13      A.   I assume someone in North American
14  portfolio.
15      Q.   Well, but if the -- this -- the trend,
16  the downward trend is -- is --
17           Well, let me put it this way.  If you
18  look -- if you look at the -- at the 12
19  months --
20           Do -- do you know roughly what the
21  annual tablet sales were for Daraprim in 2015 at
22  the time that you were considering this
23  proposal?
24      A.   The number of tablets being sold, is

M. Hatch

1   that what you're asking?
2       Q.   Yes.
3       A.   I don't.  I don't recall.
4           Again, this is one of hundreds and
5   hundreds of opportunities, so to recall one
6   would be unusual.
7       Q.   So if -- and you say you don't know
8   whether that 558,000 represents your estimate of
9   Mylan's projected market share versus the total
10  size of the market?
11      A.   Yeah, I don't know if that represents
12  the -- it says "Total Estimated Doses," but I
13  don't know if that refers to the innovator
14  products or our -- our estimated doses, the
15  generic, our generic.
16      Q.   Is the same true for the -- the
17  average brand price per dose, or do you -- do
18  you understand that is referring to the -- to
19  actual --
20      A.   Finish your sentence.  Go ahead.
21      Q.   Do you understand that is referring to
22  the actual price charged by the brand
23  manufacturer?
24      A.   I understand that column to represent

M. Hatch

1   just what it says, the average brand price per
2   dose.
3       Q.   Do you know what the actual brand
4   price per dose -- per dose was at this time in
5   2015?
6       A.   Well, to say "actual" would be very
7   difficult to characterize from anybody with, you
8   know, customer discounts and different pricing
9   opportunities at different customers.  And not
10  every customer, I would assume, had the same
11  price.  So I assume that this is a -- an average
12  that's used for calculation.
13      Q.   But you don't know what the basis for
14  that is?
15      A.   What the basis for the number is?
16      Q.   Uh-huh.
17      A.   I don't know what the basis for the
18  number is.
19      Q.   So is it safe to say that you don't
20  know what the basis for any of the assumptions
21  in this spreadsheet are?
22           MR. PERLMAN:  Objection.  Form.
23      A.   I wouldn't -- I wouldn't characterize
24  it that way, no.

M. Hatch

1
2      Q.    Okay.  What -- what is your
3   understanding of the basis for the assumptions
4   in this spreadsheet?
5      A.    Again --
6      MR. PERLMAN:  Objection.  Vague.
7      A.    My understanding of the -- of --
8      Well, you need to be more specific on
9   which number, sorry, because some numbers are
10  clearly marked IMS -- or, I'm sorry, are --
11  appear to be IMS, some appear to be average
12  market price.  The estimated net generic price
13  per dose, you know, appears to be a falling
14  average based upon the percent of brand WAC.  I
15  can -- I can see that from the sheet.
16     Q.    But in terms of the basis specifically
17  for the downward trend and the projected
18  continuation of the downward trend, do you know
19  what the basis for those assumptions was?
20     MR. PERLMAN:  Objection.  Form.
21     A.    I don't know specifically, no.
22     Q.    Did -- after the -- the product was
23  approved in November of 2015, were the -- was
24  this particular forecast updated at any point
25  after the approval of the project?

M. Hatch

1
2      A.    I don't have any clue when this
3   particular document was created.
4      Q.    Well, you at least know that it was
5   printed on September 28 of 2015, right?
6      That's what it --
7      A.    Okay.  Yes.
8      MR. PERLMAN:  Objection.  Form.
9      A.    I do know that the document has that
10  date on it, yes.
11     Q.    So my question is --
12     A.    If I could -- if I could just finish.
13     The source data that's used to create
14  it, meaning the IMS, it appears to be from July
15  of 2015.
16     Q.    Uh-huh.  And so my -- my question is
17  were -- was this forecast, to your knowledge,
18  ever updated after the project was approved?
19     A.    I am sure it has been because the
20  forecasts are regularly updated.
21     Q.    Do you know whether the assumptions of
22  the downward trend in sales volume were changed
23  or updated at any point?
24     A.    I couldn't tell you the specifics that
25  went into the creation of the forecast, the

M. Hatch

1
2   specific variables that they used.
3      Q.    Who would be able to answer that
4   question?  Would it be someone on the portfolio
5   team?
6      A.    The North American portfolio team
7   creates forecasts for the North American
8   projects.
9      Q.    That's Mr. Harper's team?
10     A.    That is Mr. Harper's team.
11     Q.    Do you know why the two -- there are
12  two boxes that are highlighted in the middle of
13  the page, one under the "15%" column and one
14  under the "30%" column.
15     Do you know why those two boxes are
16  highlighted?
17     A.    Typically, when creating a -- a
18  forecast, the North American team would -- would
19  generally highlight some feasible scenarios in
20  which they think would be the most likely, and
21  these appear to be those scenarios, both from a
22  pricing and market share perspective.
23     Q.    So the -- the number in the larger
24  box, so looking first at the one under the "15%"
25  column, is 11,715,000 -- or is that 718?

M. Hatch

1
2      A.    It appears to be 11,718,000, but I see
3   which one you're referencing.
4      Q.    Yeah; and so that is -- that number
5   represents net -- net sales at a price of $140
6   per dose and assuming a 15 percent market share;
7   is that right?
8      MR. PERLMAN:  Objection.  Leading.
9   Form.
10     A.    My understanding is that that
11  references a, you know, 35 percent of brand WAC
12  and 15 percent of the generic market.
13     Q.    So, and it says "net."
14     Net of what?
15     A.    So, sorry, the net -- oh, I see what
16  you're saying.  Under "Market Share," under that
17  column?
18     Q.    Yeah, where it says the 11.7 million
19  is -- is a net number, but I'm asking net of
20  what?
21     A.    So --
22     MR. PERLMAN:  Objection.  Form.
23     A.    -- historically, the way that they
24  would -- they would characterize the two numbers
25  are net and gross margin.

M. Hatch

1
2      A.     Yeah; it would have -- it would have
3  gone to a team along with all of their other
4  projects, yes.
5      Q.     And would that team have been
6  responsible for identifying an API source for
7  the product and -- and obtaining RLD?
8      A.     No.  No, R&D is not responsible for
9  either of those activities.
10             So the sourcing team is responsible
11 for sourcing of API, and then there's an RLD
12 team that -- that works to source drug as well.
13 They are not under the purview of the R&D
14 leader -- of the specific R&D leaders.
15     Q.     So until the R&D team has RLD and API,
16 what can it do to develop the project before it
17 has those two things?
18             MR. PERLMAN:  Objection.  Form.
19     A.     They can evaluate literature, if there
20 is any literature on the product, in terms of,
21 you know, its history, or, you know, you could
22 look at the package insert that's published, if
23 it's a, you know, US product, you can evaluate
24 those things, but that's -- that's not very
25 much.

M. Hatch

1
2      Q.     No.  And do you know whether in fact
3  the R&D team did those things?  Did it research
4  the literature on Daraprim?  Did it look at the
5  package insert?
6      A.     I do not know.
7      Q.     Do you know if the R&D department ever
8  took any specific steps to develop Daraprim
9  after the project was approved in November of
10 2015?
11     A.     I don't know what specific steps they
12 would have taken.  I do not know.
13     Q.     So you don't -- as far as you know,
14 they might have done nothing?
15             MR. PERLMAN:  Objection.  Form.
16     A.     I don't recall specifically what they
17 would have done.
18     Q.     Who would know what, if anything, the
19 R&D department did to develop Daraprim?
20     A.     Someone within R&D.  I don't -- I
21 don't -- those names that I gave you could be
22 possible alternatives.
23     Q.     During the first year after the
24 project was approved, did Mylan spend any money
25 on the Daraprim project?  So, in 2016, did Mylan

M. Hatch

1
2  spend any money on the Daraprim project?
3      A.     I -- I wouldn't be able to tell you
4  what money we've spent on Daraprim.  Again, it's
5  one of hundreds of products, so to be able to
6  say specifically, it would be hard for me to
7  know.
8             MR. CRAVENS:  Frank, can you put both
9       components of Tab 5 into the ShareFile.
10     Q.     We're going to be looking at a number,
11 while we're waiting for that to load, at a
12 number of exhibits, Mr. Hatch, that are a cover
13 e-mail and then the attached Excel
14 spreadsheet --
15     A.     Okay.
16     Q.     -- that's referenced in there.
17             So I've -- there are going to be
18 separate documents, but they will have the same
19 exhibit number.  So you can just -- you can look
20 at the PDF of the cover e-mail to provide you
21 with context, but then the questions I'm going
22 to be asking are going to be generally about the
23 spreadsheet itself, and that will be in native
24 format, an actual Excel document.
25     A.     Understood.

M. Hatch

1
2             MR. DeSIMONE:  And this will be
3       Exhibit 95.
4             (Vyera Exhibit 95, a document bearing
5       Bates Nos. MYL-DARAPRIM_0000997 with
6       attachments 95.2 and 95.3, marked for
7       identification, as of this date.)
8             MR. DeSIMONE:  You should see it now.
9             THE WITNESS:  Okay.  I see 95.1, 95.2,
10 and 95.3.
11 BY MR. CRAVENS:
12     Q.     So if look at 95.1.  That should be
13 the cover e-mail.  If you want to take a
14 look at that to give you context of what the
15 spreadsheet is.
16             The 95.2 is just the slip sheet from
17 the production indicating that the document was
18 produced in native format, so you don't need to
19 look at that.
20             And then 95.3 should be the actual
21 Excel spreadsheet.
22     A.     Okay.  I'm -- I've looked at 95.1 and
23 2.  I'm opening up 95.3.
24     Q.     Okay.  And when you get there, if you
25 can look at -- row 49 is the -- is the

M. Hatch

1   pyrimethamine.
2       A.   This -- it had an error.  So just give
3   me a moment to try to do this again.
4            Okay.  I have the spreadsheet open
5   now.
6       Q.   Great.  So if you can go to row 49,
7   and I'll ask you to scroll all the way over to
8   column AG.
9       A.   Okay.
10      Q.   So does -- does column AG refresh your
11  recollection about whether Mylan spent any money
12  on the Daraprim project in 2016?
13      A.   It doesn't.  I can see that the column
14  says zero under "2016 spend as of September 30."
15      Q.   So, at least as of September 30, 2016,
16  had Mylan spent any money on the Daraprim
17  project?
18      A.   If you look at --
19           MR. PERLMAN:  Objection.  Foundation.
20      Form.
21      A.   If you look at column 17 under "R&D
22  Rating," that's where we would identify if it's
23  in a work plan; and, if so, which one.
24      Q.   Uh-huh.

M. Hatch

1       A.   So this one is labeled as in the 2017
2   work plan.
3       Q.   Yeah.
4       A.   So it would make sense that no money
5   would have been spent in 2016.
6       Q.   So can -- I'm sorry.  I'm just trying
7   to make sure there's a clear record.
8            You're confirming that, to the best of
9   your knowledge, no money was spent on the
10  Daraprim project in 2016?
11      A.   I have no recollection of any money
12  being spent or not being spent.
13      Q.   Okay.  But it's -- it would be
14  consistent with your understanding that this was
15  included in the 2017 work plan that no money
16  would have been spent on it in 2016?
17           MR. PERLMAN:  Objection.  Form.
18      A.   It would make sense that a product
19  that isn't in a work plan until 2017 wouldn't
20  have spend until 2017.
21      Q.   The -- looking at the next column, AH,
22  what is -- what is "2017 Committed Spend," what
23  does that column represent?
24      A.   I --

M. Hatch

1            MR. PERLMAN:  Objection.  Foundation.
2       A.   I don't know.  This is -- this isn't
3   a -- this isn't a standard report.  This is a,
4   kind of an ad hoc report that's been created.
5   So it's not a -- it's not like an export from
6   our systems this way.  At least not that I'm
7   aware of.
8       Q.   Do you -- looking at the cover e-mail,
9   does -- do you recall who created it and why?
10      A.   I looked at the cover e-mail, and it
11  doesn't give me any indication as to the context
12  specifically, no.
13      Q.   What about the next column over, AI,
14  which has 2017 spend, and then it has an amount
15  of $2,276.69.
16           Do you know what that represents?
17      A.   I don't know specifically the context.
18  So, no, I wouldn't be able to tell you
19  specifically what that means.
20      Q.   And do you have any idea who -- who
21  would?
22      A.   Who --
23           MR. PERLMAN:  Objection.  Foundation.
24      A.   Whoever created the spreadsheet might

M. Hatch

1   be able to provide some insight.
2       Q.   Do you know who created the
3   spreadsheet?
4       A.   I do not.
5       Q.   Would it have been someone in your
6   department?
7       A.   It could have been.
8       Q.   So can you -- can you identify for me
9   any specific steps that Mylan took to advance
10  the generic Daraprim project in 2016?
11      A.   My understanding based on the
12  chronology of the documents that we've seen so
13  far is that it -- it wasn't even PRB-approved
14  until the very end of '16 -- or, I'm sorry, the
15  end of '15.  So, at that time, it would have
16  been challenging to add it to a 2016 work plan
17  because the budget would have been established
18  at that time.
19           That wouldn't have precluded us from
20  still trying to evaluate sources for API or RLD,
21  but there is no money to spend if you can't find
22  a source for RLD or if you can't find a source
23  for API.  So it makes sense that we wouldn't
24  have spent any money at that point.

Page 134

M. Hatch

1  M. Hatch
2  that sourcing would have discussed any potential
3  vendors with -- on any product.
4      Q.   Do you know whether Mylan did any
5  specific research into manufacturers that were
6  supplying pyrimethamine powder to the
7  compounding industry in the United States?
8      A.   I'm not aware of what specific
9  activities the sourcing team took with regard to
10 pyrimethamine.
11     Q.   Who -- who on the sourcing team would
12 have that information?
13     A.   Our group would generally work with
14 Paula Raesa.
15     Q.   Both with respect -- just with respect
16 to API, or also with respect to RLD sourcing?
17     A.   API sourcing only.
18     Q.   Okay.  And we'll get to RLD later.
19          Does Mylan ever manufacture its own
20 API?
21     A.   Mylan does manufacture some APIs.
22     Q.   How do you determine, you know,
23 what -- what APIs are candidates for Mylan to
24 manufacture on its own?
25     A.   There's an API PRB process, similar to

Page 135

M. Hatch

1  M. Hatch
2  the finished dose process, that we undertake.
3      Q.   Do you know whether any consideration
4  was ever given to Mylan developing its own API
5  for pyrimethamine?
6      A.   I'm -- I'm not aware of any specific
7  considerations that might have been made.  I'm
8  not part of the -- or historically, haven't been
9  part of the API PRB process.
10     Q.   Do you know whether pyrimethamine is a
11 difficult molecule to manufacture?
12     A.   I don't.  I do not know about the --
13 the complexity of the molecule itself.
14     Q.   Could Mylan have manufactured its own
15 pyrimethamine API in 2016?
16          MR. PERLMAN:  Objection.  Foundation.
17     A.   I wouldn't have the ability to answer
18 that.  That's out of my purview.
19     Q.   How many different APIs does Mylan
20 manufacture?
21     A.   I don't know the number of APIs that
22 we manufacture.
23     Q.   Do you know ballpark?  More than a
24 dozen?
25     A.   I believe it to be more than a dozen,

Page 136

M. Hatch

1  M. Hatch
2  yes.
3      Q.   More than 50?
4      A.   I couldn't say beyond that.  I know
5  that it's predominantly in the ARB market,
6  antiretroviral.  That's the focus.
7      Q.   How did Mylan identify RL Fine as a
8  potential source for pyrimethamine API?
9      A.   I'm not aware of the specific instance
10 that led up to deciding on them as a potential
11 partner.
12     Q.   Did RL Fine ever indicate to Mylan
13 that it was unwilling to supply Mylan with
14 pyrimethamine API?
15     A.   I -- I'm not privy to the
16 conversations that took place between -- all the
17 conversations that took place between RL Fine
18 and the sourcing team.
19     Q.   But you're not aware of any instance
20 in which RL Fine had said that it would not
21 provide pyrimethamine API to Mylan?
22          MR. PERLMAN:  Objection.  Form.
23     A.   I'm not aware of any of the
24 conversations.
25     Q.   Did RL Fine in fact provide samples of

Page 137

M. Hatch

1  M. Hatch
2  pyrimethamine powder to RL Fine in April of
3  2017?
4          MR. PERLMAN:  Objection.  Form.
5      A.   Could you repeat the question, please?
6      Q.   Uh-huh.
7          Did RL Fine in fact provide samples of
8  pyrimethamine API to Mylan in April of 2017?
9      A.   Based upon what I read through the
10 documentation, it appears as though a sample was
11 sent.
12     Q.   And during the course of 2017, do you
13 know whether Mylan actively reached out to any
14 other potential suppliers of pyrimethamine API
15 other than RL Fine?
16     A.   I'm not aware of what specific
17 conversations the sourcing team might have taken
18 to find an alternate source.
19     Q.   Would you turn to the page that has
20 Bates number 0005397.
21     A.   Okay.  I'm there.
22     Q.   Do you see the -- the e-mail at the
23 top from Greg Aucremanne?
24     A.   Greg Aucremanne, uh-huh.
25     Q.   And you see in the third sentence

Page 142

M. Hatch

1  top of my head.
2      Q.    And sitting here today, do you know
3  whether RL Fine ever filed a DMF for
4  pyrimethamine?
5      A.    I don't have a recollection of that,
6  no.
7          THE WITNESS:  Frank, did you send that
8  through chat?  I apologize.  I can't --
9          MR. DeSIMONE:  It's uploading, and it
10  should have just landed.  You should be able
11  to just click to open.
12         THE WITNESS:  It wants me to save it
13  to my desktop.  I'm trying to find an option
14  that will allow me to just view it.
15         MR. CRAVENS:  You know what, given --
16         MR. DeSIMONE:  If you double-click it,
17  it opens.
18         THE WITNESS:  Yeah, I tried that.  It
19  goes right to the "save" function.  It must
20  be part of our internal security.
21  BY MR. CRAVENS:
22      Q.    Given your -- your answer to the
23  question, I think we can just move on to the
24  next exhibit.

