# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**FEDERAL TRADE COMMISSION**

        **Plaintiff,**

              **v.**

**ACTAVIS, INC., et al.,**

        **Defendants.**

**CASE NO. 1:09-CV-955-TWT**

## DEFENDANTS' OPPOSITION TO FEDERAL TRADE COMMISSION'S MOTION FOR PERMISSION TO SERVE NINE TRIAL SUBPOENAS

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................1

II.  ARGUMENT...............................................................................................4

   A.   The FTC Is Not Entitled to Seek Nationwide Trial Subpoenas
        Under 15 U.S.C. § 23 ........................................................................4

   B.   The FTC Lacks Cause for Issuance of the Nine Trial Subpoenas
        it Requests. .....................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A. Kush & Assocs. v. Weingeroff Enter., Inc.*,
    1988 WL 64082 (N.D. Ill. June 8, 1988)..............................................................13

*Amgen v. Kidney Ctr. of Del.*,
    879 F. Supp. 878 (N.D. Ill. 1995).......................................................................7

*City of Kenosha v. Bruno*,
    412 U.S. 507 (1973)...........................................................................................6

*Farmer v. Arabian Am. Oil Co.*,
    379 U.S. 227 (1964).........................................................................................11

*Fed. Trade Comm'n v. Onkyo U.S.A. Corp.*,
    1995 WL 579811 (D.D.C. Aug. 21, 1995).....................................................5, 9

*Gunn v. Minton*,
    568 U.S. 251 (2013)...........................................................................................8

*Johnson v. Big Lots Stores*,
    251 F.R.D. 213 (E.D. La. 2008) ........................................................................7

*Luria Steel & Trading Corp. v. Ogden Corp.*,
    484 F.2d 1016 (3d Cir. 1973) ..........................................................................10

*Nashville Milk Co. v. Carnation Co.*,
    355 U.S. 373 (1958)...........................................................................................5

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*,
    484 U.S. 97 (1987).......................................................................................6, 10

*Pool Waters Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ........................................................................10

*Romero v. Int'l Terminal Operating Co.*,
    358 U.S. 354 (1959)...........................................................................................6

**TABLE OF AUTHORITIES**
(Continued)

Page

*United States v. Wyeth*,
    2015 WL 8024407 (D. Mass. Dec. 4, 2015)......................................................11

*Yamaha Motor Corp. v. FTC*,
    657 F.2d 971 (8th Cir. 1981) ..............................................................................10

**FEDERAL STATUTES**

15 U.S.C. § 12(a). ..........................................................................................passim

15 U.S.C. § 16(i) ....................................................................................................10

15 U.S.C. § 16(g) .....................................................................................................9

15 U.S.C. § 23 ..............................................................................................passim

15 U.S.C. § 45(b) .....................................................................................................9

15 U.S.C. § 49 .....................................................................................................6, 9

**FEDERAL RULES**

Fed. R. Civ. P. 32(a)(3)(B) .....................................................................................13

Fed. R. Civ. P. 45(c)(1)...........................................................................................11

**TREATISES**

Wright and Miller, 13D Fed. Prac. & Proc. § 3562 (3d ed. 2018
    Update).............................................................................................................8

## I.   <u>INTRODUCTION</u>

Defendants are sympathetic to the notion that live testimony is preferable at trial.  And given that almost no witnesses still work for Defendants, the Defendants might themselves benefit from nationwide subpoena power.  But such preferences cannot come at the expense of ignoring the law, which does not permit witnesses who live more than 100 miles from the courthouse to be subpoenaed for trial. Granting such power would require the Court to interpret 15 U.S.C. § 23 in a manner clearly at odds with its plain meaning and, as officers of the Court, Defendants cannot ask the Court to do that.  The rules limiting the subpoena power exist to protect witnesses from the burdens of traveling great distances to testify at a trial in which they have no stake.  That the FTC may now regret not having asked witnesses certain questions at their videotaped depositions is no excuse to ignore those rules.

Numerous courts, including the Supreme Court, have observed that Congress uses clear, direct language where it intends to authorize nationwide service of process.  But nothing in Section 23 says that nationwide service of trial subpoenas is available in a case brought under the FTC Act.  To the contrary, that statute permits nationwide service only in cases arising under the "antitrust laws," which is a clearly and precisely defined list of statutes that does ***not*** include the

1

FTC Act.  15 U.S.C. § 12(a) *et seq.*  Because the FTC made the choice to bring this case under the FTC Act, and only the FTC Act, Section 23 simply does not apply here.  That this case is colloquially referred to as an "antitrust case" cannot change the clear statutory definitions applicable to Section 23.

Even if Section 23 applied here, the FTC has not shown the "cause" required under the statute to subpoena the nine witnesses discussed in its motion.  The FTC says that it can show cause because the witnesses here have relevant or important testimony.  That is simply not enough.  Such "cause" exists in every case— presumably, every witness a party wants to bring across the country for trial would have relevant and important testimony.  The FTC fails to show some special circumstance for these witnesses warranting an exception to Rule 45's 100-mile limit—and the facts here simply do not support that showing.

A major purpose of the deposition process, after all, is to preserve testimony for trial from distant or otherwise unavailable witnesses.  Here, the FTC has had every opportunity to obtain trial testimony through videotaped depositions, and either did obtain testimony or chose not to pursue it.  The FTC asked the Court for permission to take 40 depositions.  ECF No. 269.  The Court granted that request (over Defendants' objection), and that is one reason this case had such a lengthy fact discovery period.  ECF No. 307.  The FTC identifies no instance in which it

2

somehow did not appreciate the need to depose a witness or it was unable to obtain the testimony it wanted. To the contrary, these nine witnesses were all deposed at one point or another in this litigation.

For example, the FTC asks the Court to authorize a subpoena to former Solvay employee Murray Kay. But the FTC has long been aware of Mr. Kay's role and had every opportunity to develop his testimony. Mr. Kay was examined by the FTC for two days during the FTC's pre-filing investigation. The Private Plaintiffs then deposed Mr. Kay during the sham phase. And then the FTC asked to depose Mr. Kay during this phase, *but ultimately chose not to proceed with the deposition*. Having made that choice, there is no "cause" to force a retired former employee to fly hundreds of miles to provide testimony that the FTC could have taken in Mr. Kay's home district. Nor is it reasonable to require the other eight witnesses to travel equal or greater distances without some special circumstance which limited the FTC's ability to obtain their testimony at deposition.

The FTC's motion should be denied.

Defendants also wish to make clear that this opposition is not being filed on behalf of any of the nine witnesses. The witnesses did not even receive notice of this motion and are not parties before this Court. Should the Court conclude that it has the power to authorize nationwide subpoenas, those witnesses must have the

3

right to object and contest the propriety of being forced to travel to Atlanta to testify.

## II.    <u>ARGUMENT</u>

The FTC's motion should be denied because the nationwide service statute does not apply in this case and, even if it did, the FTC could not show "cause" for the subpoenas as the statute requires.

### A.    <u>The FTC Is Not Entitled to Seek Nationwide Trial Subpoenas Under 15 U.S.C. § 23</u>

The statute the FTC cites, 15 U.S.C. § 23, authorizes nationwide service of process only for claims "arising under the antitrust laws." *Id.* "[A]ntitrust laws" is a *defined* term for purposes of the statute. And, as the FTC admits (Mot. at 6), that definition in 15 U.S.C. § 12(a) does not list the FTC Act—the basis for all of the FTC's claims in this case. Thus, the nationwide service of process statute does not, by its plain language, apply to this case. That is the end of the matter. None of the FTC's arguments for ignoring the statutory definition is convincing.

*First*, the FTC notes this case has been colloquially referred to as an "antitrust case" by the parties and the courts in a variety of contexts. But such colloquial references cannot trump the express definition of the term "antitrust laws" in the statute. The Supreme Court has specifically instructed that whether a statute "may be colloquially described as an antitrust [law]" is "of no moment"

4

when interpreting Section 12.  *Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373,

376 (1958).  Instead, as the notes to 15 U.S.C. § 23 explain, "[t]he antitrust laws,

referred to in text, are defined in section 12 of this title."  15 U.S.C. § 23 note,

attached as Ex. A.  The Supreme Court has also said that the list in Section 12 "is

exclusive."  *Nashville Milk Co.*, 355 U.S. at 376.  For this reason, courts maintain

that "[t]he FTC Act is not an 'antitrust law' within the meaning of the Clayton Act,

15 U.S.C. § 12(a)."  *Fed. Trade Comm'n v. Onkyo U.S.A. Corp.*, 1995 WL 579811,

at *4 n.2 (D.D.C. Aug. 21, 1995).

    *Second*, the FTC suggests that, in derogation of the plain language of the

statute, other courts have "routinely authorize[d] nationwide service of trial

subpoenas in cases brought by the FTC."  Mot. at 3.  What the FTC fails to explain

is that in the cases it cites, the FTC had asserted claims under the Clayton Act, *i.e.*,

one of the "antitrust laws" under Section 12.  *See* Complaint at 2-3 & ¶¶ 17, 22, 87

(ECF No. 11-1), *FTC v. Sysco Corp.*, No. 15-cv-00256 (APM) (D.D.C. Feb. 20,

2015) (attached as Ex. B); Complaint at 2 (ECF No. 3), *FTC v. Whole Foods Mkt.,*

*Inc.*, No. 07-cv-01021-PFL (D.D.C. June 6, 2007) (attached as Ex. C); Complaint

at 2 & ¶ 79 (ECF No. 14-1), *FTC v. Staples, Inc.*, No. 15-cv-02115-EGS (D.D.C.

Dec. 9, 2015) (attached as Ex. D); Amended Complaint at 9 (ECF No. 68), *FTC v.*

*Lundbeck, Inc.*, No. 08-cv-6379 (JNE/JJG) (D. Minn. Apr. 10, 2009) (attached as

Ex. E).  Thus, in none of these cases did the courts consider the applicability of

Section 23 to claims under the FTC Act.[1]

*Third*, there is no basis for the FTC's convoluted arguments of legislative

intent.  The FTC says that the FTC Act was included in Section 23 by Congress's

use of the phrase "*arising under* the antitrust laws."  But Congress would not have

been so bashful about its intentions, especially as jurisdictional grants are narrowly

construed.  *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 408 (1959)

("[T]his Court has adhered to a policy of construing jurisdictional statutes

narrowly.").  Congress was quite explicit, for example, in authorizing nationwide

service in administrative actions brought by the FTC.  *See* 15 U.S.C. § 49.  As the

Supreme Court has explained, "[i]t would appear that Congress knows how to

authorize nationwide service of process when it wants to provide for it.  That

Congress failed to do so here argues forcefully that such authorization was not its

intention."  *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 106

(1987).

---

[1] Furthermore, all but one of the cases involved *stipulations* where the applicability of Section 23 was not litigated. *Cf. City of Kenosha v. Bruno*, 412 U.S. 507, 512-13 (1973) (no inference regarding an issue can be drawn from cases that do not directly address that issue). As the FTC has itself argued to this Court, "a court's role in entering a consent judgment differs fundamentally from its role when parties invoke the adjudicatory process to petition." *Cf.* ECF No. 258 at 9-10.

Given the importance of not expanding their power beyond the limits imposed by Congress, courts will not presume to be granted the extraordinary authority to issue subpoenas beyond the limits of the federal rules without clear and express language to that effect: "[W]hen Congress has sought to provide for service of subpoenas in places other than those listed in Rule 45(b)(2), it has done so with **unmistakable clarity**."[2] *Johnson v. Big Lots Stores*, 251 F.R.D. 213, 218 (E.D. La. 2008) (emphasis added). *Cf. Amgen v. Kidney Ctr. of Del.*, 879 F. Supp. 878, 882 (N.D. Ill. 1995) ("[T]hose statutes providing for extraterritorial service do so explicitly.").

The FTC's interpretation of "arising under" also makes no sense on its own terms. The FTC argues that "arising under the antitrust laws" includes claims that do not literally arise under the antitrust laws but are instead merely related to, inspired by, or consistent with the antitrust laws. The FTC cites by analogy cases that read the phrase "arising under federal law" in 28 U.S.C. § 1331 broadly to include causes of action that are not literally created by federal law. But the FTC's free-wheeling interpretation of § 1331 is outdated and incorrect. The FTC cites case law that predates the Supreme Court's 2013 decision in *Gunn*, which clarifies

---

[2] Indeed, some cases use the statute at issue here, 15 U.S.C. § 23, as an example of Congress's "unmistakable clarity" when it chooses to authorize nationwide subpoena power. *See Johnson*, 251 F.R.D. at 218.

that "a case arises under federal law when federal law creates the cause of action asserted" and that this rule admits of "only ***extremely rare*** exceptions." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (emphasis added).  The antitrust laws, as defined by the statute, did not create the claim being pursued by the FTC; rather it's the FTC Act that created the claim being asserted here.  The FTC points to no authority holding that a claim brought under the FTC Act § 5 actually "arises under" some other statute.

Moreover, there is no reason to think the phrase "arising under" in Title 15 was meant to incorporate the case law interpreting "arising under federal law" jurisprudence under Title 28.  Section 23 was, after all, adopted in 1914, decades before the law the FTC cites interpreting 28 U.S.C. § 1331.  Even if Congress had been able to see into the future, the meaning of Section 1331 was never well settled such that Congress might have relied on it.  *See, e.g., Gunn*, 568 U.S. at 258 (recognizing that, when interpreting Section 1331, "we do not paint on a blank canvas. Unfortunately, the canvas looks like one that Jackson Pollock got to first."); *see also* Wright and Miller, 13D Fed. Prac. & Proc. § 3562 (3d ed. 2018 Update) (recognizing that although meaning of "arising under" in § 1331 attracted attention from "giants of the bench," "no single rationalizing principle will explain all of the decisions.").

8

*Finally*, the FTC asks the Court to ignore the language of the statute for policy reasons, specifically the supposed need to treat the FTC equally with the Department of Justice ("DOJ"). But there is no such apparent policy need; the FTC is subject to a variety of different rules and practices than the DOJ. For example, the procedural requirements of the Tunney Act, which applies to "any consent judgment *pursuant* to the antitrust laws," 15 U.S.C. § 16(g) (emphasis added), do not apply to proceedings to enforce the FTC Act. *Onkyo*, 1995 WL 579811, at *4 n.2. The FTC, unlike the DOJ, also has the power to bring claims in its own administrative proceedings. *See* 15 U.S.C. § 45(b). When the FTC brings its claims this way, rather than in federal court, it has nationwide subpoena power, 15 U.S.C. § 49, and follows a variety of other procedural practices that do not apply in federal court.

These differences are not "arbitrary," but by Congressional design, even if the FTC might find some of that design unappealing. The FTC could have brought an administrative proceeding against Defendants and taken advantage of nationwide subpoena power under 15 U.S.C. § 49, but opted not to do so. Likewise, the FTC chose to bring this case under § 5 of the FTC Act and not one of the antitrust laws. The FTC must live with that tactical choice. It cannot seek the

advantages of a different path, while avoiding the limits Congress put on those alternatives.

Even if the FTC could show that Congress's judgment to give the FTC nationwide service power to enforce the FTC Act in an administrative rather than a judicial context was unwise, that would not permit a different outcome here. *Omni*, 484 U.S. at 111 (holding that even a compelling policy case for nationwide service does not permit judicial creation of that right; "[t]hat responsibility, in our view, better rests with those who propose the Federal Rules of Civil Procedure and with Congress.").[3]

---

[3] Some older cases do hold that the tolling provision in 15 U.S.C. § 16(i) can apply where the FTC has asserted claims sounding in antitrust under the FTC Act § 5. *See, e.g., Luria Steel & Trading Corp. v. Ogden Corp.*, 484 F.2d 1016, 1021-22 (3d Cir. 1973). Notably, these cases do not address 15 U.S.C. § 23, and the interpretation of a tolling provision is not subject to the same rigorous statutory interpretation doctrines applicable here. More recent authority have reached the correct conclusion that the FTC Act is not an "antitrust law" even for purposes of the tolling provision of Section 16(i). *See, e.g., Pool Waters Prods. v. Olin Corp.*, 258 F.3d 1024, 1031 n.4 (9th Cir. 2001) (analyzing "prima facie" weight provision of Clayton Act, 15 U.S.C. § 16(a), and noting that "prima facie weight is given only to violations of the 'antitrust laws' as defined by the Clayton Act," which "does not include violations of the FTC Act"); *Yamaha Motor Corp. v. FTC*, 657 F.2d 971, 982 (8th Cir. 1981) (explaining that Section 5 of the FTC Act is not "one of the 'antitrust laws' within the meaning of Sections [16(a) and 16(i)] of the Clayton Act").

10

## B.    The FTC Lacks Cause for Issuance of the Nine Trial Subpoenas it Requests.

Even if 15 U.S.C. § 23 were to apply here, the FTC still has not established good cause for trial subpoenas for these specific witnesses. Section 23 does not deviate from the 100-mile rule of Fed. R. Civ. P. 45(c)(1) as a matter of course, but rather requires a showing of specific "cause" for why a subpoena should issue. *See* 15 U.S.C. § 23. The 100-mile rule is intended to protect individuals from the burden and expense of testifying in foreign jurisdictions. *See Farmer v. Arabian Am. Oil Co.*, 379 U.S. 227, 235 (1964). The cause requirement exists "to avoid the imposition of undue burden on persons subject to a subpoena." *United States v. Wyeth*, 2015 WL 8024407, at *4 (D. Mass. Dec. 4, 2015) (analyzing cause requirement under similar nationwide subpoena provision of the False Claims Act, 31 U.S.C. § 3731(a)). Thus, to satisfy the good cause standard, the FTC must show a compelling need to require these nine witnesses to travel hundreds of miles to testify at trial. The FTC has not met this standard.

The FTC's primary argument for cause is that the witnesses in this case are "geographically dispersed." Mot. at 9. But this is plainly insufficient to meet the burden of showing cause. If geographic dispersion alone were enough, it would essentially read the "cause" requirement out of the statute and require witnesses to

11

travel across the country for every civil proceeding brought by the government under the antitrust laws.

The FTC cites some case management orders involving cases brought by the United States DOJ under the antitrust laws, which find good cause. *See id.* But these case management orders provide no insight into the nature of the claims or the arguments made by the parties, and therefore should not be afforded any weight. Presumably good reasons were provided in those cases.

The FTC also points to supposed changes in Defendants' corporate ownership, arguing that the witness's geographic "dispersion" is due to corporate transactions. The FTC appears to be suggesting that witnesses are outside the subpoena power because of Defendants' actions during the litigation, but these arguments are not based in fact. Of the four current or prior defendants, only Solvay was ever based in Atlanta. Watson, Par, and Paddock never had any permanent connection to Atlanta, and their changes in ownership are irrelevant. Moreover, only two of the nine witnesses that the FTC seeks to force to travel for trial were ever based in Atlanta: Murray Kay and Elaine Yang. Ms. Yang left Solvay (and Atlanta) in 2006, years before this case was even filed or any of the transactions involving Solvay. Mr. Kay retired and moved to Florida. His residence is not related to any Solvay transaction. The remaining seven witnesses

were never based in Atlanta and therefore transactions involving the Defendants had no effect on the FTC's ability to compel them to come to trial under the standard requirements of Rule 45.

The FTC's final argument is that these witnesses may provide "material testimony." Mot. at 9. The FTC never explains what is meant by "material testimony" and how that would be different from any witness the FTC might seek to force to travel across the country for trial. Is the FTC suggesting that it would otherwise force witnesses without "material testimony" to attend trial? This argument also fails to account for why compelling these witnesses to attend trial is necessary in light of the extensive discovery taken in this case. The FTC has had ample opportunity to depose all of these witnesses and, to the extent it chose to do so, are free to use that deposition testimony at trial where it is otherwise admissible. *See* Fed. R. Civ. P. 32(a)(3)(B); *see also A. Kush & Assocs. v. Weingeroff Enter., Inc.*, 1988 WL 64082, at *5 (N.D. Ill. June 8, 1988) (explaining, in the context of analyzing the analogous nationwide subpoena provision in RICO, 18 U.S.C. § 1965(c), that given "the liberal discovery available in federal practice," the "nationwide service provision of RICO will rarely be available to compel the

attendance of a witness").[4]  The FTC does not, for example, claim that some new

fact arose after discovery closed, that there is ongoing conduct that would make

prior discovery stale, that the FTC was previously unaware of the witness or

unable to depose them for some reason, or that the FTC did not realize the need for

the witness's testimony until after discovery had closed.  Rather, the FTC had the

opportunity to depose each of these witnesses on the exact topics the FTC claims

are "material" to its case, and where it chose not to do so it was due to a strategic

choice or the FTC's own inadvertence.  The good cause standard cannot be met

merely because the FTC prefers witnesses to appear live or is unsatisfied with the

discovery it took.

