UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Civil Action No. 20-3590 (JEB)

## ORDER

Plaintiff the Federal Trade Commission will soon present its case that Defendant Meta Platforms, Inc., violated Section 2 of the Sherman Act in acquiring Instagram and WhatsApp. The parties have now each filed a host of Motions *in Limine* in an effort to shape the evidence that will be admitted at trial. See ECF Nos. 402-1 (Nieh MIL), 403-1 (Presser-Roberts MIL), 405-1 (Meta MIL); see also ECF Nos. 412-1 (FTC Opp.), 414-1 (Opp. to Presser-Roberts MIL), 416-1 (Opp. to Nieh MIL), 420-1 (Presser Roberts Reply), 421-1 (Nieh Reply), 424-1 (Meta Reply). The Court's subsequent analysis begins with Meta's Motions and then moves to the FTC's, always bearing in mind the well-accepted maxim that trial courts in civil bench trials "are afforded broader than usual latitude to admit evidence as they see fit," Cobell v. Norton, 224 F.R.D. 266, 285 (D.D.C. 2004), because judges in their factfinding role "routinely disregard inadmissible evidence." NLRB. v. Jackson Hosp. Corp., 257 F.R.D. 302, 307 & n.2 (D.D.C. 2009). At this preliminary stage, the Court will therefore exclude proffered testimony or evidence only upon a clear showing that is entirely unreliable, nonprobative, or otherwise

1

inconsistent with the Federal Rules of Evidence. That approach is especially appropriate here because trial time will be allocated by a chess clock, thus discouraging the introduction of irrelevant or minimally relevant evidence. The Court, finally, assumes its ability to minimize any evidence a party believes prejudicial.

I.     **Meta's Motions** *in Limine*

Meta seeks an Order directing the FTC "not to mention, discuss, imply, argue, or allude to" seven different categories of information. See Meta MIL at 1. The Court takes them in turn.

First, Defendant would like to exclude "any expert testimony or argument that is inconsistent with the FTC's contention . . . that the 'personal social networking' market is an 'all-in' market that includes everything users do on Facebook and Instagram except for Facebook Dating." Meta MIL at 1, 2–3. According to Meta, Plaintiff previously "committed to an 'all-in' market definition" in discovery, and permitting it to change its "candidate market" now would "run afoul of the Court's order and prejudice Meta's defense." Id. at 10. The FTC has consistently maintained, however, that the relevant product market is the one for personal social-networking services. See id. at 2 (admitting as much). Meta's objection goes to what is included in that market, but that is "basically a fact question dependent upon the special characteristics of the industry involved." FTC v. Meta Platforms, Inc., 2024 WL 4772423, at *8 (D.D.C. Nov. 13, 2024) (quotation marks omitted). That the boundaries of Plaintiff's purported product market — and, correspondingly, the most accurate measurements of market share — might shift throughout discovery (especially given the fluidity of tech advancements) is therefore not, on its own, a reason to exclude any evidence or testimony. Indeed, Defendant's Motion asks, in effect, that the Court predetermine that factual question now. That is the purpose of trial. The Court sees no

2

reason to prevent either side from amply presenting its case for the proper boundaries of the relevant product market. It will thus deny this Motion.

Second, Meta seeks exclusion of "argument or evidence about or in support of claims or allegations this Court has already dismissed or that the FTC has abandoned," Meta MIL at 1 — namely, other acquisitions that Meta pursued and that are not at issue in this case. See id. at 18–20. Defendant is correct that those acquisitions cannot form the basis of any liability. The FTC must show that either the Instagram acquisition or the WhatsApp acquisition (or both) were anticompetitive, not that Meta pursued an anticompetitive "course of conduct" consisting of both those purchases and others not at issue. See FTC Opp. at 22. The Court, however, will permit Plaintiff to discuss such acquisitions as are necessary to provide general context for the claims centrally at issue; it will not allow an involved minitrial on any. This Motion is therefore granted in part and denied in part.

