**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

FEDERAL TRADE COMMISSION,

        Plaintiff,

    v.

META PLATFORMS, INC.,

        Defendant.

---

Case No. 1:20-cv-03590-JEB

**DEFENDANT'S PRETRIAL BRIEF**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

CONTROLLING LEGAL STANDARDS .................................................................... 3

I.      Alleged Monopoly Power Over "Personal Social Networking" – Today ........................ 3

      A.      Topic #1:  The FTC Must Proffer Direct or Second-Best Indirect
              Evidence That Proves Monopoly Power – Today ..................................................... 3

      B.      Topic #2:  Indirect Evidence Requires Proof That Product
              Differences Make Services Unacceptable as Substitutes ......................................... 9

II.     The Instagram and WhatsApp Acquisitions ....................................................... 19

      A.      Topic #3:  The FTC Must Prove the Effect of the Acquisitions Was
              Anticompetitive – Intent Is Not Relevant Here ..................................................... 19

      B.      Topic #4:  The FTC Bears the Rebuttal Burden on Procompetitive
              Benefits ................................................................................................................... 22

# TABLE OF AUTHORITIES[*]

Page

## CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396 (7th Cir. 1989) ....................20

*AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216 (2d Cir. 1999)................................7

*AMR Corp., In re*, 625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL
2563897 (2d Cir. Mar. 20, 2023), *cert. denied*, 144 S. Ct. 102 (2023)............................21

\* *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) .......................5, 8

*BanxCorp v. Bankrate, Inc.*, 2019 WL 2098842 (D.N.J. Mar. 21, 2019),
*aff'd*, 847 F. App'x 116 (3d Cir. 2021) ...............................................................5

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ...........................................................................5

\* *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)...............4, 20, 22

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...............................14, 15, 16, 19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...........................................21

*California Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ........................................................22, 24

\* *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537
(2d Cir. 1993)...........................................................................................23

*DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332 (Fed. Cir. 2014) ....................................9, 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................10

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009)..................................................................13

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), *cert. denied*,
144 S. Ct. 681 & 682 (2024)..........................................................................25

\* *EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig., In re*,
44 F.4th 959 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1748 (2023)................................21

*Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849 (1st Cir. 2016) ...........................................12

---

[*] Authorities principally relied upon are marked with an asterisk.

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999) ....................................................................................................................5

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ..................................13, 24

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ...................................9

\* *FTC v. Facebook, Inc.*:

560 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................3, 23

581 F. Supp. 3d 34 (D.D.C. 2022) ........................................................................3

*FTC v. Freeman Hosp.*, 69 F.3d 260 (8th Cir. 1995) ...................................................15

*FTC v. Lundbeck, Inc.*, 650 F.3d 1236 (8th Cir. 2011)................................................10

\* *FTC v. Meta Platforms, Inc.*, 2024 WL 4772423 (D.D.C. Nov. 13, 2024) .............6, 10, 22, 23, 25

*FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069 (N.D. Cal. 2023), *appeal pending*, No. 23-15992 (9th Cir.) ........................................................................................24

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (3d Cir. 2020)..................................................25

*FTC v. R.R. Donnelley & Sons Co.*, 1990 WL 193674 (D.D.C. Aug. 27, 1990).........................12

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ............................................9

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019).........................................3

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ...........................................18

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023)..........................................3

*FTC v. Tapestry, Inc.*, --- F. Supp. 3d ---, 2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024) .............................................................................3-4

*FTC v. Tempur Sealy Int'l, Inc.*, --- F. Supp. 3d ---, 2025 WL 617735 (S.D. Tex. Feb. 26, 2025)....................................................................................16

*FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999) .................................15

\* *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) .............................15, 16, 17, 18

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018).........................10, 18

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485 (2d Cir. 2004).......................7, 9

\* *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701
(S.D.N.Y. 1997) ...........................................................................................................11, 12

\* *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792 (1st Cir. 1988) ...........................10

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275
(10th Cir. 2004)......................................................................................................................11

*Gross v. Wright*, 185 F. Supp. 3d 39 (D.D.C. 2016) ......................................................................10

*Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008)...................8

\* *IGT v. All. Gaming Corp.*, 702 F.3d 1338 (Fed. Cir. 2012)......................................................12, 15

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010)................................................5

\* *Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009)...................................15

\* *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710 (7th Cir. 2006)............................6

*Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012) ..............................................17

*Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323 (3d Cir. 2018) ..........................................10

*Live Concert Antitrust Litig.*, *In re*, 247 F.R.D. 98 (C.D. Cal. 2007) ...........................................13

\* *Lorazepam & Clorazepate Antitrust Litig.*, *In re*, 467 F. Supp. 2d 74 (D.D.C. 2006) ...................9

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) .....................................................................8

*Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38 (D.D.C. 2008) ........................................13

\* *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ..................12, 18

*Mullis v. Arco Petroleum Corp.*, 502 F.2d 290 (7th Cir. 1974)......................................................11

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) .................................................................................................13

*Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831 (D.C. Cir. 2006) ........................................24

*NCAA v. Alston*, 594 U.S. 69 (2021).........................................................................................23, 25

*NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984)..............................................22

*NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614 (D.D.C. 1991) .....................................................22

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................22

*New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) ...............................20

\* *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ....................................4

\* *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360 (9th Cir. 1988) ...........................8

\* *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ............................................4, 6, 23, 25

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) ......................20

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., In re*, 714 F. Supp. 3d 65 (E.D.N.Y. 2024)........................................................................6

*Pennsylvania v. Centre Lane Partners, LLC*, 2024 WL 4792043 (W.D. Pa. Nov. 14, 2024) ......................................................................19

*PepsiCo, Inc. v. Coca-Cola Co.*:

    114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002)......................19

    315 F.3d 101 (2d Cir. 2002)........................................................................16

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007) ............................24

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) ......................................21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ............................12

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ....................................5

*Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327 (2d Cir. 2024)..........................10

*Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312 (7th Cir. 2006)...........................14

*Reynolds Metals Co. v. FTC*, 309 F.2d 223 (D.C. Cir. 1962)........................................10

\* *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) .......7, 9, 14, 19

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002) ...................... 10-11

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989) .................11, 15

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) ................................8

