**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>                    Plaintiff,<br><br>          v.<br><br>**META PLATFORMS, INC.**<br><br>                    Defendant. | Civil Action No. 1:20-cv-03590 (JEB)<br><br>**PUBLIC VERSION** |

**Plaintiff Federal Trade Commission's Pretrial Brief**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

I.  Meta Possesses Monopoly Power over PSN Services in the United States ............................ 5

   A.  Indirect evidence demonstrates Meta's monopoly power over PSN services in the United States. ........................................................................................................ 5

      1.  Market definition: *Brown Shoe* factors and the hypothetical monopolist test ............... 5

      2.  Meta's dominant share established by multiple metrics ................................. 10

      3.  Meta's dominance is protected by substantial barriers to entry. .................................. 12

   B.  Direct evidence proves Meta's monopoly power. ............................................................. 12

II.  Meta's Acquisitions of Instagram and WhatsApp Constitute Anticompetitive Conduct that Harmed Competition and Consumers ..................................................................... 14

   A.  Meta's acquisitions of Instagram and WhatsApp were anticompetitive and contributed to the maintenance of Meta's monopoly power. ..................................... 14

   B.  Proof of ensuing consumer harm is not required, but is present here. ............................. 17

III.  Meta Cannot Prove that Its Claimed Procompetitive Justifications (If Any) Outweigh the Harm to Competition from Its Conduct ............................................................... 19

   A.  Meta has the burden to establish that competition was enhanced because of the acquisitions. ...................................................................................................... 20

   B.  Meta will not establish at trial that any of its procompetitive justifications were not "pretextual." ..................................................................................................... 20

   C.  Meta will not be able to establish at trial that its procompetitive justifications could not have been achieved absent the merger. ........................................... 22

   D.  Procompetitive effects outside of the relevant market are not cognizable. ..................... 23

   E.  Meta is unable to shift the burden back to the FTC, and in any event, evidence indicates significant harm to competition and consumers. ................................. 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................ 5, 6, 7

*Citizen Pub. Co. v. United States*, 394 U.S. 131 (1969) ............................................ 18

*Clarett v. National Football League*, 306 F. Supp. 2d 379 (S.D.N.Y. 2004),
    *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004) ...................................... 24

*Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768 (6th Cir. 2002) ...................... 13

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ........................................ 5, 7

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) ...................................... 10

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .................................... 22, 23, 25

*FTC v. Staples*, 970 F. Supp. 1066 (D.D.C. 1997) .................................................. 9

*FTC v. Sysco Corp.*, 113 F. Supp. 3d (D.D.C. 2015) ............................................ 11

*FTC v. Whole Foods Mkt., Inc.,* 548 F.3d 1028 (D.C. Cir. 2008) ........................ 8, 9, 13

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ............... 12

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ......... 20, 21

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) .......................................................... 24

*Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16 (D.D.C. 2012) ....................... 24

*LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2004) ......................................... 4, 20, 21

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ............................................ 21

*PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101 (2d Cir. 2002) ................................. 13

*Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 1983 WL 1853
    (D. Neb. June 14, 1983) .......................................................................... 20

*Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) ...................................................................... 13

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C.),
   aff'd, 855 F.3d 345 (D.C. Cir. 2017) ............................................................. 5, 11, 23

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO,
   2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ........................................................... 12

*United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387 (D. Del. 2003),
   aff'd in relevant part, 399 F.3d 181 (3d Cir. 2005) ................................................ 21

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) ........................................ 1, 9, 13

*\*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ..............................................*passim*

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ................................... 6

*\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .....................................*passim*

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ..................................... 16, 17

*United States v. Philadelphia Nat'l. Bank*, 374 U.S. 321 (1963) ...................................... 24

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) ....................................... 22, 23

## Statutes

Section 2 of the Sherman Act, 15 U.S.C. § 2 ........................................................ 4, 25

Section 5 of the FTC Act, 15 U.S.C. § 45 ........................................................... 4, 25

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:*
   *An Analysis of Antitrust Principles and Their Application* (2022) ............................... 16, 19, 25

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 4.4.B (2023) ........................ 10, 11

## INTRODUCTION

For more than a decade, Meta has maintained a monopoly over personal social networking ("PSN") services in the United States.  Rather than outcompeting its rivals on the merits of its PSN offering (Facebook), Meta chose to protect its position through anticompetitive means: buying out the significant threats it identified in Instagram and WhatsApp.  Meta's anticompetitive conduct cuts to the core of the Sherman Act's monopolization offense.  Indeed, "it is hard to imagine an action that better fits the definition of conduct with anticompetitive effects than a monopolist's buying out its rivals."  Memorandum Opinion on Summary Judgment, ECF 384 ("MSJ Op.") at 57.

The evidence at trial will establish that Meta's flagship product Facebook has, from its inception, served demand for a social networking experience—PSN services—that "put friends and family at the core of the experience."  The evidence will also show that Meta, other providers of online services, and consumers all recognize that a friends-and-family social networking experience is distinct from other kinds of popular online services.  As a result, non-PSN apps are not reasonable substitutes for PSN services and the apps like Facebook, Instagram, and Snapchat that offer that experience; thus, non-PSN apps are not interchangeable with PSN services and apps "for the 'same purposes.'"  *See United States v. Google LLC*, 747 F. Supp. 3d 1, 71, 114 (D.D.C. 2024) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)).

Meta attempts to sidestep this evidence and obscure the market definition inquiry by (i) touting Meta's integration of activities into Facebook and Instagram over time that are not directly tied to sharing with friends and family, and (ii) complaining about one of the FTC's multiple market share estimates—the estimate based on Meta's overwhelming share of time spent compared to other PSN services.  Meta's effort fails because Facebook and Instagram are

1

still friends-and-family-based social networking services and are used by millions for that purpose, notwithstanding Meta's integration of other activities into the friends-and-family sharing experience. Moreover, other types of online services are not reasonable substitutes because they do not offer that experience and do not constrain Meta's exercise of monopoly power. And the FTC's market share estimates—calculated multiple ways—accurately show Meta's competitive significance and dominance over PSN services.

