# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 1:20-cv-03590-JEB |

**<u>META PLATFORMS, INC.'S MOTION FOR JUDGMENT UNDER RULE 52(c)</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...........................................................................................................1

LEGAL STANDARD......................................................................................................2

ARGUMENT ..................................................................................................................2

I.    THE FTC HAS NOT CARRIED ITS BURDEN TO PROVE THAT META HAS
      MONOPOLY POWER ..........................................................................................2

      A.    The FTC Has No Direct Evidence That Meta Has Monopoly Power ....................3

      B.    The FTC Has No Indirect Evidence That Meta Has Monopoly Power.................6

II.   THE FTC HAS NOT CARRIED ITS BURDEN TO SHOW THAT META'S
      ACQUISITIONS CONSTITUTED EXCLUSIONARY CONDUCT...........................11

      A.    The FTC Failed To Provide Evidence That Meta's Acquisition of
            Instagram Harmed Consumers...............................................................11

      B.    The FTC's Case Failed To Show That WhatsApp Was a Nascent "PSNS" .........14

CONCLUSION..............................................................................................................16

# TABLE OF AUTHORITIES[*]

Page

**CASES**

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406
(7th Cir. 1995) ................................................................................................ 6

*Burke v. Rec. Press, Inc.*, 951 F. Supp. 2d 26 (D.D.C. 2013), *aff'd and remanded
sub nom. U.S. ex rel. Burke v. Rec. Press, Inc.*, 816 F.3d 878 (D.C. Cir. 2016) .................... 2

*Díaz Aviation Corp. v. Airport Aviation Servs., Inc.*, 716 F.3d 256 (1st Cir. 2013) .................. 2-3

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), *cert. denied*,
144 S. Ct. 681 & 682 (2024) .......................................................................... 13

*EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig., In re*,
44 F.4th 959 (10th Cir. 2022) ......................................................................... 14

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) .............................................. 5

*FTC v. Innovative Designs, Inc.*, 489 F. Supp. 3d 378 (W.D. Pa. 2020),
*aff'd*, 2021 WL 3086188 (3d Cir. July 22, 2021) ..................................................... 2

*FTC v. Meta Platforms, Inc.*, --- F. Supp. 3d ---, 2024 WL 4772423
(D.D.C. Nov. 13, 2024) ........................................................... 3, 6, 7, 11, 12, 13, 14

*FTC v. Tempur Sealy Int'l, Inc.*, --- F. Supp. 3d ---, 2025 WL 617735
(S.D. Tex. Feb. 26, 2025) ............................................................................. 9

* *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) .................................... 10

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) .............................. 6

*Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792 (1st Cir. 1988) ......................... 8

* *IGT v. All. Gaming Corp.*, 702 F.3d 1338 (Fed. Cir. 2012) .......................................... 8

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ....................... 10

*NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984) .................................... 13

*Nkpado v. Standard Fire Ins. Co.*, 697 F. Supp. 2d 94 (D.D.C. 2010) .................................. 2

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ..................................................... 3-4

---

[*] Authorities principally relied upon are marked with an asterisk.

*U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 298 F. Supp. 2d 91
    (D.D.C. 2004) ................................................................................................ 2

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ................................................. 9

\* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................................ 2, 11, 13

**STATUTES AND RULES**

Sherman Act, 15 U.S.C. § 1 *et seq.*:

§ 2, 15 U.S.C. § 2 ...................................................................................... 14

Fed. R. Civ. P. 52(c) ...................................................................................... 1, 2, 3, 16

## INTRODUCTION

With the close of the FTC's case, the trial record establishes that Meta Platforms, Inc. ("Meta") acquired Instagram and WhatsApp in order to improve them and expand its own portfolio of services – to better compete against many dynamic, innovative, and fierce rivals. And Meta did just that.  Meta has made two promising mobile apps with uncertain prospects into two of the most successful apps in the world, enjoyed by approximately half of the planet's population (including hundreds of millions of U.S. consumers) on demand, in unlimited quantities, all for free.  The FTC has not carried its burden to prove that Meta "is currently violating the antitrust laws."  Order at 1 (Apr. 2, 2025), ECF No. 503.  The Court should therefore enter judgment in Meta's favor under Federal Rule of Civil Procedure 52(c).