Page 143

M. Hatch

1  A.    Okay.
2          MR. CRAVENS:  Frank, can you put Tab
3  10 up?  Hopefully we'll have better luck
4  with it.  It's yet another e-mail chain.
5          THE WITNESS:  Okay.
6          MR. CRAVENS:  In the same thread.
7          (Defendants Exhibit 99, a document
8  bearing Bates Nos. MYL-DARAPRIM_0005504
9  through 5562, marked for identification, as
10  of this date.)
11         MR. DeSIMONE:  This will be Exhibit
12  99.
13         Any luck with this one?
14         THE WITNESS:  It's giving met same
15  warning, but it looks like it might have
16  skipped past it.  So just give me one
17  second.
18         MR. DeSIMONE:  Okay.  Great.
19         THE WITNESS:  Let me see if I can kind
20  of just view it rather than download it.
21  Because downloading it wants to put it into
22  a quarantine box and try to verify its
23  authenticity before it'll let me view it, so
24  let me see if I can just view it on-screen

Page 144

M. Hatch

1  rather than download it.
2          Yeah, it's -- it's -- if you could
3  give me just a second.  What I'll do is I'll
4  close all this out and try to come back in,
5  and maybe that will clean this up.  Because
6  I don't want this to happen for every
7  document.
8          And this is 99?
9          MR. DeSIMONE:  That's right.
10         THE WITNESS:  Okay.
11         It's giving me my internal
12  organization V scale here.  Internet
13  scrubber wants to look at this further.  So
14  if you give me a couple more seconds here,
15  we'll see if it'll come through.
16         It's flagging these as potentially
17  harmful documents.
18         MR. CRAVENS:  Well, if this doesn't
19  work, I guess the last resort option is I
20  could do a screen-share.
21         THE WITNESS:  That might be very
22  helpful.
23         Yeah, what it's doing now is it's
24  quarantining each document, scrubbing it,

Page 145

M. Hatch

1  and then it won't release it to me.  It says
2  it'll take up to ten minutes per document.
3          MR. CRAVENS:  Frank, can you go ahead
4  and see if you can share Bates number 5507?
5          MR. DeSIMONE:  Yes.
6          THE WITNESS:  Apologies, guys.  Sorry
7  about that.
8          MR. CRAVENS:  I'm amazed we got this
9  far into the deposition before having
10  technical issues.  It took us much earlier
11  in the others.
12         MR. DeSIMONE:  Bear with me one
13  moment.
14         Are you seeing it now?
15         THE WITNESS:  I am.
16         MR. DeSIMONE:  So this is 5507.
17  BY MR. CRAVENS:
18      Q.    So -- and you can ask Frank to scroll
19  down, as you need.  I just wanted to ask you
20  whether this e-mail confirms that Mylan ordered
21  and received an additional kilogram of
22  pyrimethamine from RL Fine in August of 2017?
23         MR. PERLMAN:  Objection.  Form.
24      A.    It appears though -- as though we did

Page 146

```
 1                    M. Hatch
 2   receive -- Mylan did receive a sample of the
 3   API, the pyrimethamine API.
 4        Q.   And the subject actually refers to one
 5   kilogram of the API, correct?
 6        A.   The -- the subject line does, but the
 7   body of the e-mail doesn't reference the exact
 8   amount.
 9        Q.   Uh-huh.  The e-mail itself also
10   references impurities received from RL Fine.
11             Can you explain what impurities are in
12   the context of API?
13        A.   My limited knowledge on API impurities
14   specifically are that, generally, an API will
15   come with -- generally, APIs will have some
16   level of impurity, and the FDA typically
17   requires you to identify those impurities to
18   understand the -- whether or not those
19   impurities are harmful and what percent they
20   make up of the -- of the API itself to determine
21   kind of the cleanliness of the API.
22             So it's common to get -- I believe
23   it's common to get sample -- or, at least
24   understand the impurities that are coming from
25   the API supplier along with the API itself.
```

Page 147

```
 1                    M. Hatch
 2        Q.   And it appears from this e-mail that
 3   RL Fine also provided those impurities to -- to
 4   Mylan for pyrimethamine?
 5             MR. PERLMAN:  Objection.  Form.
 6   Leading.  Sorry.
 7        A.   It appears they're included as part of
 8   the COA and part of the invoice.
 9             MR. CRAVENS:  Frank, can you scroll up
10   to the preceding page, 5506.
11        Q.   You'll see, first, the e-mail from
12   Bill Cain from RC2 Pharma to several different
13   people at Mylan.  You can take a minute to read
14   that.
15        A.   Okay.  I've had a chance to review it.
16        Q.   So did -- do you read that e-mail as
17   RC2 asking if Mylan would require any additional
18   pyrimethamine API at that point in time?
19        A.   It appears --
20             MR. PERLMAN:  Objection.  Form.
21        A.   It appears as though RC2 is asking if
22   we've had a chance to analyze the material and
23   if we will require any additional material in
24   2018 or -- or in later -- looks like later in
25   '17.
```

Page 148

```
 1                    M. Hatch
 2        Q.   Or in 2018?
 3        A.   Or in 2018.
 4        Q.   And how did Mylan respond to that
 5   offer?
 6        A.   Would you scroll up?
 7             Looks like the API sourcing team
 8   responded that the material had not been used to
 9   date.
10        Q.   And what does that indicate with
11   respect to the development of the Daraprim
12   project?
13        A.   It indicates to me that the API
14   sourcing team does not believe that the API had
15   been used for development at that time.
16        Q.   So it doesn't tell you anything about
17   what plans were for the development of the
18   project going forward?
19        A.   Well --
20             MR. PERLMAN:  Objection.  Form.
21        A.   That wouldn't be a call from the API
22   sourcing team.  That would be an R&D call.
23        Q.   Okay.  So do you know what the
24   competing priorities in R&D were that are
25   referred to on the e-mail?
```

Page 149

```
 1                    M. Hatch
 2        A.   I don't know specifically what -- I'm
 3   not sure who --
 4             Who is this from?  Greg?
 5        Q.   Uh-huh.  Yeah.
 6        A.   I'm not sure what specific competing
 7   priorities Greg was referring to.
 8        Q.   Who determines priorities for projects
 9   in -- within R&D?
10        A.   The R&D team.
11        Q.   So it would be the R&D team assigned
12   to Daraprim who would have made that decision,
13   that there were competing priorities?
14        A.   Well, I -- those are two different
15   questions.  So if you're asking me what this
16   reference is to, that -- that would -- Greg
17   would have to give you the context, but in terms
18   of prioritization within R&D projects, that's
19   within the R&D team specifically.  So the site
20   R&D team.
21             So, for example, MPI, Morgantown, the
22   development team for that group would evaluate
23   the opportunities in front of them and try their
24   best to prioritize them.
25        Q.   Do you have any -- does your -- does
```

M. Hatch

1                     M. Hatch
2 your department have any role in determining the
3 priority of projects within R&D?
4      A.    Our group works with many other
5 groups, as we discussed before, to establish the
6 R&D work plan. So, in that regard, we assist in
7 the prioritization of projects from PRB to the
8 R&D work plan.
9      Q.    Do you recall making any priority
10 determinations with respect to the Daraprim
11 project in 2017?
12      A.    I don't recall any specific
13 prioritization decisions, no. I mean, remember,
14 there are hundreds of products, so I can't -- I
15 can't tell you what specifically might have been
16 discussed regarding this product.
17          MR. CRAVENS: Frank, can we scroll up
18 to the previous page, 5505?
19      Q.    I'm going to ask you, Mr. Hatch, to
20 look first at the -- at the Tuesday, November 7,
21 2017 at 3:57 p.m. e-mail from Bill Cain at RC2
22 to Greg Aucremanne.
23      A.    Okay. Okay, I finished that.
24      Q.    Do you understand in that e-mail Mr.
25 Cain is asking about the status and plans for

M. Hatch

1                     M. Hatch
2 the Daraprim project?
3          MR. PERLMAN: Objection. Form.
4      A.    It appears as though he's asking for
5 the development -- our plans for development for
6 pyrimethamine.
7      Q.    And if you can scroll up to the next
8 page, you see there's another e-mail on November
9 13, 2017 from Mr. Cain asking again, "Does Mylan
10 still plan to start development work on the
11 pyrimethamine this year?"
12      Do you see that?
13      A.    I do see that.
14      Q.    And how did Mylan respond to that
15 e-mail.
16      You can scroll up, Frank.
17      A.    It appears from the e-mail that Greg
18 indicated the project had been placed on hold.
19      Q.    What does that -- what does that mean,
20 when a project is placed on hold?
21      A.    I don't -- I don't know that there's a
22 hard and fast definition for "placed on hold."
23 So I'm not sure what specific definition to
24 provide to you.
25      Q.    Well, do you have any understanding of

M. Hatch

1                     M. Hatch
2 what Mr. Aucremanne meant when he said that the
3 project was placed on hold?
4          MR. PERLMAN: Objection. Foundation.
5      A.    I don't know his intent with the
6 e-mail, no.
7      Q.    What is your -- what is your
8 understanding of the status of the Daraprim
9 project as of November 2017?
10      A.    I don't have a specific understanding
11 of a single product from a few years ago.
12      Q.    So you have -- you have no idea
13 whether there was any active work going on with
14 respect to the Daraprim project in 2017?
15      A.    I don't know what specific work might
16 have been taking place at that time.
17      Q.    Who -- is there a specific department
18 that has the authority to place a project on
19 hold?
20      A.    No, not that -- well, again, not that
21 I'm aware of. I'm not aware of a specific
22 procedure or something like that that says now
23 this product is placed on hold.
24      Q.    After -- are you aware of any further
25 efforts by Mylan to obtain additional

M. Hatch

1                     M. Hatch
2 pyrimethamine API after November 2017?
3      A.    I -- I am not specifically aware of --
4 of any attempts to pursue it -- you know, any
5 specific time periods in which we tried to
6 pursue API for the product.
7      Q.    And we've already established that
8 Mylan did obtain pyrimethamine API from RL Fine
9 in the summer of 2017, correct?
10          MR. PERLMAN: Objection. Leading.
11 Form.
12      A.    Based upon the previous e-mail, it
13 appears as though a sample had been received.
14      Q.    Did Mylan ever seek to obtain any
15 additional pyrimethamine API from RL Fine?
16      A.    I'm not sure what specific steps the
17 sourcing team may have taken beyond that sample.
18      Q.    Are you aware whether the R&D team
19 ever did anything with the pyrimethamine that
20 they obtained from RL Fine?
21      A.    I'm not aware specifically of what
22 they might or might not have done with the API.
23      Q.    Are you aware of any API supplier that
24 refused a request from Mylan to supply
25 pyrimethamine API?

Page 154

M. Hatch

1
2    A.    I'm not aware of any API supplier that
3 was in a position to refuse, because that would
4 indicate that they had something that they were
5 unwilling to provide.
6    Q.    And you're not aware of that having
7 happened?
8    A.    I am not aware of that.
9         MR. PERLMAN:  Objection.  Form.
10   Q.    So, other than obtaining the API from
11 RL Fine in the summer of 2017, what specific
12 steps in addition to that did Mylan ever take to
13 advance the Daraprim project before it was
14 abandoned?
15   A.    Well, to clarify, what we received was
16 a sample, based upon what I've read here.  So it
17 was a -- it was -- it was enough for evaluation,
18 if I understand the quantities correctly.
19        Additional steps for -- well, one of
20 the other main steps in order to -- to develop a
21 product is to have the reference product in hand
22 to be able to deconstruct it.  So I think that
23 was an ongoing effort at the same time.
24   Q.    Do you have specific knowledge of what
25 those efforts were?

Page 155

M. Hatch

1
2    A.    Well, based upon my -- the documents
3 that I reviewed in preparation for this
4 discussion, I'm aware of multiple attempts to
5 try to source RLD.
6    Q.    Did Mylan ever reach out to the brand
7 manufacturer directly to try to obtain RLD?
8    A.    I'm not sure if they did specifically,
9 but that would not be a common practice.
10   Q.    Why not?
11   A.    I -- I'm not familiar with who
12 established the common practices.  I just know
13 that we -- we have a preferred list of approved
14 vendors that we work with that are, you know,
15 both approved from a health authority
16 perspective and from our quality perspectives,
17 legally, that kind of thing.
18        So we tend to stick with the -- the --
19 the folks that we have the ability to evaluate
20 and know that we're getting, you know, the right
21 product in-house.
22   Q.    To the best of your knowledge, Mylan
23 never reached out to the brand manufacturer to
24 obtain RLD because that was simply not Mylan's
25 common practice?

Page 156

M. Hatch

1
2         MR. PERLMAN:  Objection.  Leading.
3    A.    All I can tell you is that is not
4 our common practice.  I don't know whether they
5 did or did not.
6         Based -- I've seen documents of
7 sources that we attempted to -- to find the
8 product from.  In that list of sources, the
9 brand company was not listed.
10   Q.    To the best of your knowledge, there
11 was never any attempt to reach out directly to
12 the brand manufacturer?
13   A.    I'm not aware of any attempt.
14        MR. CRAVENS:  Frank, can you put up
15 Tab 17.
16        (Defendants Exhibit 100, a document
17        bearing Bates Nos. MYL-DARAPRIM_0000232
18        through 235, marked for identification, as
19        of this date.)
20 BY MR. CRAVENS:
21   Q.    Mr. Hatch, this is an e-mail.
22        I'm hoping that this one is small
23 enough that it won't give too many problems to
24 your system.
25   A.    Are you going to -- are you going to

Page 157

M. Hatch

1
2 display it like we did the previous document, or
3 are you --
4    Q.    I'm just going to have Frank, at least
5 as an initial matter, try to just use ShareFile.
6    A.    Okay.
7    Q.    And then we'll see, since it's a
8 smaller document, maybe -- maybe it'll work.
9    A.    All right.
10        MR. DeSIMONE:  This will be Exhibit
11 100.  It should be in the shared folder now.
12   A.    Okay.  I'm able -- I'm actually able
13 to see this one.
14   Q.    Oh, great.
15        Can you look at the -- just the
16 first-page e-mail and tell me if you understand
17 what this document is.
18   A.    It appears to be a -- a request from
19 the Mylan sourcing team to a potential vendor
20 for pricing on reference listed drug.
21   Q.    And it says that, in the second
22 sentence, "Please be advised that this is for
23 budgetary purposes only at this time."
24        Do you see that?
25   A.    I do see that.

Page 158

M. Hatch

2    Q.    What do you understand that to mean?
3    A.    I understand that to mean that they're
4  not placing an order; that they're trying to
5  establish the cost and availability.
6    Q.    And in -- what would the process be if
7  the sourcing department decided they actually
8  did want to place an order for RLD?
9    A.    So --
10       MR. PERLMAN:  Objection to form.
11    A.    The sourcing team most likely wouldn't
12  make that call.  That would -- that direction
13  would come from the R&D team.
14         The sourcing team will evaluate
15  sources and cost, provide that information to
16  the R&D team in terms of the quantity that they
17  can get, the number of lots that they can source
18  from, the strengths, price, all of those things,
19  the R&D team would, because the R&D team holds
20  the budget, would make that determination about
21  whether or not to proceed.
22    Q.    As far as RLD goes, the sourcing
23  department just acts as a conduit for the
24  information to the R&D department, and then the
25  R&D department makes the determination when to

Page 159

M. Hatch

2  actually place an order?
3       MR. PERLMAN:  Objection.  Leading.
4    A.    The R&D team would make the decision
5  about the actual purchase, but the sourcing team
6  are the ones who have the relationships with the
7  suppliers and -- and do the legwork in order to
8  be able to provide, you know, what's available
9  out there to the R&D team.
10    Q.    Are you aware of the R&D team ever
11  actually authorizing the placement of an order
12  for Daraprim RLD?
13    A.    I am not aware of an order being
14  placed, no.
15       MR. CRAVENS:  Frank, can you put up
16    Tab 18?
17       (Defendants Exhibit 101, a document
18    bearing Bates Nos. MYL-DARAPRIM_0000042
19    through 48, marked for identification, as of
20    this date.)
21       MR. DeSIMONE:  This will be Exhibit
22    101.
23  BY MR. CRAVENS:
24    Q.    This is another short one, Mr. Hatch,
25  so hopefully it'll come through as well.

Page 160

M. Hatch

2       MR. DeSIMONE:  You should see it now.
3    A.    Okay.  And this is --
4    Q.    Should be an e-mail exchange between
5  Tara Dalton at Mylan and Max Leaver --
6    A.    I just -- I'm sorry.  I just wanted to
7  clarify the exhibit number.
8         Is it 101?  Is that what you said?
9       MR. DeSIMONE:  That's correct.
10    A.    I just wanted to make sure I had the
11  right one open.  Okay.
12    Q.    And is that in fact what it is, an
13  e-mail between Tara Dalton and Max Leaver at
14  Bionical?
15    A.    That is appear -- that is -- that is
16  what it appears to be.
17    Q.    And in this e-mail Bionical provides a
18  quote of $115,000 for a 100-tablet bottle of
19  Daraprim; is that right?
20       MR. PERLMAN:  Objection.  Form.
21    A.    That's the -- that's what's listed on
22  the page.  They have a -- the drug, the
23  manufacturer, the strength, and the price.
24    Q.    Do -- do you have any basis to believe
25  that the R&D department ever placed an order for

Page 161

M. Hatch

2  Daraprim in response to this e-mail?
3    A.    I'm not aware what would have happened
4  subsequent to this e-mail.
5         Is that what you're asking me?
6    Q.    Uh-huh.  Yes.
7    A.    I'm not aware specifically of what R&D
8  would have done or not done with regard to this
9  information.
10    Q.    So you're not aware of what they did
11  or didn't do?
12    A.    Correct.
13       MR. PERLMAN:  Objection.  Form.
14    Q.    Do you have any reason to believe that
15  if Mylan had placed an order with Bionical for
16  Daraprim RLD, that Bionical would not have been
17  able to provide it?
18       MR. PERLMAN:  Objection.  Form.
19    A.    I do, yes.  Well, not -- maybe not
20  specific to this -- to this drug, but we have
21  seen on other occasions where we have placed an
22  order for a price that's been given, and it
23  never -- it's never been able to be filled.
24    Q.    Other than that past experience with
25  other suppliers, any specific basis to believe

M. Hatch

1 that Bionical could not have provided this
2 Daraprim in response to an order from Mylan?
3         MR. PERLMAN:  Objection.  Form.
4     A.    I don't have any specific context for
5 that.
6     Q.    So why didn't Mylan place an order
7 with Bionical?
8         MR. PERLMAN:  Objection.  Form.
9     A.    I don't have -- I don't have all of
10 the pieces to be able to answer if it did or
11 didn't and why they might or might not have done
12 it.
13    Q.    Who would know?
14    A.    Who would know which piece?  I
15 apologize.
16    Q.    Who would know whether Mylan ever
17 acted on the order and -- on the offer and who
18 would know why they decided to act or not act?
19        MR. PERLMAN:  Objection.  Compound.
20    A.    The -- whether or not the order was
21 placed would have to be answered by the RLD
22 sourcing team.
23    Q.    What -- so, in the normal course, if
24 the RLD sourcing team goes out and gets a

M. Hatch

1 quote --
2     A.    Uh-huh.
3     Q.    -- do they then provide that quote to
4 the R&D department to make a decision one way or
5 the other about whether to issue a purchase
6 order?
7     A.    That is the general process, is that
8 the API -- the RLD sourcing team would evaluate
9 opportunities.  Whatever that search yielded,
10 they would go back and discuss that with the R&D
11 team.
12    Q.    Would that be typically by e-mail or
13 by telephone?
14    A.    To be honest, I don't -- I don't know
15 their -- how they would interact, because the --
16 the RLD sourcing team and the Morgantown
17 development team are in the same building, so it
18 could be any number of ways.
19        MR. CRAVENS:  Frank, could you put up
20 tabs -- we might as well do them at the same
21 time -- tabs 19 and 20.
22        (Defendants Exhibit 102, a document
23        bearing Bates Nos. MYL-DARAPRIM_0000027
24        through 28 with attachment 102.2, marked for

M. Hatch

1        identification, as of this date.)
2        MR. DeSIMONE:  These would be together
3 Exhibit 102.  It's a cover e-mail and an
4 attachment.
5        So those have been uploaded.
6        THE WITNESS:  Okay.  So I have -- do
7 you have questions about both documents at
8 the same time or --
9 BY MR. CRAVENS:
10    Q.    Yeah, I do.  So let's start with the
11 cover e-mail.
12    A.    I'm sorry, I have 102.1 open.  Is that
13 the appropriate one?
14    MR. DeSIMONE:  That's correct.
15    THE WITNESS:  Okay.
16 BY MR. CRAVENS:
17    Q.    So, first, let me just make sure I
18 understand who the -- who the sender and
19 recipients are.
20        Tara Dalton, I assume, is in the -- in
21 the sourcing department.  I think you mentioned
22 her earlier and couldn't remember her last name.
23        Is that the same Tara you were
24 referring to earlier?