Regardless, the FTC's arguments about the "material testimony" of the

witnesses it seeks to compel to attend trial do not establish cause.

### 1. David Buchen

As the FTC acknowledges, Mr. Buchen resides in South Florida,

approximately 500 miles from Atlanta; he has been retired since 2015.  He also has

been deposed ***three times*** in connection with this matter:  in 2008 in an FTC

---

[4] The court in *A. Kush* appears to have incorrectly applied the nationwide service
of process provision of RICO to actions brought by private parties, but the "good
cause analysis" remains unaffected.

14

investigational hearing[5] (where the FTC was the sole examiner), in 2011 during the

sham phase of the litigation, and once more in 2015 during the current phase of the

litigation (where the FTC was the lead examiner).  At all three of those

depositions, which total over 600 transcribed pages, Mr. Buchen testified at length

about "the negotiations with Solvay, the various drafts of the agreements, and

Watson's FDA approval and first-filer status for generic AndroGel."  In other

words, Mr. Buchen already has provided hours of testimony about the very

subjects on which the FTC seeks to call him at trial.  The FTC does not explain

why the hours of testimony it already has is somehow insufficient.  Defendants

hope to secure Mr. Buchen's voluntary appearance at trial.  However, the FTC

provides no compelling reason—and there is none—why Mr. Buchen should be

required to attend trial if he is unwilling.

### 2.    Paul Campanelli

Mr. Campanelli is a former Par employee, who currently resides in New

Jersey, approximately 800 miles from Atlanta.  He has already been deposed twice

in this litigation, once by the Private Plaintiffs in 2011 and once in this phase in

2016.  At these depositions, Mr. Campanelli testified at length regarding "Par's

---

[5] By referencing the FTC's investigational hearing testimony in this motion,
Defendants in no way concede that the referenced investigational hearings are
admissible against any or all parties.

15

negotiations with Solvay"—the exact topic on which the FTC suggests Mr. Campanelli's testimony is needed for at trial.  The FTC has not provided any reason Mr. Campanelli's prior testimony on these topics is inadequate, nor does it identify another reason that Mr. Campanelli, a former employee of a third party, should be required to bear the burden of traveling over 800 miles to testify again.

### 3.  Murray Kay

Mr. Kay is a former Solvay employee, who now lives in South Florida, over 500 miles from Atlanta.  The FTC contends that Mr. Kay is a key witness with "material testimony."  However, these representations are belied by the fact that ***the FTC chose not to even depose Mr. Kay during this phase of the litigation***, after having taken his testimony during its initial investigation in 2008 and after he was deposed in the sham phase.  The FTC clearly made a strategic choice that Mr. Kay was in fact not a "key" witness and that it had no need to depose him.  The FTC offers no explanation or change in circumstance that would now justify requiring Mr. Kay to attend trial.  Having intentionally forgone the deposition of Mr. Kay in his home district, the FTC cannot claim that his testimony is essential now.  Moreover, despite not deposing him, the FTC still has hours of testimony from Mr. Kay from its investigational hearing and the sham phase deposition on the very topics it which it seeks to call him at trial.  Forcing Mr. Kay, a third party

16

to this case, to travel for trial testimony without adequate cause would be unreasonably burdensome and unfair.

### 4.  Louis Lipinski

Mr. Lipinski is the Manager of Marketing and Analytics for the AndroGel business, a position he began in 2014.  He has no contemporaneous knowledge of the events at issue in this litigation.  His only involvement in this litigation is that he was designated as Solvay's 30(b)(6) witness on the payments Solvay made to Watson under the Watson Co-Promotion Agreement.  Although the FTC now stresses Mr. Lipinski's importance, it chose not to even attend his deposition in person and did not ask any questions of Mr. Lipinski through its telephonic appearance.  The FTC provides no reason it was unable to secure the testimony it needed from Mr. Lipinski during discovery.  Having made no effort to secure Mr. Lipinski's testimony in a less burdensome way, the FTC cannot now say it has good cause to require him to attend trial in Atlanta.

### 5.  William Mink

Mr. Mink was Paddock's Director of Technical Services, and currently resides in Minnesota.  He was not an executive nor was he involved in the negotiations of the agreements.  Further, the FTC extensively deposed Mr. Mink in 2015 on the implementation of the backup manufacturing agreement, the only

17

topic on which it seeks Mr. Mink to testify to at trial.  The FTC does not offer any

reason why that testimony is insufficient.  Indeed, the relevant events all occurred

prior to his deposition—the backup manufacturing agreement terminated in 2012,

well before his deposition.  The FTC has not made any showing why he should be

required to travel over 1000 miles from his home in Minnesota to testify at trial.

### 6.    Joseph Todisco

Mr. Todisco is a former employee of Par, who currently resides in New

Jersey.  As the FTC admits, he was not a primary negotiator of the agreement nor

an executive, but rather just a senior financial analyst with limited involvement in

the relevant events.  Further, the FTC took Mr. Todisco's deposition in 2015.  That

deposition lasted almost seven hours and covered the exact subjects on which it

seeks to call him at trial.  The FTC does not identify any reason why Mr. Todisco's

prior testimony is now inadequate, or any other compelling reason why Mr.

Todisco, a former employee of a third party, should be required to travel over 800

miles from New Jersey to attend trial in Atlanta.

### 7.    Edward Tykot

Like Mr. Buchen, Mr. Tykot has been deposed three times in this

litigation—in 2008, 2011, and 2016—and the FTC offers no compelling reason

why it requires further testimony from Mr. Tykot now.  Indeed, the FTC suggests

that it seeks to call Mr. Tykot primarily to testify about "revenue forecasts" he created, but noticeably fails to mention that such forecasts were introduced as exhibits in all three of Mr. Tykot's depositions. Mr. Tykot has not been an employee of Watson or its current or former affiliates since 2014 and lives roughly 800 miles from Atlanta. Defendants are seeking Mr. Tykot's agreement to appear voluntarily at trial. But if he is unwilling, it would be unduly burdensome and unfair to force him to testify merely to give the FTC a fourth bite at the apple.

### 8.     Difei (Elaine) Yang

As explained above, Ms. Yang left Solvay in 2006, long before this case was ever filed. Ms. Yang has not been employed by Solvay for over a decade, and currently resides and works in New York, over 800 miles from Atlanta. While Ms. Yang was employed at Solvay, she was a specialist in the strategic and business analysis department, not an executive or one of the primary negotiators of the agreements. Further, the FTC deposed Ms. Yang in 2015 and should already have the testimony it requires. The FTC does not identify any reason why it requires further testimony from Ms. Yang.

### 9.     Carol Yeomans

The FTC spends the least space in its brief on Ms. Yeomans for good reason: Ms. Yeomans's only relevance to this case is that, in her role as a member of the

19

Watson Finance department, she was involved in tracking payments Watson received from Solvay for services performed under the Watson Co-Promotion Agreement.  The FTC questioned Ms. Yeomans extensively about her role and Watson's payments during a 2016 deposition, and the FTC has included numerous documents on its exhibit list that relate to the same issues.  The FTC does not and cannot explain why, despite the existing record, Ms. Yeomans—who is retired and resides in New Jersey—should be required to travel roughly 800 miles to attend trial.

Defendants respectfully request that the Court deny the FTC's motion in its entirety.

Date:  December 7, 2018

Respectfully submitted:

Teresa T. Bonder
Georgia Bar No. 703969
Matthew D. Kent
Georgia Bar No. 526272
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000 (telephone)
(404) 881-7777 (facsimile)
teresa.bonder@alston.com
matthew.kent@alston.com


*Counsel for AbbVie Products LLC f/k/a*
*Solvay Pharmaceuticals, Inc.*

*/s/ Rohit K. Singla*
Jeffrey I. Weinberger*
Rohit K. Singla*
Kyle W. Mach*
Adam R. Lawton*
Justin P. Raphael*
Joshua S. Meltzer*
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100 (telephone)
(213) 687-3702 (facsimile)
jeffrey.weinberger@mto.com
rohit.singla@mto.com
kyle.mach@mto.com
adam.lawton@mto.com
justin.raphael@mto.com
joshua.meltzer@mto.com

* Practicing pursuant to this Court's
Initial Case Management Order

*Counsel for AbbVie Products LLC f/k/a*
*Solvay Pharmaceuticals, Inc.*

21

Seslee S. Smith
Georgia Bar No. 663377
MORRIS, MANNING, & MARTIN LLP
3343 Peachtree Road, N.E.
Suite 1600 Atlanta Financial Center
Atlanta, GA 30326
(404) 233-7000 (telephone)
(404) 365-9532 (facsimile)
sss@mmmlaw.com

/s/ Paul M. Eckles
Steven C. Sunshine*
Paul M. Eckles*
Julia K. York*
Timothy H. Grayson*
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., N.W.
Washington, D.C. 20005
(202) 371-7000 (telephone)
(202) 393-5760 (facsimile)
steven.sunshine@skadden.com
paul.eckles@skadden.com
julia.york@skadden.com
timothy.grayson@skadden.com

* Practicing pursuant to this Court's
Initial Case Management Order

*Counsel for Actavis, Inc. (n/k/a Allergan
Finance, LLC) and Actavis Holdco US,
Inc.*

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel hereby certifies that the foregoing

**DEFENDANTS' OPPOSITION TO FEDERAL TRADE COMMISSION'S**

**MOTION FOR PERMISSION TO SERVE NINE TRIAL SUBPOENAS** has

been prepared in accordance with Local Rule 5.1 using Times New Roman 14

point font.

Respectfully submitted this 7th day of December, 2018.

/s/ Rohit K. Singla
Rohit K. Singla*
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 (Telephone)
(415) 644-6976 (Facsimile)
rohit.singla@mto.com

*Counsel for AbbVie Products LLC f/k/a
Solvay Pharmaceuticals, Inc.*

* Practicing pursuant to this Court's
Initial Case Management Order

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed a true and correct copy of **DEFENDANTS' OPPOSITION TO FEDERAL TRADE COMMISSION'S MOTION FOR PERMISSION TO SERVE NINE TRIAL SUBPOENAS** with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Dated: December 7, 2018

/s/ Rohit K. Singla
Rohit K. Singla*
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 (Telephone)
(415) 644-6976 (Facsimile)
rohit.singla@mto.com

*Counsel for AbbVie Products LLC f/k/a Solvay Pharmaceuticals, Inc.*

* Practicing pursuant to this Court's Initial Case Management Order

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION** | **CASE NO. 1:09-CV-955-TWT** |
| **Plaintiff,** | |
| **v.** | |
| **ACTAVIS, INC., et al.,** | |
| **Defendants.** | |

**DECLARATION OF ROHIT K. SINGLA IN SUPPORT OF DEFENDANTS'
OPPOSITION TO FEDERAL TRADE COMMISSION'S MOTION FOR
PERMISSION TO SERVE NINE TRIAL SUBPOENAS**

I, Rohit K. Singla, declare:

1.       I am an attorney with the law firm of Munger, Tolles & Olson LLP, counsel for Defendant AbbVie Products LLC f/k/a Solvay Pharmaceuticals, Inc. ("Solvay") in the above-captioned matter.  I am duly licensed to practice law before the courts of the State of California and am allowed to appear before this Court pursuant to paragraph 5 of the Case Management Order.  I submit this declaration in support of Defendants' Opposition to Federal Trade Commission's Motion for Permission to Serve Nine Trial Subpoenas.  I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.

2.       Attached as Exhibit A is a true and correct copy of an excerpt of Title 15 of the United States Code, including 15 U.S.C. § 23.

3.       Attached as Exhibit B is a true and correct copy of the Complaint (ECF No. 11-1), in *FTC v. Sysco Corp.*, No. 15-cv-00256 (APM) (D.D.C. Feb. 20, 2015)

4.       Attached as Exhibit C is a true and correct copy of the Complaint (ECF No. 3), in *FTC v. Whole Foods Mkt., Inc.*, No. 07-cv-01021-PFL (D.D.C. June 6, 2007)

5.     Attached as Exhibit D is a true and correct copy of the Complaint (ECF No. 14-1), in *FTC v. Staples, Inc.*, No. 15-cv-02115-EGS (D.D.C. Dec. 9, 2015) (attached as Exhibit D)

6.     Attached as Exhibit E is a true and correct copy of the Amended Complaint (ECF No. 68), in *FTC v. Lundbeck, Inc.*, No. 08-cv-6379 (JNE/JJG) (D. Minn. Apr. 10, 2009).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of December 2018 at San Francisco, California.


/s/ *Rohit K. Singla*
Rohit K. Singla

# EXHIBIT A

Amendment by Pub. L. 98–443 effective Jan. 1, 1985, see section 9(v) of Pub. L. 98–443, set out as a note under section 5314 of Title 5, Government Organization and Employees.

### EFFECTIVE DATE OF 1959 AMENDMENT

Section 2 of Pub. L. 86–107 provided that: "The amendments made by section 1 [amending this section] shall have no application to any proceeding initiated before the date of enactment of this Act [July 23, 1959] under the third or fourth paragraph of section 11 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes', approved October 15, 1914 (38 Stat. 734, as amended; 15 U.S.C. 21) [this section]. Each such proceeding shall be governed by the provisions of such section as they existed on the day preceding the date of enactment of this Act."

### TRANSFER OF FUNCTIONS

For transfer of functions of Federal Trade Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 8 of 1950, § 1, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1264, set out under section 41 of this title.

## § 21a. Actions and proceedings pending prior to June 19, 1936; additional and continuing violations

Nothing herein contained shall affect rights of action arising, or litigation pending, or orders of the Federal Trade Commission issued and in effect or pending on review, based on section 13 of this title, prior to June 19, 1936: *Provided,* That where, prior to June 19, 1936, the Federal Trade Commission has issued an order requiring any person to cease and desist from a violation of section 13 of this title, and such order is pending on review or is in effect, either as issued or as affirmed or modified by a court of competent jurisdiction, and the Commission shall have reason to believe that such person has committed, used or carried on, since June 19, 1936, or is committing, using or carrying on, any act, practice or method in violation of any of the provisions of said section 13 of this title, it may reopen such original proceedings and may issue and serve upon such person its complaint, supplementary to the original complaint, stating its charges in that respect. Thereupon the same proceedings shall be had upon such supplementary complaint as provided in section 21 of this title. If upon such hearing the Commission shall be of the opinion that any act, practice, or method charged in said supplementary complaint has been committed, used, or carried on since June 19, 1936, or is being committed, used or carried on, in violation of said section 13 of this title, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and serve upon such person its order modifying or amending its original order to include any additional violations of law so found. Thereafter the provisions of section 21 of this title, as to review and enforcement of orders of the Commission shall in all things apply to such modified or amended order. If upon review as provided in said section 21 of this title the court shall set aside such modified or amended order, the original order shall not be affected thereby, but it shall be and remain in force and effect as fully and to the same extent as if such supplementary proceedings had not been taken.

(June 19, 1936, ch. 592, § 2, 49 Stat. 1527.)

### REFERENCES IN TEXT

Nothing herein contained, referred to in text, probably means nothing contained in act June 19, 1936, ch. 592, 49 Stat. 1526, popularly known as the Robinson-Patman Antidiscrimination Act and also as the Robinson-Patman Price Discrimination Act, which enacted sections 13a, 13b, and 21a of this title and amended section 13 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 13 of this title and Tables.

### TRANSFER OF FUNCTIONS

For transfer of functions of Federal Trade Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 8 of 1950, § 1, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1264, set out under section 41 of this title.

## § 22. District in which to sue corporation

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

(Oct. 15, 1914, ch. 323, § 12, 38 Stat. 736.)

### REFERENCES IN TEXT

The antitrust laws, referred to in text, are defined in section 12 of this title.

## § 23. Suits by United States; subpoenas for witnesses

In any suit, action, or proceeding brought by or on behalf of the United States subpoenas for witnesses who are required to attend a court of the United States in any judicial district in any case, civil or criminal, arising under the antitrust laws may run into any other district: *Provided,* That in civil cases no writ of subpoena shall issue for witnesses living out of the district in which the court is held at a greater distance than one hundred miles from the place of holding the same without the permission of the trial court being first had upon proper application and cause shown.

(Oct. 15, 1914, ch. 323, § 13, 38 Stat. 736.)

### REFERENCES IN TEXT

The antitrust laws, referred to in text, are defined in section 12 of this title.

## § 24. Liability of directors and agents of corporation

Whenever a corporation shall violate any of the penal provisions of the antitrust laws, such violation shall be deemed to be also that of the individual directors, officers, or agents of such corporation who shall have authorized, ordered, or done any of the acts constituting in whole or in part such violation, and such violation shall be deemed a misdemeanor, and upon conviction therefor of any such director, officer, or agent he shall be punished by a fine of not exceeding $5,000 or by imprisonment for not exceeding one year, or by both, in the discretion of the court.

(Oct. 15, 1914, ch. 323, § 14, 38 Stat. 736.)

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

**DISTRICT OF COLUMBIA**
441 4th Street, N.W.
Washington, DC 20001

**STATE OF CALIFORNIA**
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

**STATE OF ILLINOIS**
100 West Randolph Street
Chicago, IL 60601

**STATE OF IOWA**
1305 East Walnut Street
Des Moines, IA 50309

**STATE OF MARYLAND**
200 St. Paul Place, 19th Floor
Baltimore, MD 21202

**STATE OF MINNESOTA**
102 State Capitol
St. Paul, MN 55155

**STATE OF NEBRASKA**
2115 State Capitol
Lincoln, NE 68509

**STATE OF OHIO**
150 E. Gay Street, 23rd Floor
Columbus, OH 43215

**COMMONWEALTH OF PENNSYLVANIA**
14th Floor, Strawberry Square
Harrisburg, PA 17120

**STATE OF TENNESSEE**
500 Charlotte Avenue
Nashville, TN 37243

Civil Action No. 15-cv-00256 (APM)

**FILED UNDER SEAL
(PUBLIC VERSION)**

1

**COMMONWEALTH OF VIRGINIA**
900 East Main Street
Richmond, VA 23219

          Plaintiffs,

    v.

**SYSCO CORPORATION**
1390 Enclave Parkway
Houston, TX 77077-2099

       and

**USF HOLDING CORP.** and
**US FOODS, INC.**
9399 West Higgins Road, Suite 500
Rosemont, IL 60018

         Defendants.

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, and the District of Columbia; the States of California, Illinois, Iowa, Maryland, Minnesota, Nebraska, Ohio, and Tennessee; and the Commonwealths of Pennsylvania and Virginia (collectively, "Plaintiff States"), acting by and through their respective Attorneys General, petition this Court, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, for a temporary restraining order and preliminary injunction enjoining Sysco Corporation ("Sysco") from consummating its proposed merger (the "Merger") with USF Holding Corp. and US Foods, Inc. (together, "US Foods"). Absent such provisional relief, Sysco and US Foods (collectively, "Defendants") would be free to consummate the Merger after 11:59pm on March 2, 2015.

Plaintiffs require the aid of this Court to maintain the status quo during the pendency of an administrative proceeding on the merits scheduled to begin on July 21, 2015, which the Commission already has initiated pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45.  That administrative proceeding will determine the legality of the Merger, subject to judicial review by a federal Court of Appeals, and will provide all parties full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Merger.

## NATURE OF THE CASE

1.      This is an action to temporarily restrain and preliminarily enjoin the consummation of an anticompetitive merger between intense rivals, Sysco and US Foods. Defendants are—by a wide margin—the two largest broadline foodservice distributors in the United States and each other's closest competitor.  Sysco and US Foods are the only two broadline distributors with nationwide networks of distribution centers, making them the best options for customers with facilities spread across the country.  Defendants also compete fiercely with one another in numerous local areas to serve independent restaurants and other foodservice customers.  The vigorous head-to-head competition between Sysco and US Foods yields substantial benefits to customers in the form of lower prices, better service, and higher product quality.  The Merger would eliminate that competition and those benefits.  Indeed, Sysco characterizes the proposed merger as ██████████████████████████████ US Foods explained to its employees that it is ███████████████████████████████ ████████████████████████.  If consummated, the Merger threatens significant harm to a wide range of foodservice customers, who will be forced to absorb the increased costs and, in many cases, pass them on to consumers.