Third, Meta objects to "argument or . . . testimony concerning the FTC's unsubstantiated assertion that Meta's document submissions under the Hart-Scott-Rodino Act were incomplete in 2012 (for Instagram) or 2014 (for WhatsApp)." Meta MIL at 1; see id. at 21. The basis for Meta's objection is that the FTC previously blocked discovery into those submissions by asserting the deliberative-process privilege, so it should not now be permitted to put Meta's HSR submissions at issue in the trial. See id. at 23–24. Defendant is correct. To the extent that the HSR process arises at trial, the FTC will not be permitted to submit evidence — previously blocked in discovery — that Meta's submissions were incomplete or inadequate. In granting this Motion, however, the Court reminds Meta that reliance on the purported validity of the HSR process is not especially probative. The Court has already twice "rejected this argument, and it

3

sees no reason to revisit that issue." Meta Platforms, 2024 WL 4772423, at *29 (citation omitted).

Fourth, Meta asks the Court to bar any "inflammatory material relating to the FTC's legally irrelevant assertions about user mental health and how some users might misuse Meta's services," Meta MIL at 1 — specifically, the prevalence of "objectionable" "third-party" content on its platforms and the relationship of social media to mental health. See id. at 26. Defendant suggests that Plaintiff seeks to "use this trial as a platform to scourge Meta and social media generally." Id. As another court in this district has recently held, however, "[T]he various Courts of Appeals are in relative unanimity that prejudice objections have no logical application in bench trials," and "excluding relevant evidence on the basis of unfair prejudice [in a bench trial] is a useless procedure." United States v. Griffith, 2023 WL 2043223, at *2 (D.D.C. Feb. 16, 2023) (cleaned up). The FTC explains that it seeks to admit such material to rebut Meta's assertion that its acquisition of Instagram was procompetitive because its "tools and expertise helped Instagram attack its integrity problems at scale." FTC Opp. at 34 (quotation marks omitted). Evidence tending to address a central element of a party's defense is plainly relevant. The Court will therefore deny this Motion.

Fifth, Meta objects to the admission of filings to foreign-competition regulators made by individuals employed by "Meta's rivals" on the basis that such "lawyer-crafted advocacy" is impermissible hearsay. See Meta MIL at 1, 34. These regulatory filings contain "statements by industry participants regarding" the existence of a possible market for personal social networking, as well as "competition in that market." FTC Opp. at 46. Plaintiff first responds that such filings should be admitted under the residual hearsay exception for documents. Id. at 47; see Fed. R. Evid. 807(a) (permitting admission of hearsay where it is "supported by sufficient

4

guarantees of trustworthiness" and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"). The D.C. Circuit has cautioned, however, that this exception is "extremely narrow" and should be used "sparingly," "only if the out-of-court statement is both very important and very reliable." United States v. Mason, 951 F.3d 567, 574 (D.C. Cir. 2020) (quotation marks omitted). While the Court has no reason to assume that the filings are false or grossly exaggerated, it is nonetheless not persuaded that they meet the very high bar set by Rule 807(a).

That said, the FTC's fallback position is that the filings are admissible not for the truth of the matter asserted, but as evidence of "industry or public recognition" of a certain product market. See FTC Opp. at 45–46 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)). On this understanding, descriptions in the regulatory filings that, for example, purport to define the features of PSN services or to identify the relevant competitors would be used not to show that those assertions were true, but only to demonstrate that an industry player thought they were true. Such representations would not be hearsay. See United States v. Hall, 613 F.3d 249, 256 (D.C. Cir. 2010) (statement that individual "believed" his conduct was "legal" was not hearsay evidence if offered only to show what he believed, not whether conduct was, in fact, legal). They would also be relevant: an industry player's belief that a certain market exists, expressed in a formal filing with a state regulatory authority, is relevant to the Brown Shoe factor that aims to capture such industry recognition. The Court will thus deny this Motion in part and permit the introduction of such evidence to show "industry or public recognition" of a distinct product market.

Sixth, Meta seeks to exclude Professor Rim's rebuttal opinion on the likelihood that WhatsApp would "develop a social networking offering similar to Facebook." Meta MIL at 38