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991).................................12

*U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305 (3d Cir. 2010) ....................................15

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .......................................14

*United States v. AT&T Inc.*:

  310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ...................24

  916 F.3d 1029 (D.C. Cir. 2019) ...................................................................................25

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ....................................................11

*United States v. Eastman Kodak Co.*, 853 F. Supp. 1454 (W.D.N.Y. 1994),
  *aff'd*, 63 F.3d 95 (2d Cir. 1995) .............................................................................. 8-9

* *United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir. 1997) ...............................19

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993) ........................................19

*United States v. Google LLC*:

  687 F. Supp. 3d 48 (D.D.C. 2023) ............................................................... 21-22

  747 F. Supp. 3d 1 (D.D.C. 2024) ....................................................................7, 21

* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ............................3, 4, 7, 10, 20, 23

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004)..................................14, 15

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ........................................11

*USFL v. NFL*, 1986 WL 10620 (S.D.N.Y. July 31, 1986) ..............................................10

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)....................................25

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001) ...........................21

**STATUTES**

Clayton Act, 15 U.S.C. § 12 *et seq.* ...........................................................................21, 23

  § 7, 15 U.S.C. § 18......................................................................................21, 23

Sherman Act, 15 U.S.C. § 1 *et seq.* ..............................................................................1, 3

  § 2, 15 U.S.C. § 2..........................................................................1, 2, 3, 5, 6, 23

15 U.S.C. § 53(b) .........................................................................................................3

**OTHER MATERIALS**

Br. of the Fed. Trade Comm'n, *McWane, Inc. v. FTC*, No. 14-11363
    (11th Cir. Aug. 29, 2014), ECF No. 64.................................................................................18

## INTRODUCTION

Defendant Meta Platforms, Inc. ("Meta") respectfully submits this brief to assist the Court as it considers the evidence in the forthcoming trial. Meta submits this brief not to summarize or argue the evidence but rather to provide controlling authority on fundamental points of law that set the bar for what the FTC will need to prove.

***First***, the law as to element one of the FTC's Sherman Act § 2 claim – monopoly power in a properly defined relevant antitrust market:

- ***Topic #1:  The FTC Must Present Direct or Second-Best Indirect Evidence That Proves Monopoly Power – Today.***  The FTC must prove that Meta has monopoly power in its claimed relevant market *now*, not at some time in the past.  The primary evidence the FTC must marshal – proof of supracompetitive prices, reduced output, or (maybe) reduced quality – necessarily requires comparison with a competitive benchmark, which the FTC has not even tried to establish.  The secondary or "indirect" evidence (i.e., significant shares in a well-defined relevant market) is a proxy for proof of power; it can establish only a rebuttable presumption.  The FTC asks the Court to turn a blind eye to ample direct evidence of expanding output and other objective quality improvements in favor of alleged indirect evidence that Meta possesses the power to restrict output – even though it never has.

- ***Topic #2:  Indirect Evidence Requires Proof That Product Differences Make Services Unacceptable as Substitutes.***  For market definition, the controlling legal question is not whether products have differences – most products are differentiated – but whether such differences prevent them from being acceptable substitutes for consumers.  Evidence of mere differentiation is insufficient to prove products are not substitutes.  In this case, the evidence of substitution to and from apps like TikTok,

YouTube, messaging apps, and others is determinative. Claims that these services are different in some respects from Meta's apps prove only that these close competitors innovate in features and function to lure user minutes from each other (indeed, Facebook and Instagram and Snapchat are all differentiated yet within the FTC's alleged relevant market).

*Second*, the law as to element two of the FTC's claim – maintenance of monopoly power through unlawfully anticompetitive or "exclusionary" conduct – for both challenged acquisitions (Instagram in 2012 and WhatsApp in 2014):

- ***Topic #3:  The FTC Must Prove the Effect of the Acquisitions Was Anticompetitive – Intent Is Not Relevant Here.***  Intent is relevant in antitrust cases only to the extent it provides evidence of likely effects. Where, as here, the actual effects are known, that effects evidence is determinative. Yet the FTC's case rests almost entirely on emails (many more than a decade old) allegedly expressing competitive concerns – i.e., "intent" evidence – without any evidence of anticompetitive effects, which is what matters in a retrospective Section 2 case like this one.

- ***Topic #4:  The FTC Must Prove That Procompetitive Benefits Actually Achieved Would Have Been Achieved – and as Quickly – Without the Acquisitions.***  Once Meta establishes that, for example, output expanded dramatically to hundreds of millions more U.S. users as a direct result of Meta's stewardship (the very definition of a procompetitive benefit or acquisition efficiency), it is the FTC's burden to prove that the acquired apps would have achieved the same or greater procompetitive benefits – and as quickly – without Meta. In the face of a mountain of evidence about the benefits that Meta gave to Instagram and WhatsApp, the FTC will offer nothing but implausible speculation, which cannot carry its burden.

2

## CONTROLLING LEGAL STANDARDS

I.    **Alleged Monopoly Power Over "Personal Social Networking" – Today**

    A.    ***Topic #1:  The FTC Must Proffer Direct or Second-Best Indirect Evidence That Proves Monopoly Power – Today***

    1.    "[T]he FTC must prove that [Meta] is currently violating the antitrust laws," which turns on evidence of competition ***today***.  Order at 1 (Apr. 2, 2025), ECF No. 503 (explaining that the TikTok outage in 2025 is "certainly relevant").  Otherwise, it has no authority to maintain this lawsuit.  *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 12 (D.D.C. 2021) (quoting 15 U.S.C. § 53(b)); *see also*, *e.g.*, *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159-61 (3d Cir. 2019)  The FTC has repeatedly acknowledged that its authority "to bring this case in federal court" depends on whether Meta "*is violating* or is about to violate" Section 2 of the Sherman Act "within the meaning of Section 13(b) of the FTC Act."  Am. Compl. ¶ 18 (Aug. 19, 2021), ECF No. 82 (emphasis added); *see also* FTC Pretrial Statement at 1-2 (Mar. 12, 2025), ECF No. 417; FTC Opp. to Mot. To Dismiss Am. Compl. at 37 (Nov. 17, 2021), ECF No. 85.  That requires proving Meta *possesses* – present tense – monopoly power today.  *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 43 (D.D.C. 2022); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam) ("possessing monopoly power" is "a necessary element of a monopolization charge").  Therefore, as the FTC has itself successfully argued in another case, "the Court should measure the cross-elasticity of demand in the present day" to assess monopoly power and market definition.  *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 38 (D.D.C. 2023); *see id.* at 39 ("[T]he Court concludes that focusing on the state of the market now to determine the relevant product market is appropriate, and the Court will adopt the FTC's framework."); *see also FTC v. Tapestry, Inc.*, --- F. Supp. 3d ---, 2024 WL

4647809, at *33 (S.D.N.Y. Nov. 1, 2024) (focusing on "today," it would be "ideal to use data from 2024 to analyze diversion in 2024").