Further, the evidence will confirm that Meta's monopoly power is protected by entry barriers. For instance, Meta's documents recognize the presence of strong network effects, which both give Meta leverage over users and make it hard for firms to challenge it—for example, Meta's documents celebrate the fact that ██████████████████ and ██ ████████████████████ making Meta ██████████████ and ████████████████ ████████████ Other evidence of Meta's monopoly power includes Meta's ability to reap enormous economic profits over many years from Facebook and Instagram without attracting a viable new entrant, and Meta's degradations of quality (such as through increased ad loads and unpopular privacy practices) without losing a prohibitive number of users.

Meta has unlawfully maintained its monopoly power by eliminating threats through anticompetitive means during a unique window of vulnerability in the early 2010s when consumers' usage of mobile apps skyrocketed. Meta dominated on desktop devices but was ill-prepared for this "shift to mobile," and its clunky mobile Facebook app lagged. Meta therefore watched with dread as Instagram launched and caught fire with its mobile-first friends-and-family social networking offering. As Meta recognized, Instagram offered an alternative that paralleled Facebook's offering: according to Instagram's founder consumers used Instagram, upon its launch in October 2010, to "share their daily lives" "with their friends and family."

Meta initially tried to compete with Instagram by improving its own mobile photo-sharing capabilities, but its efforts stalled due to technical mistakes and its then-limited mobile capabilities. By 2012, Instagram was ahead of Facebook in providing a desirable mobile experience and had attracted millions of users to its "parallel network." Meta justifiably feared that "some people might just share on Instagram now." Rather than continuing to work to outcompete Instagram, however, Meta made the anticompetitive choice to pay $1 billion to neutralize the competitive threat.

During the same period, Meta recognized that firms in Asia had used mobile messaging applications as a "springboard to build more general mobile social networks," and that Meta ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Similar to Instagram, Meta initially attempted to meet the threat of mobile messaging services with a competitive product offering, but by 2013, Meta ███████████████████████████ ██████████████████████████████████████████ So Meta paid a staggering $19 billion to acquire and thus eliminate the threat.

By eliminating competitive threats through acquisitions, Meta plainly "foreclosed competition on the merits," and thus maintained its monopoly through anticompetitive means. MSJ Op. at 55. Meta will likely attempt to advance purported procompetitive justifications at trial, but it cannot satisfy any of the legal prerequisites for doing so. Meta's justifications fail at the threshold because a monopolist's acquisition of a competitive threat is quintessentially not a form of "competition on the merits." *Microsoft*, 253 F.3d 34, 59. The evidence will show that Meta purchased Instagram and WhatsApp because they represented threats to its monopoly power, and "[m]aintaining a monopoly is not the type of valid business reason that will excuse

exclusionary conduct." *LePage's, Inc. v. 3M*, 324 F.3d 141, 164 (3d Cir. 2004). And even were this not the case, Meta's supposed justifications are legally non-cognizable for other reasons as well: all are *post hoc* and pretextual; none are merger-specific; and some are unrelated to the relevant PSN services market.

Meta's unlawful interference with the competitive process has produced predictable results: in the years since the acquisitions, Meta has profited enormously, while consumers have suffered. Meta has ramped up its ad load on Facebook and Instagram (█████████, in Meta's own terms), degraded its friends and family sharing experience, flouted users' privacy preferences, and allowed other quality dimensions to decline—all while reaping huge economic profits and watching user sentiment decline.

The FTC will present its case on behalf of consumers and to vindicate the competitive process embodied in the Sherman Act. Based on the evidence presented, the Court should find Meta liable of violating Section 2 of the Sherman Act, 15 U.S.C. § 2, as incorporated in Section 5 of the FTC Act, 15 U.S.C. § 45, and set this case for a remedies phase.

## ARGUMENT

The FTC's evidence at trial will establish both elements of its monopoly maintenance claim: "(1) the possession of monopoly power in the relevant market and (2) the willful . . . maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." MSJ Op. at 16 (quoting *Microsoft*, 253 F.3d at 50, and *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). The FTC will show that, since at least 2011, Meta has possessed monopoly power over consumers of PSN services in the United States, *infra* § I, and it has illegally maintained that monopoly by acquiring both Instagram and WhatsApp to eliminate them as competitive threats, *infra* § II. While Meta now asserts various procompetitive reasons for the acquisitions, its after-the-fact justifications

are not legally cognizable, and moreover are insufficient to outweigh the significant harm to competition and consumers caused by Meta. *Infra* § III.

## I.      Meta Possesses Monopoly Power over PSN Services in the United States

Monopoly power can be established either through "indirect or 'circumstantial evidence' of monopoly power by inferring it from 'a firm's possession of a dominant share of a relevant market,'" *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 12 (D.D.C. 2021) ("*Facebook I*") (quoting *Microsoft*, 253 F.3d at 51), or through direct evidence that a firm can profitably raise prices or exclude competition, *Grinnell*, 384 U.S. at 571. The FTC's trial evidence will prove both.

### A.      Indirect evidence demonstrates Meta's monopoly power.

The FTC's evidence at trial will establish Meta's possession of monopoly power via indirect proof. When evaluating this method, "courts infer the existence of a monopoly through three pieces of 'circumstantial evidence': the existence of (1) a relevant antitrust market, in which the defendant holds (2) a dominant market share, protected by (3) barriers to the entry of rivals." MSJ Op. at 17 (quoting *Microsoft,* 253 F.3d at 51).

#### 1.      Market definition: *Brown Shoe* factors and the hypothetical monopolist test

With respect to the first element of indirect proof, the trial record will establish that the provision of PSN services in the United States is a properly defined relevant market.[1] Courts define relevant markets by evaluating the *Brown Shoe* practical indicia, the hypothetical monopolist test, or both. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 198 (D.D.C.), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). The FTC's trial proof will demonstrate both.