*First*, the record demonstrates that Meta does not have monopoly power in the alleged market for "personal social networking services" ("PSNS") – one in which only Snapchat and MeWe compete with Meta's apps to serve user demand for "friends-and-family sharing."  Direct evidence shows that market-wide output has exploded – the fruits of competition, not monopoly – and the FTC has no proof that the overall quality of Meta's apps has declined, much less below any competitive benchmark.  Indirect evidence, in turn, underscores that the FTC's candidate "PSNS" market is a fiction.  And recent data decisively refutes the claim that "friends-and-family sharing" insulates Meta's apps from competition from (among many others) YouTube, iMessage, and, most dramatically, TikTok – a disruptive entrant that forced Meta to transform Facebook and Instagram or risk precipitous decline.  Without a relevant antitrust market limited to Meta's apps and Snapchat (plus MeWe), the case fails.

*Second*, the record shows that Meta's acquisitions were not anticompetitive, another reason the case fails.  Instagram and WhatsApp have grown and grown and grown – delighting billions of users – because Meta has devoted billions of dollars and resources to that end.

Nothing but speculation supports the claim that, if Meta had left Instagram and WhatsApp to go it alone, "friends-and-family sharing" users would be even better off. The founder of Instagram testified to the contrary. The FTC's principal expert admitted this is all just speculation without evidence of what would have happened without Meta. And WhatsApp had no intention of becoming a Facebook-style app, let alone in the United States, where its presence was insignificant at the time of the acquisition. The FTC thus cannot show that these acquisitions "harm[ed] the competitive *process* and thereby harm[ed] consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam).

## LEGAL STANDARD

Under Rule 52(c), this Court may "enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence," including at the close of the plaintiff's case-in-chief. *Nkpado v. Standard Fire Ins. Co.*, 697 F. Supp. 2d 94, 98 n.4 (D.D.C. 2010). In ruling on this motion, the Court "may not draw any special inferences in favor of" the FTC. *U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 298 F. Supp. 2d 91, 92 (D.D.C. 2004). Instead, the Court "applies the same standard of proof, weighs the evidence, and assesses witness credibility as it would at the conclusion of the bench trial." *FTC v. Innovative Designs, Inc.*, 489 F. Supp. 3d 378, 388 (W.D. Pa. 2020) (footnote omitted), *aff'd*, 2021 WL 3086188 (3d Cir. July 22, 2021); *accord Burke v. Rec. Press, Inc.*, 951 F. Supp. 2d 26, 31 (D.D.C. 2013), *aff'd and remanded sub nom. U.S. ex rel. Burke v. Rec. Press, Inc.*, 816 F.3d 878 (D.C. Cir. 2016).

## ARGUMENT

## I.    THE FTC HAS NOT CARRIED ITS BURDEN TO PROVE THAT META HAS MONOPOLY POWER

This Court should grant judgment in Meta's favor because the FTC has no proof that Meta has monopoly power. *See Díaz Aviation Corp. v. Airport Aviation Servs., Inc.*, 716 F.3d

256, 264-65 (1st Cir. 2013) (affirming judgment under Rule 52(c) where plaintiff lacked proof "of market definition, market share, barriers to entry, or any other economic evidence of monopoly power").

### A.    The FTC Has No Direct Evidence That Meta Has Monopoly Power

At summary judgment, the Court observed that the FTC had "chosen to navigate into gusty winds" on monopoly power because Meta's apps are free. *FTC v. Meta Platforms, Inc.*, --- F. Supp. 3d ---, 2024 WL 4772423, at *22 (D.D.C. Nov. 13, 2024).  Given that traditional direct proof of supracompetitive prices is categorically unavailable here, the FTC had the difficult task of providing direct evidence of monopoly power through some *other* competitive benchmark – like output or (maybe) quality.  The FTC failed to do so.

**1.    *No price increase or reduced output.***  The FTC has no evidence that Meta has the power to profitably hold price above or output below a competitive benchmark.  Meta's apps are free for users.  *See* Apr. 15 Tr. 222:24-25 (Zuckerberg).  As undisputed testimony shows, Meta cannot profitably charge users *any* price for Facebook and Instagram without losing those users to Meta's many free rivals.  *See id.* at 224:22-225:7.  It also is undisputed that output – both of Meta's apps *and* of the FTC's alleged PSNS apps on a market-wide basis – has greatly increased.  *Compare* Apr. 16 Tr. 68:17-69:5 (Zuckerberg:  less than 9 million U.S. MAU of Instagram pre-acquisition) *with* May 8 Tr. 187:1-6 (Mosseri:  more than 230 million U.S. MAU in 2025); Apr. 21 Tr. 180:2-6 (Arora:  Meta "helped [WhatsApp] with growing faster").