M. Hatch

1     A.    That is the Tara I was referring to
2 earlier, and Tara Dalton is API -- I'm sorry,
3 RLD sourcing.
4     Q.    And who is Jodi Dennis?
5     A.    Jodi is in the same department.
6     Q.    Sourcing?
7     A.    RLD sourcing, yes.
8     Q.    What about Mary Lynn?
9     A.    I believe Mary Lynn was also a -- an
10 associate within that same group.
11    Q.    Okay.  It says -- it says "Technical
12 Associate, Clinical Operations."
13        Is that -- is that -- is sourcing part
14 of that?
15    A.    Yes.
16    Q.    Okay.  And who is Ryan Nicewarner?
17    A.    Ryan Nicewarner is a -- is one of my
18 project managers.
19    Q.    Nicole Garrett?
20    A.    Nicole and Tara and Mary E. Lynn are
21 all part of the same RLD sourcing team.
22    Q.    Okay.  And Mary Lynn in this e-mail
23 says, "I am pleased to say I have sourced
24 Daraprim and attached the quote.  We have been

M. Hatch

1 advised that there are large quantities
2 available."
3
4         Do you see that?
5     A.    I do.
6     Q.    Do you recall ever seeing this -- this
7 e-mail before today?
8     A.    I saw this e-mail within our document
9 review two days ago.
10    Q.    But you don't recall ever seeing it
11 before then?
12    A.    Not prior to that, no.
13    Q.    Were you -- let's take a look at the
14 attached quote.
15    A.    Is that the second attachment?
16    Q.    Yeah.
17    A.    Okay.
18    Q.    Do you recognize this as a price quote
19 for Daraprim tablets at a price of $128,142.63
20 for a 100-count bottle?
21    A.    If you -- if you give me --
22         MR. PERLMAN:  Objection to form.
23    A.    If you give me a moment, please.  It's
24 still opening.
25         Okay.  Could you repeat your question,

M. Hatch

1 please?
2
3    Q.    Yeah.  Do you -- do you recognize this
4 attachment as being a quote for Daraprim tablets
5 at a price of $128,142.63 for a 100-tablet
6 bottle?
7    A.    This appears to be a quote for one
8 bottle of Daraprim.
9    Q.    And how did Mylan respond to this
10 quote?
11    A.    I don't know how Mylan responded to
12 this quote.
13    Q.    Do you know whether Mylan responded at
14 all to the quote?
15    A.    I do not know what Mylan did with the
16 quote.
17    Q.    Do you know whether this quote was
18 passed on to the R&D department?
19    A.    I do not know what they did with the
20 quote.
21    Q.    Do you have any basis to believe that
22 Durbin, specifically, would not have been able
23 to provide Daraprim RLD to Mylan if Mylan had
24 placed an order?
25    A.    It appears, though -- this is what I'm

M. Hatch

1 trying to get my head wrapped around.  It
2 appears as though Durbin is not in the United
3 States.
4    Q.    Right.
5    A.    So I don't know what we would have
6 done with the bottle that comes from outside the
7 United States.
8    Q.    Well, look at the -- look at the
9 description of the -- of the product in the
10 quote.
11    A.    I see.  Okay.
12         I'm sorry.  Could you go back to your
13 question, please?  I'm sorry.
14    Q.    Yeah.  Do you have any basis, specific
15 basis, to believe that Durbin could not have
16 provided Daraprim RLD to Mylan if Mylan had
17 placed an order?
18    A.    I don't have any specific reason to
19 think or to know whether or not they could
20 supply this one bottle or not.
21    Q.    Well, the one bottle is a price quote,
22 right?
23    A.    Correct.
24    Q.    So why didn't Mylan place an order

M. Hatch

1 with Durbin for the RLD?
2         MR. PERLMAN:  Objection to form.
3    A.    I don't -- I don't know the answer to
4 Mylan purchasing or not purchasing.  I don't
5 know if they executed this or not.
6    Q.    Who would know?
7    A.    My guess would be someone in the RLD
8 sourcing team.
9         MR. CRAVENS:  Can you -- Frank, can
10 you put Tab 22 into ShareFile?
11         (Defendants Exhibit 103, a document
12 bearing Bates Nos. MYL-DARAPRIM_0000137 with
13 attachments 103.2 and 103.3, marked for
14 identification, as of this date.)
15 BY MR. CRAVENS:
16    Q.    This is another one of those cover
17 e-mails with a spreadsheet.  So you may have
18 trouble with it, I don't know.
19         MR. DeSIMONE:  Apologies, my Internet
20 is now being a bit slow.  Bear with me for
21 one moment.
22         THE WITNESS:  I'm glad I'm not the
23 only one.
24         MR. CRAVENS:  What exhibit number is

```
                    M. Hatch
 1
 2        it going to be?
 3             MR. DeSIMONE:  This will be 103.
 4             I had to log out and back into the
 5        ShareFile.  I apologize.
 6             It's working now.  It's uploading
 7        three documents.
 8             Are you able to see them, Mr. Hatch?
 9             THE WITNESS:  Yes, they're here now.
10        Yep.
11   BY MR. CRAVENS:
12        Q.   After you've had a chance to take a
13   look at the -- at the cover e-mail for context,
14   if you can, once you get to the spreadsheet, if
15   you can go to row 17.
16        A.   So I'm looking at 103.2?  Is that my
17   context?
18             MR. DeSIMONE:  It should be 103.1.
19        Q.   Point 1.
20        A.   Okay.  So I have a 103.2 and 103.3,
21   which is the spreadsheet.  I haven't seen 103.1
22   yet.
23             MR. DeSIMONE:  Let me try that one
24        again.
25             THE WITNESS:  I'll refresh here as
```

```
                    M. Hatch
 1
 2        well.
 3             MR. DeSIMONE:  It should work now.
 4             THE WITNESS:  There it is.
 5             MR. DeSIMONE:  Great.
 6             THE WITNESS:  Okay.  I have it open
 7        now.
 8   BY MR. CRAVENS:
 9        Q.   Do you have the spreadsheet open?
10        A.   I did.  Give me a just a moment.  Let
11   me see if I can get it open.
12             It's opening now.
13        Q.   Okay.  Just let me know when you've
14   gotten to row 17, which should be the row for
15   pyrimethamine.
16        A.   Okay.  I have the spreadsheet open.  I
17   am on row 17.
18        Q.   Great.
19             And of course, mine is not opening for
20   me, but I believe if you scroll across row 17,
21   which should be the row for pyrimethamine, there
22   should be notes indicating "FTN Race," "Low
23   Internal Priority," "In 2017 Work Plan."
24             Do you see that?
25        A.   I do.
```

```
                    M. Hatch
 1
 2        Q.   What does -- where it says, "Not
 3   funded in 2017 budget," what does that mean?
 4        A.   I'm not sure the exact context for the
 5   spreadsheet.  This is another kind of ad hoc
 6   spreadsheet, but it appears to not be a -- a
 7   funded project for the 2017 work plan.
 8        Q.   I'm just trying to understand what
 9   that means as a practical matter, that a project
10   is not funded.
11        A.   So when the -- when the budget is
12   established, the R&D teams try to estimate the
13   spend for a given project to be able to roll
14   those collective programs up to request a budget
15   for -- for a given year.  So it could mean that
16   they weren't able to estimate and decided to not
17   estimate any value or any costs associated with
18   the program in a given year.
19        Q.   Okay.  And what does it mean when it
20   says "Low Internal Priority"?
21        A.   I don't know the context for that.
22   Again, this is -- this is like a one-off
23   spreadsheet.  It's not a -- you know, it's not
24   an export or something that we would typically
25   do.  This looks like --
```

```
                    M. Hatch
 1
 2        Q.   Can you tell from the cover e-mail who
 3   created the spreadsheet?
 4        A.   Let me go back.
 5             It looks like the spreadsheet was sent
 6   from me to Teresa Eddy.
 7        Q.   But you don't recall creating the
 8   spreadsheet yourself?
 9        A.   No; I don't recall this specific
10   spreadsheet, no.
11        Q.   And you don't know who might have
12   created it?
13        A.   I don't.
14             MR. CRAVENS:  So, Frank, I think we
15        can move on to Tab 23, which is a small
16        document.
17             THE WITNESS:  Can I close this
18        particular document?
19             MR. CRAVENS:  Yes.
20             MR. DeSIMONE:  This will be Exhibit
21        104.
22             (Defendants Exhibit 104, a document
23        bearing Bates Nos. MYL-DARAPRIM_0003553,
24        marked for identification, as of this date.)
25             MR. DeSIMONE:  It should be available
```

M. Hatch

1 now.

2    THE WITNESS: It's here.

3 BY MR. CRAVENS:

4  Q. Let me know when you've got it open.

5  A. Okay. It's open.

6  Q. Okay. Do you recognize this e-mail?

7  A. I don't recognize this e-mail, no.

8  Q. Who is -- I believe you identified Mr.

9 Harper previously as being one of the people who

10 may have been in the R&D department?

11  A. No, portfolio. North American

12 portfolio.

13  Q. Portfolio.

14  And the e-mail, at least the top one

15 in the chain, is from Mr. Harper, right?

16  A. Yes, appears to be.

17  Q. And it's to Dan Snider, you, and

18 copied are Scott Chervenick and David Mitchell.

19  Who are -- who is Mr. Snider?

20  A. Dan Snider would have been in R&D, and

21 I think he's one of the names that I gave you

22 earlier in terms of heading up the R&D side.

23  Scott Chervenick is -- is our head of

24 the PK group, pharmacokinetics department, and

(Page 174, continued)

1     M. Hatch

2 now.

3    THE WITNESS: It's here.

4 BY MR. CRAVENS:

5  Q. Let me know when you've got it open.

6  A. Okay. It's open.

7  Q. Okay. Do you recognize this e-mail?

8  A. I don't recognize this e-mail, no.

9  Q. Who is -- I believe you identified Mr.

10 Harper previously as being one of the people who

11 may have been in the R&D department?

12  A. No, portfolio. North American

13 portfolio.

14  Q. Portfolio.

15  And the e-mail, at least the top one

16 in the chain, is from Mr. Harper, right?

17  A. Yes, appears to be.

18  Q. And it's to Dan Snider, you, and

19 copied are Scott Chervenick and David Mitchell.

20  Who are -- who is Mr. Snider?

21  A. Dan Snider would have been in R&D, and

22 I think he's one of the names that I gave you

23 earlier in terms of heading up the R&D side.

24  Scott Chervenick is -- is our head of

25 the PK group, pharmacokinetics department, and

M. Hatch

1 David Mitchell is in North American portfolio.

2 He works for Jason Harper.

3  Q. So do you have -- do you have any

4 recollection what prompted this e-mail exchange?

5  A. I don't. I have not -- I don't recall

6 seeing this one at -- this wasn't in -- in one

7 of the documents I reviewed earlier.

8  Q. And you don't remember -- I assume

9 that means you don't remember any followup from

10 this -- this discussion either?

11  A. I do not.

12  Q. Okay.

13  MR. CRAVENS: Frank, can we get Tab

14 25. It should be a PDF of a PowerPoint

15 slide deck.

16  THE WITNESS: Okay.

17  MR. DeSIMONE: This will be Exhibit

18 105.

19  (Defendants Exhibit 105, a document

20 bearing Bates Nos. MYL-DARAPRIM_0000114

21 through 130, marked for identification, as

22 of this date.)

23  MR. DeSIMONE: And it's been shared

24 with you.

M. Hatch

1  MR. SILBER: Why don't we plan to take

2 a break after you finish up with this

3 document, whatever this document --

4  MR. CRAVENS: What's that?

5  MR. SILBER: Why don't we plan to take

6 a break after you finish with this document

7 or whatever one you're on.

8  MR. CRAVENS: Sure. Sure.

9  THE WITNESS: It's opening now.

10  Okay.

11 BY MR. CRAVENS:

12  Q. So do you recognize what this

13 presentation is?

14  A. Not specifically. I recognize "OSD

15 PRB 2017-01" as some nomenclature that we would

16 use.

17  Q. And what does that indicate?

18  A. It's a -- a workshop document for PRB,

19 for the PRB process.

20  Q. For which -- which aspect of it?

21 Global or -- or North American?

22  A. I don't recall which. Yeah, I

23 don't -- I don't recall.

24  The PRB process continues to evolve,

M. Hatch

1 so I'm not -- I'm not -- not really sure exactly

2 which.

3  Q. So the fact that it says "Global

4 Portfolio Strategy" doesn't necessarily indicate

5 that it was the global PRB that this was

6 presented to?

7  A. Not necessarily. It could have

8 been -- it could have been --

9  Well, yeah, I don't want to -- I don't

10 want to assume.

11  Q. Can you turn to slide 16.

12  A. Okay. I'm on slide 16.

13  Q. Do you see the -- the line for

14 pyrimethamine in the final -- under the

15 "Comments" column. It says, "R&D said they

16 could procure RLD during Strat but would not

17 expensive."

18  What does that mean?

19  A. I -- you know, you're asking me to --

20 to -- to assume what the author of this document

21 meant by that. I don't -- I don't know.

22  Q. Would you at least know what they mean

23 by "Strat"?

24  A. I do know. That would be the

Page 178

```
               M. Hatch
 1
 2  strategic plan exercise.
 3      Q.   The strategic plan exercise?
 4      A.   Correct.
 5      Q.   And what is that?
 6      A.   That's a financial exercise of trying
 7  to establish revenue over a -- over a period of
 8  years for the company.
 9      Q.   Oh.  I think I -- I think I misread
10  it.
11           So is it -- and I know you don't --
12  you don't recall writing it and don't have
13  firsthand knowledge of what it says, but do you
14  understand that column as saying that the R&D
15  department said during the strat process that
16  they could procure the RLD, but that it would be
17  expensive?
18           MR. PERLMAN:  Objection.  Form.
19      A.   Are you asking me if that's what the
20  column says?
21      Q.   Yeah.
22      A.   The column says, "R&D said they could
23  procure RLD during Strat, but would be
24  expensive."
25      Q.   Do you have any reason to believe that
```

Page 179

```
               M. Hatch
 1
 2  the R&D department couldn't have obtained or
 3  procured RLD for Daraprim?
 4      A.   I don't have any specific
 5  understanding one way or the other.
 6      Q.   But at least this presentation says
 7  that R&D said they could, correct?
 8           MR. PERLMAN:  Objection.  Form.
 9  Leading.
10      A.   On this slide, it says R&D said they
11  could procure RLD during strat, but would not
12  expensive.
13           MR. PERLMAN:  Oh, I promised we
14  would -- we would take a break after that.
15           Let me make sure I don't have any
16  other questions on that document.
17           Okay, yeah, it's a good time for a
18  break.
19           THE VIDEOGRAPHER:  We are pausing --
20  we are pausing recording in the third
21  medium.  Going off record at 2:33 p.m.
22           (Recess.)
23           THE VIDEOGRAPHER:  We are back on
24  record in the third media at 2:47 p.m.
25           MR. CRAVENS:  Frank, if you can put up
```

Page 180

```
               M. Hatch
 1
 2      Tab 26.
 3           (Defendants Exhibit 106, a document
 4      bearing Bates Nos. MYL-DARAPRIM_0000135
 5      through 136, marked for identification, as
 6      of this date.)
 7           MR. DeSIMONE:  This will be Exhibit
 8      106.
 9  BY MR. CRAVENS:
10      Q.   Mr. Hatch, just let me know when
11  you've had time to take a look at that.
12      A.   I don't see it just yet.
13           MR. DeSIMONE:  Should be available
14  now.
15      A.   There it is.
16           Okay.  I have it open now.
17      Q.   Do you recognize this e-mail?
18      A.   I mean, no, I don't have a specific
19  recollection of the e-mail, no.
20      Q.   Who is Teresa Eddy?
21      A.   Teresa Eddy is one of my project
22  managers.
23      Q.   And she is providing a list to the
24  recipients of this e-mail projects that have
25  been removed from the 2017 work plan; is that
```

Page 181

```
               M. Hatch
 1
 2  right?
 3      A.   That appears to be what this is, yes.
 4      Q.   And you see under the text where it
 5  says, "The following projects have been removed
 6  from the 2017 work plan and have been proposed
 7  to be abandoned or moved to buy/wish," and
 8  pyrimethamine is listed under that heading.
 9           Do you see that?
10      A.   I do see that.
11      Q.   What does it -- what does it mean if a
12  project is proposed to be abandoned?
13      A.   "Abandoned" is typically associated
14  with the PRB process.  So, once a product is
15  abandoned, it's not available for selection to
16  be included in a given R&D work plan.
17      Q.   And what does it mean for a project to
18  be moved to buy/wish?
19      A.   Buy/wish are two different things.
20  "Buy" means that it could be moved to a bucket
21  where, if we found a third party to source the
22  product from, like another -- a competitor or
23  somebody had found the product -- or, been able
24  to develop the product in establishing a
25  relationship with them.
```

Page 182

M. Hatch

1
2        "Wish" is a list of those potential
3   opportunities that we would give to our
4   third-party sourcing team -- third-party
5   finished dose sourcing team to be on the lookout
6   for.
7        Q.   I'm sorry, third-party what?
8        A.   Third-party finished dose sourcing
9   team.  Not API, not RLD, but the actual product
10  itself.
11       Q.   What does it mean when it says, "Mylan
12  expected to be late to market"?
13       A.   Typically, this phrase or this --
14  nomenclature like this comes from the portfolio
15  team, and it's meant to represent how it's being
16  modeled from a financial standpoint.
17       Q.   In what way?
18       A.   So when you -- when you saw earlier
19  the designation of "first to market," that had a
20  connotation that -- that refers to a specific
21  set of circumstances in terms of competitive
22  landscape, timing to market, pricing.
23       So does "late to market."  "Late to
24  market" assumes a different set of
25  circumstances:  That someone else would get

Page 183

M. Hatch

1
2   there first, and then your pricing would be
3   different, your market share would be different.
4        Q.   So, at this point, Mylan had reason to
5   believe that it would not be the first generic
6   on the market with a generic version of
7   Daraprim?
8        A.   Well, not necessarily.
9        MR. PERLMAN:  Objection.  Form.
10       A.   What this specifically refers to is a
11  financial model.  So what -- what will -- what
12  the portfolio team has historically done in
13  situations like this is, while we -- while we
14  don't specifically know of someone -- and it
15  could be that we do or we don't -- that they
16  would model -- again, this is a financial model
17  reference, typically.  So they would assume,
18  from a modeling perspective, that someone would
19  figure out a way to get there.
20       Q.   And as a result of that change in
21  projection, it was no longer as appealing an
22  opportunity to Mylan; is that right?
23       MR. PERLMAN:  Objection.  Form.
24       A.   I -- I don't have enough information
25  to know what went into their thought process in

Page 184

M. Hatch

1
2   terms of creating the forecast or changing the
3   designation from "first to market" to "late to
4   market."
5        MR. CRAVENS:  Frank, can you put up
6   Tab 29?
7        (Defendants Exhibit 107, a document
8        bearing Bates Nos. MYL-DARAPRIM_0000012
9        through 16, marked for identification, as of
10       this date.)
11       MR. DeSIMONE:  This will be Exhibit
12  107.
13       It should be available now.
14       THE WITNESS:  Okay.  I have it open.
15  BY MR. CRAVENS:
16       Q.   Do you see the e-mail from Dan Herlihy
17  at Premium Health Services to Tara Dalton at
18  Mylan at the bottom of the first page?
19       It's the e-mail from September 25,
20  2017, 3:38 p.m.
21       A.   I do.
22       Q.   Do you see where Mr. Herlihy, he
23  writes, "You have asked about Daraprim in the
24  past and now we are able to procure.  The
25  lead-time is seven days per bottle of 100

Page 185

M. Hatch

1
2   tablets.  Please see informal quote below," and
3   then there was a price quote?
4        A.   I do see that.
5        Q.   Do you know whether Ms. Dalton or
6   anyone else in the RLD sourcing group passed on
7   that price quote to the R&D department?
8        A.   I -- I don't know.
9        Q.   Do you know whether the -- whether
10  Mylan ever placed an order with Premium Health
11  Services for Daraprim API?
12       A.   I do not know.
13       Q.   Do you have any reason to believe that
14  Premium Health Services could not have provided
15  Daraprim to Mylan if Mylan had placed an order
16  with them in September of 2017?
17       MR. PERLMAN:  Objection.  Form.
18  Foundation.
19       A.   I don't have any context to know
20  whether or not they could or could not supply.
21       MR. CRAVENS:  Frank, can you put up
22  Tab 30?
23       This is a cover e-mail and attached
24  spreadsheet.
25       (Defendants Exhibit 108, a document

Page 186

M. Hatch

1    bearing Bates Nos. MYL-DARAPRIM_0000139 with
2    attachments 108.2 and 108.3, marked for
3    identification, as of this date.)
4            MR. DeSIMONE:  This will be Exhibit
5    108.
6            Should be available to you now.
7            THE WITNESS:  Okay.  So I have 108.1,
8    108.2, 108.3.
9    BY MR. CRAVENS:
10   Q.    So go ahead and look at 108.1 first
11   just to give you context.
12   A.    Okay.
13         Okay.  I have reviewed 108.1.  Do you
14   want me to go through the other two as well?
15   Q.    Yeah.
16   A.    Okay.
17   Q.    We're going to be focusing on the
18   spreadsheet.
19   A.    Okay.
20         Okay.  I have the spreadsheet open
21   now.
22   Q.    Okay.  So do you recognize this as a
23   spreadsheet of low ROI products that you
24   requested from Ryan Nicewarner?

Page 187

M. Hatch

1            MR. PERLMAN:  Objection to form.
2    Foundation.
3    Q.    You can refer back to the cover e-mail
4    if you'd like.
5    A.    So I'm going back to the cover letter
6    now.  Just a second.
7            Okay.  Could you repeat your question,
8    please?
9    Q.    Uh-huh.  So do you recognize the
10   attached spreadsheet as being a list of low ROI
11   products that you requested from Ryan
12   Nicewarner?
13   A.    I see "Low ROI Product List" in the
14   title, but I don't recognize the document
15   specifically.  I'm looking at the spreadsheet
16   again now.
17         I have the spreadsheet open now.
18   Q.    Do you recall ever asking Mr.
19   Nicewarner to provide you with a list of low ROI
20   products?
21   A.    No.
22   Q.    Is that the sort of thing that you
23   would typically ask him to provide?
24   A.    No, it's not.