3

2.      Broadline foodservice distributors, or "broadliners," play a critical role in the
foodservice industry.  Broadliners sell and deliver food and related products to a variety of
foodservice operators, including restaurants, hospitals, hotels, school cafeterias, and other places
where people eat "food away from home."  Broadliners warehouse, sell, and distribute a "broad
line" of food and food-related products, including national-brand and private-label (i.e., their
own distributor-brand) products.  Because they can serve as a "one-stop-shop" for their
customers, broadliners are a vital, cost-effective source for most or all of a foodservice operator's
food and food-related products.  Foodservice operators depend on broadline foodservice
distributors for frequent and flexible delivery service (including next-day and emergency
delivery), high levels of customer service, product depth and breadth, and value-added services,
such as order tracking, menu planning, and nutrition analysis.

3.      Broadline foodservice distribution is distinct from other types of foodservice
channels, such as systems foodservice distribution, specialty foodservice distribution, and cash-
and-carry stores.  None of these other forms of distribution is reasonably interchangeable with, or
an adequate substitute for, broadline foodservice distribution because each lacks critical
attributes that customers of broadline distribution require and that broadline distributors offer.

4.      Defendants compete to provide broadline foodservice distribution services to a
wide variety of customers, ranging from single-location restaurants to national hotel chains and
other customers with locations dispersed throughout the country.  Single-location restaurants,
small local restaurant chains, and other local customers (also known as "street" customers)
purchase broadline distribution services (and distributed products) from broadliners with a
proximate distribution center, and typically without a contract.  Customers with numerous
facilities dispersed nationally or across multiple regions of the United States ("National

Customers"), such as national hotel chains, foodservice management companies, and group purchasing organizations ("GPOs"), typically purchase broadline foodservice distribution services (and distributed products) pursuant to contracts awarded through requests for proposal ("RFPs") or bilateral negotiations.

5.      National Customers have requirements that certain broadline foodservice distributors are best positioned to fulfill.  For example, because of administrative and cost efficiencies, among other reasons, National Customers require or typically contract with a broadline distributor that offers consistency of pricing, service, ordering, and products across all of their geographically dispersed locations, as well as efficient ordering and contracting processes.  As a result, many National Customers are most effectively served by a broadline foodservice distributor that has the capability to provide nationwide coverage.  Defendants are the only two single-firm broadline distributors that meet these requirements.  The only remaining options for National Customers are consortia of regional broadline distributors, such as Distribution Market Advantage ("DMA"), or an ad hoc region-by-region network of distributors, both of which have significant disadvantages and in some cases are not viable options.

6.      Defendants are the two major players in the market for broadline foodservice distribution services sold to National Customers.  This Merger would combine the two top choices—by far—for a significant number of National Customers and create a firm with a dominant share of the market.  Post-Merger, Sysco would control approximately 75% of the sales of broadline foodservice distribution services to National Customers.  *See* Figure 1, below.  The next-largest distributor has only 11% of this market.  Thus, the Merger would result in a post-Merger Herfindahl-Hirschman Index of 5,836 and an increase in concentration of 2,800 in this market.

FIGURE 1: ESTIMATES OF BROADLINE MARKET SHARES FOR NATIONAL CUSTOMERS



7.     Under the relevant case law and the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), the extraordinarily high post-Merger market share, the market-concentration level, and the increase in concentration in the market for broadline foodservice distribution services sold to National Customers render the Merger presumptively unlawful.

8.     Defendants also compete vigorously with one another for the business of local customers (i.e., customers, such as independent restaurants or other "street" accounts, with a single location or a few locations geographically concentrated in a single local area).  In numerous local markets, the Merger would combine the two largest—and in certain local markets the only two meaningful—broadline distributors.  Local markets in which the Merger would substantially lessen competition include the local markets listed in Appendix A. Defendants' post-Merger market share would be 50% or higher in at least 32 local markets

across the country and result in significant increases in concentration in already concentrated markets. In each of those 32 local markets in the United States, the Merger is presumptively unlawful under the relevant case law and the Merger Guidelines.

9. For both National Customers and local customers in numerous local markets, Sysco and US Foods are unambiguously each other's closest competitor. Unmatched by other broadline distributors, Defendants possess similarly vast networks of distribution centers, salesforces, fleets of delivery trucks, and other competitive advantages. US Foods' own strategic planning documents recognize the ███████████████████████████████████ ████████████████████████████████████ Customers use this interchangeability to play one off the other to obtain lower pricing and better terms. Indeed, Sysco and US Foods frequently lower prices, increase discounts, and offer financial and other incentives to keep customers from using the other distributor and to take business away from each other.

10. Sysco and US Foods are the two best and most often used options for National Customers. In fact, some National Customers consider Defendants the only viable options for their broadline distribution needs. Regional consortia and ad hoc region-by-region networks have many significant disadvantages—including limited geographic footprints, inconsistent product offerings and pricing, higher costs, and logistical and coordination challenges— compared to the only integrated national broadline distributors, Sysco and US Foods. Because of these disadvantages, these regional consortia and ad hoc networks are of limited competitive significance compared to Sysco and US Foods, which is borne out in these distributors' minimal shares of sales to National Customers, as Figure 1 above demonstrates. Thus, the Merger would eliminate competition between the two largest, most significant, and most attractive alternatives

for National Customers, leaving them with only significantly less effective—if not inadequate— alternatives (i.e., regional consortia and ad hoc regional networks). These alternatives cannot constrain the post-Merger Sysco. Thus, Sysco will be able to charge supracompetitive prices— that is, charge higher prices or offer fewer discounts and other financial incentives to National Customers relative to what it could charge if faced with competition from US Foods—and it will have a diminished incentive to maintain or improve quality for these customers.

11. Sysco and US Foods are also the two best options for customers in many local markets. Defendants command the number one and number two positions among broadline distributors in many local markets because of their proximate distribution centers, vast salesforces, broad product offerings, value-added services, large truck fleets, scale, and other competitive advantages. Combined, Defendants will dominate the local markets alleged in Appendix A. Thus, the Merger would eliminate competition between the two largest, most significant, and most attractive alternatives for many local customers. Other broadline distributors in these local markets cannot constrain the merged Sysco / US Foods. Thus, Defendants will have the ability to charge supracompetitive prices to, and will have a diminished incentive to maintain or improve quality for, local customers.

12. Defendants' plan to divest 11 of US Foods' distribution centers to Performance Food Group ("PFG") (the "Proposed Divestiture"), announced on February 2, 2015, does not remedy the competitive harm caused by the Merger because it does not restore the competition lost by eliminating US Foods as an independent competitor. Adding 11 distribution centers to PFG's current footprint will not replace the competition lost for National Customers because PFG still will lack (i) the necessary geographic coverage to serve National Customers, and (ii) the capacity, operational efficiencies, reputation, product breadth, and industry-specific

expertise to compete with the merged Sysco / US Foods as effectively as US Foods competes with Sysco today. The Proposed Divestiture also does not address the competitive harm caused by the Merger in many local markets. Therefore, the Proposed Divestiture is inadequate and does not prevent the substantial competitive harm caused by the Merger.

13.    Defendants cannot show that new entry or expansion by existing distributors would be timely, likely, or sufficient to counteract the anticompetitive effects of the Merger. Significant barriers to entry into broadline distribution exist in both the national market and many local markets, making entry or expansion difficult and incapable of constraining the merged entity.

14.    Defendants cannot show cognizable efficiencies that would offset the likely and substantial competitive harm from the Merger.

15.    On February 19, 2015, by a 3-2 vote, the Commission found reason to believe that the Merger would violate Section 7 of the Clayton Act and Section 5 of the FTC Act by substantially reducing competition, leading to higher prices and lower quality.

16.    A temporary restraining order enjoining the Merger is necessary to preserve the Court's ability to afford full and effective relief after considering the Commission's application for a preliminary injunction. Preliminary injunctive relief is imperative to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding. Allowing the Merger to proceed would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Merger if it is ultimately found unlawful after a full trial on the merits and any subsequent appeals.

## JURISDICTION AND VENUE

17.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345.

This is a civil action arising under Acts of Congress protecting trade and commerce against

restraints and monopolies, and is brought by an agency of the United States authorized by an Act

of Congress to bring this action.

18.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

> Whenever the Commission has reason to believe –
>
>> (1) that any person, partnership, or corporation is
>> violating, or is about to violate, any provision of law
>> enforced by the Federal Trade Commission, and
>>
>> (2) that the enjoining thereof pending the issuance of a
>> complaint by the Commission and until such complaint
>> is dismissed by the Commission or set aside by the
>> court on review, or until the order of the Commission
>> made thereon has become final, would be in the interest
>> of the public – the Commission by any of its attorneys
>> designated by it for such purpose may bring suit in a
>> district court of the United States to enjoin any such act
>> or practice. *Upon a proper showing that weighing the
>> equities and considering the Commission's likelihood of
>> ultimate success, such action would be in the public
>> interest*, and after notice to the defendant, a temporary
>> restraining order or a preliminary injunction may be
>> granted without bond . . . . (emphasis added)

19.     In conjunction with the Commission, the Plaintiff States bring this action for a

preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and

restrain Sysco and US Foods from violating Section 7 of the Clayton Act, 15 U S C § 18,

pending the Commission's administrative proceeding.  The Plaintiff States have the requisite

standing to bring this action because the Merger would cause antitrust injury in the markets for

broadline foodservice distribution services sold to customers in their states.

20.    Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.  Defendants also are, and at all relevant times have been, engaged in commerce in each of the Plaintiff States.

21.    Defendants transact substantial business in the District of Columbia and are subject to personal jurisdiction therein.  Venue, therefore, is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

## THE PARTIES AND THE PROPOSED MERGER

22.    Plaintiff, the Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, DC 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C § 45.

23.    The Plaintiff States, by and through their respective Attorneys General, bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 in their sovereign or quasi-sovereign capacities as *parens patriae* on behalf of the citizens, general welfare, and economy of each of their states.

24.    Defendant Sysco is a publicly traded corporation organized under the laws of Delaware with headquarters in Houston, Texas.  Sysco is the largest North American distributor of food and related products primarily to the foodservice industry.  Sysco distributes food and related products and provides services to approximately 425,000 customers across the United States, including independent restaurants, healthcare and educational facilities, lodging

establishments, and other foodservice customers. In its fiscal year 2014, Sysco generated sales of $46.5 billion.

25.     Defendant Sysco operates through three business divisions: Broadline; SYGMA, which provides "systems" (also known as "custom") foodservice distribution services; and "Other," which is a division that provides, among other things, specialty produce distribution. Sysco's Broadline division includes 72 distribution centers in the United States that distribute a full line of food and related products to foodservices operators. SYGMA distributes a more limited set of food and related products to certain large chains, primarily quick-service restaurants. In fiscal year 2014, the breakdown of total Sysco sales by division was approximately 81% Broadline, 13% SYGMA, and 6% Other.

26.     Defendant US Foods, Inc. is a privately held corporation based in Rosemont, Illinois, and incorporated under the laws of Delaware. US Foods, Inc. is a wholly owned subsidiary of Defendant USF Holding Corp., which is owned and controlled by investment funds associated with or managed by Clayton, Dubilier & Rice, Inc., and KKR & Co., L.P.

27.     Defendant US Foods Holding Corp. is the second-largest distributor of food and food-related products in the United States. US Foods Holding Corp. operates 61 distribution centers from which it provides broadline distribution services throughout the United States. In its fiscal year 2013, US Foods Holding Corp. generated approximately $22 billion in sales to more than 200,000 customers nationwide.

28.     On December 8, 2013, Sysco and US Foods signed a definitive merger agreement ("Merger Agreement"), pursuant to which Sysco would acquire all shares of US Foods in a transaction valued at $8.2 billion. The Merger Agreement expires on September 8, 2015.

29.     Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, and a timing agreement between Defendants and Commission staff, unless enjoined by this Court, Defendants would be free to consummate the Merger after 11:59pm on March 2, 2015

30.     On February 19, 2015, by a 3-2 vote, the Commission found reason to believe that the Merger would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C § 45, by substantially lessening competition.  That same day, the Commission commenced an administrative proceeding on the antitrust merits of the Merger before an Administrative Law Judge, with the merits trial scheduled to begin on July 21, 2015. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  *See* 16 C.F.R. § 3.41 (2014). The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

31.     In authorizing the filing of this complaint in this Court, the Commission has determined that (1) it has reason to believe the Merger would violate the Clayton Act and the FTC Act by substantially lessening competition in one or more lines of commerce, and (2) an injunction of the Merger pending the resolution of the Commission's administrative proceedings and any appeals will promote the public interest, so as to minimize the potential harm to customers and preserve the Commission's ability to order an adequate remedy if it concludes, after the hearing, that the Merger is unlawful.

## RELEVANT MARKETS

### A.     Relevant Product Markets

32.     Broadline foodservice distribution entails the warehousing, sale, and distribution of a wide range of product categories and a variety of products within those categories, along

with high levels of customer service and value-added services. Broadline foodservice distribution is not reasonably interchangeable with other forms of food distribution (e.g., systems or specialty distribution); it is distinguished by a number of key factors, including but not limited to:

a. <u>Product Breadth and Depth</u>: Customers of broadline distributors demand, and broadline distributors offer their customers, a distinct combination of products that other distribution channels do not offer. This combination includes a broad array of stock keeping units ("SKUs") in many different product categories, including canned and dry goods, dairy, meat, poultry, produce, seafood, frozen foods, beverages, and related products, such as chemicals, equipment, and paper goods. Carrying products in all of these categories—and a wide variety of SKUs within each category—allows broadline distributors to satisfy customer demand for product breadth and depth that is unavailable through any other channel of distribution.

b. <u>Private-Label Products</u>: Foodservice customers often demand, and broadline distributors typically carry, a broad selection of private-label (i.e., distributor-branded) food and food-related products that are typically lower cost than branded items.

c. <u>Customer Service</u>: Customers demand, and broadline foodservice distributors typically provide, high levels of customer service, a frequent and flexible delivery schedule (including next-day and emergency deliveries), and other value-added services, such as order tracking, menu planning, and nutritional information.

33.     Reflecting customer demands, these key distinguishing characteristics, among others, make broadline foodservice distribution a distinct relevant product market.  For example, broadline distributors tend to have significantly larger product portfolios and salesforces than other types of distributors, including systems and specialty distributors.  Broadliners tend to use distribution centers specifically for broadline distribution, and broadline distribution centers tend to be larger than distribution centers used for systems and specialty distribution.  Moreover, because a different set of competitors provides broadline foodservice distribution than provides systems and specialty distribution, respectively, the competitive conditions for broadline foodservice distribution differ from other types of distribution.

34.     When determining their pricing, broadline foodservice distributors primarily consider the pricing of other broadline foodservice distributors, with other forms of distribution playing no significant role.

35.     Other foodservice channels—namely, systems foodservice distribution, specialty foodservice distribution, and brick-and-mortar cash-and-carry stores—are not in the relevant product market.  The competitive conditions in each of these channels are distinct from broadline distribution because different sets of distributors compete to provide each service.

36.     Systems foodservice distribution is not reasonably interchangeable with, or an adequate substitute for, broadline foodservice distribution.  Customers that require broadline distribution services cannot use systems distribution because systems distributors do not provide the necessary breadth of products, customer service, delivery frequency, and proximity to customer locations (due to their typically sparser networks of distribution centers).  Notably, Sysco's SYGMA division is a distinct business unit dedicated to systems distribution.  Other

distinguishing features of systems distribution versus broadline distribution include the following:

a.   Systems distributors primarily service large chain quick-service restaurants that develop restaurant-proprietary food products with food manufacturers and contract for most of their food products directly with those manufacturers. As a result, systems customers demand, and systems distributors typically provide, only warehousing and distribution services, and systems distributors do not themselves sell food.

b.   Systems distributors have significantly fewer salespeople, carry a limited number of SKUs, have significantly smaller distribution centers, lack distributor-branded private-label offerings, make larger and less flexible deliveries, travel greater distances to reach customers, and offer fewer value-added services.

c.   Because of systems distributors' infrastructure and business model, customers need to be a certain minimum size and scale for systems distributors to consider taking on their business, which alone eliminates systems distribution as an option for virtually all local customers.

37.   Specialty foodservice distribution is not reasonably interchangeable with, or an adequate substitute for, broadline foodservice distribution. Specialty distributors focus on one or a small number of product categories, such as produce or seafood. As a result, compared to broadline distributors, specialty distributors have limited product breadth (i.e., they carry fewer SKUs), have a smaller delivery fleet, employ fewer salespeople, often offer higher quality or unique products, typically charge higher prices, and have significantly smaller distribution

centers.  Although some customers of broadline distribution services also use specialty
distributors to complement their broadline distributor, customers could not cost effectively or
practicably buy the majority, much less all, of their foodservice products from specialty
distributors.  Notably, Sysco operates multiple specialty distribution businesses separately from
its broadline distribution business.

38.     Cash-and-carry stores, such as Restaurant Depot and club stores like Costco and
Sam's Club, are not reasonably interchangeable with, or an adequate substitute for, broadline
distribution services.  The primary reason is that the vast majority of cash-and-carry stores do not
deliver.  Customers have to shop for and transport the food themselves, which is resource-
intensive and impracticable for most customers, including because customers typically do not
own refrigerated trucks to transport food.  To the extent they use cash-and-carry stores at all,
foodservice customers generally use such stores only for limited purposes, such as filling a
temporary item shortage or when their purchase volumes are so low that they cannot use
broadline distribution services.  Furthermore, cash-and-carry stores lack a number of attractive
features that are important to customers of broadline distribution services, including:  product
breadth, sufficient product quality, the option to make purchases at multiple cash-and-carry
locations on the same customer account (i.e., centralized purchasing), discounted contract
purchasing, and the consistent availability of products across all facilities.  Consequently, cash-
and-carry stores are not a reasonable alternative to broadline distribution for many customers and
are not an option for National Customers.

39.     Broadline foodservice distributors are not meaningfully constrained competitively
by systems distributors, specialty distributors, or cash-and-carry stores.  As such, an insufficient
number of customers of broadline distribution services would switch to other distribution

channels or brick-and-mortar stores to render a small but significant and non-transitory increase in the price of broadline foodservice distribution services unprofitable for a hypothetical monopolist of such services.

40.    Accordingly, broadline foodservice distribution services is a relevant product market.

41.    National Customers are a distinct set of customers for broadline foodservice distribution services because their contracting and service requirements are substantially different from local broadline customers.  National Customers include—but are not limited to— GPOs consisting of nationally dispersed members, such as hospitals, nursing homes, and other institutions; foodservice management companies that operate cafeterias and other venues nationwide; and hotel and restaurant chains with locations dispersed throughout the United States.

42.    National Customers centrally negotiate their contracts with broadline foodservice distributors, but they place orders from, and require delivery to, multiple geographically dispersed locations.  Due to that geographic dispersion, National Customers typically contract with a broadline foodservice distributor that has distribution centers proximate to all (or virtually all) of their locations.  In addition, National Customers typically contract with a broadliner that can provide—across all of their locations—product consistency and availability, efficient contract management and administration (e.g., centralized ordering and reporting, a single point of contact, and consistent pricing across all locations), volume discounts from aggregated purchasing, and the ability to expand geographically with the same broadline foodservice distributor.  Accordingly, many National Customers typically contract with a broadline foodservice distributor that is national in scope.  A hypothetical monopolist of broadline

foodservice distribution services sold to National Customers could profitably impose a small but significant price increase on such distribution services to make such a price increase profitable.

43.     Defendants distinguish between National Customers and local customers in the ordinary course of business.  Defendants' documents describe the distinct requirements of "National Customers" as including, among other needs, "efficient ordering across multiple locations," "consistency of service, pricing, and products across multiple markets," a "large number" of foodservice SKUs, and ███████████████████ US Foods describes "National Accounts" as "[c]ontracted customers located across the country."

44.     Thus, broadline foodservice distribution services sold to National Customers is a second relevant product market in which to analyze the Merger's likely effects.

### B.     Relevant Geographic Markets

45.     Defendants compete for the sale of broadline foodservice distribution services to National Customers and local customers.  Accordingly, it is appropriate to analyze the competitive effects of the Merger in a national market and in the local markets in which Defendants compete.