(quotation marks omitted). According to Defendant, Rim is unqualified to offer such an opinion and used no reliable methodology to reach it, and it is therefore excludable on that basis. See id. at 39–40. As the FTC rightly points out, however, Rim's relevant experience is extensive, including lengthy stints in tech-focused venture capital, serving as the CEO and Board Director of Kakao Corporation ("one of the largest publicly traded technology companies in Korea" and a company that owns and operates both a mobile messenger and a PSN service), and teaching at a leading business school. See FTC Opp. at 55–56. Such experience "alone can constitute a basis of 'reliable principles and methods.'" Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A., 315 F. Supp. 3d 101, 110 (D.D.C. 2018) (quoting Fed. R. Evid. 702(c)); see also id. at 110–11 (collecting cases). Whatever the merits of Rim's expert opinion, he also clearly "connects [that] particular relevant experience to his conclusions," Arsanjani v. United States, 2023 WL 3231101, at *8 (D.D.C. May 3, 2023); see FTC Opp. at 57–60, and the Court is not persuaded that it constitutes "rampant speculation." Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 568 (D.C. Cir. 1993) (quotation marks omitted). Meta's objections to his opinion go to its weight, not its admissibility. The Court will therefore deny this Motion.

       Finally, Meta lodges another methodology-based objection to the testimony of Professor Hemphill. It argues that Hemphill's reliance on another expert's (Michal Malkiewicz's) survey data in order to compute *pro rata* market shares is unreliable "junk science" because it commits a category error — namely, confusing data measuring the "most important" reason respondents use an application with the time they spend pursuing that preference. See Meta MIL at 1, 43–44, 45–48. To be sure, the connection between survey data measuring reasons for using an application and the time spent on certain applicants is open to attack, but the Court is not persuaded that Hemphill's opinion must be excluded on that basis under Rule 702.

To start, Meta appears to assume that there could not possibly be a relationship between a person's reasons for using an application and the amount of time spent using the application for that purpose. See Meta MIL at 47–48 (contending that the surveys "provide no information . . . about how much time consumers spend performing any use case on the apps and services at issue"). But Defendant presents no evidence why that must be the case, instead asserting repeatedly that it is simply "nonsense" to assume such a relationship exists. See Meta Reply at 34. Other methods of determining *pro rata* market share, moreover — such as monthly average users (MAUs) or daily average users (DAUs) — may be less susceptible to Meta's objections on this score, as the Court has already indicated. Meta Platforms, 2024 WL 4772423, at *20 ("[I]f the millions of people who open their Facebook or Instagram applications every day do so in part because those applications meet a specific need for friends-and-family sharing, it is plausible that all those users should 'count' as part of Meta's MAUs or DAUs, even if some (or even most) of their time spent on Meta's products does not strictly relate to such sharing.").

More to the point, Meta offers no alternative way to calculate use-case-specific market shares. The Court does not deny that Plaintiff will have to carry its burden at trial to demonstrate that Meta possesses a predominant share of a relevant product market, and Defendant is free at trial to attack the evidence Plaintiff presents however it wishes. The Court will not, however, exclude one of the few methods in the record for calculating a potentially relevant market share simply because Meta wishes to begin those attacks early. See United States v. Anthem, Inc., 236 F. Supp. 3d 171, 207 (D.D.C. 2017) ("[P]laintiffs need not present market shares . . . with the precision of a NASA scientist. The closest available approximation often will do.") (internal quotation marks omitted). The Court will therefore deny this Motion.

7

## II.     FTC's Motions *in Limine*

### A.     Jason Nieh

The FTC first requests that the Court use Rule 702 to bar Meta's expert Jason Nieh from testifying on the cost benefits of moving Instagram and WhatsApp to Meta's infrastructure. See Nieh MIL at 1–2; see also Fed. R. Evid. 702.  Specifically, it argues that his opinion on cost savings is unsupported by facts and does not result from an accepted methodology or specialized knowledge.  Id. at 4–12.  Meta retorts that Nieh does "not seek to provide a comprehensive estimate of all of the costs that Meta has saved by operating Instagram and WhatsApp on its infrastructure," but only to explain "several specific ways in which Meta's technical choices in building its infrastructure have enabled it to optimize for providing superior performance at a relatively low cost compared to alternatives," which he is qualified to do.  See Opp. to Nieh MIL at 5.  Cost-saving and cost-performance analysis, Defendant continues, are two significantly different concepts, with the latter being defined as "the cost required to achieve a desired performance level."  ECF No. 402-3 (Nieh Report), ¶ 75.