2.      There are two ways for the FTC to prove Meta possesses monopoly power today. The most relevant and reliable is direct evidence. The FTC cannot claim any such evidence here, and indeed the direct evidence will refute the claim of monopoly power. With the direct evidence proving – if anything – the *absence* of monopoly power, the FTC will resort to indirect evidence. But that requires proof of a high market share protected by significant entry barriers in a properly defined relevant market, which must include *all* products that consumers can turn to as reasonable substitutes. The FTC will fall short because it artificially limits its share calculations to Meta and only two other apps (Snapchat and MeWe), while ignoring other obvious and obviously constraining substitutes – *closer* substitutes than Snapchat – such as TikTok, YouTube, and iMessage.

a.      *First*, direct evidence: "[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level." *Microsoft*, 253 F.3d at 51. Direct evidence of monopoly power requires proof that the alleged monopolist restricted output or raised price significantly above a benchmark, i.e., the "*competitive level*" that would prevail without any monopoly. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) (rejecting antitrust claim where "the price and output data do not support" that defendant "elevated prices above a *competitive level*") (emphasis added); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013) (Gorsuch, J.) ("To prevail on a section 2 claim, a plaintiff generally must show the defendant possessed sufficient market power to raise prices substantially above a competitive level without losing so much business that the gambit becomes unprofitable."); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 547-48 (2018) (plaintiff must "offer . . . evidence that the price of [the relevant product] was higher than the price one would

4

expect to find in a competitive market"); *BanxCorp v. Bankrate, Inc.*, 2019 WL 2098842, at *4 (D.N.J. Mar. 21, 2019) (requiring "baseline measure of competitive pricing"), *aff'd*, 847 F. App'x 116 (3d Cir. 2021).

"Without market power to increase prices above competitive levels, and sustain them for an extended period, a predator's actions do not threaten consumer welfare." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (plaintiff failed to show market power or anticompetitive effects where "there is nothing establishing the competitive level above which [defendant's] allegedly anticompetitive conduct artificially raised prices"). Antitrust courts require this benchmarking against a competitive level because "a reasonable finder of fact cannot infer monopoly power just from higher prices – the difference may reflect a higher quality more costly to provide" or simply industry-wide price increases due to higher costs. *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475-76 (9th Cir. 1997) (holding that higher prices without "accompanying showing of restricted output" fails as "direct evidence" under Section 2), *aff'd*, 525 U.S. 299 (1999); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986) (monopoly power is "the ability to cut back the market's total output and so raise price"). There will be no evidence here that Meta raised price at all, much less above a competitive level. Nor will the FTC prove the required output restriction; output is exploding on a marketwide basis, whichever way one defines the market.

Lacking evidence of higher prices or reduced output, the FTC resorts to allegations about the purported quality of certain aspects of Meta's apps. Courts sometimes refer to the power to reduce quality below the competitive level as direct evidence of power. And this Court has likewise explained that perhaps a supracompetitive "quality-adjusted price" – which necessarily

would have to include all dimensions of quality, i.e., a composite or net "quality-adjusted price" – might pass muster. *FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, at \*14 (D.D.C. Nov. 13, 2024). But no case Meta has found (and no case cited by the FTC) has ever relied on quality-related claims as proof of power in a Section 2 case without pricing evidence. For good reason: quality is often subjective, hard to observe, and multidimensional, with ostensible improvements along one dimension necessitating tradeoffs on others (for example, few buyers prefer consumer electronics with shorter battery life, but some would trade battery life for less weight).

Even if theoretically possible, using product quality as direct proof of power therefore creates an even greater need for competitive benchmarking than using pecuniary prices. Determining a pecuniary price is usually straightforward, but many factors affect product quality in a case like this such that it is exceedingly difficult to determine an objective level of overall quality. *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006) (holding that "no reasonable jury" could conclude the proffered "evidence of diminished quality" was "proof of higher 'quality adjusted' costs" to establish monopoly power, including because there was no "statistical analysis focusing on measurable indices of quality" or comparison of "the quality . . . prior to defendants' . . . acts with the quality . . . after these acts"). The FTC's apparent claim that "ad load" is a price (it isn't) is also unavailing because it is not supported by any evidence that Meta has "charged" a supracompetitive ad load – indeed, the FTC does not even present evidence of what a competitive ad load would be, much less provide a way to adjust for the quality of the ads themselves (or other factors).

References to quality or pricing unmoored from a competitive benchmark – i.e., the "competitive level" reflecting what consumers would get "in a competitive market" – are simply not a "reliable measure" of power. *Am. Express*, 585 U.S. at 547-48; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 83 (E.D.N.Y. 2024)

("Output, prices, and quality are compared to the levels that might be observed but for the challenged restraints (a hypothetical scenario often referred to as the 'but-for world')."). For example, in *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), the court rejected the plaintiffs' attempts to use "privacy to demonstrate monopoly power," including because the plaintiffs had "not established any framework for evaluating whether Google's privacy offerings are suboptimal." *Id.* at 118-19. Consistent with this case law, evidence regarding quality is categorically insufficient to show the exercise of monopoly power in the absence of (1) a comprehensive and quantitative measure of quality that (2) can be compared to the same comprehensive and quantitative competitive benchmark for rival products – that is, as this Court has indicated, a "quality-adjusted price" that exceeds the competitive price. The FTC will present no evidence as to *either* a quality-adjusted price *or* the competitive level.