---

[1] Pervasive evidence shows that the United States is a relevant geographic market, and to date Meta has not advanced evidence or argument contesting this point. *See* MSJ Op. at 18 ("Here, the parties agree that the relevant geographic market is the United States.").

At trial, Meta and third-party ordinary course records, testimony, and other evidence will show a basic truth: that there is a distinct consumer demand for a product offering ("PSN services") that allows people to maintain relationships and share with friends and family in a shared space online ("friends and family sharing"), and specialized apps have developed to serve that demand ("PSN apps") while others are not well-suited to do so ("non-PSN apps"). Facebook was not the first PSN app to exist—Myspace, among others, came before it—and others have tried, including now-defunct services such as Google+ and Path. But Meta has enjoyed a dominant position over this product offering stretching back to at least 2011. Its power has proven durable, and Snapchat is the only remaining provider of notable size in the United States.

This evidence will delineate a relevant market comprising PSN services and PSN apps, with non-PSN apps properly excluded. As courts have observed, the *Brown Shoe* factors serve as "evidentiary proxies" for assessing whether products outside a proposed relevant market are "reasonably interchangeable" with those inside of it. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51, 54 (D.D.C. 2011). Here, evidence indicates that PSN apps have a core use and functionality dedicated to friends and family sharing, while other apps—like entertainment apps YouTube and TikTok, and interest-based apps Twitter/X and Pinterest—do not. These are *Brown Shoe*'s "peculiar characteristics and uses." *Brown Shoe*, 370 U.S. at 325.

Extensive evidence establishes this *Brown Shoe* factor and underscores its salience to delineating PSN services as a relevant product market. Indeed, the particular "uses" of PSN services are central to market definition because friends and family social networking is strongly influenced by network effects and norms—as a result, an app or online service can provide consumers with a reasonable alternative for the purpose of friends and family sharing only if

others use the service for this purpose.  Thus, whether or not an app has a core use and functionality for friends and family sharing dictates where consumers can practically turn to satisfy demand for PSN services.

Ubiquitous evidence similarly demonstrates "industry and public recognition" of a distinct consumer demand for friends and family sharing, and a distinct set of PSN apps that serve that demand.  This evidence includes how apps hold themselves out to consumers, with PSN apps instructively emphasizing that they are well-suited for friends and family sharing, while other apps do not.  *Compare* Ex. 1, PX0727 at -002 (Meta website stating that "Facebook helps you connect with friends, family, and communities of people who share your interests.") (Mar. 10, 2025), *with* Exs. 2-3, PX8013A at -049-060 (LinkedIn's self-descriptions emphasizing the ability to connect with professional networks).  Indeed, the evidence will show that industry recognition is intertwined with public recognition, as relevant firms' "internal assessments" reflect their extensive efforts to understand "public expectations."  *See* MSJ Op. at 29-30.  Accordingly, the apps that compete to satisfy consumers' demand for friends and family sharing are well known to both industry participants and the public, and Facebook is the paradigmatic example—indeed, "no one who hears the title of the 2010 film 'The Social Network' wonders which company it is about."  *Facebook I*, 560 F. Supp. 3d at 20.

Evidence will also establish the *Brown Shoe* factors of insensitivity to price changes, distinct customers, and distinct prices.  In particular, multiple forms of evidence will show inelastic demand among users of Facebook and Instagram, and that Meta has successfully exploited that inelasticity to profitably raise quality-adjusted prices.  The FTC will also show that Meta can and does engage in price discrimination, raising quality-adjusted price even higher for more inelastic users.  Finally, the FTC will show that PSN apps have unique production facilities,

including a network of users producing and sharing friends and family content, which is difficult for non-PSN apps—even ones with large user bases—to replicate.

The FTC's ordinary-course and testimonial evidence regarding market definition will be buttressed by expert testimony. The FTC's economic expert, Prof. Scott Hemphill, will testify that a hypothetical monopolist of PSN services would profitably raise quality-adjusted prices above a competitive level. Prof. Hemphill's analysis includes empirical work demonstrating the distinctions between PSN apps and non-PSN apps, and how the latter do not serve and are not well suited to serve demand for PSN services. And his analysis of Meta's high profits, inelastic demand, profitable increases in quality-adjusted price, and ability to price discriminate not only supports a finding of monopoly power by direct evidence, but also confirms PSN services as a relevant market. *See FTC v. Whole Foods Mkt., Inc.,* 548 F.3d 1028, 1038-39 (D.C. Cir. 2008) (core customers with demand for the relevant product who were vulnerable to price discrimination confirmed the existence of a relevant market).

Meta, naturally, disputes the relevant market. One of Meta's principal arguments, which Meta's lawyers and executives will likely stress at trial, is that the market for PSN services is undermined because Meta has chosen in recent years to add features to Facebook and Instagram that are not directly tied to interacting with friends and family. For example, Meta added Reels, a short form video ("SFV") feature, after ██████████████████████████████████████ ██████ But Meta is incorrect that its inclusion of activities in Facebook and Instagram that are less directly tied to sharing with friends means that non-PSN apps belong in the relevant market.

Meta's decision to leverage its friends and family social graph to find additional ways for its users to spend time while on Facebook and Instagram does not transform non-PSN apps into reasonable substitutes for the purpose of a friends and family social networking experience. It is

8

unremarkable for a firm possessing monopoly power in incorporate new features, but this does

not mean that each firm that offers such a feature necessarily provides a product that is

interchangeable with the monopolist's offering "for the 'same purposes.'"  *Google*, 747 F. Supp.