That leaves the FTC to argue that Meta shows users too many ads, which it alleges is like charging too high a price.  But the FTC's economic expert offered no opinion regarding a competitive benchmark for the right number of ads, let alone that Meta showed more ads than such a competitive benchmark.  *See* May 14 Tr. 49:24-50:7 (Hemphill).  The FTC therefore has no proof that ad load exceeded "a competitive level."  *Ohio v. Am. Express Co.*, 585 U.S. 529,

549 (2018).  Further, ad load isn't a price.  Few people would want to pay higher prices.  But many users find ads useful – that is why, sometimes, users click on ads and go on to buy things.  *See* Apr. 17 Tr. 15:12-23 (Sandberg:  ads "additive to your experience"); May 1 Tr. 178:2-179:16 (Hegeman:  discussing "conversions"; "it would be pretty unusual for somebody to buy a product that they weren't interested in or didn't want").

Meta also does not profit by showing more ads to users who do not click on them – that mistaken view of how ads work is just not how the business makes money.  *See* May 1 Tr. 182:13-183:4 (Hegeman:  "[T]he thing that really matters for our business growth is whether we can show more relevant ads that people will actually choose to click on and make purchases from."); May 12 Tr. 121:13-22 (Schultz: ███████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ ).  A user who has no interest in an ad can swipe past it in a blink.  *See* Apr. 17 Tr. 17:12-16 (Sandberg); May 14 Tr. 47:20-48:17 (Hemphill); *see also* Apr. 15 Tr. 168:21-25 (Zuckerberg:  "I think all of the data that we have overwhelmingly suggests that people would rather have a free service with high-quality, relevant ads than having to pay . . . .").

       **2.**    ***No reduced "quality."***  Meta knows of no case finding monopoly power based solely on a claimed degradation in product quality, and the FTC has cited none – even as Meta has raised this point repeatedly.  Nor has the FTC offered any measure of *overall* quality that Meta's apps fail to meet.  And with respect to the few aspects of quality the FTC claims have declined – ad load, privacy, integrity, and features – the FTC offered no competitive benchmark that Meta fell below.  *See* May 6 Tr. 214:10-21 (McCoy:  integrity); May 13 Tr. 27:24-28:9 (Hemphill:  privacy); May 14 Tr. 42:3-43:16, 49:24-50:7, 52:2-25 (Hemphill:  ad load and

features); Apr. 23 Tr. 267:10-268:2 (Lampe: "[I]n the Cambridge Analytica event, . . . I was

recognizing that Meta was not behaving differently than other tech companies.").

Meta has dramatically improved the quality of both Instagram and WhatsApp, as the

massive growth in users and engagement shows. Meta has (1) released new features, *see*, *e.g.*,

Apr. 15 Tr. 228:2-21 (Zuckerberg); May 8 Tr. 153:14-154:12, 156:18-157:17, 160:8-162:18

(Mosseri); May 7 Tr. 89:19-90:11 (Cathcart); May 14 Tr. 42:9-23 (Hemphill); (2) improved the

quality of ads for users, *see*, *e.g.*, Apr. 17 Tr. 22:2-16 (Sandberg); May 1 Tr. 178:2-179:16

(Hegeman); Apr. 22 Tr. 261:3-18 (Systrom); (3) improved privacy choices for users, *see*, *e.g.*,

Apr. 21 Tr. 185:20-186:4 (Arora); Apr. 23 Tr. 268:3-6 (Lampe); and (4) improved the reliability

and performance of the app infrastructure, *see*, *e.g.*, Apr. 15 Tr. 71:9-74:1 (Zuckerberg); Apr. 22

Tr. 267:10-14 (Systrom); Apr. 21 Tr. 178:8-179:2 (Arora). Further, the best indicators of quality

for a free app are engagement and growth, and both WhatsApp and Instagram have those in

spades. *See* Apr. 16 Tr. 230:7-8 (Sandberg); May 12 Tr. 192:3-23 (Schultz).

Without data showing any quality decline, the FTC points to surveys like "Cares About

Users." But these surveys measure subjective brand reputation, not service quality. *See* May 1

Tr. 30:5-19, 69:24-72:3 (Cobb); May 8 Tr. 269:13-270:12 (Schultz). In any event, Meta's

sentiment scores *today* are increasing and better than its rivals' – refuting the FTC's theory on its

own terms. *See* May 1 Tr. 45:3-10 (Cobb); May 8 Tr. 270:21-24 (Schultz).

**3.     *Meta's profits are legally irrelevant.*** Meta earns its profits in an advertising

market, not the FTC's posited market. *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 19 (D.D.C.