Page 188

M. Hatch

1    Q.    So do you have any idea why you
2    requested it in this instance?
3    A.    I do not, no.
4    Q.    If you look at line 42.  It should be
5    the line for pyrimethamine.
6    A.    I see it.
7    Q.    And so pyrimethamine at this point in
8    November of 2017 is listed as a low ROI project?
9    A.    I see that here.  I see the column
10   that says "Reason Code:  Low ROI."
11   Q.    And "ROI" is return on investment?
12   A.    Return on investment is how I would
13   typically use "ROI."
14   Q.    What -- what is a low ROI project
15   within Mylan?
16   A.    I don't -- I don't know the -- the
17   specific context here, but I -- low ROI would
18   typically imply low return on investment.
19   Q.    And what -- what is the basis for the
20   determination that the Daraprim project was a
21   low return on investment project, as reflected
22   in this spreadsheet?
23   A.    It -- I -- you're asking me to --
24   to -- to understand why Ryan chose to write "low

Page 189

M. Hatch

1    ROI" here, so I -- I don't know the answer to
2    that.
3    Q.    Well, I mean, it appears that you
4    requested the spreadsheet from Mr. Nicewarner.
5    A.    It also is pretty common for me to
6    request things from Mr. Nicewarner on a regular
7    basis.  So if you take into account the
8    thousands of spreadsheets I have probably
9    requested from him over the years, to recall
10   this particular one would be unlikely.
11   Q.    Well, did -- but when you asked for
12   this, did you have some criteria in mind for
13   what constitutes a low ROI project?
14   A.    I don't even recall the request, so
15   it's hard for me to give a frame of reference
16   for that time.
17   Q.    Do you have in your own mind criteria
18   for what constitutes a low ROI project?
19   A.    In general, I would say a low ROI
20   product is something that has very high cost
21   that is not significantly outweighed by the
22   expected return.
23   Q.    And if you look here, the estimated
24   costs for Daraprim are roughly $2.1 million.

M. Hatch

2     Do you see that?

3     A.    I do see that.

4     MR. PERLMAN:  Objection.  Form.

5     Q.    Do you know what the basis was for

6  that cost estimate?

7     A.    I didn't -- I do not know what the

8  basis was for that cost estimate.

9     Q.    And you see the estimated net peak

10  sales of $21 million?

11     A.    I do see that.

12     Can I go back to your previous

13  question for a moment?

14     Q.    Sure.

15     A.    I just note, in the body of the e-mail

16  to me from Ryan, he says, "There are some

17  products in which the product costs may not

18  accurately reflect the remaining spend."

19     So I'm not sure if this is one of

20  those products or not.

21     Sorry.  Did I -- did I skip over

22  another question?  I apologize.

23     Q.    No, I don't know if you still have the

24  last question in mind, which was, do you know

25  what the basis was for the estimated net peak

M. Hatch

2  sales among those?

3     A.    The peak net sales value comes from

4  the US portfolio -- just for this particular

5  product would have come from the US portfolio

6  team.

7     Q.    What inputs would that portfolio team

8  typically use to generate that estimated net

9  peak sales?

10     A.    To calculate a peak net sales value,

11  the US portfolio team would use many factors,

12  including the -- the timing to market of our

13  product -- our generic alternative, any legal

14  landscape, any timing of submission for our

15  product, any expected hurdles from a regulatory

16  perspective and how that might impact timing,

17  the selling price of the innovator product, the

18  projected cost of our generic product, among

19  many other factors.

20     Q.    Do you know how that estimated net

21  peak sales of $21 million in this November 2017

22  forecast compares to the net peak sales forecast

23  at the time the Daraprim project was approved in

24  November of 2015?

25     MR. PERLMAN:  Objection.  Form.

M. Hatch

2     A.    I don't know what the respective

3  numbers were.  I also don't know if this is an

4  old number or not.

5     Q.    If a spreadsheet listed Dara- -- an

6  internal Mylan spreadsheet listed Daraprim as a

7  project on hold, would that help give you any

8  context to help you understand what is meant by

9  a project being on hold?

10     MR. PERLMAN:  Objection.  Form.

11     A.    I -- I'm not sure I understand.

12     Q.    Well, before -- we talked to you a

13  little bit before in the context of one of the

14  e-mails about your understanding of what it

15  means when a project is on hold; and I think you

16  said you don't know what that means; and what

17  I'm asking is, before I go through the

18  time-intensive process of loading another

19  spreadsheet for you, if you saw that same

20  phrase, "on hold," in a spreadsheet, would that

21  help refresh your recollection about what is

22  meant by that?

23     MR. PERLMAN:  Objection.  Form.

24     Q.    Let's go ahead and do it.

25     A.    So --

M. Hatch

2     Q.    Then we'll see.

3     MR. CRAVENS:  Can you -- Frank, can

4  you put Tab 31 up?

5     MR. DeSIMONE:  This will be Exhibit

6  109.

7     (Defendants Exhibit 109, a document

8  bearing Bates Nos. MYL-DARAPRIM_0000906

9  through 907 with attachment 109.2, marked

10  for identification, as of this date.)

11     MR. DeSIMONE:  There's a cover e-mail

12  and an attachment.

13     THE WITNESS:  Okay.

14     MR. DeSIMONE:  Okay, it says it's

15  uploaded.

16     THE WITNESS:  Okay, I see it.

17  BY MR. CRAVENS:

18     Q.    Direct you to 109 --

19     MR. PERLMAN:  Am I looking at the

20  wrong thing?

21     MR. DeSIMONE:  I'm sorry.  So 109.1

22  should be MYL-DARAPRIM_000906.  We're going

23  to delete the second one of those.  I

24  apologize.  So we're going to delete 002172.

25  I'll get the correct one in there.

Page 194

M. Hatch

1              M. Hatch
2          Okay.  You should have 109.2 now as
3       the spreadsheet.
4          THE WITNESS:  Okay.  I have -- I have
5       both documents open now.
6    BY MR. CRAVENS:
7       Q.   Okay.  So after you've taken a look at
8    the cover e-mail for context, I'm going to ask
9    you to go to row 1266 in the spreadsheet.
10         It should be the row for Daraprim.
11      A.   So I'm just refreshing on the initial
12   document.
13         Okay, I'm in the spreadsheet now.
14      Q.   Okay.  So you see that this is a
15   December 2017 Mylan spreadsheet, and you see
16   that --
17         MR. PERLMAN:  Objection to form.
18      Q.   You see that row 1266 identifies the
19   Daraprim project?
20      A.   1266.  Okay, I'm there now.
21         So it indicates on the spreadsheet
22   that the project status is on hold.
23         Is that what you're asking?
24      Q.   Yes, I'm asking you what that means.
25      A.   Yeah, I don't -- I mean, I don't have

Page 195

M. Hatch

1    the specific context.  I can just -- I can see
2    that it's out of the work plan, but I can't -- I
3    don't -- I don't know what the specific context
4    for on hold is.
5          That could be, you know, PRB could
6    place it on hold, portfolio team could place it
7    on hold, R&D could place it on hold.  Any number
8    of different definitions of "on hold."
9       Q.   Well, all right.  So you just
10   identified different departments that could put
11   a project on hold.
12         What would it mean if they did put a
13   project on hold?
14      A.   What it would mean, from -- from their
15   point of view, the project is on hold.
16      Q.   Which means what?
17      A.   That, from their point of view and
18   their respective department, they wouldn't be
19   considering the product in whatever capacity
20   they operate.
21      Q.   Do you know of any specific steps that
22   Mylan took to advance the Daraprim project after
23   the project was put on hold?
24      A.   Saying that it was placed on hold is

Page 196

M. Hatch

1    kind of a broad statement.  I mean, it -- I
2    agree it does in it the spreadsheet.
3       Q.   Let me do it by date instead.
4       A.   Okay.
5       Q.   Do you know of any specific steps that
6    Mylan took to advance the Daraprim project after
7    December 2017?
8       A.   I'm -- I'm not aware of any specific
9    steps they did or did not take.
10         MR. CRAVENS:  Frank, can you put up
11      Tab 32.
12         (Defendants Exhibit 110, a document
13      bearing Bates Nos. MYL-DARAPRIM_0000382
14      through 385, marked for identification, as
15      of this date.)
16         MR. DeSIMONE:  This will be Exhibit
17      110, and it should be available now.
18   BY MR. CRAVENS:
19      Q.   Let me know when you have that up, Mr.
20   Hatch.
21      A.   Okay.  I have the document open now.
22      Q.   Do you see that this is an e-mail from
23   a firm called Globyz Pharma to Ms. Tara Dalton
24   advertising RLD sourcing services?

Page 197

M. Hatch

1       A.   I see who it's from and who it's to.
2    I don't see the context specifically.
3       Q.   Well, if you turn to the second
4    page --
5       A.   I see it.  I do now, yes.
6          It says, "We have access to the
7    following products from US market."
8       Q.   Uh-huh.  And the unredacted text lists
9    Daraprim as being a product that Globyz Pharma
10   has access to, correct?
11      A.   That's what's indicated on the -- on
12   the e-mail.
13      Q.   Do you know whether Mylan ever
14   responded to this e-mail from Globyz Pharma?
15      A.   I do not know if they responded or
16   not.
17      Q.   Do you know -- so you don't know
18   whether Mylan ever placed an order for Daraprim
19   with Globyz Pharma?
20      A.   I do not.
21      Q.   Do you have any basis to believe that
22   Globyz Pharma could not have provided Daraprim
23   to Mylan if Mylan had placed an order with them
24   in January of 2018?

Page 198

```
1                    M. Hatch
2      A.   I don't know anything about the
3   company, so it would be hard for me to speak on
4   their ability to supply a product.
5      Q.   So you don't know one way or the
6   other?
7      A.   Correct.
8           MR. CRAVENS:  Can you -- Frank, can
9   you put up Tab 33?
10          (Defendants Exhibit 111, a document
11      bearing Bates Nos. MYL-DARAPRIM_0000206
12      through 207 with attachment 111.2, marked
13      for identification, as of this date.)
14          MR. DeSIMONE:  This will be Exhibit
15      111.
16          MR. CRAVENS:  And this is -- am I
17      right, Frank, this is a two-part -- an
18      e-mail with an attachment?
19          MR. DeSIMONE:  That's correct.  It's
20      a -- it's a cover e-mail and a presentation
21      attachment.
22          So it should be up for you.
23          THE WITNESS:  This is 111, 112.
24          MR. DeSIMONE:  It's 111.1 and 2.
25          THE WITNESS:  I'm sorry.  I misread
```

Page 199

```
1                    M. Hatch
2      it.  Yes.
3   BY MR. CRAVENS:
4      Q.   Let me know when you have it up.
5      A.   Okay.  I've got the first one of them.
6   Downloading the second one now.
7      Q.   So, looking at the first one, if you
8   have that up already, do you know who Abhijit
9   Barve is?
10     A.   I do.
11     Q.   Who is he?
12     A.   He, at this time, would have been head
13  of our clinical area, our global clinical lead.
14     Q.   And do you see that he is in this
15  e-mail forwarding to Nicole Garrett information
16  about a company that has -- has helped with
17  sourcing issues in the past?
18          MR. PERLMAN:  Objection.  Form.
19     A.   I see the -- I see the e-mail that --
20  that Abhijit has forwarded to Nicole from, looks
21  like, SymbioGenerics.
22     Q.   Uh-huh.  And he says, "Please assess
23  their capabilities and their sources and track
24  record."
25          Do you see that?
```

Page 200

```
1                    M. Hatch
2      A.   I do.
3      Q.   So now if you turn to the -- to the
4   attachment and go to slide 7, do you see that
5   slide 7 indicates an ability to source Daraprim
6   RLD?
7      A.   Apologies.  It's giving me the error
8   just on that second sheet.  Just give me a
9   moment to try again.
10          There I got it.  I got it open.
11          Okay.  I'm sorry, where were we
12  supposed to go?
13     Q.   Slide 7.
14     A.   Okay.  I'm on slide 7.
15     Q.   Do you see that it indicates an
16  ability to source Daraprim RLD?
17          MR. PERLMAN:  Objection.  Form.
18     A.   I see the product on the slide labeled
19  "REMS Lines - Additional Products."
20          Is that what you're referring to?
21     Q.   Yeah.  Do you see Daraprim listed
22  there?
23     A.   I do see Daraprim listed there.
24     Q.   Do you know whether Mylan ever made
25  any effort to follow up -- call this potential
```

Page 201

```
1                    M. Hatch
2   source for Daraprim RLD?
3      A.   I do not know.
4           MR. PERLMAN:  Objection.  Form.
5      Q.   Do you know whether Ms. Garrett ever
6   investigated this firm's capabilities or sources
7   and track record, as requested by Mr. Barve?
8           MR. PERLMAN:  Objection.  Form.
9      A.   I do not know what actions she may or
10  may not have taken.
11     Q.   Do -- do you have any basis to believe
12  that Spring Bio Solutions could not have
13  provided Daraprim RLD to Mylan in January of
14  2018 if Mylan had placed an order with them?
15     A.   I don't know anything at all about
16  that company, so I wouldn't have any insight
17  whatsoever into what their capabilities would
18  be.
19     Q.   You just don't know one way or the
20  other?
21     A.   Correct.
22          MR. CRAVENS:  Frank, can we turn to
23      Tab 34?
24          MR. DeSIMONE:  This will be Exhibit
25      112.  It's three files, 112.1, 2 and 3,
```

Page 202

M. Hatch

1    cover e-mail, slip sheet, attachment.
2            (Defendants Exhibit 112, a document
3        bearing Bates Nos. MYL-DARAPRIM_0000823 with
4        attachments 112.2 and 112.3, marked for
5        identification, as of this date.)
6   BY MR. CRAVENS:
7        Q.    Let me know when you have it.
8            THE WITNESS:  I'm sorry.  Did it come
9        through, Frank?
10            MR. DeSIMONE:  It's still uploading.
11            It just finished.
12            THE WITNESS:  Okay.
13            Okay.  So 112.2 and 112.3 have come
14        through.
15            MR. DeSIMONE:  And not 112.1?
16            THE WITNESS:  Now it has.  It came
17        through.  It came through late.
18            Okay.  So I have 112.1 open.  Is that
19        the appropriate document?
20   BY MR. CRAVENS:
21        Q.    Should be, yes.
22        A.    Okay.
23        Q.    So it gives you context.
24            So do you recognize this as a -- as an

Page 203

M. Hatch

1   e-mail forwarding a draft of the 2019 and Beyond
2   WP file?
3        "WP" I assume is work plan.
4        A.    That is -- this appears to reference
5   the 2019 work plan.
6        Q.    And now if you turn to the
7   spreadsheet, we'll go to row 493.
8        A.    Okay.  I'm there.
9        Q.    If we look under column M, do you see
10   that the recommendation is to kill the Daraprim
11   project?
12        A.    I do see "kill" under "PM Future WP
13   recommendation."
14        Q.    So why was the recommendation made to
15   kill the Daraprim project?
16            MR. PERLMAN:  Objection.  Form.
17        A.    I don't -- I don't know the specific
18   reason why it indicates "kill" there for the
19   program.
20        Q.    Could it have been because Mylan had
21   determined that Daraprim was a low ROI project?
22            MR. PERLMAN:  Objection.  Form.
23        Foundation.
24        A.    Are you asking me if that's one of the

Page 204

M. Hatch

1   many possibilities?
2        Q.    Possibilities, yes.
3        A.    That seems to be a reasonable one of
4   many potential reasons.
5            MR. CRAVENS:  If we can take a short
6        break just so I can go over my notes, I
7        think I -- I may be done.  I just want to
8        look over things one more time.
9            THE WITNESS:  Sure.  Should we just go
10        to the respective breakout rooms?  Or do you
11        have a timeframe?  What works for you?
12            MR. CRAVENS:  Five minutes.
13            THE VIDEOGRAPHER:  We are pausing
14        recording in the third media.  Going off
15        record at 3:26 p.m.
16            (Recess.)
17            THE VIDEOGRAPHER:  We are back on
18        record at 3:34 in the third media.
19   FURTHER EXAMINATION BY
20   MR. PERLMAN:
21        Q.    Good afternoon, Mr. Hatch.
22            Before I start my questions, I just
23        want to make sure we're on the same page.
24            So do you understand that when you

Page 205

M. Hatch

1   were answering Mr. Cravens' questions, counsel
2   for the defendants, that you were answering
3   questions in a corporate capacity?
4        A.    I do.
5        Q.    And do you understand that -- let me
6   rephrase that.
7            Did you understand this morning, when
8   you were discussing with me, that you were
9   answering questions in your personal capacity?
10        A.    I did.
11        Q.    Okay.  And so, again, I'm asking you
12   questions again now, and I'll be asking you
13   questions again in your personal capacity.
14            Do you understand?
15        A.    I do.
16        Q.    And one more question along those
17   lines, Mr. Hatch.  When you reviewed documents
18   with counsel a couple days ago, did those
19   documents refresh your recollection as to
20   Mylan's generic Daraprim project?
21        A.    Did they refresh my personal
22   recollection; is that what you're asking?
23        Q.    Yeah, that's my question.
24        A.    Not really, no.

1              M. Hatch
2    testifying.
3           I've been asking for your knowledge of
4    this -- of these questions, you know, your
5    individual knowledge, and then, you know,
6    whether you're speaking for the company or for
7    the company and for yourself is sort of a
8    separate issue.
9           So, from your perspective, I'm just
10   asking what -- what you yourself know?
11          MR. SILBER:  Let me just clarify
12      something.
13          Mr. Cravens, when you started your
14      portion of the deposition, you were clear
15      you were asking him questions in his
16      corporate role, so I just want to be clear,
17      for that portion of the deposition, that's
18      how he was answering the questions,
19      regardless of how you noticed the
20      deposition.
21          MR. CRAVENS:  Right, but it's the
22      same -- it's the same body of knowledge that
23      I'm asking for.
24          MR. SILBER:  I just wanted that to be
25      clear on the record.

1              M. Hatch
2           Go ahead, why don't you restate your
3       question, and Mr. Hatch will answer as best
4       he can.
5           MR. CRAVENS:  I think what I said was
6       that, at the beginning of the deposition, I
7       asked Mr. Hatch if he understood that he was
8       here testifying both in his individual
9       capacity and as a 30(b)(6) representative,
10      but we can save -- we don't need to use the
11      witness's time for that discussion.
12   BY MR. CRAVENS:
13      Q.   You said in response to Mr. Perlman's
14   question that -- that you thought the challenges
15   to obtaining API were one of the reasons that
16   the Daraprim project was abandoned.
17          Do you remember saying that?
18      A.   I do.
19      Q.   Okay.  And you -- we established
20   earlier that -- that Mylan in fact was able to
21   obtain Daraprim -- pyrimethamine API from RL
22   Fine in 2017, correct?
23          MR. PERLMAN:  Objection.  Form.
24      Misstates the testimony.
25      A.   We -- we -- I recall we established

1              M. Hatch
2    that we were able to -- to get a sample of the
3    product.
4       Q.   And are you aware of any instance in
5    which Mylan tried and failed to obtain
6    pyrimethamine API?
7       A.   I think this is -- and I'll apologize
8    upfront.  This may have been where I was getting
9    confused between my -- representative of the
10   company versus Mr. Perlman's questions about my
11   personal recollection.
12      Q.   Do you have any basis to believe that
13   Mylan ever tried and failed to obtain
14   pyrimethamine API?
15      A.   I don't -- I don't have any specific
16   basis, no.
17      Q.   Do you have any basis to believe that
18   Mylan ever placed an order for Daraprim RLD and
19   was unable to obtain it?
20      A.   I don't have any specific knowledge of
21   what steps were taken to order API --
22      Q.   And as far as IMS data goes --
23      A.   -- or RLD.
24      Q.   -- did you -- did you review any IMS
25   sales data for Daraprim after the project was

1              M. Hatch
2    approved in November of 2015?
3       A.   Did I see any IMS data?  Yes.
4       Q.   And what did that IMS data show?
5       A.   It appeared to show roughly the same
6    number over the course of many months and many
7    different periods of evaluation.
8       Q.   It appeared to show the same numbers,
9    you said?
10      A.   Roughly the same numbers from an IMS
11   perspective.
12      Q.   So you didn't see a significant change
13   in the IMS numbers from the time you first
14   looked at them in 2015 until the time the
15   project was abandoned?
16      A.   So --
17          MR. PERLMAN:  Objection to form.
18      A.   My recollection is that the IMS itself
19   didn't change much.
20      Q.   Okay.  You have no reason to believe
21   that there was any significant change in
22   Daraprim's sales between 2015 and 2019?
23          MR. PERLMAN:  Objection.  Form.
24      Foundation.
25      A.   I think we established earlier IMS

Page 214

M. Hatch

1  is -- does not accurately -- we didn't believe
2  that IMS accurately reflected the value of the
3  product, so the number was kind of irrelevant.
4      Q.   But did you -- but you said the number
5  stayed the same?
6      A.   The IMS number.
7           Is that -- is that what you're asking?
8      Q.   Right.
9      A.   Yes.
10     Q.   So you're saying the IMS number stayed
11  the same, and you didn't believe that it was
12  accurately reflecting sales.
13          So did you believe that sales were in
14  fact higher or lower than the IMS numbers were
15  showing?
16          MR. PERLMAN:  Objection.  Form.
17     A.   I believe the portfolio group believed
18  that the numbers were higher than the sales
19  reflected in IMS.
20     Q.   And what was the basis for that
21  belief?
22     A.   I don't know what their basis for that
23  belief was.
24     Q.   So do you know what data was used when

Page 215

M. Hatch

1  calculating that $21 million net peak sales
2  value we talked about earlier?
3      A.   I do not know --
4           MR. PERLMAN:  Objection.  Form.
5      A.   I do not know what specific values
6  they took into account.
7           MR. CRAVENS:  I don't have anything
8  else.
9           MR. PERLMAN:  I don't know, did any of
10  the other defendants -- I apologize if I
11  missed it.
12          Were any of the other defendants going
13  to ask questions?
14          MR. RUDOWITZ:  No questions here,
15  Neal.
16          MS. LEWIS:  No questions from here,
17  Neal.
18          (Continued on the next page to include
19  the jurat.)