#### 1)     The United States

46.     Defendants compete to provide broadline foodservice distribution to National Customers through a network of distribution centers strategically located around the country to serve locations throughout the continental United States.

47.     National Customers are customers that operate or manage a number of locations dispersed nationwide or across multiple regions of the United States.  As a result, National Customers require a geographically dispersed network of distribution centers to serve their facilities.  A substantial number of National Customers also choose their broadliner based on its ability to provide centralized and consistent services and terms across their facilities, including:

(1) centralized contracting, (2) consistent pricing and terms, (3) a single point of contact, (4) consistent product availability, (5) a single reporting/auditing function, (6) efficient administration of the broadline distribution contract, and (7) volume discounts from aggregating purchases. Additionally, National Customers typically contract with a distributor that has a geographically dispersed network because it allows the National Customer to add facilities in new locations without having to contract with a new broadliner.

48.     Defendants, other broadline distributors, customers, and other industry participants recognize the existence of a national market for broadline foodservice distribution services. For example, Defendants refer to themselves as the only two national broadline foodservice distributors, structure their corporate organizations to compete for and service National Customers specifically, and promote themselves to customers as "national" distributors. Notably, several regional distributors formed a consortium (DMA) in an effort to serve National Customers on a national basis. Furthermore, Defendants engage in national planning for National Customers and deal with National Customers' multistate businesses on the basis of nationwide contracts that include, among other nationwide terms, pricing schedules that apply nationwide.

49.     Therefore, for broadline distribution services sold to National Customers, the United States is the relevant geographic market.

**2)      Local Markets**

50.     For customers with a single location or a few locations geographically concentrated in a single local area, broadline foodservice distribution competition occurs on a local level. Local customers of broadline services require proximity to distribution centers because they often need frequent or next-day deliveries (often at specific delivery times),

fulfillment of emergency orders, quick replacement of broken or missing products, and high levels of customer service.

51.     Broadline distributors typically generate the majority of their local business from customers located within approximately 100 miles of their distribution centers.  Broadline distributors deliver from distribution centers that are geographically proximate to their customers because it is more cost-effective and profitable to have dense delivery routes, and regulations limit the number of hours a driver of a delivery truck can spend on the road.  Moreover, Defendants and other broadline distributors have field salesforces dedicated to serving customers in local areas.

52.     Because it is necessary, or at least highly advantageous, for distribution centers to be close to customer locations, foodservice industry participants—including Defendants, other broadline distributors, and customers—generally recognize local areas or individual geographic regions as distinct markets.  Each of the localized areas in which Defendants compete with one another to provide broadline foodservice distribution services constitutes a relevant geographic market.

53.     It is appropriate to analyze the proposed Merger's competitive effects in the numerous local markets in which Sysco and US Foods compete against one another.  Under the Merger Guidelines, when suppliers can price discriminate (i.e., charge different prices) based on the location of customers, it can be appropriate to define geographic markets around the region into which sales are made to customers.  Because Sysco and US Foods can price discriminate based on customers' locations, relevant local markets here are defined as the overlapping trade areas of the Defendants' distribution centers (i.e., the locations of the local customers that could be served by both Defendants' distribution centers).  These overlapping trade areas constitute

relevant markets because they are the areas where the Defendants currently compete against each other and where the Merger would eliminate competition.

54. For illustration, the overlapping trade areas of Sysco and US Foods in Las Vegas, Nevada, constitute a relevant local geographic market for purposes of analyzing the effects of the proposed transaction. Sysco and US Foods both have distribution centers, sales representatives, and support infrastructure in Las Vegas. Defendants can price discriminate against customers in Las Vegas because the customers' broadline distribution alternatives are limited to the set of broadline distributors that could serve Las Vegas.

55. For purposes of analyzing the effects of the proposed Merger on local customers, the relevant geographic markets in which harm is likely to result are those local markets identified in Appendix A.

## MARKET STRUCTURE AND THE MERGER'S PRESUMPTIVE ILLEGALITY

56. Sysco and US Foods are the only two broadline distributors with a truly nationwide presence. Post-Merger, the combined entity would have a dominant share of sales to National Customers and to customers in numerous local markets. In addition, the Merger would greatly increase concentration in already highly concentrated markets. Therefore, under the relevant case law and the Merger Guidelines, the Merger is presumptively unlawful.

### A.     Market Structure and Concentration—National Market

57. The Merger Guidelines and courts measure concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumptively illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

58.     In the market for broadline distribution services sold to National Customers—including sales by regional distributors (via consortia or individually) to National Customers—the parties control the vast majority of sales and the market is highly concentrated.  Post-Merger, Sysco would control 75% of this relevant market.  *See* Table 1, below.  The next largest competitor would possess only about 11% of the market.  Post-Merger, the market would be substantially more highly concentrated than it is today.  The Merger would result in a post-Merger HHI of 5,836 and an increase in concentration of 2,800 points, or 14 times the increase necessary to establish a presumption of competitive harm.

TABLE 1:  ESTIMATES OF MARKET SIZE AND SHARE:  SALES TO NATIONAL CUSTOMERS

|  | 2013 National Revenues ($B) | Share | Pre-Merger HHI | Post-Merger HHI |
|---|---|---|---|---|
| *Sysco* | | *40%* | *1,600* | |
| *US Foods* | | *35%* | *1,225* | |
| Combined Post-Merger | | 75% | | 5,625 |
| DMA | | 11% | 121 | 121 |
| PFG | | 5% | 25 | 25 |
| Unipro/MUG | | 1% | 1 | 1 |
| Others[1] | | 8% | 64 | 64 |
| **Total Market** | | | **3,036** | **5,836** |
| | | | **Change in HHI:** | **2,800** |

Based on the combined shares, market concentration, and increase in concentration, the Merger is presumptively illegal under the relevant case law and Merger Guidelines.

## B.     Market Structure and Concentration—Local Markets

59.     The competitors in each local market are the firms currently selling broadline distribution services into the relevant geographic market or firms to which customers could practicably turn for broadline foodservice distribution.  Firms that compete in the local market

---

[1] Others include Ben E. Keith Company ("BEK"); Food Services of America ("FSA"), a part of Services Group of America ("SGA"); Gordon Food Service ("GFS"); HPC Foodservice, Inc. ("HPC"); Jacmar Foodservice Distribution ("Jacmar"); Labatt Food Service ("Labatt"); Maines Paper & Food Service, Inc. ("Maines"); Merchants Foodservice ("Merchants"); Nicholas and Company ("Nicholas"); Reinhart Foodservice L.L.C. ("Reinhart"); and Shamrock Foods ("Shamrock").

may be located outside the boundaries of a geographic market, as long as they currently provide, or could rapidly provide, broadline distribution services into the specified local market.

60.     Sysco and US Foods are the two largest competitors in most local markets across the country.  In 32 local markets in which Sysco and US Foods compete head-to-head, Sysco's post-Merger market share in the sale of broadline foodservice distribution services would be 50% or higher.  All of these markets would be highly concentrated after the Merger (HHIs between 2,997 and 10,000) with large increases in concentration (HHI increases between 1,053 and 3,695).  For example, in Columbia/Charleston, South Carolina, the post-merger HHI would increase by 2,264 to 5,731.

61.     Therefore, the Merger is presumed likely to create or enhance market power—and is presumptively illegal—in each of those local markets.  Appendix A provides a list of these 32 local geographic markets, Defendants' combined market shares, HHI levels, and the increases in concentration.

## ANTICOMPETITIVE EFFECTS:  THE MERGER WOULD ELIMINATE VITAL HEAD-TO-HEAD COMPETITION BETWEEN SYSCO AND US FOODS

62.     The Merger would eliminate significant direct, head-to-head competition between Defendants, the two largest broadline foodservice distributors in both the national market and the local markets alleged herein.  Customers ranging from the corner diner to hospital and nursing home cafeterias to hospitality venues—and all of the diners who eat at these and hundreds of thousands of other venues—benefit substantially from the competition between Sysco and US Foods in the form of lower prices, better service, and higher product quality.  By eliminating vigorous competition between Sysco and US Foods, the Merger would significantly reduce these

benefits, harming businesses that offer food away from home and, ultimately, their end consumers.

A.     **The Merger Would Likely Harm Competition for National Customers**

63.     Defendants are each other's closest competitor and by far the largest providers of broadline distribution services to National Customers.  They are the only two single-firm broadline distributors with national geographic reach and, as such, are best positioned to serve National Customers.  Sysco and US Foods both offer to National Customers what no other distributor can offer:  a national footprint with more than 60 distribution centers each; correspondingly large truck fleets and salesforces; greater product breadth and depth than any other competitor, including private-label products; and significant value-added offerings, such as order tracking, menu planning, and nutritional information.  The scale of Sysco and US Foods— including their distribution networks, warehouse capacity, truck fleet, employees, and revenues—is similar to each other and dwarfs the next-largest broadline distributor (a regional broadline distributor).  *See* Table 2, below.

TABLE 2: COMPARISON OF DISTRIBUTORS' BROADLINE CAPABILITIES[2]

| Distributor | Broadline Sales ($B)[3] | Broadline DCs | Broadline Sq. Ft. | Broadline Salesforce | Truck Fleet Size |
|---|---|---|---|---|---|
| Sysco | | 72 | | | |
| US Foods | | 61 | | | |
| *Combined* | | *133* | | | |
| PFG | | 24 | | | |
| Gordon | | | | | |
| Reinhart | | | | | |
| DMA[4] | | | | | |
| Ben E. Keith | | | | | |
| FSA | | | | | |
| Shamrock | | | | | |
| Cheney Bros. | | | | | |
| Labatt | | | | | |
| Maines | | | | | |
| Merchants | | | | | |
| Nicholas | | | | | |
| Cash-Wa | | | | | |
| Jacmar | | | | | |
| Pate Dawson | | | | | |
| HPC | | | | | |

64.     As the only two broadline distributors with national scale, Sysco and US Foods are most often the first and second choices for National Customers. Indeed, Defendants predominantly win National Customers from, and lose National Customers to, each other.

65.     Defendants compete aggressively on price and non-price terms to win national broadline business from each other. Sysco and US Foods frequently respond to competing bids or offers from the other by lowering prices to customers. Price competition between Defendants

---

[2] The figures in Table 2 include totals for each distributor (i.e., their entire business) and are not limited to sales to National Customers or distributions assets / personnel dedicated to National Customers. Because the figures in Table 2 include these distributors' local sales / business, they greatly overstate their presence in market for the sale of broadline distribution services to National Customers.

[3] For all distributors other than Defendants, the "Broadline Sales ($B)" column reflects all sales (including sales of systems foodservice distribution) made from any distribution center that had broadline sales. Therefore, these figures overstate the broadline sales totals of multiple non-Defendant distributors to the extent that they service non-broadline (e.g., systems) customers from broadline or hybrid distribution centers.

[4] The number of broadline distribution centers, broadline square footage, and trailer figures for DMA reflect the total distribution assets of DMA's members (BEK, FSA, GFS, HPC, Jacmar, Maines, Nicholas, Reinhart, and Shamrock). The broadline sales and total salesforce figures reflect actual DMA numbers.

includes lowering list prices, reducing margins, eliminating fuel surcharges, and providing
significant cash incentives to win or keep National Customer accounts.

66.     National Customers benefit from the competition between Defendants because it
enables them to pit Sysco and US Foods against each other to obtain lower prices and better
terms.  National Customers switch, or threaten to switch, their business from Sysco to US Foods,
and vice versa, to obtain better prices, discounts, cash incentives, favorable service concessions,
and other beneficial terms.

67.     The following are just a tiny fraction of the examples of direct price competition
between Sysco and US Foods for National Customers:

    a.   In competition with Sysco for the business of ██████████████
          , US Foods internally recognized that "Sysco will 'come hard' after
        [ ]██████ . . . . Only 'true' options for . . . ██████ is either Sysco or
        USF[.]  The regional players will bid, but not be seriously considered."  In
        response to the competition from Sysco, US Foods "offer[ed] an ██████
        ██████ reduction from [its] current program margin for a ████████████
        ████████ .  The total annualized investment would be approx. ██████
        at current sales levels.  This [was] an aggressive bid that [US Foods]
        expect[ed] to be competitive.  That said, US Foods expect[ed] that Sysco
        [would] present an even more aggressive offer."

    b.   ████████████████████████████ , issued an RFP for broadline
        foodservice distribution services in ██████  During the RFP process,
        ██████████ used US Foods as "leverage" to obtain a better offer from Sysco, a
        ██████████ incumbent supplier.  In particular, after Sysco submitted its initial
        proposal, "██████████ asked for further enhancement of [Sysco's] offer in
        order to keep USF out of the mix.  ██████████ was getting a lot of pressure
        from ██████████ to add USF."
        ██████ felt that ████████████████████████████████████████
        ████████████████████████████████████████████████ recently
        testified that ████████████████████████████████████████
        ██████████ According to ██████████ , other
        distributors could not provide ██████████ because
        Sysco ████████████████████████████████████
        ██████████ The year after ██████████ awarded
        its contract to Sysco, Sysco noted that ██████████████████████████
        ████████████████████████████████████████████ in order
        to keep USF from being made an approved distributor."

c. Sysco won the business of ████████████████████████, even though US Foods "put a lot on the table" to win the business. ████████ was able ████████ due to the presence of US Foods ████████

d. ████████████████████████, informed Sysco that it was "priced significantly higher ████████ vs [US Foods] as [████████ was] analyzing ████████," and ████████ was "going to send [Sysco] ████████ to see what [Sysco could] do to lower [its] price."

e. In response to a bid from US Foods, "Sysco made 'concessions' to their current agreement in order to maintain [the] business of ████████, a fast casual ████ restaurant.

f. In response to competition from US Foods, Sysco reduced the prices it offered to ████████, a restaurant with locations dispersed throughout the United States. ████████ then took Sysco's reduced offer and "asked [US Foods] to move the transition [bonus] from ████ to ████ which [would] be more in line with Sysco." US Foods agreed to the increased transition bonus, after which ████ asked Sysco "to match [US Foods'] offer of [a] ████ signing [bonus] to keep [the business]."

g. ████████, a ████ restaurant with locations throughout the country, used an offer from US Foods as leverage to get a better deal from Sysco, which "matched [US Foods'] offer and provided a ████ signing incentive." US Foods had offered a ████ signing bonus.

h. In the face of competition from US Foods, Sysco retained the business of ████████, a ████ restaurant with locations in various places throughout the country, by "lowering the current [prices] and offering a ████ stay bonus."

i. As the competition with US Foods was "heating up" for ████, a ████ with several locations across the country, Sysco "put up ████████ for [████] business (for ████████) and matched [US Foods'] margins."

68. Defendants themselves also recognize the intensity of the price competition between them. For example, upon learning of another aggressive Sysco bid aimed at luring a National Customer away from US Foods, ████████████████████████████ ████████████████████████████████████████████ US Foods has shown itself game for the battle. As US Foods' ████████████ wrote after the Merger was announced, ████████████████████████████████████████ That

28

sentiment was shared by industry analysts at ███████████████████████████
███████████████████████████████. In April 2012, ████████████ reported ████████████
that ███████████████████████████████████████████████████████████████████
██████

69.     The Merger would eliminate this pervasive and significant head-to-head competition for National Customers' business.  Post-Merger, Sysco would face significantly less meaningful competition than it does today with US Foods, which is the only broadline foodservice distributor with the geographic scope and other resources that comes close to matching Sysco.  Consequently, Sysco will not need to compete as aggressively on price to win business from National Customers and, thus, will be able to price at supracompetitive levels.

70.     Sysco and US Foods also compete aggressively on non-price terms to win National Customers by offering high-quality products and services.  Defendants currently risk losing business to each other if customers perceive one company's products and service inferior or lacking.  Defendants improve and expand their product lines and services to compete with, and win customers from, each other. ███████████████████ observed that, ███████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████     After the Merger, Sysco would face substantially less competition for National Customers and, correspondingly, would have less incentive to improve, or even maintain, its current level of products or service to win or keep business.

71.     Regional broadline distributors and distribution consortia do not meaningfully constrain Defendants today.  They will be even less able to do so post-Merger when Sysco will be dominant.  These broadline distributors' paltry market shares of sales to National Customers

compared to Defendants' shares show their insignificance. US Foods itself recognized, when referring to two of its largest National Customers, that those customers' only █████ options are ████████████████████████████████████████████████████████████████████

USF internally expressed the same sentiment about competition from regional players after announcement of the Merger: ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████

72.     Contracting separately with multiple distributors region-by-region (without using a consortium) is even less attractive than working with a consortium—in many cases, it is impracticable—for the same reasons. As one National Customer emphasized to US Foods shortly before the Merger announcement, it needs a ████████████████████████ ██████████████████████████ because contracting with multiple regional broadline distributors is ████████ with a ██████████████████

**B.     The Merger Would Likely Harm Competition for Local Customers**

73.     Sysco and US Foods are each other's closest competitor across a range of competitively significant attributes in the relevant geographic markets. Defendants have greater product breadth, broader private-label product portfolios, and more value-added services than local and regional broadline distributors. Sysco and US Foods also generally have larger distribution centers, more sales representatives, and more trucks than other local and regional broadline distributors. *See* Table 2, *supra*.

74.     While regional broadline distributors are present to varying degrees in various local markets, Sysco and US Foods are the two largest—often by far—broadline distributors in the relevant geographic markets. Sysco views itself as ████████████████████████████

███████████████   US Foods believes that it has the ██████████████████████████

███████

75.     Sysco and US Foods compete intensely for customers in the relevant geographic

markets, to the direct benefit of customers.  On a daily basis in these local markets, Sysco and

US Foods compete most fiercely with each other, offering lower prices, upfront payments, and

other financial incentives to win business from each other.  ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

76.     Eliminating the significant head-to-head competition between Defendants would

lead to supracompetitive prices, reduced product offerings, and diminished product quality and

service for customers in the relevant geographic markets.  In describing the post-Merger world,

one local customer stated that his restaurant would ███████████████████████████████

Another local customer likened post-Merger competition between regional broadline distributors

and the merged Sysco / US Foods to ██████████████████████████   Indeed, ██

████████████████████████████████████████   was excited about the Merger because it

████████████████████████████████████   and ████████████████████████████

█████████

## LACK OF COUNTERVAILING FACTORS

77.     Defendants cannot demonstrate that new entry or expansion by existing firms

would be timely, likely, or sufficient to offset the anticompetitive effects of the Merger.  A firm

seeking to enter or expand in the market for broadline foodservice distribution to National Customers would face significant barriers to success. Creating a national broadline distribution network anywhere close to that offered by Sysco or US Foods would be time and resource intensive. As █████████████ internally concluded, US Foods and Sysco have a █████ ████████████████ that is insulated because █████████████████████ ████████████████████████████████████████████████████████ █████████████████

78.     Expansion by regional firms or networks likewise would face serious obstacles and would not prevent or remedy the Merger's likely anticompetitive effects for National Customers. One key obstacle is having the geographic footprint to serve National Customers. All other broadline foodservice distributors have far fewer distribution centers than either Defendant does. The next-largest broadline distributor after the Defendants, PFG, currently has 24 distribution centers compared to the 61 that US Foods operates and the 72 that Sysco operates today. Thus, other broadline distributors are many years and significant capital investments away from being in a position to replace the competition currently provided by US Foods, even assuming they were likely to expand their geographic footprints.

79.     In local markets, broadline distributors also face significant obstacles to entry, and any meaningful entry would likely take at least several years and is unlikely to achieve similar scale to US Foods today. Building a new distribution center in a new, *non-adjacent* geographic area (known as "greenfield entry") is rare because of the financial risk of buying costly distribution infrastructure and perishable inventory for an area where the distributor has no customer base. Instead, distributors typically expand by first "stretching" distribution services into an *adjacent* territory using an existing distribution center and local sales representatives;

only after distributors achieve significant sales in the adjacent territory do they build a new distribution center (known as a "fold-out"). But even fold-outs are financially risky, expensive, time-consuming, and logistically challenging. Broadline distribution is a capital-intensive business, requiring large distribution centers equipped with refrigeration and freezer capability to store perishable inventory, as well as large fleets of trucks, a field salesforce, and information technology infrastructure. Indeed, fold-out broadline distribution centers can cost tens of millions of dollars and take many years to complete. Additionally, stretch distribution is more costly because of the longer delivery miles, so a distributor typically is at a cost (and service) disadvantage until the fold-out distribution center is built and operating at an efficient scale.