To the extent that Nieh is testifying that Meta has been able to optimize its cost performance in a way that is likely better than those of other infrastructures, he is qualified to do so.  See, e.g., id., ¶ 79 ("[T]he long-term costs of relying on the public cloud exceed the costs of running one's own infrastructure."); id., ¶ 83 ("Cloud providers have various non-uniform capabilities, and each application must be designed to work with each cloud provider's particular capabilities.  To switch cloud providers, therefore, it is necessary to modify software to make it compatible with the new providers' distinct capabilities.  Such modifications can be costly."). He has trained and published for decades in the key technologies used in the various infrastructures that he now compares, and, as stated above, such experience "alone can constitute

8

a basis of 'reliable principles and methods.'" Bazarian, 315 F. Supp. 3d at 110 (quoting Fed. R. Evid. 702(c)); Nieh Report, ¶¶ 1–7.

To the extent, however, that he seeks to establish that Meta's infrastructure definitively has a lower cost performance than other infrastructures, he does not meet Rule 702's qualification requirements to do so. To say that Meta's cost performance is outright cheaper, he must know what it costs to run the applications on Meta's infrastructure as well as the cost to run at the same performance level on other infrastructures. But Nieh does not possess information on "how much it costs or has cost Meta to operate Instagram or WhatsApp on its infrastructure." Nieh MIL at 4. The Court will therefore deny the FTC's request to bar Nieh from testifying that Instagram and WhatsApp likely have a lower cost performance on Meta's infrastructure than on alternatives, but it will grant the FTC's Motion as it relates to Nieh's opinions that Meta definitively has a lower cost performance than competing infrastructures.

      B.     Adam Presser and Julia Roberts

The FTC next asks the Court to admit the testimony of Adam Presser, the representative from TikTok, Inc., and Julia Roberts, the representative of Pinterest, Inc., as to topics addressing those companies' responses to a European Commission Request for Information. See Presser-Roberts MIL at 1–2. Meta responds that their testimonies should be barred as neither witness was involved in the ROIs and thus has no personal knowledge on the subject. See Opp. to Presser-Roberts MIL at 3–4, 6–7, 8.

To frame this question, we need to look at the relevant rules. Federal Rule of Civil Procedure 30(b)(6) permits a party in pretrial discovery to depose an organization through its representative, who is not required to possess personal knowledge of the content of the testimony. See 8A Charles Alan Wright *et al.*, Federal Practice and Procedure, at § 2103 (3d ed.

2023). Deposition testimony, in turn, may be used at trial only if it "would be admissible under the Federal Rules of Evidence if the deponent were present and testifying." Fed. R. Civ. P. 32(a)(1)(B). In addition, Federal Rule of Evidence 602 specifies that testimony is only admissible if the witness has personal knowledge of the matter on which she is testifying.

At first glance, Rule 602 appears to foreclose the use at trial of deposition testimony from company representatives who lack personal knowledge of a particular corporate transaction. However, "using a deposition transcript at trial is one of the main reasons for taking a deposition." Kraft Foods Glob., Inc. v. United Egg Producers, Inc., 2023 WL 5647204, at *9 (N.D. Ill. Aug. 31, 2023). To square FRCP 30(b)(6) with FRE 602, one court remarked that the former was established to minimize barriers to obtaining information from corporate entities, and "strictly imposing the personal knowledge requirement would only recreate the problems that Rule 30(b)(6) was created to solve." Sara Lee Corp. v. Kraft Foods Inc., 276 F.R.D. 500, 503 (N.D. Ill. 2011). That court thus construed a corporate representative as satisfying the personal-knowledge requirement since he was "testif[ying] vicariously, for the corporation, as to its knowledge and perceptions." Id. (internal quotation marks omitted); see also Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP, 2020 WL 10505198, at *1 (N.D. Ill. Dec. 4, 2020) ("Federal Rule of Evidence 602's personal knowledge requirement does not preclude 30(b)(6) testimony that is in the nature of 'corporate knowledge.'"). This Court finds such reasoning persuasive here, especially since this is a bench trial, where more latitude is afforded to the admission of evidence. See Cobell, 224 F.R.D. at 285. The Court will thus admit Presser's and Roberts's testimony based on corporate knowledge.

The Court, accordingly, ORDERS that the [404] and [408] Motions *in Limine* are GRANTED IN PART and DENIED IN PART, and the [407] Motion *in Limine* is GRANTED.

/s/ James E. Boasberg<br>
JAMES E. BOASBERG<br>
Chief Judge

Date: April 7, 2025