    **b.**    ***Second***, indirect evidence: Although less probative than direct evidence, "circumstantial evidence of monopoly power . . . [can] be inferred from a firm's possession of a dominant share of a relevant market." *Microsoft*, 253 F.3d at 51. The purpose of market definition is to identify competitive constraints that can restrain the defendant from exercising monopoly power. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) ("Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the 'relevant market' rests on a determination of available substitutes."); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level.") (cleaned up); *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 228 (2d Cir. 1999) (per curiam) ("It is important to remember that a 'market' is any grouping of sales whose sellers, if unified by a

hypothetical cartel or merger, *could profitably raise prices* significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market.") (cleaned up). That is why it is critical to require proof of what consumers and competitors *do* – i.e., actual substitution – rather than engage in exegeses on why one app does not look exactly like another.

Even where circumstantial evidence of power might exist, it is rebuttable where, as here, direct evidence is available. *See McWane, Inc. v. FTC*, 783 F.3d 814, 830-31 (11th Cir. 2015); *see also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998); *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689, at *8 (N.D. Cal. Jan. 5, 2008) ("[T]he Supreme Court has long recognized that market share alone can be misleading, and will consider other evidence to determine whether a company has the power to restrict output and raise prices, i.e., monopoly power."). For example, while "[a] high market share . . . may ordinarily raise an inference of monopoly power, [it] will not do so in a market with . . . other evidence of a defendant's inability to control prices or exclude competitors." *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) (citation omitted).

Direct evidence is therefore a better measure of competitive conditions where available, while indirect evidence is a second-best proxy. If a firm is not exercising monopoly power – restricting output below competitive levels and thereby charging a supracompetitive price or (maybe) a supracompetitive "quality-adjusted price" – it either is irrationally forgoing profit maximization or does not have monopoly power. "Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them." *Ball Mem'l Hosp.*, 784 F.2d at 1336; *see also United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1472-73 (W.D.N.Y. 1994) (explaining that actual pricing evidence and practices "are better measures of market power" because, "if market

power is the ability to raise prices and maintain such prices above competitive levels, then a high degree of price sensitivity in a market exemplifies a lack of market power"), *aff'd*, 63 F.3d 95 (2d Cir. 1995).

**B.**    ***Topic #2:  Indirect Evidence Requires Proof That Product Differences Make Services Unacceptable as Substitutes***

A relevant antitrust market must account for all acceptable substitutes.  That key inquiry – substitution – turns on interchangeability, not product differentiation.

1.    "The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices [actual or 'quality adjusted'] above the competitive level." *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81 (D.D.C. 2006) (cleaned up); *see also Rothery Storage*, 792 F.2d at 218 (same); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998) ("[T]he definition of the 'relevant market' rests on a determination of available substitutes.").  The question is not competition in its broadest sense (e.g., both ice cream and carrots are food but unlikely to be in the same relevant market) but rather *competitive constraint* (e.g., potato chips might constrain pricing of pretzels).  *See FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) ("substitution polices the outer boundaries of a product market," because "substitution . . . illuminates whether customers can switch to one product and constrain anticompetitive pricing") (cleaned up); *see also DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1344 (Fed. Cir. 2014) (the "pertinent economic question" is "whether a sufficient number of customers would switch to a competing technology").

Accordingly, "[t]he goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output."  *Geneva Pharms.*, 386 F.3d at 496; *see also Rothery Storage*, 792 F.2d at 218

(similar).  A relevant market therefore must include "*all* products reasonably interchangeable by consumers."  *Microsoft*, 253 F.3d at 52 (emphasis added; cleaned up).  In each case, "the applicable analysis is whether or not the products are *economic* substitutes, not whether they appear to be functionally similar."  *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024); *see also Gross v. Wright*, 185 F. Supp. 3d 39, 50 (D.D.C. 2016) ("The ultimate inquiry is whether the amount of actual or potential substitution of one product or service for another acted to constrain pricing behavior.") (cleaned up).

"[T]he touchstone is demand substitution."  *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018); *see also FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011) ("Determining a product market . . . focus[es] on whether consumers will shift from one product to the other in response to changes in their relative cost.") (cleaned up); *USFL v. NFL*, 1986 WL 10620, at *6 (S.D.N.Y. July 31, 1986) (two products are "in the same relevant market" if, "as a matter of practical fact and the actual behavior of buyers, the products [are] reasonably interchangeable substitutes").  And the best evidence is actual consumer behavior, i.e., "whether and to what extent purchasers are willing to substitute one [product] for the other."  *Meta*, 2024 WL 4772423, at *9; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467, 472-73 (1992) ("actual market behavior revealed in the record" determines "the existence of market power"); *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 226 (D.C. Cir. 1962) ("The problem of defining a market turns on discovering patterns of trade which are followed in practice.").

   **2.**   Substitution – *not* product differentiation – is therefore the North Star for market definition.  *See, e.g.*, *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 798 (1st Cir. 1988) (Breyer, J.) (explaining that differentiated products can be substitutes); *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 339 (3d Cir. 2018) ("[D]ifferentiation is often present among competing products in the same market."); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d

1124, 1132 (10th Cir. 2002) ("[r]easonable interchangeability does not depend on product similarity"). This can be *especially* true for entertainment products: in the days of broadcast television, a police procedural on NBC competed for viewers against a situation comedy on CBS in the same timeslot, as differentiated as they were. *See United States v. Syufy Enters.*, 903 F.2d 659, 669 n.15 (9th Cir. 1990) ("Competitors need not provide a perfectly undifferentiated product in order to be competitive; it is a strength of our free market economy that competitors often provide products that cater to the varied tastes and preferences of consumers."); *see also Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) (explaining that any given consumer may choose "Pepsi because she prefers the taste, or NBC because she prefers 'Friends,'" but for antitrust purposes "Pepsi is one of many sodas, and NBC is just another television network").