3d 1, 114 (SVPs were properly excluded from the relevant market even though "Google

developed verticals" that competed with the offerings of SVPs because "an SVP may be

reasonably interchangeable with a [general search engine] for a discrete purpose but not for the

'same purposes.'") (quoting *Microsoft*, 253 F.3d at 52).  Similarly, relevant markets are routinely

defined around product offerings that include components that are available outside the relevant

market.  *See, e.g.*, *Grinnell,* 384 U.S. at 572-73 (finding a relevant market for central station

services even though parts of that service offering were available separately); *FTC v. Staples*,

970 F. Supp. 1066, 1079-80 (D.D.C. 1997) (office supply superstores constituted a relevant

product market even though consumers also purchased office products through other retail

outlets); *Whole Foods,* 548 F.3d at 1040 (the fact that consumers "cross-shopped" between

premium and organic supermarkets and ordinary supermarkets did not require the latter's

inclusion in the relevant market).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████.  This is simply incorrect, as evidence will

show that friends and family sharing remains large and important on both Facebook and

Instagram, and is central to why millions of people use both apps.  Non-PSN apps do not

provide, and are not suitable alternatives for, this experience.  Indeed, Meta itself recognizes that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████.

Accordingly, as the Court recognized at summary judgment, a non-PSN app that does not offer a reasonable alternative for engaging in friends and family sharing is properly not included in the PSN services market.  MSJ Op. at 37.

### 2. Meta's dominant share established by multiple metrics

The FTC will proffer market share measures that demonstrate Meta's dominance of the PSN services market since at least 2011.  Indeed, Prof. Hemphill's analysis of data from market participants and commercial data providers will show that Meta's market share throughout the period well exceeds the 60% threshold "that courts ordinarily find sufficient to establish monopoly power."  *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 47-48 (D.D.C. 2022) ("*Facebook II*").  Prof. Hemphill's market share estimates are drawn from multiple ordinary course metrics—including time spent, monthly active users ("MAU"), daily active users ("DAU"), and user broadcast posts—for usage across all PSN apps.  *Cf.* U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 4.4.B (2023) ("Non-price indicators, such as number of users or frequency of use, may be useful indicators in markets where price forms a relatively small or no part of the exchange of value.").

MAU and DAU are plainly reliable indicia of competitive significance, and the trial evidence will show that millions of people who open PSN apps do so in part because those apps provide a friends and family sharing experience not available on non-PSN apps, "even if some (or even most) of their time spent on Meta's products do not strictly relate to such sharing."  *See* MSJ Op. at 46.  Meta's experts have not advanced any arguments to the contrary, nor have they suggested that Prof. Hemphill used unreliable data sources for these metrics, or any others.

Unable to dispute these metrics, Meta instead focuses on a single metric—time spent—

and quibbles with it by resurfacing market definition arguments at the market share stage, as the Court has observed.  MSJ Op. at 44.  In effect, Meta argues that usage of non-PSN apps should be included in market share calculations—or at least time spent calculations—because of Meta's insistence that time spent on Facebook and Instagram includes activities not directly related to sharing with friends and family.  Meta Br. at 15; *see also* MSJ Op. at 46 (noting a question of whether the FTC's calculation of market shares based on "<u>all</u> time spent on PSN applications" should include "<u>none</u> of the time spent on applications like YouTube, TikTok, or X").

Meta's argument fails because the FTC's market-share approach—in general and as to time spent—follows standard methods.  Specifically, the standard approach to assessing competitive conditions within a market is to (1) identify the products offered within a market, (2) assess the output of each product based on a relevant metric, and then (3) compare the output of each market participant.  *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 216-18; *Horizontal Merger Guidelines* § 4.4B (2023) ("The Agencies normally calculate product market shares for all firms that currently supply products . . . in a relevant market, subject to the availability of data.").  In other words, once a firm's product is excluded at the market definition stage, none of its output is taken into account when calculating market shares.  For this reason, it is unnecessary—and even inappropriate—to include time spent on apps outside the relevant market when calculating market shares, because doing so would defeat the purpose of measuring market participants' significance compared to other providers of the relevant product.  This is true even where relevant markets exclude firms that might offer a piece of the relevant product offering.  *See, e.g., FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 53-54 (market shares calculated for sales of broadline distributors despite specialty distributors outside the relevant market offering some of the same items).

Further, Prof. Hemphill will demonstrate that his conclusion that Meta dominates PSN services is robust to multiple sensitivities—for example, his conclusions would be unchanged even if he counted <u>none</u> of the time spent on surfaces within the apps that Meta insists are not associated with friends and family sharing.  "Whichever way the data is sliced," the results are the same: Meta has a dominant share.  MSJ Op. at 44.  Meta misses the point when it attempts to create confusion by attacking Prof. Hemphill's sensitivity analyses: the reason to present sensitivity analyses does not undermine Prof. Hemphill's basic calculation of market shares based on each PSN app's total DAU, MAU, time spent, and broadcast posts.  By demonstrating that different approaches to measuring market shares would nonetheless show that Meta possesses a dominant share, Prof. Hemphill makes the conclusion that Meta is a monopolist *stronger*, not weaker.  *See, e.g., FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 61 (D.D.C. 2018) (crediting FTC expert's analysis where expert calculated market shares via multiple methods); *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *32-37 (N.D. Cal. Jan. 8, 2014) (crediting expert's "robustness checks" on his market share calculations which showed "consistent results" and "revealed the same basic market structure," even though the data available was "imperfect").

> 3.    <u>Meta's dominance is protected by substantial barriers to entry.</u>

Finally, the evidence at trial will show that Meta's monopoly power is durable due to high barriers to entry into the PSN services market—including network effects, user switching costs, and high startup costs.

### B.    Direct evidence proves Meta's monopoly power.

The FTC's trial evidence will also establish through direct evidence that Meta wields monopoly power over the service it offers users of Facebook and Instagram, obviating the need to define a relevant market.  "When plaintiffs can [] provide 'direct proof' of supracompetitive

prices that remain protected from erosion through competition, 'the existence of monopoly power is clear.'"  MSJ Op. at 17 (quoting *Microsoft*, 253 F.3d at 51).  When a plaintiff has proved that the defendant has the power to control prices or exclude competitors, it has established the existence of monopoly power and need not *also* need to establish monopoly power via the indirect method.  *See PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 107-08 (2d Cir. 2002) ("a relevant market definition is not a necessary component of a monopolization claim" where there is direct evidence of monopoly power); *Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768, 783 n. 2 (6th Cir. 2002) (monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, *or* it may be inferred from one firm's large percentage share of the relevant market.") (emphasis added).