2021) ("The overall revenues earned by PSN services cannot be the right metric for measuring

market share here, as those revenues are all earned in a separate market – *viz.*, the market for

advertising."). As Professor Hemphill conceded, profits may reflect increased demand,

innovation, or superior management, and he did not exclude those as explanations for Meta's

profits.  *See* May 14 Tr. 66:15-69:23 (Hemphill); *see also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) (profits may reflect procompetitive conduct).  And the trial record confirms that Meta's profits are the result of those other explanations and not output-restricting price increases.  *See* Apr. 17 Tr. 35:3-37:9 (Sandberg) (detailing Meta's efforts to build Instagram's "very successful" ad business); May 1 Tr. 175:5-14, 177:24-179:16 (Hegeman:  Meta does not maximize profits by increasing ad load, but rather by increasing the relevance of ads, and the relevance of ads is increasing over time).  And the FTC has provided no benchmark against which Meta's profits can be compared for the PSNS or advertising markets.  *See* Apr. 24 Tr. 71:3-72:2 (Hearle); May 13 Tr. 8:6-14 (Hemphill).

> **B.**    **The FTC Has No Indirect Evidence That Meta Has Monopoly Power**

The Court previously noted that "[s]ignificant unresolved questions remain[ed] over the ultimate viability of" the FTC's indirect evidence.  *Meta Platforms*, 2024 WL 4772423, at *20.  *First*, the FTC's "have-it-both-ways market definition" – everything on Facebook, Instagram, Snap, and MeWe is PSNS but nothing on any other app is – needed "more precision" because "much of the same content is available on multiple applications" both inside and outside the FTC's proposed PSNS market.  *Id.* at *16, *20.  *Second*, "dramatic[ ]" changes to Facebook and Instagram since the acquisitions raise the question whether "the 'personal social networking' service that [the FTC] highlights as Meta's core use case is distinct enough from the many other social-media products vying for consumers' online attention that it still constitutes its own relevant antitrust market."  *Id.* at *22.  The record resolves both of those questions in Meta's favor, and the FTC has no other indirect evidence of monopoly power.

> **1.**    ***No PSNS market.***  "[T]he touchstone" of whether a market is viable "is demand substitution."  *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018).

Yet the FTC presented no evidence that consumers treat Snap (or MeWe) as the only acceptable substitute for Facebook and Instagram.  The substitution data presented in the FTC's own case shows that, when consumers spend more time on TikTok, for example, they spend less time on Facebook and Instagram, and vice versa, *and* that such substitution affects usage of Meta surfaces such as Feed and Stories where the FTC claims friends-and-family sharing occurs (not just Reels).  *See* Apr. 15 Tr. 226:1-13 (Zuckerberg); Apr. 17 Tr. 31:18-32:16 (Sandberg: discussing DX1018); Apr. 29 Tr. 194:23-25 (Olivan); May 8 Tr. 122:12-124:25 (Mosseri: discussing DX0660); May 12 Tr. 67:10-68:13, 69:5-12 (Schultz); *id.* at 82:24-83:4 (Schultz: discussing DX0535); May 14 Tr. 237:20-238:23 (Alison:  "The main factor we attributed the declining engagement" observed in 2021 "to was competitive pressure from TikTok."); *accord*

██████████████████████ .  ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ .  *See* May 8 Tr. 190:9-196:4 (Mosseri); *see also* May 12 Tr. 69:5-12 (Schultz).  The FTC's principal economic expert agreed that ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ – precisely the lack of "precision," *Meta Platforms*, 2024 WL 4772423, at *20, the FTC needed to fix but did not.

Moreover, the many features and use cases of Facebook and Instagram – all of which the FTC insists count as PSNS – have direct counterparts in other apps that directly compete for engagement with Meta's apps (but which the FTC improperly excludes from the market).

- **TikTok** features short-form video, stories, and in-app messaging.  *See* Apr. 30 Tr. 49:7-15, 91:25-92:4 (Presser); *see also* Apr. 15 Tr. 185:1-13 (Zuckerberg); May 8 Tr. 112:2-12 (Mosseri); DX1088 at 3 ("Today, TikTok, Reels and Shorts are virtually – and deliberately – indistinguishable in function and user experience.").

- **YouTube** offers all types of video, with sharing options for all of them. *See* Apr. 17 Tr. 206:2-9 (Filner: Meta's competitors for users include YouTube, TikTok, and others); *id.* at 200:18-201:2 (no unique characteristic impedes YouTube from competing with Meta); *id.* at 215:17-19 (confirming YouTube's internal assessment that TikTok "is eating into Facebook, Instagram, and YouTube").