Page 216

M. Hatch

1      MR. PERLMAN:  Okay.  Great.  I'm all
2  through with my questions as well.  So thank
3  you, Mr. Hatch and everyone else, for your
4  time, and we can go off the record.
5      THE VIDEOGRAPHER:  We have concluded
6  today's deposition of Michael Hatch.  We're
7  going off record in the third media at 3:48
8  p.m.
9      (Whereupon, the deposition concluded
10  at 3:48 p.m.)
11                  oOo

16  _____
             MICHAEL HATCH

18  Subscribed and sworn to
    before me this     day
19  of        2021.

20  _____

Page 217

M. Hatch

3           CERTIFICATE
4  STATE OF NEW YORK )
                     : ss
5  COUNTY OF NEW YORK)
6      I, Kathy S. Klepfer, a Registered
7  Merit Reporter and Notary Public within and
8  for the State of New York, do hereby
9  certify:
10     That MICHAEL HATCH, the witness whose
11  deposition is herein before set forth, was
12  duly sworn by me and that such deposition is
13  a true record of the testimony given by such
14  witness.
15     I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage and that I am in no way
18  interested in the outcome of this matter.
19     In witness whereof, I have hereunto
20  set my hand this 27th day of January 2021.

22  _____
        KATHY S. KLEPFER, RPR, RMR, CRR, CLR

2

3              UNITED STATES DISTRICT COURT

4              SOUTHERN DISTRICT OF NEW YORK

5    ---------------------------------------------------------
     FEDERAL TRADE COMMISSION, STATE OF NEW YORK;
6    STATE OF CALIFORNIA; STATE OF ILLINOIS;
     STATE OF NORTH CAROLINA; STATE OF OHIO;
7    COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH
     OF VIRGINIA,
8
              Plaintiffs,              Case No.
9                                      1:20-cv-00706-DLC
     -vs-
10
     VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG;
11   MARTIN SHKRELI, former officer of Vyera
     Pharmaceuticals, LLC and Phoenixus AG
12   (formerly known as Turing Pharmaceuticals, LLC
     and Turing Pharmaceuticals AG); and
13   KEVIN MULLEADY, individually, as an owner
     and director of Phoenixus AGA and a former
14   executive of Vyera Pharmaceuticals, LLC,

15            Defendants.
     _____/
16

17

18
              VIDEOTAPED DEPOSITION OF HAMILTON LENOX
19
                 Wednesday, February 24, 2021
20                 11:07 a.m. - 1:39 p.m.

21              (Conducted Virtually)

22

23   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR
24   Notary Public, State of Florida
     TSG REPORTING
25   Job No. 190392
                         -   -   -

Page 30

H. LENOX

1
2  period are reflected in pages 0007978 through -7981?
3       A.    To the best of my knowledge, yes.
4       Q.    And that -- those data were maintained in the
5  ordinary course of LGM's business?
6       A.    Yes.
7       Q.    So looking at the -- at the Customer Name
8  column, do you have an understanding based on -- well,
9  actually looking at the End Client Description column,
10 is that -- does that column represent the ultimate
11 customer for the pyrimethamine API?
12      A.    The ultimate customer --
13            MR. PERLMAN:  Objection, form.
14            You can answer, Mr. Lenox.
15            THE WITNESS:  To my knowledge, it represents
16      the end client from LGM's perspective.
17 BY MR. CRAVENS:
18      Q.    Do you have an understanding from looking at
19 the end client description names, which of these clients
20 were purchasing pyrimethamine API for human drug
21 compounding?
22      A.    Just looking at the names, no, I do not.
23      Q.    Do you have any understanding as to -- to --
24 well, I'll -- let's just go one by one.
25            Do you have any understanding as to the use

Page 31

H. LENOX

1
2  by Horse Necessities, Inc., of pyrimethamine API?
3       A.    It is a veterinary use, based on my
4  understanding.
5            (Reporter clarifies.)
6  BY MR. CRAVENS:
7       Q.    What about Diversified Pharmaceutical Ingre,
8  do you know -- oh, that might be "ingredient."
9            Do you know what use Diversified
10 Pharmaceutical Ingredient had for pyrimethamine API?
11           MR. PERLMAN:  Objection.  Form.
12           THE WITNESS:  And no, I do not.
13 BY MR. CRAVENS:
14      Q.    What about Medisca, Incorporated?  Do you
15 know what sort of business Medisca, Incorporated is?
16      A.    My understanding personally is that Medisca
17 is a repacker and reseller who buys bulk API and then
18 repacks it and resells it.
19      Q.    Do you know whether they service primarily
20 human drug compounding?
21           MR. PERLMAN:  Objection.  Form.
22           THE WITNESS:  And no, I do not know who their
23      typical end clients are.
24 BY MR. CRAVENS:
25      Q.    What about the Vetnoquinol NA?

Page 32

H. LENOX

1
2       A.    I don't have personal knowledge.  I did look
3  them up and believe they are a veterinary company.
4       Q.    What about Letco Medical?
5            MR. PERLMAN:  Objection.  Form.
6            THE WITNESS:  My understanding is that Letco
7      Medical is also a repacker and reseller of APIs,
8      and I do not have direct knowledge of who their end
9      customers are.
10 BY MR. CRAVENS:
11      Q.    Do you know what sort of business Wedgewood
12 Pharmacy is?
13      A.    Wedgewood Pharmacy is a veterinary
14 compounding pharmacy company.
15      Q.    Do you know what sort of business Park
16 Compounding is?
17      A.    I do not, no.
18      Q.    So the Exhibit 270 that we looked at shows
19 all of the pyrimethamine API that LGM imported into the
20 US.  Does -- does LGM sell all of the pyrimethamine API
21 that it imports into the US in either the United States
22 or Canada?
23      A.    To the best of my knowledge, yes.
24      Q.    So it does not reexport any pyrimethamine API
25 that it's imported to countries other than the US or

Page 33

H. LENOX

1
2  Canada, to your knowledge?
3       A.    Not to my direct personal knowledge, no.
4       Q.    And in terms of the due diligence that LGM
5  conducts of its API suppliers, does it make any
6  distinction in that due diligence depending on whether
7  the API is going to be used for veterinary purposes or
8  for human drug compounding?
9       A.    To my personal knowledge, my understanding is
10 that we would qualify them the same; however, the level
11 of documentation required might be different.
12           MR. CRAVENS:  And, Michelle, can we get
13      Defendants' Exhibit 272?
14 BY MR. CRAVENS:
15      Q.    While you're waiting for that to load,
16 Mr. Lenox, I will tell you it's a 20-plus-page email
17 chain involving various people at LGM Pharma, including
18 Mr. Schurder.  You were not on the email chain.  I'm
19 just going to ask you a few questions about some of the
20 email.
21           (Defendants' Exhibit 272 was marked for
22 identification.)
23           THE WITNESS:  I have Defendants' Exhibit 272
24      PDF open.
25

Page 34

H. LENOX

BY MR. CRAVENS:

Q.   So you can take as much time as you need to scroll through it.  The first question I'm going to ask you about is on page 3718.

A.   Okay.  I have reviewed page 3718.

Q.   All right.  If you look at the bottom email from Mr. Schurder on March 13, 2016, at 1:01 a.m., do you understand Mr. Schurder as indicating to the recipient of this email that LGM needed 250 kilograms of pyrimethamine as soon as possible?

A.   Based on reading the email, that would be my understanding, yes.

Q.   And then if you flip forward two pages to page 3716.  And then if you could see the top email in the chain from Mr. Schurder, again to Mr. Ramachandra, is Mr. Schurder indicating in this email that LGM's requirement for pyrimethamine had become urgent because LGM's clients were lined up waiting for material?

A.   What was the question with regard to that email?

Q.   Was it your understanding that that is what Mr. Schurder is indicating to Mr. Ramachandra?

A.   Based on my personal reading of the email, that appears correct.

Page 35

H. LENOX

Q.   Is it fair to say that this email shows that there was significant demand for pyrimethamine from LGM's customers at this time?

MR. PERLMAN:  Objection.  Form.

THE WITNESS:  I honestly wouldn't know how to answer that, because I don't know what would be considered significant demand for this specific API.

BY MR. CRAVENS:

Q.   At the very least, there was demand from LGM's customers for pyrimethamine API that LGM was trying to satisfy; is that fair?

A.   That would be fair to say, yes.

Q.   Do you have an understanding of what was driving the demand for pyrimethamine powder in the US at this time, in 2016?

MR. PERLMAN:  Objection.  Form.

MR. CRAVENS:  Michelle, can you load Defendants' Exhibit 273.

Let me know when that's loaded, Mr. Lenox.

THE WITNESS:  I will.

(Reporter clarifies.)

(Defendants' Exhibit 273 was marked for identification.)

Page 36

H. LENOX

THE WITNESS:  I have document 273 open.

BY MR. CRAVENS:

Q.   Okay.  This is another email chain that you are not copied on, but it is -- Mr. Schurder is copied on all of the emails, or the ones that we're going to be looking at anyway.

If you can turn to the second-to-last page, so it's Bates Number 000900.

A.   Okay.

Q.   So this is an email -- the one I'm looking at is an email from Joe Kraatz to Mendy Schurder and Gideon Schurder with a copy to Jessica Hinson, H-I-N-S-O-N.

And first of all, who is Mr. Kraatz?

A.   He is a sales representative for Willow Birch, a client of LGM.

Q.   And who is Mendy Schurder?

A.   Mendy Schurder is the former chief operating officer of LGM.

Q.   And who is Jessica Hinson, H-I-N-S-O-N?

A.   Jessica Hinson is an assistant who works for Joe Kraatz at Willow Birch.

Q.   Do you have an understanding of why Imprimis was looking for a DMF source of pyrimethamine in October of 2018?

Page 37

H. LENOX

A.   I do not.

Q.   Do you have an understanding of what Imprimis is?

A.   I believe that Imprimis is a 503A and 503B compounding pharmacy.

Q.   So do you have an understanding as to whether Imprimis also manufactures FDA-approved prescription drugs?

A.   I personally do not, no.

(Reporter clarifies.)

BY MR. CRAVENS:

Q.   So if you turn to the first page, and you see that there is a table that Mr. Kraatz has pasted into the email?

A.   Yes.

Q.   Do you have an understanding of what that table represents?

A.   I believe that this is a representation of companies that have a registered NDC number, for pyrimethamine.

Q.   And does having a registered NDC number for pyrimethamine, does that indicate that the company who has the registered NDC number is actually the manufacturer of the pyrimethamine?

H. LENOX

1  facility as well.

2

3        MR. CRAVENS:  Michelle, can you mark

4     Defendants' Exhibit 275.

5        MS. CASTANEDA:  Will do.

6  BY MR. CRAVENS:

7     Q.   While you're waiting for it to load, it's

8  another email chain, I'm just going to ask you about the

9  first email, the first page.

10       (Defendants' Exhibit 275 was marked for

11  identification.)

12       THE WITNESS:  I have Exhibit 275 open.

13  BY MR. CRAVENS:

14     Q.   All right.  If you look at the email from

15  Mr. Schurder at the top of the first page, and you see

16  he's pasted into the body of the email some data from

17  IMS.  Do you know what that data reflects?

18     A.   It appears to be sales of the API and

19  different markets -- US, Europe, Latin America,

20  et cetera -- for various time periods.

21     Q.   Do you have an understanding of IMS is?

22       (Reporter clarifies.)

23       THE WITNESS:  I have a general understanding

24     in that it is a database that we purchase access to

25     that collates data regarding API and finished dose

H. LENOX

1

2     product sales.  Our understanding is it is not

3     entirely accurate, but it is a close approximation.

4  BY MR. CRAVENS:

5     Q.   Do you personally use IMS data in the course

6  of your work?

7     A.   I do use it, but I do not access the database

8  personally.

9     Q.   Do you have an understanding of how IMS

10  collects data concerning volume of API consumption in

11  the US?

12     A.   No, I do not.

13     Q.   Do you know whether the API consumption that

14  IMS tracks only reflects API that is being consumed for

15  use in FDA approved prescription drug products?

16       MR. PERLMAN:  Objection.  Form.

17       THE WITNESS:  No, I do not.

18  BY MR. CRAVENS:

19     Q.   If you look at the volumes in consumption and

20  kilograms in -- like, if you look for the 12 months

21  ending September 30, 2017, and it lists only

22  3.7 kilograms of pyrimethamine?

23     A.   Yes.

24     Q.   So is it fair to say that that certainly does

25  not include the pyrimethamine that LGM itself was

H. LENOX

1  importing and selling during that time period?

2

3     A.   I don't have personal knowledge of that.

4  Based upon the number there, it does appear to be lower

5  than what LGM had imported in that time period.

6     Q.   If you look at the second email in the chain,

7  so this is an email from Mr. Lustman on March 11th at --

8  2019 at 5:36 p.m., and he says:  "I have a potential

9  source, but we would need to know guaranteed quantities

10  from Imprimis in order to proceed."

11       Do you have any idea of what potential source

12  Mr. Lustman had identified for pyrimethamine API?

13     A.   Based on reviewing this email chain, no, I do

14  not.

15     Q.   Is that something that you asked Mr. Lustman

16  about when you were speaking with him in preparation for

17  your deposition?

18     A.   No, I did not.

19     Q.   Did you -- did you ask Mr. Lustman at all

20  about this request by Imprimis for a US DMF source for

21  pyrimethamine?

22     A.   No, I did not.

23     Q.   Do you have an understanding or does LGM have

24  an understanding of who the suppliers were for the other

25  regions that are indicated here in the IMS data, who the

H. LENOX

1  suppliers of pyrimethamine were?

2

3     A.   Not to my direct personal knowledge, no.

4     Q.   In the top email from Mr. Schurder, he says

5  at the end:  "In my opinion, no one else would file a

6  US DMF for this API unless Imprimis can guarantee

7  relatively large quantities at a premium price."

8       Do you see that?

9     A.   I see that, yes.

10     Q.   And in your experience is that generally the

11  case for APIs that have a very low volume demand?

12     A.   In a --

13       MR. PERLMAN:  Objection, form.

14       THE WITNESS:  In a general sense I would say

15     yes, as there are costs associated with submitting

16     and maintaining a drug master file to the US FDA.

17  BY MR. CRAVENS:

18     Q.   Can --

19       MR. CRAVENS:  Michelle, can you load

20     Defendants' Exhibit 276.

21       (Defendants' Exhibit 276 was marked for

22  identification.)

23  BY MR. CRAVENS:

24     Q.   Let me know when you've had a chance to

25  upload that.  The first one time I'm going to ask you

Page 46

1                          H. LENOX
2   about is on page 2827.
3        A.   I have Exhibit 276 open.  Which page number
4   did you refer to?
5        Q.   0002827.
6        A.   I'm on that page.
7        Q.   So do you see the bottom email at the page,
8   Ellen Shafner is sending a purchase order for
9   100 kilograms of pyrimethamine to Mr. Ramachandra at
10  R L Fine.
11            Do you see that?
12       A.   Yes.
13       Q.   Who is Ms. Shafner?
14       A.   Ellen reports in to Aliza, she works for the
15  logistic groups -- logistic group in Israel.
16       Q.   And in Mr. Ramachandra's response, he says:
17  "Due to managerial decisions, we would not be able to
18  offer this product for US market."
19            Do you have any understanding as to -- as to
20  the reasons that R L Fine stopped providing
21  pyrimethamine API to LGM in 2018?
22       A.   No, I do not have any direct personal
23  knowledge of why that decision was made.
24            MR. CRAVENS:  Michelle, can we go ahead and
25       load Defendants' Exhibit 277.

Page 47

1                          H. LENOX
2            (Defendants' Exhibit 277 was marked for
3   identification.)
4            MS. CASTANEDA:  277 should be uploaded.
5   BY MR. CRAVENS:
6        Q.   This is another shorter email chain that I'm
7   going to ask you questions about, the second page, which
8   is page number 948.
9        A.   I have Exhibit 277 open.
10       Q.   I guess you'll actually have to start at the
11  bottom of page 947, the first page, to see that it's an
12  email.  The email I'm quoting you to is an email from
13  Mendy Schurder dated March 22, 2018.
14            And if you see at the top of the next page,
15  she writes:  "R L Fine Chem are having problems with
16  their intermediate.  It is manufactured with a cyanide
17  reaction and the Indian authorities have closed a number
18  of factories, hence a major shortage.  R L hoped to have
19  new supplies of the intermediate in three to six
20  months."
21       A.   I see that email.
22       Q.   Do you have any understanding as to the cause
23  of the disruption of R L Fine's supply of pyrimethamine
24  in 2018?
25            MR. PERLMAN:  Objection.  Form.

Page 48

1                          H. LENOX
2            THE WITNESS:  No, I do not.
3   BY MR. CRAVENS:
4        Q.   Do you have any knowledge of discussions
5   between R L Fine and LGM at DCAT in March of 2018?
6        A.   No, I do not, as it was before I had joined
7   LGM DCAT is.
8            (Reporter clarifies.)
9   BY MR. CRAVENS:
10       Q.   Mr. Lenox, do you know what DCAT stands for?
11       A.   If I remember correctly, it's Drug, Chemical
12  and Manufacturers Association.
13            (Reporter clarifies.)
14  BY MR. CRAVENS:
15       Q.   And is it your understanding that DCAT is a
16  convention for the pharmaceutical industry?
17       A.   Yes, that is my understanding.
18       Q.   Do you know who attends -- or do you now who
19  attended DCAT on behalf of LGM in 2018?
20       A.   I do not have personal knowledge of all
21  attendees for LGM at the conference for 2018, no.
22       Q.   Can --
23            MR. CRAVENS:  Michelle, can you load
24       Defendants' Exhibit 279?
25            MS. CASTANEDA:  Will do.

Page 49

1                          H. LENOX
2            (Defendants' Exhibit 279 was marked for
3   identification.)
4            THE WITNESS:  And DCAT actually does stand
5       for Drug, Chemical and Associated Technologies
6       Association.
7            MS. CASTANEDA:  279 is ready.
8   BY MR. CRAVENS:
9        Q.   Let me know when you've had a chance to open
10  it.  I'm going to ask you first about page 4304.
11       A.   I have exhibit 279 open now.
12       Q.   So if you turn to page 4304, there's an email
13  from Mr. Lustman to Aadivighnesh.
14       A.   Yes, I see.
15       Q.   November 3, 2019.
16            And he writes:  "Please quote and give lead
17  time 300 to 500 kilograms pyrimethamine on Basis Cif Air
18  CVG ex Anuh."
19            That's A-N-U-H.
20            Is the Anuh reference there the name of
21  another manufacturer of pyrimethamine API?
22       A.   That is my understanding, yes.
23       Q.   And is that -- is Anuh the name of LGM's
24  current source of pyrimethamine API?
25       A.   To my current understanding, yes.