80. Distributors seeking to enter or expand also must recruit and hire a competent and experienced salesforce. Sysco and US Foods have substantially more sale representatives than other broadline distributors. To hire enough sales representative to enter or expand on a sufficient scale to constrain the merged firm in local markets would take a significant amount of time and effort, particularly in light of non-competition and non-solicitation agreements that incumbent distributors have with their employees.

81. Additionally, entrants must satisfy regulatory requirements, and overcome reputational barriers to entry and Defendants' strong incumbency advantage. Even after a new distribution center opens, it often takes years for a fold-out to achieve sales similar to incumbent broadline distributors. Thus, entry would not be timely, likely, or sufficient in the relevant local markets to counteract the anticompetitive effects of the Merger.

82. Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the strong presumption and evidence that the Merger likely would substantially lessen competition in the relevant markets.

83.     On February 2, 2015, Defendants announced the Proposed Divestiture, under which PFG will purchase 11 US Foods distribution centers and associated assets.  The Proposed Divestiture will not enable PFG to replace US Foods as a formidable competitor to Sysco for the sale of broadline foodservice distribution services and will not counteract the significant competitive harm caused by the Merger.  Including the assets from the Proposed Divestiture, PFG would be less than ███████ the size of US Foods today in terms of broadline sales revenue to National Customers and substantially smaller in terms of the number of broadline distribution centers (35 versus 61).  Even with the Proposed Divestiture, PFG would be about ███████ the size of the merged Sysco / US Foods in terms of broadline revenue, with about a quarter the number of broadline distribution centers (35 versus 122).

84.     In particular, the Proposed Divestiture will not remedy the Merger's reduction in competition for National Customers because PFG will be an inferior competitor compared to pre-Merger US Foods and particularly inferior compared to post-Merger Sysco / US Foods.  PFG will lack (i) a network of distribution centers capable of serving National Customers, due to remaining gaps in geographic coverage; (ii) the capacity or operational efficiencies to serve National Customers as effectively as an independent US Foods; and (iii) other qualities that are important to National Customers, such as competitive IT infrastructure, a track record for effectively servicing broadline National Customers across the U.S., a comparably broad private-label product offering, overall product breadth, and sufficient value-added services.

85.     For similar reasons, the Proposed Divestiture will not remedy the Merger's harm in many relevant local geographic markets.  In many of the relevant geographic markets, the Proposed Divestiture will have no effect because PFG will not acquire any additional assets, leaving local market conditions unchanged.

34

## LIKELIHOOD OF SUCCESS ON THE MERITS,
## BALANCE OF EQUITIES, AND NEED FOR RELIEF

86.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding.  In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.  Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

87.     The Commission is likely to succeed in proving that the effect of the Merger may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45.  In particular, Complaint Counsel for the Commission is likely to succeed in demonstrating, among other things, that:

        a.      The Merger would have anticompetitive effects in the market for broadline foodservice distribution services sold to National Customers and in the relevant local geographic markets for broadline foodservice distribution services;

        b.      Substantial and effective entry or expansion in these markets is difficult and would not be likely, timely, or sufficient to offset the anticompetitive effects of the Merger; and

      c.      The efficiencies asserted by Defendants are insufficient as a matter of law to justify the Merger.

      d.      The Proposed Divestiture is unlikely to remedy the substantial lessening of competition resulting from the Merger.

88.      Preliminary relief is warranted and necessary.  Should the Commission rule, after the full administrative trial, that the Merger is unlawful, reestablishing the status quo ante of vigorous competition between Sysco and US Foods would be difficult, if not impossible, if the Merger has already occurred in the absence of preliminary relief.  Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim, even if suitable divestiture remedies were obtained later.

89.      Accordingly, the equitable relief requested here is in the public interest.

Wherefore, the Commission and the Plaintiff States respectfully request that the Court:

      1.      Temporarily restrain and preliminarily enjoin Defendants from taking any further steps to consummate the Merger, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

      2.      Retain jurisdiction and maintain the status quo until the administrative proceeding that the Commission has initiated is concluded;

      3.      That Plaintiffs be awarded their costs of this action, including attorneys' fees to the Plaintiff States; and

      4.      Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: February 19, 2015

Of counsel:

DEBORAH FEINSTEIN (D.C. Bar 412109)
Director
Federal Trade Commission
Bureau of Competition

JONATHAN NUECHTERLEIN (D.C. Bar 442470)
General Counsel
Federal Trade Commission

ALEXIS GILMAN (D.C. Bar 483229)
Assistant Director

MARK D. SEIDMAN (D.C. Bar 980662)
Deputy Assistant Director

MELISSA L. DAVENPORT (D.C. Bar 990479)
CHRISTOPHER J. ABBOTT (D.C. Bar 1014487)
THOMAS H. BROCK (D.C. Bar 939207)
KRISHA A. CERILLI (D.C. Bar 983281)
MICHAEL B. DeRITA
DAVID J. LAING (D.C. Bar 418597)
MATTHEW MCDONALD
STEPHEN A. MOHR (D.C. Bar 982570)
JEANNE LIU NICHOLS
RYAN K. QUILLIAN (D.C. Bar 994846)
KRISTIAN ROGERS
CATHERINE M. SANCHEZ
SOPHIA VANDERGRIFT (D.C. Bar 1005319)

Attorneys
Federal Trade Commission
Bureau of Competition
Mergers IV Division

Respectfully Submitted,

STEPHEN WEISSMAN
D.C. Bar 451063
Deputy Director
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Ave., NW
Washington, DC 20580
Telephone: (202) 326-2030
Email: sweissman@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

FOR PLAINTIFF DISTRICT OF COLUMBIA:

KARL A. RACINE (D.C. Bar No. 431534)
Attorney General for the District of Columbia

ELLEN A. EFROS (D.C. Bar No. 250746)
Deputy Attorney General, Public Interest Division

BENNETT RUSHKOFF (D.C. Bar No. 386925)
Chief, Public Advocacy Section
441 4th Street, N.W., Suite 600 South
Washington, DC 20001
Tel: (202) 727-5173
Fax: (202) 741-0599
bennett.rushkoff@dc.gov

NICHOLAS A. BUSH (D.C. Bar No. 1011001)
Assistant Attorney General
441 4th Street, N.W., Suite 600 South
Washington, DC 20001
Tel: (202) 442-9841
Fax: (202) 715-7720
nicholas.bush@dc.gov

Attorneys for the District of Columbia

Dated: February 18, 2015

KAMALA HARRIS
Attorney General Of The State Of California
MARK BRECKLER
Chief Assistant Attorney General
KATHLEEN E. FOOTE
Senior Assistant Attorney General
NATALIE S. MANZO
Supervising Deputy Attorney General
MARGARET SPENCER
Deputy Attorney General

ABIEL GARCIA
Deputy Attorney General
Office of the Attorney General of California
300 S. Spring Street, Suite 1700
Los Angeles, California 90013
Telephone: (213) 897-2691

Attorneys for the State of California

FOR PLAINTIFF STATE OF ILLINOIS:

LISA MADIGAN
Attorney General
ROBERT W. PRATT
Chief, Antitrust Bureau

By: _____

Robert W. Pratt
Office of Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601
(312)814-3722
Fax: (312)814-4209
rpratt@atg.state.il.us

FOR PLAINTIFF STATE OF IOWA:

THOMAS J.MILLER
Attorney General of Iowa

By: Layne M. Lindebak
Assistant Attorney General
STATE OF IOWA
Iowa Department of Justice
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, Iowa 50319
Telephone: (515) 281-7054
Fax: (515) 281-4902
Layne.Lindebak@iowa.gov

FOR PLAINTIFF STATE OF MARYLAND:

BRIAN E. FROSH
Attorney General of Maryland

ELLEN S. COOPER
Chief, Antitrust Division

JOHN R. TENNIS
Deputy Chief, Antitrust Division

By: _____
GARY HONICK
SCHONETTE J. WALKER
Assistant Attorneys General
Office of the Maryland Attorney General
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, Maryland 21202
Tel: (410) 576-6470
Fax: (410) 576-7830

FOR PLAINTIFF STATE OF MINNESOTA:

LORI SWANSON
Attorney General
State of Minnesota

By: _____

BENJAMIN VELZEN (#0388344)
Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1235 (Voice)
(651) 296-9663 (Facsimile)
*benjamin.velzen@ag.state.mn.us*

JAMES W. CANADAY (#030234X)
Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1421 (Voice)
(651) 296-9663 (Facsimile)
*james.canaday@ag.state.mn.us*

ATTORNEYS FOR PLAINTIFF
STATE OF MINNESOTA

FOR PLAINTIFF STATE OF NEBRASKA:

DOUG PETERSON
Attorney General of Nebraska

By: Collin Kessner

Collin Kessner, NE #25265
Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509-8920
Phone: (402) 471-2683
collin.kessner@nebraska.gov

*Counsel for the State of Nebraska*

FOR PLAINTIFF STATE OF OHIO:

R. MICHAEL DEWINE
Attorney General of Ohio
JENNIFER L. PRATT
Assistant Attorney General
Chief, Antitrust Section

By: _____
Kimberly R. Parks (Ohio S.Ct. No.
0083921)
Antitrust Division
150 E. Gay St., 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269

DATE: 2/19/15

KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

Bruce R. Beemer
First Deputy Attorney General

JAMES A. DONAHUE, III
Executive Deputy Attorney General
Public Protection Division
Pennsylvania State Bar #42624

By: _____
Tracy W. Wertz
Chief Deputy Attorney General
Pennsylvania State Bar #69164
Commonwealth of Pennsylvania
Pennsylvania Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
Facsimile: (717) 705-7110
twertz@attorneygeneral.gov

Jennifer A. Thomson
Senior Deputy Attorney General
Pennsylvania State Bar #89360
jthomson@attorneygeneral.gov

Norman Marden
Senior Deputy Attorney General
Pennsylvania State Bar #203423
nmarden@attorneygeneral.gov

Aaron Schwartz
Deputy Attorney General
Pennsylvania State Bar #319615
aschwartz@attorneygeneral.gov

FOR PLAINTIFF STATE OF TENNESSEE:

HERBERT H. SLATERY III
Attorney General and Reporter of Tennessee

By: _____
VICTOR J. DOMEN, JR
Senior Antitrust Counsel
Office of the Attorney General and Reporter
500 Charlotte Avenue
Nashville, TN 37243
Tel: (615) 253-3327

FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:

MARK R. HERRING
Attorney General of Virginia

CYNTHIA E. HUDSON
Chief Deputy Attorney General

RHODES B. RITENOUR
Deputy Attorney General
Civil Litigation Division

By: *Sarah Oxenham Allen*

SARAH OXENHAM ALLEN
Assistant Attorney General
Consumer Protection Section
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Tel: (804) 786-6557
Fax: (804) 786-0122
SOAllen@oag.state.va.us

STEPHEN JOHN SOVINSKY
Assistant Attorney General
Consumer Protection Section
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Tel: (804) 823-6341
SSovinsky@oag.state.va.us

### APPENDIX A: LOCAL MARKET SHARE AND CONCENTRATION INFORMATION

| Local Market | Defendants' Post-Merger Share | Δ HHI | Post-Merger HHI |
|---|---|---|---|
| *San Diego, CA | 100% | 3,537 | 10,000 |
| *Las Vegas, NV | 93% | 3,695 | 8,635 |
| Omaha/Council Bluffs, NE/IA | 90% | 1,475 | 8,224 |
| *Kansas City, MO/KS | 86% | 3,619 | 7,582 |
| Philadelphia, PA | 84% | 3,114 | 7,113 |
| Chicago, IL | 83% | 3,164 | 6,991 |
| Memphis, TN | 81% | 3,086 | 6,905 |
| Washington/Baltimore, DC/MD | 80% | 2,874 | 6,477 |
| Bloomington, IL | 77% | 2,917 | 6,244 |
| Pensacola, FL | 77% | 2,817 | 6,150 |
| *Los Angeles, CA | 76% | 2,900 | 5,886 |
| *Minneapolis, MN | 76% | 2,880 | 6,106 |
| *San Francisco Bay Area, CA | 76% | 2,684 | 5,929 |
| Raleigh/Durham, NC | 74% | 2,563 | 5,634 |
| Central Pennsylvania | 72% | 2,537 | 5,448 |
| Columbia/Charleston, SC | 72% | 2,264 | 5,731 |
| Tampa, FL | 69% | 2,254 | 5,088 |
| Orlando, FL | 68% | 2,265 | 4,979 |
| Fargo, ND | 67% | 2,216 | 4,828 |
| *Cleveland, OH | 66% | 1,698 | 4,506 |
| Birmingham, AL | 64% | 2,009 | 4,290 |
| Pittsburgh, PA | 64% | 1,816 | 4,597 |
| Atlanta, GA | 63% | 1,959 | 4,931 |
| *Salt Lake City, UT | 63% | 1,951 | 4,815 |
| St. Louis, MO | 63% | 1,936 | 4,428 |
| Jackson, MS | 63% | 1,903 | 4,754 |
| Southwest Virginia | 62% | 1,931 | 4,260 |
| Charlotte, NC | 62% | 1,696 | 4,555 |
| Rochester, NY | 57% | 1,591 | 3,492 |
| Lubbock, TX | 56% | 1,470 | 3,702 |
| Milwaukee, WI | 53% | 1,053 | 3,498 |
| Albany, NY | 51% | 1,054 | 2,997 |

* Asterisks denote markets where a divestiture has been proposed.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of February, 2015, I served the foregoing on the

following counsel via electronic mail:

Richard Parker
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
202-383-5380
rparker@omm.com

Marc Wolinsky
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
212-403-1226
MWolinsky@wlrk.com

Counsel for Defendant Sysco Corporation

Joseph F. Tringali
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY, 10017
212-455-3840
jtringali@stblaw.com

Counsel for Defendants USF Holding Corp. and US Foods, Inc.

Alexis Gilman
Attorney for Plaintiff Federal Trade Commission

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,  )
600 Pennsylvania Avenue, N.W.  )
Washington, D.C. 20580  )
    )    Civ. No.
       Plaintiff,  )
    )    COMPLAINT FOR TEMPORARY
    )    RESTRAINING ORDER AND
    )    PRELIMINARY INJUNCTION
    v.    )    PURSUANT TO SECTION 13(b)
    )    OF THE FEDERAL TRADE
WHOLE FOODS MARKET, INC.  )    COMMISSION ACT
550 Bowie Street  )
Austin, Texas 78703  )
    )
and  )
    )
WILD OATS MARKETS, INC.  )
1821 30th Street  )    FILED UNDER SEAL
Boulder, Colorado 80301  )
    )
    )
       Defendants.  )

## I.
## INTRODUCTION

Whole Foods Market, Inc.'s ("Whole Foods") proposed acquisition of Wild Oats

Markets, Inc. ("Wild Oats"), will substantially lessen competition and thereby cause significant

harm to consumers. This merger, involving the two leading operators of premium natural and

organic supermarkets, will increase prices and reduce quality and services in a number of

geographic markets throughout the United States. Whole Foods' Chief Executive Officer John

Mackey bluntly advised his Board of Directors of the purpose of this acquisition: "By buying

[Wild Oats] we will . . . avoid nasty price wars in Portland (both Oregon and Maine), Boulder,

Nashville, and several other cities which will harm [Whole Foods'] gross margins and

profitability.   By buying [Wild Oats] . . . we eliminate forever the possibility of Kroger, Super

Value, or Safeway using their brand equity to launch a competing national natural/organic food

chain to rival us. . . . [Wild Oats] may not be able to defeat us but they can still hurt us . . . .

[Wild Oats] is the only existing company that has the brand and number of stores to be a

meaningful springboard for another player to get into this space.  Eliminating them means

eliminating this threat forever, or almost forever."  To prevent this consumer harm, the Federal

Trade Commission ("Commission") petitions the Court to maintain the status quo and enjoin

defendants from allowing Whole Foods to acquire any stock, assets, or other interests in Wild

Oats, during the pendency of an administrative proceeding, which will be commenced by the

Commission pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18 and 21, and

Section 5(b) of the FTC Act, 15 U.S.C. § 45(b).


## II.
## THE PARTIES

1.      Plaintiff Commission is an administrative agency of the United States

Government established, organized, and existing pursuant to the Federal Trade Commission Act,

15 U.S.C. § 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W.,

Washington, D.C. 20580.  The Commission is vested with authority and responsibility for

enforcing, among other things, Section 7 of the Clayton Act and Section 5 of the FTC Act.

2.      Defendant Whole Foods is a corporation organized, existing, and doing business

under and by virtue of the laws of Texas, with its office and principal place of business at 550

Bowie Street, Austin, Texas 78703.  Established in 1980, Whole Foods operates approximately

190 premium natural and organic supermarkets in more than 30 states and the District of Columbia. It is the largest operator of premium natural and organic supermarkets in the United States.

3.      According to Mr. Mackey, Whole Foods is "a company that is authentically committed to its mission of natural/organic/healthy foods. Its core customers recognize this authenticity and it creates a customer loyalty that will not be stolen away by conventional markets who sell the same products. Whole Foods has created a 'brand' that has real value for millions of people."

4.      Defendant Wild Oats is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 1821 30th Street, Boulder, Colorado 80301. Wild Oats is the second largest operator of premium natural and organic supermarkets in the United States, currently operating numerous premium natural and organic supermarkets throughout the United States.

5.      Founded in 1987, Wild Oats provides a broad selection of natural, organic, and gourmet foods, environmentally friendly products, and natural vitamins, remedies, and body care products. The firm was built "on the vision of enhancing the lives of our customers and our people with products and education that support health and wellbeing." As Wild Oats' Vice President of Marketing Laura Coblentz has described: "Wild Oats is more than a retail chain—it's about a lifestyle, and that's how we market ourselves."

6.      Consumers spent a combined total of $6.5 billion in fiscal 2006 at Whole Foods and Wild Oats. Approximately 70% of that total was spent on perishable products, such as produce, meat, seafood, baked goods, and prepared foods.

## III.
## JURISDICTION AND VENUE

7.    Jurisdiction is based on Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and 28

U.S.C. §§ 1337 and 1345.  Venue is proper under Section 13(b) of the FTC Act, 15 U.S.C. §

53(b); 28 U.S.C. § 1391(b) and (c); and Section 12 of the Clayton Act, 15 U.S.C. § 22.

8.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

>     (b)    Whenever the Commission has reason to believe --
>
>         (1) that any person, partnership or corporation is violating,
>     or is about to violate, any provision of law enforced by the
>     Federal Trade Commission, and
>
>         (2) that the enjoining thereof pending the issuance of a
>     complaint by the Commission and until such complaint is
>     dismissed by the Commission or set aside by the court on review,
>     or until the order of the Commission made thereon has become
>     final, would be in the interest of the public –
>
> the Commission by any of its attorneys designated by it for such purpose may
> bring suit in a district court of the United States to enjoin any such act or
> practice.  Upon a proper showing that, weighing the equities and considering the
> Commission's likelihood of ultimate success, such action would be in the public
> interest, and after notice to the defendant, a temporary restraining order or a
> preliminary injunction may be granted without bond . . . .

9.    Whole Foods and Wild Oats are engaged in commerce, as "commerce" is

defined in Section 1 of the Clayton Act, 15 U.S.C. § 12(a).  The businesses of Whole Foods and

Wild Oats have been and are now in or affecting commerce, as "commerce" is defined in

Section 4 of the FTC Act, 15 U.S.C. § 44.

10.    Whole Foods transacts business within the District of Columbia.

11.    Wild Oats transacts business within the District of Columbia.

**IV.**
**The Proposed Acquisition and the Commission's Response**

12.  On February 21, 2007, Whole Foods and Wild Oats executed an agreement whereby Whole Foods proposes to acquire all of the voting securities of Wild Oats through WFMI Merger Co., a wholly-owned subsidiary of Whole Foods. The purchase will be effected through tender offer for all shares of Wild Oats common stock. The total cost of the acquisition is expected to be approximately $671 million in cash and assumed debt.

13.  The closing of the transaction is subject to clearance under the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a. The defendants have advised the Commission that, in the absence of a court order to the contrary, Defendant Whole Foods will be free to acquire all shares of Wild Oats common stock after 11:59 pm June 6, 2007.

14.  Defendant Whole Foods intends to then merge Wild Oats into Whole Foods; to close numerous Wild Oats stores; to sell several Wild Oats stores; and to operate the remainder as Whole Foods stores.