Differentiation alone – without evidence of substitution behavior – is therefore "an inadequate basis for concluding that [firms] lack the ability to attract substantial amounts of business away from each other." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989); *see also United States v. Cont'l Can Co.*, 378 U.S. 441, 450 (1964) (that two products "have different characteristics which may disqualify one or the other, at least in their present form, from this or that particular use . . . [is] not sufficient to obscure the competitive relationships" between them); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 296 (7th Cir. 1974) (requiring explication of "the competitive significance of any such possible differentiation"). If differentiation without more were sufficient to define a market, then every firm would have a monopoly over its own differentiated product – and that is not the law. *See Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004). Products that "differ . . . in performance, physical appearance, size, capacity, cost, price, reliability, ease of use, service, customer support, and other features" may "[n]evertheless . . .

compete with one another sufficiently that the price of one brand is greatly constrained by the price of others." *DSM*, 749 F.3d at 1339-40.

Indeed, differentiation can be *how competition occurs*. *See IGT v. All. Gaming Corp.*, 702 F.3d 1338, 1347 (Fed. Cir. 2012) ("[E]vidence of player preference for wheel games says nothing about whether . . . wheel games constitute a separate market; to the contrary, it is in harmony with the rest of the evidence that gaming machines are a differentiated market and that wheel games compete with all gaming machines to accommodate the spectrum of player preferences."). "A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market." *Glob. Disc.*, 960 F. Supp. at 705; *see also Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854-55 (1st Cir. 2016) (evidence that a firm claims its product is "better suited" than another for some purpose "has no bearing on the key questions of product interchangeability and cross-elasticity of demand from the perspective of consumers").

For the same reason, stated "consumer preference" – standing alone and without being reflected in actual consumer decisions – "is economically irrelevant" to market definition. *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664-65 (7th Cir. 2004); *see also FTC v. R.R. Donnelley & Sons Co.*, 1990 WL 193674, at *2 (D.D.C. Aug. 27, 1990) ("[T]he personal preferences of a distinct group of consumers do[ ] not suffice for defining a separate product market."). Consumers can and do substitute even where "there may be some degree of preference for the one [product] over the other." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) (evidence that "farmers *preferred* the Ford tractor" over other tractors did not indicate that "the relevant product market was limited only to Ford tractors," particularly where "these same farmers did not buy Ford tractors exclusively and demonstrated sensitivity to price").

"[W]hile some customers might prefer" a certain product, that does not "pro[ve] that such customers would not surrender that preference rather than pay a significantly higher price" for the product. *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 355 (S.D.N.Y. 2009). Even if one can point to some consumers who would not surrender their preferences in the face of a price increase, that does not suffice under applicable precedent to define those customers as a separate market where other customers would switch in sufficient numbers to make the price increase unprofitable.

Accordingly, "[c]ourts have repeatedly rejected efforts to define markets by price variances or product quality variances" in a vacuum, because doing so "presumes that consumers are [or are not] willing to make tradeoffs based on [those] very factors" without establishing whether consumers actually do so. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989). "[T]he essential inquiry is whether the amount of actual or potential substitution between [products] act[s] to constrain the pricing behavior of [their sellers], regardless of any functional interchangeability that may have existed between [them]." *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 58 (D.D.C. 2008). And because customer perceptions do not always match actual patterns of substitution, "antitrust authorities do not accord great weight to the subjective views of customers in the market," for the "opinions of purchasers must be viewed in light of their actual behavior." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 145 (D.D.C. 2004) (collecting authority); *see In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 127 (C.D. Cal. 2007) ("[T]he 'least reliable' evidence in predicting the effects of a hypothetical price increase is 'subjective' testimony by customers that they would or would not defect in response to a given price increase.") (cleaned up).

Instead, the way to establish a defendant's competitive constraints – i.e., how to define a relevant antitrust market – is to identify substitutes to which a marginal consumer can and will

turn in the face of a price increase because those are the alternatives that can *constrain monopoly power* from being exercised. The theory that consumers might be substituting to non-constraining alternatives because a dominant firm already charges the monopoly price (the so-called Cellophane fallacy) does not undermine the probative value of evidence of consumer substitution where the plaintiff identifies both the defendant and another firm (e.g., Snapchat) as competitors in the relevant market. In that setting, the evidence can test whether consumers substitute *more* to a third product than to the other firm admitted to be in the market. That inquiry – finding the *close* substitutes – is key. *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017). Indeed, "the Cellophane fallacy" is particularly inapt when applied to "differentiated products," where "an unduly narrow product market definition proves too much." *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) (explaining that, in such cases, "strong presumptions based on mere market concentration may be ill-advised").

    **3.**    The two cases the FTC purports to rely on do not advance its cause. Instead, they demonstrate that the FTC will not be able to satisfy its burden at trial.

    **a.**    ***Brown Shoe Co. v. United States*, 370 U.S. 294 (1962):**  The FTC says that, under *Brown Shoe*, "practical indicia" support treating "personal social networking services" as a relevant market. But the FTC misreads *Brown Shoe*, which does not endorse the FTC's effort to ignore actual evidence of consumer behavior in the marketplace.

    *First*, the *Brown Shoe* "practical indicia" are relevant only insofar as they serve as reliable "evidentiary proxies for direct proof of substitutability." *Rothery Storage*, 792 F.2d at 218-19 & n.4. These proxies must be "economically significant." *Brown Shoe*, 370 U.S. at 325; *see also Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) ("the 'practical indicia' named in *Brown Shoe* . . . were never intended to exclude economic analysis"). Accordingly, under a *Brown Shoe* analysis, "the economic criteria" – notably, "distinct prices" and "sensitivity

to price changes" – "are primary." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037-39 (D.C. Cir. 2008) (opinion of Brown, J.); *see also Thurman Indus.*, 875 F.2d at 1375-77 (rejecting proposed market based on qualitative *Brown Shoe* factors that lacked "economic significance"). For example, in *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999), the court reversed an FTC trial victory where its proposed market drew support from "testimony" about "competitor perceptions and consumer habits" that "failed to show where consumers could practicably" substitute based on evidence of actual and observed consumer behavior. *Id.* at 1054; *see also FTC v. Freeman Hosp.*, 69 F.3d 260, 269-70 (8th Cir. 1995) (similar).