In particular, the FTC will show multiple types of well-recognized direct evidence of monopoly power.  First and foremost, for more than a decade Meta has reaped enormous profits that vastly outstrip what might be expected if Meta lacked monopoly power.  *See Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 481 n.17 (3d Cir. 1992) ("[C]ourts can also infer market power from direct evidence of sustained supranormal profits *rather than indirectly* from evidence of market shares[.]" (emphasis added)).  Second, Meta has profitably increased its quality-adjusted prices by vastly increasing ad load and degrading the quality of its friends and family experience.  *See Google*, 747 F. Supp. 3d at 118 ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers."  (internal quotation omitted)).  Third, Meta's enormous profits and price increases have not been disciplined by declining user sentiment, because Meta faces inelastic demand, and it has exploited users' inelastic demand by engaging in price discrimination.  *See Whole Foods*, 548 F.3d at 1038 (price discrimination

against inelastic customers is a vehicle to "extract monopoly profits").  And finally, Meta's own lawyers and experts argue that Meta has the ability to exclude would-be competitors.  Meta Br. at 40; *Grinnell*, 384 U.S. at 576 (defendant "perfected the monopoly power to exclude competitors and fix prices" via acquisitions).

Each type of evidence above is sufficient individually and collectively to show that Meta wields monopoly power—*i.e.*, the "power to control prices or exclude competition," *Grinnell*, 384 U.S. at 570-71—over consumers of Facebook and Instagram in the United States.

## II. Meta's Acquisitions of Instagram and WhatsApp Constitute Anticompetitive Conduct that Harmed Competition and Consumers

The FTC will demonstrate at trial that Meta harmed the competitive process by acquiring Instagram and WhatsApp, thereby eliminating them as competitive threats.  This evidence establishes the second element of the FTC's Sherman Act claim—that Meta has maintained its monopoly through means "other than through competition on the merits."  MSJ Op. at 56 ("Again and again, *Microsoft* holds that anticompetitive conduct by a monopolist is simply conduct that maintains or expands its monopoly other than through competition on the merits."); *see also Grinnell*, 384 U.S. at 570-71.

### A. Meta's acquisitions of Instagram and WhatsApp were anticompetitive and contributed to the maintenance of Meta's monopoly power.

A monopolist's acquisition of "actual competitors or nascent threats" is anticompetitive "because such action tends to maintain monopoly by means other than competition on the merits."  MSJ Op. at 61.  Here, the evidence will prove that Meta's acquisitions of Instagram and WhatsApp were precisely that—successful efforts by Meta to extinguish an actual competitor and nascent threat to its dominance via acquisition rather than competition on the merits.

In particular, the evidence will show that Instagram was a serious threat because Instagram was designed to be—and from its earliest days, was—a mobile-first, photo-based

14

personal social network that allowed people to share their lives on the go with friends and family. By early 2012 Meta recognized that Instagram █████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████, prompting Meta executives to express concern that "Facebook is not that far ahead [of Instagram] on iPhone." PX2514[2] at -006. After Meta's efforts to respond to Instagram's competition *with* competition proved unavailing, Meta bought out Instagram in order to "neutralize a potential competitor." PX1136 at -002.

Further, the evidence will show that WhatsApp "reasonably constituted a nascent threat" to Meta in PSN services when Meta acquired it. As the Court has observed, in evaluating whether a firm is a "reasonably constituted nascent threat[]," the monopolist's perception of the acquired firm as a threat is "highly probative" evidence. MSJ Op. at 63-64. Here, the evidence will show that Meta recognized that WhatsApp posed a threat to its PSN monopoly. Specifically, Meta knew that Asia-based mobile messaging services had launched ████████████████ through the alternate paths of either adding social features (*e.g.*, WeChat) or bootstrapping a separate stand-alone PSN application (*e.g.*, Kakao), and Meta was keenly aware that ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ PX1297. More than a year prior to the acquisition, Meta ████████████████████████████ ████████████████████████████████████████████████████████████ PX1103 at -006-007. Moreover, Meta was aware that WhatsApp was growing rapidly, far

---

2 The FTC does not reattach with this brief exhibits already submitted at summary judgment. *See* Plaintiff FTC's Memorandum of Law in Opposition to Defendant Meta Platforms, Inc.'s Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment, (May 24, 2024), ECF No. 327-1 ("FTC's Summ. J. Br.").

stronger in the United States than Asia-based messengers such as WeChat and Kakao, ██

████████████████████████████████████████████████████████████████████████

██████. PX1486 at -001. Evidence will further show that, in order to develop a sustainable

monetization path, WhatsApp had the incentive to pivot into PSN services, either on its own or

after acquisition by another firm. ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████.

Meta will not be able to rebut this highly probative evidence with a contrary showing that

WhatsApp "could not reasonably have matured into a real competitor," MSJ Op. at 64, because

no such evidence exists. On the contrary, the evidence will show that WhatsApp had robust

capabilities, including the backing of experienced and significant venture capitalists, and that its

investors recognized that WhatsApp ████████████████████████████████████████

████████████████████████████████████████████" PX10232 at -003. Meta's

acquisition of WhatsApp was thus anticompetitive, as a monopolist's "acquisition of any firm

that has the economic capabilities for entry and is a more-than-fanciful possible entrant is

presumably anticompetitive, unless the acquired firm is no different in these respects from many

other firms." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust

Principles and Their Application* ¶ 701d (2022).