- **iMessage** has a "█████████" of sharing with friends and family. ████████████████ ██████████ And it is the dominant messaging app in the United States. ████████ ████████████████████████████████████; *see also* Apr. 15 Tr. 216:25-217:2 (Zuckerberg); May 12 Tr. 91:5-92:10 (Schultz).

*See also* May 8 Tr. 151:9-153:13 (Mosseri); May 12 Tr. 65:16-20 (Schultz); *see id.* at 105:25-108:4 (Schultz: discussing LinkedIn, Reddit, and Discord); May 14 Tr. 233:20-234:5 (Alison: discussing Reddit, Twitter/X, Nextdoor, and Discord).

The FTC built its case around differences (real or contrived) between these apps and PSNS apps. But the FTC has never coherently explained why the distinctions it picked matter, while all distinctions among PSNS apps (such as Facebook Marketplace or disappearing messages on Snapchat) do not. More to the point, differentiation *is* competition, not its absence. *See IGT v. All. Gaming Corp.*, 702 F.3d 1338, 1347 (Fed. Cir. 2012); *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 798 (1st Cir. 1988) (Breyer, J.). The through line connecting all of these *social* apps is that each vies to show the most compelling user-generated content so that it can take as much user time and attention as possible from the other apps, including Meta's apps. *See* May 12 Tr. 175:18-176:4 (Schultz: "[A]ll these apps we're talking about when we talk about TikTok, YouTube, Facebook, and Instagram" have many users in the United States, "which is why we're saying the competition is about marginal time. . . . [T]ime is the thing they're all competing for, because people are multihoming. They're using every app.").

Moreover, the relative differences between these apps have only narrowed in recent years, and the FTC failed to show that any historical norms that may have arisen from original feature sets have any current competitive significance. Virtually every feature of TikTok exists on

Instagram (and Facebook), and virtually every feature of Instagram exists on TikTok – in fact,

TikTok today includes a "Friends" tab and multiple ways to add friends and family (including by

importing friends from Facebook) and engage with them via messaging. *See* Apr. 30 Tr. 90:16-

91:1 (Presser: Friends tab); *id.* at 81:8-83:19 (importing friends and follow recommendations);

*id.* at 85:9-87:10 (messaging); May 8 Tr. 151:9-153:13 (Mosseri); May 12 Tr. 70:8-71:22

(Schultz); May 15 Rough Tr. 20:15-22 (Alison); ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████. YouTube, similarly, includes social features (likes, comments, and

following via "subscription"), like TikTok and Facebook, and has integrated sharing features

within its billions of videos (long and short form) to facilitate friends-and-family sharing. *See*

Apr. 17 Tr. 194:12-195:3 (Filner); *see id.* at 196:8-22 (Filner: "possible" that many YouTube

"users share videos with friends and family"); May 8 Tr. 152:8-153:13 (Mosseri); May 12 Tr.

86:21-91:4 (Schultz); May 15 Rough Tr. 21:1-22:5 (Alison). Sound bites and marketing from a

bygone era cannot obscure the fact of dynamic competition *today*. *See United States v. Cont'l

Can Co.*, 378 U.S. 441, 453-55 (1964). Not a single witness from Meta or any nonparty

embraced the FTC's theory of a PSNS market limited to Facebook, Instagram, and Snap (plus

MeWe) – and that is fatal. *See FTC v. Tempur Sealy Int'l, Inc.*, --- F. Supp. 3d ---, 2025 WL

617735, at *17 (S.D. Tex. Feb. 26, 2025).

     **2.**    ***No monopoly power over "friends-and-family sharing."*** The FTC's experts also

argued that, even if Meta faces competition for certain features of its apps, it has power by virtue

of a supposed "core use" of "friends-and-family sharing." But there is no dispute that friends-

and-family sharing is a small and diminishing aspect of both Facebook and Instagram and that

sharing has moved overwhelmingly to messaging apps, including Apple's iMessage (which is

dominant in the United States). *See* May 8 Tr. 118:13-19, 119:15-120:5 (Mosseri: "shift to

messaging," discussing DX0517); *id.* at 200:23-201:8 (Mosseri: ███████████
███████████████████████████████████"); May 12 Tr. 45:1-17 (Schultz: ██████████
████████████████████████████████████████████████████████████████████████
████████████████████); *id.* at 48:6-24 (Schultz: ████████████████████████
████████████████████); *id.* at 48:25-49:22 (Schultz: sharing moved to messaging);
May 7 Tr. 71:16-72:20 (Cathcart: "world is moving towards messaging first") (quoting DX0585
at 3); May 14 Tr. 176:21-25 (Alison: Feed "has been declining for many years, and we're seeing
sharing shift more into messaging, which is why private messaging and unlocking sharing to
messaging from Facebook was a key priority"); *see also* Apr. 23 Tr. 246:8-248:10 (Lampe: not
disputing his own prior academic work found shift away from broadcast sharing).