Page 50

```
 1                        H. LENOX
 2      Q.    What does Basis CIF Air CVG mean?
 3      A.    CIF Air refers to an inco term for shipping.
 4  CVG refers to Cincinnati Airport.
 5            (Reporter clarifies.)
 6  BY MR. CRAVENS:
 7      Q.    So is it your understanding here that
 8  Mr. Lustman is looking for a quote for a purchase of 300
 9  to 500 kilograms of pyrimethamine from Anuh?
10      A.    That would be my understanding upon reading
11  the email, yes.
12      Q.    And if you flip -- well, Mr. Lustman also
13  asks Aadivighnesh for a COA with the quote.
14            What does COA stand for?
15      A.    COA stands for certificate of analysis.
16      Q.    And if you flip to the first page, did
17  Aadivighnesh reply to LGM with the lead time?
18      A.    Based upon the email from Aadivighnesh, it
19  appears that they did respond with a lead time, yes.
20      Q.    And what was the lead time that they
21  provided?
22      A.    In the email it states the lead time would be
23  five weeks.
24      Q.    Did they also attach a COA?
25      A.    I believe so, but I do not have direct
```

Page 51

```
 1                        H. LENOX
 2  personal knowledge of that.
 3      Q.    And if you go to the second page, what was
 4  the price per kilogram that Aadivighnesh quoted?
 5      A.    Looking from the email from Aadivighnesh, on
 6  November 11, 2019, at 7:21 a.m., it appears that the
 7  price would be 125 US dollars per kilo.
 8            MR. CRAVENS:  I believe that is all I have,
 9      subject to any redirect after Mr. Perlman is
10      finished with you.
11            MR. PERLMAN:  Why don't we go off record.
12      I'd like to take a short break to go over my
13      questions.  I shouldn't have too many.
14            MR. CRAVENS:  Okay.
15            THE VIDEOGRAPHER:  Off the record at
16      12:42 p.m.
17            (A brief recess was taken from 12:41 p.m.
18  until 1:03 p.m.)
19            THE VIDEOGRAPHER:  Back on record at
20      1:03 p.m.
21                   CROSS EXAMINATION
22  BY MR. PERLMAN:
23      Q.    Good afternoon, Mr. Lenox.  My name is
24  Neal Perlman, and I'm an attorney with the Federal Trade
25  Commission.
```

Page 52

```
 1                        H. LENOX
 2            Before the break, when you were talking with
 3  Mr. Cravens, you discussed LGM's purchases of
 4  pyrimethamine API from a company called R L Fine.
 5            Do you -- do you recall that?
 6      A.    Yes, I do.
 7      Q.    Has LGM acquired pyrimethamine API from
 8  R L Fine since 2017?
 9      A.    Not to my knowledge based on the
10  documentation that I reviewed, that was presented and
11  shared by Reed Smith.
12      Q.    Could you open what Mr. Cravens labeled as
13  DX276, please.  And let me know when you have that open.
14      A.    I have Exhibit 276 open now.
15      Q.    I apologize it's taking a second for me to
16  open.
17            Could you turn to page 2826 of Defendants'
18  Exhibit 276.
19            And in the middle of that page, there is an
20  email from a Gideon Schurder to Ellen Shafner,
21  Ramachandra, and cc'ing Aliza Sanders, sent on March 14,
22  2018.
23            Do you see the email that I mean?
24      A.    Yes, I do.
25      Q.    The first line in that email from
```

Page 53

```
 1                        H. LENOX
 2  Mr. Schurder to Mr. Ramachandra says:  "As you know,
 3  this is a product that we sell regularly to the
 4  compounding industry without any regulatory
 5  documentation."
 6            Do you see that?
 7      A.    Yes, I see that.
 8      Q.    Does "this" in that sentence refer to
 9  pyrimethamine API?
10      A.    Based upon my understanding of the email and
11  looking at the subject line, I would assume that it is
12  referring to pyrimethamine, yes.
13      Q.    Do you have any understanding of what
14  Mr. Schurder could mean by "without any regulatory
15  documentation"?
16      A.    I would have to speculate, but my
17  understanding, looking at this document and the email in
18  front of me and my understanding and the compounding
19  space in the general sense, would be that many
20  compounding pharmacies did not at that time require APIs
21  that was from -- that had a DMF on file with the US FDA.
22      Q.    So earlier, I think you discussed DMFs and
23  FDA registration with Mr. Cravens.  Could you discuss
24  what the difference is between an API that is FDA
25  registered and one that has a DMF file?
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2
    FEDERAL TRADE COMMISSION; STATE  §
 3  OF NEW YORK; STATE OF            §
    CALIFORNIA; STATE OF ILLINOIS;   §   CASE
 4  STATE OF NORTH CAROLINA;         §   NO. 1:20-CV-00706-DLC
    STATE OF OHIO; COMMONWEALTH      §
 5  OF PENNSYLVANIA; AND             §
    COMMONWEALTH OF VIRGINIA,        §
 6                                   §
         PLAINTIFFS,                 §
 7                                   §
    VS.                              §
 8                                   §
    VYERA PHARMACEUTICALS, LLC;      §
 9  PHOENIXUS AG; MARTIN SHKRELI,    §
    INDIVIDUALLY, AS AN OWNER AND    §
10  FORMER OFFICER OF VYERA          §
    PHARMACEUTICALS, LLC AND         §
11  PHOENIXUS AG (FORMERLY KNOWN AS  §
    TURING PHARMACEUTICALS, LLC      §
12  AND TURING PHARMACEUTICALS       §
    AG); AND KEVIN MULLEADY,         §
13  INDIVIDUALLY, AS AN OWNER AND    §
    DIRECTOR OF PHOENIXUS AG AND     §
14  A FORMER EXECUTIVE OF VYERA      §
    PHARMACEUTICALS, LLC,            §
15                                   §
         DEFENDANTS.                 §
16

17
                REMOTE AND VIDEOTAPED DEPOSITION OF
18                   AMANDA JEWEL LOPEZ
                     FEBRUARY 23, 2021
19
         REMOTE AND VIDEOTAPED DEPOSITION OF AMANDA
20  JEWEL LOPEZ, produced as a witness at the instance
    of the Defendants and duly sworn, was taken in the
21  above styled and numbered cause on Tuesday,
    February 23, 2021, from 8:36 a.m. to 2:27 p.m.,
22  before TAMARA CHAPMAN, CSR, RPR-CRR in and for the
    State of Texas, reported remotely by computerized
23  stenotype machine in Austin, Texas, pursuant to the
    Federal Rules of Civil Procedure and any provisions
24  stated on the record herein.

25   Job No. 190215
```

1    A.    Yes.

2    Q.    What is your understanding of what

3 Ms. Khan is conveying in this email?

4          MR. SCHULTZ:  Objection to form.

5    A.    She is offering the product to Mylan, in

6 case they had any need.

7    Q.    Let's flip to the first page of the PDF,

8 where it appears that Ms. Khan forwards this email

9 to someone named Amanda.  Do you see the first page

10 where it says "Hi Amanda" at the top?

11    A.    Yes.

12    Q.    So, first of all, at the risk of asking

13 the obvious, is that you?

14    A.    That is me.

15    Q.    Okay.  Do you see at the top of the page

16 in the "to" line where it says "Durbin USA Clinical

17 Trial Mailbox"?

18    A.    Yes.

19    Q.    Are you familiar with that email address?

20    A.    Yes.

21    Q.    And do you receive mail that's sent to

22 that address?

23    A.    I do.

24    Q.    All right.  I'd like to just read the

25 email for the record briefly.  It says "Hi, Amanda.

1 I just wanted you to know that we made the below

2 offer to Mylan for the Daraprim in case they ever

3 get back to you directly.  They have expressed no

4 need for it at the moment but please make note of

5 the pricing in case this arises again.  Many thanks!

6 Kind regards, Zulaika Khan."

7          Do you see where it says that?

8    A.    I do.

9    Q.    Do you know if anyone at Mylan responded

10 to this offer?

11          MR. SCHULTZ:  Objection to form.

12    A.    I do not know that.

13    Q.    Did anyone at Mylan contact you about

14 purchasing Daraprim?

15    A.    No.

16    Q.    Do you know if Mylan ever contacted

17 Ms. Khan about purchasing Daraprim?

18          MR. SCHULTZ:  Objection to form.

19    A.    I do not know that.

20    Q.    Let me ask you this.  Do you know if

21 Mylan contacted anyone at Durbin about purchasing

22 Daraprim?

23          MR. SCHULTZ:  Objection to form.

24    A.    Mylan -- Mylan did not contact Durbin

25 USA.

1    Q.    Did -- to your knowledge, did Mylan

2 purchase Daraprim from Durbin?

3          MR. SCHULTZ:  Objection to form.

4    A.    No, they did not.

5    Q.    So, Ms. Lopez, based on this email, is it

6 your understanding that Durbin could have sold

7 Daraprim to Mylan, if Mylan wanted to purchase it?

8          MR. SCHULTZ:  Objection to form.

9    A.    Yes.

10    Q.    Okay.  Thanks, Ms. Lopez.  We can put

11 this exhibit to the side.

12          MR. KAUFMAN:  Let me just suggest

13 that we take a brief break.  Again, I know we've

14 only been going for about an hour, but everyone's

15 been sitting for almost two.  So would it work for

16 everyone if we took maybe a five or ten-minute

17 break?

18          (Discussion off the written record.)

19          THE VIDEOGRAPHER:  We're going off

20 the record at 9:46 a.m.  This marks the end of

21 Media 1.

22          (Break.)

23          THE VIDEOGRAPHER:  We are back on the

24 record at 10:01 a.m.  This starts the beginning of

25 Media 2.

1    Q.    All right.  Welcome back, Ms. Lopez.  I'd

2 like to change gears and talk about a different

3 topic now.  Are you familiar with a company called

4 Jupiter Research Services?

5    A.    Yes.

6          (Exhibit 255 was marked.)

7    Q.    So I'd like to introduce what's been

8 marked as Defendants' Exhibit 255.  It should be in

9 the chat and it's also been made available on

10 ShareFile.  I'd just ask you to please try to open

11 Defendants' Exhibit 255.

12          MR. BAILEY:  Exhibit 255.  Okay.  I

13 was looking at the Bates number.

14          MR. KAUFMAN:  Yeah, let me just state

15 for the record, as Benje just mentioned, this

16 document has marked with Bates stamp

17 DURBIN-00001225.

18    Q.    Ms. Lopez, if you could just let us know

19 when you've been able to open that up.

20    A.    It's open.

21    Q.    All right.  Let me ask you to please

22 start with the first-in-time email.  So I'll just

23 ask you to scroll to Page 2 of the PDF, which is

24 marked at the bottom DURBIN-00001226.

25          So, Ms. Lopez, let me just ask first, it

Page 50

1  appears that this email was sent to the Durbin USA
2  clinical trial mailbox.  Is that the same address
3  that you said earlier you received email from at
4  Durbin?
5        MR. SCHULTZ:  Objection to form.
6    A.   Yes, it is.
7    Q.   Do you recall receiving this particular
8  email?
9    A.   Yes.
10    Q.   Do you see the date reflected as
11  ███████████?
12    A.   I do.
13    Q.   Does this appear to be an accurate copy
14  of the email that you received on ███████████
15  ██?
16    A.   Yes.
17    Q.   All right.  I just ask you to keep that
18  ███████████ date in mind.  Let's start at the
19  very bottom on Page 2.
20        Do you recognize the name Pratik,
21  P-R-A-T-I-K?
22    A.   Yes.
23    Q.   Who is Pratik?
24    A.   He was the accounts representative at
25  Jupiter.

Page 51

1    Q.   Do you know if Pratik is his first name
2  or his last name?
3    A.   That is his first name.
4    Q.   Do you know what his last name is?
5    A.   I do not know.
6    Q.   No problem.  I believe you mentioned a
7  moment ago that you're familiar with Jupiter
8  Research Services.  What is your understanding of
9  what line of work Jupiter Research Services is in?
10        MR. SCHULTZ:  Objection to form.
11    A.   My understanding is that they are a
12  wholesaler.
13        (Simultaneous speaking.)
14    A.   They are a supplier.
15    Q.   I'm sorry, Ms. Lopez.  I didn't mean to
16  speak over you.  Could you just repeat the last part
17  of your answer?
18    A.   They are a supplier to Durbin.
19    Q.   Have you worked with Jupiter Research
20  Services before?
21    A.   Yes.
22    Q.   Has Jupiter Research Services supplied
23  comparator drugs to Durbin in the past?
24        MR. SCHULTZ:  Objection to form.
25    A.   Yes.

Page 52

1    Q.   All right.  Let's take a look at the body
2  of the email.  I'll read this for the record.
3        "Hi, Amanda.  Is any of your client
4  looking for Daraprim?  I can supply at 2 weeks' lead
5  time and the price is $130,000 per pack.  Please let
6  me know if this may work for you.  Regards, Pratik."
7        Do you see where it says that?
8    A.   I do.
9        MR. SCHULTZ:  Objection to form.
10    Q.   What do you understand Pratik to have
11  been conveying in this email?
12        MR. SCHULTZ:  Objection to form.
13    A.   He is offering Daraprim.
14    Q.   Was it your understanding that Jupiter
15  Research Services had access to Daraprim at the time
16  Pratik sent this email?
17        MR. SCHULTZ:  Objection to form.
18    A.   Yes.
19        (Exhibit 256 was marked.)
20    Q.   I'd like to introduce the next exhibit.
21  This is Defendants' Exhibit 256.  It should already
22  be in the chat.  And I'll note for the record it's
23  marked DURBIN-00000488.  And it should have been
24  uploaded to ShareFile already as well.
25        Ms. Lopez, if you could just --

Page 53

1    A.   I have it open.
2    Q.   Great.  Ms. Lopez, let me just give you a
3  moment and ask you to please look this document over
4  briefly.
5    A.   (Pause.)
6        All right.
7    Q.   Do you see the date here where it says
8  ███████████?
9    A.   Yes.
10    Q.   And let me direct your attention to the
11  cc line.  Do you see the reference there to the
12  "Durbin USA Clinical Trial Mailbox"?
13    A.   I do.
14    Q.   Would you have received this email if it
15  was sent to that address?
16    A.   Yes.
17    Q.   Do you recall receiving this email?
18    A.   I do.
19    Q.   And, Ms. Lopez, does this appear to be an
20  accurate copy of the email as you received it on
21  ███████████?
22    A.   Yes.
23    Q.   Do you recall the date of the last email
24  that we looked at a moment ago was ███████████
25  ██?

Page 58

1    A.    Yes.

2    Q.    Okay.  So I'd like to read here from the

3 body of the email.  It says, "Hi, ███████.  As

4 discussed I have provided a price for both strengths

5 of ██████████████████

6          Do you know what ███████ is?

7    A.    Yes, I do.

8    Q.    What is ███████

9    A.    It's a comparator or a reference listed

10 drug.

11   Q.    Okay.  Then do you see below that it

12 says, "I have also included a cost for Daraprim as I

13 know Abby contacted you regarding this and it may be

14 of interest to you."

15         Do you see that?

16   A.    Yes.

17   Q.    Do you know who -- who's being referred

18 to when there is a reference to Abby?

19         MR. SCHULTZ:  Objection to form.

20   A.    I do.

21   Q.    What is your understanding of who that

22 refers to?

23         MR. SCHULTZ:  Objection to form.

24   A.    Abby Haynes.  She also worked as a

25 project coordinator at Durbin UK.

Page 59

1    Q.    Is it your understanding that ███████ was

2 interested in purchasing Daraprim from Durbin?

3          MR. SCHULTZ:  Objection to form.

4    A.    Yes.

5    Q.    What is the basis for -- for your

6 understanding?

7          MR. SCHULTZ:  Objection to form.

8    A.    I really can't say if ███████ contacted

9 Durbin UK directly and not Durbin USA.

10   Q.    Understood.  Okay.  That's helpful.

11 Thank you.

12         So let's go back to the email here.  If

13 you flip to Page 2 of the PDF at the top, do you see

14 where it says, "NDC: 69413-330-10.  Daraprim 25mg

15 tablets x 100 (bottle).  Pack size:  1x100.  Store

16 at 25, excursions permitted to 15-30 degrees

17 Celsius.  Manufacturer:  Vyera Pharmaceuticals LLC.

18 Price per pack:  $122,451.23."

19         Do you see that?

20   A.    I do.

21   Q.    What did you understand Ms. Logue's email

22 to be conveying to ███████?

23         MR. SCHULTZ:  Objection to form.

24   A.    I understand that she was offering

25 Daraprim.

Page 60

1    Q.    Do you know if ███████ ultimately placed a

2 purchase order for Daraprim?

3          MR. SCHULTZ:  Objection to form.

4    A.    Yes.

5          (Exhibit 257 was marked.)

6    Q.    All right.  Ms. Lopez, we can put that

7 exhibit to the side.

8          I'm going to ask you some questions about

9 the ███████ purchase order.  So I'd ask you to please

10 pull up Defendants' Exhibit 257, which I'd like to

11 introduce.  It's both in the chat and also in

12 ShareFile.  And I'll note for the record this has

13 been marked DURBIN-00000092.

14   A.    I have it open.

15   Q.    All right.  Ms. Lopez, I'll ask you to

16 just take a moment to review this document and

17 familiarize yourself with it.

18   A.    Okay.

19   Q.    Ms. Lopez, do you recognize this

20 document?

21   A.    I do.

22   Q.    What -- what does it appear to be?

23   A.    It is the purchase order from ███████ to

24 Pharmaceutical Trade Services d/b/a Durbin.

25   Q.    And is Pharmaceutical Trade Services the

Page 61

1 trade name for Durbin Global or Durbin USA?

2    A.    Durbin USA.

3    Q.    Have you seen this document before?

4    A.    I have.

5    Q.    Does this appear to be an accurate copy

6 of the purchase order from ███████ to Durbin USA?

7    A.    Yes.

8    Q.    And can you tell who placed this purchase

9 order?

10         MR. SCHULTZ:  Objection to form.

11   Q.    Let me -- let me restate the question.

12 Can you tell which company placed this purchase

13 order?

14         MR. SCHULTZ:  Objection to form.

15   A.    Yes.

16   Q.    All right.  Let me ask you to please

17 scroll to the second page of the PDF.  At the

18 bottom, it's marked DURBIN-00000093.

19         Can you --

20         MR. BAILEY:  Noah, while she's doing

21 that -- Noah, while she's doing that, she's going to

22 plug up her phone just to make sure she's got juice.

23         MR. KAUFMAN:  Yeah.  Absolutely.

24         THE WITNESS:  Okay.

25   Q.    So, Ms. Lopez, once you're on Page 2, my

Page 74

1 invoice corresponds to the purchase order that
2 Durbin send to Jupiter Research Services for
3 Daraprim?
4          MR. SCHULTZ:  Objection; form.
5     A.    Yes, it is.
6     Q.    All right.  So I'm going to ask you to
7 please jump back again to the email chain, which is
8 Defendants' Exhibit 258.
9     A.    Okay.
10    Q.    And this time I'm going to ask you to
11 please scroll to Page 10, which is DURBIN-00000692.
12    A.    Okay.
13    Q.    Do you see the email from you to Pratik
14 dated ███████████?
15    A.    I do.
16    Q.    I'm going to read that email briefly for
17 the record.
18          It says "Hello Pratik.  Any update on the
19 Daraprim - so far so good?  Best regards, Amanda
20 Lopez."  Do you see where it says that?
21    A.    I do.
22    Q.    Do you recall sending that email to
23 Pratik?
24    A.    I do.
25    Q.    What was the purpose of the email?

Page 75

1          MR. SCHULTZ:  Objection to form.
2     A.    I was asking for an update on the
3 purchase order to make sure that everything was
4 (unintelligible).
5          THE STENOGRAPHER:  Everything was
6 what?
7          THE WITNESS:  Still available.
8     Q.    Let's scroll up to the next email.  This
9 one begins at the bottom of Page 9 of the PDF marked
10 DURBIN-00000691.  Do you see the email from Pratik
11 dated ████████████
12    A.    Yes.
13    Q.    What was Pratik's response to your
14 question?
15          MR. SCHULTZ:  Objection to form.
16    A.    He stated that they were expecting to
17 receive the stock the next day and that he would
18 update me.
19    Q.    I'm going to scroll up a little bit to
20 Page 5 of this PDF.  Do you see an email from Pratik
21 to you dated ████████████
22    A.    Yes.
23    Q.    Do you recall receiving this email from
24 Pratik?
25    A.    I do.