15.  On June 5, 2007, following a three-month investigation, the Commission determined that it has reason to believe that the Acquisition would violate Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act because the Acquisition may substantially lessen competition and/or tend to create a monopoly in the operation of premium natural and organic supermarkets across the United States.

16.  On that same day, the Commission determined that the injunctive relief requested herein would be in the public interest and authorized its staff to seek a temporary restraining order ("TRO") and preliminary injunction ("PI") in federal district court under Section 13(b) of

the FTC Act. The purpose of the TRO and PI is to prevent the Acquisition during the pendency

of an administrative proceeding to be initiated by the Commission under Section 5(b) of the

FTC Act, 15 U.S.C. § 45(b), challenging the legality of the proposed Acquisition under Section

7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15

U.S.C. § 45. The legality of the proposed Acquisition, and the appropriate remedy in the event

it is found illegal, will be determined by the Commission through those administrative

proceedings, subject to judicial review.

## V.
## PREMIUM NATURAL AND ORGANIC FOODS INDUSTRY

17.      "Natural foods" are foods that are minimally processed and largely or completely

free of artificial ingredients, preservatives, and other non-naturally occurring substances.

18.      "Organic foods" are foods that are produced using: agricultural practices that

promote healthy ecosystems; no genetically engineered seeds or crops, sewage sludge, long-

lasting pesticides or fungicides; healthy and humane livestock management practices including

use of organically grown feed, ample access to fresh air and the outdoors, and no antibiotics or

growth hormones; and food processing that protects the healthfulness of the organic product,

including the avoidance of irradiation, genetically modified organisms, and synthetic

preservatives.

19.      Pursuant to the United States Department of Agriculture's ("USDA's") Organic

Foods Production Act of 1990 (the "Organic Rule"), all products labeled "organic" must be

certified by a federally accredited certifying agency as satisfying USDA standards for organic

foods. The Organic Rule further requires that retailers of products labeled "organic" use

handling, storage, and other practices to protect the integrity of organically-labeled products, including: preventing commingling of organic and non-organic ("conventional") products; protecting organic products from contact with prohibited substances; and maintaining records that document adherence to the USDA requirements.

20.　Premium natural and organic supermarkets offer a distinct set of products and services to a distinct group of customers in a distinctive way, all of which significantly distinguish premium natural and organic supermarkets from conventional supermarkets and other retailers of food and grocery items ("Retailers").

21.　Premium natural and organic supermarkets are not simply outlets for natural and organic foods. Whole Foods' Chief Executive Officer John Mackey acknowledged that "Whole Foods isn't primarily about organic foods. It never has been. Organic food is only one part of its highly successful business model." In announcing its fourth quarter results for 2006, Whole Foods stated that "Whole Foods Market is about much more than just selling 'commodity' natural and organic products. We are a lifestyle retailer and have created a unique shopping environment built around satisfying and delighting our customers." Specifically, Mr. Mackey has said that "superior quality, superior service, superior perishable product, superior prepared foods, superior marketing, superior branding, and superior store experience working together are what makes Whole Foods so successful . . . people who think organic foods are the key don't understand the business model."

22.　To begin with, premium natural and organic supermarkets focus on perishable products, offering a vast selection of very high quality fresh fruits and vegetables–including exotic and hard-to-find items–and other perishables. As Whole Foods stated in its 2006 annual

report, "We believe our heavy emphasis on perishable products differentiates us from conventional supermarkets and helps us attract a broader customer base." Whole Foods' Mr. Mackey has also emphasized the importance of high quality perishable foods to Whole Foods' business model: "This [produce, meat, seafood, bakery, prepared foods] is over 70% of Whole Foods total sales. Wal-Mart doesn't sell high quality perishables and neither does Trader Joe's while we are on the subject. That is why Whole Foods coexists so well with [Trader Joe's] and it is also why Wal-Mart isn't going to hurt Whole Foods."

23. Relative to conventional supermarkets and most other Retailers, premium natural and organic supermarkets target shoppers who are, in the words of one of the defendants, "affluent, well educated, health oriented, quality food oriented people." The core shoppers of premium natural and organic supermarkets have a preference for natural and organic products, and premium natural and organic supermarkets offer an extensive selection of natural and organic products to enable those shoppers to purchase substantially all of their food and grocery requirements during a single shopping trip.

24. Premium natural and organic supermarkets are differentiated from other Retailers in that premium natural and organic supermarkets offer more amenities and service venues; higher levels of service and more knowledgeable service personnel; and special features such as in-store community centers.

25. Premium natural and organic supermarkets promote a lifestyle of health and ecological sustainability, to which a significant portion of their customers are committed. Through the blending together of these elements and others, premium natural and organic supermarkets strive to create a varied and dynamic experience for shoppers, inviting them to

-8-

make the premium natural and organic supermarket a destination to which shoppers come not merely to shop, but to gather together, interact, and learn, often while enjoying shared eating and other experiences. Premium natural and organic supermarkets expend substantial resources on developing a brand identity that connotes this blend of elements, and especially the qualities of trustworthiness (*viz.*, that all products are natural and, when so-labeled, organic, that the store's suppliers practice humane animal husbandry and provide humane working environments for employees, and that the store's actions are ecologically sound) and qualitative superiority to other Retailers.

26.     Relative to most other Retailers, premium natural and organic supermarkets' products often are priced at a premium reflecting not only product quality and service, but the marketing of a lifestyle to which their customers aspire.

27.     As Whole Foods' Mr. Mackey has acknowledged, "Safeway and other conventional retailers will keep doing their thing – trying to be all things to all people . . . . They can't really effectively focus on Whole Foods Core Customers without abandoning 90% of their own customers . . . . Whole Foods core customers will not abandon them because Safeway has made their stores a bit nicer and is selling some organic foods. Whole Foods knows their core customers well and serves them far better than any of their potential competitors do."

28.     Mr. Mackey has also said that "all those [conventional supermarkets and club stores] you named have been selling organic foods for many years now. The only thing 'new' is that they are now beginning to sell private label organic foods for the first time. However, they've been selling organic produce and organic milk for many years now. Doing so has never hurt Whole Foods."

-9-

29.     Wild Oats' most recent 10K filed with the Securities and Exchange Commission noted: "Despite the increase in natural foods sales within conventional supermarkets, [Wild Oats] believe[s] that conventional supermarkets still lack the concentration on a wide variety of natural and organic products, and emphasis on service and consumer education that our stores offer."

30.     Premium natural and organic supermarkets are also very different from mass-merchandisers, such as Wal-Mart and Target.  According to Mr. Mackey, "Wal-Mart does a particularly poor job selling perishable foods.  Whole Foods quality is better, its customer service is far superior, and the store ambience and experience it provides its customers is fun, entertaining and educational."

31.     With respect to Trader Joe's, Mr. Mackey stated: "TJ's is a completely different concept than WFMI.  WFMI's business is all about perishables - fresh produce, fresh seafood, fresh meat, in store delis, juice bars, and bakeries.  WFMI has stated that more than 50% of their sales are in these categories of products - categories which TJ's doesn't even have.  TJ's is primarily a discount private label company with a large wine selection."

32.     Unlike other natural and organic product retailers, premium natural and organic supermarkets offer an extensive selection of natural and organic products to enable shoppers to purchase substantially all of their food and grocery requirements during a single shopping trip.  As a result, premium natural and organic supermarkets are appreciably larger than other natural and organic retailers in square footage, number of products offered, inventory for each product offered, and annual dollar sales.

33.     Premium natural and organic supermarkets' primary competitors are other

-10-

premium natural and organic supermarkets. Shoppers with preferences for premium natural and organic supermarkets are not likely to switch to other retailers in response to a small but significant non-transitory increase in premium natural and organic supermarket prices.

## VI.
## RELEVANT MARKETS

34. The operation of premium natural and organic supermarkets is a distinct "line of commerce" within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

35. Unlike conventional supermarkets, which tend to draw their customers from within a radius of three or four miles, premium natural and organic supermarkets tend to draw their customers from within a radius of five or six miles. As a result, areas as small as approximately five or six miles in radius from premium natural and organic supermarkets or as large as a metropolitan area are distinct "sections of the country" within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VII.
## COMPETITION BETWEEN WHOLE FOODS AND WILD OATS

36. Whole Foods and Wild Oats, respectively, are the largest and second largest operators of premium natural and organic supermarkets in the United States.

37. Whole Foods and Wild Oats are the only two nationwide operators of premium natural and organic supermarkets in the United States.

38. Whole Foods and Wild Oats are one another's closest competitor in twenty-one geographic markets. Consumers in those markets have reaped price and non-price benefits of

-11-

competition between Whole Foods and Wild Oats. The markets where the two compete head to head are: Albuquerque, NM; Medford, MA (suburban Boston); Saugus, MA (suburban Boston); Boulder, CO; Hinsdale, IL (suburban Chicago); Evanston, IL (suburban Chicago); Cleveland, OH; Denver, CO; Lakewood, CO; Ft. Collins, CO; West Hartford, CT; Henderson, NV; Indianapolis, IN; Kansas City-Overland Park, KS; Las Vegas, NV; Los Angeles-Santa Monica-Brentwood, CA; Louisville, KY; Omaha, NE; Pasadena, CA; Phoenix, AZ; Portland, ME; Portland, OR; Princeton, NJ; St. Louis, MO; and Tualatin, OR.

39.    Over the last five years, Whole Foods has targeted markets for entry where, in Whole Foods' words, Wild Oats enjoyed a "monopoly." Consumers in those markets benefitted from the new competition in those markets.

40.    There are other geographic markets in which only one or the other is present. In many of these markets, Wild Oats or Whole Foods plans, but for the proposed Acquisition, to enter to offer direct and unique competition to the other. Each has developed expansion plans that target each other's "monopoly" markets, as Whole Foods describes it. These markets include: Palo Alto, CA; Fairfield County, CT; Miami Beach, FL; Naples, FL; Nashville, TN; Reno, NV; and Salt Lake City, UT.

41.    Whole Foods' Mr. Mackey has said that "Whole Foods has taken significant market share from OATS wherever they have opened competing stores--Boulder, Santa Fe, Denver, Boca Raton, Ft. Lauderdale, and St. Louis." Each of the parties, in anticipation of entry by the other, engages in aggressive price and non-price competition that conveys to shoppers benefits that go well beyond the benefits resulting from the presence or threatened entry in those geographic markets of other retailers. In addition, when Whole Foods or Wild Oats expects the

-12-

other to enter one of its markets, each plans substantial improvements in quality, including renovations, expansions, and competitive pricing. As Mr. Mackey explained upon Whole Foods' entry into Nashville: "At least Wild Oats will likely improve their store there in anticipation of Whole Foods eventually opening and [customers will] benefit from that." Neither company responds in the same way to competition from conventional supermarkets or other retailers.

42. Consumers have benefitted directly from the price and quality competition between Whole Foods and Wild Oats. If the acquisition occurs, those benefits will be lost if the acquisition occurs in the markets where the two currently compete and they will not occur in those markets where each is planning to expand.

## VIII.
## LIKELIHOOD OF SUCCESS ON THE MERITS AND NEED FOR RELIEF

43. The Commission is likely ultimately to succeed in demonstrating, in administrative proceedings to adjudicate the legality of the proposed merger, that the proposed Acquisition would violate Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act. In particular, the Commission is likely ultimately to succeed in demonstrating, among other things, that:

    a.    the proposed Acquisition will eliminate one of only two or three premium natural and organic supermarkets and substantially increase concentration in the operation of premium natural and organic supermarkets in each of the geographic areas identified in paragraphs 38 and 40 hereof, each of which already is highly

-13-

concentrated;

b.      the proposed Acquisition will eliminate substantial and effective price and non-price competition between Defendant Whole Foods and Defendant Wild Oats in the operation of premium natural and organic supermarkets in each of the geographic areas identified in paragraphs 38 and 40 hereof, substantially reducing or eliminating competition in the operation of premium natural and organic supermarkets in each of those geographic areas;

c.      the proposed Acquisition will eliminate one of only two or three premium natural and organic supermarkets in each of the geographic areas identified in paragraphs 38 and 40 hereof, tending to create a monopoly in the operation of premium natural and organic supermarkets in each of those geographic areas;

d.      the proposed Acquisition will eliminate the only existing company that can serve as a meaningful springboard for a conventional supermarket operator to enter the premium natural and organic supermarket market in each of the geographic areas identified in paragraphs 38 and 40 hereof, tending to create a monopoly in the operation of premium natural and organic supermarkets in each of those geographic areas;

e.      the proposed Acquisition will eliminate defendant Whole Foods' closest competitor in geographic and product space in each of the geographic areas identified in paragraphs 38 and 40 hereof, resulting in the loss of direct and unique price and non-price competition that conveys to shoppers benefits that go well beyond the benefits resulting from the presence or threatened entry of other

-14-

retailers;

f.    the proposed Acquisition will result in the closing of numerous Wild Oats stores, reducing or eliminating consumer choice in premium natural and organic supermarkets; and

g.    the proposed Acquisition will enable the combined Whole Foods/Wild Oats to exercise market power unilaterally.

h.    the proposed acquisition will eliminate potential competition in numerous parts of the country.

44.    Entry or repositioning into the operation of premium natural and organic supermarkets is time-consuming, costly, and difficult. As a result, entry or repositioning into the operation of premium natural and organic supermarkets in the geographic localities identified in paragraphs 38 and 40 hereof is unlikely to occur or to be timely or sufficient to prevent or defeat the anticompetitive effects described in paragraph 43 hereof.

45.    If the proposed Acquisition were to occur, it likely would be difficult or impossible to reconstitute Wild Oats as it presently exists and to restore the competitive *status quo ante*. Further, it is likely that substantial harm to competition would occur in the interim even if it proved possible to reconstitute Wild Oats as it presently exists and to restore the competitive *status quo ante*.

46.    For the reasons stated above, the granting of the injunctive relief sought is in the public interest.

WHEREFORE, the Commission requests that the Court:

1.    Temporarily and preliminarily enjoin Defendant Whole Foods from taking any

-15-

further steps to acquire the stock, assets, or any other interest in Wild Oats, directly or indirectly;

    2.      Retain jurisdiction and maintain the status quo pending the issuance of an

administrative complaint by the Commission challenging the proposed Acquisition, and until

such complaint is dismissed by the Commission, set aside by a court on review, or becomes

final; and

    3.      Award such other and further relief as the Court may determine to be proper and

just, including costs.

                           Respectfully submitted,

Dated: June 6, 2007

**WILLIAM BLUMENTHAL**
General Counsel

**JEFFREY SCHMIDT**
Director

**KENNETH L. GLAZER**
Deputy Director
Bureau of Competition
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580

**MICHAEL J. BLOOM**
CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
JOAN L. HEIM
THOMAS H. BROCK (D.C. Bar No. 939207)
MICHAEL A. FRANCHAK
ABIGAIL SLATER
JEANNE H. LIU
Federal Trade Commission
601 New Jersey Ave., N.W.
Washington, DC 20001
(202) 326-2475 (direct dial)
(202) 326-2284 (facsimile)
mjbloom@ftc.gov

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC 20580<br><br>**DISTRICT OF COLUMBIA**<br>441 4th Street, N.W., Suite 600 South<br>Washington, DC 20001<br><br>**COMMONWEALTH OF PENNSYLVANIA**<br>14th Floor Strawberry Square<br>Harrisburg, PA 17120<br><br>                  Plaintiffs,<br><br>          v.<br><br>**STAPLES, INC.**<br>500 Staples Drive<br>Framingham, MA 01702<br><br>          and<br><br>**OFFICE DEPOT, INC.**<br>6600 North Military Trail<br>Boca Raton, FL 33496<br><br>                Defendants. | Civil Action No. 15-cv-02115<br><br>**PUBLIC VERSION** |

# COMPLAINT FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION PURSUANT TO
### SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), by its designated

attorneys, and the District of Columbia and the Commonwealth of Pennsylvania, acting by and

through their respective Office of Attorney General (collectively, "Plaintiff States"), petition this

Court for a temporary restraining order and preliminary injunction enjoining Staples, Inc.

("Staples") from consummating its proposed merger (the "Merger") with Office Depot, Inc.

("Office Depot"). Plaintiffs seek this provisional relief pursuant to Section 13(b) of the Federal

Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15

U.S.C. § 26. Absent such provisional relief, Staples and Office Depot (collectively,

"Defendants") would be free to consummate the Merger at 12:01 a.m. on December 9, 2015.

Plaintiffs require the aid of this Court to maintain the status quo during the pendency of

an administrative proceeding on the merits. The Commission has already initiated that

administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21,

and Section 5 of the FTC Act, 15 U.S.C. § 45. That administrative proceeding is scheduled to

begin on May 10, 2016. The administrative proceeding will determine the legality of the Merger

and will provide all parties a full opportunity to conduct discovery and present testimony and

other evidence regarding the likely competitive effects of the Merger.

## NATURE OF THE CASE

1.      This is an action to temporarily restrain and preliminarily enjoin the

consummation of a Merger between Staples and Office Depot. Defendants are—by a wide

margin—the two largest vendors of consumable office supplies to large "business-to-business"

("B-to-B") customers (i.e., business customers buying for their own end-use) in the United

States.

2.      Staples' and Office Depot's own documents state that they are the only

participants in a "two player" national market. Defendants are the best options for most large B-

to-B customers—and the only meaningful options for some large customers—particularly those

with facilities in multiple regions of the country. And they are each other's closest competitors

for such customers. As Staples explained at an internal Leadership Summit, "There are only two

2

real choices for customers," Staples and Office Depot. Office Depot similarly made clear to a customer that "[o]n a national scale, Office Depot's competition is Staples."

3. Direct head-to-head competition between Staples and Office Depot yields substantial benefits to large B-to-B customers in the form of lower prices and better service. If consummated, the Merger would eliminate that competition. Office Depot acknowledged this in April 2015—two months after the Merger was announced—encouraging a large B-to-B customer to accept its "best and final" offer promptly, stating "If and when [Staples'] purchase of Office Depot is approved, Staples will have no reason to make this offer."

4. By eliminating direct competition between Staples and Office Depot, the Merger threatens significant harm to a wide range of large B-to-B customers.

5. Office supplies vendors, such as Defendants, sell and distribute consumable office supplies (e.g., pens, staplers, notepads, folders, and copy paper) to all manner of businesses across the United States. Employees of these businesses use consumable office supplies in connection with their jobs. As a result, businesses depend on vendors to provide consistent and reliable delivery of consumable office supplies so that their employees have the products they need to work productively and on a cost-effective basis.

6. Large B-to-B customers typically require an office supplies vendor with experience and a strong reputation for providing consumable office supplies to large B-to-B customers. These requirements are especially important for customers seeking delivery on a multi-regional or national basis. Many large B-to-B customers require that their office supplies vendor provide a broad range of national-brand and private-label products, flexible and reliable delivery (including desktop delivery), high levels of customer service, customizable product catalogs, detailed utilization reporting, and sophisticated information technology ("IT")

interfaces for procurement and billing. Moreover, large B-to-B customers require those features and services to be part of the transaction, along with consumable office supplies at competitive prices.

7.      Large businesses typically purchase consumable office supplies pursuant to contracts awarded through requests for proposal ("RFPs"), auctions, or bilateral negotiations. Defendants generally compete head-to-head in such proceedings. They are often the two finalists in RFPs or other contest because they can obtain the lowest cost of goods from office supplies manufacturers and they possess similar networks of distribution centers, salesforces, and other services and features, such as strong reputations and experience, high levels of customer service, sophisticated IT, and product utilization monitoring and tracking. Large B-to-B customers often use those similar offerings to play one Defendant off the other to obtain lower pricing, other financial incentives, better service, and improved contract terms. Indeed, Staples and Office Depot frequently lower prices, increase discounts, and offer other financial incentives to take business away from each other, and to avoid losing business to each other.

8.      Many large B-to-B customers contract with a single office supplies vendor for consumable office supplies. Doing so allows these customers to consolidate their purchases and leverage the bigger purchasing volume to negotiate lower prices and higher discounts, rebates, or other pricing concessions. In addition, contracting with a single office supplies vendor allows large businesses to track and monitor usage of office supplies through one vendor, rather than several different vendors, thereby lowering their costs and improving operational efficiency. Using a single office supplies vendor also provides large B-to-B customers with a single point of contact for problems or concerns, a single IT interface for ordering, and a single payee for administrative purposes. These features are important to many large B-to-B customers because

they enhance efficiency, ease of use, and administration, thereby lowering their costs of doing business.