The FTC has yet to identify a *Brown Shoe* case that defines a market – after presentation of evidence at trial – based on descriptive product differences alone. *Cf. U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 311 (3d Cir. 2010) (plaintiff's "failure to present evidence that [consumers'] pricing decisions are constrained cannot be overcome by the 'practical indicia' evidence" showing that products had "distinct and separate prices"); *IGT*, 702 F.3d at 1346-47 (rejecting argument that a product's unique features were a "peculiar characteristic" under *Brown Shoe* absent evidence that distinctions were "economically significant"); *Oracle*, 331 F. Supp. 2d at 1119 (cautioning against "identifying artificially narrow groupings of sales on the basis of noneconomic criteria having little to do with the ability to raise price above cost") (cleaned up). Antitrust courts have turned down *Brown Shoe* analysis unmoored from or lacking evidence about pricing and substitution. *See Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 917-19 (6th Cir. 2009) ("[T]hese practical indicia come into play *only after* the outer boundaries of a product market are determined by evaluating the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.") (emphasis added; cleaned up). Indeed, the Supreme Court in *Brown Shoe* itself rejected the "division of product

lines [into different markets] based on 'price/quality' differences" that failed "to recognize competition" between differentiated products. *Brown Shoe*, 370 U.S. at 326.

*Second*, for the "practical indicia" to be relevant under *Brown Shoe*, these proxies must align with the market alleged. In particular, for the "industry or public recognition" factor, *see id.* at 325, there cannot be a mismatch between the candidate market – here, "personal social networking" comprised of *all* features and activities on Facebook, Instagram, Snapchat, and MeWe (except for Facebook Dating) – and what those competitors actually say based on daily experience in the market. As one district court recently explained in *FTC v. Tempur Sealy International, Inc.*, --- F. Supp. 3d ---, 2025 WL 617735 (S.D. Tex. Feb. 26, 2025) – rejecting the FTC's alleged market and *Brown Shoe* analysis – industry participants "at least have to agree on what *products* the description" of the relevant market "actually applies to" in order "to find that a relevant market exists." *Id.* at *17.

In other words, industry participants with knowledge must recognize the claimed relevant market as alleged to support an argument that the proposed market reflects market conditions and is not a litigation construct. *See, e.g.*, *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 106-07 (2d Cir. 2002) (per curiam). For this case, therefore, the FTC needs economic indicia – pricing or substitution evidence – or at least industry recognition that every feature available on Facebook and Instagram (other than Facebook Dating) is constrained only by Snapchat and MeWe. But there is no such evidence; instead, the competitor evidence – ordinary-course business documents and even public filings – will overwhelmingly show that the many apps and services the FTC excludes from its market-share calculations can and do compete effectively with apps included in the alleged market.

b.    ***FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008):**  The FTC's procedurally improper fallback theory – *see* Meta's Mot. To Exclude at 2-17 (Feb. 21, 2025),

ECF No. 404 – turns on case law that also has legal requirements the FTC cannot satisfy. Specifically, to the extent the FTC is permitted to switch to a submarket comprised only of a small subset of consumers for "core" or broadcast sharing with online "friends," that new claim requires evidence that the small group lacks acceptable substitutes for *that* feature *and* that Meta therefore identifies that group as ripe for exploitation and exploits them in measurable and objectively determinable ways (such as higher prices). No such evidence is available here.

*Whole Foods* involved a timely and preliminary challenge to a prospective merger between Whole Foods and Wild Oats. The FTC alleged a market for "premium, natural, and organic supermarkets" or "PNOS" grocery stores focused on specialty organic perishables. *See Whole Foods*, 548 F.3d at 1032 (opinion of Brown, J.). The defendants observed that these so-called PNOS stores also sell "dry" groceries sold in ordinary grocery stores (like Safeway) that act as competitive constraints on price increases for those non-organic products. *See id.* at 1039-40; *see also Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 18 (D.D.C. 2012). Instead of contending that all the products in Whole Foods are premium, natural, and organic products, the FTC in that case instead showed that competition for dry groceries and premium organic products ran on separate tracks. Specifically, Whole Foods charged supracompetitive prices for specialty organic groceries *unless* a Wild Oats (that is, another PNOS) was nearby. By contrast, even without a nearby Wild Oats constraint, Whole Foods charged competitive prices for dry groceries (which Safeway et al. constrained). This was "exactly the kind of price discrimination that enables a firm to profit from core customers for whom it is the sole supplier." *Whole Foods*, 548 F.3d at 1039-40 (opinion of Brown, J.). The FTC paired that evidence with consumer switching data, i.e., "evidence of consumer behavior." *Id.* at 1040. Specifically, Whole Foods had "internal projections, based on market experience," to show that "if a Wild Oats near a Whole Foods were to close" – i.e., a complete outage (more than a "SSNIP") – then

"the majority (in some cases nearly all) of its customers would switch to the Whole Foods rather than to conventional supermarkets." *Id.*

In the years since the D.C. Circuit decided *Whole Foods*, courts in this District have consistently held that such evidence of targeted price hikes for, or some actual discrimination against, a particular group or subgroup of consumers is *necessary* to prove a market based on "core" demand – without that evidence, it cannot be said such distinct demand exists and is exploitable.  In *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016), the court explained that "[d]efining a market around a targeted consumer . . . requires finding that sellers could profitably target a subset of customers for price increases," which *requires* "differentiated pricing."  *Id.* at 117-18 (cleaned up).  In *FTC v. Wilh. Wilhelmsen Holding ASA*, the court said that "a targeted customer market may exist when a price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away," which "*demands* that there be differentiated pricing."  341 F. Supp. 3d at 46-47 (emphasis added; cleaned up); *see also Menasha*, 354 F.3d at 664-65 (similar).  The FTC itself has argued the same:

> When a substantial group of customers can be identified, segregated, and charged monopoly prices for a significant period, sales to that group constitute a relevant market.  The federal enforcement agencies term this a "price discrimination" market.  Here, projects with domestic-only specifications can be targeted for higher pricing, and a hypothetical monopolist could raise prices by reducing its output because imported fittings cannot satisfy domestic-only specifications.  *See generally FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (discussing the "hypothetical monopolist" construct for market-definition purposes).

Br. of the FTC at 25 n.9, *McWane, Inc. v. FTC*, No. 14-11363 (11th Cir. Aug. 29, 2014), ECF No. 64 (citations omitted).