Indeed, both Instagram and WhatsApp presented considerably more immediate and

concrete threats to Meta's monopoly power than did the nascent threats at issue in *Microsoft*

(Navigator and Java). In *Microsoft*, the nascent threats did not even participate in the relevant

market for operating systems, and they had not yet had any impact on competitive conditions

within it: the district court expressly found that there was "insufficient evidence" that even

16

absent Microsoft's conduct middleware vendors "already would have ignited genuine competition in the market[.]"  *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 112 (D.D.C. 1999).  The court nonetheless found that Microsoft violated Section 2 by obstructing the distribution of products that might in the future erode entry barriers, because in doing so Microsoft "retarded, and perhaps altogether extinguished, the process by which [the] middleware technologies could have facilitated the introduction of competition."  *Id.*  The Court of Appeals affirmed, based on the same reasoning.  *Microsoft*, 253 F.3d at 62, 71, 77, 79; *see also Grinnell*, 384 U.S. at 576 (finding one of Grinnell's acquisitions exclusionary under Section 2 even though Grinnell did not yet compete in that service line, because the acquisition "eliminated [the] alternative" of Grinnell's entry and "eliminated any possibility of an outbreak of competition").

Because the trial record will show that Instagram and WhatsApp "reasonably constituted nascent threats (or actual competitors) at the time Meta acquired them," MSJ Op. at 61 (citing *Microsoft*, 253 F.3d at 79), Meta's acquisitions were anticompetitive.  *See* MSJ Op. at 60, 70. The acquisitions eliminated head-to-head competition between Meta and Instagram, and eliminated WhatsApp as a nascent threat to Meta's monopoly power over PSN services in the United States.  And by continuing to own and operate both Instagram and WhatsApp, Meta maintains a competitive "moat" against entry by other would-be competitors.  FTC's Counterstatement of Material Fact, ¶¶ 1472, 1877, ECF No. 363-2.  Meta's acquisitions are thus "the type of conduct that is reasonably capable of contributing significantly to [Meta's] continued monopoly power."  MSJ Op. at 61 (quoting *Microsoft*, 253 F.3d at 79).

### B.      Proof of consumer harm is not required, but is present here.

As the Court has recognized, the FTC will establish the anticompetitive effect of Meta's actions by demonstrating that Meta harmed the competitive process, and thus need not "separately show consumer harm."  MSJ Op. at 54.  Nonetheless, the FTC intends to present

17

such evidence by showing, *inter alia*, that consumers have suffered since the acquisitions from higher ad loads, a diminished friends and family sharing experience, degraded privacy and data protections, and other diminished forms of quality.  While not required, this evidence will provide further "confirmation that the acquisitions were anticompetitive."  MSJ Op. at 61.

The FTC anticipates that Meta will attempt to respond by arguing that the output of Instagram and WhatsApp increased in the years following the acquisitions.  While it is true that both apps have grown over time, that growth fails to show that the acquisitions had procompetitive effects, much less procompetitive effects sufficient to justify Meta's interference with the competitive process.  Meta has not demonstrated that such growth is merger specific, and evidence indicates it is not.  *Infra* III.C.  Further, absent Meta's acquisitions either app might have grown faster, or even if it grew slower it might have offered different features and innovations and exerted competitive pressure on Meta to serve users better.[3]  The but-for world cannot be mapped with specificity, because Meta's own anticompetitive conduct has prevented the but-for world from developing.  But harm to consumers is presumed from a showing of anticompetitive effects, MSJ Op. at 54, and having "squash[ed] an actual or nascent competitor," Meta must "suffer the uncertain consequences of its own undesirable conduct."  MSJ Op. at 72 (quoting *Microsoft*, 253 F.3d at 79).

In any event, trial evidence will amply demonstrate that Instagram and WhatsApp were doing well and on track to continue their successful trajectories but-for Meta's acquisition, and that the assistance Meta provided to Instagram and WhatsApp post-acquisition did not involve

---

[3] To the extent that Meta argues that Instagram and WhatsApp would have stumbled or flailed in the but-for world, Meta bears the burden of establishing that defense—which the trial record will belie.  *See Citizen Pub. Co. v. United States*, 394 U.S. 131, 138-39 (1969) (discussing "failing company doctrine" in Section 2 case); *see also* FTC's Summ. J. Br. at 52-53.

any unique capabilities that were not available outside of Meta.  *See infra* III.C (discussing the

lack of merger specificity of Meta's procompetitive benefit claims).  Further, expert testimony

will explain the significant harms associated with continued monopoly, and that the introduction

of any competitive pressure—even from a smaller Instagram—would have been competitively

meaningful.  As one leading treatise explains:

> The acquisition [by a monopolist of even a "small" rival] should be prevented
> even if we assume the small firm would probably continue to play only a very
> minor role.  To find a §2 monopoly is necessarily to declare the preciousness of
> any viable rival.  Notwithstanding its minor position, such a rival offers an
> alternative source to buyers, an additional locus of decision making and possible
> innovation, an actual or possible check on the monopolist's pricing or other laxity,
> and a center of production or marketing experience that might come into more
> aggressive hands and thus facilitate a more substantial competitive challenge to
> the monopolist.

> Areeda & Hovenkamp, *Antitrust Law*, ¶ 701c.

In sum, while not strictly required, the FTC's trial record will demonstrate that Meta's

acquisitions produced the ensuing harms one would expect from a monopolist's removal of

actual and nascent threats through means other than competition on the merits.