To support its theory that Meta exercises monopoly power over this waning "core," the
FTC needed to provide evidence that Meta can and does price discriminate against that "core";
otherwise, competition on the margins protects all users including those engaged in friends-and-
family sharing. *Cf. FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039-40 (D.C. Cir. 2008)
(Op. of Brown, J.) (relying on evidence of "price discrimination"); *see also Menasha Corp. v.
News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664-65 (7th Cir. 2004) (rejecting targeted-
customer market for lack of such evidence). The FTC has no evidence of price discrimination
because, again, Meta's apps are free for all.

The FTC tried but failed to prove price discrimination using ad load. The FTC offered no
evidence that Meta shows more ads to users engaged in friends-and-family sharing. *See* May 14
Tr. 90:25-93:20 (Hemphill: acknowledging Meta testimony "dismissive of this idea" and
offering no evidence to the contrary); *see also*, *e.g.*, Apr. 17 Tr. 25:9-26:23 (Sandberg: FTC
theory "not true and doesn't make any sense"); May 1 Tr. at 180:3-182:12 (Hegeman); May 12
Tr. 149:13-150:8 (Schultz. Meta does not show more ads to those engaging in friends-and-

family sharing; it shows more ads to users who engage with ads (because that is how Meta makes money) and fewer ads to users who do not. *See* Apr. 17 Tr. 24:4-10, 25:13-24 (Sandberg: "[F]riends and family sharing is not something that would change how you target ads. You would target ads . . . based on engagement with ads . . . ."); May 12 Tr. 150:3-8 (Schultz).

       **3.**    ***No monopoly share in any other market.*** The FTC has no evidence that Meta has a 60 percent share of any market that includes TikTok or YouTube along with Snapchat. *See* May 13 Tr. 182:17-24 (Hemphill: no relevant product market other than PSNS). For this reason, the FTC's failure to prove that TikTok and YouTube (and iMessage) do not act as competitive constraints on Meta's apps is fatal to its indirect case.

**II.**    **THE FTC HAS NOT CARRIED ITS BURDEN TO SHOW THAT META'S ACQUISITIONS CONSTITUTED EXCLUSIONARY CONDUCT**

       The FTC also failed to prove that Meta's acquisitions of Instagram and WhatsApp had an "anticompetitive effect" and were therefore "exclusionary." *Microsoft*, 253 F.3d at 58. Judgment should be granted for that reason, too.

       **A.**    **The FTC Failed To Provide Evidence That Meta's Acquisition of Instagram Harmed Consumers**

       Meta transformed Instagram from a promising but uncertain photo-sharing app with less than four million daily users in the United States into a feature-rich experience with more than 230 million U.S. users (and billions worldwide). The FTC's theory that Meta "squashed an actual . . . competitor," *Meta Platforms*, 2024 WL 4772423, at *32, has no basis. Before Meta acquired Instagram, its features were limited to taking, filtering, and sharing attractive photos. *See* Apr. 14 Tr. 234:14-235:5 (Zuckerberg); Apr. 16 Tr. 79:2-4 (Zuckerberg); *see also* Apr. 22 Tr. 26:16-17 (Systrom: "shar[ing] photos" was "effectively the only use case" on Instagram in the early days); *id.* at 184:24-185:4 (Instagram's "main use case . . . in 2012 was sharing photos," while "people did a lot more on Facebook in 2012"). Instagram was therefore viewed as a differentiated

complement for Facebook's (and Twitter's) users. *See* Botha (Sequoia) Dep. Designation Rep. 58:10-59:11 (played Apr. 21, 2025); *see also id.* at 53:2-56:19, 82:9-83:8; Apr. 22 Tr. 193:1-6 (Systrom: Instagram was not an alternative to Facebook, but a "complement").