Page 76

1     Q.    Do you see where it says -- do you see
2 where it says, "Please see below picture for your
3 reference"?
4     A.    Yes.
5     Q.    So I'll note for the record, it doesn't
6 seem as though the picture made it into this version
7 of the document.  Do you have any recollection of
8 whether there was a picture either included in the
9 email or attached to the email?
10    A.    I do.
11    Q.    Do you recall what that picture was of?
12    A.    It was a picture of the five bottles of
13 Daraprim.
14    Q.    Was it your understanding that Pratik had
15 received the five bottles of Daraprim?
16          MR. SCHULTZ:  Objection; form.
17    A.    Yes.
18    Q.    To your knowledge, Ms. Lopez, did Jupiter
19 Research Services have any difficulty obtaining
20 those five bottles of Daraprim?
21    A.    No, they did not.
22    Q.    If we scroll back to Page 20 of the PDF.
23 I'm referring now to your original email to Pratik
24 about Daraprim.  By "original," I mean the
25 first-in-time email in this chain.  Do you see the

Page 77

1 date of the email that you sent to Pratik where it
2 says, "Hello, Pratik, can you supply" -- then it
3 lists the NDC code for Daraprim.  Do you see a date
4 of that email?
5     A.    Yes.
6     Q.    And then if we scroll back to Page 5
7 where Pratik sends the picture of the five bottles
8 of Daraprim, do you see the date there is
9 ████████████?
10          MR. SCHULTZ:  Objection to form.
11    A.    Yes.
12    Q.    So is it correct that about 13 days
13 passed between the day of your inquiry to Pratik on
14 ███████████, and the email that was
15 received on ███████████, with the picture
16 of the five bottles of Daraprim?
17          MR. SCHULTZ:  Objection to form.
18    A.    Yes.
19    Q.    After Jupiter Research Services received
20 the five bottles of Daraprim, do you know whether
21 they -- whether Jupiter Research Services sent those
22 bottles to Durbin?
23          MR. SCHULTZ:  Objection to form.
24    A.    They did.
25    Q.    Scroll up, please, to the very bottom of

Page 134

1 couldn't get?

2          MR. KAUFMAN:  Objection.  I think
3 that mischaracterizes the testimony.

4     Q.    Well, in your experience in -- you know,
5 your -- at Durbin USA and acquiring, you know,
6 specialty drugs, how many specialty drugs have been
7 as difficult to obtain as Daraprim has?

8          MR. KAUFMAN:  Object to form.

9     A.    I would say probably about five or six.

10    Q.    And how many specialty drugs does
11 Daraprim purchase over just a period of one year?

12         MR. KAUFMAN:  Object to form.

13    A.    Can you repeat the question?

14    Q.    How many specialty drugs -- well,
15 approximately how many specialty drugs does
16 Daraprim -- does Durbin USA purchase on behalf of
17 its customers over a period of just one year?

18         MR. KAUFMAN:  Object to form.

19         MR. BAILEY:  Could I just ask a
20 question of clarification?

21         MR. SCHULTZ:  Sure.

22         MR. BAILEY:  Are we referring to the
23 number of separate drugs or the number of purchases
24 of separate drugs?  I mean, we could -- you know,
25 it's a huge difference in number.  I'm just trying

Page 135

1 to figure out -- make sure I understand the
2 question.  She -- she appears to be a little
3 confused as well.

4     Q.    Okay.  Well, I was thinking of the number
5 of drugs.  You mentioned that there were five or six
6 that were as difficult to obtain as Daraprim was and
7 I was looking to get a number to compare that with
8 for the total number of specialty drugs that Durbin
9 would -- Durbin USA would be purchasing on behalf of
10 its customers.

11    A.    I would say that we purchased on average
12 maybe 18 to 20 specialty drugs.

13    Q.    A year --

14         MR. KAUFMAN:  Object to form of the
15 question.  I apologize.

16    Q.    That would be on an annual basis?

17    A.    It's really hard to say.  I would say on
18 an annual basis, maybe, at the most, 40.

19         MR. SCHULTZ:  No other questions at
20 this time.  Reserve time -- a short period of time
21 for any follow-up questions.

22         MR. KAUFMAN:  Should we go off the
23 record?

24         MR. SCHULTZ:  Yes.  Yeah, we could go
25 off the record.

Page 136

1          THE VIDEOGRAPHER:  We're off the
2 record at 1:12 p.m.

3          (Break.)

4          THE VIDEOGRAPHER:  We're back on the
5 record at 1:37 p.m.

6                 EXAMINATION

7 BY MR. KAUFMAN:

8     Q.    All right.  Welcome back, Ms. Lopez.
9 This is Noah Kaufman again for Vyera Pharmaceuticals
10 and Phoenixus AG.  I expect to have just a fairly
11 short series of questions for you here on redirect
12 examination.  I'd like to start by circling back to
13 a topic that we covered earlier today and I'd like
14 to follow up on that based on some further questions
15 that you got from Mr. Schultz.

16         Do I recall correctly that earlier today
17 you testified that on average Durbin USA receives
18 about 15 comparator drug requests per day?

19    A.    Yes, that is correct.

20    Q.    Okay.  And, again, please correct me if
21 I'm wrong.  But my memory is that you testified that
22 Durbin USA is able to get quotes for approximately
23 10 of those 15 comparator requests.  Is that
24 correct?

25    A.    That's correct.

Page 137

1     Q.    And I believe you testified that Durbin
2 USA is unable to get quotes for an average of
3 approximately five out of those 15 per day.  Is that
4 correct?

5     A.    Yes.

6     Q.    Then the last piece of this was I believe
7 you testified earlier that of the 15 comparator drug
8 requests per day, approximately two of those, Durbin
9 USA will be able to get a quote, but the purchaser
10 will reject the quote because it's too high.  Is
11 that correct?

12    A.    Yes, that's correct.

13    Q.    Okay.  Mr. Schultz asked you a number of
14 questions about Durbin USA's efforts to source
15 specialty drugs.  Do you generally recall those
16 questions?

17    A.    I do.

18    Q.    And I believe you testified that Daraprim
19 is a specialty drug.  Is that correct?

20    A.    That's correct.

21    Q.    In your experience, is sourcing specialty
22 drugs more difficult than sourcing nonspecialty
23 drugs?

24    A.    Yes.

25    Q.    Do you have a view on why it's more

Page 138

1 difficult to source a specialty drug than a
2 nonspecialty drug?
3      A.    I do.
4      Q.    Can you explain, please.
5      A.    They are mainly not available to the
6 first-line wholesalers and distributors.  You have
7 to go through special pharmacies to obtain these and
8 some of the products have specific requirements to
9 be able to access those drugs.
10     Q.    So maybe let's take that in reverse
11 order.  What are some of the special requirements
12 that are needed to obtain access to those specialty
13 drugs?
14     A.    Some manufacturers require the
15 physician's information or they may require the
16 physicians to enroll in their access program.  They
17 may even require a copy of the prescription from the
18 physician's patient.
19           And then there are some requirements such
20 as the REMS program.  They require the physicians to
21 enroll in those programs as well.
22     Q.    So when we talk about those types of
23 restrictions that you just described in your answer,
24 in your experience, how common are those
25 restrictions in place for specialty drugs?

Page 139

1      A.    I would say it's very common.
2      Q.    When you say "very common," does that
3 mean 75 percent of specialty drugs, 80 percent of
4 specialty drugs?  Can you give an approximation?
5           MR. SCHULTZ:  Objection to form.
6      A.    I would say probably 80 percent.
7      Q.    Okay.  And Mr. Schultz asked you some
8 questions about how frequently Durbin USA is asked
9 to source specialty drugs and it may have just been
10 me, but I couldn't quite follow where we came out on
11 that so I wanted to try to clarify, if I could.
12 Let's use the annual basis that Mr. Schultz was
13 asking you about.  Do you have an understanding on
14 an annual basis approximately how many specialty
15 drugs Durbin USA is asked to source?
16           MR. SCHULTZ:  Objection; form.
17     A.    Well, when I was questioned, I thought
18 that the question was on an annual basis, how many
19 of specialty drugs did we purchase.  The number of
20 purchases for the specialty drugs is different than
21 the number of quotes that we have provided for
22 specialty drugs.
23     Q.    Got it.  Okay.  Maybe that was the source
24 of my confusion.
25           So let's start with quotes.  On an annual

Page 140

1 basis, what is your best estimate of the number of
2 quotes that Durbin USA is asked to provide for
3 specialty drugs?
4           MR. SCHULTZ:  Objection; form.
5      A.    I would say at least 300 quotes.
6      Q.    And of those -- again, I understand it's
7 an approximation.  Of those approximately 300 or
8 more quotes for specialty drugs, what is your best
9 estimate of the number of those specialty drugs for
10 which Durbin USA is able to provide a quote?
11     A.    I would say --
12           MR. SCHULTZ:  Objection --
13     A.    -- probably 200 of those we could
14 provide.
15     Q.    And does that mean that for the remaining
16 100, Durbin USA is unable to provide a quote?
17           MR. SCHULTZ:  Objection; form.
18     A.    I would think so.
19     Q.    Okay.  You testified earlier that in your
20 view, there were other drugs that were more
21 difficult to source than Daraprim.  Is that correct?
22     A.    That's correct.
23     Q.    Can you give an example of a drug that is
24 more difficult to source than Daraprim?
25     A.    Yes.

Page 141

1           MR. SCHULTZ:  Objection; form.
2      A.    One example would be Revlimid.
3      Q.    What is Revlimid?
4      A.    I'm really not sure what the -- what the
5 usage is for.  I just know that I have been asked
6 several times on numerous occasions, and every time
7 we have been told no, that we are not able to get
8 it.
9      Q.    Is Revlimid a specialty drug?
10           MR. SCHULTZ:  Objection; form.
11     A.    Yes.
12     Q.    Is Revlimid a REMS drug?
13     A.    Yes, it is.
14     Q.    It is.
15           What are some other examples of drugs
16 that, in your view, are more difficult to source
17 than Daraprim?
18     A.    There is --
19           MR. SCHULTZ:  Objection --
20     A.    -- another one.  Excovio (phonetic) is
21 one and then another one that is hard to access is
22 TUKYSA.
23     Q.    Are those specialty drugs?
24     A.    Yes.
25     Q.    Are there others you can think of that,

1

2  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3  Case No. 1:20-cv-00706-DLC

4  -----------------------------x

5  FEDERAL TRADE COMMISSION;
    STATE OF NEW YORK; STATE OF
6  CALIFORNIA;· STATE OF ILLINOIS;
    STATE OF NORTH CAROLINA;
7  STATE OF OHIO; COMMONWEALTH
    OF PENNSYLVANIA;· And
8  COMMONWEALTH· OF VIRGINIA,
                  Plaintiffs,
9         v.
    VYERA PHARMACEUTICALS,· LLC;
10  PHOENIXUS· AG; MARTIN SHKRELI,
    Individually, as an owner and
11  former officer of Vyera Pharmaceuticals, LLC
    and Phoenixus AG (formerly
12  known as Turing Pharmaceuticals, LLC
    and Turing Pharmaceuticals AG);
13  and· KEVIN MULLEADY, individually,
    as an owner and director of
14  Phoenixus AG and a former
    Executive of Vyera Pharmaceuticals, LLC,
15                 Defendants.

16  -----------------------------x

17

18       REMOTE DEPOSITION OF DENNIS SAADEH

19           February 10, 2021

20

21

22  Reported by:

23  MARY F. BOWMAN, RPR, CRR

24  JOB NO. 189140

25

Page 50

```
 1                    Saadeh
 2       A.    I believe it did, yes.
 3       Q.    Do you recall if the cost changed
 4  over time from 2015 until today?
 5       A.    I believe it did.
 6       Q.    Do you have any sense for how it
 7  changed?
 8       A.    It is very difficult because when
 9  we had the API on hand, we were buying
10  very, very small quantities.  As time went
11  on, we purchased larger quantities.  So
12  pricing on smaller quantities generally is
13  much higher than it is on larger
14  quantities.
15            So that changed and then there
16  was actual cost associated with the package
17  size that changed over the years as well.
18       Q.    I think we have been going for a
19  while.  Would folks like to take a break?
20       A.    Yes, I would appreciate a bio
21  break, yeah.
22            THE VIDEOGRAPHER:  11:37 a.m.
23       eastern standard time, we are off the
24       record.
25            (Recess)
```

Page 51

```
 1                    Saadeh
 2            THE VIDEOGRAPHER:  11:48 a.m.
 3       Eastern standard time, we are back on
 4       the record.
 5       Q.    Mr. Saadeh, could we now please
 6  take a look at a document GX3350.
 7            (Exhibit GX3350, document Bates
 8       stamped Harrow 0248 through 49 marked
 9       for identification, as of this date.)
10       Q.    This document is Bates stamped
11  Harrow 0248 to Harrow 0249.
12       A.    Thank you, I've reviewed it.
13       Q.    Mr. Saadeh, what is this
14  document?
15       A.    It appears to be a sales
16  confirmation of a blanket order for
17  pyrimethamine API.
18       Q.    From which supplier?
19       A.    Which Willow Birch.
20       Q.    Now, going to the attached sales
21  order, Harrow 0249, could you please tell
22  me the price for the pyrimethamine?
23       A.    It appears to be 7,000 dollars
24  for 25 kilos.
25       Q.    It has a rate of 28 cents.  What
```

Page 52

```
 1                    Saadeh
 2  does that rate refer to?
 3       A.    Per gram?  No, that doesn't make
 4  sense.
 5            I'm not sure what that rate
 6  refers to honestly.
 7       Q.    OK, and then in the description
 8  column, do you see that there is, "Caution,
 9  Pharmacy Compounding Use Only."  Do you
10  know what that means?
11       A.    Those are labeling requirements
12  from the manufacturer of the API,
13  cautionary labeling that they usually put
14  on their packages.
15       Q.    The next line says, "Caution RX
16  only."  Do you know what that refers to?
17       A.    For prescription only, for
18  prescription use only.
19       Q.    So does that mean it can't be
20  used for bulk compounding?
21       A.    Not necessarily.  It actually
22  just means that you can't use this product
23  or compound this product and sell it
24  without a valid prescription.
25            So in other words, you can't sell
```

Page 53

```
 1                    Saadeh
 2  it as an OTC product.  You have to have a
 3  valid prescription for -- in order to use
 4  this product in the sale of any compounded
 5  preparation.
 6       Q.    That requirement is coming from
 7  Willow Birch or from the manufacturer?
 8       A.    The requirement is coming from
 9  Willow Birch, but is also typically a
10  requirement of the API manufacturer.
11       Q.    Thank you, I'm done with that
12  document.  Thank you very much.
13            Next I'm ask you to please take a
14  look at GX3556.
15            Are Excel sheets still not
16  populating in the drive?  you only have
17  access to the PDF?
18       A.    That's my experience.  I don't
19  know if it is different for anyone else.
20            (Exhibit GX3556, document Bates
21       stamped Harrow 0591 marked for
22       identification, as of this date.)
23       Q.    This document is Bates stamped
24  Harrow 0591.
25       A.    Thank you, I've reviewed it.
```

Page 54

Saadeh

2  Q.   What is this document?
3  A.   It looks to be an inventory
4 report of all pyrimethamine raw material
5 checked in to inventory at our New Jersey
6 facility.
7  Q.   My apologies for the format, but
8 could you just sort of walk me through this
9 spreadsheet and explain what it's showing
10 here.
11  A.   Yeah, it's a bit confusing. So
12 the very first line describes the API, and
13 then in the very next column, it appears to
14 identify the manufacturers' lot or batch
15 number.
16     Next to that, the expiration
17 date. The next column identifies the
18 actual manufacturer, wholesaler if there is
19 a wholesaler. And then that second column
20 below -- sorry, the second row below that
21 is technically part of the continuing line
22 and that describes the quantity in numeric
23 value, the unit which is grams, and then
24 the unit cost, and then the NDC on the
25 final column there.

Page 55

Saadeh

2  Q.   My apologies. So what appears to
3 be underneath initial cost NDC, you have
4 dates. Are those the purchase dates?
5  A.   Correct. And so the initial cost
6 would be the actual date entered into
7 inventory and then the NDC is the 11 digit
8 number there.
9     MR. RENDINO:  Michael, can I ask,
10     is this document attached to a parent
11     e-mail or was this standalone?
12     MR. BATTAGLIA:  This was just
13     standalone.
14     MR. RENDINO:  Thank you. Sorry
15     for interrupting.
16     MR. BATTAGLIA:  No problem.
17  Q.   So according to this document, it
18 appears, at least for your New Jersey
19 facility, the 2013 pyrimethamine purchase,
20 five purchases in 2015, two purchases in
21 2016, one in 2017, one in 2018. And there
22 is that last date, was there a purchase in
23 2020?
24  A.   Correct.
25  Q.   For that 2020 purchase going to

Page 56

Saadeh

1 the manufacturer, what -- do you know what
2 A-N-U-H Pharm refers to?
4  A.   I do not. My guess is that the
5 actual manufacturer of the product.
6  Q.   Thank you.
7     And just so I understand, the
8 pricing and the wholesaler in price
9 heading, so for example, the first one,
10 under Medisca, that 45 number, what does
11 that represent?
12  A.   It should be represent the
13 package cost.
14  Q.   Do you know what the quantity
15 would be for one package?
16  A.   It looks like 100 grams. In the
17 very top example, it looks like 1 by 100
18 grams at a cost of 45 dollars.
19  Q.   Does this sheet represent all of
20 the pyrimethamine currently stored in your
21 facility today?
22  A.   Only if it's unexpired inventory.
23 So most of this was likely used and/or
24 expired. So only the remaining items would
25 be basically down at the very bottom entry

Page 57

Saadeh

2 that have an expiration that is still
3 viable.
4  Q.   Would that include the 2017
5 purchase or just the 2018 and 2020
6 purchases?
7  A.   Actually, it would only include
8 the 2020 purchases. It looks like the 2018
9 purchase expired in April of 2020.
10  Q.   OK, I see the expiration date.
11 Thank you very much. That is helpful.
12     OK, I am done with that document.
13 If we take a look at GX3357. This document
14 is Bates stamped Harrow 0592 and it was
15 produced in native form without any
16 transmittal e-mail.
17     (Exhibit GX3357, document Bates
18     stamped Harrow 3357 marked for
19     identification, as of this date.)
20  A.   I've read it.
21  Q.   Can you please tell us what that
22 document is?
23  A.   Similarly, it appears to be an
24 inventory report, but for our Irvine
25 California facility of all pyrimethamine

Page 114

```
         Saadeh
 1
 2   drug companies as its competitor, right?
 3       A.    Correct.
 4       Q.    OK, you can put that document
 5   aside.
 6             Who does Harrow consider to be
 7   its customer?
 8       A.    We have several.  We sell to
 9   individually identified patients through a
10   pharmacy.  We sell to physician offices,
11   surgery centers, and hospitals through our
12   outsourcing facility.
13       Q.    Does Harrow consider payers to be
14   its customer?
15       A.    No.
16       Q.    When Harrow made the decision to
17   enter the market in 2015 with its
18   compounded alternative to Daraprim, what
19   percentage of U.S. Daraprim sales did
20   Harrow expect to capture upon entry?
21       A.    I don't have any recollection.
22       Q.    When Harrow made the decision to
23   enter the market in 2015 with its
24   compounded alternative to Daraprim, did
25   Harrow consider the potential impact of
```

Page 115

```
         Saadeh
 1
 2   generic entry?
 3       A.    We did not.
 4       Q.    Are you aware that there is now
 5   an FDA approved generic version of Daraprim
 6   in the market?
 7       A.    I am.
 8       Q.    Did the approval of generic
 9   Daraprim impact Harrow's sales of its
10   compounded alternative to Daraprim?
11       A.    I don't know that we can make
12   that correlation.  In other words, our
13   sales have gone down, but I don't know how
14   we can make that correlation.
15       Q.    Let me ask you that -- since
16   March of 2020, have Harrow's sales of
17   compounded Daraprim alternative gone down?
18       A.    I believe they have, yes.
19       Q.    So at the time Harrow decided to
20   pursue a compounded alternative to
21   Daraprim, was it aware of other generic
22   manufacturers attempting to enter the
23   market for pyrimethamine?
24       A.    We were not.
25       Q.    Did Harrow monitor behavior by
```

Page 116

```
         Saadeh
 1
 2   generics for signs of potential entry?
 3       A.    We did not routinely, no.
 4       Q.    In your answer, you just said you
 5   did not routinely.  Did you at all?
 6       A.    I don't recall that we did in
 7   this case.
 8       Q.    I believe earlier you testified
 9   that Harrow uses Symphony data when making
10   decisions about products to sell, is that
11   right?
12       A.    As part of the analysis, yes.
13       Q.    As part of your analysis, you
14   look at Symphony data, right?
15       A.    Um-hm.
16       Q.    What is Harrow's understanding of
17   the reliability of Symphony data?
18       A.    None other than they are a
19   provider of the reference data for a lot of
20   databases that utilize that information.
21       Q.    I would like to show you another
22   document.
23             I've just loaded into the share
24   file what I've labeled as Defendants'
25   Exhibit 132.
```

Page 117

```
         Saadeh
 1
 2             (Defendant's Exhibit 132,
 3       document Bates stamped Harrow 0579
 4       marked for identification, as of this
 5       date.)
 6       Q.    Do you see that?
 7       A.    I do.
 8       Q.    For the record, this document has
 9   the Bates number starting with Harrow 0579
10   which was produced by Harrow in this
11   action.
12             It is an e-mail with an
13   attachment from Andrew Boll to Mark Baum
14   dated June 22, 2016 with a subject line
15   "Daraprim script"?
16       A.    Right.
17       Q.    So you are not on this document,
18   you'll notice.  I'm going to ask you about
19   this document in your capacity as a
20   corporate representative.
21       A.    Thank you.
22       Q.    Is Mark Baum the CEO of Harrow?
23       A.    He is.
24       Q.    I think you told me earlier that
25   Andrew Boll is the CFO of Harrow?
```

Page 118

Saadeh

2    A.    Correct.

3    Q.    Can you look at the attachment to
4    the e-mail.

5    A.    OK.

6    Q.    Is this Symphony data?

7    A.    I believe it is, yes.

8    Q.    In his e-mail attaching that
9    Symphony data, Mr. Boll says that this data
10   shows that Daraprim sales at institutions
11   decreased from 35,000 prescriptions per
12   month to 13,000 prescriptions per month.
13   Do you see that?