9.  For large B-to-B customers with locations across the United States or in multiple regions of the country, choosing a single office supplies vendor generally means using an office supplies vendor with national or multi-regional distribution capabilities.  Staples and Office Depot are the only two office supplies vendors that can provide on their own the low prices, nationwide distribution, and combination of services and features that many large B-to-B customers require.

10. Once a large B-to-B customer contracts with an office supplies vendor, it attempts to ensure that the employees responsible for purchasing consumable office supplies purchase under the contract with its chosen office supplies vendor.  Maximizing spend with its contracted office supplies vendor often allows a large B-to-B customers to earn the highest volume-based discounts, rebates, or other pricing incentives.  It also minimizes the inefficiency of having to pay invoices from multiple vendors and accommodate multiple deliveries.

11. Other supply options have significant disadvantages for large B-to-B customers.

12. Local or regional vendors (including but not limited to W.B. Mason), local or regional consortia, and ad hoc region-by-region networks of suppliers have higher costs and thus higher prices, limited geographic footprints, and/or logistical and coordination challenges for large B-to-B customers.  Because of these disadvantages, these other supply options have relatively small shares of sales to large B-to-B customers.

13. The Merger would combine the office supplies vendors that are—by far—the two top choices for a significant number of large B-to-B customers.  It would eliminate beneficial

competition between the two largest, most significant, and most attractive alternatives for many large B-to-B customers.

14.    The Merger also would create a firm with a dominant share of the relevant market and significantly increase market concentration.  Post-Merger, Staples would control more than 70% of the relevant market.  The next-largest competitor would possess less than 5% of the relevant market.  Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful.  Post-Merger market concentration would be more than 4900, and would increase HHIs in an already concentrated market by well over 200 points.  Thus, the Merger is presumptively unlawful.

15.    Other office supplies vendors, including but not limited to Amazon Business, regional vendors such as W.B. Mason, distribution consortia, and distributors of adjacency products, such as janitorial/sanitation products or breakroom supplies, cannot meaningfully constrain a post-Merger Staples.  As a result, Staples could charge higher prices and would have a diminished incentive to maintain or improve quality for large B-to-B customers if it were allowed to acquire Office Depot.

16.    Similarly, manufacturers of "core" consumable office products, such as pens, folders, and notepads, generally do not sell core office supplies directly to large B-to-B customers, particularly in the quantities that such customers would want.  They generally sell to wholesalers or vendors such as Respondents.  Nor would it be practicable for large B-to-B customers to buy office supplies from a large number of manufacturers.  Wholesalers do not generally sell consumable office supplies directly to large B-to-B customers.  Rather, they

generally sell to office supplies vendors, which then resell those products to large B-to-B customers.

17.     Finally, buying at retail, whether from brick-and-mortar or online retailers, including Amazon Business, generally would be more expensive for large B-to-B customers than purchasing from an office supplies vendor, and generally would not provide the full combination of other benefits important to large B-to-B customers, such as desktop delivery, order tracking, electronic ordering, flexible payment terms, negotiated pricing, and consistency of product selection and availability.

18.     Defendants cannot show that new entry or expansion by existing vendors would be timely, likely, or sufficient to counteract the anticompetitive effects of the Merger. Significant barriers to entry into office supplies distribution to large B-to-B customers— particularly national and multi-regional customers—exist, making entry or expansion difficult and incapable of constraining the merged entity.

19.     Defendants cannot show cognizable efficiencies that would offset the likely and substantial competitive harm from the Merger.

20.     On December 7, 2015, by a 4-0 vote, the Commission found reason to believe that the Merger would violate Section 7 of the Clayton Act and Section 5 of the FTC Act by substantially reducing competition.

21.     A temporary restraining order enjoining the Merger is necessary to preserve the Court's ability to afford full and effective relief after considering the Commission's application for a preliminary injunction.  Preliminary injunctive relief is similarly necessary to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding. Allowing the Merger to proceed would harm consumers and undermine the Commission's ability

to remedy the anticompetitive effects of the Merger if it is found unlawful after a full trial on the

merits and any subsequent appeals.

## JURISDICTION AND VENUE

22.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b); and 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under Acts of

Congress protecting trade and commerce against restraints and monopolies, and is brought by an

agency of the United States authorized by an Act of Congress to bring this action.

23.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

> Whenever the Commission has reason to believe –
>
> > (1) that any person, partnership, or corporation is
> > violating, or is about to violate, any provision of law
> > enforced by the Federal Trade Commission, and
> >
> > (2) that the enjoining thereof pending the issuance of a
> > complaint by the Commission and until such complaint
> > is dismissed by the Commission or set aside by the
> > court on review, or until the order of the Commission
> > made thereon has become final, would be in the interest
> > of the public – the Commission by any of its attorneys
> > designated by it for such purpose may bring suit in a
> > district court of the United States to enjoin any such act
> > or practice.  Upon a proper showing that weighing the
> > equities and considering the Commission's likelihood
> > of ultimate success, such action would be in the public
> > interest, and after notice to the defendant, a temporary
> > restraining order or a preliminary injunction may be
> > granted without bond . . . .

24.     In conjunction with the Commission, the Plaintiff States bring this action for a

preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and

restrain Staples and Office Depot from violating Section 7 of the Clayton Act, 15 U.S.C. § 18,

pending the Commission's administrative proceeding.  The Plaintiff States have the requisite

standing to bring this action because the Merger would cause antitrust injury in the markets for the sale and distribution of consumable office supplies to large B-to-B customers in their states.

25.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.  Defendants also are, and at all relevant times have been, engaged in commerce in each of the Plaintiff States.

26.     Defendants transact substantial business in the District of Columbia and are subject to personal jurisdiction therein.  Venue, therefore, is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

## THE PARTIES AND THE PROPOSED MERGER

27.     Plaintiff, the Federal Trade Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 et seq., with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, DC 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C § 45.

28.     The Plaintiff States bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 in their sovereign or quasi-sovereign capacities as *parens patriae* on behalf of the citizens, general welfare, and economy of each of their states.

29.     Defendant Staples is a publicly traded corporation organized under the laws of Delaware with headquarters in Framingham, Massachusetts.  In fiscal year 2014, Staples generated $22.5 billion in sales, with 54.8% of that coming from office supplies.  Staples operates three business segments:  North American Stores & Online, North American

Commercial, and International Operations.  In fiscal year 2013, 34.8% of Staples' total sales came from the North American Commercial segment.  Staples is the country's largest vendor of consumable office supplies to B-to-B customers.

30.     Defendant Office Depot is a publicly traded corporation organized under the laws of Delaware with headquarters in Boca Raton, Florida.  In fiscal year 2014, Office Depot had $16.1 billion in revenue, with 47.2% of that coming from sales of office supplies.  Office Depot operates through three divisions:  North American Retail Division, North American Business Solutions Division, and International Division.  In fiscal year 2014, 37.4% of Office Depot's sales came from the North American Business Solutions Division.  Office Depot is the country's second-largest vendor of consumable office supplies to B-to-B customers.

31.     In November 2013, Office Depot acquired OfficeMax, Inc., which was then the third-largest vendor of office supplies and services in the United States.

32.     On February 4, 2015, Staples and Office Depot entered into an Agreement and Plan of Merger ("Merger Agreement"), pursuant to which each share of Office Depot stock would be converted into the right to receive $7.25 in cash, plus approximately 0.2 shares of Staples' common stock.  As of the market's close on February 3, 2015, these terms of the Merger Agreement equated to a value of Office Depot of $6.3 billion.  Either party may terminate the Merger Agreement if it is not consummated by February 4, 2016.

33.     Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, and a timing agreement between Defendants and Commission staff, unless temporarily restrained and preliminarily enjoined by this Court, Defendants would be free to consummate the Merger at 12:01 am on December 9, 2015.

34.     On December 7, 2015, by a 4-0 vote, the Commission found reason to believe that the Merger would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C § 45.  On December 7, 2015, the Commission commenced an administrative proceeding on the antitrust merits of the Merger before an Administrative Law Judge, with the merits trial scheduled to begin on May 10, 2016. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  *See* 16 C.F.R. § 3.41 (2014). The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

35.     In authorizing the filing of this complaint, the Commission has determined that (1) it has reason to believe the Merger would violate the Clayton Act and the FTC Act by substantially lessening competition in one or more lines of commerce, and (2) an injunction of the Merger pending the resolution of the Commission's administrative proceedings and any appeals will promote the public interest, so as to minimize the potential harm to customers and preserve the Commission's ability to order an adequate remedy if it concludes, after the administrative proceeding, that the Merger is unlawful.

## RELEVANT MARKET

36.     The relevant market is the sale and distribution of consumable office supplies to large B-to-B customers in the United States.  Large B-to-B customers are particularly vulnerable to the proposed Merger because many have nationwide or multi-regional operations and require an office supplies vendor that can provide low pricing, high levels of service, and delivery across all of their operations.  For such customers, Staples and Office Depot are the two best options.

A.      **Relevant Product Market**

37.      Consumable office supplies consist of an assortment of office supplies, such as pens, paper clips, notepads, and copy paper, that are used and replenished frequently.  It is appropriate to evaluate the Merger's likely effects through an analysis of the assortment of consumable office supplies because each of the products in the assortment is offered under similar competitive conditions.  Thus, grouping the hundreds of individual consumable office supplies into an assortment for analytical convenience enables the efficient evaluation of competitive effects with no loss of analytic power.

38.      B-to-B customers buy consumable office supplies for their own end-use (i.e., for their employees to use in the course of performing their job duties), rather than for resale.

39.      Consumable office supplies do not include ink and toner for printers and copiers. Many B-to-B customers, particularly large B-to-B customers, buy ink and toner directly from ink and toner manufacturers, or as part of a package of "managed print services," in which vendors bundle ink and toner sales with leases of copier and printers, repair services, and/or copy and printer maintenance services.  As a result, large B-to-B customers often purchase ink and toner from different vendors, under different contracts, than those from whom they purchase consumable office supplies.

40.      Consumable office supplies do not include other office-related products, such as janitorial or break-room products.  Janitorial or break-room products are sold under substantially different competitive conditions than consumable offices supplies.

41.      Large B-to-B customers include, but are not limited to, those that buy at least $1 million annually of consumable office supplies for their own end-use.

42.      The sale and distribution of consumable office supplies to large B-to-B customers, many of whom have multi-regional or national operations, entails the warehousing, sale, and

distribution of a wide range of such office supplies, along with high levels of customer service and value-added services.

43.     The sale and distribution of consumable office supplies to large B-to-B customers is distinct from the sale and distribution of consumable office supplies to other customers, including individual consumers or small- and medium-sized businesses.  Large B-to-B customers generally require, and the sale and distribution of consumable office supplies to large B-to-B customers is distinguished by, a number of key attributes, including but not limited to:

    a.    <u>Procurement Processes</u>:  Large B-to-B customers generally procure consumable office supplies on contracts awarded through formal RFPs, auctions, or direct negotiations, often obtaining lower prices than other customers.

    b.    <u>National or Multi-Regional Distribution</u>:  Many large B-to-B customers have operations in multiple regions of the United States.  As a result, to increase efficiency and reduce transaction costs, large B-to-B customers often require a single vendor with a broad geographic footprint that can distribute consumable office supplies to all their locations in multiple regions of the country.

    c.    <u>Next-Day Desktop Delivery</u>:  Many large B-to-B customers require next-day and desktop delivery—that is, delivery to one or more desks or drop-off points within an office building—to reduce customers' storage costs.

    d.    <u>High Levels of Service</u>:  Large B-to-B customers require that their office supplies vendors provide high levels of customer service, including dedicated

account representatives and/or customer service representatives to address any customer concerns or issues in a timely manner.

e.  <u>Valued-Added Services</u>:  Large B-to-B customers often require detailed utilization reporting to allow them to track and monitor on a regular basis their employees' uses of and needs for office products.  They also often require the creation of customizable catalogs to encourage their employees to order and use products for which they have already negotiated the lowest prices.

f.  <u>Sophisticated IT Systems</u>:  Large B-to-B customers generally require their office supplies vendor to have sophisticated IT capabilities that interface directly with their e-procurement and billing systems.

g.  <u>Reputation and Financial Stability</u>:  Large B-to-B customers generally require an office supplies vendor with experience and a strong reputation for supplying large B-to-B customers with office supplies, as well as financial stability.

44.  Defendants recognize the particular needs of large B-to-B customers and tailor their products and services to meet those needs.  Both Defendants categorize B-to-B customers by size, with groups of employees dedicated to serving different groups of customers.

45.  Thus, the sale and distribution of consumable office supplies to large B-to-B customers is the relevant product market in which to analyze the Merger's likely effects.

**B.  Relevant Geographic Market**

46.  Defendants compete for the sale and distribution of consumable office supplies across the United States.  Many large B-to-B customers operate nationally or in multiple regions

14

of the country.  Accordingly, it is appropriate to analyze the competitive effects of the Merger in the United States.

47.     Defendants' own documents acknowledge the existence of a national market for the sale and distribution of consumable office supplies to large B-to-B customers, referring to themselves as the only two players in a "national market."

48.     Defendants compete to provide the sale and distribution of consumable office supplies to large B-to-B customers through their respective networks of warehouses and distribution centers located around the United States.

49.     Many large businesses have a number of locations dispersed nationwide or across multiple regions of the United States.  A substantial number of large B-to-B customers choose a single office supplies vendor with a geographically dispersed network of distribution centers to serve their facilities.  These customers do so because consolidating their purchases with a single vendor gives them the ability to get lower prices, or increased discounts, rebates or other pricing incentives, from that vendor.  In addition, choosing a single nationwide office supplies vendor provides large B-to-B customers with centralized and consistent services and terms across their facilities, including:  (1) centralized contracting, (2) a single point of contact, (3) a single reporting/auditing function, (4) a single IT interface for users, and (5) ease of administration of the distribution contract.

50.     Additionally, many large B-to-B customers enter into contracts for nationwide distribution, with nationwide pricing terms, and consider the vendor's ability to provide nationwide distribution and service in the selection process.  Many large B-to-B customers with operations in multiple regions of the country, as opposed to nationwide, similarly want one

vendor that can provide consistent pricing, service, and delivery across all their locations, and therefore often require a vendor with national capabilities.

51.     Therefore, for consumable office supplies sold and distributed to large B-to-B customers, the United States is the relevant geographic market.

## MARKET STRUCTURE AND THE MERGER'S PRESUMPTIVE ILLEGALITY

52.     Staples and Office Depot are by far the two largest vendors of consumable office supplies to large B-to-B customers.  When large B-to-B customers issue RFPs for the sale and distribution of office supplies, Staples and Office Depot (including the legacy OfficeMax business) are usually the two finalists for the business.  In fact, Defendants are often the only two companies that submit a proposal to supply a broad range of consumable office supplies on a nationwide basis.

53.     The Merger Guidelines and courts measure concentration using the Herfindahl-Hirschman Index ("HHI").  The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market.  Under the Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumptively illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

54.     The market for the sale and distribution of consumable office supplies to large B-to-B customers is highly concentrated, and the parties control the majority of sales.  Post-Merger, the market would be substantially more highly concentrated than it is today. Post-Merger, Staples would control more than 70% of this relevant market.  The next largest competitor would possess less than 5% of the relevant market.  The Merger would result in a post-Merger HHI of well over 2,500, and an increase in concentration of well over 200 points.  Post-Merger market concentration would be more than 4900, and would increase HHIs in an already concentrated

market by well over 200 points.  Thus, the Merger would result in concentration above the amount necessary to establish a presumption of competitive harm.

55.    The Merger is presumptively unlawful under relevant case law and the Merger Guidelines.

## ANTICOMPETITIVE EFFECTS:  THE MERGER WOULD ELIMINATE VITAL HEAD-TO-HEAD COMPETITION BETWEEN STAPLES AND OFFICE DEPOT

56.    Defendants are each other's closest competitors.  They are the two largest vendors of consumable office supplies to large B-to-B customers in the United States.  The scale and capabilities of Staples and Office Depot are similarly matched, and are much larger and more robust than those of the next-largest vendor of consumable office supplies to large B-to-B customers (a regional office supplies vendor, W.B. Mason).

57.    Staples' and Office Depot's size allows them to obtain products from manufacturers at lower prices than other vendors generally can.  Both also offer a collection of distribution services that no other vendor of consumable office supplies can match:  a national footprint with an extensive array of warehouses and distribution centers located across the country; correspondingly large salesforces; product breadth and depth, including private-label products; a single point of contact across all of a customer's locations; a single user interface for all of a customer's employees to use that connects to the customer's procurement and billing systems; and other significant value-added offerings, such as order tracking, utilization reporting, and customizable catalogs.

58.    Defendants acknowledge that they are each other's closest competitors.  One of Office Depot's own documents indicates that "[o]n a national scale, Office Depot's competition

17

is Staples." Staples refers to itself as operating in a "2 player national market" and notes that "[t]here are only two real choices for customers."

59.     Defendants are often the first and second choices for large B-to-B customers of consumable office supplies. Defendants predominantly win large B-to-B customers from, and lose large B-to-B customers to, each other.

60.     Defendants compete aggressively with each other on price and non-price terms to win and retain the business of large B-to-B customers. Staples and Office Depot frequently must compete with each other by lowering prices, increasing discounts or rebates, and providing significant cash incentives to win or keep large B-to-B customer accounts.

61.     Large B-to-B customers benefit from the competition between Defendants. Among other things, that competition enables customers to pit Staples and Office Depot against each other to obtain lower prices and better contract terms. Large B-to-B customers switch, or threaten to switch, their business from Staples to Office Depot, and vice versa, to obtain better prices, discounts, cash incentives, and other beneficial terms.

62.     The following are examples of direct price competition between Staples and Office Depot for large B-to-B customers:



- In November 2014, Office Depot offered a ███████ payment ████ ████████████ to secure the business of ████████. It lost out to Staples, who offered ████████████.
- In March 2014, ████, a Fortune 500 company, informed its current supplier, Office Depot, that it was putting its business out for bid. ████ and Office Depot discussed the fact that ████████████ ████████████████████████ ████████
- In late 2013, ████████ a Fortune 100 company, decided to benchmark Staples' prices against Office Depot's prices. To avoid losing ████████ business to Office Depot, Staples ████████

- In the fall of 2013, ███████ a Fortune 100 company, informed Office Depot that it was switching its business to Staples unless ███ ███████████ An internal Office Depot email explains that ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████

- In 2013, with its contract with Staples expiring, ███████ a Fortune 500 company, informed Staples that it was considering Office Depot and OfficeMax as potential suppliers.  Staples ███████ to keep the business.

- In the fall of 2012, ███████ a Fortune 100 healthcare services provider, ran a reverse auction for office products.  Although Staples was the incumbent, ███████ was prepared to switch to Office Depot if there was not ████████████████████████.  To keep the business, Staples ████████████████████████████████.

63.     The Merger would eliminate this intense head-to-head price competition for large B-to-B customers.  Post-Merger, Staples would face less meaningful competition than it does today.  Consequently, Staples would not need to compete as aggressively on price to win the business of many large B-to-B customers, and it would be able to price at higher levels.

64.     Staples and Office Depot also compete aggressively on non-price terms to win large B-to-B customers by offering high-quality services.  Defendants currently risk losing business to each other if large B-to-B customers perceive one Defendant's service inferior or lacking.  After the Merger, Staples would face substantially less competition for large B-to-B customers, and would have less incentive to improve, or even maintain, its current level of service to win or keep business.

65.     Retail stores and internet websites directed at retail consumers are not viable alternatives for most large B-to-B customers.  Such retailers cannot provide the level of pricing

or service that office supplies vendors such as Respondents provide and that large B-to-B customers require.

66.     Wholesale suppliers of office supplies are not meaningful alternatives for most large B-to-B customers because wholesalers generally sell only for resale, not to businesses for their own use.  Even when wholesalers work with independent vendors to distribute to customers, those wholesaler-vendor partnerships cannot provide the level of pricing or service that office supplies vendors like Respondents provide and that large B-to-B customers require.

67.     Manufacturers of consumable office supplies are not a viable distribution option for most large B-to-B customers' consumable office supplies needs.  Given the breadth of office supplies large B-to-B customers buy, such customers would have to purchase from a large number of different manufacturers to cover their employees' needs.  Such purchasing would be highly inefficient, costly, and not practicable for most large customers.  Moreover, manufacturers of consumable office supplies generally sell only in very large quantities, generally far larger than a B-to-B customer would purchase for its own use.  As a result, manufacturers of consumable office supplies generally do not sell their products directly to customers buying for their own end-use and not for resale.