Merely claiming, as the FTC will here, that *some* consumers lack acceptable alternatives for a feature that represents a small part of the total usage of Facebook and Instagram comes

nowhere close to clearing the legal bar that Meta therefore has monopoly power over that demand that it can exploit because Meta is unconstrained by competition or the threat of substitution. "[W]hen determining the relevant market," the question is whether substitution can constrain a price increase because "it is possible for only a few customers who switch to alternatives to make the price increase unprofitable, thereby protecting a larger number of customers who would have acquiesced in higher . . . prices." *United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997).

Therefore, without evidence that Meta (1) identifies such consumers when they are engaged in the supposedly "core" activity, and then (2) targets them with price increases above a competitive level, the fallback submarket fails. *See Rothery Storage*, 792 F.2d at 219 (rejecting captive-geographies market); *United States v. Gillette Co.*, 828 F. Supp. 78, 83-84 (D.D.C. 1993) (rejecting captive-customers market); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249-51, 256-57 (S.D.N.Y. 2000) (rejecting captive-demand market), *aff'd*, 315 F.3d 101 (2d Cir. 2002); *Pennsylvania v. Centre Lane Partners, LLC*, 2024 WL 4792043, at *5-6 (W.D. Pa. Nov. 14, 2024) (no evidence of "price discriminat[ion]" defeats *Brown Shoe* market).

## II.    The Instagram and WhatsApp Acquisitions

### A.    *Topic #3:  The FTC Must Prove the Effect of the Acquisitions Was Anticompetitive – Intent Is Not Relevant Here*

The FTC will base its theory of exclusionary conduct on "intent" evidence and argument that the Meta CEO and others were afraid of Instagram and WhatsApp as potential competitors. But intent is relevant in antitrust cases only to the extent it predicts likely *effects*. Such evidence may have a role in prospective merger cases, where the Court needs to *predict* future effects. But here the Court need not guess:  Meta has actual evidence of those effects, and that should be determinative.

The D.C. Circuit has instructed:  "[I]n considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of § 2, our focus is upon the *effect* of that conduct, not upon the intent behind it.  Evidence of the intent behind the conduct of a monopolist is relevant *only* to the extent it helps us understand the likely effect of the monopolist's conduct."  *Microsoft*, 253 F.3d at 59 (emphases added).  "[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'"  *Id.* at 58.  "[C]onduct cannot be condemned as exclusionary, even where the intent behind it is anticompetitive, unless there has been a showing that the monopolist's conduct on balance harms competition."  *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 138 (D.D.C. 2002) (cleaned up), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc); *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("[I]f conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant.").  Indeed, "[i]ntent does not help to separate competition from attempted monopolization," but instead invites "[t]raipsing through the warehouses of business in search of misleading evidence" that "will be even more ambiguous than the economic data it seeks to illuminate."  *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989).

Meta's intent is best shown by what in fact it did:  acquire and improve distinct services as complements to the Facebook app.  And the FTC's cherry-picked "worry" emails to suggest different intent are irrelevant.  In a case challenging acquisitions completed more than a decade ago, intent proves nothing under *Microsoft*'s express holding because the effects are known.  *See Brooke Grp.*, 509 U.S. at 234 ("One could speculate, for example, that the rate of segment growth would have tripled, instead of doubled, without [the alleged conduct].  But there is no concrete evidence of this.").  As another court in this District reasoned, "it is unnecessary to

consider intent evidence to further 'understand' " conduct where a court can already assess the actual "anticompetitive effects" (or lack thereof) of that conduct. *Google*, 747 F. Supp. 3d at 186-87. And "[w]hen the challenged conduct is so wholly devoid of any inference of exclusionary effect, intent cannot save the plaintiff's case." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 991 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1748 (2023). That principle controls here. What happened after Meta acquired Instagram and WhatsApp can be observed, measured, and evaluated. *See Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085-86 (11th Cir. 2016) ("[e]xpert testimony" about "the likely effect of removing a competitor cannot take the place of presenting specific and concrete facts," requiring "some empirical evidence of actual effects"); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) ("expert testimony rooted in hypothetical assumptions cannot substitute for actual market data" about anticompetitive effects).

It will be undeniable that Meta did *not* eliminate Instagram or WhatsApp, but improved and grew both alongside Facebook, resulting in extraordinary output expansion (hundreds of millions of additional U.S. users) all to the benefit of consumers. The FTC's challenge to long-closed transactions based on misleading intent evidence risks condemning acquisitions that have had demonstrably beneficial effects. *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977) (not all acquisitions are unlawful – even if the intent is to harm rivals – without effects, even under the lower Clayton Act § 7 standard); *In re AMR Corp.*, 625 B.R. 215, 254-55 (Bankr. S.D.N.Y. 2021) (focusing on effects in evaluating retrospective merger challenge), *aff'd*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023), *cert. denied*, 144 S. Ct. 102 (2023). To avoid that risk, the FTC is "required to show with proof that the monopolist's conduct *indeed* has the requisite anticompetitive effect," *United States v. Google LLC*, 687 F. Supp. 3d 48, 81 (D.D.C.

2023) (cleaned up), consistent with decades of Supreme Court precedent.  *See*, *e.g.*, *California Dental Ass'n v. FTC*, 526 U.S. 756, 776-77 (1999); *Brooke Grp.*, 509 U.S. at 234.

## B.    *Topic #4:  The FTC Bears the Rebuttal Burden on Procompetitive Benefits*

In the event the Court finds both a current monopoly and that past anticompetitive conduct maintained the monopoly – Meta respectfully submits that the evidence does not and cannot support either element – the Court will need to consider Meta's defenses, including that the two acquisitions produced enormous efficiencies or consumer benefits and were therefore procompetitive.  Indeed, the result of the acquisitions cannot seriously be disputed:  Instagram grew from 3.9 million U.S. users pre-acquisition (according to the FTC's lead expert) to a current level of more than 230 million U.S. users enjoying scores of new features, all for free; WhatsApp likewise grew from around 10 million U.S. users pre-acquisition to more than 100 million U.S. users also enjoying scores of new features, also all for free.  These are undeniable "efficiencies" or consumer benefits that will be established at trial.  *See Meta*, 2024 WL 4772423, at *35 ("a merger might have procompetitive justification if it increased output, decreased prices, improved service or quality, [or] spurred greater innovation"); *see also NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103 (1984) (conduct that "increase[s] sellers' aggregate output" is "procompetitive"); *NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614, 644 (D.D.C. 1991) (conduct that "increases output" is procompetitive).