## III.    Meta Cannot Prove that Its Claimed Procompetitive Justifications (If Any) Outweigh the Harm to Competition from Its Conduct

In response to the FTC's prima facie case, Meta will likely assert the procompetitive

justifications it advanced during discovery.  Meta faces a steep climb.  *See* MSJ Op. at 60 (citing

IV Areeda & Hovenkamp, ¶ 912a, at 92 (monopoly acquisition "bears a very strong presumption

of illegality that should rarely be defeated.").  Indeed, it is doubtful that a monopolist's

acquisition of an actual or nascent competitor can ever be justified by purported procompetitive

justifications.  Such conduct is not "a form of competition on the merits," MSJ Op. at 79-80, and

thus does not fall within *Microsoft*'s contemplation that a Section 2 defendant can respond to a

plaintiff's prima facie case by asserting "a nonpretextual claim that its conduct is indeed a form

of competition on the merits." *Microsoft*, 253 F.3d at 59; *see also Grinnell*, 384 U.S. at 576 n.7 (declining even to reach question of procompetitive justifications because "the record clearly shows that this monopoly power was consciously acquired"); *Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 1983 WL 1853, at *14 (D. Neb. June 14, 1983) ("[W]hen the conduct is not an innovation, [but an acquisition] it is more properly viewed as an unlawful act of a monopolist: there is a suppression of competition without any corresponding benefits.").

In any event, Meta's asserted justifications fail to satisfy the legal prerequisites, because Meta cannot show its justifications: (1) are a form of "competition on the merits;" (2) are not pretextual; (3) "could not have been achieved without the acquisitions in question;" and (4) relate to the relevant market of concern. *See* MSJ Op. at 79-82. Meta can establish none of these elements. *Infra* III. A-D. And even if one of Meta's purported benefits could meet all four requirements, Meta cannot make the required "overwhelming" showing of "extraordinary" benefits necessary to rebut the FTC's prima facie case. *Infra* III.E.

A. **Meta has the burden to establish that competition was enhanced because of the acquisitions.**

To establish a procompetitive benefit, Meta must show that *competition* was increased or improved because of the acquisitions. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) (procompetitive justifications must "legitimately promote competition"). Meta cannot make this showing because, as detailed above, the evidence will show that the acquisitions were defensive responses by Meta to competitive threats. Meta opted to squelch Instagram and WhatsApp rather than trying to compete with them, and its conduct thus did not enhance competition. *See LePage's*, 324 F.3d at 163.

B. **Meta will not establish at trial that any of its procompetitive justifications were "nonpretextual."**

Meta must also establish that its justifications are not pretextual. *LePage's*, 324 F.3d at

164 ("The defendant bears the burden of persuading the [factfinder] that its conduct was justified by [a] normal business purpose."). Any justifications that were "not a genuine reason for [Meta's] conduct" cannot be considered. *See Kodak*, 125 F.3d at 1220 n.12 (jury instructions stating that "pretextual" means "not a genuine reason for [defendant's] conduct") *Microsoft*, 253 F.3d at 59 (requiring a "nonpretextual claim"); MSJ Op. at 80.

For this reason, none of Meta's supposed justifications are legally cognizable because the evidence will show that they represent post-hoc justifications that were "not a genuine reason for [Meta's] conduct." *Kodak*, 125 F.3d at 1220 n.12 (internal quotation omitted). The evidence will show that Meta acquired Instagram and WhatsApp—at significant premiums—after identifying both as significant competitive threats and after hastily arranged deals involving no analysis of or plans for the justifications it now advances. Such evidence will demonstrate that the "genuine reason" Meta acquired Instagram and WhatsApp was to eliminate them as competitive threats, and not to promote competition or to achieve the justifications Meta now claims. Justifications must be rejected as pretextual where, as here, contemporaneous documents contradict a defendant's proffered justifications. *See McWane, Inc. v. FTC*, 783 F.3d 814, 841 (11th Cir. 2015) (defendant's procompetitive justifications belied by "internal documents" that discussed the exclusionary conduct "in terms of . . . preventing [the target] from becoming an effective competitor"); *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 453 (D. Del. 2003), *aff'd in relevant part*, 399 F.3d 181, 197 (3d Cir. 2005) (rejecting defendant's proffered justifications where the defendant's "pre-litigation rationale for [the relevant conduct] was expressly to exclude competitors").

Further underscoring the post-hoc nature of its justifications, Meta hinted at summary judgment that it may advance new alleged benefits from the acquisitions that it did not raise in

response to the Court's previous Order instructing Meta to provide "a complete list of such benefits," and/or "certify that its response is full and complete to the best of its knowledge and belief." *See* Mem. Op. at 4 (Apr. 26, 2023), ECF No. 281 ("Mem. Op.").  If Meta seeks to advance at trial a justification that it was unable to identify in response to the Court's Order, that justification is post-hoc and pretextual.  Notably, pursuant to the Court's Order, Meta identified supposed benefits to Instagram and WhatsApp, but it did not purport to identify any benefits to Facebook or other Meta products.  To the extent that Meta claims at trial that the acquisitions benefited Facebook or other Meta products, such claims should be disregarded as post-hoc and pretextual because Meta plainly did not have them in mind at the time of the acquisitions, or it would have been able to identify them in response to the Court's Order.

### C.    Meta will not be able to establish at trial that its procompetitive justifications could not have been achieved absent the merger.

Meta's procompetitive justifications also fail for a third reason:  Meta will not be able to establish that its supposed benefits could not have been achieved without its anticompetitive acquisitions.  "[T]he burden [is] on Meta to demonstrate that benefits it claims resulted from its acquisitions 'could not have been achieved absent the acquisitions.'"  Mem. Op. at 7; *see also* MSJ Op. at 81; *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 478 (7th Cir. 2020) (defendant must show that its conduct was "the result of, or necessary to achieve, much greater procompetitive benefits"); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 722 (D.C. Cir. 2001).

Meta will likely claim at trial that procompetitive benefits arose because it provided Instagram and WhatsApp with access to resources such as infrastructure, monetization, and integrity support.  And Meta seems to want to claim that any increased usage of Instagram and WhatsApp should be credited to Meta as a procompetitive benefit.  The issue before the Court is not, however, whether Meta used its resources to develop its newly-acquired assets once it

owned them—instead, the issue is whether Meta can prove that these alleged benefits could not have been achieved "without the concomitant loss of a competitor." *Heinz*, 246 F.3d at 722 (defendant must establish that efficiencies from the merger cannot be achieved "without the concomitant loss of a competitor").