As co-founder Kevin Systrom testified, if Instagram had stayed independent, success was hardly assured – "[i]t could have gone either way." Apr. 22 Tr. 206:15-207:16 (Systrom). It had no revenue, nor a timeline for becoming profitable. *See id.* at 166:15-167:18. Its infrastructure was "pretty broken and duct-taped" together and left the app vulnerable to spam, which negatively impacted the user experience and distracted its engineers from feature development. *See id.* at 168:21-171:22. Instagram was also highly dependent on Meta for distribution – which Meta could have cut off. *See id.* at 174:22-178:19, 181:25-184:11. Although Instagram had built a popular *app*, it still had to do "everything that goes into building a successful *company*." Botha (Sequoia) Dep. Designation Rep. 120:9-19 (played Apr. 21, 2025) (emphasis added); *see also id.* at 62:13-19 ("[O]ne of the things that's very challenging about this business – I sometimes likened it to playing a piece of music where getting 99 percent of the notes correct doesn't produce beautiful music.").

Meta's acquisition of Instagram enabled massive growth – with correspondingly massive benefits for U.S. consumers. Again, by Mr. Systrom's own account, Meta's resources allowed Instagram to "thrive" – adding many new features, attracting hundreds of millions and then billions of users, and monetizing with great success. *See* Apr. 22 Tr. 214:3-8, 215:12-17, 226:9-11, 238:18-239:19, 239:14-19, 242:6-17, 255:23-260:3, 268:9-15 (Systrom); *see also* May 8 Tr. 186:18-187:6 (Mosseri); ███████████████████. Instagram users have always paid *nothing*. Massively improving Instagram and expanding its reach while keeping it free is a consumer-welfare bonanza. *See Meta Platforms*, 2024 WL 4772423, at *35 ("[A] merger might

have a procompetitive justification if it increased output, decreased prices, improved service or quality, [or] spurred greater innovation."); *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103 (1984) (conduct that "increase[s] sellers' aggregate output" is "procompetitive").

The FTC came nowhere close to carrying its burden to show that these benefits would have materialized, at all or as quickly, without the acquisition and Meta's resources. *See* ECF No. 518 at 22-23 (discussing the "demanding standard" the FTC must satisfy "in rebutting established procompetitive benefits"); *see Meta Platforms*, 2024 WL 4772423, at *40 (similar). As Instagram's founder testified:  "We grew much more quickly because we were part of Facebook than we would have as an independent company."  Apr. 22 Tr. 268:18-19 (Systrom). And the current head of Instagram – citing benefits to Meta as a whole as well as to Instagram – called it one of the most successful acquisitions *ever*.  *See* May 8 Tr. 188:18-189:12 (Mosseri).

The FTC has no evidence of any other path to these consumer benefits – much less one that would have been "virtually as effective in [achieving these outcomes] without significantly increased cost."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024).  On the contrary, the FTC's principal expert washed his hands of any opinion that Instagram would have grown faster without Meta.  *See* May 13 Tr. 92:5-93:5 (Hemphill:  "So I think we genuinely don't know what would have happened.  It might have been smaller.  It might have been bigger. . . .  So there's a lot going on.  And I think in the but-for world, how this all would have played out, we don't know.").

The FTC relied on emails that it says prove Mr. Zuckerberg was worried about Instagram and intended to take it off the board.  But efforts to litigate Mr. Zuckerberg's state of mind before the acquisition in 2012 are pointless (and legally irrelevant).  *See Microsoft*, 253 F.3d at 59 ("Evidence of the intent behind the conduct of a monopolist is relevant *only* to the extent it helps

us understand the likely effect of the monopolist's conduct."); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 991 (10th Cir. 2022) ("When the challenged conduct is so wholly devoid of any inference of exclusionary effect, intent cannot save the plaintiff's case.").  What matters is what Meta *did*.  By investing in Instagram and supporting its expansion and growth, Meta benefited consumers.  That has never been – and should not here be – the basis for liability under Section 2.

In any event, the FTC's characterization of a few dated emails does not gainsay the evidence that Meta's intent was to acquire Instagram to improve and grow the app.  *See*, *e.g.*, Apr. 22 Tr. 196:5-7 (Systrom:  Mr. Zuckerberg "promised . . . to keep Instagram separate from Facebook and grow it"); Apr. 29 Tr. 181:16-182:13 (Olivan:  asking if Meta should "go wild promoting Instagram," and testifying that Mr. Zuckerberg said to "push hard, and we pushed the hell out of it"); *see also* DX0263 (Mr. Zuckerberg to Mr. Systrom:  "I'm really excited about what we can do to grow Instagram as an independent brand and product while also having you take on a major leadership role within Facebook").