14   A.    I do.

15   Q.    What do you understand Mr. Boll
16   to mean by the term "institutions"?

17   A.    Hospitals, clinics.

18   Q.    What type of customers would not
19   be captured in that term?

20   A.    Individual prescriptions.

21   Q.    Mr. Boll goes on to suggest that
22   Harrow could capture those 22,000 lost
23   Daraprim prescriptions and also capture
24   more of Vyera's share, right?

25   A.    In the second paragraph, I assume

Page 119

Saadeh

2    that's what he references, yes.

3    Q.    So Harrow is estimating that it
4    could handle the supply volume of 22,000
5    prescriptions per month, that is right?

6         MR. DAVIDSON:  Object to form.

7    A.    I don't think there is a
8    reference to our ability to handle it.

9    Q.    Harrow was estimating that it
10   could compete with Daraprim well enough
11   that providers would switch their
12   prescribed toxoplasmosis therapy to
13   Daraprim's compounded alternative, right?

14   A.    Um-hm.

15   Q.    Is that a yes?

16   A.    Yes.  Sorry.

17   Q.    Harrow was estimating enough
18   providers would switch their prescribed
19   therapy to Harrow's product that Harrow
20   would capture some of the Vyera or Turing's
21   share, right?

22   A.    Right.

23   Q.    Did you attend the Jefferies
24   healthcare conference in 2016?

25   A.    I did not, no.

Page 120

Saadeh

2    Q.    Do you know if Harrow was present
3    at that conference?

4    A.    I don't recall.

5    Q.    Do you know whether Harrow, at
6    that conference, told potential investors
7    that it had captured 10 percent of Turing's
8    Daraprim market share?

9    A.    I have no recollection.

10   Q.    Are some active pharmaceutical
11   ingredients more difficult to make than
12   others?

13   A.    More difficult than in the sense
14   of a compounded dosage form.  We don't make
15   active pharmaceutical ingredients per se.

16   Q.    Right.  Sorry, I'm not asking
17   about whether it's more difficult for
18   Harrow to make it, but whether or not you,
19   as a corporate representative of Harrow,
20   have an understanding of whether certain
21   API are more difficult to make than others?

22   A.    Again, we don't make APIs though.
23   We just use the APIs to compound our final
24   dosage forms.  To understand, we don't
25   manufacture APIs themselves.

Page 121

Saadeh

2    Q.    I understand that.  So I take
3    your answer to mean that you don't have an
4    understanding of whether or not there are
5    APIs are more difficult to manufacture than
6    others?

7    A.    Oh, in general you're asking.
8         Yes -- no, we do have an
9    understanding that some APIs are more
10   difficult to manufacture, correct.

11   Q.    What is your understanding of
12   what makes it more difficult to manufacture
13   some API than others?

14   A.    The availability of the starting
15   material, the process synthesis-related
16   substances and potential toxic substances
17   that can be generated.  Costs.

18   Q.    I'm sorry, are you finished?  I
19   don't want to interrupt?

20   A.    No, I'm finished.

21   Q.    Do you have an understanding of
22   whether pyrimethamine is a difficult active
23   pharmaceutical ingredient to make in
24   comparison to other active pharmaceutical
25   ingredients?

1

2              UNITED STATES DISTRICT COURT

3            SOUTHERN DISTRICT OF NEW YORK

4   FEDERAL TRADE COMMISSION;      )
    STATE OF NEW YORK; STATE OF    )
5   CALIFORNIA; STATE OF ILLINOIS; )
    STATE OF NORTH CAROLINA; STATE )
6   OF OHIO; COMMONWEALTH OF       )
    PENNSYLVANIA; and              )
7   COMMONWEALTH OF VIRGINIA,      )
                                   )
8                  Plaintiffs,     ) Case No.
                                   ) 1:20-cv-00706-DLC
9              vs.                 )
                                   )
10  VYERA PHARMACEUTICALS, LLC;    )
    PHOENIXUS AG; MARTIN SHKRELI,  )
11  individually, as an owner and  )
    former officer of Vyera        )
12  Pharmaceuticals, LLC and       )
    Phoenixus AG (formerly known   )
13  as Turing Pharmaceuticals, LLC )
    and Turing Pharmaceuticals     )
14  AG); and KEVIN MULLEADY,       )
    individually, as an owner and  )
15  director of Phoenixus AG and   )
    a former executive of Vyera    )
16  Pharmaceuticals, LLC,          )
                                   )
17                 Defendants.     )
    ------------------------------)

18

19  VIDEOTAPED DEPOSITION OF ERIC STEFAN SREDZINSKI

20                Via Videoconference

21                Scottsdale, Arizona

22           Tuesday, February 16, 2021

23

24  Reported by:
    KRISTIN KOCH, RPR, RMR, CRR
25  JOB NO. 189143

E. Sredzinski

1  A.   I am aware of two in particular.
2  Q.   What are those two?
3  A.   Medisca and Professional Compounding
4  Centers of America.
5  Q.   And is Professional Compounding
6  Centers of America more commonly referred to as
7  PCCA?
8  A.   Yes.
9  Q.   Do you know if Medisca manufactures
10 API itself?
11 A.   I understand they don't manufacture
12 it themselves. I understand that they source
13 the APIs from a manufacturer.
14 Q.   Do you know if PCCA manufactures API
15 itself?
16 A.   I'm not aware that they do.
17 Q.   Do you know what types of quality
18 checks or audits Medisca conducts before
19 determining whether or not to source API from a
20 third party?
21 A.   They provide a certificate of
22 analysis of the bulk APIs that reviews potency
23 and purity of the products.
24       THE COURT REPORTER:   I'm sorry.
25

E. Sredzinski

1  Purity and --
2        THE WITNESS:   Potency.
3  Q.   Does the certificate of analysis
4  that they provide review anything else?
5  A.   I'd have to see a sheet to
6  understand exactly what it contains and then
7  they will also provide a material data and
8  safety, so an MDSA sheet.
9  Q.   Understood.
10       Has Avella ever been unable to
11 source API for products that it compounded?
12 A.   Over the years, yeah, there are
13 times where bulk APIs may no longer be
14 available or in shortage.
15 Q.   Did Avella ever have difficulty or
16 trouble sourcing pyrimethamine API?
17 A.   I don't recall. I think in the
18 initial sourcing and reaching out to the -- to
19 the wholesalers I believe it was Medisca was
20 the one that had the product that was available
21 for us. I don't think PCCA had it.
22 Q.   But Medisca was able to provide you
23 with the product when you first reached out?
24 A.   I -- I didn't -- I wasn't part of
25

E. Sredzinski

1  procurement process, so I'd have to -- I'd have
2  to review the date that we made the initial
3  request and when we received the product.
4  Q.   Sitting here today, are you aware of
5  any instances in which Avella requested
6  pyrimethamine API from Medisca and in which
7  Medisca declined that request?
8  A.   Not that I'm aware of.
9  Q.   And does Avella obtain pyrimethamine
10 from both Medisca and PCCA?
11 A.   I believe only -- only Medisca.
12       (Defendants' Exhibit 214, Excel
13       spreadsheet, Bates stamped
14       FTC-Optum-0000001, marked for
15       identification.)
16 Q.   I'd like to introduce another
17 document into evidence, which is Exhibit --
18 Defendants' Exhibit 214 and we will have that
19 put into the chat and into the share file, and
20 I will just note for the record that this is a
21 document Bates stamped FTC-Optum-0000001 and it
22 is a stand-alone Excel sheet.
23 A.   I have it open.
24 Q.   Have you had a chance to look at the
25

E. Sredzinski

1  data contained in this document,
2  Mr. Sredzinski?
3  A.   I'm reading it now.
4  Q.   Just let me know when you have had a
5  chance to finish looking.
6  A.   Okay.
7  Q.   Have you seen this document before?
8  A.   I don't recall seeing this document.
9  Q.   Does this document appear to reflect
10 Avella's purchases of pyrimethamine?
11 A.   It appears to be order dates,
12 quantity received without date received, so
13 they look like purchase orders placed by both
14 Medisca and PCCA.
15 Q.   And, again, I believe you testified
16 earlier that you are not aware of any instances
17 in which Avella placed an order for
18 pyrimethamine that was not filled; is that
19 right?
20 A.   Not that I'm aware of.
21 Q.   Column A says "Store."  Do you see
22 that?
23 A.   Yes.
24       MS. HUBINGER:   Objection.
25

E. Sredzinski

1                 E. Sredzinski
2    Speculation.
3       Q.    What is Avella of Deer valley,
4 number 12?
5       A.    It's one of our dispensing locations
6 in Phoenix located on Deer Valley Road.
7       Q.    And Column B says "Product";
8 correct?
9       A.    Yes.
10       Q.    And below that in Rows 2 through 5
11 it says "pyrimethamine USP 25 GM." Do you see
12 that?
13       A.    Yes.
14       Q.    Do you know what that refers to?
15       A.    United States Pharmacopeia and then
16 25 grams.
17       Q.    And then in Row 6 there is a
18 notation of 5 GM. Does that reflect 5 GMs?
19       A.    5 grams, yes.
20       Q.    5 grams. Thank you.
21       And then Column C says "Date
22 Ordered." Do you see that?
23       A.    Yes.
24       Q.    What is it -- what is your
25 understanding of that column?

E. Sredzinski

1                 E. Sredzinski
2       MS. HUBINGER: Objection. Form.
3       MR. RENDINO: You may answer.
4       A.    The date the order was placed from
5 the wholesaler.
6       Q.    And Column D says "Vendor"; is that
7 right?
8       A.    Yes.
9       Q.    Do you understand this document to
10 show that Medisca placed orders for
11 pyrimethamine on December 3rd, 2015 -- strike
12 that. Let me rephrase.
13       Do you understand this document to
14 show that Avella placed orders from Medisca for
15 pyrimethamine 25 grams on December 3rd, 2015,
16 November 29th, 2016, April 18th, 2017, and June
17 20th of 2017?
18       MS. HUBINGER: Objection. Form.
19       A.    Yes.
20       Q.    And do you understand this document
21 to show that Avella placed an order from PCCA
22 for 5 grams of pyrimethamine on December 27th
23 of 2018?
24       MS. HUBINGER: Objection. Form.
25       A.    Yes.

E. Sredzinski

1                 E. Sredzinski
2       Q.    And Column G says "Qty Order." What
3 is your understanding of that?
4       MS. HUBINGER: Objection. Form.
5       A.    The quantity. So for line 2 it
6 would be quantity 1, 25 grams.
7       Q.    And what do you understand Column H
8 to show?
9       MS. HUBINGER: Objection. Form.
10       A.    Quantity received.
11       Q.    Do you know whether some active
12 pharmaceutical ingredients are more difficult
13 to make than others?
14       A.    Yes.
15       Q.    And what is your understanding of
16 what makes a particular API more difficult to
17 make?
18       A.    The source of the ingredients and
19 the process by which the API is finally ready
20 to be used in a product.
21       Q.    Do you know whether pyrimethamine is
22 difficult to make?
23       A.    I do not know.
24       Q.    I would like to just move on to
25 another document. It's a document that you

E. Sredzinski

1                 E. Sredzinski
2 discussed already earlier today and it is
3 government Exhibit 3362. Do you still have
4 access to that document?
5       A.    Yes.
6       Q.    If you could, please, just open it
7 up and let me know once you have it open.
8       A.    I have it open.
9       Q.    And I believe you testified earlier
10 that this was a press release that you worked
11 on. Is that correct?
12       A.    Yes.
13       Q.    Do you know whether this press
14 release was actually issued?
15       A.    It was.
16       Q.    And I want to direct your attention
17 to the second page of the document, which is
18 GX3362-002, and specifically in paragraph 1 it
19 states: Avella Specialty Pharmacy announced
20 today that it will begin compounding a less
21 expensive alternative to Daraprim, a drug used
22 to treat or prophylaxis against toxoplasmosis
23 and pneumocystis pneumonia.
24       Do you see that?
25       A.    Yes.

Page 86

E. Sredzinski

1              E. Sredzinski
2  assuring the safety of the products that you
3  sourced?
4      A.   Yes.
5      Q.   I have one more document, I think,
6  that I just want to show you, Mr. Sredzinski?
7         MR. RENDINO:  So Noah, if you would
8      please up load Defendant's Exhibit 216
9      (sic).
10        (Defendants' Exhibit 215, Excel
11     spreadsheet, Bates stamped OPT00005, marked
12     for identification.)
13     Q.   And in the meantime I will note for
14 the record that this is a document Bates
15 stamped OPT00005.  It is an Excel sheet and I
16 believe it is a stand-alone document.  I
17 believe it's in the chat now.
18        Mr. Sredzinski, just let me know
19 when you have had a chance to open the document
20 and review it.  Please take your time.
21        THE COURT REPORTER:  Counsel, this
22 will be 215?
23        MR. RENDINO:  This should be, I
24     believe, 216 (sic), but I could sort that
25     out with you at a break, if you would like.

Page 87

1              E. Sredzinski
2         THE COURT REPORTER:  Okay.
3      A.   Okay.  I have the document open.
4      Q.   Great.  Do you see the tab is titled
5  RX Audit, do you see that at the bottom?
6      A.   Yes.
7      Q.   First let me ask, have you seen this
8  document before?
9      A.   Yes.
10     Q.   And what is it?
11     A.   This is a prescription audit, so
12 it's a report run from the pharmacy system to
13 show transactions of prescriptions that we
14 fulfilled.
15     Q.   And do you know who at Avella
16 conducted this audit?
17     A.   Yes.
18     Q.   And who was that?
19     A.   I believe it was Chris Dinoffria is
20 the pharmacist who ran the report.
21     Q.   And was that audit conducted in the
22 ordinary course of Avella's business
23 activities?
24     A.   This document was run as a result of
25 this hearing.

Page 88

1              E. Sredzinski
2      Q.   This document was specifically put
3  together in preparation for this deposition?
4      A.   Yes.
5      Q.   Okay.
6         MR. KOKKINEN:  If I can just jump in
7      actually here, this -- Dr. Sredzinski, is
8      it your understanding this report was
9      generated in response to the subpoena that
10     came from the FTC back in the summer of
11     last year?
12        THE WITNESS:  Yes.
13        MR. RENDINO:  Thank you, John.
14     Q.   Does this document reflect the sales
15 of the compounded pyrimethamine that Avella
16 made between June of 2016 and August of 2018?
17     A.   Yes, these are compounded leucovorin
18 and pyrimethamines.
19     Q.   And do you know if Avella has made
20 sales of compounded pyrimethamine and
21 leucovorin since August of 2018?
22     A.   Not that I'm aware of.
23     Q.   I just want to direct your attention
24 to Column P.  Can you just let me know what's
25 reflected in that column, please?

Page 89

1              E. Sredzinski
2      A.   It's the drug name of the compound.
3      Q.   And how about Column W?
4      A.   It's the dispensed quantity.
5      Q.   And Column AF?
6      A.   That's our listed acquisition cost.
7      Q.   And do you have any understanding of
8  why the acquisition cost in Row 2 is higher
9  than the acquisition cost of any of the other
10 rows listed below?
11     A.   I don't know.  I'm assuming these
12 are -- these could be results of errors.  I
13 don't know without further reviewing the data.
14     Q.   Sure.  And how about Column AG, what
15 does that reflect, the column just to the right
16 of AF?
17     A.   That's listed as the total price.
18     Q.   And that is the price to whom?
19     A.   That should be -- let's see.  The
20 total price, the amount paid is Column
21 B-as-in-boy B-as-in-boy, and B-as-in-boy
22 A-as-in-apple is the patient's out-of-pocket
23 expense.
24     Q.   And so do you know what AG would
25 reflect in terms of the listing there, total

Page 90

```
 1                 E. Sredzinski
 2   price?
 3        A.   It should be the price that is going
 4   to be billed.
 5        Q.   I see.  And do you see in Rows 4
 6   through 6 there is an acquisition cost of
 7   $1,038.75 listed in Column AF, do you see that?
 8        A.   Yes.
 9        Q.   Do you know why the cost there is
10   higher than the cost in the rows below?
11        A.   I do not.
12        Q.   Do you see that there is a total
13   price listed in Rows 4 through 6 of between
14   $474.87 and $492.78, do you see that?
15        A.   Yes.
16        Q.   Do you know why those prices are
17   different?  And for reference, the quantity
18   dispensed in Column W appears to be the same
19   for each and it's the same patient.  I'm just
20   curious.
21        A.   I don't know.  I'd have to -- one
22   thing I could refer back to would be the price
23   of the APIs that were purchased from Medisca.
24        Q.   Okay.  And then just two last
25   questions.  Column AK is Adjusted Total Price.
```

Page 91

```
 1                 E. Sredzinski
 2   What does that reflect?
 3        A.   It's typically what's been run
 4   through, so if there is an insurance that pays
 5   for it, there is a usual and customary that has
 6   to be paid.
 7        Q.   And Column BB, I believe you
 8   referenced it before, can you just explain one
 9   more time what that column is?
10        A.   BB is the amount paid by an
11   insurance company.
12        Q.   Okay.  And is it your understanding
13   that the entries reflected in this document are
14   entries that Avella -- strike that.
15             Is it your understanding that the
16   entries reflected in this Excel sheet reflect
17   sales of leucovorin and pyrimethamine to
18   patients that were made in the course of
19   Avella's business?
20        A.   Yes, pursuant to prescriptions, yes.
21             MR. RENDINO:  Great.  I think if we
22        could just go off the record and now might
23        be a decent time for a quick break.
24             THE VIDEOGRAPHER:  The time is 11:53
25        a.m.  We are going off the record.
```

Page 92

```
 1                 E. Sredzinski
 2             (Recess was taken from 11:53 to
 3        12:01.)
 4             THE VIDEOGRAPHER:  The time is
 5        12:01 p.m.  We are back on the record.
 6             MR. RENDINO:  Mr. Sredzinski, this
 7        is Nicholas Rendino.  Thank you very much
 8        for your time today.  At this time I have
 9        no further questions, but I will reserve
10        the balance of my time pending any further
11        questions from your own counsel or for
12        counsel for the plaintiffs.  Thank you very
13        much.
14   EXAMINATION BY
15   MR. KOKKINEN:
16        Q.   Dr. Sredzinski, just to make sure
17   that there is anything that isn't inaccurate,
18   you were asked if you had spoken with anyone
19   about this deposition and you said -- other
20   than me and you said no.  There were two other
21   attorneys from the organization that
22   participated in conversations that you and I
23   were involved in; is that correct?
24        A.   Correct.
25        Q.   And that was Steven Sorosky, one of
```

Page 93

```
 1                 E. Sredzinski
 2   the lawyers at Avella, and Jennifer Molinar, a
 3   lawyer at Optum; is that right?
 4        A.   Yes.
 5        Q.   In addition, the deposition notice,
 6   number 14 of the deposition notice asked about
 7   Avella's communications with any -- I'm sorry,
 8   number 13.  Avella's communications with any
 9   defendant concerning Daraprim and/or compounded
10   pyrimethamine, and there was conversations to
11   prepare you to be the 30(b)(6) deponent on that
12   topic.  There was a meeting between you, me and
13   another Avella employee, Leslie Yendro, to make
14   sure that you would be prepared to discuss
15   anything about -- any meetings that Avella had
16   with Vyera; is that correct?
17        A.   Yes.
18             MR. KOKKINEN:  Okay.  That was all I
19        had.
20   FURTHER EXAMINATION BY
21   MS. HUBINGER:
22        Q.   So thanks again, Dr. Sredzinski, for
23   your time.  I just have a few follow-up
24   questions.  I am hoping this won't take too
25   long.  But I'd like to start with the document
```

# Exhibit C

**Filed Under Seal**