68.     Other office supplies vendors, such as Amazon Business, regional vendors such as W.B. Mason, distribution consortia, and distributors of adjacency products, such as janitorial/sanitation products or breakroom supplies, generally have some combination of higher costs and thus higher prices, limited geographic footprints, and/or logistical and coordination challenges for large B-to-B customers.  As a result, they do not meaningfully constrain Defendants exercise of market power Post-Merger.

## LACK OF COUNTERVAILING FACTORS

69.     Defendants cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Merger.

70.     A firm seeking to enter or expand in the market for the sale and distribution of consumable office supplies to large B-to-B customers, many of whom operate nationally or in multiple regions of the country, would face significant barriers to success.

71.     One key obstacle to expansion by regional firms or consortia is having the geographic footprint to serve large B-to-B customers, many of which operate nationally or in multiple regions of the country.  Creating a national distribution network anywhere close to that offered by Staples or Office Depot would be time and resource intensive.

72.     The next-largest vendor of consumable office supplies after the Defendants, W.B. Mason, operates only in 13 states, primarily in the Northeast. ███████████████

████████████████████████████████████████████

73.     Other vendors of consumable office supplies are many years and significant capital investments away from being in a position to replace the competition that Office Depot currently provides to Staples, even assuming those other vendors were likely to expand their geographic footprints.

74.     Additionally, entrants must develop sophisticated IT systems that large B-to-B customers expect, to allow customized ordering systems that interface with the customer's procurement, billing, and utilization tracking systems.  Such systems are costly to develop and maintain.

75.     Large B-to-B customers also value having a relationship with an experienced sales representative that understands their particular needs.  Thus, vendors seeking to enter or expand must recruit and hire a competent and experienced salesforce that can serve customers in

multiple regions of the country.  To hire enough sales representative to enter or expand on a sufficient scale to constrain the merged firm in multiple regions or nationally would take a significant amount of time and effort, particularly in light of non-competition and non-solicitation agreements that incumbent vendors have with their employees.

76.     Entrants also must overcome reputational barriers to entry and Defendants' strong incumbency advantage.  A significant percentage of RFPs are won by incumbent vendors—and often one of the Defendants.

77.     Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the strong presumption and evidence that the Merger likely would substantially lessen competition in the relevant market.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

78.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding.  In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.  Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

79.     The Commission is likely to succeed in proving that the effect of the Merger may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of

the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45.  In particular, the

Commission is likely to succeed in demonstrating, among other things, that:

a. The Merger would have anticompetitive effects in the market for the sale of consumable office supplies to large B-to-B customers;

b. Substantial and effective entry or expansion in these markets is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Merger; and

c. The efficiencies asserted by Defendants are insufficient as a matter of law to justify the Merger.

80.     Preliminary relief is warranted and necessary.  Should the Commission rule, after the full administrative trial, that the Merger is unlawful, reestablishing the status quo ante of vigorous competition between Staples and Office Depot would be difficult, if not impossible, if the Merger has already occurred in the absence of preliminary relief.  Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim, even if suitable divestiture remedies were obtained later.

81.     Accordingly, the equitable relief requested here is in the public interest. Wherefore, the Commission respectfully requests that the Court:

1. Temporarily restrain and preliminarily enjoin Defendants from taking any further steps to consummate the Merger, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

2. Retain jurisdiction and maintain the status quo until the administrative proceeding that the Commission has initiated is concluded; and

3.      Award such other and further relief as the Court may determine is

appropriate, just, and proper.

Dated:  December 7, 2015

Of counsel:

DEBORAH L. FEINSTEIN
(D.C. Bar 412109)
Director
Federal Trade Commission
Bureau of Competition

JONATHAN NUECHTERLEIN
(D.C. Bar 442470)
General Counsel
Federal Trade Commission

ALEXIS JAMES GILMAN
(D.C. Bar 483229)
Assistant Director

KEVIN HAHM
(D.C. Bar 463397)
Deputy Assistant Director

STELIOS S. XENAKIS
HELDER G. AGOSTINHO (D.C. Bar 1023275)
KIMBERLEY G. BIAGIOLI (D.C. Bar 996655)
KRISHA A. CERILLI (D.C. Bar 983281)
MARIA M. DIMOSCATO (D.C. Bar 489743)
STEPHANIE GRECO
KELLY A. HORNE (D.C. Bar 981775)
AMANDA G. LEWIS
MATTHEW D. MCDONALD
DAVID E. OWYANG
ROHAN K. PAI (D.C. Bar 1015652)
MICHAEL J. PERRY
ANGEL PRADO
RYAN K. QUILLIAN (D.C. Bar 994846)
HAIDEE L. SCHWARTZ (D.C. Bar 980754)
JOSHUA B. SMITH (D.C. Bar 979133)
ROBERT E. ZUVER, JR. (D.C. Bar 987216)

Attorneys
Federal Trade Commission
Bureau of Competition
Mergers IV Division

Respectfully Submitted

TARA L. REINHART
(D.C. Bar 462106)
Chief Trial Counsel
CHARLES A. LOUGHLIN
(D.C. Bar 448219)
Deputy Chief Trial Counsel
Federal Trade Commission
Bureau of Competition
400 Seventh Street, N.W.
Washington, D.C. 20024

*Attorneys for Plaintiff Federal Trade Commission*

FOR PLAINTIFF DISTRICT OF COLUMBIA:

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH S. GERE
Acting Deputy Attorney General
Public Interest Division

BENNETT RUSHKOFF (D.C. Bar #386925)
Assistant Deputy Attorney General
Public Integrity Unit

CATHERINE A. JACKSON (D.C. Bar #1005415)
Assistant Attorney General
441 4th Street, N.W., Suite 600 South
Washington, DC 20001
Tel: (202) 442-9864
Fax: (202) 715-7720
catherine.jackson@dc.gov

Attorneys for the District of Columbia

FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:

BRUCE R. BEEMER
First Deputy Attorney General

JAMES A. DONAHUE, III
Executive Deputy Attorney General
Public Protection Division
Pennsylvania State Bar #42624

Tracy W. Wertz
Chief Deputy Attorney General
Pennsylvania State Bar #69164
Commonwealth of Pennsylvania
Pennsylvania Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Fax: (717) 705-7110
twertz@attorneygeneral.gov

Norman Marden
Senior Deputy Attorney General
Pennsylvania State Bar #203423
nmarden@attorneygeneral.gov

Attorneys for the Commonwealth of Pennsylvania

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

FEDERAL TRADE COMMISSION
  600 Pennsylvania Avenue, N.W.
  Washington, D.C. 20580

                                    Plaintiff,                   08-cv-6379 (JNE/JJG)

          v.

LUNDBECK INC.,
  Four Parkway North, Suite 200,
  Deerfield, IL 60015

                                    Defendant.

## AMENDED COMPLAINT FOR PERMANENT INJUNCTION
## AND OTHER EQUITABLE RELIEF, INCLUDING
## DISGORGEMENT OF UNLAWFUL MONOPOLY PROFITS

Plaintiff, the Federal Trade Commission (FTC), by its designated attorneys,

petitions this Court, pursuant to Section 13(b)(2) of the Federal Trade Commission Act,

15 U.S.C. § 53(b)(2), for a permanent injunction and ancillary equitable relief against

defendant, Lundbeck Inc., for Lundbeck's unlawful asset acquisition and exercise of

monopoly power in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section

5 of the FTC Act, 15 U.S.C. § 45.

## NATURE OF THE CASE

1.      This action challenges an anticompetitive acquisition that is forcing

hospitals to pay monopoly prices for drugs used to treat premature babies born with a

potentially life-threatening congenital heart defect known as patent ductus arteriosus

(PDA).  Indocin and NeoProfen are the only two pharmaceutical treatments for PDA sold

in the United States.  Lundbeck – which was then named Ovation Pharmaceuticals, Inc.

(Ovation) – purchased rights to Indocin in August 2005 and then acquired the U.S. rights

to NeoProfen in January 2006.

2.     At the time Ovation (now Lundbeck, and hereafter called Lundbeck)

purchased the rights to Indocin, NeoProfen was awaiting approval by the Food and Drug

Administration (FDA).  Lundbeck expected that NeoProfen would take a substantial

portion of sales from Indocin.  To eliminate this competitive threat, Lundbeck acquired

NeoProfen.

3.     Once it acquired NeoProfen, Lundbeck immediately raised the price it

charged for Indocin nearly 1,300 percent, from $36 to approximately $500 per vial.

When Lundbeck launched NeoProfen in July 2006, it set a price of approximately $483

per vial, essentially matching Indocin's price.  Lundbeck has maintained prices for the

two PDA drugs at or above this level for more than two years.

4.     The only alternative treatment for PDA is surgery, which carries a risk of

serious complications and costs far more than treatment with drugs.  As a result, hospitals

have little choice but to pay Lundbeck's monopoly price for PDA drug therapy.  The

artificially high prices that hospitals are forced to pay ultimately raise costs for families,

tax-supported programs such as Medicaid, and other public and private purchasers.

5.     Lundbeck's acquisition of NeoProfen substantially reduced competition and

illegally maintained Lundbeck's monopoly in drug treatments for PDA, depriving

2

consumers of the benefits of competition and the lower prices such competition would bring. As a result of its unlawful acquisition, Lundbeck has obtained and continues to obtain substantial ill-gotten gains.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

7. This Court has personal jurisdiction over Lundbeck pursuant to 15 U.S.C. § 53(b) in that Ovation has the requisite minimum constitutional contacts with the United States of America and the State of Minnesota.

8. Venue in this district is proper under Section 13(b)(2) of the FTC Act, 15 U.S.C. § 53(b)(2), and 28 U.S.C. § 1391(b), (c), and (d) because Lundbeck resides or transacts business in the District of Minnesota.

## THE PARTIES

9. Plaintiff, the Federal Trade Commission, is an administrative agency of the United States, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The FTC has authority and responsibility for enforcing, *inter alia*, Section 5 of the FTC Act, which prohibits unfair methods of competition, and Section 7 of the Clayton Act, which prohibits acquisitions that may substantially lessen competition or tend to create a monopoly. The FTC is authorized under Section 13(b) of the FTC Act, 15

U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

10.     Defendant, Lundbeck, successor in interest to Ovation, is a privately owned, for-profit Illinois corporation with its headquarters at Four Parkway North, Deerfield, Illinois, 60015.  Lundbeck was established on or about March 19, 2009, as a result of the acquisition of Ovation by H. Lundbeck A/S, based in Denmark.  Lundbeck sells pharmaceuticals in more than 85 countries, including the United States.

11.     Lundbeck is, and at all relevant times has been, engaged in "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12.  Lundbeck's general business practices, its NeoProfen acquisition, and the unfair methods of competition alleged herein are acts "in or affecting commerce" within the meaning of Sections 4 and 5 of the FTC Act, 15 U.S.C. §§ 44 and 45.

12.     Lundbeck is, and at all times relevant has been, a "corporation" within the meaning of Section 4 of the FTC Act, 15. U.S.C. § 44.

## BACKGROUND

13.     PDA is a disorder that primarily affects very low birth weight premature infants.  In babies with this condition, the blood vessel connecting two major arteries of the heart, the aorta and the pulmonary artery, fails to close on its own soon after birth.  PDA can lead to fatal complications if not treated.

14.     The preferred treatment for PDA is drug therapy.  Surgery presents a risk of serious complications as well as much higher costs.

15.    Hospitals purchase PDA drugs for use in neonatal intensive care units.

16.    An estimated 30,000 cases of PDA are treated with drugs in the United States each year.

17.    Indocin (indomethacin for injection) was approved by the FDA to treat PDA in infants in 1985.  There are no unexpired patents on the product.  Until April 2006, Indocin was the only FDA-approved drug for treatment of PDA.

18.    In August 2005, Lundbeck purchased rights to Indocin from Merck & Co. Merck agreed to manufacture Indocin and supply it to Lundbeck.

19.    Upon acquiring Indocin from Merck, Lundbeck raised the price of Indocin from approximately $26 to $36 per vial.

## LUNDBECK ELIMINATES
## THE COMPETITIVE THREAT POSED BY NEOPROFEN

20.    When it acquired Indocin, Lundbeck became the only seller of PDA drug treatment in the United States.  But Lundbeck knew that it faced the threat of imminent entry from a new drug to treat PDA that was awaiting approval by the FDA, NeoProfen (ibuprofen lysine injectable).  Lundbeck expected NeoProfen to take substantial sales from Indocin.   Acquiring NeoProfen would eliminate this threat.

21.    In January 2006, Lundbeck purchased the U.S. rights to NeoProfen from Abbott Laboratories, Inc.  The size of the NeoProfen transaction fell below the regulatory threshold for reporting acquisitions to the federal antitrust agencies.  The FDA approved NeoProfen for treatment of PDA in premature infants in April 2006.

5

## LUNDBECK EXPLOITS ITS MONOPOLY POWER

22.     Once Lundbeck acquired rights to NeoProfen in January 2006, thereby eliminating NeoProfen as a competitive threat, it promptly raised the price of Indocin nearly 1,300 percent, from approximately $36 to approximately $500 per vial.

23.     The price at which Merck supplied Indocin to Lundbeck was a small fraction of the $36 per vial that Lundbeck had previously charged for Indocin.

24.     When Lundbeck launched NeoProfen as its second PDA drug in July 2006, it set the price of NeoProfen at slightly below the price of Indocin.

25.     Lundbeck has continued to charge prices for Indocin and NeoProfen at or above the level it set for those drugs in 2006.

## THE MONOPOLIZED MARKET

26.     The relevant line of commerce, or product market, in which to analyze the effects of Lundbeck's acquisition of NeoProfen is the sale of drugs approved by the FDA to treat PDA.

27.     Indocin and NeoProfen are the only two FDA-approved PDA drugs available in the United States.  Both products are intravenous formulations of non-prescription drugs (indomethacin and ibuprofen, respectively) and both work to close a patent ductus arteriosus through inhibition of prostaglandin synthesis.  Some physicians and hospitals consider Indocin and NeoProfen to be substitutes and exclusively use one product or the other for treating infants with PDA.  Many other physicians and hospitals

6

consider Indocin and NeoProfen to be reasonable substitutes for the vast majority of PDA patients.

28.     The relevant section of the country, or geographic market, in which to analyze the effects of Lundbeck's acquisition of NeoProfen is the United States.

29.     At all times relevant to the complaint, Lundbeck has possessed a 100 percent share of the relevant market.

30.     Direct evidence of Lundbeck's monopoly power in the relevant market includes Lundbeck's ability to raise the price of Indocin nearly 1,300 percent and to maintain prices for both Indocin and NeoProfen at or above this level for over two years.

**ENTRY BARRIERS**

31.     Lundbeck has charged a monopoly price for its PDA drugs for more than two years and during that time no competing PDA drug has entered the market.

32.     Developing a new drug and obtaining FDA approval to market it in the United States is a costly and time consuming process that takes substantially more than two years.  Entry by a generic version of an existing drug product requires a manufacturer to develop and obtain FDA approval for the generic product.  Once a company submits an application, FDA approval of a generic drug takes an average of about 18 months and the approval process can take two years or more.

33.     Characteristics of the market for PDA drugs also make entry difficult.  With an estimated patient population of 30,000, the PDA drug therapy market is small relative to numerous other pharmaceutical product markets, which limits sales opportunities for

7

any potential new entrant.  In addition, the patient population is exceedingly fragile, and any new entrant must convince physicians who treat premature infants with PDA to forgo use of an existing product with a well-established track record in favor of one that lacks such a history and may present a risk of unanticipated side effects.

34.     One company – Bedford Laboratories, Inc. – has FDA approval to sell a generic version of Indocin, but to date it has not entered the market.  Bedford received FDA approval for generic Indocin in July 2008.

35.     The earliest the FDA could approve a generic version of NeoProfen is 2013, because until then NeoProfen enjoys market exclusivity under the Orphan Drug Act, 21 U.S.C. §§ 360aa-360dd.  In addition, two patents claim NeoProfen, the latter of which expires in 2021.

## ANTICOMPETITIVE EFFECTS

36.     The effects of Lundbeck's acquisition of NeoProfen include, among other things:

> a.     eliminating the expected actual, direct, and substantial competition between Indocin and NeoProfen;
>
> b.     maintaining Lundbeck's monopoly in the sale of drugs to treat PDA in the United States;
>
> c.     enabling Lundbeck to exercise monopoly power in the relevant market;
>
> d.     eliminating the competitive constraint that the independent introduction of NeoProfen in 2006 would have placed upon the price of Lundbeck's first PDA drug, Indocin;

e.      dramatically increasing the price of PDA drug treatment;

f.      raising the cost that hospitals and other purchasers, including federal and state agencies, pay for drugs to treat PDA; and

g.      depriving consumers of the benefits of competition from entry of NeoProfen as an independent competitor in the market for sale of drugs for PDA in the United States.

37.     By acquiring NeoProfen, dramatically increasing the price of Indocin, and pricing NeoProfen to virtually match the Indocin price, Lundbeck has unlawfully maintained its monopoly and unlawfully profited from its ability to extract monopoly price increases.

38.     Had Lundbeck not acquired NeoProfen, an independent competitor likely would have entered the market, and prices for both Indocin and NeoProfen would have been substantially below the monopoly prices Lundbeck has charged since January 2006.

**VIOLATIONS**

**COUNT I – UNLAWFUL ACQUISITION IN
VIOLATION OF CLAYTON ACT § 7 AND FTC ACT § 5**

39.     Paragraphs 1-38 above are realleged as if fully set forth.

40.     Lundbeck's acquisition of rights to NeoProfen is an asset acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

41.     The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in PDA drugs for sale in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

## COUNT II – MONOPOLIZATION

42.     Paragraphs 1-38 above are realleged as if fully set forth.

43.     Lundbeck has, and at all relevant times has had, monopoly power in the market for the sale of drugs for treatment of PDA in the United States.

44.     Lundbeck willfully maintained its monopoly power by acquiring the U.S. rights to NeoProfen.  Eliminating the competitive threat that an independent NeoProfen posed is conduct reasonably capable of contributing significantly to Lundbeck's maintenance of monopoly power.

45.     With its monopoly power secure, Lundbeck raised the price of Indocin by nearly 1,300 percent, set the price of NeoProfen therapy at approximately the same level, and has maintained prices at or above this level since 2006.

46.     Lundbeck's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

WHEREFORE, the FTC respectfully requests that this Court, as authorized by 15 U.S.C. §§ 26 and 53(b)(2), and pursuant to the Court's inherent equitable powers:

1.     Adjudge Lundbeck's acquisition of NeoProfen to violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45;

2.     Order divestiture, rescission, and any further actions needed to establish the competition that would have existed but for the unlawful acquisition of NeoProfen;

10

3.     Permanently enjoin Lundbeck, including any subsidiaries, joint ventures, and any persons acting on behalf of Lundbeck, from acquiring or maintaining any simultaneous legal or beneficial interest in NeoProfen and Indocin; and

4.     Grant such other equitable relief, including disgorgement of all unlawfully obtained profits, as the Court finds just and proper to redress and prevent recurrence of Lundbeck's unlawful conduct.

Dated: April 10, 2009                                        Respectfully submitted,

Of Counsel:                                                       /s/ Kyle Chadwick
                                                                          (all admitted *pro hac vice*)
DAVID P. WALES                                          J. ROBERT ROBERTSON
Acting Director                                               Chief Trial Counsel
Federal Trade Commission                          MARKUS H. MEIER
Bureau of Competition                                 Assistant Director
                                                                          KYLE CHADWICK
KENNETH L. GLAZER                               Senior Trial Counsel
Senior Deputy Director                                MARTHA OPPENHEIM
Federal Trade Commission                          PHILIP M. EISENSTAT
Bureau of Competition                                 ROBERT S. CANTERMAN
                                                                          SUE KIM
DAVID C. SHONKA                                   JON J. NATHAN
Acting General Counsel                                Attorneys
Federal Trade Commission                          Federal Trade Commission
                                                                          Bureau of Competition
                                                                          601 New Jersey Ave. N.W.
                                                                          Washington, DC 20580
                                                                          (202) 326-3725
                                                                          kchadwick@ftc.gov

                                                                          Attorneys for Plaintiff Federal Trade
                                                                          Commission in No. 08-cv-6379