Once Meta establishes these effects, it is the FTC's burden to prove that Instagram and WhatsApp would have achieved the same or greater procompetitive benefits – and as quickly, *see Meta*, 2024 WL 4772423, at *40 – without the acquisitions and Meta's resources.  *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 211 (S.D.N.Y. 2020) (crediting benefits achieved *faster* as acquisition-specific).  The Supreme Court has held that, "[i]f the defendant [shows a procompetitive benefit], then the burden shifts back to the plaintiff to demonstrate that

the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Am. Express*, 585 U.S. at 542. The case the Supreme Court cited in *American Express – Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) – is the same case the D.C. Circuit cited when it held that "the burden shifts back to the plaintiff" once the "monopolist asserts a procompetitive justification" such as "greater efficiency or enhanced consumer appeal." *Microsoft*, 253 F.3d at 59 ("it is clear that the analysis under section 2 is similar to that under section 1") (cleaned up).

The FTC faces a "demanding standard" in rebutting established procompetitive benefits. *NCAA v. Alston*, 594 U.S. 69, 101 (2021). The FTC's burden here is heavier still given that it has initiated a retrospective challenge to two acquisitions more than a decade after it already cleared them under a statute specifically directed to potentially harmful acquisitions. The FTC has never claimed that it has litigated such a Section 2 case. The FTC is asking the Court to find all "nascent" acquisitions unlawful under Section 2, where such acquisitions would not be found unlawful under Section 7 of the Clayton Act – which was enacted for the very purpose of lowering the government's burden of proof. This is backwards. And as the Court observed, the FTC "having made its bed with [Section 2] . . . must lie in it." *Meta*, 2024 WL 4772423, at *35.

In this context, the FTC should shoulder an even heavier-than-normal burden, *especially* as to observable and quantifiable procompetitive benefits and efficiencies such as output expansion. *See id.* at *34 ("[The FTC's claim] is not prospective; Meta can point to actual consumer benefits that it contends have flowed from the acquisition. Merger law's traditional concern with speculative efficiencies therefore has less purchase here."); *Facebook*, 560 F. Supp. 3d at 32 (belated merger review might warrant "adjustment in certain burdens of proof"). It would be unfair and unreasonable to place on Meta the burden of proving how Instagram and WhatsApp would have fallen short of the actual effects that were obtained under Meta

23

stewardship. Where, as here, consumers directly and objectively benefited following the cleared acquisitions, the FTC bears the burden to prove that the acquisitions nonetheless had anticompetitive effects because consumers would have had something even better without them. *See California Dental Ass'n*, 526 U.S. at 776-77 (requiring FTC to prove "anticompetitive effects," rather than "shift[ing] a burden" to defendant); *see also Arch Coal*, 329 F. Supp. 2d at 132 ("The novel approach taken by the FTC in this case makes its burden to establish anticompetitive effects in the post-merger [product] market more difficult.").

That is all the more true given the challenged acquisitions are *not* traditional horizontal mergers like those between two grocery stores or gas stations or rebar factories. Meta operates a hyperscale infrastructure that delivers content – including Facebook, Instagram, and WhatsApp – to consumers around the world, much in the way that Disney uses its infrastructure to deliver Star Wars and ESPN or Unilever uses its distribution to sell both popsicles and ice cream sandwiches. The vertical nature of the acquisitions gives Meta a legally recognized incentive to realize the economies of its content-delivery infrastructure by increasing the output and features of that content. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018) ("[M]any vertical mergers create vertical integration efficiencies between purchasers and sellers."), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). Courts have therefore recognized that vertical conduct, including acquisitions in particular, is presumptively not anticompetitive. *See*, *e.g.*, *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) (Kavanaugh, J.) ("[V]ertical integration creates efficiencies for consumers."); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) ("Vertical expansion by a monopolist, without more, does not violate section 2 of the Sherman Act."); *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1084 (N.D. Cal. 2023) (depriving the government of presumptions in challenging a vertical acquisition), *appeal pending*, No. 23-15992 (9th Cir.). For such acquisitions, the

government faces a *heavier* burden to show "anticompetitive effect," *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019), not a lower bar than announced in *American Express* and its progeny.

In all events, the FTC must show that the actual, indisputable "consumer-welfare benefits from the acquisitions" – e.g., "increased output," or output and innovation achieved "faster" with Meta and its resources, *Meta*, 2024 WL 4772423, at *35-36, *40 – would have been achieved (and as quickly) without the acquisitions.  *See*, *e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (3d Cir. 2020); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 464 n.14 (7th Cir. 2020).  Specifically, the FTC must prove that Instagram would have 230 million (or more) U.S. consumers enjoying its many new features for free today and that WhatsApp would have 100 million or more U.S. consumers enjoying that app and its many new features for free today – or sooner than Meta accomplished these feats.

The FTC cannot satisfy this burden merely by pointing to a theoretical possibility that Instagram and WhatsApp *might* have achieved these successes absent the acquisitions.  *See Alston*, 594 U.S. at 98 (noting that "a skilled lawyer will have little difficulty imagining possible less restrictive alternatives," and "judicial acceptance of such imaginings would risk interfering with" legitimate competition) (cleaned up).  Rather, the FTC's proffered "less restrictive alternative" – the counterfactual world in which Meta did not acquire Instagram and WhatsApp – "*must* be virtually as effective in [achieving these outcomes] without significantly increased cost."  *Epic Games*, 67 F.4th at 990 (emphasis added; cleaned up).  That is, the FTC must prove that consumers *would* have had more (or better) options sooner without the acquisitions.  Meta respectfully submits that the FTC will not be able to introduce any evidence to satisfy its burden on that front, much less the heavier burden it should carry here.

Dated:  April 7, 2025

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Alex A. Parkinson (D.C. Bar No. 166695)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*