Meta will be unable to make this showing, because the evidence at trial will show that Instagram and WhatsApp were well-positioned to succeed on their own, just as multiple other applications have managed to scale, monetize, and handle infrastructure, integrity, and feature development without Meta's assistance. So too for Meta's sweeping claims of procompetitive benefits from purported "increased output." *See* Meta Br. at 2 (emphasis omitted). Meta cannot demonstrate that its acquisitions were "necessary to achieve" the growth in Facebook, Instagram, or WhatsApp that has occurred over the last decade, as other factors—including the explosion in consumers' use of smartphones—explain such growth, and both of the acquired apps had the capabilities and opportunities to grow while remaining independent. *See Viamedia*, 951 F.3d at 478. Moreover, assuming counterfactually that Instagram or WhatsApp needed to be acquired, they could have been acquired by an established firm other than Meta—for example, Twitter could have acquired Instagram and Tencent could have acquired WhatsApp—which would have preserved competition between Meta and rivals within the relevant market.

The foregoing evidence will prevent Meta from establishing that its claimed benefits could not have been achieved absent the acquisitions. *See Anthem*, 855 F.3d at 357-58.

**D.    Procompetitive effects outside of the relevant market are not cognizable.**

Several of Meta's purported procompetitive benefits do not even relate to the relevant market for PSN services in the United States, and therefore should not be credited. Meta "may not justify" anticompetitive effects in one market "by arguing that it has procompetitive effects *in a different market*." *See Clarett v. National Football League*, 306 F. Supp. 2d 379, 408-09

(S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004).  For example, Meta appears to claim that its acquisition of WhatsApp is justified by increased usage of WhatsApp as a mobile messaging service (not a PSN service), and most of this increased usage occurred outside the United States.  Such justifications cannot rebut the FTC's prima facie case, because when courts assess procompetitive justifications for acquisitions, "anticompetitive effects in *one market* [cannot] be justified by procompetitive consequences in *another*."  *See Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 24 (D.D.C. 2012) (JEB) (alteration in original) (quoting *United States v. Philadelphia Nat'l. Bank*, 374 U.S. 321, 370 (1963)).

Similarly, Meta cannot justify its acquisitions based on a claim that it achieved greater profits or revenue by increasing ad load on Facebook and Instagram.  Meta's profits and any purported benefits to advertisers are non-cognizable claims that benefited neither competition nor consumers within the relevant market for PSN services in the United States, and thus cannot rebut the FTC's prima facie case.  *E.g.*, *Clarett*, 306 F. Supp. 2d at 408-09 (a defendant "may not justify" anticompetitive conduct that causes effects in one market "by arguing that it has procompetitive effects in a different market"); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1151-52, 1155 (N.D. Cal. 2014) (same).

### E. Meta is unable to shift the burden back to the FTC, and in any event evidence indicates significant harm to competition and consumers.

As detailed above, Meta will be unable to meet its burden of proving that any of its justifications meet all four required elements that (i) they were non-pretextual benefits that (ii) enhance competition (iii) in the PSN services market in the United States, for which (iv) the same benefit could not have been achieved absent the acquisitions.

Meta also cannot sustain its procompetitive justification defense because it will not make the required "overwhelming" showing of "extraordinary" benefits attendant in a Section 2 case

involving acquisitions of actual and nascent rivals.  Areeda & Hovenkamp, *Antitrust Law,* ¶ 701h ("[A]n efficiency defense cannot be allowed in monopoly cases [involving an acquisition] in the absence of an overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms."); *Heinz*, 246 F.3d at 720 ("high market concentration" requires "proof of extraordinary efficiencies").  The Court of Appeals recognizes that a monopolist's acquisitions of a competitive threat represents a significant disruption of the competitive process, with significant attendant harms—and therefore cannot even in principle be justified absent an exceptional showing of merger-specific benefits that required the loss of the actual or potential rival.  *See Heinz*, 246 F.3d at 720 ("[e]fficiencies almost never justify a merger to monopoly or near-monopoly."); MSJ Op. at 60 (monopolist's acquisitions of nascent rivals "bears a very strong presumption of illegality that should rarely be defeated") (quoting IV Areeda & Hovenkamp, ¶ 912a, at 92); Mem. Op. at 6.

Because Meta cannot provide overwhelming proof of extraordinary procompetitive benefits, it will not shift the burden back to the FTC to rebut Meta's claim.  *See Microsoft*, 253 F.3d at 59.  And even if the Court entertained reaching the "balancing" stage of the *Microsoft* framework, where the Court would evaluate whether "the anticompetitive harm of the conduct outweighs the procompetitive benefit," *id.*, the trial record will show that the FTC should prevail. The same principles detailed above apply to any balancing evaluation: Meta will not be able to demonstrate that any of its procompetitive benefit claims are cognizable and eligible to be placed on the scale, much less that they are "extraordinary" or "substantial" enough to overcome the harm that flows when a monopolist forestalls competition by buying out competitive threats.

## CONCLUSION

After hearing the trial evidence, the Court should find Meta liable for violating Section 2 of the Sherman Act, as incorporated into the FTC Act, and set this case for a remedies phase.

Dated:    April 7, 2025                    Respectfully submitted,

                                           */s/ Daniel Matheson*
                                           Daniel Matheson (D.C. Bar 502490)
                                           Krisha Cerilli (D.C. Bar 983281)
                                           Nathan Brenner (IL Bar 6317564)
                                           Robert Zuver (D.C. Bar 987216)
                                           Karen Goff (N.Y. Bar 4630901)
                                           Federal Trade Commission
                                           Bureau of Competition
                                           600 Pennsylvania Avenue N.W.
                                           Washington, DC 20580
                                           Telephone: (202) 326-2075
                                           Email: dmatheson@ftc.gov

                                           *Attorneys for Plaintiff*
                                           *Federal Trade Commission*