## B.    The FTC's Case Failed To Show That WhatsApp Was a Nascent "PSNS"

The FTC also failed to prove that WhatsApp "was a *nascent* competitor" in the so-called PSNS market when Meta acquired it.  *Meta Platforms*, 2024 WL 4772423, at *32.  On the contrary, the evidence shows that WhatsApp would never have pivoted from the simplicity that had made it successful in many countries *outside* the United States to being a Facebook-like, ad-supported app, especially in the United States.

Only two witnesses affiliated with pre-acquisition WhatsApp testified in the FTC's case: Mr. Goetz (an investor and board member) and Mr. Arora (a former employee).  They explained that WhatsApp's founders were deeply committed to keeping WhatsApp a lightweight messaging app without added features or ads.  Indeed, that simplicity was integral to its success

in the developing world, where the telecommunications infrastructure was relatively immature.
*See* Apr. 17 Tr. 81:13-82:17, 129:11-130:23, 131:16-23, 141:3-16 (Goetz:  WhatsApp's founders
had "very passionate" opposition to a social-platform "pivot"; it was "laughable" to think
Sequoia "would have forced WhatsApp to start displaying ads," because "there's just no chance
[the founders] were ever going to embrace advertising"); Apr. 21 Tr. 173:19-22, 174:10-175:9
(Arora).  WhatsApp's "simplicity" thus "was critical for adoption in emerging countries."  Apr.
17 Tr. 130:17-18 (Goetz); *see id.* at 130:18-23 (WhatsApp "emulated the SMS experience and
had very few options or features and tried to create a very compelling simple experience that
could be easily adopted by the emerging markets."); Apr. 29 Tr. 80:18-82:2 (Olivan:  WhatsApp
was "an extremely thin app" that "was doing what SMS did except for free.  That's why it was
growing so quick in many countries in the world where SMS was very badly priced.").

By the time of the acquisition, Meta itself understood that WhatsApp was *not* going to
develop additional social features similar to Facebook and was gaining no traction in the United
States.  Mr. Zuckerberg – the ultimate decision-maker on the WhatsApp acquisition, *see* Apr. 29
Tr. 166:20-23 (Olivan) – testified that he "thought that" such a pivot "was extremely unlikely
based on getting to know" WhatsApp's founders.  Apr. 16 Tr. 100:17-21 (Zuckerberg).  His
testimony is corroborated by a contemporaneous email recording his impressions after a personal
meeting with one of those founders (Mr. Koum).  *See* DX1102 at 2 (Zuckerberg:  "Looks down
on features in Asian clones[.]  Wants to stay focused on messages[.]"); *see also* Apr. 16 Tr. 99:4-
100:16 (Zuckerberg:  "[I]t just kind of became clear that" Mr. Koum "wanted to build this as a
simple messaging service").  Other Meta executives testified to the same point.  *See* Apr. 29 Tr.
173:18-174:4, 176:2-18 (Olivan:  unlike "some of the messaging apps like LINE and

KakaoTalk," "WhatsApp was really growing as an SMS replacement, very thin app, not doing service expansion").  Meta did not buy WhatsApp to stop a pivot it thought would never occur.

The FTC's claim that Meta was worried Google might buy WhatsApp and then force its founders to convert it into a PSNS is likewise without evidence.  The sole Meta witness to (supposedly) learn of Google's acquisition efforts testified that he did not have that worry.  *See* Zoufonoun (IH) Dep. Tr. 247:16-18, 248:11-16 (Aug. 12, 2020).  Nor is there any evidence that WhatsApp would have sold to Google on terms that would allow Google to pivot WhatsApp. *See* Apr. 21 Tr. 175:14-22 (Arora:  "independence" was an important deal term for WhatsApp). Much like its other theories, the FTC's musings on WhatsApp are contrary to the record.

## CONCLUSION

The Court should enter judgment in Meta's favor under Rule 52(c).

Dated:  May 15, 2025                    Respectfully submitted,

                                        */s/ Mark C. Hansen*
                                        Mark C. Hansen (D.C. Bar No. 425930)
                                        Aaron M. Panner (D.C. Bar No. 453608)
                                        Geoffrey M. Klineberg (D.C. Bar No. 444503)
                                        Daniel V. Dorris (D.C. Bar No. 1012305)
                                        Alex A. Parkinson (D.C. Bar No. 166695)
                                        Collin R. White (D.C. Bar No. 1031005)
                                        KELLOGG, HANSEN, TODD,
                                          FIGEL & FREDERICK, P.L.L.C.
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Tel: (202) 326-7900
                                        mhansen@kellogghansen.com

                                        *Counsel for Defendant Meta Platforms, Inc.*